# EXHIBIT 1

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

District of _____ Delaware _____

In re  Boy Scouts of America and Delaware BSA, LLC _____

_____Debtor_____

*(Complete if issued in an adversary proceeding)*

Case No. _____ 20-10343 (LSS) _____

Chapter _____ 11 _____

_____

_____Plaintiff_____

v.

_____

_____Defendant_____

Adv. Proc. No. _____

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: National Capital Area Council, BSA
9190 Rockville Pike, Bethesda, MD 20814-3897

*(Name of person to whom the subpoena is directed)*

☒  *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

Contained herein in Exhibit 1

| PLACE Hyatt Regency Bethesda<br>One Bethesda Metro Center, 7400 Wisconsin Ave, Bethesda, MD 20814<br>Attn: Stamatios Stamoulis (302) 999-1540 stamoulis@swdelaw.com. | DATE AND TIME<br>October 18, 2021 by 5:00 pm Eastern |
|---|---|

☐  *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____ 10/8/2021 _____

CLERK OF COURT

OR

_____        *Stamatios Stamoulis*
Signature of Clerk or Deputy Clerk        _____
                                                         *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
___ Century Indemnity Company ___ , who issues or requests this subpoena, are:
___ Stamatios Stamoulis 800 N. West Street, Third Floor Wilmington, DE 19801 (302) 999-1540 stamoulis@swdelaw.com ___

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on (*date*) _____ ; or

☐ I returned the subpoena unexecuted because:  _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


      I declare under penalty of perjury that this information is true and correct.

Date:  _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
        (i) is a party or a party's officer; or
        (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
    (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
    *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
        (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
        (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
    *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
        (i) fails to allow a reasonable time to comply;
        (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
        (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
        (iv) subjects a person to undue burden.
    *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
        (i) disclosing a trade secret or other confidential research, development, or commercial information; or

        (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
        (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
        (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
    *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
        (i) expressly make the claim; and
        (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**EXHIBIT 1 (National Capital Area Council, BSA)**

## DEFINITIONS

For the purposes of this Subpoena and these Requests for Production, the following Definitions shall apply:

1.      "Abuse" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

2.      "Abuse Claim" means a liquidated or unliquidated Claim against a Boy Scouts of America, Local Council and/or Chartering Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based on misrepresentation, concealment, or unfair practice, public or private nuisance, or any other theory, including any theory based on public policy or any

act or failure to act by a Boy Scouts of America, Local Council and/or Chartering Organization or any other Person for whom any of the foregoing parties is alleged to be responsible.

3.    "Chapter 11 Cases" means the cases filed by the Debtors under chapter 11 of the Bankruptcy Code, jointly administered under Case No. 20-10343 (LSS).

4.    "Chartered Organization" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

5.    "Claim Form" means any Sexual Abuse Survivor Proof of Claim Form submitted in these Chapter 11 Cases.

6.    "Coalition" means the Coalition of Abused Scouts for Justice, an *ad hoc* committee composed of thousands of holders of Direct Abuse Claims that filed a notice of appearance in the Chapter 11 Cases on July 24, 2020 at Docket No. 1040.

7.    "Coalition Professionals" means (a) Brown Rudnick LLP, (b) Robbins, Russell, Englert, Orseck & Untereiner LLP, (c) Monzack, Mersky and Browder, P.A., (d) Province, LLC, and (e) Parsons, Farnell & Grein, LLP.

8.    "Communication" means the transmittal of information (in the form of facts, ideas, beliefs, inquiries, documents, or otherwise), including discussions, negotiations, agreements, understandings, meetings, conversations in person, telephone conversations, records of conversations or messages, telegrams, facsimile transmissions, electronic mail transmissions, letters, notes, reports, memoranda, formal statements, press releases, newspaper stories, or other form of verbal, written, mechanical, or electronic disclosure. References to Communications with business entities shall be deemed to include all officers, directors, employees, personnel, agents,

attorneys, accountants, consultants, independent contractors, or other representatives of such entities.

9.      "Debtors" means Boy Scouts of America and Delaware BSA, LLC and each of their attorneys.

10.      "Disclosure Statement" means any disclosure statement for a Plan of Reorganization for the Debtors, including but not limited to, the *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6445], and any later-filed version(s) thereof.

11.      "Documents" means any writings, recordings, electronic files and mails, or photographs, whether original or duplicate, as defined in Federal Rule of Evidence 1001 and Federal Rule of Civil Procedure 34(a), inclusively, including (but not limited to) all documents and information in your possession, custody, or control, and includes: all and any written, recorded, or graphic material, however produced or reproduced, minutes, summaries, memoranda, transcripts, tapes, or other voice recordings, and all other documents and tangible things, including booklets, brochures, pamphlets, circulars, notices, periodicals, papers, records, contracts, agreements, photographs, minutes, memoranda, messages, appraisals, analyses, reports, files, interoffice memoranda, or interoffice communications of any description, calculations, invoices, accounting entries, diary entries, calendars, inventory sheets, ledgers, correspondence, emails, phone recordings, instant messages, text messages, telegrams, advertisements, press releases, notes, letters, diaries, working papers, schedules, projections, graphs, charts, films, tapes, print-outs, and all other data, whether recorded by electronic or other means, and all drafts thereof. If a Document was prepared in several copies, or if additional copies were thereafter made, and if any such copies are not identical in all respects or are no longer identical by reason of subsequent

notation or modification of any kind whatsoever, including notes on the front or back, in the margins, or on any of the pages thereof, then each such non-identical copy is a separate Document and must be produced.

12.    "Fifth Amended Plan of Reorganization" means the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America And Delaware BSA, LLC* [Docket No. 6443], and any later-filed version(s) thereof.

13.    "Firm" means each known Attorney representing holders of Abuse Claims.

14.    "Hartford Settlement Agreement" means that certain settlement agreement, which remains subject to definitive documentation, by and between Hartford, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and certain state court counsel to holders of Direct Abuse Claims, as such agreement is described in the term sheet appended to the *Sixth Mediators' Report* [D.I. 6210] filed on September 14, 2021, and as such agreement may be subsequently set forth in a definitive written settlement agreement that is consistent with such term sheet and executed by all of the parties thereto (and any additional parties that execute a joinder thereto). Upon its execution by all of the parties thereto, the Hartford Insurance Settlement Agreement shall be filed with the Plan Supplement and attached hereto as Exhibit I-1.

15.    "Local Councils" means, collectively, the local councils of the Boy Scouts of America, including its individual members and any attorneys, representatives, consultants, advisors or anyone acting on a Local Councils' behalf.

16.    "Plan of Reorganization" means a document prepared by the Debtors detailing how they will continue to operate post-confirmation and how they plan to pay creditor claims over a fixed period of time.

17.     "Person" means an individual, a firm, a corporation, or other entity as the context requires.

18.     "Petition Date" means February 18, 2020.

19.     "POC" means any claims against the Debtors based on Abuse filed in these Chapter 11 Cases using the Sexual Abuse Survivor Proof of Claim Form.

20.     "TDPs" means "Trust Distribution Procedures" and has the meaning provided in the Fifth Amended Plan of Reorganization and any  Trust Distribution Procedure for a prior plan of reorganization in these Chapter 11 Cases..

21.     The terms "You" or "Your" and variants thereof mean National Capital Area Council, BSA and all persons or entities acting on its behalf.

## INSTRUCTIONS

For the purposes of this Subpoena and these Requests for Production, the following Definitions shall apply:

1.     The preceding Definitions apply to each of the Requests. Any capitalized terms used but not defined herein shall have the meanings given to such terms in the Fifth Amended Plan of Reorganization and/or Disclosure Statement.

2.     The terms used in these Requests are to be given their most expansive and inclusive interpretation unless otherwise expressly limited in a Request. The terms "all," "any," and "each" shall each be construed as encompassing any, all, each, and every. The singular form of a word shall include the plural and vice versa. The terms "and" or "or" shall be both conjunctive and disjunctive. The term "including" means "including without limitation." The present tense shall be construed to include the past tense, and the past tense shall be construed to include the present tense.

3.      These Requests shall be deemed continuing in nature. In the event you become aware of or acquire additional information relating or referring to any of the following Requests, such additional information is to be promptly produced.

4.      You are required to produce all Documents and all other materials described below that is in your actual or constructive possession, custody, or control, including in the possession, custody, or control of current or former employees, officers, directors, agents, agents' representatives, consultants, contractors, vendors, or any fiduciary or other third parties, wherever those Documents and materials are maintained, including on personal computers, PDAs, wireless devices, or web-based email systems such as Gmail, Yahoo, etc.

5.      You must produce all Documents in your possession, custody, or control, whether maintained in electronic or paper form and whether located on hardware owned and maintained by you or hardware owned and/or maintained by a third party that stores data on your behalf.

6.      Documents not otherwise responsive to these Requests should be produced:  (a) if such Documents mention, discuss, refer to, explain, or concern one or more Documents that are called for by these Requests; (b) if such Documents are attached to, enclosed with, or accompany Documents called for by these Requests; or (c) if such Documents constitute routing slips, transmittal memoranda or letters, comments, evaluations, or similar materials.

7.      Documents should include all exhibits, appendices, linked Documents, or otherwise appended Documents that are referenced in, attached to, included with, or are a part of the requested Documents.

8.      If any Document, or any part thereof, is not produced based on a claim of attorney-client privilege, work-product protection, mediation privilege, or any other claimed privilege or

exemption from production, then in answer to such Request or part thereof, for each such Document, you must:

      a.      Identify the type, title and subject matter of the Document;

      a.      State the place, date, and manner of preparation of the Document;

      b.      Identify all authors, addressees, and recipients of the Document, including information about such persons to assess the privilege asserted; and

      c.      Identify the legal privilege(s) and the factual basis for the claim.

9.      Documents should not contain redactions unless such redactions are made to protect information subject to the attorney-client privilege, mediation privilege, and/or work-product doctrine. In the event any Documents are produced with redactions, a log setting forth the information requested in Instruction 8 above must be provided.

10.      To the extent a Document sought herein was at one time, but is no longer, in your actual or constructive possession, custody, or control, state whether it:  (a) is missing or lost; (b) has been destroyed; (c) has been transferred to others; and/or (d) has been otherwise disposed of. In each instance, identify the Document, state the time period during which it was maintained, state the circumstance and date surrounding authorization for such disposition, identify each person having knowledge of the circumstances of the disposition, and identify each person who had possession, custody, or control of the Document. Documents prepared prior to, but which relate or refer to, the time period covered by these Requests are to be identified and produced.

11.      If any part of the Requests cannot be responded to in full, please respond to the extent possible, specifying the reason(s) for your inability to respond to the remainder and stating whatever information or knowledge you have concerning the portion to which you do not respond.

12.     If you object to any of these Requests, state in writing with specificity the grounds of your objections. Any ground not stated shall be waived. If you object to a particular portion of any Request, you shall respond to any other portions of such Request as to which there is no objection and state with specificity the grounds of the objection.

13.     If the identity of Documents responding to a Request is not known, then that lack of knowledge must be specifically indicated in the response. If any information requested is not in your possession, but is known or believed to be in the possession of another person or entity, then identify that person or entity and state the basis of your belief or knowledge that the requested information is in such person's or entity's possession.

## MANNER OF PRODUCTION

1.     All Documents produced shall be provided in either native file ("native") or single-page 300 dpi-resolution group IV TIF format ("tiff") format as specified below, along with appropriately formatted industry-standard database load files and accompanied by true and correct copies or representations of unaltered attendant metadata.  Where Documents are produced in tiff format, each Document shall be produced along with a multi-page, Document-level searchable text file ("searchable text") as rendered by an industry-standard text extraction program in the case of electronic originals, or by an industry-standard Optical Character Recognition ("ocr") program in the case of scanned paper Documents.  Searchable text of Documents shall not be produced as fielded data within the ".dat file" as described below.

2.     <u>Database Load Files and Production Media Structure</u>:  Database load files shall consist of:  (i) a comma-delimited values (".dat") file containing:  production Document identifier information, data designed to preserve "parent and child" relationships within Document "families," reasonably accessible and properly preserved metadata (or bibliographic coding in the case of paper Documents), custodian or Document source information; and (ii) an Opticon (".opt")

file to facilitate the loading of tiff images.  Load files should be provided in a root-level folder named "Data," images shall be provided within a root level "Images" folder containing reasonably structured subfolders, and searchable text files shall be provided in a single root-level "Text" folder.

3.    <u>Electronic Documents and Data, Generally</u>:  Documents and other responsive data or materials created, stored, or displayed on electronic or electro-magnetic media shall be produced in the order in which the Documents are or were stored in the ordinary course of business, including all reasonably accessible metadata, custodian or Document source information, and searchable text as to allow Century, through a reasonable and modest effort, to fairly, accurately, and completely access, search, display, comprehend, and assess the Documents' true and original content.

4.    <u>Emails and Attachments, and Other Email Account-Related Documents</u>:  All Documents and accompanying metadata created and/or stored in the ordinary course of business within commercial, off-the-shelf email systems including but not limited to Microsoft ExchangeTM, Lotus NotesTM, or Novell GroupwiseTM shall be produced in tiff format, accompanying metadata, and searchable text files or, alternately, in a format that fairly, accurately, and completely represents each Document in such a manner as to make the Document(s) reasonably useable, manageable, and comprehendible by Century.

5.    <u>Documents and Data Created or Stored in or by Structured Electronic Databases</u>: With the exclusion of email and email account-related Documents and data, all Documents and accompanying metadata created and/or stored in structured electronic databases or files shall be produced in a format that enables Century to reasonably manage and import those Documents into a useable, coherent database.  Documents must be accompanied by reasonably detailed documentation explaining the Documents' content and format including but not limited to data

dictionaries and diagrams. Some acceptable formats, if and only if provided with definitive file(s), table(s), and field level schemas include:

        a.      XML format file(s);

        b.      Microsoft SQL database(s);

        c.      Access database(s); and/or

        d.      fixed or variable length ASCII delimited files.

      6.    <u>Spreadsheets, Multimedia, and Non-Standard File Types</u>: All Documents generated or stored in software such as Microsoft Excel or other commercially available spreadsheet programs, as well as any multimedia files such as audio or video, shall be produced in their native format, along with an accompanying placeholder image in tiff format indicating a native file has been produced. A "Nativelink" entry shall be included in the .dat load file indicating the relative file path to each native file on the production media. To the extent You have other file types that do not readily or easily and accurately convert to tiff and searchable text, You may elect to produce those files in native format subject to the other requirements listed herein. Native files may be produced within a separate root-level folder structure on deliverable media entitled "Natives."

      7.    <u>"Other" Electronic Documents</u>: All other Documents and accompanying metadata and embedded data created or stored in unstructured files generated by commercially available software systems (excluding emails, structured electronic databases, spreadsheets, or multimedia) such as, but not limited to, word processing files (such as Microsoft Word), image files (such as Adobe .pdf files and other formats), and text files shall be produced in tiff and searchable text format in the order the files are or were stored in the ordinary course of business.

8.     <u>Paper Documents</u>:    Documents originally created or stored on paper shall be produced in tiff format.  Relationships between Documents shall be identified within the Relativity .dat file utilizing document identifier numbers to express parent Document/child attachment boundaries, folder boundaries, and other groupings.   In addition, the searchable text of each Document shall be provided as a multi-page text file as provided for by these Requests for Production.

<u>**REQUESTS FOR PRODUCTION OF DOCUMENTS**</u>

<u>**BOARD AND COMMITTEE MINUTES**</u>
<u>**ABOUT BANKRUPTCY**</u>

<u>**REQUEST FOR PRODUCTION NO. 1:**</u>

All Documents provided to Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council Concerning the Chapter 11 Cases, any Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, the Hartford Settlement Agreement and/or the Abuse Claims asserted in the POCs in these Chapter 11 Cases.

<u>**REQUEST FOR PRODUCTION NO. 2:**</u>

All Documents provided to Your Council Key 3 Concerning the Chapter 11 Cases, any Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, the Hartford Settlement Agreement and/or the Abuse Claims asserted in the POCs in these Chapter 11 Cases.

<u>**REQUEST FOR PRODUCTION NO. 3:**</u>

All minutes of Your Council Key 3 Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, and/or the

Hartford Settlement Agreement and/or the Abuse Claims asserted in the POCs in these Chapter 11 Cases.

**REQUEST FOR PRODUCTION NO. 4:**

All minutes of Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council Concerning the Chapter 11 Cases, a Plan of Reorganizaiton for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, the Hartford Settlement Agreement and/or the Abuse Claims asserted in the POCs in these Chapter 11 Cases.

**REQUEST FOR PRODUCTION NO. 5:**

All Documents that Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council reviewed and/or relied upon in evaluating the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, and/or the Hartford Settlement Agreement.

**REQUEST FOR PRODUCTION NO. 6:**

All Communications among members of Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, and/or the Hartford Settlement Agreement.

**REQUEST FOR PRODUCTION NO. 7:**

All Documents (including presentations) and Communications exchanged between the Debtors and members of Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, and/or the Hartford Settlement Agreement.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents (including presentations) and Communications exchanged between Alverez & Marsal and members of Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, the Abuse Claims and/or the Hartford Settlement Agreement.

**REQUEST FOR PRODUCTION NO. 9:**

All drafts of term sheets for any Plan of Reorganization for the Debtors.

**REQUEST FOR PRODUCTION NO. 10:**

All Documents Concerning Communications with State Court Counsel, the Coalition, TCC, FCR and/or their counsel Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, Abuse Claims and/or the Hartford Settlement Agreement.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents Concerning any request that You support a motion, application or inclusion of a provision a Plan of Reorganization for the Debtors that in any way called for or supported the payment of the fees for the Coalition.

**REQUEST FOR PRODUCTION NO. 12:**

All Documents Concerning the TDPs to be employed with any Plan of Reorganization for the Debtors, including all drafts of the TDPs.

**REQUEST FOR PRODUCTION NO. 13:**

All Documents and Communications that BSA exchanged with Your Local Council Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, the Abuse Claims and/or the Hartford Settlement Agreement.

## ABUSE CLAIMS AND ANALYSIS OF ABUSE CLAIMS

**REQUEST FOR PRODUCTION NO. 14:**

All Documents that Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council reviewed and/or relied upon in evaluating and or determining the amount of Your Local Council's contribution to the Settlement Trust.

**REQUEST FOR PRODUCTION NO. 15:**

All Communications among members of Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council Concerning the amount of Your Local Council's contribution to the Settlement Trust.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents that Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council reviewed and/or relied upon in evaluating and or determining the amount of Your Local Council's contribution to the Settlement Trust.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents authored or generated by Bates White Concerning the POCs, the Debtors, the Abuse Claims against the Debtors, and/or these Chapter 11 Cases.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents Concerning the methodology that was employed to allocate the aggregate contribution by all Local Councils to the Settlement Trust to individual Local Councils including

any allocation by percentage or other means of the aggregate contribution to individual Local Councils.

**REQUEST FOR PRODUCTION NO. 19:**

All Documents Concerning the calculation and/or determination of the amount of Your Local Council's contribution to the Settlement Trust.

## CHARTERING ORGANIZATIONS

**REQUEST FOR PRODUCTION NO. 20:**

All Documents and Communications that BSA exchanged with any Chartered Organizations concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, and/or the Hartford Settlement Agreement.

## AGREEMENTS WITH CHARTERING ORGANIZATION

**REQUEST FOR PRODUCTION NO. 21:**

All Documents and Communications relating to any agreements between or among the Local Councils, Chartered Organizations and BSA that address in any way responsibility for defending and/or indemnifying claims by persons alleging injury arising from a scouting activity asserted against a chartering organization.

**REQUEST FOR PRODUCTION NO. 22:**

All Documents Concerning any claim that Chartering Organizations have asserted against Your Local Council for contribution and/or indemnity for Abuse Claims asserted against Chartering Organizations.

**REQUEST FOR PRODUCTION NO. 23:**

All Documents Concerning any claim, assertion or allegation that Local Councils generally and Your Local Council specifically took on an obligation to defend and indemnify Chartering

Organizations for Abuse Claims or other claims through the terms of the annual charter agreements between the Chartered Organizations and Local Councils.

**REQUEST FOR PRODUCTION NO. 24:**

The charter agreements entered into by Your Local Council from January 1, 2014 to the petition date with the following Chartering Organizations: (1) the Methodist Church and any group associated with the Methodist Church, (2) dioceses, parishes and/or schools associated with the Catholic Church (3) the Episcopalian Church and any dioceses, parishes, school or other group associated the Episcopalian Church (4) the Lutheran Church and any diocese, parish, school or other group associated with the Lutheran Church (5) The Knights of Columbus. (6) the YMCA, and (7) the Presbyterian Church and any group associated with the Presbyterian Church.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents and Communications Concerning the POCs filed by any of the Chartered Organizations in these Chapter 11 Cases.

**REQUEST FOR PRODUCTION NO. 26:**

All Documents and Communications analyzing, assessing, or evaluating the proofs of claim filed by any of Chartered Organizations.

**CHARTER MEMBERSHIP**

**REQUEST FOR PRODUCTION NO. 27:**

All Documents and Communications Concerning membership projections, including any Documents and Communications reflecting analysis of the impact that the disassociation of one or more Chartered Organization from the Debtors and/or Your Local Council would have on the Debtors' membership levels and revenue projections and/or Your Local Council's membership levels.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents authored or generated by Bates White Concerning Abuse

Claims asserted or alleged against Your Local Council.

**REQUEST FOR PRODUCTION NO. 27:**

All Documents and Communications Concerning Abuse Claims asserted on behalf of

individuals that you were unable to confirm were scouts in Your Local Council.

**REQUEST FOR PRODUCTION NO. 28:**

The Database, electronic spreadsheet, data and/or other information that was used to

determine the amount of Your Local Council's contribution to the Settlement Trust

**REQUEST FOR PRODUCTION NO. 30:**

All Documents and Communications that the Debtors sent to Your Local Councils with

the Local Council Feedback Template and Mandatory Reporting Procedures for Proofs of Claim

filed in these Chapter 11 Cases.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents and Communications that Your Local Council generated in response to the

request to complete the Local Council Feedback Template and Mandatory Reporting Procedures

for Proofs of Claim filed in these Chapter 11 Cases.

**REQUEST FOR PRODUCTION NO. 32:**

All Communications between or among BSA Membership Standards Group and Your

Local Councils related to the Local Council Reporting Procedures for any claims based on Abuse,

including but not limited to, questions regarding the verification of Proof of Claim data.

**REQUEST FOR PRODUCTION NO. 33:**

All incident reports generated by Your Local Council in connection with the Proofs of Claim filed in these Chapter 11 Cass, including any and all supporting documentation attached to those incident reports.

**REQUEST FOR PRODUCTION NO. 34:**

All membership rosters for Your Local Council that correspond to the date of alleged abuse for the POCs that refer to Your Local Council.

**REQUEST FOR PRODUCTION NO. 35:**

All Documents and Communications between and/or among the Your Local Councils, the Chartered Organization Representative (COR) (or Institutional Head, where applicable), unit Committee Chair (CC) and/or unit program leader to notify them of the action being taken to remove the alleged abusers identified by the claimants in the Proof of Claim filed in these Chapter 11 cases from participation in Scouting.

**LOCAL COUNSEL ASSETS**

**REQUEST FOR PRODUCTION NO. 36:**

All Documents and Communications concerning whether assets that are donor-restricted should, or should not be, contributed to the Settlement Trust.

**REQUEST FOR PRODUCTION NO. 37:**

All Documents and Communications relating to Your cash and financial assets, including but not limited to bank statements, investment statements, listing of individual assets/holdings and associated market values, appraisals or other indicators of market value, records demonstrating any conditions or restrictions of use and/or encumbrances on the assets and any analysis related thereto.

**INSURANCE**

**REQUEST FOR PRODUCTION NO. 38:**

All Documents Concerning any insurance policies issued to Your Local Council by Hartford.

**REQUEST FOR PRODUCTION NO. 39:**

All Documents concerning the retained limits and/or deductibles associated with any insurance available to Your Local Council for Abuse Claims.

**REQUEST FOR PRODUCTION NO. 40:**

All Documents Concerning Your Council's responsibility to fund retained limits and or deductibles associated with any insurance coverage that it by rd.

**LIQUIDATION ANALYSIS**

**REQUEST FOR PRODUCTION NO. 41:**

All Documents and Communications concerning any liquidation analysis of the Debtors, Local Councils, and/or Chartered Organizations.

**REQUEST FOR PRODUCTION NO. 42:**

All Documents and Communications Concerning a pre-packaged bankruptcy to resolve Abuse Claims against the Boy Scouts of America.

**REQUEST FOR PRODUCTION NO. 43:**

All Documents that You relied upon in deciding to support the First Hartford Settlement Agreement, the Hartford Insurance Settlement Agreement and the TCJC Settlement Agreement.

**REQUEST FOR PRODUCTION NO. 44:**

All Documents and Communications Concerning the consideration and/or negotiation of a pre-packaged bankruptcy to resolve Abuse Claims against the Boy Scouts of America.

**REQUEST FOR PRODUCTION NO. 45:**

All Documents that set out Your document retention policies and practices over the last five years, including but not limited to the period over which You retain electronic communications.

**REQUEST FOR PRODUCTION NO. 46:**

All Documents that memorialize any directive or instruction given by You or anyone else to Your Local Council and its staff directing them to retain documents concerning the Chapter 11 Cases.

Dated:  October 8, 2021

*Respectfully Submitted,*

By:  /s/ Stamatios Stamoulis
     *Stamatios Stamoulis (#4606)*

STAMOULIS & WEINBLATT LLC
800 N. West Street Third Floor
Wilmington, Delaware 19801
Telephone: 302 999 1540
Facsimile: 302 762 1688

O'MELVENY & MYERS LLP
Tancred Schiavoni (pro hac vice)
Daniel Shamah (pro hac vice)
Times Square Tower
7 Times Square
New York, New York 10036-6537 Telephone:
212 326 2000
Facsimile: 212 326 2061
Email: tschiavoni@omm.com
dshamah@omm.com

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*

OMM_US:80266131.1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

**In re Boy Scouts of America and Delaware BSA, LLC, Debtor**

CASE NO. : 20-10343 (LSS)
CHAPTER 11

vs                                                                              *Plaintiff*

                                                                                *Defendant*

# AFFIDAVIT OF SERVICE

State of Maryland  }
County of Montgomery }   ss.:

The undersigned, being duly sworn, deposes and says;

Deponent is not a party herein, is over 18 years of age and resides in the state of Maryland,

That on **10/08/2021** at **12:45 PM** at **9190 Rockville Pike, Bethesda, MD 20814**

deponent served a(n) **Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (or Adversary Proceeding), Exhibit 1**

on **National Capital Area Council, BSA**, a domestic corporation,

by delivering thereat a true copy to **Mario Perez** personally,

deponent knew said corporation so served to be the corporation witness and knew said individual to be **authorized to accept service** thereof.

<u>Description of Person Served:</u>
Gender: Male
Skin:  White
Hair: Black
Age: 45 - 55 Yrs.
Height: 5' 10" - 6' 0"
Weight:Over 200 Lbs.

Sworn to before me this
     day of October, 2021

-------------------------------------------
              NOTARY PUBLIC

-----------------------------------------------
                        Eric Young

# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | |
| *Boy Scouts of America and Delaware BSA, LLC* | Chapter 11 |
| Debtors. | Case No. 20-10343 (LSS) |

**NATIONAL CAPITAL AREA COUNCIL OF THE BOY SCOUTS OF AMERICA'S
RESPONSES AND OBJECTIONS TO CENTURY INDEMNITY COMPANY'S
SUBPOENA DUCES TECUM**

The National Capital Area Council of the Boy Scouts of America ("NCAC") hereby

responds and objects to Century Indemnity Company's Subpoena Duces Tecum (the "Subpoena")

served by Century Indemnity Company ("Century") on or about October 8, 2021.

**GENERAL OBJECTIONS**

1.       In making these responses and objections to the Requests for Production in the

Subpoena (the "Requests," and individually each is a "Request"), NCAC does not in any way

waive or intend to waive, but rather intends to preserve and is preserving:  (a) all objections as to

competence, relevance, materiality, privilege and admissibility of any responses and/or

information provided; (b) all rights to object on any ground to the use of any of these objections,

responses and/or information provided, in any subsequent proceedings; and (c) all rights to

object on any grounds to any requests for further responses to these (or any other) document

requests or discovery requests.

2.       NCAC objects to any and all Requests that require NCAC to undergo the undue

burden of producing certain documents that could be obtained from other sources, including the

Debtors.  NCAC further objects to the Requests to the extent that they seek production of certain documents that are already available through the Debtors' data site, to which Century already has access.  To the extent that NCAC is aware that the documents requested are available through the Debtors' data site, it will not endeavor to produce them.

3.    NCAC's failure to object to a Request shall not be construed as an admission or representation that any responsive information exists or that, if such information exists, it is non-privileged.  NCAC's failure to object to a Request on a particular ground or grounds shall not be construed as a waiver of NCAC's right to object on that or any other additional ground.  NCAC reserves the right to assert additional objections to these Requests as appropriate and to supplement these objections.

4.    NCAC objects to the Requests to the extent that they seek information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the common interest or joint defense doctrine, mediation privilege, or any other applicable rule, doctrine, privilege or immunity or protection from discovery (whether based upon statute, rule, or common law).  NCAC will not disclose such information, and any disclosure of information so protected is inadvertent and shall not be deemed a waiver of any such privilege, rule, doctrine, or immunity, pursuant to Federal Rule of Evidence 502 and otherwise.  In particular, NCAC notes that it is party to a Joint Defense Agreement by and among NCAC, the Ad Hoc Committee of Local Councils and the National BSA and that certain documents and communications among the parties above may be privileged to the extent they are made in furtherance of such parties' common interests.

5.    NCAC objects to the Requests as imposing undue burden to the extent that they seek production of certain documents that could be obtained from other sources, including the

2

Debtors.  NCAC further objects to the Requests to the extent that they seek production of certain documents that are already available through the Debtors' data site, to which Century already has access.  To the extent that NCAC is aware that the documents requested are available through the Debtors' data site, it will not endeavor to produce them.

6.      A statement by NCAC that it will produce information or documents in response to a particular Request is not to be construed as an admission that any responsive information or documents now exist or previously existed, or that any responsive information or documents are within NCAC's possession, custody or control, or that, if such information exists, it is non-privileged.

7.      All of NCAC's objections are continuing throughout the responses to the specific Requests set forth below, even when not further referred to in said responses.  The objections set forth in the above-numbered paragraphs are incorporated in each response set forth below.

8.      NCAC reserves its rights under Bankruptcy Rule 9016, including the right to require any enforcement of the Subpoena before the United States District Court for the District of Maryland (the "NCAC's District Court").  If Century believes that the responses provided herein are inadequate or incomplete, NCAC requests that Century set out in writing its basis for such assertion and that NCAC and Century meet and confer prior to Century taking any steps to seek to enforce the Subpoena before the NCAC's District Court.

9.      NCAC objects to the Requests as improper to the extent they purport to require production of documents on or before October 18th.  To the extent that NCAC agrees to produce documents, it will endeavor to do so in accordance with the timeline set forth in the Scheduling Order [D.I. 6528].

10.    NCAC objects to the Requests as vague, ambiguous and unduly burdensome insofar as they do not specify or provide a range of dates for documents and other communications that they purport to require NCAC to produce.  Unless otherwise indicated, NCAC will not produce documents or other communications that arose on or prior to February, 18, 2020, the date that the Debtors commenced their Bankruptcy Cases.

11.    Any production made in response to any Request shall be subject to, and governed by, the terms of the Confidentiality and Protective Order [Dkt. No. 799].  For the avoidance of doubt, NCAC shall be considered a "Producing Party," and Century shall be considered a "Receiving Party," as defined therein.

12.    NCAC submits these Responses and objections without waiving any objections it may have regarding the relevance, materiality, competency, or authenticity of the subject matter of any Request, document request, document or information provided, and without implying that any of the information or documents requested in fact exist or are within NCAC's knowledge, possession, custody, or control.

13.    NCAC, in making its specific Responses, incorporates its general objections into each response to each individual Request as though fully set forth therein.

## RESPONSES AND OBJECTIONS TO SPECIFIC REQUESTS

**Document Request No. 1**:  All Documents provided to Your Council Executive Board, Council Executive and/or any Special or Advisory Council Concerning the Chapter 11 Cases, any Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, the Hartford Settlement Agreement and/or the Abuse.

**Response to Document Request No. 1**:  NCAC objects to this Request as

overbroad and unduly burdensome because it asks NCAC for "all" documents concerning the

Chapter 11 Cases, "any" Plan of Reorganization for the Debtors, the Fifth Amended Plan of

Reorganization, the TDPs, the Hartford Settlement and/or the Abuse Claims asserted in the POCs

in these Chapter 11 cases, without regard to the relevance of that information to this case. NCAC

further objects to this Request as the documents requested have no direct or indirect relationship

to any objection that Century has lodged with the Bankruptcy Court in connection with

confirmation of the plan of reorganization for which this Subpoena was issued.  Nor are the

documents requested reasonably related to any matter that might come before the Bankruptcy

Court in connection with the plan of reorganization.  Subject to and without waiving the foregoing

objections, NCAC will provide relevant and non-attorney client privileged documents responsive

to this Request, to the extent that they exist.

**Document Request No. 2**:  All Documents provided to Your Council Key 3 Concerning the Chapter 11 Cases, any Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, the Hartford Settlement Agreement and/or the Abuse Claims asserted in the POCs in these Chapter 11 Cases.

**Response to Document Request No. 2**:  NCAC objects to this Request as

overbroad and unduly burdensome because it asks NCAC for "all" documents concerning the

Chapter 11 Cases, "any" Plan of Reorganization for the Debtors, the Fifth Amended Plan of

Reorganization, the TDPs, the Hartford Settlement and/or the Abuse Claims asserted in the POCs

in these Chapter 11 cases, without regard to the relevance of that information to this case. NCAC

further objects to this Request as the documents requested have no direct or indirect relationship to any objection that Century has lodged with the Bankruptcy Court in connection with confirmation of the plan of reorganization for which this Subpoena was issued.  Nor are the documents requested reasonably related to any matter that might come before the Bankruptcy Court in connection with the plan of reorganization.  Subject to and without waiving the foregoing objections, NCAC will provide relevant and non-attorney client privileged documents responsive to this Request, to the extent that they exist.

**Document Request No. 3**:  All minutes of Your Council Key 3 Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, and/or the Hartford Settlement Agreement and/or the Abuse Claims asserted in the POCs in these Chapter 11 Cases.

**Response to Document Request No. 3**:  NCAC objects to this Request as overbroad and unduly burdensome because it asks NCAC for "all" minutes concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, the Hartford Settlement and/or the Abuse Claims asserted in the POCs in these Chapter 11 cases, without regard to the relevance of that information to this case. NCAC further objects to this Request as the documents requested have no direct or indirect relationship to any objection that Century has lodged with the Bankruptcy Court in connection with confirmation of the plan of reorganization for which this Subpoena was issued.  Nor are the documents requested reasonably related to any matter that might come before the Bankruptcy Court in connection with the plan of reorganization.  Subject to and without waiving the foregoing objections, NCAC will provide relevant and non-attorney client privileged documents responsive to this Request, to the extent that they exist.

**Document Request No. 4**:  All minutes of Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs,

6

the Hartford Settlement Agreement and/or the Abuse Claims asserted in the POCs in these Chapter 11 Cases.

**Response to Document Request No. 4**:  NCAC objects to this Request as overbroad and unduly burdensome because it asks NCAC for "all" minutes concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, the Hartford Settlement and/or the Abuse Claims asserted in the POCs in these Chapter 11 cases, without regard to the relevance of that information to this case. NCAC further objects to this Request as the documents requested have no direct or indirect relationship to any objection that Century has lodged with the Bankruptcy Court in connection with confirmation of the plan of reorganization for which this Subpoena was issued.  Nor are the documents requested reasonably related to any matter that might come before the Bankruptcy Court in connection with the plan of reorganization.  Subject to and without waiving the foregoing objections, NCAC will provide relevant and non-attorney client privileged documents responsive to this Request, to the extent that they exist.

**Document Request No. 5**:  All Documents that Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council reviewed and/or relied upon in evaluation the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, and/or the Hartford Settlement Agreement.

**Response to Document Request No. 5**:  NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" documents related to this request, without regard to relevance of that information to this case. NCAC further objects to the extent this Request calls for production of documents subject to the attorney-client privilege and attorney work product. NCAC objects to this Request as the documents requested have no direct or indirect relationship to any objection that Century has lodged with the Bankruptcy Court in connection with confirmation of the plan of reorganization for which this Subpoena was issued.  Nor are the

7

documents requested reasonably related to any matter that might come before the Bankruptcy Court in connection with the plan of reorganization.  Subject to and without waiving the foregoing objections, NCAC will produce responsive, non-privileged documents responsive to this Request, to the extent that they exist.

**Document Request No. 6:**  All Communications among members of Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, and/or the Hartford Settlement Agreement.

**Response to Document Request No. 6**:  NCAC objects to this Request as the communications requested have no direct or indirect relationship to any objection that Century has lodged with the Bankruptcy Court in connection with confirmation of the plan of reorganization for which this Subpoena was issued.  Nor are the documents requested reasonably related to any matter that might come before the Bankruptcy Court in connection with the plan of reorganization. NCAC further objects on the grounds that producing "all" documents in response to this request would place an undue burden on NCAC. NCAC also objects to the extent this Request calls for production of documents subject to the attorney-client privilege or work product protection. Subject to and without waiving the foregoing objections, NCAC will provide relevant and non-attorney client privileged documents responsive to this Request, to the extent that they exist.

**Document Request No. 7**:    All Documents (including presentations) and Communications exchanged between the Debtors and members of Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, and/or the Hartford Settlement Agreement.

**Response to Document Request No. 7**:  NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" documents (including presentations) and communications related to this request, without regard to the relevance of those communications to this case. NCAC objects to this Request as the documents requested appear to be in the

possession, custody, and control of the Debtors and can be more readily obtained from the Debtors. NCAC believes the documents responsive to this Request it possesses, if any, are duplicative of documents in the possession of the Debtors. On these bases, NCAC objects to producing any documents in response to Request No. 7.

**Document Request No. 8**:   All Documents (including presentations) and Communications exchanged between Alverez and Marsal and members of Your Council Executive Board, Council Executive Committee and/or Special or Advisory Council of Your Council Concerning the Chapter 11 Cases, a Plan of Reorganization, the TDPs, the Abuse Claims and/or the Hartford Settlement Agreement.

**Response to Document Request No. 8**:   NCAC objects to this Request as overbroad and unduly burdensome because it asks NCAC for "all" documents, presentations, and communications exchanged between Alverez & Marsal and members of Our Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Our Council related to this request, without regard to the relevance of those documents, presentations, and communications to this case. NCAC further objects to this Request as the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors or Alvarez & Marsal. NCAC believes the documents responsive to this Request it possesses, if any, are duplicative of documents in the possession of the Debtors.  On these bases, NCAC objects to producing any documents in response to Request No. 8.

**Document Request No. 9**:  All drafts of term sheets for any Plan of Reorganization for the Debtors.

**Response to Document Request No. 9**:   NCAC objects to this Request as overbroad and unduly burdensome because it asks NCAC for "all" drafts of term sheets for "any" Plan of Reorganization for the Debtors, without regard to relevance of those drafts to this case. NCAC further objects to this Request as the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC

believes the documents responsive to this Request it possesses, if any, are duplicative of documents

in the possession of the Debtors.  On these bases, NCAC objects to producing any documents in

response to Request No. 9.

**Document Request No. 10**:  All Documents Concerning Communications with State Court Counsel, the Coalition, TCC, FCR and/or their counsel Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, Abuse Claims and/or the Hartford Settlement Agreement.

**Response to Document Request No. 10**:  NCAC objects to this Request as

overbroad and unduly burdensome because it seeks "all" documents concerning communications

related to this request, without regard to relevance of those documents to this case. NCAC further

objects to the extent this Request calls for production of documents subject to the attorney-client

privilege      or      work      product,      specifically      with      respect      to

"Communications with *State Court Counsel*, the Coalition, TCC, FCR and/or *their counsel*."

NCAC further objects to this Request as the documents requested appear to be in the possession,

custody, and control of State Court Counsel, the Coalition, TCC, and/or FCR and can be more

readily obtained from one of them.  Each are parties in the Bankruptcy Case. NCAC believes the

documents responsive to this Request it possesses, if any, are duplicative of documents in the

possession of State Court Counsel, the Coalition, TCC, and/or FCR.  Subject to and without

waiving the foregoing objections, NCAC will provide relevant and non-attorney client privileged

documents responsive to this Request, to the extent that they exist.

**Document Request No. 11**:  All Documents Concerning any request that You support a motion, application, or inclusion of a provision a Plan of Reorganization for the Debtors that in any way called for or supported the payment of the fees for the Coalition.

**Response to Document Request No. 11**:  NCAC objects to this Request as

unnecessarily overbroad, as several recent versions of the plan have called for payment of the

Coalition's fees.  Furthermore, no version of any Plan of Reorganization for the Debtors has at any

10

time "called for" or requested the support of NCAC for the payment of the fees of the Coalition. NCAC further objects to the extent this Request calls for production of documents subject to the attorney-client privilege or work product doctrine. Subject to and without waiving the foregoing objections, NCAC will provide relevant and non-attorney client privileged documents, to the extent that they exist, that were specifically directed to NCAC and specifically sought NCAC's support of a Plan of Reorganization for the Debtors that includes payment of the Coalition's fees on or before November 5, 2021.

**Document Request No. 12**:  All Documents Concerning the TDPs to be employed with any Plan of Reorganization for the Debtors, including all drafts of the TDPs.

**Response to Document Request No. 12**:  NCAC objects to this Request as the documents requested appear to be in the possession, custody, and control of parties other than NCAC, including the Debtors, State Court Counsel, the Coalition, TCC, and/or FCR.  To the extent that they are, NCAC objects to this Request on the basis that it is unduly burdensome and responsive documents can be more readily obtained from one of them.  NCAC believes the documents responsive to this Request it possesses, if any, are duplicative of documents in the possession of the Debtors, State Court Counsel, the Coalition, TCC, and/or FCR. On these bases, NCAC objects to producing any documents in response to Request No. 12.

**Document Request No. 13**:  All Documents and Communications that BSA exchanged with Your Local Council Concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, the Abuse Claims and/or the Hartford Settlement Agreement.

**Response to Document Request No. 13:**  NCAC objects to this Request as the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC further objects on the grounds that producing documents in response to this Request would place an undue burden on NCAC.  NCAC believes

the documents responsive to this Request it possesses, if any, are duplicative of documents in the

possession of the Debtors.  On these bases, NCAC objects to producing any documents in response

to Request No. 13.

**Document Request No. 14**:  All Documents that Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council reviewed and/or relied upon in evaluating and/or determining the amount of Your Local Council's contribution to the Settlement Trust.

**Response to Document Request No. 14**:  NCAC objects to the extent this Request

calls for production of documents subject to the attorney-client privilege and work product

protection. NCAC further objects to this Request as the documents appear to be in the possession,

custody, and control of the Ad Hoc Committee of Local Councils ("AHCLC") and can be more

readily obtained from AHCLC.  The AHCLC is a party in the Bankruptcy Case.  NCAC believes

the documents responsive to this Request it possesses, if any, are duplicative of documents in the

possession of AHCLC.  NCAC further objects on the grounds that producing documents in

response to this Request would place an undue burden on NCAC.  Moreover, NCAC has submitted

substantial data concerning its assets, asset restrictions, and similar data to assist the active parties

in the Bankruptcy Case to assess NCAC's proposed contribution to the Settlement Trust.  Upon

information and belief, those documents have been available to Century.  Responding further, the

AHCLC originally provided the amount that NCAC was expected to contribute to the Settlement

Trust on June 18, 2021. Subject to and without waiving the foregoing objections, NCAC will

produce responsive, non-privileged, and non-duplicative documents generated between June 18,

2021 and November 5, 2021, to the extent that they exist.

**Document Request No. 15**:  All Communications among members of Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council Concerning the amount of Your Local Council's contribution to the Settlement Trust.

**Response to Document Request No. 15:**  NCAC objects to the extent this Request calls for production of communications subject to the attorney-client privilege or work product protection. NCAC further objects to this Request on the grounds that producing documents in response to this request would place an undue burden on NCAC.  Moreover, NCAC has submitted substantial data concerning its assets, asset restrictions, and similar data to assist the active parties in the Bankruptcy Case to assess NCAC's proposed contribution to the Settlement Trust.  Upon information and belief, those documents have been available to Century.  Responding further, the AHCLC originally provided the amount that NCAC was expected to contribute to the Settlement Trust on June 18, 2021. Subject to and without waiving the foregoing objections, NCAC will produce responsive, non-privileged documents generated between June 18, 2021 and November 5, 2021, to the extent that they exist.

**Document Request No. 16**:  All Documents that Your Council Executive Board, Council Executive Committee and/or any Special or Advisory Council of Your Council reviewed and/or relied upon in evaluating and/or determining the amount of Your Local Council's contribution to the Settlement Trust.

**Response to Document Request No. 16:**  NCAC objects to this Request as it is duplicative of Request No. 14.

**Document Request No. 17**:  All Documents authored or generated by Bates White Concerning the POCs, the Debtors, the Abuse Claims against the Debtors, and/or these Chapter 11 Cases.

**Response to Document Request No. 17:**  NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" documents related to this request, without regard to relevance of that information to this case.  NCAC objects to this Request as the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors or Bates White.  NCAC believes the documents responsive to this Request it possesses are duplicative of documents in the possession of the

13

Debtors.   On these bases, NCAC objects to producing any documents in response to Request No.17.

**Document Request No. 18**:  All Documents Concerning the methodology that was employed to allocate the aggregate contribution by all Local Councils to the Settlement Trust to individual Local Councils including any allocation by percentage or other means of the aggregate contribution to individual Local Councils.

**Response to Document Request No. 18:** NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" documents related to this request, without regard to relevance of that information to this case. NCAC further objects to this Request as vague and ambiguous as to the Court's use of the term "the methodology", which is not a defined term, and whose plain meaning is subject to multiple interpretations. NCAC further objects to the extent this Request calls for production of documents subject to the attorney-client privilege or work product protection. NCAC further objects to this Request as the documents appear to be in the possession, custody, and control of AHLCL and can be more readily obtained from AHCLC. The AHCLC is a party in the Bankruptcy Case. NCAC believes the documents responsive to this Request it possesses, if any, are duplicative of documents in the possession of AHCLC. On these bases, NCAC objects to producing any documents in response to Request No. 18.

**Document Request No. 19**:  All Documents Concerning the calculation and/or determination of the amount of Your Local Council's contribution to the Settlement Trust.

**Response to Document Request No. 19:**  NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" documents related to this request, without regard to relevance of that information to this case. NCAC further objects to the extent this Request calls for production of documents subject to the attorney-client privilege and work product protection. NCAC further objects to this Request as the documents appear to be in the possession, custody, and control of AHCLC and can be more readily obtained from AHCLC. The AHCLC is

a party in the Bankruptcy Case. NCAC believes the documents responsive to this Request it possesses, if any, are duplicative of documents in the possession of AHCLC.  On these bases, NCAC objects to producing any documents in response to Request No. 19.

**Document Request No. 20**:  All Documents and Communications that BSA exchanged with any Chartered Organizations concerning the Chapter 11 Cases, a Plan of Reorganization for the Debtors, the Fifth Amended Plan of Reorganization, the TDPs, and/or the Hartford Settlement Agreement.

**Response to Document Request No. 20:**  NCAC objects to this Request insofar as it calls for NCAC to produce documents between NCAC and Chartered Organizations.  NCAC is not NCAC and is not a Chartered Organization, nor are documents between NCAC and a Chartered Organization within NCAC's possession, custody, or control.  NCAC therefore objects on the basis that this Request demands documents outside the scope of permissible discovery from a third party.  NCAC further objects on the basis that producing "all" documents in response to this Request would impose an undue burden on NCAC.  On these bases, NCAC objects to producing any documents in response to Request No. 20.

**Document Request No. 21**:  All Documents and Communications relating to any agreements between or among the Local Councils, Chartered Organizations and BSA that address in any way responsibility for defending and/or indemnifying claims by persons alleging injury arising from a scouting activity asserted against a chartering organization.

**Response to Document Request No. 21:**  NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" documents and communications relating to "any" agreements, without regard to relevance of that information to this case. NCAC further objects to the extent this Request calls for production of documents and communications subject to the attorney-client privilege or work product protection specifically pertaining to documents or communications that "address in any way responsibility for defending and/or indemnifying claims by persons alleging injury arising from a scouting activity asserted against a chartering

organization. NCAC believes that any documents responsive to this Request it possesses, if any, to which the Debtors are a party are duplicative of documents in the possession of the Debtors. Subject to and without waiving the foregoing objections, NCAC will produce any non-duplicative agreements between NCAC and a Chartered Organization to which the Debtors are not also a party between June 18, 2020 and November 5, 2021.

**Document Request No. 22**:  All Documents Concerning any claim that Chartering Organizations have asserted against Your Local Council for contribution and/or indemnity for Abuse Claims asserted against Chartering Organizations.

**Response to Document Request No. 22:**  NCAC objects to this Request on the grounds that it is overly broad and vague. NCAC further states that producing "all Documents" in response to this Request imposes an undue burden on NCAC and not proportional to the needs of the Bankruptcy Case and NCAC therefore objects on these additional grounds. In response to this Request, NCAC states that it has not received any specific written demand from any Chartered Organization seeking contribution and/or indemnity for Abuse Claims. As a result, NCAC does not have documents responsive to this Request.

**Document Request No. 23**:  All Documents Concerning any claim, assertion, or allegation that Local Councils generally and Your Local Council specifically took on an obligation to defend and indemnify Chartering Organizations for Abuse Claims or other claims through the terms of the annual charter agreements between the Chartered Organizations and Local Councils.

**Response to Document Request No. 23:**  NCAC objects to this Request in that producing "all Documents" in response to this Request imposes an undue burden on NCAC and the Request is not proportional to the needs of the Bankruptcy Case.  NCAC further states that from and since approximately 2014, the agreement between NCAC and Chartered Organizations contains provisions that may require NCAC to defend and/or indemnify Chartered Organizations in particular circumstances.  NCAC states that it will produce exemplars of such agreements on or prior to November 5, 2021 that are in its possession, custody, and control and responsive to

16

Request No. 24. However, in response to this Request, NCAC states that it has not received any specific written demand from any Chartered Organization for Abuse Claims. As a result, NCAC does not have documents responsive to this Request.

**Document Request No. 24**:  The charter agreements entered into by Your Local Council from January 1, 2014 to the petition date with the following Chartering Organizations: (1) the Methodist Church and any group associated with the Methodist Church, (2) dioceses, parishes and/or schools associated with the Catholic Church (3) the Episcopalian Church and any dioceses, parishes, school or other group associated the Episcopalian Church (4) the Lutheran Church and any diocese, parish, school or other group associated with the Lutheran Church (5) The Knights of Columbus. (6) the YMCA, and (7) the Presbyterian Church and any group associated with the Presbyterian Church.

**Response to Document Request No. 24:**  NCAC further states that it is unduly burdensome to produce "all" such agreements and such agreements are duplicative of one another and are otherwise not proportional to the needs of the Bankruptcy Case.  NCAC will not produce other or further documents in response to this Request. Subject to and without waiving the foregoing objections, NCAC incorporates its response to Request No. 23 and states that it will provide an exemplar of its agreement with Chartered Organizations from and since January 1, 2014 on or before November 5, 2021 to the extent it exists and is within NCAC's possession, custody, or control.

**Document Request No. 25**:  All Documents and Communications Concerning the POCs filed by any of the Chartered Organizations in these Chapter 11 Cases.

**Response to Document Request No. 25**:  NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" documents and communications, without regard to relevance of that information to this case. NCAC objects to this Request as certain of the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC believes the documents responsive to this Request, if any, it possesses are duplicative of documents in the possession of the Debtors. NCAC

further objects on the grounds that producing "all" documents in response to this request would place an undue burden on NCAC and are not otherwise proportional to the needs of the Bankruptcy Case. Subject to and without waiving the foregoing objections, NCAC will produce any responsive, non-duplicative documents in its possession, custody or control, to the extent that they exist.

      **Document Request No. 26**:    All Documents and Communications analyzing, assessing, or evaluating the proofs of claim filed by any of Chartered Organizations.

      **Response to Document Request No. 26:**  NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" documents and communications analyzing, assessing, or evaluating the proofs of claim filed by "any" of the Chartered Organizations, without regard to relevance of that information to this case. NCAC objects to this Request as certain of the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC further objects on the grounds that producing "all" documents in response to this request would place an undue burden on NCAC and are not otherwise proportional to the needs of the Bankruptcy Case.  Subject to and without waiving the foregoing objections, NCAC will produce any responsive, non-duplicative, non-attorney client privileged documents in its possession, custody or control, to the extent that they exist.

      **Document Request No. 27**: All Documents and Communications Concerning membership projections, including any Documents and Communications reflecting analysis of the impact that the disassociation of one or more Chartered Organizations from the Debtors and/or Your Local Council would have on the Debtors' membership levels and revenue projections and/or Your Local Council's membership levels.

      **Response to Document Request No. 27:**  NCAC objects to this Request as certain of the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC further objects on the grounds that

producing "all" documents in response to this Request would place an undue burden on NCAC and this Request is not otherwise proportional to the needs of the Bankruptcy Case.  Subject to and without waiving the foregoing objections, NCAC will produce any non-privileged and non-duplicative documents in its possession that were not generated by the Debtors on or before November 5, 2021, to the extent that they exist.

**Document Request No. 25**:[1]  All Documents authored or generated by Bates White Concerning Abuse Claims asserted or alleged against Your Local Council.

**Response to Document Request No. 25:** NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" documents related to this request, without regard to the proportionality to the needs of the Bankruptcy case. NCAC further objects to this Request as the documents requested appear to be in the possession, custody, and control of the Debtors or Bates White and can be more readily obtained from the Debtors or Bates White.  NCAC believes the documents responsive to this Request it possesses are duplicative of documents in the possession of the Debtors. Subject to and without waiving the foregoing objections, NCAC will produce any responsive, non-duplicative documents in its possession, custody or control, to the extent that they exist.

**Document Request No. 27**:[2]   All Documents and Communications Concerning Abuse Claims asserted on behalf of individuals that you were unable to confirm were scouts in Your Local Council.

**Response to Document Request No. 27:**  NCAC objects to this Request as certain of the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC further objects to this Request as overbroad

---

[1]      The Subpoena contains two separate Requests labeled "Request for Production No. 25." NCAC's responses do not correct this oversight but instead track the same Request number order.
[2]      The Subpoena contains two separate Requests labeled "Request for Production No. 27." NCAC's responses do not correct this oversight but instead track the same Request number order.

and unduly burdensome because it seeks "all" documents related to Abuse Claims from individuals

not confirmed to be scouts in NCAC and is not proportional to the needs of the Bankruptcy Case.

NCAC therefore objects on these additional grounds. Subject to and without waiving the foregoing

objections, NCAC will produce responsive documents that are not duplicative of documents in the

possession of the Debtors, to the extent that they exist.

**Document Request No. 28**:   The Database, electronic spreadsheet, data and/or other information that was used to determine the amount of Your Local Council's contribution to the Settlement Trust.

**Response to Document Request No. 28:**   NCAC objects to this Request as the

documents appear to be in the possession, custody, and control of AHCLC and can be more readily

obtained from AHCLC. The AHCLC is a party in the Bankruptcy Case. NCAC believes the

documents responsive to this Request it possesses, if any, are duplicative of documents in the

possession of AHCLC. On this basis, NCAC objects to producing any documents in response to

Request No. 28.

**Document Request No. 30:**[3]   All Documents and Communications that the Debtors sent to Your Local Councils with the Local Council Feedback Template and Mandatory Reporting Procedures for Proofs of Claim filed in these Chapter 11 Cases.

**Response to Document Request No. 30:**   NCAC objects to this Request as

overbroad and unduly burdensome because it seeks "all" documents and communications related

to this request, without regard to relevance of that information to this case. NCAC further objects

to the extent this Request calls for production of documents subject to the attorney-client privilege

or work product protection. NCAC further objects to this Request as the documents requested

appear to be in the possession, custody, and control of the Debtors and can be more readily

obtained from the Debtors.  NCAC believes the documents responsive to this Request it possesses,

---

[3]       The Subpoena does not contain a "Request for Production No. 29."

if any, are duplicative of documents in the possession of the Debtors.  On these bases, NCAC objects to producing any documents in response to Request No. 30.

**Document Request No. 31**:  All Documents and Communications that Your Local Council generated in response to the request to complete the Local Council Feedback Template and Mandatory Reporting Procedures for Proofs of Claim filed in these Chapter 11 Cases.

**Response to Document Request No. 31:**  NCAC objects to producing "all Documents" in response to this Request on the grounds that it imposes an undue burden on NCAC and is not proportional to the needs of the Bankruptcy Case.  NCAC further objects to the extent this Request calls for production of documents subject to the attorney-client privilege or work product protection.  NCAC further objects to this Request as certain of the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC states that production of the Local Council Feedback Template and Mandatory Reporting Procedures that NCAC prepared for and provided to the Debtors provides a sufficient response to this Request and that such documents are obtainable from, and should be obtained from, the Debtors.  Subject to and without waiving the foregoing objections, NCAC will produce responsive documents that are not duplicative of documents in the possession of the Debtors, to the extent that they exist.

**Document Request No. 32**:  All Communications between or among BSA Membership Standards Group and Your Local Councils related to the Local Council Reporting Procedures for any claims based on Abuse, including but not limited to, questions regarding the verification of Proof of Claim data.

**Response to Document Request No. 32:**  NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" communications related to this request, without regard to the proportionality of the needs of the Bankruptcy case. NCAC further objects to this Request as the communications requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC believes the

21

communications responsive to this Request it possesses, if any, are duplicative of documents in the possession of the Debtors. NCAC therefore directs Century to the Debtors for production of any documents in response to this Request.  Subject to and without waiving the foregoing objections, NCAC will produce responsive documents that are not duplicative of documents in the possession of the Debtors, to the extent that they exist.

**Document Request No. 33**:  All incident reports generated by Your Local Council in connection with the Proofs of Claim filed in these Chapter 11 Cases, including any and all supporting documentation attached to those incident reports.

**Response to Document Request No. 33:**  NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" incident reports related to this Request, without regard to relevance of that information or its proportionality to the needs of the Bankruptcy Case. NCAC objects to this Request on the grounds that it is overly broad and vague.  Responding further, NCAC objects to this Request as the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC believes the documents responsive to this Request it possesses, if any, are duplicative of documents in the possession of the Debtors. Subject to and without waiving the foregoing objections, NCAC will produce responsive documents that are not duplicative of documents in the possession of the Debtors, to the extent that they exist.

**Document Request No. 34**:  All membership rosters for Your Local Council that correspond to the date of alleged abuse for the POCs that refer to Your Local Council.

**Response to Document Request No. 34:**  NCAC objects to this Request as being vague and overbroad.  On its face, this Request seeks "all" rosters for any date on which there is an allegation of abuse.  Furthermore, producing documents in response to this Request would impose an undue burden on NCAC and are not otherwise proportional to the needs of the Bankruptcy Case.  NCAC further states that it has produced relevant rosters to the Debtors.

22

Responding further, NCAC objects to this Request as the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors. NCAC believes the documents responsive to this Request it possesses, if any, are duplicative of documents in the possession of the Debtors. On these bases, NCAC objects to producing any documents in response to Request No. 34.

**Document Request No. 35**:  All Documents and Communications between and/or among the *[sic]* Your Local Councils, the Chartered Organization Representative (COR) (or Institutional Head, where applicable), unit Committee Chair (CC) and/or unit program leader to notify them of the action being taken to remove the alleged abusers identified by the claimants in the Proof of Claim filed in these Chapter 11 cases from participation in Scouting.

**Response to Document Request No. 35:**  NCAC objects to this Request as the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC believes the documents responsive to this Request it possesses, if any, are duplicative of documents in the possession of the Debtors. Subject to and without waiving its general objections, NCAC will produce all non-privileged and non-duplicative documents responsive to this Request on or before November 5, 2021, to the extent that they exist.

**Document Request No. 36**:  All Documents and Communications concerning whether assets that are donor-restricted should, or should not be, contributed to the Settlement Trust.

**Response to Document Request No. 36:**  NCAC objects to this Request on the grounds that it is overly broad and vague.  NCAC further states that producing "all" Documents in response to this Request imposes an undue burden on NCAC and is not otherwise proportional to the needs of the Bankruptcy Case.  Responding further, NCAC objects to this Request as the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors.  NCAC believes the documents responsive to this

Request it possesses, if any, are duplicative of documents in the possession of the Debtors. NCAC further objects to the extent this Request calls for production of documents and communications subject to the attorney-client privilege or work product protection. Responding further, NCAC states that the AHCLC originally provided the amount that NCAC was expected to contribute to the Settlement Trust on June 18, 2021. Subject to and without waiving its foregoing objections, NCAC will produce non-privileged and non-duplicative documents responsive to this Request, to the extent that they exist.

**Document Request No. 37**: All Documents and Communications relating to Your cash and financial assets, including but not limited to bank statements, investment statements, listing of individual assets/holdings and associated market values, appraisals or other indicators of market value, records demonstrating any conditions or restrictions of use and/or encumbrances on the assets and any analysis related thereto.

**Response to Document Request No. 37:** NCAC objects to this Request on the grounds that NCAC has submitted substantial data concerning its assets, asset restrictions, and similar data to assist the active parties in the Bankruptcy Case to assess NCAC's proposed contribution to the Settlement Trust. Upon information and belief, those documents have been available to Century. NCAC further understands that Century has access to the PeopleSoft system that is maintained by the Debtors, which contains NCAC's financial records. On these bases, NCAC objects to producing any documents in response to Request No. 37. However, NCAC is prepared to meet and confer with Century to determine what additional documents, if any, it can produce in addition to those that are currently in the data room that would not impose an undue burden on NCAC and would otherwise be proportional to the Bankruptcy Case.

**Document Request No. 38:** All Documents Concerning any insurance policies issued to Your Local Council by Hartford.

**Response to Document Request No. 38:** NCAC objects to this Request to the extent that it calls for production of documents that are or may also be in the possession of the

Debtors.  NCAC states that from and since 1978, NCAC has been an additional insured on insurance policies issued to the Debtors.  On that basis, any documents responsive to this Request from and since 1978 will also be in the possession of the Debtors and it is unduly burdensome to demand that NCAC produce such documents on a duplicative basis.  NCAC has also conducted, and continues to conduct, a good faith search for additional insurance policies issued to it.  In connection with such search, all documents that NCAC has identified that would be responsive to this Request, NCAC has shared with the Debtors or their representatives, including the firm KCIC.  NCAC directs Century to the Debtors and/or KCIC for any such documents.

**Document Request No. 39:**  All Documents concerning the retained limits and/or deductibles associated with any insurance available to Your Local Council for Abuse Claims.

**Response to Document Request No. 39:**  NCAC directs Century to its response to Document Request No. 38 and incorporates it in full as if fully restated herein.  NCAC further states that its practice has been to look to the Debtors' insurance counsel for analysis of insurance policies and, as a result NCAC does not have any Documents responsive to this Request that are not already in the possession of the Debtors.

**Document Request No. 40**:  All Documents Concerning Your Council's responsibility to fund retained limits and or deductibles associated with any insurance coverage that it by rd *[SIC]*.

**Response to Document Request No. 40:** NCAC objects to this Request as vague and ambiguous because it is not clear what is the Court's interpretation of "deductibles associated with any insurance coverage that it by rd [sic]." To the extent the NCAC understands this Request, NCAC directs Century to its response to Document Request No. 38 and incorporates it in full as if fully restated herein.

**Document Request No. 41**:  All Documents and Communications concerning any liquidation analysis of the Debtors, Local Councils, and/or Chartered Organizations.

**Response to Document Request No. 41:** NCAC objects to this Request as certain of the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors. NCAC believes the documents responsive to this Request it possesses, if any, are duplicative of documents in the possession of the Debtors. Responding further NCAC states that it has not undertaken any independent liquidation analysis for the Debtors and on such basis contends that it does not have documents responsive to this Request.

**Document Request No. 42**: All Documents and Communications Concerning a pre-packaged bankruptcy to resolve Abuse Claims against the Boy Scouts of America.

**Response to Document Request No. 42:** NCAC objects to this Request as overbroad and unduly burdensome because it seeks "all" documents and communications related to this Request, without regard to the proportionality to the needs of the Bankruptcy Case. NCAC further objects to this Request as certain of the documents requested appear to be in the possession, custody, and control of the Debtors and can be more readily obtained from the Debtors. NCAC believes the documents responsive to this Request it possesses, if any, are duplicative of documents in the possession of the Debtors. Responding further NCAC states that the only documents in its possession, custody, or control that are responsive to this Request were provided to it by the Debtors and NCAC directs Century to the Debtors for these documents and will not produce such documents on a duplicative basis.

**Document Request No. 43**: All Documents that You relied upon in deciding to support the First Hartford Settlement Agreement, the Hartford Insurance Settlement Agreement and the TCJC Settlement Agreement.

**Response to Document Request No. 43:** NCAC objects to this Request insofar as it is not a party to any of the First Hartford Settlement Agreement, the Hartford Insurance

Settlement Agreement, or the TCJC Settlement Agreement.  NCAC further objects to this Request

as vague and ambiguous.  NCAC will not produce documents in response to Request No. 43.

**Document Request No. 44**:  All Documents and Communications Concerning the consideration and/or negotiation of a pre-packaged bankruptcy to resolve Abuse Claims against the Boy Scouts of America.

**Response to Document Request No. 44:**  NCAC states that this Request is largely

duplicative of Request No. 42. NCAC incorporates its response to Request No. 42 as if fully

restated herein.

**Document Request No. 45**:  All Documents that set out Your document retention policies and practices over the last five years, including but not limited to the period over which You retain electronic communications.

**Response to Document Request No. 45:**  NCAC objects to this Request as it calls

for documents that may be attorney-client privileged or attorney work product. Subject to and

without waiving the foregoing objections, NCAC will produce documents any non-attorney client

privileged that set out NCAC's document retention policies and practices over the five years prior

to November 5, 2021.

**Document Request No. 46**:  All Documents that memorialize any directive or instruction given by You or anyone else to Your Local Council and its staff directing them to retain documents concerning the Chapter 11 Cases.

**Response to Document Request No. 46:**  NCAC objects to this Request as it calls

for documents that may be attorney-client privileged or attorney work product. Subject to and

without waiving the foregoing objections, NCAC will produce any non-privileged documents

responsive to this Request on or before November 5, 2021.

Dated: October 18, 2021

/s/ James Van Horn
James Van Horn
Adeyemi O. Adenrele
**BARNES & THORNBURG LLP**
1717 Pennsylvania Avenue, N.W.
Suite 500
Washington, D.C. 20006
Ph. (202) 289-1313
Fax (202) 289-1330
JVanHorn@btlaw.com
Adey.Adenrele@btlaw.com

*Attorneys for National Capital Area Council of the
Boy Scouts of America*

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney hereby certifies that on the 18th day of October, 2021, a true and correct copy of the foregoing Responses and Objections to Century Indemnity Company's Subpoena Duces Tecum was served by electronic mail on stamoulis@swdelaw.com.


<u>*/ s / James Van Horn*</u>
James Van Horn

# EXHIBIT 3

1

1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3                                    .  Chapter 11
     IN RE:                          .
4                                    .  Case No. 20-10343 (LSS)
     BOY SCOUTS OF AMERICA AND       .
5    DELAWARE BSA, LLC,              .
                                     .  Courtroom No. 2
6                                    .  824 North Market Street
                                     .  Wilmington, Delaware 19801
7                                    .
                     Debtors.        .  September 23, 2021
8    . . . . . . . . . . . . . . . .  1:00 P.M.

9        TRANSCRIPT OF TELEPHONIC DISCLOSURE STATEMENT HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                   UNITED STATES BANKRUPTCY JUDGE

11   TELEPHONIC APPEARANCES:

12
     For the Debtor:          Derek Abbott, Esquire
13                            MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                              1201 North Market Street, 16th Floor
14                            Wilmington, Delaware 19899

15                            - and -

16                            Jessica C. Lauria, Esquire
                              WHITE & CASE LLP
17                            1221 Avenue of the Americas
                              New York, New York 10020
18

19
     Audio Operator:          Brandon J. McCarthy, ECRO
20

21   Transcription Company:   Reliable
                              1007 N. Orange Street
22                            Wilmington, Delaware 19801
                              (302)654-8080
23                            Email:  gmatthews@reliable-co.com

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
25

TELEPHONIC APPEARANCES (Cont'd):

For the Debtors:          Matthew E. Linder, Esquire
                          Laura Baccash, Esquire
                          WHITE & CASE LLP
                          111 South Wacker Drive
                          Chicago, Illinois 60606

For Century:              Tancred Schiavoni, Esquire
                          O'MELVENY & MYERS LLP
                          Times Square Tower
                          7 Times Square
                          New York, New York 10036

For the FCR:              Robert Brady, Esquire
                          Edwin Harron, Esquire
                          YOUNG CONAWAY STARGATT & TAYLOR LLP
                          Rodney Square
                          1000 North King Street
                          Wilmington, Delaware 19801

For Tort Claimants:       James Stang, Esquire
                          PACHULSKI STANG ZIEHL JONES LLP
                          919 North Market Street, 17th Floor
                          Wilmington, Delaware 19801

For the Ad Hoc            Richard Mason, Esquire
Committee of Local        WACHTELL, LIPTON, ROSEN & KATZ
Councils:                 51 West 52nd Street
                          New York, New York 10019

For the Coalition of      David Molton, Esquire
Abused Scouts for         BROWN RUDNICK LLP
Justice:                  7 Times Square
                          New York, New York 10036

                          - and -

                          Eric Goodman, Esquire
                          601 Thirteenth Street NW, Suite 600
                          Washington, D.C. 20005

For the AIG Companies:    Michael Rosenthal, Esquire
                          GIBSON, DUNN & CRUTCHER LLP
                          200 Park Avenue
                          New York, New York 10166

```
 1  TELEPHONIC APPEARANCES (Cont'd):

 2  For the United Methodist Jeremy Ryan, Esquire
    and Roman Catholic Ad    POTTER ANDERSON & CORROON LLP
 3  Hoc Committee:           Hercules Plaza
                             1313 North Market Street, 6th Floor
 4                           P.O. Box 951
                             Wilmington, Delaware 19801
 5
 6  For Numerous Firms and   Irwin Zalkin, Esquire
    Claimants:               THE ZALKIN LAW FIRM, P.C.
 7                           1441 Broadway, Suite 3147
                             New York, New York 10018
 8
    For Zurich Insurers:     Mark Plevin, Esquire
 9                           CROWELL & MORING LLP
                             3 Embarcadero Center, 26th Floor
10                           San Francisco, California 94111
11
    For Zalkin Law Firm:     Thomas Patterson, Esquire
12                           KTBS LAW LLP
                             1801 Century Park East, 26th Floor
13                           Los Angeles, California 90067
14
    For the Committee        Joseph Celentino, Esquire
15  Of Local Councils:       WACHTELL, LIPTON, ROSEN & KATZ
                             51 West 52nd Street
16                           New York, New York 10019
17
    For HMM Victims:         Evan Smola, Esquire
18                           HURLEY MCKENNA & MERTZ, P.C.
                             20 S. Clark Street, Suite 2250
19                           Chicago, Illinois 60603

20  For Guam Abuse           Delia Lujan Wolff, Esquire
    Survivors:               LUJAN & WOLFF LLP
21                           238 Archbishop FC Flores
                             Suite 300
22                           Hagatna, Guam 96910
23
    For the Girl Scouts:     Eric Lopez Schnabel, Esquire
24                           DORSEY & WHITNEY LLP
                             300 Delaware Avenue, Suite 1010
25                           Wilmington, Delaware 19801
```

```
 1  TELEPHONIC APPEARANCES (Cont'd):

 2  For the U.S. Trustee:    David Buchbinder, Esquire
                             Hannah McCollum, Esquire
 3                           UNITED STATES DEPARTMENT OF JUSTICE
                             OFFICE OF THE UNITED STATES TRUSTEE
 4                           844 King Street, Suite 2207
                             Lockbox 35
 5                           Wilmington, Delaware 19801

 6
     For Hartford Financial: Philip Anker, Esquire
 7                           WILMERHALE
                             250 Greenwich Street
 8                           New York, New York 10007

 9                           - and -

10                           James Ruggeri, Esquire
                             SHIPMAN & GOODWIN LLP
11                           1875 K Street NW, Suite 600
                             Washington, DC 20036
12
    For the Church of Jesus  Adam Goldberg, Esquire
13  Christ of Latter Day     LATHAM & WATKINS LLP
    Saints:                  1271 Avenue of the Americas
14                           New York, New York 10020

15
    For Abuse Survivors:     Paul Mones, Esquire
16                           PAUL MONES, P.C.
                             13101 Washington Boulevard
17                           Los Angeles, California 90066

18

19

20

21

22

23

24

25
```

MATTERS GOING FORWARD:

1. Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (D.I. 2295, filed 3/2/21)

2. Debtors' Motion For Entry of Order (I) Scheduling Certain Dates and Deadlines in Connection with Confirmation of the Debtors Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relief (D.I. 2618, filed 4/15/21)

3. Motion for Leave to Exceed Page Limit Requirement for Objection of the Tort Claimants' Committee to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection With Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (D.I. 3529, filed 5/10/21)

4. Motion for Leave to Exceed Page Limit Requirement for (i) Objection of Century Indemnity Company to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief and (ii) Century Indemnity Company's Objections to the Debtors' Solicitation Procedures and Form of Ballots (D.I. 3858, filed 5/12/21)

5. Motion for Leave to Exceed Page Limitations Regarding Debtors' Reply in Further Support of Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof (D.I. 4102, filed 5/16/21)

6. Motion for Leave to Exceed Page Limitations Regarding Debtors' Omnibus Reply in Support of Debtors' Motion for Entry

1  of an Order (I) Approving the Disclosure Statement and the
   Form and Manner of Notice, (II) Approving Plan Solicitation
2  and Voting Procedures, (III) Approving Forms of Ballots, (IV)
   Approving the Form, Manner, and Scope of Confirmation Notices,
3  (V) Establishing Certain Deadlines in Connection with Approval
   of the Disclosure Statement and Confirmation of the Plan, and
4  (VI) Granting Related Relief (D.I. 4111, filed 5/16/21)

5
   7. Motion to Exceed Page Limitations with Respect to Certain
6  Insurers' Supplemental Objection to Motion for Approval of
   Debtors' Disclosure Statement (D.I. 6054, filed 8/17/21)

7
   8. Tort Claimants' Committees' Motion to Adjourn the Hearing
8  to Consider Approval of Disclosure Statement and Solicitation
   Procedures for the Fifth Amended Chapter 11 Plan of
9  Reorganization for Boy Scouts of America and Delaware BSA, LLC
   (D.I 6222, filed 9/15/21)
10
   9. Motion for Leave to Exceed the Page Limits Regarding
11 Debtors' Amended Omnibus Reply in Support of Debtors' Motion
   for Entry of an Order (I) Approving the Disclosure Statement
12 and the Form and Manner of Notice, (II) Approving Plan
   Solicitation and Voting Procedures, (III) Approving Forms of
13 Ballots, (IV) Approving the Form, Manner, and Scope of
   Confirmation Notices, (V) Establishing Certain Deadlines in
14 Connection with Approval of the Disclosure Statement and
   Confirmation of the Plan, and (VI) Granting Related Relief
15 (D.I. 6250, filed 5/16/21)

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  Good afternoon, counsel.  This

2    is Judge Silverstein.  We're here for the continued

3    disclosure statement hearing on Boy Scouts of America,

4    case number 20-10343.  Turn it over to debtors'

5    counsel.

6            MS. LAURIA:  Mr. Abbott, you're muted.

7            THE COURT:  Mr. Abbott, I'm not hearing you.

8            MR. ABBOTT:  Sorry about that, Your Honor.

9    I guess I muted instead of unmuting.  So again, Derek

10   Abbott of Morris Nichols here for the debtors.  Your

11   Honor, we -- we wanted to just sort of organize a

12   little bit at the beginning of the hearing if we

13   might.

14           From the debtors' perspective, Your Honor,

15   there are, I think, four things that we need to do,

16   you know, between today and maybe sometime next week.

17   The first is, obviously Your Honor expressed an

18   interest in hearing some limited discussion on the

19   confirmation issues as a -- as a preview, I guess.

20   Second, we -- we obviously need to -- to work through

21   the voting and solicitation procedures that were

22   proposed.

23           The third thing, Your Honor, is to talk

24   about a schedule to get to confirmation, assuming that

25   the Court ultimately approves the disclosure

1  statement.  And the fourth is just a final review and

2  -- and -- and final getting Your Honor to call balls

3  and strikes on whatever remaining disputes there are

4  on the disclosure documents.  The parties are

5  currently in -- you know, began last night, and I

6  think we'll be working today and probably through the

7  day and -- and evening to -- to get those documents

8  squared away.

9        It makes sense to the debtors, Your Honor,

10  that that final check of the documents probably occur

11  Tuesday or Wednesday.  Ideally, we would -- we would

12  ask the Court for whatever Your Honor can give us on

13  Tuesday with some spillover Wednesday, if needed, just

14  for that final document discussion.

15        The other two things that we think are

16  critical today are -- are the -- obviously the voting

17  and solicitation but then, also, Your Honor, to

18  address scheduling to get to confirmation.  The reason

19  we think this is critical today, Your Honor, is that

20  the debtors have proposed a schedule, and Mr. Kurtz

21  and will go into greater detail on it.  You know,

22  candidly, we don't expect that it will be uniformly

23  embraced, Your Honor, so we thought that some early

24  discussion would be good.

25        Today is important to us, Your Honor,

1   because that proposed schedule has some things that

2   start to happen in the next few business days of next

3   week -- or early next week.  So we thought it would

4   make sense to touch on that.  Again, I think Mr. Kurtz

5   will drive the train on that when -- when it's time.

6   But those are at least the debtors' thoughts and

7   priorities, Your Honor, for -- for what it's worth.

8   And obviously, we stand ready to procedure however the

9   Court wishes.

10          THE COURT:  Thank you.  Those things were

11  all on my list.  I would like to start with -- and I

12  -- and first of all, I do agree that any, you know,

13  review and discussion of the disclosure statement

14  documents should happen next week so the parties have

15  an opportunity to review them.  And I did ask Ms.

16  Johnson this morning to take a look at my next week,

17  and I will consult with her during a break so that we

18  know exactly what is available.  I would like to start

19  with voting and solicitation.

20          MR. O'NEILL:   Great, Your Honor.  Good

21  afternoon.  This is Andrew O'Neill, White & Case, on

22  behalf of the debtors.  I guess I drew the -- the

23  short straw or the long straw, depending on your point

24  of view, and get to address these issues.  Before I

25  jump in, I would just like to thank Your Honor, again,

1  for accommodating us over these last couple of days

2  and then stay again.  It's been a bit of marathon, and

3  that's on the heels of your -- your marathon Monday in

4  the Imerys case, which I suspect we'll hear about

5  today.

6          I just want to let you know we're grateful

7  for your time and your role in this to forge ahead on

8  solicitation while we, you know, parallel path, iron

9  out the disclosure fixes and -- and augment that

10  document that we've discussed with Your Honor over the

11  last couple of days.

12          You know, usually I'm accustomed to

13  solicitation procedures being a little bit of an

14  afterthought.  I think most people on this, you know,

15  hearing probably feel the same way.  But -- but

16  obviously given what -- what happened on Monday and --

17  and what you instructed us last night, you know, that

18  -- that's different in this case, and we understand

19  and appreciate your focus on these issues.

20          With -- with that, Your Honor, you know, I'd

21  just like to say, you know, although I wasn't involved

22  in the Imerys hearing, and I know that others on this

23  -- on this hearing will have been directly involved, I

24  think we have a handle and understand some of the

25  issues that are bothering Your Honor based on that

1   hearing and some of the issues that have arisen in

2   that case.

3        All that said, we do think and -- and we'd

4   like to tell you about -- and I'll tell you about some

5   of the major differences between our case procedurally

6   and the solicitation materials in our case.  And --

7   and by that, I mean that I'm -- mostly mean the proof

8   of claim process here, Your Honor, and the master

9   ballot before you, which is fundamentally different

10  than the master ballot in a couple respects from

11  Imerys.  It has additional certifications and

12  protections.

13       You know, we -- we know, though, that Your

14  Honor has been putting a lot of thought into this, as

15  well, when -- whenever you have some time in your

16  schedule, given -- given the hearings this week.  And

17  -- and you may have suggestions for us, and we're

18  ready to listen.  So I -- I'm -- first and foremost

19  I'd like to -- to offer that.  So you can stop me at

20  any point if there are things that you want to suggest

21  to us based on your review of the solicitation

22  procedures.  And I don't often open a hearing with

23  that --

24       THE COURT:  Don't worry.

25       MR. ABBOTT:  Yeah, okay.  Good.  You won't

Page 12

1    disappoint me, it sounds like, which is great.

2    Because this is very important, Your Honor.  We want

3    to get this vote right.  The estates have been waiting

4    a long time to send out materials.  And, you know, I

5    don't want to be presumptuous, but -- but we think we

6    have a confirmable plan, obviously, that provides a

7    lot of values to -- a lot of value to survivors and to

8    other creditors in these cases and also continues the

9    vital mission of the BSA.

10              And we -- we want to get this solicitation

11    started.  I think you even said that yesterday or the

12    day before.  So once we've made these revisions to the

13    DS, you know, in a -- in an agreeable fashion, we want

14    to get these packages out.  It's a complicated case.

15    As you know, there's over 82,000 unliquidated

16    nonduplicative abuse claims.  We need to solicit those

17    folks in a way that -- that makes sense and -- and is

18    not overly burdensome on the estate, but -- but also

19    protects the estate from any fraud or -- or misdoings

20    that -- that some may wish to undertake.  So we think

21    we can do that.

22              So what I would like to do, Your Honor, is

23    start with a little background on some of the earlier

24    case milestones that sort of impact the solicitation

25    and have impacted our procedures and how they have

1   been developed, some of the clay we have to work with

2   here, if you will.  And then I'll describe some of the

3   critical features of the procedures in the master

4   ballot from the debtors perspective and -- and how we

5   think they'll help insulate the integrity of the vote.

6         After that, you know, probably sadly to you

7   or some on the phone, I'll jump back into our handy

8   110-page chart to address the remaining solicitation

9   objections.  But -- but I think in this case, it'll

10  only be the last ten pages or so.  So that's how I

11  plan to proceed, Your Honor, but if -- but if you'd

12  like to -- to do something differently, please let me

13  know.  I'd -- I'd be happy to --

14         THE COURT:  That's fine.

15         MR. ABBOTT:  Okay.  Fantastic.  So, Your

16  Honor, unlike many asbestos cases or asbestos and talc

17  in the Imerys case, we did have a bar date established

18  in this case, as Your Honor well knows.  May 2020, our

19  date order was approved, setting November 16th as the

20  date for abuse survivors.  And you approved a

21  customized proof of claim form to use for -- with

22  special confidentiality provisions for the submission

23  of those claims.

24         Pursuant to the bar date order, the debtors

25  conducted a multi-million dollar advertising program

Page 14

1   involving TV, print media, and others that was

2   designed to reach the maximum number of men over the

3   age of 50, which is the primary target audience.  We

4   think we reached over 95 percent of those men.  During

5   the claim's filing period, Your Honor, the TCC filed a

6   motion to -- to supplement the bar date order to

7   clarify the admissibility of electronic signatures.

8   The debtors did not oppose this relief.

9          However, the -- on September 30th, the

10  coalition filed a motion to revise the bar date order

11  to permit the authority for attorneys to sign claim

12  forms on behalf of abuse survivors.  We -- we did

13  oppose that relief.  However, that was permitted and

14  also clarifying that electronic signatures were

15  permitted.

16         Unlike cases with no bar date, like Imerys

17  and like so many of the asbestos cases where any party

18  purporting to have a claim could vote, here only

19  claimants that there is a proof of claim on file on or

20  before the bar date can vote.

21         As Your Honor know, these proofs of claim

22  all contain three serious requirements or penalties, a

23  certification that I have examined the information in

24  this sexual abuse survivor proof of claim and have a

25  reasonable belief that the information is true and

1    correct, a declaration under penalty of perjury that

2    the foregoing statements are true and correct, and a

3    potential penalty for fraudulent claim of up to

4    $500,000 or imprisonment for up to five years.  Those

5    are heavy, heavy requirements and penalties, Your

6    Honor.

7              As of the November 16 bar date,

8    approximately 82,500 unique timely filed abuse claims

9    have been filed by abuse survivors on account of

10   sexual abuse.  This number is now approximately 82,200

11   after accounting for withdrawals.  Importantly, Your

12   Honor, I think it's important for the Court to know --

13   and we checked with our claims agent Omni last

14   night -- that, as you probably suspect but -- but

15   maybe didn't know, there have been a significant

16   number of amendments to these claims in the

17   intervening months since the Bar Date.

18             Specifically, there have been approximately

19   24,000 total amendments, and that includes

20   approximately 17,000 amendments since February 16,

21   2021, which is the -- the date that the last of the

22   declarations of Mr. Schiavoni's proof of claim

23   evaluators were -- were filed.  And of course, the

24   amendment standard being what -- what it is in

25   Delaware, there are more amendments coming all the

1  time, and we expect there to be significant amendments

2  all the way up until, you know, the -- the -- the

3  confirmation hearing.  So, Your Honor, that sets the

4  table on the bar date.

5          There -- there's also been other activity in

6  this case.  And I won't belabor this, but -- but, you

7  know, I think it's important because in this context,

8  there's going to be evidence presented about, you

9  know, handwriting experts and proofs of claim and what

10  they're missing or we're missing or -- or, you know,

11  lazy or nefarious -- call it what you will --

12  signatures that have been affixed or -- or printed or

13  photocopied.

14          But much of this is -- has already been -- I

15  hesitate to say litigated -- but has been brought

16  before this Court in the 2004 and 2019 context.  And

17  as Your Honor, you know, obviously knows, the -- the

18  2004 motion seeking to serve discovery on a sampling

19  of actual claimants, and what we're worried about here

20  are the claimants, not necessarily the attorneys and

21  the aggregators because I think, as Your Honor

22  identified, you've looked back and although, you know,

23  other case have -- have, you know, identified issues

24  with the attorneys and aggregators, no one has really

25  prevented somebody from voting because of their --

1   their -- the way their vote was called or the way it

2   was produced by their attorney.

3           But in any event, there -- there has not

4   been 2004 discovery on -- on the claimants.  We do

5   know that -- that Your Honor obviously approved some

6   of the 2004 with respect to certain claims aggregators

7   and then ordered the 2019 statement to be filed by the

8   Kosnoff firm.

9           Your Honor, after the bar date in service of

10  this solicitation, the debtors endeavored to create

11  what we call the solicitation directive.  And the

12  important part about the directive was -- was to get

13  back in touch with the attorneys for these 80,000-plus

14  abuse claimants and try to figure out a way to -- to

15  solicit in an effective and administratively efficient

16  manner, and then the best way to get those folks, the

17  claimants, the actual voice to vote.

18          On the bar -- or on the proof of claim form,

19  rather, Your Honor, there was an ability for the

20  claimant to note its law firm and -- and to accept or

21  to allow the debtors to communicate with their law

22  firm.  And the debtors did that through the directive

23  to ask what their preferred mode -- mode of

24  solicitation would be.

25          Just as a note, the directive also went out

1  to some claimants where the communications with the

2  firm box was not checked, but in those instances in

3  order to respond on behalf of the claimant, the law

4  firm was required to submit written verification of

5  their authorization from the abuse survivor client to

6  receive the solicitation package on his or her behalf.

7         Those directives, Your Honor, specifically

8  asked if they would prefer to receive a direct ballot

9  or receive -- on behalf of their clients -- or receive

10  a master ballot to vote on behalf of their clients in

11  one centralized document.

12         The directive requested that the law firms

13  voluntarily informed the debtors of their preference,

14  and many firms did.  Importantly, Your Honor, because

15  I think this will come up later in the context of

16  whether or not a 2019 is now required for a firm to

17  vote its master ballot.

18         These directive did themselves contain,

19  actually, pretty extensive certifications.  Among

20  other things, the directive certification provided

21  that by signing below, I hereby certify that I have

22  authority under law and I have duly valid and

23  enforceable authorizations to vote to accept or reject

24  the plan on behalf of my abuse survivor clients in

25  accordance with my firm's customary practices.

1               Further, it provides I represent each of the

2     abuse survivor clients set forth on the Excel

3     spreadsheet that lists the claim numbers' names,

4     mailing addresses, emailing addresses, and other

5     information regarding my survivor clients that I have

6     received from the solicitation.

7               So Your Honor, it provided more, as well,

8     but I won't continue to read from the certification.

9     But the point is that that directive was sort of an

10    intermediate step for the -- the estates to liaise

11    with these firms that represent the clients and try to

12    understand and confirm that they represented this

13    group of clients and that they would prefer to vote

14    via master ballot.

15              THE COURT:  Mr. O'Neill, is that -- is that

16    certification on file -- the format, the template for

17    the certification on file with the Court somewhere?

18              MR. O'NEILL:  Yes, Your Honor.  It is.  And

19    I'm getting a docket cite.  Oh, it's Exhibit 11, Your

20    Honor, to the order.

21              THE COURT:  Okay.  Thank you.

22              MR. O'NEILL:  Sure, and I -- you know, happy

23    to have you read along or you can read at your leisure

24    without me having to belabor it on the Zoom vid.  So

25    I'll continue going -- do you want to go over it, Your

Page 20

```
 1   Honor?  I'll wait.

 2            THE COURT:  I don't recall seeing it, but

 3   obviously, I'm reading a lot of documents.  But the --

 4   but what you're telling -- is what you're telling me

 5   that the -- that these certifications have already

 6   gone out and been filled out and been returned?

 7            MR. O'NEILL:  Correct, Your Honor.  Yes.

 8   This happened back in April.  And just to clarify one

 9   point, if the directive went out and did not come

10   back, the debtors will be sending direct ballots to

11   those claimants.

12            THE COURT:  Okay.

13            MR. O'NEILL:  So meaning if the firm was

14   unable to certify to these things, their clients are

15   going to get direct ballots, and they can send them

16   in.

17            So Your Honor, one of the effects of that is

18   that working with Omni, the estate has been able to

19   utilize this information to help support and validate

20   the master balloting process.  And as a result, we

21   plan to send a total of approximately 19,000 direct

22   abuse claim solicitation packages instead of

23   approximately 82.200, which, depending on where we end

24   up with Mr. Buchbinder later on the form of packaging,

25   in any event, it saves the estate significant money.
```

1   But if we have to mail hard copies, we're talking -- I

2   can't do the math in my head, but millions of dollars,

3   if not tens of millions of dollars.

4          So Your Honor, so moving to solicitation and

5   what we're asking for from Your Honor today, we filed

6   disclosure statements, as people have been wont to

7   point out over the last couple days, and rightfully

8   so, as well as four versions of the solicitation

9   procedures order and related materials, including the

10  version currently before the Court.

11         While the plan and DS (phonetic) have

12  evolved significantly, as you might suspect, the

13  solicitation procedures, in large part, have remained

14  the same, especially the versions filed on July 2 and

15  last week.  There were very few changes, but we've

16  provided red lines to these documents, and they're in

17  your document binder under Exhibit B, and that begins

18  at Page 244 of the PDF numbering to the extent you

19  want to reference the documents.

20         The voting procedures and forms of nonabuse

21  claimants are standard for nonabuse claimants, Your

22  Honor, and have raised a couple of objections that are

23  kind of catch-all objections from the U.S. Trustee's

24  office.

25         But given the nature of the survivor claims

1   pool, as Your Honor well knows, we're stuck with some

2   special procedures for that class, just in order to

3   deal with 80,000-plus unliquidated claimants and how

4   to solicit a group that large with -- with little

5   visibility on the actual claims.  So we've -- we've

6   done what most debtors in this position have done, but

7   we've added a few critical tweaks.  And I'll -- I'll

8   walk through those with you, Your Honor, just to --

9   just to give you an idea.

10          First, as noted above, we submitted a

11  voluntary directive intended to streamline the

12  transmission of the solicitation information.  Not

13  only has this put us in a position to solicit more

14  effectively and -- and administratively more

15  efficiently, but it created another layer of defense

16  to confirm which of these firms represents the

17  claimants.  It took the proof of claim information,

18  put it to these firms, and they had to certify that

19  there were willing to vote on behalf of those folks.

20          Second, given the -- the large number of

21  abuse claimants represented by counsel, we're -- we're

22  going to use the master balloting process.  And this

23  is typical.  But beyond that, it's important here to

24  give the number of claimants administrative

25  convenience and -- and also, Your Honor, our ballot --

1   our master ballot is not typical.  You know, I'm not

2   going to sit here and tell you everybody's done this,

3   so we need to do this.  That -- that may or may not be

4   true, but in fact, we're using a master ballot that's

5   a little bit different and unique in a good way.

6           First of all, it's specifically tied to the

7   claimant's proof of claim that that firm -- that are

8   those firm's clients.  So the Excel spreadsheet that's

9   attached has a specific dropdown for each client, you

10  know, to vote in the release election and the

11  expedited election.  And then a law firm must fill out

12  this box for each client.

13          And second, there will be a claim number for

14  which a claim has been submitted under penalty of

15  perjury for each claim on the exhibit that is mailed

16  to each law firm, along with claimant name, last four

17  of Social Security, and month and year of birth.  Law

18  firms will not be able to add claimants to the master

19  ballot.  This is not an ad hoc process, Your Honor,

20  were a firm goes through its files and pulls out, you

21  know, 2,000 new claimants so it can juice the vote.

22  That can't happen here.  It's -- it's based on the bar

23  date and submission of proofs of claim.

24          And, you know, as I alluded to earlier, Your

25  Honor, in our certification section -- and we -- we

1   can talk about whether this is beefy enough -- but we

2   have eight certifications rather than the three that

3   were on the Imerys master ballot.

4           And -- and if Your Honor would like, we can

5   turn to them now.  But I'll -- I'll just submit to you

6   that this includes a robust additional collection of

7   representation regarding representation, the

8   collection of ballots, and the authority to vote on

9   the plan.  The plan is defined as the plan, so it

10  means our plan.  And a representation that the

11  disclosure statement has been provided to that abuse

12  survivor client.  I think you'll find, Your Honor --

13  and we don't need to read through them together

14  with -- with all these, you know, folks on the hearing

15  and on the call -- but I think you'll find that

16  they're materially different and improved.

17          THE COURT:  Let me ask -- let me ask a

18  question, Mr. O'Neill.  I do have the certifications

19  and acknowledgements in front of me.  I happen to be

20  looking at the clean copy.  I realized after I started

21  I wasn't working at -- looking at the red line, and I

22  can find that if that's what other people have been

23  looking at.  But -- and I'm specifically looking at

24  the master ballot for Class A, direct abuse claim

25  master ballot.  And I think I have a couple of

Page 25

1  questions before the certifications, but with

2  respect --

3          MR. STANG:  Your -- Your Honor?  Your Honor,

4  could you tell us the docket number you're looking at

5  so we can all pull it up?

6          THE COURT:  Yes, I --

7          MR. STANG:  Because some of us have the red

8  line up.

9          THE COURT:  I'm at Document 60 --6215.

10          MR. STANG:  Okay.  Sorry to interrupt.

11  Thank you, Your Honor.

12          THE COURT:  That's okay.  Thank you.  6215,

13  I'm in dash 1.

14          MR. STANG:  Got it.

15          MR. O'NEILL:   And if you're on the red

16  line, you're in dash 2.  Sorry -- sorry to interrupt,

17  Your Honor, but that might be helpful.

18          THE COURT:  And I'm on Page 116 of 240.

19          MR. O'NEILL:   Okay, Your Honor, would you

20  like me to highlight the -- the --

21          THE COURT:  Let me ask -- let me ask some

22  questions.  I'm just making sure everybody has time to

23  get to it.

24          MR. O'NEILL:   Got it.

25          THE COURT:  I don't --

Page 26

 1          MR. O'NEILL:   Sorry.

 2          THE COURT:  Good for y'all that can do that

 3    on computer.  The -- and I do think it's an important

 4    distinction that you've raised that in Imerys, I did

 5    not have the benefit -- or some may say not benefit,

 6    but I didn't have the benefit of a bar date order, so

 7    I didn't have a universe of claims in front of me,

 8    regardless of what you think of those claims.  I

 9    didn't have a universe of claims in front of me.  And

10    so we were in situation where the master ballots went

11    out to law firms, and -- and law firms were -- well,

12    the number of claims that they -- that they returned

13    was a stranger -- a stranger basically to the Court,

14    in terms of what number they -- they returned on their

15    ballots.

16          So there certainly was less clarity about

17    what -- where -- how ballots were generated and the

18    source and the basis for the claims on those ballots.

19    So I -- I do acknowledge that that's quite frankly a

20    material difference.  I really do think it is a

21    difference.  And let me ask a couple of questions with

22    respect to the certification.

23          First question I have is it's -- it says

24    the -- the -- the prefatory language is, by signing

25    this master ballot, the undersigned certifies on

```
 1   information and belief that the following statements

 2   are true and correct.  And some of these statements --

 3   maybe all but at least some of these -- I don't think

 4   should be on information and belief.  I think -- not

 5   the way I think of it as a pleading kind of -- how you

 6   would use that in a pleading.  Some of these things

 7   are true or they're not true, and they're -- and they

 8   should be able to be validated, the easiest one, for

 9   example, seven: I've provided the disclosure statement

10   in hard copy, flash drive, or electronic format to my

11   abuse survivor clients.

12           The attorney did that or didn't do that and

13   can verify that.  And I recognize maybe his assistant

14   did it or something, but nonetheless, I think that's

15   something that should not be on information and

16   belief.  That's the statement.  They did it or they

17   didn't do it.  And actually, I like the fact that they

18   had to do it, so I appreciate that.  The abuse

19   survivor may be overwhelmed by -- by getting that

20   document, but I think that's appropriate.  So --

21           MR. O'NEILL:   And -- and we -- we --

22           THE COURT:  -- I'm wondering what -- the

23   base -- why -- do we need information and belief?  And

24   on which one of these do we need information and

25   belief?
```

1          MR. O'NEILL:   I think we're -- the debtors

2   are prepared to just strike that entirely, Your Honor,

3   and not monkey with which of it applies to -- what

4   does it apply to and what doesn't it apply to.

5          THE COURT:   Okay.   The -- another question I

6   have, then, with respect to what this certification

7   could be -- and quite frankly, I'm up to hearing

8   discussion about it because I haven't had to think

9   through these issues before.

10          To the extent -- and -- and I have

11   conflicting views on this.   Should this certification

12   be made as an Officer of the Court?   These are being

13   made by attorneys.   As an Officer of the Court

14   pursuant to -- let me say it this way.   Should it be

15   expressly made -- these certifications be expressly

16   made as an Officer of the Court pursuant to and

17   subject to all applicable rules of professional

18   conduct that any attorney may be subject to?

19          And the reason I'm asking this is because I

20   think those kinds of statements convey to the signer

21   the seriousness with which this document is being

22   signed and reminds the signer -- and let me say right

23   here.   I do not believe every attorney perhaps needs

24   to be reminded.   But it reminds the signer of the

25   import of what they're signing.

1          And on the other hand, I could make the

2    argument that when the attorney is signing for the

3    client, they are acting as the client, not necessarily

4    as the lawyer.  And therefore, I think that has

5    ramifications in terms of down the line discovery

6    or -- or subjecting yourself to questions that your

7    client would have to answer.

8          So I'm -- I'm throwing it out there.  I

9    recognize you don't realize what questions I'm going

10   to ask.  But it -- the thought I had as I read this as

11   to the capacity in which the lawyer, employing the

12   master ballot, is certifying -- and in this instance,

13   I do think he's certifying as a lawyer and perhaps

14   should be reminded of the seriousness of which I would

15   take such a certification.

16          MR. O'NEILL:   And -- and, Your Honor, I --

17   my reaction to that is, if that is what Your Honor

18   thinks -- or rather, if that would make Your Honor

19   more comfortable with our process and the eradication

20   of any fraud or bad behavior, then I think that the

21   estates would be comfortable with that, that the

22   debtors would be comfortable adding language to that

23   effect.  I -- I -- I understand entirely your thrust

24   here, which is to put some more seriousness behind it

25   so you're not just signing something.  You're doing it

1  as an Officer of the Court, and the expectations of

2  that weight of being an Officer of the Court are

3  therefore on you when you sign this.

4        I -- I -- I think it's a -- it's sort of a

5  middle ground between making this subject to penalty

6  of perjury.  And, you know, I think this could be an

7  appropriate middle ground.  Obviously, we're happy to

8  hear from others if anybody thinks it's inappropriate,

9  but seems to me that Your Honor has been contemplating

10  this since Monday, and it's not coming out of the blue

11  on this -- this call, so --

12        THE COURT:  Yes, but contemplating this

13  since all of Monday and -- the other way to look at

14  it.  So I don't know if this has been done in any

15  other circum -- any other cases.  Again, whether it

16  has or hasn't is not influential, necessarily.  But

17  it's a -- it's a thought I had.

18        MR. O'NEILL:   I mean --

19        THE COURT:  I don't know if any others have

20  thoughts on this and want to weigh in or not.

21        MR. STANG:  Your Honor, I have my hand --

22  it's Mr. Stang.  I have my hand up.

23        THE COURT:  Mr. Stang?

24        MR. STANG:  Your Honor, we are definitely

25  living in a post-Imerys hearing world.  There's no

1  doubt about it.  And this order with -- with all due

2  respect to everyone on this call, was done with some

3  maybe less awareness of some the problems that can

4  arise in these situations.  Certainly, for me this --

5  what happened in Imerys at the hearing that I -- we

6  represent -- we have representation of Imerys.  While

7  I wasn't on the call, Ms. Grassgreen participated in

8  the hearing, and I heard about it in details.

9           I think the word that stood out from all of

10  Mr. O'Neill's presentation was integrity.  We have got

11  to be sure that the process has integrity, but as

12  important -- and this is critical to Mr. -- Dr.

13  Kennedy, Mr. Humphrey, and the seven other committee

14  members.  This will be probably the only instance,

15  other than maybe the proof of claim process, where a

16  survivor can truly say, I have been heard.  This is --

17  this is the time.  This is probably the last time in

18  this case where they will be able to have -- speak

19  their own voice.  And so integrity is really

20  important.

21           And so I think the highest standard -- I

22  mean, I didn't hear you say Officer of the Court as

23  some kind of middle ground to penalty of perjury, the

24  way Mr. O'Neill stated it, but we should have layer

25  upon layer upon layer here.

1          And I want to make one thing absolutely

2     clear.  While the TCC opposes this plan, this has

3     nothing to do with my comments on the first day about

4     mass tort lawyers and what impact it may have on the

5     case.  This is about survivors.  And we need to be

6     sure that whoever is submitting a master ballot using

7     a process that does not bear that client's signature

8     on the ballot has every level of protection that their

9     voice is being accurately heard.

10          So I have lots of comments on the

11     certification part, Your Honor.  I will hold back on

12     that, but as for this Officer of the Court, applicable

13     rules of professional conduct, thumbs up, thumbs up.

14     Penalty of perjury, thumbs up.  This has got to be

15     rock solid as we can make it as far as the

16     certifications are concerned.  Thank you, Your Honor.

17          THE COURT:  Thank you.  Mr. Schiavoni?  You

18     need to unmute.

19          MR. SCHIAVONI:  So I'm not quite sure how

20     you intend to proceed here.  I thought you were going

21     to hear proponents of the form of order and then

22     opponents of it.  I mean, I'm happy to proceed on this

23     line-by-line however, but --

24          THE COURT:  Well --

25          MR. SCHIAVONI:  -- I would like to be heard

1    at some point in a --

2           THE COURT:  Of course.

3           MR. SCHIAVONI: -- (inaudible) way.  And --

4    and I'd like to make a proffer of evidence, and I'd

5    like to offer evidence, also, as part of that, so --

6           THE COURT:  We'll get to that, and, you

7    know, that's a good question about exactly how this

8    part should proceed.  But I will absolutely give you

9    an opportunity to speak.  I'm throwing out some --

10   some thoughts out there.  And I realize that some

11   people have question -- all types of issues with

12   respect to voting, and we're going to get to those.

13          MR. SCHIAVONI:  So let me, then, take your

14   invitation and just comment on this, on whether or not

15   -- you know, Your Honor, I did sit through and listen

16   to Tom Bevan's testimony.  I know Tom Bevan from other

17   matters, and we've read his prior depositions from

18   other cases.  You know, I don't know how you could

19   listen to -- well, let me put it differently.  My case

20   --

21          THE COURT:  Let's be careful because he's

22   not here.

23          MR. SCHIAVONI:  That's -- that's fair

24   enough.  That's fair enough.

25          THE COURT:  Okay?

1           MR. SCHIAVONI:  I think -- here we -- here's

2    my concern, without making it specific to him, but

3    it's -- it's, like, I think that there are -- there

4    are lawyers who think that there's nothing wrong at

5    all with what they did.  And that the description that

6    we sort of heard when you asked him about, you know,

7    what was done to vet the claims, and his -- and the

8    responses we got about, well, all I needed was sort of

9    a thought that it was possible we had a claim, if you

10   remember that as part of the vetting.

11           And then it was even looser than that, a

12   sort of good-faith sort of basis for it.  And then

13   questioning about, well, gosh, did you get any, you

14   know, conflict waivers?  And it's like, no, of course

15   not, okay?

16           Does anyone think really that the

17   certification would have changed the vote from that

18   fellow?  I -- it -- you know, or not -- not with

19   respect to him personally, but does Your Honor -- I

20   think you have to sit back and think about this, about

21   whether or not fundamentally self-certification to a

22   lawyer who's going to take 40 percent as -- as part of

23   a locked-up coalition, you know, of the money here

24   wasn't going to change anything.

25           It's, like -- you know, Your Honor, as part

1   of the, you know, the decision about -- and the advice

2   Your Honor gave to the parties about how they should

3   sign the proofs of claim.  Your Honor admonished folks

4   that the proofs of claim should, you know, really be

5   signed by the claimants.  Your Honor was going to

6   allow attorneys to do it, but if they did it, they

7   were admonished on the record that, like, they really

8   needed to vet the claims.  And you have the evidence

9   before you on what happened.  Does -- you know, you

10  can -- you can put belt and suspenders on the

11  certification, but if it's -- at the end of the day,

12  it's a self-certification that doesn't allow any

13  testing by the Court.  Does it get us anywhere?  Does

14  it change anything?

15          THE COURT:  It's a fair question.  It's a

16  fair question.  Then the -- the situation might be do

17  we allow master ballots at all, but the -- I'm not

18  sure what the in-between position is, but I hear that.

19  I hear that, and it's a fair question, and something

20  I've thought of.  And that's why I'm having this

21  discussion because I thought of this since all of

22  Monday, okay?

23          MR. SCHIAVONI:  I think this --

24          THE COURT:  And I'm not sure what exactly to

25  do with this.  So --

Page 36

1           MR. SCHIAVONI:  (Inaudible).

2           THE COURT:  -- Mr. Rose -- oh, I'm sorry.

3           MR. SCHIAVONI:  I'm sorry, I thought

4    yesterday Your Honor was half maybe suggesting or

5    maybe I'm reading too much into it that the history of

6    these master ballots and, you know, I think, you know,

7    it is true that they've been used in mass tort cases

8    for some time.

9           There's been a couple of cases where the --

10   those issues were tested, not as broadly as here, to

11   be clear, and when I get an opportunity to make my

12   overall presentation, I'd like to talk about those.

13   But the real background on this is that this process

14   sort of start, like, it was used by indentured

15   trustees --

16           THE COURT:  Um-hum.

17           MR. SCHIAVONI:  -- you know, who have --

18   it's an entirely different kind of background where

19   they have --

20           THE COURT:  Right.

21           MR. SCHIAVONI:  -- you know, a contractual

22   obligation, you know, delegated authority, and they

23   would, like, the practice was for them to use master

24   ballots.  And it was picked up, you know, by some here

25   in some of these mass tort cases and used, and then,

1  there were some challenges to it.  But there, you

2  know, there has not been a court that's looked behind

3  it.

4           I don't know that there's any precedent for

5  someone trying to change their vote so that it would

6  kind of reveal kind of what was happening or

7  precedent, frankly, for what we have here as far as,

8  you know, the evidence on the proofs of claim.

9           So yeah, you are going to hear me argue that

10  master ballots should not be used here or at least not

11  used in particular circumstances.

12           THE COURT:  You're back, okay, I'm sorry.  I

13  was frozen there for a bit.  I don't know if everybody

14  else was or not.  I'm familiar generally with master

15  ballots in the context of indentured trustees, with

16  master ballots in the context of shareholders, equity,

17  a proxy fight in CD and Co (phonetic) and that kind of

18  thing.  I don't know how they got imported.  I'm sure

19  some enterprising mass tort lawyer said, here's

20  something we can use to help in a particular case.

21           But I hear the point.  I'd like some others'

22  thoughts on it.  I will say sort of connected to this

23  whole idea, especially in a situation where there's

24  actually going to be, if this ballot is approved, a

25  party can elect into a $3,500 settlement, in essence,

Page 38

1    of their claim.

2            That's a whole other level of complication

3    here, to make certain that the client understands that

4    they've settled their claim and that the lawyer has

5    authority to settle their claim for $3,500.  And I

6    recognize, again, people have issues that, but to

7    throw things out there, that, to me, is another level

8    of complication to this.

9            MR. SCHIAVONI:  Your Honor --

10           THE COURT:  (Inaudible), oh.

11           MR. SCHIAVONI:  Yeah, just, you know,

12    another that's -- and you'll hear me talk about this,

13    but another thing that flows into is the fact that the

14    voting bloc for which the master ballots are really

15    going to be used, the attorneys' fees are being -- are

16    embedded in the plan, so that the -- it creates, I

17    think, a conflict between the lawyers and their voting

18    clients.

19           You heard Mr. Molton yesterday talk about

20    what's in his letter, but I think he came at it from

21    the wrong side because his retention letter, if you

22    remember, went out to the Coalition, all their

23    clients, okay?  And you know, they claim there's,

24    like, 50,000 of those clients.  Most of them, the vast

25    bulk of them, affirmatively opted out of retaining Mr.

1   Molton.

2           So it's like the statement in the letter,

3   retention letter, that says you may seek a substantial

4   contribution claim, that could bind the actual

5   technical Coalition members, but there's a relatively

6   small number of those.  I forget whether it's 14 or

7   17,000 is the claim.  The bulk of them affirmatively

8   opted out, so now, we have the debtor putting that in

9   the plan, encouraging -- and it's pretty clear, it's

10  to lock up the votes of the voting Coalition members

11  to deliver this vote that they're talking about.

12          And when we objected to the fees in

13  connection with the RSA we set out for Your Honor, we

14  gave you all the case law about the conflict that

15  poses, really, for a lawyer, you know, when he has a

16  direct self-interest in something -- to inject that

17  into the balloting, it does inject yet another level

18  of complication for the Coalition to use master

19  ballots.

20          THE COURT:  Mr. Rosenthal, you've had your

21  hand up for a while.

22          MR. ROSENTHAL:  Thank you, Your Honor.

23  Michael Rosenthal of Gibson Dunn on behalf of the AIG

24  companies.  Your Honor, I want to address the specific

25  question you raised.  And while I don't think my

```
 1    answer is directly on point, I think by analogy it may

 2    be.

 3            I fully support that these certifications

 4    should be -- either as Officers of the Court or more

 5    appropriately, I think, under penalty of perjury.  We

 6    have some examples of this in the asbestos context.

 7    You know, the Court may know as the case law has

 8    developed as the years have gone by that courts

 9    hearing asbestos cases, including your colleague,

10    Judge Cary, when he was on the bench, you know, have

11    insisted on fraud prevention measures to prevent

12    fraudulent claims from being asserted.

13            Now, that was not in the context of voting,

14    but it was in the context of asserting claims against

15    trust.  But I think it has the same impact.  Those

16    fraud prevention measures include certifications, but

17    they also include audit rights, and they include the

18    ability to hold a lawyer to account for filing claims

19    that are inappropriate.

20            And it is that last mechanism that causes, I

21    think, the lawyers to pause before they submit claims

22    that they don't believe are appropriate or that they

23    don't have support for.  And that's, you know, that

24    panoply of fraud prevention measures is what Judge

25    Cary ordered in the Miramonte case.
```

Page 41

1          THE COURT:  Miramonte?

2          MR. ROSENTHAL:  Um-hum.  And what have been

3   ordered in any number of cases dating to the original

4   case that set this up was the Garlock case out of the

5   Western District of North Carolina.  So I offer that,

6   and I think that here requiring that does make these

7   lawyers stand back and have certainty or at least

8   investigate these claims enough to be able to say,

9   yes, I'm entitled to both these claims.  I'm entitled

10  to make the election because I've spoken to my client

11  about it.  I am committing them for something.

12          THE COURT:  I'm aware generally of Miramonte

13  and the issues that the United States Trustee and

14  others have been raising in the various cases.  And I

15  assumed this was an issue we would get to with respect

16  to TDPs.  I do wonder whether there's something we can

17  borrow from it to put in the ballots.  And I don't

18  view the fact that this issue was not something I drew

19  attention to specifically at proof-of-claim time,

20  although I do recall admonishing lawyers of their

21  responsibilities in signing the proof of claim.

22          I don't consider, you know, the horse out of

23  the barn.  This is another -- this is another step,

24  and I think we should impose appropriate admonitions

25  here.  And I want to say, again, particularly because

1   I know I have members of the plaintiffs' bar on this

2   Zoom cast, and I'm not impugning the integrity of any

3   particular plaintiff's lawyer, and I don't want to

4   suggest that I'm doing that.

5           I'm addressing an issue that I've not had to

6   address before and, quite frankly, haven't really seen

7   in my 35 years of practice of how we should be

8   handling the ballots, particularly in this master

9   ballot situation where we do have lawyers voting for

10  their clients.  And here, perhaps resolving a claim in

11  that very same vote.

12          MR. STANG:  Your Honor, just on that

13  element, there are retainer agreements that are on

14  file with the Court that -- some of which talk

15  about -- and I had put aside the certification that

16  was done earlier in the case, the retainer agreements

17  sometimes, and I had the authority to settle the case.

18          But we all know from the rules of

19  professional conduct that you have to consult with

20  your client regarding a settlement.  The client has to

21  have informed consent, and you know, this idea of the

22  $3,500 election, as you've pointed out, is a whole new

23  wrinkle.

24          Someone's got to talk to the client about

25  that.  I don't think you can rely on something that

1   was done in April -- I think it was April -- when the

2   $3,500 expedited payment wasn't even in most people's

3   constellations.  It certainly wasn't there at the time

4   of the execution of the retainer agreement.

5           So I think you're right.  The different

6   elections, be it 3,500, the releases, whatever after

7   check-the-boxes are going to be, adds a complication

8   on the informed consent aspect of this.

9           THE COURT:  Mr. Smola?

10          MR. SMOLA:  Thank you, Your Honor.  I just

11  wanted to give the Court plaintiffs' lawyers'

12  perspective on this for just a moment.

13          THE COURT:  Um-hum.

14          MR. SMOLA:  This plan and the impact of a

15  yes vote is significant.  It potentially compromises

16  that individual's rights against a local council.  It

17  potentially compromises that individual's rights

18  against a charter.  It presumably turns down an offer

19  of $3,500.  All of these things have to be conveyed

20  under all of the rules of ethics to every client, and

21  it needs to be signed off on by every client.

22          And it's particularly important in this case

23  because a yes vote from a victim doesn't just impact

24  that victim.  This court's going to be deciding issues

25  involving non-consensual third-party releases.  So

1   those yes votes, that consent, and the integrity of

2   that consent is absolutely critical.

3          So I would endorse every possible mechanism

4   this Court seeks to employ to ensure the integrity of

5   the vote.  Thank you, Your Honor.

6          THE COURT:  Thank you.  Okay.

7          MR. GOODMAN:  Your Honor.  Do you see my

8   hand up?

9          THE COURT:  Oh, I'm sorry, Mr. Goodman.  I

10  hear you.  There you are.  Okay.

11         MR. GOODMAN:  Thank you, Your Honor.  Eric

12  Goodman, Brown Rudnick, on behalf of the Coalition.

13  Your Honor, I would just like to state our

14  understanding as to how this is supposed to work so

15  there's no ambiguity on these issues.  And before I

16  even get into that, I did want to correct a statement

17  that Mr. Schiavoni said earlier, and I've heard him

18  say this several times, and it is not true that, you

19  know, tens of thousands of clients represented by

20  Coalition firms affirmatively opted out of being part

21  of the Coalition.  That is false.  You know, to my

22  knowledge, I'm not aware of any "opt-outs."  You know,

23  so I just wanted to correct the record on that point.

24         Your Honor, if you look at the master ballot

25  solicitation method, there are really two parts of it.

1   I don't know if the Court has -- what you have in

2   front of you.  I'm looking at Docket number 6215-1.

3   This is on Page 7.  It's Section 5A, and

4   notwithstanding my tendency as a draftsman to go from

5   number to letter to number, there's a 5AA in the whole

6   and then a 5AB.

7           As Coalition counsel, I'm really not

8   terribly focused on 5B.  That's the provision that

9   would have firms claiming that they have authority

10  under applicable law to vote.  I'm actually --

11          THE COURT:  Sorry, Mr. Goodman.  I'm not

12  following you.  You're in document 6215-1, and what

13  page are you on?

14          MR. GOODMAN:  I'm on Page 24 of 240.

15          THE COURT:  Ah, in the -- I got you, Page

16  24.

17          MR. GOODMAN:  Yeah, I just want to

18  correct --

19          THE COURT:  Okay.

20          MR. GOODMAN:  -- I think there's a -- so I'm

21  looking at 5AA.

22          THE COURT:  Um-hum.

23          MR. GOODMAN:  And it's --

24          THE COURT:  I have AA, yeah.

25          MR. GOODMAN:  Yeah, and that's -- I'm

1   actually not terribly thrilled or concerned about B.

2   I'm much more focused on A.  From our perspective, the

3   master ballot solicitation method permits law firms

4   to, first, find out from the client how they want to

5   vote.  Second, cast the votes based on that direction

6   as provided by the client.  Third, report that vote on

7   a master ballot, and then, submit the master ballot to

8   Omni.

9           Under these procedures, Omni is to send the

10  disclosure statement package to each law firm, but

11  each law firm must transmit and make those materials

12  available to the client.  The client decides how they

13  will vote.  The language in 5A, which describes the

14  master ballot solicitation method, states that each of

15  the survivor shall have indicated to the firm his or

16  her informed decision on such vote.

17          That's something we added.  That's something

18  the Coalition insisted on.  Unless a firm has clear

19  authority to vote on behalf of its abuse survivor

20  clients, and I'm not saying any do, each survivor must

21  communicate to his or her firm how he or she is

22  voting.  And the votes must be cast in strict

23  accordance with the client's instructions.

24          The Coalition firms will recommend that

25  their clients vote yes, but -- and I want to be very

1    clear on this -- we will not and do not guarantee that

2    100 percent will vote yes.  There have been multiple

3    filings in this case where the Coalition has stated

4    that it would use reasonable efforts to advise and

5    recommend.  You've seen phrases like meaningful and

6    informed participation on voting decisions.  That's

7    our language.  That came from us.

8            Survivors are entitled to make their own

9    decision.  I don't know how many times I have to say

10   that, and I will keep saying it.  Votes should be cast

11   based on the survivor's decision.  Now, why is this

12   important here?  We are trying to avoid

13   disenfranchisement.  When you make firms a voting hub

14   or a polling location, to use a modern analogy, the

15   result is a process that runs more efficiently than

16   any alternative that I have seen.  It works.

17           And we would not be here supporting

18   procedures if they were not efficient and if they were

19   not designed to be implemented in a way that would be

20   successful in this particular case.  We're trying to

21   use the best tools at hand.

22           If survivors have questions, and I think

23   almost all of them will, they can and they will

24   contact their attorneys.  And despite the time spent

25   on the disclosure statement, I must say, respectfully,

Page 48

```
 1    it's a challenging document for a layperson to
 2    understand and so may be the plan summary.
 3            I think a lot of the survivors here are
 4    going to look to their attorneys for help in figuring
 5    out what to do.  And when the Coalition firms say, as
 6    they have, that they support the plan and will
 7    recommend that their clients vote yes, that is real
 8    value in a mass tort case.  All of the progress in
 9    this case hinges on that.  The Hartford settlement,
10    the TCJC settlement, future settlements with insurers,
11    the plan architecture for chartering organization all
12    depend on survivors voting to accept the plan.
13            Otherwise, there can be no (inaudible)
14    injunction, and without that, this entire plan fails.
15    So we do want to use the best tools available, and we
16    also know that if and when we get to plan
17    confirmation, dissatisfied parties, and I know there
18    are a number of them who are here today, are going to
19    object, and they may challenge the vote.
20            We understand that going in.  You would have
21    to be crazy not to, and we know that this has to be
22    done right.  We know that every I has to be dotted, we
23    know that every T has to be crossed, and we expect
24    that this will be an issue at confirmation.  And we're
25    going to be prepared for it.
```

1          Last point I want to make, Your Honor, there

2   was a bar date in this case as Mr. O'Neill noted at

3   the beginning of his presentation.  The proofs of

4   claim here were filed under penalty of perjury, and

5   those claim forms make it abundantly clear that the

6   claims asserted are for sexual abuse.  They're not

7   generic claims.

8          And I will note that many, many of the

9   amendments that Mr. O'Neill mentioned that have been

10  filed since February were filed to add clients'

11  signatures to the claim form.  I think it's premature,

12  frankly, for any party to be challenging votes at this

13  stage or even bringing up that issue for the simple

14  reason that we don't know who is going to show up and

15  vote.

16          Even in cases with very, very robust voter

17  turnout have never seen 100 percent tort victim

18  participation.  And if past events are any indication

19  of future events, I would expect that the survivors

20  that put the most time, the most effort into

21  completing the claim forms are the ones that are the

22  mostly likely to vote.  That is true in most mass tort

23  cases, and I have no reason to expect a different

24  result here.

25          I'm happy to answer any questions the Court

1  may have, but we feel very strongly that solicitation

2  procedures like these are necessary, extremely helpful

3  in a case like this, and you know, these are things

4  that should be done with the utmost integrity.  And

5  anyone who's suggesting otherwise, I respectfully

6  disagree.  Thank you.

7            MR. O'NEILL:  Your Honor, this is Andrew

8  O'Neill, I seemed to have started a cavalcade of sort

9  of opening statements, and I would like to get back to

10  my presentation, if we could do that.  And I, you

11  know, if Your Honor, you know, wanted to continue to

12  talk about the certification, that's fine, but it

13  seems like we'll get to it in other parts of the

14  discussion when we get to some of the objections.  So

15  if I could continue, Your Honor?

16            MR. STANG:  Your Honor, in that regard, I

17  just -- you have not, I think, actually ever spoken to

18  my partner, Debra Grassgreen.  She would like the

19  address the Court on the issue of the use of master

20  ballots, and Ms. Grassgreen has the unique status that

21  she was a personal -- she was a creditor of PG&E.

22            Her home was burned down, and she can tell

23  you something about how master ballots worked in that

24  case and the experience of an actual fire victim as to

25  the master ballot process vis a vis her lawyer.  So if

1  you want to do that now, she's ready.  If you want to

2  put that off, I just want you to know that she'd like

3  to address the Court on that personal experience she

4  had.

5         THE COURT:  Well, Ms. Grassgreen, I'm sorry,

6  I thought Mr. Stang was going to say that your

7  experience was in some case.  I'm sorry it was as a

8  personal creditor of PG&E.  I will hear you.  I am

9  hearing -- because I did ask the questions yesterday

10  about the use of master ballots, and so I will

11  certainly hear you.  I will say that I've -- no, I

12  won't say that.  The -- but let me know because I

13  don't want to forget this.

14         I'm glad -- I'll ask Mr. Goodman.  I'm glad

15  Mr. Goodman referred us to paragraph 5AA because I

16  think the language in there is more -- and I do recall

17  reading it -- I think it's more -- it's phrased

18  differently than the certifications, and I think it's

19  actually helpful language.  And it may be that we can

20  take parts of that and use it, as well.

21         Ms. Grassgreen?  And then, we will get back

22  to Mr. O'Neill.

23         MS. GRASSGREEN:  Good morning, Your Honor.

24  Debra Grassgreen, Pachulski Stang, and, yes, my family

25  lost its home and my husband and my son were trapped

1   in the fire, so it's a pretty personal issue to me.

2   But the experience that I had with respect to a lawyer

3   who had multiple clients who had actually signed an

4   RSA in that case was not on the committee I think it's

5   just important to share so that we can figure out as

6   we go through this process how we communicate with the

7   clients of firms that have, you know, multiple

8   clients.

9           Because what happened to me was that I

10  opposed the plan in PG&E.  I voted against it, but I

11  had an attorney who had signed an RSA and agreed to

12  recommend it and not oppose the plan.  So I was in the

13  situation where I had a lawyer who could not take my

14  instructions.

15          Now, I was unusual because I was involved in

16  the case, and I understood the case, and I'm an

17  experienced bankruptcy lawyer who's appeared before

18  Judge Moncalli (phonetic) many times, and I was able

19  to represent my own family's interests individually.

20          But -- and an unsophisticated client who is

21  a client of a lawyer who makes a recommendation, how

22  are we going to communicate to them what do they do

23  and how the lawyers are going to deal with that

24  ethical problem.  It wasn't addressed in PG&E, and

25  what happened in PG&E was there were lots of clients

1  who voted yes, voted no, but if they had the same

2  lawyer, there was a conflict, and their voices weren't

3  heard.

4        My voice was only heard because of who I am,

5  so I just wanted to share that experience with you.  I

6  mean, it happened to me, you know, and I called my

7  lawyer, and my lawyer said I agreed not to oppose the

8  plan, and oh, if I oppose the plan for you, this

9  person, client, wants me to support the plan.

10        So how are we going to help survivors

11  understand that the decision isn't being made for

12  them, either in reality or effectively, because of the

13  master ballot process and because of the joint

14  representation.  That's what I wanted to share, that

15  particular personal experience.  It's a very difficult

16  one, Your Honor, but that's what happened to me.

17        THE COURT:  Well, I think there's a -- if I

18  heard you correctly, if you -- agreeing to recommend

19  the plan is not agreeing to deliver a yes vote.

20  That's how I view it.  And if a client instructed

21  their lawyer that their vote was no and their lawyer

22  refused to check the no box, I think that lawyer --

23        MS. GRASSGREEN:  So it's a different --

24        THE COURT:  -- has an issue.

25        MS. GRASSGREEN:  My vote was accurately

1  recorded as a no vote.  It's not the voting, but I had

2  an objection to the plan.  I had an objection.  And so

3  the clients, somehow we need to, under the appropriate

4  rules of professional conduct, make sure that they

5  understand that just because they're part of a group

6  that's represented by one lawyer, and it doesn't --

7  this isn't at all unique to the Coalition.  It's

8  unique -- it's for any lawyers that are representing

9  multiple clients -- that if they --

10          THE COURT:  Right.

11          MS. GRASSGREEN:  -- want them to raise an

12  objection, if they disagree with the recommendation,

13  that the lawyer may not be able to represent them in

14  that disagreement.  I think that's the concern and how

15  do we communicate that.

16          MR. STANG:  Your Honor, I would add that in

17  the RSA, which I acknowledge has expired, but I have

18  no idea what the agreements are between the FCR, the

19  Coalition on the issue.  The RSA had a specific

20  negative -- two negative covenants.  One was the firms

21  could not object or take any other action to interfere

22  with the acceptance of the plan and could not solicit

23  approval or acceptance of, encourage proposed file,

24  any vote that was for anything other than the admitted

25  plan.

1           So it's not just the recommendation part.

2  There were negative covenants in the RSA.  And again,

3  I don't know what the terms are of whatever agreement

4  that now exists between the Coalition and the FCR and

5  the debtor, but it was in the original RSA.  Thank

6  you, Your Honor.

7           MS. GRASSGREEN:  And it may be as simple,

8  Your Honor, as in the communications that go out to

9  survivors to explain to them that if your lawyer is

10  representing more than one survivor and those clients,

11  some want to support the plan and some want to oppose

12  the plan, you may have to get a different lawyer.

13           I mean, I don't know what else you can say,

14  but I don't think an unsophisticated survivor would

15  understand that.  I understood it, obviously, I'm not

16  your normal victim in a mass tort case.

17           THE COURT:  Okay.  Thank you.  This raises

18  issues that are not unique to the mass tort case.

19  Every lawyer who's ever had multiple clients has

20  conflict rules to work through and issues to work

21  through with respect to multiple representations,

22  hopefully worked out in the beginning of the

23  representations, but I have -- and lawyers have their

24  state law ethical duties.

25           Whether I can be -- and I think I cannot --

1    be the personal guarantor that every client has chosen

2    the right lawyer and that every lawyer is respecting

3    their professional obligations is something that I

4    said probably at other points in this case and

5    certainly in other cases that there are state law

6    rules, there are disciplinary council, there's all

7    kind of structures surrounding that.

8              So I have to give this some thought.  I

9    think we've talked about this as much as we can.

10   Let's move on, see what other issues we have, and I

11   will be giving all of this some thought, but I, of

12   course, appreciate what I'm hearing on this call,

13   which is that each individual survivor's vote needs to

14   be appropriately reflected in a ballot, counted

15   appropriately.

16             And what I'm going to be giving thought to,

17   and I'm sure it's going to come up in other aspects of

18   this, is can we take a vote so that at confirmation,

19   challenges of whatever nature people want to raise,

20   there's an ability to do so and have a vote that we

21   can look at to apply those challenges to.  So that's

22   what I'm trying to think about, as well, as we go

23   through this process.

24             For example, there is challenge to the

25   $3,500 expedited distribution and questions about

1   whether that is going to sway the vote and whether it

2   should.  Well, we're going to know the answer to that

3   question when we get the vote and whether the votes of

4   the survivors who choose the $3,500 distribution swing

5   the class.  We'll know that.  There are things we can

6   know once we see the vote and who's voted.

7             There may be -- and that's what I'm thinking

8   about.  Is there a way that at confirmation, if people

9   are going to challenge the vote, that we have the

10  information necessary to answer the questions that

11  will arise?  So I'm thinking about that, as well, in

12  connection with how the vote goes out and the

13  information that we ask for in the ballot.

14            I'm going to go back to Mr. O'Neill.

15            MR. O'NEILL:  Thank you, Your Honor.  And we

16  agree with much of what you said, and you'll hear me

17  actually iterate that, I think, throughout this

18  discussion.  You know, there are a lot of things that

19  people have raised that we just don't believe are a

20  today issue or are a front-end solicitation issue.  It

21  might well be a back-end issue with the voting report

22  or, you know, a matter of slicing and dicing the

23  information in connection with confirmation

24  objections.

25            We think we are position to do that at that

Page 58

1  point, but again, our theme is we would like to begin

2  the solicitation, and we have procedures in place,

3  including the master ballot, which allow us to do

4  that.  Mr. Goodman hit on this, but remember, it's the

5  claimants that gave us the ability to contact their

6  law firms and have their law firms select the method

7  of voting.

8            We are pro-suffrage, we are also wanting to

9  do this the right way, but we acknowledge that people

10  get to choose how they want to vote.  So we're trying

11  to sort of juggle all those balls, Your Honor, and I

12  think we've done a good job as we'll discuss.

13           So I don't want to set off another round of

14  discussion with this very talkative crew on the

15  certifications at this point.  I just -- my last point

16  on the certifications is that it has a built-in audit

17  procedure for the debtors to require a power of

18  attorney or other written documents be provided to the

19  debtors.

20           So you know, and we talk about this, Your

21  Honor, but perhaps, you know, we can use that on the

22  backend to, you know, just double check in a couple

23  instances what, you know, what certifications have

24  been made and if there's a valid authorization for the

25  attorney for be voting.

1           So Your Honor, in sum on my opening remarks,

2    I think the debtors submit these procedures are

3    appropriate and protective given the unliquidated

4    claims pool that we're dealing with in this case.  And

5    again, I think what we've provided in our procedures

6    are the only way that we are going to get to

7    confirmation on the schedule that we've proposed.  Our

8    schedule is typical in these matters.

9           Again, you know, there's an objection on

10   that from the TCC, though I'm not sure it's live, I'm

11   not sure what their objections are, given their

12   involvement in the RSA.  But it seems that there may

13   be some.  So in any event, with that, Your Honor, what

14   I'd like to do, and my idea was to sort of imitate

15   yesterday's hearing and the day before where we go

16   through this chart and discuss the outstanding

17   objections because that seemed like a fairly orderly

18   way to do it.  And although I'm, to be completely

19   candid, a little bit loathe to have multiple people

20   jumping in, I guess, you know, that's the process by

21   which we can do this.

22           I know Mr. Schiavoni noted before that he

23   has some evidence that he would like to proffer or

24   other evidence that he will be providing.  The main

25   Century objection, Your Honor, comes at sort of the

1   end of the chart, which is to say that they have some

2   other objections, but number 67, which is kind of at

3   the very end of the chart, I think we probably could

4   wait until then for the evidence to come in and you

5   know, we'll see what happens when the evidence does

6   come in.

7            I think we'll have something to say, and

8   others might, as well.  Or we could do it now, at the

9   front end, and just get it out of the way and then

10  move into the objections.

11           THE COURT:  Why don't we go through the

12  chart.

13           MR. O'NEILL:  Very good.  Okay.  Thanks,

14  Your Honor.  So the first -- and it's number 60 on my

15  master chart, that's page 107.  And you'll see the

16  title is solicitation procedures master ballot

17  procedures.  That may sound a lot like what we've just

18  been discussing for the last 45 minutes, but in fact,

19  it's more specific than that and tailored.

20           The main thrust of this objection is that

21  there's a problem with ballots -- master ballots being

22  submitted by the same firms that have the same

23  plaintiffs on them.  And we actually have a procedure

24  that deals with this, Your Honor.  First of all, it's

25  not likely to happen very much, just given the way

1   that we've designed the master ballot where specific

2   proofs of claim will be provided on their attachment

3   with the ballot that they actually get to vote.

4            But in the event there is overlap and

5   there's a conflicting vote that Omni will do research

6   on the proofs of claim, they'll go back and double

7   check everything.  And in the event that that's not

8   sufficient, then they will require both firms to show

9   proof that they actually represent that client and

10  have the authority to make the vote.

11           And based on that, the debtors will be able

12  to determine which is the valid vote.  To the extent

13  that we can't, the vote will not count.  So that's the

14  procedure.  We think it's the best way to proceed in

15  these limited instances where there'll actually be a

16  conflicting vote.

17           Really, the other objection under this

18  category, Your Honor, it's actually from Century but

19  it's not going to implicate the evidence is that we

20  forfeited the obligation to police the solicitation

21  process.

22           I think that's probably a general comment.

23  It sounds familiar from what we've heard.  But this

24  isn't specifically with respect to requiring the last

25  four digits of the Social Security number.  That

1   actually is a part of the ballot in an attachment to

2   the ballot.  So we are requiring that.

3          The next objection, Your Honor, on the chart

4   --

5          THE COURT:  Well, let's wait, and let's see

6   if there are any further outstanding objections with

7   respect to those two issues.

8          Mr. Stang?

9          MR. STANG:  Your Honor, I'm not sure if --

10   the way this is broken up, the objections, I'm not

11   quite sure when to address paragraph 5A because it

12   contains a number of things.  I have some very

13   specific comments about the exact wording of 5A, and

14   you know, some -- I'm just not sure which pigeonhole

15   that would fit into as we go along.  But if you want

16   me to go through 5A, there are about three or four

17   things I would comment on.  They don't go to whether

18   or not there should be a master ballot.  We're past

19   that one.

20          THE COURT:  Mr. O'Neill, does 5A fall

21   anywhere within here or the order fall anywhere within

22   here?

23          MR. O'NEILL:  I'm not aware of what that

24   objection would be.  We haven't seen any language from

25   Mr. Stang, so I'm not sure what exactly he's referring

1   to.

2          THE COURT:  Okay.  Why don't we put at the

3   end of this the form of order?  And that way,

4   everybody can comment on whatever issues they have

5   with the form of order.

6          MR. O'NEILL:  Very good, Your Honor.  And it

7   sounds like the form of order, which will approve the

8   solicitation procedures hopefully, and will have some

9   emendations or something with respect to language in

10  certain sections.

11         MR. STANG:  Yeah, I guess it's -- Your

12  Honor, it's actually a solicit -- 5A is in the

13  solicitation procedures, which is an exhibit to the

14  order.  I just have comments on 5A.  Whenever it's

15  time for me to make those specific comments, I'll do

16  it.  I just --

17         THE COURT:  Well, I went through the form of

18  order and the solicitation procedures, and I've got

19  some markups, too, so we're going to get to that.

20         MR. STANG:  Okay.

21         THE COURT:  So that will be the time when

22  everyone can comment on the form of order.

23         MR. STANG:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25         MR. O'NEILL:  Thank you, Your Honor, and I

Page 64
1  apologize to Mr. Stang and the Court.  There was one

2  more sort of objection in this category, and that's

3  just a timing issue, which is that if there are

4  duplicative votes on master ballots, that the parties

5  have 14 days instead of 10 days to resolve the

6  dispute.

7          And the reason it's 10 days rather than 14,

8  Your Honor, is that 14 is the entire amount of time

9  that Omni is going to have to generate its report.  So

10  there needs to be some time on the backend to just do

11  the final product.  I'm not even sure that Mr. Stang

12  is pursuing that anymore, again, but it is here on the

13  chart, so I thought I --

14          THE COURT:  Is that an issue for anyone?  I

15  don't hear anything.  Let's go to the next issue.

16          MR. O'NEILL:  Great.  So the next category

17  is called solicitation procedures proposed dates and

18  timelines.  Again, I think I just don't know if the

19  TCC is pursuing this at this point.  But certainly,

20  the U.S. Trustee's objection here that Labor Day is

21  implicate and therefore, it's not a good schedule is

22  mooted at this point, sadly.

23          So the thrust of the TCC objection, Your

24  Honor, was that 43-plus days that we've afforded for

25  people to vote is not enough.  We certainly think it

1  is.  Again, most of the population of voters will get

2  substantially more than the 43 days, up to -- well,

3  I'm looking at my colleague, but 50 or so.  In any

4  event, we don't think additional time is necessary.

5           And again, as Your Honor knows, and I'll

6  come back to this siren song again, is that we need to

7  get this going and our schedule is tight.  So that's

8  why we're doing this on the schedule we're doing.  But

9  also footnote that and say this is a completely normal

10  solicitation period.

11           THE COURT:  Mr. Schiavoni?

12           MR. SCHIAVONI:  So Your Honor, this -- I

13  will come back to this when we get to make our general

14  objections, but if you just think about this for a

15  second as a practical matter, okay?  The Coalition

16  firms, which are locked up in this bloc to vote, many

17  of them are very small firms with only three or four

18  lawyers, but they have thousands and thousands of

19  claims.

20           In the 2004 motions, we brought this out

21  about just, like, temporally, how they were voting

22  hundreds of claims a day and how putting aside, you

23  know, the testimony we haven't obtained from those

24  lawyers yet, but just the impossibility of vetting the

25  claim in that period of time.

1          Apply that here to the use of a master

2     ballot, instead of individually just handing them each

3     ballot and express their views, they're going to poll,

4     you know, a firm with two or three lawyers is going to

5     poll thousands and -- like, 7,000 claimants in a

6     matter of 43 days and get their individual views.

7          I mean it just masks what's really going to

8     go on here.  You know, it's, like, the lawyers for the

9     Coalition are going to vote as a bloc.

10          THE COURT:  Mr. Rosenthal?

11          MR. ROSENTHAL:  Yes, Your Honor.  I don't

12     want to repeat what Mr. Schiavoni said, but I think

13     there are two issues implicated here.  One is the

14     schedule generally, and obviously, we want to talk to

15     you about the schedule generally.  We think that there

16     should be significantly more time allowed.

17          But I agree with Mr. Schiavoni that because

18     of the two-step process required in a master ballot

19     situation and all of the communications that have to

20     go between not just the debtor and the law firm, but

21     the law firm and each of it multiple clients and the

22     explanations and everything, this is why in a master

23     ballot situation, you generally give, you know, more

24     time in any event, and certainly in this particular

25     case, you would think that it would take quite a bit

1   of time for people to vote hundreds if not thousands

2   of claims in a master ballot format on a fully

3   informed basis.

4          THE COURT:  Mr. Stang?

5          MR. STANG:  Thank you, Your Honor.  I'm

6   looking at it from the perspective of actual

7   survivors, and while I appreciate Mr. O'Neill's need

8   for moving this case along, you know, if he'd listened

9   to Mr. Molton and me and Mr. Patton (phonetic) about

10  the original Hartford deal, the BSA wouldn't be in the

11  time crunch they're in.  But that's an aside the

12  point.

13         THE COURT:  You have the second point.

14  Let's move on and let's stay with the issues.

15         MR. STANG:  I will, but he keeps on invoking

16  it, so that's important to understand.  You have

17  untold numbers of letters from prisoners who have

18  explained to you the difficulties in getting mail and

19  sending mail out.  People should have as much as time

20  as is reasonable, and 60 days is reasonable.

21         Likewise, I am told by state court counsel

22  from time to time that their clients don't use email,

23  they use snail mail.  They can be hard to get ahold

24  of.  You've had some exposure already through the

25  letters to some of the communication issues that

1   survivors have.  We need to afford these folks a

2   reasonable period of time.

3          Just remember the mission of the Boy Scouts

4   and this case includes and fair and equitable

5   treatment of survivors.  We shouldn't for over 13 days

6   deprive those folks of an opportunity to make a

7   meaningful vote.  Thank you, Your Honor.

8          THE COURT:  Thank you.  This --

9          MR. O'NEILL:  Your Honor, understood, and

10  look, we understand Mr. Schiavoni's role here,

11  obviously, and Mr. Stang.  You know, we'll leave that

12  one alone, but I think, you know, part of this is what

13  the schedule's going to be.  Mr. Rosenthal is right,

14  and I think, you know, if we can keep it on the right

15  side of, in our view, 60 days, that would be best,

16  obviously, but we're willing to be flexible on this,

17  obviously, as it pleases the Court.

18         THE COURT:  Okay.  I was going to say, we

19  can consider this with the overall schedule, but I

20  will say, this is a complicated case, and counsel need

21  time to speak with their clients and for their clients

22  to have an ability to understand what they're doing

23  and determine their -- what their vote's going to be.

24         And I actually am aware of the prisoner

25  issue, as well, because I've noticed several of those

1    letters.  I'm not sure exactly how to do this to make

2    certain they all get the mail appropriately.  But I

3    think 60 days is probably more in the ballpark for the

4    additional time.  But we're going to consider this in

5    the context of an entire schedule.

6              And as for lawyers with small shops, they

7    took on the clients.  They're going to have to figure

8    out how to appropriately represent them.

9              MR. O'NEILL:  Thank you, Your Honor, and

10   agreed, they can work the phones, and we'll take this

11   up in conjunction with the scheduling.

12             The rest of the objections up until the U.S.

13   Trustee are in the order of sort of me, too -- the TC

14   wanting to get access or be part of the process when

15   votes are looked at for irregularities.  And we think

16   we've addressed all of these with language in the

17   solicitation procedures, but I'll defer to Mr. Stang

18   to see if they have any outstanding objections of this

19   ilk.

20             MR. STANG:  Your Honor, to the contrary.

21   There are a whole number of paragraphs that originally

22   had us, the Coalition, and the FCR having rights

23   regarding extension of deadlines to vote.  I mean I

24   can go through each subparagraph, but there was a host

25   of things that collectively the Plaintiffs' interests

1   and the debtor had to coordinate on, like, extending

2   the bar date, dealing with votes that seem to be

3   invalid.

4          And they changed all that to just being the

5   debtor.  So we can go through each subparagraph, but I

6   felt like they were trenched.  Maybe they have an

7   agreement with the Coalition and the FCR as to what to

8   do because they're now supporters of the plan, but I

9   thought it was actually retrenchment.

10          MR. O'NEILL:  Your Honor, I think what we've

11   defaulted to instead of parties participating in the

12   process is to make a voting report -- it available in

13   the voting report.  And then, I believe there are

14   notice provisions to be heard for parties on that

15   voting report.

16          But you know, this again, I think is

17   something we can talk about with Mr. Stang.  I think

18   that neither the TCC nor the Coalition nor the FCR are

19   directly included.  So that's currently the state of

20   play.

21          THE COURT:  The issue that this raises is

22   another issue I've been thinking about recently in

23   connection with solicitation procedures, which is how

24   much discretion should the plan proponent be given to

25   vary dates, extend deadlines, accept a late ballot,

1  permit withdrawal of a ballot, and what's the role of

2  -- and should the voting and the solicitation agent

3  be, like, a third party neutral, or is there some

4  advocacy, if you will.

5          And this was something that certainly became

6  highlighted, as well, in Imerys is how does a debtor

7  use their discretion?  Are they using it selectively

8  or not?  Are they using it to favor the outcome they

9  want?  And is it okay if a debtor does that, to

10  promote confirmation of a plan?

11          MR. O'NEILL:  So Your Honor, that's a great

12  question,  and I didn't articulate it well at all

13  before, but I think what I meant to say was what we

14  landed on is for full disclosure of these decisions in

15  the voting report, so that parties are put on notice

16  and can see what was done and it can be discussed

17  about, you know, discussed in an open forum.

18          So instead of going through the TCC and the

19  Coalition and others who obviously get the flavor on

20  this hearing, they're not going to agree on anything.

21  Maybe, hopefully, they will be by then, but at this

22  point, we don't know how a process could work with

23  that dynamic.  So instead we've decided to put it in

24  the voting report, and then, people can have at it.

25          And that's part of this back-end process

1   that I think Your Honor favors and is part of

2   transparency in this.

3          THE COURT:  I'm not sure if I favor it or

4   not.  I think that's where it ends up sometimes.  No,

5   front end would be better so that we're not dealing

6   with these issues on the back end.  But including it

7   in the report is a minimum, and I've required that

8   since I've been on the bench.

9          There are no undisclosed extensions,

10  decision-making, anything that requires discretion.

11  Nothing should be within the sole discretion of the

12  debtor.  Everything has to be subject to reporting and

13  court approval, if necessary.  Should others have an

14  opportunity to weigh in?  I don't know if it makes it

15  more or less difficult because each party's going to

16  weigh in.

17          Presumably if people are weighing in, it's

18  not neutral, it's not becoming neutral.  It's become

19  partisan, if you will.  Why should people disagree?

20  If someone wants to file a late ballot, what are the

21  reasons people are disagreeing over that?  It's

22  because it doesn't serve their interest.

23          So I'm not ready to cut it out because,

24  again, I haven't had the benefit of thinking this

25  through.  I don't know that I want every late-filed-

1  ballot issue coming in front of me.  I don't know that

2  that's an effective use of time or it needs to happen.

3  And so it's this balancing act, only becoming an issue

4  in -- well, this in particular, is it neutral or not,

5  is something I've been thinking about for well over a

6  year in different contexts.

7          But I shouldn't be solving a singular issue,

8  you know, with a sledgehammer.  It's not to procedures

9  and practices, and I recognize that.  So --

10          MR. O'NEILL:  And I'll add to that, Your

11  Honor, the sledgehammer, again, it's voting.  We don't

12  know what's going to happen or which of these issues

13  will be implicated.  That's part of the trick here,

14  and so the sledgehammer, you know, might be the wrong

15  approach, although I --

16          THE COURT:  Absolutely.

17          MR. O'NEILL:  -- take Your Honor's points

18  about, you know, certainly looking backwards with the

19  benefit of Imerys on parties' interests.  So I think

20  our proposed procedures do give that period for people

21  to come in and challenge what was done, and I think

22  that that's an appropriate way to do this, not that

23  Your Honor wants to deal with one-off issues, but

24  that's currently how it's constructed.

25          If there's a better mousetrap to vet that,

1  we can continue to think about that.  But we don't

2  think it's a free-for-all with 1,000 professionals

3  each looking at a ballot that came in, you know, for

4  some really good reason it was late, but it should be

5  accepted.  It's not a, you know, this is going to

6  make-my-case or kill-my-case issue that people, you

7  know, are thinking about it that way.

8          And again, that's why Omni in the first

9  instance has the decision-making on many of these

10  issues.

11          THE COURT:  Just want to make sure Omni has

12  a fulsome report as to what has -- votes they've

13  counted, votes they haven't counted, and why.  Any

14  extensions, anything that varies from the approved

15  process needs to be accurately reported.

16          MR. O'NEILL:  Understood, Your Honor, and we

17  will make sure that happens.  So Your Honor, -- oh,

18  Mr. Stang's hand.

19          THE COURT:  Mr. Stang?

20          MR. STANG:  Your Honor, I really appreciate

21  what you just said.  At the beginning of the case, we

22  had a little tiff with Omni because a certain

23  communication was included with the notice of the

24  commencement of the case that we thought was an

25  inappropriate communication by the debtor to

1   creditors.

2           And Omni informed me that in that

3   circumstance they were an agent of the debtor, and the

4   debtor told them to include the letter from BSA with

5   the notice of commencement of the case, and that's

6   what they did.  So they have a capacity where they are

7   working as your claims agent.

8           THE COURT:  They do.

9           MR. STANG:  I don't know if it's noticing

10  agent, claims agent where they said to me, we're an

11  agent of the debtor, and I pointed out they have

12  responsibilities as an entity doing the clerk's work,

13  if you will.  But I appreciate what you just said

14  because Omni needs to really understand that, you

15  know, they are not to be taking instructions from the

16  debtor in making decisions on this.  At least that's

17  my read on what you said.

18          THE COURT:  Well, that's the question.  So

19  it used be before there were claims agents, right,

20  that ballots went to the debtor, you know.  There's

21  this whole cottage industry that sprang up, but it

22  used to be ballots went to the debtor, and the debtor

23  reported.  And that's why I say when I've been

24  thinking about these issues, you know, is the

25  balloting -- I'm not sure that Omni is a -- is acting

1   in a clerk's capacity when it's doing balloting.

2           Think about it in the nonbankruptcy context,

3   in a proxy statement, right?  The company hires

4   somebody to do the balloting.  So I'm raising issues.

5   I'd love the benefit of thoughts people have.  I'm

6   really serious about that because I think these are

7   all issues that we've taken for granted over the

8   years, but then, occasionally, there is a problem.

9           On the other hand, if it's a singular

10  problem, I don't want to hit it with a sledgehammer.

11  But it used to be, of course, that ballots went to the

12  debtors.  They solicited, they reported, they

13  presumably made decisions that we maybe knew or didn't

14  know anything about.

15          Mr. Rosenthal?

16          MR. ROSENTHAL:  I'm sorry, Your Honor, I'm

17  very confused because I'm an old-time bankruptcy

18  lawyer.  You know, I don't understand why a voting

19  deadline doesn't mean a voting deadline, and ballots

20  that come in by the voting deadline get counted.  You

21  can -- we've always been able to change your vote, and

22  the last vote you make counts if it's in before the

23  voting deadline.  And then, why is that any different

24  from a bar date?

25          THE COURT:  Bar date.

1          MR. ROSENTHAL:  Yeah, you can file a claim

2     after the bar date, but you have to show some

3     excusable neglect.  You have to show some basis for

4     not getting it in timely.  I just think if you go away

5     from it -- look, I'm speaking more generally than

6     specifically on this case, but you asked for views.

7          THE COURT:  Um-hum.

8          MR. ROSENTHAL:  I think if you go away from

9     having a voting deadline that's a pretty hard

10    deadline, you're just asking for mischief because

11    people, you know, people end up saying, well, she's

12    not going to kick it out anyway, I'll file it, you

13    know, I'll file it five days before the hearing, or

14    I'll see what the general tendency is, and then, I'll

15    file something.  I think that's asking for more

16    problems than it solves.

17         THE COURT:  I think that's a fair point.

18         MR. O'NEILL:  I think it is a fair point,

19    and I think that is what we're proposing to solve for

20    with our voting report and having to account for what

21    that would be.  And I agree with Mr. Rosenthal,

22    generally, on late-filed claims.

23         So Your Honor, I think moving along from

24    that topic to the rest of the objections in this

25    section, 62.  There are some old objections from the

1  U.S. Trustee's Office that I believe are not -- no

2  longer live.

3          I'll let Mr. Buchbinder speak to that, but

4  we have been exchanging emails with his office on what

5  we understand to be his last couple of comments, and

6  one objection, which they will be pursuing, and it's

7  later in the agenda.

8          So I -- unless Mr. Buchbinder says

9  otherwise, I'll move on.

10          THE COURT:  Mr. Buchbinder?

11          MR. BUCHBINDER:  Thank you, Mr. O'Neill, for

12  letting me speak for myself.  One issue that I have

13  remaining here on number 62 was the Rudy Sweetwater

14  issue, and you can see what the debtor wrote in that

15  column, Your Honor, by revising it to be subject to

16  the entry of the confirmation order.  It's a minor

17  point, and if you want to punt it to the confirmation

18  hearing, I'll defer to your discretion.

19          THE COURT:  If it's really a confirmation

20  issue, let's push it.  I'm looking for it.

21          MR. BUCHBINDER:  It's the Rudy Sweetwater

22  issue.  We can do it now or we can do it later.  I'll

23  leave it to you, Your Honor.  And I doubt it will

24  actually be raised here as a practical matter.

25          THE COURT:  Well, do you want to remind me

1   what the issue is?  I'm sorry.

2          MR. BUCHBINDER:  The issue is if no one in a

3   class votes --

4          THE COURT:  Ah.

5          MR. BUCHBINDER:  -- (inaudible), the class

6   is deemed to consent to the plan.

7          THE COURT:  Yeah, isn't there language that

8   qualifies that, that if the plan is confirmed with

9   that in it -- I don't generally approve that in

10  advance.  You have to ask for it, and I thought there

11  was -- I thought I read language that said subject to

12  a confirmation order approving this.

13         MR. BUCHBINDER:  They revised it to that,

14  Your Honor.  If you're fine with that for today and

15  move it to the confirmation hearing, I'm fine, too.

16         THE COURT:  I'm fine with that today, and we

17  can move that to the confirmation hearing.  Thank you.

18         Mr. Patterson, I saw your hand was up.

19         MR. PATTERSON:  Thank you, Your Honor.  I'm

20  on the West Coast.  I'm three hours behind everybody,

21  but I just wanted to go back to the voting deadline

22  issue, and I'm looking at 6215-1 at page 33.  And this

23  is the order, and I guess we're ultimately going to

24  talk about the order and the procedures.  But I just

25  wanted to note that 6215-1, page 33, paragraph 8, and

1    --

2         THE COURT:  I've got that circled, yeah.

3         MR. PATTERSON:  Okay.  Then, we're going to

4    get to it, Your Honor.  I'll reserve.

5         THE COURT:  What's your concern, though?

6         MR. PATTERSON:  Well, it seems to me that a

7    change of vote, withdrawal, or modification should

8    really be pursuant to court order.  And the voting --

9    the request for confirmation can include a request for

10   deviations from the vote as tabulated by the voting

11   agent and the debtor can make its case why some should

12   be in, and some should be out, and why they should be

13   modified.

14        But to Mr. Rosenthal's point, I think, you

15   know, presumptively, we're using the voting deadline

16   as the voting deadline.  So that's my thought on that

17   one, Your Honor.

18        THE COURT:  Thank you.  Those are the words

19   I had circled in that provision, and Rule 3018 tells

20   us how to deal with -- actually, doesn't even say

21   after voting, but in my mind, I've sort of made that

22   line of demarcation, that you can do what you want

23   ahead of time, but afterwards, you shouldn't be able

24   to change it without coming to the Court.

25        MR. PATTERSON:  Right, and that's not -- and

1  with respect to changes that take place prior to the

2  voting deadline, I assume that the voting report will

3  also reflect that, but --

4           THE COURT:  It should.

5           MR. PATTERSON:  -- I agree with Your Honor.

6  It's where the votes lay at the voting deadline that

7  is presumptively the vote tabulation that the agent

8  provides.

9           THE COURT:  I think that's correct, and it

10 results in the least mischief, and parties just

11 shouldn't wait till the last minute to vote.

12          MR. O'NEILL:  We can make an appropriate

13 change to accommodate that, Your Honor.

14          THE COURT:  Thank you.  Mr. Schiavoni?

15          MR. SCHIAVONI:  Your Honor, I just wanted to

16 deal with this issue about the voting agent.  I mean I

17 do think you've got some visibility in sort of some of

18 the things that's happened with -- as this voting

19 agent cottage industry has developed, you know,

20 there's a lot of money behind it.  They're picked by

21 the debtors.  There's a lot of, you know, world series

22 tickets get exchanged and you know, lot of -- you

23 know, all that kind of stuff goes on.

24          But the main thing is the voting agents

25 have, you know, really feel beholden to the debtors

1   and they, you know, increasingly feel beholden to an

2   outcome.  They should be independent in how they're

3   handling things.  But whatever one's view is on that,

4   you know, transparency, sunlight is the answer to a

5   lot of things on this.

6          One particular issue here, you know, just to

7   show you where there's a problem is this whole sort of

8   like procedure to elect to use a master ballot, you

9   know, we wrote the debtor and said, gees, you know,

10  we'd like -- you know, and I think we separately may

11  have written Omni, saying, you know, we'd like to see

12  copies of, you know, the elections, particularly with

13  regard to AIS.

14         You know, Your Honor's aware that there's

15  particular concerns about AIS, with conflicting 2019

16  statements about it.  We had Mr. Kosnoff making public

17  statements that he controls those, you know, that

18  those votes should not be voted on a master ballot,

19  and we would have liked to have had those documents,

20  so we could have had an informed discussion here

21  about, you know, in a practical, direct way how those

22  decisions are being made.

23         Is someone like -- you know, it's the

24  largest single bloc of Coalition votes.  It shows up

25  in all of their representations that have been made in

1   connection with the LDS and the Hartford settlement

2   and the restructuring support agreement that one law

3   firm is going to deliver the entire group of those and

4   represents -- they represent all of them.

5           And you know, we've put before the Court

6   written statements by Mr. Kosnoff, granted in the form

7   of tweets about his views otherwise, but also in the

8   form of his 2019 statement on this, and you know,

9   we -- but we don't have the documents that would have

10  shed light on it, you know, the documents exchanged

11  with the voting agent, you know, with respect to that.

12          So I can't have an informed discussion on

13  that right now.  We could take from the Coalition how

14  -- what's the answer on that, how that's come down.

15  Are they are going to vote by master ballot or not?

16          MR. O'NEILL:  Yeah, Your Honor, first of

17  all, I just want to clear the record that Mr.

18  Schiavoni did receive those directives, so you know,

19  what you just heard is completely inaccurate and --

20          MR. SCHIAVONI:  No, we don't have the

21  responses from the Coalition.  We don't have, like,

22  Mr. Kosnoff's submission -- response, we don't have

23  that.

24          MR. O'NEILL:  My understanding is that you

25  do, Mr. Schiavoni.  So maybe there's some confusion on

Page 84

1   your end.

2        I think, Your Honor, what Mr. Schiavoni's

3   inadvertently done is led us into the next objection,

4   which is about the solicitation procedures directive.

5        THE COURT:  Okay.

6        MR. O'NEILL:  And you know, this was from

7   the TCC, and again, I'm not sure this is a live

8   objection.  I know we helped, or we worked with the

9   TCC to craft the directive, and they were involved in

10  that.  But maybe Mr. Stang has a different view.

11       THE COURT:  Mr. Stang, any --

12       MR. STANG:  Your Honor, I apologize.

13       THE COURT:  -- (inaudible) this?

14       MR. STANG:  Mr. Lucas, in my office, was

15  really involved in this, and I think he's going to

16  have answer whether we still have an issue with this.

17       THE COURT:  Mr. Lucas?

18       MR. LUCAS:  Yeah, I'm sorry, Mr. O'Neill,

19  could you state that one more time?  I apologize.

20       MR. O'NEILL:  Oh, sure, Mr. Lucas.  How are

21  you?  I was just saying that there's -- it could be an

22  old and cold objection from the TCC because I know you

23  all worked on the directive.

24       MR. LUCAS:  Yes.

25       MR. O'NEILL:  (Inaudible) indication of the

1   survivors' proof of claim or whether the debtor should

2   contact the debtor.  I think essentially -- well, hold

3   on, let me just read it carefully.  The debtors'

4   procedures involve an attorney solicitation.

5          It appears that you were objecting to the

6   directive, that -- rather than take the word of the

7   attorney on whether they should get the master ballot

8   on account of the claimant, we should go back to the

9   proofs of claim to review and see if they were one of,

10  I think, 95 percent that said they were represented by

11  counsel and wanted communications distributed to

12  counsel and defer to that for master balloting

13  purposes.

14         MR. LUCAS:  I believe that we worked that

15  out because I think that the default was that the

16  master ballot, along with the survivors who would be

17  listed on any master ballot, would be sent to the

18  attorney to the extent that the proof of claim

19  reflected that the survivor said that the attorney may

20  be contacted instead of the survivor.  So that is

21  correct.

22         MR. O'NEILL:  Right, that was sort of the

23  follow up.  Got it.  Okay.  Thanks, Mr. Lucas, for

24  clearing that up.  So I think, Your Honor, that that

25  answers that question.  I think -- I don't know if Mr.

1   Lucas or Mr. Stang, I still see Mr. Lucas loud and

2   clear here.

3          But the next objection --

4          MR. STANG:  Hold it.  If this was leading

5   into my objection, Your Honor, could we have an

6   answer, then, to is AIS voting on a master ballot or

7   not?  I mean putting aside the representation I've

8   been given the documents, which I can't find, but

9   it's, like, is AIS voting on a master ballot?  I mean

10  if you're --

11         THE COURT:  Well, I think that conversation

12  should take off offline.  I think it's -- I don't see

13  why there should be any lack of transparency over

14  which firms are going to use a master ballot.  Those

15  directives are there.  If Mr. O'Neill says they've

16  been shared, if you can't find them, share them again,

17  and let's find out.

18         But I don't know that that's something that

19  has to be here in the disclosure statement hearing.

20         MR. LUCAS:  Your Honor, this is John Lucas.

21  I'd just like to state for the record that the TCC

22  would like copies of the results from the directives.

23  If they were shared with others, the TCC would like

24  them, too, please.

25         THE COURT:  Again, it seems to me there's no

1   reason why they should not be shared.  If there's

2   confidential information in them, people can deal with

3   that appropriately as they have with other things, but

4   -- meaning the survivors' confidential information.

5           MR. LUCAS:  Well, for what it's worth, Your

6   Honor, you know, obviously, the TCC or the counsel to

7   the TCC, my firm, has full access to all the proofs of

8   claims.  We've seen the proofs of claims, and so with

9   respect to a survivor's name and all that sort of

10  stuff, you know, we have been authorized by the Court

11  to see all that information.

12          But obviously, if there's something else,

13  we're willing to discuss it.  We're not looking to get

14  an advantage, but we would like to see how the

15  directive process resulted or how it turned out, and

16  to make sure all the steps are being followed.

17          THE COURT:  Okay.  Again, I'm not sure

18  that's a disclosure statement issue, but you've heard

19  my views that I think -- I don't see a reason why

20  those directives would not be shared in an appropriate

21  way.

22          MR. O'NEILL:  That's fine, Your Honor, and

23  the debtors have no problem with that, obviously,

24  subject to the confidentiality issues you described,

25  which may not apply to Mr. Lucas and the TCC.  We're

1    obviously happy to share with Mr. Buchbinder at the

2    U.S. Trustee's Office and others.  So --

3              MR. SCHIAVONI:  But Your Honor, if I may, I

4    mean just most respectfully with regard to this, if

5    we're going to discuss what procedures are proper

6    here, isn't it directly illustrative of how they work

7    to know whether the largest bloc of votes here, which

8    is hotly disputed among their own lawyers in

9    conflicting 2019 statements, are going to be voted,

10   you know, under what's been already submitted as a

11   master ballot or not?  Because it'll give great

12   guidance on how this procedure's going to apply

13   otherwise.

14             THE COURT:  Why not, for purposes of your

15   argument you're going to make to me, just assume

16   they're going to vote by bloc and let's -- we'll talk

17   about it by master ballot?

18             MR. O'NEILL:  Your Honor, again, it's clear

19   that Mr. Schiavoni has some issues with the AIS.  And,

20   you know, he's got rights down the line to potentially

21   designate those votes, also.  So there are options

22   here, and we don't think it's indicative of anything

23   with respect to our general procedures and our form of

24   master ballot or the process to use master ballots.

25             So we can -- I'm sure he will talk about it

1   later in his larger presentation.  So I'd like to,

2   then, move along, Your Honor, if that's --

3          THE COURT:  That's fine.

4          MR. O'NEILL:  Thank you.  So Your Honor, the

5   next item on the chart is 64, and that is on page 111.

6   And this is -- is or was or still is from the TCC, and

7   it, I think, dovetails with a lot of what we heard

8   from Mr. Stang over the last couple days about

9   isolating information, about local councils, and

10  figuring out what the claim amounts are for particular

11  local councils.

12         Essentially, the objection wants us to, I

13  think, go out and try to research and find out for the

14  holders of proofs of claim that haven't listed their

15  local council, what that is for purposes of their

16  ballot, which, you know, as a general matter, we're

17  just -- we're not in a position to do that.

18         We had a proof of claim process.  It was

19  very fulsome.  The TCC participated, and you know, if

20  people didn't list a local council, they didn't list a

21  local council.  If that comes up later during the TDP

22  process, it can come up during that process, when

23  their claim is allowed and valued under the TDP.

24         But you know, to require additional work and

25  I'm not even sure what that work would be, short of a

1   new bar date or something along those lines, this is

2   inappropriate.  We also don't see any need, Your

3   Honor, to list local councils or do any upfront work

4   to try to segregate claims into different silos based

5   on local council.

6          So the ballot is a ballot for the BSA

7   bankruptcy case, and they are voting on the BSA

8   bankruptcy plan.  And so the Debtors are not inclined

9   to do anything with respect to the ballot in terms of

10  adding local councils or charitable organizations, for

11  that matter, which, I think, is another objection that

12  may be placed in a different category, but the same

13  argument applies.

14          THE COURT:  Mr. Stang?

15          MR. STANG:  Thank you, Your Honor.  This is

16  one of the important ones.  Certainly -- and Mr.

17  Patterson will have a lot of say about this, and I'm

18  not going to step on his agenda or -- I shouldn't say

19  agenda, his issues.  But the Debtor -- the proof of

20  claim form did ask for local councils.  I don't think

21  it asked for chartered organizations, but we think

22  that should be included, too.

23          I'm not asking the Boy Scouts to go out and

24  research my claim.  If I had put down my local

25  council, then, tell me which one it is.  But if

1   they're going to use preprinted ballots for people

2   with barcodes and all that kind of good stuff, they

3   could fill that in for someone.

4           From my perspective -- and we could, when we

5   get the claim  form, check my ballot against my claim

6   form to see if I did put down the local council.  But

7   it's really important to know the local council for

8   the creditor and the charter for the creditor.  Mr.

9   Patterson will explain to you why.

10          But as Mr. O'Neill has pointed out, there

11  have been lots of amendments.  I think he said there

12  were thousands and thousands of amendments.  We get

13  questions every day.  I have more information, do I

14  need to amend my claim now, when do I need to amend my

15  claim now.  So we don't know if everyone is sensitive

16  to adding more information than is necessary for the

17  best analysis of how the voting turns out.  This is

18  what Mr. Patterson's going to talk about.

19          So it's not a big -- I don't know why it's a

20  big deal to ask a survivor to put down the name of

21  their local council, if they know it, and to put down

22  the name of the chartered organization, if they know

23  it.  I am not suggesting that if I don't know the name

24  of my local council that my ballot doesn't count.  I'm

25  not saying that.  But for people where this has been a

1   -- I think someone sometimes uses the term iterative

2   process, and people are going up to the attic to find

3   the box to see if they have their Boy Scout card that

4   might have the name of the local council on it.  I

5   mean, people should be able to update the information

6   on something like this.

7           Now, Mr. Patterson, I think will --

8           THE COURT:  Okay.  I'm unclear -- I guess

9   I'm unclear.  I thought the objection was you wanted

10  the debtor to put information on the ballot.  Now, I'm

11  hearing you want the survivor to be able to put

12  information on the ballot it returns.  Which is it?

13          MR. STANG:  If the debtor -- I think it

14  would be simplest if the debtor knows the local

15  council information and if it is doing some kind of

16  individualized ballot that it should carry that

17  information over from Bates White (phonetic) and put

18  in on my ballot, so that it's clear.

19          I don't have to go take the ballot and go

20  check the proof of claim to see what my local council

21  is.  If they know it and they can technologically do

22  it, it would be a  nice gesture on their part of

23  include it, so that all of us, as we're looking at the

24  ballots from different perspectives, will have it

25  right then and there.

1            If they don't have the information because

2    it's not on the proof of claim, I'm not asking Mr.

3    O'Neill to go do a search for my local council, but if

4    that is already in their database, put it on.  If it's

5    not in their database, leave it blank, and let the

6    survivor fill it in, if the survivor, since the filing

7    of the proof of claim, which was November of last

8    year, has since discovered the name of his local

9    council.  That's what I'm asking for.

10           THE COURT:  And what's the import of that if

11   they do?  Let's say --

12           MR. STANG:  I --

13           THE COURT:  -- the proof of claim didn't

14   have that information, and now, the survivor has

15   figured it out or remembered, what's the import of

16   that?

17           MR. STANG:  I could tell you, but Your

18   Honor, this is something that Mr. Patterson it's near

19   and dear to his heart, and we share his views on this,

20   so could I kick it over to him?

21           THE COURT:  Yes.  Mr. Patterson?

22           MR. PATTERSON:  Thank you, Your Honor, Tom

23   Patterson for Zalkin and (inaudible) firms.  The issue

24   that we're talking about right now is kind of the

25   endpoint of a series of issues, not the starting

1   point, so that's why, I think, in part, your

2   discussion with Mr. Stang was somewhat awkward because

3   you're wondering why are we talking about this.

4            So here's our issue.  Because of the nature

5   of the BSA liability, we talked about this yesterday

6   with the exemplar claims and so forth, it is not a

7   situation like the standard mass tort case where I,

8   Tom Patterson, have a claim against the debtor, and in

9   the opioid case, all of the manufacturers of opioids,

10  because I took a bunch, and all of the drug stores,

11  because I went to CVS and Rite Aid and Walgreens and

12  so forth.  That's not this case.

13           What this case is is a survivor has a claim

14  against a local council, against a chartered

15  organization, and against the BSA.  So for purposes of

16  master mortgage, when this Court assesses whether or

17  not the release provisions are approved by the vast

18  majority of the affected creditors, the affected

19  creditors have to be, for those purposes, measured by

20  people who claims against a particular local council

21  or a particular charted organization.

22           And that's particularly true where they are

23  themselves being treated differently.  Local councils

24  are making different contributions, they have

25  different kinds of a liabilities, they have different

1   asset bases.

2          And so a creditor making a decision whether

3   to release the Orange County council is making a

4   different decision from the creditor in Ohio, who's

5   making a decision whether or not to release the

6   applicable Columbus, Ohio, local council that they

7   feel was responsible for the abuse they suffered.

8          And so our view is that this isn't a

9   classification issue, but our view is that when the

10  debtor tabulates the votes, when Omni tabulates the

11  votes, it's important that the report reflect the yea

12  or nay votes for the plan divided by the affected

13  local councils and chartered organizations, if

14  applicable.

15         And the reason for that is even more

16  significant because there are -- we talked about

17  Exhibit F yesterday, Your Honor.  Exhibit F was the

18  very long report that had the unique and timely claims

19  and the non-barred unique and timely claims.

20         THE COURT:  Yes.

21         MR. PATTERSON:  That was at Docket 6213,

22  page 369.  And I think the debtor was doing to -- the

23  Court had some modifications to that report.  I

24  believe it was going to updated and modified.  But if

25  the Court just looks at an example of that.  For

1   example, so with regard to the Greater St. Louis area,

2   I'm just picking, I think, the fifth or sixth one

3   down.

4           There are 921 unique and timely filed

5   claims, and 64 non-barred unique and timely filed

6   claims.  So when we ask who voted in favor of the plan

7   and who didn't vote in favor of the plan, for master

8   mortgage purposes, there's a lot of information that's

9   important to know.

10          First, who's affected by that local council

11  release?  And second, what was the vote among the 64

12  people, if I'm still on the right line, the 64 people

13  who actually have preserved the claim against the

14  local council?  Because again, if what we got was

15  52,000 votes in favor of releasing the Greater St.

16  Louis council, it's meaningless.  If what we got was

17  850 votes in favor of releasing the Greater St. Louis

18  council, that's meaningless.

19          What's really meaningful and who's really

20  affected by that release, who is making a judgment

21  about I'm going to give up something to get something?

22  It's someone who has preserved a timely claim in the

23  tort system or still has the right to file a valid

24  claim in the tort system.

25          The person who doesn't have a claim against

1    that local council because they weren't in that

2    geographic area or the person who let their claim

3    against that local council lapse and didn't file it

4    and now it's time barred, their decision is should I

5    get something for nothing or should I not get

6    something for nothing.  Something for nothing sounds

7    better than not something for nothing.  So I'll take

8    something for nothing.

9            And the real master mortgage question is the

10   people who are giving up something for something and

11   that's why the vote tabulation has to reflect this.

12   Now, the issue that you were talking to Mr. Stang

13   about, it's kind of the backend of that issue because,

14   as has been reported, a great number of claimants

15   didn't name their local council when they filled out a

16   proof of claim.  And so we have kind of a backend

17   question -- what to do with that.

18           We could, as Mr. O'Neill said, if they

19   didn't list a local council, they didn't list a local

20   council.  Their vote would not be tabulated, recorded,

21   or reflected for purposes of figuring this test out.

22   We can do it that way.  That's one way to do it.

23           Another way to do it is to say, well, you

24   filled out your proof of claim form, but now -- and

25   you weren't asked to list this information, but we're

1   going to give you another chance to provide that

2   information because we're using it in a different

3   context, and if you want to name it now, you can name

4   it now.

5          But -- and you know, I'm happy to discuss

6   that issue with the Court, but that issue is sort of

7   the backend issue.  The front-end issue is really the

8   key to the case, which is are people who are adversely

9   affected by the release of the local council the ones

10  who are voting in favor of releasing local council.

11         And now, we can disagree at confirmation

12  over the importance of this information.  The debtor

13  can tabulate, but we can't disagree over the

14  importance of this information at confirmation if we

15  don't have it at confirmation.

16         And so it seems to me that this is an

17  important piece of information that the Court should

18  have, and I assume the debtor would want.  If all the

19  classes come in and all the people who have preserved

20  their timely claims against local councils are 100

21  percent in favor of giving up those rights in favor of

22  this plan, then, that's meaningful information for the

23  Court.  And if they're not, that's meaningful

24  information.

25         We can argue about whether it's dispositive

1   and all the rest of it, but that's tomorrow.  I think

2   the key is today to make sure that we put in place

3   structures that give us that relevant information.

4           THE COURT:  Thank you.  Let me hear a

5   response from the Debtors.

6           MR. O'NEILL:  Yeah, thank you, Your Honor.

7   I think the response is this.  Mr. Patterson has laid

8   out one of his confirmation objections.  He's spoken

9   passionately about it and what he thinks the

10  information will be that he'll use to support it.

11          The information is already there, Your

12  Honor.  We're getting votes on the plan, and then, on

13  the backend, if we need this information, if Your

14  Honor thinks that this is a valid argument and it's

15  something that the Court needs to look into, we will

16  have all the proofs of claim, and at that point, they

17  will all be amended with the latest and greatest

18  information reflecting not just local council but, you

19  know, 1 of the 41,000 chartered organizations.

20          And the Court can choose to use that

21  information how it likes, and the Debtors will be able

22  to slice and dice it how it likes.  But to add a new

23  ability to select the local council or chartered org

24  in a ballot is inappropriate, it's expensive, and it's

25  not necessary.  We carefully built a bar date program

1   and bar date notice and bar date for folks to file

2   their claims and name their local council or chartered

3   org if applicable.

4           I don't think we now need to add a line item

5   on a ballot that would have them do that further.  I

6   think it creates confusion in addition to all the

7   issues I just noted before.  If parties want to, you

8   know, amend their ballot, they can do that.  Mr.

9   Patterson can advise his clients that haven't filled

10  out that portion of their ballot -- I'm sorry, their

11  proof of claim to do so.

12          And then, at the end of the cases or I

13  should say at the end of solicitation, in conjunction

14  with confirmation, if this is going to be an issue, we

15  can try to create a matrix with 250 local council and

16  41,000 chartered organizations and how people in those

17  -- with -- that marked their proofs of claim -- by the

18  way, which will not be validated, vetted, allowed, or

19  evaluated claims.  That will happen under the TDP by

20  the Trust, how those should be evaluated.

21          Your Honor, we don't think this is

22  necessary.  I think actually Mr. Patterson got

23  frontend and backend issues mixed up.  So we disagree,

24  and we think the ballots are fine as is.

25          THE COURT:  Okay.  I can hear everyone, but

```
 1  I can't see anyone anymore.  We're working on that.
 2  Let me ask this question because this goes to sort of
 3  what I said before, are we going to have the
 4  information -- thank you -- are we going to have the
 5  information we need to have, in the event we need it,
 6  at confirmation, and are we going to have an ability
 7  to -- for people to make the arguments they need to
 8  make and have the data they need it to be based on?
 9           And is what I'm hearing is that the debtor
10  has a database that it will -- that it can slice and
11  dice and come up with these -- the categorization and
12  the vote by categorization if need be?
13           MR. O'NEILL:  Oh, to be clear, Your Honor,
14  we don't think that will be necessary, but we have,
15  though Omni, the database of the proofs of claim and
16  as they'll be amended at the time of confirmation,
17  which have a line for local council and a line for
18  chartered organization.  And then, you'll have a
19  voting report that lists by proof of claim who voted
20  yea, who voted nay.  So necessarily, we have that
21  information.
22           And the question of whether we need it,
23  whether Your Honor wants to see it is a question for
24  another day, we feel.  We dispute the legal premise,
25  but we acknowledge that it's a confirmation issue.
```

1  But we will, I think, be in a position to have what we

2  need.

3          THE COURT:  And for others to have what they

4  need.  So that'll be a discovery issue where if people

5  want that information, it will be provided to them.

6          MR. O'NEILL:  Correct.

7          THE COURT:  Mr. Zalkin?

8          MR. ZALKIN:  Thank you, Your Honor.  I just

9  want to point out to the Court that -- and I'm sure

10  you understand -- that many, many, many of these

11  survivors cannot remember what their council -- who

12  their council was or --

13          THE COURT:  Yes.

14          MR. ZALKIN:  -- or who was the chartered

15  organization.  And one of the things, when we filled

16  out the proof of claims and those were filed, we were

17  told that we would be able to get rosters from the

18  local councils or from the BSA that would help our

19  clients remember or identify councils and sponsoring

20  organizations.

21          That hasn't happened.  We've had a great

22  deal of difficulty with getting that kind of

23  information.  So I would ask that the Court please

24  ensure that there be a process where that kind of

25  data, to the extent it exists, to the extent it can be

1   provided, will be provided as we were told it would

2   be, so that we can help our clients to the best of our

3   ability and their ability identify these local

4   councils and these sponsors.  Thank you.

5          THE COURT:  Thank you.  Mr. Patterson.

6          MR. PATTERSON:  Your Honor, the issue of

7   whether or not -- they should have led with -- was

8   this issue of whether people should be given the

9   ability to put the name on the ballot at this point.

10  And I mean it just really seems to me that what we're

11  trying to do is ensure at the confirmation process

12  that we have the highest quality of information that

13  we can with respect to who the folks are and who

14  they're not.

15         And a situation I don't want to get into is

16  a situation where we don't ask for this information

17  now.  We have, as we know, 20,000-odd ballots that --

18  or pardon me -- claims that didn't list a local

19  council.  And then, the debtor has a metric for

20  saying, well, here's who they really are.  We know who

21  they are because we know what their geographic area

22  is, and we're going to assign them to a local council.

23         So if the debtor doesn't want to ask for

24  that information now, then, it seems to me that's it.

25  We're not going to, then, ask for it later when they

1   need it or come up with a second-best alternative

2   later on when the debtor thinks they need it or want

3   it.  This is the time to find out whether we're going

4   to get that information.

5          MR. MASON:  Your Honor?  Ricky Mason on -- I

6   don't know if you can see me.

7          THE COURT:  I can.

8          MR. MASON:  Okay.  I didn't want to cut my

9   friend, Mr. Patterson, off, and I apologize.  I just

10  want to briefly respond.  First of all, we do disagree

11  vehemently with Mr. Patterson's statement of the

12  standard for a master mortgage determination of

13  whether the local council releases, assuming the plan

14  is voted in favor of, whether that's satisfied.

15          It sounds to me like he wants to create,

16  frankly, not just 250 subclasses, one for each local

17  council, but potentially thousands of additional

18  subclasses, depending upon the chartered organization

19  releases.  And we don't think that's appropriate.

20  That's obviously an issue for confirmation, but I

21  didn't want to let the moment pass by being silent and

22  having folks assume that we agree.

23          I also think that if we have additional

24  lines on the ballot, we're doing two things.  We're

25  sort of heading in the opposite direction of what, I

1 think, Your Honor has appropriately tried to do, which

2 is simplify things.  I really do worry that the

3 debtors or Omni getting ballots with local council

4 information filled in, what happens if there's a

5 conflict between the information on the ballot and

6 what's in the proof of claim?

7        The proof of claim is really where the

8 action occurs with respect to the identification of

9 the local council.  As Your Honor heard, the proofs of

10 claim are being amended as people find additional

11 evidence of which local council is involved in the

12 alleged abuse.  That's the process by which a local

13 council should be identified, if it's necessary at the

14 confirmation hearing.  And I think we heard Mr.

15 O'Neill say that the debtor has that information

16 available should the Court decide that it's required.

17        With respect to Mr. Zalkin's statement about

18 rosters, we've had numerous iterations of roster

19 requirements on the part of local councils and

20 certifications and providing information to the extent

21 that folks have it into a database.

22        So I'm not sure if Mr. Zalkin has access to

23 that, but local councils with -- working with the TCC

24 and others have undertaken over a year's worth of

25 effort in that regard.  And frankly, that roster

1  information, together with the proof of claim

2  information, ought to obviate the need to have the

3  information on the ballot, as well.  Thank you, Your

4  Honor.

5         THE COURT:  Thank you.

6         MR. LUCAS:  Your Honor, may I just jump in

7  here really quick because I want to follow up with

8  something that was just said by Mr. Mason.

9         THE COURT:  Yes.

10         MR. LUCAS:  Because I think it's important.

11  Under the third and fourth stipulations extending the

12  preliminary injunction, there were processes or

13  procedures put in place to deal with the limited

14  production of rosters.  And so while the TCC worked

15  hard with the debtors here to try to arrange a

16  process, we were unable to address, I think, sort of

17  the point that Mr. Zalkin was raising.

18         For example, a survivor just doesn't know,

19  doesn't recall, you know, when he was abused when he

20  was ten years old.  You know, it wasn't impressed upon

21  him by his parents to remember his local council.  And

22  so in that context, there aren't rosters being

23  searched for for that individual because the process

24  that's set up, it's, you know, survivor, you know, the

25  survivor says, I list local council X, and then, so

1   the proof of claim is sent to local council X, and

2   local council X is looking for the roster that has

3   that survivor's name on it, if it exists.

4           But when the survivor doesn't know, then,

5   there's no search being done, and no search has ever

6   been done for that right there.  And so there is a big

7   gap and there's a big hole there,  and I think that's

8   what -- and I'm putting words in Mr. Zalkin's mouth,

9   but I think that's one of the big limitations here

10  about trying to locate rosters, which the TCC has been

11  asking for and trying to work to get since the

12  committee's appointment in March of 2020.

13          THE COURT:  Okay.  Well, I don't remember

14  this issue being brought in front of me.  I remember

15  hearing about it here and there.  I don't remember it

16  ever being brought in front of me.  So I think the

17  question in front of me now is am I going to require

18  the Debtors to put a line on the -- to include a line

19  on the ballot for local -- for survivors to add

20  information to about their claim.

21          And I'm not going to require it.  And one of

22  the reasons I'm not going to require it is because I

23  don't want some survivor to think that they have

24  amended their proof of claim by doing that.

25          MALE VOICE:  Exactly.

1          THE COURT:  Okay?  And that they therefore

2     don't have to provide any further information to

3     perhaps the settlement trustee, perhaps somebody else

4     to help validate their claim.  I don't want them to be

5     under any misapprehension about what -- and that's why

6     I asked what's the import of putting that information

7     on a ballot, and I think the answer's going to be

8     none.

9          So I don't want there to be any

10    misunderstandings out there.  So I'm not going to

11    require it.  But what I am hearing, of course, number

12    1, is a dispute over the relevant standard of what I

13    will have to decide at confirmation with respect to

14    third-party releases.  But to the extent that this

15    information is relevant to my decision, if the Debtors

16    don't have it, they don't have it.  And that would be

17    problematic.

18          So I'm not going to require it.  I will also

19    say that once -- and I even hate -- hesitate to say

20    this -- once I approve a disclosure statement, as far

21    as I'm concerned, it could start now.  Once

22    discovery's open on confirmation, it's open on any

23    information that is relevant to confirmation.  People

24    can seek discovery.

25          Okay.  Next issue.

1            MR. O'NEILL:  Thank you, Your Honor, and we

2    appreciate that.  I think that also when we get there,

3    we can discuss it, but I think that also addressed a

4    couple of later objections that are down in number 65

5    of the same nature or ilk.  So thank you for that.

6            I'll ask a question to the Court, if Your

7    Honor would like to take a break for five or ten

8    minutes or keep going.  We've been at it for two-and-

9    a-half hours.

10            THE COURT:  Let's take a ten-minute break.

11            MR. O'NEILL:  Okay.  Very good, Your Honor.

12            THE COURT:  Good idea.

13            MR. O'NEILL:  Okay.

14            THE COURT:  And parties can look through and

15    see what additional specific disclosure statement

16    objections remain outstanding.  Thank you.  What time

17    is it?  I've got 3:31.  Why don't we just say 3:45

18    we'll be back?  Thank you.

19            (Whereupon a recess was taken)

20            THE COURT:  This is Judge Silverstein.

21    Going back on the record.

22            MR. O'NEILL:  Hello, Judge Silverstein.

23    Thank you.  Is everybody back, or should we wait a

24    couple more minutes, I see?  I guess we have who we

25    have.  Should we get started?

Page 110

1          THE COURT:  Yeah, we can get started.

2          MR. O'NEILL:  Okay.  Thank you, Your Honor.

3    I think the next item is Item 65 on Page 111 of the

4    chart.  And excepting the sort of objections at the

5    bottom that we discussed with respect -- or in respect

6    of Number 64, just prior to the break, the idea behind

7    these objections is that instead of temporarily

8    valuing the claims at $1 for voting purposes that the

9    Court should create some sort of proxy value based on

10   the TDPs or otherwise to value the claims for voting

11   purposes in that manner.

12          And of course, the objectors use 1126 as the

13   justification for doing so, arguing that we can't

14   properly determine amount of voting for -- for

15   confirmation purposes.

16          You know, as Your Honor knows, I think, you

17   know, this started in H. Robinson (phonetic) and Johns

18   Manville (phonetic), and it's been a long-used

19   mechanism, where you have, like here, tens of

20   thousands of unliquidated claims that are not going to

21   be evaluated by the estate for allowance but rather by

22   the trust, which is going to be administered by a

23   trustee post-effective date.

24          There are some arguments made about various

25   ways you could do it.  I'd submit to Your Honor that

1  they're all premature, given that the TDPs have not

2  even been approved, and many of the same, you know,

3  parties to this objection and on the phone or on the

4  screen plan to object vociferously to those TDPs.

5           So picking and choosing one or another

6  scaling factors or a base amount or some other proxy

7  for value for claims, which again, haven't been fully

8  evaluated and are not complete, as we discussed --

9  many are amending their claims, as we speak, and will

10  going forward -- is not a good way to do that.  And we

11  submit there is no good way to do that.  That's why

12  the $1 proxy is commonly used.

13          So Your Honor, I can allow others to give

14  you their point of view, but you know, I just leave

15  you with -- and I know that all the precedent in this

16  area, you know, is -- is not perfect, as we've

17  identified earlier in this -- in this discussion.  But

18  in this case, there -- there really is no other way to

19  do it.

20          The one case that's cited by the objectors

21  for this proposition is Quigley, and of course, in

22  Quigley, the evaluated at confirmation because it felt

23  it had to do that because it wasn't abundantly clear

24  from the voting percentages that, you know, in

25  addition to numerosity, which was clear, that the

1   amount would be satisfied.  Here, we hope to be in the

2   good position of -- of not having ambiguity on that

3   point, but I would submit that, you know, again, if --

4   if necessary, this could possibly be done at

5   confirmation with more information at that point.  But

6   right now, the $1 proxy is the way to go out with

7   these station procedures.

8           THE COURT:  Okay.  Mr. Patterson?

9           MR. PATTERSON:  Right, Your Honor.  I still

10  think I'm right, but I haven't got anybody interested

11  in this in this case.  And so we concede this point.

12  But I still think I'm right.

13          And to Mr. O'Neill's point that I spoke

14  passionately, I felt a little remonstrated for that.

15  I think it's because I talk a lot with my hands.  My

16  sister once said that the way to shut me up was to tie

17  my hands, and so I apologize for that.  I try to

18  maintain appropriate decorum.  But on this issue, Your

19  Honor, we're down to a dollar a claim it is.

20          THE COURT:  Okay.  Okay, so it sounds like

21  that issue is not a today issue, in any event.

22          MR. SCHIAVONI:  Your Honor, you have our

23  written objection to this, and we stand on that --

24          THE COURT:  Ah.

25          MR. SCHIAVONI:  Sorry.  We stand on our

1   written objection.  I'm not going to belabor it.  I

2   think Judge Gerber's observations are directly on

3   point.  There's clearly going to be a vote that is

4   close here, no matter what, and you know, what Gerber

5   observed, Judge Gerber observed, was that, you know,

6   when that's the case, you've got to basically, you

7   know, wait the votes.

8          The acknowledgement -- admission, I'll call

9   it -- that the estate has done nothing to "evaluate

10  the claims" that you just heard, they certainly -- and

11  in the subsequent statement that they haven't "fully

12  evaluated the claims" is the situation we have here.

13  The debtor's done nothing to evaluate the claims.  And

14  that's being used as the base to vote when there's

15  clearly evidence that there's a systematic problem

16  with the -- with the proofs of claim.

17         So we stand on our written objections.  I do

18  think, in a way, the way the debtor has sort of broken

19  up this sort of way to argue it, you kind of missed

20  the forest in the trees, and I'm going to save my

21  remarks for the next -- next of their bullet points,

22  our bigger picture points.

23         THE COURT:  Okay.  Well, let me say this,

24  which is that I -- given where we are, I will approve

25  it with the dollar going out.  But that is not to say

1   that people are precluded from raising the issues at

2   confirmation about whether that's the appropriate way

3   for me to -- for the votes to be counted.

4           And -- but I'll make another observation, at

5   least, with respect to the insurance companies.  My

6   understanding is different than in Imerys.  My

7   recollection is that, here, the insurance companies

8   are placed in a separate class.  And so their

9   individual vote will not be overrun, if you will, by

10  the votes of the survivors.

11          So certainly for purposes of voting, I'm not

12  sure whether insurers will have the ability to raise

13  that particular issue in -- on that -- raise the

14  dollar issue on voting issues.  Maybe for something

15  else, and I'm going to hear from you, Mr. Schiavoni.

16  But I'll -- I'll point that out, and that is different

17  than in Imerys, where they were lumped together so

18  that -- so that personal injury claimant's votes, in

19  fact, are going to -- could outstrip and control the

20  class.  That doesn't happen here.

21          MR. SCHIAVONI:  Thank you, Your --

22          THE COURT:  Mr. Patterson's client's

23  obviously in a different situation.  They're in the

24  same class.  Mr. O'Neill?

25          MR. O'NEILL:  Thank you, Your Honor, and I'm

1  -- I won't respond to much of what Mr. Schiavoni said,

2  but I'll just say there were no admissions there.  I

3  was just stating what everybody knows here, which is

4  that the TDP process by the trust is going to be the

5  only full evaluation of these claims during these

6  cases.

7           So Your Honor, moving on to 66, I don't know

8  that we have an issue with the TCC at all on this

9  cover letter, but I'm -- as I sit here, and I could

10  have missed it, given what's been going on this

11  afternoon, but I -- I don't know that we have a letter

12  from them.

13           But I think that we are not opposed to it

14  pursuant to the -- the discussions over the last two

15  days, but we -- we obviously need a draft of something

16  before it can be agreed to.

17           So that leaves Mr. Buchbinder's objection,

18  Your Honor.  You know, I guess -- I guess I'll start

19  by saying, you know, there's -- I'll state the

20  obvious.  There's a lot of claimants in this case, and

21  even with the -- the procedure with the master ballot,

22  which -- which saves us from sending, you know, a full

23  package to tens of thousands of people, Mr.

24  Buchbinder's office is still saying that we should

25  send a full package of paper, over 1,000 pages, to the

Page 116

1    voting parties in these cases.

2              To us, this is not just a case of, you know,

3    administrative or expense savings for the estate, but

4    it's also just wasteful.  Sending over 1,000 pages to

5    people in this day and age is not appropriate.  It's

6    not the trend in the case.  Mr. Buchbinder backs that

7    up, I think, with a -- with a request for not a CDROM

8    but a -- a thumb drive, which is what some courts have

9    done.

10             We think the link is perfectly sufficient,

11   Your Honor.  It's how most of us access documents

12   these days, well, at least, you know, us people

13   sitting in conference rooms on a, you know, hours-long

14   court hearings.  But I think the vast majority of the

15   population is in that same boat.

16             I don't want to belabor this point too much,

17   Your Honor.  I think maybe you have a perspective.  So

18   I'll just defer to Mr. Buchbinder if he wants to argue

19   this.

20             THE COURT:  Mr. Buchbinder.

21             MR. BUCHBINDER:  Thank you, Your Honor.

22   David Buchbinder on behalf of the U.S. Trustee.

23   Frankly, Mr. O'Neill, in his tone and his attitude,

24   expresses his entire lack of understanding for the

25   82,500 abuse claimants in this case.  I'll start with

1    that.

2            Bankruptcy Rule of Procedure 3017(d) is

3    quite explicit.  And it reads in part, except to the

4    extent that the Court orders otherwise with respect to

5    one or more unimpaired classes of creditors or equity

6    security holders, the debtor in possession shall.  And

7    then it goes on to say mail the solicitation package

8    to all of the impaired creditors.  There's no

9    exception here for cost savings.  There's no exception

10   here for the fact that they're going to get master

11   ballots from attorneys.

12            And let's go back to that issue and the

13   certification for a moment.  It would appear that in

14   the certification, the debtor is attempting to pass

15   off its duty to serve hard copies of the solicitation

16   package to the abuse claimants through the attorneys

17   who are going to recommend to them to vote for the

18   plan.  I don't have a problem with that, but the

19   problem I have with that, as was pointed out by many

20   of the other parties in the earlier discussion this

21   afternoon, was despite the certification and despite

22   the comments about additions to the certification to

23   act as a deterrent, there isn't going to be any real

24   practical way to police that these personal injury

25   attorneys have actually sent the solicitation package

1    in some form to their clients.  That's the debtor's

2    responsibility.

3             And it's one thing to propose a master

4    ballot where the attorney who represents multiple

5    clients will report the votes of his or her clients.

6    But it's another thing to say that that means that

7    those clients received the materials they needed to

8    analyze to determine how to tell their attorney how to

9    vote.

10            Bankruptcy Rule 3017(d) authorizes

11   summaries, but it doesn't authorize them in lieu of a

12   solicitation package.

13            Additionally here, many of the abuse

14   claimants, based upon the hundreds of letters that

15   have been sent to the Court, are incarcerated

16   prisoners.  Outside of those letters, other prisoners

17   have from time to time filed pleadings, indicating to

18   the Court how difficult it is for them to receive

19   materials or to send them back.  The incarcerated

20   prisoners among other issues have limited or no access

21   to computers, or when they do, they only have limited

22   time periods where they can access the screen.  Those

23   folks have to have hard copies of the materials.

24            Additionally, many of the abuse claimants

25   are elderly.  Many of them are computer-illiterate.

1   They still read pieces of paper.  The debtor here has

2   told us that it's going to cost millions of dollars to

3   send these packages to people.  Frankly, that's

4   poppycock.   They try to compare this case to Takata

5   and to PG&E.  I was involved in both of those cases,

6   and each of those cases had millions of creditors, not

7   82,500 plus the trade creditors and insurance

8   companies.  There are many ways in which the debtor

9   could print the solicitation package to economize its

10  expenses.  It could be printed on newsprint.  The

11  pages could be printed two up, back to back, and it

12  would be -- look like a prospectus in its material,

13  but that would be the least expensive way to produce

14  it and to mail it, and everyone would have their hard

15  copy.  They would get their summaries.  They'll get

16  their letters from whoever's going to tell them to

17  vote for or against the plan, but they'll have all the

18  information that the code and the rules entitle them

19  to.  And we can't pass this off to the third-party

20  attorneys for all the various reasons stated by other

21  counsel.

22          Finally, Your Honor, if the debtor thinks it

23  can't afford to comply with the requirements of the

24  Bankruptcy Rules of Procedure in this regard, then

25  maybe it ought to be rethinking the chapter it is in.

1    Thank you.

2         THE COURT:  Thank you.  Mr. Stang.

3         MR. STANG:  Thank you, Your Honor.  I just

4    wanted to point out that if we do put in a letter,

5    that letter per the procedures goes to the attorneys,

6    who will then communicate only the disclosure

7    statement to their clients, not the entire

8    solicitation package.  So this may be what we do at

9    the end, when we go through the order, but since we

10   were talking about the letter, the way they've done

11   it, the letter doesn't have to go to the -- to the

12   clients.  Only the disclosure statement goes to the

13   clients if it's done through the attorneys.

14        The attorneys get it, but they only have to

15   send out the disclosure statement, which of course has

16   the plan, you know, attached.

17        THE COURT:  Okay, thank you.  Response, Mr.

18   O'Neill?

19        MR. O'NEILL:  Yeah.  No, thank you, Mr.

20   Stang.  We can make that clarification.  That

21   certainly wasn't the intent to -- to prevent the

22   letter from going along with the disclosure statement.

23        To Mr. Buchbinder, what we're hearing from

24   Omni is that this would cost the estate over $3

25   million to send paper.  I think maybe we could, you

1   know, quibble about that number based on different

2   methods of printing.  But I think what's more

3   important here is that everybody in this case, all

4   claimants are getting the notice of confirmation

5   hearing.  And on that notice, printed writ large, is a

6   phone number, and they can call Omni, and they can

7   request a paper copy to be delivered to them free of

8   charge.

9           Nobody is relying on the attorneys, although

10  they have that obligation if they're going to certify

11  to the vote, to show their clients the disclosure

12  statement in order to -- to Mr. Stang's point, the

13  entire solicitation package.

14          We are giving people the option to self-

15  help, if they want a paper copy.  But for the vast

16  majority of people -- and we think it is the vast

17  majority that aren't going to do that -- we think the

18  current mode of solicitation is sufficient, Your

19  Honor.

20          THE COURT:  Okay.  Mr. Buchbinder, let me

21  ask you a question, and as parties will know, I fit --

22  apparently, I fit into the old category because I'm a

23  paper person.

24          The -- I see the rule.  I'm looking at it.

25  But I know that in the past, I have been asked to

1  approve -- and I'm sure I have approved -- used to be

2  CDROMs.  Then it used to be a flash drive.  I don't

3  know what else you can put it on these days, you know,

4  pair of glasses you could send somebody.  I don't

5  know.

6          But I've been asked to do different things,

7  right?  And as long as there's an option for someone

8  to request paper and it is free to them, and maybe we

9  could even make certain that it gets sent out by

10  overnight so there's not a loss of time to review the

11  papers, are we meeting the spirit of the rule, which

12  was obviously drafted at some prior point in time?

13          And I've also, I should say, then had

14  situations where the ballot, probably the letter from

15  the committee, I forget, the notice, certain other

16  things, certain portions were sent by paper, and then

17  the rest was either on some electronic format or you

18  could request paper.

19          Are we not meeting the spirit of the rule?

20  And I'm with you in terms of paper for anybody who

21  wants it.  And I want to make sure they get it timely

22  and in enough time to review it.  But I recognize I'm

23  a dinosaur.  So if there are people who, in fact,

24  would review it online or would review it in some

25  other fashion, are we not meeting the spirit of the

1    rule?

2            MR. BUCHBINDER:  Thank you, Your Honor.  I'm

3    also a dinosaur, and in most cases, I wouldn't

4    disagree with a word that you've said.  But we need to

5    look at the nature of the abuse claimants in this

6    case.  Many thousands of them are elderly, very

7    elderly, in their 60s, 70s, and 80s.  Many of them, as

8    we've noted, are incarcerated.  Many of the elderly

9    ones, I would venture to guess, may live in assisted

10   living or other types of facilities where they don't

11   have access to computers, where they -- or where they

12   can easily request the paper copies.

13           And, as Mr. Humphrey pointed out to us

14   yesterday, there are 82,500 individuals who are going

15   to be mistrusting this entire process if they don't

16   get the papers.  This is a different mix of creditors

17   here.  This is a unique class of claims, and they need

18   to be served with hard copies for all of these

19   reasons.

20           There has been no declaration filed as to

21   the cost, but you know what, the cost to these

22   individuals over the decades that they have suffered

23   is immeasurable.  And so the debtor can afford to pay

24   the bill for them.  Thank you.

25           THE COURT:  Okay.  I'm convinced.  Mr.

1  Buchbinder is correct.  I think the unique mix of

2  creditors here, which does, at least has been

3  represented to me, skewed towards older and would make

4  sense, given that the debtor has consistently said

5  that its more current measures to prevent abuse means

6  that there are less victims who are younger.  I'm

7  going to require paper.  It is an expense, but quite

8  frankly, 3 million in this case -- it sounds horrible

9  -- it's a small number in this case.  Mr. Ryan?

10          MR. RYAN:  Your Honor --

11          THE COURT:  You need to unmute.

12          MR. RYAN:  Yeah, can you hear me now, Your

13  Honor?

14          THE COURT:  Yes.

15          MR. RYAN:  I wasn't sure when to raise this,

16  but now that we're on the topic of putting things in

17  the mail is just the issue of -- of those who aren't

18  creditors -- you know, the charter organizations who

19  aren't creditors whose rights are getting affected,

20  and I wasn't sure when Your Honor wanted to address

21  that part of -- of solicitation or notice.

22          THE COURT:  We're going to have to deal with

23  that, and, Mr. O'Neill, when did you plan to deal with

24  that?

25          MR. O'NEILL:  Your Honor, we had

1   communications with Mr. Ryan.  I'm not sure exactly

2   what he's referring to, but I think what we assumed

3   was that in the communication that we were putting

4   together with -- with the assistance of Mr. Ryan, that

5   that would contain all the -- the necessary

6   disclosures and other things that he was looking for.

7   We plan to have that, you know, prepared and then

8   approved as part of the order, as part of the

9   solicitation materials so that we could have it sent

10  out to the relevant parties as part of this process.

11           MR. RYAN:  And that's the issue, Your Honor.

12  It's to whom are they going to send because it's --

13  the procedures right now were drafted, you know, with

14  a different -- a different -- a different world.  And

15  so there's a call to send out solicitation packages to

16  indirect abuse creditors, which there are 16,600.  But

17  there are 40,000 chartered organizations who are going

18  to, whether they're creditors or not, their rights are

19  going to be affected by this plan or -- or purported

20  to be affected by this plan by -- by moving them into

21  certain categories and -- and affecting their rights

22  as additional insureds, and giving them releases.  So

23  I think they need to know.

24           THE COURT:  There's going to have to be some

25  notice to them directly.  Anyone whose rights are

1   going to be affected by that.

2           MR. O'NEILL:  We agree, Your Honor, and all

3   41,000 chartered orgs will be getting the

4   communication that we are working on with Mr. Ryan,

5   which -- which will be comprehensive.  We devoted

6   quite a bit of time to this over the last couple days,

7   discussing what will be in it, and we plan to work in

8   good faith to make it plain English and to make it

9   useful, and all 41,000 will get it.

10          MR. RYAN:  That sounds perfect, Your Honor.

11  I just wasn't sure when to raise and just make sure

12  that we had the -- the mailing part of the mechanics

13  done.

14          THE COURT:  Thank you.  Well, if your crew

15  skews younger and you want to suggest a different

16  method, I will consider that for you.  Mr. Lucas.

17          MR. RYAN:  I was going to say, Your Honor,

18  it may be -- it may be that -- that for -- for -- for

19  -- I don't know how -- how young church elders skew.

20  I won't pretend to know that for -- for -- for all

21  these churches.  But it may be that a hybrid of

22  sending out a paper notice and a link so we're not

23  adding another million eight to -- to the expense cost

24  is -- is something that I think is probably a good --

25  maybe a very good solution for -- for -- for the

1  chartered organizations and not ring up, you know, a

2  forest of dead trees that the Boy Scouts could

3  otherwise preserve.

4          THE COURT:  Mr. Lucas.

5          MR. LUCAS:  Thank you, Your Honor.  I wanted

6  to follow up on something that Mr. Buchbinder was

7  saying, and it goes into the Court's ruling just now,

8  and I think it's important to understand.

9          As we've said before, my firm receives calls

10  and inquiries -- calls, emails, and inquiries from

11  just a great number of prisoners, people who are

12  incarcerated who are survivors.  There are

13  approximately at least 2,000 survivors that have filed

14  proofs of claim that are incarcerated.  And so when

15  this paper is going to be sent to them, the

16  solicitation package, in addition to putting the exact

17  address and the prisoner number, which you know, I

18  obviously -- debtors can only supply to the extent

19  it's on the proof of claim.

20          In addition to that, it's important to say

21  that there are legal materials inside on the cover.

22  When my firm communicates and asks questions, we put

23  that so that it gets to the survivor.  Otherwise,

24  sometimes it's -- it's stopped, it takes -- there's

25  delay, and it doesn't go directly to him or her, and

1   it takes a while.  And so that's -- again, that's

2   maybe something that we could talk with the BSA's

3   counsel about just to ensure, as has happened with the

4   number of communications that we have had.

5          And then I had a follow-up question about

6   the paper ruling, Your Honor.  The solicitation -- you

7   know, under the master ballot process, it's -- it's

8   the Plaintiff lawyers or -- or their state court

9   counsel, if you will, that are going to be sending the

10  solicitation packages.  Does that mean that the

11  Plaintiff's lawyers are sending the solicitation

12  packages in paper to their respective clients?

13         THE COURT:  Well, I would think it -- on a

14  normal master ballot, CD kind of thing, bond issuance

15  kind of thing, I think the ballots are -- the paper is

16  given to the -- to the agent, who then follows it on.

17  But the packages are delivered.  I don't know.  Y'all

18  can work on that and how you want it done, but that's

19  how I think it's normally supplied.  I think the

20  debtor's supposed to do it.

21         It may be that it's duplicative and we

22  should not task the Plaintiff's lawyers with doing it.

23  We should think about that.  If the -- I certainly

24  don't think that they should be getting two packages,

25  one from the debtor and one from the -- their

1    attorneys.  That's a waste, and that's confusing, and

2    they shouldn't get two packages.  So if you want to

3    talk further about which you think is better or how

4    that should work, that's fine.

5              In terms of the prisoners, please work with

6    debtor's counsel and then with Omni.  I have seen some

7    of those letters.  I have seen the -- the issue about

8    sufficiently noting legal documentation.  Some prisons

9    may -- may do it differently.  So notwithstanding

10   everyone's best effort, it still may not get there.  I

11   understand that notice issue.  It's a problem.  But

12   let's do the best we can to get the information to

13   that -- to everyone, and we have to hope the Bureau of

14   Prisons on the federal level and whatever state

15   equivalents there are is going to get the information

16   to these -- to these parties.  We can -- have to do

17   the best we can.  Mr. Smola.

18             MR. SMOLA:  Your Honor, I just -- to follow

19   up on Mr. Lucas' point, there are many, many men in

20   this case who have not told their families about their

21   abuse.  And if they receive a solicitation package to

22   their home that is focused on abuse, that is going to

23   harm them further.  We specifically have in our firm a

24   way in which we keep track of which men find mail to

25   their home acceptable and which do not.  And I will

1   tell you the vast majority do not.

2           THE COURT:  Do not.

3           MR. SMOLA:  So -- so the -- the problem I

4   foresee is hundreds, if not thousands, of phone calls

5   about why an individual -- an individual's spouse who

6   they haven't told about their abuse just received a

7   solicitation package about their sexual abuse.  Thank

8   you.

9           THE COURT:  So Mr. Buchbinder, does this --

10  does -- I find that somewhat compelling.

11          MR. BUCHBINDER:  I'm giving it serious

12  thought.  I did have a couple of suggestions before

13  Mr. Smola's comment.  One would be to take the

14  attorney certification -- take the service of the

15  solicitation package out of the certification -- out

16  of the attorney certification, and the second would be

17  to put on -- a legend on the envelop legal documents.

18          But Mr. Smola seems have a -- have made a

19  good point.  And this is a very difficult issue

20  because he's -- this is one where, you know, I'm

21  thinking back to Fiddler on the Roof, and the scene in

22  Fiddler on the Roof where all of the men are talking,

23  and Reb Tevye looks at the first one.  He says, you

24  know, you're right.  And the second guy says

25  something, and then Reb Tevye says, you know, you're

1   right, too.

2          Everyone's right here.  The rules are the

3   rules, and Mr. Smola is not wrong.  And we need to

4   find a -- we need to find a viable compromise that

5   works for everyone because we do have, as I indicated,

6   the many thousands of elderly people, some of whom may

7   or may not be in Mr. Smola's category, who still would

8   want to get paper copies.  So we have a difficult

9   quandary here, and I do understand Mr. Smola's well-

10  made statement.

11         MR. SMOLA:  So I -- I would just point out

12  to the Court that we have about 4,000 clients, about

13  800 to 900 fall into the category of not capable of

14  using email.  And -- and we have clearly are --

15  defined those clients in our firm, and they'll receive

16  a paper copy from us if they want one.  So but even

17  within that group, some don't want mail.  They only

18  want to communicate via phone, so it's -- it's a very

19  complicated issue.

20         THE COURT:  Thank you.  Mr. Patterson?

21         MR. PATTERSON:  Your Honor, I wasn't going

22  to address myself to this issue, so I'll let this

23  issue go.  I'd like to be heard subsequently.

24         THE COURT:  Okay.  I -- I'd like the parties

25  to talk and present me hopefully with some kind of

1   agreed way to do this.  I -- I am sensitive to the --

2   to the fact that many of the survivors are older, and

3   therefore, maybe not be as technologically savvy.  But

4   I think Mr. Smola's point is excellent, well taken,

5   and we don't want to create more angst for the

6   survivors by sending something to their home which

7   they do not want sent to their home, invading their

8   privacy further.  And -- but we have to make certain

9   that they get appropriate notice.

10          So I'd like the parties who understand these

11  issues to talk.  I'm not trying to avoid making a

12  call.  I'm just trying to make sure I'm sufficiently

13  informed in giving the parties who really understand

14  the concerns -- the issue.  I am willing to break from

15  the rule in this circumstance, and make sure -- but I

16  want to make sure that the survivors get what they

17  need to make the decisions.  I see Mr. Beckett, who

18  has his hand up.

19          MR. BECKETT:  Yes, Your Honor.  Richard

20  Beckett on top of -- or representing about 165

21  Claimants.  In addition to the matters that Mr. Smola

22  brought forth, we also have a couple of Claimants who

23  are homeless, and we're able to get in contact with

24  them because we have means of getting a hold of them.

25  But if they go out in the mail, I don't think they'll

1    ever receive the materials.

2            THE COURT:  So another complication.  Well,

3    it certainly looks like the lawyers need to be

4    involved in this process, and I think that's what has

5    to happen.  And to the extent that we need some

6    separate type -- and maybe it's a separate type of

7    certification of how they reach their clients, then

8    maybe that's what we do.  And they can indicate

9    whether they were able to do it by mail or email or

10   phone or whatever.  But we'll know that they have

11   reached their clients, and I would like some subset of

12   you, including Mr. Smola and Mr. Beckett if you're

13   interested, speaking with Mr. Buchbinder and the

14   debtors' counsel, and let's come up with the best we

15   can do under the circumstances, mindful of the rule

16   but mindful of the privacy concerns and mindful of the

17   need to reach these men.

18           MR. BECKETT:  Thank you, Your Honor.

19           THE COURT:  Thank you.  Oh, Mr. Lucas?

20           MR. LUCAS:  Just, Your Honor, a thought.  We

21   will work with debtors' counsel and the others that

22   you referenced earlier, but I -- as I'm looking

23   through some things here, I just wanted to let the

24   Court know, I think that there are ways in using the

25   proof of claim to substantially narrow the issues and

1   to ensure that the communication or the disclosure of

2   the notice or how -- whatever it's going to be -- gets

3   to the survivor and the survivor, his or herself, as

4   opposed to somebody in his or her family that might

5   not know about the abuse.  And so I -- I do think that

6   there are ways -- you know, we might not be able to

7   deal with every single person, but I do think that

8   there are ways to substantially narrow this problem.

9               THE COURT:  Okay, thank you.

10              MR. O'NEILL:   And -- and, Your Honor, we

11  pledge to work with Mr. Lucas and Mr. Beckett and Mr.

12  Smola and also Mr. Buchbinder to figure this out.  I

13  think it's -- it's complicated.  There are people who

14  have opted out for confidentiality purposes, law

15  communications.  So there's a whole bunch of

16  categories of people that would -- not similarly

17  impacted by this.  So we appreciate Your Honor's, you

18  know, thoughts on this, and we'll -- we'll work to put

19  together a sensible protocol based on what we've

20  heard.

21              THE COURT:  Thank you.

22              MR. O'NEILL:  Okay.  Your Honor, I think

23  with that we're -- we're to Number 67 on the chart on

24  Page 113, which is the sort of string of Century

25  objections, which -- which Mr. Schiavoni has referred

1  to.  I -- I believe that he has the intent to put on

2  witnesses, so I think with that, I'll let him proceed

3  to that, and we'll -- we'll deal accordingly on the

4  debtors' side and any other parties that want to cross

5  or otherwise deal with these witnesses.

6           THE COURT:  Mr. Schiavoni?

7           MR. PATTERSON:  Your Honor, may I -- I

8  apologize for interrupting, but just before we get to

9  that, could I finish off our prior discussion with a

10 couple --

11          THE COURT:  Oh, I'm sorry.  Yes.

12          MR. PATTERSON:  No, no, it's -- thank you,

13 Your Honor.  When we talked about the master mortgage

14 and what would need to be shown, I may have said but

15 may have neglected to say that it may also be relevant

16 with regard to chartered organizations, particularly

17 those that have become contributing chartered

18 organizations, now that those amounts are going to be

19 earmarked, to know who of the claimants who are -- who

20 have viable commission against that entity and then

21 what percentages are those claimants in particular

22 voting to give a chartered organization a release.  So

23 I may have said that, but if I didn't, I wanted to

24 ensure it.

25          Second, Your Honor, the plan, as Your Honor

1   has indicated, has a provision allowing claimants to

2   elect for the $3,000 or so distribution, similar to

3   the general and secured creditors, although for them I

4   think it's $50,000.  Our view is that people who make

5   this election are fundamentally in a different

6   position from those whose claims are going to go

7   through the TDP and be subject to the settlement trust

8   and so forth.

9           And so our view is that that group should be

10  separately classified.  I would urge the debtor to do

11  that because I think it's an obvious case.  It's an

12  administrative convenience class.  The code provides

13  for it.  Encourage the debtor to do it, but if the

14  debtor doesn't do it, we'll file an appropriate motion

15  to be heard at confirmation to designate the people

16  who make the election as a separate class so that

17  those people's votes, again, are not counted towards

18  the various other provisions that the rest of the

19  creditors are going to be tied up with.

20          THE COURT:  Thank you.  And I'm not

21  surprised to hear that, having read the papers.  But

22  as I said, we'll know who that is, and that's sort of

23  the objective is to -- to make sure the people have

24  the information they need to make the arguments that

25  they will -- will make.

1          MR. PATTERSON:  Thank you, Your Honor.

2          THE COURT:  Mr. Moxley, I see your hand.

3          MR. MOXLEY:  Good afternoon, Your Honor.

4    I'm Cameron Moxley of Brown Rudnick on behalf of the

5    Coalition.  Your Honor, given Mr. O'Neill's comment

6    that he would be turning the podium over to Mr.

7    Schiavoni, who, I understand, intends to call

8    witnesses, we do just want to note for the Court that

9    we have some very limited objections to the witness --

10   to the witnesses that may be called.  I don't want to

11   interrupt Mr. Schiavoni's presentation if he is

12   calling witnesses at the top but to be heard, if I

13   could, Your Honor.  Or if he plans on presenting some

14   things, you know, before witnesses are called, I will

15   be heard before the witnesses are called.  Thank you,

16   Your Honor.

17         THE COURT:  Okay.  Well, I'm going to let

18   Mr. Schiavoni make his presentation, and we'll see

19   where you fit in, Mr. Moxley.

20         MR. MOXLEY:  Thank you, Judge.

21         MR. SCHIAVONI:  So, thank you, Your Honor.

22   Tancred Schiavoni for Century Indemnity.  Your Honor,

23   I do think there is -- although the -- the Circuit has

24   not directly address the -- the use of master ballots,

25   they have -- they have, in fact, touched on it in a

1   very important way that I think gives guidance in the

2   Combustion Engineering decision.  In that decision,

3   the Court reversed -- even though there was a majority

4   vote in favor of the plan -- the Court reversed and

5   remanded for several reasons, but including an

6   1129(a)(3) reason for good faith based upon how the

7   balloting went forward in that case.

8              And if you remember from the facts of the

9   case, there was an effort there by the debtor to put

10  together a -- a bloc group of claimants in advance of

11  the bankruptcy and then bring them into the bankruptcy

12  to bring about a yes vote.  And the group they put

13  together, so the Circuit says, were claimants that

14  were either unimpaired or had only "slightly impaired"

15  claims.  They refer to them as "stub claims."

16             And that ended up being the voting majority

17  in the case.  They happen to control in that case the

18  -- the official committee, and there was an ad hoc

19  committee in the position effectively of -- of where

20  the official committee is here, made up of Mr. Cassin

21  (phonetic) and some other groups of claimants who

22  represented mesothelioma claimants.  And they appealed

23  the plan, and they appealed it on, you know, among

24  other reasons on how the balloting was done.

25             And the Third Circuit, in looking at the

1   balloting in that case, observed that the

2   consequence -- the consequence, you know, of the

3   "debtor" balloting in the manner that they did was

4   that it -- that a group of Claimants that

5   "represented" a voting majority, despite holding in

6   many cases only a slightly impaired stub claims, were

7   the ones that carried the vote at the end of the day.

8   That's on 244 of the decision, which is 391 F.3.  The

9   Court found that, accordingly, the monitoring function

10  of 1129(a) I think (10), which requires that at least

11  one class of impaired Claimants must accept the plan

12  "may have been weakened."  And -- and then it went on

13  to say enabling a manipulation of the voting process,

14  and that's on Page 243.

15          And then the Circuit went on to talk about

16  "the chief concern with such conduct is that it

17  potentially allows a debtor to manipulate the Chapter

18  11 confirmation process by -- by engineering literal

19  compliance with the code while avoiding opposition to

20  the -- to a reorganization by truly impaired

21  claimants."

22          Here -- and then -- and then the Court, as

23  part of -- as part of the remand specifically directed

24  as part of the remand that discovery be directed at

25  that issue or -- or the Court be able to develop a

Page 140

1    full record with respect to it.

2          It is very hard, Judge, to look at this

3    record that you have before you and not see that

4    guidance called directly into play.  The Court has

5    before it in evidence, based on prior proceedings, the

6    email from the head of the coalition at the time the

7    coalition was formed that was submitted to the U.S.

8    Trustee by the official committee.

9          That -- that email is blunt, it's direct,

10   it's to the point about why the coalition was formed.

11   It's -- it's disparaging in its nature to the

12   claimants themselves and to the members of the

13   committee, and it talks specifically about how the

14   purpose of the coalition was to form a voting bloc --

15   a voting bloc in favor of -- of -- of basically

16   gaining control of the case.  I think that's the exact

17   words that Mr. Kosnoff used, gaining control of the

18   case.  And that's what they did.  They gained control

19   of the case.

20         And we now have -- that -- that's the fact

21   pattern that we sort of start with here, the voting,

22   the solicitation procedures, and the plan that's

23   resulted from this, from the -- from the claims that

24   they generated -- and if you remember in that proof of

25   -- in that -- in that email, he goes on to say how

1   they're going to focus, you know, on generating these

2   claims.

3          And then Mr. -- Mr. Kosnoff has since

4   submitted a sworn 2019 statement acknowledging that

5   the point of what he was doing was trying to generate

6   invalid claims from statute of limitations states.  He

7   doesn't call them invalid, but he says he was directly

8   trying to solicit claims from -- from states where the

9   statute of limitations had run.

10          So that's -- that's the sort of base that we

11   start with here.  Then what -- the result that comes

12   from it, the plan and the solicitation procedures, are

13   exactly what you would -- that flow -- and it's very

14   similar to what the Circuit saw.  The Circuit saw in

15   the Combustion Engineering case a use of master

16   ballots by this ad hoc group to deliver the bloc that

17   they promised pre-petition and that they promised to

18   get the -- get the plan done, and they got a plan that

19   they wanted and a plan that favored disproportionately

20   paying those kinds of claimants.

21          Here, we have a plan and solicitation

22   procedures that calls for claimants to get paid,

23   curiously a number that's a -- you know, somewhat --

24   you know, two to three times above what the

25   advertisements were for the cost of buying one of

1   these claims early on, 30 -- this $3,500 number, to

2   vote and be completely, you know, un -- unreviewed.

3   There's no scrutiny on the $3,500 claims.

4            So you have that class going into the vote.

5   You also have going into it the -- a plan designed by

6   these folks that is specifically directed at the kinds

7   of claims that they -- they put together.  It has very

8   low scrutiny, and there'll be evidence, if Mr. Green

9   stays in, that there's a -- the trustee put in has a

10  close connection, we believe it will show to the group

11  that was put in to basically approve their claims.

12           The other thing it's going to have is it's

13  going to have imbedded in the plan, just like it was

14  imbedded in the RSA, requirements that the fees

15  incurred by the Coalition -- even if that's really

16  what it is -- but at least $10 million as a lump sum

17  is going to be paid in fees, and then a mill -- almost

18  $950,000 a month on a going forward basis.  By the

19  way, it's going forward post-confirmation for at least

20  some period of time, I believe, how that is phrased.

21           You heard that I misrepresented somehow that

22  there -- how folks opted out.  I didn't.  Go back.

23  It's in the record.  It's in the record of the 2019

24  submission by the coalition where they were

25  specifically proffering what the evidence was that

1    Brown Rudnick, in fact, represented these groups.

2            And what they had to do as part of that, is

3    they had to go out -- the firms that were part of the

4    "coalition" purportedly represented somewhere in the

5    neighborhood of 50-or-60,000 Claimants as a result of

6    the advertising campaign.  They had to go out to those

7    folks, and they had to get affirmative consent to the

8    Brown Rudnick engagement.  And they -- they -- they

9    post they have a sort of consent letter that they

10   have, and they told you as part of the 2019 submission

11   that they had obtained a certain amount of consents

12   and that they were still getting others and that they

13   were going to make a secondary submission on it.  And

14   they did.  They did just that.

15           And what they did was, they went out to

16   those folks, that 50-to-60,000, and they said, will

17   you agree to this?  Will you agree to be a part of the

18   "coalition" and in essence fund the Brown Rudnick

19   fees?  The coalition, as it's now represented, doesn't

20   have 50,000/60,000 members in it.  It has a much

21   smaller number, and that's represented by the most

22   recent 2019 statements that they filed.  It's a number

23   -- I don't have it on the tip of my tongue, but

24   it's -- it's somewhere below 20,000.  I think it's

25   17,000 or some -- somewhere in that neighborhood.

1  That means that the other 40-to-50,000 Claimants that

2  that group represented turned down the request to --

3  to, you know, be members of the coalition and agree to

4  pay these fees.

5          What the plan does in putting those fees

6  into it is that it -- it overrides -- it's, like,

7  these -- these lawyers all represented people who were

8  asked, do you want to pay?  Do you not want to pay?

9  And they're told in the letter that if you say no, it

10  won't be part of what you're going to pay.  And large

11  numbers of them, the vast majority of them, said no.

12  And they've now put in a plan a provision that

13  requires them to vote yes, so that -- it's, like, that

14  is both a secondary provision that's going to tie

15  directly into what I believe the Circuit looked at as

16  far as the inducements here to create a situation

17  where you have a minority -- where you have these

18  lesser impaired claims taking control of the case and

19  voting and raising a good faith challenge.

20          Now, we've put before the Court, in

21  connection with the RSA, specific case law about the

22  conflict posed by having a lawyer both getting --

23  being offered a financial inducement as part of

24  something as well as making recommendations to their

25  client.  And although it's a little sort of worded

1   differently from the RSA, we're in exactly the same

2   situation.  It's like here, the Coalition is going to

3   make a recommendation to support the plan, and they're

4   -- and they have a financial inducement, those

5   lawyers, to do so.

6           And there's no mistake about why that was

7   arranged that way.  It was arranged exactly that way,

8   I think you will in evidence confirmation, for the

9   very reasons that the voting bloc group was arranged

10  in -- in the Combustion Engineering case.  And in

11  fact, you'll find some of the same lawyers involved.

12  Mr. Rice was involved in that case, and you'll find

13  Mr. Rice is involved in this case in the Coalition.

14          So it's some of the same reasons.  It's

15  something that really -- it affects the vote.  It has

16  the potential to taint where the case is going to go

17  overall.

18          You have here -- the Court, remember, in

19  Combustion Engineering, referred the matter back to

20  say let's -- we're remanding for further record

21  developed on that.  Here, the Court has a record.

22  It's like we developed a record in connection with the

23  2004 process, showing -- I think we made more than a

24  prima facie case that there was significant problems

25  with how the proofs of claim were put together.  I

1   think there's some acknowledgement of that, perhaps.

2   I don't want to put words in your Judge's -- in Your

3   Honor's mouth, but to the extent there's a ruling

4   about the 2004 case is a basis for them to go forward.

5   I think there's a recognition that what we put forward

6   was legitimate evidence that there's a significant

7   problem here.  Putting aside the fact that we're

8   dealing with a case where the claims went from 245 in

9   the tort system and maybe another 1,000 or 1,500

10  asserted to the -- to the -- whatever that number is.

11  My math is bad, but 2,000 claims to over 82,000 claims

12  and allegations such as $100 billion now of liability

13  generated by a process controlled by the people who

14  generated these claims and generate them through an

15  advertising system that was found to have fundamental

16  misrepresentations made in connection with it.

17          The claims that we put before Your Honor on

18  evidence that was uncontested in the prior proceedings

19  was that attorneys submitted proofs of claim affixing

20  electronic signatures that had nothing to do with that

21  claimant.  There's examples of handwritten signatures

22  that are completely forged or -- well, I guess forged

23  is the right word.  They're the same signature on

24  hundreds and hundreds of claims.

25          There's other evidence of -- that -- that we

1  put before the Court, showing that the aggregator

2  itself was the one that was affixing signatures and --

3  and reviewing the claims.  That -- that evidence, we

4  asked for the ability, we were cautious, we were

5  careful about how we proceeded on this.  We asked for

6  2004 discovery before going on and making further

7  conclusions.  It was targeted, what we were after.

8         And Your Honor, we didn't sit on our rights.

9  We brought this early.  We brought it up at every

10  single opportunity that we thought this was an

11  important issue.  It was an important issue to us

12  especially because the -- the -- the concern that

13  these very claimants, this very bloc was generating a

14  plan that was set to kind of create liability where

15  liability didn't exist and would infect the process of

16  creating -- of creating the plan.

17         Well, we have the plan that it generated,

18  and we never got really to test those claims.  We --

19  you know, Your Honor gave us the right to issue the

20  discovery to the -- to the aggregators.  We did so as

21  fast as we could after the -- within 48 hours of the

22  orders being issued.  That discovery is going to come

23  back, you know, the document portion of it next week.

24  Your Honor asked us to hold off on the specific

25  discovery directed at the lawyers that were -- you

1    know, that we revealed what they were engaged in, and

2    that was based upon -- you know, like we didn't just

3    run off and issue subpoenas to them.  We put before

4    the Court very specific evidence about what was going

5    on.

6              Further, we put before the Court the results

7    of what was coming out of these claims on the back

8    end, and Your Honor has all that.  We needed that

9    further discovery to sort of tie some other links

10   together.  We did not want to run out and file, you

11   know, large numbers of objections to proofs of claim

12   without having more specificity.  We tried to be

13   careful about this.  And you know, we now are where we

14   are.

15             We would -- we don't think that the

16   solicitation procedure should go forward or

17   solicitation without some effort to vet the claims.  I

18   mean, the entire solicitation process is supposed to

19   be one under 502, where the claims are presented and

20   there's an ability really to legitimately test them.

21             You know, despite what Mr. O'Neill said --

22   and granted, you know, I -- whether he speaks for the

23   whole debtor or not, it's an admission of candor here

24   that there was no evaluation by the debtor of these

25   claims.  And there was no need to.  Once they reached

1    a deal to cap their liability, it's like there was no

2    -- there was no need to.  And in fact, the whole plan

3    was to basically work with the Coalition to come

4    forward.  That is what it is, and if that's acceptable

5    to the Court, so be it.  But that's a situation we

6    face them now.

7            The procedures that they've put forward, I

8    mean, we would say that the solicitation shouldn't go

9    forward until our discovery gets to go forward and

10   complete itself.  And we'd be prepared to move as fast

11   as possible to do that, but we can't move faster than

12   what the rules provide us on when we could serve the

13   subpoenas.

14           You know, on the -- on the -- you know, some

15   of the lawyer depositions, it's like we would have

16   started with Mr. Kosnoff, who made specific

17   allegations and didn't identify some of the people

18   that he was referring to as a way to go forward.  We

19   do think that discovery is necessary.  Mr. Kosnoff

20   actually posted a tweet, saying why is it taking so

21   long for someone to serve a subpoena on me.  If one --

22   I mean, that is among the more crazy tweets he's

23   issued, but I don't think -- it's like there's any --

24   he's so over the line at this point that there's any

25   reason to hold back from that.

1                As far as the procedures that you have in

2      the face of the evidence that you have before you,

3      what we effectively have through these procedures is a

4      self-certifying process, a process whereby, you know,

5      the -- the councils certify that they've complied.

6      And Your Honor, I don't think that complies,

7      ultimately, with the gatekeeping function that you

8      really have under 3018.

9                The ballots allow anybody to claim -- any

10     one of these lawyers to claim that they're authorized

11     agents but without any proof to establish that in any

12     of these cases.

13               We know from looking -- in the Coalition's

14     case, the -- the -- you know, the ballots -- the

15     retention agreements have been produced.  In the case

16     of AIS, there's direct -- there's actually a 2019 on

17     file, saying that the AIS lawyers do not have

18     authority to use a master ballot.  But these

19     procedures -- you asked me to assume how they're done.

20     The procedures allow self-certification that they can

21     go ahead -- one of the three firms can go ahead and

22     ballot them.  It's -- the self-certifying nature of

23     the procedures is just inconsistent with how this

24     should work.  Whatever's done should be transparent so

25     that the Court -- if they're going to vote a master

1   ballot, they should provide the proof that they could

2   get to vote, each one of these -- each one of these

3   clients, so it can be tested by both the Court and the

4   other parties.

5           There's no requirement of showing that

6   counsel's authorized to cast the votes on any of these

7   votes here.  There's no requirement that any of the

8   counsel comply with Rule 2019, and Your Honor, that is

9   a mechanism that when I said that some courts have

10  touched on this, Judge Fitzgerald towards the -- maybe

11  the second half of her tenure in these cases started

12  to issue rulings that she would only accept ballots if

13  there was, I believe, an individual proxy for the

14  specific case.  And she also required Rule 2019

15  submissions in those cases.

16          There's a -- there's a -- I don't have the

17  ruling right in front of me, but there's a ruling on

18  this, I believe, in federal Mogul (phonetic).  It was

19  -- it was a sort of unusual ruling because it required

20  these submissions to be made, but then you had to make

21  a showing in order to see them.  So it's like -- but

22  they're -- but they were -- but they were made, the

23  Rule 2019 submissions.  It allowed the Court to assess

24  itself whether or not they had proof.

25          We don't think that's the way to go here, to

Page 152

1   be clear.  We think that there's sufficient evidence

2   before the Court on, in this case, like when the

3   Coalition came back and asked that the -- that the

4   certification process for the proofs of claim be

5   changed to allow lawyers to certify instead of

6   claimants, there was significant back-and-forth

7   argument about whether that should happen or not.

8           And as part of that, the record is robust

9   with the Court -- and with an exchange among the

10  parties -- let me put it that way -- including the

11  Court that, you know, basically, the use of the

12  attorney proofs of claim signatures should -- I don't

13  know how -- it's not exactly what Your Honor said --

14  but should be the exception rather than the rule.  And

15  that by doing so, among other things, the lawyer was

16  putting themselves at risk that they would -- they

17  would -- they would waive any privilege over what they

18  did to vet the claims.  That was the basis of the 2004

19  submission, that by -- by -- in large blocs, the

20  lawyers doing this, they were exposing themselves to

21  being questioned about what they, in fact, did to vet

22  the claims.  And given the enormous volumes of claims

23  and the small number of lawyers --

24           (First audio ends)

25           (Second audio begins)

1          MR. SCHIAVONI:  -- almost a prima facie

2    suggestion that it was impossible for them to have

3    vetted the claims, that besides the fact of like the

4    rapid fire submission of them.  But with that evidence

5    before the Court to -- for the debtor to suggest that

6    just more certification is adequate in this situation,

7    it just -- it -- it's -- it's in context of this case,

8    it just doesn't make sense.  It doesn't hold water.

9          It's, I think, a little like what you saw in

10   Emeris (phonetic).  It's the situation that the Third

11   Circuit that the Third Circuit in W.R. Grace

12   (phonetic) referred to, that the Court shouldn't hide

13   its eyes to what's right before it, that large numbers

14   of lawyers in this coalition, you know, or large

15   numbers of proofs of claim were signed by lawyers who

16   didn't really -- who -- who either gave their

17   signature page to an aggregator or the aggregator

18   signed the -- signed it.

19          Meanwhile, the attestation under oath of

20   what they did was made under oath.  It wasn't even --

21   it wasn't a certification or as a member of the bar.

22   It was under oath, and -- and it came with a warning

23   and the admonition of the Court about the importance

24   at that point of doing it.

25          And with all of those warnings, we still got

Page 154

1    the result we did.  I don't think further

2    certifications is what would deliver what you need to

3    have here.  Of all the -- all the stuff you've heard

4    about these solicitation procedures, the one is you

5    haven't really gotten any kind of, like there's no

6    evidence before you or anything else to suggest what's

7    the problem with sending out ballots to individually

8    balloting these folks?

9           From everything I've heard, it's almost more

10   laborious and more intensive to do a master ballot and

11   go through various hoops in the process than to just

12   send out individual ballots to the individual

13   claimants and get back the results, whatever they are.

14   And the one thing I think you've sort of seen, or I've

15   seen, or I thought I've seen from these proceedings,

16   from the several claimants who have spoken pro se is

17   there really is like a wide view on -- on how they

18   would come out on things.

19          So I don't know how if I was a lawyer

20   representing them I could individually poll them

21   otherwise, or recommend that they all vote one way or

22   the other.  I think it's -- they've got -- the ballots

23   should go out individually, and if Your Honor is not

24   going to do it that way I think the self-certification

25   doesn't work for those firms who haven't provided

1   direct evidence to the Court that can be tested that

2   they really have authority to do what they're doing.

3          AIS would be one example of that, but others

4   would be those firms that we have the retention

5   agreements from all of them in evidence before the

6   court on the 2019 submissions, and the bulk of them

7   don't contain a joint engagement waiver or a joint

8   engagement description of the risks.

9          And, you know, I -- I did hear Your Honor

10  and I took it to heart that this is not the court to

11  address ethics issues or what -- what not among the

12  parties, but 3018 vests this Court with the -- with

13  the gatekeeping function of deciding who should get to

14  vote.  And here when you have the engagement letters

15  directly in front of you, and they don't contain

16  waivers, it's -- I -- I think you can make that

17  decision.  It's not a close call.  It's like that --

18  those -- those waivers are required in every state.

19          So, Your Honor, with those -- with all of

20  that, you know, you've heard our argument that we

21  think that, you know, some discovery further ought to

22  go forward on the claims and that master ballots ought

23  not to be used.  If we had been permitted to complete

24  the discovery, we would -- just to make a short

25  proffer, Your Honor, we would -- we would have

1  proffered the results of what we got from the -- from

2  the aggregator firms.  We would have proffered the

3  results of the testimony from them and the testimony

4  from the lawyers associated with the filings of the

5  proofs of claim.  We have before Your Honor in these

6  prior matters concerning the proofs of claim, the

7  declaration of Eric Specland (phonetic).  That's at

8  1975-4.  That was admitted into evidence, and of Paul

9  Hinkland (phonetic), which is 1975.3.  That, I

10  believe, was also admitted into evidence.  We would

11  move into evidence Mr. Cosanov's (phonetic) verified

12  statements, which is 5917 and 5919.

13           If there's no objections, I would -- I would

14  move those statements into evidence.

15           THE COURT:  Thank you.  Okay.  Let me hear

16  from others.

17           MR. SCHIAVONI:  Your Honor, --

18           THE COURT:  Okay.  You're not (inaudible).

19           MR. SCHIAVONI:  -- hold on.  I'm -- so, Your

20  Honor, I'm just not sure about -- it's like is the --

21  is there no objection to the move of the --

22           THE COURT:  Is there any objection to what

23  Mr. Schiavoni wants me to review, which is the

24  declarations of Mrs. Specland (phonetic), Hinton

25  (phonetic), and, too, Cosanov (phonetic) statements,

1    the 2019s.

2              MR. SCHIAVONI:  I think the -- the --

3              THE COURT:  Or the declarations.

4              MR. SCHIAVONI:  -- the two declarations I

5    referred to were already in evidence in connection --

6              THE COURT:  They were --

7              MR. SCHIAVONI:  Right.

8              THE COURT:  -- in connection with the Rule

9    2004.  I recall them.  They're still sitting on my

10   desk somewhere.

11             MR. SCHIAVONI:  And I -- so what I -- I'm

12   moving afresh, and I -- I ask to make that part of the

13   record here, but I'm moving afresh with regard to Mr.

14   Cosonov's (phonetic) verified statements.

15             THE COURT:  Yes.

16             MR. SCHIAVONI:  5917 and 5919.

17             THE COURT:  Mr. -- Mr. Moxley?

18             MR. MOXLEY:  Yes, Your Honor.  Good

19   afternoon, Cameron Moxley, again, Judge, from

20   (inaudible) for the Coalition.

21             Your Honor, we would object to the Court's

22   consideration of Mr. Specland (phonetic) and the other

23   declarations that Mr. Schiavoni had previously raised

24   in the 2004 context and seeks to now raise in

25   connection with the disclosure statement (inaudible)

1    procedures hearing.

2            Your Honor, there are a few reasons.  They

3    all go to relevance.  I'll be very, very brief, Judge.

4    First, these declarations were all submitted and --

5    and made in January and February of 2021, more than

6    seven months ago, Your Honor.  As you heard from Mr.

7    O'Neil, at the beginning of the solicitation procedure

8    presentation today, Judge, there have been thousands

9    of amendments to the proofs of claim in the

10   intervening seven months.

11           Those declarations, Judge, frankly, are now

12   stale because many of those amendments, as you heard

13   throughout the proceedings today, involved a change

14   where the signature previously of a lawyer is now the

15   claimant's signature.  So those declarations are

16   simply outdated and mooted, Judge, by intervening

17   events.

18           To the extent, and I understand, as I

19   mentioned previously, that I understand Mr. Schiavoni

20   intends to or is considering at least calling one or

21   more of those witnesses to testify today.  Your Honor,

22   to the extent that those witnesses have updated

23   analysis or opinions that they wish to share with the

24   Court in the course of this hearing, we would suggest,

25   Judge, that -- that they not be allowed to do so and

1  object to their doing so because those witnesses would

2  have failed to update their expert written reports in

3  accordance with Rule 26(a)(2)(b)(1), Judge, which

4  requires that experts provide a written report, which

5  sets forth all of that expert's opinions including all

6  of the reasons and bases for those opinions.

7           So on the one hand, Judge, just to

8  summarize, on the one hand the prior declarations, if

9  being admitted now, they're mooted.  They have very

10  little evidentiary value.  If there's updated

11  opinions, those updated opinions have not been shared

12  with the parties and shouldn't be heard on the fly

13  today, Your Honor.

14           Your Honor, more fundamentally, we would

15  just note that none of these witnesses, which, you

16  know, Your Honor may recall from the earlier 2004

17  proceedings, these -- these -- these opinions go to

18  analyses of, you know, handwriting experts or meta

19  data analyses of signatures and when those signatures

20  were put on a document, those types of things.

21           None of those declarations, Judge, set forth

22  an opinion that any of the proofs of claim should be

23  disallowed.  They don't -- they don't actually serve

24  any relevant purpose other than the purpose of -- of -

25  - of -- that Mr. Schiavoni has argued that there needs

1   to be sort of further investigation.  But Century in

2   its own pleadings, Judge, and I would just point Your

3   Honor to Docket 5214 where Century itself said that

4   this is not the time to disallow any particular proofs

5   of claim.  So it's just not the right forum, Judge,

6   for these issues to be raised, and we don't think that

7   there's a basis for the Court to consider these

8   declarations now or to hear from these witnesses in

9   the course of this proceeding.  Thank you, Your Honor.

10          MR. SCHIAVONI:  Your Honor, briefly, of

11   course, there's no evidence at all that anything's

12   been amended, let alone any of the proofs of claim

13   reviewed by our experts.  So I don't think you can --

14   I don't think the coalition can moot the relevancy of

15   a witness through non-presentation of evidence.  Okay?

16   It's like plus and besides that, look, the testimony

17   is being offered for what happened.  It's like the

18   same lawyers are going to be asked to self-certify

19   here, so I -- it's like it's directly relevant to

20   what's before the Court on procedures and what

21   procedures ought to be put in place.

22          THE COURT:  Thank you.

23          MR. SCHIAVONI:  I take it there's no -- but

24   I do take it there's no objection from -- from the --

25   from Brown Rudnick (phonetic) to the -- Mr. Cosonov's

1    statements coming into evidence.

2        THE COURT:  Mr. Moxley?

3        MR. MOXLEY:  Your Honor, we don't take a

4    position on Mr. Cosonov's statements.  We are

5    concerned with respect to the experts that Century

6    wishes to move into evidence.

7        THE COURT:  Thank you.  Mr. Kurtz, I've seen

8    your hand up.  Do you have an objection to the

9    evidence?  I'm sure you have other things to say, too.

10        MR. KURTZ:  Yeah, no thank you, Your Honor.

11    Glenn Kurtz, White and Katz (phonetic) on behalf of

12    the debtors.  I'm only raising my hand on the

13    evidentiary issue Mr. O'Neil will be handling the

14    substance here.  We have a slightly different

15    objection.  We don't have an objection to the

16    introduction.  We don't have any objection, by the

17    way, to the verified statements of Cosonov (phonetic).

18        We have an objection, a limited objection to

19    the use of the expert declarations.  I wanted to give

20    a little background on how they got here.  They

21    weren't -- they weren't produced for or appended to

22    the objections to the voting solicitations procedure.

23    They were cited to some extent but only as -- mostly

24    at least as a historical matter for 2004 and in 2019

25    applications.

1        And we had -- it wasn't briefed.  There was

2   no explanation how it would be relevant to the voting

3   procedures.  It looked to us as if it was an effort to

4   disallow claims, although they specifically disavowed

5   that in papers, alternatively, maybe, to designate

6   votes, but the votes haven't been cast yet.  So that

7   would be premature.  We don't know who will vote, and

8   we don't know what the bonafides will be of anybody at

9   the time that they come to vote.

10        The debtors certainly have an interest in

11   ensuring that only valid claims are voted.  That can

12   be assessed only after the votes are cast, and then,

13   of course, that will have to be noticed to the

14   specific abuse victims so that they can be heard on

15   the issue.  That has not happened in this motion.  No

16   one has joined issue on this proof.  There's been no

17   discovery on it.  It came up for the first time last

18   Friday when Mr. Schiavoni indicated this should be on

19   a witness list.

20        So notwithstanding what we think would be

21   valid objections to introduction, we're only -- we're

22   only offering a limited objection to using it for

23   anything other than the belief of Century that they've

24   uncovered potentially invalid claims.  We don't think

25   it would be appropriate for the court to actually make

1  findings with respect to the validity of proofs of

2  claims or with respect to the issues of voting unless

3  we have votes and then only subject to a hearing that

4  has noticed the right parties.  We think that's all

5  premature.

6          So I'm not even positive Century is asking

7  for findings, but it sounded like it was at least

8  brushing up on that subject.  And so we object to the

9  use for -- for -- for that purpose.  We don't think it

10  would be appropriate to make factual findings that

11  there were invalid votes.

12          We don't think that there's anything about

13  the -- the investigation, which sounds like it's still

14  going on and therefore may be a little premature that

15  -- that has to do with the procedures themselves, as

16  opposed to instances where we have claims.  We would

17  ask that it be limited to the use of -- of -- of -- of

18  just Century's views on -- on potential defenses to

19  certain proof of claims that will have to be raised

20  later if at all.

21          MR. SCHIAVONI:  Your Honor, the declarations

22  I cited are in our solicitation objection.  You can --

23  they can be found at Docket Number -- I think it's --

24  if I read -- yeah, Docket 3857 on Page 10 of that

25  docket number, page 11, page 12.  Mr. Kurtz, you can

1  find them there.  They're discussed at great length

2  over three or four pages there, and in the argument

3  section.  And they were provided within the rules, you

4  know, at the -- at the time they were admitted into

5  evidence without objection by Mr. Kurtz's client or

6  anyone else.  And those declarations were also and

7  those witnesses were specifically noticed on the

8  agenda in accord with the Court's, you know,

9  requirements for scheduling witnesses.

10        THE COURT:  Okay.  Let me interject here.  I

11  -- I -- I recall the testimony and the -- and the --

12  from the previous hearing.  I don't necessarily thing

13  that because it was introduced in a previous hearing

14  that it gets introduced here.  I don't consider

15  discreet issues to be rolling.  Like this isn't like a

16  rolling evidentiary record from the beginning of the

17  case until now.

18        But let me -- let me say this.  One of the

19  reasons I didn't grant the Rul3e 2004 motion with

20  respect to the depositions of the individual

21  claimants, well, there were several reasons, but one

22  of them was I needed a context in which that discovery

23  should be taken.  And I didn't think the Rule 2004

24  openness gave me a context in which it -- in -- in

25  which it should be taken.

1           I also said that I didn't think that the

2    movants had shown that the -- I forget what they're

3    called now, but the subgroups, the population

4    subgroups, the six to seven population subgroups would

5    give a basis to file mass claim objections, which is

6    one of the reasons that those motions was filed.  And

7    that the case law related to surrounding and I'm

8    remembering Judge Fagone's (phonetic) decision out of

9    Maine, the case law surrounding what to do with, for

10   example, a proof of claim that was -- where the

11   signature was an issue.  And his cases I think had to

12   do with signatures in mortgage cases in the 2008

13   mortgage, you know, debacle.

14           The -- the result wasn't disallow a claim.

15   That was not the result of those cases where there was

16   issues where the signatory did not have knowledge,

17   supposedly.  It wasn't disallow the claim.  So there

18   were many reasons why I didn't permit the discovery at

19   that time.  We're having a context now.  We're having

20   a context in connection with confirmation where if

21   there are issues for voting purposes we can have that

22   discussion, and I permitted some discovery to start.

23   And once confirmation discovery starts, you can take

24   confirmation discovery.

25           So I think that's where -- that's where we

1    are.  We don't know who is going to vote.  We don't

2    know how the vote's going to turn out.  We don't know

3    if the counsel who have said they can deliver certain

4    votes can deliver them.  We don't know.

5              I've already heard argument, you know, we

6    shouldn't let the $3,500 expedited discovery be the

7    tail that wags the dog.  Can probably make that

8    argument without any discovery, but you can see how

9    much of the coalition group is in the 3500.  We're

10   going to have that information, and I think it would

11   be appropriate for appropriate parties to be able to

12   do that discovery.

13             Now, I'll say this again because I have to

14   think about it.  The insurance company is not going to

15   be voting in that group.  Their vote is not going to

16   be decided by the votes of the survivors.  So I need

17   to think about the context in which the insurers can

18   use that information.  There may be another context in

19   which you can use that information.  But I understand

20   the issue.  I did have an expressed some concern about

21   the way some of these claims were generated.  I've

22   permitted discovery with respect to the aggregators to

23   understand how it was generated.

24             And if it creates a problem for the vote,

25   once we get the vote in, although you don't have to

1   wait to take discovery, if you don't want to, until we

2   get the vote in, we're going to have to deal with it.

3   But maybe the vote won't be influenced that way.  I

4   don't know.  I just don't know, but I think the

5   context matters.  I think we need to understand these

6   arguments in the context in which they're going to

7   arise when it comes to voting, which is the combustion

8   engineering issue, the Quigley (phonetic) issue.

9   Let's -- let's -- let's consider it.

10          And if there needs to be discovery around

11   the certifications that counsel are going to file with

12   respect to their master ballots, so be it.  I would

13   hope we don't get into side issues, but if we're going

14   to go there, we'll go there.  So I'm -- I'm -- I'm not

15   going to stop the master ballots from going out.  I'm

16   going to see where they end up, and that could delay

17   things.  I don't know.  But the debtor has decided to

18   go out with master ballots.  People are saying we

19   should.  I do have some concern about going out with

20   individual ballots given the discussion we just had

21   about ways to deliver the ballots to individual

22   survivors and to ensure their confidentiality.  So I

23   do have concerns about individual ballots at least in

24   some circumstances.

25          So I understand the issues, but in terms of

1    I'm looking at what you -- the relief you want from

2    it.  I'm not going to go with individual ballots here.

3    I -- I -- that could leave us in a situation where we

4    have problems at confirmation.  But it's what the

5    debtors requested.  Given the discussion we just had,

6    I'm not going to in the first instance send out those

7    individual ballots.

8              If there's a separate, and maybe there needs

9    to be, as I said before, some separate certification

10   page that we need to do to get more information from

11   law firms that are sending out the master ballots or

12   that are submitting the master ballots, I'm okay with

13   that.

14             And, yes, I recognize that I cannot police

15   people's ethical -- whether they follow their ethical

16   obligations or not, but there may be a consequence if

17   what I see in front of me suggests that we had a

18   problem.  And I'm going to deal with it on voting.

19             MR. SCHIAVONI:  Your Honor, I'm not going to

20   -- I'm not rearguing anything, but just, you know, I -

21   - so I hear your ruling on the master ballots.  You

22   know, the alternative step you could take is to

23   require that everyone who files a master ballot by

24   doing so is 2019.

25             THE COURT:  I actually think that's fine.

1            MR. SCHIAVONI:  And -- and --

2            THE COURT:  I don't have a problem with

3     2019.

4            MR. SCHIAVONI:  -- and has to file a

5     complaint 2019 statement.

6            THE COURT:  I have no problem with that.

7     They should file a 2019 if you're going to do a master

8     ballot.  I think that's perfectly acceptable, and I

9     see no reason why a law firm should have a problem

10    doing that.

11           MR. SCHIAVONI:  Your Honor, just to try your

12    patience on just one further thing, okay, the -- look,

13    I -- I hear why the -- the claimant 2004 was denied.

14    Okay?  The whole concept of us filing at that time the

15    two different 2004s were they were coming at this from

16    the two ends of the pipeline.  The one was -- that was

17    denied was let's see what comes out and test certain

18    proofs of claim.  And -- and Your Honor found

19    statistically that didn't work or wasn't -- wasn't --

20    didn't provide sufficient support and denied it.

21           But the other one was still getting at the

22    same point of what proof of claim challenges could be

23    filed but in a different way.  It was trying to

24    identify the sources of the proofs of claim, okay, by

25    who was generating them and where the problems were to

1   target objections at that.

2          Now, you're -- you know, we're not before

3   you on a request to file an omnibus relief there, but

4   in part that was the point of that discovery, to file

5   clusters of it.  So we're pursuing the aggregator

6   discovery.  We'll pursue it with light speed, but Your

7   Honor said we have to come back to you on some of the,

8   you know, on the other part of it with lawyers, and

9   I've got the -- the problem with lawyers, deposing

10  them, okay, but to get at the problem faster if we

11  could have relief from two or three, to allow two or

12  three to go forward, that would just allow us to move

13  at a quicker speed and get at the answer I think

14  quicker.

15         THE COURT:  I don't think you need my

16  permission to proceed with confirmation discovery.  So

17  you should proceed with it, and if parties have

18  problems, they can file a motion for a protective

19  order.  I want it all brought on quickly, and I'll

20  deal with it, but recognize, again, that the case law

21  even around -- am I going to throw out people's proofs

22  of claim because they hired the wrong lawyer?  That's

23  a good question.  And -- and the case law that I read

24  in any event, doesn't suggest that.  It would give

25  parties an opportunity to amend their claims, and I

1  understand I don't have evidence.  But there's

2  representations in front of me that some 20,000 I

3  think was the -- was the number plus have amended

4  claims.

5          My guess is because of the signature lines,

6  some of the lawyers corrected that.  So that's the

7  issue I'm struggling with is what would I do with the

8  information that you gave me, and I'm not saying I

9  can't be convinced.  I'm saying we looked at the law,

10  and we -- at the time, and we independently, and we

11  didn't see case law that suggested that you could

12  disallow these claims, which was really the basis for

13  the motions, as I recall.

14          Now, if there's an issue, I understand the

15  issue with voting.  That's perhaps a little bit of a

16  different issue, but, again, disenfranchising

17  claimants because of an action their lawyer took or

18  didn't take, assuming, of course, the underlying

19  validity of the claim.  And that's the -- you know,

20  that's the -- the issue.  If somebody has a valid

21  claim, would I throw it out because their lawyer mass

22  produced a signature.

23          MR. SCHIAVONI:  Your Honor, I -- I

24  understood that is how you focused on it, but that was

25  really not the direction we were going in there.  It's

1  like the context was -- to give context to it, was we

2  did subsequently give you this declaration of Verona

3  Stensonson (phonetic) who was one of the people who

4  worked in the boiler rooms.

5          THE COURT:  I do recall that.

6          MR. SCHIAVONI:  And the point here was not

7  to disallow -- like I got it, a big fish net could go

8  out and it could pick up some valid claimants and it

9  could be picked up in a bad why by an aggregator or

10 something, but the guy could still have a valid claim.

11 I understand that, but the point is that somebody

12 working at $15 an hour, it's like that's where the bad

13 claims may be concentrated.  That's what -- that's

14 what we were trying to get at.

15         THE COURT:  And I'm going to let you do it

16 now.

17         MR. SCHIAVONI:  All right.  Thank you, Your

18 Honor.

19         THE COURT:  Later than you want, but I'm

20 going to let you do it now, and we'll see how the vote

21 comes back.

22         MR. O'NEILL:  Thank you, Your Honor.  So if

23 I -- if I'm following correctly, and I don't want to

24 give you more than you need because I feel like you

25 kind of got to the conclusion already.

1          So I was going to correct the record on

2    quite a few things that Mr. Schiavoni said, but I'm --

3    I'm not going to do that, not just because I take

4    visual cues like somebody shaking their head no, but

5    because it was my inclination.

6          So I think what we'd propose, Your Honor, is

7    we have some work to do to clean up the certification,

8    and I think the order.  We have several people that

9    are in on the discussion about how to properly

10   distribute packages, vis-à-vis paper packages versus

11   other options versus no option, if somebody opted for

12   confidentiality.  And we will take all of that on and

13   move it along, Your Honor.

14         On -- on a general matter we heard you loud

15   and clear that -- that we'll proceed with the master

16   ballots and that you expect firms that submit master

17   ballots to submit a 2019 statement, either before or -

18   - or -- or when they submit that master ballot.

19         THE COURT:  No later than contemporaneously.

20         MR. O'NEILL:  Okay.  Thank you for that

21   clarification, Your Honor.  We'll get to work on that,

22   but I think just for the wake of completeness, there

23   were two more objections on the chart.  One is Ms.

24   Wolff, and I think this is number 68 at page 115.

25         And I believe this is moot, Your Honor,

1   because it's -- it's about the (inaudible) plan.

2          THE COURT:  Okay.  Is Ms. Wolff on the

3   phone?  I haven't seen her today.

4          MR. O'NEILL:  Okay.  We'll -- we'll move

5   along, Your Honor, and then 69 was from a pro se

6   claimant, and I'm not sure if that person is on the

7   phone, pro se claimant 242.  And this was Docket

8   Number 6027.  And this is about the bar date notice by

9   publication in the Prison Legal News.

10          I think, you know, our view is that the bar

11   date noticing procedures were -- were sufficient.  I

12   think we've taken some counsel on this call from Mr.

13   Buchbinder, which is good counsel about prisoners and

14   their unique needs in terms of receiving  materials.

15          So we'll endeavor to -- to make the packages

16   that they get going forward marked with something that

17   -- that notes the urgency of the contents, Your Honor,

18   so hopefully that fixes this going forward.

19          THE COURT:  Which objection was that?

20          MR. O'NEILL:  This is Number 69, Your Honor,

21   on Page 115.

22          Oh, you know what, Your Honor, it's been

23   pointed out to me that this is listed number 70 as

24   well, and it's been resolved.

25          THE COURT:  Was it resolved?

1              MR. O'NEILL:  Apologies, again.  This piece

2    that I'm talking to you about has not been resolved,

3    the part under Number 70 miscellaneous has been

4    resolved.  But you've heard the debtor's position.

5    I'm not sure anyone is on the phone on this topic.

6              THE COURT:  Okay.  Was our -- the pro se

7    claimant who filed the objection, did he use his name?

8              MR. O'NEILL:  We might have it, but we think

9    it was redacted, Your Honor.

10             THE COURT:  Okay.  If there is a pro se

11   person, someone representing themselves who filed this

12   objection with respect to notification to men in

13   prison, I'm happy to hear from you.  I'm not hearing

14   anyone.  Mr. Lucas, I see your hand.

15             MR. LUCAS:  Thank you, Your Honor.  I -- I'm

16   sorry for the -- sort of the process question, just

17   going forward with respect to the Court's ruling about

18   the 2019 statements, but I -- I just sometimes foresee

19   some of the -- nothing is simple, I think, sometimes

20   unfortunately.

21             Should the counsel presume that they can

22   file the list of their client's names under seal, or

23   just file the list of the proofs of claim numbers or

24   something like that to identify the list of their

25   clients?

1          THE COURT:  Don't we -- do we have -- didn't

2     we go through this before in this case about 2019

3     statements.

4          MALE VOICE:  This is (redacted name).

5          THE COURT:  (Redacted name.)  Yes.

6          MALE VOICE:  I am Abuse Claimant 242, and I

7     -- I mentioned this objection to re-publish the bar

8     date notice in Prison Legal News in my filing.

9          THE COURT:  Okay.  And your concern I take

10     it is that certain men in prison did not receive the

11     previous notice?

12          MALE VOICE:  That's correct.  I cited a

13     letter to Your Honor that was previously on the docket

14     to that effect.  And so I don't know how widespread

15     that actually is, but it -- I -- based on the filings

16     and other public discussion it seems plausible that it

17     may have happened.

18          THE COURT:  Thank you.  I do recall

19     receiving at least a couple of letters with respect to

20     -- from men in prison with respect to notice issues.

21     I'm going to say this, that to be effective notice, it

22     may be that it needed to be received by a man in

23     prison.  And there may be an argument that, in fact,

24     notice wasn't appropriate.  And there might not be

25     that would have an effect.  Let's put it that way.

1  Claims may not be channeled.  They may have

2  outstanding claims post reorganization.  It will

3  depend on the circumstance and their particular notice

4  issue.

5          I probably would not be the first judge to

6  recognize that persons who are incarcerated have

7  difficulty getting notice, and I would suggest that

8  the debtor consider along with others here whether any

9  further or different notice might be preferable so

10 that they don't end up post-confirmation with any

11 significant number of notice issues.

12         So I appreciate your bringing that forward,

13 (redacted name).  And as to whether there should be

14 any kind of notification if the -- if -- which I

15 assume, but I don't recall, that you're going to do

16 publication notice of confirmation hearing, et cetera,

17 you might consider publishing that in the Prison Legal

18 News.

19         MR. O'NEILL:  Thank you, Your Honor.

20         MALE VOICE:  Thank you.

21         THE COURT:  Thank you.  Thank you, (redacted

22 name).

23         I thought I saw another hand before.  Mr.

24 Patterson?

25         MR. PATTERSON:  Your Honor, I'm just not

1  sure where we ended up with certification.  I gather

2  the debtor is going to work on it, but I thought it

3  might be helpful just to round out that discussion

4  with a couple of other views.  It -- it really seems

5  to us that, one, because the certification is going to

6  cover voting potentially settling the claim with the

7  $3,500 election, potentially opting out or not opting

8  out of a release, this certification now covers a

9  number of very important decisions and it really seems

10  to us that the appropriate way to deal with it is to

11  require a power of attorney specifying that the

12  attorney has the right to make -- vote with respect to

13  each of those three issues in order for it to be

14  valid.

15          There are -- there are -- the way the

16  certification is worded, it is self-certification, but

17  it's also self-certification in the sense that the

18  person represents that they -- they have the

19  authority.  And I can see situations where people say,

20  well, I thought I did have the authority.  I thought I

21  had it under applicable law, or I had it under this

22  argument or that argument.  And now we're sort of in a

23  situation where the Court is upset because the person

24  didn't have the authority.  They're upset because they

25  thought they did.  There's a question about it, and it

1  just seems to me that the proper way to deal with this

2  to seal it all off is to just require up front that

3  master ballot requires a power of attorney from the

4  applicable client with regard to each of the three

5  items.

6          MR. O'NEILL:  Yeah, Your Honor, this is

7  Andrew O'Neill for the debtors.  We think that -- we

8  appreciate Mr. Patterson and his ideas about ways to -

9  - to beef up the certification.

10          Rule 9010(c) does not require a power of

11  attorney to vote.  The -- the -- the election of your

12  treatment under a plan is tantamount to part of the

13  plan voting process.  So is giving releases.  This --

14  this strikes me as something that we don't need.

15  Furthermore, we already have, which I described

16  earlier, the audit available to the debtor, where we

17  can request authorization to see the power of attorney

18  or authorization that attorneys have to vote on behalf

19  of their clients.  So we think we're already covered

20  here, Your Honor.

21          MR. GOODMAN:  Your Honor, this is Eric

22  Goodman.  I don't know if you can see my hand up or

23  not.

24          THE COURT:  Yes.

25          MR. GOODMAN:  I just wanted to point out

1  again I'm back to my favorite paragraph 5(a)(a), and,

2  again, I'm annoyed that it doesn't go 5(a) and then

3  (1), but it is what it is.

4         Firms that are reporting, sorry, under

5  section B to have the authority to vote, which, again,

6  is very different than authority to cast a vote that

7  the client is making, would require a power of

8  attorney.  That's already in the procedures, but if a

9  firm is simply transmitting the vote as cast by the --

10  or as made by the survivor client serving as sort of a

11  voting hub if you will, that that does not require a

12  power of attorney.  Nor do we think that it should

13  under the procedures.

14         The other thing that I would like to just

15  call to the Court's attention, these -- these

16  procedures were put together back in the -- I think in

17  the May/June timeframe, the coalition, the debtors,

18  and the TCC all having input onto these issues.  And I

19  -- I think that on -- on this point we did get it

20  right, that if you are simply communicating the vote

21  to -- to Omni from the clients that that would not be

22  something we required.

23         Mr. Smola?

24         MR. SMOLA:  Your Honor, I'm just going to

25  harken back to what I said earlier.  A yes vote

1  compromises a client's rights against their local

2  counsel, compromises a client's votes against a

3  charter, and it waives, presuming they don't elect the

4  $3,500 option.  It -- it declines an offer, so a power

5  of attorney is sort of a -- a -- normally in a

6  conventional personal injury case, you would want that

7  in writing.

8           You would want a release of the local

9  counsel claim.  You would want a release of the

10 charter claim.  Your client would sign off on that.

11 You could never sign off on that as -- as the attorney

12 for the client.  The client has to sign off on that.

13 Here we're in a different setting where a yes vote

14 effectively waives those rights and sort of almost

15 doubles as a release.  I think a power of attorney is

16 sort of a bare minimum here, and I think it should be

17 required.

18           THE COURT:  Mr. Schiavoni?

19           MR. SCHIAVONI:  Yeah, I mean, Your Honor, to

20 the extent we ever were to become a settled insurer,

21 it would be very important for us to have a power of

22 attorney to know that these releases have effect.  And

23 it -- it makes it more difficult to become a settled

24 insurer without having that power of attorney.  That's

25 one.

1          Two, I -- like I'm completely mystified by

2    this description in the solicitation procedures about

3    how individual claimants provide the ballot to the

4    balloting hub, and then -- and then they sign a master

5    ballot.  If -- to the extent they have it, I -- I just

6    don't even understand what that means.  If -- if they

7    have a ballot from the individuals, that should just

8    be -- like why isn't that just made part of -- it

9    could be bundled up by the voting hub law firm and --

10   and given to the -- you know, to the claims agent as

11   proof of the vote.  It's like to -- to demonstrate it.

12          I -- I don't even understand what's

13   contemplated by a communication of voting that doesn't

14   get produced.  I mean that would seem to be part of

15   it, and then, third, this audit right, to make it like

16   the only person who gets to see the audit is the

17   debtor who is self-interested in the outcome, it --

18   like it would seem to me that should be transparent

19   and part of the report by the -- by the agent, you

20   know, what was found and -- and then those -- those

21   results produced as part of the report.

22          [crosstalk]

23          THE COURT:  I will tell you what I'm

24   intrigued by is that the -- the parties that are

25   suggesting and supporting the power of attorney are

1    Plaintiff's lawyers.

2            MALE VOICE:  Right.

3            THE COURT:  So they don't seem to have a

4    problem with it.

5            MR. O'NEILL:  Well, Your Honor, it's -- it's

6    required under the certification.  I just want to be

7    clear because I think the waters got a little muddy

8    here.  It's -- it's required.

9            THE COURT:  What's required?

10           MR. O'NEILL:  A power --

11           THE COURT:  A power of attorney?

12           MR. O'NEILL:  We're just not requiring them

13   to provide it with every -- as with respect to every

14   vote that they're providing.

15           THE COURT:  Oh, well, if it's required, why

16   shouldn't they provide it?  Why shouldn't it be in the

17   backup?

18           MR. SCHIAVONI:  Your Honor, it's not

19   required.  It's not what the order says.  5(A) says a

20   power of attorney or other written documentation to

21   that effect may be requested by the debtors in the

22   debtors' discretion.  It doesn't say it has to be a

23   power of attorney.

24           THE COURT:  Mr. Zalkin?

25           MR. ZALKIN:  I would just like -- I -- I'm

1  just echoing what Mr. Smola said.  I think this is too

2  vital and too critical and as -- as an attorney

3  representing the survivors in this case, I -- I agree.

4  I think a power of attorney should be required, and we

5  would have no problem with that.

6          THE COURT:  Mr. Goodman?

7          MR. GOODMAN:  Your Honor, I just wanted to

8  point out something that -- it's obvious to me, and I

9  just want to make sure that it's clear to the Court.

10 There are a number of state court firms involved in

11 this case that are supportive of the plan.

12          There also are a number of firms in this

13 case that want nothing more than for the plan to be

14 voted down and will be objecting to the plan, and will

15 be taking whatever course of action they deem

16 appropriate to prevent the Boy Scouts from confirming

17 a plan that includes a channeling injunction for the

18 benefit of the local counsels and chartering

19 organizations.

20          The attorneys that you have heard speak in

21 favor of this are all a part of the opposition to the

22 plan.  So I think, you know, the fact that they are

23 speaking up in unison with the insurance companies on

24 this issue I think speaks to sort of their collective

25 interest and what they're trying to accomplish at this

1   point in the case.  So I don't want the Court to be

2   under the impression that the state court counsel that

3   you haven't heard from necessarily agree with Mr.

4   Smola on this issue.

5          THE COURT:  Okay.  Well, let me hear from

6   anybody who disagrees.  Mr. Goodman, does the

7   coalition disagree, and if so, why?

8          MR. GOODMAN:  Again, Your Honor, on the

9   power of attorney issue, if law firms are purporting

10  to be acting as the voter, if they are voting for the

11  client, a power of attorney is unequivocally required

12  under the procedures as proposed.

13         THE COURT:  Show me where.  Show me where

14  that is.

15         MR. GOODMAN:  That's in 5(A)(B).

16         THE COURT:  Okay.  So if it's required, but

17  -- but -- but the discretion is simply to -- for the

18  debtors to -- for the debtors to request it, and if

19  it's required, then why can't we just have it attached

20  as back-up to the master ballot?

21         MR. GOODMAN:  Again, Your Honor, not all law

22  firms who use the master ballot and I would say

23  probably most of the coalition firms are not

24  purporting to be voting for their clients.  This is

25  under the 5(A)(A) section.  The firms that are simply

1   collecting and recording the votes that are conveyed

2   to them by the survivors and filing out a master

3   ballot that may say that 80 percent or 82 percent or

4   85 percent of their clients are voting yes, and the

5   other portion of their clients are voting not, you

6   know, the folks who are transmitting the vote,

7   collecting the vote, communicating with their clients

8   about what the plan means and offering the

9   recommendation, answering questions, those people

10  under 5(A)(A) in performing that function are not

11  required to require every single one of their clients

12  to execute a valid power of attorney in order for them

13  to perform that function.

14          And -- and -- and, frankly, Your Honor, I

15  think that the request to try to impose that

16  obligation on the firms in these cases is really

17  intended -- intended, that may be a little bit harsh.

18  I think it would have the effect of potentially

19  disenfranchising a lot of voters on these issues.  And

20  that's why I -- I don't think it would be appropriate

21  in that context.

22          THE COURT:  And why would it disenfranchise

23  them?

24          MR. GOODMAN:  Well, again, I -- I could back

25  to the -- you know, just the -- the nature of the

1   claimants, the challenges that exist in terms of

2   communicating with certain survivors.

3         I mean if you go back to the statements made

4   earlier about survivors being in prison, what this

5   would do is it would say, look, I can get my client on

6   the phone.  The client can tell me how he or she wants

7   to vote on the plan, and I could record that.  If I

8   have to take the additional step of requiring that

9   claimant to sign a valid power of attorney in order

10  for me to record their vote, as it is conveyed to me

11  as -- as the attorney, I do think that would have a

12  chilling effect.

13        THE COURT:  Okay.  So what if the lawyer

14  then had to keep a log of its communications so that

15  it could show that, in fact, it had received

16  instruction from its client?

17        MR. GOODMAN:  Your Honor, you're speaking my

18  language.  As I -- I said earlier, we know what we're

19  up against in this case.  We know what the various

20  parties' objectives are, and, you know, to think that

21  someone would be coming into this without dotting

22  every "i", crossing every "t" and maintaining an

23  appropriate record, if and when this is challenged, I

24  think you can definitely expect that a lot of firms

25  are going to do that for -- for that very reason.

```
 1              THE COURT:  Mr. Smola?

 2              MR. SMOLA:  Your Honor, I was going to -- I

 3    was going to echo that.  This Court will have

 4    affidavits from me and the lawyers in my firm about

 5    the communications we had with homeless clients.  It

 6    will have the dates, the times, the instructions we

 7    provided them, the advice we provided them, the

 8    options they had, and it will say how they instructed

 9    us to vote on their behalf.

10              And for those clients that require that, we

11    will have affidavits from lawyers.  Otherwise, we will

12    have power or attorneys.

13              THE COURT:  Thank you.  Mr. Stang?

14              MR. STANG:  Thank you, Your Honor.  Just --

15    I assume at some point we will go back through the

16    order because there would be some miscellaneous things

17    we pick up, but two things.  I can't tell from 5(A)

18    how the firm shows that it was the hub, using Mr.

19    Goodman's terminology, or actually exercising, or --

20    or -- or voting?  It -- it's not clear to me now one

21    differentiates that so we know whether a valid power

22    of attorney is necessary.  That's point number one.

23              Point number two is it allows the firm to

24    collect and record the votes through customary and

25    accepted practices.  We saw when the coalition went
```

1    back initially contacted its constituency that it did

2    it on a negative notice.  You're a member the

3    coalition unless you tell us you're not.

4            So I don't know what each -- and I'm

5    speaking about all the law firms.  I am not picking on

6    the coalition law firms.  I simply don't know whether

7    law firms say to their clients, I'm going to assume

8    you're going to vote per my recommendation or vote no

9    per my recommendation unless I hear from you

10   otherwise.  I mean I don't know what their custom and

11   practice is.

12           So I laud Mr. Smola, not just because he has

13   a client on the creditors committee, but because he's

14   right.  There needs to be a record here.  There are

15   references throughout this order that people can

16   communicate with their clients by phone and record

17   their votes that way, by talking to someone.  Now, if

18   it's a homeless person, maybe there needs to be an

19   affidavit that you don't -- the person doesn't have an

20   address, but I can't really on the firm's customs and

21   practices, and a negative notice vote on this plan

22   should be addressing and tell people, I think, today

23   whether that's an appropriate way of soliciting votes.

24           THE COURT:  Okay.  Well, I did actually

25   circle those words, through customary and accepted

1  practices.  I don't know what means.  I think there's

2  a balance, and I'm not sure it's my place to interfere

3  with communications that lawyers have with their

4  clients in all kinds of different ways.

5          MR. SCHIAVONI:  I -- I just think a negative

6  (inaudible).

7          THE COURT:  I do think there needs to be --

8  there needs to be because of this plan, which has

9  multiple parts as Mr. Smola has said and as I said at

10  the very beginning of this -- of today's hearing, that

11  this has settlement authority for $3,500.  It grants

12  releases, not only to the debtor but to third parties

13  if approved.  There was something else I said in the

14  beginning.  I don't remember anymore, but these --

15  this isn't just a vote yes or no on a plan.  It's,

16  essentially, authority to settle a claim or not -- or

17  not to accept an offer.  I mean that's -- it's one of

18  the other.

19          So if parties want to do it by power of

20  attorney, that might be the appropriate way to do it.

21  If they want to -- I think there needs to be a record.

22  That's what this suggests.  They're going to collect

23  and record, collect and record is an affirmative

24  obligation.  I'm going to reach out to my client.  I'm

25  going to collect a vote, and I will therefore vote the

1  way my client tells me to do.  I'm not voting for him

2  with the power of attorney.  And if you're going to

3  reach out and collect and record a vote, I think it's

4  an affirmative vote.

5          MR. GOODMAN:  Your Honor, I'm sorry I didn't

6  want to interrupt.

7          MR. SCHIAVONI:  Your Honor, does --

8          THE COURT:  Mr. Goodman?

9          MR. SCHIAVONI:  -- affirmative mean

10 expressed?  Is that what you mean by an affirmative

11 vote, an expressed vote, not negative notice.

12         THE COURT:  I think they need to talk to

13 their client.  I think they need to talk or reach out

14 to their client and find out how their client wants to

15 vote.

16         Mr. Goodman?

17         MR. GOODMAN:  Your Honor, just to clarify a

18 few points, I think Mr. Stang's comment was

19 inaccurate.  There is no one who is a member of the

20 coalition on negative notice.

21         THE COURT:  Great.

22         MR. STANG:  No, initially.  Initially, Mr.

23 Goodman, that's the way it was done initially.

24         THE COURT:  I recall how this -- I recall

25 how this played out.

1              MR. STANG:  Yeah, I said initially.

2              MR. GOODMAN:  All right.  Well, so long as

3    we're clear on that point.  Your Honor, again, the --

4    the language that we inserted in here, and it's

5    important from our standpoint it's clear that people

6    have to make an informed decision on this plan.

7    Survivors are entitled to make an informed decision,

8    and that means to me that they are providing

9    affirmative guidance to their counsel as to how they

10   want to vote.

11             So I do not support and I would not support

12   negative notice in this context.

13             THE COURT:  Okay.  It seems like we're in

14   agreement.  That's a first.

15             MR. SCHIAVONI:  But -- but -- but, Your

16   Honor, how is -- how is that to be documented? Is that

17   like a document that gets turned over to the

18   (inaudible) agent?

19             THE COURT:  I think there should be some

20   kind of backup to the master ballot that has some kind

21   of chart that references how they got the affirmative

22   vote from their client, that they are recording, or if

23   they are voting on behalf of their client, their power

24   of attorney.

25             MR. O'NEILL:  Your Honor, I think we may be

1   able to accommodate that on the exhibit to the ballot,

2   and figure out a nifty and thoughtful way to do that.

3           THE COURT:  Yeah, I'm not going to get into

4   the weeds on that.  I think we have agreement now on

5   how to proceed and I'll let the parties figure out how

6   to document it.

7           MR. O'NEILL:  Okay.  Thank you, Your Honor.

8           THE COURT:  Thank you.

9           MR. O'NEILL:  Thank you for your time.  I

10  think we're at the end of the agenda.

11          THE COURT:  I think --

12          MR. O'NEILL:  Or am I wrong?

13          THE COURT:  -- Mr. Stang had some concerns

14  with the order --

15          MR. STANG:  We were going to go back to the

16  order.

17          THE COURT:  -- we haven't gone through.

18          MR. O'NEILL:  Oh, I apologize.  I apologize.

19          MR. STANG:  Your Honor, we may have touched

20  upon them, but you had also done your own circling you

21  just said a moment ago.

22          THE COURT:  Yeah, I'm looking.

23          MR. STANG:  So I think a lot of the things I

24  was going to say have been picked up in the course of

25  this.  I just -- I don't know how you want to proceed.

1          MR. PATTERSON:  Well are we also talking

2   about the schedule at this point, Your Honor?

3          THE COURT:  We haven't done that.

4          MR. STANG:  Your Honor, we also had the

5   issues about some discussion of confirmation issues,

6   as they may relate to the solicitation going out.  I

7   know you addressed that in part, but you did say I

8   thought late yesterday you would consider limited time

9   argument on that.  I don't know if people still want

10  to pursue that.

11         MR. ABBOTT:  Your Honor, Derrick Abbot.  If

12  I may be heard quickly.  We had talked a little bit

13  about hat at the beginning of the hearing.  Obviously,

14  we are at the Court's pleasure, but it is critical to

15  talk about scheduling and how we get from now to

16  confirmation in terms of discovery and those sorts of

17  things.  And I know Mr. Kurtz is anxious to address

18  those, and I'm not sure which the Court would prefer

19  to do first.

20         THE COURT:  We're going to take scheduling,

21  and I'm looking through the order.

22         MR. PATTERSON:  The confirmation schedule,

23  Your Honor, is at Document 6216 and the red line page

24  5 of 7.

25         MALE VOICE:  Well, wait a minute, are we on

1  scheduling or are we on the solicitation order review

2  as a final kind of recap?

3       THE COURT:  I think let's finish up with the

4  solicitation order and the solicitation procedures,

5  which I think also include the timing.  I know I

6  reviewed it somewhere.  It's here on page 5 of the

7  order.

8       MR. SCHIAVONI:  You had suggested that you

9  might entertain an hour or something of argument on

10  the -- the legal merits, Your Honor.  It's like we do

11  think there's a direct link between some of the legal

12  merit issues on what's going to be done, what findings

13  are going to be pursued, and the -- the schedule.

14  Like the two things are linked, just like how you

15  addressed with what ended up being a sort of core

16  issue with the RSA, that, you know, it's like where

17  you admonished us and we probably should have listened

18  to you about let's focus on what we're doing here, so

19  to speak.

20       I don't know you probably have a more

21  articulate way to put it, I'll hand it to you, okay,

22  but I do think that maybe scheduling is not a 6:00

23  argument for tonight, that like if it would -- we

24  could have that hour discussion after an hour on the

25  legal merits.  You might find that we -- like there's

1   a lot of efficiency built into it.  It's -- it's not a

2   delaying measure, but it's like I do think there's a

3   link between, you know, how broad like what we're

4   doing is and what -- what time we need to do it.  So,

5   you know, doing the two together might make some

6   sense.

7                Ms. LAURIE:  Your Honor, this is Jessica

8   Laurie (phonetic) if I may step in for just a moment

9   with a couple of thoughts on that.  One, the reason we

10  encouraged the Court to raise the scheduling today is

11  because the debtors' schedule that we put out, and we

12  understand that Your Honor is inclined to grant a 60-

13  day solicitation period, so there may be some

14  adjustments to that.  But the schedule that the debtor

15  put out does contemplate that document discovery

16  requests I believe are due the 27th, so four days from

17  now.

18                And I do think also in light of Your Honor's

19  statements today concerning, you know, we need to get

20  confirmation discovery up and running, it is -- it is

21  open now that we provide some guidance with respect to

22  that issue before we go into the weekend.  So that is

23  why we had suggested that confirmation scheduling be -

24  - be addressed today.  I think as Mr. Abbott said at

25  the outset of today's hearing, we have a lot of work

1  to do still on the disclosure statement, including

2  communications with parties, including working through

3  some of the plain English disclosures.

4         We do envision ourselves coming back before

5  the court.  We would love to have Tuesday with

6  potential overflow for Wednesday.  But I do think

7  we're not suggesting that we're closing things out

8  tonight.  We just wanted to address some issues that

9  are particularly timely.

10         MR. SCHIAVONI:  But, Your Honor, it begs the

11  question to know what discovered issue as to what --

12  what is going to be at issue.  It's like the two

13  things are directly tied.  This is like a friend of

14  mine as a trial lawyer once said if I had a little bit

15  more time to pack, I would pack less, and, you know,

16  having this argument four days from now or three days

17  from now, it's like I just think you're more likely to

18  get a more efficient.  We can send out blunderbuss

19  discovery as fast as possible, I suppose, but it's

20  like I think just we're talking three or four days

21  here to have a discussion that might make it a lot

22  more logical about what discovery is sought.

23         MS. LAURIE:  And, again, Your Honor, I think

24  that's my point.  Right now we don't -- we may not

25  need a deadline of next week with respect to

1   discovery, but we do think we should broach the issue

2   from a timing perspective so that parties actually

3   have the ability to refine discovery based upon the

4   timeline.  That's all we're suggesting.

5          MR. SCHIAVONI:  But the discovery is driven

6   by what the substance is, not by the timeline.  It's

7   like what discovery is going to be needed.

8          THE COURT:  And you think that we're going

9   to narrow the view on that?  I thought the position

10  was the plan should not go out or the plan should go

11  out.

12         MR. SCHIAVONI:  Well, Your Honor, I thought

13  you made it clear that you were going to rule on

14  solicitation, on the disclosure statement and to the

15  extent you're going to issue it you're going to issue

16  it.  But you were going to entertain an hour on -- on

17  argument about what was -- whether or not the plan

18  should go out or not, and that would involve pure

19  legal issues about what the -- what is really going to

20  be in the plan, what findings are going to be sought

21  and what not.  You know, if you remember with the RSA,

22  it's like as Your Honor focused the parties on this is

23  what the -- this is what the finding would be, and as

24  it narrowed, it lessened the discovery.  There's some

25  issues here about the findings that are required that

1   would -- would -- would require tremendous amounts of

2   discovery and that if they're going to be -- it's like

3   I think we would want to be heard as part of that hour

4   discussion, substantively on whether those are

5   appropriate or not.  But if they're deemed not to be

6   appropriate, I think you ought to hear as part of that

7   argument the discovery associated with them because

8   the -- the two are tied together.

9           It's like if, in fact, it's like as in the

10  coalition's pleadings all insurance issues are going

11  to be decided in this case and that, you know, broad

12  and comprehensive findings are going to be made in

13  that regard, you know, no surprise we're going to need

14  a lot of discovery.  Okay?  And we're going to need

15  some time for that.  If it's going to be narrower than

16  that, and, no, contrary to what the coalition has said

17  in its papers, we're not going to be seeking --

18  they're not going to be seeking findings on binding us

19  on all insurance issues, less discovery and less time

20  is needed.  And I'm not asking you to decide that

21  issue right now in a five-minute back and forth.

22          But I am suggesting that hearing us on an

23  hour on that would be use -- it ties right into what

24  this discovery is and what the schedule will be.

25  Otherwise, the scheduling discussion is just going to

1  be in the abstract.  The Boy Scouts want to get out as

2  fast as possible, and how can we do it before the year

3  is done?  It's going to be a discussion in the

4  abstract and not tied to what actually needs to be

5  done in the case.

6          THE COURT:  Okay.  I see Mr. Brown.  I see

7  your hand.

8          MR. BROWN:  Thank you, Your Honor, and good

9  afternoon.  Thank you for staying long and late, a

10  long day.  Just contextually, I thought it might be

11  helpful and Ms. Laurie (phonetic) referenced this.

12  The -- the current scheduling order, and I also think

13  there was -- there's a couple before you.  The one

14  that was referenced was 6216, but then there was an

15  amended one filed, which is 6320.  I think the debtor

16  is proposing the later one, which has even shorter and

17  more brutal deadlines, but we'll deal with that when

18  we deal with that.

19          But in any event, the thing that I just

20  wanted to highlight is what is -- is put an

21  exclamation point on what Ms. Laurie (phonetic) said.

22  These were all -- all the dates in the debtor's

23  proposed scheduling order for plan discovery and the

24  like were based on a much shorter solicitation period,

25  which I think the Court has already indicated is not

1   going to pass muster.  So right now the current

2   scheduling for the solicitation date is October 4, and

3   the voting deadline is November 16.

4            So we're already completely blown out of

5   what the debtor is proposing just based on the

6   solicitation timeframe alone.  And so I think that's

7   -- it's important to view what -- what's being said

8   here in terms of the wisdom of understanding what's

9   going to be at issue and how taking a little more time

10  to consider that is really a non-issue in terms of the

11  overall timing of this because we're already not

12  anywhere, we're already out of the land of the

13  debtor's proposed order.

14           THE COURT:  Mr. Kurtz?

15           MR. KURTZ:  Thank you, Your Honor.  I think

16  you put your -- your finger on it when you said don't

17  we already know what they're going to be seeking in

18  discover?  The plan is the plan.  Everybody knows what

19  the objections are.  We've been hearing about them for

20  a long time.  We've been hearing about them for a

21  week.  Mr. Schiavoni has confirmed their ability to

22  get their requests out.  If they believe by something

23  that happens next week that they can limit some of

24  that discovery, we would be very pleased to hear that.

25  I don't really expect to receive a call like that.

1           The schedule is really critical at this

2    point, and before I address what the schedule should

3    be and why we think it's more than enough time because

4    it will be modified.  What's on record will be

5    modified based on the 60-day solicitation period here.

6    I just want to highlight why the timing here is so

7    important, and that's that the debtors are running out

8    of cash.

9           By the end of the first quarter, the debtors

10   are projected to no longer have the cash necessary to

11   fund a full financial contribution to the plan.  If we

12   had a December 31 emergence, and I realize that's

13   pretty aggressive at this point, but maybe still

14   achievable, the debtors contribute $59 million in

15   cash.

16          By the time we get to March, the end of

17   March, the contribution drops to 26 million.  By the

18   time we get to May 1st, the contribution is at zero.

19   So delay here impairs recovery for abuse victims and

20   also may render the plan not feasible without

21   adjustments that would require further concessions to

22   a deal that was lengthy in achieving, difficult and

23   hard fought, in -- in mediation.

24          So the schedule is basically case critical

25   here, and although I am sure that the parties

1   legitimately would like to have some more time to

2   engage in discovery notwithstanding their request that

3   we delay this discussion until next week.  I'm also

4   sure that delay is a goal for the objectors because if

5   the objectors can get delay and they can time out the

6   plan, they don't have to win on the merits.

7           So delay is -- is -- is -- is also a goal in

8   and of itself.  Now, I recognize that the plan that we

9   have the schedule on the plan that we had proposed,

10  was not maybe overly generous with the calendar, and

11  the good news is it's going to get longer based on the

12  Court's remarks about a 60-day solicitation.  I think

13  we're going from two and a half months or so to

14  approximately three and a half months.  So everybody

15  gets more time without even having to fight about it.

16          And -- and those objecting to relief almost

17  always want more time, but I know that everybody

18  always completes the work they have to complete within

19  the time period that's provided.  That's true in every

20  case.  That's certainly been true in this case.  The

21  objectors have repeatedly told this Court that they

22  didn't have enough time to object, only to file

23  absolutely comprehensive objections and argued

24  absolutely comprehensive objections within the

25  scheduled time, and without failing to raise any one

1    of their objections.  So we can get there.

2           It's important to note we're not starting

3    from scratch.  The debtors have provided a substantial

4    amount of discovery in this case.  We've produced a

5    lot of documents.  We've provided depositions.  The

6    objectors have been working on their objections.

7    Frankly, for months, we've heard about them.  We've

8    heard about them this week.  And we are confident that

9    the objectors will mount the same challenges in the

10   same way on any schedule, whether it's two and a half,

11   now three and a half months or two and a half or three

12   and a half years, we're going to see the same

13   challenges.

14          And we believe that the three and a half

15   months or so that we would be proposing now coupled

16   with the discovery they've already had, and the fact

17   that they have been free to seek confirmation

18   discovery and, in fact, they have done that to some

19   extent is adequate.

20          It will keep the cases on track to

21   paraphrase Your Honor from this week, and, frankly,

22   when parties have deadlines, they tend to get to

23   resolutions leading up to or at the date of the

24   deadline.  And that tends to mean that matters will

25   resolve faster if we have a tighter schedule than they

1   will otherwise.  So I would submit that maybe some

2   pressure here would actually help, but in any case I

3   understand why the objectors would want more time even

4   without the interest in delay.  But I would submit

5   that when you balance the relevant interests and

6   consequences to a delay, it is -- it's better to have

7   the lawyers work hard than it is to -- to -- to have

8   reduced recoveries to abuse victims and potentially a

9   step backwards where we have to restart with a plan.

10          We had suggested a number of interim dates

11  that were directed towards a confirmation hearing on

12  December 9.  That's no longer, I think, on the table.

13  We would reset those interim dates working backwards

14  from a confirmation hearing that we would hope to get

15  as soon as we could after the -- after the

16  solicitation period.  We can talk to everybody about

17  it.  We tried to have a dialog about interim dates

18  before.  We got no, no, no -- we got objections to the

19  timeline but no suggestions on how to allocate the

20  work within the timeframe we were proposing.  But

21  we'll give people another crack at that.  We'll try to

22  be flexible.  We think we -- we know the best way to

23  sort of leave enough room to get it done, but we think

24  there's more than enough time.  I think everybody on

25  this hearing has probably tried a confirmation case on

1  less than three and a half months even without getting

2  all of the discovery they've had so far.  And given

3  the cash drain here, we think it should be set, and it

4  should be set as soon as it can be.

5            THE COURT:  Okay.  Well, Mr. Kurtz, are you

6  -- I heard two things there I think at the end.  One,

7  we'll work with everybody to come to a schedule, and,

8  two, we should schedule it as soon as possible.  So is

9  there -- is there a proposal?  And I will confess I

10  don't have the right document in front of me so I'm

11  going to need to take a break if I need to get it.

12  But I'm -- I guess I need clarification on where you

13  were there at the end.

14            MR. KURTZ:  Right.  So -- so what I -- what

15  I would like to impose, in effect, on the objectors,

16  is a confirmation hearing date from which we can work

17  backwards.  Where I think we can work with people if

18  they'll work with us this time, they didn't last time

19  would be to populate the dates between now and then.

20            THE COURT:  On the interim dates.

21            MR. KURTZ:  So as to allow for the -- the

22  work to be done in a productive way.

23            THE COURT:  Okay.  Thank you.

24            Mr. Ryan?  It's frozen to me. I'll come

25  back.

1          Mr. Rosenthal?

2          MR. ROSENTHAL:  Yes, Your Honor.  I think

3    Mr. Plevin is going to talk about the -- the

4    scheduling issues, but I -- I do want to correct the

5    record.  Mr. Kurtz spends a lot of time talking about

6    delay, delay, and how he gave the insurers an

7    opportunity to participate, the objectors, and no one

8    said anything.  I -- I asked him a very specific

9    question.  Is your December 9 date inflexible?  And he

10   said, yes, it's inflexible.  That period of time, Your

11   Honor, at that point it was just a question from his

12   perspective of moving an already impossible schedule

13   and moving things around that already impossible

14   schedule.

15          We need more time to do discovery, and just

16   because the debtor delayed in filing the plan and is

17   where it is in the case does not mean, Your Honor,

18   that the Court can ignore the due process rights of

19   the objectors and prevent the parties from taking the

20   discovery they need to present their case.  So I'll

21   leave it there because I know Mr. Plevin wants to

22   address the specifics of the schedule.

23          THE COURT:  Mr. Plevin?

24          MR. PLEVIN:  Your Honor, my first question

25   is whether we're talking about the schedule now or

1   whether we're talking about when we're talking about

2   the schedule because I'm a little confused about which

3   we're doing.

4           THE COURT:  I guess we're somewhat -- we're

5   somewhat talking about the schedule.

6           MR. PLEVIN:  Because one of the -- the

7   reason I ask that is we have -- if we're going to dig

8   into the schedule and talk about the debtors'

9   schedule, as compared to the schedule that we proposed

10  in our papers, and by the way I never heard from Mr.

11  Kurtz even though I sent in the brief that had the

12  insurer's proposed schedule.

13          So I don't know who he was wanting to have

14  dialogue with, because I never heard from him, but we

15  proposed a very specific schedule keyed to the

16  approval of the disclosure statement, and I can walk

17  through our proposed schedule and the debtors'

18  proposed schedule and explain why theirs is not

19  workable and ours is.  And I'm prepared to do that

20  now, but I do know it's 6 p.m. and I don't think this

21  is going to be over any time soon.  And I really don't

22  see what the difference is between arguing this today

23  or tomorrow.

24          I do agree with Mr. Schiavoni that one of

25  the things I was going to say is it's important to

1    know what we're litigating here, and there were some

2    comments made yesterday by Your Honor that suggest we

3    may have a lot more litigation on our hands than we

4    hoped and that has ramifications for the schedule.  So

5    if the Court can give me some guidance as to whether I

6    should just dive in for the next half-hour or not, I'd

7    appreciate that.

8            THE COURT:  Okay.  The question with respect

9    to what discovery is necessary, and I guess what I'll

10   need some more input on is probably around the

11   findings related to the insurance that the debtors

12   seek in the plan, and whether they're really legal

13   issues we're talking about because some of them I view

14   that way, and -- or whether they're factual issues.

15   And I say that because, for example, and I don't have

16   the findings right in front of me -- well, but I

17   probably do, but not in the way that I marked them is

18   -- and I think we've had this discussion before, you

19   know, whatever the words, magic words are, fair and

20   reasonable around the -- the values in the TDPs,

21   whatever that finding is.

22            There's an argument as to what one should be

23   able to do with that finding, right, but that's more a

24   legal issue to me than an actual factual issue.  So I

25   would want to understand why people think that's a

1  factual issue rather than a legal issue because I'm

2  not, as I said, going to be interpreting someone's

3  policy that says here's the loss language in their

4  policy and, in fact, whatever number I come up --

5  whatever number's in the TDP is -- equates to whatever

6  the definition is in the policy that says here's what

7  the debtor bought.  Okay?

8         So those are the kinds of things I'm trying

9  to get my head around, but that's an easier one for me

10  because an insurance policy is here is the insurance

11  the debtor wants, here's the insurance the debtor got.

12  That's what they bargain for.  It's the contract.  If

13  someone has a contract that says, for example, what

14  I'm covering is the distribution amount in a

15  bankruptcy proceeding and not the allowed -- not the

16  full value of someone's claim who doesn't get paid.

17  Well, then that's the insurance that the debtor

18  bought.  They bought a product, and that's what it

19  was.

20         So I'm not going to be making those

21  decisions.  So I'm at somewhat of a loss of what

22  people think those findings mean and what they think

23  that they're going to then equate to.  So those are

24  the kinds of things I've been thinking about in terms

25  of the findings that people are asking me to make, and

1   I am not on a policy-by-policy basis going to be

2   making those decisions.  I don't see it.  Maybe I

3   could be convinced that I'm misunderstanding

4   something, but those are the kinds of things I don't

5   see.  And I don' think that either increases or

6   decreases the coverage that's available.  I think it's

7   what it is.

8          And that's my goal, what it is.  I don't

9   call that insurance neutrality.  Forget that term.  I

10  think it's been misused.  I recognize I'm a newcomer

11  in this field, but I think it's confusing and it's

12  been misused.  And I look at it, and I see, yes, can I

13  decide, perhaps, that the values for confirmation that

14  are contained in the TDP are appropriate?  Yeah, I

15  think I can decide that.

16         If you want to morph it into something else,

17  I'm not sure I get to do that, or that that's

18  appropriate.  So those are the kinds of issues I'm

19  talking about.  Probably shouldn't talk off the cuff,

20  but that's the easiest one to -- to talk about, and

21  now all the hands are raised.  So that's -- there's

22  some thoughts.

23         Here's what I'd like to do.  I'd like to

24  take a few minutes break here.  I'd like to get the

25  relevant document in front of me with the scheduling

Page 212
1  order, which for some reason I don't have.  My

2  apologies.  I'd like to make sure I have, which I

3  thought I did, Mr. Plevin's filing, because I do

4  remember seeing an alternate schedule.

5          So if you could tell me what docket item

6  that -- the two documents I need are to have in front

7  of me, I would like to get them during the break so I

8  can be more intelligent on the scheduling.  But in

9  that context, broader context of these findings, what

10  are the factual issues that are really in dispute

11  versus the legal issues?

12          MR. SCHIAVONI:  Your Honor, can you see why

13  we wanted to tie this to our one-hour argument on the

14  legal merits of the plan.  It's like that's really the

15  reason.  It's to tie the two together.  We just

16  thought it would be more efficient, and it's -- and

17  maybe not doing it when everybody is, you know, tired.

18  But that was the thought.  It wasn't going to delay --

19  like we weren't looking for a lot of delay on that.

20  It's just we though the two would tie together.

21          MR. ROSENTHAL:  And I think, Your Honor, it

22  -- I'm sorry to bug in, but I think it will also give

23  you a sense of the answer to the question you just

24  asked because the findings are one thing, but some of

25  the other arguments relate to whether -- whether the

Page 213

1    TDP values and criteria are actually fair and

2    reasonable and/or improperly inflate the value of the

3    debtors' abuse liability, which is -- which is

4    somewhat of a factual issue.  And so I think if you

5    understand the full scope of what we're trying to say,

6    whether you decide that it's patently unconfirmable or

7    not, I think you've already given us your -- your --

8    your initial perspective on that.

9           But I think we were trying through some of

10   these -- some of the argument that you said you would

11   listen to, to set a framework for you and provide some

12   -- some guidance on things that would relate to these

13   scheduling issues.

14          MR. PELVIN:  Your Honor, while I agree with

15   both Mr. Schiavoni and Mr. Rosenthal, I can I think

16   try to answer your question on a go forward basis when

17   we come back.  One question I can answer quite easily

18   for you is that our scheduling brief with the proposed

19   schedule is Docket Number 6060.

20          MR. KURTZ:  And, Your Honor, Glen Kurtz.  I

21   can direct you to our schedule at Docket Entry 6320.

22          THE COURT:  6320 and 6060.

23          MR. KURTZ:  Yeah, 6320.

24          THE COURT:  Okay.  Let's take -- let's take

25   ten minutes.

Page 214

1          MR. RYAN:  Your Honor, can I make one

2   suggestion for the break?

3          THE COURT:  Mr. Ryan?

4          MR. RYAN:  Is we also look at Your Honor's

5   calendar.  We've already added 17 days.  I think 17

6   days is a December 26th trial start date.  That's not

7   going to happen.  So I think a rational discussion

8   about a -- what our schedule is also involves Your

9   Honor looking at her calendar and it's in January at

10  this point.

11         THE COURT:  Yeah, which is not a good

12  calendar, but I'm going to pull it out.

13         Okay.  Let's take ten minutes.  We're in

14  recess.

15         (A recess was taken from 6:15 p.m. to 6:26

16         p.m.)

17         THE COURT:  Okay.  This is Judge

18  Silverstein.  I've got the two different schedules

19  now, which, obviously, are nowhere in harmony and or

20  for that matter close.

21         And if we weren't virtual, I'd have you in

22  chambers to have a discussion.  But that's not an

23  option.  I'm -- I had thought maybe -- maybe just

24  wishful thinking that from the discussion earlier

25  today that maybe we weren't going to be meeting

```
1    tomorrow and that we were going to be continuing until
2    sometime next week and take up further issues with the
3    exception of the scheduling issue and et cetera.
4    Maybe that -- maybe that -- as I say maybe that was
5    wishful thinking.
6              I think I probably need to hear argument on
7    some of these issues, and provide some preliminary
8    thoughts on them, and I'm not going to start that
9    tonight.  The -- but I also think it's necessary to
10   get this matter scheduled for confirmation, and it's
11   not going to be in -- let's see.
12             MALE VOICE:  December 7th.
13             THE COURT:  Well, it's not going to be on
14   December 7th.  It's not going to be --
15             MALE VOICE:  9th, 9th.
16             THE COURT:  It's not going to be 217 days
17   after approval of the disclosure statement either,
18   which is what I think is in the insurer request.
19             MR. KURTZ:  Your Honor, I don't know if you
20   have any -- any room in your schedule for January.
21   That would leave some substantial time and we can -- I
22   don't want to -- I don't want to argue right now about
23   the time --
24             THE COURT:  Right.
25             MR. KURTZ:  -- but we all know that people
```

1    can get the work done with whatever time period we

2    have but we have to work backwards.

3           THE COURT:  I do agree that people can get

4    stuff done in the amount of time that you give them.

5           MR. KURTZ:  Right.

6           THE COURT:  Believe it or not, I have an

7    insurance coverage trial in January, which some of you

8    are involved in, which quite frankly I had moved to

9    accommodate where I thought Boy Scouts might fall when

10   we were looking at this many months ago.  So it's been

11   moved once already, and I've got to give this some

12   thought.

13          What I'd like the parties to think about,

14   and I think every party has acknowledged that this is

15   one of, if not the, most complex cases that they've

16   probably dealt with in their bankruptcy careers, as it

17   brings together many issues, many challenging issues,

18   each one of which on their own would make any case

19   complex.  And to the extent that people are adding on

20   sort of the wish list of what they would like to an

21   already complex case, it not only adds that many

22   layers of complication but increases, quite frankly,

23   the time that the parties and the Court need to

24   prepare for the case, as well as ultimately to decide

25   it.

1           And while I'd like to give you some guidance

2    on every issue because -- and try to narrow things

3    down before we get to confirmation, because some of

4    these issues don't get decided every day, because they

5    are complex, it's hard to do that and still permit

6    people to make appropriate arguments on issues, which

7    could go either way.

8           So I think people really need to think about

9    what it is they need to accomplish from the

10   bankruptcy, and -- and I'll see if there's some

11   guidance that I can give you on issues.

12          The third-party release issue alone, we all

13   know, we've heard the arguments, it's challenging

14   enough.  But it's been a crux of this case from the

15   beginning.  Everybody knew this was going to be an

16   issue.

17          When you start adding to that already very

18   complex, and it's both factual and legal issues, and

19   we have very able lawyers here that are going to be

20   arguing it and putting on the evidence.  And when you

21   glom onto that issues that perhaps are not regularly

22   decided in the context of confirmation and maybe don't

23   need to be decided in the context of confirmation,

24   then it takes longer time.

25          So I don't know.  Were people planning on

1  coming back tomorrow/  What was the -- what was the

2  thought, Ms. Laurie (phonetic) when you thought about

3  this, or Mr. Abbott at the beginning of the day?

4          MS. LAURIE:  I'll tell you what our original

5  vision was, but, obviously, we'll take guidance from

6  Your Honor.  I think we had hoped to get through

7  solicitation and scheduling issues today.  We've heard

8  other people's views on that.  I think our view had

9  been we would work on the documents and then come back

10  subject to your schedule on Tuesday, split Tuesday

11  between the confirmation-type arguments that you may

12  need to hear and then clean up on the disclosure

13  statement document itself to the extent that there are

14  lingering issues.

15          THE COURT:  That's kind of what I thought.

16          MR. SCHIAVONI:  Judge, could I plead for

17  Friday off?

18          THE COURT:  Well, that's what Ms. Laurie

19  (phonetic) had thought we -- and that's where I

20  thought we were going to so.

21          MR. KURTZ:  I mean, Your Honor, I don't

22  think the debtors have any dire need for -- for -- for

23  Friday subject to getting some schedule plugged in.  I

24  think if there's some way that Your Honor can find

25  time in your schedule for a confirmation hearing, we

1   can probably then at least have a dialogue with --

2   with the objectors on how to populate the interim

3   dates.  We'll either get somewhere or we won't, and we

4   can resubmit.  But, you know, I don't know that we

5   have to tie them.  I think we need a schedule no

6   matter what happens, no matter what kind of guidance

7   we get, which we'll appreciate, of course, but it's a

8   little -- we're probably sort of in a standstill until

9   we know what we're working against.

10          MR. PLEVIN:  But, Your Honor, I would ask

11  you not to pre-judge at this point when the

12  confirmation hearing is going to be until you hear the

13  arguments about the discovery that's needed and the

14  sequencing of events.  Obviously, you can have a date

15  in mind, but I would urge you to have an open mind and

16  not tell us what that date is so we can argue to you

17  how much time we need and why.

18          MR. KURTZ:  I mean the debtors are burning

19  cash.  It just doesn't work to --

20          THE COURT:  I understand that.  I understand

21  that, and there's more people that want the debtor to

22  pay for them, so you know.

23          MR. KURTZ:  Right.

24          THE COURT:  Maybe that shouldn't be the

25  case.  I don't know.

1           MR. KURTZ:  With or without those numbers

2    the cash is going out the door.  So the calendar

3    matters, and I know that there's an interest in delay

4    but it's not in the interest of the estate.  And all

5    we're looking for is dates.  If it has to move because

6    somebody convinces Your Honor of something, so be it,

7    but I don't think that's what's going to happen.

8           MR. RYAN:  Your Honor, with all respect,

9    it's not about delay.  Mr. Kurtz is just inflaming

10   everything.  There's no reason -- a schedule is a

11   schedule, and it leads to a confirmation hearing.  You

12   may not agree that it should be a 200-day schedule.

13   You may agree that it should be, you know, whatever,

14   somewhere between where the debtor has proposed and --

15   and -- and -- and where the insurers have proposed.

16          But at least hear the various arguments

17   about how to effectuate a timely schedule that -- that

18   -- you know, that doesn't put -- it's not about making

19   the lawyers work too hard.  I mean the lawyers will

20   have to work as hard as they have to work, but some of

21   these things are just unrealistic deadlines that --

22   that need to be changed to accommodate an orderly

23   process.

24          MR. BROWN:  Your Honor, this is Ken

25   (inaudible).  Not to get into the weeds --

1          MR. KURTZ:  Your Honor, I've literally tried

2    cases.

3          MR. BROWN:  -- on this, and if I could

4    speak, Mr. Kurtz, because you've been saying a lot in

5    generalities and you've been casting some aspersions

6    about people doing this just to slow down the process.

7    Your Honor, just by way of example, and there's a

8    reason that Mr. Kurtz is only speaking in generalities

9    and hasn't referenced a single actual thing that the

10   debtor is trying to impose on folks here, but just as

11   an example, the order that you have in front of you,

12   the one that the debtor was trying to get you to

13   impose on everyone sets the last date to serve written

14   discovery as September 27, and then the last day to

15   respond to that discovery four days later on October

16   1.

17          That is just one example of the breakneck,

18   nauseating pace that the debtor is trying to impose on

19   everyone.  This is not about scheduling, as much as it

20   is about not allowing people to have the time to do

21   what they need to get due process here.  All you have

22   to do is look at this order to see the multiple -- the

23   multiple examples of just completely unrealistic

24   deadlines.  But four days after you propound discovery

25   to respond to it?  That's heading one.

1          MR. KURTZ:  Your Honor, it doesn't take four

2   days to take your prior objections and reintroduce

3   them into a new document.  It's a little silly to talk

4   about due process.  I've literally tried cases from

5   complaint to trial in 20 days, and I'm sure other

6   people have as well.  Chrysler was a major case.  I

7   think we went -- in 18 days we had that trial.  We

8   were in the Second Circuit within a few days after

9   that and the Supreme Court after that.

10          It's not hard, and there's no generalities.

11   I put in all the dates that seemed appropriate when we

12   work backwards from a confirmation hearing date.  I

13   said we'll resubmit with new interim dates working

14   backward from a new confirmation hearing date, but

15   these are all doable, and primarily the discovery is

16   going to be coming from the debtors and we'll comply

17   with it.

18          MR. PLEVIN:  Your Honor, the discovery won't

19   all be coming from the debtors.  It will be coming

20   from other parties.  We're going to propound discovery

21   on other parties, and just by way of one other example

22   in addition to what Mr. Brown said, we're supposed to

23   have rebuttal experts reports submitted nine days

24   after the affirmative reports.

25          The idea that you can get a -- you can get

1  an affirmative expert report, review it, decide who to

2  -- what kind of rebuttal you need, recruit a rebuttal

3  expert and have that rebuttal expert turn a report and

4  do all of that in nine days is just not -- it's not

5  feasible.  It's not practical.  It doesn't happen that

6  way.

7           MALE VOICE:  Can we -- can we resume on

8  Tuesday?  Because I think the weekend, cooler heads

9  will think about this over the weekend about how if

10  you glom on less, less discovery is necessary.  It's

11  like I think we have some guidance on that, and

12  Tuesday may be we have a-- you know, a little bit more

13  time, we pack less, more efficient.  It's like we're

14  going to achieve something on Tuesday.

15           THE COURT:  Okay.  I'm -- can tell you at

16  this moment in January I don't have three days for

17  this confirmation hearing.  So I cannot give the

18  debtor something in January today.

19           What I'm going to do is assuming you guys

20  can still hear me because I can't see anybody.

21           MIXED VOICES:  We can hear you.

22           THE COURT:  Okay.  What I'm going to do is

23  I'm not going to give a schedule, a date today,

24  because, debtors, I can't give you what you want.

25           I'm going to look at my schedule.  I'm going

1   to consider the filings, and I'd like the parties to

2   think about, again, what kind of findings they need

3   because I think that can make a difference in what the

4   discovery is going to be.

5          So we're going to resume -- I also think

6   parties need time to take a look at what we've done to

7   date on the disclosure statement and get all of that

8   resolved.

9          So looking at my schedule, on Tuesday I can

10  have you back here.  I do believe I have a couple --

11  well, I do have a couple of things schedule.  I will

12  see if I can move them.  One might just be a status

13  conference.  We'll take a break, but I'll have you

14  back here at 10:00 on Tuesday, and we can carry over

15  on Wednesday probably starting around noon.

16          I have something I do not think I can change

17  that morning, and then I do understand that you guys

18  are in mediation, some of you, Thursday and Friday.

19  So I would suggest you use that time well.  That's

20  what we're going to do.

21          I will entertain argument, I guess, first,

22  and --

23          MR. PLEVIN:  Your Honor, argument on the

24  scheduling or on the --

25          THE COURT:  On the issues that you think

Page 225

1  that I can resolve and get out of the way for

2  confirmation or that will convince me that I should

3  not send this plan out at all.

4          MR. RYAN:  Understood.

5          THE COURT:  So I'll take that first, and

6  I'll have ideas on scheduling assuming you don't

7  convince me.

8          Mr. Rosenthal, I will keep an open mind.

9          MR. ROSENTHAL:  Thank you.

10          THE COURT:  Mr. Patterson, I see your hand.

11          MR. ROSENTHAL:  But I think, Your Honor, one

12  thing you said is very -- is -- is -- is interesting,

13  and I would hope the parties would think about it.  I

14  think you're absolutely right, if you can still hear

15  me.

16          THE COURT:  I can.

17          MR. ROSENTHAL:  You're kind of frozen, but

18  to the -- that one of the things that drives the

19  schedule are the findings.  And if those findings

20  weren't required there would be less time required,

21  and so, you know, fairness and reasonableness are

22  evidentiary issues about the TDPs and the values, and

23  the like, and they -- they will take required

24  discovery.  And that's one of the things that is

25  driving the longer schedule.

Page 226

```
1              THE COURT:  Okay.  Mr. Patterson?
2              MR. PATTERSON:  Your Honor, I just wanted to
3    say that we're kind of new to the litigation fight
4    here.  We have not taken substantial discovery from
5    anybody.  We haven't received any, although my guess
6    is that something will come our way, so we just hope
7    you'll keep an open mind that we -- it's not that
8    we're sitting here with reams of information that
9    we've, you know, deposed people or had document
10   discovery from anybody.  We'll do the best we can, and
11   we -- we appreciate, Your Honor.
12             THE COURT:  Thank you.  Mr. Harron?
13             (crosstalk)
14             THE COURT:  Oh, I'm sorry.
15             MR. BROWN:  It's Ken Brown.
16             MR. HARRON:  I think Mr. Rosenthal is
17   suggesting a false premise, which I just couldn't let
18   sit.  Implicit in his comment is absent the findings
19   and with some form of neutrality this case resolves
20   quickly.  And Mr. Rosenthal and I both know that we
21   have a case exactly like that in North Carolina,
22   completely insurance neutral, claims are passed
23   through to the insurers and Mr. Rosenthal is taking
24   stuff to the Fourth Circuit.  Eliminating the fight
25   over the findings will not eliminate the insurers
```

1   fights.

2          MR. ROSENTHAL:  Well, obviously, we disagree

3   with that, Your Honor, but that's for another day.

4          THE COURT:  Okay.

5          MALE VOICE:  (inaudible) Circuit apparently.

6          MR. HARRON:  We couldn't be more neutral in

7   that case, and we're at the Fourth Circuit.

8          THE COURT:  I'm really worried about what's

9   going to be in front of me and what parties are going

10  to request that I have to decide.

11         Mr. Brown?

12         MR. BROWN:  Something, again, we can pick up

13  on Tuesday, but one of the things that we're very

14  concerned about in terms of the timing here is, you

15  know, the debtor has referred to all the documents

16  that they've already produced and why normal discovery

17  timelines don't matter because of that.  The thing

18  that is important to keep in mind as we go through

19  this is that that was produced in the context of, much

20  of it, in mediation, and there's a data room.  And

21  virtually everything in the data room has been

22  designated confidential.

23         We have been trying since last week to go

24  through the process with the debtor to get this stuff

25  undesignated so it can be used in some practical way,

1   but we haven't gotten anywhere.  And you would think

2   that a debtor who is trying to impose breakneck

3   deadlines would be going out of its way to deal with

4   things like that.  And we feel like all we're getting

5   is stone-walled.  Right now, we can't use any of the

6   so-called, you know, discovery that has thus far been

7   propounded.  (inaudible) is going to be filed under

8   seal and we're going to have a sealed courtroom.

9           MR. SCHIAVONI:  Well, let's take a break for

10  the day.

11          THE COURT:  Okay.

12          MR. KURTZ:  Your Honor, that's -- that's

13  just not true.  We didn't produce the discovery.  My

14  understanding is we've been requested to help

15  facilitate a discussion with other parties that may

16  have designated materials as confidential.  We said we

17  would do that.  They then sent us literally hundreds

18  of pages of documents that we haven't yet had an

19  opportunity to even go through.  The debtors have not

20  done that, and it's just an inaccurate statement that

21  was just made.

22          THE COURT:  Okay.  We're going to adjourn

23  until Tuesday at 10:00, and parties should use the

24  time well to turn documents that the disclosure

25  statement and other documents that need to be turned,

1    and I know people are worked around the clock to do

2    that.  And should consider what we can achieve.

3           I, last August, not this past, the year

4    before, had two complete valuation trials with parties

5    had about three weeks to prepare for.  On the other

6    hand, I've got some cases where the discovery disputes

7    get in the way, and they prolong things.  And that's

8    not bad faith discovery disputes.  That's just regular

9    old discovery disputes.  So we're going to find a

10   happy median.  We're going to recognize that this

11   debtor is burning cash, and I have no reason at all to

12   believe that Ms. Lauria or whoever told me that, it's

13   probably Mr. Kurtz, is inaccurate in what they're

14   saying, no reason to believe that.

15          And I don't think that benefits anybody, so

16   we're going to balance, clearly the due process rights

17   of all parties against what's necessary in this case.

18   And that's where we're going to leave it.

19          So thank you very much.  Enjoy your Friday

20   away from here.  I will see you Tuesday morning.

21          MALE VOICE:  Thank you, Your Honor.  Have a

22   nice weekend.

23          THE COURT:  Thank you.

24          MALE VOICE:  Thank you, Your Honor.

25          THE COURT:  Thank you.

Page 230

1    MALE VOICE:  Thank you, Your Honor.

2    (Whereupon the hearing adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 231

1                          CERTIFICATE

2

           I, Wendy Sawyer, do hereby certify that I
3
   was authorized to and transcribed the foregoing
4
   recorded proceedings and that the transcript is a true
5
   record, to the best of my ability.
6

7

8
           DATED this 24th day of September, 2021.
9

10

11

12   _____

13           WENDY SAWYER, CDLT

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

```
1                     UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3    IN RE:                         .  Chapter 11
                                    .  Case No. 20-10343 (LSS)
4    BOY SCOUTS OF AMERICA AND      .
     DELAWARE BSA, LLC,             .  (Jointly Administered)
5                                   .
                                    .  Courtroom 2
6                                   .  824 Market Street
              Debtor.              .  Wilmington, Delaware 19801
7                                   .
                                    .  Tuesday, September 28, 2021
8    . . . . . . . . . . . . . . .  10:11 a.m.

9                     TRANSCRIPT OF ZOOM HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Derek Abbott, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                             1201 North Market Street
                               16th Floor
14                             Wilmington, Delaware 19899

15                             - and -

16                             Jessica C. Lauria, Esquire
                               Glenn M. Kurtz, Esquire
17                             WHITE & CASE LLP
                               1221 Avenue of the Americas
18                             New York, New York 10020

19   (APPEARANCES CONTINUED)

20   Electronically
     Recorded By:              Madaline Dungey, ECRO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1  <u>APPEARANCES (CONTINUED)</u>:

2  For the Debtors:           Matthew E. Linder, Esquire
                              WHITE & CASE, LLC
3                             111 South Wacker Drive
                              Chicago, Illinois 60606
4
                              -and-
5
                              Adrian C. Azer, Esquire
6                             HAYNES & BOONE, LLP
                              800 17TH Street, NW
7                             Suite 500
                              Washington, DC 20006
8
   For the Tort Claimants'
9  Committee:                 John W. Lucas, Esquire
                              Kenneth H. Brown, Esquire
10                            PACHULSKI STANG ZIEHL & JONES, LLP
                              150 California Street
11                            15th Floor
                              San Francisco, California 94111
12
                              James I. Stang, Esquire
13                            10100 Santa Monica Boulevard
                              11th Floor
14                            Los Angeles, California 90067

15 For AIG Companies:         Michael A. Rosenthal, Esquire
                              GIBSON, DUNN & CRUTCHER, LLP
16                            200 Park Avenue
                              47th Floor
17                            New York, New York 10166

18 For Century Indemnity
   Company:                   Tancred Schiavoni, Esquire
19                            O'MELVENY & MYERS, LLP
                              Times Square Tower
20                            7 Times Square
                              New York, New York 10036
21
   For American Zurich
22 Insurance Company:         Mark D. Plevin, Esquire
                              CROWELL & MORING, LLP
23                            Three Embarcadero Center
                              26th Floor
24                            San Francisco, California 94111

25

 1  | <u>APPEARANCES (CONTINUED)</u>:

 2  | For Pfau Cochran
    | Vertetis Amala and
 3  | The Zalkin Law Firm:        Thomas E. Patterson, Esquire
    |                            KTBS LAW, LLP
 4  |                            1801 Century Park East
    |                            26th Floor
 5  |                            Los Angeles, California 90067

 6  | For the Future Claimants'
    | Representative:            Kami E. Quinn, Esquire
 7  |                            GILBERT, LLP
    |                            700 Pennsylvania Avenue SE
 8  |                            Suite 400
    |                            Washington, DC 20003

 9  |
10  |                            -and-

    |                            Edwin J. Harron, Esquire
11  |                            Robert S. Brady, Esquire
    |                            YOUNG CONAWAY STARGATT & TAYLOR, LLP
12  |                            The Brandywine Building
    |                            1000 West Street
13  |                            17th Floor
    |                            Wilmington, Delaware 19899
14  |
    | For the Coalition of
15  | Abused Scouts for
    | Justice:                   Eric R. Goodman, Esquire
16  |                            BROWN RUDNICK, LLP
    |                            601 Thirteenth Street, NW
17  |                            Suite 600
    |                            Washington, DC 20005
18  |
19  |                            David J. Molton, Esquire
    |                            Seven Times Square
20  |                            New York, New York 10036

21  |                            -and-

22  |                            Kenneth M. Rothweiler, Esquire
    |                            EISENBERG, ROTHWEILER, WINKLER,
23  |                              EISENBERG & JECK, P.C.
    |                            1634 Spruce Street
24  |                            Philadelphia, Pennsylvania 19103

25  |

1  APPEARANCES (CONTINUED):

2  For United Methodist
   Ad Hoc Committee:              Jeremy W. Ryan, Esquire
3                                 POTTER, ANDERSON & CORROON, LLP
                                  1313 North Market Street
4                                 6th Floor
                                  Wilmington, Delaware 19801
5
   For the HMM Claimants:         Evan M. Smola, Esquire
6                                 HURLEY MCKENNA & MERTZ, P.C.
                                  20 South Clark Street
7                                 Suite 2250
                                  Chicago, Illinois 60603
8
   For Claimant Sexual
9  Abuse Victims:                 Paul Mones, Esquire
                                  PAUL MONES, PC
10                                13101 Washington Boulevard
                                  Suite 103
11                                Los Angeles, California 90066

12 For The Church of Jesus
   Christ of Latter-day
13 Saints:                        Jeffrey E. Bjork, Esquire
                                  LATHAM & WATKINS, LLP
14                                335 South Grand Avenue
                                  Suite 100
15                                Los Angeles, California 90071

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2  <u>MOTIONS</u>:                                                <u>PAGE</u>

3  Agenda
   Item 1:   Debtors' Motion for Entry of an Order (I)
4            Approving the Disclosure Statement and the
             Form and Manner of Notice, (II) Approving Plan
5            Solicitation and Voting Procedures, (III)
             Approving Forms of Ballots, (IV) Approving
6            Form, Manner, and Scope of Confirmation Notices,
             (V) Establishing Certain Deadlines in Connection
7            with Approval of the Disclosure Statement and
             Confirmation of the Plan, and (VI) Granting
8            Related Relief
             (D.I. 2295, filed 3/2/21).
9
             Court's Ruling:
10
   Agenda
11 Item 2:   Debtors' Motion For Entry of Order (I)
             Scheduling Certain Dates and Deadlines in
12           Connection with Confirmation of the Debtors Plan
             of Reorganization, (II) Establishing Certain
13           Protocols, and (III) Granting Related Relief
             (D.I. 2618, filed 4/15/21).
14
             Court's Ruling:
15
   Agenda
16 Item 3:   Motion for Leave to Exceed Page Limit
             Requirement for Objection of the Tort Claimants'
17           Committee to Debtors' Motion for Entry of an
             Order (I) Approving the Disclosure Statement
18           and the Form and Manner of Notice, (II)
             Approving Plan Solicitation and Voting
19           Procedures, (III) Approving Forms of Ballots,
             (IV) Approving Form, Manner and Scope of
20           Confirmation Notices, (V) Establishing Certain
             Deadlines in Connection With Approval of the
21           Disclosure Statement and Confirmation of the
             Plan, and (VI) Granting Related Relief
22           (D.I. 3529, filed 5/10/21).

23           Court's Ruling:

24

25

1                              INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 4:   Motion for Leave to Exceed Page Limit
4              Requirement for (i) Objection of Century
               Indemnity Company to Debtors' Motion for Entry
5              of an Order (I) Approving the Disclosure
               Statement and the Form and Manner of Notice,
6              (II) Approving Plan Solicitation and Voting
               Procedures, (III) Approving Forms of Ballots,
7              (IV) Approving Form, Manner and Scope of
               Confirmation Notices, (V) Establishing Certain
8              Deadlines in Connection with Approval of the
               Disclosure Statement and Confirmation of the
9              Plan, and (VI) Granting Related Relief and (ii)
               Century Indemnity Company's Objections to the
10             Debtors' Solicitation Procedures and Form of
               Ballots (D.I. 3858, filed 5/12/21).
11
               Court's Ruling:
12
     Agenda
13   Item 5:   Motion for Leave to Exceed Page Limitations
               Regarding Debtors' Reply in Further Support of
14             Debtors' Third Motion for Entry of an Order
               Extending the Debtors' Exclusive Periods to File
15             a Chapter 11 Plan and Solicit Acceptances Thereof
               (D.I. 4102, filed 5/16/21).
16
               Court's Ruling:
17
     Agenda
18   Item 6:   Motion for Leave to Exceed Page Limitations
               Regarding Debtors' Omnibus Reply in Support of
19             Debtors' Motion for Entry of an Order (I)
               Approving the Disclosure Statement and the Form
20             and Manner of Notice, (II) Approving Plan
               Solicitation and Voting Procedures, (III)
21             Approving Forms of Ballots, (IV) Approving the
               Form, Manner, and Scope of Confirmation Notices,
22             (V) Establishing Certain Deadlines in Connection
               with Approval of the Disclosure Statement and
23             Confirmation of the Plan, and (VI) Granting
               Related Relief (D.I. 4111, filed 5/16/21).
24
               Court's Ruling:
25

1                                    INDEX

2    MOTIONS:                                                        PAGE

3    Agenda
     Item 7:    Motion to Exceed Page Limitations with Respect
4               to Certain Insurers' Supplemental Objection to
                Motion for Approval of Debtors' Disclosure
5               Statement (D.I. 6054, filed 8/17/21).

6               Court's Ruling:

7    Agenda
     Item 8:    Motion for Leave to Exceed the Page Limits
8               Regarding Debtors' Amended Omnibus Reply in
                Support of Debtors' Motion for Entry of an
9               Order (I) Approving the Disclosure Statement
                and the Form and Manner of Notice, (II)
10              Approving Plan Solicitation and Voting
                Procedures, (III) Approving Forms of Ballots,
11              (IV) Approving the Form, Manner, and Scope of
                Confirmation Notices, (V) Establishing Certain
12              Deadlines in Connection with Approval of the
                Disclosure Statement and Confirmation of the
13              Plan, and (VI) Granting Related Relief
                (D.I. 6250, filed 5/16/21).

14              Court's Ruling:

15
     Transcriptionist's Certificate                              275
16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:11 a.m.)

2          THE COURT:  Good morning.  This is Judge

3   Silverstein.  We're here on the continued disclosure

4   statement hearing in Boy Scouts of America; Case 20-10343.

5          I would remind everyone who is not speaking to

6   please make sure your audio is muted.  And I will turn it

7   over to debtor's counsel.

8          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbot

9   of Morris Nichols Arsht & Tunnell for the debtors.

10          Your Honor, we appreciate the break we had gotten

11   in the hearing.  I think the parties had been hard at work.

12   I'm going to turn it over to Ms. Lauria to detail that for

13   you and get the hearing started if I may.

14          THE COURT:  Thank you.

15          Ms. Lauria?

16          MS. LAURIA:  Thank you, Your Honor.  Jessica

17   Lauria, White & Case, on behalf of the debtors.

18          Your Honor, we just wanted to provide you with a

19   brief update of what the parties have been up to since we

20   last saw you on Thursday of last week.  In particular, as we

21   indicated at that hearing, on Friday afternoon we circulated

22   to the objecting party's revisions to the disclosure

23   statement as well as disclosure statement exhibits that were

24   intended to address the court's statements on the record last

25   week as well as various concessions and agreements that were

1 made during the course of last week's hearing.  That was

2 Friday.

3          On Saturday we circulated to the parties the plan

4 English chartered organization summary that had been

5 discussed at length last week.  Then on Sunday we distributed

6 to the parties revisions to the solicitation procedures.

7          We received comments from parties on Friday,

8 throughout the weekend.  We were on the phone with the TCC

9 until very late last night in an effort to try to continue to

10 narrow the issues that would show-up back before the court.

11 We did, in fact, as you probably saw, filed a number of

12 documents in the early morning hours this morning.  Again, we

13 had wanted to file those earlier, but also wanted to give

14 folks the opportunity to comment on them and try to reflect

15 those comments as much as we possibly could.

16          Walking through, sort of the, what I will call,

17 baskets of documents that are left with respect to the

18 disclosure statement we believe we have substantially

19 resolved the objections to the disclosure statement.  I

20 believe we saw an email from the TCC early this morning or

21 maybe it was late last night indicating that we still have

22 four or five issues outstanding with them.  There may be some

23 cats and dogs with other objectors.  Your Honor, it's our

24 intention to work during the breaks today and, frankly,

25 throughout the course of today to try to narrow those even

1  further so that we can minimize or eliminate what comes back

2  in front of the court.

3         On the chartered organization plain English

4  document I know Mr. Ryan is still reviewing that document.

5  We also received a number of comments from insurer parties.

6  I don't believe that all of those have been incorporated as

7  of yet.  So we will continue to work today on addressing

8  those comments and making sure that we communicate with Mr.

9  Ryan during breaks to get all of his feedback.

10        Finally, Your Honor, on the solicitation

11  procedures you may have seen the TCC filed an emergency

12  motion with respect to one change the debtors are proposing

13  there.  So we do have one significant issue outstanding that

14  will likely need to come back in front of you at an

15  appropriate time today or tomorrow and that's pertaining to

16  the $3,500 expedited distribution.

17        I think after listening to argument last week and

18  having a greater understanding of the complications that

19  would present to particularly individuals that represent

20  hundreds if not thousands of claimants in terms of advising

21  those claimants whether to accept a settlement in the context

22  of a ballot.  We thought it made sense to remove it, but you

23  will be hearing argument, I'm sure, on that point either,

24  again, later today or tomorrow whenever the court would like

25  to hear that argument.

1         Other than that the TCC did file their own

2    alternative version of the solicitation documents. I hope I

3    am not going out on a limb by saying I don't think that so

4    much reflective of the distance between the parties other

5    than the point I just noted versus the fact that there was a

6    lot of material being passed back and forth yesterday and we

7    just didn't have the opportunity to drill down on all of the

8    issues on solicitation procedures.

9         So I think we're also hopeful that we can narrow

10   the issues on the solicitation procedures.  So what comes

11   before the court ultimately is something much less then may

12   have been reflected in the filings.  So that is where we're

13   at on the documents.

14        As far as today goes, I mean, we heard the court

15   last week I think we have, sort of, three big things coming

16   up.

17        One is to the extent the court would like to hear

18   a preview of some of the confirmation objections I think we

19   heard you last week, Your Honor, to suggest that certainly

20   with respect to insurance issues you would like to hear some

21   argument around that because of the impact that may have on

22   the confirmation schedule.  We think that many, if not all,

23   of the other confirmation objections were teased out during

24   the course of our three days together last week.  So it's

25   really the insurance ones that the court will need to hear,

1  but, obviously, defer to Your Honor on what would be useful

2  for you to hear today.

3           We also have scheduling.  We would propose to go

4  to that after the confirmation objections, again, simply

5  because we're still working through some of the document

6  issues and would like to close out some of that before we

7  come back to the court.

8           Finally, whatever remaining document issues and

9  certainly the expedited distributions placement on the ballot

10  or not and the classification issues will need to be

11  addressed at some point.

12           So that is where I think we see ourselves this

13  Tuesday morning.

14           THE COURT:  Okay.  Well, I appreciate the work

15  that has, obviously, been done over the course of the last

16  few days.  I have not had an opportunity to review everything

17  that was filed last night.  I have quickly run through the

18  redline of the plan and disclosure statement, but that is

19  about it.

20           So I think we should start with the confirmation

21  objections, in particular the insurance issues.  I don't know

22  if the insurers have coordinated.  I would say that in

23  looking at some of that over the weekend it seemed to me that

24  the insurers were not necessarily aligned on all issues.  I

25  could be wrong, but I think there were a few cross issues.

1  So I think I will hear from insurers, hopefully have

2  coordinated some.

3          Mr. Lucas, I see your hand.

4          MR. LUCAS:  Thank you, Your Honor.  I just wanted

5  to confirm one thing that Ms. Lauria said that the TCC did

6  file its alternative version of the solicitation procedures,

7  but after reviewing the debtor's markup that was set late

8  last night I just wanted to let the court know that the

9  issues have been narrowed substantially and that if there is

10 a break today hopefully we could resolve the rest of them.

11         As Ms. Lauria said, there is the 3013 issue which

12 does go to the procedures to some extent and that is still

13 outstanding.  But a lot of the issues have been narrowed and

14 I haven't been able to confirm that with White & Case yet

15 today, and wanted to, at least, convey to the court and to

16 White & Case that there has been progress.

17         THE COURT:  Fabulous.  Thank you.

18         Mr. Rosenthal?

19         MR. ROSENTHAL:  Good morning, Your Honor.  Michael

20 Rosenthal of Gibson Dunn for the AIG Companies.

21         Your Honor, in response to your question the

22 insurers have coordinated to a great extent.  I think that

23 what you are going to hear is a presentation from me followed

24 by one from Mr. Schiavoni, and then Mr. Plevin; however,

25 there may be others that want to lend their voice.  We

1  have -- hopefully we won't be duplicating for Your Honor.

2           THE COURT:  Okay, thank you.

3           Let's go ahead then and get started.

4           Mr. Rosenthal?

5           MR. ROSENTHAL:  Thank you, Your Honor.  First, let

6  me say we appreciate all -- can you hear me?

7           THE COURT:  Excuse me, yes.

8       (Off record discussion)

9           THE COURT:  Mr. Rosenthal?

10           MR. ROSENTHAL:  Thank you.  Your Honor, we

11  appreciate all the time Your Honor has devoted to this case,

12  not just last week but since the inception of it.  I have to

13  say I agree with Your Honor, the statement you made last week

14  that at least from my perspective and over 40 years of

15  bankruptcy practice I haven't seen a case as complicated and

16  also as gut wrenching as this case.

17           We are truly witness to an American tragedy.  The

18  abuse of children by trust Boy Scout leaders across the

19  country.  We agree with statements that Your Honor has made

20  that scouting is a mission that should be preserved, but that

21  doesn't mean, Your Honor, that the debtor gets a free pass to

22  ignore the requirements of the bankruptcy code or applicable

23  law.  I know it's tempting to approve the disclosure

24  statement and move this case along, but there are some

25  factors I hope that you would consider before you do that.

1        First, Your Honor, as a prudential matter, we

2    don't believe it's wise for the debtors to send out a vote on

3    a plan that does not represent anything close to a global

4    consensus.  This plan is opposed by the insurers, most of the

5    insurers, the TCC, many of the chartered organizations, and a

6    significant number of claimants.

7        There is just too much uncertainty including about

8    the vote at this point.  This may result in the debtors have

9    well less than the requisite support they need to obtain

10    acceptance of the plan and the entry of the channeling

11    injunction. If that is the case the debtors would have wasted

12    tens of millions of dollars in administrative fees and months

13    on an overall confirmation process.

14        The ultimate resolution may be a new plan, but it

15    also may be a liquidation of the debtors; therefore, it's a

16    scheduling matter.  We believe that it might make sense for

17    the court to delay approval of the disclosure statement for

18    two to three weeks to allow further mediation to occur.  That

19    mediation might result in additional settlements perhaps,

20    Your Honor, in light of guidance you may be willing to

21    provide today or tomorrow or in a more comprehensive deal

22    with chartered organizations.

23        Importantly, though, those deals may require

24    amendments to the plan and additional disclosures.  And if

25    solicitation has already begun re-solicitation may be

1  required which will delay the process further.  And, Your

2  Honor, we do not believe that a short delay on entry of the

3  disclosure statement order will actually delay the case.

4         Even if you took the disclosure statement order

5  under advisement for a couple of weeks we could begin

6  discovery now so it wouldn't delay the overall confirmation

7  hearing.  And even under a January or February confirmation

8  hearing scheduled, and you will hear more about the schedule

9  later, there still would be ample time for a 60 day voting

10 window that Your Honor indicated was appropriate.

11        Second overview point, Your Honor, is I know you

12 don't believe that you are ruling on the terms of the plan at

13 this time, and I heard your statement that you don't intend

14 to decide coverage issues even at confirmation, but the

15 proposed plan findings you are being asked to make by the

16 debtors and the supporters of the plan tell a different

17 story.

18        These findings, coupled with the criteria for

19 allowance of claims by the trust, are an attempt to alter the

20 insurance contracts and obtain awards through this bankruptcy

21 far in excess of what could be expected in the tort system.

22 We will talk more about that later.

23        I fully realize, Your Honor, that this is your

24 courtroom and you can allow the disclosure statement to go

25 forward without telling us whether you will make the required

1   plan findings, but in doing so you should understand that,

2   among other things, its sending a clear message to the

3   claimant professionals that you might enter these findings

4   and that will embolden them to take even more unreasonable

5   stances in this case including in mediation.

6          One of the principal reasons for that, Your Honor,

7   is that the plaintiffs' representatives see in this case the

8   opportunity to use Your Honor to overturn decades of

9   insurance neutrality precedent which they can then trump not

10  just in this case, but in every subsequent mass tort case.

11  That strategy, Your Honor, makes it extremely difficult to

12  reach a global settlement because many insurers like AIG are

13  only willing to do a deal that is both economically sensible

14  and insurance neutral.  It doesn't create a precedent that

15  could be used against them in other cases.

16         In order to  put these Chapter 11 cases back on

17  track toward a global resolution, Your Honor, we believe the

18  claimants representatives need to hear a clear no from  Your

19  Honor on your willingness to enter the findings.  We will

20  talk about the findings more.

21         Third, Your Honor, allowing the debtors to move

22  forward with a plan that contains the disputed findings will

23  alter the confirmation timeline.  Mr. Plevin will talk about

24  how that will extend the timeline.  Basically, Your Honor,

25  the debtors and the other supporters of the plan have chosen

1  to put this before you and that has consequences.  One of the

2  consequences is that additional discovery will be necessary.

3         Finally, Your Honor, I can get to the crux of

4  what, you know, I told you I wanted to talk to you about.  I

5  had hoped to be able to persuade you that approval of the

6  disclosure statement is sending us all down a futile and

7  expensive path which is exactly what the Third Circuit's

8  decision in American Capital Equipment sought to prevent.

9         I recognize this is likely to be an unpersuasive

10  argument today, but alternatively what I'd like to do, Your

11  Honor, is provide you a roadmap for what to look for when

12  reviewing the plan.  And when considering this roadmap ask

13  you to keep an open mind about what you can tell the parties

14  today about what you are willing or unwilling to do at

15  confirmation.

16         So let's talk about the principal confirmation

17  defects of the plan.  They fit into three buckets.

18         The first is the coalition fees.  The plan

19  contemplates, as we discussed last week, without requiring

20  any showing of substantial contribution, the payment of the

21  coalition's fees. Your Honor said that this was inappropriate

22  when you denied the RSA, the RSA provisions that dealt with

23  it.  The plan proponents have chosen to ignore your ruling

24  and a question that I would ask Your Honor is how does one

25  evaluate duplication of effort and substantial contribution

1  where the coalition and the TCC both have incurred fees on

2  behalf of the same constituents, but in furtherance of

3  countervailing interests.

4          Second principal defect, Your Honor, relates to

5  third-party releases.  There are a number of issues

6  concerning the discharge of non-debtors such as the propriety

7  of the channeling injunction and third-party releases under

8  Section 105 in the Third Circuit's Continental Airlines

9  decision which will require close scrutiny of the non-debtors

10 contributions to the trust.

11         Among other things, in this plan there are not

12 only the usual issues with third-party releases, but also the

13 unusual issue that the abuse here occurred not at the hands

14 of the debtors, but by perpetrators who were directly

15 overseen by the non-debtor local councils and chartered

16 organizations.  So really the debtor's abuse liabilities are

17 derivative of these non-debtor entities as opposed to the

18 other way around which is the usual way this arises in mass

19 tort cases.

20         Third, and getting to the heart of the insurers'

21 objection, the plan impermissibly alters the contractual

22 rights of the insurers and requires you to decide coverage

23 issues at the confirmation hearing as it attempts to bind the

24 insurers to liability for abuse claims now despite Your

25 Honor's repeated statements that you would not be deciding

1  coverage issues, despite the fact that this court has no

2  jurisdiction to determine personal injury claims, and despite

3  the fact that the actual determination of the claim values is

4  going to be made way down the road by the settlement trustee

5  applying in his sole discretion and within wide ranges the

6  criteria and values that you are being asked to approve.

7          The attempt to alter insurance contracts and

8  binding insurers is accomplished in three ways; by assigning

9  non-debtor insurance interest, by inflating the debtor's

10 abuse liability, and through the insurance prejudicial

11 findings.

12         Turning to that first aspect the plan requires the

13 assignment of non-debtor rights under insurance policies in

14 violation of any assignment clauses in those policies.  We

15 are not aware of any case law or rule that permits this

16 assignment absent consent.  The debtors haven't sited any.

17         In Combustion Engineering the Third Circuit

18 plainly held that the assignment of such non-debtor

19 contractual rights is not permitted under Section 1123(a)(5)

20 or any other code section over any assignment clause.  The

21 debtors have cited Federal-Mogul, but in Federal-Mogul the

22 Third Circuit expressly distinguished Combustion Engineering

23 because unlike in Combustion Engineering, Federal-Mogul dealt

24 with debtor insurance rights only.

25         The debtors claim that they have fixed this with a

1 | savings clause that allows the non-debtor insureds to retain

2 | their insurance and pursue their rights on behalf of

3 | claimants and then turn over the proceeds to the trust.  But

4 | to the extent that these work at all, and it's unclear they

5 | do, this is merely a de facto assignment of insurance rights

6 | and an impermissible work around that contravenes the

7 | applicable Third Circuit law.

8 |         THE COURT:  Why is that?  Why would that be an

9 | impermissible workaround?

10 |         MR. ROSENTHAL:  Because we think it accomplishes

11 | the same thing, Your Honor.  It's the same -- its effectively

12 | assigning the rights to the insurance to the trust.  It's

13 | just a different way to do it.

14 |         THE COURT:  Well sometimes there are different

15 | ways to do things that make them permissible.  And if we're

16 | talking about a technical assignment versus a workaround

17 | assignment if a party decides that they are going to go and

18 | pursue the insurance and then provide the proceeds to the

19 | trust what is wrong with that workaround?

20 |         MR. ROSENTHAL:  Your Honor, I think it gets us to

21 | the same goal, but I hear Your Honor's statement and it may

22 | be that the way it ends up being structured may actually be

23 | an acceptable workaround.

24 |         The final issue, Your Honor -- the second point I

25 | want to raise, Your Honor, in addition to non-assignment of

1  the -- the assignability of the non-debtor rights relates to

2  the inflation of abuse liability.

3         The TDP's are expressly designed to inflate the

4  debtor and local councils abuse claim liability and then pass

5  those inflated claims onto the insurers for payment.  This

6  strategy was rejected by the Third Circuit in Global Industry

7  Technologies which expressly found that by inflating claims

8  well above historical norms the debtors were, effectively,

9  modifying their prepetition insurance policies by altering

10 the debtor's risk profile.

11        The insurers aren't attempting to limit their

12 liability, Your Honor.  Rather, their argument is entirely

13 different.  Their argument, consistent with GIT is that

14 bankruptcy doesn't expand their liability and that a plan

15 that does so is unconfirmable.  I want to give you some

16 examples of how the TDP's inflate the liability.

17        Let's start with the expedited distribution.  The

18 expedited distribution has now been increased from $1,500 to

19 $3,500 and it's available simply by signing a proof of claim

20 without any additional showing of proof and most importantly

21 without any of the ability of the settlement trustee to go

22 behind and investigate the proof of claim.  That is a process

23 accepting a claim at face value with absolutely no party

24 having the right to contest it, that's wholly inconsistent

25 with Section 502.  Even the trustee, even the settlement

1  trustee, Your Honor, doesn't have the right to object to

2  these claims.

3          THE COURT:  So let me ask you, Mr. Rosenthal, is

4  your objection there, and I realize you may have some points

5  on that, that the $3,500 is being offered or that the $3,500

6  would be binding on the insurance company in some future

7  coverage action?

8          MR. ROSENTHAL:  It's that it would be binding on

9  the insurance companies in a future coverage action.  So what

10  we're basically saying, Your Honor, is that these claims are

11  subject -- should be subject to objections.  Some of these

12  claims may be fraudulent claims.  They shouldn't be paid the

13  $3,500.

14          What is happening here is that the trust may be

15  paying tens of thousands of claims that would not be

16  compensable in a tort system at all and that this court would

17  disallow if there was no -- you know, if an objection was

18  filed and the court found that there is no basis for the

19  claim.

20          THE COURT:  But from a practical perspective

21  perhaps paying $3,500 for a claim, a no look claim, might be

22  less expensive then evaluating that claim for the trustee to

23  evaluate that claim, and make a determination, and then pay

24  the valid claims, and then not pay the not valid claims.  So

25  this is, I view it, through convenience class kind of issue.

1        MR. ROSENTHAL:  Perhaps, Your Honor, but giving

2    the trustee even a right to object to the claim, even a right

3    to object to the claim would have some -- would have value in

4    terms of causing people to be, I think, more honest about the

5    claims that they assert.

6        You know, one of the things that we talked about

7    before were the fraud prevention measures in Maremont.  So

8    those measures aren't applied to every single claim.  The --

9    you have to prove some things, you have to provide some

10    information when you file your claim, but the value of the

11    measures is that there are audit rights.

12        So to somebody who gives you information and if

13    you randomly check it and you find out that it's not

14    appropriate you can actually -- you have remedies -- you have

15    an audit right and you have remedies.  Here, the failure to

16    allow the objection means that all those claims just get

17    paid.

18        THE COURT:  I think it's a fair comment.  What I

19    am trying to tease out from it is, I guess, two things.  One,

20    I hear the antifraud concerns.  That is something I am

21    concerned about.  So I hear that.  Second, what I think I'm

22    also hearing is the insurers don't want to be stuck with

23    $3,500 times 10,000 claims for which the settlement trustee

24    is going to seek coverage and argue that you are bound by the

25    $3,500 -- your client is bound by the $3,500 figure.

1        MR. ROSENTHAL:  That's correct, Your Honor.  And

2   it gets even worse with the next example I am going to give

3   you.

4        THE COURT:  This example, though, I think is a

5   fair comment to say, I think it would be hard-pressed to, for

6   me to say that $3500 is recoverable absolutely under an

7   insurance policy on -- it might be a fair settlement.  I

8   don't know.

9        In that sense, I suspect I would be approving this

10  because of the convenience class factor, and whether a

11  convenience class factor could bind an insurance company, you

12  know, you may get a fair and reasonable finding, but I don't

13  see how that binds an insurance company down the line, given

14  the basis on which I think I would approve that.  So, I think

15  there are two issues there that the insurance companies are

16  fairly raising.

17       MR. ROSENTHAL:  We'll talk about some of that with

18  the findings.

19       THE COURT:  Uh-huh.

20       MR. ROSENTHAL:  Let me go to the second example of

21  how the TDPs lead to inflated claim amounts.  And it relates

22  to what must be shown to have an allowed claim, and we're

23  talking not about the $3500.

24       So, in the tort system, BSA sex abuse claims would

25  require a showing of negligence on the part of the debtors or

1    another protected party.  That would mean that if this Court

2    were reviewing the claim under Section 502, you could not

3    allow it without a showing of negligence.  This follows from

4    the uncontroversial bankruptcy principle that, by and large,

5    bankruptcy relies on underlying state law to determine

6    whether a claim should be allowed or disallowed.

7            Not so under the TDPs.  Under the TDPs, a showing

8    of negligence is not required to obtain a base recovery.

9    And, remember, base recoveries can be significant.  So, the

10   base recovery for a penetration claim, for example, is

11   $600,000.

12           Instead, under the TDPs, a claimant receives an

13   enhanced recovery from the base if it's capable of showing

14   negligence.  When combined with the requested finding that

15   the TDPs are fair and reasonable, based on the evidence

16   presented, how can this not be an attempt to alter the

17   insurance contracts?

18           Effectively, this makes the TDPs a strict-

19   liability TDP when the underlying tort is not a strict-

20   liability tort; it requires negligence.

21           Before the debtors entered into the agreement with

22   the coalition and the FCR, the debtors -- the TDPs actually

23   required the settlement trustee to disallow a claim if he

24   found that the evidence submitted does not support a viable

25   claim against a protected party in the tort system.  The

1  coalition and the FCR completely re-drafted the TDPs so that

2  now a showing that a claim would be compensable in the tort

3  system is no longer a threshold requirement.

4  　　　　Instead, the trustee must now pay claimants, even

5  if they can't demonstrate negligence.  And what had been a

6  requirement for a claim is now an aggravating scaling factor,

7  which would increase recoveries.

8  　　　　The next area in which -- and if you have

9  questions, Your Honor, let me know.

10  　　　　THE COURT:  Well, somewhere over the weekend, I

11  had written down a note to myself that said, well, what do

12  the insurance companies want that will get them to not object

13  to this plan?

14  　　　　Is this the list that I'm getting or is this just

15  the objections that I'm going to hear, but even if you get

16  all this, you're still going to object, your clients are

17  still going to object to the plan?

18  　　　　MR. ROSENTHAL:  Your Honor, I can't --

19  　　　　THE COURT:  Maybe not a fair question to ask --

20  　　　　MR. ROSENTHAL:  I can't commit --

21  　　　　THE COURT:  -- but this is the sort of a lens for

22  which I'm hearing objections.

23  　　　　MR. ROSENTHAL:  I hear that and I can't commit to

24  that now; obviously, that's a client decision.

25  　　　　THE COURT:  Sure.

1    MR. ROSENTHAL:  But also obviously, what you're

2  hearing from me are the principal concerns of my, you know,

3  of my client and of other insurers.

4    THE COURT:  Fair enough.

5    MR. ROSENTHAL:  And to the extent that those

6  concerns are addressed, I think, you know, the client will

7  have to evaluate what their position is.

8    THE COURT:  Fair enough answer.

9    MR. ROSENTHAL:  So, the third area, Your Honor,

10  deals with the treatment of claims that are barred by the

11  statute of limitations.  Under the TDPs, the trustee is not

12  permitted to zero out time-barred claims.  This is despite

13  the fact that the debtors' claims expert, Bates White,

14  believes that approximately 59,000 claims are presumptively

15  barred by the statute of limitations and not entitled to a

16  recovery.

17    Again, Your Honor, I want to draw the difference

18  between the TDPs and Section 502 and how would you apply it.

19  You, Your Honor, I think, would be duty-bound not to allow a

20  claim that was barred by the statute of limitations.  Here,

21  those claims are allowed.

22    Federal District Court Judge Watson of the

23  Southern District of Ohio just ruled last Wednesday in a case

24  involving abuse at Ohio State University that although there

25  was no question that unspeakable abuse had been inflicted on

1   over 300 victims, the cases could not move forward because

2   the statute of limitations had expired.

3          So, the allowance of claims that are otherwise

4   time-barred, effectively, allows claims that would not be

5   compensable in the tort system and that would not be

6   allowable by Your Honor if you were reviewing these claims.

7          THE COURT:  Did Judge Watson do that on an

8   aggregate basis or did he do that on a claim-by-claim basis?

9          MR. ROSENTHAL:  I think he did it -- I don't know,

10  Your Honor.  I don't know.  But I know it was 300 claims that

11  were the subject of that.

12         Finally, Your Honor, separate and apart from the,

13  you know, allowance of claims that would not be allowed in

14  the tort system, the insurers have an issue with the broad

15  discretion granted to the trustee to increase claim values

16  based on aggravating factors.  Now, he can also decrease

17  factors, based on mitigating factors, but there's a nuance,

18  but important difference in the trustee's discretion in this

19  regard that, effectively, will result in increasing the

20  claims, more than in decreasing them.

21         In the case of aggravating factors, the trustee is

22  almost directed to increase this claim value somewhere

23  between an established range.  So, you have to increase it by

24  somewhere between X and Y.

25         With respect to decreases, however, the trustee

1  has almost unlimited discretion to decide not to decrease the

2  claim value at all from the base matrix value.  There's no

3  recommended -- you know, there's no range that he has to

4  decrease a certain amount if this mitigating factor comes

5  into play.

6          The only instance where there is a range relates

7  to statute of limitations.  So, there is a recommended range

8  for a decrease with statute of limitations, but in some

9  states, the reduction based on a "statute of limitations" bar

10 is as low as 30 percent.  So, while there's a reduction, he's

11 still allowing the claim at a considerable amount.

12         In one of the --

13         THE COURT:  Do you think there can be no scaling

14 factors for the statute of limitations at all for states

15 which currently do not have an open window?

16         MR. ROSENTHAL:  I think that there, I think that

17 the proper way to handle those claims is to defer them, the

18 way this plan does, to see if the window opens.  If the state

19 passes survivor legislation.

20         If, however, it does not, I think the proper way

21 to handle it is either to disallow them entirely or to allow

22 them with a significant reduction, a very significant

23 reduction, over 90-percent reduction.  And I think a

24 claimant --

25         THE COURT:  And I haven't, and I'm not sure it's

1  in the disclosure statement, to know the basis upon which

2  each state was placed in a category, but -- and that's, I

3  assume, information that I would get at confirmation, but I

4  hear you on the "statute of limitations" issue, which is why

5  I asked if it's a binary yes-or-no or if there could be some

6  kind of scaling factors, but I hear you on that.

7         MR. ROSENTHAL:  One of the mitigating, scaling

8  factors the trustee can consider is allocating responsibility

9  between protected parties and other responsible, non-

10 protected parties.  This is really sort of an apportionment

11 issue.  You know, these -- it's sad to say, but some of these

12 claimants have suffered abuse unrelated to Boy Scouts and

13 applicable law would apportion liability so that claimants

14 are not paid more than once for the same claim.

15        Here, the trustee has discretion to apportion, but

16 no requirement to do so.  And at least so far, there is no

17 provision that actually requires a claimant to certify what

18 other defendants the claimant might have recovered from or

19 have a claim against, so that the trustee can even attempt to

20 determine BSA's allocable share.

21        And this is, Your Honor, one of the crux issues in

22 the asbestos context, where claimants file claims against a

23 debtor and they have also filed claims against other non-

24 bankrupt defendants and against other trusts created by

25 debtors who previously went into bankruptcy, and it's the

1  failure to disclose those which makes it difficult to

2  appropriately value the share of the debtor.

3        So, all these factors, Your Honor, we believe will

4  expand the quantum of abuse liability well beyond the actual

5  abuse liability and any of the projections produced by Bates

6  White.  So, they value abuse liability between 2.4 billion

7  and 7.1 billion, based on their opinion that only roughly 20

8  percent of the claims filed to date are entitled to a

9  recovery at all, much less than the 100 percent that are

10 entitled to recovery under the TDPs.

11       And under GIT, this inflation of plans alters the

12 debtors' risk profile and is clearly a modification of

13 insurance contracts, which this Court does not have the power

14 to approve.

15       THE COURT:  So, I thought I had the Global

16 Industrial case out here with me -- I don't -- but my

17 recollection of Global Industrial is that at the circuit

18 level, the Court was looking at appellate standing.  No, I'm

19 sorry, the Court wasn't looking at appellate standing; the

20 Court was looking at Bankruptcy Court standing and the

21 Bankruptcy Court had determined that the insurers did not

22 have standing to raise certain confirmation objections.

23       And the Third Circuit, looking at bankruptcy

24 standing, said a couple things, but the quantum of liability

25 raised by the silica-based claims, which had increased from a

1   couple hundred to 6,000 or something like that, meant that

2   the bankruptcy judge should have permitted the insurance

3   companies to participate in confirmation and raised issues

4   regarding whatever they wanted to raise issues on, but, in

5   particular, I think there were fraud issues, and remanded for

6   that purpose, notwithstanding that the bankruptcy judge

7   apparently had made extensive findings, based on other

8   parties' objections, very similar objections.

9           I don't think the Third Circuit said that the

10  potential for an increase in liabilities means a plan is not

11  confirmable or that, or necessarily that -- well, I don't

12  think they said it was not confirmable.  I think they said

13  the insurance company had to be able to participate and raise

14  the issues and then Global Industrial doesn't end up in front

15  of the Third Circuit again, so I think the insurance

16  companies end up settling, as I recall.  We did take a look

17  at what the subsequent history was to see what happened,

18  because it would have been interesting.

19          So, I think the insurance companies are using

20  Global Industrial a little bit differently than I read it.  I

21  read it to give the insurance companies bankruptcy standing

22  to raise the issues they were not permitted to raise below in

23  Global Industrial, but it doesn't mean that there's no

24  confirmable plan out there simply because there may be some

25  increase in quantum.

1          But I view that differently as I think what you're

2    going to argue to me on findings, so where am I wrong on

3    that, Mr. Rosenthal?

4          MR. ROSENTHAL:  Well, I think on the point that

5    you were just raising, one of the statements you made the

6    other day was you think insurance neutrality is a misused

7    term or maybe a misunderstood term.

8          You know, I conflate two concepts.  I conflate

9    standing, and I think I've said this to you before, I

10   conflate standing with the principle that you are altering

11   the insurers' rights, and that if you -- and that what was

12   really happening in GIT was that the Court said you're

13   increasing the quantum of liability.  In that case it was

14   silica.

15         In this case, the increase is from 1700 claims to

16   82,000 claims, something like that.

17         But it's not that increase that we're complaining

18   about.  It's actually not that increase.  Those are claims

19   filed (indiscernible) bankruptcy, right.

20         It's more the alteration of the contracts, the

21   standards by which claims are evaluated.  And so, it goes to

22   the specific points we were talking about when we were going

23   through the specific items of allowing items that are time-

24   barred, of allowing claims that don't prove the essential

25   elements of a cause of action:  negligence.

1          THE COURT:  Okay.

2          MR. ROSENTHAL:  Okay.  Now, let's talk about

3   insurance findings.  Your Honor, however the Court defines

4   "insurance neutrality," we think the plan turns it on its

5   head and requires the Court to make confirmation findings

6   that, (A), are unnecessary to confirmation, and, (B), strip

7   away key, contractual rights and coverage defenses of the

8   insurance.

9          Quite simply, Your Honor, the findings seek this

10  Court's blessing today for inflated claim determinations that

11  Mr. Green or some other settlement trustee will make down the

12  road with respect to each abuse claim.  These findings will

13  be used to support the inevitable argument by the settlement

14  trustee to the coverage court that this Court effectively

15  entered a judgment about the validity and amount of each

16  claim, a judgment that, as you know, you are not making --

17  you told us that -- and that you're jurisdictionally

18  incapable of making about a personal injury claim.

19          You know, so I would (indiscernible) the finding

20  issue or the CliffsNotes version of that is that none of the

21  findings are required and all alter the insurers' rights,

22  which this Court has no authority to do.

23          So, let me go over the three insurance findings

24  that are problematic.

25          THE COURT:  Yeah, let me get my ...

1           (Pause)

2                THE COURT:  Where can I most easily find them?

3                I had them marked in my RSA, which I don't have

4    here.

5                MR. ROSENTHAL:  In the plan --

6                THE COURT:  Uh-huh.

7                MR. ROSENTHAL:  -- if you go to the conditions

8    preceding the confirmation and then --

9                THE COURT:  Okay.

10                MS. LAURIA:  Your Honor, if you have the

11    blacklines that were filed last night, I can give you the

12    precise page preference if that would be helpful.

13                Sorry, Mr. Rosenthal.

14                It's Docket 6385-1.

15                THE COURT:  Uh-huh.  Okay.

16                MR. ROSENTHAL:  And, Your Honor --

17                MS. LAURIA:  In the PDF, it's 107.

18                THE COURT:  They're in the conditions preceding.

19           (Pause)

20                MR. ROSENTHAL:  So, the first finding, Your Honor,

21    if you've found it, is Finding R.  I think it's R.  It's a

22    finding that the TDP allowance procedures are fair and

23    reasonable, based on the evidence presented to the Court and,

24    specifically, the finding is, you know, the procedures

25    including the trust, the TDPs, pertaining to the allowance of

1  claims and the criteria included in the TDPs pertaining to

2  the calculation of the claim amounts, including the claims

3  matrix, base values, maximum matrix values, and scaling

4  factors are fair and reasonable, based on the evidentiary

5  record offered to the Court.

6           To us, at least, it's clear how this, that this

7  finding alters the insurers' rights and how it will be used

8  against the insurers.  The settlement trustee will bring a

9  State Court coverage action and argue that the Bankruptcy

10  Court, based on evidence presented to it, because it's got to

11  be based on the evidentiary record, found that the procedures

12  and criteria for allowance are fair and reasonable and that,

13  therefore, the determination of claim amounts that flow from

14  those procedures and criteria, you also blessed and bind all

15  non-settling insurers to whatever number the settlement

16  trustee has determined is the appropriate amount of a

17  particular claim.

18           This finding an effectively a determination that

19  every personal injury claim allowed by the trustee has your

20  stamp of approval, because you've approved the procedures,

21  the criteria, they're fair and reasonable, you've had a

22  record.

23           But, Your Honor, as you know, you don't

24  constitutionally have the jurisdiction to do anything of the

25  sort.  And it's also clear why, even if you were inclined to

1  make this finding and had authority to make it, substantial

2  discovery would be required.

3        They're asking you to make the finding based on

4  the evidence.  At a minimum, you can't possibly make the

5  evidentiary finding without, as a matter of fairness and due

6  process, giving objectors a reasonable opportunity to gather

7  and provide their evidence in opposition to the evidence that

8  we know will be presented by the coalition and the FCR.

9        If you move to the next finding, Your Honor, this

10 really fortifies; Finding S fortifies the first one.  That

11 finding is that an abuse claimant's right to payment is the

12 amount at which such abuse claim is allowed under the TDPs.

13       And in my outline, I have highlighted "is the

14 amount at which is allowed."  So, effectively, this finding

15 confirms that from your perspective, the claimant's right to

16 payment is the amount determined by the settlement trustee;

17 that's what it says, "claimant's right to payment is the

18 amount at which it is allowed."

19       And you made it a point to say, last week, that

20 you weren't going to be evaluating individual insurance

21 policies in determining whether an insurer right or might not

22 have to pay a, as a result of the bankruptcy.  But if you

23 look at this finding, Your Honor, it's asking you to make

24 precisely that determination.  It's asking you to determine

25 now that a claimant is entitled to be paid the amount at

1  which its abuse claim is allowed under the TDPs.

2          THE COURT:  Well, don't I have to find that?

3  Don't I have to make a finding that relative among claimants,

4  at least, right, that the amount that the settlement trustee

5  determines is the allowed amount of their claim -- "allowed

6  amount" is, I guess, a loaded term -- is the amount of the

7  claim so that, in fact, a *pro rata* distribution can be made?

8          MR. ROSENTHAL:  I don't think you have to, Your

9  Honor.  I don't think you have to make that as a confirmation

10  finding.  I think this is an agreement -- what the TDP is, is

11  an agreement among the claimants and the FCR as to how

12  they're going to allocate whatever value comes into the

13  trust.  And I don't think that your stamp of approval on that

14  can be -- is inappropriate and can be terribly misused.

15          THE COURT:  Well, this is the Fuller-Austin issue,

16  right, this second one here?

17          MR. ROSENTHAL:  This is the Fuller-Austin issue,

18  but the way the finding is structured, it's more than the

19  Fuller-Austin issue, because it's not just -- because the way

20  it is structured, in conjunction with the first finding

21  you're talking about is, you know, is the amount at which

22  it's allowed under the TDPs.

23          It really does -- let me give you an example, and

24  there's another -- T is a different finding, you know, that

25  the plan and trust distributions procedures were proposed in

1  good faith.  But what I really want you to focus on, I think,

2  is if you suspend reality for a second and you take yourself

3  off of this bench and you put yourself on a --

4            THE COURT:  Can I do that?  Can I really do that?

5            MR. ROSENTHAL:  Well, you may not want the second

6  part of my assumption.

7       (Laughter)

8            THE COURT:  Okay.

9            MR. ROSENTHAL:  And you put yourself on a state

10  coverage court bench --

11       (Laughter)

12            MR. ROSENTHAL:  -- where, you know, you are

13  looking at bankruptcy.  And what you see in bankruptcy --

14  because you're not a bankruptcy lawyer -- is a confusing

15  amaze of Code provisions that is, you know, overseen by a

16  bankruptcy judge, a thoughtful bankruptcy judge.

17            Now, from that seat, Your Honor, can you honestly

18  tell me that after reviewing the findings that you would have

19  entered if you agree with the proponents, you would not be

20  inclined to conclude that the Bankruptcy Court had stamped

21  its approval on the claim values.  I think you would conclude

22  that you stamped your approval on the claim values.

23            And that's precisely why the coalition and the

24  FCR, with the support of the debtors, want these findings.

25  And it's also why the insurers think it's important not only

1  that the plan, you know, be insurance-neutral, but that you

2  give direction to that Court to say, yes, I am confirming the

3  plan.  I am doing my job.  I am approving the plan under the

4  confirmation requirements, but I am not, I am not determining

5  whether any insurer is liable for them.  I am not actually

6  determining the claim values.  I am not finding that the TDPs

7  represent judgments.

8            Remember that Mr. Zalkin told the Court that he

9  had been told by the claimants' representatives that what

10  they were trying to do is, and what they thought they would

11  get out of this case, is get Your Honor to issue findings and

12  orders that effectively represented judgments, with respect

13  to the claims.

14            THE COURT:  So, what do you think I can do?

15            MR. ROSENTHAL:  I think you can approve the plan.

16  If you believe it's appropriate, I think you can confirm the

17  plan.  And, you know, say the plan has been proposed in good

18  faith, the plan complies with the provisions of the

19  Bankruptcy Code that are in 1129, but not bless the claim

20  determinations that come out of the TDPs.  You know, that,

21  Your Honor, is something that should be reserved for -- the

22  TDPs can do whatever they want, but when they go to collect

23  from insurers, they will have to demonstrate that those

24  claims are entitled to be covered under the policies.  And

25  they shouldn't be able to rely on your findings in any way,

1   shape, or form, to make that argument.

2           Now, you raised a good question.  Is there an

3   intermediate position that you might be able to take, the

4   plan treats everyone the same, you know, that treats

5   substantially similar claimants the same?

6           Maybe.  But I think if you did that, you would

7   have to make it very clear that that was the extent to which

8   you were going.  You were not putting your stamp of approval

9   on the amounts that came out of those TDPs or that they were

10  covered by insurance.

11          I'm not even sure you need to do that.  This is

12  not a 524(g) case.  You don't have to make 524(g) findings.

13  That would be required in 524(g), but this is not a 524(g)

14  case.

15          THE COURT:  Well, I have to say that I don't know

16  that sitting here, I know every finding I need to make to

17  confirm a plan, because I don't know exactly what objections

18  are going to be posed to me in what fashion, and that's hard

19  to know until we see them, until we know what the vote is,

20  until we see what issues are raised.  And so, that's why it's

21  hard to anticipate -- I wouldn't say there's a vacuum -- I've

22  heard a lot of confirmation objections, but I haven't heard

23  them in the context of a solicited, voted plan that's in

24  front of me.

25          And I can anticipate that I would need to make

1  some findings for confirmation purposes and on a record

2  that's built at confirmation with respect to the TDPs and

3  maybe the values in the TDPs, depending on the objections

4  that I get.

5          MR. ROSENTHAL:  If you are going to make the

6  findings, I would think you would need to consider all the

7  evidence, but, I mean, this goes to the point that, you know,

8  we don't think that these findings truly have anything to do

9  with confirmation and they bring with them, a total, in terms

10 of timing and cost.  And, you know, they put you, frankly,

11 right in the middle of claim determinations, with respect to

12 personal injury claims, which I don't see how you can do.

13          I mean, if you make a finding that the, you know,

14 that $600,000 is the appropriate base amount and that the

15 range for -- and that that should be allowed, notwithstanding

16 no finding of negligence, and that the range for a

17 demonstration of negligence should increase that by X or Y,

18 and you're giving the trustee full discretion to determine

19 whether it's X or Y or somewhere in between, Your Honor, I

20 think you are effectively putting your finger on these claims

21 in a way that certainly a coverage court may very well think

22 you've made the determination now, even though the actual

23 determination of the amount is not going to be made later by

24 the trustee.

25          And I think that's the opposite -- I think that

1  alters the insurers' rights, to -- that alters the insurers'

2  rights, and it is something that Your Honor cannot do in

3  bankruptcy and does not need to do.

4       THE COURT:  Well, I don't see how I would be

5  determining and fixing the amount of any particular claim,

6  but I do think, again, depending on the objections I get,

7  that I may have -- that I have to determine that the TDPs set

8  up an appropriate process for the settlement trustee to

9  exercise his discretion within.  It's not grammatically

10 great, but okay.

11      So, because we don't send the claims to a trust

12 with no guidance on how to evaluate them; there has to be

13 guidance on how to evaluate them, so that all of those claims

14 are evaluated consistently and share appropriately from the

15 pot.  So, I can't just say, hand them over and say, figure it

16 out, with no guidance; with no guidelines, nobody

17 understands.

18      Well, maybe I could -- I don't know -- I guess

19 that's what a judge does all the time, but I don't think

20 that's the way this is historically done.

21      MR. ROSENTHAL:  I don't think courts get down into

22 the weeds and say -- I mean, are you going to get down and

23 say that the base value should be X for this kind of abuse

24 and Y for the other kind of abuse?  Are you going to make a

25 judgment about the amount of the uplift or down lift that

1 occurs for certain factors?

2          Because if you get it, if you think that you can

3 or should get into that, I think you're, with respect, Your

4 Honor, I think you're going far beyond what you are -- not

5 just what you're permitting to do, because I -- but I

6 think -- not what you're constitutionally permitted to do,

7 jurisdictionally permitted to do, but what you're permitted

8 to do under the Bankruptcy Code.

9          Because you said it a couple times, you can't

10 alter the rights of the insurers.  The insurers have the

11 right, you know, under their contracts they have many rights,

12 including the right to, you know, participate in settlements

13 and approve settlements, the right to take over the defense

14 of these claims.  You know, they -- what you're effectively

15 doing is forcing them to come, because they don't know what

16 effect a State Court will have, based on what you rule, but

17 they have a strong suspicion.  My example is exactly what a

18 State Court would do.  They have to come here and litigate

19 not only the appropriateness of what you're being asked to

20 do, separate and apart from the values, but also the values.

21          THE COURT:  Well, would you agree with me that I

22 may have to determine an aggregate number, an aggregate value

23 for the claims in some context at confirmation?

24          MR. ROSENTHAL:  Why do you think you need that?

25 No one has asked you for that.

1          THE COURT:  I kind of thought somebody had.

2          MR. ROSENTHAL:  They had before, but I don't think

3    there's anything currently on the table for that.

4          THE COURT:  Okay.

5          MR. ROSENTHAL:  Look, I think --

6          THE COURT:  This is why it's hard to have a

7    discussion in the abstract.

8          MR. ROSENTHAL:  Do you know how the TDPs, how most

9    TDPs work?

10          Most TDPs, well, I'll -- most TDPs, you know, they

11    apply similar criteria.  Most TDPs that we know recently are

12    asbestos-related, but, obviously, you know, there are other

13    mass torts that have become more prominent in terms of cases.

14          So, what the TDPs generally do is they do treat

15    everyone similarly situated in a similar manner.  That's

16    something that 524 would require.  But, at the same time,

17    they do that and they don't need, necessarily, to have

18    estimates of the overall value, because they pay to the

19    claimant, they do an assessment of what the assets are at the

20    time, and they pay to the claimant a payment percentage --

21    not the full amount of the claim -- but a payment percentage,

22    based on the assets at the time.

23          And if they subsequently collect additional assets

24    from additional insurance or if they had other real property

25    assets and they sold that real property and they subsequently

1    are able to pay a supplemental distribution on account of

2    that claim, then they would make another assessment three

3    months down the road or a year down the road and say, okay,

4    we paid the claimant 10 cents on the dollar, because that's

5    all we had on day one.  We thought we were going to have, you

6    know, 80,000 claims.  We had a claims expert.  We thought we

7    were going to have 80,000 claims and based on the information

8    that we got from the claims expert, we were able to make an

9    initial distribution of X percent on the dollar.  As further

10    monies come in, we can supplement that distribution.

11            So, while there are determinations made by the

12    trust from time to time about what the claims would be, and

13    those are used for determining the payment percentage,

14    primarily, so, you know, in some cases, Your Honor, courts do

15    make estimates of claim values.  In other cases, they do not.

16            In that, you know, Garlock case from six or seven

17    years ago, and it turns out to be a lot longer now, the

18    parties, there was a huge fight about what the claims

19    estimates were, because the parties were worlds apart.  And

20    the debtor pressed for an estimation and there was a lengthy

21    estimation process in that case.  The result of the

22    estimation actually led to a settlement, but that's not the

23    case in every case.

24            So, Your Honor, let me just -- I thank you for

25    your time.  I know it's taken quite a bit of time, and I am

1  happy to answer any more questions you have, but I will just

2  say in closing, we agree with the debtors that further

3  mediation may very well bear fruit, but, unlike the debtors,

4  we believe that so long as the possibility exists that Your

5  Honor might embrace the insurance prejudicial provisions and

6  findings, the claimant representatives have every incentive

7  to be, frankly, unreasonable, even at the expense of outcomes

8  that would be better for everyone in the case, because their

9  desires, and I mentioned this at the outset, I believe their

10 desires exceed the four corners of this case.  They want to

11 make new precedent that they can use in other cases.

12           But without a true global settlement, these cases

13 will drag on for months, possibly years, through appeals, and

14 during that time, legitimate claimants will suffer the

15 consequences as they wait for meaningful compensation.

16           So, we believe that approval of the disclosure

17 statement and commencement of solicitation, without at least

18 a strong admonition that the proposed findings render the

19 plan unconfirmable, not only imposes an obstacle to a global

20 resolution and a quick exit, but it leads the debtors down a

21 costly and expensive path to solicit votes on a plan that's

22 not confirmable, in our view.

23           Your Honor, thank you for your time.  I appreciate

24 your thoughtful questions.

25           THE COURT:  Thank you.

1          Mr. Schiavoni?

2          MR. SCHIAVONI:  Your Honor, I was candidly going

3    to rely upon, stand on my papers, but if you could just hear

4    me for 10 minutes, I would appreciate that.

5          THE COURT:  Okay.

6          MR. SCHIAVONI:  There is an overlay I would just

7    like to put on Mr. Rosenthal's comments.  I would like to

8    bring Your Honor back to my argument about Combustion

9    Engineering and the reversal that took place in Combustion

10   Engineering, because I think it's important in how one looks

11   at this case as one goes forward.

12         Your Honor, in Combustion Engineering, what the

13   Court -- there's a key phrase in there, from my perspective,

14   that the Court talked about, and what it talked about there

15   in giving guidance on how to look at these kinds of cases is

16   it looked at the elaborate steps that the debtor had taken

17   with this group of claimants that had, as it terms, either

18   stub claims or weak claims or potentially non-compensable

19   claims, in order to sort of jimmy up a majority vote for a

20   plan.

21         And what the Court said in there was something to

22   the effect -- I don't have the exact quote in front of me --

23   was that one could, by, you know, individually, you know,

24   take steps that look like they comply with the Code, but

25   overall, those steps combined, were -- in that case, the

1   Court was concerned -- were really intended to avoid the

2   purpose of the overall Code.  And in there, what they were

3   focused on was the importance of an affirmative vote by an

4   impaired class and whether they really had an impaired class

5   there or not; in other words, an individual, if you just

6   looked at it step-by-step, they might comply and on other

7   things, not comply.

8           Your Honor has earned a well-founded reputation as

9   a balls-and-strike judge who takes each issue presented to

10  her and tries to call it fairly, and that's appreciated by

11  everyone.  But if you look at how these different steps over

12  time combined, and then you look at the result on the back

13  end, which is what you hear from the TCC talking about a

14  hundred-billion-dollar payout here.  And you see it in

15  various other papers and it's inflamed the claimants.

16          It's like, and then you compare it to with what we

17  started here, which was a Defendant in the tort system, which

18  had definite problems and, you know, even if there was only

19  one abuse claimant, it was a horrendous problem, but when

20  they filed, they had 275 claims and a thousand alleged, and

21  within just a few months, they generated 80-plus-thousand

22  claims through the use of these, you know, for-profit

23  aggregators.

24          And now, we're on a path where they're saying

25  they're going to get a -- it's like they think they've got a

1    plan where they're basically saying they're going to hand it

2    to a trustee at the end of the case and he's going to prove-

3    up claims and, you know, you've heard it from the TCC,

4    there's a hundred billion dollars that's going to come out

5    the back end.  And if that happens, that will cause enormous

6    damage, enormous damage beyond the scope of this case.  The

7    notion that one can just print money and it not have an

8    impact is wrong.  It will have tremendous damage.

9            But let's just look at some of the components on

10   how we got there.  But as a starting point, just in some of

11   the exchanges that you had with Mr. Rosenthal, I want you to

12   think about how this term "TDP" evolved and really what it

13   is, okay.  It's a trust distribution procedure.  It's just

14   that.  It's how a settlement trust, you know, allocates money

15   out among its claimants.

16           It's not too different from in regular District

17   Court litigation where you have class actions, money is paid,

18   and then the settlement trust makes and allocates out the

19   money.  And the Plaintiffs' lawyers can have wide discretion

20   in sort of how they make those allocations, how they spread

21   the money around among their various claimants.

22           They can, in that sort of situation, if that's all

23   that's happening, they can have the trustee, you know, make

24   various presumptions in their favor and, you know, they have

25   wide discretion on how they might allocate money.

1          What these are, and what the word "TDP," it means

2    trust distribution procedure.  It doesn't mean trust

3    adjudication procedure.

4          It's like the findings that Your Honor is being

5    asked to make and what's embedded in the TDP, itself -- and,

6    you know, there's various texts in there that they want you

7    to approve -- converts this into just that, from just an

8    allocation procedure among the claimants about how they're

9    going to allocate the money among their claimants, into a

10   trust adjudication procedure where, effectively, you know, a

11   gentleman selected by the claimants with procedures picked by

12   the claimants is then going to, quote, determine the

13   liability of the debtor.

14         And it's utterly and completely at odds, that

15   process, with what's contemplated by the insurance contracts

16   here.  In large measure, it explains the entire difference

17   between why there were 275 claims in the tort system when the

18   case started and why there's 80-plus-thousand claims right

19   now.

20         In the tort system, and under the policies, there

21   was a process, whereby, someone with a stake in the game

22   would first make an assessment about, you know, whether or

23   not the claim should be settled or not.  If it wasn't settled

24   immediately, it would be, then, presented in the tort system,

25   where the burdens of proof would be placed on the Plaintiff

1  and various levels of proof would be required and good claims

2  would be, you know, vetted out from bad claims.  That's a

3  process that's tied to, and built into, how the insurance

4  contracts work.

5          This trust distribution procedure, if all the

6  Court is approving is, look, this is how they're going to

7  pass the money out among the claimants -- fine -- but if it's

8  converted into a trust adjudication procedure, it's

9  completely different from the tort world.  No amount of

10 presenting evidence about what a particular claim might get

11 or might not get in the tort system changes the fundamental

12 nature of this, which is, there is not an independent, you

13 know, judicial official with the Rules of Evidence and the

14 burden requirements set in the tort system, making an

15 adjudication of what the claims are worth.

16         The TDP specifically, basically, makes the --

17 flips the presumptions and the burdens of proofs on their

18 head.  There's even a provision in the TDP that says that if

19 the trustee effectively determines that there's no evidence

20 at all supporting a claim, the claim (indiscernible) be

21 dismissed; instead, the claimant shall be given an

22 opportunity to sort of rummage through the Boy Scouts' files

23 that are turned over to try to, then, come up with some

24 evidence to make a claim out of what he finds in the files of

25 the Boy Scouts.

1           It's utterly and completely a different procedure

2    than in the tort system.  It's not an adjudication procedure

3    at all; it's an allocation procedure.  And what the claimants

4    have tried to do in drafting these TDPs is flip it around

5    into an adjudication procedure.

6           Now, when I say Your Honor calls balls and strikes

7    going through, I think you did, you know, and let's walk

8    through some of those.  When the bar date order was presented

9    to the Court, the Court, you know, looked at that order, I

10   think, strictly under the Code and Your Honor made decisions

11   and approved the proofs of claim as it went forward.

12           But what happened?

13           It's like the proof-of-claim form, in fact, only

14   has a few questions about the claims.  There's a number of --

15   you know, there's like 15 questions in total.  There may be a

16   little more, you know, I'm not -- I don't want to bind myself

17   to 15, exactly, right -- but the bulk of the questions,

18   numerically, are things like:  Where did you go to college?

19   Where do you live?  Things like that.

20           The questions about the claims only come down to a

21   couple.  As we argued then and we've argued on appeal, there

22   was no requirement in the proof of claim that sufficient

23   facts be laid out in order to establish the elements of the

24   fact a claim against the debtor in the various states in the

25   union.

1          And as you heard from Mr. Rosenthal, it's like,

2    that's not insubstantial because there is not strict

3    liability for these types of claims.  One has to establish in

4    the different states, different levels of evidence, including

5    negligence, and there's not strict liability.

6          I think what Your Honor, in a show of your further

7    diligence, I think you said at one point you looked at, you

8    pulled some random proofs of claim to look at yourself.  And,

9    you know, I have every sense that you looked at a variety of

10   them.  They tell different stories and different levels of

11   detail, but the bulk of them really just lay out that the

12   person, you know, to the extent they do this -- by the way,

13   many don't even assert abuse by Boy Scouts or in Boy Scouts.

14   There's a whole package of claims that just talk about abuse

15   in their families.

16          But the ones that do talk about Boy Scouts or say

17   something about it, you know, many of them just laid out

18   that, in fact, the person was abused and not much further.

19   So, the proofs of claim, themselves, you know, provided the

20   most bare-bones, you know, setout of what the claim was

21   about.

22          Overlay on that, that there was, you know,

23   extremely comprehensive confidentiality put over the claims

24   so that, you know, one is effectively, completely prohibited

25   from -- there's no way that we can take the information even

1  in the proof of claim and we can't speak to spouses or family

2  members or others, you know, referred to in the proof of

3  claim, because all of the contents of the proof of claim are

4  deemed confidential.

5       So, the ability of third parties and the debtor

6  to, you know, but mostly third parties, to investigate the

7  claim, based upon what the proof of claim, you know, the

8  contents of it, which, to begin with, are incredibly bare-

9  bones, is incredibly restricted.  You know, we tried, Your

10  Honor.

11       You know, even if the proof of claim said that I

12  was abused, you know, in a public spot where others were

13  witnesses, we couldn't take the proof of claim and send a

14  private investigator to speak to other people and say, look,

15  this was asserted in a proof of claim that this happened on

16  this day by Mr. Johnson, did it happen?

17       We would breach confidentiality under the proof of

18  claim to, you know, even pursue that investigation.  So, the

19  ability to investigate the claims on this very sketchy proof

20  of claim was incredibly restricted.

21       We tried to deal with that in a responsible manner

22  by the 2004 motions that we brought before the Court and

23  trying, selectively, to get at groups of claims, how they

24  were prepared and to get at individual claimants, you know,

25  to establish, you know, some of the *bona fides* of the proofs

1  of claim.

2          We've not been able to take depositions.  And, you

3  know, I've got it, Your Honor is sort of suggesting perhaps

4  maybe now we can do it, but it's like we have not been able

5  to do any testing of the proofs of claim directly and the

6  ability to test the proofs of claim for what they say is

7  incredibly harshly restricted by the confidentiality

8  provisions.

9          So, what do --

10          THE COURT:  Let me ask this question.  Let me ask

11  this question, Mr. Schiavoni:  Isn't the insurance companies'

12  involvement with the proofs of claim inconsistent with the

13  position that the trust distribution procedures don't matter,

14  that they shouldn't matter to the insurance companies,

15  because they should be insurance-neutral, that I shouldn't be

16  making any decisions.

17          Because if I'm not making any decisions with

18  respect to the trust distribution procedures, why do the

19  insurance companies care about what's in a proof of claim?

20          MR. SCHIAVONI:  So, Your Honor, I think I'm sort

21  of building to that kind of -- to give you the answer to that

22  question.

23          THE COURT:  Okay.

24          MR. SCHIAVONI:  Because the bottom line, is the

25  proofs of claim are completely untested at all.  It's like,

1  we then -- and this goes to, again, <u>Combustion Engineering</u>,

2  that each step along the way might, might have been proper,

3  but in combination, what does it give us, okay?

4        It's like, so the next step here is the Court, you

5  know, decides to send these out, you know, with each claim,

6  with each proof of claim getting one vote without any of them

7  tested.  And a key element of 502, the whole thought on how

8  502 would work was that if proofs of claim are out there and

9  then people vote based on it, that, in essence, there's some

10 validity to the vote because all parties in interest would

11 have had an opportunity to kind of test who's voting, so to

12 speak, right.  That's like a core element of 502 was that the

13 reason why you get a vote, like, votes would be allowed is

14 because people could object to the people voting, okay.

15       But if there's been no ability to test the votes

16 and then, you know, we then have the vote going out without

17 any of these, it's like without really knowing whether this

18 is a good vote or not, because no one has really been able to

19 test the votes.

20       And what's happened is like what's happened, I

21 think, in <u>Combustion Engineering</u>.  The debtor has aligned

22 itself with a group that purports to, you know, bring about

23 the majority vote and it's then an untested vote, based on

24 the proofs of claim, because we didn't have the ability to

25 test it.

1              And what, then, is embedded in that?

2              Exactly what the Circuit was sending back for

3    discovery in Combustion Engineering; a plan comes out that

4    has incredibly loose distribution procedures.  Again, I don't

5    think they're adjudication procedures; they're distribution

6    procedures.

7              The claimants didn't embed in here, and the

8    debtors certainly didn't, requirements that, you know,

9    strongly encourage the vetting out of good claims and bad

10   claims.  That's not -- it's like you'll hear evidence on what

11   these proofs of claim do, but that's not what they do.

12             It's not like they've appointed, you know, a

13   former head of the FBI to run the trust; they've appointed

14   someone who you'll hear evidence about, and if it's somebody

15   else, it's someone still, nonetheless, who effectively is

16   going to be controlled under these governance procedures by

17   the so-called TAC in how they're going to make decisions.

18             This is -- it's -- the procedure that ends up

19   coming out of the plan, you know, is one that approves these

20   lesser claims.  And again, this is the complaint,

21   fundamentally, that was being made by the Kazan claimants,

22   who prevailed in Combustion Engineering, that the plan

23   process then was hijacks by who was being allowed to vote.

24   And you know, so that's the sort of -- I don't know if we're

25   on the third of fourth step here that combines together on,

1  you know, a path where one might have said -- again, each one

2  of these was, you know, in good faith, decided by the Court.

3  But where does it leave us, you know, ultimately, and sort of

4  where the result takes us.

5            So, you know, then what happens is the debtor

6  also, as part of the plan, in agreement with the coalition,

7  to get their vote, agrees to assign their -- all of their

8  rights to object under 502 to the -- to this trustee.  They

9  do it without the consent of the insurers.  And that -- you

10 know, in an insurance coverage court, like that would be like

11 a really, really important, you know, right of ours.

12           In writing these contracts, the contracts directly

13 tie the consent to settle, you know, to -- you know, to

14 the -- it's an essential right to the contract.  It's like,

15 when folks issued insurance policies, they didn't issue a

16 blank check machine to their policy holders to settle cases

17 willy-nilly, any way they wanted.  It -- they said, to the

18 extent they took on a defense obligation and an indemnity

19 obligation, it was -- it's absolutely tied in the contract

20 that it's we would get -- it's like we can make a decision to

21 settle or we get to defend the case.

22           We didn't say you can -- you could settle

23 eighty -- you could create a system where you could get out

24 from your liability and create a system where you have -- you

25 could then willy-nilly, you know, settle 82,000 cases for any

1  dollar volume you have.  But that's embedded in the plan,

2  that, without our consent, they're assigning all of their

3  objections to the claimants, to the claimants' appointed

4  trustee, to impose and -- or decide.

5        And how is he doing it?  Well, I don't think

6  anyone can look at those trust distribution procedures, at

7  the end of the day -- and again, I don't think the focus,

8  frankly, should be whether X amount for this kind of claim or

9  Y amount is a fair amount.  I think it ought to be on how the

10  decision is made to determine that, if it's going to -- if

11  it's going to, you know, bind us and apply to us because

12  it's -- the procedure is not any -- you know, again, it's

13  nothing like what's in -- we would anticipate in the tort

14  system.  It's simply the plaintiffs themselves basically

15  applying procedures that they have blessed, agreed upon, I

16  would say drafted if we had the evidence, you know, to

17  confirm that, that the trustee presumptively will give them a

18  claim for almost anything.

19        Even on the statute of limitations, by the way,

20  he's given really sort of wide-ranging ability to basically

21  deem the statute of limitations as set aside.  You know, and

22  it's not just a scaling factor down.  It's like he can set it

23  aside, but -- in very -- you know, based upon the exercise of

24  his judgment.  That's not at all what would happen in the

25  ordinary course.

1           And it's like -- now there's two other things I'd

2    just like to build into this before we come to the end.  And

3    it's like, yeah, you're going to be asked to make good faith

4    findings in connection with the plan itself and how the

5    debtor and local councils acted.  And we did talk about this

6    a little bit in connection with the disclosure statement.

7    But look at -- it's like you will get evidence that you will

8    see about what -- when they were negotiating with their money

9    on the line -- and they had money on the line because the

10   policies for half the period of time have significant

11   retained limits and/or deductibles, where they were directly

12   liable, the nondebtors, the nondebtor local councils and the

13   Boy Scouts.

14          And what's the deal they struck?  The deal they

15   struck that they was at arm's length was they settled the --

16   they settled this volume of claims somewhere -- if you -- I

17   don't think this is a fair way to sort of analyze like how

18   the money is changing hands, in some ways.  But it's like

19   three to $6,000 a claim, if you just -- if you spread it

20   equally.  And that's what they paid, that's what they

21   negotiated at arm's length when their money was at issue.

22          And you saw it when we walked through for the

23   individual local councils that many of them are not even

24   contributing a single retained limit/deductible -- whatever

25   one wants to call it -- for, you know, even one policy that

1  falls in those periods.  It's like that would reflect what

2  they thought the claims were really worth.

3           But when they turned the pen over and gave it to

4  the claimants to say go draft a TDP, okay, it's like they

5  generate something that, you know, theoretically, from what

6  they say, generated a hundred-billion-dollar outcome.  That's

7  not consistent with -- it's in no way consistent with, you

8  know, looking at those TDPs as, quote, an "adjudication" of

9  their liability.

10          It's like I -- you know, you'll hear evidence from

11  this on us [sic], but it's like I don't think one can say

12  that, if the local councils settled for $3,000, and as part

13  of that capped its liability, and then turned around to the

14  trust -- the claimants and said, okay, draft a TDP and pick

15  your trustee to decide what the insurers should pay, that the

16  Court can turn around and enter a finding that says that that

17  trust adjudication procedure represents what the debtor is

18  liable for or what the local councils were liable for.  If it

19  was, they should be putting a lot more money in.

20          And you know, you heard some argument before that

21  this was us arguing out of, you know, two sides out of our

22  mouth about what they all ought to pay.  Hopefully, you've

23  heard a little bit more about this and you understand now

24  what I'm talking about.  It's like they can't be saying that,

25  if they paid not even a full deductible or retained limit,

1  you know, to resolve their claims in total, that somehow

2  it -- you know, what they're giving the trustee represents

3  their, quote, "actual liability."

4          So, yes, that finding is completely toxic to us

5  because of how we think the plan here has, step by step, you

6  know, abused what the Code is really intending.  And there's

7  a series of bankruptcy objections that are built into how

8  these steps sort of combine, you know, including that we

9  think the vote will fundamentally be bad at the end of the

10 day, but that make these findings just terribly toxic.

11         And they do something else.  It's like it's

12 created this specter you have in front of you of not just the

13 insurers objecting, okay, because of -- like it's made the

14 case virtually impossible to settle with the claimants if

15 they are to think that they, themselves, will decide what all

16 the claims are worth.  I mean, one can imagine, you know,

17 what that kind of discussion would be like.

18         And Judge, God knows we've tried -- we have worked

19 to settle this case.  I mean, Mr. Ryan and I worked very hard

20 in the Blitz case and we settled a very difficult case

21 together.  And as I know, your patience with me as an

22 adversary has been epic, and I appreciate that.  But I

23 just -- trust me that we've -- you know, we've worked very

24 hard to try to resolve the case.  It's made almost impossible

25 by this dynamic.

1          And it's not just us, it's the claimants

2   themselves are at each other's throats over this because

3   there's no process by which -- you know, none of them --

4   neither constituency is able, really, to stand up and say we

5   need an aggressive procedure here to whittle down the claims

6   or to focus the money on the more high-value claims.  They're

7   almost institutionally -- and I'm not -- in some ways, I'm

8   not even faulting them for this.  But it's against -- you

9   know, it's like they'll be called traitors by their own

10  constituency if they do it, but it's like they're unable to

11  do it.

12         The U.S. Trustee we've reached out to on this.

13  And I mean no fault, the U.S. Trustee is doing a fine job.

14  But they're not going to step forward into that role.  You

15  know, so there's no one else in that role in the tort system.

16  It would be us doing that.

17         And to be clear, the debtor had that option.  All

18  right?  You know, you heard in Imerys how, at one point,

19  Imerys -- J&J stepped forward and said, you know, lift the

20  stay, let the cases go forward in the tort system.  There

21  were CIPs before the debtor.  You know, you heard, I think,

22  even some evidence during the RSA how Hartford put forward,

23  you know, a claims procedures that just passed the claims --

24  the tort system.  All of those were rejected because this is

25  just more favorable, letting the claimants decide what their

1  own claims are worth and having the Court issue a finding

2  that hey get to adjudicate -- that that adjudication then is

3  binding on the insurers.

4         And yes, it's like will a subsequent state court

5  case -- court be confused about that?  Absolutely.  It's like

6  absolutely.  And that was -- you know, in some ways, it's one

7  of the teachings of that Fuller-Austin decision is just sort

8  of, you know, how the trial court there was confused in the

9  first instance by, you know, 1129 findings, you know, without

10  any description of really what they were about being

11  presented to the, you know, court there.

12         So, look, that's an overlay on what Mr. Rosenthal

13  said.  I -- you know, it's -- it makes -- all of this

14  infects, you know, what's necessary for discovery because,

15  you know, it's like the claimants are asserting that

16  basically all coverage issues need to be side -- decided

17  here.  It creates a nest of complex evidentiary issues.

18  It -- you know, for instance, like the complete blocking of

19  us from getting any evidence at all about how the TDPs were

20  negotiated, if that's even, quote, the right word to be

21  applied here, when they otherwise were going to seek findings

22  on the -- you know, that they were not in good faith.  It's

23  like we'll have motions on all of those issues and just --

24  it's just making it incredibly difficult to deal with this in

25  a three-month period.

1          I mean, in three months, to package these issues,

2    for them to them come out and say there's a hundred billion

3    dollars' worth of liability on the back end, it's like these

4    findings are just utterly unnecessary.  They're

5    unprecedented, really, because other courts have looked at

6    this as distribution procedures and not adjudication

7    procedures.

8          And if you go back through most of the mass tort

9    cases that have been decided, yes, it's true that like, by

10   the time they got to confirmation, the cases -- more or less,

11   many of them had resolved themselves to the extent appeals

12   were taken.  You know, not many of them got through to like

13   post-claim, you know, adjudication.

14         What's made this one just particularly difficult

15   to -- you know, to reach any settlement is that the claimants

16   are taking a strong run at like having this Court decide that

17   these are adjudication procedures.  And it's like just made

18   it impossible for folks to decide things.  So that's an

19   overlay.

20         I have one brief argument I'd like you to consider

21   on -- you know, on -- I do think some of the findings should

22   be dropped, you know, or the Court should have encourage them

23   to be dropped because it's going to infect discovery going

24   forward.  We'd ask you to -- perhaps to keep an open mind on

25   that until you hear the discovery schedule argument.

1          But there's just one other thing that I think --

2    and it's not really an insurance issue, per se, but this

3    thing about the coalition fees.  I know Your Honor probably

4    feels that all of the issues we've talked about can be dealt

5    with at confirmation.  You know, you've heard, respectfully,

6    why we disagree on that.  But you know, we -- you know, we

7    all listen to the Court very closely.

8          But there's an issue that can't be -- the bell

9    can't be unrung on, that I would suggest that there -- you

10   know, it might make sense to address, you know, now.  We

11   might even try to bring a summary judgment motion to do it --

12   if that's what Your Honor wants, before solicitation.  But

13   that is, again, this issue about the fees being put back into

14   the plan.

15         I just think having those -- the coalition fees in

16   the plan is -- it's going to raise issues about tainting of

17   the vote, one way or the other, no matter what, and that --

18   it's like, consistent with your pre -- the Court's prior

19   order, as I seem to -- as I understood it, was that basically

20   the coalition would be free at the end of the case to bring a

21   motion on to seek its fees, and that that motion would make

22   its -- you know, present its case on whether they had, quote,

23   "made a substantial contribution" or not, and that they would

24   present evidence, et cetera, along those lines.

25         I see no prejudice to the coalition being to --

1  you know, that that's the way to do it and that it shouldn't

2  be in the plan.  It's like having it in the plan, you know,

3  creates this whole specter that the vote is tainted by what

4  we believe to be a conflict associated here.  And we will

5  argue that there is a conflict because of how the majority of

6  the coalition clients declined to be Brown Rudnick paying

7  claimants.  And now Brown Rudnick is imposing, in essence,

8  those fees on them through the plan itself.

9          And we think, as we've said, that that's tied

10  directly to the master ballot issue and how they're trying

11  to, you know, basically, you know, get the claimant lawyers

12  themselves, who are, in fact, taking 40 percent of the money

13  here, to, you know, bring about that master ballot vote.  So

14  we think that should come out because it can't -- that bell

15  can't be unrung.

16          We also think that's -- although it's the tail

17  that's wagging the dog, it's one that is just -- is

18  encouraging the case not to settle because it's promising

19  them another $900,000 every month that they litigate the

20  case, instead of trying to work to resolve the case, so I'd

21  ask you to consider that.

22          And thank you very much, Your Honor, otherwise,

23  for hearing us.

24          THE COURT:  Thank you.

25          Mr. Plevin.

1          MR. PLEVIN:  Your Honor, I will be very brief, and

2    I'm not going to veer into scheduling at this point.  I just

3    want to tie together a couple of things that Mr. Rosenthal

4    and Mr. Schiavoni said.

5          Mr. Schiavoni said the policies here are not check

6    writing machines.  And why is that?  If Your Honor were to

7    look at the actual policy language, you would see that the

8    insurers have to pay in only two circumstances:

9          First, when there's a judgment after an actual

10   trial.  Obviously, "actual trial" means a trial, an adversary

11   event with people on both sides putting in evidence.  There's

12   case law that says that a settlement by a debtor with its

13   creditors is not an actual trial.  That should be self-

14   evident, but that's the first time that an insurer has to

15   pay.  And obviously, a judgment after an actual trial carries

16   certain -- it shows that it's a real result because a jury or

17   a judge has made a decision based on evidence presented in a

18   contested proceeding.

19         The other instance in which an insurer has to pay

20   under the policy language is where there is a settlement in

21   writing, agreed to by the insured, the claimant, and the

22   insurance company because, as Mr. Schiavoni pointed out, the

23   insurers have the right to defend claims, and that includes

24   the right to settle claims.  And so, if an insurer settles a

25   claim, it takes on an obligation to make a payment pursuant

1  to a settlement agreement.

2         Those are the only circumstances in which an

3  insurer has to pay.  And when you talk about what Mr.

4  Schiavoni called the "trust adjudication procedures," versus

5  trust distribution procedures, you see that.

6         Now how does this play out in the coverage

7  context?  You asked Mr. Rosenthal a question about this.

8  What would happen outside of the bankruptcy context is, if an

9  insured settles without the consent of the insurance company,

10  often they'll do so because they'll say the insurer isn't

11  defending or the insurer is not -- hasn't accepted a

12  reasonable settlement offer and is hanging the insured out to

13  dry.

14         But if they settle on their own and then seek

15  insurance coverage, the insurer has the opportunity to

16  litigate in the coverage case whether the settlement was

17  reasonable because courts will often allow an insured to

18  settle, notwithstanding the insurer's right to be involved,

19  if the settlement is reasonable.  And then, in that case, the

20  coverage case -- the coverage court looks at how the

21  settlement was entered into, was it at arm's length, how does

22  it relate to the amounts being sought, what were the defenses

23  that were being asserted, and can make a determination as to

24  whether the settlement is actually reasonable.

25         That's not the situation that we would have here

1    because, in that litigation, it's the -- the arguments are

2    being made by the insured on the one hand and the insurance

3    company on the other hand.  And the insured says I think this

4    is reasonable and here's why; the insurance company says I

5    think it's not reasonable and here's why.

6         But the one thing that the insured doesn't get to

7    do in that circumstance is to say, not only do I think it's

8    reasonable, but here's a confirmation order by a Federal

9    Judge, a Federal Bankruptcy Judge, who says she thinks it's

10   reasonable, too.  And that gets presented to the trier of

11   fact in the coverage case.

12        What they're trying to do, Your Honor, is have you

13   put your thumb on the scale and allow the insured, in that

14   context, to make the argument to the jury or the trier -- or

15   the bench, depending on how the coverage case is being

16   litigated, and to say we think this is reasonable, and part

17   of the reason is because the Bankruptcy Judge said so.

18        And remember, as Mr. Rosenthal pointed out, you're

19   being asked basically to make decisions about the

20   reasonableness of determinations by the settlement trustee,

21   who hasn't been appointed yet, who is going to be make

22   those -- going to be making those decisions after

23   confirmation of the plan.  And so that illustrates, I think,

24   why, as Mr. Schiavoni put it, these findings are toxic and

25   they're prejudicial.  And you know, we just can't abide them.

1          And with that, I'm going to just say I have lots

2     of things to say about scheduling, but I'm going to defer

3     those until later.  Thank you.

4          THE COURT:  Thank you, thank you.

5          Okay.  I'm going to give the plan proponents an

6     opportunity to respond -- not the plan proponents, I'm

7     sorry -- the debtor and/or the FCR or the coalition an

8     opportunity to respond to these arguments.  But I really do

9     want a focus on why these findings are necessary and

10    appropriate, the import of them as to how they will be used,

11    and why aren't the trust distribution procedures just an

12    intra-creditor -- and by that I mean intra, I guess, abuse

13    claim creditor -- allocation mechanism.

14         And that goes along with questions I've had and

15    somewhat posed, probably not in this case, about the genesis

16    of the trust distribution procedures and why there's even a

17    trust advisory committee made up of plaintiffs' lawyers and

18    why the settlement trustee is often chosen by those lawyers

19    and why -- I understand why the FCR, certainly in an asbestos

20    case, gets a role because I think it's required in the

21    statute.  But given how these procedures, the trust

22    distribution procedures -- I don't know if they've evolved or

23    they've always been that way.

24         But it does seem curious that the beneficiaries of

25    the trust influence the procedures under which they receive a

1 distribution, if it's binding on others.  And if you go back

2 to just general trust law, a settlor chooses a trustee, a

3 settlor decides the provisions of the trust, and the

4 beneficiary is just a beneficiary.

5         So I'm -- we're going to take a break, we're going

6 to take about 15 minutes, and I'd like to hear a response.

7         But I think I said back in May I don't anticipate

8 making any coverage decisions, and I still do not intend to

9 make any decisions that are properly decided in a coverage

10 action.  And perhaps juxtaposed against this is that this is

11 a collective procedure.  And I don't have however many days

12 of a hearing and then it has no impact, right?  It has to

13 have an impact.  But it shouldn't have an impact beyond

14 what's necessary for me to decide confirmation issues.  So I

15 want to see that.

16         Mr. Patterson?

17         MR. PATTERSON:  Your Honor, before you turn to the

18 debtor, I wanted to address some of the issues that

19 Mr. Rosenthal and his colleagues addressed, and it might be

20 helpful if I do that before that.  I'm happy to do it right

21 after the break.  It should be about five or ten minutes,

22 Your Honor.

23         THE COURT:  Yes, I'll hear people in response, and

24 that can go beyond the debtors and the FCR and the coalition.

25 I'm happy to hear from others.

1          MR. PATTERSON:  Thank you.

2          THE COURT:  But those are the -- those are the

3   issues that I see, the big picture issues.  That's apart

4   from, I guess, the initial comments Mr. Rosenthal made about

5   some uncertainty we still have in this plan.  But I'm more

6   interested in the bigger picture issues of the trust

7   distribution procedures.

8          So we're going to take 15 minutes.  I don't know

9   what time it is.  It's 12:06.  Come back at 12:20.  We're in

10  recess.

11      (Recess taken at 12:06 p.m.)

12      (Proceedings resume at 12:22 p.m.)

13          THE COURT:  This is Judge Silverstein.  We're back

14  on the record.

15          Ms. Lauria.

16          MS. LAURIA:  Thank you, Your Honor.

17          I was just going to briefly outline how we had

18  allocated responsibilities on the debtor/FCR/coalition side

19  of the ledger, so that you're not hearing repeated arguments.

20          With respect to the insurance and trust issues

21  that you raised, Ms. Quinn, whose hand is up, as well as

22  members of the coalition, will be taking the lead role on

23  those arguments, so I'm going to pass the podium off to them

24  or the virtual podium.

25          I also heard issues from Mr. Rosenthal and

1   Mr. Schiavoni concerning the timing uncertainty point,

2   coalition fees, the third-party releases, thirty-five-

3   hundred-dollar expedited distribution, "liquidation of claims

4   for voting purposes" -- those are my words, not

5   Mr. Schiavoni's, but I'm trying to boil that down -- issues

6   with the proofs of claim and good faith.  All of those types

7   of issues, I will be taking on in responding to those.

8           But Your Honor, my sense was you wanted to dive

9   right into the insurance issues.  So, if it's okay, I'll

10  table that laundry list that I just mentioned.  I would like

11  to come back to those and respond to those, to the extent you

12  think it would be helpful.  And in the meantime, I'm going to

13  hand it off to -- I see Ms. Quinn, Mr. Molten, and

14  Mr. Goodman, so one of them I think are going to take the

15  lead on the insurance issues.  Maybe Ms. Quinn is first up.

16          THE COURT:  Ms. Quinn.

17          MR. STANG:  Your Honor, I'm sorry.  I thought

18  Mr. Patterson was going to address the Court.

19          THE COURT:  Mr. Patterson, the only thing I want a

20  response to is -- right now, is the insurance issues.  So I

21  don't actually really care, in particular, what order they go

22  in, but that's what I am -- the findings and the insurance

23  issue.

24          MR. PATTERSON:  I can limit my remarks to that

25  topic at this point, Your Honor.

1           THE COURT:  Okay.

2           MR. PATTERSON:  Thank you, Your Honor.  Tom

3    Patterson.

4           Our concern with the findings is that they do lie

5    at the heart of the architecture of the plan, and one of the

6    principal reasons for that is because of the involvement of

7    the local council settlements.

8           Mr. Rosenthal alluded to the <u>Combustion</u>

9    <u>Engineering</u> case, which dealt with the assignability of

10   nondebtor insurance under a plan and said that the Bankruptcy

11   Code powers do not extend to that extent.  And the Court

12   asked whether or not the savings language that has now been

13   introduced to the plan would be sufficient to eliminate that

14   defense on the part of the insurers.  And the answer is, for

15   a couple of reasons, that it's not.

16          One reason is the reason that Mr. Plevin

17   articulated, which is that, even apart from assignability of

18   insurance rights, the local council settlement and

19   contributions represent -- has the potential to trigger a

20   variety of coverage defenses, including consent to settlement

21   and the cooperation clause.

22          And the risk is that entering in a settlement

23   without consent can, in some jurisdictions, limit coverage or

24   void coverage.  It can limit coverage to the amount of the

25   settlement that was paid -- in this case, that could be the

1  amount of the local council contribution -- or it could void

2  coverage in other circumstances.

3           Second, Your Honor, the savings language provides

4  an additional coverage defense that is not otherwise present

5  because -- and by the way, I mean, it -- I have a full

6  appreciation for the irony that I'm articulating coverage

7  defenses, but I am articulating ones that the insurers have

8  passed on to me, so I do not feel that I am providing any

9  insights that they don't have.

10           But with regard to the assignment issue, if a

11  debtor -- well, a nondebtor in this case -- channels its

12  liability to a trust, then you have separated the liability

13  on the claim from the insurance, and there is a significant

14  coverage defense that the insurer has at that juncture, in

15  fact, if sued by the local council, that the local council no

16  longer has an indemnity right because it no longer has the

17  liability on the underlying claim.

18           And so, you know, our feeling is that these

19  coverage defenses are significant, at a minimum.  They would

20  take a considerable amount of time to resolve through,

21  likely, appellate decisions in more than one jurisdiction,

22  and that they provide an incentive, given the architecture of

23  the plan, for those who are advancing this plan at this point

24  to settle insurance at almost any price to avoid the flaw

25  that the settlement has a tendency -- has had a tendency to

1  create.

2         So I had other comments that I wanted to make that

3  keyed off things that Mr. Rosenthal and others have said, but

4  Your Honor asked me specifically with regard to insurance,

5  and so I'm limiting my comments to that at this point.

6         THE COURT:  Okay.  Thank you.

7         Ms. Quinn.

8         MS. QUINN:  Good afternoon again, Your Honor.

9  Kami Quinn, insurance counsel for the FCR.  And I am going to

10  respond to some of the insurance issues that were raised this

11  morning.

12         First, very briefly on neutrality, because I think

13  it's very clear that Your Honor has heard this, has read the

14  briefs, has read the cases, has considered this issue very

15  carefully.  There is no requirement that any plan be, quote,

16  "insurance neutral."  Insurance neutrality is a standing

17  doctrine that just has no relevance in a case where insurers

18  are being heard on every issue.

19         In the case -- in the neutrality cases, debtors

20  and plan supporters voluntarily made a strategic choice to

21  carve out insurers from otherwise generally applicable

22  provisions, but that sort of choice is not mandated anywhere.

23  And as an aside, Your Honor, remembered the GIT case and the

24  holding there exactly correctly.  So neutrality isn't an

25  issue that needs to be reached in this case because no one

1  has sought to deny the insurers standing.

2          Instead, because of that, the insurers have

3  pivoted to the idea that these findings impermissibly alter

4  their contract rights.  They don't.  But Your Honor has

5  expressed some concern about these findings and we -- and the

6  insurers have raised them today, and so we can talk about --

7  let's talk about these findings one by one.

8          And I don't intend to argue the truth of the

9  findings.  I just want -- this argument is to make clear

10  that, if we are able to convince you of their truth through

11  evidence and legal argument between now and confirmation that

12  these findings are appropriate for you to make in this

13  context and that they are not coverage determinations.

14          So I will start by being very clear.  We have

15  heard you.  We do not intend to issue coverage rulings in

16  this case.  The findings do not ask you to.  They don't ask

17  you to interpret a state law coverage issue, to review a

18  single policy, to single out insurers for any particular

19  treatment.  They don't ask you to determine the impact of

20  your findings on subsequent coverage litigation, nor do they

21  ask you to determine what impact or rulings will not have.

22  And they don't ask you to determine that any insurer has an

23  obligation to pay any particular claim.

24          All of the arguments about what the policies cover

25  or, as Your Honor has characterized, what product the debtor

1 bought, including all of the issues raised in pre-petition

2 litigation, remain wholly unaffected; issues like the number

3 of occurrences, whether and for which carriers the first

4 encounter is the appropriate trigger, whether SIRs and

5 deductibles apply, whether there's intentional conduct

6 related limitations to the policies.  All of those are

7 preserved for coverage litigation.

8            But the honor -- but the insurers have

9 characterized these findings as "coverage findings."  Indeed,

10 Mr. Schiavoni went so far last week to say that the findings

11 require you to find that there is coverage for the claims.

12 And today, you said that all coverage needs to be decided

13 here.  These findings unequivocally do no such thing.

14            So I will take each of the findings that

15 Mr. Rosenthal raised in turn, and we can go through them.

16 And the first is the assignment -- is the insurance

17 assignment.  This is -- courts in this circuit have been

18 making this finding in the context of mass tort cases with

19 respect to debtors' coverage for almost a decade now.  It is

20 settled bankruptcy law and uncontroversial on the point of

21 the debtors' coverage.

22            The insurers have argued that it's not appropriate

23 to extend this finding to nondebtors.  Your Honor noted that

24 the finding actually only requires you to find it -- to find

25 that the assignment is appropriate to the extent of

1  applicable law, that there is a savings here, to the extent

2  that applicable law -- which we're not asking to determine --

3  doesn't permit this finding, doesn't permit this assignment.

4          And so we think it's an appropriate finding.  We

5  think that there is no question that findings about the

6  validity and the applicability of a transfer of the insurance

7  rights under a plan is the appropriate finding for a

8  Bankruptcy Court to make in the context of confirmation.  And

9  we either will or we won't convince you that this assignment

10  is appropriate, or that the finding is appropriate to make to

11  the extent that -- of applicable law and to the extent that a

12  nondebtor policy can be assigned under applicable state law

13  (indiscernible)

14      (Participants speak simultaneously)

15          THE COURT:  Excuse me.  Please check your audio.

16          Ms. Quinn.

17          MS. QUINN:  Okay.  So that's assignment.  Unless

18  Your Honor has any questions on that, I'll go on to the TDPs.

19          THE COURT:  No.  I will confess that I hate these

20  provisions in an order that say "to the extent of applicable

21  law" because it just leaves issues open.  But I take it the

22  arguments that would be made are the ones I've seen in the

23  papers about being able to -- the conduct has already

24  happened.

25          MS. QUINN:  Correct.

1        THE COURT:  Okay.

2        MS. QUINN:  That is exactly correct, yes.

3        THE COURT:  Okay.

4        MS. QUINN:  Okay.  So the TDP.  The TDP finding

5   says:

6        "The procedures included in the trust distribution

7   procedures pertaining to the allowance of abuse claims and

8   the criteria are fair and reasonable, based on the

9   evidentiary record offered to the Bankruptcy Court."

10        So we spent hours this morning listening to

11   arguments which boiled down to the insurance position -- the

12   insurers' position that the TDPs are not, in fact, fair and

13   reasonable.  I'm not going to address whether or not they are

14   fair and reasonable because that is a question that we need

15   evidence, as it says in the finding.  We will get -- we will

16   find -- we will get evidence, we will argue these issues.  If

17   we can't convince you of the truth of the finding, then,

18   obviously, you won't make the finding.  But that's a

19   different question than whether or not it is appropriate to

20   make this finding in the context of your confirmation order.

21        So I'm -- and on this one, I think you put this

22   exactly right last week, when you said that of course Your

23   Honor can find that a settlement embodied in a plan is fair

24   and reasonable in the context of a confirmation order.  Of

25   course you can.  But that you -- but that you will not be

1  finding whether the insurance policies that the debtor

2  bought, whether the product that they purchased covers that

3  settlement.  That's perfect.  That's -- and we agree

4  completely.

5        THE COURT:  So is the -- what's the 1129 standard?

6  Is there an 1129 standard that these findings go to or is

7  this -- you're considering this a settlement?

8        MS. QUINN:  We're considering this a settlement.

9        THE COURT:  So it's not an 1129 standard, not part

10 of the 1129 standards.  So this is a settlement.  And who is

11 it a settlement among?

12       MS. QUINN:  It is a settlement among the abuse

13 claimants and the debtor and the local councils and, to

14 the -- and potentially others, to the extent that there are

15 separate provisions relating to chartering orgs, such as

16 TCJC, who have their own issues.

17       THE COURT:  Okay.

18       MS. QUINN:  So -- and I will point out that

19 Mr. Rosenthal raised the issue of, you know, these will

20 create all -- this terrible precedent.  Unfortunately, the

21 horse is out of that barn.  These findings that a TDP is fair

22 and reasonable have been made in Brower, Christy, Western

23 Asbestos; all of them included those findings.  This is

24 not -- this is not brand new.

25       And because it's a recent case, where confirmation

1  findings were disputed by insurers in a mass tort case, I can

2  talk about, if you're interested, the findings that Judge

3  Drain just made in Purdue on these issues, I can compare and

4  contrast a little.

5          Judge Drain made a finding that the settlements

6  reached between the debtors and the opioid claimants, as

7  embodied in the plan, are fair, equitable, and reasonable,

8  and were entered into in good faith, based on arm's length

9  negotiations, and the various intercreditor allocation

10  agreements and settlements are fair, equitable, and

11  reasonable.  And that's essentially what we're asking for

12  here.

13          Judge Drain went on to say some more stuff,

14  including that such negotiation, settlement, and resolution

15  of liabilities will not operate to excuse any insurer from

16  its obligations under any insurance policy, notwithstanding

17  its terms, including consent to settle or pay first or other

18  provisions in non-bankruptcy law.  That's not in our finding,

19  not what we're asking Your Honor to find, and an issue that

20  will be determined in the coverage litigation.

21          What the insurers are asking you to -- go ahead.

22          THE COURT:  Is that in the form of order?  Is that

23  where those findings come from?

24          MS. QUINN:  Judge Drain's?

25          THE COURT:  Yes.

1          MS. QUINN:  Uh-huh, yes.

2          THE COURT:  Okay.

3          MS. QUINN:  What the insurers are asking you to do

4    is prejudge how a coverage court will use a finding that the

5    TDPs are fair and reasonable.  They're asking you to

6    determine what their -- what the rights to defend under a

7    policy -- insurance policy are, what circumstances they get

8    to exercise those rights.  And they are asking you to say

9    what a coverage court can and cannot do this -- with that

10   finding.

11          Mr. Plevin said, well, in the tort system, we

12   would get to litigate whether the settlement is reasonable in

13   a coverage action.  But nobody is precluding Mr. Plevin from

14   litigating whether this settlement is fair and reasonable.  I

15   mean, we're just saying he only gets to do it once.  The

16   insurers are definitely going to litigate whether these TDPs

17   are fair and reasonable; indeed, I think they started today.

18   They just don't get to do it twice.

19          But this doesn't -- but a finding of fair and

20   reasonable TDP doesn't require you to determine that that's

21   the standard by which insurance policies pay, that insurance

22   policies pay fair and reasonable settlements entered into

23   without their consent, that fair and reasonable means the

24   same thing here that it means in a coverage court.  All

25   it's -- the findings say what they say.  And all of the

1  insurers' concerns about how they might be used are just

2  that.

3          I mean, they're free to make those arguments to

4  the coverage court about why it would not be appropriate to

5  use that finding for that purpose here, or why that findings

6  doesn't mean that they have a coverage obligation.  Nothing

7  about that finding says insurers have to pay any claim.  It

8  says the TDPs are fair and reasonable.

9          THE COURT:  For purposes of 9019.  Is that the

10  right -- is that the right standard of 9019?

11          MS. QUINN:  I think so.  I think fair and

12  reasonable with respect to all parties.

13          If the insurers come in and -- if the insurers

14  come in and litigate for days in front of Your Honor about

15  whether the TDPs are fair and reasonable as to them -- which

16  is what they will litigate, which is the issue they're

17  litigating, right?  Then they should be bound by the results

18  of that litigation.  They don't get to try it once then and

19  then determine -- and then, if they lose, try again somewhere

20  else.

21          THE COURT:  Well, but I thought I heard you say --

22  well, I guess the question is:  Does the 9019 standard --

23  assuming I approved a settlement, does the 9019 standard meet

24  whatever standard one would use to determine if there was a

25  coverage obligation?

1             MS. QUINN:  I don't know.  I mean, that's an issue

2   I think that will be decided by a coverage court, right?

3   Because the standard doesn't require you to define -- to find

4   that it meets the standard of an insurance policy,.  It

5   requires you to find that it's fair and reasonable.

6             THE COURT:  I don't know if that's the 9019

7   standard or not, but I'll take a look at the 9019 standard.

8   I think that's the standard, the four-part Martin standard.

9   I'm not sure it's fair and reasonable.  It's sort of the same

10  question I asked with respect to the RSA.  What does "good

11  faith" mean in this context?  Is that part of the standard?

12            And that's why I asked you what part of the 1129

13  standard is this because I'm going to be deciding

14  confirmation issues at confirmation.  And I don't know that I

15  have to determine what effect my ruling has down the line.  I

16  don't know --

17            MS. QUINN:  We --

18            THE COURT:  -- that I could --

19            MS. QUINN:  We agree.

20            THE COURT:  -- or that I should.

21            MS. QUINN:  Right.

22            THE COURT:  But I'll be looking at the settlement

23  standard then --

24            MS. QUINN:  Right.

25            THE COURT:  -- because that's what you're telling

1  me this is, a settlement.

2          MS. QUINN:  Well, I think that -- I think that it

3  may be the case -- and I'll defer to some of my bankruptcy

4  lawyer colleagues on the coalition who are going to talk next

5  about, you know, whether or not there's other bases for this

6  finding of fair and reasonableness.  But the finding is fair

7  and reasonable, and it is not a finding that fair and

8  reasonable is a coverage standard or that fair and reasonable

9  means that an insurance company has to pay.

10          THE COURT:  Okay.

11          MS. QUINN:  And the same goes, essentially, for

12  the third finding, which is the right to payment.  And I

13  can -- I will, again, you know, defer a little bit to my

14  bankruptcy brethren to talk about the specifics of this.  But

15  this is a statement of what the right to payment is under the

16  Code.  This is -- what this is, is a statement of how

17  claimants' claims will be liquidated.  And Your Honor

18  mentioned that this is something that goes to how assets will

19  be distributed amongst these claimants.

20          And this finding is -- it's necessary for the

21  plan.  And the reason why that it -- the reason why it's

22  necessary, to be clear here, to make this finding is in order

23  to describe appropriately what the settlement is that's being

24  reached in this plan.

25          Let me just take a step back here.  The debtors

1  here, they -- in the negotiation between the debtors and the

2  claimants, the debtors looked at this big liability and said

3  we think insurance coverage covers most of it, so we will

4  give you, trust claimants -- you have the right to pursue

5  coverage for the claims, the same as we would have had,

6  because, absent this bankruptcy, we think insurance would

7  have covered most of this, and then we'll negotiate with you,

8  you know, based on our ability to pay and a whole bunch of

9  other factors of, you know -- and the insurance has some

10 holes and, you know, gaps and whatever, and we're going to

11 negotiate with you a number 200 million or so, and that's the

12 amount we're going to give you to fill those holes and gaps

13 and that should work.  And that's the settlement that was

14 reached.

15          Absent this finding, there is a danger that the

16 settlement is interpreted as something else, which is that

17 the debtors paid $200 million to resolve what is, by their

18 own estimates, almost seven -- up to potentially $7 billion

19 in liability, and according to the -- you know, to the

20 victims' representatives, a whole heck of a lot more.  And

21 the -- so they settled the whole liability, the whole

22 billion -- multi-billion-dollar liability for 200 million and

23 maybe the right to pursue their reimbursement claim for that.

24          And that's not a deal that the claimants would

25 have agreed to.  And so what the need, the necessary for this

1  finding is, is to make clear what deal was reached in this

2  court.  And we think that this is the only -- this is, of

3  course, the Court that is appropriate to make clear what the

4  nature of the settlement in the plan is, the plan settlement

5  that is reached in this Court.

6           Again, it does not require the Court to say that

7  the policies cover any of this settlement.  If, as Your Honor

8  posited last week, the policies say we only cover the amounts

9  contributed by a debtor to a trust in bankruptcy, they still

10  say that and a coverage court will enforce that.  That's what

11  it says that they pay.  If the policies don't cover any of

12  the claims at all, they don't cover any of the claims.

13           But this is a clarification of what the deal is,

14  which is that the debtors are transferring their rights to

15  pursue coverage for the claims, not their right for

16  reimbursements of the amount paid and not limited to their

17  right to pursue reimbursement of the amounts paid to the

18  trust, that they paid to the trust, because that wasn't the

19  settlement of the whole liability, and that's it.  Those are

20  the -- those are the three findings.

21           THE COURT:  Well, isn't there an easier way to say

22  that, that doesn't use words like "allowed" and things like

23  that, that get interpreted certain ways?

24           MS. QUINN:  Is there is an easier way -- well, I

25  mean, there -- is there -- there's an almost infinite number

1  of ways to say it, so possibly yes.

2       (Pause)

3            THE COURT:  Yeah, I think this one is an -- well,

4  this is interesting because I would think this should not be

5  so controversial, but it is, apparently, relative to

6  insurance coverage issues.  And this is not the only context

7  in which we see this issue arise; and, yet, it seems to --

8  it's an issue for insurance coverage.  Cases are coming out

9  different ways on it, not bankruptcy cases, non-bankruptcy

10 cases.  Okay.

11      (Pause)

12           THE COURT:  Okay.  Ms. Quinn?

13           MS. QUINN:  And that's all I've got, unless you

14 have additional questions for me.  I can turn it over to

15 Mr. Goodman, who's going to talk some more about the

16 bankruptcy basis for some of these and the need for

17 discovery.

18           THE COURT:  Okay.  Thank you.

19           Mr. Goodman.

20           MR. GOODMAN:  Good afternoon, Your Honor.  Eric

21 Goodman, Brown Rudnick, counsel for the coalition.

22           To answer the last question, the standard under

23 Bankruptcy Rule 9019 is fair and equitable.  This comes from

24 the 1968 Supreme Court decision in Anderson, which held that

25 the rule that plans of reorganization be both fair and

1  equitable applies to compromises in a bankruptcy case.  We

2  can quibble over "equitable" and "reasonable," but I think

3  the import of both words are roughly the same in this

4  context.

5          With that answer provided, Your Honor, I would

6  like to come back to a question, beginning -- that you posed

7  at the last hearing because, frankly, that's what I'm

8  prepared to talk about first, which is:  Which of the

9  findings are legal issues, which are factual issues, and what

10  discovery is necessary, and how does all of this relate to

11  plan confirmation?  And I'm going to try to do my best to

12  answer those questions very directly.

13          There are five findings in the plan that were in

14  the restructuring support agreement.  They appear on

15  different paragraphs in the plan, in Article 9(a)(3).  I'm

16  going to refer to them as "Findings 1 through 5," for the

17  sake of simplicity.

18          Two findings that I'll discuss in a moment are

19  purely legal issues, two are obviously factual issues, and

20  the third is hybrid because it has to do with appropriately

21  documenting or clearly documenting what our settlement is.

22          I'll start with the two legal issues, and I'm not

23  going to spend a lot of time on the first because I think

24  this has been already discussed at length, which is:

25          Finding 1 appears in Article 9(a)(3-Q), which is

1  that the plan be binding on all parties-in-interest.  This

2  finding, obviously, does not require this Court to interpret

3  any insurance policies or make any coverage determinations,

4  nor does it require the Court or even ask the Court to

5  rewrite any insurance policies.  This finding is about basic

6  principles of res judicata and collateral estoppel, as they

7  have been applied in bankruptcy cases for years.

8        Judge Drain did address this exact issue last

9  month in Purdue.  He held, and I quote:

10       "There is no concept or requirement that a plan be

11 insurance neutral."

12       I presume that Judge Drain read Combustion

13 Engineering and Global Industrial because the same insurance

14 lawyers in this case cited those cases to him and argued that

15 issue in front of Judge Drain.  Obviously, they lost.

16       I would go further and say that, because the

17 bank -- because of the Bankruptcy Code, the plan here

18 actually has to be binding on the insurers.  The insurers,

19 including Century, claim that they are creditors.

20 Section 1141(a) mandates, therefore, that they be bound by

21 the confirmation order.  So, as to Century, there's just

22 simply no way that they could not be bound.

23       In addition to that, the insurers here have

24 notice.  They are active participants in the case.  If we

25 were to pull all of the transcripts at the end of this case

1  and see who spoke the most, I would put my money on

2  Mr. Schiavoni.  Third Circuit case law requires that, when a

3  party appears, litigates, objects, and an order is entered,

4  that order is binding on that party.  This is a legal issue,

5  not a factual issue, so I don't think there is any discovery

6  needed for this.

7       So that moves on now to Finding Number 2, that is

8  the insurance assignment must be authorized.  This is in

9  Article 9(a)(3-J) of the plan.  And this also is a purely

10 legal issue and one that does not require the Court to

11 interpret any insurance policies or make any coverage

12 determinations or rewrite the terms of any insurance

13 contracts.  Parties are free to argue that the insurance

14 rights are or are not assignment at plan confirmation.  I

15 think we have the better argument under Third Circuit law

16 that this is a legal issue on which discovery is not

17 necessary.

18      Before I move on, I want to make a very keen

19 observation, which is this:

20      As the Court well knows, sometimes parties change

21 their mind during a bankruptcy case.  You hear counsel for

22 AIG and Century say last week and again today that their

23 clients simply cannot settle unless they get finality.

24 Finality.  That is an important word, "finality."  Let me

25 explain what I think they mean by "finality."

1          Many of the insurers want to settle.  The BSA

2     policies that they issued years ago have multiple insureds.

3     In some years, it's the BSA and the local councils; in other

4     years, it's the chartered organizations are also insureds.

5     That's why 1976 is so magical, not just because it's a

6     bicentennial year, but chartered organizations are not

7     additional insureds under the BSA policies pre 1976.

8          The chartered org proposal that you've heard so

9     much about and will probably hear more about is entirely

10    insurance driven.  When the insurers say that they are

11    settling, what they want is to buy back the policies, which

12    means that you have to collect all of the rights from all of

13    the insureds.  It's kind of like a game of monopoly.  You

14    have to own all three properties before you can build a

15    hotel.  There are the BSA rights, there are the local council

16    rights, and there are the chartered org rights.  You put all

17    three together, assign those rights to the settlement trust,

18    and then you can settle with the insurers.

19         The insurers that want all of the rights -- there

20    are insurers that want to settle and they want all of the

21    rights to be assigned to the settlement trust.  The insurers

22    that have not settled may stand up today and say, Judge, you

23    cannot approve these assignments.  But they may be standing

24    before you at plan confirmation saying, Judge, you absolutely

25    have to approve these assignments, we consent, I changed my

1  mind.

2          I mention this today only because this Court does

3  not know, right now, if any insurers are actually going to

4  appear at confirmation and object to the assignment.  We are

5  here on a disclosure statement.  This is clearly a

6  confirmation issue and one that I don't even know how you

7  sort out today.

8          Finding Number 3 is the finding that the, quote,

9  "right to payment" that the holder of an abuse claim has

10  against the debtors is the allowed value of the abuse claim.

11  This is in Article 9(a)(3-F) of the plan.  This finding is

12  based on quotes from and is worded entirely based on the

13  definition of "claim" set forth in Section 101(5) of the

14  Bankruptcy Code.

15          As a legal matter, a survivor's right to payment

16  from the debtors is not what the debtors can afford to pay.

17  If that were true, no debtor would ever be insolvent.

18          Now I want to be clear on one point.  We are not

19  asking the Court to rule on what the insurers must pay.  If

20  you look very carefully at this finding, you'll see that the

21  word "insurer" does not appear anywhere in this finding.  I

22  would very much like to put a finding like this in front of

23  the Court that said the insurers must pay, but I think I know

24  what the Court's answer would be.

25          This finding, the one that is actually in the

1  plan, as opposed to the one that is invented, doesn't say

2  anything about insurers being liable.  Insurers can and will

3  argue post-confirmation that their policies do not require

4  them to pay any of the claims determined under the TDP.  What

5  we are doing is making it clear what the terms of our

6  settlement are and what we are agreeing to.

7          We believe and what the plan settlement reflects

8  is that the debtors will fund a trust.  That trust will

9  assume liability for and will be responsible for paying abuse

10  claims.  The debtors are making a contribution to the trust.

11  That contribution is not the same thing as the liability that

12  the debtors estimate to be between 2.4 and $7 billion.

13  Rather, it is just a contribution.  The trust will pursue and

14  liquidate the trust assets and the trust will make

15  distributions to survivors based on their claims.  And as the

16  Court noted, those distributions must be made on a pro rata

17  basis, based on the allowed amount of the claims.

18          The settlement that we support and will recommend

19  to tens of thousands of survivors to vote in favor of is the

20  settlement reflected in the plan, which does not wipe out or

21  extinguish billions of dollars in liability for a mere

22  $220 million.

23          We have to be clear about what we are agreeing to.

24  I don't want anyone to say that we agreed to a settlement

25  that we did not, in fact, agree to.  Neither you, nor I can

1  control what a coverage court does with the confirmation

2  order, no question.  But I learned years ago from a veteran

3  banking attorney at Sullivan & Cromwell that sometimes you

4  have to use very clear language on issues that are obvious to

5  you, in order to make aspects of a deal clear to parties that

6  haven't lived it.

7          We have to be very clear about what we are

8  agreeing to.  I don't want anyone to say that the right to

9  payment that the abuse -- holders of abuse claims have is the

10 $220 million that the debtors are contributing to the trust,

11 and I don't want anyone to say that we supported a plan or a

12 settlement that meant that.  Parties that settle have a right

13 to know what the settlement is.

14         And I'll note this is a confirmation issue for us

15 because we don't support a plan of reorganization that is

16 intended to effectuate a discharge of the insurers' potential

17 liability, whatever that may be.

18         I will also note that, if the plan is delivering

19 or is intended to deliver a, quote, "Fuller-Austin result," I

20 don't see how the Court could approve a channeling injunction

21 under Millennium.  Fuller-Austin, in my view, was incorrectly

22 decided, but it was incorrectly decided because of ambiguous

23 language in the plan and the confirmation order.  That is not

24 a mistake we care to repeat.  This is a confirmation issue

25 and it goes to the heart of the plan because of the

1  channeling injunction and our need to know what our

2  settlement is, and it's clearly stated.

3         So that leaves Finding Number 5.  This is that the

4  TDPs are fair and reasonable based on the evidentiary record

5  offered to Bankruptcy Code at the confirmation hearing.  This

6  is set forth in Article 9(a)(3)(R) of the plan.  This is -- I

7  call it the lightning rod.  This is the one that gets all the

8  attention, Your Honor, so let's talk about it.

9         This finding does not ask this Court to interpret

10 any insurance policies or make any coverage determinations.

11 And I'm going to be very, very clear on what I'm about to

12 say.  No one is asking you to find that the insurers must pay

13 the $3500, we are not asking for that finding.  No one is

14 asking you to find that the insurers must pay any claim

15 determined under the TDP; we are not asking you for that

16 finding.  And no one is asking you to find that the insurers

17 must pay time-barred claims, we are not asking for that

18 finding.  Those are straw man arguments.

19         We want an evidence-based TDP.  What does that

20 mean?  We want a TDP that is based on and mirrors the

21 debtors' historical settlement practices and experience in

22 the tort system.  Under what circumstances did the debtors

23 agree to settle abuse claims prior to the bankruptcy?  And

24 there are a lot of them.  What did they agree to pay?  What

25 did the insurers agree was a reasonable settlement?  What

1  evidence has to be produced by the survivors?  That is what

2  we're trying to do.

3         We want the Court to approve a process that's fair

4  and reasonable and equitable based on the evidence.  A couple

5  things follow from this.

6         First, this is obviously a confirmation issue, not

7  a disclosure statement issue.  The evidence in question has

8  not been offered.  The insurers are entitled to produce their

9  own evidence, we hope they do, but the Court cannot judge the

10  evidence until we get the plan confirmation.

11         Second, discovery.  The evidence needed on this

12  topic is in the debtors' possession, custody, and control,

13  and I know this because this evidence has already been

14  produced.  The debtors know their own settlement practices

15  and they know how much they have paid to settle abuse claims.

16  And the insurers have all of this information too because

17  they approved the settlements and they also have been given

18  access to the same information.

19         There was the discussion last week about the Bates

20  White report and the TDPs.  The Bates White report is based

21  on an analysis of the settlement data.  In terms of timing,

22  in terms of which came first, the chicken or the egg, the

23  Bates White report came first, the TDPs followed by several

24  months.  And the point of the TDPs was to reflect the

25  debtors' own historical practices and settlement values.  The

1  data the debtors have already shared and was used to create

2  the TDPs doesn't need months and months of discovery,

3  everyone has it.

4          And I'm going to make this point because I think

5  it's obvious, but it needs to be said, discovery from

6  survivors or law firms would not be relevant to this finding

7  at all.

8          I want to be clear on another point:  this finding

9  does not ask the Court to determine how many valid claims

10 there are.  The findings and orders put the reasonableness

11 and the fairness of the matrix values and the procedures

12 before the Court, they do not put a --

13         THE COURT:  Well, what 1129 standard does that go

14 to?

15         MR. GOODMAN:  This goes to the 9019 standard that

16 Ms. Quinn mentioned, Your Honor.

17         THE COURT:  Okay, so this is another 9019 issue.

18         MR. GOODMAN:  Yes, it is.

19         THE COURT:  And why -- and who is it a settlement

20 among?

21         MR. GOODMAN:  Again, it would be a settlement

22 among the abuse survivors and the debtors.

23         THE COURT:  Why is the debtor a party to that

24 settlement?

25         MR. GOODMAN:  Because they are the party who is

1  liable for the abuse claims and they are the proponent of the

2  plan.

3          THE COURT:  Well --

4          MR. GOODMAN:  I also think it would be --

5          THE COURT:  -- but -- but they --

6          MR. GOODMAN:  -- I'm actually --

7          THE COURT:  -- are providing a number, they're

8  providing an amount, they're making a contribution and then

9  they're gone, not unlike many debtors, mass tort or not, not

10 unlike many debtors.  The settlement with the debtors is

11 their contribution.  So how is this a settlement among the

12 debtors and the abuse survivors?

13         MR. GOODMAN:  Well, Your Honor, I think the Court

14 could entertain the settlement of a claim under 9019.  Here

15 we have --

16         THE COURT:  A claim.

17         MR. GOODMAN:  -- here we -- yes.  I mean, if there

18 was a claim filed against a debtor, let's just say you had an

19 ordinary trade claim filed for a million dollars, the debtors

20 were to file an objection to that claim, the parties

21 negotiated and agreed on a settlement of that claim, I

22 believe that would be brought before the Court under 9019.

23         And I will amend my prior response, Your Honor.

24 Actually, that also is 1129, because the 1129 fair and

25 equitable is actually what informs the 9019 issue.  So I

1  actually think that it's both 1129 and 9019.

2            THE COURT:  I find --

3            MR. GOODMAN:  We can get more --

4            THE COURT:  -- I find -- I have said on any number

5  of occasions that I do not believe a plan to be a settlement.

6  The plan gets imposed on people, it's not a settlement.  And

7  I get asked to make all kinds of findings at confirmation

8  that I don't find are appropriate.  So far, nobody has been

9  able to convince me I'm wrong on that one point, but that's

10 why I want to understand what the finding is and who is the

11 settlement among.  I get the intra-abuse creditor nature of

12 the settlement.  I'm not sure I understand at this point how

13 the debtor -- the debtors' interest in the allocation of

14 funds that it has contributed and to which it has no more

15 liability, it's contributed, it's done.

16            MR. GOODMAN:  Well, the liability here is being

17 assumed by the trust, so it's not --

18            THE COURT:  Uh-huh.

19            MR. GOODMAN:  -- disappearing, it continues on and

20 that liability has to then be determined post-confirmation in

21 accordance with the procedures.  Again --

22            THE COURT:  Well, an allocation does, yeah.  An

23 allocation does, which goes back to my question about why, in

24 fact if the debtor was on the other side of this issue, why

25 does it leave it to a trustee it didn't choose and a trust

1  advisory committee made up of plaintiffs' lawyers?

2          MR. GOODMAN:  Oh, I see the issue.  Yeah, I think

3  the concern that you're raising is that, once this process

4  goes into effect and the debtor steps away post-confirmation,

5  the debtor can't really control what happens in that process.

6  And, you know, the insurers have painted a picture of all of

7  the tort lawyers in this case effectively settling with

8  themselves and, you know, presenting inflated claims.  No, I

9  hear that point.  I don't know, though, how this issue is

10  really before the Court on this one.  I mean, it's the

11  debtors who have proposed the plan; it is the debtors who

12  have put forth the TDP based on their own historical

13  settlement practices and values.

14          So, given that the debtors are the plan proponent,

15  I don't think that they can absolve themselves of

16  responsibility on this one until the confirmation order is

17  entered.

18          THE COURT:  I hear you, but the concern I have I

19  want directly addressed, the concern I have in this case and

20  others, and it's how are these trust distribution procedures

21  negotiated and who is it a settlement among or is it really

22  just an allocation among claimants.  And, again, it's really

23  no different than any bankruptcy case in which the debtor

24  makes a contribution and then they don't care how it gets

25  whacked up, right?  Here's -- I get to give this amount and I

1  walk away, I get my discharge, I don't care how it's whacked

2  up.

3          This is -- the trust distribution procedures are

4  in essence the whack-up, right?  That's what it is.  Maybe I

5  have to rule on them and maybe I don't, but that's what I'm

6  trying to figure out.  And then, of course, what's going to

7  be done with them later on down the line.  Maybe I need to

8  know, maybe I don't, but what 1129 standard is it that I have

9  to make these findings on.  And if it's not an 1129 standard,

10  if it's a 9019 settlement, then who is the settlement among,

11  for real.  And those are the questions I have.

12          MR. GOODMAN:  Your Honor, thank you, and normally

13  I'm prepared for everything, but on this one I actually think

14  I want to go back and do some more research and homework on

15  this in terms of what 1129, 1123, and 9019 say on these

16  issues.

17          But I would note this point, because I was

18  recently dealing with a similar issue in front of the Ninth

19  Circuit where a party contended that a specific provision in

20  trust distribution procedures simply had to be struck down

21  because the trustee could go rogue and not comply with it.

22  And, you know, my response to that was, wait a second, you're

23  not really objecting to the procedures, what you're claiming

24  in advance is you think that people won't comply with them,

25  you think people won't follow the procedures, and that's

1  really not fair.  I mean, I think what you're doing is you're

2  sort of prejudging or assuming ahead of time that the trust

3  distribution procedures won't be followed, that the trustee

4  won't do his job; that the parties administering the claims

5  won't do so with integrity in regard to their fiduciary

6  obligations.

7          I don't begin my day with those assumptions.  I

8  think that we have to assume that if procedures are

9  propounded or put forth by the debtors in terms of what they

10 think is fair and reasonable based on their historical

11 settlement practices, if that is being imposed on the

12 survivors here, because the survivors are not free to

13 allocate among themselves how this gets divvied up, you know,

14 here, Your Honor, it's different.  It's not as though all of

15 the tort lawyers are getting in a room and deciding how these

16 funds get allocated among themselves and, you know, how the

17 claims are allowed, that would be a negotiated TDP, this is

18 an evidence-based one.  This is where the debtors are coming

19 in and saying these are our practices, these are the values

20 where we settled claims, this is what we required before we

21 would enter into a settlement with an abuse victim and

22 they're imposing that process on us.

23          We're accepting it because the debtors have a need

24 and I think they have an obligation to put forth procedures

25 that are fair and reasonable, as opposed to ones that are

1    just arbitrary and capricious.  That obviously wouldn't work

2    in a bankruptcy case.

3         So I do think that the debtors have an interest in

4    this.  I will argue now and argue, I believe, in the future

5    that the debtors are a part of this from a settlement

6    standpoint because right now they have the liability for

7    these claims and they are trying to resolve the abuse claims

8    in this bankruptcy case.  If we don't resolve the abuse

9    claims, Your Honor, a lot of money has been spent here for

10   nothing.  That is something that we have to achieve and I

11   think that this goes to the heart of that resolution.

12        And if I did not answer your question, Your Honor,

13   I'll be back and I will read more cases.

14        THE COURT:  I'm not sure it's in the cases.  I've

15   been looking for this.

16        MR. GOODMAN:  I appreciate that.

17        The last finding, Your Honor, good faith.  No one

18   has talked about this, at least the insurers didn't.  That's

19   in Article 9(a)(3)-T of the plan.  The Court obviously has to

20   make a good faith finding in order to confirm a plan, that's

21   what Section 1129(a)(3) says.  This is also a factual issue.

22   And I raise it -- you know, a few things.

23        First, we can't avoid this.  This isn't really

24   coming from the findings, this is also coming from

25   1129(a)(3).

1          Regarding discovery, my understanding is that the

2     insurers want to pierce the mediation privilege and take

3     discovery on how the TDP was negotiated; I think that would

4     be wrong.  Whether the TDPs and the plan were proposed in

5     good faith I think follows from what those documents say.  I

6     don't think the mediation discussions would necessarily

7     inform that, but that issue, the reason I'm flagging it now,

8     is going to be one on which there are going to be discovery

9     disputes.  Obviously, there are things that the insurers are

10    going to want that the debtors are probably going to oppose.

11    If the debtors were successful in piercing the mediation

12    privilege, there will be a lot of discovery that I'll want

13    from the insurers that they probably will then oppose.

14          So I'm just flagging that issue, Your Honor, now

15    because I know that one of the things that we are trying to

16    get through for purposes of today or this week is an

17    appropriate schedule going forward on discovery issues.

18          THE COURT:  How does this finding -- and I think

19    1129(a)(3), good faith, is what the Third Circuit says it is

20    for confirmation, not some other good faith standard that

21    might be out there or not a general good faith standard, but

22    good faith as the Third Circuit defines it in collection with

23    1129(a)(3).

24          But how does this, if at all, since you've brought

25    up mediation privilege, how does this align with the position

1 that the -- that we just discussed with respect to finding R

2 that the debtors' part of the settlement of the TDPs, that

3 they were involved, is this involved with the good faith

4 finding, is that something I have to be concerned about

5 breaking mediation privilege on?  How do those two -- and I

6 don't know, I'm asking -- how do those two findings mesh, or

7 are they separate?

8          MR. GOODMAN:  My answer to the question posed is

9 that those two findings are separate and distinct, but I do

10 think that there is going to be some overlap, and I think

11 that they are the two factual issues that will be before the

12 Court at plan confirmation and, therefore, I think it follows

13 that those are the two issues on which there's going to need

14 to be discovery.

15          And I don't know that I can go much further than

16 that at this point other than to flag those issues, but I

17 will say this -- and we'll get there later when we talk about

18 scheduling -- if you think in terms of are the trust

19 distribution procedures reasonable based on the debtors'

20 historical practices.  If you asked the question, you know,

21 about the plan itself being proposed in good faith, the

22 discovery necessary to inform the Court and for the Court to

23 rule on those issues I don't think is going to be this six-

24 to-eighteen-month-long circus that would involve going out

25 and deposing thousands of abuse survivors, because I just

1   don't know what -- I mean, I would -- I think the Court

2   should hear from the abuse survivors at plan confirmation, I

3   don't want to be glib on that issue, I think what they have

4   to say is extremely valuable and important.

5           I listened to the hearing last week, Your Honor,

6   and I heard Mr. Washburn speak.  I thought he did so very

7   eloquently and I appreciate the time that this Court afforded

8   to him in listening to him and considering his views on these

9   issues.  So those are obviously extremely important.  But in

10  terms of the issues before the Court and getting through the

11  1129 issues, good faith and the fair and reasonable I think

12  are what will -- what are and should inform the discovery

13  that's necessary to get through plan confirmation.

14          And I hate the fact that I did not give you a

15  direct answer to your question, it's just that I feel as

16  though I need to give a little more thought to that before I

17  come back with an answer.

18          THE COURT:  Thank you.

19          MR. GOODMAN:  Your Honor, I have nothing further,

20  unless you have more questions for me.

21          THE COURT:  No.  Thank you.

22          MR. MOLTON:  Your Honor, may I go next?

23          THE COURT:  Do you have a separate topic from Mr.

24  Goodman?

25          MR. MOLTON:  I do, Your Honor.  I didn't expect

 1  to, but I didn't expect to be involved in this afternoon's

 2  discussion.  But Your Honor has asked about trustee selection

 3  and TAC, which is something that I know a little about.  So

 4  I'd like to talk about that, Your Honor, and address those

 5  issues, which are separate from the insurance and the

 6  findings issue.  So I'm not going to repeat anything that

 7  you've heard from Ms. Quinn or Mr. Goodman, and I'm going to

 8  be concise, Your Honor, and I'm going to cut to the chase

 9  pretty quickly.

10          Your Honor, with respect to trustee selection,

11  there's nothing remarkable or unusual with respect to how

12  trustees are picked in mass tort cases.  As Your Honor noted

13  at the date of confirmation -- or the date the debtor emerges

14  from bankruptcy, I think you just said then they're gone and

15  that's true, and that's true of the debtors here and the

16  local councils here.

17          This is not like a charitable trust, Your Honor,

18  where the settler and the settler's wishes remain primary,

19  and the settler needs to retain control over those wishes.

20  Here, Your Honor, it's something even greater than that, it's

21  Your Honor's confirmation order and the plan and the plan

22  documents, which include -- and I'll get to this in a

23  minute -- the trust agreement, which will be approved by Your

24  Honor, and the TDP -- again, which will be approved by Your

25  Honor.

1          Indeed, Your Honor, contrary here to settlement

2    trusts or other assorted private trusts, family trusts, in

3    the mass tort context it is usually the settler, the settler

4    itself -- himself, itself -- that is at fault for the wrong

5    for which the bankruptcy occurred and which led to the

6    creation of the trust.

7          The beneficiaries here, Your Honor -- and here we

8    understand we're at about 80,000 beneficiaries, at least as

9    we count them now -- need to be assured and to be comforted

10   that the person, he or she, that's in charge of the trust

11   understand his or her job, have absolute independence -- and

12   I'll use that again -- subject, subject to what I just

13   mentioned, what I call the constitutional documents, because

14   I do represent trusts, Your Honor, in major mass tort cases,

15   and the constitutional documents for a trust and for the

16   trustee is Your Honor's confirmation order and the plan.

17         So somebody that has independence with integrity,

18   *bona fides*, expertise, and a reputation for getting these

19   very, very -- in this case, as Your Honor remarked, perhaps

20   one of the most challenging cases done.  Your Honor should be

21   advised that it's been my experience that never is a trustee

22   selected for which the debtor doesn't have input, doesn't

23   have a say, whether it be express, you know, conditional

24   approval or otherwise.  And this was a plan, Your Honor, that

25   contains a trustee selection that is being put forward by the

1  debtor.  So I just want to say that.

2         Some recent examples, Your Honor, you know, that

3  show exactly what I'm saying is PG&E, where the Honorable

4  John Trotter, appellate -- retired appellate judge from

5  California, was named a trustee under similar circumstances.

6  In Purdue, I know there are -- I won't say dozens, but a

7  multitude of trusts that are in the process of either having

8  been created or will be created that this process is

9  undergoing.

10         In Takata, Your Honor, in this very court, the

11  trustee came out of the TCC process, I think, with a

12  nomination or selection in which the TCC participated and is

13  operating those trusts.

14         I'm going to get back to the point, though.  The

15  point is what Mr. Goodman identified, is what's to stop a

16  trustee, as Your Honor said or suggests, from going rogue,

17  being in the bad, doing whatever he or she feels is

18  appropriate under the circumstances.  It's Your Honor's

19  confirmation order and Your Honor -- and the plan, which

20  contains the trust agreement and contains the TDP, which are

21  approved by the Court after notice, opportunity to object,

22  and a determination by the Court about what's right or what's

23  wrong in it.  That's as tight as it gets, Judge.

24         I think, you know, somebody used the word -- you

25  know, I forget what -- it was (indiscernible) -- but this

1  whole issue on trustee selection, I'll use a French word,

2  actually a Yiddish word -- I always say, here's a French

3  word -- boogie monster, it's the boogie monster in the

4  room -- because at the end of the day, Your Honor, if Your

5  Honor takes a look and I've asked for -- I didn't expect to

6  talk on this, Your Honor, at this length today, so I don't

7  have the docket number of the most recent trust agreement

8  that's been filed with Your Honor for Your Honor's

9  consideration, but I do want to note a couple of things in

10 it, Your Honor.

11          Section 1.7 of the trust agreement -- and these

12 are really tight -- from my perspective, Judge, a lot of work

13 went into this trust agreement and from all of the parties,

14 and that includes the TCC -- paragraph 1.7, "Jurisdiction.

15 The bankruptcy court shall have continuing jurisdiction with

16 respect to the trust; provided, however, the Courts of the

17 State of Delaware, including any Federal Court located

18 therein, shall also have jurisdiction shall also have

19 jurisdiction over the trust."  That's our Stern v. Marshall

20 proviso, I gather.

21          In any event, Your Honor, the ability to run rogue

22 is proscribed by a -- what would be a court-approved trust

23 agreement which contains at Section 8.5 -- and I hope I'm

24 reading the most recent provisions -- "Modification.

25 Material modifications to this trust agreement, including the

1  exhibits hereto" -- which are the TDP -- "may be made only

2  with the consent of the trustee, a majority of the STAC" --

3  which is the equivalent of what folks call the TAC -- "and

4  the FCR, which consent in each case shall not be unreasonably

5  withheld, conditioned, or delayed, and subject to the

6  approval of the bankruptcy court; provided, however, that the

7  trustee may amend this trust agreement from time to time

8  without the consent of approval or other authorization of,

9  but with notice to the bankruptcy court to make minor

10 corrective or clarifying amendments necessary to enable the

11 trustee to effectuate the provisions of this trust agreement,

12 provided such minor corrective or clarifying amendments shall

13 not take effect until ten days after notice to the bankruptcy

14 court," therefore giving anybody in the world who's following

15 your docket an ability to put their hand in the air and say,

16 no, no, no, no, no, that's not a clarifying amendment or a

17 minor corrective change, that is a substantive modification.

18          "Except as permitted pursuant to the preceding

19 sentence," it goes on, "the trustee shall not modify this

20 trust agreement in any manner that is inconsistent with the

21 plan or the confirmation order without the approval of the

22 bankruptcy court.  The trustee shall file notice of any

23 modification of this trust agreement with the bankruptcy

24 court and post such notice on the trust website."

25          Your Honor, that's the answer to your question, I

1 respectfully submit.

2          Second, the TAC, Your Honor asked about the TAC,

3 what we call the STAC.  If Your Honor looks at the trust

4 agreement, you will see they have absolutely -- by the way,

5 I'll go back a second.  Judge, how many times in a week when

6 I get a question on some of the other cases that I represent

7 trusts on, which include Takata and include PG&E, I get a

8 question and the first thing we do is let's go to the -- you

9 know, not let's go to the videotape, let's go to our

10 constitutional documents.  That's the answer to your

11 question.

12          Our trust agreement, Your Honor, prohibits, does

13 not allow, does not contemplate, does not envision any of the

14 TAC members from having a role in claims administration,

15 that's not what they're there for.  They're there to provide

16 their experience, expertise, ideas, et cetera, in a

17 cooperative, consultive way in order to make the trust work.

18          We articulate in the trust agreement, Your Honor,

19 those matters requiring consultation by the trustee with the

20 TAC, what's called the STAC in the FCR -- and that's

21 paragraph 5.13, Your Honor, of the trust agreement -- stuff

22 that folks who -- folks who have an overriding interest in

23 seeing beneficiaries treated fairly arguably should be

24 consulted on it.

25          And by the way, Your Honor, you know, I tried to

 1  find it in the time, but my understanding is the trust

 2  agreement -- and I could come back to this because I know

 3  it's in others -- say that the TAC members have a

 4  fiduciary  -- they don't become a TAC member without

 5  accepting this -- a fiduciary obligation to the

 6  beneficiaries.

 7          So 5.13, "Matters requiring consultation.  The

 8  trustee shall consult with the STAC and the FCR on the

 9  following:  the selection or replacement of the claims

10  processor; two, the forms of a release to be executed by a

11  beneficiary; an annual estimate of the budget of trust-

12  operating expenses" -- always an issue -- "and the

13  administration investment of assets of and expenses to be

14  charged against the future abuse claims reserve."

15          Again, all issues in which you would think that

16  folks acting in an advisory fashion as fiduciaries for the

17  beneficiaries might have views on and might help -- help --

18  the trustee with its, his or her, independent decision-

19  making.

20          Section 5.14, Judge, then articulates the matters

21  requiring the consent of the STAC or the FCR with respect to

22  decisions of the trustee, "(a) the determination of the

23  initial payment percentage and any subsequent adjustment of

24  the payment percentage."  That's the amount, the pro rata

25  payment based on the corpus of distributable assets in the

1  trust that will go to claimants.  Clearly, the bedrock rule

2  of bankruptcy is pro rata, pro rata, pro rata, nobody wants

3  to be in a position where too much money is being given,

4  thereby leaving folks later on who are later in the

5  submission of their claims, have more difficult claims, and

6  their determination is made later from not getting the same

7  pro rata amount.

8         So that's A, consent for that, consent of the TAC

9  for any proposed modification of the indemnification

10 provisions of the trust agreement.  That's clear because they

11 are indemnified parties as fiduciaries.

12        "(c) any proposed sale, transfer, or exchange of

13 trust assets above bracket a certain amount," and that's

14 going to have to be determined.  Any proposed sale of trust

15 assets below that amount shall not require the STAC or the

16 FCR consent.

17        Next, 4, "Any apportionment, appointment, or

18 retention of the special reviewer or any successful special

19 reviewer in the event of a vacancies."  The special reviewer,

20 Your Honor, is a position -- and I don't want to get too much

21 in the weeds but will have appellate-like overview of any

22 what I call insurer -- post-effective date insurer or

23 chartered organization settlements by the trustee."

24        And then also with respect to -- again, I don't

25 want to get too much in the weeds -- there's various way in

1  which folks who -- beneficiaries can exit into the tort

2  system whether or not they exit.

3       "Consent," item 5, "any proposed material

4  modification to the trust agreement or the TDP, if and as

5  required by the consent provisions set forth herein."

6       And of course, that would of course at the end of

7  the day require Your Honor's final approval.

8       Next, "Any proposed increase or decrease in the

9  size of the future abuse claims reserve," again, another

10  unremarkable instance in which the TAC would have consent

11  rights over the independence of the trustee.

12       And, lastly -- and this is the special situation I

13  talked about -- "the commencement or continuation of a

14  lawsuit by a direct abuse claimant against the trust pursuant

15  to a tort election"  -- and I'm not going to get too far in

16  the weeds on that, Your Honor -- "and approval and execution

17  of any global settlement subject to the terms of another

18  provision of the trust."

19       All of those are pretty unremarkable.  You know,

20  it's the same thing, Your Honor, with respect to what I would

21  call a non-ordinary course -- non-ordinary course sale by the

22  debtor, it's going to -- the debtor just doesn't get to do

23  it, it's going to have to require further approval here by

24  the TAC, under certain circumstances and in accordance with

25  the trust agreement.  And there's specific provisions as to

1  how that happens and, again, it's pretty detailed and I'm not

2  going to get into it.

3           So that's my, hopefully, not too long answer to

4  Your Honor's questions.  And if Your Honor gives me leave, I

5  would just like to -- since I guess I'm batting clean-up

6  here -- just address just a number of other points that were

7  made earlier in the day that don't necessarily relate to

8  those issues but relate to a few others.  I promise, Your

9  Honor, I'm going to be very brief.  May I?

10          THE COURT:  Well, I thought I was going to hear

11 from Ms. Lauria on those.  Let me hear from Mr. Harron on

12 these specific issues, I want to finish this out.

13          MR. MOLTON:  Okay.  Thank you, Judge.

14          MR. HARRON:  Thank you, Your Honor.

15          THE COURT:  Mr. Harron.

16          MR. HARRON:  For the record, Ed Harron for the

17 Future Claimants' Rep.

18          I want to address three issues that Your Honor has

19 been focused on:  the specific issue of the structure of the

20 trust and the trust administration, why the findings are

21 appropriate, and why the findings don't render the plan

22 unconfirmable.

23          First a simple point on the trust structure.  This

24 trust structure follows a structure with which Your Honor is

25 well familiar, the non-mass tort cases.  As Your Honor is

1  aware, in the non-mass tort cases where there's a settlement

2  trust or litigation trust, it's almost always the case that

3  the beneficiaries of the trust are the unsecured creditors

4  and that trust -- that the trustee is selected by the

5  creditors committee and the oversight of that trust is

6  handled by an analog to the creditors committee comprised of

7  the same or a subset of the members.

8          So, really, there's nothing different here.  And

9  the reason that you have -- the only real difference is you

10  have an FCR and that's in part because of the long-tail

11  nature of the trust.  And really, for example, the payment

12  percentage is a spot where an FCR is helpful to provide a

13  counterbalance to the committee representing the interests of

14  current claimants, when the trustee is forced to evaluate the

15  payment percentage.  The current claimants, obviously, always

16  want the trust to pay out as much as reasonably possible as

17  soon as reasonably possible.  It's incumbent upon the future

18  claimants' rep to make sure that the payouts are consistent

19  with our view of the trust's future liabilities.

20          So, really, these trusts follow the same structure

21  that you see in the non-mass tort cases except for the

22  addition of the future's rep, which we think is appropriate

23  based on the application of a payment percentage and the

24  long-tail nature of many of the torts.

25          That's all I have on that topic, Your Honor,

1  unless you had questions.

2         THE COURT:  No.  I mean, I think that's a fair

3  analogy, but I think it -- it's again because the debtor is

4  out of the equation and you have a liquidating trust that's

5  for the benefit of creditors.  So, yes, I think it's --

6  you're right and I think it follows that.

7         MR. HARRON:  But keep in mind, Your Honor, that

8  it's not only the creditors that want the debtors to be out

9  of the equation, the debtor wants to be out of the equation.

10         THE COURT:  Yes.

11         MR. HARRON:  The debtor wants to be fully and

12  finally resolved of this issue and, therefore, it walks away,

13  but as part of that walk-away the parties with a financial

14  stake need some reasonable assurance that the trust is going

15  to work and that the trust will operate in a way that it

16  preserves the value of the estate assets, and that's all

17  we're asking for here.

18         So, you're right, the debtor has a stake in making

19  sure that the trust serves its purpose and obtains the

20  support of the survivors and meets the requirements of the

21  bankruptcy code, primarily because they want the finality of

22  the injunction.  But really during the case the debtor has a

23  strong interest in making sure the trust is appropriate and

24  satisfies all those concerns.  It's not until the case is

25  over on the effective date when the debtor really has -- no

1   longer has an interest in it.

2          So I don't think it's fair for anyone to suggest

3   that the debtor has no interest in how these procedures work.

4   The debtors want to vote and the debtors want the procedures

5   to comply with the bankruptcy code.  The claimants want the

6   procedures to work in a way that maximizes the value of the

7   assets or, at a minimum, doesn't diminish the value of the

8   estate assets, and that takes me to my second point.

9          Your Honor, insurance is a significant asset,

10  particularly for future claimants.  Our future claimants

11  primarily are those claimants right now who are under 18.  In

12  our view, they'd have full access to insurance to cover their

13  claims -- and these are claims for which Century does not

14  provide coverage -- absent the bankruptcy, they'd be paid in

15  full.  Even were the Scouts to liquidate, these future

16  claimants could go out and sue the chartered orgs and access

17  this very same coverage.  We don't need the Scouts, we don't

18  need the bankruptcy to get paid from insurance.

19         So, in our view, we want assurances that when this

20  case is over the bankruptcy has done no harm to the ability

21  of claimants to recover insurance, the Boy Scouts' insurance,

22  to the very same extent they could before the bankruptcy.

23         For example, Your Honor, and as I've mentioned,

24  it's important to the BSA that they kind of put this issue

25  behind them.  And one of the things for which they've

1    negotiated is that the claims will be resolved pursuant to a

2    trust.  Subject to some limited exceptions, claimants no

3    longer will name Boy Scouts or other participating parties

4    when they seek to get paid on their claims.

5            You may recall, Mr. Plevin mentioned earlier today

6    that it's his view -- and, anecdotally, he's asking you to

7    make a coverage finding when he suggests to you what the

8    policies say, but it's his view that the insurers don't have

9    to pay a thing until the Boy Scouts or other parties are

10   named in a lawsuit.  We have to reconcile these interests,

11   the interests of the claimants in preserving the insurance

12   asset and the interest of the Boy Scouts in no longer being

13   named as defendants in lawsuits, and we have to do it in a

14   way that doesn't allow lawyers like Mr. Plevin to argue in

15   the future that, hey, because the injunction doesn't allow

16   claimants to name the Boy Scouts, you no longer have

17   coverage, that's what we're trying to do.

18           So, Your Honor, there's a fair and equitable

19   component in Section 524(g).  As Mr. Rosenthal noted, this is

20   not an asbestos case, but I think even Mr. Rosenthal would

21   concede that analogies are drawn from 524(g) in non-asbestos

22   mass tort cases.

23           The 524(g) provision to which I allude is Section

24   524(g)(4)(B)(ii) where it talks about the relief --

25   "identifying the debtors and other third parties in an

1  injunction with respect to such demands, i.e. future

2  claimants, is fair and equitable with respect to the persons

3  that might subsequently assert demands."

4        And that's our point, Your Honor, we think this

5  plan is only fair and equitable if it doesn't prejudice our

6  ability to obtain insurance to the same extent we could

7  access that insurance pre-bankruptcy.  In our view, that's

8  what the findings do.  They don't expand the estate's rights,

9  they just make sure that the insurers don't opportunistically

10 utilize the bankruptcy to create defenses to coverage that

11 didn't exist before the bankruptcy occurred.  And, as I

12 mentioned a few days ago, we believe that's consistent with

13 Section 524(e) of the bankruptcy code, which makes clear that

14 the discharge of the debtor shall not release co-liable third

15 parties.

16       Your Honor, to my final point, you know, and

17 essentially why this plan should go out with our proposed

18 findings, the standard for denying a disclosure statement

19 based on the terms of a plan is basically the plan could not

20 possibly be confirmed.  It's often referred to as un-

21 confirmable on its face.  Your Honor, I'd suggest to you that

22 if you review the insurers' arguments in opposition to the

23 findings, their premised almost exclusively on factual

24 conjecture.  They speculate about the plan proponents'

25 motivations, they speculate about the quality of the claims

1   to be resolved by the trust, they speculate about the manner

2   in which Boy Scouts resolved claims prior to the bankruptcy,

3   they speculate that they're only liable if cases are taken to

4   judgment when we all know that they paid plenty of cases in

5   settlements and not judgments, they speculate about how we

6   might want to use these findings in other cases.  When Mr.

7   Rosenthal told you that the only party that's conceded that

8   they're opposing these findings for purposes of other cases

9   is Mr. Rosenthal and his clients, when he told you we won't

10  settle because of this precedent.

11         So, Your Honor, we'd suggest that if they need to

12  rely on factual speculation that supports our suggestion,

13  that we be allowed to make a factual record and that we'll

14  refute each and every one of the things they said, and we'd

15  like to do it at confirmation.  As a matter of law, that

16  would suggest that these findings are inappropriate, but

17  we've explained as a matter of law why they are.

18         Now, Your Honor, one thing you did not hear from

19  the insurers at all today was how these findings prejudice

20  their interests as creditors of the estate, not one mention

21  of it.  They're here today arguing in their capacity as

22  debtors of the debtors and debtors to the claimants.

23         And why do I mention that, Your Honor?  Well, I

24  get the sense that Your Honor is struggling with how best to

25  move this case forward, how best to do it quickly,

1  efficiently, and in a manner that preserves Scouting, and

2  you're wondering whether these findings will bring the

3  insurers to the table or prolong confirmation.  And I would

4  suggest to Your Honor that with the limited time you have to

5  hear from all of us and review our pleadings, you know, I'm

6  very sympathetic, that's a tough position for you to be in,

7  and I think the more appropriate route is just to defer to

8  the law and the bankruptcy code and what renders a plan not

9  confirmable on its face.

10         And I would also add, Your Honor, that the estate

11  fiduciaries, the debtor, the future rep, we have no

12  independent financial incentive, which is unlike the

13  incentives of the insurers.  The debtor; the future rep; the

14  Coalition, to the extent they're a fiduciary, which I believe

15  they are; and the TCC, who supported these findings when we

16  negotiated the term sheet -- I'm not certain today whether

17  Mr. Stang supports them still, but when he signed the RSA he

18  did -- all of the estate fiduciaries view these findings as

19  part of a package, which we believe is the most efficient and

20  appropriate way to get this case to confirmation.  And we

21  would suggest that our role as estate fiduciaries should

22  entitle us to more deference than what you're hearing from

23  insurers acting in their capacity as debtors of the debtor.

24         Thank you, Your Honor.

25         THE COURT:  Thank you.

1        Okay, we're going to take a break at 2 o'clock.

2   Mr. Stang, you have the floor between now and 2:00 --

3   Eastern, because you're on the West Coast.

4        (Laughter)

5        MR. STANG:  Thank you, Your Honor.  I just -- this

6   might in the nature of the cleanup.  You had asked earlier in

7   the hearing whether you were going to be asked or have you

8   been asked to determine the value of the claims and will you

9   be asked to do that.  And I think you said, well, no one has

10  asked me yet.  And there was an allusion, it may have been by

11  Mr. Rosenthal, to the aborted estimation motion.  We do think

12  that you're going to have to value the claims in the context

13  of determining whether Master Mortgage has been met, whether

14  the Hartford TCJC settlements are fair to meet the 9019

15  standard or whatever conditional standards may exist because

16  they're in the plan, and also the best interests test.

17       We have filed an application to employ a valuation

18  expert.  That application is pending, that is why we sought

19  to employ that firm, and we think that you will be asked to

20  value the claims, at least in the context of those three

21  matters, if not others.

22       Thank you, Your Honor.

23       THE COURT:  Thank you.

24       Okay, Mr. Rosenthal, you have like 11 minutes.

25       MR. ROSENTHAL:  Your Honor, I was wondering if you

1  wanted a response or if we wanted to take a break.  I'm fine

2  with --

3         THE COURT:  No, let me hear from you,

4  Mr. Rosenthal.

5         MR. ROSENTHAL:  Okay.  First, Your Honor, I tried

6  to write down things as they were said, but I would say to

7  Your Honor, just to address sort of the fundamental point, I

8  have never thought of the TDPs as a settlement.  I think what

9  we have here is a plan.  As Your Honor correctly indicates,

10  the settlement between the debtor -- is between the debtors

11  as to how much they will have to contribute to the plan, and

12  that settlement is measured -- because that's what all plans

13  do -- that settlement is measured by the 1129 standards.

14         As you were saying, it's not really a settlement

15  with the debtor.  What really happened here is that the

16  claimants went out and they reached a deal with the debtor to

17  resolve the debtors' liability for an agreed amount of money

18  that the debtor thought was a pretty good deal and, in

19  exchange, the TDPs and the -- you know, the drafting of the

20  TDPs to the claimants, so that they could, as you were

21  saying, whack up whatever money came into that trust in

22  whatever way they thought appropriate.  I don't think the

23  debtors had anything to say about that, I don't think they

24  had a dog in that fight.

25         One of the things that you heard people say is

1   that, you know, this -- these TDPs reflect what the debtor

2   was doing in the tort system in historical norms.  That is

3   absolutely not true.  There were very few cases in the tort

4   system.  The historical norms, on average, were substantially

5   lower than what's being allowed here.  This is no different

6   than in an asbestos where the debtor -- you know, the debtor

7   turns over, you know, the keys to the trust to the claimants

8   and they figure out how to -- you know, how to distribute it.

9   In some cases, for example, in asbestos, meso claimants, they

10  don't get treated the same as other claimants in the trust,

11  they get a disproportionately high recover because that's a

12  negotiation that has occurred between the claimants' lawyers

13  themselves.

14          So I think the appropriate way to look at this is

15  as a confirmation issue, the appropriate standards are the

16  1129 standards.

17          There was some discussion, Your Honor, about a

18  trustee, why it wasn't chosen by the debtors and why a TAC.

19  So just a little background there.  Obviously, this is --

20  this comes from, originally, from the bankruptcy context.

21          When the debtors struck their deal, they didn't

22  really care what the deal looked like.  They didn't care how

23  the money was distributed, so they didn't care who was

24  distributing it.  I'm betting, Your Honor, that if you have

25  cases where, in fact, the debtor has an ongoing or a parent

1  company has an ongoing obligation to fund, that they would be

2  extremely interested in who the trustee would be.

3        In many of these cases we have three trustees to

4  represent various interests that sort of play off of one

5  another.  Here, we have one trustee that has connections to

6  the, you know, has connections to the claimants, including

7  the FCR, and is given wide discretion to allow claims

8  pursuant to these procedures.

9        The TAC is a typical, you know, the trust advisory

10  committee is a typical mechanism for a trust.  Their role is

11  really to sort of be the watchdog of what the trustee does,

12  and I think that's the same here.

13        One of the things that was pointed out, I think,

14  by Mr. Molton, in terms of the modification, is that they

15  have to come back to the Court for any modification.  I would

16  suggest to you that this is, again, this is exactly what Mr.

17  Molton said.  This is, again, the claimants wanting

18  safeguards against themselves.  They made this decision to

19  whack it up a certain way and they don't want the trustee to

20  change that decision, either without their consent or without

21  coming back to the Court, and that's the purpose, in this

22  TDP, of that provision.

23        Just briefly on Ms. Quinn's remarks, she had

24  argued that the findings don't really make determinations;

25  obviously, Your Honor, I disagree, and I think they can be

1   misused to imply that they, and suggest that you made

2   determinations, and certainly can be done to do unless you

3   clarify exactly what you're doing and what you're not doing.

4          And I think she or one of the others went on to

5   say that the insurers shouldn't get two bites at the apple.

6   I think this was made whether in response to one of my

7   comments or Mr. Plevin's, but this is exactly the point I was

8   making.  This is intended to be determinative.  Their view is

9   she couldn't get two bites at the apple.

10          The first bite is this Court's determination, and

11   then they're going to go to a coverage court and say, you

12   already decided it, Your Honor.  They shouldn't get two bites

13   at the apple.

14          One of the things that was mentioned by, I think,

15   Mr. Goodman is that I hadn't talked about the good faith

16   finding.  I was about to talk about that, but we got waylaid

17   at the time.  I agree that 1129(a)(3) requires a good faith

18   finding, but it requires a good faith finding with respect to

19   the plan, and they want to extend that finding to the trust

20   distribution procedures, which we think is not appropriate,

21   and it's inappropriate for all the reasons that I've been

22   discussing, which is to say, these weren't negotiated

23   procedures.  And so, what went on while the claimants were

24   deciding how they wanted to whack up these values isn't

25   proper for this Court to consider or opine on.

1          There was a reference, Your Honor, Ms. Quinn tried

2    to say -- and I knew she was going to do this because she was

3    very active in Purdue -- she tried to argue that, you know,

4    the horse is out of the barn, that Judge Drain had decided

5    that, you know, a plan should not be insurance-neutral.  I

6    don't think that's what Judge Drain decided, Your Honor.

7          As Ms. Quinn, herself, argued to Judge Drain, the

8    Purdue case was *sui generis* and didn't have a broader impact.

9    There were, in fact, no findings in Purdue that approved TDPs

10   or liquidations of values.  What was involved there was a

11   settlement, similar to the sort of the settlement between the

12   estate and, you know, between the debtors -- with the

13   debtors.

14          This time, though, it was a settlement, it was a

15   third-party settlement with the Sackler (phonetic) family.

16   So, I don't think that Purdue is analogous to this case, nor

17   do I think that it opens the door.  But if it does, Your

18   Honor, I think it goes back to a point that I was making,

19   that they're trying to use this Court to build on that case

20   to change the insurance neutrality doctrine or the doctrine

21   that you shouldn't -- in my view, that's the doctrine that

22   you shouldn't be altering the contractual rights of insurers

23   to something different, that you are able to alter the

24   contractual rights of insurers.

25          You had mentioned something about one of the

1  findings, I think it was T, something like that, that the

2  finding about, you know, is any amounts -- they use loaded

3  words.   In each of these findings they're using loaded

4  words -- allowed -- whatever.   Of course, the reason, I

5  think, Your Honor, they're using these loaded words is

6  because they want to squeeze them within the parameters of

7  allowed claims.

8          You know, the normal way you might -- you would do

9  something like this in an asbestos context, for example, is

10  their treatment, the treatment would be, you know, the

11  treatment of the asbestos claimants here, abuse claimants is

12  the treatment they get in the TDP, period.   That's the

13  treatment.

14          Let me -- I have a couple more things and then

15  I'll let us break.   One of the questions you asked me was

16  about expedited distributions and saying isn't this really

17  just a convenience payment?

18          I don't think it is, Your Honor.   First, we don't

19  make $3500 convenience payments in these situations.   We,

20  generally, would make smaller payments, and, of course, this

21  is in addition to the comment I made about no ability of the

22  trustee to object.

23          But I think another equally important point is

24  that these claims would never have been brought in the tort

25  system.   You know, for $3500 even, how many of these claims

1 would make it to the tort system?

2           It costs more than that to put the litigation

3 together and bring the claims.  So, these claims, and this is

4 more of an observation, you know, many of these claims would

5 never have been brought, and so this $3500 times 10,000 or

6 20,000 or 30,000 is a lot of money.

7           You had asked me on Ohio State, the Ohio State

8 decision, whether it was decided on an aggregate basis and I

9 got about a hundred emails from the insurers, some of the

10 insurers over the last 30 minutes saying it was that the

11 abuse was in, I think, 1998 and there was a two-year abuse

12 statute relevant there, and, you know, this was 20 years

13 later.

14           So, one more thing -- no, I don't think I have

15 anything further.  Thank you very much for the time, Your

16 Honor.

17           THE COURT:  Thank you.  We are going to take a

18 break, because, while I could continue, my staff needs a

19 break and they're, as we know, the most important people that

20 we have to be concerned about here, so we're going to take a

21 break.

22           But let me ask you one question, Mr. Rosenthal.  I

23 mean, you would agree that the settlement that the debtor is

24 making in this case is not just their contribution; it's also

25 the assignment, contribution, whatever you want to call it,

1 | their right to insurance or insurance proceeds or their

2 | whatever rights they have under the policy to the trust.

3 |           MR. ROSENTHAL:  I would.

4 |           THE COURT:  Okay.  We're going to take a break.

5 | It's two o'clock.  We're going to take a break until 3:00 and

6 | we'll be back.

7 |           We're in recess.

8 |           COUNSEL:  Thank you, Your Honor.

9 |      (Recess taken at 2:00 p.m.)

10 |      (Proceedings resumed at 3:03 p.m.)

11 |           THE COURT:  This is Judge Silverstein.  We're back

12 | on the record in Boy Scouts.

13 |           MR. ABBOTT:  Thank you, Your Honor.  Ms. --

14 |           THE COURT:  I --

15 |           MS. ABBOTT:  Go ahead.  Your Honor, do you have a

16 | desire about how we proceed from here?

17 |           THE COURT:  So I have thoughts about what I've

18 | heard to date.  Mr. Schiavoni, I see your hand is up.  I'll

19 | give you five minutes.

20 |           MR. SCHIAVONI:  Just, what if I just do it in a

21 | minute because what I'm --

22 |           THE COURT:  Better.

23 |           MR. SCHIAVONI:  Better, good.  Here's what I'm

24 | going to suggest to Your Honor if you could, you know, please

25 | give some thought to in essence reserving decision or -- or

1  discussion here until you hear now argument on the schedule

2  because I think you've gotten a flavor, like one of the

3  things we suggested the other day when -- or I did when we

4  talked about this argument was how together with the -- with

5  the -- one informs the other so to speak.  Okay?

6         Whether or not Your Honor determines that a

7  particular finding can or could not be made, and you may well

8  decide the more prudent thing to do is to await confirmation

9  and make that decision.  There's a secondary issue with

10  regard to each one of these, but, you know, frankly, I would

11  suggest that you've got to really look at them collectively.

12         And that is how they impact discovery, okay, and

13  the schedule because I think you've gotten a flavor that this

14  is -- these are not pure issues of law, that these are driven

15  by, I think, intense analysis of what happened.  The notion

16  that you're going to make a finding clarifying what the deal

17  is without having any of the documents before you of what the

18  deal is, in fact, right that was actually discussed among the

19  parties, how you're going to make findings that are very

20  broad on good faith instead of limited without having the

21  documents about the transaction, how you're going to make

22  some sort of finding that these are procedures that would

23  adjudicate 82,000 claims without actually having claimant

24  discovery and what not, it all implicates discovery.  And,

25  you know, the flip side of all of this is that, you know, the

1  debtor is saying do this discovery.  You're going to hear it

2  in 60 days and that you serve one set of discovery requests

3  and that's it.  And it's like, you know, we -- we get it all

4  done before Christmas.  It's like when, you know, bottom line

5  when this hits the circuit, it's like if, in fact, it's

6  presented just because I got -- I'm almost at the minute

7  mark, it's like what comes out is that like in some 60-day

8  proceeding, we generated an adjudicated result for 82,000

9  claims, you know, exceeding $100 billion or $200 billion, or

10 whatever the number is now.  You know, that tells its own

11 story.  This is not -- this is -- it's com- -- this is off

12 the rails as far as what the ask is for the findings and what

13 the -- the -- the discussion is on the discovery.

14          THE COURT:  Okay.  Thank you.  Okay.  Well, let me

15 give some thoughts and let me say this wasn't part of what I

16 was thinking about, but in terms of the appellate process

17 it's an important part of any case.  And it is a part of a

18 case.  And I think my job is to do -- is to make the best

19 decision that I can make, and then if parties disagree with

20 that decision, they take it up, and that's part of the

21 process.  I've said this in other cases.  It doesn't offend

22 me.  It's part of the process.  It's how it works.  My job is

23 to make the best decision that I can make based on the

24 presentations, factual and legal arguments that are presented

25 to me.

1           But I do have some thoughts because I think these

2    findings have clearly been a focus of many hearings before

3    me, and they are a focus of the parties and not -- in terms

4    of sending the plan out, not in the sense that a plan would

5    be patently unconfirmable as a matter of law without these

6    findings, but that people are telling me that -- people,

7    the -- the -- in particular, I guess, I'm hearing it from the

8    coalition, the FCR, are telling me that these findings are

9    necessary for their clients to support the settlement.

10           That's what I'm hearing.  It's not hearing as a

11   matter of law there's some patently unconfirmable plan in

12   front of me but that these findings are necessary.

13           So let me -- I'm not going to satisfy everybody,

14   but let's walk through some of them and I will give you some

15   thoughts.

16           The first one, and I am looking in the plan,

17   Article 9, paragraph 3, J was the first condition precedent.

18   The insurance assignment is authorized as provided in the

19   plan, notwithstanding any terms of the policy or provisions

20   of non-bankruptcy law and that the settlement trust is a

21   proper defendant for abuse claims to assert the liability of

22   the protected parties to trigger, I guess that's an insurance

23   concept, such insurance rights, et cetera.

24           I will be making a decision on the insurance

25   assignment for the debtor's policies, for sure.  That's a

1  matter of law, and I believe there's law in the Third Circuit

2  with respect to it.  And I will respect that law and apply

3  that law with respect to the debtor's policies.

4        And it strikes me that the settlement trust has to

5  be an appropriate person to assert rights with respect to the

6  debtor's policies or else we couldn't be here and no mass

7  tort claim -- no mass tort case would work.  It just doesn't

8  make any sense.

9        With respect to non-debtor policies, I understand

10  that that is a different issue, and the debtors have proposed

11  a workaround.  And we'll see if that workaround works.

12  That's what people have suggested.  It might.  As I said,

13  it's not a workaround that I particularly care for,

14  generally, on principle, but nonetheless it's what's being

15  put in front of me, and I think I can probably rule on that.

16        With respect to "Q," the plan, the plan documents,

17  and the confirmation order shall be binding on all parties in

18  interest, I will say there what I say oftentimes in the

19  context of a confirmation order, a sale order, et cetera.

20        This provision really tells us who a plan binds,

21  and the code and the case law tell -- case law explains it.

22  Okay?  That's who I can bind.  I don't think I can do

23  anything other than that, and that includes the code 1141,

24  case law interpreting 1141, doctrines of res judicata,

25  collateral estoppel, doctrines of a plan as a contract, et

1  cetera.

2           So mirror the code.  Okay?  Some -- some judges

3  used to say, yeah, here's my two-page confirmation order.  I

4  confirmed your plan.  Okay?  And then all of the effects that

5  it has, it has.  But here is a mirror the code.

6           I'm going to skip down to T.  The plan and the

7  trust distribution procedures were proposed in good faith and

8  sufficient to satisfy the requirements of 1129(a)(3).  I'm

9  going to apply 1129(a)(3) in accordance with Third Circuit

10 law.  Whether you can sweet the trust distribution procedures

11 into that or not, I don't know.  But I'm not sure I should be

12 doing that.  It's the -- the -- the requirement of 1129(a)(3)

13 is with respect to -- let me make sure I'm right, the plan,

14 which might encompass a lot of things.

15          The plan has been proposed in good faith and not

16 by any means forbidden by law.  That's what I am supposed to

17 find, and what was interesting, when I went back and looked

18 at these conditions precedent, is many of them contain a

19 specific reference to a code section or 9019.  They give me a

20 frame of reference as to what I am supposed to be guided by.

21 Some of these do, and some of these that we're looking at

22 don't, but I think it's interesting that it highlights the

23 fact that for certain of these findings there's no reference

24 to the code or any provision of the rules.

25          Okay.  I think those three are pretty, quite

1  frankly, easy, and they're within my -- the general bailiwick

2  of a confirmation hearing.  And I don't think those are

3  different than what I would have to find, except for the

4  insurance assignment, obviously.  The insurance assignment

5  is -- is specific to here, but the bindingness of the plan,

6  1129(a)(3), that is the same as any other plan that is put in

7  front of me than where I have to contend with it on

8  confirmation.

9          Finding or condition precedent R, the procedures

10  included in the trust distribution procedures pertaining to

11  the allowance of abuse claims, and the criteria, et cetera,

12  are fair and reasonable.  I'm still not sure what this falls

13  under in terms of a plan confirmation standard.

14          If I have to find because it's contested, if it

15  is, that the trust distribution procedures or the claims

16  amounts in the matrices are appropriate, acceptable, I don't

17  know, part of a negotiation.  I don't know what I'm going to

18  find out there, I may make that kind of a finding.  But it's

19  certainly going to be constrained by the type of hearing that

20  I have and the purpose of the hearing.  And that's the

21  context in which I will make any such findings.

22          I don't know if fair and reasonable is the

23  standard, nor, quite frankly, do I know how that could

24  possibly impact anybody -- any insurance company's

25  obligations under a plan -- under their policies.  I don't

1  know if those are magic words or not magic words.  I suspect

2  they are not the words in the policy.

3          With respect to condition precedent S, the right

4  to payment that the holder of an abuse claim has against the

5  debtors, or another protected party, is the allowed value of

6  such abuse claim, as liquidated in accordance with the

7  distribution procedures, and is not the initial or

8  supplemental payment percentage or the contributions made by

9  the debtors.  Again, I don't know what standard this would

10  fall within, but I think there's some general things we can

11  say about this.

12          A claimant's right to payment, and that does come,

13  someone said this, right from the definition of a claim.

14  Somebody has a claim.  There are other contexts in which we

15  look at what their claim is, which might be analogous here, I

16  don't know.  But if someone is adjudicated to have a claim

17  for $1,000 and there's a bankruptcy distribution of 10 cents

18  on the dollar, it doesn't mean their claim is $100.  Their

19  claim is still $1,000.  Whether they will be ever able to

20  collect that amount from anybody else is a different issue.

21  Maybe there's a guarantor who will pay them the other $900.

22  Maybe that guarantor doesn't have to pay them the other $900

23  because their contract of guarantee limits it.

24          But we know that there are bank -- we know that

25  rarely do creditors receive 100 cents.  They get some sort of

1  bankruptcy distribution, and I think anybody looking at a

2  bankruptcy distribution would not say that that person didn't

3  have a claim for the full amount of their claim, whatever it

4  is.  I would hope that's not controversial.

5         What I think is controversial about this paragraph

6  is how can -- is -- is -- how does that work in the insurance

7  coverage context?  What does a policy provide for?  What does

8  it say it covers?  What product did the debtors buy?  And so

9  this paragraph is probably the one I find most concerning in

10  terms of not knowing how it might be used later on down the

11  line, but I think there's some -- ought to be some

12  fundamental universal first principles about claims that I

13  think parties could probably agree to.

14         And then some other court looks at it and applies

15  it to particular contracts and a particular context.  But I

16  will say that that paragraph S to the extent it has to be in

17  the form that is in this condition precedent is something

18  that I might not feel comfortable with in the way it's

19  written.  And, as I said, the most troubling in that regard,

20  and I don't think anyone should be surprised by this, are

21  condition precedent R and S.  But I think that there are some

22  fundamental principles behind some of this, particularly S,

23  that parties presumably could agree on.

24         And that's the guidance that I can give.

25         Other than that, I think, again, context matters.

1  I don't know what's going to be put in front of me.  Somebody

2  says parties are on, you know, shifting.  I would say a lot

3  of the parties have shifted their positions, depending on

4  whether they're in agreement in a particular time with what's

5  going forward or not.  So -- and that's not surprising.  It

6  happens in cases, and that's where we are in this case.

7        So I don't know if that was helpful or unhelpful,

8  but that's the best I can do at this point in time.  I do

9  think, though, that to the extent that these particular

10 findings are gating issues for somebody who is supportive of

11 this plan, you need to give some thought to my comments.

12 Okay.  Let's move on.

13        Ms. Lauria?

14        MS. LAURIA:  Thank you, Your Honor.

15        Appreciate that feedback, and presumably we may

16 have another break today and we'll circle up with the other

17 co-proponents to determine what their reaction is or their

18 initial reaction to Your Honor's remarks.  But we appreciate

19 that very much.

20        Your Honor, by my count we had another six or

21 seven issues that were raised in Mr. Rosenthal's remarks.  I

22 didn't see any of them as rising to the level of patently

23 unconfirmable.  I'm happy to address any or all of them.  I

24 do think, importantly, we should address the timing and the

25 uncertainty point that he raised because I feel that is an

1   issue that we've been confronting regularly.  And as

2   Mr. Kurtz said last week it's something that is critically

3   important to the debtors and so I want to get that on the

4   table.

5           And then, again, happy to respond to, and I can

6   list them again, the handful of other issues that he

7   mentioned.

8           You know, Mr. Rosenthal opened his remarks today

9   by saying, you know, we don't think that this disclosure

10  statement should be sent out now for solicitation, that we

11  should hold off a couple of weeks because right now we don't

12  have anything close to global consensus.  And as Your Honor,

13  and probably more particularly your chambers, is painfully

14  aware, there have been multiple times during this case that

15  due to where we're at in mediation we have contacted chambers

16  and we've asked chambers to push something off so that we can

17  continue to mediate.

18          We have done that when we have felt we are on the

19  brink of something that could be, you know, a game changer

20  with respect to the case itself.

21          We are not there, Your Honor.  This is -- we are

22  at the point where we have a plan that is substantially

23  mature, and it is ready to go out for solicitation.  No

24  amount of mediation is going to change the core and

25  fundamental principles of this plan of reorganization,

1  subject, of course, to the remarks that Your Honor just made,

2  which we want to circle up with our colleagues about.

3       I didn't hear anything that necessarily should

4  change folks' minds, but right now I think we have a core

5  plan that is ready for solicitation.  Importantly, from the

6  continued mediation perspective, we think mediation should

7  continue.  We will continue to mediate with the chartered

8  organizations.  We will continue to mediate with

9  Mr. Rosenthal and the other insurers.  In fact, the nice

10  thing about this plan, now that we have one very significant

11  insurer on sides, that's Hartford, and one very significant

12  chartered organizations on sides, that's -- that's LDS or

13  TCJC, we've had someone wearing the hat of an insurer and the

14  hat of a chartered organization review the plan and comment

15  on those terms.

16       So as we look forward, additional settlements are

17  really bolt-ons to the structure that we already have and

18  that were already contemplated by the plan of reorganization

19  itself.  No amount of time is going to change that, and, in

20  fact, as you heard from Mr. Kurtz last week and myself at the

21  outset of the hearing last week, time is not the debtor's

22  friend.

23       By the time we get to March, our trust

24  distribution is going to go down to zero from a cash

25  perspective, and the rest of the plan becomes significantly

1  infeasible if not infeasible and would have to be recut.  So

2  time is not our friend, and we are ready to launch.

3          In terms of there's too much uncertainty, I can

4  tell you, Your Honor, there are numerous members of the

5  coalition law firms or in state court counsel that I think

6  are here to tell you today that it's not uncertain, that

7  state court counsel representing 81 percent of abuse

8  claimants are here in support of the plan.

9          The coalition lawyers and state court counsel

10  affiliated with them have worked incredibly hard through the

11  mediation process.  They have literally shown up at every

12  mediation session for the last year, probably before that.

13  These were hard fought negotiations through mediation that

14  the coalition and FCR and debtors worked very, very, very

15  hard for.  So to suggest there's some sort of uncertainty or

16  a lack of global consensus, I think we have numerous

17  individuals on the line today, Your Honor, that will tell you

18  that's just not the case.

19          Have we reached agreement with all of our

20  insurers?  Clearly not, and we are looking forward to

21  continuing to negotiate with them.  We clearly have not

22  reached agreement with all of the chartered organizations,

23  and we're looking forward to continuing to negotiate with

24  them.  But that doesn't change the fact that we have a huge

25  ground swell of support for this plan today and, again, Your

1 Honor, I haven't heard anything that renders this plan

2 patently unconfirmable under American Capital Equipment that

3 should prohibit it from going out the door and being

4 solicited and getting that process started.

5           We also think it's critically important, and

6 you'll hear from Mr. Kurtz on this later in today's

7 presentation that we think it's critically important that the

8 timeline for confirmation discovery get kicked off

9 immediately.

10          So that, I think, was something that was very

11 important for me to address with the Court, Your Honor.  In

12 terms of the other issues, I'm going to tick them off just to

13 see if there's something that you want to hear more about.

14          We heard about the coalition legal fees.  In

15 short, we thought it was appropriate at the RSA phase given

16 the amount of energy that the coalition put into this, we

17 heard Your Honor at the RSA say it's premature for me to

18 endorse this today.  Let's see where this case comes out.

19 That's why it's baked into the plan because that's at the

20 tail end.  That's when you know when these cases come out.

21 They've worked hard.

22          They're continuing to work hard, and the debtors

23 thought it was appropriate.

24          On third-party releases, and I believe

25 Mr. Patterson also referenced this in one of his pleadings,

1   Mr. Rosenthal indicated that we've got it backwards, that the

2   debtor's claims are indeed derivative of local councils and

3   chartered organizations, not the reverse.  That's just wrong,

4   Your Honor.

5            As you know from the first day of this case, the

6   Boy Scouts of America was congressionally chartered with the

7   mission of scouting in 1916 pursuant to an act of Congress.

8   It is only the national organization that has the ability to

9   grant charters to provide scouting throughout the United

10  States.

11           National controls the delivery of scouting at a

12  local level, and so these are, in fact, we are the scouts, we

13  are the scouting movement, we hold the congressional charter,

14  and no one has asserted, and, in fact, we haven't seen any

15  complaints where the national organization is getting accused

16  of some sort of vicarious liability on the part of the local

17  councils or on the part of chartered organizations.

18           In fact, you'll remember, Your Honor, I think it

19  was three months into this case, I think it was our first

20  contested hearing on the preliminary injunction, pre-

21  bankruptcy case, these complaints defined scouting as

22  scouting, national local counsel and at the local

23  organization unit level.  But that's a factual issue.  That's

24  not an unconfirmable on its face, Your Honor.

25           But I did -- it's an important legal issue that

1  you will hear a lot about and a factual issue to the extent

2  there's issues with the third-party releases.

3            You've heard a lot about the $3,500 expedited

4  distribution.  That's going to come up, again, when we deal

5  with the committee's motion.  Mr. Rosenthal raised issues

6  concerning whether there would be an adequate basis to pay

7  out on those $3,500 claims.  Again, I don't want to belabor

8  that point now.  I'm just going to make two observations.

9  One, the expedited distribution has been tossed around a lot

10 over the last four days of court.

11           Two important things:  One, in order to receive

12 the expedited distribution, the party had to have

13 substantially completed their proof of claim form.  And, two,

14 the individual had to sign their proof of claim form.  It

15 could not have been signed by an attorney.  The TDP has

16 always said it had to have been actually signed by the

17 claimant itself to be eligible.

18           I have to correct the record from Mr. Schiavoni

19 who suggested that the majority of the proof of claim form

20 was background information concerning the individual.  That's

21 just not true.  It's 12 pages.  8 of those pages pertain to

22 questions related to abuse, scouting, chartered

23 organizations, the relationship with the abuser.  There's one

24 page on background, two pages on instructions, one signature

25 page.

1          And then, finally, I think you heard a lot about

2    good faith.  That is clearly a factual issue.  Whether it's

3    in the 1129(a)(3) context or not, we will be prepared at the

4    confirmation hearing to demonstrate that the debtor satisfies

5    all of the 1129 standards for receiving confirmation of the

6    plan, including 1129(a)(3), and that's just not a reason to

7    prevent the plan and the disclosure statement from going out

8    for solicitation.

9          So that was a very fast canvassing of the issues

10   that you heard about.  We're happy to go into more of them

11   now, later, but we don't think there's anything here that

12   should prevent this plan from being solicited.

13         As I said, Your Honor, I know there's coalition

14   folks here that may want to be heard.  In fact, I see

15   Mr. Rothweiler has raised his hand, but unless you've got

16   questions for me, that's where -- where I think we see the

17   world.

18         THE COURT:  Thank you.  No, I don't have any

19   questions from you.  I am going to want to hear more about

20   the $3,500 expedited distribution in the context of the

21   committee motion or the change to the plan, and so we'll deal

22   with that.  But, no, I don't need anything further on the

23   other issues you ticked off quickly for me.

24         MS. LAURIA:  Thank you, Your Honor.

25         THE COURT:  Okay.  I do see Mr. Rothweiler.

1          MR. ROTHWEILER:  Your Honor, can you hear me?

2          THE COURT:  I can.

3          MR. ROTHWEILER:  Very good.  Thank you, Your

4    Honor.  I appreciate the opportunity to speak.  Let me just

5    introduce myself since I haven't been before the Court

6    before.  My name is Ken Rothweiler.  I am a cofounder of the

7    firm of Eisenberg, Rothweiler, Winkler, Eisenberg, and Jeck.

8          I think I need to tell you a little bit about my

9    background, Your Honor, because it may be relevant to some of

10   the comments that I will be making so that you know a little

11   bit about my history.  I am here in Philadelphia.  I have

12   been a trial lawyer for 40 years, and when I say I've been a

13   trial lawyer, I've actually tried cases.  I've tried cases

14   from my first day out of law school, and I -- I've never been

15   in the practice of trying automobile cases or slip and fall

16   cases.  I've tried cases that are catastrophic injury cases.

17   My clients are brain-damaged individuals, paraplegics.

18          The most severely injured amongst all claimants

19   are the claimants I've represented for 40 years.

20          I've also represented sex abuse clients that I'll

21   tell you more about.  In my career, Your Honor, I've tried

22   over a hundred trials to verdict, so I have extensive

23   experience in a courtroom.  I don't have extensive experience

24   in a courtroom like this, Your Honor, so I'm unfamiliar with

25   bankruptcy court but I've learned a lot over the last 19

1  months.  It's a whole different way of practicing law, and I

2  must say just as an aside that you have amazing stamina and

3  patience because some of these hearings go extremely law and

4  it tests my own stamina and patience.  So I just wanted to

5  say that to you.

6          THE COURT:  Well, welcome to the Wild West, which

7  is what my former partners who were litigators thought about

8  whenever I asked them to come into bankruptcy court.

9          MR. ROTHWEILER:  That's what I've heard.

10         Your Honor, I'm -- I'm one of those lawyers that

11  you would say I try one case at a time.  I represent one

12  client at a time.  It's very unusual for me to represent any

13  more than one client.  The only exception was I was one of

14  the counsel that represented the Amtrak victims that got

15  hurt, severely hurt and killed here in Philadelphia a number

16  of years ago.  I represented a dozen or so of those Amtrak

17  clients to a successful conclusion, and that's probably my

18  only example of representing more than one client in -- in

19  any litigation.

20         I should tell you that I'm a proud member of the

21  Plaintiff's Bar here in Philadelphia.  I have served as

22  president of the Philadelphia Trial Lawyers Association and

23  also of the Pennsylvania Trial Lawyers Association.  I've

24  represented, you know, over 15,000 plaintiffs trial lawyers

25  before the Harrisburg legislature fighting tort reform and

1  other issues that came before the Plaintiffs Bar over the

2  last 40 years.

3          So I'm steeped in the tradition of a plaintiffs

4  trial lawyer, Your Honor.  I'm proud to be one, and I've

5  heard -- on these hearings I've heard some innuendo about and

6  insinuation about plaintiffs' trial lawyers.  I can tell you

7  that that hurts.  It comes -- it comes as an offense to me

8  because those of us that try cases risk everything going into

9  a courtroom representing clients with by the way no guarantee

10 of ever being paid.  I work on cases for years, years without

11 any guarantee of ever being paid.

12         I spend hundreds of thousands of dollars on cases

13 and through the workings of other lawyers in my office and

14 through discovery and through the different things that we

15 have to do.  We hopefully are successful at the end of the

16 day.

17         So just a little bit of editorial comment there,

18 Your Honor, but I just think that I needed to say that.  I

19 have to tell you, Your Honor, that I did not intend to speak

20 during any of these hearings.  That was not my goal.  I have

21 very able counsel with Mr. Molton and Mr. Goodman to speak

22 for us, which they have done.

23         But hearing some of the objectors, I felt I needed

24 to speak and address some issues and to provide the Court

25 with context.

1          And to start off with, Your Honor, I would just

2    like to respond to one thing that Mr. Rosenthal said earlier

3    today, and I -- and I wrote it down when he said it, and he

4    said many survivors oppose the plan.

5          I don't know what Mr. Rosenthal's definition of

6    "many" is, but I can cite some facts for you.  In the RSA, 41

7    firms supported the RSA, 70,347 survivors supported the RSA.

8    And, Your Honor, that was before the Hartford deal, and that

9    was before the LDS deal.

10          What was in the RSA at that time was $850 million

11    that was coming from the BSA and the local councils.  Through

12    the hard work of a lot of people, we've now increased that

13    amount to $1.9 billion, and we're not done yet.  We're

14    nowhere near done, and as we put more money into that trust,

15    the amount of people that agree with the plan and will vote

16    for the plan goes up, because as you can tell a lot of the

17    survivors if you talk to them, the ones that are opposed,

18    they're opposed because they believe there's not enough money

19    to fund the trust.  Well, we're working on that every day.

20          Your Honor, for the last 19 months, I've done

21    nothing other than work on this 24/7.  I've not worked on one

22    other case other than this case.  Through the last 19 months,

23    I've suffered through COVID.  I got COVID.  My mother died as

24    a result of COVID.  It's been, you know, a very traumatic

25    experience for me and for my law firm.  So people are hard at

1  work, and we're hard at work because we believe that these

2  survivors need to be compensated and they need to put this

3  behind them.  And time is not their friend.

4         During the pendency of this bankruptcy, I've had

5  clients that have died.  I've had clients that have committed

6  suicide.  Time is not the friend of survivors, and I believe

7  the Court, you know, needs to know that and needs to hear

8  that.

9         With regard to the objectors, last week, Your

10 Honor, I heard two -- and we call them state court lawyers in

11 bankruptcy court, but, you know, in my world we call them

12 plaintiffs lawyers.  State court lawyers is a little bit of a

13 different term for me.

14        But I heard two state court lawyers speak, and

15 they're both prominent state court lawyers and I have a lot

16 of respect for both of them, but they do not speak for the

17 majority of the survivors.

18        My firm represents over 16,800 survivors.  We

19 represent the largest group of survivors in the bankruptcy.

20 Your Honor, the amount of survivors that my firm represents

21 is twice as many survivors then the entire TCC combined.  So

22 we believe that we have a loud voice in this bankruptcy.

23        We also believe that we have a fiduciary right,

24 you know, obligation here.  I know that the TCC is -- has

25 been appointed by the U.S. trustee and serves as the

1  fiduciary, but with the amount of clients that we represent,

2  Your Honor, we believe that we have that same fiduciary

3  obligation.

4            I think I need to give Your Honor some context of

5  how we got here.  Why so many cases?  You know, Mr. Schiavoni

6  said how did there become such a case explosion?  And when he

7  has said that and when he has been before this Court, there

8  was always at least from my perspective an implication by

9  Mr. Schiavoni that somehow plaintiffs' lawyers were the cause

10  of the explosion in cases.

11           Let me make this clear for everybody listening.

12  Pedophiles are the cause of the explosion.  Pedophiles is the

13  reason why there are so many cases, not plaintiffs' lawyers,

14  and that needs to be said because plaintiffs' lawyers are

15  just representing those survivors.  It's the pedophiles that

16  are the enemy, not the Plaintiffs Bar, not plaintiffs' trial

17  lawyers.

18           We're doing our best to do what we can for the

19  survivors.

20           And I think I need to tell Your Honor how I became

21  involved in this -- this -- this litigation, and how it

22  progressed for me.  And I need to tell you we need to go back

23  to 2013 for that description and that story because a young

24  man walked into my office and sat right there in my couch in

25  my office, 24 years old.  He told me a very compelling story

1  about being abused by his scout master when he was 12 years

2  old.

3          And as he told me the story, tears down his face

4  and down my face.  He told me about for 12 years he kept it

5  to himself, never told his mother, never told his best

6  friend, never told his girlfriend, and he was married at the

7  time, never told his wife.

8          Told me he was suicidal during that time period.

9  But he told me he needed to get his story out, and he thought

10 I was the lawyer to take on the case.  Well, we worked on the

11 case, we took depositions, and the case settled as it was

12 coming up for trial.  It was a very, very compelling case,

13 and it was a significant settlement, probably the largest

14 settlement of any single case that the Boy Scouts have ever

15 paid on.  And that's probably still true today.

16          And to be honest with, Your Honor, I thought it

17 was a single case.  I thought it was just another one of the

18 cases that of a plaintiff that I represented in my forty

19 years' practice, but it wasn't.  It wasn't, and -- and two

20 years later, Your Honor, CNN Did a ten- minute feature on

21 that case, and if anyone is interested you can still see that

22 case on YouTube on the internet, and as a result of that case

23 getting some publicity, I started to get referrals for,

24 again, single cases from around the country.  I got them from

25 the West Coast, from the East Coast and from all over.

1          And every one of those cases, Your Honor, we

2  settled, and some of those cases had very significant statute

3  of limitations issues, but you know what good lawyers can

4  figure out arguments to overcome things like -- problems like

5  statute of limitation problems.  And the BSA paid on every

6  single one of those cases.

7          And then the bankruptcy occurred.  And why was

8  there this explosion, Your Honor?  Why all of the sudden did

9  it go, as Mr. Schiavoni said, from 200 cases or maybe 1,000

10  cases to this 82,000 cases?  You know and I wrestled with

11  that question myself, and you know the answer I came up with.

12  People that have suffered sexual abuse who have suffered in

13  science now realized that there was a whole community of

14  people out there that the same thing happened to them over

15  the decades, and it gave them comfort.  If you listen to the

16  survivors, they will tell you that the most comforting thing

17  in this whole saga has been that there are tens of thousands

18  of other men that it happened to and they also suffered but

19  now they were a community together.

20          Mr. Buchbinder, when we were interviewing for the

21  TCC committee, he heard hundreds of those stories.

22          I sat in a room with him while he listened to

23  those stories, you know, and -- and they're compelling and

24  they're unbelievable that this kind of thing, you know, has

25  gone on in America where there's been tens of thousands of

1  pedophiles that have caused this situation.

2          Then what happened, Your Honor, we -- we formed

3  the TCC.  When I say we formed it, I was on the TCC, and my

4  firm was on the TCC, and we had a representative, a survivor,

5  on the TCC.  And I came to know the people on the TCC, who I

6  very much respect.

7          And I came to know two other firms on the TCC,

8  Andrews and Thornton, and Ann Andrews, who was one of the

9  people I got to know.  Slater, Slater and Schulman from New

10  York City.  I got to know Adam Slater very well, and we

11  started to understand, Your Honor, that between our three

12  firms, we represented over 40,000 survivors.  And we

13  understood what goes on in bankruptcy court where there has

14  to be votes at the end, and we understood that we had a

15  big -- big position in the bankruptcy because of all of the

16  clients that we represented.

17          After five months of being on the TCC, Your Honor,

18  we realized that we had unresolvable differences in

19  philosophy with the TCC, and what we decided to do, our three

20  firms, is we decided to form an ad hoc committee called the

21  coalition.

22          And I have to tell you, Your Honor, this is - -

23  this took a lot of thought and a lot of consideration from

24  all of our firms.  I mean I have a firm of ten lawyers.  I

25  don't have a big firm.  We handle big cases, but it's not a

1   lot of lawyers that make up my firm.  We knew that we were

2   going to have to assume the financial burden of going forward

3   as an ad hoc committee.  That means paying the -- the

4   bankruptcy lawyers, paying all of the professionals, the

5   financial advisor and everybody that we would need in order

6   to go through the bankruptcy.  And it was a big decision, but

7   between Ann Andrews, Adam Slater, and myself, we said to

8   represent the survivors the way the survivors need to be

9   represented, we need to band together in order to represent

10  the survivors.  And, hence, the coalition was formed.

11          Your Honor, we now represent over 65,000 survivors

12  between all of the members of the coalition committee and

13  it's not just our three firms.  Other firms have joined us as

14  well with thousands of clients that they also represent.

15          Your Honor, by contrast, the TCC represents about

16  6,800 survivors.  So they represent 6,800, and we represent

17  65,000.  And we actually represent more than that when you

18  add all of the survivors and the survivors' lawyers that are

19  not part of the coalition per se but are people that support

20  the coalitions' positions.

21          And, Your Honor, I think it's important for you to

22  realize that the three firms rallied around a common goal and

23  mission.  And here is our common goal and mission:  No

24  survivor would be left behind.  All survivors would be

25  compensated.  Philosophically what we thought, Your Honor, is

1  if someone was sexually abused by a Boy Scout leader in New

2  York, which is an open state, and if someone was sexually

3  abused by a scout leader in Alabama, which is a closed state,

4  it shouldn't make a difference.  It shouldn't make a

5  difference.  Sexual abuse is sexual abuse.  Their lives were

6  still as scarred whether they lived in New York or they lived

7  in Alabama.  And we took a pact that we were going to

8  represent them equally.

9         Our second common goal and mission was that the

10 survivors need to be compensated in their lifetimes.  Most of

11 my clients, Your Honor, are between 60 and 70 years old.

12 Time is not their friend, as I said before.  As I said

13 before, clients have died.

14         Time, time, time is important, and what I've

15 realized in this bankruptcy is time keeps moving on, and for

16 the survivors it's just not something we can tolerate.  We

17 get calls every day about when is it going to be over, when

18 is it going to be over.  It's been a year and a half.  It's

19 hard to give them an answer, Your Honor, because as I said,

20 you know, I'm a plaintiffs' state court lawyer.  We normally

21 know the timeframe.  If a case comes into my office today, I

22 can look the client in the eye and say you're going to have a

23 trial in two years.  Put it in your -- put it in your

24 calendar right now.  We're going to be trying your case in

25 two years, and they get resolution to their case in two

1  years.

2          And that's a wonderful thing.  It's just not quite

3  the same that I've learned in bankruptcy court.

4          Your Honor, there's been some criticism of what

5  people have called the mass tort lawyers and let me just take

6  two seconds and talk about that.  I've never really dealt

7  with mass tort lawyers because that's not my practice.  These

8  are some of the most outstanding lawyers I have ever dealt

9  with.  You talk about committed lawyers?  Most of these

10  people are working 24/7, and this is their only case, as it's

11  my only case.  That's how strongly we feel about the

12  dedication that we need to have for the survivors.

13          They deserve nothing less than that.  I've learned

14  a lot from these lawyers who have been in bankruptcy court

15  and understand what needs to be done.

16          And I have to tell you, and I'll say it publicly,

17  I really appreciate it because there's a lot that I didn't

18  know and they've opened my eyes.

19          But there's been some criticism about that, you

20  know, mass tort lawyers about the contact they have with

21  clients.  Well, I can tell you, and this is true for all of

22  the people in the coalition, that contact with clients is

23  constant.  With my firm, we have -- we get over 2,000 calls a

24  month where we advise clients as to what's going on.  We have

25  monthly updates with them.  We send out to them a written

1  monthly update every month.  There's been 18 of them so far.

2          We have phone calls daily, like I said, and we

3  have Zoom calls and we have video discussions with them, and

4  we plan on having, we plan on expanding that, Your Honor, so

5  that we have more planned Zoom calls so we get a bigger

6  audience and we get them to see what we're doing and we get

7  the opportunity to answer those questions.

8          There's a TCC survivors committee, and I know a

9  lot of people on that committee, Your Honor, because like I

10  said I was on that committee for five months.

11          And those survivors are really no different than

12  every other survivor.  They all have their own story, and

13  they're all compelling, and they're all very sad.  But we put

14  together our own survivors' advisory committee.  As a matter

15  of fact, last night we had a meeting of that committee.

16  They're from California and from New York and New Jersey and

17  Texas, from all over the country.

18          And we listen to them.  What are your concerns?

19  What do you -- what do you need more from us so you can

20  weather the storm, as we go through this bankruptcy?  And

21  it's -- it's a very tough thing to tell them that they have

22  to wait, and I don't like using that word when I say to them

23  you have to wait.

24          Now the question has been, Your Honor, what has --

25  you know, what has the -- what has the coalition's goal been

1  in this bankruptcy?  Well, the goal is very simple.  It's to

2  formulate a confirmable plan to compensate all survivors.

3              Well, let's talk about that a little bit.

4              What has the coalition done to move that goal?

5  Well, there's been the BSA deal.  The coalition was

6  instrumental in getting that deal done, Your Honor.

7              You can ask Ms. Lauria and Mr. Andolina the

8  coalition's participation because it was daily and we worked

9  and we worked and we worked on it.

10             And then there was the local counsel deal.

11             The coalition was instrumental in getting that

12  deal done.  You can ask Mr. Mason about that because he saw

13  what the participation was from the coalition.  Then there

14  was the Hartford deal, tough deal, tough deal, and when I saw

15  it was daily, it was -- it was daily and it was -- it really

16  was 24/7.  We needed to get that -- and you can ask

17  Mr. Ruggeri and you can ask Mr. Anker about the coalition's

18  participation in getting that deal done because it was

19  significant.  And I dare say that that Hartford deal would

20  have never gotten done but for the coalition.

21             The LDS deal, you can ask Mr. Bjork and

22  Mr. Austin, the LDS deal, the coalition was instrumental in

23  getting that deal done.  Because, again, Your Honor, going

24  back to what I said before, time is not the friend of the

25  survivors.  And you know what, as a plaintiff's lawyer, I

1  know, you know what, if I stretch it out, maybe I can get

2  more money, maybe I'll have more leverage.  But that takes

3  time.

4          Appeals, litigation is not the friend of

5  survivors, at all.

6          We've put together, Your Honor, $1.9 billion

7  that's going to go into a trust, and we're just getting

8  started.  We spent all day in New York yesterday with

9  Century.  We're trying to work on getting deals done.  It's a

10 difficult process, probably the most difficulty in my 40-year

11 career.  But I know it can get done because there's a lot of

12 talent.  On this screen, as I see all these lawyers, these

13 are some of the most talented lawyers I have ever dealt with

14 in my entire career.  And I know it can get done.

15         So we're talking with Century.  We're talking with

16 AIG and Mr. Rosenthal.  We're talking with the Catholic

17 Church, and we're talking with the Methodists, and we're

18 talking with the Episcopals, and we're talking with the

19 charters.  We're going up to New York again.  I just got back

20 from New York.  We're going back up.  I'm going back up

21 tomorrow, again, for two days of mediation where we're going

22 to be talking with some of the charters and some of the

23 insurance companies.  So we plan on that $1.9 billion that a

24 lot of people will criticize yet, and they use the math and

25 they say it's so much per -- per survivor.  Well, that's

1   really kind of an inadequate description of the amount of

2   money that we're getting into the trust because as we talked

3   about different people will get different amounts depending

4   upon, you know, the criteria, whether they satisfy the

5   criteria or not.

6           And we intend to at least double that number, Your

7   Honor.  I'm going out on a limb by saying that, but that's

8   the goal because our goal is to get as much money into that

9   trust as possible.  Now, there's been some objectors out in

10  the public forum in the media that have criticized the

11  coalitions as sellouts, and I take that as an extreme

12  offense.

13          For the record, Your Honor, the coalition along

14  with the FCR and the BSA has to date put together the largest

15  compensation fund for survivors of sexual abuse in the

16  history of the United States.  Let me repeat that.  The

17  coalition along with the FCR and BSA has to date put together

18  the largest compensation fund for survivors of sexual abuse

19  in the history of the United States.  That's a true

20  statement, and we're only halfway there.

21          In contrast, Your Honor, the TCC has put together

22  no deals with insurers or chartered organizations.  They just

23  have been in the position of objecting to everything the

24  coalition has done.  And I would suggest to the TCC that as

25  fiduciaries of all the survivors, they spend the time helping

1  to enlarge the compensation fund rather than objecting and

2  creating roadblocks for the survivors.

3          Your Honor, the -- there's many lawyers on the TCC

4  that are my friends.  I've developed friendships with them

5  over the course of this 19 months.  I've spent a lot of time

6  working with them, and when I formed the coalition with Ann

7  Andrews and Adam Slater, I still reached out to the TCC

8  because I didn't consider us to competing forces.  I

9  considered us to be all working for survivors because we are

10  all working for survivors.  So I arranged Zoom calls with the

11  TCC and with other members of the coalition to see where we

12  could drive together and work together for the benefit of the

13  survivors.  I arranged a meeting in New York where we all --

14  everybody flew in.  We had dinner together, the TCC and the

15  coalition.  We broke bread together to come to agreements so

16  that we could move this forward and so there wouldn't be

17  roadblocks.  We met in Chicago, and I -- I -- I still today

18  consider many of the TCC lawyers are my friends.  But we're

19  all working in the same direction, Your Honor.  We're working

20  for survivors.  We're all in this together.  I invite all

21  objectors to come join us to build the largest fund for all

22  survivors so they can be properly compensated.  They deserve

23  it, Your Honor.  These survivors have suffered enough.  They

24  don't need to wait any longer, and I hope this process

25  concludes quickly.

1              Thank you very much for giving me the time, Your

2    Honor.  I really appreciate it.

3              THE COURT:  Thank you, Mr. Rothweiler.  Okay.  I

4    see hands.  Mr. Stang, I will let you speak.  I'm sure you

5    want to respond.  I don't think -- but let's realize it's

6    4:00.  There are things we need to get done today, and over

7    the course of any number of hearings now, I've heard from all

8    sides of all issues.  And I recognize that you and members of

9    your committee may disagree with much of what Mr. Rothweiler

10   has said.  So please appreciate that I understand that.

11             MR. STANG:  Thank you, Your Honor.

12             THE COURT:  Mr. Stang?

13             MR. ABBOTT:  Your Honor, may I be heard briefly --

14             MR. STANG:  Thank you, Your Honor.

15             MR. ABBOTT:  -- before we get to Mr. Stang, Your

16   Honor, just briefly on timing?

17             THE COURT:  Mr. Abbott?

18             MR. ABBOTT:  Your Honor, we have spent, obviously

19   a number of days in front of the Court, and I appreciate

20   Mr. Rothweiler's passion.  I appreciate the passion that he

21   has aroused in other folks who are on this Zoom call.  But it

22   is critical, Your Honor, that we get to the scheduling

23   process.

24             THE COURT:  We're going to get to it.

25             MR. ABBOTT:  I just want to make that clear.

1  Mr. Kurtz has been waiting patiently, Your Honor.

2           THE COURT:  And I have views on it.

3           MR. ABBOTT:  Okay.  Thank you.

4           THE COURT:  Yes.  Thank you.

5           MR. STANG:  Thank you, Your Honor.  I had to take

6  a really deep breath during Mr. Rothweiler's prepared

7  comments.  For someone who was not anticipating speaking, he

8  certainly read off his script explaining why his -- he and

9  his other law firm coalition members are entitled to a

10  substantial contribution so that the fees that Mr. Molton has

11  incurred are reimbursed to them or perhaps never having to be

12  paid by them.

13           And what he has said really reflects a

14  misunderstanding of what the TCC is about and how survivors

15  are to be treated in this case.  He said I was on the TCC,

16  referring to himself.  He was not on the TCC.  Mr. Kennedy,

17  Mr. Humphrey, and seven other survivors are on the TCC.  They

18  are the fiduciaries.

19           He said the TCC represents 6,800 people.  Again,

20  he doesn't understand the role of the TCC or for that matter

21  his role or for that matter I'll pick out one of my state --

22  one of the state court counsel who represents committee

23  members, Mr. Modus' role.  The -- Mr. Humphrey, Mr. Douglas,

24  Mr. Kennedy represent the constituency.  No attorney

25  represents the constituency.

1        He said the TCC met with the coalition in Chicago.

2   No, it didn't.  Mr. Kennedy did not appear at that meeting.

3   Mr. Humphrey was not at that meeting.

4        Mr. Greer (phonetic) was not at that meeting.  Mr.

5   Tabone (phonetic) was not.  He met with other lawyers because

6   this is about control.  He told you how they represent

7   upwards of what, 70,000 people.  Well, he may, but this is

8   about them thinking that they should run the case because

9   they think -- think they have the votes.

10        They thought they should have had control of the

11   committee, but Mr. Buchbinder and his staff appointed one

12   committee member, if you -- if you look at it from this

13   perspective, one committee per law firm, and that really

14   torqued them.  They couldn't stand that because as they

15   started amassing clients, I believe Mr. Molton referred to

16   them as inventory last week, they thought, wow, this really

17   isn't fair.  We've got survivors making decisions for

18   survivors.  We represent all of these people.  We should be

19   making decisions for the survivors.

20        And then he criticizes the TCC for not making any

21   deals.  Well, you know what, I could make a deal with

22   Mr. Schiavoni in five minutes.  I just have to meet his

23   number.  I could make a deal with Mr. Ruggeri in three

24   minutes.  I just have to match his number.  So if I want to

25   race to the bottom, I'm faster than anybody, but that's not

1  the TCC's goal.  The TCC's goal is to get as much as possible

2  for survivors.

3          You know how much someone who was anally

4  penetrated is going to get in an open state using their

5  current settlement number?  $57,000, that's how much -- and

6  our chart that's going to go into the disclosure statement is

7  going to say that.  You know how much you're going to get in

8  the next lower-tiered state, Judge?  $34,600.  You know what?

9  I'll double that.

10          I'll take Mr. Rothweiler at his word and say he's

11  going to double that.  $68,000 for multiple penetration

12  claims in Oregon or Washington.  Well, congratulations.  You

13  all did a great job.  That is not the goal of the TCC.  The

14  TCC opposed the settlements that have been reached because

15  they are race to the bottom settlements.  And the Mass Tort

16  Bar, the lawyers who have multiple clients have an agenda

17  that is beyond simply in my opinion maximizing the return to

18  clients because at some point a third or 40 percent of a big

19  number is a big number, and it doesn't matter how much each

20  person gets.  But if I had experienced sodomy in California

21  and you tell me I'm getting $58,000, I'm not accepting that

22  settlement.

23          And we will see how many people accept that kind

24  of settlement.  So I may be right.  I may be wrong, but to

25  hear a 15-minute presentation that was an opening statement

1  for a substantial contribution claim, frankly, was

2  inappropriate.  It shouldn't have been done, and I hope we

3  don't have to hear it again before we get to the -- before

4  the hearing on their substantial contribution motion.  Thank

5  you, Your Honor.

6           THE COURT:  Okay, thank you.

7           We're going to get to scheduling now, and I don't

8  have my calendar.  So we're going to take five minutes.  I'm

9  going to get my calendar, and we're going to talk scheduling.

10           We're in recess.

11           UNIDENTIFIED:  Thank you, Your Honor.

12      (Recess taken at 4:02 p.m.)

13      (Proceedings resumed at 4:06 p.m.)

14           THE COURT:  This is Judge Silverstein.  I'm not

15  sure if I'm a minute or so early.  So let's give people time

16  to get back on.

17      (Pause)

18           THE COURT:  Mr. Kurtz, I have some thought about

19  scheduling, but I will hear from you initially.

20           MR. KURTZ:  Thank you.  Thank you very much, Your

21  Honor.  Glenn Kurtz, White and Case, on behalf of the

22  debtors.

23           Hopefully, this will be a little less energetic,

24  but interestingly enough, we have some similar impact on

25  abuse victims because as the Court well knows time is money

1  here not just in the traditional sense of having less cash on

2  the balance sheet, but in the direct sense of having reduced

3  cash contributions to the trust, which is in effect the

4  proverbial melting ice cube.  And so we really have something

5  to -- to work hard at here in addition to feasibility issues

6  and the like.

7          It struck me that the request for a lengthy period

8  of time between solicitation and confirmation was unusual.

9  We did a little research on that.  We looked at Delaware

10  confirmation cases, big -- what we thought were larger cases,

11  and confirmed that the average time period between

12  solicitation and the confirmation hearing is 46 days.  And

13  Hertz was 42 days, and so we think, of course, the request

14  for six months and five months, which are 3.5 to 4 times more

15  than the normal period of time is pretty excessive.

16          We also don't think as much time is needed here

17  for a couple of reasons.  One, we're not starting from

18  scratch.  I mentioned this before, but I went back and

19  confirmed that we started producing information to -- to the

20  objectors in March of 2020.  We have produced information

21  relating to historical claims, local councils' information

22  related to the debtor's insurance, financial condition, it's

23  organization, board minutes, and other documents and we've

24  also produced for deposition the CEO, the chairman of the

25  board, and the financial restructuring expert here.  So we're

1 pretty far down the line the way we see it.

2        We also believe that in addition to the normal

3 interests and simply having more time, which is fairly common

4 place in most cases and particularly for somebody that is

5 seeking to avoid relief, there does seem to be I think pretty

6 clearly an independent interest in having some delay.  And I

7 think even this exercise has reflected that because the time

8 you have for discovery is from a start date to an end date.

9        And so, therefore, everybody should be looking for

10 a very early start date because the earlier you start the

11 more you can get done, and here we've had a lot of

12 resistance.  We've been raising this for a while now, and the

13 objectors won't agree to a start date.  They didn't even want

14 Your Honor to hear confirmation scheduling until this week.

15        So -- so there's a lot -- there's sort of a lot of

16 indications including all of the requests for adjournments or

17 not to set schedules that we think are kind of transparent

18 here.

19        Also, if the objectives were really concern about

20 the amount of time that they needed in order to complete

21 discovery, then, of course, they would be starting just as

22 soon as they could, as opposed to resisting the start.  I

23 think there's a certain amount of vigilance that should be

24 expected of a party that's complaining about timing here.

25        They have known that we had intended to proceed,

1  and I know we're not getting that anymore, but we had

2  intended to proceed on December 9th and yet we didn't have

3  any document requests or any discovery requests.  They

4  haven't been propounded even though it was at least

5  conceivable we would have been successful on that.

6          Your Honor stated at least as of the August 30

7  hearing that, quote, "Think about how discovery is going to

8  be conducted to promptly get us to a confirmation hearing."

9  So the parties have been on -- on notice for a few weeks now

10  that we really needed to get moving on it.  You stated more

11  than once last week that there's nothing that would keep

12  people from pursuing discovery now, and -- and the only thing

13  I really heard is we don't have an approved disclosure

14  statement.  That -- that's language.  The deal terms are what

15  they are.  The objections are what they are.

16          They are free to and needed to serve and pursue

17  discovery kind of vigilantly, I think, before they watch the

18  ice cube melt a little more.  There was certainly no reason

19  they couldn't serve discovery.  If it turned out that

20  something got mooted, then we simply wouldn't have produced

21  it, or we could have made a motion for a protective order,

22  which is something that Your Honor raised last week as well.

23          I think you're going to hear that there is some

24  need for a substantial amount of discovery.  I don' think

25  there is any more need for discovery here in -- in any

1 greater volumes than in most cases.  As I said, we've already

2 given a lot of the discovery.  I think a lot of the issues

3 Your Honor is going to need to grapple with to the extent

4 they don't get resolved between now and confirmation are

5 largely legal.  And insurance neutrality, probably largely --

6         THE COURT:  Excuse me, please.  Excuse me,

7 Mr. Kurtz.  Please check your audio.

8         MR. KURTZ:  I think insurance neutrality is

9 largely a legal issue.  I think third-party releases is

10 largely a legal issue.  Certainly, there will be some

11 questions about good faith.  There will be some questions

12 about the TDPs, but nothing that is not manageable within the

13 normal time period, much less what I think is already going

14 to be somewhat extended.

15         I guess the last issue is how do you populate the

16 schedule once we have a hearing date, and I think the best

17 way to deal with that is wait for Your Honor to give us

18 something on the schedule, and then we can work something

19 out.  I don't know how difficult that should be.  I think

20 there's more than enough time, if we were fortunate enough to

21 get January, which would leave close to four months, there's

22 plenty of time for us to take discovery.  Get all of the

23 objections on file.  Get all of the replies and proceed.

24         So I -- I -- I do want to express appreciation for

25 the accommodations Your Honor has given us through the course

1   of the case.  I appreciate your schedule is very busy.  I

2   appreciate January is particular busy.  As fiduciaries of the

3   estate, dealing with maybe a melting ice cube trust, we sort

4   of feel compelled to just ask for the earliest possible date,

5   especially since we still have a period of time before

6   emergence even after a confirmation approval assuming that

7   one is forth coming, during which time, of course, we are

8   continuing to kind of burn off cash.

9             So we're hoping that there's some flexibility

10  there, Your Honor.  We'll do everything we can on our end to

11  expedite matters, and -- and -- and we appreciate any

12  accommodation you could afford us.

13            THE COURT:  Thank you.  I do have some things in

14  mind.

15            Mr. Plevin?  Mr. Plevin, you are muted.

16            MR. PLEVIN:  Thank you, Your Honor.

17            Let me first start by responding to some of the

18  points that Mr. Kurtz made, and then I want to talk about the

19  impact of the findings and what we heard earlier today about

20  the insistence on going forward with those and the factual

21  nature of several of the findings and how that impacts

22  discovery.

23            Mr. Kurtz ended by saying that what he was

24  suggesting the Court do is pick a date, and then we'll fit

25  the schedule to it, and then to me that's just completely

1  upside down as to how we ought to proceed, and it's contrary

2  to what Your Honor has said not only in this case but in

3  other cases about the need for due process.

4         To just fit litigation deadlines into a date, a

5  confirmation hearing date that's chosen for no reason other

6  than for convenience, makes little sense.  You need to look

7  at what are the issues, what are the discovery needs, how

8  quickly can the parties move, and build the schedule out

9  based on that.

10         This is not -- Mr. Kurtz gave a couple of

11  examples.  This is not a case that's a pre-pack where there's

12  not going to be a contested evidentiary proceeding.  This is

13  not a case in which the debtor simply sells its assets and

14  disappears in which there's not a contested evidentiary

15  confirmation hearing.  This is a different kind of case, and

16  it needs to be treated as such.

17         Mr. Kurtz talked about some information that had

18  been made available.  He talked about the fact that some

19  information had been produced.  AS Your Honor heard last

20  week, almost all that information is locked up in mediation

21  confidentiality and can't be used.

22         He said they made people available for

23  depositions, and that's true but that was with respect to the

24  RSA, not with respect to confirmation issues, which are

25  completely different.  So maybe there's a little bit of

1  streamlining that can be done because we don't have to ask

2  people about their background when they've already been asked

3  about that, but it's not a substitute for discovery.

4         So in setting the schedule here, Your Honor, the

5  real question is what do we need to litigate, and we've

6  pointed out in our objections and you heard robust argument

7  today about the required findings under the plan, which we

8  think are purposefully designed to prejudice the insurers,

9  and I'm not going to repeat that except I want to make one

10 point that I -- I didn't have a chance to make earlier today,

11 and that's with respect to 10M of the plan or X.M, which is

12 the insurance neutrality clause.

13        And what makes that so important, Your Honor, is

14 that that clause said that the -- that the policies are

15 subject to the findings of the Court and the terms of the

16 plan.  So when you heard argument earlier today about how

17 there was no effort to modify the policies or seek insurance

18 coverage rulings, the plan itself in Section X.M tells you

19 that that's wrong, that what the debtors and their supporters

20 are trying to do is use the confirmation order and the plan

21 to modify the terms of the insurance policy.

22        And that means that we have to have the right to

23 contest those findings, because if we were simply to go away

24 and not participate in the confirmation hearing and evidence

25 were presented and Your Honor issued the plan with their

1 findings, our policies will have been modified in a

2 prejudicial way.  And so I -- I needed to point out Section

3 X.M to the Court.

4          I also heard Ms. Lauria say that they would circle

5 up and I guess the 5-minute break we just had probably wasn't

6 long enough for them to do that about reactions to Your

7 Honor's discussion of the proposed findings.

8          Before Ms. Lauria, earlier today we heard from

9 Mr. Harron, from Ms. Quinn, that they were -- they believe

10 the findings are appropriate, they are entitled to them.

11 Mr. Goodman explained in some detail how some of these

12 findings were evidentiary based, there had to be a record

13 made under the terms of the findings, and he -- he

14 acknowledged that some of these findings required evidence.

15          So we have a situation where the debtors and the

16 plan supporters want findings that are based on evidence that

17 we believe are highly prejudicial, and you can't deny us

18 consistent with due process the right to go get that

19 evidence.

20          So the debtors really - there are two basic

21 pathways here, Your Honor, and they have a choice of which

22 path to go down.  One is the path of an expressly insurance-

23 neutral plan, one that does not include these findings, does

24 not prejudice the insurers.  If we go down that path, then

25 maybe Mr. Kurtz can have the confirmation hearing he wants in

1  January because there would not be a need by the insurers to

2  contest the findings in the plan, but if the plan -- if the

3  debtors and the plan supporters want to go down the other

4  path, which is the one that we believe prejudices the

5  insurers, then we need discovery.  And what do we need

6  discovery on and what do we need to litigate?

7          We need to litigate insurance neutrality.  We need

8  to litigate the reasonableness of the values in the TDPs, the

9  base claim values, the maximum claim values.  We need to

10  litigate the process by which the TDPs came into being.  We

11  need to litigate the impact of the TDPs on the insurers.  We

12  need to litigate the role and the discretion of the

13  settlement trustee.  We need to determine whether the

14  settlement trustee has conflicts.  We need to litigate

15  whether the settlement trustee ought to be selected by the

16  debtors or by other parties or by the court.  We need to

17  determine whether his -- if we could, to what extent the

18  settlement trustee's future decisions on claims that have not

19  been fully presented are reasonable or could be reasonable.

20  We need to talk about and litigate the plan's goal to

21  preclude insurers from raising effective coverage defenses.

22          And, Your Honor, if you want to know how this is

23  being set up to prejudice the insurers, you need only look at

24  the proposed letter from the coalition and the FCR that is --

25  that was filed, I believe last night, to go out with the --

1  with the plan and the disclosure statement where they explain

2  in so many words that the purpose of the plan is to put the

3  screws to the insurers and make them pay more.

4          So that's what we need to do.  The items we would

5  be seeking in discovery include the following:  Documents

6  related to the formulation of the plan and the settlement of

7  claims thereunder.  We were told earlier today that the TDPs

8  are an evidence-based plan.  We -- we seem to think that --

9  we tend to think that's completely wrong because when claims

10 were settled before bankruptcy, they were settled, as I

11 mentioned earlier today, in an adversary process in a court

12 with people on opposite sides with the Boy Scouts seeking to

13 either establish they're not liable or if they are liable,

14 that they're liable in a lesser amount than the plaintiff

15 wanted.

16         That is not the structure that is being proposed

17 here.  So if it is going to be an evidence- based TDP

18 structure and that's the contention, then we need to find out

19 what happened all along in the history of the Boy Scouts

20 settling claims.  And it may be -- Mr. Goodman said the

21 insurers have that information.

22         My clients are an excess insurer.  We were only

23 involved in a very, very small number of claims before

24 bankruptcy.  We don't have access to all that information.

25 So we need to find out what the course of dealing was and how

1  the settlements took place.

2          We need to get the documents relating to abuse

3  cases that were dismissed or resolved without payment.  What

4  defenses were asserted?  How were they successful?  Why were

5  they successful?  We need to get documents related to Eric

6  Green's relationship with parties in this case, and

7  communications related to his selection as trustee.  We need

8  to get information regarding the negotiation and history of

9  the current version of the TDPs, the debtor's input into

10 those issues, the evidence of the roles of the various

11 parties in the drafting of the TDPs, and the basis for the

12 values in the TDPs.

13         And we need to get the information about the

14 course of dealing.  We need to get information not only

15 regarding the debtor's own liabilities as a historical

16 matter, but we're being told that these values to some extent

17 may wrap in sex abuse settlements from other cases.  If

18 that's the case, we'd want to know if that's the contention.

19 We'd need discovery on that.

20         I mentioned course of dealing.  One thing you

21 might look at is the combustion engineering case where the

22 Third Circuit looked at the course of dealing in terms of how

23 claims were handled pre-bankruptcy.  We would need to

24 establish the insurer's non-involvement in the creation of

25 the TDPs.  We would need financial information regarding the

1  claims against and assets of the parties who would become

2  protected parties under the plan, which could include issues

3  regarding which assets are restricted and not available for

4  contribution to the trust, something that several weeks ago

5  we heard Mr. Brown talk about at great length.

6           Some of these requests, Your Honor, will

7  predictably become enmeshed in issues of mediation privilege,

8  particularly when we talk about good faith.  The debtors

9  acknowledge this.  They have filed a motion, which I think of

10 at least as sort of an abstract motion that is not tethered

11 to any specific discovery in the confirmation context, and

12 that motion is calendared for hearing on October 19th.

13          We know that no matter what discovery requests we

14 make now, the debtors are going to object to producing

15 anything they feel is subject to that privilege.

16          Depending on the outcome of the Court's ruling on

17 that, we could get a significant additional production on

18 October 19.  I'm sure that it makes no sense in anybody's

19 mind to start depositions before October 19 and then re-start

20 them and take them over, again, after October 19.  So that's

21 a problem.  This whole issue of mediation privilege, which

22 was highlighted in the RSA context has to be addressed.

23          The schedule that the debtors proposed in

24 connection with their fourth amended plan was not only too

25 compressed but it was also illogical.  And I -- I sort of

1 | hear them now saying they're not going with that schedule,

2 | maybe they are.  They certainly didn't propose one since last

3 | week.

4 |         We submitted a revised proposal.  We heard the

5 | Court say 217 days is not going to do it.  We went through

6 | our proposal and shut out about 35 days, which I think is

7 | cutting it to the bone.

8 |         The TCC did the same thing with their -- well,

9 | actually they submitted a new proposal.  Their proposal ends

10 | up roughly the same time as ours, roughly a little bit

11 | earlier, but I'm going to talk about some of the respects in

12 | which their proposal is not logical.  But the debtors haven't

13 | given us anything to chew on, only a request that you set it

14 | for the earliest possible date, and somehow we're going to

15 | figure it out later.

16 |         But they don't put any effort into deciding what

17 | it is that we need to -- that we need to litigate or why.

18 |         So our -- our proposal, and I realize, Your Honor,

19 | we may have done a disservice to the Court a little bit

20 | because we started in a different place than the TCC.  We

21 | based all of our days on days after approval of the

22 | disclosure statement, but we didn't assume a date for that.

23 | They did assume a date, and so they went with October 1st.

24 |         So I put together our schedule and tried to

25 | compare it with theirs to see where we came out.

1          There's a lot of similarities between the two

2   proposals but let me just talk about some of the differences

3   that we think that doesn't make sense.

4          The TCC has a deadline to depose fact witness --

5   let me start one other place.  We put in a deadline to serve

6   initial written discovery, and I think that's clear -- that's

7   important, Your Honor, because we're prepared and will be

8   prepared to submit comprehensive document requests, as

9   comprehensive as we can make them based on what we know now.

10  But that can't be the last time we're entitled to serve

11  discovery requests.

12         Things come up in depositions.  Things come up in

13  discovery.  One of the things we know, one of the lessons

14  from Imerys is that voting issues came up once the vote

15  tabulation was done.  So the debtors had a deadline in their

16  proposal for written discovery.  Ours is for initial written

17  discovery, and I think that's appropriate.

18         When we get to the deadline to depose fact

19  witnesses, we said 75 days after approval of the disclosure

20  statement.  If you take the TCC's assumption that October 1

21  is the date, then our 75 days ends December 15, which is 33

22  days after our proposed date for completion of document

23  production.  So that would mean the comprehensive document

24  requests go out.

25         They're responded to much more quickly than the

1 │ federal rules require.

2 │        We get the documents, we have a chance to look at

3 │ them, schedule depositions, we have 33 days to take

4 │ depositions.  The TCC, as I read their proposal has set up a

5 │ 9-day deposition window.  We have experience with deposition

6 │ windows in Imerys and they just don't work.  Everyone tries

7 │ to go to the end of the window, and then we end up taking

8 │ depositions after the window is over.

9 │        I had emails today about what's happening with

10 │ expert depositions in Imerys where there's going to be at

11 │ least one if not two or three depositions taken after the

12 │ window by agreement.

13 │        So but even so their -- the TCC's deposition

14 │ period is December 14 to 23.  Our deposition deadline would

15 │ actually be in the first part of that range, December 15th.

16 │        The TCC shaves some time off their schedule by

17 │ having initial expert reports due on December 17, which is

18 │ right in the middle of the fact deposition window.  So to me

19 │ that makes no sense.  I think you need to finish the fact

20 │ depositions before you can have initial expert reports, and

21 │ we provided 15 days after the end of depositions for fact

22 │ depositions, rather for expert reports.

23 │        Rebuttal expert reports, I mentioned last week the

24 │ eight days allowed by the debtors in their schedule just is

25 │ undoable, unworkable.  It's not enough time to figure out

1  even what rebuttal expert you need, let along go out and

2  recruit one and have that person prepare a report.  The TCC

3  gives 28 days for rebuttal reports.  Our proposal gave 25

4  days.  I think that is probably the irreducible minimum for

5  that.

6       Deadline to depose expert witnesses, the TCC

7  shaves that down to seven days after rebuttal reports are

8  due.  We gave 20 days for that.  Again, I don't think that's

9  an unusual or too long a figure for expert reports.  The TCC

10 has us filing motions in limine before deposition

11 designations, so we wouldn't even know what the deposition

12 designations are when the motions in limine would be due.

13      And the TCC's proposal ends on February 28th, Your

14 Honor.  Ours ends on March the 30th.  So -- and I should say

15 a couple of things, Your Honor.  There's no explicit.

16 There's no explicit time in our proposal for voting-related

17 discovery, which -- which could happen.  It may be necessary

18 as -- as I heard the colloquy's last week a lot of the issues

19 about the voting are going to be decided at the back end.  So

20 it's reasonable to think you may need some time for discovery

21 of voting issues.  We certainly did in Imerys.  There is no

22 time in this proposal for any delays caused by motions to

23 compel or motions for protective order.  And as Your Honor

24 pointed out last week, there's not only the perhaps more

25 exotic discovery issues but the regular discovery issues that

1  pop up that may have to be addressed by the -- by the Court.

2          I think there needs to be some time, obviously

3  we've got this mediation motion that's set up for October 19.

4  But that's as I said, an abstract thing that may not work.

5          So that's our proposal, Your Honor.  We think that

6  ending up where we propose is as I said the irreducible

7  minimum, this would be the end of March.

8          You know, I've -- I've -- I'm not going to go

9  through my biography the way some others do, but I litigated

10  pre-packs in the asbestos world 20 years ago, and I used to

11  tell people then that we were litigating at the speed of

12  sound, just to give them an idea of how crazy it was.  This

13  schedule that we've proposed is litigating at the speed of

14  light.  It's much faster.

15          It's hard for me to envision as a litigator how we

16  are actually going to get through this schedule.  I think the

17  experience we've seen in Imerys is instructive in that, you

18  know, we set an aggressive schedule and even though the

19  debtors wanted to keep the schedule, they have come to the

20  court and asked for relief sometimes just because it wasn't

21  working.

22          I think what we've proposed is something that has

23  a chance of working, and if the parties work hard we could

24  stick to it.  But the main point I want to leave Your Honor

25  with is the schedule ought to be driven by the issues that

1   need to be litigated.  And if we're going to have to litigate

2   the findings, the factual basis for the findings, as

3   Mr. Goodman acknowledged earlier today, and the impact on the

4   insurers of those findings, I think we can't do this in --

5   in -- in January or even February.  I just don't think those

6   dates are workable.  Thank you, Your Honor.

7          THE COURT:  Okay.  Thank you.  Let me note one

8   difference between Imerys and this case, and there are many,

9   but one significant difference is that Imerys is not

10  operating anymore and Boy Scouts is.

11         Mr. Brown?

12         MR. BROWN:  Thank you, Your Honor.  For the tort

13  committee.  Much of what the committee and its professionals

14  are so concerned about has been articulated by Mr. Plevin.

15  There are a couple of additional issues that I wanted to

16  highlight for the Court.  I mean I think the -- the overall

17  concern is that certainly the proposed schedule that we saw

18  last week was far more than a scheduling order.  And whether

19  it was intentional or -- or not, and I'm going to try not to

20  pass judgment on that.  But it was going to have the impact

21  of imposing unworkable limitations on the committee's

22  professionals and its experts to discover and put before the

23  court what needs to be discovered and put before the court in

24  order for the survivors who do not support this plan and do

25  not want to be bound by a non-consensual third-party release

1  and a channeling injunction, it will deny them the

2  opportunity to make that case to you, as to why the national

3  mortgage factors are not met here.

4            And, in particular, Mr. Plevin highlighted I think

5  a lot of what the insurers need to do from their perspective

6  in terms of investigating the underlying claims.  And there

7  is a massive amount of data and discovery that needs to be

8  obtained and analyzed and synthesized.

9            As Mr. Stang mentioned earlier today, we have a

10  pending application for our experts on that.  We've had

11  extensive discussions with them about how much time they will

12  need after they get the data in order to file their expert

13  report.

14            And the sequencing proposed by the debtor was

15  just -- was shocking.  I mean it was a matter of days.

16            I mean and that's never been done in a case.  I

17  mean you look at Imerys, you look at Purdue, the timeframes

18  that are allotted from the time that documents are produced

19  to when expert reports are due, in this case I believe they

20  are -- well, initially it was a matter of expert reports were

21  due November 8, four days after fact discovery is completed.

22            That's what the debtor's initial proposal was.

23  That -- I mean I just think that's exemplary of what the

24  debtor is trying to do to the committee and their ability

25  to -- to put on an effective showing at confirmation.

1          This idea of -- well, the issue you -- I think you

2   asked, am I going to be required to make an aggregate

3   determination of claims.  And there was discussion about,

4   well, the estimation motion is off so maybe you don't.  But

5   you clearly will.  I -- one of the master mortgage factors is

6   whether or not the plan pays all or substantially all of the

7   claims of the class that's going to be impacted by the

8   channeling injunction and release.

9          So if there's going to be non-consensual releases

10  in this case, we're going to have to know what the claims

11  are.  Our experts --

12          THE COURT:  Doesn't the committee know what the

13  claims are?  The committee has been telling me what the

14  claims are.

15          MR. BROWN:  I think we have -- we are retaining

16  experts to tell me what the claims are.

17          THE COURT:  When are those on?  I don't recall

18  seeing any of -- of a motion, but when did you schedule those

19  for a hearing?

20          MR. BROWN:  I'm going to defer, if I may,

21  because -- to Mr. Stang or Mr. Lucas on that.

22          THE COURT:  Fair enough, but -- okay, go ahead.

23          MR. BROWN:  So the same -- the same issue with

24  respect to claims is going to come up with respect to the

25  best interest test, and it's going to come up at least a

1  subset of the claims in connection with the Hartford

2  settlement.

3          It's a great deal of the same data.  It all

4  funnels into what the -- what our expert is going to say on

5  this and how much time it's going to take to gather the data,

6  how much time it's going to take for them to synthesize it,

7  put it in an expert report, have their depositions taken.

8  There's going to be another - - you know, this is going to be

9  a battle because the debtors are going to have their own

10  experts and we're going to have to rebut those.  Maybe it

11  will be the same expert.  Maybe there will be a different

12  expert, I don't know yet, but that's a huge concern of ours

13  here is time to do discovery, time to get the expert reports

14  done, time to get the rebuttal reports done.

15          Some of the things, also, that are going to come

16  up here, I mentioned last time and I got a lot of pushback

17  from Mr. Kurtz, about -- but whether I accurately

18  characterized it or not, but the fundamental truth is we have

19  been trying for -- since early last week to address the issue

20  of the local counsel designations confidentiality.  Virtually

21  everything they produced has been designated confidential.

22          Clearly, it's not all confidential.

23          BSA has -- the protective order requires BSA to

24  facilitate this -- this declassification.  We're not getting

25  where we need to get.  We don't have the issue resolved.

1            It's likely going to require a motion, and that's

2    going to take time, and it may require additional discovery

3    to get documents that were not -- that have only been

4    produced in the context of mediation and for which a

5    mediation privilege is being claimed.

6            There's the mediation privilege issue, and I -- I

7    think that this is -- this was raised by Mr. Plevin, but that

8    the issue really boils down to BSA and Hartford and any other

9    parties that are going to settle, they are seeking a good

10   faith determination with respect to the plan.  They're

11   seeking a 9019 determination with respect to fair and

12   equitable.

13           Are they going to offer the mediation at the --

14   the fact of mediation as evidence of good faith and

15   reasonableness?  If they do, then is that not a waiver of the

16   mediation privilege?  You can't use that privilege as both a

17   sword and a shield, and if they're going to advance the

18   mediation as evidence of reasonableness or good faith, then

19   they can't hide discovery.  They can't preclude discovery on

20   how the sausage was made.

21           I think that's similar to what Mr. Plevin was

22   saying, but we have the very same concerns because -- and so

23   that motion is going to be heard, that -- not until

24   October 19th.  Then there will be fights over the mediation,

25   over the mediation privilege, and what the nature of the

1  discovery is.

2          There is no discussion in the debtor's version of

3  a schedule for any discovery on voting integrity, and we

4  think that issue has been raised.

5          It's come up.  We've built it into our schedule,

6  and we think it is critical that there is time allotted for

7  that, and that's not something that can be done right away.

8          And I also just want to point out that, you know,

9  in Mr. Kurtz's initial statements he was critical of all the

10  objectors for not having already launched their discovery.

11          Yet, I have a recollection that Century was just

12  stopped in its tracks on doing discovery that hadn't yet been

13  teed up because the disclosure statement hadn't been approved

14  and the plan wasn't at issue.

15          So, you know, you can't have it both ways.  I

16  think everybody has been holding their powder on discovery

17  because of what happened with Century.  This isn't at issue

18  yet.  I mean technically I thought what the Court said was

19  the plan isn't yet a contested matter.

20          THE COURT:  I don't think I said that.

21          MR. BROWN:  No, you didn't say -- so I think that

22  is how it was interpreted.

23          So in any event, it hasn't been a foot- dragging

24  exercise.  There was concern that plan discovery was not yet

25  ripe.

1          So if you have any questions, I am happy to answer

2   them, Your Honor, but those are, I think, you know, those

3   reflect some profound concerns that we have.  And I just

4   think as somebody -- well, for all of us who are going to be

5   impacted by this schedule, there is just, you know, there -

6   there's an element of what's doable and what's -- you know,

7   what is humanly possible and what the debtor is proposing,

8   had initially proposed, it's just not humanly possible to do

9   what needs to be done in this very complex case with multiple

10  issues in anything that resembles a competent way in the

11  timeframe that the debtor is proposing.

12          THE COURT:  I agree that competing time concerns

13  are an issue, but what nobody has really disputed is that BSA

14  is going to run out of money if we don't get this thing

15  going, that the contribution from the BSA clearly goes down

16  every month that we continue to have -- that we don't have a

17  resolution of this matter, and, you know, this debtor doesn't

18  make a product.  It's not -- it's a different kind of entity,

19  and we can't lose sight of that.

20          I'll hear from Mr. Ryan and then maybe we should

21  take some break.  I forgot about the need to caucus about my

22  thoughts with respect to the findings.  But I'll hear from

23  Mr. Ryan first.

24          MR. BROWN:  Well, Your Honor, just before --

25  before that, just I wanted to answer your question about

1 our -- our expert.  It was -- the expert is Claro (phonetic)

2 and the application was filed on September 17th.  So I'm

3 sorry, I just wanted to address your prior question.

4          THE COURT:  Thank you.  When's it going to be

5 heard?  Not until the 19th?  We may be able to speed that up.

6          MR. LUCAS:  Well, Your Honor, this is John Lucas.

7 It was filed, and the objection period runs on the -- I don't

8 have my glasses on, the objection period runs on the first, I

9 believe, of October.  And so assuming there are no objections

10 and we don't receive anything, we'll be able to submit an

11 order under COC.

12          THE COURT:  Okay.  Thank you.  Mr. Ryan?

13          MR. RYAN:  Thank you, Your Honor.  Jeremy Ryan on

14 behalf of the Catholic and Methodist Ad Hoc Committees.  I'll

15 be brief, Your Honor, I just -- as we're discussing these

16 30,000-foot issues, I didn't want people and Your Honor to

17 lose sight of this isn't Hertz.  This isn't a plan that

18 leaves creditors unimpaired, and in fact, to the contrary

19 here, Your Honor, you have a plan where you have 24,000

20 chartered organizations who didn't file proofs of claims who

21 aren't creditors of the estate and you have a plan that

22 proposes to strip them of their property rights and insurance

23 policies, proposes them to deem them to grant releases.  It

24 proposes to do a lot of things to people who aren't creditors

25 of this Court, who are not participants in this proceeding,

1  and whether that can ultimately be done or not is going to be

2  left for another day.  But there is a substantial question of

3  how much due process do people, who aren't creditors whose

4  property rights are being taken away under a plan need to get

5  in all of this and the notices of what's going to happen to

6  them.

7          How much due process do we need for the 16,000

8  chartered organizations who filed proofs of claims, who

9  aren't sophisticated parties?  They don't have access to the

10 unlimited budget many of the parties here have, and how long

11 do they need to have to get to understand and receive these

12 things and have a long enough period to vote.

13         So as we're taking about due process and the

14 timeline of this, and we're certainly not advocating for a

15 March -- a March confirmation date, but I don't want to lose

16 sight of the fact that this is not a 42- day case or a 50-day

17 case or a 60-day case.

18         Now, as Your Honor noted last week, there's at

19 least 60 days that you have to give notice to people.  And we

20 need to be cognizant of the tremendous amount of people who

21 aren't sophisticated parties and who aren't even creditors

22 whose rights are being taken away under this plan.  So I just

23 think we need to have that -- have that perspective, as we

24 look at trial dates, and as we look at a calendar and when

25 things go out for solicitation and for notice and when people

1   have to object and respond by.  Thank you.

2              THE COURT:  Okay.  Thank you.

3              Ms. Lauria, how much time do you want to caucus

4   with the FCR and the coalition about my remarks with respect

5   to the findings and what you're hearing in terms of discovery

6   that is generated from certain of those findings?

7              MS. LAURIA:  Your Honor, I'm just looking at my

8   clock right now.  I see it's 4:50.  I know we've had a long

9   day, but I think we want to achieve as much as we can today.

10  So I would say we come back in 15 or 20 minutes if that works

11  for the Court.

12             THE COURT:  That's fine.  Let's take 20 minutes

13  and let's see -- let's see where we -- where we are, and,

14  again, I think the two findings that in my mind create the

15  most issues are the condition precedent R and S, as they are

16  currently drafted.  We're in recess.

17             MS. LAURIA:  Thank you.

18         (Recess taken at 4:50 p.m.)

19         (Proceedings resumed at 5:12 p.m.)

20             THE COURT:  This is Judge Silverstein.  Ready to

21  get back on the record?

22             MS. LAURIA:  Your Honor, this is Jessica Lauria.

23  We were just gathering.  I see folks from the coalition and

24  FCR back on the line, so I think we are ready from our

25  perspective.

1        THE COURT:  Okay.

2        MS. LAURIA:  So we spent the last 15 or 20

3  minutes, Your Honor, specifically focusing on R and S

4  although we take your remarks on the other provisions as

5  helpful.  And I guess what I would say is this:  We do think

6  there may be a mechanism to tighten the language with respect

7  to R.  We certainly take your point that any findings you

8  make do need to be limited by the type of hearing that you

9  are hearing those findings, and certainly we think that's in

10 the 1129 context, 1129(a)(1), which I think could incorporate

11 in 1123(a)(3).

12       There may necessitate a 9019 standard.  I don't

13 know that we need to make a determination right now.  It

14 sounds like this could even be an issue that needs to be

15 briefed but suffice it to say I think the parties certainly

16 understand that you're only making a ruling under the legal

17 regime that is presented to you, that this Court has the

18 power to decide and not some other legal regime.

19       With respect to S, Your Honor, certainly

20 appreciate what I will call your Fuller-Austin observations,

21 that the fact that the debtor is, for example, contributing

22 $220 million, bankruptcy dollars, to the trust doesn't

23 necessarily mean that that is establishing the aggregate

24 claim liability.

25       I think, as you noted, this one is controversial,

1  and it's also complicated for us to -- and it was a little

2  too complicated for us to determine in the 10 or 15 minutes

3  how we were going to address the Court's rulings.  But I

4  think I don't necessarily want to speak for the others, but

5  I'll speak for the debtor.  We heard you loud and clear, and

6  we understand that this language needs to be tightened for

7  the purposes of the proceeding and for what is in front of

8  the Court and not for other purposes.  I don't know if the

9  FCR Coalition would like to weigh in on that.

10         THE COURT:  Okay.  I'll -- I'll make one other

11  comment, which maybe I shouldn't, but I will.  I wrote this

12  down when Mr. Rothweiler was speaking.  He said they had a --

13  this is my word, sort of a fundamental principle, no survivor

14  left behind.  A very laudable goal and a -- and a call that I

15  think the survivors can make.  But I don't know that

16  that's -- that that's a -- a deal that the insurance

17  companies made when they issued policies.

18         So, again, and it's not the first time by the way

19  that I've heard that -- that sentiment or in the papers

20  somewhere.  Okay?

21         Listen, here are my thoughts on -- on scheduling.

22  We need to get this on the calendar.  Parties need to get

23  going on discovery.  There's going to need to be abbreviated

24  time frames to determine issues and that I recognize also

25  puts quite frankly pressure on me as well to decide things in

1  a timely fashion of disputes that get put in front of me.

2              But this is not, as I've already said, this isn't

3  Imerys.  It's not Purdue.  Okay?  Those are very different

4  cases.

5              This is case of a not-for-profit entity that as I

6  recall is right now going through its fundraising season

7  while it's in bankruptcy.  It's going through its membership-

8  raising season while it's in bankruptcy, and I think Boy

9  Scouts, but as importantly, and I'll stress that, as

10  importantly, survivors need to know is there a resolution

11  here or not.  So this needs to be scheduled, and I'm looking

12  at starting a trial on January 24th.

13              I recognize that is an incredibly tight schedule.

14  That does not go -- I'm not -- it's not lost on me.  That

15  will mean that, again, timeframes need to be shortened for

16  production of documents.  Time frames will need to be

17  shortened to resolve discovery disputes.  If there's going to

18  be an assertion of media privilege that is getting in the way

19  of documents and I have not seen what the debtors have filed

20  yet, that's got to be resolved.

21              I will tell you, as I think I've said in this

22  case, I'm sure I did because I had it here.  I probably had

23  it in some other cases recently.  There's got to be a balance

24  in the mediation privilege when you want certain findings at

25  confirmation.  Not everything is going to be able to be

1  protected, and we're going to have to find the balance.

2          It is hard to decide these privilege issues in the

3  abstract.  I did that recently in Imerys.  Then I get

4  documents in front of me, and it makes me have to rethink

5  what I did.  It's very hard to do it in the abstract, but I

6  will take a look at that motion.  We're going to start on the

7  24th of January.

8          I will give the parties an opportunity to see if

9  they can arrange a schedule.  If not, I will hear that

10 promptly, and I'll impose a schedule.  But in the first

11 instance, I'm going to let the parties see if they can work

12 it out.

13         I think it's an appropriate schedule.  I think

14 it's a doable schedule with cooperation.  I recognize it's a

15 tight schedule, and -- but I think all parties agreed at

16 various points in this case that from their different

17 perspectives there needs to be an -- an endpoint where we

18 know whether there's a confirmable plan or not.  And we'll

19 see.

20         MR. KURTZ:  Thank you very much, Your Honor,

21 for -- for setting the schedule.  Glenn Kurtz.  We will be

22 seeing you somewhat shortly on the motion for a protective

23 order.  I tried not to make it abstract.  Tried to tie it to

24 specific documents, which will be pulled and available for *in*

25 *camera* review if Your Honor chooses to do so or at least by

1  very specific categories.

2          So we look forward to resolving that.  I hear you

3  on the balance.  Ultimately, we have to figure out what that

4  is.  We don't have anything to hide.  IF it's protected and

5  it doesn't have to go out, we're happy with that.  If it's

6  not protected and it does have to go out, we're happy with

7  that as well, Your Honor.

8          MR. SCHIAVONI:  Your Honor, we have before you a

9  motion to shorten notice on the motion to compel the

10 documents withheld by Mr. Green on the assertion of the in

11 preparation for mediation privilege, as yet to be recognized,

12 and another motion to compel on shortened notice against the

13 debtor with respect to the documents that concern the

14 modified plan.  We didn't sit on our rights in those regards

15 at all.  All of the third-party aggregators have failed to

16 comply with the subpoenas.

17         I -- you know, the coalition partners of those

18 folks are not cooperating.  We'll bring motions on shortened

19 notice if necessary to try to move those along.  You know,

20 cooperation is sort of like the hallmark of, you know, moving

21 on an expedited schedule.  So we need that from the

22 coalition.

23         THE COURT:  It is.  I will take a look at those,

24 and we'll get a hearing scheduled on those.  Hopefully I can

25 announce it tomorrow when we're going to have a hearing on

1  those matters, but that's going to be the hallmark is parties

2  cooperating and getting documents and other discovery out.

3           Okay.  Ms. Lauria?

4           MS. LAURIA:  Thank you, Your Honor, and we will,

5  obviously, work on putting together a proposed scheduling, as

6  Mr. Kurtz suggested.  I think what that leaves for purposes

7  of rounding out the disclosure and solicitation process are

8  three issues.  And maybe I would propose to go in this order,

9  just because of the impact that the issues may have on the

10 documents.

11          The first is how to treat that $3,500 expedited

12 distribution election because that flows through the ballots

13 and the plan and the disclosure statements, and I do believe

14 it is one of the truly remaining substantive issues left it

15 may make sense to take that first.

16          Next, we have, and I think Mr. Ollinder (phonetic)

17 will go through with you anything that may remain on the

18 disclosure statement.  Knock on wood, we've been

19 communicating with folks during the course of today, and I'm

20 hoping that those are relatively limited issues.  And then,

21 finally, I believe Mr. O'Neal will pick back up with the

22 solicitation procedures, everything other than that $3,500

23 expedited distribution.  Also, I understand that he's had

24 some constructive conversations with the TCC Today, so

25 hopefully we've rounded those out as well.

1          I'm not sure if you want to turn to any of that

2    tonight, Your Honor.  I'm ready to go on the $3,500 expedited

3    distribution issue and why the change was made to the ballot

4    over the weekend if that makes sense.

5          THE COURT:  Yes, let's do that.

6          MS. LAURIA:  Thank you, Your Honor, and what I'd

7    like to do is just give you --

8          MR. STANG:  Excuse me, Your Honor, that is our

9    motion.  I think that's our motion.  I don't know why

10   Ms. Lauria is addressing something that we filed.  It's not

11   an order shortening time.  We haven't had a ruling on it, and

12   it's -- if you think that the $3,500 issue and our

13   classification motion are the same thing, we're the ones that

14   filed it.

15         MS. LAURIA:  Your Honor, we --

16         THE COURT:  Okay, well, the debtors have made a

17   change -- the debtors have made a change to their plan, so

18   I'm going to hear both of you.

19         MR. STANG:  Okay.

20         THE COURT:  Don't worry about it.  No one gets an

21   advantage over the other, but there's a change in the plan.

22   I noticed it in the plan, and let's talk about it.

23         MR. STANG:  Okay.

24         MS. LAURIA:  Your Honor, and I certainly didn't

25   mean to cut the TCC off in that regard.  We did make the

1  change to the plan.  I thought it would make sense to explain

2  why.  Also, we didn't file a written objection simply because

3  we haven't had the time to do it.  So I thought it might make

4  sense to put some perspective on this.  What I'd like to do

5  is just give a brief, a very brief history of the $3,500

6  expedited distribution and then go into why it is that we

7  made the change over the weekend to the plan and the ballots.

8          And I guess I would chalk this up to the category

9  of no good deed goes unpunished in this case.  You know,

10  throughout 2021, this literally the entirety of this year

11  we've had various conversations with parties on all sides of

12  this proceeding concerning some sort of expedited

13  distribution mechanic.  That includes both folks on the

14  survivor side and folks on the -- on the insurer side.

15          And when we came to resolution around the RSA with

16  the TCC and the coalition, we all agreed to a $3,500

17  expedited distribution.  And that was embodied in both the

18  fourth amended plan, the RSA, as well as the plan that we

19  went forward on, the fifth amended plan.

20          When we came to that understanding, speaking for

21  the debtors and really for myself in particular, because I

22  probably was at the middle of this decision, we were

23  contemplating two different mechanisms for soliciting -- I'm

24  using that in the little "s" sense of the word -- soliciting

25  the elections on the expedited distribution.  The first was

1   just getting those indications through the trust process

2   itself, and, in fact, as I mentioned earlier in the hearing,

3   there is a mechanism in the TDP and this existed, you know,

4   well before this weekend where the trustee would, in fact,

5   review the proof of claim, insure that the proof of claim was

6   substantially complete, and insure that the individual itself

7   signed the proof of claim form, not just the attorney, but

8   the individual itself signed the proof of claim form.  So we

9   thought about doing an election mechanism in connection with

10  the TDP.

11          The second option was in connection with the

12  balloting process, and that is what we elected to do, again

13  going back to the fourth amended plan.  The logic behind

14  that, Your Honor, was really one of efficiency and ease of

15  administration for both the claimants themselves as well as

16  the trust.  Our view was we were going to be sending out a

17  massive solicitation to 82,000 individuals, and with that

18  touchpoint with those individuals we should gather as much

19  information as we possibly could, including whether or not

20  those individuals wanted to take the $3,500 election.

21          As you undoubtedly saw in the confirm- -- in the

22  disclosure statement objections, we received a ton of

23  objections from the insurers to the $3,500 election.  And

24  those were along the lines of some of what you heard from

25  Mr. Rosenthal and Mr. Schiavoni today that the debtors were

1  attempting to do vote buying by putting the $3,500 election

2  on the ballot, that we were trying to carry the class by

3  buying votes with respect to that election.  And I can assure

4  you, Your Honor, that is absolutely not what our intention

5  was ever with respect to that $3,500 election.

6          But we proceeded to keep it on the ballot as we

7  went into last week's hearing.  And as we sat there, and I

8  think it was on the 23rd, when we got to the solicitation

9  procedures, we heard Mr. Stang and Mr. Smola describe very

10  convincingly the complications with the balloting process

11  here, and in particular the fact that we included on the

12  ballot this election to settle a claim, you know, not just

13  whether or not you're going to vote up or down on the plan

14  but actually settle a claim.

15          And, you know, when we went back and looked at the

16  transcript, Mr. Stang made a very impassioned speech about

17  the fact that due to rules of professional conduct an

18  attorney has an obligation to consult with its client about

19  the settlement of any claim.

20          And as we heard Mr. Smola further describe the

21  difficulties that many of the plaintiff lawyers have in

22  communicating with their clients due to confidentiality

23  concerns and the sensitive nature of the claim, it struck us

24  as, you know, we had added that to the ballot to try to ease

25  the administrative burden on both the plaintiffs and the

1  trust, but it became apparent after last week that we were,

2  in fact, increasing the burden, maybe unnecessarily so, on

3  the plaintiff lawyers.

4          In fact, we have 70 to 75,000 individuals that are

5  represented by counsel.  Whether those individuals are

6  completing master ballots or not, that's a lot of people.

7  That ranges from lawyers representing one person or a few

8  hundred persons to, I think, Mr. Smola indicated he

9  represents 4,000 persons, to Mr. Rothweiler who said his firm

10 of 10 lawyers represent 16 to 17,000 people.

11         As you know, and we just heard, we're on a very

12 tight timeframe.  We are contemplating a 60-day solicitation

13 period, and from our perspective for those lawyers to advise,

14 based on what I heard last week on whether you could or

15 should elect the option, it depends on a couple of things.

16         One, first you have to determine whether your

17 client is eligible, so whether they did complete a proof of

18 claim and whether they signed it.  We've now heard that, I

19 think, 20,000 amendments have been made to the proofs of

20 claim.  A big number of those are to substitute individual

21 signatures for attorney signatures, but that sort of part one

22 is assessing that.

23         And, next, you need to assess whether or not the

24 client should, in fact, take the $3,500 election.

25         So it struck us that we were maybe asking for too

1  much on the ballot given the timeframe and given the number

2  of claimants that are indeed represented by counsel and given

3  their ability to determine eligibility versus, you know,

4  whether or not they should even take the settlement.

5          So we thought in the face of that, and I think

6  Your Honor said last week, the expedited distribution is

7  turning into the tail that's wagging dog.  That is never what

8  we intended with the expedited distribution, so if that's

9  going to be a hardship on plaintiffs, I think our view was

10  take that off the ballot.

11          The TCC we now understand didn't like that.  They

12  want that on the ballot.  I think that from our perspective,

13  you know, there may be a balance where it can remain on the

14  ballot but rather than jam people with the voting deadline

15  and particularly those individuals who are represented by

16  counsel who needs to advise all of their clients whether

17  they're eligible and whether to accept you can have it on the

18  ballot and then also have an opportunity to take the election

19  via the trust process or via the trustee, we don't like that.

20  That sounds kind of confusing to me.

21          But at the end of the day I think we were just

22  simply trying to strike the balance between making the ballot

23  less complicated, not forcing individual lawyers to feel like

24  they needed to provide individual advice to clients on

25  eligibility and whether or not to settle and sort of delink

1    it from that process and, again, also delink it from the

2    accusations that we're trying to do some sort of vote buying

3    because that was certainly never the intention.

4         I have looked at the TCC's classification motion.

5    I'm happy to respond to that now, too.  We don't think it's

6    appropriate, and we think it's legally wrong.  But just to be

7    clear, when we made that change to the ballot believing that

8    change was really in the wake of I think what we all heard

9    last week in terms of extreme complications around the voting

10   process itself.  That was the genesis for the change.

11        You know, under bankruptcy rule 3013, one, we

12   don't have an accepted plan yet.  3013 speaks to an accepted

13   plan and whether we need to look at classification in the

14   context of an accepted plan.  God willing we get to an

15   accepted plan, but those aren't the facts before us today,

16   and, secondly, we think classifying the direct abuse claims

17   in the same class is appropriate.

18        1122(a) says substantially similar claims go

19   [interposing] the same class.  As I read the committee's

20   pleading, I think maybe what they're talking about is

21   disparate treatment within the class.  And the cases that

22   have evaluated disparate treatment under 1123(a)(4) have all

23   concluded that so long as you give everyone an equal -- first

24   of all, it specifically speaks to giving a creditor the

25   opportunity to take less.

1          And it, second, speaks to the case law that is

2    speaks to sort of an equal opportunity that the opportunity

3    to take an election is given equally to all class members.

4    So we don't think it's appropriate now.  We don't think it's

5    correct to separately classify them.  We're happy to brief

6    that more fully in connection with the confirmation hearing,

7    but we really don't think that's an issue that pertains to

8    the ballot or not or trying to deconfuse the ballot.  I think

9    they're simply suggesting that there is some difference

10   between, I don't -- big claims and small claims.  And we just

11   don't think that's appropriate under the law to distinguish

12   folks on that basis.

13          So, again, happy to do a hybrid if people think

14   that's more appropriate.  I think that's confusing.  We

15   thought the ballot was over burdening people, but that's the

16   background, and that's how we found ourselves here today on

17   that issue.

18          THE COURT:  Thank you.

19          Mr. Stang?

20          MR. STANG:  Thank you, Your Honor.  Today's my

21   birthday, and so I maybe as a present I can get an extra five

22   minutes.

23          MR. GOODMAN:  Your Honor, I don't mean to

24   interrupt Mr. Stang, but there are others who may want to

25   speak in support of this and I think Mr. Stang is going to

1  speak in opposition.  I wasn't sure if you wanted me to go

2  now or wait until later.

3        THE COURT:  Mr. Stang, what would you prefer?

4  It's your birthday.

5        MR. STANG:  Let's hear it all at once, Your Honor.

6        THE COURT:  Mr. Goodman?

7        MR. GOODMAN:  Okay.  I was right, to be fair.

8        Again, Eric Goodman, (inaudible) counsel for the

9  coalition.  The plan, as filed by the debtors back in April,

10  provided for a $1,500 expedited distribution.  That was under

11  the global resolution plan but not the toggle plan.  That's,

12  you know, April, so many months ago.

13        That did change under the plan filed in July.  The

14  amount of the expedited distribution went up from 1,500 to

15  3,500.  We also insisted on upping the standard.  The

16  requirement changed so that the proof of claim must be

17  complete and signed by the survivor under penalty of perjury.

18  That was added by the coalition and the TCC.

19        The TCC back in July supported the expedited

20  distributed.  Since the RSA terminated, the TCC has made it

21  clear that this was going to become a significant voting and

22  plan confirmation issue for them.

23        In addition, the insurers I think have always

24  consistently suggested that they would argue that the

25  expedited distribution was the equivalent of buying votes.

1          I will fight very, very hard on issues that I

2   think are major issues, issues that I care about, issues that

3   are important to survivors and the survivors receiving a fair

4   recovery in this case.

5          I don't agree with the insurers.  I don't agree

6   with the TCC, but I also know a distraction when I see one.

7   I think that the trustee should be able to pay nuisance

8   values, especially when the payment is less than the cost of

9   reviewing the claim.

10          I also think that it might be a bit unfair at this

11  point for people to make the election of 3,500.

12          You heard from Mr. Rothweiler that the amount of

13  funding in the trust could go up significantly in the coming

14  months.  So it may be, you know, unfair to even ask people to

15  make that election right now.

16          Given those factors, we support the debtor's

17  change in this regard.  I do think it gets rid of an issue of

18  potential distraction.  Given the current state of affairs, I

19  do think it makes sense for this to be something that is done

20  later and not at the voting stage.  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          Mr. Patterson?

23          MR. PATTERSON:  I was going to defer to Mr. Stang,

24  Your Honor.  I'm on Mr. Stang's side.

25          THE COURT:  All right.  Okay.

1        Mr. Stang?

2        MR. STANG:  Thank you, Your Honor.  Your Honor,

3   this is not an example of no deed -- no good deed goes

4   unpunished.  This is an example of no self- serving deed goes

5   un noticed because that's really what's happening here.

6        This is not a gesture by the debtor to relieve

7   over-burdened state court counsel from actually getting the

8   informed consent of their clients.  Not a single person at

9   the hearings last week said that they couldn't effectively

10  communicate with their client regarding this election.

11        In fact, the debtor's schedule, the abbreviated

12  schedule you just heard about was on file.  No one said they

13  couldn't accomplish this.  For all of my differences with

14  Mr. Rothweiler, he said just within the last two hours that

15  they are in constant contact with their clients, fielding

16  thousands of phone calls a month, regularly communicating

17  with them in some fashion.

18        So this idea that the debtor is doing the

19  plaintiffs' bar a favor, it's a favor no one asked for.  And

20  so I really think that we need to look at this from two

21  perspectives.

22        One is should it be a separate class.  That's the

23  subject of our motion, and should it be on the ballot because

24  those could be two different things.

25        Now, you said last week that it was important to

1  understand the voting, to see where this -- on this issue

2  where the support was coming from.  That's how I interpreted

3  your comments, and we cited to the transcript in our motion.

4         The elimination of the $3,500 election from the

5  ballot makes it impossible to track who's voting for this

6  plan as -- if you think of them as people who elect for the

7  3,500 and people that will go into the TDP either to litigate

8  their claims if that's permitted under the TDP or through the

9  TDP process.

10         If you don't make people indicate their election

11  on the ballot, we will never know the level of support that's

12  being given to the class by those folks because one thing --

13  everyone talks about we've got to put this stuff in context.

14  Here's the context.  No court since these abuse cases started

15  being filed in 2002, I think, has ever crammed down on a

16  survivor class.  No one.  But what is going on here is that

17  the plan proponents want that class to be as big as possible

18  and to get them all to vote yes.

19         If this is a separate class, those yes votes, the

20  people electing for the 3,500 don't count towards the vote

21  tallies on the impaired class.  They don' want that.  This is

22  in effect kind of stuffing the ballot box.  I thought it was

23  gerrymandering, but it's really stuffing the ballot box.

24  They want as many yes votes in there as possible, and that's

25  a creditor who is going to get 2,500.  They want that person

1  to vote yes.  And you'll come out with the 80+ percent

2  approval rating of this by that class.

3          But if those people who are getting at least below

4  $3,500 under the TDP and when you look at the chart that we

5  have proposed and the debtor has accepted for inclusion in

6  the disclosure statement, there are a lot of people $3,500

7  and under and there are a lot of people in that -- in a

8  higher number, maybe 5,000, 7,000 who will take the 3,500 and

9  not take the risks and the delay associated with being in the

10 TDP.

11         So that's what's really going on here.  They want

12 to maximize the people in the class, get them to vote yes,

13 and then those people may elect the 3,500 but they have in

14 effect they've impacted the voting, and, frankly, I think

15 they have distorted the voting.

16         When I spoke to this issue last week, and I think

17 I -- Mr. Smola will speak for himself.  We didn't say that it

18 was too complicated or that the professionals couldn't do it.

19 We talked about integrity, the integrity of the voting

20 system, making sure that counsel who was signing the master

21 ballot were acting in the first capacity as Mr. Goodman

22 described it as kind of collectors of the ballots.  And that

23 there were no shenanigans going on with people not accurately

24 recording their client's vote.  Or in the second capacity,

25 actually making the decision themselves, which would be

1   backed up by power of attorney, which issue I think we've

2   resolved as we'll get through the solicitation motion.  But

3   no one opposed the idea that they couldn't communicate with

4   their clients effectively to get an informed consent on what

5   to do.

6          I don't think the hybrid that Ms. Lauria was

7   suggesting really makes sense because it doesn't give you

8   that measure of who is supporting the plan in that class.

9   Whose money is really at risk?  Who's rolling the dice and

10  who is not?  Because the $3,500 if you take that election,

11  you're not rolling the dice.  And while it is true that the

12  trustee does have to check to make sure that the signature is

13  on the claim form and that it is substantially completed,

14  that's not really a -- in my opinion a substantive review

15  process.  That's checking a signature block and seeing how

16  many answers were given.  It's not even looking at the

17  answers.

18         I don't think is an issue of vote buying because

19  if you put those people in a separate class, and every plan

20  that I've had any experience with has always had the

21  convenience class, the nuisance class, as someone described

22  it as a separate class.  Well, if they're in a separate

23  class, they're not -- the vote buying is not an issue because

24  they're not tilting the impaired class to acceptance.

25         So I think that if you have separate

1   classification this concern about vote buying goes away.

2            3013 does not deal with a, quote, "accepted plan."

3   It's not what the language says.  It says for the purposes of

4   the plan and its acceptance, the court may on motion direct

5   determine classes or creditors.

6            It doesn't say after the plan has been accepted or

7   after voting is completed.  This is the time to do it.  This

8   is the time to make the plan accurately reflect what is going

9   on in the case.

10           And everyone will have the opportunity to take the

11  election.  There will be no discrimination amongst abuse

12  survivors, but if you take the election, you're in an

13  unimpaired class and you're deemed to have voted yes.  Well,

14  you're unimpaired.  I guess you're -- you're not voting at

15  all, I'm sorry.  You're not voting at all.  I get an -- I

16  get -- I get an erasure on that one because it's my birthday.

17           I made a mistake, and so to me this is about

18  integrity of the voting system, being able to keep track of

19  who is voting how and how that is really going to affect your

20  view of where the support is coming from in the plan, and if

21  you do it any other way, we will never know if, in fact, the

22  survivors whose claims are really at risk are supporting

23  this.

24           People have called this the tail wagging the dog.

25  I don't -- you may have -- I think you may have used that

1  expression, Judge.  We don't know that.

2         There could be 10,000, 15,000, we estimate using

3  our chart the TDP values that we're talking about that

4  possibly as many as 25,000 people might be making that

5  election because under the distribution scheme and given the

6  current plan settlements, that's about how many people it

7  might make sense to take that election.  It cries to the

8  inadequacy of the settlements, please.  We won't get started

9  on that, but this is not the tail wagging the dog.  This may

10 be the dog.

11        So, Your Honor, we think it makes sense.  It

12 reflects the concerns you expressed last week.  We think

13 keeping it on the ballot absolutely is necessary so we can

14 track where the support of the survivors really is and whose

15 money is at risk here, if you will, and we think it should be

16 in a separate class to avoid the issue of vote buying, and we

17 think it makes it cleaner.  So that's all, Your Honor.

18        THE COURT:  Thank you.

19        Mr. Patterson?

20        MR. PATTERSON:  Thank you, Your Honor.  I lack the

21 history that so many people here have, and so I look at it

22 very, very simply.  This is a plan that provides for

23 alternative treatments.  The two alternative treatments give

24 the claimant a fundamentally different interest or stake in

25 the outcome of the plan.

1          One, reduces the claim if pertinent or actually

2    potentially increase their distribution to $3,500.  Accepts

3    that, executes the required releases and moves on with life.

4          The second is going to be tied up with the TDP

5    process, payment percentages, hold backs, whatever set aside

6    there is for the futures and all the rest of that

7    architecture for many, many years and except getting more

8    money overtime, hopefully, maybe not, but agreeing to take

9    that risk in exchange for potentially a greater distribution.

10         *Ex ante*, leaving everything else aside, leaving

11   this case aside, ex ante, those are two different classes,

12   and that is why the first time I think I drafted a plan and I

13   had a little nifty -- I thought I could collapse it and I put

14   in my little trade class, this is what you get, but if you

15   agree to reduce your claim, then you get this little amount

16   of money, and I thought I had made an efficient move.  And we

17   went to a disclosure statement hearing, it was a small case,

18   and the partners let me kind of run with it so I could get my

19   nose bloodied and learn how to practice law.  And I did.  The

20   judge said those are two classes, Mr. Patterson.  Those

21   people have different rights.  Those are different classes.

22   Read 1122 before you come back.  And so that's -- that is the

23   correct analysis.

24         Now, this Court need not resolve the 3013 motion

25   in the sense of deciding they're separate classes today, but

1  this goes back to what the history that I am familiar with,

2  which was last week.  And I raised this issue because I

3  wanted to make sure, we were talking about a number of issues

4  related to how we're going to count the votes, how we're

5  going to measure the votes for master mortgage, and I said

6  and by the way, Your Honor, I just want you to know we may

7  bring a 3013 motion because we think these people are

8  fundamentally in a different class.

9          And, Your Honor, said -- you know, I think I'm not

10 surprised given the papers that that is something someone is

11 going to do, and we'll have all the information.  And I was

12 completely satisfied with that because having the information

13 is the important part here.  At the end of the day, the Court

14 can decide the 3013 motion later, but the balloting issue is

15 really the key issue.

16         And I don't think you need a starker case than to

17 look at combustion engineering, and when that case went up to

18 the Third Circuit and the fact that the vast majority of the

19 votes have been delivered by people whose rights were

20 fundamentally different.

21         They, in that case they were receiving some money

22 from one trust and had a spillover claiming to the other

23 trust in a small amount.

24         And the Third Circuit -- in that case it was an

25 artificial impairment case, but the principle is really the

1  same.  And the debtor is given a certain amount of discretion

2  with regard to classification and treatment, but when the

3  purpose or when the underlying effect of that is to conceal

4  what the real support is for the plan by people who have a

5  real and meaningful economic state in it, or to separate out

6  people who have a different economic stake in it, then that

7  is improper classification or improper treatment.

8          Your Honor, I think this issue of eligibility and

9  the other little things, that's a complete red herring.  The

10  election can be I elect to take this treatment, but I

11  understand that I have to comply with the requirements of the

12  trust in order to receive it.

13          That -- this is not something that ought to get in

14  the way.  We heard loud and clear from the coalition lawyers

15  that they were able to do all the solicitation necessary, and

16  the idea that there has been a revisiting of this principle

17  with regard to the 3,500, frankly, it doesn't really -- it

18  doesn't really hold water.

19          Finally, Your Honor, with respect to the point

20  that the integrity of the balloting could be put at issue,

21  first, no one has said that.  That's speculation.  I think

22  it's a red herring, but even leaving that aside, this is an

23  election that's going to have to be made at some point.  And

24  a 60-day balloting period that we have for this purpose given

25  the focus that people are going to have on this process,

1 given the materials that they are going to be receiving,

2 given the communications that all of the lawyers are going to

3 be making with their clients, there is no better time to

4 ascertain what the claimant's preference is in this regard

5 than now.

6 This is the time when they are focused on the

7 issue.  To suggest that they would get a standalone piece of

8 paper at some point in the future that advises them about it,

9 that wouldn't be meaningful.  This is the time that they are

10 focused on it.  This is the time that people are in

11 communication with them.

12 Your Honor, I was a little disappointed to see the

13 switch about.  I understand that the debtor wants to have a

14 valid vote and a meaningful vote to record the votes on the

15 plan and really gauge the support, and I think if they really

16 want to do that, they would want to know are people who are

17 accepting this plan truly the people who are impacted by the

18 insurance settlements, who are impacted by the third- party

19 releases, who are impacted by the loss of their rights in the

20 tort system?  And that's what this gauges, Your Honor.

21 I'm happy to answer any questions the Court has.

22 THE COURT:  Thank you.  I don't have any

23 questions.

24 Mr. Smola?

25 MR. SMOLA:  Thank you, Your Honor.  Can you hear

1  me okay?

2         THE COURT:  I can.

3         MR. SMOLA:  I'll just be very brief.  With respect

4  to Ms. Lauria's point about the $3,500, frankly, that is the

5  least of a plaintiff's lawyer's concern for the informed

6  consent they need to obtain for their clients.  A yes vote in

7  this case, as I have sort of said three or four times now,

8  potentially compromises a case against a third party, a local

9  counsel, and potentially compromises a case against another

10 third-party non-debtor, a chartering organization, and every

11 lawyer that votes yes in this case is going to have to get

12 affirmative consent from their clients in order to execute

13 that vote and is going to have to inform their clients that

14 they are potentially compromising those other cases.

15        Certainly, the $3,500 was an additional

16 consideration, but it's really those first two considerations

17 that drive the communication we as plaintiff's lawyers have

18 to get from our clients in order to compromise their claims

19 by way of a yes vote.

20        Thank you, Judge.

21        THE COURT:  Thank you.

22        Ms. Lauria?

23        MS. LAURIA:  Thank you, Your Honor, and I will

24 also be brief.  I want to just put some meat to the bones of

25 something that Mr. Goodman said, which is from the

1  plaintiff's perspective, as the settlement amounts increase

2  in this case, so do their recovery percentages under the TDP

3  matrix.

4          And I'm going to point the Court to the blackline

5  disclosure statement that we filed in the overnight hours.

6  It's docket 6385-2, and I'm going to ask the Court to turn

7  to -- it's page 40 of 507 of the PDF or page 33 of the

8  disclosure statement itself.

9          And while you're getting there, Your Honor, I just

10 want to set the stage for what this is.  Mr. Stang has

11 referenced multiple times that they prepared a recovery

12 chart.  It provides for pittance of recoveries, and that the

13 debtors endorsed it, apparently, by putting it in the

14 disclosure statement, and, therefore, that proves that a huge

15 number of folks may take the $3,500 under our plan.

16          That's simply not the case.  What Mr. Stang failed

17 to mention was that the debtors provided their own recovery

18 chart where we took the TDP values.  We applied the scaling

19 factors as they pertain to the -- and, again, Your Honor,

20 it's page 33 of the black line, page 40 of 507 of docket

21 number 6385-2.  We applied the scaling factors for the

22 statute of limitations, and then we applied various recovery

23 percentages at both the base claim amount under the TDP, as

24 well as the max claim amount.  The base claim amount of 10

25 percent we calculated based on the Bates White estimation of

1   a 7.1 billion trust applying the Hartford distribution, the

2   distribution from the local councils, as well as the $100

3   million Delaware Statutory Trust note, as well as the debtors

4   own contribution.  The 63 percent recovery is assuming the

5   valuation is at Bates White's low end, which is $2.4 billion,

6   but, again, utilizing the same assumptions and then it is our

7   contention, of course, that claimants may receive up to a 100

8   percent recovery as additional insurance settlements come in

9   the door based on the Bates White estimation.

10          And if you just glance through this chart, you

11  will see whether you're talking about in-statute claims for

12  non-touching that appears on page 35, or out-of-statute

13  claims versus various states in the scaling factors, the

14  difference between a 10 percent recovery or a 63 percent

15  recovery could formulate the difference between electing a

16  $3,500 expedited distribution or not.  You see that

17  repeatedly including even in the more severe abuse claim

18  category types.

19          So we do think that more information, and, again,

20  this is just to add to Mr. Goodman's point, there is a

21  dramatic difference between recovery percentages depending

22  upon the dollars that are in the trust and also depending

23  upon the ultimate value of the -- the liabilities that the

24  trust is confronting.

25          Beyond that, Your Honor, I will say that as we

1  said, I guess it was last week, we think many of the voting

2  issues can be dealt with on the back end.  Maybe we

3  misinterpreted the statements of counsel last week at the

4  hearing, but at the end of the day we felt like this truly

5  was turning into the tail that was wagging the dog and that

6  it was appropriate to remove it from the ballot.

7              Thank you, Your Honor.  Unless you have any

8  questions for me, that concludes our views of this topic.

9              MR. STANG:  Your Honor, may I make one comment

10  about this issue of the moving target of the settlements?

11              THE COURT:  Yes.

12              MR. STANG:  I think this works, I think this might

13  work.  The notion that I heard was essentially let people opt

14  into it later at some undefined period of time after the

15  effective date.  And that, of course, is the problem that I

16  tried to identify.  I thought Mr. Patterson made it as well,

17  that we just don't know if the people voting yes really have

18  skin in the game.

19              But you could have an approach that says you have

20  to make the election, and you can opt out later.

21              If it turns out that on the effective date of the

22  plan they've doubled, just to use Mr. Rothweiler's hopeful

23  example or even, you know more than doubled the settlements,

24  people might go, you know what, maybe I shouldn't have taken

25  that election.  But we don't know.  There could be no more

1  settlements.  I have no idea who Mr. Schiavoni is talking

2  about talking to in settlements.  I thought he was talking to

3  us, but apparently not because he met with the coalition

4  yesterday, but we don't know.  The settlement numbers might

5  not change at all, so the idea that someone makes the

6  election, we know they are electing, and they can, in effect,

7  opt out of that election so that they are not damaged by an

8  increasing pot of money.  Maybe that is a resolution to this,

9  but we really feel the need to keep track of who's making

10 this election so we can see if it's skewing the voting, and

11 the idea that we could take up the classification issue at

12 the confirmation hearing is interesting.  Maybe that's a way

13 of doing it, but we really need to identify these folks so we

14 can see whether people with significant interest in the

15 issues that Mr. Patterson identified are voting yes or not.

16         THE COURT:  Mr. Goodman?

17         MR. GOODMAN:  Thank you, Your Honor.  Eric

18 Goodman, counsel for the coalition.  I'd just like to speak

19 on one issue.  1122(a) provides that a plan may place a claim

20 or interest in a particular class only if such claim or

21 interest is substantially similar to the other claims or

22 interest.  I think we satisfy that here plainly because all

23 of the claims in Class 8 are survivor claims.  On the

24 treatment issue, that's actually an 1123(a)(4), not 1122, and

25 1123(a)(4) provides that the plan shall provide the same

1  treatment for each claim or interest of a particular class

2  unless the holder of a particular claim or interest agrees to

3  a less favorable treatment of such particular claim or

4  interest.

5          The plan does provide for the same treatment.  It

6  provides the same options, you know, what people decide to do

7  later on if -- if they decide to accept less favorable

8  treatment for reasons that are personal to them, I don't

9  think that impacts the analysis under 1122 or 1123 at all.

10 That's my only point, Your Honor.

11         THE COURT:  So I haven't read the motion yet.

12 That's my -- I have to confess when I heard it was under

13 3013, I said what rule is that, but the but I see it's there,

14 and my gut reaction is it's not a classification issue

15 because all of the holders in the class have the same legal

16 rights *vis-à-vis* the debtors, and because they all have the

17 same options.  They all have the same opportunities with

18 respect to their recoveries, depending, of course, on what

19 abuse they suffered.

20         But -- so I don't know if it's a classification

21 issue, but my gut reaction is it's not.  But the reason I

22 thought this information would be helpful had more to do with

23 the channeling injunction request and the third-party release

24 request that I'm going to be -- that I'm being asked to make.

25 And not necessarily a cram down issue, although I guess I

1  hear that, too.  But or the channeling injunction and the

2  third-party releases appropriate under the relevant

3  standards?

4          And in that regard, I thought it would be helpful

5  to know who was voting and what their choice is.  Of course,

6  I could have been in a situation where there was no choice.

7  You just -- there's no convenience class.  You just are

8  funneled into the trust, and if you end up with, you know,

9  $19 for a non- touching claim on a 10 percent recovery, then

10  you get $19.  You don't have the option to get $3,500.  But

11  I'll confess I hadn't -- I did note these charts.  I hadn't

12  thought about this issue in connection with the charts.

13          I do think counsel is going to have to have

14  communication with their clients with respect to voting on

15  this plan, and it's a complicated plan and it does - - even

16  whether one accepts it or rejects it is a complicated

17  decision, much less whether one accepts the particular offer

18  of $3,500.

19          I don't know if it's a classification issue, but I

20  think it's important to understand the vote.  I don't know

21  about an opt out.  I don't know if that's something the

22  debtors or anyone else would accept.  So I think it needs to

23  stay on the ballot.

24          MR. PATTERSON:  Thank you, Your Honor.

25          THE COURT:  Thank you.

1          MS. LAURIA:  Your Honor, we will conform the

2    ballots and the other documents back to the format that they

3    were in on this topic previously.

4          THE COURT:  What else can we accomplish this

5    evening?  There were two -- two other topics, Ms. Lauria.

6    Let me see my notes.

7          MS. LAURIA:  Yes, Your Honor, it was sort of

8    clean-up on the actual disclosures on the disclosure

9    statements and then resolution of any open issues with

10   respect to the solicitation procedures.

11         Both of those topics are being handled by the team

12   in the White and Case conference room, which I cannot see.  I

13   might as Mr. Linder if he is somewhere near the camera to let

14   us know if one or both of those topics are a size that can be

15   dealt with still this evening.

16         MR. LINDER:  Good afternoon, Your Honor, White and

17   Case.  As for the disclosure statement itself, we're

18   certainly a long way off from where we were with 170

19   objections last week.  I think we're -- we're down to maybe

20   four issues that I have on my list.  So I think that's

21   something discreet enough that we might be able to accomplish

22   in the time remaining today.

23         THE COURT:  Okay.  Let's see if we can knock those

24   out.

25         MR. LINDER:  Great.  Thank you, Your Honor.

1          As Ms. Lauria mentioned, we've been working

2   extremely hard since we broke last week -- I think it was

3   last Thursday -- to revise the disclosure statement, the

4   plan, the solicitation materials and the various exhibits and

5   schedules to account for the revisions that the debtors

6   agreed to make during the hearing last week as well as the

7   items that the Court directed us to include in a revised

8   version of the documents.

9          We've also worked to reconcile our comments with

10  the numerous objectors' comments, and we believe that the

11  draft we filed in the early morning hours today at Docket

12  Number 6385-2 that's the redline is very close to resolving

13  all of the disclosure statement objections.

14         Again, as I mentioned, I believe there are four

15  categories of issues that I'm aware of so I would propose to

16  just walk through each of those in turn, starting, Your

17  Honor, with the future claims disclosures.

18         Your Honor will recall that certain of the

19  objectors asked for disclosures with respect to an estimate

20  of the future abuse claims so that they could better

21  understand what effect if any those claims may have in terms

22  of dilution, potential dilution of their recoveries, vis-à-

23  vis future abuse claims.

24         We have conferred with the FCR's counsel over the

25  weekend, Your Honor, and the FCR has preliminarily estimated

1  that future abuse claims in number are projected to equal

2  approximately 14 percent of the number of abuse survivors

3  that are not future abuse claims.  And in value, Your Honor,

4  are projected by the FCR to equal approximately 21 percent of

5  the value attributable to abuse claims that are not future

6  abuse claims.

7           Your Honor, from the debtors' perspective, those

8  numbers I just want to be clear do not comport with our view

9  or our analysis.  We're continuing to engage in discussions

10  with the FCR's representatives with respect to their

11  preliminary projections, but regardless, Your Honor, we will

12  continue to confer with the FCR and include -- we would

13  propose to include in a further revised version of the

14  disclosure statement what I suppose would be the solicitation

15  version those estimates.

16           And, specifically, in the version that we filed

17  last night, Your Honor, the main provision that we included

18  is on page 96 of the redline, and what that essentially has

19  is a placeholder for the projected amount and value that I

20  just recited.  And, again, that's on page 96 of the redline.

21  It indicates both the FCR's forecast and our dispute of those

22  forecasts based on our own valuation expert's analysis of

23  future abuse claims.

24           We've also added, Your Honor, risk factors to

25  emphasize that there is a risk, that the projected value of

 1  claims is higher than the debtors range or that the types

 2  of -- or that the claims that could be allowed in amounts

 3  higher than the total projected ranges for each type of

 4  claim, which could also reduce recoveries for holders of

 5  compensable claims.  That risk factor is on page 275 to 276.

 6          So with those changes, Your Honor, we believe that

 7  that is sufficient disclosure on the topic of future abuse

 8  claims.  And we propose to memorialize that in a further

 9  revised version of the DS.

10          MR. SCHIAVONI:  Your Honor, our just -- our one

11  concern about that is that there's no explanation of the

12  methodology that was -- that's applied to come up with the 14

13  to 21 percent.

14          MR. MONES:  Your Honor, this is Paul Mones.  May I

15  speak?

16          THE COURT:  Yes.

17          MR. MONES:  Thank you, Your Honor.  I am and have

18  been since the beginning of this future claims, since a

19  future claims representative has participated been very, very

20  concerned about the methodology of arriving at this number

21  considering the on-the-ground reality of states which allow

22  repressed memory and the number of juveniles who -- people

23  under the age of 18, who are -- would not have filed given

24  the nature of the criminal justice system as it's been

25  applied in the last 3 to 5 years with regard to

1  organizational -- abuse in organizations like the Boy Scouts

2  whereas back in the 60s, 70s, 80s, 90s, the numbers of

3  reports of sexual abuse that were -- that were reported to

4  law enforcement were less, the numbers now according to law

5  enforcement research, et cetera, at least in institutions,

6  not in family matters has significantly been altered.  So I

7  hope we would have a -- echoing perhaps Mr. Schiavoni's

8  comments we would have an opportunity in some way to have an

9  evidentiary hearing on the way in which this number was

10  formulated because, again, purely in my opinion I think those

11  numbers are way, way off.

12            MR. LINDER:  Your Honor, if I could briefly

13  respond.  Our understanding is that this analysis, again, is

14  preliminary.  Ankura is the FCR's valuation expert.  With

15  respect to substantiating the value, that's obviously

16  something that we would expect to happen at confirmation.

17            THE COURT:  I think there will be discovery on it.

18            MR. MONES:  Thank you, Your Honor.

19            MR. STANG:  Your Honor, may I make a comment on

20  this?

21            THE COURT:  Yes, Mr. Stang.

22            MR. STANG:  Your Honor, first of all, whatever is

23  going to be expressed in terms of the FCR's opinion should

24  not be in percentages, it should be dollar amounts or number

25  of people.  One shouldn't have to go back and compute

1  percentages.  There's just no reason.  But we received a

2  draft redline of the plan a little past midnight on Monday.

3        It was not marked confidential.  It was not marked

4  subject to the mediation privilege, and that e-mail or in

5  that draft redline, it said that the FCR estimates there are

6  11,300 future claims and 5.055 billion dollars in value.

7        Now, I'm not a math whiz but 5 billion dollars is

8  more than 21 percent of the high-end range of the debtor's

9  estimates at 7 billion.  So when they say percentage of

10 value, I have no idea what the value means.

11       And I have a communication.  I presume it came

12 from the debtor that the FCR was estimating these claims at

13 11,300 people and 5.055 billion dollars.

14       Would someone please explain to me how we got from

15 Monday at 12:40 a.m. with those numbers to what we just

16 heard?

17       MR. LINDER:  Your Honor, before the FCR responds,

18 what I would note is that my understanding is the FCR does

19 not adopt the debtor's estimation.  It does not adopt our

20 range of values, just to respond to Mr. Stang's comment.  But

21 with respect to the propriety of how the estimation is

22 expressed, I would defer to the FCR.

23       MR. SMOLA:  Your Honor, can I just be heard for

24 just very briefly?  I think this should be a very simple

25 disclosure.  How many future claims are projected in terms of

1  numbers?  How many of those are repressed memory claims,

2  meaning claims that can come from policies in the 70s and

3  80s?  How many of them are minor claims?  We heard the FCR

4  earlier saying they felt many of these were minor claims that

5  would be fully insured.  Is it 8,000 minor claims?  Is it 200

6  minor claims?  What is the projection, and what is the total

7  estimate for future liability?

8          It's relevant for two reasons in disclosure.  One

9  is where do these claims fall in the insurance picture?  Are

10 they for minors who were abused in the last decade, or are

11 they going back to the Hartford era, Century era, and other

12 non-aggregate limits?  And, two, it may dictate how the FCR

13 discovery goes.  If there is 11,000 claims, that discovery

14 may need to be robust.  If it's much less than that, it may

15 not need to be so robust.  So I think a simple disclosure

16 will -- will put us on the right path in my view.

17          MR. BRADY:  Your Honor, Robert Brady for the FCR.

18 Both of those statements are correct, what Mr. Stang saw in a

19 black line and what the debtors propose to put in now.  So we

20 can express this in either way.

21          I think the debtor preferred percentages.

22          But we do expect this to be the subject of

23 discovery, and we are prepared to sit down with the TCC, the

24 coalition, and anyone else who wants to understand the

25 methodology and we'll present that to them.  But we always

1   expect that this would be a confirmation issue, and we're

2   making the disclosure now because the Court asked us to.  And

3   we understood that the Court asked us to list the number of

4   claims and the amount.

5           The fact is Mr. Stang has said these claims are

6   worth over $100 billion.  The debtor believes they are

7   somewhere between 2 and 7, and the FCR has his own view as to

8   what the value of the claims are.

9           THE COURT:  Okay.  So let's --

10          MR. LINDER:  Your Honor, just to be clear on the

11  percentage versus the dollar amount, the reason the debtors

12  prefer the only apples-to-apples comparison that can be made

13  is with respect to numbers of claims given the disparity

14  between the FCR's valuation number and the debtor's valuation

15  number.  Doing a percentage allows an apples-to-apples

16  comparison to be made.

17          MR. STANG:  Your Honor, I'm just not sure what the

18  apples are.  It's 14 percent of the value if it's $5 billion.

19  If my math is right, it's $25 billion in claims because

20  that's 20 percent, 5 percent is 20 -- that's the math, I

21  guess.  I guess I just don't understand what the value means.

22          I understand the people because we know there's

23  82,200 some odd.  That's easy.  I just don't understand the

24  value side of it.  Just give us the number like Mr. Smola

25  suggested.

1          THE COURT:  I don't understand it either.  I wrote

2   it down, but I wasn't quite sure what it -- what it meant or

3   what it was correlated to.  And so, Mr. Brady, it's 21

4   percent of value, whatever that value happens to be?  Is

5   that -- is that what Ankura's opinion is, or do they have an

6   opinion on a number?

7          MR. BRADY:  They have run the claims through the

8   TDPs, and they have an opinion on the value of the claims run

9   through the TDPs.

10          THE COURT:  So it's as run through the TDPs?

11          MR. BRADY:  Correct.

12          THE COURT:  Okay with some, I suppose analysis as

13   to what they think are the appropriate scaling factors?

14          MR. BRADY:  Correct.

15          THE COURT:  Just explain that in a sentence and

16   give out the numbers.

17          MR. LINDER:  We will work with the FCR, Your

18   Honor, to do that.

19          THE COURT:  Thank you.

20          MR. ROSENTHAL:  So, Your Honor?

21          THE COURT:  Mr. Rosenthal?

22          MR. ROSENTHAL:  Yes, it's Michael Rosenthal of

23   Gibson Dunn.  So what the FCR is going to give is -- is -- is

24   an aggregate number, a percentage, and the actual -- the

25   actual number of claims, an aggregate value and the

1    percentage of that value to a total value, all three of those

2    things.  Is that what we're looking for?  I heard 11,300

3    claims.  I heard $5 billion, and I heard $5 billion

4    represents 21 percent of something.

5              THE COURT:  That sounds -- you could put the

6    percentages in.  That's fine, and that one sentence or so on

7    just what Mr. Brady explained.  Then it's discovery.

8              MR. LINDER:  With that, Your Honor, I propose to

9    move on to the next, the second of the four categories.

10             THE COURT:  Yes.

11             MR. LINDER:  That is the plain English summary

12   document.  This is -- this is a document that was actually

13   appended to the revised solicitation procedures order that we

14   filed, docket 6386-1.  I'm raising it in the context of the

15   disclosure statement, Your Honor, because Mr. Ryan had

16   suggested that it would be an efficient means, an effective

17   means of communicating with charter organizations with

18   respect to information contained in the disclosure statement.

19             And, Your Honor, this was exhibit 12, and that

20   starts at page 243 of 256 if you're looking at the stamp at

21   the top.

22             THE COURT:  Page 243, okay.

23             MR. LINDER:  Your Honor, we spent a good portion

24   of our day on Friday and Saturday, the debtors did, working

25   with the ad hoc committee of local councils preparing the

1   draft that is appended to the revised solicitation procedures

2   order.  We sent this draft in substantially this form to all

3   of the objecting parties including Mr. Ryan and the other

4   representatives of charter organizations.  We sent that on

5   Saturday afternoon.  We then sent a further revised version

6   to all parties including Mr. Ryan on Monday.

7          Last night at about 7 p.m. Central Time we

8   received preliminary comments from Mr. Ryan, and we made good

9   faith efforts after we received those to incorporate as many

10  comments as we could, given the time constraints and the

11  number of documents we were working to file.

12         The document that's before Your Honor is -- it's

13  about a ten-page document, and it's comprised of four items.

14  The first is -- is about nine pages of frequently asked

15  questions regarding the treatment, I don't know if treatment

16  is the right word, but the effect of the plan on charter

17  organizations with respect to what we view as their three

18  options under the plan.

19         The first is to become a participating charter

20  organization, and that is the "default" option.  The second

21  is to negotiate a settlement by which they can become a

22  contributing chartered organization, and then the last is to

23  opt out of that treatment assuming that the charter

24  organization is not a debtor in bankruptcy.

25         So we've set forth several FAQ on each of those

1  options, a table at the back of the document that attempts to

2  summarize the three options on a single page, as best we can

3  in terms of what the contribution that's required to be made

4  by those charter organizations and the protections that the

5  charter organizations would receive under the plan for each

6  option.

7          There's also an opt out election form.  Mr. Ryan

8  had requested that rather than the more informal method of

9  contacting the debtors to opt out of becoming a participating

10  (inaudible) that there actually be something that looked more

11  like a ballot that could be opted out, that could be

12  submitted as an opt out.

13          We've prepared that.  That would be -- that is

14  proposed to be remitted to our claims and noticing agent.

15          And, finally, we would propose to append to the

16  summary and FAQ a confirmation hearing notice so that parties

17  know what the relevant objection deadlines are and the

18  proposed date for the hearing on confirmation of the plan.  I

19  understand from communications with Mr. Ryan during the

20  hearing, Your Honor, that there are a number of items that he

21  would propose be added to this document.  We've been trying

22  to balance the desire, Your Honor, to have this be a concise

23  and effective summary against what we view as a risk of this

24  taking on a life of its own and becoming in essence a mini

25  version of the disclosure statement.  The disclosure

1 statement has already been heavily negotiated.

2          So what I'd propose to do, Your Honor, is to in an

3 attempt to make sure all the information that Mr. Ryan

4 believes should be included in this document is included is

5 to add a section perhaps before the chart that and some of

6 the examples of what Mr. Ryan would like articulated in this

7 document are voting, means by which holders of indirect abuse

8 claims, most of which are charter organizations can vote

9 their claims be effective, the releases and injunctions on

10 charter organizations, et cetera.

11          What I would propose to do would be to add a

12 section that bullet points out some of those items and cross-

13 references the disclosure statement and where those -- where

14 all of those items, all of which have been articulated in the

15 disclosure statements can be found.

16          All of the indirect claim holders, indirect abuse

17 claim holders who are charter organizations will be receiving

18 the disclosure statement as part of their solicitation

19 package, so from our perspective, we think that is an

20 appropriate way to balance the charter organization's desire

21 for a one stop shop for all of this information against this

22 document again taking on a life of its own.

23          THE COURT:  Mr. Ryan?

24          MR. RYAN:  Thank you, Your Honor.  We do -- we

25 do -- first, we commend a lot of effort went into getting

1  something into -- an effort to put into plain English.  You

2  know, what our hope is and what we thought the Court agreed

3  with was that charter organizations need something that gives

4  them the entirety of what they're being asked to decide on in

5  plain English.  And there's -- there's two components to

6  that.  One is the three options for the releases and the

7  treatment with respect to all chartered organizations, and

8  also the creditors, and there are 16,000 creditors needed to

9  understand that part of the disclosure statement in plain

10  English as well.

11         So, addressing half of -- half the loaf, and then

12  giving them a key that points them back to the disclosure

13  statement in our view is -- just falls a little short.  I

14  understand the concern of not wanting a 50-page document,

15  but, you know, we gave them a turn that we think has a lot of

16  those concepts in 10 pages.  We think it can be done.  We

17  think we're losing the goal of plain English if we say, hey,

18  there's going to be some maybe consensual, maybe not

19  consensual third- party releases.  Here, go look in the

20  disclosure statement for where they're discussed, and then

21  you're going to find a whole lot of defined terms that you're

22  going to have to go into a plan to understand.  It's just

23  leading them down the rabbit hole that we're trying to avoid,

24  which is these are not sophisticated people who don't

25  understand legal documents and not to have them wade through

 1  a disclosure statement which requires page flipping back to a

 2  plan to read one definition, to read another definition.

 3        We think we can get this all in there in plain

 4  English simply.  There are a lot of very important concepts

 5  that aren't in right now.  Most notably, it doesn't speak

 6  anything about the 16,000 charter organizations that have to

 7  vote, that are entitled to vote.

 8        It doesn't say anything about the third-party

 9  releases, consensual or non-consensual and those things need

10  to be in a plain English document.  Those are some of the

11  most important things that are going to be going on with

12  respect to a chartered organization.  There's a whole list of

13  other things, Your Honor, that I could run through at a high

14  level that it doesn't have.  I think probably, Your Honor,

15  and I'm expecting that based on where this was in the revised

16  proposed solicitation procedures order, you haven't looked at

17  what the debtors have done either.

18        Perhaps the simplest thing to do to save everyone

19  a lot of time on this is you have what the debtor submitted.

20  We'll be happy to -- to send something over to the Court

21  under a notice of filing of what we think can be done, and

22  Your Honor can take a look at those two.  And if you have

23  some discreet questions between the two, you know, this thing

24  is not getting printed tomorrow.  We have time tomorrow.  We

25  can have a much more discreet hearing with less than 260

1   people.  This is not an issue that affects the vast majority

2   of people who are on this line, and that gives the Court the

3   time to not have us negotiate line by line but just see two

4   different presentations.  Ultimately, both of them asked and

5   say that it's a court-approved document, so let the Court --

6   you know, we'll live with what the Court chooses.

7          THE COURT:  Okay.  Why don't you submit what you

8   want and I'll take a look at it, but are the chartered

9   organizations with their creditor hat on going to receive

10  another plain English document that --

11         MR. RYAN:  No.

12         THE COURT:  -- deals with --

13         MR. RYAN:  No, Your Honor, this is the only - -

14  that -- and that is part of the problem.  This is the only

15  plain English document the debtor is proposing to send out.

16  And the genesis of this was chartered organizations need to

17  know everything that affects them in plain English.  So,

18  again, that is my half a loaf comment is telling them about

19  the options under the plan with respect to releases, and

20  claims, and channeling, and contributions, it completely

21  doesn't tell them about their -- their rights as creditors,

22  the effect of signing the ballot, what happens if they don't

23  opt out of the consensual releases.

24         None of that's in there in plain English, and

25  that's exactly the kinds of things that we think creditors

1  need to know.  Chartered organizations need to know as

2  creditors casting a ballot.

3           THE COURT:  Okay.  I'll take a look at what you

4  submit.

5           MR. RYAN:  Thank you, Your Honor.

6           THE COURT:  Mr. Schiavoni?

7           MR. SCHIAVONI:  Your Honor, I'm happy that maybe

8  I'll have an opportunity to give my final round of comments

9  to Mr. Ryan this evening, and then either he'll include them

10 or you can look at them.  Two critical elements of this

11 that's not really there is really an explanation of in the

12 Hartford settlement there's a clause that says that

13 Hartford's coverage is going to be released.  There's just no

14 disclosure really of what that means in this settlement.

15           There's the same thing with regard to in the

16 Hartford settlement the deemed release that's to be part of

17 the TDP that's a condition of the Hartford settlement,

18 there's no disclosure of what that means here either.  And

19 it's like the most fundamental thing that strikes me as wrong

20 with that is that you've really got to go to Page 4 of what

21 is a dense single- spaced document to realize that you're not

22 getting, you're left un protected and that there's 35,000

23 claims going to be coming at you and no one is representing

24 you in the bankruptcy.

25           I mean Mr. Ryan is like carrying a big load, but

1  there's no committee, there's no one representing them, and

2  you know to the extent some of these folks maybe think, you

3  know, I don't want anybody to be pointing at like the

4  carriers are representing them.

5           So I think it should be clear that they're un --

6  you know, they're unrepresented, and the net result of this

7  death trap provision is that they're -- it's like even under

8  the election or the -- the -- the negative assignment,

9  they're left uncovered, you know, for all these claims.

10          So it's just, you know, it seems like the very

11  first question is, is the effect of the plan, will it release

12  me, and the answer is no.  Local counsels get full release,

13  and you don't.  You don't have counsel in the case, but I

14  will give those comments to Mr. Ryan and we'll see what

15  happens.

16          MR. RYAN:  And, Your Honor, we'll welcome those

17  from Mr. Schiavoni.  I will say, I didn't want to go into

18  this, but the lack of disclosures regarding the Hartford

19  settlement are one of our biggest concerns.

20          You know, the document right now doesn't tell

21  people, it says, hey, you'll have your insurance rights.  It

22  doesn't tell them the Hartford rights are gone.  It doesn't,

23  you know, and there's been a substantial movement in some of

24  the things, Your Honor, but we know from Boy Scouts own --

25  they've taken positions on pre- 1976 local counsel insurance

 1  coverage and whether it -- it covered chartered

 2  organizations.  If you look at the first version of the

 3  latest disclosure statement, it said there's no coverage for

 4  you guys.

 5           You know, we know from the Boy Scouts own

 6  documents that 300 local councils participated over an eight-

 7  year period in a blanket policy that covered charter

 8  organizations.  So there's concerns about that.  Now, that

 9  has been fixed, but one of our concerns has been that there's

10  been a lack of adequate diligence into some of the things

11  that under the rubric of the Boy Scouts believe -- well, the

12  Boy Scouts believed until we pointed them to their own data

13  room that there was very little coverage for local -- for

14  chartered organizations under the local counsel policies.

15           You know, Mr. Linder had said to you last week

16  that, you know, the Boy Scouts never agreed to defend and

17  indemnify chartered organizations.  There is a resolution of

18  Boy Scouts in response to the handling of sexual abuse claims

19  that says Boy Scouts shall defend and indemnify against

20  claims, and that was specifically enacted with respect to

21  abuse claims.  And it was not a go forward defend and

22  indemnify.  It was any claim regardless of when time was

23  occurred.

24           So there is that kind of lack of Folsom disclosure

25  that concerns us that is -- we only know what we know as far

1  as what beliefs are there.  I mean there's a whole

2  representation as to what the Boy Scouts believe chartered

3  organizations thought 60 years ago about a charitable

4  doctrine of immunity.

5          Things like that don't need to be in there, but,

6  you know, I think if you look at the evolution, there's been

7  some improvement but that shouldn't have to be the parties

8  say, hey, your own documents.

9          There's a corporate resolution that says, you will

10 defend and indemnify.  It should just say we agree to defend

11 and indemnify you, and as Mr. Schiavoni mentions, we want to

12 make clear that people -- just saying you're still exposed to

13 lawsuits in the court system, people need to know you can't

14 defend on boy scouts to honor their prior promises.  Those

15 things need to be clear.

16         That's not a -- that's not a belief.  Those are

17 facts, and those need to be prominently disclosed to people

18 because they've always been subject to sexual abuse claims.

19 But what they need to know is that the Boy Scouts are no

20 longer going to defend and indemnify them.

21         Those kinds of things need to be made clear that

22 they won't have insurance from the Hartford.

23         That's what we need to get out to these people in

24 plain English.  Thank you.

25             MR. LINDER:  Your Honor, I would just ask that

1  if -- if there's going to be a submission by Mr. Ryan that we

2  impose some parameters on when that -- when that might be

3  filed, just in the interest of finalizing our documents.

4          THE COURT:  Well, I don't know.  Everything is

5  last minute.  People are working as quickly as they can.

6  Debtors are.  Other people are.  He said he'd do it at some

7  point tonight.  We'll look at it tomorrow.  That's all I can

8  ask.

9          MR. ROSENTHAL:  And, Your Honor, I only have my

10  hand up because I would hope that Mr. Ryan would include us

11  in those discussions, please.

12          MR. RYAN:  Absolutely, Mr. Rosenthal.

13          THE COURT:  This is clearly an important issue,

14  and it's -- and it's an issue that really only surfaced in

15  court in a significant way recently so --

16          MR. RYAN:  And, Your Honor, I know I said tonight,

17  but I'm already looking at 6:40, so it may be tomorrow

18  morning.  I will tell you that.

19          THE COURT:  I'm not staying up waiting for it,

20  so --

21          MR. RYAN:  I appreciate that.  You know, our

22  clients have the resources they have.  We don't have, you

23  know, go to trial in 20 day resources like some of the other

24  people on this call.

25          THE COURT:  I know, but, no, my only point is this

1   is a very important issue, these chartered organizations and

2   their ability to understand what's happening, especially

3   given the way this is structured.  And as with many things in

4   this case, it's complex and I don't know that there's a lot

5   of precedent for this.

6           So communications with the chartered organizations

7   really need to be helpful.  That doesn't mean add another 50

8   pages to it.  I don't know that that makes it helpful, but

9   they need -- it needs to be helpful so that they understand

10  what's going on.

11          MR. MONES:  Your Honor, could I have 30 seconds,

12  please?

13          THE COURT:  Mr. Mones?

14          MR. MONES:  I would just refer the Court to Dale

15  versus Boy Scouts of America, which is a 2000 United States

16  Supreme Court decision that gave the Boy Scouts of America

17  the right to exclude gay scout leaders.

18          Part of that decision was that the Boy Scouts of

19  America control the hiring, firing, and even to that point,

20  sexual preference of the scout leaders gave no discretion to

21  the charter organizations or to the counsels in this regard

22  with regard to the Boy Scout's control over the core issue of

23  scouting, which is the identity of the scout leaders.

24          So I would just offer to the Court in evaluating

25  this in the future because it's been a centerpiece of the Boy

1  Scout's liability over the last 16 to 18 years in state court

2  litigation that the United States Supreme Court at least has

3  decided at least partially about this issue about the duty

4  owed by and the control of the Boy Scouts of America over

5  their charter organizations since the charter organizations

6  do select the scout leader.  Thank you, Your Honor.

7           THE COURT:  Okay.  Next?

8           MR. LINDER:  Next, Your Honor, we have the third

9  issue, which is that we've been advised by Mr. Patterson that

10 the revised description of the source (inaudible) waiting is

11 in his view not clear and appears to be contrary to the

12 representation that only affected claimants would receive

13 shares of non-BSA- sourced assets.  Your Honor, the language

14 that he's referencing is on page 240 of the red-line

15 document.

16          MR. PATTERSON:  It's on page 6385-2, yeah,

17 page 240.  Thank you, yeah.

18          THE COURT:  I have to switch documents.

19          Okay, thank you.

20          MR. LINDER:  And you'll recall, Your Honor, that

21 last week it was noted that the language only used the term

22 in part with respect to the non-BSA-sourced assets.  It only

23 referenced part of those assets being allocated among holders

24 of claims that relate to the -- the source of the assets

25 being attributed.

1            And -- and -- and we were specifically we were

2    discussing the TCJC settlement.  We've revised that, Your

3    Honor, to provide that it's either all or in part those

4    assets are being contributed to the trust and then being used

5    to pay holders of claims, again, that relate to the

6    contributor in question.  I think that is now clear.  The

7    only instance in which the TCJC contribution under this

8    revised provision, which just parenthetically, Your Honor, is

9    really a recitation of what is now in the revised trust

10   distribution procedures on the same topic.

11           The only instance in which the funds would be used

12   to pay claimants other than TCJC claimants is if as a

13   predicate all TCJC claimants were -- their claims were all

14   satisfied in full from those proceeds, and then the

15   overage -- I think it's the last sentence of this -- this

16   provision in blue, if there's a remainder after the

17   satisfactions of all relevant holders, then that remainder

18   shall be distributed to all holders of abuse, allowed abuse

19   claims in accordance with their payment percentage.

20           THE COURT:  Okay.  So I get that sentence, that

21   last sentence, but what does all or in part mean?

22           MR. RYAN:  Your Honor, what I understand it to

23   mean is that we really don't know what the terms of a future

24   settlement with another organization might provide for.  So

25   this is intended to permit flexibility with respect to

1  further settlements.  The TCJC settlement is predicated on

2  those proceeds going only to TCJC claims with the remainder

3  being distributed to other claimants if there is any.  But

4  this is intended to preserve that flexibility in the event

5  that further settlements provide for different terms.

6           THE COURT:  Mr. Patterson, what's your concern?

7           MR. PATTERSON:  Well, is there a statement

8  somewhere in the disclosure statement that the TCJC proceeds

9  will be used only to pay TCJC claimants up to the full value

10 of their claims?

11          MR. RYAN:  Your Honor, I believe where we put that

12 and for the front we have summary bullets.  This is on page

13 14 of the redline, and it is at the top of page 14 there is

14 a -- a new sentence that states that the TCJC contribution

15 will pay claimants with a claim against TCJC in addition to a

16 *pro rata* share of trust expenses.

17          MR. PATTERSON:  I didn't read that to be

18 exclusive, and then when I read the source affected waiting

19 language that said in whole or in part, I read them as

20 consistent with each other.  But if the intent is on page 14

21 that -- that it's only, then I would ask that it's TCJC's

22 contribution will go to pay only abuse claimants with a claim

23 against TCJC.

24          MR. RYAN:  That's fine with us, Your Honor.  We're

25 happy to make that change to clarify.

1          MR. PATTERSON:  But with that, I understand there

2   is no flexibility with regard to TCJC other than with regard

3   to an overage, and there is flexibility with regard to any

4   future settlement.

5          THE COURT:  That's how I understand it now.  Okay.

6   I think that fixes that problem.

7          MR. RYAN:  Correct.

8          And, Your Honor, that brings us just to the last

9   category, which is really a catch-all.  We would just note

10  for the record that we've been conforming changes to the

11  disclosure statement to reflect changes to the solicitation

12  procedures, and we'll continue to do that.  And so there may

13  be further changes on that front.  It's not really a disputed

14  category, but I wanted to note it for the record that our

15  further revised version of the disclosure statement will --

16  will account for anything else that's discussed on the record

17  today or tomorrow.

18          THE COURT:  Okay.  So what do we have for

19  tomorrow?

20          MR. PATTERSON:  Your Honor, I just -- before we

21  finish, I had one other comment regarding the plan and

22  disclosure statement.

23          THE COURT:  Okay.

24          MR. PATTERSON:  And it goes to -- the easiest

25  place to see it is I'm in document 6385-1, PDF page 12 of

1  416.  And it's the definition of abuse claim.

2              THE COURT:  So that's in the plan?

3              MR. PATTERSON:  Yeah, it's in the plan, Your

4  Honor.

5              THE COURT:  Okay.  I don't have the docket items

6  on here.  Plan page 12?

7              MR. PATTERSON:  Your Honor, it's definition 18.

8  It's on page 4 of my version.

9              THE COURT:  Definition 18, abuse.  Okay.

10             MR. PATTERSON:  So I'm -- my concern with regard

11 to this definition is two-fold, and this deals with whether

12 or not the release, which uses the term "abuse claim" is

13 broader than the Court indicated as being confined to

14 scouting-related activities.

15             So my first concern is that and the architecture

16 of this definition is that the first 12 or so lines down to

17 the provided, however, those first 12 lines that's just --

18 that is what applies to the debtor, and then the proviso

19 introduces the concept of what this application of this

20 definition of abuse to protected parties, chartered

21 organizations and so forth or just chartered organization --

22 contributing chartered organizations to begin with.

23             And the way that proviso works is it says that

24 provided, however, with respect to a contributing chartered

25 organization, abuse claim is limited to and then there was a

 1  whole series of provisions.  It's limited to a claim that's

 2  attributable to, arises from or based upon in whole or in

 3  part abuse that took place occurred prior to the petition

 4  date.  And I'm concerned with that in whole or in part

 5  because of some of the claims, and this is, ultimately, Your

 6  Honor, a confirmation issue.  But we're going to get to

 7  confirmation and we're going to be making this argument, and

 8  I just want to be clear if this is the release that the

 9  debtor wants to go out with, then that's the definition they

10  want to go out with.

11          So that's the first concern.  And the second is

12  when it says that is limited to a claim that's attributable

13  to --

14          UNIDENTIFIED:  Do you need the papers to deal with

15  this or --

16          THE COURT:  Excuse me, Mr. Patterson.  I'm hearing

17  somebody's cross conversation, we're all hearing it.

18          Mr. Patterson, yeah?

19          MR. PATTERSON:  Thank you, Your Honor.  It has a

20  series of includings, so the first one is about five lines

21  down, including a claim that seeks monetary damages,

22  including fraud and the inducement, including negligent

23  hiring, including any theory, and this is the key one,

24  including any theory based on public policy or failure to act

25  by a protected party and so on and so forth, or for whom a

1  protected party or limited protected party is alleged to be

2  responsible in connection in whole or in part with the

3  contributing charter organizations involvement in or

4  sponsorship of one or more scouting units.  The -- as I read

5  the grammar of this section, the limitation of involvement in

6  the scouting units is applicable only to the prior including

7  any theory based upon, but not applicable to the entire

8  *proviso*.

9          THE COURT:  Okay.  Well, I had to write on

10  something like this once.  I think it was on a dip document,

11  what did the proviso mean, and what did it relate back to,

12  and, you know, pulling out Scalia's book on -- shoot, what's

13  the one he and Garner have on different --

14          UNIDENTIFIED:  Yeah.

15          THE COURT:  Yeah, that one, and, you know, we

16  don't want to end up in that situation.  So I would ask the

17  parties to look at the definition of abuse claim to make sure

18  that it or its use in the releases is clear that there is no

19  non-BSA-related activity or conduct that is being released

20  here because I think that is just basic to what we're doing.

21          And if there is a protected party that has

22  exposure or liability and I'm not prejudging any of that, but

23  they have exposure in more than one capacity in a BSA-related

24  and a non-BSA- related, that the non-BSA-related conduct is

25  not being released.  It's not being included here.

1        MR. PATTERSON:  And just given the way that these

2  documents inter-relate with each other, I mean it's

3  frequently the case that you put a sentence like that in.

4        THE COURT:  Yeah.  It may be the -- I hate these

5  sentences, too, for the avoidance of doubt or notwithstanding

6  the above, or, you know, all the sentences we hate that are

7  qualified, but it might be very necessary in this context to

8  be clear on that.

9        MR. LINDER:  I think what I'd propose to do, Your

10  Honor, and I'm happy to work with Mr. Patterson on this is to

11  move that qualification relating to involvement in or

12  sponsorship of scouting units that key nexus between the

13  abuse and scouting, to move that up to maybe right after the

14  *proviso* to make it apply to everything that comes after or

15  otherwise to make it -- make it work better because we

16  certainly don't want any implication that we're hiding the

17  ball or otherwise constructing this provision to accomplish

18  something that I think you represented last week we're not

19  trying to accomplish.  We're only (inaudible) in scouting-

20  related claims.

21        MR. PATTERSON:  That certainly helps, and it takes

22  away my opportunity to argue the -- the rule of the prior

23  antecedent or the last antecedent.

24        THE COURT:  Yeah, whatever that is.

25        MR. PATTERSON:  Whatever that is, exactly.

1           But -- but even with that, Your Honor, when we

2   have these terms that say arises from, is based upon, results

3   from in whole or in part, directly or indirectly, or relates

4   in any way, that -- we -- we -- I think we would benefit from

5   having the stop sign as well because this definition can take

6   you a long way before you stop if you don't understand the

7   Court's intention that this is not intended to apply to non-

8   scouting-related abuse.

9           THE COURT:  Right.  I -- I do think that it would

10  be helpful.  You know, you -- this is one sentence that's a

11  page, and I think it would be helpful if -- well, fix this

12  however best grammatically it works to accurately reflect

13  what we're talking about.  But I also think it would be

14  helpful to have a separate sentence from this definition that

15  makes it crystal clear that no non-BSA-related conduct is

16  being released.  I think that is really helpful, and it will

17  be helpful down the line, and I think it's non-

18  controversial.  So let's just make sure it says that.

19          MR. BJORK:  Your Honor, may I be heard very

20  briefly?  Jeff Bjork from Latham and Watkins.

21          THE COURT:  Mr. Bjork?

22          MR. BJORK:  Hi.  Here on behalf of TCJC.  I'm

23  happy to look at the language because I think in part it's

24  our language that we've been working with the debtor on.  I

25  would just say that in terms of the unrelated to scouting

1  absolutely is not covered, not intended to be covered by the

2  scope of the TCJC injunction.  But the settlement does

3  encompass any allocated liability that relates to scouting-

4  related conduct.

5         All I'm raising, Your Honor, is it's complicated

6  because it's -- it's claim by claim, fact by fact, and I

7  don't want to get into it right now because it's late for you

8  especially.  But it is something that I was going to call

9  Mr. Patterson about and we're speaking to Mr. Smola about

10 because it's not -- it has to encompass our allocated share

11 as part of the settlement.  And so there's mixed facts

12 depending upon the claimant and the claim.  Every claim that

13 was filed in this case asserts it's BSA related.

14        And they may also, certain claims, assert that

15 there is some church connection as well.

16        THE COURT:  Yes.

17        MR. BJORK:  That's fact-specific.

18        THE COURT:  Yes.

19        MR. BJORK:  So I'm not trying to prejudge it now.

20 I'm just saying it's something that we would want to brief to

21 you and -- and -- and argue at the appropriate time.

22        MR. PATTERSON:  If that's the case, that could be

23 fairly straightforward, because then you would take out in

24 whole or in part, and you would just define the -- allocable

25 liability.  And keep in mind, Your Honor, I'm not consenting

1  to any of this.  I'm just trying to make it accurate or

2  understandable for -- for someone like me.

3            MR. BJORK:  I think our concern, Mr. Patterson

4  is --

5            THE COURT:  He says modestly.  So I'll let the two

6  of you all speak and --

7            MR. BJORK:  Okay.

8            THE COURT: -- loop in the debtors obviously on

9  this, but, yes, we had sort of a similar discussion I guess

10 it was last week that about allocable shares.  And I -- that

11 concept I fully appreciate, and, yes, if some jury were to

12 say 10 percent is allocable to BSA and 70 percent is

13 allocable to the church, and, you know, whatever is left, 20

14 percent is allocable to some family member, that's -- I

15 understand those distinctions, and I think that is what this

16 needs to reflect.

17            But, yes, the allocable share of the church's

18 liability that's BSA-related, I understand to be being

19 released, and I don't think Mr. Patterson disagrees with

20 that.  So it just has to be accurately reflected.

21            Hopefully I didn't confuse things more on that.

22            MR. PATTERSON:  Crystal clear.

23            MR. BJORK:  Tom, I'll call you shortly.

24            THE COURT:  Okay.  What else?

25            MR. LINDER:  I think that's it, Your Honor, on

1  disclosure statement.

2          THE COURT:  Okay.  So --

3          MR. SCHIAVONI:  I'm sorry, Mr. -- Your Honor,

4  there was a schedule of insurance policies that was going to

5  be added to the disclosure statement.  I'm just not sure

6  whether you ended up adding the -- a column for the SIRs and

7  the deductibles to it.

8          MR. LINDER:  Your Honor, we did file revised

9  schedules to -- those are schedules to the plan, schedule 2

10  and schedule 3.  We made extensive modifications to those

11  schedules.

12          THE COURT:  I would ask that you take a look at

13  it, Mr. Schiavoni.  I do remember quickly thumbing through

14  schedules that had changes to them.  Why don't you take a

15  look, and if there's any issue contact Mr. Linder.

16          MR. LINDER:  I think the issue on that, Your

17  Honor, and I'm recalling that correspondence that we had with

18  Mr. Schiavoni, is that the SIRs and deductibles as opposed to

19  the other projected information that's set forth on that

20  chart are disputed.

21          So I believe what we did is we dropped footnotes

22  in an appropriate place indicating that those are disputed

23  issues among debtors and certain carriers.  So from our

24  perspective I don't believe it would be appropriate to try to

25  shoehorn that into the chart that was just intended to

1  contain objective information with regards to the policy.

2          MR. SCHIAVONI:  But, Your Honor, it's my

3  understanding and it's like I -- it's like I'm reading as

4  fast as I can, but it's my understanding that a change was

5  made to the plan or maybe it was the disclosure statement, in

6  connection with Zurich and others that modified the

7  description of the SIRs and then sort of adopted the -- that

8  there are, in fact, SIRs.

9          So if that's the case, and, again, we can try to

10  look at it overnight and deal with Mr. Linder tomorrow about

11  it, but they should be described and if just to, quote,

12  dispute whether other things are SIRs or deductibles.  It

13  seems like if you're going to present, you know, occurrence

14  limits, you might as well, it's like it's totally misleading

15  not to present the retain limits and the deductibles.  It --

16  it -- it gives a completely misleading presentation of the

17  chart.

18          MR. LINDER:  I would note, Your Honor, that my

19  colleague, Adrian Azer, who is with Hanes and Boone, BSA's

20  insurance coverage counsel is available to address this issue

21  as well to the extent --

22          MR. AZER:  Your Honor, may I be heard briefly on

23  this?

24          THE COURT:  Mr. Azer?

25          MR. AZER:  Going to Mr. Schiavoni's point, we and

1 the FCR and the coalition did negotiate language with Zurich

2 and certain insurers on this issue.  I don't think there was

3 any concession as to the existence of the SIR.  Again, going

4 to Mr. Schiavoni's point and Your Honor's comment, to the

5 extent, Mr. Schiavoni you would like to talk about it we are

6 certainly happy to go off line and address that language and

7 address any comments you have to the schedule and try to work

8 through it and come to some resolution that's acceptable.

9           But, yeah, I'm not sure the language we negotiated

10 with Zurich made that concession.

11           Ms. Quinn -- I don't know if Ms. Quinn has any

12 further addition on that.

13           THE COURT:  Okay.  Well, Mr. Schiavoni, I'll let

14 you talk to Mr. Azer about this.  I want to make sure you

15 have a chance to look at the language and look at the chart,

16 which I'm looking at, and let's see if that can be worked

17 out.

18           MR. SCHIAVONI:  Terrific.

19           THE COURT:  If not, I'll address it tomorrow.

20           MR. SCHIAVONI:  Great.

21           MR. LINDER:  Now I think we're done, Your Honor.

22           THE COURT:  Okay.  So tomorrow we may have some

23 cats and dogs disclosure statement, but I also have

24 confidence that you all are going to resolve all of this

25 overnight, and then what else?

1          MR. LINDER:  I Believe the last remaining category

2   is -- is the solicitation procedures order, Your Honor.

3          THE COURT:  Okay.  So that, the solicitation

4   procedures order, and the plain English, which might be

5   included in that, the plain English charter -- chartering

6   organization issues we've talked through?

7          MR. LINDER:  Correct, Your Honor.

8          THE COURT:  Okay.  Okay.

9          MR. STANG:  Your Honor?

10          THE COURT:  Mr. Stang?

11          MR. STANG:  The TCC, on its own behalf, and the

12   FCR and the coalition jointly have filed proposed letters.  I

13   am extremely sensitive to editing someone's letter because I

14   don't want them to edit mine, but there is one statement in

15   the FCR coalition letter that I think is really inaccurate.

16          And I don't know if you want to -- it's literally

17   one sentence.  And if you wanted to do that now, we could, or

18   if that's part of the solicitation, tomorrow.

19          THE COURT:  Have you all discussed it?  Have you

20   discussed it with them?

21          MR. STANG:  We -- we -- I have not, Your Honor.

22          THE COURT:  Then I'd like you to discuss it with

23   them first.

24          MR. STANG:  Okay.

25          THE COURT:  Okay.  I'm just making a list.

1            So the proposed letters, the plain English,

2    chartering organizations, the solicitation procedures,

3    meaning disclosure statement.  That should be it.  Okay.

4            MR. ABBOTT:  Your Honor, Derek Abbott, as long as

5    we're talking about tomorrow, Ms. Johnson had asked us to

6    remind all of the parties that the Zoom information that they

7    used for today's hearing is what they should use for

8    tomorrow.

9            We understood the Court had reserved noon on in

10   the afternoon, but there might be some greater specificity

11   that the Court could share with us at this point.

12           THE COURT:  Yeah.  I've got a morning evidentiary

13   hearing so we're going to start at 1:30.

14           And I think I will be on time.  If I find out that

15   I am going to be significantly late, I will let you know, but

16   I think that should do it from what counsel in the matter is

17   telling me and my own guestimation.

18           MR. ABBOTT:  Very well.  Thank you, Your Honor.

19   Much appreciated.

20           THE COURT:  So you'll have some additional time,

21   not to come up with more issues but to resolve the issues we

22   have on the table that are remaining.  No more new issues.

23           MR. RYAN:  Your Honor, the only -- the only thing

24   I would say is some of us are going to have to leave

25   relatively mid-afternoon to late afternoon to catch flights

1  for the mediation in New York.

2          THE COURT:  Okay.  Shoot.  Okay.  Let's -- let's

3  say 12:30, instead of 1:30.  That gives us an additional

4  hour, but I'm hoping that should be enough.

5          MR. RYAN:  Thank you.

6          THE COURT:  Because I certainly want people to get

7  on their planes.

8          MR. SCHIAVONI:  I was holding out hope that Your

9  Honor was going to say get a good night's sleep and stuff.

10          THE COURT:  No.  I don't get one, you don't get

11 one.  Okay.

12          MR. SCHIAVONI:  That was an attempt at humor, Your

13 Honor.  I'm sorry.

14          THE COURT:  It's been what?

15          MR. SCHIAVONI:  It was an attempt at humor.  I --

16          THE COURT:  I'm smiling.

17          Okay.  Okay, counsel.  Well, thank you.  That

18 concludes tonight.

19          I will see you tomorrow at 12:30.

20      (Proceedings concluded at 7:08 p.m.)

21

22

23

24

25

1                          CERTIFICATION

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    /s/ William J. Garling                    September 29, 2021

10   William J. Garling, CET**D-543

11   Certified Court Transcriptionist

12   For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25