```
 1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3                                    .    Chapter 11
       IN RE:                         .
 4                                    .    Case No. 20-10343 (LSS)
       BOY SCOUTS OF AMERICA AND      .
 5     DELAWARE BSA, LLC,             .
                                      .    Courtroom No. 2
 6                                    .    824 North Market Street
                                      .    Wilmington, Delaware 19801
 7                                    .
                        Debtors.      .    Friday, November 19, 2021
 8     . . . . . . . . . . . . . . .       10:00 A.M.

 9                       TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                  UNITED STATES BANKRUPTCY JUDGE

11     APPEARANCES:

12
       For the Debtor:          Derek Abbott, Esquire
13                              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                1201 North Market Street, 16th Floor
14                              Wilmington, Delaware 19899

15                              - and -

16                              Jessica C. Lauria, Esquire
                                Glenn Kurtz, Esquire
17                              WHITE & CASE LLP
                                1221 Avenue of the Americas
18                              New York, New York 10020

19
20     Audio Operator:          LaCrisha Harden

21     Transcription Company:   Reliable
                                1007 N. Orange Street
22                              Wilmington, Delaware 19801
                                (302)654-8080
23                              Email:  gmatthews@reliable-co.com

24     Proceedings recorded by electronic sound recording; transcript
       produced by transcription service.
25
```

1   APPEARANCES (Cont'd):

2   For the Debtors:           Adrian Azer, Esquire
                               HAYNES & BOONE LLP
3                              800 17th Street NW, Suite 500
                               Washington, DC 20006
4

5   For Zurich Insurers:       Mark Plevin, Esquire
                               CROWELL & MORING LLP
6                              3 Embarcadero Center, 26th Floor
                               San Francisco, California 94111
7
                               - and -
8
                               Kelly Currie, Esquire
9                              CROWELL & MORING LLP
                               590 Madison Avenue, 20th Floor
10                             New York, New York 10022

11  For Marc J. Bern &         William Sullivan, Esquire
12  Partners:                  SULLIVAN HAZELTINE ALLINSON LLC
                               919 North Market Street
13                             Wilmington, Delaware 19801

14  For Century:               Tancred Schiavoni, Esquire
                               O'MELVENY & MYERS LLP
15                             Times Square Tower
                               7 Times Square
16                             New York, New York 10036

17
    For Liberty Mutual:        Kim Marrkand, Esquire
18                             MINTZ LEVIN COHN FERRIS GLOVSKY
                                  & POPEO PC
19                             One Financial Center
                               Boston, Massachusetts 02111
20
    For the Coalition of       Cameron Moxley, Esquire
21  Abused Scouts for          BROWN RUDNICK LLP
    Justice:                   7 Times Square
22                             New York, New York 10036

23  For the FCR:               Emily Grim, Esquire
                               GILBERT LLP
24                             700 Pennsylvania Avenue, SE
                               Suite 400
25                             Washington, DC 20003

1  <u>APPEARANCES (Cont'd)</u>:

2  For Krause & Kinsman:     Bernard Conaway, Esquire
                            CAMPBELL & LEVINE, LLC
3                           222 Delaware Avenue, Suite 1620
                            Wilmington, Delaware 19801
4

5  For Slater Slater         Justin Alberto, Esquire
   Schulman:                 COLE SCHOTZ P.C.
6                           500 Delaware Avenue, Suite 1410
                            Wilmington, Delaware 19801
7

   For the U.S. Trustee:     David Buchbinder, Esquire
8                           UNITED STATES DEPARTMENT OF JUSTICE
                            OFFICE OF THE UNITED STATES TRUSTEE
9                           844 King Street, Suite 2207
                            Lockbox 35
10                          Wilmington, Delaware 19801

11
   For Eisenberg             Daniel Hogan, Esquire
12 Rothweiler, Winkler,      HOGAN MCDANIEL
   Eisenberg & Jeck:         1311 Delaware Avenue
13                          Wilmington, Delaware 19806

14 For Tort Claimants:       James O'Neill, Esquire
                            PACHULSKI STANG ZIEHL & JONES LLP
15                          919 North Market Street, Suite 1700
                            Wilmington, Delaware 19801
16
                            - and -
17
                            Richard Pachulski, Esquire
18                          PACHULSKI STANG ZIEHL & JONES LLP
                            10100 Santa Monica Blvd., 13th Floor
19                          Los Angeles, California 90067

20                          - and -

21
                            Jeffrey Schulman, Esquire
22                          PASICH LLP
                            757 Third Avenue, 20th Floor
23                          New York, New York 10017

24

25

1 | APPEARANCES (Cont'd):

2 | For Napoli Shkolnik:    Brett Bustamante, Esquire
3 |    NAPOLI SHKOLNIK PLLC
    360 Lexington Avenue, 11th Floor
4 |    New York, New York 10017

5 | For National Surety    Harris Winsberg, Esquire
    Corporation and    TROUTMAN PEPPER HAMILTON SANDERS LLP
6 | Interstate Fire:    Bank of America Plaza
    600 Peachtree Street NE, Suite 3000
7 |    Atlanta, GA 30308-2216

8 | For Ask LLP and    Lawrence Robbins, Esquire
    Andrews & Thornton:    ROBBINS, RUSSELL, ENGLERT, ORSECK,
9 |     & UNTEREINER LLP
    2000 K Street NW, 4th Floor
10 |    Washington, DC 20006

11 | For Kosnoff Law:    David Wilks, Esquire
12 |    WILKS LAW, LLC
    4250 Lancaster Pike, Suite 200
13 |    Wilmington, Delaware 19805

14 | For Travelers Insurance: Louis Rizzo, Esquire
    REGER RIZZO & DARNALL LLP
15 |    1521 Concord Pike, Suite 305
    Wilmington, Delaware 19803
16 |

17 | For Great American:    David Christian, Esquire
    DAVID CHRISTIAN ATTORNEYS LLC
18 |    P.O. Box 9120
    Mission, Kansas 66201

19

20

21

22

23

24

25

1  MATTERS GOING FORWARD:

2  2. Motion of Marc J. Bern & Partners LLC to Quash Subpoena to
   Produce Documents Issued to KLS Legal Solutions LLC (D.I.
3  6380, filed 9/27/21)

4      **Court's Ruling:  Matter Moved to November 29th.**

5  5. Letter to the Honorable Chief Judge Laurie Selber
   Silverstein from Certain Insurers' to Respectfully Request
6  this Court Compel the Boy Scouts of America and Delaware BSA,
   LLC to Comply with Court' October 25, 2021 Order (D.I. 7198,
7  filed 11/12/21)

8      **Court's Ruling:   44**
9
10 6. Letter to the Honorable Chief Judge Laurie Selber
   Silverstein from American Zurich Insurance Company Regarding
   Certain Insurers' Motion to Quash Notices of Deposition for
11 Individual Witnesses (D.I. 7205, filed 11/14/21)

12 7. Letter to the Honorable Chief Judge Laurie Selber
13 Silverstein from Mark D. Plevin Regarding Certain Insurers'
   Motion to Quash and/or Limit Rule 30(b)(6) Deposition Notices
14 to Insurers (D.I. 7206, filed 11/14/21)

15     **Court's Ruling:   130**

16 8. Letter to the Honorable Chief Judge Laurie Selber
   Silverstein from Kelly T. Currie Regarding Insurers' Omnibus
17 Motion to Compel Kosnoff Law PLLC, AVA Law Group, Napoli
   Shkolnik, PLLC, Krause & Kinsman Law Firm, Andrews & Thornton,
18 Attorneys at Law, and ASK LLP to Respond to Document Requests
   and Interrogatories (D.I. 7239, filed 11/15/21)
19
20 9. Letter to the Honorable Chief Judge Laurie Selber
   Silverstein from Kelly T. Currie Regarding Certain Insurers'
21 Motion to Compel Compliance with the Subpoena to Produce
   Responsive Documents Served on Slater Schulman LLP (D.I. 7240,
22 filed 11/15/21)

23 10. Letter to the Honorable Chief Judge Laurie Selber
   Silverstein form K. Currie Regarding Insurers Motion to Compel
24 Compliance with the Subpoena to Produce Responsive Documents
   Served on Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck,
25 P.C. (D.I. 7241, filed 11/15/21)

11. Letter to the Honorable Chief Judge Laurie Selber
Silverstein from Jeffrey Schulman Regarding TCC and Certain
Insurers' Discovery (D.I. 7253, filed 11/16/21)

**Court's Ruling:  Motions Continued**

1         (Proceedings commence at 10:02 a.m.)

2         THE COURT:  Good morning, counsel.  This is Judge

3   Silverstein.  We're here in the Boy Scouts of America

4   bankruptcy, Case 20-10343.

5         I will turn this over to debtors' counsel.

6         MR. O'NEILL:  Your Honor, sorry to interrupt, its

7   James O'Neill.

8         THE COURT:  Mr. O'Neill.

9         MR. O'NEILL:  Can you hear me okay?

10         THE COURT:  Yes.

11         MR. O'NEILL:  Your Honor, good morning.  James

12   O'Neill, Pachulski Stang Ziehl & Jones, on behalf of the tort

13   claimants committee.

14         Your Honor, I am sorry to interrupt this morning,

15   but I am joined today by my partner, Richard Pachulski, who

16   would like to address the court.  So I would like to turn it

17   over to Mr. Pachulski.

18         THE COURT:  Mr. Pachulski.

19         MR. PACHULSKI:  Thank you so much, Your Honor.  I

20   apologize, I was not intending to attend today's hearing, at

21   least not until about 6:45 Pacific this morning, 9:45 your

22   time.  And I did ask Mr. O'Neill if he could introduce me

23   first.  As I said, I did not intend to join, but I would like

24   to explain why I did if that would be okay with Your Honor.

25         Again, Your Honor, just for the record Richard

1 Pachulski of Pachulski Stang Ziehl & Jones on behalf of the

2 creditors committee in the BSA case.  If that is okay with

3 Your Honor I would like to make a short presentation.

4          THE COURT:  You may.

5          MR. PACHULSKI:  Thank you, Your Honor.

6          For background, Your Honor, as to why I am here

7 yesterday I sent an email to the major players in this case

8 that I was going to be lead counsel for this matter going

9 forward.  And I sent it as part of an email that had

10 originally been sent in the morning, basically, to all of

11 those parties asking that all future correspondence and

12 pleadings be served on myself and my partner, Alan Kornfeld,

13 who is going to lead the litigation in the matter.

14          That that was how the matter was going to go

15 forward; that I had spoken to the committee, that was the

16 committee's determination, and that I would go forward, and I

17 would rearrange my schedule so that I could provide virtually

18 full time to this case which was not the easiest thing for my

19 calendar, but I thought it was critical.

20          In that respect, Your Honor, I wanted to make it

21 very clear at the beginning that I sincerely apologize on

22 behalf of the firm for what has happened. I am not here to

23 make any excuses for it.  We will deal with it another day,

24 but simply put it should not have happened.  And as the person

25 who helped start the firm I am the one who needs to take

1  responsibility even though I was not -- I have not, to my

2  recollection, billed a single minute to the case.

3        So the reason that I am actually here is that Mr.

4  Molton, this morning, had sent an email to me and to the other

5  parties who had gotten my email and asked two questions.  The

6  second question, frankly, was, was I going to appear today.

7  And since I really don't think it's a great idea just to

8  appear at hearings when it's not on the agenda.  I had decided

9  yesterday, and Mr. Kornfeld is on and he knew the position

10 that to try to bring the temperature down, because the

11 temperature is up which is one of the major reasons that I am

12 joining this and that the TCC, which, frankly, is not

13 responsible for any of this in my view, that if this issue

14 came up that Mr. Kornfeld would respond to it.

15       Mr. Molton asked if I would attend and, frankly, I

16 sent an email saying I wasn't going to attend.  I had spoken

17 to Mr. Kornfeld to confirm what we were going to do, that he

18 would be prepared if came up and realized that that was wrong,

19 that I should appear before Your Honor.  So I changed my mind

20 and decided to appear.

21       The second question, Your Honor, frankly, which is

22 why I didn't want this to turn into -- go in a different

23 direction is Mr. Molton asked what Mr. Stang and Mr. Lucas, if

24 they were going to be walled off in the case.  I said they are

25 not going to be walled off because, frankly, as someone who

1  hasn't spent a minute on this case and did not have their

2  historical knowledge would just not work.  I don't think it

3  would be fair for the TCC.  Whether parties decided to simply

4  seek a disqualification, and assuming Your Honor granted the

5  disqualification, that without Mr. Lucas's and Mr. Stang's

6  knowledge, and because of an extraordinarily serious error

7  that was made, that they were going to have to be involved.

8  That is just the reality of the situation.  I informed them of

9  that.  And if people want to disagree with the decision that

10  was made by the TCC and myself then they have every right to

11  file whatever motion.

12          What I am here for, effectively, Your Honor, and

13  why I agreed to go forward and lead the representation is

14  aside from the gravity of the case in general and the gravity

15  of what we have done, I hope that I can bring the temperature

16  down and find a remedy for what has happened or, at least,

17  assist in a remedy.  I don't have any history in this case.  I

18  know that the party's emotions are really high.  And I have

19  done this for a really long time, and I hope I can bring some

20  help to this case to either get it resolved or, at least,

21  litigate it in a courteous and thoughtful way.

22          I get why everybody has high emotions. I have

23  watched it and, frankly, I made a decision years ago, Your

24  Honor, that this was the type of case that was so emotionally

25  charged that it was better I work on other matters, but that

1  is just not an option at this point.  And I intend to give it

2  my all to try to get it resolved and to demonstrate to the

3  court and to the parties that we are doing the right thing.

4  We have built a reputation on doing the right thing and we're

5  going to fix it in this case.

6           So if people want to file motions they should file

7  them.  I think it would be best, in terms of bringing the

8  temperature down, to wait on some of it until the end of the

9  case to see where we are at.  I think the status conferences,

10 based on what I have seen from innumerable emails from

11 survivors and others, is not helping the voting situation, but

12 that is Your Honor's and other parties determination.

13          The press has made this a (indiscernible) which I

14 certainly understand, but I don't think having multiple status

15 conferences for things that aren't changing will be that

16 helpful, but, obviously, Your Honor, that is Your Honor's

17 determination.

18          So I wanted to, at least, after first saying no,

19 explain to Your Honor and not find out that Your Honor was

20 upset because I didn't show-up now that I'm leading the case.

21 So I changed other plans.  I had a conflict, but it didn't

22 matter, this is more important than any other matter at this

23 point.  I am happy to answer any of Your Honor's questions.  I

24 can assure, Your Honor, I am not tone deaf to what is going on

25 in this case.  I am -- I have very good hearing as to what is

1  going on.  I have appeared many times before Your Honor. And I

2  understand how Your Honor operates and what your expectations

3  are.  And I intend to meet those expectations. I intend that

4  everyone in our firm and the TCC all meet the expectations.

5          This is on us.  This is not on the TCC.  And I want

6  to make that very clear.  And if Your Honor has any other

7  questions for me I would be happy to answer them. I apologize

8  in advance, at some point I will have to step off.  Frankly, I

9  know very little about what is going on at today's hearing

10  because this is really more Mr. Kornfeld then others to

11  understand it in terms of dividing up responsibilities, but

12  even if Your Honor said I'd like you to stay on the entire

13  time I would do that and make some other arrangements.

14          Again, I am happy to answer any questions.  I

15  apologize for having Mr. O'Neill interrupt, but I thought it

16  was important that you knew that a change had been made and

17  what the intentions of the firm are.

18          THE COURT:  Thank you very much.  No, I do not have

19  any questions for you, Mr. Pachulski.  And, certainly, you can

20  attend or not consistent with your schedule and your duties.

21  So on my account you do not need to stay at the hearing for

22  the entire time.

23          MR. PACHULSKI:  Well, thank you.  If I thought that

24  I was going to have to attend today I assure, Your Honor, I

25  would not have made -- well I would have had a board meeting

1  take place at another time which is what it is, it's a

2  conflict in that respect.  I did want to be on and wanted to,

3  at least, present to Your Honor as to what my intentions and

4  the firm's intentions are.

5            THE COURT:  Okay.  Thank you.

6            Let me remind people, I'm hearing some open mics.

7  So, please, everyone check your audio and make certain that

8  it's muted. If we do have difficulties with your particular

9  audio you may find that you get disconnected from the hearing.

10  So, please, check that your audio is muted.

11            Mr. Abbott.

12            MR. ABBOTT:  Thank you, Your Honor.  Obviously, not

13  troubled at all by Mr. O'Neill's interruption and Mr.

14  Pachulski's discussion, but I do think it warrants a little

15  response, if I may.  So I am just going to turn it over to Ms.

16  Lauria, if I might, Your Honor.

17            MS. LAURIA:  Thank you, Mr. Abbott.

18            This is Jessica Lauria, White & Case.  Your Honor,

19  I will be brief.  I just wanted to assure the court and Mr.

20  Pachulski that we were actually not intending to discuss the

21  issues pertaining to the Pachulski firm today.  I also was not

22  planning to appear because we have many other very important

23  issues before the court today.

24            As Your Honor knows from Wednesday we've got

25  discovery that is ongoing with respect to that matter.  So

1  that is all I wanted to assure yourself, Your Honor, as well

2  as Mr. Pachulski.

3          THE COURT:  Okay.  Thank you.

4          Let me say to Ms. Lauria and any other counsel that

5  are on the hearing, at the hearing, if you do not need to be

6  here for purposes of what is going forward today do not feel

7  constrained to be here, okay.

8          Mr. Abbott, let's get to the agenda.

9          MR. ABBOTT:  Thank you, Your Honor.  Again, Derek

10 Abbott, Morris Nichols, for the debtors.

11          Your Honor, we had sent over, I believe, a second

12 amended agenda to run through today. I wanted to make sure the

13 court had that.

14          THE COURT:  I do.

15          MR. ABBOTT:  Thank you, Your Honor.

16          Your Honor, I think the first matters to address

17 are items two and three.  Those, we understand, have been

18 agreed by the parties to be adjourned to sometime next week,

19 subject to the court's availability.  We have heard that the

20 23rd is available for some of these matters.  So with the

21 court's permission we will just put those on the agenda for

22 the 23rd if that is acceptable to the court.

23          THE COURT:  That is and I don't recall if we

24 provided a time.

25          MR. SULLIVAN:  Your Honor, may I be heard on this?

1  Bill Sullivan.

2            THE COURT:  Mr. Sullivan.

3            MR. SULLIVAN:  Your Honor, for the record Bill

4  Sullivan on behalf of Marc Bern & Partners.

5            Our motion to quash is item two on the agenda.  I

6  did speak with counsel to Century about this that it was not

7  going forward and that we are waiting on dates yesterday.

8  That is as far as it got, but my client, who has provided a

9  declaration, is not available on Tuesday the 23rd, but the

10  29th, I understand, is being scheduled at two o'clock for, at

11  least, one matter.

12            So I would request that our matter be moved to the

13  29th as well.  I think there is a matter involving ADA.  There

14  was a letter exchanged yesterday and that is being moved to

15  the 29th.  So unless anyone has an objection to that I think

16  that would be appropriate for us because of the conflict with

17  the 23rd.

18            THE COURT:  It's okay with me.  Is that an issue

19  for Century?

20            MR. SCHIAVONI:  That's fine, Your Honor.  Thank

21  you.

22            THE COURT:  Then item number two, the motion of

23  Marc J. Bern & Partners, will be continued until the 29th at

24  2.

25            MR. ABBOTT:  Thank you, Your Honor.

1          I believe the next item going forward on the agenda

2    is agenda item number five which is Docket No. 7198.  That is

3    a letter from certain insurers.  So I will turn it over to

4    their counsel, Your Honor.

5               THE COURT:  Okay.

6               MS. MARRKAND:  Good morning, Your Honor.

7               THE COURT:  Good morning.

8               MS. MARRKAND:  This is Kim Marrkand for Liberty

9    Mutual and certain insurers.  Thank you very much, Your Honor,

10   for the opportunity to be heard.

11              First, Your Honor, I would like to address the

12   context and circumstances that led to our filing the motion to

13   compel.  Your Honor, that is Docket No. 7198.  Second, I would

14   like to address the scope of the court's October 25th ruling

15   on the mediation privilege.

16              Turning, Your Honor, first, to what brought us

17   here, as the court will recall, debtors' filed their motion

18   for a protective order on September 17th and that is Docket

19   No. 6288.  Among other things, Your Honor, debtors urged the

20   court to, in effect, call the balls and strikes on debtors'

21   claim that the mediation privilege foreclose the insurers from

22   seeking discovery on communications debtors denominated as

23   mediation privilege.

24              In that motion, Your Honor, the debtors urged the

25   court to address the scope of the mediation privilege not on a

1 document by document basis, but broadly so that all parties

2 would have a road map for what was or was not appropriate for

3 discovery.  The court, as early as July, at the July 27th

4 hearing, and as recently, Your Honor, as a few days ago, on

5 Wednesday, urged the parties to bring disputes before the

6 court promptly especially given, that is as recently as

7 Wednesday, Your Honor, you stated that the January 24th

8 confirmation date remains in place.

9          While we accepted the court and the debtors'

10 invitation to do just that, which is to bring disputes

11 promptly before the court, we have declined the debtors'

12 proposal to, in effect, police the debtors' productions for

13 compliance with their discovery obligations and then bring a

14 series of piecemeal document by document disputes before the

15 court with all the delay that entails.

16          As the court is aware, the debtors sought to

17 protect from disclosure all documents either on mediation

18 privilege or attorney/client privilege three general topics;

19 board related communications, communications among mediation

20 parties regarding the Hartford settlement agreement, the TCJ

21 settlement agreement, the restructuring support agreement, the

22 plan, the TDP's and other documents filed with the plan, and,

23 the third category, drafts of settlement proposals exchanged

24 between mediation parties including the plan, TDP's and other

25 documents filed with the plan.  That is all set forth, Your

1  Honor, in Paragraph 9 of their motion, Docket No. 6288.

2          After briefing and oral argument the court issued

3  its ruling on October 25th.  Your Honor declined to grant the

4  debtors the sweeping immunity they sought based on the

5  mediation privilege and explicitly addressed "issues

6  surrounding the trust distribution procedures" because, as

7  Your Honor noted, "Discovery disputes related to the TDP's had

8  crystallized."

9          As set forth in our motion, Your Honor, discovery

10  disputes have crystallized not only regarding drafts of the

11  TDP's, but particularly regarding the plan and related plan

12  documents.  As set forth in the debtors' opposition, the

13  debtors have forthrightly told the court that they are

14  redacting plan term sheets to exclude information that does

15  not relate to the TDP's.

16          As set forth in our motion, Your Honor, as early as

17  February 2nd, 2021, Mr. Molton sent an email to Ms. Lauria,

18  Mr. Andolina and Mr. Linder attaching a term sheet describing,

19  in his words -- and this is the cover email set forth in our

20  motion, Your Honor.  In his email, Mr. Molton says that -- Mr.

21  Snow, I think you're not muted.  The proposed modifications in

22  his email addressing the proposed modification to the debtors'

23  plan, the initial terms of the TDP's, the terms of the

24  settlement trust and the coalitions proposed claim valuation

25  matrix.

1        Most importantly, however, Mr. Molton instructed

2    the debtors not to file their proposed plan and that the

3    debtors were to engage on the coalition's plan.  In other

4    words we, the coalition, not the debtors, are now in charge.

5        As the court will recall, at Paragraph 21 of

6    debtors' motion for protective order, the debtors said "The

7    debtors are not withholding any such information" and as such,

8    Your Honor, refer to regarding to what the debtors considered

9    when they considered it or what they decided, "Other then,

10   this is in their motion, the back and forth of mediation."

11       Mr. Molton's directive to the debtors not to go

12   ahead with filing their plan without the coalition's approval

13   is certainly more than the breezy back and forth debtors

14   describe to the court.  This instruction, Your Honor, goes to

15   the heart of Section 129(a)(3)'s requirement that the plan be

16   proposed in good faith and not by any means forbidden by law.

17       The debtors also told the court, in their motion,

18   that the insurers were incorrect that the plaintiffs or

19   claimants' counsel had drafted the TDP's and that "The debtors

20   drafted them."  That is in Paragraph 40, Your Honor, of Docket

21   No. 6288.  The debtors also referenced in that same paragraph

22   the May to June timeframe thereby implying that no drafts had

23   been created or exchanged beforehand.

24       This statement, Your Honor, follows what the

25   debtors said in Paragraph 37 that the debtors have nothing to

1  hide.  Had Your Honor not denied debtors' motion to withhold

2  Mr. Molton's email neither the court nor the insurers would

3  ever have seen this document which shows that the coalition

4  drafted, as Mr. Molton admitted, the initial terms of the

5  TDP's as early as February.

6          This is the context, Your Honor, in which we filed

7  our motion which brings me to the scope of Your Honor's

8  October 25th ruling.  In all candor, Your Honor, Your Honor

9  knows what Your Honor ruled, but you let the parties -- you

10 explained your rationale.

11         First, you focused on the Section 1129(a)(3)

12 standard that for confirmation a plan must be proposed in good

13 faith and not by any means forbidden by law.  It must be

14 proposed with honesty and good intentions.  Your Honor then

15 explained that for plan confirmation you will look at the

16 totality of the circumstances including whether a plan is

17 proposed with ulterior motives.

18         Your Honor cited to the Third Circuit's decision in

19 Combustion Engineering as did the debtors which, among other

20 things, noted at the very beginning that it was trying to

21 address how "An injured person with a legitimate claim (where

22 a liability and injury can be proven) obtains appropriate

23 compensation."  Absent proof of liability and injury,

24 standards missing in the TDP's, how can anyone be paid.

25         Combustion Engineering, as the court is well

1  familiar, also raised good faith under Section 1126 regarding

2  stub claims and allegations of vote buying.  This is an issue

3  that the court has recently had to focus on, but it's not an

4  issue that has not been raised previously.

5         Your Honor then responded to debtors' argument that

6  for plan approval the debtors need only put in evidence

7  regarding the process of a mediation.  As Your Honor

8  explained,

9         "Debtors motivation in proposing the plan, others

10 participation in drafting the plan, as well as the requirement

11 that the plan fairly achieve results consistent with the

12 purposes of the bankruptcy code permit in an appropriate case

13 evidence beyond what the Boy Scouts characterizes as process."

14        You then turned, Your Honor, to findings R, S and T

15 where you pointed out that those findings "Clearly open up

16 discovery related to the correctness of the findings."  Your

17 Honor, you reiterated that point later when you said discovery

18 regarding these findings is appropriate.

19        Your Honor then stated you were denying debtors'

20 motion to shield discovery communications, oral or written,

21 regarding the TDP's based on the mediation privilege as the

22 court concluded that that was the sole issue that it

23 crystallized or was right at that point in time.  Now, Your

24 Honor, finding R is specifically tied to the plan as it seeks

25 a finding that the TDP's procedures and criteria are

1  appropriate and provide adequate and proper means for

2  implementation of the plan in compliance with Section 1123

3  and, otherwise, comply with the bankruptcy code and applicable

4  law.

5       Finding T, Your Honor, is likewise tied to the plan

6  as it seeks a finding that the plan, the plan and the TDP's,

7  were proposed in good faith and satisfy Section 129(a)(3).

8  Mr. Molton's email and its attachment have squarely put at

9  issue the plan, drafts of the plan, the TDP's and drafts of

10  the TDP's, the terms and drafts of the settlement trust, and

11  the claims valuation matrix, and who was in control of the

12  plan and when.

13       The term sheet, Your Honor, which you do not have

14  in front of you, but I will make this representation, is quite

15  lengthy.  It was produced to the insurers in February of 2021.

16  I will note, just for a minute, that that was when the debtors

17  thought it was in their interest to provide us with that, but

18  now that the debtors' strategy has changed it actually took

19  the position that it did not have to produce the term sheet

20  and redacted over 90 percent of it.

21       Be that as it may, Your Honor, the important point

22  isn't how the debtors chose to designate this document.  What

23  is important here, Your Honor, is that in February of 2021 the

24  coalition directed the debtors, and this is a quote, Your

25  Honor, "No insurance neutrality provision shall be included in

1  the plan or related documents."  The term sheet also said the

2  coalition and the FCR would control any settlement the debtors

3  could make with the insurers.  Another provision, the debtors

4  "shall" consent to the coalition and the FCR's intervention

5  and any coverage action.  The last one I have chosen, Your

6  Honor, to illustrate is that the plan, the disclosure

7  statement, the trust agreement, the TDP's and other plan

8  documents shall be acceptable to the coalition in all

9  respects.

10         There are, at least, six other terms, Your Honor,

11  that show who controlled the pen. Going back, Your Honor, to

12  the selective production, this term sheet, the debtors cannot

13  produce the term sheet in February when they thought it was to

14  their advantage and now take the position nine months later

15  that they don't want the insurers to have the term sheet, but

16  much more importantly, Your Honor, they want to wall off

17  everything that happened after the term sheet was circulated.

18         The debtors' opposition, Your Honor, was surprising

19  in that it appeared to chastise the insurers for doing exactly

20  what the debtors did when they moved for a protective order.

21  They brought an issue, an important issue, before you to set

22  the boundaries for discovery.  That is exactly what we have

23  done, Your Honor.

24         This late date, Your Honor, no depositions have

25  gone forward on our end, Your Honor, it's for the simple

1  reason that were not going to start depositions or impose on

2  any witness to testify twice until we have all the responsive

3  documents.  It's noteworthy too, Your Honor, that in their

4  opposition the debtors even withheld certain documents

5  regarding the TDP's.

6        When the debtors moved, Your Honor, for their

7  order, their protective order, on September 17th they had

8  already logged 112 documents on a chart labeled BSA Chart of

9  Email Correspondence, Re TDP's.  That chart, Your Honor, is

10 attached as Exhibit 12 to their motion.

11       We quickly determined that the attachments from the

12 first two entries on that log were missing from the debtors'

13 production.  Because we have no idea what other materials

14 might have withheld, we asked debtors to certify that their

15 production was complete which they declined to do.  After we

16 filed our motion, Your Honor, debtors produced 426 documents

17 regarding the TDP's.  This is significant, Your Honor, because

18 debtors' admit the total number of TDP documents that they

19 produced is 783 meaning that over 50 percent of the TDP

20 related documents were produced after we filed our motion.

21       This all has to be looked at, I think, Your Honor,

22 in the context of the debtors' overall productions.  By

23 November 5th, Your Honor, the date by when debtors' production

24 should have been substantially complete, they had produced

25 approximately 679,000 pages.  Between November 5th and

1  yesterday debtors' produced approximately 15 more volumes of

2  documents comprised of 695,000 pages.  Thus, the debtors'

3  production has doubled since November 5th.

4          Turning briefly, Your Honor, to the coalitions

5  response it tries to decouple production of the claim

6  valuation matrixes from the TDP's, but the values are central

7  to the TDP's.  Indeed, finding R specifically seeks a finding

8  that the claims matrixes are appropriate and fair and

9  equitable.

10         The coalition makes one argument the debtors

11 rightly did not make that settlement related communications

12 are immune from disclosure, but as Your Honor well knows

13 Federal Rule 408 governs admissibility not discoverability of

14 settlement related communications.  Simply put, Your Honor,

15 the parties are at an impasse regarding the scope of Your

16 Honor's ruling.  We believe Your Honor was crystal clear that

17 we are entitled to discovery regarding the plan under Section

18 1129(a)(3) and particularly given the findings R, S and T, and

19 that the debtors are not entitled to wall off that discovery,

20 that material on the basis of the mediation privilege.

21         Given the volume of the debtors rolling

22 productions, which right now I think total approximately 23

23 volumes, and their withholding of documents that should have

24 been produced under any reading of Your Honor's ruling.  We

25 respectfully request, Your Honor, that the debtors be ordered

1  to complete their production forthwith and certify that they

2  have produced all responsive documents.

3          Thank you very much, Your Honor, for your

4  consideration and naturally I welcome any questions.

5          THE COURT:  Thank you.

6          I guess I want to make sure exactly I understand

7  the last request that the debtors complete their production

8  and they certify that they have done so by some date.

9          MS. MARRKAND:  Right.

10         THE COURT:  I want to make sure that I understand.

11 I do understand that there were documents that were not

12 produced related to the TDP's.

13         MS. MARRKAND:  Correct.

14         THE COURT:  I assume the debtors is going to tell

15 me that was, as they did in their response, inadvertent and

16 they will produce, if they haven't already, all TDP --

17 communications, documents related to the TDP's.

18         The second area is the claim matrixes.  So I am

19 just trying to divide them into areas.  So we have the TDP's,

20 the claim matrixes, I think the settlement trust document and

21 the plan.  Do I have the four areas correct?

22         MS. MARRKAND:  Yes, Your Honor.

23         THE COURT:  Okay.  I hear the argument being on the

24 breadth of my ruling which, by the way, that was even more

25 cringing then hearing one of my cases being talked about by a

1  panel, but thank you for running through that.  That is an

2  experience.

3       (Laughter)

4            THE COURT:  So it's the breadth of my ruling, but I

5  didn't hear you say that attorney/client or that you believe

6  you are entitled to anything that is protected by

7  attorney/client or work product privilege, is that correct?

8            MS. MARRKAND:  That is correct, Your Honor.  This

9  is solely on the scope regarding the mediation privilege.

10           THE COURT:  Okay that is what I thought, but you

11 had an extensive presentation.  So I wanted to make sure I am

12 hearing it correctly.  Thank you.

13           Let me hear from the debtors.

14           MR. KURTZ:  Good morning, Your Honor.

15           Glenn Kurtz from White & Case, on behalf of the

16 debtors.  Thank you.

17           Let me start with many -- a couple of introductory

18 remarks here, which is I think we were characterized as

19 chastising counsel for raising an issue promptly with respect

20 to discovery.  That's not actually right.

21           We're happy to have all the discovery issues raised

22 as promptly as possible.  Our problem is we've agreed to

23 produce everything at issue and they've refused to identify

24 anything that we haven't produced, and I'm going to address

25 that.

1          The second introductory comment I would make is

2    that very little of what was said today is either raised in

3    the motion and certainly was not raised at meet-and-confers.

4    And it's not well taken for us to be sort of blindsided with

5    issues in front of the Court, instead of working to resolve

6    things, as is required prior to getting to court.

7          And I think it's worth giving some context to

8    something else which is not part of this motion, which is

9    *seriatim* criticisms about the debtors' productions.  And I

10   don't want to give a lot of detail, because it's not before

11   the Court.  I will tell you, Your Honor, that we produced, we

12   substantially completed our productions on the dates that they

13   were due.  There was a big swap of documents that went out

14   that were purely local council charters of nominal, if any --

15   of nominal or any relevance.  And we also had to wait to

16   produce the documents that had the survivor names and

17   identifiers until after we got through the hearing and we

18   promptly produced after that.  Other documents have largely

19   been requests for information that weren't included in the

20   original requests, but that we accommodated anyway.

