# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

Requested Objection Deadline: November 29, 2021 at 11:00 a.m. (ET)
Requested Hearing Date: November 29, 2021 at 2:00 p.m. (ET)

## EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105, 1103, 1125, AND 1126 OF THE BANKRUPTCY CODE APPOINTING A PLAN VOTING OMBUDSPERSON AND GRANTING RELATED RELIEF

The Official Committee of Tort Claimants to Boy Scouts of America and Delaware BSA, LLC (the "TCC"), hereby moves (the "Motion"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), appointing a plan voting ombudsperson for the benefit of all survivor claimants and granting related relief in the above-entitled cases (the "Bankruptcy Cases"). In support of its Motion, the TCC respectfully represents as follows:

### Preliminary Statement

1. What has become clear – particularly as a result of recent discovery – is that even before November 6, 2021, due to a variety of circumstances, there was widespread confusion and mistrust developing among survivors regarding plan voting, as further detailed hereinafter, with the transmission of the Kosnoff Letter (as defined below) aggravating the situation. To remedy this ongoing problem and to minimize the possibility that any of these circumstances will cause

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

further voter confusion, or lead to expensive plan resolicitation or efforts to designate votes, the TCC hereby moves for an order of the Court directing the Office of the United States Trustee to appoint an independent ombudsperson (the "Voting Ombudsperson"), as a resource and problem-solver for survivor questions and concerns that have arisen and may arise in the future in connection with voting on the Debtors' Plan (as defined below), and for related relief.[2]

2. Specifically, the TCC seeks entry of an order pursuant to sections 105(a), 1103(c), 1125 and 1126 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") directing the Office of the United States Trustee[3] to appoint an independent ombudsperson authorized, inter alia, to serve, as set forth in Paragraph 10 below and generally, as a neutral resource for survivors to contact in the event they have any confusion about the plan voting process, or are encountering difficulties obtaining a ballot or critical information they need to make an informed decision on casting their ballot for or against the Plan.

3. The undersigned TCC counsel agrees to bear financial responsibility for those fees and expenses incurred by the Voting Ombudsperson to correct any voter confusion caused by the undersigned counsel, as determined by the Court to be reasonable.[4] The TCC also asks that the Solicitation Procedures Order (as defined hereinafter) be modified to extend the voting deadline by a minimum of two weeks to allow for the Voting Ombudsperson process to be implemented.[5]

---

[2] In the event the Court determines that there is insufficient statutory authority to require the Office of the United States Trustee to appointment the Voting Ombudsperson, the TCC requests that the Court undertake such appointment.

[3] *See* fn. 2, infra.

[4] The TCC does not intend by this Motion to foreclose parties from seeking further relief associated with the Kosnoff Letter, rather, the TCC is choosing to focus here on ameliorating concerns directly related to plan balloting and voting to ensure the plan process stays on course, an issue of primary importance to all.

[5] Aside from this deadline extension, at this time the TCC does not seek any deadline extensions or hearing continuances with respect to the Plan confirmation process.

4. The TCC's goal is to minimize the risk the Plan will have to be resolicited and to ensure that no survivor is at risk of having their vote disenfranchised, particularly through no fault of their own, as a result of the demonstrable problems with the voting process. While the Court could rely upon its powers to order a resolicitation of the plan or to designate votes, the TCC hopes that appointment of the Voting Ombudsperson will reduce these possibilities in light of the anticipated multi-million dollar cost to complete a second plan solicitation[6] and the harsh outcome vote designation would generate for survivors. As such, the relief requested herein would be beneficial and in the best interest of the survivors and the estates. A Voting Ombudsperson will protect the integrity of the voting process, provide assistance to survivors, promote transparency and provide the Court and all parties with greater confidence in the voting result – no matter the outcome.

5. Several troubling aspects of the voting process have come to the TCC's attention. One major area of confusion has arisen in connection with the thousands of survivors represented by attorneys operating under the Abuse in Scouting ("AIS") umbrella. These survivors are being represented jointly by three law firms that are now obviously at war with each other and advocate diametrically opposed courses of action with respect to the Plan.

6. Indeed, recently produced email correspondence by one of the three AIS firms reveals that a substantial number of survivors ostensibly represented by the three firms are commonly experiencing confusion and frustration regarding the plan voting process generated by facts having nothing to with the Kosnoff Letter. See **Exhibits B through F** attached hereto.[7]

---

[6] The Plan proponents have previously indicated that completing solicitation of the Plan cost approximately $4.2 million for the solicitation agent alone – an enormous expense that the estates should take measures now to avoid.
[7] The TCC acknowledges that Mr. Rothweiler has asserted that attorney client privilege prevents the admission of these emails into evidence, however, each email produced by Mr. Kosnoff includes the express written waiver of said privilege by each respective survivor client.

