## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. D.I. 7447** |

### DEBTORS' OMNIBUS OBJECTION TO TORT CLAIMANTS' COMMITTEE'S (I) EMERGENCY MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105, 1103, 1125, AND 1126 OF THE BANKRUPTCY CODE APPOINTING A PLAN VOTING OMBUDSPERSON AND GRANTING RELATED RELIEF AND (II) RELATED MOTION TO SHORTEN NOTICE

Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession (together, the "Debtors") in the above-captioned chapter 11 cases, hereby file this objection (the "Objection") to the *Emergency Motion of the Official Committee of Tort Claimants for Entry of an Order Pursuant to Sections 105, 1103, 1125, and 1126 of the Bankruptcy Code Appointing a Plan Voting Ombudsperson and Granting Related Relief* [D.I. 7447] (the "Motion") and related motion to shorten notice [D.I. 7448] (the "Motion to Shorten"), filed by the official committee of tort claimants (the "TCC"). In support of the Objection, the Debtors state as follows:

### PRELIMINARY STATEMENT

1.      The TCC has been working with a rogue attorney, Timothy Kosnoff, to negatively influence the vote in this case. The Motion is just the latest step in this strategy to defeat the Plan from the TCC, Mr. Kosnoff and certain aligned plaintiffs' firms. The TCC first reached out

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

to the Debtors on Tuesday, November 23, in the midst of a deposition of a Pachulski Stang Ziehl & Jones LLP ("Pachulski") attorney on the TCC/Kosnoff Communications,[2] lengthy mediation sessions, and intensive discovery surrounding the TCC/Kosnoff Communications and plan discovery.  The Debtors advised the TCC that they were unable to immediately confer on the motions due to this crowded schedule, but the Debtors agreed to confer on the Motion and the Motion to Shorten on the morning of Wednesday, November 24, on the eve of a holiday week.  The TCC insisted that a hearing must be scheduled less than one week later, on the Monday after Thanksgiving.  The TCC then filed the Motion and the Motion to Shorten at approximately 2:30 p.m. ET on November 24, providing the Debtors with virtually no working hours to review and respond to both motions.  Despite the objections of the Debtors and other parties in this case to this timing—including the United States Trustee (*see* D.I. 7450)—the TCC refused to delay its filings until even the next working business day.

2.      The prejudicial timing of this Motion and the manufactured emergency around it are clearly an attempt to deflect attention from the Debtors' ongoing investigation into the TCC's partnership with Mr. Kosnoff to defeat the Plan, brought to the Court's attention through the Motion to Enforce.  Mr. Kosnoff has continuously made disparaging statements about the parties, counsel, and the Court, yet the TCC reached out to him to offer to send out a false and disparaging communication, along with a link to his Twitter account.  There could have been no reason for doing so, other than to elevate those misleading attacks on the Plan through the imprimatur of an official committee appointed by the United States Trustee and approved by the Court presiding over the case.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion to Enforce.

3.     Although the TCC represented to the Court that it "had no participation in the writing of [the TCC/Kosnoff Letter],"[3] discovery has revealed that the TCC wrote five of the seven false and misleading statements in the TCC/Kosnoff Letter.  The TCC then sent this communication to thousands of abuse survivors, including thousands of survivors represented by other counsel, advising them to reject the Plan in direct contradiction to the advice of such retained counsel and in violation of the rules of professional conduct.  The TCC argues that it did not intend to reach those survivors, but there is no document instructing the use of a more limited distribution list.  Moreover, certain other counsel advised the TCC at least three times on Saturday, November 6 that the TCC/Kosnoff Communications were being sent to survivors represented by counsel and asked to speak with the TCC, but the TCC did not stop the transmission and chose to not even return the calls until Sunday, by which time the deliveries were complete.  Meanwhile, the TCC was forwarding hundreds of responses to the TCC/Kosnoff Communications directly to Mr. Kosnoff.

4.     The TCC's position that it intended only to reach the AIS clients fares little better.  The TCC was trying to use its weight and standing to cause the AIS clients to disregard the advice of certain of their own counsel.  Specifically, the TCC sought to support Mr. Kosnoff's advice to reject the Plan, even though those survivors were represented by other counsel giving contrary advice.  The TCC had no right to contact survivors represented by other counsel, here multiple counsel, to give advice contrary to that of certain of those counsel, indeed two of the three firms representing the AIS survivors.  The TCC had no right to undermine the advice of the Eisenberg Rothweiler firm by supporting Mr. Kosnoff (and writing much of his letter).  Indeed the TCC now argues that various canons of ethics required a joint communication outlining the

---

[3]    Nov. 10, 2021 Hr'g Tr. at 17:25-18:1, Ex. 1.

conflicting advice of the multiple attorneys.  Yet, the TCC did the opposite, using its office to support one side against the Plan.  The TCC's harmful actions to defeat the Plan have polluted the voting process, damaging these estates and survivors.

