**Exhibit 2**

**Excerpts of Lucas Deposition Transcript**



Transcript of the Testimony of

# JOHN LUCAS

November 23, 2021

## IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

```
 1
 2              UNITED STATES BANKRUPTCY COURT
 3               FOR THE DISTRICT OF DELAWARE
 4                      - - -
 5   IN RE:                         : CHAPTER 11
 6   BOY SCOUTS OF AMERICA AND      : CASE NO.
 7   DELAWARE BSA, LLC,             : 20-10343 (LSS)
 8        Debtors.                  : (Jointly Administered)
 9                      - - -
10
11
12              Remote videotaped deposition of
13   JOHN LUCAS, held via videoconference on Tuesday,
14   November 23, 2021, beginning at approximately
15   2:50 p.m. Eastern Standard Time, the proceedings
16   being recorded stenographically by Gail Inghram
17   Verbano, Registered Diplomate Reporter, Certified
18   Realtime Reporter, Certified Shorthand
19   Reporter-CA (No. 8635), and transcribed under her
20   direction.
21                         COPY
22
23
24
25
```

Page 14

```
 1      Q.    Okay. How has your role changed
 2  with respect to the committee?
 3      A.    I don't know if it has. I don't
 4  think it has. I just -- you -- yeah. It hasn't.
 5      Q.    Well, there was a town hall last
 6  Thursday; right?
 7      A.    Yes, there was.
 8      Q.    And you did not appear on that
 9  town hall; correct?
10      A.    Yes, that's correct.
11      Q.    Did you meet with the committee
12  before that town hall?
13      A.    No.
14      Q.    You did not?
15      A.    No.
16      Q.    And in previous town halls, you
17  appeared on video; right?
18      A.    Yes.
19      Q.    And presented?
20      A.    Yes.
21      Q.    You were one of the lead voices
22  for the TCC?
23          MR. KORNFELD: Objection.
24      A.    I was one of the attorneys for the
25  TCC that spoke at the town halls. I don't know
```

Page 15

```
 1  if I would characterize my voice as a lead
 2  because I wasn't the only counsel that spoke at
 3  the town halls; it was other of my partners,
 4  associates, counsel and other professionals that
 5  are engaged by the TCC.
 6      Q.    Okay. And none of those
 7  professionals you just mentioned participated in
 8  last Thursday's town hall; correct?
 9      A.    I didn't watch the town hall last
10  Thursday, but it's my understanding that it was
11  just the committee members that attended.
12      Q.    Why was that?
13      A.    I don't know.
14      Q.    Who made that decision?
15      A.    I don't know.
16      Q.    You didn't make the decision?
17      A.    No.
18      Q.    You were not involved in making
19  that decision?
20      A.    No.
21      Q.    Who can answer the question of who
22  made the decision to have no counsel appear on
23  last Thursday's town hall? Who is my best person
24  to ask that?
25      A.    I don't know. I don't know who
```

Page 16

```
 1  made the decision.
 2      Q.    I'm asking you who at Pachulski
 3  might know the answer to that. Because I would
 4  have thought you would have been in the heart of
 5  that decision.
 6      A.    I was not.
 7      Q.    Okay. Can you give me any ideas
 8  who at Pachulski I should ask?
 9      A.    Ask -- ask --
10          MR. KORNFELD: Objection --
11      objection as to form.
12      A.    I suggest you could ask
13  Richard Pachulski.
14      Q.    Okay. You said you did not watch
15  the town hall; is that correct?
16      A.    Correct.
17      Q.    Did you ever see a transcript of
18  it?
19      A.    No.
20      Q.    Have you -- did you attend either
21  Mr. Golden or Mr. Phan's depositions?
22      A.    No.
23      Q.    Did you read a transcript?
24      A.    I read the transcript of
25  Mr. Golden's.
```

Page 17

```
 1      Q.    On October 16th of this year,
 2  Tim Kosnoff emailed you a Law Review article
 3  entitled, "Rethinking Conspiracy Jurisdiction in
 4  Light of Stream of Commerce and Effects-Based
 5  Jurisdictional Principles."
 6          And I can show you the email in
 7  the cover of the Law Review article if you'd
 8  like, but do you recall getting that article from
 9  Mr. Kosnoff?
10      A.    I recall receiving the email with
11  the attachment.
12      Q.    Okay. Did you have a conversation
13  with Mr. Kosnoff before he sent you that Law
14  Review article?
15      A.    No. No, I did not. Mike, I might
16  have talked to him before. I don't recall.
17      Q.    Fair question.
18          About the Law Review article
19  itself, did you discuss -- did you have a
20  discussion about the issues raised by the
21  Law Review article?
22      A.    No.
23      Q.    Okay. Why did he send you that
24  Law Review article?
25      A.    I have no idea.
```

Page 26

1  Q. And that's why you copied him,
2  because he was on the original string from
3  Mr. Kosnoff?
4  A. Yes.
5  Q. And is Mr. Kennedy -- is -- I'm
6  sorry.
7     Is Dr. Kennedy Mr. Kosnoff's
8  client?
9  A. No.
10 Q. Who represents Dr. Kennedy? What
11 state court counsel?
12 A. The law firm -- Merson Law.
13 Q. Merson Law. And that's
14 Jordan Merson?
15 A. Yes.
16 Q. How long did it take you to edit
17 the Kosnoff letter on Sunday, October 17th?
18 A. I don't remember.
19 Q. Okay. Let's --
20    MR. ANDOLINA: Leah, if you
21 would flip down.
22    MR. KORNFELD: Mike, sorry to
23 interrupt again. Leah sent me an email
24 with the Lucas exhibits, but it will not
25 download. So if she could send it again,

Page 27

1  it would be very much appreciated.
2     MR. ANDOLINA: So are others
3  able to get it from the file share?
4     Alan, maybe you could get
5  someone in there, and I'm happy to take a
6  short break to have you download it from
7  the file share.
8     MR. KORNFELD: No. I could get
9  it from the file share if I knew the
10 password. And I see -- I might be able to
11 do this.
12    MR. ANDOLINA: Okay. I've got
13 faith.
14 Q. Let's skip ahead to pages --
15 starting on page 13 of the PDF. And I'd just
16 like to scroll down, pages 13, 14, 15, 16, 17
17 and 18.
18    And, Mr. Lucas, feel free to
19 direct us to any of those specific pages if you
20 need to see them more closely, but do they
21 reflect your edits to the Kosnoff letter made on
22 October 17th, 2021?
23 A. Yes.
24 Q. Other than Dr. Kennedy, did other
25 members of the TCC, the committee, know that you

Page 28

1  were revising the Kosnoff letter?
2  A. No.
3  Q. Do you know if Dr. Kennedy had
4  conversations with the committee about whether,
5  in fact, you had revised the Kosnoff letter?
6  A. Can you ask the question again
7  Mike?
8  Q. Yeah. I asked an inartful first
9  question, which is, do you know -- do you have
10 personal knowledge as to whether other members of
11 the committee other than Dr. Kennedy knew that
12 you were revising the Kosnoff letter?
13 A. No, I don't know whether or not
14 anybody else knew that.
15 Q. Okay. Did you charge the debtor's
16 estate for the revisions that you made to the
17 Kosnoff letter on Sunday, October 17th?
18 A. I don't recall.
19 Q. Well, would it have been your
20 practice when you were working on this case to
21 charge your time?
22 A. Yes, but it's also my practice to
23 not always charge my time, and so I don't charge
24 every second of every day that I'm working.
25 Q. Okay. Did you have a special

