**<u>Exhibit 7</u>**

**Excerpts of Stang Deposition Transcript**



Transcript of the Testimony of

## JAMES STANG

November 24, 2021

## IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

JAMES STANG

```
 1              UNITED STATES BANKRUPTCY COURT

 2               FOR THE DISTRICT OF DELAWARE

 3                      -   -   -

 4    IN RE:                    : CHAPTER 11

 5    BOY SCOUTS OF AMERICA AND  : CASE NO.

 6    DELAWARE BSA, LLC,         : 20-10343 (LSS)

 7        Debtors.              : (Jointly Administered)

 8                      -   -   -

 9

10

11              Remote videotaped deposition of

12    JAMES STANG, held via videoconference on

13    Wednesday, November 24th, 2021, beginning at

14    approximately 9:00 Pacific Time, the proceedings

15    being recorded stenographically by Jennifer

16    Billstein-Miller, Registered Merit Reporter,

17    Certified Realtime Reporter, Certified Cout

18    Reporter-NJ, and transcribed under her direction.

19

20

21

22

23

24

25
```

ORIGINAL

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 50

```
 1          A.      No idea at all.
 2                  MR. ANDOLINA:  Let's go to
 3       page 6.
 4   BY MR. ANDOLINA:
 5          Q.      So this is an October 17th email
 6   from Mr. Kosnoff to Mr. Lucas attaching a draft
 7   letter that has come to be known as "the Kosnoff
 8   letter."
 9                  Are you familiar with the Kosnoff
10   letter, Mr. Stang?
11          A.      I'm aware it exists.  I've never
12   read it.
13          Q.      You've never read the letter that
14   you sent out to 20,000 people from the BSA
15   survivors' email address that your firm sent out?
16                  MR. KORNFELD:  Objection as to
17       the form of the question.
18                  THE WITNESS:  I have not read
19       the letter.
20   BY MR. ANDOLINA:
21          Q.      As a named partner in a law firm,
22   do you think you should have read a letter that
23   you sent to 20,000 people from the official tort
24   committee email address?
25                  MR. KORNFELD:  Objection as to
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 84

```
 1   it.
 2           Q.      Tell me what you remember
 3   generally.
 4           A.      That David was upset that we had
 5   communicated with people on the AIS list, and
 6   this was more of the same from his November 1st
 7   correspondence.
 8           Q.      Did you say that, or did Mr. Lucas
 9   say that?
10           A.      I don't remember.
11           Q.      And you told Mr. Lucas that you
12   would take care of responding to Mr. Molton,
13   right?
14           A.      Yes.
15           Q.      Did Mr. Lucas suggest maybe you
16   ought to respond and say, "No, the email only
17   went to AIS clients.  You're wrong"?
18           A.      Well, Mr. -- can you repeat the
19   question?
20                   MR. ANDOLINA:  The court
21      reporter can read it back.
22           (Record read as requested.)
23                   THE WITNESS:  I don't remember
24      if we discussed that in this call --
25
```

1    answer forthwith.  We reserve all rights."

2           Q.    Did you talk to Mr. Lucas after

3    8:20 p.m. on Saturday?

4           A.    As I said to you on several

5    occasions, I cannot remember the distinct phone

6    calls with Mr. Lucas.  I remember speaking with

7    him on Saturday.

8                 The conversations are kind of a --

9    what -- or kind of -- I think I used the word

10   "amalgamated" before.  And that's -- seeing this

11   email does not change that testimony.

12          Q.    Okay.  You read both the 4:11 p.m.

13   email and the 8:20 p.m. email at some point on

14   Saturday, right?

15          A.    Correct.

16          Q.    You also received a call from

17   Mr. Molton, correct?

18          A.    I did.

19          Q.    And did you answer it?

20          A.    No.

21          Q.    Why not?

22          A.    Because I thought David was,

23   again, angry, frustrated by the fact that I had

24   not complied with his demands of November 1st.

25   And I had answered his demands of November 1st in

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 95

1  a letter that cited legal authority and our

2  position.

3               And my understanding on Saturday

4  was that David was lashing out because we had not

5  complied with his November 1st demand.

6       Q.    And you didn't call Mr. Molton

7  back on Saturday, right?

8       A.    I didn't.  I think the -- I

9  called -- my telephone response to him was on

10  Sunday.

11      Q.    So you didn't call him on

12  Saturday?

13      A.    I don't recollect calling him.  I

14  may have.  But I don't recollect, sitting here

15  today, doing it.  But I do recollect my Sunday

16  conversation with him.

17      Q.    Okay.  Well, you just testified

18  that you ignored his call on Saturday because you

19  thought this was just a reprise of earlier

20  communications.

21               So in light of that, do you think

22  you actually called him on Saturday, Mr. Stang?

23      A.    I actually don't remember,

24  Mr. Andolina.

25      Q.    Okay.  And we'll get your phone

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 96

1    records for that.

2            A.      That's fine.

3            Q.      So if Mr. Lucas testified that you

4    tried to call Mr. Molton twice on Saturday and

5    that you told him that, that would not have been

6    an accurate comment, correct?

7            A.      My records -- my phone records

8    will have to speak for themselves.  I -- I don't

9    know what to say other than that.

10           Q.      Okay.  Did you -- did you lie to

11   Mr. Lucas, when you talked to him on Saturday,

12   that you tried to call Mr. Molton?

13           A.      I don't lie to people,

14   Mr. Andolina.

15           Q.      So he just must have not

16   recollected that conversation correctly?

17                   MR. KORNFELD:  Objection as to

18       the form of the question.

19                   THE WITNESS:  My phone record

20       will speak for themselves.  I'm telling

21       you what I remember and what I don't

22       remember.

23   BY MR. ANDOLINA:

24           Q.      Okay.

25           A.      And I don't lie to people.

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 97

