# Exhibit 10

**Excerpts of Golden Deposition Transcript**



Transcript of the Testimony of

**STEPHEN GOLDEN**

November 21, 2021

**IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

```
 1
 2              UNITED STATES BANKRUPTCY COURT
 3                FOR THE DISTRICT OF DELAWARE
 4                        -  -  -
 5   IN RE:                      : CHAPTER 11
 6   BOY SCOUTS OF AMERICA AND   : CASE NO.
 7   DELAWARE BSA, LLC,          : 20-10343 (LSS)
 8        Debtors.               : (Jointly Administered)
 9                        -  -  -
10
11
12              Remote videotaped deposition of
13   STEPHEN GOLDEN, held via videoconference on
14   Sunday, November 21, 2021, beginning at
15   approximately 12:09 p.m. Eastern Standard Time,
16   the proceedings being recorded stenographically
17   by Gail Inghram Verbano, Registered Diplomate
18   Reporter, Certified Realtime Reporter, Certified
19   Shorthand Reporter-CA (No. 8635), and transcribed
20   under her direction.
21
22                         COPY
23
24
25
```

Page 14
1  that I did not click the unpin button prior to
2  the town hall opening.
3       Q.    And the town hall meeting itself
4  on November 18th was -- was very short, about
5  10 minutes; right?
6       A.    That's correct.
7       Q.    And how did the length of that
8  meeting compare to the other five or six meetings
9  that you participated in?
10      A.    It was short.
11      Q.    How long were the other meetings?
12      A.    Generally about an hour long.
13      Q.    And during the November 18th
14 meeting, Dr. Kennedy said it would be a short
15 meeting because there hasn't been a lot of
16 developments.
17            Do you recall that, when
18 Dr. Kennedy said that?
19      A.    I do.
20      Q.    Do you agree with the
21 characterization that over the last week, there
22 hasn't been a lot of developments?
23            MR. KORNFELD:  Objection;
24   vague.
25      Q.    You can answer.

Page 15
1       A.    I don't know whether there were or
2  weren't a lot of developments in the case over
3  the past week.
4       Q.    You don't know that?
5       A.    I have not been participating
6  in -- I had not participated in any hearings or
7  anything of that nature for about a week prior to
8  the Thursday town hall.
9       Q.    Okay.  You knew that there's a
10 hearing before Judge Silverstein on
11 November 12th and November 17th; right?
12 You're aware those hearings occurred?
13      A.    12 -- yes, I'm aware that there
14 were hearings on those dates.
15      Q.    Okay.  And were those developments
16 that survivors should have been told about?
17            MR. KORNFELD:  Objection; calls
18   for speculation.
19      Q.    You can answer.
20      A.    I don't know what occurred on
21 those hearings, so I don't know whether or not
22 they were notable or otherwise.
23      Q.    Well, one of the things that
24 occurred was that your deposition was scheduled;
25 right?

Page 16
1       A.    Yes.  It was scheduled about a
2  week ago today; correct.
3       Q.    And there were three other
4  depositions, including in addition to yours, of
5  Pachulski lawyers and employees; right?
6  Scheduled.
7       A.    That is my understanding, yes.
8       Q.    And you were aware of that.
9       A.    Yes, I'm aware that.
10      Q.    And do you think it's a notable
11 development that three lawyers and a staff member
12 from the Pachulski firm were going to be deposed
13 in connection with the Kosnoff communications.
14            MR. KORNFELD:  Objection; vague
15   and calls for speculation.
16      Q.    You can answer.
17      A.    I -- I don't understand what you
18 mean by "notable," nor do I -- nor do I think it
19 is fair for me to say what -- what is and is not
20 notable for the purpose of a town hall meeting
21 that I did not plan.
22      Q.    Okay.  Do you think that the
23 development that four Pachulski representatives
24 were going to be deposed was a development
25 survivors should have been told about?

