```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3   IN RE:                       .  Chapter 11
                                  .  Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND     .
     DELAWARE BSA, LLC,            .  (Jointly Administered)
 5                                 .
                                  .  Courtroom 2
 6                                 .  824 Market Street
               Debtor.            .  Wilmington, Delaware 19801
 7                                 .
                                  .  Monday, November 29, 2021
 8   . . . . . . . . . . . . . . .  2:03 p.m.

 9                    TRANSCRIPT OF ZOOM HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Derek C. Abbott, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                             1201 North Market Street
                               16th Floor
14                             Wilmington, Delaware 19899

15                             -and-

16                             Jessica C. Lauria, Esquire
                               WHITE & CASE LLP
17                             1221 Avenue of the Americas
                               New York, New York 10020
18

19   (APPEARANCES CONTINUED)

20   Electronically
     Recorded By:              Lisa Brown, ECRO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the Baltimore Area
   Council Boy Scouts
3  of America, Inc.:          Todd M. Brooks, Esquire
                              WHITEFORD, TAYLOR & PRESTON, LLP
4                             7 Saint Paul Street
                              Baltimore, Maryland 21202
5
   For the Cradle of
6  Liberty Council of the
   Boy Scouts of America:     Jeffrey A. Lutsky, Esquire
7                             STRADLEY RONON STEVENS & YOUNG, LLP
                              2005 Market Street
8                             Suite 2600
                              Philadelphia, Pennsylvania 19103
9
   For the National
10 Capital Area Council:      Kevin G. Collins, Esquire
                              BARNES & THORNBURG, LLP
11                            1000 North West Street
                              Suite 1500
12                            Wilmington, Delaware 19801

13 For American Zurich
   Insurance Company:         Kelly T. Currie, Esquire
14                            CROWELL & MORING, LLP
                              590 Madison Avenue
15                            20th Floor
                              New York, New York 10022
16

17 For Versus, LLC:           Rasmeet K. Chahil, Esquire
                              LOWENSTEIN SANDLER, LLP
18                            One Lowenstein Drive
                              Roseland, New Jersey 07068
19
   For Century Indemnity
20 Company:                   Tancred Schiavoni, Esquire
                              O'MELVENY & MYERS, LLP
21                            Times Square Tower
                              7 Times Square
22                            New York, New York 10036

23
   For AVA Law Group, Inc:    Joseph Grey, Esquire
24                            CROSS & SIMON, LLC
                              1105 North Market Street
25                            Suite 901
                              Wilmington, Delaware 19801

1   <u>APPEARANCES (CONTINUED)</u>:

2   For the Tort
    Claimants' Committee:       Richard M. Pachulski, Esquire
3                               PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Boulevard
4                               13th Floor
                                Los Angeles, California 90067
5
    For Timothy Kosnoff,
6   Interested Party:           David E. Wilks, Esquire
                                WILKS LUKOFF & BRACEGIRDLE, LLC
7                               4250 Lancaster Pike
                                Suite 200
8                               Wilmington, Delaware 19806

9   For Eisenberg,
    Rothweiler, Winkler,
10  Eisenberg & Jeck, PC:       Daniel K. Hogan, Esquire
                                HOGAN MCDANIEL
11                              1311 Delaware Avenue
                                Wilmington, Delaware 19806
12
    For the Future
13  Claimants'
    Representative:             Robert S. Brady, Esquire
14                              YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                The Brandywine Building
15                              1000 West Street
                                17th Floor
16                              Wilmington, Delaware 19899

17  For The Zalkin Law
    Firm, PC, and Pfau
18  Cochran Vertetis
    Amala, PLLC:                Thomas E. Patterson, Esquire
19                              KTBS LAW, LLP
                                1801 Century Park East
20                              26th Floor
                                Los Angeles, California 90067
21

22  For the Coalition of
    Abused Scouts for
23  Justice:                    David J. Molton, Esquire
                                BROWN RUDNICK, LLP
24                              Seven Times Square
                                New York, New York 10036
25

1  APPEARANCES (CONTINUED):

2  For the Ad Hoc
   Committee of Local

3  Councils of the Boy
   Scouts of America:          Richard G. Mason, Esquire

4                              WACHTELL, LIPTON, ROSEN & KATZ
                               51 West 52nd Street

5                              New York, New York 10019

6  For the US Trustee:         David L. Buchbinder, Esquire
                               OFFICE OF THE UNITED STATES TRUSTEE

7                              J. Caleb Boggs Federal Building
                               844 King Street

8                              Suite 2207, Lockbox 35
                               Wilmington, Delaware 19801

9
   For Andrews & Thornton

10 and ASK, LLP:               Lawrence S. Robbins, Esquire
                               ROBBINS, RUSSELL, ENGLERT,

11                               ORSECK & UNTERRINER, LLP
                               2000 K Street, NW

12                             4th Floor
                               Washington, DC 20006

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX

2  MOTIONS:                                              PAGE

3  Agenda
   Item 1:   Motion of Marc J. Bern & Partners LLC to          14
4            Quash Subpoena to Produce Documents Issued
             to KLS Legal Solutions LLC
5            (D.I. 6380, filed 9/27/21).

6  Agenda
   Item 2:   Letter to the Honorable Chief Judge Laurie        14
7            Selber Silverstein Seeking an Order Compelling
             Verus LLC to Comply with a Subpoena
8            (D.I. 6813, filed 10/27/21).

9  Agenda
   Item 3:   Letter to the Honorable Chief Judge Laurie        18
10           Selber Silverstein from Kelly T. Currie
             Regarding Insurers' Omnibus Motion to Compel
11           Kosnoff Law PLLC, AVA Law Group, Napoli
             Shkolnik, PLLC, Krause & Kinsman Law Firm,
12           Andrews & Thornton, Attorneys at Law, and ASK
             LLP to Respond to Document Requests and
13           Interrogatories (D.I. 7239, filed 11/15/21).

14           Court's Ruling:                                   87

15 Agenda
   Item 4:   Letter to the Honorable Chief Judge Laurie         7
16           Selber Silverstein from Tancred Schiavoni
             Seeking an Order Compelling Baltimore Area
17           Council to Comply with a Subpoena
             (D.I. 7261, filed 11/16/21).
18
             Court's Ruling:                                   10
19
   Agenda
20 Item 5:   Letter to the Honorable Chief Judge Laurie         7
             Selber Silverstein from Tancred Schiavoni
21           Seeking an Order Compelling Cradle of Liberty
             Council to Comply with a Subpoena
22           (D.I. 7263, filed 11/17/21).

23           Court's Ruling:                                   10

24

25

1

INDEX

2     <u>MOTIONS</u>:                                                              <u>PAGE</u>

3     Agenda
      Item 6:    Letter to the Honorable Chief Judge Laurie              7
4                Selber Silverstein from Tancred Schiavoni
                 Moving to Compel the Compliance of the
5                National Capital Area Council with Century's
                 Subpoena (D.I. 7384, filed 11/21/21).
6
                 Court's Ruling:                                        10
7
      Agenda
8     Item 7:    [SEALED] Emergency Motion of the Official             26
                 Committee of Tort Claimants for Entry of an
9                Order Pursuant to Sections 105, 1103, 1125,
                 and 1126 of the Bankruptcy Code Appointing a
10               Plan Voting Ombudsperson and Granting Related
                 Relief (D.I. 7445, filed 11/24/21).
11
      Agenda
12    Item 8:    Motion to Shorten Notice Period and Schedule          26
                 Hearing on Emergency Motion of the Official
13               Committee of Tort Claimants for Entry of an
                 Order Pursuant to Sections 105, 1103, 1125,
14               and 1126 of the Bankruptcy Code Appointing a
                 Plan Voting Ombudsperson and Granting Related
15               Relief (D.I. 7448, filed 11/24/21).

16    Agenda
      Item 9:    Motion for Entry of an Order Authorizing the          26
17               Tort Claimants' Committee to File Under Seal
                 Certain Exhibits and Information in Support of
18               the Emergency Motion of the Official Committee
                 of Tort Claimants for Entry of an Order
19               Shortening the Notice and Objection Periods
                 for Emergency Motion of the Official Committee
20               of Tort Claimants for Entry of an Order Pursuant
                 to Sections 105, 1103, 1125, and 1126 of the
21               Bankruptcy Code Appointing a Plan Voting
                 Ombudsperson and Granting Related Relief
22               (D.I. 7449, filed 11/24/21).

23    Transcriptionist's Certificate                                  100

24

25

1          (Proceedings commence at 2:03 p.m.)

2          THE COURT:  Good afternoon.  This is Judge

3    Silverstein.  We're here in the Boy Scouts of America

4    bankruptcy, Case 20-10343.

5          Let me turn it over to Mr. Abbott.

6          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

7    of Morris Nichols, here for the debtors.

8          Your Honor, a handful of things on the agenda.

9    And apologies, again.  Things are moving fast, including both

10   discovery and mediation that I believe started as early as 5

11   a.m. this morning.

12         Maybe we can talk quickly through the agenda, Your

13   Honor.  We did send over a second amended agenda.  And if I

14   could work from that and at least give the Court our

15   perspective on how that ought to -- how that ought to work

16   with the parties' input, and obviously subject to the Court's

17   approval, that might be a good way to start.

18         THE COURT:  That's fine.  And I have that.

19         MR. ABBOTT:  Thank you, Your Honor.

20         So Items 1 and 2 were previously adjourned by

21   agreement to a date to be determined.

22         Item 3, I believe, Your Honor, is still going to

23   go forward.  That's a remaining discovery issue, although I'm

24   sure Mr. Grey and others want to be heard on that.

25         Your Honor, with respect to 4, 5, and 6, those are

1  Century motions, Your Honor.  And the parties have recently,

2  minutes before the hearing, agreed again to adjourn those to

3  the Thursday hearing, if possible, Your Honor, so that they

4  can, frankly, again, focus on things more relevant.

5          I apologize that these adjournments keep happening

6  at the nth hour, but unless the Court -- and I'm happy to

7  have both Century's counsel and counsel for all the

8  respondents to weigh in.  But it's my understanding that, on

9  the condition that they can be moved to Thursday, and

10  obviously subject to the Court's approval, Century and the

11  responding parties are okay pushing those to that date, Your

12  Honor.

13          THE COURT:  Okay.  Well, let me hear -- I --

14  Mr. Abbott, what's on for Thursday?

15          MR. ABBOTT:  I should know that answer, Your

16  Honor, and I -- let me go find that agenda, unless Ms. Topper

17  has it at her fingertips, I don't have that schedule right in

18  front of me now, Your Honor.  But again, I think that is one

19  of the dates that Your Honor had set for sort of a -- just a

20  check-in sort of status conference on the path to discovery.

21  It's not clear to me, other than these matters, if there's

22  any -- been anything officially scheduled for that date.

23          THE COURT:  That's what I have on my calendar, is

24  that it's a status.  And so I'm not sure that anyone -- it

25  wasn't necessarily an omnibus day, but certainly can be used

1  for these discovery matters.

2          MR. ABBOTT:  And that's consistent, Your Honor,

3  with what we had heard from your chambers, I believe last

4  week or maybe the later end of the previous week.

5          THE COURT:  Okay.  So let me hear from --

6  actually, let me hear from counsel for the objectors because,

7  as reflected in the second amended agenda, when this was

8  drafted, there -- the objectors were not in agreement to an

9  adjournment.  So let me hear from counsel for the Baltimore

10  Area Council.

11          MR. BROOKS:  Good afternoon, Your Honor.  Todd

12  Brooks from Whiteford, Taylor & Preston on behalf of the

13  Baltimore Area Council.  Can you hear me?

14          THE COURT:  I can.

15          MR. BROOKS:  Very good.

16          It is our understanding that the parties are hard

17  at work on other aspects of this case.  And it's for that

18  reason that we have agreed to adjourn a further time on the

19  condition that we would hopefully get Thursday of this week

20  to finally bring this matter to conclusion.  There are very

21  few issues that are up to discuss on this outstanding motion,

22  and we think it can be resolved quite easily.

23          THE COURT:  Okay.  Thank you.

24          Let me hear from counsel for Cradle of Liberty

25  Council.

1          MR. LUTSKY:  Good afternoon, Your Honor.  Jeff

2    Lutsky for the Cradle of Liberty Council.

3          We agree with Mr. Brooks' statement.

4          THE COURT:  Okay.  And let me hear from counsel

5    for the National Capital Area Council.

6          MR. COLLINS:  Good afternoon, Your Honor.  Kevin

7    Collins from Barnes & Thornburg for National Capital Area

8    Council.

9          Your Honor, I believe my colleagues Jim Van Horn

10   and Adey Adenrele may also be on today, and they may want to

11   pipe in.  But my understanding is that we did agree to an

12   adjournment of our discovery matter to Thursday.

13         THE COURT:  Okay.  Thank you.

14         MR. ABBOTT:  Your Honor, Derek Abbot again.

15         I did confirm that, other than being available for

16   discovery matters, there's nothing else that has been yet

17   firmly scheduled for that Thursday hearing, Your Honor.

18         THE COURT:  Okay.  Then, with the agreement of the

19   objectors, those three discovery matters are adjourned until

20   Thursday at ten o'clock.

21         MR. ABBOTT:  Thank you, Your Honor.

22         I guess, next, I would, if I may, turn it over to

23   Ms. Lauria, so that she can give the Court a little bit of

24   further status update, as we've done from time to time, Your

25   Honor.

1          THE COURT:  Ms. Lauria.

2          MS. LAURIA:  Thank you, Your Honor.  Jessica

3  Lauria, White & Case, on behalf of the debtors.  And I'll be

4  brief, but we did want to bring a couple of items to the

5  Court's attention.

6          First, as Mr. Abbott alluded, we have been in

7  basically around-the-clock mediation for the last seven or

8  ten days.  We had in-person mediation the week before

9  Thanksgiving.  That continued into the week of Thanksgiving.

10  You may see a lit of tired faces on the Zoom today because we

11  have all been working very hard and apologize to all of our

12  families for the lack of time we spent with them over the

13  holiday weekend but wanted the Court to be aware that we are

14  still working very hard to resolve with parties in this case

15  and to reduce the number of issues that the Court is

16  ultimately going to have to decide and the number of

17  objecting parties that will be in front of Your Honor.

18          With respect to the plan itself, as the Court may

19  recall, tomorrow is the plan supplement filing deadline.

20  that deadline was set forth in the solicitation procedures

21  order.  We are, by my count, filing I think 23 documents

22  tomorrow.  That will be draft documents reflecting the

23  various deals that are already incorporated into the plan and

24  other, what I would say are standard plan supplement filings.

25          So the debtor and all of the parties, candidly,

1  have been very hard at work getting those documents into

2  shape, so that they can be filed tomorrow in advance of the

3  voting deadline.

4          Plan discovery is ongoing.  We have a number of

5  depositions that are going forward on the debtors' side this

6  week, and parties have been hard at work preparing witnesses,

7  preparing to take those depositions, and going forward with

8  those depositions this week.  So I think suffice it to say

9  both the plan supporters and the plan objectors have been

10 working very hard.

11         There is one voting issue that I wanted to bring

12 to the Court's attention and for the attention of the parties

13 in this case.  In the wake of the TCC/Kosnoff communications,

14 the debtors quit distributing the preliminary voting report.

15 You'll recall that, at the disclosure statement hearing, the

16 debtors had indicated that, under the protective of the

17 protective order in this case, the debtors would circulate a

18 preliminary voting report weekly.  And indeed, we had

19 circulated one on that Friday before the TCC/Kosnoff

20 communication went out.

