## Exhibit R

**Form of Restated Credit Facility Documents**

**You may access a full and complete copy of the Form of Restated Credit Facility Documents, free of charge, at <u>https://omniagentsolutions.com/bsa-plansupplement</u>.**

**DRAFT**
**SUBJECT TO FURTHER NEGOTIATION**

AMENDED AND RESTATED CREDIT AGREEMENT[1]

dated as of

[_____], 2022

between



BOY SCOUTS OF AMERICA,
as the Borrower,

ARROW WV, INC.,
as a Guarantor

and

JPMORGAN CHASE BANK, N.A.



---

[1] This document remains subject to ongoing review and material revision in all respects.  The Debtors, Coalition, the Future Claimants' Representative, the Ad Hoc Committee, the Creditors' Committee, JPM, Hartford and TCJC (each as defined in the Plan) are each continuing to review the documents that are part of the Plan Supplement, and each of their respective rights are reserved with respect to the Plan Supplement and the information contained therein, as applicable.

Table of Contents

Page

**ARTICLE I. DEFINITIONS** ……………………………………………………………...1

SECTION 1.01.    DEFINED TERMS ........................................................................ 2
SECTION 1.02.    CLASSIFICATION OF LOANS .................................................... 24
SECTION 1.03.    TERMS GENERALLY .................................................................. 24
SECTION 1.04.    ACCOUNTING TERMS; GAAP .................................................. 25
SECTION 1.05.    INTEREST RATES; BENCHMARK NOTIFICATION ..................... 26
SECTION 1.06.    LETTERS OF CREDIT................................................................ 26
SECTION 1.07.    DIVISIONS .............................................................................. 27

**ARTICLE II. THE CREDITS** ........................................................................... 27

SECTION 2.01.    TERM LOANS .......................................................................... 27
SECTION 2.02.    LOANS AND BORROWINGS. ..................................................... 27

    (a)    Initial Type ..................................................................... 27
    (b)    Limitation on Interest Periods ....................................... 27

SECTION 2.03.    [RESERVED]............................................................................. 27
SECTION 2.04.    [RESERVED]............................................................................. 27
SECTION 2.05.    INTEREST ELECTIONS. ............................................................ 27

    (a)    Conversion and Continuation ......................................... 27
    (b)    Delivery of Interest Election Request ............................ 28
    (c)    Contents of Interest Election Request ............................ 28
    (d)    Automatic Conversion.................................................... 28
    (e)    Limitations on Election ................................................. 28

SECTION 2.06.    [RESERVED]............................................................................. 29
SECTION 2.07.    REPAYMENT OF LOANS; EVIDENCE OF DEBT. ......................... 29

    (a)    Lender Records .............................................................. 29
    (b)    Prima Facie Evidence.................................................... 29
    (c)    Request for a Note......................................................... 29
    (d)    Amortization.................................................................. 29

SECTION 2.08.    PREPAYMENT OF LOANS. ........................................................ 31

    (a)    Optional Prepayment...................................................... 31
    (b)    Excess Cash Sweep ........................................................ 31
    (c)    Notice of Prepayment; Application of Prepayments................. 31

SECTION 2.09.    AMENDMENT FEES; LETTER OF CREDIT FEES ........................... 32
SECTION 2.10.    INTEREST. ............................................................................... 32

    (a)    CBFR Borrowings .......................................................... 32
    (b)    SOFR Borrowings .......................................................... 32
    (c)    Default Interest ............................................................. 32
    (d)    Payment of Interest........................................................ 32
    (e)    Computation .................................................................. 33

SECTION 2.11.    ALTERNATE RATE OF INTEREST; ILLEGALITY .......................................... 33
SECTION 2.12.    INCREASED COSTS. ................................................................................... 34

    (a)    Change In Law .................................................................... 34
    (b)    Capital Adequacy ................................................................ 35
    (c)    Delivery of Certificate ........................................................ 35
    (d)    Limitation on Compensation ............................................... 35

SECTION 2.13.    BREAK FUNDING PAYMENTS ..................................................................... 36
SECTION 2.14.    TAXES ....................................................................................................... 36

    (a)    Gross Up ............................................................................. 36
    (b)    Payment of Other Taxes ..................................................... 36
    (c)    Tax Indemnification ........................................................... 36
    (d)    Receipts .............................................................................. 37
    (e)    Defined Terms .................................................................... 37
    (f)    Status of Lenders ............................................................... 37
    (g)    Treatment of Certain Refunds ............................................. 39
    (h)    Survival .............................................................................. 39

SECTION 2.15.    PAYMENTS GENERALLY; ALLOCATION OF PROCEEDS ............................ 39
SECTION 2.16.    MITIGATION OBLIGATIONS ....................................................................... 40
SECTION 2.17.    LETTERS OF CREDIT .................................................................................. 40

    (a)    General ............................................................................... 40
    (b)    [Reserved] .......................................................................... 40
    (c)    Expiration Date ................................................................... 40
    (d)    Reimbursement .................................................................... 41
    (e)    Obligations Absolute .......................................................... 41
    (f)    Disbursement Procedures .................................................... 42
    (g)    [Reserved]. ......................................................................... 42
    (h)    Cash Collateralization ........................................................ 42

**ARTICLE III. REPRESENTATIONS AND WARRANTIES** ............................................. 43

SECTION 3.01.    ORGANIZATION; POWERS ......................................................................... 43
SECTION 3.02.    AUTHORIZATION; ENFORCEABILITY ......................................................... 43
SECTION 3.03.    GOVERNMENTAL APPROVALS; NO CONFLICTS ........................................ 43
SECTION 3.04.    FINANCIAL CONDITION; NO MATERIAL ADVERSE CHANGE ................... 44
SECTION 3.05.    PROPERTIES .............................................................................................. 44
SECTION 3.06.    LITIGATION AND ENVIRONMENTAL MATTERS. ......................................... 44

    (a)    Actions ............................................................................... 44
    (b)    Environmental Matters ........................................................ 44
    (c)    Disclosed Matters ............................................................... 45

SECTION 3.07. COMPLIANCE WITH LAWS AND AGREEMENTS ......................................... 45
SECTION 3.08. INVESTMENT COMPANY STATUS ................................................................ 45
SECTION 3.09. ERISA .......................................................................................................... 45
SECTION 3.10. DISCLOSURE ................................................................................................. 45
SECTION 3.11. SUBSIDIARIES ............................................................................................... 45
SECTION 3.12. INSURANCE .................................................................................................... 45
SECTION 3.13. MARGIN SECURITIES .................................................................................... 45
SECTION 3.14. COLLATERAL DOCUMENTS ........................................................................... 46
SECTION 3.15. LOCAL COUNCILS ......................................................................................... 46
SECTION 3.16. REAL PROPERTY ........................................................................................... 46
SECTION 3.17. ANTI-CORRUPTION LAWS AND SANCTIONS ................................................. 46

**ARTICLE IV. CONDITIONS .......................................................................................... 46**

SECTION 4.01. EFFECTIVE DATE .......................................................................................... 46

    (a) Execution and Delivery of This Agreement ............................. 46
    (b) Corporate Authorization Documents ....................................... 47
    (c) Closing Certificate ................................................................. 47
    (d) Personal Property Security Agreement .................................... 47
    (e) Insurance ................................................................................ 47
    (f) Bond Documents ..................................................................... 47
    (g) Pledged Notes ......................................................................... 47
    (h) Collateral Assignments .......................................................... 48
    (i) Intercreditor Agreements ........................................................ 48
    (j) Final Order ............................................................................. 48
    (k) Real Property ......................................................................... 48
    (l) Fees ........................................................................................ 49
    (m) LC Reimbursement ................................................................. 49

SECTION 4.02. EACH CREDIT EVENT .................................................................................... 49

    (a) Representations and Warranties .............................................. 49
    (b) No Default .............................................................................. 49

**ARTICLE V. AFFIRMATIVE COVENANTS .................................................................. 50**

SECTION 5.01. FINANCIAL STATEMENTS AND OTHER INFORMATION ............................... 50

    (a) Annual Audit .......................................................................... 50
    (b) Quarterly Financial Statements ............................................... 50
    (c) Compliance Certificate ........................................................... 50
    (d) Additional Information relating to the Project or the
         Collateral ................................................................................ 51

SECTION 5.02. NOTICES OF MATERIAL EVENTS ................................................................. 51

    (a) Default .................................................................................... 51
    (b) Notice of Proceedings ............................................................. 51
    (c) ERISA Event .......................................................................... 51
    (d) Material Adverse Effect .......................................................... 51

SECTION 5.03.   EXISTENCE; CONDUCT OF OPERATIONS ................................................... 51
SECTION 5.04.   PAYMENT OF OBLIGATIONS ....................................................................... 51
SECTION 5.05.   MAINTENANCE OF PROPERTIES ................................................................. 52
SECTION 5.06.   INSURANCE .............................................................................................. 52
SECTION 5.07.   BOOKS AND RECORDS; INSPECTION AND AUDIT RIGHTS ................... 52
SECTION 5.08.   COMPLIANCE WITH LAWS AND AGREEMENTS ........................................ 52
SECTION 5.09.   USE OF PROCEEDS ................................................................................... 52
SECTION 5.10.   FURTHER ASSURANCES ............................................................................ 53
SECTION 5.11.   BANKING RELATIONSHIP .......................................................................... 53

**ARTICLE VI. NEGATIVE COVENANTS** ............................................................... **53**

SECTION 6.01.   INDEBTEDNESS ......................................................................................... 53
SECTION 6.02.   LIENS ...................................................................................................... 55
SECTION 6.03.   FUNDAMENTAL CHANGES ........................................................................ 56
SECTION 6.04.   INVESTMENTS, LOANS, ADVANCES, GUARANTEES AND
                ACQUISITIONS ......................................................................................... 56
SECTION 6.05.   ASSET SALES ........................................................................................... 57
SECTION 6.06.   SALE AND LEASEBACK TRANSACTIONS ................................................... 57
SECTION 6.07.   SWAP AGREEMENTS ................................................................................. 58
SECTION 6.08.   RESTRICTED PAYMENTS; CERTAIN PAYMENTS OF INDEBTEDNESS .......... 58
SECTION 6.09.   TRANSACTIONS WITH AFFILIATES ............................................................ 58
SECTION 6.10.   CHANGE IN FISCAL YEAR ........................................................................ 59

**ARTICLE VII. FINANCIAL COVENANTS** ........................................................... **59**

SECTION 7.01.   MINIMUM LIQUIDITY ............................................................................... 59
SECTION 7.02.   CONSOLIDATED DEBT SERVICE COVERAGE RATIO .................................. 60
SECTION 7.03.   ADDITIONAL FINANCIAL COVENANTS ...................................................... 60

**ARTICLE VIII. EVENTS OF DEFAULT** ............................................................... **60**

SECTION 8.01.   EVENTS OF DEFAULT; REMEDIES .............................................................. 60
SECTION 8.02.   PERFORMANCE BY THE LENDER ............................................................... 63

**ARTICLE IX. MISCELLANEOUS** ......................................................................... **63**

SECTION 9.01.   NOTICES .................................................................................................. 63
SECTION 9.02.   WAIVERS; AMENDMENTS. ........................................................................ 64

        (a)     No Waiver; Rights Cumulative ................................................ 64
        (b)     Amendments .............................................................................. 65

SECTION 9.03.   EXPENSES; INDEMNITY; DAMAGE WAIVER. ............................................. 65

        (a)     Expenses ................................................................................... 65
        (b)     Indemnity ................................................................................. 65
        (c)     Waiver of Damages .................................................................. 66
        (d)     Payments .................................................................................. 66

SECTION 9.04.   SUCCESSORS AND ASSIGNS ....................................................................... 66

        (a)     Successors and Assigns ............................................................ 66
        (b)     Assignment ............................................................................... 66
        (c)     Register ..................................................................................... 67

|  |  | (d) | Participations | 67 |

| SECTION 9.05. | SURVIVAL | 68 |
| SECTION 9.06. | COUNTERPARTS; INTEGRATION; EFFECTIVENESS | 68 |
| SECTION 9.07. | SEVERABILITY | 69 |
| SECTION 9.08. | RIGHT OF SETOFF | 70 |
| SECTION 9.09. | GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS. | 70 |

|  | (a) | Governing Law | 70 |
|  | (b) | Jurisdiction | 70 |
|  | (c) | Venue | 70 |
|  | (d) | Service of Process | 70 |

| SECTION 9.10. | WAIVER OF JURY TRIAL | 71 |
| SECTION 9.11. | HEADINGS | 71 |
| SECTION 9.12. | MAXIMUM INTEREST RATE | 71 |

|  | (a) | Limitation to Maximum Rate; Recapture | 71 |
|  | (b) | Cure Provisions | 71 |

| SECTION 9.13. | NO DUTY | 72 |
| SECTION 9.14. | NO FIDUCIARY RELATIONSHIP | 72 |
| SECTION 9.15. | CONSTRUCTION | 72 |
| SECTION 9.16. | INDEPENDENCE OF COVENANTS | 72 |
| SECTION 9.17. | USA PATRIOT ACT | 73 |
| SECTION 9.18. | CONFIDENTIALITY | 73 |
| SECTION 9.19. | COLLATERAL RELATED PROVISIONS | 73 |
| SECTION 9.20. | [RESERVED] | 74 |
| SECTION 9.21. | AMENDMENT AND RESTATEMENT | 74 |
| SECTION 9.22. | REAFFIRMATION AND GRANT OF SECURITY INTERESTS | 74 |
| SECTION 9.23. | FINAL AGREEMENT | 74 |

## LIST OF SCHEDULES AND EXHIBITS

<u>SCHEDULES</u>:

| | | |
|---|---|---|
| Schedule 1.01(b) | – | Conservation Easements |
| Schedule 2.17 | -- | Existing Letters of Credit |
| Schedule 3.06 | – | Disclosed Matters |
| Schedule 3.11 | – | Subsidiaries |
| Schedule 3.17 | – | Mortgaged Property |
| Schedule 6.01 | – | Existing Indebtedness |
| Schedule 6.02 | – | Existing Liens |

<u>EXHIBITS</u>:

| | | |
|---|---|---|
| Exhibit A | – | Form of Compliance Certificate |
| Exhibit B | – | Form of Interest Election Request |

AMENDED AND RESTATED CREDIT AGREEMENT (this "Agreement"), dated as of [_____], 2022, by and among BOY SCOUTS OF AMERICA, as the borrower, ARROW WV, INC., a West Virginia non-profit corporation ("Arrow WV"), as a guarantor, and JPMORGAN CHASE BANK, N.A., as the lender.

## W I T N E S S E T H :

WHEREAS, the Borrower and the Lender entered into (i) that certain Credit Agreement, dated as of August 11, 2010 (as amended by that certain First Amendment to Credit Agreement, dated as of November 5, 2010, that certain Second Amendment to Credit Agreement, dated as of November 11, 2011, that certain Third Amendment to Credit Agreement, dated as of March 9, 2012, that certain Fourth Amendment to Credit Agreement, dated as of April 25, 2016, that certain Fifth Amendment to Credit Agreement, dated as of March 2, 2017, that certain Sixth Amendment to Credit Agreement, dated as of February 15, 2018 and that certain Seventh Amendment to Credit Agreement, dated as of March 21, 2019, the "2010 Credit Agreement"), and (ii) that certain Credit Agreement, dated as of March 21, 2019 (as amended, restated or otherwise modified prior to the date hereof, the "2019 Credit Agreement" and, together with the 2010 Credit Agreement, the "Original Credit Agreements"), pursuant to which, collectively, the Lender provided the Borrower with a term loan, a revolving line of credit and certain other extensions of credit as set forth therein;

WHEREAS, to secure the obligations arising under or related to the Original Credit Agreements, the Borrower, Arrow WV and the Secured Party, on its own behalf and on behalf of the other Secured Creditors, entered into that certain Third Amended and Restated Security Agreement, dated as of March 21, 2019 (which amended and restated that certain Second Amended and Restated Security Agreement, dated as of March 9, 2012, which amended and restated that certain Amended and Restated Security Agreement, dated as of November 10, 2010, which amended and restated that certain Security Agreement, dated as of August 11, 2010, the "Original Security Agreement");

WHEREAS, on February 18, 2020 (the "Petition Date"), the Borrower filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and at such time all revolving commitments and term loan commitments were terminated pursuant to the terms of the Original Credit Agreements and, as of the date hereof, the Lender has no commitment to extend any loans or issue any additional Letters of Credit, pursuant to the terms of the Original Credit Agreements;

WHEREAS, on [_____], 2022, the Bankruptcy Court entered an order (the "Confirmation Order") approving and confirming the Chapter 11 Plan (as defined below), which order was affirmed by the United Stated District Court for the District of Delaware on [_____], 2022; and

WHEREAS, in accordance with the terms of the Confirmation Order and the Chapter 11 Plan, the Borrower, the Guarantor and the Lender desire (i) to convert the outstanding principal amount of all loans outstanding under the 2010 Credit Agreement into a single term loan

consistent with the Chapter 11 Plan and (ii) to otherwise amend and restate and consolidate each of the Original Credit Agreements, collectively, into this Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I.

