## <u>Exhibit S</u>

**Form of Restated Security Agreement**

**You may access a full and complete copy of the Form of Restated Security Agreement, free of charge, at <u>https://omniagentsolutions.com/bsa-plansupplement</u>.**

**DRAFT**
**SUBJECT TO FURTHER NEGOTIATION**

<u>FOURTH AMENDED AND RESTATED SECURITY AGREEMENT</u>[1]

THIS FOURTH AMENDED AND RESTATED SECURITY AGREEMENT (the "<u>Agreement</u>") dated as of [_____], 2022, by and among BOY SCOUTS OF AMERICA (the "<u>Borrower</u>") and ARROW WV, INC. ("<u>Arrow WV</u>"; along with the Borrower, collectively the "<u>Debtors</u>" and each individually, a "<u>Debtor</u>"), JPMORGAN CHASE BANK, N.A. ("<u>JPMorgan</u>"), in its capacity as the collateral agent hereunder for the Secured Creditors (in such capacity, the "<u>Secured Party</u>") and in its capacity as the Lender under the Credit Agreements referred to below (in such capacity, the "<u>Lender</u>" and as assignee of the Notes (as defined in this Agreement)) and THE COUNTY COMMISSION OF FAYETTE COUNTY, WEST VIRGINIA, in its capacity as the Issuer under the Amended and Restated Series 2010B Bond Purchase and Loan Agreement and the Amended and Restated Series 2012 Bond Purchase and Loan Agreement, each referred to below (in such capacities, the "<u>Issuer</u>" and as assignor of the Notes (as defined in this Agreement)).

R E C I T A L S:

The Borrower and the Lender entered into (i) that certain Credit Agreement, dated as of August 11, 2010 (as amended by the First Amendment to Credit Agreement, dated as of November 5, 2010, the Second Amendment to Credit Agreement, dated as of November 11, 2011, the Third Amendment to Credit Agreement, dated as of March 9, 2012, the Fourth Amendment to Credit Agreement, dated as of April 25, 2016, the Fifth Amendment to Credit Agreement, dated as of March 2, 2017, the Sixth Amendment to Credit Agreement, dated as of February 15, 2018 and the Seventh Amendment to Credit Agreement, dated as of March 21, 2019, the "<u>2010 Credit Agreement</u>"), and (ii) that certain Credit Agreement, dated as of March 21, 2019 (as amended, restated or otherwise modified prior to the date hereof, the "<u>2019 Credit Agreement</u>" and, together with the 2010 Credit Agreement, the "<u>Original Credit Agreements</u>"), pursuant to which the Lender provided the Borrower with a term loan, a revolving line of credit and certain other extensions of credit as set forth therein;

The Debtors, the Issuer and JPMorgan entered into that certain Bond Purchase and Loan Agreement, dated as of November 5, 2010 (as amended by the First Amendment to Bond Purchase and Loan Agreement, dated as of March 9, 2012, the Second Amendment to Bond Purchase and Loan Agreement, dated as of March 2, 2017, and the Third Amendment to Bond Purchase and Loan Agreement, dated as of March 21, 2019, the "<u>2010 Bond Purchase and Loan Agreement</u>"), pursuant to which the Issuer issued and sold to JPMorgan and JPMorgan purchased from the Issuer (i) the Commercial Development Revenue Bond (Arrow WV Project), Series 2010A, in the original principal amount of $50,000,000 (the "<u>2010A Bond</u>") and (ii) the Commercial Development Revenue Bond (Arrow WV Project), Series 2010B, in the original principal amount of $50,000,000 (the "<u>Original 2010B Bond</u>"), the proceeds of each of which were loaned by the Issuer to the Borrower. The loans from the Issuer to the Borrower were evidenced by that certain Promissory Note - 2010A (the "<u>2010A Note</u>") executed by the Borrower and payable to the order of the Issuer in the original principal amount of $50,000,000 and that certain Promissory Note - 2010B (the "<u>2010B Note</u>") executed by the Borrower and payable to the order of the Issuer in the original principal amount of $50,000,000, which notes were assigned by the Issuer to JPMorgan to secure the repayment of the 2010A Bond and the Original 2010B Bond, respectively;

---

[1] This document remains subject to ongoing review and material revision in all respects. The Debtors, Coalition, the Future Claimants' Representative, the Ad Hoc Committee, the Creditors' Committee, JPM, Hartford, and TCJC (each as defined in the Plan) are each continuing to review the documents that are part of the Plan Supplement, and each of their respective rights are reserved with respect to the Plan Supplement and the information contained therein, as applicable.

The Debtors, the Issuer and JPMorgan entered into that certain Bond Purchase and Loan Agreement, dated as of March 9, 2012 (as amended by the First Amendment to Bond Purchase and Loan Agreement, dated as of March 2, 2017 and the Second Amendment to Bond Purchase and Loan Agreement, dated as of March 21, 2019, the "2012 Bond Purchase and Loan Agreement", and together with the 2010 Bond Purchase and Loan Agreement, the "Original Bond Purchase and Loan Agreements") pursuant to which the Issuer issued and sold to JPMorgan and JPMorgan purchased from the Issuer (i) the Commercial Development Revenue Bond (Arrow WV Project), Series 2012, in the original principal amount of $175,000,000 (the "Original 2012 Bond"), the proceeds of which were loaned by the Issuer to the Borrower. The loans from the Issuer to the Borrower are evidenced by that certain Promissory Note - 2012 (the "2012 Note") executed by the Borrower and payable to the order of the Issuer in the original principal amount of $175,000,000, which note was assigned by the Issuer to JPMorgan to secure the repayment of the Original 2012 Bond;

The proceeds of the loans from the Issuer to the Borrower in respective of each of the 2010A Bond, the Original 2010B Bond and the Original 2012 Bond were advanced to Arrow WV, who in turn used the proceeds to, *inter alia*, acquire, construct, and equip the Summit Bechtel Family National Scout Reserve located in Fayette County, West Virginia and Raleigh County, West Virginia, and the Borrower agreed to repay such loans on the terms and conditions set forth in the Original Bond Purchase and Loan Agreements;

To secure the obligations arising under or related to the Original Credit Agreements and the Original Bond Purchase and Loan Agreements, the Borrower, Arrow WV and the Secured Party, on its own behalf and on behalf of the other Secured Creditors, entered into that certain Third Amended and Restated Security Agreement, dated as of March 21, 2019 (which amended and restated that certain Second Amended and Restated Security Agreement, dated as of March 9, 2012, which amended and restated that certain Amended and Restated Security Agreement, dated as of November 10, 2010, which amended and restated that certain Security Agreement, dated as of August 11, 2010, the "Original Security Agreement");

On February 18, 2020 (the "Petition Date"), the Borrower filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

On [_____], 2021, the Bankruptcy Court entered an order (the "Confirmation Order") approving and confirming the Modified [Fifth] Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (the "Chapter 11 Plan"), and [_____], 2021 is the effective date of the Chapter 11 Plan;

In accordance with the terms of the Confirmation Order and the Chapter 11 Plan, (i) the Borrower and JPMorgan are entering into that certain Amended and Restated Credit Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Amended and Restated Credit Agreement"), which is an amendment and restatement, collectively, of each of the Original Credit Agreements, pursuant to which, among other things, the maturity date of the term loan, the revolving line of credit and the other extensions of credit thereunder will be extended; (ii) the Debtors, the Issuer and JPMorgan are entering into that certain Amended and Restated Series 2010B Bond Purchase and Loan Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Amended and Restated Series 2010B Bond Purchase and Loan Agreement", which is an amendment and restatement of the 2010 Bond Purchase and Loan Agreement, pursuant to which, among other things, the maturity date of the Original 2010B Bond and the 2010B Note will be extended; (iii) the Debtors, the Issuer and JPMorgan are entering into that certain Amended and Restated Series 2012 Bond Purchase and

Loan Agreement, dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Amended and Restated Series 2012 Bond Purchase and Loan Agreement</u>" which is an amendment and restatement of the 2012 Bond Purchase and Loan Agreement, pursuant to which, among other things, the maturity date of the Original 2012 Bond and the 2012 Note will be extended; and (iv) to secure the Secured Obligations (as defined in this Agreement), the Borrower and Arrow WV have each agreed to grant a first priority and continuing security interest in and Lien on all of its right, title and interest in and to substantially all of its assets now owned or hereafter acquired, respectively, on the terms and conditions set forth herein and have agreed to amend and restate the Original Security Agreement accordingly in the form of this Agreement; and

The execution and delivery of this Agreement is a condition to the effectiveness of each of the Amended and Restated Credit Agreement, the Amended and Restated Series 2010B Bond Purchase and Loan Agreement, and the Amended and Restated Series 2012 Bond Purchase and Loan Agreement (collectively, the "<u>Credit Agreements</u>").

