## <u>Exhibit T</u>

**Form of Foundation Loan Agreement**

**You may access a full and complete copy of the Form of Foundation Loan Agreement, free of charge, at <u>https://omniagentsolutions.com/bsa-plansupplement</u>.**

DRAFT
SUBJECT TO FURTHER NEGOTIATION

CREDIT AGREEMENT[1]

This Credit Agreement dated as of [●], 2022 is entered into between Boy Scouts of America, a congressionally chartered nonprofit corporation under title 36 of the United States Code (the "Borrower"), Arrow WV, Inc., a non-stock, non-profit corporation organized under the law of the State of West Virginia, as guarantor (the "Guarantor") and the National Boy Scouts of America Foundation, a District of Columbia nonprofit corporation (the "Lender").

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01.  Defined Terms.  As used in this Agreement, the following terms have the following meanings:

"Affiliate":  With respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"Agreement":  This Credit Agreement, as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time.

"Anti-Corruption Laws":  All laws, rules, and regulations of any jurisdiction applicable to the Borrower or the Guarantor or other obligors from time to time concerning or relating to bribery or corruption.

"Arrow Intercompany Note":  That certain Amended and Restated Promissory Note dated as of March 21, 2019 in the original principal amount of $350,000,000, executed by the Guarantor and payable to the Borrower, as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time.

"Arrow Intercompany Note Maturity Date": As of the Closing Date, [March 31, 2029], as such date may be modified from time to time in accordance with the terms of the Arrow Intercompany Note and the Loan Documents.

"Bond Issuer": The County Commission of Fayette County (West Virginia), acting for and on behalf of Fayette County, West Virginia, a political subdivision of the State of West Virginia, its successors and assigns.

---

[1] This document remains subject to ongoing review and material revision in all respects.  The Debtors, Coalition, the Future Claimants' Representative, the Ad Hoc Committee, the Creditors' Committee, JPM, Hartford, TCJC, and the Foundation (each as defined in the Plan) are each continuing to review the documents that are part of the Plan Supplement, and each of their respective rights are reserved with respect to the Plan Supplement and the information contained therein, as applicable.

AMERICAS 108370031

"Bond Purchase Agreements": Collectively, (a) that certain Amended and Restated Series 2010B Bond Purchase and Loan Agreement dated as of the date hereof among the Guarantor, the Bond Issuer, the Borrower and JPMorgan Chase Bank, N.A., as the "Lender" thereunder and (b) that certain Amended and Restated Series 2012 Bond Purchase and Loan Agreement dated as of the date hereof among the Guarantor, the Bond Issuer, the Borrower and JPMorgan Chase Bank, N.A., as the "Lender" thereunder.

"Bonds": Collectively, (a) the Commercial Development Revenue Bond (Arrow WV Project), Series 2010B issued by the Bond Issuer in an original principal amount of $50,000,000, and (b) the Commercial Development Revenue Bond (Arrow WV Project), Series 2012 issued by the Bond Issuer in an original principal of $175,000,000, in both cases, the proceeds of which were loaned to the Borrower under the terms of the applicable Bond Purchase Agreement.

"Borrower": As set forth in the introductory paragraph of this Agreement.

"BSA Settlement Trust Note": means the secured promissory note, dated [_____], 2022, in the original principal amount of $80,000,000 issued by the Borrower to the Settlement Trust, as amended, restated, amended and restated, extended, supplemented and/or otherwise modified from time to time.

"Business Day":  A day other than a Saturday, Sunday or a day on which commercial banks in Texas are authorized or required by law to close.

"Capital Lease Obligations": Of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; provided that, notwithstanding anything to the contrary contained herein, any change in accounting for leases pursuant to GAAP resulting from the adoption of Financial Accounting Standards Board Accounting Standards Update No. 2016-02, Leases (Topic 842) ("FAS 842"), to the extent such adoption would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect prior to the adoption of FAS 842, such lease shall not be considered a capital lease (whether or not such operating lease was in effect on such date), and all calculations, definitions and deliverables under this Agreement or any other Loan Document shall be made, construed or delivered, as applicable, in accordance therewith.

