1

```
1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
2

3    IN RE:                        .  Chapter 11
                                   .  Case No. 20-10343 (LSS)
4    BOY SCOUTS OF AMERICA AND     .
     DELAWARE BSA, LLC,            .  (Jointly Administered)
5                                  .
                                   .  Courtroom 2
6                                  .  824 Market Street
               Debtors.           .  Wilmington, Delaware 19801
7                                  .
                                   .  Thursday, December 2, 2021
8    . . . . . . . . . . . . . . . .  10:00 a.m.

9                    TRANSCRIPT OF ZOOM HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10               CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:           Derek C. Abbott, Esquire
                                MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                              1201 North Market Street
                                16th Floor
14                              Wilmington, Delaware 19899

15                              -and-

16                              Jessica C. Lauria, Esquire
                                WHITE & CASE LLP
17                              1221 Avenue of the Americas
                                New York, New York 10020
18
     (APPEARANCES CONTINUED)
19
     Electronically
20   Recorded By:               LaCrisha Harden, ECRO

21   Transcription Service:     Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302) 654-8080
                                E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the Baltimore Area
   Council Boy Scouts
3  of America, Inc.:           Todd M. Brooks, Esquire
                               WHITEFORD, TAYLOR & PRESTON, LLP
4                              7 Saint Paul Street
                               Baltimore, Maryland 21202
5
   For the Cradle of
6  Liberty Council of the
   Boy Scouts of America:      Jeffrey A. Lutsky, Esquire
7                              STRADLEY RONON STEVENS & YOUNG, LLP
                               2005 Market Street
8                              Suite 2600
                               Philadelphia, Pennsylvania 19103
9
   For the National
10 Capital Area Council:       Kevin G. Collins, Esquire
                               BARNES & THORNBURG, LLP
11                             1000 North West Street
                               Suite 1500
12                             Wilmington, Delaware 19801

13 For American Zurich
   Insurance Company:          Kelly T. Currie, Esquire
14                             CROWELL & MORING, LLP
                               590 Madison Avenue
15                             20th Floor
                               New York, New York 10022
16
                               Mark D. Plevin, Esquire
17                             Three Embarcadero Center
                               26th Floor
18                             San Francisco, California 94111

19 For Century Indemnity
   Company:                    Tancred Schiavoni, Esquire
20                             O'MELVENY & MYERS, LLP
                               Times Square Tower
21                             7 Times Square
                               New York, New York 10036
22
   For Eisenberg,
23 Rothweiler, Winkler,
   Eisenberg & Jeck, PC:       Daniel K. Hogan, Esquire
24                             HOGAN MCDANIEL
                               1311 Delaware Avenue
25                             Wilmington, Delaware 19806

```
 1   APPEARANCES (CONTINUED):

 2   For the Tort
     Claimants' Committee:      Richard M. Pachulski, Esquire
 3                              PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Boulevard
 4                              13th Floor
                                Los Angeles, California 90067
 5
     For Timothy Kosnoff,
 6   Interested Party:          David E. Wilks, Esquire
                                WILKS LUKOFF & BRACEGIRDLE, LLC
 7                              4250 Lancaster Pike
                                Suite 200
 8                              Wilmington, Delaware 19806

 9   For The Zalkin Law
     Firm, PC, and Pfau
10   Cochran Vertetis
     Amala, PLLC:               Thomas E. Patterson, Esquire
11                              KTBS LAW, LLP
                                1801 Century Park East
12                              26th Floor
                                Los Angeles, California 90067
13
     For the Coalition of
14   Abused Scouts for
     Justice:                   David J. Molton, Esquire
15                              D. Cameron, Moxley, Esquire
                                BROWN RUDNICK, LLP
16                              Seven Times Square
                                New York, New York 10036
17
     For the Roman Catholic
18   and United Methodist
     Ad Hoc Committee:          Jeremy W. Ryan, Esquire
19                              POTTER ANDERSON & CORROON, LLP
                                1313 North Market Street
20                              6th Floor
                                Wilmington, Delaware 19801
21

22   For AVA Law Group, Inc:    Joseph Grey, Esquire
                                CROSS & SIMON, LLC
23                              1105 North Market Street
                                Suite 901
24                              Wilmington, Delaware 19801

25
```

1   APPEARANCES (CONTINUED):

2   For AVA Law Group, Inc:    Joseph Grey, Esquire
                               CROSS & SIMON, LLC
3                              1105 North Market Street
                               Suite 901
4                              Wilmington, Delaware 19801

5   For Marc J. Bern &
    Partners:                  William D. Sullivan, Esquire
6                              SULLIVAN HAZELTINE ALLINSON, LLC
                               919 North Market Street
7                              Suite 420
                               Wilmington, Delaware 19801
8
    For the Ad Hoc
9   Committee of Local
    Councils of the Boy
10  Scouts of America:         Joseph C. Celentino, Esquire
                               WACHTELL, LIPTON, ROSEN & KATZ
11                             51 West 52nd Street
                               New York, New York 10019
12
    For National Capital
13  Area Council:              Adeyemi O. Adenrele, Esquire
                               BARNES & THORNBURG, LLP
14                             1717 Pennsylvania Avenue, NW
                               Suite 500
15                             Washington, DC 20006

16  For Slater Slater
    Schulman, LLP:             Justin R. Alberto, Esquire
17                             COLE SCHOTZ, P.C.
                               500 Delaware Avenue
18                             Suite 1410
                               Wilmington, Delaware 19801
19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 1:   Motion of Marc J. Bern & Partners LLC to         19
4              Quash Subpoena to Produce Documents Issued
               to KLS Legal Solutions LLC
5              (D.I. 6380, filed 9/27/21).

6    Agenda
     Item 2:   Letter to the Honorable Chief Judge Laurie        20
7              Selber Silverstein from Tancred Schiavoni
               Seeking an Order Compelling Baltimore Area
8              Council to Comply with a Subpoena
               (D.I. 7261, filed 11/16/21).
9
               Court's Ruling:                                   51
10
     Agenda
11   Item 3:   Letter to the Honorable Chief Judge Laurie        54
               Selber Silverstein from Tancred Schiavoni
12             Seeking an Order Compelling Cradle of Liberty
               Council to Comply with a Subpoena
13             (D.I. 7263, filed 11/17/21).

14             Court's Ruling:                                   61

15   Agenda
     Item 4:   Letter to the Honorable Chief Judge Laurie        62
16             Selber Silverstein from Tancred Schiavoni
               Moving to Compel the Compliance of the
17             National Capital Area Council with Century's
               Subpoena (D.I. 7384, filed 11/21/21).
18
               Court's Ruling:                                   67
19
     Agenda
20   Item 5:   Letter to the Honorable Chief Judge Laurie        68
               Selber Silverstein from Justin R. Alberto
21             Regarding Motion to Quash the Deposition
               Subpoenas Served on Slater Slater Schulman
22             LLP (D.I. 7465, filed 11/26/21).

23             Court's Ruling:                                   69

24

25

1                                    INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 6:   Letter to the Honorable Chief Judge Laurie       68
4              Selber Silverstein from Daniel K. Hogan
               Regarding Motion to Quash Deposition Subpoenas
5              Served On Eisenberg, Rothweiler, Winkler,
               Eisenberg and Jeck, P.C.
6              (D.I. 7466, Filed 11/26/21)

7              Court's Ruling:                                   69

8    Transcriptionist's Certificate                             124

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:06 a.m.)

2          THE COURT:  Good morning.  This is Judge

3  Silverstein.  We're here in the Boy Scouts of America

4  bankruptcy, Case 20-10343.

5          Mr. Abbott.

6          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

7  of Morris Nichols here for the debtors.

8          Your Honor, I just wanted to make sure.  We filed

9  this morning a second amended agenda.  I wanted to make sure

10 the Court had that.

11         THE COURT:  I do.

12         MR. ABBOTT:  Thank you.

13         Your Honor, again, I'll turn the podium over to

14 Ms. Lauria for a quick update on a couple of issues.

15         THE COURT:  Ms. Lauria.

16         MS. LAURIA:  Thank you, Your Honor.  Jessica

17 Lauria, White & Case for the debtors.  Just a few quick

18 issues that we wanted to bring to the Court's attention this

19 morning.

20         The first is, as I reported on Monday, mediation

21 has continued; in fact, we were mediating until midnight last

22 night.  And the mediators have requested that certain parties

23 appear in front of them in person next Monday and Tuesday.

24 So, rest assured, we are continuing to work to take issues

25 off of your table and deal with them outside of the

1  courtroom, to the extent we're able to.

2         The second issue that I wanted to mention to the

3  Court is, as we discussed on Monday, the debtors were looking

4  at potentially moving the voting deadline.  But as I pointed

5  out then, we still need to maintain our time line, and there

6  are a number of dates and deadlines that are dependent upon

7  the voting deadline.

8         We had discussions with Omni.  Omni has, again,

9  confirmed that they do need 7 calendar days to do a

10  preliminary, unaudited voting report and 20 calendar days to

11  do an audited voting report.

12         We took a look at the calendar, and what we could

13  do, Your Honor, is move the voting deadline out by two

14  weeks -- which I think was also what was proposed as an

15  initial matter in the TCC's motion that was filed -- move the

16  voting deadline to December 28th.  For the seven-day time

17  period for the preliminary voting report, that would come in

18  January 4th.

19         Right now, the objection deadline is January 7th

20  to the plan, and so parties would have the benefit of the

21  preliminary voting report, in order for them to formulate

22  their objections and file those objections.  And as I

23  indicated on Monday, the debtors will start again providing

24  the preliminary results to parties on a confidential basis.

25  And most of those parties are folks that could potentially

1  file objections to the plan.

2          So we could do a preliminary report on

3  January 4th, with the objection deadline on the 7th, and then

4  the final tabulation, the audited version, on January 17th.

5          So we wanted to raise that with the Court and the

6  parties this morning.  We have -- I previewed this for the

7  Office of the United States Trustee, but I know this was

8  something that the parties were very interested in, I think

9  on all sides, and wanted to, again, bring it to the Court's

10 attention this morning, to see -- to get some guidance.

11         Let me ask this question:  How many survivors have

12 voted?  I don't want the breakdown, I just want that total

13 number.

14         MS. LAURIA:  Sure, Your Honor.  So the data that I

15 have is as of the Wednesday before Thanksgiving, and it's

16 still a little bit of a lag.  But I believe, around that

17 Wednesday, 4,300 survivors had voted.

18         THE COURT:  Okay.

19         MS. LAURIA:  And I'm sure it won't come as a

20 surprise to the Court, but a lot of people vote at the last

21 minute, so we're expecting a large rush there as we get

22 closer to the voting deadline.

23         THE COURT:  Okay.  Well, let me hear if there's

24 any opposition to the debtors' suggestion.

25         Mr. Schiavoni.

1        (No verbal response)

2              THE COURT:  You're muted.

3              MR. SCHIAVONI:  I'm sorry Your Honor, Tanc

4    Schiavoni for Century.  I have a question, not opposition.

5              It just -- it wasn't clear to me the -- Ms. Lauria

6    said something about advising parties confidentially of the

7    status of the vote.  Who would be advised and when?  I

8    just -- like, in connection with this.  If she could provide

9    some clarification on that, that would be helpful.

10             THE COURT:  Ms. Lauria.

11             MS. LAURIA:  Yes, Your Honor.

12             Prior to the TCC/Kosnoff communication, the

13   debtors had been distributing, on each Friday after the

14   solicitation had been launched, a preliminary voting update.

15   That update went to parties that are under the protective

16   order.  So I believe Mr. Schiavoni would have received that,

17   as well as the other insurers.  The TCC would have received

18   that, the UCC would have received that, and I believe a few

19   of the chartered orgs may have received that.  But it was

20   provided to parties pursuant to the protective order on a

21   highly confidential basis.

22             We discontinued that practice around two weeks

23   ago, just while we were letting the dust settle on the

24   Kosnoff situation.  On Monday, I indicated to the Court that

25   we would start the practice again, again, subject to the

1   highly confidential designation under the protective order,

2   we would be providing summary-level detail each Friday, as we

3   lead up to the voting deadline and receiving the report, the

4   final report; and that, with respect to how individual

5   survivors voted, we would only be providing that data to

6   individuals that were attorneys for those particular

7   survivors.  So that's the preliminary report, the weekly

8   preliminary report that I was referring to.

9           MR. PACHULSKI:  Your Honor, if I may comment?

10          THE COURT:  Mr. Pachulski.

11          MR. PACHULSKI:  Thank you, Your Honor.  Richard

12  Pachulski of Pachulski, Stang, Ziehl & Jones, on behalf of

13  the TCC.

14          I think I would at least like to go back to my

15  client.  I'm not sure of the context because we are prepared

16  to file the modified motion.  But our client was pretty clear

17  to us that they would like the voting deadline to stay in

18  place, unless it got continued because of our request.  So

19  Ms. Lauria hasn't given us the context, and so I'd like to

20  speak to our clients about it because the voting deadline is

21  an issue that the TCC is very focused on.

22          But to be frank, Your Honor, I'm a little

23  surprised because Ms. Lauria fought the issue and stated how

24  difficult it would be to move the voting deadline and,

25  without knowing it, now she's saying I want to move it.  So

1  I'm a little perplexed, to be frank, and would at least like

2  to understand the context because it was a very specific

3  context that we had asked for, and it had been clearly

4  fought.  We thought -- didn't think it would be that

5  controversial when we first started this process.  I was

6  wrong in my foray into this manner, into the case.  So I

7  would at least like the opportunity to speak to my client and

8  take a position, unless I can understand why suddenly we're

9  moving it, but there's no agreement to send a joint letter.

10          THE COURT:  I think it has nothing to do with

11  that.  My recollection is Ms. Lauria said at a previous

12  hearing that she anticipated some further settlements coming

13  out of the mediation, and it would give the survivors an

14  opportunity to evaluate those, as well, in connection with

15  their vote, which is why I asked the question as to how many

16  survivors had already voted.  Am I remembering --

17          MR. PACHULSKI:  Yeah.  No --

18          THE COURT:  -- correctly --

19          MR. PACHULSKI:  -- Your Honor, I --

20          THE COURT:  -- Ms. Lauria?

21          MS. LAURIA:  Thank you, Your Honor.

22          That is what I indicated.  On Monday, when we were

23  before the Court with respect to the status on the ombudsman

24  motion, as I indicated to the Court at that time, there were

25  two forms of relief the motion was seeking:  One was the

1 appointment of the ombudsman, the second was the moving of

2 the voting deadline.

3          As I explained at that point in time, it wasn't

4 just as easy as simply moving the voting deadline.  I think I

5 was very clear that the debtors needed to speak with Omni

6 further about whether the voting deadline could be moved in

7 light of the interdependence of the dates in this case.  And

8 I indicated on Monday that I would report back to the Court

9 today as to how those conversations went.

10          We understood that the TCC wanted the voting

11 deadline moved, that was specifically asked for in their

12 motion, understanding that they withdrew the ombudsman

13 portion.  And from the debtors' perspective, we also thought

14 that there might be some logic to moving the deadline in

15 light of the continued mediation sessions and what we believe

16 is a strong possibility for further settlements.

17          So I, too am surprised to hear Mr. Pachulski say

18 that he has to check with his client because I thought -- and

19 I think I was very clear on the record on Monday -- that,

20 while it was complicated, we were willing to go back to the

21 solicitation agent, have those discussions, and report today.

22          THE COURT:  Okay.

23          MR. PACHULSKI:  Your Honor, ultimately -- I'm

24 sorry, Your Honor.

25          THE COURT:  I'll let the parties talk, and let's

1  see.

2              Is there anyone else who has anything to say about

3  this issue?

4              Mr. Ryan.

5              MR. RYAN:  Your Honor, I just wanted -- I wasn't

6  sure that I followed it completely.  I just wanted to

7  understand if this was for all voting classes or just the

8  personal injury survivor voting class.  That was -- I'd just

9  ask for that clarification.

10             THE COURT:  It would have to be for everyone.

11             MR. RYAN:  Thank you.

12             THE COURT:  Mr. Patterson.

13             MR. PATTERSON:  Your Honor, just a point of

14  clarification.  Could I ask Ms. Lauria to repeat the entire

15  schedule of dates that she recounted?

16             THE COURT:  Yes.

17             Ms. Lauria.

18             MS. LAURIA:  Yes.  Thank you, Your Honor.

19             So the proposal that we think is workable, based

20  on our discussions with the voting agent, would be a new

21  voting deadline of December 28th at 4 p.m., so that's moving

22  the voting deadline out by two weeks.

23             A preliminary voting report would be filed on the

24  docket, so this is in addition to the weekly reports that the

25  parties are getting under the protective order.  But the

1  preliminary voting report would be filed on the docket on

2  January 4th.

3          The objection deadline for the plan would remain

4  the same as it is in the current order, which is January 7th.

5          The final audited voting report would be filed on

6  the docket on January 17th.  January 17th is also -- and this

7  is already in the solicitation procedures order, so not a

8  change.  January 17th is also the confirmation brief/plan

9  support reply deadline, so we would be filing our brief on

10  that day, as well.

11          And then the confirmation hearing would start,

12  again, one week later, on January 24th.

13          (Pause)

14          THE COURT:  Ms. Lauria, as I'm hearing it again, I

15  do have a concern; in that, in another case I have, the --

16  there were significant differences between the preliminary

17  voting report and the final voting report.  And I don't

18  necessarily anticipate that again, but I don't know what I'm

19  going to see.  And to the extent that there could be a

20  significant difference, parties aren't going to know that

21  until after the objection deadline and after -- and very

22  close to confirmation.  And even the time period -- I don't

23  know if the 4th and the 7th are a Friday and a Monday.  But

24  even the time now for the preliminary voting report and the

25  plan objection deadline are three days apart.

1          MS. LAURIA:  Yes, Your Honor.  And Your Honor, we

2   understand that.  We've had extensive discussions with Omni.

3   And just given the volume of solicitation, we just can't

4   tighten it up any more than we already have.

5          I think, frankly, based on our discussions with

6   them, turning out a preliminary, to-be-filed report in 7 days

7   is aggressive.  Turning out an audited final report in 20

8   days is aggressive.  We did push on those time lines.

9          So completely understand Your Honor's perspective.

10  We just wanted to explore that for the Court and for parties.

11  And again, that's why, candidly, we set the solicitation

12  deadline when we set it to begin with, to accommodate that

13  time period.

