**ROBBINS | RUSSELL**
Robbins, Russell, Englert, Orseck & Unterreiner LLP

Lawrence S. Robbins
202.775.4501
lrobbins@robbinsrussell.com

December 3, 2021

**By CM/ECF**

Chief Judge Laurie Selber Silverstein
United States Bankruptcy Court for the District of Delaware
824 North Market Street, 6th Floor
Wilmington, Delaware 19801

> Re:  *In re Boy Scouts of America and Delaware BSA, LLC*, No. 20-10343 (LSS)
> Motion to Quash Discovery Requests of Certain Insurers

Dear Judge Silverstein:

    A few weeks ago, the Insurers moved to compel Andrews & Thornton, Attorneys at Law ("A&T"), and ASK LLP ("ASK"), among other firms, to respond to interrogatories and document requests that the Insurers had issued under Federal Rules of Bankruptcy Procedure 7033 and 7034.  *See* Dkt. No. 7239; *see also* Declaration of William J. Trunk ("Trunk Decl.") Exs. 1–4.  A&T and ASK opposed that motion, asserting that they are nonparties to this bankruptcy and thus not subject to discovery under Rules 7033 and 7034.  *See* Dkt. No. 7334.

    Earlier this week, the Court ruled that attorneys who signed claim forms on behalf of their clients are "parties" for discovery purposes.  At that hearing, the Court considered no other objections to the Insurers' discovery requests.

    The next day, the Insurers noticed the depositions of A&T attorney Sean Higgins and ASK attorney David Stern.  *See* Trunk Decl. Exs. 5–6.  A&T and ASK objected to the deposition notices, the document requests, and the interrogatories (together, the "Requests"), on grounds of relevance, privilege, and burden.

    Just yesterday, the Court resolved objections brought by Slater Slater Schulman LLP and Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. to substantially similar discovery requests

December 3, 2021
Page 2

from the Insurers. We do appreciate how that ruling likely portends a similar result here. Even so, A&T and ASK feel constrained to submit this motion to preserve their appellate rights.

## I. The Requests Seek Irrelevant And Privileged Material, Pose An Undue Burden, And Should Be Quashed

The Requests target law firms and lawyers. From time immemorial, courts have justifiably resisted discovery aimed at attorneys. As then-Judge Sotomayor explained, judges "have been especially concerned about the burdens imposed on the adversary process when lawyers themselves have been the subject of discovery requests, and have resisted the idea that lawyers should routinely be subject to broad discovery." *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003) (citing *Hickman v. Taylor*, 329 U.S. 495, 506–14 (1947)).

The Insurers bear a heavy burden in justifying their request to depose, and rifle through the files of, their opposing counsel. They have not remotely carried that burden.

### 1. The Requests seek irrelevant information.

The Requests seek information about the process for gathering claims submitted by attorney-signed claim forms. *See generally* Trunk Decl. Exs. 1–4. To discover that information, the Insurers must show how that information is relevant. *See, e.g.*, *In re Energy Future Holdings Corp.*, 513 B.R. 651, 657 (Bankr. D. Del. 2014). They cannot.

The Insurers evidently believe that the Requests may impeach a claim's validity. But even so (and more on that mistaken belief below), claim validity is irrelevant to plan confirmation and plan voting. Claims are presumed valid under Bankruptcy Rule 3001(f), treated as allowed under Section 502(a), and thus entitled to vote under Section 1126(a). The Insurers have lodged no objections to claims submitted through A&T and ASK. And an estate fiduciary will determine— *after* plan confirmation—the ultimate validity of any given claim.

But even if claim validity were somehow relevant to plan confirmation, the Requests would shed no light on that question. The Requests seek information about the *process for gathering* claims. That information, even if produced, would tell us nothing about the validity of any *particular* claim. A sterling claim-gathering process can muster an invalid claim, just as a shoddy process can fetch a valid claim.

The Insurers have hinted that attorney-signed forms may not correspond to real claimants. But here again, that (unfounded) concern has nothing to do with plan confirmation. Votes will not be tallied by master ballot. All claimants represented by A&T and ASK instead are voting individually, by submitting a signed ballot—claimant-by-claimant—that votes the plan either up or down. Because genuine signatures require genuine claimants, only real claimants will sign ballots, and only real claimants will vote.

**ROBBINS | RUSSELL**

December 3, 2021
Page 3

The Insurers respond that "mere voting is in no way an indication that those claims have gone through an adequate vetting process." Dkt. No. 7495 at 2. And they say that an adequate vetting process shows whether the plan was proposed in good faith. *See id*. Not so. The Debtors proposed the plan, and so the question is whether the *Debtors* proposed the plan in good faith. *See* 11 U.S.C. § 1129(a)(3). Discovery into A&T and ASK's legal work has more to do with the price of tea in China than with whether the Debtors proposed the plan in good faith.

In all events, the Insurers have identified nothing unusual (much less nefarious) about how A&T and ASK retained clients and filed claims on their behalf. Many claims were submitted just as they are in all mass-tort cases: using third-party vendors that specialize in communicating with victims and processing their intake forms. Nor should the fact that A&T and ASK signed some claim forms surprise anyone. The claim forms were submitted during a pandemic, and survivors are confronting—often for the first time in years—horrible abuse. So A&T and ASK were ethically obligated to take every measure to pursue their client's goals—including signing claim forms to preserve their clients' claims.

