# Exhibit B

```
 1
 2              UNITED STATES BANKRUPTCY COURT
 3              FOR THE DISTRICT OF DELAWARE
 4                       -  -  -
 5   IN RE:                    : CHAPTER 11
 6   BOY SCOUTS OF AMERICA AND : CASE NO.
 7   DELAWARE BSA, LLC,        : 20-10343 (LSS)
 8        Debtors.             : (Jointly Administered)
 9                       -  -  -
10
11
12              Remote videotaped deposition of
13   JAMES PATTON, ESQ., held via videoconference on
14   Tuesday, November 30, 2021, beginning at
15   approximately 10:05 a.m., the proceedings being
16   recorded stenographically by Gail Inghram
17   Verbano, Registered Diplomate Reporter, Certified
18   Realtime Reporter, Certified Shorthand
19   Reporter-CA (No. 8635), and transcribed under her
20   direction.
21
22
23                            COPY
24
25
```

Page 70

1  the -- the future claims will be awarded under
2  the TDP in the aggregate is 5 billion.
3       Q.   And if that's 21 percent of the
4  total value of direct abuse claims, that's far
5  above the range of 2.4 to 7.1 billion; is that
6  right?  Total abuse claims?
7       A.   You are correct.  That math is
8  correct.
9       Q.   So in light of that, do you have
10 any hesitations in recommending the plan -- the
11 fifth amended plan as set forth in the letter
12 that we've been looking at in Exhibit 8?
13      A.   Not at the moment.
14      Q.   As the FCR, is it your expectation
15 that the settlement trustee is going to hold
16 aside 21 percent of the trust assets for future
17 claimants?
18      A.   No.  That would be inconsistent
19 with the TDP.
20      Q.   In what way?
21      A.   That's just not how the TDP works.
22      Q.   So how does the TDP deal with
23 the -- with the allocation of the 21 percent of
24 trust assets for future claimants that you
25 contemplate?

Page 71

1       A.   So once the -- once the trust is
2  up and running this -- this notion of future
3  claim/present claim falls away.
4            Claims will be presented in
5  whatever sequence -- whatever order they come in
6  the door.  The TDP requires that they be subject
7  to a two FIFO queues -- first-in, first-out, two
8  FIFO queues, one based on date of filing and
9  another based on date of successful allowance.
10 It will be the responsibility of the trustee and
11 the STAC and the FCR to determine what the likely
12 universe of claims is to be.
13           And that will allow -- and what
14 the likely size of the asset pool -- or what the
15 actual size of the asset pool is at any given
16 time.
17           So this is the way all these mass
18 tort -- true -- you know, mass tort involving
19 tens of thousands of claims, mass tort trusts
20 work.  It takes a long time to work your way
21 through 80 or 100,000 claims; and when I say long
22 time, I mean it's going to take years.
23           So the trustee is going to have to
24 make a judgment about how much can be paid to
25 each claim without knowing for sure exactly how

Page 72

1  many claims of what type will be filed and be
2  allowed; and when they will show up.  And that
3  judgment gets revised over time.  So a payment
4  percentage is established and reviewed
5  periodically -- this is all set out in the TDP
6  and trust agreement -- and adjusted periodically
7  based on the facts available at that time,
8  including additional assets and the actual claim
9  experience of the trust.
10           And the goal is to pay the last
11 claim in substantially the same manner as the
12 first claim.  So it's a -- it's -- it's a -- it's
13 a process that unfolds through time, more or less
14 as I've just described and, you know, there are
15 80 or 90 trusts out there running this -- or more
16 running this same way.
17      Q.   And if I understand you correctly,
18 as the process unfolds, the settlement trustee
19 will have to make some judgment calls about what
20 to pay and how to pay; is that correct?
21      A.   Of course.  I mean, there is, of
22 course, the option that you don't pay anybody
23 until the last claim arrives, but that seems
24 entirely unfair since that will be years,
25 undoubtedly, before every last claim arrives and

Page 73

1  is evaluated.
2       Q.   And I take it that's not typical
3  in futures claims situations such as this; isn't
4  that correct?
5       A.   I don't think that's typical in
6  any claims situation.  I mean, whether or not you
7  have a future claim problem or category in the
8  context of this trust, what I've described would
9  have to happen with or without a Future
10 Claimants' Representative when you've got 80-some
11 thousand claims to evaluate.
12           I -- I -- and -- and what I've
13 described is exactly how the TDP is -- well, more
14 or less how the TDP is designed.  So it's going
15 to happen in this context.  As described with or
16 without future claims.
17      Q.   Were you involved in the drafting
18 of the TDPs?
19      A.   Yes.
20      Q.   In -- in what way?
21      A.   Well, the pen was wielded in the
22 first instance by the coalition legal team.  They
23 started with a TDP and trust agreement that was
24 derived from the TDP and trust agreements that
25 we've developed in mass torts over the last 30 or

