1
2

          UNITED STATES BANKRUPTCY COURT
            DISTRICT OF DELAWARE

3

                .   Chapter 11

IN RE:              .

4
                .   Case No. 20-10343 (LSS)

BOY SCOUTS OF AMERICA AND   .

5
DELAWARE BSA, LLC,       .

                .   Courtroom No. 2

6
                .   824 North Market Street
                .   Wilmington, Delaware 19801

7
                .

           Debtors.   .   Monday, December 6, 2021

8
. . . . . . . . . . . . . . . . .   11:00 A.M.

9

              TRANSCRIPT OF HEARING

10
    BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
       UNITED STATES BANKRUPTCY JUDGE

11

APPEARANCES:

12

For the Debtor:       Andrew Remming, Esquire

13
                MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                1201 North Market Street, 16th Floor

14
                Wilmington, Delaware 19899

15
                - and -

16
                Jessica C. Lauria, Esquire

17
                WHITE & CASE LLP
                1221 Avenue of the Americas
                New York, New York 10020

18

19
Audio Operator:      LaCrisha Harden

20
Transcription Company:  Reliable

21
                1007 N. Orange Street
                Wilmington, Delaware 19801

22
                (302)654-8080
                Email:  gmatthews@reliable-co.com

23

Proceedings recorded by electronic sound recording; transcript

24
produced by transcription service.

25

APPEARANCES (Cont'd):

For Marc J. Bern &          William Sullivan, Esquire
Partners:                   SULLIVAN HAZELTINE ALLINSON LLC
                            919 North Market Street
                            Wilmington, Delaware 19801

For Century:                Tancred Schiavoni, Esquire
                            O'MELVENY & MYERS LLP
                            Times Square Tower
                            7 Times Square
                            New York, New York 10036

For the Coalition of        Cameron Moxley, Esquire
Abused Scouts for           BROWN RUDNICK LLP
Justice:                    7 Times Square
                            New York, New York 10036

For Krause & Kinsman:       Bernard Conaway, Esquire
                            CAMPBELL & LEVINE, LLC
                            222 Delaware Avenue, Suite 1620
                            Wilmington, Delaware 19801

For Kosnoff Law:            David Wilks, Esquire
                            WILKS LAW, LLC
                            4250 Lancaster Pike, Suite 200
                            Wilmington, Delaware 19805

For Verus LLC:              Michael Kaplan, Esquire
                            LOWENSTEIN SANDLER


For Various Law Firms:      Raeann Warner, Esquire
                            JACOBS & CRUMPLAR P.A.
                            750 Shipyard Drive, Suite 200
                            Wilmington, Delaware 19801

                            - and -

                            Jonathan Hilton, Esquire
                            HILTON PARKER LLC
                            7544 Slate Ridge Boulevard
                            Reynoldsburg, Ohio 43068

1   APPEARANCES (Cont'd):

2   For Great American:      Bruce McCullough, Esquire
                             BODELL BOVE, LLC
3                            1225 North King Street, Suite 1000
                             Wilmington, Delaware 19801
4
                             - and -
5
6                            David Christian, Esquire
                             DAVID CHRISTIAN ATTORNEYS LLC
7                            105 W. Madison Street, Suite 1400
                             Chicago, Illinois 60602
8
    For Zalkin and Pfau      Sasha Gurvitz, Esquire
9   Cochran:                 Thomas Patterson, Esquire
                             KTBS LAW LLP
10                           1801 Century Park East, 26th Floor
                             Los Angeles, California 90067
11
12  For the United Methodist Jeremy Ryan, Esquire
    and Roman Catholic Ad   POTTER ANDERSON & CORROON LLP
13  Hoc Committee:           Hercules Plaza
                             1313 North Market Street, 6th Floor
14                           P.O. Box 951
                             Wilmington, Delaware 19801
15
    For Tort Claimants:      David M. Klauder, Esquire
16                           BIELLI & KLAUDER, LLC
                             1204 N. King Street
17                           Wilmington, Delaware 19801
18
    For AVA Law:             Joseph Grey, Esquire
19                           CROSS & SIMON LLC
                             1105 North Market Street, Suite 901
20                           Wilmington, Delaware 19801

21  Appearing Pro Se:        Guy Taylor
                             Jason Turner
22

23

24

25

1 | <u>MATTERS GOING FORWARD</u>:

2 | Motion of Marc J. Bern & Partners LLC to Quash Subpoena to
3 | Produce Documents Issued to KLS Legal Solutions LLC (D.I.
6380, filed 9/27/21)

4 | **Court's Ruling:  Motion to Quash Granted**

5 | 2. Letter to the Honorable Chief Judge Laurie Selber
6 | Silverstein Seeking an Order Compelling Verus LLC to Comply
with a Subpoena (D.I. 6813, filed 10/27/21)

7 | **Court's Ruling: Motion to Compel Granted**

8 | 3. Letter to the Honorable Chief Judge Laurie Selber
9 | Silverstein from Bruce D. Celebrezze Regarding Certain
Insurers' Seeking an Order Compelling the Coalition's Rule
10 | 30(b)(6) Deposition (D.I. 7471, filed 11/29/21)

11 | 4. Letter to the Honorable Chief Judge Laurie Selber
12 | Silverstein from Daniel K. Hogan on behalf of Eisenberg,
Rothweiler, Winkler, Eisenberg & Jeck, P.C. Regarding a
13 | Protective Order for Discovery Responses Produced by Timothy
Kosnoff (D.I. 7480, filed 11/29/21)

14 | **Court's Ruling:  Matters Taken Under Advisement**

15 | 6. Letter to the Honorable Chief Judge Laurie Selber
16 | Silverstein from Kelly T. Currie Regarding Insurers' Omnibus
Motion to Compel Kosnoff Law PLLC, AVA Law Group, Napoli
17 | Shkolnik, PLLC, Krause & Kinsman Law Firm, Andrews & Thornton,
Attorneys at Law, and ASK LLP to Respond to Document Requests
18 | and Interrogatories (D.I. 7239, filed 11/15/21)

19 | **Court's Ruling:  134**

20

21

22

23

24

25

1          (Proceedings commence at 11:06 a.m.)

2              THE COURT:  This is Judge Silverstein.  Good

3   morning.  We're here in Boy Scouts of America, Case 20-10343.

4              And I'll turn this over to debtors' counsel.

5              MR. REMMING:  Good morning, Your Honor.  For the

6   record, Andrew Remming, Morris, Nichols, Arsht & Tunnell, for

7   the debtor.

8              We're going to -- we're working off of the second

9   amended agenda that we filed this morning.  Does Your Honor

10  have a copy of that?

11             THE COURT:  I do.

12             MR. REMMING:  Terrific.  Before we get into the

13  agenda, as we typically do, I'd like to turn it over to Ms.

14  Lauria for a case update.

15             THE COURT:  Ms. Lauria.

16             MS. LAURIA:  Thank you, Your Honor.  Jessica

17  Lauria, White & Case, on behalf of the debtors.

18             Your Honor, following our hearing last Thursday,

19  where I made a brief presentation concerning a potential

20  change to the voting deadline in these Chapter 11 cases, the

21  debtors, on Friday, December 3rd, hosted the meet-and-confer

22  with a number of the parties in this case, those that are

23  particularly interested in this issue.  We had a followup

24  meet-and-confer on this topic on Sunday, December 5th.  And

25  I'm happy to report, Your Honor, that we reached a number of

1  agreements with the participating parties concerning changes

2  to the dates, subject, of course, to Your Honor's views.

3          I sent an email to the participating parties

4  yesterday evening that contained a number of bullet points

5  concerning those agreements.  And what I'd like to do, Your

6  Honor, is walk the Court and the other parties present at

7  today's hearing what those agreements are, subject, of course,

8  to any feedback we may receive from you.

9          So, Your Honor, I'm going to divide this because

10  we're dealing with a lot of dates, so I'm going to divide this

11  into basically three categories:

12          We've got the dates themselves.

13          We also want to walk the Court through how the

14  debtors would propose to re-notice out the supplemental -- or

15  the extended voting deadline, I should say.

16          And then, finally, there were a number of other

17  agreements that were reached with the parties in connection

18  with this entire package that I know folks are anxious to have

19  me read into the record.

20          So why don't I start with the dates?  And what I'd

21  like to do, just because there are a number of dates that are

22  affected, is just quickly give what the dates are that we're

23  talking about and then go back and unpack each of those dates

24  with some additional color for how we got there.

25          So, first and foremost, the parties have agreed to

1  extend the voting deadline from January 14th to January 28th.

2  That would then extend the date for which the preliminary

3  voting report would be filed on the public docket to January

4  4th.  It's currently December 21.  That would move to January

5  4th.

6          There is a new highly confidential voting report

7  that would be provided to participating parties.  That would

8  be provided on January 6th.  When I come back and unpack the

9  dates, I'm going to walk through what that report looks like

10  in greater detail.  But for now, let's call that the "highly

11  confidential voting report."

12          January 7th would remain the objection deadline on

13  the plan for the nonparticipating parties.  January 10th is

14  the objection deadline on the plan for the participating

15  parties, with a critically important exception, and that's for

16  supplemental objections related to voting.  I'll explain what

17  those are in a minute, but wanted to flag that those are being

18  carved out.

19          The final voting report would be filed on January

20  17th.

21          The plan support and brief deadline would remain

22  January 17th.  It's January 17th today.

23          That supplemental voting objection, which I'll

24  unpack in a moment, that would be January 19th, with a reply

25  deadline to that of January 21.

1          So that's the full list of dates.  Let me go back

2    and unpack some of the issues pertaining those dates.

3          So, again, as I mentioned, the parties have agreed

4    voting deadline extended from December 14th to the 28th.

5          Preliminary voting report prepared by Omni, the

6    solicitation agent, gets filed on the public docket on January

7    4th.

8          Then I mentioned January 6th, there is a highly

9    confidential report that would be provided to participating

10   parties.  You'll recall, Your Honor, at the disclosure

11   statement hearing -- and there -- it may have come up at a few

12   subsequent hearings -- that Mr. Patterson raised the issue of

13   receiving some data that correlates the votes of individuals

14   with whether or not those individuals indicated a local

15   council or a chartered organization on their proof of claim

16   form.

17         The debtors have agreed that the advisors will

18   provide, again, highly confidential to the participating

19   parties on January 6th, a report that correlates the voting

20   behavior with the thirty-five-hundred-dollar elections, as

21   well as indications of local council or chartered organization

22   involvement on the proof of claim form.

23         I'll come back to that, Your Honor.  But the

24   debtors have agreed to meet and confer with Mr. Patterson, the

25   TCC, and any other interested party over what that report

1    looks like and the data that's going to go into that report,

2    so that we're ready to go on January 6th with that report.  We

3    hope, Your Honor, that that saves the parties from having to

4    prepare discovery requests and other unnecessary discovery.

5    We're just going to prepare the report.  And you'll hear there

6    are a couple of reservation of rights pertaining to that

7    report.

8            Again, just walking through the time line, that

9    gets us to the January 7th/January 10th objection deadline.  I

10   mentioned that there's a carveout of that objection deadline

11   for supplemental voting-related objections.  This is not

12   intended to give parties another bite at the apple.  We've

13   agreed, however, that -- and Your Honor pointed this out, I

14   believe, at the last hearing or two hearings ago -- there may

15   be changes between the preliminary voting report on January

16   4th and the final voting report on January 17th.  Parties

17   should be able to file supplemental objections to deal with

18   those changes.

19           In addition, to the extent that there is voting-

20   related discovery that extends past that January 4th or

21   January 10th objection deadline, and parties discover new

22   issues or new information in connection with voting-related

23   discovery, they should be able to supplement their objection.

24           And then, similarly, we've agreed that, if a party

25   received voting-related discovery prior to January 10th, but

1    in close proximity to January 10th, such that it would be

2    unreasonable for them to incorporate that objection into their

3    filed objection on the 10th, that could be the subject of a

4    supplemental objection.

5            As I mentioned, that supplemental objection

6    deadline, we're looking at January 19th.  It's intended to

7    only cover a very discrete universe of issues with a

8    supplemental reply deadline following on January 21.  The 21st

9    is, indeed, the Friday before January 24th, the start of the

10   confirmation hearing.

11           So, Your Honor, those are the dates.  I can go

12   through the notices and other agreements and reservations of

13   rights for purposes of the record.  But before I do that, I

14   want to just pause on the dates to see if the Court has any

15   questions.

16           THE COURT:  No, I don't have any questions.

17           MS. LAURIA:  Okay, Your Honor.  Let me move then to

18   how we would propose to notice this out.  And again, this

19   information was provided to the participating parties in

20   advance.

21           The debtors intend to mail a simple one-page notice

22   to all voting parties that simply announces that the deadline

23   for voting has been changed.  We would also prepare a more

24   comprehensive notice describing what I just laid out, and that

25   comprehensive notice would be served on the 2002 list.  Both

1    of the notices are not going to be advocacy pieces, and the

2    debtors have agreed to consult with the parties-in-interest

3    with respect to those notices before sending.

4         Going back to the one-page notice for a moment,

5    Your Honor, that, I think, we need to prioritize.  It's one

6    page.  Omni needs to start printing it sooner, rather than

7    later, so the debtors would endeavor to get that one-page

8    notice out to the parties today, in the hope that we can get

9    the mailing launched within the next 24 to 48 hours

10   completely.

11        Because some of these dates are reflected in the

12   solicitation procedures order itself, we think it's probably

13   prudent to prepare a brief supplement that order, indicating

14   the changes to the dates.  But again, I wouldn't want that

15   order or debates over the order to hold up the printing of the

16   one-page notice because it is really critically important, we

17   think, that we notify, not only the 82,000 survivors who

18   received ballots, but also the thousands of chartered

19   organizations that received indirect ballots and the hundreds,

20   if not a few thousand other parties who received either

21   convenience claim solicitations or the general unsecured claim

22   ballots.

23        And then, finally, Your Honor, in the context of

24   these discussions, a number of other agreements and

25   reservation of rights were reached:

1         First, the debtors have agreed to instruct and work

2    with Omni, the solicitation agent, to make the survivor

3    ballots that have been received to date available to the

4    participating parties under the protective order on a highly

5    confidential -- that's an attorneys' eyes only -- basis.  they

6    won't be publicly available.  Again, these are going to be

7    designated as highly confidential.  We believe we can have

8    that first batch of ballots received to date available to the

9    parties by midweek, with the ballots that are received

10   subsequently available on a rolling basis for those future

11   tranches.

12        As I indicated, there's that highly confidential

13   January 6th report that correlates the voting information with

14   local council chartered org information.  We've agreed to meet

15   and confer, as I indicated earlier, with interested parties on

16   the content of that report and how that report will be

17   displayed, so it's user friendly for parties when they receive

18   it.  And we can start working with both Omni and Bates White

19   to gather that data and have it available to folks.

20        Your Honor, all parties reserve the right to argue

21   that the extension of the voting deadline may not be

22   sufficient to cure notice issues with respect to any plan

23   amendments that are filed from here on out.  And the debtors

24   and plan supporters, of course, are reserving right -- the

25   right to argue that sufficient notice is going to be given, if

1 | there are further plan amendments that are made.

2 |      Similarly, Your Honor, our provide -- the debtor is

3 | providing discovery into the ballots themselves or into the --

4 | providing the local council chartered organization correlated

5 | report is without prejudice to -- and we are reserving all

6 | rights to argue that that information is not relevant to the

7 | matters that the Court will consider at the confirmation

8 | hearing.  And similarly, the plan objectors are reserving the

9 | right to argue that it is relevant.

10 |      And then, finally, Your Honor, the extension of the

11 | voting deadline does not affect any party's right to take

12 | discovery with respect to solicitation matters or voting

13 | matters, either prior to or after the January 4th deadline,

14 | when the preliminary voting report is being filed.

15 |      So, with that, Your Honor, we worked pretty hard

16 | this weekend or over the last three days to reach these

17 | resolutions.  I think I've accurately reflected it.  And

18 | again, happy to answer any questions.  But that's where we

19 | sort of see the voting landscape today.

20 |      THE COURT:  Okay.  I don't have any questions.

21 |      Does anyone wish to be heard with respect to the

22 | deadlines and the agreements that Ms. Lauria has set out?

23 |    (No verbal response)

24 |      THE COURT:  Okay.  I hear no one.

25 |      I will permit the extension of the voting deadline

1  and related dates, as described and agreed to, with the

2  reservations that parties have agreed to.  I do believe that

3  the notice to creditors of the extended voting deadline needs

4  to be simple and straightforward and not an advocacy piece.

5          And the only thing that strikes me about extending

6  the time is that parties -- the creditors who have already

7  voted don't think they have to re-vote and hope there won't be

8  any confusion on that front.

9          But I will leave it to the parties to draft this

10 very simple, non-advocacy piece and permit it to go out

11 because -- immediately, because I do think, if we're extending

12 the deadline, people need to know right away.  And with the

13 mail these days, it seems to be slowed again, I think that

14 needs to get in the mail.

15         So those dates are fine.  And you can also

16 memorialize that in a form of order, but you don't have to

17 wait for that in order to begin.

18         MS. LAURIA:  Thank you, Your Honor.

19         THE COURT:  Okay.

20         MR. REMMING:  Thank you, Your Honor.

21         Turning back to the agenda, the first item on the

22 agenda is a motion by Bern & Partners, a motion to quash.

23         THE COURT:  Yes.

24         MR. REMMING:  I'll turn it over to counsel to Bern

25 & Partners if it's acceptable to Your Honor.

1            THE COURT:  Yes.

2            Mr. Sullivan.

3            MR. SULLIVAN:  Good morning, Your Honor.  For the

4  record, Bill Sullivan on behalf of Bern & Partners.

5            Your Honor, this motion was filed more than two

6  months ago, so I'll briefly review the procedural history:

7            Your Honor entered an order back on September 9th,

8  permitting Rule 2004 discovery against certain aggregaters.

9  KLS was not included on that order as a party from whom

10  discovery could be taken.  But nevertheless, five days later,

11  on September 14th, Century issued a subpoena to KLS.

12            We filed the motion on September 27th, before this

13  Court had adopted or created a protocol governing confirmation

14  discovery disputes.  But in the motion, we advised Century

15  that KLS is an entity through which the Bern firm employs and

16  pays paralegals and legal assistants working in its

17  Pennsylvania office, which is located in Conshohocken, and

18  which is the place where Century served the subpoena on KLS.

19  Based on that, the motion sets forth that any communications

20  that KLS employees had or any documents they worked on would

21  be both privileged and protected work product.

22            Century filed a response that included several

23  contentions:

24            First, they contended that the relationship between

25  Marc Bern and KLS was not defined.

1        They indicated that there was no evidence presented
2   that Bern has an ownership interest in KLS.

3        They argued that the discovery is relevant to
4   investigate KLS's involvement in submitting proofs of claim on
5   behalf of the Bern firm, some of which were signed by Mr.
6   Cappelli.  KLS did not sign the forms -- any forms, of course.

7        But I guess, most incredibly, the Century response,
8   at one point, argues that KLS's paralegal services are, at
9   most, similar to an online platform for the dissemination and
10  collection of questionnaires, summarizing the collected data
11  in a chart, and making a preliminary assessment of whether the
12  individuals completing the questionnaires met certain
13  requirements.  That's actually the description of services in
14  the Ravenell case that they rely on their response, but it
15  certainly doesn't describe KLS and what it did with respect to
16  the Bern firm matters at all.

17       For that reason, on October 29th, we filed a reply
18  and we included two declarations in the reply that would set a
19  clear factual record for this Court in making any decisions on
20  the motion to quash.  The declarations -- the initial motion
21  had sort of a general declaration from Mr. Cappelli and
22  included discussion of specific claims, where things stood
23  with respect to the Marc Bern claims that had been filed in
24  this case.

25       But on -- the two declarations filed with the reply

1   were from Mr. McKelly -- Mr. Cappelli, who's the managing

2   offer -- officer -- or managing partner -- I'm sorry -- of

3   Marc Bern's Philadelphia office, and also from Karen

4   Studebaker Cappelli, who is his wife, who's the owner of KLS.

5          And those declarations give a pretty

6   straightforward factual record that KLS employees and legal

7   assistants work out of the Bern firm's Conshohocken office;

8   that, to date, they have worked solely for Bern & Partners.

9   They have assisted Bern & Partners since 2017 in various mass

10  tort cases and continue to do so.  They don't do marketing or

11  case acquisition and they don't maintain separate documents or

12  files.  Rather, they work on files that are Marc Bern's files

13  for Marc Bern's clients.

14         So Your Honor, the reply makes clear that the

15  attorney/client privilege applies to any documents or

16  information that KLS may have.  And I'd simply want to

17  reference two quotes from Paragraph 5 of our reply.  And it

18  says with respect to the attorney/client privilege:

19         "What is vital to the privilege is that the

20  communication be made in confidence for the purpose of

21  obtaining legal advice from the lawyer."

22

23         And that:

24         "The attorney-client privilege 'must include all

25  other persons who act as the attorney's agents.'"

1        Your Honor, I think the most significant case for

2   the Court to review with respect to the privilege is the case

3   of United States v. Kovel, which is a Second Circuit case from

4   1961.  It is cited in the case that we rely on, U.S. v. El

5   Paso Company, which is a Fifth Circuit case from 1982.  The

6   Kovel case is also cited in Ravenell case that Century relies

7   on, which is a case from the Southern District of New York in

8   2012.  But in terms of responding to the case law, Century

9   argues that the privilege was waived based on the disclosure

10  of information to a third party; i.e., KLS, relying on the

11  Ravenell case.

12        I would point out to Your Honor that Ravenell notes

13  there is an exception to waiver for communications to an

14  attorney's agents for purposes of obtaining legal advice from

15  the lawyer.  And that's a specific quote at Page 2 of the

16  Ravenell case, citing to Kovel at Page 922, and that's

17  referenced in paragraph -- I believe that's Paragraph 9 of our

18  reply.

19        Your Honor, there can't be any argument that

20  paralegals and legal assistants working in a law firm's office

21  are agents of the firm, and that a client would have an

22  expectation of privacy for a statement made to them in

23  connection with legal services they expected to receive from

24  the law firm.  The privilege is not altered simply by how

25  these paralegals and legal assistants get paid.  And holding

1  otherwise, I think, would eviscerate agency from the privilege

2  entirely.

