## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Ref. D.I. 7447, 7459, 7461, 7467, 7601 |

### OBJECTION OF THE COALITION OF ABUSED
### SCOUTS FOR JUSTICE TO TCC MODIFIED EMERGENCY MOTION

The Coalition of Abused Scouts for Justice (the "Coalition"), by and through their undersigned counsel, hereby submit this Objection (the "Objection") to the *Modified Emergency Motion of the Official Committee of Tort Claimants Regarding Plan Voting Issues* [D.I. 7601] (the "Modified Motion"), modifying the *Emergency Motion of the Official Committee of Tort Claimants for Entry of an Order Pursuant to Sections 105, 1103, 1125, and 1126 of the Bankruptcy Code Appointing a Plan Voting Ombudsperson and Granting Related Relief* [D.I. 7447] (the "Ombudsperson Motion"), filed by the TCC.[2]  In further support of this Objection, the Coalition respectfully states as follows:

### OBJECTION

1.       The TCC frames the Modified Motion as seeking relief designed to rectify what the TCC refers to as rampant "confusion" among certain Survivors.  Painting a (false) picture that hapless Survivors need the TCC's intervention to save Survivors from communicating with their

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]  Capitalized terms used but not otherwise defined herein has have the meanings given to them in the Motion or the Solicitation Procedures Order [D.I. 6438] (the "Solicitation Procedures Order").

lawyers, the TCC advocates that *it* should play the role of a neutral party to "fix" the "confusion." Indeed, counsel for the TCC—in a shocking bit of irony—spends numerous paragraphs lecturing the parties about proper client communications under the Model Rules of Professional Conduct, the Canons of Professional Ethics, and the Code of Professional Responsibility.  In the end, the TCC seeks an order from this Court directing an affirmative, joint communication of legal advice by three firms to *their* clients concerning voting recommendations—a communication that, if ordered by the Court, would inject both the TCC and the Court into the middle of the attorney-client relationship and attorney-client communications.

        2.        Notwithstanding the gloss, the TCC's Modified Motion should be viewed for what it is: the latest in a series of attempts by the TCC to prevent the Plan from receiving sufficient voting support.  The Modified Motion is at least the TCC's fifth attempt in less than 100 days to influence the vote, including, specifically:

> a.        The TCC's proposal to take what is undoubtedly a good, positive and beneficial aspect of the chapter 11 plan – i.e. that Survivors will have the right to choose a $3,500 "quick pay" election through the claims process – and weaponizing it as part of the voting process, by forcing Survivors to choose the $3,500 "quick pay" election as part of the voting process (rather than during the claims process), in an effort to show that those Survivors' votes should be treated differently than other Survivors' votes;[3]

> b.        The growing attacks by the TCC and certain State Court counsel who also oppose the Plan on the Electronic-Ballot (or "E-Ballot") that is being used

---

[3]  The $3,500 election is undoubtedly one of the most important parts of the Plan for various reasons previously discussed.  But in all other mass tort situations, this decision gets made at the claims administration stage, not the voting stage. Requiring Survivors to make a judgment about whether they will choose the "quick pay" while simultaneously making the gut-wrenching decision about how to vote on the Plan reflects the TCC's ulterior motive. The Coalition anticipates that the TCC and State Court counsel objecting to the Plan will argue that those who choose to receive this "quick pay" rather than subject their claims to the rigors and time of the TDPs should have their votes separately classified.  Of course, that is inappropriate, and is designed to obfuscate the following facts: (1) many Survivors come from "closed states" who, under the TDPs, may not get $3,500 because of the facts and circumstances of their cases; (2) some elderly Survivors may not want to wait years for their payout, even if they are entitled to more than $3,500; (3) some Survivors for personal financial reasons may wish to opt to receive their money now, and a check of that magnitude may well make a difference in their and their families' lives; and (4) we are living through a pandemic and many Survivors—like many Americans—may have lost their jobs and therefore are in need of the quick-pay.

by the Survivors represented by many law firms that are part of the Coalition;

c.   The TCC's deliberate and ill-fated decision to itself send Tim Kosnoff's inflammatory and defamatory email (which its counsel reviewed and edited) and letter (which its counsel effectively authored) to 20,000 Survivors (some of whom are part of AIS, thousands of whom the TCC knew were not) using the TCC's proprietary email account; and

d.   The TCC's Ombudsperson Motion, in which it suggested the **unprecedented** appointment of an ombudsperson to oversee the Voting Process and be a "neutral" person that Survivors could look to for advice.

Each of these have been misguided; the Modified Motion is as well.

3.      Through the Modified Motion (as well as through sending the Kosnoff Letter the weekend of November 5th-7th), the TCC is focused on the fact that of the 82,000 Survivors eligible to vote, nearly 20% are part of Abused in Scouting (or "AIS")—the group that is co-represented by Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. ("Eisenberg Rothweiler"), AVA Law Group, Inc. ("AVA Law"), and Kosnoff Law.  The TCC knows well that if all eligible Survivors vote, the number of Survivors represented by various known State Court counsel who support the TCC and oppose the Plan may be insufficient (by itself) to block the Plan from receiving the requisite support.[4]  The TCC is zeroing in on AIS, therefore, in an attempt to influence as many voters in this group as possible to vote  "No", or otherwise attempting to create a perceived situation that would allow objecting parties to argue that the votes of AIS-represented Survivors should be designated.  It is this strategy that is animating the TCC to ask this Court to force the three law firms in AIS to prepare one-page position papers that will be sent to all AIS Survivors behind a cover letter signed by the TCC.

---

[4]  It is difficult to believe that the TCC would have filed the Modified Motion if (a) the "disagreement" among co-counsel involved three firms that represented **three** Survivors (as opposed to thousands), or (b) the TCC were certain that votes sufficient to block approval of the Plan will be cast.

4.      Avoiding the true intentions underlying the Modified Motion, the TCC's stated reason for seeking the relief requested is "AIS Survivor Confusion."  The TCC does not define what this confusion is.  But as even the TCC would have to concede, information is abundant, and answers are obtainable: among other things, there are the solicitation documents; there are the letters from each of the AIS law firms to the AIS Survivors *already*; there are TCC Town Halls and Coalition Town Halls; there are hundreds of articles written about the Plan; there are hundreds of tweets from Tim Kosnoff himself over the last 75 days about the Plan; and there are numerous phone numbers for Survivors to call if they want to get more information—from their counsel or from others.  While it is possible that some AIS Survivors may be confused about why their counsel disagrees with each other, *that disagreement is not in the purview of this Court, the TCC, nor any other party in these Cases other than those three law firms* and their Survivor-clients.

5.      Moreover, the "evidence" that the TCC has submitted about AIS voter confusion or AIS Survivors "complaining" about communications from their lawyers does not support granting the Modified Motion.  In *every large mass tort case*, there are going to be individual Survivors/Victims who require additional communication and explanation, and, despite receiving answers and advice, may nevertheless still make mistakes when voting; this is not a criticism of any individual,  ballot, or counsel, but simply a fact in large mass tort cases.  As an example, the fact that Eisenberg Rothweiler may be contacting Survivors who submit "No" votes to make sure that those votes were correctly cast—and not, as is sometimes the case, that such votes were cast to avoid receiving the $3,500 expedited payment—is simply Eisenberg Rothweiler doing its job to protect its clients.  It is ironic that after requiring that such $3,500 "quick pay" be added to the ballot, the TCC now complains when law firms want to make sure that their Survivor-clients are choosing that option for the right reasons and not out of confusion.

6.      In that vein, it is also disingenuous for parties to complain about the use of "E-Ballot" by Eisenberg Rothweiler and the Coalition, which is another reason animating the Modified Motion.  First, as will be explained more fully herein, voting procedures—including the use of the so-called "Hybrid" method—were approved by this Court after a lengthy hearing in which the TCC actively participated, thereby allowing for the use of E-Ballot. Second, and more substantively, E-Ballot gives voting power to the Survivors, not their law firms.   With E-Ballot, there is no master ballot filled out by any law firm, nor is there 100% block voting by law firms representing hundreds or thousands of Survivors.   As the Voting Results will show, many Coalition-represented Survivors have and will vote against the Plan using E-Ballot, dispelling any argument that E-Ballot does not permit Survivors to vote to reject the Plan or allegations that sending out E-Ballot is improper.  And third, it should not go unmentioned that E-Ballot allows Survivors a sense of privacy and confidentiality regarding their history of sexual abuse; it is no secret that some Survivors want to maintain such history private, and therefore utilizing secure electronic means to vote—rather than receiving a paper ballot in their mailbox that may be opened by an unknowing family member or friend—ensures such privacy.

