IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 20-10343 (LSS)<br>)<br>) Jointly Administered<br>)<br>) Re: D.I. 7447, 7459, 7461, 7467, 7601<br>)<br>) |

**EISENBERG, ROTHWEILER, WINKLER, EISENBERG & JECK, P.C.'S JOINDER AND OBJECTION TO THE MODIFIED EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS REGARDING PLAN VOTING ISSUES**

Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. ("Eisenberg Rothweiler"), by its undersigned counsel, hereby submits this Joinder and Objection (the "Objection") to the *Modified Emergency Motion of the Official Committee of Tort Claimants for Entry of an Order Pursuant to Section 105, 1103, 1125 and 1126 if the Bankruptcy Code Appointing a Plan Voting Ombudsperson and Granting Related Relief* [Dkt. No. 7601] (the "Motion"),[2] modifying the *Emergency Motion of the Official Committee of Tort Claimants for Entry of an Order Pursuant to Sections 105, 1103, 1125, and 1126 of the Bankruptcy Code Appointing a Plan Voting Ombudsperson and Granting Related Relief* [D.I. 7447] (the "Ombudsperson Motion"), filed by the TCC. Eisenberg Rothweiler joins in the objections filed to the Motion by the Coalition's Objection at Dkt. 7690, the objection of AVA Law Group, Inc. at Dkt. 7680, as well as the Debtors' Objection to the Ombudsperson Motion filed at Dkt. 7467. In support of this Objection, Eisenberg Rothweiler respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.
[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

**PRELIMINARY STATEMENT**

1. The TCC cannot let a good crisis go to waste, including one of its own making. The TCC, together with Kosnoff, collaborated to taint the Plan Solicitation Procedures by the transmittal of the TCC/Kosnoff Communications[3] to sexual abuse survivors ("Survivors") to advance their opposition to the Plan. Now, apparently undeterred by the fallout from the TCC/Kosnoff Communications, or by the *Agreed Interim Order on Debtors' Motion (i) Enforcing the Solicitation Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against The Tort Claimants' Committee, and (III) Granting Related Relief*, [Dkt. No 7401], the TCC seeks a remedy, unsupported by statutory or case law authority, for the confusion it precipitated by the transmittal of the TCC/Kosnoff Communications,[4] in the hopes of advancing the TCC's opposition to the Plan.

2. Unsatisfied with the results of the disruption caused by its' dissemination of the TCC/Kosnoff Communications, the TCC now seeks to inappropriately inject itself, or the Court, into the attorney-client relationship between the clients of "Abused in Scouting" ("AIS"), and the law firms that service the AIS clients. Not surprisingly, the TCC relies upon the Kosnoff Response[5] as justification for the relief sought in the Motion. The extraordinary relief sought by the TCC, mandating that AIS counsel communicate with their clients, effectively at the direction of the TCC, because of confusion precipitated by the TCC and Kosnoff, strains all credulity. The requested

---

[3] The TCC/Kosnoff Communications is not mentioned by the TCC in the Motion, but the term is equivalent to the defined term "Kosnoff Letter" which the TCC utilized in the Ombudsperson Motion [Dkt. No. 7447] as "counsel for the TCC sent an email and letter from Mr. Kosnoff (the "Kosnoff Letter") to (a) all individuals on the TCC's email contact list and (b) individuals identified as clients of Mr. Kosnoff by Mr. Kosnoff, between Friday, November 5, 2021, and Sunday, November 7, 2021."
[4] Copies of the TCC/Kosnoff Communications are attached as Exhibit 3 to the *Declaration of Blair M. Warner Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against Tort Claimants' Committee, and (III) Granting Related Relief*, [Dkt. No. 7119]. Declaration, at Exhibit 3.
[5] See *Kosnoff Law, PLLC's Response in Support of Emergency Motion to Appoint a Plan Voting Ombudsperson*, [Dkt. No. 7461].

relief would have this Court restrain the free speech of Eisenberg Rothweiler by forcing it to join in a public statement with Kosnoff, accompanied by a cover letter written by the TCC, and with the endorsement of this Court, effectively dignifying the TCC and Kosnoff in the eyes of the AIS clients.

## BACKGROUND

3. The relationship between the TCC and Kosnoff can best be described by the ancient proverb: The enemy of my enemy is my friend. Their common enemy is the Plan and by extension, any constituency which supports the Plan. Their collective animus towards the Plan knows little bounds as evidenced by the events surrounding the TCC/Kosnoff Communications and has in turn, led us to the current Motion. A brief recitation of some of the events which led us to this current Motion is instructive.

