IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. D.I. 7447, 7467, 7601** |

**DEBTORS' RESPONSE TO MODIFIED EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS REGARDING PLAN VOTING ISSUES**

Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession (together, the "Debtors") in the above-captioned chapter 11 cases, hereby file this response (the "Response") to the *Modified Emergency Motion of the Official Committee of Tort Claimants Regarding Plan Voting Issues* [D.I. 7601] (the "Modified Emergency Motion"), which seeks to modify the *Emergency Motion of the Official Committee of Tort Claimants for Entry of an Order Pursuant to Sections 105, 1103, 1125, and 1126 of the Bankruptcy Code Appointing a Plan Voting Ombudsperson and Granting Related Relief* [D.I. 7447] (the "Initial Emergency Motion") filed by the official committee of tort claimants (the "TCC"). In support of this Response, the Debtors incorporate and reference the *Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief* [D.I. 7118] (the "Emergency TCC Enforcement Motion") and related declaration of Blair M. Warner [D.I. 7119] in support (the "Warner Declaration"), filed on November 10, 2021, and the *Debtors' Omnibus Objection to*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

*Tort Claimants' Committee's (I) Emergency Motion for Entry of an Order Pursuant to Sections 105, 1103, 1125, and 1126 of the Bankruptcy Code Appointing a Plan Voting Ombudsperson and Granting Related Relief and (II) Related Motion to Shorten* [D.I. 7467] (the "<u>Debtors' Objection</u>"),[2] filed on November 29, 2021.  In further support of the Response, the Debtors state as follows:

## PRELIMINARY STATEMENT

1. The Debtors do not object to the three AIS counsel sending a joint communication outlining their advice to clients.  But there is no basis for the TCC to ask this Court to issue a mandatory injunction requiring AIS counsel to provide advice and to specify the particular format of such advice.  Indeed, although the joint communication would also contain advice from the other AIS counsel, the TCC again is trying to put before survivors, that have not asked for it, Timothy Kosnoff's advice to reject the Plan.  Moreover, there is no reason to believe that yet another communication outlining the conflicting position of counsel will help clients or undo the damage caused by the TCC's prior conduct in drafting and delivering Mr. Kosnoff's advice to reject the Plan to the AIS clients and to the non-AIS clients that were given the exact opposite advice by their retained counsel.  Additionally, a single document providing conflicting advice does not provide guidance and likely will just confuse survivors.  And clients receiving a joint communication providing conflicting advice will likely have further questions that will not be posed to all counsel, so separate advice will be given in follow-up, rendering the joint communication largely meaningless.  Additionally, ordering attorneys with conflicting views to draft and deliver advice almost certainly will cause dispute, further proceedings and delay.  So,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Modified Emergency Motion, the Emergency TCC Enforcement Motion, or the Debtors' Objection, as applicable.

this Modified Emergency Motion seems to be made as a distraction by a Plan objector at a very busy time in this case, and is further wasting time and estate resources.

2.  Moreover, the request of Pachulski Stang Ziehl & Jones LLP ("Pachulski"), as counsel to the TCC, to deliver a cover letter, again seeking to inject itself into the communications between other firms' clients and their chosen counsel, is inappropriate. It would likely cause questions to again come to the TCC, rather than retained counsel, which the TCC previously forwarded to only Mr. Kosnoff. If the Pachulski firm was to provide a cover letter, however, then that cover letter should state that the TCC's prior communication delivering the TCC/Kosnoff Communications was inappropriately sent by Pachulski attorneys working with Mr. Kosnoff, was not discussed with or approved by the TCC, should not be read to endorse Mr. Kosnoff's statements or advice or to have provided any advice about how to vote, and that the TCC takes no position as to how the AIS clients should vote. It should also instruct recipients not to respond to Pachulski.

3.  The events that led to this Modified Emergency Motion are important to understanding it, as the so-called "emergency" now again before the Court was caused by the TCC. The TCC's suggestion that discord among the AIS law firms and their ongoing communications to their clients is at the root of the problem that must be fixed by this Court ignores the TCC's integral role in creating this problem.

