# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| | (Jointly Administered) |
| Debtors. | Re: Dkt. 7447, 7459, 7460 & 7601 |

## JOINDER OF THE ZALKIN LAW FIRM, P.C., AND PFAU COCHRAN VERTETIS AMALA PLLC TO THE MODIFIED EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS REGARDING PLAN VOTING ISSUES

The Zalkin Law Firm, P.C., and Pfau Cochran Vertetis Amala PLLC ("Zalkin and Pfau") each respectfully join in the *Modified Emergency Motion of the Official Committee of Tort Claimants Regarding Plan Voting Issues* [D.I. 7601] (the "Modified Motion") filed by the Official Committee of Tort Claimants (the "TCC") in the above-captioned cases (the "Bankruptcy Cases"),[1] which seeks to modify the *Emergency Motion of the Official Committee of Tort Claimants for Entry of an Order Pursuant to Sections 105 and 1103 of the Bankruptcy Code Appointing a Plan Voting Ombudsperson and Granting Related Relief* [D.I. 7447] (the "Initial Motion"). In support hereof, Zalkin and Pfau rely on the *Declaration of Jason Amala* [D.I. 7460] (the "Amala Declaration") filed with the *Joinder of the Zalkin Law Firm, P.C., and Pfau Cochran Vertetis Amala PLLC to the Emergency Motion of the Official Committee of Tort Claimants for Entry of an Order Pursuant to Sections 105 and 1103 of the Bankruptcy Code Appointing a Plan Voting Ombudsperson and Granting Related Relief* [D.I. 7459] and further represent as follows.

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Modified Motion.

In the midst of apparent widespread confusion regarding the voting process in these Bankruptcy Cases among survivors who are clients of the three lawyers who comprise Abused in Scouting ("AIS" and such clients, the "AIS Clients"), Zalkin and Pfau support the TCC's Modified Motion as an effort to provide AIS Clients with clarity at this critical time. This issue of voter confusion first came before the Court on the Debtors' *Emergency Motion for Entry of Order (I) Enforcing Solicitation Procedures [etc.]* [D.I. 7118] (the "Debtors' Emergency Motion"), which prompted Zalkin and Pfau to notice the deposition of one of the AIS attorneys, Timothy Kosnoff. Mr. Kosnoff's deposition took place on Monday, November 22 and revealed pervasive confusion and frustration among AIS Clients and other survivors that goes well beyond the confusion described in the Debtors' Emergency Motion.

Among other issues, AIS Clients are clearly very confused by the conflicting recommendations being transmitted to them from their three separate lawyers, particularly Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. ("ER") and Mr. Kosnoff. Survivors, including numerous AIS Clients, are also confused and frustrated by the manner in which voting is taking place, including those who have been asked to vote via an "E-ballot" app transmitted to them by ER (and perhaps other firms), rather than via the official balloting mechanisms that were approved by this Court's solicitation order. These survivors report concerns with the E-ballot ranging from the fact that the E-ballot contains solicitation messages and is thus not a neutral ballot, to cyber-security issues associated with the E-ballot, to the failure of the E-ballot to accurately record and transmit survivors' votes. Other AIS Clients report concerns with the voting process that go beyond the E-ballot itself, including troubling complaints of harassment and pressure with respect to survivors' voting decisions, to more basic issues such as uncertainty regarding who their attorneys are, how to get in touch with their attorneys, what they stand to recover under the Plan, or what their attorneys recommend with respect to voting on the Plan.

Emails from AIS Clients produced in Mr. Kosnoff's deposition reflect this confusion.[2] One AIS Client expressed confusion about receiving the E-ballot from ER, because he thought AVA Law was his attorney and was not aware of their association, and further stated that when he opened the E-ballot he "was shocked!  The opening diatribe from Eisenberg Rothweiler seemed to me, a layman, wholly inappropriate for its inclusion as part of the ballot.  If it is illegal for a candidate to solicit votes at a polling place, how can this possibly be acceptable in our voting process on a 'ballot that is supposed to be neutral?'"  Kosnoff Depo. Tr., Exhibit 14.  Another AIS Client complained of the "completely unprofessional, unethical, and biased manner in which Eisenberg Rothweiler send out the ballot information."  Kosnoff Depo. Tr., Exhibit 15.  Still another AIS Client complains that the E-ballot contains "a message from atty. Eisenberg suggesting strongly we accept the offer," but contains "no message from [Kosnoff] or Van Arsdale on that ballot suggesting strongly we not accept this offer and for that to be the only opinion on the ballot."  Kosnoff Depo. Tr., Exhibit 16.  An AIS Client complains "How many times are you going to email my username and password?  Don't you feel this is a potential security issue?"  Kosnoff Depo. Tr., Exhibit 18.  Another email states "I got the vote through Eisenberg email though when I tried to reject the terms, I could not type in the other information asked.  The field would not except [sic] any typing. … Each and every vote counts!  Well, no my vote statis [sic] is not registering!  Please Help!"  Kosnoff Depo. Tr., Exhibit 19.  Other AIS Clients also reported "errors" with the ability of the E-ballot to transmit their votes.  Kosnoff Depo. Tr., Exhibit 21.  Another AIS Client states "I've gotten 35 emails already saying take the deal take the deal."  Kosnoff Depo. Tr., Exhibit 23.  Another email from an AIS Client states,

---

[2] The following described emails were introduced as exhibits at the Kosnoff deposition, and were authenticated by Mr. Kosnoff as emails he received from AIS Clients.  The emails contain waivers of the attorney client privilege, which this Court has upheld.  *See* D.I. 7641.  The emails are attached hereto for reference.

regarding the AIS attorneys, "How can you be partners, both organizations working together and one jumps ship? Now working against each other. Is this [l]egal? Vote no, vote yes. Where's our, (client) qualify of professional / fiduciary responsibility?" Kosnoff Depo. Tr., Exhibit 25. Another AIS Client states "I cast my vote already believing Rothweiler statements to be truthful, now I am told by my Attorneys at AIS that Rothweiler has deceived me. … I request you to file a motion with the Court to allow me and others like me who were tricked into casting votes for the plan … be allowed to resend our votes and vote anew." Kosnoff Depo. Tr., Exhibit 27.

