UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 20-10343(LSS) |
| BOY SCOUTS OF AMERICA AND | . |  |
| DELAWARE BSA, LLC, | . |  |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtors. | . |  |
| . . . . . . . . . . . . . . . . | . | December 14, 2021 |

TRANSCRIPT OF VIDEO HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:   (On the Record)

| For the Debtors: | Derek C. Abbott, Esq.<br>MORRIS, NICHOLS, ARSHT<br> & TUNNELL, LLP |
|---|---|
|  | Jessica C. Lauria, Esq.<br>WHITE & CASE, LLP |
| For the U.S. Trustee: | David Buchbinder, Esq.<br>OFFICE OF THE U.S. TRUSTEE |
| For the Ad Hoc Committee<br>of Local Councils: | Richard Mason, Esq.<br>WACHTELL, LIPTON, ROSEN & KATZ |
| For the Coalition of Abused<br>Scouts: | David Molton, Esq.<br>BROWN RUDNICK, LLP |

(Appearances Continued)

| Audio Operator: | Electronically Recorded<br>by Brandon J. McCarthy, ECRO |
|---|---|
| Transcription Company: | Reliable<br>1007 N. Orange Street<br>Wilmington, Delaware 19801<br>(302)654-8080<br>Email: gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA ZOOM:  (Continued)

For Century Indemnity
Co.:                        Tancred Schiavoni, Esq.
                            O'MELVENY & MYERS

For the Zalkin Law Firm, PC,
et al:                      Thomas Patterson, Esq.
                            KTBS LAW, LLP

For the AIG Companies:      James Hallowell, Esq.
                            GIBSON, DUNN & CRUTCHER

For the Roman Catholic and
Methodist Ad Hoc
Committees:                 Jeremy Ryan, Esq.
                            POTTER, ANDERSON & CORROON, LLP

For Ponil Ranch:            Thomas Horan, Esq.
                            COZEN O'CONNOR

INDEX

                                                          Page

STATUS CONFERENCE                                          4

PRETRIAL CONFERENCE PONIL RANCH ADVERSARY PROCEEDING      31

MODIFIED EMERGENCY MOTION OF THE TCC RE:  PLAN VOTING     32

1        (Proceedings commence at 10:00 a.m.)

2            THE COURT:  Good morning.  This is Judge

3    Silverstein.  We're here in the Boy Scouts of America

4    bankruptcy, Case 20-10343.

5            I'll turn it over to debtors' counsel.

6            MR. ABBOTT:  Thank you, Your Honor.  Good morning.

7    Derek Abbott of Morris Nichols here for the debtors.

8            Your Honor, we have, although a lengthy agenda on

9    paper, only a couple of matters going forward.  Your Honor,

10   I'll first turn it over to Ms. Lauria to address the Court on

11   some recent developments, if I may.

12           THE COURT:  Thank you.

13           Ms. Lauria.

14           MS. LAURIA:  Thank you, Your Honor.  Good morning.

15           I'm pleased to be here today because we have

16   finally achieved what I can only describe as a "monumental

17   breakthrough" in the Chapter 11 case.

18           The FCR, the debtors, the coalition, the Ad Hoc

19   Committee of Local Councils announced last night that they

20   reached an agreement with Mr. Schiavoni's client, Century,

21   and Ms. Forshaw's client, the Chubb Companies.  That

22   agreement was memorialized in termsheet that was filed

23   attached to a mediator's report yesterday evening.

24           As an aside, Your Honor, we discovered one error in

25   the mediator's report, not in the termsheet itself, so we re-

1    filed it this morning, but the deal remains the same.

2    This agreement with Century and the Chubb companies

3    increases the settlement trust to over $2.6 billion.  This is

4    enormous value to survivors of sexual abuse in these Chapter

5    11 cases; and, indeed, this is the largest settlement fund in

6    history for abuse survivors.

7    We worked very hard with the parties that I just

8    mentioned to put this together, and I thank all of them and

9    Mr. Gallagher for their efforts.

10    Just to run down a few specifics, although of

11    course that settlement is not before the Court today, the

12    Century and Chubb Companies will be contributing $800 million

13    to the settlement trust.  The debtors and the local councils

14    will be selling their Chubb/Century policies back to Century

15    and Chubb.  And Century and the Chubb Companies will be

16    designated as settling insurers under the plan and as

17    protected parties under the plan.

18    But there's more than just that, Your Honor.  As

19    the Court is well aware, there is tremendous

20    interconnectedness between the Boy Scouts, the local

21    councils, and the chartered organizations.  And nowhere is

22    that more apparent than in the debtors' and the local

23    councils' insurance policies, where the chartered

24    organizations are arguably additional insureds under many, if

25    not most of those policies.  So, in order to unlock the

1    tremendous insurance value, like what we just achieved in the

2    context of Century and the Chubb Companies, we also need to

3    come up with a resolution for chartered organization issues.

4          So, not only does the Century structure provide a

5    resolution with Century and the Chubb Companies, but it also

6    provides a mechanism for most chartered organizations to

7    receive full protection for scouting-related abuse claims

8    under the plan.  We've achieved that because the local

9    councils have agreed to contribute another $15 million to the

10   trust, so they've agreed to increase their five-hundred-

11   million-dollar trust contribution to $515 million.  And

12   they've also agreed to increase the Delaware statutory trust

13   note -- this is the hundred-million-dollar note that they

14   were effectively funding -- they've agreed to increase that

15   note from $100 million to $125 million.  So that's an

16   incremental forty additional million -- 40 million additional

17   dollars to the trust to help facilitated the chartered

18   organization protection.

19         In addition, the Boy Scouts and the local councils

20   have agreed to an additional potential payment of up to $100

21   million.  That was would be split 75/25 BSA/local councils.

22   That would be attributable to future growth and BSA

23   membership on account of the chartered organizations'

24   continued sponsorship of scouting units and support for the

25   mission of scouting.  That's, again, just a tremendous

breakthrough, not only on the insurance side, but also on the

chartered organization side.

Now I did say, Your Honor, that this resolves most

of our chartered organization issues.  There is a basket of

issues that it doesn't resolve, and that is principally with

respect to the Roman Catholic Church and the United Methodist

Church, for their pre-1976 uninsured liability.  We haven't

resolved that yet.  We are -- but I say "yet" because we are

still continuing to work very hard with United Methodist and

the Roman Catholics.  And the Boy Scouts -- and I think I can

speak for Mr. Mason, as well -- look very much forward to

continuing to negotiate and mediate with those parties, so we

can get a full and final resolution for them, as well.

We're also continuing to mediate with insurers.  So

I hope this is not the last one of these announcements.  I

don't think it will be.  But certainly, this will be what I

think is a monumental moment in these Chapter 11 cases.

What I'd like to do, Your Honor, is just briefly

address our game plan for moving forward on the Century

chartered organization settlement that I just mentioned, and

that's going to require me to go back in time a little bit.

You'll recall -- and the debtors have said this

since the outset of this case -- that our goal was to achieve

exactly these types of resolutions, whether it was early in

the case or late in the case.  And we constructed the plan,

1    the disclosure statement, and the solicitation procedures to

2    take into account just this type of resolution, reflecting, I

3    think, the very strong bankruptcy policy that settlements are

4    favored and that we'd like to minimize our time before the

5    Court when it comes to the confirmation hearing.  So the

6    disclosure statement was very clear that the debtors were

7    continuing to mediate and negotiate, and that the debtors

8    expected additional settlements.

9         You'll recall we had back-and-forth at the

10    disclosure statement hearing concerning a hyperlink that was

11    included in the direct abuse claims ballot; it was on Page 2

12    of the ballot, where the ballot indicated to parties that the

13    debtors were continuing to mediate and negotiate, and that

14    there may be additional protected parties.  It instructed

15    voters to go to the hyperlink.  It was an easy hyperlink, I

16    did it myself this morning, typed it into my web browser.

17    And there is a tab in that hyperlink that provides parties

18    with notice that there may be additional protected parties

19    that are added to the plan.  And you'll recall we had a

20    colloquy about the fact that we listed all of the chartered

21    organizations.  There was also a listing of all of the non-

22    settling insurance companies with a very clear indication

23    that these parties could potentially become protected

24    parties.

25         So, consistent with that and the disclosures that

1    were in the disclosure statement about this, what we would be

2    inclined to do, Your Honor, is to send a notice out to the

3    voting -- actually, the 2002 list and the voting creditors of

4    the mediator's report.  We do need to file some plan

5    amendments to effectuate the terms of the Century settlement.

6    But we think, once again, these are plan amendments that were

7    contemplated by the original solicitation.  And we will, of

8    course, serve those out on all parties-in-interest.

9            So we wanted to bring that to the Court's attention

10   and the other parties' attention, if they hadn't seen it on

11   the docket.  And with that, Your Honor, unless you have any

12   questions, that concludes my update for the Court.

13           THE COURT:  Thank you.  No, I don't have any

14   questions.  I will say I'm not sure I fully appreciate the

15   seventy-five/twenty-five-million-dollar additional

16   contribution, but I haven't had a chance to read the

17   termsheet yet.  So I don't have any questions at this point.

18   Thank you for the update.

19           MS. LAURIA:  Thank you, Your Honor.

20           MR. MASON:  Your Honor, Richard Mason.  May I be

21   heard very briefly?

