



FILED

2021 DEC 16   AM 8: 44

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

December 3, 2021

Hon. Laurie Selber Silverstein
U.S. Bankruptcy Court
District of Delaware
824 Market Street; 6th Floor
Wilmington, DL  19801

**SUBJ:  BSA BANKRUPTCY CASE; 20-10343 (LSS) - LETTER TO JUDGE FROM VICTIM - JOINDER WITH PARTIES IN DOCUMENTS 7427, 7437, 7439, 7441, 7443, 7447, 7477, 7533, AND OPPOSITION TO 7515**

Dear Judge Silverstein;

I'm claimant ▮ on Debtor's current list - ▮ on the Omni list. I wrote in August, and again in October to express my utter dismay with the course of this case. I note that my October letter has never been filed with the clerk, so a copy of that letter has been attached on the assumption that the mail-eating trolls which live under the bridges between Georgia and Delaware feasted on its contents.

There is one reason for my correspondence today - the ever growing controversy related to the AIS attorneys, and my intention to join with parties as noted above and within this letter.

I'm one of the many claimants who are incarcerated, and as you may or may not be aware, most inmates [especially in prison systems which do not pay inmates for labor] have some sort of "hustle" to provide an income. Given my age and background as a college professor, I have tended to get recruited to help less literate inmates with their legal work. I don't do a lot of this "writ writing," but my reputation as being one of the more competent "jailhouse lawyers" has gotten around, so I regularly get requests from others to either take over their cases or at least assist them as they represent themselves. One such request came from an inmate at another institution a few months ago.

The individual at this other institution ▮ reached out to me because he was confused about what was going on with the case, and was frustrated by the fact that his attorney was simply not very responsive. While I advised him that he needed to communicate with his retained attorney, I attempted to keep him up to date with the latest news in the case ▮ is represented by Adam Van Arsdale [AVA] and the AIS mini-coalition, and he is not at all pleased with the fact that in spite of 40% of whatever settlement he receives going to AIS, he is unable to get straight answers from AVA.

For example, ███ was abused in Hawaii in the 1970s. ███ has been asking AVA about filing a lawsuit in Hawaii naming the perpetrator, sponsoring organization, and Aloha Council ever since he signed the representation contract, but has never received any response. Beyond that, AVA had made several misstatements on the proof of abuse claim filed with OMNI, and ███ wanted to know if this could be corrected. After AVA failed to take corrective action with either of these situations, I put ███ in contact with the TCC, and helped him through the process of amending his claim through the link provided by the TCC. After researching the Hawaii statute of limitations, I advised ███ to contact the local superior court in Honolulu to obtain the forms necessary for him to file a pro se lawsuit - even though his claim is probably time-barred due to AVA's failure to act prior to the statutory deadline earlier this year. Given the fact that ███ claim is near the top of the TDP claim valuation listing, AVA's failure in this regard is potentially no small matter.

My October letter was written shortly after having addressed the above matters with ███ He also told me about having received an email from Timothy Kosnoff recommending that he vote against the plan. ███ was not upset or offended by having received this letter, but he was quite confused about why he had never heard anything from AVA, and had not received a solicitation package from either AVA or OMNI. I asked ███ to forward the Kosnoff email to me [purely out of curiosity], and again advised him to contact AVA, the TCC, and OMNI about the lack of solicitation package from AIS or OMNI.

After reading the October 18, 2021 email from Kosnoff to ███ and other AIS clients, I sent an email to Kosnoff telling him how I came to receive his email, and stating that I agreed with what he had recommended in the email. We exchanged a couple of emails during the next several days, during which time I composed and provided him with a copy of my October 20, 2021 letter to you, he replied to say that he had been trying to get across the same points concerning the BSA for well over a decade, and that he had gone so far as to attempt to get Congress to wake up and take the situation seriously over a decade ago. I responded by relating my similar unsuccessful attempts as commander of an incarcerated military veterans association to get any part of officialdom to respond to an almost identical crisis within the prisons concerning almost exactly the same sort of sexual abuse of young men who are only a few years older than the BSA victims. Even though the DOJ is currently investigating the Georgia DOC on precisely this issue, the authorities in the GDC have continued being unresponsive to proposals to help address the problem.

