**Exhibit 1**

Redline of Second Modified Fifth Amended Plan [D.I. 7833]

---

IN ADDITION TO RELEASES AND INJUNCTIONS PROVIDED UNDER THE SECOND MODIFIED FIFTH AMENDED PLAN, THE PLAN ALSO CONTAINS VALUABLE DEFINITIONS, SOME OF WHICH HAVE BEEN MODIFIED, INCLUDING:

- **"ABUSE" (ARTICLE I.A.17)**
- **"ABUSE CLAIM" (ARTICLE I.A.18)**
- **"CONTRIBUTING CHARTERED ORGANIZATION" (ARTICLE I.A.77)**
- **"OPT-OUT ABUSE CLAIMS" (ARTICLE I.A.181)**
- **"OPT-OUT CHARTERED ORGANIZATION" (ARTICLE I.A.182)**
- **"OTHER CHARTERED ORGANIZATION" (ARTICLE I.A.183)**
- **"PARTICIPATING CHARTERED ORGANIZATION" (ARTICLE I.A.187)**
- **"PARTICIPATING CHARTERED ORGANIZATION INSURANCE ASSIGNMENT (ARTICLE I.A.189)**
- **"PARTICIPATING CHARTERED ORGANIZATION SETTLEMENT CONTRIBUTION" (ARTICLE I.A.191)**
- **"PROTECTED PARTIES" (ARTICLE I.A.221)**
- **"RELEASED PARTIES" (ARTICLE I.A.229)**
- **"RELEASING CLAIM HOLDER" (ARTICLE I.A.231)**
- **"SCOUTING-RELATED" (ARTICLE I.A.244)**

YOU MAY ACCESS FULL AND COMPLETE ELECTRONIC COPIES OF THE SECOND MODIFIED FIFTH AMENDED PLAN, THE BLACKLINE THEREOF, OR ANY OTHER DOCUMENTS RELATED TO THE SECOND MODIFIED FIFTH AMENDED PLAN, FREE OF CHARGE, AT HTTPS://OMNIAGENTSOLUTIONS.COM/BSA OR COPIES IN PAPER, UPON REQUEST, BY: (A) CALLING THE DEBTORS' TOLL-FREE RESTRUCTURING HOTLINE AT 866-907-2721, (B) EMAILING BSABALLOTS@OMNIAGNT.COM, (C) WRITING TO BOY SCOUTS OF AMERICA BALLOT PROCESSING, C/O OMNI AGENT SOLUTIONS, 5955 DE SOTO AVENUE, SUITE 100, WOODLAND HILLS, CA 91367; OR (D) SUBMITTING AN INQUIRY ON THE DEBTORS' RESTRUCTURING WEBSITE AT HTTPS://OMNIAGENTSOLUTIONS.COM/BSA. YOU MAY ALSO ACCESS FROM THESE MATERIALS FOR A FEE VIA PACER AT HTTP://WWW.DEB.USCOURTS.GOV.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**SECOND MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF
REORGANIZATION FOR
BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        laura.baccash@whitecase.com
        blair.warner@whitecase.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email: dabbott@morrisnichols.com
        aremming@morrisnichols.com
        ptopper@morrisnichols.com

*Attorneys for the Debtors and Debtors in Possession*

Dated: ~~September 29~~December 17, 2021
        Wilmington, Delaware

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

## TABLE OF CONTENTS

Article I. Definitions and Rules of Interpretation ............................................... 1

    A.    Definitions ............................................................................................ 1

    B.    Interpretation; Application of Definitions and Rules of Construction ....... ~~43~~48

    C.    Reference to Monetary Figures ............................................................ ~~44~~49

    D.    Consent Rights .................................................................................... ~~44~~49

    E.    Controlling Document ......................................................................... ~~44~~50

Article II. Administrative Expense and Priority Claims ........................................ ~~44~~50

    A.    Administrative Expense Claims ........................................................... ~~44~~50

    B.    Priority Tax Claims ............................................................................. ~~46~~52

Article III. Classification and Treatment of Claims and Interests ......................... ~~47~~53

    A.    Classification of Claims and Interests .................................................. ~~47~~53

    B.    Treatment of Claims and Interests ....................................................... ~~48~~54

    C.    Elimination of Vacant Classes ............................................................ ~~56~~62

    D.    Cramdown .......................................................................................... ~~56~~62

Article IV. Settlement Trust .............................................................................. ~~56~~62

    A.    Establishment of the Settlement Trust .................................................. ~~56~~62

    B.    Purposes of the Settlement Trust ......................................................... ~~56~~62

    C.    Transfer of Claims to the Settlement Trust ........................................... ~~57~~63

    D.    Transfer of Settlement Trust Assets to the Settlement Trust ................... ~~57~~64

    E.    Settlement Trustee .............................................................................. ~~60~~66

    F.    Settlement Trust Advisory Committee .................................................. ~~60~~66

    G.    Future Claimants' Representative ........................................................ ~~60~~67

    H.    Trust Distribution Procedures ............................................................. ~~60~~67

    I.    Post-Effective Date Contributing Chartered Organizations. ................... ~~61~~67

    ~~J.~~    ~~Post-Effective Date Participating Chartered Organizations.~~ ................... ~~61~~

    ~~K~~I.    Post-Effective Date Settling Insurance Companies. ............................... ~~62~~68

    ~~L~~K.    Settlement Trust Expenses ................................................................... ~~62~~68

    ~~M~~L.    Reimbursement by Settlement Trust ..................................................... ~~62~~68

    ~~N~~M.    Trust Defense of TCJC Settlement ...................................................... ~~63~~69

    ~~O~~N.    Assignment of Claims and Defenses .................................................... ~~63~~69

    ~~P~~O.    Investment Guidelines ........................................................................ ~~63~~70

    ~~Q~~P.    Excess Settlement Trust Assets ........................................................... ~~64~~70

    ~~R~~Q.    Document Agreement .......................................................................... ~~64~~70

| | | | |
|---|---|---|---|
| SR. | Privileged Information | | 6470 |
| TS. | No Liability | | 6470 |
| UT. | U.S. Federal Income Tax Treatment of the Settlement Trust | | 6471 |
| VU. | Institution and Maintenance of Legal and Other Proceedings | | 6571 |
| WV. | Notation on Claims Register Regarding Abuse Claims | | 6571 |

Article V. Means for Implementation of the Plan ......................................................... 6571

| | | | |
|---|---|---|---|
| A. | General | | 6571 |
| B. | Operations of the Debtors between Confirmation and the Effective Date | | 6572 |
| C. | BSA Governance Documents | | 6672 |
| D. | Continued Legal Existence of BSA | | 6672 |
| E. | Reorganized BSA's Directors and Senior Management | | 6672 |
| F. | Dissolution of Delaware BSA | | 6672 |
| G. | Due Authorization | | 6672 |
| H. | Cancellation of Interests | | 6672 |
| I. | Restatement of Indebtedness | | 6673 |
| J. | Cancellation of Liens | | 6773 |
| K. | Effectuating Documents and Further Transactions | | 6773 |
| L. | Sources of Consideration for Distributions | | 6773 |
| M. | Calculation of Minimum Unrestricted Cash and Investments | | 6874 |
| N. | Resolution of Abuse Claims | | 6874 |
| O. | Funding by the Settlement Trust | | 6975 |
| P. | Core Value Cash Pool | | 6975 |
| Q. | Creditor Representative | | 6975 |
| R. | Residual Cash in Core Value Cash Pool | | 6975 |
| S. | Compromise and Settlement of Claims, Interests and Controversies | | 6975 |
| T. | Payment of Coalition Restructuring Expenses | | 7581 |
| U. | Good-Faith Compromise and Settlement | | 7582 |
| V. | Restated Debt and Security Documents | | 7682 |
| W. | Foundation Loan | | 7885 |
| X. | BSA Settlement Trust Note | | 7985 |
| Y. | DST | | 8086 |
| Z. | Pension Plan | | 8086 |
| AA. | Single Satisfaction of Allowed General Unsecured Claims | | 8087 |
| BB. | Exemption from Certain Transfer Taxes and Recording Fees | | 8187 |

CC.    Non-Monetary Commitments ................................................ 8187

Article VI. Executory Contracts and Unexpired Leases ................................ 8389

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ... 8389

B.    Rejection Damages Claims .................................................. 8490

C.    Cure of Defaults under Executory Contracts and Unexpired Leases ........ 8490

D.    Dispute Resolution .......................................................... 8591

E.    Contracts and Leases Entered into After the Petition Date .............. 8692

F.    Insurance Policies .......................................................... 8692

G.    Compensation and Benefits Programs ...................................... 8793

H.    Restoration Plan and Deferred Compensation Plan ........................ 8793

I.    Workers' Compensation Program .......................................... 8793

J.    Indemnification Obligations .............................................. 8894

K.    Gift Annuity Agreements and Life-Income Agreements .................... 8894

L.    Modifications, Amendments, Supplements, Restatements, or Other
Agreements .................................................................. 8894

M.    Reservation of Rights ...................................................... 8895

N.    Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4) ..... 8995

Article VII. Provisions Governing Distributions ...................................... 8995

A.    Applicability ................................................................ 8995

B.    Distributions Generally .................................................... 8995

C.    Distributions on Account of Certain Claims Allowed as of the Effective Date 8995

D.    Distributions on Account of Allowed General Unsecured Claims ........... 8995

E.    Distributions on Account of Disputed Claims Allowed After the Effective
Date .......................................................................... 8995

F.    Rights and Powers of Disbursing Agent .................................... 8996

G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions . 9096

H.    Undeliverable and Non-Negotiated Distributions .......................... 9097

I.    Manner of Payment under the Plan ........................................ 9197

J.    Satisfaction of Claims ...................................................... 9197

K.    Minimum Cash Distributions .............................................. 9197

L.    Postpetition Interest ........................................................ 9198

M.    Setoffs ...................................................................... 9298

N.    Claims Paid or Payable by Third Parties .................................. 9298

O.    Compliance with Tax Requirements and Allocations ...................... 9399

Article VIII. Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ....... ~~93~~99

    A.    Applicability ....... ~~93~~99

    B.    Allowance of Claims ....... ~~93~~99

    C.    Claims Administration Responsibilities ....... ~~93~~99

    D.    Estimation of Claims ....... ~~94~~100

    E.    No Distributions Pending Allowance ....... ~~94~~100

    F.    Distributions after Allowance ....... ~~94~~100

    G.    Disputed Claims Reserve ....... ~~94~~100

    H.    Adjustment to Claims Register without Objection ....... ~~95~~101

    I.    Time to File Objections to Claims ....... ~~96~~102

    J.    Treatment of Untimely Claims ....... ~~96~~102

Article IX. Conditions Precedent to Confirmation and Effective Date ....... ~~96~~102

    A.    Conditions Precedent to Confirmation of the Plan ....... ~~96~~102

    B.    Conditions Precedent to the Effective Date ....... ~~99~~105

    C.    Waiver of Conditions Precedent ....... ~~100~~107

    D.    Substantial Consummation of the Plan ....... ~~100~~107

    E.    *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date ....... ~~101~~107

Article X. Effect of Plan Confirmation ....... ~~101~~108

    A.    Vesting of Assets in Reorganized BSA ....... ~~101~~108

    B.    Retention of Certain Causes of Action ....... ~~101~~108

    C.    Binding Effect ....... ~~101~~108

    D.    ~~Pre-Confirmation~~ Injunctions and Stays ....... ~~102~~109

    E.    Discharge ....... ~~102~~109

    F.    **Channeling Injunction** ....... ~~103~~110

    G.    Provisions Relating to Channeling Injunction ....... ~~105~~113

    H.    **Insurance Entity Injunction** ....... ~~106~~114

    I.    **Injunction against Interference with Plan** ....... ~~108~~116

    J.    **Releases** ....... ~~108~~116

    K.    **Exculpation** ....... ~~113~~122

    L.    **Injunctions Related to Releases and Exculpation** ....... ~~114~~122

    M.    Insurance Provisions ....... ~~115~~123

    N.    Judgment Reduction. ....... ~~115~~124

    O.    Reservation of Rights ....... ~~116~~125

    P.    Disallowed Claims ....... ~~117~~125

Q.     No Successor Liability ...................................................... 117125

R.     Indemnities ...................................................................... 117125

S.     The Official Committees and the Future Claimants' Representative ......... 118126

Article XI. Retention of Jurisdiction .................................................... 118127

A.     Jurisdiction ..................................................................... 118127

B.     General Retention ............................................................... 119127

C.     Specific Purposes ............................................................... 119127

D.     Courts of Competent Jurisdiction .............................................. 122130

Article XII. MISCELLANEOUS PROVISIONS ................................... 122131

A.     Closing of Chapter 11 Cases .................................................. 122131

B.     Amendment or Modification of the Plan ..................................... 122131

C.     Revocation or Withdrawal of Plan ............................................ 123131

D.     Request for Expedited Determination of Taxes .............................. 123132

E.     Non-Severability of Plan Provisions .......................................... 123132

F.     Notices ........................................................................... 124132

G.     Notices to Other Persons ...................................................... 124133

H.     Governing Law .................................................................. 125133

I.     Immediate Binding Effect ..................................................... 125133

J.     Timing of Distributions or Actions ........................................... 125134

K.     Deemed Acts .................................................................... 125134

L.     Entire Agreement ............................................................... 125134

M.     Plan Supplement ................................................................ 125134

N.     Withholding of Taxes ........................................................... 125134

O.     Payment of Quarterly Fees ..................................................... 126134

P.     Effective Date Actions Simultaneous .......................................... 126134

Q.     Consent to Jurisdiction ......................................................... 126134

**EXHIBITS**

Exhibit A        Trust Distribution Procedures
Exhibit B        Settlement Trust Agreement
Exhibit C        Contributing Chartered Organization Settlement Contribution
Exhibit D        Contributing Chartered Organizations
Exhibit E        Foundation Loan Facility Term Sheet
Exhibit F        Local Council Settlement Contribution
Exhibit G        Local Councils
Exhibit H        Related Non-Debtor Entities
Exhibit I        Insurance Settlements
Exhibit I-1      Hartford Insurance Settlement Agreement
Exhibit I-2      Century and Chubb Companies Insurance Settlement Agreement
Exhibit J-1      TCJC Settlement Agreement
Exhibit K        Non-Participating Chartered Organizations

**SCHEDULES**

Schedule 1      Artwork
Schedule 2      BSA Insurance Policies
Schedule 3      Local Council Insurance Policies
Schedule 4      Oil and Gas Interests

**PLAN SUPPLEMENT DOCUMENTS**

Amended BSA Bylaws
Assumed Contracts and Unexpired Leases Schedule
BSA Settlement Trust Note
Creditor Representative
Directors and Officers of Reorganized BSA
Document Agreement
DST Agreement
DST Note
Form of Settling Insurance Company Release
Forms of Claimant Trust Distribution Procedures Releases
Foundation Loan Agreement
Leaseback Requirement Agreement
Rejected Contracts and Unexpired Leases Schedule
Restated 2010 Bond Documents
Restated 2012 Bond Documents
Restated Credit Facility Documents
Restated Security Agreement
Settlement Trust Advisory Committee
Initial Special Reviewer
Changes to Local Council Settlement Contributions
Century and Chubb Companies Insurance Settlement Agreement
Hartford Insurance Settlement Agreement

TCJC Settlement Agreement

# INTRODUCTION

Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases, hereby propose this plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings ascribed to such terms in Article I.A. The Plan provides for the global resolution of Abuse Claims against the Debtors, Related Non-Debtor Entities, Local Councils, Contributing Chartered Organizations, Settling Insurance Companies, and their respective Representatives. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan is also proposed in accordance with the JPM / Creditors' Committee Term Sheet, pursuant to which the Debtors, the Creditors' Committee and JPM have agreed to take certain actions to support the prosecution and consummation of the Plan. The Coalition and the Future Claimants' Representative also support the Plan. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, charitable mission, operations, projections for those operations, risk factors, and certain related matters. The Disclosure Statement also provides a summary and analysis of the Plan. YOU ARE URGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN WITH CARE IN EVALUATING HOW THE PLAN WILL AFFECT YOUR CLAIM(S) BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINITIONS AND RULES OF INTERPRETATION

A.    Definitions.   The capitalized terms used in the Plan shall have the respective meanings set forth below.

1.    "2010 Bond" means The County Commission of Fayette County (West Virginia) Commercial Development Revenue Bond (Arrow WV Project) Series 2010B in an aggregate principal amount of $50,000,000, issued by the Bond Issuer pursuant to the 2010 Bond Agreement, the proceeds of which were loaned to the BSA pursuant to the 2010 Note.

2.    "2010 Bond Agreement" means that certain Bond Purchase and Loan Agreement dated as of November 5, 2010, by and among the Bond Issuer, JPM, the BSA and Arrow, as amended, restated, supplemented or otherwise modified from time to time.

3.    "2010 Bond Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2010 Bond Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2010 Bond Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to repay the 2010 Note, interest on the 2010 Note, and all fees, costs, expenses and obligations of any kind or character due or recoverable from the Debtors under the 2010 Bond Documents.

4. "2010 Bond Documents" means collectively, the 2010 Bond, the 2010 Bond Agreement, the 2010 Note, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2010 Bond Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

5. "2010 Credit Agreement" means that certain Credit Agreement dated as of August 11, 2010, by and between the BSA, as borrower, and JPM, as lender, as amended by that certain First Amendment to Credit Agreement dated as of November 5, 2010, that certain Second Amendment to Credit Agreement dated as of November 11, 2011, that certain Third Amendment to Credit Agreement dated as of March 9, 2012, that certain Fourth Amendment to Credit Agreement dated as of April 25, 2016, that certain Fifth Amendment to Credit Agreement dated as of March 2, 2017, that certain Sixth Amendment to Credit Agreement dated as of February 15, 2018, and that certain Seventh Amendment to Credit Agreement, dated as of March 21, 2019, pursuant to which JPM agreed to make term loans to the BSA in an aggregate amount of $25,000,000 and agreed to make revolving loans to the BSA and issue letters of credit on behalf of the BSA in an aggregate amount not to exceed $75,000,000.

6. "2010 Credit Facility Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2010 Credit Facility Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2010 Credit Facility Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to pay principal and interest, and all fees, costs, expenses and other obligations of any kind or character due or recoverable under the 2010 Credit Facility Documents.

7. "2010 Credit Facility Documents" means, collectively, the 2010 Credit Agreement, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2010 Credit Facility Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

8. "2010 Note" means that certain Promissory Note – 2010B executed by the BSA, as borrower, and payable to the order of the Bond Issuer in the original principal amount of $50,000,000, which note was pledged by the Bond Issuer to JPM pursuant to the 2010 Bond Agreement to secure the repayment of the 2010 Bond, as amended, restated, supplemented or otherwise modified from time to time.

9. "2012 Bond" means The County Commission of Fayette County (West Virginia) Commercial Development Revenue Bond (Arrow WV Project), Series 2012, in an aggregate principal amount of $175,000,000, issued by the Bond Issuer pursuant to the

2012 Bond Agreement, the proceeds of which were loaned to the BSA pursuant to the 2012 Note.

10.    "2012 Bond Agreement" means that certain Bond Purchase and Loan Agreement dated as of March 9, 2012, between the Bond Issuer, JPM, the BSA and Arrow, as amended, restated, supplemented or otherwise modified from time to time.

11.    "2012 Bond Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2012 Bond Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2012 Bond  Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to repay the 2012 Note, interest on the 2012 Note, and all fees, costs, expenses and obligations of any kind or character due or recoverable from the Debtors under the 2012 Bond Documents.

12.    "2012 Bond Documents" means collectively, the 2012 Bond, the 2012 Bond Agreement, the 2012 Note, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2012 Bond Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

13.    "2012 Note" means that certain Promissory Note – 2012, executed by the BSA, as borrower, and payable to the order of the Bond Issuer in the original principal amount of $175,000,000, which note was pledged by the Bond Issuer to JPM pursuant to the 2012 Bond Agreement to secure the repayment of the 2012 Bond, as amended, restated, supplemented or otherwise modified from time to time.

14.    "2019 RCF Agreement" means that certain Credit Agreement, dated as of March 21, 2019, by and between the BSA, as borrower, and JPM, as lender, pursuant to which JPM agreed to make revolving loans to the BSA and issue letters of credit on behalf of the BSA in an aggregate amount not to exceed $71,500,000, the maturity date of which was extended pursuant to that certain Consent to Extension of Maturity Date dated as of January 16, 2020.

15.    "2019 RCF Claim" means any Claim against the Debtors arising under, derived from, or based upon the 2019 RCF Documents, including any Claim for obligations, indebtedness, and liabilities of the BSA arising pursuant to any of the 2019 RCF Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligation of the BSA to pay principal and interest, and all fees, costs, expenses and other obligations of any kind or character due or recoverable under the 2019 RCF Documents.

16.    "2019 RCF Documents" means, collectively, the 2019 RCF Agreement, the Prepetition Security Documents (2019), the Prepetition Security Agreement (2020) (in the case of the Prepetition Security Documents (2019) and the Prepetition Security Agreement (2020), solely as such documents and agreements pertain to obligations under the other 2019 RCF Documents), and all documentation executed and delivered in connection therewith, as amended, restated, supplemented or otherwise modified from time to time.

17.    "Abuse" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

18.    "Abuse Claim" means a liquidated or unliquidated Claim against a Protected Party ~~or~~, a Limited Protected Party, or an Opt-Out Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date ~~(and in the case of Limited Protected Parties, on or after January 1, 1976)~~, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, *respondeat superior*, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based on ~~on~~upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization or any other Person for whom any Protected Party ~~or~~, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible~~; provided, however, that with respect to any Contributing Chartered Organization or its personnel or affiliates, the term "Abuse Claim" shall be limited to any such Claim that is attributable to, arises from, is based upon, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, concealment, or unfair~~

~~practice, public or private nuisance, or any other theory, including any theory based on~~ ~~public policy or any act or failure to act by a Protected Party, a Limited Protected Party or~~ ~~any other Person for whom any Protected Party or Limited Protected Party is alleged to~~ ~~be responsible, in connection, in whole or in part, with the Contributing Chartered~~ ~~Organization's or its personnel's or affiliates' involvement in, or sponsorship of, one or~~ ~~more Scouting units~~ (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon~~; provided further,~~ ~~however, that with respect to any Participating Chartered Organization, the term "Abuse~~ ~~Claim" shall be limited to Post-1975 Chartered Organization Abuse Claims~~. Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, <u>any Opt-Out Abuse</u> <u>Claims,</u> and any Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged <u>Scouting-related</u> Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations. For the avoidance of doubt, no Claim alleging Abuse shall be an "Abuse Claim" against a ~~Contributing~~<u>Protected Party, Limited Protected Party, or Opt-Out</u> Chartered Organization ~~or a Participating Chartered Organization~~ if such Claim is wholly unrelated to Scouting.<u>;</u> <u>provided, further, that any Claim alleging Abuse involving the Debtors, Reorganized</u> <u>BSA, Non-Debtor Entities, Local Councils, and each of their Representatives, is</u> <u>necessarily Scouting-related and shall be considered an Abuse Claim.</u>

19.     "<u>Abuse Claims Settlement</u>" has the meaning ascribed to such term in <u>Article V.S</u>.

20.     "<u>Abuse Insurance Policies</u>" means, collectively, the BSA Insurance Policies<u>,</u> and the Local Council Insurance Policies. Abuse Insurance Policies do not include Non-Abuse Insurance Policies <u>or Postpetition Insurance Policies</u>.

21.     "<u>Accrued Professional Fees</u>" means, as of any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's or Coalition Professional's accrued fees and reimbursable expenses for services rendered in the Chapter 11 Cases up to and including such date, whether or not such Professional or Coalition Professional has then filed an application for the Allowance and payment of such fees and expenses: (a) to the extent that any such fees and expenses have not been previously paid by the Debtors; and (b) after each Professional has applied to such accrued fees and expenses the balance of any retainer that has been provided by the Debtors to such Professional, if applicable. No amount of a Professional's or Coalition Professional's fees or expenses denied by a Final Order of the Bankruptcy Court shall constitute Accrued Professional Fees.

22.     "<u>Ad Hoc Committee</u>" means the Ad Hoc Committee of Local Councils of the Boy Scouts of America.

23.     "<u>Administrative Expense Claim</u>" means any right to payment from the Debtors that constitutes a cost or expense of administration incurred during the Chapter 11 Cases of the kind specified under 503(b) of the Bankruptcy Code and entitled to

priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates or continuing the operations of the Debtors incurred during the period from the Petition Date to the Effective Date; (b) the Hartford Administrative Expense Claim and, if applicable in accordance with the Hartford Insurance Settlement Agreement, the Hartford Additional Administrative Expense Claim; (c) Professional Fee Claims; and (d) Quarterly Fees.

24.    "Affiliate" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor in the Chapter 11 Cases, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

25.    "Affirmation Order" means an order of the District Court affirming Confirmation of the Plan and issuing or affirming the Channeling Injunction in favor of the Protected Parties and the Limited Protected Parties, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative and Hartford, the Settling Insurance Companies, and TCJC, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet.

26.    "Allowed" has the following meanings for Non-Abuse Claims:

a.    with respect to any Claim that is asserted to constitute an Administrative Expense Claim: (i) a Claim that represents an actual and necessary cost or expense of preserving the Estates or continuing the operations of the Debtors incurred during the period from the Petition Date to the Effective Date for which a request for payment is filed, (A) to the extent such Claim is determined by the Debtors to constitute an Administrative Expense Claim or allowed by a Final Order of the Bankruptcy Court or (B) as to which no objection to allowance has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law; (ii) other than with respect to a Professional Fee Claim, a Claim that arises during the period from the Petition Date to the Effective Date for which a request for payment is filed that is Disputed by the Debtors, which Claim is allowed in whole or in part by a Final Order of the Bankruptcy Court to the extent that such allowed portion is determined by a Final Order to constitute a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code; (iii) a Claim that arises during the period from the Petition Date to the Effective Date in the ordinary course of the Debtors' non-profit operations that is determined by the Debtors to constitute an Administrative Expense Claim; (iv) a Professional Fee Claim, to the extent allowed by a Final Order of the Bankruptcy Court; or (v) any Claim that is expressly allowed as provided in Article II.A.1;

b.    with respect to any 2010 Credit Facility Claim, 2019 RCF Claim, 2010 Bond Claim, or 2012 Bond Claim, any such Claim that is expressly allowed as provided under Article III; and

c.    with respect to any Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, Non-Abuse Litigation Claim, or any portion of any of the foregoing, a Claim that is: (i) listed in the Schedules as not being disputed, contingent or unliquidated and with respect to which no contrary or superseding Proof of Claim has been filed, and that has not been paid pursuant to an order of this Court prior to the Effective Date; (ii) evidenced by a Proof of Claim filed on or before the applicable Bar Date, not listed in the Schedules as disputed, contingent or unliquidated, and as to which no objection has been filed on or before the Claims Objection Deadline; (iii) not the subject of an objection to Allowance, which Claim (A) was filed on or before the Claims Objection Deadline and (B) has not been settled, waived, withdrawn or Disallowed pursuant to a Final Order; or (iv) expressly Allowed (x) pursuant to a Final Order, (y) pursuant to an agreement between the holder of such Claim and the Debtors or Reorganized BSA, as applicable, or (z) pursuant to the terms of the Plan.  For the avoidance of doubt, the holder of a Claim evidenced by a Proof of Claim filed after the applicable Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting and distribution.

"Allowance" and "Allowing" have correlative meanings.

27.    "Amended BSA Bylaws" means the amended and restated bylaws of the BSA, substantially in the form contained in the Plan Supplement.

28.    "Arrow" means Arrow WV, Inc., a West Virginia non-profit corporation.

29.    "Arrow Collateral Assignment" means that certain Collateral Assignment of Promissory Note and Credit Line Deed of Trust, dated as of March 21, 2019, by and between the BSA, as assignor, and JPM, as lender, pursuant to which BSA assigned the Arrow Intercompany Note and Arrow Deed of Trust to JPM to secure the obligations under the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, and the 2012 Bond Documents.

30.    "Arrow Deed of Trust" means that certain Credit Line Deed of Trust, dated as of June 30, 2010, made and executed by Arrow, as grantor, to Leslie Miller-Stover, as trustee, for the benefit of the BSA, as amended by that certain First Amendment to Credit Line Deed of Trust, dated as of March 21, 2019.

31.    "Arrow Intercompany Note" means that certain Amended and Restated Promissory Note dated as of March 21, 2019, issued by Arrow to the BSA in an original principal amount of $350,000,000.

32.    "Artwork" means the artwork listed on Schedule 1.

33.    "Assumed Contracts and Unexpired Leases Schedule" means the schedule of Executory Contracts or Unexpired Leases to be assumed by the BSA under the Plan and the Cure Amount for each such Executory Contract or Unexpired Lease, as set forth

in the Plan Supplement, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof.

34.    "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination or other Claims, causes of action or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes or common law, including preference and fraudulent transfer and conveyance laws, in each case whether or not litigation to prosecute such Claim(s), Cause(s) of Action or remedy(ies) were commenced prior to the Effective Date.

35.    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as in effect on the Petition Date.

36.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

37.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

38.    "Bar Date" means (a) November 16, 2020 for any Claim (other than an Administrative Expense Claim or a Claim of a Governmental Unit), or (b) August 17, 2020 for any Claim of a Governmental Unit, in each case as established by the Bar Date Order.

39.    "Bar Date Order" means the *Order, Pursuant to 11 U.S.C. §§ 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, (I) Establishing Deadlines for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, (III) Approving Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Survivors, and (IV) Approving Confidentiality Procedures for Abuse Survivors*, entered by the Bankruptcy Court on May 26, 2020 at Docket No. 695, as amended, modified or supplemented by order of the Bankruptcy Court from time to time.

40.    "Bond Issuer" means The County Commission of Fayette County (West Virginia) in its capacity as the issuer under the 2010 Bond Agreement and the 2012 Bond Agreement.

41.    "BSA" means Boy Scouts of America, a congressionally chartered non-profit corporation under title 36 of the United States Code.

42.    "BSA Charter" means the congressional charter of the BSA, enacted on June 15, 1916, as amended.

43.    "BSA Insurance Policies" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the ~~Effective~~Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2. ~~For the avoidance of doubt~~Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any ~~Settling~~ Insurance Company; (b) any Non-Abuse Insurance Policy; ~~or~~ (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

44.    "BSA Settlement Trust Contribution" means:

a.    all of the Net Unrestricted Cash and Investments, which are forecasted to total approximately $90,000,000, subject to potential variance depending upon the timing of the Effective Date and the BSA's cash flow performance up to and including the Effective Date;

b.    the BSA Settlement Trust Note, in the principal amount of $80,000,000, subject to the terms of Article V.S.3;

c.    the BSA's right, title and interest in and to the Artwork, which are deemed to be valued at approximately $59,000,000, and the rights to any insurance or the proceeds thereof with respect to missing, damaged, or destroyed Artwork, if any;

d.    all of the BSA's right, title and interest in and to the Warehouse and Distribution Center, subject to the Leaseback Requirement, or the proceeds of a third-party sale-leaseback of the Warehouse and Distribution Center for fair market value, which is valued at approximately $11,600,000;

e.    the BSA's right, title and interest in and to the Oil and Gas Interests, which are valued at approximately $7,600,000;

f.    the net proceeds of the sale of Scouting University, which equal approximately $1,962,000;

g.    the Insurance Assignment;

h.    the Debtors' Settlement Trust Causes of Action; and

i.    the assignment of any and all Perpetrator Indemnification Claims held by the BSA.

For the avoidance of doubt, the BSA Settlement Trust Contribution shall not include: (i) the proceeds of the Foundation Loan Facility; or (ii) any Causes of Action against

Released Parties or holders of General Unsecured Claims, Non-Abuse Litigation Claims, or Convenience Claims released by the Debtors and their Estates under Article X.J.

45.    "BSA Settlement Trust Note" means the secured, interest-bearing promissory note in the principal amount of $80,000,000, substantially in the form contained in the Plan Supplement, to be issued to the Settlement Trust by Reorganized BSA on the Effective Date in accordance with Article V.S.3 and Article V.X.

46.    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

47.    "Cash" means legal tender of the United States of America.

48.    "Cash Collateral Order" means the *Final Order (I) Authorizing the Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Party Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 503, and 507; and (III) Granting Related Relief*, entered by the Bankruptcy Court on April 15, 2020 at Docket No. 433.

49.    "Causes of Action" means any claims, interests, damages, remedies, causes of action, demands, rights, actions (including Avoidance Actions), suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, choate or inchoate, secured or unsecured, capable of being asserted, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, whether arising before, on, or after the Petition Date.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (d) any claim under any local, state, federal or foreign law, including any fraudulent transfer or similar claim.

50.    "Century" means (a) Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America; (b) Century Indemnity Company as successor to CIGNA Specialty Insurance Company f/k/a California Union Insurance Company; (c) Insurance Company of North America; and (d) and each of their past, present and future direct or indirect parents, subsidiaries, affiliates and controlled entities, and each of their respective officers, directors, stockholders, members, partners, managers, employees, attorneys, agents, experts, consultants, predecessors, successors and assigns, each in their capacity as such; provided that the term "Century" shall not include the foregoing persons and entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any

actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

51.     "Century and Chubb Companies Insurance Settlement" has the meaning ascribed to such term in Exhibit I.

52.     "Century and Chubb Companies Insurance Settlement Agreement" means that certain settlement agreement, which remains subject to definitive documentation, by and between the Century and Chubb Companies, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and certain state court counsel to holders of Direct Abuse Claims, as such agreement is described in the term sheet appended to the *Seventh Mediator's Report* [D.I. 7745] filed on December 14, 2021, and as such agreement may be subsequently set forth in and superseded by a definitive written settlement agreement that is consistent with such term sheet and executed by all of the parties thereto (and any additional parties that execute a joinder thereto).  Upon its execution by all of the parties thereto, the Century and Chubb Companies Insurance Settlement Agreement shall be filed with the Plan Supplement and attached hereto as Exhibit I-2.  Pending such execution, the term sheet shall serve as the description of the applicable agreement.

53.     "Century and Chubb Companies Policies" shall have the meaning set forth for "Settling Insurers' Policies" in the Century and Chubb Companies Insurance Settlement Agreement; provided, however, that such policies shall not include (a) Non-Abuse Insurance Policies, except to the extent of a request for coverage and/or any Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, omissions or positions taken in connection with the Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise or (b) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

54.    "Century and Chubb Companies Settlement Contribution" shall mean the "Settlement Amount" as defined in the Century and Chubb Companies Insurance Settlement Agreement, which is equal to Eight Hundred Million Dollars ($800,000,000).

55.    50. "Channeling Injunction" means the permanent injunction provided for in Article X.F with respect to (a) Abuse Claims against the Protected Parties and, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, and (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies with respect to such coverage for Abuse Claims, (d) Opt-Out Abuse Claims against the Opt-Out Chartered Organizations under any insurance policy issued by the Settling Insurance Companies with respect to such coverage for Abuse Claims, to be issued pursuant to the Confirmation Order.

56.    51. "Chapter 11 Cases" means the cases filed by the Debtors under chapter 11 of the Bankruptcy Code, which are jointly administered under Case No. 20-10343 (LSS).

57.    52. "Chartered Organizations" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

53. "Chartered Organization Reserved Policies" shall mean liability insurance policies, if any, that (a) (i) were issued to individual Local Councils before January 1, 1976 or (ii) were issued to the BSA before January 1, 1976, (b) have a policy period that ends before January 1, 1976, and (c) name Chartered Organizations as insureds, either individually or collectively.

58.    "Chubb Companies" means (a) Westchester Fire Insurance Company; (b) Westchester Surplus Lines Insurance Company; (c) Industrial Insurance Company of Hawaii; (d) Chubb Custom Insurance Company; (e) Federal Insurance Company; (f) Pacific Indemnity Company; (g) Texas Pacific Indemnity Company; (h) U.S. Fire Insurance Company, to the extent policies were assumed by or novated to Westchester Fire Insurance Company; (i) International Insurance Company to the extent policies were assumed by or novated to Westchester Fire Insurance Company; (j) Industrial Indemnity Company; (k) Pacific Employers Insurance Company; (l) The North River Insurance Company; (m) Aetna Insurance Company; (n) American Foreign Insurance Association; (o) Chubb Atlantic Indemnity Ltd.; and (p) INA Insurance Company of Illinois; (q) and each of their past, present and future direct or indirect parents, subsidiaries, affiliates and controlled entities, and each of their respective officers, directors, stockholders, members, partners, managers, employees, attorneys, agents, experts, consultants, predecessors, successors and assigns, each in their capacity as such provided that the term "Chubb" shall not include the foregoing persons and entities in their capacities as contractual obligors under: (i) Non-Abuse Insurance Policies (including but not limited to D&O Liability Insurance Policies) except to the extent of a request for coverage and/or any

Claims or Causes of Action related to, arising from or in connection with Abuse Claims, any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise and (ii) Postpetition Insurance Policies, except for any Claims or Causes of Action related to, arising from or in connection with any actions, omissions or positions taken in connection with the Debtors' Chapter 11 Cases and related proceedings and any extra-contractual claims related to, arising from or connected with actions or omissions occurring prior to the Effective Date, including the Settling Insurers' performance of their obligations under such policies whether for defense, settlement of claims or otherwise.

59. 54. "Claim" means any "claim," as defined in section 101(5) of the Bankruptcy Code, which, for the avoidance of doubt, shall include any Abuse Claim.

60. 55. "Claims Objection Deadline" means the deadline for filing an objection to any Administrative Expense Claim (other than a Professional Fee Claim), Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, or Non-Abuse Litigation Claim, which deadline shall be: (a) 180 days after the Effective Date with respect to all such Claims and Interests other than Convenience Claims, General Unsecured Claims, and Non-Abuse Claims, subject to any extensions approved by an order of the Bankruptcy Court; and (b) sixty (60) days after the Effective Date with respect to Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims, subject to any extensions approved by an order of the Bankruptcy Court with the consent of the Creditor Representative (such consent not to be unreasonably withheld); provided, however, that the Debtors shall not be bound by the Claims Objection Deadline with respect to any Claim filed after the Bar Date; provided further, however, that the Claims Objection Deadline shall not apply to Abuse Claims, which shall be administered exclusively in accordance with the Settlement Trust Documents.

61. 56. "Claims Record Date" means the Voting Deadline, which is the date on which the transfer register for each Class of Non-Abuse Claims against or Interests in the Debtors, as such register is maintained by the Debtors or their agents, shall be deemed closed.

62. 57. "Claims Register" means the official register of Claims maintained by the Notice and Claims Agent in the Chapter 11 Cases.

63. 58. "Class" means each category of holders of Claims or Interests as set forth in Article III pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

64. 59. "Coalition" means the Coalition of Abused Scouts for Justice, an *ad hoc* committee composed of thousands of holders of Direct Abuse Claims that filed a notice of appearance in the Chapter 11 Cases on July 24, 2020 at Docket No. 1040.

