# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br>Objection Deadline: 12/20/21 @ 4:00 p.m.<br>Hearing Date: 12/21/21 @ 2:00 p.m.<br>Ref. Dkt. No. 7769 |

### JOINT OBJECTION OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE AND THE FUTURE CLAIMS REPRESENTATIVE TO CERTAIN INSURERS' (I) MOTION TO MODIFY THE CONFIRMATION SCHEDULING ORDER AND (II) MOTION FOR AN EXPEDITED HEARING ON SAME

The Coalition of Abused Scouts for Justice (the "Coalition") and the Future Claims Representative (the "FCR"), by and through their undersigned counsel, hereby object to the *Certain Insurers' (I) Motion to Modify the Confirmation Scheduling Order and (II) Motion for an Expedited Hearing on Same* (Dkt. No. 7769) (the "Motion"). In support of this Objection, the Coalition and the FCR respectfully state as follows.

### INTRODUCTION

1. In the Motion, and at multiple hearings, the insurers have advanced a false narrative regarding certain "proposed findings" (the "Proposed Findings"). Specifically, as part of the plan settlement with the BSA and the Local Councils, the Coalition and the FCR negotiated for and received a requirement that the confirmation order include certain Proposed Findings as a condition to confirmation so that the Debtors' most valuable assets—their insurance assets—

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

would be preserved for the Survivors' benefit. The Proposed Findings are designed to ensure that the confirmation of the Plan[2] does not destroy the value of these insurance assets. Failing to protect these insurance assets would be a betrayal of Survivors and could render the Plan unconfirmable, because the insurance assets would arguably be worth more in a chapter 7 liquidation without the Proposed Findings.

2. The Coalition and the FCR intend to thoroughly brief these issues in the context of plan confirmation. But the insurers' unfortunate decision to raise the Proposed Findings as an excuse for extending the Plan confirmation timeline in connection with their Motion warrants a response. To this end, and as part of opposing the underlying relief sought in the Motion, the Coalition and the FCR make **three** points in an effort to begin to address the false narrative that the insurers have been presenting to the Court:

> A. The Proposed Findings for which the insurers seek discovery are neither remarkable nor items that require further discovery—they are Proposed Findings that are necessary in the context of this Plan and consistent in all respects with the Bankruptcy Code.
>
> B. The Plan's proposed TDPs are not driving the additional discovery that the insurers want; it is other, more harassing types of discovery that are driving the insurers' requests for an extension of the confirmation timeline, a point belied by the fact that the insurers are the only parties in these cases for whom delay and preventing distribution to Survivors is a paramount goal.

---

[2] Capitalized terms used and not defined herein have the terms ascribed to them in the *Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, dated December 18, 2021 (Dkt. No. 7832) (the "Plan").

  C. Having shown no reason for an extension of the Plan confirmation timeline, the insurers' Motion should be denied.

3. For the avoidance of doubt, however, to the extent that this Court delays the start date for the confirmation hearing by any number of days as a result of the Motion, the Coalition and the FCR believe that the Voting Deadline should be extended by the exact same number of days, for reasons that have been briefed and argued in other contexts.

## OBJECTION

**I. <u>The Proposed Findings Are Mandated by the Bankruptcy Code and Case Law</u>**

4. First, the insurers' assertion that the plan supporters are insisting on "unnecessary and overreaching findings" unrelated to the Bankruptcy Code is incorrect. *See* Motion at 2. Each of these Proposed Findings is related to specific provisions in the Bankruptcy Code that must be satisfied for the Debtors to confirm a global resolution plan that channels Abuse Claims to the Settlement Trust and grants non-consensual releases in favor of non-debtor third parties.

