```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

                                  .     Chapter 11
IN RE:                            .
                                  .     Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND         .
DELAWARE BSA, LLC,                .
                                  .     Courtroom No. 2
                                  .     824 North Market Street
                                  .     Wilmington, Delaware 19801
                                  .
                    Debtors.      .     Tuesday, December 21, 2021
. . . . . . . . . . . . . . . .         2:00 P.M.

                        TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                  UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:           Derek Abbott, Esquire
                          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                          1201 North Market Street, 16th Floor
                          Wilmington, Delaware 19899

                          - and -

                          Jessica C. Lauria, Esquire
                          Glenn Kurtz, Esquire
                          WHITE & CASE LLP
                          1221 Avenue of the Americas
                          New York, New York 10020


Audio Operator:           LaCrisha Harden

Transcription Company:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          (302)654-8080
                          Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

APPEARANCES (Cont'd):

For Century:               Tancred Schiavoni, Esquire
                           O'MELVENY & MYERS LLP
                           Times Square Tower
                           7 Times Square
                           New York, New York 10036

For Zalkin:                Thomas Patterson, Esquire
                           KTBS LAW LLP
                           1801 Century Park East, 26th Floor
                           Los Angeles, California 90067

For the United Methodist   Jeremy Ryan, Esquire
and Roman Catholic Ad      POTTER ANDERSON & CORROON LLP
Hoc Committee:             Hercules Plaza
                           1313 North Market Street, 6th Floor
                           P.O. Box 951
                           Wilmington, Delaware 19801

For the Coalition of       David Molton, Esquire
Abused Scouts for          BROWN RUDNICK LLP
Justice:                   7 Times Square
                           New York, New York 10036

For the U.S. Trustee:      David Buchbinder, Esquire
                           UNITED STATES DEPARTMENT OF JUSTICE
                           OFFICE OF THE UNITED STATES TRUSTEE
                           844 King Street, Suite 2207
                           Lockbox 35
                           Wilmington, Delaware 19801

For Zurich Insurers:       Mark Plevin, Esquire
                           CROWELL & MORING LLP
                           3 Embarcadero Center, 26th Floor
                           San Francisco, California 94111

For Tort Claimants:        Richard Pachulski, Esquire
                           PACHULSKI STANG ZIEHL & JONES LLP
                           10100 Santa Monica Blvd., 13th Floor
                           Los Angeles, California 90067

For Hartford Financial:    Philip Anker, Esquire
                           WILMERHALE
                           250 Greenwich Street
                           New York, New York 10007

APPEARANCES (Cont'd):

| | |
|---|---|
| For the Ad Hoc Committee of Local Councils: | Richard Mason, Esquire<br>WACHTELL, LIPTON, ROSEN & KATZ<br>51 West 52nd Street<br>New York, New York 10019 |
| For the Church of Jesus Christ of Latter Day Saints: | Adam Goldberg, Esquire<br>LATHAM & WATKINS LLP<br>1271 Avenue of the Americas<br>New York, New York 10020 |
| For Certain Insurers: | James Hallowell, Esquire<br>GIBSON DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, New York 10166 |
| For the FCR: | Kami Quinn, Esquire<br>GILBERT LLP<br>700 Pennsylvania Avenue, Suite 400<br>Washington, DC 20003 |

1

MATTER GOING FORWARD:

2

1. Certain Insurers' (I) Motion to Modify the Confirmation
Scheduling Order and (ii) Motion for an Expedited Hearing on

3

the Same (D.I. 7769, filed 12/14/21)

4

    **Court's Ruling:  103**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 11:06 a.m.)

2          THE COURT:  Good afternoon, counsel.  This is Judge

3   Silverstein.  We're here in the Boy Scouts of America

4   bankruptcy, Case 20-10343.

5          I will turn it over to debtor's counsel.

6          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

7   of Morris Nichols here for the debtors.

8          Your Honor, we do have a couple of announcements

9   that I will turn it over to Ms. Lauria to make here in a

10   moment.

11          Before we get there, Your Honor, I just want to

12   note, so the court is aware, Your Honor has seen and heard an

13   awful lot about various Twitter activity.  There has been an

14   increase in the last little bit on some tweets that are

15   particularly over the top, Your Honor.  The debtors have seen

16   those and are, you know, obviously evaluating alternatives,

17   but they remain quite concerning, Your Honor.  I just wanted

18   to give the court a head's up because we have notified the

19   Office of the United States Trustee and hope to speak to them

20   about that.

21          Other than that, Your Honor, I would like to turn

22   it over to Ms. Lauria for some good news.

23          THE COURT:  Okay.  Thank you.  If there is anything

24   further on that certainly that is appropriate for me let me

25   know; otherwise, I assume it will be handled elsewhere if

1  necessary.

2          Ms. Lauria.

3          MS. LAURIA:  Thank you, Your Honor.  Jessica

4  Lauria, White & Case, on behalf of the debtor.

5          I will be brief, Your Honor, but as Mr. Abbott

6  suggested, I do, once again, have good news to report.  In the

7  hours prior to this hearing the debtors, the coalition, the

8  future claimant's representative and the ad hoc committee of

9  local councils reached two additional settlements.

10          The first was with the ad hoc committee for the

11  United Methodist.  That settlement was filed with a mediator's

12  report, I believe it was the eighth mediator's report, at

13  Docket No. 7884, filed just prior to the hearing.  So parties

14  may not have had the opportunity to review that yet, but very

15  positive news.

16          The ad hoc committee of United Methodist has agreed

17  to support a contribution by the United Methodist of $30

18  million to the settlement trust over the course of three years

19  from the effective date of the plan.  They have also agreed to

20  support a $100 million fundraising campaign for the trust.

21  That $100 million fundraising campaign would be backstopped by

22  the growth payment obligation that I described at our last

23  hearing and that was embodied in the Century term sheet that

24  we discussed last week.  That is in exchange for protected

25  party status under the plan.

1          As the court will recall, last week, the agreement

2   with Century as well as the supplemental contributions from

3   the local councils enabled us to provide full protected party

4   status for the time period after 1976 for all chartered

5   organizations for that time period pre 1976 for all but the

6   United Methodist and Catholics it provided full protected

7   party status.  As we said, we wanted to keep working with the

8   United Methodist and the Roman Catholics to deliver a further

9   settlement with them.  And we have done that, as I said, with

10  the Roman -- excuse me, with the United Methodist.

11         The United Methodist have agreed to work with, what

12  has been called, the survivor working group on youth

13  protection initiatives.  They have agreed with the Boy Scouts

14  and the local councils to strengthen and grow the scouting

15  relationship for the next 15 years through the year 2036 as

16  one of our very valued chartered partners.  And, of course,

17  Your Honor, they have agreed to support the plan and cast

18  their indirect abuse claims ballot in favor of the plan.  So

19  that is very good news that we announced just prior rot the

20  hearing.

21         Your Honor, I am also happy to announce -- and the

22  mediators report has not been filed, this literally occurred

23  within moments of the hearing that the Boy Scouts, the ad hoc

24  committee of local councils, the future claimants

25  representative, and the coalition, and, again, everybody has

1  been working really hard, have now reached an agreement with

2  Mr. Plevin's client, Zurich.  We reached an agreement with

3  Zurich to sell back the Boy Scouts policies to Zurich for a

4  $52.5 million contribution to the trust.  Zurich will, and its

5  related entities, of course, receive protected party status

6  for that.

7          The Zurich agreement is substantially similar to

8  the terms of the Century deal that was previously announced

9  and filed with the court.  We will be, after the hearing,

10  filing a ninth mediator's report that attaches the executed

11  Zurich term sheet for all parties to review, but that is very

12  good news, I think, coming out of, again, the mediation.

13          As I've continued to say to the court, folks are

14  still working really hard to reach agreements all around and

15  it's always nice to be able to announce some of this good news

16  at the start of these hearings.

17          THE COURT:  Okay.  Thank you.

18          MR. PLEVIN:  Your Honor, if I could make one

19  comment.  I've been asked to state that in light of the

20  settlement Zurich Insurers, which have joined in the motion

21  that you are hearing later today on the schedule, have

22  withdrawn their participation in that motion.

23          THE COURT:  Thank you.

24          MR. MASON:  Your Honor, may I be heard for a

25  moment?

1              THE COURT:  Mr. Mason.

2              MR. MASON:  Yes.  Thank you, Your Honor.  Richard

3    Mason, Wachtell Lipton Rosen & Katz, for the ad hoc committee

4    of local councils.

5              Your Honor, I just wanted to echo briefly what Ms.

6    Lauria said, in particular, about the United Methodist

7    settlement.  The ad hoc committee of local councils was

8    intensively involved in the mediated negotiation of that deal.

9    We believe it is good for survivors and for scouting.  We

10   wholeheartedly support it, Your Honor.

11             We would like to thank the United Methodist ad hoc

12   committee for their diligence and their effort in reaching

13   this agreement.  We also thank the coalition, Your Honor, for

14   its efforts. Ove the past many months we've learned, through

15   intensive, literally, 24/7 mediations that the coalition are

16   very tough negotiators for their constituents and also we

17   think very constructive in reaching agreements to build, what

18   is currently the largest proposed abuse settlement fund in

19   U.S. history.  Much of the credit, we think, for that

20   milestone goes to them and, Your Honor, I just wanted to say I

21   would be remiss if I didn't say so on the record in commenting

22   on the United Methodist deal.

23             Thank you, Your Honor.

24             THE COURT:  Thank you.

25             Mr. Molton.

1      MR. MOLTON:  Your Honor, just a few remarks.  David

2   Molton of Brown Rudnick for the coalition.

3      I just want to express our gratitude to everybody

4   that has been involved in the mediation.  It's been very

5   difficult, very hard.  It's been occupying everybody's lives

6   24/7 for longer than I can remember.

7      I want to say,  Your Honor, we're not done with the

8   mediation yet and I'm sure Ms. Boelter -- Ms. Lauria would

9   have told you that as well.  So I just want to, you know,

10  express gratitude to everybody who is working hard.  We are

11  dealing with really difficult issues, difficult challenges,

12  Your Honor, but the good faith of the parties to the mediation

13  should not go unnoticed.

14      THE COURT:  Thank you.

15      Let's get to our agenda.

16      MR. ABBOTT:  Your Honor, the only agenda item on

17  for today is Agenda Item No. 1; that's Docket Item 7769, it's

18  the certain insurers' motion to extend the confirmation

19  schedule.  So I will turn it over to their counsel to present

20  the motion, Your Honor.

21      THE COURT:  Thank you.

22      MR. HALLOWELL:  Good afternoon, Your Honor.  This

23  is Jim Hallowell of Gibson Dunn & Crutcher speaking on behalf

24  of the certain insurers.

25      Your Honor, even at the time you entered the

1  scheduling order everyone acknowledged that the schedule was

2  extremely tight and that it would require the full cooperation

3  of the parties, the seamless completion of tasks and a healthy

4  dose of good luck to get it done.  Unfortunately, Your Honor,

5  we have had problems in all three areas.

6          As a result the few weeks that remain under the

7  current schedule are not enough time to complete all that must

8  be done if the confirmation hearing is to provide all

9  participants a fair opportunity to present their positions in

10  a manner that best aides the court.  We ask only for four

11  additional weeks and without that four weeks the insurers and

12  others will be materially prejudiced in their ability to

13  develop and present a complete record.

14          While the insurers have done their best to overcome

15  them there have been a litany of delays by the plan proponents

16  that have slowed the process.  The insurers have been diligent

17  in attempting to address those issues and as the debtors

18  response to this motion confirms, the insurers have not sat on

19  our hands when it comes to bringing our concerns about the

20  schedule to the court.  We did it in real time as this court

21  requested.

22          There are suggestions in the responses from the

23  debtors, and the coalition, and the FCR that the insurers have

24  sought delay as a tactic to defeat the plan, liquidating the

25  debtors in the process.  These contentions are deeply

1  misguided, Your Honor, and it is regrettable that these kinds

2  of accusations have been made.  We hope and expect that the

3  court understands from the manner in which we have comported

4  ourselves before you that the insurers have no such nefarious

5  intentions.

6          The insurers have worked day and night to comply

7  with the schedule just like we had participated in good faith

8  in all aspects of this proceeding.  We have done so because we

9  are all mindful of the tremendous importance of this matter to

10 the many stakeholders here.

11         In keeping with that the parties, including the

12 insurers, have cooperated to make adjustments along the way to

13 adhere to the schedule as much as possible.  Contrary to the

14 debtor's suggestions, prior to now the insurers have not asked

15 this court to move the confirmation hearing, but it is now

16 clear that extension of interim dates will no longer address

17 the piling of scheduling issues we now confront.

18         One category of delays that have had a far ranging

19 impact on the proceedings has involved document productions.

20 Document productions were required to be substantially

21 completed on November 5th.  Although the debtors quivering

22 with responses from a few insurers from among the more than a

23 dozen here the fact is the insurers complied with that

24 substantial completion deadline, but the debtors did not.

25         In fact, over half of the debtor's massive

1  production, roughly a million pages, was produced after that

2  November 5th deadline including documents produced as recently

3  as last week.  Even assuming those productions are now

4  complete weeks of the schedule have been lost because debtors

5  failed to meet the deadline that they had so strongly pushed

6  for in the first place.

7       Contrary to what they contend, Your Honor, the

8  debtors late produced documents have included many that are

9  directly relevant to the insurers plan confirmation

10 objections.  At the depositions the insurers have taken we

11 have repeatedly used as exhibits documents produced late by

12 the debtor; in many instances documents produced just hours or

13 days before.

14       The documents produced late by the debtors have

15 also included documents the insurers have been forced to

16 identify based on production (indiscernible). In fact,

17 throughout discovery production of TDP related documents has

18 been the subject of constant back and forth between the

19 parties and the insurers have needed to continue to insist

20 that the debtors make an appropriate production.  This

21 included our motion to compel filed in November, Your Honor,

22 which the court granted in part on November 19th; yet these

23 key documents continue to be produced late, often only after

24 more prodding from the insurers.

25       The result of this is that as late as Monday,

1  December 13th debtors have produced still additional documents

2  related to the TDP's.  The delayed production of documents was

3  prejudicial to the insurers in and of itself, but on a

4  compressed schedule like this one that delay directly resulted

5  in others resulting in the pile-up in the schedule the parties

6  currently picked up which takes us, Your Honor, to

7  depositions.

8            Depositions were supposed to be completed in this

9  matter by December 1st.  The insurers promptly noticed

10  depositions they wanted to take, and met, and conferred

11  appropriately with the parties, including the debtors, to

12  focus discovery proceeding by Rule 30(b)(6) as much as

13  possible, but only five depositions have been completed by

14  December 1st.

15            Since that time, as set out in our motion, seven

16  additional depositions have been taken.  Again, the insurers

17  have been diligent in completing these depositions as

18  expeditiously as possible, but the result is we're running to

19  the end of December, Your Honor, and fact discovery is still

20  not completed.  This week and next we have key depositions

21  still going forward including the debtor's 30(b)(6) deposition

22  on TDP negotiations which was just completed yesterday, Your

23  Honor, the coalition's 30(b)(6) witness, which is going

24  forward today, and the TCC's 30(b)(6) witness which is next

25  week.

1    Each of these witnesses will have testimony on a

2 host of issues that are critically important to the insurers

3 plan objections and we're just learning this information now

4 at the end of December.  The delays associated with the

5 coalition 30(b)(6) deposition are particularly egregious, Your

6 Honor, as their filing an opposition to this motion has made

7 abundantly clear the coalition and the FCR are the drivers

8 behind the proposed findings and orders that are the main

9 focus of the insurer's objections.  The coalition held the pen

10 with regard to the TDP's for the coalition insisted to this

11 court that it is not an entity and it refused to sit for a

12 30(b)(6) deposition.

13    On December 10th the court rejected that argument

14 and the coalition deposition is now going forward today, but

15 the damage is done, Your Honor.  The coalition's insistence

16 that it does not exist for Rule 30(b)(6) purposes has resulted

17 in a month of delay in obtaining highly relevant evidence and

18 has compromised the party's schedule.

19    As things now stand, Your Honor, instead of having

20 completed fact depositions over a month before objections to

21 the plan are due on January 10th, those depositions will be

22 completed only days before that important deadline

23 (indiscernible) and none of this is the fault of the insurers,

24 Your Honor.

25    Separate and apart from the depositions that were

1  to be completed by December 1st are the depositions of law

2  firms and aggregators that this court's rulings, which were

3  made in early December, have made clear should go forward.

