# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Re: Docket Nos.:  6528** |

**THE OFFICIAL COMMITTEE OF TORT CLAIMANTS' STATUS REPORT RE: SECOND MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

The Official Committee of Tort Claimants (the "TCC") appointed in the above-captioned chapter 11 cases of Boy Scouts of America and Delaware BSA, LLC (collectively, the "Debtors") hereby files its status report (the "Status Report") in connection with the *Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 7832] (the "Plan"),[2] and respectfully states as follows:

       1.       The TCC originally prepared this Status Report in anticipation of the January 10, 2022, 10:00 a.m. (Eastern Time) status conference with Participating Parties as ordered by the Court pursuant to paragraph 13 of the *Order (I) Scheduling Certain Dates and Deadlines in Connection With Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relief* [Docket No. 6528] (the "Plan Scheduling Order").  However, late in the evening of January 6, 2022, counsel for the Debtors

---

[1] The Debtors in the chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, Texas 75038.

[2] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

1

advised parties in interest through the filing of an agenda notice [Docket No. 8174] that all hearings on January 10 had been canceled.

2. At its December 21, 2021, hearing regarding *Certain Insurers' (I) Motion to Modify the Confirmation Scheduling Order and (II) Motion for an Expedited Hearing on the Same* [Docket No. 7769] (the "Motion to Modify"), the Court emphasized the importance of the voting results, indicating that the survivors' exercise of their right to vote would "inform the Court as to . . . what [the Court] should do in certain circumstances, what's appropriate to do and, for this reason," the Court expressed interest in "know[ing] where that vote comes out."[3]

3. Survivors have spoken. The Preliminary Voting Report indicates that only 73.12% of holders of Class 8 Direct Abuse Claims voted to accept the Plan and 26.88% of such holders voted to reject the Plan.[4] If survivors that elected to take the $3,500 expedited distribution are counted separately from other Direct Abuse Claims, acceptances drop to 70.5% and rejections increase to 29.5%. In addition, Class 9 Indirect Abuse Claims voted to reject the Plan with acceptances of 63.99% in favor of the Plan, less than the two-thirds amount necessary to signify acceptance by this class of claims.[5]

---

[3] Transcript of Hearing before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge regarding *Certain Insurers' (I) Motion to Modify the Confirmation Scheduling Order and (II) Motion for an Expedited Hearing on the Same* [Docket No. 7769] (Dec. 21, 2021) at 52, 6-11 ("12/21/21 Hearing Transcript"), *see also id.* at 105, ll. 11-12 ("I do want to see what the vote is, I think we all need to see what the vote is."). Although the Court granted the Motion to Modify, it declined to grant the TCC's request that the Court bifurcate the confirmation hearing to first consider as a "gatekeeping" issue whether or not it has the authority to issue the channeling injunctions and grant nonconsensual releases of nondebtor claims against the Local Councils and Chartered Organizations as requested in the Plan. *See Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 382 (3d Cir. 2002); *In re Combustion Eng'g*, 391 F.3d 190, 227, 232 (3d Cir. 2004); *In re Imerys Talc Am., Inc.*, 2019 U.S. Dist. LEXIS 120572 (D. Del. July 19, 2019); *In re Purdue Pharma, L.P.*, 2021 U.S. Dist. LEIXS 242236, at *211 (S.D.N.Y. Dec. 16, 2021).

[4] *See Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Preliminary Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 8141] (the "Preliminary Voting Report").

[5] *See* 11 U.S.C. § 1126(c).

