# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Ref. D.I. 8190 & 8210 |

### DEBTORS' RESPONSE TO THE OFFICIAL COMMITTEE OF TORT CLAIMANTS' STATUS REPORT RE: SECOND MODIFIED FIFTH AMENDED PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

1.  The Debtors file this response (the "Response") to the "status report" [D.I. 8190] (the "TCC Status Report") filed by the Official Committee of Tort Claimants (the "TCC") with respect to the *Second Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 7832] (as may be amended, modified, or supplemented from time to time, the "Plan") and the joinder filed by the Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC [D.I. 8210] ("PCVA").[2]

**I.    Individual Voting Survivors Overwhelmingly Support the Plan. Plaintiffs' Firms, Using Master Ballots, Account for the Majority of Rejections.**

2.  The TCC Status Report is not, as the name suggests, an attempt to update this Court and parties in interest on the status of these chapter 11 cases. Rather, it is once again an advocacy piece by the TCC intended to further poison the well in these cases and destroy the results of the Coalition, Future Claimants' Representative, Debtors, and Ad Hoc Committee's hard-fought efforts. If the TCC is successful, survivors will receive virtually no recovery in these chapter 11

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

cases and the only "winners" will be the TCC's professionals and those state court lawyers that believe public destruction of the Debtors' Plan will yield more for them in individual negotiations pertaining to their cases. Let's get the facts straight. While the TCC notes in the TCC Status Report that the "[s]urvivors have spoken," it wholly disregards the wishes of the vast majority of survivors and proceeds to act against them. The survivors have voted to accept the Plan. *See* 11 U.S.C. 1126(c) ("A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . ."). Moreover, the *preliminary* voting results[3] demonstrate that 85% of individual abuse survivors who voted via direct Ballot (rather than by Master Ballot) voted in favor of the Plan. In contrast, more than 59% of the votes to reject the Plan were cast by Master Ballots. Of these, vocal opponents aligned with the TCC accounted for at least 79%. These preliminary results demonstrate that individual abuse survivors heavily support the Plan, while certain plaintiffs' firms—largely those aligned with the TCC—that voted their clients' claims via Master Ballot oppose the Plan.

**II.     The TCC, as a Fiduciary for All Survivors, Must Support the Plan.**

3.     The TCC is an official committee that owes a fiduciary duty to the class of creditors that it represents, and its members are required to place the interests of its constituent class above their own personal stake in the bankruptcy case. *See, e.g.*, *In re Res. Cap., LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012) (citing *In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006)); *see also* TCC 30(b)(6) Dep. Hr'g Tr. at 112:2-3 (testifying that the TCC "represents" and "acts as

---

[3]     *See Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Preliminary Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8141] (the "<u>Preliminary Voting Report</u>").

a fiduciary for all survivors of sexual abuse").[4]  Indeed, the TCC has acknowledged that an abuse survivor's vote in favor of the Plan is a "definitive expression that that survivor believes it is in his interest that the plan be confirmed." *See* TCC 30(b)(6) Dep. Hr'g Tr. at 68:25-69:7.

4.   Having seen the Preliminary Voting Report, the TCC now knows what the class it represents wants.  Seventy-three percent of the survivors to whom the TCC owes duties voted in favor of the Plan.  The TCC simply disregards its fiduciary duty in advocating against the interests of the overwhelming majority of the class it represents in favor of certain minority plaintiff attorneys representing, at best, only 27% of the class.  And without discovery into the Master Ballot process, the Debtors and the Court have no idea if these minority claims' votes were informed and valid.  When the TCC and its members were not trying to destroy the Debtors, they argued that Master Ballots should be subject to rigorous levels of protection for abuse survivors.  Now the TCC relies on Master Ballots to favor members of the class it represents that are outnumbered by approximately 300%.  The TCC has no legitimate basis to act against the interests of some 73% of the class it represents.

5.   All of this is even more significant given the TCC's use of estate funds to engage in a massive negative campaign against the Plan during solicitation, including numerous town halls, video productions, and the inappropriate authoring and dissemination of the TCC/Kosnoff Communications.  The Debtors believe these actions resulted in 27% of abuse survivors voting against the Plan, the majority of which were voted by Master Ballot.  The Debtors are in disbelief that this statutory committee continues to act against the interests of the majority of the voted interests of the class it is supposed to represent.  The Debtors question how the collective interests

---

[4]   Relevant excerpts of the deposition transcript are attached hereto as **Exhibit B**.

of survivors in a Plan proposing a Settlement Trust with over $2.69 billion[5] in cash and notes, plus valuable insurance rights, are served by a committee that seeks not to safeguard this value, but to eschew it.

