THE DEBTORS AND THE SUPPORTING PARTIES (INCLUDING THE CREDITORS' COMMITTEE, THE FUTURE CLAIMANTS' REPRESENTATIVE, THE COALITION, AND THE AD HOC COMMITTEE) SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE DEBTORS AND THE SUPPORTING PARTIES BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS AND IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.

The Plan provides the framework for global resolution of Abuse Claims against the Debtors, Related Non-Debtor Entities, and Local Councils, as well as any Participating Chartered Organizations and Contributing Chartered Organizations and Settling Insurance Companies that may make contributions to the Settlement Trust for the benefit of survivors of Abuse (collectively, "Abuse Survivors"). The Plan has been designed to maximize and expedite recoveries to Abuse Survivors. The Debtors and the Supporting Parties strongly encourage all holders of Claims in the Voting Classes, including Direct Abuse Claims, to vote in favor of the Plan.

By order dated September 30, 2021, the Bankruptcy Court approved this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code and found that it contained "adequate information" sufficient to enable a hypothetical investor of the Debtors to make an informed judgment about the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan. Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the accuracy or completeness of the information contained herein nor an endorsement by the Bankruptcy Court as to the fairness or merits of the Plan. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.

A copy of the Plan is attached hereto as **Exhibit A**. The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement. **Please note that if any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern in all respects.**

B.      The BSA

The BSA's charitable mission is to prepare young men and women for life by instilling in them the values of the Scout Oath and Law and encouraging them to be trustworthy, kind, friendly and helpful. The BSA also trains young men and women in responsible citizenship, character development, and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older ages, career-oriented programs in partnership with community organizations. Indeed, since its inception more than 110 years ago, more than 130 million young men and women have participated in the BSA's youth programs, and at least 35 million adult volunteers have helped carry out the BSA's mission.[18] Today, the BSA remains one of the largest youth organizations in the United States and one of the largest Scouting organizations in the world, with approximately 762,000 registered youth participants and approximately 320,000 adult volunteers. The BSA's alumni are legion among our nation's business, political, and cultural

[18] *See BSA, About the BSA,* https://www.scouting.org/about/.

8

leaders. Their legacy is the creation and support of Scouting units in virtually every corner of America and at U.S. military bases worldwide.

The BSA welcomes all young men and women, regardless of gender, race, ethnic background, sexual orientation, disability, or gender identification, who are willing to accept Scouting's values and meet the other requirements of membership. A Scout subscribes to the following oath: "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."[19] Scouts are expected to conduct themselves in accordance with the Scout Law: to be "trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."[20]

The BSA cares deeply about all survivors of child abuse. The BSA understands that no apology can repair the damage caused by abuse or take away the pain that survivors have endured. The BSA is steadfast in its commitment to continually improve all of its policies to prevent abuse.

C.      Voting and Confirmation

**Article VIII** of this Disclosure Statement specifies the deadlines, procedures, and instructions for voting to accept or reject the Plan, as well as the applicable standards for tabulating ballots and master ballots, used in voting on the Plan (each, generally referred to herein as a "**Ballot**"). The following is an overview of certain information related to voting that is contained in Article VIII of this Disclosure Statement and elsewhere in this Disclosure Statement.

This Disclosure Statement is being transmitted in order to provide adequate information to enable holders of Claims in Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims), which Claims in such Classes are Impaired and entitled to vote on the Plan, to make an informed judgment in exercising their right to vote to accept or reject the Plan.

Each Class of Claims entitled to vote shall have accepted the Plan pursuant to the requirements of section 1126(c) of the Bankruptcy Code if at least two-thirds (2/3) in amount and more than one-half (1/2) in number of those voting in each such Class voted to accept the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled for January 24, 2022, at 10:00 a.m. (Eastern Time) before the Bankruptcy Court. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation

[19] *Id.*
[20] *Id.*

9

Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. Any objection or response to Confirmation of the Plan must: (i) be in writing; (ii) state the name and address of the objecting party and the nature and amount of the Claim of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan and include any evidentiary support therefor; and (iv) be filed with the Bankruptcy Court, 824 North Market Street, Third Floor, Wilmington, Delaware 19801 together with proof of service **on or before January 7, 2022 at 4:00 p.m. (Eastern Time)** (the "Plan Objection Deadline"), and served on the Debtors and certain other parties in interest in accordance with the Solicitation Procedures Order (defined below) so that they are received on or before the Plan Objection Deadline.

The Debtors have engaged Omni Agent Solutions (the "Solicitation Agent" or "Notice and Claims Agent") to assist in the voting process.

The Solicitation Agent will provide additional copies of all materials and will process and tabulate the Ballots, as defined in the *Debtors' Motion for Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 2295] (the "Solicitation Procedures Motion"), filed on March 2, 2021, for Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8, and 9, as applicable. You may obtain these documents from the Solicitation Agent free of charge by (a) calling the Debtors' toll-free restructuring hotline at (866) 907-2721, (b) visiting the Debtors' restructuring website at https://omniagentsolutions.com/bsa, (c) writing to Boy Scouts of America, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367, or (d) emailing BSABallots@omniagent.com. You may also access from these materials for a fee via PACER at http://www.deb.uscourts.gov/.

