## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC.[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

## AFFIDAVIT OF SUPPLEMENTAL SERVICE

STATE OF CALIFORNIA    }
                              } ss.:
COUNTY OF LOS ANGELES    }

CATHERINE NOWNES-WHITAKER, being duly sworn, deposes and says:

1. I am employed by Omni Agent Solutions ("**Omni**"), the claims and noticing agent for the Debtors in the above-captioned chapter 11 cases.

2. On October 19, 2021, through December 27, 2021, I caused to be served:

    a) A USB containing:
        i. Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief, without the exhibits [Docket No. 6438], (the "Solicitation Procedures Order"),
        ii. Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [Docket No. 6443], (the "Plan"),
        iii. Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, [Docket No. 6445], (the "Disclosure Statement"),

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.
[2] A copy of the Cover Letter is attached hereto as **Exhibit E.**
[3] A copy of the UCC Letter is attached hereto as **Exhibit F.**
[4] A copy of the FCR/Coalition Letter is attached hereto as **Exhibit G**.
[5] A copy of the Plan Summary/FAQs attached hereto as **Exhibit H**.
[6] A copy of the TCC Letter is attached hereto as **Exhibit I**.
[7] A copy of the Charter Organization Notice is attached hereto as **Exhibit J**.

b) A paper copy of the Notice of Hearing to Consider Confirmation of Modified Fifth Amended Chapter 1 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [Docket No. 6639], (the "Notice"),

c) A paper copy of the Typographical Correction for the Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [Docket No. 6547], (the "Errata Notice"),

d) A paper copy of the Boy Scouts of America and Delaware BSA, LLC Letter, (the "Cover Letter")[2],

e) A paper copy of the Official Committee of Unsecured Creditors of Boy Scouts of America and Delaware BSA, LLC, (the "UCC Letter")[3],

f) A paper copy of the Coalition of Abused Scouts for Justice and Court-Appointed Future Claimants' Representative Letter, (the "FCR/Coalition Letter")[4],

g) A paper copy of the Summary and Frequently Asked Questions, (the "Plan Summary/FAQs")[5],

h) A paper copy of the Tort Claimants Committee Letter, (the "TCC Letter")[6],

(2a through 2h collectively referred to as the "Solicitation Package")

i.) Summary Regarding Chartered Organizations' Options Under the BSA's Chapter 11 Plan, (the "Charter Organization Notice")[7],

j.) Ballot for Class 5 (Convenience Claims) and Class 6 (General Unsecured Claims), (the "Class 5 & 6 Ballot"),

k.) Individual Ballot for Class 8 (Direct Abuse Claims), (the "Class 8 Ballot"),

l.) Ballot for Class 9 (Indirect Abuse Claims), (the "Class 9 Ballot"),

m.) Prepaid Return Envelope, (the "Envelope"),

By causing true and correct copies to be served via the method set forth on the Exhibits as listed below:

    I.   the Solicitation Package, Class 5 and Class 6 Ballot, and Envelope to those parties on the annexed **Exhibit A**,

    II.  Hard Copies of the Solicitation Package, Class 8 Ballot, and Envelope to those parties on the annexed **Exhibit B**,

    III. the Solicitation Package, Charter Organization Notice, Class 9 Ballot, and Envelope to those parties on the annexed **Exhibit C**,

    IV.  the Class 8 Ballot, and Envelope to those parties on the annexed **Exhibit D**.

Dated: January 18, 2022

Catherine Nownes-Whitaker
Omni Agent Solutions
5955 De Soto Avenue, Suite 100
Woodland Hills, CA 91367
(818) 906-8300

{State of California          }
{                             } ss.
{County of Los Angeles        }

Subscribed and sworn to (or affirmed) before me on this 18th day of January, 2022, by Catherine Nownes-Whitaker proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Notary Public

DARLEEN SAHAGUN
Notary Public – California
Los Angeles County
Commission # 2230950
My Comm. Expires Feb 11, 2022

# EXHIBIT A

**Exhibit A**
**Class S&6 Ballot Solicitation**
**Served as set forth below**

| Description | Creditor | Address1 | Address2 | Address3 | Address4 | Address5 | Method of Service |
|---|---|---|---|---|---|---|---|
| Plan Class S&6 | Alison K Schuler | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Amanda Kay Covington | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Anthony T Peluso | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Arthur Falk Oppenheimer | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Aubrey B Harwell | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Bradley D Tilden | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Bray Barnes | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Brian P Williams | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | C David Moody | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | C Travis Traylor | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Charles W Dahlquist II | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Craig Fenneman | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | D Kent Clayburn | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Daniel G Ownby | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Daniel M Cabela | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | David Biegler | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | David L Steward | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | David L. Briscoe | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | David M. Clark | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | David P. Rumbarger | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | David S Alexander | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | David Weekley | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Dennis Chookaszian | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Devang Desai | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Dominic Wolters | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Douglas Dittrick | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | E Gordon Gee | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Eleanor Morrison | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Eric H. Schultz | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Forrest J Gerlin | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Francis R Mcallister | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Frank D Tsuru | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Frank R Ramirez | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Frederick Joel Markham | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Gary E Wendlandt | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Gary Earl Crum | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | George F Francis III | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Glen Mclaughlin | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Glenn A Adams | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Harrington Thomas | 1500 Sansom St, Suite 300A | Philadelphia, PA 19102 | | | | First- Class Mail |
| Plan Class S&6 | Harris Butler | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Hector A Tico Perez | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Hegwood Ronald K | 27 HONORS LN | HATTIESBURG MS 39402-7100 | | | | Hegwood Ronald K |
| Plan Class S&6 | Howard Bulloch | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Jack Furst | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Jack Otto | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | James A. Ryffel | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | James D Rogers | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | James S. Turley | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | James S. Wilson | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Janice Bryant Howroyd | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Jeanette Prenger | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Jeanne Arnold | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Jennifer Hancock | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Joe Crafton | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Joe Walkoviak | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | John C. Cushman III | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | John Finch | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | John Gottschalk | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | John R. Donnell, Jr. | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Jose F. Nino | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Joseph Brett Harvey | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Joseph P Landy | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Judy R. Mcreynolds | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Keith A Clark | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | L.B. Eckelkamp, Jr. | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Larry M Gibson | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Lawrence W. Kellner | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Lisa Argyros | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Lloyd Hugh Redd | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Lyle R Knight | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Mark Mays | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Matthew K Rose | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Matthew Parsons | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Michael G Hoffman | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Michael Goodrich | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Michael Sears | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Michael Surbaugh | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Nathan Owen Rosenberg | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Nevada A Kent IV | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | O Temple Sloan Jr | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Pamela Petterchak | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Philip M. Condit | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Pratik Vaidya | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | R Doyle Parrish | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | R. Ray Wood | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Ralph De La Vega | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Randall Stephenson | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Ray Capp | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Raymond E Johns Jr | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Rex W. Tillerson | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |

**Exhibit A**
Class S&6 Ballot Solicitation
Served as set forth below

| Description | Creditor | Address1 | Address2 | Address3 | Address4 | Address5 | Method of Service |
|---|---|---|---|---|---|---|---|
| Plan Class S&6 | Robert H Reynolds | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Robert J Lafortune | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Robert J Mazzuca | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Robert J Smith | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Robert M Gates | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Roger C Mosby | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Ronald K Migita | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Ronald Kirk | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Ronald O Coleman | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Ross II, David J | P.O. Box 5242 | Carefree, AZ 85377-5242 | | | | First- Class Mail |
| Plan Class S&6 | Scott R Christensen | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Scott William Beckett | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Stephen W Owen | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Steve Hemsley | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Steve P. Mcgowan | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Steven Rendle | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Steven Weekes | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Tanya Acker | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Thear Suzuki | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Thomas C Edwards | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Thomas R Yarboro | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Wayne Brock | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Wayne M Perry | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Wesley Coleman | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | Wesley J Smith | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | William E. Rosner | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | William F. Cronk | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | William S Sorrels | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |
| Plan Class S&6 | William W Stark Jr | c/o Boy Scouts of America | Attn: Chase Koontz | 1325 W Walnut Hill Ln | Irving, TX 75015 | | First- Class Mail |

## **<u>EXHIBIT B</u>**

5,599 CLASS 8 PARTIES WERE SERVED VIA US MAIL. THE NAMES AND CONTACT INFORMATION FOR THESE PARTIES HAVE BEEN REDACTED IN ORDER TO MAINTAIN THE CONFIDENTIALITY OF EACH PARTY.

61 CLASS 8 PARTIES WERE SERVED VIA OVERNIGHT MAIL. THE NAMES AND CONTACT INFORMATION FOR THESE PARTIES HAVE BEEN REDACTED IN ORDER TO MAINTAIN THE CONFIDENTIALITY OF EACH PARTY.

1,226 INCARCERATED CLASS 8 PARTIES WERE SERVED VIA US MAIL. THE NAMES AND CONTACT INFORMATION FOR THESE PARTIES HAVE BEEN REDACTED IN ORDER TO MAINTAIN THE CONFIDENTIALITY OF EACH PARTY.

