

Lawrence S. Robbins

202.775.4501
lrobbins@robbinsrussell.com

January 21, 2022

<u>VIA CM/ECF</u>

Hon. Laurie Selber Silverstein
Chief Judge
United States Bankruptcy Court, District of Delaware
824 North Market Street, 6th Floor
Wilmington, Delaware 19801

Re:   <u>In re Boy Scouts of America, et al., Case No. 20-10343 (LSS); Opposition to Insurers'
Omnibus Motion to Compel (Dkt. 8351)</u>

Dear Judge Silverstein:

    I write on behalf of my clients, Andrews & Thornton and ASK LLP, as well as the similarly situated law firms (collectively, the "Firms")[1] that are the targets of the Insurers' discovery motion. As explained below, the Insurers' motion misrepresents basic facts and seeks to relitigate matters the Court has previously decided. The motion should be denied.

## BACKGROUND

    On December 2, 2021, the Court granted in part the Insurers' motion to compel discovery from the Firms. The Court limited that discovery in three important ways. *First*, the Court held that the discovery should be confined to a "small sample" of proofs of claim that could be "extrapolate[d]" to the full population of claims and provide a "statistically significant result." Tr. 101, 120-21. *Second*, the Court held that only attorney-signed proofs of claim were subject to discovery. Tr. 77:16-23. *Third*, the Court ordered the production of "factual" work product, but held that opinion work product and attorney-client privileged materials need not be produced. Tr. 112:13-17, 113:6-16

    Contrary to the Insurers' self-serving narrative, the Firms have worked diligently to comply with the Court's order. They promptly produced written responses to the Insurers' discovery requests, together with the vendor agreements and exemplar authorization forms that the Insurers

---

[1] The additional law firms are Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C.; Slater Slater Schulman LLP; Napoli Shkolnik, PLLC; and Krause & Kinsman Law Firm.

**ROBBINS | RUSSELL**

January 21, 2022
Page 2

requested. Upon receiving the Insurers' proposed "sample" of claims—comprising between 150 and 200 claims for each law firm, and nearly 1,100 claims total—the Firms proactively engaged with the Insurers over the size and provenance of that sample. At a meet and confer on December 13, 2021, the Firms asked, among other things, whether the samples were chosen at random and thus capable of statistical extrapolation, as the Court had contemplated. The Insurers responded that the sample was *not* randomized—rather, the Insurers strategically chose these 150 to 200 claims in particular, and they chose them precisely because they supposedly share common features (*e.g.*, missing data). Because cherrypicked data is incapable of statistical extrapolation, the consequence of the Insurers' methodology is that neither the Court nor the Insurers will be able to extrapolate findings from this set to the larger claims pool. The Firms urged the Insurers to reconsider their methodology. The Insurers took the matter under consideration.

Nearly two weeks passed. The Insurers then requested a second meet and confer on December 27, 2021. *See* Ex. A, Dec. 23, 2021 E-mail. At that meet and confer, the Insurers insisted again on the permissibility of their "sampling"—*i.e.*, choosing whatever claims they like—and rejected our proposal that the sample be randomly selected and statistically significant. To avoid burdening the Court, the Firms acceded, asking only that the "sample" (such as it is) be reduced to a more manageable number. The Insurers again took the matter under consideration.

On January 3, 2022, the Insurers proposed a revised set of claims, totaling fifty per firm. Upon reviewing the revised sets, the Firms discovered that the sets contained a large number of *claimant*-signed forms, which the Court had excised from its discovery order. Tr. 77:16-23. The Firms brought this to the Insurers' attention at a meet and confer on January 5, 2022. The Insurers yet again took the matter under consideration.

On January 11, 2022, the Insurers sent *another* proposed "sample," now totaling sixty claims per firm—most attorney-signed, but some claimant-signed. In a gesture of good faith, the Firms agreed to this revised set, notwithstanding that they included claimant-signed forms outside the scope of the Court's discovery order.

Since receiving the Insurers' final subset ten days ago, the Firms have worked diligently. They have collected and produced the native claim forms for each of the more than 350 claimants chosen by the Insurers,[2] as well as the operative engagement letters (redacted as necessary for privilege). The Firms also have collected and reviewed more than 16,000 documents from the client files for the claims selected by the Insurers. In so doing, the Firms have withheld and logged

---

[2] Strangely enough, the Insurers now disparage the native claim forms as senseless discovery because the forms are "available for download to all Participating Parties from Omni." Mot. 3. But it was the Insurers themselves that insisted they needed these native claim forms to review any embedded metadata. Tr. 100:5-19, 110:18-111:14.

