UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 20-10343 (LSS) |
| BOY SCOUTS OF AMERICA AND | . |  |
| DELAWARE BSA, LLC, | . |  |
|  | . |  |
| _____Debtors._____ | . |  |
| CENTURY INDEMNITY COMPANY and | . | Adv. Pro. No. 22-50071 |
| CHUBB GROUP HOLDINGS, INC., | . |  |
|  | . |  |
| Plaintiffs, | . |  |
|  | . |  |
| v. | . | Courtroom No. 2 |
|  | . | 824 North King Street |
| TIMOTHY KOSNOFF, | . | Wilmington, Delaware 19801 |
|  | . |  |
| Defendant. | . | Monday, January 24, 2022 |
| . . . . . . . . . . . . . . . . . | . | 2:30 P.M. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:          Derek Abbott, Esquire
                         MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                         1201 North Market Street, 16th Floor
                         Wilmington, Delaware 19899




Audio Operator:          Brandon J. McCarthy

Transcription Company:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         (302)654-8080
                         Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1   APPEARANCES (Cont'd):

2   For Continental          Laura McNally, Esquire
    Insurance and Columbia   LOEB & LOEB LLP
3   Casualty:                321 North Clark Street, Suite 2300
                             Chicago, Illinois 60654
4

5   For Andrews & Thornton,  Lawrence Robbins, Esquire
    ASK LLP:                 William Trunk, Esquire
6                            ROBBINS, RUSSELL ENGLERT, ORSECK
                               & UNTEREINER LLP
7                            2000 K Street NW, 4th Floor
                             Washington, DC 20006
8

9   For Century:             Tancred Schiavoni, Esquire
                             O'MELVENY & MYERS LLP
                             Times Square Tower
10                           7 Times Square
                             New York, New York 10036
11

12  For AIG Companies:       James Hallowell, Esquire
                             GIBSON DUNN & CRUTCHER LLP
13                           200 Park Avenue
                             New York, New York 10166
14

15  For Timothy Kosnoff:     David Wilks, Esquire
                             WILKS LAW LLC
                             4250 Lancaster Pike, Suite 200
16                           Wilmington, Delaware 19805

17  Pro Se Litigants:        Timothy Zinkand
                             Jason Turner
18                           Guy Taylor

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>MATTER GOING FORWARD</u>:

1. Letter to Honorable Chief Judge Laurie Selber Silverstein Seeking Clarification on Court's Ruling with Respect to Insurers' Omnibus Motion to Compel Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., Slater Slater Schulman LLP, Napoli Shkolknik, PLLC, Krause & Krause Law Firm, Andrews & Thornton, Attorneys at Law, and ASK LLP (D.I. 8351; Filed 1/18/22)

   **Court's Ruling:  32**

<u>ADVERSARY PROCEEDING</u>:

*Century Indemnity Company and Chubb Group Holdings, Inc., v. Timothy Kosnoff,* Adversary Case No. 22-50071

2. [SEALED] Motion for Temporary Restraining Order (A.D.I. 3; Filed 1/21/22)

   **Court's Ruling:  35**

1          (Proceedings commence at 2:31 a.m.)

2          THE COURT:  Good afternoon, counsel.  This is Judge

3 Silverstein.  We're here in the Boy Scouts of America

4 Bankruptcy; Case 20-10343.

5          I will turn it over to debtor's counsel for the

6 agenda.

7          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

8 of Morris Nichols Arsht & Tunnell here for the debtors.

9          Your Honor, I wanted to make sure that you had the

10 second amended agenda in hand.

11          THE COURT:  I'm good.

12          MR. ABBOTT:  Terrific.  Your Honor, the first --

13 and we're just going to go, unless the court would prefer to

14 do otherwise, in agenda order.  So I believe Ms. McNally is

15 presenting Agenda Item No. 1 on behalf of various insurance

16 providers.

17          THE COURT:  Very good.  Ms. McNally.

18          MS. MCNALLY:  Good afternoon, Your Honor.  My name

19 is Laura McNally.  I represent CNA Insurance Company and we

20 are here representing certain insurers on discovery issues to

21 the law firms that were mentioned in the letter sent to

22 Chambers.

23          We are here today as part of the series of motions

24 and hearings we've had on the dispute relating to discovery of

25 certain proofs -- the generation process of certain proofs of

1 | claim.  We are hoping to narrow today and hopefully cap-off
2 | some of these remaining open issues.  So particularly to
3 | address some of the issues raised by opposing counsel in their
4 | response letter I'd like to just give a little background on
5 | how we got to where we are back to you yet again on this topic
6 | if that is all right with you.

7 |       Only briefly I'd like to go back to before we
8 | started -- well before the bar date.  There was an issue at
9 | that time about attorneys signing proofs of claim.  You will
10 | recall there was a fair amount of discussion on that topic.
11 | And when you ruled on October 14th you cautioned --
12 | essentially cautioned the counsel about taking the step of
13 | signing proofs of claim.

14 |       You said the rules permitted it, you described it
15 | as no matter how ill-advised that practice might be, but you
16 | said I'm going to permit the signing of a proof of claim by a
17 | lawyer who is authorized to do so.  You said the rules permit
18 | it no matter what it might mean with respect to the client's
19 | claim or attorney privilege.

20 |       You also added, this is all if you want to look at
21 | page 189 of the October 14th, 2020 transcript,

22 |       "And if I were that attorney, notwithstanding what
23 | I just said about authorized e-signature, I'd have that
24 | authority witness which might also suggest that the client
25 | could sign a proof of claim."

1        So going back before we even got to the bar date it

2   was clear -- it should have been clear to these lawyers that

3   there were going to be issues with the proofs of -- inquiry,

4   at least, with the proofs of claim they signed under penalty

5   of perjury attesting to their investigation -- attesting to

6   the claims.

7        So as you will recall -- I am not going to make

8   everyone hate me by going through every step of this

9   discussion, I am going to fast-forward now to December 2nd,

10  2021 where we are, again, talking through what is discoverable

11  in this process.  Your Honor held that because of the findings

12  you were being asked to make including the fairness, this now

13  is page 69 to 71 of your transcript, of the trust distribution

14  procedures and whether you should allow the expedited

15  distribution and other things relating to the matrixes and

16  procedures.  You said,

17        "The generation of these claims could be relevant

18  information.  So based on the plan that is in front of me for

19  confirmation I find that information to be relevant."