21         And in terms of a comparison, because we keep

22   getting these insurer suggestions that somehow the debtors

23   aren't doing what they need to do in contrast to the insurers,

24   I will say that Ms. Marrkand's client Liberty Mutual produced

25   30 pages when due on November 5, which turns out to be 1

1  percent of their production.  They've continued to make

2  productions, including as of last night.

3          Indian Harbor, Munich Reinsurance, and Old

4  Republic, the other moving insurers, none of them produced

5  anything when due on November 5th.  Some of them were

6  producing as recently as of last night.  So, they had not

7  small failures, but 100 percent failures.  We have not brought

8  that to the Court.  That's the way these cases work when

9  you're moving on the schedule that you're moving on.

10          But I am getting a little weary of hearing that

11  while the debtors produced hundreds of thousands of documents

12  when due and others produced nothing, that somehow it's the

13  debtors that are not following the schedule.

14          Now, as I think I tried to indicate in the letter,

15  we were a little surprised that this was filed, not because

16  it's not appropriate to get prompt resolutions of cases and

17  disputes, but rather, because we're not withholding any

18  documents that any moving insurer has identified.  And most of

19  today you heard, and most of the motion you read, related to

20  two documents that were inadvertently withheld.

21          We pointed out that -- well, I should first say

22  that they brought that to our attention and that very same

23  day, we said, that's inadvertent and we'll produce it, and we

24  did.

25          We then subsequently learned and pointed out to the

1  Court in our opposition that one of those documents had

2  already been produced.  So, it was in the files of the insurer

3  before they even came to us.  Now, they've flipped that on its

4  head to make a completely reckless and false assertion that

5  some of the drivers of the debtors' representation had gone

6  and reviewed documents, had decided they were changing stories

7  and theories, and then redacted something that had already

8  been provided.  That is completely false.  It is an

9  inadvertent failure to produce two documents out of over 1.3

10  million pages, which is not demonstrating any systemic problem

11  and it certainly was not strategic and there's no basis for

12  asserting that it was.

13          It would have been, I think, a little bit more

14  palatable to us if counsel had just said, Right, we didn't

15  notice that we had already gotten one, rather than trying to

16  find nefarious intent on the part of the debtors when they

17  know that none exists.  So, what dispute do we have, because

18  all the briefing and most of the argument relates to two

19  documents that have already been produced and were produced

20  before the motion was filed.

21          So, there's three categories the way we read it.

22  One is the TDPs.  And the insurers are arguing that the

23  debtors were failing to produce draft TDPs and that is

24  completely and utterly incorrect.

25          Starting on November 2nd, the debtors -- which is

1  before the date for substantial completion -- the debtors

2  began producing all of their draft TDPs and numerous other

3  TDP-related documents.  We have produced more than 150 drafts

4  of the TDPs among more than 750 TDP-related documents that

5  have been produced.  The debtors are not withholding any TDPs

6  and we're not withholding any TDP-related materials, as far as

7  we know.

8          And we have repeatedly confirmed that to the

9  insurers and they have not identified anything we haven't

10 provided.  So, all the arguments about what we're not

11 providing are inaccurate.

12         Something that was not raised today, as least I

13 don't think I heard as raised today, was that the debtors were

14 redacting drafts of the TPD.  That is untrue and the insurers

15 know that's untrue, because they had the TDPs and they can

16 confirm there are zero redactions.  The debtors have never

17 said that they were redacting the TDPs.

18         So, the TDP piece, which was really the thrust of

19 almost all of this, is a non-issue and I believe we have

20 completed our production on that.

21         The second category were claim matrices, and as far

22 as we know, we have produced all the claim matrices.

23 Certainly, the insurers have not identified anything that we

24 have withheld, nor have they identified any related deficiency

25 in our productions.  So, that wasn't an issue and it wasn't an

1  issue before the motion got filed.

2          And then we have the third category, which is

3  really the category that I thought we had a dispute, simply

4  not a legitimate dispute, and that is what was charged in the

5  letter as "related plan documents."  Now, initially, there is

6  no document request to the debtors for "related plan

7  documents," so there is nothing to move on today.  And that,

8  alone, is a fatal deficiency in the motion.

9          The debtors, however, have been extremely

10  cooperative in trying to get everybody information they want

11  to the extent it's reasonable, and I think we have gone beyond

12  proportionality in doing so.  And so we asked on a meet-and-

13  confer what are you referring to?

14          And they were unable to tell us.  They either

15  wouldn't or couldn't name a single document or a single

16  category of documents that would fall under this big term,

17  phrase "related plan documents."  And because they refuse to

18  provide us with any information or explanation whatsoever, we

19  are unable to identify those documents, discuss them, and

20  consider whether or not they would be appropriate for

21  production.

22          This not only makes it impossible to resolve a

23  dispute, but also violates meet-and-confer rules, which are

24  designed to prevent the exercise of burdening the Court with

25  disputes that may or may not be resolvable without judicial

1  intervention.

2       It is probably not lost on Your Honor that the

3  parties have repeatedly raised meet-and-confer violations in

4  connection with a number of disputes here, but those typically

5  have a live dispute and the fight really revolved around some

6  kind of timing issue, while parties said that there was no

7  meet-and-confer, while simultaneously arguing that they didn't

8  actually have to produce the information at issue.

9       Here, we haven't refused to produce any information

10  that's been identified to us.  And I'll give you an example of

11  how a meet-and-confer works when it's appropriate, and that

12  example is the identical meet-and-confer conference that we

13  had preceding this motion.  So, when we were getting off the

14  phone, because we couldn't get any answers from the moving

15  counsel as to what was meant by "related plan documents,"

16  counsel to AIG said, Well, they're looking for settlement

17  trust agreements.

18       We had no request for production addressing

19  settlement trust agreements.  Settlement trust agreements

20  wasn't raised in the preconference letter seeking a meet-and-

21  confer and it wasn't raised during the meet-and-confer until

22  the very end.  And we responded that day that we would provide

23  those documents and we then did provide those documents.

24       So, there's no dispute -- we have -- what I will

25  say is that the two instances in which the insurers identified

1  what they wanted, the two inadvertent documents, the two

2  documents that were inadvertently withheld, which turns out

3  there's only been one inadvertent document that was

4  inadvertently withheld and the settlement trust agreements,

5  which hadn't even before asked for, were all provided.

6         So, the motion should be denied.

7         But let me speak a little to the mediation issue

8  because that was not a discussion that we had either.  And let

9  me correct the facts, because we filed the motion for a

10 protective order with respect to mediation.  The insurers did

11 not look to expand beyond what was ultimately addressed.  The

12 insurers, themselves, are continuing to invoke mediation

13 privilege and withholding their documents.

14        So, the issue comes up, what got addressed by Your

15 Honor on mediation privilege?

16        We think that your decision is unambiguous in

17 addressing the TDPs and we have withheld none of those

18 documents on the basis of mediation privilege.  We have gone

19 another step.  We -- I, personally, have repeatedly stated to

20 any number of plan objectors that if they have documents that

21 they believe they should be receiving that are not

22 specifically addressed by Your Honor's decision, because

23 they're not TDP documents, but that otherwise would seem to be

24 covered by Your Honor's reason that we were prepared to have a

25 conversation about that to ensure that we don't have

1  unnecessary motion practice, if we were comfortable that Your

2  Honor would come out the say way on that category of

3  documents.

4          And not one party, not one party has told us that

5  there's a particular set of documents that they want or

6  documents in a particular area.  So, I don't know what we're

7  being asked to produce.  They didn't tell us.  They didn't put

8  it in their motion.  I'm not sure I heard about it today.

9          I will say that Your Honor has not abrogated the

10 mediation privilege in its entirety.  Not a single party in

11 this case has taken the position that Your Honor abrogated the

12 mediation privilege in its entirety and we're at a complete

13 loss as to know why we're arguing today about documents that

14 they won't even identify to us.

15          THE COURT:  Thank you.

16          Mr. Moxley?

17          MR. MOXLEY:  Thank you, Your Honor.  Good morning.

18          Cameron Moxley of Brown Rudnick, on behalf of the

19 Coalition.  Your Honor, I'd like to make a brief presentation

20 and then also address some of the comments that Ms. Marrkand

21 made in her presentation.

22          Your Honor, the Court's October 25th ruling was

23 very focused and Your Honor I would quote from that hearing

24 transcript at page 15, beginning at line 4, and I'm reading

25 from the transcript, Judge.  Your Honor said:

1          "I denied debtors' motion to the extent that

2   debtors seek to shield discovery communications, oral and

3   written, regarding the trust issue distribution procedures

4   based on the mediation privilege."

5          The relief sought in the motion, Your Honor, is

6   for, "all drafts of the trust distribution procedures, claim

7   valuation matrices, and related plan documents and

8   communications."

9          That is an extension, Your Honor, of the Court's

10  ruling of October 25th.  And it is an extension that was clear

11  from Ms. Marrkand's presentation that the insurers are asking

12  this Court to broaden the October 25th ruling.

13          We note that many of the documents, Your Honor --

14  we note this in our letter -- that are sought to be discovered

15  by this motion to compel were exchanged among mediating

16  parties while physically in mediation with the mediators, and

17  at times, at their direction.  We note further, Your Honor,

18  that the Coalition has not waived the mediation privilege and,

19  frankly, to our understanding, neither have the insurers or

20  any other party.

21          The only mediation privilege that has been not

22  waived, but has been addressed is Your Honor's

23  October 25th ...

24          Your Honor, as Mr. Kurtz explained and as the

25  debtors explained in their letters to the Court, we understand

1   that the debtors have complied and produced hundreds of TDP-

2   related documents, including more than 150 drafts of the TDPs,

3   themselves.  The insurers are seeking here to bootstrap from

4   the Court's prior, very specific mediation ruling to a much

5   broader extension of that ruling to cover a very vague and

6   unclear category that Mr. Kurtz laid out from what was

7   discussed in the course of the mediation.

8           The alleged basis for this, Judge, in terms of the

9   letter that the insurers actually submitted was that the

10  debtors can't be trusted somehow to draw appropriate lines as

11  to what the Court's order meant.  We disagree with that

12  strongly.

13          But, Judge, Ms. Marrkand's presentation, I think,

14  took things a bit further.  To this point that and this

15  argument that somehow the Coalition has been in charge since

16  February and was taking the pen on certain documents since

17  that time, let's just discuss quickly, if we could, Judge,

18  what we all know, all of us who have lived this case and have

19  seen the items on the docket and have been at these hearings.

20          The email the insurers referenced in their argument

21  and letter was sent in February of 2021.  We know, Your Honor,

22  that subsequent to that email, the debtors entered into a

23  settlement with Hartford that the Coalition did not support.

24          We know the debtors filed TDPs in April and May on

25  the docket that the Coalition did not support.  Those TDPs, we

 1  know from discussion in open court by Hartford's counsel, were

 2  reviewed by Hartford before they were filed.

 3          We are at a loss, Your Honor, as a Coalition, to

 4  understand how the Coalition could have been said to have been

 5  in charge (indiscernible) when the debtors were doing

 6  everything that we didn't want them to do after this email

 7  that is highlighted in the insurers' letter.

 8          It is an argument, Your Honor, that is really based

 9  -- this extension of the Court's mediation ruling on October

10  25th is really based on this type of very vague *innuendo* that

11  is just not supported by the facts of what has actually

12  happened in this case, that we all know from what's publicly

13  available, Your Honor.

14          And, finally, Judge, I'll just note that the

15  reference to Rule 408 in our submission, we of course,

16  understand that's an admissibility issue, but when coupled,

17  Your Honor, with the fact that -- and we put this in our

18  letter, Judge -- when coupled with that these settlement

19  communications were made in connection with mediation and in

20  reliance on Rule 90 -- Local Rule 9019-5(b), which was

21  incorporated, of course, as Your Honor well knows, in your

22  mediation-referral order, it's in that context that these

23  settlement communications were made.

24          And with all due respect to Ms. Marrkand, she's

25  sort of honing in on word choice, words like "shall" to

1  suggest that somehow the person who wrote the word "shall" for

2  the debtors had the ability to direct the debtors.  Your

3  Honor, you know, it's hard to pick out, sort of, you know,

4  word choice from a particular settlement communication that's

5  not a settlement communication.

6          Candidly, as Your Honor wells knows from

7  experience, parties discuss their positions in settlement and

8  they say, this is what we will accept.  And you can phrase

9  that in different ways, depending on the settlement

10  communication.  It's not an indication, Your Honor, that the

11  party who's saying, this is what I demand, this is my

12  settlement demand, has the ability to enforce that demand,

13  require that the person receiving the demand comply with it.

14  And the facts here, Your Honor, that we all know, what

15  happened in the months after the email that is highlighted in

16  the insurers' letter, belie that any such ability or power

17  existed.  That's just plain.

18          So, Your Honor, we think that this sort of couched

19  as a discovery motion saying the debtors have been -- have not

20  produced all documents that were responsive to the Court's

21  October 25th ruling, I think it's clear now, Your Honor -- it

22  was clear to us, Judge, from the letters, but I think it's

23  very clear now from today's presentation by        Ms.

24  Marrkand, that it's an incredibly broad extension of the

25  Court's October 25th ruling and we submit, respectfully, Your

1   Honor, that there's no basis for such an extension.

2            Thank you, Your Honor.

3            THE COURT:  Ms. Marrkand?

4            MS. MARRKAND:  Okay, Your Honor.  I have to thank

5   Mr. Moxley for actually, I think, Your Honor, proving our

6   point.  He has just raised a question of fact about when the

7   Coalition exercised control and if it did.

8            Because what this Court knows from the

9   restructuring support agreement hearing was exactly what the

10  Coalition did several months later.  So, our point, Your

11  Honor, is the debtors have opened this door.  When Mr. Moxley

12  says the Coalition hasn't waived the mediation privilege, only

13  he can speak for the Coalition, but the debtors waived it,

14  Your Honor, when they produced this document to us in February

15  of '21.

16           Second, Your Honor, we sought exactly what the

17  debtors sought, and I'm a little baffled here that our request

18  is vague.  Mr. Kurtz argued before you on their motion for a

19  protective order that three tranches of communications or

20  documents should be protected from disclosure on the basis of

21  mediation privilege or attorney-client work product.

22           And our motion couldn't be clearer, Your Honor.

23  We're saying, you don't get to do that, debtors.  You cannot

24  do that, especially given what we've already seen, Your Honor.

25           And I think with your Court's indulgence, I think

1  you can understand how is it possible for us to identify what

2  we don't have?  How could we possibly know that?

3          We got lucky with the TDP log that identified

4  attachments, but this is the ask that I noted earlier:  We

5  declined to accept that the burden shifts to us to tell the

6  debtors when they have withheld something.  How would we

7  possibly know that, Your Honor?

8          I have to note, too, that when Mr. Kurtz said a few

9  minutes ago, this is not a systemic problem, it absolutely is

10  a systemic problem, Your Honor.  And that's why I said, in all

11  candor and respectfully, Your Honor, you know what you ruled.

12  You know what your thinking is.

13          We're not here -- we're here for you to do what you

14  have said you would do and what you have done consistently:

15  to call balls and strikes.  And all the parties live with your

16  decision.

17          What I was trying to do was walk through what I

18  thought was your rationale in the October 25th ruling.  I

19  attended the hearing.  Obviously, I read your ruling several

20  times.

21          But nobody -- right now, I'm not here, actually, to

22  blame the debtors for anything.  I took your remarks on

23  Wednesday about civility, not kindness, but civility and

24  professionalism, seriously.  I always have.

25          I'm taken by Mr. Pachulski's remarks earlier about

1  turning the temperature down.  That's why we're not -- if I

2  have done anything to suggest that I am attacking the debtors,

3  I apologize, because I'm not.  What I was trying to do was

4  bring before you the record; unvarnished, not with heated

5  rhetoric, not with adjectives, and not with blaming.

6          I have every reason to believe the debtors are

7  doing the best they can on their productions, given the

8  extraordinary time constraints that we're all under.  It's not

9  blaming them, Your Honor; it's reporting where we sit on

10 November 19th.  So, no blame at all.

11         I don't want to get distracted about what someone

12 else has or hasn't done, because that's not in front of you.

13 What is in front of you is an extremely serious issue, Your

14 Honor, and for the first time, we're able to put it to you not

15 in shadows and not with opinion and not with guesswork.

16         We have given you a document and we can certainly

17 provide you with the termsheet.  But it cannot be that the

18 debtors can file a motion that says, we don't have to give you

19 any of these three buckets, Your Honor -- three    buckets --

20 of information -- putting aside attorney-client work product -

21 - because of the mediation privilege.  And then, now, whether

22 it's Mr. Kurtz or Mr. Moxley, accuse the insurers of being

23 opaque.

24         It is perfectly clear what we are after, Your

25 Honor, and it is all laid out in Mr. Molton's email and the

1  termsheet.  Those are the facts, Your Honor.

2         And then we have the law and knowing what you're

3  going to have to do at the confirmation hearing.  You once

4  said at one hearing -- I think it's actually -- I'm not sure

5  which one -- where Mr. Kurtz said, Your Honor, we'll give you

6  anything you want.

7         And you said, Mr. Kurtz, you're confused.  It's not

8  what I want; it's the debtors' burden.  You have to put on

9  your case.

10         That's true with us, Your Honor.  We get to put on

11  our evidence, but we can't do it when we have every reason to

12  believe we're not getting all the evidence.  We're not

13  pursuing, clearly, attorney-client work product.  We're not

14  pursuing Hartford or The Church of Latter Day Saints

15  settlement agreements, we're not after any of that.  What

16  we're after, Your Honor -- and to try and understand, do we

17  have a basis to come before you.

18         Right now, it's looking like we do.  So, that

19  is -- I'm trying to go through everything here.  Oh, and the

20  very last thing, Your Honor, apparently, there is some

21  misunderstanding of what did and didn't happen at the meet-

22  and-confer.

23         What matters is we filed our motion.  All the

24  debtors had to do, or the Coalition -- happens all the

25  time -- the motion is filed -- pick up the phone and call us.

1 We have the meet-and-confers.

2          Apparently, the debtors tried, and what they're

3 trying to do here is say we produced the two documents, as if

4 that's all that's at stake here, and tell us, let's do it

5 document by document.  But we have no ability to do that, Your

6 Honor.

7          And I'm a little surprised.  We actually -- I could

8 set forth we did it in several exchanges with the debtors

9 about our discovery, where we sought the very information, as

10 far back as September, and I can easily supply that to the

11 Court.

12          So, I think this whole conversation reveals why we

13 filed our motion having followed, frankly, the practice of the

14 debtors.  They did not come before you with a single document

15 and say, This document should be protected or that document

16 should be protected.

17          And, Your Honor, respectfully, I think this case,

18 and I'm sure there are many words to be describe it -- maybe

19 volatile is a good one -- warrants, as you said, this is one

20 of the cases.  This is the circumstance where the mediation

21 privilege cannot be used to wall off, shield, and deprive the

22 insurers of critical materials and information.  Thank you.

23          THE COURT:  Thank you.

24          Okay.  Well, I am prepared to rule on this, and I

25 appreciate the arguments of counsel.  I did review the letters

1 beforehand and I do think that the argument went slightly

2 beyond the letters but let me try to refocus.

3 　　　　My October ruling was focused on the TDPs because

4 that has been the insurers' focus throughout this case, that

5 in essence -- and I don't have -- I may be the only one who

6 doesn't have my October ruling in front of me, but I don't

7 have it in front of me -- but my recollection is that, again,

8 the TDPs have been the focus and has been the focus of the

9 insurers from the inception of the case.  And in that context,

10 the argument has been made or the contention has been made

11 that the pen was turned over to the Coalition.

12 　　　　And that's why the focus was on the TDPs in my

13 ruling, and I do think, though, that the claims matrices,

14 which are embedded in the TDPs, and even the settlement trust

15 agreement, which is clearly the agreement that is going to be

16 used by the trustee, if one -- if we get to -- if it's

17 confirmed, to implement the TDPs, are all within that ambit

18 and the debtors have seemed to recognize that by turning over

19 claims -- documents related to the claims matrices and the

20 settlement trust agreement.  And if they had not, I would have

21 ordered that.  I do believe that's a package.

22 　　　　The termsheet, to the extent that it discusses the

23 TDPs or the claims matrices or the settlement trust agreement

24 should be produced, and, again, my understanding is it has

25 redacted for other communications and that follows two other

 1  documents.  So if it's in the board minutes and they're

 2  talking about the TDPs or the claims matrices; again, that

 3  should be turned over, subject to appropriate redaction for

 4  information that is not in those categories.

 5          I did not go beyond that in my October ruling and I

 6  don't see a basis in what I've read and heard to broaden that

 7  ruling to include what is somewhat of an all-encompassing and

 8  a little bit broad concept of related plan documents.  And,

 9  further, I've heard there was not a request for whatever that

10  happens to be.

11          Again, the insurance companies' focus has been on

12  the TDPs.  I understand that focus and I'm not going to

13  broaden my ruling, based on what I've read.

14          As far as Ms. Marrkand's truism, I suppose, that

15  you can't know what you don't have and you can't identify what

16  you don't have, that can be said of all document productions

17  that anyone could make.  It is, you can't identify what you

18  don't have, because you don't have it.

19          But what you can do, and you have done, the

20  insurance companies have done is say, Oh, there's an

21  attachment here and we don't have it.  So, clearly, that's

22  missing.  And in response to that, the debtors have responded

23  and produced.

24          And I really think that's all that can happen here.

25  The debtors are telling me they are unaware of documents that

1  haven't been produced related to the TDPs and except for these

2  couple of items that have since been remediated, there's no

3  indication that there are further documents.  So, certainly,

4  if in its review, the insurance company comes up with other

5  documents that appear to be missing from a review of what's

6  been produced, I would expect that you would go to the debtors

7  and, in fact, the debtors would produce whatever those

8  documents are.  I realize maybe that flips the burden to some

9  extent, but two missing items out of a production can

10  certainly be inadvertence.  So, that's my ruling.

11          Ms. Marrkand?

12          MS. MARRKAND:  All I was going to say, Your Honor,

13  is thank you.  I think we were all looking for clarity and

14  calling the balls and strikes.

15          So, we understand your ruling and, obviously, we'll

16  comply with it.  So, thank you.

17          THE COURT:  Of course.  Thank you.

18          Okay.

19          MR. ABBOTT:  Your Honor, I believe that brings --

20  again, Derek Abbott of Morris Nichols for the debtors -- I

21  think that brings us to Number 6 on the agenda.  Your Honor,

22  that's Docket Item 7205.

23          As noted, it looks like that's not going forward

24  with respect to the TCC.  It has been withdrawn with respect

25  to a number of the insurers but will go forward with respect

1  to the remaining insurers that were subject to that.  So, I'll

2  just turn it over to counsel for American Zurich, Your Honor.

3          THE COURT:  Okay.  And before that, I need five --

4          MS. GRIM:  I'm sorry, it -- go ahead, Your Honor.

5          THE COURT:  I said I need five --

6          MS. GRIM:  I just wanted to clarify Mr. Abbott's

7  statements and something on the agenda.

8          THE COURT:  Okay.  Well, give me a second.  I have

9  a chart that I made for Agenda Item 6 and it's not in my

10 folder, so I need to get that.  So, let's take five minutes

11 and then we'll come back on the record.

12          We're in recess.

13      (Recess taken at 11:17 a.m.)

14      (Proceedings resumed at 11:24 a.m.)

15          THE COURT:  Okay, this is Judge Silverstein.  We

16 can go back on the record and we're on Agenda Item 6.

17          MS. GRIMM:  Your Honor, Emily Grimm, Gilbert LLP,

18 for the FCR.  There were two administrative issues I wanted to

19 clear up with respect to the agenda before we get into

20 argument.  The first is that the most recent agenda seems to

21 indicate in the status paragraph under Item 6 that the dispute

22 as to the insurers' motion to quash is not going forward with

23 respect to the Allianz, Century, Old Republic, and Zurich.  I

24 just wanted to clarify -- and of course Mr. Plevin can jump in

25 if he has a different view -- that it is the FCR's cross-

1  motion to compel production of claims handling information

2  that has been withdrawn with respect to the insurers.

3          The FCR's opposition to the insurers' motion to

4  quash, which was filed in conjunction with the motion to

5  compel since it involved the same underlying legal issues, has

6  not been withdrawn, and my understanding is that the insurers

7  have not withdrawn their own motions to quash.  So that was

8  item one.

9          The second issue we wanted to clarify is that the

10 matter is also not moving forward as to Evanston.  To be

11 clear, Evanston did not join in the insurers' motion to quash

12 and the FCR's motion to compel has been withdrawn without

13 prejudice to them.

14         We confirmed this with counsel for Evanston right

15 before the hearing, but we just didn't have time to clarify it

16 on the agenda.

17             THE COURT:  Okay.

18             MR. PLEVIN:  Your Honor, that's my understanding as

19 well.  I had understood the FCR was withdrawing its cross-

20 motion as to certain carriers, but we were not limiting our

21 motions to quash.

22             MR. ABBOTT:  Your Honor, my apologies if we

23 misstated in that agenda.  Obviously, these folks know way

24 better than I do.  So, apologies, again.

25             THE COURT:  It's okay, I had already prepared.  So

1    -- and, quite frankly, if there's some distinction that

2    parties -- that different insurance companies are making --

3    and I recognize that the insurers are not a monolith in the

4    positions that they are taking before the Court in many

5    matters -- then you need to let me know.

6              Okay, so let's proceed.

7              MR. PLEVIN:  Your Honor, Mark Plevin for the Zurich

8    insurers.  I would propose actually to take our two motions to

9    quash together because I think they're interrelated and the

10   debtors' opposition, for instance, covered both motions, and I

11   think it makes sense to proceed together.

12             THE COURT:  That's fine.  Actually, as I was

13   reading them, I thought Agenda Item 7 made a little bit more

14   sense to go first, but we can take them together and any way

15   you wish.  But, yeah, they're related.

16             MR. PLEVIN:  All right.  Thank you.

17             Your Honor, these two motions seek to quash or

18   limit 44 depositions of insurers.  And that's right, 44

19   depositions.  Of these, 35 are Rule 30(b)(6) depositions and

20   nine are individual depositions.

21             What are we doing here?  Or, in a single word, why?

22   Why have 44 insurance depositions been noticed in this plan

23   confirmation proceeding?  What Section 1129 confirmation

24   issues are all these depositions directed toward?

25             The answer, Your Honor, is that we are here because

1  the debtors and the plan supporters have decided to ask the

2  Court to make certain findings as conditions preceding the

3  plan confirmation.  In particular, Articles 9(a)(3)(q) through

4  (t), but especially (r), which requires the Court to find that

5  the procedures and criteria included in the TDPs are fair and

6  reasonable based on the evidentiary record offered to the

7  bankruptcy code.  But nothing, nothing in the bankruptcy code

8  requires that such findings be included in a plan.

9          The debtors can point to no other sex abuse

10  bankruptcy case that conditions confirmation on such findings

11  being entered by a court.  Indeed, debtors can point to no

12  other mass tort bankruptcy in which the plan conditions

13  confirmation on the entry of these sorts of findings.

14          This is why we say, Your Honor, that debtors are

15  seeking to transform this plan confirmation proceeding into an

16  insurance coverage lawsuit.  They are seeking findings

17  regarding the fairness and reasonableness of the TDPs that

18  they don't need to confirm the plan, but which will short-

19  circuit future insurance coverage litigation in their favor if

20  the plan is confirmed.  They want to use this Court and the

21  pressure to confirm a plan to leverage their way to favorable

22  insurance coverage findings that they can use to pretermit

23  future insurance coverage litigation.

24          The debtors, the same debtors who have asked the

25  Court for an expedited confirmation hearing and a highly

1  compressed confirmation litigation schedule, have created the

2  situation.  They are trying to cram a years-long coverage

3  litigation into a few short weeks and they are doing this even

4  though it is not something they're required to do or that the

5  code requires for plan confirmation.

6          This background is significant for the Court's

7  determination of the insurers' two motions to quash.

8          Rule 26(b)(1) governs the scope of discovery.

9  Discovery is permissible only if it satisfies two

10 requirements.  The first requirement is that the discovery

11 must be relevant to any party's claim or defense.

12          Here, it is fair to apply this standard by asking,

13 what is relevant to plan confirmation under Section 1129?

14 Discovery that is not relevant to the confirmation

15 requirements under Section 1129 should not be permitted.

16          As I've explained, Section 1129 does not require

17 findings of the sort requested by the debtors to confirm the

18 plan.  Thus, I would argue that debtors' proposed depositions

19 of the insurers do not meet the Rule 26(b)(1) relevance

20 standard.

21          Debtors seem to argue that the depositions are

22 relevant because they may pertain to the insurers' defenses to

23 confirmation, but nothing the insurers did or didn't do in

24 connection with BSA abuse claims prepetition is relevant to

25 any of the 1129 requirements.  Thus, if issues extraneous to

1    1129 requirements are not relevant, the insurers would have no

2    need to defend against such extraneous issues.

3            As our motions point out, Your Honor, BSA largely

4    handled its own claims.  The insurers were involved only in a

5    small number of those claims.  After 1986, only claims that

6    exceeded the limits of fronting policies or self-insured

7    retentions.  And the insurers' involvement in such claims was

8    generally limited to responding to requests from BSA, such as

9    requests to fund portions of settlements.  And I say portions

10   because, generally, the BSA had the first $1 million.

11           If insurers agreed to contribute money to settle a

12   claim at a particular level or for a particular amount, BSA

13   knows that and has that information in its files, and its own

14   witnesses can provide testimony about that.  If what BSA is

15   doing is hunting for admissions or contradictions, it already

16   has access to that information too; it does not need to take

17   44 insurer depositions to develop that evidence.

18           Moreover, if the issue, as we understand it, is

19   whether the TDPs replicate the BSA's own prepetition claims

20   experience, as the Coalition has posited, debtors do not need

21   to know what the insurers think or how they may have analyzed

22   a handful of claims to prove how claims against debtors were

23   valued and paid before bankruptcy.  They can show from the

24   debtors' own records what was paid, why debtors paid it, and

25   how that relates to the TDPs.

1          We understand, Your Honor, that debtors may want

2     depositions to find out what any insurer witnesses will say if

3     called to testify at trial in opposition of the plan.  So let

4     me take that concern off the table.  We had an insurer call

5     yesterday and we discussed whether any insurer intended to

6     call any of its current or former employees as witnesses

7     during the confirmation hearing to talk about claim values or

8     how claims were analyzed, adjusted, or handled.  Not a single

9     lawyer for any insurer said they intended to call any such

10    witness.  Accordingly, there is no need for debtors or anyone

11    else to depose any insurer witness just to find out what that

12    witness will testify to at trial.

13         The second requirement under Rule 26(b)(1), Your

14    Honor, is that discovery must be proportional to the needs of

15    the case.  The rule goes on to identify certain considerations

16    that a court should take into account in assessing

17    proportionality, including the importance of the issues at

18    stake in the action, the amount in controversy, the parties'

19    relative access to relevant information, the parties'

20    resources, the importance of the discovery in resolving the

21    issues, and whether the burden or expense of the proposed

22    discovery outweighs its likely benefit.

23         Let me discuss some of these factors; first,

24    importance of the issues at stake.  The issues are actually

25    not important at all since the findings driving this discovery

1    are not required under Section 1129 or any other provision of

2    the bankruptcy code.  How the insurers thought about BSA abuse

3    claims pre-bankruptcy proves nothing about what BSA paid to

4    claimants when it settled claims.

5         Second, the parties' relative access to relevant

6    information.  As I've suggested, debtors do not need discovery

7    from the insurers to find out how BSA itself handled BSA abuse

8    claims or how much BSA paid --

9        (Background noise)

10        MR. PLEVIN:  Excuse me, Your Honor, I can't mute

11   myself at the same time I'm talking.  I apologize for that.

12        I think what I was saying is the debtors don't need

13   discovery from the insurers to find out how BSA itself handled

14   BSA abuse claims, or how much BSA paid for particular claims

15   or types of claims.  Debtors don't even need discovery from

16   insurers to find out what positions the insurers took on

17   whether to contribute to settlements of abuse claims.  Debtors

18   have that information in their own files.

19        Third, the parties' resources.  The debtors say

20   they are running out of money and need to get to a

21   confirmation hearing in an expedited manner.  How then can

22   they justify the costs of preparing for and taking 44

23   insurance company depositions?  And that doesn't even include

24   the impact on our resources of having to prepare witnesses and

25   defend those depositions.

1          Fourth, importance of the discovery in resolving

2    the issues.  I've already discussed how -- what the debtors

3    thought -- how what the insurers thought about the resolution

4    of abuse claims against BSA is not at all necessary for

5    debtors to put on a case attempting to show that the TDPs

6    mirror the way BSA abuse claims were handled and paid

7    prepetition.

8          Also, when you look at what the insurers have said,

9    nothing that happened prepetition is relevant to certain

10   important aspects of the TDPs.  No one contends that debtors

11   paid or offered to pay claimants $3500 prepetition on a no-

12   questions-asked, no-proof-required basis.  So discovery won't

13   illuminate that issue.  Similarly, no one contends that BSA

14   abuse claims were determined prepetition by an all-powerful

15   settlement trustee chosen by claimants instead of in the tort

16   system with judges, juries, rules of evidence, and appeals.

17   So discovery is not needed on this issue either.

18         Fifth, whether the burden or expense of the

19   proposed discovery outweighs its likely benefit.  Here, I

20   think it is essential that we have 44 insurance depositions

21   that are supposed to be completed by December 1, which is the

22   discovery cutoff.  Even if they leak to the end of that week,

23   December 3, that is 44 depositions in just eight business days

24   from now, or an average of 5.5 insurance depositions every

25   day.

1          Each deposition for the insurers takes at least two

2    days of counsel time, one to meet with the witness and one to

3    defend the deposition.  I'm sure on the other side it takes a

4    similar amount of time for the debtors to prepare, not to

5    mention other people who are being paid by the estate such as

6    the FCR.

7          This expenditure of time, money, and effort comes

8    at the same time that the parties are trying to take 23 other

9    depositions of people who need to be deposed, such as the

10   Coalition, the debtors, and others.

11         The Court held that the debtors were entitled to an

12   expedited confirmation hearing because of their financial

13   situation, but the Court has also requested that the parties

14   focus their discovery on what really matters.  What the

15   insurers thought about the handling of BSA abuse claims pre-

16   bankruptcy is not something that matters here.

17         In the circumstances of this case on this

18   expedited, compressed schedule, the 44 insurance company

19   depositions that are being sought are simply not proportional

20   to the needs of the case, and so the depositions should be

21   quashed on that basis.