3

Instances of confusion and outright mistrust in the warring AIS factions are found throughout that email production, for example:



- ██████████████████████████████████████ **Exhibit B at KOSNOFF000132** (email dated Nov. 10, 2021)

- ██████████████████████████████████████ **Exhibit C at KOSNOFF000090** (email dated Oct. 26, 2021)

- ██████████████████████████████████████ **Exhibit D at KOSNOFF000095** (email dated Nov. 6, 2021)

- ██████████████████████████████████████ **Exhibit E at KOSNOFF000110** (email dated Nov. 6, 2021)

- ██████████████████████████████████████ **Exhibit D at KOSNOFF000095** (email dated Nov. 6, 2021)

The produced survivor emails also reflect disappointment over attorney responsiveness and corresponding confusion as to the vote, for example:



- ██████████████████████████████████████ **Exhibit F at KOSNOFF000011** (email dated Nov. 15, 2021)

- ██████████████████████████████████████ **Exhibit F at KOSNOFF000011** (email dated Nov. 15, 2021)

DOCS_LA:340864.11 85353/003

Notably, survivor correspondence filed on the docket, reflects frustration with voting and confusion over the AIS split. *See* **Exhibit G** attached hereto, Docket Nos. 7123 and 7388. These are but two of many examples of survivor correspondence requesting that the Court take remedial measures to address balloting problems (e.g. issue new ballots to address ballot irregularities and related concerns). From these communications, it is obvious that the three AIS law firms have not provided a clear or collaborative communication to their clients regarding the plan vote, for example, including recommendations of each lawyer.[8]

Beyond this, survivors have been flummoxed by an "electronic ballot" (or "e-ballot") presented by one of the AIS law firms to survivors which "ballot" reportedly fails to accurately record votes or other key balloting information and appears to have been dispersed without the approval of the other two AIS law firms or any Court authority.[9] This "electronic ballot" has also fed into confusion caused by the split among the AIS law firms over the Plan as it was accompanied by a recommendation to vote in favor of the Plan despite the fact that many survivors previously counseled by Timothy Kosnoff expected to be advised to *reject* the Plan.[10]

7. It is apparent that voter confusion is pervasive based on the evidence offered with this Motion, as well as the AIS "engagement letter,"[11] which does not address the situation present here where multiple law firms representing the same clients are at war with one another,

---

[8] *See* Model Code of Prof'l Responsibility EC 5-12 (1983) ("Inability of co-counsel to agree on a matter vital to the representation of their client requires that their disagreement be submitted by them jointly to their client for his resolution, and the decision of the client shall control the action to be taken."); *see also* Canons of Professional Ethics 7 (1969) ("When lawyers jointly associated in a cause cannot agree as to any matter vital to the interest of the client, the conflict of opinion should be frankly stated to him for his final determination.").

[9] It is not clear that the "electronic ballot" complies with the Solicitation Procedures Order and the requirement that the communications between law firms and clients with regard to master ballot issues be collected through "customary and accepted practices in accordance with applicable rules of professional conduct (by standard communications means)." *See* Solicitation Procedures, IV.A.5.a.(a).

[10] At least one Coalition-related law firm is also presenting eBallots to creditors. *See*, e.g., **Exhibit H** attached hereto which is a scanned printout of a page from the Slater, Slater & Schulman website at https://sssfirm.com/bsa-resources. This website is publicly available and thus may be viewed by non-clients of their firm.

[11] *See* **Exhibit I** attached hereto, AIS Engagement Letter at Docket no. 1997-3, p. 15 of 93.

leaving the clients without effective representation under the circumstances.[12]  The emails produced by Kosnoff reflect that survivors represented by the AIS attorneys are understandably confused by the conflicting messages they are receiving, as reflected in complaints regarding their ballots, lack of attorney of responsiveness and other problems fundamentally affecting their ability to cast an informed ballot with the benefit of the advice of counsel.  The TCC does not intend to minimize that the transmission of the Kosnoff Letter added to the problem, but the underlying arrangements between and among the AIS firms and their jointly-represented clients are independently a substantial cause for concern that demonstrably impacts AIS's clients' ability to exercise their franchise in an informed way.