5.      The TCC now seeks to misuse its position to defeat the Plan.  Specifically, the TCC now asks this Court to order the U.S. Trustee or the Court to appoint a "voting ombudsperson," someone with absolutely no background or experience in this case, to provide eleventh hour advice to survivors represented by counsel.  It is not clear that a new attorney could even assess the case and advise survivors (already represented by counsel of their choosing) on the confirmation schedule.  In any case, the TCC cannot impose an attorney on clients represented by counsel, either advising those clients to accept or reject the Plan contrary to the advice of certain of their chosen counsel, and especially from the elevated role of an advisor appointed by the Court and the Office of the United States Trustee.  And the TCC does not even try to explain how this TCC "voting ombudsperson" will be authorized to interfere with the advice given to survivors represented by a single counsel advising clients to vote in favor of the Plan.[4]

6.      Remarkably, the TCC characterizes this appointment and authority as straightforward and precisely provided for in the Bankruptcy Code.  To the contrary, the Bankruptcy Code does not provide the TCC the right to appoint a "voting ombudsman," much less to speak with and advise those already represented by other counsel.  The TCC does not cite any statutes or a single case granting such relief or suggesting that such relief is available.

---

[4]     *See*, *e.g.*, Motion ¶ 10(c) ("The Voting Ombudsperson should be authorized to discuss with any survivor the voting process in the event a survivor contacts the Voting Ombudsperson. This will allow parties who receive survivor communications regarding the voting process, including the TCC, to forward any such communications inquiring about the voting process to the Voting Ombudsperson").  Moreover, the Debtors find it difficult to ascertain the relief the TCC seeks in paragraph 10(d) based on the language of the request.

Indeed, the TCC does not cite any example of any party seeking such relief, or any authority whatsoever for appointing an attorney to advise clients already represented by counsel in violation of the governing rules of ethics.

7.     The TCC's argument that it is simply trying to protect the interests of the case is ironic.  There is no mystery that the TCC and its counsel are trying to defeat the Plan.  The same TCC and the same law firm cannot pretend to have new interests simply by having another attorney at the same firm seek the relief.  The TCC is not trying to undo the damage caused by its misconduct—it is trying to defeat the Plan and hopes that a new attorney, operating as a "voting ombudsman," will adopt the TCC's position.  Indeed, the TCC says it is sorry and wants to help, but at a town hall meeting on November 18, the TCC declined to disavow its conduct and instead represented to survivors—following three serious hearings inside one week—that there had been no material developments to report in the case.[5]

8.     Further proof that the TCC is using this Motion to defeat the Plan is revealed through the TCC's supporters.  The plan proponents object to the Motion to Shorten, while certain plan opponents support it.  The TCC has already tried to defeat the Plan by endorsing Mr. Kosnoff under the authority of a statutory committee.  The TCC should not be allowed to further prejudice the Debtors' estates by cloaking a new attorney with authority to advise survivors who already have counsel.

9.     In connection with the Motion to Enforce, the TCC has produced a limited set of documents and four witnesses for deposition: partners James Stang and John Lucas, associate Steven Golden, and Mr. Lucas's assistant and Pachulski office manager Hung Phan (together, the

---

[5]   *See* Golden Dep. Tr. at 14:3-19, Ex. 10.  The TCC has agreed that the exhibits and transcripts attached to this Objection may be de-designated as highly confidential materials under the Confidentiality and Protective Order [D.I. 799] such that the Debtors are not required to file these documents under seal.

"Pachulski Witnesses").  Notwithstanding the deficiencies in the TCC's production and improper

limits on the testimony of the Pachulski Witnesses, the facts adduced are stunning and call into

serious question the Pachulski firm's conduct in the case and candor to the Court.  Given the

Pachulski firm's transparent efforts to divert the Court's attention, the Debtors feel it is important

to raise these issues to the Court's consideration.  While further discovery is likely needed, the

documents and testimony produced to date paint an even more troubling picture than what was

previously known and contradict many of the Pachulski firm's prior in-court representations:

- **Even before sending the TCC/Kosnoff Communications, the TCC obtained the AIS client list (the "AIS List"), then regularly communicated with 20,000 individuals, including survivors represented by a variety of lawyers**.  The TCC has repeatedly represented that the "Kosnoff List" and the "TCC List" were kept separate,[6] and that the transmission of the TCC/Kosnoff Communications to both lists was an error.[7]  Although the Pachulski firm has now finally admitted that any distribution of the TCC/Kosnoff Communications was wrong, facts adduced in discovery demonstrate that the distribution of the communications to the AIS List was reckless at best.

  On October 12, TCC co-chair Doug Kennedy provided an excel spreadsheet with more than 13,000 email addresses to Mr. Lucas.[8]  Mr. Kennedy had previously received the list from Mr. Kosnoff.[9]  The Pachulski firm did nothing to verify that the email addresses on the AIS List belonged to AIS clients of Mr. Kosnoff.[10]  The Pachulski firm combined the AIS List with a list of email addresses it previously collected, and immediately begin sending communications to the full list.[11]  Indeed, despite the Pachulski firm's statements to the contrary, after receiving the AIS List from Mr. Kosnoff, the Pachulski Firm distributed all subsequent email communications to the consolidated list.[12]  To send an email communication only to the AIS List would have been a departure from the Pachulski firm's established practice up until that point. Moreover, Mr. Lucas's purported instruction to distribute the TCC/Kosnoff Communications only to the

---

[6]    Nov. 10, 2021 Hr'g Tr. at 18:10-25, Ex. 1.