Page 29

1  exemption when you were working on things for
2  Mr. Kosnoff that you didn't record your time?
3     MR. KORNFELD: Objection.
4  A. I did not have -- I was never
5  working for Mr. Kosnoff. So that's just not
6  correct.
7  Q. What I said is you're working on
8  things for Mr. Kosnoff.
9     MR. KORNFELD: Objection as to
10    form.
11 A. I wasn't working on things. I
12 provided edits to Mr. Kosnoff's letter.
13 Q. At his -- at his request; correct?
14 A. That is correct.
15 Q. Okay. And you provided
16 substantial edits to his letter?
17    MR. KORNFELD: Objection as to
18    form.
19    MR. ANDOLINA: Let's flip
20 through it again just so you can see.
21    Would you agree that the
22 revisions that you provided to the Kosnoff
23 letter were substantial?
24 A. I agree that I made every one of
25 those edits that are marked there in that PDF,

Page 34

1  A.  Correct.
2  Q.  Do you recall any phone calls that
3  you had with Mr. Kosnoff on the 15th, 16th or
4  17th?
5  A.  I do not.
6  Q.  If you had such phone calls, would
7  they be reflected in your time sheets?
8  A.  They might.
9  Q.  You mentioned that Mr. Kosnoff
10 told you that his letter went out, but you didn't
11 recall the specific timing of that conversation.
12      Was it the week of October 18th?
13 A.  That I learned when his letter
14 went out?
15 Q.  Yes.
16 A.  Was that the question?
17 Q.  Yes.
18 A.  I don't recall the specific time
19 period about when I learned his letter went out.
20 Q.  Okay.  Prior to October 15th,
21 the TCC had actually received an Excel file with
22 the email addresses of individuals for whom
23 Mr. Kosnoff was a co-counsel; is that right?
24 A.  Yes.  Mr. Kosnoff sent an Excel
25 file, yes.

Page 35

1  Q.  Okay.  And he sent that to
2  Mr. Kennedy, and then Mr. Kennedy forwarded it to
3  you; correct?
4  A.  Yes.
5  Q.  And did you talk to either
6  Mr. Kennedy or Mr. Kosnoff before the Pachulski
7  firm received the Kosnoff email address file?
8  A.  I did not talk to Mr. Kosnoff?
9  Q.  Did you talk to Dr. Kennedy about
10 that?
11 A.  And what was the temporal aspect
12 of your question?  Are you asking before, after?
13 Q.  Before, before you got -- before
14 you got the file with the email addresses.
15 A.  Yes.
16 Q.  What was the nature of that
17 communication?
18     MR. KORNFELD:  I'm going to
19   object on the grounds that that question
20   calls for attorney-client communication.
21   I'm going to instruct him not to answer.
22 Q.  Are you going to follow your
23 lawyer's advice and not answer the question,
24 Mr. Lucas?
25 A.  Yes.

Page 36

1  Q.  Did anyone at the Pachulski firm
2  reach out to Mr. Rothweiler or Mr. Eisenberg to
3  let them know that the TCC had acquired an email
4  list of clients for which they were co-counsel
5  with Mr. Kosnoff?
6     MR. KORNFELD:  Objection as to
7   form.
8  A.  No.
9  Q.  And did that happen at any time
10 before November 5th, 2021?
11 A.  Can you restate the question,
12 please.
13 Q.  Sure.  At any time before
14 November 5th, 2021, did the TCC inform
15 Rothweiler Eisenberg that Mr. Kosnoff had
16 provided a list of his clients for which
17 Eisenberg, Rothweiler was co-counsel to the TCC?
18 A.  The TCC wasn't communicating with
19 Mr. Rothweiler or Mr. Eisenberg.
20 Q.  So the answer is, no, you didn't
21 tell them that?
22 A.  I don't understand --
23     MR. KORNFELD:  Objection --
24   hold on.
25     Objection as to form.

Page 37

1  A.  I don't understand your question.
2  Q.  My question is:  Once you acquired
3  the list of Kosnoff client email addresses, did
4  you tell Eisenberg, Rothweiler, who were
5  co-counsel, that the TCC had that list?
6  A.  Again, your question is:  Is it to
7  me?  Did I tell them?
8  Q.  Did Pachulski -- did anyone at
9  Pachulski communicate that?
10 A.  Pachulski -- I did not tell
11 Mr. Rothweiler or Mr. Eisenberg, nor did anybody
12 at my firm.
13 Q.  Is the issue of whether you had a
14 duty to inform co-counsel that you had a list of
15 email addresses one of the things that you
16 consulted with ethics counsel about?
17 A.  No.
18 Q.  When the Pachulski firm received
19 the Kosnoff client email list, my understanding
20 is you did not undertake any steps to confirm
21 that the individuals on the email list were, in
22 fact, Kosnoff clients.  Is that correct?
23 A.  That's correct.
24 Q.  And from my conversation with your
25 assistant, I understand that the Kosnoff list was

Page 66

1    MS. KARCHMER: Which page was
2 it that you wanted?
3    MR. ANDOLINA: Can we go, start
4 on page 30 and then backwards through 27.
5    Q.    And I really just wanted to ask
6 you about pages 30 and 29, Mr. Lucas.
7    MR. ANDOLINA: But let's start
8 at 30 so Mr. Lucas can read from the
9 beginning. Leah, go back to 30, please.
10    Great. Thank you.
11    A.    (Witness reviews document.)
12    Okay. I've read that. I have a
13 question. Yeah -- yes, I've read it. I'm sorry.
14 Go ahead.
15    Q.    Uh-huh. And then --
16    A.    Can you just go down a little bit.
17 There's something on the top that I missed there
18 because there's an email that straddles the page.
19    Okay. Can you go down again?
20    It went too fast. I'm sorry. A
21 little bit more.
22    Perfect. Thank you.
23    You could scroll up to the top,
24 please.
25    Q.    Yeah. That's -- those are the

Page 67

1 only ones I wanted to ask you.
2    A.    Yes, I've reviewed it.
3    Q.    So if we go to page 30, this is an
4 email from Dr. Kennedy to Mr. Kosnoff, attaching
5 a video clip of him and Mr. Humphreys.
6    Have you seen that video?
7    A.    If this is referencing the video
8 that was posted on YouTube, then, yes.
9    Q.    Was that video something that was
10 proposed by the Pachulski firm?
11    A.    No.
12    Q.    Was it a response, though, on
13 behalf of the Tort Claimants' Committee?
14    A.    Yes.
15    Q.    And the video is now posted front
16 and center of the TCC website that is run by the
17 Pachulski firm; right?
18    A.    Last time I looked, it was. I
19 believe it is. I don't know that it's been taken
20 down or anything, so -- but yes.
21    Q.    And the video was distributed
22 through the BSASurvivors email address; right?
23    A.    You cut out there.
24    Q.    It was distributed through the
25 BSASurvivors email address?