```
 1            Q.     And you'll agree to produce
 2  your -- your phone and text records from
 3  Saturday, November 7th -- Saturday, November 6th?
 4                   MR. KORNFELD:  We're going to
 5       look at any discovery requests that you
 6       serve and respond to those discovery
 7       requests with an objection or objections.
 8                   And please serve whatever
 9       discovery requests you want to serve that
10       are relevant to the matters that are
11       before the Court.
12                   MR. ANDOLINA:  We served
13       requests for those texts, Mr. Kornfeld.
14       And you've taken the position that they're
15       somehow privileged.
16                   So those requests are out
17       there, and we can deal with that in motion
18       practice.
19                   MR. KORNFELD:  That's a
20       completely erroneous characterization of
21       our position.  So let's not argue a
22       discovery motion now.  Let's please move
23       on with the deposition.
24  BY MR. ANDOLINA:
25            Q.     So as of Saturday, November 6th,
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 98

1   you've had three emails and a phone call from

2   Mr. Molton.

3              And your recollection is the first

4   conversation you had with him is actually Sunday

5   morning, November 7th; is that right, Mr. Stang?

6        A.     Yes.

7        Q.     How long have you been practicing

8   for, Mr. Stang?

9        A.     Practicing law?

10       Q.     Yes.

11       A.     Since the fall of 1980.

12       Q.     Is it your experience that when a

13  counsel on a case that you're working on tries to

14  reach out to you as many times as Mr. Molton did,

15  that the issue is typically not urgent?

16             MR. KORNFELD:  Objection to the

17       form of the question.

18             THE WITNESS:  It may have been

19       urgent to Mr. Molton.

20             But based on what I understood

21       had happened, based on his November 1st

22       letter and my response and my general

23       understanding of Mr. Molton's personality

24       and that when he thinks something is

25       urgent, it is, therefore, urgent, I

1   shouldn't read them?

2          A.     I have not communicated with

3   Mr. Kosnoff in any way, shape, or form since the

4   time that we discussed earlier today.

5          Q.     Has the Pachulski firm reached out

6   to Mr. Kosnoff and raised that issue of sending

7   450 emails to him that may or may not be from

8   clients represented by other lawyers?

9          A.     I don't think so.

10         Q.     You think you ought to have that

11   communication with Mr. Kosnoff?

12                MR. KORNFELD:  Objection as to

13      the form of the question.

14                We're in litigation now.  Other

15      lawyers have made various threats against

16      our firm.

17                I'm going to instruct him not

18      to answer on work product grounds.

19   BY MR. ANDOLINA:

20         Q.     Do you think Mr. Kosnoff is

21   someone who can be trusted with information?

22                MR. KORNFELD:  Objection as to

23      the form of the question.