Page 17
1            MR. KORNFELD:  Objection; calls
2    for speculation.
3       Q.    Answer the question.  Answer the
4  question, and, Mr. Kornfeld, we're getting into
5  speaking objections now.
6       A.    I -- you're asking me to speculate
7  as to whether or not something should or should
8  not have been -- is notable or should have been
9  said in a -- in a context that I don't -- I have
10 not been asked to look at that issue.  I have not
11 been asked to opine on that.  And so I -- I'm --
12 I don't think it is something that would be
13 appropriate for me to do.
14      Q.    Well, if you were a survivor that
15 was being informed by the TCC of developments,
16 would you want to know that the lead lawyers who
17 had been representing you for two years were
18 being deposed in connection with communications
19 that they distributed?
20            MR. KORNFELD:  Objection; calls
21   for speculation.
22      A.    I -- I am not a survivor.  I don't
23 know what -- I cannot speculate as to whether a
24 survivor would or would not expect or want to
25 know that a deposition was scheduled of an

Page 62

1  A. I'm not sure what you mean by the
2 word "endorse." I don't see anything in this
3 email that does or does not endorse -- does or
4 does not express the TCC's endorsement of a
5 Twitter account.
6  Q. Is there a comment from the TCC
7 anywhere in this document that says, This is an
8 email from Mr. Kosnoff, we do not adopt
9 Mr. Kosnoff's views?
10  A. There is no sentence in this email
11 like that, no.
12  Q. In fact, the email is a direct
13 communication from Mr. Kosnoff; right?
14     MR. KORNFELD: Objection;
15   vague.
16  A. It reads that way, yes.
17  Q. And that's why you were getting
18 inundated with responses to Tim, and that's why
19 you called Mr. Lucas and Mr. Stang; right?
20     MR. KORNFELD: Objection;
21   vague.
22  A. I don't know if we were -- we were
23 inundated with responses that said, Dear Tim. We
24 certainly got some, but there were responses to
25 the email as a general matter. What the content

Page 63

1 of the majority of those emails said or who they
2 were addressed to, I don't know.
3  Q. Okay. And there were more than
4 500 responses that you've gotten; right?
5  A. I think that's correct, yes.
6  Q. And you batched them up, and then
7 you were instructed to send them to Mr. Kosnoff;
8 right?
9  A. I was instructed to send them to
10 Mr. Kosnoff, and because of the rate at which
11 replies were coming in, as in they did not all
12 come in at once, they were -- I did send them in
13 batches, yes.
14  Q. So anything else in this
15 conversation on Saturday morning with Mr. Lucas
16 that you remember?
17  A. I believe Mr. Lucas said that, you
18 know, We will -- we'll -- let me call Tim first
19 to tell him about these emails that we're
20 getting, and I'll let you know what we should do.
21  Q. He was going to take instruction
22 from Mr. Kosnoff, then he was going to relay that
23 instruction to you?
24     MR. KORNFELD: Objection;
25   misstates the testimony.

Page 64

1  A. I don't know that he was going to
2 take instruction, but he was going to talk to
3 Mr. Kosnoff and then let me know the results of
4 that conversation.
5  Q. And did he let you know the
6 results of that conversation?
7  A. By email, yes.
8  Q. Okay. And what -- what was the
9 result of the conversation he let you know by
10 email?
11  A. The email was -- it was an email,
12 I believe, to myself and to Mr. Kosnoff saying,
13 Steve, you know, go ahead and send those emails
14 to Mr. Kosnoff.
15  Q. Had there ever been a -- any
16 communication sent from the BSASurvivors email
17 that only went to a subgroup?
18     MR. KORNFELD: Objection;
19   vague.
20  A. I don't know.
21  Q. And you understand what I mean by
22 "subgroup"; right?
23  A. I understood your question to be
24 asking whether -- if there was a list of X number
25 of email addresses, that it would go to some

Page 65

1 amount less than X of those email addresses, and
2 the answer to that is I don't know whether that
3 is or is not the case.
4  Q. And who would know that?
5  A. Prior to the sending of the
6 Kosnoff email on -- on or -- I guess it was on
7 the 5th, it would be John Lucas.
8  Q. And who would know that now?
9  A. I don't know.
10  Q. When was the last time you talked
11 to Mr. Lucas?
12  A. I think I would have last talked
13 to Mr. Lucas earlier in this past week, Monday or
14 Tuesday maybe.
15  Q. Was it an in-person conversation
16 or by phone?
17  A. It was by phone. We are on
18 different time zones.
19  Q. I understand that. People travel.
20 What did you talk about?
21     MR. KORNFELD: Okay. I'm going
22   to let you answer as to the general
23   subject matter, but caution you not to go
24   further than that.
25     And it's a privilege caution