21         Just in the wake of that issue, and while we have

22 been getting to the bottom of what happened there, we quit

23 sending out that preliminary voting report.  And my phone has

24 been ringing off the hook, candidly, from all the parties in

25 this case who were receiving the report to want to receive it

1 again.

2          From the debtors' perspective, I think we are

3 amenable to sending the report again with a very important

4 modification.  The report previously that was distributed to

5 the TCC's advisors contained the actual names of survivors

6 and how they were voting with respect to the plan.  In light

7 of what we're dealing with, we don't think that's prudent.

8          If we have indication that a particular lawyer is

9 representing claimants, whether that's through indication on

10 the proof of claim form or by producing indications to Omni

11 concerning that representation, we're happy to, of course,

12 share that information with that individual's lawyer.  But we

13 don't think we should be sharing the individual voting

14 activity from actual survivors to any other group, other than

15 that particular individual's counsel.

16          So, with that, unless the Court feels otherwise,

17 we would be amenable to recirculating those reports under the

18 highly confidential designation that we were sending them out

19 previously.  And of course, it's going to take a little bit

20 of time, to the extent individual attorneys want information

21 concerning their claimants, it's going to take us a little

22 bit of time to pull that information together, but we will

23 work on doing that, again, unless the Court has some concerns

24 about it.

25          With that, Your Honor, that's the extent of my

1  sort of overall case update.

2          We did have a very active week last week, in

3  connection with the TCC/Kosnoff discovery.  There were

4  depositions every day.  You may have seen some of that in the

5  opposition that we filed to the TCC's ombudsman motion.  But

6  I understand that that's at the end of the agenda for the

7  status conference today.  So, unless you have any questions

8  about that, we'll save our remarks for that moment.

9          I don't have any questions about that and I don't

10  have any questions about the circulation of the preliminary

11  voting reports.  My recollection is you were doing that

12  weekly.  I do not have a problem with what you are

13  suggesting, in terms of a report that does not include

14  specific names of the voters.

15          MS. LAURIA:  Thank you, Your Honor.

16          THE COURT:  Mr. Currie, I see your hand up.

17          MR. CURRIE:  Thank you, Your Honor.  Good

18  afternoon.  Kelly Currie on behalf of the Zurich insurers.

19          Your Honor, what I wanted to address were Items 1

20  and 2 that were on today's agenda, the motion of Marc Bern &

21  Partners to quash a subpoena to produce documents issued by

22  Century as to KLS Legal Solutions, and a similar letter

23  submitted by Century regarding to compel Verus, LLC to comply

24  with a subpoena.

25          Our client, Zurich insurers, has joined both of

1  these motions.  And given the discovery deadlines that we're

2  all struggling with, we were -- based on the agenda today, it

3  appeared these matters were going forward, but apparently

4  that's not the case.

5          But what we would request is if we could have

6  those be on the agenda for Thursday's hearing if we're not

7  going to go forward with them today, understanding that, you

8  know, many participants in these proceedings have been

9  occupied with other things over the last several days.  But

10  our interests and I -- our clients' interests in moving

11  forward on these discovery issues we think is timely and time

12  sensitive.  So we would like, if it's not going to be these

13  issues heard today, they be heard on Thursday.

14          THE COURT:  It's fine with me that they be heard

15  on Thursday.  They've been carried for quite some time.  So

16  I'll put them on Thursday and -- unless I hear from counsel

17  for Mr. Bern or counsel for Verus that that doesn't work.

18          Let me also mention something else.  I think we

19  got a communication from counsel for Verus that they were

20  planning to have witnesses.  Let me ask.  Is that the case?

21          MS. CHAHIL:  Good afternoon, Your Honor.  This is

22  Rasmeet Chahil from Lowenstein Sandler on behalf of

23  Verus, LLC.

24          We did submit a declaration from our client from

25  Mark Eveland and we were planning to make him available for

1  the hearing.  We had received a communication from Century at

2  one point that they wanted to depose him in advance of the

3  hearing, so we were assuming that they might have some cross-

4  examination, but I'm not sure if that is the case.

5          MR. SCHIAVONI:  We weren't able to schedule a

6  deposition because they took the position that they wouldn't

7  produce him for deposition.  But we can do it Wednesday, the

8  deposition, and he can be produced on Thursday for the

9  hearing.

10         MS. CHAHIL:  So the last request for the

11  deposition came the day before the hearing and we weren't

12  available.  Next week, Wednesday, will not work for us

13  because we have a disclosure statement hearing in the Diocese

14  of Camden that day, which makes the 9th also somewhat

15  difficult for us.  So, if that's the case, we would request

16  that this be put on for the following week.

17         THE COURT:  Okay.  Well, we're looking at this

18  Thursday.  So how is Wednesday?

19         MS. CHAHIL:  Oh, I -- sorry.  I was under the

20  impression we were still talking about December 9th.

21         THE COURT:  No.

22         MR. SCHIAVONI:  So we could do tomorrow or we

23  could do Wednesday this week.

24         THE COURT:  No, the Thursday we're talking about

25  is December 2nd.

1         MS. CHAHIL:  Yeah, this week won't work for Verus.

2   The partner from my firm, Michael Kaplan, who's going to be

3   handling this, is traveling this week, since we were under

4   the impression that we were adjourning the hearing.  And so

5   it -- he's not available this week.

6         THE COURT:  Okay.  Well, we need to find a date

7   and nail it down, and that will be the date that it goes

8   forward for Verus.  I consider Verus to be -- the Verus

9   motion to be an important motion, and that how I rule on

10  Verus may affect other matters.  So that one needs to go

11  forward.

12        And if you're going to put him up as a witness,

13  then parties are entitled to his deposition, and you're going

14  to have to figure it out, and they're going to have to be

15  available.  The fact discovery cutoff in this matter, I

16  think, is the 1st, so we're already stretching things.  So

17  Verus is going to have to figure out how to become available.

18        And anyone who has filed a joinder or -- to this

19  matter needs to be consulted with respect to any further

20  continuances.

21        MS. CHAHIL:  Understood, Your Honor.  We will work

22  with Century to figure this out.

23        I just wanted to note that this matter has been

24  adjourned a number of times, not at our request, and we've

25  been very accommodating of all the requests to date.  So we

1   hope that the other parties will be accommodating of our

2   schedules, as well.

3          THE COURT:  Fair enough.  Okay.

4          MR. ABBOTT:  Thank you, Your Honor.  My apologies

5   to Mr. Currie.  I did not realize he had not been consulted,

6   so that's on me, Your Honor.

7          Your Honor, the next item that I believe will be

8   going forward is Number 3 on the agenda, and that is back to

9   Mr. Currie.

10         THE COURT:  Yes.  Mr. Currie.

11         MR. CURRIE:  Thank you, Your Honor.

12         Your Honor, you'll recall that this is a

13  continuation of our argument we had, a similar argument

14  related to several other law firms, where certain insurers

15  are seeking discovery, written discovery, from these firms.

16  And the issue is whether they ought to be treated as parties

17  to this litigation or, at least for the purposes of

18  responding to written discovery requests, that they be so

19  treated.

20         And with regard to AVA Law, Your Honor, AVA Law,

21  as the Court is likely familiar, is a law firm that has a

22  single attorney, Mr. Van Arsdale, and was, at one point, a

23  member of the coalition, and has since then been part of an

24  entity or an association referred to as "ALS" that purports

25  to represent many thousand claimants in this case.  Mr. Van

1  Arsdale also is the owner of one of the aggregators that

2  subject to litigation, at this point outside of the

3  jurisdiction because it's based in Montana, Reciprocity, that

4  handled aggregation for many thousands of claims.

5          And so, in this regard, Your Honor, the

6  information that insurers are seeking goes to the issue of

7  the integrity of the claims solicitation and aggregation

8  process and regarding the -- whether these proofs of claim,

9  particularly those signed by counsel, by attorneys, and the

10 scrutiny that ought to be applied, or at least give us the

11 discovery, Your Honor, regarding whether these claims were

12 actually vetted carefully by counsel under the requirements

13 of the Bankruptcy Rules and the proceedings in this case.

14 And therefore, we believe that the way that AVA Law, Mr. Van

15 Arsdale, has played a central role in this case, Your Honor,

16 requires or -- essentially acting as a party in many

17 respects, ought to be required to respond to discovery

18 requests and provide documents in this case.

19          You know, Your Honor has heard many of the

20 arguments that -- we were before you recently on this issue.

21 But essentially, it's the same argument and the same

22 relevance that applies to many of the other law firms that we

23 were discussing previously.

24          THE COURT:  Let me ask this question, Mr. Currie.

25 Did Mr. Van Arsdale or -- well, I guess it would just be him.

1  Did he sign any proofs of claim?

2            MR. CURRIE:  Your Honor, I'm looking for that

3  information.  Just a moment, please.

4            MR. GREY:  Your Honor, this is Joseph Grey.  We're

5  working with Mr. Van Arsdale and AVA Law.  Can you hear me,

6  Your Honor?

7            THE COURT:  I can.

8            MR. GREY:  Okay.  The answer is no, Mr. Van

9  Arsdale did not sign any proofs of claim, nor did anyone with

10 his firm.  And it's correct, he's the only attorney there.

11           THE COURT:  Okay.  Thank you.

12           Mr. Currie --

13           MR. SCHIAVONI:  Your Honor, that does beg the

14 question about who affixed the electronic signatures to the

15 proofs of claim.

16       (Pause)

17           MR. GREY:  Your Honor, may I speak in response to

18 Mr. Currie?

19           THE COURT:  Yes.

20           MR. GREY:  Or did you have more --

21           THE COURT:  But I'm trying to determine whether

22 there should be a difference between who signed the proof of

23 claim and who affixed the signature and what that --

24           MR. SCHIAVONI:  Your Honor --

25           THE COURT:  -- should mean.  Why -- if someone was

1 given authority to affix the signature of counsel to a proof

2 of claim, why should that subject the affixer of the

3 signature to discovery here.

4        MR. SCHIAVONI: So, Your Honor, the call center

5 for Reciprocity is located in Montana.

6        THE COURT: Uh-huh.

7        MR. SCHIAVONI: The AVA firm has a single lawyer,

8 Mr. Van Arsdale, who is a -- is -- was described at length at

9 Mr. Kosnoff's deposition as a "marketing person," who only

10 graduated law school in 2018.

11        To the extent signatures were affixed en masse in

12 Montana, you know, I think that -- it goes to whether the

13 role of the attorney was supplanted by the people running the

14 boiler room in Montana.

15        THE COURT: Okay. Thank you.

16        MR. GREY: Your Honor, I --

17        THE COURT: Mr. Grey.

18        MR. GREY: Yes, Your Honor. I'll deal with that

19 last point first because I think that the AVA Law Group was

20 only involved in actually filing about a hundred proofs of

21 claim. They were affiliated with Mr. Kosnoff's firm and the

22 Eisenberg Rothweiler firm, and they filed most of the claims

23 that were submitted by the group.

24        Anyway, this is a -- this is a motion to compel.

25 But Your Honor, it's sort of morphed into a motion to

1  transfer venue, but one directed to the wrong court.  My

2  client was first subpoenaed in California, where we've always

3  said he can be subpoenaed.  Mr. Arsdale and his firm were

4  both subpoenaed in California on October the 5th, I believe.

5  And since, we timely responded with those subpoenas.  We

6  tried to meet and confer with counsel to deal with them.

7          And frankly, counsel for the insurers slow-walked

8  the process.  And so now they found themselves -- if they

9  hadn't done that, then the discovery they sought in

10  California would probably be accomplished by now.  Instead,

11  they waited, and now they're trying to get these matters

12  transferred to this Court for rulings, when they --

13  because -- I guess because they don't think they can get

14  adequate relief in California.

15          They could have filed a motion to transfer in

16  California.  They filed one in Montana.  And the Reciprocity

17  company we just talked about is based in Montana.  They were

18  subpoenaed in Montana, and they filed a motion to transfer

19  that venue unsuccessfully, again, in Montana.  But having --

20  I guess, having lost there, they didn't want to try the same

21  thing in California.  And so now they're trying to turn this

22  motion to compel into something the Court -- that really

23  should have been directed to the Court in California.

24          And we are not a party, AVA Law Group is not a

25  party, I -- Your Honor, no more than Mr. Schiavoni or

1   Mr. Currie are parties in this case.  And I dare say that

2   nobody ever thought AVA Law Group was a party here.  It was

3   clear from the get-go and at all times after that, that we

4   represent claimants.  We don't -- we are not parties in this

5   case.

6           I don't want to repeat everything that's been said

7   or written on -- with respect to the other parties' motions.

8   I just wanted to bring our kind of unique, I think,

9   perspective to this situation.

10          MR. SCHIAVONI:  We did not -- the Court in Montana

11  did not deny the motion to transfer for Reciprocity, unless

12  counsel has seen an order.  I haven't in the last few days.

13  Counsel for Reciprocity sought to further delay the Court in

14  Montana from hearing the motion.  We had to file a motion to

15  ask for an emergency, you know, hearing to get it -- to

16  expedite the transfer.  That's pending in Montana.  We got a

17  request to extend the hearing date on that.

18          In San Diego, where Mr. Van Arsdale is, we either

19  have on file now a motion to transfer or it will be on file

20  within the hour.  We got -- we did not slow-roll anything

21  there.  We got straight-up objections to every document

22  request and to the request to produce Mr. Van Arsdale for

23  deposition.  We sought to try to get them to produce him, he

24  declined.

25          The testimony from Mr. Kosnoff the other day,

1  which I think is still sealed, as well as all documents

2  associated with him, only further highlight the importance of

3  Mr. Van Arsdale as a witness, and really, frankly, the role

4  that he played as a businessman in -- you know, in charge of

5  Reciprocity.  And -- you know, and the testimony from Mr.

6  Kosnoff about, in essence, the investments made in the claims

7  for profit of people investing in them.

8          So it's like we will have that motion to transfer

9  decided in San Diego as fast as we can convince the Court

10 there to decide it.  But it -- you know, it's like we've

11 done -- we've gotten nothing but resistance on all of these

12 motions, and all -- and straight up and down the line from

13 the aggregators.

14         MR. GREY:  Your Honor, just -- I just wanted to

15 make it clear that what we wrote in our letter about the

16 status of all this was my understanding as of, I think it was

17 the twenty -- the day before Thanksgiving when I filed that.

18         Mr. Schiavoni corrects me on one point, and he's

19 right.  It wasn't a motion to transfer they filed in -- or

20 they filed a motion to expedite in Montana, I believe that

21 was -- at least I was told that was shot down.

22         But nothing Mr. Schiavoni said is a reason to

23 transfer venue.  In fact, if they have pending motions in

24 other districts, then -- that were filed be -- then those

25 districts should be allowed to decide them.  And that's our

1  point in all of this.  They decided where toe file the first

2  subpoenas, not us.  And having chosen the forum -- the

3  correct forum, by the way -- they shouldn't be allowed to go

4  back on that and try and transfer everything to this Court,

5  without even asking the other courts.

6          And by the way, they haven't withdrawn any of

7  these subpoenas.  So now we're dealing with multiple

8  discovery requests.  And frankly, we're not sure which ones

9  to respond to.