### Definitions

Section 1.01.   Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"2010 Credit Agreement" has the meaning set forth in the recitals of this Agreement.

"2010 Existing Term Loan" means the term loan extended by the Lender to the Borrower pursuant to the 2010 Credit Agreement and reaffirmed pursuant to the terms of this Agreement in an aggregate principal amount of $11,250,000 as of the date of this Agreement.

"2010 Converted Term Loan" means the 2010 Original Converted Term Loan, as increased by any 2010 Converted Term Loan Increase.

"2010 Converted Term Loan Increase" means any increase to the 2010 Converted Term Loan from time to time by the aggregate amount of any LC Disbursements made on or after the date of this Agreement in respect of the Specified Letters of Credit to the extent deemed financed initially with CBFR Borrowings pursuant to Section 2.17(d).

"2010 Original Converted Term Loan" means the revolving loans extended by the Lender to the Borrower pursuant to the 2010 Credit Agreement, converted to a term loan pursuant to the terms of this Agreement in an aggregate principal amount of $25,212,317, representing the outstanding principal balance of such revolving loans as of the date of this Agreement.

"2019 Credit Agreement" has the meaning set forth in the recitals of this Agreement.

["2019 Letters of Credit" means Existing Letters of Credit issued under the 2019 Credit Agreement that remain outstanding and undrawn on the Effective Date.]

"Adjusted Term SOFR Rate" means, for any Interest Period, an interest rate per annum equal to (a) the Term SOFR Rate for such Interest Period, *plus* (b) the SOFR Adjustment.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person. The parties hereto agree that no local council of the Borrower is an Affiliate of the Borrower for purposes of this Agreement.

"Agreement" has the meaning set forth in the first paragraph hereof.

"Allowed General Unsecured Claims" has the meaning assigned to such term in the Chapter 11 Plan.

"Alternate Rate" has the meaning set forth in Section 2.11(c).

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower, any of the other Loan Parties, or any Guarantor or other obligors from time to time concerning or relating to bribery or corruption.

"Applicable Rate" means, for any day, with respect to any Loan, the applicable rate per annum set forth below:

| 2010 Existing Term Loan SOFR Spread | 2010 Converted Term Loan SOFR Spread |
|---|---|
| 1.00% | 1.25% |

"Arrow Intercompany Note" means that certain Amended and Restated Promissory Note dated as of March 21, 2019, issued by Arrow WV to the Borrower in an original principal amount of $350,000,000.

"Arrow WV" means Arrow WV, Inc., a West Virginia nonprofit corporation.

"Available Cash" means, as of any Excess Cash Test Date, the unrestricted Cash and balance sheet investments owned by the Borrower that are not subject to legally enforceable restrictions on the use or disposition of such assets for a particular purpose, determined on a pro forma basis after having given effect to the principal payment, if any, due on February 15 of the following year under the BSA Settlement Trust Note, if applicable.

"Banking Services" means each and any of the following bank services provided to the Borrower or any other Loan Party by the Lender or any of its Affiliates, including any such obligations owing to Chase Merchant Services (operated by Paymentech, LLC, a wholly-owned subsidiary of Lender) or its successor in interest ("CMS") under a certain Select Merchant Payment Instrument Processing Agreement (as may have been later amended), dated on or about May 12, 2016, between the Borrower and/or its Subsidiaries and CMS: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) merchant processing services, and (d) deposit, lock box, cash management, or treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, any direct debit scheme or arrangement, overdrafts and interstate depository network services).

"Banking Services Obligations" means any and all obligations of the Borrower or any other Loan Party, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

- 3 -

"Bankruptcy Court" has the meaning set forth in the recitals of this Agreement.

"Benchmark" means, initially, the Term SOFR Rate; *provided* that if a Benchmark Transition Event has occurred with respect to the Term SOFR Rate, then "Benchmark" means the Alternate Rate to the extent that such Alternate Rate has replaced such prior benchmark rate pursuant to clause (c) of Section 2.11.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the Term SOFR Rate:

(1)     a public statement or publication of information by or on behalf of the CME Term SOFR Administrator (or any successor administrator of the Term SOFR Rate, or the published component used in the calculation thereof) announcing that such CME Term SOFR Administrator has ceased or will cease to provide the Term SOFR Rate (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Term SOFR Rate (or such component thereof); or

(2)     a public statement or publication of information by the NYFRB, the Federal Reserve Board, or, as applicable, the regulatory supervisor for the CME Term SOFR Administrator, an insolvency official with jurisdiction over the CME Term SOFR Administrator, a resolution authority with jurisdiction over the CME Term SOFR Administrator, or a court or an entity with similar insolvency or resolution authority over the CME Term SOFR Administrator, in each case, which states that the CME Term SOFR Administrator (or any successor administrator of the Term SOFR Rate, or the published component used in the calculation thereof) has ceased or will cease to provide the Term SOFR Rate (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Term SOFR Rate (or such component thereof); or

(3)     a public statement or publication of information by the Federal Reserve Board, the NYFRB, the CME Term SOFR Administrator, or the regulatory supervisor for the CME Term SOFR Administrator (or any successor administrator of the Term SOFR Rate, or the published component used in the calculation thereof), announcing that the Term SOFR Rate (or such component thereof) is no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to the Term SOFR Rate if a public statement or publication of information set forth above has occurred with respect to each then-current available tenor of the Term SOFR Rate.

"Bond Purchase Agreements" means, collectively, (a) that certain Amended and Restated Series 2010B Bond Purchase and Loan Agreement dated as of the date hereof among Arrow WV, Issuer, the Borrower and JPMorgan Chase Bank, N.A., as the "Lender" thereunder and (b) that certain Amended and Restated Series 2012 Bond Purchase and Loan Agreement dated as

of the date hereof among Arrow WV, Issuer, the Borrower and JPMorgan Chase Bank, N.A., as the "Lender" thereunder.

"Bonds" means, collectively, (a) the Commercial Development Revenue Bond (Arrow WV Project), Series 2010B issued by the Issuer in an original principal amount of $50,000,000, and (b) the Commercial Development Revenue Bond (Arrow WV Project), Series 2012 issued by the Issuer in an original principal of $175,000,000, in both cases, the proceeds of which were loaned to the Borrower under the terms of the applicable Bond Purchase Agreement.

"Borrower" means Boy Scouts of America, a non-profit corporation chartered by an Act of the United States Congress on June 15, 1916.

"Borrowing" means a Term Borrowing.

"BSA Settlement Trust Note" means the secured promissory note, dated [_____], 2022, in the original principal amount of $80,000,000 issued by the Borrower to the Settlement Trust, as amended, restated, amended and restated, extended, supplemented and/or otherwise modified from time to time.

"Business Day" means any day (other than a Saturday or a Sunday) on which banks are open for business in New York City or Chicago; provided that, when used in connection with a SOFR Loan, the term "Business Day" shall also exclude any day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP (for the avoidance of doubt, subject to Section 1.04).

"Cash" means legal tender of the United States of America.

"CB Floating Rate" means the greater of the Prime Rate or 2.50%. Any change in the CB Floating Rate due to a change in the Prime Rate shall be effective from and including the effective date of such change in the Prime Rate.

"CBFR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the CB Floating Rate.

"Change in Law" means the occurrence after the date of this Agreement of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) compliance by the Lender (or, for purposes of Section 2.12(b), by any lending office of the Lender or by the

Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Plan" means the Modified Fifth Amended Plan of Reorganization for the Borrower and Delaware BSA, LLC, approved by the Bankruptcy Court, with an effective date of [_____], 2022.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (or a successor administrator).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of the Borrower or any other Loan Party, now existing or hereafter acquired, that may at any time be, become or be intended to be, subject to a security interest or Lien in favor of the Lender or the Collateral Agent, on behalf of itself and the other Secured Parties, to secure all or a portion of the Obligations.

"Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as "Secured Party" under the Security Agreement for the benefit of the Lender, the affiliates of the Lender who are owed any of the Secured Obligations (as defined in the Security Agreement) and the Issuer, and any of their assignees that are owed any of the Secured Obligations (as defined in the Security Agreement).

"Collateral Documents" means, collectively, the Intercreditor Agreements, the Security Agreement, the Mortgages, any control agreements and any other agreements, instruments and documents executed in connection with the Original Security Agreement, the Security Agreement or this Agreement that are intended to create, perfect or evidence Liens to secure the Obligations, including, without limitation, all other security agreements, pledge agreements, control agreements, assignments, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by Borrower or any of the other Loan Parties and delivered to the Lender or the Collateral Agent, in each case, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Debt Service Coverage Ratio" means, at any date, the ratio of (a) the Consolidated Operating Surplus for the Rolling Period ended on the most recent Test Date, *divided by* (b) the sum of (i) the Consolidated Interest Expense for such Rolling Period *plus* (ii) the Consolidated Required Amortization for such Rolling Period.

"Consolidated Operating Surplus" means, for any period of determination, without duplication, of the sum of the following, determined on a consolidated basis for the Borrower, its Subsidiaries, and its Affiliates: (i) Unrestricted Change in Net Assets – Controlling Interest during such period; *plus* (ii) to the extent deducted in determining Unrestricted Change in Net Assets – Controlling Interest during such period, (1) income tax expense, (2) Consolidated Interest Expense, (3) all amounts attributable to depreciation and amortization expense, and (4) extraordinary non-cash charges for such period (5) any other non-cash charges for such period, including any fresh start adjustments, (6) restructuring expenses arising from the Borrower's bankruptcy proceeding and the Chapter 11 Plan, and (7) capital expenditures.

"Consolidated Interest Expense" means, for any period, total interest expense (including that attributable to Capital Lease Obligations) of the Borrower, its Subsidiaries and its Affiliates for such period with respect to all outstanding Indebtedness of the Borrower, its Subsidiaries and its Affiliates (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Swap Agreements in respect of interest rates, to the extent such net costs are allocable to such period in accordance with GAAP, calculated for the Borrower, its Subsidiaries and its Affiliates on a consolidated basis for such period in accordance with GAAP; provided that, for purposes of calculating Consolidated Interest Expense hereunder, (x) all interest expense in respect of the BSA Settlement Trust Note shall be excluded and (y) for the avoidance of doubt all interest expense in respect of the Bonds, the Loans and the Foundation Loan shall be included.

"Consolidated Required Amortization" means, for any period of determination, without duplication, an amount equal to the sum of all scheduled principal payments of Funded Debt during such period, including, without limitation, (i) payments made in respect of the Bonds and the Loans, (ii) payments made to fund the Core Value Cash Pool, and (iii) payments made in respect of the Foundation Loan.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.   "Controlling" and "Controlled" have meanings correlative thereto.

"Core Value Cash Pool" has the meaning assigned to such term in the Chapter 11 Plan.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Distribution" has the meaning assigned to such term in the Chapter 11 Plan.

"Dividing Person" has the meaning assigned to such term in the definition of "Division".

"Division" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Division Successor" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division.  A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"DST" means the [Delaware statutory trust] under Article V.Y and the DST Agreement (as defined in the Chapter 11 Plan) for the purposes set forth therein.

"dollars" or "$" refers to lawful money of the U.S.

"ECP" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the SEC.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Electronic System" means any electronic system, including e-mail, e-fax, web portal access for the Borrower, Intralinks®, ClearPar®, Debt Domain, Syndtrak and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Lender or any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to (a) the environment, (b) preservation or reclamation of natural resources, (c) the management, Release or threatened Release of any Hazardous Material or (d) with respect to exposure to Hazardous Materials, health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any other Loan Party directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing, but excluding any debt securities convertible into any of the foregoing to acquire such interests.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(a)(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of the Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition upon the Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in critical status, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning assigned to such term in Section 8.01.

"Excess Cash" has the meaning assigned to such term in Section 2.08(b).

"Excess Cash Amount" has the meaning assigned to such term in Section 2.08(b).

"Excess Cash Sweep Prepayment" has the meaning assigned to such term in Section 2.08(b).

"Excess Cash Test Date" means (i) December 31, 2024 and (ii) December 31 of each successive calendar year until December 31, 2031.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an ECP at the time the Guarantee of such Guarantor or the grant of such security interest becomes or would become effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in a Loan or Letter of Credit pursuant to a law in effect on the date on which (i) such Recipient acquires such interest in the Loan or Letter of Credit (other than pursuant to an assignment request by the Borrower under Section 2.16) or (ii) such Recipient changes its lending office, except in each case to the extent that, pursuant to Section 2.14, amounts with respect to such Taxes were payable either to such Recipient's assignor immediately before such Recipient acquired the applicable interest in a Loan or Letter of Credit or to such Recipient immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.14 and (d) any withholding Taxes imposed under FATCA.

"Existing Letters of Credit" means each letter of credit issued by the Lender prior to the Effective Date and listed on Schedule 2.17.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions (as determined in such manner as shall be set forth on the NYFRB's Website from time to time) and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate, provided that if

the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"Financing Transactions" means the execution, delivery and performance by Borrower, and Guarantee by the other Loan Parties, of the Loan Documents to which each is, or is to be, a party, the extending and borrowing of Loans and the use of the proceeds thereof.

"Flood Insurance Regulations" shall mean (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, et seq.), as the same may be amended or recodified from time to time, and (iv) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Term SOFR Rate. For the avoidance of doubt the initial Floor for Term SOFR Rate shall be zero.

"Foreign Lender" means any Lender that is not a U.S. Person.

"Foundation Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of the date hereof, by and among the Lender, the Borrower, Arrow WV and the National Boy Scouts of America Foundation, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Foundation Loan" means the loan made under the Foundation Loan Agreement.

"Foundation Loan Agreement" means that certain Credit Agreement, dated as of the date hereof, by and between the Borrower and the National Boy Scouts of America Foundation, a District of Columbia nonprofit corporation, as amended, restated, supplemented and/or otherwise modified from time to time.

"Fully Satisfied" has the meaning set forth in the Security Agreement.

"Funded Debt" of any Person means, without duplication, the sum of the following, to the extent constituting Indebtedness, determined on a consolidated basis for such Person in accordance with GAAP: (A) all obligations of such Person for borrowed money; (B) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (C) all obligations of such Person upon which interest charges are customarily paid; (D) all obligations of such Person in respect of the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business and overdue deferred purchase price

obligations); (E) all Capital Lease Obligations of such Person; and (F) all obligations of such Person under any Swap Agreement; provided that, for purposes of calculating Funded Debt hereunder, all obligations under the BSA Settlement Trust Note shall be excluded.  The Funded Debt of any Person shall include the Funded Debt of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Funded Debt provides that such Person is not liable therefor.  The amount of the obligations of the Borrower or any other Loan Party in respect of any Swap Agreement shall, at any time of determination and for all purposes under this Agreement, be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such other Loan Party would be required to pay if such Swap Agreement were terminated at such time giving effect to current market conditions notwithstanding any contrary treatment in accordance with GAAP.