NOW, THEREFORE**,** in consideration of the premises and for other good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I.**

<u>Definitions</u>

Section 1.01.    <u>Definitions</u>.  As used in this Agreement, the following terms have the following meanings:

"<u>2010 Bond Documents</u>" means the "Bond Documents" as defined in the Amended and Restated Series 2010B Bond Purchase and Loan Agreement dated as of the date hereof, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>2012 Bond Documents</u>" means the "Bond Documents" as defined in the Amended and Restated Series 2012 Bond Purchase and Loan Agreement dated as of the date hereof, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Accounts</u>" means all "accounts", as defined in Article 9 of the UCC and all "payment intangibles", as defined in Article 9 of the UCC.  Accounts shall specifically include, without limitation, all amounts payable in connection with any agreement by a donor, grantor or other Person to donate or otherwise contribute funds to a Debtor for the Project.

"<u>Account Debtor</u>" means any Person obligated on any Account.

"<u>Applicable IP Office</u>" means the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency within or, solely in the case of Section 4.06, outside the United States.

"<u>Bond Documents</u>" means, collectively, the 2010 Bond Documents and the 2012 Bond Documents.

"<u>Bond Obligations</u>" means all obligations, indebtedness, and liabilities of the Borrower and Arrow WV to the Issuer arising pursuant to or in connection with any of the Bond Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including, without limitation, the obligation of the

Borrower to repay the Notes, interest on the Notes and all fees, costs, and expenses (including attorneys' fees, costs and expenses) provided for in the Bond Documents.

"Chattel Paper" has the meaning set forth in Article 9 of the UCC.

"Collateral" has the meaning specified in Section 2.01 of this Agreement.

"Commercial Tort Claims" has the meaning set forth in Article 9 of the UCC.

"Control" has the meaning set forth in Article 8 of the UCC or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"Copyrights" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to copyrights and all mask works, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"Credit Documents" means the Credit Agreements, the other Bond Documents, the other Loan Documents, and this Agreement, as each of the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Default" means any event or condition which constitutes an Event of Default under the Credit Documents, or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default under the Credit Documents.

"Deposit Account" has the meaning set forth in Article 9 of the UCC.

"Deposit Account Control Agreement" means an agreement, in form and substance satisfactory to the Secured Party, among any Debtor, a banking institution holding such Debtor's funds, and the Secured Party with respect to collection and control of all deposits, credits and balances held in a Deposit Account maintained by such Debtor with such banking institution.

"Documents" has the meaning set forth in Article 9 of the UCC.

"Equipment" has the meaning set forth in Article 9 of the UCC.

"Equity Interests" has the meaning assigned to it in the Amended and Restated Credit Agreement.

"Event of Default" means any Event of Default, as such term is defined in any of the Credit Documents.

"Excluded Property" means (a) any Deposit Account or Securities Account to the extent a Debtor is prohibited by applicable law or a contractual obligation, or condition placed upon a donation, from granting a Lien in assets maintained in such Deposit Account or Securities Account to secure the Secured Obligations and only for so long as any such Debtor is prohibited from granting a Lien on such assets; *provided* that any assets within such Deposit Accounts which are not subject to such prohibition or restriction shall automatically constitute a part of the Collateral and any assets which at any time cease to have such a prohibition shall automatically constitute a part of the Collateral upon the expiration of such prohibition or restriction; *provided further*, that, subject to the foregoing, such Deposit Accounts and Securities Accounts include, as of the Effective Date, those in the name of, or for the benefit or account of, the Persons listed on Exhibit A hereto; (b) any lease, contract, license, sublicense, other agreement or document, government approval, charter, authorization or franchise (or any asset subject to such

agreement or arrangement) with any Person if, to the extent and for so long as, the grant of a Lien thereon to secure the Secured Obligations would require the consent of a third party (unless such consent has been received or such agreement or arrangement was entered into in contemplation of such restriction) (it being understood that no Debtor shall be under any affirmative obligation to obtain such consent) or would violate or invalidate, constitute a breach of or a default under, or create a right of termination in favor of any party (other than any Debtor or an Affiliate of a Debtor) to, such lease, contract, license, sublicense, other agreement or document, government approval, charter, authorization or franchise (but, in each case, after giving effect to the applicable anti-assignment provisions of the UCC, or any other applicable law, the assignment of which is expressly deemed effective under the UCC or other applicable law notwithstanding such prohibition); (d) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with the United States Patent and Trademark Office ("USPTO") with respect thereto, and acceptance by the USPTO of such filing, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law; (e) any asset (including Equity Interests) if, to the extent and for so long as the grant of a Lien thereon to secure the Secured Obligations is prohibited by applicable law, or any contractual obligation existing on the Effective Date, or agreements with any Governmental Authority (other than to the extent that any such prohibition would be rendered ineffective pursuant to the applicable anti-assignment provisions of the UCC, or any other applicable law, the assignment of which is expressly deemed effective under the UCC or other applicable law notwithstanding such prohibition) or which would require consent, approval, license or authorization from any Governmental Authority or regulatory authority (it being understood that there shall be no requirement to obtain the consent of any governmental authority or person that is not an Affiliate of any Debtor, including, without limitation, no requirement to comply with the Federal Assignment of Claims Act or any similar statute), unless such consent, approval, license or authorization has been received; (f) any assets to the extent that the granting of a Lien thereon to secure the Obligations could reasonably be expected to result in adverse (other than de minimis consequences) tax consequences to either a holder of the Bonds or any Debtor, as reasonably determined by the Borrower; (g) any assets with respect to which, in the reasonable judgment of the Lender and the Borrower (as agreed to in writing), the cost of pledging such assets shall be excessive in view of the benefits to be obtained by the Lender therefrom and (h) Equity Interests in Persons other than wholly-owned Subsidiaries.

"Fixtures" has the meaning set forth in Article 9 of the UCC.

"Fully Satisfied" means, as of any date, that on or before such date:

(a)    with respect to the Secured Obligations: (i) the principal of and interest accrued to such date on such Secured Obligations shall have been paid in full in cash, (ii) all fees, costs, expenses (including attorneys' fees, costs, disbursements and expenses) and other amounts then due and payable which constitute Secured Obligations shall have been paid in full in cash, (iii) the commitments, if any, shall have expired or irrevocably been terminated, and (iv) the contingent LC Exposure shall, at the request of the Lender, have been secured by: (A) the grant of a first priority, perfected Lien on cash or cash equivalents in an amount at least equal to 102% of the amount of such LC Exposure or other collateral which is acceptable to Lender in its sole discretion or (B) the issuance of a "back–to–back" letter of credit in form and substance acceptable to Lender with an original face amount at least equal to 102% of the amount of such contingent LC Exposure and issued by an issuing bank satisfactory to the Lender in its sole discretion;

(b)    with respect to the Swap Obligations: (i) all termination payments, fees, costs, expenses (including attorneys' fees and expenses) and other amounts then due and payable under the related Swap Agreements which constitute Swap Obligations shall have been paid in full in cash; and (ii) all contingent amounts which could be payable under the related Swap Agreements shall have

been secured by: (A) the grant of a first priority, perfected Lien on cash or cash equivalents in an amount at least equal to 105% of the amount of such contingent Swap Obligations or other collateral which is reasonably acceptable to the Secured Creditor or affiliate of the Secured Creditor holding the applicable Swap Obligations or (B) the issuance of a letter of credit in form and substance reasonably acceptable to the Secured Creditor or affiliate of the Secured Creditor holding the applicable Swap Obligations and in an amount at least equal to 105% of the amount of such contingent Swap Obligations; and

(c) with respect to the Deposit Obligations: (i) all fees, costs, expenses (including attorneys' fees and expenses) and other amounts then due and payable which constitute Deposit Obligations shall have been paid in full in cash, (ii) any further commitments to extend credit in connection with such Deposit Obligations shall have expired or irrevocably been terminated or reasonably satisfactory arrangements to secure the same shall be made with the depository bank, and (iii) all contingent Deposit Obligation amounts arising in connection with the extensions of credit and in connection with indemnification or expense reimbursement obligations to the extent a claim thereunder has then been made shall have been secured by: (A) the grant of a first priority, perfected Lien on cash or cash equivalents in an amount at least equal to 105% of the amount of such contingent Deposit Obligations or other collateral which is acceptable to the Secured Creditor or affiliate of the Secured Creditor holding the applicable Deposit Obligations or (B) the issuance of a letter of credit in form and substance reasonably acceptable to the Secured Creditor or affiliate of the Secured Creditor holding the applicable Deposit Obligations and in an amount at least equal to 105% of the amount of such contingent Deposit Obligations.

"General Intangibles" has the meaning set forth in Article 9 of the UCC.

"Goods" has the meaning set forth in Article 9 of the UCC.

"Industrial Designs" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to registered industrial designs and industrial design applications.

"Instruments" has the meaning set forth in Article 9 of the UCC.

"Intellectual Property" means all rights, title and interests in or relating to intellectual property and industrial property arising under any Requirement of Law and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Industrial Designs, Software, Trademarks, Internet Domain Names, Trade Secrets and IP Licenses.

"Internet Domain Name" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to internet domain names.

"Inventory" has the meaning set forth in Article 9 of the UCC.

"Investment Property" has the meaning set forth in Article 9 of the UCC.

"IP Ancillary Rights" means, with respect to any Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property throughout the world, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution,

violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right throughout the world.

"IP License" means all contractual obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in or relating to any Intellectual Property.

"Liens" has the meaning assigned to it in the Amended and Restated Credit Agreement.