"Closing Date": [●], 2022.

"Control": The possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

2

"<u>Debt</u>":  As applied to any Person, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind; (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such Person upon which interest charges are customarily paid; (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person; (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business and overdue deferred purchase price obligations); (f) all Debt of others secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Debt secured thereby has been assumed; (g) all guarantees by such Person; (h) all Capital Lease Obligations of such Person; (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty; (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances; (k) all obligations of such Person under any swap agreement; (I) all obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which lease is required or is permitted to be classified and accounted for as an operating lease under GAAP but which is intended by the parties thereto for tax, bankruptcy, regulatory, commercial law, real estate law and all other purposes as a financing arrangement; and (m) all other amounts (other than accruals, deferred revenue and deferred taxes) which are required by GAAP to be included as liabilities on a consolidated balance sheet of such Person. The Debt of any Person shall include the Debt of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Debt provide that such Person is not liable therefor. The amount of the obligations of the Borrower or any other Loan Party in respect of any swap agreement shall, at any time of determination and for all purposes under this Agreement, be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Loan Party would be required to pay if such swap agreement were terminated at such time giving effect to current market conditions notwithstanding any contrary treatment in accordance with GAAP.

"<u>Dollars and $</u>":  Dollars in lawful currency of the United States of America.

"<u>Effective Date</u>": As defined in the Plan.

"<u>First Lien Credit Agreement</u>":  That certain [Amended and Restated Credit Agreement, dated as of the date hereof, between the Borrower and JPMorgan Chase Bank, N.A.], as amended, restated, amended and restated, supplemented, modified, refinanced or replaced from time to time .

"<u>First Lien Documents</u>": The First Lien Credit Agreement and all "Loan Documents" (or an equivalent term under any replacement agreement) referred to therein.

"<u>GAAP</u>":  United States generally accepted accounting principles applied on a consistent basis.

"<u>Guarantor</u>":  As set forth in the introductory paragraph of this Agreement..

3

"<u>Guaranty</u>": the guaranty provided by the Guarantor pursuant to Article VIII hereof.

"<u>Intercreditor Agreement</u>": That certain Intercreditor Agreement, dated as of the date hereof, among JPMorgan Chase Bank, N.A., the Lender and the Borrower, as amended restated supplemented and/or modified from time to time.

"<u>Internal Revenue Code</u>":  The Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter.

"<u>Lender</u>":  As set forth in the introductory paragraph of this Agreement, and its successors and permitted assigns.

"<u>Lien</u>":  With respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Loan</u>":  As defined in Section 2.01(a).

"<u>Loan Documents</u>":  This Agreement, the Note, the Security Agreement, the Intercreditor Agreement and each other document delivered to the Lender in connection with this Agreement and/or the credit extended hereunder.

"<u>Loan Parties</u>":  The Borrower and the Guarantor, and their respective successors and permitted assigns.

"<u>Material Adverse Effect</u>":  A material adverse effect on (a) the business, assets, operations or condition, financial or otherwise, of any Loan Party, (b) the validity or enforceability of any Loan Document or (c) the rights of or remedies available to the Lender under any Loan Document.

"<u>Maturity Date</u>":  [●], 2032.

"<u>Note</u>":  That certain Promissory Note dated as of the date hereof, executed by Borrower and payable to Lender, in the original principal amount of $42,800,000, as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time.

"<u>Obligations</u>":  The Loan, all other Debt, liabilities, obligations, covenants and duties owing by any  Loan Party to the Lender, or to any Person required to be indemnified, in each case that arises under any Loan Document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired, including, without limitation, principal, interest, fees, expenses or otherwise (including interest

accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Person":  Any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"Plan": The Modified Fifth Amended Plan of Reorganization for the Borrower and Delaware BSA, LLC approved by the Bankruptcy Court, with an effective date of [_____], 2022.

"Potential Event of Default":  A condition or event which, after notice or lapse of time or both, would constitute an Event of Default.

"Related Persons": With respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor or consultant of or to such Person or any of its Affiliates.