14          THE COURT:  Mr. Plevin.

15          MR. PLEVIN:  Thank you, Your Honor.

16          I had a question, a comment, and a suggestion.

17  The question is one that Mr. Patterson already asked, which

18  was to get the schedule restated.

19          The comments it that the solicitation procedures

20  order at Docket Number 6528 does, as Ms. Lauria said, provide

21  that the plan objection deadline is January 7.  But there's a

22  footnote saying that the debtors and the participating

23  parties have agreed that the deadline -- excuse me -- for

24  participating parties to file plan objections will be

25  extended until January 10th.

1          THE COURT:  I see that.

2          MR. PLEVIN:  And I just wanted that to be clear,

3  that we are treating January 10 as the deadline and not

4  January 7th.

5          And the suggestion was that, given that this is

6  the first we're hearing about the schedule -- and I believe

7  we're back in court on Monday -- is that perhaps we could

8  have until that court hearing to -- as Mr. Pachulski

9  suggested that he wanted to do with his client, for the other

10 parties to get together with themselves and their clients and

11 possibly with the debtors and see if we could talk about this

12 change and any other changes that might be appropriate.

13         THE COURT:  Thank you.

14         Mr. Patterson.

15         MR. PATTERSON:  Your Honor, I think Mr. Plevin's

16 suggestion is a good one, and we're happy to work with the

17 parties on this.

18         Our issue is, as the Court will recall, that we

19 wanted to ensure that there was ample time to test some

20 aspects of the voting tabulation, especially as it related to

21 whether those claimants who voted in favor did or didn't have

22 claims against various councils and charters.  And that is

23 going to be -- that was going to be a crush as it was set up,

24 but one that we were prepared to endure, to be able to

25 provide the Court with all the information we thought was

1  relevant to confirmation.  But this obviously doesn't

2  function at all with regard to those issues.

3          THE COURT:  Okay.  And that's a fair comment.

4          So I think there -- I'll permit the parties to

5  talk and we'll address this on Monday.

6          MS. LAURIA:  And Your Honor --

7          THE COURT:  What --

8          MS. LAURIA:  -- we can -- the debtor is happy to

9  arrange for a meet-and-confer for interested parties to talk

10  about the deadlines.

11          THE COURT:  Let's do that, with the recognition

12  that of course these deadlines have been in place and people

13  have been working toward them and counting on them, to some

14  degree, to be able to explore and then file any objections

15  they may have.  So I'll let the parties talk, we'll revisit

16  it.

17          And there is no way in which I think that Omni

18  should be crunched at all.  This is an important --

19  obviously, an important function that they serve, and they

20  need the time to ensure that they are accurately recording

21  the vote and reflecting it accurately in their reports.

22          Mr. Molton?

23          MR. MOLTON:  Thank you, Your Honor.  Can you hear

24  me?

25          THE COURT:  I can.

1            MR. MOLTON:  Good.  Thank you.  David Molton of

2   Brown Rudnick for the Coalition of Abused Scouts for Justice,

3   Your Honor.

4            I just want to say that we have no objection to

5   Ms. Lauria's statements today and the extension of the voting

6   deadline by the two-week period and look forward to working

7   with the parties to make sure that the deadlines and all the

8   other logistical matters work in connection with that.

9            THE COURT:  Thank you.  Okay.

10           Then let's get to the agenda.

11           MR. ABBOTT:  Thank you, Your Honor.  Derek Abbot,

12  again, Morris Nichols, for the debtors.

13           Your Honor, we understand that Agenda Item 1 has

14  been agreed between Century and the respondents to be put

15  over to the hearing for Monday.  I'm not sure if parties want

16  to confirm that or comment on it, but I understand that that

17  will not be going forward today.

18           MR. SULLIVAN:  Your Honor, Bill Sullivan on behalf

19  of Marc Bern.

20           That's correct.  We -- all parties conferred

21  yesterday and agreed to move this to Monday.

22           THE COURT:  Okay.

23           MR. SULLIVAN:  I just don't know the time of the

24  hearing scheduled for Monday.

25           THE COURT:  I think it was 11:00 but let me check.

1  Yes, eleven o'clock.

2          MR. SULLIVAN:  Okay.  Thank you.

3          THE COURT:  Okay.

4          MR. ABBOTT:  Thank you, Your Honor.  That leads us

5  to Agenda Item Number 2, Docket Item 7261, the Century letter

6  seeking to compel the Baltimore Area Council that we've

7  discussed a number of times previously.  We understand that

8  will go forward, so I'll cede the podium to counsel to

9  Century, Your Honor.

10          THE COURT:  Thank you.

11          MR. SCHIAVONI:  Your Honor, thank you.  Tancred

12  Schiavoni for Century.

13          Your Honor, we've spent a significant amount of

14  time trying to resolve this dispute, as well as two others.

15  I want to address these sort of on a big picture level of

16  what we were seeking and what the core problem is and why

17  it's relevant, why it's important to the case.

18          So we issued subpoenas to sort of, not necessarily

19  a sample, but a specific set of the local councils, the

20  Baltimore Council was one of them.  What we found was that,

21  as a general matter, it looks like the local councils all

22  kind of, to some extent, were guided by coordinated

23  instructions on how to respond, or at least responded in

24  sim -- in an identical way on their -- on various big-picture

25  topics with regard to these.

1          There's three areas I want to talk about where

2   there's an issue:

3          One is we sought from the local councils documents

4   concerning the abuse claims that are asserted against them.

5   With regard to each of these local councils, what happened

6   was, as part of the proof of claim process, some of these

7   local councils had had no claims historically against them or

8   only a few, others had some history of claims.  But when the

9   proofs of claim came in, each one of them, all of a sudden,

10  had a little flood of such claims.

11          Baltimore had -- I don't have the specific number

12  in front of me, but I think it's 490 or somewhere in the 400

13  range, approximately, claims out of the blue asserted against

14  them in Baltimore.  Those proofs of claim were identified for

15  the local council by Boy Scouts national, and these lists

16  were provided to them, if not more, of those claims.  They

17  then made an assessment of those claims and they made an

18  offer to resolve those claims, a payment.  And in some

19  respects, that's what the confirmation hearing is going to be

20  about, about what is being paid for those claims, why, and

21  what they're worth.

22          We, of course, have the proofs of claim, and Your

23  Honor has heard from us in the past about the difficulty of

24  making an assessment of those claims based on the minimal

25  information in the claims.  So, you know, we have tried to

1  get at this in various ways, about the merits of these

2  claims.

3          So, in this -- and this is one of those ways to

4  get at the issue.  The abuse didn't happen at National, it

5  didn't happen in Dallas; it happened at the local level, at

6  the local council level.  So when the proofs of claim came in

7  and were sent out to the locals to look at, one would expect

8  that the local councils would review the claims, look to see

9  who the perpetrators were, who the claimants were; look to

10 try to identify were these claimants Boy Scouts in our local

11 council; were the perpetrators that are identified here, are

12 they still working in the local council, are they on our

13 board, are they current scout leaders; if they're former

14 scout leaders, are they still in the community; what do

15 people know here about these claims; do they have merit; do

16 we know some of these people.  There's a whole series of

17 questions one would think they would ask.

18          Then there's questions that we know they had to

19 ask and documents we know they had to generate.  The Boy

20 Scouts have put in place a very extensive youth protection

21 set of guidelines that has extensive documentation

22 requirements about it that require that, when they learn for

23 the first time that there was an alleged abuser in the local

24 counsel, they're supposed to fill out an incident report,

25 they're supposed to do a basis investigation, they're

1    supposed to crate other documents, all in connection with

2    ensuring the safety of the local council because, if there's

3    a serial pedophile that's been identified in the local

4    council, there's an obvious desire to sort of sort that out,

5    identify the person, and move on.  There's also a requirement

6    to basically assess whether or not the claims have some sort

7    of merit in connection with the decision that was being made

8    at the same time here about what to pay for these claims.

9           So we -- you know, we know that they had to

10   produce documents about the claims, and we know that common

11   sense said there would be all kinds of documents generated

12   when the news hit the ground at the local council that a

13   large number of people were claiming that they had been

14   abused and identifying specific individuals in -- not in

15   every case, in many, they don't identify anybody -- but

16   naming folks.  So we propounded I think seven or eight

17   requests for production, asking for a series of different

18   types of documents about abuse claims, what was known about

19   them, what was assessed about them, the specific youth

20   guidelines documents that were produced in connection with

21   them.

22          The Boy Scouts, separately, prior to this,

23   propounded a request on the local councils, but it was

24   different in nature.  They asked a very specific question,

25   and it goes back to the type of questions that were asked

1  when these claims were being handled in the tort system.

2  They sent out a spreadsheet to each of the local councils and

3  they asked could you please ident -- look up on your rosters

4  to see whether the claimant that has filed the proof of

5  claim, look to see whether he was -- who's saying that he was

6  a scout, see whether he, in fact, was a scout.  This was a

7  very basic sort of step in the process of verifying claims

8  that was done in the -- when the claims were in the tort

9  system.  You know, was this person, in fact, associated with

10  our local council, was he a scout in the first place, was the

11  perpetrator listed as a scout.  Those spreadsheets asked that

12  basic question.  They were filled out and they were sent back

13  to National -- or I think really Bates White, along with, if

14  there was a roster page that confirmed the fellow was a

15  scout, it was sent back.

16          The point here about this is twofold:

17          One is the request that Boy Scouts made was very

18  narrow and very different from ours.  They really asked to

19  confirm -- it's a key piece of information they were seeking,

20  but it was narrow.  They asked to confirm whether the fellow

21  was a scout.  Our requests are broader.  They are -- you

22  know, they ask for, you know, what documents do you have

23  concerning these 400 claimants who claim abuse in your local

24  council.  And again, one would expect that there would be --

25  that the local council would review these, generate some

1  inform -- documents about, you know, their assessment, there

2  would be checks run and assessments, both for the safety

3  requirements, but also in connection with the effort that was

4  taking place at the very same time to determine what should

5  pay -- what should be paid for them because they would have

6  the same questions we would have as an insurer.  How is it

7  that, out of the blue, this huge number of claims have come

8  in?  Is there merit behind these, is there not?  But you

9  would also have these safety issues.

10       So what is the response we've received as a

11  general matter?  The three councils that we have -- and

12  Baltimore is one of them -- objected to these requests.  They

13  objected on a variety of more or less boilerplate grounds and

14  then wrote us separately that, you know, whatever

15  documents -- you know, that the documents were given to Boy

16  Scouts with the spreadsheet.  So, in other words, they said

17  we turned over the spreadsheet to Bates White, go get it from

18  them, that these are documents that somebody else has, not

19  us.

20       In the first instance, Your Honor, our document

21  requests are significantly broader than this spreadsheet.  So

22  it's a sort of non-response to a very important question to

23  say go get the spreadsheets because, yes, we have the

24  spreadsheets and, you know, we did go look in -- you know, in

25  a needle-in-a-haystack-type search, you know, where these

1    were, you know, produced in the Boy Scout thing.  In some

2    situations, we got Bates ranges.

3           But the documents we sought, we weren't told by

4    Baltimore that, oh, yeah, we collected a whole series of

5    emails, incident reports, other documents about what went on,

6    on the ground, to investigate these claims.  No.  It's like

7    and we turned them over.  No, that's not what it's about.

8    It's like they turned over the spreadsheets.  It's totally

9    different than the broader request that we have.

10          So we said, well, what about those documents.  And

11   those documents have not been produced.  In various

12   instances, we've been told we don't think we have anything.

13   We've been told, well, anything about abuse we would destroy,

14   you know, if it was older abuse incidents, but we don't have

15   it.  We don't even know whether it was searched for.  We've

16   received letters that are all over the place on what's

17   happened here.

18          The only way we can really get to the bottom of

19   where these documents are -- now, look, I can't rule out that

20   it's possible that they received word that there were 490

21   claims and however many corresponding perpetrators asserted,

22   and no one in the local council did anything, that no one

23   looked at them, no one generated a single document about

24   them, nobody went to look these folks up.  It's possible.

25   Okay?  I don't think that's likely, but I can't rule it out

1  that it's possible.

2         But the only way we get to the bottom of what, in

3  fact, really exists is to have the objection struck and a

4  simple response put in:  We have no documents or we have done

5  a search and, you know, we're going to turn over what we

6  have.  But where we are now is we have these like endless

7  letters about meeting and conferring, but not really a clear

8  answer to a very simple question about a set of documents

9  that really should exist.

10         Now what did we get on the rosters?  And that's

11  important and it informs, I think, why we're asking this

12  question.  The spreadsheets that were filled out came back

13  with a kind of remarkable response, that the number of folks

14  in these three -- in the three councils that are up for today

15  that were confirmed to actually being scouts in those local

16  councils is less than 15 percent.  One of them is 3 percent,

17  the other one is 5, I think one of them is 8.  So the number

18  of confirmed scouts that are claimants here is extremely low.

19  That's a red flag for us.

20         In the tort system, when someone would allege

21  abuse, the very first thing national defense counsel would do

22  would be to contact the local council, ask Joe -- John Doe

23  has asserted that he was a scout and he was abused, was he,

24  in fact, a scout, and an answer would come back.  And you

25  know, it's not a definitive situation if the answer is no, we

1  don't have a record of him.  But it's at least something that

2  they -- it would raise, right off, a red flag for further

3  inquiry.  So the numbers here are very low.

4        We've heard, by the way, all kinds of explanation

5  from that from National; that, oh, the records don't exist,

6  that, you know, they're spotty records.  But that's

7  specifically why, in this situation, the second category of

8  documents we asked for is important.

9        We've asked for, if -- to the extent you contend

10  that it's like one of these fellows you cannot identify as a

11  scout, could we please have the roster that corresponds to

12  that scout -- that scout's troop level at the time that

13  the -- of the abuse, so we can show that he's not listed

14  there.  Okay?  Or, alternatively, let us go through them

15  ourselves, so we can establish that on our end.  But we won't

16  be left with this sort of open-ended who knows really what

17  the situation is about why we're turning in such low

18  verification numbers when, again, in the defense of the

19  claims in the ordinary course, this was a very important

20  issue.  So the abuse claims are important, and to tie this

21  together to how it ties in the bigger scheme of things.

22        What you'll see going forward -- and we've talked

23  about this in the disclosure statement -- is that the

24  individual councils have paid an amount -- there's an amount

25  paid -- you know, associated with each one of them.  We're

1  not here to tell you it's too high or too low, you know,

2  today.  But it's like what -- the issue that stands out about

3  it is the numbers, when one looks at what the SIRs were and

4  the deductibles, we made the point that like the claim

5  substantially would fall within those, that they were really

6  negotiating with their own money.  And the money that they

7  were paying is they're paying amounts that correspond to the

8  belief at the local council that the claims, as a general

9  matter, don't have a high level of merit.  The numbers,

10  that's how they correspond to the SIRs and deductibles on

11  what the payout is.

12        That's not, of course, how the TDPs work.  And you

13  know, our view is that, basically, when they were negotiating

14  with their own money, they were negotiating on what they

15  really felt these claims were worth and the TDPs reflect

16  something different.  But in order to get at that, we would

17  need whatever claims information there is.

18        And at the local council level, they didn't even

19  review the claims and they didn't generate a single document?

20  That's informative of something.  But we ought to have

21  definitive -- something definitive to show Your Honor on that

22  at confirmation, and it ought to be a response to a document

23  request that says we have no documents or we have produced

24  whatever documents we have, not a paragraph-long objection

25  that ends saying we're not producing any documents, and then

1  a series of letters saying here's some documents we're

2  voluntarily producing.

3         What's the third category of documents?  It's four

4  categories, Judge, so it's not -- and I appreciate the

5  patience in listening to me.  But let me -- there's only two

6  more left.  Okay?

7         The third category of documents go to the issue of

8  the local council contribution.  Again, what we were told

9  here is go see Alvarez & Marsal and, you know, their

10 production and/or the Boy Scout production because -- and/or

11 the Ad Hoc Committee of Local Councils because we came up

12 with some sort of formula, it was done at that level, it was

13 sent around, and whatever documents we had we've turned over

14 to them to produce to you, go find them from them.

15        They did produce documents about an allocation

16 formula.  You will hear, no doubt, from an expert who's

17 operating that formula and whatnot at confirmation.  But we

18 served the subpoenas on a selection of local councils to find

19 out what was happening at the local council level, after all.

20 All right?  And it shouldn't be that the local councils can,

21 again, you know, immunize themselves from having to produce

22 any documents by pointing to a narrower set of documents that

23 were just in the possession of an expert or the ad hoc

24 committee.

25        Yes, we have that formula, yes, you'll hear about

1  it.  But it's simply implausible to think that that, at the

2  local council level, when they got the request, they didn't

3  generate some documents indicating how they were analyzing

4  the claims, how they were analyzing the valuation for them,

5  how they were assessing them.

6          And again, we think that's, you know, extremely

7  important for confirmation because the way -- the values they

8  came up with, you know, are indicative, we think, of a

9  different valuation than what the TDPs have, and those

10 documents simply haven't been produced.  Yes, there's an

11 alternative collection, a narrower set of requests that they

12 would prefer that we, you know, limit ourselves to, and

13 that's strictly what this formula says and how it applies.

14          We have been told, by the way, that the formula

15 came -- you know, was generated by the ad hoc committee, and

16 that, when it was circulated, everyone was told there's no

17 negotiation, just pay.  It's possible, it's possible that

18 that edict came down from the Wachtell firm and everyone just

19 followed it.  I can't rule that out.  But if that's the

20 situation, again, we ought to just have a clean response that

21 says, you know, no objections, you know, there are no

22 documents, besides the method -- besides the formula that

23 came down.  That's not what we have.  And I don't think

24 common sense really like suggests to anybody that, you know,

25 a number -- a set of numbers come down, and that's that,

1  because the numbers had to be built from ground up from what

2  was known at the council level about the claim.

3          So, again, on this set of requests, what -- our

4  requests were broader than just simply asking for the formula

5  that came down from the ad hoc committee and its consultants.