### 2. The Requests threaten multiple privileges.

Equally unsurprising is that the Requests—targeted, as they are, at the Insurers' opposing counsel—seek an array of privileged materials. For example, one of the Requests asks for "all documents relating to the inquiry . . . conducted to confirm the existence of evidentiary support for each fact set forth in the Claim Form." Trunk Decl. Ex. 3, at 12 (¶ 10); *see also id*. Ex. 4, at 12 (¶ 10). These materials plainly are privileged (and implicate attorney work-product protections, to boot). *See* Fed. R. Civ. P. 26(b)(3)(B); *Sporck v. Peil*, 759 F.2d 312, 315–16 (3d Cir. 1985) (granting writ of mandamus and reversing district court decision to permit discovery of documents used to prepare witness for deposition because the "selection process" of documents "itself" is protected opinion work-product).

Other Requests demand communications and work-product generated by the law firms' agents. *See* Trunk Decl. Ex. 3, at 12 (¶ 13) (requesting "all documents reflecting communications with third party vendors pertaining to soliciting, processing, vetting, and filing Claim forms"); *see also id*. Ex. 4, at 12 (¶ 13) (same). But "[f]actual investigations conducted by an agent of the attorney," such as gathering information to vet the merits of a claim, "clearly fall within the attorney–client rubric." *See Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 494 (S.D.N.Y. 2019); *see also, e.g.*, *Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*, 255 F. Supp. 3d 561, 572–73 (M.D. Pa. 2017) (attorney–client privilege extends to "agents of either" the lawyer or the client "who facilitate communications between them" (quoting Restatement (Third) of the Law Governing Lawyers § 70 (2020))).

Still others probe for details about the dates and times on which the firms took various actions. *See* Trunk Decl. *See* Trunk Decl. Ex. 1, at ¶ 3(e); *id*. Ex. 2, at ¶ 3(e). But "details about . . . when [an attorney–client communication] occurred relative to other critical events, how

long it lasted, where the attorney and client were when they communicated—might reveal information protected by the attorney work-product doctrine." *Turkmen v. Ashcroft*, No. 02-CV-2307 (JG), 2006 WL 1517743, at *5 (E.D.N.Y. May 30, 2006).

At bottom, the attorney–client and work-product privileges protect not just the substance of attorney action but also "the manner of counsel's preparation for it." *See Walker v. United Parcel Servs.*, 87 F.R.D. 360, 362 (E.D. Pa. 1980) (refusing to permit deposition when "Plaintiffs would depose counsel not only on the very subject matter of the court hearing, but on the manner of counsel's preparation for it"). The Requests seek precisely that.

3.   **The Requests would inflict immense burdens without benefit.**

A discovery request that seeks relevant and nonprivileged information must also "be 'proportional to the needs of the case.'" *In re Maxus Energy Corp.*, 617 B.R. 806, 813 (Bankr. D. Del. 2020) (quoting Fed. R. Civ. P. 26(b)(1)). That proportionality test determines "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* The Insurers' Requests flunk the exam: They offer all pain and no gain.

Start with the pain. The Requests threaten "the relationship between attorneys and clients." *Subpoena Issued to Dennis Friedman*, 350 F.3d at 70 (recognizing that threat as burdening the adversarial process). They seek what amount to entire case files, and would require attorneys to disclose client confidences and attorney work-product.

Worse still, the Requests place no "reasonable limits on the sources or types of information that [A&T and ASK] must search for and retrieve." *In re SunEdison, Inc.*, 562 B.R. 243, 251 (Bankr. S.D.N.Y. 2017). The interrogatories ask the firms to identify *each* attorney who spoke with *each* claimant, *each* outside vendor involved in preparing or submitting *each* claim, *everything* the targeted lawyer did to confirm *each* claim's veracity, and how long that all took *per claim*. *See* Trunk Decl. Exs. 1–2. One document request alone seeks—for *each claim* submitted by an attorney-signed form—"all documents relating to the inquiry" that an attorney—or anyone working at the attorney's direction—made in vetting that claim. Trunk Decl. Ex. 3, at 12.

Now consider the absence of gain. Even if the claims-gathering process in general were both relevant and important to plan confirmation (and we steadfastly believe it is not), these particular Requests would not move the ball down the field. *See* Fed. R. Civ. P. 26(b)(1) (proportionality requires considering "the importance of the discovery in resolving the issues" at stake). At last count, nearly 90% of the claim forms submitted by A&T and ASK bore client signatures, and that number is likely to increase as we approach plan confirmation. As for the remaining claims, even the Insurers do not assert—nor could they—that *every* attorney-signed claim form represents an invalid claim or a fabricated claimant. So the Requests implicate a trivial-at-best percentage of claims, and thus are unimportant to resolving any issues at stake during plan confirmation.

ROBBINS | RUSSELL

December 3, 2021
Page 5

Finally, the Insurers have a different, and first-hand source for information about claim validity: the claimants. *See* Fed. R. Civ. P. 26(b)(1) (proportionality involves "the parties' relative access to relevant information"). Yet how many discovery requests have the Insurers served on claimants? None.

\*     \*     \*

The Insurers' decision to target lawyers instead of claimants betrays the Insurers' ignoble motives. The Insurers are uninterested in pursuing good-faith discovery about claim validity or in objecting to survivors' claims. Their real interest lies in suffocating A&T and ASK with discovery requests for just long enough to bully forth a plan that only an insurer could love. All at the survivors' expense. The Court should forbid the Insurers from hijacking the discovery rules to serve such ends.

Sincerely,

/s/ Lawrence S. Robbins

Lawrence S. Robbins
Counsel to ANDREWS & THORNTON,
ATTORNEYS AT LAW and ASK LLP