Page 74

1   40 years, which I've been intimately involved
2   with during that time in developing them.
3          Then we focused on the results of
4   that drafting effort from our point of view and
5   provided comments.  And then those comments were
6   reacted to and the process went back and forth
7   until the final TDP was approved.
8          The debtor was involved in that as
9   well.  And so, too, was the TCC.
10     Q.     When you say -- when you say the
11  coalition legal team, are you referring to
12  Mr. Molton and his colleagues?
13     A.     Yes.
14     Q.     It's correct, is it not that
15  you've served as an FCR in multiple cases?
16     A.     Yes.
17     Q.     And have you ever -- has there
18  ever been an occasion in which you filed a proof
19  of claim in any of those cases as the FCR?
20     A.     No.  As the FCR, no.
21         MS. LEVINE:  Okay.  Let's take
22     a 10-minute break, and then I'll probably
23     have an hour or so of questioning.  I
24     suspect others will have questioning after
25     that.  So . . .

Page 75

1          THE VIDEOGRAPHER:  Okay, going
2     off the record at 11:39 Eastern time.
3             -  -  -
4         (Whereupon, a short recess was taken.)
5             -  -  -
6          THE VIDEOGRAPHER:  Everything
7     is recording, and we are back on the
8     record at 11:50 a.m. Eastern time.
9   BY MS. LEVINE:
10     Q.     Good morning, Mr. Patton.
11     A.     Good morning.
12     Q.     Mr. Patton, is it correct that the
13  plan proposed by -- by the debtors and others
14  contemplates a settlement trustee?
15     A.     Yes.
16     Q.     And what is your understanding of
17  the responsibilities of the settlement trustee?
18     A.     Well, first of all, they're
19  spelled out in quite a bit of detail in the trust
20  agreement in the TDP; but, broadly, it's the
21  settlement trustee's job to oversee and run the
22  trust.  He's a fiduciary for the claimants.
23     Q.     And I'd like to draw your
24  attention to the settlement trust agreement which
25  you just referred to and that's contained within

Page 76

1   the plan.
2      A.     Mm-hmm.
3      Q.     It's Exhibit B to the plan.  If
4   you look at the top of the document, there are
5   pages that go across.
6      A.     Yes.
7      Q.     Page numbers.  So the Exhibit B
8   begins on page 165 of 413.  Can you flip to that?
9      A.     Got it.  Wait a minute.
10     Q.     The plan.
11     A.     Yeah, 165?
12     Q.     Yep.
13     A.     I have it.
14     Q.     Great.  Now, drawing your
15  attention to page 175 of 413 which is part of the
16  settlement trust agreement, it's page 5 --
17     A.     Yes.
18     Q.     -- of the trust agreement.  And
19  can we put -- can we put that back on -- back up
20  on the screen as well.  That's Exhibit 7.  So
21  we're going to go to the page 175 of 413 if
22  you're looking at the pages at the top.
23         There we go.  So I'd like to refer
24  you to Section 2.1(d)(ii) which is the bottom of
25  that page.

Page 77

1      A.     Yes.
2      Q.     Okay.  And it provides that "the
3   trustee shall have the power to," and then (ii)
4   is adopt procedures to allow valid Abuse Claims
5   and determine an allowed liability amount for
6   each Allowed Abuse Claim in accordance with the
7   TDP.
8          Do you see that?
9      A.     Yes, I do.
10     Q.     And you agree that that's part of
11  the responsibilities of the settlement trust --
12  of the settlement trustee?
13     A.     Yes.
14     Q.     And settlement trustee is the --
15     A.     Defined as a power, but, yes, it's
16  part of his responsibilities as well.
17     Q.     And he's supposed to do that in
18  accordance with the TDP; correct?
19     A.     Correct.
20     Q.     All right.  And then I'd like to
21  draw your -- draw your attention as well to the
22  TDPs which are Exhibit A to the plan.  And they
23  begin on page 135 of 413.
24     A.     I'm there.
25     Q.     And does this appear to be the