3          With respect to other discovery disputes, Your

4  Honor has had colloquy and the insurers have said they are

5  just looking for facts and facts aren't privileged.  And

6  certainly that's true, Your Honor, that facts aren't

7  privileged based on their disclosure to counsel.  But who

8  facts can be obtained from is entirely governed by privilege.

9          Your Honor, the reply also focuses on the work

10  product doctrine, which applies here.  We rely on the Cendant

11  case from the Third Circuit, which is a 2003 case.  And with

12  respect to the work product doctrine, the Cendant case

13  includes, as a summary, the work product is the product --

14  covers the -- or it says the proper, or it says the proper

15  preparation of a client's case demands that the lawyer

16  assemble information, sift the relevant from the irrelevant

17  facts, and prepare his legal theories and strategy without

18  undue and needless interference.  That's from the Cendant case

19  and it's citing to Hickman v. Taylor, which is the seminal

20  Supreme Court case on work product.

21          Your Honor has had discussions with some of the

22  other law firm parties that says that, well, we're dealing

23  with fact work product here, not opinion work product.  We

24  agree.  We had discussed that briefly in Paragraph 8 of our

25  reply.  But with respect to fact work product, the standard

1   for it to be obtained is both need and hardship, and Century

2   simply can't meet that here.  It might be met if a client had

3   died or could no longer testify.  But other than that, there's

4   no basis to seek the information from paralegals and legal

5   assistants, obtaining the information.

6           Your Honor, the parties did meet and confer.  And

7   at the meet-and-confer, I raised the issue of what is it that

8   triggers a need to obtain discovery from KLS.  And I was

9   referred to the 2004 motions that were filed back in February.

10  And as to -- for factual references, as to the declarations on

11  which they rely, without any specificity, Your Honor, there

12  are two declarations in particular that were relevant to the

13  2004 motions:  The Speckin declaration and the Hinton

14  declaration.

15          And from my review of that, the only thing that I

16  can ascertain is that, in Paragraph 5 of the Hinton

17  declaration, the Omni database includes an email address

18  associated with each proof of claim submission, and that's,

19  with paralegals and legal assistants submitting proofs of

20  claim, it may have included a KLS email address, based on the

21  way that Marc Bern employs them.

22          That sole piece of information, which is nowhere

23  stated in any of the filing from Century, but which is what --

24  really, what I'm trying to ascertain, is not a basis to demand

25  wholesale discovery from KLS as to any client of the Bern firm

1  that a paralegal or legal assistant spoke with or any claim

2  that they helped process.

3          So, Your Honor, in summary, regardless of whether

4  Century is mistaken about what KLS does or if it's just using

5  it as a -- fishing for information from them relating to Marc

6  Bern, all of the information requested from KLS, to the extent

7  it exists, would be covered by the attorney/client and work

8  product privileges, and we respectfully request that the

9  motion be granted.

10          THE COURT:  Thank you.

11          Let me hear from Century.

12          MR. SCHIAVONI:  Your Honor, Tancred Schiavoni for

13  Century.

14          The Marc Bern firm submitted 5,911 claims,

15  approximately 6,000 claims.  The 2004 motion was an attempt

16  to, in a very targeted way, target specific claims to explore

17  how the claims overall were generated.  It targeted from the

18  Bern firm 635 claims submitted by Mr. Cappelli.  And I

19  apologize if I've mispronounced his name.  But of those 635

20  claims, what's revealed in the motion to quash is that an

21  effort was made after those were the subject of inquiry to go

22  and try to cure the submissions.

23          And as a result of that, 245 of those claims could

24  not be pursued.  So there was a 40 percent failure rate among

25  the claims that were the subject of the -- of our original

1  2004.  And that's a not insignificant failure rate among the

2  claims.  There's no explanation provided why they had to

3  abandon 40 percent of those claims at all in the submissions.

4        The requests here that we seek from this firm are

5  not as blunderbussed as I think has been suggested.  What we

6  want is very targeted.  What we're seeking is the native

7  copies of the proofs of claim forms that were uploaded by KLS.

8  There's no dispute now with regard to this entity that it is

9  the entity that prepared the proof of claim forms and

10 submitted them.  That's asserted in the motion to quash.

11 There's no privilege associated with the native form of those

12 documents.  It's simply what was submitted.

13        It's got metadata in it that will show who attached

14 the signatures to each of the proofs of claim.  It's not

15 metadata in it that will show when the file was created, when

16 it was completed.  So it's got time logs in it, we believe.

17 And it's got information in it about who is the one who

18 submitted the information in the proof of claim in its

19 preparation.

20        So there's nothing in the native form of the proof

21 of claim form that I think should raise any of Mr. Sullivan's

22 concerns about privilege or revealing secrets of what the

23 clients, you know, may have conveyed to this third party

24 entity, nor would I submit, Your Honor, is it burdensome to

25 produce this.  These files will all be, you know, able to be

1  copied in one electronic sweep.  If necessary, we're prepared

2  to send in our own -- you know, our consultant to help make

3  the copies for them.  But it's just a simple matter of one

4  electronic set of copies of those 6,900 files.  And so we

5  don't think there's burden or cost associated with it.  We

6  don't think there's an issue of privilege associated with it.

7          There's two other things we would seek, Your Honor:

8          One is there is a document request here, I think

9  it's Request Number 5, that seeks, in broad terms, documents

10 concerning the processes and procedures followed for providing

11 the services.  To the extent that there was a protocol or

12 instruction prepared by this third-party vendor for the

13 attachment of signatures, whether they be the purported

14 claimants' signatures or attorneys' signatures, we'd ask for

15 that.  We don't think that's a communication between a client

16 and an attorney or one that is intended to facilitate it.

17 It's a ministerial communication about how the proofs of claim

18 were prepared.  And we think that likely does exist, in one

19 form or another.

20         The related document we would seek is the -- to the

21 extent there's a retention agreement or agreement that sort of

22 sets out the scope of work that this entity, this vendor was

23 supposed to do, we'd ask for that, again, to the extent it

24 would contain information about the protocols for attaching

25 signatures and the general nature of what the instruction was

1  and relationship of what they were prepared to do.  That's

2  what we seek here.

3         And I don't think it's -- you know, it's not

4  particularly burdensome for them to do.  And again, if

5  necessary, we'll pick up the cost of sending in, you know, an

6  electronic vendor to make the copies of the native files.  But

7  I don't think that's really something that, you know, requires

8  even a consultant, something that Mr. Sullivan's office could

9  likely do themselves very easily.  But again, we'd have

10  someone sent to go in and copy them, if necessary.  Thank you,

11  Your Honor.

12         THE COURT:  Thank you.

13         It strikes me, in hearing the requests, that the

14  requests had been narrowed significantly from what was

15  originally sent -- maybe I'm wrong -- but also that the issue

16  regarding the relationship between the law firm and KLS is not

17  as much of an issue anymore.  I actually don't think, even if

18  this had been done total -- strictly in house -- which maybe

19  it was, given the nature of the relationship between these two

20  entities -- I'm not sure that is as significant an issue as I

21  thought it was to the briefing.  Am I missing something on

22  that, Mr. Schiavoni?

23         MR. SULLIVAN:  No, Your Honor.  I think, as we've

24  learned more about the different aggregaters, that's been

25  helpful to us.  And I think there is some difference between

1  KLS and some of the other entities.

2         You know, Your Honor, if you could just have some

3  sympathy to side of the looking glass that we're looking at

4  this from, we -- you know, we don't have transparency on what

5  is happening on the other side.  We were able to pull from the

6  proofs of claim that came in to Omni, not all of them because

7  many of them were scraped of metadata, but we were able to

8  pull from them, you know, these -- some of these particular

9  codes that kept taking us back to KLS.  We were uncertain as

10 to what that entity was and where it was.

11        I am accepting Mr. Sullivan's representations about

12 what it is.  You know, I don't think it -- it's -- so it's

13 able to make us -- it's able to help us narrow this request.

14 It is somewhat different from some of these other entities.

15 But it still has -- you know, the concerns here are still the

16 same.  You know, the failure rate on just the ones we've

17 pulled are -- is not in any way insignificant.

18        THE COURT:  Okay.  Mr. Sullivan, let me hear a

19 response to these, I would say more narrow response --

20 requests and why they raise privilege concerns because I think

21 it is different than how I came into this, which was more the

22 relationship between the two entities.  But I do view -- it

23 looks like KLS is somewhat of a captive paralegal firm for

24 Marc J. Bern.  But notwithstanding, why are these narrowed

25 requests still improper?

1          MR. SULLIVAN:  Well, Your Honor, I think the issue

2    is that KLS is still being described as a third-party vendor

3    and an aggregater in the argument.  That's what I'm still

4    hearing when he talks about this "third-party vendor."  And

5    they're contract employees working entirely with the firm and

6    they haven't challenged that factually at all, and there's

7    been two months, so it is undisputed.

8          And the issue is, is that, even though that

9    information is now plainly out there, Century wants to ignore

10   it.  And you know, Marc Bern is not a -- the -- a subpoena to

11   Marc Bern is not at issue; it's subpoenaing KLS that is the

12   issue here, in this particular motion.

13         THE COURT:  Well --

14         MR. SULLIVAN:  So --

15         THE COURT:  -- does KLS not have responsive

16   documents?  Are you saying that this subpoena needs to be

17   directed to the law firm?  Is that what you're saying?

18         MR. SULLIVAN:  Well, Your Honor, the -- one of the

19   things that we say in our -- in Mr. Cappelli's declaration is

20   that KLS isn't keeping separate files.  They're working, the

21   employees are working on files of the Bern firm.  So the -- we

22   haven't gone through to do anything because we've never gotten

23   any recognition that we're somehow different.  Today, we have

24   that, but that's still not enough.  And it doesn't make, you

25   know, any sense to continue with respect to this.

1          I'm looking right now to see if I can point Your

2    Honor to where that would be.  Oh, it's Paragraph 12 of Mr.

3    Cappelli's declaration.  It says KLS doesn't maintain

4    independent files, they're working in the Bern office in

5    Conshohocken and they're working on Bern files.

6          So, Your Honor, the scope of this was -- as, you

7    know, defined earlier, was every claim that KLS worked on,

8    also inappropriate.

9          And Your Honor, there was a brief reference to the

10   fact that claims -- certain claims were withdrawn.  And Your

11   Honor, the Bern firm indicated back in February that it was

12   going through that process, where Mr. Cappelli signed a claim

13   that they would try to contact and get a signature; and, if

14   they weren't able to get a signature, then they would withdraw

15   the claim.  And Mr. Cappelli's declarations indicates they're

16   down to two claims, one of which is for an estate that hasn't

17   been opened.  And I don't really think that's relevant to what

18   Your Honor is deciding as to the relationship between KLS and

19   Bern.

20          But I would note that -- and one of the things

21   that's noted in his declaration, at Paragraph 22, is that some

22   of the signed claim forms were signed well in advance of the

23   claims bar date.  But for whatever mailing issues or other, I

24   guess, snafus, they didn't get there in time.

25          And so, you know, there -- I almost hesitated to

1  speculate about why they have subpoenaed KLS, and I did it

2  just because that's the sparse evidence that there is.  But

3  there really isn't any reason to be going to the paralegals

4  and legal assistants of the law firm.  They don't -- they're -

5  - it's the Pennsylvania office.  If they want something from

6  Marc Bern because Mr. Cappelli signed a proof of claim, they

7  can do that, they can ask for that.  But they can't go to KLS,

8  which creates different burdens and issues.  And it's simply

9  not supported by any of the case law.

10         THE COURT:  Okay.  Well, what I'm hearing and what

11  I've reviewed with the declarations is that KLS and Marc J.

12  Bern are a different relationship.  They are not an

13  aggregater, as I think of them in this case and as that has

14  been described to me.  And they also do not have their own

15  documents, they work on Marc J. Bern files.

16         So I'm going to grant the motion for the protective

17  order or to quash the subpoena because I think it's directed

18  at the wrong entity.  And -- but that's without prejudice for

19  the insurers to send a subpoena to the law firm with respect

20  to the relevant information.  I hope it would be limited to

21  the requests that this was narrowed down to on this call.

22         But I do think the facts here are that KLS doesn't

23  have documents.  If anybody has documents, it's the Marc J.

24  Bern firm, and that's who it should be -- the -- any requests

25  should be directed to.

1       MR. SULLIVAN:  Thank you, Your Honor.

2       THE COURT:  Thank you.  Okay.

3     (Pause in proceedings)

4       THE COURT:  The next matter is the Verus matter.

5       MR. REMMING:  That's correct, Your Honor.  For the

6 record, Andrew Remming, Morris, Nichols, Arsht & Tunnell, for

7 the debtor.

8       The next matter is the Verus matter.  As reflected

9 in the status item, Verus has withdrawn its opposition to the

10 letter filed by Century, but we understand it would like to

11 make some comments on the record regarding this matter.

12       THE COURT:  Okay.

13 **#2 Argument**              MR. KAPLAN:  Good morning, Your

14 Honor.  Michael Kaplan from Lowenstein Sandler on behalf of

15 Verus.

16       Yes, as the debtor noted, following Your Honor's

17 hearing last week and ruling we have spoken with counsel for

18 the respective plaintiffs' firms as well as counsel for

19 Century and Zurich, and have withdrawn our blanket objection

20 to the subpoena; however, as we have stated time and again the

21 privilege at issue here does not belong to Verus and, in fact,

22 belongs to the individual plaintiffs' firms.  We understand

23 that they intend to continue to assert that with respect to a

24 majority of the documents where possible and where we have

25 been able to gain consensus.

1    We have started to make productions, but largely,

2  Your Honor, unless you have additional questions I committed

3  to being at the hearing so as to provide background as to what

4  documents we may have.  I know the subpoena is directed at

5  Verus.  We certainly -- this is a different scenario because

6  we do have possession of documents then what you heard just a

7  moment ago, but it is not our privilege to assert and not

8  ultimately our privilege to defend.

9    I know that I see Mr. Hilton and Mr. Conaway here

10  for the various plaintiffs' firms.  So I will -- unless you

11  have some questions, Your Honor, I will put myself on mute

12  until asked.

13    THE COURT:  Well I have lots of questions on Verus,

14  but let me hear from others.

15    I was surprised that I didn't get some kind of

16  fulsome objections from the law firms because I do believe,

17  and even before the most recent round of filings, that this is

18  not Verus's privilege.  So let me hear from whoever wants to

19  talk.

20    MR. SCHIAVONI:  Do you want to hear from which side

21  first, Your Honor.

22    THE COURT:  Well let me hear from Century.  Then

23  I'll let the plaintiff law firms respond.

24    MR. SCHIAVONI:  So, Your Honor, as you have noted

25  there were no objections by the firms that retained Verus

1  prior to today.  Verus alerted them on Thursday that they were

2  withdrawing their objections and they did so they didn't have

3  to produce their president for a deposition the following day.

4  They then also alerted them that they were going to start

5  complying and they produced to us the retention agreements

6  with the firms that have appeared -- that filed a notice on

7  Sunday, I think it was Sunday, stating that they, you know,

8  would like to meet and confer, and have objections perhaps

9  going forward on privilege.

10        We submitted, after we saw that notice, I

11  apologize, but its, you know, late Sunday night, the actual

12  retention agreements with an objection to this notice to carry

13  this forward further then today.  And I think, Your Honor, the

14  retention agreements are really the starting place, you know,

15  for the court to thin about this in connection with what the

16  arguments are you are about ready to hear because those

17  retention agreements are very, very different from the type of

18  retention agreement that a lawyer hiring a consultant in a

19  litigation typically puts in place.

20        You know, every one of those agreements I have ever

21  put in place has the word "privileged" used in it.  It's made

22  clear that the retention is in connection with an ongoing

23  matter and that privilege applies, and that if one is to

24  receive a subpoena they are to alert counsel so that privilege

25  can be preserved, etc., etc.  That is not what these

1  agreements set out.

2         The agreement -- not only does the word privilege

3  appear nowhere in any of the Verus agreements, but it contains

4  a number of statements that are sort of really at odds with

5  there being a privilege.  One is that Verus has quite clearly

6  described in the agreement as an independent contractor, that

7  Verus is not to be considered a partner or representative of

8  the client or in any way an agent of the firm.  The client

9  here is explicitly defined as being the counterparty firm and

10  not, you know, any of the underlying clients that the firm

11  might represent.  There is no mention or reference to the

12  actual matter.  There is no mention of the word "privilege."

13         Further, there is a specific clause in the

14  retention agreement that states that the engagement is limited

15  in its privity exclusively between Verus and the firm, that no

16  one is intended to be, on an express or implied basis, a

17  third-party beneficiary.  And that no third party is entitled

18  in any way to rely upon the agreement, the purpose of the

19  agreement or the services of Verus.  You know, one, it's hard

20  not to read that clause as applying to preclude any kind of

21  relationship between Verus and the actual underlying

22  claimants.

23         There is all sorts of sound and good business

24  reasons why Verus wouldn't want to be in a relationship in any

25  way, a privileged relationship or otherwise, with the

1  underlying claimants in this kind of engagement.  So, you

2  know, I think the retention agreement gives some guidance here

3  on what the intent of the parties was with regard to privilege

4  in the first place.

5        The other thing that is, you know, of some note,

6  you know, in connection with these is the dates of all the

7  agreements, of course, predate the bar date; you know, some by

8  several months, others by more than several months.  So these

9  are agreements put in place in the context of this case in

10 connection with when an effort was underway to generate

11 (indiscernible) not as a general matter when firms  had claims

12 and were working, you know, on those claims on an ongoing

13 matter.

14       So I'd ask the court to take all those things into

15 consideration in evaluating Verus's role.  You know, again,

16 here with regard to Verus, you know, the specifics of what is

17 sought is, you know, of importance.  You know, I think we're

18 seeking along the lines of, at least, what Your Honor ruled

19 the other day with regard to these other firms.

20       I think perhaps a useful starting place with these

21 firms is that on each of the retention agreements there is a

22 summary statement of the services to be provided and we would

23 ask that those statements, that that statement of what the

24 service was be provided, not be redacted.  We don't think that

25 that should be privileged.  We don't think that's either a

1  communication, you know, with a client or one to facilitate a

2  communication with a client.  It simply describes what they

3  were going to do with regard to the proofs of claim here.

4  That falls specifically within our request -- just one second,

5  Your Honor.  Its request number five that deals with the

6  processes and procedures followed for performing the services

7  and what was done.  Request number four, I think, seeks the

8  contracts and agreements with the firms.  That explains what

9  they were doing.

10          So, Your Honor, with that we would ask that that

11  aspect of those agreements be unredacted and that, otherwise,

12  we go forward, you know, with our motion to draw a ruling on

13  the substantive request for relief.

14          THE COURT:  Thank you.

15          Who is going to go first for the law firms?

16          MS. WARNER:  Your Honor, this is Raeann Warner.

17  Good afternoon now.  I am from Jacobs & Crumplar in Delaware

18  on behalf of seven of the law firms.

19          I would like to introduce Mr. Jonathan Hilton of

20  the law firm Hilton Parker to present an argument for those

21  firms.  He has been admitted *pro hac vice*.

22          THE COURT:  Thank you.

23          MR. HILTON:  Thank you, Your Honor.

24          So as Ms. Warner mentioned, I was retained by seven

25  law firms that contracted with Verus specifically for the

1  purpose of asserting the attorney/client privilege and the

2  work product doctrine protections.  There are two points

3  primarily that I want to address.

4       First, Your Honor had expressed some surprise that

5  they had not -- that the court had not received written

6  objections from the law firms at this point in time.  The

7  reason that the law firms have not at this point filed written

8  objections with the court was that the law firms believed that

9  they were covered under the actions taken by Verus in

10 objecting to the motion to compel.

11      In particular there was a deposition of Verus's CEO

12 that was supposed to take place on Friday and my firm

13 specifically was retained to go to that deposition and to

14 assert work product doctrine and attorney/client privilege as

15 necessary and appropriate throughout that deposition.

16      Late Thursday night Verus filed a document

17 withdrawing its opposition to the motion to compel and the

18 deposition for Friday was cancelled.  Since then we have been

19 trying to regroup.  Primarily what we need at this point is

20 time to meet and confer to narrow the issues with opposing

21 counsel and if necessary then to file our own motion for a

22 protective order.

23      So at this point what we are --

24      THE COURT:  Well you are a little late to the game

25 and that is the problem because this is a very expedited

1  procedure that we're in.  And I noted in one of the documents

2  filed in the Verus matter that Lowenstein Sandler in an

3  October 1st, 2021 letter says by way of copy to the

4  plaintiffs' firms we note that it is their burden to protect

5  any applicable privilege and that they should file whatever

6  motion they deem appropriate.

7          So what is -- that is October 1st and we're at

8  December 6th.  That is two months since the firms were put on

9  notice that they needed to do something.

10          MR. HILTON:  Yes, Your Honor.  The biggest holdup

11  on our end is that we are still, at this point, waiting for

12  Verus to actually turn over to the law firms the documents

13  that it has in its possession for our privilege review.  As

14  the court will note in Verus's objections it filed blanket

15  category objections originally that cited large categories of

16  documents.  Each firm needs the opportunity to receive those

17  documents to see what they are.

18          Under the services agreement each law firm has the

19  right to see those documents and my understanding is that

20  Verus is working very hard to turn all of those records over

21  to the law firms hopefully by the end of this week so that

22  each law firm then can file its own protective order or motion

23  for a protective order as necessary.

24          Earlier it would have been impossible to assert any

25  kind of a detailed privilege log or any objections that went

1   beyond what Verus filed because at this point the law firms

2   simply don't know the extent of the documents that Verus has.

3           THE COURT:  Well explain to me the relationship

4   then between the law firms and Verus.