7.      But putting aside the TCC's true motivations behind the Modified Motion, their crowing about calls made by counsel to client, and their complaints about allowing Survivors to vote on their own and in private, there is no reason the Modified Motion should be granted, and there are at least five reasons the Modified Motion should be denied:

a.      **Lack of Bankruptcy Court Jurisdiction**: The TCC fails to address the question the Court specifically asked  regarding whether attorney-client speech constitutes solicitation such that the Court's jurisdiction over solicitation may be invoked;

b.      **Lack of Authority for Interference With Co-Counsel Relationship**: The Court has acknowledged—in fact, days after the TCC filed the Ombudsperson Motion—there is an ***absence of authority*** for the

proposition "one co-counsel **must** include all co-counsel on communications with its clients." Hr'g Tr. 8:2-6, Dec. 7, 2021 (emphasis added). The Modified Motion disregards this Court's prior statements;

c. <u>**The Requested Relief is a Restraint on Speech**</u>: The Modified Motion asks the Court to restrain speech to correct alleged voter confusion since some voters have received conflicting advice. The relief sought infringes on counsels' First Amendment rights. As this Court has acknowledged, its ability to regulate the speech content of attorney-client communications is limited. *See* Hr'g Tr. 53:1-15, Sept. 9, 2020 (addressing standards of review in connection with Debtors' request for prior restraint of attorney advertising), Hr'g Tr. 67:23-68:24, Nov. 29, 2021 (addressing limitations of jurisdiction over attorney-client speech in connection with Ombudsperson Motion and Modified Motion).

Indeed, immediately **after the Kosnoff Letter situation came to light, even TCC counsel refused to commit itself to authoring a letter acknowledging wrongdoing, stating: "What we cannot do is, essentially, have a prior restraint on what we say to our constituency**."[5] This Court **agreed with the TCC regarding prior restraint, noting that it lacked authority to compel the TCC to write a letter**, and could only comment upon the language proposed and agreed by relevant parties. *See, e.g.*, Hr'g Tr. 47:7-9, Nov. 12, 2021 ("I'm not going to make the Committee counsel use words that they disagree with in their letter"); 50:8-14 ("I'm viewing today as permitting a letter to go out…I'm not going to force the Committee to sign a letter that is not their view. So, in terms of approving it, I don't know exactly what that is, to be honest.").

d. <u>**Ordering the Relief Requested Is Inconsistent with The Notion that this Court is a Court of Equity**</u>: The Court should not reward the behavior of Mr. Kosnoff (or the TCC) by ordering relief that would seem to give the Court's imprimatur to Mr. Kosnoff's actions. Many of Mr. Kosnoff's public statements in the context of these Cases are reprehensible. The TCC now asks this Court to place Mr. Kosnoff on equal footing with Mr. Rothweiler and order Mr. Rothweiler to co-sign a letter with a lawyer who has—in no uncertain terms—publicly insulted and defamed Mr. Rothweiler.

For example, a week after the Court admonished that "disagreements need to take place within the bounds of professional obligations, professional ethics, decency, and civility,"[6] Mr. Kosnoff re-tweeted a statement that "My Christmas wish is Ken [Rothweiler] gets run over by a reindeer" along with

---

[5]  *Id.* 20:21-22.

[6]  Hr'g Tr. 50:9-12, Nov. 17, 2021.

a graphic description of Mr. Kosnoff laughing at the suggestion.[7]   Mr. Kosnoff has broadcast Mr. Rothweiler's face to thousands of people with the suggestion that he should be "put down" like a dying dog.[8] Mr. Kosnoff has suggested his legal adversaries should be imprisoned.[9]   No person should be subjected to the type of verbal and public words that Mr. Kosnoff has hurled at Mr. Rothweiler in any context, much less by a lawyer bound to professional standards of civility and decency.   The TCC—which actually partnered with Mr. Kosnoff by co-authoring Mr. Kosnoff's letter, reviewing and authoring Mr. Kosnoff's inflammatory and defamatory email and then sending both to almost 20,000 Survivors on a TCC email— effectively asks this Court to legitimize Mr. Kosnoff's public actions by allowing him to be part of a "co-signed letter": such purported relief does not comply with rules of professional conduct, rather, it would suggest that lawyers who act like Mr. Kosnoff has, when such actions purportedly sew confusion, will be rewarded.  Such relief has no place in a Court of equity.

e.    **<u>Even Assuming That the Four Reasons Above Are Insufficient, There is No Evidence Adduced to Support the Motion</u>**: There is simply no evidence adduced for the need for this relief—the TCC has not (i) defined the "confusion" that it says exists, (ii) demonstrated that confusion exists beyond anecdotal evidence, (iii) demonstrated that any confusion is more pervasive among the clients of AIS than elsewhere among the voting class or is any different or more pervasive than in any other chapter 11 Mass Tort voting process involving sexual abuse or personal injury victims, or (iv) demonstrated that its requested relief is narrowly tailored to, and in fact will, resolve any confusion that does exist.

---

[7]    Kosnoff   Law   (@SexAbuseAttys),   TWITTER   (Nov.   30,   2021   6:32   p.m.),   available   at https://mobile.twitter.com/SexAbuseAttys/status/1465826192292925442 (Kosnoff re-tweet of tweet from client Guy Taylor stating "My Christmas wish is Ken gets run over by a reindeer."); Exh. F at 16 (screenshot of same); Kosnoff   Law   (@SexAbuseAttys),   TWITTER   (Nov.   2,   2021,   8:17   p.m.),   available   at https://twitter.com/SexAbuseAttys/status/1455690609604194304   (tweet   containing   picture   of   Kenneth Rothweiler, captioned "Ok, how many of you cried at the end when Old Yeller had to be shot?  How about this Old Yeller?  Vote No on the plan and put this rabid lawyer down"); *Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief* [D.I. 7118] (the "<u>Enforcement Motion</u>") p. 5 (screenshot of same).

[8]    Kosnoff   Law   (@SexAbuseAttys),   TWITTER   (Nov.   2,   2021,   8:17   p.m.),   available   at https://twitter.com/SexAbuseAttys/status/1455690609604194304   (tweet   containing   picture   of   Kenneth Rothweiler, captioned "Ok, how many of you cried at the end when Old Yeller had to be shot?  How about this Old Yeller?  Vote No on the plan and put this rabid lawyer down"); Enforcement Motion p. 5 (screenshot of same).

[9]    Kosnoff Law (@SexAbuseAttys), TWITTER (Dec. 1, 2021, 11:58 a.m.), available at https://twitter.com/SexAbuseAttys/status/1466089414937874435 ("Ignore the BS fear mongering. Rothweiler and the law firms promoting this horrendous plan are picking your pocket because they think you are stupid or desperate. The whole lot of them should be in orange jumpsuits."); Exh. F at 15 (screenshot of same).

8.      There are just two weeks left in the Voting process.  There is no statutory basis nor factual reason to grant this Modified Motion.  Parties in this Case can see this Modified Motion for what it is, and what it is not.  All parties—including the TCC—have known about the disagreement between Kosnoff and Eisenberg Rothweiler for the first 60 days of the Voting Process and could have brought the issue to all parties' attention sooner to determine whether collective action should have been taken.  Instead, the TCC drafted and sent the Kosnoff Letter in early November, filed the Ombudsperson Motion on Thanksgiving Eve, and now is filing the Modified Motion.  Enough is enough.  Let the Survivors vote, and let counsel to Survivors represent and advise those Survivors as best as they know how.  The Modified Motion should be denied.

## **BACKGROUND**

9.      What follows is a brief recitation of facts relevant to the Modified Motion, including the permitted solicitation procedures underlying the TCC's purported cause for relief as well as the long and troubled history of the TCC's unholy alliance with Mr. Kosnoff.  The Coalition believes that a factual record of this length is necessary for this Court to truly understand how this Modified Motion fits within this Case and the TCC's "win at all costs" opposition to the Plan, notwithstanding the TCC's allegations concerning purported voter confusion.