4. Eisenberg Rothweiler, along with AVA Law Group ("AVA Law"), has worked tirelessly with AIS clients, both before the commencement of these proceedings and since, to advance the interests of Survivors. Eisenberg Rothweiler and AVA Law work daily, together with attorneys and support staff answering phone calls and e-mails from AIS clients, responding to our clients' needs in a compassionate and professional manner. The communications that Eisenberg Rothweiler is making to the AIS clients are not harassing, but rather the type of calls and communications that tort law firms make all the time to their clients in mass tort situations, to ensure that they understand the operation of the Plan, that they understand the ballot, and finally, to assure them that once they have voted, that they indeed voted the way they meant to. The ballots are complicated. For instance, due to the presence of the Expedited Distribution election of $3,500[6] on the ballot (which was added at the request of the TCC), Eisenberg Rothweiler is aware that

---

[6] See Article VI, Expedited Distributions, *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, [Dkt. 6443].

some AIS Survivors believe that they need to vote "no" in order to avoid receiving the Expedited Distribution election.

5. Eisenberg Rothweiler decided to use the E-Ballot as a way to make voting easier for Survivors, and to ensure that Survivors are allowed to sign their own ballot – rather than have lawyers fill them out. This was done to ensure the integrity of the voting process, as opposed to the reverse. Indeed, because of E-Balloting, many AIS clients will indeed vote to reject the Plan, which is contrary to Eisenberg Rothweiler's advice and counsel. When contrasted with those law firms who are using a master ballot, and whose clients therefore will vote in 100% blocks, Eisenberg Rothweiler stands out as protecting AIS Survivors' individual voting rights.

6. Meanwhile, Kosnoff has contributed little in the past 12 months to the AIS co-counsel arrangement except for his tweets and his efforts to actively sabotage AIS efforts with his defamatory, degrading, and debasing conduct. As he has proudly acknowledged, Kosnoff has spent the last several months living and practicing law from his boat.

7. In October 2021, with Plan voting about to commence, Eisenberg Rothweiler requested that AVA Law, as AIS co-counsel, distribute a letter to all AIS clients promoting the virtues of the Plan and counseling AIS clients to vote in favor of the Plan. In response, Kosnoff separately requested that AVA Law distribute his letter to all AIS clients recommending that clients vote against the Plan. AVA Law transmitted both letters to the joint AIS clients on their authors' respective letterheads. Each letter was sent out only one time by AVA Law. Such was the state of play until the TCC intervened with the TCC/Kosnoff Communications.

**A.    The TCC's "Mistake"**

8. With voting underway, on November 6, 2021, attorneys at White & Case LLP received an urgent email from Omni Agent Solutions, the Court-appointed voting and solicitation

agent in these chapter 11 cases (the "Solicitation Agent"). A survivor had just forwarded to the Solicitation Agent a screenshot of an email the survivor had received from the official creditor-facing email address of the TCC, BSASurvivors@pszjlaw.com. The survivor and the Solicitation Agent were confused because what appeared to be an official communication from the TCC was in fact an email signed by Kosnoff encouraging all Survivors to vote against the Plan, in what appeared to be an official communication from the TCC but was instead the TCC/Kosnoff Communications encouraging all Survivors to vote against the plan and to contact Kosnoff in connection therewith. The survivor in question is not a client of Kosnoff or AIS but is instead represented by separate state court counsel.

9.  It quickly became apparent that the TCC email address reserved for official communications with Survivors had been used to circulate an inflammatory, derogatory, false, and defamatory email and five-page letter, previously defined as the TCC/Kosnoff Communications, from Mr. Kosnoff urging Survivors to vote to reject the Plan.

10. The Debtors were informed by Coalition counsel that the TCC's emails disseminating the TCC/Kosnoff Communications were sent to thousands of abuse Survivors, many of whom were represented by counsel other than AIS, and that the emails had already caused confusion among Survivors.

11. The Debtors, in response to an intentional and illegal effort by the TCC and Kosnoff to solicit votes to reject the Debtors' plan of reorganization using statements that are either false or grossly misleading, filed the *Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against Tort Claimants' Committee, and (III) Granting Related Relief*, [Dkt. No. 7118] ("Debtors' Emergency Motion").