- **The TCC Initiated the TCC/Kosnoff Communications and Drafted Much of the TCC/Kosnoff Email and Letter.** There is no dispute that the TCC is trying to defeat the Plan, and has been working with a rogue attorney, Mr. Kosnoff, to negatively influence the vote. The Pachulski firm reached out to Mr. Kosnoff—who has throughout the case made false and disparaging statements publicly about counsel and the Court—to offer to send a false and disparaging communication soliciting survivors to reject the Plan. Debtors' Obj., TCC-PlanConf-122916-122919, Ex. 6. The TCC also directed survivors to Mr. Kosnoff's Twitter account containing dozens of those disparaging statements. Although the TCC represented to this Court that "had no participation in the writing of [the TCC/Kosnoff Letter]," Debtors' Status Report, Ex. 5, Nov. 10, 2021 Hr'g Tr. at

3

17:25-18:1, discovery has revealed that the Pachulski firm wrote the majority of the TCC/Kosnoff Letter that it distributed to over 20,000 AIS and non-AIS clients, including five of the seven false statements in the TCC/Kosnoff Communications. *See Notice of Filing of Document Referenced on the Record at the November 17, 2021 Hearing* [D.I. 7300] (Nov. 17, 2021). The Pachulski firm also modified the cover email, which describes the firm of Rothweiler, Winkler, Eisenberg & Jeck, P.C. as being deceitful and motivated by greed, and directs readers to Mr. Kosnoff's Twitter account. *Id.*

- **The TCC Violated the Purported Rules by Which It Seeks to Mandate a Communication from AIS Counsel.** The TCC now argues that the conflicting AIS counsel are dysfunctional, generally ignoring its role in using the office of the TCC to support Mr. Kosnoff's side. Indeed, the premise of the TCC's Modified Emergency Motion is that a balanced joint communication providing the conflicting advice of all counsel is required by the Model Rules. Yet the TCC breached that purported obligation by its office partnering with one of the three AIS lawyers to attack the Plan. The Pachulski firm knew that AIS clients were represented by other counsel advising them to vote in favor of the Plan, and that it had no right to contact AIS clients to provide contrary advice. There could have been no reason to draft and distribute the TCC/Kosnoff Communications other than to elevate Mr. Kosnoff's attacks on the Plan, and to influence clients to reject the advice of certain of their retained counsel supporting the Plan through the imprimatur of an official committee appointed by the Office of the United States Trustee (the "U.S. Trustee") and approved by the Court without directly signing it, so the TCC could claim inaccurately, and they then did, that they had not endorsed it. *See*, *e.g.*, Debtors' Status Report, Ex. 5, Nov. 10, 2021 Hr'g Tr. at 17:25-18:1 ("This motion concerns one email that was written by Mr. Kosnoff. We had no participation in the writing of it."); Ex. 1, Nov. 12, 2021 Hr'g Tr. at 29:18-19 ("[T]he distribution of the letter was not an endorsement by the TCC of the contents of those documents").

- **TCC Counsel Failed to Take Corrective Action.** In addition to improperly drafting and then sending out a solicitation to AIS clients advising them to reject the Plan, in direct conflict with the advice those clients were receiving from certain of their retained counsel, the Pachulski firm also sent the TCC/Kosnoff Communications to thousands of clients represented by non-AIS counsel that advised them to reject the Plan in direct contradiction to the advice of their retained counsel. The TCC argues that it did not intend to reach non-AIS clients, but there is no document instructing the use of a more limited distribution list. Debtors' Obj., Lucas Dep. Tr. at 119:2-6, Ex. 2; Debtors' Obj., Phan Dep. Tr. at 49:3-23, Ex. 4. Moreover, counsel for the Coalition advised the TCC multiple times by email on Saturday, November 6, 2021, that the TCC/Kosnoff Communications were being sent to non-AIS clients represented by other counsel— raising a very serious ethical issue—and asked to speak. Warner Decl. Ex. 2. Mr. Stang and Mr. Lucas received and discussed these communications with each other, and decided not to respond and not to stop the transmissions, returning the calls on Sunday, after the 20,000 transmissions were completed. Debtors' Obj., Stang Dep. Tr. at 95:6-10, Ex. 7

4

- **The TCC Shared Survivor Responses with Mr. Kosnoff with Knowledge that Email Went Out to Non-AIS Clients.** The TCC launched the TCC/Kosnoff Communications on November 5 and 6 to over 20,000 email addresses. The TCC sent more than 450 email responses received from survivors in response to the TCC/Kosnoff Communications to Mr. Kosnoff, and no else, including an unknown number of communications from clients represented by counsel other than Mr. Kosnoff and unrepresented survivors, again violating the rules of professional conduct.[3] Debtors' Obj., Golden Dep. Tr. at 63:3-13; 85:7-11, Ex. 10; Debtors' Obj., Lucas Dep Tr. at 129:7-20, Ex. 2.