AIS may represent as many as twenty percent of the eligible survivor votes on this Plan. It is intolerable that so many survivors are represented by a group of attorneys who have failed to agree on a common method of communicating with their clients that ensures that survivors receive appropriate information. If they disagree on what the message should be—as apparently, they do—they should at least agree on *how* to communicate their disagreements so survivors are not subject to uncoordinated, competing, and inconsistent messages. Since the AIS lawyers have not been able to accomplish even that modest task, the intervention of the Court to ensure a clear and consistent communication to AIS Clients is necessary. The hundreds of responses from confused and/or frustrated survivors that Mr. Kosnoff received when the "E-Ballot" was distributed to AIS clients is ample proof that intervention is necessary.

Although Zalkin and Pfau are cognizant of the Court's concerns both with interfering in the attorney-client relationship and with restraints on First Amendment rights, the Court has inherent authority to supervise attorneys appearing before it. *See De La Cruz v. V.I. Water & Power Auth.*, 597 F. App'x 83, 87 (3d Cir. 2014) ("The district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it.") (*citing United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). In *In re Mirant Corp.*, the Bankruptcy Court for the Northern District of Texas held that an attorney

who represented an ad hoc committee of equity holders violated 1125(e) when he communicated certain information both publicly and to his clients that contained materially misleading and factually inaccurate information about the proposed plan. *See Official Comm. of Equity Sec. Holders of Mirant Corp. v. Wilson Law Firm, P.C. (In re Mirant Corp.)*, 334 B.R. 787 (N.D. Tex. 2005). The court held that the while prior restraint on speech would ordinarily be offensive, misrepresentations of fact or law are not entitled to First Amendment protection. *See id.* at 793.

Zalkin and Pfau believe the relief sought in the Modified Motion would be at least a helpful start in addressing many of these issues. Zalkin and Pfau believe that the confusion that is rampant in the voting process must be remedied and that every effort should be made to avoid the designation of survivors' votes. Both the Debtors and the Coalition have raised the specter of vote designation. *See, e.g.* Hr'g Tr. (Nov. 10, 2021) at 15:4-6 (Mr. Molton: "we reserve the right for other remedies and some of them may be designation of votes of no votes during a period of time before remediation"); *id.* at 30:10-14 (Ms. Lauria: "We may need remedial measures with respect to the votes, themselves, in terms of – and I hate to use the word 'vote designation' when we're talking about survivor individuals…."); *Supplement to Joinder of the Coalition of Abused Scouts for Justice to Debtors' Emergency Motion for Entry of an Order (I) Enforcing the Solicitation Procedures Order, (II) Enforcing Section 1103 of the Bankruptcy Code Against the Tort Claimants' Committee, and (III) Granting Related Relief* [D.I. 7294] at ¶ 21 ("[T]he Coalition reserves the right to seek additional relief regarding the voting process, including the extension of the voting deadline [and] designation of 'no' votes…."). Designation—taking away a survivor's vote—is a drastic remedy, particularly when there is no allegation that the survivors themselves committed any improper act. To be sure, the Debtors and Coalition no doubt had in mind that only those votes cast against the Plan should be designated, as the above-quoted excerpts indicate. But given the confusion and the manner of solicitation, it is not at all clear that

the designation would or should stop there.  In order to avoid the specter that survivors' votes could be subject to designation because of the manner in which the AIS votes are being solicited, Zalkin and Pfau respectfully submit that the joint communication sought via the Modified Motion is necessary to ensure the integrity of the voting process in a manner designed to best prevent the mass disenfranchisement of survivors.

    Accordingly, for the reasons set forth herein, in the Amala Declaration, and in the Modified Motion, Zalkin and Pfau respectfully submit that the TCC's Modified Motion should be granted.

DATED:  December 13, 2021         Respectfully Submitted,

         **BIELLI & KLAUDER, LLC**

By:  */s/ David M. Klauder*
     David M. Klauder, Esquire (No. 5769)
     1204 N. King Street
     Wilmington, DE 19801
     Phone: (302) 803-4600
     Fax: (302) 397-2557
     Email: dklauder@bk-legal.com

     KTBS LAW LLP
     Thomas E. Patterson (p*ro hac vice*)
     Daniel J. Bussel (p*ro hac vice*)
     Robert J. Pfister (*pro hac vice*)
     Sasha M Gurvitz (p*ro hac vice*)
     1801 Century Park East, Twenty-Sixth Floor
     Los Angeles, California 90067
     Telephone   310-407-4000
     Email:  tpatterson@ktbslaw.com;
           dbussel@ktbslaw.com
           rpfister@ktbslaw.com
           sgurvitz@ktbslaw.com

     *Counsel to each of The Zalkin Law Firm, P.C.,*
     *and Pfau Cochran Vertetis Amala PLLC*