22           THE COURT:  Mr. Mason.

23           MR. MASON:  Yes, thank you, Your Honor.  Richard

24   Mason, Wachtell, Lipton, Rosen & Katz, for the Ad Hoc

25   Committee of Local Councils.

1    I just want to echo what Ms. Lauria said and to

2    thank the parties involved in an intensive, round-the-lock

3    negotiation under mediation, and thanks to Mr. Gallagher, in

4    particular, for the many, many weeks and months that it took

5    to bring this deal together.

6    As Ms. Lauria indicated, when you add it up, the

7    deal is a total of up to $940 million -- that's 800 million

8    from Century, another $40 million that the ad hoc committee

9    will be recommending to local councils -- of course the ad

10   hoc committee has been the mediation party, not the local

11   councils themselves, so we weren't able to roll this out

12   before the announcement.  But that 40 million would be $15

13   million in addition cash at the closing and a twenty-five-

14   million-dollar addition to the non-recourse note.  We have

15   every reason to believe that the local councils will be able

16   to do that, and we're beginning the explanation tour.

17   Literally, it began last night.

18   That last piece, Your Honor, of the $100 million

19   you'll see in the termsheet, and it's either -- apologies --

20   Paragraph 17 or 18.  If scouting grows by the end of this

21   decade by more than 50 percent, then out of those additional

22   revenue dollars, there is a split-up where a percentage of it

23   goes into the trust up to $100 million.  And that $100

24   million -- and these are happy days because the trust gets

25   more money and scouting is growing, thanks to the BSA, local

1    councils, and our charter partners.  Out of that potential

2    $100 million, it's a 75/25 split, 75 million BSA, 25 million

3    local councils.  Again, we're going to roll this out for the

4    local councils very shortly.

5         And to boot, as Ms. Lauria indicated, critical to

6    the deal was unlocking of course the insurance from Century.

7    Critical to that was dealing with the charter partners'

8    insurance rights.  And so, therefore, we have a proposed

9    global resolution that does provide for release and

10   channeling injunction complete for most of our charter

11   partners, recognizes the insurance rights of the Methodist

12   and Catholic organizations, and gives us the opportunity to

13   address -- continue to address in mediation a potential

14   resolution of their uninsured exposure.

15        So we think it's a terrific result for scouting, we

16   think it's a terrific result for survivors, and we think it's

17   a terrific result for our charter partners, to enable us to

18   get at the insurance and enable the organization to move on.

19        And of course, all of this, Your Honor, as you

20   know, is subject to your consideration at the confirmation

21   hearing.  But I just thought it was appropriate for me to

22   thank all of the parties in this intense negotiation and to

23   play it out briefly from the ad hoc committee's perspective.

24        THE COURT:  Thank you.

25        Mr. Molton.

1          MR. MOLTON:  Thank you, Judge.  Can you hear me?

2          THE COURT:  I can.

3          MR. MOLTON:  Good.

4          I'm not going to take a lot of time, Judge.  I just

5    want to comment about a few things, just thanking all the

6    parties and Mr. Gallagher for 24/7 exhausting mediation

7    sessions that we got through in order to put this, Your

8    Honor, on your desk today.  No small effort by all the

9    parties.

10          I do want to art -- clarify two things that Ms.

11   Lauria said because it's important to survivors:

12          With respect to the 800 million from Century/Chubb,

13   50 million, per the termsheet, will be paid into the trust on

14   the effective date, Your Honor, and the remaining 750 million

15   will be funded thereafter into an escrow and paid on final

16   order into the trust.  So I just wanted to make that clear,

17   Your Honor.

18          And number two, Your Honor, with respect to the

19   fifteen-million-dollar component of the forty-million-dollar

20   component from the local councils that both Mr. Mason and Ms.

21   Lauria talked about, 15 million of that will be added to the

22   $500 million that the local councils will be putting into the

23   trust on the effective date.  Again, that puts cash into the

24   trust on the effective date, again, no small matter for

25   survivors who are waiting to receive their just compensation.

1          I do also want to note, Your Honor, that mediation

2    continues.  And you know, as other people have said, we're

3    not going to slow down.  Thank you, Judge.

4          THE COURT:  Thank you.

5          Mr. Schiavoni.

6          MR. SCHIAVONI:  So, Judge, just very briefly, I do

7    want to thank you, first of all, for listening to us and your

8    extreme patience, I suppose, in listening to me in particular

9    the last year and a half.  I think that was extremely -- I

10   can't -- your -- I just want you to know we heard everything

11   you had to say.  It's also true that we heard everything that

12   Mr. Buchbinder and his office had to say about pursuing

13   mediation.

14         I thought I heard you say at one point, Judge, that

15   you don't know -- you only know 20 percent about what's

16   happening in a case, and you don't know what's -- I think you

17   were sort of suggesting that you didn't know what exactly was

18   happening in the hallway, so that -- or in the mediation, so

19   that that was not a place where you would intervene.  I just

20   want you to know that we heard.  And although, we were -- we

21   felt very strongly about our positions -- and you heard us in

22   court -- we were working extremely hard, you know, behind the

23   scenes to basically try to come up with an answer to a

24   problem that's a Rubik's Cube.

25         And to just give you just one sense of this, there

was a point in these discussions, not in the last two months,

but a little earlier, where the chasm was much larger, where

we had, I think, really given up hope that we had an answer

and we were going on to a full war footing.  And one of the

mediators actually drove to my home in Rhode Island, where I

was at the time, to urge us to come back to the table.  He

was somehow who had worked with the claimants for a very long

time.

He was going to -- he was going to Mass General the

next morning, that's why he was in Rhode Island, where he

faced possible open heart surgery.  As luck would have it,

you know, he was able to get through with a stent.  But you

know, frankly, you know, that sufficiently moved me that it

gave me some ammunition to go back to our client to say to go

back in the line and to continue to push this.

And you know -- and you know, our mediator, as luck

would have it, was back at it two weeks later, and you know,

which shocked us all because, frankly, I thought he was going

to retire.  But he came right back and pushed this forward.

And you know, we continue to meet.  And you know, so I thank

him for his effort.  He's not still -- you know, he's stepped

aside, so to speak, but you know, that's just an example of

just how difficult this really was.

So I -- you know, it's often said in mediations,

probably way too often, that don't make the perfect the enemy

1   of the good.  You know, but there is no case where I think

2   that motto applies more than here.  This -- you know, this --

3   everyone -- you know, the -- our adversaries here are driven

4   by, you know, very legitimate goals and it's very tempting to

5   push for the perfect.

6        This is not everything we would want in a

7   settlement, to be clear.  But you know, I think we've

8   delivered something that we can take to our client.  And I

9   also think it provides a path through to others.

10       So I hope to work with Mr. Patterson and Mr.

11  Pachulski.  I -- you know, we worked with mister -- we did

12  meet with Mr. Stang and his colleagues and talked to them, as

13  well as committee members.  We thought we were getting close

14  with them.  I thought they dealt with us in good faith, and

15  I'm appreciative of that.  I'm sorry we didn't reach a deal

16  with them, ultimately.  But you know, we hold out hope of

17  continuing some dialogue with them.  And I just urge them not

18  to let the perfect be the enemy of the good as we move

19  forward.  Thank you, Your Honor.

20            THE COURT:  Thank you.

21            Mr. Patterson.

22            MR. PATTERSON:  Thank you, Your Honor.

23            Just very briefly because we're all learning this

24  in real time, but the settlement gives the appearance of how

25  my brothers and I used to resolve disputes, which was to

deprive my younger brother of any of the benefits.  And my

older brother and I found that a very congenial and amenable

resolution, and it worked for a fair amount of time.  It's

created some problems in our mid-life, but it certainly

resolved the disputes at the time.

And that's what we have here, Your Honor.  If the

Court has an opportunity to review the settlement termsheet,

the Court will note that there's a new definition of an "opt-

out chartered organization" in Section 13.  And that is an

organization that is not a participating chartered

organization, so it's not one that contributes in its

indemnity claims and so forth, and it's not a contributing

chartered organization, so it's not one that's making a

settlement payment.

And with respect to that opt-out chartered

organization, that opt-out chartered organization is entitled

to receive the benefit of the settling insurer policy

injunction and the release of all abuse claims that are

covered under insurance policies issued by the settling

insurers on the release date.  So that is the BSA policies,

that is the shared policies, that is the local policies.  And

that is separate policies that the Century insurers may have

issued to one or more of the 40,000 chartered organizations

under a conventional CGL policy program.

And I would just note that there's a document --

1    and I regret, Your Honor, I don't have a docket number for

2    it.  I was looking for it.  But the Court may recall, during

3    the disclosure statement process, that there was a plain

4    language insert that was distributed along with the

5    solicitation package, and it's entitled "Summary and

6    Frequently Asked Questions."  And on the very last page of

7    that, there's a helpful table.  And the last question of the

8    frequently asked questions is:

9         "Can I still sue parties other than the Boy Scouts

10   to recover my abuse claims?"

11        That would be a good question.  And there's a table

12   of parties who may be sued by survivors after confirmation of

13   the plan.  And I'll just try to do this, but the Court will

14   note that the first ten or so, eight or ten in the column are

15   no.  You can't sue the Boy Scouts, you can't sue

16   participating chartered organizations, except for, you know,

17   certain claims.  You can't sue non-settling insurance

18   companies, so all these things that you can't sue.

19        But the two entities you can sue is a non-

20   contributing chartered organization against which you may

21   have a claim and the non-contributing chartered

22   organizations' insurers; that is, the separate insurance

23   issued by an insurance issue in favor of a chartered

24   organization.