Shortly after the conclusion of my email exchanges with Kosnoff, I contacted the TCC [PSZJ attorney Steve Golden] to express my conclusion that the BSA is not capable of being reorganized in such a manner as to protect kids because of its organizational structure. A copy of my October 20, 2021 letter was attached to my email. Mr. Golden acknowledged receipt of the email and forwarded it to TCC co-chairman Doug Kennedy, who responded to my comments by saying that the TCC had long ago decided that it would not seek the elimination of the BSA, but intended to focus on: [1] maximizing compensation to victims; [2] holding the local councils & sponsoring organizations accountable; & [3] emphasizing the need for more robust youth protection by the reorganized BSA. We went back and forth several times with neither of us able to convince the other as to the TCC's last goal.

███ contacted me again to advise that he had finally received his solicitation package, but that he was unable to vote, and he was extremely concerned that he received his package not from OMNI or AVA, but from the Eisenberg-Rothweiler law firm, and he had started receiving emails from Kenneth Rothweiler pretty much demanding that he vote to accept the plan. I again told him how to obtain a ballot directly from OMNI, and advised him the contact AVA to insist that he be able to cast his ballot

directly. I contacted the TCC to express my concern that there were serious problems with the voting process, and I told ▮▮ that he needed to write to you about his experiences.

At almost the same time that the BSA was raising a stink about the TCC having accidently emailed a Kosnoff letter to non-AIS claimants, I was surprised to receive an email from Rothweiler providing a link to a letter from him pretty much insisting that the AIS clients needed to all vote to accept the plan because there won't be any settlement otherwise. Now, your honor, I know that I'm not a lawyer, but I have been involved in two prior bankruptcies as a creditor, and I know for a fact that what Rothweiler was telling me and who knows how many others is simply not true. And I also know that Rothweiler had less than no business communicating anything to me since I am not his client, and I am proceeding pro se. It doesn't even matter if the Rothweiler email was sent to me accidently - it was a clear violation of the Court's orders concerning the way votes were to be solicited, and was definitely a breach of ethics.

I contacted James Stang of PSZJ to "weigh in" on the entire "Kosnoff Kerfuffle." I pointed out that I had served as a voting monitor in third world countries and that the voting process has been a mess even when compared with what I observed in those places decades ago.

- Omni "accidently" sent solicitation packages to victims whose lawyers demanded that they vote by different methods [master ballots, etc.], and then invalidated the votes received directly from those victims.

- AIS clients received modified solicitation packages from Rothweiler instead of from their own attorneys. Rothweiler was bombarding AIS clients with missives essentially demanding that they vote for the plan.

- The BSA was making all sorts of accusations about the PSZJ lawyers and the TCC, while utterly ignoring the greater improprieties from OMNI, the Coalition, and Rothweiler - including the fact that even I had received an email from Rothweiler as discussed above.

- I reported the fact that the OMNI e-ballot procedure was screwed up and had insufficient instructions, and that all efforts to verify whether my mailed ballot had actually been received and counted had been unsuccessful. If someone as educated and as relatively tech-savvy as myself couldn't make their system work - how were those less educated or sophisticated supposed to do so?

- I also reported that I had received a second solicitation package and ballot without any explanation as for why I had received this.

Mr. Stang reached out to the BSA's lawyers and was able to verify that OMNI had received my ballot and recorded it as against acceptance of the plan, and he was able to get a clarification that the second solicitation package had been sent in response to my questions concerning whether my mailed ballot had been received [a not insignificant question for someone in prison, since prison mail systems are notorious for "losing" inmate mail in and out - especially "legal mail"]. He asked for, and received a copy of the Rothweiler email. I suspect that the TCC motion for an Ombudsman is related to these facts.

I read pretty much everything that appears on the OMNI daily docket report, and have noted that two major warring camps have emerged. On the one side we have the BSA, the Coalition of mass tort lawyers, and Hartford Insurance - all vociferously in favor of the current plan - and apparently quite willing to do whatever it takes to ram this plan down the throats of everyone else involved. On the other side we seem to have the "Zalkin Group," Century Insurance, and the TCC - all of whom seem rather

concerned about what has been going on with the process of everything from how the plan was put together to how voting has been conducted.