65.   60. "Coalition Professionals" means (a) Brown Rudnick LLP, (b) Robbins, Russell, Englert, Orseck & Untereiner LLP, (c) Monzack, Mersky and Browder, P.A., (d) Province, LLC, and (e) Parsons, Farnell & Grein, LLP.

66.   61. "Coalition Restructuring Expenses" has the meaning ascribed to such term in Article V.T.

67.   62. "Common-Interest Communications with Insurers" means documents, information, or communications that are subject to the attorney-client privilege, attorney-work product doctrine, or other privilege or protection from disclosure, and are shared between or among (a) the Debtors and/or any Protected Party or Limited Protected Party, on the one hand, and (b) any Insurance Company or its Representatives, on the other hand, including documents that reflect defense strategy, case evaluations, discussions of settlements or resolutions, and communications regarding underlying litigation.   Common-Interest Communications with Insurers do not include any communications between or among the Debtors and any Insurance Company relating to matters on which an Insurance Company has denied coverage.

68.   63. "Compensation and Benefits Programs" means all employment agreements and policies, and all employment, compensation, and benefit plans, policies, savings plans, retirement plans (including the Pension Plan), deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit agreements, plans or policies, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors, and the employees, retirees and non-employee directors of the Local Councils and the Related Non-Debtor Entities.   Notwithstanding the foregoing, the Compensation and Benefits Programs shall not include the Deferred Compensation Plan or the Restoration Plan.

69.   64. "Compensation Procedures Order" means the *Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* entered by the Bankruptcy Court on April 6, 2020 at Docket No. 341, as amended by the *Order Amending the Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* entered by the Bankruptcy Court on August 6, 2021 at Docket No. 5899.

70.   65. "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.   "Confirm," "Confirmed" and "Confirmability" shall have correlative meanings.

71.   66. "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

72. 67. "Confirmation Hearing" means the hearing(s) held by the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

73. 68. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative and Hartford, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and TCJC (in accordance with the TCJC Settlement Agreement) and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D.

74. "Contributing Chartered Organization Insurance Action" means any Cause of Action of the Contributing Chartered Organizations, or any of them, under the laws of any jurisdiction, against any Non-Settling Insurance Company, arising from or related to an Abuse Insurance Policy, including: (a) any such Non-Settling Insurance Company's failure to provide coverage or otherwise pay under an Abuse Insurance Policy; (b) the refusal of any Non-Settling Insurance Company to compromise and settle any Abuse Claim under or pursuant to any Abuse Insurance Policy; (c) the interpretation or enforcement of the terms of any Abuse Insurance Policy with respect to any Abuse Claim; (d) any conduct by any Non-Settling Insurance Company that could give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (e) any right to receive proceeds held by such Contributing Chartered Organization with respect to an Abuse Insurance Policy. For the avoidance of doubt, no Cause of Action of the Contributing Chartered Organizations, or any of them, against any Settling Insurance Company shall be deemed an Insurance Action, except for any Cause of Action arising from or related to an Insurance Settlement Agreement.

75. "Contributing Chartered Organization Insurance Rights" has the meaning ascribed to such term in Article V.S.1.b.

76. 69. "Contributing Chartered Organization Settlement Contribution" means the following:

a. the contributions to the Settlement Trust by the Contributing Chartered Organizations, including the TCJC Settlement Contribution, as set forth on Exhibit C, the Supplemental LC Contribution, and the Settlement Growth Payment, each as set forth in the Century and Chubb Companies Insurance Settlement Agreement and including contributions made after the Effective Date in accordance with Article IV.I;

b. to the maximum extent permitted by applicable law, any and all of the Contributing Chartered Organizations' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or

15

unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Abuse Insurance Policies, the Settling Insurer Policy Rights, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries;

      c.    the waiver, release, and expungement from the Claims Register, as of the Effective Date, of any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Contributing Chartered Organization, including any Indirect Abuse Claims, without further notice to or action, order, or approval of the Bankruptcy Court, and the agreement of each Contributing Chartered Organization not to (i) file or assert any Claim or Claims against the Settlement Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors on or prior to the Confirmation Date or (ii) file or assert any rights or interests in any property transferred to the Settlement Trust under the Plan; provided, however, that the Indirect Abuse Claims (Claim Nos. 1248 and 12530) filed by TCJC relating to the payment of costs to defend and resolve Abuse Claims shall be subordinated and not otherwise receive distributions until the date that the Confirmation Order and Affirmation Order become Final Orders at which time such claims shall be waived and expunged from the Claims Register;

      d.    the Contributing Chartered Organizations' Settlement Trust Causes of Action; and

      e.    the assignment of any and all Perpetrator Indemnification Claims held by the Contributing Chartered Organizations.

77.   70.  "Contributing Chartered Organizations" means the current or former Chartered Organizations listed on Exhibit D hereto, including any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.I.; provided, however, no Other Chartered Organization shall become a Contributing Chartered Organization if it (a) objects to confirmation of the Plan or (b) informs Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the TCJC Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), TCJC is a Contributing Chartered Organization and shall be designated as such in the Confirmation Order and the Affirmation Order. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the Other Chartered Organization Settlement by an Order of the Bankruptcy Court (including the Confirmation Order), upon the Effective Date all Other Chartered Organizations shall be designated as Contributing Chartered Organizations, subject to the terms of the Century and Chubb Companies Insurance Settlement Agreement. Notwithstanding the foregoing,

16

with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be treated as a Contributing Chartered Organization only if it advises the Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment, provided, however, that Abuse Claims against such Chartered Organizations shall be subject to the injunction and release applicable to Opt-Out Abuse Claims.  A list of Chartered Organizations that are debtors in bankruptcy as of the Confirmation Date is attached hereto as Exhibit K.  No Chartered Organization shall be a Contributing Chartered Organization unless it provides or is deemed to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

71.  "Contributing Chartered Organization Insurance Rights" has the meaning ascribed to such term in Article V.S.1.b.

78.    72.  "Convenience Claim" means any Claim that would otherwise be a General Unsecured Claim that is Allowed in an amount of $50,000 or less; provided that a holder of a General Unsecured Claim that is Allowed in an amount greater than $50,000 may irrevocably elect, as evidenced on the Ballot (as defined in the Voting Procedures) timely and validly submitted by such holder (or other writing acceptable to the Debtors), to have such Claim irrevocably reduced to $50,000 and treated as a Convenience Claim (upon Allowance) for purposes of the Plan, in full and final satisfaction of such Claim; provided further that a General Unsecured Claim may not be subdivided into multiple Convenience Claims.  The holder of an Allowed Non-Abuse Litigation Claim may elect to have such Allowed Claim treated as a Convenience Claim solely in accordance with the terms of Article III.B.9.  For the avoidance of doubt, the holder of an Abuse Claim (including Direct Abuse Claims and Indirect Abuse Claims) may not elect to have such Claim treated as a Convenience Claim.

79.    73.  "Core Value Cash Pool" means Cash in the aggregate amount of $25,000,000 for purposes of making Distributions to holders of Allowed General Unsecured Claims and, subject to the terms of Article III.B.9, holders of Allowed Non-Abuse Litigation Claims.  Reorganized BSA shall fund the Core Value Cash Pool in accordance with Article V.P.

80.    74.  "Creditor Representative" means the creditor representative to be appointed as of the Effective Date in accordance with Article V.P Article V.Q.  The Creditor Representative will be identified in the Plan Supplement.

81.    75.  "Creditor Representative Fee Cap" the maximum amount of reasonable compensation and reimbursement of expenses that shall payable by Reorganized BSA to the Creditor Representative on account of its services, which shall be equal to $100,000.

82.    76. "Creditors' Committee" means the official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases under section 1102(a) of the Bankruptcy Code.

83.    77. "Cure Amount" means, with respect to any Executory Contract or Unexpired Lease sought to be assumed or assumed and assigned by the Debtors, the monetary amount, if any, required to cure the Debtors' defaults under any such Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the non-Debtor party to an Executory Contract or Unexpired Lease) at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

84.    78. "Cure and Assumption Notice" means the notice of proposed assumption of, and proposed Cure Amount payable in connection with, an Executory Contract or Unexpired Lease (and, to the extent the Debtors seek to assume and assign any such Executory Contract or Unexpired Lease pursuant to the Plan, adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code), to be served in accordance with Article VI.C.

85.    79. "D&O Liability Insurance Policies" means all Insurance Policies issued at any time to any of the Debtors, the Local Councils, and the Chartered Organizations for directors', managers', and officers' liability (including any "tail policy" or run-off coverage) and all agreements, documents, or instruments relating thereto.

86.    80. "De Minimis Asset" means any miscellaneous asset that is valued by the Debtors at $10,000 or less and that is located at the premises subject to any Unexpired Leases rejected by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, including furniture and equipment.

87.    81. "Debtors" means the BSA and Delaware BSA, the non-profit corporations that are debtors and debtors in possession in the Chapter 11 Cases.

88.    82. "Deferred Compensation Plan" means the Boy Scouts of America 457(b) Plan, a non-qualified deferred compensation plan under section 457(b) of the Internal Revenue Code, which allows eligible BSA and Local Council employees to make elections to defer the payment of a certain amount or percentage of their regular base salary or bonus for future payment.

89.    83. "Delaware BSA" means Delaware BSA, LLC, a Delaware limited liability company.

90.    84. "Direct Abuse Claim" means an Abuse Claim that is not an Indirect Abuse Claim.

91.    85. "Disallowed" means, as to any Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, or Non-Abuse Litigation Claim, any such Claim or portion thereof that: (a) has been disallowed, denied, dismissed, expunged, or overruled pursuant to the

18

terms of the Plan or a Final Order of the Bankruptcy Court or any other court of competent jurisdiction or by a settlement; (b) has been listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order, or otherwise deemed timely filed under applicable law; or (c) has not been scheduled and as to which a Bar Date has been established but no Proof of Claim has been timely filed, such that the creditor holding such Claim shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution. "Disallowance" and "Disallowing" have correlative meanings. With respect to any 2010 Credit Facility Claim, 2019 RCF Claim, 2010 Bond Claim, 2012 Bond Claim, Direct Abuse Claim, Indirect Abuse Claim, or Interest, the term "Disallowed" shall not apply.

92.    86. "Disbursing Agent" means, with respect to all Claims other than Abuse Claims, Reorganized BSA or a Person or Persons selected by the Debtors or Reorganized BSA to make or facilitate Distributions contemplated under the Plan.

93.    87. "Discharge Injunction" means the injunction issued in accordance with sections 524 and 1141 of the Bankruptcy Code and contained in Article X.E.2 of the Plan.

94.    88. "Discharges" means the discharges set forth in Article X.E.

95.    89. "Disclosure Statement" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, which is in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition and the Future Claimants' Representative and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet.

96.    90. "Disclosure Statement Order" means one or more orders entered by the Bankruptcy Court, in form and substance reasonably acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition and the Future Claimants' Representative and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet: (i) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code; (ii) fixing the amounts of Claims solely for voting purposes and not for purposes of distributions; (iii) approving the Voting Procedures; and (iv) authorizing solicitation of the Plan.

97.    91. "Disputed" means, as to any Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Convenience Claim, General Unsecured Claim, or Non-Abuse Litigation Claim, any such Claim (or portion thereof) (a) that is neither Allowed nor Disallowed, (b) that is listed on the Schedules as "disputed," "contingent," or "unliquidated" or (c) for which a Proof of Claim has been

filed or a written request for payment has been made to the extent that any party in interest has interposed a timely objection to such Claim, which objection has not been withdrawn or adjudicated pursuant to a Final Order.  The term "Disputed" does not apply to Abuse Claims.

98.    ~~92.~~  "Disputed Claims Reserve" means the reserve of Cash within the Core Value Cash Pool to be Distributed to holders of Disputed General Unsecured Claims, if and when such Disputed Claims become Allowed, which shall be funded with amounts and on terms acceptable to the Creditor Representative.

99.    ~~93.~~ "Distribution" means the payment or delivery of Cash, property, or interests in property, as applicable, to holders of Allowed Non-Abuse Claims under the terms of the Plan.  "Distributed" and "Distribution" have correlative meanings.

100.    ~~94.~~ "Distribution Date" means the dates on which the Disbursing Agent makes a Distribution, or causes a Distribution to be made, from the Core Value Cash Pool to holders of Allowed General Unsecured Claims and, subject to the terms of Article III.B.9, holders of Allowed Non-Abuse Litigation Claims.  Each Distribution Date shall occur as soon as practicable after Reorganized BSA makes each semi-annual installment payment of the Core Value Cash Pool in accordance with Article V.P.

101.    ~~95.~~ "District Court" means the United States District Court for the District of Delaware.

102.    ~~96.~~ "Document Agreement" means the document agreement, substantially in the form contained in the Plan Supplement, by and among Reorganized BSA, the Related Non-Debtor Entities, the Local Councils, the Contributing Chartered Organizations, and the Settlement Trust, in form and substance acceptable to the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative and TCJC.

103.    ~~97.~~ "DST" means the Delaware statutory trust established under Article V.Y and the DST Agreement for the purposes set forth therein; provided, that the DST may be any other type of Entity, provided such Entity is not affiliated with Reorganized BSA or the Local Councils under principles of accounting.

104.    ~~98.~~ "DST Agreement" means the agreement governing the DST, dated as of the Effective Date, the form of which shall be included in the Plan Supplement.

105.    ~~99.~~ "DST Note" means the non-recourse interest-bearing promissory note in the principal amount of $~~100,000,000~~125,000,000 (subject to modification as set forth in the Century and Chubb Companies Insurance Settlement Agreement), substantially in the form contained in the Plan Supplement, to be issued to the Settlement Trust by the DST on the Effective Date in accordance with    Article V.Y and the DST Note Mechanics.

106.    ~~100.~~ "DST Note Mechanics" means the terms of Exhibit F as they relate to the payments that will be made by the DST following the Effective Date.

107. 101. "Effective Date" means the first Business Day on which all of the conditions precedent to the occurrence of the Effective Date set forth in Article IX.B shall have been satisfied or waived pursuant to Article IX.C.

108. 102. "Encumbrance" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property, including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, to secure payment of a debt or performance of an obligation.

109. 103. "Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

110. 104. "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

111. 105. "Estate Causes of Action" means any and all Causes of Action owned, held, or capable of being asserted by or on behalf of either Debtor or its Estate, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including actions that: (a) arise out of or are based on breach of contract, fraudulent conveyances and transfers, breach of fiduciary duty, breach of duty of loyalty or obedience, legal malpractice, recovery of attorneys' fees, turnover of property and avoidance or recovery actions of the Debtors or their respective Estates, including actions that constitute property of the Estate under section 541 of the Bankruptcy Code that are or may be pursued by a representative of the Estates, including pursuant to section 323 of the Bankruptcy Code, and actions, including Avoidance Actions, that may be commenced by a representative of the Estates under section 362 or chapter 5 of the Bankruptcy Code, seeking relief in the form of damages (actual and punitive), imposition of a constructive trust, turnover of property, restitution, and declaratory relief with respect thereto or otherwise; or (b) seek to impose any liability upon, or injunctive relief on, any Protected Party or to satisfy, in whole or in part, any Abuse Claim.

112. 106. "Excess Cash and Investments" means, as of any date on or after the Effective Date, the unrestricted Cash and balance sheet investments owned by Reorganized BSA that are not subject to legally enforceable restrictions on the use or disposition of such assets for a particular purpose.

113. 107. "Excess Cash Sweep" has the meaning ascribed to such term in Article V.V.

114. 108. "Exculpated Parties" means, collectively, the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Creditors' Committee; (d) the members of the Creditors' Committee in their capacities as such; (e) the Tort Claimants' Committee;

(f) the members of the Tort Claimants' Committee in their capacities as such; (g) the Future Claimants' Representative; (h) the Creditor Representative; and (i) all of such Persons' current officers and directors, former officers and directors who served in such capacity during the pendency of the Chapter 11 Cases but are no longer officers or directors as of the Effective Date, employees, volunteers, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals; provided, however, that Pachulski Stang Ziehl & Jones LLP and its Representatives shall not be Exculpated Parties.

115.   109. "Executory Contract" means any executory contract to which BSA is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

116.   110. "Expedited Distribution" means a one-time Cash payment from the Settlement Trust in the amount of $3,500.00, conditioned upon satisfaction of the criteria set forth in the Trust Distribution Procedures.

117.   111. "Fee Examiner" means Justin H. Rucki of Rucki Fee Review, LLC, in his capacity as the fee examiner appointed pursuant to the *Order Appointing Fee Examiner and Establishing Related Procedures for the Review of Applications of Retained Professionals*, entered by the Bankruptcy Court on September 18, 2020 at Docket No. 1342, or any successor appointed by the Bankruptcy Court.

118.   112. "Final Order" means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that has not been reversed, vacated, stayed, modified or amended, and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied with prejudice or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order to not be a Final Order.

119.   113. "Florida Sea Base Assignment" means the Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

120. ~~114.~~ "Florida Sea Base Mortgage" means the Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

121. ~~115.~~ "Foundation" means the National Boy Scouts of America Foundation, a District of Columbia nonprofit corporation.

122. ~~116.~~ "Foundation Loan" means the new second-lien term loan lending facility pursuant to which the Foundation, as lender, shall make a term loan to Reorganized BSA, as borrower, in the principal amount of $42,800,000, which is equal to the appraised value of the Summit Bechtel Reserve.   The material terms of the Foundation Loan are set forth on the term sheet attached hereto as Exhibit E, which is qualified in its entirety by reference to the Foundation Loan Agreement.

123. ~~117.~~ "Foundation Loan Agreement" means the credit agreement governing the Foundation Loan, dated as of the Effective Date, the form of which shall be included in the Plan Supplement.

124. ~~118.~~ "Future Abuse Claim" means any Direct Abuse Claim against any Protected Party ~~or~~, Limited Protected Party, or an Opt-Out Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose; provided~~, however, that with respect to any Contributing Chartered Organization or Participating Chartered Organization, the term "Future Abuse Claim" shall be limited to any such Direct Abuse Claim that satisfies either (a) or (b) in connection, in whole or in part, with the Contributing Chartered Organization's, Participating Chartered Organization's, or its respective personnel's or affiliates' involvement in, or sponsorship of, one or more Scouting units, including any proportionate or allocable share of liability based thereon; provided~~ further, however, that with respect to any Participating Chartered Organization, the term "Future Abuse Claim" shall be limited to Post-1975 Chartered Organization Abuse Claims that satisfy either (a) or (b).  For the avoidance of doubt, no Claim alleging Abuse shall be a "Future Abuse Claim" against a Contributing Chartered Organization ~~or~~, a Participating Chartered Organization, or an Opt-Out Chartered Organization if such Claim is wholly unrelated to Scouting.

125. ~~119.~~ "Future Claimants' Representative" means James L. Patton, Jr., the legal representative appointed by the Bankruptcy Court for holders of Future Abuse Claims, or any successor legal representative appointed by the Bankruptcy Court.

126.    120. "General Unsecured Claim" means any Claim against the Debtors that is not an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a 2010 Credit Facility Claim, a 2019 RCF Claim, a 2010 Bond Claim, a 2012 Bond Claim, a Convenience Claim, a Non-Abuse Litigation Claim, a Direct Abuse Claim, or an Indirect Abuse Claim.  Claims arising under the Deferred Compensation Plan or the Restoration Plan shall be deemed to be General Unsecured Claims.

127.    121. "Gift Annuity Agreements" mean the charitable gift annuity agreements described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer, Scout, and Donor Programs and Practices and (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief*, filed by the Debtors on the Petition Date at Docket No. 8.

128.    122. "Governmental Unit" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

129.    123. "Hartford" means Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company and each of their past, present and future direct or indirect parents, subsidiaries, affiliates and controlled entities, and each of their respective officers, directors, stockholders, members, partners, managers, employees, predecessors, successors and assigns, each in their capacity as such.

130.    124. "Hartford Additional Administrative Expense Claim" means Hartford's administrative expense claim, in addition to the Hartford Administrative Expense Claim, of $23.61 million that Hartford may assert in accordance with the terms and conditions of the Hartford Insurance Settlement Agreement in the event that BSA exercises a Fiduciary Out or takes another Specified Action (as such capitalized terms are defined in the Hartford Insurance Settlement Agreement), which administrative expense claim shall be reserved for prior to distributions to unsecured creditors and to which the Debtors, the Ad Hoc Committee, the Future Claimants' Representative, the Coalition, and the State Court Counsel (as identified and defined in the Hartford Insurance Settlement Agreement) shall not object or argue that the claim should be allowed in an amount less than $23.61 million (except as permitted under the Hartford Insurance Settlement Agreement).

131.    125. "Hartford Administrative Expense Claim" means Hartford's administrative expense claim for the Debtors' alleged breach of the Settlement Agreement and Release between Hartford and the Debtors, dated as of April 15, 2021, in the amount of $2,000,000, which shall be paid in full in Cash to Hartford on, or as soon as reasonably practicable after, the Effective Date in accordance with the Hartford Insurance Settlement Agreement.

132.   126.  "Hartford Insurance Settlement" has the meaning ascribed to such term in ~~Article V.S.4~~Exhibit I.

133.   127.  "Hartford Insurance Settlement Agreement" means that certain settlement agreement, which remains subject to definitive documentation, by and between Hartford, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and certain state court counsel to holders of Direct Abuse Claims, as such agreement is described in the term sheet appended to the *Sixth Mediators' Report* [D.I. 6210] filed on September 14, 2021, and as such agreement may be subsequently set forth in a definitive written settlement agreement that is consistent with such term sheet and executed by all of the parties thereto (and any additional parties that execute a joinder thereto).  Upon its execution by all of the parties thereto, the Hartford Insurance Settlement Agreement shall be filed with the Plan Supplement and attached hereto as Exhibit I-1.

134.   128.  "Hartford Policies" shall have the meaning set forth for such capitalized term in the Hartford Insurance Settlement Agreement.

135.   129.  "Hartford Settlement Contribution" shall mean the "Settlement Amount" as defined in the Hartford Insurance Settlement Agreement, which is equal to Seven Hundred Eighty-Seven Million Dollars ($787,000,000).

136.   130.  "Headquarters" means that certain parcel of real property owned by the BSA located at 1325 West Walnut Hill Lane, Irving, Texas 75038, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

137.   131.  "Headquarters Assignment" means that certain Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

138.   132.  "Headquarters Deed of Trust" means that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and between the BSA and JPM.

139.   133.  "High Adventure Base Participant" means a registered Youth Member who has paid the participation fee (which has not been refunded in whole or in part) for attending a BSA program at one of the four high adventure bases (Florida Sea Base, Northern Tier, Philmont or Summit Bechtel Reserve).  High Adventure Base Participants do not include Youth Members attending a Jamboree, an Order of the Arrow program, or an event sponsored by the World Organization of the Scouting Movement (WOSM) or a member of WOSM other than the BSA.

140.   134.  "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

141. ~~135.~~ "Indemnification Obligations" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, limited liability company agreements, or other organizational or formation documents, board resolutions, management or indemnification agreements, employment or other contracts, or otherwise, for the past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents who provided services to the Debtors before, on, or after the Petition Date.

142. ~~136.~~ "Indirect Abuse Claim" means a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; provided, however, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim and shall be treated in accordance with Article IV.D.1.

143. ~~137.~~ "Injunctions" means the Discharge Injunction, the Channeling Injunction, the Insurance Entity Injunction, the Release Injunctions, and any other injunctions entered by the Bankruptcy Court or the District Court in connection with Confirmation of the Plan.

144. ~~138.~~ "Insurance Action" means any claim, Cause of Action, or right of the Debtors, Related Non-Debtor Entities, Local Councils, ~~Participating Chartered Organizations, and Contributing Chartered Organizations,~~ or any of them, under the laws of any jurisdiction, against any Non-Settling Insurance Company, arising from or related to an Abuse Insurance Policy ~~(except for Participating Chartered Organizations' claims, Causes of Action, or rights arising from or related to the Chartered Organization Reserved Policies)~~, including: (a) any such Non-Settling Insurance Company's failure to provide coverage or otherwise pay under an Abuse Insurance Policy; (b) the refusal of any Non-Settling Insurance Company to compromise and settle any Abuse Claim under or pursuant to any Abuse Insurance Policy; (c) the interpretation or enforcement of the terms of any Abuse Insurance Policy with respect to any Abuse Claim; (d) any conduct by any Non-Settling Insurance Company constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law; ~~or~~ (e) Participating Chartered Organization Insurance Action, (f) Contributing Chartered Organization Insurance Action; or (g) any right to receive proceeds held by such Person with respect to an Abuse Insurance Policy or an Insurance Coverage Action. For the avoidance of doubt, no claim, Cause of Action, or right of the Debtors, Related Non-Debtor Entities, Local Councils, Participating Chartered Organizations or Contributing Chartered Organizations, or any of them, against any Settling Insurance Company shall be deemed an Insurance Action, except for any Cause of Action arising from or related to an Insurance Settlement Agreement.

145.    ~~139.~~ "Insurance Action Recoveries" means (a) Cash or other proceeds derived from and paid by an Insurance Company pursuant to an Insurance Settlement Agreement and (b) the right to receive the proceeds or benefits of any Insurance Action.

146.    ~~140.~~ "Insurance Assignment" means (x) the assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, and (d) all other rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves), and (y) the Participating Chartered Organization Insurance Assignment.  The Insurance Assignment does not include (i) any rights, claims, benefits, or Causes of Action under or with respect to any Non-Abuse Insurance Policies ~~and,~~ including D&O Liability Insurance Policies or (ii) any Local Council Reserved Rights.

147.    ~~141.~~ "Insurance Company" means any insurance company, insurance syndicate, coverholder, insurance broker or syndicate insurance broker, guaranty association, or any other Entity that has issued, or that has any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under or with respect to, any Insurance Policy or Local Council Insurance Policy.

148.    ~~142.~~ "Insurance Coverage Actions" means any and all pending coverage litigation between the BSA and any Insurance Company as of the Effective Date, including: (a) *Boy Scouts of America, et al. v. Insurance Company of North America et al.*, Case No. DC-18-11896, pending in the 192nd Judicial District Court of Dallas County, Texas; (b) *Boy Scouts of America, et al. v. Hartford Accident and Indemnity Co., et al.*, Case No. DC-18-07313, pending in the District Court of Dallas County, 95th Judicial District; (c) *National Surety Corp. v. Boy Scouts of America, et al.*, Case No. 2017-CH-14975, pending in the Circuit Court of Cook County, Illinois, Chancery Division; and (d) *Hartford Accident and Indemnity Co. and First State Ins. Co. v. Boy Scouts of America, et al.*, Adv. Pro. No. 20-50601 (LSS), pending before the Bankruptcy Court.

149.    ~~143.~~ "Insurance Coverage Defense" means, subject to Article X.M, all rights and defenses that any Insurance Company may have under any Insurance Policy and applicable law with respect to a claim seeking insurance coverage or to an Insurance Action, but Insurance Coverage Defenses do not include any defense that the Plan or any of the other Plan Documents do not comply with the Bankruptcy Code.  Upon entry of the Confirmation Order in the Chapter 11 Cases determining that the Insurance Assignment is authorized notwithstanding any terms or provisions of the Abuse Insurance Policies that any Insurance Company asserts or may assert otherwise prohibits the Insurance Assignment, an Insurance Coverage Defense shall not include any defense that the Insurance Assignment is prohibited by the Abuse Insurance Policies or applicable non-bankruptcy law.

150.    144. "Insurance Entity Injunction" means the injunction described in Article X.H.

151.    145. "Insurance Policies" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the ~~Effective~~Petition Date naming the Debtors, ~~or either~~the Local Councils, the Chartered Organizations, or any of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors, the Local Councils, or the Chartered Organizations insurance coverage.  Insurance Policies include Abuse Insurance Policies, BSA Insurance Policies, Local Council Insurance Policies, and Non-Abuse Insurance Policies.

152.    "Insurance Settlements" mean the settlement agreements with Settling Insurance Companies, as attached hereto as Exhibit I.

153.    146. "Insurance Settlement Agreement" means: (a) ~~the Hartford Insurance Settlement Agreement; (b) any other~~any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (~~e~~b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

154.    147. "Insurance Settlement Period" has the meaning ascribed to such term in ~~Article IV.K~~Article IV.I.

155.    148. "Interest" means any "equity security" as defined in section 101(16) of the Bankruptcy Code.

156.    149. "Internal Revenue Code" means title 26 of the United States Code, 26 U.S.C. §§ 1 *et seq.*, as in effect on the Petition Date, together with all amendments,

modifications, and replacements of the foregoing as the same may exist on any relevant date to the extent applicable to the Chapter 11 Cases.

157. ~~150.~~ "JPM" means JPMorgan Chase Bank, National Association and any successors and assigns.

158. ~~151.~~ "JPM / Creditors' Committee Settlement" has the meaning ascribed to such term in Article V.S.

159. ~~152.~~ "JPM / Creditors' Committee Term Sheet" means that certain settlement term sheet appended as Exhibit A to the *First Mediators' Report* filed on March 1, 2021 at Docket No. 2292.

160. ~~153.~~ "JPM Exit Fee" means an exit fee to be paid by Reorganized BSA on the Effective Date, in an amount equal to the aggregate principal amount due and owing as of the Effective Date, plus the undrawn amount of any letters of credit then outstanding, under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents, multiplied by 0.50%.

161. ~~154.~~ "Leaseback Requirement" means the requirement that Reorganized BSA be entitled to lease the Warehouse and Distribution Center from the Settlement Trust for fair market value so long as the Settlement Trust holds title to such premises and that any sale or other transfer of the Warehouse and Distribution Center by the Settlement Trust be subject to Reorganized BSA's right to lease such premises from any Person that acquires the Warehouse and Distribution Center from the Settlement Trust (or any subsequent acquirer) for fair market value for a term of not less than two years with four two-year options to renew at the option of Reorganized BSA. If as of the filing of the Plan Supplement the Bankruptcy Court has not approved a sale of the Warehouse and Distribution Center or if no motion to approve such sale is then pending before the Bankruptcy Court, then an agreement reflecting the terms of the Leaseback Requirement shall be filed with the Plan Supplement.

162. ~~155.~~ "Lien" means any "lien" as defined in section 101(37) of the Bankruptcy Code.

163. ~~156.~~ "Life-Income Agreement" means the agreements described in the *Supplement to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer, Scout, and Donor Programs and Practices and (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief*, filed by the Debtors on March 3, 2020 at Docket No. 134.

164. ~~157.~~ "Limited Protected Parties" means the Participating Chartered Organizations.

165. ~~158.~~ "Local Council Insurance Policies" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the ~~Effective~~Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local

Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company  For the avoidance of doubt, Local Council; (b) any Non-Abuse Insurance Policies do not includePolicy: (c) any BSA Insurance Policy or any insurance policy issued at any time to any of the Local Councils for directors', managers', and officers' liability (including any "tail policy" or run-off coverage) or any agreements, documents, or instruments relating thereto.; or (d) any Postpetition Insurance Policy.

166. 159. "Local Council Insurance Rights" has the meaning ascribed to such term in Article V.S.1.a.

167. 160. "Local Council Reserved Rights" means(a) any right of a Local Council under any Specified Insurance Policy with respect to any Non-Abuse Litigation Claim and (b) any right of a Local Council or Related Non-Debtor Entity under any Specified Insurance Policy with respect to any Cause of Action against such Local Council or Related Non-Debtor Entity that does not relate to Abuse and remains unresolved as of the Effective Date; provided, that such Local Council, Related Non-Debtor Entity, or applicable claimant provides notice of such claim or Cause of Action to the Debtors, the Coalition, and the Future Claimants' Representative prior to the Effective Date.

168. 161. "Local Council Settlement Contribution" means:

a.      the contributions to the Settlement Trust by the Local Councils, as set forth on Exhibit F and as updated in the Plan Supplement;

b.      to the maximum extent permitted under applicable law, any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the BSA Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof (but not the policies themselves, except as otherwise required under the Insurance Settlement Agreements); (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries; provided, however, that the transfer set forth herein will not include the Local Council Reserved Rights;

c.      to the maximum extent permitted under applicable law, any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the

Local Council Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries; provided, however, that the transfer set forth herein will not include the Local Council Reserved Rights;

       d.     the waiver, release, and expungement from the Claims Register, as of the Effective Date, of any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Local Council, including any Indirect Abuse Claims, without any further notice to or action, order, or approval of the Bankruptcy Court, and the agreement of each Local Council not to (i) file or assert any Claim or Claims against the Settlement Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors on or prior to the Confirmation Date or (ii) file or assert any rights or interests in any property transferred to the Settlement Trust under the Plan.

       e.     the Local Councils' Settlement Trust Causes of Action; and

       f.     the assignment of any and all Perpetrator Indemnification Claims held by the Local Councils.

169.    162.  "Local Councils" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G hereto, "supporting organizations" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

170.    163.  "Mediators" means the Honorable Kevin J. Carey (Ret.), Paul A. Finn, and Timothy V.P. Gallagher, each of whom iswho were appointed by the Bankruptcy Court as a mediatormediators in the Chapter 11 Cases under the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* entered on June 9, 2020 at Docket No. 812, as modified and limited to the time periods set forth in the supplemental order entered on November 17, 2021 at Docket No. 7283 and the second supplemental order entered on December 7, 2021 at Docket No. 7589.

171.    164.  "Net Unrestricted Cash and Investments" means all of the Unrestricted Cash and Investments as of the Effective Date, after Reorganized BSA has received the proceeds of the Foundation Loan, less (a) $25,000,000 (subject to potential variance as set forth in Article V.M) which shall be funded first from the proceeds of the Foundation Loan, (b) an amount of Cash equal to the JPM Exit Fee, (c) an amount of Cash sufficient to fund all unpaid Allowed Administrative Expense Claims, (d) without duplication, an amount of Cash sufficient to fund the Professional Fee Reserve, (e) an amount of Cash equal to the Creditor Representative Fee Cap, (f) the amount of Cash estimated to be required to satisfy Allowed Priority Tax Claims, Allowed Other Priority

Claims, Allowed Secured Claims, and Allowed Convenience Claims, and (g) an amount of Cash sufficient to fund all accrued but unpaid interest and reasonable fees and expenses of JPM as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.

172. 165. "Non-Abuse Claim" means any Claim against the Debtors that is not an Abuse Claim.

173. 166. "Non-Abuse Insurance Policy" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Effective Petition Date naming the Debtors, or either the Local Councils, the Chartered Organizations, or any of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors, the Local Councils, or the Chartered Organizations insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Non-Abuse Claim and which does not include coverage for Abuse Claims.—; provided, however, Non-Abuse Insurance Policies, including the D&O Liability Insurance Policies, do not include Abuse Insurance Policies (which Abuse Insurance Policies, for the avoidance of doubt, include the Specified Insurance Policies).

174. 167. "Non-Abuse Litigation Claim" means any Claim that is a prepetition unsecured non-priority Claim against the Debtors relating to pending or threatened litigation against one or both of the Debtors that does not relate to Abuse. For the avoidance of doubt, Non-Abuse Litigation Claims include (a) all personal injury or wrongful death Claims against the Debtors that do not relate to Abuse and (b) all Claims against the Debtors asserted by the Girl Scouts of the United States of America. Non-Abuse Litigation Claims do not include any Administrative Expense Claims that may be asserted by holders of Non-Abuse Litigation Claims.

175. 168. "Non-Settling Insurance Company" means any Insurance Company to the extent it is not a Settling Insurance Company.

176. 169. "Northern Tier Assignment" means that certain Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

177. 170. "Northern Tier Mortgage" means that certain Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

178. 171. "Notice and Claims Agent" means Omni Agent Solutions, in its capacity as "claims and noticing agent" for the Debtors, and any successor thereto.

179.    ~~172.~~ "Official Committees" means the Tort Claimants' Committee and the Creditors' Committee.

180.    ~~173.~~ "Oil and Gas Interests" means those certain mineral or royalty interests owned by the BSA, consisting of approximately 1,027 properties located in Alabama, Arkansas, California, Florida, Georgia, Illinois, Louisiana, Michigan, Mississippi, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Texas, South Dakota and Wyoming.  The Oil and Gas Interests include those listed on Schedule 4.

181.    "Opt-Out Abuse Claims" means any Abuse Claim against an Opt-Out Chartered Organization that is alleged to have occurred prior to the Petition Date (including prior to January 1, 1976) that is covered under an insurance policy issued by a Settling Insurance Company with respect to such coverage for such Abuse Claims.

182.    "Opt-Out Chartered Organization" means a Chartered Organization that is not a Contributing Chartered Organization or a Participating Chartered Organization because such Chartered Organization has (a) objected to confirmation of the Plan or (b) informed Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment.

183.    "Other Chartered Organization" shall mean all Chartered Organizations other than TCJC, United Methodist Entities, and Roman Catholic Entities.

184.    "Other Chartered Organization Settlement" means that certain settlement set forth in the Century and Chubb Companies Insurance Settlement Agreement, pursuant to which the Other Chartered Organizations shall be treated as Contributing Chartered Organizations if on or before the Release Date (as defined in the Century and Chubb Companies Insurance Settlement Agreement) the following contributions are made to the Settlement Trust: (a)(1) the Supplemental LC Contribution has been deemed contributed to the Settlement Trust; (2) the Century and Chubb Companies Settlement Amount is released to the Settlement Trust; and (b) for any Other Chartered Organization that is an Opt-Out Chartered Organization, a contribution equivalent in form and substance to the Participating Chartered Organization Settlement Contribution. No Chartered Organization shall be a Contributing Chartered Organization unless it provides or is deemed to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

185.    ~~174.~~ "Other Priority Claim" means any Claim against the Debtors that is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

186.    ~~175.~~ "Other Secured Claim" means any Secured Claim against the Debtors other than any 2010 Credit Facility Claim, 2019 RCF Claim, 2010 Bond Claim, or 2012 Bond Claim.

187.    ~~176.~~ "Participating Chartered Organization" means a Chartered Organization ~~that~~(other than the TCJC) does not (a) object to confirmation of the Plan or

(b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment.  Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment.  A list of Chartered Organizations that are ~~not~~ debtors in bankruptcy and may not be Participating Chartered Organizations is attached hereto as Exhibit K.  For the avoidance of doubt, so long as they do not object to the Plan or opt out, all Other Chartered Organizations are Participating Chartered Organizations and shall automatically become Contributing Chartered Organizations upon the Effective Date in accordance with the Other Chartered Organization Settlement and shall be deemed to have made the Participating Chartered Organization Settlement Contribution.