  A. <u>The Plan Must be Binding on All Parties in Interest</u>

5. Section 1141 of the Bankruptcy Code mandates that the plan be binding on all creditors. *See* 11 U.S.C. § 1141(a). And, in the Third Circuit, a confirmation order is *res judicata* as to all issues decided or which could have been decided at the confirmation hearing. *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018) (quoting *In re Szostek*, 886 F.2d 1405, 1408 (3d Cir. 1989)). Therefore, the Proposed Finding in Section IX.A.3.r of the Plan—"The Plan Documents (including the Plan) and the Confirmation Order shall be binding on all parties in interest consistent with applicable legal doctrines, including the doctrines of *res judicata* and collateral estoppel, and section 1141 of the Bankruptcy Code (and related legal authority)"—is actually unremarkable in that it adds nothing that the Bankruptcy Code and Third Circuit precedent

do not already require.  The insurers have not explained how this Proposed Findings, which is simply a statement of blackletter law, is overreaching or is fueling Plan discovery.

**B.   Insurance Assignment Is Consistent with Section 1123 of the Bankruptcy Code**

6.     The Proposed Findings contained in Section IX.A.3.j of the Plan—the approval of the Insurance Assignment—is consistent with section 1123 of the Bankruptcy Code and the Third Circuit's decision in *In re Federal Mogul Global, Inc.*, 684 F.3d 355, 369 (3d Cir. 2012).  To date, the insurers have failed to articulate a single reason why this Proposed Finding is remarkable or controversial.  Nor have the insurers explained how this Propose Finding is overreaching.  Further, this is a legal issue, and one that should be easily resolved in the Debtors' favor given that the assignment of non-debtor insurance rights is occurring "to the maximum extent permitted by applicable law."  Plan at §§ I.A.76, I.A.168 & I.A.191.  The insurers do not need discovery on a legal issue.

**C.   The *Master Mortgage* Factors Must be Satisfied**

7.     The Proposed Finding contained in Section IX.A.3.t of the Plan—that the Debtors' obligation to pay is the claim value and not simply what the Debtors can afford to pay—is mandated here by the fact that the Plan includes a channeling injunction and nonconsensual releases.

8.     Not all plans include settlements involving abuse (or other personal injury) claims against a debtor's estate.  Not all plans include non-consensual third-party releases that benefit over 250 non-debtor Local Councils and over ten thousand chartered organizations (or other third parties).  But the Debtors' Plan does.  What the Bankruptcy Code and case law require in this context is driven by what the Debtors' Plan seeks to accomplish.

9. The Coalition and the FCR believe that this Court will no doubt follow its prior decision in *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252 (Bankr. D. Del. 2017), and therefore will apply the *Master Mortgage* factors to the proposed third-party releases. Accordingly, the Court will require the Debtors to show that the Plan provides for "payment of all or substantially all" of the survivors' claims. *Id.* at 271-72. If the Plan is confirmed, Survivors will be enjoined from pursuing or continuing litigation against non-debtor Local Councils and protected non-debtor-Chartered Organizations, many of whom have substantial assets of their own.

10. As a factual matter, the Debtors will not be able to satisfy all of the *Master Mortgage* factors if the insurance assets are discharged or modified by the confirmation of the Plan and the TDPs. Even though most courts have held that an insurer cannot avoid its obligation to indemnify based on the insolvency of its insureds[3] (indeed, a provision confirming this principle is contained in standard-form policies), this is not a theoretical concern.[4]