4  These depositions are related to the law firms whose lawyers

5  signed large numbers of proofs of claim.  Those law firms are

6  affiliated with the coalition, Your Honor.

7          As coalition members these firms should be held to

8  the same high standard of cooperation as all other parties

9  here, yet they have aggressively avoided complying with the

10 discovery that this court ordered.  We have been stonewalled

11 through the meet and confer process and tied up in

12 negotiations and disputes regarding the samples of relevant

13 proofs of claim.  Some of these law firms even continue to

14 contend, Your Honor, despite your ruling to the contrary that

15 a subpoena is required for discovery.

16         The result is that this discovery has not yet been

17 completed and we will likely need to return to this court yet

18 again for an order compelling the document productions and

19 depositions the court has already ruled on to go forward.

20         THE COURT:  Mr. Hallowell, are any of those

21 depositions noticed?

22         MR. HALLOWELL:  The depositions have not been

23 scheduled, but we have served notices on the parties,

24 subpoenas.

25         THE COURT:  Okay.

1      MR. HALLOWELL:  None of this is the fault of the

2   insurers, Your Honor.  We have been diligent in seeking this

3   discovery from the law firms for months now.

4      There is also discovery related to information

5   disclosed for the first time in the November 30th plan

6   supplement.  This includes discovery regarding the selection

7   of Mr. Carey as the initial special review.  This issue was

8   caused entirely, Your Honor, by the debtors and the coalition.

9   It was, obviously, not anticipated when scheduling discovery

10  in the confirmation hearing.

11     The court has noticed that the nomination of Mr.

12  Carey effected the neutrality of the mediation. This is core

13  issue for confirmation.  We are obtaining deposition discovery

14  about this issue for the first time this week in the

15  depositions of the debtor and the coalition, but they have

16  produced no documents on this issue and they should be

17  required to do so.

18     In addition, plan supplement discovery the insurers

19  seek include discovery directed to three coalition lawyers who

20  have been proposed as trust advisory committee members.  This

21  discovery is also important, Your Honor, since the debtors and

22  the plan proponents are proposing that the settlement trust

23  will be able to adjudicate the rights of the insurers in a

24  binding way regarding individual abuse claims.

25     The qualifications of these coalition lawyers to

1   serve as trust fiduciaries, the manner in which they were

2   selected for the roles and the conflicts they may have given

3   their contingency fee interests and the outcomes of the trust

4   are all relevant to plan confirmation.  The current schedule

5   should be adjusted so that the insurers have the necessary

6   time to complete this discovery.

7           It also seems inevitable, Your Honor, as the

8   parties have discussed, that there will be significant

9   discovery about the voting process in this case.  Under the

10  current schedule this discovery is to take place in mid-

11  January after the deadline for serving confirmation objections

12  and immediately before the scheduled January 24th hearing.

13  This late discovery will further deplete the party's time and

14  resources to prepare for the hearing and to present

15  confirmation issues to the court.

16          The debtors contend that this discovery was always

17  contemplated, but that just devoids the issue, Your Honor.

18  This voting discovery, which was just a possibility when the

19  schedule was set, is now an (indiscernible) and it will

20  necessarily impact the remaining schedule at a critical time.

21          And while all this discovery, which should have

22  been completed weeks ago, is ongoing, Your Honor, expert

23  discovery will begin.  The expert discovery project here is

24  just as massive as fact discovery with, at least, 20 separate

25  experts noticed among the parties.

1          The debtors try to blame plan opponents for this,

2   lumping the insurers, the TCC and the Roman Catholic ad hoc

3   committee together, but the fact is the debtors are putting

4   forward, at least, six experts on issues of wide ranging as

5   plan feasibility, the TDP matrix and insurance allocation and

6   coverage issues which Your Honor has repeatedly stated will

7   not be addressed here.

8          The TCC has put forward a similarly broad range of

9   experts also with the focus on insurance issues.  The insurers

10  will need to depose all of these experts in a few remaining

11  schedule days.  Absent an adjournment, Your Honor, rebuttal

12  reports will be served on December 24th.  Under the current

13  schedule depositions are to be completed of experts by January

14  9th.  Given the Christmas holiday and the need to review the

15  expert materials before depositions the parties will need to

16  triple and quadruple track the taking and defending of expert

17  depositions all on the first week of January.

18          It is simply not reasonable to require the parties

19  to take and defend expert depositions on such a compressed

20  timeline and stacked up in such a manner.  Further, Your

21  Honor, under the current schedule the insurers' confirmation

22  objection brief will be due January 10th, the day after this

23  expert discovery is scheduled for completion.

24          It is impossible under such a schedule to provide

25  the court with the briefs that we will address in necessary

1  detail and with the benefit of the information gathered from

2  the fact (indiscernible) discovery the complex issues that the

3  court will need to address during the confirmation hearing.

4  And it does nothing to suggest, as the debtor does, that the

5  schedule always contemplated this.

6        The schedule also contemplated the production of

7  documents by November 5th and the completion of fact discovery

8  by December 1st which would have permitted some hope of

9  drafting confirmation briefs in a timely way, but the

10 departure from those deadlines, Your Honor, has meant that

11 everything is happening at once; document discovery, fact

12 depositions, expert discovery and briefing.  It is not

13 sustainable.

14        The complexity of the issues this court will face,

15 including the issues raised in response to the motions by the

16 TCC, the Zalkin firm, Roman Catholic ad hoc committee, and

17 even by the coalition underscores the need for careful

18 briefing of the issues that will arise during confirmation.

19 At the end of the day, Your Honor, all of the parties before

20 you in this action the insurers very much included are vested

21 in the success of this process.  Everyone wants the court to

22 get these very serious issues right.

23        Your Honor, we are here.  The insurers want this

24 process to work and the suggestions made by the debtor and the

25 coalition in their papers that the insurers "have no interest

1    in an efficient resolution of this bankruptcy," their words,

2    and that we are trying to just "derail the case" are false,

3    Your Honor.  There is no reason the insurers would want such

4    an outcome.  We simply request adequate time for a fair

5    process.

6           This brings me, Your Honor, to the debtor's

7    resources.  The debtors have said that Your Honor has no

8    choice but to proceed on the current schedule because their

9    cash position precludes any delay at all of the confirmation.

10   But this circumstance is a problem of the debtor's own making

11   and they cannot now use it to deny due process to the

12   insurers.

13          The debtors plan here is not plain vanilla;

14   everyone knows that.  It includes the highly contested

15   findings of orders which seek to bind the insurers to outcomes

16   determined in the future by the settlement trustee exercising

17   broad and unsupervised discretion.  The plan also includes TDP

18   components that bear no relation to the resolution of abuse

19   claims in the tort system.

20          It is the coalition and the FCR's insistence on

21   these findings and TDP components, and the debtor's response

22   to you in a footnote in their brief that they're working on

23   it.  That is the cause of the sheer magnitude of the discovery

24   here and its intended costs and delays.

25          The debtors claim that the brief adjournment

1  requested here by the insurers will reduce their cash

2  contribution to the trust to zero; not so, Your Honor.  Even

3  on the current timeline the debtors and their financial

4  advisor project the debtor's estimated contribution to the

5  settlement trust at emergence will be zero.  The insurers'

6  adjournment request made here simply has nothing to do with

7  the debtor's contribution to the trust.

8          It is also notable that the debtors have not

9  considered any reasonable alternative methods to resolve any

10 current financial needs they have.  Most obviously, Your

11 Honor, the plan still contemplates an $18 million voluntary

12 cash payment to the coalition for its professional fees, fees

13 that are not owed by any of the survivors here and are solely

14 responsible -- solely the responsibility of the coalition

15 member firms.

16         It does not answer the issue, Your Honor, to simply

17 say that this amount will go to the settlement trust if it

18 doesn't go to the coalition.  These are amounts that the plan

19 proponents could agree now to use to fund these cases.  It

20 also bears mention that the debtors are an ongoing entity,

21 Your Honor.  They generate funds from membership and other

22 sources that could be used to fund their Chapter 11 expenses.

23 Their resources also include restricted funds and investments

24 that can be used consistent with donor's intent.  Ongoing

25 donations from generous and long-standing donors have been

1  made, access to credit facilities are available, and millions

2  in retained cash investments set aside for continuing

3  operations.

4        Any one of these resources, Your Honor, could be

5  called upon by the debtors to assisted funds at this point.

6  In the face of all this, Your Honor, the debtor's financial

7  position is not a basis to deny the insurers due process and

8  fundamental fairness (indiscernible).

9        Your Honor, at the end of September when you set

10  the schedule you indicated an openness to adjusting it should

11  circumstances warrant it.  The insurers expressed their

12  concerns then, but worked mightily to meet the schedule over

13  the ensuing months. It is simply apparent now for all the

14  reasons we have discussed that an adjustment to the schedule

15  is made.

16        Your Honor, we ask that you briefly extend this

17  highly compressed schedule by an additional four weeks from

18  January 24th to February 27th to allow due process and

19  fundamental fairness to the objectors.  Your Honor, with that

20  I am happy to answer any questions you have.

21        THE COURT:  Mr. Hallowell, one of the responses

22  suggested a bifurcated process where something would start

23  going forward on the current date, January 24th, and other

24  matters that still require discovery could go forward later.

25  Quite frankly, bifurcation is something I had given some

1  thought to as I was thinking about this matter.  Is that

2  something that the insurers have given any thought to?

3           MR. HALLOWELL:  That is an issue that we would meet

4  and confer about and see if we can reach an appropriate

5  resolution.  You have heard our concerns, Your Honor.  We need

6  to elongate the proceeding in a manner that will allow us to

7  bring our confirmation objections in a reasonable way, will

8  allow us to complete the discovery that needs to be completed

9  and will allow us to present the issues that we have to Your

10  Honor in an appropriate way.

11           If we can do that with some of the phasing that has

12  been suggested -- and perhaps we can, perhaps we can identify

13  issues in a narrow way that allows that to go forward then,

14  yes, that is something that we could consider.

15           THE COURT:  Okay.  Thank you.

16           Let me hear from the debtors first -- wait, let me

17  ask, there were some parties who also would like to see an

18  extension and I think that includes the catholic committee.

19           Mr. Ryan.

20           MR. RYAN:  Thank you, Your Honor.  Jeremy Ryan on

21  behalf of the Roman Catholic ad hoc committee.

22           Your Honor, we join in everything that Mr.

23  Hallowell just stated, but on top of that with respect to the

24  Roman Catholic ad hoc committee last Monday the fundamental

25  nature and premise of this plan changed and the fundamental

1  premise now is that any settling insurer who provided

2  insurance coverage the BSA, the local councils or any roman

3  catholic entity for abuse claims, all of those policies are

4  gone.  We had spent the last three months on the premise that

5  we were only involving the BSA policies and the local council

6  policies.

7            Now the plan seeks to effect Roman Catholic

8  chartering organizations own policies and any other policies

9  obtained by third parties that provide insurance coverage for

10  abuse claims to a Roman Catholic charter. That is

11  fundamentally different, Your Honor. That is in the last week.

12            In addition to that the plan has changed

13  specifically with respect to the Roman Catholic chartering

14  organizations.  The old plan, as we put in the paper, Your

15  Honor, was a pre and post 1976 dichotomy.  There was a full

16  release post 1976.  You were on your own pre 1976, you could

17  opt-out, keep all of your insurance rights in every policy.

18  And pre 1976 you kept all of your insurance rights in the

19  local council's policies.  That has changed fundamentally.

20            So now the offer on the table is if you object you

21  still get an injunction covering any insurance policy that

22  provided coverage to an additional insured under BSA.  Any

23  insurance policy that provided coverage to a Roman Catholic

24  chartered organization has an additional insured under local

25  council policies, and nay insurance policy that provides

1  coverage obtained elsewhere to a Roman Catholic chartered

2  organization.  If you object to the plan that is all you get.

3  If you don't object to the plan you still get a full post 1976

4  release.

5          The fundamental issue, Your Honor, is coverage and

6  that is exactly what the Century term sheet says, covered

7  under insurance policies.  Boy Scouts has consistently and the

8  local councils have consistently denied that policies provided

9  coverage to chartered organizations at additional insureds.

10 The insurance companies have never said that their policies

11 provide coverage to additional insurers.

12         We don't know what this means.  We need the Boy

13 Scouts, the local councils and most importantly any insurance

14 company that looks to settle has to tell us what policies

15 provide coverage for additional insureds because without

16 knowing that, Your Honor, a Roman Catholic entity can't know

17 what injunction is on the table for free, what injunction

18 remains if you object.

19         More importantly, Your Honor, because this seeks to

20 invade Roman Catholic chartered organizations own insurance

21 policies we need to know from the insurance companies what

22 those policies are.  We can put aside for the moment whether

23 that can be accomplished, but if they want to assign a policy

24 brought by a church from Century to a trust they need to tell

25 us what policies they want to do.

1        As we laid out an example in the joinder, Your

2   Honor, just one diocese in Buffalo has 161 parishes.  Those

3   parishes all bought their own insurance. Century wrote

4   policies to a lot of those insurance companies. It is public

5   record.  Mr. Schiavoni entered his appearance in that

6   bankruptcy case because of that fact.

7        There could be tens, hundreds or thousands and that

8   is one of 200 diocese across the United States.  We have no

9   idea what insurance policies Century and Hartford are seeking

10  to compromise that were not purchased by Boy Scouts or the

11  local councils. They should tell us that.

12       THE COURT:  Mr. Ryan, I thought your objection was

13  interesting in that you treated this, as your arguing it now,

14  as a factual issue and that the Roman Catholic dioceses,

15  parishes, churches need to know what insurance policies they

16  bought that are being swept into this plan.  Presumably the

17  dioceses, parishes know what policies they own; although,

18  maybe it's a fair statement to say we want to know if there is

19  agreement out there about what we own that may provide

20  coverage.

21       I don't recall that you raised it really as a legal

22  issue as to whether, in fact, the policies bought by the

23  diocese and the parishes can be swept into the case.  Am I

24  getting that correct?

25       MR. RYAN:  You're correct, Your Honor. That is an

1  issue for confirmation.  Today is not the day to have that.

2  What we need to know and what the insurance carriers know is

3  the policies they wrote; not just to a church, but to a

4  diocese who is not a chartered organization.

5        There are non-chartered organizations who bought

6  policies for chartered organizations and additional insureds.

7  We know that because the local councils did it, diocese do it.

8  The carriers know who they wrote policies too.

9        As we know from the debtor's own disclosure

10  statement for a non-profit to go back 70 or 80 years and do an

11  insurance archeology is an enormous undertaking.  Why should

12  that burden be put upon people who don't want their policies

13  to be compromised.  Those who are asking to do it, those who

14  are asking to take an asset and transfer it to a trust should

15  identify the assets they want transferred to the trust.  And

16  the assets they want transferred to the trust are policies --

17  I'm sorry.

18        THE COURT:  No.  That's okay.

19        UNIDENTIFIED SPEAKER:  It's a --

20        THE COURT:  I'm talking to Mr. Ryan.

21        So if the -- well there seem to be two things going

22  on there, Mr. Ryan.  One is factual knowledge -- I guess I

23  understand we want to know what the insurance companies think

24  are the universe of policies, but if, in fact, the Roman

25  Catholic ad hoc committee is going to object on any of their

1  policies that are not via any of their own policies not coming

2  in, not being treated under this plan why do you need to know

3  which ones there are?  I am just trying to figure out what are

4  the factual issues and the really necessary facts that you

5  need to get versus the legal issue.  If it's for settlement

6  purposes I'm not sure that is discovery related, plan related

7  purposes.

8          MR. RYAN:  It's not for settlement purposes, Your

9  Honor. It is a factual issue to discover what policies are out

10 there because that is the structure that forms the channeling

11 injunction.  Maybe there are so many policies every year that

12 the Roman Catholic entities are willing to take a risk on this

13 plan getting over the line and not object.  We don't know.  We

14 don't know what the web and structure is of the BSA policies

15 that the carriers are now saying provide coverage.