4. The extent of survivor support is a litmus test for confirmation of the Plan: among other requirements, the nondebtor, third-party releases that form the core of the Plan must enjoy the overwhelming support of those parties affected by such releases in order to be approved.[6] *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 n.17 (3d Cir. 2000) (citing *In re Master Mortgage Inv. Fund*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)("A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has 'overwhelmingly' voted to accept the proposed plan treatment.")).[7]

5. In chapter 11 cases where nondebtor, third-party releases have been approved, courts generally appear to have interpreted overwhelming creditor support to mean that at least 90% of affected voting creditors accept the plan:[8]

---

[6] *See In re Johns-Manville Corp.*, 68 B.R. 618, 621 (Bankr. S.D. N.Y. 1986)("On November 20, the Debtor announced preliminary voting results on its reorganization plan. According to those results, the plan was overwhelmingly accepted by Asbestos Health Claimants, Property Damage Claimants, Unsecured Creditors and Preferred Shareholders. Common Shareholders were the only class to reject the plan.").

[7] The *Master Mortgage* factors have been applied by courts in this District in deciding whether to grant a third-party release of estate claims as part of a plan. *See In re Wasington Mut., Inc.*, 442 B.R. 314, 349 (Bankr. D. Del. 2011); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (stating that courts in Delaware follow the *Master Mortgage* factors, sometimes called "*Zenith* factors," in deciding whether to grant a third-party release of estate claims as part of a plan) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (applying *Master Mortgage* factors to third-party releases of estate claims against nondebtors)); *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017); *see also In re Millennium Lab Holdings II*, No. 15-12284 (Bankr. D. Del. Dec. 12, 2015) [Docket No. 206], hearing transcript at 17:9-24:18 (*Master Mortgage* factors applied to proposed nonconsensual creditor release of nondebtors).

[8] *See In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 777 (Bankr. N.D. Tex. 2007)("Most courts have held that factor four [of the *Master Mortgage* factors] is satisfied when over ninety percent of the impacted creditors approve the plan."). *See also In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 674 (Bankr. D.D.C. 1992) (citing to overwhelming support of plan with releases as indicative of "good faith": "Of the 64 creditors voting—other than partners of the debtor—62 voted for the plan or roughly 97%.").

3

| Case Name | Percentage of Creditor Support |
|---|---|
| American Family Enterprises[9] | 99% |
| Purdue Pharma[10] | 96% |
| Blitz U.S.A.[11] | 95% |
| Specialty Equipment[12] | 95% |
| Master Mortgage[13] | 95% |
| A.H. Robins[14] | 94% |
| Millennium Lab Holdings[15] | 93% |
| AOV Industries[16] | 90% |

---

[9] Percentage indicated is rounded down from 99.99%. *See In re American Family Enters.*, 256 B.R. 377, 392 (D.N.J. 2000)("The creditors have overwhelmingly (100% of Plan Classes 5 and 7 and over 99.99% of Plan Class 6) voted in favor of the Plan, and thereby consented to the Channeling Injunction. Exh. C-10, Exhibit A. Less than 1% of the Plan Class 6 Class Members have filed objections to the Settlement Agreement and/or Plan.").

[10] *See In re Purdue Pharma L.P.*, 2021 Bankr. LEXIS 2555, *84, 633 B.R. 53 (Bankr. S.D.N.Y. Sep. 17, 2021).

[11] Percentage indicated is rounded down from lesser of voting results from two classes of personal injury claims. *See In re Blitz U.S.A.,* 2014 Bankr. LEXIS 2461, at **15-16 (Bankr. D. Del. Jan. 30, 2014)("As reflected in the Voting Declaration, 95.29% (81 out of 85) of the holders of Blitz Personal Injury Claims in Class 4(a) of the Plan that voted on the Plan and 100% (3 out of 3) of the holders of Blitz Personal Injury Claims in Class 4(b) of the Plan have voted to accept the Plan. On the record at the Confirmation Hearing, three of the parties that had originally voted against confirmation of the Plan announced that they were changing their votes to votes in support of the Plan. As a result of those announcements, only one vote against confirmation of the Plan in Class 4(a) remains, and that claimant did not object to confirmation of the Plan. Accordingly, the Plan has been overwhelmingly accepted by the classes of creditors affected by the Releases and the Channeling Injunction and there is no remaining objection to confirmation of the Plan.").