### III. The TCC's Third Party Release Arguments Are Premature, Misplaced, and a Transparent Attempt to Poison the Well.

6. The TCC weaponizes the preliminary voting results to make inappropriate confirmation arguments regarding third party releases, which are not properly before the Court, and based upon voting results that are subject to change, as clearly set forth in the Preliminary Voting Report. Regardless, preliminary results demonstrate that Class 8 (Direct Abuse Claims) has voted in favor of the Plan by a preliminary tally of 73.12%. This vote meets the statutory requirements of section 1126(c) of the Bankruptcy Code. Moreover, the TCC's chart of cases is a disingenuous presentation of the law regarding nonconsensual third party releases. In fact, the Pachulski firm—the TCC's counsel here including many of the same lawyers—represented the tort claimants' committee, a plan proponent, in *In re TK Holdings*, No. 17-11375 (BLS) (Bankr. D. Del.), a mass tort case in this District where nonconsensual third party releases were approved with 74-78.18% of affected voting creditors accepting the Plan, but remarkably excluded that case from its chart. There can be no legitimate reason to exclude that adverse exemplar other than to disingenuously suggest to this Court and the interested public that the Debtors' Plan is not confirmable.[6]

### IV. Survivors of Abuse Will Be Paid in Full Under the Debtors' Plan.

7. Unfortunately for survivors, the TCC has failed to inform them of the real facts underlying this Plan, including the fact that Class 8 will likely be paid in full. In particular, in the

---

[5] *See Notice of Tenth Mediator's Report Regarding Clarendon Term Sheet* [D.I. 8102], Ex. A (Jan. 3, 2022).

[6] *TK Holdings* was a much more recent case than most of the cases listed on the TCC's chart, and as such, appears to be deliberately omitted rather than a product of the case being out of date.

Bates White rebuttal report served last Wednesday, a copy of which is attached hereto as **Exhibit A** (the "Bates Rebuttal Report"), the Debtors' expert, Dr. Charles E. Bates, states that "based on my review of the 29 verdicts, further review of the settlement history, and further analysis of the economics of sexual abuse claim filings, I now believe that the value of the Abuse Claims is most likely in the lowest quartile of the range I originally estimated, that is, most likely between $2.4 and $3.6 billion." *See* Bates Rebuttal Report at 3 (emphasis added). In light of Dr. Bates's opinion that (i) the value of the Direct Abuse Claims has a midpoint of $3.0 billion, (ii) the size of the contributions already being made to the Settlement Trust (over $2.69 billion), and (iii) the expected value of non-settling insurance rights and non-settling chartered organization claims, the Debtors anticipate *payment in full* to holders of allowed claims in Class 8 in accordance with the Trust Distribution Procedures. It belies common sense that the TCC is continuing to attack a Plan with a preliminary accepting vote of 73% in a class that will be paid in full.

**V.     Ballots Are Still Being Reconciled and Voting Discovery Is Ongoing.**

8.     It is important for the Court to be aware that Ballots are still being reconciled and remain subject to further review and audit, including more than 1,200 Class 9 Ballots that were not included in the preliminary voting results. Updated preliminary reporting from Omni Agent Solutions ("Omni") as a result of this review indicates that Class 9 is now an accepting class in favor of the Plan.