**As further described in the Solicitation Procedures (which are annexed to the Solicitation Procedures Order as Exhibit 1), to be counted, your Ballot indicating acceptance or rejection of the Plan must be received by the Solicitation Agent no later than 4:00 p.m. (Eastern Time) on December 14, 2021 (the "Voting Deadline")**, unless the Debtors, in their sole discretion, extend the period during which votes will be accepted on the Plan, in which case the term "Voting Deadline" shall mean the last date on, and time by which, such period is extended. Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as an acceptance or rejection and will not count toward the tabulations required pursuant to either section 1129 of the Bankruptcy Code.

Prior to deciding whether and how to vote on the Plan, each holder of a Claim entitled to vote should consider carefully all of the information in this Disclosure Statement, including Article X entitled "Risk Factors." **Each holder of a Claim entitled to vote on the Plan should review this Disclosure Statement and the Plan and all Exhibits hereto and thereto before submitting**

10

**a Ballot. This Disclosure Statement contains a summary of certain provisions of the Plan and certain other documents and financial information. The Debtors believe that these summaries are fair and accurate as of the date hereof and provide adequate information with respect to the documents summarized; however, such summaries are qualified to the extent that they do not set forth the entire text of those documents and as otherwise provided herein.**

D.      Settlements and Resolutions

To both maximize distributions to holders of Direct Abuse Claims and continue the BSA's long tradition of Scouting, the Debtors and Supporting Parties seek approval of a plan of reorganization under chapter 11 of the Bankruptcy Code that provides a framework for global resolution, which, if confirmed and consummated, will allow the Debtors, as Reorganized BSA, to emerge from bankruptcy, having fulfilled their dual restructuring goals of (a) providing an equitable, streamlined, and certain process by which Abuse Survivors may obtain compensation for Abuse and (b) ensuring that the Reorganized BSA has the ability to continue its vital charitable mission.

The Plan incorporates certain of the material terms and provisions of the expired Restructuring Support Agreement. Additionally, as described above and in more detail below, the Plan incorporates the JPM / Creditors' Committee Settlement, which, subject to its terms and the effectiveness of the Plan, resolves all issues and objections that could be asserted by the Creditors' Committee with respect to confirmation of the Plan and prospective lien challenges, and all claims or causes of action that might be brought by or on behalf of the Debtors' Estates. As described more fully below and set forth in the Plan, the JPM / Creditors' Committee Settlement provides for substantial benefits to the Debtors' Estates, including distributions to holders of Allowed Convenience Claims, Allowed General Unsecured Claims, and Allowed Non-Abuse Litigation Claims, in addition to extensions of the maturity dates of the Prepetition Debt and Security Documents, including a two-year moratorium on principal, which allows the Debtors to increase their contributions to the Settlement Trust. The JPM / Creditors' Committee Settlement also contemplates the Allowance of JPM's Claims by amending and restating the Prepetition Debt and Security Documents in the manner described in the Plan.

The BSA's charitable mission of Scouting is supported by certain Entities that are not Debtors in these Chapter 11 Cases, including Local Councils and Chartered Organizations. As described in this Disclosure Statement, the Local Councils serve geographic areas of varying size across the United States and facilitate the delivery of the Scouting program at the local level. Chartered Organizations are typically local organizations—such as faith-based institutions, clubs, civic associations, educational institutions, businesses, and groups of citizens—that sponsor local Scouting units. Under the Plan, substantial contributions to the Settlement Trust by the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies will be made in exchange for the treatment of the foregoing Entities as Protected Parties under the Channeling Injunction. Additionally, Participating Chartered Organizations will agree to assignment and transfer to the Settlement Trust of their BSA insurance related rights and actions in exchange for treatment as Limited Protected Parties under the Channeling Injunction. The foregoing settlements are intended to provide for the fair and equitable resolution of Abuse Claims.

11

BEEN OBTAINED FROM SUCH REPORTS AND OTHER SOURCES OF INFORMATION AS ARE AVAILABLE TO THE DEBTORS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN FURTHERANCE OF A SETTLEMENT OF SUCH CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR SHALL THIS DISCLOSURE STATEMENT BE CONSTRUED AS CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS OR REORGANIZED BSA. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

4

### ARTICLE II. INTRODUCTION

A.   Background

This Disclosure Statement is being furnished by the Debtors in connection with the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (as such may be amended, altered, modified or supplemented from time to time, the "Plan"), dated September 29, 2021, pursuant to section 1125 of the Bankruptcy Code, and in connection with the solicitation of votes to accept or reject the Plan.

The Plan described in this Disclosure Statement is proposed by the Debtors and supported by the Future Claimants' Representative, the Creditors' Committee, the Coalition, and the Ad Hoc Committee[7] (collectively, the "Supporting Parties"). The Plan further incorporates settlements with JPM, Hartford, and TCJC.

Since the outset of these cases, the Debtors have advocated for a global resolution of Scouting-related sexual abuse claims that would comprehensively address liabilities of the Debtors and the many non-debtor Local Councils and Chartered Organizations that administer and carry out Scouting programming nationwide. Negotiations increased in intensity during 2021 and have occurred in the context of informal negotiations, countless hours of formal telephonic and video mediation sessions, and formal in-person mediation with the support of three Mediators appointed by the Bankruptcy Court.[8] The Debtors entered into a settlement with the Creditors' Committee and JPM in March 2021. The Debtors also entered into a settlement with Hartford (the "Initial Hartford Settlement Agreement") in April 2021.[9] Thereafter, negotiations continued with the other mediation parties. In those sessions, the Debtors made substantial progress toward a consensual plan of reorganization that would garner the support of the representatives of a majority of holders of Abuse Claims.