# **EXHIBIT C**

**Exhibit C**
Class 9 Ballot
Served as set forth below

| Description | Creditor | Address1 | Address2 | Address3 | Address4 | Address5 | Method of Service |
|---|---|---|---|---|---|---|---|
| Plan Class 9 | Abraham Lincoln Council, Inc. Boy Scouts of America | Attn: Gary S Schwab | 5231 S 6th St Rd | Springfield, IL 62703 | | | First-Class Mail |
| Plan Class 9 | Ann Hope United Methodist Church Inc. | Attn: Rev. Matt Turner | 702 Goddard Ave | Seneca, SC 29678 | | | First-Class Mail |
| Plan Class 9 | Arcadia United Methodist Church | Attn: Stagger Brock | 391 Arcadia St | Spartanburg, SC 29301 | | | First-Class Mail |
| Plan Class 9 | Asbury United Methodist Church | Attn: Scott Masters | 40 Evans Circle | Keene, NH 03431 | | | First-Class Mail |
| Plan Class 9 | Athens First UMC | Attn: Denise Davis, Treasurer | 2 S College St | Athens, OH 45701-2904 | | | First-Class Mail |
| Plan Class 9 | Beech Grove UMC | Attn: Connie Stutts, Pastor | 1037 Washington Post Rd | New Bern, NC 28562 | | | First-Class Mail |
| Plan Class 9 | Bethel United Methodist Church | 585 Mckay Rd | Bolivia, NC 28422 | | | | First-Class Mail |
| Plan Class 9 | Bethesda United Methodist Church | Attn: Rev Joyce M Edwards | P.O. Box 843 | Kingstree, SC 29556 | | | First-Class Mail |
| Plan Class 9 | Bethesda United Methodist Church Inc. | Attn: Howard Keith Hiller | 516 Piedmont Rd | Easley, SC 29642 | | | First-Class Mail |
| Plan Class 9 | Broad Cove Church | Attn: Anne Roundy | 456 River Rd | Cushing, ME 04563 | | | First-Class Mail |
| Plan Class 9 | Broad Street United Methodist Church | Attn: Steve Keck | 310 N Broad St | Clinton, SC 29325 | | | First-Class Mail |
| Plan Class 9 | Caneadea United Methodist Church | Attn: Craig Buntow | 3 Chapel St | Belfast, NY 14711 | | | First-Class Mail |
| Plan Class 9 | Centenary UMC | 15 Sanford St | | Attleboro MA 02703 | | | First-Class Mail |
| Plan Class 9 | Church Hill UMC | 11 Church St | | Norwell, MA 02061 | | | First-Class Mail |
| Plan Class 9 | Church Of TheIncarnation | Attn: The Rev Tom Phillips | 1601 Alafaya Trl | Oviedo, FL 32766 | | | First-Class Mail |
| Plan Class 9 | Clarkton United Methodist Church | Attn: Shannon Owens Ross, Pastor | 9072 US Hwy 701 S | P.O. Box 744 | Clarkton, NC 28433 | | First-Class Mail |
| Plan Class 9 | Colfax United Methodist Church | Attn: Ken Tape, Treasurer | P.O. Box 216 | Colfax, WI 54730 | | | First-Class Mail |
| Plan Class 9 | Colonial Heights UMC | Attn: Rev. Rhonda Hobbs | 6321 Chapman Hwy | Knoxville, TN 37920 | | | First-Class Mail |
| Plan Class 9 | Concord UMC | Attn: Greg Brumley | 1645 West St | Concord, CA 94521 | | | First-Class Mail |
| Plan Class 9 | CreedmoorUnitedMethodistChurch | 214 Park Ave | | Creedmoor, NC 27522 | | | First-Class Mail |
| Plan Class 9 | Daniel Webster Council | Attn: Lindsay Zahradka Milne | 100 Middle St | Portland, ME 04062 | | | First-Class Mail |
| Plan Class 9 | Del-Mar-Va Council | Attn: Robert Nakagawa | 1910 Baden Powell Way | Dover, DE 19904 | | | First-Class Mail |
| Plan Class 9 | Dover Foxcroft UMC | Attn: Anne Cress | P.O. Box 623 | Dover-Foxcroft, ME 04426 | | | First-Class Mail |
| Plan Class 9 | Downs Memorial United Methodist | Attn: Steve Mitchell | 8026 Idaho Street | Oakland, CA 94608 | | | First-Class Mail |
| Plan Class 9 | East Carolina Council BSA, Inc. | c/o Ward and Smith, PA | Attn: Paul A Fanning | P.O. Box 8088 | Greenville, NC 27835-8088 | | First-Class Mail |
| Plan Class 9 | East Jewett Umc | P.O. Box 53 | | East Jewett, NY 12424 | | | First-Class Mail |
| Plan Class 9 | EastSaugusUnitedMethodistChurch | Attn: Patricia Oduor | 85 Chestnut St | Saugus, MA 01906 | | | First-Class Mail |
| Plan Class 9 | Edenton Street United Methodist Church | Attn: Patricia Joanne Gravinese, CFO | 228 W Edenton St | Raleigh, NC 27603 | | | First-Class Mail |
| Plan Class 9 | Elizabeth Sullivan Memorial UMC | 510 Ave B | | Bogalusa, LA 70427 | | | First-Class Mail |
| Plan Class 9 | Elizabeth Sullivan Memorial UMC | Attn: Freda Billings | 1711 Gayland Dr | Bogalusa, LA 70427 | | | First-Class Mail |
| Plan Class 9 | ElizabethStreetUmc | 313 Andover Rd | | Durham, NC 27712 | | | First-Class Mail |
| Plan Class 9 | ElizabethUnitedMethodistChurchInSmithfield | Attn: Rev Christine Yeatts/Brenda Pearce | 933 Sunrise Drive | Garner, NC 27529 | | | First-Class Mail |
| Plan Class 9 | Enfield United Methodist Church | Attn: Pastor Paul Guest | P.O. Box 484 | Enfield, NH 03748 | | | First-Class Mail |
| Plan Class 9 | Epworth Umc Berkley | Attn: Annette Cayot Treasurer | 1953 Hopkins St | Berkeley, CA 94707 | | | First-Class Mail |
| Plan Class 9 | Fair Oaks UMC | Attn: Caretia Cain-Grizzell | 9849 Fair Oaks Blvd | Fair Oaks, CA 95628-7012 | | | First-Class Mail |
| Plan Class 9 | Federated Church of Wauconda | 200 S Barrington Rd | | Wauconda, IL 60084 | | | First-Class Mail |
| Plan Class 9 | First Presbyterian Church At Red Bank | 255 Harding Rd | | Red Bank, NJ 07701 | | | First-Class Mail |
| Plan Class 9 | First Presbyterian Church At Red Bank | Attn: Clerk | 255 Harding Rd | Red Bank, NJ 07701 | | | First-Class Mail |
| Plan Class 9 | First United Methodist Church | Attn: Brittany Taylor & Charles B Mcelveen | 307 E Godbold St | Marion, SC 29571 | | | First-Class Mail |
| Plan Class 9 | First United Methodist Church Amesbury Ma | Attn: Steven Murray | 92 Newton Rd | Plaistow, NH 03865 | | | First-Class Mail |
| Plan Class 9 | First United Methodist Church Canton | Attn: Pastor Adam Muckleroy | 600 S Buffalo St | Canton, TX 75103 | | | First-Class Mail |
| Plan Class 9 | First United Methodist Church Crockett Texas | Attn: Pastor | P.O. Box 484 | Enfield, NH 03748 | | | First-Class Mail |
| Plan Class 9 | First United Methodist Church Crockett Texas | Attn: Pastor | P.O. Box 984 | Crockett, TX 75835 | | | First-Class Mail |
| Plan Class 9 | First United Methodist Church El Campo Texas | 1001 Ave I | | El Campo, TX 77437 | | | First-Class Mail |
| Plan Class 9 | First United Methodist Church Hamlet | Attn: Treasurer | 300 Charlotte St | Hamlet, NC 28345 | | | First-Class Mail |
| Plan Class 9 | First United Methodist Church Of Myrtle Beach | Attn: Rev Meredith M Dark | 901 N Kings Hwy | Myrtle Beach, SC 29577 | | | First-Class Mail |
| Plan Class 9 | First United Methodist Church Of Natchitoches | Attn: Kenny Kaufman Jr | 727 Whitfield Dr | Natchitoches, LA 71457 | | | First-Class Mail |
| Plan Class 9 | First United Methodist Church, Elgin | Attn: Samuel Blanco | 216 W 3rd St | Elgin, TX 78621 | | | First-Class Mail |
| Plan Class 9 | Foundry UMC Virginia Beach | 2801 Virginia Beach Blvd. | | Virginia Beach, VA 23452 | | | First-Class Mail |
| Plan Class 9 | Genesis United Methodist Church | Attn: Rev Emily Merritt | P.O. Box 1123 | Cary, NC 27512 | | | First-Class Mail |
| Plan Class 9 | Grace United Methodist Church | Attn: Tal Madison | 401 Grace St | Wilmington, NC 28401 | | | First-Class Mail |
| Plan Class 9 | Grand View United Methodist Church | Attn: Administrative Board | 3242 John Wesley Dr | Dubuque, IA 52002 | | | First-Class Mail |
| Plan Class 9 | Groveton United Methodist Church | Pastor  Eungil Cho | 12 Pleasant Street | Milan, NH 03588 | | | First-Class Mail |
| Plan Class 9 | HaymountUnitedMethodistChurch | c/o Hutchens Law Firm LLP | 4317 Ramsey St, P.O. Box 2505 | Fayetteville, NC 28302 | | | First-Class Mail |
| Plan Class 9 | Highland UMC Colonial Heights | Attn: Alice Van Arsdale | 125 East Westover Ave. | Colonial Height, VA 23834 | | | First-Class Mail |
| Plan Class 9 | Indian Waters Council | Attn: Douglas W Stone | 715 Betsy Dr | Columbia, SC 29210 | | | First-Class Mail |
| Plan Class 9 | Langley UMC of Aiken (Dana Evans) | PO Box 161 | | Langley, SC 29834-0161. US | | | First-Class Mail |
| Plan Class 9 | Langley United Methodist Church Of Aiken County | Attn: Dana Evans | P.O. Box 161 | Langley, SC 29834 | | | First-Class Mail |
| Plan Class 9 | Laurel United Methodist Church | 631 S Grand Ave W | | Springfield, IL 62704 | | | First-Class Mail |
| Plan Class 9 | Local Council, Ty Page | Attn: Ty Page | 7601 Lockheed Dr | El Paso, TX 79925 | | | First-Class Mail |
| Plan Class 9 | Mapleton UMC | Attn: Treasurer Michelle Buck | 1755 Main St | Mapleton, ME 04757-4221 | | | First-Class Mail |
| Plan Class 9 | Mapleton United Methodist Church | Attn: Treasurer Michele Buck | P. O. Box 208 | Mapleton, ME 04757 | | | First-Class Mail |
| Plan Class 9 | Mapleton United Methodist Church | Attn: Treasurer Michelle Buck | P. O. Box 208 | Mapleton, ME 04757 | | | First-Class Mail |
| Plan Class 9 | Marin Council 035 | Attn: Michael Dabeck | 225 W End Ave | San Rafael, CA 94901 | | | First-Class Mail |
| Plan Class 9 | Marshfield Federated Church | Attn: Terry Pierce, Co-Treasurer | 1516 US Rte 2 | Marshfield, VT 05658 | | | First-Class Mail |
| Plan Class 9 | Minot United Methodist Church | Attn: Steven Verrill | 270 Bailey Hill Rd | Poland, ME 04274 | | | First-Class Mail |
| Plan Class 9 | Mishawaka First United Methodist Church | Attn: Rev Rick Taylor | 201 E 3rd St | Mishawaka, IN 46544 | | | First-Class Mail |
| Plan Class 9 | Mosaic United Methodist Church | Attn: Tina R Patterson | 8008 St Andrew Chr Rd | Louisville, KY 40258-3830 | | | First-Class Mail |
| Plan Class 9 | MosaicUnitedMethodistChurch_129838.pdf | Attn: Tina R Patterson | 8008 St Andrews Church Rd | Louisville, KY 40258 | | | First-Class Mail |
| Plan Class 9 | Moultonborough United Methodist Church | Attn: Enid Burrows & Charles Fritz | P.O. Box 188 | Moultonborough, NH 03254-0188 | | | First-Class Mail |
| Plan Class 9 | Mount Calvary Lutheran Church of Lake Arrowhead California | Attn: Jeffrey Jay Zanora | 27415 School Rd | P.O. Box 250 | Lake Arrowhead, CA 92352 | | First-Class Mail |
| Plan Class 9 | Mt Carmel United Methodist Church | Attn: Rebecca Marie Bradley | 2706 Salem Church Rd | Goldsboro, NC 27530-7914 | | | First-Class Mail |
| Plan Class 9 | Mt Carmel United Methodist Church | Attn: Rebecca Marie Bradley | 2706 Salem Church Rd | Goldsboro, NC 27530 | | | First-Class Mail |
| Plan Class 9 | Munford First United Methodist Church | Attn: Bob Wilbanks | 57 S Tipton St | Munford, TN 38058 | | | First-Class Mail |
| Plan Class 9 | Munsonville UMC | c/o Chapel by the Lake | Attn John Halter | 529 Granite Lake Rd | Munsonville, NH 03457 | | First-Class Mail |
| Plan Class 9 | National Capital Area Council | Attn: Craig Poland | 9190 Rockville Pike | Bethesda, MD 20814 | | | First-Class Mail |
| Plan Class 9 | Nevada First United Methodist Church | Attn: Rev Mike Carey | 1036 7th St | Nevada, IA 50201 | | | First-Class Mail |
| Plan Class 9 | Northeastern Pennsylvania | Attn: Mark J Barberitz | 72 Montage Mtn Rd | Moosic, PA 18507 | | | First-Class Mail |
| Plan Class 9 | Oakwood United Methodist Church | Attn: Lori L Reiber | 206 E Hadley Ave | Oakwood, OH 45419 | | | First-Class Mail |
| Plan Class 9 | Ozark Trails Council | Attn: John S Feick | 1616 S Eastgate Ave | Springfield, MO 65809 | | | First-Class Mail |
| Plan Class 9 | PageMemorialUnitedMethodistChurch | Attn: Dennis Holder | P.O. Box 695 | 115 W Main St | Aberdeen, NC 28315 | | First-Class Mail |
| Plan Class 9 | ParkwoodUnitedMethodistChurch | Attn: Treasurer, Parkwood United | Methodist Church | 5123 Revere Rd | Durham, NC 27713-2420 | | First-Class Mail |
| Plan Class 9 | Pennsylvania Dutch Council | Attn: Matthew Adams | 630 Janet Ave | Lancaster, PA 17601 | | | First-Class Mail |
| Plan Class 9 | Penobscot, S. Penobscot, N. Penobscot UMC | Attn: Sally Bridges | P.O. Box 30 | Penobscot, ME 04776 | | | First-Class Mail |
| Plan Class 9 | Peoples United Methodist Church | Attn: Frank King | PO Box 150 | Fremont, NH 03044-0150 | | | First-Class Mail |
| Plan Class 9 | PilmoorMemorialUnitedMethodistChurch | Attn: Nedra Daughdrill Lane | 192 Courthouse Rd | Currituck, NC 27929 | | | First-Class Mail |
| Plan Class 9 | Pinetops United Methodist Church | Attn: Treasurer | P.O. Box 13 | Pinetops, NC 27864 | | | First-Class Mail |
| Plan Class 9 | PineValleyUnitedMethodistChurch | Attn: Hyun Joseph Park | 910 Pine Valley Rd | Jacksonville, NC 28546 | | | First-Class Mail |
| Plan Class 9 | Pinole United Methodist Church | Attn: Rev Elmar De Ocera | 2000 San Pablo Ave | Pinole, CA 94564 | | | First-Class Mail |
| Plan Class 9 | Pisgah United Methodist Church Inc | Attn: Josh Mcclendon | 621 N Ebenezer Rd | Florence, SC 29501 | | | First-Class Mail |
| Plan Class 9 | Pleasant Grove United Methodist Church | c/o Bentz Law Firm | Attn: Sean Bollman | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Pleasant Grove United Methodist Church | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Pleasant Street United Methodist Church | Attn: Bernard Campbell, Esq | 1 Stiles Rd, Ste 107 | Salem, NH 03079 | | | First-Class Mail |
| Plan Class 9 | Porterville First United Methodist Church | Attn: Jim McFarlin | 344 E Morton Ave | Porterville, CA 93257 | | | First-Class Mail |
| Plan Class 9 | PrinceOfPeaceUmc | 6299 Token Forest Drive | | Manassas, VA 20112 | | | First-Class Mail |
| Plan Class 9 | Propst Memorial United Methodist Church | Attn: Tommy Webb | 253 Martha St | P.O. Box 87 | Millport, AL 35576 | | First-Class Mail |
| Plan Class 9 | Pushmataha Area | Attn: Jeremy D Whitmore | P.O. Box 9570 | Columbus, MS 39705 | | | First-Class Mail |
| Plan Class 9 | Refugio First United Methodist Church | Stephen Clay Strahan | 1406 Cougar Dr | Refugio, TX 78377 | | | First-Class Mail |
| Plan Class 9 | RiptonCommunityChurchUnitedMethodistChurch | Attn: Nick Tossem | P.O. Box 119 | Ripton, VT 05766 | | | First-Class Mail |
| Plan Class 9 | Rock Church Ministries | Attn: Steven Murray | 92 Newton Rd | Plaistow, NH 03865 | | | First-Class Mail |
| Plan Class 9 | Rock Springs UMC - Lawrenceville | 1100 Rock Springs Rd | | Lawrenceville, GA 30043 | | | First-Class Mail |
| Plan Class 9 | Rock Springs UMC 1100 Rock Springs Rd | 1100 Rock Springs Rd | | Lawrenceville, GA 30043 | | | First-Class Mail |
| Plan Class 9 | Rockbrook United Methodist Church | c/o Bradley Arant Boult Cummings, LLP | Attn: Edwin G Rice | 100 N Tampa St, Ste 2200 | Tampa, FL 33602 | | First-Class Mail |
| Plan Class 9 | Simpsonville United Methodist Church | Attn: Mike Smith | 215 SE Main St | Simpsonville, SC 29681 | | | First-Class Mail |
| Plan Class 9 | Spring City United Methodist Church | Attn: Dave Grant | P.O. Box 158 | Spring City, TN 37381 | | | First-Class Mail |
| Plan Class 9 | Spring City United Methodist Church | Attn: Dave Grant | P.O. Box 158 | Spring City, TN 37381 | | | First-Class Mail |
| Plan Class 9 | St Andrews United Methodist Church | Attn: Deborah Minshew | 9200 Dietz Elkhorn Rd | Fair Oaks Ranch, TX 78015 | | | First-Class Mail |
| Plan Class 9 | St Johns United Methodist Church | Attn: Janet Warfield, Treasurer | 28 Cataract Ave | Dover, NH 03820 | | | First-Class Mail |
| Plan Class 9 | St Mark United Methodist Church | 601 W Braker Ln | | Austin, TX 78753 | | | First-Class Mail |
| Plan Class 9 | St Matthews United Methodist Church | Attn: Steven Murray | 92 Newton Rd | Plaistow, NH 03865 | | | First-Class Mail |
| Plan Class 9 | St Matthew's United Methodist Church | 6017 Camphor St | | Metairie, LA 70003 | | | First-Class Mail |
| Plan Class 9 | St. Johns United Methodist Church Of Aiken | Attn: Dr Tim McClendon | 104 Newberry St Nw | Aiken, SC 29801 | | | First-Class Mail |
| Plan Class 9 | St. Lukes United Methodist Church of Houston Texas | Attn: Dr. Tom Pace | P.O. Box 22013 | Houston, TX 77227 | | | First-Class Mail |
| Plan Class 9 | Stevensville United Methodist Church | Attn: Rev David F Hills | 5506 Ridge Rd | Stevensville, MI 49127 | | | First-Class Mail |
| Plan Class 9 | ThreeBellsUnitedMethodistChurch | Attn: Treasurer | 312 Fugate St | Duffield, VA 24244 | | | First-Class Mail |
| Plan Class 9 | Trinity United Methodist Church | Attn: Joseph James | 226 W Liberty St | Sumter, SC 29150-5316 | | | First-Class Mail |
| Plan Class 9 | Trinity United Methodist Church | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Trucksville United Methodist Church 080320 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Trucksville United Methodist Church 080320 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | TwelfthStreetUmc187762 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Union Chapel UMC | 2625 Pannell Rd | | Monroe, GA 30655 | | | First-Class Mail |
| Plan Class 9 | Union Chapel UMC 2625 Pannell Rd Monroe GA 30655 | 2625 Pannell Rd | | Monroe, GA 30655 | | | First-Class Mail |
| Plan Class 9 | Union United Methodist Church | Attn: Roderic L Mullen | 2212 Nursery Rd | Lithington, NC 27546 | | | First-Class Mail |
| Plan Class 9 | United Methodist Church Of Newton Newton Ma | Attn: Paulina Andzie - Quainoo, Treasurer | 430 Walnut St | Newton, MA 02460 | | | First-Class Mail |
| Plan Class 9 | United Methodist Korean Church Of Astoria | 3044 Crescent St | | Astoria, NY 11102 | | | First-Class Mail |
| Plan Class 9 | Urah UMC Gardners | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Uriah UMC Gardners | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Valhalla United Methodist Church | Attn: Sal Vaccaro | 200 Columbus Ave | Valhalla, NY 10595 | | | First-Class Mail |
| Plan Class 9 | Van United Methodist Church | Attn: Southern District WVUMC | 313 S Heber Street | Beckley, WV 25801 | | | First-Class Mail |
| Plan Class 9 | VanceboroUnitedMethodistChurch | Attn: Nicholas Guay | P.O. Box 18 | Vanceboro, ME 04491 | | | First-Class Mail |
| Plan Class 9 | Waterloo United Methodist Church | Attn: Rebecca Pezzul | 21 E Williams St | Waterloo, NY 13165 | | | First-Class Mail |
| Plan Class 9 | Waters Edge United Methodist Church | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Waters Edge United Methodist Church | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Waymart Calvary United Methodist Church 30386 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Waymart Calvary United Methodist Church 30386 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Wehrwoodiltinc179285 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Weirs United Methodist Church Attn Treasurer | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Wesley Chapel United Methodist Church | P.O. Box 5368 | | Lacey, WA 98509 | | | First-Class Mail |
| Plan Class 9 | Wesley Chapel United Methodist Church | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Wesley Chapel United Methodist Church 178461 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Wesley United Methodist Church | 450 Sylvan St | | Marysville, PA 17053 | | | First-Class Mail |

**Exhibit C**
Class 9 Ballot
Served as set forth below

| Description | Creditor | Address1 | Address2 | Address3 | Address4 | Address5 | Method of Service |
|---|---|---|---|---|---|---|---|
| Plan Class 9 | WesleyUnitedMethodistChurch4200 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | WesleyUnitedMethodistChurch4200 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | West Milan United Methodist Church | Attn: Eungil Cho | 12 Pleasant Street | Milan, NH 03588 | | | First-Class Mail |
| Plan Class 9 | West Ridge United Methodist Church | Attn: Rev Taesung Kang | 40 Evans Circle | Keene, NH 03431 | | | First-Class Mail |
| Plan Class 9 | Westchester Surplus Lines Insurance Company | Attn: Christopher J Celentano | 10 Exchange Pl, 9th Fl | Jersey City, NJ 07302 | | | First-Class Mail |
| Plan Class 9 | Westchester Surplus Lines Insurance Company | Attn: Christopher J Celentano | 10 Exchange Pl, 9th Fl | Jersey City, NJ 07302 | | | First-Class Mail |
| Plan Class 9 | Westridge United Methodist Church | 2307 West Greenleaf Ave | Chicago, IL 60645 | | | | First-Class Mail |
| Plan Class 9 | WestSideUnitedMethodistChurch180828 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Williamsburg United Methodist Church 177502 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | WilliamsburgUnitedMethodistChurch177502 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Wilton UMC | Attn: Pastor | PO Box 517 | Wilton, ME 04294 | | | First-Class Mail |
| Plan Class 9 | WoodlandPleasantValleyUmc189407 | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | York Grace | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | York Grace | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | York Springs United Methodist Church | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | York Springs United Methodist Church | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |
| Plan Class 9 | Zion UMC | c/o Bentz Law Firm | Attn: Leonard Spagnolo | 680 Washington Rd, Ste 200 | Pittsburgh, PA 15228 | | First-Class Mail |

# EXHIBIT D

17,377 CLASS 8 PARTIES WERE SERVED VIA US MAIL. THE NAMES AND CONTACT INFORMATION FOR THESE PARTIES HAVE BEEN REDACTED IN ORDER TO MAINTAIN THE CONFIDENTIALITY OF EACH PARTY.

# **EXHIBIT E**



September 30, 2021

Re:    *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343
       (LSS), Chapter 11 Bankruptcy

**To All Holders of Claims Entitled to Vote on the Plan:**

On February 18, 2020, the Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Debtors filed the Chapter 11 Cases in order to address the significant potential liabilities arising from Claims related to alleged historical acts of Abuse in the BSA's programs.

The BSA cares deeply about all survivors of child abuse.  The BSA understands that no apology can repair the damage caused by abuse or take away the pain that survivors have endured.  The BSA is steadfast in its commitment to continually improve all of its policies to prevent abuse.