*only* those documents that are attorney-client privileged or which constitute opinion work product. The Firms are in the process of completing their productions of factual work product relating to the Insurers' chosen claims. Meanwhile, they have agreed to the deposition dates requested by the Insurers, which are scheduled to occur in the coming days.

On January 17, as the Firms were working to complete their productions and privilege logs, the Insurers abruptly demanded (for the first time) that the Firms supplement their productions with all "fact-based documents" and "fact-based communications." *See* Ex. B, Jan. 17, 2022 E-mail. Presuming that the Insurers intended to refer to factual work product, the Firms advised that they were working to complete their productions and privilege logs by January 19—two days later—and suggested that the parties meet and confer once the privilege logs were produced to discuss any factual work product that the Insurers believe was incorrectly withheld. *See id.*[3] The Insurers refused. *See id.* They filed this motion the next day.

The Insurers do not present a good-faith dispute as to whether any particular document (or even category of documents) withheld by the Firms constitutes factual work product. How could they? They filed their motion before receiving the Firms' privilege logs. At bottom, the Insurers propose to relitigate whether the Firms must produce the opinion work product and attorney-client privileged materials that the Court has already held need not be produced.

The motion should be denied.

## ARGUMENT

The Insurers present two arguments. *First*, they contend that the Firms have refused altogether to produce "claim-specific" materials. *Second*, they argue that any documents "transmitting facts" (as all documents do) are inherently nonprivileged and thus subject to production. The first argument is factually untrue. The second is legally groundless, and not remotely what the Court ordered.

I.  **The Firms Have Not Refused To Produce Claim-Specific Materials**

The Insurers insist that the Firms have refused to produce "claim-specific" discovery. That is not true. And had there been any confusion on that point, it should have been resolved through a meet and confer (which we invited) before the Insurers filed this motion.

---

[3] The Insurers' assertion that we only vaguely promised our privilege logs "at some unidentified point" is false. *See* Ex. B, Jan. 17, 2022 E-mail ("Our expectation is that we will complete our production and produce our privilege log by this coming Wednesday. I'll keep you posted.").

**ROBBINS | RUSSELL**

January 21, 2022
Page 4

In reality, the Firms have collected and reviewed the claim files for every one of the 360 claimants identified by the Insurers. In total, the Firms have collected and reviewed more than 15,000 documents from their claim files. Not surprisingly, the vast majority of the lawyers' files reflect attorney-client privileged communications or opinion work product. The Firms' privilege logs contain more than 5,000 such documents in the aggregate, and those logs consumed hundreds of attorney hours to prepare. All the while, the Firms have begun to produce nonprivileged documents and factual work product from those claim files.[4]

## II. The Insurers Are Not Entitled To Attorney-Client Privileged Materials Or Opinion Work Product

The Insurers next resurrect the same argument the Court already rejected: By signing certain proofs of claim, the Firms have forfeited any underlying attorney-client privilege and opinion work product protections. The Insurers pressed this very same argument two months ago. *See* Dkt. 7240 at 4; Dkt. 7241 at 5. And, at the December 2 hearing, the Court rejected that argument.[5] The Court instead adopted a middle ground: The Court ordered the Firms to produce all "fact work product," Tr. 112:15-17, while holding that "opinion work product" and "attorney-client privileged information" remained "protected," Tr. 113:6-12.

The Court's considered distinction between factual work product, on the one hand, and opinion work product and attorney-client privilege, on the other, is quite correct. Factual work product, which extends to "raw factual information" gathered by attorneys in anticipation of litigation, *In re Intel Corp. Microprocessor Antitrust Litig.*, 258 F.R.D. 280, 293–94 (D. Del. 2008), is subject to a qualified privilege that may be overcome by a showing of "substantial need," *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985); *see also In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003). By contrast, *opinion* work product—which "encompasses the mental impressions, conclusions, opinion, or legal theories of an attorney or other representative"—is "generally afforded near absolute protection from discovery." *In re Cendant*, 343 F.3d at 663 (quotation marks omitted). Only in exceedingly rare circumstances, such as where the crime-fraud exception is invoked, is opinion work product subject to discovery. *E.g.*, *In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir. 1982). Attorney-client privilege is even more sacrosanct: Animated by the need to encourage the "full and frank" exchange of information between a client and her

---

[4] The factual work product produced by the Firms includes, among other things, logs reflecting phone calls, text messages, house visits, and other forms of outreach by the Firms to their clients.

[5] Were it otherwise, an attorney's signature on a pleading, interrogatory response, or any other of the manifold documents that attorneys routinely verify on their clients' behalf would open the floodgates for opposing counsel to rifle through his or her privileged communications. That is not the law.

attorney, *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981), the attorney-client privilege is absolute and cannot be overcome by any showing of need by the opposing party, *see Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1429 (3d Cir. 1991); *Arcuri v. Trump Taj Mahal Assocs.*, 154 F.R.D. 97, 105 (D.N.J. 1994).