20        So we were deciding then what would be

21  discoverable.  We talked about counsel raised in his letter

22  there was a dispute about whether this sample, rather than

23  having the counsel have to be prepared on all thousands and

24  thousands of claims let's come up with a sample we could talk

25  about and that day, on December 2nd, you might recall, Mr.

1  Schiavoni raised some particular issues he had seen on certain

2  of the claims and you said to him, "Show that subset."

3         So what the insurers took from that was we needed

4  to have a smaller number, a sample, but that those could -- if

5  there were particular types of issues we were seeing those

6  were the ones we could ask about.  That is what we did.  The

7  law firms had a view that what you had instructed was that

8  they needed to be a random sample.  We understood you to

9  permit a subset because you even said why don't you see if

10 there is some kind of a subset that can be generated since you

11 have those in particular. So that is what we did.  We came up

12 with a subset.

13        Our original subset was about 150 to 200 claims per

14 firm.  And just to give some context here the firms we're

15 talking about, about 25 percent of their claims were attorney

16 signed claims, very high number, thousands of claims.  We got

17 it down to about 150 to 200 per firm.  This is now in this

18 period starting after December 2nd.  We sent them the list and

19 heard back, it's still too much; it's still too much.  We had

20 a big zoom.

21        In this time period I will tell you, we had group

22 calls, we had group zooms, group emails, individual zooms, any

23 kind of permutation you can think about there was a lot of

24 conversation going on.  So we had a call in late December that

25 150 to 200 is too much; we would like it to be half that, 50

1  percent.  So what we did, we said we will do better, we're

2  going to bring it down to 60; 60 per firm.

3          We selected the 60 and we cited them to the

4  transcript where you talked about a subset and we said this is

5  how we're proceeding, we're going to give you a list of 60.

6  So they accepted that number.  We sent over the 60 and then

7  immediately heard back.  Some of these are claimant signed

8  claim forms.  The judge only permitted attorney signed

9  discovery.  So we went back to the transcript and Your Honor

10  might recall saying that,

11          "I think the intake is relevant as well as the

12  process by which the claim for itself was generated, and that

13  the relevance goes to all proofs of claims whether signed by

14  an attorney or by a client, the survivor.  There may be

15  different questions based on whether it was signed by an

16  attorney or a client, but given the findings I have to make I

17  think the information is relevant."

18          So that was our understanding of why we were asking

19  for claimant signed forms.  The law firms had a great deal of

20  concern about that and we had more conversation back and forth

21  and reached an accommodation.  For every firm we agreed we

22  would have, at least, 50 of the 60 would be attorney signed

23  forms.  And then for the remaining 10 it would vary by firm.

24  Some firms, Eisenberg Rothweiler Firm, for example, didn't

25  have any claimant signed forms.  They got 60 all attorney

1  signed forms.

2        Then there is a variety with the other firms

3  depending on what some of the issues were.  As to those, since

4  there was still some discomfort with this idea, the insurers

5  said we will meet with you in a group or one by one, we will

6  meet with you, show you the claim form that is client signed,

7  and explain to you why we wanted to take these because we

8  understand the transcript to be, I will acknowledge, a little

9  unclear on this.

10        So what we were saying is these are why we want to

11  do them, if you don't agree that's fine; we will just go back

12  to the judge and explain here is our issue with this

13  particular one.  The issues were things like, off the top of

14  my head, one wasn't signed at all; some of them were signed

15  but had no email address, but they were electronically signed,

16  so how are they electronically signed without an email

17  address; or there was handwriting, several different types of

18  handwriting, like what is happening.  It's just a handful, so

19  it varied between zero and nine for these firms.  The

20  overwhelming of the discovery goes to the attorney signed

21  forms.

22        We had agreement on that.  Finally we got agreement

23  on that and we thought we had spent -- by this time now we're

24  into the first week of January.  We spent a lot of time going

25  back.  I know the letter from opposing counsel takes issue

1  with how long it took us to get them the names.  We were

2  taking to heart their comments.  We were taking to heart their

3  pushback, their concerns about privilege, their understanding

4  of a transcript and we were working collaboratively to try and

5  come up with something, but finally, first week of January, it

6  felt at last we had an understanding of what the universe of

7  discovery would be.

8        Then we started to get an understanding of what

9  they would produce.  I don't know why we spent all this time

10  to be honest because what we have gotten is proofs of claim

11  from the law firms.  We asked for them in native form.  We

12  haven't gotten them in native form from, at least, one of the

13  firms just produced the Omni version.  Others, I will

14  acknowledge, did give them a native form.  We got, other then

15  I think that is the common denominator, offers of proofs of

16  claim.

17        We have a blanket privilege universally of

18  communications with the claimants whether or not it was

19  attorney signed, or we got documents where everything is

20  redacted other than the two and from.  We have the

21  authorizations, you know, the original order was you may file

22  a claim if you are authorized to do so, so we asked for the

23  retainer agreements and authorizations.  We got either nothing

24  from certain firms, Krause & Kinsman, we got heavily redacted

25  versions.

1          We got exemplar, Eisenberg Rothweiler gave us one

2    exemplar.  Slater Slater Schulman gave us three documents, two

3    of them heavily redacted.  We have some firms gave us logs;

4    it's not a privilege log, but a log of like a contact of text,

5    text, email, text, text, email with dates.  I would be happy

6    to show you, but they're all kind of like highly privileged

7    and I know this is a fairly public hearing. So I don't want to

8    share my screen to show these things.

9          We have logs that don't provide almost at all

10   descriptions other than like the types of things, types of

11   communications.  I will acknowledge that some of the logs

12   provide more detail, but I cannot -- it is certain, to be

13   true, that we can't say that all of these firms are providing

14   the contents of these logs.

15          Then we got documents from some of the firms, but

16   not all, that describe themselves to be privilege logs.  Those

17   privilege logs often times had just -- some firms were more

18   like what traditional privilege log you might expect.  ASK and

19   Anderson Thornton had more traditional privilege logs.  Others

20   had group descriptions.  The Eisenberg Rothweiler privilege

21   log would have just a group description of a whole variety of

22   emails, calls, etc., described in one kind of paragraph; no

23   date of when any communications happened, for instance whether

24   it was before filing the proof of claim, no individuals by

25   name just various professionals at ER and/or client.  So it

1 says it's a privilege log, but it's not really usable as a

2 privilege log.  That is where we ended up.