22         Your Honor, let me turn now briefly to the 30(b)(6)

23   topics.  I don't propose to go through them all because our

24   motion already does that, but I did want to highlight a few

25   points.

1          First, there are unquestionably improper contention

2    topics.  Our brief gives examples, debtors' topics 7 and 11,

3    which expressly ask for testimony about the insurers'

4    contentions.  These cannot be permitted.

5          Another salient example is debtors' topic 8, the

6    trust distribution procedures.  The debtors say that topic

7    asks for facts, not contentions, but everyone knows that the

8    insurers did not draft the TDPs, did not negotiate the TDPs;

9    indeed, had nothing at all to do with the creation of the

10   TDPs.  All our witnesses could do is restate what, if

11   anything, they learned about the TDPs from their counsel or

12   what they gleaned about the TDPs from reading them.  In other

13   words, the insurers have no facts about the TDPs that a

14   30(b)(6) witness could or should be required to testify about.

15         The same goes for other similar topics like the

16   plan settlements or the BSA plan settlements.  These are about

17   contentions, not facts.

18         Second, prepetition claims handling.  This is a

19   major issue that pervades both motions, as well as the FCR's

20   cross-motion.  And we're not without guidance from the Court

21   on this because the Court held in Imerys that such information

22   should be obtained from the debtors first and would be

23   permitted from the insurers only if the debtors didn't have

24   the information.  The debtors here don't claim that they don't

25   have the information.  That fact alone should be dispositive

1  in our favor on all of the claim handling topics.

2          The debtors and others point out that the Court

3  noted in Imerys that discovery of insurers' prepetition claims

4  handling would be fair game if the insurers were putting in

5  evidence of their own treatment of the claims or their own

6  handling of the claims.  But the Court was very specific, only

7  if the insurers were going to put their information at issue

8  would that information be discoverable.

9          We are not going to put our own information at

10  issue.  I've already made that clear when I said the insurers

11  will not call any of their own employees or former employees

12  as witnesses.  This too should be dispositive.

13          And the fact, Your Honor, that we are seeking

14  discovery of the debtors on their claim handling activity and

15  their knowledge of how the claims were resolved does not

16  justify the discovery sought by the insurers.  The debtors

17  have all the information about all of the claims; none of the

18  insurers do, either separately or collectively, because so

19  many of the claims were handled within that $1 million layer,

20  which was either fronting coverage or SIR.

21          The debtors and the Coalition seek to justify the

22  TDPs on the basis that they supposedly mirror the debtors'

23  prepetition claim results.  So we need to know what that is in

24  order to rebut it.  And, as the Court ruled in Imerys, getting

25  that information from the debtors is proper and appropriate.

1          Some of the topics at issue, Your Honor, are

2    unquestionably coverage related, like those that seek to have

3    the insurers testify about policy underwriting or the forms

4    that insurers use to draft policies.  None of that could

5    possibly pertain to any issue properly presented in this

6    confirmation proceeding.

7          I also want to note, Your Honor, that I found the

8    debtors' position that they did not share a common interest

9    with the insurers with respect to prepetition claims handling

10   to be, frankly, astonishing.  BSA was providing defense

11   counsel summaries and reports to the insurers to support their

12   requests that the insurers contribute to funding certain

13   settlements.  Those documents were and still are privileged

14   and, to the extent our witnesses considered what BSA's defense

15   counsel said about particular claims, they could not testify

16   about that in a deposition without breaching privilege, which

17   they should not be required to do.  It's not clear, Your

18   Honor, that this plan will be confirmed and it could be that

19   we find ourselves back in the tort system, and the claimants

20   should not have access to the defense counsel reports, period.

21         Otherwise, Your Honor, with respect to the 30(b)(6)

22   depositions, I'll stand on our brief, unless the Court has

23   questions.

24         THE COURT:  The only question I think I have -- I

25   heard you loud and clear on the no fact witnesses or the no

1  insurer employees, current or former, what about an expert

2  witness?  Are the insurers going to be providing expert

3  witnesses on any of these -- well, let me just end it.  Are

4  you going to be proffering an expert witness?

5          MR. PLEVIN:  I expect we will, Your Honor.  The

6  parties exchanged, I think it was earlier this week, the

7  topics on which they might present affirmative expert

8  testimony.  I think we had five or six topics, the debtors

9  have 24 topics.  I hope that doesn't mean they're going to be

10 calling 24 expert witnesses, but it's possible.

11         If we call an expert witness on these claim

12 handling issues, it will be based on the debtors' information,

13 not on our own information.  None of us are planning to give

14 an expert witness access to our own records.  It would be the

15 debtors' records, this is how the debtor handled claims, this

16 is how they paid claims.

17         We do intend as well to take depositions of the

18 debtors and one of their in-house people about how they

19 handled claims because, Your Honor, that's what the debtors

20 are putting at issue here.  They want to say and the Coalition

21 wants to say that the TDPs mirror what the debtors did

22 prepetition, so we know what the debtors did prepetition, we

23 don't know.  My client is an excess insurer and over the

24 course of the entirety of their involvement with the Boy

25 Scouts paid on five claims.  We don't have the full record.

1  We don't understand what they did.  We may know what they did

2  on respect to five claims, but that's not statistically

3  significant.

4        So, yes, we may have expert witnesses, but they're

5  going to look at the Boy Scouts' records, not ours.

6        THE COURT:  Thank you.

7        Mr. Winsberg?

8        MR. PLEVIN:  Let me move --

9        THE COURT:  Oh, I'm sorry, go ahead.

10       MR. PLEVIN:  Yeah, let me move Your Honor quickly

11  to the motion to quash the individual depositions.

12       THE COURT:  Yes, sorry.

13       MR. PLEVIN:  This motion relates to the depositions

14  of nine individuals who according to the debtors are the claim

15  handlers, who the BSA interacted with in certain instances

16  daily to evaluate and value claims.  The debtors assert that

17  these individuals are the persons with the most knowledge

18  regarding the prepetition handling of abuse claims.  Now, why

19  did debtors want to depose these people?  The debtors argue

20  that they will have relevant evidence that may rebut the

21  insurers' objections to the TDPs.

22  In other words, this is not a fact-finding effort by the

23  debtors; this is an effort to hunt for admissions.

24        I've already said, Your Honor, we're not going to

25  call any of these people as witnesses, so the debtors don't

1   need to prepare for that.  Moreover, the testimony of these

2   individual witnesses is not relevant.  The debtors know how

3   they handled their own claims and they know what positions the

4   insurers took, if the insurers were asked to take a position

5   on any claims.  They don't need these depositions and they're

6   not proportional to the needs of the case given the calendar

7   year.

8           These witnesses, Your Honor, could only testify

9   about prepetition handling of BSA claims.  As I explained

10  before, this is not a proper topic.  And, even if it were and

11  if you were to include -- if you were to conclude that the

12  30(b)(6) witnesses had to testify, then these depositions

13  would be cumulative of the 30(b)(6) depositions.  The insurers

14  should not have to put up two witnesses to give the same

15  testimony on these irrelevant, unnecessary subjects in the

16  compressed time frame of this confirmation hearing.

17          The debtors' opposition introduces another false

18  equivalence, saying that what they're trying to do is just

19  like our asking for a BSA 30(b)(6) deposition and the

20  deposition of their former employee Mr. Allen, and that's what

21  I was referring to a moment ago.  The distinguishing fact is

22  that the TDPs are being justified on the basis that they

23  mirror the debtors' claim experience and we need discovery of

24  that experience if the findings are going to remain in the

25  plan.  In contrast, our responses to debtors' requests for

 1 | funding are not the issue.  One deposition on that topic is

 2 | unnecessary and non-proportional, two from the same carrier is

 3 | cumulatively unnecessary and non-proportional.

 4 | And, Your Honor, that concludes my remarks, unless

 5 | you have any further questions.

 6 | THE COURT:  No.  Thank you.

 7 | Mr. Winsberg?

 8 | MR. WINSBERG:  Yes, Your Honor.  Can you hear me

 9 | okay?

10 | THE COURT:  I can.

11 | MR. WINSBERG:  Harris Winsberg on behalf of the

12 | Allianz insurers.  Just real briefly, not to re-go over Mr.

13 | Plevin's remarks, which we concur with.

14 | The FCR's cross-motion was dropped as to Allianz,

15 | but not as to my other two clients, National Surety and

16 | Interstate, and just briefly, I just wanted to focus Your

17 | Honor on one matter, which is the FCR's cross-motion, which is

18 | at Docket 7233, it talks about on the first page the insurers

19 | -- and the quote is, "But the insurers have put the values and

20 | claim evaluation protocols set forth in the TDPs directly at

21 | issue in these confirmation proceedings."  But that just isn't

22 | true, Your Honor, as Mr. Plevin noted.  It's the BSA and the

23 | Coalition and FCR that are putting these at issues with the

24 | findings and orders that we've talked about at the last

25 | hearing and in the hearings before that.

1           And I would note, Your Honor, that we filed a

2   motion for stay relief, the BSA and FCR and the Coalition

3   successfully resisted that coverage case going forward, but

4   they're asking this Court to do what should be done in that

5   coverage case in this court in connection with confirmation.

6   It should also be noted that these conditions precedent, which

7   address things, as Your Honor is aware of, like the

8   (indiscernible) Austin issue, whether the TDPs are fair and

9   equitable or fair and reasonable, and the like, that those are

10  issues that are not a requirement under the bankruptcy code.

11          And, as Your Honor noted at the disclosure

12  statement hearing, those conditions precedent are waiveable.

13  And I believe Your Honor said one of the reasons why the

14  disclosure statement -- at the hearing that why it was not

15  patently un-confirmable is because those conditions could be

16  waived, but these conditions precedent are driving the

17  discovery in this case and I think Your Honor during the

18  hearing on the motion for stay called them a disaster, and

19  that's what they are.  I mean, they are over-broad and trying

20  to bring into this case what we view as really coverage

21  litigation matters that have no bearing in connection with

22  confirmation of the plan.

23          And the last thing I would point out, Your Honor,

24  as further evidence of that is BSA, as Mr. Plevin talked

25  about, they listed their expert witness topics, you asked

1  about that, Your Honor, and you can look at them at Docket

2  7238, and --

3        THE COURT:  Go ahead.  I did print that out, I just

4  don't know what I did with it, but go ahead.

5        MR. WINSBERG:  Number two, Your Honor, just to

6  quote, "The allocation of each insurer's proportionate share

7  of responsibility for the underlying claims."  That's one of

8  their expert proposed topics.  That is a coverage case and

9  that's like we're back to the binding estimation.  I'm at a

10  loss.  If BSA is truly a melting ice cube and needs to exit

11  bankruptcy quickly, then the discovery needs to be

12  proportional to that exist.  They can't have it both ways,

13  compress the schedule and try to jam the insurers with what

14  really is coverage maters that have nothing to do with 1129.

15        And, with that, Your Honor, we respectfully request

16  that you grant the motions that are on final and deny the

17  FCR's cross-motion.

18        THE COURT:  Thank you.

19        MR. WINSBERG:  Thank you, Your Honor.

20        THE COURT:  Okay.  Who's going to go first?  Mr.

21  Azer?

22        MR. AZER:  Yes, Your Honor.  Happy Friday and thank

23  you for hearing me.  Adrian Azer on behalf of the debtors from

24  Haynes Boone.

25        So I want to touch on some initial points first and

1  then we can go specifically to the topics, and I want to start

2  where Mr. Winsberg left off.  He noted that one of our expert

3  topics is allocation.  Well, it has to be.  We're having to

4  defend the Hartford settlement, you have to determine how much

5  Hartford would otherwise owe and you can't allocate just to

6  one insurer, you have to allocate to the block, right?

7           So we're not turning this (indiscernible) but for

8  us to defend the settlement we have to show how much Hartford

9  would have otherwise owed to defend it's a reasonable

10  settlement.  So I don't think just because we're saying

11  allocation we're turning this Court into a coverage court;

12  that is not our intent, but we have to defend the settlement.

13           Two, I think Your Honor started by saying that the

14  insurers are not a monolith, neither are the debtors and the

15  plan proponents, we are not -- I'm sorry, Your Honor, are you

16  having trouble hearing me?

17           THE COURT:  A little bit.  I'm going to put my

18  earphones on.  Go ahead.

19           MR. AZER:  Your Honor, is this better?

20           THE COURT:  Yes.

21           MR. AZER:  Okay, great.  Thank you.

22           Your Honor, you heard Mr. Plevin talk about 44

23  depositions.  The debtors did not propound 44 30(b)(6), we

24  propounded ten.  And, if you'll notice in the insurers'

25  motion, we propose to limit that only to insurers who actually

1  paid claims, which is probably going to be around five to

2  seven.  So we are certainly not seeking a huge number of

3  depositions.

4         Now, Mr. Plevin also said, well, we're not going to

5  call any witnesses and so, therefore, this is all unnecessary.

6  Your Honor, I would love to protect witnesses that would

7  contradict my position and that's exactly what the claim

8  adjusters are going to do.

9         To the extent the insurers contend -- and we'll

10  walk through this in more detail -- that the TDP validity

11  criteria or scaling factors are inconsistent with prepetition

12  practices, those claim adjusters may say directly to the

13  contrary because, as Mr. Plevin noted -- and it's a little bit

14  -- I think it's a little bit of doubletalk by Mr. Plevin,

15  right?  Well, you didn't really work with us on the claims,

16  but the individual adjusters worked extensively on the claims.

17  They worked on a daily basis on the claims.  Indeed, Your

18  Honor, when we pulled NCC records of communications with the

19  insurers, they would communicate up to three times a day with

20  the claim adjusters on the valuation of claims, including what

21  makes a valid claim and how do you value the claims.

22         Now, we can't produce those documents because the

23  insurers are saying, well, those are all protected by common

24  interests.  So the only avenue we have to rebut the insurers

25  contentions is through this testimony.

1           THE COURT:  How is that?  Explain that --

2           MR. AZER:  And to be clear, Your Honor --

3           THE COURT:  Explain that to me.  Why can't --

4           MR. AZER:  Yes, Your Honor.

5           THE COURT:  -- the debtor testify?

6           MR. AZER:  Well, Your Honor, the debtors made

7    recommendations to the insurers about whether a claim is valid

8    and what the value would be, meaning is it worth more or less

9    based upon certain factors, but the insurers then performed

10   their own independent evaluation and said we either agree or

11   disagree with the debtors in that regard.

12          And so we do not -- we are not the repository of

13   how the insurers' claim adjusters looked at claims.  In many

14   instances, you are correct, they accepted what we said and

15   that statement that they accepted what we said, to the extent

16   the insurers challenge the TDPs, would rebut their contentions

17   and, if they didn't, we're entitled to know why that is.

18          THE COURT:  But don't the debtors --

19          MR. AZER:  We're entitled to know what is --

20          THE COURT:  -- know --

21          MR. AZER:  I'm sorry.

22          THE COURT:  Don't the debtors know?  The debtors

23   know whether or not the insurance company accepted their

24   recommendation and they can testify to that, right?

25          MR. AZER:  So, Your Honor, I think what might be

1  helpful a little bit is if we actually look at the TDPs for a

2  moment.  I'm hoping that you have a copy of the TDPs in hand,

3  but I can reference -- I can also share my screen,

4  anticipating that the Court might not have, but it's Docket

5  Number 6443, page 145.  Would it be helpful if I shared my

6  screen, Your Honor?

7            THE COURT:  I've got them.

8            MR. AZER:  Okay.

9            THE COURT:  Page 145.  Okay.

10            MR. AZER:  Yes, Your Honor.  And you see under

11  subsection (c), "Settlement trustee review procedures"?

12            THE COURT:  Oh, wait a second.

13            MR. AZER:  Do you see where I'm looking?

14       (Pause)

15            THE COURT:  Okay.  Where are you looking?

16            MR. AZER:  Subsection (c), "Settlement trustee

17  review procedures" --

18            THE COURT:  Yes.

19            MR. AZER:  -- do you see that?  Great.

20            So, Your Honor, I think what you're relying on is

21  the issues that arose in Imerys, right?  And let's talk about

22  Imerys for a moment.

23            In the Imerys transcript and if you look at page

24  237, when you were hearing the TCC and FCR talk about why they

25  need these claims handling, it was as to very objective facts:

1  the value paid by the insurers, whether they reserved or

2  denied coverage, right?  Those are documents and information

3  that the debtors should -- or the policyholder should have in

4  this circumstance.

5         Now let's look at the TDPs.  If you look at

6  subsection (c)(2), there are criteria for evaluating claims.

7  Does the claimant allege the abuse?  Does it identify the

8  abuser?  Does it have a connection to Scouting?  Date and age,

9  location of abuse.  All of those goes to whether a claim is

10 compensable.

11        The debtors would basically go to the insurers and

12 say, look, we think this claim is compensable because they

13 satisfied these criteria.  The insurers' claim adjuster then

14 would say I agree or disagree.

15        So, no, the debtors don't necessarily always have,

16 whether they agreed with all this criteria or didn't.  And to

17 the extent that the insurers basically say these are not the

18 same criteria that was applied prepetition, the debtors should

19 be able to know that and should be able to talk to the claim

20 adjuster and say, no, actually, for this claim, you did look

21 at this criteria and this is inconsistent.  It would impeach

22 their arguments as to whether these are appropriate criteria.

23        And then second, Your Honor, if you could turn to

24 page --

25              THE COURT:  What if they looked at different

1  criteria, would that mean the debtor is wrong?  Would that

2  mean the debtor fails in their burden of proof?

3         MR. AZER:  Well, Your Honor -- well, one, I don't

4  think they did look at different criteria, based upon what we

5  know and the recommendations we gave.  But, Your Honor, if

6  they're going to argue that and they're going to say that the

7  TDPs fail because they're not consistent with prepetition

8  practices, because the insurers evaluated different criteria

9  and that's how they paid or that's what the BSA did, we should

10  know that.

11         So, second, Your Honor, if you look at the scaling

12  factors, which are actually on page 151, it's the same

13  concept.  Once you determine a claim is compensable, you

14  determine whether a claim should be valued for more or less

15  given certain factors.  The aggravating factors here include

16  instances of abuse, abuser profile, impact of the abuse.

17  Again, we would make recommendations to the carriers and say,

18  look, we think this is the appropriate thing.

19         If the insurers basically contend that this is not

20  consistent with prepetition practices, two facts come from

21  30(b)(6) witnesses, right?  One is, no, actually, the claim

22  adjuster did do that and they agreed with the BSA in saying

23  this is correct; or, two, if they considered something else,

24  we -- again, we need to know that.  If their contention is,

25  no, the BSA actually considered all these other factors, then

1  we should be entitled to elicit that testimony from the claim

2  adjuster to say, okay, what did you consider?  Why did you

3  consider that?  Why didn't you articulate that to the BSA when

4  you were settling claims or paying for claims?

5              THE COURT:  But that's not your argument.  Your

6  argument isn't that why the insurers considered or didn't

7  consider certain things, that's not your argument, and why is

8  that relevant to your argument that you have to prove that

9  these are appropriate -- I don't know, what are you calling

10 them -- fair and reasonable, whatever that means?

11             MR. AZER:  Sure, Your Honor.  I mean, I guess the

12 point I would raise is, if the insurers are going to contest

13 that these are inconsistent with the BSA's prepetition

14 practices, they were part and parcel to the creation of our

15 prepetition practices.

16             THE COURT:  Were they?

17             MR. AZER:  So I guess what I -- they were involved

18 in the adjustment of claims.  They paid claims that were part

19 of the resolution process.  And so when we consulted with them

20 and said, hey, insurer, here's a claim, this is why we think

21 you should pay, if they somehow are now taking the position

22 and be like, no, we actually didn't consider any of those

23 factors, then that's certainly -- the testimony of the claim

24 adjuster certainly would undermine that.

25             THE COURT:  Okay.

1          MR. AZER:  Your Honor, I'm pausing because it looks

2   like you have a question.

3          THE COURT:  No.  I'm thinking, yeah --

4          MR. AZER:  So, Your Honor --

5          THE COURT:  -- no, that's --

6          MR. AZER:  Yes.  So, Your Honor, I mean,

7   ultimately, the fact is that these claim adjusters actually do

8   have relevant information that is important.  And it is not

9   like Imerys where it's just some objective piece of

10  information that we have or don't have, it's not a settlement

11  payment, it's not a reservation of right or denial payment, it

12  is actually trying to understand what the insurers considered

13  and whether they were in line with us in what they considered

14  --

15         THE COURT:  What difference --

16         MR. AZER:  -- because that certainly would

17  contradict some of their arguments.

18         THE COURT:  -- I still don't understand what

19  difference that makes.  I don't understand what difference it

20  makes whether the insurers are in line with what the Boy

21  Scouts thought, because the Boy Scouts are putting on what

22  they believe -- what it believes are the relevant factors.  It

23  developed the TDPs, perhaps with input, and maybe it didn't

24  develop it, whatever, but we know the insurance companies

25  didn't develop them.

1              MR. AZER:  Yes, Your Honor, I appreciate that.  Let

2    me try to -- try a different tack.

3              If the insurers comes in and say this is

4    inconsistent with your prepetition practices, yet the insurers

5    consented to those practices prepetition as to how to evaluate

6    claims, wouldn't that directly rebut the arguments they're

7    making to the Court?

8              THE COURT:  I don't know, did they -- I don't know,

9    because I don't know that I think that's relevant, but I'll

10   ask Mr. Plevin that question.

11             And I suspect --

12             MR. AZER:  I think Mr. Plevin is on mute.

13             THE COURT:  -- the debtors -- that the debtors know

14   -- no, I'm not asking him right now, but the debtors know --

15             MR. AZER:  Oh, I'm sorry, I thought --

16             THE COURT:  No.

17             MR. AZER:  I'm sorry.

18             THE COURT:  The debtors know whether in fact the

19   insurers consented or didn't consent.

20             MR. AZER:  Your Honor, we do have some

21   communications, but, as Mr. Plevin noted, the insurers are

22   effectively blocking us from using those communications based

23   upon common interest issues.  So we are effectively -- unless

24   we want to come to Your Honor and basically say they put this

25   at issue and, therefore, waived the common interest, so that

1  we can use those documents to impeach any arguments made by

2  the insurers and rebut any argument made by the insurers, we

3  are left with the testimony.

4           THE COURT:  Okay.

5           MR. AZER:  So, Your Honor, on the claim adjustment,

6  we do think it's relevant.  We think that it will contradict

7  the insurers' position, we think it will basically show that

8  they were aligned with us on how we created the TDPs.

9           But let's shift over to Mr. Plevin's other topics.

10  And we can go topic by topic, Your Honor, because I think it's

11  -- I think that's how you handled it in Imerys and I think it

12  makes sense.

13          On the legal conclusions, Your Honor, you know,

14  they object to topics 7 through 9, 11 and 12, and 20.  You

15  know, Your Honor, if you look at Imerys, I think you have to

16  look at all of them, right?

17          So, Your Honor, do you have Exhibit 7 to the

18  insurers' brief?  It's at -- so it's Docket Number 7206-5, and

19  I direct you to page 31 of 40.

20      (Pause)

21          THE COURT:  Okay.  What page number is that of the

22  transcript?

23          MR. AZER:  It is page 240-241.

24          THE COURT:  Okay.

25          MR. AZER:  So, Your Honor, this exact same issue

1  actually came up in Imerys.

2       If you look at Ms. Frazier's argument starting at

3  line 15 on page 240, and I'll read, "Okay.  So, number 7 and

4  8, this is kind of the core of the dispute.  Reasons that you

5  contend the plan is not insurance-neutral."

6       She goes on.  And the court then states on page

7  241, lines 5 through 7, "I think that's fair game and, if it's

8  limited and not legal conclusions, I think it's fair game."

9       Your Honor, if you look at our topic number 7, it's

10  the exact same thing, their contentions on whether the plan is

11  insurance-neutral.  We are entitled to understand the factual

12  predicate and only the factual predicate to their objections

13  and contentions as to the plan.  If there are factual issues,

14  just like in Imerys, we are entitled to investigate that and

15  that is what topics 7 through 12 seek.

16       Good faith is inevitably a factual issue, right?

17  If they think we are not acting in good faith, they have to

18  identify the facts and the policy provisions that they think

19  we are violating.  We should be completely entitled to that,

20  consistent with Imerys.

21       The same thing with regard to -- I'll drop to the

22  lack-of-information arguments, which are topics number 17

23  through 18, 21 through 24.  So those topics, Your Honor, you

24  can find it on -- in the Exhibit 2 to the insurers' motion, on

25  page 14 of 16 of Docket Number 7206.  17, 18, 21 through 24

1  deal with the liquidation analysis and feasibility of the

2  plan.  All we're asking for is not just communications, but to

3  the extent that the insurers have facts relating -- any

4  analysis of the feasibility of the plan or the liquidation

5  analysis, we should be entitled to it, just like insurance

6  neutrality.  Just like in Imerys, we should be entitled to

7  that information.

8         Now, Your Honor, Mr. Plevin I think talked about

9  Zurich, and Zurich noted it didn't have any communications.

10  To the extent that these insurers don't have information and

11  are willing to represent they have no independent facts, we

12  are willing to stipulate to waiving topics.  So that is -- we

13  are not trying to create depositions for the purpose of

14  depositions and we're happy to work with the insurers to

15  stipulate as to certain facts if they don't have any.  But,

16  absent that stipulation, the insurers should be required to

17  produce a witness that talks about the factual predicates for

18  their contentions or, alternatively, if it's expert testimony,

19  tell us it's expert testimony, and we'll go from there and see

20  what they rely on.

21         For those reasons, Your Honor -- I think I've

22  covered all the topics addressed in the motion to quash.  If

23  Your Honor has any questions, I'd be happy to answer them.

24         THE COURT:  No, I don't think so.

25         MR. AZER:  Thank you, Your Honor.

1              THE COURT:  Thank you.

2              Okay.  I'm sorry to do this but, as I announced on

3    Wednesday, I've got a work commitment from now, then I'll be

4    back at 1:45.  So we'll take this back up at 1:45.  My

5    apologies.  I would prefer not to disrupt the argument, but I

6    have to.

7              So we're --

8              MR. PLEVIN:  Your Honor, should we just pause our

9    Zoom feeds or should we --

10              THE COURT:  I think you can --

11              MR. PLEVIN:  -- reconnect --

12              THE COURT:  -- I think you can do that.

13              Thank you.  We're in recess.

14              COUNSEL:  Thank you, Your Honor.

15         (Recess taken at 12:10 p.m.)

16         (Proceedings resumed at 1:54 p.m.)

17              THE COURT:  This is Judge Silverstein.  We're back

18    on the record.  My apologies, my meeting lasted a little bit

19    longer than I thought it would, but we're back.

20              So let's pick up from where we were.  Mr. Azer, I

21    believe that you were -- you had finished your argument,

22    correct?  Okay.

23              Let's go with Mr. Christian.

24              MR. CHRISTIAN:  Yes, Your Honor.  Can you hear me

25    all right?

1          MR. CHRISTIAN:  Thank you.  I don't mean to go out

2     of order, I just have a few remarks on behalf of my client,

3     Great American, in response to some of the things Mr. Azer

4     said, and I'll do that now or I'll wait until an appropriate

5     time in the schedule.

6          THE COURT:  Well, I also see I have Ms. Grimm.  Who

7     else will I be hearing from?  And Mr. Moxley.

8          Well, Ms. Grimm may be interested in hearing what

9     you have to say, so why don't you go ahead.

10          MR. CHRISTIAN:  Okay.  Thank you, Your Honor.  I'll

11     try not to be repetitive of anything that's already been said,

12     but I do want to address the arguments you've heard from the

13     standpoint of Great American.

14          We've been told by the plan supporters that they're

15     going to prove to you at the confirmation hearing that these

16     are a scientific TDP, they are science-based, and what I

17     understand them to mean by that is that they're based on Boy

18     Scouts' historical experience, that's what they're trying to

19     prove.  Now, we don't think that has anything to do with

20     Section 1129 of the bankruptcy code; rather, they're going to

21     try and prove that to you because it's in their insurance-

22     related findings.  We don't think that's appropriate, we don't

23     think the Court should make those findings, but they haven't

24     withdrawn them, they haven't waived that condition to plan

25     confirmation, and so that's the issue that we're disputing.

1        Let me give you some context about how my client
2   fits into that puzzle.  We are an excess carrier that issued
3   policies in some of the years of the early 2000s and in some
4   of the years of the 1990s.  We sit above a million dollar SIR,
5   we sit above a primary carrier, and so we've encountered very
6   few sex abuse-related claims against Boy Scouts over the
7   years.  There are occasions where we've been asked to
8   contribute to a settlement of a claim that reached into our
9   layer, but we were not, as you heard argued this morning,
10  involved in the handling of Boy Scouts' claims.  To the extent
11  you could call anything we did as being involved in handling
12  and maybe, if you use a broad definition, it would capture
13  what Great American did, it was for a very small and non-
14  representative subset of the claims.

15        Now, Mr. Azer's remarks about the insurers being on
16  daily calls and so forth may or may not be true with respect
17  to a company like Hartford that covered decades where there
18  were lots of sex abuse claims and where it's a primary
19  carrier, but that can't be said for my client and that can't
20  be said for lots of the other insurers who are the subject of
21  these 40-plus deposition notices.

22        So I make those remarks because I think folks in
23  this case have tended to paint with a very broad brush.  I
24  certainly don't think the discovery sought from my client on
25  this subject aids in the findings you're being asked to make

1   about the supposedly scientific TDPs based on Boy Scouts'

2   historical experience.  And even if there were some tangential

3   relationship to those findings -- and I don't think there is,

4   I don't even understand the logic of how the few claims that

5   we were asked to contribute to at the excess layer would be

6   relevant to that inquiry, but even if we're tangentially

7   related, the idea that we're going to go through years and

8   years of files, make a witness available and have not only our

9   client's preparation and professional fees, but multiple

10   estate representatives with multiple lawyers and multiple

11   other insurers dialing in or what have you, in the midst of a

12   very truncated and break-neck schedule -- we have lots of

13   other witnesses to get through and we're going to turn very

14   quickly to expert discovery -- it just strains the idea that

15   it's proportional to the needs of the case.

16          And I do want to emphasize that point I just

17   mentioned about the experts.  It strikes me that the debate,

18   if we have to have one at the confirmation hearing, about the

19   supposedly scientific TDPs, is more of an expert case, right?

20   I mean, there's going to be the facts about what Boy Scouts

21   did and then there are going to be experts, probably on both

22   sides, disagreeing with one another about how the TDPs match

23   with that experience or do not match with that experience.  We

24   may also have expert testimony about whether it's reasonable

25   or unreasonable.  You know, we'll see how the case unfolds,

1  but the idea that we're doing more than 40 insurance company

2  depositions with individual claims handlers to address what's

3  really at the confirmation hearing going to be more of an

4  expert issue, and we're going to take time away from our work

5  in November and December and over the holidays where we should

6  be focused on those issues to engage in what I regard as

7  something of a sideshow, really doesn't make any sense to me.

8           So I'll just -- I'll conclude by returning to the

9  point that we think the findings that you're being asked to

10 make are sort of a la carte and unrelated to the requirements

11 of Section 1129.  For that reason alone, we don't think you

12 should be allowed to make them.  But, if you're going to be

13 asked to make them, then we ought to focus on what they're

14 arguing to you and not things about what my client contributed

15 to in the 1990s on one particular claim.

16           Thank you.

17           THE COURT:  Thank you.

18           Ms. Grimm?

19           MS. GRIMM:  Thank you, Your Honor.  And I see Mr.

20 Azer has his hands up, I don't -- hand up -- I don't want to

21 jump in front of him if he had a direct response to Mr.

22 Christian.

23           THE COURT:  No, that's okay.  I'm going to hear

24 from everybody once and then we'll go back.

25           MS. GRIMM:  Great.  Thank you, Your Honor.

1          Your Honor, Emily Grimm from Gilbert LLP, counsel

2   for the FCR.  As I noted earlier, the FCR filed an opposition

3   to the insurers' motions to quash and a cross-motion to compel

4   the production of claims handling materials.  We filed both

5   together since the underlying legal issues were the same and,

6   in light of that, I think it might be most efficient to

7   address some of the points raised by Mr. Plevin and Mr.

8   Winsberg and Mr. Christian now, then address at the end a

9   couple of procedural issues that the insurers raised

10  specifically with respect to our motion, but I defer to the

11  Court on your preferred approach.

12          THE COURT:  No, that's fine.

13          MS. GRIMM:  Your Honor, I heard Mr. Plevin and Mr.

14  Winsberg raise two key points this morning in support of their

15  motions, and the insurers raised those same arguments in their

16  opposition to the FCR's motion to compel.  They say that the

17  debtors already have all the information they need to prove up

18  their case and that insurer claims handling information isn't

19  relevant to confirmation in any event.

20          Our response is the same with respect both to

21  depositions and to documents.  The insurers who defended and

22  paid the abuse claims prepetition have relevant information

23  regarding the claims evaluated by that insurer.  And to the

24  extent that insurer contends that the TDPs do not reflect

25  prepetition practices or that they're otherwise unreasonable,

1  collusive, unfair, all words that the insurers have used in

2  their disclosure statement objections and in hearings at

3  various points in this case, documents and communications from

4  that insurer regarding those practices are going to be crucial

5  in rebutting their arguments.

6          The insurers just should not be allowed to advance

7  arguments like this while withholding any evidence disproving

8  their arguments and demonstrating that they either agreed with

9  and approved of the debtors' approach, or that they

10  independently used the same factors and approach and,

11  therefore, by definition, viewed them as reasonable and

12  appropriate for in-house purposes.

13          THE COURT:  I'm not sure --

14          MS. GRIMM:  And to be --

15          THE COURT:  -- that correlates and that's what I'm

16  trying to do.  So let's say one -- and we just heard one of  -

17  - let's say Great American in 1990, okay, however many years

18  ago is that, right?  Twenty one -- thirty one years ago in

19  1990, Great American, in the context of the number of

20  outstanding claims at that point in time decided to accept or

21  not object to a recommendation by the debtor, what does that

22  have anything to do with what's happening today?

23          MS. GRIMM:  I think it has something to do with

24  what's happening today if Great American stands up after all

25  those years and says we don't agree with these values, we

1  don't agree with these scaling factors, they are unreasonable,

2  inappropriate, unfair, call -- you know, use whatever

3  adjective that you want.  You know, we have offered with the

4  debtors and Coalition to not take a deposition if the insurer

5  at issue doesn't have any evidence, aren't challenging these

6  things, but we have yet to hear assurances on that front.