8. In recent hearings, with voting now under way, the Court expressed the concern that the most important point to focus on is the integrity of the voting process.  This Motion aims to eliminate concerns directly related to plan balloting and voting to ensure the plan process stays on course.  The TCC and its counsel agree: integrity of the vote is of immediate and paramount importance.  However, protecting the franchise of survivors and ameliorating confusion in the voting process requires taking additional steps beyond sending a corrective communication as to the Kosnoff Letter (the "Corrective Letter").

9. Mindful of the Court's concerns, the TCC and its counsel have endeavored to develop and put forward further measures to remediate any voter confusion during the plan voting process.  Appointing an independent Voting Ombudsperson will provide survivors with a neutral resource to contact with questions about the voting process and to clear up confusion of any kind they are experiencing. The Voting Ombudsperson also could serve generally as an "information clearinghouse" for survivors and a resource to the Court to enhance the integrity of the voting process. At the same time, ensuring the faith of survivors in the Plan approval process

---

[12] The AIS Engagement Letter also is silent on conflict of interest waivers among jointly represented clients.

via the Voting Ombudsperson now will help avoid any need to resolicit votes on the plan which would be an expensive and time-consuming development.

10.     Appointing an independent Voting Ombudsperson will aid in the conduct of a more orderly voting process, and provide a sounding board for survivors with questions about their ballots and the communications they have received generally about the Plan. In particular, the TCC requests as follows:

a. The Voting Ombudsperson should be directed to work with the three AIS law firms (in order to avoid confusion and abide by their ethical responsibilities) to create a single collective statement for all AIS clients regarding their recommendation respecting voting on the Plan. The Voting Ombudsperson should be directed to send a cover letter and this AIS statement of recommendation informing the AIS clients that if they need to contact the Voting Ombudsperson, they may do so. If the Voting Ombudsperson is unable to negotiate a collective letter among the AIS law firms, the Voting Ombudsperson shall immediately inform the Court of the Voting Ombudsperson's inability to achieve such agreement.

b. The Voting Ombudsperson should be directed to send a letter to those survivors not represented by AIS (except those survivors whose lawyers have advised they should not be contacted further) who received the Kosnoff Letter on or about November 6, 2021, stating that, among other things, those survivors should contact their legal counsel with any questions regarding the voting process and, in the event they do not have counsel, that they may contact the Voting Ombudsperson to review and discuss the voting process.

c. The Voting Ombudsperson should be authorized to discuss with any survivor the voting process in the event a survivor contacts the Voting Ombudsperson. This will allow parties who receive survivor communications regarding the voting process, including the TCC, to

7

forward any such communications inquiring about the voting process to the Voting Ombudsperson.

        d. The Voting Ombudsperson should be authorized and available to resolve survivor's voting concerns or confusion in the event any other party seeks relief from the Court to expand the Voting Ombudsperson's role at the direction of the Court.

11. In this way, any confusion existing among survivors (including, for example, over the correspondence they have received or, for AIS clients, due to having engaged three law firms that now hold disparate views on the Plan), as well as any questions survivors may have about the voting process, can be addressed by an independent person who holds no recommendation one way or another on the Plan itself.[13]

## Background

12. On February 18, 2020 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing cases for relief under chapter 11 of the Bankruptcy Code.

13. Also on the Petition Date, the Debtors filed a plan and associated disclosure statement. During the subsequent nearly two years, the Debtors filed a series of amended plans and disclosure statements, the most recent of which are the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6443] (the "Plan") and *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6445] (the "Disclosure Statement").

---

[13] Aside from the fact that all AIS clients have at least three sets of lawyers, many survivors filed claims with multiple law firms. Thus, unsurprisingly perhaps, multiple firms (not just the AIS firms) have messaged the same client which has contributed to the deepening confusion and potential lack of trust in the process.

14. By order entered on September 30, 2021 [Docket No. 6438] (the "Solicitation Procedures Order"), the Court approved the Disclosure Statement. Pursuant to the Solicitation Procedures Order, the Court established December 14, 2021, as the voting deadline and scheduled a hearing on confirmation of the Plan to commence on January 24, 2022.

15. As the Court is aware, counsel for the TCC sent an email and letter from Mr. Kosnoff (the "Kosnoff Letter") to (a) all individuals on the TCC's email contact list and (b) individuals identified as clients of Mr. Kosnoff by Mr. Kosnoff, between Friday, November 5, 2021, and Sunday, November 7, 2021.

16. Since then, hearings were held regarding the *Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief* [Docket No. 7118] on November 10, 12 and 17, 2021. On November 12 and 15, 2021, counsel for the TCC sent the Corrective Letter reviewed with the Court on the record. During those hearings, the Court understandably expressed concerns about the integrity of the voting process and that remediating any harm to the process is of the highest priority.