[7]    Nov. 10, 2021 Hr'g Tr. at 22:3-7, Ex. 1.

[8]    Lucas Dep. Tr. at 35: 1-4, Ex. 2.

[9]    Lucas Dep. Tr. at 34:20-25, Ex. 2; Ex. 3, Bates No. TCC-PlanConf-123102, at 4.

[10]   Lucas Dep. Tr. at 37:24-38:4, Ex. 2.

[11]   Phan Dep. Tr. at 49:3-23, Ex. 4.

[12]   Phan Dep. Tr. at 58:12-14; 78:13-16, Ex. 4.

AIS List was an oral instruction, the only time any of the Pachulski Witnesses could remember such a distribution being requested by Mr. Lucas without a writing.[13]

- **With the knowledge of the Pachulski firm, the TCC coordinated with Mr. Kosnoff to share content on his Twitter feed.**  At the hearings on November 10 and 12, 2021, Mr. Stang stated that the TCC does not endorse Mr. Kosnoff's Twitter feed.[14]  Discovery has revealed that statement to be inaccurate at best.

   As a threshold matter, the TCC/Kosnoff Email specifically directs readers to Mr. Kosnoff's Twitter feed.  The email was reviewed by Mr. Lucas at Mr. Kosnoff's request, and Mr, Lucas testified that he bolded and underlined the word "REJECT" because that was the TCC's position regarding the Plan.[15]  Moreover, prior to the distribution of the TCC/Kosnoff Communications, on October 23, the TCC used the AIS List to distribute a video of TCC co-chairs Doug Kennedy and John Humphries attacking the Plan and the Eisenberg Rothweiler firm.[16]  On the same date, Mr. Kennedy sent emails to Mr. Kosnoff, copying Mr. Lucas, sharing the video, and asked that Mr. Kosnoff "promote" it.[17]  On October 24, Mr. Kosnoff tweeted the video over his Twitter feed, with the text:  "THE TCC STRIKES BACK!"[18]

- **Mr. Lucas wrote a substantial portion of the TCC/Kosnoff Letter that was sent to 20,000 individuals by the TCC.  Mr. Stang approved Mr. Lucas revising the letter, although at least as of his deposition Mr. Stang *had never even read the TCC/Kosnoff Letter that his firm distributed*.**  At the hearing on November 10, Mr. Stang stated: "This motion concerns one email that was written by Mr. Kosnoff.  We had no participation in the writing of it."[19]  At the hearing on November 12, Ms. Grassgreen described the letter as Kosnoff's "view to his clients."[20]  Those statements have been shown to be false.[21]

---

[13]  Lucas Dep. Tr. at 119:2-6, Ex. 2; Phan Dep. Tr. at 49:3-23, Ex. 4.

[14]  Nov. 10, 2021 Hr'g Tr. at 19:13-15, Ex. 1; Nov 12, 2021 Hr'g Tr. at 43:4-11, Ex. 5.

[15]  Lucas Dep. Tr. at 104:21-107:4, Ex. 2.

[16]  Lucas Dep. Tr. at 67:21-68:1, Ex. 2.

[17]  *See* Ex. 6, TCC-PlanConf- 122916-122919, at 30.

[18]  *See* Kosnoff Law (@SexAbuseAttys), TWITTER (Oct. 24, 2021 1:11 PM), *available at* https://mobile.twitter.com/SexAbuseAttys/status/1452336905526431753.

[19]  Nov. 10, 2021 Hr'g Tr. at 17:25-18:1, Ex. 1.

[20]  Nov. 12, 2021 Hr'g Tr. at 22:11, Ex. 5.

[21]  After the Debtors raised the issue at the hearing on November 17, Ms. Grassgreen conceded that Mr. Stang's representation to the Court that the TCC played no role in drafting the TCC/Kosnoff Letter was false.  *See* Nov. 17, 2021 Hr'g Tr. at 41:19-23, Ex. 8 ("Absolutely, Mr. Lucas edited that.  State Court counsel call us all the time and ask us to look at things: Is this right?  Is it wrong?  He was trying to make it more accurate.").