Page 68

1    A.    Yes.
2    Q.    And that went to both the Kosnoff
3 list and the regular list, approximately 20,000
4 folks?
5    A.    No. It went to the Kosnoff list,
6 which was about 13,000, a little bit less. And
7 it also went to the TCC list, which was about
8 7500.
9    Q.    Okay. So I said about 20,000. Is
10 that accurate?
11    A.    What's the question?
12    Q.    I think what I asked you was
13 whether the list went to both the Kosnoff list,
14 and I called it the regular list; you called it
15 the TCC list, and that was about 20,000 email
16 addresses. The video went to both of those
17 lists; correct?
18    A.    Yes, it went to both lists; that
19 is correct.
20    Q.    Okay. So if we scroll up,
21 Mr. Kosnoff responds -- well, before we go,
22 Mr. -- Dr. Kennedy says, "If you agree, please
23 help us promote it."
24    Do you see that?
25    A.    Yes, I do.

Page 69

1    Q.    And do you have an understanding
2 of how Mr. Kosnoff would promote this YouTube
3 video?
4    A.    I do not know.
5    Q.    Okay. Do you know if this YouTube
6 video was tweeted out by Mr. Kosnoff?
7    A.    I believe it was. I can't say
8 that I saw it on his -- on his Twitter feed,
9 though.
10    Q.    Okay. Let's go to page 29.
11    MR. ANDOLINA: Leah, if you
12 could move up one page.
13    Okay. Just go down.
14    Q.    So Mr. Kosnoff writes, "You have
15 my permission to use the AIS email list to
16 distribute this video clip. Same with a link to
17 the TCC website."
18    Do you see that?
19    A.    Yes, I do.
20    Q.    And then Dr. Kennedy copies in you
21 and says, "Thanks, Tim. I'm cc'ing John Lucas on
22 this so we can make it happen."
23    Do you see that?
24    A.    I do.
25    Q.    And that's on October 24th that

Page 70

1  this happened; right?
2      A.   Yes.
3      Q.   Did anyone at Pachulski ask
4  Mr. Kosnoff's co-counsel for permission to
5  distribute the Kennedy video to the AIS client
6  list?
7      A.   I'm sorry.  Ask whose permission?
8  I'm sorry.  I'm not trying to be difficult.  I
9  just --
10     Q.   I understand.  I understand.
11          Mr. Kosnoff's co-counsel, either
12 Mr. Van Arsdale or Mr. Rothweiler.
13     A.   No.  No.
14     Q.   And did Pachulski obtain advice
15 from ethics counsel as to whether consent of
16 co-counsel was needed in order to distribute
17 materials on behalf of one lawyer where the
18 client was represented by multiple lawyers?
19     A.   No.
20     Q.   So if you scroll up, you ask
21 Mr. Kosnoff, "In addition to the video, may I
22 also send your clients the town hall notice for
23 this Thursday and communicate with them during
24 the town hall and any follow-up questions they
25 send that are not answered during the town hall?"

Page 71

1           And that's on October 25th that
2  you send that email; right?
3      A.   Yes.
4      Q.   Okay.  Why are you asking
5  Mr. Kosnoff's permission to send out the video
6  and the town hall?
7      A.   I'm asking if I can send a
8  communication to his clients?
9      Q.   And was it your understanding that
10 you needed his written authority to communicate
11 with his clients?
12     A.   I needed his authority, yes.
13     Q.   But not the authority of his
14 co-counsel?
15     A.   Correct.
16     Q.   And your position is when you send
17 out communications from the BSASurvivors email
18 list, those are communications on behalf of the
19 TCC?
20     A.   They're communications from --
21 from my firm and, you know, an email address that
22 my firm was set up for administrative purposes of
23 collecting questions and sending out responses to
24 lawyers and survivors who have questions about
25 the case.

Page 72

1      Q.   Did Pachulski receive any ethics
2  advice with respect to obligations around sending
3  communications through a BSASurvivors or TCC
4  email Listserv?
5      A.   I don't understand what you mean
6  by a Listserv.
7      Q.   Sending survivors --
8  communications of -- through to multiple
9  survivors.
10          MR. KORNFELD:  Objection as to
11    form.
12     A.   I sought advice of counsel under
13 what circumstances I could send a communication
14 to represented parties that had more than one
15 counsel.
16     Q.   Okay.  Is there a writing that
17 reflects that legal advice?
18     A.   Nothing other than the emails that
19 were produced.
20     Q.   Can you tell me the advice that
21 you were given?
22     A.   That as long as I had the consent
23 of an attorney that represented the
24 co-represented survivors, I could send a
25 communication to them.

Page 73

1      Q.   Okay.  And who gave you that
2  advice?
3      A.   Robert Kehr.
4      Q.   And when did he give you that
5  advice?
6      A.   In the -- maybe the second week of
7  October.  I don't have the exact date.
8      Q.   And that was oral advice?
9      A.   Yes.
10     Q.   Who else participated in that
11 phone call?
12     A.   My partner, Kenneth Brown.
13     Q.   Did you and Mr. Brown describe to
14 Mr. Kehr the fact that your communications were
15 going to be going out on a Listserv to
16 potentially 20,000 people?
17     A.   Again, I don't understand what a
18 Listserv is.
19     Q.   Through a mass emailing to 20,000
20 people.  Was that fact provided to Mr. Kehr?
21     A.   Yes.
22     Q.   I understand from your
23 interrogatory responses that Mr. Kehr did not
24 advise Pachulski with respect to the propriety of
25 sending the Kosnoff email or the Kosnoff letter.

Page 74

1  Is that correct?
2      A.   Yes.
3      Q.   Did you inform Mr. Kehr that the
4  co-counsel that you wished to communicate -- that
5  the clients that you wished to communicate with
6  were represented by Mr. Kosnoff?  Did his name
7  come up during the call that you had with
8  Mr. Kehr?
9      A.   I don't recall if I specifically
10  mentioned Mr. Kosnoff's name.
11      Q.   Did you tell Mr. Kehr that there
12  were three different law firms that represented
13  clients jointly?
14      A.   Yes.
15      Q.   How long did the call where you
16  received advice from Mr. Kehr last?
17      A.   I don't remember.
18      Q.   Was it more than an hour?
19      A.   No.
20      Q.   Were there follow-up calls with
21  Mr. Kehr?
22      A.   Yes.
23      Q.   How many?
24      A.   Approximately two or three.
25      Q.   Let's pull up -- let's go to

Page 75

1  page 51, please.
2           Okay.  We'll just take these kind
3  of one at a time.
4           First email is from Mr. Brown and
5  copies to Mr. Kehr and copies you and Mr. Stang.
6           Do you see that?
7      A.   Yes.
8      Q.   Is this around the time where you
9  had the call, October 6th?
10      A.   Yes.
11      Q.   Okay.  And that email is from
12  1:06 p.m.; right?
13      A.   Yes.
14      Q.   And then if you go up, Mr. Kehr
15  responds on October 6th at 2:17 quoting
16  Delaware Rule 4.2.
17           Do you see that?
18      A.   Yes.
19      Q.   And he copies Mr. Stang, and he --
20  he sends an email to Mr. Brown, and he copies you
21  and Mr. Stang; right?
22      A.   Yes.
23      Q.   Okay.  Did the call -- the initial
24  call with Mr. Kehr occur between 1:06 p.m. and
25  2:17 p.m. on Wednesday, October 6?