24                THE WITNESS:  I don't

25      understand -- well, if information is --

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 154

```
 1      now.
 2   BY MR. ANDOLINA:
 3           Q.      So you believe, your testimony
 4   today, that it was improper for the TCC BSA
 5   survivors' email address to be used even to send
 6   the Kosnoff email and Kosnoff letter to the AIS
 7   client list is consistent with the positions that
 8   Pachulski is taking before the Court?
 9                   MR. KORNFELD:  Objection.
10      Vague.  Objection to the form.
11                   THE WITNESS:  That's a
12      mouthful, Mr. Andolina.
13   BY MR. ANDOLINA:
14           Q.      Okay.  We can read it back if you
15   want.
16           A.      No.  No.  But I can answer.
17                   We are on the record -- comments
18   that Ms. Grassgreen has made, comments that
19   Mr. Pachulski has made to the Court about -- that
20   our conduct -- that our actions were a mistake.
21   There have been other adjectives used to describe
22   it.  I'm not walking away from those.
23                   But -- and we said what we said.
24   But it was a mistake.  We should not have done
25   it.  We've apologized for it.  We've done that
```

1    more than once.

2              And so I -- I don't have a better

3    response to you than that.

4         Q.    Okay.  I agree with you that the

5    record is what it is, so I won't -- I won't

6    belabor the point.

7              I just think there's been some

8    inconsistency, and we'll -- as you said, the

9    record is what it is, Mr. Stang.  I appreciate

10   that.

11             Do you believe that the -- the

12   Pachulski firm breached its fiduciary duties to

13   the TCC by emailing the Kosnoff email and Kosnoff

14   letter to the AIS survivor list?

15        A.    No, I do not.

16        Q.    Do you believe the TCC breached

17   its fiduciary duties by emailing the Kosnoff

18   email and Kosnoff letter to the TCC survivor

19   list?

20             MR. KORNFELD:  Objection.

21        Objection to the form of the question.

22             THE WITNESS:  The email -- the

23        communications from Mr. Kosnoff were

24        transmitted by my law firm using that

25        email address.  The TCC expect -- the TCC

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 168

 1    17th.

 2            Q.      When did you first become aware of

 3    the fact that Mr. Lucas revised that letter?

 4            A.      At the time that he was making the

 5    revisions.

 6            Q.      So on or around October 17th?

 7            A.      Yes.

 8            Q.      And how did you become aware of

 9    that fact?

10            A.      At about that time, he told me

11    that he was making some revisions to a letter

12    that Tim was preparing.

13            Q.      Was that in a phone call or an

14    email?

15            A.      I believe it was a phone call.

16            Q.      And what do you recall him saying,

17    and how did you respond?

18            A.      It's been a while.  But my general

19    recollection is that he said that Tim had

20    prepared an email -- I'm sorry -- a letter that

21    was going to go out to his clients describing his

22    position on the plan; that it was -- it had some

23    inaccuracies in it, which he had not -- it had

24    some inaccuracies in it; that it could have been,

25    therefore, more effective if those inaccuracies

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 169

1  were corrected; and that he was going -- he had

2  been or was going to do it.

3              And my response was, "Okay."

4      Q.      And did he share with you the

5  alleged inaccuracies in the original draft of the

6  Kosnoff letter?

7      A.      I don't remember him telling me

8  the specifics.

9      Q.      Did he share with you his proposed

10 revisions?

11     A.      No.

12     Q.      Did you ask if you could see the

13 changes that he was making to the letter?

14     A.      No.

15     Q.      Were others at Pachulski aware

16 that Mr. Lucas was editing the Kosnoff letter?

17     A.      I don't know.

18     Q.      After that conversation on or

19 about October 17th, when was the next time --

20 strike that.

21              Did you, at some point, learn that

22 the Kosnoff letter had been distributed to

23 Mr. Kosnoff's clients?

24     A.      Yes.

25     Q.      When did you learn that?

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 210

1        A.        I don't believe we did.

2        Q.        Okay.  So back to -- back to the

3   narrative of your conversation with Mr. Kehr.

4        A.        So I got -- we received

5   Mr. Molton's November 1st letter.  And I felt

6   that it was important for Mr. Kehr to advise us

7   as to whether that -- that letter constituted a

8   change in circumstances that would cause him to

9   reconsider his advice.

10                 So when I spoke with him, I

11  said -- it was the first conversation -- I think

12  it was the first conversation I've ever had with

13  the man.

14                 I said to him, "In prior

15  communications that you had had with our office,

16  we had one person saying 'yes' and no

17  communication from the other two," the other two

18  being Mr. Van Arsdale or Eisenberg Rothweiler.

19  "But now we've got one saying 'yes' and one

20  saying 'no.' So does that change your advice?"

21                 And he asked me some questions

22  about -- more specifically about what those

23  communications were like and how did they come

24  about, how did we get told the no.

25       Q.        I'm sorry.  When you say "more

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 217

1  the Kosnoff communications, either of those

2  issues on the November 11th town hall?