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

STEPHEN GOLDEN

Page 82
1    Q.    Okay.  Fair enough.  I understand
2  the consternation in that regard.
3          And I saw you're a rising star
4  this fall, so congratulations on that.
5    A.    Thank you.  I don't know why I
6  deserve that, but I appreciate the accolades
7  nonetheless.
8    Q.    It's quite an honor, it really is.
9          So the sort of -- the messaging
10 to, you know, halt the forwarding was something
11 that you actually affirmatively raised to
12 Mr. Lucas?
13   A.    Correct.
14   Q.    Okay.  And before that time, when
15 you kind of raised your hand, no one, not
16 Mr. Stang, not Mr. Lucas, no one else at
17 Pachulski, had reached out and said, Hold on,
18 stop the forwarding to Mr. Kosnoff?
19   A.    That's correct.
20   Q.    And as I understand it, there is a
21 current batch of responses to the Kosnoff
22 communications that are sort of in a holding pen
23 at Pachulski.  And I think that's probably a bad
24 way to describe it, but they've been segregated
25 and neither reviewed by the Pachulski firm, nor

Page 83
1  sent to Mr. Kosnoff?
2    A.    That is correct.  And to give you
3  just slightly more context, as I mentioned
4  earlier, what would occur when there was a Re: --
5  I'm looking at the title -- Boy Scouts message
6  from Tim Kosnoff email, I would immediately put
7  it into a subfolder, so it would be -- I would
8  not be able to view it.
9          Unless I affirmatively did
10 something, it would be out of the general
11 population; and after sending, as you termed it,
12 batches to Mr. Kosnoff, I would mark the fact
13 of -- I would basically mark them, I think, with
14 a, quote/unquote, yellow category, which was just
15 my way of saying these have been sent to
16 Mr. Kosnoff.
17         And then, thus, subsequently, you
18 know, even as emails come in -- came in
19 afterwards, I would put it in the same folder,
20 but they would not be labeled "yellow" category
21 and, therefore, would never have been sent to
22 Mr. Kosnoff.
23   Q.    I see.  And when you say "yellow
24 category," did you put a -- did you like check
25 the flag, or how did you connotate those?

Page 84
1    A.    It's -- in Outlook, there is an
2  ability to call something a category, like in --
3    Q.    Right, right.
4    A.    In mine, I have -- for my
5  calendar, I have, you know, personal category,
6  whatever.  You know, I did a similar thing, but
7  it was just I decided on one color, and I think
8  yellow was the one I saw first.
9    Q.    Okay.  So segregate them as they
10 come in into a subfolder.  Then as they're
11 forwarded to Mr. Kosnoff, they're marked --
12 they're categorized as yellow for distributed?
13   A.    Correct.
14   Q.    So there's a remaining category
15 that is not marked yellow but that is in the
16 subfolder right now?
17   A.    That's exactly correct.
18   Q.    Got it.  Okay.
19         And of those -- and there's about,
20 I think, 500 plus that are yellow based on your
21 privilege log that we saw yesterday; does that
22 sound like about a right estimate?
23   A.    That sounds about correct.  I
24 don't remember the exact number, but if that's
25 what was in the log, then that would be correct.

Page 85
1    Q.    Okay.  And of that 500, as you sit
2  here today, you have no idea how many are
3  responses from Kosnoff clients, responses from
4  clients of other lawyers, or responses from
5  unrepresented survivors?
6    A.    That is correct.
7    Q.    Okay.  And Mr. Kosnoff got all 500
8  of those emails that you sent out?
9    A.    Correct.  He received all of the
10 three batches, whatever number that was, that I
11 had not reviewed prior.  That's correct.
12   Q.    Got it.
13         Let me just show you a couple of
14 emails kind of reflecting the batching
15 communications.  Let's look at page 50 and 51 of
16 the PDF, please.
17   A.    You said 50 and 51?
18   Q.    Yeah.
19   A.    Yes, I see that one.
20   Q.    Okay.
21   A.    Okay, I'm there.
22   Q.    So take a look at page 51 first.
23 It's an email from Mr. Lucas to you on
24 November 6th at 1:37 p.m.
25         Is that -- is the timing on the