10         MR. SCHIAVONI:  Your Honor, the same goes for

11  much -- from those who much is given, much is asked for.

12  This expedited schedule was sought by the plan proponents

13  with the promise of cooperation, not the -- they didn't need

14  to oppose our motion to expedite relief in Montana, like they

15  did.  But that's what they did.  Now they're here in Delaware

16  saying that, well, it shouldn't be heard.  Let the thing take

17  its course in Montana, where they opposed even the motion

18  being heard on a timely basis.

19         MR. GREY:  Your Honor --

20         THE COURT:  Okay.  Well --

21         MR. GREY:  -- I don't believe we're a plan

22  proponent.

23         THE COURT:  Reciprocity is not a plan proponent.

24  Okay.  Thank you.

25         Well, one of the reasons I asked whether AVA --

1   or, rather, Mr. Van Arsdale had signed any proofs of claim is

2   because I find that significant in my thinking about whether

3   discovery can issue out of this Court.  And I'm going to hold

4   AVA to the side for the moment.  I will think about that one

5   further, perhaps be prepared to rule on Thursday, but -- so

6   I'll consider that, the dispute between the insurers and

7   Mr. Van Arsdale and his law firm under consideration.

8           But I am prepared to rule on the insurers'

9   discovery requests that I heard the week of the 17th, I

10  believe.  And so I'm going to do that at the conclusion of

11  this hearing.  But I'm going to hold -- as I said, I'm going

12  to hold AVA Law Group aside on -- for that.

13          So let's go on to the next matter.

14          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

15  again for the debtors.

16          I think that takes on to Matter Number 7 on the

17  agenda, Docket Item 7445, which was the TCC's motion

18  regarding an ombudsman, followed on the agenda by their

19  motion to shorten and motion to seal.  I'll turn the podium

20  over to Mr. Pachulski for that, I gather.

21          THE COURT:  Okay.  Mr. Pachulski --

22          MR. PACHULSKI:  Thank --

23          THE COURT:  -- this is a status.

24          MR. PACHULSKI:  Thank you so much, Your Honor.  I

25  appreciate your setting this for a status conference, and I

1  will present it as such.

2         Just for appearance, Your Honor, Richard Pachulski

3  of Pachulski, Stang, Ziehl & Jones, on behalf of the TCC.

4         I will not spend much time, frankly, Your Honor,

5  responding to the pleading that was filed today.  I didn't

6  see it until just before the hearing.  I did my best to

7  review it, and I did read at least the body of it, but did

8  not have a chance to think most -- many of the issues

9  through, but I'm going to do my best through that.

10        But I think what's most important is Your Honor

11 has raised the status issue.  And frankly, based on some of

12 the events that have been going on, I'm actually going to

13 modify the request, which I will explain in my presentation

14 of where I think the matters is, if that is acceptable to

15 Your Honor.

16        The -- first, Your Honor, as Your Honor knows, I

17 didn't get truly involved in this matter until Friday -- the

18 case itself until Friday, November 19th.  I was aware earlier

19 of the issue relating to the Kosnoff letter.  I evaluated

20 that as a firm issue, not as the BSA issue, because I was not

21 involved with the case.  But frankly, now that I'm in the

22 case, I'm reviewing it with respect to all matters.

23        Since November 19th, Your Honor, I feel like I

24 have been dropped into a war zone, and I've done my best to

25 get up to speed.  And there are really three areas that I've

1  spent primary time on, and I'll get to how that relates to
2  the motion that was filed:
3          I've spent an exceptional amount of time with the
4  TCC and state court counsel to understand the goals and the
5  positions of the TCC, in particular.
6          I have gotten significant downloads for people on
7  our team, but that's somewhat difficult because many of them
8  had other things they needed to do, but I -- they did the
9  best they could under the circumstances, such as
10 Mr. Kornfeld, who is the one who is defending the
11 depositions.
12          And the third, I appreciate that the mediators
13 spent some time with me at the beginning of next week to at
14 least give me a status.
15          What I will say, Your Honor, I find very difficult
16 to understand -- and this is one I haven't not gotten a
17 complete download from our team, but I've gotten some
18 perspective from the mediators -- is that, for all intents
19 and purposes, Your Honor, since August 19, I understand
20 the -- relating to the RSA that is long gone, that, for all
21 intents and purposes, the committee has been excluded.
22          I find that kind of unusual or extremely unusual.
23 I've -- what little I've heard is that they really find us
24 irrelevant, for the most part.  It was confirmed by the
25 mediators that we have been excluded.  I have, in speaking to

1   the mediators, explained what I think are the three biggest

2   issues for the TCC, based on my involvement to date.  But in

3   essence, Your Honor, we have -- the committee, by being

4   excluded and not involved, not in the process, has really

5   been given no recourse, but to object to the plan because the

6   TCC finds serious issues with the plan, and we are going to

7   pursue that.

8           But my goal in all cases is, if at all possible,

9   to avoid that type of litigation and to try to resolve

10  matters.  And I think I have a history in my career of doing

11  that.  But it's very hard to do when you're, frankly,

12  excluded.  So I point that out.  I'm not sure that Your Honor

13  is going to do anything about that.  But I would ask that --

14  if anything, that it be suggested we be included.  For

15  instance, we are well aware there are negotiations going on

16  right now.  That has been made clear, not by the parties to

17  us, necessarily, but by the status conferences that we hear,

18  like everybody else hears.

19          I do want to then go to the reason for the motion

20  and, ultimately, the timing of it and where I see we should

21  change it because I am trying to do what I can, and in real

22  time, to pursue the goals and objectives of the TCC.

23          The primary reason, Your Honor, when you cut

24  through it, is that whatever may have occurred that our firm

25  was involved with, well before our firm did anything, the

1  issue between the disputes that Mr. Rothweiler, Mr. Kosnoff,

2  and I believe Mr. Van Arsdale -- and I say "I believe"

3  because I'm not sure what his position is on all of this --

4  is that the idea that three lawyers, who represent the same

5  clients -- and frankly, with the number of clients they have,

6  there really isn't much interaction, there's no real -- there

7  can't be any debate about that -- is, frankly, in my view, in

8  appropriate.

9          And I think that that is why, in terms of the

10  model code -- which I understand and I've learned a lot more

11  about the Delaware ethical rules in the last week than I

12  wanted to, particularly because of the issue associated with

13  Mr. Rothweiler, Mr. Van Arsdale, and Mr. Kosnoff -- is that

14  it is clear that, if three lawyers in this case have a

15  disagreement on a potential client, they should be doing that

16  jointly.  They shouldn't be writing -- they shouldn't be

17  writing letters that conflict with each other.  If anything,

18  they should put a single letter together, which is one of the

19  things we responded to with respect to the voting on this

20  person motion.

21          In that regard, Your Honor, with 20/20

22  hindsight -- and I'll get to a few of the issues raised in

23  the opposition.  But with 20/20 hindsight, our firm, instead

24  of having sent -- participated in the Kosnoff letter, the

25  voting ombudsperson motion should have been filed very early

1  on because it had to be repaired.  There is a risk completely

2  unrelated to what our firm (indiscernible) that votes will be

3  designated because of what has gone in with the conflicting

4  letters.

5           Mr. Molton has said -- and that was in relation to

6  ours -- that he may seek to designate all no votes from that

7  group or any group because of the let -- the Kosnoff letter.

8  But the fact of the matter is, Your Honor, it's just not

9  appropriate.  It's not what should happen in this or mass

10 tort cases, in general.

11          Frankly, in looking at this case -- and I don't

12 pretend to be a mass tort expert -- just has we have privacy

13 ombudspeople, and just as we have patient ombudspeople, we

14 should have voting ombudspeople.  This is really

15 unbelievable, in my experience.  And so the second reason,

16 with 20/20 hindsight, this should have always been done.

17          The third, Your Honor -- and I think this is

18 really important -- is, having had the opportunity to speak

19 to the TCC and to state court counsel, they are laser focused

20 on making sure that all survivors are heard.  What does that

21 mean?  That we don't get embroiled in endless voting

22 discovery, which we think may happen if the

23 Rothweiler/Kosnoff/Van Arsdale issue is not resolved.  They

24 want to avoid designation.  They don't want any more of

25 survivors having the pain that they've had to endure because

1  now there will be designation motions.

2          And in that same regard, Your Honor, they do not

3  want to see a re-solicitation.  Win, lose, or draw, they want

4  this matter resolved.  We all agree to that.  If we lose --

5  if we win, that's one thing; if we lose, it's another thing.

6  But they want it done quickly.  And so we believe that issue

7  should be resolved.

8          Now we did file the voting ombudsperson motion,

9  Your Honor, to deal with other issues.  But the key issue is

10 what we provided in Paragraph 10(a), which is trying to get a

11 single letter out to everybody saying this is

12 Mr. Rothweiler's position, vote yes; this is Mr. Kosnoff's

13 position, vote no; and this is Mr. Van Arsdale's position,

14 which actually is pretty thoughtful, which is:  You need to

15 review your individual situation and make your own

16 determination.  That's what I understand it is.  I haven't

17 seen a letter to that effect, but I've been told secondhand

18 that that is, in essence, where we're at.  And that they

19 should send that letter.  That is what a voting ombudsperson

20 would do.

21          The other three were to address if there are any

22 issues.  And to date, I haven't heard of any, in terms of any

23 damage because of the Kosnoff letter being sent on

24 November 5th to 7th.  But I understand everyone has their

25 position.  General confusion.  But Your Honor, at the end of

1  the day, we thought the voting ombudsperson and I thought the

2  voting ombudsperson, in consultation with the TCC and their

3  counsel, was the best thing that could be done in this

4  particular case.

5              Here's what I did not know, Your Honor:  I did not

6  know, until late in the day on Wednesday, that Mr. Wilkes, on

7  behalf of Mr. Kosnoff --  and this is in the declaration that

8  you've seen -- had actually approached Mr. Rothweiler's

9  counsel to do exactly what I thought a voting ombudsperson

10  should do.

11             Now, to be honest with you, Your Honor, I didn't

12  anticipate that.  I would think that the only thing that

13  Mr. Kosnoff and Mr. Rothweiler would actually agree to is

14  oppose any efforts to try to make sense out of this, to try

15  to undo voter confusion, to try to undo what may be ethical

16  violations.  But instead, I understood, on November 12th --

17  which I think is actually an interesting date that I'll get

18  to in a moment -- that Mr. Wilkes had contacted Mr. Hogan on

19  November 12th, saying, let's try to fix this.  And the answer

20  from Mr. Hogan was no or about Mr. Rothweiler.

21             Apparently, after -- which I will get to in a

22  minute -- the "meet-and-confer," I would call it, after the

23  meet-and-confer -- or before the meet-and-confer, Mr. Wilkes,

24  again, on behalf of Mr. Kosnoff, tried to get Mr. Rothweiler,

25  through Mr. Hogan, to agree to do the very thing of a joint

1  letter, to at least explain it.  The answer again was no.

2          So, Your Honor, frankly, I'm not going to pursue,

3  because it's created so much havoc, the voting ombudsperson.

4  I was looking to try to get a solution, not to create any

5  other issues.  But I do intend to pursue that this Court

6  should order, which I believe it has the right to do, that a

7  joint letter be sent so we can avoid any specific issue

8  because, apparently, at least one of the parties, Mr.

9  Kosnoff, has been prepared to do that and the others have

10  not.

11          So, rather than getting into a fight of what will

12  the voting ombudsperson do and the rest of it, I don't think

13  that that is really going to be worthwhile.  I've now seen

14  enough in this case to figure out everyone fights everything,

15  but I do not understand why anyone would fight to try to undo

16  the damage by having warring lawyers representing the same

17  clients.

18          Now, Your Honor, I want to spend a moment on the

19  timing of the motion, because that was raised in the -- that

20  was the very beginning of the motion -- the opposition that

21  the debtors filed.

22          The voting deadline is December 14th.  The

23  deposition of Mr. Kosnoff took place, I believe, last Monday.

24  I may be wrong about that, but I believe so.  Mr. Kornfeld

25  was the one involved with it, not me.  Through discovery, we

1   saw a bunch of emails that showed that there was confusion

2   not because of what we sent out, but because of what Mr.

3   Rothweiler and Mr. Kosnoff had been sending out to the

4   clients, and we believed that it was appropriate to try to

5   put a voting ombudsperson motion together, that was my

6   opinion.  I, of course, had to go through and explain that to

7   the TCC and state court counsel.  They ultimately authorized

8   it on a unanimous basis.  We had to draft it and we had to

9   get it out.

10          What was the urgency?  We have a December 14th

11  voting deadline.  At some point, if we had waited to file it

12  later, we would have been told too late, not going to work,

13  even extending it two weeks will be not enough.  So what did

14  we do?  We worked on it as quickly as possible.  We got it to

15  the parties on the Tuesday before the Wednesday, last

16  Wednesday.

17          We got -- I mean, I got a response -- maybe I

18  should have been prepared for it -- that was extraordinarily

19  negative.  This was, again, we are trying to do nothing more

20  than to undo whatever we did, that is beyond wrong.  To try

21  to accommodate people, I have not recalled ever doing this

22  before, and I knew that I probably would lose the date by

23  doing it, rather than just say I assume all of you will just

24  say no, to shorten time, and to the motion, which I was

25  actually surprised because I was trying to fix what I think

1  is a serious problem here, Your Honor, because of the

2  reaction I was getting, I agreed to a meet-and-confer the

3  next day, on Wednesday.  I knew, realistically, we weren't

4  going to have a hearing today, but we had to file it to get

5  something.

6         And so we had the meet-and-confer, we did not

7  agree.  We then filed our motion with the motion for order

8  shortening time.  And I assumed, which was why I asked for

9  it, which was different than our original request for

10 shortening time, that if we couldn't have the hearing, we

11 should at least have a status conference, and I appreciate

12 very much Your Honor giving us the opportunity to do it.  So

13 that is why we filed it because right now we're at November

14 29th and we are 16 or 17 days away from the voting deadline.

15 And we had asked for a two-week extension because we thought

16 that would be helpful to get an individual involved to help

17 through this process.  So we didn't think we would get the

18 reaction we did, but we did get it.

19        I do want to respond to just a quick -- a few

20 items with respect to and to finalize the status on the

21 motion -- the opposition to the motion itself.

22        Number one -- and I must tell you, Your Honor, I

23 stated it on the Friday and I'm really getting tired of it,

24 but everything always says the TCC did with respect to the

25 Kosnoff letter.  There is no evidence in all the depositions

1  that the TCC had anything at all to do with this.  If there

2  was an error, it was my firm's error, it was not the TCC, and

3  to try to somehow drag the TCC into having done it is

4  inappropriate based on the evidence in the case.

5          Second of all, Your Honor, virtually everything in

6  the opposition, virtually everything, relates to a rehash of

7  what occurred between November 5th and November 7th, that

8  somehow the voting ombudsperson should not be approved,

9  which, again, I'm not going to pursue at this point.  I'm

10 going to pursue the other action, which is to have Your Honor

11 require a joint letter, but even without the request for a

12 joint letter and we were simply at the voting ombudsperson,

13 Your Honor, rehashing through the pleading does not address

14 at all the issue of the Rothweiler/Kosnoff/Van Arsdale

15 dispute and its effect on its clients and its potential

16 effect, which is the most important part, on whether or not

17 there will be any issue with the votes themselves either

18 being designated or re-solicited.  That is the issue that is

19 really here, not our firm's issue.  We may have to take that

20 up on another day, but to read about it on every single

21 pleading is not appropriate.