"GAAP" means generally accepted accounting principles in the U.S.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation (including any obligations under an operating lease) of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation (including any obligations under an operating lease) of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantor" means Arrow WV, and any other Person hereafter who provides a Guarantee of the Obligations.

"Guaranty Agreement" means that certain Guaranty Agreement, dated as of the date hereof, executed by Arrow WV in favor of the Lender, and any other agreement pursuant to which any other Person provides a Guarantee of the Obligations.

"Hazardous Materials" means (a) any substance, material, or waste that is included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste," "toxic substances," "toxic materials," "toxic waste," or words of similar import in any Environmental

- 12 -

Law; (b) those substances listed as hazardous substances by the United States Department of Transportation (or any successor agency) (49 C.F.R. 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) (40 C.F.R. Part 302.4 and amendments thereto); and (c) any substance, material, or waste that is petroleum, a petroleum breakdown product, or a petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas or radon.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind; (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such Person upon which interest charges are customarily paid; (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person; (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business and overdue deferred purchase price obligations); (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed; (g) all Guarantees by such Person; (h) all Capital Lease Obligations of such Person; (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty; (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances; (k) all obligations of such Person under any Swap Agreement; (l) all obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which lease is required or is permitted to be classified and accounted for as an Operating Lease under GAAP but which is intended by the parties thereto for tax, bankruptcy, regulatory, commercial law, real estate law and all other purposes as a financing arrangement; and (m) all other amounts (other than accruals, deferred revenue, deferred taxes, and reserves such as those established for litigation) which are required by GAAP to be included as liabilities on a consolidated balance sheet of such Person.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  The amount of the obligations of the Borrower or any other Loan Party in respect of any Swap Agreement shall, at any time of determination and for all purposes under this Agreement, be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such other Loan Party would be required to pay if such Swap Agreement were terminated at such time giving effect to current market conditions notwithstanding any contrary treatment in accordance with GAAP.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in the foregoing clause (a) hereof, Other Taxes.

"Intercreditor Agreements" means, collectively, the Foundation Intercreditor Agreement and the Settlement Trust Intercreditor Agreement.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.05.

"Interest Payment Date" means (a) with respect to any CBFR Loan, the first day of each March, June, September and December and the Maturity Date, and (b) with respect to any SOFR Loan, the last day of each Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a SOFR Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period and the Maturity Date.

"Interest Period" means, with respect to any SOFR Loans, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter, as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (iii) no Interest Period may extend beyond the Maturity Date. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"Issuer" means The County Commission of Fayette County (West Virginia), acting for and on behalf of Fayette County, West Virginia, a political subdivision of the State of West Virginia, its successors and assigns.

"LC Collateral Account" has the meaning assigned to such term in Section 2.17(h).

"LC Disbursement" means any payment made by the Lender pursuant to a Letter of Credit.

"LC Exposure" means, at any time, without duplication, the sum of the aggregate undrawn amount of all outstanding Letters of Credit at such time plus the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.

"Lender" means JPMorgan Chase Bank, N.A., and it successors and assigns.

"<u>Letter of Credit Agreement</u>" means any agreement or letter of credit application, in each case, executed and delivered by the Borrower in connection with the Existing Letters of Credit and all modifications, extensions or amendments thereto.

"<u>Letters of Credit</u>" means the letters of credit issued pursuant to the Original Credit Agreements and shall include each Existing Letter of Credit, and the term "Letter of Credit" means any one of them or each of them singularly, as the context may require.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Liquidity</u>" means, as of any date of determination, the sum, on a consolidated basis, without duplication, of the following: (i) the Borrower's, its Subsidiaries' and its Affiliates' cash and cash equivalents, short term investments and other investments to the extent readily marketable which, in each case, are not subject to any Lien (other than a Lien created under the Collateral Documents or the Lien securing the Foundation Loan) and not subject to any restriction on transfer or use imposed by the applicable donor, grantor or applicable law; *plus* (ii) the Borrower's, its Subsidiaries' and its Affiliates' cash and cash equivalents, short term investments and other investments to the extent readily marketable which are subject to a Lien securing Indebtedness of the Borrower but are otherwise not subject to any restriction on transfer or use imposed by the applicable donor, grantor or applicable law other than the payment of the Indebtedness secured thereby.

"<u>Loan Documents</u>" means this Agreement, the Security Agreement, the Guaranty Agreement, the Collateral Documents and all other documents now or hereafter executed and/or delivered pursuant to or in connection with this Agreement or the Original Credit Agreements.

"<u>Loan Obligations</u>" means all obligations, indebtedness, and liabilities of the Borrower to the Lender arising pursuant to any of the Loan Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including, without limitation, the obligation of the Borrower to repay the Loans, the LC Disbursements, interest on the Loans and LC Disbursements, and all fees, costs, and expenses (including attorneys' fees, costs and expenses) provided for in the Loan Documents.

"<u>Loan Parties</u>" means, collectively, the Borrower, the Borrower's Subsidiaries, the Guarantor and any other Person who becomes a party to this Agreement pursuant to a joinder agreement and their respective successors and assigns, and the term "Loan Party" means any one of them or all of them individually, as the context may require.

"<u>Loans</u>" means the 2010 Existing Term Loan and the 2010 Converted Term Loan extended by the Lender to the Borrower pursuant to this Agreement and all LC Disbursements financed with a CBFR Borrowing under Section 2.17(d).

"Margin Stock" means margin stock within the meaning of Regulations T, U and X, as applicable.

"Material Adverse Effect" means a material adverse effect on the (a) business, assets, operations or condition, financial or otherwise, of the Borrower, (b) validity or enforceability of any Loan Document or (c) rights of or remedies available to the Lender under any Loan Document.

"Material Indebtedness" means Indebtedness (other than the Loans and Letters of Credit but including, without limitation, obligations in respect of one or more Swap Agreements) of any one or more of the Borrower and any other Loan Party in an aggregate principal amount exceeding $1,000,000. Material Indebtedness shall specifically include the Indebtedness arising in connection with the Bond Purchase Agreements, the Bonds, the Notes and any Subordinated Indebtedness.

"Maturity Date" means the later of [_____], 2032 or (ii) such later date, as requested by the Borrower at least 120 days prior to the currently effective Maturity Date and approved in the sole and absolute discretion of the Lender.

"Maximum Rate" has the meaning assigned to such term in Section 9.12(a).

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Collateral Agent, for the benefit of the Lender and the other Secured Parties, on real property of the Borrower, Arrow WV or any other Loan Party, including any amendment, restatement, modification or supplement thereto.

"Mortgaged Property" means all real property owned by the Borrower, Arrow WV or any other Loan Party which is encumbered by a Mortgage.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Notes" means, collectively, (a) that certain amended and restated promissory note of the Borrower issued in favor of the Issuer and assigned to the Lender pursuant to the Amended and Restated Series 2010B Bond Purchase and Loan Agreement in the original principal amount of $50,000,000 and (b) that certain amended and restated promissory note of the Borrower issued in favor of the Issuer and assigned to the Lender pursuant to the Amended and Restated Series 2012 Bond Purchase and Loan Agreement in the original principal amount of $175,000,000; each of such notes being assigned by the Issuer to Lender to secure the repayment of the corresponding series of Bonds.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if

none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Lender from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Obligations" means all Banking Services Obligations, Loan Obligations and Swap Obligations.

"Operating Lease" means any lease (other than a lease constituting a Capital Lease Obligation) of real or personal property.

"Objection Date" has the meaning set forth in Section 2.11(c).

"Original Credit Agreements" has the meaning set forth in the recitals of this Agreement.

"Other Applicable Indebtedness" has the meaning assigned to such term in Section 2.08(b).

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan, Letter of Credit or any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16).

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar transactions denominated in Dollars by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Participant" has the meaning set forth in Section 9.04(c).

"Participant Register" has the meaning set forth in Section 9.04(c).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Encumbrances" means:

(a)     Liens for taxes, assessments or other charges imposed by a Governmental Authority that are not yet due or are being contested in compliance with Section 5.04;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in compliance with Section 5.04;

(c)     Liens arising by reason of deposits with, or the giving of any form of security to, any Governmental Authority that are (1) required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, (2) granted to enable any Person to maintain self insurance or to participate in any funds established to cover any insurance risks, or (3) granted to secure obligations arising in connection with workers' compensation, unemployment insurance, pensions or profit sharing plans or other social security plans or programs;

(d)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)     Liens on or in property given, granted, bequeathed or devised by the owner thereof existing at the time of such gift, grant, bequest or devise, provided that (i) such Liens consist solely of restrictions on the use thereof or the income therefrom, or (ii) such Liens secure Indebtedness which is not assumed by the Borrower or any other Loan Party and such Liens attach solely to the property (including the income therefrom) which is the subject of such gift, grant, bequest or devise;

(f)     judgment Liens in respect of judgments that do not constitute an Event of Default under Section 8.01(k);

(g)     easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any other Loan Party;

(h)     Liens, defects, irregularities of title and encroachments on adjoining real property as normally exist with respect to real property similar in character to the real property involved and which do not materially adversely affect the value of, or materially impair, the real property affected thereby for the purpose for which it was acquired or is held by the owner thereof;

(i)    Liens arising from filing UCC financing statements regarding leases permitted by this Agreement;

(j)    leases or subleases entered into by Borrower or any other Loan Party in good faith with respect to its property not used in its business and which do not materially interfere with the ordinary conduct of business of the Borrower or any other Loan Party;

(k)    leases of real property owned by the Borrower or any other Loan Party for office space, food service facilities, gift shops, other similar specialty services, or employee rental apartments provided that such leases do not materially interfere with the ordinary conduct of business of the Borrower or any other Loan Party, do not materially decrease the value of the real property subject to such lease, and are entered into by the Borrower or such other Loan Party in good faith;

(l)    statutory and common law landlords' liens under leases to which Borrower or any one of the other Loan Parties is a party;

(m)    customary Liens (including the right of set-off) in favor of banking institutions encumbering deposits held by such banking institutions incurred in the ordinary course of business; and

(n)    (i) conservation easements granted by Borrower's Affiliate, Arrow WV encumbering 12 tracts of property owned by Arrow WV at The Summit Bechtel Reserve located in Fayette County, West Virginia and Raleigh County, West Virginia and more particularly described on Schedule 1.01(b) and (ii) "Right of First Refusal" provision of Section 5C of the 1978 Boundary Waters Canoe Area Wilderness Act (P.L.) 95-495, 92 Stat. 1652) encumbering a portion of Borrower's "Northern Tier" real property located at 14790 Moose Lake Road, Ely, MN 55731;

provided that, the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United

States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)    money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; and

(f)    other investments made in accordance with the Borrower's or any other Loan Party's investment policy which has been approved by Borrower's Executive Board of Directors or the investment committee of such board and any amendments or other modifications to any such investment policy which have been approved by the Borrower's Executive Board of Directors or the investment committee of such board.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Potential CDSCR Default" has the meaning set forth in Section 8.01(q).

"Potential Liquidity Default" has the meaning set forth in Section 8.01(p).

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Lender) or any similar release by the Federal Reserve Board (as determined by the Lender). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Project" means the development and construction of the roads, water lines, sewer lines and camp site improvements on the Summit National Scout Reserve located in Fayette County, West Virginia and Raleigh County, West Virginia which is owned by Arrow WV.

"Recipient" means: (a) the Lender, or (b) any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, as applicable.

"Redetermination Date" means: (a) in relation to any December 31 Test Date, the next March 31; and (b) in relation to any June 30 Test Date, the next September 30.

"Register" has the meaning set forth in Section 9.04.

"Registered Holder" has the meaning set forth in Section 9.04.

"Regulation D" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation T" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of any substance into the environment.

"Relevant Governmental Body" means, the Federal Reserve Board or the NYFRB, the CME Term SOFR Administrator, as applicable, or a committee officially endorsed or convened by the Federal Reserve Board or the NYFRB, or, in each case, any successor thereto.

"Requirement of Law" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person, and (b) any statute, law (including common law), treaty, rule regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests.

"Reuters" means, as applicable, Thomson Reuters Corp, Refinitiv, or any successor thereto.

"Rolling Period" means the period of twelve (12) consecutive calendar months ending on the last day of each June and December, as applicable.

"S&P" means S&P Global Ratings, and any successor thereof.

"Sanctioned Country" means, at any time, a country, region, or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union member state or Her Majesty's Treasury of the United Kingdom other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission of the U.S.

"Secured Parties" means (a) the Collateral Agent, (b) the Lender, (c) each provider of Banking Services, to the extent the Banking Services Obligations in respect thereof constitute Obligations, (d) each counterparty to any Swap Agreement, to the extent the obligations thereunder constitute Obligations, (e) the beneficiaries of each indemnification obligation undertaken by Borrower or any of the other Loan Parties under any Loan Document, (f) the Issuer and (g) the successors and assigns of each of the foregoing.

"Security Agreement" means that Fourth Amended and Restated Security Agreement, dated as of the date hereof, among the Borrower, Arrow WV, the Lender, the Issuer and the Collateral Agent, as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time.

"Settlement Trust" means the trust organized under the laws of the state of Delaware and established under Article IV and the Settlement Trust Agreement (as defined in the Chapter 11 Plan) for the purposes set forth therein.

"Settlement Trust Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of the date hereof, by and among the Lender, the Borrower, Arrow WV and the Settlement Trust, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Adjustment" means 0.10% per annum.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means any Borrowing bearing interest in reference to the Adjusted Term SOFR Rate.

"SOFR Loan" means any Loan bearing interest in reference to the Adjusted Term SOFR Rate.

"Specified Letters of Credit" means the Existing Letters of Credit issued pursuant to the 2010 Credit Agreement and designated as such on Schedule 2.17.

"Subordinated Indebtedness" means Indebtedness of the Borrower or any other Loan Party that is: (a) incurred on terms and conditions satisfactory to the Lender, (b) evidenced by documentation satisfactory to the Lender, and (c) subordinated to the Obligations pursuant to a written subordination agreement satisfactory to the Lender and on terms and conditions satisfactory to the Lender.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date.

"Subsidiary" means any subsidiary of the Borrower. The term "Subsidiary" shall not include (i) any local council of the Borrower unless the accounts of such local council are required to be consolidated with those of the Borrower in the Borrower's consolidated financial statements or (ii) DST.

"Swap Agreement" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any other Loan Party shall be a Swap Agreement.

"Swap Obligations" means all obligations, indebtedness, and liabilities of the Borrower to the Lender or any Affiliate of the Lender, arising pursuant to any Swap Agreements entered into by the Lender or Affiliate with the Borrower or any other Loan Party whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including, without limitation, all fees, costs, and expenses (including attorneys' fees, costs and expenses) provided for in such Swap Agreements.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Term SOFR Rate" means, with respect to any SOFR Borrowing, such reference rate as is published by the CME Term SOFR Administrator at approximately 5:00 a.m., Chicago time, two Business Days prior to the commencement of such tenor comparable to the applicable Interest Period; such rate being the rate per annum determined by the Lender as the forward-looking term rate based on SOFR; provided that if the Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be the Floor for the purposes of this Agreement.

"Term Loans" means the Loans extended, or deemed to be extended, pursuant to Section 2.01.

"Test Date" has the meaning assigned to such term in Section 7.01.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted Term SOFR Rate or the CB Floating Rate.

"Unrestricted Change in Net Assets – Controlling Interest" means, for any period, the consolidated unrestricted revenues less unrestricted expenses plus net assets released from restriction. Unrestricted Change in Net Assets includes operating results from the general operations fund and board designed fund for the Borrower, its Subsidiaries, and its Affiliates.

"U.S." means the United States of America.

"U.S. Person" means any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"Warehouse and Distribution Center" means that certain parcel of real property owned by the Borrower located at 2109 and 2121 Westinghouse Boulevard, Charlotte, North Carolina 28269, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02.  Classification of Loans.  For purposes of this Agreement, Loans may be classified and referred to by class (e.g., a "Term Loan") or by Type (e.g., a "SOFR Loan") or by class and Type (e.g., a "SOFR Term Loan").  Borrowings also may be classified and referred to by class (e.g., a "Term Borrowing") or by Type (e.g., a "SOFR Borrowing") or by class and Type (e.g., a "SOFR Term Borrowing").