"Loan Documents" has the meaning assigned to it in the Amended and Restated Credit Agreement.

"Material Intellectual Property" means Intellectual Property that is owned by or licensed to any Debtor and material to the conduct of such Debtor's business.

"Notes" means each "Note" as defined in the Amended and Restated Series 2010B Bond Purchase and Loan Agreement and in the Amended and Restated Series 2012 Bond Purchase and Loan Agreement.

"Patents" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to letters patent and applications therefor.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"Pledged Collateral" means all Instruments, Securities and other Investment Property of the Debtors, whether or not physically delivered to the Secured Party pursuant to this Agreement.

"Project" means the development and construction of the roads, water lines, sewer lines and camp site improvements on the Summit National Scout Reserve located in Fayette County, West Virginia and Raleigh County, West Virginia.

"Secured Creditors" means the Lender, the affiliates of the Lender who are owed any of the Secured Obligations and the Issuer and any of their assignees that are owed any of the Secured Obligations.

"Secured Obligations" means (a) all "Obligations" as such term is defined in the Amended and Restated Credit Agreement and (b) all Bond Obligations.

"Securities Account" has the meaning set forth in Article 8 of the UCC.

"Securities Intermediary" has the meaning set forth in Article 8 of the UCC.

"Software" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

"Stock Rights" means all dividends, instruments, other distributions, any other securities entitlements (as defined in Article 8 of the UCC) and any other right or property which any of the Debtors shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Equity Interest constituting Collateral, any right to receive an Equity Interest and any right to receive earnings, in which any of the Debtors now has or hereafter acquires any right to, issued by an issuer of such Equity Interest.

"<u>Trade Secrets</u>" mean all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to proprietary, confidential and/or non-public information, however documented, including but not limited to confidential ideas, know-how, concepts, methods, processes, formulae, reports, data, customer lists, mailing lists, business plans and all other trade secrets.

"<u>Trademarks</u>" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, trade dress, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of Texas; <u>provided</u>, <u>however</u>, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Texas, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority or remedies.

Section 1.02.    <u>Other Definitional Provisions</u>.    Terms used herein that are defined in the Amended and Restated Credit Agreement and are not otherwise defined herein shall have the meanings therefor specified in the Amended and Restated Credit Agreement.    References to "Sections," "subsections," "Exhibits" and "Schedules" shall be to Sections, subsections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specifically provided.    All definitions contained in this Agreement are equally applicable to the singular and plural forms of the terms defined.    All references to statutes and regulations shall include any amendments of the same and any successor statutes and regulations.    References to particular sections of the UCC should be read to refer also to parallel sections of the UCC as enacted in each state or other jurisdiction where any portion of the Collateral is or may be located.    Terms used herein, which are defined in the UCC, unless otherwise defined herein or in the Amended and Restated Credit Agreement, shall have the meanings determined in accordance with the UCC.

## ARTICLE II.

### Security Interest

Section 2.01.    <u>Security Interest</u>.    Each Debtor hereby pledges, collaterally assigns and grants to the Secured Party, for its own benefit and the benefit of the other Secured Creditors, a security interest and other Liens in all of its right, title and interest in, to and under all personal property and all other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Debtor (including under any trade name or derivations thereof), and whether owned or consigned by or to, or leased from or to, such Debtor, and regardless of where located (all of which will be collectively referred to as the "<u>Collateral</u>"), including, but not limited to:

(a)  all Accounts;

(b)  all Chattel Paper;

(c)  all Copyrights, Patents and Trademarks;

(d)  all Documents;

(e)  all Equipment;

(f)  all Fixtures;

(g)  all General Intangibles;

(h)  all Goods;

(i)  all Instruments;

(j)  all Inventory;

(k)  all Investment Property;

(l)  all cash or cash equivalents;

(m) all letters of credit, Letter-of-Credit Rights and Supporting Obligations;

(n)  all Deposit Accounts;

(o)  all Securities Accounts;

(p)  all Commercial Tort Claims; and

(q)  all accessions to, substitutions for and replacements, proceeds (including Stock Rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing;

to secure the prompt and complete payment of the Secured Obligations and the performance of the obligations under the Credit Documents; provided however, that the Collateral shall not include any Excluded Property.

Section 2.02.    Debtor Remains Liable.  Notwithstanding anything to the contrary contained herein, (a) each Debtor shall remain liable under the documentation included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Secured Party of any of its rights or remedies hereunder shall not release any Debtor from any of its duties or obligations under such documentation, (c) neither the Secured Party nor any other Secured Creditor shall have any obligation under any of such documentation included in the Collateral by reason of this Agreement, and (d) neither the Secured Party nor any other Secured Creditor shall be obligated to perform any of the obligations of any Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

## ARTICLE III.

### Representations and Warranties

Each Debtor represents and warrants to the Secured Party and each other Secured Creditor that:

Section 3.01.    [Reserved].

Section 3.02.    Office Locations; Fictitious Names; and Organizational Identification Number. The (i) location of the principal place of business and the chief executive office, (ii) the jurisdiction of organization, and (iii) the organizational identification number (if one exists) of each of the Debtors is set

as set forth on <u>Exhibit H</u> hereto. Within the last four months no Debtor has had any other jurisdiction of organization other than as set forth on <u>Exhibit H</u>. Neither of the Debtors engages in business or activities, and have not done so during the last four months prior to the date hereof, under any name, trade-name or fictitious business name other than Boy Scouts of America or Arrow WV, Inc., respectively. All books and records relating to any of the Collateral of any Debtor are located at such Debtor's chief executive office.

Section 3.03.    <u>Delivery of Collateral</u>.  Except as provided by Section 4.03, such Debtor has delivered to Secured Party all Collateral the possession of which is necessary to perfect the Lien of the Secured Party therein.

Section 3.04.    <u>Deposit Accounts</u>.  All of such Debtor's Deposit Accounts, other than accounts constituting Excluded Property, are listed on <u>Exhibit B</u>.

Section 3.05.    <u>Letter-of-Credit Rights and Chattel Paper</u>.  <u>Exhibit C</u> lists all Letter-of-Credit Rights and Chattel Paper, in each case with a stated amount in excess of $100,000, of such Debtor.  All action by such Debtor necessary or desirable to protect and perfect the Secured Party's Lien on each item listed on <u>Exhibit C</u> (including the delivery of all originals and the placement of a legend on all such Chattel Paper as required hereunder) has been duly taken. The Secured Party will have a fully perfected first priority and continuing security interest and Lien in the Collateral listed on <u>Exhibit C</u>.

Section 3.06.    <u>Accounts and Chattel Paper</u>.  As of the date hereof, except as specifically disclosed on <u>Exhibit C</u>, (i) no Accounts are evidenced by a judgment, Instrument or Chattel Paper; (ii) there are no setoffs, claims or disputes existing or asserted with respect thereto and such Debtor has not made any agreement with any Account Debtor for any extension of time for the payment thereof, any compromise or settlement for less than the full amount thereof, any release of any Account Debtor from liability therefor, or any deduction therefrom except a discount or allowance allowed by such Debtor in the ordinary course of its business for prompt payment and disclosed to the Secured Party; (iii) to such Debtor's knowledge, there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or could reasonably be expected to reduce the amount payable thereunder as shown on such Debtor's books and records and any invoices and statements with respect thereto; (iv) such Debtor has not received any notice of proceedings or actions which are threatened or pending against any Account Debtor which might result in any adverse change in such Account Debtor's financial condition; and (v) such Debtor has no knowledge that any Account Debtor has become insolvent or is generally unable to pay its debts as they become due.

Section 3.07.    <u>Inventory</u>.  As of the date hereof, (a) the Inventory owned by the each Debtor (other than Inventory in transit) is located at one of such Debtor's locations set forth on <u>Exhibit H</u>, (b) no Inventory (other than Inventory in transit) is stored at any other location except as permitted by Section 4.02(d), (c) such Debtor has good, indefeasible and merchantable title to such Inventory and such Inventory is not subject to any Lien whatsoever except for Liens permitted hereunder or under the other Credit Documents, (d) such Inventory has, to the best of the Debtors' knowledge, been produced in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder and (e) the completion of manufacture, sale or other disposition of any material portion of such Inventory by the Secured Party following an Event of Default shall not require the consent of any Person and shall not constitute a breach or default under any contract or agreement to which such Debtor is a party or to which such property is subject.

Section 3.08.    <u>Intellectual Property</u>.

(a) <u>Exhibit D</u> contains a complete and accurate listing as of the date of this Agreement of all Intellectual Property registered or applied for with the USPTO or United States

Copyright Office that such Debtor owns, licenses or otherwise has the right to use, separately including for each of the foregoing items (A) the owner, (B) the title, and (C) as applicable, the registration or application number and registration or application date.  Such Debtor owns directly or is entitled to use, by license or otherwise, all Intellectual Property necessary for the conduct of such Debtor's business as currently conducted.  All of the U.S. registrations, applications for registration or applications for issuance of the Intellectual Property are in good standing and are recorded or in the process of being recorded in the name of such Debtor.