"Restricted Payment":    Any dividend or other distribution (whether in cash, securities or other property) with respect to any equity interests, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any equity interests.

"Sanctioned Country":  At any time, a country, region, or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person": At any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"Sanctions": Economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Security Agreement":  That certain Security Agreement, dated as of the date hereof, between the Borrower and the Lender, as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time.

AMERICAS 108370031

"Settlement Trust" means the trust organized under the laws of the state of Delaware and established under Article IV and the Settlement Trust Agreement (as defined in the Plan) for the purposes set forth therein.

"Subsidiary":    With respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Unauthorized Purposes":    Payments to any creditors' trust pursuant to the terms of the confirmed Plan, any direct or indirect payments to tort claimants, and any payments or transactions that would be considered "self-dealing" under the Internal Revenue Code or could otherwise give rise to excise tax.

SECTION 1.02.    Other Definitional Provisions.

(a)    As used herein and in any certificate or other document made or delivered pursuant hereto, accounting terms not defined in subsection 1.01, and accounting terms partly defined in subsection 1.01 to the extent not defined, shall have the respective meanings given to them under GAAP.

(b)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references, if any, are to this Agreement unless otherwise specified.

(c)    The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

(d)    Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in any Loan Document), (ii) any reference to any Law herein shall, unless otherwise specified, refer to such Law as amended, modified or supplemented from time to time.

ARTICLE II

THE LOAN

SECTION 2.01.    The Loan.    The Lender agrees, on the terms and conditions hereinafter set forth, to make a term loan ("Loan") to the Borrower on the Closing Date in a

single advance in the principal amount equal to $42,800,000. The Lender shall make available the proceeds of the Loan to the Borrower on the Closing Date by wire transfer in immediately available funds to the account specified by the Borrower in writing. Any amount of the Loan which is repaid or prepaid may not be reborrowed.

SECTION 2.02.  Repayment.

(a)  Mandatory Repayments.

The Borrower shall repay the principal of the Loan in installments on the last calendar day of each March, June, September and December of each year (each such date, a "Payment Date") commencing on the first such date to occur no less than 45 days after the Closing Date, in an amount equal to 2.50% of the original aggregate principal amount of such Loan made on the Closing Date.  The outstanding principal and interest of the Loan shall be due and payable on the Maturity Date.

(b)  Voluntary Prepayments.  The Borrower may at its option prepay the Loan, in whole or in part, at any time and from time to time.  Partial prepayments of the Loan shall be applied to reduce the remaining scheduled amortization payments of the Loan as directed by the Borrower or, if no such direction is given, in direct order of maturity.

SECTION 2.03.  Interest Rates and Payment Date.

(a)  Interest Rate.  The Loan shall bear interest on the unpaid principal amount thereof at a rate per annum equal to 6.50% from the date hereof until the full repayment thereof (whether at maturity, by prepayment or otherwise). Interest in respect of the Loan shall be calculated on the basis of a 360 day year for the actual days elapsed.

(b)  Default Rate.  Upon the occurrence and during the existence of an Event of Default, the overdue Obligations shall bear interest at a per annum rate equal to 2.00% plus the rate otherwise applicable to the Loan as provided in Section 2.03(a).

(c)  Payment of Interest.  Accrued interest on the Loan shall be payable in arrears and in cash on each Payment Date, commencing on the first Payment Date to occur no less than 45 days after the Closing Date; provided that any interest pursuant to Section 2.03(b) shall be payable on written demand by the Lender.

(d)  Maximum Lawful Rate. Anything herein to the contrary notwithstanding, the obligations of the Borrower hereunder shall be subject to the limitation that payments of interest shall not be required for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the Lender would be contrary to the provisions of any law applicable to the Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by the lender, and in such event the Borrower shall pay the Lender interest at the highest rate permitted by applicable law ("Maximum Lawful Rate"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, then the Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received

7

by the Lender is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

## ARTICLE III

## GENERAL PROVISIONS CONCERNING THE LOANS

SECTION 3.01.  Use of Proceeds.  The proceeds of the Loan shall be used by the Borrower to fund working capital and general corporate purposes of the Borrower; provided that, for the avoidance of doubt, proceeds of the Loan shall not be used for Unauthorized Purposes.