6  It was what documents do you have at the local level on this

7  issue to be produced.

8          The last here is really on -- is really the board

9  minutes.  There's different levels of compliance on the three

10  local councils that are before you today on motions on the

11  board minutes.  Some of have produced, you know, it seems

12  like, you know, a full set of them, others have -- like are

13  in a completely different category.

14          What you saw during the RSA hearing was these are

15  organizations that have -- are very regimented in how they're

16  ordered, that they have these various committees that meet

17  very periodically and there's this whole enormous sort of

18  compulsive collection of minutes on things.  We don't have,

19  from all three of these, minutes on the bankruptcy

20  presentations.  We have them from some, but not from others.

21          And again, this is one where we just got

22  objections across the board, and then letters sort of saying,

23  well, we'll give you this, we'll give you that, but there's

24  no clarity.

25          So our request here, with respect to these folks,

1  is that, for these four topics:  The abuse claims, the local

2  council contribution documents, the board minutes, and the

3  rosters, that the objections either be stricken, so that it's

4  clear that the documents -- it's like whatever documents they

5  have -- or that they be ordered just to amend the pleading to

6  provide a clear statement that we have no documents in this

7  category, if that's the situation.  And I think that would

8  really sort of smoke things out on whether there really are

9  documents here or not; and, if there aren't documents, that

10 we'll have something that we can rely upon to show that they

11 generated nothing in this particular category.

12        The other thing we'd ask for is a witness from

13 each of these three to offer testimony on these three topics,

14 what they did on the abuse claims to look into them and how

15 they evaluated their contributions.

16        And with that, Your Honor, I appreciate you

17 listening to me.  You know, in some respects, the argument is

18 topically the same for the three different councils, if that

19 helps Your Honor structure how you want to hear from -- hear

20 on this.  You know, there are variations on compliance, but

21 the same problem on compliance runs through them all, and

22 that is I -- nobody can really tell whether it's complete

23 unless we have like a straightforward answer in the pleading

24 that says we have no documents in this category or not.

25 Thank you, Your Honor.

1          THE COURT:  Thank you.  And -- no, I'm going to

2  ask that.

3          Let me hear from the Baltimore Council.

4          MR. BROOKS:  Thank you, Your Honor.  Can you hear

5  me?

6          THE COURT:  Mr. Brooks.

7          MR. BROOKS:  Todd Brooks, Whiteford, Taylor &

8  Preston on behalf of the Baltimore Area Council.

9          Your Honor, I'll be much more brief.  And

10  actually, Century's presentation just now is part and parcel

11  of the reason we're here today.  You instructed us, two

12  Mondays ago, on November 23 -- actually, that was a

13  Tuesday -- to discuss further, to see if we could resolve or

14  at least narrow specific document requests.  That's exactly

15  what we spent the last nine days trying to do, and I didn't

16  hear a single document request presented at this presentation

17  just now.

18          We are here today because Century refuses to

19  withdraw its objection -- I'm sorry -- its motion.  We're

20  here today because, weeks ago, Century decided that, if it

21  refused to acknowledge that there are no remaining legitimate

22  disputes between us, it would have a hearing today, and it

23  could just talk about local councils generally, talk about

24  whatever it wants.

25          We have reached a resolution on all outstanding

1   disputes with Century.  We met and conferred with them a few

2   days ago, on November 26th.  We talked about a few categories

3   of documents, not specific document requests, but a few

4   categories.

5           And in my supplemental declaration, which is at

6   Docket Number 7469, I have identified the five document

7   requests that are at issue.  They are the five document

8   requests that we spoke about on the 26th.  I'm not surprised

9   at all to hear Century now talking about different material.

10          I'm not going to complain any further about

11  Century's approach to this matter.  But on Page 5 of my

12  supplemental declaration, we have included a chart that shows

13  how chaotic and unproductive this has been.  No one should

14  have to go through what we have gone through in the last

15  three weeks.

16          We have five document requests at issue, and I'm

17  going to walk through them right now.  They are so simple.

18  Century claims it has no clear answers.  Frankly, if someone

19  were to read my declaration, it's offensive to hear that we

20  haven't provided clear answers.

21          Request Number 33, the first of five document

22  requests at issue, incident reports.  Century has heard me

23  say it, Century has a writing from me.  We have no responsive

24  documents.

25          Request 34, rosters.  I want to start by

1  commenting that rosters and Request Number 34, Century did

2  not move to compel, and it's now one of the four things that

3  Century wants to talk about at a hearing on a motion to

4  compel.

5          But in any event, the Baltimore Council produced

6  731 files, each of them containing one or more rosters, most

7  of them containing more than one roster.  We have produced

8  thousands of rosters.  Beyond that, we have since learned

9  that -- I believe it was on November 13 before Century moved

10  to compel -- the Boy Scouts also produced those same rosters

11  to Century.

12          So bottom line for Request Number 34, the rosters,

13  we have produced all of the rosters that Century sought in

14  Request Number 34.  And to the extent Century wants to re-

15  request Number 34 a different way now, I don't know what to

16  say about that.  But we have made a production of 731 files.

17          THE COURT:  And Mr. Brooks, were those made to

18  Century, that production made --

19          MR. BROOKS:  Absolutely.  Twice, one time before

20  they moved to compel.

21          But you know, Century will say we haven't provided

22  clear explanations.  I -- all I can point the Court to is my

23  supplemental declaration and maybe the declaration before

24  that.  We could not be clearer.

25          Request Number 18, 19, and 28 are the three

1   remaining of the five document requests at issue, Your Honor,

2   and they go to the contribution formula.  And again, the

3   problem here is Century is not listening.  Century didn't

4   care to listen, it wanted a hearing today.

5         The Baltimore Council did not create a

6   contribution formula.  It did not calculate what it would --

7   what it would contribute to this case for the benefit of

8   survivors and to give scouting an opportunity to survive.  It

9   did not determine what it would contribute.  The Ad Hoc

10  Committee of Local Councils, a mediation party, apparently

11  worked with a group to come up with an aggregate local

12  council contribution number.  My understanding is it's a half

13  a billion dollars.  And the ad hoc committee created a

14  formula that calculates what each local council is asked to

15  contribute toward that aggregate half a billion dollars.  We

16  received the formula.  We were asked one thing:  To express

17  our intent to make the specific contribution that was asked

18  of us.  The disclosure statement materials, the plan

19  materials identify that number, and we have expressed our

20  intent to make that number.

21         So, at the end of the day, with Request Number 18,

22  19, and 28, we have no responsive documents because all of

23  those materials are things that the Ad Hoc Committee of Local

24  Councils created and put together.

25         Beyond that, Century has every single one of the

1 documents responsive to 18, 19, and 28.  And in my

2 supplemental declaration, Your Honor, there is an email that

3 I sent, and I believe I marked it as Exhibit C, which is

4 7469-1.  It's an email chain over the Thanksgiving break.

5 And on pages -- ECF Pages 6 to 7, I identified for Century

6 where it could find, in documents produced to Century that we

7 do not have, where all of the material it is seeking can be

8 found.

9        It really is this simple, Your Honor.  There is no

10 legitimate remaining dispute.  We are here today because

11 Century refuses to withdraw its motion.  It refuses to

12 withdraw its motion because it wanted to be here today to

13 talk about the things that Century's counsel talked about

14 before I just spoke.  That's the only reason we're here.

15 There's no legitimate remaining dispute about anything.

16        And so I'm happy to answer any questions the Court

17 has.  But we would ask that the Court deny Century's letter

18 motion at 7261.  Thank you.

19        THE COURT:  Thank you.

20        Has the council been noticed for a deposition?

21        MR. BROOKS:  No, Your Honor.

22        THE COURT:  All right.

23        MR. BROOKS:  And Your Honor, if I -- well, no, we

24 have not.

25        MR. CELENTINO:  Your Honor, this is Joe Celentino.

1   May I be heard briefly on that last point.  I --

2              THE COURT:  Which last point?

3              MR. CELENTINO:  The notice of deposition.

4              THE COURT:  Mr. Celentino, I'm sorry.  I forget

5   who you represent.

6              MR. CELENTINO:  I represent the Ad Hoc Committee

7   of Local Councils.

8              THE COURT:  Okay.

9              MR. CELENTINO:  Just one fact that you should

10  know, Your Honor, is that the Ad Hoc Committee of Local

11  Councils has been noticed for a deposition by Century,

12  including on the formula.  That deposition took place on the

13  30th of November.  Century received significant advance

14  notice of that date, they received our notice from us.  We

15  called them at the beginning of the deposition.

16              Mr. Stamoulis, who's on the line, did not answer.

17  We emailed them, asked them if they would attend the

18  deposition.  They then sent someone to attend the deposition.

19  We asked that attendee if they had any questions for the

20  witness; the attendee said -- did not have any questions.

21              I know that Mr. Schiavoni has not actually

22  reviewed the production that the ad hoc committee made

23  because his characterizations of what is in it and what is

24  not in it are inaccurate.  And I received an email from

25  Mr. Stamoulis two days before the deposition, asking us to

1  resend them the production, so I know they couldn't have

2  reviewed it before that date.

3          I will just say that, to the extent that Century

4  is attempting to characterize the councils or the ad hoc

5  committee as not having responded fully and Century as not

6  being in possession of any relevant documents, we very much

7  disagree with that.

8          We also -- this probably goes without saying, Your

9  Honor, but we disagree with a lot of the broad statements

10 that Century made at the beginning of this hearing.  But

11 obviously, those aren't in front of you today, so, without --

12 I have nothing further at this time.

13         THE COURT:  Okay.  Thank you.

14         Mr. Schiavoni, I'm looking at the supplemental

15 declaration that was filed by Mr. Brooks and the five

16 document requests that were at issue.  And what's lacking in

17 this response?

18         MR. SCHIAVONI:  Your Honor, the abuse documents

19 that were requested were not limited just to incident

20 reports.  They were -- we sought whatever documents they had

21 concerning the abuse claims through multiple different

22 requests.  If they didn't prepare incident reports, as they

23 were required to do by their own safety protocols, so be it.

24 I guess that's now in the record.  But it's they didn't

25 produce any documents about the abuse claims, nothing.

1            All right?  It's like -- it's that stark.  Okay?
2    It's like, yes, there's a formula coming down from the ad hoc
3    committee, but as far as hitting the local council 490
4    claims, there's nothing.  There's no emails, there's no
5    memos.  There's no, hey, did anybody know who Joe and Bill
6    were, they're listed here as scout leaders that were involved
7    in the abuse.  There's nothing.  There's no evidence that a
8    search was made.  I asked about this during the meet-and-
9    confer.  There's absolutely nothing.
10           So, you know, what you're hearing is a sort of
11   self-redefined list of what the requests were, and then a
12   self-serving sort of assertion that they've satisfied those.
13   They did not produce any documents about the abuse claims at
14   the local level, period.
15           And you know, whatever Wachtell had at its -- you
16   know, at its committee is really just a formula that comes
17   down.  It doesn't -- it's not -- it's like this is where the
18   abuse allegedly took place, these are the people who knew
19   the -- allegedly, the claimants.
20           As far as the rosters go, what they produced were
21   only -- it's like when I say they confirmed that five or six
22   percent of the claimants were scouts, those are the rosters
23   that they produced.  They didn't give us the rosters for the
24   other claimants that would show that the claimant wasn't part
25   of the count -- you know, that the claimant wasn't listed at

1 | that time for being in the -- in scouting, in that unit.

2 |          THE COURT:  Let me ask --

3 |          MR. SCHIAVONI:  On the --

4 |          THE COURT:  Let me --

5 |          MR. SCHIAVONI:  -- contribution --

6 |          THE COURT:  -- ask you --

7 |          MR. SCHIAVONI:  -- formula --

8 |          THE COURT:  -- this question.

9 |          MR. SCHIAVONI:  Yeah.

10 |          THE COURT:  Wait a second.  So I'm looking at the

11 | document requests.  Where in the document requests does it

12 | ask for any and all documents about the abuse -- about their

13 | evaluation of the proofs of claim or the allegations in the

14 | proofs of claim.  I see the requests for the incident

15 | reports.

16 |          MR. SCHIAVONI:  I'm sorry.  Stan, do you have

17 | that -- those request numbers in front of you?  My -- I'm

18 | just asking my colleague here.

19 |          UNIDENTIFIED:  Give me one second, Tanc, I'll get

20 | that.

21 |     (Pause)

22 |          THE COURT:  Okay.  I see 27.  Okay.  But I don't

23 | see that -- 27.

24 |     (Pause)

25 |          THE COURT:  So maybe it's Request 27.  But at

1  least according to the chart, that wasn't something that was

2  specifically addressed during the meet-and-confer or it was

3  abandoned at some point.

4        MR. SCHIAVONI:  We didn't abandon any of these.

5  They were all part of the requests, from beginning to end.

6        THE COURT:  Well, you had meet-and-confers to

7  narrow, right?  And at least according to Mr. Brooks, there

8  was a lot of narrowing.  Are you saying that that's not true?

9        MR. SCHIAVONI:  I'm saying that, on each one of

10  these goals, we said we need the abuse documents.  And on

11  each one of these goals, Mr. Brooks would come back and self-

12  narrow what the requests were.  But it's -- we never moved

13  off of we need the requests associated -- we need the

14  documents associated with the abuse claims.  It's what -- it

15  was fundamental to what the requests were about.  The same

16  with respect to the -- with the contribution formula.

17        MR. BROOKS:  Your Honor, if I may be heard.  This

18  is Todd Brooks.

19        MR. SCHIAVONI:  I mean, I spoke to him just last

20  week about this.

21        THE COURT:  Well, let me ask this question,

22  Mr. Brooks.  Are there any documents responsive to -- I guess

23  it's the second request, Number 27.

24        MR. BROOKS:  Right.  So I will get to that.  I'll

25  say, in the -- as I look for that, I will -- no, we

1 absolutely did not discuss this a few days ago on

2 November 26th.  We discussed rosters, the contribution

3 formula, and incident reports, period, end of story.

4           MR. SCHIAVONI:  (Indiscernible)

5           MR. BROOKS:  And this is that -- and this is

6 exactly why we are here today because, every time we speak

7 with Century, they change the goalposts, they move them.

8           Now, with 27, something that they have

9 abandoned -- and by the way, I think, for the record, this is

10 the second Number 27; there are two 27s.

11           THE COURT:  Yes.

12           MR. BROOKS:  I think we're talking about the

13 second one.  So we have produced all non-privileged documents

14 responsive to Request Number 27.

15           And beyond that, Your Honor, Century, in its

16 presentation at the outset, talked about these feedback

17 templates, and everything Century wants to know is in those

18 feedback templates.

19           THE COURT:  Well, there's a difference between

20 being able to look at a template and being able to look at an

21 underlying document.

22           MR. BROOKS:  Right.  But I guess part of the

23 problem -- and I appreciate that, Your Honor.  But part of

24 the problem here is Century will not listen to us.  We have

25 nothing further to produce.  We have produced all non-

1  privileged documents that are responsive to Request 27.

2          THE COURT:  Okay.  I think that's your answer,

3  Mr. Schiavoni.

4          MR. SCHIAVONI:  Your Honor, so they have no

5  documents at all on any of the 490 abuse claims.  It's

6  like --

7          MR. BROOKS:  We have --

8          MR. SCHIAVONI:  -- can we just --

9          MR. BROOKS:  As I said, we have no non-privileged

10 documents left to produce to you.

11         MR. SCHIAVONI:  Well, they didn't produce any

12 documents on the abuse claims in the first place, so there's

13 nothing left to produce.  All we have are the -- all we have

14 are the spreadsheets that say whether the fellow was a scout

15 or not.  There's no documents that were produced on the abuse

16 claims, none.

17         And it's like we did meet and confer on it, I

18 did -- I was incredulous.  I did say, well, you have to have

19 things like incident reports because you were required to

20 prepare those.  I didn't say stop looking for anything else.

21 I just said that's an example of something you have to have.

22 And if you come back and say you don't have anything, just

23 simply respond to the request by withdrawing the objection

24 and stating you have no documents.

25         But now we're getting -- and this is exactly,

1  really, the problem.  We're getting we have no further

2  documents.  It's like there were no documents produced on

3  this topic.

4              THE COURT:  Okay.  Well, what I'm hearing

5  Mr. Brooks represent to the Court is that he has nothing,

6  whether it's further, other, different, whatever, to produce,

7  with respect to document request number 27, which, on my

8  five-second review, seems to be the document request at

9  issue, and that's the answer.

10              The rosters, now -- what I take it, Mr. Schiavoni,

11  you want, is not just the rosters, which have been produced,

12  which reflect where a, either a Scout or a Scoutmaster or

13  somebody has been identified, but you want all the other ones

14  that exist that do not show a survivor or an alleged

15  perpetrator; is that right?

16              MR. SCHIAVONI:  The ones that would be sufficient

17  for us to show that for the particular -- for these

18  particular requests, that the fellow was not a Scout, yes.

19  And we're not going to -- we can come and do that review at

20  the Baltimore office and identify, with particularity, those

21  documents there.  We'll do all the work for them.

22              THE COURT:  Mr. Brooks?

23              MR. BROOKS:  Thank you, Your Honor.

24              UNIDENTIFIED:  (Indiscernible.)

25              MR. BROOKS:  Oh, I know.  He remembers everything.

1           THE COURT:  Excuse me?

2           UNIDENTIFIED:  (Indiscernible.)

3           THE COURT:  Excuse me?

4           UNIDENTIFIED:  (Indiscernible.)

5           THE COURT:  Excuse me.  I'm getting someone's

6    conversation.  Please check your audio.

7           Mr. Brooks?

8           MR. BROOKS:  Thank you, Your Honor.

9           So, as I mentioned before, we have produced all

10   rosters that include in them, either the name of a claimant

11   or the name of an alleged perpetrator.

12           THE COURT:  Uh-huh.

13           MR. BROOKS:  That is what document request number

14   34 seeks.

15           Now, if Century wants to broaden that and ask for

16   every other roster that we have in our possession, we've got

17   to talk about what is unduly burdensome, what is overbroad,

18   and what is not proportional to Century's needs in this case.