5           MR. HILTON:  Yes, Your Honor.  So I think the best

6   2way to treat this relationship would be, essentially, as a

7   form of a staffing agency.  Each of the law firms would then

8   be working with numerous people at Verus who have been

9   specially trained to process and work with survivors of this

10  kind of sex abuse.  So there would be a relationship there

11  where the law firms are directing individuals at Verus as to

12  how to communicate with clients.  There would be documents

13  that are coming in then between Verus and the law firms where

14  the law firms are editing documents, where drafts that are

15  being prepared by Verus employees but at the direction of

16  attorneys at the law firms. Those drafts would be produced.

17          So I think that the important thing to note is that

18  under Third Circuit precedent the work product doctrine

19  extends to any documents that are prepared in anticipation of

20  litigation for a party.  And that is going to include

21  selection and arrangement of materials, that is going to

22  include the selection and arrangement of evidence that is

23  being gathered.  It is going to include communications and

24  summaries of communications with the client that are being

25  prepared.

1          So I think the important point is that under Third

2   Circuit precedent even if it's not strictly an agency

3   relationship, which the law firms may contend that it is and

4   particularly with respect to individual employees of Verus

5   there is attorney direction that is taking place where the

6   attorneys are directing individual Verus employees to gather

7   information from the clients in certain ways.

8          THE COURT:  How does that take place -- how does

9   that direction take place?

10         MR. HILTON:  So in some cases, Your Honor, that

11  direction would be taking place in terms of the attorney's

12  drafting, for instance, the questions and the information that

13  they want gathered from the clients, then communicating to

14  Verus that, you know, we want this kind of information to go

15  out to the clients and we want this kind of information

16  gathered.  We want the materials arranged a certain way.  We

17  want drafts prepared.  Then it would all come to the attorneys

18  for their review and for their editing.

19         THE COURT:  That seems to run counter to what I

20  read in the Verus pleadings that Verus was retained for its

21  expertise in communicating with clients and knowing what

22  questions to ask, and how to discuss things.

23         MR. HILTON:  Yes, Your Honor.  I believe that Verus

24  does have that expertise, but I think this is where there is a

25  necessity then for the law firms to be able to review the

1  categories of documents in more depth then what they have been

2  provided.  On some occasions there may be a very direct

3  directive from the law firms that would go something like

4  this: we want to communicate these text messages, for

5  instance, to all of our clients.

6          So in that case there would be this direction from

7  the law firms to Verus to then go to the clients, but in other

8  cases Verus would be relying on its own expertise.  What

9  really needs to happen is for us to know exactly what

10 documents are being produced and then to review them so that

11 we know what documents are going to have what potential

12 privileges attached.

13         So you are right, Your Honor, in that there is just

14 a lot of communication that is going to have to be looked at

15 and some of it may run one way and some of it may run another.

16         THE COURT:  Well I am not suggesting that there is

17 a lot of communication or there is not, or that Verus has an

18 expertise, or that it somehow falls within the relevant

19 privileges.  I am just exploring because, well for one, I

20 noticed as well that the statement of work were redacted, so I

21 don't know what they did. And I am holding right now that the

22 full contract needs to be provided, no redactions.  This seems

23 to me to be a commercial relationship between the law firm and

24 Verus.  We don't need to categorize them, but a third-party,

25 you know, relationship, it's a commercial relationship and we

1  need to know what it is.

2           Whether it was necessary to retain Verus to

3  communicate with clients that hasn't really been explained to

4  me why it was necessary to do that and how it falls within the

5  Third Circuit's guidance on who -- on how far either a

6  privilege or the work product doctrine expands to include

7  third-party contact scenarios. It may simply be that some of

8  the firms took on so many clients that they couldn't

9  communicate directly.  I assume no firm is going to say that

10  they don't have the expertise to speak to a client and gather

11  information.

12           MR. HILTON:  Thank you, Your Honor.

13           Another way to think of Verus in terms of its

14  expertise is that they did retain and train significant staff

15  who are knowledgeable about social work and about

16  communicating with survivors.  So in that sense it could be

17  viewed as a consultant working in conjunction with the law

18  firm on how to best communicate with the clients.

19           In terms of that process of formulating how to

20  communicate with the clients and in terms of the strategy for

21  communicating with clients who are survivors that is going to

22  be something over which the law firms will want to assert the

23  work product doctrine.

24           So, Your Honor, I will read you a quote from one

25  case.  This is SightSound Technologies, LLC v. Apple Inc.  I

1   will give you the Lexus cite, its 2012 U.S. District Lexus

2   194667.  The quote here is,

3          "Indeed, Third Circuit precedent indicates that

4   attorney involvement is not necessary for work product

5   protection."

6          In this case there certainly is significant

7   attorney involvement in developing the strategies for

8   communicating with these highly sensitive clients, but I think

9   the important baseline position is the work product protection

10  can extend over these processes and the strategies for the

11  clients even absent attorney involvement.

12         THE COURT:  I will have to read that case, but

13  absent attorney involvement somebody can speak with your

14  client and have it be protected by the work product privilege?

15         MR. HILTON:  Yes, Your Honor.  So in the SightSound

16  Technologies case, SightSound Technologies v. Apple, at issue

17  were documents created by a client without any attorney

18  involvement whatsoever.

19         THE COURT:  By a client?

20         MR. HILTON:  Right, but a client could retain a

21  consultant or work with a consultant or, essentially, anyone

22  that the client wants to work with in order to develop

23  materials in anticipation of litigation. As long as the

24  materials are developed for a party in anticipation of

25  litigation, even if an attorney never was involved, which here

1  there was significant attorney involvement, but even in that

2  case work product protection applies.

3          THE COURT:  Okay.  I don't know what involvement

4  there was by the attorneys.  That certainly doesn't appear to

5  be how Verus bills itself, but I don't know that.  I am still

6  coming back to the fact that two months ago the law firms were

7  apprised of the fact that they needed to be asserting

8  attorney/client privilege.  What actions did they take to get

9  these documents so they could look at them?

10          MR. HILTON:  Thank you, Your Honor.  Under the

11  service agreement the law firms have a right to see all of the

12  documents and they are -- they have requested these documents

13  from Verus and the understanding that the law firms had in

14  their communications with Verus was that the law firms would

15  rely on the objection that had been lodged by Verus until more

16  specifics were known.

17          My law firm was retained to appear at the

18  deposition on Friday and at this point the law firms are ready

19  and willing to do whatever steps are necessary now to protect

20  the privilege.  Logistically speaking if that means that the

21  firms need to go ahead and file a motion for a protective

22  order before any meet and confer, any substantive meet and

23  confer has taken place on the specific documents they are

24  certainly willing and ready to do that.

25          I think it would be more productive if the law

1  firms had a chance to meet and confer with the defendants --

2  I'm sorry, with the proponents of the discovery in order to

3  try to narrow the issues for the court.

4            THE COURT:  Well I agree, but it would have been

5  nice if that happened sometime in the last two months.  These

6  law firms have been sitting on the sidelines is what I am

7  hearing and relying on Verus.  And even after Verus told you

8  not to do that, and now you are slowing down a process that we

9  have here that cannot afford to be slowed down.

10           MR. HILTON:  We are ready to work as quickly as

11  possible, Your Honor.  All haste.  You know, we will do

12  everything we need to do as fast as we can do it.

13           THE COURT:  Well has Verus over the last two months

14  refused to provide you access to these documents?

15           MR. HILTON:  Your Honor, as I sit here today I

16  can't tell you the exact date on which the law firms requested

17  the information, so I will leave that then to Verus's counsel.

18           THE COURT:  Okay.  Mr. Schiavoni.

19           MR. SCHIAVONI:  Your Honor, the predicate for

20  asserting work product and attorney/client that you heard from

21  Mr. Hilton of an agency relationship has been specifically, in

22  writing, disavowed by these six law firms in their retention

23  of Verus.  Verus did that, I am certain, for a very good

24  reason about how they wanted to limit their relationship.

25           Further, it's like they actually in that retention

1  agreement expressly say that third-party claims, which I don't

2  know how you read them other than the claimants themselves,

3  carry no duties to them.  I don't know how Mr. Hilton can

4  actually even make out a claim for attorney or for work

5  product given the terms, the express written terms, of the

6  agreement itself.

7          Putting that aside, the time for them to come

8  forward has passed. It's like they have arguably waived any

9  objection that they might have had at this point.  The

10 suggestion that attorneys were heavily involved here, I mean

11 obviously it's not supported by any facts before the court,

12 but it's actually contrary to the nature of the services that

13 Verus is, sort of, holding itself out as actually performing.

14         The documents we seek here are, you know, in the

15 first instance native copies of the proofs of claim that they

16 submitted. There is not even an argument with respect to those

17 documents that the metadata is attorney/client or work

18 product.  Its time stamping and indications of who would affix

19 signatures and what not to the documents.  So there is not

20 even an attorney/client issue on that.

21         Again, you know, I made this argument before, I

22 don't think there is really a burden issue because you copy

23 it, you copy it once, we will just run the scan over the whole

24 set of them all at once.  So those -- I think those documents

25 ought to be produced pronto so that we can get into them and

1  conduct an analysis of them.

2         The other documents we received are fairly

3  straight-forward.  I think a lot of it will be cleared up by

4  when we get to scope of services attached to the agreements

5  themselves. So I don't think there really is a reason to delay

6  this one, you know, from just going forward.

7         THE COURT:  I think it needs to go forward.  Verus

8  has actually withdrawn their objection. I haven't seen

9  objections from the law firms.  And I have already held that

10  the scope of work, the full contract needs to be provided.  I

11  haven't heard an argument that native copies of proofs of

12  claim are in any way privileged.

13         I will permit the parties to talk and if there is

14  something very specific I may entertain some kind of motion,

15  but this was directed at Verus, Verus responded, they have now

16  withdrawn their requests.  I am looking at the contract.  I

17  think Mr. Schiavoni is characterizing section seven of it

18  correctly.  The law firms are just late to the party.  That's

19  bad, this isn't a party, my apologies.

20         I don't understand why the law firms were not in

21  here sooner protecting the interests of their clients.  They

22  clearly are not Verus's clients.  So I am going to -- well

23  there is not any objection in front of me to rule on.  So

24  Verus can continue with -- Verus should -- well I take that

25  back, this was started from Century the request to compel I'm

1  granting it.

2           Mr. Conaway.

3        (No verbal response)

4           THE COURT:  You're muted, Mr. Conaway.

5           MR. CONAWAY:  Can you hear me now, Your Honor?

6           THE COURT:  I can.

7           MR. CONAWAY:  I'm sorry.  Bernard Conaway.  I

8  represent Krause & Kinsman.

9           I can't speak to why the law firms didn't setup any

10 sort of response, but what we are ultimately doing here is

11 blowing a howitzer sized hole in privilege and

12 confidentiality.  If mistakes were made they were made.

13          What I look forward to, though, is receiving

14 information from Verus which I understand is coming this week,

15 reviewing it and then engaging with Mr. Schiavoni and Mr.

16 Currie.  I expect that we can work out quite a bit of progress

17 once we have documents in hand. I would like to think we can

18 work everything out, but I know at least with respect to Mr.

19 Schiavoni I have a hard time working out anything with him.  I

20 am kidding though.

21          That is the timeline and that is the consequence of

22 where we are at right now.  The water has passed. Unless we

23 are willing to ignore what our critical pillars of the legal

24 profession I think that time is appropriate. It would have had

25 to have happened at some point, whether Verus objected or did

1  not drop their objection or not.

2          So I think to follow-up on Mr. Hilton's point I

3  know, at least with respect to my client, they will work and

4  work diligently to get to the goal line here and try to meet

5  the expectations of both the court and the insurers.

6          Thank you.

7          THE COURT:  Thank you.

8          What is our next matter?

9          MR. REMMING:  Thank you, Your Honor.  The next

10 matter is the -- this is Andrew Remming of Morris Nichols

11 Arsht & Tunnell for the debtors for the record.  The next

12 matter is item number three.  It is a letter from certain

13 insurers compelling the coalition's 30(b)(6) deposition.  I

14 will turn it over to counsel to certain insurers to handle

15 this matter.

16          MR. MCCULLOUGH:  Good afternoon, Your Honor.  Bruce

17 McCullough from Bodell Bove here in Wilmington representing

18 certain insurers in this matter.  David Christian, who has

19 been admitted *pro hac vice,* is here and will present the

20 argument.

21          THE COURT:  Thank you.

22          Mr. Christian.

23 **#3**     MR. CHRISTIAN:  Good morning, Your Honor, or good

24 afternoon, I guess, it is in Delaware.  David Christian for

25 Great American and I am here to present our motion to compel a

1  30(b)(6) deposition of the coalition on behalf of the so

2  called propounding insurers.

3          I want to make two points in my presentation here

4  today.  First, that the coalition is an entity that is subject

5  to Rule 30(b)(6) and second that our notice for a single

6  deposition of the coalition is in no way analogous to the 44

7  deposition notices that were previously issued to insurers and

8  that were quashed by this court at an earlier hearing.

9          First of all, with respect to the coalition being

10  an entity it has all the indicia of an entity. It's a group

11  acting in concert, that is the phraseology from Rule 2019.

12  And Your Honor knows that the coalition has filed multiple

13  Rule 2019 statements.  It's also telling to me that people can

14  join the coalition and people can unjoin the coalition.  In

15  other words it's a thing that can be joined and unjoined.

16          The coalition has bylaws and a management structure

17  -- written bylaws, I should say.  The coalition has obtained

18  financing for its efforts from outside lenders. The coalition

19  has retained professionals.  As Your Honor knows very well

20  those professionals take positions in the case as an entity or

21  on behalf of an entity at every hearing or, at least,

22  virtually every hearing.

23          We also know from the discovery that has been

24  completed so far that the coalition initially held the pen

25  with respect to the trust distribution procedures. This is

1  from the FCR's deposition transcript of page 73.  I bring up

2  that particular point because it shines a light on why we need

3  this discovery.

4         Your Honor will be familiar with the AC&S case

5  decided by this court at 311 Bankruptcy Reporter 36.  At the

6  end of that opinion, page 43, Judge Newsome said the following

7  -- and I have some ellipsis in here, so I'm not reading the

8  entire paragraph word for word, but it reads as follows:

9         "Based on correspondence among plaintiff's counsel

10  presented at trial, the plan was largely drafted by and for

11  the benefit of the prepetition committee."

12         I will insert here that the prepetition committee

13  in that case is akin, in our view to the coalition in this

14  case. Again, continuing with Judge Newsome's words,

15         "Given the unbridled dominance of the committee and

16  the obvious self-dealing it is impossible to conclude that the

17  plan was consistent with the objectives and purposes of the

18  bankruptcy code."

19         On that basis Judge Newsome denied confirmation of

20  the mass injury plan in that case.  The court is, of course,

21  not to take and be ruling on the merits of that argument. The

22  court is not, today, hearing evidence about the facts in this

23  case.  But the insurers are entitled to the discovery in aid

24  of making the same case here.  A 30(b)(6) deposition of the

25  coalition is central to that effort.

1          I will also point out that the coalition is seeking

2   a substantial contribution claim under Section 503(b)(3)(d) of

3   the Bankruptcy Code.  That section refers to a creditor,

4   indenture trustee, equity security holder, or a committee

5   other than the official committee.  So what the coalition must

6   be saying here in resisting the 30(b)(6) deposition is that

7   it's a committee, but not an entity.  We just believe that is

8   total inconsistent with both English usage and the usage of

9   those terms in the context of the bankruptcy code.

10         Turning to the point about the alleged analogy to

11  the 44 insurer deposition notices that this court previously

12  quashed we simply don't believe that survives any scrutiny.

13  The coalition has argued to this court already that it will

14  prove at the confirmation hearing the TDP's are "science

15  based."  The coalition has argued that the disputed insurance

16  findings in the plan are authorized by, among other things,

17  Section 1123 of the Bankruptcy Code including the argument

18  that they are "fair and equitable," borrowing that term from

19  Section 1129(b)(1).

20         The coalition has put these things at issue for the

21  confirmation hearing over insurers' objections.  We have made

22  clear that we would prefer not to litigate these matters here

23  and now.  We don't think they are relevant to confirmation of

24  the Chapter 11 plan under Section 1129 and we don't think they

25  are properly before the bankruptcy court, but the coalition

1  has asked for those, insisted upon those findings, made sure

2  they are in the plan and has argued previously to Your Honor

3  that they will show under the bankruptcy code and under the

4  terms of the TDP's that these are appropriate.  So we must be

5  in a position to rebut that argument.

6         Let me be very clear for the record that we don't

7  think the findings sought by the coalition are applicable or

8  appropriate here.  In our view the court is being asked to

9  approve a settlement between the debtors and the creditors

10 under Bankruptcy Rule 9019(a).  That rule requires the court

11 to inquire into whether the settlement is a reasonable

12 exercise of the debtors' business judgment.  From the debtors,

13 that is from the bankruptcy estate's perspective.  And, of

14 course, it goes without saying that something can be quite

15 reasonable from the standpoint of a debtor trying to exit

16 Chapter 11 as opposed to from the insurers who have contracts

17 that may or may not provide coverage for the liabilities

18 established.

19        In particular, once the debtor establishes a cap on

20 its exposure under the plan the debtor has no financial

21 interest in limiting further financial exposure for the

22 insurers and the debtor presumably wants to obtain the votes

23 by as many creditors as possible who have the adverse

24 incentive, the opposite interest from the insurers.  So the

25 debtor may say if it gets me the votes of 60,000 members of

1 the coalition I am happy to do it if I know my financial

2 contribution is capped and if I know that it provides a

3 pathway to exit Chapter 11.

4        So the finding by this court that something is

5 reasonable from the estate's perspective or from the debtor's

6 perspective in trying to exit Chapter 11 really should have

7 nothing to do with the insurance related findings that are

8 proposed in the plan.  But the coalition went searching for a

9 hook under the bankrupty code for these findings to use

10 against the insurers later.  That is why at Docket No. 6650 on

11 October 18th there were amended versions of the findings that

12 this court had heard about in the context of the disclosure

13 statement hearing and at other hearings in this case.

14        It includes references now to various provisions of

15 the bankruptcy code on which the coalition hopes to hang their

16 arguments in favor of this court making those findings in the

17 context of confirmation.  Your Honor may recall you got into

18 the subject in some depth with Mr. Goodman in the context of

19 the disclosure statement hearing and we started to hear about

20 Section 1141 and Section 1123.

21        That fair and equitable standard from Section 1123

22 has no application here whatsoever.  That is about cram-down

23 which may not apply at all in this case, but certainly doesn't

24 apply to the debtor's relationship with its insurers.  Section

25 1123(b)(1) by its terms applies with respect to a class of

1  claims who have voted not to accept the plan.  That is not the

2  position the insurers were in and that is not what the

3  insurance findings are about.  It simply doesn't apply.

4          So long as we are being forced to fight that issue

5  at a confirmation hearing we are entitled to discovery to

6  rebut those positions and specifically we are entitled to take

7  the coalition's deposition.  This deposition that we proposed

8  bears no comparison to the 44 insurer depositions about claims

9  handling.  The court observed in ruling on the motion to quash

10  the claims handling depositions that whatever tangential

11  relevance that subject might have to the confirmation hearing

12  was not enough to take up, you know, 44 days' worth of

13  depositions or whatever it would take to get through those

14  deposition notices leading up to a confirmation hearing on a

15  very expedited schedule.

16          The court didn't even conclude that any relevance

17  whatsoever, but it best had tangential relevance. So they

18  didn't serve the needs of the case.  As setup by the coalition

19  in this case, however, the confirmation hearing will focus on

20  the TDP's and it will focus on the insurance findings touted

21  by the coalition.  The coalition cannot put those questions

22  front and center and say the needs of the case require not

23  even a single deposition of its witness.

24          With that I can answer questions Your Honor has.

25          THE COURT:  Thank you.  I don't have any questions.

1           MR. CHRISTIAN:  Thank you, Your Honor.

2           THE COURT:  Thank you.

3           Let me hear from -- I think we had a joinder before

4    I get to the coalition.

5           Ms. Gurvitz.

6           MS. GURVITZ:  Yes, Your Honor.  Sasha Gurvitz from

7    KTBS Law LLP on behalf of the Zalkin Law Firm P.C. and the

8    Pfau Cochran law firm.

9           We joined the insurers' motion. I won't take up too

10   much more of your time because I think insurance counsel has

11   gone through the points, but we do feel that the coalition has

12   acted as an entity throughout this case and particularly in

13   discovery.  We have been one of the most active participants

14   in discovery and have proved their ability to act on an

15   organizational basis, and have often touted their achievements

16   to this court.  In light of the influence they claim to have

17   yielded particularly in the process of shaping the TDP's, we

18   do feel a deposition would appropriate.

19           Thank you, Your Honor.

20           THE COURT:  Thank you.

21           For the coalition I see Mr. Moxley.

22           MR. MOXLEY:  Yes.  Good afternoon, Your Honor.

23   Cameron Moxley of Brown Rudnick on behalf of the coalition.

24   Thank you, Your Honor, for the opportunity to address the

25   court on this issue.

1          Your Honor, I plan to address the arguments that

2   the court has heard thus far today appropriate in the course

3   of my presentation.  To give Your Honor a sense of where my

4   remarks today will focus I plan to cover, among other things,

5   Judge, what the movants really want by this motion; namely

6   lawyer depositions.  I plan to cover the scope of the topics

7   that have been noticed.  I plan to cover what some of the

8   discovery to date has really shown, Your Honor. I plan to

9   cover why the coalition is not a profitable 30(b)(6) target.

10          On that point, though, Your Honor, the proper

11  target point, if the court will indulge me, I want to fully

12  come to that later in my presentation, but let me just say at

13  the outset to dispel any question the court has on this narrow

14  aspect of this point the coalition is a party and is subject

15  to discovery. I want to be clear about that, Your Honor.  The

16  coalition has produced documents in response to document

17  requests and no one has complained about our document

18  production.

19          The coalition has responded to interrogatories and

20  no one has complained about our interrogatory responses.  So

21  make no mistake, Your Honor, the coalition acknowledges it has

22  discovery obligations and the coalition has met those

23  obligations with no complaint from the other parties.  I have

24  more to say on the propriety, Your Honor, of the 30(b)(6)

25  notice to an ad hoc group of natural persons like the

1   coalition, but if the court will allow me I will come back to

2   that.