10.     In further support of the factual recitation provided herein, the Coalition incorporates by reference the statements of fact and exhibit and declaration materials provided in the following documents previously filed with the Court:

      a.     *Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure*

*Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 6438] (the "<u>Solicitation Procedures Order</u>")

b. *Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief* [D.I. 7118] (the "<u>Enforcement Motion</u>");

c. *Joinder of the Coalition of Abused Scouts for Justice to Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief* [D.I. 7120];

d. *Supplement to Joinder of the Coalition of Abused Scouts for Justice to Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief* [D.I. 7235]; and

e. *Debtors' Omnibus Objection to Tort Claimants' Committee's (I) Emergency Motion for Entry of an Order Pursuant to Sections 105, 1103, 1125, and 1126 of the Bankruptcy Code Appointing a Plan Voting Ombudsperson and Granting Related Relief and (II) Related Motion to Shorten Notice* [D.I. 7467] (the "<u>BSA Objection to Ombudsperson Motion</u>").

### *The Four Approved Solicitation Methods*

11.     To understand what appears to be motivating the TCC's actions, it is important to start with the Solicitation Procedures the Court approved in connection with the Plan. *See* Solicitation Procedures Order at ¶¶ 22-32, Exh. 1. Those procedures permit four different methods of voting on the Plan.

12.     The **_first_** is the Direct Solicitation Method. *See* Solicitation Procedures Order Exh. 1 at Section IV(A)(5)(b). Under this method, the Debtors, through their Solicitation Agent, sent the Solicitation Package (including an appropriate Ballot) directly to the Survivors, who in turn were instructed to complete their Ballots and return them to the Solicitation Agent prior to the

Voting Deadline.  This can be done by returning the Ballot to the Solicitation Agent via mail or by uploading the Ballot on the Solicitation Agent's website.  *Id.* at ¶ 12; *id.* at Exh. 1 Section (II).

13.     The ***second*** and ***third*** methods fall under the title "Master Ballot Solicitation Method."  Firms that elect the Master Ballot Solicitation Method can either (a) function as a polling location for their clients by recording affirmative responses on a Master Ballot and then submitting that Master Ballot to the Solicitation Agent prior to the Voting Deadline; or (b) complete the Master Ballot pursuant to a power of attorney that gives the Firm the authority to vote to accept or reject the Plan on behalf of the Survivor.  *Id.* at Exh. 1 Section IV(A)(5)(a).  Firms submitting Master Ballots under their method must comply with the applicable certifications and file Rule 2019 Statements with the Court.  *Id.* at Exh. 1 Section IV(B)(6); *id.* at Exh. 1 Section IV(B)(4).

14.     ***Fourth***, the Court approved a hybrid method.  *Id.* at Exh. 1 Section IV(A)(5)(c). Firms that had previously elected the Master Ballot Solicitation Method were given the option of distributing the Solicitation Package (with the Ballot) to their clients in accordance with the clients' preferences.  This way, Survivors that did not want to be contacted via mail—some for fear that their family members would learn of their abuse due to the mailing—could be contacted in the manner they had requested.  The clients, in turn, would complete the Ballot sent by their attorney. *Id.* at Exh. 1 Section IV(A)(5)(c)(a).  Once completed, the Ballot is returned to the Solicitation Agent either by the Survivor directly or by the firm.  *Id.*  This can be done via mail or by uploading the Ballot on the Solicitation Agent's website.  *Id.* at ¶ 12.

15.     The hybrid method is **not** a Master Ballot method as no Master Ballot is utilized. Each Survivor votes by completing a Ballot.  The Firms play a role in making sure that the clients receive the appropriate materials (in accordance with their preferences) and assisting the clients in returning completed Ballots to the Solicitation Agent prior to the Voting Deadline so they are

counted.  To this end, some Firms have provided their clients with electronic ballots to make it easier for clients to sign and return their Ballots, so they are counted by the Voting Deadline. Coalition-affiliated firms may use different secure software platforms to assist Survivors in completing their *own* Ballots.

16.    Most Coalition-affiliated law firms—including Eisenberg Rothweiler—are utilizing the hybrid method.  Survivors represented by these firms will complete their own Ballots. In many instances, these Ballots will be returned to the firms, who will then submit them to the Solicitation Agent using the methods and at the addresses provided in the Solicitation Procedures Order.  It is the Coalition's understanding that a number of TCC-affiliated Firms, in contrast, are utilizing the Master Ballot Solicitation Method and are purporting to vote for their clients.

***The TCC Allies with Kosnoff and Co-Authors Communications to AIS Clients***

17.    Mr. Kosnoff is co-counsel with two other law firms in representing AIS Survivor clients.  The AIS law firms disagree on key strategic matters in these cases.

18.    The TCC once opposed Mr. Kosnoff's involvement in the cases.  *See* D.I. 1228. Mr. Kosnoff once sent an email expressing disagreement with TCC counsel.  *Id.* at 20-21. Mr. Kosnoff also has a long history of voicing his opinions on Twitter, including by posting attorney personal information, insulting attorneys and the Court and tweeting and re-tweeting comments in which he expresses a desire for his opponents to suffer bodily harm.[10]

---

[10]    *See, e.g.*, Enforcement Motion ¶5 (providing examples); Kosnoff Law (@SexAbuseAttys), TWITTER (Nov. 30, 2021 6:32 p.m.), available at https://mobile.twitter.com/SexAbuseAttys/status/1465826192292925442 (Kosnoff re-tweet of tweet from client Guy Taylor stating "My Christmas wish is Ken [Rothweiler] gets run over by a reindeer."); Kosnoff Law (@SexAbuseAttys), Twitter (Nov. 29, 2021 11:05 p.m.), available at https://mobile.twitter.com/SexAbuseAttys/status/1465532334841679874 (Kosnoff re-tweet of photo of Kenneth Rothweiler with family, calling Mr. Rothweiler a "Classic narcissist" and "fucking crybab[y]"); *see also* Exh. F at 16-17 (screenshots of foregoing cited postings).

19.     In August of 2021, the TCC discontinued its support of the Plan.  As a result, the TCC found itself in alignment with Mr. Kosnoff against the Plan, and against Mr. Kosnoff's co-counsel who support the Plan.  Mr. Kosnoff agreed with his co-counsel that electronic ballots could be sent to his clients electronically and returned to counsel for submission to the Debtors.[11] Although Mr. Kosnoff understood that the technological capability existed to email his clients *en masse*, he never obtained that capability for himself.  Exh. K, Kosnoff Dep. 57:14-20, 58:5-8, Nov. 22, 2021 ("I have no ability, technical ability to send out 15,000 e-mails.  I mean, I knew that I was going to have to figure out, hire a service to do that, but I hadn't set up an account so that I could utilize one of these services…I could have.  There were companies like Constant Comment and so forth, but you've got to set up an account").

20.     As such, by his own agreement with co-counsel and notwithstanding any disagreement regarding the advice to be provided to clients regarding the ballot, Mr. Kosnoff at all relevant times voluntarily relied upon co-counsel to circulate electronic ballots to AIS Survivors.  *See id.* at 57:16-20, 58:5-8, 58:22-59:1.

21.     When his co-counsel began sending emails inviting clients to live meetings, and again when co-counsel sent electronic ballots to co-represented clients, Mr. Kosnoff wrote to the TCC asking for their assistance in crafting and distributing his message.[12]

22.     Mr. Kosnoff provided the email addresses of approximately 13,000 AIS clients to the TCC via its co-chair Douglas Kennedy in early October.[13]  The TCC's counsel did nothing to

---

[11]  *See* Exh. K, Kosnoff Dep. 58:22-59:1 ("I expected that the official Court-approved printed ballots would be mailed or emailed to our clients and they would vote their own ballot, sign it, return it to us or return it directly to Omni").

[12]  *See* Exh. G, Lucas Dep. 35:1-4, Nov. 23, 2021; Exh. K, Kosnoff Dep. 56:21-57:20; Exh. L, e-mail from Timothy Kosnoff to John Lucas (Oct. 15, 2021) TCC-PlanConf-122932 (Kosnoff e-mail to TCC counsel asking for assistance with client communications; and associated reply agreeing to do so).