12. After two hearing on the Debtors' Emergency Motion, and corresponding written discovery and depositions, counsel to the TCC acknowledged that the distribution of the TCC/Kosnoff Communications was a mistake, apologized for any confusion caused by such distribution and acknowledged that distribution of the Kosnoff Letter from the [bsasurvivors@pszjlaw.com](mailto:bsasurvivors@pszjlaw.com) email address was ill-advised and not an endorsement by the TCC of the contents of those documents. See, *Statement of the Tort Claimant Committee With Respect to Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against Tort Claimants' Committee, and (III) Granting Related Relief*, [Dkt. No. 7216].

**B.     Kosnoff's Tweets**

13. Kosnoff's antics and indiscretions have been the subject of multiple hearings. As the Court is well aware, Mr. Kosnoff has been active on social media since the beginning of these chapter 11 cases. The Court has previously characterized Mr. Kosnoff as having "poor judgment in how he expresses himself [and] how he views other professionals." See Oct. 16, 2020 Hr'g Tr. at 12:23–13:2, See *Warner Decl*. Ex. 4, [Dkt. No. 7119].

14. Additional evidence provided to this Court has shown that Mr. Kosnoff:

- Has made derogatory statements about Survivors, the mediators and counsel for the Debtors. *See, e.g.*, D.I. 1285, Ex. 1 ("Andolina and the 3 Amigos need to get that message. They are wasting their time talking to the TCC. . . . We are not going to do anything to help grease the gears for Stang and the dimwits including speeding up the insurance analysis.").

- Resigned from the Coalition, along with Mr. Van Arsdale, after the derogatory email referenced immediately above became public. See Oct. 14, 2020 Hr'g Tr. (AM Session) at 33:4–5, Warner Decl. Ex. 6 ("[MR. MOLTON:] Your Honor, on September 29th, Kosnoff and Andrew Van Arsdale resigned from the Coalition."); Oct. 14, 2020 Hr'g Tr. (PM Session) at 23:18-24:2, Warner Decl. Ex. 6 ("[MR. MOLTON:] So dealing with what I call the second elephant in the room, the Kosnoff e-mail. Listen, I'm not going to sit here and make up explanations for it, I wasn't there, I'm not going to make up excuses for it, I

can't. But I'm going to say, look what we've done and look who we are now. Look at the firm representative [sic] who have joined us, all of whom have qualified bona fides in the mass tort bankruptcy world and in the mass tort world.").

15. Apparently unsatisfied with these proceedings, Kosnoff's cyber bullying has continued, with him continuing to make demeaning statements about the Court and multiple attorneys associated with this case, including Mr. Kenneth Rothweiler, and has posted multiple photos of attorneys involved in the case. A sampling[7] from his recent Twitter feed follows:



---

[7] Eisenberg Rothweiler finds the language contained in the Kosnoff tweets to be both offensive and reprehensible and only includes them in this pleading to make the Court aware of the nature and extent of the *ad hominen* attacks perpetuated by Kosnoff and some of his followers.

7



**Kosnoff Law**
@SexAbuseAttys

Liar whose lies to survivors constitute abuse and revictimization. Stop lying KEN! Save your tattered reputation and abandon support for this sell out Plan.



11:35 AM · Oct 23, 2021 · Twitter for iPhone

2 Retweets   1 Quote Tweet   4 Likes





16. It is painstakingly apparent from these tweets that Kosnoff has no appetite for polite civil discourse and good manners, and that he is in fact, so crude and unrefined as to be lacking in discrimination and sensibility. Furthermore, his repeated *ad hominem* attacks on Eisenberg Rothweiler, generally, and Mr. Kenneth Rothweiler, specifically, serve to discredit the interests of the AIS clients he purports to represent. Kosnoff recently went so far as to tweet a copy of his deposition transcript, which includes defamatory material.

17. Meanwhile, the TCC argues that the AIS law firms are "warring" with each other, but Eisenberg Rothweiler and AVA Law are not at war with anyone. There is no evidence, or twitter feed or tweets, from Eisenberg Rothweiler or AVA Law about the TCC, Kosnoff or any other constituencies. Instead, the Motion is a poorly veiled attempt to divert the Court's attention from the TCC's involvement in the TCC/Kosnoff Communications, and it only serves to dignify the aforementioned attorney misconduct.