4. The TCC's improper action to defeat the Plan has polluted the voting process and damaged the Debtors' bankruptcy estate. When the TCC/Kosnoff Communications were discovered, the TCC maintained that its conduct, which violated the ethical rules, was completely appropriate, with the exception of contacting clients not represented by AIS. *See, e.g.*, Email from Mr. Stang (Nov. 7, 2021), Warner Decl. Ex. 17 ("My firm intended to forward Mr. Kosnoff's email to all of his clients. I have confirmed that my staff was instructed to limit the emails to his clients only. I have just learned that, notwithstanding that instruction, staff sent the email to our entire listserv. . . . I am taking immediate steps to email those people Who [sic] are not Mr. Kosnoff's clients and inform them that the communication was inadvertent and that it should be disregarded."); Email from Mr. Stang (Nov. 7, 2021), Warner Decl. Ex. 20 ("[T]he TCC is allowed to solicit rejections of the Plan with materials other than the Disclosure Statement. In furtherance of the TCC's rights and powers, it transmitted Mr. Kosnoff's email.

---

[3] *See* Del. Law. Prof. Conduct 4.2 ("In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."); *In re Snyder*, 51 B.R. 432, 438 (Bankr. D. Utah 1985) (finding that communication with creditors regarding the Plan is "analogous to communicating with an adverse party regarding settlement. In each case, the ethical canons require the prior consent from the communicant's attorney."); *In re Grand Union Co.*, 204 B.R. 864, 877 (Bankr. D. Del. 1997) ("Authorizing direct contact with the claimant contradicts prevailing ethical standards that require dealings with counsel where an opposing party is known to be represented, unless counsel consents or the communication is authorized by law. The ethical rule is meant 'to prevent lawyers from taking advantage of uncounselled [sic] lay persons and to preserve the integrity of the lawyer-client relationship.' . . . . The rule is designed to shield opposing parties not only from an attorney's approaches which are intentionally improper, but from approaches which are well-intended but misguided." (quoting *Graham v. United States*, 96 F.3d 446 (9th Cir. 1996))).

While we can debate whether Sections 1102 and 1103 override applicable state law . . . and whether such applicable state law would restrict the TCC's rights and powers, I have acknowledged that email was inadvertently sent to non-AIS clients . . . ."). It was not until this Court expressed concern that the TCC reversed its position to an apology in an effort to maintain credibility. *See*, *e.g.*, *Supplemental Statement of the Tort Claimants' Committee with Respect to the Debtors' Status Report, the Supplement to Joinder of the Coalition of Abused Scouts for Justice and the Joinder of Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., Regarding the Emergency TCC Enforcement Motion* [D.I. 7255] (Nov. 16, 2021) ("Counsel for the TCC apologizes and is remorseful for distributing the Kosnoff email and letter from the firm email system."). Now the TCC claims a neutral interest in voting integrity, but the TCC and its counsel have not changed, nor has their goal. They were seeking to defeat the Plan then and they continue to seek to defeat the Plan. The same TCC and the same law firm cannot pretend to have new interests simply by having another attorney at the same firm seek relief that is supported only by other Plan objectors.[4] Indeed, the record is clear about the ongoing communications between TCC co-chair Douglas Kennedy, Mr. Kosnoff, and a Pachulski lawyer. Among other communications, Mr. Kennedy requested that Mr. Kosnoff "promote" an anti-plan video on Mr. Kosnoff's Twitter account, and Pachulski requested coordination with Mr. Kosnoff to have the video sent to AIS clients through the TCC's email system. Debtors' Obj., TCC-PlanConf-122916-122919, Ex. 6. And, notwithstanding its recognition of misconduct and statements of

---

[4] Counsel to the TCC has argued that the TCC was unaware of, and did not authorize, its conduct in helping to draft and then deliver the TCC/Kosnoff communication. Regardless of the professional implications of doing so, the Pachulski firm is an authorized representative of the TCC and its conduct is attributable to the TCC. *In re Pearle*, 725 F.3d 1023, 1027 (9th Cir. 2013) ("Ordinarily, a lawyer is a client's agent . . . ."); *Washington v. Parkinson*, 737 F.3d 470, 473 (7th Cir. 2013) ("[A]n attorney is the agent of her client . . . ."); *In re Pague*, No. 01-32061, 2010 Bankr. LEXIS 913 (Bankr. N.D.W. Va. 2010) (noting that attorneys are agents for their clients and that under the general rule of *respondeat superior* a "principal is liable for the wrongful acts of its agent within the scope of the agent's authority").

apology, the TCC declined to disavow its conduct before survivors during the November 11 and 18 town hall meeting, and instead represented—following three serious hearings inside one week—that there had been no material developments.[5]  *See*, *e.g.*, Debtors' Obj., Golden Dep. Tr. at 14:3-19, Ex. 10.  The TCC has refused to explain why it made that misstatement to survivors.