25        So we'll look at the disclosure that is done -- I

1    suppose that's one important issue -- and the press release

2    that the coalition issued yesterday, publicizing the

3    settlement in advance of it being on the docket.  There was a

4    lot of trumpeting about the $800 million, but there was

5    nothing about my little brother.  And similar in the

6    description that the debtors gave of the settlement today,

7    there was a lot of trumpeting of the $800 million and a

8    rather elliptical reference to resolution of the charter

9    organization issue, which my brother and I would describe as

10   the manner in which we resolved the dispute over the

11   remaining piece of dessert.  And so the claimants are

12   obviously left in the cold.

13        We will continue to evaluate this, Your Honor, not

14   drawing lines in the stand.  But as things presently stand,

15   this is an atrocious outcome for survivors who, given the

16   extremely paltry distributions contemplated under the plan,

17   could at least in some cases look to suing responsible

18   chartered organizations and their separate insurers to

19   recover for the injustice and harm that they suffered.  That

20   has now been destroyed in service of a settlement in favor of

21   the insurance company.

22        And so it's -- and I think it was Mr. Schiavoni, my

23   friend, who said that this case is like a Rubik's Cube, and

24   it is.  But what I would suggest, Your Honor, is that the

25   manner in which it's been solved today lines up all green and

1    all blue and all red for the coalition, for the debtor, and

2    the insurers, but the survivors' side still has some jumbled

3    colors.  We will continue to work on this, Your Honor, but as

4    presently constituted, I doubt this will be acceptable.

5    Thank you, Your Honor.

6                    THE COURT:  Thank you.  Mr. Hallowell.

7                    MR. HALLOWELL:  Good morning, Your Honor.  Can you

8    hear me okay?

9                    THE COURT:  I can.  Good morning.

10                    MR. HALLOWELL:  Jim Hallowell from Gibson, Dunn &

11    Crutcher on behalf of the AIG Companies.

12                    Your Honor, as a status update, we want to bring to

13    your attention that AIG, together with a group of other

14    insurers, plan to file a motion seeking an adjournment of the

15    confirmation hearing by at least four weeks from the current

16    scheduled date of January 24th, 2022.  The parties met and

17    conferred on this request yesterday, but could not reach

18    agreement.  We'll get the motion on file today.

19                    Given the urgency of the relief we're requesting

20    and the effect on the schedule, we would ask that you

21    consider a hearing on this motion as early as this week, if

22    Your Honor has any availability.

23                    I won't get into a lot of detail on the grounds for

24    the motion, Your Honor, but suffice to say, when you first

25    put the scheduling order in place, it was with the

understanding that the schedule was extremely tight and would

only be feasible with the full cooperation of all the

parties.  And ultimately, that hasn't happened.  And it's

simply become apparent now, despite the insurers' best

efforts to work through the various discovery delays, that

the existing schedule is simply unworkable for all the

parties.  Leaving the current schedule in place will preclude

plan objectors from fully developing and presenting the

evidence and arguments that the Court appropriately should

consider at the confirmation hearing.

We will detail the issues in our motion, but I want

you to understand the seriousness of the delays and the

situation that the parties and particularly the insurers are

dealing with.  Document production was supposed to have been

completed on November 5th.  And while the insurers

substantially complied with that deadline, the debtors have

produced 38 volumes of documents with all but 9 of those

volumes of documents, not counting the recent production of

ballots, coming after the November 5th deadline.  The most

recent production by the debtors was December 11th.  These 29

volumes of documents make up roughly 57 percent of the

debtors' total production.  And that production, Your Honor,

is massive.  Nearly a million pages of documents have been

produced by the debtors alone after the substantial

completion deadline.

1    Fact discovery was supposed to close by December

2    1st, but as of today, we have key depositions going forward

3    late next week, including a debtors' 30(b)(6), the

4    coalition's 30(b)(6), and the TCC's 30(b)(6).  That means

5    that key witnesses from key parties in this case will not

6    even go forward until a few days before Christmas.

7    Now, on top of that, Your Honor, we have a series

8    of law firm and aggregater depositions that this Court

9    recently ruled should go forward and are yet to be scheduled

10   largely because we need relevant documents to be produced

11   before the depositions can go forward.  And none of this is

12   the fault of the insurers, Your Honor.  We've been diligent

13   in seeking this discovery from the law firms for weeks now.

14   Expert discovery is similarly piling up, Your

15   Honor.  Fifteen expert reports were filed and additional

16   rebuttal reports will be filed on December 24th, Christmas

17   Eve.  The schedule only provides until January 9th for

18   depositions and experts.  Given the Christmas holidays and

19   the need to review the expert material before depositions,

20   we're looking at something like four expert depositions per

21   business day.

22   Your Honor, the list goes on and on, but I won't

23   belabor the point now.  But we do think the time has come, as

24   you've repeatedly stated, for us to raise this issue with you

25   and for you to decide whether this compressed schedule should

1    continue or whether you should briefly extend it by four

2    weeks or so to allow due process and fundamental fairness to

3    the objectors.

4            As I mentioned, Your Honor, we're ready to get the

5    motion on file today and we'll work with your scheduling

6    clerks and the parties, so that hopefully we can have it

7    heard this week.

8            I'm happy to answer any questions that you have.

9            THE COURT:  Thank you.  I don't have any questions.

10   I'll review the motion when I get it.  I don't need a

11   response by everybody to that request.

12           Mr. Pachulski.

13           MR. PACHULSKI:  Thank you so much, Your Honor.

14   Your Honor, hopefully, you hear me okay.

15           THE COURT:  Yes.  Good morning.

16           MR. PACHULSKI:  Thank you.  So good morning, Your

17   Honor.

18           I do want to comment quickly on two separate

19   issues:  One that Ms. Lauria and the other parties raised

20   with respect to the Century settlement, and I actually want

21   to spend maybe a minute on Mr. Hallowell's request because I

22   was on the meet-and-confer yesterday.

23           Your Honor, I -- while I understand Ms. Lauria

24   states that the number is high, being 800 million plus,

25   somewhere between eight hundred and 900 million, depending on

1  how you do the math, if you do the math *vis-a-vis* the per-

2  survivor amount, it's actually, we think, monumentally low.

3  But that's really not for today.

4          I think, for today, there are really two issues,

5  one that Ms. Lauria raised and one that Mr. Hallowell raised.

6  And that is what happens with respect to the confirmation

7  hearing.

8          The TCC, while its had its disputes with the

9  various parties, actually was very much in favor of going

10  forward on January 24th.  But I think two issues have been

11  raised today:

12          One is -- and Mr. Patterson has raised it in some

13  degree with respect to the settlement -- is that these are

14  material modification.  Now Ms. Lauria -- and I haven't had

15  an opportunity to review this termsheet.  I've had an

16  opportunity to review Hartford, for instance, but not the

17  Century.  But it changes a great deal in the plan.

18          And I think, at some point, Your Honor has to make

19  a determination as to when the motion -- the plan amendment

20  should be filed and heard because, if it is material -- if

21  they are material modifications, if they weren't so clearly

22  provided for in the plan, then Your Honor is going to have to

23  continue the confirmation hearing because there may have to

24  be some form, whatever that might be, of re-solicitation.

25  Now, again, that's not before Your Honor today, but we have

1    to deal with that issue.  And so I would ask Your Honor to

2    set that.

3            With respect to Mr. Hallowell, I made very clear in

4    the meet-and-confer yesterday that I did not have any

5    authority from the TCC to either agree with their motion or

6    disagree, aside from the fact that we didn't even have a copy

7    of it.  But I have a pretty good sense as to what is going to

8    be said in the motion.

9            But what is clear is there will be at least 15

10   expert depositions.  There are additional fact witnesses

11   coming up.  We will be seeking depositions because we think

12   the mediation was compromised based on Your Honor's ruling

13   last week reflecting that.  And we believe that there will

14   likely be discovery with respect to voting issues.  So we

15   have to assess all of that and the TCC wants our view on it.

16           But the one thing that we are in favor of, both

17   with respect to the plan amendments and Mr. Hallowell's

18   client's motion, is that it should be heard -- both of them

19   should be heard much sooner than later because the next few

20   weeks will be a monumental grind.  If this is going to be

21   continued, we should know it sooner than later.  If it's not

22   going to be continued, we should know it sooner than later.

23   I'm not here to argue Mr. Hallowell's motion, I'm not here to

24   argue the plan amendment motion, but I am here to argue that

25   they should all be heard sooner than later.

1          And while people think this is a monumental

2    settlement, the TCC and many survivors do not, when you

3    consider the releases that are now being granted that were

4    not granted initially in the plan and the per-survivor likely

5    recovery.  And with that, Your Honor, I think the rest will

6    be left for another day.

7          THE COURT:  Thank you.

8          Mr. Ryan.

9       (No verbal response)

10         THE COURT:  Mr. Ryan, you're still muted.

11         MR. RYAN:  Sorry, Your Honor.

12         I'm going to leave aside for a moment or for today

13   my clients' collective feelings on being excluded from the

14   largess of the local councils and being singled out in this

15   latest termsheet.  But I did want to echo on a couple of

16   points that Mr. Hallowell has raised, Mr. Patterson has

17   raised, and Mr. Pachulski has raised.

18         The termsheet has substantial changes.  The

19   releases that were discussed in (indiscernible) for the

20   charters are changed as to the Methodists and the Catholics.