The "Zalkin Group" objected to the invalidation of ballots by OMNI in document 7427. I join in that objection, but the real problem is that the process has been faulty from the get go. There's a principal we tend to follow in this country called one person - one vote. Each and every sexual abuse claimant should have received a paper ballot and voted for themselves, and I don't care if that meant that there would be a lot of paper ballots to count. If OMNI couldn't do the job, they needed to be replaced. Beyond the fact that each claimant should have mailed in their own ballot [no e-ballots because they are too easy to rig - and I say that as having spent a very large part of my life in the field of information security], whoever designed the ballot should be taken out into the public square and executed. There was no reason whatsoever to make the ballot 24 pages long. There were exactly 3 questions: [1] accept/reject the plan; [2] accept/decline the $3,500; [3] opt in/out of the exoneration of certain parties. A grade-schooler could have designed a simple one-page ballot with these three questions and all the required information/signature... And such a ballot would not have required hours of TCC town halls guiding folks with 6th grade reading comprehension levels through the process. The ONLY reason for making the ballot so long and complex was to make the claimants dependent on their lawyers [read - the Coalition of mass tort lawyers].

In document 7447, the TCC made a motion for appointment of an Ombudsman to try to restore some semblance of order and reliability to the voting process. I join in that motion, because what we have ruight now is an unmitigated disaster - which I suspect is precisely what the BSA, Coalition, and Hartford want [given their vociferous opposition to the notion of an Ombudsman].

Several of the sexual abuse claimants sent you letters that were filed as documents 7437, 7439, 7441, 7443, and 7477, in which they expressed serious concerns about Kenneth Rothweiler's involvement in the voting process [I'm sure there have been others which I've failed to cite]. I join in their concerns, because Rothweiler is emblematic of precisely what is wrong with this entire case, and has been since the second that "the Coalition" first interjected itself as an alternate version of the TCC.

The "Zalkin Group" filed an opposition to Rothweiler's motion for a protective order related to all the voting shenanigans as document 7533. I also join with this opposition. Rothweiler's relationship with the BSA in creating the plan and voting mess needs to be exposed, and appropriate action needs to be taken. [I believe that one of the sexual abuse claimants suggested that a certain Philadelphia lawyer needs to go to jail.]

I recently finished reading the BSA's supplements to the modified 5th amended plan of reorganization filed as document 7515, and to my utter amazement, I think I may have discovered why Rothweiler is so active in his attempts to push this plan down the throats of his clients, AVA's clients, Kosnoff's clients, and the rest of us who have - and want nothing to do with any of the mass tort lawyers. Buried at Exhibit H [7515-8] we discover that in repayment for his great assistance in forcing this plan through, the BSA proposes to put him as one of those in charge of supervising the settlement trust. Oh really?

I recall that several parties have commented along the way that the relationship between the Coalition of mass tort lawyers [please let's stop calling them the advocates for those abused in scouting - because they are not - and I do not recall having read a single survivor's letter raving about their "representation"], and the BSA has been entirely too cozy. Rothweiler holds himself out as having been a major player in putting together the supposed settlements and plan, and the probability is that there is a lot of truth in that claim. The problem is that the insertion of the Coalition of mass tort lawyers into the

process has undermined the efforts of the TCC to represent the interests of ALL the sexual abuse claimants, and to work with the insurers, local councils, and BSA to arrive at a more equitable resolution. When you have insurers agreeing with the TCC and others that the process has been highjacked by the mass tort lawyers, you know you have a real problem. When you have the BSA proposing to put someone like Rothweiler on the committee to supervise the settlement trust, you have more than just a problem.

I really do wish that folks would take the time to actually read the so-called proposed by-laws for the BSA as included in document 7515, because maybe then they would understand my point about the organizational structure of the BSA being at the root of the problem. It is pure fiction to pretend that the local councils are not merely departments of the BSA. They exist for one reason and one reason only. If there were no BSA, there would be no surviving local councils, because they have their existance solely within the BSA. [What would a locally incorporated council do were there to be no BSA? The answer is simple. They would cease to exist. And that is implicit within the BSA's own by-laws.] This organizational structure has been utterly disinterested in addressing or resolving the sexual abuse issue for 111 years. Given that the plan retains the same organizational structure, why would any sane person conclude that things will be different? One of the definitions of insanity is doing the same thing over and over and expecting a different outcome. Well, how many more kids need to get molested before we figure out that this system is the problem? How many parents do those involved with this process believe will entrust their children to the same organizational structure in the future? More to the point, is there anyone anywhere who honestly believes there is an insurance company on this planet which will issue a policy to this organizational structure?

Judge, it is time to remove the Coalition of mass tort lawyers from this process - starting with Rothweiler - and it is past time for folks to get realistic about the future of scouting [which is something entirely separate from the BSA and it's failed organizational model].