188.   ~~177.~~ "Participating Chartered Organization Insurance Action" means any Cause of Action of the Participating Chartered Organizations, or any of them, under the laws of any jurisdiction, against any Non-Settling Insurance Company, arising from or related to an Abuse Insurance Policy ~~(excluding Chartered Organization Reserved Policies)~~, including: (a) any such Non-Settling Insurance Company's failure to provide coverage or otherwise pay under an Abuse Insurance Policy ~~(excluding Chartered Organization Reserved Policies)~~; (b) the refusal of any Non-Settling Insurance Company to compromise and settle any Abuse Claim under or pursuant to any Abuse Insurance Policy ~~(excluding Chartered Organization Reserved Policies)~~; (c) the interpretation or enforcement of the terms of any Abuse Insurance Policy ~~(excluding Chartered Organization Reserved Policies)~~ with respect to any Abuse Claim ~~(excluding Abuse Claims that are not Post-1975 Chartered Organization Abuse Claims)~~; (d) any conduct by any Non-Settling Insurance Company that could give rise to extra-contractual damages, or other wrongful conduct under applicable law ~~(excluding conduct relating to Chartered Organization Reserved Policies)~~; or (e) any right to receive proceeds held by such Participating Chartered Organization with respect to an Abuse Insurance Policy ~~(excluding Chartered Organization Reserved Policies)~~.  For the avoidance of doubt, no Cause of Action of the Participating Chartered Organizations, or any of them, against any Settling Insurance Company shall be deemed ~~a Chartered Organization~~ an Insurance Action, except for any Cause of Action arising from or related to an Insurance Settlement Agreement.

189.   ~~178.~~ "Participating Chartered Organization Insurance Assignment" means ~~the assignment and transfer by~~ any and all of the Participating ~~Chartering~~ Chartered Organizations ~~(and each of them) to the Settlement Trust of their~~' rights in and to (a) the Participating Chartered Organization Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, ~~and~~ ~~(d) all other rights, claims, benefits, or Causes of Action under or with respect to~~ claims thereunder and proceeds thereof, (d) the Abuse Insurance Policies (but not the policies themselves)~~; provided, however, that the Participating Chartered Organization Insurance Assignment shall not~~

apply to Chartered Organization Reserved Policies or any rights, claims, benefits, or Causes of Action thereunder or with respect thereto. issued by Settling Insurance Companies, and (e) Settling Insurer Policy Rights.

190.    179. "Participating Chartered Organization Insurance Rights" has the meaning ascribed to such term in Article V.S.1.c.

191.    180. "Participating Chartered Organization Settlement Contribution" means:

a.    to the maximum extent permitted by applicable law, the Participating Chartered Organization Insurance Assignment;

b.    the waiver, release, and expungement from the Claims Register, as of the Effective Date,  of to the extent of any rights, claims or interests not assigned to the Settlement Trust pursuant to the Participating Chartered Organization Insurance Assignment, the waiver and complete release of (i) each of the Participating Chartered Organization's rights, titles, privileges, interests, claims, demands or entitlements under the Settling Insurance Companies' Abuse Insurance Policies and any Settling Insurer Policy Rights; (ii) any Claim held by the Participating Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or part, directly, indirectly, or derivatively (including through any insurance policy issued by the Settling Insurance Companies), alleged Abuse Claims that occurred prior to the Petition Date against the Settlement Trust, the Debtors, Reorganized BSA, the Local Councils, any Contributing Chartered Organization or Settling Insurance Companies; (iii) any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Participating Chartered Organization, including any Indirect Abuse Claims, without any further notice to or action, order, or approval of the Bankruptcy Court, which Claims shall be expunged from the Claims Register, and the agreement of each Participating Chartered Organization not to (ia) file or assert any Claim or Claims against the Settlement Trust, the Debtors, or Reorganized BSA arising from any act or omission of the Debtors, the Local Councils, any Contributing Chartered Organization, or any Participating Chartered Organization on or prior to the Confirmation Date, (b) object to the Document Agreement and obligations thereunder, or (iic) file or assert any rights or interests in any property transferred to the Settlement Trust under the Plan, including the proceeds of any settlements paid by a Settling Insurance Company; and

c.    the assignment to the Settlement Trust of any and all Perpetrator Indemnification Claims held by the Participating Chartered Organizations.

192.    181. "Pension Plan" means the Boy Scouts of America Retirement Plan for Employees, a single-employer, qualified, defined benefit pension plan that is subject

to the Employee Retirement Income Security Act of 1974, as amended, and the Internal Revenue Code, of which BSA is the sponsor.

193.    182. "Perpetrator" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim. The term "Perpetrator" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

194.    183. "Perpetrator Indemnification Claim" means a Claim against a Perpetrator for indemnification or contribution arising from or relating to an Abuse Claim.

195.    184. "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code."

196.    185. "Petition Date" means February 18, 2020.

197.    186. "Philmont Assignment" means that certain Assignment of Agreements, Licenses, Permits and Contracts, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

198.    187. "Philmont Mortgage" means that certain Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee, which secures the BSA's obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement.

199.    188. "Plan" means this *Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* filed by the Debtors, as the same may be amended or modified from time to time pursuant to section 1127 of the Bankruptcy Code.

200.    189. "Plan Documents" means, collectively, the Plan, the Disclosure Statement, the Disclosure Statement Order, each of the documents that comprises the Plan Supplement, and all of the exhibits and schedules attached to any of the foregoing (including the Settlement Trust Documents, the Hartford Insurance Settlement AgreementAgreements, and the TCJC Settlement Agreement).  The Plan Documents shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition., the Future Claimants' Representative and Hartford, Hartford, the Century and Chubb Companies, and any other Settling Insurance Companies all in accordance with

36

their consent rights, and (b) the Creditors' Committee and JPM in accordance with their consent rights under the JPM / Creditors' Committee Term Sheet.

201.    190. "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, exhibits, and annexes to the Plan, which the Debtors shall file no later than fourteen (14) days before the Voting Deadline, unless otherwise ordered by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications or supplements to the Plan Supplement.  The Plan Supplement will include the following: (a) the Amended BSA Bylaws; (b) the Assumed Contracts and Unexpired Leases Schedule; (c) the form of the BSA Settlement Trust Note; (d) the form of the Document Agreement; (e) the form of the DST Agreement; (f) the form of the DST Note; (g) the name of the Creditor Representative; (h) changes, if any, to Reorganized BSA's directors and officers; (i) the form of the Foundation Loan Agreement; (j) the form of agreement reflecting the terms of the Leaseback Requirement; (k) the Rejected Contracts and Unexpired Leases Schedule; (l) the forms of  the Restated 2010 Bond Documents; (m) the forms of the Restated 2012 Bond Documents; (n) the forms of the Restated Credit Facility Documents; (o) the form of the Restated Security Agreement; (p) the names of the initial members of the Settlement Trust Advisory Committee; (q) the name of the initial Special Reviewer; (r) the execution copy of the Hartford Insurance Settlement Agreement once the settlement memorialized in the term sheet appended to the *Sixth Mediators' Report* [D.I. 6210] filed on September 14, 2021 is set forth in a definitive written settlement agreement that is consistent with such term sheet and executed by all parties thereto (and any additional parties that execute a joinder thereto from time to time); (s) the execution copy of the TCJC Settlement Agreement once the settlement memorialized in the term sheet appended to the *Sixth Mediators' Report* [D.I. 6210] filed on September 14, 2021 is set forth in a definitive written settlement agreement that is consistent with such term sheet and executed by all parties thereto (and any additional parties that execute a joinder thereto from time to time); and (t) the form execution copy of the Century and Chubb Companies Insurance Settlement Agreement once the settlement memorialized in the term sheet appended to the *Seventh Mediator's Report* [D.I. 7745] filed on December 14, 2021 is set forth in a definitive written settlement agreement that is consistent with such term sheet and executed by all parties thereto (and any additional parties that execute a joinder thereto from time to time); (u) the forms of release to be executed by a holder of an Abuse Claim in favor of each Settling Insurance Company with respect to such Abuse Claim as a condition precedent to receiving any proceeds from the Settlement Trust as set forth in the Trust Distribution Procedures; and (v) actual or anticipated changes in Local Council Settlement Contributions; provided that the Plan Documents listed in clauses (b) and (k) of the foregoing sentence will be revised, in the Debtors' discretion, subject to Article VI, to account for any additional Executory Contracts or Unexpired Leases to be assumed or rejected in advance of the Confirmation Hearing.  The Plan Supplement shall be served only on those parties that have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 and any party in interest who requests in writing a copy from counsel to the Debtors.  Once the Plan Supplement is filed, a copy will also be available for review on the Notice and Claims Agent's website free of charge at https://omniagentsolutions.com/BSA.  The Plan

Supplement shall be in form and substance reasonably acceptable to the Creditors' Committee ~~and~~, JPM, and the Settling Insurance Companies.

202.   ~~191.~~ "Post-1975 Chartered Organization Abuse Claims" means any Abuse Claim against a Participating Chartered Organization that relates to Abuse alleged to have first occurred on or after January 1, 1976; provided, however, that the term "Post-1975 Chartered Organization Abuse Claims" shall be limited to any Claim against a Participating Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from Abuse that occurred in connection, in whole or in part, with the Participating Contributing Chartered Organization's or its personnel's or affiliates' involvement in, or sponsorship of, one or more Scouting units (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon.  For the avoidance of doubt, no Claim alleging Abuse shall be a "Post-1975 Chartered Organization Abuse Claim" against a Participating Chartered Organization if such Claim is wholly unrelated to Scouting.

203.   ~~192.~~ "Post-Effective Date Chartered Organization Settlement" shall have the meaning ascribed to such term in Article IV.I.

204.   ~~193.~~ "Post-Effective Date Insurance Settlement" shall have the meaning ascribed to such term in ~~Article IV.K~~Article IV.J.

205.   "Postpetition Insurance Policies" means insurance policies issued by the Settling Insurance Companies to the Debtors, the Local Councils, or the Chartered Organizations and effective on or after the Petition Date covering Claims and Causes of Action first arising after the Petition Date.

206.   "Pre-1976 Chartered Organization Abuse Claims" means any Abuse Claim that is alleged to have occurred prior to January 1, 1976 that is covered under an insurance policy issued by a Settling Insurance Company with respect to such coverage for such Abuse Claims.  For the avoidance of doubt, no Claim alleging Abuse shall be a "Pre-1976 Chartered Organization Abuse Claim" if such Claim is wholly unrelated to Scouting.

207.   "Prepetition Century and Chubb Companies Claims" means all Claims and Causes of Action of the Debtors against certain of the Century and Chubb Companies for payment of defense and indemnity costs allegedly owed as of the Petition Date.

208.   ~~194.~~ "Prepetition Debt and Security Documents" means, collectively, the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, the 2012 Bond Documents, the Prepetition Security Documents (2019), and the Prepetition Security Agreement (2020).

209.   ~~195.~~ "Prepetition Security Agreement (2019)" means that certain Third Amended and Restated Security Agreement, dated as of March 21, 2019, by and among

the BSA and Arrow, as debtors, JPM, in its capacity as collateral agent, JPM, in its capacity as the lender under each of the 2010 Credit Agreement and the 2019 RCF Agreement, and as holder under each of the 2010 Bond Agreement and the 2012 Bond Agreement.

210. ~~196.~~ "Prepetition Security Agreement (2020)" means that certain Consent and Security Agreement dated as of February 3, 2020, by and among Delaware BSA, the BSA, JPM, as collateral agent, and JPM, in its capacity as the lender under the 2010 Credit Agreement and the 2019 RCF Agreement, and as holder under the 2010 Bond Agreement and the 2012 Bond Agreement.

211. ~~197.~~ "Prepetition Security Documents (2019)" means, collectively, the Prepetition Security Agreement (2019), the Florida Sea Base Mortgage, the Florida Sea Base Assignment, the Headquarters Deed of Trust, the Headquarters Assignment, the Northern Tier Mortgage, the Northern Tier Assignment, the Philmont Mortgage, the Philmont Assignment, and the Arrow Collateral Assignment.

212. ~~198.~~ "Priority Tax Claim" means any Claim of a Governmental Unit against the Debtors that is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

213. ~~199.~~ "Privileged Information" means any privileged information that relates, in whole or in part, to any Abuse Claim, including: (a) the Debtors' books and records transferred to the Settlement Trust in accordance with the Document Agreement; (b) any privileged information containing a factual or legal analysis or review of any Abuse Claim; (c) any privileged information evaluating the reasonableness, effectiveness, or Confirmability of the Plan or any other chapter 11 plan filed or that could be filed in the Chapter 11 Cases; (d) any privileged information exchanged by the Debtors or their professionals, on the one hand, and any of the Related Non-Debtor Entities, Local Councils, the Ad Hoc Committee, either Official Committee, the Future Claimants' Representative, or their respective Representatives, on the other hand, related to the Plan, the Plan Documents, or the Abuse Claims; and (e) information shared pursuant to that certain Joint Defense, Common Interest, and Confidentiality Agreement among the BSA, the Ad Hoc Committee, and each Local Council that executed a joinder to said agreement that was acknowledged in writing by the BSA and the Ad Hoc Committee; (f) any privileged information containing a factual or legal analysis of the Debtors' potential exposure in connection with any Abuse Claim or any litigation related thereto; and (g) any Common-Interest Communications with Insurers.

214. ~~200.~~ "Pro Rata" means, at any time, with respect to any Claim, the proportion that the amount of such Claim in a particular Class or group of Classes bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or group of Classes, unless in each case the Plan provides otherwise.

215. ~~201.~~ "Pro Rata Share" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

216. ~~202.~~ "Professional" means any Person retained by the Debtors, the Tort Claimants' Committee, the Creditors' Committee, or the Future Claimants' Representative pursuant to a Final Order of the Bankruptcy Court entered under sections 327, 328, 363, or 1103 of the Bankruptcy Code.

217. ~~203.~~ "Professional Fee Claim" means any Claim of a Professional or other Person for Allowance by the Bankruptcy Court and payment by the Debtors of compensation for services rendered and/or reimbursement of costs or expenses incurred in the Chapter 11 Cases for the period from the Petition Date to and including the Effective Date under sections 328, 330, 331, or 503(b) of the Bankruptcy Code, including a Claim for reimbursement and/or payment of Coalition Restructuring Expenses under Article V.T.

218. ~~204.~~ "Professional Fee Reserve" means a segregated account funded from Unrestricted Cash and Investments on hand of the Debtors as of the Effective Date in an amount equal to the Professional Fee Reserve Amount as of such date, solely for the purpose of paying all Allowed Professional Fee Claims.

219. ~~205.~~ "Professional Fee Reserve Amount" means the aggregate Accrued Professional Fees as of the Effective Date, as estimated by the Professionals in accordance with Article II.A.2.

220. ~~206.~~ "Proof of Claim" means any proof of claim filed with the Bankruptcy Court or the Notice and Claims Agent pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002 that asserts a Claim against either of the Debtors.

221. ~~207.~~ "Protected Parties" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies~~, including Hartford~~; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

222. ~~208.~~ "Quarterly Fees" means all fees due and payable pursuant to section 1930(a)(6) of title 28 of the United States Code.

223. ~~209.~~ "Reinstatement" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation,

40

compensating the holder of such Claim (other than the Debtors or an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code) for any actual pecuniary loss incurred by such holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder thereof. "Reinstated" has a correlative meaning.

224.    210. "Rejected Contracts and Unexpired Leases Schedule" means the schedule of Executory Contracts or Unexpired Leases to be rejected by the BSA under the Plan, as set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time.

225.    211. "Rejection Damages Bar Date" has the meaning ascribed to such term in Article VI.B.

226.    212. "Rejection Damages Claim" means a Claim for damages alleged to arise from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 or 1123 of the Bankruptcy Code.

227.    213. "Related Non-Debtor Entities" means the Entities listed on Exhibit H, including non-debtor Affiliates of the Debtors that are directly or indirectly wholly owned by, or subject to the control of, the BSA. For the avoidance of doubt, Related Non-Debtor Entities do not include Local Councils or Chartered Organizations.

228.    214. "Release Injunctions" means the injunctions described in Article X.L.

229.    215. "Released Parties" means, collectively, the following Persons, in each case in its or their respective capacities as such: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Creditors' Committee; (e) the members of the Creditors' Committee in their capacities as such; (f) the Tort Claimants' Committee; (g) the members of the Tort Claimants' Committee in their capacities as such; (h) the Future Claimants' Representative; (i) the Coalition; (j) JPM; (k) the Settling Insurance Companies, including Hartford; (l) the Contributing Chartered Organizations, including TCJC; (m) the Foundation, in its capacity as lender under the Foundation Loan Agreement; (n) the Ad Hoc Committee; (o) the members of the Ad Hoc Committee in their capacities as such; (p) the Creditor Representative; (q) the Mediators; and (r) all of such Persons' Representatives; provided, however, that Pachulski Stang Ziehl & Jones LLP and its Representatives shall not be Released Parties; provided further, that no Perpetrator is or shall be a Released Party; provided further, that the definition of "Released Parties" shall in all instances be subject to Article X.J.

230.    216. "Releases" means the releases set forth in Article X.J.

231.    217. "Releasing Claim Holder" means, collectively, (a) all holders of Claims that vote to accept the Plan and do not opt out of the releases set forth in Article X.J.4; (b) all holders of Claims that are presumed to accept the Plan, except for holders of such Claims that file a timely objection to the releases set forth in Article X.J.4; (c) all holders of Claims entitled to vote on the Plan and who vote against the Plan and do not opt out of the releases set forth in Article X.J.4; and (d) all of such Persons' predecessors,

successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and all such Persons' respective heirs, executors, estates, servants and nominees, in their respective capacities as such. No holder of a Claim in a Class that is Impaired under the Plan will be deemed a "Releasing Claim Holder" to the extent such holder abstained from voting.

232.   218.  "Reorganized BSA" means the BSA, as reorganized pursuant to and under the Plan on or after the Effective Date.

233.   219.  "Representatives" means, with respect to any Person, such Person's (a) predecessors, successors, assigns, subsidiaries, and Affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) respective heirs, executors, estates, and nominees, in each case solely in its capacity as such.

234.   220.  "Restated 2010 Bond Documents" means those certain restated bond documents, including a restated revenue bond, bond purchase agreement, promissory note, security agreement, and all documentation executed and delivered in connection therewith, in each case containing substantially the same terms as the 2010 Bond Documents except that: (a) the amortization schedule attached to the 2010 Bond shall be amended and restated such that (i) interest is payable in monthly installments (at the same rates in the 2010 Bond Documents) beginning on the date that is one month after the Effective Date (as to be specified in the Restated 2010 Bond Documents) and ending on the Restated Maturity Date, and (ii) principal is payable in monthly installments (in the same monthly amounts as the periodic amortization amounts in the 2010 Bond Documents) beginning on the date that is two years after the Effective Date (as to be specified in the Restated 2010 Bond Documents) and ending on the Restated Maturity Date; and (b) the Restated 2010 Bond Documents shall be guaranteed by Arrow. The covenants in the Restated 2010 Bond Documents shall be in form and substance acceptable to JPM and the BSA. The obligations under the Restated 2010 Bond Documents shall be secured by the Restated Security Agreement. The then-current forms of the Restated 2010 Bond Documents shall be filed with the Plan Supplement.

235.   221.  "Restated 2012 Bond Documents" means those certain restated bond documents, including a restated revenue bond, bond purchase agreement, promissory note, security agreement, and all documentation executed and delivered in connection therewith, in each case containing substantially the same terms as the 2012 Bond Documents except that: (a) the amortization schedule attached to the 2012 Bond shall be amended and restated such that (i) interest is payable in monthly installments (at the same rates in the 2012 Bond Documents) beginning on the date that is one month after the Effective Date (as to be specified in the Restated 2012 Bond Documents) and ending on the Restated Maturity Date, and (ii) principal is payable in monthly installments (in the same monthly amounts as the periodic amortization amounts in the 2012 Bond

Documents) beginning on the date that is two years after the Effective Date (as to be specified in the Restated 2012 Bond Documents) and ending on the Restated Maturity Date; and (b) the Restated 2012 Bond Documents shall be guaranteed by Arrow.  The covenants in the Restated 2012 Bond Documents shall be in form and substance acceptable to JPM and the BSA.  The obligations under the Restated 2012 Bond Documents shall be secured by the Restated Security Agreement.  The then-current forms of the Restated 2012 Bond Documents shall be filed with the Plan Supplement.

236.    222.  "Restated Credit Facility Documents" means those certain restated credit facility documents, which shall contain substantially the same terms as the 2010 Credit Facility Documents and the 2019 RCF Documents, as applicable to the 2010 Credit Facility Claims and the 2019 RCF Claims, except that: (a) the revolving credit facilities provided under the 2010 Credit Facility Documents and the 2019 RCF Documents shall be frozen and converted to term loans; (b) the Revolving Maturity Date and the Term Loan Maturity Date (each as defined in the 2010 Credit Facility Documents) and the Maturity Date (as defined in the 2019 RCF Documents) shall be extended to the Restated Maturity Date; (c) interest is payable in quarterly installments (at the same rates in the applicable Prepetition Debt and Security Documents) beginning on the date that is three months after the Effective Date (as to be specified in the Restated Credit Facility Documents) and ending on the Restated Maturity Date; (d) principal is payable in quarterly installments (at 1/40th of the outstanding balance on the Effective Date) beginning on the date that is two years after the Effective Date (as to be specified in the Restated Credit Facility Documents) and ending on the Restated Maturity Date; and (e) the Restated Credit Facility Documents shall be guaranteed by Arrow.  The covenants in the Restated Credit Facility Documents shall be in form and substance acceptable to JPM and the BSA.  The obligations under the Restated Credit Facility Documents shall be secured by the Restated Security Agreement.  The then-current forms of the Restated Credit Facility Documents shall be filed with the Plan Supplement.

237.    223.  "Restated Debt and Security Documents" means, collectively, the Restated 2010 Bond Documents, the Restated 2012 Bond Documents, the Restated Credit Facility Documents, and the Restated Security Agreement.  The Restated Debt and Security Documents shall be on terms acceptable to JPM and the BSA, and reasonably acceptable to the Creditors' Committee.

238.    224.  "Restated Maturity Date" means the maturity date applicable to each of the Restated Debt and Security Documents in accordance with the terms thereof, which shall in each case be the date that is ten (10) years after the Effective Date.

239.    225.  "Restated Security Agreement" means that certain restated security agreement, pursuant to which Reorganized BSA and Arrow shall grant blanket first-priority liens on and security interests in all of Reorganized BSA's and Arrow's assets, including all collateral secured by the Prepetition Security Documents (2019), to JPM to secure Reorganized BSA's and Arrow's obligations under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility

Documents.  The then-current form of the Restated Security Agreement shall be filed with the Plan Supplement.

240.  226. "Restoration Plan" means the Boy Scouts of America Retirement Benefit Restoration Plan, a non-qualified defined benefit retirement plan under section 457(f) of the Internal Revenue Code, which provides supplemental retirement benefits to certain current and former employees of the Debtors or Local Councils.

241.  "Roman Catholic Entities" means each and every (i) Roman Catholic parish, school, diocese, archdiocese, association of religious or lay Persons in the United States or its territories that sponsored, promoted, hosted, was involved with, or provided any support in connection with Scouting activities in any way, including as a social service organization, ministry, camping ministry, or by the use of a camp facility, camp, retreat, or other facilities in connection with Scouting activities, regardless of whether any of the foregoing entities is or was a Chartered Organization at any time or whether such facilities were owned or leased by any of such entities or a third party; (ii) all entities listed or eligible to be listed in the Official Catholic Directory since January 1910, (iii) all Representatives of the foregoing, including their attorneys and the Roman Catholic Ad Hoc Committee. However, no Perpetrator is or shall be a Roman Catholic Entity.

242.  227. "Schedules" means, with respect to each Debtor, the schedules of assets and liabilities and the statement of financial affairs filed by such Debtor with the Bankruptcy Court pursuant to sections 521 and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements may be amended or supplemented from time to time prior to the Effective Date.

243.  228. "Scouting" means any and all programs, activities and services of any kind in any way, directly or indirectly, associated with, arising from or related to the BSA or the BSA's, any Local Council's, any Related Non-Debtor Entity's, or any Chartered Organization's (including their personnel and their affiliates') participation in, involvement in, or sponsorship of, any units or programs offered or previously offered pursuant to the charter of the BSA, including activities such as formal or informal scout meetings, troop activities, jamborees, or interactions of any kind between scouts and other scouts or scout leaders in their capacities as such.

244.  "Scouting-related" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

245.  229. "Scouting Released Claims" has the meaning ascribed to such term in Article X.J.

246.  230. "Scouting University" means that certain parcel of real property owned by the BSA located at 1301 Solana Boulevard, Westlake, Texas 76262, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located

thereon, the sale of which was approved pursuant to the *Order, Pursuant to Section 363 of the Bankruptcy Code, Authorizing the Sale of Certain Real Property Located in Westlake Texas*, entered by the Bankruptcy Court on June 14, 2021 at Docket No. 5326.

247.    231. "Secured" means, with respect to any Claim, the extent to which the Claim is: (a) secured by a Lien on property of a Debtor's Estate (i) as set forth in the Plan, (ii) as agreed to by the holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code, but, with respect to both of the foregoing clauses (a) and (b), only to the extent of the value of the interest of such holder in the Estate's interest in the property securing such Claim or the amount subject to setoff, as applicable.

248.    232. "Settlement of Restricted and Core Asset Disputes" has the meaning ascribed to such term in Article V.S.3.

249.    "Settlement Growth Payment" has the meaning ascribed to such term in the Century and Chubb Companies Settlement Agreement.

250.    233. "Settlement Trust" means the trust organized under the laws of the state of Delaware and established under Article IV and the Settlement Trust Agreement for the purposes set forth therein, including assuming liability for all Abuse Claims, holding, preserving, maximizing, and administering the Settlement Trust Assets, and directing the processing, liquidation and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents.

251.    234. "Settlement Trust Advisory Committee" or "STAC" means the committee serving in accordance with Article IV and the Settlement Trust Agreement, which shall have the powers, duties and obligations set forth in the applicable Settlement Trust Agreement. The initial members of the Settlement Trust Advisory Committee shall be identified in the Plan Supplement.

252.    235. "Settlement Trust Agreement" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached hereto as Exhibit B, as the same may be amended or modified from time to time in accordance with the terms thereof, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition and the Future Claimants' Representative and (b) the Creditors' Committee with respect to the treatment of Non-Abuse Litigation Claims.

253.    236. "Settlement Trust Assets" means the following assets and any income, profits and proceeds realized, received or derived from such assets subsequent to the transfer of such assets to the Settlement Trust:

    a.    the BSA Settlement Trust Contribution;

    b.    the Local Council Settlement Contribution;

c.    the Contributing Chartered Organization Settlement Contribution, including the TCJC Settlement Contribution, the Supplemental LC Contribution, and the Settlement Growth Payment;

d.    the Participating Chartered Organization Settlement Contribution; and

e.    any and all funds, proceeds or other consideration contributed to the Settlement Trust under the terms of any Insurance Settlement Agreement, including the Hartford Settlement Contribution.

254.    237.    "Settlement Trust Causes of Action" means any Estate Cause of Action and any Cause of Action held by any Local Council or other Person that is or becomes a Protected Party or a Limited Protected Party, which Estate Cause of Action or other such Cause of Action, as applicable, is not otherwise expressly released under the Plan or the Plan Documents, in each case solely attributable to: (a) all defenses to any Abuse Claim, including all defenses under section 502 of the Bankruptcy Code; (b) with respect to Abuse Claims, all rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted; (c) any other Causes of Action with respect to Abuse Claims that either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party would have had under applicable law if the Chapter 11 Cases had not occurred and the holder of such Abuse Claim had asserted such Cause of Action by initiating civil litigation against either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party (including any Causes of Action against co-defendants); and (d) any Cause of Action of either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party, under the laws of any jurisdiction, for reimbursement, indemnity, contribution, breach of contract, or otherwise arising from or relating to any payments made by either Debtor, any Related Non-Debtor Entity, any Local Council or any other Protected Party or Limited Protected Party on account of Abuse Claims on or before the Effective Date.

255.    238.    "Settlement Trust Documents" means, collectively, (a) the Settlement Trust Agreement, (b) the Trust Distribution Procedures, (c) the Document Agreement, (d) the Confirmation Order, and (e) any other agreements, instruments and documents governing the establishment, administration and operation of the Settlement Trust, which shall be substantially in the forms set forth as exhibits hereto or in the Plan Supplement, as the same may be amended or modified from time to time in accordance with the terms thereof.

256.    239.    "Settlement Trust Expenses" means any liabilities, costs, or expenses of, or imposed upon, or in respect of, the Settlement Trust once established (except for payments to holders of Abuse Claims on account of such Claims).   Settlement Trust Expenses shall also expressly include: (a) any and all liabilities, costs, and expenses incurred subsequent to the Effective Date in connection with the Settlement Trust Assets

(including the prosecution of any Settlement Trust Causes of Action and Insurance Actions), in each case whether or not any such action results in a recovery for the Settlement Trust; (b) the reasonable documented costs and expenses incurred by Reorganized BSA, the Related Non-Debtor Entities, the Local Councils, the Ad Hoc Committee, or the Contributing Chartered Organizations in taking any action on behalf of or at the direction of the Settlement Trust, if any, following such Entities' transfer to the Settlement Trust of copies of all records and documents in their possession, custody or control pertaining to Abuse Claims in accordance with the Document Agreement; and (c) reasonable, documented and contractual professional or advisory fees incurred by the Coalition for up to thirty (30) days after the Effective Date in connection with the initial effectuation of the Plan and the Settlement Trust.

257.   240.  "Settlement Trustee" means Eric D. Green or any successor trustee who may subsequently be appointed pursuant to the terms of the Settlement Trust Agreement.

258.   241.  "Settling Insurance Company" means, solely with respect to Abuse Insurance Policies that are the subject of an Insurance Settlement Agreement, any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust.  Without limiting the foregoing, subject to Confirmation of the Plan and approval of the Hartford Insurance Settlement AgreementAgreements by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Hartford is athe Insurance Companies listed on Exhibit I hereto are each Settling Insurance CompanyCompanies and shall be designated as such in the Confirmation Order and the Affirmation Order.

259.   "Settling Insurer Policy Rights" means any and all of the Participating Chartered Organizations' and Contributing Chartered Organizations' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to any insurance policies issued by a Settling Insurance Company that cover Abuse Claims with respect to such coverage for Abuse Claims, including the types of claims listed in the definition of Insurance Actions.

260.   242.  "Special Reviewer" means the individual approved by the Coalition for the purposes set forth in the Settlement Trust Agreement.  The name of the initial Special Reviewer shall be identified in the Plan Supplement.

261.   243.  "Specified Insurance Policy" means any BSA Insurance Policy with an inception date of March 1, 2013 to the present, except for (a) the excess liability policy issued to the BSA by Navigators Specialty Insurance Company for the period from March 1, 2013 to February 28, 2014, and (b) the excess liability insurance policy issued to the

BSA by Westchester Fire Insurance Company and Westchester Surplus Lines for the period from March 1, 2013 to February 28, 2019.

262.    244. "Specified Primary Insurance Policy" means any Specified Insurance Policy that is a primary Abuse Insurance Policy.  Specified Primary Insurance Policies include primary Abuse Insurance Policies issued by Old Republic Insurance Company for the periods of coverage between March 1, 2013 and February 28, 2019, and by Evanston Insurance Company for the period of coverage between March 1, 2019 and February 2829, 2020, subject to the definition of Postpetition Insurance Policies.

263.    245. "Specified Excess Insurance Policy" means any Specified Insurance Policy that is an umbrella or excess Abuse Insurance Policy.

264.    246. "Summit Bechtel Reserve" means the parcels of real property that comprise the Summit Bechtel Family National Scout Reserve, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

265.    "Supplemental LC Contribution" shall have the meaning ascribed to such term in the Century and Chubb Companies Insurance Settlement Agreement, which should provide an aggregate $40,000,000 in additional consideration paid to the Settlement Trust, including a cash and property contribution that shall not be less than $15,000,000 and an increase in the principal amount of the DST Note of $21,000,000 to $25,000,000 as set forth in the Century and Chubb Companies Insurance Settlement Agreement.

266.    247. "TCJC" means The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole, including any affiliates or personnel.

267.    248. "TCJC Settlement Contribution" shall mean the "Settlement Amount" as defined in the TCJC Settlement Agreement, which is equal to Two Hundred Fifty Million Dollars ($250,000,000).

268.    249. "TCJC Settlement" has the meaning ascribed to such term in Article V.S.50.

269.    250. "TCJC Settlement Agreement" means that certain settlement agreement, which remains subject to definitive documentation, by and between TCJC, the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and certain state court counsel to holders of Direct Abuse Claims, as such agreement is described in the term sheet appended to the *Sixth Mediators' Report* [D.I. 6210] filed on September 14, 2021.  Upon its execution by all of the parties thereto, the TCJC Settlement Agreement shall be filed with the Plan Supplement and attached hereto as Exhibit J-1.

270.    ~~251.~~ "Tort Claimants' Committee" means the official committee of tort claimants, consisting of survivors of childhood sexual abuse, appointed by the United States Trustee in the Chapter 11 Cases under section 1102(a) of the Bankruptcy Code.

271.    ~~252.~~ "Trust Distribution Procedures" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached hereto as Exhibit A, as the same may be amended or modified from time to time in accordance with the terms thereof, which shall be acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition and the Future Claimants' Representative and (b) the Creditors' Committee with respect to the treatment of Non-Abuse Litigation Claims.

272.    ~~253.~~ "Unexpired Lease" means a lease to which BSA is a party, including any and all pre- and post-petition amendments thereto, that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

273.    ~~254.~~ "Unimpaired" means any Claim that is not Impaired, including any Claim that is Reinstated.

274.    "United Methodist Entities" means each and every (i) United Methodist local church, federated, or union church, including any Federated Church or Union Church that includes a historically United Methodist Church congregation, that sponsored, promoted, hosted, or provided any support in connection with Scouting activities, regardless of whether such local, union, or federated church is or was a Chartered Organization at any time; (ii) church currently federated or yoked, and which current federated or yoked church includes a current or former United Methodist Church congregation that sponsored, promoted, hosted or provided any support in connection with Scouting activities; (iii) other United Methodist related or affiliated organizations that sponsored, promoted, hosted, or provided any support in connection with Scouting activities, including any social service organization, ministry, camping ministry, camp facility, camp, retreat, or other facilities in the nature of a camp or retreat; (iv) any camp, retreat, or other facility in the nature of a camp or retreat that is not United Methodist related or affiliated, but otherwise promoted, hosted, or provided any support in connection with Scouting Activities for an entity described in (i), (ii) or (iii); (v) all organizations affiliated or related to (i) (ii), (iii) or (iv) including, but not limited to, the United Methodist Ad Hoc Committee, each district, annual conference, and jurisdictional conference of The United Methodist Church, the general, annual conference, district, local church agencies of The United Methodist Church, the Council of Bishops of The United Methodist Church, and the non-jural bodies commonly referred to as "The United Methodist Church," the "Judicial Council of The United Methodist Church," and the "General Conference of The United Methodist Church"; and (vi) all Representatives of the foregoing. However, no Perpetrator is or shall be a United Methodist Entity.

275.    ~~255.~~ "United States Trustee" means the Office of the United States Trustee for the District of Delaware.

276.    ~~256.~~ "Unrestricted Cash and Investments" means all Cash and balance sheet investments owned by the Debtors as of the date that is immediately prior to the

Effective Date that are not subject to legally enforceable restrictions requiring the use or disposition of such assets for a particular purpose.

277.    257. "Volunteer Screening Database" is the database established and maintained by the BSA to, among other things, track and remove from Scouting volunteer leaders suspected of having acted in an inappropriate sexual manner with youth participants in Scouting.

278.    258. "Voting Deadline" means the date by which all Persons entitled to vote on the Plan must vote to accept or reject the Plan.

279.    259. "Voting Procedures" means those certain procedures and supplemental procedures approved by the Bankruptcy Court for soliciting and tabulating the votes to accept or reject the Plan cast by holders of Claims against the Debtors entitled to vote on the Plan.  The Voting Procedures shall be in form and substance reasonably acceptable to the Creditors' Committee as they pertain to Convenience Claims, General Unsecured Claims and Non-Abuse Litigation Claims.

280.    260. "Warehouse and Distribution Center" means that certain parcel of real property owned by the BSA located at 2109 Westinghouse Boulevard, Charlotte, North Carolina 28269, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

281.    261. "Workers' Compensation Program" means the Debtors' (a) written contracts, agreements, agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance issued to or entered into at any time by any of the Debtors.

282.    262. "Youth Member" means a youth member of the BSA registered as of December 31 of any applicable year in a core program (Cub Scouts, Scouts BSA (in each case under age 18), Sea Scouts, Venturing, or Exploring (in each case under age 21)), whose registration is current as of such date and who has paid the individual annual registration fee (which fee has not been refunded in whole or in part).

B.    Interpretation; Application of Definitions and Rules of Construction.   For purposes of the Plan, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; provided, however, that the rule of interpretation set forth in clause (2) shall not be imputed to any contract, lease, instrument, release, or other agreement as to which JPM or the Creditors' Committee have consent rights pursuant to the JPM / Creditors' Committee Term Sheet, and such consent rights

shall be as set forth in the JPM / Creditors' Committee Term Sheet and incorporated herein pursuant to Article I.D; (3) any reference in the Plan to an existing document, schedule or exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to the Plan; (4) any reference to a Person as a holder of a Claim or Interest includes that Person's successors and assigns; (5) unless otherwise stated, all references in the Plan to Articles are references to Articles of the Plan, as the same may be amended or modified from time to time in accordance with the terms hereof; (6) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Article or clause contained in the Plan; (7) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (9) any immaterial effectuating provisions may be interpreted by Reorganized BSA in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Person; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any reference to a Person's "subsidiaries" means its direct and indirect subsidiaries; and (13) in computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply.

C.    Reference to Monetary Figures.  All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

D.    Consent Rights.  Notwithstanding anything herein to the contrary, the consent rights of JPM and the Creditors' Committee, respectively, as set forth in the JPM / Creditors' Committee Term Sheet, with respect to the form and substance of the Plan, all exhibits and schedules to the Plan, the Plan Supplement, and the other Plan Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, to the extent they pertain to the treatment of the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims, or the 2012 Bond Claims (in the case of JPM) or Convenience Claims, General Unsecured Claims, or Non-Abuse Litigation Claims (in the case of the Creditors' Committee), shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and fully enforceable as if stated in full herein.  TCJC will have consent rights with respect to any modifications to the Plan, the Settlement Trust Documents, the Confirmation Order, and the Affirmation Order including those relating to the Channeling Injunction, releases by holders of Abuse Claims, and related definitional terms including, for the avoidance of doubt, "Abuse," "Abuse Claim," and "Protected Parties," but only to the extent that such modifications would affect  TCJC.  Hartford, the Century and Chubb Companies, and the Settling Insurance Companies will have consent rights with respect to any modifications to the Plan, the Settlement Trust Documents, the Confirmation Order, and the Affirmation Order including those relating to

the Channeling Injunction, releases by holders of Abuse Claims, and related definitional terms including, for the avoidance of doubt, "Abuse," "Abuse Claim," and "Protected Parties," but only to the extent that such modifications would affect Hartford, the Century and Chubb Companies, or the Settling Insurance Companies, as applicable.  The Coalition and the Future Claimants' Representative will have consent rights with respect to any modifications to the Plan, the Settlement Trust Documents, the Confirmation Order, and the Affirmation Order relating to Abuse Claims.