---

[3] *See, e.g., Matter of Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993) ("[I]t makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge"); *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (reversing district court's finding that the insured's covered loss was the amount the settlement trust actually pays to tort victims on the ground that it conferred a "windfall" on the debtor's insurers and was contrary to applicable law); *In re Jet Fla. Sys., Inc.*, 883 F.2d 970, 975 (11th Cir. 1989) ("The 'fresh-start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured."); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, No. 03-3408, 2012 WL 734176, at *3 (D. Md. Mar. 6, 2012) ("The Bankruptcy Code is not intended to enable insurers to evade their indemnity obligations. The notion that bankruptcy of the insured should not accrue to the benefit of the insurers is well-established."); *ARTRA 542(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, No. 09-cv-458, 2011 WL 4684356, at *2 (N.D. Ill. Sep. 30, 2011) ("The court finds no support for Transport's assertion that the provisions prevent the trust from asserting that the policy language and Illinois law require Transport to indemnify it for any covered claims at the full amount of the claim rather than at the bankruptcy discount rate."); *see also Chapman v. Bituminous Ins. Co. (In re Coho Res., Inc.)*, 345 F.3d 338, 343 (5th Cir. 2003) (stating that it would be "fundamentally wrong" to "allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge") (citation omitted); *Tucker v. Am. Int'l. Grp., Inc.*, 745 F. Supp. 2d 53, 65 (D. Conn. 2010) ("[C]ourts have 'reasoned that the insurance company should not be entitled to gain a benefit that was not intended or in any way computed within the rate charged for its policy.'")

[4] *See Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1168 (N.D. Cal. 2016) (following *Fuller-Austin* and finding insurers' obligation to pay was the amount the trust paid to tort victims based on the trust payment percentage rather than the tort victims' actual damages); *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958, 997-98, 1000 (Cal Ct. App. 2006) (same).

11. But even if insurance law, or the polices themselves did not prevent such a windfall for the Debtors' insurers, the Bankruptcy Code does. The Bankruptcy Code makes it clear that the "discharge of a debt" of the Debtors "does not affect the liability of any other entity"—including the Debtors' insurers—for "such debt." 11 U.S.C. § 524(e).

12. Proposed Finding "T" is designed to preserve the status quo and prevent the insurers from using this bankruptcy to obtain a surreptitious discharge of their coverage obligations. Such a discharge—which would directly harm Survivors—is incompatible with section 524(e) of the Bankruptcy Code and with a Plan that channels over 80,000 Abuse Claims to a trust that is being funded, in part, with an assignment of insurance assets. For the Plan to provide for the "payment of all or substantially all" of the survivors' claims, the Court must determine that the insurance assets being assigned to the Settlement Trust are not impaired by the confirmation of the Plan.

### D. The Fair and Reasonable Finding

13. The Proposed Finding contained in Section IX.A.3.s of the Plan—that the TDPs are fair and equitable—is required here for at least two reasons.

14. **First**, the Plan and TDPs reflect a plan settlement of tort claims against the Debtors' estates, which must satisfy the "fair and equitable" standard under section 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019. *See, e.g.*, *In re Duro Dyne Nat'l Corp.*, No. 3:19-CV-15433-MAS, 2020 WL 6270691, at *73 (D.N.J. Oct. 23, 2020) (applying the "fair and equitable" standard in approving a settlement and mutual release of claims set forth in the plan of reorganization); *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (applying "fair and equitable" standard under Bankruptcy Rule 9019 to plan settlement involving claims against the debtors' estates); *In re G-I Holdings*, 420 B.R. 216, 256 (D.N.J. 2009) (applying the "fair and equitable" standard under Bankruptcy Rule 9019 to a global settlements of asbestos

personal injury claims asserted against the debtors); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832-35 (Bankr. D. Del. 2008) (because the plan definitions reflected a negotiated settlement of claims against the debtors' estates, the plan could not be confirmed unless the "fair and equitable" standard under Bankruptcy Rule 9019 was satisfied).

15.  For the Court to confirm the Plan, the Debtors must establish by a preponderance of the evidence that the Plan satisfies each of the requirements of section 1129(a) of the Bankruptcy Code.  *See Nutritional Sourcing*, 398 B.R. at 824.  Section 1129(a)(1) of the Bankruptcy Code, which provides that a plan must "compl[y] with the applicable provisions of this title," requires that a plan comply with section 1123 of the Bankruptcy Code.  When a plan includes a settlement of claims against the debtor, section 1123(b)(6) and Bankruptcy Rule 9019 mandate that such settlement satisfy the "fair and equitable" standard.  *Id.* at 832-34.