16         We don't know what are the local council policies

17 they are saying now provide coverage and in what years.  And

18 we don't know what the web of policies that are not BSA or

19 local council that provide coverage, not just under which

20 coverage is asserted or has been claimed, but provide coverage

21 that ensure a chartered organization purchased by someone

22 other than BSA and local councils.  That is the entirety of

23 the injunction that they get for free.  Maybe that is worth

24 it, maybe it's not.  We don't know until we're told.

25         THE COURT:  Are you making a distinction --

1        MR. RYAN:  And that is why we have issued discovery

2   to seek that.

3        THE COURT:  -- between providing coverage, meaning

4   an admission that there is coverage that is provided under the

5   policy, versus a policy that exists that the Roman Catholic

6   Church believes may provide coverage?

7        MR. RYAN:  Exactly, Your Honor.  I will read from

8   the Century term sheet, on the release date all abuse claims

9   against insureds and co-insureds covered under insurance

10  policies, not for which coverage has been sought, covered.  So

11  I need to know what policies Century says cover additional

12  insureds for abuse claims because that is the extent of the

13  injunction.  To date Boy Scouts, the local councils and the

14  carriers have maintained that there is very little, if any,

15  coverage for additional insureds.  That is significantly

16  different than if every policy written provides coverage.

17        THE COURT:  Okay.

18        MR. RYAN:  So, Your Honor, we have started

19  discovery.  We issued yesterday interrogatories and document

20  requests to Century, Chubb, and Hartford.  We hear Zurich has

21  now settled.  We will have to issue the same discovery for

22  them.  We will need 30(b)(6)'s of them.  As we noted in our

23  objection there was a 30(b)(6) of Hartford two days after the

24  plan supplement was filed.  That witness disavowed any

25  knowledge of the plan supplement draft term sheet attached

1   there.  We still have yet to see the Hartford settlement

2   agreement -- I'm sorry, the draft settlement agreement

3   attached to the plan supplement for Hartford.

4           So the Hartford 30(b)(6) has yet to occur with

5   respect to the Hartford settlement which, unless I have missed

6   it on the docket, has yet to be provided.  The Century

7   settlement agreement is supposed to be in the forthcoming plan

8   supplement agreement.  And will it be provided enough time to

9   take discovery prior to the January 10th objection deadline.

10          Is it fair, Your Honor, to force a plan objection

11  on January 10th when on December 13th and December 17th the

12  plan was fundamentally changed in ways that necessitate

13  discovery that was previously not knowable or to be taken.

14  Does that provide due process?

15          If the debtors want to march forward on this plan

16  and march forward toward a confirmation trial that is fine.

17  We will be targeted. I understand the responses may be

18  voluminous, but this is a plan and a mechanism in a mouse trap

19  of their own building.  The policies implicated are the ones

20  they have chosen to implicate, but they need to tell us that

21  before we make any decision as to whether to object to a plan

22  or not and that can't be done.

23          We have noticed the discovery with a January 3rd

24  return date, but it can't be done by then.  We need, at least,

25  ten days to digest all of that information, to decide whether

1  to object to a plan and incorporate that into a plan.  That

2  can't be done before January 24th, but we joined with Mr.

3  Hallowell and those insurers not asking for an indefinite

4  extension or multi-month, but to get the full cooperation of

5  those who are settling and those who are plan proponents whose

6  idea this is, get us the information.

7        We will work towards a date, we will work towards a

8  date of (indiscernible) if they cooperate and get us the

9  information.  We are not seeking to derail this, but we also

10  didn't fundamentally change the plan on the eve of the

11  objection deadline.

12        I don't have anything further if Your Honor doesn't

13  have any other questions.

14        THE COURT:  Thank you.

15        Let me hear from the debtors and I would like the

16  debtors to include in that discussion the recent changes that

17  are in the second modified fifth amended Chapter 11 plan.

18        MR. KURTZ:  Thank you, Your Honor.  Glenn Kurtz

19  from White & Case on behalf of the debtors.

20        I thought it might make sense to first respond to

21  the insurers' presentation and move into the presentation by

22  the catholics.

23        I think every discussion about the schedule has to

24  start with it's not for profit ability to fund these cases and

25  to make a contribution to survivors.  And we have already

1  burned through, as you have now heard, more cash than we

2  anticipated based on this scorched earth litigation that has

3  been undertaken by objectors.  We are at the point where we

4  are now projecting a need to sell assets to fund operations

5  that, otherwise, would be contributed to the trust.

6         A delay here derails these cases and the objectors

7  can deny that that's their intent, but it's a little hard to

8  credit that from where we're standing.  And there is really no

9  legitimate interest.  No one should have a legitimate interest

10 in working through the remaining cash and assets that the

11 debtors have that, otherwise, can be used to fund recoveries

12 to survivors.

13        We understand that the schedule requires a lot of

14 work.  As between damaging survivors and these estates and

15 working hard as contemplated by the existing schedule we think

16 the choice is very easy to make.

17        The arguments that you are hearing are rehashes of

18 arguments that you have heard before, none of which, I think,

19 are updated in any meaningful way since the last time you

20 heard them on November 19th at a hearing.  And I have to, sort

21 of, correct some of the statements that are being made in the

22 record or on the record about the record.

23        Initially, I don't think it's particularly relevant

24 to anything other than the standing of a party to, sort of,

25 attack performance, but the insurers did not comply as has

1  been represented with the schedule themselves.  In fact, most

2  of them didn't produce anything when it was due.  One of them

3  produced 30 pages of documents and we're not complaining about

4  their compliance, I'm just complaining about the

5  representation that they had compliance.

6           The debtors, in contrast, have materially complied

7  with the schedule and we have been through this before, but I

8  think it's worth going through on some of it again.

9  Initially, the notion of not having enough time to complete

10 the work necessary to amount the challenge to the plan has

11 been raised from the outset and when parties started to

12 complain about that Your Honor counseled them to be selective

13 in their discovery which you also noted you weren't going to

14 require, but that you thought made a lot of sense.

15          At a bare minimum it certainly bears on the merit

16 of any argument that they are unable to complete discovery

17 when they have been so broad in their pursuits.  They

18 completely disregarded that sound counsel and instead they

19 served the debtors with 379 document requests which is

20 extraordinary for any case; 138 interrogatories, 139 requests

21 for admissions, 12 personal depositions, and then 110 topics

22 for 30(b)(6) depositions.

23          The debtors produced over 175,000 documents

24 comprising more than 2 million pages.  The insurers and others

25 are focusing on some of the later productions.  Those later

1 productions are maybe materially looking in size, but not in

2 context and also largely dealt with at the November 19th

3 meeting.  Some of the information is voting information which

4 wasn't available and wasn't due under the existing schedule.

5 Some of the information were survivor names which we weren't'

6 able to produce until after the November 19th hearing where we

7 got an order allowing us to produce the documents without

8 redactions.  Some of it is expert material which wasn't due

9 before the time that we produced it.  Very, very little of it

10 related to the TDP's as represented if any.  We dealt with all

11 of this at the November 19th hearing.

12          Mr. Hallowell says that Your Honor ordered us to

13 produce documents we are withholding relating to TDP's.  That

14 is not right.  There was nothing that was compelled to be

15 produced.  We had identified our position as producing

16 everything but for a couple of mistakes which we then produced

17 right after and Your Honor accepted that.  So that is not what

18 happened there as well.

19          Since November 19th 93 percent of the later

20 production volume has been ballots which haven't been cast and

21 was (indiscernible) under the existing schedule.  Virtually

22 all of the remaining documents were the documents that we

23 produced first after getting an order on the ability to

24 produce documents without redacting survivor names.   In total

25 those documents comprised .2 percent of the entire production.

1   The insurers have not identified a single material document

2   that they say they didn't have in time to use at the

3   depositions or that they have questions about even now.

4           In fact, counsel said they were receiving up to the

5   time of the deposition then use them at the deposition.  So

6   this, sort of, falls under the category of having been

7   addressed already and we're passed it.  On productions, at

8   least with respect to matters that were inadvertently not

9   produced, a common play was even the objectors have

10  acknowledged in the past.

11          On depositions, depositions were scheduled

12  consensually among the parties to accommodate the schedules of

13  witnesses and of counsel.  They have all been completed as of

14  the end of today except for one.  So this is another one that

15  doesn't warrant additional delay because we have already

16  addressed all the depositions.

17          There is one deposition left and it is the

18  deposition of the TCC.  And we don't think that one objector

19  seeking delay can rely on the delay of another objector

20  seeking delay.  The only deposition that had not been

21  completed at the time this application had been filed was with

22  respect to a 30(b)(6) witness we had proffered.  That

23  deposition had been cancelled based on a serious personal

24  family emergency and now has been complete.

25          Notably, it's just probably -- well, first, let me

1  make two remarks about that deposition.

2          One is it was represented to you that the debtors

3  passed a pin and it was the coalition who drafted the TDP's.

4  Just yesterday the 30(b)(6) witness on this topic testified to

5  exactly the opposite that it was the debtors that drafted the

6  TDP's.  That is well document at this point.  The fact that

7  it's getting brought up we think suggests that there is a more

8  nefarious reason for seeking delay then a need for information

9  or any lack of information.

10          The insurers at this point have fully developed

11  their objections.  Your Honor has heard many of them.  They

12  have actually submitted expert reports, so they have been able

13  to get through that exercise.  We have heard throughout this

14  case that if the objectors don't get more time they won't be

15  able to provide meaningful presentations challenging the

16  debtor relief on the table and in each and every instance they

17  have been able to amount comprehensive attacks on the then

18  application by the debtors. And they are going to be able to

19  do that here whether that is in January, February, March or

20  any other date.  They are going to put the same information in

21  and they're going to complain about the timing no matter what.

22          The objectors talk about voting issues.  Voting

23  issues they claimed in their papers wasn't contemplated. I

24  didn't hear that repeated today.  It was contemplated.  It was

25  discussed and we allowed for it in the schedule.

1          The objectors talk about the experts.  They

2   complained in their papers there were 15 experts, but they

3   didn't mention that nine of those experts were their own.

4   They complained that they only have four days to complete

5   those depositions.  In fact, under the schedule they have 16.

6          They complained to Your Honor about the findings.

7   I understand why they raised that issue.  It's been raised

8   quite a few times in this case.  The debtors were one, if I

9   understood Your Honor's views on the findings that, frankly,

10  the debtor's views on the findings is that they are for

11  purposes of 1129(a) and they won't have finding effect in any

12  subsequent litigation.

13          In any case whether that is how Your Honor views

14  this or not we have heard you, we have been working, we will

15  continue to work to try to address those, but it has nothing

16  to do with the delay because those findings were on the table

17  when the schedule was set.  That is not new information.

18  Those issues are largely legal in nature, not factual.  In any

19  case we have provided the discovery that relates to that.

20  They made their challenges multiple times on the findings.

21  You will hear the same challenges whether we go forward on

22  time or whether we delay at the cost to survivors.

23          There is an argument about needing discovery with

24  respect to Mr. Carey and his role.  We provided that

25  discovery.  We provided a 30(b)(6) witness on that topic

1  yesterday and I am advised that the examination amounted to

2  one question.  Now maybe that was an oversimplification, maybe

3  there was a follow-up or two, but that is how important that

4  issue was and that is how much discovery they thought they

5  needed.  They are seeking a delay to seek discovery with

6  respect to Carey and then they ask one question at the

7  deposition which doesn't justify losing the confirmation

8  hearing.

9          That really is my remarks on the moving insurers.

10  I am moving now to the position of the Methodists -- I'm

11  sorry, I'm confusing them because they are confusing.  I will

12  start with my surprise.  There has been a pleading filed that

13  is attacking the schedule and staking out positions that are

14  contrary to the plan.

15          Counsel represents, the counsel representing the

16  Roman Catholics represents the Methodists.  And as Your Honor

17  heard earlier today, we have a settlement with the Methodists

18  and those Methodists are supporting the schedule and they're

19  supporting the plan.  I don't understand how their counsel

20  could be arguing to Your Honor for a delay in confirmation or

21  undermining the viability of the plan.  I don't think one can

22  do that.  Even if one could do that the discovery that the

23  Roman Catholics seek is not new.

24          The issues as to the treatment with respect to

25  insurance, the releases and the channeling injunction has bene

1  around since the very first filing of the initial plan back in

2  2020.  It has changed in part, but the basic facts and the

3  basic information about the insurance policies and the

4  treatment of the insurance policies, as people join

5  settlements, has been around since the beginning.  Then the

6  specifics of what is going on in the recent settlement has

7  been a structure that has been cycling since, at least, late

8  November.  I have seen emails with Mr. Ryan in November 26th

9  that speak exactly to this structure.

10        So if the Catholics were interested in obtaining

11 information about the policies the time to do it was earlier

12 then now.  Having said that we have provided the discovery.

13 We have provided -- there was four subsections of discovery

14 that the Roman Catholics outlined in I believe Paragraph 10(a)

15 through (d) of their objection.

16        The first of which -- I don't know the page, which

17 is on page 5 of their objection.

18        THE COURT:  I'm there.

19        MR. KURTZ:  So the first is the BSA policies issued

20 by Century.  They say Chubb.  I don't think there are policies

21 by Chubb that I am aware of and the Hartford.  All the

22 debtors' insurance policies were produced long ago.  Moreover,

23 the debtors have advised parties, including in the disclosure

24 statement that all post 1975 policies included other insurers.

25 That information has been provided.

1          10(b) where the local council policies that

2   potentially cover the Roman Catholics, that information, to

3   the extent the debtors had it, likewise, has already been

4   produced.

5          (c) was, oddly enough, the chartered organization

6   policies.  The debtors don't have this, obviously.  The Roman

7   Catholics are responsible for obtaining the insurance that has

8   been issued to the Roman Catholics and as I understand it one

9   of the members of the ad hoc group for the Roman Catholics

10  includes, and I don't have the exact title, but something like

11  the Roman Catholic Mission which is their in-house captive

12  insurance company.  So they uniquely have that information, we

13  don't.

14         Then (d) is which abuse claims are covered by each

15  of the categories above.  So Bates White actually went through

16  the exercise of identifying the claims that potentially could

17  be made against the Roman Catholics beyond the simplicity

18  exercise of looking to the proof of claims for those that

19  mention the Roman Catholics, but actually also evaluating the

20  areas and people involved that could have been associated with

21  the Roman Catholics.  I believe since April of this year that

22  has been available to the Roman Catholics.  So they have that

23  information.

24         If they are talking about mapping each claim to

25  each policy that is not something the debtors have done, that

1  is not something that the debtors are required to do.  If they

2  want to assert some objection based on some manipulation of

3  data they are certainly free to do so, but I don't believe

4  that these estates should bear the burden of walking through

5  mapping exercises.  They have the same data we have.  Either

6  we would do it or they would do it.  Since it's their

7  purported defense it's really for them to do.

8         The last issue that I would address, Your Honor, is

9  really from the TCC and from Zalkin, Pfau, it says bifurcation

10 concept.  They haven't been heard so I am not going to go

11 through all of their objections.  I am going to just address

12 what, at least, seem to have caught Your Honor's attention and

13 that is the bifurcation issue.

14        The bifurcation I will start by saying that the

15 real issue here is the completion of confirmation, not the

16 commencement of confirmation because if somebody starts on

17 January 24th and then gets a break and finishes in March it

18 has the same financial impact on the estates and on the

19 survivors as if it was started in March and completed in

20 March.

21        So the notion doesn't make a lot of sense to us,

22 nor does any idea of having a break.  Staging can sometimes,

23 though, be attractive and I understood Your Honor to be asking

24 about that.  Let me start with the general notion of when I

25 think bifurcation is appropriate and when I think it's not

1  appropriate.  I will also start by telling you that most

2  defendants sort of favor a tactic, it's a weapon.  It's

3  generally applied in a way that elevates an issue that you

4  want raised that you want to be the focal point of a trial.

5  And it is brought to the forefront, is brought out of order.

6  It has the effect of disrupting the presentation of either

7  plaintiffs of defendants as is the case.  Here it is the

8  debtors.

9          It can be done effectively, and it's not done a lot

10  in my experience, but it can be done effectively where you

11  have totally segregated proof meaning that if you have one,

12  two or three witnesses that are going to speak only to an

13  issue that is subject to bifurcation and you have one -- you

14  know a set of documents, exhibits that is relevant only to the

15  bifurcated issue it may still be disruptive, it may not be the

16  way  a plaintiff or debtor wants to proceed, but, at least,

17  it's not completely destroying efficiencies.