[12] *See In re Specialty Equipment Cos.*, 3 F.3d 1043, 1045 (7th Cir. 1993).

[13] Percentage indicated is rounded up from 94.8%. *See Master Mortgage*, 168 B.R. at 938 ("Factor four considers creditor approval of the injunction. The Court considers this the single most important factor. As shown by the table above, the creditors have overwhelmingly voted to approve the plan. Specifically, Class 5 which is impaired only by virtue of the injunction voted 94.8% in favor of the plan. The members of Class 3A, interest holders in Secured Note, voted 93.4% in number and 96.2% in amount in favor of the plan. Thus, the classes most affected by the permanent injunction have overwhelmingly accepted the proposed Plan treatment. Additionally, the Court notes that the only rejecting class, Class 2B containing the FDIC, settled its claims with Master Mortgage and no longer opposes the Plan. Thus, factor four weighs heavily in favor of the injunction.").

[14] *See Menard-Sandford v. Mabey (In re A.H. Robins Co., Inc.)*, 880 F.2d 694, 702 (4th Cir. 1989).

[15] *See In re Millennium Lab Holdings II,* 945 F.3d 126, 132 (3d Cir. 2019), cert. denied, 140 S. Ct. 2805 (2020).

[16] *See In re AOV Indus.,* 792 F.2d 1140, 1143 (D.C. Cir. 1986).

As the Preliminary Voting Report makes clear, the Debtors' Plan does not have the overwhelming support of survivors.

6. In addition to the voting shortfall, the Plan includes other legal infirmities that cannot be cured by a vote—even if there were substantial survivor support. That is why the TCC reached out to the Mediator as the final ballots were being tallied to resume mediation sessions. Beginning on January 3, 2022, the TCC resumed mediating with the Debtors, Coalition, and FCR.

7. As the final ballots were being tallied, the Debtors issued written discovery to twenty-nine non-Coalition affiliated state court counsel (including attorneys representing members of the TCC) and deposition notices to around twenty such counsel (as well as to the TCC) relating to Plan voting and solicitation issues.[17] The voting discovery issued was principally directed at attorneys who used the master ballot method of solicitation *and* the majority of whose clients cast votes to reject the Plan. The Debtors have not articulated any basis whatsoever for their apparently one-sided "investigation" of the voting results, which, together with the scope of the releases sought, has rendered their Plan not confirmable in its present form.

8. As noted above, the TCC will continue to work with the mediator and engage in negotiations with the Debtors, FCR, and Coalition in an effort to formulate a plan that is acceptable to all of the major constituencies in these cases. However, the TCC believes that the parties need guidance from the Court regarding the focus of their efforts in these cases, which stand on the edge of a precipice: for the next three weeks, the Participating Parties will

---

[17] The TCC has noticed the depositions of the Debtors and Omni Agent Solutions, their balloting agent, to determine whether either is aware of any irregularities, improprieties or other issues relating to voting on the Plan. None have been revealed to date.

undertake the substantial time and expense—much of it to be incurred by the bankruptcy estates—to complete the depositions of as many as fifty fact and expert witnesses (which must be completed by January 28, 2022) to further the Court's eventual consideration of a Plan which is already "dead on arrival."

9. Accordingly, the TCC respectfully requests that the Court conduct a status conference (as was originally contemplated in the Plan Scheduling Order) at a date and time convenient to the Court's calendar on or after January 12, to provide parties with sufficient notice and to engage fully in discussions. This will allow the Participating Parties and the Court to assess the state of these proceedings and determine the best path forward.

Dated: January 7, 2022      PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073) (admitted pro hac vice)
Alan J. Kornfeld (CA Bar No. 130063) (admitted pro hac vice)
Debra I. Grassgreen (CA 169978) (admitted pro hac vice)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email: rpachulski@pszjlaw.com
       akornfeld@pszjlaw.com
       dgrassgreen@pszjlaw.com
       joneill@pszjlaw.com

*Counsel for the Tort Claimants' Committee*