9.     Additionally, Master Ballots are being reviewed for compliance with the Disclosure Statement Order (*i.e.*, review of whether (i) proper powers of attorney were returned for certain clients, (ii) detailed logs related to attorney/client communications were returned for certain clients, and (iii) Bankruptcy Rule 2019 statements were filed for all attorneys submitting Master Ballots). The TCC again advocates against the class it represents by questioning the Debtors' work in investigating the Master Ballots. The TCC has explicitly recognized the potential

infirmities associated with Master Ballots: *see, e.g.*, Sept. 23, 2021 Hr'g Tr. at 32:5–9 [D.I. 6391] (MR. STANG: "This is about survivors. And we need to be sure that whoever is submitting a master ballot using a process that does not bear that client's signature on the ballot has every level of protection that their voice is being accurately heard."); *see also id.* at 43:14-44:5 (MR. SMOLA: "So those yes votes, that consent, and the integrity of that consent is absolutely crucial. So I would endorse every possible mechanism this Court seeks to employ to ensure the integrity of the vote."). Yet the TCC has no interest in assessing the validity of the Master Ballot votes of the minority interests it is representing against the overwhelming majority of the class. Indeed, the TCC has served written discovery and deposition notices, but only on the Debtors, the Debtors' voting agent, and Plan proponents. This is not surprising, as the TCC has aligned with rogue plaintiffs' counsel in providing contrary advice to survivors represented by other counsel and survivors represented by multiple counsel.

10. Additionally, as the TCC can see, discovery as to the Master Ballots is appropriate for anyone interested in a valid count. As demonstrated by the voting percentages discussed above, the Master Ballot vote results are strikingly different from the direct Ballot results. For example, the preliminary voting results demonstrate the following percentages of TCC-aligned firms voting against the Plan by Master Ballot:

| Law Firm | Total Votes on Master Ballot to Accept or Reject Plan (Not Superseded by Direct Ballot) | Percent Rejecting the Plan |
|---|---|---|
| Hurley McKenna & Mertz PC | 2,904 | 89.98% |
| Zuckerman Spaeder LLP / Abused in Scouting | 1,314 | 93.38% |
| Pfau Cochran Vertetis Amala PLLC | 905 | 98.90% |
| Crew Janci LLP | 342 | 99.71% |
| Horowitz Law | 208 | 98.56% |
| Herman Law | 165 | 98.79% |

While the Debtors' review of the Master Ballots and related materials remains ongoing, the Debtors have already identified several significant concerns regarding the validity and integrity of the votes cast by Master Ballot, including from several of the firms listed above:

  (a) certain of the documents purportedly evidencing a survivor's vote are not signed or have the signature crossed out;

  (b) certain firms submitted Master Ballots that included purported clients not identified on the client lists provided to Omni;

  (c) certain of the "power of attorney" documents allegedly authorizing survivor voting fail to comply with the laws of the states in which they were executed;

  (d) certain of the signatures do not match the name of the survivor who is purportedly casting the vote; and

  (e) certain of the votes appear to have been counted twice by the law firm submitting them.

11. Although discovery into Master Ballots will not yet be complete, the final voting report will be filed on January 17, 2022, in accordance with the scheduling order entered by the Court [D.I. 7996]. If action is needed with respect to Master Ballots, it will occur after full and fair discovery has concluded.

**VI. The Debtors Continue to Investigate and, Simultaneously, Mediate.**

12. As the Court is aware, the Debtors are continuing to investigate the impact of the Pachulski firm's improper drafting and endorsement of Mr. Kosnoff's communications to thousands of survivors, many of whom were not clients of Mr. Kosnoff, from the TCC's official email address. In that regard, the TCC recently produced additional discovery—which was withheld until after the Pachulski witnesses were deposed—that further demonstrates: (1) Mr. Lucas wrote significant portions of the TCC/Kosnoff Letter, including portions that clearly circumvent the Court's Disclosure Statement Order, and, despite representations to the contrary,

the TCC and its advisors were aware of this fact;[7] (2) Mr. Stang and Mr. Lucas were on notice that the TCC/Kosnoff Communications were being disseminated to non-Kosnoff clients, and discussed and strategically decided to ignore the Debtors' and Coalition's inquiries;[8] and (3) so unusual was the TCC's transmission of the TCC/Kosnoff Letter that some survivors thought Mr. Kosnoff was communicating directly to them from the BSA Survivors email address.[9]

13. As a result of ongoing mediation efforts, the size of the Settlement Trust now stands at more than $2.69 billion. The Debtors and other parties in interest are continuing to mediate on a daily basis, with additional in-person mediation scheduled for this week to reach settlements with parties preliminarily voting against the Plan and to continue to grow the size of the Settlement Trust. The TCC and certain of its aligned state court counsel will attend, and the Debtors sincerely hope they will pivot from blindly attacking the Plan to a constructive dialogue that supports all survivors.[10]