On July 1, 2021, the Debtors entered into a restructuring support agreement [D.I. 5466, 5813, 5866] (together with all exhibits, including the term sheet attached thereto and as may be amended or modified from time to time in accordance with the terms thereof, the "Restructuring Support Agreement")[10] with the Future Claimants' Representative, the Tort Claimants' Committee, the Coalition, and the State Court Council,[11] as well as the Ad Hoc Committee

---

[7]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

[8]   The Ad Hoc Committee of Local Councils is comprised of eight representative Local Councils (as defined in the Plan, the "Ad Hoc Committee").

[9]   In addition to numerous telephonic and video sessions, formal in-person mediation sessions were held on (i) March 30–April 1, 2021 in Miami; (ii) June 2–3, 2021 in Chicago; (iii) June 29–30, 2021 in Los Angeles; and (iv) May 4–6, May 26–27, June 7–9, August 3–5, August 18–24, September 1, and September 9–10, 2021 in New York City. See Article V.K herein for a further discussion on mediation throughout these Chapter 11 Cases, the Mediators, and the mediation parties.

[10]  The Initial Hartford Settlement Agreement was announced on April 16, 2021 [D.I. 2624] and incorporated into a prior version of the Plan filed on May 10, 2021 [D.I. 4107].

[11]  Capitalized terms in this Article II.A not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement.

[12]  The Coalition was formed in connection with certain law firms ("State Court Counsel") representing holders of Abuse Claims. These firms are: (i) Slater Slater Schulman LLP, (ii) ASK LLP, (iii) Andrews & Thornton, (iv) Levin Papantonio Thomas Mitchell Rafferty & Proctor P.A., (v) Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., (vi) Junell & Associates PLLC, (vii) Reich & Binstock LLP, (viii) Marc J. Bern & Partners LLP, (ix) Krause & Kinsman Law Firm, (x) Kelley Cowan Heckaman PLLC, (xi) Babin Law, LLC, (xii) Jason J. Joy & Associates, PLLC, (xiii) Motley Rice LLC, (xiv) Weller Green

5

(together with the Debtors, the "RSA Supporting Parties"), and concurrently filed a motion to approve the Restructuring Support Agreement (the "RSA Motion"). The Restructuring Support Agreement provided for a plan of reorganization that would deliver global resolution in these Chapter 11 Cases, and the representatives of approximately 70,000 holders of Abuse Claims supported the plan as set forth in the term sheet attached to the Restructuring Support Agreement.

Under the terms of the plan of reorganization contemplated by the Restructuring Support Agreement, the incorporation of any settlement with Hartford was required to be on terms and conditions acceptable to the Debtors and the RSA Supporting Parties. The terms and conditions of the Initial Hartford Settlement Agreement were not acceptable to the RSA Supporting Parties and were required to be removed from the plan of reorganization. To comply with the Restructuring Support Agreement, the Debtors sought a determination from the Bankruptcy Court that they had no obligations under the Initial Hartford Settlement Agreement.

After holding a hearing on the RSA Motion on August 12, 13, and 16, the Bankruptcy Court issued a bench ruling on August 19, 2021. The Bankruptcy Court ruled, among other things, that the Debtors were authorized to enter into the Restructuring Support Agreement but refrained from ruling with respect to whether the Debtors have any obligation to seek approval of the Initial Hartford Settlement Agreement.

Without a clear path for removing the terms and conditions of the Initial Hartford Settlement Agreement from the plan of reorganization, the Debtors and RSA Supporting Parties continued to engage in mediated negotiations regarding the terms of a settlement with Hartford that would be acceptable to representatives of holders of Direct Abuse Claims. On August 27, 2021, during those negotiations, the Restructuring Support Agreement expired in accordance with its terms. The Debtors and the RSA Supporting Parties continued to mediate with various parties in interest, including Insurance Companies and certain Chartered Organizations. After further mediation, negotiations yielded an improved settlement with Hartford, supported by the Debtors, the Future Claimants' Representative, the Coalition and certain State Court Counsel, and a settlement with TCJC.[12]

On September 14, 2021, the Debtors filed the Sixth Mediators' Report, which stated that the Debtors, Hartford, the Future Claimants' Representative, the Coalition, and the Ad Hoc Committee had agreed in principle to a settlement terms that will result in an additional $1.037 billion of cash contributions to the Settlement Trust, in addition to the contributions of up to approximately $820 million that will be made by the Debtors and the Local Councils [D.I. 6210].[13] Specifically, such parties have agreed on: (1) as a result of negotiations led on behalf of Abuse

---

Toups & Terrell LLP, (xv) Colter Legal PLLC, (xvi) Christina Pendleton & Associates PLLC, (xvii) Forman Law Offices, P.A., (xviii) Danziger & De Llano LLP, (xix) Swenson & Shelley PLLC, (xx) Cohen Hirsch LP (formerly Brooke F. Cohen Law, Hirsch Law Firm), (xxi) Damon J. Baldone PLC, (xxii) Chtor Law PC, (xxiii) The Robert Pahlke Law Group, (xxiv) Napoli Shkolnik PLLC, (xxv) Porter & Malouf, P.A., (xxvi) The Moody Law Firm, and (xxvii) Linville Johnson & Pahlke Law Group [D.I. 1917].