> **THE DEBTORS, THE COALITION OF ABUSED SCOUTS FOR JUSTICE, THE FUTURE CLAIMANTS' REPRESENTATIVE, THE CREDITORS' COMMITTEE AND THE AD HOC COMMITTEE OF LOCAL COUNCILS (THE "SUPPORTING PARTIES") BELIEVE THE PLAN OF REORGANIZATION PROVIDES HOLDERS OF CLAIMS, INCLUDING ABUSE CLAIMS, SUBSTANTIALLY GREATER RECOVERY THAN ANY OTHER ALTERNATIVE AND URGE YOU TO SUBMIT A TIMELY BALLOT VOTING TO ACCEPT THE PLAN OF REORGANIZATION.**
>
> **THE VOTING DEADLINE IS DECEMBER 14, 2021 AT 4:00 P.M. (EASTERN TIME).**

On September 30, 2021, the Bankruptcy Court entered an order [D.I. 6438] approving the *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6445] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time, the "Disclosure Statement").  On the same date, the Bankruptcy Court entered an order [D.I. 6438] (the "Solicitation Procedures Order") that, among other things, authorizes the Debtors to solicit votes to accept or reject the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6443] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time, the "Plan").[1]

**The Plan is supported by the Debtors and the other Supporting Parties.  The BSA and the Supporting Parties all believe that the Plan represents the best possible means to (a) timely and equitably compensate survivors of alleged Abuse in Scouting and (b) ensure**

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.



that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission. **The BSA and the other Supporting Parties believe that the Plan provides the highest and best recovery—and the best outcome—for all creditors and is in the best interests of the Debtors' estates. Therefore, the BSA and the other Supporting Parties urge eligible creditors to vote to accept the Plan.**

You are receiving this letter and the accompanying materials because you may be entitled to vote on the Plan. The following materials constitute the "Solicitation Package" which, in addition to this letter, is comprised of:

(a)    the Disclosure Statement, including all exhibits thereto, attached to which is the Plan, including all of its exhibits and schedules (to the extent such exhibits and schedules are filed with the Bankruptcy Court before the Solicitation Date);

(b)    the Solicitation Procedures Order;

(c)    the Confirmation Hearing Notice;

(d)    an appropriate ballot with detailed voting instructions, including instructions for voting online via the electronic ballot submission platform (the "E-Ballot Platform") on the website of Omni Agent Solutions, the Debtors' claims, noticing, and solicitation agent in these chapter 11 cases (the "Solicitation Agent"), and return instructions or a return envelope with postage, if applicable;

(e)    a letter from any official committee or the Coalition, substantially in the form filed on the docket of the Chapter 11 Cases (and as may be modified, amended, or supplemented from time to time); and

(f)    any other materials ordered by the Bankruptcy Court to be included as part of the Solicitation Package.

---

**ACCESS TO PLAN AND DISCLOSURE STATEMENT**

**IMPORTANT**: You should have received a hard copy or USB flash drive copy of the Plan, the Disclosure Statement, and the Solicitation Procedures Order (excluding exhibits except for the Solicitation Procedures). You may also access the Plan, the Disclosure Statement, and the Solicitation Procedures Order free of charge at https://omniagentsolutions.com/bsa-SAballots (Direct Abuse Claims) or https://omniagentsolutions.com/bsa-ballots (all other Claims). You may also obtain copies of any of the other Solicitation Package materials free of charge at these websites. If you would prefer to receive paper copies or documents on a USB drive, please contact the Solicitation Agent to make such a request by: (a) calling the Debtors' toll-free restructuring hotline at 1-866-907-2721, (b) emailing BSAballots@omniagnt.com, (c) writing to Boy Scouts of America Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367, or (d) submitting an inquiry on the Debtors' restructuring website at https://omniagentsolutions.com/BSA.

---



The comprehensive restructuring of the Debtors proposed in the Plan is the product of agreements reached among the BSA, the other Supporting Parties, JPM (the Debtors' senior secured lender), Hartford, and The Church of Jesus Christ of Latter-day Saints ("TCJC"), which provides the framework for global resolution of Abuse Claims against the Debtors, Related Non-Debtor Entities, and Local Councils, as well as any other Contributing Chartered Organizations, Participating Chartered Organizations, and Settling Insurance Companies that may become party to the restructuring settlements after the date of this letter, in exchange for contributions by such parties to the Settlement Trust for the benefit of survivors of Abuse (collectively, "Abuse Survivors"). The Plan has been designed to maximize and expedite recoveries to Abuse Survivors, resulting in substantial recoveries, as set forth in the recovery chart in the Disclosure Statement. The Debtors and the other Supporting Parties strongly encourage all holders of Claims in the Voting Classes, including Direct Abuse Claims, to vote in favor of the Plan.

The Plan, which incorporates a settlement with Hartford for $787 million and a settlement with TCJC for $250 million, as well as the JPM / Creditors' Committee Settlement, provides for a mechanism to channel to the Settlement Trust all Abuse Claims asserted against the Debtors and certain non-debtor third parties, including the Local Councils, Participating Chartered Organizations, Contributing Chartered Organizations (including TCJC), and Settling Insurance Companies (including Hartford) that make contributions to the Settlement Trust for the benefit of Abuse Survivors. If the Plan is approved, the Settlement Trust will exclusively administer and resolve the Abuse Claims. In exchange for channeling all Abuse Claims to the Settlement Trust, as described in the Disclosure Statement, the BSA will make a substantial contribution to the Settlement Trust of approximately $220 million assuming an Effective Date of December 31, 2021. The BSA will also assign and transfer to the Settlement Trust all of its insurance rights under the BSA's insurance policies, thereby providing the potential for substantial insurance recoveries to holders of Direct Abuse Claims.

Additionally, Local Councils will make a substantial contribution to the Settlement Trust to resolve the Abuse Claims that may be asserted against them in exchange for being included as Protected Parties under the Plan and receiving the benefits of the Channeling Injunction, consisting of (a) $500 million, comprised of at least $300 million in Cash with the balance in property, exclusive of insurance rights, (b) the DST Note, a $100 million interest-bearing variable-payment obligation note issued to the Settlement Trust by a Delaware statutory trust on or as soon as practicable after the Effective Date, and (c) the assignment and transfer to the Settlement Trust of all Local Council insurance rights under the BSA's and Local Councils' liability insurance policies that provide coverage for Abuse Claims, thereby providing the potential for substantial insurance recoveries to holders of Direct Abuse Claims.

The Plan also provides a mechanism by which Chartered Organizations can become Participating Chartered Organizations (unless they elect not to or are chapter 11 debtors in their own restructuring cases) through the assignment and transfer to the Settlement Trust of all of their post-1975 insurance rights under BSA and Local Council policies that provide coverage for Abuse Claims in exchange for being included as a Limited Protected Party under the Plan, resulting in the potential for substantial additional insurance recoveries for holders of Abuse Claims. Insurance Companies may also make substantial contributions and Chartered Organizations may also make further substantial contributions to the Settlement Trust in exchange for becoming



Protected Parties under the Plan and receiving the comprehensive benefits of the Channeling Injunction.

Additionally, the Plan also provides for the BSA's assumption of its prepetition Pension Plan and specifies the treatment of holders of Allowed Convenience Claims, Allowed General Unsecured Claims and Allowed Non-Abuse Litigation Claims, resulting in substantial recoveries, as set forth in the recovery chart in the Disclosure Statement. The treatment of all classes of Claims entitled to vote is described more fully in the Plan and the Disclosure Statement.

The Debtors and the Supporting Parties support confirmation of the Plan and urge all claimants to vote in favor of the Plan. **The Debtors and the Supporting Parties believe that the Plan will offer the highest and best recovery for all creditors and that the Plan will provide more certain recoveries to survivors of Abuse and other creditors than any other alternative. The Debtors and the Supporting Parties also believe that the Plan will provide those recoveries more quickly than would any alternative, including by avoiding time-consuming and costly litigation.**

If the Plan cannot be confirmed by the Bankruptcy Court, or if an insufficient number of voting claimants vote in favor of the Plan, (i) the Debtors may be required to liquidate and/or voluntarily convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code, (ii) the Debtors may seek approval of a revised plan of reorganization that provides for less favorable treatment for creditors, or (iii) other parties may submit an alternate plan to reorganize BSA. **The Debtors believe that all of these alternatives would result in significantly reduced recoveries for Abuse Survivors, and would significantly delay the date by which Abuse Survivors can begin expecting payments from the Settlement Trust.**

<div style="border:1px solid black; padding:8px;">

**To Chartered Organizations that Hold Indirect Abuse Claims Under the Plan:** Thank you for your support of the Scouting movement. Millions of young men and women have passed through your doors, and our joint mission to serve them has helped countless youth become prepared for life. Your support for the Plan is essential for the mission of Scouting, and the success of the BSA's bankruptcy case depends your support for the Chartered Organization settlement framework set forth in the Plan. The BSA urges you to support the survival and continuation of Scouting by voting your Indirect Abuse Claim in favor of the Plan.

</div>

**Please read the Plan carefully. In particular, please review the injunction, release, and exculpation provisions provided in <u>Article X</u> of the Plan. If you vote to accept or reject the Plan, you will be releasing the Released Parties from any and all Claims/Causes of Action to the extent provided in <u>Article X.J.4</u> of the Plan unless you "opt-out" of such releases. If you decide to opt out of the release in <u>Article X.J.4</u> of the Plan, please do so by checking the appropriate box on your ballot.**

**If you are the holder of an Abuse Claim, then regardless of whether you opt out of the releases in <u>Article X.J.4</u> of the Plan, if the Plan is confirmed, you will be bound by the releases and Channeling Injunction set forth in <u>Article X.J.3</u> and <u>Article X.F</u> of the Plan.**

4



The Debtors and other Supporting Parties believe that the Plan constitutes a good-faith compromise and settlement of all Claims and controversies based upon the unique circumstances of these chapter 11 cases, and will provide the maximum recovery for creditors. The Debtors and other Supporting Parties believe that the acceptance of the Plan by holders of Claims entitled to vote to accept or reject the Plan is in the best interests of holders of Claims against the Debtors. Moreover, the Debtors and other Supporting Parties believe that any alternative other than Confirmation of the Plan may result in, among other risks, delays and significantly increased administrative expenses, and significantly diminished distributions on account of Allowed Claims.

> **THE DEBTORS AND OTHER SUPPORTING PARTIES STRONGLY URGE YOU TO TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN IN ACCORDANCE WITH THE INSTRUCTIONS IN YOUR BALLOT.**
>
> **THE VOTING DEADLINE IS DECEMBER 14, 2021 AT 4:00 P.M. (EASTERN TIME).**

For the reasons set forth herein and in the Disclosure Statement, the Debtors and other Supporting Parties recommend that all persons or entities entitled to vote on the Plan vote to accept the Plan by timely submitting a properly completed ballot. Instructions for casting your vote on the Plan are provided on your ballot. You are strongly encouraged to submit your ballot online via the E-Ballot Platform on the Solicitation Agent's website. In order to have your vote to accept or reject the Plan counted, your Ballot must **actually be received** by the Solicitation Agent on or before **December 14, 2021 at 4:00 p.m. (Eastern Time)**.

If you would like electronic copies of any of the materials enclosed herein, or any other filings in the Debtors' chapter 11 cases, they can be accessed at the Debtors' restructuring website free of charge at https://omniagentsolutions.com/BSA.

If you have any questions, or need to obtain additional solicitation materials, you may contact the Solicitation Agent by: (a) calling the Debtors' toll-free restructuring hotline at 866-907-2721, (b) emailing BSAballots@omniagnt.com, (c) writing to Boy Scouts of America Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367, or (d) submitting an inquiry on the Debtors' restructuring website at https://omniagentsolutions.com/bsa. Please note that the Solicitation Agent is not authorized to, and will not, provide legal advice to you. If you need legal advice, please consult with your attorney.

Sincerely,

*Boy Scouts of America and Delaware BSA, LLC*



**EXHIBIT F**

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF**
**BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

| | |
|---|---|
| TO: | All Holders of General Unsecured Claims, Non-Abuse Litigation Claims, and Convenience Claims against Boy Scouts of America and Delaware BSA, LLC (the "**Debtors**") |
| FROM: | The Official Committee of Unsecured Creditors of Boy Scouts of America and Delaware BSA, LLC (the "**Creditors' Committee**")[1] |

On September 29, 2021, the Bankruptcy Court for the District of Delaware approved the Disclosure Statement for the Debtors' Fifth Amended Chapter 11 Plan (the "**Disclosure Statement**" and "**Plan**," respectively, Dkt. Nos. 6445, 6443)[2] in the Debtors' bankruptcy cases. You are receiving this letter because you are an unsecured creditor of Boy Scouts of America or Delaware BSA, LLC and entitled to vote on the Plan.  The Disclosure Statement explains the distributions that will be made to creditors under the Plan.

The Creditors' Committee represents the interests of all unsecured creditors other than holders of Abuse Claims.  The Creditors' Committee supports the confirmation and consummation of the Plan.

Accordingly, the Creditors' Committee recommends that you vote to *ACCEPT* the Plan by marking the official Ballot that was enclosed with the Disclosure Statement as follows:

☑    **ACCEPT (vote FOR) the Plan**

and sending in your Ballot in the manner provided in the Solicitation Package and the instructions accompanying your Ballot.

**Your Ballot must be received by <u>December 14, 2021 at 4:00 p.m. (Prevailing Eastern Time)</u> to be counted**.

Please read the Disclosure Statement and the materials in your Solicitation Package carefully.  These materials contain instructions for completing and submitting your Ballot, and they describe the Plan and its terms.

The following summarizes the distributions that will be made to general unsecured creditors under the Plan and the Creditors' Committee's investigation of certain matters that are

---

[1] The current members of the Creditors' Committee are: (i) Girl Scouts of the United States of America, (ii) Pension Benefit Guaranty Corporation, (iii) Roger A. Ohmstede, (iv) Pearson Education, Inc. and (v) Lion Brothers Company, Inc.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan or the Disclosure Statement, as applicable.

settled under the Plan.  It is qualified in its entirety by reference to the Disclosure Statement.  Each capitalized term in this letter is defined in the Disclosure Statement or the Plan.

## I.      **The Plan**

As described in detail in the Disclosure Statement, the Plan embodies a settlement between many of the major creditor constituencies in these chapter 11 cases, which was achieved after extensive arm's-length negotiations among (i) the Debtors, (ii) JPMorgan Chase Bank, N.A. ("**JPM**"), (iii) the Creditors' Committee, (iv) the Coalition of Abused Scouts for Justice, (v) Hartford, (vi) The Church of Jesus Christ of Latter-day Saints, (vii) certain state court counsel to holders of Abuse Claims, (viii) the Future Claimants' Representative, and (ix) the Ad Hoc Committee of Local Councils.  The Creditors' Committee took an active role in certain of these negotiations.  The settlement provides significant value to the holders of General Unsecured Claims and Non-Abuse Litigation Claims (including creditors who opt to receive Convenience Claim treatment), provides the Debtors with more favorable terms under the restated debt facilities provided by JPM under the Restated Debt and Security Documents, and provides for procedures to compensate holders of Abuse Claims asserted against the Debtors in a manner that will be supported by a substantial majority of such claimants.  The settlement also ensures that the Pension Plan shall continue and will not be impacted by the bankruptcy filing or the Plan.

The Creditors' Committee's goal was to maximize value for unsecured creditors, and the Creditors' Committee focused on, among other things: (a) ensuring the best possible outcome for holders of claims arising from the Boy Scouts of America Retirement Benefit Restoration Plan ("**Restoration Plan**") and the Boy Scouts of America 457(b) Plan (the "**Deferred Compensation Plan**"); (b) providing holders of Non-Abuse Litigation Claims with the right to receive a full recovery from insurance proceeds; (c) providing unsecured creditors with the ability to opt into a convenience class and receive up to $50,000; (d) ensuring that the Boy Scouts will continue to operate, providing an ongoing benefit to trade creditors; and (e) providing for holders of General Unsecured Claims to receive significant value in exchange for releasing potential claims against JPM.

The Plan provides for significant recoveries to unsecured creditors that the Creditors' Committee believes exceed recoveries unsecured creditors would receive in a liquidation or under any available alternative plan of reorganization.  Accordingly, the Creditors' Committee believes that confirmation of the Plan is in the best interests of all unsecured creditors.  Moreover, the Creditors' Committee believes that the settlement of the various issues embodied in the Plan constitutes a reasonable compromise of complex disputes, and will avoid the expense and delay that would have been incurred had certain of the disputed issues been litigated.

## II.     **Unsecured Creditors' Plan Consideration**

The Plan provides for three separate classes of unsecured claims that are unrelated to Abuse Claims: (i) General Unsecured Claims; (ii) Non-Abuse Litigation Claims; and (iii) Convenience Claims.  As discussed herein, as part of the integrated settlement, the Plan also settles issues relating to the allocation and distribution of value among holders of secured claims, unsecured claims, and abuse claims, thereby avoiding complex, protracted, and costly litigation of these

issues that would have otherwise reduced the available distributions for all creditors. Based on this settled allocation of value, estimated claims in each creditor class, and the valuation of the Debtors, the Disclosure Statement includes estimates of projected recoveries for each class members' allowed claims. The distributions provided under the Plan will be in full and final satisfaction, release, discharge, and settlement of such claims against the Debtors. More specifically, the Disclosure Statement projects the following estimated percentage recoveries for each class of unsecured claims:

| Class | Estimated Recovery |
|-------|-------------------|
| Class 5 – Convenience Claims | 100% |
| Class 6 – General Unsecured Claims | 75-95% |
| Class 7 – Non-Abuse Litigation Claims | 100% |

Article VI.E of the Disclosure Statement contains a detailed description of the treatment of each class of claims. Please reference the Disclosure Statement for a more detailed summary of the mechanics for distributions to unsecured creditors under the Plan, the facts and assumptions behind these predictions and projections, and for information relating to the Debtors and these Chapter 11 Cases. Each estimate and projection in this letter is taken from the Disclosure Statement and qualified by all of the information in the Disclosure Statement.