The Insurers ignore that distinction drawn by the Court and invent one of their own: The Insurers propose to draw a line between documents transmitting "facts," which they want to see, and documents transmitting "legal advice," in which they disclaim interest. But that is not how those privileges work. Opinion work product and attorney-client privileged communications frequently (almost invariably) entail the discussion of "facts." But that does not vitiate either privilege. Factual discussions between an attorney and his client are no less privileged than legal discussions. *See Upjohn Co.*, 449 U.S. at 390, 394-95 ("The first step in the resolution of any legal problem is ascertaining the factual background."). Opinion work product, too, protects the attorney's mental impressions and analysis of both facts and law alike. *See Sporck*, 759 F.2d at 316-17 (opinion work product protects, among other things, the "inferences" counsel draws from witness interviews and his "selection and compilation of [factual] documents . . . in preparation for pretrial discovery").

The Insurers, while refusing to review the Firms' privilege logs in advance of filing the motion, acknowledge that "privilege issues surrounding the claim files require a fact-specific inquiry." Adherence to this general principle is crucial in abuse-survivor cases where factual discussions between attorneys and their clients—the process through which victims recount horrific details that, for many, have been suppressed for decades—are often the only evidence available. For example, a victim may initially describe to his attorney a memory of the wet feel of urine on his legs following an encounter, only to later recall that it was blood. The *process* by which a sexual abuse victim recalls and conveys these details to his attorney for the purpose of obtaining legal advice is indisputably privileged—whether the victim seeks redress by filing a complaint in the tort system, or by filing a proof of claim in the bankruptcy court. In either case, victims would be *irreparably* prejudiced if privileged factual discussions with their attorneys were laid bare for the world to see. To the extent the Insurers (after reviewing the Firms' privilege logs) dispute particular assertions of privilege, the Firms will attempt to resolve those disputes through good-faith discussions. Failing that, privilege disputes should be resolved by the Court through the customary "fact-specific inquiry"—not the wholesale waiver approach advanced by the Insurers.

## CONCLUSION

The Insurers' motion should be denied.

**ROBBINS | RUSSELL**

January 21, 2022
Page 6

        Respectfully,

        /s/ Lawrence S. Robbins
        Lawrence S. Robbins (admitted *pro hac vice*)
        William J. Trunk (admitted *pro hac vice*)
        ROBBINS, RUSSELL, ENGLERT, ORSECK &
        UNTEREINER LLP
        2000 K Street, N.W., 4th Floor
        Washington, DC 20006
        Telephone: (202) 775-4500
        Facsimile: (202) 775-4510
        Email: lrobbins@robbinsrussell.com

        Anthony M. Saccullo (DE Bar No. 4141)
        Mary E. Augustine (DE Bar No. 4477)
        A. M. SACCULLO LEGAL, LLC
        27 Crimson King Drive
        Bear, Delaware 19701
        Telephone: (302) 836-8877
        Facsimile: (302) 836-8787
        Email: meg@saccullolegal.com

        *Counsel for Andrews & Thornton, Attorneys at Law and ASK LLP*

        /s/ Daniel K. Hogan
        Daniel K. Hogan (DE Bar No. 2814)
        HOGANMCDANIEL
        1311 Delaware Ave
        Wilmington, DE 19806
        Telephone: 302 656-7540
        Facsimile: 302-656-7599
        Email: dkhogan@dkhogan.com

        *Counsel for Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C.*

**ROBBINS | RUSSELL**

January 21, 2022
Page 7

/s/ Justin R. Alberto
Justin R. Alberto
COLE SCHOTZ P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: 302-651-2006
Facsimile: 302-574-2106
Email: jalberto@coleschotz.com

*Counsel for Slater Slater Schulman, LLP*

/s/ Paul J. Winterhalter
Brian McLaughlin (DE Bar No. 2462)
Paul J. Winterhalter (admitted *pro hac vice*)
OFFIT KURMAN, P.A.
222 Delaware Avenue, Suite 1105
Wilmington, Delaware 19801
Telephone: (267) 338-1370
Facsimile: (484) 930-0091
Email: pwinterhalter@offitkurman.com

*Counsel for Napoli Shkolnik, LLC*

/s/ Bernard George Conaway
Bernard George Conaway (DE Bar No. 2856)
CONAWAY-LEGAL LLC
Nemours Building
1007 North Orange Street, Suite 400
Wilmington, DE 19801
Telephone: 302-428-9350
Facsimile: 844-364-0137
Email: bgc@conaway-legal.com

*Krause and Kinsman, LLC*