3         That log, for the most part with exception of one

4 of the firms, those logs came in after we filed our motion.

5 The reason we filed our letter motion when we filed it was we

6 saw what was happening and we also saw the clock ticking down

7 to a hearing that is coming up.  We recalled Your Honor's

8 recommendation in the December hearing to come back to you if

9 we had problems.

10         Now understand from the letter response brief that

11 counsel was frustrated that we didn't wait longer to see the

12 privilege log.  You know, having seen it I'm glad we didn't,

13 but we had tried in our group zoom to get an answer of what

14 they would claim privilege, what would we receive.  We were at

15 an impasse and we needed your help.

16         So what I would like to talk to you today about is

17 about the two main objections that we got that are addressed

18 in my letter.

19         The first goes to responsiveness.  Now having seen

20 more we've gotten more production, more logs I think that -- I

21 think -- we might hear otherwise from counsel, but I think we

22 had actually gotten to an okay position on this one and that

23 is what is relevant here is the process of intake and process

24 of generation.  So I thought that we were at a dispute about

25 whether that could include claimant level inquiry, but now

1  looking at their production, even as limited as it is, it

2  appears they are not standing on that petition.  So that is

3  our understanding.

4         We get anything that lays out the process like

5  here's a roadmap, that would be responsive; documents that log

6  communications that kind of summarize what happened.  Then in

7  our view the communications themselves that reflect the intake

8  process would also be responsive.  Putting aside privilege,

9  those are responsive.  They show the generation of the claims.

10 The 60 claims we had narrowed down from thousands and

11 thousands to 60 per firm.

12        Then the heart of the dispute is the privilege

13 dispute.  I will stop.  I mean if Your Honor has any questions

14 up till then, otherwise, I will be happy to jump into what I

15 think is the big meat of our dispute as it relates to the

16 privilege.

17        THE COURT:  Let's hear that.

18        MS. MCNALLY:  Okay.  Now this is an issue that,

19 obviously, surprised no one.  We're all lawyers in this

20 conversation and we're all sensitive to the privilege and the

21 fundamental role it plays in our legal system.  We're not

22 being cavalier about this.  I mean I'd ask you to trust me,

23 you don't know me, but we are not being cavalier about the

24 privilege here.

25        Your Honor cautioned everyone privilege was going

1  to be an issue.  December 2nd you said, and we took to heart,

2  there could be a particular communication as opposed to

3  information.  You said information is not privileged.  It

4  might be privileged.  There might be.  There might be some

5  privileged communication, but then you said those are going to

6  have to be -- the privilege is going to have to be asserted if

7  it's a deposition, a question by question basis or if it's a

8  document on a document by document basis.

9        It's the communications that are privileged, not

10  facts.  That is what we were expecting that this was going to

11  have to be done at a granular level because we understand that

12  -- now we are talking about attorney/client communications,

13  not work product; the attorney client communications.  Here is

14  what we -- we don't assert that by signing a proof of claim

15  there is just a broad waiver of all client communications.  We

16  understand that that is not how it works.

17        If there is a request for legal advice, a provision

18  of legal advice in the sense of, well, you're in this state,

19  the statute of limitations is this or this is how strong I

20  think your case is or weak, or this is the elements of

21  negligence you have to prove.  Obviously that is not part of

22  this.  Well what happened is there was a memory in someone's

23  mind and there was a proof of claim filed by somebody else and

24  we believe that by that other person signing and attesting

25  there was a waiver as to that transmission of factual

1  information.

2          So there is a presumptive privilege for sure

3  between attorney and client, but in this case where the

4  communication was for purposes of submitting something to a

5  court that operates as a waiver.  This was discussed, and I

6  didn't put it in here because I didn't realize this was even a

7  controversial issue, it was in counsel's response letter,

8  interrogatory verifications aren't operating as a waiver.

9          Well in the Third Circuit in the Eastern District

10  of Pennsylvania there is a case called <u>Langer v. Presbyterian</u>

11  <u>Medical</u>.  I can give you the site if you would like, its 1995

12  Westlaw 79520.  In that case an in-house counsel verified

13  facts in interrogatory answers.  Then there was a deposition

14  of claim privilege.

15          The District Court there said it doesn't work that

16  way, that here Ms. Smith was being a factual witness

17  concerning factual issues and she cannot foreclose discovery

18  of the factual basis for her factual representations in the

19  affidavit anymore then she could take the witness stand and

20  testify on direct to the factual matters and then preclude

21  cross examination by invoking attorney/client privilege.  That

22  is exactly what we are trying to understand here, how is it

23  that we had factual attestations by counsel and not be able to

24  test their word for how it got there.

25          We have reason to have concern because there are

1  instances where we have found that clients were also signing

2  these for other firms.  There more than a couple where you --

3  and these are in our 60 where you had an attorney sign one and

4  you had a client sign one, the same client.  The client signed

5  one was right in the same time period, like within weeks,

6  months, and the attorney signed ones were more severe abuse,

7  more incidents, more severity.

8          So we have reason to be dubious of the generation

9  of how it came to be that these attorneys were attesting.

10  Nobody forced them to do it.  If they did it so they could get

11  the claim in before the bar date that has real consequences.

12  We learned in the Omni deposition last week that the one thing

13  they looked at to make sure a claimant could vote, the one

14  thing is that they had a proof of claim before the deadline.

15  So that -- those claims could have been filed after the

16  deadline, but they would have had to come to Your Honor, they

17  would have had to comply with the rules, state their good

18  cause for being late.

19          These counsel chose expediency, chose to put their

20  name on so it could be done beforehand so they wouldn't have

21  to come back to you and explain the reason for the delay, but

22  now we need to be able to ask them how those claims were

23  generated.  We understand that this whole analysis is not

24  going to translate to the claimant signed forms that smaller

25  percentage.  Those kind of have different issues.  It's the

1 attorney signed ones that we believe we should be entitled to

2 see the communications that are transmitting the facts that

3 show-up in the proofs of claim.