7           I hear talk of experts, and you touched on this a

8  little bit earlier, but what are these experts going to be

9  relying upon?  Are we going to see -- are these experts going

10 to be relying upon documents or information, internal

11 documents and information --

12           THE COURT:  No.

13           MS. GRIMM:  -- provided by insurers?

14           THE COURT:  No, they're not.  That's not --

15           MS. GRIMM:  Then I think we need to --

16           THE COURT:  -- going to happen.  It's not going to

17 happen that an expert is provided documents from the insurance

18 company to make its analysis if those insurance companies have

19 told me, which they have, that their witnesses -- that their

20 employees and their documents are not relevant and they're not

21 going to use them.  That's not going to happen.  If that were

22 to happen, that would be different.  If an insurance company

23 were to provide an expert with internal documents, then

24 they're clearly discoverable, but that's not going to happen.

25           MS. GRIMM:  And I think that's going to be helpful

1  in continuing to narrow our dispute.  I'm not sure we have

2  received those assurances until today during this hearing, and

3  so I am pleased to hear that.

4           I think another way to look at it is that the

5  debtors have the burden to prove good faith under Section

6  1129(a)(3), so the debtors are preparing to put on evidence

7  that their plan was proposed in good faith.  The insurers are

8  saying that the plan was not proposed in good faith and they

9  are pointing to the TDPs in support of that agreement.

10          Now, if the evidence shows that the TDP reflects

11 the insurer's own procedures, even if it's Great American's

12 procedures from 15 years ago, I don't see how that insurer can

13 credibly tell you that the plan was not proposed in good faith

14 on that basis except with respect to --

15          THE COURT:  From 15 years ago?

16          MS. GRIMM:  -- (indiscernible) scaling factors.

17          THE COURT:  I don't understand why that's relevant

18 to anything, what an insurer thought 15 years ago about maybe

19 five cases.

20          MS. GRIMM:  If they are making it relevant to their

21 arguments by challenging, then I think -- I would submit that

22 it is relevant.

23          THE COURT:  So let me ask you about that, because

24 here's what I wrote down, that you say, the FCR argues that

25 the insurers have put the values and claim evaluation

1  protocols in the TDP directly at issue in plan confirmation,

2  and then you say, here's how.  They say the value and

3  evaluation protocols in the TDPs are not, quote, "fair and

4  reasonable," unquote.  But isn't that the finding that the

5  debtors have put at issue; not the insurers, the debtors have?

6  And, therefore, the insurers might respond, but the debtors

7  have put that at issue.

8           MS. GRIMM:  If you would take a look at -- I'm sure

9  you might not have this one handy, but the insurers'

10  disclosure statement objections, which, as an example, you

11 could find at Docket Number 6052.  They are not just arguing

12 reactively to these findings, they spend the bulk of their

13 brief affirmatively attacking the TDPs and arguing, for

14 example, that the TDPs violate Section 502(a) and 502(b)(1) of

15 the bankruptcy code because they purportedly permit payment of

16 claims not compensable in the tort system.  They argue, as we

17 all know, that the plan and TDPs are collusive and not

18 negotiated in good faith under Section 1129.

19           And, Your Honor, these are the types of arguments

20 they've been making throughout the bankruptcy, even before the

21 findings were referenced in the plan, and in fact that's the

22 reason the findings are necessary to the plan.  They're in

23 defense --

24           THE COURT:  Isn't it true -- isn't it true that

25 these claims will not ever be adjudicated under 502?  I mean,

1 | that's just true.

2 |       MS. GRIMM:  I leave that to the insurers who raised

3 | the argument.  I'm getting out of my insurance mode into the

4 | bankruptcy world here, but I am just repeating the objections

5 | that the insurers have raised to date to show that they're not

6 | just saying that these confirmation findings are unnecessary

7 | or inappropriate.  They are not just reacting to the findings,

8 | they have been making affirmative arguments about the validity

9 | of claims coming in.  You know, they've been claiming that the

10 | proofs of claim were fraudulent from day one.

11 |       And so I don't think it's completely accurate to

12 | say that all of these arguments stem from what the debtor has

13 | done and the debtor's findings.  I think that findings in fact

14 | were defensive and reactive to what the insurers have been

15 | arguing throughout the course of this case.

16 |       THE COURT:  Well, maybe, but I don't -- but I don't

17 | -- well, you've heard my view on the findings, but as I'm

18 | reading -- and I've got four things that I've quoted from your

19 | filing -- that, yeah, the TDPs violate 502(a) and 502(b)(1),

20 | that's -- I'm not sure how that has anything to do with what

21 | the insurance companies did or didn't do prepetition with

22 | respect to these claims.

23 |       This, combined with the RSA's requirement that the

24 | debtors obtain a finding in any confirmation order that all

25 | allowed claim amounts and the procedures leading thereto are

1  fair and reasonable, amount to an attempt by the debtors and

2  abuse claimant representatives to bind the debtors' insurers

3  to pay over 235 million in liability for likely invalid claims

4  that are not subject to review by anyone, ever, not even the

5  abuse claimants' representative's hand-picked settlement

6  trustee.  That has nothing to do with what the insurance

7  companies did pre-bankruptcy.

8          So that's what I'm trying to understand, as well as

9  the arguments about proportionality, cost, expense, what we're

10 doing here with 40-some-odd depositions when we've got a whole

11 host of other things that have to be done in the next two

12 months.  So what's the value added -- let me ask it that way -

13 - what's the value added by taking these depositions?

14         MS. GRIMM:  You know, once again -- and I'm not

15 saying that we are using these depositions to -- there are

16 certain other arguments raised by the insurers like who should

17 the settlement trustee be, et cetera, that obviously claims

18 handling practices, they're not relevant to, I don't think

19 anybody is claiming that they are.

20         But, again, you know, we have what the insurers

21 have argued, the findings are in the plan, they are required

22 for the plan to be confirmed and, if the insurers are going to

23 stand up and make an argument that the TDP is unreasonable,

24 then we're entitled to see what information and evidence they

25 have to support that.

1          THE COURT:  Okay.  And you think that's going to

2   come from their witness -- their employees who did handling 20

3   years ago?

4          MS. GRIMM:  I think they have their own internal

5   documents, communications, manuals, procedures.  To the extent

6   they have things that are not duplicative of whatever the

7   debtor has produced, we can stipulate or do whatever we need

8   to do to, you know, not make them duplicate such productions,

9   unless they can tell us they don't have it, which some of them

10  have not, I think they have to produce it.

11         THE COURT:  Okay.

12         MS. GRIMM:  I believe, Your Honor, those were all

13  of my points on the merits.  I'm happy to address the

14  procedural issues with regard to our motion now or I can wait

15  until the very end when people have had a chance to speak.

16         THE COURT:  What are the procedural -- no, go

17  ahead.  What are the procedural issues?

18         MS. GRIMM:  Sure.  So the insurers raised two

19  procedural issues with our motion, one was that the FCR cannot

20  move to compel these documents because they didn't ask for

21  them.  I think the requests themselves make clear that's not

22  quite accurate and we did file a sample of those requests as a

23  supplemental exhibit at Docket Number 7352.  Admittedly, we

24  just did it today due to a miscommunication about the filing

25  and I apologize for that.  So I can certainly screen-share

1  them, pull them up, if it would be helpful for Your Honor to

2  see, but I can also just paraphrase or describe them, if you'd

3  prefer.

4          THE COURT:  You can just paraphrase, but what

5  you're telling me is you have asked for this information?

6          MS. GRIMM:  So what you would see is that we sought

7  interrogatories seeking targeted information regarding the

8  insurers' evaluation of the abuse claims and our document

9  requests seek all documents referenced in response to those

10 interrogatories.

11         The reason we didn't also add another slew of

12 document requests specifically parsing out claims handling

13 materials is because we thought it was duplicative of the

14 request I just described.  And, frankly, we also didn't do it

15 because the Coalition had issued exactly those requests raised

16 that way, and so we were trying not to reissue the same

17 requests over and over again.  But if the insurers truly

18 believe that our document requests would not have encompassed

19 anything related to claims handling or if the Court would find

20 it more appropriate for the Coalition to file another joinder

21 brief to our motion, we can certainly talk to the Coalition

22 about that, but it just seems unnecessary to us given the

23 volume of discovery briefing the Court is already dealing

24 with.

25         MR. CHRISTIAN:  Your Honor, may I briefly be heard

1   on that specific procedural point?

2           THE COURT:   Let me ask Ms. Grimm, do you have

3   anything further?

4           MS. GRIMM:   There's a second procedural point, but

5   I can address it when Mr. Christian is finished or --

6           THE COURT:   No --

7           MS. GRIMM:   -- whichever way --

8           THE COURT:   -- let's -- I'd like you to finish, Ms.

9   Grimm.

10          MS. GRIMM:   Okay.   The second one is that the

11  insurers argue that we did not give them appropriate

12  opportunity to meet and confer on these issues.   I can say,

13  Your Honor, we would love to come to a global resolution on

14  this issue, we would have preferred not to bring this dispute

15  before you today.   But, as of this morning, only four of the

16  22 insurers that we invited to meet and confer on Monday had

17  even bothered to respond, which, frankly, was not that

18  surprising because our request and our motion came on the

19  heels of several meet-and-confers we had had with respect to

20  depositions on claims handling where the insurers had made

21  their position on the legal issues very clear.   Our motion

22  also came on the heels of the insurers' motion to quash with -

23  - again, quash with respect to the same topics, claims

24  handling.

25          And so, again, if the Court would find it more

1   appropriate, we can certainly withdraw the motion without

2   prejudice and re-file it today or Monday, since we've given

3   the insurers five days to respond.  But, again, since the

4   insurers filed their motions to quash on Sunday and since the

5   Court was going to hear legal arguments on these issues today,

6   and we had had many conversations about our views on these

7   issues, it just seemed most efficient and appropriate to argue

8   everything at once.

9           THE COURT:  Thank you.

10          MS. GRIMM:  One more note, Your Honor, I'm sorry.

11  I do want to be clear that just by only hearing from a handful

12  of insurers, we did affirmatively reach out to the debtors to

13  obtain their prior communications with the insurers regarding

14  the specific topic of claims handling manuals, and that's why

15  we were able to unilaterally withdraw our motion as to -- I

16  forget what the list is -- I think maybe five insurers, based

17  on representations made in those communications.

18          So we have been working to narrow the scope of the

19  dispute, but I think this is about as far as we could get and,

20  given that depositions are scheduled to start imminently, we

21  just couldn't sit on our hands anymore.

22          That's all I have, Your Honor.  Thank you.

23          THE COURT:  Thank you.

24          Mr. Moxley?

25          MR. MOXLEY:  Thank you, Your Honor.  Good

1  afternoon, Cameron Moxley of Brown Rudnick on behalf of the

2  Coalition.

3          Your Honor, we've heard a number of representations

4  today about potential discussions that have been happening and

5  that are ongoing.  I note that the insurers' motion itself in

6  footnote 1, that's at Docket Item 7206 at footnote 1

7  references their ongoing discussions.  Your Honor, what I'd

8  like to do, if it works for the Court, is just walk through a

9  bit -- and I'll be very, very brief, Your Honor -- in terms of

10 the way the Coalition approached the topics that it noticed

11 for deposition and what its approach was, and then come back

12 to the end, Your Honor, and sort of tie that together with

13 what occurred and (indiscernible) forward.

14         What I -- let me just start then, Your Honor, if I

15 could, Your Honor, with the Coalition's sort of discovery

16 approach here.  What we've sought to do is just discover facts

17 -- and it's just facts, it's not legal conclusions or

18 contentions -- that the insurers have that suggest that the

19 TDPs are not consistent with the debtors' historical practices

20 or not fair and reasonable.

21         How do we go about targeting that discovery in the

22 most efficient way?  What we did, Your Honor, is we tried to

23 be very constructive and utilize all the tools of discovery

24 that are at the parties' disposal.  In particular, we utilized

25 requests for admissions, interrogatories, and the 30(b)(6)

 1  topics in an interlocking way, Your Honor, to try to narrow

 2  the scope of issues as we much as we could.

 3        What we did is we asked insurers -- and I note,

 4  Your Honor, we were targeted as well on who we served.  In

 5  footnote 1 of our letter, Your Honor, you'll see who it was

 6  that we targeted and we targeted ten, and we posed to them

 7  questions asking them to admit certain things about the TDPs,

 8  and we were very specific and precise in those questions.

 9        For example, we asked the insurers to admit that

10  the claims matrix values are consistent with the BSA's

11  historical settlement practices.  Now, if an insurer, Your

12  Honor, admitted that, then we understood that the insurer --

13  who, unlike the Coalition, did not exist at the time -- the

14  insurer, based on its experience and evidence available to it,

15  had no evidence that those values were inconsistent with

16  historical practices.  That effectively ended the inquiry for

17  us on that issue if an insurer admitted that position.  If it

18  didn't, that's fine.

19        What we then said is, here's an interrogatory, if

20  you didn't admit that the claims values, for example, were

21  consistent with the debtors' historical practices, what is the

22  factual basis for you not being able to admit that, and did

23  you have claims handling experience with them that said in the

24  -- and just by way of example, Your Honor, you know, the claim

25  and the TDP is dealt with at a certain value, let's just say

1  100, and your practice is that, no, no, that was always at

2  five, fine, we want to discover that now.  We don't want to

3  discovery that at the confirmation hearing, so lay that out

4  for us, if you could, in response to this interrogatory.

5           And, no surprise, the insurers did not meaningfully

6  respond to the interrogatories, and so what we did is we

7  propounded 30(b)(6) notices that said, to the extent that they

8  denied that a particular -- you know, like I -- Your Honor, if

9  you look at the RFAs, which are appended as Exhibit 2 to the

10 insurers' motion, so they are before the Court -- if you look

11 at those RFAs, we ask very specific, targeted questions.  And,

12 as we said, if you denied that, then we'd like that to be the

13 subject of a 30(b)(6) deposition, the basis for your denial.

14          These aren't legal conclusions or contentions, Your

15 Honor, these are facts.  There's no question in our mind that

16 these are factual questions, how it handled claims, what

17 criteria the insurers relied on, what caused the BSA to

18 address such claims in the tort system at higher or lower

19 values, what informed that.  These are all factual issues that

20 we were seeking to understand from the insurers.  And, like I

21 said, if along the way there were particular ones that they

22 admitted, then we wouldn't have to ask any questions about

23 those topics.

24          The insurers' own authority, Your Honor, as we put

25 in our letter, supports that the way in which we framed these

1  questions is a proper way of doing it.  I just direct Your

2  Honor to the State Farm case that we cited in our letter and

3  that the insurers relied on.

4          We should note too, Your Honor, that the Coalition

5  -- I just want to correct the record here on this -- the

6  Coalition did meet and confer with insurers, we met with them

7  and conferred with them on November 5th.  Their contention at

8  that meet-and-confer was essentially that our topics called

9  for a legal conclusion.  Just as I did just now in presenting

10  to Your Honor, I discussed with the -- I personally discussed

11  with the insurers in that meet-and-confer how we were actually

12  seeking to understand facts and the approach we were taking

13  and why we were taking it the way we were, to be as efficient

14  as we could.

15          And I specifically asked if any insurer, you know,

16  during that meet-and-confer on November 5th, if any insurer

17  intended to refuse to make a designee available at all or

18  could we continue our discussions, and no insurer advised me

19  on that date that they intended to not make a designee

20  available.  It was not until nine days later when this motion

21  was filed.

22          Your Honor, but what we've heard today -- so that's

23  the -- I just wanted the Court to understand the approach

24  we've taken.  We've tried to be as targeted as we could and to

25  narrow issues along the way.  What we've heard today, I think,

1  from Mr. Plevin and the insurers, Your Honor, is that they are

2  not planning to call any fact witnesses at the confirmation

3  hearing.  Your Honor asked the question that I and a number of

4  others, I think, had immediately, which was how does that play

5  into the expert reports that will be provided.  I'm not sure

6  we heard the same thing from Mr. Plevin and from Mr.

7  Christian.

8         I think what we heard -- and I am loathe to put

9  words in lawyers' mouths, but they'll come back and tell me if

10  I got it wrong -- I think what we heard from Mr. Plevin was

11  that their expert would be basing things on, you know, the

12  debtors' information alone.  I think what we heard from Mr.

13  Christian, essentially, was that their experts may speak to

14  the facts as their insurance company understood them.

15         So we'll see how that plays out, you know, Your

16  Honor.  What I would suggest, though, is that there may be a

17  path forward, as you heard from, I think, all parties on

18  different sides of this issue, depending on what the insurers

19  are willing to stipulate to with respect to what they will or

20  will not put into evidence either via fact witness or an

21  expert witness.

22         And so I would -- I hope it's constructive, Your

23  Honor, that I make the suggestion that we don't think it's

24  appropriate for the motion to quash to be granted given that

25  these (indiscernible) are continuing.  So we would urge the

1 Court not to rule and grant the motion for that reason.  We

2 think that, for all the reasons we've stated today and as we

3 stated in our letter, the motion should be denied.

4 But of course, if Your Honor denies the motion,

5 that won't stop us from continuing discussions.  If Your Honor

6 grants the motion, it will have an adverse effect on the

7 willingness of parties to talk, obviously.

8 So I hope that was helpful, Your Honor.  I'm happy

9 to answer any questions you may have.

10 THE COURT:  Well, are you suggesting that if we get

11 clarity around the issue of whether the -- of whether the

12 insurers -- and that's too broad a brush, okay -- an insurance

13 company is going to be introducing their own factual evidence

14 at confirmation with respect to the TDPs, the values, the

15 matrices, et cetera, and whether -- and if they're not -- and

16 if they're not going to be providing their internal factual

17 information to an expert, but simply relying on the debtors'

18 information, then are you saying you don't need these

19 depositions, is that where we're going?

20 MR. MOXLEY:  I think what I would say, Your Honor,

21 is that if a particular insurer was willing to stipulate that

22 the TDPs are based on the debtors' historical settlement

23 practices, then our issue is resolved from the Coalition's

24 perspective.

25 THE COURT:  Yeah, but that's a different issue.  I

1   mean, you know, admitting to something versus not knowing the

2   facts are very different, it's very different.  It's not, you

3   know -- not admitting doesn't mean you're denying and it

4   doesn't mean you know the facts.  So I think it's different

5   and --

6           MR. MOXLEY:  Yes, and I think --

7           THE COURT:  -- I don't see them agreeing to that.

8   It was a thought.  I just wanted to make sure I understood.

9           MR. MOXLEY:  Yes.  And, Your Honor, what I would

10  say is -- maybe I wasn't as clear as I should have been on

11  this -- let me just say, from the Coalition's perspective -- I

12  don't want to speak for other parties -- from the Coalition's

13  perspective, we are open to having continued discussions with

14  the insurers to understand precisely what it is they do and do

15  not plan to put into evidence, whether via a fact witness or

16  an expert witness through the expert report or through expert

17  testimony.  Today was the -- I mean, you know, you heard from

18  Mr. Plevin that the insurers had a call yesterday and he

19  reported that on this -- that's the first that we, the

20  Coalition, have heard that information.

21          And so what I'm suggesting to Your Honor is that I

22  think that discussions can continue and are potentially

23  productive to either obviate the need for some of the insurer

24  depositions, depending on what insurance companies are doing.

25  And I agree with you, Your Honor, that the insurance companies

1  take different positions, so there may be some insurers that

2  are willing to stipulate to certain things and other insurance

3  companies are not.  And so there may be a way to reduce the

4  number of depositions that go forward if these talks are

5  allowed.

6          Thank you, Your Honor.

7          THE COURT:  Let me ask you this -- and I don't

8  think I've asked this question yet of anyone -- when you --

9  when the Coalition issued their deposition notices, did you

10  issue them to all insurers, primary insurers, excess insurers?

11  Who did you issue them to?

12          MR. MOXLEY:  No, we didn't issue them to all

13  insurers, Your Honor.  We issued them to ten insurance

14  companies.  They're identified in footnote 1 of our letter,

15  which is Docket Item 7312.

16          And the approach we took, Your Honor, was to ask

17  insurance companies who had been heavily involved in the case

18  -- so I'm not suggesting that they necessarily were all

19  primary or that that was the driving factor in who we chose,

20  it was more to understand sort of the insurance companies that

21  have really inserted themselves into the issues in the case,

22  what is their position, what is their evidence, if any, that

23  suggests the TDPs are inconsistent with historical practices.

24          And, Your Honor, just to put a finer point on this,

25  you know, the way our RFAs were structured and the way that

1  they've been built into the 30(b)(6) topics, the idea was to

2  understand if a particular insurance company had any evidence

3  that was contrary to or that suggested that the values in

4  their experience were different from the TDPs.

5           So Your Honor is quite right to correct me and to

6  say that maybe I went too far in what we would need in a

7  stipulation, but if there was something that, for instance, an

8  insurance -- and I recognize, Your Honor, that I may be sort

9  of negotiating a stipulation in the middle of court and I

10 don't want to be inappropriate about that, but since you asked

11 what will be constructive -- you know, if there are ways in

12 which a particular insurance company could stipulate to what

13 information it has.  For instance, we don't have any

14 information -- we, Insurance Company X, do not have any

15 information that suggests that the values are different; we

16 still have issues and objections to the TDPs, but we don't

17 have any evidence, that may obviate the need for a deposition

18 because we don't have to be concerned then that there's going

19 to be evidence in the expert report that we never got a chance

20 to ask questions about or discover.

21           THE COURT:  Okay.  I'm still struggling with the

22 idea that one insurance company -- and, particularly, perhaps

23 an excess insurance company -- who had minimal experience with

24 the debtor, would know what the debtors' historical experience

25 was and/or would know whether they had any evidence that was

1  contrary to it, or would -- and I had a third or, I lost it,

2  but --

3          MR. MOXLEY:  Well, Your Honor -- I'm sorry, Your

4  Honor.  Well, on the first of your two ors, you know, they may

5  not know.  And that's part of our point is we just want them

6  to say, we don't have anything contrary.  On the second, you

7  know, what they --

8          THE COURT:  Those are two different things.  Those

9  are two different things that require a whole lot of different

10 diligence, let's put it that way.

11         MR. MOXLEY:  Right.  But, Your Honor, that goes to

12 the point, though, of whether or not we should have an

13 opportunity to depose the person or the company.

14         THE COURT:  And I guess I'm trying to figure out

15 the -- quite frankly, the value of that information, even if

16 somebody -- even if some insurance company 20 years ago has,

17 you know, helped -- paid on five claims, what's the worth of

18 that versus they're having to go figure all of that out, and

19 the time and expense for both the insurance company and, quite

20 frankly, the estate, and given the time period that we have

21 and what has to be done?

22         MR. MOXLEY:  I think the Coalition agrees with Your

23 Honor wholeheartedly, but that is the balance.  That's what

24 we're saying, I think, is that if an insurance company is not

25 willing to tell us, they're not going to bring to bear the

1   experience they had in those five cases in 1990, they should

2   tell us they're not going to bring that to bear at the

3   confirmation hearing, if that's what it is.  If they're not

4   willing to say that, we should have an opportunity to question

5   the company about that experience and how they plan to use it.

6           So it's a balance, I think, Your Honor, and if --

7   so I think we shouldn't be hamstrung by not being able to

8   question the witness if they're not also willing to say I'm

9   not going to bring that today.

10           THE COURT:  Okay.  And I take it the Coalition has

11  been able to see the information that the debtor has with

12  respect to its historic claims handling procedures?

13           MR. MOXLEY:  No, Your Honor, we have not.  And we

14  are, just as the other parties, a part of the discovery

15  process now.  We -- I don't want to inappropriately get into

16  mediation issues, but we don't have any special access.

17           THE COURT:  Okay.

18           MR. AZER:  Your Honor, can I provide some insight

19  into one issue that was raised?

20           THE COURT:  Mr. Azer.

21           MR. MOXLEY:  Thank you, Your Honor.

22           THE COURT:  Thank you, Mr. Moxley.

23           MR. AZER:  Yes.  Thank you, Your Honor.

24           I know one thing that you focused on is, you know,

25  claims from 15 years ago, and I think that was based on Mr.

1  Christian's comments, and I just want to clarify a couple of

2  points.

3         The insurers were paying out claims basically up

4  until the time of filing.  And so I actually looked at an

5  exhaustive spreadsheet we have for Great American and the last

6  -- the most recent one I can find that they paid is 2016.

7  Zurich, for example, paid claims in 2018/2019.  So we're not

8  talking about claims that are truly historical from 20 -- 15,

9  20 years ago, we're talking about more current claims.  That's

10  point one.

11         And then, point two, Your Honor, we completely hear

12  you about the proportionality point, and that's why the

13  debtors are willing to limit the depositions to those insurers

14  who actually paid to defend claims or paid indemnity amounts,

15  which would significantly narrow the scope of the depositions.

16         THE COURT:  Okay.  So doesn't the fact that you can

17  look at a spreadsheet tell me that you have all of the

18  information that the debtors need to put on their case?

19         MR. AZER:  So, Your Honor, the spreadsheet tells me

20  they paid a number, but it doesn't tell me -- like, if we look

21  at the TDP -- sorry -- when we look at the TDPs together,

22  right, there are criteria for determining that it's a valid

23  claim.  So what the spreadsheet tells me is on -- I think it

24  was March 21 of 2016, Great American made a contribution to an

25  abuse claim, but what it doesn't tell me is, when Great

1   American made that contribution to that abuse claim, did it

2   consider the same factors we consider in the TDPs, which is

3   identity of abuser, connection to Scouting, date of abuse,

4   location, it doesn't say that.

5          So that's the piece that we're really talking about

6   is not the quantifiable numbers -- yeah, we have the

7   quantifiable numbers, but what we don't have is saying, hey,

8   claim adjuster, you thought about the same things we did.

9   Does that --

10          THE COURT:  And what if they didn't --

11          MR. AZER:  -- help answer the question, Your Honor?

12          THE COURT:  -- and what if they didn't, then should

13  I find the TDPs' criteria are not good, is that -- that seems

14  to be the flipside --

15          MR. AZER:  No, I think --

16          THE COURT:  -- of this.

17          MR. AZER:  Your Honor, I actually don't think

18  that's the case.  You know, we obviously have our criteria and

19  we're saying it's consistent with that, but if the debtor --

20  if the -- I'm sorry, not the debtor, apologies, Your Honor --

21  if the insurers basically are verifying that they looked at

22  the same thing, we don't understand how they can basically

23  take the opposition position now when on a prepetition basis

24  they were agreeing with what we did.

25          THE COURT:  There could be any number of reasons

1  for that.  Okay.  Thank you.

2          MR. AZER:  We understand, Your Honor.

3          THE COURT:  Thank you.

4          Mr. Rizzo, you're a new face here.

5          MR. RIZZO:  Good afternoon, Your Honor, Louis Rizzo

6  for Travelers Insurance Company and related entities.  Thank

7  you for allowing me to address some of the points raised most

8  recently and provide some context.

9          Travelers is one of those excess carriers that

10  participated in payment of two claims, one was 26 years ago,

11  the other 28 years ago.  And not only is that the history of

12  claim payment known to the debtors, that was disclosed in our

13  discovery answers, and yet, with that information in hand, we

14  received these same -- not just 30(b)(6) notice, but also an

15  individual claims handler notice for the claims handler

16  involved in those two claims decades ago.

17          And I can't help but recall as I sit and listen

18  today to Your Honor's admonition when this compressed schedule

19  was put in place where all of us, all parties were admonished

20  to think -- be thoughtful about discovery requests, be mindful

21  of the schedule, and think about what's needed -- needed --

22  for each party's burden.

23          We've seen shifting sands of argument here from the

24  parties, including filings, Your Honor, that have taken place

25  during this hearing relating to these matters in dispute, it's

1  hard to understand how these issues can arise in the face of

2  the knowledge of not just the body of information that is

3  available to all and in the possession of the debtor, but we

4  played out clearly in our discovery responses.  It seems to me

5  there has been no effort to discriminate between what's needed

6  and what's not.  And so the notion that how an adjuster may

7  have thought about whether he should agree to the requested

8  funding for a settlement proposed by the Boy Scouts 26 or 28

9  years ago is necessary for the debtor to meet its burden is

10  impossible to fathom.

11          There's a suggestion that they want to speak to the

12  carriers that defended and paid these claims.  Excess carriers

13  without -- almost without exception, do not defend the claims;

14  they have the right, but not the obligation to defend them.

15  The Boy Scouts and perhaps their primary carrier defend those

16  claims.  That's the information that's potentially relevant to

17  the analysis as the debtor and the plan proponents have framed

18  it.

19          And with that context, Your Honor, we would urge

20  the Court to grant our -- the insurers' motions to quash and

21  deny the cross-motion to compel.

22          Thank you.

23          THE COURT:  Thank you.

24          Ms. Marrkand, I have not heard from you yet on this

25  matter.

1          MS. MARRKAND:   Thank you, Your Honor.   As I

2   mentioned earlier, I represent Liberty Mutual.   And you've

3   heard Mr. Plevin and I think others talk about fronting

4   policies.   So I hate to get into the weeds on coverage like

5   this, but under the fronting policies, Your Honor, as we've

6   disclosed to the Coalition, the FCR, and the TCC -- of course,

7   the Boy Scouts already knew this -- the Boy Scouts handled all

8   of the claims, Your Honor, prepetition claims under the

9   fronting policies.   They selected defense counsel, they

10  litigated the cases, they settled the cases, they took the

11  cases to trial.

12          So I think I'm hearing then, Your Honor, that

13  because Liberty Mutual didn't -- and we do have some excess

14  policies, Your Honor, upper, upper, upper excess, we never

15  even got notice of any prepetition claims under those policies

16  -- so Liberty Mutual never paid a single dollar for the

17  defense or indemnity of a prepetition abuse claim.

18          Number two, Your Honor, I'm a little -- I think

19  it's very important here about when anyone makes a

20  representation to you about what they have or haven't done,

21  and the FCR said it served discovery.   And it did serve

22  discovery, Your Honor, interrogatories, all of which are

23  identified in this letter, there are about eight of them, all

24  of which go to prepetition claims handling.   Those are

25  interrogatories.   There is a single document request, Your

1  Honor, about manuals or claims handling procedures from the

2  FCR.

3      And when Ms. Grimm said a minute ago, Judge, this

4  is just kind of empty procedural, we don't want to get caught

5  in this kind of quagmire, because we could have just jumped on

6  what the Coalition did.  Well, actually, Your Honor, the

7  debtors had moved for protection of claims manuals and that

8  motion was ripe, and the Coalition and the T -- I think

9  everybody joined them, the debtors withdrew their motion, Your

10 Honor, as did the Coalition withdraw its joinder.

11     So, first, there was no discovery served by the FCR

12 for claims handling procedures; secondly, the debtors, who

13 initially moved for that, withdrew their motion, and Mr. Azer

14 reported that to you.  So we are now so attenuated from what

15 really matters, which is the debtors prepetition claims

16 handling practices.

17     And you might recall, Your Honor, Mr. Goodman told

18 you on October 5th -- these are his words, Your Honor -- that

19 you were asking kind of for a roadmap of what was going to

20 happen on confirmation discovery and Mr. Goodman, a plan

21 proponent, said that, "In terms of discovery, debtors'

22 historical settlements and experience in the tort system is

23 what is driving the discovery process.  Debtors will prove the

24 TDP values and factors are consistent with debtors' historical

25 experience."

1             For us, Your Honor, Liberty Mutual, and as Mr.

2   Plevin said a little while ago, we have no independent facts.

3   What are we going to rely upon when we come before you?  We're

4   going to look at what the debtors have produced, we're going

5   to look at what their experts say and what our experts say.

6   Under no circumstances could we be hypocritical and put on a

7   witness whom we haven't let be deposed, whether as a 30(b)(6)

8   or a fact witness, and think you would ever allow us to do

9   that, nor are we going to provide an expert with any

10  information or documents on prepetition claims handling unless

11  that too has been provided.

12            So it is difficult to understand right now, Your

13  Honor, how any of this bears on what you are going to be

14  dealing with and what the debtors have asked you to deal with.

15            And I would just make one final remark.  When you

16  asked Mr. Moxley does he have access to the prepetition claims

17  handling, he's a plan proponent, Your Honor, the debtors do.

18  It's the debtors' plan and it will be the debtors who are

19  going forward.

20            So I think, Your Honor, you have asked a series of

21  very surgical questions and I'm, in all candor, not sure that

22  one of your questions that you put to the debtors' counsel or

23  the FCR's counsel or the Coalition's counsel was actually

24  answered, I think it was artfully -- they were artfully

25  deflected, but if we need to say it again and confirm it in

1  writing, certainly, I can do that for Liberty Mutual.  I know

2  Mr. Plevin was authorized to speak on behalf of all of us.  We

3  have no independent facts.  We're not putting on any fact

4  witnesses, nor are we relying on any data.

5          And as I did note, when debtors initially sought a

6  claims manual from Liberty Mutual -- and it's exactly what

7  Your Honor has said -- does it mean that if a witness

8  testifies that the TDPs are unreasonable, are not consistent

9  with the tort system, therefore, your work is over?  They

10  would never admit to that.

11          This is about legitimate fact discovery in the

12  context of this case, Your Honor, and I would respectfully

13  urge that you certainly deny the FCR's cross-motion, at a

14  minimum, and grant our motions, but if you need to, to ask

15  your questions again to get straight answers.

16          I really appreciate the time to address you.

17          THE COURT:  Thank you.  Let me ask you a question,

18  which then I'll ask -- I've got the three -- I've got Mr.

19  Winsberg's hand up, Mr. Plevin, and Mr. Christian -- and when

20  you address me, you can answer the same question then for me.

21          The gist of -- quite frankly, the whole gist of the

22  argument, I think, that the -- I'll call them all the

23  objectors to the motion for a protective order or to quash,

24  their whole position is, seems to be boiled down to, well,

25  what if an insurance adjuster has information or adjusted

1  claims in the exact same way the Boy Scouts did, then aren't

2  we entitled to know that to -- I think what someone said was -

3  - impeach the insurer's position -- they didn't say impeach a

4  witness, but they said impeach the insurer's position.

5           What's the response to that?

6           MS. MARRKAND:  I think, Your Honor, that is why it

7  is the debtors' historical claims handling practices.  We

8  didn't pay any, so -- nor defend any.  I'm somewhat in the

9  bucket of the excess carriers.

10          THE COURT:  Uh-huh.

11          MS. MARRKAND:  So why could it possibly be that an

12  insurer who paid -- it doesn't seem to matter, Your Honor, if

13  it's ten claims or what the year was that those payments were

14  made, how does that bear now on 2021 and the way cases are

15  litigated in the tort system today?

16          Because what you will know, Your Honor, is -- and

17  the Boy Scouts are going to admit this in front of you -- when

18  they handled their claims, they considered the jurisdiction,

19  they considered the judge, they considered the defense -- I'm

20  sorry, the plaintiff's counsel, they considered the nature of

21  the abuse, the severity of the abuse.  And when Mr. Ogletree -

22  - I believe he is the Boy Scouts' 30(b)(6) witness -- he's

23  also going to talk, just as the Third Circuit did in

24  Combustion Engineering, about liability.  There has to be

25  liability and injury that the Boy Scouts can prove.