17. The TCC has received a large number of inquiries from survivors who, among other concerns, did not receive a Ballot, do not understand how to complete it, or are unable to navigate the electronic ballot provided for by the Solicitation Procedures Order or unauthorized "voting apps." As reflected above, there are clients of AIS who are confused by the fact that the three law firms who represent them now hold strongly conflicting views on the Plan and are no longer acting in cooperation. Further, there may be survivors confused by the Kosnoff Letter even following receipt of the Corrective Letter.

9

DOCS_LA:340864.11 85353/003

**Argument**

A.  **THE APPOINTMENT OF A PLAN VOTING OMBUDSPERSON IS CLEARLY WITHIN THE COURT'S POWERS GRANTED IN SECTIONS 105, 1103, 1125 AND 1126 OF THE BANKRUPTCY CODE**

18.  Section 1103(c) of the Bankruptcy Code states in relevant part that an official committee may:

> (3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan. …
>
> (5) perform such other services as are in the interest of those represented.

11 U.S.C. § 1103(c).

19.  Sections 1125 and 1126 of the Bankruptcy Code generally govern plan solicitation and voting issues. In particular, section 1126 of the Bankruptcy Code spells out the requirements for plan voting and empowers the Court to designate votes. 11 U.S.C. section 1126(e).

20.  Section 105(a) of the Bankruptcy Code allows the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title . . . shall be construed to preclude the court from taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules." 11 U.S.C. § 105(a).

21.  Section 105(a) has been interpreted to expressly empower bankruptcy courts with broad equitable powers to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir.

2003) (*en banc*). Although not limitless, this section has also been construed to give bankruptcy courts authority to provide equitable relief appropriate to assure the orderly conduct of bankruptcy proceedings. *See, e.g.*, *In re Combustion Engineering, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004).

22. The powers granted the Court under section 105 are broadly designed to address precisely the relief sought by this Motion (*i.e.*, remedies to protect the integrity, and ensure the orderly conduct of, the plan voting process). Absent the installation of a Voting Ombudsperson, potentially thousands of survivors will be left with unanswered questions when attempting to navigate the voting process here, and their votes are at risk of unnecessarily being designated. The appointment of a Voting Ombudsperson would go a long way towards resolving these concerns by giving all survivors a neutral resource to address their voting and balloting inquiries, and relieving the obvious voter confusion experienced by the survivors represented by AIS. In this manner, it is hoped that the Court will be able to provide all constituencies and the Court itself with the comfort that survivors are able to cast their vote on the Plan in an informed manner.

23. The record reflects confusion among survivors regarding issues such as the identity of their counsel, what to do about electronic ballot issues, and how to proceed in the face of seemingly conflicting advice among AIS's founding members. Absent a Voting Ombudsperson and the related relief herein requested, it is clear that survivors will be left with a voting process that fails to address their key concerns and leaves them open to a tug-of-war between opposing factions – an outcome that should not be allowed to take root here. It benefits no constituency to have a voting process hampered by confusion and potential distrust among

survivors. Rather, this juncture provides an opportunity to install an ombudsperson who can serve the interests of survivors and simultaneously ensure the integrity of the voting process.

## Notice

24. Notice of this Motion has been provided to (a) the Debtors; (b) the Office of the United States Trustee; (c) counsel to the Official Committee of Unsecured Creditors; (d) counsel to the Future Claimants' Representative; (e) counsel to the Coalition; (f) counsel to the Ad Hoc Committee of Local Councils; and (g) all parties requesting notice in the Bankruptcy Cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The TCC submits that no other or further notice is necessary under the circumstances.

## **Conclusion**

WHEREFORE, for the reasons set forth herein, the TCC respectfully requests that the Court grant the relief requested herein and enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, directing the United States trustee to appoint a Plan Voting Ombudsperson, and for such other and further relief as is just and proper under the circumstances.

Date: November 24, 2021  **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073) (admitted *pro hac vice*)
Alan J. Kornfeld (CA Bar No. 130063) (admitted *pro hac vice*)
Debra I. Grassgreen (CA 169978) (admitted *pro hac vice*)
Iain A.W. Nasatir (CA Bar No. 148977) (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email: rpachulski@pszjlaw.com
 akornfeld@pszjlaw.com
 dgrassgreen@pszjlaw.com
 inasatir@pszjlaw.com
 joneill@pszjlaw.com

*Counsel for the Tort Claimants' Committee*