As described above, Mr. Lucas testified that at Mr. Kosnoff's request, he reviewed the TCC/Kosnoff Email and bolded and underlined the word "REJECT." In addition, an email exchange between Mr. Lucas and Mr. Kosnoff reveal that the letter was in fact written in large part by Mr. Lucas.  Indeed, of the seven statements identified by the Debtors as false or misleading in the Motion to Enforce, Mr. Lucas wrote five.[22]

Moreover, Mr. Lucas told Mr. Stang that he was revising the TCC/Kosnoff Letter, and Mr. Stang approved.[23]   Incredibly, Mr. Stang testified that although he approved of Mr. Lucas revising the TCC/Kosnoff Letter and distributing it to the AIS List, to this day he had never even read it.[24]

- **The unwritten "ethics advice" received by the Pachulski firm had nothing to do with the propriety of the distribution of the TCC/Kosnoff Communications by an official bankruptcy committee**.  At the November 12 hearing, Ms. Grassgreen represented that the Pachulski firm sought the advice of "ethics counsel" prior to sending the TCC/Kosnoff Communications.[25]   But the Pachulski firm did not seek "advice" of "ethics counsel" in connection with distribution of either the TCC/Kosnoff Email or the TCC/Kosnoff Letter.  Nor did the Pachulski firm seek advice regarding the content of those communications. Instead, the "advice of ethics counsel" consisted of three phone calls with lawyer Robert Kehr concerning the Pachulski firm's desire to distribute town hall notices to the AIS List, and whether consent from one lawyer where a client was represented by multiple lawyers was sufficient.[26]   In seeking this advice, the Pachulski firm did not mention Mr. Kosnoff, nor did they provide Mr. Kehr with any documents.[27]   The Pachulski firm did not obtain a formal opinion or *any writing* from Mr. Kehr.[28]   And while Mr. Stang did not participate in those initial calls, he participated in a follow-up call with Mr. Kehr to discuss whether a letter received from Mr. Molton objecting to communication with clients jointly represented by Mr. Kosnoff "constituted a change in circumstances that would cause him to reconsider his advice."[29]   Incredibly, Mr. Stang testified that in seeking this "updated" advice, he did not provide Mr. Kehr the letter from Mr. Molton on which he was seeking advice.

---

[22]   *See Notice of Filing of Document Referenced on the Record at the November 17, 2021 Hearing* [D.I. 7300] (Nov. 17, 2021).

[23]   Stang Dep. Tr. at 168:2-169:3, Ex. 7.

[24]   Stang Dep. Tr. at 50:13-19, Ex. 7.

[25]   Nov. 12, 2021 Hr'g Tr. at 20:3-4, Ex. 5.

[26]   Lucas Dep. Tr. at 72:12-15, 76:7-23, Ex. 2.

[27]   Lucas Dep. Tr. at 29:1-7, 78:14-16, 88:15-25, Ex. 2.

[28]   Lucas Dep. Tr. at 79:19-24, Ex. 2.

[29]   Stang Dep. Tr. at 210:4-9, Ex. 7.

- **Mr. Stang and Mr. Lucas intentionally ignored multiple communications on Saturday November 7, 2021, indicating that the TCC/Kosnoff Communications had been delivered to non-AIS clients, and did not respond to repeated inquiries and requests for more information on the distribution until all 20,000 emails had already been delivered.** At the November 10 hearing, Mr. Stang stated that "*as soon as I was able to determine* that [the TCC/Kosnoff Communications] had gone out to this other list . . . *I promptly communicated* with Mr. Lucas, and he with our staff, to issue an email to that TCC list saying it was sent to them by mistake."[30] This characterization of events has been shown to be misleading.

On Saturday, November 6, 2021, David Molton, counsel for the Coalition, emailed Mr. Lucas and Mr. Stang three times, notifying them that the TCC/Kosnoff Communications had gone out to recipients other than AIS clients. Lucas Dep. Tr. at 144:3-10. Indeed, as early as 6:05 ET, Mr. Molton wrote:

> Jim:
>
> I just tried to call you.
>
> Please see the attached letter from Tim Kosnoff that was circulated to the entire TCC BSA list serve over your firm's email address.
>
> How did this happen?? Did you or anyone on your team authorize this??
>
> The TCC is a fiduciary for all survivors. It is an incredible and unconscionable breach of that duty for one counsel to appropriate and utilize the TCC's list serve for his own purposes and send a letter that may reach clients he claims he represents, and certainly and improperly reaches survivors who you know are represented by other lawyers. Further, how is it possibly appropriate for the TCC to effectuate communications from an outside counsel to its own clients?[31]

Later that day, Mr. Molton forwarded an email demonstrating that Mr. Molton himself had received the TCC/Kosnoff Email and the TCC/Kosnoff Letter purportedly intended for AIS clients.[32] He followed up with another email an hour later.[33] Both Mr. Stang and Mr. Lucas testified that they received and read all three of Mr. Molton's emails on Saturday, and that they spoke with each other on multiple occasions about what to do about the matter, but that they

---

[30]  Nov. 10, 2021 Hr'g Tr. at 21:25-22:5, Ex. 1.

[31]  Declaration of Blair M. Warner in Support of Motion to Enforce [D.I. 7119] (the "Warner Declaration"), Ex. 2.

[32]  *See* Warner Decl. Ex. 2.