Page 76

1      A.   I believe so.
2      Q.   And did Mr. Stang participate in
3  that call?
4      A.   No.
5      Q.   Tell me everything you recall
6  about the call.
7      A.   I explained the circumstances that
8  the AIS survivors are co-represented by three
9  different law firms.  And because -- because
10  this -- I explained to them that this is a very
11  unique situation.  This isn't a situation where
12  you have an attorney or a law firm representing
13  one or more clients.  And this is something that
14  is unique in the sense that you have three
15  separate law firms that are distinct that are
16  representing the same clients pursuant to a
17  single engagement letter in which all three firms
18  and the survivor execute.
19           And in that context, in that
20  unique situation, wanted to understand if there
21  are limitations or differences in communicating
22  with parties that are represented by counsel when
23  they are represented by multiple counsel.
24      Q.   Did you tell him that two of the
25  law firms had differing views in terms of

Page 77

1  advising their client?
2      A.   Yes.
3      Q.   And that the one law firm that was
4  providing you -- did you tell him that the law
5  firm that was providing you the contact
6  information was the law firm that the TCC agreed
7  with in terms of their position on the plan?
8      A.   I don't know if we agree with
9  Mr. Kosnoff.  That -- no, that isn't what I told
10  him.
11      Q.   What did you tell him?  Tell me
12  how you described the three law firms.
13      A.   I said that there are three law
14  firms, one of which is recommending a vote
15  against the plan, and another -- and the other
16  two law firms -- I wasn't sure about
17  Mr. Van Arsdale.  But certainly Mr. Rothweiler,
18  he and his firm are recommending an accept or a
19  yes vote in the plan; and -- and, obviously, it
20  is consistent -- or correct that, that the TCC is
21  also recommending a no or a reject vote in the
22  plan.  And so I did describe that dynamic to him.
23      Q.   Did you tell him that the
24  communication would be made on behalf of a
25  fiduciary committee from an official email

Page 78

1 address?
2  A.  I -- I don't -- I told him that
3 the communication would be sent out from my firm.
4  Q.  Is he an expert in bankruptcy
5 committee work?
6  A.  Not to my knowledge.
7  Q.  Does he have any experience in
8 terms of the obligations of bankruptcy
9 committees?
10  A.  I don't know.
11  Q.  Was that something that came up
12 during the call?
13  A.  I don't recall.
14  Q.  Did you provide him any documents
15 in advance of the call?
16  A.  No.
17  Q.  You received the Kosnoff email
18 list on October 12th.
19       On October 6th, when you talked
20 to Mr. Kehr, did you know you were going to
21 receive those?
22  A.  Did I know --
23  Q.  Was this in advance of you
24 receiving the AIS email addresses, this call?
25  A.  Yes.

Page 79

1  Q.  And did you anticipate receiving
2 them when you had this call with Mr. Kehr?
3  A.  I was inquiring with Mr. Kehr
4 under what context my firm could send a
5 communication to co-represented survivors.
6  Q.  I understand that, Mr. Lucas.  But
7 my question is:  When you had this call, did you
8 anticipate getting a list of 13,000 email
9 addresses from Mr. Kosnoff?
10  A.  If I was -- if I received the
11 advice that it was permissible to get the list,
12 yes.
13  Q.  Was the propriety of actually
14 receiving the list something that you also
15 received advice on?
16  A.  No.
17  Q.  Did that come up?
18  A.  No.
19  Q.  And you had a call for less than
20 an hour.  And there were no writings that you
21 provided to Mr. Kehr, and he provided no writings
22 other than the one email in response; is that
23 right?
24  A.  Yes.
25  Q.  And it looks like there's another

Page 80

1 call with Mr. Kehr on October 12th; is that
2 right?  If we look at page 48.  I'm sorry.
3       Did you have another call with
4 Mr. Kehr on the 12th?
5  A.  I believe so.
6  Q.  And on the first call, did
7 Mr. Brown and Mr. Stang participate, or just you
8 and Mr. Brown?
9  A.  Just me and Mr. Brown.
10  Q.  Did you update Mr. Stang after
11 that call?
12  A.  Yes.
13  Q.  By email or phone?
14  A.  Telephone.
15  Q.  And generally during this period
16 between October 17th and October 24th, how
17 often are you in communication with Mr. Stang?
18  A.  Regularly.
19  Q.  Multiple times a day?
20  A.  Sometimes.
21  Q.  Did you have communications with
22 Mr. Stang around the Kennedy and Humphrey video
23 that we talked about earlier?
24       MR. KORNFELD:  Objection; vague
25    as to form.

Page 81

1  A.  I did discuss the -- the --
2 Mr. Humphrey and Mr. Kennedy YouTube video with
3 Mr. Stang.
4  Q.  And Mr. Stang knew that you were
5 going to be sending that out to the AIS list and
6 the TCC list?
7  A.  Yes.
8  Q.  And he knew that in advance of you
9 sending it out?
10  A.  Yes.
11  Q.  Did he approve that?
12  A.  No.
13  Q.  Is that because you don't think --
14 he didn't need to; you just kind of give him a
15 heads-up?
16  A.  No.  I -- I sent out the notice
17 along with the town hall notice and the YouTube
18 link, as we have communicated with the
19 constituencies in the past.
20  Q.  On this call that you had on
21 October 12th, what was discussed with Mr. Kehr?
22  A.  The same topic.
23  Q.  Why did you need a follow-up call?
24  A.  To run through the unique scenario
25 again and talk with him about sending the

Page 86

1    A.    I don't deny that -- there are --
2 there are represented survivors on that list;
3 that is correct.
4    Q.    And you --
5    A.    I never --
6    Q.    You never saw -- and you had been
7 sending out notices to those 7,000 people for
8 months; right?
9    A.    Yes, and trying to fulfill our --
10 our duties under 1102 and 1103. However, in
11 hindsight, I probably should have been -- be a
12 little bit more prudent.
13    Q.    In terms of getting permission
14 from represented parties as to whether the TCC
15 could communicate with them?
16    A.    Yes.
17    Q.    Did that come to mind when you
18 reached out to Mr. Kehr to get advice on the
19 Kosnoff list?
20    A.    It did not.
21    Q.    So tell me about the call on
22 November 2nd.
23    A.    I reached out to Mr. Kehr in
24 response to a letter that we received from
25 bankruptcy counsel to the coalition on

Page 87

1 November 1st.
2    Q.    And what was the substance of the
3 November 1st letter from the coalition?
4    A.    To stop communicating with the
5 clients of the -- what I'll call like the state
6 court counsel coalition that had signed on to
7 that letter.
8    Q.    And what advice did Mr. Kehr give
9 you in that regard?
10    A.    Well, the question that was posed
11 to him is: Can one of the attorneys -- or one of
12 the firms or the attorneys that represent the --
13 the co-represented survivors still give me the
14 necessary authorization to communicate with those
15 on the Kosnoff list?
16    Q.    And what did he tell you?
17    A.    Yes.
18    Q.    Did he say there was additional
19 risk now that you had been contacted with respect
20 to co-counsel for Mr. Kosnoff?
21    A.    He did not raise that.
22    Q.    Were you concerned about that?
23    A.    As I said before, this was a
24 unique situation. And in unique situations that
25 don't come up regularly in my day-to-day sort of