3        A.    I don't remember them.  And if we

4  did discuss it, it was probably more in passing

5  than anything else.

6        Q.    Okay.  Is there a reason that that

7  issue was not raised on November 11th?

8              MR. KORNFELD:  I'm going to

9        instruct him not to answer both on work

10       product and possibly on attorney-client

11       grounds.

12             We were -- we were defending a

13       motion, i.e., litigation at that time.

14  BY MR. ANDOLINA:

15       Q.    Do you think the events that have

16  transpired with respect to the Kosnoff email and

17  the Kosnoff letter and the impact that their

18  dissemination has had are events that the TCC

19  should share with survivors?

20             MR. KORNFELD:  I'm going to

21       instruct him not to answer that on the

22       grounds it relates to attorney-client

23       communications, it relates to work

24       product.

25             And would note, for the record,

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 218

1          that all of the litigation pleadings that

2          have been filed -- and at this point,

3          they're a good number, taking into account

4          all the parties that have filed litigation

5          pleadings -- are publicly on the Court's

6          docket.

7     BY MR. ANDOLINA:

8          Q.      Mr. Stang, do you expect survivors

9     to be checking the Court's docket on a regular

10    basis for information about this case?

11                 MR. KORNFELD:  Objection as to

12         form.

13                 THE WITNESS:  Do I expect them

14         to?  I -- I don't have an expectation one

15         way or another.

16                 I think people do look at the

17         docket, but I don't -- I don't have an

18         expectation that they will.

19    BY MR. ANDOLINA:

20         Q.      What's the purpose of the TCC's

21    town hall meetings?

22         A.      To provide information to the

23    TCC's constituency.

24         Q.      Does that information include

25    updates on the status of the case?

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 219

1          A.        On what we consider to be material

2    and important to survivors, yes.

3          Q.        Okay.  Does the TCC -- does the

4    Pachulski firm consider the debtors' emergency

5    motion and the issues raised by the Kosnoff

6    communications to be material and important?

7                    MR. KORNFELD:  I'm going to

8          object on the grounds of work product.

9          And certainly we have filed pleadings,

10         this witness has testified.

11                   And we consider those events

12         that are discussed in connection with the

13         Kosnoff letter to be important.  But

14         getting into our work product at this

15         point in time, given litigation that is

16         going on, is inappropriate.

17                   And on those grounds, I will

18         instruct you not to answer.

19   BY MR. ANDOLINA:

20         Q.        On the November 18th town hall,

21   you did not appear, correct?

22         A.        I did not appear.

23         Q.        No Pachulski lawyer appeared,

24   correct?

25         A.        Correct.  Well, Mr. -- I --

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 220

1   Mr. Golden was in the background doing the

2   technical part of it, but no Pachulski lawyer

3   appeared on the screen.

4          Q.     And no Pachulski lawyer said

5   anything on that update?

6          A.     Correct.

7          Q.     And there was no mention during

8   that town hall of the hearing on November 10th or

9   the hearing on November 12th or the hearing on

10  November 17th, correct?

11         A.     Correct.  I did watch the video

12  after the fact, but I don't recollect there being

13  any mention.

14                But as I said before, they're

15  recorded, they're posted.  And if I am wrong, I

16  missed it.  But I don't think there was.

17         Q.     A survivor -- well, let me just --

18  let me show you the document.

19                Let's turn to page 46, please, of

20  the Lucas exhibit.

21                So this is an email from a

22  redacted email address.  I believe that's because

23  it is from a survivor.  It was produced by your

24  firm, Mr. Stang.

25         A.     Okay.  Is there a question?  Are

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

JAMES STANG

Page 221

1    you asking me if it was?

2            Q.      No.  I'm just giving you the

3    background, and I'm going to ask you a few

4    questions.

5            A.      Okay.

6            Q.      In -- at the beginning of the

7    fifth paragraph -- this is in reference to the

8    Kosnoff communications, this email.

9                    And feel free to read it, if you'd

10   like, before you answer.

11                   But the survivor writes, "That

12   fiasco should have been addressed last Thursday,

13   and it most certainly should have been addressed

14   this evening."

15                   Do you agree with the survivor's

16   statement, Mr. Stang, that the fiasco of the

17   Kosnoff communications should have been addressed

18   at the TCC's town halls?

19                   MR. KORNFELD:  I'm going to

20       object on the grounds of work product and

21       instruct the witness not to answer for the

22       same reasons I outlined in my prior

23       objections on this subject matter.  We're

24       in litigation now.

25