Page 126

1  been an email is protected.  Is your
2  position that the fact that there's an
3  email, that it exists, it is protected?
4            MR. KORNFELD:  I think
5  you're -- you're getting into the line on
6  work product and what the firm is doing in
7  connection with its communications
8  internally.  So I'm going to instruct him
9  that what we're doing internally is not a
10 subject that I'm going to allow him to
11 testify on.
12           I'll consider your objection;
13 and I suggest you ask it at other
14 depositions of -- of -- witnesses, and
15 we'll see where we are then.
16      Q.   Are you going to take your
17 lawyer's advice and refuse to answer my question?
18      A.   Yes, I will.
19           MR. ANDOLINA:  Okay, we've gone
20 another -- about an hour.  Let's take
21 another 10-minute break.  I don't think I
22 have too much more, Mr. Golden, but let's
23 take 10 minutes.
24           THE WITNESS:  Sure.  Thank you.
25           MR. KORNFELD:  Okay.

Page 127

1            THE VIDEOGRAPHER:  We're off
2  the record.  The time is 11:56 Pacific
3  time, 2:56 Eastern time.
4                - - -
5       (Whereupon, a short recess was taken.)
6                - - -
7            THE VIDEOGRAPHER:  We're back
8  on the record.  The time is 12:06 Pacific,
9  3:06 Eastern time.
10 BY MR. ANDOLINA:
11      Q.   Mr. Golden, we talked earlier
12 about your role during the TCC town halls.  Can
13 you describe the difference between Q&A and
14 commenters?  You referenced that earlier.
15      A.   My understanding is that the Q&A
16 function -- let me actually do it the opposite
17 way.
18           My understanding is in the -- in
19 Zoom, there's a chat function.  For instance, I
20 see from this Zoom that there is a chat function
21 where at least six individuals have made a
22 comment, which is available to everybody
23 automatically, and so everybody can -- can read
24 it and see who says it.
25           The Q&A function is a function

Page 128

1  where somebody can type in a question and it is
2  only visible -- I believe -- I believe the
3  response and the question are only visible if it
4  is, in fact, responded to.
5       Q.   I see.  So you will get a bunch of
6  questions; and then the lawyers would decide what
7  questions we're going to respond to; and then
8  once you decide to respond, both the question and
9  the answer would be visible to those viewing the
10 town hall?
11      A.   Not necessarily.  It would not --
12 in the first instance, there is -- the lawyers
13 would not decide who would respond.  It would be
14 if somebody responded -- as I mentioned, that can
15 include Mr. Kennedy -- I'm sorry, Dr. Kennedy,
16 and Mr. Humphrey.  They would -- they could
17 respond to -- there was no screening, respond to
18 this, don't respond to this, or anything of that
19 nature.
20           There was also -- you could
21 respond only to that person.  I don't know the
22 extent to which people other than me would click
23 that option.  But that is an option in the Zoom
24 Q&A.
25      Q.   I guess I'm -- okay.  So how --

Page 129

1  during the town halls, how do you decide who was
2  going to respond to what question?
3       A.   There was no decision.  What
4  occurs in the Q&A function is that if
5  somebody -- you know, let's say Mr. Kornfeld and
6  I are responding -- you know, are doing the
7  responses to Q&As, and Mr. Goodman, just because
8  I see his picture, poses a question, you know,
9  "How are you today," then what would happen is if
10 Mr. Kornfeld were to start responding, it would
11 say, "Alan cornfield is typing."  So in that
12 instance, I then would not type an answer to that
13 question.
14           However, if there was a -- there
15 was no such, you know, "Alan Kornfeld is typing,"
16 I might then answer that question.
17      Q.   I see.  So how does that differ
18 from the chat?
19      A.   The chat function, as I understand
20 it, is a -- it's almost more akin to a chatroom
21 where everybody can talk to everybody, everybody
22 sees everything; and it's -- it's less of a
23 question-and-answer, and, in fact, I believe,
24 in -- in Zoom you cannot directly respond to
25 somebody's chat question, it's just a chatroom.