22          We also haven't created wars, Your Honor.  You

23 know, the fact of the matter is, it is one issue in this

24 case, it is a major issue, but it's not the only issue and it

25 is not -- and we are not one of the three law firms that

1  created the problem.

2          Now, the other thing that is stated in the

3  pleading, Your Honor, is somehow this is -- our goal is to

4  designate the votes or to cause re-solicitation.  Your Honor,

5  if I wanted to have the votes designated or re-solicit --

6  that was really the TCC's goal in mind -- I assure you or I

7  wouldn't be bringing this motion, there's enough in this case

8  to make those claims.  A voting ombudsperson would actually

9  fix it, not cause it.

10          So, if anything, which I find kind of ironic, is

11  for instance Mr. Molton during I think one of the hearings

12  said that this may result in them having to seek to designate

13  all the no votes.  Well, I don't want to see and the TCC does

14  not want to see yes or no votes designated.  The survivors

15  should have a say in this and they should not be designated,

16  particularly when many of them are represented by counsel who

17  realistically -- and I don't mean this in a pejorative way --

18  who realistically cannot get back to them.  That's just the

19  way it works.

20          So we are trying to fix the problem, we are not

21  trying to undermine this process.

22          Now, the next thing I'd like to address is there

23  is really nothing in the response that addresses the fact

24  that Mr. Rothweiler, Mr. Kosnoff, and Mr. Van Arsdale are

25  completely confusing their clients.  It would be really

1  simple to send a joint letter that says here are the

2  positions, here are our positions; you should make your own

3  determination.  In fact, Your Honor, we can debate the Model

4  Rules and the Model Code, and I've done a lot of reading

5  about it, is I understand what Delaware has enacted and what

6  Delaware has enacted in fact cross-references the Model Rules

7  cross reference the Model Code, which has EC5-12, that says,

8  "If there is a dispute between lawyers representing the same

9  client, they should jointly provide the information to their

10 clients," which is why I believe Your Honor should require

11 them to do it.

12          Now, I do want to read from one paragraph in the

13 opposition that I found kind of interesting, which is

14 paragraph 19 of the opposition, which reads, "Indeed, the

15 Court has already expressed concern about improper

16 communications to represented parties."  Stating at the

17 November 12 hearing that, quote, "I am concerned with

18 communications to represented parties who have their own

19 counsel, who should be communicating with them and maybe

20 trying themselves to clear up the confusion."

21          It was on November 12th that it sounds like Mr.

22 Welch may have heard you and he tried to clear up the

23 confusion, and Mr. Rothweiler refused to do that.

24          And so what I don't understand -- and maybe I

25 should, maybe I'm being naïve about it -- is why the parties

1  would not want to resolve this voting confusion issue.

2  Forget about a voting ombudsperson, forget about anything

3  else, this voting confusion issue is clear and it's not dealt

4  with in the response and we're happy -- what I would ask is

5  that we actually do have a hearing where we will modify our

6  request, and we will respond in detail to the opposition and

7  try to deal with this issue.

8           But no one, I think, can legitimately say there

9  isn't a problem and voting confusion by something that Model

10 Code EC-512 dealt with specifically.  And it's very hard to

11 find ethical rules that deal with it because it's so unusual

12 that you would have multiple lawyers who would be in a

13 position that they would be providing for this, but I don't

14 understand why everyone is hammering on us, which they have a

15 right to do, if they'd like, but this is -- but what has been

16 done with respect to multiple letters, I've heard multiple

17 letters go out each day to these clients by different lawyers

18 representing the same clients and that that should not be

19 corrected.  And if Your Honor believes that that is -- that

20 it's okay what they're doing, then I'll back off of this.

21 But it is not okay, in my view, and I'm hoping that Your

22 Honor will see it the same way, but if not, I will absolutely

23 respect whatever your decision is, but that is why we're here

24 today.

25           And I --

1          THE COURT:  Well, if you're going --

2          MR. PACHULSKI:  -- I know that there are other --

3 I'm sorry, Your Honor.

4          THE COURT:  -- if you're going to modify your

5 request, I'd like a modification and some authority for what

6 it is that you would like me to do, so that --

7          MR. PACHULSKI:  I would be --

8          THE COURT:  -- others can --

9          MR. PACHULSKI:  Sorry.

10         THE COURT:  -- so that I can take a look at it and

11 others can take a look at it.  I grant you, this is an

12 unusual situation; I've never seen it before.  I'm not sure

13 who is entitled to a remedy and what that remedy is, and who

14 has standing to raise the issue.  And, if you're basing it on

15 the model code, as opposed to the Bankruptcy Code, that could

16 make a difference.

17         It's not that -- it's not that perhaps everyone

18 shouldn't be concerned about the confusion, I don't know, but

19 there was nothing in your papers that I read that tells me

20 that I have the authority or should get involved at this

21 point given where we are.  But maybe I should, I don't know,

22 but I will say there was nothing in your papers, especially

23 on the model rules point, which was just in a footnote, which

24 tells me that I can get involved, I should get involved, and

25 what involvement should be, because what you're telling me is

1  that counsel are breaching their professional ethical

2  obligations, is what you're telling me.  Certainly the

3  clients have a cause of action or have some remedy, but I'm

4  not sure what else there is, maybe there's something.

5          I do have concerns, as I said before, on the

6  impact of the voting, but sending out a letter now with many

7  parties already having voted, I presume, I have to think -- I

8  would have to think that through, even if I think that your

9  position might be correct, as some abstract proposition

10 raised by a creditors committee with respect to professionals

11 involved in this case.  And they're not --

12          MR. PACHULSKI:  Your Honor --

13          THE COURT:  -- really involved, they represent

14 parties in the case.

15          MR. PACHULSKI:  If I could comment a moment, Your

16 Honor, I'd be happy to.

17          THE COURT:  Uh-huh.

18          MR. PACHULSKI:  I'm not looking -- I do think Your

19 Honor has authority and we will take it upon ourselves to

20 modify the motion as to what we're requesting.  It's simply

21 not just the ethical issue, but that is an issue, it's also

22 in terms of preventing voting designation and other issues,

23 which I think Your Honor has the right to require certain

24 things be sent out.  You could have required as approval of

25 the disclosure statement that that letter be out, be sent out

1  because it would create voter confusion, but rather than --

2           THE COURT:  Maybe, I don't know --

3           MR. PACHULSKI:  Well --

4           THE COURT:  -- but to do it now, what do we do

5  with all the people who've already voted?

6           MR. PACHULSKI:  Your Honor, that's a very fair

7  point and I think what would have to be -- well, we're still

8  going to request a two-week extension and, if people who get

9  the letter state that they want to change their vote, they

10 should be able to change their vote.  If I get additional

11 information or I say, wait a second, I thought all the

12 lawyers agreed and now I'm finding out they didn't agree, I

13 want to change my vote.  I think --

14          THE COURT:  But didn't we already send -- didn't

15 we already send a letter that said to people that, if they

16 wanted to change their vote, they could?

17          MR. PACHULSKI:  Well, that is my understanding,

18 Your Honor, but if the issue is the vote, then people would

19 have the right to change their vote if they received this

20 letter and they felt that, based on what was in the letter,

21 which now they had the position of each of the three lawyers

22 on a single document, they're getting bombarded with a

23 variety of letters, is -- would be appropriate.

24          So when Your Honor says, how do -- because Your

25 Honor asked an excellent question, which is, okay, how are we

1  going to fix this?  I think the way to fix it is to give

2  those clients a period of time that they change their vote,

3  if they deem it appropriate, and that is what we would

4  request.

5         I understand Your Honor's concerns, Your Honor,

6  and I'm trying to do the best I can because where I see this

7  potentially going is that some party -- and I'm not sure who

8  it is because I don't know where the vote is going to come

9  out -- is going to raise this as a voting designation or a

10 re-solicitation issue.

11        THE COURT:  And I'm --

12        MR. PACHULSKI:  And so --

13        THE COURT:  -- not sure that sending anything

14 further out is going to prohibit -- prevent any party from

15 doing that very thing.  It's just going to be another item

16 that's raised.  You may be right, I need some specific

17 authority on this, and I really don't think it's in your

18 current motion.  And, you know, why isn't there going to be a

19 lot of authority on this?  Because this doesn't happen.

20        MR. PACHULSKI:  Right.  I mean, Your Honor, I've

21 spent -- I can't even tell you how much time I've spent on

22 this and I've had some other people in our firm do it, I --

23 Your Honor, I've practiced 42 years, I have never seen

24 anything remotely close to this, in a bankruptcy or non-

25 bankruptcy matter.  The idea that you have three lawyers who

1  disagree, I think that is why the model code tried to deal

2  with it.  And, while the model code cross-references to the

3  model rules, the model rules cross-references the model code

4  under 1.2(a) and is to be instructive, I'm still not clear if

5  it's a -- how the Court deals with it.  I'm still trying to

6  get my head around it because it is so highly unusual.

7          As I said, Your Honor, my goal is to fix what I

8  think is a problem and Your Honor will have to decide if it's

9  a big enough problem to deal with or, frankly, whether you

10 have authority to do it, and I -- and what we are going to

11 work on because I still think this is an important issues,

12 independent of other issues, is that Your Honor should make

13 the determine right or wrong.  And I do believe it does

14 negate some of the voter designation issues because it's

15 going to be on these very ballots, because these people

16 represent 20 percent of the voting group.  But we will draft

17 it up, we will do the best we can, and we will allow Your

18 Honor to make a decision on that motion.

19         And I see -- you know, I see a lot of hands up, I

20 don't want to hog the podium, Your Honor, but I did want Your

21 Honor to understand that I am doing what I can to try to

22 bring some sense at least vis-a-vis what the TCC is trying to

23 do.

24         THE COURT:  Okay.  Thank you.

25         MR. PACHULSKI:  Thank you so much, Your Honor, for

1    giving me the opportunity.

2            THE COURT:  Certainly.

3            Ms. Lauria?

4            MS. LAURIA:  Thank you, Your Honor, Jessica

5    Lauria, White & Case, for the debtor.

6            Your Honor, I need to respond to four points that

7    were raised by Mr. Pachulski's remarks and some of them I'll

8    be brief, but some of them I'm going to need to take a little

9    bit more time on.

10           First, with respect to the mediation, Your Honor,

11   we have a long history of mediating with the TCC in this

12   Chapter 11 case; that culminated in the RSA.  As Your Honor

13   is aware, that RSA was not pursued and, in the wake of that,

14   in the wake of the RSA not going effective and the

15   settlements that were reached thereafter, the TCC -- and I'm

16   trying to be careful with respect to the mediation privilege

17   even though I know others occasionally are not -- we were

18   unable to engage productively with them.  But I will make an

19   observation that Your Honor made a long time ago, the phone

20   works both ways, and I will add to that it takes two to

21   tango, and I'll leave the mediation at that.

22           Second, with respect to the late-breaking news

23   that they are now withdrawing their request to appoint a

24   voting ombudsperson, I have to walk Your Honor through the

25   timeline.  This is extremely disappointing and frustrating

1  for the debtor that if they were going to withdraw this

2  relief they did not contact the debtor in advance of today's

3  hearing or even at some point over the holiday weekend, so we

4  could have avoided the tremendous waste of estate resources

5  that were expended upon responding to this motion.

6           We heard from Mr. Pachulski that he became

7  involved in this matter on Friday, November 19th.  On Monday,

8  November 22nd, in light of some Kosnoff communications, he

9  concluded, based upon his two days of involvement in this

10  case, that a voting ombudsperson was necessary.  I was

11  contacted Tuesday afternoon via text message telling me that

12  I needed to get on a phone call within 30 minutes with them

13  in order to avoid them filing an emergency motion.  I was on

14  an airplane.

15           We ultimately had to yank people out of mediation,

16  spend the evening of Tuesday working through their motion,

17  getting on a meet-and-confer Wednesday morning, which was

18  very clearly intended to basically present two options to the

19  debtor, which was either you take this ombudsperson motion or

20  there is going to be a vote designation or a re-solicitation

21  in this case, both of which I absolutely disagree with.  As

22  we explained to them at the time, we do have a voting

23  ombudsperson, it's Your Honor, Judge Silverstein is our

24  voting ombudsperson.

25           We spent five days in September going through the

1  disclosure statement and the solicitation procedures.  The

2  timeline was specifically calculated to deal with voting

3  issues.  We did not have this issue of confusion until the

4  Pachulski, I'll call it, Kosnoff communication went out a few

5  weeks ago.  We then worked all weekend with respect to the

6  reply that was filed ultimately around 10:00 or 11:00 a.m.

7  Eastern time this morning, about three hours prior to the

8  hearing.

9          Had we known that they were not going to pursue

10  the appointment of the ombudsperson, we would have expended

11  our resources on both the mediation and plan-related

12  discovery or the plan supplement, but instead -- at least

13  I'll speak for the debtors' team, although I understand --

14  because I know Mr. Brady was on calls -- estate professionals

15  and professionals that are compensated by the estate spent

16  literally hundreds of hours on this matter over the last

17  couple of days.  And we did that when we were stretched

18  extremely thin from a staffing perspective.

19          Third, Your Honor, with respect to it sounds like

20  they're going to continue their request to extend the voting

21  deadline by, I believe their pleading said at a minimum of 14

22  days, I'm not sure if they're standing by the minimum of 14

23  days, but I wanted to address that point.

24          The debtors, as Your Honor has probably gathered,

25  are in the process of negotiating what we hope will culminate

1   in additional settlements.  We are evaluating whether there

2   is any room in the schedule to move the voting deadline so

3   that voters have the benefit of seeing those additional

4   settlements.  But, as the Court is aware, because we did

5   spend a full day on this at the disclosure statement hearing,

6   there are multiple dates that are interdependent with the

7   voting procedures date, at least five.  We have the voting

8   deadline itself; then again we had extensive debate at the

9   disclosure statement hearing about the need for a preliminary

10  voting report, so one that would go out publicly for all

11  parties, and then a final voting report.  Both the

12  preliminary and final voting report were calculated to; one,

13  giving the voting agent, which is going to be tabulating

14  potentially 82,000 votes, both of those dates were calculated

15  to give the voting agent sufficient time to review and

16  tabulate the ballots; and then they were interlinked with the

17  next deadline, which was the objection deadline.

18          We heard from the objecting parties that they

19  wanted the voting report -- and it makes sense -- prior to

20  filing their objection.  Our reply deadline was then based

21  upon the objection deadline.  And of course we all wanted

22  Your Honor to have sufficient with the pleadings in advance

23  of the January 24th hearing, so that you could actually read

24  and understand the parties' position.

25          By moving the voting deadline by two weeks, that

1 would literally have the voting deadline occur after the date

2 in the solicitation procedures order for the preliminary

3 voting report, that date is December 21, moving two weeks

4 puts that -- the voting deadline itself on December 28th.  It

5 would be impossible, Your Honor, to have a final voting

6 report prior to January 7th, which is the plan objection

7 deadline.  And, again, there's just a ripple effect with the

8 other plan deadlines.