Section 1.03.  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words

"include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or other modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04.   Accounting Terms; GAAP.

(a)      Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if after the date hereof there occurs any change in GAAP or in the application thereof on the operation of any provision hereof and the Borrower notifies the Lender that the Borrower requests an amendment to any provision hereof to eliminate the effect of such change in GAAP or in the application thereof (or if the Lender notifies the Borrower that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

(b)      Notwithstanding anything to the contrary contained herein, any change in accounting for leases pursuant to GAAP resulting from the adoption of Financial Accounting Standards Board Accounting Standards Update No. 2016-02, Leases (Topic 842) ("FAS 842"), to the extent such adoption would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect prior to the adoption of FAS 842, such lease shall not be considered a capital lease (whether or not such operating lease was in effect on such

date), and all calculations, definitions and deliverables under this Agreement or any other Loan Document shall be made, construed or delivered, as applicable, in accordance therewith.

Section 1.05.  <u>Interest Rates; Benchmark Notification</u>.  The interest rate on a Loan may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 2.11(c) provides a mechanism for determining an alternative rate of interest.  The Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability. The Lender and its Affiliates and/or other related entities may engage in transactions that affect the calculation of any  interest rate used in this Agreement or any alternative, successor or alternative rate (including any Alternate Rate) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower or any other Loan Party.  The Lender may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 1.06.  <u>Letters of Credit</u>.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the amount of such Letter of Credit available to be drawn at such time; provided that with respect to any Letter of Credit that, by its terms or the terms of any Letter of Credit Agreement related thereto, provides for one or more automatic increases in the available amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum amount is available to be drawn at such time.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Article 29(a) of the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the applicable time) or Rule 3.13 or Rule 3.14 of the International Standby Practices, International Chamber of Commerce Publication No. 590 (or such later version thereof as may be in effect at the applicable time) or similar terms of the Letter of Credit itself, or if compliant documents have been presented but not yet honored, such Letter of Credit shall be deemed to be "outstanding" and "undrawn" in the amount so remaining available to be paid, and the obligations of the Borrower and the Lender shall remain in full force and effect until the Lender shall have no further obligations to make any payments or disbursements under any circumstances with respect to any Letter of Credit.

Section 1.07.  <u>Divisions</u>.  For all purposes under the Loan Documents, in connection with any Division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II.

### The Credits

Section 2.01.  <u>Term Loans</u>.  Subject to the terms and conditions set forth herein, the Lender agrees that, on the Effective Date and in accordance with the Chapter 11 Plan, the 2010 Existing Term Loan and the 2010 Original Converted Term Loan shall be deemed extended by the Lender to the Borrower as if originally extended pursuant to this Agreement as Term Loans. Amounts prepaid or repaid in respect of the Term Loans may not be reborrowed.

Section 2.02.  <u>Loans and Borrowings</u>.

(a)  <u>Initial Type</u>.  Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type.  Subject to Section 2.11, as of the Effective Date, each Term Borrowing shall be comprised entirely of SOFR Loans with an Interest Period of one month, with noticed deemed made in accordance with Section 2.05 prior to the Effective Date.  The Lender at its option may make any SOFR Loan by causing any domestic or foreign branch or Affiliate of the Lender to make such Loan (and in the case of an Affiliate, the provisions of Sections 2.11, 2.12, 2.13 and 2.14 shall apply to such Affiliate to the same extent as to the Lender); <u>provided</u> that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(b)  <u>Limitation on Interest Periods</u>.  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03.  <u>[Reserved]</u>.

Section 2.04.  <u>[Reserved]</u>.

Section 2.05.  <u>Interest Elections</u>.

(a)  <u>Conversion and Continuation</u>.  Each Borrowing initially shall be of the Type and with an Interest Period specified in Section 2.02 (or Section 2.17(d), if applicable). Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.05 and subject to the limitations in Section 2.02.  The Borrower may

elect different options with respect to different portions of the affected Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     _Delivery of Interest Election Request_.  To make an election pursuant to this Section, the Borrower shall notify the Lender of such election either (i) by telephone, (ii) in writing (delivered by hand or fax) by delivering an Interest Election Request signed by a Responsible Officer of the Borrower or (iii) through Electronic System, if arrangements for doing so have been approved by the Lender, in each case not later than (x) 10:00 a.m., Dallas, Texas time, three (3) Business Days before the date of a continuation of, or conversion to, a SOFR Borrowing and (y) noon, Dallas, Texas time, on the date of a conversion to a CBFR Borrowing.  Each such Interest Election Request shall be irrevocable and shall, in the case of a telephonic request, be confirmed promptly by hand delivery or telecopy to the Lender of a written Interest Election Request in the form of Exhibit B hereto and signed by a Responsible Officer of the Borrower.

(c)     _Contents of Interest Election Request_.  Each Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be a CBFR Borrowing or a SOFR Borrowing; and

(iv)     if the resulting Borrowing is a SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a SOFR Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)     _Automatic Conversion_.  If the Borrower fails to deliver a timely Interest Election Request with respect to a SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period, such Borrowing shall be continued as a SOFR Borrowing with an Interest Period of one month.

(e)     _Limitations on Election_.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Lender so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a SOFR Borrowing and (ii) unless repaid, each SOFR Borrowing shall be converted to a CBFR Borrowing at the end of the Interest Period applicable thereto.

Section 2.06.    [Reserved].

Section 2.07.    Repayment of Loans; Evidence of Debt.

(a)    Lender Records.    The Lender shall maintain accounts in which it shall record (i) the amount of each Loan made, or deemed to be made, hereunder, the Type thereof and the Interest Period applicable thereto, if any, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to Lender hereunder and (iii) the amount of any sum received by the Lender hereunder.

(b)    Prima Facie Evidence.    The entries made in the accounts maintained pursuant to paragraph (a) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(c)    Request for a Note.    Lender may request that the Loans be evidenced by promissory notes.  In such event, the Borrower shall prepare, execute and deliver to Lender a promissory note payable to the order of Lender (or, if requested by Lender, to Lender and its registered assigns) and in a form approved by the Lender.  Thereafter, the Loans evidenced by such promissory notes and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

(d)    Amortization. The Borrower hereby unconditionally promises to pay to the Lender on the first Business Day of the month following each date set forth below the aggregate principal amount of the corresponding Term Loan set forth opposite such date in the tables below (in each case as adjusted from time to time pursuant to Section 2.08(b) and Section 2.17(d)):

(i)    For the 2010 Existing Term Loan:

| Loan | Date | Amount |
|------|------|--------|
| 2010 Existing Term Loan | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Loan | Date | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Maturity Date |  | The entire unpaid principal amount of the 2010 Existing Term Loan |

(ii)    For the 2010 Converted Term Loan:

| Loan | Date | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| 2010 Converted Term Loan |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Maturity Date |  | The entire unpaid principal amount of the 2010 Converted Term Loan |

; provided that the amount of each such installment pursuant to clauses (i) and (ii) shall be reduced on a pro rata basis by the amount of any Excess Cash Sweep Prepayment made pursuant to Section 2.08(a).

To the extent not previously paid, the Term Loans shall be paid in full in cash by the Borrower on the Maturity Date.

Section 2.08.   Prepayment of Loans.

(a)   Optional Prepayment.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without prepayment penalty or premium subject to the requirements of this Section and Section 2.13.

(b)   Excess Cash Sweep.

(i)   If Available Cash exceeds $75,000,000 (the amount of such excess being referred to as "Excess Cash") on any Excess Cash Test Date, then, as soon as reasonably practicable but in no event later than 30 days after such Excess Cash Test Date, the Borrower shall remit (the "Excess Cash Sweep Prepayment") to the Lender an amount equal to 25% of the Excess Cash (the "Excess Cash Amount"); *provided*, *however*, that the Borrower shall have no obligation to remit any Excess Cash Sweep Prepayments until the last Distribution is made on account of Allowed General Unsecured Claims under the terms of the Chapter 11 Plan (the occurrence of which shall be determined by the Borrower in good faith).

(ii)   Each Excess Cash Sweep Prepayment shall be accompanied by a certificate signed by a Financial Officer certifying the manner in which the Excess Cash and the Excess Cash Sweep Prepayment were calculated, as reasonably determined by the Borrower in good faith. If there is no Excess Cash on an applicable Excess Cash Test Date, such certificate shall certify only that no Excess Cash existed on the applicable Excess Cash Test Date.

(iii)   Notwithstanding the foregoing, if at the time that any Excess Cash Sweep Prepayment would be required, the Borrower is required to offer to prepay or repurchase any Bonds or any other Indebtedness outstanding at such time that is secured by a Lien on the Collateral ranking pari passu with the Lien securing the Loans pursuant to the terms of the documentation governing such Indebtedness with the Excess Cash Amount (such Indebtedness required to be offered to be so repurchased, "Other Applicable Indebtedness"), then the Borrower may apply the Excess Cash Amount on a pro rata basis (determined on the basis of the aggregate outstanding principal amount of the Loans and Other Applicable Indebtedness at such time) to the prepayment of such Other Applicable Indebtedness; provided, that in no event shall the aggregate amount of the prepayment of the Loans and such Other Applicable Indebtedness exceed the Excess Cash Amount; provided, further, that (A) the portion of the Excess Cash Amount allocated to the Other Applicable Indebtedness shall not exceed the amount of the Excess Cash Amount required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Excess Cash Amount shall be allocated to the Loans in accordance with the terms hereof to the prepayment of the Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Loans that would have otherwise been required pursuant to this Section 2.08(b) shall be reduced accordingly.

(c)   Notice of Prepayment; Application of Prepayments.  The Borrower shall notify the Lender by telephone (confirmed by fax) of any prepayment hereunder in the case of prepayment of a Term Benchmark Borrowing, not later than 11:00 a.m., Dallas, Texas time, three Business Days before the date of prepayment and in the case of prepayment of an ABR Borrowing or RFR Borrowing, not later than 11:00 a.m., Dallas, Texas time, one Business Day

before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.10.

Section 2.09.  Amendment Fees; Letter of Credit Fees.

(a)    In connection with any amendment or other modification of any Loan Document, an amendment fee in an amount equal to the greater of (A) $3,000 plus the reimbursement of Lender's reasonable costs or expenses (including, without limitation, reasonable attorneys' fees and documented costs and expenses) incurred in connection with any such amendment or other modification or (B) such other amount as the Lender may determine.

(b)    The Borrower agrees to pay to the Lender a fronting fee, which shall accrue at the rate of 0.50% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the Maturity Date and the date on which there ceases to be any LC Exposure, as well as the Lender's standard fees with respect to the amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder. Fronting fees accrued through and including the last day of March, June, September and December of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after the Effective Date. Any other fees payable to the Lender pursuant to this clause (b) shall be payable within 10 days after demand. All fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

Section 2.10.  Interest.

(a)    CBFR Borrowings. The Loans comprising each CBFR Borrowing shall bear interest at the CB Floating Rate.

(b)    SOFR Borrowings. The Loans comprising each SOFR Borrowing shall bear interest at the Adjusted Term SOFR Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)    Default Interest. Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, the Lender may, at its option, by notice to the Borrower, declare that (i) all Loans shall bear interest at 4% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 4% plus the rate applicable to such fee or other obligation as provided hereunder.

(d)    Payment of Interest. Accrued interest on each Loan (for CBFR Loans, accrued through the last day of the prior calendar month) shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (d)

of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)    Computation.  All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the CB Floating Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable CB Floating Rate, Adjusted Term SOFR Rate, and Term SOFR Rate, shall be determined by the Lender, and each such determination shall be conclusive absent manifest error.

Section 2.11.   Alternate Rate of Interest; Illegality.

(a)    Subject to clause (c) of this Section 2.11, if prior to the commencement of any Interest Period for a SOFR Borrowing:

(i)    the Lender determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR Rate or the Term SOFR Rate, as applicable, for such Interest Period; or

(ii)    the Lender determines the Adjusted Term SOFR Rate or the Term SOFR Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to the Lender of making or maintaining its SOFR Loans (or SOFR Loan) included in such Borrowing for such Interest Period;

then the Lender shall give notice thereof to the Borrower by telephone, fax or through an Electronic System as provided in Section 9.01 as promptly as practicable thereafter and, until (x) the Lender notifies the Borrower that the circumstances giving rise to such notice no longer exist and (y) the Borrower delivers a New Interest Election Request in accordance with the terms of Section 2.05, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a SOFR Borrowing shall be ineffective and any such SOFR Borrowing shall be repaid or converted into a CBFR Borrowing on the last day of the then current Interest Period applicable thereto.

(b)    If the Lender determines that any Requirement of Law has made it unlawful, or if any Governmental Authority has asserted that it is unlawful, for the Lender or its applicable lending office to make, maintain, fund or continue any SOFR Borrowing, or any Governmental Authority has imposed material restrictions on the authority of the Lender to purchase or sell, or to take deposits of, dollars in the interbank offering market, then, on notice thereof by the Lender to the Borrower, any obligations of the Lender to make, maintain, fund or continue SOFR Loans or to convert CBFR Borrowings to SOFR Borrowings will be suspended until the Lender notifies the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower will upon demand from the Lender,

either prepay or convert all SOFR Borrowings of the Lender to CBFR Borrowings, either on the last day of the Interest Period therefor, if the Lender may lawfully continue to maintain such SOFR Borrowings to such day, or immediately, if the Lender may not lawfully continue to maintain such Loans.  Upon any such prepayment or conversion, the Borrower will also pay accrued interest on the amount so prepaid or converted.

(c)     Notwithstanding anything to the contrary herein or in any other Loan Document (and any Swap Agreement shall be deemed not to be a "Loan Document" for purposes of this 2.11(c)), if a Benchmark Transition Event has occurred, Lender may, by notice to Borrower, amend this Agreement to establish an alternate rate of interest for the Benchmark that gives due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) the then-evolving or prevailing market convention for determining a benchmark rate as a replacement for the then current Benchmark at such time (the "<u>Alternate Rate</u>"); Borrower acknowledges that the Alternate Rate may include a mathematical adjustment using any then-evolving or prevailing market convention or method for determining a spread adjustment for the replacement of the Benchmark (which may include, if any Benchmark already contains such a spread, adding that spread to the Alternate Rate). The Lender may further amend this Agreement by such notice to Borrower to make technical, administrative or operational changes (including, without limitation, changes to the definition of "Interest Period", timing and frequency of determining rates and making payments of interest, the timing of prepayment or conversion notices, the length of lookback periods, the applicability of breakage provisions and other technical, administrative or operational matters) that Lender decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of the Alternate Rate. The Alternate Rate, together with all such technical, administrative and operational changes as specified in any notice, shall become effective at the later of (i) the fifth Business Day after Lender has provided notice (including without limitation for this purpose, by electronic means) to the Borrower (the "<u>Objection Date</u>") and (ii) a date specified by Lender in the notice, without any further action or consent of the Borrower, so long as Lender has not received, by 5:00 pm Eastern time on the Objection Date, written notice of objection to the Alternate Rate from the Borrower. If, on the date the Benchmark actually becomes permanently unavailable pursuant to a Benchmark Transition Event, an Alternate Rate has not been established in this manner, Loans will, until an Alternate Rate is so established, bear interest at the CB Floating Rate. In no event shall the Alternate Rate be less than the Floor.

(f)     All determinations by Lender under this Section 2.11 shall be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.11.

Section 2.12.   <u>Increased Costs</u>.

(a)     <u>Change In Law</u>.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or

other assessment) against assets of, deposits with or for the account of, or credit extended by, the Lender (except any such reserve requirement reflected in the Adjusted Term SOFR Rate);

(ii)    impose on the Lender or the applicable offshore interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein; or

(iii)    subject the Lender to any Taxes (other than (a) Indemnified Taxes, (b) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (c) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to the Lender of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to the Lender of issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(b)    Capital Adequacy.    If the Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on the Lender's capital or on the capital of the Lender's holding company as a consequence of this Agreement, the Loans made, by Letters of Credit issued by the Lender to a level below that which the Lender or the Lender's holding company could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of the Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender or the Lender's holding company for any such reduction suffered.