(b) On the Effective Date, all Material Intellectual Property owned by such Debtor is valid, in full force and effect, subsisting, unexpired and enforceable, and no Material Intellectual Property has been abandoned.  There are no pending (or, to the knowledge of such Debtor, threatened) actions, investigations, suits, proceedings, claims, demands, orders or disputes challenging the ownership, use, validity, enforceability of, or such Debtor's rights in, any Material Intellectual Property of such Debtor.  To such Debtor's knowledge, no Person has been or is infringing, misappropriating, diluting, violating or otherwise impairing any Intellectual Property of such Debtor.

(c) No settlement or consents, covenants not to sue, nonassertion assurances, or releases have been entered into by such Debtor or exist to which such Debtor is bound that adversely affect its rights to own or use any Intellectual Property except as could not be reasonably expected to result in a Material Adverse Effect, in each case individually or in the aggregate.

(d) This Agreement is effective to create a valid and continuing Lien on such Copyrights, IP Licenses, Patents and Trademarks and, upon filing with the Applicable IP Office of the Confirmatory Grant of Security Interest in Copyrights, the Confirmatory Grant of Security Interest in Patents and the Confirmatory Grant of Security Interest in Trademarks (each, a "Confirmatory Grant"), and the filing of appropriate financing statements in the jurisdictions listed in Exhibit E hereto, all action necessary or desirable to protect and perfect the Lien in, to and on such Debtor's Patents, Trademarks, Copyrights or IP Licenses have been taken and such perfected Lien is enforceable as such as against any and all creditors of and purchasers from such Debtor.

Section 3.09.    Pledged Collateral.

(a) Exhibit F sets forth a complete and accurate list of all Pledged Collateral owned by such Debtor.  Such Debtor is the direct, sole beneficial owner and sole holder of record of the Pledged Collateral listed on Exhibit F as being owned by it, free and clear of any Liens except Liens created or permitted hereunder or under the other Credit Documents.  Such Debtor further represents and warrants that (i) all Pledged Collateral owned by it constituting an Equity Interest has been (to the extent such concepts are relevant with respect to such Pledged Collateral) duly authorized, validly issued, are fully paid and non-assessable, (ii) with respect to any certificates delivered to the Secured Party representing an Equity Interest, either such certificates are Securities as defined in Article 8 of the UCC as a result of actions by the issuer or otherwise, or, if such certificates are not Securities, such Debtor has so informed the Secured Party so that the Secured Party may take steps to perfect its Lien therein, (iii) all such Pledged Collateral held by a Securities Intermediary is covered by a control agreement among such Debtor, the Securities Intermediary and the Secured Party pursuant to which the Secured Party has Control and (iv) all Pledged Collateral which represents (to the best of such Debtor's knowledge) Indebtedness owed to such Debtor has been duly authorized, authenticated or issued and delivered by the issuer of such Indebtedness, is the legal, valid and binding obligation of such issuer and such issuer is not in default thereunder.

(b) In addition, (i) none of the Pledged Collateral owned by it has been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any

jurisdiction to which such issuance or transfer may be subject, (ii) no options, warrants, calls or commitments of any character whatsoever (A) exist relating to such Pledged Collateral or (B) obligate the issuer of any Equity Interest included in the Pledged Collateral to issue additional Equity Interests, and (iii) no consent, approval, authorization, or other action by, and no giving of notice, filing with, any Governmental Authority or any other Person is required for the pledge by such Debtor of such Pledged Collateral pursuant to this Agreement or for the execution, delivery and performance of this Agreement by such Debtor, or for the exercise by the Secured Party of the voting or other rights provided for in this Agreement or for the remedies in respect of the Pledged Collateral pursuant to this Agreement, except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

(c) Except as set forth in Exhibit F, such Debtor owns 100% of the issued and outstanding Equity Interests which constitute Pledged Collateral owned by it and none of the Pledged Collateral which represents Indebtedness owed to such Debtor is subordinated in right of payment to other Indebtedness or subject to the terms of an indenture.

**ARTICLE IV.**

Covenants

Each Debtor covenants and agrees with the Secured Party that until this Agreement terminates in accordance with Section 8.12 hereof:

Section 4.01.    Accounts.    Such Debtor, in accordance with its customary business practices, endeavor to collect or cause to be collected from each Account Debtor, as and when due, any and all amounts owing under the Collateral.  Without the prior written consent of the Secured Party, such Debtor shall not, except in compliance with its customary policies when no Default exists, (a) grant any extension of time for any payment with respect to any of its Collateral beyond 120 days after such payment's due date, (b) compromise, compound, or settle any of its Collateral for less than the full amount thereof, (c) release, in whole or in part, any Person liable for payment of any of its Collateral, (d) allow any credit or discount for payment with respect to any of its Collateral other than customary discounts granted in the ordinary course of operations, or (e) release any Lien, guaranty or other supporting obligation securing any of its Accounts unless the Account has been paid in full.  It shall not, except in the ordinary course of operations when no Default exists, amend or otherwise modify the contractual terms governing any Collateral.

Section 4.02.    Inventory and Equipment.    Such Debtor will do all things reasonably necessary to maintain, preserve, protect and keep its Inventory and the Equipment in good repair and working and saleable condition, except for damaged or defective goods arising in the ordinary course of such Debtor's business and except for ordinary wear and tear in respect of the Equipment.

Section 4.03.    Delivery of Instruments, Certificated Securities, Chattel Paper, and Documents and other Property Perfected by Possession. Such Debtor will (a) deliver to the Secured Party immediately upon execution of this Agreement the originals of all Chattel Paper, Securities, Instruments and other assets subject to a Lien which are perfected by possession constituting Collateral owned by it (if any then exist), (b) hold in trust for the Secured Party upon receipt and immediately thereafter deliver to the Secured Party any such Chattel Paper, Securities, Instruments and other assets subject to a Lien which are perfected by possession constituting Collateral, and (c) upon the Secured Party's reasonable request, deliver to the Secured Party (and thereafter hold in trust for the Secured Party upon receipt and immediately deliver to the Secured Party) any Document evidencing or constituting Collateral, and (d) promptly upon the Secured Party's request (which request may be made no more frequently than once per fiscal quarter), deliver to the Secured Party a duly executed amendment to the exhibits to this Agreement,

in the form of Exhibit G hereto (the "Amendment"), pursuant to which such Debtor will confirm its pledge of such additional Collateral. Such Debtor hereby authorizes the Secured Party to attach each Amendment to this Agreement and agrees that all additional Collateral owned by it set forth in such Amendments is considered to be part of the Collateral.

Section 4.04.    Uncertificated Pledged Collateral. Such Debtor will use commercially reasonable efforts to permit the Secured Party from time to time to cause the appropriate issuers (and, if held with a Securities Intermediary, such Securities Intermediary) of uncertificated securities or other types of Pledged Collateral owned by it not represented by certificates to mark their books and records with the numbers and face amounts of all such uncertificated securities or other types of Pledged Collateral not represented by certificates and all rollovers, replacements, successor securities and numbers and amounts therefor to reflect the Lien of the Secured Party granted pursuant to this Agreement. With respect to any Pledged Collateral owned by it, such Debtor will take any actions necessary to cause (a) the issuers of uncertificated securities which are Pledged Collateral and (b) any Securities Intermediary which is the holder of any such Pledged Collateral, to cause the Secured Party to have and retain Control over such Pledged Collateral.  Without limiting the foregoing, such Debtor will, with respect to any such Pledged Collateral held with a Securities Intermediary, transfer agent or registrar, cause such Securities Intermediary, transfer agent or registrar, as applicable, to enter into a control agreement with the Secured Party, in form and substance satisfactory to the Secured Party, giving the Secured Party Control; until the Secured Obligations are Fully Satisfied, each Debtor grants to Secured Party an irrevocable Power of Attorney coupled with an interest to cause on its behalf and in its name such Securities Intermediary, transfer agent or registrar, as applicable, to enter into a control agreement with the Secured Party, in form and substance satisfactory to the Secured Party, giving the Secured Party Control over such Collateral.

Section 4.05.    Pledged Collateral.

(a)    Changes in Capital Structure of Issuers. Such Debtor will not (i) permit or suffer any issuer of an Equity Interest constituting Pledged Collateral owned by it to dissolve, merge, liquidate, retire any of its Equity Interests or other Instruments or Securities evidencing ownership, reduce its capital, sell or encumber all or substantially all of its assets or merge or consolidate with any other entity except to the extent not prohibited by the Credit Documents, or (ii) vote any such Pledged Collateral in favor of any of the foregoing except to the extent not prohibited by the Credit Documents.

(b)    Issuance of Additional Securities.  Such Debtor will not permit or suffer the issuer of an Equity Interest constituting Pledged Collateral owned by it to issue additional Equity Interests, any right to receive the same or any right to receive earnings, except to a Debtor.

(c)    Registration of Pledged Collateral.  Such Debtor will permit any registerable Pledged Collateral owned by it to be registered in the name of the Secured Party or its nominee at any time at the option of the Secured Party.

(d)    Exercise of Rights in Pledged Collateral.

(i)    Without in any way limiting the foregoing and subject to clause (ii) below, such Debtor shall have the right to exercise all voting rights or other rights relating to the Pledged Collateral owned by it for all purposes not inconsistent with this Agreement or the other Credit Documents; provided however, that no vote or other right shall be exercised or action taken which would have the effect of impairing the rights of the Secured Party in respect of such Pledged Collateral.