SECTION 3.02.  Payments.  The Borrower shall make each payment of principal and interest hereunder without setoff or counterclaim, no later than 4:00 p.m., Central Standard Time, on the day when due in lawful money of the United States of America in immediately available funds by wire transfer to an account  of the Lender designated from time to time

SECTION 3.03.  Payment on Non-Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day.

## ARTICLE IV

## CONDITIONS OF LENDING

The obligation of the Lender to make the Loan is subject to the conditions precedent that:

(a)  the Lender shall have received, on or before the Closing Date:

(i)     executed counterparts of this Agreement and each other Loan Document, including, without limitation, the Note, the Security Agreement, and the Intercreditor Agreement, from the parties thereto; and

(ii)    copies of the executed First Lien Credit Agreement and the other First Lien Documents in existence at such time; and

[(iii)    a copy(ies) of the document(s) evidencing the extension of the Arrow Intercompany Note Maturity Date to a date that is at least thirty (30) days later than the Maturity Date.][2]

(b) the United States Bankruptcy Court for the District of Delaware shall have entered a final order reasonably acceptable to the Lender confirming the Plan and all conditions to the effectiveness of the Plan shall have been satisfied or waived.

---

[2] NTD: To be deleted if extension has not occurred as of the Closing Date.

8

ARTICLE V

REPRESENTATIONS AND WARRANTIES

SECTION 5.01.    Representations and Warranties.    Each Loan Party represents and warrants as follows:

(a)    Organization.    Such Loan Party is duly organized, validly existing and in good standing under the laws of the state of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required. The Borrower has been determined to be exempt from federal income taxes under Section 50l(a) of the Internal Revenue Code. The Borrower has not impaired its status as an exempt organization as described in Section 50l(c)(3) of the Internal Revenue Code.

(b)    Authorization.    The execution, delivery and performance by such Loan Party of this Agreement, and the making of borrowings hereunder in the case of the Borrower, are within such Loan Party's corporate powers and have been duly authorized by all necessary corporate and, if required, member or sponsor action on behalf of such Loan Party.    This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which such Loan Party is a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c)    No Conflict.    The execution, delivery and performance by each Loan Party of this Agreement and the consummation of the transactions hereunder (i) do not require any consent or approval of, registration or filing with, or any other action by, any governmental authority, except such as have been obtained or made and which are in full force and effect and (ii) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of such Loan Party or any order of any governmental authority applicable to such Loan Party.

(d)    Litigation.    There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of the other Loan Parties (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (except as disclosed to the Lender) or (ii) that involve any of the Loan Documents or the Loan.

(e)    Anti-Corruption and Sanctions.    Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its subsidiaries and their

9

respective officers and directors and, to the knowledge of such Loan Party, its employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person.  None of (a) any Loan Party, any subsidiary or any of their respective directors, officers or, to the knowledge of any such Loan Party, employees, or (b) to the knowledge of any such Loan Party, any agent of such Loan Party that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

ARTICLE VI

COVENANTS

SECTION 6.01.  <u>Affirmative Covenants</u>.  So long as any Obligation shall remain unpaid, the Borrower will, unless the Lender shall otherwise consent in writing:

(a)  <u>Financial Information</u>.  Furnish to the Lender:

(i)  within 150 days after the end of each fiscal year of the Borrower (commencing with the fiscal year ended December 31, 2022, provided that with respect to the fiscal year ended December 31, 2022, the financial information shall only be required to cover the period commencing on the Effective Date and ending on December 31, 2022), its audited consolidated balance sheet and related statements of operations as of the end of and for such year, setting forth in each case (other than for the fiscal year ending December 31, 2022) in comparative form the figures for the previous fiscal year, all reported on by an independent public accountants of recognized standing (without any qualification or exception as to the scope of such audit other than with respect to any upcoming maturity of indebtedness or financial covenant noncompliance) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(ii)  within 45 days after the end of each March, June and September of each year, the Borrower's balance sheet and related statements of operations as of the end of the month then ended and the then elapsed portion the fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year; and