19           We have tens of thousands of rosters and we

20   believe that we have probably something approaching, if not

21   crossing, 100,000 rosters that we have not produced.  These

22   things are in files.  We went through them and we went

23   through them to make the production of the 731 PDF files that

24   we did produce that do contain rosters, actually relevant to

25   anything involved in this case.

1          The notion that we would produce rosters that have

2    no bearing or relationship to the proofs of claim filed in

3    this case that do not identify a claimant, that do not

4    identify an alleged perpetrator, would be an undertaking that

5    would be -- I think, all-in, it took the Baltimore Council a

6    month to produce those 731 files.  These are on pieces of

7    paper, where when you pick them up, you have to be careful

8    that they do not disintegrate to take them, to scan them, to

9    assemble them.  And, you know, quite frankly, every roster

10   that has the name of a claimant or an alleged perpetrator

11   already is in Century's possession.

12          THE COURT:  Okay.  So, I'm reading request 34.  I

13   don't think, actually, you're characterizing it correctly.

14          But let me ask this, because it asks for all

15   membership rosters that correspond to the date of alleged

16   abuse for the proofs of claim that refer to your local

17   council.  So, that's whether or not somebody's name is on it.

18          But what you're telling me is that if there is a

19   roster for the date of alleged abuse that somebody -- that

20   claimant -- that survivor A filed, if you didn't hand over a

21   roster, survivor A's name doesn't appear on a roster that the

22   council has.

23          MR. BROOKS:  Maybe if I just take one step back,

24   and I think I can actually simplify this.  So, eighty-two and

25   a half thousand abuse claims were filed.  The BSA provided us

1  the spreadsheets that Century's counsel has made mentions of.

2  And the spreadsheets that were provided to our council

3  identify, among those eighty-two and a half thousand claims,

4  which of them, which of those claims potentially may

5  implicate my client.

6           And then our task was to go through all of those

7  claims and then to go into our rosters, and to the extent we

8  identify -- we see the name of a claimant or the name of an

9  alleged perpetrator, we pull those rosters and we produce

10  them.

11          It took weeks, all-in, probably all month.  We

12  produced every single one that hit on the name of a claimant

13  or the name of an alleged perpetrator.  We did not produce,

14  and I don't believe any other local council has produced,

15  every single roster that would span the period of time in

16  which claims were filed.  And, frankly, Your Honor, I'm not

17  even sure what that is.

18          But I do know one thing:  It's tens of thousands

19  of rosters.  And what took us a month to put together, to

20  produce what we did was, I mean, it would oh this would be a

21  very large undertaking.  And I don't see how it's

22  proportional to what Century needs.  If Century wants them to

23  say, Ah, yes, there is no claimant or alleged perpetrator on

24  there, we already know the answer to it:  there will not be.

25          And, in fact, one of the documents that the BSA

1 produced, and we produced, is a document called a "Roster

2 Search Certification."  In connection with our review of all

3 of our files to go through that process, we signed a Roster

4 Search Certification, certifying that we did what I just told

5 Your Honor, which is another way of saying, the remaining

6 rosters will not have the name of a claimant on them or the

7 name of an alleged perpetrator.

8           THE COURT:  Okay.  Mr. Schiavoni, why isn't that

9 good enough?

10          MR. SCHIAVONI:  Your Honor, just first of all

11 here, you know, at least, I hope you understand that this

12 isn't a total fishing expedition.  The notion that 95 percent

13 of the claimants in this council can't be confirmed as being

14 Scouts, we will be offer that at the confirmation hearing as

15 relevant, you know, towards proof that we'll be otherwise

16 offering.  That's -- that is almost more relevant than if

17 only 5 percent were found, okay.  That is a significant fact

18 about the process here about the proofs of claim.

19          Now, if they're certifying that that was the

20 result of the full search and Your Honor's -- and, you know,

21 we would offer that into evidence, that's terrific, that

22 would come in.

23          But if there's going to be -- you know, when we

24 push back to Boy Scouts saying, My God, look how these

25 results are coming back.  The local councils are saying

1  virtually none of these people are, in fact, Scouts.  It's

2  like, we got this pushback that, like, well, you know, maybe

3  they don't have any records.  Maybe there aren't any records

4  and that's why.

5          Well, it's like, Yeah, that's why we served these

6  subpoenas.

7          And what are we hearing from Mr. Brooks?

8          Yeah, they got the whole set.  It's in fact they

9  have hundreds of thousands of these records and they're

10  complete and this is what it shows.

11          It's like we just can't have them backtracking at

12  the confirmation hearing, now, Well, geez, you know, the

13  other 95 percent of the records are lost.

14          If they have them here, it's like I'll take that

15  certification if that's what they're willing to put in at the

16  hearing; otherwise, we'd like to just go out and, ourselves,

17  have someone check them so we can offer into evidence our own

18  search that said, Yeah, they have all of these files.  We

19  checked them and only 5 percent, in this council, for

20  instance, showed up as, in fact, being Scouts.

21          THE COURT:  I'll leave it up to you.  I'll let you

22  go search the records.  I'll let you send someone to go look.

23          I think it's fairly -- quite frankly, it's fairly

24  captured by document request 34.  So, I'll let you do it or

25  take their certification.  I can't imagine somebody is going

1  to backtrack from what was just told to me.

2          MR. SCHIAVONI:  Your Honor, with that guidance,

3  we'll talk to Boy Scouts about a stipulation on that and

4  Mr. Brooks about, if we need to follow-up and do the search

5  ourselves.

6          THE COURT:  Okay.  What's the next -- let's see --

7  okay.  The local council contribution records, I think we've

8  heard about that, too.

9          So, what's the problem with or what's remaining

10  with the response to it looks like 18, 19, and 20.

11          MR. SCHIAVONI:  Your Honor, there weren't any

12  documents produced --

13          THE COURT:  The 28th, I'm sorry.

14          MR. SCHIAVONI:  Yeah.  There weren't any documents

15  commenting on putting input in or in any way responding on

16  what the methodology was for calculating the contribution or

17  what their contribution was.

18          I guess you heard just -- that it was dictated,

19  that nothing was generated.  This would be the first time in

20  my career when I've heard that someone had asked for money

21  and 250 councils just said, "Yes."

22          But if that's the state of play and, you know, we

23  did ask here.  I find that fairly incredible, but, you know,

24  not a single email, nothing on this.  But that's why we ask

25  just that the objection be stricken and they just provide a

1  straight response that they have nothing responsive.

2          THE COURT:  Okay.  Well, let me ask the same

3  question, Mr. Brooks:  Are there no documents?

4          I understand there may be no documents with

5  respect to the ad hoc committee's determination and

6  calculation.  You may not have those; the Ad Hoc Committee

7  has that.

8          But did the council not consider it and approve,

9  for example, the amount that was allocated and agreed to

10  accept it; did they not have a meeting and do that?

11          MR. BROOKS:  They did, Your Honor, and we produced

12  that information.  And to the extent that we have any further

13  information, it is privileged.

14          THE COURT:  Okay.  So, that information has been

15  produced, except for privilege.

16          What's remaining -- I think those are the

17  categories -- let me look at my notes.  So, that would

18  presumably include board minutes?

19          MR. BROOKS:  Yes, Your Honor.

20          THE COURT:  Okay.  I think that concludes

21  Baltimore Council.

22          Let's go to --

23          MR. SCHIAVONI:  Your Honor, I believe Cradle of

24  Liberty is next on the agenda.

25          THE COURT:  Yes, Cradle of Liberty.

1          MR. PATTERSON:  Your Honor, Tom Patterson.

2          Your Honor, may I interrupt just for a second?

3          THE COURT:  Mr. Patterson?

4          MR. PATTERSON:  Thank you, Your Honor.  I

5    apologize for interrupting.

6          I'd like to request to be excused from the

7    remainder of the hearing if the only matters to be discussed

8    are the agenda items.

9          THE COURT:  As far as I know.  You may be excused.

10         MR. PATTERSON:  Thank you, Your Honor.

11         THE COURT:  Thank you.

12         If there's anyone else who is not interested in

13   the matters that are on the agenda, certainly, you feel free

14   to leave.

15         MR. SCHIAVONI:  Okay.  So, Your Honor, geez, you

16   know, I thought this case has many challenges.  Going up

17   against adversaries things like "Cradle of Liberty" and

18   "Scouts for Justice," man, it puts me in a new position,

19   okay.

20         So, for Cradle of Liberty, you know, we have --

21   it's the same issue about not getting -- you know, they seem

22   to be operating on, basically, the same instruction that, you

23   know, production of and referral to the spreadsheets is

24   adequate and that, you know, for abuse claims, and that, you

25   know, they don't need to produce any documents that they

1  generated locally about the sexual abuse claims.

2          So, it's like we did not get documents from them

3  on the actual abuse claims that were tagged to their local

4  council.

5          THE COURT:  Mr. Lutsky?

6          MR. LUTSKY:  Thank you, Your Honor.

7          I'm actually incredulous to hear Mr. Schiavoni's

8  presentation.  First of all, it's completely divorced from

9  the two meet-and-confer conferences we've had with Century.

10  And it may be that Mr. Schiavoni didn't participate in either

11  of those conferences.

12          I also had a separate email exchange with his co-

13  counsel in an attempt to narrow the issue.  All of these

14  communications, I've submitted to Your Honor as part of my

15  declaration that was submitted on Monday.  And, again,

16  Mr. Schiavoni was not on that, as well, so perhaps he's not

17  aware of what happened in the meet-and-confer or the

18  communications that we've had.

19          With regard to abuse claims, I have repeatedly,

20  repeatedly, in writing, told Century that we do not have any

21  documents concerning incident reports or the supportive

22  materials because the BSA had a longstanding policy that

23  those documents were to be delivered to them and no copies

24  were to be kept.

25          So, for example, in my follow-up communication

1  with Mr. Stamoulis on November 26th, following our meet-and-

2  confer conference that day, which Your Honor has as part of

3  my declaration, I wrote:

4  　　　　"I can confirm that as we previously informed

5  Century, any incident reports, investigative materials, or

6  other documentation concerning abuse claims were delivered to

7  the BSA, per the BSA's longstanding policy, and as required

8  by this BSA policy, no copies were retained by Cradle of

9  Liberty Council."

10  　　　　I have said that to them at least two or three

11  times in writing and, apparently, they do not listen to what

12  I'm saying.  We have no documents to produce regarding sexual

13  abuse claims, period, hard stop.

14  　　　　Similarly, with the contribution, the matter of

15  the contribution, the claim contribution, as Mr. Brooks

16  indicated, these were contributions assigned to the councils

17  by the Ad Hoc Committee.  I have repeatedly told Century,

18  there were no negotiations with the Ad Hoc Committee

19  regarding the claim contribution.

20  　　　　I have also told them that we did have a few

21  documents that referred to claim contribution and they were

22  produced.  I produced a board presentation to them in which

23  the claim contribution was approved and discussed.  We

24  produced, as part of our first production, minutes of that

25  meeting.  We produced, as part of our first production, some

1  internal email communications regarding it.

2         But, Your Honor, the Cradle of Liberty Council was

3  satisfied with the Ad Hoc Committee's assignment of its claim

4  contribution.  So, it's not surprising that there were no

5  objections raised and no evaluation, to the extent that

6  Mr. Schiavoni thinks there should have been, or no

7  negotiations with the Ad Hoc Committee.  It did not exist.

8         And so, in the same letter that I just referred

9  to, to Mr. Stamoulis on November 26th, following our second

10  meet-and-confer, I said to him:

11         "I can, again, confirm that COLC has no

12  additional, responsive, and non-privileged documents to

13  produce regarding its claim contribution."

14         Again, hard stop, no documents; they've all been

15  produced, to the extent that we have them.

16         With regard to rosters, first of all, let me,

17  again, echo Mr. Brooks' comment.  The request number 34,

18  which addresses rosters, that was not included in Century's

19  motion to compel, so I'm hard-pressed to understand why

20  Mr. Schiavoni is even talking about that today, because it

21  was not even in the motion to compel.

22         But, nonetheless, we did identify for Century, the

23  roster production made by the BSA.  We gave them instructions

24  how to search for it.  We told them what volume of the BSA's

25  production it was in.  We gave them examples of the roster

1  information by Bates number.

2          And we also, as Mr. Brooks indicated, provided

3  them with the templates that the BSA gave to us.  And I want

4  to address this for a moment so Your Honor understands and

5  gets the full picture here.  These templates confirm all of

6  the roster information we have regarding the abuse claimants.

7  All of that information was populated by the Cradle of

8  Liberty Council for its abuse claims, of which there were

9  approximately 685.  All the information we have regarding

10  that was populated in those spreadsheets.  And we have a

11  Roster Search Certification, as did Baltimore, which

12  acknowledges that all the information was provided.

13          Moreover, in my very last meet-and-confer with

14  Mr. Stamoulis, which occurred on November 26th, I asked him

15  whether or not those spreadsheets provided all of the

16  information necessary, concerning those rosters and he

17  agreed.  And, in fact, I confirmed his agreement in my

18  follow-up communication with him in writing on that day,

19  November 26th.  I said:

20          "State you agreed with me that these spreadsheets,

21  which Century has reviewed, provides all the information

22  necessary concerning the COLC rosters during the time period

23  covered by any of the 685 or so claimants, alleged involved

24  in the COLC."

25          The only thing he asked me for in that meet-and-

1  confer with regard to that, Your Honor, after he agreed they

2  had all the relevant information, was would we provide an

3  affidavit, if asked, to enable him to authenticate that

4  information, which I readily agreed and said, If you ask, we

5  will provide that affidavit.  And I also directed him to the

6  Roster Search Certification, which was attached to the four

7  stipulations, as Your Honor probably recalls, and that

8  provides, really, all the information he needs, but if he

9  wants a subsequent affidavit so that he can authenticate the

10 roster information that we provided to the BSA, we would be

11 happy to provide that.

12         We have no dispute, right now, that's outstanding

13 with Century as a result of the two meet-and-confer

14 conferences we've had, as a result of the follow-up email

15 exchange we've had with them independent of those meet-and-

16 confer conferences.  We have produced everything that is not

17 privileged that we have regarding those areas.

18         And for Mr. Schiavoni to indicate that they don't

19 have a clear answer on that is absolutely incredulous when

20 I've said it at least three times in writing and, in fact, in

21 my letter to the Court on Monday of this week, in which I

22 copied Century.

23         Again, we can't make a more definitive statement

24 than we have made.  We have no more documents.  I'm sorry

25 that he expects we should, but we have no more, and that's

1  our position.

2         MR. SCHIAVONI:  Your Honor, if I may?

3         On the abuse claims, what Mr. Lutsky indicated was

4  that they would generate documents about abuse claims and

5  that they would have -- they were under instructions not to

6  retain them, but to turn them over to National.

7         Let's be clear about what's at issue here.  The

8  first reporting to the Cradle of Liberty of the particular

9  claims at issue here, would have taken place in 2020.  Not in

10 1955 or 1975.  They would have taken place in 2020.

11        At that point in time, they were being asked to,

12 basically, you know, also pay for these claims.  So, they

13 received a list of who the claimants were and the alleged

14 perpetrators in the council.  If what Mr. Lutsky is saying

15 that in 2020 they, then, used that information to generate

16 these documents and then sometime later in 2020, quickly

17 turned them over to Boy Scouts, then I will follow-up with

18 Boy Scouts to get those documents.

19        But it's like, that's what we're after.  When they

20 learned that there were 600 new proofs of claim for this

21 particular council with all, you know, alleged people, you

22 know, it's a great seriousness has been put on these proofs

23 of claim.  It's like -- you know, so one would think if the

24 local council has really thought that these were real,

25 meritorious claims, they'd been generating documents on them

1  at the local level.

2          So, if Mr. Lutsky has turned those documents over,

3  they would have also been electronic.  He'd still have

4  records of them at this point.

5          So, it's like, you know, we're not on a wild hunt

6  here.  It's like, we made this clear to him that those

7  documents should exist and they should be there in 2020.

8          MR. LUTSKY:  Your Honor, whatever documents we had

9  regarding incident reports, investigative materials, or other

10  documentation concerning those claims, have been delivered to

11  the Boy Scouts and we have no copies.

12          The only thing we did have -- and we produced this

13  to Century -- was that we did produce three letters or

14  notices to individuals who were still involved with Scouting,

15  that they could no longer participate because of claims that

16  were alleged involving them.  And we produced that in our

17  first production; those three pieces of correspondence.

18          We do not have anything else.  I don't know how

19  many more times we're going to keep saying it.

20          THE COURT:  Okay.  Thank you.

21          Mr. Schiavoni, Mr. Lutsky has definitively stated

22  what has been produced and what they generated, but do not

23  have, because they turned it over to the Boy Scouts.  So,

24  yes, follow-up with the Boy Scouts.  But I take Mr. Lutsky at

25  his word.

1            Is there anything further for the Cradle of

2   Liberty Council?

3            MR. SCHIAVONI:  No, Your Honor.

4            We understand that they generated no documents

5   about the abuse claims.

6            THE COURT:  Thank you.

7            Then our next is National Capital Area Council and

8   that is Barnes & Thornburg.

9            MR. COLLINS:  Good morning, Your Honor.  Kevin

10  Collins of Barnes & Thornburg, on behalf of the National

11  Capital Area Council.

12           THE COURT:  Mr. Collins.

13           MR. COLLINS:  Your Honor, Jim Van Horn and Adey

14  Adenrele are together on a Zoom screen and they've been

15  admitted *pro hac vice*.  I believe Mr. Adenrele was going to

16  be addressing the Court today on this issue.

17           THE COURT:  Thank you.

18           MR. SCHIAVONI:  Hello, Your Honor.  On the

19  National Capital, 630 claims were asserted against this

20  Council.  They produced zero documents concerning those

21  claims.

22           And, you know, not to be a broken clock, but it's,

23  again, they were, under the Youth Guidelines, supposed to

24  have generated incident reports and/or otherwise investigated

25  to determine whether or not any of the allegations of

1  perpetrators -- you know, if there were still perpetrators

2  there, file police reports, et cetera, make some sort of

3  inquiry about it.  So, we thought there should be some

4  documents, not zero documents here.