3           Let me start, if I could, Judge, with why the

4   coalition's arguments against this motion to compel are,

5   otherwise, notwithstanding the improper target point, really

6   (indiscernible) as though successfully advanced by the

7   insurers and the insurers' motion to quash. I heard Mr.

8   Christian that it's not analogous, but I would like to talk

9   about that, Judge.

10          Your Honor commented at the last hearing that the

11  irony, and with all due respects to the court that was the

12  word that Your Honor used, the irony of the insurers' position

13  with respect to seeking to compel testimony from certain state

14  court counsel in light of the insurers' own motion just days

15  earlier to quash depositions of themselves.  That wasn't lot

16  on Your Honor.

17          Here, Your Honor, on this motion we have slipped

18  well beyond irony and into untenable.  The basis for the

19  court's granting of the insurers' motion to quash cannot be

20  reconciled with granting the insurers motion to compel the

21  coalition's Rule 30(b)(6) deposition.  Let's look, Judge, at

22  what the insurers argued to Your Honor right before

23  Thanksgiving.

24          They argued that they were not going to have fact

25  witnesses at the confirmation hearing.  They represented they

1  are calling no fact witnesses and so depositions of them need

2  not be taken to find out what fact witnesses might say because

3  there would be none.  The same is true for the coalition.  The

4  coalition is not calling fact witnesses at the confirmation

5  hearing. So just as with the insurers there is no need for a

6  coalition deposition to occur to find out what a coalition

7  witness would say because there won't be one at the

8  confirmation hearing.

9          The insurers argued that any 30(b)(6) witness that

10  any of them may put up would, and I quote, Your Honor, from

11  the hearing,

12          "All our witnesses could do is restate what, if

13  anything, they learned about the TDP's from their counsel or

14  what they gleaned about the TDP's from reading them; in other

15  words, the insurers have no facts about the TDP's that a

16  30(b)(6) witness could or should be required to testify

17  about."

18          Your Honor, that was Mr. Plevin for the insurers at

19  the November 19th hearing at page 58, lines 10 to 14. The same

20  is true for the coalition, Your Honor, but let me break that

21  down and address what movants argue with respect to the

22  coalition "taking the pen" on the TDP's.

23          First, the coalition is a group of people that did

24  not exist when the Boy Scouts were settling abuse claims over

25  the years.  Those historical settlement practices and tort

1  system experiences were all gained by the debtors before the

2  coalition ever came together.  You know who was in existence

3  and who lived and helped shape the debtor's historical

4  settlement practices, the insurers.  That is not just me

5  telling you that, Your Honor.

6          Bruce Griggs who has served as national

7  coordinating counsel for the BSA on sex abuse claims from

8  August of 2016 until the bankruptcy petition was filed was

9  deposed by insurers just last week.  Mr. Griggs testified that

10 every step of the way insurers were part of the process.  No

11 defense counsel, none, for an individual claim selected

12 without insurers approval. The insurers participated in

13 settlement negotiations, participated in mediations, helped

14 shape how claims were handled.

15         Mr. Griggs also testified that he, Mr. Griggs, gave

16 input into the TDP's specifically focused on whether they

17 aligned with the debtors' historical settlement practices and

18 even more specifically with respect to mitigating an

19 aggregating scaling factor.  Mr. Griggs testified, for

20 example, Judge, that when pressed by insurers about the $3,500

21 expedited payment option that when possible claims certainly

22 were so for relatively low dollar amounts.  He said for even

23 more than $3,500 and that the expedited payment option is part

24 of the debtor's historical settlement practices.  He lived it.

25         You know what Mr. Griggs did not know at

1  deposition, Your Honor, he did not know that Brown Rudnick

2  represented the coalition. So here you have the BSA's national

3  coordinating counsel, a person in that role for years, a

4  person who testified he gave BSA input into the TDP's

5  specifically to ensure that they align with debtors'

6  historical settlement practices and he did not even know who

7  my firm was.

8         This notion that the coalition has "taken the pen"

9  is fantasy, Your Honor.  If we, Brown Rudnick coalition

10 counsel, "took the pen" as the movants say we must have taken

11 it and run away by ourselves if Mr. Griggs doesn't even know

12 who we are.  And their --

13        THE COURT:  Did the coalition have no input in the

14 TDP's, that is what you are telling me?

15        MR. MOXLEY:  No.  The coalition provided comments

16 to the TDP's, Your Honor, but this notion that the coalition

17 drafted the TDP's is not the case.  We know, for instance,

18 Judge, and I'm going to get to this, but we know, for

19 instance, from Hartford's deposition, which happened just last

20 Thursday, that Hartford drafted TDP's and sent it to the

21 debtors.

22        We know that from the deponents own testimony

23 during his testimony.  That is not me telling you that, Judge.

24 That is Hartford telling you that.  And the only reason that

25 deposition occurred is because Hartford enjoined in the motion

1   to quash.

2          In their reply, Your Honor, movants tried out Mr.

3   Kosnoff's quote again regarding the "control" of the case.

4   That is a red herring, Judge. Your Honor, Mr. Kosnoff left the

5   coalition in the fall of 2020.  The debtors proposed their

6   TDP's in the spring of 2021, just a different factor.

7          With respect to their reference to Mr. Patton, Your

8   Honor, in their reply we would submit that that is taken out

9   of context.  As I just mentioned, the coalition compiled and

10  coordinated on sending comments on the TDP's from lots of

11  parties, the FCR, TCC, ourselves provided those to the

12  debtors.

13         Your Honor, speaking of the movants reply this is a

14  confusing aspect of the movant's reply argument. On the one

15  hand they say they have no interest in discovering privileged

16  information; yet on the other hand they cite to Mr. Goodman's

17  and Ms. Lauria's appearances on privilege logs as reasons why

18  the coalition deposition must occur. To be clear, Your Honor,

19  if there were to be a coalition 30(b)(6) witness it will not

20  be Mr. Goodman or Ms. Lauria.  They are both currently

21  involved in insurance mediation discussions.

22         We did note that while they say they are not

23  interested in delving into attorney/client privilege

24  communications or work product they are silent as to the

25  mediation privilege which they themselves have not weighed.

1   Again, Your Honor, if we are going to go down the road of

2   discovering mediation communications, pure mediation

3   communications then we need to depose the insurers on their

4   mediation communications on the TDP's too, but we can't do so

5   because those depositions won't go forward.  We submit, Judge,

6   that that decision, having been made, the same should hold

7   true with respect to our mediation.

8          Second, Judge, yes, and I'm coming to your question

9   now, the coalition lawyers have some knowledge about what was

10  discussed during the mediation about the TDP's.  Coalition

11  lawyers engaged in those discussions pursuant to the mediation

12  privilege set forth in the local rule and the court's

13  mediation orders.  The coalition has not waived that

14  privilege.  Never in a million years, Your Honor, did we think

15  it would be appropriate to depose insurers' lawyers who

16  participated in mediation.

17         Make no mistake, while insurers' counsel argues

18  they were not in the room for some of the discussions

19  coalition counsel may have had during the mediation concerning

20  the TDP's we know from (indiscernible) going to violate the

21  mediation privilege, Your Honor, but we know that they had

22  conversations.  It's the debtors' good faith, Your Honor, that

23  is at issue, not ours.

24         We think that during -- we think the discovery of

25  insurers would show, consistent with Mr. Briggs's testimony

1   that the TDP's are consistent with the debtors' historical

2   practices.  If we're going to go down this road and the

3   coalition has to testify about its mediation communications

4   concerning the TDP's then the court, as a matter of pure

5   fairness, we would respectfully submit, Your Honor, unless we

6   consider the decision to quash the insurer's depositions.

7   That decision having been made for consistency sake, again,

8   we're making the same arguments, we don't think that the court

9   should turn around and order the coalition's deposition.  The

10  insurers --

11          THE COURT:  I don't see the -- I'm not sure I see

12  the consistency there.  The depositions that I quashed were

13  mostly directed to reserves, they were mostly directed to past

14  experience of excess insurers, not primary insurers. They

15  weren't directed, as I recall, of the TDP's.  I could be

16  wrong, but I don't recall that. It certainly wasn't a big

17  topic of discussion.

18          Here we are talking about the TDP'.  One, I already

19  said the mediation privilege was abrogated with respect to the

20  TDP's for the reasons that I stated.  I am not going to go

21  back through that again.  So I don't view the mediation

22  privilege as an issue.

23          I don't see the equivalency between the depositions

24  that were requested of 40 some odd insurers and one deposition

25  of the coalition with respect to the TDP's which it had some

1  hand in; although, there seems to be a dispute about what that

2  is and their findings. So let's get to that, the findings that

3  I found, one of the big reasons, in fact, that the mediation

4  privilege with respect to the TDP's was abrogated.

5           MR. MOXLEY:  So, Your Honor, let me take that in

6  two steps if I could.   On the "40" plus insurer depositions,

7  you know, there was no targeted approach taken in the course

8  of that motion to quash to determine that some of the insurer

9  depositions should go forward. So there is an incongruity

10 there, Judge, by saying that the insurers who absolutely

11 without question have relevant information.  They don't

12 dispute they have relevant information.

13          THE COURT:  I found it was tangentially relevant

14 and we moved on --

15          MR. MOXLEY:  Yes, Your Honor.

16          THE COURT:  -- because of the way the coalition

17 chose or whoever chose to take the amount of discovery that it

18 decided to take and the topics.

19          MR. MOXLEY:  And, Your Honor, this is not to be

20 argumentative with Your Honor, just to note that the

21 coalition, if you recall, Judge, at that point I mentioned an

22 argument, we did not notice dozens of insurers.  We were more

23 targeted because we viewed --

24          THE COURT:  Correct.  It was everybody.

25          MR. MOXLEY:  Right.

1           THE COURT:  It a collection.  Fair enough.

2           MR. MOXLEY:  Right.  That is sort of the fairness

3  point I'm getting at, Your Honor, is that it really ought not

4  to be that insurers get a, you know, what I will colloquially

5  refer to as a free pass to confirmation without having to sit

6  for a deposition just because a lot of them were notice.  You

7  know, if it was only one or two insurers that were noticed,

8  just as we found with the one insurance company's deposition

9  that was taken last week, there very well could be key

10 important relevant information concerning the TDP's, how they

11 were developed, who drafted them, etc.  Those depositions on

12 mass are not happening and they are not happening because the

13 insurers argue that what they had to say about the development

14 of the TDP's was tangential.

15          What we have to say, the coalition, what we have to

16 say about the development of the TDP's is also for the same

17 reason tangential. It's tangential, Judge, because it's the

18 debtors who are making the proposal.  Mr. Christian argued

19 that the coalition submitted the findings, the coalition did

20 this, the coalition did that.  The coalition did none of those

21 things. The debtors are the ones who are proposing the plan.

22          THE COURT:  But the debtors -- my recollection of

23 Ms. Lauria is that she was willing to get rid of all the

24 findings and made that proposal, but others did not go along

25 with it.  Are you telling me the coalition is willing to get

1  rid of the findings?

2          MR. MOXLEY:  Judge, it's not our findings to get

3  rid of or not to get rid of.  It's not our plan.  With all due

4  respect, Your Honor, it's the debtors plan.  So Ms. Lauria may

5  have said whatever she may have said at various hearings in

6  terms of as this process has evolved over the many months,

7  Your Honor, but the fact remains that the debtor's plan that

8  is proposed and that is up for confirmation is what it is and

9  its proposed not by us, but by the debtors.

10         So, you know, it's not really our findings to say

11 that we are willing to do away with or not do away with.

12 They're not our proposed findings, they're the debtors'

13 proposed findings, Judge.  That is why, again, Judge, what we

14 have to say about them is really beside the point. It is

15 really -- it's not our good faith that is at issue, it's the

16 debtor's good faith.

17         So, Your Honor, let me just -- if I may, Your

18 Honor, let me just move to a couple other quick points I want

19 to hit before we get to the point about whether we're a proper

20 target which I think the court -- I think the court will find

21 it very interesting sort of first principals conversation to

22 have.

23         Your Honor, what the insurers really want are

24 lawyer depositions.  While we and others have cited cases to

25 the court about why lawyer depositions are frowned upon and

1  are only to be pursued if there is really no other vehicle for

2  obtaining the discovery it really hardly needs citation,

3  Judge.  Everyone knows that lawyer depositions are to be the

4  extraordinarily rare circumstance.

5            THE COURT:  Let me ask a question about this,

6  though.  Why is it lawyer depositions?

7            MR. MOXLEY:  Well --

8            THE COURT:  Is it lawyer depositions because the

9  lawyers are dominating the Coalition and making the decisions?

10 Why is it lawyer depositions when the Coalition is in fact

11 individuals?

12           MR. MOXLEY:  It is in fact individuals, Judge, and

13 that's part of our -- that's part of the problem that we have

14 in terms of figuring out how to create a witness or to even

15 possibly create a witness in response to this deposition

16 notice because, the Court has it exactly right, the Coalition

17 is 18,000 individuals.  Who can speak for 18,000 survivors of

18 child sex abuse?

19           THE COURT:  Who signed the interrogatory answers?

20           MR. MOXLEY:  Lawyers signed the interrogatory

21 answers, Your Honor, but let me just --

22           THE COURT:  As the client?

23           MR. MOXLEY:  -- let me just clarify --

24           THE COURT:  As the client?

25           MR. MOXLEY:  No.

1           THE COURT:  Well, don't --

2           MR. MOXLEY:  No, Your Honor, with --

3           THE COURT:  -- don't interrogatories have to be

4  signed by a client?

5           MR. MOXLEY:  Yes, Your Honor, but we signed as to

6  the objections, Your Honor, and --

7           THE COURT:  Okay.  Well, what about as to the

8  answers?

9           MR. MOXLEY:  I will have to look back, Your Honor.

10  Literally, as I sit here today, I do not recall getting a

11  survivor to respond on behalf of 18,000 survivors, I know we

12  did not do that.  But, Judge, we're not the ones insisting

13  that it be a lawyer, I just want to make sure that's clear.

14  It's the movants who are arguing that it's the lawyers, it's

15  the movants who are arguing that -- and who have tied

16  explicitly in their letter to this Court on this motion, they

17  have tied explicitly the fact that they seek depositions of

18  state court counsel, which certain state court counsel have

19  objected to, skew the fact that they have sought Coalition

20  testimony and say that, because of that, that they're being

21  deprived of a necessary deposition.  It's they who want a

22  lawyer deposition --

23           THE COURT:  Okay, but I'm not --

24           MR. MOXLEY:  -- that's --

25           THE COURT:  -- looking at the lawyer depositions,

1  those aren't in front of me, this is a Coalition deposition.

2  So why is the Coalition deposition necessarily of a lawyer?

3          MR. MOXLEY:  It's not necessarily of a lawyer,

4  Judge, but that's what makes it even more problematic because

5  it -- are we really going to have a survivor testify as to the

6  broad topics that are noticed here?  I mean, Your Honor, one

7  of the topics --

8          THE COURT:  I don't know.  Who's making decisions

9  for the Coalition?  There has to be a client.

10         MR. MOXLEY:  Yes, there is a client.  The clients,

11 Your Honor, are the 18,000-plus survivors who have

12 specifically signed consent forms to be represented by

13 Coalition counsel.  Our client, as Your Honor well knows -- I

14 know the Court is getting to this -- our client is not the

15 state court counsel, we do not represent those firms, those

16 firms are represented by other, extraordinarily able counsel

17 who've appeared before you, one of whom appeared before you

18 earlier this morning.

19         So the state court counsel have their lawyers.  We

20 are not the lawyers to the state court counsel, we are the

21 lawyers to the survivors, and if -- it is -- it is really

22 difficult, Your Honor, as a practical matter, if you can

23 imagine, having a survivor sit for a deposition, a 30(b)(6)

24 deposition, to talk about -- this is one of the topics, Your

25 Honor -- the debtors' liquidation analysis, to talk about

1  abuse claims against local councils, to talk about

2  communications between the BSA and local councils.

3          Your Honor, we're talking about this at a high

4  level, but if you actually, really -- and I'm sure the Court

5  has or will, if it chooses to -- if you look at the topics,

6  they are outrageously broad.  And we have asked, we have asked

7  the insurers in the meet-and-confer process to narrow these

8  topics and never once have they offered to do so.  They

9  literally want Coalition counsel testimony -- or, excuse me,

10 strike that -- they literally want Coalition testimony, quote-

11 unquote, "Coalition testimony" about the debtors' liquidation

12 analysis.  We don't have --

13         THE COURT:  Well, that may not be --

14         MR. MOXLEY:  -- that information, Your Honor.

15         THE COURT:  -- relevant, that may not be relevant,

16 and we can go through the topics, but let's stick -- and we

17 should then, but let's stick with the idea that the Coalition

18 -- and maybe you're getting to this -- you know, if it's a

19 30(b)(6), the Coalition can designate whoever the Coalition

20 wants, it's up to the Coalition.

21         MR. MOXLEY:  That's correct, of course that's

22 correct, Your Honor.  Your Honor is absolutely right.

23         Let me, if I -- I think I know where the Court is

24 going, let me just speak to the point now to why we're not a

25 proper target for a 30(b)(6) deposition.  That's really

1  fundamental and, as the Court said, we are -- they are counsel

2  to 18,000 survivors, that's what the Coalition is.

3       We understand, as I mentioned at the outset and I

4  just want to underscore it again quickly for the Court, the

5  Coalition is a party, it has discovery obligations, and it's

6  met those obligations.  The fact that a party is subject to

7  discovery, Your Honor, does not that mean every party is

8  subject to a Rule 30(b)(6) deposition.  A Rule 30(b)(6)

9  deposition is a very specific discovery tool with a very clear

10 history and purpose, and it's all outlined, Your Honor, in the

11 Advisory Committee Notes.  It is absolutely clear that the

12 30(b)(6) tool is intended to apply to entities or

13 organizations with some kind of legal existence that is

14 separate from its members.

15      The Coalition, as Your Honor I know is keenly aware

16 of, does not represent state court counsel, as we just

17 discussed.  Why does that matter?  Why do we -- why does the

18 Court emphasize that point and why am I emphasizing that

19 point?  Well, here, we would submit, Your Honor, it's critical

20 to the fact of -- it's a critical fact to the analysis, both

21 practically and legally.  And I would submit, Your Honor, that

22 the practical and legal here are really intertwined.

23      Practically, we understand that there are times in

24 bankruptcy proceedings where ad hoc groups receive a 30(b)(6)

25 notice and those ad hoc groups determine, maybe for strategic

1  reasons or practical reasons, or because one of the clients in

2  the group really wants to have their deposition taken and tell

3  the story, for whatever reason, they decide they want to put

4  up a witness to testify and they don't object to the 30(b)(6)

5  notice.  We understand that happens, but in those situations,

6  Your Honor, the ad hoc group very often is, if not always --

7  we haven't found a case where an ad hoc group of natural

8  persons like ours has been required ever to designate a

9  30(b)(6) designee, but in those situations --

10          THE COURT:  You haven't found one one way or the

11  other, right, you just haven't found a case?

12          MR. MOXLEY:  We haven't found a case and neither

13  have any of the movants.  There's no case where a group of

14  natural persons like our ad hoc group has been required to put

15  up a designee.  There's also no case, Your Honor, where a

16  group of -- where an ad hoc group even of entities has been

17  required to do so, but, as a practical matter, we understand

18  that in bankruptcy cases that sometimes happens.  But in those

19  cases where it happens, Your Honor, we would just note that

20  often those ad hoc groups are themselves with -- like secured

21  lender groups or bondholder groups or noteholder groups --

22  they're often comprised themselves of entities.

23          And so, if you were to go through the membership of

24  the group and you were to serve a 30(b)(6) notice on an

25  individual member of that group, that would be appropriate

1  because they're entities, but here the Coalition -- as the

2  Court, I note, recognized in the course of this argument --

3  here, our group is 18,000 people, none of whom as natural

4  persons, Your Honor, would be subject to a 30(b)(6) notice.

5  Natural persons are not deposed by topics, they're deposed

6  based on their personal knowledge pursuant to Rule 30(b)(1).

7        Legally, the rule is very clear, a target for a

8  30(b)(6) deposition is, quote -- I'm quoting from the rule,

9  Your Honor -- "a public or private corporation, a partnership,

10 an association, a governmental agency, or other entity."  The

11 Coalition is none of these.

12       The movants say, oh --

13       THE COURT:  How are they not an association?  How

14 are they not an association, a group that is formed for a

15 particular purpose?

16       MR. MOXLEY:  Yeah, that, we would submit, Your

17 Honor, is really in reference to things like trade

18 associations which are actual entities that have an existence

19 outside of their membership that people can join or not join,

20 that have, you know, a legal existence that they can speak

21 from through designees like 30(b)(6) depositions, that's not

22 us.  We're just a group of individual people.

23       Your Honor, the movants say, oh, but you have

24 bylaws, but they don't cite any authority that says bylaws

25 that a group of people decide to abide by equals 30(b)(6),

1  there's no such authority for that.

2          The movants say, oh, but you've acted in an

3  organized way in these proceedings.  Yes, yes, we have.  The

4  Coalition, as a group of people, is a party and the Coalition

5  has behaved as a party, both with respect to the benefits of

6  that status and its burdens, i.e. we've produced discovery.

7          The movants say, oh, but you filed 2019s.  And Your

8  Honor knows this issue very well, there's no authority that

9  says a 2019 equals a 30(b)(6).  Of course that makes sense.

10  The rules are very distinct in their purposes, 2019 concerns

11  disclosure regarding a group that's acting in concert to

12  advance a common interest.  That doesn't mean that the

13  30(b)(6) mechanism applies to them whereby you have binding

14  testimony by a particular designee that binds 18,000 natural

15  persons, that's not the same thing at all as the purpose of a

16  2019, so that doesn't shed any light on it either.

17          Your Honor, the movants --

18          THE COURT:  So what about a committee, what about

19  just a regular creditors committee?

20          MR. MOXLEY:  A creditors committee, we would submit

21  to Your Honor, is different because -- because, again, in the

22  situations where this practically has come up, those types of

23  committees aren't comprised of natural persons, they're

24  comprised of entities themselves.