[13]  Exh. G, Lucas Dep. 34:20-25; Exh. M, e-mail from Doug Kennedy to John Lucas (Nov. 11, 2021) TCC-PlanConf-123102 (Kosnoff e-mail sending Kennedy client e-mail list).

verify that the email addresses on the AIS list belonged to AIS clients of Mr. Kosnoff.[14]  The TCC

then combined the AIS list with a list of email addresses previously collected and began sending

communications to the full list of approximately 20,000 Survivors in mid-October.[15]

Notwithstanding denials of the same by TCC counsel, the TCC distributed all subsequent email

communications through and including Mr. Kosnoff's emails to the consolidated list of AIS and

non-AIS Survivors.  *Id.*  To send an email communication only to the AIS list would have been a

departure from TCC counsel's standard practice.  *See id.*

23.     A few days after providing the TCC with his clients' email addresses, Mr. Kosnoff

wrote again to the TCC asking for their assistance in writing a letter to his clients and providing a

draft letter.[16]

24.     TCC counsel accepted the invitation and re-wrote large portions of the letter for

Mr. Kosnoff, including by adding several statements later identified as false or misleading.  *See*

*id.*  As described more fully below, the TCC subsequently denied having written any portion of

the letter.  *See* Hr'g Tr. 18:1, Nov. 10, 2021.  Mr. Kosnoff sent the letter on or around October 18,

2021 (the "October 18 Letter").[17]

25.     The TCC's public statements reflect that around this same time, it was actively

endorsing Mr. Kosnoff to all TCC constituents.  For instance, a series of comments from TCC

Town Halls show the TCC rebuffing requests from attendees to correct affirmative

---

[14]    Exh. G, Lucas Dep. 37:18-23.

[15]    Exh. I, Phan Dep. 58:12-14, 78:13-16.

[16] Exh. L, e-mail from John Lucas to Timothy Kosnoff (Oct. 15, 2021) TCC-PlanConf-122932 (requesting assistance); Exh. A, e-mail from John Lucas to Timothy Kosnoff (Oct. 17, 2021) TCC-PlanConf-064136 (exchanging drafts).

[17] Exh. K, Kosnoff Dep. 54:12-14; *Objection to Modified Emergency Motion of the Official Committee of Tort Claimants Regarding Plan Voting Issues* [D.I. 7680] (the "AVA Law Objection") ¶3 (noting that AVA Law Group sent statements from both of its AIS co-counsel in October 2021); *see also* Exh. A, e-mail from John Lucas to Timothy Kosnoff and Douglas Kennedy (Oct. 17, 2021) TCC-PlanConf-064136-149 (attaching clean and redline copies of October 18 Letter).

misrepresentations about the Coalition, issuing corrections only when specifically requested by

Timothy Kosnoff, and thereafter thanking Mr. Kosnoff:

| DATE | Q&A QUESTION NO. | EXHIBIT C PAGE NO. | QUESTION FROM ATTENDEE[18] | RESPONSE FROM TCC |
|---|---|---|---|---|
| 9/30/21 | 162 | TCC-PlanConf-080412 | Abused in scouting is not part of the coalition. One of the law firms that is part of it is, the others are not | Abused in Scouting leads the Coalition. Abused in Scouting founded the Coalition. |
| 9/30/21 | 173 | TCC-PlanConf-080412 | Abused in Scouting is not part of the Coalition. Ken Rothweiler is. Please correct your response, it is error. | Mr. Kosnoff. My apologies. You are absolutely correct. DK Thanks for that and I'll be sure not to make that mistake agaiun [*sic*]. AND, thank YOU for your support of ALL survivors. Doug K |
| 10/14/21 | 132 | TCC-PlanConf-080425 | Is AIS part of the coalition or group of firms. How will my vote be verified if being reported by Attorney? | Yes, AIS is part of the Coalition, one of its founders. You [*sic*] need to email your counsel how you want to vote if he/she is using a master ballot. IF you get the ballot yourself, then fill it out and mail it so that it is received before Dec. 14 |
| 10/14/21 | 173 | TCC-PlanConf-080425 | AIS is NOT part of the Coalition. There is a difference of opinion between the three founders. | Correct, Tim Kosnoff is not part of the Coalition but the other two firms that make up AIS are. |
| 10/14/21 | 200 | TCC-PlanConf-080426 | AIS is NOT part of the Coalition. Eisenberg Rothweiler is on the Coalition. Kosnoff is NOT. Eisenberg Rothweiler will not be touching a ballot. Only the clients of AIS will be signing ballots. | Thanks Tim. I was hoping you were there setting the record straight. |

---

[18] The TCC's production of Q&A responses redacted the identity of the parties asking questions

26.     Another series of comments from the same time shows the TCC insulting its adversaries and Mr. Kosnoff's co-counsel based on (if anything) the TCC's affirmative predictions of this Court's rulings:

| Date | Q&A Question No. | Exhibit C PDF Page No. | Question from Attendee[19] | Response From TCC |
|---|---|---|---|---|
| 10/7/21 | 221 | TCC-PlanConf-080420 | Why was the penetration value 1.2 mil for the gymnasts and only 600 for Boy Scouts? | Because the Coalition is willing to settle for so little money.  That is why the TCC is fighting for more. |
| 10/14/21 | 30 | TCC-PlanConf-080424 | I spoke with my attorney and he is telling me that the information you all are giving is not 100% accurate? I don't know who to believe at this point.  My attorney is with the AVA Law Group | Of course AVA does not agree with what TCC says.  AVA law wants to settle for pennies.  TCC is trying to get more money so that survivors receive a meaningful payment. |
| 10/14/21 | 73 | TCC-PlanConf-080424 | What is this "coalition" I am hearing about? | It is a group of law firms that are trying to control the outcome of the case by voting to accept the plan for small and low settlements |
| 10/21/21 | 100 | TCC-PlanConf-080442 | The coalition town hall were basically saying that we should accept the offer, because we may not get another deal and that people that were in "closed states" are included in this and they may not be in a new deal.  Please clarify this if you can. | This is not true.  If voted down, the Judge will force us to mediation to make the deal better[…] |
| 10/21/21 | 416 | TCC-PlanConf-080448 | The Coalition is full of shit…………… | [Note: Questions in the Q&A are not visible until the TCC responds.  Here, the TCC responded with "." with the evident purpose of rendering the question visible.] |

27.     Also, at approximately the same time, the TCC was actively endorsing Mr. Kosnoff

and his Twitter feed.  On October 23rd, the TCC emailed to the list of 20,000 Survivors a video

---

[19] The TCC's production of Q&A responses redacted the identity of the parties asking questions.

which, among other things, accused the Coalition of lying to Survivors and assured Survivors of the specific actions this Court would take were the Plan not confirmed.[20]

28.      After being made aware that the TCC's video had been circulated to parties represented by counsel, the Coalition wrote to the TCC on November 1, 2021 advising the TCC of its ethical obligation to refrain from such communications.  *See* Exh. O (letter from David Molton to James Stang).  The TCC responded on November 4th denying that it had engaged in unauthorized communications with parties represented by counsel.  Exh. P (letter from James Stang to David Molton).

### *The TCC Escalates Attacks on Coalition Following Hybrid Solicitation Rollout*

29.      In late October and early November, many Coalition-affiliated law firms began offering their clients the opportunity to vote electronically.  Mr. Kosnoff, apparently surprised by this development, wrote to the TCC for support in his assertions that the electronic ballot was unlawful.  *See* Exh. E, email from John Lucas to Timothy Kosnoff and Douglas Kennedy (Oct. 24, 2021) (TCC-PlanConf-122935-36).   TCC counsel opined that the electronic ballot was **not** unlawful.  *Id.* ("*he['s] wrong about the order*") (emphasis supplied); *see also See* Exh. G, Lucas Dep. 91:7-9 ("at that point in time, I didn't see anything inconsistent with the [Solicitation Procedures O]rder").

30.      Nevertheless, the rollout of electronic ballot collection using the Court-approved hybrid method appears to have caused the TCC to enter into an active partnership with Mr. Kosnoff and engage in improper conduct.  On October 24th, Mr. Kosnoff wrote to TCC co-chair Douglas

---

[20] *See* Exh. G, Lucas Dep. 67:21-68:1.  On the same date, the TCC sent emails to Mr. Kosnoff asking Mr. Kosnoff to promote the video to his Twitter.  Exh. J, email from Timothy Kosnoff to Douglas Kennedy and John Lucas (Oct. 24, 2021) ("Exhibit J") TCC-PlanConf- 122939-40 at 30.  *See* Kosnoff Law (@SexAbuseAttys), Twitter (Oct. 24, 2021 1:11 PM), https://mobile.twitter.com/SexAbuseAttys/status/1452336905526431753  (Kosnoff promoting video via Twitter).