18. The TCC's Motion is replete with references to "confusion," "disfunction," and "crippling discord," but the Motion is bereft of any reference to the actions of the TCC and Kosnoff. However, despite the TCC's reliance on Kosnoff's description of "crippling discord", Kosnoff has previously acknowledged that "[g]iven (1) the complexity of these proceedings; (2) the disparate circumstances in which claimants in different jurisdictions and with different experiences find themselves; and (3) the disparate viewpoints of the three primary law firms involved here, those clients (AIS) will require a great deal of guidance and advice. Their attorneys, including Kosnoff Law, AVA Law Group and Eisenberg Rothweiler, will provide that guidance and advice. This group of claimants has the distinct advantage of having available to it a range of recommendations and perspectives from lawyers who view these proceedings in differing ways."[8]

---

[8] *See Kosnoff Law's Supplemental Omnibus Objection to Hartford's and Century's Motions to Compel Rule 2019 Statements*, [Dkt. No. 5679] at Par. 7. "Moreover, the law firms in the Abused in Scouting cooperative co-counsel

## ARGUMENT

19. Both the TCC and Kosnoff oppose the Plan. Their opposition to the Plan motivated them to disseminate the TCC/Kosnoff Communications to manufacture a Plan solicitation and voting crisis. Undeterred by the fallout from the "mistake", and sensing that they were unsuccessful in effectuating a crisis, the TCC now proposes a solution that will only further victimize Survivors. The TCC and Kosnoff have systematically and purposely sought to disrupt the Plan solicitation and voting by weaponizing TCC/Kosnoff Communications in an attempt to create widespread confusion and mistrust. In doing so, the TCC and Kosnoff have endeavored to taint the solicitation process for those Survivors represented by AIS. The purposeful transmittal of the TCC/Kosnoff Communications was a strategic decision, designed to drive a wedge between AIS clients and Eisenberg Rothweiler.

20. The relief sought in the Motion is an illicit restraint on free speech. Free and open communication between a legal representative and client is an essential tenet of effective representation. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Restraints on the free flow of communication between a legal representative and client, or potential clients, are strongly disfavored. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 95 (1981).

21. Similarly, not engaging in speech is also recognized and protected speech. The doctrine of prior restraint governs compelled speech as well as restrictions upon speech, without distinction. *Riley v. Nat'l Fed'n. of the Blind of North Carolina*, 487 U.S. 781, 796-797 (1988); see also Hrg. Tr. 11/10/21 at 20:21-22 (the TCC's admission of same).

---

arrangement do not share a common agenda or point of view with respect to numerous aspects of these proceedings. For example, certain members of one of the firms have publicly supported positions that another firm has publicly condemned."

22. A law firm's decision to refrain from speech, including a decision to not engage with Kosnoff to write a joint letter to the clients of AIS, is a form of speech, and the restraint of which is subject to strict scrutiny review. *See Id.; Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Content-based [restrictions]—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."). It has long been established that content-based prior restraints "constitute the most serious and the least tolerable infringement on our freedoms of speech." *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)).

23. The TCC's actions in disseminating the TCC/Kosnoff Communications have corrupted the attorney-client relationship between Eisenberg Rothweiler and its' AIS clients by facilitating the transmittal, utilizing an official e-mail address and therefore with the apparent support of the TCC, and of Pachulski Stang, of a defamatory e-mail smearing the good name and reputation of one of AIS clients' co-counsel, Eisenberg Rothweiler, that represents over 15,000 Survivors. The TCC's distribution of the TCC/Kosnoff Communications was a tacit endorsement of the defamatory statements made by Kosnoff about Eisenberg Rothweiler. The TCC's purpose was to discredit Eisenberg Rothweiler and all of the efforts to obtain a Yes vote on the Plan. Many of AIS's clients are now upset, having received an e-mail defaming one of the law firms that represents the AIS clients as well as a correspondence soliciting them to reject the plan. The pretext that the TCC was allowing Kosnoff to respond to Mr. Rothweiler's e-Ballot communication is a diversion by the TCC from its' true purpose which is to discredit the Plan. Furthermore, actively distributing Kosnoff's twitter account, e-mail address, and phone number only compounded the attacks on Eisenberg Rothweiler.