5.  Before this Modified Emergency Motion, the TCC asked this Court to order the U.S. Trustee to appoint a "voting ombudsman"—someone with absolutely no background in this case—to come in at the eleventh hour to somehow provide advice to tens of thousands of survivors represented by other counsel to accept or reject the Plan, contrary to the advice of certain of their chosen counsel, and to do so from the elevated role of an adviser appointed by the Court and the Office of the U.S. Trustee.  The TCC's relief was supported by only Plan objectors, and unsupported by any authority.  And the fact that the TCC sought to impose their voting ombudsman on all survivors, even non-AIS clients, demonstrates that it was seeking to interfere with the advice of counsel that had recommended that their clients vote in favor of the Plan.  *See*, *e.g.*, Initial Emergency Motion ¶ 10(c) ("The Voting Ombudsperson should be authorized to discuss with any survivor the voting process in the event a survivor contacts the Voting Ombudsperson.").  After refusing to delay that filing, and requiring the bankruptcy estate to incur substantial time and money responding to that frivolous motion over a holiday weekend, the TCC abandoned it.[6]  Instead, the TCC now asks the Court to issue a mandatory injunction

---

[5]  Only after the Debtors' questions about the failure, which the TCC refused to answer, did the TCC inform survivors of their misconduct related to the TCC/Kosnoff Communications during the town hall on December 2, nearly a month after distributing the TCC/Kosnoff Communications.

[6]  The TCC argued that it reconsidered its relief after reviewing the opposition, but the objectors had already vehemently opposed the relief and had explained that there was no basis for the relief, so the TCC knew exactly the position of the objectors and was not surprised by the opposition as it represented.  *See* Ex. 2, Nov. 29, 2021 Hr'g Tr. at 84:10-85:2 ("[MR. PACHULSKI:] I had no idea that a 119-page pleading was going to be filed for a status conference. . . . And if I had known that . . . then I would have said: Enough. . . . I thought I'd . . . fix the voting issue, but instead, I got a vitriol that was really unbelievable.  So, I decided I would try to drop the temperature, but still do the right thing by after seeing the pleading, chang[ing the relief requested]. I did not

compelling the AIS attorneys to draft a joint communication to be forwarded *with a cover letter from the TCC*.

## OBJECTION TO MOTION

6. The Debtors support any appropriate step that would mitigate the damage caused by the TCC and to provide better information to AIS clients, but the TCC has not demonstrated that some unidentified joint communication, presumably repeating the same conflicting advice, would do anything other than cause more confusion—and certainly the requested relief would do nothing to remedy the confusion the TCC caused in delivering advice to non-AIS clients that was contrary to the advice they were receiving from their retained counsel. Indeed, it appears that the TCC basically wants to again get Mr. Kosnoff's advice to reject the Plan before survivors, albeit this time in a communication that also includes contrary advice. And clients likely will follow-up with questions about any communication giving them contrary advice, and therefore no meaningful guidance, and those follow-ups will not be joint, mooting the joint approach sought by the TCC (as to other counsels' clients). In any case, the Debtors do not believe there is any basis for compelling a joint communication or adjudicating any disputes about the content, timing and delivery of such a communication, so this Motion is only wasting time and money, and threatening delay.

7. This Motion is based on the TCC's representation that the Model Code EC 5-12 requires a joint letter outlining the opposing views of multiple attorneys representing a client. But the Model Code was superseded over thirty-five years ago by the Model Rules, and there is no such provision in the now applicable rules. *See, e.g., Alphabetical List of Jurisdictions*

---

know this weekend I was going to make that determination. I knew that determination after I looked at the pleadings and said, Whoa, this has gone way beyond anything that I anticipated.").

*Adopting Model Rules*, AM. BAR ASS'N, https://www.americanbar.org/groups/professional_ responsibility/publications/model_rules_of_professional_conduct/alpha_list_state_adopting_mod el_rules/ (last updated Mar. 28, 2018); Ann. Mod. Rules Prof. Cond., Correlation Tables A and B (2019) (listing Model Rule 1.2(a) as a cross-reference to EC 5-12, "but only in the sense that the provisions consider substantially similar subject matter or reflect similar concerns," and a cross-reference "does not indicate that a provision of the ABA Model Code of Professional Responsibility has been incorporated by the provision of a Model Rule"). Consequently, there is no ethical obligation to provide a joint letter, the basis for the TCC's request.