21   That concerns us greatly.  The implications for a charter's

22   own insurance policies and whether they choose to settle or

23   not and what is being done (indiscernible) those policies

24   concerns us greatly.

25         Most importantly, Your Honor, though, the

1    definition of "abuse change" -- "abuse claim" has been

2    expanded from what was in the plan.  And I raise this, Your

3    Honor, because we're struggling.  We're struggling to

4    reconcile the definitions in the plan with Your Honor's

5    comments in September about what the scope of a release is,

6    and we struggle because we don't know.

7              And it would aid us greatly, and I think it would

8    aid a lot of parties greatly to know what the scope is of an

9    achievable release.  It would aid us in our settlement

10   discussions to know if what is being proposed can be achieved

11   or if it can't be achieved.  It would aid, I believe, all of

12   the parties in this proceeding to have some clarity on that

13   now.

14             I saw through a three-week trial in Purdue, Your

15   Honor, where every day it opened with Judge Drain negotiating

16   with the plan proponents about the scope of their release.

17   Every day, it was telling them to scale it back and scale it

18   back.  Half of the trial was consumed with the scope of those

19   releases.

20             I can only tell you that it would aid my clients

21   greatly in deciding whether to settle and whether to accept

22   some of the conditions of the Century termsheet if we knew

23   that the releases being proposed can be achieved and approved

24   by this Court; or, if we're going to have that, maybe we have

25   that as a gating issue because I think Mr. Patterson and his

1    clients and Mr. Pachulski and his constituency also need to

2    know that.  Thank you.

3              THE COURT:  Thank you.

4              Ms. Lauria.

5              MS. LAURIA:  Your Honor, I understand your comments

6    that -- I take it you do not want to hear argument on this

7    today, and I appreciate that.  I do want to just briefly,

8    though, make a couple of quick points for not only the

9    Court's reference, but also for the parties' reference.

10              First, I understand that AIG is going to be filing

11   a motion to extend the confirmation time line.  It sounds

12   like the TCC and potentially even two ad hoc committees of

13   chartered orgs may support that.  I would like to just remind

14   everyone that this time line was established months ago

15   because of the debtors' liquidity position and the adverse

16   impact that this bankruptcy case is having on survivors of

17   sexual abuse.

18              Originally, we had hoped to emerge from bankruptcy

19   at the end of January.  And if we had done that, the Boy

20   Scouts themselves would have been in a position to contribute

21   $26 million to the trust.  Now, optimistically, we're looking

22   at a February emergence.  That's assuming we maintain the

23   January 24th confirmation hearing date.  And at the end of

24   that February emergence, we're looking at eleven-million-

25   dollar contribution to the trust.

1   If this bleeds into March for emergence from

2   bankruptcy, there will be zero cash from the Boy Scouts of

3   America to contribute to the trust.  It will all be eaten up

4   by the administrative costs of these Chapter 11 cases and,

5   namely, professional fees that will be expended to continue

6   to litigate with Mr. Hallowell, Mr. Patterson, Mr. Ryan, and

7   Mr. Pachulski.  We do not believe that's in the best

8   interests of the survivors or the mission.

9   And in fact, to fund that incremental month of the

10  case, the Boy Scouts would be in a position where we would

11  need to start selling the assets that are right now being

12  contributed to the trust.  So it's not only we're going down

13  to zero cash, but we would have to sell the assets that would

14  otherwise go to the trust to fund the cases.

15  So we have all worked very hard to maintain this

16  time line, including the insurers, who are suggesting they

17  want to extend it.  And I would suggest that, for the benefit

18  of survivors who are also dependent upon payments from the

19  future of scouting under the plan, that everyone work very

20  hard to continue to maintain this time line because, quite

21  frankly, Your Honor, we don't have a choice, we have to

22  maintain this time line.

23  With respect to the termsheet, the debtors are

24  happy to talk to any of the advisors that are present today

25  at the hearing, many of whom have actually seen this

1    termsheet on a number of occasions.  But we're happy to talk

2    to anyone about the termsheet.  And in particular, the change

3    to "abuse claims," frankly, Your Honor, was intended to

4    conform it to records -- to the record at the disclosure

5    statement hearing, to ensure that it's only related to

6    scouting claims, that we're not trying to release abuse

7    claims that have nothing to do with scouting and to otherwise

8    conform it to the plan.

9         But that's not for today, Your Honor.  As I've

10   noted and others have noted, I would only say that, again, as

11   we've observed many times in this case, starting with Your

12   Honor, the phone works two ways.  And we are very happy to

13   have a conversation with anyone that reaches out to us about

14   the terms of the Century deal.

15        THE COURT:  Thank you, Your Honor.

16        Mr. Buchbinder.

17        MR. BUCHBINDER:  Excuse me, Your Honor.  Good

18   morning.  David Buchbinder on behalf of the United States

19   Trustee.

20        I do want to compliment the parties on what does

21   appear to be a big moment in the case, but I would like to

22   make a couple of observations.

23        Our office did have some discussions with the

24   debtor several weeks ago about the prospect that there could

25   be some big announcements around this time.  And one of the

1    concerns we expressed to the debtor at that time was the

2    particular -- I'm going to use the word "feelings," even

3    though that might not be the right word -- feelings of the

4    82,500 abuse survivors in this case, who are the main focus

5    of this case.

6         Many of the hundreds, if not thousands of letters

7    that have been written to the Court express deep trust

8    issues.  And one of the concerns we expressed to the debtor,

9    even under these very positive circumstances, is that these

10    people be given a chance and an opportunity to change their

11    vote with proper disclosure.

12         All of the -- I've read the termsheet, and I do

13    want to compliment the parties.  One aspect of it I think

14    does require additional disclosure.  And my suggestion this

15    morning would be to add to the list of items Ms. Lauria

16    checked off at the beginning of the -- at the beginning of

17    her comments would be some additional disclosure on

18    projections of the potential $100 million because the

19    termsheet is quite confusing in that paragraph.

20         And I want to thank Mr. Mason for pointing out that

21    it could be another $100 million at the end of the decade.

22    So there's a big swing there and there's 8 more years in the

23    decade.  If there are projections of the likelihood of those

24    funds being paid into the trust, those should be included in

25    whatever additional materials are provided to the voting

1    parties.

2                    And having said that, I thank you, Your Honor.

3                    THE COURT:  Okay.  Thank you.

4                    Let's get to the agenda.  Mr. Abbott.

5                    MR. ABBOTT:  Thank you, Your Honor.

6                    I think, in terms of efficiency, Your Honor, there

7    was one adversary proceeding agenda on today, it's at the end

8    of the docket.  But I think it should be very brief and I'd

9    like to get that out of the way first, if we may, Your Honor.

10                    THE COURT:  That's fine.

11                    MR. ABBOTT:  Your Honor, that's the Ponil Ranch

12   adversary proceeding against the Boy Scouts.  It relates to

13   various real property rights at Philmont Scout Ranch.

14                    Your Honor, the parties have been talking and are

15   continuing to talk.  They have agreed to extend the date by

16   which the Boy Scouts must answer, move, or otherwise respond

17   until January 14th, subject to further extension if there are

18   meaningful advances in the settlement discussions.

19                    Your Honor, what we'd like to do is simply push the

20   pretrial conference until the next omnibus hearing after

21   that, which I believe is February 24, at which time, assuming

22   that -- well, we'll know whether there's been meaningful

23   settlement discussions or not and would hope to propose a

24   schedule for the litigation, if not, on that date, Your

25   Honor.

1          I believe Mr. Horan is online and represents the

2     plaintiff, so I'm happy to have him correct anything I've

3     misstated, Your Honor.

4          THE COURT:  Mr. Horan.

5          MR. HORAN:  Good morning, Your Honor.  Thomas Horan

6     for Ponil Ranch.  I have nothing to add to Mr. Abbott's

7     remarks.

8          THE COURT:  Okay.  Thank you.

9          I reviewed, quickly, the complaint and encourage

10    the parties to talk.  And I will grant the continuance and

11    the extension of time.

12         MR. ABBOTT:  Thank you, Your Honor.

13         Your Honor, that brings us on the agenda to Agenda

14    Item Number 10, which is the modified motion of the TCC, Your

15    Honor.  So I'll turn the virtual podium over to Mr.

16    Pachulski.

17         THE COURT:  Mr. Pachulski.

18         MR. PACHULSKI:  Thank you so much, Your Honor.

19    Richard Pachulski of Pachulski, Stang, Ziehl & Jones on

20    behalf of the TCC.  And again, Your Honor, I thank Your Honor

21    for giving us the opportunity to argue this motion today.

22         I'd like to begin, Your Honor, because there's a

23    piece of this motion that I find somewhat ironic, at lease

24    the replies, and most of what I'm going to respond to today

25    will be the replies that came in yesterday.  We would have

1    filed -- I'm sorry -- the objections came in yesterday.  We

2    would have file da reply, but considering the timing, most of

3    it will have to be in my oral argument.

4         The argument that's made is almost, in many cases,

5    less a defense of what -- how the AIS is kind of operating

6    with its client base, but more, again, an attack of our firm.

7    And so, to some degree, the TCC, even though I've made it

8    very clear that the TCC had nothing to do with the Kosnoff

9    letter.  And so the main argument is we should not get our

10   relief because of the items that our firm did.