Very Respectfully Yours,

ENCLOSURE:
    [1] Copy of Claimant ▮ letter on October 3, 2021.



October 20, 2021

Hon. Laurie Selber Silverstein
U.S. Bankruptcy Court
District of Delaware
824 Market Street; 6th Floor
Wilmington, DL 19801

SUBJ: BSA BANKRUPTCY CASE; 20-10343 (LSS) - LETTER TO JUDGE FROM VICTIM

Dear Judge Silverstein;

I'm claimant ▓ on Debtor's current list - ▓ on the Omni list. I wrote in August to express my utter dismay with the course of this case. Since my last letter, I've read every word of every pleading [including the letters you've had filed in the record], transcripts, the TCC Townhall transcripts, and I just finished reading the latest iteration of the plan that we're supposed to vote on. I don't know if there's a word to describe my response to "all of the above," but I have a few comments which I think everyone involved needs to hear. While the court probably can't force any of this, the court can potentially bring about the conditions which would allow a permanent resolution something like that set out below to take place. My comments are based upon two facts - my experiences as a sex abuse victim & as someone who was intimately involved with the operations of the BSA.[1]

---

[1] I worked in extremely close contact with the professional scout leaders for the BSA at three different camps, in three different local councils for over 8 years as a member of staff - 5 of those years as camp commissioner or program director. I attended college as part of the American Humanics Foundation Program [AHFP] for training so-called professional scouters, and graduated from the BSA's National Camp Leadership Training School. I also worked at the BSA's National Training Center in Mendham Township, NJ, making television commercials for the BSA. Virtually none of the AHFP classes at Missouri Valley College in the late sixties had anything to do with the scouting program [there was one class in camp leadership]. The primary focus was on fundraising and what we would today call human resources and assets management. Those of us who felt like more emphasis needed to be placed on the basics of scouting were bluntly informed by the AHFP Director [who was a former scout executive from Chicago] that we were not being trained to become better at scouting - we were being trained to manage the volunteers who were the real "professional scouts." The common refrains I heard from district executive level professional scouts was that their jobs had precious little to do with scouting, and everything to do with fundraising and accumulation of assets - and that they were woefully underpaid while their bosses were overpaid. [As noted below, the underpaying of district executives is no longer an issue.] Remove the fundraising and accumulation of assets from the picture, and there's a chance that the scouting program could return to its roots as envisioned

6

1. The root problem underlying the sex abuse scandal that no one is talking about is the organizational structure of the BSA. The organizational structure is what needs to change. What we really have here is a Pyramid Scheme. If the BSA didn't have such great public relations folks and powerful friends in high places, any honest investigation would conclude it's a problematic operation.

2. The National Council of the Boy Scouts of America [BSA] is a Congressionally Chartered Organization. The charter needs to be revoked, and it needs to permanently go out of business. Period. No ifs. No ands. No buts. Whatever vital national interest scouting as a program potentially provides has been outweighed by the organization's century of failures to protect America's youth, and its continuing insistence upon self-preservation of assets over all other considerations. Enough. No more.

3. The local councils of the BSA are all chartered by the BSA, with the revocation of the Congressional Charter, all local charters would become null and void, therefore all local councils would also cease to exist. The "legal-make-believe" concept that the local councils are somehow separate entities is ludicrous given the necessity of each such council to possess a charter granted by the BSA. Congress chartered only one BSA - not 253 BSAs. All 253 local councils operate under the authority of that one Congressional Charter. No national charter = no local council. Period.[2]

4. Since all assets of these local councils were obtained on the premise that the assets were for local use for scouting programs of the BSA, those assets either properly belong to the overall organization, or they were fraudulently obtained. The assets were donated to support scouting - the concept. It is extremely relevant to the discussion to note that the founder of Scouting was adamant that scouting ought not be permitted to become a fund-raising, assets-accumulating organization run by paid professionals.

5. The insurance companies are undoubtedly correct that a large number of the abuse claims are either completely fraudulent, or they are from individuals residing in states where their claims are definitively time-barred as a matter of law. While it may not seem to be fair to individuals unfortunate enough to reside in states with time-bars, that is the nature of the federal system in this country, and this court ought not have authority to ignore the wishes of the states with such time-bars. No insurance company will ever ignore this fact because they owe a duty to their shareholders to not pay out claims which are contrary to law even if that would be the moral thing to do. I suspect a compromise could be reached if the BSA was out of the way.