E.    Controlling Document.  In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement), on the one hand, and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), on the other hand, the Plan (without reference to the Plan Supplement) shall govern and control; provided, however, that (1) in the event of a conflict between Confirmation Order, on the one hand, and any of the other Plan Documents, on the other hand, the Confirmation Order shall govern and control in all respects, and (2) in the event of a conflict between the terms and provisions of the Plan, the Disclosure Statement, the Plan Supplement, or any other Plan Document, on the one hand, and the terms and provisions of the Hartford any Insurance Settlement Agreement, on the other hand, the terms and provisions of the Hartford applicable Insurance Settlement Agreement shall control.

## ARTICLE II.

## ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

A.    Administrative Expense Claims.

1.    Administrative Expense Claims Generally.  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with respect to such Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims, which are governed by Article II.A.2) shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Claim, payment of Cash in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim, or such amounts and on other such terms as may be agreed to by the holders of such Claims, on or as soon as reasonably practicable after the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (c) such other date(s) as such holder and the Debtors or Reorganized BSA shall have agreed; or (d) such other date ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' non-profit operations during the Chapter 11 Cases may be paid by the Debtors or Reorganized BSA in the ordinary course of operations and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of operations, or customary practice.  Notwithstanding anything to the contrary herein or in the Cash Collateral Order, no Claim on account of any diminution in

the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) (as each such capitalized term is defined in the Cash Collateral Order) from and after the Petition Date shall be Allowed unless such Claim is Allowed by a Final Order of the Bankruptcy Court. The Hartford Administrative Claim shall be an Allowed Administrative Expense Claim and shall be paid in full in cash to Hartford on, or as soon as reasonably practicable after, the Effective Date.

2.      Professional Fee Claims.

a.      Final Fee Applications.    All Professionals or other Persons requesting the final Allowance and payment of compensation and/or reimbursement of expenses pursuant to sections 328, 330, 331 and/or 503(b) or under Article V.T as described therein, for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for Allowance and payment of Professional Fee Claims on counsel to the Debtors and the United States Trustee no later than the first Business Day that is forty-five (45) days after the Effective Date. Objections to any Professional Fee Claim must be filed and served on Reorganized BSA and the applicable Professional within twenty-one (21) calendar days after the filing of the final fee application that relates to the Professional Fee Claim (unless otherwise agreed by the Debtors or Reorganized BSA, as applicable, and the Professional requesting Allowance and payment of a Professional Fee Claim). The Fee Examiner shall continue to act in its appointed capacity unless and until all Professional Fee Claims have been approved by order of the Bankruptcy Court, and Reorganized BSA shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

b.      Professional Fee Reserve.  On the Effective Date, the Debtors shall establish and fund the Professional Fee Reserve with Cash in an amount equal to the Professional Fee Reserve Amount plus a reasonable cushion amount determined by the Debtors. Funds held in the Professional Fee Reserve shall not be considered property of the Debtors' Estates, Reorganized BSA, the Settlement Trust, or the Core Value Cash Pool. Professional Fees owing on account of Allowed Professional Fee Claims shall be paid in Cash from funds held in the Professional Fee Reserve as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court or authorized to be paid under the Compensation Procedures Order; provided, however, that Reorganized BSA's obligations with respect to Allowed Professional Fee Claims shall not be limited by or deemed limited to the balance of funds held in the Professional Fee Reserve. To the extent the funds held in the Professional Fee Reserve are insufficient to satisfy the Allowed Professional Fee Claims in full, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any deficiency, which shall be satisfied in accordance with Article II.A.1. No Liens, Claims, interests, charges, or other Encumbrances or liabilities of any kind shall encumber the Professional Fee Reserve in any way. When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Reserve, if any, shall be

transferred (i) to Reorganized BSA to the extent the minimum Unrestricted Cash and Investment levels are lower than indicated in Article V.M, and (ii) thereafter, to the Settlement Trust.

c.    Professional Fee Reserve Amount.  To be eligible for payment for Accrued Professional Fees incurred up to and including the Effective Date, Professionals shall estimate their Accrued Professional Fees as of the Effective Date and deliver such estimate to the Debtors at least five (5) Business Days prior to the anticipated Effective Date, and Coalition Professionals shall provide the Debtors a reasonable estimate of total Coalition Restructuring Expenses in accordance with Article V.T.  If a Professional or Coalition Professional does not provide such estimate, the Debtors may estimate the unbilled fees and expenses of such Professional or Coalition Professional.  The total amount so estimated will constitute the Professional Fee Reserve Amount, provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional or Coalition Professional.

d.    Post-Effective Date Fees and Expenses.  From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 or 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of operations without any further notice to or action, order, or approval of the Bankruptcy Court.  The reasonable and documented fees and expenses incurred by the Professionals to the Creditors' Committee after the Effective Date until the complete dissolution of the Creditors' Committee for all purposes in accordance with Article X.R will be paid by Reorganized BSA in the ordinary course of business (and not later than thirty (30) days after submission of invoices).

B.    Priority Tax Claims.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtors or Reorganized BSA, as applicable: (1) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, however, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (2) regular installment payments in Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      Classification of Claims and Interests.

      1.      Grouping of Debtors for Convenience.  The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

      2.      Classification in General.  For purposes of organization, voting, and all matters related to Confirmation, and except as otherwise provided herein, all Claims (other than Administrative Expense Claims and Priority Tax Claims) against and Interests in the Debtors are classified as set forth in this Article III.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims described in Article II have not been classified and are excluded from the following Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest falls within the description of such Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Interest falls within the description of such other Class or Classes. Notwithstanding anything to the contrary contained in the Plan, no distribution shall be made on account of any Claim that is not Allowed for distribution purposes (if applicable) or any Claim that has been satisfied, released, or otherwise settled prior to the Effective Date.

      3.      Summary of Classification.  The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; or (c) presumed to accept or deemed to reject the Plan.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 3A | 2010 Credit Facility Claims | Impaired | Entitled to Vote |
| 3B | 2019 RCF Claims | Impaired | Entitled to Vote |
| 4A | 2010 Bond Claims | Impaired | Entitled to Vote |
| 4B | 2012 Bond Claims | Impaired | Entitled to Vote |
| 5 | Convenience Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Non-Abuse Litigation Claims | Impaired | Entitled to Vote |
| 8 | Direct Abuse Claims | Impaired | Entitled to Vote |
| 9 | Indirect Abuse Claims | Impaired | Entitled to Vote |
| 10 | Interests in Delaware BSA | Impaired | Deemed to Reject; Not Entitled to Vote |

B.     Treatment of Claims and Interests.

1.     Class 1 – Other Priority Claims.

a.     Classification:  Class 1 consists of all Other Priority Claims.

b.     Treatment:  Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim, in full and final satisfaction of such Allowed Other Priority Claim, at the sole option of Reorganized BSA: (i) each such holder shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the date on which the holder of such Allowed Other Priority Claim and the Debtors or Reorganized BSA, as applicable, shall otherwise agree in writing; or (ii) satisfaction of such Allowed Other Priority Claim in any other manner that renders the Allowed Other Priority Claim Unimpaired, including Reinstatement.

c.     Voting:  Class 1 is Unimpaired, and each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

2.     Class 2 – Other Secured Claims.

a.     Classification:  Class 2 consists of all Other Secured Claims.  To the extent that Other Secured Claims are Secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving Distributions under the Plan.

b.     Treatment:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction of such Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim will receive, at the sole option of Reorganized BSA: (i) Cash in an amount equal to the Allowed amount of such Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the date on which the holder of such Allowed Other Secured Claim and the Debtors or Reorganized BSA, as applicable, shall otherwise agree in writing; (ii) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (iii) return of the applicable collateral on

56

the Effective Date or as soon as reasonably practicable thereafter in satisfaction of the Allowed amount of such Other Secured Claim.

c.    Voting:   Class 2 is Unimpaired, and each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

3.    Class 3A – 2010 Credit Facility Claims.

a.    Classification:   Class 3A consists of all 2010 Credit Facility Claims.

b.    Allowance:  On the Effective Date, all 2010 Credit Facility Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $80,762,060 (including $44,299,743 of undrawn amounts under letters of credit issued under the 2010 Credit Facility Documents, provided such letters of credit are not drawn on or before the Effective Date), plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2010 Credit Facility Claims are deemed fully Secured, there are no unsecured 2010 Credit Facility Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2010 Credit Facility Claims.

c.    Treatment:  Except to the extent that a holder of an Allowed 2010 Credit Facility Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Credit Facility Claim, each holder of an Allowed 2010 Credit Facility Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2010 Credit Facility Claim.

d.    Voting:   Class 3A is Impaired, and each holder of an Allowed 2010 Credit Facility Claim is entitled to vote to accept or reject the Plan.

4.    Class 3B – 2019 RCF Claims.

a.    Classification:  Class 3B consists of all 2019 RCF Claims.

b.    Allowance:  On the Effective Date, all 2019 RCF Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $61,542,720 (including $41,542,720 of undrawn amounts under letters of credit issued under the 2019 RCF Documents, provided such letters of credit are not drawn on or before the Effective Date), plus

any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order. Because all 2019 RCF Claims are deemed fully Secured, there are no unsecured 2019 RCF Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2019 RCF Claims.

c.      Treatment:  Except to the extent that a holder of an Allowed 2019 RCF Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2019 RCF Claim, each holder of an Allowed 2019 RCF Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2019 RCF Claim.

d.      Voting:  Class 3B is Impaired, and each holder of an Allowed 2019 RCF Claim is entitled to vote to accept or reject the Plan.

5.      Class 4A – 2010 Bond Claims.

a.      Classification:  Class 4A consists of all 2010 Bond Claims.

b.      Allowance:  On the Effective Date, all 2010 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of not less than $40,137,274, plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2010 Bond Claims are deemed fully Secured, there are no unsecured 2010 Bond Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2010 Bond Claims.

c.      Treatment:  Except to the extent that a holder of an Allowed 2010 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Bond Claim, each holder of an Allowed 2010 Bond Claim shall receive a Claim under the Restated 2010 Bond Documents in an amount equal to the amount of such holder's Allowed 2010 Bond Claim.

d.      Voting:  Class 4A is Impaired, and each holder of an Allowed 2010 Bond Claim is entitled to vote to accept or reject the Plan.

6.      Class 4B – 2012 Bond Claims.

a.      Classification:  Class 4B consists of all 2012 Bond Claims.

b.      Allowance:  On the Effective Date, all 2012 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of not less than $145,662,101, plus any accrued but

unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2012 Bond Claims are deemed fully Secured, there are no unsecured 2012 Bond Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2012 Bond Claims.

c.    Treatment:  Except to the extent that a holder of an Allowed 2012 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2012 Bond Claim, each holder of an Allowed 2012 Bond Claim shall receive a Claim under the Restated 2012 Bond Documents in an amount equal to the amount of such holder's Allowed 2012 Bond Claim.

d.    Voting:  Class 4B is Impaired, and each holder of an Allowed 2012 Bond Claim is entitled to vote to accept or reject the Plan.

7.    Class 5 – Convenience Claims.

a.    Classification:  Class 5 consists of all Convenience Claims.

b.    Treatment:  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, an Allowed Convenience Claim, each holder of an Allowed Convenience Claim shall receive, on the Effective Date or within thirty (30) days following the date that such Convenience Claim becomes Allowed (if such Claim becomes Allowed after the Effective Date), Cash in an amount equal to 100% of such holder's Allowed Convenience Claim.

c.    Voting:  Class 5 is Impaired, and each holder of a Convenience Claim is entitled to vote to accept or reject the Plan.

8.    Class 6 – General Unsecured Claims.

a.    Classification:  Class 6 consists of all General Unsecured Claims.

b.    Treatment:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, subject to the holder's ability to elect Convenience Claim treatment on account of the Allowed General Unsecured Claim, its Pro Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim in the manner described in Article VII.

c.    Voting:   Class 6 is Impaired, and each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

9.      Class 7 – Non-Abuse Litigation Claims.

a.      Classification:   Class 7 consists of all Non-Abuse Litigation Claims.

b.      Treatment:   Except to the extent that a holder of an Allowed Non-Abuse Litigation Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Non-Abuse Litigation Claim, each holder thereof shall, subject to (i) the holder's ability to elect Convenience Claim treatment as provided in the following sentence and (ii) the terms and conditions of Article IV.D.3 (as applicable), retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (x) available insurance coverage or the proceeds of any Insurance Policy, including any Abuse Insurance Policy or Non-Abuse Insurance Policy, (y) applicable proceeds of any Insurance Settlement Agreements, and (z) co-liable non-debtors (if any) or their insurance coverage. Solely to the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have the unsatisfied portion of its Allowed Claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000.

c.      Voting:   Class 7 is Impaired, and each holder of a Non-Abuse Litigation Claim is entitled to vote to accept or reject the Plan.

10.     Class 8 – Direct Abuse Claims.

a.      Classification:  Class 8 consists of all Direct Abuse Claims.

b.      Treatment:

(i)      The Settlement Trust shall receive, for the benefit of holders of Abuse Claims, the BSA Settlement Trust Contribution, the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution (subject to the terms and conditions set forth in the Hartford Insurance Settlement Agreement), the Century and Chubb Companies Insurance Settlement Contribution (subject to the terms and conditions set forth in the Century and Chubb Companies Insurance Settlement Agreement), and the proceeds of any other applicable Insurance Settlement Agreements.  In addition, each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect on his or her Ballot to

receive an Expedited Distribution, subject to criteria set forth in the Trust Distribution Procedures, in exchange for providing a full and final release in favor of the Settlement Trust, the Protected Parties and the Chartered Organizations.  The Settlement Trust shall make the Expedited Distributions on one or more dates occurring on or as soon as reasonably practicable after the latest to occur of (a) the Effective Date, (b) the date the applicable holders of Direct Abuse Claims who have elected to receive an Expedited Distribution have satisfied the criteria set forth in the Trust Distribution Procedures, and (c) the date upon which the Settlement Trust has sufficient Cash to fund the full amount of the Expedited Distributions while retaining sufficient Cash reserves to fund applicable Settlement Trust Expenses, as determined by the Settlement Trustee.

(ii)    As of the Effective Date, the Protected Parties' liability for all Direct Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents. Pursuant to the Channeling Injunction set forth in Article X.F, each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Direct Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Direct Abuse Claims against any of the Protected Parties and may not proceed in any manner against any of the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Direct Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(iii)    As of the Effective Date, the Limited Protected Parties' liability for all Post-1975 Chartered Organization Abuse Claims and the Limited Protected Parties' liability for all Pre-1976 Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents. Pursuant to the Channeling Injunction set forth in Article X.F, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) and each holder of a Pre-1976 Chartered Organization Abuse Claim shall have such holder's Pre-1976 Chartered Organization Abuse Claim against the Limited Protected Parties permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered

Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. Holders of Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim against any of the Limited Protected Parties and may not proceed in any manner against any of the Limited Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(iv)    For the avoidance of doubt, the Protected Parties shall include: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations, including TCJC; (f) the Settling Insurance Companies, including Hartford; and (g) all of such Persons' Representatives.  The Limited Protected Parties shall include the Participating Chartered Organizations.

c.    Voting:  Class 8 is Impaired, and each holder of a Direct Abuse Claim is entitled to vote to accept or reject the Plan.

11.    Class 9 – Indirect Abuse Claims.

a.    Classification:  Class 9 consists of all Indirect Abuse Claims.

b.    Treatment:

(i)    As of the Effective Date, the Protected Parties' liability for all Indirect Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents solely to the extent that an Indirect Abuse Claim has not been deemed withdrawn with prejudice, irrevocably waived, released and expunged in connection with the Local Council Settlement Contribution, the Contributing Chartered Organization Trust Contribution, the Participating Chartered Organization Trust Contribution, or the Hartford InsuranceTCJC Settlement Agreement, or the Insurance Settlement Agreements. Pursuant to the Channeling Injunction set forth in Article X.F, each holder of an Indirect Abuse Claim shall have such holder's Indirect Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Indirect Abuse Claim shall thereafter be

asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Indirect Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Abuse Claims against any of the Protected Parties and may not proceed in any manner against any the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Indirect Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(ii)     As of the Effective Date, the Limited Protected Parties' liability for all Post-1975 Chartered Organization Abuse Claims and the Limited Protected Parties' liability for all Pre-1976 Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents. Pursuant to the Channeling Injunction set forth in Article X.F, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) and each holder of a Pre-1976 Chartered Organization Abuse Claim shall have such holder's Pre-1976 Chartered Organization Abuse Claim against the Limited Protected Parties permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim and Pre-1976 Chartered Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Post-1975 Chartered Organization Abuse ClaimsClaim and Pre-1976 Chartered Organization Abuse Claim against any of the Limited Protected Parties and may not proceed in any manner against any the Limited Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

(iii)     For the avoidance of doubt, the Protected Parties shall include: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations, including TCJC; (f) the Settling Insurance Companies, including Hartford; and (g) all of such Persons'

Representatives.  The Limited Protected Parties shall include the Participating Chartered Organizations.

c.     Voting:  Class 9 is Impaired, and each holder of an Indirect Abuse Claim is entitled to vote to accept or reject the Plan.

12.     Class 10 – Interests in Delaware BSA.

a.     Classification:  Class 10 consists of all Interests in Delaware BSA.

b.     Treatment:  On the Effective Date, Interests in Delaware BSA shall be deemed cancelled without further action by or order of the Bankruptcy Court and shall be of no further force or effect, whether surrendered for cancellation or otherwise.

c.     Voting:  Class 10 is Impaired, and each holder of an Interest in Delaware BSA shall be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Interests in Delaware BSA are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Interests in Delaware BSA.

C.     Elimination of Vacant Classes.  Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

D.     Cramdown.  If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (1) seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (2) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims are, or any class of Claims is, impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.

## SETTLEMENT TRUST

A.     Establishment of the Settlement Trust.  The Settlement Trust shall be established on the Effective Date in accordance with the Plan Documents.  The Settlement Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code, with respect to which Reorganized BSA shall timely make an election to treat the Settlement Trust as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.

B.    Purposes of the Settlement Trust.

1.    The purposes of the Settlement Trust shall be to assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to direct the processing, liquidation and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents.  The Settlement Trust shall resolve Abuse Claims in accordance with the Settlement Trust Documents in a fair, consistent, equitable manner, and on a pro rata basis, in compliance with the terms of the Settlement Trust Documents and to the extent of available Settlement Trust Assets.

2.    In the event of any ambiguity or conflict between the terms of the Settlement Trust Agreement or any related document required or provided for under the Settlement Trust Documents (other than the Confirmation Order), on the one hand, and the terms of the Plan and the Confirmation Order, on the other hand, the terms of the Plan and the Confirmation Order shall control, notwithstanding that the Settlement Trust Agreement and related documents required or provided for under the Settlement Trust Documents may be incorporated in or annexed to the Plan or the Confirmation Order.

C.    Transfer of Claims to the Settlement Trust.

1.    On the Effective Date or as otherwise provided herein, and without further action of any Person, the Settlement Trust shall assume the liabilities, obligations, and responsibilities, financial or otherwise, of (a) the Protected Parties for all Abuse Claims ~~and,~~ (b) the Limited Protected Parties for all Post-1975 Chartered Organization Abuse Claims and all other Abuse Claims covered under insurance policies issued by the Settling Insurance Companies with respect to such coverage for such Abuse Claims, (c) the Limited Protected Parties for all Pre-1976 Chartered Organization Abuse Claims, and (d) the Opt-Out Chartered Organizations for the Opt-Out Abuse Claims.  These assumptions by the Settlement Trust shall not affect (i) the application of the Discharge Injunction or the Channeling Injunction or (ii) any Non-Settling Insurance Company's obligation under any Abuse Insurance Policy or applicable law.

2.    Except as otherwise expressly provided in the Plan, the Settlement Trust Agreement, or the Trust Distribution Procedures, the Settlement Trust shall have control over the Settlement Trust Causes of Action and the Insurance Actions, and the Settlement Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right (except as otherwise provided in Article IV.D.4) to enforce each of the Settlement Trust Causes of Action and the Insurance Actions, and the proceeds of the recoveries on any of the Settlement Trust Causes of Action or the Insurance Actions shall be deposited in and become the property of the Settlement Trust, and the Settlement Trust shall have the right to enforce the Plan and any of the other Plan Documents (including the Document Agreement) according to their respective terms, including the right to receive the Settlement Trust Assets as provided in the Plan; provided, however, that (a) the Settlement Trust shall have no other rights against the Protected Parties except to enforce the Plan and any of the other Plan Documents; (b) the Settlement Trust shall have no other rights against the Limited Protected Parties with respect to Post-1975 Chartered Organization Abuse Claims~~; (c~~ all

other Abuse Claims covered under insurance policies issued by the Settling Insurance Companies with respect to such coverage for such Abuse Claims except to enforce the Plan and any of the other Plan Documents; (c) the Settlement Trust shall have no other rights against the Opt-Out Chartered Organizations with respect to Opt-Out Abuse Claims except to enforce the Plan and any of the other Plan Documents; (d) the Settlement Trust Causes of Action, and the Insurance Actions, and the Participating Chartered Organization Insurance Actions shall not include any Claims or Interests fully and finally released, compromised, or settled pursuant to the Plan or any Plan Documents, or any Claims against HartfordSettling Insurance Companies released, compromised and settled under the Hartford Insurance Settlement AgreementAgreements; and (de) for the avoidance of doubt, the Settlement Trust Causes of Action, and the Insurance Actions, and the Participating Chartered Organization Insurance Actions do not include any rights of the Protected Parties or the Limited Protected Parties, or Opt-Out Chartered Organizations arising under the Channeling Injunction or any of the Injunctions, Releases, or Discharges granted under the Plan and the Confirmation Order.

D.    <u>Transfer of Settlement Trust Assets to the Settlement Trust</u>.

1.    <u>Transfers on the Effective Date</u>.  On the Effective Date, subject to <u>Article IV.D.2</u>, all right, title, and interest in and to the Settlement Trust Assets and any proceeds thereof shall be automatically, and without further act or deed, transferred to, vested in, and assumed by the Settlement Trust free and clear of all Encumbrances or Claims or other interests of any Person, subject to the Channeling Injunction and other provisions of the Plan.  Notwithstanding the foregoing, the Settlement Trust shall satisfy, to the extent required under the relevant policies and applicable law, and in accordance with the Trust Distribution Procedures, any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies.  The Debtors and the Local Councils shall establish an appropriate escrow mechanism to ensure that the Cash to be paid to the Settlement Trust by Local Councils on the Effective Date can be paid in a timely manner.

2.    <u>Transfers after the Effective Date</u>.  To the extent any of the Settlement Trust Assets are not transferred to the Settlement Trust by operation of law on the Effective Date pursuant to the Plan, then when such assets accrue or become transferable subsequent to the Effective Date, they shall automatically and immediately transfer to the Settlement Trust free and clear of all Encumbrances and Claims or other interests of any Person, subject to the Channeling Injunction and other provisions of the Plan.  To the extent any Artwork is not physically transferred to the Settlement Trust on the Effective Date, the Debtors or Reorganized BSA and the Settlement Trust shall mutually agree on the terms of the storage and subsequent physical transfer thereof.  For the avoidance of doubt, title to the Artwork (and the risk of loss thereof) will transfer to the Settlement Trust on the Effective Date.  To the extent that any action of a Protected Party or Limited Protected Party is required to effectuate such transfer, such Protected Party or Limited Protected Party shall promptly transfer, assign, and contribute, such remaining Settlement Trust Assets to the Settlement Trust.  In the event a Protected Party or a Limited Protected Party breaches any obligation contained in this section, the Settlement Trust

will have no adequate remedy at law and shall be entitled to preliminary and permanent declaratory and injunctive relief.  This Article IV.D.2 applies, without limitation, to (a) that portion of the Local Council Settlement Contribution required to be contributed to the Settlement Trust after the Effective Date and (b) the transfer to the Settlement Trust of the Warehouse and Distribution Center, subject to the Leaseback Requirement.

3.    Specified Insurance Policies and Non-Abuse Litigation Claims.

a.    The Settlement Trust shall have consent over any post-Effective Date settlement of any Non-Abuse Litigation Claim (such consent not to be unreasonably withheld) that is entitled to a recovery from the proceeds of Specified Insurance Policies.  A condition of payment of a Non-Abuse Litigation Claim by the Settlement Trust from a Specified Insurance Policy shall be a release by the holder of such Non-Abuse Litigation Claim of the Debtors, the Local Councils, and any other insureds under applicable Specified Insurance Policies. Before the Settlement Trust settles any Specified Insurance Policy(ies) under which the holder of a Non-Abuse Litigation Claim is seeking to recover, the holder of a Non-Abuse Litigation Claim may recover up to the full amount of such Claim in the first instance from any such available unsettled Specified Primary Insurance Policy(ies) or unsettled Specified Excess Insurance Policy(ies). If and when the Settlement Trust settles one or more Specified Insurance Policies under which the holder of a Non-Abuse Litigation Claim is seeking to recover: (a) the holder of such Non-Abuse Litigation Claim shall remain entitled to recover up to $1,000,000 of such Claim under any such Specified Primary Insurance Policy(ies); and (b) any amounts exceeding $1,000,000 shall be recoverable in the first instance from any such available unsettled Specified Excess Insurance Policies.  Subject to a review of the details concerning a Non-Abuse Litigation Claim by the Settlement Trustee, to the extent that the holder of a Non-Abuse Litigation Claim cannot, as a result of the Settlement Trust's release of such Specified Insurance Policy(ies), recover the full amount of any judgment or settlement of such Claim consented to by the Settlement Trust (such consent not to be unreasonably withheld) from any Specified Insurance Policy(ies) under which the holder of a Non-Abuse Litigation Claim is seeking to recover, then any unpaid amounts (up to applicable policy limits) shall be submitted to the Settlement Trust, which shall pay such amounts out of the proceeds of the Specified Insurance Policies.

b.    The Settlement Trustee shall have a duty to treat Direct Abuse Claims and Non-Abuse Litigation Claims that implicate the Specified Insurance Policies fairly and equally.  In negotiating any settlements involving Specified Insurance Policies, the Settlement Trustee shall bear in mind the interests of both Direct Abuse Claims and Non-Abuse Litigation Claims in structuring any settlement and use best efforts to maximize recoveries for both constituencies.

c.    Notwithstanding anything to the contrary in the Plan, with respect to any Non-Abuse Litigation Claim that has been asserted or could be asserted against any Local Council, notice of which is provided to the Debtors, the

Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative prior to the Effective Date, the rights of the Local Council to recover for such Non-Abuse Litigation Claim under the Specified Insurance Policies up to the applicable coverage limits shall be preserved; provided, however, that if the holder of a Non-Abuse Litigation Claim provides a full and complete written release of any claims that such holder of a Non-Abuse Litigation Claim may have against the Local Council related to the Non-Abuse Litigation Claim, then the Local Council will be deemed to have waived any rights it may have against the Specified Insurance Policy with respect to such Non-Abuse Litigation Claim.

4.    Settlement Trust Causes of Action.  The transfer of the Settlement Trust Causes of Action to the Settlement Trust, insofar as they relate to the ability to defend against or reduce the amount of Abuse Claims, shall be considered the transfer of a non-exclusive right enabling the Settlement Trust to defend itself against asserted Abuse Claims, which transfer shall not impair, affect, alter, or modify the right of any Person, including the Protected Parties, the Limited Protected Parties, an insurer or alleged insurer, or co-obligor or alleged co-obligor, sued on account of an Abuse Claim or on account of any asserted right relating to any Abuse Insurance Policy, to assert each and every defense or basis for claim reduction such Person could have asserted had the Settlement Trust Causes of Action not been assigned to the Settlement Trust (including any defense or basis for claim reduction that any Insurance Company or other insurer or alleged insurer could have asserted under section 502 of the Bankruptcy Code, applicable non-bankruptcy law, or any Abuse Insurance Policy or other agreement with respect to (a) any alleged liability of the BSA or any Local Council, Contributing Chartered Organization, Participating Chartered Organization or any other insured Person for any Abuse Claim or (b) any alleged liability of any Insurance Company or other insurer or alleged insurer to provide indemnity or defense relating to any Abuse Claim or any alleged extracontractual liability of any Insurance Company or other insurer or alleged insurer relating to any Abuse Claim).

E.    Settlement Trustee.    There shall be one Settlement Trustee, who shall be appointed by the Bankruptcy Court in the Confirmation Order.  The initial Settlement Trustee shall be Eric D. Green.  Any successor Settlement Trustee shall be appointed in accordance with the terms of the Settlement Trust Agreement.  For purposes performing his or her duties and fulfilling his or her obligations under the Settlement Trust and the Plan, the Settlement Trustee shall be deemed to be, and the Confirmation Order shall provide that he or she is, a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  The Settlement Trustee shall be the "administrator" of the Settlement Trust as such term is used in Treas. Reg. Section 1.468B-2(k)(3).

F.    Settlement Trust Advisory Committee.

1.    The Settlement Trust Advisory Committee shall be established pursuant to the Settlement Trust Agreement.  The initial STAC shall be composed of seven (7) members, five (5) of which shall be selected by the Coalition and two (2) of which shall be selected by the Tort Claimants' Committee, subject to discussion between and the

consent of the Coalition and the Tort Claimants' Committee.  The STAC members shall be reasonably acceptable to the Debtors and shall have the functions, duties, and rights provided in the Settlement Trust Agreement.  Each STAC member shall serve in accordance with the terms and conditions of the Settlement Trust Agreement.

2.     The commencement or continuation of a STAC Tort Election Claim (as defined in Article XII.B of the Trust Distribution Procedures) and the approval of any global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party must be approved by the Settlement Trustee, the Future Claimants' Representative and the majority of the STAC, *provided*, *however*, that the refusal of any of the foregoing to (a) authorize the commencement or continuation of a STAC Tort Election Claim or (b) approve a global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party shall be subject to immediate review under the standard set forth in the Settlement Trust Agreement by the Special Reviewer if three (3) members of the STAC so require.

G.     <u>Future Claimants' Representative</u>.  The Settlement Trust Agreement shall provide for the continuation of the Future Claimants' Representative to represent the interests of holders of Future Abuse Claims.  The initial Future Claimants' Representative shall be James L. Patton, Jr. so long as he is the Future Claimants' Representative in the Chapter 11 Cases as of the Effective Date.

H.     <u>Trust Distribution Procedures</u>.  On the Effective Date, the Settlement Trust shall implement the Trust Distribution Procedures in accordance with the terms of the Settlement Trust Agreement.  From and after the Effective Date, the Settlement Trustee shall have the authority to administer, amend, supplement, or modify the Trust Distribution Procedures solely in accordance with the terms thereof and the Settlement Trust Agreement.

I.     <u>Post-Effective Date Contributing Chartered Organizations.</u>

1.     Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any <u>Opt-Out </u>Chartered Organization <s>that is not a Contributing</s><u>or Participating</u> Chartered Organization as of the Effective Date may become a Protected Party if <u>(a) a financial contribution is made by or on behalf of such Opt-Out Chartered Organization or Participating Chartered Organization, (b) such Opt-Out Chartered Organization or Participating Chartered Organization agrees to provide the assignments and releases applicable to Contributing Chartered Organizations, set forth in the definition of Contributing Chartered Organization Settlement Contribution, and (c) if and to the extent required by BSA, it agrees to cooperate with youth protection, and (d) </u>the Bankruptcy Court, after notice and an opportunity for parties in interest to be heard, approves a settlement agreement between such Chartered Organization and the Settlement Trustee (a "<u>Post-Effective Date Chartered Organization Settlement</u>").  After the Effective Date, the Settlement Trustee shall have the exclusive authority to seek approval of a Post-Effective Date Chartered Organization Settlement.  Upon the Bankruptcy Court's entry of a Final Order approving a Post-Effective Date Chartered Organization Settlement, <u>Exhibit C</u> shall be amended by the Settlement Trustee to

include such Chartered Organization, and such Chartered Organization (and any related Persons or Representatives, as applicable) shall be deemed to be a Contributing Chartered Organization and a Protected Party for all purposes hereunder. **A list of Chartered Organizations that may potentially become Contributing Chartered Organization may be accessed at https://omniagentsolutions.com/bsa-SAballots**.

2. Any Chartered Organization that becomes a Protected Party in accordance with this Article IV.I shall have all of the rights, remedies and obligations of a Protected Party under the Plan, including under the Channeling Injunction, notwithstanding that such Chartered Organization was not a Protected Party under the Plan as of the Effective Date.

J. Post-Effective Date Participating Chartered Organizations.

1. Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Chartered Organization that is not a Participating Chartered Organization as of the Effective Date may become a Participating Chartered Organization by agreement with the Settlement Trustee and without further order of the Bankruptcy Court; provided, however, that the Settlement Trustee shall file a notice with the Bankruptcy Court within thirty (30) days of entering into any agreement with a Chartered Organization that deems such Chartered Organization to be a Limited Protected Party, together with an amendment to Exhibit J removing such Chartered Organization from the list of Chartered Organizations that are not Participating Chartered Organizations.

2. Any Chartered Organization that becomes a Limited Protected Party in accordance with this Article IV.J shall have all of the rights, remedies and obligations of a Limited Protected Party under the Plan, including under the Limited Channeling Injunction, notwithstanding that such Chartered Organization was not a Limited Protected Party under the Plan as of the Effective Date.

J. K. Post-Effective Date Settling Insurance Companies.

1. Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Insurance Company that is a Non-Settling Insurance Company may, within twelve (12) months of the Effective Date (the "Insurance Settlement Period"), enter into an Insurance Settlement Agreement with the Settlement Trustee (a "Post-Effective Date Insurance Settlement"); provided, however, that the Settlement Trustee shall file a notice with the Bankruptcy Court within thirty (30) days of entering into any such Post-Effective Date Insurance Settlement, together with an amendment to Exhibit I including such Post-Effective Date Insurance Settlement, and such Insurance Company (and any related Persons or Representatives, as applicable) shall be deemed to be a Settling Insurance Company and a Protected Party for all purposes hereunder. The Post-Effective Date Insurance Settlement and amendment shall be deemed binding and effective absent objection by any Person within fifteen (15) calendar days. The Settlement Trustee shall have the sole discretion, upon order of the Bankruptcy Court, to extend the Insurance Settlement Period.

2. Any Insurance Company that becomes a Protected Party in accordance with this ~~Article IV.K~~Article IV.J shall have all of the rights, remedies and obligations of a Protected Party under the Plan, including under the Channeling Injunction, notwithstanding that such Insurance Company was not a Protected Party under the Plan as of the Effective Date.

K. ~~L.~~ Settlement Trust Expenses. The Settlement Trust shall pay all Settlement Trust Expenses from the Settlement Trust Assets. The Settlement Trust shall bear sole responsibility with respect to the payment of the Settlement Trust Expenses. Additionally, the Settlement Trust shall promptly pay all reasonable and documented Settlement Trust Expenses incurred by any Protected Party for any and all liabilities, costs or expenses as a result of taking action on behalf of or at the direction of the Settlement Trust following the transfer to the Settlement Trust of copies of all records and documents in such Persons' possession, custody or control pertaining to Abuse Claims in accordance with the Document Agreement. To the maximum extent permitted by applicable law, the Settlement Trustee shall not have or incur any liability for actions taken or omitted in his or her capacity as Settlement Trustee, or on behalf of the Settlement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or omissions in his or her capacity as Settlement Trustee, or on behalf of the Settlement Trust, except for any actions or omissions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Settlement Trustee shall be satisfied only from the Settlement Trust Assets.

L. ~~M.~~ Reimbursement by Settlement Trust. From and after the Effective Date, the Settlement Trust shall reimburse, to the fullest extent permitted by applicable law, Reorganized BSA and each of the Local Councils for any documented out-of-pocket, losses, costs, and expenses (including judgments, attorneys' fees, and expenses) incurred by Reorganized BSA or any Local Council after the Effective Date attributable to the defense of a Direct Abuse Claim that is channeled to the Settlement Trust if the holder of such Direct Abuse Claim seeks to hold Reorganized BSA and any Local Council liable for such Direct Abuse Claim in violation of the terms of the Plan or the Confirmation Order; provided that the Settlement Trust's reimbursement obligations to Reorganized BSA and any Local Council for any Direct Abuse Claim shall be capped at and shall not exceed the amount actually payable by the Settlement Trust to the holder of such Direct Abuse Claim under the Trust Distribution Procedures (*i.e.*, the amount paid based on the Settlement Trust payment percentage) ~~and~~; provided, further, that any amounts (1) incurred by the Settlement Trust as set forth herein, (2) incurred by the Settlement Trust to enforce the Channeling Injunction against a holder of a Direct Abuse Claim, or (3) that reduce Settlement Trust Assets as a result of the enforcement of the Channeling Injunction shall be deducted on a dollar-for-dollar basis against such holder's distribution from the Settlement Trust on account of such Direct Abuse Claim. Reorganized BSA and any Local Council shall provide notice to the Settlement Trust within ten (10) business days of the service of any claim or lawsuit filed by a holder of an Abuse Claim that could result in any reimbursement obligations by the Settlement Trust under this provision. In the event that any litigation asserting an Abuse Claim is filed naming Reorganized BSA or any Local Council as a defendant in violation of the terms of the Plan or the Confirmation Order, the Settlement Trust shall, at the request of Reorganized BSA or such Local Council, promptly appear (1) before the Bankruptcy Court to obtain entry of

an order enforcing the Channeling Injunction and (2) in such litigation and seek the dismissal of the case.  Other than this limited reimbursement obligation, the Settlement Trust shall not be required to reimburse or indemnify any Protected Parties or Limited Protected Parties for any claims, liabilities, losses, actions, suits, proceedings, third-party subpoenas, damages, costs and expenses, including any liabilities related to, arising out of, or in connection with any Abuse Claim.  Except for the right to seek reimbursement or indemnity set forth in this ~~Article IV.M~~Article IV.L, the Debtors, the Local Councils, the Contributing Chartered Organizations, the Participating Chartered Organizations and any other Person that is or becomes a Protected Party shall be forever barred from seeking compensation from the Settlement Trust for or on account of any Claims arising prior to the Petition Date.