16.  As in *TK Holdings* and *G-I Holdings*, absent the Plan's settlement of Abuse Claims, as implemented through the TDPs, there would be costly and time-consuming litigation that would further reduce liquidity and value otherwise available to all creditors—not just the survivors.  As in *Nutritional Sourcing*, if the Plan settlement of Abuse Claims does not meet the "fair and equitable" standard, then Plan cannot be confirmed under sections 1129 and 1123 of the Bankruptcy Code.  The "fair and equitable" finding is what the Bankruptcy Code requires given the terms of the Plan.

17.  **<u>Second</u>**, since the Court's equitable power to approve the Channeling Injunction and involuntary release of claims against non-debtor third parties is grounded in sections 105(a), 1123(b)(6) and 1129(a)(1) of the Bankruptcy Code, the terms of that injunction—namely the TDPs—must provide a fair and equitable resolution of Abuse Claims being channeled.  *See In re Blitz U.S.A., Inc.*, No. 11-13603 (PJW), 2014 WL 2582976, at *5 (Bankr. D. Del. Jan. 30, 2014)

(approving channeling injunction of personal injury tort claims where the proposed TDPs provided for "a fair and equitable" mechanism for the liquidation of such claims); *In re Global Indus. Techs., Inc. (GIT)*, No. 02-21626 (JKF), 2013 WL 587366, *15 (Bankr. W.D. Pa. Feb 13, 2013) (approving channeling injunction for silica-related claims because the "GIT Plan is fundamentally fair and equitable" to holders of such claims in that the GIT Plan, the TDPs, and the Trust Agreement provided appropriate mechanisms for the payment and valuation of such claims).

18. The Third Circuit has made it clear that equitable powers authorized by section 105(a) of the Bankruptcy Code must be invoked to "achieve fairness and justice in the reorganization process." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235-36 (3d Cir. 2004). Section 105(a) can be invoked **only if** doing so achieves a fair and equitable result. *Id.*; *accord Blitz U.S.A.*, 2014 WL 2582976, at *5; *GIT*, 2013 WL 587366, *15.

19. The Debtors are asking the Court to invoke section 105(a) to approve the Channeling Injunction, which is consistent with this Court's holding in *Millennium Lab*. 575 B.R. at 272 (non-debtor releases must comply with the applicable provisions of the Bankruptcy Code: "§§ 1129(a)(1), 1123(b)(6) and 105[a]"). If the channeling of Abuse Claims under the Plan does not achieve a fair and equitable result for Survivors, then sections 105(a), 1123(b)(6) and 1129(a)(1) cannot be invoked.

20. It would be anathema to section 105(a) to channel approximately 80,000 Abuse Claims to a trust where they would be liquidated and paid pursuant to procedures that are arbitrary and capricious. The claim values, scaling factors, and gating criteria, based on and rooted primarily in the Debtors' historical settlement practices and experience in the tort system, achieve a fair and equitable result. The insurers argue that this Court should not make a "fair and equitable" finding. But a Channeling Injunction that is not fair and equitable to Survivors is an injunction

that this Court cannot issue under sections 1129(a)(1), 1123(b)(6) and 105(a) of the Bankruptcy Code. Without the "fair and equitable" finding, the Plan is unconfirmable.

### E.     The Good Faith Finding

21.     The Proposed Finding in Section IX.A.3.u of the Plan—the good faith finding—also mirrors what section 1129 and applicable case law already provide. Section 1129(a)(3) of the Bankruptcy Code requires that the plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Third Circuit has stated that the "touchstone" of the good faith inquiry is "the plan itself and whether it will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[5]

22.     The factors that courts in the Third Circuit consider in determining a debtor's good faith include if the plan: (a) fosters a result consistent with the Bankruptcy Code's objectives; (b) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (c) exhibits a fundamental fairness in dealing with the creditors. *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013). The "most important feature" of the good faith inquiry is "the fundamental fairness of the plan." *In re Hercules Offshore, Inc.*, 565 B.R. 732, 764 (Bankr. D. Del. 2016) (citing *Am. Capital Equip.*, 688 F.3d at 157).