18          Here, neither the TCC, the Zalkin firm or anyone

19  else has identified, at least in the papers, any efficiencies

20  that could be achieved by bifurcating and moving up the issue

21  that they want to have adjudicated.  And as we wrestled with

22  this we couldn't find it.  We think that there is -- that the

23  same witnesses will be testifying multiple times because we

24  don't think there is any standalone issue relating to subject

25  matter jurisdiction or statutory authority to issue third-

1  party or approved third-party releases which is, by the way,

2  largely a legal issue and they can raise that, I suppose

3  whenever they want, but we don't see how the factual issues

4  segregate, in any way, that separate.

5         We think that the same witnesses will come back and

6  have to testify a same [sic] time.  We think the same exhibit

7  -- you'll get the same testimony for context or otherwise, a

8  second time.  You will get the same exhibits put in front of

9  you and read through, you know, a second time, and that's a

10 second time per witness.

11        We believe that the same factual showing that would

12 be made in support of any objection that's being raised with

13 respect to third-party releases will be the same evidence that

14 will support the 1129(a) finding.  So, we don't see it.  If

15 there had been some comprehensive way that had been presented

16 that we could agree with that would move some issues forward

17 without dislocating the presentations and the proof and

18 without delaying the case at a very serious cash burn and

19 damages to the estates and to the survivors, we would have

20 taken it seriously.

21        We don't see that.  We certainly don't see how

22 there could be a break in all this.  So, we're not sort of

23 following how this gets you there.  They cite a case.  They

24 don't actually cite you bifurcation cases.  They're pretty far

25 and few between.  They're highly discretionary.  They do cite

1    you Mallinckrodt.  What they don't tell Your Honor about

2    Mallinckrodt is that that case was bifurcated on consent.

3    That wasn't -- that was not a not-for-profit.  There wasn't an

4    overhanging financial, you know, prejudice looming.  And when

5    it was bifurcated, 1129(a) went forward first.  What it got

6    bifurcated for were new issues that got raised in connection

7    with the settlement.  So, it not only doesn't support

8    bifurcation, but it's a pretty strong, in my view,

9    illustration of why you don't bifurcate.

10          And then my last comment, subject to questions is

11   really maybe just an overarching issue, which is every time

12   some new settlement comes up, I don't believe, as a policy

13   matter or as a practical matter, or as a matter of practice,

14   that there can be a new schedule.  Debtors throughout the

15   country work very hard and achieve settlements from the

16   disclosure statement through confirmation, often times on the

17   steps of the confirmation hearing or halfway through the

18   confirmation process itself, the hearing, itself.

19          And the notion that a debtor running out of money

20   is placed in a position where it has to choose between gaining

21   greater acceptance, more value and less objections or giving

22   up its confirmation schedule as people seek a reset as a

23   material new development is really unworkable in all cases.

24   It is particularly unworkable in a case where it's a not-for-

25   profit, you don't have ongoing sales, and you are dissipating

1 assets that are already promised under the plan, otherwise,

2 for -- to be transferred to a trust for the benefit of

3 survivors.  So, it hurts the mission, which is the emerging

4 entities' interests and it hurts the survivors' compensation,

5 of which is the other primary issue in this case.

6      And so, we note -- I warned at the outset you were

7 going to get a *seriatim* of motions to delay.  It doubt this

8 will even be the last one, but we really need to put our noses

9 to the grindstone, finish whatever we have and get through

10 this hearing.

11      THE COURT:  So, I take it from that, that it's the

12 debtors' position that no further disclosure needs to go out,

13 with respect to the second modified, fifth amended Chapter 11

14 plan and that nothing in the settlement is a material change.

15      MR. KURTZ:  Not a material adverse change;

16 although, if Your Honor wants sort of chapter and verse on

17 that, other than -- our position is it doesn't require re-

18 solicitation.  That it's not a material, adverse change; it's

19 a beneficial change.  But if Your Honor wants to really

20 discuss that, I would pass the podium back to Ms. Lauria for

21 that.

22      THE COURT:  No, I wanted to know the debtors'

23 position because that's part of the questions I had with

24 respect to the schedule going forward, but I take it it's the

25 debtors' position that the filing, the recent filing of the

1  modified plan does not, in any way, from the debtors'

2  perspective, create a situation where there needs to be any

3  delay or any resolicitation?

4            MR. KURTZ:  That is correct, Your Honor.

5            THE COURT:  Okay.  Thank you.

6            MR. KURTZ:  Thank you very much.

7            Mr. Molton?

8            MR. MOLTON:  Thank you, Your Honor.

9            Can you hear me, Judge?

10           THE COURT:  I can.

11           MR. MOLTON:  Good.  I'll try to be quick and brief.

12           David Molton of Brown Rudnick for the Coalition of

13  Abused Scouts for Justice.  Judge, we join in all the

14  arguments Mr. Kurtz made and I just wanted to address five

15  points, Your Honor.

16           And Mr. Kurtz, at the end of his discussion, after

17  we've been at that for almost an hour, used the word

18  "survivors."  I believe it was the first time that word was

19  used in this entire proceeding today, but one of the most

20  important things as we approach the second-year anniversary of

21  this case is to get this case to the finish line for the

22  benefit of the reason for this case:  80,000-plus survivors

23  who are watching, paying attention, engaging, and waiting for

24  the resolution and a confirmation order that will allow them

25  to get their just and affordable compensation.

1          So, I just want to make that first point and

2    reiterate something that often is lost as we engage in this

3    back-and-forth of he said/she said, you delayed, no I delayed,

4    no, she delayed, no, who delayed.

5          In any event, Judge, this case needs to progress

6    for the benefit of survivors.  Number two, we've heard about,

7    you know, the reason and cost of delay.  I join in debtor in

8    saying that every day that goes by, we see money that

9    otherwise would be available for survivors, going out the

10   door.

11         I found it rich, Your Honor, the reason for the

12   one-month adjournment suggested by the insurers was, in part,

13   the Coalition's 30(b)(6) objection.  I note that the insurers

14   had plenty of those themselves.  That point was put before

15   Your Honor with efficiency.  Your Honor decided it with an

16   alacrity and that deposition is going forward today.

17         Number two, Your Honor, along that line, I do want

18   to note, Your Honor, that we continue to hear -- since I've

19   been in this case, after the first -- the TDPs were produced

20   after the, you know, late last spring or whenever it was that

21   we had the RSA, I've heard the mantra:  The Coalition held the

22   pen to the TDPs.  And, you know, I gather if people repeat

23   that enough, they think Your Honor is just going to accept it.

24         Judge, we've heard a lot of attorneys testifying

25   during these proceedings in this case and often times I've --

1  I understand Your Honor is an experienced jurist and Your

2  Honor understands what that means and doesn't mean.  I am

3  often attempted to say, Objection, assumes facts not in

4  evidence.  I do want to note, because it's an important point

5  that Your Honor has heard again, and again, and again, that

6  yesterday, the deposition of the debtors' witness on this

7  issue dispositively established that debtors shall, I say, in

8  my own words, ownership and pen on that TPD.

9         So, in any event, I know Your Honor hears a lot of

10 posturing and planting of seeds for further argument.  I know

11 Your Honor understands those for what they are, but I do want

12 to note that.

13        Again, another reason for a one-month delay is,

14 currently, the insurers need to have depositions of the stack

15 members, you know, the trust oversight committee or advisory

16 committee, that was disclosed in the plan supplement.  Your

17 Honor, it's my submission that that's a red herring.  You

18 know, whether or not that committee has any decision-making

19 authority whatsoever over claims administration, it has

20 nothing to do with the identity of those persons and

21 everything to do with the trust agreement, itself.

22        It's my position, and we'll argue this during the

23 upcoming hearings and trial that the trust agreement, as

24 written, unremarkably for a trust agreement in a mass-tort

25 case, does not give claims administration decision-making

1    authority to the staff members.  In any event, the identity of

2    those members and their depositions is just a red herring.

3            Another red herring, Your Honor, off of, you know,

4    the reason why this case should proceed as scheduled, somehow

5    we're back to coalition fees and somehow in terms of the he

6    said, me said, we all said about the cost of delay, the cost

7    of delay is the cost of delay.  Your Honor will be getting and

8    deciding the Coalition fee issue as Your Honor sequenced it in

9    due time, pursuant to the criteria that Your Honor

10    established.  Again, it's irrelevant at this point.  Every day

11    of delay, simply put, indisputably, reduces the amount

12    available for survivors, period, and out.

13            So the issues of delay, I've dealt with, Your

14    Honor.  The third thing I want to deal with is what does a

15    firm trial date bring?  What are its attributes?

16            And I don't have to tell Your Honor.  Your Honor

17    sees it in front of you.  It brought you a Century deal last

18    week.  It brought you a Methodist deal today.  And at the last

19    minute, at the eleventh hour before this hearing, it brought

20    you a Zurich deal.  A firm trial date, as every trial judge

21    knows, firmly established and held to, incents parties to do.

22            And I remember, Your Honor, one of my first

23    hearings, Your Honor looked at all of us and said, Go get

24    consensual agreements.  That's what a firm trial date does.

25    And I would ask Your Honor to add here to the one that has

1  been established in this case.

2          My fourth point on bifurcation, Your Honor, I think

3  Mr. Kurtz said it all, I do want to note that there is great

4  interconnectedness between all of the factual and, indeed,

5  legal issues here and I think it would be very, very, very

6  difficult, as Mr. Kurtz explained to do a true bifurcation.

7          My fifth point, Your Honor, is if Your Honor

8  does -- and last point -- if Your Honor does entertain the

9  notion to delay this case in any manner, I think it would only

10  be fair that the voting deadline be extended for the same

11  period of time that Your Honor has agreed to adjourn the

12  confirmation hearing.  And, again, we're not saying that Your

13  Honor should do that.

14          Your Honor repeated last week, I think it was, how

15  important that survivors have the chance to vote and if -- and

16  the reason we have the deadline at this point where it is, in

17  part, is driven by that confirmation date of late January.  In

18  the event that gets moved, it would be the Coalition's

19  submission, Your Honor, that the voting deadline be moved the

20  same number of days, but we don't believe that the

21  confirmation date should be moved.

22          Those are my remarks, Your Honor.  Unless you have

23  questions, I'm finished.

24          THE COURT:  Two -- well, one comment and one

25  question.

1          I saw the statement in the Coalition's submission

2   about the extension of the voting deadline in the event that I

3   were to extend the confirmation date and I will say, I'm not

4   going to do that under any circumstances.  I do hope that

5   every survivor will vote.

6          As I said before, they all have a right to vote.  I

7   think they should exercise that right.  It will inform the

8   Court as to, inform me as to what I should do in certain

9   circumstances, what I can do in certain circumstances, what's

10  appropriate to do, and I'd like to know where that vote comes

11  out.  And I think, while permitting more time may bring a few

12  more votes in, I think it's really important to know where

13  that vote comes out and I do believe that survivors have had

14  sufficient time to vote, as other creditors, as well, and

15  certainly, a longer period of time than customary, because I

16  recognize the complexity of this plan and the nature of it.

17         With respect to discovery that's still outstanding,

18  my understanding from the papers is that discovery from the

19  law firms and the aggregators has not happened yet and the

20  members, and members of the Coalition, are, and many, if not

21  most, from what you're telling me, the subjects of that

22  discovery.  And of course, all of those members are entitled

23  to assert their own rights with respect to discovery directed

24  at them, but they can also choose to forego certain objections

25  to discovery and comply or move faster.

1          So, if fact discovery isn't complete, how should I

2  weigh that with respect to this decision?

3          MR. MOLTON:  Your Honor, I'll try to address that.

4          Needless to say, my firm and the Coalition's

5  counsel don't represent those law firms for the purpose of

6  that discovery --

7          THE COURT:  Uh-huh.

8          MR. MOLTON:  -- so, I'm not sitting here instantly

9  cognizant of all the various issues that are out there or the

10 progress of certain discovery in connection therewith.

11         I would point out, Your Honor, from the Coalition

12 (audio interference) -- from the Coalition's point of view --

13         THE COURT:  Please -- I'm sorry, Mr. Molton --

14 please, make sure if you're not speaking that your audio is

15 muted.  I'm getting some other audio.

16         MR. MOLTON:  Yeah, me, too, Judge.  I was just

17 trying to -- you know, I will let other folks speak to that,

18 to the extent they're representing those law firms, but my

19 understanding, Your Honor, is that there are very, very

20 intricate attorney-client objections and important attorney-

21 client objections, communication objections that many -- that

22 there was requests made that implicate that issue.  That

23 is -- Your Honor knows that issue is a very important issue

24 and one that, you know, the attorneys have to be very, very

25 zealous in guarding and those issues, I think, are working

1  their way, you know, through the dispute-resolution, you know,

2  through meet-and-confers to decision.

3          I can't tell you today -- I know Your Honor said a

4  week or so ago that Your Honor had dealt with everything that

5  was on your desk.  I don't know if there's more on your desk

6  now, but if there isn't, well, that gives a good sense of

7  whether or not the insurers really need that information and

8  what is the relevance of that information to the point -- you

9  know, to the confirmation issues they are pushing.

10          But, again, Your Honor, I'm speaking -- you know,

11  I'm not speaking with specific knowledge as to each one of the

12  issues that are out there.  I can't do that.  So -- but that's

13  my view.

14          But I would say, Judge, from a practical point of

15  view, that those issues are discrete, with respect to those

16  law firms and should not get in the way of the bigger

17  confirmation issues that have been discovered, that are being

18  dealt with, and that Your Honor will probably be devoting 99.9

19  percent of your judicial time on during the confirmation trial

20  and during your consideration of whether confirmation is

21  appropriate here.

22          So, my view, from a practical point of view -- and,

23  again, I can't speak to what's out there and what hasn't been

24  put on your desk, Your Honor, but it would seem to me that

25  that issue, again, should not delay the progress of this case

1    for the benefit of all the survivors.

2            THE COURT:  The only reason I raised it is because

3    those lawyers represent the survivors and if things are being

4    delayed and, therefore, survivor recoveries are being

5    affected, those law firms, as I understand it, represent a

6    significant number of those survivors.  But I understand that

7    you do not represent those law firms.  Thank you.

8            MR. MOLTON:  Thank you, Judge.

9            THE COURT:  Ms. Quinn?

10           MS. QUINN:  Thank you, Your Honor.

11           Kami Quinn from the Gilbert firm, special insurance

12   counsel to the FCR.  I just wanted to, again, say, we echo Mr.

13   Molton's remarks.  We support the schedule continuing on as

14   anticipated.  We think that everybody here is working flat-

15   out, days, nights, weekends, holidays, and we continue to

16   believe that it is possible to get this done on the schedule

17   that was originally contemplated.

18           I would also note, we did mention, you know, our

19   papers discussed the findings and I would just sort of echo

20   Mr. Molton's statement that repeating unsupported repetitions

21   of conclusions does not make them true.  The insurers here

22   repeatedly said that the findings are unnecessary, overbroad,

23   and the like.  While we understand that's not at issue with

24   respect to scheduling, we did feel we needed to address it

25   briefly in our papers because it's been repeated so often.

1    So, I won't go into that now, because I don't think it really

2    bears on the issue in front of you, but if Your Honor has any

3    questions on that?

4              THE COURT:  I don't.  Thank you.

5              MS. QUINN:  Thanks.

6              THE COURT:  Mr. Pachulski?

7              MR. PACHULSKI:  Thank you so much, Your Honor.

8              I want to begin a little out of order.  It's been

9    commented about the TCC 30(b)(6) witness.  Very unfortunately,

10   Your Honor, that witness' father died during this recent

11   process and there had been other family emergencies and,

12   frankly, we're going to have to change the 30(b)(6) witness

13   because the witness who was the co-chair of the committee, we

14   don't believe it would be appropriate at this point to have

15   his deposition taken, so we will have a different witness.

16             But I want to make it clear that it wasn't just

17   continued for continued's sake; it was because of personal

18   issues that that particular witness had; though, it's been

19   mentioned both, in the motion to modify the scheduling and

20   also in the debtors' response.

21             I do want to address why we recommended what we

22   did, which is the bifurcation.  The TCC instructed me to try

23   to figure out a solution, with respect to three significant

24   issues.  One, the TCC, though it previously wanted a

25   continuance, does not want a continuance of the start date.