---

[7] *Compare* **Exhibit C**, Nov. 10 Hr'g Tr. at 17:25-18:9 (MR. STANG: "This motion concerns one email that was written by Mr. Kosnoff. We had no participation in the writing of it."), *with* **Exhibit D**, KOSNOFF000183 (October 18, 2021 emails between Mr. Kennedy and Mr. Kosnoff with the subject line "Great letter!", in which Mr. Kennedy states, "I hope it gets some traction and your clients read it" and Mr. Kosnoff responds, "I'm happy with how the letter turned out. Lucas made some great edits and added details I had not known"); *see also* **Exhibit E**, TCC-PlanConf-064136 (Oct. 17, 2021 email from Mr. Lucas to Mr. Kosnoff, copying TCC co-chairman Doug Kennedy, attaching a mark-up of the TCC/Kosnoff Letter).

[8] *See* **Exhibit F**, TCC-PlanConf-123770 (Nov. 6, 2021 text message from J. Lucas to J. Stang stating "Molton's email has grown on me and I like it more now. My initial reaction to things like that is dread because I want to avoid problems. However, now that it is sunk in a bit and I thought about it, what is he going to do? Tell him to file an adversary proceeding and we will see him next month after we file our answer. No need to respond."); **Exhibit G**, TCC-PlanConf-123793 (Nov. 7, 2021 email from Mr. Stang to Mr. Lucas forwarding a letter from Ms. Lauria and stating "I see no reason to reply to Jessica's letter," to which Mr. Lucas responds "And the follow up from Molton and Eisenberg.").

[9] *See* **Exhibit H**, Golden Dep. Tr. at 47:18-48:5 ("I asked Mr. Lucas what should be done with respect to these email replies that were being received by the BSASurvivors email inbox; and in light of the fact that I – I noticed that there were, you know, some that started with the words 'Dear Tim.'); *see also* **Exhibit I**, TCC-PlanConf-123786 (Nov. 6, 2021 email from Mr. Golden to Mr. Lucas stating "I now see that we sent this out, presumably on his behalf. In the future, please give me a heads up about all mass mailings because I am getting replies I was not expecting coming in mass and am not sure how to reply (because they all think I am Tim Kosnoff and I am not)").

[10] As the Debtors have previously noted, aside from voting-related issues, the costs to the estate in connection with the TCC's drafting and dissemination of the TCC/Kosnoff Communications have been significant. The Debtors

14. As always, the Debtors welcome any guidance the Court wishes to provide to the parties in this case. The Debtors believe the Plan is confirmable, and intend to continue to work at reaching further settlements and increasing support for the Plan, in accordance with their duty to the estates, survivors and all parties in interest.

*[Remainder of Page Intentionally Left Blank]*

---

have recently received information from the TCC and other estate fiduciaries regarding these associated fees and costs, and plan to share information and meet-and-confer as part of the mediation.

| | |
|---|---|
| Dated: January 11, 2022<br>Wilmington, Delaware | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br><br>*/s/ Paige N. Topper*<br>Derek C. Abbott (No. 3376)<br>Andrew R. Remming (No. 5120)<br>Paige N. Topper (No. 6470)<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347<br>Telephone: (302) 658-9200<br>Email: dabbott@morrisnichols.com<br>       aremming@ morrisnichols.com<br>       ptopper@morrisnichols.com<br><br>– and –<br><br>**WHITE & CASE LLP**<br>Jessica C. Lauria (admitted *pro hac vice*)<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 819-8200<br>Email: jessica.lauria@whitecase.com<br><br>– and –<br><br>**WHITE & CASE LLP**<br>Michael C. Andolina (admitted *pro hac vice*)<br>Matthew E. Linder (admitted *pro hac vice*)<br>Laura E. Baccash (admitted *pro hac vice)*<br>Blair M. Warner (admitted *pro hac vice)*<br>111 South Wacker Drive<br>Chicago, Illinois 60606<br>Telephone: (312) 881-5400<br>Email: mandolina@whitecase.com<br>       mlinder@whitecase.com<br>       laura.baccash@whitecase.com<br>       blair.warner@whitecase.com<br><br>ATTORNEYS FOR THE DEBTORS AND<br>DEBTORS IN POSSESSION |