[12]  While the Tort Claimants' Committee supported the plan of reorganization as described in the expired Restructuring Support Agreement, the material terms of which are incorporated into the Plan, the Tort Claimants' Committee does not support the settlements with Hartford and TCJC.

[13]  As of the date of the filing of this Disclosure Statement, every Local Council has submitted a non-binding letter of intent reflecting each Local Council's intent to contribute the amounts based on Exhibit C to this Disclosure Statement. A form of the non-binding letter of intent is attached as Exhibit B hereto.

6

Survivors by the Coalition, the Future Claimants' Representative, and their respective professionals, the terms of a modified settlement with Hartford, with State Court Counsel supporting and agreeing to be bound by such terms; and (2) a settlement with TCJC.[14] The modified Hartford settlement, the principal terms of which are set forth in the term sheet attached to the Plan as Exhibit I-1 and which will be the subject of a definitive settlement agreement which will be filed with the Bankruptcy Court and included in the Plan Supplement (the "Hartford Insurance Settlement Agreement"), supersedes and, upon the Effective Date, renders the Initial Hartford Settlement Agreement void.[15] In exchange for Hartford's $787 million cash contribution to the Settlement Trust,[16] Debtors will sell to Hartford, under the Plan, all liability insurance policies issued by Hartford to the BSA as the first named insured, free and clear of all interests in such policies. Hartford will be designated as a Settling Insurance Company and a Protected Party under the Plan and, subject to Bankruptcy Court approval, will receive the Hartford Administrative Expense Claim in the amount of $2 million, to be paid in accordance with the terms of the Hartford Insurance Settlement Agreement. Notably, the Hartford Settlement Contribution is not subject to reduction based on the terms of settlements with other insurers.[17] Moreover, in exchange for TCJC's (1) $250 million cash contribution to the Settlement Trust, (2) rights under applicable insurance policies owned by the Debtors and the Local Councils, and (3) subordinate and/or waiver, release and expungement of TCJC's claims against the Debtors, TCJC will be designated as a Contributing Chartered Organization and Protected Party under the Plan. As consideration for such contributions by Hartford and TCJC, both parties will be entitled to the benefits of the Channeling Injunction and third-party releases under the Plan with respect to Abuse Claims, subject to Bankruptcy Court approval.

This Disclosure Statement describes the Plan, which incorporates the material terms set forth in the expired Restructuring Support Agreement and additionally incorporates the new settlements with Hartford and TCJC, as well as the JPM / Creditors' Committee Settlement. The Plan allows the Debtors to achieve the dual objectives that the Debtors set out to accomplish at the outset of these cases: (a) to timely and equitably compensate survivors of Abuse in Scouting and (b) to ensure that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission.

---

[14]  The Hartford term sheet is attached as Exhibit A and TCJC term sheet is attached as Exhibit B to the Sixth Mediators' Report [D.I. 6210].

[15]  Under the Plan, Hartford would be granted an Allowed Administrative Expense Claim in the amount of $2 million relating to the Initial Hartford Settlement Agreement.

[16]  The modified Hartford Insurance Settlement Agreement provides for an increased cash contribution to the Settlement Trust of $137 million as compared to the Initial Hartford Settlement Agreement.

[17]  The Initial Hartford Settlement Agreement included a reduction provision based upon any future contribution amount from Century to the Settlement Trust.

7

*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

## AMENDED DISCLOSURE STATEMENT FOR THE MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: jessica.lauria@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mandolina@whitecase.com
          mlinder@whitecase.com
          laura.baccash@whitecase.com
          blair.warner@whitecase.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: dabbott@morrisnichols.com
          aremming@morrisnichols.com
          ptopper@morrisnichols.com

*Attorneys for the Debtors and Debtors in Possession*

Dated: September 30, 2021
        Wilmington, Delaware

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

**TABLE OF CONTENTS**

Page

ARTICLE I. IMPORTANT DATES ............................................................................. 1

ARTICLE II. INTRODUCTION ................................................................................. 5

A.   Background ......................................................................................................... 5
B.   The BSA ............................................................................................................. 8
C.   Voting and Confirmation .................................................................................... 9
D.   Settlements and Resolutions ............................................................................. 11
E.   Treatment of Chartered Organizations Under the Plan ..................................... 17
F.   Timeline ............................................................................................................ 21
G.   The Channeling Injunction ............................................................................... 23
H.   Summary and Description of Classes and Treatment ........................................ 25
I.   Illustrative Recovery Charts for Direct Abuse Claims under the Trust Distribution
     Procedures ......................................................................................................... 32
J.   The Settlement Trust ......................................................................................... 38
K.   Further Information Regarding Non-Abuse Litigation Claims .......................... 39
L.   Description of Certain Insurance Provisions of the Plan ................................... 40
M.   Modification and Amendments ......................................................................... 41

ARTICLE III. ORGANIZATION OVERVIEW AND CORPORATE HISTORY ........ 42

A.   Organization Overview ..................................................................................... 42
B.   Corporate Structure ........................................................................................... 49
C.   Revenue Sources and Assets ............................................................................. 52
D.   Prepetition Capital Structure ............................................................................ 54
E.   Local Councils and Chartered Organizations .................................................... 59
F.   Insurance Coverage for Abuse Claims .............................................................. 59