A.      **Class 5 Convenience Claims**

Holders of General Unsecured Claims or Non-Abuse Litigation Claims (after first seeking to recover from insurance, and having exhausted all remedies with respect to such applicable insurance policy or policies) that have an Allowed Claim of $50,000 or less may elect to have their claims treated as Convenience Claims, which are paid by Reorganized BSA in full, using Cash on hand, on the Effective Date of the Amended Plan or, if such Claim becomes Allowed after the Effective Date, as soon as reasonably practicable after Allowance. Any holder of a General Unsecured Claim or Non-Abuse Litigation Claim that is Allowed in an amount greater than $50,000 may elect to have its claim treated as a Convenience Claim and receive payment of $50,000 in Cash in full and final satisfaction of such Claim; **please note that this election is irrevocable and must be made on a timely and validly submitted Ballot**.

B.      **Class 6 General Unsecured Claims**

Holders of Allowed General Unsecured Claims (including holders of Claims under the Restoration Plan, the Deferred Compensation Plan, holders of trade Claims, and holders of Rejection Damages Claims) will receive, on account of such Claims, their Pro Rata Share of the Core Value Cash Pool, which shall be funded by reorganized BSA in four semi-annual installments of $6,250,000 (for a total of $25,000,000), beginning 180 days after the Effective Date and concluding two years after the Effective Date. Any Cash remaining in the Core Value Cash Pool after all Allowed General Unsecured Claims have been satisfied in full (including interest), shall be first used to fund any shortfall in payments from the BSA's available insurance and co-liable non-Debtors on account of any Non-Abuse Litigation Claims, and then be transferred to and vest in Reorganized BSA.

### C.   <u>Class 7 Non-Abuse Litigation Claims</u>

Holders of Non-Abuse Litigation Claims will, upon the liquidation of such Non-Abuse Litigation Claims following the Effective Date, be satisfied solely from the BSA's available insurance and from any non-Debtor party or parties that may be determined to be co-liable with the Debtors on account of such Non-Abuse Litigation Claims.  No holder of an allowed Non-Abuse Litigation Claim shall be entitled to recover from the Core Value Cash Pool on account of such Claim, unless and until all allowed General Unsecured Claims have been paid in full.  Solely in the event any Non-Abuse Litigation Claim is not covered by applicable BSA insurance or there is a shortfall in BSA's applicable insurance for such Non-Abuse Litigation Claim, following the exhaustion of remedies with respect to applicable insurance and any co-liable non-Debtor, the holder of an Allowed Non-Abuse Litigation Claim may elect to have such Claim treated as a Convenience Claim and receive Cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of  its Allowed Non-Abuse Litigation Claim and (b) $50,000.

The abuse Settlement Trust will have the right to settle certain of the insurance policies that cover Non-Abuse Litigation Claims.  To the extent that the abuse Settlement Trust has settled the applicable insurance policy with respect to a Non-Abuse Litigation Claim, such claimant will be able to recover on account of its claim from the abuse Settlement Trust.  The abuse Settlement Trust will have reasonable consent rights over certain settlements of Non-Abuse Litigation Claims.

To the extent a Non-Abuse Litigation Claim is asserted against a Local Council as well as the Debtors, the holder of the Non-Abuse Litigation Claim must release its claim against the Local Council in order to receive payment from the abuse Settlement Trust.

### III.   <u>Committee Investigations</u>

After the Debtors filed for bankruptcy, the Creditors' Committee launched a comprehensive investigation into a number of prepetition transactions consummated prior to the commencement of the Chapter 11 Cases, including, but not limited to, the following:

- The incurrence of substantial secured obligations;

- The grant of additional security interests on the eve of bankruptcy (and in the face of a wave of substantial liability stemming from sexual abuse claims); and

- The creation, capitalization and financing of non-debtor Arrow WV, Inc. ("**Arrow**") along with various related transfers and transactions; and

While the Creditors' Committee believed it could develop significant causes of actions related to these issues, the Creditors' Committee also recognized the risks inherent in any litigation.  Accordingly, the Creditors' Committee engaged in extensive arm's-length negotiations that resulted in significant recoveries for general unsecured creditors and avoided the uncertainties and expense of further litigation.  The Creditors' Committee believes that confirmation of the Plan is in the best interests of all unsecured creditors.

Moreover, the Creditors' Committee believes that the settlement constitutes a reasonable compromise of complex disputes, will avoid the significant expense and delay that would have been incurred had any of the disputed issues been litigated, and will allow the Debtors to exit bankruptcy efficiently and without the uncertainty attendant to litigation of these disputes.

## IV.    __Important Deadlines__

The Disclosure Statement also contains a number of important ***record dates*** and ***deadlines***, including (but not limited to) the following:

- **October 1, 2021** is the ***record date for purposes of determining which claimants are entitled to vote to accept or reject the Plan***.  You can only vote claims you held in a voting class as of **October 1, 2021**.

- **December 14, 2021, at 4:00 p.m. (Prevailing Eastern Time)** is the ***deadline*** for the Debtors' solicitation agent to receive Ballots from all creditors.

- **January 24, 2022 at 10:00 a.m. (Prevailing Eastern Time)** is the proposed date for the ***hearing on the confirmation*** of the Plan.

Please review your Solicitation Package and the Disclosure Statement for other dates and deadlines that may be important to you.

## V.    __Conclusion__

The Creditors' Committee recommends each holder of a claim receiving this letter vote to **ACCEPT** the Plan and return its Ballot indicating such acceptance in accordance with the voting instructions described in the Disclosure Statement and Ballot.  Your vote is important and all unsecured creditors are encouraged to vote in favor of the Plan.

You should carefully read the Disclosure Statement and the Plan in their entirety and may wish to consult your own legal or financial advisors.  This letter is not offered as legal advice as to any specific claim or treatment under the Plan.  It is for informational purposes only.

This letter does not purport to reflect the views of the Bankruptcy Court and does not constitute findings of facts or conclusions of law endorsed by the Bankruptcy Court; nor does it necessarily reflect the views of any individual Creditors' Committee member, which reserve any and all of their rights.

If you have questions or require additional information, please visit boyscoutsucc.com or contact the Creditors' Committee at BSAUCCinquiry@kramerlevin.com.

Very truly yours,

The Official Committee of Unsecured Creditors of Boy Scouts of America and Delaware BSA, LLC

- 5 -

**THE CREDITORS' COMMITTEE'S RECOMMENDATION THAT UNSECURED CREDITORS VOTE TO ACCEPT THE PLAN SHOULD NOT SERVE AS A SUBSTITUTE FOR EACH UNSECURED CREDITOR'S OWN CAREFUL READING AND CONSIDERATION OF THE DISCLOSURE STATEMENT, PLAN, AND RELATED DOCUMENTS DISSEMINATED THEREWITH, AND CONSULTATION WITH COUNSEL OR OTHER PROFESSIONAL ADVISORS.**

**THIS LETTER MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE CREDITORS' COMMITTEE'S VIEWS ON HOW TO VOTE ON THE PLAN, AND THE INFORMATION CANNOT BE RELIED UPON FOR ANY OTHER PURPOSE.  THE CREDITORS' COMMITTEE DOES NOT GUARANTEE ANY PARTICULAR RESULT IN THE DEBTORS' BANKRUPTCY CASES.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS SOLICITATION LETTER TO BE INCLUDED AS PART OF THE SOLICITATION PACKAGE DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

**THIS COMMUNICATION DOES NOT CONSTITUTE, AND SHALL NOT BE CONSTRUED AS, A SOLICITATION BY THE CREDITORS' COMMITTEE OR BY ANY INDIVIDUAL MEMBER OF THE CREDITORS' COMMITTEE.**

**EXHIBIT G**

**brown**rudnick



YOUNG
CONAWAY

September 30, 2021

**To:** Holders of Direct Abuse Claims Against the Boy Scouts of America
**From:** Coalition of Abused Scouts for Justice and Court-Appointed Future Claimants' Representative

**RE:    RECOMMENDATION THAT SEXUAL ABUSE VICTIMS VOTE TO ACCEPT THE
        BOY SCOUTS OF AMERICA REORGANIZATION PLAN**

The **Coalition of Abused Scouts for Justice** (the "**Coalition**") and **James Patton**, **the Future Claims Representative** (the "**FCR**") appointed in the chapter 11 cases of the Boy Scouts of America (the "**BSA**"), together and jointly urge survivors to ***vote to ACCEPT the reorganization Plan*** (the "Plan") proposed and negotiated between the BSA and these survivor representatives, the Coalition and the FCR.

The Coalition is an ad hoc committee that represents survivors of sexual abuse suffered in connection with Scouting. The Coalition's members – approximately 18,000 survivors – are represented by over two dozen law firms that collectively represent over 60,000 survivors. The Coalition was formed to negotiate on behalf of its substantial survivor constituency, maximize the recovery available to all survivors, and minimize the time and expense to achieve those recoveries. The FCR was appointed by the Bankruptcy Court to be the official advocate for the interests of future claimants, including current minors and survivors suffering from repressed memories of their abuse.

The Coalition and the FCR have worked tirelessly on behalf of survivors to negotiate the terms of the Plan, which will provide ***over $1.7 billion*** (likely more) to be paid to survivors. It also provides the framework for substantial future settlements that will increase the recovery for survivors. The Plan is currently supported by representatives of approximately 70,000 survivors.

**The Plan represents the only assured path to recover and pay billions of dollars to survivors of sexual abuse in the BSA's programs. The only other path for survivors likely involves years of litigation and significant risk that survivors will receive much less than they are assured of receiving under the Plan. In our view, the settlement embodied in the Plan represents the best possible outcome for sexual abuse survivors. It will result in meaningful distributions of over a billion dollars in value (likely more) to survivors following confirmation, without lengthy, expensive and harmful litigation of individual abuse claims. A very brief description of the Plan terms, as pertaining to you and your recoveries, is contained below.**

I.    <u>What You Will Receive Under the Plan</u>

If the Plan is confirmed, a newly formed Settlement Trust will be established. Your claim against BSA, as well as any Local Council, and certain other "Protected Parties," will be transferred to and paid from the Settlement Trust. The Settlement Trust will assess your claim in accordance with its Trust Distribution Procedures (TDP) and value the claim based on the type and extent of abuse suffered and other factors. Based on these factors, most claims will be valued between $3,500 and $2,700,000. If you do not wish to undergo the full claims evaluation process, you will be able to elect to receive a one-time payment of $3,500, prior to the start of that process.

**Brown Rudnick LLP** | brownrudnick.com | 7 Times Square, New York, NY, 10036 | 1.212.209.4800

Case 20-10343-LSS   Doc 8378   Filed 01/19/22   Page 29 of 62


To: Holders of Direct Abuse Claims Against the Boy Scouts of America
September 30, 2021
Page 2



   The Settlement Trust will collect funds from the BSA, its Local Councils, their insurers, and chartered organizations, and distribute available funds to survivors.  To date, there are settlements that will provide over $1.8 billion (likely more) in initial funding to the Settlement Trust.  The actual amount of your recovery, unless you select the one-time $3,500 payment, will depend on both the specifics of your claim and the amounts contributed to the Settlement Trust by, among others, insurance companies and chartered organizations in the future.

## II.  What the Boy Scouts and Their Affiliates And Insurers Are Contributing to the Plan

   **To date, the Coalition and FCR have negotiated commitments of approximately $1.8 billion to the Settlement Trust.  The Coalition and FCR expect that number to grow significantly in coming months given this amount only includes financial contributions from one (1) insurer settlement and one (1) Chartered Organization settlement to date, with potentially many insurer and Charter Organization financial contribution settlements to come.**

   **Of the over $1.8 billion that we have negotiated to date, these contributions include:**

- **The BSA itself will contribute assets worth approximately $220 million to the Settlement Trust, along with potentially billions of dollars' worth of insurance rights.**  The exact amount depends on certain timing factors and the prices of non-liquid assets which will have to be monetized.  The Coalition and FCR believe this is the maximum amount that could be contributed by the BSA by law without forcing the organization into liquidation or years-long litigation, either of which would diminish assets available to abuse survivors.

- **The BSA's Local Councils will contribute assets valued at approximately $600 million to the Settlement Trust, along with potentially billions of dollars' worth of insurance rights.**  While this may leave some Local Councils with significant assets, BSA's own insurance polices cannot be unlocked without the Local Councils' rights to those policies.  Moreover, not every Local Council faces the same abuse liability, and many of the Local Councils with the most property and assets are located in jurisdictions that do not have favorable statutes of limitations for survivors.  Additionally, many Local Councils take the position that most of their property is legally restricted and cannot be used to pay survivors.  While the Coalition and FCR do not necessarily agree with all (or many) of the positions being taken by the Local Councils, we believe that  in the absence of an agreed settlement like the one represented by the BSA Plan, many of these Local Councils may not have an incentive to contribute insurance rights.  The settlement that we have negotiated with Local Councils – for $600 million in the aggregate – is very substantial.  Indeed, some Local Councils under the settlement may be paying more than they would likely have to pay in the absence of a settlement.  The settlement also avoids the likelihood that some or many Local Councils would be forced to liquidate, which would make it more challenging to recover assets for survivors.

- The Hartford insurance company will contribute $787 million to the Settlement Trust.  You may remember that BSA announced a settlement with Hartford in April 2021 that BSA claimed was for $650 million.  The Coalition and FCR opposed that settlement vigorously.  We thought that it did not make Hartford pay enough to survivors and it contained a provision through which Hartford could have paid substantially less, potentially $400 million or below.  Survivors face a significant risk that the Bankruptcy Court might enforce this earlier settlement agreement with these unfavorable terms that might allow Hartford to pay only a fraction of its exposure.





To: Holders of Direct Abuse Claims Against the Boy Scouts of America
September 30, 2021
Page 3

The Coalition and FCR led negotiations to correct these problems with the original Hartford settlement. The deal in the Plan does this. Through the work of the Coalition and the FCR, Hartford has agreed to increase its contribution to $787 million. That amount is not subject to reduction. And it is only available through the Plan. In the Coalition and FCR's view this settlement amount, the assurance that it will be received under the Plan, and the elimination of the risk that Hartford might pay substantially less make this revised settlement with Hartford fair.

- **The Church of Jesus Christ of Latter-Day Saints ("TCJC") will contribute $250 million to the Settlement Trust**, **along with potentially billions of dollars' worth of insurance rights.** The Coalition and FCR believe that this amount represents a substantial portion of the aggregate liability for sex abuse claims related to the TCJC (for which it is co-liable with the BSA, Local Councils, and insurers such as Hartford, who will also contribute to survivor recoveries, as noted above). The Coalition and FCR believe that this commitment is reasonable and provides an excellent recovery for survivors of abuse related to the TCJC's scouting programs.

- **The Coalition and the FCR will continue to negotiate with dozens of other insurers and sponsoring "chartered organizations" to make significant additional contributions to the Settlement Trust for the benefit of survivors.** The Plan provides a framework to allow the Coalition and the FCR to continue to negotiate additional settlements for the benefit of survivors. The substantial amounts that will be available to survivors in the Settlement Trust on Day One represent the payments of only one insurer and one chartered organization (in addition to the BSA and Local Councils). There are literally dozens of insurers and chartered organizations with whom we are continuing to negotiate. Many of the BSA's insurers have disputed that they are obligated to honor their coverage obligations. Some have gone so far as to allege widespread fraud by survivors and their representatives in the filing of claims. The Plan is designed to reduce their ability to continue to shirk their coverage obligations. We believe it will force them to honor their promises to pay, and make significant financial contributions for the benefit of survivors and the Settlement Trust. We believe that with continued negotiation (or, if necessary, litigation), insurers and chartered organizations will, over time, significantly increase the amounts they will pay to compensate survivors.

### III.   The Plan Provides a Fair and Equitable Recovery for the Harm You Suffered, and Allows the Boy Scouts to Continue Their Charitable Mission

We strongly believe that the Plan represents fair value for those who suffered abuse in connection with BSA programs. In fact, if the Bankruptcy Court does not find that the Plan will provide you a fair and reasonable recovery, the Plan cannot be confirmed. The Coalition, FCR and the BSA believe that the Plan will indeed provide a substantial recovery, and much more quickly than if the parties choose litigation.

Moreover, **the Plan will allow the BSA to continue into the future, while requiring the BSA to implement even stronger protections against sexual abuse for future participants.** The Coalition and FCR understand that abuse survivors may or may not support the continuation of the BSA's charitable mission. However, the BSA's survival is important for two reasons:

- If the BSA were to terminate its programs and liquidate its assets, it is very unlikely that abuse survivors would receive greater recoveries than under the Plan. This is because, among other things, the BSA and Local Councils would likely incur over a billion dollars in priority pension liability, and insurers would be incentivized to deny and litigate coverage obligations on an individual-by-individual basis.

28647764.2



To: Holders of Direct Abuse Claims Against the Boy Scouts of America
September 30, 2021
Page 4



- The BSA and the Local Councils have made financial commitments to make ongoing contributions to the Settlement Trust depending on its financial performance.  In other words, the more youths that choose to participate in BSA programs in future, the more likely it is that the BSA will be able to honor its obligations under the Plan.