4          For those reasons, Your Honor, we would ask for a

5 ruling today that requires the firms to hand over all of the

6 engagement letters, privilege logs that explain the basis for

7 withholding claims on a document basis, as you mentioned, in

8 your original ruling.  There are other redactions that we see,

9 redactions for business purposes, but they don't want to tell

10 us the name of a form or they redacted the other referring law

11 firm and they don't want their -- there are other reasons

12 things are being redacted, we don't have a log to explain

13 those.  We probably can work them out, but we need some

14 guidance from Your Honor about what is inside and what is

15 outside the line.

16          The time is running short.  We are not asking for

17 more time, but we need to get things moving so that we can

18 review these and get these depositions done in events of the

19 confirmation hearing.  Thank you.

20          THE COURT:  Thank you.  So, Ms. McNally, what I am

21 hearing is you need un-redacted engagement letters and

22 privilege logs on a document by document basis?

23          MS. MCNALLY:  Yes.  And we need -- Your Honor, we

24 also need -- we have a big disagreement about what is

25 privileged.  In our view the communications that relate to

1  claims that were signed by counsel that are transmitting facts

2  are not -- have been waived.  That privilege as to the

3  communications transmitting facts that then are presented to a

4  court by counsel alone those -- we ask for a ruling that those

5  -- that as a waiver as to those communications and that those

6  be un-redacted and produced.

7           THE COURT:  Thank you.

8           Mr. Robbins.

9           MR. ROBBINS:  Good afternoon, Your Honor.  Larry

10 Robbins for the -- we represent A&T and ASK.  I have submitted

11 a letter on behalf of all the law firms.

12          My partner, Bill Trunk, who is on the line today,

13 Your Honor, handled most of the day to day back and forth with

14 the insurers on these issues.  So it was closer, I think, to

15 the details of the negotiations.  I might, with the court's

16 permission ask him to read off to provide his analysis and

17 then when he concludes I may just say a word or two in

18 conclusion if that pleases the court.

19          THE COURT:  That's fine.  Mr. Trunk.

20          MR. TRUNK:  Thank you, Your Honor.  Bill Trunk for

21 Andrews & Thornton and ASK.  I hope the audio is okay and

22 everyone can hear me.

23          Your Honor, I won't go back through the various

24 procedural history and whose fault it may be that we're

25 sitting here in January with discovery disputes in front of

1   us.  I want to get right to the heart of the matter.  In

2   closing Ms. McNally really articulated, as best as I could

3   tell, three requests.  The first is for un-redacted engagement

4   letters, the second for the document by document privilege

5   logs.

6           I am not going to speak to those things because

7   Andrews & Thornton and ASK have already done both of those

8   things. I think Ms. McNally acknowledged that.  So there may

9   be other lawyers on the line who may want to speak to those

10  two issues, but I want to talk just about the question of

11  privilege which I think is really the heart of the matter and

12  why we're here today.

13          Ms. McNally, you know, prefaced her comments by

14  saying that they, you know, understand privilege and are not

15  trying to be cavalier in their requests.  I would respectfully

16  submit that that is incorrect and that virtually everything

17  about their requests, both now as well as the prior two or

18  three times they made the same requests for core privileged

19  materials between attorneys and their clients, it is the

20  definition of cavalier.

21          There is no question, under the case law, that even

22  purely factual communications between lawyers and their

23  clients are quintessentially privileged.  You know, dating

24  back to the Supreme Court's decision in Upjohn, for example,

25  where the court acknowledged that there's a give and take

1   between lawyers and clients; lawyers provide the advice,

2   clients provide the facts.  It's not a one-way street.  The

3   factual communications themselves are privileged.

4          Ms. McNally -- it sounded to me like Ms. McNally is

5   making the same waiver argument that the insurers have made in

6   the past in which this court already rejected on December 2nd.

7   The insurers have previously argued that somehow by signing

8   these claim forms on behalf of their clients the lawyers

9   injected themselves into the proceeding in such a way as to

10  waive any underlying privilege.  The court rejected that

11  argument and held very clearly and quite sensibly that there

12  is a difference between factual work product on the one hand

13  and core opinion work product and attorney/client privilege on

14  the other.

15         Your Honor ordered that factual work product be

16  produced.  We have done that.  We have produced hundreds of

17  documents, speaking only for my two clients, reflecting purely

18  factual work products that we identified in the course of our

19  lengthy review of more than 15,000 documents.  We have

20  produced documents that reflect, you know, factual materials

21  gathered by lawyers, factual materials shared between lawyers

22  and clients even.

23         To the extent that the communication does not

24  reflect any request or furnishment of legal advice it's merely

25  a non-privileged factual document that is attached to an

1  email.  We produced it notwithstanding that in the normal

2  course, of course, even that would be privileged.  Here, Your

3  Honor held that factual work product should be turned over,

4  that is what we have done.

5          Conversely, we have, again, done a very cumbersome

6  review in the last week and a half since we received the

7  subsets that the insurers finally settled on.  We did a lot of

8  work.  It took a lot of time.  We produced, you know,

9  privilege logs that are several hundred entries long, document

10 by document laying out the type of privilege describing the

11 communication and in each instance the documents that we

12 withheld and we logged constitute core opinion work product,

13 attorney/client privilege communications or both.

14         These are substantive communications between

15 lawyers talking about the claims, talking about legal issues

16 with respect to the claims.  These are logs reflecting actual

17 communications between their lawyers and their clients.  I

18 spoke to claimant John Doe, he told me X.  It's all reflected

19 in a log.  Of course, that is sacrosanct.  That is

20 definitionally attorney/client privilege so we have withheld

21 it and we've logged it.

22         It's a little difficult to argue in a vacuum today

23 because, of course, this motion was filed before the insurers

24 even saw our privilege logs.  So it's a little difficult to

25 argue in a vacuum as to whether any particular line item in

1  our privilege log is, you know, close to the line and, you

2  know, maybe there is a reasonable argument to be made that

3  maybe it is not opinion work product, its purely factual work

4  product.

5          Those are the sorts of debates that attorneys have

6  in the normal course.  We are more than happy and ready to

7  have those sorts of good faith discussions with the insurers

8  if they, upon reviewing our privilege log, believe that we

9  have incorrectly designated something as privilege.  In the

10  meantime the bear assertion that as a categorical matter

11  factual communications are not privileged that is just not

12  correct.  It's not correct and it's not what Your Honor

13  ordered.