1          I suspect -- I don't know, Mr. Ogletree hasn't been

2   deposed -- but what an insurer did or a series of insurers did

3   in the context of a handful of claims, or maybe Hartford more,

4   I don't honestly know, how does that then, as basically what

5   the debtors are saying is, we should be estopped, Your Honor,

6   actually estopped from defending the TDPs -- or challenging

7   the TDPs because in a certain context this is what insurance

8   company did.  So you will then be asked, Your Honor, to

9   evaluate the claims handling for each particular claim, that's

10  what that will devolve into.

11          So it is not -- and that's what -- I'm afraid I'm

12  seeing some, you know, hide-and-seek here because we've heard

13  a couple of -- we've heard a couple of statements.  If you

14  defended -- wait a minute, let me get it exactly right -- I

15  think Mr. Moxley said, "If an insurer were heavily involved,

16  inserted themselves into this case" -- I'm not quite sure what

17  that means -- I have inserted Liberty Mutual into this case

18  because I was invited to this proceeding as an insurer, so of

19  course I've inserted Liberty Mutual into the case because we

20  issued those fronting policies and excess policies, but it

21  doesn't mean that I am precluded, Your Honor, from offering

22  evidence relying on the debtors' documents, the debtors'

23  testimony and their experts, from bringing that to the Court's

24  attention and saying this is what they've just said, Your

25  Honor.

1          Under what they're asking you to do is basically

2   say I just want to play this out for trial.  A witness

3   testifies -- yeah, I didn't consider, for example, how many

4   times this poor young person was abused.  Therefore, Your

5   Honor, does that mean in that particular case that you would -

6   - since this is not in front of a jury -- you would estop that

7   insurer and say, see, you didn't consider that in the Jones

8   case?  Whether it was 40 years ago, like Mr. Rizzo said for

9   Travelers -- and I take Mr. Rizzo at his word that there must

10  have been something recent, I believe he said with Great

11  American -- that cannot be that the debtors, who have put this

12  all before you, are basically giving -- this is the Faustian

13  bargain they want, withdraw your complaints about the TDPs and

14  we won't depose you.

15          And what you have rightly spotted, Your Honor, is

16  that's not right.  We don't have the burden here, they do, and

17  we are trying to get the discovery that we're entitled to to

18  see how we put forth our case.  But you've heard Mr. Plevin

19  say we're not putting up any fact witnesses, we don't have any

20  independent evidence; we're not giving secret information to

21  experts.

22          This all comes down to one issue, the argument of

23  impeachment, and I think that is extreme and I think

24  particularly, Your Honor, given the clock that we're under, it

25  is, as Mr. Plevin said, completely disproportionate to what

1  this case requires.

2          THE COURT:  Thank you.

3          Mr. Winsberg?

4          MR. WINSBERG:  Yes, Your Honor.  Can you hear me

5  okay?

6          THE COURT:  I can.

7          MR. WINSBERG:  Just real briefly.  I think Your

8  Honor hit on the head, Mr. Azer was able to on the tip of his

9  fingers in the middle of this hearing, pretty impressively,

10 pull up information, you know, on what carriers had paid in

11 settlements.  They have this information, they're not

12 contesting it, it's at his fingerprints; they produced it.

13 There is a document production and in there is a spreadsheet,

14 a pretty voluminous spreadsheet, I'm told it's over a hundred

15 columns, that has all this information in it.  So they have

16 the information.

17         As our clients, the Allianz insurers, are excess,

18 we produced a redacted loss run, among other things, so they

19 have our information already on those settlements.  And what

20 they're really trying to get at and trying to argue in

21 relevancy for Your Honor is the sausage-making -- the idea

22 that somebody's sausage-making and how they made a decision

23 back like, you know, five, ten, thirty years ago, you can take

24 the pick, is somehow relevant or proportional to determine

25 whether these TDPs, which the debtors have put at issue with

1   their proposed findings and order, are appropriate or relevant

2   or proportional, and we don't think they are.

3          And so we would respectfully submit that the Court

4   should, you know, grant the motion for protective order, that

5   the claims information, you know, is not relevant or

6   proportional in light of your decision in <u>Imerys</u> and we think

7   you got it right there.

8          And we'd also note, you know, one last point on the

9   FCR's motion.  You know, look, everybody needs a little bit of

10  grace in this case and we get it, it's such a busy case, but

11  they did file their supplemental paper in the middle of a

12  hearing and, you know, we don't really think that's

13  appropriate either.  But, in any event, we do think you got it

14  right in <u>Imerys</u>.  They have the information and what they're

15  really asking for is information that they could have tried to

16  get from us if they had just granted -- consented to our

17  motion for stay relief, but that's not what they chose to do

18  and how they want to do it on this compressed time frame.

19         So we respectfully request Your Honor grant the

20  motions and thank you for your time today.

21         THE COURT:  Thank you.

22         Mr. Christian?

23         MR. CHRISTIAN:  Thank you, Your Honor.  David

24  Christian, again, for Great American.

25         I'm first going to address the question you posed

1    to all of us, and then I just want to hit on a couple of more

2    technical points for the sake of record and to make sure

3    there's no confusion for Your Honor or later.

4             In response to the question you posed first to Ms.

5    Marrkand, I think Your Honor had already sort of gotten your

6    hands around what is the appropriate response and that is,

7    let's say a claim that was first presented to us in the early

8    2000s for abuse that allegedly took place in the 1990s, you

9    know, it involves a particular judge in a particular

10   jurisdiction and there's a settlement demand that the debtor

11   wants to accept, and we're being asked to contribute, you

12   know, a share to it.  In other words, it's not our settlement,

13   we're not paying the total value of it, we weren't involved in

14   the defense of it, but we're just being asked to resolve a

15   particular case.  And our insured says, you know, it's the one

16   case we've got right now that's really got us worried and we'd

17   like you to contribute.  And this is all, of course,

18   hypothetical; I'm not disclosing any particular details about

19   a specific case.

20            Our decision to either go along with or not contest

21   or not file a declaratory judgment action against our insured

22   with respect to that case is a decision that has no bearing

23   whatsoever on the findings this Court has to make under

24   Section 1129 of the bankruptcy code.  It also has nothing to

25   do with how one would reasonably and appropriately and fairly

1  address 80-some-thousand claims that are being presented.

2          We have gone from a world where I think it was

3  something like 250 cases, maybe a thousand or slightly more

4  than a thousand of potential claims, to over 80,000 non-

5  duplicative claims, and how you handle that fairly and

6  reasonably is totally unrelated to a question of will you

7  contribute to this particular settlement in this case that

8  we've worked up that maybe is trial-ready, that is going to

9  have defense costs associated with it, maybe in the millions

10 of dollars, right?  So they're not just apples and oranges,

11 they're fruits and vegetables; they're not even in the same

12 category.

13          And so, you know, I think that's the response to

14 Your Honor's question and I think Your Honor had sort of

15 gleaned that earlier in the hearing.

16          Now, on two more technical points, I guess I wanted

17 to return briefly to the -- FCR's cross-motion with respect to

18 the procedural arguments that were addressed by Ms. Grimm.

19 Just so the record is clear and so Your Honor understands what

20 we're dealing with, I want to lay out exactly what happened.

21          FCR filed a cross-motion on Monday in which they

22 admit that they did not meet and confer prior to filing the

23 motion, they said they could meet and confer after they filed

24 the motion.  Then, late last night, they withdrew the motion

25 with respect to some carriers, including Mr. Plevin's client,

1  who authored the response to their cross-motion, so that

2  presumably he couldn't argue it today?  I really don't

3  understand the decision-making on that, but that happened late

4  last night.

5          And then, today, during the hearing, after the

6  Court had already been convened for more than two hours, they

7  filed a proposal of what they would serve on us by way of

8  document requests if they were allowed to do so.  Because, as

9  you've already heard, they didn't actually request these

10  documents, the FCR didn't.

11          And why is all that technicality significant here?

12  Well, because there are some carriers who never got any

13  document requests from the FCR.  My client did, so I can't

14  make that point.  But if my client had been asked to meet and

15  confer about this cross-motion before it was filed, it's

16  possible we would have resolved it.  Indeed, we resolved that

17  issue with other parties who have served document requests on

18  us.  So the order and the timing makes a difference.

19          And so here we are in a position where the FCR has

20  cross-moved about something it never sought, that it tried to

21  piggyback on parties with whom we've resolved issues through

22  the meet-and-confer process that is supposed to happen before

23  a motion gets filed just so we don't get caught in the

24  situation with the FCR seeking documents that it never sought

25  in the first place during a hearing.

1        So I do think the procedural issues are an

2    independent basis to deny the FCR's cross-motion.  I think,

3    however, the argument you've heard today, Your Honor, means

4    you can deny the cross-motion on the merits.  I mean, I think

5    we've spent a lot of time and Your Honor has gotten a good

6    feel for the substance of it.  And so, on either basis, I'd be

7    happy for you to deny the cross-motion, but I think we know

8    what the right answer is on the merits as well.

9        And then just one last technicality, at the risk of

10   over-lawyering this for just a half a minute -- I feel like,

11   given the stakes in this case and the number of parties

12   involved, it's important to be clear about this.  I heard Mr.

13   Moxley say that it would help the Coalition to know that we

14   would use the debtors' information alone, that's the phrase I

15   wrote down in my notes.  Well, it's not necessarily the

16   debtors' information alone that would be used, and let me give

17   just two examples to be clear about that.

18       Let's say an expert -- and I include in this the

19   debtors' experts, Bates White for example, they surely are

20   aware of other facts related to sex abuse claims.  I mean

21   when, for example, Bates White does its analysis, it's surely

22   bringing to bear its experience in other mass tort

23   bankruptcies and other bankruptcies involving sex abuse

24   claims.  And so, you know, I don't want the sort of

25   characterization that's gone on at this hearing about the fact

1   that we're not presenting our witnesses and our claims

2   handling as factual evidence that's relevant to the Section

3   1129 issues to mean that we're limited strictly to the

4   debtors' information alone.  And I'll give just another

5   example about that.

6        I might argue to you later that in most mass tort

7   cases the convenience class payment is $200.  That's a fact,

8   right, from another case, that's not the debtors' information.

9   And that, when you compare that to the $3500 being offered

10  under the plan supported by the Coalition, that that's not

11  reasonable, right?  I may make that argument to you and I'm

12  relying on a fact that's not debtors' information, it's -- you

13  know, it's the Kaiser Gypsum TDP that pays $200 rather than

14  $3500 for a convenience class.

15       So I know Mr. Moxley was speaking off the cuff and

16  even trying to negotiate, as I think he put it, in open court,

17  and so I don't mean to suggest that Mr. Moxley was purposely

18  trying to box us in or play "gotcha" with us, but I did --

19  because of the number of parties and because of the stakes, I

20  wanted to be clear.  When we get through the expert case, when

21  we get through the presentation of the evidence at the

22  confirmation hearing, there may be things that aren't in the

23  debtors' files that are brought to the Court's attention.  But

24  just to reiterate, to the extent it needs to be -- Mr. Plevin

25  said it, Ms. Marrkand said it, let me say it on behalf of

1  Great American, we're not going to come touting to you, you

2  know, this is how Great American resolved a sex abuse claim or

3  this is what a Great American claims handler thinks or, you

4  know, see right here, we have this guidance where we say don't

5  do it like they do it in the TDPs.  We don't think they should

6  do it the way they're proposing to do it in the TDPs, but our

7  evidence isn't going to be because Great American on its own

8  has determined what the right answer here is.

9            So, with that, I think I've covered all the points

10 I wanted to make sure were clear for the record and I'm happy

11 to answer any questions.

12            THE COURT:  Thank you.

13            MR. CHRISTIAN:  Thank you, Your Honor.

14            THE COURT:  Okay.  Mr. Plevin, I'm going to let you

15 play last.

16            MR. PLEVIN:  Thank you, Your Honor.

17            The first point I would make is that neither Mr.

18 Azer nor Mr. Moxley nor Ms. Grimm addressed the

19 proportionality point at all.  And I would ask you to consider

20 what this is going to look like in the confirmation hearing,

21 if this discovery goes forward.  The debtors apparently want

22 to go claim-by-claim in the depositions to see what the

23 insurers thought about each claim they handled.

24            So I think my client was involved in five claims

25 where they were asked to contribute to a settlement, they're

1  going to depose one or two of my witnesses, presumably for

2  seven hours each, about what they did in those five claims.

3  And then if we make an argument at the confirmation hearing

4  based on the debtors' evidence that we think the TDP values

5  are too high or that the matrix -- that the matrix uses an

6  aggravating factor that it shouldn't, they're going to then

7  want to present to you the evidence of the depositions about

8  these five claims.

9        The result, Your Honor, the inevitable result is

10 that you're going to be mired in the details of what an

11 individual claim handler at Zurich or Great American or some

12 other carrier thought about the debtors' request that they

13 contribute to a particular settlement, whether that's in 2016

14 or 1998.  It's going to take the confirmation hearing way off

15 track and add days and days to it.  And, when you think about

16 proportionality, I would ask that you think about that.

17        Debtors made an offer of a stipulation, but that

18 stipulation is illusory.  Sorry, Your Honor, the mail just was

19 delivered.  What the debtors' response to the motion, in their

20 motion what they say they're looking to stipulate is, quote,

21 "Specifically, if an insurer can stipulate that it has no

22 information relevant to the debtors' historical claims

23 handling practices and agrees not to contest the plan, then

24 the debtors won't depose that insurer."

25        So, in other words, we have to -- in order to avoid

1   these depositions under their proposed stipulation, we have to

2   agree not to file any plan objections on any issue, and that

3   seems to me to be an illusory stipulation and not a meaningful

4   offer.

5           Mr. Azer attempted to argue that the debtors needed

6   information about allocation to other insurers in order to

7   defend the Hartford settlement.  And I think Mr. Winsberg was

8   exactly correct in calling this a renewal of the request for a

9   binding estimation.

10          Hartford's policies, as I understand it, were in

11  the 1960s and 1970s.  My client's policies and the policies of

12  the other excess insurers are all in 1986 or later.  There's

13  no reason to think that we would have had any involvement or

14  any potential responsibility, or that any analysis of our

15  policies or claims handling is needed with respect to an abuse

16  that might trigger a Hartford policy 20 or 25 years earlier.

17          What is more, debtors entered into not one, but two

18  settlements with Hartford without the need for depositions of

19  or information from any other insurers.  The debtors had all

20  the information they felt they needed to conclude that they

21  thought the Hartford settlement was a good settlement and they

22  don't need depositions of other insurers on that issue.

23          Mr. Azer indicated that he thought -- and this is

24  not a quote, this is a characterization -- that the insurers

25  were throwing up a roadblock of sorts in asserting that

1  defense counsel-privileged submissions should be -- should be

2  held privileged, because the reality is, as Mr. Christian just

3  explained, is when our clients were asked to contribute to a

4  settlement, they typically got defense counsel evaluations of

5  the case as part of the information that the insurers looked

6  at to decide whether to agree to what the Boy Scouts were

7  asking.  This case, Your Honor, is not delivering full

8  releases to chartered organizations, and I'm sure they would

9  be thrilled to know that debtors are proposing to hand over

10  defense counsel-privileged claim evaluations to the

11  plaintiffs' bar so that those can be used against the

12  chartered organizations in future tort actions.

13          What is more, the TDPs themselves have an opt-out

14  that allows claimants to seek recovery in the tort system.

15  Again, what claimant wouldn't love to have BSA's defense

16  counsel's privileged case evaluation as they pursue tort

17  system claims?  And all of this is for information that is, at

18  best, marginally relevant, including topics on underwriting

19  and negotiation of the policies that have no relevance at all

20  and which for some of the carriers go back decades.

21          Ms. Grimm made a point where she said that the --

22  they need discovery from the insurers because the insurers say

23  that the TDPs are or may be collusive.  Well, the information

24  about that is not in our files, the information about that is

25  in the documents exchanged between the debtors and the other

1  plan supporters like the Coalition, and we'll evaluate that

2  evidence when we see it and decide if we are going to make an

3  argument that things were collusive.  What we did in

4  responding to Boy Scouts requests has nothing to do with that

5  issue.

6          Ms. Grimm said the findings are required for the

7  plan to be confirmed.  And I suppose that's right in a sense

8  because they have put them in as conditions precedent, but the

9  bankruptcy code doesn't require those findings.

10          Mr. Moxley said that the RFAs were targeted and are

11 proper subjects for the insurers' 30(b)(6) witnesses.  Our

12 response to the RFAs -- and I think most of the other insurers

13 gave similar responses -- is that we don't at this time have

14 sufficient information to admit or deny the RFAs, and my

15 responses pointed out that's because we haven't had discovery

16 yet from the debtors.  So my witnesses don't have any

17 information yet to support any of the things that they've

18 asked us to admit.

19          When and if they do get that information, it's all

20 going to be something that they either received through

21 counsel and they would be called upon at a deposition to

22 marshal that evidence, marshal the evidence of what the Boy

23 Scouts' historical practices are, and then compare that to

24 what they did or what their company did, and then explain the

25 basis for an admission or a denial -- I guess it would be a

1  denial of the RFA.  That is a classic contention interrogatory

2  and the cases are quite clear that a human being is not

3  required to serve as an answer to a contention interrogatory.

4  So I disagree completely with Mr. Moxley's characterization of

5  the Coalition's RFA-related topics as targeted or seeking

6  facts, it is seeking evaluative legal conclusions and

7  contentions, and requiring someone to marshal all of that

8  information on the spot.

9          And then, Your Honor, I think to respond to your

10  question -- I don't want to beat a horse that Ms. Marrkand and

11  Mr. Christian have already addressed -- I don't think that

12  what -- if one our claim handlers in evaluating a claim looked

13  at the same factors that the TDPs proposed to include, that

14  doesn't mean that the TDPs necessarily should be confirmed.

15  It means perhaps that our claim handler acceded to a request

16  by the BSA, that's all it means.  And, again, we're going to

17  get into the point of being mired in claim-by-claim

18  evaluations and we're going to be delving into privilege

19  issues because a lot of what our claim handlers did, if they

20  were looking at this, was based on what privileged information

21  they were receiving from the Boy Scouts.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          Okay.  Well, I see hands are up, but I'm prepared

25  to rule on this.  And I appreciate very much the arguments, I

1  had read the papers and found them helpful in defining the

2  issues, I haven't read anything that was filed today.

3         And I was interested in the question that I asked

4  almost everyone, which is what if there is some difference

5  between -- or what if the insurance company takes a position

6  but its claims adjuster -- I'm not being articulate here.  Let

7  me back up.

8         The question I asked was, okay, what if the claims

9  adjuster on its one or five claims agreed with the Boy Scouts,

10  would that be relevant information, or how do I use that

11  information?  And I think the responses I got from the

12  separate insurance companies is correct, we would be down

13  rabbit holes.  We would be off in tangents in the confirmation

14  hearing.  How would that information be used?

15         And that leads me back to the main point, which is

16  that the debtor has the burden of proof on the appropriateness

17  of the TDPs since it has put them at issue very specifically

18  in the case and asked for very specific findings, the

19  insurance companies did not initially put this at issue and it

20  is the debtors' burden.  They have the information that they

21  need.  They know why they crafted the TDPs, which the

22  insurance companies had no part of, and they'll put on their

23  proof.

24         The deposition notices, which are what are in front

25  of me, also do not appear to have been targeted to insurance

1  companies that may have significant information about their

2  own claims handling in the sense that they handled a

3  significant number of claims.

4       What I'm hearing is I've got excess insurance

5  companies that are being asked questions who maybe were

6  involved in two or five or ten claims, I've got fronting

7  policies, which I'm learning about, but my understanding is

8  that the insurers company really is just administering the

9  claim, it's more of an administrative function.  I hope I'm

10 right on that.  I don't think I have a primary insurance

11 company in front of me who would have handled, I'm guessing  -

12 - and it is just a guess because I don't have this in front of

13 me -- a significant number of cases.  The criteria for being

14 served with the notice of deposition appears to be that you

15 were involved in the case, the insurance company is involved

16 in the case and has spoken up, that does not mean they have

17 information.

18      So I do not find that these depositions were --

19 such as they were are even targeted at insurance companies

20 that might have what's arguably relevant information, although

21 minimally relevant and I think would lead us down tangents.

22 So that's another reason that I'm denying the motions and the

23 cross-motion, and I'll get to that.

24      The other -- well, that leads to proportionality.

25 Given that, I don't think that the deposition notices were

1  targeted toward insurance companies most likely to have

2  information that the debtors and the Coalition and the FCR say

3  they need.  I think that the 44 deposition requests are simply

4  out of proportion to the possibility that there might be some

5  relevant information that might be able to be used.  And I'm

6  saying that because of, again, what I've already stated, but

7  also because we are in essence 60 days before confirmation.

8          The debtors asked for and I gave them a very

9  expedited confirmation schedule.  I know Mr. Kurts has said on

10  a number of occasions, well, this is twice as much as you

11  normally get.  Well, this case is more than twice as much as

12  the normal bankruptcy case heading towards confirmation in

13  terms of the issues that are outstanding.  And I'm told the

14  debtors have 26 areas, topics that they might present expert

15  testimony on.

16          In all of this context, I just think that these

17  requests are not proportional to the time it would take away

18  from the critical confirmation issues, the expense of that to

19  the estate, the expense of that to the insurance companies

20  whose employees I think, again, have minimal, minimal relevant

21  evidence, if any.  So I think that that's important as well.

22          When I went through the topics, I found this

23  Exhibit 2, "Topics at issue," very helpful.  This was Mr.

24  Plevin's filing.  As I walked through many of the contentions

25  of the debtors, I do believe they're asking for legal

1  conclusions.  I wasn't sure that the Coalition actually had

2  responses to Coalition topics 1 through 4, so I wouldn't grant

3  that.  I'm not sure the FCR had a response to its topic 3.  I

4  think the TCC's matters have been continued.

5          The prepetition claims handling, that's really what

6  I've been addressing.  The RFAs, which were the Coalition's,

7  while the Coalition says it wants the factual basis in the

8  filings, I couldn't often on some of these topics tell the

9  difference between these and the legal conclusions that were

10 in previous -- that were in the previous section on legal

11 conclusions.

12         And then the big question I did have with respect

13 to the lack of information category, which encompassed a lot

14 of this, is were the insurance companies going to be putting

15 on a factual witness to talk about their own experience and

16 their own claims adjustment and experience, and the answer has

17 been resoundingly no.  And Ms. Marrkand has actually -- has

18 obviously picked up on my comments that, no, no expert is

19 going to be able to use any internal documentation of the

20 insurers that hasn't been shared, and which I'm not making be

21 shared, to support an opinion, and I know that no lawyer would

22 think I would permit that to happen.  So that's not going to

23 happen.

24         So, when I put all this together and I see what we

25 have coming in front of us in January -- and, again, the at

1  best, minimal, used for impeachment purpose on positions and

2  not even witnesses, I don't know how that would even play out

3  -- I'm denying the motion and the cross-motion.

4          Again, when I looked at the statements that the FCR

5  is relying on in the cross-motion to say that there's some

6  relevance here to what they're requesting, I don't see it, I

7  just don't see it.  So even if I -- I think someone said --

8  provide some grace in this, which I think is wholly

9  appropriate, that the documents were never asked for and the

10  meet-and-confer didn't happen.  I've heard enough argument

11  that I'm not going to grant the cross-motion.

12          MR. PLEVIN:  Your Honor, may I just ask a

13  clarification?

14          THE COURT:  Yes.

15          MR. PLEVIN:  I think you said inadvertently twice

16  that you were denying the motions and the cross-motions.

17          THE COURT:  Oh, I'm sorry.  Yeah, I'm sorry.

18          I'm granting them.  Thank you.

19          MR. PLEVIN:  So, you're granting the two motions to

20  quash and --

21          THE COURT:  I'm granting --

22          MR. PLEVIN:  -- denying the cross-motion?

23          THE COURT:  Yes.  I'm granting the motion to quash.

24  I am denying the cross-motion.  Thank you.

25          MR. PLEVIN:  Thank you.

1          UNIDENTIFIED:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Okay.  That's Numbers 6 and 7.

4          MR. ABBOTT:  Yes, Your Honor.  That puts us up to

5    Number 8 on the docket, which is D.I. 7239.  That's a letter

6    from Ms. Currie [sic], regarding the insurers' motion to

7    compel.  I'll just assume Ms. Currie is on the line; although,

8    I'm not sure she, or whoever from her group, is going to argue

9    that, Your Honor.

10          MR. CURRIE:  Good afternoon, Your Honor.  This is

11   Kelly Currie from Crowell & Moring, on behalf of the Zurich

12   Insurers.  And our client is joined by a number of other

13   insurers in bringing the motion to compel.

14          And, Your Honor, if I may, I may just start for a

15   few minutes to try to just go over, briefly, some of the

16   ground that the Court has heard before about why we are

17   seeking this motion to compel discovery against these law

18   firms who represent thousands and thousands of claimants in

19   this matter.  And it's because, you know, as the Court has

20   heard before in the context of the Rule 2004 applications

21   brought by Century and joined by others, that, you know, these

22   firms have had a much more than passive role in this

23   litigation.

24          The Court learned about relationships that these

25   law firms have with claims aggregators and a whole range of

1  red flags in the claims aggregation and processing, and,

2  frankly, lights were flashing red just on the number of the

3  claims and the volumes of claims explosions leading up to the

4  bar date.

5          And what we have here, Your Honor, is the situation

6  where, as the Court has referred to a couple times today in

7  going into this discovery period, per the confirmation

8  process, the Court urged all the participants to be as

9  cooperative as possible, to try to tee up the issues that are

10 relevant before this Court, and to, you know, bring to light

11 the discovery that is going to inform a lot of arguments that

12 are going to be relevant in terms of the confirmation process.

13         And what's happened, you know, since the discovery

14 period has started, we served discovery on these firms -- and

15 I should have said at the beginning, Your Honor, one of the

16 law firms that we served discovery against, AVA Law Group,

17 they're not being heard today because Mr. Gray had a

18 scheduling issue and we've all agreed that as to AVA Law, this

19 will be heard on the 29th.

20         But as to the other five firms, Your Honor, what

21 happened was, essentially, in a number of meet-and-confer

22 conferences with counsel, we offered, Your Honor, in the

23 interests of really getting to the real discovery issues, to

24 withdraw these motions and agree that we would proceed as if

25 we were in a Rule 45 context, a subpoena context, if the firms

1  would agree that the substantive discovery disputes would be

2  heard before Your Honor, rather than in disparate, foreign

3  jurisdictions where we may have to, you know, bring motions to

4  transfer; whereas, this Court, I think everyone agrees is

5  certainly best-suited to hear the substantive issues, you

6  know, that might be raised, for example, that come up in the

7  other motions that we're going to talk about later, for

8  example, privilege issues, in the way.

9        And so, our effort in this motion to compel, Your

10  Honor, is to say that given the level and the kind of

11  engagement that the law firms have consistently had in this

12  proceeding, that even if they are not nominal parties, Your

13  Honor, they have comported themselves as parties.  And if

14  not --

15        THE COURT:  Excuse me for a moment.

16        MR. CURRIE:  Yes, Your Honor.

17        THE COURT:  Excuse me just for a moment,

18  Mr. Currie.

19        Please check your audio, everyone else.  I'm

20  hearing a keyboard.  Thank you.

21        MR. CURRIE:  Thank you, Your Honor.

22        And so, you know, the effort really was to try to

23  be as pragmatic as possible, given what the Court has

24  expressed many times, without the express discovery schedule.

25        And the issues that I think are most important that

1   are on deck for the other firms that we're going to talk about

2   later, you know, for example, we've been saying we're not

3   seeking privileged information; we're seeking facts that go to

4   the integrity of the claims process, the facts that go to, you

5   know, whether Section 1129, you know, good faith requirements

6   have been met.

7            And so, that's what brings us here today.  And I

8   want to talk a bit about the activity of each law firm that's

9   before us here today in this motion and why the Court ought to

10  consider them, if not, nominal parties, you know, parties for

11  the purpose of discovery.  But with the Court's permission,

12  one of the law firms is the Kosnoff Law Firm and, as the Court

13  is aware, Century is scheduled to take

14  Mr. Kosnoff's deposition next week.

15           And Mr. Schiavoni, I think, would like to be heard

16  as to the intersection between this motion here and what is

17  scheduling to be teed up next week so that there's not any --

18  so there's clearer understanding of what the expectations are

19  for what's to happen next week and how that might intersect

20  with the Court's views on this broader motion.

21           So, with the Court's permission, I would like to

22  pass the baton to Mr. Schiavoni to be heard regarding Kosnoff

23  Law Firm and then I will briefly discuss the other firms that

24  are the subject of this motion.

25           THE COURT:  Okay.  Well, I do think it would be

1  helpful to, and I think we need to talk about each firm

2  individually, and I want to make sure I know what you think

3  the deposition is, or the document requests and

4  interrogatories are specifically relevant to, for confirmation

5  purposes.  And I know some of the law firms have raised the

6  relevancy issue, so I want to understand what you think it's

7  relevant to and then we'll -- I do think the law firms, some

8  of them may be in different positions, and they may not be,

9  but I think each one is entitled to be heard separately.

10          So, if you want to start with Kosnoff, that's fine.

11          MR. SCHIAVONI:  Okay.  Your Honor, I will.

12          This is Tanc Schiavoni and maybe I could just lay

13  some of the groundwork for Mr. Kelly [sic] on the rest of it.

14          So, with Mr. Kosnoff, we noticed his deposition and

15  we subpoenaed him also; we did both.  The subpoenas were

16  issued on the West Coast.  The notice was issued out of this

17  court.

18          He's agreed to appear on Monday.  Frankly, I

19  thought that was the end of it.  I actually didn't even

20  realize he was on the calendar here and now I realize I sort

21  of maybe was bamboozled a little bit, that there's some sort

22  of embedded dispute in the Monday deposition.  I think

23  Mr. Kosnoff is under the view that he's only going to appear

24  with respect to the dispute on solicitation and no other

25  issues.

1          So, you know, we do, as a practical matter, need to

2    resolve this, okay.  So, we have Mr. Kosnoff signed large

3    numbers of proofs of claim.  He's filed a 2019 statement

4    saying that his signature was attached to other proofs of

5    claim by other unidentified individuals.  He's interjected

6    himself directly in solicitation, I would say both, by, in a

7    sense, signing the proofs of claim, which, you know, lead to,

8    then, the selection of who gets to vote, but also by his --

9    the role he's played in balloting.

10          Others of these folks, you'll hear from Mr. Kelly,

11   have interjected themselves by the use of either master

12   ballots or by the use of self-described balloting centers at

13   their firms, where they collected individual ballots.  I think

14   it's sort of just another form of a master ballot.

15          In Mr. Kosnoff's case, in addition, when his

16   counsel did appear in the case, he's identified the appearance

17   as being on behalf of Mr. Kosnoff as a party.  So, there's

18   that, also.

19          And, you know, in addition to that, we did think

20   that Mr. Kosnoff was conceding the jurisdiction or

21   acknowledging it, in agreeing to be deposed under the notice

22   on Monday.  And, in fact, we moved it from today to Monday,

23   really thinking that he was conceding the jurisdiction in that

24   regard.  If I'm mistaken, you know, I will -- I'm not going to

25   hold Mr. Wilks to agree to the deposition in that regard, but

1  I was certainly under that impression in deciding to go

2  forward.

3         We can, of course, do Mr. Kosnoff's deposition just

4  on the solicitation issue on Monday.  We file a motion to

5  transfer and do his deposition and get documents, the

6  documents from him later.  You know, that's not ideal.  I have

7  a motion here.  We're ready to file it this evening if that's

8  what the Court, you know, would like us to do.  But I think

9  he's within the jurisdiction of the Court by the function of

10 how he's interjected himself holding solicitation and in

11 signing the proofs of claim.

12        And to be clear, you wanted to know what documents

13 we wanted.  You know, in Mr. Kosnoff's case, we were able to

14 identify a significant number of proofs of claim that he

15 signed on a given day; a number that we thought was

16 impossible, objectively, to vet in submitting them.

17        We also picked up through, like, forensic document

18 review, some that were, you know, appear to be basically

19 issued in two -- on the West Coast and East Coast at the same

20 time, so it looks like other people were submitting them,

21 using his name.  And, you know, I think that's a legitimate

22 area of inquiry.

23        You know, in some of these situations, we have

24 folks saying, Well, like, whatever happened, we've since cured

25 it by running out and getting signature for them, okay.  But,

1   Your Honor, it's like the way we did this to identify them,

2   it's like we were only able to identify certain groups.  Like,

3   this was not intended to be all of them.

4          So, the fact that someone was sort of caught and

5   then focused on trying to cure ones that we came across in the

6   82,000, it doesn't mean that it's not -- like there's others

7   like this out there, that they're the tip of the iceberg.

8   There's no question, but that this method of how these

9   signatures were done were wrong and there's also no question

10  under the case law that by signing, under oath, these folks

11  were submitting themselves to being questioned about what they

12  did about, you know, this process.  We cited case law to Your

13  Honor on the 2019 submissions and then later about it.

14         It doesn't seek, you know, privileged information,

15  if that's what those cases hold, you know, that when you

16  signed, you can explain what you did and how it was done.  I

17  think you're going to see as we get closer to confirmation,

18  you know, we have some thoughts about how some of this is tied

19  together, but we need to take the discovery.

20         It's like we, you know -- you the original plan was

21  that we do the aggregators first.  They put up massive

22  resistance.  You know, we're trying to get them down, right,

23  Rule 45 to this Court.

24         But, you know, the most appropriate way is to go

25  right to the source.  Mr. Kosnoff says he has evidence

1  directly about this, and if Your Honor would prefer we issue a

2  Rule 45, you know, the transfer motion, we will get that on

3  file and we will get that on file tonight, but we're going to

4  lose a week on it -- that's the only thing -- and we'll get it

5  on file with a motion to shorten notice.

6          But, you know, I think we have the basis to go

7  forward with what we have and what we're asking for is highly

8  relevant because the entire voting here turns on these proofs

9  of claim.  And, yes, some of them have been technically cured

10  by having their signatures put on them, but, you know, the

11  thing that's lost in this case is that -- and I've heard it.

12  It's like, well, you know, there's no objections being filed

13  to the proofs of claim.

14          And no one has wanted to go out and blunderbuss,

15  issue objections, but, you know, it ties back to the

16  complaints we had, which was, one was that the questions that

17  actually go to the core issue of liability, you know, are

18  minimal, okay.  It's like there is enough notice here to know

19  that the person is alleging a claim against the Boy Scouts,

20  but there's not strict liability in most of these

21  jurisdictions.  So, it's like the actual establishment of

22  liability, it comes down to a question or two on these, you

23  know, on the proofs of claim for which we're not able to go

24  out and take information in the proof of claim to actually

25  directly investigate it.