[33]  *See* Ex. 9, Bates No. TCC-PlanConf-075621-075622.

intentionally did not respond to Mr. Molton.[34]  Nor did they reach out to Mr. Phan about the distribution list.  Mr. Lucas testified that Mr. Stang directed him not to respond, as Mr. Stang stated that he intended to call Mr. Molton himself.[35] However, Mr. Stang decided to ignore Mr. Molton, even purposefully disregarding a call from him, based on his "general impression of Mr. Molton's personality" that Mr. Molton's concerns were not truly "urgent."[36]

In addition to contact from the Coalition, on Saturday November 6, Mr. Lucas also spoke with Mr. Goldfarb, who notified Mr, Lucas that the TCC/Kosnoff Communications had gone out to his clients as well. Mr. Lucas testified that he believed that Mr. Goldfarb and AIS "shared clients," and presumed that was why his clients were receiving it.[37]

Despite these communications, it was not until the following day, Sunday, November 7, after all of the more than 20,000 emails had been delivered, that Mr. Stang bothered to return Mr. Molton's call.[38]

- **At Mr. Stang and Mr. Lucas's direction, the Pachulski firm knowingly and intentionally delivered more than 450 email responses to the TCC/Kosnoff Communications to Mr. Kosnoff, including an unknown number of communications from unrepresented survivors and survivors represented by counsel other than Mr. Kosnoff.**  After the TCC/Kosnoff Communications were distributed, Mr. Lucas—with Mr. Stang's approval—instructed Mr. Golden to package together any responses the Pachulski firm received to the TCC/Kosnoff Communications and send them to Mr. Kosnoff.[39]  Mr. Golden followed this instruction, ultimately coordinating with Mr. Kosnoff to provide him with over 450 emails in three separate batches.[40]  The third and final of these batches was delivered by the Pachulski firm to Mr. Kosnoff on Sunday morning, November 7, more than 18 hours after Mr. Stang and Mr. Lucas had first been notified by Mr. Molton of the potential distribution of TCC/Kosnoff Communications to non-AIS clients. Moreover, neither Mr. Golden nor anyone else at the Pachulski firm reviewed any of these emails before sending them to Mr. Kosnoff.[41]  To date, the Pachulski firm has not reached out to Mr. Kosnoff to request that he delete or

---

[34] Stang Dep. Tr. at 97:25-98:6, Ex. 7; Lucas Dep. Tr. at 143:19-23, Ex. 2.  The TCC has refused to produce communications between Mr. Stang and Mr. Lucas, and other internal communications, on the grounds that these communications are protected by the attorney work product doctrine.

[35] Lucas Dep. Tr. at 144:14-21, Ex. 2; Stang Dep. Tr. at 84:11-14, Ex. 7.

[36] Stang Dep. Tr at. 94:16-18; 98:20-25, Ex. 7.

[37] Lucas Dep. Tr. at 173:14-19, Ex. 2.

[38] Stang Dep. Tr. at 95:6-10, Ex. 7.

[39] Golden Dep. Tr. at 63:3-13; 85:7-11, Ex. 10; Lucas Dep. Tr. at 129:7-20, Ex. 2.

[40] Lucas Dep. Tr. at 129:17-20, Ex. 2.

[41] Lucas Dep. Tr. at 130:13-21, Ex. 2; Golden Dep. Tr. at 85:1-12, Ex. 10.

refrain from reading these emails, as they may include communications from parties who are unrepresented or represented by other counsel.[42]

- **Finally, discovery has revealed that since the Debtors filed the Motion to Enforce on November 10, the Pachulski firm has failed to update survivors on any issues raised by that motion, in violation of its fiduciary duties.** Since the filing of the Debtors' Motion to Enforce, the TCC has held two town hall meetings, on November 11 and 18. As Mr. Stang testified, one of the purposes of these town hall meetings is to apprise survivors of material developments in the case.[43] Incredibly, there was no mention at either town hall meeting of the Debtors' Motion to Enforce or the Court's concerns about the "taint of the vote."[44] Notably, at the November 18 town hall meeting, which took place after three Court hearings discussing the Debtors' Motion to Enforce, for the first time no Pachulski lawyers appeared to address survivors.[45] During that town hall, there was no mention of the Debtors' Motion to Enforce nor any of the related developments, including the appearance of a new lead counsel for the TCC, the upcoming deposition of the Pachulski lawyers, or the Court's concerns about the potential taint of the vote on the Plan. Instead, Mr. Kennedy reported that there were no material updates and ended the town hall meeting after only about 10 minutes.[46] One survivor expressed serious concern regarding the information void.[47]

> The TCC sent an anti-plan letter from Mr. Kosnoff, an email that clearly was not a mistake. The debtors know it. The judge knows it. The insurers know it. But the only acknowledgment to us by the TCC, our supposed representative, was a letter from the TCC attorney disavowing Mr. Kosnoff's letter/email that the same law firm who coordinated with Mr. Kosnoff and emailed it out.
>
> That fiasco should have been addressed last Thursday and it most certainly should have been addressed this evening. It APPEARS the TCC, not just the counsel for the TCC, sought to circumvent the judge's solicitation order. How does the TCC explain its position? How do these people who represent survivor interests explain what happened? Why should survivors trust the TCC?