Page 88

1 practice, I sought advice of somebody in this
2 unique situation and -- to get a response.
3    Q.    How did you decide that Mr. Kehr
4 was the right person to contact?
5    A.    On the recommendation of -- my
6 partner, Kenneth Brown, suggested that we reach
7 out to Mr. Kehr.
8    Q.    Had Mr. Brown worked with Mr. Kehr
9 before?
10    A.    I believe so.
11    Q.    Why didn't you ask for a writing
12 of Mr. Kehr's legal advice?
13    A.    Because we talked -- we talked
14 through the issues on the phone.
15    Q.    And am I correct that in any of
16 these communications you didn't send Mr. Kehr a
17 single document other than I assume you sent him
18 the letter from the coalition?
19    A.    I didn't send him anything.
20    Q.    So you didn't even send him the
21 letter from the coalition?
22    A.    The emails that are -- that are
23 the written communications with Mr. Kehr.
24    Q.    So the letter the coalition sent
25 to you that you asked for his advice in

Page 89

1 responding to you didn't even provide to him?
2    A.    At this time, I don't believe I
3 sent it. I know we produced a lot of emails to
4 you. And so if you're going to show me an email
5 where I sent to him, then I'm ready to concede
6 that. But right now, I don't believe I shared
7 the letter with him.
8    Q.    No, I don't have that email. I'm
9 just kind of flabbergasted that you would seek
10 legal advice on a communication and not actually
11 provide that communication to the lawyer that
12 you're seeking legal advice from. So I don't
13 have an email to show you.
14        MR. ANDOLINA:    So let's turn to
15    page 25, please.
16        And let's go down to 26 so
17    Mr. Lucas can look at the beginning of the
18    chain.
19    Q.    These are emails between
20 Mr. Kosnoff and Mr. Kennedy about an eBallot app
21 that was provided by the coalition.
22        Do you see those emails?
23    A.    Yes, I do.
24    Q.    Okay. And then on the next page,
25 you get looped into the communication. And we'll

Page 102

1    attention to document 142.
2             MR. ANDOLINA:  And if we could
3    go to the following page, 143.  Right
4    there.  That's good.
5        Q.   And we can see 144, there's
6    nothing on there, Mr. Lucas, just to confirm for
7    you.  That's it.
8             So there's an email here that is
9    forwarded to you from Mr. Kosnoff at 3:51 p.m. on
10   November 5th.  If we go up to the next page.
11       A.   I can't see the date -- stop
12   there, please.
13       Q.   Yeah, sure.  Of course.
14       A.   Got it.  And, again, as --
15       Q.   Timing can be complicated because
16   we're talking about time zones.
17       A.   Yeah, and so that may very well be
18   4:48.  That time stamp there on that email is
19   probably East Coast time.
20       Q.   I think you're right.  Yep.
21            And if we go up, there's an email
22   forwarded to -- that email is forwarded to
23   Mr. Kosnoff, who then forwards the chain to you.
24       A.   Yes.
25       Q.   Do you recall receiving that email

Page 103

1    from Mr. Kosnoff?
2        A.   Yes.
3        Q.   Do you recall what time of day --
4    were you in your office, or where were you when
5    you got the email?
6        A.   I was working from home.
7        Q.   So you were at your home.  And
8    where -- where do you live?
9        A.   In San Francisco.
10       Q.   Okay.  And then you respond -- if
11   we can go up.
12            And can you read what you respond
13   to Mr. Kosnoff on Friday November 5th.
14       A.   "Want us to help you resend your
15   letter?"
16       Q.   And did you use the word "resend"
17   there because you knew that the October 18th
18   letter had already been sent out to AIS clients?
19       A.   Yes.
20       Q.   When you got the email and you
21   responded, did you have any phone communications
22   with Mr. Kosnoff on November 5th?
23       A.   No.
24       Q.   Do you know where Mr. Kosnoff was
25   located at this point?

Page 104

1        A.   At this point in time?
2        Q.   Yes.
3        A.   I don't know.  And -- I had one
4    phone conversation with him in which he told me
5    he was in Palm Springs.  I just don't remember
6    whether or not that conversation predated this
7    communication.
8        Q.   Okay.
9        A.   Yeah.
10            MR. ANDOLINA:  If we go to 146.
11   And let's go all the way to 148 so
12   Mr. Lucas can see the -- okay.
13            Go all the way up to -- and we
14   can scroll down, Mr. Lucas, so you can
15   see.
16            So an email from Mr. Kosnoff --
17   I'm sorry, Leah.  Can you just show the
18   beginning, and then we can see the whole
19   thing.
20            Go up one more just so -- okay.
21       Q.   So email from Mr. Kosnoff to you:
22   "John, attached is the letter."
23            By the way, did you have a copy of
24   the final Kosnoff letter from October 18th?
25       A.   No.

Page 105

1        Q.   "John, attached is the letter.
2            "The email could say this."
3            And then he provides some text.
4            MR. ANDOLINA:  Can you go all
5    the way down, Leah?
6        Q.   All right.  And you recall
7    receiving that -- that text from Mr. Kosnoff?
8    The text to the email?
9        A.   Yes.
10            MR. ANDOLINA:  Okay.  Leah, can
11   you go up.
12       Q.   And you respond and say,
13   "Received; will prepare ASAP."
14       A.   Correct.
15       Q.   And then -- we can go up.
16            And then Mr. Kosnoff responds:
17   "Okay to send.  I don't need to see your edits.
18   I'm certain they are excellent."
19            And do you know why Mr. Kosnoff
20   was certain your edits would be excellent?
21       A.   I do not.
22       Q.   And you respond, "I only made
23   one -- I only made word reject in bold and
24   underscored.  Thanks.  The email and your letter
25   will go out tonight.  Thank you."

Page 106

1   Q.  Why did you edit the cover email
2   by bolding and underscoring the word "reject"?
3   A.  The TCC is of the view that the
4   plan that's on the table now should be rejected
5   or not approved by the Court.
6   Q.  So you wanted to make sure that
7   that communication reflected the TCC's view on
8   that critical issue?
9   A.  No. I wasn't intending on
10  communicating or -- or endorsing Mr. Kosnoff's
11  email or letter. I was trying to facilitate the
12  administrative function of sending out the email
13  and letter by way of the software program that my
14  firm has that enables somebody to send a single
15  communication out to numerous email recipients
16  without putting them all in the -- you know, sort
17  of "to" line, because I was told that you get a
18  bunch of sort of administrative hiccups when
19  doing that.
20      And so that was the purpose of
21  sending it out, to -- to facilitate something --
22  to get it out through using that software
23  program. That was the intention.
24  Q.  Right. But you just didn't cut
25  and paste the email; you bolded and capped the

Page 107

1   word "reject"; correct?
2   A.  I did bold and capped the -- as
3   it's reflected in the emails there, that's
4   exactly what I did, yes.
5   Q.  Okay. And -- and you had written
6   a substantial portion of the Kosnoff letter that
7   was attached to the email; correct?
8   A.  I provided comments as reflected
9   in the markup in which you said earlier. That's
10  exactly what I did, those comments.
11  Q.  Okay. Those comments included
12  rewriting portions of the Kosnoff letter;
13  correct?
14  A.  The comments are -- the -- it is
15  right there in -- in black and white; and I'm not
16  disputing the changes that I made. I made every
17  one of those changes. That's what I did.
18  Q.  Okay. Before you forwarded the
19  email and letter to your assistant, did you
20  discuss with the committee?
21  A.  No.
22  Q.  Did you discuss with Dr. Kennedy?
23  A.  No.
24  Q.  Did you discuss with anyone else
25  at Pachulski?