9          The debtors, however, are engaged with Omni, the

10 voting agent, to make sure we understand what their timeline

11 is for tabulating the votes, whether we've been able to

12 squeeze every day we can out of the timeline.  But, suffice

13 it to say, moving the voting deadline is going to result in a

14 final voting report not being available by the objection

15 deadline unless the objection deadline and the other

16 deadlines are moved.

17          This confirmation process has cost the estates

18 much more than we anticipated.  We have to hold that

19 January 24th deadline if we want any hope of there being any

20 cash available for the trust and, frankly, the ability to

21 continue to compensate the advisers in this case and pay the

22 administrative costs of the Chapter 11 proceeding.

23          Finally, Your Honor, I think it became very clear

24 during Mr. Pachulski's remarks that really what they're

25 focused on is a dispute between three lawyers that have a

1  joint representation.  That does not necessitate a voting

2  ombudsperson or a person or a broad solicitation letter,

3  which, by the way, it sounds like it's intended to say what

4  the original letter already said, that we already had a

5  hearing in front of Your Honor about.  That to me is a matter

6  that is before -- that involves those three law firms and how

7  they want to address their clients.

8          I will note, however, Your Honor, and we pointed

9  this out in our pleading, that the model rules that were

10  relied upon in the TCC's pleading are actually a dated

11  version.  But beyond that, Your Honor, I think everybody

12  needs to see the actual relief that the TCC is requesting

13  before we start responding to this letter proposal or

14  dictating to lawyers how they handle their own relationships

15  with their clients.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          Let me hear from Mr. Wilks.

19          MR. WILKS:  Thank you, Your Honor, I appreciate

20  the opportunity.

21          You know, Mr. Pachulski kind of talked through

22  what I presented to Your Honor on Wednesday and, if Your

23  Honor hasn't had a chance to read it, that's completely

24  forgivable with Thanksgiving and I know Your Honor will, but

25  he gave you the high points.

1         Mr. Kosnoff did hear it, Your Honor, loud and

2  clear, and wanted to just -- let's do the right thing by our

3  clients.  Mr. Kosnoff has been accused probably of a lot of

4  things in this case, I've never heard anyone accuse him of

5  not having his clients' best interests at heart.  And so that

6  was the goal when I contacted Dan Hogan and kicked this idea

7  around.  And, if Mr. Pachulski is going to revise his motion

8  and ask now for something from Your Honor compelling

9  Eisenberg Rothweiler to play along with this idea and

10 cooperate, we'd be supportive of that.  It was our idea and I

11 wish we had had the idea sooner, but we didn't.  We are most

12 amenable to do that, Your Honor, but I think it's important

13 to clear up a couple things, a couple misstatements today

14 that I think are really important because it tells Your Honor

15 really what we're up against here, more importantly what our

16 clients -- what the Kosnoff, the AIS clients are up against.

17        The multiple communications that go to the AIS

18 clients, these 15,000 mostly men, are not coming from various

19 law firms, my understanding is they're all coming from

20 Eisenberg Rothweiler.  These people get four, five, up to

21 nine emails a day attaching an eBallot and -- I mean,

22 propaganda is probably not too strong a word -- you know,

23 really cajoling people, vote to accept the plan, vote to

24 accept the plan, vote to accept the plan.  They're getting

25 this over and over and over, and it's alarming to them, it's

1 disturbing to them, and so forth.

2          But that's all.  One of the huge problems with

3 this eBallot is, when it works at all -- I'm not sure if they

4 fixed or not, but it doesn't work on a smartphone and so

5 forth.  But one just shocking problem with this thing is, if

6 you vote reject, you may very well have your vote recorded as

7 accept.  I mean, it doesn't record the vote properly, at

8 least going in that direction.  That's the kind of thing that

9 was so alarming to Mr. Kosnoff, which caused him to send out

10 the early November communication again to the clients is

11 those kinds of problems.

12          But the real problem to me that is most disturbing

13 is clients who do send in a ballot marked "reject" receive

14 phone calls from lawyers at Eisenberg Rothweiler trying to

15 convince those people to change their vote.  So not only they

16 get all the information, they get all these communications,

17 submit a vote to reject, and then they get a call from a

18 lawyer hectoring them to change their vote, and it goes on

19 for ten minutes or more.  After somebody says, "Listen, I'm

20 not interested in changing my vote," the lawyer keeps

21 hectoring them into changing their vote to accept.

22          That can't happen, in my view, Your Honor, that's

23 completely unacceptable.  But what was our idea that I

24 thought was so cool was, hey, look, you guys don't like

25 (indiscernible) up on Twitter, fine, we don't like this

1  relentless campaign bombing these poor people with the same

2  thing over and over and over and then phone calls.  We'll put

3  down Twitter, Mr. Kosnoff and Kosnoff Law, we'll put down

4  Twitter, and you folks stand down on this campaign.  Here's

5  what we'll do.  And it's in my papers, Your Honor knows what

6  the idea is.  We're going to put together a one-document

7  thing and send it to these folks and say, here are the

8  reasons why it would be a good idea for you to vote to accept

9  the plan, here are the reasons why it's a rotten idea for you

10 to accept the plan and why you should vote to reject.

11        And it may -- you know, people may find their own

12 situation found in -- you know, in those explanations,

13 because not all claimants are created equal here.  I think

14 that much we can all agree on.  Everybody's situation might

15 be a little bit different.  So I, as a client, what's best

16 for me?  That's what these folks are dying to know.  Why

17 can't we come together as attorneys and say here's the pros

18 and the cons of each side.

19        Now, Your Honor, months and months ago, I was on a

20 hearing, I don't remember which one it was, and I told Your

21 Honor something -- it was probably on the 2019 issue or

22 something -- I told Your Honor that I thought that the AIS

23 clients were in the best possible position, that they were in

24 the best position of any claimant in this case.  Why?

25 Because they had lawyers who viewed this two ways and they're

1  going to get the best possible advice each side, and then

2  they could, as an individual with his own unique

3  circumstances, make the best call for himself.

4         Now, was I right that that puts somebody in a

5  great position to get two different pieces of advice from

6  their lawyers?  I don't know.  I would like that if I were a

7  client.  But when I said that, Your Honor, it never occurred

8  to me that Eisenberg Rothweiler would refuse to engage in a

9  process whereby professional advice would be given to these

10 poor claimants.

11         That's what we tried to present, Your Honor, and I

12 still to my soul and to Mr. Kosnoff's, the heart -- to his

13 very heart want this very badly, to put this out there to

14 these clients, and then we all stand down.  Let these very

15 intelligent people with their own set of unique circumstances

16 make decisions for themselves.  That's all Mr. Kosnoff is

17 asking for, Your Honor, that's all I'm -- we're asking Your

18 Honor for.

19         Now, if the TCC is going to put together a

20 revised, you know, petition or a motion or something, great.

21 And, listen, I'll work hard too, Your Honor, on the standing

22 issue and Your Honor's authority.  Maybe it's Kosnoff Law

23 should be the one with standing.  That seems weird to me, but

24 we'll look into it and we're going to come to Your Honor.

25 But, Your Honor, I ask you to keep an open mind because it's

1  the claimants here who are suffering the most, and

2  Mr. Kosnoff is coming to Your Honor with a sincerity to serve

3  these people the best that we can.

4           I've probably said enough.  Thank you, Your Honor.

5           THE COURT:  Thank you.  One thought that comes to

6  mind, Mr. Wilks, is that state law counsel has really wanted

7  me to stay out of their relationships with their clients, and

8  they have not even wanted to tell me what those relationships

9  are and, until ordered -- I think that is this case and I

10 might be confusing it with Imerys -- but I think, until

11 ordered, they wouldn't file Rule 2019 statements.

12          So to think that -- to think that counsel wants me

13 to get involved in their relationship with their client and

14 how they choose to provide their clients advice is, quite

15 frankly, a little surprising, but I hear you.

16          MR. WILKS:  It is, Your Honor.  If I may speak

17 just a second, I know other people want to be heard.

18          I was a very vocal opponent of allowing discovery

19 against lawyers, depositions of lawyers; I thought it was odd

20 that a 2019 would be filed.  But, you know, the 2019 was

21 probably different, but it was the discovery against a

22 litigating attorney which just really, really bothered me,

23 and I just think it was completely uncalled for when it was

24 originally asked for, then circumstances changed.

25          And so, Your Honor, Mr. Kosnoff sat for a

1  deposition a week ago today and he -- everybody was there.

2  You had -- Mr. Andolina was there for the debtors and

3  everybody was there.  And Mr. Kosnoff said, I know there's a

4  seven-hour limitation, I waive it, you all take as long as

5  you want, ask me anything you want.  Mr. Patterson went

6  first, Mr. Schiavoni asked all the questions that he had,

7  with the exception of those that others objected to and

8  asserted privilege, which Mr. Kosnoff doesn't agree with, we

9  don't think privilege attached to the topics that

10 Mr. Schiavoni asked about.  He answered every single

11 question.  He produced all the documents that Mr. Schiavoni

12 asked for that he had.  I mean, there are things

13 Mr. Schiavoni asked for that aren't in Mr. Kosnoff's

14 possession and that's fine.

15         So we -- in this case, Your Honor, we completely

16 took off the kimono, if you'll forgive that remark.  The

17 thing is, circumstances change.  And I'm not going to tell

18 Your Honor that in the next case that comes along I'm going

19 to say it's great for lawyers to give depositions because it

20 isn't.  These were odd circumstances and Mr. Kosnoff put his

21 money where his mouth was and said ask me anything you want

22 because what's going on here is wrong, and the clients are

23 suffering for it and it's got to be stopped.

24         And, Your Honor, it shocked me, it almost broke my

25 heart to hear that the Eisenberg Rothweiler firm said, that's

1    a nonstarter, we're not doing that.  Your Honor, that's got

2    to be something somebody can do about that, and I hope it's

3    Your Honor who can.

4              THE COURT:  Thank you.

5              Mr. Hogan?

6              MR. HOGAN:  Thank you, Your Honor, Daniel Hogan of

7    Hogan McDaniel on behalf of Eisenberg Rothweiler.  Can you

8    hear me, Your Honor?

9              THE COURT:  I can.

10             MR. HOGAN:  Thank you.

11             Your Honor, let me start with the last comment

12   that Mr. Wilks made.  I think the one thing that we can agree

13   on ultimately is that it's the survivors who are of the

14   utmost concern, and Eisenberg Rothweiler shares that concern.

15             I think, Your Honor, it's important for the Court

16   to have the understanding in the context about how Eisenberg

17   Rothweiler thinks about Mr. Kosnoff in terms of all of his

18   machinations, both in the context of this case as well as

19   within the context of Twitter.  Because of Mr. Kosnoff's

20   repeated defamation statements of Mr. Rothweiler,

21   Mr. Rothweiler and Eisenberg Rothweiler are reluctant to sign

22   onto any sort of joint letter to all the clients when there

23   already have been a number of emails and communications to

24   those clients.

25             That being said, if forced by the Court or ordered

1  by the Court to do so, I'm sure that we could acquiesce to

2  the Court's instruction and undertake something in the nature

3  of a joint communication, but you have to understand

4  Eisenberg Rothweiler's reluctance in light of what is to this

5  date really been a one-sided war waged by Mr. Kosnoff against

6  anybody who disagrees with him.  And, you know, the Twitter

7  thing is lost on me, Your Honor, but, you know, in light of

8  the recent political environment and past Presidents, you

9  know, using Twitter to tear down people, it just seems that

10  Mr. Kosnoff has taken a page from other people's books as it

11  relates to that.

12          Your Honor, I want the record to be clear, first

13  and foremost, the motion isn't before the Court.  So what I'm

14  hearing is that we're arguing a number of the issues

15  contained in the motion, which we haven't even responded to

16  yet officially because you never entered an order shortening

17  notice and scheduling this for anything other than the status

18  conference today.  So, Your Honor, I reserve my right to

19  respond to whatever the TCC ultimately files with regard to

20  this ombudsperson in the motion, but let me be clear on a

21  couple things, Your Honor.

22          The TCC, as much as they want to say that their

23  hands are clean or at least not that dirty with regard to

24  this whole controversy, they helped create this crisis and

25  now they're trying to utilize it, unsupported by statutory

1   case law, to leverage it for their benefit.  And ultimately,

2   from our perspective, that shouldn't be countenanced by the

3   Court.  The Kosnoff letter that was sent out on the weekend

4   of November 5th has helped to create widespread confusion and

5   mistrust in the voting process, and Mr. Kosnoff has helped

6   facilitate that lack of trust and, from our perspective, the

7   Court shouldn't allow that to occur.

8          So, from our perspective, you know, I'm of the

9   belief, Your Honor, that this motion needs to be fully

10  briefed, fully argued.

11         And one other thing, Your Honor, just so the

12  record is clear because, in reading Mr. Kosnoff's response to

13  the ombudsperson motion -- you know, I don't like being

14  called out for anything in this court, but particularly I

15  don't like being called out for being a bad guy.  And in

16  looking at that motion and the response of Mr. Kosnoff, my

17  email that it's not going to happen was at the end of a long

18  dialogue, a series of phone calls, conversations with

19  Mr. Wilks, as well as emails, and the phone calls aren't,

20  obviously, a part of the record.

21         But suffice it to say, Your Honor, that when I do

22  file a response it will be clear that I said to Mr. Wilks at

23  one point, well, let me see what you propose in terms of this

24  joint letter and what's it going to say.  And the reason I

25  said that, Your Honor, is because it's clear that Mr. Kosnoff

1    has his own agenda and his own fiery brand way of

2    articulating things that, obviously, the Eisenberg Rothweiler

3    firm doesn't agree with.  And so what you see there at the

4    end is an email, at the conclusion of a dialogue that

5    continued for some time, about the possibility of a letter

6    and, after consultation with their attorney, Eisenberg

7    Rothweiler made the determination for whatever reason that

8    the Kosnoff firm -- or that the Kosnoff could not be trusted,

9    and that's what you see as a result of that, Your Honor.

10            So, unless you have any other questions for me,

11   I'm going to reserve my comments until such time as an

12   appropriate motion is before the Court and we have an

13   opportunity to respond.

14            Do you have any questions for me, Your Honor?

15            THE COURT:  Thank you, Mr. Hogan, no, I do not.

16            Mr. Grey?

17            MR. GREY:  Thank you, Your Honor.  I'll be very

18   brief because, Your Honor, I thought this was a status

19   conference on this motion.  We know that a motion was filed

20   for shortened proceedings and it was not granted, so we

21   haven't filed anything yet.  Mr. Pachulski got into the

22   merits quite a bit, and Mr. Wilks actually went far beyond

23   the merits of the motion that was filed, and an awful lot was

24   said, we believe, without any basis and some of it with

25   respect to the AVA Law Group, which we're working with.

1          So, Your Honor, I just want to -- I guess the TCC

2   will file a new motion or at least supplement the one they

3   filed before.  We'll see what relief they're asking for and

4   we'll see what factual basis they allege for it, and then

5   we'll respond at an appropriate time.  Until then, I would

6   just ask the Court to not make up your mind about anything

7   because you're not hearing the whole story yet.