(c)    Delivery of Certificate.    A certificate of the Lender setting forth the amount or amounts necessary to compensate Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Limitation on Compensation.    Failure or delay on the part of Lender to demand compensation pursuant to this Section shall not constitute a waiver of Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.13.   <u>Break Funding Payments</u>.  In the event of (i) the payment of any principal of any SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default or as a result of any prepayment pursuant to Section 2.08), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure to borrow, convert, continue or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto, then, in any such event, the Borrower shall compensate the Lender for the loss, cost and expense attributable to such event.  In the case of a SOFR Loan, such loss, cost or expense to the Lender shall be deemed to include an amount determined by the Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such SOFR Loan had such event not occurred, at the Adjusted Term SOFR Rate plus the Applicable Rate that would have been applicable to such SOFR Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such SOFR Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the applicable interbank market, whether or not such SOFR Loan was in fact funded. A certificate of the Lender setting forth any amount or amounts that the Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay the Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

Section 2.14.   <u>Taxes</u>.

(a)     <u>Gross Up</u>.  Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable law; <u>provided</u> that if the Borrower shall be required by applicable law (as determined in the good faith discretion of the Borrower or Guarantor, as applicable) to deduct any Indemnified Taxes from such payments to a Recipient, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Recipient receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     <u>Payment of Other Taxes</u>.  In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or at the option of the Lender timely reimburse it for the payment of any Other Taxes.

(c)     <u>Tax Indemnification</u>.  The Borrower shall indemnify the Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes paid by the Lender on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other Loan Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A

certificate as to the amount of such payment or liability delivered to the Borrower by Lender shall be conclusive absent manifest error.

(d)     Receipts.  As soon as practicable after any payment of Indemnified Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(e)     Defined Terms.  For purposes of this Section 2.14, the term "applicable law" includes FATCA.

(f)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.14(f)(ii)(A), Section 2.14 (f)(ii)(B) and Section 2.14 (f)(ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or

reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit B-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-2 or Exhibit B-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit B-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's

obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

(g)    Treatment of Certain Refunds.    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Survival.    Each party's obligations under this Section 2.14 shall survive any assignment of rights by, or the replacement of, the Lender and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.15.    Payments Generally; Allocation of Proceeds.    The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or of amounts payable under Section 2.12, 2.13 or 2.14, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 12:00 noon, Dallas, Texas time), on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Lender at its offices in Dallas, Texas. If any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in dollars. If at any time insufficient funds are received by and available to the Lender to pay fully all amounts of principal, interest and fees

then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder and (ii) second, towards payment of principal.  To effectuate any payment due under the Loan Documents, the Borrower hereby authorizes the Lender to initiate debit entries to any deposit account of the Borrower maintained with the Lender and to debit the same to such account.  This authorization to initiate debit entries shall remain in full force and effect until the Lender has received written notification of its termination in such time and in such manner as to afford the Lender a reasonable opportunity to act on it provided that no notice of termination may be given if a Default exists.  The Borrower acknowledges (a) that such debit entries may cause an overdraft of any such account which may result in the Lender's refusal to honor items drawn on any such account until adequate deposits are made to any such account; (b) that the Lender is under no duty or obligation to initiate any debit entry for any purpose; and (c) that if a debit is not made because any such account does not have a sufficient available balance, or otherwise, the payment may be late or past due.

Section 2.16.  <u>Mitigation Obligations</u>.  If Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to Lender or any Governmental Authority for the account of Lender pursuant to Section 2.14, then Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.14, as the case may be, in the future and (ii) would not subject Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by Lender in connection with any such designation or assignment.

Section 2.17.  <u>Letters of Credit</u>.

(a)    <u>General</u>.    On and after the Effective Date, each Existing Letter of Credit shall be deemed for all purposes a Letter of Credit outstanding under this Agreement and entitled to the benefits of this Agreement and the other Loan Documents, and shall be governed by the applications and agreements pertaining thereto and by this Agreement.  Other than the Existing Letters of Credit, the Lender shall have no obligation to issue any other Letters of Credit or to modify, renew or extend (other than, to the extent applicable, pursuant to automatic extension provisions under such Letters of Credit) any Letters of Credit (including the Existing Letters of Credit) under this Agreement. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any Letter of Credit Agreement, the terms and conditions of this Agreement shall control.

(b)    [Reserved].

(c)    <u>Expiration Date</u>.  Each Letter of Credit shall expire (or be subject to termination or non-renewal by notice from the Lender to the beneficiary thereof) at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any extension of the expiration date thereof, including, without limitation, any automatic renewal provision, one year after such extension) (provided that any Letter of Credit with a one-year term may provide for the renewal thereof for additional one-year

periods not to extend past the date in the following clause (ii)) and (ii) the date that is five Business Days prior to the Maturity Date.

(d)  <u>Reimbursement</u>.  [If the Lender shall make any LC Disbursement in respect of a 2019 Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Lender an amount equal to such LC Disbursement; <u>provided</u> that such payment shall be made by applying cash collateral held by the Lender pursuant to Section 2.17(h) to reimburse such LC Disbursement.] If the Lender shall make any LC Disbursement in respect of any other Letter of Credit, the Borrower shall have the option to reimburse such LC Disbursement by paying to the Lender an amount equal to such LC Disbursement not later than 12:00 noon, Dallas, Texas time, (i) on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m., Dallas, Texas time, on such date, or, (ii) on the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; <u>provided</u> that, if the Borrower does not elect to reimburse such LC Disbursement pursuant to clause (i) or (ii), such LC Disbursement shall be deemed financed on such date with a CBFR Borrowing in the form of a 2010 Converted Term Loan in an amount equal to such LC Disbursement, and to the extent so financed, the aggregate outstanding principal balance of the 2010 Converted Term Loan at such time shall be automatically increased by the amount of such LC Disbursement and Borrower's obligation to make such payment for the LC Disbursement shall be deemed paid with the resulting 2010 Converted Term Loan.

(e)  <u>Obligations Absolute</u>.  The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (d) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, Letter of Credit Agreement or this Agreement, or any term or provision herein or therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) any payment by the Lender under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Lender nor any of its Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms, any error in translation or any consequence arising from causes beyond the control of the Lender; <u>provided</u> that the foregoing shall not be construed to excuse the Lender from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Lender's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or

willful misconduct on the part of the Lender (as finally determined by a court of competent jurisdiction), the Lender shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Lender may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(f)    _Disbursement Procedures_.  The Lender shall promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Lender shall promptly notify the Borrower by telephone (confirmed by fax or through Electronic Systems) of such demand for payment and whether the Lender has made or will make an LC Disbursement thereunder; _provided_ that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Lender with respect to any such LC Disbursement.

(g)    [Reserved].

(h)    _Cash Collateralization_.  [At all times from and after the Effective Date, the Borrower shall have deposited in an account with the Lender, in the name and for the benefit of the Lender (the "LC Collateral Account") an amount equal to 102% of the undrawn 2019 Letters of Credit at such time (it being acknowledged that such amount has been deposited in such account as of the Effective Date).]  Borrower acknowledges that all LC Disbursements owed by it in respect of 2019 Letters of Credit are secured by the Collateral and any cash or deposits may be applied to pay any LC Disbursements. If any Event of Default shall occur and be continuing, on the Business Day that the Borrower receives notice from the Lender demanding the deposit of cash collateral pursuant to this paragraph, the Borrower shall deposit in the LC Collateral Account, an amount in cash equal to 102% of the LC Exposure in respect of any other Letters of Credit as of such date _plus_ accrued and unpaid interest thereon; _provided_ that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in clause (h) or (i) of Section 8.01.  Each such deposit in the LC Collateral Account shall be held by the Lender as collateral for the payment and performance of the Obligations.  The Lender shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC Collateral Account and the Borrower hereby grants the Lender a security interest in the LC Collateral Account and all money or other assets on deposit therein or credited thereto.  Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Lender and at the Borrower's risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in the LC Collateral Account.  Moneys in the LC Collateral Account shall [be applied by the Lender for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure in respect of any drawn 2019 Letters of Credit or], if the maturity of the Loans has been accelerated, be applied to satisfy other Obligations.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three (3) Business Days

after all such Events Default have been cured or waived as confirmed in writing by the Lender. At any time the amount in the LC Collateral Account exceeds the amount required to be deposited therein pursuant to this Section 2.17(h) (including when a cash collateralized Letter of Credit expires or is terminated), and so long as no Default or Event of Default has occurred or is continuing at such time, then upon written request of the Borrower, the Lender shall promptly (but in any event within three (3) Business Days following the Lender's receipt of such request) return such excess cash to the account designated by the Borrower in such request.

## ARTICLE III.

Representations and Warranties

The Borrower represents and warrants to the Lender that:

Section 3.01.  Organization; Powers.  The Borrower and each other Loan Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business and activities as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.  The Borrower has been determined to be and is exempt from federal income taxes under Section 501(a) of the Code.  The Borrower has not impaired its status as an exempt organization as described in Section 501(c)(3) of the Code.

Section 3.02.  Authorization; Enforceability.  The Financing Transactions to be entered into by the Borrower and each other Loan Party are within such Loan Party's corporate powers and have been duly authorized by all necessary corporate and, if required, member or sponsor action on behalf of such Loan Party.  This Agreement has been duly executed and delivered by the Borrower and each other Loan Party and constitutes, and each other Loan Document to which the Borrower or any other Loan Party is a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03.  Governmental Approvals; No Conflicts.  The Financing Transactions (a) do not, as to the Borrower and Arrow WV, require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of the Borrower, Arrow WV or any other Loan Party or any order of any Governmental Authority applicable to the Borrower, Arrow WV or any other Loan Party, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower, Arrow WV or any other Loan Party or its assets evidencing any Material Indebtedness or that would otherwise have a Material Adverse Effect, or give rise to a right thereunder to require any payment to be made by the Borrower, Arrow WV or any other Loan Party, and (d) will not result in the creation or

imposition of any Lien on any asset of the Borrower, Arrow WV or any other Loan Party other than the Liens created under the Collateral Documents or the Bond Purchase Agreements.

Section 3.04.  <u>Financial Condition; No Material Adverse Change</u>.  The Borrower has heretofore furnished to the Lender its audited consolidated balance sheet and statement of operations as of and for the fiscal year ended December 31, 2018.  Such financial statements present fairly, in all material respects, the financial position and results of operations of the Borrower and the Subsidiaries as of such dates and for such periods in accordance with GAAP. Except as disclosed in the financial statements referred to above or the notes thereto (including the disclosure of changes in the market value of investments set forth therein) and except for the Disclosed Matters and as otherwise publicly disclosed in the Chapter 11 Plan or the proceedings relating thereto, after giving effect to the Financing Transactions, none of the Borrower or any other Loan Party has, as of the Effective Date, any material contingent liabilities, unusual long-term commitments or unrealized losses.  Since December 31, 2018, there has been no change that has resulted in a Material Adverse Effect.

Section 3.05.  <u>Properties</u>.  Each of the Borrower and the other Loan Parties has good title to, or valid leasehold interests in, all its real and personal property material to its operations, except for (a) minor defects in title that do not interfere with its ability to conduct its operations as currently conducted or to utilize such properties for their intended purposes and (b) Liens and other encumbrances permitted by <u>Section 6.02</u>. Each of the Borrower and the other Loan Parties owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by the Borrower and the other Loan Parties does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.06.  <u>Litigation and Environmental Matters</u>.

(a)  <u>Actions</u>.  There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of the other Loan Parties (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any of the Loan Documents or the Financing Transactions.

(b)  <u>Environmental Matters</u>.  Except for the Disclosed Matters and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, neither the Borrower nor any of the other Loan Parties (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(c)    Disclosed Matters.  Since the date of this Agreement, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

Section 3.07.    Compliance with Laws and Agreements.  Each of the Borrower and the other Loan Parties is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

Section 3.08.    Investment Company Status.  Neither the Borrower nor any of the other Loan Parties is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

Section 3.09.    ERISA.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. The present value of future benefits under each Plan did not, as of the date of the most recent actuarial valuation, exceed the total value of the assets of such Plan for valuation purposes.

Section 3.10.    Disclosure.  The Borrower has disclosed to the Lender all agreements, instruments and corporate or other restrictions to which the Borrower or any of the other Loan Parties is subject, and all other matters known to any of them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower to the Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Section 3.11.    Subsidiaries.  As of the Effective Date, Borrower has no Subsidiaries except as reflected on Schedule 3.11 attached hereto.

Section 3.12.    Insurance.  Each of the Borrower and the other Loan Parties maintain with financially sound and reputable insurers, insurance with respect to its properties and business against such casualties and contingencies and in such amounts as are usually carried by businesses engaged in similar activities as the Borrower and the other Loan Parties and located in similar geographic areas in which the Borrower and the other Loan Parties operate.

Section 3.13.    Margin Securities.  Neither the Borrower nor any other Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock and no part of the proceeds of any Loan were or will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock.

Section 3.14.  <u>Collateral Documents</u>.  The Collateral Documents are effective to create in favor of Collateral Agent for the benefit of the Lender and its affiliates, as security for the Obligations, security interests in the Collateral.  The security interests and other Liens created by the Collateral Documents in that portion of the Collateral in which a security interest may be perfected by the filing of a financing statement under the Uniform Commercial Code is perfected and rates first in priority with respect to all other Liens.

Section 3.15.  <u>Local Councils</u>.  The Borrower does not directly, nor indirectly through one or more intermediaries, Control any local council of the Borrower as of [_____]. As of [_____], the Borrower is not under common Control with any local council of the Borrower.

Section 3.16.  <u>Real Property</u>.  As of the Effective Date, all Mortgaged Property is set forth on Schedule 3.16 attached hereto.  Any other real property owned by Borrower or any other Loan Party that is not Mortgaged Property is not subject to any Lien for Indebtedness except as set forth on Schedule 6.02.

Section 3.17.  <u>Anti-Corruption Laws and Sanctions</u>.  Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its subsidiaries and their respective officers and directors and, to the knowledge of such Loan Party, its employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person.  None of (a) any Loan Party, any subsidiary or any of their respective directors, officers or, to the knowledge of any such Loan Party, employees, or (b) to the knowledge of any such Loan Party, any agent of such Loan Party that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

## **ARTICLE IV.**

### Conditions

Section 4.01.  <u>Effective Date</u>.  The obligations of the Lender to make Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived by the Lender):

(a)  <u>Execution and Delivery of This Agreement</u>.  The Lender (or its counsel) shall have received (i) a counterpart of this Agreement signed on behalf of each party hereto (which, subject to Section 9.06(b), may include any Electronic Signatures transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page) and (ii) a counterpart of each other Loan Document (each in form and substance reasonably satisfactory to Lender) signed on behalf of each party thereto [and (iii) such other certificates, documents, instruments and agreements as the Lender shall reasonably request

in connection with the Transactions, in each case in form and substance satisfactory to the Lender.]

      (b)    Corporate Authorization Documents. The Lender shall have received such documents and certificates as the Lender or its counsel may reasonably request relating to the organization, existence and good standing of Borrower and the Guarantor, the authorization of the Financing Transactions and any other legal matters relating to the Borrower and the Guarantor, the Loan Documents or the Financing Transactions, all in form and substance satisfactory to the Lender and its counsel.

      (c)    Closing Certificate. The Lender shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of the Borrower, confirming compliance with the conditions set forth in paragraphs (a) and (b) of Section 4.02.

      (d)    Personal Property Security Agreement. The Lender (or its counsel) shall have received counterparts of the Security Agreement signed by the Borrower, Arrow WV and the Collateral Agent together with the following:

      (i)    all documents and instruments, including Uniform Commercial Code financing statements and amendments, required by law or reasonably requested by the Lender to be filed, registered or recorded to create or perfect the Liens intended to be created under the Security Agreement; and

      (ii)    the results of the search of the Uniform Commercial Code (or equivalent) filings, tax Liens and judgment Liens made with respect to the Borrower in each jurisdiction (A) in which such a party is organized, and (B) where such a party has its chief executive office or has had its chief executive office within the last four months prior to the Effective Date; and copies of the financing statements (or other documents) disclosed by such search and evidence reasonably satisfactory to the Lender that the Liens indicated by such financing statements (or similar documents) are permitted by Section 6.02 or have been released or, simultaneously with the initial Loans hereunder, will be released.