(ii)    Such Debtor will permit the Secured Party or its nominee at any time after the occurrence of an Event of Default, without notice, to exercise all voting rights or other rights

relating to the Pledged Collateral owned by it, including, without limitation, exchange, subscription or any other rights, privileges, or options pertaining to any Equity Interest or Investment Property constituting such Pledged Collateral as if it were the absolute owner thereof.

(iii)    Until an Event of Default, such Debtor shall be entitled to collect and receive for its own use all cash dividends and interest paid in respect of the Pledged Collateral owned by it to the extent not in violation of any of the Credit Documents; provided however, that until actually paid, all rights to such distributions shall remain subject to the Liens created by this Agreement.

(e)    Interests in Limited Liability Companies and Limited Partnerships.  Each Debtor agrees that it shall not take any action to amend any limited liability company agreement or limited partnership agreement to make ownership interests in a limited liability company or a limited partnership which are included within the Collateral owned by such Debtor constitute a Security under Article 8 of the UCC of the applicable jurisdiction.

Section 4.06.    Intellectual Property.

(a)  After any change to Exhibit D (or the information required to be disclosed thereon), such Debtor shall provide the Secured Party notification thereof in the next compliance certificate required to be delivered under the Amended and Restated Credit Agreement and the respective Confirmatory Grant as described in this Section 4.06 and any other documents that Secured Party reasonably requests with respect thereto.

(b)  Such Debtor shall (and shall cause all its licensees to) (i) (A) continue to use each Trademark included in the Material Intellectual Property in order to maintain such Trademark in full force and effect with respect to each class of goods for which such Trademark is currently used, free from any claim of abandonment for non-use, (B) maintain at least the same standards of quality of products and services offered under such Trademark as are currently maintained, (C) use such Trademark with the appropriate notice of registration and all other notices and legends required by applicable Requirements of Law and (D) not adopt or use any other Trademark that is confusingly similar or a colorable imitation of such Trademark unless Secured Party shall obtain a perfected Lien in such other Trademark pursuant to this Agreement and (ii) not do any act or omit to do any act whereby (A) such Trademark (or any goodwill associated therewith) may become destroyed, invalidated, impaired or harmed in any way, (B) any Patent included in the Material Intellectual Property may become forfeited, misused, unenforceable, abandoned or dedicated to the public, (C) any portion of the Copyrights included in the Material Intellectual Property may become invalidated, otherwise impaired or fall into the public domain or (D) any Trade Secret that is Material Intellectual Property may become publicly available or otherwise unprotectable.

(c)  Such Debtor shall notify the Secured Party immediately if it knows, or has reason to know, that any application or registration relating to any Material Intellectual Property may become forfeited, misused, unenforceable, abandoned or dedicated to the public, or of any materially adverse determination or development regarding the validity or enforceability or such Debtor's ownership of, interest in, right to use, register, own or maintain any Material Intellectual Property. Such Debtor shall take all actions that are necessary or reasonably requested by the Secured Party to maintain and pursue each application (and to obtain the relevant registration or recordation) and to maintain each registration and recordation included in the Material Intellectual Property.

(d)  Such Debtor shall not knowingly do any act or omit to do any act to infringe, misappropriate, dilute, violate or otherwise impair the Intellectual Property of any other Person.  In the event that any Material Intellectual Property of such Debtor is or has been infringed, misappropriated, violated, diluted or otherwise impaired by a third Person, such Debtor shall

promptly sue for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and shall take such other actions as the Secured Party shall deem appropriate under the circumstances to protect such Material Intellectual Property.

(e)  Such Debtor shall execute and deliver to the Secured Party in form and substance reasonably acceptable to Secured Party and suitable for (i) filing in the USPTO or USCO, the respective Confirmatory Grant in form and substance acceptable to the Secured Party for all Copyrights, Trademarks and Patents of such Debtor.

(f)  Such Debtor shall take all actions necessary or requested by the Secured Party to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of all Material Intellectual Property (now or hereafter existing), including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings.

Section 4.07.  <u>Commercial Tort Claims</u>.  Such Debtor shall promptly, and in any event within two (2) Business Days after the same is acquired by it, notify the Secured Party of any Commercial Tort Claim acquired by it if the amount claimed thereunder exceeds $100,000; *provided* that after the occurrence and during the continuance of an Event of Default, upon Secured Party's request, Debtors shall promptly, and in any event within two (2) Business Days after the same is acquired by it, notify Secured Party of any Commercial Tort Claim acquired by it, regardless of the amount claimed thereunder.

Section 4.08.  <u>Letter-of-Credit Rights</u>.  If such Debtor is or becomes the beneficiary of a letter of credit with a stated amount in excess of $100,000, it shall promptly, and in any event within two (2) Business Days after becoming a beneficiary, notify the Secured Party thereof and use commercially reasonable efforts to cause the issuer and/or confirmation bank to (a) consent to the assignment of any Letter-of-Credit Rights to the Secured Party and (b) agree to direct all payments thereunder to a Deposit Account of the Debtor at the Secured Party for application to the Secured Obligations, in accordance with Section 2.17 of the Credit Agreement, all in form and substance reasonably satisfactory to the Secured Party.

Section 4.09.  <u>Further Assurances</u>.  At any time and from time to time, upon the request of the Secured Party, and at the Debtors' sole expense, it shall, promptly execute and deliver all such further agreements, instruments and documentation and take such further action as the Secured Party may reasonably deem necessary or appropriate to preserve and perfect its Lien in the Collateral and carry out the provisions and purposes of this Agreement or to enable the Secured Party or any other Secured Creditor to exercise and enforce its rights and remedies hereunder with respect to any of the Collateral. Each Debtor also hereby authorizes the Secured Party to file such financing statements naming it as debtor, the Secured Party as secured party and describing the Collateral, in each case as Secured Party may deem appropriate, including the filing of an "All Assets" filing.  Notwithstanding the foregoing however, if no Default exists:

(a)  a Debtor may retain for collection in the ordinary course of business checks representing proceeds of Accounts received in the ordinary course of business;

(b)  a Debtor may retain any letters of credit and money received or held in the ordinary course of business;

(c)  a Debtor may retain any documents received and further negotiated in the ordinary course of business; and

(d)  a Debtor shall not be required to:

(i)       grant the Secured Party Control over any Deposit Account, Securities Account, Commodities Account, any Chattel Paper or any Letter-of-Credit Right; nor

(ii)       deliver to the Secured Party any Instrument or Chattel Paper pledged as Collateral hereunder unless the amount payable under any such Instrument or Chattel paper is in excess of $100,000 or if the aggregate amount payable under all Instruments and Chattel paper which have not been delivered hereunder exceeds $500,000; *provided* that after the occurrence and during the continuance of an Event of Default, upon Secured Party's request, Debtor shall promptly deliver any Instrument or Chattel Paper pledged as Collateral hereunder, regardless of the amount payable under such Instrument or Chattel Paper, as applicable.

If a Default occurs and the Secured Party requests, then each of the Debtors shall take such action as the Secured Party may reasonably request to perfect and protect the Liens of the Secured Party in all of the Collateral including any of the Collateral described in clauses (a) through (d) above, including the following actions: (i) the delivery to the Secured Party of all Collateral the possession of which is necessary to perfect the security interest of the Secured Party therein; and (ii) instructing all Account Debtors to make payment on Accounts to a post office box or boxes or to a Deposit Account under the Control and in the name of the Secured Party (each Debtor agrees that if any proceeds of any Collateral (including payments made in respect of Accounts) shall be received by it while a Default exists, it shall promptly deliver such proceeds to the Secured Party with any necessary endorsements, and until such proceeds are delivered to the Secured Party, such proceeds shall be held in trust by such Debtor for the benefit of the Secured Party and shall not be commingled with any other funds or property).

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, (i) the other provisions of this Section 4.09 need not be satisfied with respect to any Excluded Property or any exclusions and carve-outs from the perfection requirements expressly set forth in this Agreement or any other Collateral Document, (ii) no Debtor will be required to grant a security interest in any asset or perfect a security interest in any Collateral to the extent the (x) cost, burden, difficulty or consequence of obtaining or perfecting a security interest therein outweighs the benefit of the security afforded thereby as agreed by the Borrower and the Secured Party or (y) the granting of a security interest in such asset would be prohibited by enforceable anti-assignment provisions of contracts or applicable law or, in the case of assets consisting of licenses, agreements or similar contracts, to the extent the grant of security therein would violate the terms of such license, agreement or similar contract relating to such asset or would trigger termination of any contract pursuant to any "change of control" or similar provision, in each case, after giving effect to any applicable provisions of the UCC or other applicable law; (iii) unless an Event of Default has occurred and is continuing, no Debtor will be required to seek or obtain any landlord lien waiver, estoppel, warehouseman waiver or other collateral access or similar letter or agreement and (iv) no actions will be required outside of the United States in order to create or perfect any security interest in any assets and no foreign law security or pledge agreements, foreign law mortgages or deeds or foreign intellectual property filings or searches will be required.