(b)  <u>Notices and Information</u>.  Furnish to the Lender written notice of the following promptly upon a financial officer or other executive officer or director of the Borrower obtaining knowledge thereof:

(i)  the occurrence of any Potential Event of Default or Event of Default;

(ii)  the filing or commencement of any action, suit or proceeding by or before any arbitrator or governmental authority against or affecting the Borrower

10

or any Affiliate thereof that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect; and

(iii) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(c) <u>Corporate Existence, Etc</u>.  Renew and keep in full force and effect its legal existence and, except where failure to do so could not reasonably be expected to have a Material Adverse Effect, the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names necessary to the conduct of its operations.

(d) <u>Compliance with Laws, Etc</u>.  Comply with all laws, rules, regulations and orders of any governmental authority applicable to it or its property and all agreements binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

[(e) <u>Amendment of Arrow Intercompany Note</u>.  No later than the Arrow Intercompany Note Maturity Date, extend the final maturity under the Arrow Intercompany Note to a date that is later than the Maturity Date, and deliver written confirmation of such extension to the Lender.][3]

(f) <u>Payment of Tax Obligations</u>.  Each Loan Party shall pay, discharge and perform as the same shall become due and payable or required to be performed all tax liabilities, assessments and governmental charges or levies upon it or its property, unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person, in each case so long as the failure to make such payment could not reasonably be expected to result in a Material Adverse Effect.

(g) <u>Insurance</u>.  The Loan Parties will maintain, with financially sound and reputable insurance companies insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by Persons of established repute engaged in the same or similar operations operating in the same or similar locations.  Notwithstanding the foregoing, each Loan Party may self-insure if such self-insurance (a) is in amounts not less than what is reasonable based on the operations and locations of the Borrower and its Subsidiaries, (b) is adequate to protect its property and operations, and (c) is prudent under the circumstances; provided, however, that the Borrower and the other Loan Parties may not self-insure any of their property, plant and equipment.

(h) <u>Further Assurances</u>. Promptly upon request by the Lender, the Loan Parties shall take such additional actions and execute such documents as the Lender may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Loan Document or (ii) to perfect or maintain the validity, effectiveness and priority of any of the Liens intended to be created by the Loan Documents.

---

[3] [To be deleted if extension occurs prior to the Closing Date.]

AMERICAS 108370031

SECTION 6.02.  <u>Negative Covenants</u>.  So long as any Obligation shall remain unpaid, the Borrower will not, without the written consent of the Lender:

(a) <u>Debt</u>.  Create, incur, assume or permit to exist any Debt, except:

(i) Debt created under the Loan Documents; and

(ii) Debt created under, or not prohibited to be incurred, assumed or exist pursuant to the terms of, the First Lien Documents.

(b) <u>Liens</u>.  Create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(i) Liens created under the Loan Documents; and

(ii) Liens created under, or not prohibited to be incurred, assumed or exist pursuant to the terms of, the First Lien Documents.

(c)  <u>Fundamental Changes</u>.  Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except to the extent not prohibited by the First Lien Documents. The Borrower will not engage to any material extent in any operations other than the operations of the type conducted by the Borrower on the date of execution of this Agreement and operations reasonably related thereto, except to the extent not prohibited by the First Lien Documents.

(d)  <u>Investments</u>.  Purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any equity interests in or evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except, in each case, to the extent not prohibited by the First Lien Documents.

(e)  <u>Restricted Payments</u>.  Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so except, in each case, to the extent not prohibited by the First Lien Documents. The Borrower will not make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash securities or other property) of or in respect of principal of or interest on any Debt, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Debt, except, in each case, to the extent not prohibited by the First Lien Documents.

(f)  <u>Amendments to Certain Documents</u>.  No Loan Party shall change or amend the terms of (i) the First Lien Documents, except to the extent permitted by the Intercreditor

12

Agreement, or (ii) the Arrow Intercompany Note, in each case in a manner that would reasonably be expected to be materially adverse to the Lender.