5        We'd ask that their objection to producing any

6  documents be dropped and that they respond with a clear

7  statement with regard to whether they had responsive

8  documents or not.  So, that's one issue.

9        On the rosters, this is a council that went

10 through their rosters and was only able to identify 3 percent

11 of the 630 claimants as having been Scouts associated with

12 the local council that were in the proofs of claim, tagged

13 for this council.  So, you know, I think in a sense we have

14 resolved this issue about the rosters, that we'll pursue a

15 stipulation, the 3 percent number or be able to verify -- you

16 know, go down to verify the other records.

17       But we would ask -- again, it's like -- and I

18 apologize for being incredulous, but, like, you know,

19 documents about the 630 abuse claims, if they have them, to

20 provide a clear statement that they either have responsive

21 documents or they don't.

22       THE COURT:  Thank you.

23       MR. ADENRELE:  Good morning, Your Honor.  It's

24 Adey Adenrele from Barnes & Thornburg on behalf of National

25 Capital Area Council.  I'm here with my co-counsel Jim Van

1  Horn and you've already heard from Mr. Kevin Collins.

2            You know, we don't want to reiterate everything

3  that the other local councils have said, but, generally, you

4  know, we believe that Century's motion to compel should be

5  denied at this time, primarily, or previously because, you

6  know, the motion to compel was really premature and, you

7  know, they had really not even, you know, had a real

8  discussion or meet-and-confer with us prior to filing this

9  motion to compel.  And you've heard a lot about that, and

10  that's in our papers, Your Honor, and I don't want to go

11  through all of that individually and reiterate or rehash that

12  for the Court.

13            However, I would like to identify a couple of

14  examples.  So, prior to filing this motion to compel, as you

15  know, there were alleged deficiency letters that went out to

16  all of the local council or a few of the local councils, here

17  on this call today.  And several of the alleged deficiencies

18  in that letter were clearly erroneous, had nothing to do with

19  the objections that we had alleged, had nothing to do with

20  the documents that we had actually produced, had nothing to

21  do with our responses and objections, and, in fact, alleged

22  to quote certain statements that we allegedly made in the

23  responses, which upon review of our responses, didn't exist

24  at all.

25            And part of that is consistent with Century's

1 overall general discussion here today, in which it's just

2 attempting to lump all the local councils together to say

3 that they won't -- they provided the same response, which

4 were, in fact, actually they're different and distinct

5 issues.

6         Now, to specifically talk about the actual

7 document requests that Century alleges are outstanding, it

8 seems that here, Century has admitted that the roster issue

9 is now a non-issue, and so we don't -- you know, we're not

10 going to go into detail on that here.

11         However, there are still two other outstanding, or

12 allegedly outstanding issues; one being the specific

13 Executive Board minutes and the second being incident

14 reports.  And these were discussed in the communications that

15 Century -- Century's counsel, specifically, Mr. Stamoulis.

16 I'd like to say, you know, we did not have any conversations

17 with Mr. Schiavoni and that may be part of what's going on

18 here, as well, but nonetheless, those are the two issues that

19 it seems, for us, are before the Court.

20         Well, in Century's reply brief, which the council

21 or which the Court now has, attached to that is an email

22 correspondence that NCAC's counsel has had with Century's

23 counsel.  Now, part of that, you know, part of that email

24 string, Your Honor, is missing.  There was an additional

25 email that was sent yesterday, prior to Century's reply brief

1  filing.  So, we're not exactly sure why that was not included

2  as an attachment.

3          But in that email, we went through these

4  outstanding or alleged outstanding issues and explained, one,

5  with regard to the specific Executive Board minutes, we had

6  already produced several board minutes, but Century asked us

7  for another -- for one specific Executive Board meeting

8  minutes, which we did, you know, produce yesterday.  And now,

9  those are all the minutes that NCAC has and Century has it.

10          Second, with regard to the incident reports, in

11  the email, as you can see, Your Honor, NCAC's counsel was

12  more than happy to go back and see if we have any responsive

13  documents related to those incident reports.  And upon

14  review, which we did, obviously, in good faith, trying to

15  make sure that we are complying with Rule 45, Rule 26, and

16  complying with the subpoena, generally, we went back and

17  reviewed, looked at -- you know, to determine whether any of

18  those incident reports actually exist.

19          And we can now say that after that review, that we

20  do not have any responsive incident reports at all that have

21  anything to do with the bankruptcy or any other claims.  And

22  we included that in our follow-up email yesterday at

23  7:00 p.m. to Century's counsel.

24          And so, you know, given that those are the only

25  two outstanding issues, you know, both of those have been

1  resolved and, from our point of view, not only, one, as I

2  said before, was the motion to compel premature, but now it's

3  moot, given that the issues have been resolved.

4            THE COURT:  Okay.  Thank you.

5            Mr. Schiavoni, it looks like the Council did a

6  follow-up review just to see if there was anything else and

7  has produced some Executive Board minutes and has confirmed

8  that they have nothing else on the incident reports.

9            MR. SCHIAVONI:  Your Honor, just to be clear,

10  again, like, the requests were for more than just the

11  incident reports; they were anything about these sexual abuse

12  claims.  And, apparently, they don't have anything at all.

13  Nobody thought to write an email and check or write anything

14  about the incidents, okay.

15            So be it.  I got it.  I thank you very much.  I

16  appreciate the time, Your Honor.  I hope you don't think we

17  were totally on a lark here.  It's like we did think we would

18  get some documents about the claims that are at issue from

19  the local councils where the abuse allegedly happened.

20            THE COURT:  No, I think it was a reasonable

21  request and follow-up.  I do think there was, perhaps, some

22  disconnect in the meet-and-confers on what was remaining, but

23  nonetheless, I think now everything is resolved.  There are

24  no further documents that need to be provided by any of these

25  three local councils.

1          And I understand there will be some discussion

2  about stipulations, with respect to the rosters.  I think

3  we're concluded on this.

4          MR. SCHIAVONI:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. ADENRELE:  Thank you, Your Honor.

7          Could I be excused now?

8          THE COURT:  Yes, anyone can be excused.

9          MR. ABBOTT:  Your Honor, Derek Abbott, again.

10          The next agenda item is Agenda Item 5, Docket

11  Item 7465.  I believe that is Mr. Currie's -- I'm sorry,

12  that's a response -- so, it's Mr. Alberto's request, Your

13  Honor.  I apologize.

14          THE COURT:  Yes, Mr. Alberto?

15          MR. ALBERTO:  Good morning, Your Honor.  Justin

16  Alberto from Cole Schotz, on behalf of Slater Slater &

17  Schulman.

18          Your Honor heard argument that is relevant and,

19  honestly, essential to today's argument on November 19th, in

20  connection with the insurers' document requests --

21          THE COURT:  Uh-huh.

22          MR. ALBERTO:  -- and I believe both parties have

23  said that they were willing to defer the motion to quash

24  that's currently before Your Honor until the time that Your

25  Honor rules on the prior argument.  So, I would ask Your

1  Honor if you're ready to rule, and if not, we can certainly

2  come back --

3            THE COURT:  No, I'm prepared.

4            MR. ALBERTO:  -- after you are.

5            THE COURT:  I'm prepared to rule.

6            The leftover issues -- I ruled on the party issue

7  with respect to what was, I think Agenda Item 8, which dealt

8  with five law firms, except the carve-out for AVA, which,

9  actually, I still have not had the chance to take a look at.

10            Then we had the arguments made with respect to

11  discovery issued to Eisenberg, Rothweiler and Slater Slater &

12  Schulman.  And we didn't have the party/non-party issue

13  there.  But the arguments that were raised there were, number

14  one, relevance, and I find that the discovery is relevant.

15            The plan and the findings that are requested, with

16  respect to the plan and, in particular, the trust

17  distribution procedures, ask me to make findings, with

18  respect to the reasonableness, and I think it says "the

19  fairness" of the trust distribution procedures, including the

20  matrix values, the procedures for evaluating claims, the

21  scaling factors, et cetera, and that also includes the

22  thirty-five-hundred-dollar expedited distribution.

23            And I have concluded that information related to

24  the generation of the claims could be relevant to that and

25  whether, in fact, for example, the thirty-five-hundred-dollar

1    expedited distribution is appropriate or whether I should

2    make -- whether, maybe even if it is, I should make a finding

3    with respect to that aspect of the trust distribution

4    procedures.  And that may also relate to other parts of the

5    matrices and other procedures, such as, for example, the

6    procedures in place to vet the claims and to appropriately

7    exclude any improper claims for any claims that are not

8    valid.

9             And so, I think the generation of these claims

10   could be relevant information with respect to that.  So,

11   based on the plan that's in front of me for confirmation, I

12   find the information to be relevant.

13            The -- is it privilege information?

14            I think most of it -- most of the requests do not

15   implicate privileged information or they may, but there could

16   be discovery that is not privileged and discovery that is.  I

17   am not abrogating, in any way, assertions of privilege, but

18   information with respect to the process of generating these

19   proofs of claim strike me, in the big picture, to not be

20   privileged.

21            Whether there could be a particular communication,

22   as opposed to information, that might be privileged, there

23   might be.  There might be some privileged communications.

24            But those are going to have to be -- that

25   privilege is going to have to be asserted on a -- if it's a

1  deposition, a question-by-question basis, or if it's

2  documentation, a document-by-document basis.  It's only

3  communications that are privileged, not facts.

4          MR. ALBERTO:  May I ask a few clarifying

5  questions, Your Honor?

6          THE COURT:  Yes.  And we can go through --

7          MR. ALBERTO:  I think it might make --

8          THE COURT:  -- the discovery, but yes, you may.

9          MR. ALBERTO:  I'm trying to streamline what I

10  think is ultimately going to end up -- and I hope it

11  doesn't -- back before Your Honor.  And we will certainly

12  meet-and-confer after Your Honor's ruling today to talk about

13  specific document requests and what topics are or are not

14  appropriate.

15          But I wrote down, Your Honor finding to be

16  relevant, "the generation of the claims."  And I'm not

17  certain I fully understand what "generation of claims" means

18  and I think there could be a reasonable dispute as to whether

19  that involves Slater's business practices, with respect to

20  either marketing or litigation financing.  I don't really

21  believe that that would be the generation of claims or

22  whether you're referring to the client-intake process; for

23  instance, how a client came to be a Slater Slater & Schulman

24  client.

25          And most importantly, whether this ruling applies

1  only to the 2.5 percent of proofs of claim that Slater

2  attorneys signed or whether it applies to all 14,2000 claims

3  that either, Slater attorney signed or the 97.5 percent that

4  their clients actually signed.

5        THE COURT:  With respect to the first part of

6  that, I'm not sure that I appreciate the litigation financing

7  piece of that and why that would be relevant.  So, my

8  inclination -- though, I'm willing to hear more on that,

9  because I haven't had that particularly argued to me -- is

10 that that is not necessarily relevant.  I'm not sure that I

11 see the relevance of litigation financing to the generation

12 of claims.

13        The -- I think the advertising is relevant and I

14 think the intake is relevant, as well as the process by which

15 the proof of claim form, itself, was generated, and what

16 information was reviewed and how that was done.

17        I've forgotten the last piece of your question,

18 Mr. Alberto.

19        MR. ALBERTO:  Whether -- so, I actually have a

20 follow-up to that, before I get to the last piece.  I

21 apologize, Your Honor, to backtrack, but what information was

22 reviewed would have necessarily come from Slater's clients

23 directly to Slater lawyers.

24        I don't -- forgive me if I'm being obtuse, but I

25 don't understand how that wouldn't be privileged.  Those are

1  direct client communications.

2          THE COURT:  I actually don't know what was done or

3  how it was done.  And the fact of a communication, I don't

4  think is privileged.  So, there could be discussion about

5  what types of contact there was had.

6          That's why I'm saying, we're going to have to do

7  it on a question-by-question basis.  But I don't think -- I

8  could be wrong -- but I don't think the fact of a

9  conversation -- yes, I had a conversation with my client,

10 with respect to the proof of claim and the information and

11 here's, generally, the types of questions that I asked -- I

12 don't know, because I don't know what was done.

13         The response, perhaps, might be a privileged

14 communication, but again, it's communication -- it's the

15 communication that is protected.  So, there might be a

16 document that is protected.

17         But facts are not protected, so you're going to

18 have to figure that out.  I can't anticipate every scenario.

19         MR. ALBERTO:  I understand.

20         THE COURT:  But I think the intake process --

21         MR. ALBERTO:  Oh, sorry.

22         THE COURT:  -- itself and, generally, how it

23 works, that's not -- I don't see that as protected,

24 specific -- also, because, again, with respect to proofs --

25 this was the second part of it -- with respect to proofs of

1  claim that were signed by the lawyers, which is what the

2  discovery went -- for the client -- signed by the lawyers,

3  that's what the discovery went to and so, at least that's my

4  recollection, and so that's what we're talking about.

5          MR. ALBERTO:  Your Honor, I have the document

6  request in front of us.  I would say that a fair number of

7  the document requests relate to all 14,000 Slater proofs of

8  claim and then a fair number of them also just relate to the

9  attorney-signed proofs of claim.  And so, that's why I asked

10  the question whether, you know, the relevance finding that

11  Your Honor just made applies only with respect to lawyer-

12  signed proofs of claim or whether it still applies to all

13  14,000, you know, client-signed proofs of claim or 13,700,

14  whatever the number is.

15          But 97.5 percent of these claims were signed by

16  clients.

17          THE COURT:  Ultimately.

18          MR. SCHIAVONI:  Electronic signatures were affixed

19  to them, to be clear.

20          THE COURT:  I think the relevance.

21          MR. ALBERTO:  That is permitted in this case, I

22  believe.

23          THE COURT:  I think the relevance probably goes to

24  all of the proofs of claim, whether signed by an attorney or

25  signed by a client, the survivor.  There may be different

1    questions based on whether it was signed by an attorney or

2    signed by a client but given the findings that I have to make

3    or that's being requested that I make, I think the

4    information is relevant.

5         And I'm not sure that there was really a

6    difference, but maybe there was.  I don't know.

7         MR. ALBERTO:  Well, if Slater didn't verify a

8    proof of claim by signing it and it's in client ink, Your

9    Honor, even, albeit, electronic ink, which for all practical

10   purposes is tantamount to normal ink these days under every

11   Federal Rule that I'm aware of, I just don't see how deposing

12   Slater or asking for Slater documents is at all helpful to

13   this process.  That's a client issue.

14        For instance, Your Honor, if a client comes into a

15   Slater office and says, Mr. Schulman, I am a sex abuse

16   survivor and I'd like to tell you my story and then that

17   client, that day, signs that claim, what, in that span of

18   time that I just described, is relevant and what is now

19   discoverable, pursuant to Your Honor's ruling?

20        I'm not trying to be argumentative with Your

21   Honor; of course, I'm just trying to -- I know this is going

22   to be contentious going forward, so I'm trying to anticipate

23   disputes that may arise between now and when we ultimately

24   get to depositions or document production.

25        THE COURT:  Mr. Currie, let me ask you that

1 specific question, then.  So, if the client came into

2 Mr. Schulman's office and sat down, had a conversation, they

3 filled out the proof of claim form and the client signed it,

4 based on the discussions that they had just had, what would

5 be discoverable there that would not be a privileged

6 communication, other than, perhaps, the proof of claim form,

7 itself, because I think that's a public document.  It's

8 confidential, but it's still a public document.

9 　　　　　MR. CURRIE:  Your Honor, I think that -- well,

10 first of all, we don't know what subset of the fourteen or

11 15,000 claims that the Slater Slater Schulman prepared, fit

12 into that category, where a claimant actually came into their

13 office and had a discussion described in the hypothetical,

14 and a proof of claim form was filled out that day, as opposed

15 to discussions that may have occurred independent of any

16 lawyer, where the signing of the proof of claim form would

17 have been, perhaps, detached with intervening communications.

18 　　　　　There could be -- there are a lot of -- and then,

19 ultimately, where we have an electronic signature that was

20 affixed.  So, there could be many, many other scenarios

21 outside of what I expect is probably a relatively narrow

22 range of claims, given the time period during -- at least

23 during -- part of it may have been impacted by COVID, where

24 people weren't coming into lawyers' offices, where these

25 communications would have been electronic or over the

1  telephone, maybe conducted, you know, largely conducted or

2  maybe entirely conducted by people who aren't lawyers.  We

3  just don't know, which is one of the reasons why we're

4  seeking discovery on.

5          MR. ALBERTO:  Again, Your Honor, I'm not --

6  listening to that response, I still don't know what we have

7  to prepare our clients for to answer for deposition or what

8  we have to produce.

9          I thought that the insurers' request at the last

10  hearing was being limited to attorney-signed proofs of claim

11  and that's why I asked this question.  If we have to prepare

12  for a deposition for intake protocols for 14,200 clients, I

13  can't imagine that it's going to be an easy task, and

14  extraordinarily burdensome, and probably last longer than the

15  period allowed under the Federal Rules for deposition times.

16          THE COURT:  Well, I actually don't know if the

17  intake process is going to be different for each claimant.

18          I would agree, and I don't know how you prepare

19  for 14,000 -- questions on 14,000 claims, and I assume you're

20  not going to get that, because I don't know how you would

21  prepare for that.  I guess -- let me amend what I said.

22          Let's start with the attorney proofs of claim, the

23  attorney-signed proofs of claim and the general processes.

24  And if we need to go through -- I thought I had them in front

25  of me; I might have left it on my desk -- the specific areas

1  and questions, we can do that.  It might be helpful, because

2  I would like to avoid further disputes, if possible.

3          But I do think, Mr. Currie, I really don't

4  understand how somebody could be prepared for -- to be

5  deposed on each of 14,000 proofs of claim.