25          And so, inefficient as it might be, I'd like to

1  walk through that, if I could, because I think the Advisory

2  Committee Notes actually answer this question for us.  But to

3  answer the Court's question, in that situation you could

4  inefficiently go through each of the members of such a

5  committee and take their 30(b)(6) deposition, but you can't do

6  that here.  If the movants were to wish to take depositions of

7  our group, of the individual members of our group, they could

8  not serve 30(b)(6) deposition notices on those people because

9  they're people.  People get 30(b)(1) notices.  And here those

10 individual people would be testifying as to their personal

11 knowledge, not as to topics that are designated for them, Your

12 Honor.

13         THE COURT:  So those individual people -- so the

14 individual people are collectively permitted to take positions

15 before the Court, but you're saying -- but you're saying that,

16 technically, under Rule 30(b)(6), no other party is entitled

17 to get a collective position via deposition?

18         MR. MOXLEY:  Via deposition.  And I would say it's

19 not the only -- yes, Your Honor, the short answer is yes, the

20 slightly longer answer is -- what I would -- what I would just

21 quibble with is the word "technically."  I don't think it's a

22 technicality and let me walk you through why.

23         The movants have cited to the Court the 2007

24 Advisory Committee Notes and, as we set forth in our letter,

25 if you read the portion of the Advisory Committee note, the

1  word "entities" appears, "such entities."  It proves our

2  point.

3        But a much bigger step back in time, Your Honor, to

4  the 1970 Advisory Committee Notes where the origin story of

5  Rule 30(b)(6) is recounted is really worth the Court's time.

6  It provides, I think, critical guidance on this motion.

7        What, Your Honor, the 1970 Advisory Committee Notes

8  tell us, I don't want to burden -- I'd be happy to, but I

9  don't want to burden the Court with just reading the 1970

10 Advisory Committee Notes, they're longer than the 2007

11 Advisory Committee Notes, but I highly recommend them to the

12 Court and, in short, this is what they tell us, Your Honor.

13       Prior to Rule 30(b)(6)'s existence, a party seeking

14 discovery might notice up this executive or that executive,

15 trying to find the information being sought, only to learn at

16 the deposition that they guessed incorrectly and that

17 particular person, that particular executive doesn't have the

18 information that they're seeking.  If you do that exercise

19 enough times and you consistently guess wrong, a party could

20 run through its allotted depositions without hitting on the

21 executive who happens to have the information.  Strategically,

22 parties wishing not to be forthcoming could obviously take

23 advantage of such a cumbersome and inefficient process.

24       Alternatively, a party wishing to burden its

25 adversary with deposition after deposition, could keep

1  deposing executives at a company, despite already having been

2  provided with the answer at an earlier deposition, all under

3  the guise of wanting to be diligent about discovery but really

4  wanting to up the burdens on its adversary.  Rule 30(b)(6) was

5  designed to change that inefficient and burdensome dynamic for

6  everybody and bring efficiency to the process of deposing

7  entities.

8          As the Advisory Committee wrote in 1970 -- and now

9  I'm quoting, Your Honor -- "A new provision is added whereby a

10  party may name a corporation, partnership, association, or

11  governmental agency as the deponent, and designate the matters

12  on which it requests examination, and the organization shall

13  then name one or more of its officers, directors, or managing

14  agents, or other persons consenting to appear and testify on

15  its behalf, with respect to matters known or reasonably

16  available to the organization," end quote.

17          The whole idea, Your Honor, is that the designated

18  deponent responding to a 30(b)(6) notice is testifying on

19  behalf of something with a legal existence, an existence

20  that's separate from its members.  People -- as I said, Your

21  Honor, but just to underscore the point -- people, natural

22  persons, don't testify via designees.

23          We would submit, Your Honor, that the rule is very

24  clear on its face and its history, as reflected in the

25  Advisory Committee Notes, only buttresses the point, the

1  Coalition falls outside of Rule 30(b)(6).  And, practically

2  here, we think that makes sense.  Who -- as we've discussed,

3  who could really testify on behalf of 18,000 individual

4  people?  The Coalition's membership can change.  A Rule

5  30(b)(6) deponent gives testimony that is binding upon the

6  entity for which the deponent is testifying, there is no such

7  entity here.

8          Are 18,000 individuals to be bound by what a

9  witness we would literally have to create here would say?  How

10  does that -- how does that really, practically work for those

11  individuals, Your Honor?  We submit it doesn't.

12          And the movants, respectfully --

13          THE COURT:  Well, are you binding --

14          MR. MOXLEY:  -- Your Honor, have no --

15          THE COURT:  -- the individuals -- are you binding

16  the individuals or are you binding the Coalition, which is a

17  group, at least for certain purposes?  We know it is for 2019

18  and it can be for other purposes.  So are you binding each

19  individual or are you binding what the -- I don't want to use

20  the word "entity" because that's in the rule -- but are you

21  binding the group that has appeared in front of me and taken

22  positions, is that who you're binding?

23          MR. MOXLEY:  Well, we don't think there's a way to

24  -- what is -- let me step back and say it this way.  What is

25  bound by a 30(b)(6) designee's testimony is what -- whatever

1  that thing is -- is what the deponent is designated to speak

2  on behalf of, but our fundamental sort of point, Your Honor,

3  is that there is no such thing.  Our members are just a group

4  of people, so there is no such thing.

5          With respect to other types of organizations, there

6  is a thing, there is a trade association, there is a

7  committee, there is a partnership, but there is no such thing

8  here.  We're just 18,000 people.

9          THE COURT:  So when the committee -- if there was a

10  deposition of a committee, it would bind the committee, it

11  wouldn't bind the individual members of the committee, would

12  it?

13          MR. MOXLEY:  I haven't -- I haven't studied that

14  specifically.  It certainly would bind the committee, it

15  certainly would bind the committee, but -- and then the

16  committee may have, you know, its own obligations, et cetera,

17  or members of a group that is represented via a committee,

18  there may be some mechanism there, Your Honor, but that's just

19  not our situation.

20          THE COURT:  Well, let's say you have an indenture

21  trustee and a bondholder and a union and -- well, yeah

22  (indiscernible) I forget -- the union and an individual

23  employee and a trade creditor, and the committee takes a

24  position, they take it *qua* committee, certainly an individual

25  member of that committee can and has objected to a plan which,

1    for example, the committee supports.  They're not bound by

2    what the committee does *qua* committee for their individual

3    claims that they may have.  So how is this different than

4    that?

5              MR. MOXLEY:  Well, I think, by definition -- as the

6    Court just outlined that situation, by definition, it's

7    different, right, because the committee is a committee that's

8    appointed.  Here -- you know, for example, here we have the

9    TCC, right?  That committee is appointed; it has a committee

10   structure, it has fiduciary obligations, it has a role that it

11   has to play.  We're not a committee, we're a group of people -

12   -

13             THE COURT:  You're just a group.

14             MR. MOXLEY:  -- and we --

15             THE COURT:  So a group can decide it wants to form,

16   it wants to participate in a bankruptcy case, it wants to be a

17   mediation party, it wants to be involved in discovery, and it

18   agrees or admits that it's subject to certain discovery, but

19   just not a Rule 30(b)(6)?

20             MR. MOXLEY:  Yes.  It agrees that it is a party

21   that is subject to party discovery, the appropriate party

22   discovery on it.

23             THE COURT:  So --

24             MR. MOXLEY:  It's -- we are not --

25             THE COURT:  -- they should take the deposition of

1  18,000 people, which is what this rule was designed to avoid?

2              MR. MOXLEY:  Right.  Well, they can take the

3  deposition -- they can subpoena anyone they want -- they can't

4  any longer, I suppose, given the fact discovery deadline, but

5  they could have subpoenaed anyone they wanted to.  That's

6  certainly true, they could have done that, but that's why I go

7  back, I guess, Judge, you know, respectfully, to the point

8  that what they're really interested in is not what our group

9  has to say, they really don't -- they really don't actually

10  want to know what the 18,000 survivors want to say, they want

11  to know what the lawyers want to say, that's what they're

12  after.

13              THE COURT:  Well, they want to know what the

14  committee wants to say, they want to know what the group wants

15  to say.  They want to know what's the position of the group

16  and I don't know who -- if in fact the group is run by

17  lawyers, then it is.

18              This is a really interesting conversation, I

19  understand why you say it goes to first principles, but it

20  does seem to be a little -- I want to say disingenuous, but

21  not pejoratively -- it does seem to be a little bit

22  inconsistent, let's say, with a position that this group can

23  act as a group and can take positions as a group, and wants me

24  to in fact accept the strength of that group for certain

25  arguments that it's making, but yet not be considered -- not

1   be able to be deposed as a group because we all know the

2   effectiveness of different types of discovery for different

3   things.  And so some things only depositions are good for and

4   other requests documents are good for, but if you can't

5   question somebody about the documents, you know, what's the  -

6   - you lose something.

7           MR. MOXLEY:  So can -- I can give Your Honor two

8   answers to that.

9           THE COURT:  Sure.

10          MR. MOXLEY:  The first -- let me start with the

11  second practical answer.  The second practical answer is, as

12  the Court knows from prior discovery hearings, the movants

13  have the hundreds of TDP-related documents the debtors have

14  produced, they have the redlines.  If you think about it,

15  Judge, if they were to take a 30(b)(6) deposition of comments

16  on the TDPs -- they already have the documents showing

17  markups, they have those, they have the emails -- what

18  practically beyond that could they actually ask at a

19  deposition that wouldn't clearly be subject to attorney work

20  product, meaning the mental impressions of the person who made

21  the redline.  They would ask, did you make the redline or did

22  you make this comment.  That answer might be a yes-or-no

23  answer.  Why did you make the change, is the next question,

24  and that's a mental impression or a strategic issue that is

25  clearly work product under Rule 26.

1        So we know, as a practical matter, that's one

2   answer.  The second answer, though, Your Honor, to the Court's

3   question is, I appreciate the tension that the Court is

4   observing, but we didn't make up the rule.  Rule 30(b)(6) is

5   clear on its face, we are none of the things that are

6   referenced there.  And so we just happen to be the party --

7   the party, not the entity -- a party that is standing on its -

8   - on the face of the rule.  And the fact that this hasn't

9   maybe -- well, through our knowledge, we haven't found a case

10  that has required a group like ours to be deposed, we haven't

11  found a case where that has required a designee for a group

12  that -- for an ad hoc group that even is consisting of some

13  entities, to be truthful, Your Honor, but we -- the rule is

14  the rule.

15        And so we're not trying to be -- you know, I know

16  the Court didn't use disingenuous pejoratively, I totally

17  appreciate the Court's comment on the tension, but the rule

18  says what it says and we're none of the things that are

19  listed.  And I don't -- I'm not going to unnecessarily get

20  into the back-and-forth that happened in the course of meet-

21  and-confers, but you've seen the letters from the movants,

22  they don't have any cases where that has been ordered either.

23        And so there's just no authority that says that an

24  ad hoc group like ours is required to sit for a 30(b)(6)

25  deposition.  The rule is very specific in its history and in

1  its language; we don't fall within any of the proper targets.

2  And we're not at all saying that we're not subject to

3  discovery, Your Honor, we've complied with the appropriate

4  discovery obligations we have.

5           Thank you so much, Your Honor, for hearing from me

6  for so long.  I'm happy to answer any further questions, of

7  course, but that's all I have.  Thank you.

8           THE COURT:  I don't think I have any questions, but

9  your -- so there's no authority that has found that an ad hoc

10  committee made up of a group of persons has to testify under

11  Rule 30(b)(6), but I take it there's no authority that says

12  they don't?  There's just no authority out there.

13          MR. MOXLEY:  There's just no authority and, in the

14  absence of authority, we would submit that the rule is clear

15  on its face.  And to the extent that Your Honor has any

16  questions about whether we might arguably fit into something

17  like association or other -- quote-unquote, "other entity,"

18  the two words that even within the realm of possibility could

19  apply to us because we're certainly not a public or private

20  corporation, we're not a governmental agency and we're not --

21  and we don't have a partnership, so the only potential words

22  that fall with us are "association or other entity."  And I

23  would submit, Your Honor, that any ambiguity you find there

24  are answered by the Advisory Committee Notes and the history

25  of the rule and why the rule exists, it's just not meant for a

1   group like ours.

2           THE COURT:  Yeah, really interesting.  Thank you.

3           MR. CHRISTIAN:  Your Honor --

4           THE COURT:  Yes?

5           MR. CHRISTIAN:  -- may I be heard on that point?

6   Thank you --

7           THE COURT:  Of course --

8           MR. CHRISTIAN:  -- Your Honor.

9           THE COURT:  -- of course.

10          MR. CHRISTIAN:  Thank you, Your Honor.  David

11  Christian, again, for Great American and arguing on behalf of

12  the propounding insurers.

13          The authority, Your Honor, is the Federal Rules

14  themselves.  The Advisory Committee Notes from the 2007

15  amendments indicate that "other entity" was added precisely to

16  avoid the kind of argument that Mr. Moxley is making here

17  today, and permit me to quote from those notes.

18          "Other entity is added to the list of organizations

19  that may be named as deponent.  The purpose is to ensure that

20  the deposition process can be used to reach information known

21  or reasonably available to an organization no matter what

22  abstract, fictive concept is used to describe the

23  organization.  Nothing is gained by wrangling over the place

24  to fit into current rule language such entities as limited

25  liability companies, limited partnerships, business trusts,

1  more exotic common law creations, or forms developed in other

2  countries."

3          The idea of applying this to a group like the

4  Coalition in this case is further supported by the Federal

5  Rule's use of reference to associations in places such as Rule

6  23.2.  That rule identifies unincorporated associations and

7  the idea of naming as parties representative members as a way

8  to use the class action process.

9          So the Federal Rules, through the commentary and

10  through their usage, make clear that the authors of the rules

11  are attempting to avoid the wrangling that Mr. Moxley is

12  engaging in here today and the Coalition fits squarely, in our

13  view, within the terms of "other entity."  And I think there

14  was even some discussion if they were a sort of association

15  with Your Honor earlier, but what it boils down to is this:

16  Mr. Moxley is seeking to argue that they're a group that is

17  not an entity and that is not an association and is not a

18  committee.

19          Well, why is their group not a committee, because

20  they don't use the name Committee, because they've chosen the

21  name Coalition?  They've named themselves with capital

22  letters, they've written bylaws, they have a management

23  structure, they got a loan to pursue their common objectives

24  in this case, they are a mediation party, they participated in

25  the drafting of the proposed plan and they advocate for it at

1  virtually every hearing.  That's a committee, Your Honor.

2  They could call it a subcommittee of claimants, they could

3  call it an association of claimants, they can specify in their

4  name that they're an unincorporated association, but they are

5  entity and, whether you call it a Coalition or a Committee,

6  there's no way of escaping the plain intent of Rule 30(b)(6),

7  especially as amended in 2007 and the commentary provided for

8  those amendments.  That's the authority, Your Honor.

9          Turning from that, which I regard as an interesting

10  but relatively simple threshold question, let me respond to a

11  handful of things that Mr. Moxley said that I think he just

12  got wrong.  And I presume it's -- perhaps it's because of a

13  lack of familiarity with some of the record here or maybe it's

14  trying to paint with a broad brush with respect to my clients

15  and other parties who may be involved in the case and in the

16  mediation, but he makes the argument that this discovery is

17  about the debtors' historical practices.  And I understand

18  from Mr. Goodman's previous presentations that they're going

19  to make an argument to you that the science of the debtors'

20  historical practice is the basis and the justification for the

21  TDPs in this case, but that's a factual claim and it's

22  disputed.  We don't agree with him and we don't have to take

23  Mr. Moxley's word for it, we're entitled to discovery into

24  that question.

25          And in fact what we know from discovery so far in

1   this case is that the Coalition and the other drafters of the

2   TDPs seem to have thrown out the debtors' historical

3   experience.  We know, for example -- and I'm not here for the

4   Court to make factual findings about all this, it really goes

5   to the question of why we need the discovery from the

6   Coalition, and we should have an opportunity to test the

7   arguments that Mr. Moxley made here today -- we know even

8   before bankruptcy that the debtor proposed procedures for

9   resolving the sexual abuse claims.  We have, for example, an

10  October 28, 2019 email from Mr. Andolina to Mr. Stang, making

11  proposals that vary greatly and in important respects,

12  especially from the standpoint of the insurers being asked to

13  indemnify those claims from the TDPs now being proposed for

14  confirmation.  Those were thrown out the window.

15          Now, reference was made to Mr. Briggs (ph)

16  testifying.  In his deposition, he actually said that he was

17  not involved in drafting the TDPs; he said he was asked for

18  some input.  But, revealingly, it turns out what Mr. Briggs

19  thought was in the TDPs is not in the actual TDPs being

20  proposed for confirmation.  Why?  Because the Coalition took

21  the pen.  And I respectfully submit it's not out of context.

22  The FCR was asked about the process of drafting the TDPs and

23  he said, initially, the Coalition took the pen, and then there

24  was a back-and-forth between the Coalition and the debtors and

25  the TCC, according to Mr. Patton's testimony.

1          But we know from the face of the documents that the

2    document that came out of that process does not match either

3    what Mr. Briggs thought was and should be in the TDPs or what

4    was originally proposed by the debtor.  They differ in

5    dramatic and important, material respects.  And we'll put that

6    evidence on at the confirmation hearing, but the Coalition

7    clearly has evidence to shed on that and that evidence will

8    lead to a testing of Mr. Moxley's actual claim that the

9    claims, the debtors' claims handling experience is reflected

10   in the TDPs.

11          Now, in the course of making that argument about

12   the claims handling experience of the debtor, again, something

13   hotly disputed as a factual matter and something into which

14   we're entitled to discovery, he said the insurers participated

15   and that Mr. Briggs testified about that.  Well, my client is

16   an excess insurer.  We didn't participate in handling the

17   claims in the way Mr. Moxley is suggesting.  As Your Honor

18   heard in the context of the motion to quash the depositions

19   aimed at the insurers, there may be individual claims over the

20   course of years where my client provided coverage where we

21   were either asked to contribute to a settlement or we had some

22   consultation, but not with respect to the debtors' whole

23   program.

24          Now, maybe there are primary insurers who had much

25   more significant experience.  You know, Hartford is the

1 settling party here and was deposed, they may have a different

2 experience than my client.  But we're painting with too broad

3 a brush when we say the propounding insurers who were not

4 involved shouldn't get discovery into our factual claim about

5 the consistency or inconsistency of the TDPs with the debtors'

6 experience because some other entity had a different

7 experience or was involved in a different way.

8          And that gets me back to the mediation.  Mr. Moxley

9 need not worry at all about inadvertently disclosing any

10 mediation communications because there were none with my

11 client about the TDPs, there were none.  I can represent to

12 the Court that I and my co-counsel, who went to mediation

13 sessions in person, you know, sat alone in rooms for days, not

14 once were we invited to participate in the discussion of the

15 TDPs, not once were we informed of their content until they

16 were ready to be published to the world.  So the idea that we

17 were so involved with the debtors' historical experience or

18 that we were so involved in the formulation of these TDPs, so

19 we need not get any discovery, just doesn't fit the facts.

20          Moreover, it's no substitute to say, well, you have

21 the redline documents.  We need to be able to ask a witness

22 about that.  Mr. Patton has testified that the Coalition

23 initially took the pen.  Well, what did they do with it?  Why

24 did they make the changes that they made?  Why did they insist

25 on the findings that they're insisting on?  And we shouldn't

1  be required leading up to and during the confirmation hearing

2  to guess at the support for the findings, at the meaning of

3  the findings, at the position of the Coalition.

4          If the Coalition is going to claim they get $10.45

5  million for a substantial contribution and $950,000 a month as

6  long as this case goes on because they, as an entity, are

7  making such an important contribution, then we're entitled to

8  know the facts surrounding the contribution they assert

9  they're making to this plan.  We can debate about whether it's

10  a positive contribution or a negative contribution, but

11  there's no doubt they're making -- they're making some play

12  here, they're involved intimately in what's being proposed,

13  both in terms of the findings and in terms of the trust

14  distribution procedures.

15          The last thing I just want to comment on briefly  -

16  - well, two last things, for the record.  First of all, there

17  was a suggestion from Mr. Moxley that we just want a lawyer

18  and that's why we've sought the depositions of state court

19  counsel.  We've asked for a 30(b)(6) witness, they'll put up

20  whoever they can identify as a 30(b)(6) witness.  Independent

21  of that and partly for other reasons, there are deposition

22  notices to state court counsel.  The point is that the

23  Coalition's position is that you get none of it.  And the idea

24  that they would say to us, well, you can't get it from the

25  Coalition because we're not a committee, we're not an entity,

1  and you also can't get it from the individuals that we point

2  to as the reason that we're a collection of individuals that

3  does not comprise a committee or an association or an entity

4  is the real irony here, right?  There may be reasons to argue

5  for or against a 30(b)(6) deposition of the Coalition; there

6  may be reasons to argue before or against the individual

7  deposition notices of the state court counsel.  But the irony

8  is to say, we're going to put at issue, make front and center

9  these disputes about the findings and the TDPs, we're going to

10 take the pen, but we're not going to give you any discovery

11 into it either from the entity or the individual because we're

12 not an entity, we're a collection of individuals.

13         The last point and it's a small thing, but Mr.

14 Moxley at the last hearing we had talking about this subject

15 and again today has touted the fact that the insurers say they

16 will present no fact witnesses at the confirmation hearing.

17 That's not quite right.  As I specified when this came up

18 before, we may have fact witnesses that we call, they will not

19 be our employees, right?  We're entitled to discover facts,

20 we're entitled to put on a case in rebuttal to the factual

21 assertions being made by the Coalition and by the debtors and

22 others in this case.  And the idea that we don't have a

23 factual dispute or we shouldn't be able to inquire into the

24 fact witnesses simply is an attempt to hamstring our

25 presentation of the evidence, our rebuttal to the supposedly

1  science-based, fact-based case that the Coalition argues that

2  it will present to the Court.

3           And so this really gets to the nub of why there's

4  no analogy to the insurer depositions that were quashed.  What

5  is at issue is not our historical handling of the claim from

6  the 1990s that reached into the excess layer.  What's at issue

7  is the debtors' proposed plan for confirmation that includes

8  TDPs drafted by the Coalition and findings insisted on by the

9  Coalition, and the factual assertions and the legal arguments

10 being made to you by the Coalition in support of those things.