Kennedy indicating his belief that the Coalition's use of the hybrid method of electronic ballot circulation and submission was a "serious lie." Exh. J. The email exchange between Mr. Kosnoff and Mr. Kennedy indicates that both individuals believed, incorrectly, that the Coalition would encourage Survivors to execute and submit ballots in a manner not approved by the Court in the Solicitation Procedures Order. *See id.*

31.    On October 28th, TCC counsel gave a presentation that suggested the hybrid method was not permitted, and effectively urged Survivors not to use the programs their attorneys were recommending to return executed ballots to counsel in compliance with the hybrid method which was expressly provided for in the Solicitations Procedures Order:

> James Stang:  If you get an email that says "This is your ballot for voting," that is a communication between you and whoever has sent it. But it is not the way you cast your vote directly with Omni, directly with Omni. You either are going to do it the way John described, put it in the mail, or you're going to communicate with your attorney, who will tabulate your vote on a master ballot. But there's no third way of doing it.

Exh. B, Town Hall Tr. 17:22-18:1, Oct. 28, 2021.

32.    Then, at the TCC's Town Hall on November 4th, the TCC encouraged cyberattacks on the Coalition during its Town Hall event:

| Date | Q&A Question No. | Exhibit C PDF Page No. | Question From Attendee[21] | Response From TCC |
|---|---|---|---|---|
| 11/4/21 | 431 | TCC-PlanConf-121400 | Remember anonymous is on your side. We have your backs and are planning a massive disruption this coming week to certain platforms. Stay tuned. | THANK YOU to anyone who supports the work of the TCC. Doug |

---

[21] The TCC's production of Q&A responses redacted the identity of the party asking the question, and in this instance and others, the party was anonymous.

33.     The same day, TCC counsel wrote to the Coalition denying inappropriate communications with parties represented by counsel.  Exh. P, letter from James Stang to David Molten (Nov. 4, 2021).

34.     Finally, the following day, November 5, 2021, TCC counsel wrote to Mr. Kosnoff volunteering to help him "resend" the October 18 Letter which Mr. Lucas had rewrote for Mr. Kosnoff in mid-October.  Exh. N, email from John Lucas to Timothy Kosnoff (Nov. 5, 2021) TCC-PlanConf-075713-15 ("Want us to help you resend your letter?").

***TCC Edits and Sends Kosnoff Email and October 18 Letter to 20,000 Survivors***

35.     Mr. Kosnoff eagerly accepted the offer and urged the TCC to "get it out immediately" and "append it to your two dashboards" for public view.  Exh. Q, email from John Lucas to Timothy Kosnoff (Nov. 5, 2021) TCC-PlanConf-075716-18.  TCC counsel asked Mr. Kosnoff for a cover email to submit along with the October 18 Letter.  *Id.*  Mr. Kosnoff provided the TCC with text for a cover email, Exh. S-1, email from Timothy Kosnoff (BSASurvivors@pszlaw.com) to John Lucas (Nov. 6, 2021) TCC-PlanConf-075629 (the "Cover Email"), for the TCC to distribute along with his October 18 Letter.  Exh. R, email from John Lucas to Tim Kosnoff (Nov. 6, 2021) TCC-PlanConf-075762-65.

36.     The TCC edited the Cover Email prior to sending.  *See id.*  The Cover Email directly endorses and directs Survivors to Mr. Kosnoff's twitter feed, and states among other things that Mr. Kosnoff's co-counsel "used deceit" in its circulation of electronic ballots, and that such circulation was "wholly improper and possibly illegal."[22]  Nowhere on the Cover Email, or anywhere else in the text or transmission of the Cover Email or October 18 Letter, Exh. S-2, letter

---

[22] Cover Email; *see also* Hr'g Tr. 19:2-7, Nov. 12, 2021 (Court rejecting TCC counsel's assertion that Cover Email was not an endorsement of Mr. Kosnoff and his Twitter account, stating "It had to be an endorsement.  It was nothing but an endorsement.")

from Timothy Kosnoff to Clients (Oct. 18, 2021) Bates No. TCC-PlanConf-075624 (together, the "Kosnoff Email"), did the TCC explain its involvement with Mr. Kosnoff, its role in authoring, editing, or transmitting the communication for Mr. Kosnoff, or the reason that the Kosnoff Email was being sent to Survivors not represented by Mr. Kosnoff.

37.     Beginning on the evening of November 5, 2021, and over many hours thereafter, the TCC sent the Kosnoff Email to its combined distribution list of approximately 20,000 AIS and non-AIS Survivors.  *See* Exh. I, Phan Dep. 49:20-50:6.

38.     The Cover Email accused Mr. Kosnoff's co-counsel of unlawful and unethical conduct and is, the Coalition submits, purposefully inflammatory and defamatory.  *See generally* Cover Email.  Both the Cover Email and the October 18 Letter contain statements that are false, misleading, and inconsistent with the Disclosure Statement.  *See* Enforcement Motion ¶ 35 (listing false and misleading statements); *see also* Cover Email.

39.     The TCC has subsequently stated that it intended to send the Cover Email and October 18 Letter to AIS Survivors, and that it did not intend to endorse Mr. Kosnoff.  Hr'g Tr. 21:23-22:7, Nov. 10, 2021.  However, the TCC's assertions lack credibility, for several reasons:

40.     **First**, the TCC was aware that the October 18 Letter had already been sent to AIS Survivors by Mr. Kosnoff.  The only credible purpose of the TCC's involvement in "resending" the letter was to (a) put their imprimatur on the Kosnoff communication by re-sending it from their official email account, and (b) distribute the Kosnoff communication to the broadest possible audience, again as an official TCC communication sent using the TCC email account.  *See* Exh. G, Lucas Dep. 204:16-21.

41.     **Second**, as noted, the TCC's standard practice for some weeks had been to send all Survivor communications to its combined list of AIS and non-AIS Survivors.  Exh. I, Phan Dep.

58:12-14, 78:13-16.  It would have been unusual for the TCC to distribute any communications to a different list, as a TCC counsel non-attorney staff member later confirmed.  *Id.*

**TCC Denials and False Statements**

42.    As early as mid-day on Saturday, November 6th, TCC counsel was made aware that the Kosnoff Email was being sent to Survivors and their counsel outside the AIS client relationship.[23]

43.    After discussing the matter internally, TCC counsel ignored the warnings and questions from the Coalition and others, and failed to halt the process of sending out the Kosnoff Email.[24]  On November 7th, TCC counsel sent a brief corrective email noting only that the email itself was sent in error to certain parties.[25]  For several days thereafter, the TCC denied any wrongdoing in connection with the Kosnoff Email, beyond their assertion of error in merely sending the email to the wrong persons.[26]

44.    The Debtors brought the matter to the Court's attention at a status conference on November 10th.  At that conference, TCC counsel, addressing the Court, denied any involvement in the authoring of the Kosnoff Email.  Hr'g Tr. 18:1, Nov. 10, 2021.  Discovery later showed this statement to the Court to be false.  *See* Exh. A, e-mail from John Lucas to Timothy Kosnoff (Nov. 5, 2021) TCC-PlanConf-064136. (Lucas offering revision to the Kosnoff Letter).  Thereafter, the TCC continued to deny that it had made any mistake or ethical error beyond sending the email to the wrong list.[27]

---

[23] Hr'g Tr. 21:13-22, Nov. 10, 2021; Exh. W, Stang Dep. 94:12-20.

[24] Exh. W, Stang Dep. 97:25-98:25; Exh. G, Lucas Dep. 143:19-144:18.

[25] Hr'g Tr. 22:3-7, Nov. 10, 2021; *see* Exh. U, e-mail from John Lucas to Hung Phan (Nov. 7, 2021) TCC-PlanConf-075355 (initial corrective email).

[26] *See, e.g.*, Exh. U; Hr'g Tr. 32:17-19, Nov. 10, 2021; Hr'g Tr. 18:1-8, Nov. 12, 2021.

[27]  *See, e.g.*, Hr'g Tr. 32:17-19, Nov. 10, 2021; Hr'g Tr. 18:1-8, Nov. 12, 2021.