24. The TCC argues that confusion justifies a court's exercise of supervisory authority over attorney-client communications, but glosses over the fact that its' actions led to the confusion.[9] The TCC, in seeking a prior restraint of speech in relation to the Debtor in a bankruptcy proceeding must show that the speech, whether or not false or misleading, presents a clear and present danger to the debtor's reorganization. *See In re Inslaw*, 76 B.R. 224, 225 (D.D.C 1987); cf. *Jin Nakamura v. Wells Fargo Bank, Nat'l Ass'n,* No. 17 4029-DDC-GEB, 2018 WL 994706, at *4 (D. Kan. Feb. 21, 2018) ("The moving party, therefore, must demonstrate the communication at issue is abusive in that it threatens the proper functioning of the litigation*.");* *Perkins v. Benore Logistics Sys., Inc.*, No. 16-13717, 2017 WL 445603, at *4 (E.D. Mich. Feb. 2, 2017) (holding that the proposed restrictions on communications between Plaintiff counsel and putative class members would violate the First Amendment because "[p]laintiff's counsel [had] not engaged in the type of subterfuge and subversion that constitutes an intolerable affront to the authority of the district court to police class member contacts" sufficient to allow the extreme remedy of restricting Plaintiff's counsel speech).

25. The TCC cannot meet this burden. The TCC cannot demonstrate that the relief requested will remedy the situation it seeks to remedy – conflicting recommendations by AIS co-counsel – or that it presents a clear and present danger to the Debtors' reorganization.

26. The TCC argues that the AIS attorneys are bound to Ethical Consideration 5-12. But EC 5-12 is not a rule that binds attorneys before this Court. As previously noted by the Debtors, the ABA declined to adopt EC 5-12 when it substituted the Code of Professional Responsibility and Canons of Professional Ethics with the Model Rules of Professional Conduct. Arguably, the

---

[9] The amount of "confusion" that the TCC rails about appears to be limited. First, it is unclear whether those who are complaining about "confusion" are in fact confused by the TCC/Kosnoff Communications or even recruited by Kosnoff. Second, and to be clear, if less than one hundred AIS clients (at most) appear to be confused, that is still less than 1% of the total AIS clients – i.e. 99% are not confused or complaining.

rule is no longer suitable in today's digital age, where attorneys can communicate with clients daily, and where co-represented clients can instantaneously ascertain whether and why their co-counsel may disagree, as thousands of Survivors in these cases have already done.

27. While EC-12 is instructive to the Court, it is not a rule which governs the conduct of attorneys in this Court. Imputing EC 5-12 into any Model Rule of Professional Conduct to regulate attorney-client speech is unsuitable to this controversy. The TCC, while painstakingly ignoring the conduct of Kosnoff, has failed to cite to a single instance of a breach of any ethics rule by AIS counsel. For this reason alone, the TCC's Motion fails.

28. Eisenberg Rothweiler has an independent right and professional obligation to communicate with its clients. Eisenberg Rothweiler has discharged that right and professional duty by communicating directly and honestly with its clients regarding the Plan and the proposed settlement in these proceedings. Eisenberg Rothweiler's conduct in communicating with its clients has, at all times, been ethical, appropriate and consistent with Eisenberg Rothweiler's professional obligations.

29. No lawyer should have to subject themself to the near daily barrage of personal attacks made by Kosnoff on Ken Rothweiler's legal abilities, his decision-making, or his personal life. It is incomprehensible that any Court would reward this type of behavior by requiring Eisenberg Rothweiler generally, or Mr. Kenneth Rothweiler, personally, to transmit his letter side-by-side with Kosnoff's letter. As a court of equity, this Court should recognize that there would be nothing equitable about the proposed joint communication.

30. Fundamentally, Eisenberg Rothweiler must not be compelled by this Court to legitimize the defamatory statements made by Kosnoff about Eisenberg Rothweiler by forcing it to join in a public statement with Kosnoff, accompanied by a cover letter written by the TCC, and

with the endorsement of this Court, thereby dignifying the TCC and Kosnoff in the eyes of the AIS clients.

## **CONCLUSION**

Accordingly, Eisenberg Rothweiler request that the Court enter an order denying the relief requested in the Motion and entering such other relief as the Court deems appropriate.

Dated: December 13, 2021                               **HOGAN♦McDANIEL**

*/s/ Daniel K. Hogan*
Daniel K. Hogan (DE No. 2814)
1311 Delaware Avenue
Wilmington, DE 19806
Telephone: (302) 656-7540
Facsimile: (302) 656-7599
dan@dkhogan.com

*Attorneys for Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C.*