8. The TCC cited EC 5-12 as the governing standard in its Initial Emergency Motion seeking the appointment of a voting ombudsperson, declining to mention that the Model Code had been superseded and that EC 5-12 had been eliminated. After the Debtors addressed that issue in their opposition, the TCC now acknowledges in this Motion that the Model Rules were superseded, but argues incorrectly that EC 5-12 was continued in Model Rule 1.2(a) and 1.4(b). The provision that "a lawyer shall abide by a client's decision whether to settle a matter" and "shall explain the matter to the extent reasonably necessary to permit the client to make informed decisions regarding representation" does not replicate EC 5-12, which counseled a joint communication. Those professional responsibilities apply to all attorneys and do not address multiple attorney representations. And more specifically, the Model Rules say nothing about joint communications.

9. In any case, the TCC is not party to the relationship between AIS attorneys and their clients, and has not demonstrated that it has standing to enforce the non-existent ethical guidance. Moreover, the venue for code violations is a disciplinary committee, not a bankruptcy court, and jurisdiction over such proceedings rests exclusively with the Delaware Supreme

Court.  Del. Supr. Ct. R. 62, 64 comm.; *In re Appeal of Infotechnology, Inc.*, 582 A.2d 215, 220 (Del. 1990) ("In Delaware there is the fundamental constitutional principle that this Court, alone, has sole and exclusive responsibility over all matters affecting governance of the Bar.").  The TCC must know the law, which it declined to cite, having searched so hard and unsuccessfully for authority that it cites totally inapposite cases from the 1800s, leading with a case allowing a senator to practice as a lawyer without taking an oath that he was unable to take based on the office he held under the Confederacy following Arkansas's secession from the Union.  *See Ex parte Garland*, 71 U.S. 333, 375, 380–81 (1866).  None of the TCC's aged cases cited in support of the vague proposition that federal courts have the power to regulate attorney conduct addresses multiple representations, joint communications or anything else relevant to this matter.  Moreover, in terms of remedy, even in a disciplinary proceeding, the TCC cites no authority even suggesting that it, or even clients, can obtain a mandatory injunction requiring attorneys to communicate in a particular way.  The Debtors do not support an effort to obtain such unique and unsupported relief concerning its Plan, particularly when the relief is being sought solely by those objecting to it.

10. Lastly, the TCC offers no basis for injecting itself into the proposed communication with AIS clients through a cover letter.  The AIS counsel should communicate with their own clients.  If the Pachulski firm was to be allowed to further inject itself into a communication to the AIS clients through a cover letter, however, then that cover letter should state that the TCC's prior communication delivering the TCC/Kosnoff Communications was sent inappropriately by Pachulski attorneys working with Mr. Kosnoff, was not discussed with or approved by the TCC, should not be read to endorse Mr. Kosnoff's statements or advice or to

have provided any advice about how to vote, and that the TCC takes no position as to how the AIS clients should vote. Further, any responses should be sent to AIS, not Pachulski.

## **CONCLUSION**

11. The Debtors respectfully request that the Court deny the relief requested in the Modified Emergency Motion be denied and grant any such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

| | |
|---|---|
| Dated: December 13, 2021<br>Wilmington, Delaware | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br><br>*/s/ Paige N. Topper*<br>Derek C. Abbott (No. 3376)<br>Andrew R. Remming (No. 5120)<br>Paige N. Topper (No. 6470)<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347<br>Telephone: (302) 658-9200<br>Email: dabbott@morrisnichols.com<br>       aremming@ morrisnichols.com<br>       ptopper@morrisnichols.com<br><br>– and –<br><br>**WHITE & CASE LLP**<br>Glenn M. Kurtz (admitted *pro hac vice*)<br>Jessica C. Lauria (admitted *pro hac vice*)<br>Andrew Hammond (admitted *pro hac vice*)<br>Samuel P. Hershey (admitted *pro hac vice*)<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 819-8200<br>Email: gkurtz@whitecase.com<br>       jessica.lauria@whitecase.com<br>       ahammond@whitecase.com<br>       sam.hershey@whitecase.com<br><br>– and –<br><br>**WHITE & CASE LLP**<br>Michael C. Andolina (admitted *pro hac vice*)<br>Matthew E. Linder (admitted *pro hac vice*)<br>Laura E. Baccash (admitted *pro hac vice)*<br>Blair M. Warner (admitted *pro hac vice)*<br>111 South Wacker Drive<br>Chicago, Illinois 60606<br>Telephone: (312) 881-5400<br>Email: mandolina@whitecase.com<br>       mlinder@whitecase.com<br>       laura.baccash@whitecase.com<br>       blair.warner@whitecase.com<br><br>ATTORNEYS FOR THE DEBTORS AND<br>DEBTORS IN POSSESSION |