11        Now, Your Honor, the reason I find that odd is that

12   -- the whole argument that we're trying to deflect.  If I

13   wanted to avoid having my firm trashed, which is basically

14   the vast majority of each of the pleadings, I wouldn't have

15   filed the motion, I wouldn't have recommended it to the TCC

16   because then there would be no ability to do that.  So the

17   fact is the motion was not filed to deflect.  It was filed

18   because I've taken seriously for 42 years my fiduciary duty

19   and my ethical duties.

20        I take them seriously enough that, for instance, a

21   year ago, even though there was the member of a committee who

22   had -- in the Neiman Marcus case, who had actually done an

23   admirable job on the committee, he had done something

24   inappropriate, which I had to report, not something that I

25   had any joy in doing, and it was a great disappointment

1  because it was not something that I ever thought I would have

2  to do.

3            And I've had other issues that I've had to deal

4  with in my career which were beneficial to the client, but

5  frankly, not beneficial to our firm.  And this is one of

6  those cases where the argument and the filing of the motion

7  was -- now drudged up everything that happened about six

8  weeks ago being the main argument.

9            But Your Honor, one of the reasons that we filed

10  the motion is because I know from experience, both being

11  before Your Honor several times and also because of other

12  cases that our firm is involved with, that Your Honor is very

13  serious about the fiduciary duty and the ethical duties of

14  processionals.

15            Now, Your Honor, I want to cite three specific

16  examples of that in this particular case.  One was last week,

17  when Your Honor simply didn't rule on the emails that were

18  produced in Mr. Kosnoff's deposition, but you commented on

19  the informed consent, which Your Honor is right.  Lawyers

20  have a great duty of making sure that you just don't ask the

21  client, but you also advise the client of what their

22  responsibilities are.  Your Honor was cognizant of it, Your

23  Honor stated it, and Your Honor made clear what the

24  ramifications may be.

25            The second, at that same hearing, Your Honor, is

1    the disqualification of the mediator because of his also

2    serving as a special reviewer.  Now, Your Honor, I appeared -

3    - I would have appeared at that hearing, anyway, but Your

4    Honor had ordered lead counsel to be there.  I assumed you

5    may ask us what our position was with respect to the special

6    reviewer.  If asked, I would have told you that we hadn't

7    been asked, that the mediation stipulation was very clear,

8    and that we felt that we -- the TCC would have to make a

9    final determination, but what had been done may have

10   completely compromised the mediation process, which has cost

11   literally millions and millions of dollars.  And as I stated

12   after -- before this hearing began, the TCC has already

13   determined that it will have to make a -- have to seek

14   discovery on whether the mediation has been completely

15   compromised because of what was included in the plan

16   supplement.

17        The last issue, Your Honor, that Your Honor has

18   made very clear, in terms of ethical duties, is at the

19   disclosure statement hearing, before I got involved in this

20   case, where, if you look at the transcript on September, I

21   think, 23rd, Page 168 -- and this gets right to the issue

22   that we're dealing with today -- if you look at Lines 14

23   through 20, Your Honor says as follows:

24        "And yes, I recognize that I cannot police people's

25   ethical -- whether they follow their ethical obligations or

1    not.  But there may be a consequence if what I see in front

2    of me suggests that we had a problem, and I'm going to deal

3    with it in voting."

4           That's where we are right now, Your Honor.  The way

5    AIS has dealt with their clients completely independent of

6    whatever our firm might have done is what Your Honor has to

7    deal with today.  But Your Honor's simple issue today -- or

8    two issues are:

9           Number one, does Your Honor have the power to

10   require the AIS lawyers to do anything at all because of the

11   fact that they're giving conflicting advice, no coordination,

12   and we believe, as reflected on the docket and Mr. Kosnoff's

13   production, that the clients are angry and that the clients

14   are confused?  And Your Honor will have to make a decision

15   one way or the other whether you have the power.

16          The second is:  Even if you have that power, should

17   you do it?  So today's hearing is not about what our firm

18   might have done or did do, it is not about the mediation,

19   whether it's been compromised.  It's about can you and should

20   you do something about the AIS situation.  And I believe that

21   the answer for both of those questions is an affirmative yes.

22          Now what are we asking for, Your Honor?  Number one

23   -- and I'll get to it in a second -- is some cover letter, so

24   the clients know what they get.  And I will -- that -- the

25   cover letter has been quite controversial in the pleading and

I'll respond to that when I respond to other parts of the
objection.  We're simply asking that the party -- that the
three lawyers provide one-page position papers, however they
deem fit, not being ordered how to draft it, just to draft
it; information how to obtain a ballot, since there seems to
be a great deal of confusion by the AIS clients; and frankly
-- and this answers a different issue that I'll also address
-- that each client has the right to reach out to any lawyer
they choose.  If they want to reach out to Mr. Kosnoff or Mr.
Rothweiler or Mr. Van Arsdale, that is their call.

So I'd first like to raise what I call the
"miscellaneous issues," and then get into some specific
issues that were raised by the coalition in particular.

First issue, Your Honor, the cover letter.  There's
been a lot said that, because of what the TCC said, there --
they shouldn't be sending this letter, which I am completely
fine with.  I just think the clients should get something
that says why they are receiving the letter.  I think,
frankly, the -- Omni could send it out.  I, frankly, think
the people who should send it out are the AIS lawyers.  They
should come up with a very simple letter, this is what you're
getting because the Court has ordered it.  The debtor could
send it out.

So we're not -- we put a form because we thought it
would be helpful, but it's become fairly another trigger

1    point.  And we don't want to be part of that.  If people

2    don't want the TCC to send it, that is fine.  We just think

3    someone should send it, as compared to just sending something

4    without context.

5           Second issue, Your Honor, AVA has stated several

6    times in their pleading that, somehow, this is an

7    inappropriate sanction.  We're not asking -- in no place in

8    either the original motion or the modified motion did we say

9    this is a sanction.  We're saying this is the way to correct

10   a problem.  So we, in no way -- and I want to make it clear

11   on the record.  We, in no way, see this as a sanction.  We

12   think it's necessary to keep the integrity of the voting

13   process and to avoid the designation of votes.

14           THE COURT:  If it's --

15           MR. PACHULSKI:  I have --

16           THE COURT:  -- not a --

17           MR. PACHULSKI:  -- said clearly --

18           THE COURT:  -- sanction -- if it's not a sanction,

19   Mr. Pachulski, what is it?

20           MR. PACHULSKI:  It's a requirement to comply with

21   an ethical duty.  I don't think it's a sanction.

22           THE COURT:  Well, and what -- and maybe you're

23   going to get to this.  But what authority do I have to

24   mandate that a lawyer do something?  Because we did take a

25   look at this because I didn't see any authority in the

1    motion.  And you didn't cite me to any case which required --

2    where a court required a lawyer to take an affirmative action

3    and make a statement to his client.

4              What we do see when we look at what a court can do

5    are revoke a *pro hac*, disqualify counsel, monetary fine, some

6    other kind of sanction -- let me see -- disbarment, private

7    admonition, public reprimand, suspension.  Those are the

8    kinds of things we see for ethical violations.  Nobody has

9    cited --

10             MR. PACHULSKI:  Your Honor --

11             THE COURT:  -- me to a case, and certainly the

12   committee hasn't cited me to a case where a court can order

13   an attorney to take an action because of a violation of an

14   ethical duty --

15             MR. PACHULSKI:  Your Honor --

16             THE COURT:  -- assuming it exists.

17             MR. PACHULSKI:  Oh, I'm sorry, Your Honor.  I

18   apologize if I interrupted.

19             THE COURT:  You're fine.

20             MR. PACHULSKI:  Your Honor, I'll get to that.  I

21   was going to get to it during my argument, but if you want me

22   to jump to that, I'm happy to do it.

23             THE COURT:  Yeah, let's jump to that because I

24   think --

25             MR. PACHULSKI:  Okay.

1          THE COURT:  -- that's the gating issue as to what I

2     can do if I were --

3          MR. PACHULSKI:  Okay.

4          THE COURT:  -- inclined to do anything.

5          MR. PACHULSKI:  Okay.  That's fair, Your Honor.

6          I don't -- I think there is no question and it's

7     broad that Your Honor has, based on the Chambers decision and

8     the De La Cruz decision that is cited -- the Third Circuit

9     decision that's cited by Mr. Patterson, that Your Honor has

10    the inherent authority to supervise the professional conduct

11    of the lawyers.  There's no question about that, particular

12    in this case where it affects the voting, the very

13    reorganization.

14         Now the Court also has the disciplinary

15    jurisdiction under Your Honor's local rules.  Well, what is

16    very clear is that, under Model Rule 1.4(b), a lawyer has to

17    explain to -- a matter to a client to the extent necessary to

18    make informed decisions.

19         Now I understand EC 512 -- I'm sorry -- ER 5.12 is

20    not in effect, but it is valid guidance.  And you have three

21    lawyers --

22         THE COURT:  Let's go back.

23         MR. PACHULSKI:  -- who were given --

24         THE COURT:  Let's go back to, again, what I can do.

25    Tell me what the Chambers decision -- which you didn't cite

1    to me -- says I can do.

2             MR. PACHULSKI:  I --

3             THE COURT:  What happened in that case?

4             MR. PACHULSKI:  Your Honor, the Chambers decision

5    provides for -- and that is one we did cite, Your Honor.  And

6    the Chambers decision says that Your Honor has inherent

7    authority to do what is necessary with respect to the

8    effective litigation or promotion of any particular case.

9             THE COURT:  And what was the result of that case?

10   What did that case -- what was the sanction or other order

11   issued in that case?