6. The insurance companies are also probably accurate in asserting that the so-called Coalition for those Abused in Scouting deliberately sought to increase the payout for mass tort attorneys by inducing individuals from time-barred states to file claims which could not procede under tort law in those states, as well as induced others to file knowingly fraudulent claims with the hope of getting a

---

by Lord Baden-Powell. See the comments online from a 2006 article posted in the Daily Kos - long before the bankruptcy: https://m.dailykos.com/stories/2006/1/7/176830/-

[2] Just for the heck of it I obtained a copy of the IRS form 990 filed by the Patriot's Path Council, BSA covering the year [2019] in which I filed my lawsuit in NJ. That form submitted to the IRS very clearly states at line 1 [Briefly describe the organization's mission or most significant activities:] "PROVIDE YOUTH SERVICES THROUGH THE EXECUTION OF THE CHARTER OF THE NATIONAL COUNCIL BOY SCOUTS OF AMERICA." This IRS filing gives lie to the BSA's continual obfuscation concerning the relationship with the local councils and their assets - again - illegal pyramid scheme.

minimal settlement. While this may not be completely illegal, it is disgusting and reprehensible, and the court should require the direct abuse claim class to be subdivided between those with potential tort claims, and those from time-barred states. There's a conflict otherwise.[3]

7. The entire accountability system utilized throughout the history of the BSA is a function of its organizational structure, and is a major part of the problem. The national council controls the general program and the commissioning of professional scouts, but has no relationship with the chartered organizations which provide the adults who deliver those programs except through its own chartering relationship with the local councils. Those local councils have no real authority over the decisions of the chartered sponsoring organizations which provide those adults and support the activities of the actual scout troops.[4] The truth of the matter is that for the national council and local councils it is, and always has been about money and assets. There is close to zero interaction between the "professional scouts" and actual scouts.

8. As noted above, the BSA and its ███ local councils operate as a pyramid scheme which is designed to maximize accumulatiion of assets, and following the pattern of criminal enterprises with a legitimate veneer, there is a gross propensity to undervalue assets for tax purposes.[5]

---

[3] Just for the sake of argument, assume that all 18,000 of the claims submitted by these six lawfirms are time-barred or fraudulent. If all 18,000 opt to receive the $3,500 expedited payment that's been proposed, that's $63,000,000. At a contingency fee of 40%, that is $25,200,000 for six lawfirms - roughly $6,300,000 each. Not a bad payday for cases which would net nothing or almost nothing in state torts.

[4] For example, imagine that the bankruptcy court were to decide to sponsor a scout troop. The decisions about where meetings would be held would be made by the committee of individuals appreinted by the judge - the head of the sponsoring organization. That committee would then select adults to supervise the activities - with only a few of those adults being subjected to approval by the local council. The committee would also raise all the funds necessary for the troop to operate - including purchasing all equipment necessary to carry out scouting programs. The ONLY things the bankruptcy court troop would absolutely have to rely on the local council to provide would be the uniform badges [the uniforms themselves are sold under license with BSA by various merchants] and certificates related to ranks and advancement. The bankruptcy court troop would not need to ever use the local council's camp [numerous troops have never used those camps], nor would it have to participate in local council events such as camporees or expositions. In other words, as far as the putative bankruptcy court troop would be concerned, it wouldn't matter whether the local council owned or operated a summer camp, or anything else beyond having a location where those uniform badges and certificates could be obtained, and in today's world those could all be handled through fulfillment centers. In FACT, many of the assets of the BSA and local councils are relatively recent additions which are ostensibly designed to enhance the experience which is always and everywhere supposed to be provided by the scout troops themselves, and which are not absolutely essential for success of the mission. [For example, there's no reason why summer camps couldn't be conducted at state or federal parks, etc.]

[5] Again referring to the 2019 IRS 990 form for Patriot's Path Council, BSA, it is claimed that the total value of real estate owned is $6,712,837. REALLY? Let's see: Camp Mt. Allamuchy: 977 acres of prime real estate along Interstate 80 with two lakes, a 300 man winterized professional kitchen dining lodge, a year-round medical cabin, 8 large cabins with kitchens, an office building with conference room, 2,500 square foot modern ranch-style ranger's house, large warehouse and maintenance barn, multiple boat and swimming docks, and all the various scout activity areas. The average value of undeveloped land nearby exceeds $20,000 per acre. The very least Allamuchy is worth is over $19,000,000 - three times what was reported. BUT, the council also owns another 450 acre camp in an even more valuable part of the state - AND - a 1,250 acre camp with a 250 acre lake in the Adirondack Mountains of upstate NY - AND - a large "service center" in the middle of some of the most expensive real estate in the nation. In other words, these fine upstanding developers of America's youth have only misled the IRS by something in the neighborhood of $50,000,000. Perhaps the local council is really a subsidiary of la familia Soprano - obviously has the same accountants.