M.    ~~N.~~Trust Defense of TCJC Settlement.  In the event that any litigation in any forum asserting an Abuse Claim is filed naming TCJC as a defendant in violation of the terms of the Plan or the Confirmation Order, the Settlement Trust shall, at the request of TCJC, promptly appear (1) before the Bankruptcy Court to obtain entry of an order enforcing the Channeling Injunction and (2) in such litigation seek the dismissal of the case.  Under no circumstances shall the Settlement Trust be required to reimburse or indemnity TCJC for any claims, liabilities, losses, actions, suits, proceedings, third-party subpoenas, damages, costs, and expenses, including any liabilities related to, arising out of, or in connection with, any Abuse Claim.

N.    ~~O.~~Assignment of Claims and Defenses.  Notwithstanding anything herein to the contrary, on the Effective Date, the Debtors, the Local Councils and any other party that is or becomes a Protected Party or a Limited Protected Party shall be deemed to assign any and all Claims and defenses to the Settlement Trust that arise from or relate to Abuse Claims, including any Claims and defenses against co-defendants; provided, however, that with respect to Limited Protected Parties, the foregoing assignment shall be limited to Claims and defenses that arise from or relate to Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims.

O.    ~~P.~~Investment Guidelines.  All monies held in the Settlement Trust shall be invested, subject to the investment limitations and provisions enumerated in the Settlement Trust Agreement.

P.    ~~Q.~~Excess Settlement Trust Assets.  To the extent any Settlement Trust Assets remain at such time as the Settlement Trust is dissolved under the terms of the Settlement Trust Documents, any remaining Settlement Trust Assets shall be distributed to Reorganized BSA.

Q.    ~~R.~~Document Agreement.  Reorganized BSA, the Local Councils, ~~the Contributing Chartered Organizations~~ and the Settlement Trust shall enter into the Document Agreement on the Effective Date, substantially in the form contained in the Plan Supplement.  The Document Agreement shall provide for copies of certain documents, books and records of Reorganized BSA, the Local Councils, and any Contributing Chartered Organizations to be transferred to the Settlement Trust.  The parties to the Document Agreement shall be bound by the terms thereof.

R.    ~~S.~~Privileged Information.  The transfer or assignment of any Privileged Information to the Settlement Trustee shall not result in the destruction or waiver of any

applicable privileges pertaining thereto. Further, with respect to any privileges: (1) they are transferred to or contributed for the purpose of enabling the Settlement Trustee to perform his or her duties to administer the Settlement Trust; (2) they are vested solely in the Settlement Trustee and not in the Settlement Trust, the STAC, the Future Claimants' Representative, the Special Reviewer, the SASAC (as defined in the Settlement Trust Agreement), any other Person, committee or subcomponent of the Settlement Trust, or any other Person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of an Abuse Claim; and (3) the Settlement Trustee shall keep, handle and maintain such Privileged Information in accordance with the terms of the Document Agreement. The Settlement Trustee shall succeed to and hold all rights to and interest in and related to the Debtors', Local Councils' and Contributing Chartered Organizations' privileges, including the attorney-client privilege, any Common-Interest Communications with Insurers, and any protection granted by joint defense, common interest, and/or confidentiality agreement, as to all documents, communications, and other information, including any information transferred pursuant to the Document Agreement. The Settlement Trustee shall be permitted to use Privileged Information for any purpose related to the administration of the Settlement Trust and the settlement of Abuse Claims and shall be permitted to share Privileged Information with any professional retained by the Settlement Trust; provided, however, that the Settlement Trustee shall not share Privileged Information with the STAC or any holder of an Abuse Claim except as required by law or as the Settlement Trustee determines in good faith is required by law. Notwithstanding the foregoing, nothing herein shall preclude the Settlement Trustee from providing Privileged Information to any Insurance Company as necessary to preserve, secure, or obtain the benefit of any rights under any Abuse Insurance Policy.

S. ~~T.~~ No Liability. The Protected Parties and the Limited Protected Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance in connection with or related to the Settlement Trust, the Settlement Trustee, or the Settlement Trust Documents, including the administration of Abuse Claims and the distribution of Settlement Trust Assets by the Settlement Trust, or any related agreement.

T. ~~U.~~ U.S. Federal Income Tax Treatment of the Settlement Trust. The Settlement Trust shall be a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code. Reorganized BSA shall make a "grantor trust" election under Treasury Regulation section 1.468B-1(k) with respect to the Settlement Trust for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. All parties shall report consistently with such grantor trust election. The Settlement Trust shall file (or cause to be filed) statements, returns, or disclosures relating to the Settlement Trust that are required by any Governmental Unit. The Settlement Trustee shall be responsible for the payment of any taxes imposed on the Settlement Trust or the Settlement Trust Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the Settlement Trust Agreement. The Settlement Trustee may request an expedited determination of taxes on the Settlement Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Settlement Trust for all taxable periods through the dissolution of the Settlement Trust.

U.    V.    Institution and Maintenance of Legal and Other Proceedings.  As of the Effective Date, the Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Settlement Trust, including the Insurance Actions, Abuse Claims, and the Settlement Trust Causes of Action.  Without limiting the foregoing, on and after the Effective Date, the Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions, in the name of the Debtors or Reorganized BSA, if deemed necessary or appropriate by the Settlement Trust. The Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred on or after the Effective Date arising from, relating to, or associated with any legal action or other proceeding which is the subject of this Article IV.V Article IV.U and shall pay Indirect Abuse Claims, in accordance with the Trust Distribution Procedures, that may arise from deductibles or other charges. Furthermore, without limiting the foregoing, the Settlement Trust shall be empowered to maintain, administer, preserve, or pursue the Insurance Actions and the Insurance Action Recoveries.

V.    W.    Notation on Claims Register Regarding Abuse Claims.  On the Effective Date, all Abuse Claims filed against the Debtors in the Chapter 11 Cases shall be marked on the Claims Register as "Channeled to the Settlement Trust" and resolved exclusively in accordance with the Trust Distribution Procedures.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    General.  On and after the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions consistent with the Plan as may be necessary or appropriate to enable them to implement the provisions of the Plan before, on, or after the Effective Date, including the creation of the Settlement Trust and the preparations for the transfer of the Settlement Trust Assets to the Settlement Trust.

B.    Operations of the Debtors between Confirmation and the Effective Date.  The Debtors shall continue to operate as debtors and debtors in possession during the period from the Confirmation Date to the Effective Date.

C.    BSA Governance Documents.  From and after the Effective Date, Reorganized BSA shall be governed pursuant to the BSA Charter and the Amended BSA Bylaws.  The Amended BSA Bylaws shall contain such provisions as are necessary to satisfy the provisions of the Plan, subject to further amendment thereof after the Effective Date as permitted by applicable law.  Under the BSA Charter, the BSA has no power to issue certificates of stock, its object and purpose being solely of a charitable character and not for pecuniary profit; accordingly, the requirement of section 1123(a)(6) does not apply to the BSA.

D.    Continued Legal Existence of BSA.  The BSA shall continue to exist on and after the Effective Date, with all of the powers it is entitled to exercise under applicable law and

pursuant to the BSA Charter and the Amended BSA Bylaws, subject to further amendment of the Amended BSA Bylaws after the Effective Date, as permitted by applicable law.

E.      Reorganized BSA's Directors and Senior Management.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent that there are anticipated changes in Reorganized BSA's directors and officers, the Debtors will identify any such changes in the Plan Supplement.  On and after the Effective Date, the Amended BSA Bylaws, as such may be amended thereafter from time to time, shall govern the designation and election of directors of Reorganized BSA.

F.      Dissolution of Delaware BSA.  On the Effective Date, Delaware BSA's members, directors, officers and employees shall be deemed to have resigned, and Delaware BSA shall be deemed to have dissolved for all purposes and be of no further legal existence under any applicable state or federal law, without the need for any further action or the filing of any plan of dissolution, notice, or application with the Secretary of State of the State of Delaware or any other state or government authority, and without the need to pay any franchise or similar taxes to effectuate such dissolution.  Any Allowed Claims against Delaware BSA will be treated as set forth in Article III.B.

G.      Due Authorization.  As of the Effective Date, all actions contemplated by the Plan that require corporate action of the Debtors, or either of them, including actions requiring a vote of the National Executive Board or the National Executive Committee of the BSA or the sole member of Delaware BSA, and execution of all documentation incident to the Plan, shall be deemed to have been authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by the Bankruptcy Court, members, officers, or directors of the Debtors, Reorganized BSA, or any other Person.

H.      Cancellation of Interests.  As of the Effective Date, in accordance with Article III.B.12, Interests in Delaware BSA shall be deemed cancelled without further action by or order of the Bankruptcy Court and shall be of no further force or effect.

I.      Restatement of Indebtedness.

1.      Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, and subject to the treatment afforded to holders of Allowed Claims in Class 3A, 3B, 4A, or 4B under Article III, on the Effective Date, all Prepetition Debt and Security Documents, including all agreements, instruments, and other documents evidencing or issued pursuant to the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, the 2012 Bond Documents, or any indebtedness or other obligations thereunder, and any rights of any holder in respect thereof, shall be deemed amended and restated in the form of the Restated Debt and Security Documents on the terms set forth herein.

2.      Any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the satisfactions, Injunctions,

Releases, Discharges and other transactions provided for in the Plan shall be deemed null and void and shall be of no force or effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court, including the Confirmation Order.

J.    Cancellation of Liens.  Except as otherwise provided in the Plan, on the Effective Date, any Lien securing any Allowed Secured Claim (other than a Lien securing any Allowed Secured Claim that is Reinstated pursuant to the Plan, including, for avoidance of doubt, the liens securing the Restated Debt and Security Documents) shall be deemed released and the holder of such Allowed Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such holder and to take such actions as may be requested by the Debtors (or Reorganized BSA, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or Reorganized BSA, as the case may be).

K.    Effectuating Documents and Further Transactions.  The Chief Executive Officer and President, the Chief Financial Officer, and the General Counsel of the BSA are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan in the name of and on behalf of Reorganized BSA, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

L.    Sources of Consideration for Distributions.  Distributions under the Plan shall be funded from the following sources:

1.    the Debtors shall fund Distributions on account of and satisfy Allowed General Unsecured Claims exclusively from the Core Value Cash Pool;

2.    the Settlement Trust shall fund distributions on account of and satisfy compensable Abuse Claims in accordance with the Trust Distribution Procedures from (a) the BSA Settlement Trust Contribution, (b) the Local Council Settlement Contribution, (c) the Contributing Chartered Organization Settlement Contribution, (d) the Participating Chartered Organization Settlement Contribution, (e) the Hartford Settlement Contribution, and (f) any and all funds, proceeds or other consideration contributed to the Settlement Trust under the terms of any Insurance Settlement AgreementAssets;

3.    the Debtors shall satisfy 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims, and 2012 Bond Claims in accordance with the terms of the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents, as applicable; and

4.    the Debtors shall fund Distributions on account of and satisfy all other Allowed Claims with Unrestricted Cash and Investments on hand on or after the Effective Date in accordance with the terms of the Plan and the Confirmation Order.

M.    <u>Calculation of Minimum Unrestricted Cash and Investments</u>.  The minimum amount of Unrestricted Cash and Investments to be retained by Reorganized BSA on the Effective Date shall be:

1.    $25,000,000 if the Effective Date occurs on or before September 30, 2021;

2.    $37,000,000 if the Effective Date occurs on or after October 1, 2021 but before November 1, 2021;

3.    $36,000,000 if the Effective Date occurs on or after November 1, 2021 but before December 1, 2021;

4.    $40,000,000 if the Effective Date occurs on or after December 1, 2021 but before January 1, 2022;

5.    $57,000,000 if the Effective Date occurs on or after January 1, 2022 but before February 1, 2022;

6.    $41,000,000 if the Effective Date occurs on or after February 1, 2022 but before March 1, 2022;

7.    $55,000,000 if the if the Effective Date occurs on or after March 1, 2022 but before April 1, 2022; and

8.    $54,000,000 if the Effective Date occurs on or after April 1, 2022.

Without limiting the foregoing, in accordance with the Hartford Insurance Settlement Agreement and the Allowance of the Hartford Administrative Expense Claim under the Plan, the Net Unrestricted Cash and Investments shall be reduced on a dollar-for-dollar basis equal to fifty percent (50%) of the Allowed Hartford Administrative Expense Claim, or $1,000,000.

N.    <u>Resolution of Abuse Claims</u>.  All Abuse Claims shall be channeled to and resolved by the Settlement Trust in accordance with the Trust Distribution Procedures; <u>provided</u>, that any Non-Settling Insurance Company may, subject to <u>Article X.M</u>, raise any valid Insurance Coverage Defense in response to a demand by the Settlement Trust, including any right of such Non-Settling Insurance Company to assert any defense that could, but for the Settlement Trust's assumption of the liabilities, obligations, and responsibilities of the Protected Parties for Abuse Claims, have been raised by the Debtors or other applicable Protected Party with respect to such Claim.

O.    <u>Funding by the Settlement Trust</u>.  The Settlement Trust shall have no obligation to fund costs or expenses other than those set forth in the Plan or the Settlement Trust Documents, as applicable.

P.      Core Value Cash Pool.  Reorganized BSA shall deposit Cash into the Core Value Cash Pool by making four semi-annual installment payments equal to $6,250,000.  Reorganized BSA shall make the first deposit six (6) months after the Effective Date; the second installment on the first anniversary after the Effective Date; the third installment eighteen (18) months after the Effective Date; and the fourth installment on the second anniversary of the Effective Date.

Q.      Creditor Representative; Disbursing Agent.  The Creditor Representative shall be appointed as of the Effective Date.  The Creditor Representative shall be responsible for assisting Reorganized BSA and its professionals in their efforts to efficiently reconcile Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims.  The identity of the Creditor Representative shall be determined by the Creditors' Committee, with the consent of the Debtors (such consent not to be unreasonably withheld).  The Debtors or Reorganized BSA, as applicable, will use commercially reasonable efforts to assist the Creditor Representative in reconciling Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims on or before the applicable Claims Objection Deadline.  The reasonable fees and actual and necessary costs and expenses of the Creditor Representative shall be paid by Reorganized BSA up to the Creditor Representative Fee Cap, and Reorganized BSA shall have no obligation to compensate or reimburse the costs or expenses of the Creditor Representative beyond the amount of the Creditor Representative Fee Cap.  The Disbursing Agent shall have the rights, powers and responsibilities provided in Article VII.  The reasonable fees and actual and necessary costs and expenses of the Disbursing Agent, if any, shall be paid by Reorganized BSA.

R.      Residual Cash in Core Value Cash Pool.  To the extent any Cash remains in the Core Value Cash Pool after all Allowed General Unsecured Claims have been satisfied in full, such remaining Cash shall: (1) first, on account of any Allowed Non-Abuse Litigation Claims that shall not have elected to be treated as an Allowed Convenience Claim under Article III.B.9 to satisfy any deficiency in payments of such Allowed Claims (a) from available insurance coverage, including Abuse Insurance Policies and Non-Abuse Insurance Policies, (b) from applicable proceeds of any Insurance Settlement Agreements, and (c) from co-liable non-debtors (if any) or their insurance coverage; (2) second, to pay interest to holders of Allowed General Unsecured Claims in accordance with Article VII.L; and (3) third irrevocably re-vest in Reorganized BSA.

S.      Compromise and Settlement of Claims, Interests and Controversies.  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan and the Plan Documents, as of the Effective Date, the provisions of the Plan, including the Abuse Claims Settlement, the ~~Hartford~~ Insurance Settlement Agreements, the JPM / Creditors' Committee Settlement, the TCJC Settlement, and the Settlement of Restricted and Core Asset Disputes set forth in this Article V.S, shall constitute good-faith compromises and settlements of Claims, Interests, and controversies among the parties thereto relating to the contractual, legal, equitable and subordination rights that holders of Claims or Interests may have with respect to any Claim or Interest under the Plan or any Distribution to be made on account of an Allowed Claim.  The Plan shall be deemed a motion, proposed by the Debtors and joined by the parties to the Abuse Claims Settlement, the ~~Hartford~~ Insurance Settlement ~~Agreement~~Agreements, the JPM / Creditors' Committee Settlement, the TCJC Settlement, and the Settlement of Restricted and Core Asset Disputes, respectively, and the entry of the Confirmation Order shall constitute the

Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies among the parties thereto, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable and reasonable.

1.    <u>Abuse Claims Settlement</u>.  The treatment provided for Abuse Claims, including Post-1975 Chartered Organization Abuse Claims and Opt-Out Abuse Claims, under the Plan incorporates and reflects a proposed compromise and settlement of all Scouting Released Claims, including all Abuse Claims against the Protected Parties and, all Pre-1976 Chartered Organization Abuse Claims against the Limited Protected Parties, all Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties and Opt-Out Abuse Claims against Opt-Out Chartered Organizations (the "Abuse Claims Settlement"), and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Abuse Claims Settlement.  The following constitute the provisions and conditions of the Abuse Claims Settlement:

a.    <u>Local Council Settlement Contribution</u>.  The Local Councils shall make, cause to be made, or be deemed to have made, as applicable, the Local Council Settlement Contribution.  If a Local Council is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) Insurance Actions, and (iii) the Insurance Action Recoveries (the "Local Council Insurance Rights"), then the Local Council shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Local Council Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Local Council Insurance Rights; <u>provided</u>, <u>however</u>, that while any such amounts are held by or under the control of any Local Council, such amounts shall be held for the benefit of the Settlement Trust.

b.    <u>Contributing Chartered Organization Settlement Contribution</u>.  The Contributing Chartered Organizations, including TCJC, shall make, cause to be made, or be deemed to have made, as applicable, the Contributing Chartered Organization Settlement Contribution, including the TCJC Settlement Contribution, the Supplemental LC Contribution, and the Settlement Growth Payment.  If a Contributing Chartered Organization is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, if any, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Settling Insurer Policy Rights, the Insurance Settlement

Agreements, and claims thereunder and proceeds thereof, (ii) the Insurance Actions, and (iii) the Insurance Action Recoveries (the "Contributing Chartered Organization Insurance Rights"), then the Contributing Chartered Organization shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Contributing Chartered Organization Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Contributing Chartered Organization Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Contributing Chartered Organization, such amounts shall be held for the benefit of the Settlement Trust.

c.    Participating Chartered Organization Settlement Contribution. The Participating Chartered Organizations shall make, cause to be made, or be deemed to have made, as applicable, the Participating Chartered Organization Settlement Contribution. If a Participating Chartered Organization is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, if any, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies ~~(excluding the Chartered Organization Reserved Policies)~~, the Settling Insurer Policy Rights, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof, (ii) the Insurance Actions, and (iii) the Insurance Action Recoveries (the "Participating Chartered Organization Insurance Rights"), then the Participating Chartered Organization shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Participating Chartered Organization Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Participating Chartered Organization Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Participating Chartered Organization, such amounts shall be held for the benefit of the Settlement Trust.

d.    Claims Deemed Withdrawn with Prejudice. On the Effective Date, any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Local Council, Participating Chartered Organization, Contributing Chartered Organization, or Settling Insurance Company shall be deemed withdrawn with prejudice and irrevocably waived, released and expunged from the Claims Register without any further notice to or action, order, or approval of the Bankruptcy Court, except that any withdrawal, waiver, release or expungement of any Claims asserted by ~~Hartford or~~Settling Insurance Companies and TCJC shall be governed by the terms and conditions of the ~~Hartford~~applicable Insurance Settlement ~~Agreement and~~Agreements or the TCJC Settlement Agreement, respectively. Further, no Local Council, Participating Chartered Organization, Contributing Chartered Organization, or Settling

Insurance Company shall file or assert any Claim or Claims against the Debtors or Reorganized BSA arising from any act or omission of the Debtors prior to the Confirmation Date, except as provided otherwise in the Hartford Insurance Settlement Agreement (including with respect to the Hartford Additional Administrative Expense Claim, if applicable).

e.    <u>Entitlement to Become a Protected Party</u>.    Notwithstanding anything to the contrary set forth in the Plan or any other document filed with the Bankruptcy Court: (i) no Local Council shall be treated as a Protected Party under the Plan if any part of the Cash or Property Contribution (as defined on <u>Exhibit F</u>) components of the Local Council Settlement Contribution is not contributed to the Settlement Trust on the Effective Date as described on <u>Exhibit F</u>, it being understood that the Property contribution shall be deemed to have been contributed on the Effective Date for Purposes of this provision when all individual Local Councils that are to make a Property Contribution have provided a notice of intent to contribute property to the Settlement Trust in accordance with the terms of the Property Contribution set forth on <u>Exhibit F</u>; (ii) no Contributing Chartered Organization shall be treated as a Protected Party under the Plan until its Contributing Chartered Organization Settlement Contribution shall have been made; (iii) no Settling Insurance Company shall be treated as a Protected Party under the Plan until such Settling Insurance Company shall have made its contribution to the Settlement Trust pursuant to<u>, and as set forth in,</u> an Insurance Settlement Agreement, except that Hartford <u>and the Century and Chubb Companies</u> shall <u>each</u> be treated as a Settling Insurance Company and Protected Party ~~upon the payment of the Initial Payment to the Settlement Trust and the payment of the Additional Payment into the Escrow Account (as such capitalized terms are defined in the Hartford~~<u>as set forth in their respective</u> Insurance Settlement ~~Agreement)~~<u>Agreements</u>; and (iv) no Participating Chartered Organization shall be treated as a Protected Party solely based on the Participating Chartered Organization Insurance Assignment.  <u>Notwithstanding the foregoing, no Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date (including the Archbishop of Agaña, a Corporation Sole) shall be treated as a Contributing Chartered Organization unless it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, provided, however, that such Chartered Organizations shall be otherwise deemed an Opt-Out Chartered Organization and Opt-Out Abuse Claims against such Chartered Organizations shall be Channeled to the Settlement Trust.</u>

f.    <u>Entitlement to Become a Limited Protected Party</u>. Notwithstanding anything to the contrary set forth in the Plan or any other document filed with the Bankruptcy Court, no Chartered Organization shall be treated as a Limited Protected Party under the Plan if it objects to Confirmation of the Plan or informs Debtors' counsel in writing on or before the deadline to object to Confirmation of the Plan that it does not wish to make the <u>Participating</u> Chartered Organization Insurance Assignment.  Notwithstanding the foregoing, no Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date (including the Archbishop of Agaña, a Corporation Sole) shall be treated as

81

a Participating Chartered Organization unless it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, provided, however, that such Chartered Organizations shall be otherwise deemed an Opt-Out Chartered Organization and Opt-Out Abuse Claims against such Chartered Organizations shall be Channeled to the Settlement Trust.

2. JPM / Creditors' Committee Settlement. The treatment provided for under the Plan for Allowed 2010 Credit Facility Claims, Allowed 2019 RCF Claims, Allowed 2010 Bond Claims, Allowed 2012 Bond Claims, Allowed Convenience Claims, Allowed General Unsecured Claims, and Allowed Non-Abuse Litigation Claims, together with the terms and conditions of the JPM / Creditors' Committee Term Sheet, reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee and JPM (the "JPM / Creditors' Committee Settlement").[2]  The following constitutes the provisions and conditions of the JPM / Creditors' Committee Settlement:

a. Allowance and Treatment of 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims and 2012 Bond Claims. The 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims and the 2012 Bond Claims shall be Allowed in the amounts set forth in Article III.B and receive the treatment afforded to such Claims thereunder. The Debtors acknowledge and agree that the Claims held by JPM (the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims and the 2012 Bond Claims), are core to the Debtors' charitable mission and were incurred in furtherance of the Debtors' charitable mission.

b. Treatment of Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims. Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims shall receive the treatment afforded to such Claims under Article III.B. The Debtors acknowledge and agree that General Unsecured Claims, Convenience Claims, and Non-Abuse Litigation Claims are held by creditors who are core to the Debtors' charitable mission or creditors whose Claims in such Classes, if Allowed, were incurred in furtherance of the Debtors' charitable mission; accordingly, payments by Reorganized BSA under the Plan on account of such Allowed Claims, if applicable, will be made from Cash relating to Reorganized BSA's core assets.

c. Challenge Period. As of the Effective Date, (i) the Challenge Period (as defined in the Cash Collateral Order) shall be deemed to have expired with respect to the Creditors' Committee; (ii) the Stipulations (as defined in the Cash Collateral Order) and other admissions, agreements and releases set forth in the Cash Collateral Order shall be final and binding on the Creditors' Committee. The ability of any other party to bring a Challenge Proceeding (as defined in the

---

[2] In the event of a conflict between the terms and conditions of the Plan, on the one hand, and the terms and conditions of the JPM / Creditors' Committee Term Sheet, on the other hand, the terms of the Plan shall control.

Cash Collateral Order) shall be governed by the terms and conditions of the Cash Collateral Order.

3.  <u>Settlement of Restricted and Core Asset Disputes</u>.  As a proposed compromise and settlement of any and all disputes concerning the Debtors' restricted and/or core assets, including the claims asserted in the complaint filed by the Tort Claimants' Committee in the adversary proceeding entitled *Official Tort Claimants' Committee of Boy Scouts of America and Delaware BSA, LLC v. Boy Scouts of America and Delaware BSA, LLC*, Adv. Pro. No. 21-50032 (LSS) (the "<u>Settlement of Restricted and Core Asset Disputes</u>"), the Debtors shall: (a) reduce the minimum amount of Unrestricted Cash and Investments to be retained by Reorganized BSA on the Effective Date from $75,000,000 to $25,000,000 (subject to potential variance as set forth in <u>Article V.M</u>); and (b) issue the BSA Settlement Trust Note to the Settlement Trust as of the Effective Date in accordance with <u>Article V.X</u>.  As further consideration in connection with the Settlement of Restricted and Core Asset Disputes, the Debtors have agreed under the Plan to: (i) fund the Core Value Cash Pool, in the amount of $25,000,000; and (ii) make the BSA Settlement Trust Contribution, including all of the Net Unrestricted Cash and Investments.  The proceeds of the Foundation Loan, in the amount of $42,800,000 (which Reorganized BSA will use exclusively for working capital and general corporate purposes), will permit the Debtors to contribute to the Settlement Trust a substantial amount of core value consideration in Cash on the Effective Date.

4.  ~~Hartford~~ Insurance Settlement <u>Agreements</u>.  The Plan incorporates the ~~Hartford~~ Insurance Settlement ~~Agreement~~<u>Agreements</u>, which, upon ~~its~~<u>their</u> execution by ~~all of~~ the <u>applicable</u> parties thereto, shall be filed with the Plan Supplement and attached hereto ~~as~~<u>under</u> Exhibit I-~~1~~, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and <u>assignment and/or</u> sale of the ~~Hartford~~<u>applicable Insurance</u> Policies <u>as</u> set forth in ~~the Hartford~~<u>each such</u> Insurance Settlement ~~Agreement (the "Hartford Insurance Settlement"),~~<u>Agreements,</u> pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code<u>, as applicable,</u> and Bankruptcy Rule 9019, including approval of (i) the ~~Hartford~~ Insurance Settlement ~~Agreement, (ii)~~<u>Agreements, (ii) the assignment of the Local Council Insurance Policies issued by a Settling Insurance Company to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv)</u> the sale by the Debtors and the Estates, and the purchase by ~~Hartford, of the Hartford~~<u>the Settling Insurance Companies of the applicable Insurance</u> Policies, free and clear of all ~~Interests~~<u>interests</u> of any Person or Entity (as ~~such terms are defined~~<u>set forth</u> in the ~~Hartford~~ Insurance Settlement ~~Agreement; for the avoidance of doubt, the term "Interests" as used in this~~ <u>Article V.S.4</u> ~~shall have the meaning given to the term "Interests" in the Hartford Insurance Settlement Agreement, rather than as such term is defined in~~ ~~Article I of this Plan), provided that the Interests, if any, of Chartered Organizations under the Hartford Policies shall, to the extent such Chartered Organizations are not beneficiaries of the Channeling Injunction, attach to the proceeds of the sale of the Hartford Policies, (iii) the settlement, compromise and release of the Hartford Released Claims (as defined in the Hartford Insurance Settlement Agreement) as provided in the Hartford Insurance Settlement Agreement, and (iv~~<u>Agreements, (v)</u> the Allowance of the Hartford Administrative Expense Claim<u>, and (vi) certain other</u>

settlements, compromises and releases as set forth in the Insurance Settlement Agreements. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, as applicable, and Bankruptcy Rule 9019 and Allowance of the Hartford Administrative Expense Claim and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to Hartfordthe Settling Insurance Companies, as applicable, including findings and conclusions designating Hartfordthe Settling Insurance Companies as a good-faith purchaser of the Hartford Policies.applicable Insurance Policies. Pursuant to the Century and Chubb Companies Insurance Settlement Agreement, upon the release of the Initial Payment (as defined in the Century and Chubb Companies Insurance Settlement Agreement), the Debtors or Reorganized BSA, as applicable, shall irrevocably release the Prepetition Century and Chubb Companies Claims, even in the case the Confirmation Order is reversed or vacated on appeal following the Effective Date.

TCJC SettlementTCJC Settlement. The Plan incorporates the TCJC Settlement Agreement, which, upon its execution by all of the parties thereto, shall be filed with the Plan Supplement and attached hereto as Exhibit J-1, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements set forth in the TCJC Settlement Agreement (the "TCJC Settlement") pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, including, as provided in the TCJC Settlement Agreement, payment of the TCJC Settlement Contribution to the Settlement Trust as a compromise and settlement of all TCJC Abuse Claims, TCJC Claims, and disputes relating to the Plan, including the TCJC Insurance Rights (as such terms are defined in the TCJC Settlement Agreement). The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to TCJC.

T.    Payment of Coalition Restructuring Expenses. On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(ba)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, Reorganized BSA shall reimburse state court counsel for amounts they have paid to the Coalition Professionals for, and/or pay the Coalition Professionals for amounts payable by state court counsel but not yet paid to Coalition Professionals for, reasonable, documented, and contractual professional advisory fees and expenses incurred by the Coalition Professionals (the "Coalition Restructuring Expenses") from the Coalition's inception up to and including the Effective Date, up to a maximum amount equal to (a) $950,000 per month for the period from August 16, 2021 up to and including the Effective Date (pro-rated for any partial month), plus (b) $10,500,000; provided, however, that, without limiting the foregoing, under no circumstance shall the Debtors or Reorganized BSA have any obligation to (i) pay or reimburse the Coalition, any of its members, or any Persons affiliated with the Coalition for any costs, fees or expenses other than the Coalition Restructuring Expenses or (ii) pay or reimburse any Coalition Restructuring Expenses that constitute transaction, success or similar contingent fees. The Coalition shall provide the Debtors a reasonable estimate of the total Coalition Restructuring Expenses as of the

Effective Date no later than the date that is five (5) Business Days before the anticipated Effective Date. Notwithstanding anything to the contrary in the Plan, the Coalition Restructuring Expenses shall be subject to the terms of Article II.A.2, with the following modifications: (x) Coalition Professionals shall comply with the procedures and processes set forth in Article II.A.2 by filing final fee application(s), which, for attorneys or law firms who are Coalition Professionals, shall include time entry detail, which may be redacted for privilege; and (y) payment or reimbursement of Coalition Restructuring Expenses shall be subject to the review and procedure of the Fee Examiner. For the avoidance of doubt, the Coalition Professionals shall not be considered retained professionals of the Debtors, the Creditors' Committee, the Tort Claimants' Committee, or the Future Claimants' Representative, and the retention of the Coalition Professionals shall not have been required to satisfy the standards for retention set forth in sections 327, 328 or 1103 of the Bankruptcy Code. The requirement that a separate motion be filed with the Bankruptcy Court shall not in any way prejudice or limit the payment of the Coalition Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law.

U.    Good-Faith Compromise and Settlement.  The Plan (including its incorporation of the Abuse Claims Settlement, the ~~Hartford~~ Insurance ~~Settlement~~Settlements, the JPM / Creditors' Committee Settlement, the TCJC Settlement, and the Settlement of Restricted and Core Asset Disputes), the Plan Documents, and the Confirmation Order constitute a good-faith compromise and settlement of Claims, Interests and controversies based upon the unique circumstances of these Chapter 11 Cases, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction. The Plan, the Abuse Claims Settlement, the ~~Hartford~~ Insurance ~~Settlement~~Settlements, the JPM / Creditors' Committee Settlement, the TCJC Settlement, the Settlement of Restricted and Core Asset Disputes, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, Reorganized BSA, the Protected Parties, or the Settlement Trust is a party.

V.    Restated Debt and Security Documents.

1.    On the Effective Date, the Prepetition Debt and Security Documents shall be amended and restated in the form of the Restated Debt and Security Documents, and Reorganized BSA, JPM and Arrow shall, and shall be authorized, to execute, deliver and enter into the Restated Debt and Security Documents as of such date, in principal amounts equal to the Allowed amounts set forth in Article III.B.3, Article III.B.4, Article III.B.5, and Article III.B.6 without the need for any further corporate action or any further notice to or order of the Bankruptcy Court. The Debtors or Reorganized BSA, as applicable, JPM, and Arrow shall take all actions necessary to continue the Debtors' obligations under the Prepetition Debt and Security Documents, as amended and restated by the Restated Debt and Security Documents and to give effect to the Restated Debt and Security Documents, including surrendering any debt instruments or securities that are no

longer applicable under the Restated Debt and Security Documents to the Debtors or Reorganized BSA. Entry of the Confirmation Order shall be deemed approval of the JPM Exit Fee, and Reorganized BSA is authorized and directed to pay the JPM Exit Fee to JPM on the Effective Date.

2.      Except as otherwise modified by the Restated Debt and Security Documents, all Liens, mortgages and security interests securing the obligations arising under the Restated Debt and Security Documents that were collateral securing the Debtors' obligations under the Prepetition Debt and Security Documents as of the Petition Date are unaltered by the Plan, and all such Liens, mortgages and security interests are reaffirmed and perfected with respect to the Restated Debt and Security Documents to the same extent, in the same manner and on the same terms and priorities as they were under the Prepetition Debt and Security Documents, except as the foregoing may be modified pursuant to the Restated Debt and Security Documents. All Liens and security interests granted and continuing pursuant to the Restated Debt and Security Documents shall be (a) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law; (b) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (c) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law. The Debtors, Reorganized BSA, Arrow, and JPM are authorized to make, and to the extent required by the Restated Debt and Security Documents, the Debtors, Reorganized BSA, Arrow will make, all filings and recordings, and obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Debt and Security Documents) to establish, attach and perfect such Liens and security interests under any applicable law (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Debt and Security Documents, the Restated Debt and Security Documents are deemed an amendment and restatement of the Prepetition Debt and Security Documents, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure Reorganized BSA's obligations under the Restated Debt and Security Documents, except as expressly set forth therein.

3.      The definitive terms of the Restated Debt and Security Documents shall be (x) acceptable to JPM and the BSA, (y) reasonably acceptable to the Creditors' Committee, and (z) substantially the same as the Prepetition Debt and Security Documents, except that, as to be specified in the Restated Debt and Security Documents:

a.      the maturity dates under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents, and the Restated Credit Facility Documents will be the Restated Maturity Date;

b.      principal under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be payable in monthly installments, in the same monthly amounts as the prepetition periodic amortization amounts, beginning on the date that is two (2) years after the Effective Date and ending on the Restated Maturity Date; provided, that the scheduled principal amounts payable under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be reduced, on a pro rata basis, by an amount equal to the Excess Cash and Investments, if any, that are remitted to JPM under the Excess Cash Sweep;

c.      interest under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be payable in monthly installments, at the currently applicable existing rates in the 2010 Bond Documents and the 2012 Bond Documents, beginning on the date that is one month after the Effective Date and ending on the Restated Maturity Date;

d.      principal under the Restated Credit Facility Documents shall be payable in quarterly installments, set at 1/40th of the outstanding balance on the Effective Date, beginning on the date that is two (2) years after the Effective Date and ending on the Restated Maturity Date; provided, that the principal amounts payable under the Restated Credit Facility Documents shall be reduced, on a pro rata basis, by an amount equal to the Excess Cash and Investments, if any, that are remitted to JPM under the Excess Cash Sweep;

e.      interest under the Restated Credit Facility Documents shall be payable in quarterly installments at the applicable existing rates in the Prepetition Debt and Security Documents, beginning on the date that is three (3) months after the Effective Date and ending on the Restated Maturity Date;

f.      all of the obligations of Reorganized BSA under the Restated Debt and Security Documents shall be secured by first-priority liens on and security interests in all of the assets of Reorganized BSA;

g.      all of the obligations of Reorganized BSA under the Restated Debt and Security Documents shall be guaranteed by Arrow; and

h.      beginning on December 31 of the calendar year that is two (2) years after the Effective Date and continuing on December 31 of each successive calendar year until December 31 of the calendar year that is immediately prior to the calendar year of the Restated Maturity Date, Reorganized BSA shall remit to JPM, as soon as reasonably practicable but in no case later than thirty (30) days of such date, twenty-five percent (25%) of the Excess Cash and Investments in excess of $75,000,000, if any, as of such date, measured on a pro forma basis after

having given effect to the principal payment, if any, due on February 15 of the following year under the BSA Settlement Trust Note, if applicable (the "Excess Cash Sweep"), and JPM shall apply any such amounts on a pro rata basis to the unpaid principal balances under the Restated Debt and Security Documents. For the avoidance of doubt, no payments shall be made on account of the Excess Cash Sweep until the last Distribution is made on account of Allowed General Unsecured Claims.

4.      Except as provided for in an Insurance Settlement Agreement, neither any provision of the Plan nor the occurrence of the Effective Date shall alter, amend, or otherwise impair the rights and obligations of the Debtors, Reorganized BSA, JPM, or any applicable Insurance Company holding one or more letters of credit issued by JPM to secure obligations arising under one or more BSA Insurance Policies. Without limiting the foregoing, nothing in the Plan or the Confirmation Order shall preclude any such Insurance Company from exercising any applicable rights on any such letter of credit issued, or other security provided, for the benefit of the Insurance Company in accordance with the terms and conditions of the documents governing such letter of credit or other security, or applying amounts therefrom to any Claim secured by such letter of credit or other security, and the Debtors, Reorganized BSA, and JPM reserve any and all rights with respect to such Insurance Company's exercise of any applicable rights.

W.      Foundation Loan.

1.      On the Effective Date, the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan shall be executed and delivered, and Reorganized BSA shall be authorized to execute, deliver and enter into, the Foundation Loan Agreement and related documentation governing the Foundation Loan without the need for any further corporate action or any further notice to or order of the Bankruptcy Court.

2.      As of the Effective Date, upon the granting of Liens in accordance with the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan, all of the Liens and security interests granted thereunder (a) shall be deemed to have been granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral as of the Effective Date in accordance with the respective terms of the Foundation Loan Agreement and related documentation, subject to the Liens and security interests set forth in the Restated Debt and Security Documents, as permitted under the Foundation Loan Agreement and related documentation. All Liens and security interests granted pursuant to the Foundation Loan Agreement and related documentation shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (c) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law. The Debtors, Reorganized BSA, Arrow, and the Foundation are authorized to make, and to the extent contemplated

by the Foundation Loan Agreement and related documentation, the Debtors, Reorganized BSA, Arrow will make, all filings and recordings, and obtain all governmental approvals and consents necessary to establish, attach and perfect such Liens and security interests under any applicable law (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.