23.     As the court in *Frascella Enterprises* found: "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of [section] 1129(a)(3) is satisfied. … Bad faith, on the other hand, has been

---

[5] *In re Frascella Enters., Inc.*, 360 B.R. 435, 446 (E.D. Pa. 2007) (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)); *see In re Am. Capital Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012) ("In analyzing whether a plan has been proposed in good faith under § 1129(a)(3), 'the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'") (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004)).

found where there is no realistic possibility of reorganization and the debtor seeks merely to frustrate efforts of [] creditors." 360 B.R. at 446 (citations omitted).

24.     The court in *In re Maremount Corporation* found that the focus of the good faith inquiry, in the context of a mass tort bankruptcy, is whether the plan provides "a fair and equitable" resolution of the personal injury claims. 601 B.R. 1, 20 (Bankr. D. Del. 2019) (Chapter 11 Plan was proposed "in good faith" where it was "proposed with the legitimate purpose of providing a fair and equitable resolution of the Debtors' Asbestos Personal Injury Claims and maximizing the returns available to creditors and other parties in interest.").

25.     Here, the Debtors are trying to confirm a global resolution plan. For such a plan to meet the good faith requirement in section 1129(a)(3) of the Bankruptcy Code, it must have a reasonable hope of success and exhibit a fundamental fairness in dealing with creditors. Thus, the Plan and the TDPs must exhibit fundamental fairness to the Survivors—the largest creditor constituency in these Chapter 11 Cases.

26.     Good faith here means that the Plan must provide a "fair and equitable" resolution of Abuse Claims. Given what "good faith" means in the context of section 1129(a)(3) of the Bankruptcy Code, this finding is not remarkable and should not be controversial because it mirrors what section 1129(a)(3) and applicable case law already provide.

27.     The insurers have failed to explain how the additional discovery they seek is relevant under section 1129(a)(3) and applicable case law. The discovery the insurers are seeking from law firms and vendors is not relevant to whether the Plan provides "a fair and equitable" resolution of Abuse Claims. It is not relevant to whether the Plan fosters a result consistent with the Bankruptcy Code's two principal objectives: "facilitating the reorganization and rehabilitation of the debtor as an economically viable entity" and "protecting creditors' interests by maximizing

the value of the bankruptcy estate." *See In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 303 (3d Cir. 2010). And it is not relevant to whether the Plan has been proposed with honesty and good intentions and with a basis for expecting that a reorganization can occur.[6]

28. Under the Plan, no Abuse Claims will be liquidated under the TDPs until ***after*** the Debtors have reorganized. The Plan does not require this Court to hear or decide a single Abuse Claim or determine whether some, all or none of those Abuse Claims are valid. Abuse Claims that are invalid will not survive the gating criteria in the TDPs and/or the TDPs' procedures for preventing fraudulent claims from being paid. The concern here should be what those procedures are and not whether invalid claims exist.

29. The insurers' endless attacks on the number of claims filed by conscientious state court counsel have nothing to do with the concept of "good faith" under section 1129(a)(3) of the Bankruptcy Code and applicable case law and are an effort to deflect from the real issue of whether the Plan treats Survivors fairly. Moreover, because the insurers vigorously opposed the claims estimation efforts proposed by the Coalition and the FCR earlier in these cases, their arguments regarding the merits of individual claims should be reviewed with skepticism.