1  We have no issue with that and we want that to happen.

2              The second issue, Your Honor, is the TCC also wants

3  to have sufficient time to take discovery with respect to a

4  number of issues, some of which just came up today, and will

5  continue coming up, which I will respond to in a couple of

6  minutes.  So, the TCC wants it to start, but it also wants to

7  make sure that we can deal with the discovery.

8              The third -- and this I kind of take offense at,

9  and I think it was by the debtor -- is, the third issue is

10 whether we're -- we may be right and we may be wrong, but if

11 we're right that the releases are a problem, that this matter

12 cannot be settled, at least on some reasonably consensual

13 basis, which doesn't mean that some parties won't appeal, but

14 to try to come up with a consensual deal will be virtually

15 impossible without the release issue being resolved.

16             And just so Your Honor knows, before the hearing

17 last week, we reached out to the insurance companies.  You had

18 asked them if they had thought about the issue.  We had and we

19 reached out to them to see if we could come up with a

20 mechanism to thread the needle, start the trial, but get more

21 time with respect to the discovery.

22             They said they would give it consideration.  I have

23 no doubt they did.  They didn't come back to us with a

24 proposal, but we did reach out to them.

25             Similarly, Your Honor, I reached out to debtors'

1  counsel this past Sunday and asked the same question, saying,

2  the TCC isn't trying to be an impediment.  We're just very,

3  very concerned that the position the BSA is taking is that

4  they're going to run out of money, that delay is a bad thing,

5  and if at the end of a very lengthy trial that Your Honor

6  decides that there has to be significant modifications,

7  particularly with the releases, because none of us can pretend

8  that what's going on around the country doesn't exist in

9  Purdue and yesterday in Ascena, that there may be massive

10  modifications because this may be, at least in my career, the

11  most extreme set of releases that have ever been granted; not

12  just the BSA and not just local councils, but now to charter

13  organizations that really have no relationship as the BSA has

14  said publicly.  And Your Honor is going to have to make that

15  determination, for instance.

16       And so, if Your Honor makes that determination,

17  let's assume, in April, then trying to put Humpty Dumpty back

18  together is going to become virtually impossible.  So, the TCC

19  asked us to try to deal with those three issues and we came up

20  with a bifurcation that would be the start of the hearing on

21  January 24th.

22       Now, let me spend a few minutes as responding to

23  what has been said with respect to the depos and the like.

24  Your Honor, there are not, to my knowledge, 15 depos; there

25  are 18 expert depos, 18 depositions of very, very complicated

1  reports.  Some of them by the TCC, some of them by the

2  insurance companies, some of them by the BSA, and, frankly,

3  some of them by the Catholics.  So, good, bad, or indifferent,

4  those are going to have to be dealt with.

5       There's also the -- we think the 30(b)(6) of the

6  TCC is fairly minor when you look at some of the issues

7  associated with it, but it's a deposition that has to be

8  taken, but that would not hold anything up, since it's

9  scheduled for, I think, within the week.

10      The depositions that have been stayed with respect

11 to the lawyers associated with the Coalition, those are

12 critical, Your Honor, because I can tell Your Honor now that

13 there will be a very significant objection by the TCC

14 regarding the independence of the trust.  There are members of

15 the effective oversight group that have interests.  There's

16 Mr. Green that we believe is conflicted.  And Your Honor is

17 going to have to deal with it.  Mr. Green's deposition has

18 been taken.  The other members of the trust have not been

19 taken, the proposed members.  We're going to have to do that.

20      But let's deal with some of the settlements, Your

21 Honor, and I'm actually somewhat taken aback because Your

22 Honor asked a very direct question of debtors' counsel and I

23 think you got a very indirect answer.  Your Honor asked

24 whether or not the modifications are such that they have to,

25 in some respects, be re-noticed.  Well, let's deal with it.

1  Let's deal -- start with Century.

2          Century's deposition and production of documents

3  now has to go forward because of the Century settlement.  It

4  is not a minor modification; it's an eight-hundred-million-

5  dollar resolution.  But let's deal with the bigger issue, Your

6  Honor, which no one seems to want to address, which is in the

7  disclosure statement previously, it provided that the post-'

8  76 releases may be granted for the charter organizations, but,

9  specifically, not the pre-1976.

10         We're not talking about a thousand or 2,000 abuse

11 victims, which would still be significant; we're talking about

12 47,000 abuse victims.  Nineteen thousand, very specifically,

13 have identified charter organizations.  But if you think about

14 it intellectually, it has to be virtually all of the 47,000,

15 because it wasn't the local councils or the BSA who ran the

16 Troops.

17         So, the bottom line is you have over 50 percent

18 that are affected by a material, negative modification of the

19 plan.  Nobody can argue that that is a positive development in

20 this case.

21         We then heard about Century -- I'm sorry -- we then

22 heard about Zurich.  Well, Your Honor, we now are going to

23 have to do, just as Century, is take discovery and have to

24 amend our expert reports, which, obviously, people are then

25 going to want to examine our experts, because our analysis is

1  that Zurich, the settlement is 50 percent less than we thought

2  the settlement should have been, based on our insurance

3  analysis and our special counsel's analysis.

4        Then we get to the United Methodist, which has been

5  trumpeted today as a great settlement.  The settlement, Your

6  Honor, is barely an agreement to agree.  The United Methodists

7  will argue to get their channeling injunction or will at least

8  recommend to the various United Methodist groups that they

9  should contribute over the next three years, 27 and a half or

10 $28 million.

11       What if they don't?

12       Well, now, we have to take that deposition.  Now,

13 we have to do an analysis as a value, because Your Honor is

14 going to have to make that determination.

15       So, it's not just minor modifications; it's

16 granting massive releases, most of which we think are not

17 allowed under the law, but even if they are, you have to

18 demonstrate that they're reasonable and we now have to take

19 depositions.

20       So we -- when people say, well, we should have all

21 assumed it, we were basically told we couldn't take the

22 discovery or that there was no discovery needed, because why

23 did we need charter policies when the charters, pre-1976,

24 aren't being released.  That's exactly what we were told and

25 that's fundamentally unfair.

1            So, there's been a statement that there are

2    settlements through plans.  Your Honor, I have done probably

3    in my career, 200 to 300 plans, and, yes, we have modified

4    them during the process and it's typically that someone didn't

5    want to settle and then they settled or we found some more

6    money somewhere.

7            But here, there are modifications that grant

8    release rights that are as extensive as I believe Your Honor

9    is ever going to see.  So, yes, there are settlements through

10   plans, but it's like every day and then we have to take the

11   discovery.  These weren't anticipated -- they haven't

12   anticipated resettlements, but not that massive modifications

13   would take place in the plan and this people would say, oh,

14   you should have just known that we were going to change a

15   material fact that, pre-1976 non-releases are suddenly going

16   to become massive releases.

17           So, in essence, Your Honor, we believe that it

18   should start, but we have to -- but Your Honor should order a

19   meet-and-confer to try to come up with a schedule so all the

20   depositions can be taken.  That it can be broken up in a way

21   that Your Honor can determine after a week, with due

22   consideration, what should survive and what shouldn't survive,

23   with respect to the releases, which is more likely to result

24   in an ultimate resolution.

25           And it may be, Your Honor, it may be that the Boy

1  Scouts have to do a standalone plan.  The TCC is not looking

2  to crush the Boy Scouts; it's looking for a fair result for

3  not just the Boy Scouts, but for the survivors.  And if we

4  wait until April or May or whenever were going to get a ruling

5  and then the appellate process, the Boy Scouts just won't

6  survive it.

7          And so, we're trying to help.  We're not trying to

8  hurt in this context.  We're trying to have due process.

9  We're trying to deal with a key issue.  We're trying to get

10 all the parties to get on the same page, as compared to the

11 war that's been going on in this case.

12         But I don't believe this plan is going to be

13 confirmed.  People can disagree with me, but we would

14 certainly know sooner on the key issue.  And I'm not going to

15 pretend that there may not be some duplication.  Anytime there

16 is going to be a bifurcation, there may be some, but it's

17 going to be relatively minimal in this case.

18         Counsel is right, most of it is a legal issue, but

19 not all of it.  Not if you're going to try to demonstrate that

20 you complied with Combustion Engineering and the other Third

21 Circuit cases.  So, it is our request that we are able to come

22 up with a process that should be presented to Your Honor

23 within the next week as a group, that there should be a

24 bifurcation, that the trial start January 24th, but it should

25 be on the release, channeling injunction set of issues, and

1  with respect to the voting deadline, Your Honor, I couldn't

2  agree with you more.  The TCC was very uncomfortable moving

3  it.  The survivors want to be done in terms of the vote and

4  the like and whatever Your Honor does, December 28th should be

5  the date, we should finally get the numbers, and, frankly, one

6  of the things I didn't mention is there might be voting

7  discovery that's going to go on in this case.  And we'd

8  rather, if it happen -- that even if Your Honor continues it

9  or bifurcates, that that happen sooner rather than later.

10           So, with that, Your Honor, unless Your Honor has

11  any other questions, hopefully, I've made the TCC's position

12  quite clear.

13           THE COURT:  Thank you.

14           Mr. Patterson?

15           MR. PATTERSON:  Good afternoon, Your Honor.

16           Tom Patterson for the Zalkin and Pfau firms, from

17  KTBS Law.  Your Honor, I will speak only very briefly.  The

18  releases in this case are far broader than were the case in

19  Purdue.  They're far broader than any that I have seen in, you

20  know, touching now 35 years of practice.

21           And, you know, I guess practice is incremental.

22  You're never satisfied with the last release, so let's see if

23  we can push it here, push it here, and to more and more and

24  more, but these are, in our view, plainly not supported under

25  existing Third Circuit precedent.  And we believe an early

1  ruling on that will give the debtors and the parties time to

2  refashion a plan that makes sense in light of the Court's

3  legal rulings on that issue.

4         So, we were endeavoring to be practical with regard

5  to that issue.  No one wants to be, at the end of a five-year

6  trial with the Boy Scouts, you know, putting their last dime

7  on the table and the Court saying it's can't confirm a plan on

8  a basis that everybody knew on the first day:  that the

9  debtors wanted to put their whole plan on before we obtained

10 that ruling.  And then there's less time for flexibility.

11 There's less time to put something together.

12         There's no doubt in my mind, Your Honor, that the

13 reason that this process has become attenuated is not because

14 the adversity of those who oppose the plan, but because of the

15 complexity and the overreaching of the plan.  This is an

16 extraordinarily complex plan.  And the debtors can say, well,

17 we're just a not-for-profit and we're not -- but this plan is

18 more complex than Texaco, which was one of the first plans

19 that I worked on that involved billions of dollars.  And it's,

20 I think it's more complex than any of the billion-dollar cases

21 that I have ever worked on.

22         So, I think the suggestion that we've made in the

23 papers that Mr. Pachulski has advanced in his papers, makes

24 eminent sense and, you know, we'd certainly be willing to work

25 with the debtors to try to minimize duplication, streamline

1   it, to the extent possible.  No one can say there won't be any

2   duplication, but we do believe this makes considerable sense.

3                THE COURT:  Thank you.

4                Mr. Buchbinder?

5                MR. BUCHBINDER:  Thank you, Your Honor.

6                David Buchbinder, on behalf of the United States

7   Trustee.  I was not anticipating commenting at all today and

8   the U.S. Trustee has no position with respect to the motion

9   that is on the agenda or to the request to bifurcate the

10  hearing.

11               But I would like to address the question that the

12  Court asked earlier of debtors' counsel as to whether or not

13  the amendments to the plan filed over the weekend require

14  additional disclosure, and I would like to make some

15  observations in that regard.  Section 1127(c) of the Code says

16  that the proponent of a modification shall comply with Section

17  1125 of this Title with respect to the plan as modified.

18               I observed at the status conference the Court held

19  last week where the debtor disclosed the Century settlement

20  and we have had a chance to look briefly, at that time, with

21  the additional monies that were being proposed in that.  I

22  indicated that if the debtor had some projections about what

23  is now called the "settlement growth payment," the debtors

24  should post those so that people could see these projections.

25  That's one aspect of the situation, which I'll come back to.

1          Another aspect of the situation is the amendment or

2    the term sheet that was filed earlier today regarding the

3    Methodist -- and I'll come back to that in a moment.

4          I'd like to first speak to the comments made by Mr.

5    Ryan, and all those his comments were directed at (audio

6    interference) half of his limited constituency, he really

7    spoke for all the chartered organizations in this case, not

8    just the Catholics, not just any other religious organization,

9    but all the 41,000 organizations that the debtor continually

10   reminds us is, quote, lifeblood of scouting.

11         These provisions fundamentally alter the treatment

12   being provided to the chartered organizations in this case and

13   the effect that the plan will have on their insurance

14   policies.  Mr. Ryan identified some of the issues that are not

15   issues raised by the United States Trustee.  I don't know what

16   other issues are in there, but they do fundamentally change

17   the plan and Mr. Patterson pointed out some of those a few

18   moments ago; they are fundamental, they are far-reaching.

19         Many times in cases like this, and I've been doing

20   this for quite a long time, too, where a case reaches this

21   stage and the settlements start coming in during solicitation,

22   they always seem to improve the plan and make it easier to get

23   the plan to confirmation.  But not these amendments; they

24   fundamentally alter the rights of the chartered organizations

25   and as the Court will recall, there was much discussion at the

1  disclosure statement and solicitation stage about exactly what

2  notice the chartered organizations have even received in this

3  case and they are the entities most fundamentally affected by

4  these revisions and the debtors should explain them in some

5  way.

6         Second, let's go back to these two new settlements.

7  One of the biggest portions or one of the material elements

8  the debtor described last week in the Century settlement was

9  this promise to pay an additional  $100 million; it's called

10  the "settlement growth payment."  You have to hunt for what

11  that means.  The details of this are contained in paragraph 18

12  of the Chubb term sheet, but not in the plan.

13         The $100 million does not become payable, if at

14  all, until the year after the DST note is paid in full.  Going

15  back to Article 5(x) of the plan, the DST note is not

16  scheduled to be paid in full until 10 years after the

17  effective date or 2031.  And the amount of the settlement

18  (audio interference) payment is payable over 5 years.

19         No additional disclosure has been provided of the

20  likelihood of these funds becoming payable, and even if there

21  were, the promise to pay does not mature for 10 years and

22  takes another 5 years to perform.  This, apparently, is also

23  being propounded as consideration for what has been dubbed the

24  so-called "other chartered organization settlement," which is

25  not a settlement at all, but which is a group of terms being

1  foisted upon chartered organizations to justify a release.

2  Those are the issues affecting the hundred million dollars.

3         In today's amendment, I had a chance to take a look

4  at the Methodist term sheet that was filed at 11:00 a.m. this

5  morning and the hundred million dollars there isn't  even --

6  it's included in the term sheet, but it's not a material

7  element of the transaction to the extent that if the Methodist

8  fail to raise a hundred million dollars or even a penny, it's

9  not a breach of the transaction.  And that was filed at eleven

10  o'clock this morning.

11         But even more than that, Your Honor, everyone

12  continues to treat this case like it's a bondholder case or a

13  shareholder case and, where for a few more basis points, we'll

14  make a deal, shake hands, and go home.  It's not that case,

15  folks.

16         Yes, it's about money, but this case is about more

17  than money.  This case is about these thousands of men and the

18  justice they've been seeking for, in some cases, decades.  And

19  to these men, it's not so much about money, as the chance that

20  they've been given to vote, that gives them a feeling of worth

21  that they finally have a voice in this situation.  And all of

22  these major, material plan amendments, within days of the

23  voting deadline terminate and without any explanation.

24         I thought about it for a long time and I spent

25  hours this weekend reviewing these changes and listening to

1 all of you today.  And, frankly, if I were one of the 82,500

2 men, it looks to me like what's happening right now is the

3 debtor is moving the goal posts while the ball is in the air

4 and the worst part of it all is that we don't know which way

5 the goal posts are moving.

6          And so all of these people, the major constituency

7 of the case, they need to have all of this explained to them.

8 And despite the insistence on, let's see how the voting goes,

9 they might need a chance, Your Honor, to change their votes

10 because, ultimately, this case is all about them and part of

11 this case is not about money.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Mr. Goldberg?