ARTICLE IV. EVENTS LEADING TO THE CHAPTER 11 CASES ........................... 70

A.   The BSA's Prepetition Global Resolution Efforts and Prepetition Claims Against
     the BSA ............................................................................................................. 71
B.   The Impact of Statutes-of-Limitation Changes on Claims against the BSA and
     Non-Debtor Stakeholders .................................................................................. 72

ARTICLE V. THE CHAPTER 11 CASES ................................................................... 73

A.   Commencement of the Cases and First Day Relief ........................................... 73
B.   Procedural Motions ........................................................................................... 74
C.   Critical Vendors and Shared Services ............................................................... 75
D.   Retention of Chapter 11 Professionals .............................................................. 75
E.   Appointment of Fee Examiner .......................................................................... 76
F.   Appointment of Statutory Committees, Ad Hoc Committee, and Future
     Claimants' Representative ................................................................................. 76
G.   Filing of Schedules of Assets and Liabilities and Statements of Financial Affairs ...... 79
H.   Exclusivity ........................................................................................................ 79
I.   Removal ............................................................................................................ 80

P·10

| J. | Preliminary Injunction | 80 |
| K. | Mediation | 82 |
| L. | Evaluation of Estate Assets | 84 |
| M. | Bar Dates and Body of Claims | 85 |
| N. | Description of Abuse Claims and the Valuation of Abuse Claims | 90 |
| O. | Future Claimants' Representative's Future Abuse Claims Forecast | 95 |
| P. | Assumption and Rejection of Unexpired Leases and Executory Contracts | 95 |
| Q. | Stay Relief Matters | 96 |
| R. | Other Litigation | 97 |
| S. | Material Settlements and Resolutions | 104 |
| T. | TCC / FCR Joint Standing Motion | 122 |
| U. | Other Relevant Filings & Hearings | 123 |

| | ARTICLE VI. OVERVIEW OF THE PLAN | 124 |

| A. | General | 124 |
| B. | Distributions | 124 |
| C. | Treatment of Unclassified Claims | 124 |
| D. | Classification of Claims and Interests Summary | 127 |
| E. | Treatment of Claims and Interests | 131 |
| F. | Elimination of Vacant Classes | 139 |
| G. | Cramdown | 140 |
| H. | Means for Implementation of the Plan | 140 |
| I. | Vesting of Assets in the Reorganized BSA | 159 |
| J. | Retention of Certain Causes of Action | 159 |
| K. | Compensation and Benefits Programs | 159 |
| L. | Restoration Plan and Deferred Compensation Plan | 160 |
| M. | Workers' Compensation Programs | 160 |
| N. | Treatment of Executory Contracts and Unexpired Leases | 160 |
| O. | Provisions Governing Distributions | 165 |
| P. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | 170 |
| Q. | Discharges, Channeling Injunction, Releases, Exculpations and Injunctions; Survival of Indemnification and Exculpation Obligations | 173 |
| R. | Reservation of Rights | 186 |
| S. | Disallowed Claims | 186 |
| T. | No Successor Liability | 186 |
| U. | Indemnities | 186 |
| V. | The Official Committees and the Future Claimants' Representative | 187 |
| W. | Retention of Jurisdiction | 188 |
| X. | Miscellaneous Provisions | 192 |

| | ARTICLE VII. THE SETTLEMENT TRUST AND TRUST DISTRIBUTION PROCEDURES | 197 |

| A. | The Settlement Trust | 197 |
| B. | Trust Distribution Procedures | 211 |

| | ARTICLE VIII. SOLICITATION PROCEDURES AND REQUIREMENTS | 238 |

| A. | Voting Summary and Deadline | 238 |

B. Solicitation Procedures ...................................................................................240
C. Classes Entitled to Vote on the Plan .............................................................245
D. Certain Factors to Be Considered Prior to Voting .......................................248

ARTICLE IX. CONFIRMATION PROCEDURES ...............................................................249

A. Hearing on Plan Confirmation .....................................................................249
B. Requirements for Confirmation of the Plan .................................................250
C. Acceptance by an Impaired Class .................................................................250
D. Best Interests of Creditors / Liquidation Analysis .......................................251
E. Feasibility ......................................................................................................255
F. Conditions Precedent to Confirmation of the Plan ......................................256
G. Conditions Precedent to the Effective Date .................................................259
H. Waiver of Conditions Precedent ..................................................................260
I. Substantial Consummation of the Plan .........................................................260
J. *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date ........261

ARTICLE X. RISK FACTORS ...........................................................................................261

A. Risks Relating to the Debtors' Operations, Financial Condition, and Certain
  Bankruptcy Law Considerations ..................................................................261
B. Additional Factors .......................................................................................280

ARTICLE XI. CERTAIN UNITED STATES FEDERAL INCOME TAX
  CONSEQUENCES OF THE PLAN ..................................................................281

A. The Settlement Trust ....................................................................................282
B. Holders of Claims ........................................................................................282
C. Holders that are Non-United States Persons ................................................284

ARTICLE XII. CONCLUSION AND RECOMMENDATION ...........................................284

*[handwritten: These seperate people wrote P recognize Me - P.11]*

# THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

TO:     All Holders of General Unsecured Claims, Non-Abuse Litigation Claims, and Convenience Claims against Boy Scouts of America and Delaware BSA, LLC (the "**Debtors**")

FROM:   The Official Committee of Unsecured Creditors of Boy Scouts of America and Delaware BSA, LLC (the "**Creditors' Committee**")[1]

---

On September 29, 2021, the Bankruptcy Court for the District of Delaware approved the Disclosure Statement for the Debtors' Fifth Amended Chapter 11 Plan (the "**Disclosure Statement**" and "**Plan**," respectively, Dkt. Nos. 6445, 6443)[2] in the Debtors' bankruptcy cases. You are receiving this letter because you are an unsecured creditor of Boy Scouts of America or Delaware BSA, LLC and entitled to vote on the Plan. The Disclosure Statement explains the distributions that will be made to creditors under the Plan.