**The Coalition and FCR believe that any alternative to confirmation of the Plan will result in extensive delays, increased administrative expenses, and the termination of the valuable settlements that have been negotiated in the Plan.  Each of these occurrences would, in turn, result in significantly smaller distributions to abuse survivors.**

**We believe the Plan maximizes the achievable recovery for survivors.  Therefore, the Coalition and FCR strongly recommend that you timely vote to accept the Plan in accordance with the procedures that have been established by the Bankruptcy Court.**

**IV.    When, How and Why to Vote**

You have been provided with a ballot to vote to accept or reject the Plan.  In order to have your vote counted, you must complete and return the ballot by **December 14, 2021 at 4:00 p.m. (Eastern Time)** as the deadline to vote to accept or reject the Plan (the "Voting Deadline").

Your timely vote is important.  The Plan cannot be confirmed without the broad consent of abuse survivors.

*THE FOREGOING IS NOT INTENDED AS A SUBSTITUTE FOR THE PLAN AND DISCLOSURE STATEMENT.  ALL SURVIVORS SHOULD READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, AND SPEAK TO THEIR LAWYER OR OTHER ADVISOR TO THE EXTENT THEY WISH TO DO SO.*

If you have any questions as to this recommendation, you may contact the Coalition at BSACoalition@brownrudnick.com and the FCR at BSA-FCR@ycst.com.

Sincerely,

For the Coalition,
BROWN RUDNICK LLP

For the FCR,
YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady

David J. Molton

64166782 v1-WorkSiteUS-036293/0001

# EXHIBIT H

## SUMMARY AND FREQUENTLY ASKED QUESTIONS

**THIS PLAN SUMMARY HAS BEEN PREPARED BY THE FUTURE CLAIMANTS' REPRESENTATIVE AND COALITION OF ABUSED SCOUTS FOR JUSTICE AND PROVIDES INFORMATION REGARDING THE PLAN CONFIRMATION (APPROVAL) PROCESS AND THE PLAN PROPOSED BY THE BOY SCOUTS**

On February 18, 2020, the Boy Scouts of America ("BSA") and Delaware BSA, LLC (together, the "Boy Scouts" or the "Debtors") filed for bankruptcy protection in the Bankruptcy Court.

On April 24, 2020, the Court entered an order appointing James L. Patton, Jr., the Future Claimants' Representative (the "FCR"), to represent the interests of holders of future childhood sexual abuse claims for past abuse that may be asserted against the Debtors.[1]

On July 24, 2020, the Coalition of Abused Scouts for Justice (the "Coalition"), filed a notice of appearance in the Chapter 11 Cases. The Coalition comprises more than 18,000 sexual abuse survivors who have submitted proofs of claim against the Boy Scouts and signed affirmative consents to being a part of the Coalition, as well as law firms that have filed statements with the Bankruptcy Court that they represent approximately 60,000 sexual abuse survivors.

On September 14, 2021, the Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company (collectively "Hartford"), the Debtors, the Coalition, the FCR, and the Ad Hoc Committee of Local Councils entered into a settlement (the "Hartford Settlement").

On September 14, 2021, The Church of Jesus Christ of Latter-day Saints, a Utah corporation ("TCJC"), the Debtors, the Coalition, the FCR, and the Ad Hoc Committee of Local Councils entered into a settlement (the "TCJC Settlement").

Based on the resolution with the Coalition, the FCR, and the Ad Hoc Committee of Local Councils of Boy Scouts of America (the "Ad Hoc Committee of Local Councils"), Hartford, and TCJC, the Debtors filed their *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6443] (the "Plan").[2] The Bankruptcy Court has authorized the Boy Scouts to send the Plan to survivors and other creditors for voting. ***The Coalition and the FCR have concluded that, given all the circumstances of the case, the Plan is fair, in the best interests of survivors and other creditors, and should be approved. We encourage you to vote to accept the Plan.***

## PLAN SUMMARY

This summary is provided as an overview and is not meant to provide all of the information survivors should rely on when considering whether to vote to accept or reject the

---

[1] A "future" claim is one in which the survivor as of the Petition Date (February 18, 2020) (a) had not attained the age of eighteen (18) years of age or (b) was not aware of the sexual abuse as a result of "repressed memory," if such concept is recognized by the highest appellate court of the state or territory where such claim arose.

[2] All capitalized terms not otherwise defined herein shall be given the meanings ascribed to them in the Plan or the exhibits to the Plan.

Plan.  You, along with your counsel, are encouraged to read the Plan and Disclosure Statement when deciding how to vote.  To the extent that any discrepancies exist between the summary described herein and the terms of the Plan, the Plan shall govern.

## THE PLAN CONFIRMATION PROCESS

The Bankruptcy Court overseeing the Boy Scouts bankruptcy case must decide whether or not to approve the Plan.  The Bankruptcy Court will take into consideration the votes of survivors and other creditors and whether all the other requirements of the Bankruptcy Code have been satisfied.  If the Bankruptcy Court finds that all the legal requirements are satisfied, the Bankruptcy Court will approve or "confirm" the Plan.

If the Plan is approved, the Boy Scouts will exit bankruptcy and the responsibility of the Boy Scouts, Local Councils and TCJC to address or pay the Scouting-related sexual abuse claims (the "Abuse Claims") against them will be transferred to a settlement trust (the "Settlement Trust") that will oversee the review and payment of Abuse Claims.  The Plan and Disclosure Statement are included with this summary.

As part of the package that includes this Plan Summary, the Debtors have distributed or provided electronic access to you, or your counsel, the following documents, which, with this Plan Summary are referred to as the "Solicitation Package."

- Cover letter describing the contents of the Solicitation Package and instructions to obtain access, free of charge, to the Plan, the Disclosure Statement, and the Solicitation Procedures Order via https://omniagentsolutions.com/bsa-SAballots, and urging holders of Claims in the Voting Classes to vote to accept the Plan.

- Notice of hearing that will provide the date(s) and time(s) that the Bankruptcy Court will consider approval of the Plan.

- A copy of the Disclosure Statement (and all of its exhibits), including the Plan to the extent such exhibits are filed with the Bankruptcy Court before the Solicitation Date), which is also available via https://omniagentsolutions.com/bsa-SAballots.

- A copy of the "Solicitation Order," that approved the Disclosure Statement and the voting procedures including the Solicitation Procedures, which is also available via https://omniagentsolutions.com/bsa-SAballots.

- Ballot with return instructions (and a return envelope, as applicable).

- Any other materials ordered by the Bankruptcy Court to be included as part of the Solicitation Package.

As part of the Solicitation Package you or your counsel will receive a Ballot to vote to accept or reject the Plan.[3]  After the returned Ballots are counted, the Bankruptcy Court will conduct the hearing to determine whether to approve the Plan.

**HOW TO VOTE**.  You or your counsel will receive a Ballot with instructions that explain how to vote.  If you are represented by counsel, consult your attorney regarding the appropriate method to vote.  If you have questions about the voting materials, please (a) call the toll-free restructuring hotline at (866) 907-2721; (b) visit the Debtors' restructuring website at https://omniagentsolutions.com/BSA; (c) write to Boy Scouts of America Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; or (d) email BSAballots@omniagnt.com.

**YOUR VOTE COUNTS**.  **You have the right to accept or reject the Plan if you (or your attorney on your behalf) filed a timely claim against the Boy Scouts.  Ballots must be RECEIVED by DECEMBER 14, 2021 at 4:00 p.m. (Eastern Time),** to be counted. Ballots can be submitted electronically through the E-Ballot Platform at https://omniagentsolutions.com/bsa-SAballots or delivered by mails by sending to:

<div align="center">

Boy Scouts of America Ballot Processing
c/o Omni Agent Solutions
5955 De Soto Avenue, Suite 100
Woodland Hills, CA 91367

</div>

## DESCRIPTION OF THE PLAN

- **Payment of Abuse Claims by the Settlement Trust**

Under the Plan, the Debtors will fund a Settlement Trust.  The Settlement Trust will assume the liability for the Abuse Claims.  As set forth below, the Debtors and the Local Councils are making contributions to the Settlement Trust.  These contributions are not the same thing as the Debtors' liability or obligation to pay Abuse Claims.  The Settlement Trustee will liquidate the Settlement Trust's assets which includes the contributions being made by the Debtors, the Local Councils, Hartford and TCJC.  The Settlement Trust will make distributions to survivors in accordance with the Trust Distribution Procedures (as discussed below).  These distributions are also not the same thing as the Debtors' liability or obligation to pay Abuse Claims.  However, the distributions will be based on the allowed value of the Abuse Claims, as determined under the Trust Distribution Procedures.

- **The Plan Incorporates Resolutions with Boy Scouts, Local Councils, Hartford, and TCJC**

As noted above, the Boy Scouts, Local Councils, Hartford, TCJC, Coalition and FCR reached settlements.  The Plan includes these settlements, which provide for contributions of money and other property from the Boy Scouts, Local Councils, Hartford, and TCJC and puts in

---

[3] If you indicated on your Proof of Claim form that your counsel may be contacted regarding your claim and your counsel indicated to the Debtors that it would facilitate your vote on the Plan on your behalf, your Ballot, along with the Solicitation Package, will be sent to your counsel who will facilitate your vote.  Please contact your counsel to be sure that your vote is properly reflected by your counsel on the ballot submitted.

place a framework for potential future settlements with other parties such as Insurance Companies and Chartered Organizations. Chartered Organizations are the over 40,000 secular and religious entities (such as TCJC) that support the Scouting mission of the Boy Scouts by, among other things, sponsoring local troops. Some or all of the Chartered Organizations may be subject to liability associated with their relationship with the Boy Scouts.

- **Money and Property from the Boy Scouts Will Be Transferred to the Settlement Trust to Pay Survivors**

Under the Plan, the Boy Scouts will transfer assets valued at approximately $220 million to the Settlement Trust, assuming an Effective Date of December 31, 2021. The Boy Scouts' contribution to the Settlement Trust includes cash and investments (estimated at $60 million, subject to adjustment based on timing of emergence and performance of the Debtors through emergence), the cash sale proceeds from Scouting University ($1.902 million), artwork (valued at $59 million), oil and gas interests (valued at $7.6 million), a warehouse and distribution center (valued at $11.6 million), an $80 million note to be paid over approximately 10 years or less, all rights to proceeds and claims relating to the Boy Scouts' insurance for Abuse Claims, and all causes of action relating to Abuse Claims (including claims for contribution or indemnification against a perpetrator). There will be costs associated with the sale of the artwork, oil and gas interests, and the warehouse and the value achieved in the sale may be more or less than the estimates. As a result, the proceeds from the sale or liquidation of these assets could be different than the face amount.

- **Money and Property from Local Councils Will Be Transferred to the Settlement Trust to Pay Survivors**

Under the Plan, if certain conditions are met, $500 million of money and property will be transferred to the Settlement Trust from certain Local Councils to pay Abuse Claims. In addition, a special-purpose entity will issue a note worth up to $100 million to the Settlement Trust to pay Abuse Claims. The special-purpose entity will make payments on the $100 million note from funds contributed by Local Councils. The $500 million will be composed of at least $300 million in cash plus certain real properties such as camps and scout centers with an appraised value of $200 million less any excess of cash over $300 million. In addition, the Local Councils' rights and claims relating to the Boy Scouts' and Local Councils' applicable insurance will be transferred to the Settlement Trust.

All Local Councils have signed letters of intent that are, among other things, contingent on acceptable resolution of the Plan's treatment of Chartered Organizations. As of now, the Local Councils have not confirmed whether they are satisfied with the Plan's current treatment of Chartered Organizations. Accordingly, whether any individual Local Council will make the contribution on Exhibit C is currently uncertain. If, for any reason, Local Councils do not collectively contribute $500 million in money and property, then no Local Council will be a Protected Party, and all may still be sued by survivors.

- **The Contribution from the Hartford Settlement Will Be Transferred to the Settlement Trust to Pay Survivors**

In accordance with the Hartford Settlement, Hartford will contribute $787 million to the Settlement Trust, $137 million to be available immediately to the Settlement Trust on the Effective Date of the Plan and $650 million to be held in escrow until the order confirming the Plan is final and non-appealable. In exchange for the contribution, Boy Scouts will sell to Hartford its insurance policies and Hartford will receive releases with respect to Abuse Claims in accordance with the Plan. Likewise, Hartford will benefit from the Channeling Injunction as a Protected Party. Hartford's contribution is conditioned on Hartford's satisfaction with the Plan's treatment of the rights of Chartered Organizations with respect to Hartford Insurance Policies.

- **Contributions from the TCJC Settlement Will Be Transferred to the Settlement Trust to Pay Survivors**

In accordance with the TCJC Settlement, TCJC will contribute $250 million to the Settlement Trust. These funds will be held in escrow until the order confirming the Plan is final and non-appealable. These funds will be allocated only among the Abuse Claims that could have been satisfied from TCJC absent the Plan's discharge and channeling injunction. Additionally, TCJC will contribute its rights to coverage for Abuse Claims under insurance policies issued to Boy Scouts or the Local Councils under which it is an insured, and other insurance rights related to Abuse Claims. In exchange for its contributions, TCJC will receive releases with respect to Abuse Claims and become a Contributing Chartered Organization in accordance with the Plan. As a Contributing Chartered Organization, TCJC will benefit from the Channeling Injunction as a Protected Party.

- **Contributions of Insurance Rights from Participating Chartered Organizations Will Be Transferred to the Settlement Trust to Pay Survivors**

In accordance with the Plan, all Chartered Organizations (other than TCJC) will assign their rights to coverage for Abuse Claims under insurance policies issued to the Boy Scouts or the Local Councils with policy periods on or after January 1, 1976, and which name Chartered Organizations as insureds, *unless* that Chartered Organization objects to confirmation of the Plan or informs Boy Scouts' counsel in writing that it does not wish to assign its insurance rights (a "Participating Chartered Organization"). In exchange for its contribution, the Participating Chartered Organizations (other than TCJC) will receive releases with respect to Abuse Claims arising on after January 1, 1976, and become a Limited Protected Party in accordance with the Plan. Participating Chartered Organizations will benefit from the Channeling Injunction as a Limited Protected Party with respect to Abuse Claims arising from abuse that first occurred on or after January 1, 1976.

- **Depending on the value and availability of insurance, the Settlement Trust could end up with substantially more assets to pay claimants than the enumerated $1.857 billion in this summary**

As noted above, the Plan provides that the Boy Scouts and the Local Councils will contribute all of their rights to proceeds and claims under the insurance policies that apply to the Abuse Claims to the Settlement Trust. If such contribution is approved by the Court, the

Settlement Trust will either submit Abuse Claims to the Insurance Companies (other than Hartford) for payment on such Abuse Claims, enter into settlements with Insurance Companies (other than Hartford) that will bring in cash to the Settlement Trust for the benefit of survivors, or litigate with Insurance Companies (other than Hartford) to enforce their obligations under the policies. The value of these insurance assets is uncertain, and they could be worth substantially more or substantially less than the $1.857 billion that the Boys Scouts, the Local Councils, TCJC, and Hartford are collectively expected to transfer to the Settlement Trust.

Although the BSA and Local Councils believe that Local Council and Chartered Organization insurance rights or policy proceeds can be transferred to the Settlement Trust, the insurers have asserted numerous coverage defenses. For this reason the value of the insurance rights being assigned to the Settlement Trust is speculative and uncertain.

- **Survivors May Continue to Pursue Claims Against Certain Chartered Organizations, But May Not Sue Boy Scouts, Local Councils, Settling Chartered Organizations or Insurance Companies**

The Plan stops survivors from suing the Boy Scouts, the Local Councils (if they collectively make the $500 million Local Council Contribution as specified above), TCJC, and Hartford (if Hartford is satisfied with the Plan's treatment of Chartered Organizations' rights under Hartford insurance policies) because they settled and are what is called a "Protected Party" under the Plan. The Plan stops survivors from suing Insurance Companies because the insurance policies are protected assets of the Settlement Trust, and the funds recovered from insurers will be equally available to all survivors through the Trust. Participating Chartered Organizations (other than TCJC) can be sued by survivors who have not elected the Expedited Distribution option described below for Abuse Claims arising before January 1, 1976, because those Participating Chartered Organizations have not settled and are only a "Limited Protected Party" under the Plan. If a Chartered Organization settles in the future, it will become a Protected Party and that would mean that survivors could no longer sue it for any Abuse Claim, regardless of when it arose. Instead, the amounts collected in the settlement would be paid to the Settlement Trust and used to pay Abuse Claims. Specifically, further settlements with Insurance Companies or with individual Chartered Organizations before or after the Plan's Effective Date could add some or all Chartered Organizations as Protected Parties and could prevent suits by survivors related to scouting activities. There is a chart that helps explain this in the FAQ portion of this document.

Finally, if a Chartered Organization is in chapter 11 or informs the Boy Scouts that it does not wish to have its insurance rights transferred to the Settlement Trust, it will receive no protections from the Bankruptcy Court and may be sued by survivors who have not elected the Expedited Distribution option described below because they have not settled. If more Chartered Organizations settle in the future, each would become a Protected Party and that would mean that survivors could no longer sue it. Instead, the amounts collected in the settlement would be paid to the Settlement Trust and used to pay Abuse Claims. Specifically, further settlements with Insurance Companies or with individual Chartered Organizations before or after the Plan's Effective Date could add some or all Chartered Organizations as Protected Parties and could prevent suits by survivors related to scouting activities. There is a chart that helps explain this in the FAQ portion of this document.