14          Last I want to speak briefly to this question of

15  waiver.  This argument, again, as I say, the insurers have

16  made this in the past so it's not a new argument, but this

17  notion that because the claim forms themselves became public

18  documents upon their filing that somehow that effected a

19  waiver with respect to underlying privilege communications

20  relating to those same facts.  That, again, is just

21  demonstrably incorrect.

22          There are cases, including in the District of

23  Delaware, rejecting precisely that argument including the

24  Bristol Myers case, the District of Delaware 1988 Westlaw,

25  147409, it was a patent infringement action.  There Bristol

1   Myers had moved for a preliminary injunction with respect to

2   the alleged infringement.  In furtherance of that motion for a

3   preliminary injunction Bristol Myers attorney attached an

4   affidavit signed by the attorney attesting to the

5   investigation that the attorney had done in order to reveal

6   that by the attorneys own admission this infringement was

7   going on.

8          So the attorney submitted the affidavit, signed it

9   under penalty of perjury and the other side turned around and

10  argued, well, now that the attorney has injected himself into

11  the proceeding he signed this affidavit, he has put these

12  facts into issue.  The underlying communications and the

13  underlying investigative facts are, therefore, no longer

14  privileged, that privilege has been waived.  The District of

15  Delaware rejected that argument.  The affidavit was not a

16  waiver of any underlying privilege; rather, the court held the

17  purpose of the affidavit was simply to demonstrate that the

18  plaintiff had a good faith basis for moving for a preliminary

19  injunction.

20         So to here, Your Honor, the proof of claim forms

21  that the attorneys signed at times and filed on their clients

22  behalf in order to preserve their rights those were filed

23  simply for the purpose of demonstrating that the clients have

24  a good faith basis to be claimants in this bankruptcy

25  proceeding.  The situation is not materially different, Your

1  Honor, from the Bristol Myers case.

2         There are other cases, Your Honor, and, again, I

3  apologize, its sort of hard to do this spontaneously because

4  we don't have a particular privilege dispute in front of us,

5  but there are ample other cases including from the bankruptcy

6  court in the Southern District of Georgia a case called In Re

7  Stoutamyer, 201 B.R. 592.

8         There the issue was whether publicly filed

9  bankruptcy disclosures that reflect facts, including facts

10 that were gleaned through work by attorneys together with

11 their clients.  There, again, the opposing party argued that

12 by filing this public disclosure document you have waived any

13 privilege with respect to the underlying facts and the

14 underlying communications.  The court there said no, of

15 course, that is not true.

16        It is true that, for example, the attorneys needed

17 to communicate with their clients in order to gather the facts

18 that ultimately made their way into these public disclosures.

19 That does not vitiate the privilege anymore then filing a

20 complaint for a verified set of interrogatory responses waives

21 underlying privileged communications.

22        We had another case, Your Honor.  I won't keep

23 trudging these out, but there is a third case also from the

24 District of Delaware, this one called Pfizer v. Ranbaxy

25 Laboratories, its at 2004 Westlaw 1376586; 2004 case, again,

1   in the District of Delaware.  This was a publicly filed patent

2   challenge application.

3          Here, again, same issue, opposing party argued that

4   because you placed into the public domain facts that were

5   gathered by attorneys together with their clients that the

6   underlying communications are no longer privileged, that that

7   privilege has been waived.  There, again, the court rejected

8   that argument and held that, of course, the underlying

9   communications between lawyers and their clients remain

10  privileged.

11         THE COURT:  I don't think that's the argument.  I

12  don't think the argument is that because you filed a paper in

13  the public domain that you've waived attorney-client

14  privilege.  I think the argument is that you signed a document

15  under penalty of perjury that has evidentiary status, okay?

16  That the code and rules give evidentiary status to, and that

17  is different than a declaration that somebody submits.

18  They're similar, but different.

19         So how do you deal with the evidentiary status that

20  is accorded a proof of claim that gives that proof of claim

21  *prima facie* validity that somebody has to rebut in an

22  objection?

23         MR. TRUNK:  It's a good and fair question, Your

24  Honor.  I would draw your attention to the Bristol Myers case

25  that I mentioned a moment ago because I think that that case

1   is actually on all fours.  That was an affidavit signed by the

2   attorney under penalty of perjury that was submitted for the

3   purpose of creating an evidentiary record to support a

4   preliminary injunction application.  It's, in truth, no

5   different from the proof of claim situation we're confronted

6   with here.

7          And, indeed, if you look at the Rodriguez case from

8   the Southern District of Texas that the insurers like to cite

9   so much, there Judge Isgur, he drew this -- precisely this

10  distinction that Your Honor is drawing, that a proof of claim

11  is somehow different because it is *prima facie* evidence,

12  unlike other documents that lawyers may sign on occasion, and

13  he analogized it to an affidavit.

14         So Bristol Myers is, I would respectfully submit,

15  irreconcilable with the Rodriguez case and with the

16  proposition advanced by the insurers that, by signing proofs

17  of claim on behalf of their clients, somehow all underlying

18  factual communications, even those that are at the very heart

19  of the attorney-client privilege, that those are somehow now

20  open for opposing counsel to rifle through.  I just think that

21  that's wrong; I think, to the extent that Rodriguez supports

22  that proposition, it's wrong; and, as I say, irreconcilable

23  with District of Delaware precedent.

24         THE COURT:  Well, I didn't base my conclusion based

25  on the Rodriguez case, but doesn't the signing of the proof of

1   claim, and perhaps the signing of the declaration, mean that

2   the lawyer is open to a deposition?

3           MR. TRUNK:  Well, Your Honor, I think that that is

4   certainly a fair reading of Rodriguez, that's plainly what the

5   court held there, and I won't quarrel too much with that

6   holding, not least because that's the holding that Your Honor

7   has issued.  You've ordered --

8           THE COURT:  Well, what's the Bristol Myers --

9           MR. TRUNK:  -- that the lawyers --

10          THE COURT:  -- what's the Bristol Myers --

11          MR. TRUNK:  I'm sorry?

12          THE COURT:  -- case say about that, or does it not?

13          MR. TRUNK:  The question in Bristol Myers was not

14  whether the lawyers can or cannot be deposed, it simply wasn't

15  presented there, the question was instead whether the

16  underlying communications -- there was a request for

17  production that was at issue there -- whether the underlying

18  communications ought to be turned over because the privilege

19  was waived.  So the question of whether a lawyer ought to be

20  deposed was not presented.