1    So, like, we can't take a proof of claim if it says

2  on it that Joe Smith was the guy who did this to me or

3  whatnot.  It's like, I can't be using the proof of claim to

4  cross-examine witnesses.  It's like the confidentiality order

5  is pretty straightforward in that regard and, you know, I

6  can't go speak to relatives.  I can't do things like this to

7  investigate the claim.  So, you know, we're going at it in a

8  different way about how they were -- how the claims,

9  themselves, were put together in such a rapid, you know,

10 manner.

11    And this is not -- you know, Mr. Kosnoff, you know,

12 his entire firm is responsible, he claims, for 17,000 claims.

13 It's like, having him sit for a deposition for a few hours is

14 proportionate.  It directly goes to confirmation objections,

15 solicitation objections, and we say it's relevant.

16    And if Your Honor would like us to, you know, bring

17 the Rule 45 motion, we will do that.

18    THE COURT:  I want to make sure I understand.

19 Let's say everything you say is correct.  Let's say the

20 signatures -- I don't want to speak generally; we're speaking

21 about Mr. Kosnoff -- and Mr. Kosnoff actually says in a

22 verified statement that he filed with the Court that his

23 signature was misused, used without his permission on multiple

24 claims.  I'm sure I have that right, but that's -- I've got

25 three verified statements by Mr. Kosnoff.

1            So, let's say that's correct and then let's say Mr.

2   Kosnoff also signed a bunch of proofs of claim and let's say

3   he didn't review them properly before they were signed -- and

4   we're making assumptions here; don't worry, Mr. Wilks -- let's

5   say that he didn't properly vet them and let's say the case

6   law is that if they're not properly vetted, maybe sanctions

7   are available because there's a violation of    Rule 11.  And

8   we have case law on that; Judge Fagone's (phonetic) decision.

9   There's actually a Third Circuit decision I read recently to

10  that effect.  So, let's say that's true.

11           What's the link to confirmation that you want to

12  explore, because it's not sanctions.  That's not a link to

13  confirmation.

14           MR. SCHIAVONI:  I understand that, Judge, and, you

15  know, we have not, as you know, pursued that, you know, at

16  this point.

17           You know, you've made the point that your

18  independent research has brought you to the conclusion, I

19  think, or the failure to abide by that rule is not a basis all

20  by itself to reject a claim.  And I have not done that

21  research.  That may or may not be the ultimate conclusion that

22  flows from that, but it wasn't the conclusion that we were

23  looking for, okay.

24           We thought this was relevant, Your Honor, because

25  if you remember, we brought this motion along with a motion to

1  relax the rule on limitations on omnibus objections.

2              THE COURT:  Uh-huh.

3              MR. SCHIAVONI:  And we were looking for ways to

4  identify in the claims pool where the most problematic claims

5  were to focus investigation on those claims and there were two

6  ways to do -- in some ways, there were two ways to do that.

7  One was to look at the claims that came out of the process on

8  the back end and information about them, and we put some

9  evidence before you about what the results were of the claims;

10 how many were coming in states with "statute of limitation"

11 issues about them and whatnot.

12             The other way to look at it was the process by

13 which they were put together.  If you had one group of claims

14 that were prepared by a firm that sat down in the old-

15 fashioned way, met with the claimants as they walked in the

16 door, you know, did a traditional interview, asked them a few

17 questions, and then the lawyer, after meeting them, made the

18 decision about whether to take the gentleman on, or the lady,

19 as a client, you really get one quality set of claims, right.

20             And then if you look at another set that might have

21 just been simply created by -- or not -- it's like, you know,

22 generated by a for-profit aggregator and then sold to a firm,

23 you know, for which signatures were rapidly attached as they

24 were bought as they were coming in on the bar date and they

25 might have realized that they were short on the number of

1    claims needed to hit a fixed target, it's like, you might

2    reach a different conclusion about where -- about, you know,

3    the general strength of those claims.  It would not,

4    necessarily, support by itself in the individual rejection of

5    a claim, but it would allow us all to focus resources on those

6    particular claims as ones for heightened scrutiny and the very

7    group that the Court had suggested to us that we should come

8    back with to identify claims where we might want to take

9    depositions.

10           We've been extremely careful, reluctant to, in any

11   way, you know, disturb the survivors here, but we have not

12   asked for depositions -- we have not come back and tried to

13   pick individual depositions.  This was our thought of a

14   responsible way to proceed.  And, you know, this level of

15   inquiry going after just, you know, Mr. Kosnoff, in particular

16   -- and Mr. Kelly can speak to the others -- was intended to be

17   very targeted and to go, you know, right after the proofs of

18   claim, themselves.

19           I will add, you know, on the confirmation front,

20   there's an additional sort of, you know, 1129 good faith

21   overlay with Mr. Kosnoff, his 2019 assertions, and the proofs

22   of claim because he does, in his email that the TCC felt they

23   had to turn over to the United States Trustee, lay out an

24   overall plan about how they were going to go forward to create

25   a voting bloc, how it was an intentional part of that effort

1  to try to generate a voting bloc, a supermajority voting bloc.

2  In his 2019, he goes a step further and he gives what I think

3  of as like a Combustion Engineering element.  He says that

4  they were specifically targeting jurisdictions where they

5  thought there was -- where he recognized there were "statute

6  of limitations" problems in aggregating those claims.

7          So, I think his imminence and his connection with

8  how the proofs of claim were put together, you know, it ties

9  together with a bigger story about how the whole "proof of

10  claim" process, you know, we think may have just come off the

11  rails in the first place, and -- which is a good faith

12  objection, Your Honor.  And it was very intentional; it wasn't

13  unintentional.  It was the very kind of effort the Third

14  Circuit looked at with Mr. Rice in Combustion Engineering,

15  where there was an effort pre-petition to lock up a

16  supermajority of claimants who had, I think the Circuit

17  referred to them as "stub claims" or claims of weaker merit,

18  in order to override the Code protections for having an

19  unimpaired class.

20          THE COURT:  Yeah, that was an 1129(a)(10) issue,

21  right?

22          MR. SCHIAVONI:  As framed on the reversal, yes.

23          But I think that would also go to the -- in the

24  same decision, I think he also remanded on good faith.

25          THE COURT:  So, it may go to an 1129, good faith

1   issue, I guess the trust distribution procedures, in terms of

2   claims, okay.

3              MR. SCHIAVONI:  It morphs into that because it --

4   you know, for various reasons.

5              Mr. Kosnoff is -- Your Honor, if you wanted to

6   stage these, that's one thing you could think about if we had

7   all sorts of time, but, you know, clearly, Mr. Kosnoff is the

8   one to start with and we're poised to do that and that's where

9   we put our resources.

10             And I'll let Mr. Kelly, you know, deal with the

11  others, but I think I got -- I think I have enough

12  jurisdictional basis with Mr. Kosnoff for the Court to enforce

13  the subpoenas.  But, again, if there's an issue about that,

14  you know, just be sympathetic if we lose a week on it, but we

15  will get those on file tonight, if necessary, and we will

16  plead with the Court in California to, you know, move that

17  east as fast as possible.

18             THE COURT:  Okay.  Why don't we -- Mr. Wilks, why

19  don't you respond, since this is targeted -- before we go back

20  to Mr. Currie on the other ones.  And, Mr. Wilks, I would like

21  to understand, first, why don't I have jurisdiction over Mr.

22  Kosnoff and Kosnoff Law?

23             MR. WILKS:  Well, Your Honor, it's like -- let me

24  start it this way.  One thing that kind of keeps happening is

25  we keep arguing motions that aren't on the agenda or they're

1  not even motions.  Because Mr. Currie's motion has nothing

2  whatever to do with the deposition and that's kind of what Mr.

3  Schiavoni just devoted all his remarks to.

4         So, I want to speak to that first if I may, Your

5  Honor, because we think Your Honor already told us last week,

6  you think Mr. Kosnoff has injected himself into the case on

7  the solicitation matter in ways that he had not before,

8  because Your Honor and I have talked about, I think, three

9  times before, whether or not he is before the Court as a

10  party.  Your Honor has consistently held that he is not.

11         I'm sorry if Your Honor is having a hard time

12  hearing me.

13         THE COURT:  I've got you now.

14         MR. WILKS:  Okay.  Your Honor has already ruled on

15  that a number of times.  So, I'm happy to run back through

16  that, but I want to talk about last Friday, because last

17  Friday Your Honor addressed the subpoena motion and Your Honor

18  properly said in every case, you don't enforce subpoenas

19  issued by other courts unless it has been transferred to you.

20  That's the way the rules work.  That's the way Your Honor

21  ruled and that was that.  Now, we're kind of re-arguing that.

22         But one thing Mr. Schiavoni did at the very tail

23  end of that hearing was, he said, Hey, wait a second.  Your

24  Honor has said that he's injected himself on this solicitation

25  issue.  On that, can I just issue a notice of deposition of

1    depose him?

2              Your Honor said, Yeah, I think that's probably

3    fine, or something like that.  I think a notice is fine is

4    what Your Honor said.

5              Okay.  We heard that, and so Mr. Schiavoni and I

6    got on the phone and we spent some time.  There is also

7    another party, Mr. Patterson has noticed Mr. Kosnoff's

8    deposition, and it was scheduled, actually, to take place

9    today.  On Mr. Schiavoni's request we made Mr. Kosnoff

10   available today.

11             Just the other day, I think it was Wednesday -- and

12   I had called Mr. Schiavoni this week several times, Hey, let's

13   talk about, you know, the scope and what your expectations are

14   and logistics and all those things.

15             And he finally called me back on Wednesday and

16   said, Hey, listen, can we go forward on Monday, instead?

17             So, and Mr. Patterson already noticed a deposition,

18   so, yeah, sure, we'll go forward on Monday.

19             And Mr. Schiavoni said, Look, I'll call you and

20   we'll talk about scope and we'll have a meet-and-confer and

21   the whole thing.

22             Great.  I never heard from him until just now, when

23   Your Honor heard from him.

24             So all of this is happening.  Your Honor, I'm not

25   even clear what the issue is because, you know, we're talking

1  about, you know, proofs of claim and things that Your Honor

2  has already thrown out and so forth.

3        But look, here's the thing, we have agreed to put

4  him up for a deposition.  He's going to testify on Monday by

5  Zoom and folks are going to have a link to it or so forth, or

6  however Mr. Patterson wants it, because Mr. Patterson is the

7  one -- he and I have actually talked.

8        I haven't -- Mr. Schiavoni hasn't engaged with him,

9  and so Mr. Patterson is going to go first, the way I look at

10  it -- it's his deposition -- and he's going to ask a whole

11  bunch of questions like that.  And if Mr. Schiavoni is

12  dissatisfied with the scope of that deposition, he can ask his

13  own questions, and if he's dissatisfied with it, my gosh, Your

14  Honor, he notion how to bring that up to you.

15        So, number one, there's not a motion before Your

16  Honor pertaining to any deposition, and so there's nothing for

17  Your Honor to rule on.  And number two, even if there were, I

18  would just like to ask Your Honor, hold off and let's wait and

19  see.  Because, candidly, I don't think we're going to have an

20  issue and I think Mr. Schiavoni would know that if he had just

21  called, but that didn't happen, and that's fine.

22        So, I'm happy to go further down the road on this.

23  We can address Mr. Currie's motion.  I think Mr. Robbins and

24  others have sort of broader arguments that I join in and I

25  intend to let them present those arguments.  I've already

1  presented to Your Honor, I think this is the fourth time I've

2  been before Your Honor on discovery requests of Kosnoff Law.

3          There's a whole lot of reasons that Mr. Kosnoff is

4  not a party to this case.  He's an advocate.  He's a lawyer.

5  There's no precedent that anybody has cited, and none that I

6  have found or my folks have found, could say that a lawyer who

7  represents claimants or who represents creditors is a party.

8          The filings that Mr. Kosnoff has made in this case

9  have always been solely -- actually, there's one exception --

10  have only been in resistance to discovery requests.  Resisting

11  discovery does not make you subject to discovery.  I mean, it

12  sounds kind of silly to say that, but that's kind of what

13  they're proposing.

14          THE COURT:  So, I would agree with you --

15          MR. WILKS:  The only exception, Your Honor, is the

16  2019 --

17          THE COURT:  Yes, go ahead with the exception.

18          MR. WILKS:  Well, we resisted that, Your Honor, and

19  I know Your Honor was frustrated with -- I think Your Honor

20  was frustrated with me, and I hate that, when a judge is

21  frustrated with me, but I think Your Honor asked me why am I

22  fighting this so much.

23          It's not that we were so resistant to telling

24  Mr. Kosnoff's story, Mr. Kosnoff, my gosh, this is a man who

25  loves to tell his story and he's happy to do that.  But there

1  are laws and there are rules that -- and procedures that need

2  to be followed, and we felt it was inappropriate to subject

3  Mr. Kosnoff and Kosnoff Law, actually, it's his law firm, to

4  the 2019 process.

5         But Your Honor ruled and we accepted Your Honor's

6  ruling and so, we served the 2019.  But I'm not aware of any

7  case law -- and, certainly, Mr. Currie hasn't brought it to

8  Your Honor's attention that the act of filing a 2019 confers

9  party status on a lawyer representing creditors in a case.  I

10  think that's a dangerous rule to adopt and I think this would

11  be -- there's no reason for Your Honor to adopt that sort of

12  brand new rule in this case.

13        Mr. Kosnoff is going to give a deposition on Monday

14  and I'll bet my bottom dollar that Your Honor is going to get

15  a transcript of that attached to some kind of application by

16  someone very soon.

17        MR. SCHIAVONI:  Well, Your Honor, it's going to

18  be --

19        THE COURT:  Okay.  Let me -- no, wait a second --

20  let me ask a question.

21        So, Mr. Kosnoff actually filed two 2019

22  declarations.  He filed one at --

23        MR. WILKS:  Well, there's one for AIS.

24        THE COURT:  No -- okay.  There may be one for AIS.

25        MR. WILKS:  The one for AIS was signed by all three

1 firms that, you know, worked together under that AIS name.

2         THE COURT:  Okay.  And then he filed another one

3 separately --

4         MR. WILKS:  That's correct.

5         THE COURT:  -- at Docket 5924.  And that filing

6 goes well beyond a 2019 filing.  It is nine pages where it's

7 clear that Mr. Kosnoff wanted to get his story out there.

8 This is not required by 2019.

9         And in it he makes a lot of statements, including

10 with respect to proofs of claim, how they -- how the firms,

11 the three firms worked together, how certain proofs of claim

12 were signed, and why doesn't this extra filing, which is

13 really personal to him and doesn't have anything to do with

14 his clients, why doesn't that subject him to the jurisdiction

15 of this Court to be questioned about what he chose to put in a

16 verified statement?

17         MR. WILKS:  Well, Your Honor, I just don't think

18 there's any authority for doing that.  I don't know that

19 that's been done where a non-party, let's use that term, has

20 been deemed a party.  If I can kind of use that kind of, you

21 know, terminology, it's always someone who controls a creditor

22 or has a very close relationship with a creditor.

23         There's one -- it's two different agencies of a

24 foreign government.  You know, the non-party agency is going

25 to actually reap the benefits of the litigation, as well;

1  they're deemed a party.  Those are the circumstances in which

2  a non-party is -- party status is foisted upon them by their

3  own, either their status or their activities.

4          Another case that the other side cites, Your Honor,

5  is where there's a spouse, I think a wife in a  Chapter 7

6  circumstance.  In that jurisdiction, you have the wife who's

7  presumptively a party.  So, those are the kinds of

8  circumstances in which there's authority.  There's no

9  authority -- I mean, the case law is out there, is a 2019

10 inadequate?

11         Well, now, it sounds like Mr. Kosnoff is being

12 criticized, or Kosnoff Law, I think is the actual, I think was

13 the signatory, but it doesn't matter.  He's actually being,

14 you know, penalized because he was over a case, you know,

15 providing too much information on how this group works

16 together and what it is.

17         Because there's a lot of misinformation put before

18 the Court on what -- how AIS operated.

19         THE COURT:  But that, then, has to do with him.

20         MR. WILKS:  Well, the idea behind --

21         THE COURT:  That has to do with him; that's more

22 personal.

23         MR. WILKS:  Well, it was all about this group,

24 though.  So, 2019 is about a group.  If you are representing a

25 group or if you are acting for a group or something like that,

1 tell us how the group works, what is it, who runs it.  That's

2 how we interpreted 2019.

3         And, honestly, I anticipated if I didn't do it that

4 way -- if we didn't do it that way, if Kosnoff Law didn't do

5 it that way, we were going to be right back in front of Your

6 Honor being told, this is inadequate, so -- inadequate.  I

7 mean, this is something -- he didn't volunteer to file a 2019;

8 he was ordered to do so and he did.

9         THE COURT:  Well, but there was --

10         MR. WILKS:  You know, it was comprehensive.

11         THE COURT:  But there was 2019 with the information

12 required by 2019, actually, a separate one filed by Mr.

13 Kosnoff, so there's three.

14         MR. WILKS:  Yes, Your Honor.

15         THE COURT:  Okay.  Well, I'm just saying that, I

16 don't know, do you get to put a verified statement like this

17 on the record and then say, I'm sorry, nobody gets to question

18 me about it in this court?

19         MR. WILKS:  Gosh no, Your Honor.  He's giving a

20 deposition on Monday.

21         THE COURT:  Okay.

22         MR. WILKS:  I haven't made any arguments today

23 about the scope of that deposition.

24         THE COURT:  Okay.

25         MR. WILKS:  I haven't made any arguments about

1  that.

2        I'm talking about -- when we're talking about the

3  interrogatories and the requests for production that

4  Mr. Currie is seeking, I ask -- that's a little bit different,

5  because those requests are not, Hey, tell us about your 2019.

6  It's not.

7        It's, tell us about your client contacts and your

8  client work that you did on these cases; classic work product,

9  classic stuff that lawyers are doing every day in the

10  representation of their clients.  That, I have a lot to say

11  about, Your Honor.

12        THE COURT:  Okay.

13        MR. WILKS:  The question Your Honor asked:  Hey,

14  can they ask you about the 2019?

15        Well, he's giving a deposition on Monday.  I don't

16  want to sit here and say, This is what people should ask him.

17  I'm not going to do -- I'm not going to write people's

18  deposition outlines for them.  Maybe the 2019 is their

19  roadmap.

20        But if Mr. Kosnoff is not forthcoming in that

21  Monday deposition in a way that offends Your Honor's

22  sensibilities or it breaks the rules or is caging, was not

23  comprehensive, we're going to be back here before Your Honor

24  and I'm going to have to explain that.  But I would really

25  urge Your Honor let Monday come and go and let's see what

1  happens on Monday.

2          THE COURT:  Okay.

3          MR. SCHIAVONI:  Your Honor, we haven't got a

4  response to the documents subpoena, so they haven't turned

5  over any of the documents.

6          MR. WILKS:  (Indiscernible.)

7          MR. SCHIAVONI:  Well, we certainly haven't gotten a

8  turnover of any documents at all.  Not one.

9          I can give Your Honor some very pointed omissions.

10 There were emails that the TCC has produced that show

11 Mr. Kosnoff's communications with the TCC and its members, but

12 Mr. Kosnoff hasn't produced a single one here, and that's just

13 the tip of the iceberg.  He hasn't produced to me anything,

14 period.  Nothing, okay.  So, we know he's withholding

15 documents.  There's been no compliance on that front.

16          And what I thought I heard from Mr. Wilks was that

17 the preparation of the proofs of claim had already been dealt

18 with and was off the table.  So, I take it I'm going to hear

19 on Monday that questioning on the proofs of claim are not

20 proper and it won't be permitted.

21          The other thing I guess I'm hearing is he's

22 arranged -- they're going to have someone do a deposition

23 before me.  Okay.  And, like, who knows whether I'll get any

24 time at all, you know, as part of it.

25          So, yes, I think I'm sort of a little bamboozled

1  here.  It's like, I think the topics in just the 2019 include

2  the proofs of claim and how they were prepared and we ought to

3  get the documents that were the subject of our subpoena.

4          THE COURT:  Well, the question is, do you want to

5  go forward on Monday or not, without the documents, or what

6  are you asking me for?  What do you want?

7          MR. SCHIAVONI:  Your Honor, I'm prepared to --

8  like, if Mr. Kosnoff's view is he's producing himself on

9  Monday to be heard on solicitation and I will get a separate

10 deposition on plan confirmation issues, then we'll go forward

11 with the Rule 45.  We'll be back to you hopefully next week

12 and we'll depose him a second time on those issues and have

13 the documents compelled at that point.

14         MR. WILKS:  Your Honor, can I just ask Your Honor

15 not to rule on the basis of what Mr. Schiavoni thinks might

16 happen.  That's all he's coming to you with is I think these

17 things might happen and, gosh, that might be really bad, so

18 please give me relief now; that's what he's saying to Your

19 Honor.

20         MR. SCHIAVONI:  Well, we already know you're not

21 producing documents --

22         MR. WILKS:  Hold on.  Hold on.  Just --

23         MR. SCHIAVONI:  -- unless you're going to tell us

24 now you're going to produce them.

25         MR. WILKS:  Just let me finish.

1             THE COURT:  Okay.

2             MR. WILKS:  If I may finish, Your Honor?

3             THE COURT:  Okay.

4             MR. WILKS:  Look, we filed a response to the

5  subpoena and there were objections, for a lot of the same

6  reasons we objected to Mr. Currie's requests.  It's

7  objectionable; you're asking for, basically, a lawyer's file,

8  okay.

9             So, I supplemented it by identifying for

10  Mr. Schiavoni what doesn't exist, what communications aren't

11  there.  So, it's narrow.

12             I told him:  Meet and confer with me.  Meet and

13  confer with me.  And he doesn't even confer; he just goes to

14  Your Honor and he talks to me through you, and that's fine.

15             But what he's doing now is just re-arguing his Rule

16  45 motion that Your Honor denied last week.  If there is an

17  issue after Monday, Mr. Schiavoni knows his way to Your

18  Honor's office.

19             THE COURT:  Okay.  Well, I'm not sure --

20             MR. WILKS:  There's nothing before Your Honor to

21  rule on.

22             THE COURT:  I'm not sure that -- it's been a long

23  week, so I'm not sure that I actually ruled on a Rule 45 issue

24  last week.

25             MR. WILKS:  Well, you did, Your Honor.

1        THE COURT:  I think I said that I don't generally

2   do that, okay.  If you have to subpoena somebody, then you

3   have to subpoena somebody.  I don't remember the actual

4   context, but regardless ...

5        MR. WILKS:  Well, Your Honor, yeah, there was a

6   subpoena.  One subpoena issued and there's a question of the

7   second one.

8        But Your Honor said, no, that's -- the motion, the

9   Court said, is denied.  Your Honor ruled on that --

10        THE COURT:  Okay.

11        MR. WILKS:  -- but it's a California subpoena.

12        THE COURT:  Okay.  So, you have a deposition.  It's

13   set to go forward on Monday.  If you want to go forward with

14   it, go forward with it.  Mr. Patterson, apparently is going

15   forward.  You guys need to coordinate.  If there's an issue,

16   come back to me afterwards.

17        If Mr. Kosnoff has to be deposed again, he'll be

18   deposed again.  We'll figure it out.

19        I will say that I haven't ruled on anything with

20   respect to Mr. Kosnoff being a party or not since Mr. Kosnoff

21   filed his declaration.  And that's one of the reasons I raised

22   it, Mr. Wilks, so you will go back and take a look at it.  You

23   understand that it is something that I am considering and

24   whether that changes his situation.

25        MR. WILKS:  Very good.  And, Your Honor, obviously,

1  there's other substantive arguments that we have about the

2  scope and privilege issues and work product issues and all of

3  that.  But I understand, Your Honor.  I will go back and look

4  at that, on that threshold issue of his --

5              THE COURT:  Jurisdiction --

6              MR. WILKS:  -- party status.

7              THE COURT:  -- and party status.

8              MR. WILKS:  Yes.  Yes.  Understood.  Thanks, Your

9  Honor.

10             THE COURT:  Okay.  Thank you.

11             Mr. Currie?

12             MR. CURRIE:  Thank you, Your Honor.

13             Just going in order of our motion, as we've

14 discussed earlier, we're not considering the AVA Law Group

15 today.  So, the next one in our papers is the Napoli Shkolnik

16 firm.  And addressing, first, the relevance question, Your

17 Honor, and, you know, not to repeat everything that's already

18 been said regarding the proofs of claim, but this is a

19 situation where there's evidence that, for example, Paul

20 Napoli signed 672 proofs of claim, including about half of

21 those within a couple of weeks of the bar date.

22             And other attorneys, as well, filed proofs of claim

23 from -- including Mr. Bustamante signed proofs of claim on

24 behalf of claimants.  And, you know, as the Court, and as you

25 recognized, Your Honor, there's certainly concerns that ought

1    to be examined when attorneys are signing proofs of claim.

2            And, you know, there's case law that says when an

3    attorney does so, they make themselves a potential fact

4    witness, subject to deposition, subject to examination on why

5    or what diligence did they undertake so that they would meet

6    the requirements of having personal knowledge about the claims

7    that they were attesting to in signing the claims.  And so,

8    these issues really go to the core integrity of many of the

9    claims that are part of this process.

10            And, also, I think there's evidence that hasn't

11    been refuted before, you know, for example there was a filing

12    at Docket Number 2211-3 and it's part of the Rule 2004.  It's

13    a declaration that was submitted that -- a document examiner

14    who looked at many of the proofs of claim that were, even

15    those that were purportedly cured by the Napoli firm.  Well,

16    first of all, there were -- the document expert observed that

17    the signature pages appear to be different from other pages in

18    the proofs of claim; in other words, even the ones that were

19    purportedly cured because the original proofs of claim had

20    many missing document fields, but even the cured claims had

21    signature pages different from other pages in the proofs of

22    claim, to have suggested that they were signed on different

23    days or different locations.  And we are looking for the

24    opportunity to explore these issues.

25            As I think Mr. Shkolnik described it is, you know,

1  we may be just seeing the tip of the iceberg.  You know, we

2  have these bits of evidence that we, ultimately, will want to

3  explore at deposition.  But in the first instance, we're

4  asking for documents -- not privileged documents; we're not

5  looking for communications between the law firms and the

6  claimants.  We're not looking for -- what we're looking for is

7  documents that go to how these claims were solicited, how

8  these claims were aggregated, how -- what was the relationship

9  or the financial relationships between law firms and the

10  aggregators that led to, you know, these signings of proofs of

11  claim by attorneys, in many instances.

12          And the same document I just referenced, 2211-3,

13  the document examiner said that one of the aggregators,

14  Consumer Attorney Marketing Group, he found evidence that that

15  firm submitted over 500 proofs of claim, including proofs of

16  claim submitted by an attorney from Napoli.

17          So, what we're seeking, you know, in the first

18  instance is relevant documents that go to this issue.  And,

19  ultimately, as the Court is well aware, having documents to be

20  able to use in a deposition certainly makes things go more

21  efficiently and get to the heart of the matters much quicker.

22  And, you know, there may be explanations for many of these red

23  flags, but we don't have any declarations in response to any

24  of these motions where anyone was attesting to what the facts

25  may be.  We have some representations from some of the law

1  firms, but we believe that it's important for there to be an

2  examination of these issues in a careful way that really go to

3  issues that are relevant to the confirmation, Judge.

4          THE COURT:  Okay.  Let me hear from -- is it

5  Mr. Bustamante who's for Napoli Shkolnik?

6          MR. BUSTAMANTE:  Yes, Your Honor.

7          Brett Bustamante on behalf of Napoli Shkolnik.  Can

8  you hear me, Your Honor?

9          THE COURT:  I can.

10          MR. BUSTAMANTE:  Of course, I would just like to

11  point out first that Napoli, our opposition that we filed last

12  night adopts the arguments set forth in Ask LLP's and Andrew

13  Thorton's [sic] brief.  They will be arguing the substantive

14  issues, as I understand it, so I don't want to step on their

15  feet, but since we are up first, I maybe would just like an

16  opportunity to respond to some of that.

17          And just to preface this with everything, we have

18  sort of been lumped into this group.  We have no relationship

19  with Mr. Kosnoff.  We have never worked with him or anything

20  like that.  We haven't filed the 2019 and we also haven't been

21  served a subpoena.

22          That said, just as a way of quick background, and

23  that, I think, explains our position in this.  We believe the

24  Napoli firm has been attacked by the insurers since the

25  advertising motions last year merely because of our support

1  for the Coalition.

2        With regard to Napoli, there's been very little

3  evidence offered; it's mostly *ad hominem* attacks.  And we have

4  discussed them in the court previously.  It includes attacks

5  against family members of our attorneys.  They repeatedly cite

6  to negative statements made by someone in a court filing

7  several years ago against one of our attorneys.  So, from our

8  perspective, it's mostly *ad hominem* attacks that they submit

9  as evidence to Your Honor, and they do so in the letter motion

10 that's before Your Honor right now in a footnote.

11        Really, these *ad hominem* attacks have been the

12 basis for the discovery that's been served on our vendors, on

13 our financial institutions, and now us.  And, really, from our

14 perspective, it is just an excuse to attack law firms

15 representing claimants to gain a litigation advantage.

16        The insurers' justification, as I understand it,

17 has changed over several motions.  Originally, in the

18 advertising motion, their concerns were of fraudulent claims

19 potentially being brought.  Then, in the 2004 motions, they

20 accuse Napoli, without any evidence of outright fraud -- that

21 was a quote from their motion.  Since then, in the hearings on

22 those motions, they backed away from that and said there was

23 no outright fraud.

24        Even today, in their questioning with

25 Mr. Schiavoni, you know, I think Your Honor asked the right

1  question.  Let's say all of these were improperly vetted, you

2  know, or anything or such and let's say they did everything

3  wrong:  How does it relate to plan confirmation?

4  And they gave a one-minute answer, which I noted

5  down, but at the end of it, the conclusion seemed to be it

6  just ties the story of how the "proof of claims" process came

7  together.  That's not relevant for plan confirmation for

8  discovery purposes, as least.

9  The reality is, and I'm just addressing the

10  substantive issues; the procedural issues, which I think are

11  more pressing before Your Honor are, again, being addressed by

12  other law firms, so I'll let them handle that.  But the

13  reality is, there was no fraud.  Napoli used attorney

14  signatures to preserve claims before the bar date; that's as

15  simple as that, and we stated so in our 2004 motion.

16  Since then, the vast majority of claims that we

17  originally filed bearing an attorney's signature, have been

18  amended.  Now, they have claimants' signatures.

19  So, you know, Mr. Schiavoni says that this is --

20  this doesn't matter, but it really does matter because that's

21  their whole basis for bringing this discovery and bringing

22  those motions that they've been harassing us with over the

23  past year.  Clearly, there was no fraud, because now we have

24  claimants that are on the proofs of claim.

25  There was some accusation that I don't believe has

1  ever been made before by Mr. Currie, that some of the

2  signature pages are different from other signature pages or

3  different from the rest of the document and that, somehow, is

4  the tip of the iceberg of some, you know, unarticulated

5  theory.  I mean, there's -- I mean, that's true.

6          I was part of the claims process, Your Honor, and,

7  you know, at the risk of representing too much to the Court,

8  you know, we have to send clients the forms and they have to

9  send us back their signature pages.  Sometimes they review the

10  form and send us back a signature page.  There's no reason to

11  suspect that's indicative of any fraud and it certainly

12  doesn't make the proof of claim any less acceptable for

13  confirmation purposes.

14          But with the issues that are before Your Honor

15  right now, we have not been served a subpoena.  They know --

16  the insurers know that you can't serve interrogatories on non-

17  parties; that's why they have come up with this rather

18  marvelous theory that somehow we're a party.  But the reality

19  is, we're not a party and, therefore, we should not be

20  responding to interrogatories.

21          They know that they have to comply with Rule 45;

22  that's why they complied with some law firms and not others.

23  They've determined that, I guess, we're not in the hundred-

24  mile radius and they don't want to go to another court and

25  that's why they're trying to claim we're now a party, instead

1  of complying with Rule 45.

2          And, frankly, in the meet-and-confers I had with

3  them, which took place over the course of the week, it became

4  clear they don't have a basis for this discovery.  They don't

5  know why it's relevant for confirmation purposes.  And I think

6  Mr. Schiavoni's statement expresses that, as well.  They

7  simply did not give you a reason why it would be related to

8  Napoli.  They gave you some, maybe, that are related to

9  Kosnoff that don't pertain to us, but certainly not with

10  regard to Napoli.

11          Napoli isn't using a master ballot.  All of the

12  clients are voting for themselves.  So, again, it's simply how

13  the process, or to use Mr. Schiavoni's words, the story about

14  how the "proof of claims" process came together is completely

15  irrelevant to confirmation discovery with regard to Napoli,

16  because we are not a master ballot; the clients are voting for

17  themselves.

18          And I am sure, despite this, insurers' counsel is

19  going to be able to put together some seemingly plausible

20  explanation.  You know, they'll say something like, Your

21  Honor, this is the most important discovery in the case, you

22  know, this is the dog that wags the kettle [sic] or whatever

23  phrase that they use.

24          But the reality is that this discovery targets the

25  law firms and not claimants.  It's apparent from the discovery

1   because it doesn't matter whether Napoli represents John Doe

2   or John Smith.  The discovery is irrespective of whatever

3   client we represent.

4           And they could have served discovery targeted to

5   clients, but for whatever reason, they didn't.  The intent is

6   to harass us and, frankly, Your Honor that's sort of the

7   sentiment that I want to leave you with is that parties, you

8   know, shouldn't be allowed to use the discovery process to

9   attack the adversaries' attorneys to gain a litigation

10  advantage and they shouldn't certainly not be permit to forego

11  the Federal Rules of Procedure in doing so.  It's a clear

12  abuse of the discovery process and it needs to stop.

13          Likewise, I believe it was the insurers' counsel

14  who, last week, reminded the Court about the duty of candor in

15  this jurisdiction.  We ask the Court to remind the insurers of

16  their duty of candor and cease the *ad hominem* attacks

17  concerning Napoli.

18          That said, in the meet-and-confer and multiple

19  letters, we have reached out to the insurers and we have

20  repeatedly informed them that we would accept service of a

21  properly served subpoena and they have not taken us up on that

22  offer.  They are, from our perspective, they are wasting our

23  time.  Time that I could be devoted to speaking with clients

24  and explaining the solicitation procedures right now; it's

25  being consumed with this, and that's their goal.