The Pachulski Witness refused to testify regarding any explanation for the failure to inform survivors of these developments, citing work product privilege.[48]

10.    Against this backdrop, the Pachulski firm filed the Motion. In addition to being a distraction, the Motion lacks merit for several reasons: a voting ombudsman is unnecessary, and

---

[42]  Lucas Dep. Tr. at 130:22-131:1, Ex. 2; Stang Dep. Tr. at 112:5-9, Ex. 7.

[43]  Stang Dep. Tr. at 218:20-219:2, Ex. 7.

[44]  Stang Dep. Tr. at 218:20-25; 219:1-2, Ex. 7.

[45]  Stang Dep. Tr. at 220:1-6, Ex. 7; Lucas Dep. Tr. at 15:6-11, Ex. 2.

[46]  Golden Dep. Tr. at 14:3-19, Ex. 10.

[47]  *See* Ex. 11, Bates No. TCC-PlanConf-123122.

[48]  *See* Stang Dep. Tr. at 217:6-218:6; 219:3-18; 221:19-24, Ex. 7.

will contribute to rather than resolve confusion; the TCC cites no authority supporting the appointment of a voting ombudsman, because none exists; and a voting ombudsman would likely result in further improper communications with represented survivors.  While the Debtors have endeavored to respond to the Motion in full, the Motion raises several critical issues and, in light of the compressed time that the Debtors had to respond over a holiday weekend, the Debtors reserve the right to supplement this Objection.

## **OBJECTION TO MOTION**

**I.**    **A Voting Ombudsman Paid for by the TCC Will Increase, Rather Than Alleviate, Confusion Among Survivors.**

11.    The TCC's request to appoint an independent ombudsman as a "neutral resource" for survivors who are confused about the Plan voting process will not alleviate confusion for abuse survivors.  Rather, another voice in the voting process will ***add*** confusion on the vote instead of reducing it.  As is obvious by the lines drawn in support of and against this Motion— with Plan proponents all opposed, and Plan opponents all in favor—an ombudsman will invite further litigation, expense, and delay into the voting process.  Indeed, the TCC's true intentions are made clear by the alternatives it presents to the appointment of the voting ombudsman: re-solicitation of the Plan or designation of the votes of AIS clients.

12.    Additionally, the Motion fails to answer crucial questions regarding its proposal: What is the scope and type of advice that the ombudsman would be authorized to provide to represented abuse survivors?  How would materials or communications from the voting ombudsman be approved?  How does an ombudsman avoid infringing on the attorney-client relationship for represented abuse survivors?  These questions and many others are likely to invite dispute, injecting confusion, expense and delay into the voting process.

13.     Nor is an ombudsman necessary.  Survivors already have access to the Court-approved Plan summary and FAQs for abuse survivors, the Debtors' and the Coalition's and Future Claimants' Representative's approved letters in support of the Plan, and the TCC's letter recommending rejection of the Plan.   *See* Solicitation Procedures Order [D.I. 6438]. Additionally, Omni Agent Solutions, the Court-retained solicitation agent in these chapter 11 cases (the "Solicitation Agent"), already has a call center with approximately sixteen staff members handling inbound ballot and voting questions from abuse survivors.   Any abuse survivor who contacts the Solicitation Agent to request a ballot is promptly mailed one along with complete instructions regarding how to properly submit it.  Also, any abuse survivor who contacts the Solicitation Agent to determine the name of his attorney is promptly provided with this information, to the extent ascertainable by the Solicitation Agent.  Moreover, any abuse survivor who has questions related to the mechanics of voting or where to find certain information is provided with this information by the Solicitation Agent.  It is unclear what may be gained by the appointment of a purportedly neutral ombudsman when the Solicitation Agent's call center is already answering and fielding questions from survivors regarding voting.

14.     Additionally, prior to the Pachulski firm's misconduct with respect to the TCC/Kosnoff Communications, the Debtors extensively negotiated with the TCC and other interested parties a transparent process for addressing any issues with voting.  The Solicitation Procedures specifically provide for a special notice and report to be filed with the Court in the event that the Solicitation Agent receives ballots that deviate from the approved Solicitation Procedures, in addition to the voting report that the Court-approved Solicitation Agent will file on the docket.  This existing safeguard also makes the ombudsman superfluous.