Page 108

1   A.  Yes.
2   Q.  Who did you talk to?
3   A.  Mr. Stang.
4   Q.  Was that a telephone call?
5   A.  Yes.
6   Q.  Okay. Tell me what you said to
7   Mr. Stang and what he said to you.
8   A.  I told him that we were going to
9   use our software program to transmit the email
10  and the Kosnoff letter to Mr. Kosnoff's clients
11  on the AIS list.
12  Q.  What time did that phone call take
13  place?
14  A.  Around the time of these emails.
15  I don't remember exactly, but around the time of
16  these emails.
17  Q.  Did you talk to Mr. Stang before
18  or after you revised the cover email from
19  Mr. Kosnoff?
20  A.  I don't remember.
21  Q.  Where was Mr. Stang located when
22  you had that conversation?
23  A.  Presumably Los Angeles.
24  Q.  Okay. How long did the call take?
25  A.  I don't recall.

Page 109

1   Q.  Was it a -- did Mr. Stang ask any
2   questions?
3   A.  I don't remember.
4   Q.  Did either of you discuss whether
5   you ought to reach out to ethics counsel about
6   this issue?
7   A.  No.
8   Q.  Did you discuss whether anyone
9   else at Pachulski should be involved in the
10  decision?
11  A.  No.
12  Q.  Was anyone else at Pachulski
13  involved in the decision?
14  A.  No.
15  Q.  Did you discuss whether you should
16  talk to the committee about the decision?
17  A.  No.
18  Q.  Did you discuss whether there
19  should be some sort of notation or other
20  communication from the TCC explaining that the
21  cover email and the letter were Mr. Kosnoff's
22  views?
23  A.  I don't know if we discussed it,
24  but the subject line of the email reflects that.
25  Q.  Well, my question was: Did you

Page 118

1   the -- to the Kosnoff list and the TCC list?
2       A.   No.
3       Q.   How long was the call that you had
4   with Mr. Phan?
5       A.   Five to ten minutes approximately.
6   I don't remember the exact time.
7       Q.   Did you explain to him any of the
8   background or the nature of the communication?
9       A.   No.
10      Q.   Do you know whether you used the
11  word "Kosnoff" at all?
12      A.   No, I don't know.
13      Q.   Is there a reason that there's no
14  writing reflecting the instruction of how the
15  Kosnoff email and Kosnoff letter should be
16  distributed?
17      A.   I had asked Mr. Phan to send out
18  communications in the past a number of times; and
19  I believe that we produced emails or
20  communications where I distinguished between, you
21  know, the one list and the other list, meaning
22  the smaller list, the TCC list, and the AIS or
23  Kosnoff lists.  And I was comfortable that in my
24  conversation with him, that I was able to convey
25  that to him without sending him an email

Page 119

1   explaining what to do.
2       Q.   Had you ever instructed Mr. Phan
3   to send a message to any of the lists previous to
4   Friday, November 5th, only orally?
5       A.   I don't know if I only did it
6   orally.
7       Q.   Is it possible that this is the
8   only distribution that was made from the
9   BSASurvivors email that was not accompanied by a
10  written instruction to Mr. Phan?
11          MR. KORNFELD:  Objection as to
12      form.
13      A.   I don't know.
14      Q.   Let's look at page 26, please.
15          MR. ANDOLINA:  Before we do
16      that, actually -- I'm sorry, Leah.  Could
17      you just go back to the actual text on
18      page 26, and we can actually go down -- go
19      down to 26.
20      Q.   In terms of the cover email, the
21  Kosnoff email, Mr. Lucas, did you and Mr. Stang
22  discuss the allegations from Mr. Kosnoff that
23  he's saying the conduct of Eisenberg, Rothweiler
24  "was wholly improper and possibly illegal"?
25      A.   We did not discuss it.

Page 120

1       Q.   Did Mr. Stang see the cover
2   email -- the Kosnoff email before you made the
3   decision to send it to the AIS list?
4       A.   No, we did not.
5       Q.   Did you describe it to him?
6       A.   I don't recall.
7       Q.   Did you mention the fact that
8   Mr. Kosnoff requested that recipients stay
9   current on what is happening by following me on
10  Twitter?
11      A.   No, I don't recall if I discussed
12  that.
13      Q.   Did you summarize the substance of
14  the Kosnoff email to Mr. Stang in your call?
15      A.   I don't recall.
16      Q.   Did you mention the statement
17  "There's a simple word for why lawyers do things
18  like that:  greed"?  Did you mention that that
19  was a statement by Mr. Kosnoff in the Kosnoff
20  email?
21      A.   I do not recall.
22      Q.   Did Mr. Stang ask to see a copy of
23  the Kosnoff email during your conversation?
24      A.   No.
25      Q.   Had Mr. Stang, to your knowledge,

Page 121

1   received the Kosnoff letter that was sent on
2   October 18th, 2021?
3       A.   I'm sorry.  I -- I didn't hear
4   your question.  Could you please repeat.  Sorry.
5       Q.   Sure.  The Kosnoff letter that was
6   attached to the communication sent out on the
7   BSASurvivors email on Friday, November 5th, and
8   Saturday, November 6th, had Mr. Stang, to your
9   knowledge, seen the letter since it was
10  previously sent by Mr. Kosnoff to his clients?
11      A.   I don't know.
12      Q.   Did you have any email or text
13  communications with Mr. Stang about the Kosnoff
14  email or the Kosnoff letter on Friday,
15  November 5th?
16      A.   No.
17      Q.   Okay.  If we scroll up, Mr. Phan,
18  upon receipt of your -- of your email says,
19  "Okay.  I started sending the emails.  I should
20  be able to remote in and make sure they're
21  sending from my laptop when I get home."
22          I'll represent to you, I don't
23  have a responsive email to that.
24          Do you know whether you responded
25  in any way to Mr. Phan?