8          THE COURT:  Thank you, Mr. Grey, and rest assured

9   I'm not --

10         MR. GREY:  Thank you.

11         THE COURT:  -- making up my mind yet.

12         Mr. Brady?

13         MR. BRADY:  Thank you, Your Honor, Robert Brady on

14  behalf of the FCR.

15         Your Honor, the FCR has been reserved on this

16  issue as we waited to see the results of the discovery, but I

17  have to respond to some of what has been said today.

18         I think Mr. Pachulski told you the first time he

19  appeared that his goal of taking over the case was to bring

20  the temperature down, but instead, Your Honor, all he does is

21  keep fanning the flames.  Just listen to all of the attacks

22  on the Eisenberg Rothweiler firm that he has created with his

23  motion and now his modified motion, and some of his other

24  statements about the TCC being excluded.

25         Needless to say, Your Honor, I completely disagree

1 | that the TCC has been excluded from the mediation.  I will

2 | leave it to what Ms. Lauria said because I too want to

3 | respect the mediation process.  But, needless to say, Your

4 | Honor, I think that comment was completely uninformed.

5 |          Mr. Pachulski said the TCC is laser-focused on

6 | survivors being heard, but, Your Honor, their actions have

7 | made it clear they are laser-focused on defeating this plan.

8 | I found it completely inappropriate at a status conference

9 | for Mr. Pachulski and Mr. Wilks to really testify on hearsay

10 | about what Mr. Hogan allegedly said during their

11 | conversations, what the app allegedly does, how many

12 | communications people get, how long they're on the phone.

13 | There's no evidence at all, Your Honor, before you on any of

14 | those issues.

15 |          What the evidence does show is that the Pachulski

16 | firm wrote large portions of the Kosnoff letter and then

17 | under the official TCC email address they sent it out.  And

18 | now they're telling us there's an ethical concern that, if

19 | that's true, Your Honor, that clearly exacerbated it, and now

20 | they're telling you that they know best how to fix it.

21 |          Your Honor, the TCC created this problem.  All of

22 | this really feels like another attempt to delay and defeat --

23 | or defeat the plan.  If the TCC wants relief, they should

24 | file another motion, they should spell out exactly what they

25 | want and we'll respond to it at the appropriate time.  But

1  we've spent hours of reviewing discovery, in depositions, all

2  at a time, Your Honor, where we're really trying to prepare

3  for plan confirmation and try to resolve these cases through

4  mediation, and this is another distraction and another

5  attempt to defeat the plan.

6            THE COURT:  Thank you.

7            Mr. Patterson?

8            MR. PATTERSON:  Thank you, Your Honor, Tom

9  Patterson, KTBS Law.

10           Your Honor, when the emergency motion was filed by

11 the debtors following the sending of the Kosnoff email by the

12 PSZJ firm, we looked around and noticed that no one was

13 seeking to depose Mr. Kosnoff, who was at the center of it.

14 So I called up Mr. Wilks, who I have not previously known or

15 communicated with, looked up the 2019 statement and saw that

16 he had signed it, and called him up out of the blue and said

17 this is kind of an odd circumstance, Mr. Wilks, but would

18 your client consent to being deposed on this issue of what

19 happened?  No one else seems to be interested in his

20 testimony, but we are.

21           And it took him a few days, but he got back and

22 without conditions agreed to a deposition, it got continued

23 to the Monday, and we took that deposition.  And what we

24 found was that the sending of the eBallot by

25 Mr. Rothweiler's firm is really what had caused all the

1  confusion.  That's what caused Mr. Kosnoff's phone to

2  explode, that's what caused all the communications to him,

3  and that is what generated the confusion that he was

4  endeavoring to respond to when he and the Pachulski firm

5  coordinated with regard to the transmission of his letter.

6  That is what caused the problems.

7          And I am absolutely astonished, Your Honor, that

8  these estate fiduciaries have no interest in trying to clear

9  up the manifest confusion that has taken place.

10          The deposition went on under the questioning that

11  we took for about four or five hours.  And at the conclusion

12  of the deposition, after other people had asked questions, it

13  was the Coalition, the Coalition that designated the entire

14  transcript -- the Coalition that's not a party designated the

15  entire transcript as confidential, so that only excerpts

16  could be filed under seal for Your Honor, and that people

17  couldn't see what's happening.

18          And although several clients of Mr. Kosnoff have

19  indicated -- waived the privilege so that Mr. Kosnoff could

20  tell them what was happening.  There was objections by the

21  other counsel with regard to that and they had indicated they

22  would file a motion for protective order to preserve that

23  privilege.  It's a week later now, Your Honor, no motion has

24  been filed with regard to that.

25          The confusion that has been caused is manifest and

1  the confusion -- and Mr. Pachulski and I have known each

2  other for a long time, long enough to be able to disagree.

3  The confusion goes beyond a remedy that a single letter could

4  fix.

5          There is testimony with regard to the eBallot,

6  there's testimony with regard to the pressure campaign with

7  regard to the voting.  We are interested in fixing this

8  problem before it becomes a designation problem because

9  that's where it's headed to.  There will be further discovery

10 with regard to how the ballots were taken, further discovery

11 with regard to the messaging, and it seems to me at this

12 point almost inevitable that either side, if they're

13 disappointed in the outcome -- and one side is going to be

14 disappointed in the outcome -- is going to file designation

15 motions that need to be resolved.  And it seems to me and it

16 seems to us that fixing this should be everybody's paramount

17 concern.

18         Your Honor, I believe this Court has pretty broad

19 jurisdiction over the solicitation process.  I believe

20 Combustion Engineering and other cases indicate that the

21 preservation of the integrity of the vote is something this

22 Court has jurisdiction over.

23         And it wasn't all counsel that indicated that they

24 wanted the Court out of the relationship between counsel and

25 client.  Your Honor will recall that on behalf of our clients

1  we indicated that lawyers should have a power of attorney to

2  be able to cast votes.  That wasn't the ultimate resolution,

3  but that was something that we were certainly comfortable

4  with.

5         The manner in which this case has proceeded, it

6  seems to us, it is going to be essential to have some broader

7  oversight or involvement with regard to how this vote is

8  being conducted.  The debtors, apparently, do not have an

9  interest in doing that and it seems to me that, therefore, we

10  either need an elaborate agreement with regard to a

11  coordinated approach with respect to the solicitation process

12  that includes such matters as an explanation of how the

13  eBallot is working and matters like that, or we need a

14  disinterested person to oversee it and be able to report to

15  the Court and other parties to provide some confidence that

16  the manner of voting is being conducted appropriately.

17         So we do believe that this motion should be heard

18  quickly and we do believe that relief of some kind is

19  absolutely critical, and we will be happy in connection with

20  any continued hearing to address the Court in such manner as

21  we can find to indicate the jurisdiction and power we believe

22  the court has in this circumstance.

23         THE COURT:  Thank you.  And in thinking about

24  this, if there's any authority, something you said,

25  Mr. Patterson, just prompted this, but you talked about --

1  and so did other counsel -- about a campaign.  And I'm not

2  commenting on what Mr. Rothweiler is sending to his clients,

3  and I suspect, and we've heard Mr. Rothweiler will have a

4  different story.

5          But if a communication is coming from the

6  creditors' lawyer, is that a solicitation or is that just

7  giving your client advice?

8          If you didn't like the advice the lawyer was

9  giving his client, the Court can't interfere with that.

10  That's the advice they're getting and they've chosen their

11  counsel.  So, here, is any communication from any of the

12  three law firms a solicitation?

13          Clearly, I think I have jurisdiction over

14  solicitation procedures, but do I get to say anything about a

15  communication between a lawyer and his client, giving advice

16  on how to vote?

17          And it just strikes me those are, and certainly if

18  I'm wrong, could be, two different things.  And that's where

19  I'm having some concern.  And if you're going to be filing

20  anything further, make certain you address that issue because

21  this is not a general solicitation; this is, as I hear it,

22  advice from a lawyer.  Advice from the creditors' lawyer.

23  You may be getting conflicting advice, but nonetheless,

24  advice from his lawyer.

25          MR. PATTERSON:  Well, Your Honor, that comment is

1  extremely helpful to us and really illuminates an issue.  So,

2  I would just like to say two things very briefly, but we'd be

3  prepared to address it in more detail.  It's obviously a

4  critical issue.

5          First is that the eBallot is not advice.  The

6  eBallot is an electronic mechanism, not contemplated by the

7  solicitation procedures, designed to elicit the client's

8  response with respect to the plan.  It is not, in itself,

9  advice.  And so, the manner in which that's happening is

10 something that I believe, absolutely, the Court has

11 jurisdiction on.

12         Second, Your Honor, with respect to advice, advice

13 at some point becomes a solicitation.  And I think Your Honor

14 will hear testimony that indicates that the repeated

15 communications in this case take the matter well beyond

16 advice and effectively constitute solicitation activities

17 that I believe the Court has jurisdiction over.

18         THE COURT:  Okay.  Interesting.

19         Mr. Molton?

20         MR. MOLTON:  Judge, can you hear me?

21         THE COURT:  I can.

22         MR. MOLTON:  Good.  Thank you, Judge.

23         David Molton of Brown Rudnick for the Coalition of

24 Abused Scouts for Justice.  I'm going to adopt Ms. Lauria's

25 statements and Mr. Brady's statements.  They stole a lot of

1  my points and in the sake of conciseness, I'll abide by that

2  and hope you hear that.

3          We've heard, Your Honor, today in argument, we've

4  heard a lot, as I think Mr. Brady said, a lot of unsworn

5  testimony.  We just heard it from Mr. Patterson in abundance.

6          And none of this is in front of you right now,

7  Your Honor.  Your Honor has no opposition, other than the

8  debtors' opposition which was filed right before this

9  hearing, which many of us were only able to give a partial

10 glance to.  But I would hope Your Honor, and I know Your

11 Honor is not going to be swayed by the attempted sowing of

12 the narrative here, all of which, by folks who oppose the

13 plan.

14         Let's not be -- this isn't different people with

15 different views of the plan saying, Yeah, Judge, we have a

16 voting problem that we need to address, either by invading

17 the attorney-client relationship, you know, or otherwise, by

18 motions.  Let's be clear of what we have here.  We have here,

19 at least in this courtroom, in the status conference, folks

20 who are giving unsworn testimony and argument in a status

21 conference, all of whom are opposed to the plan.

22         And, the TCC, and, again, I don't want to hit this

23 issue repeatedly, is supposed to be the representative and

24 the fiduciary for all creditors.  It seems to me, Your Honor,

25 that they have chosen sides and I'll get to that in a minute.

1   Indeed, the discovery showed that they chose sides in

2   connection with this AIS issue, put their fingers on it,

3   assisted in communications with clients in AIS, and then I

4   remarked to Your Honor at one point about the duty of candor,

5   tried to avoid telling Your Honor of their role.

6            In any event, I think Your Honor hit it on the

7   nose with respect to what's at issue here.  Is this

8   solicitation over what Your Honor has jurisdiction over or is

9   it attorney-client communication; albeit, sometimes

10  confounding or possibly challenging attorney-client

11  communication when you have three law firms representing the

12  same client, but nonetheless, attorney-client communication.

13           And with respect to -- I'll leave it to the

14  evidence to come in, but my understanding, Your Honor is with

15  respect to the -- Mr. Rothweiler's attorney-client

16  communications with his client, those clients can opt-out of

17  notices if they so want.  And I'll leave it for the actual

18  hearing on this matter when that gets vetted and approved by

19  competent evidence.

20           Judge, I just want to reiterate because, you know,

21  we heard Mr. Pachulski who came here, and I understand he's

22  new to this case and I understand what his objectives are,

23  which is protecting his firm, which he candidly admitted, and

24  representing the TCC in a very challenging situation that his

25  firm got them into.  And I'll return to that in a minute.

1           But the committee, the TCC -- to say -- to testify

2    that the TCC was excluded from the mediation -- and I'm not

3    going to -- he referred to a conversation with former Judge

4    Carey and Tim Gallagher.  You know, if he wants to produce

5    the affidavits from them, let him do so.  I'm sure they're

6    going to be a very different character than what he tried to

7    impart or tell you, Judge -- tell Your Honor, rather, just a

8    few moments ago.

9           But I, again, join Mr. Brady and Ms. Lauria in

10   saying nobody was excluded from any mediation session ever;

11   indeed, the efforts made to include the TCC, as Your Honor

12   saw in the RSA, whereby they agreed to a deal with respect to

13   local councils and the BSA that those who were following this

14   case might have thought remarkable.  In any event, from our

15   position, Your Honor, the mediation is open for all and any

16   party who wants to constructively participate is always able

17   to do that.

18          I know I heard Mr. Pachulski mention my name a

19   number of times.  If Your Honor remembers, when this thing

20   was breaking, Your Honor, a couple of weeks ago, needless to

21   say, we reserved rights.  We reserved rights regarding a

22   number of things before we were able to get our fingers on it

23   and the discovery happened.

24          And one of the things we did reserve rights on is,

25   Judge, yeah, designation.  That's not to say we want it.  The

1  Coalition who, as Your Honor knows, its affiliated law firms

2  represents over 60,000 of the voters here of the unique proof

3  of claim survivors, wants everybody to vote and clearly is

4  supportive of recognition of those votes in whatever manner

5  they are, yeah or no.  All we did was reserve rights, Your

6  Honor.  If Mr. Pachulski wants to make an argument point over

7  it, that's fine.

8          Three business days has passed since the Kosnoff

9  deposition, Your Honor, three business days and a holiday

10  weekend.  And I guess we're to blame because we designated it

11  as confidential to ensure that no attorney-client

12  communications, because Mr. Kosnoff, as you know, was an

13  affiliated law firm member of the Coalition, an affiliated

14  law firm associated with the Coalition.  We wanted to make

15  sure that those attorney-client communications were protected

16  to the extent -- we're fine with the deposition.  I'm sure

17  it's going to be de-designated, but it's three business

18  days -- really, two and a half, but there you go.

19          Your Honor, I do want to say, you know, again, if

20  you -- and I'm very happy that Mr. Pachulski has now, it

21  seems, withdrawn the motion that we got together here today

22  on, because if Your Honor looks at 10, paragraph 10 -- I know

23  he referred to 10(a), which basically, you know, imposes the

24  voting ombudsman in connection with the AIS clients and

25  directs them to get involved in that client relationship.

1          He doesn't talk about (b) or (c), which I guess

2   are now abandoned, I would hope, which (b), 10(b), the voting

3   ombudsman, should be directed to send a letter to those

4   survivors not represented by AIS, except those survivors, you

5   know, and then continues.  And so, basically continuing to

6   invade the attorney-client relationship of those non-AIS

7   represented counsel whose attorney-client relationship was

8   invaded by the Lucas-Kosnoff letter and email that was sent

9   out on November 5th and 6th.  And then (c), the voting

10  ombudsman should be authorized to discuss with any survivor,

11  the voting process in the event a survivor contacts the

12  voting ombudsman.  Again, to the extent that that client is

13  represented, that survivor is represented, that survivor's

14  attorney-client relationship, again, is apparently being

15  imposed upon.  But in any event, Your Honor, we're looking

16  forward to dealing with the new motion.