      (e)    Insurance. The Lender shall have received evidence that the insurance required by Section 5.06 is in effect.

      (f)    Bond Documents. The Lender (or its counsel) shall have received (i) a counterpart of each of the Amended and Restated Series 2010B Bond Purchase and Loan Agreement and the Amended and Restated Series 2012 Bond Purchase and Loan Agreement (each in form and substance reasonably satisfactory to Lender) signed on behalf of each party thereto, and (ii) the original Bonds and Notes as referred to in the Bond Purchase Agreements.

      (g)    Pledged Notes. The Lender shall have received each promissory note (if any) pledged to the Lender pursuant to the Collateral Documents endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(h)     Collateral Assignments.    The Lender shall have received a collateral assignment of any mortgage or deed of trust held by the Borrower covering any Mortgaged Property.

(i)     Intercreditor Agreements.    The Lender (or its counsel) shall have received a counterpart of each of the Foundation Intercreditor Agreement and the Settlement Trust Intercreditor Agreement (each in form and substance reasonably satisfactory to Lender) signed on behalf of each party thereto.

(j)     Final Order.    The Bankruptcy Court shall have entered a final order reasonably satisfactory to the Lender confirming the Chapter 11 Plan and all conditions to the effectiveness of the Chapter 11 Plan shall have been satisfied or waived.

(k)     Real Property.    The Lender shall have received, with respect to each parcel of Mortgaged Property, each of the following, in form and substance reasonably satisfactory to the Lender:

(i)     a Mortgage on such property or an amendment to the existing Mortgage;

(ii)     assignments of all rents, leases, permits, licenses, utility rights and other privileges related to such property;

(iii)     collateral assignments of all construction documents, property management agreements, development agreements, leasing agreements, and security deposits, and subordination of such agreements as requested by the Lender;

(iv)     (x) a flood determination certificate issued by the appropriate Governmental Authority or third party indicating whether such property is designated as a "Special Flood Hazard Area" as designated on maps prepared by the Federal Emergency Management Agency and (y) to the extent such flood determination certificate indicates to the satisfaction of Lender that no Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) is in a "Special Flood Hazard Area" as designated on maps prepared by the Federal Emergency Management Agency, then upon Lender's request, Borrower shall execute and deliver an amendment to the applicable Mortgage in form and substance reasonably satisfactory to Lender sufficient to cause any such property previously excluded from such Mortgage to become Mortgaged Property;

(v)     if any such parcel of real property is determined by the Lender to be in a "Special Flood Hazard Area" as designated on maps prepared by the Federal Emergency Management Agency, a flood notification form signed by the Borrower and evidence that flood insurance is in place for the building and contents, all in form, substance and amount satisfactory to the Lender;

(vi)     evidence of release of the Liens described in item [2] on Schedule 6.02 (other than Liens in favor of Lender on Mortgaged Property or Permitted Encumbrances), or

- 48 -

evidence that Borrower is in good faith contesting and diligently pursuing a resolution of such Liens; and

(vii)    all existing appraisals as may be requested by Lender and all existing environmental reports (including all available Phase I Environmental Site Assessment reports and Phase II Environmental Site Assessment reports), and any other existing reports, audits, studies or certifications associated therewith, in each case, in the Borrower's possession in connection with such real property.

(l)    <u>Fees</u>.  The Lender shall have received its pro rata portion of the JPM Exit Fee (as defined in the Chapter 11 Plan), and any other amounts due and payable to it, in each case pursuant to the terms of the Chapter 11 Plan.

(m)    <u>LC Reimbursement</u>.  Borrower shall have reimbursed Lender for all LC Disbursements in respect of a Letter of Credit issued under the 2019 Credit Agreement that occurred prior to the Effective Date and that remain unreimbursed as of the Effective Date; provided that such reimbursement shall be deemed to have occurred if the Lender shall have regained access to the cash collateral provided in respect of such Letter of Credit.

The Lender shall notify the Borrower of the Effective Date, and such notice shall be conclusive and binding.

Section 4.02.  <u>Each Credit Event</u>.  If the Lender is willing in its sole discretion to amend, renew or extend any Letter of Credit (other than pursuant to automatic extensions as provided in Section 2.17), Borrower shall provide such executed documents as requested by Lender and shall satisfy the following conditions:

(a)    <u>Representations and Warranties</u>.  The representations and warranties of the Borrower set forth in the Loan Documents shall be true and correct on and as of the date of such amendment, renewal or extension of such Letter of Credit, as applicable, except to the extent such representations and warranties specifically relate to an earlier date (and such representations and warranties shall be true and correct as of such earlier date).

(b)    <u>No Default</u>.  At the time of and immediately after giving effect to amendment, renewal or extension of such Letter of Credit, as applicable, no Default shall exist.

Each Borrowing and each amendment, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a) and (b) of this Section.

**ARTICLE V.**

Affirmative Covenants

Until the Obligations have been Fully Satisfied, the Borrower covenants and agrees with the Lender that:

Section 5.01.   Financial Statements and Other Information.   The Borrower will furnish to the Lender:

(a)   Annual Audit.   Within 180 days after the end of each fiscal year of the Borrower (commencing with the fiscal year ending December 31, 2022; provided that with respect to the fiscal year ending December 31, 2022, the financial information shall only be required to cover the period commencing on the Effective Date and ending on December 31, 2022) the audited consolidated balance sheet and related statements of operations as of the end of and for such year, setting forth in each case (other than the fiscal year ending December 31, 2022) in comparative form the figures for the previous fiscal year, all reported on by an independent public accountants of recognized standing (without any qualification or exception as to the scope of such audit other than with respect to any upcoming maturity of indebtedness or financial covenant compliance) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower, its Subsidiaries and certain of its Affiliates on a consolidated basis in accordance with GAAP consistently applied;

(b)   Quarterly Financial Statements.   Within 45 days after the end of each March, June, and September of each year, commencing with the first full fiscal quarter ending after the Effective Date, the consolidated balance sheet and related statements of operations of the Borrower, its Subsidiaries and certain of its Affiliates as of the end of and for the month then ended and the then elapsed portion of the fiscal year, setting forth, in the case of the balance sheet only, in comparative form the figures for the corresponding period of the previous fiscal year (provided that no comparative figures shall be included for such financial statements delivered during the fiscal years ending December 31, 2022 and December 31, 2023), and all (A) in form and substance substantially similar to the "Boy Scouts of America Consolidated Financial Statements for the period ending [_____] (Unaudited)" previously provided to the Lender by the Borrower, and (B) certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries referenced in such financial statements in accordance with sound accounting principles consistently applied, subject to normal year-end adjustments and the absence of footnotes;

(c)   Compliance Certificate.   Concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate in substantially the form of Exhibit A hereto of a Financial Officer of the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Article VII and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the Borrower's audited financial statements referred to in

Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate; and

        (d)      Additional Information relating to the Project or the Collateral. Promptly following any request therefor, such other information regarding the operations, affairs and financial condition of the Borrower or any other Loan Party, or compliance with the terms of any Loan Document, the status of the development and construction of the Project or the pledges made to fund the Project and any other Collateral as the Lender may reasonably request.

      Section 5.02.  Notices of Material Events. The Borrower will furnish to the Lender written notice of the following promptly upon any Financial Officer or any other executive officer or director of the Borrower obtaining knowledge thereof:

        (a)      Default. The occurrence of any Default;

        (b)      Notice of Proceedings. The filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any other Loan Party that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

        (c)      ERISA Event. The occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and the ERISA Affiliates in an aggregate amount exceeding $100,000; and

        (d)      Material Adverse Effect. Any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

      Section 5.03.  Existence; Conduct of Operations. The Borrower will, and will cause each of the other Loan Parties to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and not for profit status and, except where failure to do so could not reasonably be expected to have a Material Adverse Effect, the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names necessary to the conduct of its operations.

      Section 5.04.  Payment of Obligations. The Borrower will, and will cause each of the Loan Parties to, pay its Indebtedness and other obligations before the same shall become delinquent or in default, except (a) where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) the Borrower or such other Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation and (iv) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect and (b) for the failure to pay when

due up to an aggregate amount not to exceed $100,000 of accounts payable at any time outstanding if (i) no action has been taken to enforce collection of such obligations and (ii) the failure to make payment could not reasonably be expected to result in a Material Adverse Effect.

Section 5.05. <u>Maintenance of Properties</u>. The Borrower will, and will cause each of the Loan Parties to, keep and maintain all property material to the conduct of its business and activities in good working order and condition, ordinary wear and tear excepted.

Section 5.06. <u>Insurance</u>. The Borrower will, and will cause each of the other Loan Parties to, maintain, with financially sound and reputable insurance companies insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by Persons of established repute engaged in the same or similar operations operating in the same or similar locations. Notwithstanding the foregoing, the Borrower or any other Loan Party may self-insure if such self-insurance (a) is in amounts not less than what is reasonable based on the operations and locations of the Borrower and its Subsidiaries, (b) is adequate to protect its property and operations, and (c) is prudent under the circumstances; provided, however, that the Borrower and the other Loan Parties may not self-insure any of their property, plant and equipment. The Borrower will furnish to the Lender, upon request, information in reasonable detail as to the insurance so maintained. Each general liability insurance policy shall name the Lender as additional insured.

Section 5.07. <u>Books and Records; Inspection and Audit Rights</u>. The Borrower will, and will cause each of the other Loan Parties to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. The Borrower will, and will cause each of the other Loan Parties to, permit any representatives designated by the Lender who have agreed in writing to be bound to the confidentiality provisions hereof for the benefit of the Borrower and each of the other Loan Parties, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested. Notwithstanding the foregoing, neither the Borrower nor any of the other Loan Parties shall be required to produce that portion of any books or records that could reasonably be expected to disclose any material entitled to an attorney-client privilege.

Section 5.08. <u>Compliance with Laws and Agreements</u>. The Borrower will, and will cause each of the other Loan Parties to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property (including, without limitation, all applicable Environmental Laws) and all agreements binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries, the other Loan Parties and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

Section 5.09. <u>Use of Proceeds</u>. The proceeds of the Loans will be used only for working capital and general corporate purposes permitted by applicable law. No part of the proceeds of any Loan was or will be used, whether directly or indirectly, for any purpose that entails a

violation of any of the Regulations of the Federal Reserve Board including Regulations G, U and X. The Borrower will not request any Borrowing or Letter of Credit, and the Borrower shall not use, and shall procure that its Subsidiaries and the other Loan Parties and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 5.10.  Further Assurances.  The Borrower will execute any and all further documentation and take all such further actions, which may be required under any Requirement of Law, or which the Lender may reasonably request, to effectuate the transactions contemplated by the Loan Documents.  Subject to the terms of the Collateral Documents, the Borrower will execute any and all further documents, financing statements, fixture filings, mortgages, deeds of trust, agreements, control agreements, and instruments, and take all such further actions which may be required under any Requirement of Law, or which the Lender may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Collateral Documents or the validity or priority of any such Lien, all at the expense of the Borrower.  The Borrower also agrees to provide to the Lender, from time to time upon request, evidence reasonably satisfactory to the Lender as to the perfection and priority of the Liens created or intended to be created by the Collateral Documents.

Section 5.11.  Banking Relationship.  In an effort to assure the soundness of the Financing Transactions, the Borrower will and will cause each other Loan Party to establish and maintain its primary banking depository and disbursement relationship with the Lender.

## ARTICLE VI.

### Negative Covenants

Until the Obligations have been Fully Satisfied, the Borrower covenants and agrees with the Lender that:

Section 6.01.  Indebtedness.  The Borrower will not, and will not permit any other Loan Party to, create, incur, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness created under the Loan Documents;

(b)    Indebtedness set forth in Schedule 6.01, Indebtedness incurred after the date hereof under commitments described on Schedule 6.01 and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof or result in an earlier maturity date or decreased weighted average life thereof;

(c)    Indebtedness of the Borrower or any other Loan Party incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital

Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof or result in an earlier maturity date or decreased weighted average life thereof; provided that (A) such Indebtedness is incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement and (B) the aggregate principal amount of Indebtedness permitted by this clause (c) shall not exceed $50,000,000 at any time outstanding;

(d)     Indebtedness arising in connection with Swap Agreements permitted by Section 6.07.

(e)     to the extent constituting Indebtedness, deferred compensation payable to directors, officers or employees of the Borrower and the other Loan Parties;

(f)     cash management obligations and Indebtedness incurred by the Borrower or any other Loan Party in respect of netting services, overdraft protections and similar arrangements, in each case entered into in the ordinary course of operations in connection with cash management and deposit accounts and not involving the borrowing of money;

(g)     Indebtedness arising in connection with the Notes, the Bonds and the Bond Purchase Agreements provided that the Borrower has furnished the Lender copies of all the documentation executed in connection with the Notes and the Bonds, including, without limitation, (i) an opinion of counsel for the Issuer that the Bonds are exempt from federal and State of West Virginia taxation and that the Issuer has not designated the Bonds as a "qualified tax exempt obligations" under Section 356(b) of the Internal Revenue Code, (ii) evidence that the Notes have been assigned by the Issuer to secure the obligations arising in connection with the Bonds and that such assignment constitutes a first priority, perfected security interest in favor of the holders of the Bonds, (iii) the Bond Purchase Agreements and (iv) the Bonds.;

(h)     loans and advances from the Borrower to Arrow WV in an aggregate principal amount not to exceed $500,000,000 provided that such loans and advances are evidenced and governed by documentation reasonably acceptable to the Lender and the proceeds of such loans and advances are used by Arrow WV to finance the Project;

(i)     liabilities for contributions to self-insurance or shared or pooled risk insurance programs of the Borrowers and the other Loan Parties required or permitted to be maintained under Section 5.06 of this Agreement;

(j)     Subordinated Indebtedness in an aggregate principal amount not to exceed $20,000,000 outstanding at any time;

(k)     Indebtedness under the BSA Settlement Trust Note in a principal amount not to exceed $80,000,000 plus any interest added to such principal amount by payments in kind;

(l)     Indebtedness under the Foundation Loan Agreement in a principal amount not to exceed $42,800,000;

(m)      Indebtedness arising out of letters of credit issued to purchase goods in the ordinary course of the Borrower's or any other Loan Party's business; and

(n)      Indebtedness arising out of letters of credit in an aggregate principal amount not to exceed $10,000,000.

Section 6.02.  <u>Liens</u>.  The Borrower will not, and will not permit any other Loan Party to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)      Liens created under the Loan Documents;

(b)      Permitted Encumbrances;

(c)      any Lien on any asset (and the accessions thereto and the product and proceeds thereof) of the Borrower or any other Loan Party and set forth in Schedule 6.02; <u>provided</u> that (i) such Lien shall not apply to any other asset of the Borrower or any other Loan Party and (ii) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(d)      Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any other Loan Party; <u>provided</u> that (i) such security interests secure Indebtedness permitted by clause (c) of Section 6.01, (ii) such security interests and the Indebtedness secured thereby are incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed 90% of the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such security interests shall not apply to any other property or assets of the Borrower or any other Loan Party;

(e)      other Liens securing Indebtedness or other obligations in an aggregate principal amount not to exceed $500,000 at any time outstanding; <u>provided that</u> the aggregate book value of all assets encumbered by all the Liens permitted under this clause (e) shall not exceed $500,000, with the book value of an asset determined at the time of the granting of the Lien therein;

(f)      a second priority Lien on the Arrow Intercompany Note securing Indebtedness under the Foundation Loan Agreement;

(g)      second priority Liens on the inventory, accounts receivable (other than the Arrow Intercompany Note), Cash and the real property constituting the Borrower's headquarters as of the Effective Date, in each case securing Indebtedness under the BSA Settlement Trust Note;

(h)      Liens securing Indebtedness permitted under Section 6.01(m) provided such Liens extend only to the goods so purchased; and

(i)    Liens on cash and cash equivalents securing Indebtedness permitted under Section 6.01(n).