Section 4.10.    <u>Deposit Account Control Agreements</u>. Upon the occurrence and during the continuance of an Event of Default, such Debtor shall provide to Secured Party a Deposit Account Control Agreement or other agreements providing Control duly executed on behalf of each financial institution now or hereafter maintaining a Deposit Account of such Debtor, and signed by Debtor and Secured Party and shall provide agreements providing Control of any Securities Account of such Debtor duly executed by Debtor, Secured Party, and each Securities Intermediary maintaining any Securities Account for such Debtor now or hereafter existing. Until the Secured Obligations are Fully Satisfied, each Debtor grants to Secured Party an irrevocable power of attorney coupled with an interest to execute on its behalf and in its name, any Deposit Account Control Agreement or other agreement providing Control to

Secured Party of any Deposit Account, Securities Account or commodity accounts of such Debtor now or hereafter existing.

Section 4.11.    <u>Corporate Changes</u>.    It shall not change its name, identity, jurisdiction of organization, or corporate structure in any manner that might make any financing statement filed in connection with this Agreement seriously misleading or not located by the relevant filing office using its search logic, or its organizational identification number unless it shall have given the Secured Party thirty (30) days prior written notice thereof and shall have taken all action reasonably deemed necessary or desirable by the Secured Party to protect its Liens in the Collateral with the perfection and priority thereof required by this Agreement.    It shall not change its chief executive office or the place where it keeps its books and records unless it shall have given the Secured Party thirty (30) days prior written notice thereof and shall have taken all action deemed necessary or desirable by the Secured Party to cause its Liens in the Collateral to be perfected with the priority required by this Agreement.

Section 4.12.    <u>Transfers; Liens</u>.    It shall not sell, lease, transfer or otherwise dispose of any of its Collateral or any right, title or interest therein and shall not permit any of its Collateral to become subject to any Lien, except in each case as permitted by the Credit Documents.

Section 4.13.    <u>Chattel Paper and Letters of Credit</u>. It will not give any Person Control over any Letter-of-Credit Right or electronic Chattel Paper except Secured Party. It will not create any Chattel Paper without placing a legend on the Chattel Paper acceptable to the Secured Party indicating that the Secured Party has a Lien in the Chattel Paper.

## ARTICLE V.

### Appointment of Secured Party; Proceeds of Collateral

Section 5.01.    <u>Appointment</u>.    Each of the Secured Creditors hereby irrevocably appoints JPMorgan Chase Bank, N.A. as collateral agent on its behalf, and on behalf of each of its affiliates who are owed any Secured Obligations (each such affiliate by acceptance of the benefits of the Amended and Restated Credit Agreement hereby ratifying such appointment) and authorizes the Secured Party to take such actions on its behalf and on behalf of such affiliates and to exercise such powers as are delegated to the Secured Party by the terms of this Agreement, together with such actions and powers as are reasonably incidental thereto.

Section 5.02.    <u>Limitation of Duties and Immunities</u>.    The Secured Party shall not have any duties or obligations except those expressly set forth in this Agreement.    Without limiting the generality of the foregoing, (a) the Secured Party shall not be subject to any fiduciary or other implied duties, (b) the Secured Party shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by this Agreement that the Secured Party is required to exercise in writing by the Secured Creditors, and (c) except as expressly set forth in this Agreement, the Secured Party shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to a Debtor that is communicated to or obtained by the Person serving as Secured Party or any of its affiliates in any capacity.    The Secured Party shall not be liable for any action taken or not taken by it with the consent or at the request of any of the other Secured Creditors or in the absence of its own gross negligence or willful misconduct.    The Secured Party shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith or any other Credit Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in

this Agreement, or (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document.

Section 5.03.    <u>Reliance on Third Parties</u>.  The Secured Party shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Secured Party also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Secured Party may consult with legal counsel (who may be counsel for the Debtors, the Issuer or a Secured Creditor), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 5.04.    <u>Sub-Agents</u>.  The Secured Party may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Secured Party.  The Secured Party and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Secured Party and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Secured Party.

Section 5.05.    <u>Successor Collateral Agent</u>.  Subject to the appointment and acceptance of a successor to the Secured Party as provided in this clause, the Secured Party may resign at any time by notifying the other Secured Creditors and the Debtors.  Upon any such resignation, the Secured Creditors shall have the right, in consultation with the Debtors, to appoint a successor collateral agent.  If no successor shall have been so appointed by the Secured Creditors and shall have accepted such appointment within thirty (30) days after the retiring Secured Party gives notice of its resignation, then the retiring Secured Party may, on behalf of the Secured Creditors, appoint a successor Secured Party which shall be a bank with an office in New York, New York, or an affiliate of any such bank.  Upon the acceptance of its appointment as Secured Party hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, including the power of attorney to act in the name of and for each Debtor, privileges and duties of the retiring Secured Party, and the retiring Secured Party shall cease acting as collateral agent and the successor collateral agent shall amend all filings to reflect the name of the successor collateral agent and Secured Party shall be discharged from any responsibilities hereunder.  The fees payable by the Debtors to a successor Secured Party shall be the same as those payable to its predecessor unless otherwise agreed between the Debtors and such successor.  After the Secured Party's resignation hereunder, the provisions of this Article and Section 8.12 shall continue in effect for the benefit of such retiring Secured Party, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Secured Party.

Section 5.06.    <u>Secured Creditor affiliates Rights</u>.  By accepting the benefits of this Agreement, any affiliate of a Secured Creditor that is owed any Secured Obligation is bound by the terms of this Agreement.  But notwithstanding the foregoing: (a) neither the Secured Party, any other Secured Creditor nor any Debtor shall be obligated to deliver any notice or communication required to be delivered to any Secured Creditor under this Agreement to any affiliate of any Secured Creditor; and (b) no affiliate of any Secured Creditor that is owed any Secured Obligation shall be included in the determination of the Secured Creditors or entitled to consent to, reject, or participate in any manner in any amendment, waiver or other modification of this Agreement.  The Secured Party shall not have any liabilities, obligations or responsibilities of any kind whatsoever to any affiliate of any Secured Creditor who is owed any Secured Obligations.  The Secured Party shall deal solely and directly with the related Secured Creditor of any such affiliate in connection with all matters relating to this Agreement.  The Secured Obligations owed to such affiliate shall be considered the Secured Obligation of its related Secured Creditor for all purposes

under this Agreement and such Secured Creditor shall be solely responsible to the other parties hereto for all the obligations of such affiliate under this Agreement.

Section 5.07.    Proceeds of Collateral.

(a) Application.  All proceeds received by the Secured Party from the sale or other liquidation of the Collateral shall first be applied as payment of the accrued and unpaid fees cost and expenses including attorney's fees, costs, disbursements and expenses and other professional fees and expenses of the Secured Party hereunder and then to all other unpaid or unreimbursed Secured Obligations (including reasonable attorneys' fees, charges and disbursements) owing to the Secured Party in its capacity as collateral agent for the Secured Creditors only and then any remaining amount of such proceeds shall be distributed:

first, to the Secured Creditors, pro rata in accordance with the respective unpaid amounts of Loan Obligations and Bond Obligations, until all such Secured Obligations have been Fully Satisfied; and

second, to the Secured Creditors, pro rata in accordance with the respective unpaid amounts of the Deposit Obligations, the Swap Obligations, and the other Secured Obligations, until all such Secured Obligations have been Fully Satisfied.

After all the Secured Obligations have been Fully Satisfied, any proceeds of Collateral shall be delivered to the Person entitled thereto as directed by the Borrower or as otherwise determined by applicable law or applicable court order.

(b) Noncash Proceeds.  Notwithstanding anything contained herein to the contrary, if the Secured Party shall ever acquire any Collateral through foreclosure or by a conveyance in lieu of foreclosure or by retaining any of the Collateral in satisfaction of all or part of the Secured Obligations or if any proceeds of Collateral received by the Secured Party to be distributed and shared pursuant to this Section 5.07 are in a form other than immediately available funds, the Secured Party shall not be required to remit any share thereof under the terms hereof and the Secured Creditors shall only be entitled to their undivided interests in the Collateral or noncash proceeds as determined by clause (a) of this Section 5.07.  The Secured Creditors shall receive the applicable portions (in accordance with the foregoing clause (a)) of any immediately available funds consisting of proceeds from such Collateral or proceeds of such noncash proceeds so acquired only if and when received by the Secured Party in connection with the subsequent disposition thereof.  While any Collateral or other property to be shared pursuant to this Section is held by the Secured Party pursuant to this clause (b), the Secured Party shall hold such Collateral or other property, for its own benefit and the benefit of the other Secured Creditors, and all matters relating to the management, operation, further disposition or any other aspect of such Collateral or other property shall be resolved by the agreement of the Secured Creditors.

(c) Return of Proceeds.  If at any time payment, in whole or in part, of any amount distributed by the Secured Party hereunder is rescinded or must otherwise be restored or returned by the Secured Party as a preference, fraudulent conveyance, or otherwise under any bankruptcy, insolvency, or similar law, then each Debtor, Issuer, or Secured Creditor receiving any portion of such amount agrees, upon demand, to return the portion of such amount it has received to the Secured Party.