(g)    <u>Changes in Accounting, Name and Jurisdiction of Organization</u>.  (i) The Borrower shall not (x) make any significant change in accounting treatment or reporting practices, except as required by GAAP or (y) change its fiscal year and (ii) no Loan Party shall change its name as it appears in official filings in its jurisdiction of organization or (ii) change its jurisdiction of organization or formation, in each case without at least ten (10) days' prior written notice to the Lender.

(h)    <u>Payments on Arrow Intercompany Note</u>. The Guarantor shall not make any payments under the Arrow Intercompany Note except with the prior written consent of the Lender.

## ARTICLE VII

## EVENTS OF DEFAULT

SECTION 7.01.    <u>Events of Default</u>.  If any of the following events ("<u>Events of Default</u>") shall occur and be continuing:

(a)    The Borrower shall fail to pay (i) any amount of principal on the Loan when due, or (ii) any amount of interest or other amount payable hereunder or under any Loan Document within three (3) Business Days of the date when due; or

(b)    Any representation, warranty or certification made or deemed made by or on behalf of any Loan Party in or in connection with any Loan Document to which such Loan Party is a party or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made; or

(c)    The Borrower shall fail to perform or observe any term, covenant or agreement contained in <u>Sections 6.01(b)(i)</u>, <u>6.01(c)</u> or <u>6.02</u>) hereof on its part to be performed or observed; or

(d)    Any Loan Party shall fail to perform or observe any term, covenant or agreement contained in this Agreement or any other Loan Document, other than those referred to in <u>Section 7.01(a)</u>, <u>(b)</u> and <u>(c)</u> above, and <u>Section 7.01(i)</u> and <u>(j)</u> below, on its part to be performed or observed and any such failure shall remain unremedied for thirty (30) days after notice thereof from the Lender to the Borrower;

(e) The Borrower shall: fail to perform or observe any term, covenant or condition on its part to be performed or observed under the First Lien Documents and, as a result thereof, the obligations under the First Lien Documents shall have been accelerated and declared to be due and payable prior to their stated maturity;

13

(f)   An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Loan Party or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(g) Any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section 7.01, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; or

(h)   one or more judgments for the payment of money in an aggregate amount in excess of $6,000,000 shall be rendered against the Borrower, any other Loan Party or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed by written agreement or court order, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any other Loan Party to enforce any such judgment;

(i)   an "Event of Default" shall have occurred pursuant to Section 8.01(d) of the First Lien Credit Agreement, which Event of Default has been caused by a breach of Section 7.01 or 7.02 of the First Lien Credit Agreement by more than 20% compared to the applicable Liquidity (as defined in the First Lien Credit Agreement) or Consolidated Debt Service Coverage Ratio (as defined in the First Lien Credit Agreement), as applicable, required to be maintained thereunder and has not been cured within the period set forth in Section 8.01(p) or 8.01(q) of the First Lien Credit Agreement, as applicable; or

THEN, (i) upon the occurrence of any Event of Default described in clause (f) or (g) above, the Loan hereunder with accrued interest thereon, and all other Obligations under this Agreement and the other Loan Documents shall automatically become due and payable; (ii) upon the occurrence of any other Event of Default, the Lender may, by notice to the Borrower declare the Loan hereunder, with accrued interest thereon, and all other Obligations under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable; and (iii) the Lender may, upon notice to the Borrower, exercise any and all rights and remedies available to it under the Loan Documents or provided by law or in equity, in each case subject to the Intercreditor Agreement.  Except as expressly provided above in this Section, each Loan Party (including the Guarantor) hereby expressly waives presentment, demand, protest and all other notices of any kind.

14

ARTICLE VIII

GUARANTY

The Guarantor acknowledges and agrees that it will derive substantial direct and indirect benefits from the making of the extension of credit under this Agreement and the Note. To induce the Lender to make the extension of credit to the Borrower, the Guarantor hereby absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not as a surety, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, or acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code) the Loan, and all other Obligations , whether existing on the date of this Agreement or hereafter incurred or created, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "<u>Guaranteed Obligations</u>").