6          MR. CURRIE:  Your Honor, if I may?

7          I don't think our intention would be to try to ask

8  questions of an individual lawyer about any, you know, one of

9  14,000 proofs of claim pulled from the entire set; rather,

10  but it is relevant to talk about, in general terms:  How did

11  the intake process work?  You know, were there, you know,

12  non-lawyers involved?  What was their role?  What was the

13  degree of the attorney supervision of this process?  What

14  was -- you know, were the people who were talking to the

15  people who became claimants, were they actually -- will the

16  facts demonstrate that they were actually acting under the

17  direction of counsel or how were they trained?  Were they

18  given, you know -- and, you know, who, essentially, who were

19  the people who were -- and we assume, because we don't really

20  know -- may have been on the phone typing in information that

21  may derive from telephone conversations.  So, we're not

22  looking to depose lawyers at these firms as to a particular

23  claim; rather about, you know, more scoping out a bit, more

24  broadly, how did those intake process work.

25          And as the Court, in your ruling on Monday, for

 1  the attorney -- client-signed claims, in particular, what was

 2  the investigation that was done so that the attorney could

 3  form their belief that the information is true and accurate?

 4          But, I think, in general, we wouldn't ask for

 5  particular claims, but I think the entire intake process is

 6  relevant.

 7          And one other point, Your Honor -- this isn't

 8  particularly relevant to the Slater firm -- but to the

 9  Eisenberg, Rothweiler and other firms that are relevant here,

10  where there was involvement of outside claims aggregators,

11  and understanding the relationship and how those claims were

12  taken in and what level of attorney supervision and direction

13  was involved there is also particularly relevant.

14          Again, not relevant to Slater Schulman because I

15  understand from representations of counsel, that they did not

16  employ these outside aggregators, but I believe it is

17  relevant to Eisenberg Rothweiler and the other firms where we

18  will be seeking this kind of information.

19          THE COURT:  Okay.  Well, Mr. Alberto, it strikes

20  me the way that what was described by Mr. Currie is

21  appropriate discovery and it goes, again, more to the process

22  and the -- on a big scale and not any particular claimant.

23  And I think it's, as I said before, relevant, and I don't

24  think it's privileged, but I'm not precluding a privilege

25  assertion if, in fact, upon hearing a question or looking at

1  a particular document request, you think that there's a

2  privilege assertion to be made.

3         But, again, perhaps, again, I don't know,

4  depending on the particular question or request, there may be

5  some responsive document or communication that's privileged

6  and some that is not, as with any request that can be made.

7         MR. ALBERTO:  I think I understand, Your Honor.

8         Again, we're -- just to clarify, I believe we're

9  now all talking about the attorney-signed proofs of claim

10 and, generally, an intake process.  I don't think we need to

11 have an argument over whether a claimant's recitation of what

12 exactly happened to him or her is at all relevant; I believe

13 it would be privileged.  But, generally, an intake process,

14 with respect to the attorney-signed proofs of claim, I

15 understand.

16        I also understand, per Your Honor's ruling, that

17 you don't see the relevance of litigation financing.  I

18 completely agree with that.  I don't think anything, with

19 respect to, you know, fee-sharing or litigation financing

20 that is solely with respect to Slater's business practices, I

21 don't think that that has any bearing whatsoever on plan

22 confirmation.

23        We can go through the document requests.  I think

24 it would probably be helpful to have a meet-and-confer with

25 the other side --

1          THE COURT:  I would like you to do that.

2          MR. ALBERTO:  -- and take further disputes

3   (indiscernible).

4          THE COURT:  I would like you to do that.  And then

5   if we need to have a specific teleconference or hearing just,

6   with respect to that, after you've met-and-conferred to see

7   if you can agree, given my ruling and some guidance here,

8   based on that, whether you can agree to the scope of the

9   discovery, I'd like you to give that a shot.  Don't take too

10  long.  I will make myself available to answer further

11  questions after you've had a chance to discuss.  And then, if

12  there are particular differences, you can bring those

13  particular issues to me.

14         MR. ALBERTO:  Understood, Your Honor.

15         If we have further disputes, should we raise that

16  in a phone call to Your Honor's chambers --

17         THE COURT:  Yes.

18         MR. ALBERTO:  -- or should we work with

19  Mr. Abbott's firm?

20         THE COURT:  No.  Write directly to chambers and

21  we'll handle them quickly.

22         Okay.  I see Mr. Hogan.

23         MR. HOGAN:  Hello, Your Honor.

24         Can you hear me?

25         THE COURT:  I can.

1          MR. HOGAN:  Good afternoon, now, Your Honor.

2    Daniel Hogan, on behalf of Eisenberg Rothweiler.

3          Your Honor, I take it from your comments that

4    those comments apply equally to Eisenberg Rothweiler.  I

5    don't expect the Court to have to repeat all that, what you

6    just said.

7          But I did have a few questions I wanted to just

8    help to narrow and focus the issues.  Number one, with regard

9    to the proofs of claim that were signed by attorneys, but

10   then amended to add the signature of the claimant after the

11   bar date, what is the Court's take on where those fall in the

12   mix?

13          THE COURT:  I understand that, but I still think

14   it's appropriate that they fall into the category of attorney

15   signed.

16          MR. HOGAN:  Okay.  Thank you.

17          The next question of clarification relates to the

18   number of depositions.  As, I don't know that it's been

19   raised, necessarily, in that point, but for Eisenberg

20   Rothweiler, there are three different lawyers that have been

21   noticed for depositions and based on the ruling that you've

22   just indicated to me and the fact that this deposition is of

23   these firms, it seems to be almost in the nature of a

24   30(b)(6), in the sense that someone is speaking on behalf of

25   the firm about what the processes were.

1       And so, I'd like to know what the Court's thinking

2  is on whether three attorneys are going to have to sit for

3  this, which is -- what is already a huge undertaking will be

4  even more voluminous by virtue of having to prepare three

5  attorneys, as opposed to preparing just one.

6       THE COURT:  Let me hear a response to that.

7       Mr. Currie?

8       MR. CURRIE:  Yes, Your Honor.

9       Well, with regard to Eisenberg Rothweiler, the

10 reason that we seek to depose three different attorneys is

11 that two of the lawyers, themselves, each signed over a

12 thousand.  One signed nearly over 1400 proofs of claim and

13 another lawyer, you know, signed, you know, nearly a

14 thousand.  So, for each of those lawyers, I think it's

15 certainly relevant to depose each of them about how they

16 could have possibly done an investigation and to be able to

17 attest, as required by signing the proof of claim.

18      The other attorney that we noticed, Your Honor, we

19 understand from Mr. Kosnoff's deposition that this other

20 attorney at Eisenberg Rothweiler was working and overseeing

21 the work of non-attorneys in the claims solicitation,

22 aggregation, preparing of the claims forms.  And so -- and we

23 understand, as the Court may be aware, Mr. Kosnoff, for a

24 time, was working closely with Eisenberg Rothweiler, and so

25 from that, we understand that this other attorney was the

1  person, the attorney supervising many to several different

2  non-lawyers in the time up to the bar date.  And so, it's

3  relevant to take her testimony and, in fact, you know, she

4  may be the person best placed to talk about how, for example,

5  how non-lawyers were trained, you know, what was the work

6  done by others, to what degree was it actually done at the

7  direction of counsel, et cetera.

8          So, that's the reason why three lawyers from that

9  firm were noticed for deposition, Your Honor.

10          MR. HOGAN:  Your Honor, may I respond?

11          THE COURT:  Yes.

12          MR. HOGAN:  Thank you.

13          You know, the proportionality aspects of this

14  discovery can't be understated.  We're talking in excess of

15  15,000 claims.  The processes that were utilized by this firm

16  were consistent across the firm.  So, for one attorney to

17  testify about what the processes were, as I understand the

18  Court's ruling, that's -- the relevance of the processes is

19  that is germane to these depositions, and I'm certain that

20  one attorney can speak to that issue for the entirety of the

21  firm.  They have a uniform process, and so from a

22  proportionality aspect, Your Honor, I believe that to limit

23  it to one attorney, at least initially, Your Honor, is

24  appropriate.

25          THE COURT:  I think --

1            MR. ALBERTO:  Your Honor, I agree with Mr. Hogan's

2   comments.

3            If I may briefly, two weeks ago we were before

4   Your Honor and we listened to argument about depositions of

5   the insurers that you ultimately denied on proportionality

6   grounds.  I think that this -- your ruling there applies

7   equally here.  One attorney from each firm, I think, is

8   sufficient for the insurers' purposes here.  We, of course,

9   defer to you, but I join in Mr. Hogan's argument.

10           THE COURT:  Okay.  So, I recognize the irony of

11   the insurers' position on one side or the other.  I'll say

12   that, but -- so where I think it comes down, I think,

13   initially, one attorney and then after having taken that one

14   deposition, if that attorney can't, in fact, answer questions

15   or there's some basis for another deposition and the parties

16   can't agree on that, I'll rule on it.  But, initially, one

17   attorney, per firm.

18           MR. HOGAN:  Thank you, Your Honor.  I appreciate

19   that.

20           There are some questions that I have relative to

21   the actual discovery responses and I don't want to jump ahead

22   of Mr. Alberto with regard to Slater and Slater, but when the

23   Court has a moment, I'd like to go through those --

24           THE COURT:  Uh-huh.

25           MR. HOGAN:  -- to get some guidance from the

1  Court.  It will hopefully help our meet-and-confer, as well

2  as the actual deposition.

3          MR. ALBERTO:  I believe the discovery requests

4  served on Slater were identical, so if Mr. Hogan wants to go

5  through those discovery requests, it'll probably answer a lot

6  of the issues that we have as well, Your Honor.

7          THE COURT:  I'll willing to do that.  I don't have

8  my markup in front of me, so we'll take a break before we do

9  that so I can get it and have it in front of me.

10          MR. HOGAN:  Thank you, Your Honor.

11          THE COURT:  Mr. Moxley?

12          MR. MOXLEY:  Yes, Your Honor.  Thank you for

13  hearing from me.  Cameron Moxley of Brown Rudnick, on behalf

14  of the Coalition.

15          Judge, I'm glad that I'm having an opportunity to

16  speak to you quickly before we go through the exercise of

17  going through the specific requests, because from the

18  Coalition' perspective, we just wanted to bring a couple of

19  points to bear for the Court's consideration as you consider

20  these issues.

21          One of those points, Your Honor, just from our

22  perspective, sitting where we sit as the Coalition --

23  obviously, Mr. Alberto speaks for the Slater firm, Mr. Hogan

24  speaks for the Eisenberg Rothweiler firm, and we won't get in

25  the middle of that, Judge -- but just from our perspective,

1  we duly note that all of this discovery from the insurers is

2  directed at Coalition firms.  And so, as the Court considers

3  what I think the Court has described before, colloquially,

4  during these sessions as the original standard, what I might

5  refer to as the original issue that was raised with the 2004

6  discovery, about, you know, being attorney-signed proof of

7  claim forms.

8        We would just draw to the Court's attention that

9  the discovery is only propounded on Coalition firms and it's

10 propounded on a firm like Slater, which the Court knows has

11 something in the order of 97 and a half percent were signed

12 by claimants.  And so, I think that the Court may want to

13 keep that in mind as you consider the proportionality issues

14 and as you consider the relevance issues.

15       Thank you, Your Honor.

16       THE COURT:  Thank you.

17       Okay.  Mr. Currie?

18       MR. CURRIE:  Yes, Your Honor, just a clarifying

19 question.  We're going to begin with one attorney per law

20 firm.  Because we're not in a 30(b)(6) situation, well, we

21 just want to clarify that it would be the attorney that we

22 would select as the one that we believe to be the most

23 relevant.

24       Is that consistent with the Court's understanding?

25       THE COURT:  Sure.

1        MR. CURRIE:  And the other point, Your Honor, and

2  in some ways, regarding Mr. Moxley's point that he just made

3  very quickly, the reason, as the Court is aware, that we're

4  talking about Slater and Eisenberg Rothweiler now is that

5  they're a little bit ahead of some of the other law firms

6  that we're talking about.  So, you know, our intention, given

7  the Court's ruling on Monday is that, ultimately, we are

8  going to want to seek deposition testimony from counsel at

9  those firms, as well, but it's not just a situation where,

10  you know, the particular circumstances of one firm, you know,

11  dictates proportionality.

12        I think what we tried do is select law firms where

13  we believe the information is going to give the Court a

14  picture of how these claims ultimately were solicited and to

15  what degree they were vetted, and, ultimately, are part of

16  what's before us today.

17        THE COURT:  Okay.  Well, I recognize that these

18  firms filed a significant number of the claims.  I think the

19  Coalition has been telling me that they represent more

20  than -- I don't know if we're up to 80 percent now or not,

21  but definitely more than 60 percent.  So, if you file more

22  claims, you, you know, you're in that category.

23        Okay.  Let's -- do we have anything else?  Let me

24  look at the agenda.

25        MR. ABBOTT:  Your Honor, the only other item on

1  the agenda was Mr. Hogan's letter, Your Honor, that I think

2  we've been discussing.

3          THE COURT:  Okay.

4          MR. ABBOTT:  So, that's all for today that's on

5  the agenda.

6          THE COURT:  Let's take 10 minutes and then let's

7  go through the discovery that Mr. Hogan wants to go through

8  and I'll have it in front of me.  Thank you.

9          We're in recess.

10      (Recess taken at 12:23 p.m.)

11      (Proceedings resumed at 12:33 p.m.)

12          THE COURT:  Okay, this is Judge Silverstein.

13  We're back on the record.

14          Can you all see me?

15          COUNSEL:  Yes, Your Honor.

16          THE COURT:  Okay.  I've got some two-camera thing

17  going on here and I don't get it, but anyway.

18          COUNSEL:  We were seeing you twice, but I think

19  we're limited to one now, Your Honor.

20          THE COURT:  Lovely.  Okay.  Okay, thank you.

21          Okay, Mr. Hogan.  I'm going to make sure I'm

22  working off the same document you're working off of.

23          MR. HOGAN:  Your Honor, I have the supplemental

24  responses that we filed, Eisenberg Rothweiler's supplemental

25  responses and objection to Zurich Insurers' subpoena to

1  produce documents.  Is that what you have?

2          THE COURT:  I have --

3          MR. HOGAN:  And it's dated, so you know,

4  November 17th.

5          THE COURT:  Huh, November 18th.

6      (Pause)

7          MR. ALBERTO:  Dan, how many requests are on your

8  request for production --

9          MR. HOGAN:  Seventeen.

10         MR. ALBERTO:  Okay.

11         MR. HOGAN:  Seventeen.

12         MR. ALBERTO:  Thank you.

13         THE COURT:  Well, I have one with 17 requests, and

14 I have Eisenberg -- ah, that's Eisenberg -- yeah, Eisenberg

15 Rothweiler's responses and objections dated November 5?

16         MR. HOGAN:  We supplemented those on the 17th,

17 Your Honor, and they should be attached to the declaration

18 that I filed, the response to this motion.

19         THE COURT:  Okay.  Is it -- are we going to get

20 into your response or is it sufficient --

21         MR. HOGAN:  Very limitedly, Your Honor.  The --

22         THE COURT:  -- that I have the actual discovery

23 requests?

24         MR. HOGAN:  Okay, let's start with the discovery.

25 If we have to get into our responses, Your Honor, I'll make

1 representations as necessary and, if it becomes an issue, we

2 can go from there.

3         THE COURT:  Okay.

4         MR. HOGAN:  Your Honor, before we get into the

5 weeds on this -- and I appreciate you calling balls and

6 strikes on this -- hopefully, it will help narrow the

7 depositions -- but I did want to make just one point about

8 the designation of the appropriate person.  I can foresee a

9 situation, Your Honor, where the insurers select someone from

10 our firm who doesn't have the best understanding of the

11 processes, okay?  If what your ruling was that the process --

12 the process is what is the relevant aspect of this discovery,

13 it seems to me that the law firms will be in the best

14 position to designate a person who has the best understanding

15 of the processes used by that firm.

16         And so I just wanted to address that issue, Your

17 Honor, because I can foresee a situation where they maybe

18 pick somebody who doesn't have an understanding of those

19 processes, which would then result in them having a second

20 bite at the apple when the second occurred.

21         THE COURT:  Okay, I understand that.  And, you

22 know, on the other hand, people who actually signed proofs of

23 claim also have knowledge of what they did in particular.  So

24 I'd like there to be a discussion and see if there can be,

25 after hearing each other, some agreement on who the right

1  person is, but if there isn't, I'm going to let the insurance

2  company decide who it is.  But if somebody wants a second

3  deposition, I'll hear about it and whether --

4          MR. HOGAN:  Okay.

5          THE COURT:  -- there should be one.

6          MR. HOGAN:  Super.  Thank you, Your Honor.  Fair

7  enough.

8          Let's move on to request number 1, Your Honor.

9  And this is for "each claim form submitted to Omni by your

10  law firm that was signed by an attorney; provide any

11  authorization, forms, or documents."

12          And I don't know that this changed from one to the

13  other, Your Honor, but what the Eisenberg firm did was we

14  referred to the professional employment agreement exemplar,

15  which was attached to our 2019 statement, which gives that

16  authorization.  And so, from our perspective -- and then, of

17  course, I cited to a privilege log on the supplemental, Your

18  Honor.

19          MR. ALBERTO:  Plus Slater did the same, Your

20  Honor; we attached our exemplar form to our prior response.

21  Going through 14,000 separate client files, of course, is

22  going to be difficult, or even, you know, the 300 or so that

23  remain attorney-signed rather than client-signed, which is

24  what I understand we're talking about now.

25          THE COURT:  Well, it strikes me, if that's the

1   authorization and there weren't separate authorizations or

2   different authorizations each time, for example, an attorney

3   signed a claim, then that's what there is.  I guess, you

4   know, in terms of the response, I guess, at a deposition

5   somebody can ask if there were additional documents.  You

6   know, I don't know because I don't know what you all did, but

7   I would assume you are relying on your retainer letter,

8   because I read many of those a while ago and they -- most of

9   them, although not all, I think had some version of something

10  in them which the law firm relied on.

11          MR. HOGAN:  Okay.  Thank you, Your Honor.

12          MR. SCHIAVONI:  Your Honor, Mr. Kosnoff did

13  testify that Mr. Hogan's firm used a second form of

14  engagement letter that's not been produced.  We've written

15  Mr. Kosnoff for that exemplar, but we probably ought to have

16  that.