11 And so that's the bottom line is that what's at issue is what

12 they're proposing, not what we did in the 1990s with respect

13 to a particular claim.

14           Thank you, Your Honor.

15           THE COURT:  Mr. Christian, let me ask, if the --

16 who does the 30(b)(6) deposition of the Coalition bind?

17           MR. CHRISTIAN:  Well, certainly the entity that

18 later on is going to ask you to approve a substantial

19 contribution claim, right?  Certainly the entity that is going

20 to stand up and put on evidence, presumably, but certainly

21 make legal argument to you at the confirmation hearing about

22 why Section 1123 or Section 1141 justifies the various

23 insurance-related findings in the plan.

24           And we may get deposition testimony -- we don't

25 know what the witness will say, of course -- we may get

1  deposition testimony that undercuts or is intentioned with an

2  argument you're going to hear from that entity at the

3  confirmation hearing.  And, you know, if Mr. Goodman says X

4  and the Coalition's witness said not X, I'm entitled to

5  discover that to rebut his case at confirmation.

6          Now, it's -- you know, one might speculate that,

7  you know, is it a Pyrrhic victory to get this witness because

8  there's 18,000 constituents out there who can take 18,000

9  different positions?  You know, we'll find out, I guess, at

10 the confirmation hearing.  Maybe it won't turn out to matter

11 because the 18,000 individuals will all have different

12 arguments and you'll find one of the persuasive and it won't

13 matter what Mr. Goodman's argument is at the confirmation

14 hearing, but that's just something we don't know yet because

15 all we can know now is the facts we've gotten from the FCR and

16 other parties who've sat for a deposition.

17         We can know the arguments that have been floated so

18 far.  We noted they amended the proposed findings to add some

19 supposed hooks in the bankruptcy code, but we don't know what

20 else we might discover about Mr. Moxley's claim that all they

21 did, he said, was mark up a proposal that was consistent with

22 the debtors' historical experience.  I have reason to doubt

23 that and I have a right to test that.

24         THE COURT:  Mr. Moxley said there hasn't been any

25 attempt to limit any of the topics in the meet-and-confer.

1          MR. CHRISTIAN:  Well, they made clear in the meet-

2   and-confer that they would not budge from the idea that Rule

3   30(b)(6) does not apply to them, and my understanding is they

4   did not move for protection with respect to any particular

5   topics.

6          And in fact what I would suggest, Your Honor, is to

7   the extent Your Honor is prepared to grant our motion, we'd be

8   willing -- I don't think we ought to take up court time going

9   through -- I don't remember how many topics there were, but I

10  don't think we ought to take up everyone's time today on the

11  record going through dozens of topics to talk about, you know,

12  I don't understand this one or this one is way too broad, but

13  I can give you this narrow range, you know, from the existence

14  of the Coalition to date, or something like that.  You know,

15  if we move past the position that the Coalition is not an

16  entity subject to Rule 30(b)(6) discovery, we're obviously

17  going to have to work with Mr. Moxley on when we're taking

18  that deposition and, you know, how many people are going to

19  ask questions and things of that nature, and we're happy to

20  talk with him about any questions or concerns about the

21  topics, but they didn't ask for that relief.

22          THE COURT:  Thank you.

23          MR. CHRISTIAN:  Thank you, Your Honor.

24          THE COURT:  Mr. Moxley?

25          MR. MOXLEY:  Your Honor, may I just be heard very

1   briefly?  And I won't repeat myself.

2            THE COURT:  Yes.

3            MR. MOXLEY:  Thank you.  I'm confident the Court

4   knows my responses to many of the things that Mr. Christian

5   said, but a couple of quick points.

6            One, just to correct one thing, I am not aware of

7   the Coalition as Coalition, you know, obtaining a loan that I

8   think Mr. Christian referenced.  I'm not aware of where that

9   is in the record or that even happening, but -- so I just

10  wanted to correct that one point.

11           You know, picking up, though, on Mr. Christian's

12  sort of last point about the practicalities here.  For all of

13  the reasons that we said, we steadfastly argue, Your Honor,

14  that the motion should be denied.  If Your Honor is

15  entertaining potentially granting the motion, what we would

16  suggest as a practical sort of point -- and we put this in our

17  letter, Your Honor, this is not -- I'm not bringing this up

18  out of the blue -- what we would suggest is that the debtors'

19  depositions -- the debtors have designated a number of

20  witnesses to testify on behalf of topics that are overlapping

21  with the topics that are noticed in the Coalition's 30(b)(6)

22  deposition notice -- those depositions should be taken.  And

23  then, to the extent that there are any holes that remain -- I

24  don't think there will be, but to the extent there are --

25  movants can come back to the Court and say, you know, we've

1  taken the deposition, we still think we need the Coalition

2  testimony, whatever Coalition testimony is, not -- I'm not

3  conceding that there is really such a thing, but to the extent

4  they say they need it, then we can talk about a much more

5  narrow sort of universe of what a Coalition testifier, you

6  know, sort of even would look like.

7          We'd like to reserve our rights on whether or not

8  that's binding on individual people, particularly thousands of

9  individual people, but we can take up those types of issues

10  and privilege assertions, et cetera, if and when we get to

11  that point.  We just don't think practically that it makes

12  sense to sort of push this deposition before the depositions

13  of people who genuinely do have the knowledge are actually

14  taken.

15          And I just would flag for the Court again, we've

16  put this in our letter again, the Coalition has not waived the

17  mediation privilege and, to the extent they're down the road

18  or if the Court orders it, that there is a Coalition 30(b)(6)

19  deposition, we may have some questions about sort of the

20  appropriate scope of that deposition with respect to the

21  mediation privilege.  But I don't want to jump ahead to that

22  unless we need to, Your Honor, if we lay out that process I

23  just outlined, if a deposition were to happen, but we strongly

24  submit that none of what I have just said, Your Honor, is to

25  suggest or take away from the fact that we submit the motion

1  should be denied.

2          THE COURT:  Thank you.

3          And, Mr. Christian, I'll give you the last word.

4          MR. CHRISTIAN:  Thank you, Your Honor, just one

5  last point in response to what Mr. Moxley just said.

6          I don't think it's the case that our examination of

7  the Coalition is a gap-filler for our examination of the

8  debtor.  Just by way of example, I think the Court was

9  surprised to hear from Mr. Moxley that the insurance findings

10 were the debtors' findings, it's the debtors' plan with the

11 debtors' findings, the Coalition is okay with them, but they

12 came from the Coalition.  And the debtor and the Coalition are

13 not the same party, they're not aligned on these issues; they

14 may be -- may have come into alignment when the deal was

15 struck that the Coalition will vote for this plan if it

16 includes these things, that's what we seek to inquire into.

17         But the Coalition's positions and views are not

18 just, you know, an adjunct of the debtors' positions on these

19 issues and we're entitled to discover both of them because

20 that may be revealing about the facts, about the good faith of

21 the plan, about whether these TDPs match the debtors'

22 historical experience, and whether the insurance-related

23 findings are appropriate.

24         THE COURT:  Thank you.

25         MR. CHRISTIAN:  Thank you.

1          THE COURT:  Okay.  Well, I think, as Mr. Moxley put

2  it, I am considering potentially thinking about granting this,

3  so I want to get my thoughts together and I will.  I'll

4  probably get back to you tomorrow on that, but I think -- I am

5  going to address the threshold issue of whether the Coalition

6  is subject to Rule 30(b)(6) and, if I determine that they are,

7  then I am going to let the parties talk about all the

8  logistics and the scope of the deposition and particularly the

9  deposition topics and not rule on those individually.

10          So, I'll get back to you.  Thank you for an

11  interesting argument.

12          MR. MOXLEY:  Thank you, Your Honor, for your time.

13          THE COURT:  Okay.  What's left?  I think just --

14      (Pause)

15          MR. REMMING:  Your Honor, it's Andrew Remming from

16  Morris, Nichols for the debtor, if I may assist?

17          THE COURT:  Yes.

18          MR. REMMING:  We're on Item 4 of a six-item agenda.

19  Number 4 is a letter from Mr. Hogan -- I see Mr. Hogan on the

20  screen -- for Eisenberg, Rothweiler regarding a protective

21  order.  Number 5 is a sealing motion.  I don't believe there's

22  really any discussion on that.  And number 6, we had heard

23  from your chambers that you were prepared to rule on number 6,

24  so we listed that on the agenda.

25          So that is the balance of the day.

1          THE COURT:  Okay.  I'd like to take ten minutes and

2    then we're going to complete the agenda.

3          So, thank you.  We're in recess for ten minutes.

4          MR. REMMING:  Thank you, Your Honor.

5       (Recess taken at 1:37 p.m.)

6       (Proceedings resumed at 1:53 p.m.)

7          THE COURT:  This is Judge Silverstein.  We're back

8    on the record.

9          MR. REMMING:  Thank you, Your Honor.  Andrew

10   Remming, Morris, Nichols, Arsht & Tunnell, for the debtor.  We

11   left off on Item Number 4, which I mentioned was a letter from

12   Mr. Hogan on behalf of Eisenberg, Rothweiler.  I see Mr. Hogan

13   on the Zoom screen and I'll turn it over to him.

14         THE COURT:  Thank you.

15         Mr. Hogan?

16         MR. HOGAN:  Good afternoon, Your Honor.  Can you

17   hear me okay?

18         THE COURT:  I can.

19         MR. HOGAN:  Thank you, Your Honor.  Daniel Hogan of

20   Hogan McDaniel on behalf of Eisenberg, Rothweiler, Winkler,

21   Eisenberg & Jeck, P.C.

22   ** 4.     Your Honor, this is the time set for our motion for

23   a protective order.  This relates to discovery materials which

24   were produced by Mr. Tim Kosnoff in connection with both the

25   subpoena that was served on him by Century, as well as a

1  notice of deposition.  Your Honor, this is yet another example

2  of the sexual abuse survivors continuing to be victimized by

3  parties in this case.  Your Honor, from our perspective, this

4  is really just another attempt at an attack on the voting

5  that's gone on in this case and on Eisenberg, Rothweiler

6  generally.

7           By way of background, Your Honor, as you will

8  recall, AIS is comprised of three law firms, which includes

9  Eisenberg, Rothweiler, AVA Law, and Kosnoff Law.  And, as

10  you're aware, the Court has permitted the insurers to pursue

11  discovery now against these law firms -- or at least with

12  regard to Eisenberg, Rothweiler and AVA Law -- I'm sorry, and

13  Kosnoff Law, AVA Law has yet -- you have yet to determine

14  that.  But, in connection with Mr. Kosnoff's deposition, he

15  produced communications which were between clients of AIS and

16  himself.  And the purpose in soliciting those communications

17  by Mr. Kosnoff was to have those individual clients waive the

18  attorney-client privilege so that Mr. Kosnoff could utilize

19  those emails in furtherance of his attempts to subject the

20  voting to criticism and conjecture.

21           Your Honor, since the discovery responses were

22  produced by Mr. Kosnoff and disseminated to the parties that

23  were at the deposition, the actual emails have already been

24  utilized by the TCC in its motion for an ombudsperson at

25  Docket 7447; by a joinder of the Zalkin Law Firm to that

1  motion for the entry of an ombudsperson; and by Mr. Kosnoff in

2  support of the emergency motion to appoint a voting

3  ombudsperson.  So, Your Honor, it's clear from the utilization

4  of these emails that they are seeking to leverage these

5  communications in support of their positions as it relates to

6  both the plan and voting, and issues generally related

7  thereto.

8          Now, at Mr. Kosnoff's deposition, he testified that

9  his sole basis for claiming waiver was a brief email exchange

10 between these clients.  Your Honor, if you were to see the

11 emails that he produced, they all date to after November 5th.

12 And why is that date important, Your Honor?  That date is

13 important because that's when -- that's when the initial

14 voting report came out that so concerned the objectors to the

15 plan, and that's when Mr. Kosnoff caucused with members of the

16 TCC and Pachulski Stang to fashion an email that you've heard

17 so much about that the TCC sent out to all the various

18 parties, which included both AIS clients and clients that were

19 not in fact represented by AIS.

20          So, Your Honor, just so the record is clear, this

21 motion is opposed not just -- or this motion is supported not

22 just by Eisenberg, Rothweiler, but it's also supported by AVA

23 Law.  And I think that's important, Your Honor, because two of

24 the three firms that comprise AIS are opposed to the

25 dissemination of these emails.  And the reason that we oppose

1  them, Your Honor, is we weren't consulted, there was no

2  communication between Mr. Kosnoff and the other members of the

3  AIS group before he unilaterally decided to produce these

4  documents, which are in fact communications between clients

5  and the lawyers.

6          THE COURT:  So let me ask --

7          MR. HOGAN:  Your Honor --

8          THE COURT:  -- two questions, let me ask two

9  questions --

10         MR. HOGAN:  Please.

11         THE COURT:  -- on that.  One --

12         MR. HOGAN:  Please.

13         THE COURT:  -- in your letter -- and I think in the

14 AVA letter -- there's some questioning about whether these

15 emails in fact come from the firm's joint clients.

16         MR. HOGAN:  Yes, that's correct.

17         THE COURT:  And why do you say that --

18         MR. HOGAN:  We have no way of being able to --

19         THE COURT:  -- because you don't know who they are?

20         MR. HOGAN:  That's correct.

21         THE COURT:  Okay, because the names are blacked

22 out?

23         MR. HOGAN:  In part, yes, Your Honor.

24         THE COURT:  Okay.  The second question is, why does

25 the client need to express its consent to waive attorney-

1  client privilege to all of its counsel, as opposed to --

2            MR. HOGAN:  Well, Your Honor --

3            THE COURT:  -- just one?

4            MR. HOGAN:  Well, to the extent that the

5  communications involved the representation of those

6  individuals by the AIS law firms, then it implies, of course,

7  that those firms obviously represent those clients and have an

8  interest in what's being communicated.

9            One of our concerns here, Your Honor, in light of

10 your decision last week, is that we want to make sure that we

11 don't have a situation where the attorney-client privilege is

12 just eviscerated as to all communications between the clients

13 of AIS or Eisenberg, Rothweiler and those individual clients.

14 And so there's a concern that based on your ruling that the

15 insurers are going to be able to take discovery of individual

16 attorneys at these firms that there's going to be an argument

17 made that somehow we've waived -- the attorney-client

18 privilege has been waived and any communications between

19 individuals and those law firms are not subject to the

20 attorney-client privilege.

21           And the other reason it's important, Your Honor, is

22 because, you know, to the extent that this involves both a

23 common interest privilege, which the three firms share, as

24 well as work product, there's a concern that -- as it relates

25 to the communications sent by Mr. Kosnoff, there was no

1  indication that -- first of all, we weren't CC'd on any of the

2  emails, so there was no indication that the work product

3  privilege was being waived or that any sort of common interest

4  privilege was being waived.  And so the mere fact that he sent

5  an email and said can I share these emails with the Court and

6  then in fact he turns around and shares them -- or, you know,

7  the attorney shares them with counsel for insurance companies

8  and anyone else who was at that deposition, it just opens up

9  Pandora's box, from our perspective, Your Honor.

10        THE COURT:  Well, there's a lot of issues in there.

11  There's issues of informed consent; there's an issue of common

12  interest privilege, which actually I don't understand how

13  common interest privilege would apply here; there's attorney-

14  client privilege and there's work product.  But, as I thought

15  about this, I find this situation distinct from what I was

16  looking at before where outside parties were communicating --

17  or an outside party was communicating with a client

18  represented by all three firms and didn't have consent, that's

19  external.  This is internal, as I'm thinking of it -- I'm not

20  sure that's quite the way, but that's how I'm thinking of it,

21  internal, in that this is a communication between a client and

22  a lawyer, one of his lawyers, and I'm -- while I understand

23  the concerns that have been raised, if a client chooses to

24  speak with one of his lawyers and not all three of his

25  lawyers, isn't that the client's choice?

1    MR. HOGAN:  It is, Your Honor.  And don't get me

2  wrong, any client can speak with any one of the attorneys that

3  comprise AIS, but when a client waives the attorney-client

4  privilege, all three parties -- all three firms should be

5  implicated in that and should be informed as to that and they

6  weren't.  As a matter of fact, when Mr. Kosnoff sent the email

7  to those clients, those were clients of the other two firms.

8  So he should have -- if he's communicating for them to make an

9  informed waiver of their rights, he should have included the

10  other two law firms so that they could weigh in on what was

11  the best interest of the client and that didn't occur.

12    THE COURT:  Well, it didn't occur and, I guess

13  that's my question is, does it have to?  And I had been trying

14  to -- throughout this case at various points, people have

15  asked me to intervene between a client and a law firm that --

16  in all kinds of ways, starting with advertising and even

17  before, and I have, I think appropriately, resisted that

18  temptation, but here the three law firms are asking me to get

19  involved in their relationship.

20    And so I'm trying to figure out what's appropriate

21  and so the first question I had is, why can't a client speak

22  with one of his lawyers -- and, yes, maybe it would have been

23  better if Mr. Kosnoff had copied his co-counsel on these

24  communications, I don't know if he was required to -- I really

25  am somewhat at a loss what to do with this.  What you want me

1  to do is to claw back the communications -- is to let you claw

2  back the communications and then --

3          MR. HOGAN:  Correct.

4          THE COURT:  -- and then what?

5          MR. HOGAN:  Your Honor, essentially, we're trying

6  to put the genie back in the bottle for lack of a better

7  characterization. I want to clawback communications and let

8  them continue to exist as they are, as communications between

9  an attorney and their client and not disseminate them to

10 insurance companies, to other law firms, to anyone.

11         Your Honor, the notion that this is an informed

12 consent there is very little, other then a one line email, you

13 know, can I share your email with the court.  That is

14 important. It wasn't share your email with the world.  Had it

15 said that we probably would be in a bit of a different

16 situation, but here we are.  I'm just trying, Your Honor, to

17 put the genie back in the bottle.

18         Your Honor, if you don't have any other questions

19 for me I'd like to turn it over to Mr. Grey who represents AVA

20 Law.  I think he wanted to add something.

21         THE COURT:  Yes.  Mr. Grey.

22         MR. GREY:  Good afternoon, Your Honor.  Can you

23 hear me all right?

24         THE COURT:  I can.

25         MR. GREY:  Thank you.  The only thing I really

1  wanted to add is that, Your Honor, as we pointed out in our

2  papers I think there are -- with respect to some of the

3  documents no waiver was obtained.  For example, there was one

4  text exchange between Mr. Kosnoff and Mr. Van Arsdale where

5  Mr. Van Arsdale was discussing conversations he had with

6  clients and Mr. Van Arsdale didn't get a waiver from those

7  clients and he certainly didn't give Mr. Kosnoff a waiver.

8  Yet that text string was produced.

9         There are other examples that we cited.  So I think

10 at a minimum they did, kind of, a sloppy job of producing

11 documents without really making sure there was a waiver.  Then

12 there were certain circumstances, Mr. Hogan pointed this out

13 and so did we, where they got a waiver for the express purpose

14 of sharing information with the court and then they went

15 around and produced it to opposing counsel.

16        Your Honor, I wish we weren't here.  I don't want

17 the court to get involved in, essentially, an in-house matter;

18 one that should be between these three law firms, but, you

19 know, the documents were produced without our knowledge.  So

20 that is where we are.  We do join in the request that they be

21 clawed back.

22        MR. GREY:  Does Your Honor have any questions for

23 me?

24        THE COURT:  Do you think that the emails, such as

25 they exist, are informed consent?

1          MR. GREY:  No, Your Honor.  Look, I've been doing

2    this awhile and, Your Honor, when you talk to an client about

3    waiving the attorney-client privilege, you discuss the risks

4    associated with that, and there are very serious risks

5    associated with that.  And you don't just send a one-liner

6    saying:  Can I have your permission?

7          And they say:  Fine, you're free to go.

8          I don't even think that protects Mr. Kosnoff, which

9    is clearly the only reason he had to send that.  And, Your

10   Honor, in a case like this, we've had all -- you know, there

11   are plenty of ways that Mr. Kosnoff could have shared the

12   information he thought Your Honor needed without getting a

13   waiver from his client and that was his first thing he went

14   to.  So, I have a lot of problems and I don't think the client

15   really knew what they were waiving.

16         THE COURT:  Well, I have questions about whether

17   this was informed consent; although, it seems to me, at least

18   from some of the exchanges, that the clients very much wanted

19   this information to get to the Court.

20         And how would this information get to the Court if

21   the emails weren't, in some sense, made available to other

22   parties?

23         MR. GREY:  Well, Your Honor, the same way other

24   parties have done it.  We've had counsel that come in and

25   complained about various aspects of the claims process or the

1  voting process.  You could say, here's what's going on,

2  without attributing any of that information to your clients.

3         MR. HAVILAND:  And, Your Honor, if I may address

4  that point, too.  The docket is replete with letters to the

5  Court from individual claimants that I know you have spent a

6  great deal of time reading -- not all, necessarily, but a

7  great deal of those letters.  And so, I'm certain that if

8  someone wanted to bring that to the Court's attention, they

9  could have easily written a letter to the Court which would be

10 on the docket, but which would be redacted.

11        THE COURT:  Yeah, though, I think I've also

12 commented that, at least, I think it was with respect to

13 Mr. Kosnoff, that he can't stand behind his client's letters.

14 That he can't be encouraging your clients who are represented

15 to, then, put their own letters on the docket, because

16 that's -- I think I might have said, "hiding behind."  So, I

17 understand that.

18        But let me ask this question, too, what if

19 Mr. Kosnoff had copied Eisenberg Rothweiler and AVA Law on the

20 email and asking for permission to share their -- the client's

21 emails with the Court and the client had said yes, would we be

22 here?

23        MR. HAVILAND:  I don't think we would, Your Honor,

24 because what would happen in that instance is we would have

25 gone back to them and said, That's fine, you can share them

1  with the Court, but we'd ask that they be redacted and they be

2  shared only with the Court and not produced at a deposition or

3  in advance of a deposition and disseminated to the parties

4  that were going to participate in the deposition.