45.     The TCC asserted to the Court that it had sent the email "on advice of ethics counsel" in connection with the Kosnoff Email, an assertion that also proved false.[28]  The TCC stated that sending the Kosnoff email through the official TCC communications platform was not an endorsement of Mr. Kosnoff because the TCC allowed Mr. Kosnoff to sign the email, an incredible assertion this Court rejected immediately.  Hrg. Tr. 19:2-7, Nov. 11, 2021 ("It had to be an endorsement.  It was nothing but an endorsement.").  The TCC refused to agree to further corrective language acknowledging a mistake or error, describing such compelled speech as a "prior restraint."[29]

46.     The Court expressed concern that the Kosnoff Email had caused a "taint of the vote that the committee has caused" and permitted all parties to reserve rights on further corrective action.  *See* Hr'g Tr. 21:15-17, Nov. 12, 2021.  Nevertheless, the Court appeared to agree with the TCC that requiring the TCC to make a statement against its wishes would be improper.[30]  The TCC, Debtors, Coalition and others thereafter agreed to the language of a further corrective letter.  *See* Exh. V, letter from James Stang to TCC Clients and Kosnoff Clients (Nov. 12, 2021) (further corrective letter).

47.     The TCC held Town Hall meetings on November 11th and 18th, at which it did not address the Kosnoff Email, the Enforcement Motion, the Court's concerns regarding "taint of the vote that the committee has caused," or any other of the matters concerning TCC misconduct that

---

[28] *Compare* Hr'g Tr. 20:3-4, Nov. 12, 2021 ("we did it on advice of ethics counsel"), *with* Exh. G, Lucas Dep. 73:22-74:2 (Q: I understand from your interrogatory responses that Mr. Kehr did not advise Pachulski with respect to the propriety of sending the Kosnoff email or the Kosnoff letter.  Is that correct?  A: Yes.); *see also* BSA Objection to Ombudsperson Motion at 8 (describing circumstances of purported advice of counsel).

[29] Hr'g Tr. 20:21-22, 32:17-19, Nov. 10, 2021; Hr'g Tr. 18:1-19:22, Nov. 12, 2021.

[30] *See, e.g.,* Hr'g Tr. 47:7-9, Nov. 12, 2021 ("I'm not going to make the Committee counsel use words that they disagree with in their letter"); 50:8-14 ("I'm viewing today as permitting a letter to go out…I'm not going to force the Committee to sign a letter that is not their view.  So, in terms of approving it, I don't know exactly what that is, to be honest.").

dominated these proceedings at such time.[31]  In fact, the TCC reported that there were no material

updates at the time.  *See* Exh. H, Golden Dep. 14:3-19. [32]

48.     Meanwhile, law firms representing thousands of Survivors that received the

Kosnoff email were receiving communications from their clients asking why they had received an

email from Mr. Kosnoff and demanding to know why Mr. Kosnoff or anyone else had been given

access to their personally identifiable information.  *See, e.g.*, Exh. Y, e-mail from Steven Golden

to John Lucas forwarding email from Survivor (sample email from Survivor to TCC).  Survivor

counsels, as well as the Coalition's counsel, have received numerous such communications over

the last six weeks and have been forced to devote enormous resources to resolving Survivor

confusion caused by the TCC's misconduct—including the Kosnoff Email but also the myriad

false and misleading public statements of the TCC described above.

### *TCC Finally Admits Error, and Immediately Files the Ombudsperson Motion*

49.     Finally, on November 19th, the TCC appeared before the Court with new lead

counsel Mr. Pachulski.  Mr. Pachulski appeared to acknowledge for the first time that the TCC had

committed serious errors.  Hr'g Tr. 8:20-24, Nov. 19, 2021 ("I sincerely apologize on behalf of

the firm for what has happened.  I am not here to make any excuses for it.  We will deal with it

another day, but simply put it should not have happened.").

50.     Mr. Pachulski stated that the attorneys responsible for the Kosnoff Email, James

Stang and John Lucas, had been removed from leadership in the case, but that they would remain

involved on behalf of the TCC because Mr. Pachulski and the new team of attorneys on the case

were not capable of representing the TCC without their assistance.  *Id.* at 9:21-10:11.

---

[31] *See* Exh. W, Stang Dep. 220:1-13; Exh. G, Lucas Dep. 15:6-11; *see also* BSA Objection to Ombudsperson Motion
at 11.  Video recordings of the TCC's Town Hall meetings are also available through the TCC's website,
www.tccbsa.com, and its YouTube channel, https://www.youtube.com/channel/UC_s02ToVApJWrIhSHESckSg.

51.     Mr. Pachulski indicated at the hearing on November 19th that he had assumed leadership only hours prior.  *Id.* at 8:6-9.  Over the span of the next several days from November 21st to November 24th, Mr. Stang, Mr. Lucas, and two other colleagues of Mr. Pachulski were deposed regarding the Kosnoff Email and related matters.

52.     Notwithstanding Mr. Pachulski's recent ascendance and the ongoing depositions of his colleagues, and notwithstanding the onset of the Thanksgiving holiday on November 25th, Mr. Pachulski and his team drafted and filed the Ombudsperson Motion on November 24th—the evening prior to Thanksgiving—requesting a hearing on the Monday following Thanksgiving.

53.     The Ombudsperson Motion and joinders thereto ascribe blame for Survivor confusion **not** on the Kosnoff Email or the misconduct described above, but on the failure of the AIS co-counsel to present a coordinated message.  In a single footnote within what constitutes yet another "tone deaf" TCC pleading,[33] the TCC references a now-defunct ethical guideline once suggesting that co-counsel in disagreement should present a joint statement to their co-represented clients explaining the disagreement and the views of each counsel.  Ombudsperson Motion at 5 n.8.  The TCC requested as a remedy that the Court appoint a "Voting Ombudsperson" to communicate with Survivors—a concept that does not appear in the Bankruptcy Code and, for reasons expressed in various objections to the Ombudsperson Motion, would be ineffective, expensive, and unfairly prejudicial to the TCC's opponents.

54.     Prior to filing the Ombudsperson Motion, Mr. Pachulski was informed by the Debtors, the Coalition, and others that the Ombudsperson Motion would be vehemently opposed. Nevertheless, Mr. Pachulski and the TCC filed the motion.  Attorneys for numerous parties and

---

[33] *See* Hr,g Tr. 43:3-4 ("tone deaf is probably a very good characterization of the supplemental statement" issued by the TCC regarding the Kosnoff Email and Enforcement Motion).

firms thereafter spent hundreds of hours over the Thanksgiving holiday preparing responses to the Ombudsperson Motion.

55.    In opening remarks at the preliminary status conference on the Ombudsperson Motion on November 29th, the TCC withdrew the Ombudsperson Motion "because it's created so much havoc."  Hr'g Tr. 34:2-5, Nov. 29, 2021.  At the hearing, the TCC expressed surprise that the Ombudsperson Motion was so hotly contested, and that parties would take the Ombudsperson Motion as an opportunity to reopen attacks on the TCC in relation to the Kosnoff Email and related misconduct.  *Id.* at 35:17-37:21.

56.    Nevertheless, the TCC informed the Court that it intended to re-file the Ombudsperson Motion on the sole basis of its footnote regarding purported ethical obligations to present a joint statement.  *Id.* at 34:5-10.  The Court questioned whether it had authority to require such a statement and demanded that if the movants were to file the Modified Motion, the movants should address whether attorney-client communications constituted solicitation such that the Court's might exercise its jurisdiction over Plan-related communications.  *Id.* at 41:17-21, 68:5-21.

57.    The TCC filed the Modified Motion on December 7th, approximately as previously described, and requesting another emergency hearing.  The TCC does not address the Court's jurisdictional concerns other than to argue that highly active creditor attorneys should be required to file requests for admission *pro hac vice* in all cases and, thus, be bound to the applicable ethical rules—admitting, however, that the ethical guideline it once footnoted, which is the sole basis for the relief requested in the Modified Motion, is not a rule at all.

58.    It bears repeating that when the TCC filed the Ombudsperson Motion, Mr. Pachulski and the TCC's purported new counsel team had ***five days*** of familiarity with these proceedings and had been told in no uncertain terms that the motion would be opposed.  The

Debtors and others were in the process of not only mediation of the Plan generally, but also deposing TCC counsel.

59.     The TCC ignored this, ignored the warnings of multiple parties and the guidance provided by the Court, and chose to file the motion over the Thanksgiving holiday.  It then expressed surprise at the opposition to the motion, withdrew the motion, and then reformulated the motion to suggest that any harm caused to these proceedings stems not from its own misconduct but from purported violations of a long-defunct ethical guideline.