12            MR. PACHULSKI:  I'm -- I'd have to go back and

13   look, Your Honor.  I believe that the -- and I can take a

14   quick look.  I think the sanction -- it was actually a

15   specific sanction in the case, that the Court had the

16   inherent authority to grant sanctions because of activity,

17   but I don't have that right in front of me, Your Honor, to be

18   frank.

19            THE COURT:  Okay.  Because I -- we've looked at

20   what -- the Third Circuit actually has some rules on this,

21   and none of it suggests I can force a lawyer to do something.

22            MR. PACHULSKI:  I -- Your Honor, I think that, in

23   any inherent authority, you can force a lawyer to comply with

24   their ethical duties.  I mean, I think that the Court has

25   disciplinary jurisdiction to do that under your own rules.

1          THE COURT:  Actually, it's really interesting, and

2     it's not the federal rules, it's the Delaware Courts.  But

3     the Delaware Courts are very clear that, in fact, a trial

4     court cannot do what you're suggesting and that, in fact,

5     only the Delaware Supreme Court can issue a sanction.  And

6     again, what we're talking about is a reprimand, a public

7     sanction.  I can disqualify someone from appearing in front

8     of me, that's true, I could revoke a *pro hac*, those kinds of

9     things I can do.

10          But I don't think anybody cited me a case, and we

11     certainly didn't find one, that said --

12          MR. PACHULSKI:  Your --

13          THE COURT:  -- I can mandate that a lawyer send a

14     letter to his client under any circumstances.

15          MR. PACHULSKI:  Your Honor, I believe that, in the

16     -- in light of the fact that Your Honor controls the

17     solicitation and the voting process, if -- instead of

18     designating votes, I think Your Honor has the ability, based

19     on your inherent authority -- and Your Honor may disagree --

20     to require, not that a specific thing is sent, but that a

21     general -- that the lawyers have to send out what their

22     position is in a format that is understandable to their

23     client.

24          THE COURT:  Well, okay.  So do I then have to make

25     sure every lawyer sends out something that I think is

1  understandable to their clients?  How do I know that any

2  other lawyer has done that, in this case or any other case?

3          MR. PACHULSKI:  Your Honor, if your determination

4  is under Model Rule 1.4(b), that a lawyer has not -- has

5  created a situation where the client is either confused or

6  has ineffective information to make an informed decision,

7  Your Honor would do that.  This is the only instance that I

8  know of that, because there are three lawyers representing a

9  group of clients, that that situation has come out.

10         If it came out that another lawyer either isn't

11  responding to clients and simply appearing before Your Honor,

12  and the client is not making informed decisions, Your Honor

13  would then have the jurisdiction to do something, whether

14  it's to sanction them, whether to pull the *pro hac*, whether

15  to instruct them, you -- I believe Your Honor can instruct

16  them to speak to their client.

17         THE COURT:  I --

18         MR. PACHULSKI:  I don't -- which is an affirmative

19  act.

20         THE COURT:  Yeah.

21         MR. PACHULSKI:  So --

22         THE COURT:  But you haven't cited me to anything

23  even close to this that suggests I have that authority.

24         But let's run with this.  So we know that Mr.

25  Rothweiler sent out a communication to his client.  We know

1    that -- we know that Mr. Kosnoff sent out communication to

2    his client.  Mr. Van Arsdale says AVA law already transmitted

3    those letters.  So they have the -- before them the position

4    of each of those law firms, don't they?

5           MR. PACHULSKI:  Your Honor, the clients, as

6    reflected by both the documents that have been filed with the

7    Court and the doc -- and the emails reflected in the Kosnoff

8    production don't -- can't even figure out who their lawyer

9    is.  Some of them think that it's Mr. Kosnoff, some think

10   it's Mr. Rothweiler, some think it's Mr. Van Arsdale.  I

11   mean, frankly, Your Honor, in my entire career, I've never

12   seen anything like this, where three lawyers represent

13   multiple clients and they disagree and are simply sending

14   letters, in some cases every day, saying please vote a

15   certain way, as compared to trying to make it understandable

16   to avoid the voting confusion --

17          THE COURT:  Okay.  So what you --

18          MR. PACHULSKI:  -- which will --

19          THE COURT:  -- want me to order them to do is send

20   another communication to their clients that I'm not going to

21   control and nobody is going to tell them what to say, and you

22   think that's helpful.

23          MR. PACHULSKI:  I think that -- Your Honor, I think

24   it's absolutely helpful.  If they write a letter saying the

25   three of us represent -- that the Court has ordered the three

1   of us to state our positions simply so that you can make a

2   determination because we collectively are your lawyers, then,

3   yes, I think that is going to correct the voting confusion --

4               THE COURT:  How does --

5               MR. PACHULSKI:  -- as compared -- sorry, Your

6   Honor.

7               THE COURT:  You know, I think -- and I've read --

8   reread these handful, relatively speaking, of communications,

9   relative to the number of clients.  Okay?  And most of them -

10  - you said -- you actually said this, clients are angry or

11  confused.  I think they're mostly angry, and I think they

12  mostly fully understand that they have two lawyers who are

13  giving them conflicting positions and they're angry about it.

14  Many of them, though, are very strident nos.  They're not

15  confused about how they want to vote.  They're just angry

16  that they either are continuing to get communications that

17  they don't want or they're angry because their lawyers

18  disagreed, but they understand that, maybe not every one of

19  them.  But really, we're -- again, we're tlaking about a

20  handful here on a relative scale.  So I'm not sure they're

21  confused.  I think they're angry.

22              MR. PACHULSKI:  Well, Your Honor, I think some are

23  confused, and particularly about the balloting because they

24  don't know whether the balloting is working, how to get a

25  ballot.  I think there's confusion beyond just the -- beyond

1   just the statements.

2           And again, Your Honor, I don't think that there is

3   -- let's face it.  If -- most of these individuals probably

4   have not had to retain a lawyer before because this is an

5   unusual situation.  And they've now retained lawyers who

6   essentially tell them different things.  They have no idea

7   what they should be following, whether they voted yes or no.

8           THE COURT:  And so what is this going to do?  So

9   now they're going to get a communication that says we still

10  don't agree and here are our different views.  And by the

11  way, I don't think you can do -- I don't see how you possibly

12  inform your client in a one-page communication how to vote on

13  this plan.  Okay?  That doesn't happen.  You can tell them

14  your position, but you can't give them -- you can't help them

15  make an informed decision with one page.  There are too many

16  things that have to happen.

17          There has to be personalized communication for

18  people to understand their situation, if that's what they

19  want.  Every person has to make a decision based on their

20  unique circumstances.  And how is a one-page communication

21  going to inform someone how to vote?

22          MR. PACHULSKI:  Your Honor, it's interesting you

23  say that, but there are communications right now, without

24  dealing with the individual issue, that says you should not

25  opt in to the $3,500.  It doesn't matter who you are.  So, if

1    anything, there's clearly confusion because it's one size

2    fits all, which isn't the case with the opt-out.

3           THE COURT:  Well, that's not -- that is not a

4    function of these three law firms.  Okay?  So what I'm

5    focused on is what authority I have to do, what you want me

6    to do, and we've seen none.

7           MR. PACHULSKI:  Your Honor --

8           THE COURT:  Second is --

9           MR. PACHULSKI:  I'm sorry.

10          THE COURT:  Second is:  What would this accomplish?

11   And I don't see it accomplishing anything so far because, as

12   I said, I think people are more angry than confused at their

13   situation.

14          And third, I really don't understand how it's the

15   committee's issue.

16          MR. PACHULSKI:  Your Honor, I'll tell you -- let me

17   -- why don't we -- I'll work backwards.  It's the committee's

18   issue, Your Honor, because we're trying to avoid a voter

19   designation.  And we think the way this has been handled,

20   particularly if it's an ethical violation -- and there are a

21   variety of issues, some not before Your Honor, on this

22   motion, including the fact that the coalition has found

23   themselves to -- a deal with respect to Hartford and Century

24   without, undoubtedly, consulting their clients because they

25   have clients who have voted no.  And how they would bind

1   themselves is a different issue.

2          But they're -- we're trying to -- the TCC has made

3   it clear they do not want survivor on survivor.  That's one

4   of the major reasons we filed this because the TCC does have

5   standing with respect to the voting issues and voting

6   designation.

7          THE COURT:  I'm going to --

8          MR. PACHULSKI:  So that's --

9          THE COURT:  -- have to deal with those issues if

10   and when they arise.  And I don't necessarily think that

11   violation of ethical -- professional ethics, assuming it

12   happened, equates to voter designation.  I don't know what it

13   equates it.  I don't think it necessarily equates to that and

14   we'll have to deal with that when and if it happens.

15          I think sending yet another communication, when we

16   already sent one -- yeah, let's take the committee totally

17   out of this.  You're asking me to get involved in a

18   communication between a lawyer and a client.  I don't view it

19   as a solicitation, and you didn't cite me anything that says

20   it's a solicitation, as opposed to just giving their clients

21   advice, and you don't like the way they're doing it and maybe

22   you don't like the advice they're giving.

23          MR. PACHULSKI:  Your Honor, so I'll make it clear

24   because it's one of the thing that I was going to address

25   that -- before Your Honor wanted me to go forward and give

1    you the authority, is one of the arguments that's being made

2    is we don't like the advice they're giving.  Your Honor, the

3    advice that we've given in these letters is one person will

4    say vote yes, one will say vote no, and the third will say

5    vote your conscience.  I don't think that's going to direct

6    people how to vote.  They're going to go with whoever they're

7    going to go with, but at least they'll see what their three

8    lawyers have to say.