9. Because there is arguable value for the scouting program [the concept] to continue in some form [closer to its origins], perhaps it is time for someone to start thinking outside the box. Prior to the Iraq War, Colin Powell enunciated what I think he called the Pottery Barn Rule: "you break it - you bought it." In this context, Congress chartered this organization - and Congress allowed this organization to operate without any real supervision for the past 111 years.[6] The organization is broken. Congress owns it, or at least ought to. Congress needs to revoke the charter in order to bring this disaster to an expeditious end. Someone needs to help Congress wake up.

10. It seems to me that what should replace the BSA and local councils should look something like this:

   a. Most scouting agencies throughout the world are government run - or quasi-government run programs. Once Congress revokes the BSA charter, it should establish a U.S. National Scouting Program [NSP] as part of the Department of the Interior. The NSP would not RUN the scouting program directly. It would provide standards and guidance on how the program operates.

   b. All assets of the BSA and local councils would be ceded to the NSP. Since the assets would all become federally owned properties, the necessity for constant fundraising would cease, and those assets not strictly necessary for scouting activities would be liquidated.

   c. The NSP would be subjected to Congressional oversight, with monitoring by the Department of Justice. Sexual abuse of a minor in this context would become a federal crime, as well as subject to federal civil rights law.

   d. All camps, training schools, and high adventure locations would have statuses similar to national parks, but would be operated by the NSP through a newly created National Scouting Service - which would consist of those professional scouters and local employees deemed essential for continuing operation. [The currently inflated salaries of those who are actually glorified fundraisers would be replaced with standard federal salaries for similar administrative and executive positions.][7]

   e. Scouting at the local level would continue to be operated through volunteers and the sponsoring organizations, but those organizations would now be subject to federal laws and oversight concerning all individuals involved in all scouting activities. The relationship between the sponsoring organizations and the NSP would be identical to that between high schools that operate JROTC programs in conjunction with the Department of Defense.

---

[6] All one needs to do to see how remiss Congress has been in its oversight is to take a look at the so-called "Annual Report to Congress" submitted this year by the BSA. For an organization which has declared bankruptcy, and is in the middle of the largest child sex abuse scandal in the history of the nation to not even make a passing reference to these "minor details" in its Congressionally mandated annual report is almost unbelievable, but what can be said for a Congress that doesn't have anything to say in response except "good job."

[7] Back to the Patriot's Path Council IRS 990 form - the scout executive for this council - which has a total of 6 districts in a 5 county area in northwest NJ receives a salary of almost $200,000 per year. His entire paid professional staff of 5 or 6 district executives [entry level position] all earn over $100,000 per year - in a part of the state where the median income is under $50,000 per year.

      f. Insurance companies would no longer be involved in any aspect of this program except at the sponsoring organization level.

Of course, the problem the court faces right now is what to do concerning eighty two thousand plus sexual abuse victims. I suspect that if the debtors and insurers all understood that the BSA and local councils were going to cease to exist as currently structured, everyone would figure out that it would be in everyone's best interests to follow the basic TDP schedule of payments at 100% of established value right now, while transitioning to something like the proposed federally funded and administered NSP. How the court could get from here to there shouldn't be that hard to work out. Maybe the first step would be some iteration of Shakespeare's dictum that "the first thing we need to do is get rid of all the lawyers."

I might be wrong, but I strongly suspect that those of us who once loved scouting [the program] are unanimous in our disgust at the entire leadership and organizational structure of the BSA and its local councils, and their laser focus on protecting assets and continued existance in only slightly modified form. We are of no more importance to that goal than we've ever been. We were never of any importance to the overall organization except as a useful means to sustain the fundraising and accumulation of assets. This is why the leadership of the BSA and its local councils [and their legions of lawyers] want no part of the "Pottery Barn Rule" concerning our broken-ness. My guess is that not a single one of us would shed even a tiny tear over the end of the organizational structure of the BSA or its local councils - especially if it was replaced by something like the proposed federally funded and administered NSP. [That includes those of us who are generally opposed to more federal programs.]