X.    <u>BSA Settlement Trust Note</u>.  On the Effective Date, Reorganized BSA shall execute, issue and deliver the BSA Settlement Trust Note to the Settlement Trust and execute and deliver any related documentation governing the BSA Settlement Trust Note, including any related security agreement, without the need for any further corporate action or any further notice to or order of the Bankruptcy Court.  The BSA Settlement Trust Note will commence on the Effective Date and will be due ninety-one (91) days after the date that is ten (10) years after the Effective Date and shall bear interest at a rate of 5.5% per annum, payable semi-annually, subject to a payment-in-kind election for the eighteen (18) months immediately following the Effective Date.  The obligations of Reorganized BSA under the BSA Settlement Trust Note shall be secured by second-priority liens on and security interests in inventory, accounts receivable (except the Arrow Intercompany Note), Cash and the Headquarters.  Principal under the BSA Settlement Trust Note shall be payable in annual installments due on February 15 of each year during the term of the BSA Settlement Trust Note, commencing on February 15 of the second year following the Effective Date.  Such annual principal payments shall be equal to the sum of the following calculation: (a) $4,500,000; plus (b) $3.50 multiplied by the aggregate number of Youth Members as of December 31 of the preceding year up to the forecasted number of Youth Members for such year as set forth in the Debtors' five-year business plan; plus (c) $50 multiplied by the aggregate number of High Adventure Base Participants during the preceding calendar year; plus (d) $50 multiplied by the aggregate number of Youth Members in excess of the forecasted number of Youth Members for such year, excluding the portion of the excess that is comprised of members under the ScoutReach program, as set forth in the Debtors' five-year business plan; plus (e) $150 multiplied by the aggregate number of High Adventure Base Participants, excluding those attending events with a registration fee of less than $300 (*e.g.*, for non-typical High Adventure Base activities), in excess of the forecasted number of High Adventure Base Participants for such year as set forth in the Debtors' five-year business plan. The forecasted numbers of Youth Members and High Adventure Base Participants referenced in clauses (b), (d) and of the foregoing sentence are included in the Financial Projections attached to the Disclosure Statement.  The forecast for years after 2025 shall be deemed to be the forecast for calendar year 2025.  The BSA Settlement Trust Note may be prepaid at any time without penalty.

Y.    <u>DST</u>.  The DST shall be established on the Effective Date in accordance with the DST Agreement.  The purposes of the DST shall be to: (1) issue the DST Note to the Settlement Trust as of the Effective Date; (2) collect, manage and invest Cash contributed by Local Councils on a monthly basis to an account (and any replacement thereof) owned by the DST in accordance with the DST Note Mechanics; and (3) make annual payments (a) to the Pension Plan or (b) toward principal and interest on the DST Note, as determined in accordance with the DST Note

Mechanics and the DST Agreement.  In the event of a conflict between the terms or provisions of the Plan and the DST Agreement, the terms of the Plan shall control.

Z.      Pension Plan.  No provision contained in the Plan, Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases shall be construed to exculpate, discharge, release or relieve the Debtors, the Local Councils, or any other party, in any capacity, from any liability or responsibility to any Person with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  The Pension Plan shall not be enjoined or precluded from enforcing any such liability or responsibility as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims against the Debtors), the Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases.  The Settlement Trust shall not have any liability to any Person on account of the Pension Plan, including liability as a member of a "Controlled Group" as defined in 29 U.S.C. § 1301(a)(14)(A) or on any other basis whatsoever.

As of the Effective Date, Reorganized BSA shall assume and continue the Pension Plan to the extent of its obligations under the Pension Plan and applicable law, including, as applicable, (1) satisfaction of the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, (2) payment of all required Pension Benefit Guaranty Corporation premiums in accordance with 29 U.S.C. §§ 1306 and 1307, and (3) administration of the Pension Plan in all material respects in accordance with the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301 *et seq.*, and the Internal Revenue Code. Notwithstanding the foregoing, Reorganized BSA reserves all of its rights under the Pension Plan.  All Proofs of Claim filed by the Pension Benefit Guaranty Corporation with respect to the Pension Plan shall be deemed withdrawn on the Effective Date.

AA.     Single Satisfaction of Allowed General Unsecured Claims.  In no event shall any holder of an Allowed General Unsecured Claim recover more than the full amount of its Allowed General Unsecured Claim from the Core Value Cash Pool (plus interest from the Core Value Cash Pool at the federal judgment rate to the extent applicable under the terms hereof), and to the extent that the holder of an Allowed General Unsecured Claim has received, or in the future receives, payment on account of such Allowed General Unsecured Claim from a party that is not a Debtor or Reorganized BSA, such holder shall repay, return, or deliver to the Core Value Cash Pool any Distribution held by or transferred to such holder to the extent the holder's total recovery on account of its Allowed General Unsecured Claim from the third party and from the Core Value Cash Pool exceeds the amount of such holder's Allowed General Unsecured Claim (plus interest from the Core Value Cash Pool at the federal judgment rate to the extent applicable under the terms hereof).

BB.     Exemption from Certain Transfer Taxes and Recording Fees.  To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code and applicable law, any transfers of property pursuant to the Plan, including any transfers to the Settlement Trust by the Debtors, the Local Councils, the Contributing Chartered Organizations, and the Settling

Insurance Companies, and payments by Reorganized BSA to or from the Core Value Cash Pool, shall not be taxed under any law imposing a stamp tax or similar tax.

CC.    <u>Non-Monetary Commitments</u>.  The Debtors shall take the following actions to promote healing and reconciliation and to continue the Debtors' efforts to prevent Abuse from occurring in Scouting in the future:

1.    The Debtors shall form a committee (the "<u>Child Protection Committee</u>") of members from the BSA, Local Councils, the Tort Claimants' Committee, and the Coalition (including survivors).  The functions of the Child Protection Committee include the following:

a.    No later than six months after the Effective Date, the BSA will present to the Committee on the BSA's current Youth Protection Program (the "<u>Youth Protection Program</u>").  The BSA will report to the Child Protection Committee regarding the Youth Protection Program and any changes thereto on an annual basis for a period of three years following the Effective Date.

b.    Following that presentation, the BSA and Child Protection Committee will work with an entity engaged by the BSA that is selected with the consultation of the Child Protection Committee that is not currently affiliated with the BSA to evaluate the Youth Protection Program (the "<u>Evaluating Entity</u>").  The Evaluating Entity will have expertise in the prevention of youth sexual abuse.

(i)    Any evaluation will be comprehensive in nature and include input from current BSA volunteers and professionals, survivors of sexual abuse while involved with Scouting, the members of the Child Protection Committee, and the Evaluating Entity.

(ii)    The Evaluating Entity will report to the Child Protection Committee assessing the current Youth Protection Program and make specific recommendations for reasonable improvements to the Youth Protection Program that may include mechanisms for the elimination of abuse and accurate and annual reporting regarding the results of the Youth Protection Program, including confirmed instances of sexual abuse that is made available to the public (the "<u>Prospective Reporting</u>").

(iii)    The BSA will engage with the Evaluating Entity, and the Child Protection Committee, and will take appropriate steps as necessary to improve the Program. Changes to the Youth Protection Program will be reported on the BSA's Youth Protection Program website and training will be reasonably adjusted to reflect changes.

c.    The BSA will propose and the Child Protection Committee will consider a protocol for the review and publication of information in the Volunteer Screening Database and the Prospective Reporting, which will take into account factors including: (i) the desire to make public credibly identified perpetrators of sexual abuse in Scouting; (ii) adequate protections for survivor identities;

(iii) consideration regarding the protection of third parties, including survivor family members and volunteers; (iv) a notification process regarding any publication; (v) issues related to privacy and liability related to publication; and (vi) the potential appointment or retention of an appropriate neutral party to supervise the evaluation and review of the Volunteer Screening Database (the "Neutral Supervisor"). If the BSA and Child Protection Committee are unable to reach an agreement on the above protocol, the Neutral Supervisor shall mediate the dispute to resolution. In accordance with the process outlined above, information from the Volunteer Screening Database and Prospective Reporting shall be published annually after agreement among the parties or determination by the Neutral Supervisor.

> d.      After consultation and recommendations from the Evaluating Entity, the Child Protection Committee may propose and the BSA will in good faith consider other issues relating to child protection, including: (i) special BSA Scouting programs for survivors; and (ii) participation and leadership in a comprehensive reporting program to include other youth-serving organizations.

> e.      The BSA will engage with the Child Protection Committee and consider all appropriate measures proposed by the Child Protection Committee to improve transparency and accountability with respect to any future instances of sexual abuse, including the dissemination of information relating to abuse statistics, consistent with practices of other youth-serving organizations, including what information may be publically available on the BSA's website.

## ARTICLE VI.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.

1.      On the Effective Date, except as otherwise provided herein, all Executory Contracts and Unexpired Leases shall be deemed assumed by Reorganized BSA without the need for any further notice to or action, order, or approval of the Bankruptcy Court under sections 365 or 1123 of the Bankruptcy Code, except for Executory Contracts or Unexpired Leases: (a) that are identified on the Rejected Contracts and Unexpired Leases Schedule; (b) that previously expired or terminated pursuant to their terms; (c) that the Debtors have previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (d) that are the subject of a motion to reject that remains pending as of the Effective Date; (e) as to which the effective date of rejection will occur (or is requested by the Debtors to occur) after the Effective Date; or (f) as to which the Debtors or Reorganized BSA, as applicable, determine, in the exercise of their reasonable business judgment, that the Cure Amount, as determined by a Final Order or as otherwise finally resolved, would render assumption of such Executory Contract or Unexpired Lease unfavorable to Debtors or Reorganized BSA; provided that the Debtors reserve the right to seek enforcement of an assumed or assumed and assigned Executory Contract or

Unexpired Lease following the Confirmation Date, including seeking an order of the Bankruptcy Court rejecting such Executory Contract or Unexpired Lease for cause.

2.     Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of Executory Contracts or Unexpired Leases pursuant to the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code.  Except as otherwise set forth herein, the assumption or rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be effective as of the Effective Date; provided that the rejection of an Unexpired Lease shall be effective as of the later of: (a) the Effective Date; and (b) the date on which the leased premises are unconditionally surrendered to the non-Debtor counterparty to the rejected Unexpired Lease.  Reorganized BSA is authorized to abandon any De Minimis Assets at or on the premises subject to an Unexpired Lease that is rejected pursuant to the Plan, and the non-Debtor counterparty to such Unexpired Lease may dispose of any such De Minimis Assets remaining at or on the leased premises on the applicable lease rejection date.

3.     Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or a Final Order of the Bankruptcy Court shall re-vest in and be fully enforceable by Reorganized BSA in accordance with its terms, except as such terms may have been modified by the provisions of the Plan, the Confirmation Order, or any Final Order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by Reorganized BSA.

B.     Rejection Damages Claims.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim for Rejection Damages Claims, if any, shall be filed within thirty (30) days after the latest to occur of: (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) the effective date of the rejection of such Executory Contract or Unexpired Lease; or (3) the Effective Date (as applicable, the "Rejection Damages Bar Date").  Claims arising from the rejection of an Executory Contract or an Unexpired Lease shall be classified as General Unsecured Claims and subject to the provisions of Article VII and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.  **Any holder of a Rejection Damages Claim that is required to file a Proof of Claim in accordance with this Article VI.B but fails to do so on or before the Rejection Damages Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting or Distributions, and such Rejection Damages Claim shall be automatically Disallowed, forever barred from assertion, and unenforceable against the Debtors, their Estates, Reorganized BSA, or its or their respective property, whether by setoff, recoupment, or otherwise, without the need for any objection by the Debtors or Reorganized BSA or further notice to, or action, order, or approval of the Bankruptcy Court, and such Rejection Damages Claim shall be deemed fully satisfied, released, and discharged.**

C.    <u>Cure of Defaults under Executory Contracts and Unexpired Leases</u>.

1.    Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the Effective Date or in the ordinary course of the Debtors' or Reorganized BSA's non-profit operations, subject to the limitation described below.

2.    Except as otherwise provided in the Plan, the Debtors shall, on or before the date of filing of the Plan Supplement, cause the Cure and Assumption Notices to be served on counterparties to Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan.  Any objection by a non-Debtor counterparty to an Executory Contract or Unexpired Lease to the assumption, assumption and assignment, the related Cure Amount, or adequate assurance, must be filed, served, and actually received by the Debtors on or prior to the deadline for filing objections to the Plan (or such later date as may be provided in the applicable Cure and Assumption Notice); <u>provided</u> that each counterparty to an Executory Contract or Unexpired Lease (a) that the Debtors later determine to assume or (b) as to which the Debtors modify the applicable Cure Amount, must object to the assumption or Cure Amount, as applicable, by the earlier of: (i) fourteen (14) days after the Debtors serve such counterparty with a corresponding Cure and Assumption Notice; and (ii) the Confirmation Hearing.  **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease shall be forever barred, estopped, and enjoined from contesting the Debtors' assumption of the applicable Executory Contract or Unexpired Lease and from requesting payment of a Cure Amount that differs from the amounts paid or proposed to be paid by the Debtors or Reorganized BSA, in each case without the need for any objection by the Debtors or Reorganized BSA or any further notice to or action, order, or approval of the Bankruptcy Court.  Reorganized BSA may settle any dispute regarding a Cure Amount without any further notice to or action, order, or approval of the Bankruptcy Court.**

3.    To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed, or assumed and assigned, pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or would be deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any change of control or similar provision), then such provision shall be deemed preempted and modified such that neither the Debtors' assumption or assumption and assignment of the Executory Contract or Unexpired Lease nor any of the transactions contemplated by the Plan shall entitle the non-debtor counterparty to terminate or modify such Executory Contract or Unexpired Lease or to exercise any other purported default-related rights thereunder.

4.    **The Debtors' assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of any applicable Cure Amount in accordance with the procedures set forth in this <u>Article VI.C</u>, shall result in the full release and satisfaction of any**

**Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of: (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption; (b) the effective date of such assumption; or (c) the Effective Date, in each case without the need for any objection by the Debtors or Reorganized BSA or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.    <u>Dispute Resolution</u>.  In the event of a timely filed objection regarding: (1) a Cure Amount; (2) the ability of Reorganized BSA or any assignee to provide adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption or the requirements of section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or Reorganized BSA, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors or Reorganized BSA, applicable, shall pay the applicable Cure Amount as soon as reasonably practicable after entry of a Final Order resolving such dispute and approving such assumption, or as may otherwise be agreed upon by the Debtors or Reorganized BSA, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  To the extent that a dispute regarding the applicable Cure Amount is resolved or determined unfavorably to the Debtors, the Debtors may, in their discretion, reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect any earlier assumption or assumption and assignment.  Under no circumstances shall the status of payment of a Cure Amount required by section 365(b)(1) of the Bankruptcy Code following the entry of a Final Order resolving the dispute and approving the assumption prevent or delay implementation of the Plan or the occurrence of the Effective Date.

E.    <u>Contracts and Leases Entered into After the Petition Date</u>.  Contracts and leases entered into after the Petition Date by the BSA, including any Executory Contracts and Unexpired Leases assumed by BSA, will be performed by the BSA or Reorganized BSA in the ordinary course of its charitable non-profit operations.  Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

F.    <u>Insurance Policies</u>.

1.    Notwithstanding anything to the contrary herein, all Insurance Policies issued <u>to</u> or entered into <u>by the Debtors</u> prior to the Petition Date shall not be considered Executory Contracts and shall neither be assumed nor rejected by the Debtors; <u>provided</u>, <u>however</u>, that to the extent any Insurance Policy is determined to be an Executory Contract, then, subject to ~~Article IV.V~~<u>Article IV.U</u>, and notwithstanding anything

contained in the Plan to the contrary, the Plan will constitute a motion to assume such Insurance Policy and pay all future obligations, if any, in respect thereof and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtors, their respective Estates and all parties in interest.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to any Insurance Policy; and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any Insurance Policy shall be indefeasible.  Moreover, as of the Effective Date, all payments of premiums or other charges made by the Debtors on or after the Petition Date under or with respect to any Insurance Policy shall be deemed to have been authorized, approved, and ratified in all respects without any requirement of further action by the Bankruptcy Court.  Notwithstanding anything to the contrary contained herein, Confirmation shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

2.      Notwithstanding anything to the contrary contained in the Plan, entry of the Confirmation Order shall not discharge, impair, or otherwise modify any indemnity obligations assumed as a result of the foregoing assumption of the Insurance Policies that are D&O Liability Insurance Policies (and related documents) issued to the Debtors, and each such indemnity obligations will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

3.      Other than the permissibility of the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order or the findings made by the District Court in the Affirmation Order, the rights and obligations of the parties under the Insurance Policies, including the question of whether any breach has occurred, shall be determined under applicable law.

G.      <u>Compensation and Benefits Programs</u>.    Other than those Compensation and Benefits Programs assumed by the Debtors prior to entry of the Confirmation Order, if any, all of the Compensation and Benefits Programs entered into before the Petition Date and not since terminated shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of Reorganized BSA's assumption and continued maintenance and sponsorship of each of such Compensation and Benefits Plan under sections 365 and 1123 of the Bankruptcy Code, and the Debtors' and Reorganized BSA's obligations under the Compensation and Benefits Programs shall survive and remain unaffected by entry of the Confirmation Order and be fulfilled in the ordinary course of the Debtors' and Reorganized BSA's non-profit operations.  Compensation and Benefits Programs assumed by the Debtors prior to entry of the Confirmation Order shall continue to be fulfilled in the ordinary course of the Debtors' non-profit operations from and

after the date of any order of the Bankruptcy Court authorizing the assumption of such Compensation and Benefits Program. All Claims filed on account of an amounts asserted to be owed under Compensation and Benefits Programs shall be deemed satisfied and expunged from the Claims Register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

H.    Restoration Plan and Deferred Compensation Plan. On the Effective Date the Restoration Plan and the Deferred Compensation Plan shall be terminated and, to the extent applicable, shall be deemed rejected by Reorganized BSA pursuant to section 365 of the Bankruptcy Code and this Article VI. Claims arising from the Debtors' rejection of the Restoration Plan and the Deferred Compensation Plan shall be treated as General Unsecured Claims hereunder. Holders of Allowed Claims arising from such rejection shall be entitled to a recovery from the Core Value Cash Pool in accordance with the applicable terms of the Plan.

I.    Workers' Compensation Program. As of the Effective Date, the Debtors and Reorganized BSA shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Program. All Proofs of Claims on account of workers' compensation, including the Workers' Compensation Program, shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized BSA's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; provided further, however, that nothing herein shall be deemed to impose any obligations on the Debtors or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

J.    Indemnification Obligations.

1.    Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by Reorganized BSA effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, except for any Indemnification Obligation that is or is asserted to be owed to or for the benefit of any Perpetrator. Subject to the foregoing sentence, each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose. For the avoidance of doubt, this Article VI.J affects only the obligations of the Debtors and Reorganized BSA with respect to any Indemnification Obligations owed to or for the benefit of past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any obligation of any other Person owed to or for the benefit of such directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors.

2.    All Proofs of Claim filed on account of an Indemnification Obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification

Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

K.     Gift Annuity Agreements and Life-Income Agreements.   The Gift Annuity Agreements and Life-Income Agreements shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of such Executory Contract.

L.     Modifications, Amendments, Supplements, Restatements, or Other Agreements. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless the Debtors reject or repudiate any of the foregoing agreements.   Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

M.     Reservation of Rights.   Neither the inclusion of any Executory Contract or Unexpired Lease on the Schedules, a Cure and Assumption Notice, or the Rejected Executory contracts and Unexpired Leases Schedule, nor anything contained in any Plan Document, shall constitute an admission by the Debtors that a contract or lease is in fact an Executory Contract or Unexpired Lease or that Reorganized BSA has any liability thereunder.   If there is a dispute as of the Confirmation Date regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors, or, after the Effective Date, Reorganized BSA, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

N.     Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4).   If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.     Applicability.   None of the terms or provision of this Article VII shall apply to Abuse Claims, which shall be exclusively processed, liquidated and paid by the Settlement Trust in accordance with the Settlement Trust Documents.

B.     Distributions Generally.   The Disbursing Agent shall make all Distributions to appropriate holders of Allowed Claims in accordance with the terms of the Plan.

C.    <u>Distributions on Account of Certain Claims Allowed as of the Effective Date</u>. Except as otherwise provided in the Plan, on or as soon as practicable after the Effective Date, the Disbursing Agent shall make Distributions in Cash in amounts equal to all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Convenience Claims.

D.    <u>Distributions on Account of Allowed General Unsecured Claims</u>.    On each Distribution Date, the Disbursing Agent shall Distribute to each holder of an Allowed General Unsecured Claim an amount equal to such holder's Pro Rata Share of (1) the total balance of the Core Value Cash Pool as of such date, less (2) the balance of the Disputed Claims Reserve.

E.    <u>Distributions on Account of Disputed Claims Allowed After the Effective Date</u>. Distributions on account of any Disputed Claim shall be made to the extent such Claim is Allowed in accordance with the provisions of <u>Article VIII</u>.    Except as otherwise provided in the Plan, the Confirmation Order, another order of the Bankruptcy Court, or as agreed to by the relevant parties, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

F.    <u>Rights and Powers of Disbursing Agent</u>.

1.    The Disbursing Agent shall make all Distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan, including this <u>Article VII</u>.    Except as otherwise ordered by the Bankruptcy Court, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

2.    The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.    The Disbursing Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns for all taxable periods through the date on which final Distributions are made.

G.    <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>.

1.    <u>Claims Record Date</u>.    As of the close of business on the Claims Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors or their agents shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to a Distribution under the Plan, and there shall be no further changes in the record holders or the permitted designees with respect to such Claims.    The Debtors or Reorganized BSA, as applicable, shall have no obligation to recognize any transfer or designation of such Claims occurring after the close of business on the Claims Record Date.    With respect to payment of any Cure

Amounts or assumption disputes, neither the Debtors nor Reorganized BSA shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the close of business on the Claims Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

      2.     <u>Delivery of Distributions</u>. If a Person holds more than one Claim in any one Class, in the Disbursing Agent's sole discretion, all such Claims will be aggregated into one Claim and one Distribution will be made with respect to the aggregated Claim.

      3.     <u>Special Rules for Distributions to Holders of Disputed Claims</u>. Except as otherwise provided in the Plan or agreed to by the relevant parties: (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Person that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on account of the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Disputed Claims have been Allowed or expunged. Any Distributions arising from property Distributed to holders of Allowed Claims in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such Distributions were earlier paid to holders of Allowed Claims in such Class.

      H.     <u>Undeliverable and Non-Negotiated Distributions</u>.

      1.     <u>Undeliverable Distributions</u>. If any Distribution to a holder of an Allowed Claim is returned to Reorganized BSA as undeliverable, no further Distributions shall be made to such holder unless and until Reorganized BSA is notified in writing of such holder's then-current address or other necessary information for delivery, at which time such previously undeliverable Distribution shall be made to such holder within ninety (90) days of receipt of such holder's then-current address or other necessary information; <u>provided</u>, <u>however</u>, that any such undeliverable Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days after the date of the initial attempted Distribution. After such date, all unclaimed property or interests in property shall revert to Reorganized BSA automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred; <u>provided</u> that Distributions made from the Core Value Cash Pool and returned as undeliverable shall revert to the Core Value Cash Pool.

      2.     <u>Non-Negotiated Distributions</u>. If any Distribution to a holder of an Allowed Claim is not negotiated for a period of 180 days after the Distribution, then such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and re-vest in Reorganized BSA or re-vest in the Core Value Cash Pool if such Distribution was made from the Core Value Cash Pool. After such date, all non-negotiated property or interests in property shall revert to Reorganized BSA automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy

escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred.

       I.     <u>Manner of Payment under the Plan</u>.  Except as otherwise specifically provided in the Plan, at the option of Reorganized BSA, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of Reorganized BSA.

       J.     <u>Satisfaction of Claims</u>.  Except as otherwise specifically provided in the Plan, any Distributions to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

       K.     <u>Minimum Cash Distributions</u>.  Reorganized BSA shall not be required to make any Distribution of Cash less than twenty dollars ($20) to any holder of an Allowed Claim; <u>provided</u>, <u>however</u>, that if any Distribution is not made pursuant to this <u>Article VII.K</u>, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.

       L.     <u>Postpetition Interest</u>.  Except as provided in the Cash Collateral Order or in the following sentence, interest shall not accrue on Impaired Claims; no holder of an Impaired Claim shall be entitled to interest accruing on or after the Petition Date on any such Impaired Claim, and interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.  Notwithstanding the foregoing, each holder of an Allowed General Unsecured Claim shall accrue interest on the Allowed amount of such Claim at the federal judgment rate applicable on the Effective Date; <u>provided</u>, that such interest shall be payable to each such holder only from the Core Value Cash Pool and only to the extent that the Core Value Cash Pool shall have been sufficient: (1) first, to satisfy the full amount of all Allowed General Unsecured Claims; and (2) second, on account of any Allowed Non-Abuse Litigation Claims that shall not have elected to be treated as an Allowed Convenience Claim under <u>Article III.B.9</u>, to satisfy any deficiency in payments of such Allowed Claims (a) from available insurance coverage, including Abuse Insurance Policies and Non-Abuse Insurance Policies, (b) from applicable proceeds of any Insurance Settlement Agreements, and (c) from co-liable non-debtors (if any) or their insurance coverage.  Neither the Debtors nor Reorganized BSA shall have any independent obligation to pay interest for or on account of any Allowed General Unsecured Claims other than from the Core Value Cash Pool in accordance with the terms of this <u>Article VII.L</u>.

       M.     <u>Setoffs</u>.  The Debtors and Reorganized BSA may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, Causes of Action, debts or liabilities of any nature that the Debtors or Reorganized BSA may hold against the holder of such Allowed Claim; <u>provided</u>, <u>however</u>, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, Causes of Action, debts or liabilities.

N.      Claims Paid or Payable by Third Parties.

1.      Claims Paid by Third Parties.  A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized BSA.  To the extent a holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized BSA on account of such Claim, such holder shall repay, return, or deliver any Distribution held by or transferred to such holder to Reorganized BSA to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

2.      Non-Abuse Litigation Claims Payable from Insurance.  Subject to Article IV.D.3, no Distributions under the Plan shall be made on account of any Allowed Non-Abuse Litigation Claim that is payable pursuant to an Insurance Policy until the holder of such Allowed Non-Abuse Litigation Claim has exhausted all remedies with respect to such insurance policy, including pursuing such insurance through litigation and obtaining entry of a final, non-appealable order.  To the extent that one or more of the Insurance Companies satisfies in full or in part an Allowed Non-Abuse Litigation Claim, then immediately upon such satisfaction, the portion of the Claim so satisfied may be expunged from the Claims Register by the Notice and Claims Agent without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

O.      Compliance with Tax Requirements and Allocations.

1.      In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other mechanisms it believes are reasonable and appropriate.

2.      For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claim.

# ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    <u>Applicability</u>.    All Disputed Claims against the Debtors, other than Administrative Expense Claims, shall be subject to the provisions of this <u>Article VIII</u>.    All Administrative Expense Claims shall be determined and, if Allowed, paid in accordance with <u>Article II</u>.    None of the terms or provision of this <u>Article VIII</u> shall apply to Abuse Claims, which shall be exclusively processed, liquidated and paid by the Settlement Trust in accordance with the Settlement Trust Documents.

B.    <u>Allowance of Claims</u>.    After the Effective Date, Reorganized BSA shall have and retain any and all rights and defenses that the Debtors, or either of them, had with respect to any Claim immediately before the Effective Date.    Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim becomes Allowed by Final Order of the Bankruptcy Court or by agreement between the Debtors or Reorganized BSA, on the one hand, and the holder of such Claim, on the other.

C.    <u>Claims Administration Responsibilities</u>.

1.    Except as otherwise expressly provided in the Plan, from and after the Effective Date, Reorganized BSA shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

2.    Reorganized BSA shall consult with the Creditor Representative in connection with the reconciliation, settlement and administration of Convenience Claims, General Unsecured Claims and Non-Abuse Litigation Claims and shall use commercially reasonable efforts to resolve such Claims before the applicable Claims Objection Deadline.

D.    <u>Estimation of Claims</u>.    The Debtors (before the Effective Date) or Reorganized BSA (on and after the Effective Date) may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.    In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any Person.    If the estimated amount of a Claim constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or Reorganized BSA (on and

after the Effective Date) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

E.      No Distributions Pending Allowance.  No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved and such Disputed Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court or agreement between the Debtors or Reorganized BSA, on the one hand, and the holder of such Claim, on the other.

F.      Distributions after Allowance.  To the extent that a Disputed Claim (or a portion thereof) becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.

G.      Disputed Claims Reserve.  The provisions of this Article VIII.G apply only to the extent that any General Unsecured Claims remain Disputed as of any Distribution Date.

1.      If any General Unsecured Claims remain Disputed as of any Distribution Date, the undistributed portion of the Core Value Cash Pool shall be held in a segregated account.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination from the IRS, the Disbursing Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Debtors, Reorganized BSA, the Disbursing Agent, and holders of General Unsecured Claims) shall be required to report for tax purposes in a manner consistent with the foregoing.  The Disputed Claims Reserve shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.

2.      The Debtors or Reorganized BSA, as applicable, with the consent of the Creditor Representative, shall determine the amount of the Disputed Claims Reserve, if applicable, as of the initial Distribution Date, based on the least of: (a) the asserted amount of the Disputed General Unsecured Claims in the applicable Proofs of Claim; (b) the amount, if any, estimated by the Bankruptcy Court pursuant to (i) section 502(c) of the Bankruptcy Code or (ii) Article VIII.D if, after the Effective Date, a motion is filed by Reorganized BSA to estimate such Claim; (c) the amount otherwise agreed to by the Debtors (or Reorganized BSA, if after the Effective Date) and the holders of such Disputed General Unsecured Claims; or (d) any amount otherwise approved by the Bankruptcy Court.  Upon each Distribution Date, Reorganized BSA shall deposit into the Disputed Claims Reserve an amount of Cash equal to the amount sufficient to make the Distributions to which holders of Disputed General Unsecured Claims would be entitled under the Plan as of the applicable Distribution Date if the Disputed General Unsecured Claims were Allowed Claims as of such date.

3.      If a Disputed General Unsecured Claim becomes an Allowed Claim after the first Distribution Date, the Disbursing Agent shall, on the next Distribution Date after the Disputed General Unsecured Claim becomes an Allowed Claim (or, if the Disputed General Unsecured Claim becomes an Allowed Claim after the final Distribution Date, as soon as practicable after Allowance), Distribute to the holder of such Claim, exclusively from the Disputed Claims Reserve, the amount of Cash that such holder would have received in that Distribution and all prior Distributions (if any) if such holder's General Unsecured Claim had been Allowed as of the Effective Date, net of any allocable taxes imposed thereon or otherwise payable by the Disputed Claims Reserve.

4.      If a Disputed Claim is Disallowed, in whole or in part, then on the Distribution Date next following the date of Disallowance, Cash shall be released from the Disputed Claims Reserve and placed in the Core Value Cash Pool, which Cash shall then be unreserved and unrestricted, and which shall be available for Distribution to holders of Allowed General Unsecured Claims.

5.      If any assets remain in the Disputed Claims Reserve after all Disputed General Unsecured Claims have been resolved, such assets shall be placed in the Core Value Cash Pool and distributed Pro Rata to all holders of Allowed General Unsecured Claims on the next Distribution Date (or, if all Disputed General Unsecured Claims are resolved after the final Distribution Date, as soon as practicable thereafter).

H.      <u>Adjustment to Claims Register without Objection</u>.  Any duplicate Proof of Claim that has been paid or satisfied, or any Proof of Claim that is clearly marked as amended or superseded by a subsequently filed Proof of Claim that remains on the Claims Register, may be adjusted or expunged on the Claims Register by the Notice and Claims Agent at the direction of Reorganized BSA upon stipulation between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

I.      <u>Time to File Objections to Claims</u>.  Any objections to Claims must be filed on or before the applicable Claims Objection Deadline, as such deadline may be extended from time to time.  The expiration of the Claims Objection Deadline shall not limit or affect the Debtors' or Reorganized BSA's rights to dispute Claims asserted in the ordinary course of the Debtors or Reorganized BSA's non-profit operations other than through a Proof of Claim.

J.      <u>Treatment of Untimely Claims</u>.  Except as provided herein or otherwise agreed, any and all creditors that have filed Proofs of Claim after the applicable Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting and distribution.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

A.      <u>Conditions Precedent to Confirmation of the Plan</u>.

Confirmation of the Plan shall not occur unless each of the following conditions precedent has been satisfied or waived in accordance with <u>Article IX.C</u>.

1. The Bankruptcy Court shall have entered the Disclosure Statement Order, in form and substance reasonably acceptable to the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, Hartford, the Creditors' Committee and JPM.

2. The Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative and ~~Hartford~~the Settling Insurance Companies shall have approved of or accepted the Confirmation Order, and the Creditors' Committee and JPM shall have approved of or accepted the Confirmation Order in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet incorporated by reference in Article I.D;

3. The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and substance acceptable to the Debtors, in accordance with the requirements of the JPM / Creditors' Committee Term Sheet.[3] These findings and determinations are designed, among other things, to ensure that the Injunctions, Releases and Discharges set forth in Article X shall be effective, binding and enforceable and shall, among other things, provide that:

   a. the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud;

   b. the Channeling Injunction and the Insurance Entity Injunction are to be implemented in connection with the Settlement Trust and shall be in full force and effect on the Effective Date;

   c. upon the Effective Date, the Settlement Trust shall assume the liabilities of (i) the Protected Parties with respect to Abuse Claims ~~and the liabilities of,~~ (ii) the Limited Protected Parties with respect to Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims, and (iii) the Opt-Out Chartered Organizations with respect to

---

[3] The findings and determinations set forth in Article IX.A.3.j, Article IX.A.3.o, Article IX.A.3.p, Article IX.A.3.q, ~~Article IX.A.3.r,~~ Article IX.A.3.s, ~~and~~ Article IX.A.3.t, and Article IX.A.3.u shall not be binding on ~~Hartford~~the Settling Insurance Companies to the extent that ~~Hartford is a Settling Insurance Company and~~ the transactions contemplated in the ~~Hartford~~ Insurance Settlement ~~Agreement~~Agreements, including the release of the ~~Hartford~~Insurance Settlement ~~Contribution~~Contributions to the Settlement Trust, are fully consummated. ~~Hartford's~~The Settling Insurance Companies' agreement in the ~~Hartford~~ Insurance Settlement ~~Agreement~~Agreements not to object to entry of such findings and determinations in the Confirmation Order does not indicate ~~Hartford's~~the Settling Insurance Companies' support for such findings and determinations, and no party shall argue that ~~Hartford~~the Settling Insurance Companies agreed to or acquiesced in such findings and determinations in any proceeding. Rather, ~~Hartford is designated as a~~the Settling Insurance ~~Company and~~Companies are designated as Protected ~~Party~~Parties under the Plan, and as a result, ~~Hartford takes~~the Settling Insurance Companies take no position on such findings and determinations or on the Trust Distribution Procedures.

Opt-Out Chartered Organization Abuse Claims and have exclusive authority as of the Effective Date to satisfy or defend such Abuse Claims;

d.    the Settlement Trust will be funded with the Settlement Trust Assets;

e.    the Settlement Trust will use the Settlement Trust Assets to resolve Abuse Claims;

f.    the terms of the Discharge Injunction, the Channeling Injunction, the Release Injunctions, and the Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement;

g.    the Future Claimants' Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction and the Insurance Entity Injunction for the purpose of, among other things, protecting the rights of persons who might subsequently assert Abuse Claims of the kind that are addressed in the Channeling Injunction and the Insurance Entity Injunction, which will be transferred to and assumed by the Settlement Trust;

h.    the Plan complies with section 105(a) of the Bankruptcy Code to the extent applicable;

i.    the Injunctions are essential to the Plan and the Debtors' reorganization efforts;

j.    the Insurance Assignment is authorized and permissible by applicable law as provided in the Plan, notwithstanding any terms of any policies or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights, and the Settlement Trust (i) is a proper defendant for Abuse Claims to assert the liability of the Protected Parties to trigger such insurance rights and, (ii) is a proper defendant for Post-1975 Chartered Organization Abuse Claims to assert the liability of the Limited Protected Parties to trigger such insurance rights, and (iii) is a proper defendant for Opt-Out Chartered Organization Abuse Claims to assert the liability of the Opt-Out Chartered Organizations to trigger such insurance rights;

k.    the Insurance Settlement Agreements are approved in their entirety, and any Insurance Company that has contributed funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement is designated as a Settling Insurance Company;

l.    the Abuse Claims Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates,

complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

m.    the JPM / Creditors' Committee Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

n.    the Settlement of Restricted and Core Asset Disputes represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

o.    the Hartford Insurance Settlement, including the sale of the Hartford Policies, as set forth in the Hartford Insurance Settlement Agreement, free and clear of all ~~Interests~~interests of any Person or Entity (as such terms are defined in the Hartford Insurance Settlement Agreement) and the Allowance of the Hartford Administrative Expense Claim is approved in accordance with sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.4;

p.    the Century and Chubb Companies Insurance Settlement, including the sale of the Century and Chubb Companies Policies, as set forth in the Century and Chubb Companies Insurance Settlement Agreement, free and clear of all interests of any Person or Entity (as such terms are defined in the Century and Chubb Companies Insurance Settlement Agreement) is approved in accordance with sections 363, 1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.4;

q.    ~~p.~~the TCJC Settlement is approved in accordance with the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.S.5.

r.    ~~q.~~the Plan, Documents (including the Plan ~~Documents,~~) and the Confirmation Order shall be binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of res judicata and collateral estoppel, and section 1141 of the Bankruptcy Code (and related legal authority);

s.    ~~r.~~(i) the procedures included in the Trust Distribution Procedures pertaining to the allowance of Abuse Claims and (ii) the criteria included in the Trust Distribution Procedures pertaining to the calculation of the Allowed Claim Amounts, including the Trust Distribution Procedures' Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the Trust Distribution Procedures), are appropriate and provide for a fair and

reasonable equitable settlement of Abuse Claims based on the evidentiary record offered to the Bankruptcy Court; as required by and in compliance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, provide adequate and proper means for the implementation of the Plan as required by and in compliance with section 1123 of the Bankruptcy Code, comport with the requirements for the issuance of the Channeling Injunction under section 105(a) of the Bankruptcy Code, and otherwise comply with the Bankruptcy Code and applicable law;

   t. s. the right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party or a Limited Protected Party is the allowed value amount of such Abuse Claim as liquidated in accordance with determined under the Trust Distribution Procedures and is not (i) the BSA Settlement Trust Contribution, the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution, the Century and Chubb Companies Settlement Contribution, the TCJC Settlement Contribution, contributions by other Settling Insurance Companies, or any component(s) of such contributions, or (ii) the initial or supplemental payment percentages established under the Trust Distribution Procedures to make distributions to holders of allowed Abuse Claims or (ii) the contributions made by the Debtors or any Protected Party to the Settlement Trust; and provided, however, that nothing herein shall determine that any insurer is obligated to pay the Debtors' or another Protected Party's or a Limited Protected Party's liability so determined under the Trust Distribution Procedures; and

   u. t. the Plan and the Trust Distribution Procedures were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code.