## II. The TDPs Are Not Driving the Discovery

30. Next, the insurers are wrong in claiming that "the Debtors' insistence on specific components of the TDPs and certain plan findings are largely responsible for the litigation delays" and professional fee spend. Motion at 4. Putting aside the fact that the Proposed Findings are

---

[6] The Coalition and the FCR submit that insurers here are litigating good faith—as they do in nearly every mass tort bankruptcy—to set up a post-confirmation coverage defense that the Debtors breached their purported obligation to cooperate with the insurers. *See, e.g.,* Allianz Insurers' Objection and Limited Joinder to Certain Objections [to Disclosure Statement] at 3 [ECF 3549] ("[T]he Disclosure Statement does not divulge the possibility that the Debtors' pre- and post-petition conduct, including, but not limited to, the following may give rise to valid Insurance Coverage Defenses . . . . (iv) the establishment of **Trust Distribution Procedures and a Claims Matrix which, collectively, purport to vest the Settlement Trustee with discretion to make distributions to holders of facially invalid Abuse Claims**, such as Abuse Claims that were tardily filed and/or invalid under applicable statutes of limitation or similar laws.") (emphasis added).

11

mandated by section 1129 of the Bankruptcy Code given the Plan proposed by the Debtors, the Proposed Findings mirror the issues the insurers were ***always*** going to litigate.

31. The insurers were always going to contest good faith. *See* Dkt. No. 812. The insurers have been open about this since the beginning of the case. The insurers were always going to object to the TDPs. The insurers have been open about this the inception of the case. This is not surprising. The insurers have a playbook that they follow in mass tort cases. Before there was a Plan and TDPs, the insurers were planning on objecting and arguing that the Plan is not proposed in good faith and that the TDPs are not reasonable.

32. If the insurers are going to follow that playbook here and object to the Plan and the associated TDPs (which they clearly are), the Court will have to overrule those objections to confirm the Plan. If the Court sustains the objections, the Debtors may be headed for liquidation. But if the Court overrules those objections, the Court will have to make findings consistent with that ruling. Here, those findings will necessarily include findings regarding the Debtors' good faith and the TDPs ***because*** those are the issues that the insurers were always going to litigate.

33. The insurers assert that the Proposed Findings are fueling the discovery here. Changing the Proposed Findings would have **no impact** on plan discovery. **None**. The Coalition and the FCR have never thought that they could keep the insurers here from litigating good faith or arguing that the TDPs are unreasonable: the Coalition and the FCR have simply sought to minimize the damage to victims from the insurers' approach, by confirming in the Plan that they will not be forced to litigate these issues again after confirmation.

34. To put a fine point on this issue—insurers in mass tort bankruptcies object to TDPs even where an "insurance neutral" plan not only does **not** specifically request the findings at issue here but goes so far to as **exempt** the insurers from otherwise generally applicable findings of the

Court. For example, the plan in *In re Imerys Talc America*, Case No. 19-10289 (LSS) (Bankr. D. Del. Sept. 16, 2021) [Dkt. No. 4099 at § 11.4] contained the insurers' version of insurance "neutrality" and exempted the insurers from the *res judicata* effect of the confirmation order (and contained **none** of the findings that the insurers object to here), and the insurers **still** contested the TDPs and forced the debtors to incur substantial discovery costs. *See*, *e.g.*, Ltr. from S. Stamoulis to Hon. Silverstein, *In re Imerys Talc America, Inc.*, No. 19-10289 (LSS) (D. Del. Nov. 4, 2020) [Dkt. No. 2466] (arguing that TDPs enjoin and modify insurers' rights under their policies and inflate debtors' liability).

35.  In *Kaiser Gypsum*, the plan contained similar insurance neutrality language, again exempting insurers from otherwise generally applicable findings and determinations in the plan and confirmation order. *See, e.g.*, *In re Kaiser Gypsum Co.*, No. 20-cv-00537-GCM, 2021 WL 3215102, at *27 (W.D.N.C. July 28, 2021) (finding that "the Plan restores each insurer to the position it was in immediately prior to the Petition Date, with its rights and obligations under the applicable Asbestos Insurer Policies left undisturbed, ***as if the Debtors' bankruptcy had never occurred***") (emphasis added).