15      (No verbal response)

16          THE COURT:  Mr. Goldberg, you're still muted.

17      (Pause)

18          THE COURT:  I'm still not hearing you.

19          Is anyone else hearing Mr. Goldberg?

20          UNIDENTIFIED:  No, Your Honor.

21          MR. GOLDBERG:  Your Honor, can you hear me now?

22          THE COURT:  I can.

23          MR. GOLDBERG:  Sorry.

24          Thank you, Your Honor.  Adam Goldberg of Latham &

25 Watkins, on behalf of the Church of Jesus Christ of Latter Day

1  Saints.  I'll allow the debtors to respond to Mr. Buchbinder's

2  remarks.

3        I'd like to just address the Court very briefly to

4  echo Mr. Kurtz on the question of bifurcation, if the Court

5  would allow that?

6        THE COURT:  Yes.

7        MR. GOLDBERG:  Thank you.

8        Your Honor, I'd like to address just two points.

9  First is the lack of any precedent for any bifurcation of

10  rulings on the question of confirmation of a plan.  Your

11  Honor, the Mallinckrodt case that's been cited does not, in

12  fact, involve the bifurcation of any decisions of

13  confirmation.  The hearings were split up, as a matter of

14  administrative convenience based on available hearing dates.

15        Judge Dorsey made very clear in status conferences

16  before the Court on October 29th, quote, "The whole thing will

17  be ruled upon after we get through the entire confirmation

18  hearing," end quote.  And the order cited by Mr. Patterson

19  also makes clear that the legal arguments would only follow

20  after the can completion of all evidence presented through the

21  array of phases of hearings.  In short, Your Honor, there's no

22  actual precedent, whether in a case or a rule before this

23  Court in support of bifurcation of, or piecemeal rulings on

24  the adjudication of confirmation of the plan.

25        Second, Your Honor, in our view, there is no

1   efficiency gain from resolution of jurisdictional issues in

2   advance of other issues in the context of this case.  The

3   questions of subject-matter jurisdiction or, quote, "related-

4   to jurisdiction" are inextricably intertwined within the

5   nature of the claims of this case, the insurance rights of the

6   various parties, and the connection of claims and insurance

7   rights to the debtors' estates.  That involves an array of

8   parties and the plan as a whole.  I think, even    Mr.

9   Pachulski acknowledges that.

10          The facts -- and more than that, Your Honor, the

11  facts that are relevant to the question of related-to

12  jurisdiction are also highly relevant to the question of

13  whether the settlement's embodiment of the plan should be

14  approved by this Court, under the * Master Mortgage factors

15  and other applicable standards.

16          So, in this case, Your Honor, in this exceedingly

17  complex case, it's both, necessary and more efficient, for the

18  complete evidence to be before the Court before the parties

19  engage in argument on the legal issues and this Court makes a

20  legal determination.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Mr. Anker?

24          MR. ANKER:  Thank you, Your Honor.

25          Can you hear me okay?

1          THE COURT:  I can.

2          MR. ANKER:  Philip Anker, Wilmer Cutler Pickering

3   Hale and Dorr, for the Hartford companies.  I, too, will let

4   the debtors respond to Mr. Buchbinder's remarks, but I do want

5   to briefly respond to Mr. Pachulski's.

6          Mr. Pachulski suggests that there is some radical

7   change to the plan as currently constructed and, certainly,

8   the current construction reflects a different architecture, if

9   you will, in the -- reflected in the agreement with Century.

10  But the basic proposition that there was going to have to be

11  peace with insurance -- with chartered organizations or some

12  carve-out for one or two, before insurance companies were

13  going to pay hundreds of millions of dollars is both, common

14  sense and is something that has always been part of this plan.

15         If you look at the Hartford settlement term sheet,

16  there was a different way of going about it, but what it

17  provided in words of one syllable was that every abuse

18  claimant, who accepted a distribution from a trust, he would

19  have to grant a release and be deemed to give a release as a

20  condition precedent in order to receive a trust distribution

21  to every chartered organization that would otherwise be

22  entitled to coverage from my client, and, obviously, that

23  would be true for any other settling insurer.

24         When Mr. Pachulski says, maybe we'll need a Boy

25  Scouts alone [sic] plan, let's not check common sense at the

1  door.  Does anyone really think that anyone that the local

2  councils, the insurance companies are going to pay hundreds of

3  hundreds of millions of dollars, a pot of money that is now

4  approaching $3 billion, without obtaining complete peace of

5  claims relating to Scouting -- not relating -- unrelated to

6  Scouting, but relating to Scouting?

7       Of course not.  That's not the real world.  The

8  real world is, one way or the other, that protection has to be

9  there.  And I grant you, Your Honor, if we go down the route

10  of the current architecture, which is a direct release and

11  protection of the chartered organization, Your Honor will have

12  to decide whether I suppose you agree with Judge McMahon's

13  recent decision in Purdue.

14       I do agree with Mr. Pachulski that is, at least, in

15  large measure, a legal issue.  I think her ruling is

16  explicitly, expressly contrary to your ruling in Millennium

17  and contrary to the Third Circuit's ruling in Millennium.

18  Maybe someday the U.S. Supreme Court will say that she is

19  right and Your Honor was wrong and the Third Circuit is wrong,

20  but until and unless she does, I do submit there's controlling

21  law in this circuit.

22       And my biggest point is simply to say the

23  proposition that this is a fundamental, complete change that

24  requires complete re-solicitation ignores what has been on the

25  table through the Hartford settlement all along, along with

1  the fact that the Hartford settlement had what might be called

2  the "most-favored nations" clause.  So, if the architecture

3  changes for others, we can get the benefit of that, as well.

4         But the basic notion that local councils were not

5  going to spend 600-plus-million dollars and insurers weren't

6  going to spend hundreds upon hundreds of millions or more,

7  only to be sued, continue to be sued with respect to Scouting,

8  by all the same claimants, that was -- has been on the table

9  from day one and common sense would tell you that has to be

10  the case.  There is no Boy Scout-alone plan here that makes

11  sense and that is something that's been a reality from day

12  one.  And I wanted the Court to be aware of that when you

13  consider the question of whether more time is needed.

14         I'm not going to speak to bifurcation and the

15  question of whether any legal issue about what the Third

16  Circuit has said on third-party releases should be taken up

17  first or not.  Your Honor may -- that's a decision that seems

18  to me of case management of what makes the most sense to the

19  Court in administering Your Honor's docket.

20         Thank you, Your Honor.

21         THE COURT:  Thank you.

22         That was helpful in terms of understanding, at

23  least, Hartford's position, with respect to what you have

24  characterized as a different architecture of the settlements.

25         Without commenting on Judge McMahon's decision,

1  which I have read, or the Third Circuit's decision in

2  Millennium, which I will be reading for the who knows how many

3  times over the years since it was issued, let me point out

4  that my written decision in Millennium dealt with whether this

5  Court had the constitutional authority to enter a final order

6  granting releases.

7         It did not deal with whether releases are

8  appropriate or not.  That was not the subject of my opinion.

9  That was not the subject of the remand.  It seems to be being

10 used in that context, but that's not the holding, if you read

11 it carefully.

12        I issued a bench ruling with respect to the release

13 in Millennium, a quite different release than the one here.

14 I'll just point that out as people quote me to me.

15        MR. ANKER:  Your Honor, I appreciate that and,

16 obviously, I don't disagree with Your Honor's ruling.

17     (Laughter)

18        MR. ANKER:  I will say that on that issue, which is

19 obviously not the central issue that Judge McMahon addressed

20 in Purdue, she did address that issue.

21        THE COURT:  Uh-huh.

22        MR. ANKER:  And I read of her opinion --

23        THE COURT:  Uh-huh.

24        MR. ANKER:  -- to disagree with Your Honor and the

25 Third Circuit on that issue, and I will not comment, other

1  than to say we're in the Third Circuit and we're in front of

2  Your Honor.

3  　　　　　THE COURT:  I hear that and I'm not going to say

4  anything else.

5  　　　　　MR. ANKER:  Thank you, Your Honor.

6  　　　　　THE COURT:  Thank you.

7  　　　　　Okay.  I am ultimately going to let Mr. Hallowell

8  have the last word, so let me hear from Mr. Ryan, then I'll

9  hear from Mr. Pachulski, then I'll hear from Ms. Lauria, and

10  then, Mr. Hallowell, you will bat cleanup.

11  　　　　　MR. RYAN:  Thank you, Your Honor.

12  　　　　　Again, for the record, Jeremy Ryan.  You know, with

13  respect to Mr. Kurtz' allegations of conflict, I am more than

14  happy to meet with Your Honor in chambers with        Mr.

15  Rice's counsel from (indiscernible) and show you the proposal

16  that two informed clients have in writing to govern.  After

17  that, Your Honor, I expect to never hear another word of it in

18  open court.

19  　　　　　Moving on to substance, Your Honor, the plan has

20  changed, and despite what Mr. Anker just said, the fundamental

21  architecture has changed, because they are reaching into the

22  coffers of charters and rewriting their own insurance policies

23  for funding to the trusts.

24  　　　　　The Hartford term sheet said nothing about that.

25  The Hartford 30(b)(6) witness, when shown the draft Hartford

1  settlement agreement, which out of that condition precedent,

2  not once, but twice, they liked this idea so much they added

3  it twice, that the condition precedent to their draft term

4  sheet wasn't familiar with that concept.  So, let's not

5  pretend that the Hartford knew all along that they were going

6  to rewrite the policies the charters procured for themselves.

7          With respect to Mr. Kurtz saying, we could have

8  asked for the (indiscernible) emails going back to

9  November 27th, I'm glad that Mr. Kurtz has finally decided to

10  waive the mediation privilege, because all of those emails

11  were part of the mediation.  So, what I'm happy to tell Your

12  Honor is that in a mediation session on November 23rd, the

13  Catholics asked Century and Chubb point-blank to provide a

14  list of policies that insured Roman Catholic entities.  That

15  was refused.

16          MR. SCHIAVONI:  I object, Your Honor.  I object.

17  That's just -- it's just not true and it's, in fact -- if he's

18  going to breach mediation privilege, he ought to just say so,

19  but it's not true.

20          MR. RYAN:  Your Honor, Mr. Kurtz opened the door.

21          THE COURT:  Let's not --

22          MR. RYAN:  Mr. Kurtz opened the door by citing

23  mediation emails.

24          MR. KURTZ:  That's not -- that's not even close to

25  true.

 1            MR. RYAN:  And all I'm going to say now, Your

 2  Honor, is --

 3            THE COURT:  Okay.

 4            MR. KURTZ:  That's not even close to --

 5            THE COURT:  Gentlemen -- gentlemen, we don't talk

 6  back and forth.  There's no cross-talk.  People address the

 7  Court.

 8            Mr. Ryan?

 9            MR. RYAN:  So, Your Honor, the suggestion that I

10  should have issued discovery, the suggestion that I should

11  have issued discovery based on terms being bandied about in

12  the mediation, would have required me to violate the mediation

13  privilege.

14            The Century agreement was first publicly made

15  available last Monday, period, full stop.

16            Mr. Kurtz points to lots and lots of lists in the

17  disclosure statement.  Not one of those lists, Your Honor,

18  says, this policy provides coverage and the carrier agrees

19  that it provides coverage.  In fact, I'll read you some

20  excerpt from the disclosure statement.  At page 66:

21            "Some chartered organizations, however, have argued

22  that they believe chartered organizations are insured as

23  volunteers under pre-1976 insurance policies.  The BSA

24  disputes this contention."

25            Later on:

1           "The chartered organizations act as if the BSA's

2    1980-1982 policies may likewise be limited, given that many of

3    these policies are either insolvent, exhausted, or released

4    through settlement."

5           So, we don't have the information as to what

6    policies provide coverage.  We've got lots and lots and lots

7    of lists.  There's not one list that says Boy Scouts and local

8    councils and the issuing carrier agree that this policy is

9    live and provides coverage.

10          That's what we need to know and what we're asking

11   for now.

12          Mr. Kurtz said he's not aware of any policies

13   issued by Chubb.  There's none in the disclosure statement,

14   yet the Chubb Companies are getting a massive release of

15   policies.  So, nowhere has it been disclosed what policies

16   they're getting the release from; again, that's why we're

17   taking discovery.

18          And, fundamentally, Your Honor, they're trying to

19   invade our own property rights, without telling us what

20   property rights they're trying to invade.  This is their plan.

21   This is their burden.  They have to tell me what they're

22   taking away from me.  It's not up to me or my clients to guess

23   now or to guess 10 years down the road when a lawsuit comes in

24   from a future claimant.  Doesn't say, ah ha, that one's gone.

25   You should have objected 10 years ago.

1        They need to declare now, when you transfer assets,

2  you identify the assets you're going to transfer.  You don't

3  say, here's the general concept they're after.  So, that's

4  their burden, not ours.

5        With respect to knowledge and who has it, Your

6  Honor, in court today with me is Mr. James Murray, who is

7  coverage counsel to 16 Diocese and another group of parishes,

8  of which 6 are presently in Chapter 11.  He's been intimately

9  involved, and what he would tell you, Your Honor -- and I'm

10 not trying to make (indiscernible) presentation, but if we're

11 going to testify from the podium, he only knows what he knows

12 from those representations.  No one knows, with respect to the

13 rest of the Diocese.

14       But what we can tell you is that the Archdiocese of

15 New York bought over 25 years of policy from Century and

16 Chubb.  The Archdiocese of New York is not a chartered

17 organization.  They're not getting a release under this plan,

18 but yet under the definition of abuse claim and the channeling

19 injunction and what's being transferred to the trust, they

20 would lose their own coverage and not get a release.

21       In the Buffalo bankruptcy, there are four different

22 Chubb carriers that insure over 40 parishes, pre-1976.  So, my

23 example in my motion, or my joinder, underestimated, because I

24 hadn't had the chance to talk to Mr. Murray yet.  Even if five

25 policies for each of those 40, that's 200 for one Diocese.

1          Only the carriers know the world of the policies

2    that they have written.  They have the data.  They are the

3    ones seeking to be released.  They should provide it.

4          And with respect to Bates White and the mapping,

5    all I'm going to say, Your Honor, is if they're going to build

6    a structure of an injunction release that is dependent on a

7    claim being covered by a policy, shouldn't they be able to

8    tell us what claims are enjoined and what claims are not?

9          That seems fundamentally fair for their burden to

10   tell us what exactly are the holes and the cloth of the

11   patchwork quilt that they offer to provide.

12         Unless Your Honor has any other questions, I think

13   I've said enough.

14         THE COURT:  Thank you.

15         I think I said Mr. Pachulski next.  Mr. Pachulski?

16         MR. PACHULSKI:  Thank you, Your Honor.

17         I just want to make two very quick points.  And Mr.

18   Anker is a very accomplished advocate, so I totally appreciate

19   his comments, but the thing he doesn't mention is that, with

20   respect to many of the claims that are now being released that

21   were not provided for in the plan, which relates to the pre-

22   1976 period, the reason Hartford is now getting it is because

23   of the most-favored-nation provision in their term sheet,

24   since Century gets it, now they get it.

25         That was not necessarily contemplated.  No one knew

1  there would be a Century settlement, no one knew what the

2  Century settlement would look like, but to say we all

3  anticipated this is really not particularly fair and it's not

4  accurate.  And I think changing a plan vis-a-vis 47,000

5  claimants is material and should be -- and, typically, in any

6  case you'd have to either modify the plan and re-solicit or do

7  something.  I'm not sure what else could be done, but I don't

8  think it's as simple as we all knew that there would be

9  changes.  Hartford had a term sheet, it was clear, and then it

10  changed it because of most-favored-nation.

11            The second --

12            THE COURT:  I don't think that's what he said, but

13  I think what he said had to do with the current TDP and how

14  one would get a distribution out of it.  And I appreciated

15  that he brought the difference in architecture to my

16  attention.  Whether I agree with him or not, I don't know, I

17  have to go back and look.  And that's also an issue for the

18  debtor and it's an issue that you're raising that people are

19  going to raise, I assume, as to whether this is a material

20  difference.  And I'm not going to -- I'm not in a position

21  because I don't have the briefing on that to make -- and I

22  haven't looked at the provisions to make a difference, but I

23  think there's a nuance in what he said, which, again, I may or

24  may not agree with, but I think it's a nuance.