The Creditors' Committee represents the interests of all unsecured creditors other than holders of Abuse Claims. The Creditors' Committee supports the confirmation and consummation of the Plan.

Accordingly, the Creditors' Committee recommends that you vote to *ACCEPT* the Plan by marking the official Ballot that was enclosed with the Disclosure Statement as follows:

☑    **ACCEPT (vote FOR) the Plan**

and sending in your Ballot in the manner provided in the Solicitation Package and the instructions accompanying your Ballot.

**Your Ballot must be received by December 14, 2021 at 4:00 p.m. (Prevailing Eastern Time) to be counted**.

Please read the Disclosure Statement and the materials in your Solicitation Package carefully. These materials contain instructions for completing and submitting your Ballot, and they describe the Plan and its terms.

The following summarizes the distributions that will be made to general unsecured creditors under the Plan and the Creditors' Committee's investigation of certain matters that are

---

[1] The current members of the Creditors' Committee are: (i) Girl Scouts of the United States of America, (ii) Pension Benefit Guaranty Corporation, (iii) Roger A. Ohmstede, (iv) Pearson Education, Inc. and (v) Lion Brothers Company, Inc.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan or the Disclosure Statement, as applicable.

- 1 -

settled under the Plan.  It is qualified in its entirety by reference to the Disclosure Statement.  Each capitalized term in this letter is defined in the Disclosure Statement or the Plan.

## I.    The Plan

As described in detail in the Disclosure Statement, the Plan embodies a settlement between many of the major creditor constituencies in these chapter 11 cases, which was achieved after extensive arm's-length negotiations among (i) the Debtors, (ii) JPMorgan Chase Bank, N.A. ("**JPM**"), (iii) the Creditors' Committee, (iv) the Coalition of Abused Scouts for Justice, (v) Hartford, (vi) The Church of Jesus Christ of Latter-day Saints, (vii) certain state court counsel to holders of Abuse Claims, (viii) the Future Claimants' Representative, and (ix) the Ad Hoc Committee of Local Councils.  The Creditors' Committee took an active role in certain of these negotiations.   The settlement provides significant value to the holders of General Unsecured Claims and Non-Abuse Litigation Claims (including creditors who opt to receive Convenience Claim treatment), provides the Debtors with more favorable terms under the restated debt facilities provided by JPM under the Restated Debt and Security Documents, and provides for procedures to compensate holders of Abuse Claims asserted against the Debtors in a manner that will be supported by a substantial majority of such claimants.  The settlement also ensures that the Pension Plan shall continue and will not be impacted by the bankruptcy filing or the Plan.

The Creditors' Committee's goal was to maximize value for unsecured creditors, and the Creditors' Committee focused on, among other things: (a) ensuring the best possible outcome for holders of claims arising from the Boy Scouts of America Retirement Benefit Restoration Plan ("**Restoration Plan**") and the Boy Scouts of America 457(b) Plan (the "**Deferred Compensation Plan**"); (b) providing holders of Non-Abuse Litigation Claims with the right to receive a full recovery from insurance proceeds; (c) providing unsecured creditors with the ability to opt into a convenience class and receive up to $50,000; (d) ensuring that the Boy Scouts will continue to operate, providing an ongoing benefit to trade creditors; and (e) providing for holders of General Unsecured Claims to receive significant value in exchange for releasing potential claims against JPM.

The Plan provides for significant recoveries to unsecured creditors that the Creditors' Committee believes exceed recoveries unsecured creditors would receive in a liquidation or under any available alternative plan of reorganization.  Accordingly, the Creditors' Committee believes that confirmation of the Plan is in the best interests of all unsecured creditors.  Moreover, the Creditors' Committee believes that the settlement of the various issues embodied in the Plan constitutes a reasonable compromise of complex disputes, and will avoid the expense and delay that would have been incurred had certain of the disputed issues been litigated.

## II.    Unsecured Creditors' Plan Consideration

The Plan provides for three separate classes of unsecured claims that are unrelated to Abuse Claims: (i) General Unsecured Claims; (ii) Non-Abuse Litigation Claims; and (iii) Convenience Claims.  As discussed herein, as part of the integrated settlement, the Plan also settles issues relating to the allocation and distribution of value among holders of secured claims, unsecured claims, and abuse claims, thereby avoiding complex, protracted, and costly litigation of these

P.12

issues that would have otherwise reduced the available distributions for all creditors. Based on this settled allocation of value, estimated claims in each creditor class, and the valuation of the Debtors, the Disclosure Statement includes estimates of projected recoveries for each class members' allowed claims. The distributions provided under the Plan will be in full and final satisfaction, release, discharge, and settlement of such claims against the Debtors. More specifically, the Disclosure Statement projects the following estimated percentage recoveries for each class of unsecured claims:

| Class | Estimated Recovery |
|-------|--------------------|
| Class 5 – Convenience Claims | 100% |
| Class 6 – General Unsecured Claims | 75-95% |
| Class 7 – Non-Abuse Litigation Claims | 100% |

Article VI.E of the Disclosure Statement contains a detailed description of the treatment of each class of claims. Please reference the Disclosure Statement for a more detailed summary of the mechanics for distributions to unsecured creditors under the Plan, the facts and assumptions behind these predictions and projections, and for information relating to the Debtors and these Chapter 11 Cases. Each estimate and projection in this letter is taken from the Disclosure Statement and qualified by all of the information in the Disclosure Statement.