*It is important to consult with your attorney if you believe you have a claim against, and are considering suing, a Chartered Organization because the issues are very complicated.*

- **Youth Protection**

The Plan also obligates the Boy Scouts to continue to improve on its youth protection practices by taking the following steps: (i) form a Child Protection Committee consisting of survivors and members of the Boy Scouts and Local Councils, (ii) implement an analysis of its current Youth Protection Program, (iii) work with the Child Protection Committee and an unaffiliated expert in the prevention of youth sexual abuse to develop and recommend improvements to the Youth Protection Program, and (iv) work with the Child Protection Committee to consider a protocol for the review and publication of information contained in the Boy Scouts' Volunteer Screening Database and Rosters for those credibly accused of abuse while involved with the Boy Scouts.

- **Trust Distribution Procedures**

The Boy Scouts and the Coalition and the FCR have negotiated procedures for the efficient review and payment of the approximately 82,500 non-duplicative, timely claims.  The procedures are called "Trust Distribution Procedures" or "TDP."  The TDP will provide for the submission of additional information about your claim and the value of your individual Abuse Claim will be determined in accordance with the TDP based on a "claims matrix," which means being assigned a dollar amount based on the following guiding principles:

1. Abuse Claim eligibility criteria;

2. proof requirements;

3. administrative transparency;

4. a review and evidentiary process that requires the Settlement Trustee to determine allowed claim amounts;

5. prevention and detection of any fraud; and

6. independence of the Settlement Trust and Settlement Trustee.

The procedures set forth in the TDP are described in more detail below.

- **Channeling Injunction**

In exchange for the contributions to the Settlement Trust and other consideration provided under the Plan, the Court will issue a permanent channeling injunction (a) releasing, among others, the Boy Scouts, the newly Reorganized BSA, Contributing Local Councils, Contributing Chartered Organizations (*e.g.*, TCJC), Participating Chartered Organizations, and Insurance Companies that contribute to the Settlement Trust (*e.g.*, Hartford) (collectively, the "Protected Parties"), from Abuse Claims; (b) transferring responsibility for Abuse Claims against such parties to the Settlement Trust, to be processed and paid under the TDP; and (c) barring Holders of Abuse Claims from pursuing the Protected Parties on account of the Abuse Claims.

This injunction is an implementation of the settlement discussed above.  In addition, as described above, the Plan provides for a separate injunction barring direct claims of survivors against Insurance Companies.

## DESCRIPTION OF THE SURVIVOR CLAIM DETERMINATION AND PAYMENT PROCESS[4]

There are three options for survivors to establish the value of their claims:

A.      Expedited Distribution Election of $3,500 (election must be made on the Ballot and in accordance with TDP);[5]

B.      Trust claim submission under the Trust Distribution Procedures; or

C.      Settlement Trustee authorization to pursue the claim in court through the tort system.

### A.      Expedited Distribution Election

A survivor (other than a Future Abuse Claimant) may elect on their Ballot to resolve his or her Abuse Claim for an Expedited Distribution of $3,500, if the survivor has submitted a proper and substantially completed Proof of Claim that has been signed personally by the survivor under penalty of perjury, or supplements his or her Proof of Claim to provide such verification.  In the case of holders of a Future Abuse Claim, they need to make a submission to the Settlement Trustee to be eligible for the Expedited Distribution.  Survivors that elect to receive the Expedited Distribution will not have to submit any additional information to the Settlement Trust to receive payment of the Expedited Distribution from the Settlement Trust provided that their proof of claim form is substantially completed and is signed by the survivor attesting to the truth of its contents under penalty of perjury.  Payment will be sent upon the survivor's submission of a release, a form of which is attached as Exhibit A to the TDP.  **Your election for an Expedited Distribution <u>must</u> be made on your Ballot**[6].

### B.      Trust Distribution Procedures

If a survivor elects not to receive an Expedited Distribution of $3,500, the survivor must complete a Trust Claim Submission (a form in addition to the Proof of Claim form that you already submitted, as defined in the TDP) so that the Settlement Trustee can review the merits of the survivor's claim.  This submission will occur later, after the Plan is confirmed and you will be provided instructions at that time.  To properly make a Trust Claim Submission, a survivor must (i) complete a questionnaire; (ii) produce all records and documents related to the Abuse Claim, including all documents pertaining to settlements, awards, or contributions already received or that are expected to be received from any source; and (iii) execute an agreement

---

[4] For the avoidance of doubt, the actual terms of the Trust Distribution Procedures shall control and the Coalition and the FCR urge each survivor (or their respective counsel) to review the TDP for the full requirements and procedures associated with the review and payment of Abuse Claims under the TDP.

[5] Ballot election is not applicable to holders of Future Abuse Claims.

[6] Ballot election is not applicable to holders of Future Abuse Claims.  Future Claimants may make a Trust Submission to elect the Expedited Distribution.

(1) to produce any further records and documents reasonably requested by the Settlement Trustee; (2) consent to and agree to cooperate in any examinations requested by the Settlement Trustee; and (3) consent to and agree to cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee.  A survivor's breach or failure to comply with the commitments required by a Trust Claim Submission is grounds for the disallowance of or significant reduction to the amount or value of the Abuse Claim.

### 1.    Initial Evaluation

The Settlement Trustee will perform an Initial Evaluation of the Submitted Abuse Claim to determine whether (a) the Abuse Claimant's Proof of Claim or Trust Claim Submission is substantially and substantively completed and signed under penalty of perjury; (b) the Abuse Claim was timely submitted; and (c) the Submitted Abuse Claim had not previously been resolved by litigation and/or settlement involving a Protected Party.  If any of these criteria are not met, then the Submitted Abuse Claim shall be disallowed, and the Settlement Trustee will send the survivor a Disallowed Claim Notice.

### 2.    Review of General Criteria

If a Submitted Abuse Claim is not disallowed after the Initial Evaluation, the Settlement Trustee will determine if the submitted evidence supports the Abuse Claim, taking into account certain general criteria, including the survivor's (a) identification of acts of abuse suffered; (b) identification or description of the alleged abuser(s); (c) provision of information showing the connection of the abuse to scouting; (d) specification of the timing of such abuse and the survivor's age at the time of such abuse; and (e) identification of the location of the abuse.  If the Settlement Trustee determines that the materials provided in connection with a Submitted Abuse Claim do not meet the criteria, the Settlement Trustee may request additional materials from the survivor or disallow the Abuse Claim.  If the Settlement Trustee determines that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will provide written notice to the survivor or counsel of that determination, subject to reconsideration (as described below).

### 3.    Claims Evaluation

If the Settlement Trustee determines that the Submitted Abuse Claim should be an Allowed Claim, the Settlement Trustee will evaluate the claim using certain Abuse Types, Scaling Factors, Base Matrix Values, and Maximum Matrix Values set forth in the TDP.  The values and adjustment factors were selected and derived with the intention of achieving a fair and reasonable Abuse Claim valuation range in light of the best available information, considering the settlement, verdict and/or judgments that Abuse Claimants have received in the courts through lawsuits against the Protected Parties.

The TDP establishes six tiers of Abuse Types and provides the range of potential Allowed Claim Amounts in each tier.  If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier.  An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers. Under the TDP there are six possible valuation tiers based on the nature of the abuse:  (1) Anal or Vaginal Penetration by Adult Perpetrator; (2) Oral Contact by Adult Perpetrator or Anal or Vaginal Penetration by a Youth Perpetrator; (3) Masturbation by Adult Perpetrator or Oral Contact by a Youth Perpetrator; (4) Masturbation

by Youth Perpetrator or Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator, Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation, or exploitation for child pornography; (5) Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator; and (6) Sexual Abuse – No Touching or Adult Abuse Claims.  A chart regarding these tiers can be found in Article VIII of the TDP.

The Base Matrix Value for each tier represents the minimum Allowed Claim Amount for a claim assigned to a given tier *before any adjustments are applied*.  The adjustments are called Scaling Factors and are described below.  The Maximum Claims Matrix value for each tier represents the maximum Allowed Claim Amount for a claim assigned to a given tier *after adjustments (i.e., Scaling Factors) are applied*.  The Settlement Trustee may *increase* the amount of an Allowed Abuse Claim (up to the Maximum Matrix Value) by taking into account (a) the nature and circumstances of the abuse, (b) multiple accusations of abuse against a perpetrator; and (c) the impact of the abuse on the survivor's mental and physical health, interpersonal relationships, work or academic difficulties, and other circumstances.  The Settlement Trustee may *decrease* the amount of an Allowed Abuse Claim by taking into account (a) the existence of a familial or maintenance of a non-scouting relationship between the survivor and perpetrator or the existence of a responsible non-Protected Party, (b) amounts received and likely to be received by the survivor from other non-Protected Party sources, (c) the impact of a statute of limitations or statute of repose and (d) the failure of the survivor to submit a timely claim against the Boy Scouts or another Protected Party.  The Settlement Trustee will send the survivor an Allowed Claim Notice after making a determination of a survivor's Allowed Claim Amount.

### 4.    Reconsideration

A survivor may request reconsideration either of the disallowance of a Submitted Abuse Claim or of the Allowed Claim Amount of the survivor's claim proposed by the Settlement Trustee (a "Reconsideration Request") within thirty (30) days after receiving a Disallowed Claim Notice or an Allowed Claim Notice.  The failure to timely submit a Reconsideration Request will mean the survivor has consented to the Settlement Trustee's determination regarding the survivor's claim. Each Reconsideration Request must be accompanied by (a) a check or money order for $1,000 as an administrative fee for reconsideration; and (b) any further evidence in support of the Submitted Abuse Claim.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.  The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

### a.    Reconsideration Denied

If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the survivor within thirty (30) days of receiving the request that it will not reconsider the Submitted Abuse Claim.  If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within thirty (30) days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.

### b.    Submitted Abuse Claim Reconsidered

If the Settlement Trustee determines upon reconsideration that a previously disallowed Submitted Abuse Claim is an Allowed Abuse Claim or that an Allowed Abuse Claim should receive a new proposed Allowed Claim Amount, the Settlement Trustee will deliver an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant.

If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant ***does not support changing the earlier finding***, the Settlement Trustee's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand.

The Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within ninety (90) days of the Settlement Trust having sent notice that it was reconsidering the Abuse Claimant's Submitted Abuse Claim.

### 5.    Tort System Review

Within thirty (30) days after a survivor receives an Allowed Claim Notice or Claim Notice following a Reconsideration Request, a survivor may notify the Settlement Trust of his or her intention to seek a determination of the Abuse Claim by a court (a "TDP Tort Election Claim"). **Survivors and their attorneys considering pursuing a TDP Tort Election Claim after reconsideration should carefully review the provisions of Article XII of the TDP, which contains various parameters governing a survivor's pursuit of its Abuse Claim through the tort system.** These parameters include

- The survivor may not seek costs or expenses against the Settlement Trust in the lawsuit.

- The survivor will not have the right to introduce into evidence to the applicable court any information or documents that were requested by the Settlement Trustee and were in the possession, custody or control of the survivor but which the survivor failed to or refused to provide to the Settlement Trustee.

- If the survivor obtains a final judgment or settlement through litigation, the survivor's Allowed Claim Amount shall be the judgment or settlement amount less any payments received by the survivor.

- If the survivor resolves his, her or their Allowed Claim Amount through a TDP Tort Election Claim and the amount exceeds the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix, the excess amount shall be subordinate to and only paid after the prior payment in full of all Allowed Abuse Claims determined under the TDP claims evaluation process.

- Recoveries, if any, will be obtained from the Settlement Trust pursuant to the payment provisions in the TDP, not from any Protected Party or insurance company.

11

**C.      Up Front—Tort System Authorization**

In addition to the TDP Tort Election Claim option, the Settlement Trustee may authorize the filing or the continuation of a survivor's lawsuit against the Settlement Trust in court to obtain the Allowed Claim Amount of a survivor's Abuse Claim.  This means that the Settlement Trustee has the power to permit survivors to prosecute their claims in the tort system (*i.e.*, before a court) without first making a Trust Claim Submission which is why this is called and "Up Front Tort Out".  There are a number of factors the Settlement Trustee will consider in determining whether a lawsuit in court will be permitted.

## FREQUENTLY ASKED QUESTIONS

***What happens next?***

First, you and other creditors affected by the Plan will vote on the Plan. If the Plan is approved, the Settlement Trust will be established and Settlement Trust assets and the Protected Parties' responsibility for all Abuse Claims will be transferred to the Settlement Trust. The Abuse Claims will be reviewed, processed, and paid (if allowed) by the Settlement Trustee using the procedures described in the TDP.

***Do survivors get to vote on whether the Bankruptcy Court should approve or disapprove the Plan?***

Yes, survivors can vote to "accept" or "reject" the Plan. If the Plan is accepted by a sufficient number of survivors (all of whom are grouped together in Class 8 of the Plan) and approved by the Bankruptcy Court, the treatment of survivors' claims described in the Plan shall apply to all survivors even if you rejected the Plan.

***How many individual survivors must vote in favor of the Plan in order for the class of survivors to accept the Plan?***

In order for a survivor's vote to be counted, that survivor must return a Ballot by the deadline established by the Bankruptcy Court. In this context, if at least two-thirds (2/3) of survivors who vote on the plan vote to accept the Plan, the class of survivors will be deemed to accept the Plan. However, for the Bankruptcy Court to approve the channeling injunction in favor of the Local Councils and other potentially Protected Parties, the Bankruptcy Court may require more than 2/3 of those voting to accept to the Plan.

***Does the Bankruptcy Court need to approve the Plan?***

Yes. If the Bankruptcy Court approves the Plan, it will be "confirmed." For the Plan to be confirmed, the Court must find that the Plan complies with the requirements of the Bankruptcy Code. The Court will also consider any objections to the Plan. Several parties in interest, including Insurance Companies, have expressed the view that the Plan violates applicable law and cannot be confirmed, even if sufficient votes in favor of the Plan are received.

***What happens if the Bankruptcy Court does not approve the Plan?***

If the Plan cannot be confirmed, because the Plan violates applicable law or the Bankruptcy Court determines that the requirements for confirmation of the Plan cannot otherwise be satisfied, the Debtors may liquidate. In that scenario a trustee would be appointed to liquidate the assets and any distribution available to abuse claimants would be significantly diminished or delayed.

***How do I vote on the Plan?***

You or your counsel will receive a Ballot, included with all of the Plan Solicitation Package. The Ballot contains instructions on how to vote, where to send or submit your Ballot,

and the deadline to submit your Ballot for it to be counted.  Portions of these instructions are provided above.

If your Proof of Claim authorized your attorney to be contacted about your claim filed in the Boy Scouts' bankruptcy case and your attorney elected to submit a master ballot on your behalf, your Solicitation Package, including your Ballot, will be sent to your attorney.  As a result, it is important that you contact your counsel to ensure you receive the Solicitation Package so that you can inform your attorney how you want to vote on the Plan.

### *What am I voting on when I vote to accept or reject the Plan?*

You are voting to approve or reject the Plan.  The Plan channels claims against the Boy Scouts, Local Councils, Hartford, and TCJC (and others if they reach settlements and become Protected Parties) to the Settlement Trust.  That means that responsibility of these parties for the Abuse Claim you have against them will be the responsibility of the Settlement Trust and the value of your claim, if any, will be determined by the TDP and paid from the Settlement Trust rather than from the Boy Scouts, a Local Council, Hartford, TCJC or another Protected Party.  The Boy Scouts, Local Councils, Hartford, and TCJC are contributing cash and other assets to the Settlement Trust and those funds will be used to partially pay survivor claims and run the Settlement Trust.  Other assets may also be transferred to the Settlement Trust to pay survivor claims and run the Settlement Trust.

One of those assets is the right to collect money from Insurance Companies that insured the Boy Scouts for survivor claims that have not settled.  If the Insurance Companies do not pay what the Settlement Trust believes they owe, the Settlement Trust will sue them to collect for the benefit of survivors, and the results of such litigation is uncertain.  The Settlement Trust may also try to settle with or will bring claims against other parties that are liable on survivor claims, such as Chartered Organizations that have not settled.

When deciding how to vote, you should consider whether there is a better alternative to the Plan.  If the Plan is not approved, the Boy Scouts may choose to liquidate under chapter 7 or it may dismiss its chapter 11 case.

**The Coalition and the FCR believe that the approval and implementation of the global settlement among the Boy Scouts, the Local Councils, the Coalition and the FCR embodied in the Plan is in the best interests of creditors and <u>RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN</u>.**

### *Who will be in charge of the Settlement Trust?*

Under the Plan, the Settlement Trust will be administered by a Settlement Trustee.  A seven (7) member Settlement Trust Advisory Committee ("<u>STAC</u>") composed of five (5) members selected by the Coalition and two (2) members selected by the Official Committee of Tort Claimants will also have an oversight role as set forth in the Trust documents.  The Settlement Trustee will also consult with a Sexual Abuse Survivors Advisory Committee ("<u>SASAC</u>") regarding Settlement Trust matters, including the Settlement Trust's enforcement of BSA's non-monetary obligations relating to its Youth Protection Program described above.  The SASAC will consist of five (5) individual abuse survivors, three (3) of whom shall be selected by

the Coalition, two (2) of whom shall be selected by the TCC.  The initial Settlement Trustee is currently proposed to be Eric Green.  The initial members of the STAC shall be identified in the Plan Supplement, which will be filed no later than fourteen (14) days before the deadline for creditors to vote on the Plan.  The initial members of the SASAC shall be identified by the TCC and Coalition in a filing by the same deadline.