21          But, as I say, we are content and prepared to

22  follow Your Honor's ruling.  We have depositions starting

23  tomorrow morning, including one of my clients, who is prepared

24  to sit 10:00 a.m. tomorrow West Coast time.  And the insurers

25  can ask these questions that I think, if constructed

1  correctly, can get at what the insurers want without

2  encroaching on the most sacred of privileges, and allowing

3  them to rifle through communications between lawyers and their

4  sexual abuse victim clients.  If they want to ask questions,

5  as I'm sure they will, about what steps did you take to get

6  this claim, who did you speak with, how long did you speak to

7  that person, how many -- on how many occasions did you speak

8  directly with the claimant in question, these are all

9  questions that can get at basic facts that in the normal

10  course, again, may be factual work product, but here Your

11  Honor has ordered that the insurers can obtain factual work

12  product.

13         And so they should ask all these questions.

14  Looking through communications, you know, between the lawyers

15  and their clients, that's just a bridge too far under any case

16  law I'm aware of, even the Rodriguez case.

17         And so, Your Honor, I really think, particularly

18  given the calendar year -- and I heard Ms. McNally suggesting

19  that, you know, now that it's so late in the day, you know,

20  it's going to be difficult to get past some of these privilege

21  disputes -- first of all, since we don't actually have a

22  privilege dispute sitting here today, I would respectfully

23  submit that the best course of action would be to allow the

24  insurers to proceed, ask these factual questions of the

25  lawyers and, if it turns out that they come to believe that

1   we've incorrectly drawn the line, that we are objecting to

2   questions that are unobjectionable, or that any of the

3   hundreds of entries on our privilege log are misguided, we can

4   talk about that.

5           But as a -- you know, at a 30,000-foot level, we

6   just see the concept of privilege differently.  The insurers

7   are just wrong that purely factual communications under these

8   circumstances between lawyers and their clients are open for

9   business, I believe that that is -- not only is it

10  inconsistent with District of Delaware case law, but, as I

11  say, I don't think it can even be reconciled with the

12  Rodriguez decision, which in the end allowed the deposition

13  questions that I was alluding to, ones that can be asked in a

14  way that does not encroach upon attorney-client privilege, but

15  instead gets at the basic facts and the fact-gathering process

16  that the attorneys went through before filing these proofs of

17  claim.

18          THE COURT:  Okay.

19          MR. ROBBINS:  Your Honor, if I can just briefly add

20  one detail to Mr. Trunk's argument with -- and I'm not going

21  to repeat any of it, I obviously share his views on the legal

22  issues, but this -- I think it would be a mistake to lose

23  sight of the context in which these issues arise.

24          It is certainly true that the fact that a document

25  is ultimately submitted or signed by a lawyer doesn't vitiate

1  the underlying privilege, but imagine that you are a claimant

2  in this case, the people who actually hold the privilege.

3  These are men, some of them late in life, who have sustained

4  horrific abuse incidents.  They have not, in some cases -- in

5  many cases, they have not spoken to anyone, perhaps anyone at

6  all, least of all a lawyer whom they've never met before,

7  about these devastating events.  A lawyer is taking them

8  through their story, all facts, all things that Ms. McNally

9  would claim are merely facts.

10         They are things like this happened to me when I was

11 12, it was so-and-so who did it, it happened at camp, I could

12 feel the moisture going down my legs.  Facts.  Every one of

13 these things, facts; harsh, embarrassing, humiliating facts

14 that have been held half a lifetime or longer.  And they are

15 being provided to a lawyer so that that lawyer, he or she, can

16 provide them -- can fill out a claim.  And because the process

17 is difficult to begin with, made even more so by COVID

18 circumstances that forbid people from even meeting, these

19 clients give these intensely personal things, facts all, to

20 their lawyers, knowing that the lawyers will be filling out a

21 form and perhaps signing it on their behalf so it gets in by

22 the bar date.

23         The notion that these intensely personal

24 communications might have to be disclosed because a final

25 version of them, after vetting by the lawyers, will find their

1  way into a form, the notion that that would vitiate the

2  underlying privileged nature of these intensely personal

3  communications would assuredly chill these communications now

4  and forever, and, I respectfully suggest, put these clients in

5  the position of having their deepest, heartfelt trust

6  betrayed.

7           So this is not simply the application of black

8  letter rules, though it is surely that, it is also the

9  honoring of a commitment to men, many late in life, that their

10  trust will not be abrogated.  And that is what the insurers

11  are asking you to do and they're asking you to do it on no

12  record at all.  There's been no assertion of any given

13  individual -- no dispute over any given privilege entry, they

14  just want some broad ruling that the mere fact that lawyers

15  signed some of these forms and ultimately submitted a proof of

16  claim vitiates that trust.  And, I'll just tell you flat out,

17  it's inconsistent with all the law I know and it would be

18  disgraceful to do this.  And the insurers -- and I say this

19  with all respect to the lawyers on this call -- it is

20  disgraceful that they're even asking.

21           THE COURT:  Okay.  Thank you.

22           Here's what we're going to do, because I don't have

23  a specific dispute in front of me to rule on, I'm going to

24  permit the depositions to go forward and questions to be

25  asked.  And then, if there are questions that are not answered

1  or subsequently I determine, when I have a dispute in front of

2  me on specific documents, that documents should have been

3  produced, I will rule on those.  And I may require a further

4  deposition, but I need to have this in a particular context.

5        I do appreciate the personally intensive

6  communications.  I will suggest, however, that at some point,

7  whether it's in this context or another context, those facts

8  that underlie those personally intensive communications will

9  have to come forward and have to be put forward by a claimant

10 in order to make a claim.  So I recognize that.  I also

11 recognize the context in which this dispute came to me

12 initially, which is in the -- I won't say somewhat

13 unprecedented, but in the context of a tremendous

14 advertisement campaign to generate claims in this case.  So I

15 understand that context as well.

16        But I think I gave guidance before in terms of

17 we're talking about the process of intake, the process of

18 generation.  If it turns out, in fact, after depositions, that

19 that kind of information has been hampered by the failure to

20 provide certain documents, I'll deal with it in the context,

21 but I'm going to let the depositions -- I think the

22 depositions will inform us of what is necessary in this case.

23        So that's my ruling on the motion that's in front

24 of me.

25        Let's turn to the next matter on the agenda.

1            MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

2   again, Morris, Nichols, for the debtors.