1          Does Your Honor have any questions for me?

2          THE COURT:  The only question I have, and I don't

3  know if, perhaps, someone else is going to address this, which

4  is fine, is very specifically on the party issue, is why isn't

5  signing a proof of claim, why doesn't that make you a party

6  with respect -- and filing it -- make you a party with respect

7  to that claim --

8          MR. BUSTAMANTE:  I --

9          THE COURT:  -- and/or is it just that you're not a

10 party, but you're still subject to questioning, but just not

11 as a party; is that the answer?

12         MR. BUSTAMANTE:  I, of course, will let

13 Mr. Robbins handle the official answer.  I know my thoughts,

14 personally on the issue is that, you know, as attorneys, we

15 certainly sign all sorts of documents on behalf of our clients

16 all the time.  It does not make us a party to a litigation

17 just because we are executing a complaint, executing even a

18 sworn affidavit.

19         In New York, we have to verify complaints, which

20 are very commonly signed by attorneys.  That does not make us

21 a party in interest.  Certainly, under the Federal Rules, it

22 does not make us a party in interest for the purposes of

23 discovery.  So, that would be my answer, but if Mr. Robbins

24 tells me I'm wrong, then you'll have to go with that.

25         THE COURT:  Okay.

1      MR. CURRIE:  Your Honor, do you wish me to address

2   that question or shall I wait my turn?

3      THE COURT:  Well, Mr. Currie, why don't we go to

4   Mr. Robbins' clients next.

5      MR. CURRIE:  Thank you, your Honor.

6      If I may, I just want to say one thing in response

7   to Mr. Bustamante, regarding service of a Rule 45 subpoena.

8   You know, the insurers offered, in our discussions with, in

9   the meet-and-confers with the Napoli firm, to convert or serve

10  discovery to a Rule 45 subpoena -- you know, they have an

11  office in Wilmington -- and the response was that they believe

12  that we would have to serve the firm in New York and litigate

13  the Rule 45 subpoena in New York, which is one of the reasons

14  why, you know, in order to try to strive for efficiency, is

15  one of the reasons we brought this motion.

16      So, I think that was important to clarify that,

17  Your Honor, that we did offer to convert our discovery to Rule

18  45 and get to the more substantive issues, but they declined

19  to do so.

20      THE COURT:  Well, Rule 45 is not necessarily known

21  for its efficiency, okay.

22      MR. BUSTAMANTE:  Fair enough.

23      MR. CURRIE:  Yeah, that's absolutely right, Your

24  Honor.

25      THE COURT:  Okay.  Let's turn to Mr. Robbins'

1  clients.

2          MR. CURRIE:  Yes, Your Honor.  Thank you.  I'm just

3  going to the next part of my outline, Judge.

4          So, Your Honor, regarding Mr. Robbins' clients, so

5  his clients, Ask LLP and Andrews & Thornton, so what we put in

6  our papers is, you know, exactly -- you know, regarding the

7  proofs of claim -- the concerns that the Court forewarned

8  everyone about are present here with -- for example, one of

9  the ASK attorneys, David Stern, signed nearly 1500 proofs of

10 claim including, you know, 686 within two weeks of the bar

11 date.  An Andrews & Thornton attorney, Sean Higgins, signed

12 nearly a thousand -- 955 -- and including 951 of those within

13 two weeks of the bar date.

14         And so, you know, the same kinds of concerns that

15 we've been talking about with others where you have attorneys

16 signing hundreds and hundreds of proofs of claim really goes

17 to the core of, like, could they -- did they generally do the

18 diligence?  Does the diligence and the process support

19 counsel's signing on behalf of the claimants in the claims

20 process?

21         You know, we don't know the answer because we don't

22 have the information.  We don't have the documents.  We don't

23 have the ability to unpack the issues that are raised with

24 exactly the concerns that Your Honor raised in essentially

25 saying, I really don't want to see one lawyer signing a

1  thousand proofs of claim, but here we are with both of these

2  law firms.

3          And so, again, you know -- and, again, like, you

4  know, as we stated in our papers, you know, we're not

5  suggesting that these firms are named plaintiffs or named

6  parties in this firm [sic], but they're engagement in the

7  level of, their engagement in this process suggests that they

8  ought to be, you know, at minimum, treated as if they're

9  parties, especially when all of us are confronted with the

10  very tight discovery schedule.

11          And having the additional time, you know,

12  essentially frittered away by trying to litigate these in

13  foreign jurisdictions, essentially suggests that, you know,

14  the suggestion is that the preference is for these firms may

15  be to just run out the discovery clock with a hope that we're

16  not going to get anything.

17          And, you know, what we were trying to accomplish

18  both, through our meet-and-confers, where we were suggesting

19  to counsel, why don't we agree that we convert or we'll give

20  you a Rule 45 subpoena if we can agree that the substantive

21  issues can be considered before you, Judge, but the parties

22  declined to do that.  And what we want to do is actually get

23  to the substance, but we find ourselves here at this

24  preliminary stage.

25          THE COURT:  Okay.  Let me ask you this -- I

1   understand that argument.  Mr. Robbins is going to respond to

2   it.  He's going to start by saying that is not a thing, but

3   then he'll get beyond that.

4           So, the documents you want, let's talk about those.

5   Is there distinction between process and documents that

6   reflect communications between counsel and the client?

7           I know these issues came up in two that are not in

8   front of me today:  Verus and Mark J. Bern.  That was a big

9   part of the response to, or the filings in connection with

10  those two motions.

11          Here, I want to understand exactly what you want.

12  And I've got the first -- the sets of interrogatories in front

13  of me, and it strikes me that some of this -- well, I guess I

14  want to understand that notwithstanding the interrogatories,

15  which I'm looking at, that you're not looking for attorney-

16  client privileged information; what you're really looking for

17  is proprietary, confidential information about how the firms

18  generate clients and how they prepare the proofs of claim?

19          MR. CURRIE:  That's right, Your Honor.  We're not

20  looking for the communications with the claimants and their

21  lawyers; that's not what we're going about.

22          But I think what would shed light on whether there

23  were any issues in the integrity of the solicitation and the

24  aggregation of claims is if we knew about documents and

25  communications; for example, if a law firm was using an

1  aggregator or a vendor, what were the, you know, what do the

2  documents reflect about the nature of the financial

3  arrangements, in terms of the incentives that the aggregator

4  may have had to collect as many claims as possible within a

5  short time period, would suggest that care was not taken and

6  that they were then -- and the fact, for example, of when

7  communications transpire between the aggregators and the law

8  firms might suggest what was the potential level of diligence

9  that the lawyers were able to do if they were using claims

10 aggregators or actually talking to the claimants.

11        But what -- we're at an information deficit,

12 because we don't know what the nature of those communications

13 might be or those financial arrangements and incentives and

14 that's what we're seeking.  We're not looking for the

15 information or the discussions between the lawyers and the

16 claimants; that's not what we're about.

17        THE COURT:  Okay.  Thank you.

18        Mr. Robbins?

19        MR. ROBBINS:  Thank you, Your Honor.

20        Can you hear me all right?

21        THE COURT:  I can.

22        MR. ROBBINS:  Thank you.

23        So, I'm going to address two points:  whether our

24 clients which are -- again, for the record, A&T and ASK --

25 were also making certain broad arguments that I -- as Mr.

1  Bustamante pointed out, applied to several of the firms who

2  are similarly situated here on this motion.  We're going to

3  talk about the party versus non-party question.  We're going

4  to talk about whether the Court is free, as the insurers ask,

5  to sort of (indiscernible) the whole Rule 45 process, which is

6  what they're asking you to do.

7        But what I want to be clear about what I'm not

8  going to cover today.  I am not going to make an argument

9  about the relevance or lack thereof of what the documents are

10  that they're asking for.  If and when we get to the merits of

11  these requests, when a subpoena is duly issued and if and when

12  it comes before this Court, I will have plenty to say about

13  whether the effort by these insurance companies to discover

14  the propriety processes of the firms that I represent have

15  anything, whatsoever, to do with the confirmation process, and

16  for a whole host of reasons, I will explain at that time, they

17  manifestly do not.

18        But for today, all that matters is whether these

19  document requests, as interrogatories, are proper.  Are they

20  properly served on two law firms by virtue of their status as

21  lawyers for claimants?

22        The answer is no, they are not.  And this notion

23  that the insurers peddle that the definition of "party" can

24  sort of be some kind of sliding scale, according to which, at

25  some point, you morph from mere lawyer for a client into a

1  party in your own right is, I think, a fool's errand to begin

2  with.  Party versus non-party is an on-off switch; you either

3  are a party or you are not.

4         My clients are not.  And if there were going to be

5  a sliding scale, which, of course, there is none, and the one

6  and only case they cite, the Compagnie Francaise (phonetic)

7  case, just has no bearing on the question at all.  There, the

8  issue was whether one French governmental agency could be

9  subpoenaed for documents served on another French agency when

10  the parent agency was the principal and the other agency was

11  its agent.

12         That's obviously got nothing to do here with the

13  lawyer-client relationships.  They are not principals and

14  agents.

15         But if there ever were going to be a sliding scale,

16  Your Honor, nothing could be more perverse than the sliding

17  scale these insurance companies are feeding you, because

18  according to their argument, the more diligent the client --

19  the lawyer is, the more work the client does, the more papers

20  the client files and signs; in other words, the more the law

21  firm does its job as zealous advocates for clients, the

22  likelier it is to become a party and, therefore, to have its

23  own efforts leveraged against the clients.  What a perverse

24  set of incentives that would be if the law permitted party

25  status to depend on that, you know, how much, how involved you

1  are.

2          So, to get back to the answer that you asked Mr.

3  Bustamante and which he was kind enough to defer to me, you

4  asked whether merely signing the proofs of claim can possibly

5  make you a party.  The answer, full stop, is no; it cannot

6  possibly be.  If the law were otherwise, there are countless

7  pleadings in countless jurisdictions that require the

8  signature of a lawyer, or at least permit the signature of a

9  lawyer.

10          And if those rules converted you into a party

11  simply because you obeyed them, we would be seeing lawyer

12  depositions all the time.  In fact, we see lawyer depositions

13  almost never.  And the notion that this is an appropriate time

14  to do so, strikes me as quite odd.  Quite odd.

15          Not in the least, because some of the very

16  arguments you heard the insurers make a few hours ago when the

17  shoe was on the other foot.  When the shoe was on the other

18  foot, here are some of the things that the insurance companies

19  told you.  They said:  Gosh, this is disproportionate to the

20  case; the case is coming to confirmation soon; we have got to

21  ask ourselves, what is the value added; you know, this is a

22  melting ice cube and we don't want to see it melt by having a

23  set of rabbit trails for discovery.

24          Well, now the shoe is back on the other foot and we

25  don't hear them telling that tale anymore, but it is just as

1  true when they won their motion to quash as when they seek to

2  enforce subpoenas that are just as much, if not more, in the

3  nature of a rabbit trail.

4          Now, let's go through the more particular arguments

5  that these fellows make on party status.  In their papers, but

6  tellingly not in Mr. Currie's oral argument today, they opened

7  with this one.  They said that our firms are parties because

8  they are Coalition members, as reflected in their 2019

9  statements.  I didn't hear that argument repeated today.

10          That was because since we filed our opposition last

11  evening, the insurers, perhaps, finally read the 2019s and

12  when they did, they probably saw that in the paragraph

13  numbered one, in every single one of the filings, from the

14  very first 2019 until the very most recent one at

15  Docket 6458, paragraph number one in each case says that the

16  only members of the Coalition are persons who are sexual abuse

17  survivors.  Those are the members of the Coalition.  Those are

18  the actual parties to this case; their law firms are not.  So,

19  we can dispense with, I think, the highly misleading claim

20  about the 2019s, which, as I say, I didn't hear repeated

21  today.

22          They say, then, that the Coalition moved to be a

23  mediation party and by taking that step, they became a party

24  for all purposes.  I'm not sure about the logic of that, but

25  again, that doesn't make the point because the Coalition is

1  not the law firms; the Coalition are the claimants, full stop.

2         They say things like, Well, these firms appeared in

3  other bankruptcy cases.  Well, you know, I assume there is a

4  set of law firms that are repeat players in these cases.  I'm

5  in Bankruptcy Court at least long enough to know that it's

6  something of a repeat-actor club, but I don't see how any of

7  that makes a dime's worth of difference for purposes of making

8  people parties; otherwise, there would be all kinds of parties

9  on this screen today because some of these names show up in

10  lots and lots and lots of cases.

11         They say, well, your clients got litigation funding

12  so, therefore, they're parties.  And that also is nonsense.

13         Yes, some client law firms got funding.  Some of

14  the big insurance company law firms probably get bank

15  financing, too.  They don't have to go to hedge funds because,

16  I don't know, they've been on Wall Street for 200 years or

17  since the Mayflower landed.  Good for them.  But financing is

18  financing and it doesn't turn you into a party.

19         And then they say, Well, you know, you participated

20  in the 2004 process and you didn't speak up.  You didn't make

21  this party argument back then so you've somehow waived it.

22         Also nonsense.  2004 discovery is available against

23  non-parties.  It covers "entities"; whereas, Rules 34 and 33

24  cover parties.  So, we plainly aren't parties.

25         And as for this middle position where they say,

1  Well, you know, you're not parties, but you've been so active

2  and, you know, so noisy and -- I don't know -- some other

3  adjective, that you've somehow morphed into a party.

4          And as Your Honor stole my thunder on that, that is

5  not a thing.  There is no middle category.  Parties are either

6  parties or non-parties; it's an on-off switch.  It isn't

7  something that you can be a little bit pregnant about.

8          All right.  So, there's just nothing to the

9  argument that our clients are parties.  There's nothing to the

10  argument that any of these law firms are parties.  I don't

11  have the burden of arguing Mr. Kosnoff's case, but if I did, I

12  would tell you he's not a party either.  But, certainly, our

13  clients are not.

14          So, then they say, Well, okay, maybe we're not

15  parties, so, probably, we should have issued subpoenas.  We

16  didn't, but we would like you to pretend that we did and then

17  after you pretend that we did, we'd like you to enforce it

18  right now in front of you and get to the merits.

19          I have no doubt that's what they would like, but

20  that's not the law.  The law says you've got to obey Rule 45.

21  You've got to actually issue a subpoena.

22          We're happy to take service of the subpoena, but

23  we're not happy to waive a whole bunch of rights that the law

24  clearly prescribes, which Your Honor adverted to earlier.

25          So, to me, where we end up, Your Honor, is

1  essentially where you ended up when the shoe was on the other

2  foot this morning.  The time for confirmation is fast upon us.

3  The value added of these subpoenas, if and when they ever get

4  issued, is minimal.  But even if it was more than trivial,

5  which it isn't, but even if it were, it's not a "get out of

6  jail free" card.  You've got to follow the rules.

7         The rules are Rule 33 and 34 apply to parties.

8  We're not parties.  They need to issue a subpoena and they

9  need to obey Rule 45.

10         They make, by the way, one final point, which is

11  they tell you that you can enforce the subpoena,

12  notwithstanding Rule 45(c), either because our law firms

13  transact business within the hundred miles or because it

14  wouldn't really be that burdensome, so let's dispense with

15  Rule 45.

16         Both of those are just dead wrong.  Rule 45, the

17  applicable provision of Rule 45(c)(3)(a), I think is the

18  subprovisions, you will see, Your Honor, that the business

19  must be conducted "in person."  In person; that's what the

20  rule subsection says, and there is no contention, and there

21  couldn't be any contention that the appearance on these Zoom

22  sessions by lawyers, otherwise in California and Minnesota, as

23  my clients are, have somehow transacted business in person.

24  They haven't.  So, you can't dispense with Rule 45 on that

25  ground.

1          And then they invoke some open-ended exception that

2    they ground in a case that they cite, I believe, at Footnote

3    85 to their submission, their motion to compel.  And this sort

4    of omnibus exception, which would swallow the whole, if it

5    were true, says, according to them, Well, so long as it

6    wouldn't be terribly burdensome to produce documents, for

7    example, if they were electronically filed.  You don't really

8    have to obey Rule 45's hundred-mail rule.

9          You will search that case high and low for any real

10   support to that, and you won't find it, and not surprisingly,

11   because it would totally gut the hundred-mile rule contained

12   in Rule 45 for most document discovery in the age of

13   electronics.  And, yet, the rule has been amended since the

14   Email Age, without any material change, except for, you know,

15   some formal changes about where provisions appear.

16          So, just to sum up, we're not parties.  There's no

17   such thing as quasi-parties.  And there's no excuse for not

18   following the law that Rule 45 prescribes.

19          And with that, Your Honor, I think I'm done, unless

20   the Court has questions.

21          THE COURT:  I do have a couple of questions.  First

22   of all, let me ask you this for one of your clients since you

23   brought it up.  So ASK has appeared in person in front of this

24   court for years, and years and years, had has been approved as

25   counsel by this court for years, and years, and years

1  particularly witih respect to avoidance actions.  So why don't

2  they regularly transact business in this jurisdiction even if

3  they've been circumscribed as we all have been to virtual

4  hearings for the last couple years.

5       MR. ROBBINS:  Well the question, I guess, is

6  whether the fact that you litigate frequently in a proceeding

7  which you're retained constitutes conducting business.  I

8  suspect the answer is no or else, you know, there are some

9  large Delaware large firms that would find their files

10 ransacked on a regular basis who appear in this court every

11 single day.

12      I think the proposition simply proves too much.

13 The notion that you can appear as an advocate for clients on a

14 regular basis and thus turn yourself into a party in your own

15 right seems to me wildly counter intuitive.  I think it

16 creates a set of perverse incentives.  It means that you

17 should, for example, not be a regular member of the Delaware

18 bar because the more you participate in bar activities as a

19 lawyer the likelier you are to have your files rummaged to the

20 disadvantage of the very clients you represent.  That cannot

21 be what Rule 45 is getting at.

22      In any event, I don't think that is a question Your

23 Honor needs to ask today because there is no subpoena in front

24 of you.  They haven't served us with a subpoena.  They have

25 asked us to act as if they have, but they haven't and they've

1  asked you to act as if the improper discovery requests were

2  actually a subpoena, but they aren't.

3         So although I think the answer to your question is

4  no, appearing as a representative of parties as a lawyer does

5  not trigger the in-person business provision of Rule 45.  As I

6  say, Your Honor, it's a question for another day because there

7  is no subpoena in front of you for my clients.

8         THE COURT:  Let me ask you this question, so let's

9  say I would agree that in a circumstance where a lawyer

10  represents one client and signs a proof of claim form as agent

11  for that client, and files it with the court, does not make

12  the attorney a party.  What about a situation where here I

13  have, and I'm not sure if this is the facts for your clients,

14  but where here I have an attorney signing proofs of claim, say

15  300 proofs of claim on behalf of a client without permission.

16  Does that make the attorney a party?

17         MR. ROBBINS:  The answer is no, but let me unpack

18  it just a little.  First off, if a lawyer signs a bunch of

19  proofs of claim without permission a fact, by the way, as they

20  used to say on Perry Mason when I was a kid, assumes a fact

21  not in evidence.  There is no evidence, none, and it is false

22  to suggest that my clients did that.

23         Let's take on the hypothetical, let's suppose

24  somebody did that.  I suppose, Your Honor, they would be

25  appropriately sanctioned under Rule 11 or its bankruptcy

1   cognate, but if you look at the advisory committee notes to

2   Rule 11 you will see that Rule 11 motions are supposed to be

3   litigated on the basis of an existing record and that

4   discovery in aid of sanctions is generally forbidden.

5           So even if it were true, Judge, even if it were

6   true that some lawyer had engaged in the mischief you have

7   described it would not warrant discovery, though it might

8   warrant sanctions.  But what it would not do is convert them

9   into a party.  Imagine, for example, plaintiff's class action

10  lawyers.  So let's take it out of the mass tort context, put

11  it in the context of a securities class action.  Now I am

12  usually on the defense side of those cases, but imagine the

13  other side.

14          They're putting together a class action and they're

15  trying to satisfy the numerosity requirement of Rule 23 of the

16  Federal Rules of Civil Procedure.  They're getting a bunch of

17  people into the class sufficient to satisfy numerosity, but

18  then they have this meeting in the conference room where they

19  say, uh-oh, aren't you worried that if you tip the balance and

20  satisfy the numerosity requirement suddenly we're going to

21  become parties because we've now signed a complaint for too

22  many clients.  There's just no difference.  It cannot be that

23  you become a party in your own right simply because of the

24  number of parties you represent has increased.

25          Your hypothetical, Judge, added an important

1 wrinkle.  You said not only is it numerous, but it's unlawful.

2 It's signing up people who didn't authorize you.  That's

3 sanctionable and if you can prove it that lawyer should be

4 severely sanctioned, but there is no authority for discovery

5 even in aid of sanctions.  Here we don't even have that.

6         THE COURT:  So you're saying that somebody who

7 files a proof of claim in my court cannot be pulled into my

8 court by way of discovery issued under a notice.  They could

9 only be pulled into my court by discovery issued under a

10 subpoena and if they're outside the 100 mile radius too bad.

11         MR. ROBBINS:  Well the answer is yes with one

12 qualifier.  If the lawyer files a claim in his or her own

13 right, you know, then they become a claimant.  But the strict

14 answer to your question is no.  If all the lawyer has done is

15 sign a proof of claim and file it he or she is like any other

16 lawyer filing any other pleading in any other courtroom in any

17 other jurisdiction.  They are a lawyer, they are not a party.

18 If they've done it  unlawfully, if they've done it without

19 vetting, if they've done it in a way that violates Rule 11 the

20 court has all kinds of authority to issue sanctions, but what

21 you don't have is the authority to treat them as if they are

22 their client; they aren't

23         THE COURT:  So how would I effect my all kind of

24 authority?  How would I do that?  How would I force them to be

25 at that podium that nobody is at right now?  How would I force

1 them to do that?

2           MR. ROBBINS:  Well, of course, there are lawyers

3 who are going to come before you because they're representing

4 their clients and you can ask them all kinds of questions

5 which may or may not be germane, and they'll either answer

6 them or they won't.

7           If the question is how can you make them turn over

8 their files or their proprietary information to either the

9 court or to opposing counsel the answer is that merely because

10 they have signed a proof of claim does not give this court

11 that authority any more than it would give any other federal

12 judge the authority to go through, allow opposing counsel to

13 rummage through a lawyers file simply because, for example, he

14 or she was required to sign -- to verify an interrogatory set

15 of answers.

16           THE COURT:  Well I will make a distinction between

17 attorney/client privileged information and proprietary

18 confidential information that a firm would prefer not to turn

19 over, but is privileged at all.  So I agree with that, but I

20 am still wondering how I get that attorney in front of me.  I

21 will tell you the cases that you read about improperly signed

22 proofs of claim are all about the process.  They are all about

23 the process that the attorney used or didn't use --

24           MR. ROBBINS:  Yes.

25           THE COURT:  -- and the diligence the attorney did

1  or didn't do went before that proof of claim was signed,

2      MR. ROBBINS:  Yes.  Your Honor, adverting to a line

3  that is consequential.  So let me tell you what -- the answer

4  is you would have the authority to do what you just said

5  because if there is evidence on the record, on the existing

6  record, that suggests that a lawyer has misbehaved either by

7  making up claims or filling in information on a claims form

8  that didn't come from the client, so on and so forth, you

9  absolutely have the inherent authority to pursue discipline

10 proceedings if, you know, the process of Rule 11 is strictly

11 followed.

12      But there is no authority short of a *prima facie*

13 showing of misconduct for a court, whether this court or any

14 other federal judge, to seek the kind of internal law firm

15 discovery that the insurance companies are seeking.  This is

16 without regard to the question of relevance because I said I

17 was going to save that for another day.  I got a lot to say

18 about why this stuff is irrelevant, but for today all that

19 matters is that we are the parties and that the hypos that the

20 court is concerned about are ones that flow from your inherent

21 authority to police the proceedings in front of you under

22 principals like Deegan v. United States, and various other

23 court cases dealing with the inherent authority of courts.

24      In the absence of any evidence of the kind of

25 misconduct that triggers a court's authority to police

1  activities in front of her I'm sorry, and I always hate to be

2  a lawyer telling a judge she can't do something, but you can't

3  do something and you can't do this.

4        THE COURT:  So I can't do something if I know from

5  a review, not a personal review, but from a declaration from

6  someone who has done a review of the proofs of claim that

7  lawyer X signed 300 proofs of claim on one day.

8        MR. ROBBINS:  No, you can't.  I --

9        THE COURT:  Why not?

10       MR. ROBBINS:  Well, again, we talked about this

11  back in January of February in the context of 2004.  I -- that

12  -- at that time we didn't discuss the question of party status

13  because under 2004 that is not pertinent.  There is nothing

14  the least bit suggestive, much less nefarious, about lawyers

15  signing a bunch of documents during a pandemic when you can't

16  go out and visit people, and people can't come to your office

17  readily, and everybody is wearing a mask, and the deadline is

18  -- you know, the bar date is coming up, and it's fast upon us,

19  and people are vetting and scrambling to get information, and

20  doing their job which means it takes more time not less time

21  to get the requisite information so that the bar date is fast

22  upon us.

23       Finally, there is a certain number of people who

24  simply can't get -- you know, clients who can't sign it

25  themselves so the lawyer signs it after doing his or her

1  appropriate due diligence.  There is nothing the least bit

2  unseemly about that.  It is exactly what you would expect.  So

3  the notion that that kind of a showing could ever be enough to

4  trigger the court's inherent authority based on sanctions, I

5  think, is really a bridge too far.

6           THE COURT:  I don't think it would be based on

7  sanctions. I think it would be what you said, my inherent

8  authority over the proceedings before me and whether, yes --

9  well I guess there could be a valid reason that somebody filed

10 -- signed 300 proofs of claim on one day or there might not

11 be.  There might be a reason that isn't valid that they signed

12 300 on one day because that is a lot to sign on one day.

13          It does not suggest that you, at least,

14 contemporaneously revised 300 proofs of claim in one day, felt

15 comfortable with them and signed them.  Maybe you reviewed

16 them over the last five months, I don't know.  But that is

17 concerning to me.

18          MR. ROBBINS:  I understand that, Your Honor, though

19 I think it, frankly, strikes me as totally anodyne.  But even

20 if it -- you know, if it is concerning that still is not the

21 standard.  The inherent authority -- let's be clear, the

22 inherent authority of courts is not boundless.  You know, it

23 is closely tied to the sanctioning authority.  I don't believe

24 that the court has the authority under 105 or under inherent

25 authority or anything else to order either an in-camera review

1  of lawyers' files or, worse yet, turning it over to insurance

2  companies and opposing counsel.

3        It would be a different matter if there was

4  something facially sanctionable or even probably sanctionable

5  about some kind of behavior.  The circumstances you are

6  identifying, Judge, that somebody signed a bunch of proofs of

7  claim right before the bar date, you know, I guess I find so

8  innocuous that the notion that the court has the inherent

9  authority prescribed by no rule, limited by no precept to

10 allow opposing counsel to rummage through our files based on a

11 hunch that maybe somebody didn't vet these claims sufficiently

12 which, by the way, won't be proved by any document I don't

13 think, but it doesn't matter.

14        First of all, all that matters today is that they

15 are using an improper way of getting this material.  If and

16 when they use the right approach we can have a fully

17 elaborated version of this argument because, as I say, I've

18 got a lot to say about its relevance and its providence.  It's

19 just not today's question.

20        THE COURT:  So your position is even if I had,

21 which you would dispute, inherent authority in this scenario

22 that I posited --

23        MR. ROBBINS:  Right.

24        THE COURT:  -- that still doesn't make any of the

25 law firms a party for purposes of the discovery that is being

 1  sought, the documents and interrogatories that are being

 2  sought -- documents sought and interrogatories asked.

 3          MR. ROBBINS:  Exactly right. We are not parties.

 4  There is no such thing as quasi parties and there is no

 5  warrant for avoiding Rule 45 by its terms.  That is all you

 6  need to decide to get rid of all these motions today.

 7          THE COURT:  Thank you.

 8          MR. ROBBINS:  Thank you, Your Honor.

 9          MR. CURRIE:  Your Honor, may I be heard very

10  briefly --

11          THE COURT:  Of course.

12          MR. CURRIE:  -- on one of the points that you

13  raised which I think is a very important one.  You know, the

14  lawyers that we're talking about at the firms at issue are not

15  -- we're not talking about the same scenario where lawyers

16  ordinarily appear in front of a court or in a litigation.

17  Here the lawyers sought and obtained your permission to sign

18  proofs of claim and at the time that you agreed to permit that

19  you granted them that permission, but raised the very concern

20  that we are confronting here; the concern that situations

21  where lawyers who would be signing hundreds or even a thousand

22  proofs of claim, and the consequence of that is that they put

23  themselves squarely in the cross hairs, if you will, of

24  becoming fact witnesses.

25          How did that all come about?  How did all these

1  claims in the scramble, as Mr. Robbins talked about, heading

2  up to the bar date, how did all that sort out and how do we

3  know that proper vetting and due diligence was done?  We

4  don't, we don't know; therefore -- you know, what counsel

5  seems to be arguing here is that the court shouldn't even be

6  permitted to permit discovery on it, but yet the claimants

7  want to get paid on these proofs of claim under the plan.

8        So I think a broader point that Your Honor honed in

9  on is it's completely appropriate for discovery on these

10  issues because of what's at stake.  It may well be right that

11  Mr. Robbins, you know, may be right that in many circumstances

12  there is an explanation or an explanation for some of the

13  claims, but we don't know that.

14        THE COURT:  Thank you.  Let's move onto the others.

15        MR. CURRIE:  Yes, Your Honor.  The next firm that

16  is in our motion is Krause & Kinsman.  Again, not to repeat

17  the main point, but here, you know, one of the partners, Mr.

18  Krause, Adam Krause, signed over 2,500 proofs of claim; more

19  than any other attorney that we are aware of.  Over 2,000 of

20  those claims were within two weeks of the bar date.

21        The court is familiar, because of other motions in

22  this case, with various claims serves as the aggregator.

23  Krause & Kinsman work with that claims aggregator to submit

24  proofs of claim and our understanding, based on what we have

25  seen so far is that Verus submitted over 1,900 or

1  approximately 1,900 proofs of claim that were signed by Mr.

2  Krause.

3          So as Mr. Schiavoni mentioned earlier the effort to

4  get at relevant information that goes to this process through

5  the aggregators is proving very difficult.  And our effort

6  here is to try to get at a picture of what is going on in this

7  scenario, in the scramble leading up to the bar date with this

8  firm.  So that is why, you know, it goes to the relevance in

9  particular regarding this scenario here.

10          THE COURT:  Thank you.

11          Mr. Conaway.

12      (No verbal response)

13          THE COURT:  You're still muted.

14          MR. CONAWAY:  Good evening, Your Honor.

15          THE COURT:  Good evening.

16          MR. CONAWAY:  Mark Conaway on behalf of Krause &

17  Kinsman.

18          Before I get into the direct response I want to

19  address something that you raised with Mr. Sullivan -- excuse

20  me, Mr. Robbins.  The court absolutely has inherent authority

21  to inquire upon those that appear in front of it to answer

22  questions.  Whatever the breadth and scope of that apparent

23  authority is, however, does not inure to the insurers benefits

24  here.  The fact of the matter is your ability to do something

25  and their ability to do something are entirely two different

1  matters.

2          There is nothing that stops Your Honor from asking

3  a lawyer that appears in front of you did you do this or did

4  you do that.  That is fundamentally different from issuing the

5  subpoena to a non-party to open up their files based on what

6  is, I think, suspicion without merit. The fact that anybody

7  signed a proof of claim form and that we don't know or, I

8  think the words were, we just can't be sure that there was

9  integrity in the process I think the answer to that, Your

10  Honor, is just turn that around.

11          We have no reason to believe that, at least, with

12  respect to my client that there was anything but integrity

13  undertaken.  These folks have ethical, and professional and

14  criminal responsibility associated with their acts to sign

15  these forms.  What we are doing is now running down a rabbit

16  hole for discovery that will get us nowhere.

17          The questions they have asked, the answers they

18  will get, even if they get them all, only open another door.

19  They don't answer the question -- and, really, to tell me that

20  somebody signs so many odd forms, that they did so many in a

21  certain day, that they used the claims aggregator not one of

22  those things is prohibited by the rules, is inherently

23  illogical, inherently fraudulent, inherently wrong, but if you

24  want to come to the conclusion that those things are that's

25  great.

1          We are all big boys and girls though and litigation

2   forces all of us to make decisions.  And in this case chasing

3   this rabbit down this hole is their choice, but its

4   litigation.  We're going to a confirmation hearing in two

5   months, if you want to waste your time chasing nothing,

6   getting nothing, opening the door to additional discovery,

7   kicking over the apple cart of the debtors' reorganization

8   that is where this ends up.

9          I am not going to repeat myself over and over. I

10  wish I had had Mr. Robbins time, he did a great job.  His

11  argument over proportionality and the balance here as compared

12  to the proportionality complaints that were raised in the

13  earlier motion is remarkable given that.

14         The insurers here, if they had gotten all they

15  wanted, would have been looking at 5,500 claims for which they

16  would have sought discovery for.  Now a lot of those claims,

17  as you have heard, Your Honor, were resigned by the claimants

18  themselves.  So I don't know what the real number is, but

19  we're talking about 5,500 claims for which there was an effort

20  to dig through files, to ascertain whether something we think

21  or they think might have happened, but we don't have any

22  evidence of it.  All we know and all we have put on the

23  record, Your Honor, is that there were signatures, there were

24  lots of them, they happened near the deadline and the claims

25  aggregator involved.

1          If you are going to accuse a lawyer of not living

2  up to their professional obligations you ought to have more

3  than that in your hand; you really ought to.  This is not the

4  way to do things.  I don't accuse anybody of anything unless

5  is know what I'm talking about.  This, in my mind, Your Honor,

6  is one of the lowest forms of accusation you can make.

7          Thank you, Your Honor. If you have any questions

8  I'm available to answer them.

9          THE COURT:  No.  Thank you very much.

10          I believe that is all of the law firms involved in

11  number eight, is that correct; agenda item number eight?

12          MR. CURRIE:  Yes, Your Honor.

13          THE COURT:  Okay.  Nine and ten are similar,

14  correct?

15          MR. CURRIE:  Yes, Your Honor, they are.

16          THE COURT:  Okay.  I would like to see if we can

17  get through them tonight.  Lawyers have been here all day and

18  they raised similar issues.  So I would like to go ahead, this

19  is agenda item number 9 is a motion to compel compliance with

20  a subpoena served on Slater Slater Schulman.

21          MR. CURRIE:  Yes, Your Honor.  As you pointed out

22  our motion to compel as to Slater Slater Schulman and to the

23  Eisenberg Law Firm as well arose under similar circumstances

24  where in that we served them with a Rule 45 subpoena and they

25  responded here.  You know, some of the arguments that counsel

1  makes in response, essentially tried to conflate what we're

2  asking for into what we are not asking for, convert what we're

3  asking for into what we're not asking for.