15.    Notably, the only source of confusion for survivors is the unauthorized TCC/Kosnoff Communications sent out by the TCC on November 6.  But rather than working with the Debtors to resolve that problem, the TCC has impeded the Debtors' discovery efforts regarding the facts and circumstances surrounding the TCC's actions, *see supra*, and now seeks to force through a meritless proposal on a highly compressed timeline over the Debtors' and other parties' objection.  The TCC has stated no valid basis for its proposal, and lacks the clean hands necessary to make it.[49]

## II.    There Is No Authority for the Relief the TCC Seeks.

16.    Despite its statements that "[t]he powers granted [to] the Court under section 105 are broadly designed to address precisely the relief sought by this Motion (*i.e.*, remedies to protect the integrity, and ensure the orderly conduct of, the plan voting process)," Motion ¶ 22, the TCC does not cite to ***a single case or statutory authority*** that provides for the appointment of a voting ombudsman.  Section 105(a) provides the bankruptcy court with broad "power to fill in gaps and further the statutory mandates of Congress in an efficient manner," but this authority is limited by the other provisions of the Bankruptcy Code.  2 COLLIER ON BANKRUPTCY ¶ 105.01 (16th ed. 2021).   Similarly, section 1103(c)(5) is a catch-all provision that gives official committees flexibility regarding the services a committee may perform in a case, but the TCC cites this section in conclusory fashion and offers no explanation or authority as to why the relief it requests from the Court is supported by section 1103.  7 COLLIER ON BANKRUPTCY ¶ 1103.05

---

[49]    The Debtors note that the TCC town halls could have—and should have—served the neutral function that the TCC envisions, but the TCC has abandoned its statutory duty to represent the interests of all abuse survivors by supporting the views of a select group of counsel and distributing the TCC/Kosnoff Communications. Moreover, in the November 11 and November 18 TCC town halls, the TCC made no mention of the Debtors' Motion to Enforce or the Court's comments with respect to the Pachulski firm's actions.  Given the Pachulski firm's failure to uphold its neutrality, its proposal to present the ombudsman as a neutral third party while also paying the ombudsman's fees is unworkable.

(16 ed. 2021) (citing *In re Pursuit Capital Mgmt., LLC*, 595 B.R. 631, 655 (Bankr. D. Del. 2018)).  Nor does the TCC explain how the Court's authority to designate votes under section 1126(e) supports the relief it requests.

17.    Notably, the Bankruptcy Code explicitly contemplates the appointment of an ombudsman in certain specified circumstances, such as in consumer privacy and healthcare cases. *See* 11 U.S.C. §§ 332, 333.  Clearly, if Congress intended to provide for the availability of a voting ombudsman, it knew how to do so.  *See*, *e.g.*, *In re Turner*, 195 B.R. 476, 483 (Bankr. N.D. Ala. 1996) ("Where Congress knows how to say something but chooses not to, its silence is controlling." (citing *BFP v. Resolution Tr. Corp.*, 511 U.S. 531 (1994))).  Yet nowhere does the Bankruptcy Code mention appointment of a voting ombudsman.  This absence also explains the TCC's failure to cite ***a single precedent*** in which a bankruptcy court appointed a voting ombudsman.

### III.    The TCC's Request Would Likely Result in Further Infringements on the Attorney-Client Relationship of Represented Survivors

18.    It is axiomatic that, absent exceptional circumstances, the Court and its representatives should strive to avoid infringing on the attorney-client relationship.  *See*, *e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 246 n.5 (2010) (rejecting an interpretation of federal law that "would seriously undermine the attorney-client relationship"); *In re West*, Case No. 11-15594-BFK, 2012 WL 1344220, at *10 & n.3 (Bankr. E.D. Va. Apr. 17, 2012) (denying a party's request to contact represented clients other than permitting counsel from contacting its existing clients in order avoid interfering in "already established attorney-client relationships"); 7 AM. JUR. 2D ATTORNEYS AT LAW § 137 (observing that while courts are "vested with the responsibility of both monitoring and analyzing the attorney-client relationship . . . that responsibility must be carried out with restraint").  Communication with creditors

regarding the Plan is "analogous to communicating with an adverse party regarding settlement. In each case, the ethical canons require the prior consent from the communicant's attorney." *In re Snyder*, 51 B.R. 432, 438–39 (Bankr. D. Utah 1985); *In re Grand Union Co.*, 204 B.R. 864, 877 (Bankr. D. Del. 1997) ("Authorizing direct contact with the claimant contradicts prevailing ethical standards that require dealings with counsel where an opposing party is known to be represented, unless counsel consents or the communication is authorized by law. The ethical rule is meant 'to prevent lawyers from taking advantage of uncounselled [sic] lay persons and to preserve the integrity of the lawyer-client relationship.'" (quoting *Graham v. United States*, 96 F.3d 446 (9th Cir. 1996))).

19.     Indeed, the Court has already expressed concern about improper communications to represented parties, stating at the November 12 hearing that "I am concerned with communications to represented parties who have their own counsel who should be communicating with them and may be trying, themselves, to clear up the confusion . . . ." Nov. 12, 2021 Hr'g Tr. at 44:9–45:2, Ex. 5.