Page 126

1  Q. Because you didn't have any
2  conversations with Mr. Kosnoff before you offered
3  the TCC's email address to resend the letter?
4  A. I offered to use our email, the
5  bsasurvivors@pszjlaw.com, and the software to
6  send out the letter.
7  Q. So in your conversation on
8  Saturday morning with Mr. Kosnoff, you tell
9  Mr. Kosnoff you're going to forward all the
10 responses; right?
11 A. Yes.
12 Q. And how were you going to execute
13 the forwarding of the responses?
14 A. Mr. Golden has access to the
15 inbox, I guess, the email box of
16 bsasurvivors@pszjlaw.com, and he was going to
17 bundle them up and send them to Tim.
18 Q. And did you have a conversation --
19 a phone conversation with Mr. Golden Saturday
20 morning?
21 A. Yes.
22 Q. And tell me everything you recall
23 from that phone conversation.
24 A. I told him that, you know -- well,
25 he had told me that we were getting, you know,

Page 127

1  responses regarding the transmission of the email
2  and the Kosnoff letter. And -- and I had told
3  him that I had talked Mr. Kosnoff and that we
4  were going to send the communications to him,
5  since they're in response to his letter and
6  email, and that we aren't responding to any of
7  them.
8  Q. Did you tell Mr. Golden not to
9  review any of the communications?
10 A. I did.
11 Q. Why did you tell him that?
12 A. Because they were communications
13 in response to Mr. Kosnoff's letter and email,
14 and those were -- those are Mr. Kosnoff's
15 clients. And so I think they were intended to be
16 a communication between the AIS clients and
17 Mr. Kosnoff.
18 Q. So -- and you would have thought
19 it would have invaded the attorney-client
20 privilege for a TCC lawyer to review those?
21 A. Yes. I was trying to preserve
22 the -- the confidentiality and the communication
23 between Mr. Kosnoff and his clients, just simple.
24 I was -- we had -- my firm had no intention of
25 responding to the communications. And I thought

Page 128

1  it was most appropriate if Mr. Kosnoff did that.
2  So there was no reason for us to review them.
3  Q. Right. But the issue was caused
4  entirely by you sending the Kosnoff email and the
5  Kosnoff letter from the BSASurvivors email
6  address right?
7  A. Yes.
8  Q. You wouldn't have been in the
9  middle of it if Mr. Kosnoff or AVA had just sent
10 those emails; right?
11 A. Yes.
12 Q. Did you talk to Mr. Stang before
13 12:05 Pacific Time on Saturday, November 6th?
14 A. Yes.
15 Q. What time did you speak with him?
16 A. In the morning, early in the
17 morning.
18 Q. Tell me about that conversation.
19 A. I told him that we were receiving
20 responses to the transmission of the email and
21 the Kosnoff letter; and we discussed that we
22 should, you know, bundle them up, so to speak, or
23 zip them up and send them to Mr. Kosnoff so that
24 he could respond since they're a response to his
25 letter. That was the extent of our conversation.

Page 129

1  Q. How long did it last?
2  A. Five to ten minutes. I don't
3  recall exactly.
4  Q. Did you talk about any other
5  subjects during that call?
6  A. Not that I can recall.
7  Q. Was it Mr. Stang's suggestion to
8  bundle up and send the emails to Mr. Kosnoff or
9  was it yours?
10 A. It was Mr. Stang's.
11 Q. And you agreed with that, of
12 course?
13 A. Yes.
14 Q. Were there any alternate
15 suggestions discussed?
16 A. No.
17 Q. And eventually Mr. Golden batched
18 up three sets of emails and sent them to
19 Mr. Kosnoff; correct?
20 A. Yes.
21 Q. And there were approximately 450
22 to 500 emails that went to Mr. Kosnoff?
23 A. I don't know the number.
24 Q. And as you sit here today, do you
25 have any idea which of those emails were from AIS

Page 130

1  clients, which of those emails were from clients
2  of other lawyers, and which of those emails were
3  from unrepresented survivors?
4         A.    I -- I don't know; however --
5  because I haven't looked at the emails.
6         Q.    Right.  So you have no way of
7  knowing?
8         A.    No, that's not true.
9         Q.    Okay.  You have a way of knowing?
10        A.    Yes.
11        Q.    And what -- what way -- how could
12 you know that?
13        A.    If I looked at the emails and I
14 determined which list the email was on.  And if
15 it was not the Kosnoff list, I could determine
16 that it was one of Mr. Kosnoff's clients.
17        Q.    Has Pachulski gone through that
18 exercise?
19        A.    No, because I have not looked at
20 the emails that were sent, zipped, and sent to
21 Mr. Kosnoff.
22        Q.    Has Pachulski reached out to
23 Mr. Kosnoff and said, Tim, you may have received
24 emails from people other than from your clients.
25 Do not open?

Page 131

1         A.    No, I don't believe so.
2         Q.    Has Pachulski sought ethics advice
3  on whether a communication like that is
4  appropriate here?
5         A.    I don't understand the question.
6  What communication?  I'm sorry.  I'm just not
7  sure --
8         Q.    About whether you should tell
9  Mr. Kosnoff not to open the 500 emails that you
10 forwarded to him, because some of them may not be
11 from his clients and, in fact, may be from
12 clients who are represented by other lawyers.
13              MR. KORNFELD:  Objection as to
14    form.
15        A.    Mike, I'm sorry.  I'll have to ask
16 you to ask the question again.  I lost track of
17 it.  I apologize.
18        Q.    Have you sought ethics advice on
19 the issue of whether a communication to
20 Mr. Kosnoff is appropriate now that your firm is
21 aware you have -- may have forwarded
22 communications to him that were from clients
23 represented by other lawyers?
24              MR. KORNFELD:  Objection as to
25    form.

Page 132

1         A.    No.
2         Q.    Let me show you what has been
3  marked as -- I'm sorry -- page 52 of Lucas
4  Exhibit -- Group Exhibit 1, please.
5               MS. KARCHMER:  Sorry.  You cut
6     out for a second.  Could you tell me the
7     page number again.
8               MR. ANDOLINA:  Yeah.  52, Leah.
9     Thank you.  That's the Phan -- so we want
10    to go to Lucas -- yeah.  Thank you.
11        Q.    This is an email from David Molton
12 to Mr. Stang, copying you, sent Saturday,
13 November 6th.  I believe if we translate UST,
14 it's 12:05 Pacific Time.
15              Do you recall receiving this
16 email?
17        A.    Yes.
18        Q.    When did you receive this email?
19        A.    I mean, whatever that time
20 translates to, that's when I received it.
21        Q.    Okay.
22        A.    I don't know if I read it at that
23 time.  But, I mean, I'm not disputing the time
24 stamp on it, but whatever that translates to.
25 Again, I don't know how to do the math or the --

Page 133

1  the hours, but presumably I received it at that
2  time.  I'm not disputing it.
3         Q.    Okay.  When did you read it?
4         A.    Around that afternoon, you know,
5  between, let's say, 12 and 1 o'clock.
6         Q.    Pacific Time.  Okay.
7         A.    Right.
8         Q.    This seems like a pretty serious,
9  alarming communication.
10              Do you agree?
11              MR. KORNFELD:  Objection as to
12    form.
13        A.    I read the communication.
14        Q.    And did you immediately reach out
15 to Mr. Stang?
16        A.    Mr. Stang and I talked after this
17 was -- was received.
18        Q.    On the Sunday?
19        A.    No.  On Saturday.
20        Q.    I'm sorry.  I apologize.  On
21 Saturday.  At what time?
22        A.    Probably within the hour after it
23 was received.  I don't know the exact time.
24        Q.    Just the two of you?
25        A.    Yes.

Page 142

1  we going to respond?
2      A.   I don't believe I did.
3      Q.   Did you call anyone else to raise
4  this issue?
5      A.   No.
6      Q.   As of noon, you were on notice
7  that a communication or at least some people
8  believe a communication is being sent on behalf
9  of the TCC from Mr. Kosnoff to people that he
10 does not represent, and you don't bother to
11 respond to multiple emails about the issue?
12         MR. KORNFELD:  Objection as to
13     form.  Again, is there a question?
14         MR. ANDOLINA:  There's a
15     question.
16         MR. KORNFELD:  No, there's not.
17     There's a statement.  There's no question.
18 BY MR. ANDOLINA:
19     Q.   Did you bother to respond,
20 Mr. Lucas?
21         MR. KORNFELD:  Objection as to
22     time.
23     A.   Mr. Stang was going to respond.
24     Q.   Do you know why Mr. Stang did not
25 write back?

Page 143

1      A.   No.
2      Q.   Did you think about reaching out
3  to Mr. Phan and saying, Hey, we've heard there
4  may be some issue with this email distribution.
5  Can you hold it?
6      A.   Yes.
7      Q.   But you didn't do that, did you?
8      A.   I did.
9      Q.   When?
10     A.   On Sunday morning.
11     Q.   On Sunday morning, 18 hours after
12 you're first on notice that there may be an
13 issue.  And all the emails had already been
14 distributed, right?
15         MR. KORNFELD:  Objection; vague
16     as to time.
17     A.   I researched out to Mr. Phan on
18 Sunday morning around 9:30 Pacific Time.
19     Q.   When you were receiving these
20 communications from Mr. Molton on Saturday, did
21 you consider reaching out to Mr. Phan?
22     A.   No, no.  On Saturday, no, I did
23 not.  I was under the impression that the emails
24 had only gone out to the email addresses on the
25 Kosnoff list, and -- and I'm telling you what I

Page 144

1  was under the impression.  Obviously, I was
2  wrong.
3      Q.   Well, at 4:11 Pacific Time,
4  Mr. Molton forwards an email that he got from the
5  list.  And both you and Mr. Stang know that
6  Mr. Molton is not a client of Mr. Kosnoff; right?
7      A.   Yes.
8      Q.   So by that point, you couldn't
9  have had the impression that it only went out to
10 the AIS list.  Why didn't you stop it?
11     A.   It was -- I didn't -- it wasn't
12 clear to me what had happened; and so as a
13 result, I didn't reach out to Mr. Phan.
14     Q.   And in any event, Mr. Stang was in
15 charge of the communications back to the
16 coalition at this point; correct?
17     A.   Yes.  He told me that he would
18 respond to Mr. Molton.
19     Q.   And is it fair to say that you
20 relied on him to make those communications?
21     A.   Yes.
22     Q.   If it was up to you, Mr. Lucas,
23 and you alone, when you received the email
24 communication at noon Pacific from Mr. Molton,
25 would you have taken some additional steps?

Page 145

1          MR. KORNFELD:  Objection as to
2      form.
3      A.   In hindsight, more immediate
4  action should have been taken.
5      Q.   And -- and because it wasn't
6  taken, all 20,000 email addresses got the Kosnoff
7  email and the Kosnoff letter; right?
8          MR. KORNFELD:  Objection as to
9      form.
10     A.   The email and the letter was sent
11 to all approximately 20,000 email addresses.
12     Q.   And as you sit here today do you
13 have any idea how many times that email and
14 letter were forwarded from those 20,000
15 recipients?
16     A.   No.
17     Q.   Has Pachulski done anything to try
18 to track that communication?
19     A.   Yes.
20     Q.   What have you done?
21     A.   On Sunday, November 7th, we sent
22 out a corrective email to the email addresses on
23 the TCC list telling them that it was a mistake
24 that it was sent and that it should be
25 disregarded -- I'm just paraphrasing it, but we

Page 170

1  believe you talked to Mr. Kosnoff that morning?
2      A.    I just -- I generally don't recall
3  if I did or not.
4      Q.    So you get a long text from him at
5  11:14.  What's that about?
6      A.    I don't know.  I mean, I have
7  since reviewed it and my focus at around that
8  time was dealing with the corrective
9  communication that was sent out.  That's what my
10 focus was on.
11     Q.    I've also seen an email that
12 Mr. Kosnoff sent to you and Mr. Golden with that
13 same text.  Have you seen this email?
14     A.    Yes.
15     Q.    Was it your understanding that
16 Mr. Kosnoff wanted you to distribute -- wanted
17 the TCC to distribute his response?
18     A.    He asked me that, and I told him I
19 would not do it.
20     Q.    When did he ask you that?
21     A.    He asked me that on -- I don't
22 know if he asked about this response right here,
23 but he asked me if I could help him respond.  And
24 I'm not certain if it was on Saturday.  As I
25 said, I don't recall talking to him on Sunday.

Page 171

1  I'm not saying that I didn't talk to him on
2  Sunday; I just don't recall.
3            But I had -- in one of my
4  conversations with him, I told him that I was not
5  in a position to do any responses.
6      Q.    Why not?
7      A.    Because on -- on -- on the one
8  hand -- and as I testified previously, it was, I
9  think, his responsibility to respond to his
10 clients because I was under the impression that's
11 who the communication and the email -- or the
12 letter was sent to.
13           And -- and, you know, and then
14 after I discovered that it was sent to those on
15 the TCC list also, my primary concern was getting
16 out something to help correct the inadvertent
17 communication.
18     Q.    Understanding that, was the
19 request that Mr. Kosnoff made before you had
20 realized that the communication had also gone to
21 the TCC list?
22     A.    I'm not certain.
23     Q.    If you look at page 45, this is a
24 follow-up email from your conversation with
25 Mr. Goldfarb on Saturday, November 6th; is that

Page 172

1  correct?
2      A.    Yes.
3            MR. KORNFELD:  Can we see
4  page 46, please.
5            MR. ANDOLINA:  Of course.
6            MR. KORNFELD:  Or the bottom
7  of -- starting at the bottom of 45.
8            MR. ANDOLINA:  Yeah.  46 is
9  different, but you can see the bottom
10 of -- of course, the bottom of 45.
11           MR. KORNFELD:  46 is a
12 different -- 46 is the whole -- the
13 whole --
14           MR. ANDOLINA:  Whole different
15 email, yep.  45 -- yep.
16           Looks like he's forwarding --
17 if you go down lower, he's forwarding the
18 corrective email that the TCC sent on
19 Sunday.
20     A.    Yeah.
21     Q.    And the corrective email went out
22 to only the TCC list?
23     A.    The email there on the bottom?
24     Q.    Yes.
25     A.    Yes, that's correct.

Page 173

1      Q.    So Mr. Goldfarb himself would have
2  been on the TCC list?
3      A.    I'm not sure whether or not
4  Mr. Goldfarb or not was on the TCC list.
5      Q.    I'm just looking at -- if you look
6  at the bottom, Mr. Lucas, it looks like --
7      A.    Yes.  Yeah.
8      Q.    -- he actually received it.
9      A.    Yes, I see it.  Yes, yes.
10     Q.    Did Mr. Goldfarb, when he
11 contacted you on Saturday, indicate that he
12 himself had received the Kosnoff email and the
13 Kosnoff letter?
14     A.    The conversation I had with him,
15 he conveyed to me that his clients were receiving
16 it.  And -- and we had discussed the -- his
17 firm's and the AIS firm's shared clients; and I
18 had presumed that that's why his clients were
19 receiving it.
20     Q.    Did he accept that assumption, or
21 did he push back on that?
22     A.    No, he did not push back -- he did
23 not push back on it, but he was -- he did ask, as
24 I testified earlier, if I was going to be sending
25 out another communication like this.