17          Mr. Pachulski -- I do want to say at the end that

18  Mr. Patterson went out and took the voting ombudsman and

19  basically created a new issue that he started arguing to Your

20  Honor:  the eBallot.  And arguing that somehow whatever it

21  was that was sent to clients was not authorized, in

22  accordance with the solicitation procedures order.

23          Judge, I just want to let you know, Judge, that

24  there was a lot offered up during in this status conference,

25  a lot from opponents of the plan that want to defeat the

1  plan.  And, clearly, the solicitation procedures order speaks

2  for itself as to what's allowed and not allowed.  And as Your

3  Honor knows, since Your Honor signed it, and it was argued

4  here during the disclosure statement, it allows the

5  distribution to the ballots if the lawyer elects Section 1(a)

6  of that, of the ballot.  It allows the collection of the

7  ballot, and it allows the uploading to the Omni portal; of

8  those ballots with the signatures, the electronic signatures

9  being treated in the same way as wet signatures.

10        In any event, if that's an argument that's coming

11 down the line to exclude votes, Your Honor, to exclude votes,

12 Your Honor, it's coming not from the Coalition, not from the

13 debtor, not from the FCR, but it's being propped up right now

14 and teed up by people who are opposed to the plan.

15        Lastly, Your Honor -- so, I'm just putting that

16 out there and just calling, you know, calling what I see,

17 Your Honor -- and lastly, Your Honor, we heard Mr. Pachulski

18 say that he's never seen anything like this.  And, you know,

19 we heard a lot about various efforts by, now, contrite TCC

20 counsel, contrite Mr. Kosnoff, sincere to rectify this

21 situation.  I think Mr. Brady said it best, Your Honor, but

22 we should never forget what the evidence is going to show and

23 when Your Honor reads it, Your Honor is going to show it.

24        That what the evidence does show, Judge, is that

25 there was a deliberate, intentional effort on part of the

1  typically counsel to put their finger and their thumb into

2  the AIS issue in a way that was in favor of one of those

3  counsel against another, and in so doing, Judge, used

4  defamatory, inflammatory, inappropriate language in order to

5  sway voters.  So, I think we shouldn't lose our sight, Judge,

6  on what the facts say, what the reality is.

7          We look forward to Mr. Pachulski's new motion and

8  we'll deal with it in accord.

9          THE COURT:  Thank you.

10         MR. MOLTON:  Thank you.

11         THE COURT:  Mr. Mason?

12         MR. MASON:  Yes, thank you, Your Honor.

13         Can you hear me?

14         THE COURT:  I can.

15         MR. MASON:  Yes.  Richard Mason, Your Honor, at

16  Wachtell, Lipton, Rosen & Katz, for the Ad Hoc Committee of

17  Local Councils.

18         I just want to very briefly reiterate the point

19  that Ms. Lauria made about the mediation and its

20  extraordinary intensity at the moment and how that relates to

21  this status conference.  I would have to correct my good

22  friend Mr. Abbott, the session this morning started at

23  6:00 a.m., although emails were much earlier.

24         And it just concerns me, Your Honor, and the Ad

25  Hoc Committee, Your Honor, that estate professionals and

1  ourselves, as volunteers, have had to spend hundreds of hours

2  over the last couple of weeks on issues that were, you know,

3  at least, exacerbated, that's what Mr. Pachulski said, by the

4  Pachulski firm.  And then on top of that, collectively,

5  hundreds of more hours on a motion that's now been withdrawn,

6  while those hours could have been spent, frankly, on doubling

7  up on a mediation to try to bring a resolution to this case.

8          So, we would just ask Your Honor that if

9  Mr. Pachulski is, in fact, going to bring a revised motion,

10 that he do it on proper notice with the authority that Your

11 Honor has asked for, so that everyone can see it and study

12 it, and, particularly, be very focused on the relief he's

13 requesting.  Just, to me, from hearing it today, the relief

14 sounds quite extraordinary, if not unprecedented.  So, we

15 would want to see that on paper and without sort of the, you

16 know, the shifting request for relief and potential legal

17 arguments on the fly.

18         Because I do -- you know, I disagree with my

19 friend Mr. Patterson.  I think we all take voting issues

20 extremely seriously, but because we take it seriously and the

21 relief that's requested is serious, we need to be able to see

22 what authority they're asking -- they're using as a basis for

23 the relief that the Court would be requesting.

24         The last thing I would say is I just want to

25 address very briefly a point that Mr. Pachulski made about

1  the mediation and the TCCs not being included in it.  The TCC

2  has been, over the course of this case, an intense,

3  negotiating party with us; in fact, I have in my office here,

4  you know, the RSA that they signed and I have Mr. Stang's

5  framed signature on it.

6          So, we negotiated with them.  We reached a deal.

7  And the local council contribution that was reflected in this

8  RSA that Mr. Stang and the TCC signed onto, is in the plan

9  that they are now vehemently objecting to.  And they're

10 saying that the local council contribution is, while it was

11 acceptable here, it's now an abomination.

12         So, candidly, Your Honor, as a volunteer, I have

13 to engage in a bit of time management and I have to focus on

14 folks who are going to be constructive, negotiating parties.

15         Now, I am very happy to have a discussion with

16 Mr. Pachulski.  My firm and his have had a great relationship

17 in various matters over the course of the years.  I reached

18 out to him as soon as I heard that he was taking the lead in

19 this case.  I'm always happy to do that.

20         But the complaints that they haven't been included

21 in the mediation and, frankly, in the most recent, you know,

22 sessions over the past few weeks, I have had interaction with

23 them.  I won't go into the details; it's obviously covered by

24 the privilege.  But it's just not, I think, appropriate to

25 say that they have been excluded from this process.

1          And I would be happy to share my perspective with

2    Mr. Pachulski.  I realize he's got a lot on his plate right

3    now, but perhaps we can do that in the coming days.  Thank

4    you.

5          THE COURT:  Thank you.

6          Mr. Buchbinder?

7          MR. BUCHBINDER:  Thank you, Your Honor.  Dave

8    Buchbinder, on behalf of the U.S. Trustee.

9          And I'm going to begin by saying my internet

10   service went out and I was kicked off the Zoom call for about

11   10 minutes.  I tried to listen in on a speaker while I rigged

12   up a hotspot.  So, if my comments are passed on, to any

13   extent, that's why and you can correct me.

14          We've been quiet through this entire process.  The

15   U.S. Trustee has been listening very carefully to every

16   single word and we've carefully read every single pleading.

17   I spent the same, roughly, 40 hours the rest of you spent in

18   depositions last week.  The U.S. Trustee did not attend

19   Mr. Kosnoff's deposition, but I spent several hours this

20   morning before this hearing reading it.

21          And all that time, listening to all these hearings

22   and to all of you, I've tried to encapsulate what I've seen

23   into a paragraph.  And I do need to set the stage before I

24   read the paragraph.

25          AIS has submitted multiple 2019 statements to the

1  Court.  AIS had its clients sign a one-page engagement

2  agreement which said they were retaining Kosnoff Law, the

3  Eisenberg firm, and AVA.  They said they were being retained

4  as co-counsel.

5          If I were a client and I had signed that

6  engagement agreement, I believe that I would be able to pick

7  up the phone and call any one of those three firms and ask

8  them about my case.  And that's where we start because all of

9  these problems have arisen because of that engagement

10  agreement.  I realize that many of these issues are for a

11  different day.  But for today, and to put this issue behind

12  us, here's my one paragraph encapsulation of the last month.

13          Two of the three law firms that comprise AIS sent

14  inconsistent recommendations to their collective clients.

15  The TCC, inappropriately, because its actions present the

16  appearance of impropriety, republished one of the letters.

17  Counsel involved have withdrawn themselves from the forefront

18  of the case.  The TCC acted promptly in the first weekend,

19  although, not to the entire satisfaction of the other parties

20  who remediate the situation.

21          The law firms that are not part of AIS worked out

22  resolutions of the communication issues with counsel in the

23  order that's currently before the Court.  And the issue that

24  remains is entirely the result of a disagreement between two

25  of the three member firms; not the Coalition, not the debtor,

1  not the tort claimants committee, or anyone else.

2          It's time to put this collateral issue behind us.

3  Yes, there are fee issues that are saved for another day and

4  there may be voting issues, which are also best saved for

5  another day.  But perhaps the best solution to put this

6  behind us and move this case forward from this collateral and

7  unnecessary issue is simply -- and I'm going to suggest that

8  the two firms involved, Eisenberg and Kosnoff, agree to

9  engage in no further public communications how parties should

10 vote on a plan.  That would include no Twitters, no email

11 blasts, no phone -- mass phone calls, no TV advertisements.

12         If you want to communicate with your clients,

13 communicate with them privately.  But my swift suggestion

14 would be for the two firms to agree or be directed to make no

15 further public comments regarding the solicitation process.

16 And I think that would put this matter behind us on the main

17 event, and the issues that remain with respect to fees and

18 voting are best left for another day.

19         Thank you, Your Honor.

20         THE COURT:  Thank you.

21         Okay.  Mr. Hogan, I see your hand.  I'll permit

22 you a brief moment, then I will let Mr. Pachulski have a

23 brief moment, then we'll be done with this.

24         Mr. Hogan?

25         MR. HOGAN:  Thank you, Your Honor.  I'll be brief.

1          Just one issue, Your Honor, in response to

2   Mr. Patterson with regard to the sealing of the transcript

3   and the Kosnoff email communications, which were disclosed.

4   He indicated that a motion had not been filed, but, Your

5   Honor, this afternoon, right before this hearing, a letter

6   motion for a protective order was, in fact, filed with the

7   Court.  It's at Docket 7480, Your Honor, and that addresses

8   the issues relative to that.  And I just wanted the Court to

9   be aware of that.

10          Thank you, Your Honor.

11          THE COURT:  Thank you.

12          Matters move quickly.

13          Mr. Pachulski?

14          MR. PACHULSKI:  Thank you, Your Honor.  I will

15   make this quick.  There were a lot said and I'm going to -- I

16   figure it will come for another day for most of it.

17          First, because this has been commented by at least

18   three people about the mediation -- and we can get into that

19   later, because we'll need to -- but we don't get notices.  I

20   think Mr. Molton said we can just attend -- it's okay if

21   anyone attends, but we have to know about it.

22          It seems that maybe Mr. Mason hit the issue, which

23   is the view is even though the RSA wasn't approved, you made

24   a deal and you're stuck and even though no one else is stuck

25   with it, we don't need to invite you anymore.

1           But the fact is, Your Honor, we're not invited.

2   It's not that we don't show; we don't know about it.  We were

3   told that by the mediator.  That's what I was told last

4   Monday.  It was one of the first things I did.

5           So, why -- they may disagree with us.  And

6   mediations happen all the time when the parties disagree with

7   each other, but there's no excuse for us not to at least get

8   notices until we can't attend, because that is not the

9   message that we've been given either, by the lawyers on this

10  call or the mediators, when I spoke to them last Monday.

11          Second, Your Honor, on the timing, because I want

12  to make this very, very clear, the decision that I made to

13  change the motion happened after I had an opportunity to

14  review the papers, the 119 pages.  Mr. Abbott asked that the

15  hearing not go forward on an expedited basis on today, but

16  that they wanted until December 1st to file pleadings.

17          I had no idea what their position was going to be.

18  I had no idea that they were going to file a pleading that

19  didn't address in the slightest, the Rothweiler-Kosnoff

20  issue, but went back and rehashed everything we did.

21          So, the decision that I made is that if that's

22  what this case is going to be about and we're just going to

23  become the sideshow, then I need to take us out of the

24  sideshow.  The voting ombudsperson could potentially have

25  assisted in any way that our action caused any voter

1  confusion.  Your Honor actually suggested, at least one, if

2  not two, of the status conferences, that if there was any

3  issue that you wanted to know of solutions.  I tried to come

4  up with a solution, but it appears -- and most of the time is

5  still being spent on this -- trying to make us the issue.

6          We are not the issue.  We are not one of the three

7  law firms.  It was not to (indiscernible) the intent of the

8  voting ombudsperson so they would rehash all of it for now, a

9  fourth or fifth time.  So, I changed it on the fly.

10          I had no idea that a 119-page pleading was going

11  to be filed for a status conference.  You know, someone could

12  have told me that so I could have been prepared for it, but

13  that didn't happen because it seems in this case, people

14  decide to file things last minute.  And if I had known that,

15  they said we're going to file and we're going to make you the

16  issue, then I would have said:  Enough.

17          Now, Mr. Brady said I said I would bring down the

18  temperature.  That was my goal.  I thought I'd file it by an

19  ombudsperson and people would say, yes, you're trying to fix

20  the voting issue, but instead, I got a vitriol that was

21  really unbelievable.  So, I decided I would try to drop the

22  temperature, but still do the right thing by after seeing the

23  pleading, saying, We will change it.

24          I did not know this weekend I was going to make

25  that determination.  I knew that determination after I looked

1   at the pleading and said, Whoa, this has gone way beyond

2   anything that I anticipated.

3            With respect to the voting deadline, Your Honor, I

4   didn't think it was as big an issue, and I am just

5   learning -- Mr. Molton even stated, I think -- it was either

6   Mr. Molton or Ms. Lauria who stated that the voting deadline

7   may have to be moved.  There may be a mechanism, and we will

8   think about how to deal with that, with respect to the motion

9   that we would file.

10           Now, Mr. Patterson -- and Mr. Patterson is

11  correct, I have known him a long time, and what I was not

12  clear is that this is not just about the letter; this is

13  about dealing with things like the eBallots and the general

14  messaging.  I actually, you know -- and this doesn't happen a

15  lot in my career, Your Honor; I have to think about the last

16  time it happened -- but I actually agree with Mr. Buchbinder.

17  We have to find a way to stop it, to just move past all of

18  this.

19           And I think the best way may be, let's get a

20  letter.  Let's deal with the eBallot.  Let's deal with stop

21  the messaging.  And let's move forward.  And that's what we

22  are trying to do.

23           And if the -- and even Mr. Molton said, Yes, the

24  letter may have started -- created some challenging

25  situations or just confounding -- he didn't use "confusion,"

1   but usually if they're challenging and confounding, they

2   create confusion, which is what we're trying to deal with.

3   And so, Your Honor, I will leave with, if Your Honor says at

4   the end of the day we have to give full notice, our motion

5   will be mooted out.  We will file this as soon as possible.

6   We will file a motion for an order shortening time.  Your

7   Honor will either grant it or deny it, but if it is going to

8   be on regular notice, it is a waste.

9            But what I think we've all heard today is that

10  there is an issue that -- resulting from the Rothweiler-

11  Kosnoff relationship that adversely affects their clients.

12  And Your Honor has stated what issues you want addressed, and

13  I promise you, I will address them.  And Your Honor will make

14  the determination based on that.

15           And with that, I will leave, and I know I've taken

16  much more time, and I apologize that it devolved into this,

17  but I do think the voting issue is critical and we need to

18  deal with it.

19           Thank you, Your Honor.

20           THE COURT:  Okay.  Thank you.

21           I will wait to see what motion is filed and I'll

22  address it when it is filed.  And I have stated some of the

23  issues that spring to mind, based on the discussion that was

24  had today.  There certainly could be others, but I think the

25  motion needs to be thought through and address as many of

1  the -- and address the concerns that I raised, and any other

2  that spring from the research that's done surrounding these

3  issues, because I certainly have not done it myself.

4          Okay.  I think that's all that was on the agenda

5  today.  I have a ruling that I'm prepared to give, but we're

6  going to take -- I'm going to -- we're going to take a recess

7  and we'll be back at 4:20 -- 4:20.

8          We're in recess.

9          COUNSEL:  Thank you, Your Honor.

10     (Recess taken at 4:12 p.m.)

11     (Proceedings resumed at 4:21 p.m.)

12         THE COURT:  This is Judge Silverstein.

13         We're back on the record.  As I indicated, I have

14  a ruling to make, and even as I was reviewing it, and

15  notwithstanding that I wrote my comments down, I will say

16  this is kind of stream of consciousness, so hang with me.

17         I heard argument on certain insurers' requests for

18  discovery from lawyers who signed proofs of claim on behalf

19  of abuse survivors.  So the record is clear, the lawyers are

20  members of, or employed by the following law firms:  Kosnoff

21  Law, PLLC; Napoli Shkolnik, PLLC; Krause and Kinsman Law

22  Firm; Andrews & Thornton, Attorneys at Law; and ASK, LLP.

23         The discovery was propounded under Rule 7033 and

24  7034, as applied to contested matters by Rule 9019.  Both

25  movants and objectors focused on the signer status as

1   attorneys, rather than as signers of proof of claim forms.

2           Objectors cited case law or argued for the general

3   proposition that counsel are not parties to litigation; their

4   clients are.  They also cited me to case law, holding that

5   interrogatories and document requests directed to attorneys

6   are improper because attorneys are not non-parties to

7   litigation.

8           That position leads to the conclusion that counsel

9   must be served with subpoenas under Rule 45 and to the extent

10  that subpoenas are issued out of other courts, those courts

11  must either decide any motions to quash or transfer the

12  matter here at their discretion.

13          After considering all the arguments made by

14  counsel, as well as the relevant rules, and the evidentiary

15  nature of a proof of claim, I conclude that when an attorney

16  decides to sign a proof of claim form for his client, he

17  makes himself subject to discovery in this court, with

18  respect to all aspects of the proof of claim.

19          My reasons for this conclusion are as follows.

20  The there is a difference between an attorney signing a proof

21  of claim and an attorney signing a pleading, motion, or other

22  written document filed with this Court.  A proof of claim is

23  a document that the statute and rules accord evidentiary

24  weight.  Under Section 502 of the Code, a proof of claim

25  filed under Section 501 is deemed allowed, unless a party in

1  interest objects.

2          In a like vein, Rule 3002(f) provides that, quote:

3          "A proof of claim executed and filed in accordance

4  with the rules shall constitute *prima facie* evidence of the

5  validity and amount of the claim."

6          Unlike a complaint, answer, other pleading, or

7  other filing made in a bankruptcy case, or perhaps any civil

8  litigation, a proof of claim is evidentiary in nature; it is

9  not simply an averment or legal argument.  In other words, a

10  proof of claim, executed and filed in accordance with the

11  Bankruptcy Rules, is evidence as competent as if the signer

12  took the witness stand in the court where the proof of claim

13  was filed.  Moreover, absent objection, the filing of the

14  proof of claim permits the creditor to vote on a plan of

15  reorganization in that bankruptcy proceeding.

16          That a proof of claim is evidence is also

17  illustrated by the requirement that a proof of claim is

18  required to be signed under penalty of perjury.  The penalty

19  for presenting a fraudulent claim is a fine up to $500,000 or

20  imprisonment for up to five years, or both.

21          According to the 2011 Advisory Committee note,

22  Section 8 of the form, the signature section, was revised to

23  include a declaration intended to impress upon the filer, the

24  duty of care that must be exercised in filing a proof of

25  claim.  The Advisory Committee note also states that the

1   individual who completes the form must sign it.

2          The survivor proof of claim form used in the Boy

3   Scouts case reflects the 2011 Advisory Committee note.  The

4   survivor proof of claim form provides that the signer declare

5   under penalty of perjury that:

6          "I have examined the information in this sexual

7   abuse survivor claim and have a reasonable belief that the

8   information is true and correct."

9          Thus, the signer of the proof of claim form

10  attests to multiple things:  that he has examined the

11  information in the form, which means that he has personally

12  reviewed the information contained in the proof of claim

13  form; and that he has a reasonable belief that the

14  information is true and correct, which means that he has a

15  basis for knowing that the information is true and correct.

16         How could he have that reasonable belief?

17         He could be a percipient witness; meaning, he has

18  firsthand knowledge.  Or he could have undertaken an

19  investigation sufficient to form a reasonable belief.  It is

20  clear, therefore, that the signer of a proof of claim is

21  voluntarily offering evidence in this court and, thus,

22  suggesting himself to discovery of the evidence he has.

23         Is an attorney required to sign a proof of claim

24  form for his client?

25         The answer is no.  With a few exceptions not

1 relevant here, Rule 9011 requires an attorney of record to

2 sign all pleadings, written motions, and other papers filed

3 on behalf of his client, but Rule 3001 provides that

4 creditors can sign proofs of claim.  Rule 3001(b) states in

5 relevant part, "A proof of claim shall be executed by the

6 creditor or the creditor's authorized agent."

7       While 3001 permits a creditor's authorized agent,

8 which can be an attorney to sign and file a proof of claim

9 for its principal, it does not require it.  Thus, unlike

10 filings made with the Court throughout a bankruptcy case,

11 nothing requires a lawyer to sign a proof of claim form.

12       In the Boy Scouts case, if an authorized agent

13 signed a proof of claim form for a survivor, he was required

14 to state his relationship with the survivor and to supply his

15 own address, phone number, and email; thus, again,

16 emphasizing to the signer the duty he has undertaken in

17 signing the proof of claim form.

18       My analysis leads me to the conclusion that

19 whether or not a signer is a party to the bankruptcy case, by

20 signing a proof of claim form, an authorized agent is subject

21 to discovery before this Court, the same as if the signer

22 were the creditor himself; in other words, the signer has

23 subjected himself to the jurisdiction of this Court for

24 purposes of discovery regarding the proof of claim that he

25 signed.

1          I have no doubt that if an objection to a proof of

2     claim is filed, discovery under Rule 7026 through 7036 can be

3     directed to the signer of the proof of claim form.  While

4     that is not the context before me, this informs the outcome

5     here.

6          That permissible discovery necessarily includes

7     all aspects of the evidence the signer put before the Court,

8     including his authority to sign as an authorized agent, the

9     information contained in the proof of claim form, and the

10    basis for his knowledge.  To the extent the authorized agent

11    or signer is not a percipient witness, such as the lawyers

12    here, the process by which they investigated the claim and

13    formed their believe is discoverable.

14         To be clear, subpoenas are not necessary to take

15    discovery from a signer of a proof of claim.  The signer is

16    subject to the discovery under Rule 7026 through 7036, even

17    if the signer is an attorney.  The general rule, which I

18    subscribe to, that an attorney is not a party to a litigation

19    is simply not applicable here, and that's my ruling.

20         So, I will --

21         MR. ROBBINS:  Your Honor?

22         THE COURT:  Mr. Robbins?

23         MR. ROBBINS:  I'm sorry.  Yes, Your Honor, I don't

24    mean to interrupt if you're still entering your order, but if

25    that does conclude Your Honor's order, I wonder if I could

1  ask a question?

2           THE COURT:  You may ask a question.

3           MR. ROBBINS:  Would Your Honor entertain an

4  application for a stay so that we have enough time to consult

5  with our clients and inquire of them, whether they wish to

6  seek interlocutory review of the Court's order?

7           THE COURT:  I'm not inclined to.

8           MR. ROBBINS:  May I make an argument in favor of

9  it?

10          THE COURT:  You may.

11          MR. ROBBINS:  Well, I understand the Court's

12 rationale; obviously, we disagree with it.  And it seems to

13 me that this ruling, which, as far as I know, is

14 unprecedented in the law, is subject to the collateral order

15 doctrine or it may be subject to the collateral order

16 doctrine under Cohen v Beneficial, including on the ground

17 that once there's a confirmation order of the Court's ruling

18 that the party-nonparty distinction is erased by the signing

19 of a proof of claim, would be effectively unreviewable on

20 appeal.

21          I know there's some contrary authority.  I'm aware

22 of a case in D.C., the D.C. Circuit, which has held some time

23 ago that an order directing that other what is privileged

24 information be disclosed is subject to interlocutory review,

25 because a privilege, once breached, cannot be unbreached --

1  that particular bell cannot be untolled.

2          I think the same holds true here.  Once law firm

3  lawyers are deposed, simply by virtue of their having signed

4  a proof of claim, there will never be a moment when that

5  toothpaste can be put back in the tube, which means that this

6  unprecedented order that the Court just entered, which, to my

7  mind, I literally have never seen a case coming out this way,

8  will be unreviewable and it will then be a precedent in this

9  court, and perhaps others, with, I think, a wide range of

10  adverse, collateral consequences.

11          So, although, I'm confident the Court is convinced

12  of the correctness of the ruling you just entered and thinks

13  that our chances on appeal are, therefore, insubstantial, I

14  think our chances, in fact, are quite substantial if the

15  Court agrees to hear it, and a stay for such time as we can

16  at least consult with our clients as to whether they wish to

17  pursue interlocutory review of this order seems, to me,

18  entirely warranted under the circumstances, because this is a

19  right that will disappear, now and forever, if we cannot be

20  heard on review.

21          THE COURT:  Mr. Schiavoni?

22          MR. SCHIAVONI:  Your Honor, just very briefly.

23          Mr. Robbins is a tremendous advocate.  It's an

24  honor to be in a court where he's arguing, that's not the

25  Supreme Court.

1           As he is well aware, there are decisions, and

2    yours is not the first, that hold a signatory to a proof of

3    claim as subject to questioning about the proof of claim.

4    His clients were aware of that before they retained

5    Mr. Robbins because Your Honor told them during the argument

6    on the motion to allow attorney signatures that they would be

7    subject to deposition.  So, they were aware of that.

8           I think -- you know, and just the last thing I

9    would say is, any notion that time is needed to consult with

10   clients about a stay, the very fact that the clients have

11   gone out to hire such a noted and highly respected Supreme

12   Court lawyer as Mr. Robbins, I think it does belie the fact

13   that they probably had that consultation long since before

14   today.

15          MR. ROBBINS:  Well, I can tell you that's not

16   true.  I can tell you that's a bald-faced assertion that is

17   not true.

18          THE COURT:  Okay.

19          MR. SCHIAVONI:  I accept your representation,

20   Mr. Robbins --

21          MR. ROBBINS:  Good.

22          MR. SCHIAVONI:  -- and I withdraw that suggestion.

23   I don't know what came over me, and I apologize.

24          I have nothing further to add.  Thank you.

25          THE COURT:  Okay.  Well, thank you.

1          I think the fact that it might not be subject to

2    review -- and I don't know the specific case you're

3    referencing -- but that happens, you know, all the time in

4    appeals and, nonetheless, the Court doesn't stay just

5    because -- a case -- because an appeal may moot out the

6    issue; at least in bankruptcy, we don't do that.

7          But nonetheless, what strikes me here is the only

8    decision I made was that discovery could issue here and not

9    from some other court; that's the decision.  And so I don't

10   really see, quite frankly, sort of irreparable harm to your

11   client because if discovery could issue out of another court,

12   which nobody has argued it can't, in fact, everybody says it

13   should, it's just which court can it issue out of, I don't

14   see the irreparable harm.

15         As far as my decision, I do think it's correct.  I

16   think it logically follows from the evidentiary waiting

17   accorded to a proof of claim form.

18         Could I be wrong?

19         Of course I could be wrong, but I don't think so,

20   but I could be.

21         But, no.  If we were in, perhaps, another

22   situation where timing was not as critical as it is here in

23   this case, perhaps I would stay the decision.  I actually

24   don't think so, but perhaps.  But in the circumstances here

25   when we're coming up against fact discovery deadlines, I

1  simply cannot permit it.

2          I have not said that if information is privileged,

3  privileged, that that can't be raised.  But I think much of

4  the information that I've said is discoverable or is part of

5  discovery is not privileged.  So, I have not taken away the

6  right to raise privilege issues.  I have simply said

7  discovery is appropriate out of this court.  So, because of

8  that, I'm not going to stay the decision, but thank you.

9          MR. ROBBINS:  But, Your Honor, can I make one last

10 point, unrelated to the stay?

11         Your Honor said that all that's at stake is which

12 court enters the discovery.  That's actually not quite

13 accurate.  If this were a subpoena, which is what we think it

14 should have been, a subpoena could not advance

15 interrogatories --

16         THE COURT:  Fair enough.

17         MR. ROBBINS:  -- yet, here we are, subject to

18 interrogatories.

19         THE COURT:  Fair enough.  You're correct.

20         MR. ROBBINS:  Can I take your point, Your Honor,

21 can I take the state of play to be the following, that Your

22 Honor has ruled on the party question adverse to us, but that

23 all other objections, apart from party status, have been

24 preserved.

25         THE COURT:  I haven't ruled on them; that's

1  correct.  I haven't ruled on any other issue.

2          I will be looking at the merits issue.  So, with

3  respect to the Rothweiler firm and the Slater Slater firm,

4  which were argued in front of me, and while I had hoped to be

5  able to rule on that today, I, as to those firms, I'm not in

6  a position to do that.  I may be in a position by Thursday to

7  rule and maybe even sooner, but I have not ruled on the

8  merits question yet.

9          MR. ROBBINS:  Okay.  Well, we will, in light of

10  the Court's ruling and the denial of the stay, we will

11  attempt to promptly put in our merits responses to these

12  discovery requests.

13          THE COURT:  Thank you.

14          Any other questions?

15          Mr. Grey?

16          MR. GREY:  Yes, Your Honor.

17          If -- not with respect to your ruling, but earlier

18  in the case, we talked about the motion to compel, as it

19  applies to AVA Law Group and there was a discussion and I

20  told the Court, and it's true, that AVA Law Group did not

21  sign any proofs of claim.

22          THE COURT:  Yes.

23          MR. GREY:  I can also report to the Court that

24  neither, AVA Law Group, nor Reciprocity, affixed any

25  signatures to proofs of claim.  I just wanted you to know

1  that before the hearing was over.

2          THE COURT:  Thank you.  And I did not include AVA

3  Law Group in my ruling for that reason, because this dealt

4  with signers of proofs of claim.  I will be considering the

5  other, the arguments that were made separately as to AVA and

6  whether discovery can issue from this court, with respect to

7  AVA.

8          MR. GREY:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          Any other questions?

11      (No verbal response)

12          THE COURT:  Okay.  Then, we are adjourned.

13          COUNSEL:  Thank you, Your Honor.

14      (Proceedings concluded at 4:43 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2            I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    /s/ William J. Garling                    November 30, 2021

10   William J. Garling, CET**D-543

11   Certified Court Transcriptionist

12   For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25