Section 6.03.    <u>Fundamental Changes</u>.

(a)    The Borrower will not, nor will it permit any other Loan Party to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve. The Borrower will not, and will not permit any of the other Loan Parties to, engage to any material extent in any operations other than the operations of the type conducted by the Borrower and the other Loan Parties on the date of execution of this Agreement and operations reasonably related thereto.

(b)    The Borrower will not, nor will it permit any other Loan Party to, consummate a Division as the Dividing Person, without the prior written consent of Lender. Without limiting the foregoing, if any Loan Party that is a limited liability company consummates a Division (with or without the prior consent of Lender as required above), each Division Successor shall be required to comply with the obligations set forth in Section 5.10 and the other further assurances obligations set forth in the Loan Documents and become a Loan Party under this Agreement and the other Loan Documents.

Section 6.04.    <u>Investments, Loans, Advances, Guarantees and Acquisitions</u>.    The Borrower will not, and will not permit any of the other Loan Parties to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Equity Interests in or evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except:

(a)    Permitted Investments;

(b)    Swap Agreements permitted by Section 6.07;

(c)    loans and advances to officers, directors, and employees of the Borrower and the other Loan Parties made in the ordinary course of operations for travel and entertainment expenses, relocation costs and similar purposes up to a maximum for all such loans and advances of $250,000 in the aggregate at any one time outstanding;

(d)    endorsements of items for collection or deposit in the ordinary course of business;

(e)    loans and advances to Arrow WV in an aggregate principal amount not to exceed $500,000,000 provided that such loans and advances are evidenced and governed by documentation reasonably acceptable to the Lender and the proceeds of such loans and advances are used by Arrow WV to finance the Project and such loans and advances evidenced by one or more promissory notes pledged and delivered to Lender; and

(f)    in addition to the investments otherwise permitted by this Section 6.04, the Borrower and the other Loan Parties may acquire Equity Interests in or other securities of, make loans or advances to, Guarantee any obligations of, or make any other investment in, any other Person if the aggregate amount expended to make all such investments consummated under the permissions of this paragraph (f) shall not exceed an amount equal to $500,000; provided that as of the date of any such investment and after giving effect thereto, no Default shall exist or result therefrom.

Section 6.05.    Asset Sales.    The Borrower will not, and will not permit any of the other Loan Parties to, sell, transfer, lease or otherwise dispose of any asset, except:

(a)    sales or other dispositions of used or surplus equipment, inventory and Permitted Investments in the ordinary course of operations;

(b)    other sales, transfers and other dispositions of assets in the ordinary course of operations of the Borrower or the other Loan Party; provided that (i) all sales, transfers and other dispositions made under the provisions this clause (b) shall be made (x) for fair value, (y) for at least 90% cash consideration, and (z) in compliance with Section 6.09; and (ii) the proceeds of any disposition permitted under this clause (b) are retained by the Borrower and used to acquire other assets to be used in the operations of the Borrower or the other Loan Parties;

(c)    sales or other dispositions of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on the Bonds or the Obligations and are disposed of in accordance with such specific restriction;

(d)    (i) leases by the Borrower or any other Loan Party of the type described in clause (k) of the definition of Permitted Encumbrances and (ii) the grant or conveyance of conservation easements by Arrow WV of the type described in clause (n) of the definition of Permitted Encumbrances;

(e)    The BSA Settlement Trust Contribution (as defined in the Chapter 11 Plan); and

(f)    other sales, transfers and dispositions of assets not permitted by any other clause of this Section, provided that the aggregate fair market value of the assets sold under the permissions of this clause (f) may not exceed $1,000,000 per fiscal year.

Section 6.06.    Sale and Leaseback Transactions.    The Borrower will not, and will not permit any of the other Loan Parties to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its operations, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for (i) any such sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 90 days after the Borrower or such other Loan Party acquires or completes the construction of such fixed or capital asset and (ii) the sale-and-leaseback of the Warehouse and Distribution Center in accordance with the provisions of the Chapter 11 Plan.

Section 6.07.  <u>Swap Agreements</u>.  The Borrower will not, and will not permit any of the other Loan Parties to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any other Loan Party has actual exposure and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest–bearing liability or investment of the Borrower or any other Loan Party.

Section 6.08.  <u>Restricted Payments; Certain Payments of Indebtedness</u>.  The Borrower will not, nor will it permit any other Loan Party to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.  The Borrower will not, nor will it permit any other Loan Party to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(a)    payment of Indebtedness related to the Bonds, the Notes and the Loan Documents;

(b)    payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness other than payments in respect of Subordinated Indebtedness prohibited by the subordination provisions thereof;

(c)    payment of Indebtedness constituting pension plan liabilities arising under a Plan;

(d)    refinancing of Indebtedness to the extent permitted by Section 6.01;

(e)    payment of Indebtedness under the BSA Settlement Trust Note;

(f)    payment of Indebtedness under the Foundation Loan Agreement; and

(g)    payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness.

Section 6.09.  <u>Transactions with Affiliates</u>.  The Borrower will not, nor will it permit any other Loan Party to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions are at prices and on terms and conditions not less favorable to the Borrower or such other Loan Party than could be obtained on an arm's-length basis from unrelated third parties; (b) any loan, advance, or Guarantee permitted by Section 6.04(e) or (f), (c) any Restricted Payment permitted by Section 6.08, (d) any incurrence of Subordinated Indebtedness owing to an Affiliate permitted by Section 6.01(j) and (e) the lease of the Summit Bechtel Family National Scout Reserve by Arrow WV to the Borrower.

Section 6.10.  Change in Fiscal Year.  The Borrower will not change the manner in which either the last day of its fiscal year or the last days of the first three fiscal quarters of its fiscal year is calculated.

## ARTICLE VII.

### Financial Covenants

Until the Obligations have been Fully Satisfied, the Borrower covenants and agrees with the Lender that:

Section 7.01.  Minimum Liquidity.  Beginning with December 31, 2022, the Borrower shall not permit Liquidity as of the last day of any June or December for which quarterly or annual financial statements (as applicable) and a compliance certificate were delivered or required to be delivered pursuant to Section 5.01(a), (b) and (c), respectively (each a "Test Date"), to be less than the amount set forth in the table below opposite such Test Date.

| Test Date | Liquidity |
|---|---|
| December 31, 2022 | $47,000,000 |
| June 30, 2023 | $40,000,000 |
| December 31, 2023 | $54,000,000 |
| June 30, 2024 | $42,000,000 |
| December 31, 2024 | $39,000,000 |
| June 30, 2025 | $30,000,000 |
| December 31, 2025 | $35,000,000 |
| June 30, 2026 | $25,000,000 |
| December 31, 2026 | $30,000,000 |
| June 30, 2027 | $21,000,000 |
| December 31, 2027 | $26,000,000 |
| June 30, 2028 | $16,000,000 |
| December 31, 2028 | $22,000,000 |
| June 30, 2029 | $12,000,000 |
| December 31, 2029 | $18,000,000 |
| June 30, 2030, and each Test Date occurring on June 30 thereafter | $12,000,000 |
| December 31, 2030 and each Test Date occurring on December 31 | $18,000,000 |

| Test Date | Liquidity |
|-----------|-----------|
| thereafter |  |

Section 7.02.  <u>Consolidated Debt Service Coverage Ratio</u>.  Beginning with the Rolling Period ending as of December 31, 2022, the Borrower shall not permit its Consolidated Debt Service Coverage Ratio for any Rolling Period ending as of any Test Date to be less than (a) for each Test Date occurring on or before December 31, 2023, 1.00 to 1.00, (b) for the Test Dates occurring June 30, 2024 and December 31, 2024, 0.80 to 1.00, (c) for each Test Date occurring during the period from and including June 30, 2025 to and including December 31, 2027, 1.00 to 1.00 and (d) for each Test Date occurring on or after June 30, 2028, 1.20 to 1.00.

Section 7.03.  <u>Additional Financial Covenants</u>.  In the event the Borrower shall enter into, assume or otherwise become bound by or obligated under any agreement creating or evidencing any Indebtedness, the terms of this Agreement shall, without any further action on the part of the Borrower or the Lender, be deemed to be amended automatically to include each Additional Financial Covenant contained in such agreement.  The Borrower further covenants to promptly execute and deliver at its expense an amendment to this Agreement in form and substance satisfactory to the Lender evidencing the amendment of this Agreement to include such Additional Financial Covenants, provided that the execution and delivery of such amendment shall not be a precondition to the effectiveness of such amendment but shall merely be for the convenience of the parties hereto.  Upon the date that any Additional Financial Covenant is no longer binding on the Borrower under the terms of the original agreement which created or evidenced the applicable Indebtedness, the terms of this Agreement shall, without any further action on the part of the Borrower or the Lender, be deemed to be amended automatically to delete such Additional Financial Covenant from this Agreement.  For purposes of this Agreement, the term "Additional Financial Covenant" means any financial covenant, event of default or similar restriction applicable to the Borrower (regardless of whether such provision is labeled or otherwise characterized as a covenant) the subject matter of which either (A) is similar to that of the covenants in Article VII of this Agreement, but contains one or more percentages, amounts or formulas that in the sole judgment of the Lender is more restrictive than those set forth herein or more beneficial to the holder or holders of such other Indebtedness (and such covenant, event of default or similar restriction shall be deemed an "Additional Financial Covenant" only to the extent that it is more restrictive or more beneficial), or (B) is different from the subject matter of the covenants in Article VII of this Agreement and measures the financial performance of the Borrower utilizing financial statement components.

## ARTICLE VIII.

### Events of Default

Section 8.01.  <u>Events of Default; Remedies</u>.  If any of the following events ("<u>Events of Default</u>") shall occur and shall continue:

(a)     the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Section 8.01) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three days;

(c)    any representation, warranty or certification made or deemed made by or on behalf of the Borrower in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Sections 5.02, 5.03 or 5.07 or in Article VI or in Article VII;

(e)    the Borrower shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b), (d), (p) or (q) of this Section 8.01), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Lender to the Borrower;

(f)    the Borrower or any other Loan Party shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable;

(g)    any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due (and all applicable notices of default, if any, have been given and all applicable cure periods have expired), or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any other Loan Party or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any other Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    the Borrower or any other Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section 8.01, (iii) apply for or consent to the

appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any other Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j)     the Borrower or any other Loan Party shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k)     one or more judgments for the payment of money in an aggregate amount in excess of $5,000,000 shall be rendered against the Borrower, any other Loan Party or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed by written agreement or court order, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any other Loan Party to enforce any such judgment;

(l)     an ERISA Event shall have occurred that, in the opinion of the Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and the ERISA Affiliates in an aggregate amount exceeding $1,000,000;

(m)     any Loan Document shall otherwise for any reason cease to be in full force and effect and valid, binding and enforceable in accordance with its terms after its date of execution, or the Borrower shall so state in writing;

(n)     any Lien purported to be created under the Collateral Documents in respect of assets that constitute a material portion of the Collateral shall cease to be, or shall be asserted by the Borrower not to be (other than, in each case, in accordance with its terms), a valid and perfected Lien on such Collateral, with the priority required hereby or thereby;

(o)     Lender reasonably determines that a Material Adverse Effect has occurred or a circumstance exists that could result in a Material Adverse Effect and such condition continues unremedied for a period of 30 days after notice thereof from Lender to the Borrower;

(p)     the Borrower shall fail to comply with the covenant set forth in <u>Section 7.01</u>; <u>provided</u> that if Liquidity is less than the amount specified in Section 7.01 but equal to or greater than $10,000,000 as of any Test Date, then an Event of Default shall not be deemed to exist under this clause (p) as of such Test Date (but an event of the type with the passage of time will become an Event of Default if not cured or waived shall have occurred and such event, herein called, a "<u>Potential Liquidity Default</u>").  If a Potential Liquidity Default exists with respect to a Test Date then, as of the Redetermination Date applicable to such Test Date, such Potential Liquidity Default shall be deemed to have been cured if the Liquidity, calculated as of such Redetermination Date based on the financial statements delivered under for the Section 5.01(b) for the period ending on such Redetermination Date, is equal to or greater than the amount specified in Section 7.01; or

(q)     the Borrower shall fail to comply with the covenant set forth in <u>Section 7.02</u>; provided that if the Consolidated Debt Service Coverage Ratio is less than the level

specified in Section 7.02 as of any Test Date, then an Event of Default shall not be deemed to exist under this clause (q) as of such Test Date (but an event of the type with the passage of time will become an Event of Default if not cured or waived shall have occurred and such event, herein called, a "Potential CDSCR Default").  If a Potential CDSCR Default exists with respect to a Test Date then, as of the Redetermination Date applicable to such Test Date,  such Potential CDSCR Default shall be deemed to have been cured if the Consolidated Debt Service Coverage Ratio, calculated as of such Redetermination Date based on the financial statements delivered under for the Section 5.01(b) for the period ending on such Redetermination Date, is greater than or equal to the level specified in Section 7.02 for the prior Test Date,

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Section), and at any time thereafter during the continuance of such event, the Lender may, a, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower described in clause (h) or (i) of this Section, the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower.  In addition, if any Event of Default exists, the Lender may exercise any and all other rights and remedies afforded by the laws of the State of Texas or any other jurisdiction, by any of the Loan Documents, by equity, or otherwise.

Section 8.02.  <u>Performance by the Lender</u>.  If Borrower fails to perform any covenant or agreement in accordance with the terms of the Loan Documents, the Lender may perform or attempt to perform such covenant or agreement on behalf of the Borrower.  In such event, the Borrower shall, at the request of the Lender, promptly pay any amount reasonably and actually expended by the Lender in connection with such performance or attempted performance to the Lender, together with interest thereon at the applicable rate therefor plus the rate set forth in Section 2.10(c) from and including the date of such expenditure to but excluding the date such expenditure is paid in full.  Notwithstanding the foregoing, it is expressly agreed that the Lender shall not have any liability or responsibility for the performance of any obligation of the Borrower under any Loan Document.

# ARTICLE IX.

## Miscellaneous

Section 9.01.  <u>Notices</u>.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to paragraph

(b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(ii)     if to the Borrower, to it at 1325 Walnut Hill Lane, Irving, Texas 75038, Attention of Stephanie Phillips, Controller, Phone: (972) 580-2300; Fax: 972-580-7896; and

(iii)     if to the Lender, to JPMorgan Chase Bank, N.A., 2200 Ross Avenue, 8th Floor, Dallas, TX 75201, Attention:  [_____];  Telephone:  [_____];  Telecopy: [_____]; and

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by facsimile shall be deemed to have been given when sent, provided that if not given during normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient or (iii) delivered through Electronic Systems to the extent provided in paragraph (b) below shall be effective as provided in such paragraph.

(b)     Notices and other communications to the Borrower, any Loan Party and the Lender hereunder may be delivered or furnished by Electronic Systems pursuant to procedures approved by the Lender; provided that the foregoing shall not apply to notices pursuant to Article II or to Compliance Certificates delivered pursuant to Section 5.01(c) unless otherwise agreed by the Lender.  Each of the Lender and the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)     Unless the Lender otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(d)     Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

Section 9.02.   Waivers; Amendments.

(a)     No Waiver; Rights Cumulative.  No failure or delay by the Lender in exercising, and no course of dealing with respect to, any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder and under the other Loan Documents

are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or any other financial accommodation shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)     Amendments.  Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, except pursuant to an agreement in writing entered into by the Borrower and the Lender.

Section 9.03.   Expenses; Indemnity; Damage Waiver.

(a)     Expenses.   The Borrower shall pay (i) all reasonable out of pocket expenses incurred by the Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Lender, in connection with the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all out-of-pocket expenses incurred by the Lender, including the fees, charges and disbursements of any counsel for the Lender, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder or the extension or modification of any Letter of Credit, including all such out of pocket expenses incurred during  any workout, restructuring or negotiations in respect of such Loans, Letters of Credit or LC Disbursements.

(b)     Indemnity.  THE BORROWER SHALL INDEMNIFY THE LENDER AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF ANY LOAN DOCUMENT OR ANY OTHER AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY, THE PERFORMANCE BY THE PARTIES TO THE LOAN DOCUMENTS OF THEIR RESPECTIVE OBLIGATIONS THEREUNDER OR THE CONSUMMATION OF THE FINANCING TRANSACTIONS OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR LETTER OF CREDIT OR THE USE OF THE PROCEEDS THEREFROM (INCLUDING ANY REFUSAL BY THE LENDER TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT), (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY CURRENTLY OR FORMERLY OWNED OR OPERATED BY THE BORROWER OR ANY OF THE OTHER LOAN PARTIES, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY OF THE OTHER LOAN PARTIES, OR (IV) ANY

ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; <u>PROVIDED</u> THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR WITH RESPECT TO (III), ABOVE, ARE CAUSED BY ANY ACT OR OMISSION OF ANY INDEMNITTEE OR ARE UNRELATED TO THIS AGREEMENT OR ARE FIRST CAUSED OR EXACERBATED AFTER FORECLOSURE OR A DEED IN LIEU OF FORECLOSURE AT ANY MORTGAGED PROPERTY.  WITHOUT LIMITING ANY PROVISION OF ANY LOAN DOCUMENT, EXCEPT WITH REGARD TO (III), ABOVE, IT IS THE EXPRESS INTENTION OF THE PARTIES HERETO THAT EACH INDEMNITEE SHALL BE INDEMNIFIED FROM AND HELD HARMLESS AGAINST ANY AND ALL LOSSES, LIABILITIES, CLAIMS, DAMAGES, PENALTIES, JUDGMENTS, DISBURSEMENTS, COSTS, AND EXPENSES (INCLUDING ATTORNEYS' FEES, COSTS AND EXPENSES) ARISING OUT OF OR RESULTING FROM THE SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNITEE; PROVIDED FURTHER THAT THIS SECTION 9.03(b) SHALL NOT APPLY WITH RESPECT TO TAXES OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS, DAMAGES, ETC. ARISING FROM ANY NON-TAX CLAIM.

(c)    <u>Waiver of Damages</u>.  To the extent permitted by applicable law, the Borrower shall not assert, and the Borrower waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, incidental, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, the Loan Documents or any agreement or instrument contemplated hereby, the Financing Transactions, any Loan or the use of the proceeds thereof.

(d)    <u>Payments</u>.  All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

Section 9.04.  <u>Successors and Assigns</u>.

(a)    <u>Successors and Assigns</u>.  The provisions of this Agreement are binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Indemnitee), except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Indemnitee), Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Lender any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignment</u>.  Lender may, without the prior consent of the Borrower but with notice to the Borrower if no Default exists, assign to one or more assignees all, but not a

portion, of its rights and obligations under this Agreement provided that no such assignment shall, as of the date of the assignment and as long as no Default exists, cause the Borrower to pay any additional amounts hereunder other than legal fees and expenses incurred in connection with such assignment and typical assignment fees paid to the assignor; *provided* that, with respect to any such assignment to more than one assignee, each such assignee shall have mutually agreed with the Loan Parties in writing to amend this Agreement and the other Loan Documents to make such adjustments as are deemed necessary and appropriate by such assignees and Borrower for this Agreement and such other Loan Documents to continue with multiple Lenders and for the Loan Parties to comply with all laws and regulations notwithstanding such assignments.

(c)    <u>Register</u>. The Loan is issued in registered form as to both principal and interest. The Borrower or its agent will maintain a register (the "<u>Register</u>") for the recordation of the name and address of any holder of this Loan (the "<u>Registered Holder</u>"). The Lender will be the initial Registered Holder. All interest on, and the principal of, the Loan will only be paid to the Registered Holder. If a Registered Holder shall transfer and assign the Loan in accordance with the restrictions on transfer described in this Section 9.04, the Borrower or its agent will note the transfer and assignment appropriately on the Register, which shall identify such transferee and assignee as the new Registered Holder. The Register shall be similarly updated to reflect any subsequent transfers permitted under this section by a Registered Holder to a different Registered Holder. A holder of this Loan (including any Registered Holder) does not have the right to convert this Loan to bearer form.

(d)    <u>Participations</u>. (i) Lender may, without the consent of the Borrower but with notice to the Borrower if no Default exists, sell participations to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of Lender's rights and obligations under this Agreement; <u>provided</u> that (A) Lender's obligations under this Agreement shall remain unchanged, (B) Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement and except as set forth in the paragraph, the Borrower's obligations hereunder shall remain unchanged. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.12, 2.13 and 2.14 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender. The Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); provided that the Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Proposed Treasury Regulation Section 1.163-5(b) (or, in each case, any amended or successor version). The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each Person whose name is recorded in the Participant

Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(ii)     A Participant shall not be entitled to receive any greater payment under Sections 2.12 or 2.14 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(iii)    Pledge.  Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for Lender as a party hereto.

Section 9.05.  Survival.  All covenants, agreements, representations and warranties made by the Borrower in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Obligations have been Fully Satisfied.  The provisions of Sections 2.12, 2.13, 2.14 and 9.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration of the Letters of Credit or the termination of this Agreement or any provision hereof.

Section 9.06.  Counterparts; Integration; Effectiveness.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)     Delivery of an executed counterpart of a signature page of (i) this Agreement, (ii) any other Loan Document and/or (iii) any document, amendment, approval, consent, information, notice (including, for the avoidance of doubt, any notice delivered pursuant to Section 9.01), certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or

thereby (each an "Ancillary Document") that is an Electronic Signature transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Loan Document or such Ancillary Document, as applicable.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the Lender to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (A) to the extent the Lender has agreed to accept any Electronic Signature, the Lender shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (B) upon the request of the Lender, any Electronic Signature shall be promptly followed by a manually executed counterpart. Without limiting the generality of the foregoing, each Loan Party hereby (w) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Lender and the Loan Parties, Electronic Signatures transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (x) the Lender may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of its business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (y) waives any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or any Ancillary Document, respectively, including with respect to any signature pages thereto and (z) waives any claim against any Lender-related Person for any liabilities arising solely from the Lender's reliance on or use of Electronic Signatures and/or transmission by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any liabilities arising as a result of the failure of any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

Section 9.07.  Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08.  Right of Setoff.  If an Event of Default exists, Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by Lender, irrespective of whether or not Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which Lender may have.

Section 9.09.  Governing Law; Jurisdiction; Consent to Service of Process.

(a)  Governing Law.  This Agreement shall be governed by and construed in accordance with the applicable law pertaining in the State of Texas, other than those conflict of law provisions that would defer to the substantive laws of another jurisdiction.

(b)  Jurisdiction.  THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF TEXAS SITTING IN DALLAS COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE NORTHERN DISTRICT OF TEXAS, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH TEXAS STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)  Venue.  The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Service of Process.  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement

or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10.  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN  ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11.  <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12.  <u>Maximum Interest Rate</u>.

(a)  <u>Limitation to Maximum Rate; Recapture</u>.  No interest rate specified in any Loan Document shall at any time exceed the Maximum Rate.  If at any time the interest rate (the "<u>Contract Rate</u>") for any obligation under the Loan Documents shall exceed the Maximum Rate, thereby causing the interest accruing on such obligation to be limited to the Maximum Rate, then any subsequent reduction in the Contract Rate for such obligation shall not reduce the rate of interest on such obligation below the Maximum Rate until the aggregate amount of interest accrued on such obligation equals the aggregate amount of interest which would have accrued on such obligation if the Contract Rate for such obligation had at all times been in effect.  As used herein, the term "<u>Maximum Rate</u>" means, at any time with respect to Lender, the maximum rate of nonusurious interest under applicable law that Lender may charge Borrower.  The Maximum Rate shall be calculated in a manner that takes into account any and all fees, payments, and other charges contracted for, charged, or received in connection with the Loan Documents that constitute interest under applicable law.  Each change in any interest rate provided for herein based upon the Maximum Rate resulting from a change in the Maximum Rate shall take effect without notice to Borrower at the time of such change in the Maximum Rate.  For purposes of determining the Maximum Rate under Texas law, the applicable rate ceiling shall be the indicted rate ceiling described in, and computed in accordance with Section 303.003 of the Texas Finance Code.

(b)  <u>Cure Provisions</u>.  No provision of any Loan Document shall require the payment or the collection of interest in excess of the maximum amount permitted by applicable law.  If any excess of interest in such respect is hereby provided for, or shall be adjudicated to be so provided, in any Loan Document or otherwise in connection with this loan transaction, the provisions of this Section shall govern and prevail and neither Borrower nor the sureties,

guarantors, successors, or assigns of Borrower shall be obligated to pay the excess amount of such interest or any other excess sum paid for the use, forbearance, or detention of sums loaned pursuant hereto.  In the event Lender ever receives, collects, or applies as interest any such sum, such amount which would be in excess of the maximum amount permitted by applicable law shall be applied as a payment and reduction of the principal of the obligations outstanding hereunder, and, if the principal of the obligations outstanding hereunder has been paid in full, any remaining excess shall forthwith be paid to the Borrower.  In determining whether or not the interest paid or payable exceeds the Maximum Rate, Borrower and Lender shall, to the extent permitted by applicable law, (a) characterize any non-principal payment as an expense, fee, or premium rather than as interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the entire contemplated term of the obligations outstanding hereunder so that interest for the entire term does not exceed the Maximum Rate.

Section 9.13.  No Duty.  All attorneys, accountants, appraisers, and other professional Persons and consultants retained by the Lender shall have the right to act exclusively in the interest of the Lender and shall have no duty of disclosure, duty of loyalty, duty of care, or other duty or obligation of any type or nature whatsoever to Borrower or any other Person.

Section 9.14.  No Fiduciary Relationship. The relationship between the Borrower on the one hand and the Lender on the other is solely that of debtor and creditor, and the Lender does not have any fiduciary or other special relationship with the Borrower, and no term or condition of any of the Loan Documents shall be construed so as to deem the relationship between the Borrower on the one hand and the Lender on the other to be other than that of debtor and creditor. The Borrower acknowledges and agrees that (a) the transaction contemplated herein is an arm's length commercial transaction between the Borrower and the Lender and its affiliates, (b) in connection with such transaction, the Lender and its affiliates are acting solely as a principal and not as an advisor including, without limitation, a "Municipal Advisor" as such term is defined in Section 15B of the Securities and Exchange Act of 1934, as amended, and the related final rules (the "Municipal Advisor Rules"), agent or a fiduciary of the Borrower, (c) the Lender and its affiliates are relying on the Lender exemption in the Municipal Advisor Rules, (d) the Lender and its affiliates have not provided any advice or assumed any advisory or fiduciary responsibility in favor of the Borrower with respect to the transaction contemplated hereby and the discussions, undertakings and procedures leading thereto (whether or not the Lender, or any affiliate of the Lender, has provided other services or advised, or is currently providing other services or advising the Borrower on other matters), (e) the Lender and its affiliates have financial and other interests that differ from those of the Borrower, and (f) the Borrower has consulted with its own financial, legal, accounting, tax and other advisors, as applicable, to the extent it deemed appropriate.

Section 9.15.  Construction.  The Borrower, the other Loan Parties and the Lender acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review the Loan Documents with its legal counsel and that the Loan Documents shall be construed as if jointly drafted by the parties thereto.

Section 9.16.  Independence of Covenants.  All covenants under the Loan Documents shall be given independent effect so that if a particular action or condition is not permitted by

any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of a Default if such action is taken or such condition exists.

Section 9.17.   USA PATRIOT Act.   The Lender is subject to the requirements of the USA PATRIOT Act and hereby notifies each Loan Party that, pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow the Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

Section 9.18.   Confidentiality.   The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Lender on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section, "Information" means all information received from Borrower relating to the Borrower or any other Loan Party, other than any such information that is available to the Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 9.19.   Collateral Related Provisions.   Lender hereby agrees that the Liens granted to the Collateral Agent by the Loan Parties on any Collateral shall be automatically released (i) upon the sale or other disposition of such Collateral to any Person other than another Loan Party to the extent such sale or other disposition is not prohibited by this Agreement, (ii) to the extent such Collateral is comprised of property leased to a Loan Party, upon termination or expiration of such lease, (iii) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the applicable Guarantee or (iv) if such assets constitute Excluded Property (under and as defined in the Security Agreement) at any time (including, without limitation, following any transaction or series of transactions not prohibited by the terms of this Agreement).  Any such automatic release shall not in any manner discharge, affect or impair the Obligations or any Liens (other

than those being released) upon (or obligations (other than those being released) of the Debtors in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents. Lender hereby authorizes and instructs the Collateral Agent, and the Collateral Agent agrees to, execute and deliver any instruments, documents and agreements necessary or desirable or reasonably requested by Loan Party to evidence and confirm the release of any Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender and without any representation or warranty by the Collateral Agent.

Section 9.20.  [Reserved].

Section 9.21.  Amendment and Restatement.  Upon the Effective Date: (i) all loans, letters of credit, and other Indebtedness, obligations and liabilities outstanding under the Original Credit Agreements on such date shall continue to constitute Loans, Letters of Credit and other Indebtedness, obligations and liabilities under this Agreement, (ii) the execution and delivery of this Agreement or any of the Loan Documents hereunder shall not constitute a novation, refinancing or any other fundamental change in the relationship among the parties and (iii) the Loans, Letters of Credit, and other Indebtedness, obligations and liabilities outstanding hereunder, to the extent outstanding under the Original Credit Agreements immediately prior to the date hereof, shall constitute the same loans, letters of credit, and other Indebtedness, obligations and liabilities as were outstanding under the Original Credit Agreements. Notwithstanding the foregoing, each of the Loan Parties hereby acknowledges that any Indebtedness, obligations and liabilities which by the terms of the Original Credit Agreements expressly survive the termination, cancellation or replacement of the Original Credit Agreements constitute Indebtedness, obligations and liabilities of the Loan Parties under this Agreement.

Section 9.22.  Reaffirmation and Grant of Security Interests. Each Loan Party hereby confirms that each Collateral Document (as defined in the Original Credit Agreements) to which it is a party or is otherwise bound and all assets, property and interests encumbered thereby will continue to guarantee or secure, as the case may be, to the fullest extent possible in accordance with the Loan Documents, the payment and performance of all Obligations and guaranteed Obligations under this Agreement and the Secured Obligations (as each such term is defined in the Collateral Documents) under the Collateral Documents. Each Loan Party acknowledges and agrees that the Loan Documents (as amended, restated, amended and restated, supplemented or otherwise modified in connection herewith) to which it is a party or otherwise bound shall continue in full force and effect and that all of its obligations thereunder shall be valid and enforceable and shall not be impaired or limited by the execution or effectiveness of the amendment and restatement of the Original Credit Agreements.

Section 9.23.  Final Agreement. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BOY SCOUTS OF AMERICA

By: _____
          Name:
          Title:

ARROW WV, INC.

By: _____
          Name:
          Title:

JPMORGAN CHASE BANK, N.A.

By: _____
          Name:
          Title:   Authorized Officer

## LIST OF SCHEDULES AND EXHIBITS

<u>SCHEDULES</u>:

| | | |
|---|---|---|
| Schedule 1.01(b) | – | Conservation Easements |
| Schedule 2.17 | -- | Existing Letters of Credit |
| Schedule 3.06 | – | Disclosed Matters |
| Schedule 3.11 | – | Subsidiaries |
| Schedule 3.16 | – | Mortgaged Property |
| Schedule 6.01 | – | Existing Indebtedness |
| Schedule 6.02 | – | Existing Liens |

<u>EXHIBITS</u>:

| | | |
|---|---|---|
| Exhibit A | – | Form of Compliance Certificate |
| Exhibit B | – | Form of Interest Election Request |