(d) Notice of Amount of Secured Obligations.  Prior to making any distribution under clause (a) of this Section, the Secured Party shall request each other Secured Creditor to provide the Secured Party with a statement of the amounts of Secured Obligations then owed to such

Secured Creditor and its affiliates.  A Secured Creditor (other than the Secured Party) may provide such information to the Secured Party at any time and the Secured Party may also request such information at any time.

## ARTICLE VI.

### Rights of the Secured Party

Section 6.01.    <u>Account Verification</u>.  The Secured Party may at any time following, and during the continuance of an Event of Default, in the Secured Party's own name or in the name of a nominee of the Secured Party communicate (by mail, telephone, facsimile or otherwise) with the Account Debtors of any Debtor, parties to contracts with any Debtor and obligors in respect of Instruments of any Debtor to verify with such Persons, to the Secured Party's satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Instruments, Chattel Paper, payment intangibles and/or other Collateral.

Section 6.02.    <u>Authorization for Administrative Agent to Take Certain Action</u>.

(a)    Each of the Debtors irrevocably authorizes the Secured Party at any time and from time to time in the sole discretion of the Secured Party and appoints (which appointment shall automatically terminate upon the Maturity Date, or, in the case of a Guarantor, upon the termination or release of such Debtor's Guarantee of the Obligations) the Secured Party as its attorney in fact (i) to execute in the name and on behalf of such Debtor as debtor and to file any financing statements necessary or desirable in the Secured Party's sole discretion to perfect and to maintain the perfection and priority of the Secured Party's security interest in the Collateral, (ii) in the case of any Intellectual Property owned by or licensed to such Debtor, execute, deliver and have recorded any document that the Secured Party may request to evidence, effect, publicize or record the Secured Party's Lien in such Intellectual Property and the goodwill and General Intangibles of such Debtor relating thereto or represented thereby, (iii) to endorse and collect any cash proceeds of the Collateral, (iv) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Collateral as a financing statement and to file any other financing statement or amendment of a financing statement in such offices as the Secured Party in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the Secured Party's Lien in the Collateral, (v) to contact and enter into one or more agreements with the issuers of uncertificated securities which are Pledged Collateral or with Securities Intermediaries holding any Deposit Accounts or any Investment Property or any depository intermediary maintaining Deposit Accounts as may be necessary or advisable to give the Secured Party Control over or possession of such Collateral, (vi) to apply the proceeds of any Collateral received by the Secured Party to the Secured Obligations as provided in Section 5.07, (vii) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such Liens that are permitted under the Credit Documents), (viii) to, following the occurrence and during the continuation of an Event of Default, contact Account Debtors for any reason, (ix) to, following the occurrence and during the continuation of an Event of Default, demand payment or enforce payment of any Collateral in the name of the Secured Party or such Debtor and to endorse any and all checks, drafts, and other instruments for the payment of money relating to any Collateral, (x) to, following the occurrence and during the continuation of an Event of Default, sign such Debtor's name on any invoice or bill of lading relating to the Collateral, drafts against any Account Debtor of such Debtor, assignments and verifications of Collateral, (xi) to, following the occurrence and during the continuation of an Event of Default, exercise all of such Debtor's rights and remedies with respect to the collection of the Collateral,

(xii) to, following the occurrence and during the continuation of an Event of Default, settle, adjust, compromise, extend or renew the Collateral, (xiii) to, following the occurrence and during the continuation of an Event of Default, settle, adjust or compromise any legal proceedings brought to collect Collateral, (xiv) to, following the occurrence and during the continuation of an Event of Default, prepare, file and sign such Debtor's name on a proof of claim in bankruptcy or similar document against any Account Debtor of such Debtor or any other obligor on the Collateral, (xv) to, following the occurrence and during the continuation of an Event of Default, prepare, file and sign such Debtor's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Collateral, (xvi) to, following the occurrence and during the continuation of an Event of Default, change the address for delivery of mail addressed to such Debtor to such address as the Secured Party may designate and to receive, open and dispose of all mail addressed to such Debtor, and (xvii) to, following the occurrence and during the continuation of an Event of Default, do all other acts and things necessary to carry out this Agreement; and such Debtor agrees to reimburse the Secured Party on demand for any payment made or any expense incurred by the Secured Party in connection with any of the foregoing; provided that, this authorization shall not relieve such Debtor of any of its obligations under this Agreement or under the Credit Documents.

(b)     All acts of said attorney or designee are hereby ratified and approved. The powers conferred on the Secured Party, for the benefit of the Secured Party and the other Secured Creditors, under this Section 6.2 are solely to protect the Secured Party's interests in the Collateral and shall not impose any duty or obligation upon the Secured Party or any other Secured Creditor to exercise any such powers.

Section 6.03.    Proxy. EACH OF THE DEBTORS HEREBY, EFFECTIVE UPON THE OCCURRENCE OF ANY EVENT OF DEFAULT, IRREVOCABLY CONSTITUTES AND APPOINTS THE SECURED PARTY AS ITS PROXY AND ATTORNEY-IN-FACT (AS SET FORTH IN SECTION 6.2 ABOVE) WITH RESPECT TO ITS PLEDGED COLLATERAL, INCLUDING THE RIGHT TO VOTE ANY OF THE PLEDGED COLLATERAL, WITH FULL POWER OF SUBSTITUTION TO DO SO. IN ADDITION TO THE RIGHT TO VOTE ANY OF THE PLEDGED COLLATERAL, THE APPOINTMENT OF THE SECURED PARTY AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF ANY OF THE PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS). SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY OF THE PLEDGED COLLATERAL ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF THE PLEDGED COLLATERAL OR ANY OFFICER OR AGENT THEREOF), UPON THE OCCURRENCE OF A DEFAULT.

Section 6.04.    Nature of Appointment; Limitation of Duty.  THE APPOINTMENT OF THE SECURED PARTY AS PROXY AND ATTORNEY-IN-FACT IN THIS ARTICLE VI IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS AGREEMENT IS TERMINATED IN ACCORDANCE WITH SECTION 8.12 OR, IN THE CASE OF A DEBTOR THAT IS A GUARANTOR, THE DATE ON WHICH THE APPLICABLE DEBTOR'S GUARANTEE OF THE OBLIGATIONS IS RELEASED. NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NONE OF THE SECURED PARTY, ANY LENDER, ANY OTHER SECURED CREDITOR, ANY OF THEIR AFFILIATES, OR ANY OF THEIR OR THEIR AFFILIATES' RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, ADVISORS, AGENTS OR

REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT  IN RESPECT OF DAMAGES  FOUND BY A FINAL, NON-APPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION TO HAVE PRIMARILY RESULTED FROM SUCH PARTY'S OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT IN PERFORMING ITS ACTIVITIES OR FURNISHING ITS SERVICES UNDER THIS AGREEMENT; <u>PROVIDED</u> THAT, IN NO EVENT SHALL THEY BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

## ARTICLE VII.

### Default

Section 7.01.    <u>Rights and Remedies</u>.  If an Event of Default exists, the Secured Party shall have the following rights and remedies:

(a)  In addition to all other rights and remedies granted to the Secured Party in this Agreement, the Credit Documents or by applicable law, the Secured Party shall have all of the rights and remedies of a secured party under the UCC (whether or not the UCC applies to the affected Collateral).  Without limiting the generality of the foregoing, the Secured Party may (i) without demand or notice to it, collect, receive or take possession of the Collateral or any part thereof and for that purpose the Secured Party may enter upon any premises on which the Collateral is located and remove the Collateral therefrom and/or (ii) sell, lease or otherwise dispose of the Collateral, or any part thereof, in one or more parcels at public or private sale or sales, at the Secured Party's offices or elsewhere, for cash, on credit or for future delivery, on an "as is" and "with all faults" basis, with a disclaimer of all warranties (including, warranties of title, possession, quiet enjoyment and the like and all warranties of merchantability and fitness) and upon such other terms as the Secured Party may deem commercially reasonable or otherwise as may be permitted by law.  The Secured Party shall have the right at any public sale or sales, and, to the extent permitted by applicable law, at any private sale or sales, to bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness) and become a purchaser of the Collateral or any part thereof free of any right or equity of redemption on the part of any Debtor, which right or equity of redemption is hereby expressly waived and released by such Debtor.  Upon the request of the Secured Party, a Debtor shall assemble its Collateral and make it available to the Secured Party at any place designated by the Secured Party that is reasonably convenient to it and the Secured Party.  Each Debtor agrees that the Secured Party shall not be obligated to give more than ten (10) days prior written notice of the time and place of any public sale or of the time after which any private sale may take place and that such notice shall constitute reasonable notice of such matters.  The Secured Party shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of sale of Collateral may have been given.  The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  Debtors shall be jointly and severally liable for all reasonable expenses of retaking, holding, preparing for sale or the like, and all reasonable attorneys' fees, legal expenses and other costs and expenses incurred by the Secured Party in connection with the collection of the Secured Obligations and the enforcement of the Secured Party's rights under this Agreement.  The Debtors shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral applied to the Secured Obligations are insufficient to pay the Secured Obligations in full to the extent provided in the Credit Documents, as applicable.  Each Secured Creditor shall apply the proceeds of Collateral received from the Secured Party against the Secured Obligations in such

order and manner as such Secured Creditor may determine in its discretion. Each Debtor waives all rights of marshalling, valuation and appraisal in respect of the Collateral. Any cash held by the Secured Party as Collateral and all cash proceeds received by the Secured Party in respect of any sale of, collection from or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by the Secured Party as collateral for, and then or at any time thereafter applied in whole or in part by the Secured Party against, the Secured Obligations. Neither Secured Party nor any other Secured Creditor shall have any obligation to invest or otherwise pay interest on any amounts held by it in connection with or pursuant to this Agreement or the other Credit Documents.

(b) The Secured Party may cause any or all of the Collateral held by it to be transferred into the name of the Secured Party or the name or names of the Secured Party's nominee or nominees.

(c) The Secured Party may exercise any and all of the rights and remedies of any Debtor under or in respect of the Collateral, including, any and all rights of it to demand or otherwise require payment of any amount under, or performance of any provision of, any of the Collateral and any and all voting rights and corporate powers in respect of the Collateral. Each Debtor shall execute and deliver (or cause to be executed and delivered) to the Secured Party all such proxies and other instruments as the Secured Party may reasonably request for the purpose of enabling the Secured Party to exercise the rights which it is entitled to exercise pursuant to this paragraph (c) and to receive all the proceeds which it is entitled to receive hereunder.

(d) The Secured Party may collect or receive all money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so.

(e) On any sale of the Collateral, the Secured Party is hereby authorized to comply with any limitation or restriction with which compliance is necessary, in the view of the Secured Party's counsel, in order to avoid any violation of applicable law or in order to obtain any required approval of the purchaser or purchasers by any applicable Governmental Authority.

Section 7.02.    Standards for Exercising Remedies. To the extent that applicable law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, each Debtor acknowledges and agrees that it is not commercially unreasonable for Secured Party: (a) to fail to incur expenses reasonably deemed significant by Secured Party to prepare any Collateral for disposition; (b) to fail to obtain third Person consents for access to Collateral to be disposed of, or to obtain or if not required by other law, to fail to obtain Governmental Authority or third Person consents for the collection or disposition of the Collateral to be collected or disposed of; (c) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against the Collateral; (d) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (f) to contact other Persons, whether or not in the same business as any Debtor, for expressions of interest in acquiring all or any portion of the Collateral; (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets; (i) to dispose of assets in wholesale rather than retail markets; (j) to disclaim disposition warranties; (k) to purchase insurance or credit enhancements to insure Secured Party against risks of loss, collection or disposition of Collateral or to provide Secured Party a

guaranteed return from the collection or disposition of Collateral; (l) to the extent deemed appropriate by Secured Party, to obtain the services of brokers, investment bankers, consultants and other professionals (including Secured Party and its affiliates) to assist Secured Party in the collection or disposition of any of the Collateral; or (m) to comply with any applicable state or federal law requirement in connection with the disposition or collection of the Collateral.  Each Debtor acknowledges that this Section is intended to provide non-exhaustive indications of what actions or omissions by Secured Party would not be commercially unreasonable in Secured Party's exercise of remedies against the Collateral and that other actions or omissions by Secured Party shall not be deemed commercially unreasonable solely by not being included in this Section.  Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to any Debtor or to impose any duties upon Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

## ARTICLE VIII.

### Miscellaneous

Section 8.01.    No Waiver; Cumulative Remedies.  No failure on the part of the Secured Party to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.  The rights and remedies provided for in this Agreement are cumulative and not exclusive of any rights and remedies provided by law or in equity.

Section 8.02.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the Debtors, Issuer, Lender and the Secured Party and their respective successors and assigns, except that no Debtor may assign any of its rights or obligations under this Agreement without the prior written consent of the Secured Party and each other Secured Creditor.  Any assignment by any Debtor in violation of this Section 8.02 is void.

Section 8.03.    Notices.  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(a)  if to the Debtors, to them at their addresses set forth in Section 10.02 of the Amended and Restated Series 2012 Bond Purchase and Loan Agreement;

(b)  if to JPMorgan or the Secured Party, to it at JPMorgan's address set forth in Section 9.01 of the Amended and Restated Credit Agreement; and

(c)  if to the Issuer, to it at its address set forth in Section 10.02 of the Amended and Restated Series 2012 Bond Purchase and Loan Agreement.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five business days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section or in accordance with the latest unrevoked direction from such party given in accordance with this Section.

Section 8.04.    Amendments.  Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the

Secured Party, the other Secured Creditors and the Debtors except as otherwise provided in this Agreement.

Section 8.05.    <u>Governing Law</u>.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas and applicable laws of the United States of America.

Section 8.06.    <u>Headings</u>.    The headings, captions, and arrangements used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

Section 8.07.    <u>Survival of Representations and Warranties</u>.    All representations and warranties made in this Agreement or in any certificate delivered pursuant hereto shall survive the execution and delivery of this Agreement or any such certificate, and no investigation by the Secured Party shall affect the representations and warranties or the right of the Secured Party to rely upon them.

Section 8.08.    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts and on facsimile counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.    Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic communication shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 8.09.    <u>Waiver of Bond</u>.    In the event the Secured Party seeks to take possession of any or all of the Collateral by judicial process, each Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

Section 8.10.    <u>Severability</u>.    Any provision of this Agreement which is determined by a court of competent jurisdiction to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 8.11.    <u>Termination</u>.    If all of the Secured Obligations shall have been Fully Satisfied, the Secured Party shall, upon the written request of the Debtors, execute and deliver to each Debtor a proper instrument or instruments acknowledging the release and termination of the Liens created by or granted by this Agreement, and shall duly assign and deliver to each Debtor (without recourse and without any representation or warranty) such of the respective Collateral as may be in the possession of the Secured Party and has not previously been sold or otherwise applied pursuant to this Agreement.

Section 8.12.    <u>Expenses; Indemnity; Damage Waiver</u>.

(a) <u>Expenses</u>.    The Debtors shall pay (i) all reasonable out-of-pocket costs and expenses incurred by the Secured Party and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Secured Party, in connection with the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all out-of-pocket expenses incurred by the Secured Party, including the fees, charges and disbursements of any counsel for the Secured Party, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the exercise of any rights or remedies hereunder or in respect of the Collateral, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Secured Obligations.

(b) <u>Indemnity</u>.  EACH DEBTOR INDEMNIFIES THE SECURED PARTY AND EACH OF ITS RELATED PARTIES (EACH SUCH PERSON BEING CALLED AN "<u>INDEMNITEE</u>") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY CURRENTLY OR FORMERLY OWNED OR OPERATED BY ANY DEBTOR OR ANY OF THE SUBSIDIARIES, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY DEBTOR OR ANY SUBSIDIARY OF ANY DEBTOR, OR (III) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; <u>PROVIDED</u> THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE.  WITHOUT LIMITING ANY PROVISION OF THIS AGREEMENT, IT IS THE EXPRESS INTENTION OF THE PARTIES HERETO THAT EACH INDEMNITEE SHALL BE INDEMNIFIED FROM AND HELD HARMLESS AGAINST ANY AND ALL LOSSES, LIABILITIES, CLAIMS, DAMAGES, PENALTIES, JUDGMENTS, DISBURSEMENTS, FEES, COSTS, AND EXPENSES (INCLUDING ATTORNEYS' FEES, CHARGES AND EXPENSES) ARISING OUT OF OR RESULTING FROM THE SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNITEE.

(c) <u>Waiver of Damages</u>.  To the extent permitted by applicable law, each Debtor shall not assert, and each Debtor waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, incidental, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby or the transactions contemplated hereby.

(d) <u>Payment</u>.  All amounts due under this Section shall be payable not later than ten (10) days after written demand therefor.

Section 8.13.    <u>Amendment and Restatement</u>.  Each of the Debtors hereby (a) ratifies and affirms its obligations under the Original Security Agreement, as amended and restated herein, (b) agrees that all of the Liens granted to secure the Secured Obligations hereunder, and which were created by and existing under the Original Security Agreement shall continue to be valid and subsisting Liens securing the Secured Obligations, (c) agrees that the Original Security Agreement and the Liens granted to secure the Secured Obligations hereunder and created thereunder shall remain in full force and effect, as amended and restated herein, and (d) agrees that all rights, titles, interests, Liens granted to secure the Secured Obligations hereunder and existing under the Original Security Agreement are renewed, extended, carried forward and conveyed hereby to secure the Secured Obligations and performance under the Credit Documents.

Section 8.14.    <u>ENTIRE AGREEMENT</u>.  THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO

AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

**[The remainder of this page is intentionally left blank.]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first written above.

BOY SCOUTS OF AMERICA, as a Debtor

By: _____
[ ]

By: _____
[ ]

ARROW WV, INC., as a Debtor

By: _____
Name: _____
Title: _____

JPMORGAN CHASE BANK, N.A., as the Secured Party, Lender, a Secured Creditor and Assignee of the Notes

By: _____
[ ]

THE COUNTY COMMISSION OF FAYETTE COUNTY (WEST VIRGINIA), as a Secured Creditor and Assignor of the Notes

By: _____

[ ]