The Guarantor understands, agrees and confirms that the Lender may enforce the Guaranty up to the full amount of the Guaranteed Obligations against the Guarantor without proceeding against the Borrower, any other guarantor, or against any security for the Guaranteed Obligations.   This Guaranty is a guaranty of prompt payment and performance and not of collection.

The Guarantor and the Lender hereby confirm that it is their intention that this Guaranty not constitute a fraudulent transfer or fraudulent conveyance for purposes of Section 548 of Title 11 of the United States Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, or any applicable provisions of comparable law.   To effectuate the foregoing intention, the Guarantor and the Lender hereby irrevocably agree that the Guaranteed Obligations shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of the Guarantor that are relevant under such laws, result in the Guaranteed Obligations of the Guarantor in respect of such maximum amount not constituting a fraudulent transfer or fraudulent conveyance.

The Guarantor hereby waives and agrees not to assert any defense, whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its obligations hereunder are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Agreement, in each case except as otherwise agreed in writing by the Lender):

(a)      the invalidity or unenforceability of any obligation of the Borrower or any other guarantor under any Loan Document or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

15

(b)     the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from the Borrower or any other guarantor or other action to enforce the same or (ii) any action to enforce any Loan Document or any lien thereunder;

(c)     the failure by any Person to take any steps to perfect and maintain any lien on, or to preserve any rights with respect to, any collateral;

(d)     any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against the Borrower, any other guarantor or any of the Borrower's Subsidiaries or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(e)     any foreclosure, whether or not through judicial sale, and any other sale or other disposition of any collateral or any election following the occurrence of an Event of Default by the Lender to proceed separately against any collateral in accordance with the Lender's rights under any applicable law; or

(f)     any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of the Borrower, any other guarantor or any of the Borrower's Subsidiaries, in each case other than the payment in full of the Guaranteed Obligations.

The Guarantor further unconditionally and irrevocably agrees not to (x) enforce or otherwise exercise any right of subrogation or any right of reimbursement or contribution or similar right against the Borrower or any other guarantor by reason of any Loan Document or any payment made thereunder or (y) assert any claim, defense, setoff or counterclaim it may have against the Borrower or any other guarantor or set off any of its obligations to Borrower or any other guarantor against obligations of such person to the Guarantor.  No obligation of the Guarantor hereunder shall be discharged other than by complete performance or as otherwise agreed by the Lender.

ARTICLE IX

MISCELLANEOUS

SECTION 9.01.  Amendments, Etc.  No amendment or waiver of any provision of the Loan Documents nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Borrower and the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Any amendment to Article VIII or any defined term used therein that affects the Guaranty, and any amendment to this sentence, shall also require the written consent of the Guarantor. For the avoidance of doubt, the Lender and Borrower are hereby authorized, without notice to or demand upon the Guarantor and without discharging or otherwise affecting the obligations of the Guarantor hereunder, to do each of the following:

16

(a)(i) modify, amend, supplement or otherwise change, (ii) accelerate or otherwise change the time of payment or (iii) waive or otherwise consent to noncompliance with, any Guaranteed Obligation or any Loan Document;

(b)  apply to the Guaranteed Obligations any sums by whomever paid or however realized to any Guaranteed Obligation in such order as provided in the Loan Documents;

(c)  refund at any time any payment received by the Lender in respect of any Guaranteed Obligation;

(d)(i) sell, exchange, enforce, waive, substitute, liquidate, terminate, release, abandon, fail to perfect, subordinate, accept, substitute, surrender, exchange, affect, impair or otherwise alter or release any collateral for any Guaranteed Obligation or any other guaranty therefor in any manner, (ii) receive, take and hold additional collateral to secure any Guaranteed Obligation, (iii) add, release or substitute any one or more other guarantors, makers or endorsers of any Guaranteed Obligation or any part thereof and (iv) otherwise deal in any manner with the Borrower and any other guarantor, maker or endorser of any Guaranteed Obligation or any part thereof; and

(e)  settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations.

SECTION 9.02.  <u>Notices, Etc</u>.  Except as otherwise set forth in this Agreement, all notices and other communications provided for hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or electronic mail to the addresses separately provided in writing by the parties. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile or electronic mail shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, they shall be deemed to have been given at the opening of business on the next Business Day for the recipient).

SECTION 9.03.  <u>No Waiver; Remedies</u>.  No failure on the part of the Lender to exercise, and no delay in exercising, any right under any of the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04.  <u>Expenses</u>.  The Borrower shall pay, on the Closing Date and thereafter, within thirty (30) days of a written demand therefor (a) all reasonable and documented out of pocket fees and expenses incurred by the Lender (including reasonable attorneys' fees of one legal counsel to the Lender at any time) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (b) all reasonable and documented out of pocket fees and expenses incurred by the Lender (including reasonable

attorneys' fees of outside legal counsel to the Lender) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents.

SECTION 9.05.  Indemnity.   Each Loan Party shall indemnify, hold harmless, and defend the Lender and each of its Related Persons (the Lender and each such Person being an  "Indemnitee") against any and all losses, claims, damages, liabilities and related expenses ( incurred by the Indemnitee or asserted against the Indemnitee by any Person (other than the Indemnitee or its Affiliates) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) the Loan or the use or proposed use of the proceeds therefrom, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, and regardless of whether any Indemnitee is a party thereto; provided, such indemnity shall not, as to the Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses  are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

SECTION 9.06.  Assignments.   Neither the Borrower nor the Lender shall assign or otherwise transfer all or a portion of its rights or obligations hereunder without the consent of the other party, except that the Lender may assign all (but not a portion) of its rights and obligations under this Agreement and the other Loan Documents without the consent of the Borrower or any party hereunder following the occurrence and during the continuance of an Event of Default pursuant to Section 7.01(a), (f) or (g).

SECTION 9.07.  Effectiveness; Binding Effect; Governing Law.  This Agreement shall become effective when it shall have been executed by the Borrower, the Guarantor and the Lender and thereafter shall be binding upon and inure to the benefit of the Borrower, the Guarantor, the Lender and their respective permitted successors and assigns.   THIS AGREEMENT, AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS.

SECTION 9.08.  Waiver of Jury Trial.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER  HEREOF OR THEREOF.

SECTION 9.09.   Consent to Jurisdiction; Venue.   All judicial proceedings brought with respect to this Agreement shall be brought in any state or federal court of competent jurisdiction in Dallas County, Texas, and by execution and delivery of this Agreement, each party hereto accepts for itself and in connection with its properties, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement.  Each party

18

hereto irrevocably waives any right it may have to assert the doctrine of <u>forum non conveniens</u> or to object to venue to the extent any proceeding is brought in accordance with this Section.

SECTION 9.10.  <u>Entire Agreement</u>.  THIS AGREEMENT, TOGETHER WITH ANY EXHIBITS OR SCHEDULES ATTACHED HERETO, AND THE OTHER LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE PARTIES HERETO AND SUBPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDING, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF.

SECTION 9.11.  <u>Separability of Provisions; Headings.</u>  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.  Section headings in this Agreement are included for convenience of reference only and shall not be given any substantive effect.

SECTION 9.12.  <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart to this Agreement by electronic transmission shall be as effective as delivery of a manually signed original. The words "execution," "execute", "signed", "signature" and words of like import in this Agreement shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the parties hereto, which shall be of the same legal effect, validity or enforceability as a manually executed signature to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act,  or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.13  <u>Survival</u>. Any indemnification or other protection provided to any Indemnitee pursuant to this Agreement or any Loan Document shall survive the termination of this Agreement and the payment in full of all other Obligations.

AMERICAS 108370031

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

**BOY SCOUTS OF AMERICA**

By: _____
Name:
Title:

**GUARANTOR**:

**ARROW WV, INC.**

By: _____
Name:
Title:

AMERICAS 108370031

**LENDER:**

**NATIONAL BOY SCOUTS OF AMERICA FOUNDATION**

By: _____
Name:
Title:

[Signature Page to BSA – Foundation Credit Agreement]