17          THE COURT:  Yeah.  I mean, if there's more than

18  one exemplar that was used and some clients signed one and

19  some clients signed another, you know, yes.  Whatever the

20  generic forms are, I would think they should all be produced,

21  if there's more than one or, again, if there were a

22  separate -- a separate authorization simply for filing proofs

23  of claim; I don't think you have to give 14,000 of them, but

24  I think you need to give every version of a responsive

25  document.

1         MR. WILKS:  Your Honor, it's David Wilks.  I'm

2  sorry to jump in and I'm sorry, Mr. Hogan, to interrupt you,

3  but on -- what Mr. Schiavoni says is not -- I mean, it's a

4  little misleading.  The point that Mr. Kosnoff's deposition

5  makes is there are some instances in which other firms had a

6  referral-type relationship with the AIS firms.  All the other

7  features of the exemplar remain the same, it's just a

8  function of, you know, fee-splitting and that sort of thing.

9         So I would make that clarification and ask that,

10  you know, where we're talking about the same exemplar when it

11  comes to what these requests ask for, the single exemplar is

12  sufficient, that the fee-sharing doesn't really matter.

13         THE COURT:  If there's some arrangement with

14  another firm and that other firm is the one who sent out the

15  engagement letter and had the authority, then I think you

16  need to produce a copy of that firm's exemplar letter.

17         MR. WILKS:  Understood, but if that's not the

18  case, Your Honor, I assume the standard exemplar will

19  suffice.

20         THE COURT:  Yeah.  I don't know what's out there.

21  All I'm saying is, whatever is out there needs to be

22  produced, it can be produced as an exemplar, but there needs

23  to be produced each version or each different -- each

24  different exemplar that there is with respect to these

25  claims.

1          MR. WILKS:  On the authorization issue.

2    Understood, Your Honor.  Thank you.

3          Thanks, Dan.

4          MR. HOGAN:  Thank you, Your Honor.  Moving --

5    unless someone else has any other comments, moving to request

6    number 2, this one is for "each claim submitted to Omni by

7    your firm that was signed by an attorney; documents

8    sufficient to show which attorneys in your firm spoke or

9    interacted with claimants."

10         Again, this is going to be specific as to each and

11   this seems to be beyond the bounds of what your ruling was

12   earlier.

13       (Pause)

14         THE COURT:  Well, I think identifying which

15   attorneys spoke with claimants is appropriate because -- who

16   spoke to them and then who signed it.  And, if they're

17   different --

18         MR. HOGAN:  Okay, but this is for each claim form.

19   So it's specific as to each claim form.  So, Your Honor, I

20   can read that to mean that we're going to have to for each of

21   the 15,000 that Eisenberg Rothweiler submitted, that for each

22   one that was signed by attorney -- and it's some less than

23   the 15,000, obviously -- we're going to have to identify

24   which attorney spoke -- so it's still going to be a massive

25   undertaking with regard to that, as opposed to saying, "The

1  following attorneys at Eisenberg Rothweiler who signed proofs

2  of claim spoke or interacted with claimants."

3         THE COURT:  So, Mr. Currie, what's your response

4  to that?  How do you see --

5         MR. CURRIE:  Your Honor --

6         THE COURT:  -- how do you see this working?

7         MR. CURRIE:  Yeah.  Well, Your Honor, what we're

8  trying to understand, given the information deficit we have,

9  is, you know, were there situations or circumstances where --

10 and documents that would go to that which would identify

11 situations where the attorney who signs the form was not the

12 person who actually spoke to the claimant.  And, you know --

13 and so, you know, each attorney who signs has an obligation

14 to have, you know, an understanding of the facts sufficient

15 to be able to sign the form in good faith.

16        So that's what we're trying to get at here, Your

17 Honor, are there circumstances where -- for the attorney-

18 signed proofs of claim where the attorney who signed it is

19 someone who had no contact with the claimant, that's what

20 we're trying to get at with this request.

21        THE COURT:  So do you envision that each law firm

22 has to go through their, you know, 14,000 proofs of claim, or

23 whatever it is, and do that for each claim?

24        MR. CURRIE:  No, Your Honor.  The subset we're

25 asking for is for those situations where there was an

1  attorney-signed claim.  So, for Eisenberg Rothweiler, there

2  were a lot of claims signed by attorneys, but we're not

3  asking for their -- you know, the entire 18,000, we're asking

4  for the -- you know, it looks like there was 2,000 or more

5  than 2,000, but we're not asking for all the proofs of claim.

6        THE COURT:  Okay.  So to go through 2,000 is still

7  pretty significant.  So is there some way that there can be a

8  sampling of those?  Is there some way that -- I guess I would

9  ask you all to see if there's some way that you don't have to

10 go through all 2,000.

11       MR. HOGAN:  Your Honor, I see it, if we're going

12 to produce an attorney that the insurers will select, it

13 would appear that that attorney will be able to answer some

14 questions about this process.  Remember, this is all about

15 the process.  And, to the extent that the insurers aren't

16 satisfied with that, they can bring that back to the Court,

17 but we will discuss it on a meet-and-confer and see if we can

18 come up with a process that satisfies their needs.

19       THE COURT:  Yeah, see if there's some set of

20 documentary evidence as well that could be produced so that

21 in fact somebody can be questioned on it.

22       MR. HOGAN:  Okay.  Thank you, Your Honor.

23       Unless anyone has anything else on number 2, I'd

24 move to number 3.  Number 3, "Documents sufficient to

25 identify the call center claim processors, third party

1    administrators, claims aggregators, and other non-law firm

2    businesses involved in preparing, completing, and submitting

3    claims forms."

4         What I can tell you, Your Honor -- again, I'm not

5    sure that you're looking at the supplemental, but I can tell

6    you, Your Honor, that what Eisenberg Rothweiler, even though

7    this is a document request, after asserting a number of

8    different privileges, Eisenberg Rothweiler asserted that it

9    did not engage any call center claims processors, third party

10   administrators, claims aggregators, or other non-law firm

11   businesses in preparing, completing, and submitting claims

12   forms.  So they can ask us about that at the deposition, but

13   there aren't any documents that are relevant or responsive to

14   that request.

15        THE COURT:  Then that's the answer.

16        MR. HOGAN:  Thank you.

17        Number 4, "For each claim submitted to Omni by

18   your law firm" -- so these are all claim forms, okay -- "all

19   documents related to whether the attorney who signed the

20   claim form was authorized in writing to sign the claim form."

21        And what we did here, Your Honor, is we just drew

22   them back to number 1, the professional employment agreement

23   exemplar.

24        (Pause)

25        THE COURT:  Yeah.  And, Mr. Currie, is there

1  something more that you're looking for, other than whatever

2  it was that authorized it?

3       MR. CURRIE:  No, Your Honor.  Number 4 was a

4  slightly different way of trying to get at the information

5  we're seeking in number 1.  So, we agree.

6       THE COURT:  Okay.

7       MR. HOGAN:  Number 5, Your Honor, "For each claim

8  submitted to Omni" -- so all claims, not just attorney-

9  signed -- "all documents related to when the claim form was

10  signed by the attorney at your law firm."  Okay?

11       This is a huge undertaking and we asserted that we

12  have no documents responsive to this request that weren't

13  protected from disclosure and we referenced our privilege

14  log.

15       THE COURT:  Why would that be?  I'm not sure I

16  understand that privilege assertion.

17       MR. HOGAN:  All documents related to when the

18  claim form was signed.  The claim form would have been

19  signed, Your Honor, at either -- obviously, at some point

20  before the bar date, unless, of course, it was amended, but

21  it would have been -- that would have happened after

22  communications with the client.  And so, by virtue of that,

23  and the fact that we don't have any documents that -- so

24  Eisenberg Rothweiler is a firm that doesn't keep track of its

25  time, it's not a bankruptcy law firm or any other -- it's a

1  contingency firm, and so they don't keep track of their time

2  and so, therefore, they don't keep logs about when a proof of

3  claim was executed.

4             THE COURT:  Mr. Currie?

5             MR. CURRIE:  Your Honor, as we state at the

6  beginning of this document request, documents include meta

7  data, right?  So meta data could reveal that a proof of claim

8  form signed by an attorney was signed or -- whether

9  electronically or otherwise, and then the proof of claim form

10  was then changed or amended following that.  So that's the

11  relevance here, Your Honor.  We're trying to understand in

12  the process of how these claims were put together and

13  submitted, you know, were there issues where claim forms were

14  signed and then information was filled out after that or, you

15  know, a situation where an attorney, for example, signed a

16  single form on day one and then days later, when the bar date

17  was approach, that signature was just attached.

18             So that's the significance of this request, Your

19  Honor.

20             MR. HOGAN:  Your Honor, if I may respond?  So, for

21  Eisenberg Rothweiler, we're talking about over 15,000 proofs

22  of claim.  As I understand it, the insurers have access to

23  the Omni database and are able to procure the actual filed

24  proofs of claim directly from the Omni database, and so --

25  which are indicative of when they were signed or dated.  And

1  so there's -- it doesn't seem -- I mean, in terms of the

2  proportionality, this is way beyond what we're talking about

3  in terms of processes.  An attorney can answer questions

4  about when proofs of claim were signed relative to when they

5  were submitted, but, you know, each proof of claim is going

6  to be a different calculus.

7             And so we're well beyond the bounds of processes

8  and we're now in the weeds, and that's what we're trying to

9  avoid.

10            THE COURT:  So is this --

11            MR. SCHIAVONI:  Judge, could we just have a set,

12  maybe a sample of a hundred --

13            THE COURT:  That's my thought.

14            MR. SCHIAVONI:  -- of the native --

15            THE COURT:  Yeah, that's my thought is that there

16  should be able to be some small sample, subset that you all

17  should work on agreeing to.  You had an expert before who

18  said you could use -- I forget, I think it was 200 in a group

19  and extrapolate with 90-plus percent accuracy on something.

20            So why don't you see if you can come up with some

21  smallish sample size that would work.

22            MR. HOGAN:  We will meet and confer on that issue.

23  Thank you, Your Honor.

24            Number 6, "For each claim submitted to Omni by

25  your law firm" -- again, all the claims again, Your Honor --

1  "documents to identify the entity that submitted the claim

2  form."

3            And, just so the Court has complete clarity on

4  this, what Eisenberg Rothweiler responded is that for each

5  claim form submitted to Omni by Eisenberg Rothweiler,

6  Eisenberg Rothweiler is the entity that submitted the claim

7  form.  Okay?

8            THE COURT:  Yeah.

9            MR. SCHIAVONI:  Your Honor, I'm just -- I'm not so

10  sure how we tease that out between Kosnoff and Mr. Van

11  Arsdale.  I don't know what that means, actually.  It's like

12  there's AIS claims forms, did Eisenberg submit some subset of

13  them or submit all of them?  Like that would be an issue on

14  that to --

15            MR. HOGAN:  Well, Your Honor, that's a question

16  for the insurers to ask AVA Law or to ask Mr. Kosnoff, those

17  aren't questions that Eisenberg Rothweiler can necessarily

18  answer.

19            THE COURT:  Well, what I hear you saying, Mr.

20  Hogan, is that the proofs of claim signed by Eisenberg

21  Rothweiler were submitted by Eisenberg Rothweiler and not

22  AIS, not Mr. Kosnoff, not somebody else --

23            MR. HOGAN:  That's my understanding --

24            THE COURT:  -- is that what I'm hearing?

25            MR. HOGAN:  -- Your Honor.  That's my

1 understanding, yes, Your Honor.

2           THE COURT:  Okay.

3           MR. SCHIAVONI:  So we had, you know, signatures,

4 electronic signatures from Mr. Kosnoff that -- on a given day

5 that originate in Philadelphia and San Diego, and when it was

6 really possible to fly back and forth between the two, so it

7 appeared, at least, that his signature was being

8 electronically attached in Philly and in San Diego at the

9 same time.  So it's like that is why we were getting at that

10 issue.

11           THE COURT:  Okay.  Well, again, why don't you see

12 if there is some kind of subset that can be generated or,

13 since you have those particular -- that particular

14 information, maybe there can be an agreement that those

15 particular forms, those particular proofs of claim form be --

16 any documentation that Eisenberg may have on it gets produced

17 on particular claim forms then, if that's the concern.

18           But I think you guys should be able to work this

19 one out because Eisenberg -- it sounds like, for Eisenberg at

20 least, it submitted its own.  If it was also submitting for

21 somebody else, I think that should be part of this

22 production, but in a -- again, in a -- some kind of a sample-

23 type arrangement.

24           MR. HOGAN:  We'll explore that, Your Honor, and

25 we'll endeavor to meet and confer and come to an agreeable

1  format on that.

2          THE COURT:  Thank you.

3          MR. HOGAN:  Okay.  Number 7, Your Honor, "For each

4  claim form submitted to Omni by your law firm documents

5  reflecting the amount of time you spent investigating the

6  claim and confirming the existence of evidentiary support for

7  the facts in the proof of claim."

8          Now, this is obviously a process question, Your

9  Honor, right?  And we understand your directive to respond in

10  a deposition to that format.  What we asserted, Your Honor,

11  in our response to this, however, was that Eisenberg

12  Rothweiler does not document the amount of time spent

13  investigating claims and reviewing evidentiary support for

14  the facts set forth in the claims, and Eisenberg Rothweiler

15  has no documents responsive to the request.  Again, a

16  personal injury firm, they don't keep track of their time.

17  That's not to say that they don't have records, Your Honor,

18  but those records are really incorporated into the attorney-

19  client communications that they had with their clients.

20          And to the request specifically, the amount of

21  time you spend investigating the claims, that is super

22  specific as to claims.  They can speak to it generally, but,

23  again, this is very broad and it's for all claims, not just

24  the ones signed by attorneys.

25          MR. SCHIAVONI:  Your Honor has the affidavit from

1  the person of Reciprocity who -- one of the people who was

2  involved there in generating claims.  We do think that

3  Mr. Hogan's claims were initiated in Montana.  I guess we'll

4  find that out at the deposition, but it's like that would

5  sort of explain whether those documents and records get at

6  this because, if the -- if in fact three lawyers in

7  Philadelphia spoke to 17,000 people in 45 days, it's like --

8  that's fine, it's like it would somehow be reflected

9  ultimately in their time, but if it was really done in

10  Montana and then these folks were just filling out the

11  time -- the proofs of claim in Philly, then there would be

12  like -- it's like there being records establishing that they

13  really weren't talking to the clients, so like the time would

14  be zero.

15         MR. HOGAN:  There'd be records that they weren't

16  talking?  So it's a negative there.  You're saying there'd be

17  records that they weren't talking, how would there be records

18  that they weren't talking?

19         MR. SCHIAVONI:  Well, if, for instance, you were

20  getting the -- all you were getting was just a simple paper

21  report from Montana and your folks were just, you know,

22  signing off on proofs of claim there, there would be no time

23  spent dealing with the clients.

24         MR. HOGAN:  I would think that the deposition

25  would ferret out the processes sufficiently, Your Honor, that

1  these questions would be put to bed.

2          MR. SCHIAVONI:  There would be bills from

3  Reciprocity that would show the time, you know, associated

4  with speaking to the clients.

5          MR. HOGAN:  Mr. Schiavoni, I believe you have

6  discovery requests and subpoenas out to Reciprocity, if I'm

7  not mistaken.

8          MR. SCHIAVONI:  Yes, and they may ultimately be

9  answered, you know, if and when we can get before a court in

10 Montana, but you will have the bills there, presumably,

11 Mr. Hogan.

12         THE COURT:  Well, did you ask for -- is that what

13 this is going to, this document request?

14         MR. HOGAN:  No, it's about the amount of time you

15 spent investigating the claim and confirming the existence of

16 evidentiary support, it's not about bills.

17         THE COURT:  You, meaning the law firm.  If the law

18 firm is relying on someone else, then -- your law firm --

19         MR. HOGAN:  That's not what they asked for.

20         THE COURT:  -- you, I don't know how that's

21 defined, but --

22         MR. HOGAN:  "You" is defined as Eisenberg

23 Rothweiler, Your Honor.

24         THE COURT:  Well, if the firm does not keep time

25 records -- and I guess I'm not surprised to hear that given

1  that they are a personal injury firm -- and I'm not sure what

2  they would have that would reflect the time that they spent,

3  I suppose, again, other than perhaps a notation in a file

4  from a call with a client, and I'm not sure that that would

5  even reflect time, it would just reflect a contact.  So --

6           MR. HOGAN:  Exactly.

7           THE COURT:  -- I'm not sure if there are any --

8  you know, if there's no records, there's no records.  If you

9  want records of a contract with Reciprocity, I would have

10  thought that was encompassed in here.  Didn't we already go

11  over that somewhere or isn't that encompassed in here

12  somewhere?

13          MR. HOGAN:  It is, Your Honor, in terms of the

14  question asked about whether we had any relations --

15          THE COURT:  Yes.

16          MR. HOGAN:  -- with third party processors and

17  aggregators.

18          THE COURT:  Yeah.  I mean, if there are no

19  documents -- this clearly, most directly asks for time

20  records, which they don't have, and if they don't have some

21  other kind of just general log or a checklist or a -- you

22  know, for each client -- yeah, I heard from him; yeah, I can

23  sign the proof of claim; yeah, I can do whatever -- if they

24  don't have that, I guess they don't have that.

25          MR. CURRIE:  Your Honor, I think that -- I guess

1   what we're trying to understand in forming these requests is

2   what -- you know, for example, a file might indicate, if it

3   happened, that on, you know, date X, a lawyer spoke to the

4   claimant, and then maybe, on date Y, a lawyer spoke to the

5   claimant again.  It may not reflect that they talked for 15

6   minutes or five minutes, but it at least would demonstrate

7   contact.

8           And what we're trying to understand is really

9   getting at what was done to investigate these claims and,

10  given the information deficit that we are in, this is one of

11  the questions or one of the requests that is aimed at getting

12  that information.  So there may be records in the claim file

13  that indicate, or not, whether lawyers actually talked to

14  these claimants.

15          THE COURT:  Well, if you're generating some subset

16  of claimants that you're going to look at, then if the -- if

17  there's something in that claimant's file that's responsive

18  to this, it can be produced; it can be produced in a redacted

19  form, if it's privileged information, but it could be

20  produced.

21          MR. HOGAN:  Okay.  Understood, Your Honor.

22          Quickly, number 8 is really along the same lines.

23  "For each claim form submitted to Omni by your law firm, all

24  documents, including, but not limited to, time entries

25  reflecting or relating to actions your law firm took to

1  confirm the existence of evidentiary support."

2         THE COURT:  I would think there would be the same

3  response here, if --

4         MR. HOGAN:  And it was in fact the same response,

5  Your Honor.

6         THE COURT:  Yeah.

7         MR. CURRIE:  Your Honor, just what is different

8  between this request and the previous one is, hypothetically,

9  what a firm might do to try to confirm the existence of

10 evidentiary support is they may actually -- I don't know,

11 they could go on the internet and find out whether, you know,

12 the troop identified actually was in the location that the

13 claimant on the phone talked about, or other things like that

14 that they may have put in their files.

15        So those are facts, those are not privileged

16 communications.  So, if there were documents that reflect the

17 investigation, that's what -- that's what we're interested

18 in.  We're not interested in, you know, attorney thought

19 processes, what we're looking for is, you know, what

20 evidentiary support did they ultimately acquire and put into

21 the file.  And perhaps maybe this is another example of

22 where, if we're going to be sampling some, we could see if

23 what the samples reveal in this regard.

24        THE COURT:  Yeah.

25        MR. ALBERTO:  Your Honor, Justin Alberto.  I would

1  submit that everything Mr. Currie just said is 100 percent

2  work product.  Those are direct stories from folks that have

3  alleged rape, inappropriate sexual contact.  What can we

4  produce that is not privileged or work product there?  I

5  don't see how any of that could be produced.

6          And that actually is what I was going to say on

7  number 9 and number 10, which I think get more into the

8  claimants' files.

9          MR. HOGAN:  Agreed.

10          MR. ALBERTO:  I think those are the most

11  problematic.  For time records, our firms don't keep time

12  records, our clients' firms don't keep time records.  But

13  number 9 and number 10 are essentially asking for every piece

14  of information and every single client file.  I know that

15  we're now just talking about attorney-signed claims, but

16  either way, I mean, the work product doctrine applies to

17  attorney-signed claims or claims with client ink.

18          MR. SCHIAVONI:  What the meta data shows and what

19  we -- we have put in some of this already -- is it shows the

20  creation, time and date for the document, and then when it

21  was completed.  And, for instance, Mr. Hogan and some of the

22  ones for Mr. Eisenberg that we were able to extract from

23  Omni, and those are limited because of the -- that's why we

24  need some from you.  They show, you know, in a matter of

25  minutes or less, seconds, you know, the opening, creation,

1  and completion of the forms.

2          So it's like we may need more of those native

3  forms from you.  I'm hoping -- we'll meet and confer on it,

4  whether a sample is necessary or I need to just run down with

5  Omni with our technical people exactly, you know, what

6  problems we're encountering with the meta data when it got to

7  Omni versus the original files that you'll have.

8          MR. HOGAN:  Your Honor, what I'm hearing from

9  Mr. Schiavoni is that the insurers apparently already have a

10 lot of this information.

11         MR. SCHIAVONI:  Oh, we definitely have some from

12 Omni, but the meta data that was -- that got to Omni, some of

13 it -- it didn't get through on all the files, many of them

14 were swept before they got to Omni.

15         THE COURT:  Okay.  Well, I think, again, to the

16 extent we're using a sample, I think that will limit the

17 amount of the burden on the firm, and let's see if that

18 works.

19         MR. HOGAN:  Okay.

20         THE COURT:  In terms of -- and I'm not a meta data

21 guru, so I don't know how that works at all, but I'll let you

22 all figure that out.

23         In terms of "actions the law firm took to confirm

24 the existence of evidentiary support," I mean, that really

25 goes directly to the attorneys' investigation required by

1  the -- that he attested to under oath when he signed the

2  proof of claim form, and I think they're entitled to know

3  what investigation was done.  If it was none, it was none.

4  If it was, I spoke with the client and I talked to his

5  counselor and I went on the BSA website to see if he was in

6  troop whatever, you know, I think that is part of the

7  investigation and he's entitled to know if that was done.

8  And if there's documents that reflect that, they should be

9  produced.

10          If there's some privilege to it -- and I don't

11  know that that's a work product issue; it might be, but

12  nonetheless, for that, that's what he attested to and I think

13  he's entitled to know what was done.  So, to the extent that

14  it's opinion work product that's reflected somewhere, I think

15  that's protected.  To the extent that there's fact work

16  product, I think they're entitled to that as part of an

17  investigation of what was done.

18          MR. ALBERTO:  But to be clear, Your Honor, you're

19  referring to documents or call notes directly with claimants

20  about their experience with a troop leader or however their

21  sex abuse took place?  I mean, there's a reason that these

22  claims are confidential and now we're, you know, getting into

23  issues as to whether even attorneys for claimants can produce

24  this without violating ethical rules.

25          THE COURT:  Well, they're confidential, but to the

1   extent it went into a proof of claim, it's not confidential

2   anymore.  It's a public document.

3           MR. ALBERTO:  I understand that, but -- sorry, I

4   was talking over you, Your Honor.

5           THE COURT:  No, that's okay.  This goes to what

6   investigation was done.  If there is attorney-client

7   privileged information or if there is opinion work product,

8   then, again, I think that -- subject to seeing something

9   further on a specific objection where I have something

10  concrete in front of me to look at, my inclination on that is

11  that can be protected, it can be redacted and the privilege

12  asserted, but to the extent it's fact work product or it's

13  who I contacted, which implicates work product, when you

14  signed that form, it said you did an investigation and I

15  think people are entitled to know what that investigation

16  was.

17          Remember, work product is a qualified immunity,

18  it's most concerned with protecting attorney mental

19  impressions, and I'm going to protect that at this point,

20  unless I see a reason not to.  But in terms of -- in terms of

21  what was done, that could -- I see that that could

22  implicate -- you know, who you talk to sometimes is a part of

23  your work product, but I think in this instance that at least

24  aspect of it is at issue, so it's producible.

25          MR. HOGAN:  Thank you, Your Honor.

 1              I think, with that, we are now on -- let me just

 2  make sure -- I think we're on number 10.  "Claims submitted

 3  to Omni signed by an attorney, documents relating to the

 4  inquiry conducted to confirm the existence of evidence" --

 5  so, again, this is really the same issue, from our

 6  perspective, Your Honor.

 7              THE COURT:  I think so.

 8              MR. HOGAN:  Okay.  And then number 11, "Contracts

 9  or agreements entered into by your firm in connection with

10  soliciting, acquiring, accessing, interacting with and

11  executing signatures, or vetting claimants' potential

12  claims."

13              Again, very similar in terms of what they're

14  after; again, it goes to the processes.

15              THE COURT:  Yes.

16              MR. HOGAN:  Number 12, "All contracts, agreements

17  with third party funders."  You've earlier today that you

18  didn't see that to be relevant.

19              MR. SCHIAVONI:  Your Honor, if -- I actually

20  thought what you ruled before was you weren't reaching the

21  issue and you hadn't seen case law on it and whatnot.

22              THE COURT:  Yeah, I don't at this point, I don't

23  think so.  If you want to provide me with some authority,

24  I'll reconsider that, but at this point I don't understand

25  why it's relevant.

1          MR. SCHIAVONI:  Okay, Judge.  Judge Andrews has

2    written a decision on this and we would like to submit

3    something to it.

4          THE COURT:  Well, I'd be interested in what Judge

5    Andrews has to say.

6          MR. HOGAN:  As would I, Your Honor.  We can

7    discuss that on a meet-and-confer, and maybe Mr. Schiavoni

8    can provide us with that opinion, and we can hopefully narrow

9    any issues relative thereto.

10         THE COURT:  That's fine.

11         MR. HOGAN:  Number 13, Your Honor, "Each proof of

12   claim form submitted to Omni by your law firm" -- again --

13   "that was signed by an attorney; all documents reflecting

14   communications with third party vendors pertaining to

15   soliciting, processing, vetting, and filing proof of claim

16   forms."

17         Again, the processes.

18         THE COURT:  Yeah, it seems similar to other

19   requests.

20         MR. HOGAN:  Okay.

21         MR. SCHIAVONI:  Your Honor, I'm not quite sure

22   what that means.  Like are we going to get the agreements

23   with the -- with Reciprocity here or not?

24         THE COURT:  I think, if there are agreements with

25   these third party vendors, aggregators, whomever, yes, the

 1  agreements need to be produced.

 2          MR. HOGAN:  And, Your Honor, just so the record is

 3  clear, Eisenberg Rothweiler has indicated that it has no

 4  communications with third party vendors pertaining to the

 5  soliciting, processing, vetting, and filing claim forms.

 6          THE COURT:  Then they don't.

 7          MR. SCHIAVONI:  Well, you know, we'll get to the

 8  bottom of this in the deposition, but, you know, we have

 9  Mr. Kosnoff's testimony about the claims being originated in

10  Montana through Reciprocity, it's hard to imagine that

11  there's not some sort of agreement that memorializes that.

12          MR. HOGAN:  That's what depositions are for.  So

13  we'll get to the bottom of that.

14          THE COURT:  Okay.

15          MR. HOGAN:  Number 14, Your Honor, original PDF of

16  the claim form.  This is the Omni native format.  Again,

17  we've just referred them to Omni, obviously, because that's

18  where those forms are, and so we need some instruction from

19  the Court on what to do in this regard.

20          THE COURT:  Okay.  So what is this here?  So is

21  that a PDF that's created on the -- at the firm or whoever is

22  submitting it?  What is this?

23          MR. HOGAN:  It says, "that the firm transmitted to

24  Omni in native format."

25          THE COURT:  Okay.  Well, isn't this what we were

1  talking about before then?  So that we're going to have some

2  sample and, yes, it's produced in native format with meta

3  data so that, if the meta data got corrupted in its

4  transmission to Omni or if they wipe it or whatever they do,

5  this would presumably show the meta data.

6          So we're going to do it through a sample, not

7  every claim.

8          MR. HOGAN:  Understood, Your Honor.  We will meet

9  and confer and come to an arrangement on that.

10          Number 15, Your Honor, this is -- this is a

11  situation where we're essentially accused of submitting a

12  claim form -- "submitted to Omni where you" -- meaning

13  Eisenberg Rothweiler -- "signed a stand-alone page, page 12

14  of the claim form, rather than a signature page that was part

15  of the document."

16          And, just so the record is clear, Eisenberg

17  Rothweiler did not use a stand-alone signature page, page 12

18  of the claim form, and therefore we said we had no documents

19  responsive to the request because that's not how it was done

20  at Eisenberg Rothweiler.

21          THE COURT:  Okay.  So then -- if it wasn't, then

22  there are no documents responsive.  If somebody else --

23          MR. HOGAN:  And that's what we said in our

24  response, Your Honor.

25          THE COURT:  Yeah.  Okay.

1            MR. HOGAN:  Number 16, "For each document

2   responsive to the above request, identify by claim number the

3   claim form."  And, again -- and then they want the signed

4   stand-alone signature page.  And, again, we said we don't

5   have it, we didn't do it that way, and so we don't have

6   anything.

7            THE COURT:  Okay.

8            MR. HOGAN:  Finally, number 17, "All documents

9   reflecting communications between you, your law firm, and

10  non-law firm business pertaining to ownership of or financial

11  interest in claims."

12           And, just so the record is entirely, abundantly

13  clear, Your Honor, Eisenberg Rothweiler stated it had no

14  documents responsive to this request as there were no

15  communications between Eisenberg Rothweiler and any non-law

16  firm business pertaining to ownership of or financial

17  interest in claims in these cases.

18           THE COURT:  Okay.

19           MR. HOGAN:  So we produced nothing.

20           MR. CURRIE:  Your Honor, may I just be heard?

21  Regarding this request and some of the other ones where

22  Mr. Hogan points out that these requests might not

23  particularly be relevant to Eisenberg Rothweiler, what we

24  want to have -- ask the Court to clarify is, under

25  circumstances with other law firms where these circumstances

1  apply, whether the -- another firm would be required to

2  produce documents related to this, because we don't want to

3  be back in front of Your Honor with another firm in a few

4  days or next week with the same question.

5          THE COURT:  Yeah, no.  I mean, I was -- the

6  parties' firms either have documents or they don't have

7  documents and, if the firm does not have documents, there's

8  nothing to produce; if the firm has documents, then they need

9  to produce them.

10         And I think going through this has been helpful, I

11 hope, for the parties in terms of what we've been able to

12 narrow, I think, this down to and the sampling size that I

13 think should really work and be more tenable and less

14 burdensome.  So that's what I'd like you guys to focus on in

15 your meet-and-confer, see if you can agree, and -- but I

16 think going through this, at least for me, was helpful and,

17 hopefully, for you as well.  But, yes, if there's a firm out

18 there that's got responsive documents where Eisenberg

19 Rothweiler didn't, they have to produce them, subject to --

20         MR. HOGAN:  Thank you, Your Honor, I would agree.

21         THE COURT:  -- subject to assertions of privilege

22 as appropriate and redaction where appropriate.

23         MR. HOGAN:  Thank you, Your Honor, this has been

24 very helpful.

25         THE COURT:  Good.

1            MR. ALBERTO:  I have nothing further, Your Honor.

2   Thank you for your time today.

3            THE COURT:  Thank you.

4            Mr. Wilks?

5            MR. CURRIE:  Your Honor, I just --

6            MR. WILKS:  No, I just wanted to thank you, Your

7   Honor, it's helpful.

8            THE COURT:  Okay.

9            MR. CURRIE:  Your Honor, if I may?  I just have

10  one clarifying question.

11           THE COURT:  Yes.

12           MR. CURRIE:  Regarding the selection of samples,

13  what -- and the parties can obviously meet and confer, but we

14  don't want to run into a circumstance where there's a dispute

15  about whether, for example, if the law firms are selecting

16  files that they believe are representative and we may or may

17  not know, I think we -- I'm kind of thinking out loud here,

18  Your Honor, but what process we have in place, so we don't

19  want to end up back in front of Your Honor again where we're

20  disputing about whether the sample was actually

21  representative or not.

22           THE COURT:  Okay.  Well, you all did have an

23  expert who testified before about selecting an appropriate

24  samples size for what you guys wanted to do with the percent

25  statistically -- that would give a statistically significant

1  result, I suggest you speak with them.  And then there was

2  only one area, as I recall, where there were -- maybe you

3  needed to see certain files, and I've already forgotten what

4  that was, and you can -- because you have that information of

5  which ones they are, you could say these are the ones I want.

6          But, yes, I expect that Century should be -- or

7  Zurich, I guess here, should be coming up with the way to

8  obtain an appropriate sample and then communicating that, and

9  let's see if there's any issues.

10          MR. CURRIE:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          Okay, any other questions?

13          MR. HOGAN:  Not at this time, Your Honor.

14          THE COURT:  Thank you.  If something comes up --

15  I'm hoping it won't, but if something comes up, call my

16  chambers.  Okay?

17          MR. HOGAN:  Will do.

18          MR. SCHIAVONI:  Will do.  Thank you.

19          THE COURT:  Thank you.

20          Mr. Abbott, are we complete here?

21          MR. ABBOTT:  We are, Your Honor.  Just by way of

22  information, while we were in this hearing, we did file an

23  agenda for Monday.  There are, I think, four substantive

24  items, five items on the agenda, one of them is a motion to

25  seal or something with respect to one of them.  So there will

1  be some matters to discuss on Monday.

2          THE COURT:  Okay.  I will also rule on AVA on

3  Monday.  So can you please let Mr. Grey know, because he may

4  not come to all of these hearings, and add that to the

5  agenda?  It was -- it was Number 8 on some agenda a few

6  hearings ago that AVA was included in the certain insurers --

7  ah, Mr. Grey, good -- the certain insurers' motion to compel.

8  I had carved him out.  I'm going to rule on your client,

9  Mr. Grey.

10          MR. GREY:  Thank you, Your Honor.

11          THE COURT:  Okay.

12          MR. ABBOTT:  Thank you, Your Honor.  We'll get

13  that added to the agenda.

14          THE COURT:  Thank you.

15          Mr. Currie, do you have a question?

16          MR. CURRIE:  Yes, Your Honor, just one last thing.

17  And, obviously, we'll confer with the parties, but it may be

18  productive to proceed with -- start proceeding with some of

19  the depositions while the issues relating to documents are

20  worked out, and I think that's what we will likely propose,

21  but what we want to avoid is a situation where the law firms

22  take a position that they don't want to sit for any

23  depositions until all the document issues are resolved.  So I

24  think, given the nature of, you know, perhaps the extent of

25  the documents that will need to be searched for and produced,

1 that could cause some delay.

2          So what we are interested in is likely to proceed

3 with some of these depositions, understanding that we won't

4 have the benefit of documents at that time.

5          THE COURT:  You all can make that decision, but

6 then I suspect I'll hear back from the firms they're only

7 going to sit once.  So you just --

8          MR. CURRIE:  You got it, Your Honor.

9          THE COURT:  -- need to have that discussion and

10 decide how you want to proceed.

11          Okay.  I don't think there's anything further, so

12 we're adjourned until Monday.  Have a good weekend,

13 everybody.

14          COUNSEL:  Thank you, Your Honor.

15      (Proceedings concluded at 1:23 p.m.)

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of my

5     knowledge and ability.

6

7

8     /s/ William J. Garling                    December 2, 2021

9     William J. Garling, CET-543

10    Certified Court Transcriptionist

11    For Reliable

12

13

14    /s/ Tracey J. Williams                    December 2, 2021

15    Tracey J. Williams, CET-914

16    Certified Court Transcriptionist

17    For Reliable

18

19

20    /s/ Coleen Rand                           December 2, 2021

21    Coleen Rand, CET-341

22    Certified Court Transcriptionist

23    For Reliable

24

25