5            MR. GREY:  And, Your Honor, may I speak, too?

6            THE COURT:  Yes.

7            MR. GREY:  The thing that I would have urged, had I

8  been in that circumstance, I would have urged Mr. Kosnoff to

9  do is to also seek alternatives to waiver.  You know, if the

10  issue is problems with voting, then, you know, he could have

11  talked to the people who were involved in that process and

12  tried to be helpful in getting those issues resolved and then

13  we'd probably have different information we could bring to the

14  Court's attention without compromising our client's attorney-

15  client privilege.  So, I would have encouraged him to take a

16  different course and we'd be in a very different place.

17            THE COURT:  Okay.  Mr. Patterson?

18            MR. PATTERSON:  Good morning, Your Honor, Tom

19  Patterson for the -- from KTBS Law for the Zalkin-filed firms.

20            I guess it's important to sort of put this in

21  context a little bit because the context of the emails and the

22  texts is revealed by their substance, which is that the timing

23  of these communications was the sending of the so-called email

24  by the Rothweiler firm.  And the background to the emails and

25  the text indicates that that was the circumstances under which

1   these communications took place between Mr. Kosnoff and his

2   clients, and that there were complaints from the clients, with

3   regard to that solicitation methodology that was being used.

4          And the background to this, additionally, is that

5   that method was used and the materials were sent to the AIS

6   clients without consulting with Mr. Kosnoff.  So, clearly, the

7   implication of all of this is that these lawyers at AIS

8   proceeded in a manner where it was not required for any of

9   them to get the agreement of all of them in order to proceed.

10         Certainly, Mr. Rothweiler did not when he designed

11  the e-ballot and designed a message recommendation.  And I'm

12  trying to be very careful here, Your Honor, because there's

13  still matters under seal, but when he designed the

14  recommendation communication, there was no consultation with

15  Mr. Kosnoff and, obviously, it didn't reflect his views.

16         Your Honor, the -- I'm sure it's been pointed out

17  many times, but it's a wonderful demonstrative exhibit, is the

18  engagement letter with AIS.  The one that I have is found at

19  Docket 5923-2.  It has no reference to a protocol among --

20  that the three lawyers would use in communicating with their

21  clients, no requirement that they obtain each other's consent,

22  and, in fact, I think, very materially, as well, this

23  engagement letter from the client's point of view is not

24  designed as a joint representation letter.

25         This engagement letter says the undersigned agrees

1  to employ the three law firms to represent the undersigned in

2  claims against the Boy Scouts of America.  So, this is not a

3  situation where the engagement letter, itself, contemplates

4  that there'll be multiple clients proceeding in a coordinated

5  fashion with these law firms.  These are individual, siloed

6  attorney-client relationships.

7          It is as if I represent one claimant in this case

8  and I represent another claimant in the case separately.  That

9  is to be contrasted with --

10         THE COURT:  But aren't they all -- aren't they co-

11  counsel to all the clients?  Is that -- is my recollection

12  correct?

13         MR. PATTERSON:  That's absolutely correct, Your

14  Honor.  It is co-counsel for each of the three -- for each of

15  the 15,000, or whatever it is, individual clients.  But it is

16  not co-counsel for a group of 15,000 clients.

17         THE COURT:  Okay.

18         MR. PATTERSON:  This is, each has a siloed

19  relationship.

20         THE COURT:  Okay.

21         MR. PATTERSON:  Each has an individual relationship

22  with the three lawyers.  And Your Honor is correct to

23  (indiscernible) correct me in that regard.

24         So, in that context, the client has the right to

25  waive the privilege.  So, now, did it happen and what was its

1 | scope?

2 |      Now, Mr. Grey and Mr. Hogan had some dialogue, with

3 | regard to the fact that the clients only consented to

4 | disclosing to the Court, and maybe Mr. Rothweiler should have

5 | gone about it in a different way, but that's not what these

6 | say, Your Honor.  I'm looking at sealed Exhibit 2:

7 |      "All of our communications are privileged under the

8 | attorney-client privilege.  Will you waive that privilege, as

9 | to this specific email exchange so that I can discuss your

10 | very good points in my deposition, which I have been ordered

11 | to sit on this Friday.  I intend to bring these issues to the

12 | attention of the Court."

13 |      That's the context in which the Court comes up, but

14 | the consent is expressed to discuss in the deposition.  The

15 | same language, Your Honor, is used in Exhibit 3.  The same is

16 | used in Exhibit 4, and so on down the line -- 6.  That was the

17 | formulation that Mr. Kosnoff used.

18 |      It is pretty clear that these clients knew what

19 | they were consenting to.  They were consenting to Mr. Kosnoff

20 | bringing their complaints to the attention of the Court by way

21 | of testifying in a deposition.  That was a knowing waiver and

22 | --

23 |      THE COURT:  Was it informed?

24 |      I mean, that's my concern is more, is it informed?

25 |      MR. PATTERSON:  Well --

1          THE COURT:  There's no discussion of a downside or

2   other knock-on consequences of waiving that privilege.

3          MR. PATTERSON:  But I believe there, Your Honor --

4   so, if there was a lack of information, and I don't believe

5   there was, to these clients, because there really isn't any

6   adverse consequence to them, but leaving that aside, if there

7   was, that would go to whether Mr. Kosnoff properly advised the

8   client to waiving the privilege.  It would not go to whether

9   the waiver was effective, because it was affirmative, and it

10  was express, and it was voluntary, and those are the

11  requirements.

12         THE COURT:  So, it's not an inadvertent.  So,

13  that's -- I guess that's the point:  It's not an inadvertent

14  waiver.

15         MR. PATTERSON:  Correct, Your Honor.  Correct.

16         So, there are a couple of other things that I

17  wanted to -- well, I guess we've talked about whether they

18  needed the lawyer's consent and there's nothing in the AIS

19  agreement that requires it.  And, obviously, these lawyers did

20  not proceed as if each of them needed the consent of the

21  others to get the consent because they didn't.

22         Lastly, Your Honor, with regard to the identity of

23  the individuals, if it is material, I'm sure that Mr. Wilks

24  can speak to this and the three of them can speak to this,

25  that the names on the clients, which I don't have, can be

1  revealed to the three of them to confirm, among the three of

2  them, that they are, in fact, clients and not some interloper

3  who is seeking to introduce material for a malign reason.  But

4  if the name is confirmed, then I think that would eliminate

5  that objection.

6            Finally, Your Honor, I want to address the

7  contention that the common interest doctrine might apply here

8  and I think the Court, in its initial comments, indicated it

9  didn't see how it could.  And the truth is, it simply does

10 not.  The common or community interest privilege applies when

11 separate clients are separately represented by separate

12 counsel, not when the single client is represented by multiple

13 counsel.  And so, that objection, I think, is just plain

14 inapplicable.

15            Finally, Your Honor, there was a suggestion that

16 the common -- pardon me -- the work product doctrine might

17 apply to some portion of this.  First, that's their burden.

18 They have not indicated what portion, if any, of these emails

19 constitutes work product.

20            But what I'd like to keep in mind is that all of

21 these emails were not in connection with litigation.  They

22 were in connection -- which is the, you know, the work product

23 restriction; these were documents that were prepared in

24 connection with getting their vote, not litigation.

25            And, finally, with regard to work product, work

1  product is not an absolute privilege, unlike the attorney-

2  client privilege.  And it is permissible to invade the work

3  product privilege when invading it is necessary to obtain the

4  fact of the matter.

5          And in this case, from the point of view of

6  Mr. Kosnoff and the clients, the communication that may be

7  alleged to be a work product is the fact of the matter.  So,

8  this isn't for the purpose of invading their thinking; this is

9  for the purpose, from the client's point of view, of showing

10  the Court by way of a modest intermediary, in the form of a

11  deposition questioner, the nature of the recommendation that

12  was provided to them and own complaints that they have

13  regarding the manner in which their vote was sought by one of

14  their three lawyers.

15          So, I think that fully answers the questions that

16  the Court had and the points that Mr. Hogan and Mr. Grey made.

17  We're certainly amenable to having the names shared.  I mean,

18  I certainly don't need to see them, but there's no point in

19  these emails being unsealed unless they can be confirmed to be

20  clients.  I think that would make eminent sense.  But I'd be

21  happy, otherwise, to answer any questions that the Court has.

22          THE COURT:  No, I don't think I have any questions.

23  Thank you.

24          I see a hand from a Mr. Taylor.

25          MR. TAYLOR:  Good afternoon, Your Honor.

1        Can you hear me okay?

2        THE COURT:  I can.

3        MR. TAYLOR:  I don't know if this is appropriate or

4   not, but I've been following these hearings since we've been

5   available to do so.  I am a client of AIS.  I am one of the

6   people who wrote emails to Mr. Kosnoff.  My response to the

7   email question that was just read by Mr. Patterson, whom I

8   agree with, was:

9        "Tim, please feel free to use this email exchange

10  as you see fit.  I hereby waive my attorney-client privilege.

11  Thanks for your continued effort and counsel."

12       With my name and my phone number.  I understood,

13  fully, what he was asking me to do in opposition and I'm

14  slightly offended that Mr. Hogan and Mr. Grey don't think that

15  we, as clients, have the intelligence to know what we're doing

16  or understand the proceedings that are going on before us.

17       I have three lawyers.  I've got Mr. Kosnoff.  I've

18  got Mr. Rothweiler.  And I've got Mr. Van Arsdale.  I haven't

19  had a conversation, one, with Mr. Rothweiler.  Not one.  Not

20  one moment, not one text, not one email.  I've had several

21  conversations with Mr. Van Arsdale.  But the lawyer I've

22  spoken with on his personal cell phone was Mr. Kosnoff.  He is

23  the one who's given me the time.  He's the one who's given me

24  the effort.  He's the one that's explained things to me when I

25  wasn't sure what was going on.

1         It wasn't the town halls.  It wasn't the

2  Rothweiler, "You have to vote yes, you have for vote yes, you

3  have to vote yes."  It wasn't my e-ballot that I opened up on

4  the first page was Mr. Rothweiler's recommendation to vote yes

5  on my ballot.

6         I am my own person.  I am an intelligent person and

7  I hope that comes through as I'm speaking to you.

8         I don't need anybody to tell me to vote yes or to

9  vote no.  I don't know that there's anything else to say,

10  really, other than I did what I did with full knowledge and

11  consent.  I want the Court to know what goes on with the

12  survivors.  I want the Court to know.  I don't want it to be

13  redacted.  I don't want it to be sealed.  I want the insurance

14  companies to know.  I want the Boy Scouts of America to know.

15  I want you to know.  I want all those other lawyers to know.

16  And I think it's unfair for two of my other lawyers to be

17  trying to take that away from me.

18         So, I appreciate your time.  I appreciate what

19  you're doing and the difficulty that you must have making

20  these decisions.  So, with that, I thank you.

21         THE COURT:  Thank you, Mr. Taylor.

22         And I see a hand from Mr. Turner.  Mr. Turner,

23  you're still muted.

24         MR. TURNER:  Oh, there we go.  I would also like to

25  touch on what Mr. Taylor said.  I have also volunteered my

1    correspondence with Mr. Kosnoff to be able to be used in such

2    a way because I didn't even know who Eisenberg Rothweiler was

3    until Aaron Van Arsdale, or however you say his last name,

4    basically went silent as of the middle of October.  I've only

5    corresponded with him a couple of times directly.

6              To talk to anyone at Eisenberg Rothweiler, I have

7    literally had to flip out because I'm in a compromised

8    position where I have to find out what I can do with the

9    church because I was abused by the agent of a Catholic Church

10   and I have to pretty much lose my mind to get ahold of

11   somebody at ER, when all of a sudden they start calling me

12   when I'm trying to talk to Aaron.  And even during this

13   hearing today, while I'm driving around for work, I'm getting

14   spam emails and texts from ER that the time has come to vote

15   and that you should vote yes.

16             And the one who I've been talking to the most and

17   who gets back to me is Mr. Kosnoff.  You know, like him or

18   hate him, he's, at least, being brutally honest to a fault,

19   actually, and that's kind of the same way I am, where the

20   honesty is a bit abusive because it's not going to be

21   sugarcoated because it's truth and that's what I've seen from

22   his Twitter account.

23             And that's why I reached out to him, as well,

24   because I wanted answers that people at ER were not giving me.

25   Other than that for that, though, I appreciate the work that

1  you're doing.  Just as Mr. Taylor said, I can only imagine how

2  difficult this is.

3         THE COURT:  Thank you for your time, Mr. Turner.

4         Okay.  Mr. Wilks?

5         MR. WILKS:  Thank you, Your Honor.

6         Mr. Patterson made a lot of substantive points and

7  I'd join in all of them and I won't repeat them, but there's

8  something that I really want to emphasize.  It really goes to

9  the premise of the motion and Mr. Hogan's presentation and a

10 bit, Mr. Grey's.  What Mr. Hogan said was Mr. Kosnoff, he got

11 the voting report, went out and solicited communications from

12 clients, and then asked those clients to waive the privilege.

13        That's wrong on all three counts, really.  First,

14 I'm pretty sure Mr. Kosnoff does not get the voting report, so

15 I'll put that aside.  These were not solicited communications

16 and Your Honor has them, I think.  And just any kind of

17 cursory review will reveal, these communications were

18 unsolicited.  These were originated from the clients.  They

19 came to Mr. Kosnoff for the purpose of complaining and

20 expressing their distress with the treatment they were getting

21 at the hands of Eisenberg Rothweiler.

22        And, Your Honor, I'm sure, has read them.  These

23 folks, most of them were asking for Mr. Kosnoff to please do

24 something.  Please make a motion here.  Numbered Exhibits 2,

25 3, 12, 15 -- all of these are cries for help.  Again, I want

1  to be careful on -- these are sealed documents, but they are

2  very specific clients and some of them have been laid out in

3  our papers, so maybe I'm not running afoul of the

4  confidentiality, but there are real serious concerns here on

5  the way Eisenberg Rothweiler is conducting the solicitation

6  process.

7              These eBallots register the wrong vote.  They

8  falsify the voting result.  There's these constant phone calls

9  badgering people:  Please change your vote.

10              Those are the things that these clients came

11  forward to Mr. Kosnoff:  Please do something about this.  This

12  is what's happening, please make it stop.

13              These are not solicited by Mr. Kosnoff.  So

14  Mr. Kosnoff gets these, well, what is he going to do with

15  them?

16              And then there's this notion that, well, you said

17  you were only going to use them in court, but you used them in

18  a deposition.  Well, there's a few things wrong with that.  I

19  think Mr. Patterson pointed out, he says, I want to use them

20  in my deposition and bring them to the Court.

21              But I think the case law is awfully clear, Your

22  Honor, depositions are considered court proceedings.  The case

23  law is replete with that.  That's why we all have to behave

24  ourselves in depositions; that's one reason, among others.

25              So, to say that there's a dichotomy there, it's

1  really -- it's just not correct.  So, really, the important

2  thing here is, Your Honor, these clients raised their hands.

3  Two of them raised their hands here this afternoon and

4  addressed Your Honor and addressed this whole informed consent

5  issue.

6          As to the scope, the parade of horribles that

7  Mr. Hogan points to is, well, gosh, this is Pandora's box.

8  Well, Mr. Kosnoff's, you know, waiver request says, this is

9  for this specific email exchange.  It's a very narrow,

10 targeted waiver.  Those concerns, really, are not germane.

11         Your Honor, these clients asked for Mr. Kosnoff's

12 assistance in taking steps to put a stop to what they and  Mr.

13 Kosnoff and others feel is misconduct.  And that's what Mr.

14 Kosnoff did.  The privilege waivers were fully informed and

15 are fully voluntary, and so we ask Your Honor to deny the

16 motion for a protective order.  Thank you.

17         THE COURT:  Thank you.

18         It's the fully informed part that I'm thinking of,

19 notwithstanding the statements made by Mr. Taylor and

20 Mr. Turner, who clearly can make up their minds of what they

21 want to do, as I think all of the survivors can do.  But the

22 fully informed comes from the legal perspective of what the

23 attorney is supposed to do, not really from the client

24 perspective.  And I have no doubt that Mr. Turner,

25 Mr. Taylor, and probably the others, who I just read the

1  emails, wanted those particular emails to be shared and

2  understood that they would be shared.

3       What I don't know is if they understood the full

4  consequence.  And I'd have to think through what the full

5  consequence is of sharing it, not because they couldn't

6  understand it, but because it wasn't explained.  It wasn't set

7  out in the email and there was not an oral discussion.  But,

8  clearly, these gentlemen are more than able to understand what

9  they're doing and so I have no doubt about that.

10       Mr. Grey?

11       MR. GREY:  Thank you, Your Honor.  I just wanted to

12  respond to two quick points.  One was in response to something

13  Mr. Wilks said.  I did not hear or understand    Mr. Hogan to

14  be saying that these conversations were solicited, but,

15  clearly, Mr. Kosnoff solicited attorney-client waivers and I

16  don't think there's any doubt about that.

17       And I heard Mr. Patterson and Mr. Wilks talk about,

18  you know, the extent of the waivers and all that, but they

19  didn't mention -- well, there were certain emails that said

20  exactly what Mr. Patterson reported, by they certainly didn't

21  all say that.  And in our letter, we -- I think there were

22  eight examples of particular documents where no attorney-

23  client privilege waiver was obtained and neither, Mr. Wilks,

24  nor Mr. Patterson mentioned that.  And there's another six

25  where it was limited to disclosures from the Court.

1          So, you know, Mr. Taylor and Mr. Turner say they

2   voluntarily waived it and they understood what they were doing

3   and I have no quarrel with those gentlemen, but, clearly, all

4   these people did not.  And those are the two points that I

5   wanted to raise, Your Honor.

6          THE COURT:  Thank you.

7          Mr. Wilks, is your hand up again?

8          MR. WILKS:  It is.  Just super quick, Your Honor.

9          On the motion and Mr. Grey's joinder, they didn't

10  go through a point-by-point or document-by-document

11  recitation.  I'm happy to do that.  Mr. Grey kind of clumped

12  them together.  We can go through each and every one, but the

13  language of the waiver is clear.  The waiver request is clear.

14          And Mr. Grey is right, I don't suggest that

15  Mr. Kosnoff isn't the one who, you know, is solicit -- didn't

16  solicit the waiver; of course, he did.  Except there is the

17  person who said something like, you know, Mr. Kosnoff,

18  attached is my letter that I'm sending to the judge.  You

19  know, I'm not sure how he can get around a privilege waiver

20  there when the client actually wrote to Your Honor and that

21  letter is actually on the docket.

22          There's a text in there between Mr. Kosnoff and Mr.

23  Van Arsdale that Mr. Grey said, well, there's no privilege

24  waiver there.  Well, no, there is no privilege waiver there

25  because there is no client communication.

1    What that was, was that was the tip of the iceberg

2  of the problem.  The idea was that Mr. Van Arsdale was going

3  to blast the Omni official ballot out to all AIS clients and

4  it didn't happen.  And did happen, instead, is Mr. Van Arsdale

5  sat in the backseat and gave the keys to            Mr.

6  Rothweiler who then put together this eBallot, replete with

7  problems, and that Your Honor knows about.  And he does that

8  instead of the official ballot.  And that's what raised an

9  alarm bell in Mr. Kosnoff's head.  And then what follows is

10 this onslaught of client communications.

11    So, that's the progression, Your Honor, that's

12 important here.  That's just the factual background.  It's all

13 before Your Honor.  It's all in the record before Your Honor,

14 but I think it's important to point out that.  Thank you.

15    THE COURT:  Thank you.

16    MR. GREY:  Your Honor, may I be heard, briefly,

17 with respect to that?

18    THE COURT:  Yeah.  I don't know that I have a

19 record.  I don't have facts here with declarations on certain

20 of these things, so I'm not making any determination of fact

21 on some of the allegations that are going back and forth

22 between the law firms, okay.  So, there's no need to respond

23 to things that are not in the record.

24    MR. GREY:  Thank you, Your Honor.

25    The only other thing I wanted to point out was in

1 │ the record is my letter, with specifically Bates numbered

2 │ documents that talks about the specific ones, but there's no

3 │ waiver of attorney-client communication at all, by anyone, and

4 │ nobody has responded to that yet.  Mr. Wilks has had that now

5 │ since -- I don't know when I filed this -- the 2nd, I guess,

6 │ and nobody has responded to that.

7 │        Now, I hate to -- you know, the last thing I want

8 │ to do in a hearing on a motion for a protective order is talk

9 │ about the stuff that I think should be protected from

10 │ discovery, Your Honor.  But I gave these folks a chance to

11 │ contradict what I've said about these specific documents and

12 │ nobody has done it yet.  And that, I think, should speak

13 │ volumes to the Court.  Thank you, Your Honor.

14 │        THE COURT:  The references, here, Mr. Grey, to

15 │ Kosnoff Bates numbers --

16 │        MR. GREY:  Yes.

17 │        THE COURT:  -- I don't have those in front of me,

18 │ correct?

19 │        MR. GREY:  I don't know what was filed with the

20 │ motion.  I don't think so, Your Honor.

21 │        THE COURT:  Okay.  Those were offered at the

22 │ deposition; is that your understanding?

23 │        MR. GREY:  They were produced.  What I did was I

24 │ went through all the production and came up with these

25 │ numbers.

1          THE COURT:  Okay.  Well, actually, I may have some

2   of those.  I had focused on -- there are Bates numbers at the

3   bottom.  Okay.

4          MR. PATTERSON:  Your Honor, may I be heard on that

5   and a couple of things?

6          THE COURT:  Yeah.

7          MR. PATTERSON:  Thank you, Your Honor.

8          THE COURT:  I'm sorry, Mr. Grey, were you done or

9   did you have something else to add?

10          MR. GREY:  Well, the only other thing that I wanted

11   to add was, Your Honor, that anybody with those Bates numbers

12   would have been able to respond to my letter.

13          THE COURT:  Thank you.

14          Mr. Patterson?

15          MR. PATTERSON:  Your Honor, Mr. Grey's letter came

16   in after we opposed the motion.  So, if the Court is inclined

17   to deny the motion, we would be happy to work with Mr. Grey

18   with regard to the document numbers that are subject to it and

19   see if we can come to an amicable conclusion, depending on the

20   nature of the Court's ruling.

21          I don't think there's any need to go through the

22   numbers today.  We will obviously reach agreement on that.

23          I wanted to address the point with regard to the

24   informed consent.  And it really just strikes me as very, very

25   inappropriate for these lawyers to be objecting to a client's

1  obvious desire to have the information that they have made

2  available to Mr. Kosnoff public.

3          As I indicated, although the letter talks about,

4  the letter in support of the motion from Mr. Grey talks about

5  informed consent, there's no case cited that says that a

6  waiver of attorney-client privilege has to be an informed

7  waiver.  I don't believe that's the law.

8          These clients were asked whether they would consent

9  to the specific communication being made available in a

10  deposition or in a court and they said that they would consent

11  to that.  And I just don't think it's appropriate for us to

12  try to microtest whether that was sufficient under the

13  circumstances.  It's clear that these lawyers did not have a

14  protocol for coordinating communication and this, the

15  implication of this is that it's holding Mr. Kosnoff to a

16  standard that, clearly, the other two lawyers did not add here

17  to.

18          It's pretty clear that they willy-nilly

19  communicated with the clients, without regard to

20  Mr. Kosnoff's desires or his interests, his objectives, or his

21  recommendations.  And I think if we're going to try to get to

22  the bottom of what happened -- and clearly this is a mess and

23  we need to get to the bottom of what happened -- then we're

24  going to need to allow these clients to get the information

25  out that they have made available and want to get out so that

1  those of us who are concerned about the solicitation here can

2  get a grasp on what is truly happening.

3              THE COURT:  And that's an interesting --

4              MR. PATTERSON:  Thank you.

5              THE COURT:  Thank you.

6              And that's an interesting comment about the

7  informed consent, which may be more of a professional rules

8  concept than an attorney-client concept, privilege concept.

9              MR. PATTERSON:  Correct, Your Honor.

10             THE COURT:  Okay.  And professional rules -- I

11  haven't looked at the law for a while -- but there's a big

12  difference between professional rules and, for example, they

13  don't form the basis of a cause of action; they're

14  professional rules.  So, there's a big distinction between

15  professional rules, not that they are unimportant, because, of

16  course, they are very important, but professional rules and,

17  perhaps, the attorney-client privilege -- while they're

18  similar concepts, they're extinct concepts.

19             MR. PATTERSON:  Right.  And when we talk about

20  informed consent and waiver, but we talk about it in the

21  context of waiver of a conflict, for example, or waiver -- but

22  that's a very different context.  I mean, here, we have a

23  knowing waiver of the privilege by the client --

24             THE COURT:  Yeah, that distinction matters.  If

25  anyone wants to comment on that distinction since I've just

1 | solidified in my mind, I'm happy to hear you.

2 |          Mr. Hogan?

3 |          MR. HOGAN:  Your Honor, just two quick points.

4 | Number one, Mr. Patterson started out his comments by

5 | articulating the notion that the context here is important.

6 | And I think it's important for the Court to understand and

7 | appreciate what Mr. Patterson is trying to do, right.  He

8 | doesn't represent Mr. Kosnoff.  He represents other law firms

9 | who oppose the plan and who are looking to take the voting

10 | process and subject it to undue scrutiny in an attempt to set

11 | this entire construct aside.

12 |          Your Honor, suffice it to say that Eisenberg

13 | Rothweiler takes its position very importantly and as it

14 | relates to the comments made by Mr. Turner and Mr. Taylor,

15 | Eisenberg Rothweiler is very serious in its endeavors to help

16 | these sexual abuse victims and all sexual abuse victims that

17 | are represented by AIS.  It takes those comments very

18 | seriously and it will endeavor to reach out to those

19 | individuals to the extent that they're interested, to help

20 | them understand the pros and cons of the plan.

21 |          Your Honor, unless you have any other questions for

22 | me, I don't have any other comments.

23 |          THE COURT:  I don't.  I think I've heard enough to

24 | be able to rule on this.  I'm going to rule on this tomorrow.

25 | Get my thoughts together and that's what I'm going to do.

1           MR. HOGAN:  Do we have a hearing, tomorrow, Your

2   Honor?

3           THE COURT:  No, but I'm going to make one, though.

4           Mr. Schiavoni?

5           MR. SCHIAVONI:  Judge, I have no position at all on

6   the documents between the -- that are the subject of the

7   motion by Mr. Hogan.  He was very clear; the subject of the

8   motion was documents concerning exchanges between the clients

9   and the lawyers.

10          When we -- you know, we served the document

11  subpoena.  When we received the documents, I noticed there

12  was, in the first file, a collection of documents in that

13  category.  I immediately sequestered that file.  I let Mr.

14  Wilks know and I instructed him to let Mr. Hogan know because

15  I wanted a prompt determination of that so they could move

16  before the deposition and draw a ruling.

17          We didn't touch those documents and Your Honor will

18  address that.  I have no position on it.

19          There are other documents that were produced to us

20  in response to our subpoena that I think were properly

21  produced to us that are not between attorney and client and

22  are not the subject of Mr. Hogan's motion, which was very

23  clear that they were documents between attorney and client,

24  for which we went ahead, questioned the witness in the

25  presence of all these lawyers and nobody objected.

1    So, I'm not certain what's buried in the Bates

2  numbers of Mr. Wilks' joinder to Mr. Hogan's motion but given

3  that Mr. Hogan's motion was about attorney-client materials, I

4  just didn't think -- I don't know, I wasn't on notice that

5  anything else might be sought.  So, it's just those other

6  documents, I don't believe that are not between attorney and

7  clients, I don't believe are part of this application.

8    THE COURT:  Okay.  Well, I'm not sure, but it looks

9  to me from just a quick review that their -- these Bates

10  numbers probably are included in the exhibits to the original

11  motion.  But I'll let you take a look at them and if there's

12  some issue, then you can bring them back to me.  But I

13  understood them to be attorney-client communications we were

14  talking about.

15    Mr. Patterson?

16    MR. PATTERSON:  Your Honor, I just wanted to make a

17  note that I hope it's the case, and if it wasn't, then I want

18  to make it the case, that I did not intend to say anything

19  critical of Mr. Rothweiler or Mr. Van Arsdale or  Mr. Kosnoff

20  or anybody.  This is, I think, just on the face of it, a mess

21  that bears investigation and I do not appreciate or credit the

22  argument that our concern should be discounted because of the

23  fact that we oppose the plan, which is the lead argument that

24  everybody makes every time I open my mouth.

25    Yes, we oppose the plan.  Mr. Hogan, we oppose it.

1           MR. HOGAN:  Thank you.

2           MR. PATTERSON:  Unabashedly and unashamedly, but

3  that is not this issue.  This issue is whether or not the plan

4  has been properly solicited.

5           Thank you, Your Honor.

6           THE COURT:  Thank you.  Okay.

7           MR. PATTERSON:  Your Honor, there was a

8  housekeeping matter with respect to that, which is the seal.

9           THE COURT:  Yes.

10          MR. PATTERSON:  And I think Mr. Klauder is on the

11  line.  He was going to present if you need a presentation of

12  that motion.

13          THE COURT:  Mr. Klauder?

14          MR. KLAUDER:  Yes, Your Honor.

15          Can you hear me okay?

16          THE COURT:  I can.

17          MR. KLAUDER:  Yeah, I think the motion to seal

18  probably would go hand-in-hand with your ruling on the

19  protective order.  The items put under seal are the exact

20  items we were talking about today, the emails, which are the

21  exhibits to the motion, and then certain redactions in our

22  opposition.  So, you know, I'm happy to address that however

23  you'd like.

24          If you want to continue that with your ruling, that

25  might be the best way to handle it.

1          THE COURT:  I'll carry it with the ruling on the

2  underlying motion.  Thank you.

3          MR. KLAUDER:  Thank you.

4          THE COURT:  Okay.  So, let me rule on AVA and then

5  I see a couple hands.  But let me rule on AVA, because I think

6  that's the last thing on the agenda.  I need my notes.

7          Okay.  So, I reviewed AVA and the insurers' motion

8  to compel AVA to produce documents and respond to discovery

9  interrogatories and having reviewed this situation, I don't

10  find that AVA is a party.  They have not taken any actions as

11  a party in this case.  AVA Law did not sign any proofs of

12  claim forms and, therefore, I do not find that they are

13  subject, in the first instance, to discovery out of this

14  court.

15          AVA may be an important witness, and I think they

16  are, and I think the information sought is relevant to

17  confirmation, as I've discussed it previously, particularly,

18  with respect to trust distribution procedures, but there's no

19  basis, again, for discovery to issue out of this court in the

20  first instance.  They are not within the subpoena power of

21  this Court.  Rule 45 does apply.

22          My understanding is there are proceedings, I want

23  to say in Montana and maybe California.  Those courts can, in

24  the first instance, decide if they're going to keep the

25  discovery disputes or transfer them out here, but under Rule

1 || 45, I think that's where the discovery has to -- that's where

2 || the discovery is and I can't take it over, absent it being

3 || transferred to me.  I will say, again, that I believe the

4 || discovery is relevant to confirmation, but it's not before me

5 || and AVA Law simply hasn't put itself before me the way others

6 || have.  So, that's my ruling, with respect to AVA.  So, the

7 || motion to compel is denied, with respect to AVA.

8 ||          Okay.  Mr. Ryan?

9 ||          MR. RYAN:  Your Honor, I see that Mr. Turner has

10 || his hand up, so I would suggest that he's probably more

11 || important to hear from first.

12 ||          THE COURT:  Mr. Turner?

13 ||          MR. TURNER:  So, I just wanted to touch on what

14 || somebody had said about five minutes ago from Eisenberg

15 || Rothweiler about trying to help us better understand this.

16 || It's complicated with, for, like, me, because of the fact that

17 || I feel like I'm getting passed around like a hot potato

18 || between AVA and then, like, three or four different people at

19 || Eisenberg Rothweiler when it comes to what my options are,

20 || also, about the Catholic Church, because of the fact that it

21 || was an agent of the Church.  That -- I just wanted to address

22 || that.

23 ||          And I spent three hours on the 4th of November, on

24 || my birthday with Josh and towards the end of it, through the

25 || entire day -- three hours on the phone with him -- through the

1  end of it, he just started to get upset with me and basically

2  was like, oh, well, then just vote no, because that's in your

3  best interests, but didn't say anything about the opt-in and

4  opt-out, and then I had to watch a town hall with Kenny from

5  ER talk about the opt-in and opt-out, and then somebody from

6  the TCC about the opt-in and the opt-out, and, like, wait a

7  minute, that pertains to me.  And then I started blowing up

8  their phones again to get something to finally talk to me.

9        And it's like, it's not about trying to get us

10  better to understand the plan.  It's about communication.  I

11  shouldn't have to flip out through emails and text messages

12  and messages to get a call from somebody to find out what are

13  my best courses of action when it comes to BSA and then the

14  fact of the matter is that my abuser was an agent of the

15  Catholic Church who volunteered for the BSA and it was at the

16  sponsor organization's church where this happened.

17        I just feel like I'm not -- it's not about trying

18  to get us better to understand it.  It's more about reaching

19  back out to people and communicating better and helping them

20  understand what their best options are in terms of, like, how

21  to opt-in or opt-out.  It's not necessarily the plan, in my

22  opinion.  That's all I just wanted to say.

23        THE COURT:  Thank you, Mr. Turner.

24        Mr. Ryan?

25        MR. RYAN:  Your Honor, I'm hesitant to do this, but

1  I have an off-agenda discovery item that just the

2  circumstances of time and deadlines compel me to ask the Court

3  if I can raise a discovery item, which has not been the

4  subject of a letter to the Court, but there is a deposition

5  tomorrow morning at 10:00 a.m.

6            THE COURT:  Okay.

7            MR. RYAN:  Your Honor, tomorrow morning at    10:00

8  a.m. is the debtors' 30(b)(6) witness, Mr. Brian Whittman, who

9  is the debtors' sole 30(b)(6) witness in response to the

10 Methodist and Catholic Ad Hoc Committees' notices of

11 deposition, with respect to plan feasibility.

12            We received two weeks ago, finally, an Excel

13 business model underlying the financial statements and

14 projections included in the disclosure statement.  We spent

15 several weeks working with that model and to the extent that

16 data supporting that model was produced, trying to understand

17 that data.

18            Last night after midnight, the debtors produced an

19 expert report of Mr. Whittman, who will also be their expert

20 report on feasibility, in addition to their fact witness on

21 feasibility.  The explanation or precursor to his report

22 states:

23            Management is in the process of preparing the

24 detailed 2022 budget, which is expected to be completed in

25 December.  Based on my assessment of year-to-date 2021

1  performance, expectations for the last quarter of 2021, and my

2  review of the 2022 preliminary budget, I direct my team at A&M

3  to prepare modifications to the financial projections to find

4  us the updated financial projections, which the footnote says,

5  are included somewhere, which the footnote says, are supported

6  by a fully functioning Excel model.

7          Additionally, I work with certain BSA employees,

8  including Jeff Hunt (phonetic), Michelle -- Michael Ashline

9  (phonetic), Stephanie Phillips (phonetic), and Destiny Holly

10 (phonetic) in the development of these updated financial

11 projections.  None of those people, Your Honor, have been

12 designated as 30(b)(6) witnesses on feasibility.

13         In the development of these updated financial

14 projections, which is the basis of the feasibility report, the

15 following section describes the updated financial projections,

16 my conclusion of regarding the reasonableness of the approach

17 taken by the debtors in their preliminary 2022 budget, the

18 original five-year plan, and how the updated financial

19 projections support my opinion that the plan is feasible.

20         Your Honor, within -- to the extent that those have

21 been produced, they are buried somewhere in 200-plus megabytes

22 of data produced after midnight last night, which our experts

23 are hard at work sifting through, but have yet to find those

24 reports, the underlying data, or the Excel business model that

25 Mr. Whittman references.  We've been provided with none of

1   that data and are now being presented with a 30(b)(6) witness

2   who will testify to updated financial statements not included

3   in the disclosure statement and not previously provided to our

4   committee.

5            So, with the time press that we have, Your Honor,

6   we ask that Your Honor either belay the 30(b)(6) witness, with

7   respect to feasibility or we can go forward, Your Honor,

8   tomorrow and make a record of everything that he was proposed

9   to testify to that wasn't provided.  We prefer not to waste

10  the time and the energy of the parties for that and we regret

11  having to raise this before the Court orally, but we've been

12  provided and will be provided less than 36 hours to prepare

13  for a deposition where they're going to present an entirely

14  new set of financial projections not included in the

15  disclosure statement as the basis of feasibility.  That is

16  simply unfair, Your Honor.

17            THE COURT:  Thank you.

18            Ms. Lauria?

19       (No verbal response)

20            THE COURT:  You're muted.

21            MS. LAURIA:  Sorry about that, Your Honor.

22            Can you hear me now?

23            THE COURT:  I can.

24            MS. LAURIA:  Thank you.  Your Honor, unfortunately,

25  Mr. Hammond, who is handling Mr. Whittman's deposition

1  tomorrow is actually prepping Mr. Whittman right now and is

2  not on the line.  What I can say is the following.  Mr.

3  Whittman is both, a fact and an expert witness, in connection

4  with the confirmation proceeding.  His 30(b)(6), which is

5  going forward tomorrow, is with respect to the matters that

6  he's appearing as a fact witness on.  He's also our expert

7  witness on feasibility, as well as the debtors' best interest

8  test and he will be deposed again in connection with the

9  expert report that was provided yesterday.

10         I think the debtors would be happy to convene the

11  appropriate individuals that can speak with Mr. Ryan about Mr.

12  Whittman's testimony tomorrow, meet-and-confer on that, and to

13  the extent we need to, we can call the Court back.  But at

14  this point, from the debtors' perspective, there's two

15  separate issues that Mr. Whittman is going to be testifying

16  on.  Tomorrow is just the 30(b)(6).  There will be a

17  subsequent deposition of Mr. Whittman pertaining to the expert

18  report that was provided to the parties last night.

19         MR. RYAN:  Your Honor, if I may respond?

20         THE COURT:  Yes.

21         MR. RYAN:  Your Honor, a 30(b)(6) witness is to

22  provide the factual underpinnings of the debtors' business

23  plan.  Mr. Whittman's expert report tells us that the business

24  plan is not what was disclosed and has fundamentally changed.

25  It also tells us that people that the debtors have refused to

1    identify, the 30(b)(6) witnesses -- and we had multiple meet-

2    and-confers, Your Honor, at which we told the debtors that we

3    did not believe and accept that there would have to be more

4    than one 30(b)(6) witness to respond to the topics noticed for

5    a 30(b)(6) deposition on feasibility would need to be

6    produced.

7            Notwithstanding that, they said Mr. Whittman is

8    your fact witness.  They produced a model, an Excel model of a

9    business plan that supported the disclosure statement.  The

10   paragraph I just read to you makes it clear that the financial

11   projections in the disclosure statement are not what they

12   intend to prove for feasibility at confirmation.

13           We are entitled to timely production of documents.

14   We are entitled to timely production of a business model.  We

15   are entitled to the assumptions that underlie the business

16   model.  We are entitled to the factual data that goes into the

17   business model.  We are entitled to inquire of the people who

18   made the decisions, the business decisions that affect the

19   business model, to ask what those assumptions were, why

20   assumptions were made, why assumptions were disregarded.

21   Those are facts, Your Honor.

22           What we've been told last night is all of the facts

23   on which we have prepared for weeks have changed and we have

24   been produced something buried in 200 megabytes after midnight

25   on Sunday for a Tuesday a.m. deposition.

1          THE COURT:  Okay.  Well, I hear some disagreement.

2    I'm not sure I can resolve it, but I do think that the

3    business plan is a factual issue, as opposed to an opinion,

4    with respect to the business plan.  I mean, the business plan

5    is the underlying bottoms-up -- I don't know -- it may not be

6    bottoms-up, but, you know, management's view of their business

7    plan, which may have some input from experts.  I don't know.

8          But I will say this, if the deposition goes forward

9    tomorrow and it becomes apparent during the questioning that

10   Mr. Whittman cannot answer the questions or that his testimony

11   is now different because there is a new -- there are new,

12   updated financial projections that underguard the business

13   model, then he'll have to be deposed again or we'll have to

14   figure out what the situation is.

15         But I'd ask the parties to talk.  I'm not sure I

16   appreciate the nuance between the part of Mr. Whittman's

17   testimony that is factual and the part that will be an expert

18   opinion and I'm not sure if it can be that finely drawn

19   because I'm not involved.  So, that would be my concern.

20         But to the extent that information has just been

21   produced that forms the basis of the deposition that's going

22   forward tomorrow, I would tend to say that puts the examiner

23   in an unfair position.

24         MS. LAURIA:  Your Honor, if I may, I am regrettably

25   not the right person to be arguing this; this is the first

1  I've heard of it.  And we do not have the right members of our

2  team; they are all dealing with either mediation or prepping

3  for depositions.

4         So, what I can represent is that we would be happy

5  to get together with Mr. Ryan and any other parties to discuss

6  how that deposition is going to proceed tomorrow.

7         THE COURT:  I suggest that that be done.

8         MR. RYAN:  And, Your Honor, I would request that

9  the debtors, within the hour, direct this, because there are,

10  as I said, there are over 200 megabytes.  There are over a

11  hundred Excel files across four productions that were produced

12  last night.  The debtors need to, within the hour, tell us

13  which production and which Excel file are the business model

14  and the data points that flow into the business model.

15         We simply cannot prepare for a deposition this way.

16  We can ask all the questions we want about the business model

17  we were provided and if Mr. Whittman wants to testify all day

18  long that that's the wrong business model to ask questions

19  about, we're happy to do that.

20         THE COURT:  Let's find out how that's going to turn

21  out.

22         MR. RYAN:  Thank you, Your Honor.

23         THE COURT:  I think it's a valid concern.

24  Ms. Lauria is not in the position to fully respond, so I

25  appreciate that, as well.

1          Okay.  There's another issue I wanted to raise.  I
2   did not know that Ms. Lauria was listening in, but I still
3   think I'm going to raise it tomorrow because I don't have --
4   I've noticed, and understandably so, that many lead counsel
5   are not on the Zoom call because they have other things that
6   they are attending to at the moment.
7          But I did review the plan supplement.
8          UNIDENTIFIED:  Did you see my email?
9          Okay.  Perfect.  Thanks.
10          THE COURT:  Excuse me.  Can we please make sure
11  we're muted.
12          I did review the plan supplement and I noticed the
13  designation of the initial special reviewer and that causes me
14  some concerns and I'm going to address it tomorrow because I
15  think it needs to be addressed, but I want to make certain
16  that people are available to hear what I'm going to say.  I'm
17  not sure we're having a discussion, but available to hear what
18  I have to say.
19          So, we're going to have a hearing tomorrow.  I
20  recognize this is last-minute.  People will be involved in
21  other things.  But you'll need to take, if you need to be on
22  that call, a break from what else you're doing.
23          We're going to have it at two o'clock tomorrow and
24  I will address the couple of matters that I've taken under
25  advisement and I will address this issue.

1          MR. REMMING:  Thank you, Your Honor.  We will file

2    an agenda for that hearing as quickly as possible.

3          THE COURT:  Thank you.

4          Okay.  Anything else before we conclude?

5          MR. REMMING:  That's the end of today's agenda,

6    Your Honor.

7          THE COURT:  Thank you very much, then.

8          We're adjourned.

9          COUNSEL:  Thank you, Your Honor.

10       (Proceedings concluded at 3:07 p.m.)

11

12                      CERTIFICATE

13

14     We certify that the foregoing is a correct transcript

15   from the electronic sound recording of the proceedings in the

16   above-entitled matter.

17
     /s/Mary Zajaczkowski            December 6, 2021
18   Mary Zajaczkowski, CET**D-531

19
     /s/Coleen Rand                  December 6, 2021
20   Coleen Rand, AAERT Cert. No. 341

21
     /s/William J. Garling           December 6, 2021
22   William J. Garling, CE/T 543

23
     /s/ Tracey J. Williams          December 6, 2021
24   Tracey J. Williams, CET-914

25