## OPPOSITION TO RELIEF SOUGHT IN THE MOTION

60.     The Modified Motion fails for at least five separate reasons.

### A.     The Bankruptcy Court Has No Jurisdiction to Grant the Relief Requested

61.     There is no statutory basis for the Bankruptcy Court to grant the relief requested. The Court specifically asked the TCC to address whether attorney-client speech constitutes solicitation such that the Court's jurisdiction over solicitation may be invoked.  Hr'g Tr. 68:5-21, Nov. 29, 2021.  The TCC failed to address the question, because it cannot answer the question in any way helpful to its cause.  Simply stated, it would strain credulity that any attorney-client communication could constitute plan solicitation regulated by a Bankruptcy Court.  By its very nature, plan solicitation is intended to be the *opposite* of attorney-client communications; it allows the solicitor a "free shot" to influence the decisions of *those who are not its client*.  The Coalition has identified no cases suggesting that attorney-client advice is solicitation.

62.     As such, that would leave the only statutory basis for the relief requested to be Section 105.  But all practitioners know and understand that stretching Section 105 to cover items that *by their very nature* are outside of the Bankruptcy Code—like attorney-client

communication—would make a mockery of Section 105 and would lead us all down the proverbial "slippery slope".

### B.    There Is No Authority Requiring Counsel to Include Co-Counsel on Its Communications

63.    Days after the TCC filed the Ombudsperson Motion, this Court recognized that there is an **absence of authority** for the proposition that "one co-counsel **must** include all co-counsel on communications with its clients." Hr'g Tr. 8:2-6, Dec. 7, 2021 (emphasis added). The Modified Motion simply disregards this Court's prior statements and observations in that regard and offers no binding authority that requires counsel to include co-counsel on communications.

### C.    The Requested Relief is an Improper Restraint on Free Speech

64.    Among its many deficiencies, the Modified Motion requests an unlawful restraint on free speech. Free and open communication between a legal representative and client is an essential tenet of effective representation. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Restraints on that free flow of communication between legal representative and client, or potential clients, are strongly disfavored. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 95 (1981).

65.    The doctrine of prior restraint governs compelled speech as well as restrictions upon speech, without distinction. *Riley v. Nat'l Fed'n. of the Blind of North Carolina*, 487 U.S. 781, 796-797 (1988); *see also* Hr'g Tr. 20:21-22, Nov. 10, 2021 (TCC admission of same).

66.    In other words, a person's determination not to engage in speech—for instance, not to provide a statement to be included in a letter with other authors—is itself a speech act, restraint of which is subject to strict scrutiny review. *See Riley*, 487 U.S. at 796-97; *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Content-based [restrictions]—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."). It has

long been established that content-based prior restraints "constitute the most serious and the least tolerable infringement on our freedoms of speech." *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)).

67.    The "mere possibility of confusion" is not sufficient to justify a court's exercise of supervisory authority over attorney-client communications.[34]  A movant seeking a prior restraint of speech in relation to the debtor in a bankruptcy proceeding must show that the speech, whether or not false or misleading, presents a clear and present danger to the debtor's reorganization.[35]

68.    The TCC has admitted that relief analogous to that requested herein is a prior restraint of speech.  *See* Hr'g Tr. 20:21-22, Nov. 10, 2021.  The TCC has not even attempted to show that the speech of which it complains and seeks to rectify—contradictory statements by co-counsel—presents a clear and present danger to the Debtors' reorganization.

69.    The TCC has not attempted to show that the relief requested would rectify the situation or that it is the most narrowly tailored relief necessary to do so.  Moreover, and as

---

[34] *See Cram v. Elec. Data Sys. Corp.*, No. 07cv1842-LAB-NLS, 2008 WL 178449, at *3 (S.D. Cal. Jan. 17, 2008); *cf. Georgine v. Amchem Prod., Inc.,* 160 F.R.D. 478, 516-17, 518-19 (E.D. Pa. 1995) (granting voiding of opt out orders and ordering dissemination of notice materials "*[b]ecause it is likely that class members were deceived*, the danger is real, serious, likely and imminent that individuals have been induced to act to their detriment in reliance upon the misrepresentations, deceptive letters or blatant falsehoods of counsel. . ." however, still declining to "restrain or burden speech prior to its articulation.") (emphasis added).

[35] *See In re Inslaw*, 76 B.R. 224, 240 (D.D.C 1987)(holding that an injunction on disparaging speech against debtor did not violate the First Amendment where the speech was false and malicious sufficient "to present a clear and present danger of significant interference with the Debtor's reorganization and with the functions of the bankruptcy court[.]"; *In re Stonegate Sec. Servs.*, Ltd., 56 B.R. 1014, 1019 (N.D. Ill. 1986) ("in order for § 362 to constitutionally curtail 'harassing' speech, the speech must be truly obstructive, that is, it must amount to conduct that seriously and effectively interferes with the judicial process itself—or presents a clear and present danger of doing so—*and involves no or at least limited First Amendment interest.*  It is not enough that the behavior be 'annoying[.]'")(emphasis supplied); *cf. Jin Nakamura v. Wells Fargo Bank, Nat'l Ass'n*, No. 17-4029-DDC-GEB, 2018 WL 994706, at *4 (D. Kan. Feb. 21, 2018) ("The moving party, therefore, must demonstrate the communication at issue is abusive in that it threatens the proper functioning of the litigation."); *Perkins v. Benore Logistics Sys., Inc.*, No. 16-13717, 2017 WL 445603, at *4 (E.D. Mich. Feb. 2, 2017) (holding that the proposed restrictions on communications between Plaintiff counsel and putative class members would violate the First Amendment because "[p]laintiff's counsel [had] not engaged in the type of subterfuge and subversion that constitutes an intolerable affront to the authority of the district court to police class member contacts" sufficient to allow the extreme remedy of restricting Plaintiff's counsel speech).

discussed below, the TCC's description of events purportedly justifying this Court's imposition of

a prior restraint is inaccurate and would excuse and dignify attorney misconduct.

### D.    The TCC Presents No Evidence
### Concerning the Nature or Extent of Any "Confusion"

70.    The Modified Motion states that cause exists for the relief to be requested because

AIS Survivors are confused about the Plan.  But nowhere in the Modified Motion does the TCC:

  a.  provide the Court with any metric by which it might assess the level of confusion present among AIS Survivors;

  b.  provide any information by which the Court might compare the confusion of AIS Survivors (if any) with that of unrepresented Survivors or those of, for instance, TCC-affiliated law firms;

  c.  provide any information by which the Court might compare the confusion of AIS Survivors (if any) with that of sexual abuse Survivors or personal injury victims in other large mass tort cases to determine whether such confusion (if any) is out of the ordinary;

  d.  provide any means of attributing any extant confusion (to the extent it exists) to the actions of AIS counsel, as opposed to, for instance, the misconduct of the TCC described above;

  e.  address the fact that AIS clients have now received (i) the Solicitation Package or (ii) multiple emails from the TCC, including a corrective email intended to ameliorate some confusion caused by the TCC and Mr. Kosnoff's misconduct;

  f.  address the fact that AIS clients have received clear statements of position from their own attorneys, or explain how such statements diverge from any applicable ethical guidance;[36]

  g.  explain how an additional letter might ameliorate confusion when the great volume of information already provided to AIS clients has, in the TCC's view, failed to do so;

  h.  address how the relief requested would prevent Mr. Kosnoff from continuing to tweet abusive messages regarding this Court and his legal opponents, among others;

---

[36] *See* AVA Law Objection ¶3 ("Without waiving the attorney-client privilege or the work product doctrine in any way, AVA Law Group makes this representation…[i]n October, 2021, AVA Law Group's co-counsel, Mr. Kosnoff and Eisenberg Rothweiler, each asked AVA Law Group to distribute letters to their joint clients….AVA Law Group sent those letters to the joint clients on their authors' respective letterheads.").

    i.   address how the relief requested would prevent the Eisenberg Rothweiler and AVA Law firms from continuing to engage in the conduct described by the TCC as so offensive and the cause of such confusion.

71.    Instead, in connection with the Ombudsperson Motion, the TCC and its supporters provided select examples of Survivors who were angry with one of their chosen counsel regarding the frequency and stridency of its communications.

72.    Respectfully, the Survivor statements solicited by Mr. Kosnoff and the TCC do not appear to demonstrate confusion.  The fact that Mr. Kosnoff has openly recruited his Twitter followers to testify on the TCC's behalf, and some have chosen to do so, does not suggest or prove confusion.[37]  The Coalition respectfully suggests that, even assuming the Modified Motion can withstand the other reasons listed for its denial (which it cannot), the TCC has not met the evidentiary burden for the extraordinary request.

**E.**    **No Ethical Rules Require Drafting and Signing a Joint Statement**

73.    The TCC argues that attorneys should be effectively bound to Ethical Consideration 5-12.  The TCC concedes that EC 5-12 is "valid guidance."  Modified Motion at ¶16.  That is to say, EC 5-12 is not a rule that binds attorneys before this Court.

74.    As previously noted by the Debtors, the ABA declined to adopt EC 5-12 when it replaced the Code of Professional Responsibility and Canons of Professional Ethics with the Model Rules of Professional Conduct.  As a matter of speculation:  when EC 5-12 was adopted many decades ago, it was significantly more difficult and expensive for attorneys to contact large groups of clients on a regular basis.  The rule may no longer be appropriate today, when attorneys communicate with clients daily at essentially no cost, and any co-represented client may ascertain

---

[37] Mr. Kosnoff's efforts to recruit Survivors to speak on his behalf, and their waiver of attorney client privilege in so doing, was the subject of discussion at hearings on December 6th and 7th.

nearly instantly whether and why their co-counsel may disagree, as thousands of Survivors in these cases have already so ascertained.

75.    The old ethics considerations may be valid guidance, but they are not rules. Imputing EC 5-12 into any Model Rule of Professional Conduct to regulate attorney-client speech is inappropriate.  The fact that the TCC requests such relief from this Court on an ethical basis without citing a single breach of an actual ethical rule by any party should tell the Court all it needs to know.  The absence of any such breach causes the Modified Motion to fail any standard for this Court to remedy a breach of ethical obligations, let alone a prior restraint of speech.

**F.    A Court of Equity Should Not Entertain the Relief Requested In Light of the Actions of Kosnoff and the Movants**

76.    The transgressions of Mr. Kosnoff and the TCC have been enumerated herein and at length in other documents before the Court.  After creating the confusion that now exists, the TCC and its allied law firms now want to deflect blame.  They now want this Court to require certain law firms to draft and sign a letter to their clients explaining their contrasting positions to clients that, the record demonstrates, are already aware of such positions.  They want this Court to place its imprimatur on the TCC as the coordinator and author of the requested letter.  That is simply not the purview of a Court of equity.

77.    While the TCC does not specify the language that would be included in any such letter, the mere fact that multiple law firms would be signing a letter upon the requirement of this Court means that the signing of the letter or refusal to do so is, itself, a speech act by the law firms. The decision to provide a statement requires each affected law firm to communicate to its clients its views on whether:

     a.    the law firm co-signatories should be granted equal dignity;

     b.    the opinions expressed by the firms are entitled to equal dignity;

     c.    this Court has the authority to regulate the speech acts of attorneys to their clients; and, potentially, that

     d.    this Court considers the prior conduct of each law firm worthy of remedy for breach of ethical requirements.

78.    As previously described, the requested relief is not permitted by law.  Just as importantly, the implications of the speech to be compelled are inappropriate:

     a.    The TCC and Mr. Kosnoff made multiple false statements of material fact to their constituents.

     b.    The TCC actively and expressly encouraged unlawful attacks on its opposing parties.

     c.    The TCC ghost-wrote for Mr. Kosnoff, and Mr. Kosnoff co-wrote and signed, inflammatory, defamatory communications.

     d.    Mr. Kosnoff has published statements repeatedly attacking individual counsels and this Court.

     e.    The TCC used its official committee platform to disseminate Mr. Kosnoff's communications to 20,000 abuse Survivors at Mr. Kosnoff's request, endorsing not just the inflammatory and defamatory statements but also Mr. Kosnoff's Twitter feed.

     f.    The TCC falsely stated to this Court that its involvement in the drafting and dissemination of Mr. Kosnoff's communications attacking opponents was not an endorsement of such communications.

     g.    The TCC falsely denied its involvement in preparing Mr. Kosnoff's communications.

     h.    Mr. Kosnoff has continued to attack his perceived opponents, as well as this Court, even after the foregoing actions were brought to the attention of the Court.

79.    Against this misconduct, the TCC demands that Mr. Kosnoff's co-counsel sign a letter, with a cover letter provided by the TCC and with the stamp of approval of both the TCC

and this Court, because such co-counsel contacts its clients too frequently, or perhaps too stridently, or perhaps not enough.[38]

80.    To be sure, some amount of confusion exists in *every case*.  But this is not really about confusion.  The Survivors whose statements the TCC has submitted, and whose statements Mr. Kosnoff has solicited and submitted (in the process, encouraging clients to waive privilege and submit testimony to the Court, with apparent disregard for the consequences of such actions), are not "confused."  They are opponents of the Plan who are openly allied with Mr. Kosnoff and the TCC, some of whom have been posting their beliefs on Twitter and re-tweeting Mr. Kosnoff's tweets for months.[39]  They may oppose and dislike Mr. Kosnoff's co-counsel, and/or the Coalition, and they may disagree with the content or manner of such parties' communications, as is their right.  But that does not make them confused.

81.    The purpose of the Modified Motion, and the Ombudsperson Motion, the Kosnoff Email and the many attacks by the TCC against the Coalition and the law firms favoring acceptance of the Plan, is to weight the scales during the voting period.

82.    Any relief that the TCC and its allies can gain from the Modified Motion will dignify their argument that the Eisenberg Rothweiler law firm, and the other firms in this case that are utilizing the hybrid method and communicating to clients about it, are doing something wrong.

---

[38] Certain of the concerns raised about the Eisenberg Rothweiler law firm concern too-frequent communications; others too-infrequent.  At a hearing on December 6th, one AIS client objected that he had been unable to speak to Kenneth Rothweiler personally.  That client did not inform the Court that, among other things, he has published tweets of Mr. Rothweiler's photo and wishing that Mr. Rothweiler would suffer bodily injury – which tweets have been retweeted by and from Mr. Kosnoff.  Kosnoff Law (@SexAbuseAttys), Twitter (Nov. 30, 2021 6:32 p.m.), https://mobile.twitter.com/SexAbuseAttys/status/1465826192292925442 (Kosnoff re-tweet of tweet from client Guy Taylor stating "My Christmas wish is Ken gets run over by a reindeer."); Exh. F at 16 (screenshot of same); Kosnoff     Law     (@SexAbuseAttys),     Twitter     (Nov.     29,     2021     11:05     p.m.), https://mobile.twitter.com/SexAbuseAttys/status/1465532334841679874 (Kosnoff re-tweet of photo of Kenneth Rothweiler with family, calling Mr. Rothweiler a "Classic narcissist" and "fucking crybab[y]"); *see also* Exh. F at 16-17 (screenshots of foregoing cited postings).

[39] *See, e.g.*, *supra* note 38.

But asking Survivors to complete Ballots is not wrong.  The TCC's counsel has acknowledged that the hybrid method is permitted under the Solicitation Procedures Order.[40]  And whatever the allegation, from or concerning any party, the TCC has not met the standard of scrutiny required to justify the extraordinary relief proposed in the Modified Motion.

---

[40] Exh. E, email from John Lucas to Douglas Kennedy and Tim Kosnoff (Oct. 24, 2021) (Lucas responding to Kosnoff's accusations of impermissible solicitation by co-counsel and stating that Kosnoff was "wrong about the order.").

**<u>CONCLUSION</u>**

WHEREFORE, the Coalition respectfully requests that the Court enter an order denying

the Modified Motion and entering such other and further relief as the Court deems just and proper.

Dated: December 13, 2021  
      Wilmington, Delaware

MONZACK MERSKY AND BROWDER, P.A.

*/s/ Rachel B. Mersky*
(DE No. 2049)
1201 North Orange Street
Suite 400
Wilmington, Delaware 19801
Telephone:    (302) 656-8162
Facsimile:    (302) 656-2769
E-mail:    RMersky@Monlaw.com

-and-

BROWN RUDNICK LLP
David J. Molton, Esq. (admitted *pro hac vice*)
Eric R. Goodman, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com
E-mail:  EGoodman@BrownRudnick.com

and

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*