9         We're not trying to change anyone's vote or get

10   anyone to vote, even though we believe that the vote should

11   be no, we're not trying to get vote no through this process.

12        THE COURT:  I think --

13        MR. PACHULSKI:  That just --

14        THE COURT:  -- that clients have seen what their

15   counsel have to say.

16        MR. PACHULSKI:  Your --

17        THE COURT:  They've seen the letter from Mr.

18   Rothweiler, they've seen the letter from Mr. Kosnoff, and

19   they have a decision to make.  And they're going to see --

20        MR. PACHULSKI:  Your Honor --

21        THE COURT:  -- another letter, under what you want,

22   they're going to see another letter from Mr. Kosnoff and

23   another letter from Mr. Rothweiler.  They're still going to

24   get conflicting advice and they're going to have to figure

25   out what they're going to do.  I'm not saying it's an ideal

1    situation, far from it.  But how does sending yet another

2    letter to individuals who you say are already confused un-

3    confuse the situation.

4         MR. PACHULSKI:  I think it explains why they're

5    receiving conflicting advice from people that they've hired

6    who would give them the same -- I think what -- you hire a

7    lawyer, or even more than one lawyer, you assume that you're

8    going to get advice that is at least somewhat consistent.

9    And if you're not getting consistent advice -- because this,

10   I think, is clear from some of the letters -- you should be

11   told why.

12        And Your Honor, it's not ideal, and the TCC felt

13   that we should to fix it, not to get people to vote no or to

14   vote yes or to not vote, but to just understand it.  And if

15   Your Honor's view is that Your Honor does not have authority

16   and that, even if you did, you wouldn't exercise it, then we

17   -- the TCC tried to resolve what is a less-than-perfect

18   situation, far less.

19        This is not, as has been said before, the perfect

20   is the enemy of the good.  We're not even good here.  And so

21   we were trying to repair it, we were trying to do the right

22   thing.  That was my view coming into the case, that this was

23   a mess, and that it was an easy way to just at least get on

24   one package the information to the clients.  But if Your

25   Honor's view is that there isn't authority and your view is

1    that you shouldn't do it even if you had it, then we won't

2    pursue it.

3           THE COURT:  My view is --

4           MR. PACHULSKI:  If --

5           THE COURT:  -- you haven't cited me to any

6    authority.  I asked for it very specifically and I read your

7    motion very carefully, and I see no authority for the type of

8    relief, which is, in essence, sort of a mandatory injunction

9    that -- see no authority where -- that you've cited to me

10   under these types of circumstances or anything similar that

11   the Court can do what you're asking me to do.

12           And again, you're not -- you don't even want me to

13   mandate content.  You want me to mandate a form of

14   communication.  And again, I'm not sure a one-page -- I would

15   hesitate to --

16           MR. PACHULSKI:  Right.

17           THE COURT:  -- put my imprimatur on a one-page

18   communication that would suggest that the Court thinks that

19   that's an appropriate way and a sufficient way to communicate

20   with clients regarding this complicated plan.

21           MR. PACHULSKI:  Your Honor, it doesn't have to be

22   one page.  I mean, we thought it could be.  I think I could

23   draft it in one page so it was not confusing.  But if other

24   people think -- we're not looking for a restraint on free

25   speech.  If they want to make it five pages, we just think

1   it's better if it goes in one package, so someone gets to

2   read it, and not getting bombarded with separate position

3   papers.

4           THE COURT:  But see, that's different.  Now you

5   want me to not only say here's what you can do, but you can't

6   do anything else, you can't continue to communicate with your

7   clients in the way you believe is best to communicate, and

8   you want me to stop what you say "bombarding" clients with

9   communication when some of those clients may appreciate it.

10  I haven't heard from 14,000 plus clients.  I've heard from,

11  as I said, a relative handful of clients.

12          And I am not going -- I've seen nothing that you've

13  provided to me -- forget any responses to the papers, I've

14  seen nothing that you've provided to me that gives me

15  authority to get in the middle of an attorney/client

16  communication.  I'm not getting in the middle of the

17  communications that you have with your clients.  I am not --

18  I don't see, because you've given me no authority to say I

19  can get into the middle of communications between lawyers and

20  clients.

21          I don't consider them solicitations, and you didn't

22  cite me to anything that suggests it is.  And I don't see how

23  sending out this one more communication, quite frankly, is

24  going to prevent any party from making any motion they want

25  on designating, and I'm not encouraging that.  I want every

1   survivor to be able to vote whichever way they want to vote,

2   so that I am most informed when we get to confirmation about

3   survivors' views, but I don't see --

4               MR. PACHULSKI:  Your Honor --

5               THE COURT:  -- how this helps.

6               MR. PACHULSKI:  Okay.  Your Honor, we thought it

7   would -- we're not trying to interfere.  If, after that, as

8   we've stated, someone wants to call their lawyer, any of the

9   three, the lawyers want to send something after, we're trying

10  to just put it all together in a single package, so it's

11  clear.  Your Honor clearly doesn't believe there's the

12  authority, you don't believe we've cited it, we believe we

13  did, but Your Honor doesn't, which is the most important

14  factor.  And we don't -- and Your Honor seems to think that,

15  even if you did have authority, you wouldn't exercise it,

16  which, you know, as always, I respect Your Honor's decision,

17  what it may be, whether it's something I agree with or not.

18  So, at that point, it's -- I don't want to push the issue

19  because it's very clear where Your Honor is coming from.

20              THE COURT:  Okay.  Well, I'm just looking back at

21  your papers.  I don't see a citation -- maybe I'm missing it.

22              MR. PACHULSKI:  Chambers is -- if it's Chambers,

23  it's cited on Page 6, Your Honor.

24              THE COURT:  Oh, that's a U.S. Supreme Court case.

25  Extensive discussion of Federal Court's inherent powers.

1    Yeah, I have inherent powers --

2            MR. PACHULSKI:  That's -- Your Honor --

3            THE COURT:  -- but --

4            MR. PACHULSKI:  -- you do.

5            THE COURT:  -- but they're not to do like

6    everything in the world.

7            MR. PACHULSKI:  No, Your Honor, it's to correct

8    wrongs that are going on.  And if there -- if you believe

9    there was an ethical violation, you have a right, in your

10   inherent powers, beyond simply granting sanctions.

11           THE COURT:  I'd like to really know where that

12   comes from.  The Dyer case, which you cited, which I did

13   read, in fact, reversed and said that the Bankruptcy Court,

14   even though they found a wilful and bad faith violation of

15   the automatic stay, could not impose punitory -- punitive

16   damages as a sanction.  So the Court can't just do anything.

17   And that's just damages, that's not any kind of mandatory

18   injunctive type relief.

19           So the general notion that I have inherent powers,

20   of course, of course.  But -- no, I was looking at your

21   papers for authority.  And again, we've looked at many

22   different things.

23           We found -- let's see -- the District Court rule,

24   in terms of attorney discipline, the Court can impose

25   sanctions as the circumstances warrant, including private

1  admonition, public reprimand, suspension, or disbarment.

2  That's Rule 83.6.

3  The Third Circuit rules, rules of attorney

4  disciplinary enforcement approved by the Court on July 1,

5  2015.  Discipline may consist of disbarment, suspension from

6  practice, monetary sanction, removal from the roster of

7  attorneys eligible for appointment as court-appointed

8  counsel, reprimand, other sanction.

9  The American Bar Association Model Rules for Lawyer

10  Disciplinary Enforcement.  Rule 10, misconduct shall be

11  grounds for one of the following sanctions:  Disbarment,

12  suspension, probation not in excess of two years, reprimand,

13  admonition by disciplinary counsel, restitutions to persons

14  financially injured, disgorgement of all or part of a

15  lawyer's or a law firm's fee, limitation by the Court on the

16  nature or extend of the respondent's future practice.

17  So those are the kinds of sanctions that are

18  appropriate for violation of disciplinary rules, assuming

19  there was one here.  But we were looking for something that

20  would give us a sense of what's appropriate in a

21  circumstance.  And just inherent powers doesn't give me the

22  power to do anything.

23  MR. PATTERSON:  Your Honor, may I be heard on this

24  issue?

25  THE COURT:  Mr. Patterson.

1          MR. PATTERSON:  I apologize for interrupting, but

2     just -- and I'm not trying to step on Mr. Pachulski's toes,

3     but this is obviously the focus of the discussion at the

4     moment.  So Tom Patterson for the Pfau and Zalkin firms.

5          Your Honor, the way I see it is perhaps a little

6     different.  The Court's solicitation procedures set up a

7     variety of instructions, guardrails, and mandates with regard

8     to the transmission of information that the Court has

9     approved to the claimant.  And as part of the solicitation

10    process, the Court does have authority to oversee every link

11    in that chain.

12         If the Court found that there were a lawyer who

13    wasn't forwarding aspects of the disclosure statement --

14    disclosure package to their clients wilfully, I believe the

15    Court could, as part of its authority to oversee the

16    solicitation process, instruct the lawyer to do so or

17    sanction the lawyer for not doing it.

18         And that solicitation process -- and that's not to

19    say that what is being communicated is or isn't a

20    solicitation.  But the entire process of collecting the

21    votes, of approving information, transmitting information,

22    collecting ballots and recording ballots is an entire process

23    over which the Court has, I would say plenary authority.

24         And if the Court found that there was a lawyer who

25    was misbehaving in connection with that, either not complying

with the stated solicitation procedures, ignoring its

mandates, or in case there was a lacuna, committing an act of

misconduct with regard to that chain, I think the Court could

oversee it and remedy it.

Now this is an odd case because the question is

perhaps not so much whether there is affirmative misconduct,

although I think that there is an argument that they have a

duty to coordinate under the ethical considerations.  But

leaving that aside, the what should the Court do:  Does the

Court have authority to regulate the manner in which and the

kind of information that is transmitted?  Yes, as part of the

solicitation process, and if the Court determined that a

lawyer was giving knowingly false advice, if it happened to

learn that.

Now, in most cases, the Court wouldn't have the

opportunity to learn that.  In this case, the Court has

learned it because there's three separate lawyers and the

clients are complaining and waived the privilege.  So, if the

Court found that there was wilful misconduct in connection

with the manner in which the solicitation materials were

provided, the Court could remedy it, and I think that that is

the authority that the Court has here.  It is the power to

regulate the lawyers who appear before it, but it is in

connection with the role that they play in the solicitation

procedures that the Court has established.

1          So I just thought it might be helpful, Your Honor,

2     to give my perspective on this, which is perhaps a slightly

3     different angle than the one that the Court has been

4     considering.

5          So I appreciate that.  But does that mean, for

6     example, that I could tell Mr. Kosnoff not to tweet because I

7     think his tweets are -- don't follow my solicitation order,

8     and that I could say, sorry, no tweeting, I think -- I don't

9     approve of the content and I think it's an improper way to

10    communicate with your clients?

11         MR. PATTERSON:  I think, Your Honor -- I think that

12    the Court could, if the Court concluded, determined that the

13    tweets were part of the solicitation process and that the --

14    that solicitation was false and -- you know, and that the

15    Court has authority under 1125 to order relief.  It could

16    order him not to tweet, other than, you know, as the SEC

17    ordered with respect to Mr. Musk, that he submit his tweets

18    in advance, so that, if something is knowingly false or

19    incorrect or inaccurate, that it could be vetted before it

20    went out.  I think the Court would have the authority to do

21    that.

22         THE COURT:  Well, nobody cited me that --

23         MR. PATTERSON:  I think the --

24         THE COURT:  -- me to that kind of authority.  And

25    my concern is that -- my concern is that -- I understand

1    where you're coming from, Mr. Patterson.  But this is clearly

2    a difference in advice.  Okay?  This is clearly lawyers

3    advising their clients.  It's happening in the context of

4    solicitation, but it's lawyers giving advice to their clients

5    about the plan and how they should vote and how they view it.

6    And the issue is not -- as I'm even hearing it -- the advice.

7    It's the method in which they're communicating it.  And I'm

8    not regulating any other parties' communications with their

9    clients.  And I dare say every lawyer on this -- at this

10   hearing would be offended if I did.

11          So, yes, if I thought this was truly solicitation,

12   if this were come -- and it's a distinction I made between

13   the TCC communication and these individual lawyers'

14   communications.  The TCC communication of Mr. Kosnoff's email

15   I viewed as a solicitation, I think it was.  That was not

16   advice to their clients, and that I corrected.  This is

17   advice from lawyers to clients and an unusual situation.

18          But again, I think the clients are more angry than

19   confused.  That's my assessment of the emails that I read

20   that were provided.  I do think they understand their lawyers

21   disagree and the lawyers are not going to coalesce around a

22   position.

23          And so I think the rule -- the cannon that Mr.

24   Pachulski cited to, which I did go back and read, I think the

25   emphasis there was more on authority between client and

1    lawyers than among lawyers.  It was emphasizing that the

2    client has the ultimate decision-making authority.  And when

3    lawyers disagree, the client makes that decision.  I think

4    that was the essence of the cannon, if you will.  And that's

5    what the clients have to do here in what I would characterize

6    as an unfortunate situation.

7         But for me to step in and order lawyers to

8    communicate with their client in a certain fashion -- and

9    quite frankly, only in that fashion because, if, afterwards,

10   they're allowed to do whatever they want, then, again, what

11   have we done, what have we corrected -- how does that -- how

12   does that work?  We've corrected nothing.  We've got now

13   another communication with the imprimatur of the Court.  I

14   don't know.  Which suggests that this communication is more

15   important than others they're getting from their lawyers?

16        MR. PACHULSKI:  No, Your Honor.  It's Richard

17   Pachulski.  It's not that it's more important, it's that it

18   clarifies it.  After that, if each of the lawyers want to

19   send something and the letter said you may be getting

20   separate letters, but this gives you their position and you

21   can figure it out afterwards, I think that makes the point.

22   And I think the point is we're not trying to stop anyone from

23   sending it afterwards, per se.  We're saying put it in a

24   letter because, in some respects, some of it probably does

25   extend to solicitation, if you're sending nine or ten that

1    don't give any facts, it's just vote no because that's a good

2    thing.  That's more of a solicitation.  That's not advice.

3    That's not trying to --

4              THE COURT:  How are --

5              MR. PACHULSKI:  -- assist in --

6              THE COURT:  -- they not --

7              MR. PACHULSKI:  -- informed --

8              THE COURT:  -- following --

9              MR. PACHULSKI:  -- consent.

10              THE COURT:  -- up with their client to make sure

11    they voted, if they want to vote?  You know, it's --

12              MR. PACHULSKI:  I don't --

13              THE COURT:  It's -- I had somebody in front of me a

14    couple of months ago on something, I think it was Mr. Slater,

15    and I think it was his letter that said, from September to

16    November on the proofs of claim, they were following up with

17    their client, and two months is often not enough time for

18    these clients to react.  So how about the idea that they're

19    just following up to make sure their clients are reacting and

20    making sure their clients are voting if they want to vote.

21              And I think it's important that everyone get to

22    vote.  I don't want someone not to vote because they forgot

23    or they didn't know how or they didn't remember the deadline.

24    I don't think it's a bad thing to have lawyers reminding

25    their clients they need to vote.

1          I'm not blessing repeated communications.  But I am

2     also not going to stop repeated communications or say there's

3     anything wrong with repeated communications, particularly

4     with individuals and given what I've heard in the past about

5     communications.

6          MR. PACHULSKI:  As I said, Your Honor, I think Your

7     Honor has made your position very clear, specifically that

8     you don't believe you have authority, but even if you did,

9     you don't want to interfere with the attorney/client

10    relationship.  And if there are issues that have come up,

11    we'll raise it at the voting process and we'll not pursue

12    this.  I understand it, Your Honor.  I think you've made it

13    very clear where you stand on it, and we'll deal with it in

14    terms of the voting discovery, to figure out whether it's

15    crossed the line or not.

16         THE COURT:  And people should weigh carefully what

17    issues they want to raise.

18         MR. PACHULSKI:  We understand that, Your Honor.  I

19    assume everyone else does.

20         THE COURT:  Okay.  Well, I don't need to hear from

21    anybody else.  I'm denying the motion for all of the reasons

22    that have been part of the discussion, mainly because I asked

23    for specific authority and didn't get any that says that I

24    can order the type of relief that's being requested here, or

25    independent research on what types of sanctions are available

1   for a violation of a disciplinary rule does not suggest that

2   anything along these lines is appropriate.

3            I don't consider this solicitation.  I consider

4   this attorney/client communications in which this Court

5   should hesitate to get involved.

6            I also, based on the -- I've said "handful," but

7   I'm going to say it's 20 to 25 communications, or even

8   counting the letters I have received, which do admit of some

9   confusion, that versus 15,000 clients, I'm not sure that

10  confusion reigns as much as anger over their situation.  And

11  I don't see how the proposed relief would lessen any

12  confusion, nor do I think it would prevent motions to

13  designate, if someone is so inclined to file them.

14           We are two weeks in front of the voting deadline,

15  and what's happened to date versus the two weeks going

16  forward I don't think is going to change anybody's mind on a

17  motion to designate, unfortunately.  So I don't see this as

18  solving a problem or lessening litigation.

19           I had one other thought and I lost it.  So, while

20  it is not -- as I said, it is not an ideal situation, if the

21  lawyers cannot come together on their own to communicate

22  jointly with their clients, I do not see how or why I should

23  mandate that they do so.

24           Again, let me say, to the extent that there are

25  survivors at this hearing, which there usually are, and/or

1    this gets reported out somewhere, which it usually does, I

2    would encourage every survivor to vote.  I would encourage

3    every survivor to reach out to their counsel with any

4    confusion they have over voting or what position they should

5    take.  And I would encourage and suggest, of course, it's

6    required that every counsel respond to every one of their

7    clients and provide them with the best counsel that they can

8    on their situation.  And that's all I have.

9            MR. PACHULSKI:  Thank you, Your Honor.

10           THE COURT:  Thank you.

11           Mr. Abbott.

12           MR. ABBOTT:  Your Honor, that concludes the items

13   that were on the agenda and obviously some that were off the

14   agenda.  So we appreciate the Court's time, as always.

15           THE COURT:  Thank you.  Thank you to everyone.

16   We're adjourned.

17           COUNSEL:  Thank you, Your Honor.  Thank you, Your

18   Honor.  Thank you.

19        (Proceedings concluded at 11:35 a.m.)

20                              * * * * *

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of my

5      knowledge and ability.

6

7

8

9

10     _____      December 14, 2021

11     Coleen Rand, AAERT Cert. No. 341

12     Certified Court Transcriptionist

13     For Reliable