B. <u>Conditions Precedent to the Effective Date.</u>

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date shall occur on the first Business Day on which each of the following conditions precedent has been satisfied or waived pursuant to <u>Article IX.C</u>:

   1. (a) the Confirmation Order shall have been submitted to the District Court for affirmation; (b) the District Court shall have entered the Affirmation Order in form and substance acceptable to (i) the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative and Hartford the Settling Insurance Companies and (ii) the Creditors' Committee and JPM, consistent with the JPM / Creditors' Committee Term Sheet; (c) at least fifteen (15) days shall have passed following entry of the Confirmation Order and the Affirmation Order; (d) no court shall have entered an order staying the occurrence of the Effective Date pending an appeal of the Confirmation Order or the Affirmation Order; and (e) no request for a stay of the occurrence of the Effective Date shall be pending;

2.      the Settlement Trust Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein, be transferred to, vested in, and assumed by the Settlement Trust in accordance with Article IV and Article V;

3.      the Settlement Trust Documents and other applicable Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered and, if applicable, filed with the appropriate governmental authorities in compliance with the JPM / Creditors' Committee Term Sheet;

4.      the Restated Debt and Security Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms of the Restated Debt and Security Documents, the closing shall have occurred thereunder, and Reorganized BSA shall have paid the JPM Exit Fee to JPM;

5.      the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms of the Foundation Loan Agreement and related documentation, and the closing shall have occurred thereunder;

6.      the Debtors shall have adequately funded the Professional Fee Reserve so as to permit the Debtors to make Distributions on account of Allowed Professional Fee Claims in accordance with Article II;

7.      the Debtors shall have obtained all authorizations, consents, certifications, approvals, rulings, opinions or other documents that are necessary to implement and effectuate the Plan;

8.      all payments required to be made pursuant to the terms of the Cash Collateral Order shall have been paid;

9.      all actions, documents, and agreements necessary to implement and effectuate the Plan shall have been effected or executed;

10.      the transactions to be implemented on the Effective Date shall be materially consistent with the Plan Documents and the JPM / Creditors' Committee Term Sheet; and

11.      the Debtors shall have filed a notice of occurrence of the Effective Date.

C.      Waiver of Conditions Precedent.  To the fullest extent permitted by law, each of the conditions precedent in this Article IX may be waived or modified, in whole or in part, in the sole discretion of the Debtors; provided, however, that (1) the Creditors' Committee's consent (not to be unreasonably withheld) is required to the extent any such waiver or modification by

the Debtors impacts the treatment of General Unsecured Claims, Non-Abuse Litigation Claims, or Convenience Claims; (2) the conditions precedent set forth in Article IX.B.4 and Article IX.B.8 may be waived or modified by the Debtors only with the prior written consent of JPM; (3) the condition precedent set forth in Article IX.A.3.o and Article IX.B.1 may be waived or modified by the Debtors only with the prior written consent of Hartford; (4) , the Coalition, and the Future Claimants' Representative; (4) the condition precedent set forth in Article IX.A.3.p and Article IX.B.1 may be waived or modified by the Debtors only with the prior written consent of the Century and Chubb Companies, the Coalition, and the Future Claimants' Representative; (5) the condition precedent set forth in Article IX.A.3.p may be waived or modified by the Debtors only with the prior written consent of TCJC; (5) for , the Coalition, and the Future Claimants' Representative; (6) for Article IX.A.3.k, Article IX.A.3.j, Article IX.A.3.r, Article IX.A.3.p, Article IX.A.3.r, Article IX.A.3.s, Article IX.A.3.t, and Article IX.A.3.u, and any waiver or modification that impacts the treatment of Abuse Claims or Settlement Trust Assets, the prior written consent of the Coalition and the Future Claimants' Representative shall be required as a condition to waiver or modification by the Debtors; and (67) the conditions precedent in Article IX.B.1 and Article IX.B.6 may be waived or modified by the Debtors only with the prior written consent of the Ad Hoc Committee, the Coalition and the Future Claimants' Representative.  Any waiver or modification of a condition precedent under this Article IX may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court or the District Court, and without any other formal action other than proceedings to Confirm or consummate the Plan.  The failure to satisfy or waive any condition precedent to the Effective Date may be asserted by the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, Hartfordthe Settling Insurance Companies, the Creditors' Committee or JPM regardless of the circumstances giving rise to the failure of such condition to be satisfied or waived.

      D.    <u>Substantial Consummation of the Plan</u>.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

      E.    *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date.  If the Confirmation Order is vacated or the Effective Date does not occur within 180 days after entry of the Confirmation Order (subject to extension by the Debtors in their sole discretion), the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall (1) constitute a waiver or release of any Causes of Action by or Claims against or Interests in the Debtors or any Person; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Person; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of a Claim or Interest, or any other Person in any respect; or (4) be used by the Debtors or any other Person as evidence (or in any other way) in any litigation, including with respect to the strengths and weaknesses of positions, arguments or claims of any of the parties to such litigation.

# ARTICLE X.

## EFFECT OF PLAN CONFIRMATION

A.     <u>Vesting of Assets in Reorganized BSA</u>.  Except as otherwise expressly provided in the Plan (including with respect to the Core Value Cash Pool and the Restated Debt and Security Documents), on the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all property comprising the Estates shall vest in Reorganized BSA free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind.  On and after the Effective Date, Reorganized BSA may continue its operations and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

B.     <u>Retention of Certain Causes of Action</u>.  In accordance with section 1123(b)(3) of the Bankruptcy Code, subject to the transfer of the Debtors' Settlement Trust Causes of Action to the Settlement Trust under <u>Article IV.D</u> and the Debtors' and their Estates' release of certain Estate Causes of Action under <u>Article X.J</u>, all Causes of Action that a Debtor may hold against any Person shall vest in Reorganized BSA on the Effective Date.  Thereafter, subject to <u>Article IV.D</u> and <u>Article X.J</u>, Reorganized BSA shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized BSA, as applicable, will not pursue any and all available Causes of Action.  The Debtors or Reorganized BSA, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

C.     <u>Binding Effect</u>.  As of the Effective Date, all provisions of the Plan, including all agreements, instruments and other documents entered into in connection with the Plan by the Debtors or Reorganized BSA, the Settlement Trust, or the Protected Parties, shall be binding upon the Debtors, the Estates, Reorganized BSA, all holders of Claims against and Interests in the Debtors, each such holder's respective successors and assigns, and all other Persons that are affected in any manner by the Plan, regardless of whether the Claim or Interest of such holder is Impaired under the Plan or whether such holder has accepted the Plan.  Except as otherwise expressly provided in the Plan, all agreements, instruments and other documents filed in connection with the Plan shall be given full force and effect and shall bind all Persons referred to therein on and after the Effective Date, whether or not such agreements are actually issued, delivered or recorded on or after the Effective Date and whether or not such Persons have actually executed such agreement.

D.      ~~Pre-Confirmation~~ Injunctions and Stays.  All injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the ~~later~~latest to occur of the Effective Date, the Release Date (as defined in the Century and Chubb Companies Insurance Settlement Agreement), and the date indicated in the order providing for such injunction or stay, if any.  To the extent not otherwise in place, pending the occurrence of the Release Date and thereafter, any Claim that would be released or subject to the Channeling Injunction upon the occurrence of conditions set forth herein and in any applicable settlement agreement (including the occurrence of the Release Date) shall be stayed and enjoined pending satisfaction of such conditions.  Such injunction shall permit the filing, but not the prosecution, of the Abuse Claims.  The injunctions and stays referenced in this Article X.D includes the preliminary injunction imposed by the *Consent Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Granting the BSA's Motion for a Preliminary Injunction* entered by the Bankruptcy Court on March 30, 2020 (Adv. Pro. No. 20-50527, Docket No. 54), as extended by the Bankruptcy Court from time to time.

E.      Discharge.

1.      Discharge of the Debtors.  Except as expressly provided in the Plan or the Confirmation Order, the treatment of Claims under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, termination and release of, all Claims and Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, and, as of the Effective Date, each of the Debtors shall be deemed discharged and released, and each holder of a Claim or Interest and any successor, assign, and affiliate of such holder shall be deemed to have forever waived, discharged and released each of the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities, and all debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (d) the holder of a Claim based upon such debt is deemed to have accepted the Plan.  Notwithstanding the foregoing, nothing in this Article X.E shall be construed to modify, reduce, impair or otherwise affect the ability of any holder of an Allowed Non-Abuse Litigation Claim to recover on account of such Allowed Claim in accordance with Article III.B.9 and Article IV.D.3.

2.      Discharge Injunction.  From and after the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all holders of Claims or Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date that are discharged pursuant to the terms of the Plan shall be precluded and permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims and Interests:

(a) commencing or continuing any action or other proceeding of any kind against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; (b) enforcing, attaching, collecting, or recovering by any manner or means of judgment, award, decree or other against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; (c) creating, perfecting or enforcing any Lien or Encumbrance of any kind against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; or (d) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. The foregoing injunction shall extend to the successors and assigns of the Debtors (including Reorganized BSA) and its and their respective properties and interests in property. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims, Interests and other debts and liabilities against or in the Debtors pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time to the extent such judgment relates to a discharged Claim or Interest.

F.     **Channeling Injunction.**

1.     **Terms**.  **Notwithstanding anything to the contrary herein, to preserve and promote the settlements contemplated by and provided for in the Plan, including the Abuse Claims Settlement, the ~~Hartford~~ Insurance ~~Settlement~~Settlements, and the TCJC Settlement, and to supplement, where necessary, the injunctive effect of the Discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in this Article X, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, (a) the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party, ~~and~~ (b) the sole recourse of any holder of a Post-1975 Chartered Organization Abuse Claim against a Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party~~; accordingly~~, (c) the sole recourse of any holder of an Abuse Claim against a Limited Protected Party if such Abuse Claim is covered under any insurance policy issued by any Settling Insurance Company, shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party, (d) the sole recourse of any holder of an Opt-Out Abuse Claim against an Opt-Out Chartered Organization on account of such Opt-Out Abuse Claim shall be to and against the**

**Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Opt-Out Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization.   For the avoidance of doubt, the sole recourse for any holder of an Abuse Claim covered by any insurance policy issued by a Settling Insurance Company shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents. Accordingly,** on and after the Effective Date, all Persons that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Abuse Claim against the Protected Parties, or any of them, or any Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties, or any of them, **or any Abuse Claim against the Limited Protected Parties if such Abuse Claim is covered under any insurance policy issued by any Settling Insurance Company, or any Opt-Out Abuse Claim against the Opt-Out Chartered Organizations, or any of them,** shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from any Protected Party with respect to any such Abuse Claim**, or from any Limited Protected Party with respect to any such Abuse Claim if such Abuse Claim is covered under any insurance policy issued by any Settling Insurance Company,** or from any Limited Protected Party with respect to any such Post-1975 Chartered Organization Abuse Claim, **or from any Opt-Out Chartered Organization with respect to any Opt-Out Abuse Claim,** other than from the Settlement Trust pursuant to the Settlement Trust Documents, including:

> a.    commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party ~~or~~, Limited Protected Party**, or Opt-Out Chartered Organization,** or any property or interest in property of any Protected Party ~~or~~, Limited Protected Party**, or Opt-Out Chartered Organization**;

> b.    enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against or affecting any Protected Party ~~or~~, Limited Protected Party**, or Opt-Out Chartered Organization** or any property or interest in property of any Protected Party ~~or~~, Limited Protected Party**, or Opt-Out Chartered Organization**;

> c.    creating, perfecting, or otherwise enforcing in any manner, whether directly or indirectly, any Encumbrance of any kind against any Protected Party ~~or~~, Limited Protected Party**, or Opt-Out Chartered Organization,** or any property or interest in property of any Protected Party ~~or~~, Limited Protected Party**, or Opt-Out Chartered Organization**;

       d.     **asserting, implementing or effectuating any setoff, right of reimbursement, subrogation, indemnity, contribution, reimbursement, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party ~~or~~, Limited Protected Party, or Opt-Out Chartered Organization, or any property or interest in property of any Protected Party ~~or~~, Limited Protected Party, or Opt-Out Chartered Organization; or**

       e.     **taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents or the Settlement Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Settlement Trust, except in conformity and compliance with the Settlement Trust Documents with respect to any such Abuse Claim or Post-1975 Chartered Organization Abuse Claim, or Opt-Out Abuse Claim.**

       2.     **Protections for Insureds and Co-Insureds of Settling Insurance Companies.** All Abuse Claims against insureds and co-insureds covered under any insurance policies issued by the Settling Insurance Companies shall be channeled under Article X.F.1 and released under Article X.J.6 as provided in the Insurance Settlement Agreements.

       3.    ~~2.~~ **Reservations.** Notwithstanding anything to the contrary in this **Article X.F**, the Channeling Injunction shall not enjoin:

       a.     **the rights of holders of Abuse Claims ~~or Post-1975 Chartered Organization Abuse Claims~~ to assert such Abuse Claims ~~solely~~ against the Settlement Trust in accordance with the Trust Distribution Procedures, including the ability to pursue the Settlement Trust in the tort system as described in Article XII of the Trust Distribution Procedures;**

       b.     **the rights of holders of Abuse Claims to assert such an Abuse ~~Claims against anyone other than a Protected Party or, in the case of Post-1975 Chartered Organization Abuse Claims, against anyone other than~~Claim against (i) a Limited Protected Party; to the extent such Abuse Claims arose prior to January 1, 1976, and are not covered by any insurance policy issued by a Settling Insurance Company and (ii) an Opt-Out Chartered Organization to the extent such Abuse Claim is not covered by any insurance policy issued by a Settling Insurance Company;**

       ~~c. prior to the date that an Entity (other than an Insurance Company) becomes a Protected Party under Article IV.I, the right of holders of Abuse Claims to assert such Abuse Claims against such Entity;~~

       ~~d. prior to the date that a Chartered Organization becomes a Limited Protected Party under Article IV.J, the right of holders of Post-1975~~

~~Chartered Organization Abuse Claims to assert such Abuse Claims against such Entity;~~

c. ~~e.~~ the rights of holders of Abuse Claims that are not ~~Post-1975 Chartered Organization~~ Opt-Out Abuse Claims to assert such Abuse Claims against any ~~Limited Protected Party~~ Opt-Out Chartered Organization (unless such ~~Limited Protected Party~~ Opt-Out Chartered Organization becomes a Protected Party under Article IV.I);

d. ~~f.~~ the right of any Person to assert any Claim, debt, obligation or liability for payment of Settlement Trust Expenses solely against the Settlement Trust in accordance with the Settlement Trust Documents;

e. ~~g.~~ the Settlement Trust from enforcing its rights under the Plan and the Settlement Trust Documents; or

f. ~~h.~~ the rights of the Settlement Trust to prosecute any action against any Non-Settling Insurance Company based on or arising from Abuse Insurance Policies that are not the subject of an Insurance Settlement Agreement, subject to any Insurance Coverage Defenses.

G.    Provisions Relating to Channeling Injunction.

1.    Modifications.  Subject to post-Effective Date settlements between the Settlement Trustee and Chartered Organizations or Insurance Companies under the applicable provisions of Article IV, there can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

2.    Non-Limitation.  Nothing in the Plan or the Settlement Trust Documents shall or shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction or the Settlement Trust's assumption of all liability with respect to Abuse Claims.

3.    Bankruptcy Rule 3016 Compliance.  The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute or be deemed to constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

4.    Enforcement.  Any Protected Party ~~or~~, Limited Protected Party, or Opt-Out Chartered Organization may enforce the Channeling Injunction as a defense to any Claim (in whole or in part) brought against such Protected Party ~~or~~, Limited Protected Party, or Opt-Out Chartered Organization that is enjoined under the Plan as to such Protected Party ~~or~~, Limited Protected Party, or Opt-Out Chartered Organization and may seek to enforce such injunction in a court of competent jurisdiction.

5.    Contribution Claims.  If a Non-Settling Insurance Company asserts that it has rights, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation or other similar claims directly or indirectly arising out of or

in any way relating to such Non-Settling Insurance Company's payment of loss on behalf of one or more of the Debtors in connection with any Abuse Claim against a Settling Insurance Company (collectively, "Contribution Claims"), (a) such Contribution Claims may be asserted as a defense or counterclaim against the Settlement Trust in any Insurance Action involving such Non-Settling Insurance Company, and the Settlement Trust may assert the legal or equitable rights (if any) of the Settling Insurance Company, and (b) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such Non-Settling Insurance Company to the Settlement Trust shall be reduced by the amount of such Contribution Claims.

6. No Duplicative Recovery.  In no event shall any holder of an Abuse Claim or a Post-1975 Chartered Organization Abuse Claim be entitled to receive any duplicative payment, reimbursement, or restitution from any Protected Party or, Limited Protected Party or Opt-Out Chartered Organization under any theory of liability for the same loss, damage, or other Claim that is reimbursed by the Settlement Trust or is otherwise based on the same events, facts, matters, or circumstances that gave rise to the applicable Abuse Claim or Post-1975 Chartered Organization Abuse Claim.

7. District Court Approval.  The Debtors shall seek entry of the Affirmation Order, which shall approve (a) the Channeling Injunction and the Settlement Trust's assumption of all liability with respect to Abuse Claims and (b) the releases by holders of Abuse Claims for the benefit of the Protected Parties and the Limited Protected Parties, each as set forth in this Article X.

H.    **Insurance Entity Injunction**.

**1.    Purpose.    To facilitate the Insurance Assignment, protect the Settlement Trust, and preserve the Settlement Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue the injunction set forth in this Article X.H (the "Insurance Entity Injunction"); provided, however, that the Insurance Entity Injunction is not issued for the benefit of any Non-Settling Insurance Company, and no Non-Settling Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Insurance Settlement Agreement.**

**2.    Terms Regarding Claims against Insurance Companies.    Subject to the terms of Article X.E and Article X.F, and except for any Chartered Organization that is not aOpt-Out Chartered Organizations with respect to Non-Settling Insurance Companies and Participating Chartered Organization or a Contributing Chartered OrganizationOrganizations with respect to Non-Settling Insurance Companies coverage for Abuse Claims that arose prior to January 1, 1976, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim or cause of action (including any Abuse Claim or any claim for or respecting any Settlement Trust Expense) against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Abuse Insurance Policy or other insurance policy issued by a Settling Insurance**

**Company covering Abuse Claims**, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim or cause of action, including:

> a. commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Insurance Company, or against the property of any Insurance Company, with respect to any such claim, demand, or cause of action (including, for the avoidance of doubt, directly pursuing any suit, action or other proceeding with respect to any such claim, demand, or cause of action against any Insurance Company);

> b. enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Insurance Company, or against the property of any Insurance Company, with respect to any such claim or cause of action;

> c. creating, perfecting, or enforcing in any manner, directly or indirectly, any Lien or Encumbrance against any Insurance Company, or the property of any Insurance Company, with respect to any such claim or cause of action; and

> d. except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Insurance Company, or against the property of any Insurance Company, with respect to any such claim or cause of action;

**provided**, **however**, that: (i) the injunction set forth in this **Article X.H** shall not impair in any way any (a) actions brought by the Settlement Trust against any Non-Settling Insurance Company, (b) actions brought by Local Councils in connection with any Local Council Reserved Rights, (c) **any actions brought by any Chartered Organization relating to an Abuse Claim against a Non-Settling Insurance Company that is not channeled to the Settlement Trust; (d)** actions brought by holders of Non-Abuse Litigation Claims consistent with **Article IV.D.3**, (~~d~~**e**) the rights, if any, of any **Opt-Out** Chartered Organization ~~that is not a Participating Chartered Organization under any Chartered Organization Reserved Policy~~**under any Abuse Insurance Policy that was issued by a Non-Settling Insurance Company**, or (~~e~~**f**) the rights of any co-insured of the Debtors (x) under any Non-Abuse Insurance Policy and (y) as specified under any Final Order of the Bankruptcy Court approving an Insurance Settlement Agreement; and (ii) the Settlement Trust shall have the sole and exclusive authority at any time to terminate, or

reduce or limit the scope of, the injunction set forth in this <u>Article X.H</u> with respect to any Non-Settling Insurance Company, in accordance with the Settlement Trust Documents, upon express written notice to such Non-Settling Insurance Company, except that the Settlement Trust shall not have any authority to terminate, reduce or limit the scope of the injunction herein with respect to any Settling Insurance Company so long as, but only to the extent that, such Settling Insurance Company complies fully with its obligations under any applicable Insurance Settlement Agreement.

      3.    <u>Reservations</u>.  Notwithstanding anything to the contrary in this <u>Article X.H</u>, the Insurance Entity Injunction shall not enjoin:

      a.    the rights of any Person to the treatment accorded them under the Plan, as applicable, including the rights of holders of Abuse Claims to assert such Claims, as applicable, in accordance with the Trust Distribution Procedures, and the rights of holders of Non-Abuse Litigation Claims to assert such Claims, as applicable in accordance with <u>Article IV.D.3</u>;

      b.    the rights of any Person to assert any claim, debt, obligation, cause of action or liability for payment of Settlement Trust Expenses against the Settlement Trust;

      c.    the rights of the Settlement Trust to prosecute any action based on or arising from Abuse Insurance Policies, <u>except to the extent otherwise released</u>;

      d.    the rights of any Person to assert or prosecute (i) an Abuse Claim against ~~any Entity other than a Protected Party, or (ii) a Post-1975 Chartered Organization~~<u>an Opt-Out Chartered Organization to the extent that such Claim is not covered under an insurance policy issued by a Settling Insurance Company, or (ii) an</u> Abuse Claim against ~~any Entity other than a~~ Limited Protected Party <u>to the extent that such Abuse Claim arose prior to January 1, 1976 and is not covered under an insurance policy issued by a Settling Insurance Company</u>;

      e.    the rights of the Settlement Trust to assert any claim, debt, obligation, cause of action or liability for payment against an Insurance Company based on or arising from the Abuse Insurance Policies; or

      f.    the rights of any Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any Non-Settling Insurance Company.

I.    <u>Injunction against Interference with Plan</u>.  Upon entry of the Confirmation Order, all holders of Claims and Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

J.    **Releases**.

1.    **Releases by the Debtors and the Estates**.

a.    **Releases by the Debtors and the Estates of the Released Parties**.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate and implement the reorganization of the Debtors and the settlements embodied in the Plan, including the Abuse Claims Settlement, the JPM / Creditors' Committee Settlement, the ~~Hartford~~ Insurance ~~Settlement~~Settlements, and the TCJC Settlement, as an integral component of the Plan, the Debtors, Reorganized BSA, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Estate Causes of Action that do not constitute Settlement Trust Causes of Action, any and all other Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, the JPM / Creditors' Committee Settlement, the ~~Hartford~~ Insurance ~~Settlement~~Settlements, the TCJC Settlement, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of Confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the Distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this **Article X.J.1** shall not, and shall not be construed to: (a) release any Released Party from Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross

negligence or willful misconduct; or (b) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan.

b. **Releases by the Debtors and the Estates of Certain Avoidance Actions.** As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of Creditors' Committee and its members in their respective capacities as such in facilitating and implementing the reorganization of the Debtors, as an integral component of the Plan, the Debtors, Reorganized BSA, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all holders of General Unsecured Claims, Non-Abuse Litigation Claims, and Convenience Claims of and from any and all Avoidance Actions.

2. **Releases by the Debtors and the Estates of the Local Councils, the Contributing Chartered Organizations, and the Participating Chartered Organizations, the Opt-Out Chartered Organizations and the Settling Insurance Companies.** In furtherance of the Abuse Claims Settlement, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, on their own behalf and as representatives of their respective Estates, and Reorganized BSA, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Local Councils, the Contributing Chartered Organizations and, the Participating Chartered Organizations, the Opt-Out Chartered Organizations, the Settling Insurance Companies of and from any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Debtors, their Estates, or Reorganized BSA have, had, may have, or may claim to have: (a) against any of the Local Councils and Contributing Chartered Organizations with respect to any Abuse Claims and, (b) against any of the Participating Chartered Organizations with respect to any Post-1975 Chartered Organization Abuse Claims, (c) against any of the Participating Chartered Organizations with respect to any Abuse Claims that arose prior to January 1, 1976 and are not covered by any insurance policy issued by a Settling Insurance Company, (d) against any of the Opt-Out Chartered Organizations with respect to any Opt-Out Chartered Organization Abuse Claims, and (e) against any Settling Insurance Company with respect to any coverage for Abuse Claims (collectively, the "Scouting Released Claims"). Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article X.J.2 shall not, and shall not be construed to release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan. For the avoidance of doubt, in the event of any

**conflict or inconsistency between this Article X.J.2 and the preceding Article X.J.1, this Article X.J.2 shall control.**

3.    **Releases by Holders of Abuse Claims. As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Protected Parties and the Limited Protected Parties to facilitate and implement the reorganization of the Debtors, including the settlements embodied in the Plan, including the Abuse Claims Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release: (a) each and all of the Protected Parties and their respective property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims;** ~~and~~ **(b) each and all of the Limited Protected Parties and their respective property and successors and assigns of and from all Post-1975 Chartered Organization Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Post-1975 Chartered Organization Abuse Claims; (c) each of the Participating Chartered Organizations with respect to any Abuse Claims that arose prior to January 1, 1976 and are not covered by any insurance policy issued by a Settling Insurance Company; and (d) each and all of the Opt-Out Chartered Organizations and their respective property and successors and assigns of and from all Opt-Out Chartered Organization Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Opt-Out Chartered Organization Abuse Claims; provided, however, that the releases set forth in this Article X.J.3 shall not, and shall not be construed to: (i) release** ~~any Protected Party or Limited Protected Party from Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; (ii) release~~ **any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; or (ii~~iii~~) modify, reduce, impair or**

otherwise affect the ability of any holder of an Abuse Claim to recover on account of such Claim in accordance with **Article III.B.10** or **Article III.B.11**, as applicable. For the avoidance of doubt, holders of Abuse Claims covered by any insurance policy issued by a Settling Insurance Company shall, and shall be deemed to, release and discharge the Settling Insurance Companies for such Claims. The releases in Article X.J.4 shall not, and shall not be deemed to, limit the releases in Article X.J.3.

4.  **Releases by Holders of Claims**.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate and implement the reorganization of the Debtors and the settlements embodied in the Plan, including the JPM / Creditors' Committee Settlement, the ~~Hartford~~ Insurance ~~Settlement~~Settlements, and the TCJC Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all Releasing Claim Holders shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, the JPM / Creditors' Committee Settlement, the ~~Hartford~~ Insurance ~~Settlement~~Settlements, the TCJC Settlement, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of Confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the Distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; provided, however, that the releases set forth in this **Article X.J.4** shall not, and shall not be construed to: (a) release any Released Party from Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; (b) release any post-Effective Date obligations of any Person under the Plan Documents

or any document, instrument, or agreement executed to implement the Plan; or (c) modify, reduce, impair or otherwise affect the ability of any holder of an Allowed Non-Abuse Litigation Claim to recover on account of such Allowed Claim in accordance with **Article III.B.9**. Notwithstanding the foregoing or anything to the contrary herein, (i) with respect to holders of Allowed General Unsecured Claims or Allowed Non-Abuse Litigation Claims, nothing in the Plan or the release set forth in **Article X.J.4** shall, or shall be construed to, release any **such** claims or Causes of Action against any Local Council, Chartered Organization ~~(other than a Contributing Chartered Organization), or Non-Settling~~**, or** Insurance Company (subject to **Article IV.D.3**) and (ii) nothing in the Plan or the release set forth in **Article X.J.4** shall, or shall be construed to, release any claims or Causes of Action asserted by Century Indemnity Company against Sidley Austin LLP ("**Sidley**") related to Sidley's representation of the Debtors prior to the Petition Date.

     5.    **Releases Among Contributing Chartered Organizations and Settlement Parties.**

     a.     **In furtherance of the Abuse Claims Settlement, as of the date that the Confirmation Order and Affirmation Order become Final Orders, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Confirmation Order, and the terms of the TCJC Settlement Agreement, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Contributing Chartered Organizations, including TCJC, shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge the Debtors, Reorganized BSA, the Related Non-Debtor Entities, the Local Councils, the other Protected Parties, the Limited Protected Parties, the Settling Insurance Companies, ~~including Hartford,~~ the Future Claimants' Representative, the Coalition, the Settlement Trust, and each of its and their respective Representatives (collectively, the "Settlement Parties"), of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the date that the Confirmation Order and Affirmation Order become Final Orders (including before the Petition Date) in connection with or related to (i) Abuse Claims, (ii) the Chapter 11 Cases, (iii) the Plan, or (iv) any Claims relating to the Debtors or the Related Non-Debtor Entities that were or could have been asserted by the Contributing Chartered Organizations against the Settlement Parties or any of them.**

b.     In furtherance of the Abuse Claims Settlement, as of the date that the Confirmation Order and Affirmation Order become Final Orders, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Confirmation Order, and the terms of the TCJC Settlement Agreement, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Settlement Parties shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each of the Contributing Chartered Organizations, including TCJC, of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the date that the Confirmation Order and Affirmation Order become Final Orders (including before the Petition Date) in connection with or related to (i) Abuse Claims, (ii) the Chapter 11 Cases, (iii) the Plan, or (iv) any Claims relating to the Debtors or the Related Non-Debtor Entities that were or could have been asserted by the Settlement Parties against the Contributing Chartered Organizations or any of them.

6.     **Releases Relating to Settling Insurance Companies.** ~~The~~Notwithstanding anything to the contrary, the releases of Settling Insurance Companies and certain other parties, and the releases by Settling Insurance Companies, each as set forth in the Insurance Settlement Agreements, ~~including the Hartford Insurance Settlement Agreement,~~ are incorporated by reference as if fully set forth herein~~.~~, and control and supplement any release otherwise contained herein.  Nothing herein shall reduce the scope of any such release.

7.     Releases Relating to TCJC.  Notwithstanding anything to the contrary in Article X.J, the releases to TCJC, and the releases by TCJC, each as set forth in the TCJC Settlement Agreement, are incorporated by reference as if fully set forth herein and shall control.

K.     **Exculpation.  From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance occurring on or before the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases, the negotiation of the Plan Documents, the JPM / Creditors' Committee Settlement, the ~~Hartford~~ Insurance ~~Settlement Agreement~~Settlements, the TCJC Settlement Agreement, the Releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be Distributed under the Plan, or the management or operation of the Debtors (except for any liability that results primarily from such Exculpated Party's gross negligence, bad faith or willful misconduct).  In all respects, each and all such Exculpated Parties shall be entitled**

to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the matters referenced in the preceding sentence.  Notwithstanding the foregoing or any provision of the Plan to the contrary, Sidley shall not be an Exculpated Party with respect to any claims that Century Indemnity Company asserts against Sidley related to Sidley's representation of the Debtors prior to the Petition Date.

      L.      **Injunctions Related to Releases and Exculpation**.

      1.      **Injunction Related to Releases**.  As of the Effective Date, all holders of Claims that are the subject of **Article X.J** are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under **Article X.E** or released under **Article X.J**; provided, however, that the injunctions set forth in this **Article X.L.1** shall not, and shall not be construed to, enjoin any holder of a Claim that is **only** the subject of **Article X.J.4 (and no other release set forth in Article X.J including Articles X.J.6 and X.J.7** from taking any action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct.

      2.      **Injunction Related to Exculpation**.  As of the Effective Date, all holders of Claims that are the subject of **Article X.K** are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under **Article X.E** or released under **Article X.J**; provided, however, that the injunctions set forth in this **Article X.L.2** shall not, and shall not be construed to, enjoin any Person that is the subject of **Article X.K** from

**taking any action arising out of, or related to, any act or omission of a Exculpated Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct.**

M.      Insurance Provisions.

1.      Except for the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made by the District Court in the Affirmation Order, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights or obligations under an Insurance Policy to the extent such rights and obligations are otherwise available under applicable law, and the rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of the Plan Documents, including the Plan, the Confirmation Order, and the Affirmation Order, or any provision thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

2.      No provision of the Plan, other than those provisions contained in the applicable Injunctions contained in Article X of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Insurance Company by the Channeling Injunction.

3.      Nothing in this Article X.M is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Person.

N.      Judgment Reduction.

1.      Without limiting the Discharges, Releases and Injunctions set forth above, if any Person, including a holder of an Abuse Claim ("Plaintiff"), asserts a Cause of Action against any other Person arising from or relating to Abuse that is the subject of a proof of claim filed against the Debtors in the Chapter 11 Cases, regardless of whether such Cause of Action may be asserted pursuant to the Bankruptcy Code or is in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever (each such Cause of Action, an "Abuse Cause of Action"), and such Abuse Cause of Action results in a determination by the court or tribunal hearing the Abuse Cause of Action (including by a jury empaneled by such court or tribunal) that any Person who is not a Protected Party or a Limited Protected Party (each, a "Specified Person") is liable in damages to Plaintiff, then, prior to final entry of any judgment, order or arbitration award ("Judgment") in such Abuse Cause of Action, Plaintiff shall provide notice and a copy of the Confirmation Order to the Trial Court.  Such court or tribunal shall determine whether the Abuse Cause of Action gives rise to any Cause of Action on which any Protected Party or Limited Protected Party would have been liable to Plaintiff in the absence of the Plan and Confirmation Order.  The court or tribunal shall reduce any Judgment against a Specified Person by an amount equal to the "Judgment Reduction Amount," which shall equal the greatest amount such Specified Person would be entitled,

128

under applicable non-bankruptcy law, to set off or credit against the Judgment if such Protected Party or Limited Protected Party were not entitled to the benefits of the Discharges, Releases, or Injunctions set forth herein.  For the avoidance of doubt, a Limited Protected Party may be a Specified Person entitled to the judgment reduction provided for in this Article X.N with respect to an Abuse Cause of Action arising from or relating to Abuse that is not the subject of a Post-1975 Chartered Organization Abuse Claim.

2.    Nothing herein shall prejudice or operate to preclude the right of any Specified Person to (a) provide notice of the Confirmation Order to any court or tribunal hearing an Abuse Cause of Action, (b) raise any issues, claims or defenses regarding the Judgment Reduction Amount, including the contractual liability and/or relative or comparative fault of any Person, including any Protected Party or Limited Protected Party, in any court or tribunal hearing any Abuse Cause of Action in accordance with applicable law or procedure, or (c) take discovery of Protected Parties or Limited Protected Parties in accordance with applicable law or procedure; provided, however, that nothing herein shall in any way modify or affect the Discharges, Releases or Injunctions. For the avoidance of doubt, nothing herein shall (i) be deemed to entitle a Plaintiff to more than a single satisfaction with respect to any Abuse Cause of Action or (ii) prejudice or operate to preclude the rights of any Specified Person to assert any claims or causes of action that have not been discharged, released, or enjoined under the Plan or Confirmation Order.

3.    Each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Specified Person in a manner that fails to conform to the terms of this Article X.N.

4.    If any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to an Abuse Cause of Action, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Abuse Cause of Action with respect to such settlement.

O.    Reservation of Rights.  Notwithstanding any other provision of the Plan to the contrary, no provision of this Article X shall be deemed or construed to satisfy, discharge, release or enjoin claims by the Settlement Trust, Reorganized BSA, or any other Person, as the case may be, against (1) the Settlement Trust for payment of Abuse Claims in accordance with the Trust Distribution Procedures, (2) the Settlement Trust for the payment of Settlement Trust Expenses, or (3) any Insurance Company that has not performed under an Insurance Policy (to the extent such Insurance Policy is not the subject of an Insurance Settlement Agreement) or an Insurance Settlement Agreement.

P.    Disallowed Claims.    On and after the Effective Date, the Debtors and Reorganized BSA shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any order Disallowing a Claim that is not a Final Order as of the Effective Date solely because of a Person's right to move for reconsideration of such order

pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

Q.    No Successor Liability.  Except as otherwise expressly provided in the Plan, Reorganized BSA does not, pursuant to the Plan or otherwise, assume, agree to perform, pay or indemnify any Person, or otherwise have any responsibility for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on or after the Effective Date.  Neither the Debtors, Reorganized BSA, nor the Settlement Trust is, or shall be deemed to be, a successor to any of the Debtors by reason of any theory of law or equity (except as otherwise provided in Article IV.C), and none shall have any successor or transferee liability of any kind or character; provided, however, that Reorganized BSA and the Settlement Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

R.    Indemnities.

1.    Prepetition Indemnification and Reimbursement Obligations.  The respective obligations of the Debtors to indemnify and reimburse Persons who are or were directors, officers or employees of the Debtors on the Petition Date or at any time thereafter up to and including the Effective Date, against and for any obligations pursuant to the bylaws, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall, except with respect to any Perpetrator: (a) survive Confirmation of the Plan and remain unaffected thereby; (b) be assumed by Reorganized BSA as of the Effective Date; and (c) not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.  In furtherance of, and to implement the foregoing, as of the Effective Date, Reorganized BSA shall obtain and maintain in full force insurance for the benefit of each and all of the above-indemnified directors, officers and employees, at levels no less favorable than those existing as of the date of entry of the Confirmation Order, and for a period of no less than three (3) years following the Effective Date.

2.    Plan Indemnity.  In addition to the matters set forth above and not by way of limitation thereof, Reorganized BSA shall indemnify and hold harmless all Persons who are or were officers or directors of the Debtors on the Petition Date or at any time thereafter up to and including the Effective Date on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including attorneys' fees) on account of claims or Causes of Action threatened or asserted by any third party against such officers or directors that seek contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtors' Estates.

3.    Limitation on Indemnification.  Notwithstanding anything to the contrary set forth in the Plan or elsewhere, neither the Debtors, Reorganized BSA, the Local Councils, nor the Contributing Chartered Organizations, as applicable, shall be obligated to indemnify or hold harmless any Person for any claim, cause of action, liability,

judgment, settlement, cost or expense that results primarily from (i) such Person's bad faith, gross negligence or willful misconduct or (ii) an Abuse Claim.

S.    <u>The Official Committees and the Future Claimants' Representative</u>.  Except as otherwise described in the Settlement Trust Documents with respect to the Future Claimants' Representative, the Official Committees and the Future Claimants' Representative shall continue in existence until the Effective Date, and after the Effective Date for the limited purposes of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date.  The Debtors shall pay the reasonable fees and actual and necessary expenses incurred by the Official Committees and the Future Claimants' Representative up to the Effective Date, and after the Effective Date solely for the purposes set forth in the preceding sentence, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including <u>Article II</u>.  As of the Effective Date, the members of the Creditors' Committee shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations involving the Chapter 11 Cases.  Upon the closing of the Chapter 11 Cases, the Official Committees shall be dissolved.  Neither the Debtors nor Reorganized BSA have any obligation to pay fees or expenses of any Professional retained by the Official Committees or the Future Claimants' Representative that are earned or incurred before the Effective Date to the extent such fees or expenses (or any portion thereof) qualify as Settlement Trust Expenses, in which case such fees and expenses (or the applicable portion thereof) shall be paid by the Settlement Trust in accordance with the Settlement Trust Documents.

## ARTICLE XI.

## RETENTION OF JURISDICTION

A.    <u>Jurisdiction</u>.  Until the Chapter 11 Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan or the Settlement Trust Agreement, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce the Insurance Actions, the Settlement Trust Causes of Action, and all other Causes of Action which may exist on behalf of the Debtors.  Nothing contained herein shall prevent Reorganized BSA or the Settlement Trust, as applicable, from taking such action as may be necessary in the enforcement of any Estate Cause of Action, Insurance Action, Settlement Trust Cause of Action, or other Cause of Action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which actions or other Causes of Action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein.    Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (1) the Bankruptcy Court in fact has jurisdiction with respect to any Insurance Action, (2) any such jurisdiction is exclusive with respect to any Insurance Action, or (3) abstention or dismissal of any Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such

Insurance Action(s). Any court other than the Bankruptcy Court that has jurisdiction over an Insurance Action shall have the right to exercise such jurisdiction.

        B.    <u>General Retention</u>. Following Confirmation of the Plan, the administration of the Chapter 11 Cases will continue until the Chapter 11 Cases are closed by a Final Order of the Bankruptcy Court. The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claims and the re-examination of Claims which have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claims. The failure by the Debtors or Reorganized BSA to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the rights of the Debtors, Reorganized BSA, or the Settlement Trust, as the case may be, to object to or reexamine such Claim in whole or part.

        C.    <u>Specific Purposes</u>. In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan, including jurisdiction to:

        1.    modify the Plan after Confirmation pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

        2.    correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance in the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

        3.    assure performance by the Settlement Trust and the Disbursing Agent of their respective obligations to make distributions under the Plan;

        4.    enforce and interpret the terms and conditions of the Plan, the Plan Documents, the Settlement Trust Documents, the DST Agreement, and any Insurance Settlement Agreements;

        5.    enter such orders or judgments, including injunctions (a) as are necessary to enforce the title, rights and powers of Reorganized BSA and the Settlement Trust, (b) to execute, implement, or consummate the provisions of the Plan, the Confirmation Order, and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or the Confirmation Order, and (c) as are necessary to enable holders of Claims to pursue their rights against any Person that may be liable therefor pursuant to applicable law or otherwise;

        6.    hear and determine any and all motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

        7.    hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters, including contested matters

arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Cases;

8.      hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code;

9.      hear and determine any Causes of Action arising during the period from the Petition Date to the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtors, Reorganized BSA, the Settlement Trust, the DST, and their respective Representatives;

10.      hear and determine any and all motions for the rejection, assumption or assignment of Executory Contracts or Unexpired Leases and the Allowance of any Claims resulting therefrom;

11.      hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

12.      hear and determine the Allowance and/or Disallowance of any Claims, including Administrative Expense Claims, against or Interests in the Debtors or their Estates, including any objections to any such Claims or Interests, and the compromise and settlement of any Claim, including Administrative Expense Claims, against or Interest in the Debtors or their Estates;

13.      hear and resolve disputes concerning any reserves under the Plan or the administration thereof;

14.      hear and determine all questions and disputes regarding title to the assets of the Debtors, their Estates or the Settlement Trust;

15.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan or under the Settlement Trust Documents are enjoined or stayed;

16.      hear and determine all questions and disputes regarding, and to enforce, the Abuse Claims Settlement;

17.      hear and determine the Insurance Actions, any Settlement Trust Cause of Action and any similar claims, Causes of Action or rights of the Settlement Trust to construe and take any action to enforce any Abuse Insurance Policy, and to issue such orders as may be necessary for the execution, consummation and implementation of any Abuse Insurance Policy, and to determine all questions and issues arising thereunder; provided, that such retention of jurisdiction shall not constitute a waiver of any right of a Non-Settling Insurance Company to seek to remove or withdraw the reference of any Insurance Action filed after the Effective Date;

18.      hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases;

19.     resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, the Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

20.     enter in aid of implementation of the Plan such orders as are necessary, including the implementation and enforcement of the Injunctions, Releases, and Discharges described herein, including the Channeling Injunction;

21.     hearing a petition for relief by a Specified Person or any other party in interest in the event that a court or tribunal hearing an Abuse Cause of Action fails to apply the judgment reduction provisions of Article X.N;

22.     approve any Post-Effective Date Chartered Organization Settlement and determine the adequacy of notice of a motion by the Settlement Trustee to approve such a settlement;

23.     approve any extension of the Insurance Settlement Period, approve any Post-Effective Date Insurance Settlement and determine the adequacy of notice of a Post-Effective Date Insurance Settlement provided by the Settlement Trustee;

24.     hear and determine any questions and disputes pertaining to, and to enforce, the Abuse Claims Settlement, including the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, including the TCJC Settlement Contribution, the Participating Chartered Organization Settlement Contribution, ~~and~~ the Hartford Settlement Contribution, and the Century and Chubb Companies Settlement Contribution;

25.     hear and determine any questions and disputes pertaining to, and to enforce, the JPM / Creditors' Committee Settlement;

26.     hear and determine any questions and disputes pertaining to, and to enforce, the ~~Hartford~~ Insurance Settlement Agreements;

27.     hear and determine any questions and disputes pertaining to, and to enforce, the TCJC Settlement;

28.     hear and determine all questions and disputes regarding matters pertaining to the DST Agreement;

29.     enter a Final Order or decree concluding or closing the Chapter 11 Cases; and

30.     to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Settlement Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, to violate, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Abuse Insurance Policies; provided, however, that (a) such orders shall not impair the Insurance Coverage Defenses or the rights, claims, or defenses, if any, of any Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the

Debtors' Chapter 11 Cases, (b) this provision does not, in and of itself, grant this Court jurisdiction to hear and decide disputes arising out of or relating to the Abuse Insurance Policies, and (c) all interested parties, including any Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

As of the Effective Date, notwithstanding anything in this <u>Article XI</u> to the contrary, the Restated Debt and Security Documents and any documents related thereto shall be governed by the jurisdictional provisions thereof and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

D.      <u>Courts of Competent Jurisdiction</u>.  To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in this <u>Article XI</u> shall be deemed to be replaced by the "District Court."  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.      <u>Closing of Chapter 11 Cases</u>.  After each Chapter 11 Case has been fully administered, Reorganized BSA shall file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case.

B.      <u>Amendment or Modification of the Plan</u>.

1.      <u>Plan Modifications</u>.  Subject to the terms of the JPM / Creditors' Committee Term Sheet <u>and the Century and Chubb Companies Insurance Settlement Agreement</u>, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code unless section 1127 of the Bankruptcy Code requires additional disclosure.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  All amendments to the Plan (a) must be reasonably acceptable to JPM and the Creditors' Committee to the extent they pertain to the treatment of the 2010 Credit Facility Claims,

the 2019 RCF Claims, the 2010 Bond Claims, or the 2012 Bond Claims (in the case of JPM) or Convenience Claims, General Unsecured Claims, or Non-Abuse Litigation Claims (in the case of the Creditors' Committee), (b) shall not be inconsistent with the terms of the ~~Hartford~~ Insurance Settlement ~~Agreement~~Agreements, and (c) shall not be inconsistent with the terms of the TCJC Settlement Agreement.  The designation of Chartered Organizations as Contributing Chartered Organizations or Participating Chartered Organizations and the designation of Non-Settling Insurance Companies as Settling Insurance Companies after the Effective Date in accordance with Article IV.I~~,~~ or Article IV.J~~, or Article IV.K~~ shall not be a modification or amendment to the Plan and instead is an act that may be done to effectuate the terms of the Plan.

2. <u>Other Amendments</u>.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

C. <u>Revocation or Withdrawal of Plan</u>.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if Confirmation of the Plan or the occurrence of the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, including the Settlement Trust Documents, shall be deemed null and void (except that the ~~Hartford~~ Insurance Settlement ~~Agreement~~Agreements shall remain in full force and effect to the extent provided in such ~~agreement~~agreements in accordance with its terms); and (3) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim against, or any Interest in, the Debtors or any other Person; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission of any sort by the Debtors or any other Person.

D. <u>Request for Expedited Determination of Taxes</u>.  The Debtors and Reorganized BSA, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date to and including the Effective Date.

E. <u>Non-Severability of Plan Provisions</u>.  If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation<u>, except as provided in the Insurance Settlement Agreements with respect to the Settling Insurance Companies, as applicable</u>.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance

with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or Reorganized BSA (as the case may be), and (3) nonseverable and mutually dependent.

F.    Notices.    All notices, requests, and demands to or upon the Debtors or Reorganized BSA to be effective shall be in writing (including by email transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

> Boy Scouts of America
> 1325 W. Walnut Hill Lane
> Irving, Texas 75015
> Attn:  Steven McGowan, General Counsel
> Email: Steve.McGowan@scouting.org
>
> with copies to:
>
> White & Case LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> Attn:  Jessica C. Lauria
> Email:  jessica.lauria@whitecase.com
>
> – and –
>
> White & Case LLP
> 111 South Wacker Drive, Suite 5100
> Chicago, Illinois 60606
> Attn:  Michael C. Andolina
>        Matthew E. Linder
> Email: mandolina@whitecase.com
>        mlinder@whitecase.com
>
> – and –
>
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street, 16th Floor
> P.O. Box 1347
> Wilmington, Delaware 19899-1347
> Attn:  Derek C. Abbott
> Email:  dabbott@morrisnichols.com

G.    Notices to Other Persons.    After the occurrence of the Effective Date, Reorganized BSA has authority to send a notice to any Person providing that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Person must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; provided, however, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, Reorganized BSA

is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those Persons that have filed such renewed requests:

H.      Governing Law.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or any other Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof; provided, however, that governance matters relating to Reorganized BSA shall be governed by the laws of the District of Columbia.

I.      Immediate Binding Effect.  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of any Person named or referred to in the Plan and the successors and assigns of such Person.

J.      Timing of Distributions or Actions.  In the event that any payment, Distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then such payment, Distribution, act or deadline shall be deemed to occur on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day, shall be deemed to have been completed or to have occurred as of the required date.

K.      Deemed Acts.  Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of the Plan or the Confirmation Order without any further act by any Person.

L.      Entire Agreement.  The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.  No Person shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

M.      Plan Supplement.  Any and all exhibits, lists, or schedules referred to herein but not filed with the Plan shall be contained in the Plan Supplement to be filed with the Clerk of the Bankruptcy Court prior to the Confirmation Hearing on the Plan, and such Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein.  The Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours, at the website maintained by the Notice and Claims Agent (https://cases.omniagentsolutions.com/BSA), and at the Bankruptcy Court's website (ecf.deb.uscourts.gov).

N.      Withholding of Taxes.  The Disbursing Agent, the Settlement Trust or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal,

state and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

O.    <u>Payment of Quarterly Fees</u>.  All Quarterly Fees due and payable prior to the Effective Date shall be paid on or before the Effective Date.  The Reorganized Debtors shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Cases, and shall comply with all applicable statutory reporting requirements.

P.    <u>Effective Date Actions Simultaneous</u>.  Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

Q.    <u>Consent to Jurisdiction</u>.  Upon default under the Plan, Reorganized BSA, the Settlement Trust, the Settlement Trustee, the Official Committees, the Future Claimants' Representative, and the Protected Parties, or any successor thereto, respectively, consent to the jurisdiction of the Bankruptcy Court, and agree that it shall be the preferred forum for all proceedings relating to any such default.

*[Remainder of Page Intentionally Left Blank]*

Dated: ~~September 29~~<u>December 17</u>, 2021

Boy Scouts of America
Delaware BSA, LLC

*/s/ Roger C. Mosby*

Roger C. Mosby
Chief Executive Officer and President

# EXHIBIT A

# TRUST DISTRIBUTION PROCEDURES

**EXHIBIT B**

**SETTLEMENT TRUST AGREEMENT**

**EXHIBIT C**

**CONTRIBUTING CHARTERED ORGANIZATION
SETTLEMENT CONTRIBUTION**

The Contributing Chartered Organization Settlement Contribution is comprised of the following monetary contributions, which shall be contributed to the Settlement Trust on the terms set forth in the applicable settlement agreements attached to the Plan as <u>Exhibit J, as applicable</u>.

| TCJC | $250,000,000 |
| Supplemental LC Contribution | Expected to be $40,000,000 |
| Settlement Growth Payment | Up to $100,000,000 |

# EXHIBIT D

## CONTRIBUTING CHARTERED ORGANIZATIONS

1.    The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole, including any affiliates or personnel.

2.    All Chartered Organizations included on the list of potential Protected Parties at https://omniagentsolutions.com/bsa-SAballots, except for the United Methodist Entities and the Roman Catholic Entities (each as defined in the Century and Chubb Companies Insurance Settlement Agreement), and any Opt-Out Chartered Organizations.

**EXHIBIT E**

**FOUNDATION LOAN TERM SHEET**

# EXHIBIT F

## LOCAL COUNCIL SETTLEMENT CONTRIBUTION

## I.  Local Council Settlement Contribution – General

In addition to the other components of the Local Council Settlement Contribution specified in the Plan,[4] the Local Councils shall contribute the following to the Settlement Trust on the Effective Date:

(1)  at least $300 million of Cash to be paid on the Effective Date (the "Cash Contribution");

(2)  Unrestricted properties[5] with a combined Appraised Value (as defined below) of $200 million (the "Property Contribution"), which shall be reduced on a dollar-for-dollar basis by any Cash Contribution in excess of $300 million, *provided* that the methodology and procedures related to property selection and acceptance are provided for below; and

(3)  the DST Note, in the principal amount of $~~100~~125 million,[6] issued by the DST on or as soon as practicable after the Effective Date.[7]  The principal terms of the DST Note are set forth in the DST Note Mechanics described below.

A listing of each Local Council's total expected contribution is included in the Disclosure Statement, including a specific break-down between the (i) Cash Contribution and (ii) Property Contribution.  Any actual or anticipated changes in contributions for any Local Council will be set forth in the Plan Supplement.  Notwithstanding any change in the Cash Contribution or Property Contribution for any Local Council, the aggregate amount of the Cash Contribution and the Property Contribution shall not be less than $~~500~~515 million in any circumstance (and the Cash Contribution shall not be less than $300 million in any circumstance).

## II.  Property Contribution

The Property Contribution shall be structured as follows:  The relevant Local Council shall agree to (a) retain title to the property (and pay insurance, property taxes, other associated ownership costs and any yet unremoved debt, all on a current basis), subject to, at the election, cost, and expense of the Settlement Trust, a mortgage in favor of the Settlement Trust, (b) post (and keep continuously posted unless otherwise agreed by the Settlement Trust) the property for sale within thirty days following the Effective Date with a qualified real estate broker that will use standard

---

[4]  All terms that are capitalized but not otherwise defined on this Exhibit F have the meanings ascribed to such terms in the Plan.

[5]  "Unrestricted" properties are defined as those properties not included in the BSA-defined Restriction Tiers 1 – 2 (Tier 1: Property limited to Boy Scout use only – any conveyance causes reversion or transfer of property to 3rd party. Tier 2: Property limited to Boy Scout use only – no reversionary clause).

[6]  Up to $25 million of the DST Note is being contributed by the Local Councils as part of the Contributing Chartered Organization Settlement Contribution.

[7]  The DST may be any other type of entity that ensures the DST Note is balance-sheet neutral as to the BSA and Local Councils, as determined by the BSA in consultation with the Ad Hoc Committee, and, in such event, each reference in the Plan, including this Exhibit F, to DST shall be deemed a reference to the actual entity that issues the DST Note.

and customary marketing practices, (c) present any written sale offer to the Settlement Trust for approval, (d) present to the Settlement Trust for its review and approval all final proposed terms of any sale and purchase offers (including price, timing and other terms) ("Proposed Final Terms"); *provided* that if any Proposed Final Terms would impose additional costs on the Local Council and the Settlement Trust accepts such Proposed Final Terms, at the Local Council's option any such additional costs shall be deducted from the proceeds or paid by the Settlement Trust, and not by the Local Council,[48] (e) remit the proceeds of the sale to the Settlement Trust at closing net of posting/listing/marketing fees, escrow fees, sales commissions, and other typical costs of sale.[59]  The Settlement Trust may review the marketing and sales efforts undertaken by the Local Council and request that the Local Council make changes to such marketing and sales efforts as are appropriate and lawful; provided that any costs associated with such changes will be paid, at the option of the Local Council, by the Settlement Trust or out of the proceeds of any sale.  If the Settlement Trust is unsatisfied with the sales and marketing effort, the Settlement Trust shall have the right to require the Local Council to promptly transfer the property to the Settlement Trust by quitclaim deed.  If there is a shortfall or surplus of net proceeds as compared to Appraised Value, the Settlement Trust shall bear the risk of the shortfall and keep the surplus.  If the property is not sold on or before the third anniversary of the Effective Date, the Local Council and the Settlement Trust each shall have the right to require the prompt transfer of the property to the Settlement Trust by quitclaim deed.  If the Local Council receives a cash offer for the property the value of which is at least equal to its Appraised Value, the Settlement Trust shall accept the offer if no superior offer is made within thirty days (or, if a lesser time is specified in an offer received, then such lesser time) or accept a quitclaim deed for the property.

The "Appraised Value" shall be determined as follows:

(A)     In the case of the contribution of an entire Camp, Service Center, Scout Shop or other property that does not have a restriction in Restriction Tiers 3-5[610] ("Lower Tier Restriction"), as reasonably determined by the Debtors' property review counsel and specified on Exhibit 2 to Exhibit B to the Disclosure Statement, which summarizes the restricted appraisal reports or broker opinions of value conducted by JLL Valuation & Advisory Services, LLC ("JLL"), CBRE, Inc. ("CBRE") or Keen-Summit Capital Partners LLC in connection the BSA's chapter 11 case prior to June 10, 2021 (the "Specified Appraisals"): (1) the appraised amount set forth in any such Specified Appraisal (using the average of high and low values of such Specified Appraisal, if applicable) or (2) if the applicable Local Council elects a Qualified On-Site Appraisal, the amount

---

[4][8]  By way of non-exclusive example, if the Proposed Final Terms requires the Local Council to retrofit a water system and the Settlement Trust accepts the Proposed Final Terms, the costs of the retrofit will, at the Local Council's option be paid (or reimbursed) out of the sale proceeds or paid by the Settlement Trust.

[5][9]  For the avoidance of doubt, the proceeds of the sale shall be first applied to any debt or liens remaining on the property, which debt shall have already been reflected in the Appraised Value of the property as described below.

[6][10]    A Tier 3-5 Restriction shall mean any of the following:  (1) Tier 3: property limited to Boy Scout or similar use or recreational area; (2) Tier 4: Property subject to conservation easement or other grantor or donor restrictions on development; (3) Tier 5: Property subject to leases to 3rd party (*e.g.*, office space, cell tower, oil and gas), zoning restrictions, easements or other similar encumbrances.

established by the average of (1) and the appraised amount in such Qualified On-Site Appraisal (using, for the Qualified On-Site Appraisal, the average of high and low values, if applicable);

(B)    In the case of the contribution of an entire Camp, Service Center, Scout Shop or other property that has a Lower Tier Restriction: (a) the appraised amount set forth in a Specified Appraisal if such Specified Appraisal accounts for such Lower Tier Restriction or (b) if the Specified Appraisal does not account for such Lower Tier Restriction, the amount established by a Qualified On-Site Appraisal (using the average of high and low values, if applicable) of the property taking into account the Lower Tier Restriction.

(C)    In the case of a contribution of only a portion of a particular Camp, Service Center, Scout Shop or other property to the Settlement Trust, whether or not subject to a Lower Tier Restriction, the amount established by a Qualified On-Site Appraisal (using the average of high and low values, if applicable) of the specific parcel and acreage proposed to be contributed, taking into account any Lower Tier Restriction;

*provided*, that, in the case of (A), (B), or (C) the Appraised Value shall be net of any debt encumbering the property and that no new debts shall be placed on any property subject to the Property Contribution except any mortgages in favor of the Settlement Trust.

The applicable Local Councils and the BSA shall engage in reasonable good faith efforts to ensure all properties subject to the Property Contribution accurately reflect all restrictions that are known to (or should be reasonably known to) exist in any appraisal that is used to determine a property's Appraised Value.

In the event a restriction that was not considered by any appraisal used to determine Appraised Value is subsequently determined to exist, such appraisal shall not be eligible to determine Appraised Value, and, to the extent necessary, within a reasonable period of time, new appraisals shall be conducted and/or the relevant Local Council shall contribute additional unrestricted properties or cash to the Settlement Trust to the extent necessary to ensure the total Appraised Value of all property or properties contributed by such Local Council is equal to or exceeds the Appraised Value of property that such Local Council had originally agreed to contribute.

A "Qualified On-Site Appraisal" shall mean an appraisal conducted by a licensed real property appraiser from the geographic region where the property is located and conducted in compliance with the Uniform Standards of Professional Appraisal Practice; *provided* that the Coalition (or, if the appraisal is commenced after the Effective Date, the Settlement Trust) shall have five (5) business days to object to any licensed real property appraiser selected by the Local Council if such appraiser is either affiliated with the Local Council or is not qualified to conduct such an appraisal by the applicable licensing authority in the geographic region where the property is located.  The costs associated with any Qualified On-Site Appraisals will be borne by the Local

Council.  If the applicable Local Council has not commissioned a Qualified On-Site Appraisal as of the date that the Plan is filed, it will do so as soon as possible.

## III.    DST Note Mechanics

On the Effective Date, at the request of the Ad Hoc Committee, solely to facilitate payments from the LC Reserve Account, the DST shall be established, and the DST shall issue the DST Note in favor of the Settlement Trust in the principal amount of $~~100~~125 million.  Local Councils shall make monthly contributions into an account (and any replacement thereof) owned by the DST (the "LC Reserve Account") in an amount equal to the Required Percentage of the Local Councils' respective payrolls.  Until the DST Note is extinguished, the LC Reserve Account shall be used only to fund contributions to the Pension Plan in accordance with the next sentence and, to the extent of any excess, to pay any Payment Amounts due under the DST Note.  If at any time (including the end of any Plan Year) (a) the present value of the accumulated benefits for the Pension Plan, as determined in accordance with the requirements set forth in the definition of "Excess Balance" below for the most recently ended Plan Year, exceeds (b) the market value of the assets of the Pension Plan (clause (a) minus clause (b) being the "Shortfall Amount"), funds in the LC Reserve Account will be deposited into the Pension Plan up to the lesser of the Local Councils' collective pro rata share of the Shortfall Amount or the balance in the LC Reserve Account.

The DST Note shall be: (i) interest bearing at a rate of 1.5% per annum and without recourse except as to the LC Reserve Account; (ii) secured by a lien on the LC Reserve Account; (iii) payable on each Payment Date in an amount equal to the applicable Payment Amount; and (iv) prepayable in whole or in part at any time without premium or penalty.  The unpaid balance of the DST Note (if any) remaining on the Payment Date that is the fifteenth anniversary of the First Payment Date (the "DST Note Maturity Date") shall be automatically extinguished and shall be considered forgiven and satisfied after giving effect to any required payment on such date.  Other than the lien on the LC Reserve Account, the Settlement Trust shall have no other recourse for payment under the DST Note.

"Cushion Amount" means: (i) from the Effective Date until the first June 1 that is at least one year after the Effective Date (the "First Cushion Date"), $134.86 million; (ii) from the day following the First Cushion Date until June 1 of the following year (the "Second Cushion Date"), $124.86 million; (iii) from the day following the Second Cushion Date until June 1 of the following year (the "Third Cushion Date"), $114.86 million; (iv) from the day following the Third Cushion Date until June 1 of the following year (the "Fourth Cushion Date"), $104.86 million; and (v) from the day following the Fourth Cushion Date until June 1 of the following year (the "Fifth Cushion Date"), $100 million; and (vi) from the day following the Fifth Cushion Date to and including the DST Note Maturity Date, $100 million.

"Excess Balance" means the amount in excess of the applicable Cushion Amount, if any, by which (a) the sum of (i) the market value of the assets of the Pension Plan as set forth in the actuarial report for the Pension Plan for the most recently ended Plan Year plus (ii) the balance of the LC Reserve Account as of the month-end preceding the applicable Payment Date exceeds (b) the present value of the accumulated benefits for the Pension Plan as set forth in the actuarial report for the Pension Plan for the most recently ended Plan Year calculated using a 6.5% annual

interest rate, net of expenses, so long as the Pension Plan continues to be a Cooperative and Small Employer Charity (CSEC) plan.  The actuarial report shall be prepared in accordance with actuarial standards, past practice, and applicable law.

The Debtors have conducted a current experience study by the Pension Plan actuary with respect to the demographic assumptions for the Pension Plan (*e.g.*, rates of retirement, termination, spousal age difference, commencement age and forms of payment) (the "2021 Experience Study").  After implementing changes based on the 2021 Experience Study, demographic assumption changes, with the exception of annual updates to mortality improvement projection scales, will not be made without a subsequent experience study, and economic assumption changes will not be made without an asset liability management study.  Reorganized BSA will not commission any such studies until five (5) years after the Effective Date of the Amended Plan unless there are material changes to Internal Revenue Code § 433 (governing CSEC plans).  In the event of such a material change, Reorganized BSA shall commission any such studies only if it reasonably believes, in consultation with the Pension Plan actuary, that such study is required.  During the term of the DST Note, on an annual basis, Reorganized BSA will provide advance notice to the Settlement Trustee of any proposed material changes that the Pension Plan actuary intends to make to its actuarial assumptions and methodologies that increase the present value of accumulated benefits under the Pension Plan by more than 1.0%.  Reorganized BSA will confer in good faith with the Settlement Trustee regarding any such proposed changes.  In addition, if the Pension Plan is amended in any regard which increases the present value of benefits under the Pension Plan, such amendments will be disregarded in the calculation of the present value of accumulated benefits for the purposes of the DST Note.

"Payment Amount" means an amount, if any, on each Payment Date, payable solely from the LC Reserve Account, equal to the least of: (x) the Excess Balance on such Payment Date, (y) the remainder of the balance of $100 million accumulated at 1.5% annual interest, as amortized by any amounts previously paid; and (z) the amount in the LC Reserve Account.

"Payment Date" means, unless the DST Note is prepaid in full, May 31 of each year starting on the first May 31 after the Effective Date (or starting on the first business day that is at least thirty (30) days after the Effective Date if the Effective Date occurs between May 1 and May 31) (the "First Payment Date") until the fifteenth anniversary of the First Payment Date.

"Plan Year" means the period from February 1 to and including January 31 of the following year.

"Required Percentage" means an amount equal to 12% of a Local Council's payroll, less any pension plan related expenses which are estimated to be approximately 0.50% of such payroll, less the Local Council employer contribution match for employee contributions to the section 403(b) defined contribution benefit plan, which percentage will not exceed 4.5% of participating employee payroll until at least $50 million of the DST Note principal has been paid, at which point the employer contribution match percentage will not exceed 6% until the DST Note has been paid in full (principal and interest).

*[Remainder of Page Intentionally Left Blank]*

**EXHIBIT G**

**LOCAL COUNCILS**

Abraham Lincoln
Alabama-Florida
Alamo Area
Allegheny Highlands
Aloha
Andrew Jackson
Anthony Wayne Area
Arbuckle Area
Atlanta Area
Baden-Powell
Baltimore Area
Bay Area
Bay-Lakes
Black Hills Area
Black Swamp Area
Black Warrior
Blackhawk Area
Blue Grass
Blue Mountain
Blue Ridge
Blue Ridge Mountains
Buckeye
Buckskin
Bucktail
Buffalo Trace
Buffalo Trail
Caddo Area
Calcasieu Area
California Inland Empire
Cape Cod and Islands
Cape Fear
Capitol Area
Cascade Pacific
Catalina
Central Florida
Central Georgia
Central Minnesota
Central North Carolina
Chattahoochee
Cherokee Area (469)
Cherokee Area (556)
Chester County
Chickasaw
Chief Cornplanter
Chief Seattle
Chippewa Valley

Choctaw Area
Cimarron
Circle Ten
Coastal Carolina
Coastal Georgia
Colonial Virginia
Columbia-Montour
Connecticut Rivers
Connecticut Yankee
Conquistador
Cornhusker
Coronado Area
Cradle of Liberty
Crater Lake
Crossroads of America
Crossroads of the West
Dan Beard
Daniel Boone
Daniel Webster
De Soto Area
Del-Mar-Va
Denver Area
East Carolina
East Texas Area
Erie Shores
Evangeline Area
Far East
Five Rivers
Flint River
French Creek
Gamehaven
Garden State
Gateway Area
Georgia-Carolina
Glacier's Edge
Golden Empire
Golden Gate Area
Golden Spread
Grand Canyon
Grand Columbia
Grand Teton
Great Alaska
Great Rivers
Great Salt Lake
Great Smoky Mountain
Great Southwest

Great Trail
Greater Alabama
Greater Hudson Valley
Greater Los Angeles Area
Greater New York
Greater Niagara Frontier
Greater St. Louis Area
Greater Tampa Bay Area
Greater Wyoming
Greater Yosemite
Green Mountain
Greenwich
Gulf Coast
Gulf Stream
Hawk Mountain
Hawkeye Area
Heart of America
Heart of New England
Heart of Virginia
Hoosier Trails
Housatonic
Illowa
Indian Nations
Indian Waters
Inland Northwest
Iroquois Trail
Istrouma Area
Jayhawk Area
Jersey Shore
Juniata Valley
Katahdin Area
Lake Erie
Las Vegas Area
LaSalle
Last Frontier
Laurel Highlands
Leatherstocking
Lincoln Heritage
Long Beach Area
Longhorn
Longhouse
Longs Peak
Los Padres
Louisiana Purchase
Marin
Mason-Dixon

Mayflower
Mecklenburg County
Miami Valley
Michigan Crossroads
Mid-America
Middle Tennessee
Mid-Iowa
Midnight Sun
Minsi Trails
Mississippi Valley
Mobile Area
Monmouth
Montana
Moraine Trails
Mount Baker
Mount Diablo Silverado
Mountain West
Mountaineer Area
Muskingum Valley
Narragansett
National Capital Area
Nevada Area
New Birth of Freedom
North Florida
Northeast Georgia
Northeast Illinois
Northeast Iowa
Northeastern Pennsylvania
Northern Lights
Northern New Jersey
Northern Star
Northwest Georgia
Northwest Texas
Norwela
Occoneechee
Ohio River Valley
Old Hickory
Old North State
Orange County
Oregon Trail
Ore-Ida
Overland Trails
Ozark Trails
Pacific Harbors
Pacific Skyline
Palmetto

Pathway to Adventure
Patriots' Path
Pee Dee Area
Pennsylvania Dutch
Piedmont
Piedmont
Pikes Peak
Pine Burr Area
Pine Tree
Pony Express
Potawatomi Area
Prairielands
Puerto Rico
Pushmataha Area
Quapaw Area
Quivira
Rainbow
Redwood Empire
Rio Grande
Rip Van Winkle
Rocky Mountain
Sagamore
Sam Houston Area
Samoset
San Diego-Imperial
San Francisco Bay Area
Santa Fe Trail
Seneca Waterways
Sequoia
Sequoyah
Shenandoah Area
Silicon Valley Monterey Bay
Simon Kenton
Sioux
Snake River
South Florida
South Georgia

South Plains
South Texas
Southeast Louisiana
Southern Sierra
Southwest Florida
Spirit of Adventure
Suffolk County
Susquehanna
Suwannee River Area
Tecumseh
Texas Southwest
Texas Trails
Theodore Roosevelt
Three Fires
Three Harbors
Three Rivers
Tidewater
Transatlantic
Trapper Trails
Tukabatchee Area
Tuscarora
Twin Rivers
Twin Valley
Ventura County
Verdugo Hills
Virginia Headwaters
Voyageurs Area
W.D. Boyce
Washington Crossing
West Tennessee Area
Westark Area
Western Los Angeles County
Western Massachusetts
Westmoreland-Fayette
Winnebago
Yocona Area
Yucca

**EXHIBIT H**

**RELATED NON-DEBTOR ENTITIES**

Arrow WV, Inc.
Atikaki Youth Ventures Inc.
Atikokan Youth Ventures Inc.
BSA Asset Management, LLC
BSA Endowment Master Trust
Learning for Life
National Boy Scouts of America Foundation

# EXHIBIT I

## INSURANCE SETTLEMENTS

**Hartford Insurance Settlement.**  The Plan incorporates the Hartford Insurance Settlement Agreement, which, upon its execution by all of the parties thereto, shall be filed with the Plan Supplement and attached hereto as Exhibit I-1, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Hartford Policies set forth in the Hartford Insurance Settlement Agreement (the "Hartford Insurance Settlement"), pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Hartford Insurance Settlement Agreement, (ii) the assignment of the Local Council Policies issued by Hartford to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv) the sale by the Debtors and the Estates, and the purchase by Hartford, of the Hartford Policies, free and clear of all Interests of any Person or Entity (as such terms are defined in the Hartford Insurance Settlement Agreement; for the avoidance of doubt, the term "interests" as used in Article V.S.4 of the Plan and this description shall have the meaning given to the term "Interests" in the Hartford Insurance Settlement Agreement, rather than as such term is defined in Article I of the Plan), (v) the settlement, compromise and release of the Hartford Released Claims (as defined in the Hartford Insurance Settlement Agreement) as provided in the Hartford Insurance Settlement Agreement, (vi) the Allowance of the Hartford Administrative Expense Claim, and (vii) certain other settlements, compromises, and releases as set forth in the Hartford Insurance Settlement Agreement. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and Allowance of the Hartford Administrative Expense Claim and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to Hartford, including findings and conclusions designating Hartford as a good-faith purchaser of the Hartford Policies.

**Century and Chubb Companies Insurance Settlement.**  The Plan incorporates the Century and Chubb Companies Insurance Settlement Agreement, which, upon its execution by all of the parties thereto, shall be filed with the Plan Supplement and attached hereto as Exhibit I-2, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Century and Chubb Companies Policies set forth in the Century and Chubb Companies Insurance Settlement Agreement (the "Century and Chubb Companies Insurance Settlement"), pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Century and Chubb Companies Insurance Settlement Agreement, (ii) the assignment of the Local Council Policies issued by the Century and Chubb Companies to the Debtors and the Estates, as applicable, (iii) the Participating Chartered Organization Insurance Assignment, (iv) the sale by the Debtors and the Estates, and the purchase by the Century and Chubb Companies, of the Century and Chubb Companies Policies, free and clear of all Interests of any Person or Entity (as such terms are defined in the Century and Chubb Companies Insurance Settlement Agreement; for the avoidance of doubt, the term "interests" as used in Article V.S.4 of the Plan and this description shall have the meaning given to the term "Interests" in the Century and Chubb Companies Insurance Settlement Agreement, rather than as such term is defined in Article I of the Plan), and (v) certain other settlements, compromises, and releases as set forth in the Century and Chubb Companies Insurance Settlement Agreement. The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions

of law pertaining to such approval, in form and substance acceptable to the Century and Chubb Companies, including findings and conclusions designating the Century and Chubb Companies as a good-faith purchaser of the Century and Chubb Companies Policies.

**EXHIBIT I-1**

**HARTFORD INSURANCE SETTLEMENT AGREEMENT**

*(to be supplemented; refer to D.I. 6210-1 for the Hartford Term Sheet)*

**EXHIBIT I-2**

**CENTURY AND CHUBB COMPANIES INSURANCE SETTLEMENT AGREEMENT**

*(to be supplemented; refer to D.I. 7745-1 for the Century and Chubb Companies Term Sheet)*

**EXHIBIT J-1**

**TCJC SETTLEMENT AGREEMENT**

*(to be supplemented; refer to D.I. 6210-2 for the TCJC Term Sheet)*

# EXHIBIT K

**~~NON-PARTICIPATING~~ CHARTERED ORGANIZATIONS THAT ARE DEBTORS IN BANKRUPTCY**

**(SUBJECT TO CHANGE)**

> **THE FOLLOWING IS A LIST OF CHARTERED ORGANIZATIONS THAT THE BSA IS AWARE ARE CURRENTLY DEBTORS IN BANKRUPTCY.   IF THE BSA BECOMES AWARE OF ADDITIONAL CHARTERED ORGANIZATIONS IN BANKRUPTCY, IT WILL PROMPTLY REVISE THIS EXHIBIT.**

\*     Indicates any Chartered Organization listed below that has advised the Debtors' counsel in writing that it wishes to be treated as a Participating or Contributing Chartered Organization, as applicable.

1.     Archbishop of Agaña, a Corporation Sole, Chapter 11 Debtor in Possession, District Court of Guam, Territory of Guam, Bankruptcy Division, Case 19-00010.

2.     The Diocese of Buffalo, N.Y., Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Western District of New York, Case No. 20-10322.

3.     The Diocese of Rochester, Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Western District of New York, Case No. 19-20905.

4.     The Roman Catholic Diocese of Syracuse, New York, Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Northern District of New York, Case No. 20-30663.

5.     The Roman Catholic Diocese of Rockville Centre, New York, Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Southern District of New York, Case No. 20-12345.

6.     Roman Catholic Church of the Archdiocese of Santa Fe, Chapter 11 Debtor in Possession, United States ~~District~~Bankruptcy Court for the District of New Mexico, Case No. 18-13027.

7.     The Norwich Roman Catholic Diocesan Corporation, Chapter 11 Debtor in Possession, United States ~~District~~Bankruptcy Court for the District of Connecticut, Case No. 21-20687.

8.     All Saints Episcopal Church, Chapter 11 Debtor in Possession, United States Bankruptcy Court for the Northern District of Texas, Case No. 21-42461.

> **THE FOLLOWING IS A LIST OF CHARTERED ORGANIZATIONS (IN ADDITION TO CHARTERED ORGANIZATIONS THAT ARE CURRENTLY DEBTORS IN BANKRUPTCY) THAT HAVE ELECTED TO OPT OUT OF BECOMING CONTRIBUTING OR PARTICIPATING CHARTERED ORGANIZATIONS.**

None.

# SCHEDULE 1

# ARTWORK

**SCHEDULE 2**

**BSA INSURANCE POLICIES**

## SCHEDULE 3

## LOCAL COUNCIL INSURANCE POLICIES

# SCHEDULE 4

## OIL AND GAS INTERESTS