36.  The *Kaiser Gypsum* plan was entirely consensual among the debtors, the creditors' committee, and the future claimants' representative, and was accepted by 100% of the creditors in the only voting class. Nevertheless, the debtors' primary insurer (whose counsel represents AIG here) has appealed the confirmation order all the way up to the Fourth Circuit, arguing that the plan was not proposed in good faith **and** that the trust distribution procedures are improper. *See*, *e.g.*, Appellant's Opening Brief at 46-55, *In re Kaiser Gypsum Co.*, No. 21-1858 (4th Cir. Sept. 24, 2021) [Dkt. No. 55].

37. Any suggestion that the discovery here is being driven by the Proposed Findings, rather than by the insurers themselves, is simply untenable. The insurers have never said that they would not object to the fairness or reasonableness of the TDPs if any of the Proposed Findings were removed from the Plan. The insurers benefit from the payment holiday they enjoy during their policyholder's bankruptcy and the possibility that they could get an insolvency windfall in a case where they would otherwise have substantial payment obligations. Unlike every other party in the case, the insurers have no financial interest in an efficient resolution of the bankruptcy case in a manner that maximizes the value of the estate. This is the true driver of the plan discovery issued by the insurers—and all parties know this.

### III. Extension of Plan Confirmation Deadlines Is Not Warranted

38. Finally, the Coalition and the FCR would customarily give serious consideration to a request for an extension of time as a matter of professional courtesy, but after giving the matter due consideration, both the Coalition and the FCR have concluded that such an extension is not appropriate here. The insurers have already deposed the Debtors' witnesses and the FCR and they have obtained no facts to support their false narrative that Plan supporters (including the Settling Insurance Companies—*e.g.*, Hartford and Century) are all colluding against them.

39. The insurers have engaged in a campaign of intimidation directed at the law firms that would dare support the Debtors' Plan and allow for the Debtors to successfully reorganize. The requested extension here appears designed to give the insurers time to subpoena additional attorneys for deposition even though the deadline to complete fact discovery has passed. Attorneys that have devoted their lives to helping tort victims should not be treated this way.

40. The extension here is driven by the insurers' own conduct and appetite for litigation. The Debtors have made it clear that they are running out of money and must maintain

the existing deadlines. The Coalition and the FCR support the Debtors' position on this issue, particularly given that the costs associated with extending the deadlines would directly and negatively impact Survivors. If, however, the Court does entertain the insurers' request, the Coalition and the FCR respectfully request that the voting deadline be extended as well by a number of days equal to any extension of the commencement of the confirmation hearing. For the reasons set forth herein, the Motion should be denied.

| | |
|---|---|
| Dated: December 20, 2021<br>Wilmington, Delaware | MONZACK MERSKY AND BROWDER, P.A.<br><br>*/s/ Rachel B. Mersky*<br>Rachel B Mersky (DE No. 2049)<br>1201 North Orange Street<br>Suite 400<br>Wilmington, Delaware 19801<br>Telephone:   (302) 656-8162<br>Facsimile:    (302) 656-2769<br>E-mail:          RMersky@Monlaw.com<br><br>-and-<br><br>BROWN RUDNICK LLP<br>David J. Molton, Esq. (admitted *pro hac vice*)<br>Eric R. Goodman, Esq. (admitted *pro hac vice*)<br>Seven Times Square<br>New York, NY 10036<br>Telephone:   (212) 209-4800<br>E-mail:          DMolton@BrownRudnick.com<br>E-mail:          EGoodman@BrownRudnick.com<br><br>and<br><br>Sunni P. Beville, Esq. (admitted *pro hac vice*)<br>Tristan G. Axelrod, Esq. (admitted *pro hac vice*)<br>One Financial Center<br>Boston, MA 02111<br>Telephone:   (617) 856-8200<br>E-mail:          SBeville@BrownRudnick.com<br>E-mail:          TAxelrod@BrownRudnick.com<br><br>*Counsel to the Coalition of Abused Scouts for Justice* |

15

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Edwin J. Harron*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Sharon M. Zieg (No. 4196)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    rbrady@ycst.com
    eharron@ycst.com
    szieg@ycst.com

*Counsel to the Future Claimants' Representative*