25            MR. PACHULSKI:  Okay.  I appreciate that, Your

1    Honor.

2              The second part, Your Honor, is Your Honor --

3    there's no question Your Honor has the ability to bifurcate,

4    if that's what you deem appropriate.  You can either do it --

5    and I've had plenty of cases where courts have said we're

6    going to deal with an issue and I'll give you a tentative

7    ruling on a matter before I go forward at trial.

8              So I don't think there's any question that you can

9    do it, I think courts have done it.  I'm not sure exactly how

10   it was done in PG&E, but I know certain issues were determined

11   prior to other issues.  So, if Your Honor determines you want

12   to do it, I don't think anyone can question that you have the

13   ability to run your court as you deem appropriate.

14             So those were the two comments I wanted to make,

15   Your Honor, since I know you've heard a lot about this today.

16             THE COURT:  Thank you.

17             MR. PACHULSKI:  Thank you, Your Honor.

18             THE COURT:  I appreciate it, I do, although I've

19   never given a tentative ruling.  I know they do that a lot in

20   California.  I've never done that.  And I thought it was an

21   interesting concept as a practitioner the couple of times I

22   was in the California courts, but I haven't done it as a

23   jurist.

24             MR. PACHULSKI:  Well, Your Honor, I think you could

25   do it as a final also as part of it.  It is done in California

1  and I think I've seen throughout the country both as a

2  tentative and also as a final determination of the issue.

3  But, again, that is Your Honor's determination.

4          THE COURT:  Thank you.

5          MR. PACHULSKI:  Thank you, Your Honor.

6          THE COURT:  Okay, I see Mr. Schiavoni's hand up and

7  he hasn't addressed me yet, I'll let him do it, then we'll go

8  to Ms. Lauria.

9          MR. SCHIAVONI:  Thank you, Your Honor.

10          If I could just start on a really positive note,

11  you know, I did not get to comment at the beginning, but we

12  are very grateful to all the work that Jeremy Ryan put in

13  helping us with the Methodist settlement.  He was representing

14  both the Methodists and the Catholics.  In many ways, I

15  attribute him as almost being the architect of that

16  settlement, you know, with the Methodists and with Century.

17          The notion here that was fundamental to getting the

18  Methodists done was that the charters are absolutely essential

19  to the Boy Scouts; the two can't operate without the other.

20  Mr. Ryan has an expert report on file for the Methodists

21  pointing that out, making that very essential point, and that

22  point is what makes the release of the charters absolutely

23  integral to the restructuring of the Boy Scouts.  The two,

24  they can't be done without the other.  Mr. Pachulski knows

25  this.

1          The notion of a Boy Scouts-only restructuring is

2   just a shorthand for liquidation.  There's no way -- just read

3   Mr. Ryan's expert report that he put in for the Methodists and

4   sort of being the fundamental, you know, real brains behind

5   the settlement that we got done here, it's essential.  And

6   that shows up in the original local council settlement

7   conditions their payment on a satisfactory resolution of the

8   charter issue.

9          The Hartford settlement has a most-favored-nation

10  clause, but it was also conditioned on a satisfactory

11  resolution of the charter issue.  And, for us, it was

12  essential.  There's no way people are going to make a payment

13  only to be sued all over again.  Your Honor had extensive

14  briefing from us in connection with the RSA about illusory

15  nature of releases.  Having that was key.  And Mr. Ryan worked

16  with us on that to get us that release in connection with the

17  Methodists.

18          There's a little bit more wood to chop, obviously,

19  with the Catholics and, you know, explaining it to them,

20  obviously.  I think that's obvious from the discord today.  To

21  the extent he was able to get the Methodists over the line,

22  we're very confident that additional talks are (indiscernible)

23  with the Catholics.  There's obviously some sort of

24  misconception buried there among the Catholics and this is --

25  you know, the notion here that they don't understand their

1  coverage, Your Honor, the Catholics -- Mr. Ryan has filed an

2  expert report on behalf of an insurance expert that explains

3  their coverage.  He doesn't say in there he doesn't understand

4  it in his expert report, he fully explains it and he attaches

5  multiple schedules listing it.

6           Century has produced copies of the BSA policies it

7  has and the local council policies it has.  It refers to even

8  the extrinsic evidence that was located besides that as an

9  attachment to its term sheet.

10           There's been some suggestion here that coverage is

11 being, quote, "taken away."  There is no assignment of the

12 policies independently issued to the churches.  I think there

13 was some suggestion of that and that's sort of why we should

14 go off on this frolic and try to identify policies issued to

15 innumerable churches over, you know, 200 years.  It's like

16 there is no assignment of policies to the charters.  What --

17 you know, what has happened here is Century has paid $800

18 million, the other insurers will pay additional hundreds and

19 hundreds of millions of dollars in order to receive a release

20 for themselves and their policyholders of the abuse claims,

21 the Boy Scouts abuse claims; not the non-Boy Scouts aspect of

22 any claim, but the Boy Scouts part.

23           We've gotten the Catholics and the other charters a

24 commensurate protection as far as the channeling injunction.

25 They're not losing anything, they can -- it's like Mr. Ryan's

1  clients can opt out, if they want, but even then they're not

2  losing anything as far as the coverage that we're going to get

3  -- that we would get a release from, they're still getting a

4  channeling injunction.

5          So, I think, you know, the time will come where we

6  can, I think, present to Your Honor in somewhat more detail,

7  you know, and briefing before us and not on the fly what's

8  happened here, but there's been just a real

9  mischaracterization of what the settlement is about and what's

10  achievable here.  There is no bankruptcy; this is absolutely

11  integral to the whole bankruptcy getting this -- getting the

12  charters released.  There is no -- and, again, just look at

13  Mr. Ryan's report, it's like that -- you know, that's what

14  that says.  We're happy to work with him on whatever

15  additional questions that his other sets of clients have.  His

16  first set of clients, who were in more or less an identical

17  position, he was very helpful in bringing them, you know, to

18  the table, and we're confident that that's going to happen

19  with regard to the Catholics, Your Honor.

20          Thank you very much.

21          THE COURT:  Thank you.

22          Ms. Lauria.

23          MS. LAURIA:  Thank you, Your Honor.  Jessica

24  Lauria, White & Case, on behalf of the debtors.

25          I wanted to respond to Your Honor's question

1  concerning additional disclosure, and also Mr. Buchbinder's

2  remarks concerning 1127, because the debtors did in fact give

3  this a lot of thought.

4         As the Court is aware, 1127(a) permits a plan

5  proponent to modify a plan during the solicitation period.

6  1127(c) says that, in order to modify the plan during that

7  time period, Section 1125 does need to be complied with.  So

8  we took a very hard look at both our disclosure statement, but

9  also the case law interpreting 1127(c).  That includes the New

10  Power decision out of the Eleventh Circuit, 438 F.3d 1113

11  (11th Cir. 2006), citing Am. Solar King and the Simplot

12  decision, Am. Solar King I believe being out of this

13  jurisdiction.

14         And the courts interpreting 1127(c), I believe,

15  universally have held that the issue is not whether the plan

16  has changed and whether the change is material, but whether

17  the change is materially adverse to the voting constituents

18  such that, if you had voted in favor of the plan, you would

19  want to change your vote.

20         So we took a look at the two classes that I believe

21  are affected by the plan amendments, as well as the prior

22  disclosure that was made with respect to those classes, and we

23  universally concluded that no additional disclosure would need

24  to be made.  That doesn't mean we didn't believe they needed

25  to be noticed -- and I'll come back to notice in a moment

1  because we have provided extensive notice over the last week

2  of the changes that were made, but the question is whether

3  they needed additional disclosure.

4          And when we look at the class of abuse claimants,

5  that Class 8 direct abuse claims, from the debtors'

6  perspective -- and I believe all of the plan proponents are in

7  accord -- the plan has changed in a universally favorable

8  manner with respect to the class of direct abuse claimants.

9  We went from having a pot of funds in the billion-five-ish

10  range to now being close to $3 billion, a guaranteed enhanced

11  recovery.  By the way, that $3 billion is above the low end of

12  the Bates White range that was in the disclosure statement

13  that went out for solicitation.  So we've got significant,

14  billions of dollars of funds that are on the table for the

15  Class 8, the class of direct abuse claimants.

16          When we look at Class 9, that's the indirect

17  claimants, and the indirect claimants is where the chartered

18  organizations would fall.  We again have concluded that the

19  chartered organizations are far better off under the plan

20  today than they were two weeks ago and that's for a couple of

21  reasons.  And put the Catholics to the side for a moment, but

22  I'm going to come back to the Catholics.

23          As Mr. Schiavoni said, there is a -- this case is

24  highly integrated between the charters, the local councils,

25  and the insurers and the BSA.  All of the policies, at least

1    on the BSA and the local council level, are wrapped into one.

2    There was no way we were going to be able to deliver the

3    consideration for Class 8 direct abuse claims unless we

4    addressed the additional insureds issue under the various

5    policies.  Because of that, in the context of the Century

6    deal, the chartered organizations -- which, by the way, the

7    plan has always been crystal clear, in order to get the

8    benefit of the channeling injunction, they'd have to

9    contribute their insurance rights and there would have been

10   some sort of monetary contribution for the chartered

11   organizations.  We've had literally since February of 2020 in

12   the plan.

13           We now have the insurance rights that are being

14   contributed, we had the local council step up to the plate to

15   provide an additional contribution for the chartered

16   organizations -- again, putting aside the Catholics and the

17   Methodists -- and, as a result, now the chartered

18   organizations, putting those two aside, are getting full and

19   complete releases.  In fact, it wouldn't surprise me when we

20   get to plan confirmation if I tout the overwhelming support of

21   that class to this Court.  That we're going to have people

22   say, well, I should have just deemed them unimpaired because

23   literally their claims against the debtor are getting fully

24   released and channeled to the trust.

25           With respect to the Methodists -- so there's only

1  two groups of chartered orgs that are left, the Methodists and

2  the Catholics.  The Methodists we reached a resolution with

3  today.  With respect to the Catholics, there has been -- and

4  Mr. Schiavoni I think pointed this out very clearly and I'm

5  not going to repeat his remarks, but there's been a complete

6  misimpression I think left with the Court and the parties in

7  interest what is happening to the chartered organization

8  insurance policies.

9          We're not assigning chartered organization

10 insurance policies to the trust.  With respect to a finite

11 category of claims, Scouting-related abuse claims, to the

12 extent the Catholics have a Scouting-related abuse claim

13 asserted against them, that Scouting-related abuse claim is

14 actually being released to the extent there is a settling

15 insurer that covered it, because they're also releasing the

16 settling insurer for that claim.  It's a back-to-back release,

17 a release of the insurance to the extent it covers a Scouting

18 abuse claim and a release of the chartering organization with

19 respect to the Scouting abuse claim, it's completely back-to-

20 back.  It is not detrimental, contrary to what Mr. Buchbinder

21 suggested and what Mr. Ryan suggested, it is not detrimental

22 to the Catholics.  They are put in either a better position

23 or, at worst, a neutral position to where they are today.

24         We're only talking about Scouting-related abuse

25 claims and coverage for Scouting-related abuse claims.  The

1  Catholics still get the benefit, assuming they don't object to

2  the plan, of the post-1976 release, that's been in the

3  document the entire time.  And with respect to the pre-1976

4  time period, it's always been crystal clear in the plan that,

5  if you want the release, there needs to be some party that

6  makes a contribution to secure that release, and for the

7  Catholics, that's why we are still negotiating with those

8  parties.

9          So as we looked at the two affected classes, Class

10 8, direct abuse claims; Class 9, indirect abuse claims, we

11 don't believe under New Power, Am. Solar King, Simplot, that

12 the plan is materially adverse to those creditors.  We believe

13 the plan changes are positive for those creditors.

14         Now, let me turn to notice because --

15         THE COURT:  Let me ask you a question before you do

16 that.

17         MS. LAURIA:  Sure.

18         THE COURT:  So, with respect to the chartered

19 organization's own insurance policy that it purchased, with

20 respect to non-Scouting-related abuse claims, the chartered

21 organization can still look to that policy for coverage?

22         MS. LAURIA:  Non-Scouting-related abuse claims are

23 unaffected, their policies are unaffected by the settlements

24 that are in the plan.  This only deals with Scouting-related

25 abuse claims and coverage for Scouting-related abuse claims.

1          THE COURT:  Thank you.  Okay, notice.

2          MS. LAURIA:  You're welcome, Your Honor.

3          So, with respect to notice, we are very sensitive

4  to the fact that we are in the solicitation period and notice

5  is particularly important for all voting creditors.  I'm going

6  to put to the aside the very sophisticated lawyers that have

7  been attending these hearings week in and week out and whether

8  they can formulate their own objections, focused only

9  survivors and the voting constituencies.

10          After court last week, when we announced the

11  Century settlement, we put together a plain English, not-

12  advocacy piece describing the fact that the debtors have

13  reached an agreement with Century, instructed voters --

14  actually, this went to all voting parties, thousands of them -

15  - instructed them to consult with counsel, where they could

16  obtain ballots, how they could contact Omni, and we attached

17  the Century term sheet to that notice.  That notice went out

18  on the 15th, that was six days ago.

19          As parties have noted, it was either Friday night

20  or Saturday morning, we then filed plan amendments that took

21  into account the changes that needed to be made for the

22  Century settlement agreement.  We then prepared a second

23  notice that said the debtors have modified the plan, being

24  sensitive to the fact that in the Third Circuit and certainly

25  in Delaware it is critically important that all voting parties

1   receive full notice of any releases that they're giving under

2   a plan.

3           We actually copied the release provisions from the

4   plan, similar to what we did in their ballots, into the form

5   of the notice itself, including references to where they could

6   find the defined terms because, as we lawyers know, the

7   defined terms are often extremely important.  We then told

8   them how to get a free-of-charge copy of the plan by

9   contacting Omni.  We instructed parties to contact their

10  counsel, we instructed parties where they could get another

11  ballot if they wished to vote again on the plan or change

12  their vote on the plan.  And that notice was printed over the

13  weekend and mailed on, I believe it was Monday, to all voting

14  parties with respect to the case.

15          In addition to the folks that are on today's Zoom

16  and the sophisticated counsel representing those parties, we

17  did send to the 2002 list, effectively, the actual plan and

18  actual disclosure statement. Omni -- or, excuse me, the actual

19  plan, the actual blackline of the plan -- Omni estimated the

20  cost of mailing those documents to all voting parties over the

21  weekend at over a million dollars and, at this point, a

22  million dollars is actually really material in this case.  And

23  so that's why we ended up, as I think the Delaware rules would

24  instruct, copying and pasting the actual releases into the

25  notice form itself rather than dumping the blackline document

1  on all of the voting parties.  But that's what we did to

2  provide notice of the changes that were made with respect to

3  the Century deal.

4           And I guess, Your Honor, I'm happy to answer any

5  questions on that.  I would just conclude because I suppose

6  now I'm stealing Mr. Kurtz's thunder, by just concluding with

7  a brief remark on the bifurcation, and this really follows

8  what Mr. Schiavoni said, which is this is -- everything hangs

9  together in this case, the releases, the insurance

10 settlements, frankly, the disputes that we're going to have

11 with respect to the plan, it's all integrated.  And while I

12 think the debtors are all ears about how to make this more

13 efficient and cost-effective, at the end of the day, the

14 entire plan is about the release provisions and getting the

15 organization holistically out of bankruptcy and putting

16 Scouting -- Scouting, we're talking Scouting-related abuse

17 claims behind us, and that's why we have failed to see how

18 bifurcation is really possible in this case because of how

19 everything hangs together.

20          And, frankly, all of the history that we have had

21 in this proceeding between the preliminary injunctions that

22 have been granted and extended, local council issues,

23 chartered organization issues, we're now at the point where it

24 does hang together and we look at it more holistically than I

25 think some of the other parties.

1          THE COURT:  Thank you.

2          Okay, so I'm going to do this, Mr. Buchbinder, Mr.

3 Ryan, Mr. Patterson, and Mr. Holloway -- Hallowell, sorry --

4 no one else.

5          Mr. Buchbinder?

6          MR. BUCHBINDER:  Thank you, Your Honor.  I will be

7 extremely brief.

8          I just want to point out two things.  Number one,

9 the recent plan amendments also revised the definition of

10 abuse claims, and abuse claims did not previously include, but

11 they now include claims for breach of fiduciary duty, gross

12 negligence, and willful misconduct.  I would like to make that

13 point.

14          Second, a mailing on December 20th to a lot of

15 people who have a voting deadline of December 28th, the odds

16 of that mail reaching those people timely, I think that that

17 million dollars may have been wasted because most of that mail

18 will not be delivered until after Christmas.

19          Thank you.

20          THE COURT:  Well, there is that.  Okay.

21          Mr. Ryan?  You're muted.

22     (Pause)

23          THE COURT:  Mr. Ryan, you're muted.

24          MR. RYAN:  I apologize, Your Honor.  Your Honor, I

25 would just ask you to read paragraph 9 and 10 of the Century

1  term sheet, that tells you what's happened to chartered

2  organizations, that tells you what's happening to their own

3  insurance policies.  I can explain it and argue it, Mr.

4  Schiavoni can do it, Ms. Lauria can do it, but, ultimately,

5  you're the arbiter and paragraph 10 has the word "assignment"

6  in it.  That's point number one.

7          Point number two, there are 30,000 chartered

8  organizations affected by the assignment of their policies --

9  or partial assignment of their policies, it is a partial

10 assignment -- that are not creditors, that are not getting

11 notices to their going-to-voting creditors.  They didn't file

12 proofs of claim, 16,000 charters did of the 45,000-plus.

13          THE COURT:  Thank you.

14          Mr. Patterson?

15          MR. PATTERSON:  I just wanted to be very brief

16 about the back-to-back releases because the survivors are the

17 third back and it's on their backs that the back-to-back

18 release is being affected.  The effort is effectively to take

19 the charters' non-abuse policies away from them, to the extent

20 those non-abuse policies could also respond to an abuse claim

21 because it's a CGL policy, for example, to take that away from

22 the charters.  But don't worry, charters, the plan will grant

23 you a release of all claims by the individual survivors that

24 that policy would have to respond to, to the extent they're

25 direct abuse claims.  That is a massive shift in the plan.

1    And our clients are obviously aware of it, we are -

2  - I hesitate to say sophisticated, but we generally don't lose

3  our way on the way to court and carry a bankruptcy code with

4  us.  So we were able to digest the essential information, but

5  the essential information is that survivors were always told -

6  - and I think we attached the FAQs to our objection -- the

7  identity of the only two groups of people that -- who could be

8  sued post-confirmation, and those were non-contributing

9  chartered organizations against which you have a claim and

10  non-contributing chartered organizations' insurers, and there

11  was a carveout for the post-'76 claims, that has been

12  completely altered.

13    And the system that Ms. Lauria described with her

14  hands interweaving is very apt because what's happening is

15  that those hands are closing in on the throats of the

16  survivors who previously could have asserted claims against

17  the charters and can no longer.

18    We believe that the Court does not have subject

19  matter jurisdiction to do that.  No matter how expedient, no

20  matter how desirable, no matter how much large insurance

21  companies want it, no matter how much the Boy Scouts on their

22  honor want it, this Court does not have jurisdiction to

23  accomplish that task over the dissent of a survivor.  And we

24  can hear it on the first day, we can hear it on the 35th day,

25  the outcome is going to be the same, Your Honor, we've read

1  the precedents.

2         THE COURT:  Thank you.

3         Okay, Mr. Hallowell.

4         MR. HALLOWELL:  You're muted, Your Honor.

5         THE COURT:  I'm muted.

6      (Pause)

7         THE COURT:  Can you hear me now?

8         MR. HALLOWELL:  Yes.

9         MS. LAURIA:  Yes.

10        THE COURT:  Mr. Hallowell.

11        MR. HALLOWELL:  Thank you, Your Honor.

12        I want to bring us back to where we started today,

13  which is the certain insurers' motion for an adjournment of

14  the hearing.  We've heard a lot of over the last two hours,

15  Your Honor, and everything that we've heard over the last two

16  hours confirms that the insurers' motion should be granted and

17  we should be afforded the additional time that we absolutely

18  need to complete the discovery that has gone on in this case

19  to, prepare our confirmation objections so that we can

20  participate in these proceedings, consistent with our due

21  process rights.

22        There was some discussion of the discovery that has

23  taken place.  Mr. Kurtz raised it, others did, and it just

24  confirms the delay and slippage that has occurred.

25        Mr. Kurtz talked about the document discovery that

1 the debtors made and he referenced a November 19th date.

2 That's the date he centered on, Your Honor.  November 19th is

3 two weeks past the substantial completion date that the

4 parties were supposed to have for production of documents in

5 this case.

6         Many parties, Your Honor, have talked about the

7 ongoing depositions that have taken place.  Nobody disputes,

8 Your Honor, that significant material depositions are still

9 going on this week and will go on next weed, and should have

10 been completed by December 1st.  This is a prejudice to the

11 insurers and we need the additional time as a result.

12         Your Honor talked about the law firms that are the

13 subject of the discovery that we have served.  And I can

14 confirm, Your Honor, and Your Honor has heard over the past

15 two hours, those law firms are not cooperating with the

16 discovery that we have served, they are continuing to raise

17 objections in a meet-and-confer process, they are the

18 constituents of Mr. Molton's client and, as Your Honor stated,

19 if they chose to do so, they could cooperate; they have not

20 done so.  And no one has spoken up or them in this proceeding

21 at any point over the last two and a half hours to suggest

22 that anything I'm telling you.

23         There's additional outstanding discovery that I

24 talked about that needs to go forward.  We mentioned the staff

25 members, Mr. Pachulski agrees with us with regard to the staff

1  members, and in fact significant additional discovery needs to

2  take place with regard to other parties as well.  Both the TCC

3  and the Catholics have mentioned that they intend to serve

4  additional discovery now directed to other parties as a result

5  of the things that you've heard about over the past two hours.

6        But I don't want to get lost in this process, Your

7  Honor.  As it stands right now, we are less than three weeks

8  away from our confirmation objection deadline and you've heard

9  everything that has to take place between now and then, and

10 it's just impossible, Your Honor.  Twenty-some experts have

11 been served with detailed reports, as Mr. Pachulski mentioned.

12 There will still be fact depositions that need to take place

13 over the next several weeks, there will still be additional

14 depositions that need to take place in that time.

15       And so, Your Honor, for all of those reasons we

16 need the time and it should be granted.

17       You've also questioned the issue of phasing or

18 doing things -- doing things with the time that Your Honor

19 has.  And, Your Honor, I would simply submit, first of all, we

20 are happy to address those issues and to identify a way to

21 segregate hearing dates in a manner that allows us to complete

22 the discovery that we need to complete to prepare the

23 objections that we need to prepare, but that allow other

24 issues to go forward in this case.  And Your Honor has heard

25 two-plus hours of those other issues.  It's clear from the

1   hearing today that there are ample things that this Court and

2   these parties need to work on while the necessary discovery

3   and preparation for the confirmation hearing that the insurers

4   need to take place can get done on an extended time.

5          And I would simply add, as Mr. Pachulski mentioned,

6   we are open to it.  We talked to his clients about it over the

7   weekend.  He probably doesn't recall that they were supposed

8   to get back to us, but that's okay.  We are open about these

9   issues and perfectly happy to continue the dialogue, but, Your

10  Honor, we need to have an extension that allows us to complete

11  the necessary discovery and complete are appropriate briefing,

12  and to get ready for a trial in a reasonable and fair way.

13         Thank you.

14         THE COURT:  Thank you.

15         Okay.  Well, I'm very sensitive to the fact that

16  this debtor is a not-for-profit and that a main source of its

17  income comes from members and/or donors who would, from their

18  perspective, like to see this company come out of bankruptcy.

19  But I'm convinced from the discussion that I've heard that the

20  motion should be granted.

21         I think people have been working flat-out to

22  achieve a very aggressive schedule toward confirmation, but

23  there's agreement that there are 18 expert depositions that

24  still need to be taken.  There's other discovery that's

25  suggested that needs to be taken.  And I'm not going to

1  comment on the appropriateness of discovery that's not been

2  before me.  I've ruled on some, that hasn't happened yet.

3  I've heard different depositions people want to take.  If

4  there can't be agreement, I'll hear those disputes

5  expeditiously.

6          But I also hear different and further legal issues

7  that need to be briefed that were not necessarily contemplated

8  when this schedule was put in place.  And the combination of

9  those things leads me to conclude that some additional time is

10  needed and a month is not, on a relative scale, an

11  inappropriate amount of additional time.  I do not anticipate

12  moving the schedule again.

13          I also recognize that a firm date does drive

14  settlements.  And so, again, I hesitate to move it, but that's

15  why I'm also saying I do not anticipate it will be moved

16  again.

17          As far as the bifurcation or phasing, I think I

18  said something at the RSA hearing to the effect of I'm going

19  to let the debtor present the case it wants to present and

20  present the plan it wants to present, and I'm going to let

21  them do that.  They do not believe, at least at this point,

22  that there can be an effective phasing or decoupling of

23  issues, if you will, and I'm going to let them present their

24  case in the fashion that they want to present it.  So I am not

25  going to myself try to determine if there are separate issues

1  that could be tried and/or determined on a preliminary basis.

2          I also hesitate on some sort of tentative ruling,

3  especially on the significant kind of issues we're talking

4  about.  I do think that I need a complete record in front of

5  me and that certain of the legal issues are intertwined with

6  factual, evidentiary issues and may be the subject of dispute.

7          I also stick by my statement that the voting

8  deadline will stay where it is.  If there is a survivor who,

9  after reviewing the settlements, wants to change his vote

10  because he believes he has new information, I'll address that

11  as appropriate, but I do want to see what the vote is, I think

12  we all need to see what the vote is.

13          Any number of people on today's call has rightly

14  assessed this as a complex case and it is.  And I am counting

15  on counsel, particularly with this additional time, to confer

16  about an efficient, effective, organized way to present the

17  issues to me at the confirmation hearing.

18          So we'll start on February 22nd -- we'll start on

19  February 22nd.  And to the extent that the -- I know that

20  there was a revised schedule in the motion, I don't know that

21  parties have commented on it, I suspect not because of the

22  objections.  I will give the parties a chance to consult on

23  the proposed schedule, revised schedule and, if it's

24  acceptable the way it's been proposed, you can let me know

25  that.  And if there need to be changes, certainly, as long as

1    there's agreement, I'll enter that under certification of

2    counsel.  But I'll give the parties an opportunity to review

3    the proposal made by the insurers.

4            Okay, I see some hands.  Mr. Pachulski.

5            MR. PACHULSKI:  Your Honor, just a very quick

6    question, and I appreciate Your Honor's comments with respect

7    to the scheduling.  What I want to bring up and just because

8    people are working right now is my understanding is rebuttal

9    experts are due -- rebuttal expert reports are due on December

10   24th, which is Christmas Eve.  I think, under the proposal,

11   they're now moved to January 10th.  And, since it is coming

12   up, that would be the only one that I'd ask if Your Honor has

13   a view or if we can at least temporarily suspend because I

14   know people are working very hard to do it right before the

15   holiday.

16           THE COURT:  Well, my only thought on that is that

17   the extension does not -- was not meant to let people take

18   their foot off the gas, it was because there's additional time

19   that's needed.  So I don't know if the rebuttal reports will

20   be substantially affected by discovery that has not yet taken

21   place, so I don't know the answer to that question.

22           MR. PACHULSKI:  Okay, Your Honor.  They will,

23   that's part of the issue, it's not just getting an extension,

24   but as we mentioned that, because of the Century, Methodists,

25   and related depositions, it will affect the rebuttal reports,

1  but we can speak to the parties and discuss that with them,

2  but that was the major reason.  It's not just the time because

3  we've been working on it, but at least we can add our findings

4  based on those depositions, depending on when they're taken.

5          THE COURT:  Okay, I'll let you talk about that.

6  Again, I really do appreciate that people have been working

7  flat-out and I really do appreciate that it's the holiday

8  season, but that's not the reason that I granted the

9  extension.  So --

10          MR. PACHULSKI:  That's fine, Your Honor.

11          THE COURT:  -- I don't want things pushed off just

12  to push them off and then crunch people later.

13          Mr. Patterson?

14          MR. PATTERSON:  Your Honor, I sort of -- I intended

15  to ask this question in any event and neglected to previously,

16  but can the Court give the parties any guidance on whether the

17  confirmation hearing will be in person or be conducted through

18  this mechanism?  I have a block of rooms reserved at my

19  second-favorite hotel in the world, but any guidance the Court

20  could provide would be helpful.

21          THE COURT:  So I had hoped that we would be able to

22  have the hearing in person because I'd like to see the

23  witnesses in person.  I really -- while we've been using this

24  method for the last almost two years, as we all know, it's not

25  optimal.  It's what we're doing because we need to and it

1  works, but it's not optimal.  I prefer that.

2          I have been thinking about what that entails in

3  terms of logistics because right now our current order, which

4  I believe is the sixth amended order in place for hearings in

5  the court, requires three-foot distancing in the courtroom and

6  masking, and I don't know how many people that means I can

7  accommodate.  And we will figure that out.  But then there's

8  the issue of, because of that, who can be in the courtroom,

9  how many lawyers from a firm should be in the courtroom, and

10  how to allocate the space in a fair manner.  Even if we were

11  at full capacity, I suspect we need an overflow courtroom or

12  two, and I recognize that those not in my courtroom will feel

13  at somewhat of a disadvantage.

14          So that's something the parties can also think

15  about in terms of whether you can come up with a way -- and I

16  will think about it as well -- that that can happen.

17          Having said all that, the omicron surge that we've

18  seen over the last couple of weeks, which is just incredible

19  to me, makes me hesitate.  And I noticed that Judge Sontchi,

20  who had been sort of the pilot in the court on in-person

21  hearings again, put that on hold.

22          So I think we're still in a little flux.  My

23  preference would be to have an in-person hearing -- it would

24  have to be hybrid, a hybrid hearing.  So I would say block

25  those rooms at your second-favorite hotel for February, for

1  the February hearing, but I think we're going to have to see

2  how this omicron plays out and go from there.  I do know the

3  state also -- our Chief Justice Seitz also put in-person

4  hearings on hold.

5         So I don't think we have any state orders from the

6  Governor.  We're all just going to have to see how this plays

7  out, unfortunately.  Who thought we would be here two years

8  from now -- from then.

9         So I hope that helps.

10        MR. PATTERSON:  Enormously.  Thank you.

11        THE COURT:  Thank you.

12        Any other questions?  Mr. Pachulski, is your hand

13  up again?

14        MR. PACHULSKI:  Yes, one very quick one, Your

15  Honor.  Just so we can make arrangements, what is your

16  anticipation from February -- I know the last one we had set

17  aside a week, I just didn't know if you had anticipation what

18  we should set aside.

19        THE COURT:  This is more than a week.  I mean, it's

20  clear --

21        MR. PACHULSKI:  No, no, in terms of your

22  availability, Your Honor.  I know it's going to be a lot more

23  than a week, but just in terms of availability.

24        THE COURT:  It's clearly more than a week and I'm

25  going to, you know, clear my schedule to the extent that I

1  can.  I can see I'm already interfering with something that

2  I'm going to have to move, which I will, and we're going to

3  keep it open.  We may have a day or two that we take off from

4  this case during the couple of weeks or few weeks that we have

5  this, but the idea would be for it to be -- you know, continue

6  until it's done.

7         MR. PACHULSKI:  Okay, thank you, Your Honor.  That

8  was my question for logistics, thank you for that.

9         THE COURT:  Any other questions?

10        (No verbal response)

11        THE COURT:  Okay, Counsel, thank you very much.  We

12  are adjourned.  If I don't see you before the end of the year,

13  happy New Year.

14        COUNSEL:  Thank you, Your Honor.

15        (Proceedings concluded at 4:53 p.m.)

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2

3       We certify that the foregoing is a correct transcript

4  from the electronic sound recording of the proceedings in the

5  above-entitled matter.

6
   /s/Mary Zajaczkowski                December 21, 2021
7  Mary Zajaczkowski, CET**D-531

8
   /s/William J. Garling              December 21, 2021
9  William J. Garling, CE/T 543

10

11 /s/ Tracey J. Williams             December 21, 2021
   Tracey J. Williams, CET-914
12

13

14

15

16

17

18

19

20

21

22

23

24

25