### A.      Class 5 Convenience Claims

Holders of General Unsecured Claims or Non-Abuse Litigation Claims (after first seeking to recover from insurance, and having exhausted all remedies with respect to such applicable insurance policy or policies) that have an Allowed Claim of $50,000 or less may elect to have their claims treated as Convenience Claims, which are paid by Reorganized BSA in full, using Cash on hand, on the Effective Date of the Amended Plan or, if such Claim becomes Allowed after the Effective Date, as soon as reasonably practicable after Allowance. Any holder of a General Unsecured Claim or Non-Abuse Litigation Claim that is Allowed in an amount greater than $50,000 may elect to have its claim treated as a Convenience Claim and receive payment of $50,000 in Cash in full and final satisfaction of such Claim; **please note that this election is irrevocable and must be made on a timely and validly submitted Ballot**.

### B.      Class 6 General Unsecured Claims

Holders of Allowed General Unsecured Claims (including holders of Claims under the Restoration Plan, the Deferred Compensation Plan, holders of trade Claims, and holders of Rejection Damages Claims) will receive, on account of such Claims, their Pro Rata Share of the Core Value Cash Pool, which shall be funded by reorganized BSA in four semi-annual installments of $6,250,000 (for a total of $25,000,000), beginning 180 days after the Effective Date and concluding two years after the Effective Date. Any Cash remaining in the Core Value Cash Pool after all Allowed General Unsecured Claims have been satisfied in full (including interest), shall be first used to fund any shortfall in payments from the BSA's available insurance and co-liable non-Debtors on account of any Non-Abuse Litigation Claims, and then be transferred to and vest in Reorganized BSA.

### C.    Class 7 Non-Abuse Litigation Claims

Holders of Non-Abuse Litigation Claims will, upon the liquidation of such Non-Abuse Litigation Claims following the Effective Date, be satisfied solely from the BSA's available insurance and from any non-Debtor party or parties that may be determined to be co-liable with the Debtors on account of such Non-Abuse Litigation Claims. No holder of an allowed Non-Abuse Litigation Claim shall be entitled to recover from the Core Value Cash Pool on account of such Claim, unless and until all allowed General Unsecured Claims have been paid in full. Solely in the event any Non-Abuse Litigation Claim is not covered by applicable BSA insurance or there is a shortfall in BSA's applicable insurance for such Non-Abuse Litigation Claim, following the exhaustion of remedies with respect to applicable insurance and any co-liable non-Debtor, the holder of an Allowed Non-Abuse Litigation Claim may elect to have such Claim treated as a Convenience Claim and receive Cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of its Allowed Non-Abuse Litigation Claim and (b) $50,000.

The abuse Settlement Trust will have the right to settle certain of the insurance policies that cover Non-Abuse Litigation Claims. To the extent that the abuse Settlement Trust has settled the applicable insurance policy with respect to a Non-Abuse Litigation Claim, such claimant will be able to recover on account of its claim from the abuse Settlement Trust. The abuse Settlement Trust will have reasonable consent rights over certain settlements of Non-Abuse Litigation Claims.

To the extent a Non-Abuse Litigation Claim is asserted against a Local Council as well as the Debtors, the holder of the Non-Abuse Litigation Claim must release its claim against the Local Council in order to receive payment from the abuse Settlement Trust.

## III.    Committee Investigations

After the Debtors filed for bankruptcy, the Creditors' Committee launched a comprehensive investigation into a number of prepetition transactions consummated prior to the commencement of the Chapter 11 Cases, including, but not limited to, the following:

- The incurrence of substantial secured obligations;

- The grant of additional security interests on the eve of bankruptcy (and in the face of a wave of substantial liability stemming from sexual abuse claims); and

- The creation, capitalization and financing of non-debtor Arrow WV, Inc. ("**Arrow**") along with various related transfers and transactions; and

While the Creditors' Committee believed it could develop significant causes of actions related to these issues, the Creditors' Committee also recognized the risks inherent in any litigation. Accordingly, the Creditors' Committee engaged in extensive arm's-length negotiations that resulted in significant recoveries for general unsecured creditors and avoided the uncertainties and expense of further litigation. The Creditors' Committee believes that confirmation of the Plan is in the best interests of all unsecured creditors.



**brownrudnick** *p.13*

*These seperate people wrote & accept/recognize Me*

September 30, 2021

**YOUNG CONAWAY**

**To:** Holders of Direct Abuse Claims Against the Boy Scouts of America
**From:** Coalition of Abused Scouts for Justice and Court-Appointed Future Claimants' Representative

*BY Yang ConwAY Atty.*

## RE: RECOMMENDATION THAT SEXUAL ABUSE VICTIMS VOTE TO ACCEPT THE BOY SCOUTS OF AMERICA REORGANIZATION PLAN

The **Coalition of Abused Scouts for Justice** (the "**Coalition**") and **James Patton, the Future Claims Representative** (the "**FCR**") appointed in the chapter 11 cases of the Boy Scouts of America (the "**BSA**"), together and jointly urge survivors to *vote to ACCEPT the reorganization Plan* (the "Plan") proposed and negotiated between the BSA and these survivor representatives, the Coalition and the FCR.

The Coalition is an ad hoc committee that represents survivors of sexual abuse suffered in connection with Scouting. The Coalition's members – approximately 18,000 survivors – are represented by over two dozen law firms that collectively represent over 60,000 survivors. The Coalition was formed to negotiate on behalf of its substantial survivor constituency, maximize the recovery available to all survivors, and minimize the time and expense to achieve those recoveries. The FCR was appointed by the Bankruptcy Court to be the official advocate for the interests of future claimants, including current minors and survivors suffering from repressed memories of their abuse.

The Coalition and the FCR have worked tirelessly on behalf of survivors to negotiate the terms of the Plan, which will provide *over $1.7 billion* (likely more) to be paid to survivors. It also provides the framework for substantial future settlements that will increase the recovery for survivors. The Plan is currently supported by representatives of approximately 70,000 survivors.

**The Plan represents the only assured path to recover and pay billions of dollars to survivors of sexual abuse in the BSA's programs. The only other path for survivors likely involves years of litigation and significant risk that survivors will receive much less than they are assured of receiving under the Plan. In our view, the settlement embodied in the Plan represents the best possible outcome for sexual abuse survivors. It will result in meaningful distributions of over a billion dollars in value (likely more) to survivors following confirmation, without lengthy, expensive and harmful litigation of individual abuse claims. A very brief description of the Plan terms, as pertaining to you and your recoveries, is contained below.**

### I. What You Will Receive Under the Plan

If the Plan is confirmed, a newly formed Settlement Trust will be established. Your claim against BSA, as well as any Local Council, and certain other "Protected Parties," will be transferred to and paid from the Settlement Trust. The Settlement Trust will assess your claim in accordance with its Trust Distribution Procedures (TDP) and value the claim based on the type and extent of abuse suffered and other factors. Based on these factors, most claims will be valued between $3,500 and $2,700,000. If you do not wish to undergo the full claims evaluation process, you will be able to elect to receive a one-time payment of $3,500, prior to the start of that process.

28647764.2



To: Holders of Direct Abuse Claims Against the Boy Scouts of America
September 30, 2021
Page 2



The Settlement Trust will collect funds from the BSA, its Local Councils, their insurers, and chartered organizations, and distribute available funds to survivors. To date, there are settlements that will provide over $1.8 billion (likely more) in initial funding to the Settlement Trust. The actual amount of your recovery, unless you select the one-time $3,500 payment, will depend on both the specifics of your claim and the amounts contributed to the Settlement Trust by, among others, insurance companies and chartered organizations in the future.

## II.    What the Boy Scouts and Their Affiliates And Insurers Are Contributing to the Plan

To date, the Coalition and FCR have negotiated commitments of approximately $1.8 billion to the Settlement Trust. The Coalition and FCR expect that number to grow significantly in coming months given this amount only includes financial contributions from one (1) insurer settlement and one (1) Chartered Organization settlement to date, with potentially many insurer and Charter Organization financial contribution settlements to come.

Of the over $1.8 billion that we have negotiated to date, these contributions include:

- **The BSA itself will contribute assets worth approximately $220 million to the Settlement Trust, along with potentially billions of dollars' worth of insurance rights.** The exact amount depends on certain timing factors and the prices of non-liquid assets which will have to be monetized. The Coalition and FCR believe this is the maximum amount that could be contributed by the BSA by law without forcing the organization into liquidation or years-long litigation, either of which would diminish assets available to abuse survivors.

- **The BSA's Local Councils will contribute assets valued at approximately $600 million to the Settlement Trust, along with potentially billions of dollars' worth of insurance rights.** While this may leave some Local Councils with significant assets, BSA's own insurance polices cannot be unlocked without the Local Councils' rights to those policies. Moreover, not every Local Council faces the same abuse liability, and many of the Local Councils with the most property and assets are located in jurisdictions that do not have favorable statutes of limitations for survivors. Additionally, many Local Councils take the position that most of their property is legally restricted and cannot be used to pay survivors. While the Coalition and FCR do not necessarily agree with all (or many) of the positions being taken by the Local Councils, we believe that in the absence of an agreed settlement like the one represented by the BSA Plan, many of these Local Councils may not have an incentive to contribute insurance rights. The settlement that we have negotiated with Local Councils – for $600 million in the aggregate – is very substantial. Indeed, some Local Councils under the settlement may be paying more than they would likely have to pay in the absence of a settlement. The settlement also avoids the likelihood that some or many Local Councils would be forced to liquidate, which would make it more challenging to recover assets for survivors.

- The Hartford insurance company will contribute $787 million to the Settlement Trust. You may remember that BSA announced a settlement with Hartford in April 2021 that BSA claimed was for $650 million. The Coalition and FCR opposed that settlement vigorously. We thought that it did not make Hartford pay enough to survivors and it contained a provision through which Hartford could have paid substantially less, potentially $400 million or below. Survivors face a significant risk that the Bankruptcy Court might enforce this earlier settlement agreement with these unfavorable terms that might allow Hartford to pay only a fraction of its exposure.