### *How much will I receive on account of my Abuse Claim from the Settlement Trust and when will I receive payment?*

It is difficult to predict the total amount of recoveries for survivors.  Although there have been settlements with the Boy Scouts and Local Councils for approximately $820 million, with Hartford for approximately $787 million, and TCJC for approximately $250 million, it is not yet known how much will be collected from settlements or litigation with other Chartered Organizations and other Insurance Companies.  The Coalition and the FCR believe that the amount of the recoveries from these parties (in total) will be much more than the settlements with the Boy Scouts and the Local Councils, but it could end up being much more or much less.

Similarly, the timing of distributions is somewhat unpredictable.  Besides the unknown timing of when the Plan will be confirmed (assuming it is confirmed) and recoveries from Chartered Organizations and Insurance Companies that have not settled, your claim cannot be paid until its amount is determined.  Although the Settlement Trust is expected to move expeditiously to value claims, as described in more detail below, a survivor has the right to request reconsideration of the Settlement Trustee's determination of the amount of the survivor's claim and, thereafter, if dissatisfied with the allowed amount upon reconsideration, the right to have his, her or their claim determined by a court in the tort system.

### *Who will decide if my claim is eligible for payment?*

Survivors can choose between taking an immediate payment of $3,500 through an election on their Ballot, having their claims determined through the Trust Distribution Procedures, or obtaining authorization from the Settlement Trustee to go to court to have their claim amount determined but limited to recovery from the Settlement Trust.  Choosing the Expedited Distribution option on your Ballot will get you money sooner but it means that you will be eligible to receive only a gross payment of $3,500 and nothing more.

All Abuse Claims that are not satisfied through the Expedited Distribution option will be reviewed by the Settlement Trusts' claims reviewers.  The Settlement Trust's claims reviewers will review each Submitted Abuse Claim—including the Proof of Claim and Trust Claim Submission—and determine whether it is a valid Allowed Abuse Claim or invalid Disallowed Claim.  If the Settlement Trustee disallows your claim, the TDP includes a procedure for making a Reconsideration Request, as well as the option after reconsideration to seek a determination of your claim by a court.

### *Do I have to provide the Settlement Trustee of the Settlement Trust with additional information regarding my claim?*

Unless you elect to take an Expedited Distribution of $3,500, you will need to make a Trust Claim Submission in order for your claim to be considered under the TDP.

*Will I be paid interest on my claim?*

No.  Unfortunately, there is not expected to be enough funding to pay claims with interest.

*By way of Example, if the Settlement Trust determines that my claim is $600,000, does that mean I will be paid $600,000?*

Not necessarily.  The Settlement Trustee will determine the percentage of Allowed Abuse Claims that may be paid based on the Settlement Trustee's estimates of the Settlement Trust's assets and liabilities and the amounts of known and estimated Future Abuse Claims.  If additional money is recovered by the Trust, claimants may receive additional amounts up to the value of their claim determined by the Trust.

*Can I participate in the settlement, Plan and Trust Distribution Procedures, even if I don't have an attorney?*

Yes.  There is no requirement to have an attorney to vote on the Plan or participate in the TDP in order to have your claim reviewed.

*Where can I obtain a copy of the Trust Distribution Procedures?*

The TDP is attached as Exhibit A to the Plan and is posted at https://omniagentsolutions.com/bsa-SAballots.

*Where can I obtain a copy of the Settlement Trust Agreement?*

The BSA Settlement Trust Agreement is attached as Exhibit B to the Plan and is posted at https://omniagentsolutions.com/bsa-SAballots.

*Why is the Settlement Trust expecting to receive only $820 million from the Boys Scouts and Local Councils?  Why not more?*

The Boy Scouts and Local Councils are expected to contribute $820 million.  Hartford is expected to contribute $787 million.  TCJC is contributing $250 million.  There may be other sources of recovery, including the from other insurance companies and Chartered Organizations.  The resolution that is incorporated into the Plan—which includes the designation of $1.857 billion in assets for the payment of Abuse Claims—is the result of over eighteen months of investigations, litigation, mediation, and other negotiations among the major interested parties in the cases, including the Coalition and the FCR.  The Coalition and the FCR were sensitive to the needs of survivors in what has been a decades-long process to hold the Boy Scouts accountable for past abuses, to be afforded the opportunity to tell their stories and assert their claims for compensation, and to be assured that the Boy Scouts would implement rigorous Youth Protection Programs, subject to the Coalitions' and the FCR's input, that would ensure that similar abuses would never occur again.  In agreeing to support the transfer of $1.857 billion in assets to the Settlement Trust, the Coalition and the FCR balanced the fair values of Boy Scouts and Local Councils' assets as well TCJC's and Hartford's liabilities, the time, expense, and risks involved in pursuing and recovering certain of such assets through litigation in the absence of a settlement, and the diminishing financial condition of the Boy Scouts the longer the bankruptcy cases

continued.  The Coalition and the FCR believe that the settlement balances all of these considerations that are important to survivors to achieve a fair and equitable result.

*Can I still sue parties other than the Boy Scouts to recover my Abuse Claims?*

If the Plan is confirmed, survivors may seek recoveries against any party that is not among the Protected Parties:

| Parties who may be sued by Survivors after confirmation of the Plan | | |
|---|:---:|:---:|
| **<u>Party</u>** | **<u>Yes</u>** | **<u>No</u>** |
| Boy Scouts of America | | ● |
| Settling Insurance Company (i.e., an insurance company that issued a policy to the Boy Scouts). | | ● |
| Non-Settling Insurance Company (i.e., an insurance company that issued a policy to the Boy Scouts). | | ● |
| Local Councils | | ● |
| Settling Insurance Company (i.e., an insurance company that issued a policy to the Local Council). | | ● |
| Non-Settling Insurance Company (i.e., an insurance company that issued a policy to the Local Council). | | ● |
| Contributing Chartered Organizations (*e.g.*, TCJC) | | ● |
| Participating Chartered Organizations | | ●[7] |
| Settling Insurance Company (i.e., an insurance company that issued a policy to the Chartered Organization). | | ● |
| Non-Contributing Chartered Organizations against which you may have a claim. | ●[8] | |
| Non-Contributing Chartered Organizations' Insurers (*i.e.*, an insurance company that issued a policy to the Chartered Organization solely to the benefit of Chartered Organization and is not shared with and does not implicate the Boy Scouts). | ●[9] | |

---

[7] Participating Chartered Organizations cannot be sued on account of Abuse Claims arising on or after January 1, 1976.

[8] Unless electing the Expedited Distribution.

[9] Certain insurance companies assert that this is only available if such direct action is permitted under applicable law.

# **EXHIBIT I**



## TORT CLAIMANTS COMMITTEE RECOMMENDS THAT SURVIVORS <u>VOTE TO REJECT</u> THE BOY SCOUTS PLAN

The Official Tort Claimants Committee (TCC) in the chapter 11 bankruptcy of the Boy Scouts of America (BSA) urges survivors to ***vote to reject BSA's Plan***.  The Plan is grossly unfair to the 82,200 survivors who were sexually abused as children.

**In the TCC's opinion, survivors may receive less than 10 cents on the dollar under the current BSA Plan.**

**The TCC urges you to attend the TCC's "Town Hall" meetings. The TCC will discuss its determinations about BSA's Plan. The Schedule for the Town Hall meetings can be found at [www.tccbsa.com](www.tccbsa.com) or by emailing [BSASurvivors@pszjlaw.com](mailto:BSASurvivors@pszjlaw.com).** The Zoom link to the Town Hall meetings: [https://pszjlaw.zoom.us/j/82272826295](https://pszjlaw.zoom.us/j/82272826295) **OR** telephone: 1-669-900-9128; Code: 82272826295#

The TCC was appointed by the United States Trustee as the official fiduciary representative for all survivors of childhood sexual abuse and it recommends that survivors ***vote to reject BSA's Plan***. The nine members of the TCC have collectively spent thousands of hours devoted to assuring that survivors are fairly compensated. After all this time, BSA's Plan does not accomplish that goal. While the topline cash settlement number in the BSA's Plan seems large (approximately $1.8 billion), it only represents a fraction of what the TCC believes the settling parties should and can pay to tens of thousands of survivors based on their financial exposure and available assets. While the BSA will be seeking further settlements and contributions from insurers and Chartered Organizations, at this time, there are none and there is no guarantee that BSA will be able to settle with such parties and provide further insurance or cash to pay claims.

The key flaws in BSA's Plan include:

- BSA's Plan includes settlements with Local Councils that leave them with over a billion dollars of cash and property in excess of what their current need to fulfill the mission of Scouting.
- Under the terms of BSA's Plan, Chartered Organizations do not pay a cent for broad releases for more than 40 years of sexual abuse claims (1976-2020). Instead, Chartered Organizations receive a release of their sexual abuse liability in exchange for a transfer of their interest in insurance policies purchased by the BSA and Local Councils.
- BSA's Plan includes a settlement with The Church of Jesus Christ of Latter-Day Saints (TCJC) that is completely insufficient to pay for claims for which it has liability.
- The Hartford Insurance Company (Hartford), the only settling insurer to date, is paying a small fraction of the coverage it is contractually obligated to provide.

The payment percentage on your claim is low partially because Hartford is paying only a fraction of what the insurance policies it issued to BSA actually cover. Hartford increased its inadequate offer of $650 million to an equally subpar offer of $787 million. Because the $787 million is not being dedicated to claims that trigger Hartford's policies, the $787 million will yield approximately $8,500 per survivor after accounting for trust expenses and overhead.

BSA's Plan also includes a $250 million settlement with TCJC which had decades of direct involvement in every aspect of the Scouting program. The $250 million is not only an amount that is far below its responsibility but it has the financial ability to pay the full value of its claims many times over. The TCJC settlement funds will **only** be distributed to survivors who have claims against TCJC which may result in additional distributions only to them.

If a sufficient number of survivors vote to reject BSA's Plan, then the possible outcomes include (i) BSA's case may be dismissed and survivors may be free to pursue claims against BSA, Local Councils, Chartered Organizations and other parties subject to applicable statutes of limitation; (ii) the Court may appoint a trustee for BSA; (iii) the TCC (or other parties) may submit an alternate plan to reorganize BSA; or the BSA may amend its Plan and seek to resolicit votes to accept or reject such amended plan.

The TCC believes that survivors are likely to enjoy greater recoveries if BSA's Plan is rejected. For example, if BSA's Plan is rejected, BSA's proposed settlements with Hartford and TCJC, described in the plan, are rejected as well. Consequently, Hartford and TCJC will be forced to answer for their respective liabilities and the TCC believes that the recoveries against them will far exceed the amounts of the proposed settlements. Also, the Local Councils have more assets that they could use to pay survivors.

---

**The TCC urges you to attend the TCC's "Town Hall" meetings. The TCC will discuss its determinations about BSA's Plan. The Schedule for the Town Hall meetings can be found at www.tccbsa.com or by emailing BSASurvivors@pszjlaw.com. Here is the Zoom link to the Town Hall meetings: https://pszjlaw.zoom.us/j/82272826295 OR telephone: 1-669-900-9128; Code: 82272826295#**

---

October 1, 2021

John Humphrey, Chair                    Douglas Kennedy, Co-Chair
Robert Grier                            Richard Halvorson
Christopher Haywood                      Robb Lawson
M. Wade Paul                            Jorge Tobon
Jorge Vega

## **<u>EXHIBIT J</u>**

### SUMMARY REGARDING CHARTERED ORGANIZATIONS'
### OPTIONS UNDER THE BSA'S CHAPTER 11 PLAN

On February 18, 2020, Boy Scouts of America (the "BSA") filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The BSA has filed a chapter 11 plan of reorganization (the "Plan") which, if confirmed by the Bankruptcy Court, will allow it to exit bankruptcy. Copies of the Plan, together with various supporting documents, may be obtained by (a) calling the Debtors' toll-free restructuring hotline at 866-907-2721, (b) emailing BSAballots@omniagnt.com, (c) writing to Boy Scouts of America Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367, or (d) submitting an inquiry on the Debtors' restructuring website at https://omniagentsolutions.com/BSA.

This document is intended to assist Chartered Organizations in understanding their rights under the Plan. It is not comprehensive and does not describe every fact, issue, or consideration that may be relevant to a Chartered Organization under the Plan. The Bankruptcy Court has reviewed this document and permitted the BSA to send it to Chartered Organizations, together with the Plan and other related documents to assist Chartered Organizations in their decision as to how the Plan will affect their rights, whether they want to object to provisions of the plan, and, for those Chartered Organizations that filed Proofs of Claim, how they wish to vote on the Plan. The Bankruptcy Court has not endorsed or confirmed the Plan. **You should consult with your legal counsel and read the Plan and Disclosure Statement, including the "Risk Factors" in Article X of the Disclosure Statement, in their entirety. If there are inconsistencies between this document and the terms of the Plan, the Plan governs.**

This document contains the following:

(1)    FAQ regarding the treatment of Chartered Organizations under the Plan;

(2)    an opt-out election form, which a Chartered Organization may use to "opt-out" of becoming a "Participating Chartered Organization" under the Plan (Option #3 described below). **Please read this document, the Disclosure Statement, and the Plan before you decide whether to complete the opt-out election**; and

(3)    a notice of the hearing for the Bankruptcy Court to consider approval of the Plan, which contains important information, including instructions on how Chartered Organizations may object to the Plan.

For those Chartered Organizations that filed Proofs of Claim, a ballot is also enclosed to:

a.    Vote to ACCEPT or REJECT the Plan; and

b.    Consent to or opt out of the broad releases and waivers of claims against the "Released Parties" under the Plan, including the BSA, Local Councils, and Hartford (and any other insurance company which enters into a settlement similar to the settlement with Hartford described below).

### General FAQs

## WHAT IS A CHARTERED ORGANIZATION?

A "Chartered Organization" is any civic, faith-based, educational or business organizations, governmental entities or organizations, other entities or organizations, or groups of individual citizens that are currently or were formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

**WILL THE CHOICES THAT A CHARTERED ORGANIZATION MAKES UNDER THE PLAN IMPACT ITS CURRENT RELATIONSHIP WITH THE BSA AND SCOUTING?**

No.  The choices a Chartered Organization makes under the Plan relate only to treatment of historical alleged Abuse Claims that pre-date the BSA's bankruptcy filing.  The vast majority of Abuse Claims are decades old.  Any decision you make under the Plan will not impact your relationship with the BSA and Scouting as it stands today.  *We are asking our Chartered Organizations to make certain choices under the Plan, but the choices that you make will have no impact on your relationship with the BSA and Scouting going forward.  They relate only to handling of historical alleged Abuse Claims.*

**WHAT RIGHTS DOES A CHARTERED ORGANIZATION CURRENTLY HAVE AGAINST THE BSA, LOCAL COUNCILS, AND BSA-PROVIDED INSURANCE?**

Since January 1, 1976, the BSA has included Chartered Organizations as insured parties under its general liability insurance policies.  That is, if a claim is made against a Chartered Organization related to Scouting from any time after January 1, 1976, the Chartered Organization can make a claim against the BSA's general liability insurance policy and potentially receive coverage under that policy (in addition to any insurance policy that the Chartered Organization may have purchased for itself).  Prior to 1976, while the BSA did not include Chartered Organizations as insured parties, many Local Councils purchased insurance policies that included Chartered Organizations as additional insureds.  While we do not have a comprehensive picture of insurance coverage for Chartered Organizations prior to 1976, Local Councils purchased insurance from Insurance Company of North America ("INA/Century"), Hartford, Arrowood and others which may offer protection to Chartered Organizations.  Some Chartered Organizations have asserted that they have rights to pre-1976 BSA insurance on the basis that they are "volunteer leaders" as defined in the insurance policies; the BSA believes that those claims will be disputed by the BSA's insurers and others.

In addition to BSA-provided insurance, Chartered Organizations may have their own insurance coverage that covers an Abuse Claim related to Scouting, and Chartered Organizations may have claims against the BSA or Local Councils for "contribution," "indemnity," or both for an Abuse Claim related to Scouting.  Rights of contribution and indemnity can arise either under a written contract or, in somewhat more limited circumstances, under common law.  In 2013, the BSA adopted a resolution stating that the BSA "shall defend and indemnify Chartered Organizations . . . who act in good faith and against whom claims are asserted based upon [the BSA's] membership standards."  Certain Chartered Organizations assert that this resolution pertained to Abuse Claims.  The BSA disputes these assertions.  Following that BSA resolution, beginning in 2014, indemnification provisions in favor of Chartered Organizations were included in the annual charter agreement between a Chartered Organization and its Local Council.  Chartered Organizations may also have rights against the BSA and Local Councils by operation of law related to claims of Abuse, such as rights of contribution. Claims against the BSA on account of contribution or indemnity for Abuse Claims related to Scouting were required to be filed in the BSA's bankruptcy case on or before November 16, 2020.

**WHAT ARE THE OPTIONS A CHARTERED ORGANIZATION HAS FOR TREATMENT OF CLAIMS AND RIGHTS UNDER THE PLAN?**

The Plan provides a framework for the comprehensive resolution for historical Scouting-related Abuse Claims against the BSA and the Local Councils.  With respect to Chartered Organizations, there are three potential options that a Chartered Organization may choose from.  Each option affects, or may affect: (i) the Chartered Organization's rights in the BSA and Local Council insurance policies which provide protection to Chartered Organizations; (ii) the amount of protection a Chartered Organization may receive from Abuse Claims asserted against the Chartered Organization; (iii) how a Chartered Organization's claims against the BSA and Local Councils are treated; and (iv) if an insurer of a Chartered Organization becomes a Settling Insurance Company,

the Chartered Organization's rights in the Chartered Organization insurance policies which provide protection to Chartered Organizations, but solely to the extent of coverage for Abuse Claims related to Scouting.  Here is a summary of these three options:

***Option #1 – Participating Chartered Organization***: Unless a Chartered Organization affirmatively chooses Option #2 or Option #3 below, the Plan deems a Chartered Organization to be a Participating Chartered Organization.  This provides:

a. **Insurance**:  The Chartered Organization will not have any rights in 1976-forward BSA or Local Council insurance policies and the Plan may assign or otherwise provide for the Settlement Trust to access such insurance rights.  The Chartered Organization will retain whatever rights they previously had (to the extent such rights exist) in pre-1976 insurance policies. This is described in greater detail in the "Insurance Rights" discussion below.  BSA has not sought insurer consent for the partial assignment of coverage and there is a risk that the proposed assignment absent insurer consent might not be effective and/or could void coverage.

b. **Protection from Direct Abuse Claims**:  The Chartered Organization will remain liable for all pre-1976 Direct Abuse claims that are asserted presently or may be asserted in the future.  For 1976-forward abuse claims, abuse victims will not be able to assert claims directly against the Chartered Organization.

c. **Claims against BSA and Local Councils**:  All such claims will be waived, regardless of whether it is a claim that arose before or after January 1, 1976.

d. **Hartford Release**:  The Chartered Organization will release Hartford from insurance- and Abuse-related Claims as provided in the term sheet for the proposed settlement between the BSA and Hartford.

***Option #2 – Contributing Chartered Organization***: Chartered Organizations may negotiate with the BSA and abuse claimant representatives to make a substantial monetary contribution to the Settlement Trust and become full a Contributing Chartered Organization under the Plan.  If they do so, they will receive the same protection from Scouting-related Abuse Claims that the BSA and Local Councils will receive in exchange for their respective monetary and insurance contributions to the Settlement Trust.  This provides:

a. **Insurance**:  The Chartered Organization will not have any rights in any insurance policies purchased by the BSA or the Local Councils, whether before or after January 1, 1976 and the Plan may assign or otherwise provide for the Settlement Trust to access such insurance rights.

b. **Protection from Direct Abuse Claims**:  All Direct Abuse Claims against a Chartered Organization will be "channeled" to the Settlement Trust to the same extent as claims against the BSA and the Local Councils are channeled regardless of whether it is a claim that arose before or after January 1, 1976.  All Scouting-related abuse claims will be channeled, but not abuse claims which were unrelated to the Chartered Organization's participation in Scouting.

c. **Claims against BSA and Local Councils**:  All such claims will be waived, regardless of whether it is a claim that arose before or after January 1, 1976.

*Option #3 – Opt Out*: Chartered Organizations can "opt out" of either Option #1 or Option #2.

a. **Insurance**:  The Chartered Organization will retain rights in BSA and Local Council insurance policies regardless of whether policies were issued before or after January 1, 1976, subject to any sales by the BSA of insurance policies back to its insureds, including Hartford, in which event the rights and interests of Chartered Organizations under those policies will attach to the sale proceeds (or be afforded other adequate protection).  This is described in greater detail in the "Insurance Rights" discussion below.

b. **Protection from Direct Abuse Claims**:  The Chartered Organization will remain liable for all Abuse Claims that are asserted presently or may be asserted in the future, regardless of whether such claims arose before or after January 1, 1976.

c. **Claims against BSA and Local Councils**:  All such claims will be preserved, but they will be channeled to the Settlement Trust.  A more detailed discussion of the Settlement Trust, the Settlement Trustee and the treatment of Chartered Organizations' Indirect Abuse Claims under the Plan is described in the Settlement Trust discussion below.

d. **Hartford Settlement**:  The proposed Hartford settlement will release Hartford from any obligations Hartford has to Chartered Organizations under the Hartford insurance policies issued to the BSA.

**DOES A CHARTERED ORGANIZATION GET TO VOTE ON THE PLAN?**

Only those Chartered Organizations that filed an Indirect Abuse Claim (or other Claim) have the right to vote on the Plan.  The overwhelming majority of Chartered Organizations that filed claims in the BSA's bankruptcy filed Indirect Abuse Claims.  For those Chartered Organizations that did, they will need to fill out the CLASS 9 BALLOT to vote to ACCEPT or REJECT the Plan.  Regardless of whether a Chartered Organization casts a ballot for or against the Plan, it must independently decide which of the three Plan Options described above that it wishes to proceed under.  Chartered Organizations entitled to vote will also be asked whether to consent or opt out of the broad releases and waivers of claims against the "Released Parties" under the Plan, including the BSA, Local Councils, and Hartford (and any other insurance company which enters into a settlement similar to the settlement with Hartford described below).

**INSURANCE RIGHTS – WHAT WILL HAPPEN TO A CHARTERED ORGANIZATION'S RIGHTS UNDER BSA OR LOCAL COUNCIL INSURANCE POLICIES UNDER THE PLAN?**

a. **Insurance Rights against Hartford and the proposed Hartford Settlement**.  The Plan proposes a settlement under which the BSA will sell back to Hartford of all of the liability insurance policies issued by Hartford to the BSA that cover Abuse Claims.  Hartford issued significant amounts of insurance to the BSA under which Chartered Organizations have rights.  Specifically, Hartford issued to the BSA primary policies for 1976 and 1977 and excess policies in 1981 and 1982.  If the Bankruptcy Court confirms the Plan and approves the sale of the insurance policies that Hartford issued to the BSA, the effect will be that Hartford will buy back the BSA insurance policies "free and clear" of any and all interests of any entity (including Chartered Organizations) in those policies, with the result being that any rights and interests of Chartered Organizations under those policies will attach to the sale proceeds (or be afforded other adequate protection), but the Chartered Organization will not be able to assert those rights or interests against Hartford.  A list of the policies that Hartford is buying back and the years those policies cover can be found at Docket No. 6210-1, Exhibit A. Hartford also issued policies to the Local Councils which may also cover Chartered Organizations.  The proposed Hartford settlement requires that the BSA and Local Councils "secure an assignment to the

4

[Settlement Trust] of, or otherwise resolve to [Hartford's] satisfaction, Chartered Organizations' rights and claims to coverage" under insurance policies issued by Hartford, and that the BSA and abuse claimant representatives will use their best efforts to settle with the Chartered Organizations. The BSA, Local Councils, Hartford and the abuse claimant representatives are continuing to evaluate the how to satisfy the foregoing conditions and cannot yet disclose how or whether the condition will be satisfied without Chartered Organizations' consent.

b. **Other Insurance Rights**.

    i. **For Post-1976 Insurance Rights** - If a Chartered Organization accepts being deemed a Participating Chartered Organization (Option #1) or negotiates a settlement to become a Contributing Chartered Organization (Option #2), the Chartered Organization will waive all rights in BSA or Local Council insurance policies in exchange for the protections described above for Option #1 or Option #2.

    If a Chartered Organization chooses Option #3 and does not become a Participating Chartered Organization or a Contributing Chartered Organization, it will retain rights in post-1976 insurance policies purchased by the BSA and the Local Councils, with the exception of the Hartford policies as described above.

    The Chartered Organization may also not have rights under policies issued by the BSA's and the Local Councils' other insurance providers as the BSA may enter settlements with those carriers that may limit or remove the rights of Chartered Organizations under such policies and their own insurance policies with such insurers and/or claims of Chartered Organizations against such insurers.

    ii. **For Pre-1976 Insurance Rights** – All Chartered Organizations that elect either Options #1 or #3 will maintain their rights in pre-1976 BSA and Local Council insurance policies, with the exception of the Hartford policies as described above. The Chartered Organization may also not have rights under policies issued by the BSA's and the Local Councils' other insurance providers as the BSA may enter settlements with those carriers that may limit or remove the rights of Chartered Organizations under such policies and their own insurance policies with such insurers and/or claims of Chartered Organizations against such insurers.

    If a Chartered Organization negotiates a settlement to become a Contributing Chartered Organization (Option #2), the Chartered Organization will waive all rights in BSA or Local Council insurance policies in exchange a release of all Scouting-related Direct Abuse Claims.

## THE SETTLEMENT TRUST, THE TRUSTEE AND TREATMENT OF CHARTERED ORGANIZATIONS' CLAIMS

### What is the Settlement Trust?

The Settlement Trust is established under the Plan to collect settlement proceeds from various parties—including the $208 million (assuming a January 31, 2022 emergence) being contributed by the BSA and $600 million being contributed by Local Councils as set forth in their letters of intent (the form of which is attached hereto), in addition to the assignment of their respective insurance rights—and to liquidate, process and pay Direct Abuse Claims and Indirect Abuse Claims in accordance with "Trust Distribution Procedures" agreed to by the BSA, Local Councils and attorneys for Direct Abuse Claimants. Chartered Organizations were not involved

developing the Trust Distribution Procedures even though they will govern the payment of Chartered Organizations' claims.

## Who is the Settlement Trustee?

The proposed trustee is Eric Green.  With the approval of the BSA, Mr. Green was chosen by the attorneys representing Direct Abuse Claimants and the Future Claims Representative, who is a fiduciary chosen by the BSA to look out for the interests of abuse claimants who may come forward in the future primarily due to their being minors at the time of the bankruptcy filing.  Earlier in the bankruptcy case, the BSA sought the appointment of Mr. Green as a mediator in the bankruptcy cases, and certain insurers objected on the basis that among other things, Mr. Green must be disqualified because the Future Claimants' Representative or his law firm, have represented Mr. Green in his capacity as future claimants' representative in certain mass-tort cases.  More detail regarding Mr. Green's connections with the BSA's counsel, abuse claimant representatives and the Future Claimants' Representative can be found at Exhibit H to the Disclosure Statement.  Chartered Organizations were not consulted about the appointment of Mr. Green even though he will be a fiduciary to Chartered Organizations that have Indirect Abuse Claims.

## What are the Trust Distribution Procedures and will Chartered Organizations receive a recovery on Indirect Abuse Claims?

Only Chartered Organizations that elect to Opt Out under Option #3 will retain their Indirect Abuse Claims.  The Trust Distribution Procedures are the guidelines that the Settlement Trustee must follow in evaluating and deciding to pay Direct and Indirect Abuse Claims.  For a Chartered Organization to receive payment on an Indirect Abuse Claim:

1.  The Claim must have been filed by November 16, 2020.  Claims that arose before the BSA's bankruptcy filing on February 18, 2020 and that were filed after November 16, 2020 are not eligible to receive compensation under the Trust Distribution Procedures even if the Chartered Organization did not know of a Scouting-related Abuse Claim against it until after that date.

2.  The Settlement Trustee, not the Bankruptcy Court, must be satisfied that the Chartered Organization's claim cannot be disallowed under the Trust Distribution Procedures and/or applicable provisions of the Bankruptcy Code that provide for such disallowance.

3.  The Chartered Organization must have paid in full the claim of the survivor asserting the Direct Abuse Claim against the Chartered Organization.

Additionally, the Settlement Trust will not pay defense or other costs that the Chartered Organization may be entitled to assert as part of its claim.

## WHAT HAPPENS TO CHARTERED ORGANIZATIONS FOR DIRECT ABUSE CLAIMS AGAINST CHARTERED ORGANIZATIONS THAT ARE NOT CHANNELED TO THE SETTLEMENT TRUST?

Chartered Organizations under Options #1 and #3 will remain liable for Direct Abuse Claims asserted against them.  For Option #1 – Participating Chartered Organizations, this will be all such claims prior to January 1, 1976.  For Option #3 – Opt Out, this will be for all Direct Abuse Claims against the Chartered Organization.

For those claims, survivors of abuse will retain whatever rights they have under state law against the Chartered Organization and can assert those rights in the court system.  The BSA and Local Councils will no longer defend and indemnify Chartered Organizations, but under: (1) Option #1, the Chartered Organizations will

retain whatever rights they previously had in the pre-1976 BSA and Local Council insurance policies (with the exception of BSA policies issued by Hartford or other carriers with which the BSA enters into settlements), and (2) Option #3, the Chartered Organization will retain all rights in both the pre- and post-1976 BSA and Local Council insurance policies (with the exception of BSA policies issued by Hartford or other carriers with which the BSA enters into settlements).  It will be the responsibility of the Chartered Organizations to defend themselves against such claims and pay any claims for which the Chartered Organization is found liable.

## DO CHARTERED ORGANIZATIONS AUTOMATICALLY RECEIVE ANY PROTECTIONS FROM ABUSE CLAIMS?

Yes.  Any holder of a Direct Abuse Claim (*i.e.*, a person who claims to have been abused) may choose to receive a one-time payment of $3,500 from the Settlement Trust without the need to go through the more extensive vetting process that the Settlement Trustee uses for all other Direct Abuse Claims.  This $3,500 payment is referred to as an "Expedited Distribution."  Anyone that chooses to receive an Expedited Distribution automatically releases all Chartered Organizations with respect to that Abuse Claim.

Chartered Organizations are ***not*** required to pay anything to receive the benefits of this release.  The release will be automatic and in favor of all Chartered Organizations.  And Chartered Organizations will also still receive the benefit of this release even if they elect to "opt out" of being a "Participating Chartered Organization" (discussed immediately below).  In other words, if the Plan is confirmed, ***all*** Chartered Organizations will receive the benefit of this release from those who elect to receive the Expedited Distribution regardless of whatever else the Chartered Organization chooses to do under the Plan.  We do not yet know how many of the approximately 82,000 persons who filed Direct Abuse Claims people will elect to take an Expedited Distribution.

## OTHER THAN THE RELEASE RELATED TO THE EXPEDITED DISTRIBUTION, WHAT OTHER PROTECTIONS ARE AVAILABLE TO CHARTERED ORGANIZATIONS UNDER THE PLAN?

In addition to the release for Expedited Distributions, Chartered Organizations may be able to reduce any judgment against them by the amount of the BSA's or a Local Council's liability.  For example, if the BSA and a Local Council would have been liable for 50% of damages for an act of Abuse, a Chartered Organization may be able to reduce any judgment against it by 50%, depending on state law.  The Plan requires that this "Judgment Reduction" provision be brought to the attention of any state court that is adjudicating a claim against a Chartered Organization so that it can consider whether a judgment reduction is appropriate.

In addition, as discussed above, a Chartered Organization will have three options for how to address any other Scouting-related Abuse Claims it may face.  The method by which a Chartered Organization selects Options #1, #2 and #3 are discussed below.

## HOW DOES THE PLAN TREAT INFORMATION IN THE POSSESSION OF BSA OR THE LOCAL COUNCILS IN WHICH CHARTERED ORGANIZATIONS MAY HAVE A COMMON INTEREST?

The treatment of privileged information generated in the defense of claims in which Chartered Organizations may have a common interest is still under discussion.

## OPTION #1 FAQ

**HOW DOES A CHARTERED ORGANIZATION SELECT OPTION #1?**

Unless a Chartered Organization is a debtor in its own bankruptcy case, each Chartered Organization will *automatically* be deemed to select Option #1 *unless* it:

- completes and returns the opt-out election form attached hereto; or

- objects to confirmation of the Plan.

If a Chartered Organization is itself in bankruptcy, it will need to advise the BSA in writing if it wants to select Option #1.  If your Chartered Organization is in bankruptcy and wants to select Option #1, information on how to select Option #1 is available by having your counsel contact the BSA's counsel at BSA-COInquiries@whitecase.com.

## OPTION #2 FAQ

**How does a Chartered Organization obtain the protections afforded by Option #2?**

Under Option #2, a Chartered Organization receives protection from Scouting-related Abuse Claims.  It can only receive this protection if it makes a negotiated monetary contribution to the Settlement Trust.  If your Chartered Organization is interested in considering Option #2, you should contact the BSA, which can facilitate these negotiations.  You may contact the BSA via email at SE.Legal@Scouting.org or have your counsel contact the BSA through its counsel at the following email address:  BSA-COInquiries@whitecase.com.

**If a Chartered Organization pursues Option #2, what Abuse Claims will it be protected from under the Plan?**

Chartered Organizations that negotiates a settlement under Option #2 will receive protections under the Plan from any Scouting-related Abuse Claim that occurred prior to February 18, 2020, which is the day that the BSA filed for bankruptcy. A Chartered Organization will not receive protections from abuse claims that a survivor asserts are unrelated to Scouting.

**How does Option #2 differ from Option #1?**

The primary difference between Option #2 and Option #1 is that, under Option #2, the Chartered Organization must make a substantial monetary contribution to the Settlement Trust and, in exchange, will receive full protection from Scouting-related Abuse Claims regardless of when the claims arose.  Under Option #1, the Chartered Organization only receives a release for Scouting-related Abuse Claims alleged to have first occurred on or after January 1, 1976.

## OPTION #3 FAQ

**What is Option #3?**

Option #3 is the option available to Chartered Organizations if they do not want Option #1 or Option #2. Option #3 allows a Chartered Organization to retain the same BSA- and Local Council- provided insurance rights that it had when the BSA filed for bankruptcy (and retains today), subject to potential sale of the BSA's and the Local Councils' insurance policies back to their insurers, as addressed above.

**How does a Chartered Organization select Option #3?**

A Chartered Organization may selection Option #3 by either filling out and returning the Opt-Out Election Form enclosed with this package on or prior to the date of the hearing to confirm the Plan, or it may selection Option #3 by filing an objection to the Plan with the Bankruptcy Court.  Any Chartered Organization that does not do either will be deemed to be a Participating Chartered Organization under Option #1.