3            The next item, Your Honor, is the adversary

4   proceeding and temporary restraining order motion filed by

5   Century.  So I'll turn the podium over to -- I believe Mr.

6   Schiavoni will probably handle that.

7            THE COURT:  Mr. Schiavoni?

8            MR. SCHIAVONI:  Yes.  Your Honor, this is Tancred

9   Schiavoni for Century.  Mary Beth Forshaw is on the line for

10  Chubb.  David Wilks is on the line, I believe, for Mr.

11  Kosnoff.

12           We believe we've reached an agreement with Mr.

13  Kosnoff through his lawyer, David Wilks, on the form of a

14  consent order, Your Honor, that would resolve the injunctive

15  form of relief that's before you today.  You know, because I

16  believe we've reached agreement on that form of order, I'm not

17  going to say much more, except that I want you to understand

18  that we took this matter extraordinarily seriously.  I am

19  extremely concerned about arguing this on a public record and

20  putting further in a public proceeding some of the substance

21  of some of what's been exchanged.  But I think we have a form

22  of order that, if Mr. Wilks will confirm it to you, we would

23  like to email it to you right away.

24           Your Honor, given the nature of this, if your

25  schedule permits and you're able to look at it for five

1  minutes before we resolve things today and tell us it's in an

2  acceptable form to Your Honor, we'll get signatures off to you

3  today on it, but I'd like -- if we could resolve it today,

4  that would be advantageous, I think, all the way around.

5          THE COURT:  Yes, it needs to be resolved today.  So

6  I would like the form of order emailed to chambers.  And, I

7  will say, I was quite concerned by what I read.

8          So, yes, I'd like to see what it is.

9          MR. SCHIAVONI:  So, Mr. Stamoulis, if you would

10  send it to chambers.

11          And, Your Honor, if Mr. Wilks would just confirm

12  that -- he'll be copied on the email, I think, just to make

13  sure that he's on the same page here with us.

14          THE COURT:  That's fine.

15          MR. WILKS:  Your Honor --

16          THE COURT:  What we'll do is we'll take ten

17  minutes.  Make sure that that gets to me, I have a chance to

18  take a look at it, Mr. Wilks confirms it, I'll decide what I

19  think needs to be on the record.  But we'll take ten minutes

20  for that.

21          We're in recess.

22      (Recess taken at 3:22 p.m.)

23      (Proceedings resumed at 3:32 p.m.)

24          THE COURT:  This is Judge Silverstein.  We're back

25  on the record.

1    (Pause)

2         THE COURT:  Okay.  I did receive the proposed

3    consent order.  And, I will say, it's consistent with the type

4    of order that I was prepared to enter today.  And so, if it's

5    consented to, I will enter the form as it is consented to.

6         I will note that I -- as I've already said, I was

7    very troubled by what I read in the submissions and -- the two

8    submissions, the adversary proceeding, as well as the letter

9    that I received today from debtors' counsel with respect to

10   the depositions.

11        I will note that I now consider Mr. Kosnoff as

12   having appeared in this case by virtue of his appearance at a

13   deposition, which is the way it works in Delaware; that Mr.

14   Kosnoff was probably improperly at the deposition because he

15   has not been admitted *pro hac*.  He also doesn't appear, in

16   what I saw, to be a participating party, or whatever the term

17   is, participating party, he's not on that list.  So I'm not

18   sure why he was attending at all.  And I take seriously the

19   averments that have been made and what was filed with respect

20   to his conduct.

21        I will note that I checked the Rules of

22   Professional Responsibility in Washington State where Mr.

23   Kosnoff is barred and, not surprisingly, they are the same, in

24   essence, as those in Delaware and in the Model Rules.

25        And, in particular, I believe it's Rule 4.4(a) and

1  8.4 that might be implicated.

2          And I'll also make note of a rather infamous case

3  in Delaware the Supreme Court decided in 1994, Paramount

4  Communications v. QVC Network, 637 A.2d 34, that also

5  addresses attorney misconduct at depositions.

6          I will note that I looked at other authority cited

7  in the complaint.  It's not something I'm particularly

8  familiar with, but it concerns me.

9  ** 2.     So, having said all of that, as I said, I am

10  content to enter the form of order that has been agreed to,

11  and then the parties can go from there with respect to the

12  actual complaint.

13          And I believe that the complaint was filed under

14  seal.  Please take a look at what portion can be publicly

15  filed and what should remain under seal, and see if there's a

16  redacted version that can be put on the docket, making certain

17  that any information in the complaint that should remain

18  private is redacted.

19          Any questions?

20          MR. WILKS:  No, Your Honor.

21          THE COURT:  Okay.  Then I will look for -- I notice

22  there's signature lines for Mr. Kosnoff and for you, Mr.

23  Wilks, on behalf of your law firm, and I will look for that.

24  And I will also sign it, so that it is an order from the

25  Court, and we will get it on the docket today.

1        MR. ABBOTT:  Your Honor, Derek Abbott.  May I be

2   heard briefly?

3        THE COURT:  Mr. Abbott.

4        MR. ABBOTT:  Thank you, Your Honor.

5        Your Honor, as you know, we did file a letter this

6   morning about Mr. Kosnoff's deposition conduct.  And, while we

7   were not a party to the adversary proceeding or the TRO

8   matter, we did have a chance to look at that order and, while

9   it provides some relief -- and I understand it's consensual

10  and appreciate the parties getting there -- Your Honor, we do

11  take this behavior quite seriously and are considering what

12  other relief we may seek, and we just wanted to make sure

13  that, while it's clear in the order that that right is

14  reserved, we wanted to note that for the Court.

15        THE COURT:  Yes, it's reserved.  And I would

16  include the conduct that was the subject of your letter this

17  morning as being barred and enjoined by this order.

18        MR. ABBOTT:  Thank you, Your Honor.

19        THE COURT:  Mr. Hallowell.

20        MR. HALLOWELL:  Your Honor, I have a procedural

21  question unrelated to the Kosnoff matter, is it okay to raise

22  that now?

23        THE COURT:  Yes.  I see other hands up.

24        Mr. Wilks?

25        MR. WILKS:  Yes.  Sorry, Your Honor, I was going to

1  say something before Mr. Abbott spoke, but I just wanted to

2  clarify for Your Honor, there's a line for Century and Chubb

3  to sign that order too, Your Honor.  So I just wanted Your

4  Honor to be mindful of that.  So there's going to be two

5  rounds of signatures before it hits Your Honor's desk, but we

6  will make sure that happens today.

7                    THE COURT:  Thank you.

8                    MR. WILKS:  That's all I had to add.

9                    THE COURT:  Thank you.

10                    I do see other hands up by parties who are not part

11  of this adversary proceeding.

12                    MR. SCHIAVONI:  Your Honor, these gentlemen are

13  represented by Mr. Kosnoff and, if they're going to speak, I

14  think they need -- they should speak through Mr. Kosnoff as

15  their lawyer.

16                    THE COURT:  I really would hesitate since you're

17  represented and I think you need to speak through your

18  lawyers.  You have lawyers, you are represented.  I will give

19  you some time to speak with Mr. Kosnoff.  We can take a

20  recess.  And, if Mr. Kosnoff wants to speak as your counsel, I

21  suppose he can.  But I hesitate to -- under these

22  circumstances to -- where Mr. Kosnoff is now the subject of a

23  consent order, I hesitate to permit his clients to say

24  something that maybe they think will be supportive, but may

25  not be.

1          But if you want to take a break and speak with Mr.
2   Kosnoff, I'm happy to have you do that.

3          So, Mr. Zinkand, would you like a break to speak
4   with Mr. Kosnoff?

5          MR. WILKS:  Tim, your mike is off.

6          MR. ZINKAND:  Yes.

7          THE COURT:  Okay.  Well, I'll certainly permit
8   that.

9          And before we take a break then, Mr. Hallowell, let
10  me hear your issue, then we will take a break.

11         MR. HALLOWELL:  Yes, Your Honor.  Thank you.  This
12  is Jim Hallowell for the AIG companies.

13         And, for planning purposes, we would like to know
14  if there's any further update rom the Court on whether the
15  February 22nd confirmation hearing will be in person.

16         THE COURT:  It's going forward.

17         MR. HALLOWELL:  But is it going forward in person?

18         THE COURT:  Oh, I'm sorry.  Probably not,
19  unfortunately, given where we are.

20         MR. HALLOWELL:  Thank you.  And can I just ask
21  quickly, going back to the law firm issue?  Mr. Trunk
22  mentioned that his client produced a detailed privilege log  -
23  - or a detailed log of communications to facilitate the
24  depositions, but not all of the law firms did and in fact I
25  believe his clients were the only ones.  Are you expecting a

 1  detailed log with to, from, date, and description of

 2  communication --

 3           THE COURT:  I am.

 4           MR. HALLOWELL:  -- for the -- to still take the

 5  depositions?

 6           THE COURT:  If there is a claim of privilege, I'm

 7  expecting a privilege log.

 8           MR. HALLOWELL:  And detailed in that fashion,

 9  correct, Your Honor?

10           THE COURT:  Detailed.

11           MR. HALLOWELL:  Thank you, Your Honor.

12           THE COURT:  Thank you.

13           Mr. Conaway?

14           MR. CONAWAY:  Your Honor, Mr. Trunk I do not

15  believe is still on the line, it would have been better, far

16  better to have this conversation when he was here, as well as

17  the other attorneys.  I will tell you that my own client,

18  Krause & Kinsman, did not produce one, in part by way of

19  agreement with the insurance counsel that was assigned to deal

20  with Krause & Kinsman, they surely didn't want it by today,

21  but when the motion to compel came up, my decision and

22  recommendation to them was to hold off until the Court made

23  its resolution clear today.

24           I have no idea whether the law firms involved in

25  this discovery dispute are on the phone, but to raise this now

1   after half of them are gone is inappropriate, at best, Your

2   Honor.

3           Thank you.

4           THE COURT:  Okay.  If there were agreements, then

5   there were agreements, and I'm not, you know, going to get in

6   the way of an agreement not to produce a log.

7           I will say -- and I said it on December 22nd --

8   time is not anybody's friend and you need to be assuming that

9   discovery is going to proceed.  But if there were agreements

10  made, certainly, that a log didn't need to be produced, then

11  it doesn't need to be produced and I'm not --

12          MR. CONAWAY:  No, Your Honor --

13          THE COURT:  -- changing that.

14          MR. CONAWAY:  Your Honor, if I might?  It was not

15  that a log would not be produced, we were told specifically to

16  get documents in hand first, which we did and we're still

17  doing.  The log was identified to us as a secondary issue.

18  When the motion was filed, however, my conclusion was that it

19  would be senseless to put together a log, which takes

20  tremendous effort, only to come to court and hear the Court

21  rule in a way that would vitiate whatever effort went into the

22  log.

23          So it's coming, it will be done, but, again, this

24  should have been raised when everybody else was on the phone.

25          THE COURT:  Okay, fair enough.  I hear the point.

1  Thank you.

2            Okay.  We are going to take a break so that parties

3  who want to speak with Mr. Kosnoff can do so.  It is now 3:45

4  Eastern time --

5            MR. TAYLOR:  Your Honor, if I may?  I'll save you

6  the time of the recess.  My name is Guy Taylor.  I've already

7  spoken with Mr. Kosnoff and it's under his recommendation that

8  we stand down at this time, and reconsider and reorganize what

9  we were planning on saying today.

10            THE COURT:  Okay.  Well, thank you.

11            Does anyone have something different than that?

12            MR. TURNER:  No, I was going to go with also what

13  Guy said, but did notice he raised his hand at the same time.

14            THE COURT:  Okay.  Thank you, Mr. Turner.  Okay.

15            MR. TAYLOR:  Thank you, Your Honor.

16            THE COURT:  Thank you.

17            MR. TURNER:  Thank you.

18            THE COURT:  Okay.  Then I believe we've covered

19  everything for today and we are adjourned.

20            COUNSEL:  Thank you, Your Honor.

21            THE COURT:  Thank you.

22       (Proceedings concluded at 3:46 p.m.)

23

24

25

1

2

CERTIFICATE

3

4          We certify that the foregoing is a correct transcript

5     from the electronic sound recording of the proceedings in the

6     above-entitled matter.

7     /s/Mary Zajaczkowski              January 24, 2022
      Mary Zajaczkowski, CET**D-531

8

9     /s/ Tracey J. Williams           January 24, 2022
      Tracey J. Williams, CET-914

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25