4  　　　　　We are not asking for privileged communications

5  between the claimants and the lawyers.  As we went over it in

6  discussing the last motion what we're seeking for is documents

7  that go to the process; you know, how were -- particularly in

8  circumstances where proofs of claim were signed by attorneys,

9  what was the authorization, what were the documents to -- you

10 know, we're seeking documents that might identify lawyers who

11 interacted with claimants not what they talked about,

12 documents to identify third parties, whether its aggregators

13 or other third parties that had a role in the claims

14 accumulation and vetting process or in the signing of the

15 proofs of claim and submission of them.

16 　　　　　We -- so I can go through the list of our requests,

17 but, essentially, we're not looking for what counsel asserts

18 that we are.  We're not looking for the privileged

19 communications.  We are trying to get at this claims process

20 particularly where lawyers were signing proofs of claim close

21 to the discovery date.  One of the things that I think we will

22 probably hear, because counsel raised it in their response, is

23 some of those proofs of claims were cured, if you will, or

24 ultimately signed by claimants, but it wasn't until some of

25 these issues were raised that those cures happened.

1        So I think it's with -- even though if some of them

2    have been ultimately signed by the claimants themselves that

3    it remains relevant to the -- if for all the reasons we've

4    been talking about for the last hour or so about why unpacking

5    that process is still important and, essentially, where we are

6    with these two law firms, Your Honor, is where we ultimately

7    would like to be with all the firms that we had been talking

8    about today and be able to obtain documents.

9        I can say that we did make some progress in some of

10   the meet and confer discussions narrowing the issues and

11   trying to make our views clear.  And hearing from counsel for

12   Slater Schulman.  And I think we did manage to narrow some of

13   the issues, but we arent able to come to an agreement.  You

14   know, their view is that -- and I may be mistaken, but I don't

15   think that the Slater Schulman -- counsel for Slater Schulman

16   produced any kind of a privilege log yet.  It's a little hard

17   to address claims of work product, for example, when we don't

18   have the documents in front of us because as the court is

19   aware a work product document may have genuine work product or

20   facts that are not privileged and are not work product as part

21   of one document.  We don't have anything to discuss because we

22   don't know what there is.

23       So what we are seeking here is that the court order

24   actual compliance and compliance with our subpoena.  If we're

25   going to engage in a debate or discussion of particular

1 | privilege issues let's try to get to that.

2 | THE COURT:  Thank you.

3 | Mr. Alberto.

4 | MR. ALBERTO:  Good afternoon, Your Honor, or I

5 | should say good evening now.  I see its dark outside.  Justin

6 | Alberto from Cole Schotz on behalf of Slater Slater Schulman.

7 | I am going to start where Mr. Currie left off and I

8 | believe that we have, on several meet and confers now,

9 | indicated that we would be willing to, at some point,

10 | undertake the burden of going through a privileged log to the

11 | extent anyone can explain to me why this or to Slater why this

12 | discovery is at all relevant.

13 | I apologized before, Your Honor, I did pop onto

14 | video twice because I think there are some overlapping issues

15 | that were discussed at length during colloquies between you

16 | and Mr. Robbins earlier today. I ultimately decided to sit

17 | down both times because it wasn't my matter and I think

18 | everybody is getting tired towards the end of the day here and

19 | I didn't want to belabor the record, but the discovery that

20 | the insurers seek it's not only irrelevant, its untimely, it's

21 | completely over broad and it's not proportionate at all to the

22 | needs of the case at this time.

23 | I find a lot of irony in Mr. Currie arguing this

24 | side of the aisle this afternoon while Mr. Plevin argued the

25 | other side of the aisle this morning.  I agree with Mr.

1  Robbins in that respect -- excuse me, Mr. Russell in that

2  respect.  It's not even close to the full picture of why we're

3  here today.

4       Unfortunately, Your Honor has heard a lot about

5  turning the temperate down in these cases.  This discovery

6  does the exact opposite, in my opinion, and would leave

7  confirmation down tangents that really have no bearing on

8  11/29 or, at least, no bearings that I can figure out.  The

9  discovery is a continued effort by insurance companies, all of

10  whom have to defend against mass tort cases like the ones

11  presently before Your Honor day in and day out to investigate

12  business practices of the personal injury bar that represents

13  the claims -- excuse me, the claimants whose claims the

14  insurers may ultimately have to pay.  So they have an economic

15  incentive to be here muddying the water.  This is the second

16  time that they have sought discovery from Slater and other

17  firms based on the, still, unsubstantiated allegation that

18  there was wrongdoing in the claims process.

19       I want to make one point before I move onto the

20  discovery that is before Your Honor today.  The last time that

21  we were before Your Honor the insurers sought substantially

22  the same discovery back in February pursuant to Rule 2004

23  based on their theory that there was egregious claims mining

24  in this case before the bar date.  Rule 2004 has been noted by

25  Your Honor and Your Honor's colleagues on the bench as far

1  broader then the Rules 26 through 45 normal strictures of

2  discovery that were here today.

3       Let me say one other thing on that, Your Honor.  If

4  there was a shred of evidence that substantiated any claims

5  that the insurers believe of wrongdoing or nefarious conduct

6  we would be having a much different conversation today.  We

7  wouldn't be here on a one-off Rule 26 or 45 discovery matter.

8  We would be here fighting over an omnibus claim objection or

9  worse a sanctions motion.

10      In my view, Your Honor, again, the discovery at

11 issue today, at its core, at most is relevant to a question of

12 authority.  Did Slater attorneys have the authority to execute

13 proofs of claim on their clients' behalf. And while I still

14 believe the issue of authority is completely irrelevant at

15 this juncture the rest of the discovery about Slater's

16 business practices, how it came to represent a client are

17 wholly unnecessary and completely irrelevant to the 1129

18 confirmation standards and could never yield any probative

19 evidentiary value to plan confirmation.

20      What question Slater asked our client, what

21 documents they reviewed, what questions they have its just --

22 it goes to the heart of the attorney/client privilege and work

23 product doctrines.  The insurers know that they are not

24 entitled to that and when you read these requests for

25 production of documents, particularly, I think request 7

1  through 11 they are, essentially, asking that we turn over our

2  entire client files for 14,200 clients.

3          The claimants, Your Honor, they will have their

4  proverbial day in court when it comes time for a trustee or

5  whomever to reconcile and analyze the voracity of these claims

6  that were submitted in these cases.  The claims will rise and

7  fall on their own without regard to what Slater's intake

8  process was or was not and how they came to have -- how they

9  came to represent their clients.

10          The claims are the clients.  They are not Slaters.

11  If the trustee, after reviewing those claims, thinks certain

12  client claims are invalid for whatever reason he or she can

13  object and seek to have them disallowed or use whatever the

14  equivalent took the trustee has at its disposal pursuant to

15  the trust distribution protocol that ultimately, you know, I

16  expect to follow from confirmation in these cases.

17          So really what they're looking for, which I still

18  believe is irrelevant, but I'm happy to address about the

19  question of authority, it's been raised a lot, it's been

20  hinted at, let's get right to it.  We submitted a letter

21  response yesterday, Your Honor, and that included Slater's

22  form of engagement letter which all 14,200 Slater clients

23  signed before their claims were submitted.  That proves that

24  Slater absolutely had the authority to sign claims on behalf

25  of all of its clients, period, full stop.

1         Slater didn't stop there though. It went to great

2    efforts to have approximately 95 percent of the claims

3    submitted prior to the bar date, signed by the actual client

4    and then after the bar date obtained even more signatures to

5    bring the total percent, I believe, to 97.5.

6         So, again, Your Honor, the claimants in these cases

7    they're not corporate clients with in-house legal departments

8    who allege -- who get paid to be responsive and respond to

9    legal inquiries on a lightning fast basis.  They're

10   individuals and they're individuals who allege to have

11   suffered some of the most unthinkable and reprehensible acts

12   conceivable.

13        It's not unreasonable to think that a small

14   percentage of them might not respond to a signature request in

15   a timely fashion and this is exactly why Slater sought and

16   obtained an ethics opinion that we also attached to our

17   response yesterday that Slater not only had authority to sign

18   on behalf of its clients who for whatever reason were

19   unreachable couldn't sign for themselves, but, in fact, likely

20   had an ethical obligation to do so.  That should not open

21   Slater to discovery now.  I agree with Mr. Robbins before that

22   it would be a perverse outcome for a lawyer to take that act

23   on behalf of its client just to be opened up later on to

24   discovery.

25        Your Honor, I am happy to cede the podium.  Again,

1  I stand on my belief that at this juncture it's just wholly

2  irrelevant.  The claims are valid under 502 until they're

3  objected to. Slater is not submitting a master ballot.  And

4  the last thing I will say, Your Honor, the voting procedures

5  order also includes carefully negotiated provisions concerning

6  the use of electronic ballots.  The meta data in audit trail

7  of which, I believe, are automatically deemed to be part of

8  the record in this case.

9       So, you know, put together we have a second attempt

10  that discovery by a group of insurers economically motivated

11  to keep a pot of dollars available to claimants as low as

12  possible with no new evidence supporting how this discovery is

13  relevant to or needed to satisfy or test the 1129 plan

14  confirmation standards against the backdrop of a voting

15  process by which the party and Your Honor is ensured that

16  there could be no legitimate pampering that goes unnoticed.

17       So, again, I just don't see how this is relevant

18  now.  To the extent that I'm told by Your Honor that it is

19  relevant we will, of course, produce a privilege log, but we

20  have said and I did want to correct the record that, you know,

21  to the extent we're told that this is relevant we will, of

22  course, comply with our obligations to produce a privilege

23  log, but I just don't think that they could pass the relevancy

24  issue.  Of course Your Honor may disagree, but that is my view

25  and I'm happy to answer any questions you may have.

1          THE COURT:  I don't think I have any questions of

2    you.  I did note the ethics opinion that the Slater firm

3    received and followed.

4          Mr. Currie, the question I have about the Slater

5    firm for you was a couple.  One, I noted, and it must have

6    come out of your filings, that they filed approximately 14,200

7    claims and 95 percent of them were signed by the claimant

8    prior to the bar date.  So you are only talking about 5

9    percent of their clients whose claims the firm signed and now

10   there's 97 and a half percent who have signed proofs of claim

11   themselves, the claimant.

12         So if I am going to consider the information I got

13   from Mr. Hinton about -- and look at the fact that a certain

14   lawyer filed a number of claims and that that should be

15   suspicious because they did, when I am looking at the Slater

16   firm shouldn't I take into consideration that 95 percent of

17   their claims were signed by a client?  Doesn't that weigh in

18   favor of the fact that there doesn't need to be an

19   investigation of the Slater firm in terms of concern about

20   fabricated proofs of claim?

21         MR. CURRIE:  Your Honor, I think that the court can

22   appropriately look at figures like that across the different

23   law firms that we're talking about and the different

24   circumstances under which these claims were submitted.  So I

25   am not suggesting that it's not appropriate to consider those

1  factors.

2         Here, you know, with the Slater firm one of the

3  things that becomes -- that sort of has emerged from this

4  discovery process is we've learned a little bit more that we

5  didn't know before.  We didn't know, for example about the

6  ethics opinion that the firm sought.  I think the Slater firm

7  could be appropriately praised for that. It seems like an

8  appropriate thing to do.

9         One of the things that struck us about the opinion

10  letter that they received is the dangers of failing to

11  carefully examine claims and the ethical dangers that can

12  arise when attorneys sign proofs of claim.  So I think that

13  is, in many ways, re-enforces some of the issues that we're

14  seeing broadly among many of the cases of the law firms here.

15         So I think one of the things I think is still

16  appropriate, Your Honor, for the Slater firm is even though

17  the -- it appears or at least the representation has been made

18  that now where we are is that the outstanding claims have been

19  -- that were originally signed by lawyers has shrunk.

20         What we don't have -- and we have a representation

21  to that effect, but we don't really have an understanding of

22  the process by which that happened.  You know, in other words,

23  and I'm not suggesting that it happened here, but one of the

24  things that we -- that the court has seen from some of the

25  work that was done earlier in the process in the Rule 2004 is,

1  you know, evidence one you look under the hood reveals, for

2  example, there might be a difference between the date when a

3  claim form is signed where, for example, the lawyers signature

4  proceeded that.

5         Then even if, hypothetically, that were the case

6  and even if at some point later a claim form was signed by the

7  claimant themselves one doesn't know just from that fact is,

8  well, if the original claim form had a lot of missing

9  important elements but at some -- and it was signed by a

10  lawyer, but then was somehow cured what you don't know is what

11  went into that cure process.  Are we saying that is it the

12  case that were previously the evidence suggested that forms

13  were signed and information was filled in later which raises

14  questions about the authenticity or the accuracy of the

15  information, you know, has that been fixed.  We don't really

16  know unless we are permitted to seek discovery and ultimately

17  just seek depositions to find out from those who are involved

18  in what we're talking about here which is the post-submission

19  correction of claims what exactly happened.

20         So I think -- so just to reiterate, Your Honor, I

21  think it is -- I think it can be relevant to examine or take

22  into account what percentage of the claims submitted by a

23  particular law firm were signed by the claimants initially

24  versus counsel.  I think it's not the only factor to be

25  considered.

1          THE COURT:  Okay.  But you are kind of shifting in

2    that the original sin, as I understood it, was that a claimant

3    didn't sign their proof of claim form and now we have the

4    survivor signing their proof of claim form, but now you want

5    to know information about that.  So you are kind of shifting

6    the goal post here, aren't you?

7          MR. CURRIE:  Well I guess what I would say, trying

8    to add to your analogy, if the original sin or the original

9    evidence of the potential problem in the process is an

10   attorney signing the proof of claim form that wasn't the only

11   type of problems that became evident with the initial

12   investigation that came up during Rule 2004 process, in the

13   application of Rule 2004.

14          Some of the other examples that were described in

15   some of the declarations the court read was, you know, for

16   example, the example I said, where proofs of claim were

17   apparently created after the lawyers' signature was affixed.

18   And other proofs of claim where proofs of claims appear to

19   have like an identical preprinted signature page that are, at

20   some point in time, attached to that.

21          Instances where it wasn't just a lawyer submitting

22   a proof of claim but where some of the proofs of claims were

23   largely blank with very important fields not built in at all.

24   And so in some ways this lawyer signing the proof of claim is

25   the canary in the coal mine.  It's an indication of potential

1  serious problems in the review process, but it doesn't

2  necessarily reveal that it's the only problem or the only

3  concern.

4          MR. SCHIAVONI:  Your Honor, you drew the conclusion

5  that all these other ones were signed by the claimants.

6  Factually that is not the situation here. It's like huge

7  numbers of the signatures were electronic.  If you remember,

8  the coalition fought tooth and nail during the bar date

9  process against verification of signatures having to be

10 provided.

11         So what percentage of these signatures are

12 handwritten versus whether the aggregator chose to attach

13 electronic signatures it's like you're drawing a conclusion

14 from this that isn't before you right now.  It's like this

15 huge number of electronic signatures that are unverified.

16         THE COURT:  We permit people to file proofs of

17 claim with an electronic signature. I mean they just do.  Omni

18 does that.  Prime Clerk does that.  That is how you do it.  If

19 you submit it through their portal or whatever it is that is

20 how you do it.

21         MR. CURRIE:  These were court approved protocols.

22         THE COURT:  How can we say people can't do that?

23         MR. SCHIAVONI:  Your Honor, in the totality of the

24 circumstances that we put before you, and let's be clear about

25 this, on the 2004 hearing, you know, lawyers like Mr. Alberto

1  they were there.  They didn't submit any evidence to contest,

2  any evidence to contest any of the affidavits that went in.

3  They didn't contest any of the evidence.

4       There were hearsay assertions as there are now

5  about what took place, but the actual evidence that showed

6  large numbers of forged signatures, and we put that before the

7  court, went into evidence uncontested.  These were signatures,

8  the same handwriting used for hundreds of different claimant

9  names.  I don't remember which firm it was at the moment, so

10 I'm not --

11      THE COURT:  I'm not sure it's Mr. Slater.  I'm

12 looking, I've got those. I pulled out those declarations so I

13 will be looking at those, but I am focused on the attorneys in

14 the firms that are in front of me, and I view them as

15 individually, so I will be looking at that.

16      I do think, I mean it does strike me because this

17 is all sort of mathematical, you know, here is the percent of

18 this and the percent of that, if my numbers are right and

19 these attorneys -- the Slater firm clients signed 95 percent

20 of the claims that were submitted by the bar date that is

21 pretty indicative of not falling within the original sin,

22 let's say that.

23      MR. SCHIAVONI:  Your Honor, you may not understand

24 what we were looking at and that was fundamentally the proofs

25 of claim being prepared by third parties, by a third-party

1   source.  This firm in Montana, you know, for which we

2   submitted a declaration from an employee there.  You know,

3   huge numbers of these being generated, you know, by law firms

4   -- by these businesses and not the law firms.

5          So if this particular firm had a situation where

6   they had some stub group of them where the aggregator couldn't

7   sign them and they had to sign -- they submitted a signature

8   and they all got done that way that may just be indicative of

9   that particular problem, but we haven't been able to get at

10  any of this, get behind any of it.

11         I think what we put before you is fairly

12  significant evidence that -- you know, it's like we haven't

13  come on a lark, this isn't a fishing expedition.  You know, we

14  put forward some serious evidence that ties together to a

15  group of firms who all tie together to an email about creating

16  a particular bulk of votes and it's like you will see it also

17  ties together to fund it that's coming from a common source.

18         So, you know, it was not done *ad hominem*,  it was

19  not -- it may be that, you know, if things are here, but it's

20  like this was a legitimate effort to look into what we

21  perceived to be a legitimate problem.  It's like it's not a

22  lark, it's not a fishing expedition.  It was based on a solid

23  foundation.  It's not responded to by just these hearsay, you

24  know, assertions of outrage.  It's like when they had the

25  opportunity to put on evidence they wouldn't.  It's like the

1  level of resistance we have gotten to getting depositions from

2  anybody, the aggregators in particular has been absolutely

3  intense.

4          You know, I did hear, you know, when this schedule

5  was set, this expedited schedule, I heard the plan proponents

6  come before the court and we talked about how the plan

7  proponents for asking for something extraordinary and it was,

8  I forget the saying, like for those who ask for extraordinary

9  relief some extraordinary cooperation is going to be perhaps,

10 you know, expected.

11         So we will serve subpoenas in all the different

12 jurisdictions if that's necessary, but, you know, to show-up

13 with Mr. Robbins who is a tremendous lawyer, tremendous

14 lawyer, okay, but, you know, the level of resistance doesn't

15 correspond to the level of cooperation we were promised when

16 the schedule was set.

17              THE COURT:  Thank you.

18              Mr. Alberto.

19         (No verbal response)

20              THE COURT:  You're muted.

21              MR. ALBERTO:  Am I unmuted now?

22              THE COURT:  Yes.

23              MR. ALBERTO:  Okay, sorry about that.  I was trying

24 to interrupt Mr. Schiavoni and I guess lucky for him I was on

25 mute.  This is so far beyond anything that is in the record.

1  It is Mr. Schiavoni's clients' fishing expedition.  It is not

2  our burden to put on evidence.  They have to prove relevancy

3  and they have not done that.

4          I agree with you, Your Honor, that the evidence

5  that we have by pure numbers shows that Slater was a sterling

6  example of exactly how to present claims.  And the fact that

7  some claims were signed on the same day, even if it was

8  several hundred of them, is not probative to any fact many

9  other than the fact that Slater was still trying to get its

10  clients to sign those remaining claims and only when they

11  could not and were told that they had an ethical obligation to

12  submit those claims nonetheless that is when they submitted

13  them.

14          There is no evidence to show.  It's not our burden

15  to carry.  Discovery has to be relevant and proportionate to

16  the needs of the case.  Mr. Plevin said that earlier today and

17  I thought he outlined the standard for discovery perfectly.

18  It can be applied equally here.  This is completely irrelevant

19  and not at all proportionate to anything other than the

20  insurers fishing expedition.  Your Honor should not allow

21  this.

22          THE COURT:  Thank you.

23          I think our last matter is Rothweiler.

24          MR. CURRIE:  Yes, Your Honor.  I guess what I would

25  say is the issues are, essentially, teed up in the same way

1   for the Eisenberg Rothweiler firm.  Again, you know, they --

2   it was a firm that signed, that submitted bout 18,000 proofs

3   of claim and what we have, for example, is Mr. Eisenberg

4   signed nearly a thousand, 963 proofs of claim.  The vast

5   majority of those within a couple weeks of the bar date.  And

6   he executed 190 proofs of claim in a single day.  And another

7   ER attorney, Joshua Schwartz, signed 1,448 proofs of claim and

8   over 300 on a single day.

9           So, you know, those numbers if that is the original

10  sin, in the court's words, you know, those kinds of numbers

11  cast real doubt about whether proper vetting of these claims

12  complied with, you know, the oath affirmed in signing the

13  proofs of claim or the obligations under Rule 9011.  So it

14  seems perfectly appropriate under these circumstances that we

15  are able to get -- obtain the documents that we're requesting

16  and then, you know, ultimately our plan is to seek depositions

17  with those documents in hand to be able to explore and unpack

18  just want was going on here and to be able to shed light on

19  the issues.

20          As we talked about in our discussion of the

21  previous motion, again, we're not seeking communications

22  between an individual claimant and an attorney.  You know,

23  that is not what we are looking for.  We are looking for

24  information, documents that go to the claims aggregation,

25  compilation, submission, you know, signing and potentially any

1  cure.  And, frankly, the contracts and other documents that go

2  to understandings and relationships with third parties.

3           So, essentially, you know, what counsel has

4  submitted in response is, to us, a very generalized

5  categorical privilege log which is not of much use to anyone

6  because, essentially, it doesn't provide an opportunity to

7  actually understand what kind of documents there might be that

8  they are claiming privilege over so that we could raise

9  arguments, you know, for example, whether there may be plenty

10 of documents there that either we meet the burden of

11 demonstrating the need for them under the work product

12 doctrine or documents that may have some privileged content,

13 for example, because it contained a communication with a

14 client that could be redacted and other parts that are

15 relevant to the information that we're seeking to get at the

16 underlying issues.

17          So, you know, I welcome the fact that they were

18 willing to produce a privilege log, but it's not one that is

19 helpful to us.

20          THE COURT:  Thank you.

21          Mr. Hogan.

22          MR. HOGAN:  Thank you, Your Honor.  Good afternoon,

23 good evening, good Friday afternoon I will call it.  Thank

24 you, Your Honor.  Daniel Hogan of Hogan McDaniel on behalf of

25 Eisenberg, Rothweiler, Winker, Eisenberg & Jeck.

1          Your Honor, I will try to be brief.  It's been a

2    long day.  I have sat through all the other hearings,

3    obviously, today.  I have heard all the various relevant

4    arguments.  I will try not to pair anything that has been said

5    by Mr. Robbins or Mr. Alberto, but I just want the court to

6    have the understanding about how Eisenberg, Rothweiler is a

7    little bit different then these other parties.

8          Your Honor, we were initially served with party

9    discovery by these insurers. We pushed back immediately as you

10   would expect us to do and they conceded ultimately that we

11   weren't parties.  And I'm sure some of that has to do with the

12   fact that Eisenberg Rothweiler is a Philadelphia firm and its

13   well within 100 miles of where you sit now.

14         So nevertheless, we objected, we agreed to accept

15   the subpoena.  We, in fact, accepted the subpoena and we filed

16   initial responses and objections that really gave them

17   nothing. I mean from our perspective relevance wins the day

18   for us here.  And even if it doesn't win the day for us

19   attorney/client privilege and work product do.

20         That being said, Your Honor, and in light of your

21   comments over the past week about the need for the parties to

22   be mindful, to be thoughtful and to try to focus the issues as

23   to not burden the court with these issues we revisited our

24   responses and we prepared a privilege log.  We gave the

25   insurers some of what they were looking for in the hopes that

1  they would go away, but that is, as I know from doing this

2  long enough, not how this works.

3         Nevertheless, it gives us some credence with the

4  court as we come to you and explain that, you know, we had

5  disclosed to them the fact that Eisenberg Rothweiler didn't

6  use any call centers, didn't use any claims aggregators.  I

7  mean these are the bad acts that they're arguing are the basis

8  for the relevancy of these documents.

9         We also told them that we didn't do any -- there

10  was no third-party financing involved with these claims.  We

11  told them that -- one of the crux of questions that they had

12  related to whether page 12 of the proof of claim, which is the

13  signature page, whether that was separately signed and

14  attached to the proof of claims.  We told them that under no

15  circumstances did we do that with the claims, that when the

16  proof of claim was signed by an attorney at Eisenberg

17  Rothweiler it was done after reviewing the entirety of the

18  proof of claim.

19         Your Honor, there were a number of proof of claims

20  that were signed by Eisenberg Rothweiler attorneys in the lead

21  up to the bar date and that is not to be unexpected given the

22  time crunch and given the very nature of a deadline.  The

23  pandemic didn't help in any way, shape or form.  So, Your

24  Honor, that is where we find ourselves, but Eisenberg

25  Rothweiler did make the effort to disclose the relevant

1    information that we could provide them to the answers that we

2    could provide them that, in fact, we hadn't partaken of those

3    actions which would give rise to a potential argument that we

4    were somehow bad actors and that we did something wrong which,

5    in fact, we didn't.

6         Your Honor, if I could I just want to address the

7    relevancy argument because some of the other parties didn't

8    really have to because they did the whole dance, hey, we're

9    not a party, we will save relevance for another day.  We don't

10   have that luxury, Your Honor.  What we have is a database.

11   Eisenberg Rothweiler has claims and they have people that talk

12   to clients, take notes, and receive emails, and get documents

13   and everything goes into a database.  The database, by its

14   nature, is amalgamation of attorney/client communications, of

15   work product, of documents received from clients.

16        The notion that based on these allegations which

17   don't have any basis -- will point you to the very first page

18   of the very motion that the insurers are pursuing.  They state

19   in there that ER disclosed requested materials to a third-

20   party, for example, you're a case manager.  We have had no

21   contact communication or relation with your case manager.

22   That is just patently not true, but this is what they are

23   utilizing as a basis to boot strap themselves to make this

24   relevance argument which, again, is outside the pale.

25        1129(a)(3), obviously, the plan has got to be

1  proposed in good faith and not by any means forbidden by law.

2  That is the debtors' burden.  That is not our burden.  That is

3  not the insurance company's burden, but it is definitely not

4  our burden.  So from our perspective the relevancy and the

5  proportionality of what they are looking to take away from our

6  clients and from Eisenberg Rothweiler it is just huge.  There

7  is no basis for it, Your Honor.  In terms of the value added I

8  don't see how there is any value added to these cases in terms

9  of trying to get this confirmation across the finish line by

10 the end of January.

11         Your Honor, I just wanted to make sure that I

12 address some of the comments that you made. We definitely see

13 this as a red flag.  You know, in terms of our privilege log

14 we believe it is satisfactory and together with the

15 attorney/client privilege and the word product give rise to

16 the defense we need necessarily not have to produce any of

17 this documentation.

18         Your Honor, unless you have any questions for me I

19 will rest on my papers.

20         THE COURT:  I don't think so.  Thank you.

21         MR. CURRIE:  Your Honor, I see a couple others have

22 their hands up. I don't know if that is still from previous or

23 if they want to be heard.

24         MR. SCHIAVONI:  I just had something very quickly.

25 Your Honor, the Rothweiler claims were shared with the Kosnoff

1   claims.  Mr. Van Arsdale is the one who owns an interest in

2   the Montana shop reciprocity.  Mr. Hogan is a gentleman, he's

3   a professional, I think he has made a misstatement about the

4   source of the claims. I think he would find that they would

5   come from reciprocity, these claims, and from that boiler room

6   in Montana if he looked into it.

7           You know, that is why a little discovery here would

8   be useful because, you know, these sort of, again, hearsay

9   assertions about the facts aren't the facts.

10          MR. HOGAN:  Your Honor, could I just respond to

11  that?

12          THE COURT:  Yeah, go ahead.

13          MR. HOGAN:  Thank you.  So nowhere in the motion is

14  there any mention of reciprocity, Your Honor.  This is the

15  first I'm hearing about reciprocity.  Number two, it wasn't my

16  construct that the AVA motion be set forth either next week or

17  the following week.  I am not sure when it is scheduled for,

18  but I don't represent AVA law.  I can't speak to what AVA law

19  did, so I don't think that is appropriate for Mr. Schiavoni to

20  ask me to address something that, number one, isn't in the

21  motion and, number two, isn't relative to my client.

22          THE COURT:  Let me ask you -- whoever, Mr.

23  Schiavoni, or Mr. Currie, or whoever can answer this question

24  -- I permitted discovery of the aggregators, albeit later then

25  you wanted me to, but I did, where does that stand?  What

1  courts are those in?

2           MR. SCHIAVONI:  In Montana right now we have an

3  emergency -- like we were -- we have an emergency motion to

4  transfer the Montana proceedings to your court, Your Honor, to

5  be heard.

6           THE COURT:  That is with respect to who?

7           MR. SCHIAVONI:  Reciprocity.

8           THE COURT:  And is that in the bankruptcy court

9  there or the district court there?

10          MR. SCHIAVONI:  I believe it's in the bankruptcy

11 court.

12          THE COURT:  What about the other?  I'm recalling

13 three aggregators.

14          MR. CURRIE:  Well, Your Honor, you will recall that

15 the ones that are going to be heard later are Verus and KLS

16 are also with the Marc Bern motion.

17          THE COURT:  Okay.  So those have been put off a few

18 times.  Are you guys talking?

19          MR. SCHIAVONI:  Yes, Your Honor.  I think you had

20 admonished the parties to talk and -- maybe that is not the

21 right word to use, okay.  So enough.

22          THE COURT:  Okay.  Well its 6 o'clock and my staff

23 deserves to go home.  We have completed the docket.  Item 11

24 was the only thing left and I think that was the motion to --

25 that I think we actually talked about last time.  Am I right

1  on that?

2           Mr. Schulman, I think I saw your hand up.

3           MR. SCHULMAN:  Good evening, Your Honor.  May I

4  please the court, Jeffrey Schulman from Pasich LLP, insurance

5  counsel to the TCC.

6           I believe if Your Honor would allow for 60 or so

7  seconds just to close the loop I think that may be helpful

8  because I also think that the last item on the agenda is

9  probably the least controversial of the day.  The court

10 certainly got a flavor today for some of the insurance

11 coverage disputes by and between the parties.  The TCC is

12 continuing to work with the 22 joining insurers.  I think

13 there actually may be more on that list now in order to be

14 part of the solution and not part of the problem.

15          I studied the scheduling order before today with

16 the hopes that I could come up with a brilliant idea for how

17 to get all these stipulations negotiated, and drafted, and

18 signed and then if any issues remain to take limited

19 deposition testimony by December 1st or at least to get that

20 testimony secured at some point thereafter in a manner that

21 does not impact the confirmation hearing date.

22          In all candor, Your Honor, I don't have that

23 brilliant idea, but my guess is that this court would tell us

24 that at almost 6 o'clock in the evening on the East Coast that

25 it remains incumbent on the parties to, in effect, find a

1  solution and I remain optimistic that we can and we will do

2  so.  And I also believe, Your Honor, that in addition to

3  today's rulings this court's statements regarding the debtors'

4  burdens and others based upon representations by the insurers

5  as to the extent to which they will be calling fact witnesses,

6  what they will not be providing to their experts and how all

7  of that impacts that which is discoverable from the insurers.

8  I think all of that will be informative as we continue to work

9  together.

10           I don't have anything else to add unless Your Honor

11  has any questions or wishes to hear anything further.

12           THE COURT:  I don't.

13           Ms. McNally.

14       (No verbal response)

15           THE COURT:  Ms. McNally, you're muted.

16           MS. MCNALLY:  Does this work?

17           THE COURT:  Yes.

18           MS. MCNALLY:  Apologies.  Your Honor, I co-signed

19  the letter that originally pulled those motions from your

20  court's docket and I just wanted to echo what Mr. Schulman

21  said that we are continuing to work together. I think your

22  rulings today will be very instructive in narrowing the areas

23  of some dispute.  We hope that this will be the last you hear

24  from us.  But if you do hear from us I expect it will be on a

25  much more limited basis.

1          THE COURT:  Thank you.

2          When is our next date together?

3          MR. ABBOTT:  Your Honor, Derek Abbott.  I believe

4  we are Tuesday morning at 10, I believe.

5          THE COURT:  Okay.  Can people please check you're

6  audio.

7          Okay.  Tell me again, Mr. Abbott.

8      (No verbal response)

9          THE COURT:  You're muted.

10          MR. BUCHBINDER:  It's the 23rd, Your Honor,

11  Tuesday.

12          THE COURT:  Okay.

13          MR. ABBOTT:  At 10 a.m., Your Honor, yes.

14          THE COURT:  I thought I might have that day.  What

15  do we know is on that date?

16          MR. ABBOTT:  Give me a moment, Your Honor.  We did

17  file an agenda earlier. I will just have to go grab it.

18          THE COURT:  Okay.

19          MR. ABBOTT:  Your Honor, my apologies.  I'm not

20  finding it as quickly I had hoped.

21          THE COURT:  Okay.  Do you know is it something

22  other than discovery?

23          MR. BUCHBINDER: Your Honor, this is Dave

24  Buchbinder. I have my copy up.  If I said more of the same

25  would that be a description?  There are three --

1          THE COURT:  Go ahead, Mr. Buchbinder.

2          MR. BUCHBINDER:  There are three items and they are

3   to be summed up as more of the same; all discovery.  And

4   similar to this afternoon's matters.

5          THE COURT:  Okay.  Then I will be some or all of

6   you on Tuesday.  I am taking the 8, 9 and 10 -- I am taking

7   the last few matters that we argued collectively and I will be

8   prepared to rule on those Monday or Tuesday.  I will give you

9   the answers. I do want to take a look at the firms

10  individually as I said I would.  And you are somewhat in

11  different stages because some of the firms are at the

12  substantive stage and some of the firms are still at the am I

13  a party and what is the right process stage.

14          So I want to look at each of those, but I will do

15  that promptly and we will get a ruling on each of those

16  various matters.

17          MR. ABBOTT:  Thank you, Your Honor.

18          THE COURT:  Thank you.  We are adjourned.  Everyone

19  have a good weekend.

20      (Proceedings concluded at 6:04 p.m.)

21

22

23

24

25

1                          CERTIFICATE

2

3        We certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski              November 20, 2021
7   Mary Zajaczkowski, CET**D-531

8
    /s/William J. Garling             November 20, 2021
9   William J. Garling, CE/T 543

10

11  /s/ Tracey J. Williams            November 20, 2021
    Tracey J. Williams, CET-914
12

13

14

15

16

17

18

19

20

21

22

23

24

25