20.     A voting ombudsman will exacerbate, rather than resolve, this problem.[50]  For example, the Zalkin/Pfau Joinder in support of the Motion describes the ombudsman's proposed role as follows: "Many survivors are struggling with how to vote because they have not received basic information about their interests, such as an estimate of what they stand to recover under

---

[50]    The Debtors also note that the TCC cites an outdated version of the ethical rules, and the rule it purports to rely on is no longer in the current version. The American Bar Association has replaced the Code of Professional Responsibility and its predecessor, the Canons of Professional Ethics, in their entirety with the Model Rules of Professional Conduct. Rule 1.2(a) is the operative corollary to the Code and the canon cited by the TCC. Ann. Mod. Rules Prof. Cond. Correlation Tables A and B (2019). Rule 1.2(a) contemplates disagreements between lawyer and client, but contains no provisions regarding disagreement among co-counsel or requirements for joint action. Ann. Mod. Rules Prof. Cond. R. 1.2(a).

the plan."[51]   D.I. 7459 at 2.   This is disputed information that cannot be discussed without veering into legal advice.   The Debtors and Plan-supporting parties disagree, for example, with the TCC's calculation of proposed recoveries under the Plan, the amount of total funds that the settlement trust will have to distribute to abuse survivors, and how much would be available under an alternative plan.   A purportedly neutral ombudsman would be unable to present a coherent response on these and many other pertinent issues without improperly providing legal opinions.   Such actions by the ombudsman would not only be improper, but also unnecessary. The Solicitation Agent is already serving the function of addressing survivors' questions—within permissible ethical boundaries that do not invade the attorney-client relationship.   And survivors can already read each side's perspective on key issues in the Debtors' Disclosure Statement, which incorporates extensive comments from Plan supporters and opponents.[52]

## IV.    The Motion to Shorten Should Be Denied.

21.    It is well established that cause to shorten notice periods is not present where the purported emergency is of the movant's own creation.   *See*, *e.g.*, *In re Villareal*, 160 B.R. 786, 787 (Bankr. W.D. Tex. 1993); *Official Comm. of Disputed Litig. Creditors v. McDonald Inv. Inc.*, 42 B.R. 981 (N.D. Tex. 1984); *see also In re Fort Wayne Assocs. L.P.*, Case No. 97-10378, 1998 WL 928419, at *1 (Bankr. N.D. Ind. Dec. 16, 1998) ("Whether an 'emergency' exists is determined not by the immediacy of any particular party's need but, rather, by the suddenness

---

[51]   While the TCC purports to proffer the support of one non-AIS state court counsel, that counsel does not speak for the approximately 450 other state court counsel involved in this bankruptcy case.

[52]   The supporters of the Motion also criticize the voting process being used by Eisenberg Rothweiler in connection with Plan voting as outside the purview of the Solicitation Procedures Order and the master ballot process.   Not only is the Motion an improper vehicle for raising issues with one firm's voting methods, but the Debtors understand that Eisenberg Rothweiler's AIS clients are completing their ballots in accordance with the express authorization of the Solicitation Procedures Order.   While the confusion amongst AIS and non-AIS survivors is unfortunate, the AIS survivors are empowered to vote their own ballot.   There is no independent authority outside of these survivors' chosen counsel who can advise them whether to accept or reject the Plan—and certainly not a TCC-sponsored ombudsman purporting to be a "neutral" party in these chapter 11 cases.

with which that need arose. . . . Parties cannot dally in the administration of a case and then expect the court to extricate them from an uncomfortable situation through an 'emergency motion.'"); *In re Schindler*, Case No. 09-71199-AST, 2011 WL 1258531, at *3 (Bankr. E.D.N.Y. Mar. 31, 2011) (denying motion to shorten and stating that the "failure to plan ahead does not rise to the level of a genuine emergency justifying shortened notice or expedited relief" (citation omitted)); *In re Coldwater Creek, Inc.*, Case No. 14-10867 (Bankr. D. Del. June 9, 2014) (BLS) [D.I. 538] (denying motion to shorten notice period and expedite hearing on unsecured creditors committee's motion to terminate debtors' exclusivity periods for lack of cause where committee strategically delayed filing a motion).

22.     Here, the TCC's claimed "exigency" is of its own creation.  It is, moreover, a transparent distraction from the TCC's misconduct, and a purposeful disruption of the Debtors' efforts to keep these cases moving toward confirmation in the context of ongoing mediation, voting, and Plan discovery.  The TCC indicated to the Court at the November 17 hearing that it sought to "take the temperature down" and collaborate with the Debtors.  Nov. 17, 2021 Hr'g Tr. at 45:9–13, Ex. 8.  The TCC's decision to manufacture an emergency on the eve of a holiday weekend and force the Debtors to respond on a compressed timeframe prejudices the Debtors and belies the TCC's statement.

## CONCLUSION

23.     The Debtors respectfully request that the relief requested in the Motion be denied and any such other and further relief as the Court deems just and proper, and in the alternative the Debtors reserve the right to file a further response after having adequate time to consider the Motion.

Dated: November 29, 2021
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Paige N. Topper*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: dabbott@morrisnichols.com
        aremming@ morrisnichols.com
        ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**

Glenn M. Kurtz (admitted *pro hac vice*)
Jessica C. Lauria (admitted *pro hac vice*)
Andrew Hammond (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: gkurtz@whitecase.com
        jessica.lauria@whitecase.com
        ahammond@whitecase.com
        sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**

Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice)*
Blair M. Warner (admitted *pro hac vice)*
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        laura.baccash@whitecase.com
        blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION