UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
| BOY SCOUTS OF AMERICA AND | . | Case No. 20-10343 (LSS) |
| DELAWARE BSA, LLC, | . |  |
|  | . | Courtroom No. 2 |
|  | . | 824 North Market Street |
|  | . | Wilmington, Delaware 19801 |
|  | . |  |
| Debtors. | . | Tuesday, February 1, 2022 |

. . . . . . . . . . . . . . . . .    2:00 P.M.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:          Derek Abbott, Esquire
                         MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                         1201 North Market Street, 16th Floor
                         Wilmington, Delaware 19899

                         - and -

                         Jessica C. Lauria, Esquire
                         Glenn Kurtz, Esquire
                         WHITE & CASE LLP
                         1221 Avenue of the Americas
                         New York, New York 10020


Audio Operator:          LaCrisha Harden

Transcription Company:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         (302)654-8080
                         Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

APPEARANCES (Cont'd):

For Century:                Tancred Schiavoni, Esquire
                            O'MELVENY & MYERS LLP
                            Times Square Tower
                            7 Times Square
                            New York, New York 10036

For Chubb:                  Mary Beth Forshaw, Esquire
                            SIMPSON THACHER & BARTLETT LLP
                            425 Lexington Avenue
                            New York, New York 10017

For the U.S. Trustee:       David Buchbinder, Esquire
                            UNITED STATES DEPARTMENT OF JUSTICE
                            OFFICE OF THE UNITED STATES TRUSTEE
                            844 King Street, Suite 2207
                            Lockbox 35
                            Wilmington, Delaware 19801

For Zurich Insurers:        Mark Plevin, Esquire
                            CROWELL & MORING LLP
                            3 Embarcadero Center, 26th Floor
                            San Francisco, California 94111

For Hartford:               James Ruggeri, Esquire
                            SHIPMAN & GOODWIN LLP
                            1875 K Street NW, Suite 600
                            Washington, DC 20006

For the United Methodist    Jeremy Ryan, Esquire
and Roman Catholic Ad       POTTER ANDERSON & CORROON LLP
Hoc Committee:              Hercules Plaza
                            1313 North Market Street, 6th Floor
                            P.O. Box 951
                            Wilmington, Delaware 19801

For Defendants:             Louis Rizzo, Jr., Esquire
                            REGER RIZZO & DARNALL LLP
                            1521 Concord Pike, Suite 305
                            Brandywine Plaza West
                            Wilmington, Delaware 19803

For the Tort Claimants      Jeffrey Schulman, Esquire
Committee:                  PASICH LLP
                            286 Madison Avenue, Suite 401
                            New York, New York 10017

1   <u>MATTERS GOING FORWARD</u>:

2   1. Motion of Catholic Mutual Relief Society and the Roman
3   Catholic Ad Hoc Committee (1) For Protective Order Regarding
    Century Indemnity Company's Subpoena to Catholic Mutual; and
4   (2) to Quash the Debtors' 30(b)(6) Deposition Notice to the
    Roman Catholic Ad Hoc Committee (D.I. 8209, filed 01/07/22)

5
    2. Letter to the Honorable Chief Judge Laurie Selber
6   Silverstein regarding Hartford's Motion to Quash 30(b)(6)
    Deposition Notices (D.I. 8455, filed 01/24/22)

7
    3. Zurich Insurers' Letter to the Honorable Chief Judge Laurie
8   Selber Silverstein Regarding Zurich's Motion to Quash and/or
    Limit the RCAHCs Rule 30(b)(6) Deposition Notice to Zurich
9   (D.I. 8497, filed 01/25/22)

10  4. Zurich Insurers' Letter to the Honorable Chief Judge Laurie
    Selber Silverstein Regarding Zurich's Motion to Compel the
11  RCAHC to Produce Documents and Respond to Interrogatories
    (D.I. 8498, filed 01/25/22)
12
13  5. [SEALED] Motion of the Roman Catholic Ad Hoc Committee to
    Compel the Rule 30(b)(6) Depositions of (I) the Debtors, (II)
14  Century, (III) Chubb, (IV) Hartford, and (V) Zurich (D.I.
    8500, filed 01/25/22)
15
16  6. Letter to the Honorable Chief Judge Laurie Selber
    Silverstein Regarding Zurich's Motion to Quash and/or Limit
17  the TCC's Rule 30(b)(6) Deposition Notice to Zurich (D.I.
    8544, filed 01/28/22)
18
19  7. Letter to the Honorable Chief Judge Laurie Selber
    Silverstein Regarding Zurich's Motion to Compel the TCC to
20  Produce Documents and Respond to Interrogatories (D.I. 8545,
    filed 01/27/22)
21
22  8. Letter to the Honorable Chief Judge Laurie Selber
    Silverstein on Behalf of Century Indemnity Objecting to The
23  Roman Catholic Ad Hoc Committees Motion to Quash and Century's
    Motion to Compel the Roman Catholic Ad Hoc Committee to Comply
    With Rule 2019 (D.I. 8332, filed 01/14/22)

24      **Court's Ruling:  Ruling Deferred**

25

9. Motion for Entry of an Order Authorizing the Roman Catholic Ad Hoc Committee to Seal Exhibits to Motion to Compel (D.I. 8563, filed 01/28/22)

**Court's Ruling:  Motion Granted**

1

2          (Proceedings commence at 2:04 p.m.)

3               THE COURT:  Good afternoon, counsel.  This is Judge

4    Silverstein.  We're here in the Boy Scouts of America

5    bankruptcy, Case 20-10343.

6               I will turn it over to debtor's counsel.

7               MR. ABBOTT:  Good afternoon, Your Honor.  Derek

8    Abbott of Morris Nichols here for the debtors.

9               Your Honor, I will pass the baton to Ms. Lauria, I

10   think, who will give you a quick update before we get to the

11   numbered items on the agenda.

12              THE COURT:  Thank you.

13              Ms. Lauria.

14              MS. LAURIA:  Thank you, Your Honor. Jessica Lauria,

15   White & Case, on behalf of the debtors.

16              Your Honor, I am going to be very brief today.  We

17   have been authorized by the mediator to provide the court with

18   a very short summary of where we're at in connection with the

19   mediation.  So I have a statement that I understand has been

20   run by the mediator as well as counsel for the TCC and perhaps

21   other mediation parties.

22              In short, Your Honor, the parties have been working

23   around the clock to achieve additional survivor support for

24   the plan.  That includes nearly constant mediation sessions

25   with the ad hoc committee of local councils, the TCC, the

1  coalition, he FCR, certain objecting plaintiff groups and

2  certain insurers and chartered organizations.

3          We are pleased to report, Your Honor, that

4  significant progress has been made in an effort to close the

5  gap on the open issues between the parties.  We are, of

6  course, going to keep you informed, Your Honor, of our

7  additional progress including potentially updates later this

8  week.  And while I am, of course, always happy to answer any

9  of your questions at the request of the mediator we have all

10  collectively agreed to limit our comments to the ones that I

11  just made.

12          Thank you, Your Honor.

13          THE COURT:  Very good.  I don't have any questions.

14  Thank you.

15          MR. ABBOTT:  Your Honor, Item No. 1 on the agenda

16  is the motion of the Catholic Mutual Relief Society and Roman

17  Catholic Ad Hoc Committee for a protective order and to quash.

18  Your Honor, that appears at Docket No. 8209.  I will turn the

19  podium over to Mr. Ryan, I suppose.

20          THE COURT:  Mr. Ryan.

21          MR. RYAN:  Good afternoon, Your Honor.  Jeremy Ryan

22  on behalf of Catholic Mutual and the Roman Catholic Ad Hoc

23  Committee.

24          Your Honor, it is our motion for protective order

25  that has started this off.  We filed that as a way of

1  protection from discovery that we thought should have been

2  taken long ago when plan discovery got under way.  And we also

3  think it is irrelevant to confirmation. That went to

4  governments of the committee, Catholic Mutual's own plan

5  files, voting related discovery; although Class 9 is an

6  accepting class and then, of course, my firm's representation,

7  continued representation, of the Catholic committee following

8  the Methodist settlement.

9         Obviously, Your Honor, with Century's cross motion

10  on the Rule 2019 issues, and our reply, and what they filed

11  yesterday has certainly morphed into something larger than

12  just a motion for protective order and motion to quash.  We do

13  have a technical 2019 compliance issues.  Really, Your Honor,

14  what I think parties want to discuss is the fundamental

15  questions of does the Roman Catholic Ad Hoc Committee have

16  standing, and what does that standing mean in this case, and

17  are they required to bind all Roman Catholic entities.

18         So we can take these orders, Your Honor; these

19  issues in any order, Your Honor, you want.  I think our time

20  is probably better spent listening to you then making long

21  presentations.  I would suggest that for the technical 2019

22  compliance we filed a fairly detailed chart with our reply

23  last night that sets through why we believe we have complied

24  with the rule.  If you have technical questions on that chart

25  in compliance we're happy to answer those.  If not we will

1   take the issues that are subsumed in this motion in any order

2   Your Honor wants.

3           THE COURT:  I don't have questions about the chart,

4   but I guess I want to make sure I understand the context in

5   which everyone is proceeding.  I want to make sure I

6   understand the Roman Catholic Ad Hoc Committee's positions on

7   matters.

8           I pulled the 2019 that was filed and I understand

9   the committee's position that it is acting as an ad hoc

10  committee, that its members are those that are on Exhibit A to

11  the Rule 2019 statement, that that includes the Catholic

12  Mutual Relief Society of America and looks like 12 either

13  dioceses or archdiocese, individual dioceses or archdioceses,

14  as listed.  And the position the committee is taking that it

15  acts as a committee, but it's not binding any of its

16  individual members.

17          Have I got all of that correct?

18          MR. RYAN:  That is correct, Your Honor.  We do not

19  have the power to bind any individual diocese, archdiocese, or

20  parish churches that are (indiscernible).

21          THE COURT:  Okay.  When taking discovery then, qua

22  the committee, has the committee, meaning its members, I

23  guess, all agreed to the discovery that is being taken and the

24  responses that are filed to discovery?

25          MR. RYAN:  Your Honor, I don't believe we have

1  objected.  We had not answered interrogatories, but we have

2  committee authority for the positions we've taken with respect

3  to discovery and the positions we have taken in court.

4       THE COURT:  Okay.  Let me hear from people who have

5  filed something on this motion and find the Rule 2019

6  disclosure to be deficient.

7       Mr. Kurtz, I see your hand.  So let me start with

8  you.

9       MR. KURTZ:  Thank you, Your Honor.  Glenn Kurtz

10 from White & Case on behalf of the debtors.

11      I think I agree with Mr. Ryan and how he is trying

12 to tee this up.  I guess there is, kind of, a standing issue,

13 but more importantly it's really a matter of who is bound by

14 the committee's actions in the case.  We're not saying that

15 the ad hoc committee lacks standing to be heard here, but the

16 ad hoc committee is an informal non-juridical entity that does

17 nothing more than pull the Roman Catholic entities that are

18 the parties in interest.  They are not a separate entity that

19 alone or independently would constitute a party in interest.

20      Consequently, whatever they do they do for all of

21 their members.  Your Honor might want to look at Judge

22 Walrath's opinion in WaMu, but I don't see how that can be

23 disputed in any way.  So when the ad hoc committee objects to

24 the plan that has consequences to every member of that

25 committee and specifically the consequences they then become

1  an opt-out chartered organization which means they don't get

2  the benefit of certain plan treatment.

3          And so what we're getting here is, sort of, this

4  little cute idea that maybe the Roman Catholic entities that

5  are the only actual parties in interest don't really want to

6  object because they do want to take advantage of the plan

7  treatment, but can they somehow object through this non-

8  juridical entity, this informal association of an ad hoc

9  committee, and they can't.  I mean they can object, but then

10  they get treated as objectors.

11          A single party in interest can't split their

12  standing so that they can take two different positions in the

13  case.  One where they don't object so that they get the

14  advantage of the plan treatment for parties that don't object

15  and another where they do object which would disqualify them

16  from obtaining that plan consideration.

17          So I don't see how -- standing comes up, I guess,

18  in one way I will comment on further.  As it relates to today

19  in discovery Your Honor correctly observed then in the 2019

20  there is a disclosure that there are 13 members of the ad hoc

21  committee, the Roman Catholic Ad Hoc Committee, but it also

22  says, if you read it with some care, that it picks up their

23  related or relative chartered organizations; I think that's in

24  Paragraph 5.  That is presumably a very, very significant

25  number of churches.  Those would be the chartered

1  organizations.

2       So what we don't know and what we need to know is

3  who makes up the ad hoc committee because if it is the 13

4  dioceses alone, and the 13 diocese alone that are electing to

5  be opt-out chartered organizations under the plan by reason of

6  filing an objection, but if it is also the churches underneath

7  them then it's all of them as well.  The debtors need to know,

8  the court needs to know, future courts need to know, everyone

9  needs to know who is getting the channeling injunction.  What

10  claims are channeled and what claims are not channeled.

11       So that is why we need the information relating to

12  the composition of the ad hoc committee.  The only way this

13  turns into a standing issue, at least in the debtor's

14  judgment, is if there are no Roman Catholic entities, actual

15  chartered organizations that would elect to object given that

16  an objection would render them an opt-out chartered

17  organization that doesn't receive the benefit of a channeling

18  injunction in which case the ad hoc committee represents no

19  parties in interest and counsel won't be permitted to object

20  or litigate either for sport or on their own account.

21       So maybe everybody needs some information.  We need

22  it because we need to know who is opting out.  This court and

23  every other court in the future needs to know what claims are

24  channeled and perhaps even the chartered organizations, the

25  Roman Catholic Chartered Organizations, need to understand

1  this so they can make an informed election as to whether they

2  want to participate in the plan or not.  What they don't get

3  to do is have their cake and eat it too.

4        THE COURT:  Okay. So I picked up on the opt-out

5  issue relative to the committee and committee membership.  I

6  am no sure, which is what I think you're saying, it's a

7  standing issue.  I think each of the charted organizations if,

8  in fact, archdiocese or diocese themselves are chartered

9  organizations as opposed to specific churches within a diocese

10 or an archdiocese, but each chartered organization would have

11 standing to object, to vote, to opt-out, to do -- assuming if

12 they filed a proof of claim to vote.

13        You know, to take whatever position they want to

14 take in front of the court as would the catholic mutual

15 release society if it, in fact, is a creditor or, otherwise,

16 has standing as a party in interest could take it

17 individually.  That is my take on it from reading everything.

18 They each individually have standing or not based on their

19 particular circumstances.  They could each file an objection

20 or not, again, based on their particular circumstances.

21        So the issue of whether they can act as a group and

22 the effect of acting as a group, I think, is a little bit

23 different issue.  The question, though, of knowing who the

24 group is, I think, is a legitimate question, a legitimate

25 issue for 2019 purposes if for no other reason.

1          MR. KURTZ:  Right.  Your Honor, you have it right.

2   It's not a standing issue because they, basically, have

3   representative or derivative standing.  The committee has the

4   standing of its members, but it has no independent standing.

5   So whatever it does it does in a representative capacity on

6   behalf of members and members are bound by it.  If members

7   don't want to be bound by it if they don't agree then they

8   leave the committee.

9          I think that's how it works in all cases.  I think

10  that is how it was observed in WaMu.  I think that is the only

11  way it can work because there is no other capacity; otherwise,

12  sort of, by analogy claims split you're taking somebody who

13  says I'm an independent party in interest and as Your Honor

14  observed I can vote any way I want and I can object or not

15  object.  Then somehow they cloaked themselves with a second

16  capacity that they don't enjoy which is within some sort of

17  non-juridical artificial entity lose affiliation of an ad hoc

18  committee.

19         The ad hoc committee only acts through the parties

20  in interest.  If they didn't represent a party in interest

21  they can't be in the case.  If they represent parties in

22  interest than they are speaking for those parties in interest.

23  They don't have an independent ability to speak.

24         So the only way this turns itself into standing is

25  if no one remains in the ad hoc committee because the

1  committee is intent on objecting and the members are not. If

2  they keep people who want to object and they can mount their

3  litigation, they can make their objections and there will be

4  opt-out chartered organizations, but every single party, every

5  single member of that committee will have been deemed under

6  our plan to have been an opt-out chartered organization.

7          Maybe one other way to say this, Your Honor, and

8  make it even clearer this is a contract issue anyway and I

9  think as a matter of the way ad hoc committee's work in

10 bankruptcy works exactly the way I am describing, but it is

11 certainly the intent of the parties to the plan to treat the

12 objecting chartered organizations as opt-out chartered

13 organizations whether they do so individually or whether they

14 do so as part of an ad hoc group.

15         If there is any ambiguity about that I am hereby

16 clarifying that ambiguity.  If for some reason that needs to

17 find its way into a plan amendment it will, but there is no

18 way that chartered organizations get to object and then take

19 advantage of the benefits they get if they choose not to

20 object.  They can't have their cake and they can't eat it too.

21         THE COURT:  So I understand that issue.  I think

22 it's -- I don't know that it's unique.  I think that it's

23 coming up in a unique posture in this case because of the plan

24 and the way it's structured because in this case I have other

25 ad hoc committees who are also telling me they cannot bind

1 | their particular constituencies to a position.  And when they
2 | sign something they often say I'm using my best -- I will use
3 | my best efforts to get so and so; you know, my constituency to
4 | do X, Y or Z.
5 |         So I do have some ad hoc committees who don't
6 | strictly follow Judge Walrath's decision in WaMu about, you
7 | know, agree or get off.  So --
8 |         MR. KURTZ:  I do have -- I would make an
9 | observation about that because I too have experience where
10 | either official committees or ad hoc committees don't have the
11 | power to bind individual members.  I think you can, perhaps,
12 | create an ad hoc group where you give certain powers and you
13 | don't give certain powers, but here Your Honor observed its
14 | unique circumstances.  Here chartered organizations have to
15 | make an election.  They have to either object or not.
16 |         So, sure, they can say that the ad hoc committee
17 | doesn't have the authority to bind me and, therefore, I won't
18 | object, but someone has to instruct that committee.  So
19 | whoever is instructing the committee is an objecting party and
20 | everybody else, I believe, is dragged along for the ride or
21 | they should exit.  What I don't think they get to do is sit in
22 | a committee and take advantage of an objection while
23 | simultaneously trying to take advantage of plan treatment that
24 | is available only if they don't object.  It's too cute by
25 | half.

1          THE COURT:  I understand that position.  I will

2    certainly let Mr. Ryan respond to it at a point.

3          Mr. Schiavoni.

4          MR. SCHIAVONI:  Your Honor, Tank Schiavoni for

5    Century.

6          I do think, Your Honor, there are some other issues

7    in play here that merit giving this a little bit closer look

8    then I think what Mr. Ryan has suggested.  And if I could just

9    take one step back here and just talk for a moment just about

10   what this committee is.

11         In the first instance in this case Catholic Mutual

12   made an appearance in this action.  Catholic Mutual made that

13   appearance represented by Schiff Hardin.  Schiff Hardin is a

14   long-time coverage counsel in many actions across the country

15   and has represented Catholic Mutual for many years.  Catholic

16   Mutual is not a "Catholic" entity, it's not a charity, and

17   it's an insurance company.  Straight out its all the form that

18   takes place here.

19         Six months after Catholic Mutual appeared in

20   October, I think actually longer than six months, of 2020 this

21   committee was presented to us.  It was created by Schiff

22   Hardin.  It was -- it is not represented by Schiff Hardin.

23   The Schiff Hardin committee has had at that time common

24   Delaware counsel with the Methodist Committee which was Potter

25   Anderson.  There was a key distinction between these two

1   committees.

2          The Methodist Committee was, like the Catholic

3   Committee, made up of Methodist individual churches.  They

4   don't call themselves diocese, they call themselves, sort of,

5   I think, counsels or conferences, but structurally the same

6   except they didn't have among their members an insurance

7   company.  The insurance company's interests are very, very

8   different from the diocesan interests and the individual

9   churches interests or, you know, I could talk about

10  conferences and churches in connection with the Methodists.

11          Under this plan the plan delivers very significant

12  benefits to the diocese and the individual churches that they

13  get even if they opt-out of the plan in their entirety.

14  Catholic Mutual, he insurance company, is in a totally

15  different situation in evaluating that plan.  Catholic Mutual

16  is only in the capacity as a payor.  It isn't in the capacity

17  of getting, you know, a full release.  It's left with paying

18  amounts that are not, otherwise, insured by settled insurers.

19          Who is purportedly on the committee or are members

20  here.  There is over 190 diocese in the United States.  There

21  is, you know, somewhere in the neighborhood of 10 or 12

22  diocese associated here, but, otherwise, the chair of the

23  committee is Catholic Mutual and its counsel is long time

24  Catholic Mutual counsel.

25          With respect to the committee itself what the rule

1   requires is very straight-forward, its 2019(c)(4), it requires

2   the production of the instrument, or instruments, or

3   agreements that authorized the committee to speak on behalf of

4   its members.  It's not -- its liked this is a rule that this

5   court has applied, but not just this court, but Federal-Mogul

6   and other courts have applied to require that the instrument

7   that sets out what their authority is to actually speak on

8   behalf of the members is before all the parties so everyone

9   can see the conflict waivers, how the parties are informed of

10  conflict waivers in connection with them and then the specific

11  authority that the parties are granted.

12        Here, in a context where the chair and the forming

13  group, you know, creating the committee are in conflict with

14  its members with regard to the plan.  I think that is

15  particularly important that that be before the court and that

16  be before the parties so everyone knows who they are dealing

17  with and under what circumstances they are dealing with them,

18  but also absolutely critically that we know on an issue by

19  issue basis what authority the committee has to, in fact, act

20  on an issue by issue basis.

21        We asked for that instrument.  It's not been

22  produced.  We were given some bylaws under "settlement

23  confidentiality" which I am not able to discuss.  It's like

24  that rule needs to be complied with so we can actually have a

25  real discussion here and a real argument about how the

1  authority issues play themselves out.

2        The other aspect of the rule that applies is in

3  29(c).  It's very basic and I think counsel may have eluded to

4  it just a moment ago is that one has to disclose the actual

5  members, okay.  Now this is, sort of, stated that its

6  disclosed with respect to these 10 or 12 diocese, but the

7  issues, sort of, morphed into something a little different

8  through the 2019 statement which asserts that Catholic Mutual,

9  its private insurance company, is invoking its membership not

10 on its individual basis, but on the basis of diocese that it

11 claims to have written policies to.  So we asked for that.  We

12 asked that that be disclosed as part of this and that those

13 authorizing documents be provided.

14       What makes this all doubly critical is we served --

15 when we got -- when this discovery came into us from this

16 entity that's been formed by Catholic Mutual and it was on an

17 unprecedented scale.  We received, right before New Year's

18 Eve, 827 requests for admission.  In totality the committee

19 was used by Catholic Mutual as a vehicle to propound, we

20 believe, over 2,000 discovery requests on multiple parties.

21 In addition, the request for admission we got interrogatories

22 and RFA's.

23       I was asked by my client who is this group that's

24 purporting to serve such discovery.  You know, what is their

25 authority to act.  So we served requests for admission, very

1  basic requests for admission that asked them what their

2  authority was to act.  Specifically, its authority to act with

3  regard to serving us with all this discovery because among

4  other things, Your Honor, it struck us as very strange that

5  Catholic Mutual Insurance Company would be serving discovery

6  requiring the diocese to produce all their insurance policies

7  to the plaintiff's bar.  That seemed odd, it seemed unusual.

8              The responses we got back to the request for

9  admission are unequivocal.  They state in absolute terms that

10  the committee does not have authority to speak on behalf of

11  its members.  It doesn't say it has authority to speak on some

12  issues and not others; it says, just bottom line, it does not

13  have authority to speak on behalf of its members.

14              In that context, in the context of that kind of

15  request, that type of response to a request for admission,

16  having compliance with basic elements of the rule such as

17  requiring that the instrument or instruments, agreements that

18  set out what the authority is to be produced becomes

19  particularly important.

20              I mean one could argue here, and I was going to

21  argue it, basically, is that the court need not look beyond

22  this.  This basically puts us in a position where we have a

23  party before the court, it says that it doesn't have the

24  ability to bind its members on anything, asking for relief

25  from the court which, you know, implicates very basic issues

1   like are we dealing with just purely advisory decisions here

2   on issues on which a party that is propounding discovery

3   doesn't have authority to pursue it.

4          It also implicates like basic, you know, issues

5   here about what of this discovery really makes sense.  It's

6   like do we have the propounding party really having authority

7   on behalf of the diocese to request that all their information

8   be produced.  We have some information on some diocese that we

9   have obtained through confidentiality orders.  The ones in

10  bankruptcy aren't particularly -- don't particularly fall into

11  group where there are confidentiality orders in place.

12         We have reached out in certain circumstances to

13  some of these diocese and asked is this committee acting on

14  your behalf.  We have attached, you know, at least one email

15  from one of them coming back saying, no, they're not.  So this

16  issue is really a threshold issue.  The notion that this

17  committee which has not represented -- I heard from Mr. Ryan

18  just a moment ago that they, in fact, have authority to pursue

19  the discovery they pursued.  We have been seeking from them --

20  there is nothing in the record to support that.  We have been

21  seeking from them the document and instrument in accord with

22  29(a)(4) that would set that out over a matter of weeks now,

23  probably over a month since before the new year and haven't

24  gotten it.

25         I don't think -- as much as I hold Mr. Ryan in

1  tremendous respect that just the hearsay statement along those

2  lines can stand especially when it's an issue of particularity

3  even among the members which ones they have authority to

4  produce documents on behalf of.  So, Your Honor, I don't think

5  that they have met their threshold burden here of just basic

6  compliance with the rule to go forward with this type of

7  volume of discovery.

8         I don't think Your Honor needs to take on the issue

9  today as one of standing, it's what the rule requires.  Rule

10  2019(e) is that one shouldn't be heard until they have made

11  these basic submissions on other issues in the case.  And we

12  would ask, you know, as a result that we just adjourn this

13  until they provide this basic level of compliance.

14         I will add it goes to another issue that we will

15  address if Your Honor wants to go on from here, but that

16  whether or not the discovery that has been propounded is

17  proportionate to the needs of the case.  This issue, sort of,

18  separately addresses that that we have a committee that can't

19  say whether its bound its individual members serving massive

20  volumes of discovery, (indiscernible) volumes of discovery for

21  which we're unable to find in the District of Delaware any

22  authority finding that this volume of discovery is within the

23  proportionate needs of any case and at the same time

24  maintaining that they don't have authority to -- they don't

25  have any proven authority to issue the discovery.  That is

1 something that we think you ought to be able to take into

2 account in connection with assessing the proportionality of

3 the discovery.

4      So I do agree with what Mr. Kurtz had to say that

5 the committee -- and I think Mr. Ryan agrees with this too

6 that the committee individually may have standing on

7 particular issues if it, in fact, has authority on those

8 issues, but if it doesn't and here we have RFA's broadly

9 asserting that it doesn't have authority, it doesn't have

10 authority to be heard.

11      Thank you, Your Honor.

12      THE COURT:  Thank you.  That raises all kinds of

13 issues.  You know, the first one is who gets to decide the

14 composition of a committee and I think nobody cited me to

15 anything that says the committee can't decide the composition

16 of the committee.  So I want to hear a response on that, but

17 if -- and then with respect to the instrument authorizing the

18 entity group or committee to act on behalf of its members

19 there is a qualification, a copy of the instrument if any.  So

20 we need to talk about that.

21      Is there a difference between being able to bind

22 your members versus being able to speak on behalf of them?

23 There is, at least, three issues there that pop-out to me with

24 respect to this committee that I need to understand more

25 about.

1        Mr. Schiavoni, where is the authority that says

2   that someone other than the committee gets to decide if the

3   committee wants to work together in a bankruptcy case.  They

4   may have some divergent interest, but they also may have

5   interests on which they act in common.

6        MR. SCHIAVONI:  Your Honor, I don't have at hand

7   authority to give you right this second to say that the court

8   could, on its own, find that the composition of a committee

9   doesn't have sufficient commonality to go forward, but we have

10  put before Your Honor authority on prior rounds on the 2019

11  motions with the claimants that go to the -- that point out --

12  these were cases that pointed out the importance of the

13  instrument disclosure so that a determination could be made

14  whether or not the committees were going forward on a conflict

15  basis or not, whether they had appropriate waivers or not.

16       Those cases were cited in connection with our prior

17  2019 submissions and it was one of the specific issues that

18  those cases talk about is this is one of the underlying

19  purposes of 2019 to flush-out those very kinds of issues and -

20  -

21       THE COURT:  Actually I meant to raise the conflict

22  issue.  That is another issue, but I pulled my ruling on 2019

23  before to re-familiarize myself with 2019 which I said is a

24  disclosure rule.  That is what it is meant for, it's a

25  disclosure rule so that parties are aware -- others are aware

1  of who they are negotiating with, who is taking a position,

2  etc.  I don't think there is anything in my ruling that deals

3  with conflicts among committee members.  I am not sure that

4  that is an issue that --

5          MR. SCHIAVONI:  There isn't, Your Honor.

6          THE COURT:  -- the court gets involved in as

7  opposed to making certain that there is disclosure as to who

8  is on a committee so that we know where they are coming from

9  when they are asserting objections or taking positions.

10         MR. SCHIAVONI:  Your Honor, if you remember the

11 context in which that came out is that I think we were raising

12 issues about whether or not the 2019 should be accepted

13 because there were conflicts.  I think we put in even an

14 ethics person; you know, an affidavit from an ethics person.

15         I think what Your Honor held in connection with

16 that was that Your Honor, as I understood the ruling, only had

17 before you at that time a motion to bring about compliance

18 with 2019.  And that 2019 is a disclosure vehicle and that

19 information should be provided.

20         What we were citing to Your Honor at that time were

21 cases that were saying among the purposes of the rule was to

22 flush-out this information.  That is not inconsistent in any

23 regard with someone bringing a subsequent motion on the

24 information before the court if they have standing to raise

25 that conflict issue.

1          Rule 2019 by itself is just a disclosure vehicle.

2    That is all that is required.  It doesn't include in it

3    provisions that say that the court -- that set out policing

4    provisions in it.  Like every other conflict issue that might

5    present itself to the court it's like once that information is

6    before the parties the parties would have the information to

7    be able to address it.  We don't have that information right

8    now.

9          You know, we haven't put before the court any

10   conflict issue, but we're entitled to get the information to

11   raise that. I do think with regard to the Catholic Mutual

12   involvement the very nature of that involvement is one that

13   brings about, sort of, heightened reasoning in support of why

14   we ought to have the disclosures here so that its clear what

15   the parties respective -- you know, how this committee is

16   really working and whether or not Catholic Mutual really runs

17   the whole show or not or its run by the diocese.

18          THE COURT:  Thank you.

19          Mr. Ryan.

20          MR. RYAN:  Sure, Your Honor, I will start with the

21   last line.  What Mr. Schiavoni would really like to do is sit

22   in on our meeting it sounds like; that he would like to know

23   every bit of instruction that is going on.  He is not entitled

24   to that, Your Honor, nor is he entitled to tell us who is and

25   is not on a committee.  He doesn't have a site for any

1  authority because none exists.

2        If he had authority to say he could bounce people

3  off ad hoc committee's he could.  Ad hoc committees are self-

4  organized by people who want to associate together, that's

5  their right.  Mr. Schiavoni doesn't have any right to tell us

6  who is not or is on the committee.  Only the (indiscernible)

7  committees which are subject to the court and the United

8  States Trustees Office have their composition determined.  So

9  he doesn't get to decide that.

10        Your Honor was also right to highlight on the

11  precatory phrase "if any" in 2019(c)(2)(c), if any.  We have

12  given Mr. Schiavoni the documents that exist.  The fact that

13  he wants more documents that he would look for some sort of

14  magic bullet well the answer is if any, it doesn't exist.  We

15  gave him what exists.  If it doesn't give him the conflict he

16  wants to allege that's fine.  He also doesn't have a right to

17  fish for conflicts without any hint, even a mere allegation of

18  something being truthful.

19        Your Honor is right to note that the plan of

20  context in your earlier rulings were different contexts.  That

21  is not the context here.  He hasn't come up with anything, let

22  alone a legal expert this time, that says we think there might

23  be a problem.  He's just throwing spaghetti against a fridge

24  to try and see what sticks.

25        Your Honor, finally, you know, the fourth question

1   you had does a committee have to bind individual members.  No,

2   an official committee doesn't.  The Ad Hoc Committee of Local

3   Councils has disclaimed it at every step of the wind.  They

4   don't bind a single local council yet they have appeared

5   actively in these cases.  The Methodist Ad Hoc Committee has

6   the same disclaimer.  The coalition doesn't bind a single law

7   firm when it speaks.

8           What they are trying to do is create a new standard

9   because what they would like to do is be able to say, ah-ha,

10  we now bind every catholic entity in the country.  So if you

11  file an objection no Roman Catholic entity gets the benefit of

12  the full post-1976 injunction.  They wrote a death trap, they

13  wrote it how they wrote it; it doesn't capture the way they

14  now want it to capture.  That is their problem.  The death

15  trap isn't working for them.  That is their problem, but we

16  have fully disclosed who is on our committee.

17          There is no question we have disclosed it.  We

18  updated our disclosure when four more diocese came on.  There

19  is no question that these people are parties in interest,

20  individual.  And though some of them have had their own

21  counsel, and as we have noted have filed joinders on their

22  own.  They have counsel to bind themselves individually and

23  speak when they want to.

24          No committee, official or ad hoc, in this case has

25  been held to the standard that you have to bind each and every

1  member when you speak and that you must have some sort of

2  authority to produce to all other parties to show that you

3  have the authority to bind each and every member on what you

4  speak.  The committee speaks as a committee, to have a voice

5  heard for chartered organizations.

6            Just like the Ad Hoc Committee of Local Councils

7  speaks as an ad hoc committee they had a voice heard for local

8  councils, but every time the Ad Hoc Committee of Local

9  Councils has signed a term sheet, including its own

10  restructuring support agreement, they have specifically said

11  we don't bind individual numbers, but we have the right to

12  stand and be heard as an ad hoc committee.  That is all we are

13  asking for, Your Honor, the same treatment.

14            THE COURT:  Okay.  Just to clarify the members of

15  the committee are the 13 --

16            MR. RYAN:  We have a diocese and archdiocese, yes.

17            THE COURT:  -- those 13 entities, not churches that

18  are within their diocese --

19            MR. RYAN:  No, they're not

20            THE COURT:  -- and with respect to the Catholic

21  Mutual Relief Society of America it is just that entity and

22  not any of the entities for whom they have procured insurance

23  or who may insure, correct?

24            MR. RYAN:  Correct, Your Honor.  We have never

25  purported to speak on behalf of anyone other than the

1  committee.  It is constituted of those members, period, full

2  stop.

3          THE COURT:  Okay.  So in terms of Rule 2019 if

4  there is something other very specific that you think that

5  some objector thinks has not been produced that exists that is

6  required to be produced and that has not been I will hear from

7  that; otherwise, I find the Rule 2019 disclosures have been

8  met.  The consequence of an objection filed by the committee

9  is a different issue, but I am satisfied with the responses

10 that I'm getting and as I read Rule 2019 disclosure.

11         Mr. Kurtz.

12         MR. KURTZ:  Thank you, Your Honor.  I think you

13 have clarified it, but maybe just to make sure we're really

14 clear for the future purpose the 2019, Paragraph 5, discloses

15 not just the 13 archdiocese but also "their respective

16 chartered organizations."  So that seems either to need some

17 explanation by Mr. Ryan or to be stricken in some fashion.  If

18 this group of ad hoc -- Roman Catholic Ad Hoc Committee

19 members includes only the 13 entities that have been described

20 and not their respective chartered organizations then that is

21 the answer.

22         As Your Honor said there's issues relating to who

23 is an objecting or opt-out chartered organization, but that is

24 not necessarily before you today.

25         THE COURT:  Yeah.  I will hear from Mr. Ryan, but I

1  read Paragraph 5 as informative to who these catholic diocese

2  are, but I don't read this paragraph as saying that they're

3  respective chartered organizations or each of them is a

4  member.  Mr. Ryan has been clear that they're not; that only

5  the entities listed on Exhibit A are members of this

6  committee.

7          MR. RYAN:  That is correct, Your Honor.

8          MR. KURTZ:  We do appreciate the clarification.

9  Thank you.

10          THE COURT:  Mr. Schiavoni, you have something

11  specific as to this?

12          MR. SCHIAVONI:  Yes, I do, Your Honor.  You asked

13  whether we had somebody to point to specifically on the

14  instrument.  2019(c)(4) refers to a copy of the instrument, if

15  any, authorizing the entity group of committee to act on

16  behalf of creditors.  The committee notes, on that provision,

17  clarifies that statement further by saying that 2019(c)(4),

18          "Requires the attachment of any instrument

19  authorizing the filer of the verified statement to act on

20  behalf of the creditor or equity security holder."

21          That is a mandatory provision, it uses shall no

22  may.  There is no instrument on file.  You heard Mr. Ryan make

23  reference to something that he has given to me.  He has given

24  it to me with a huge statement on it that it's a settlement

25  communication and, you know, may not be used.  There is

1  nothing on file.  I am no able to discuss that, what's in it

2  and what is deficient about it, and what's missing from it.

3         You heard Mr. Ryan say that there's no rule that

4  requires that he has to show that every member of the

5  committee, you know, is bound by a statement or supports it.

6  That may well be true.  I even would accept that to be true,

7  but there are rules that require that you have to show that

8  you speak on behalf of someone that a member of a committee or

9  several members of the committee have, in fact, authorized

10 you.

11        You have heard, it's on the record now, both the

12 committee and the debtor both agree that to the extent the

13 committee ever has the ability to be heard its derivative of

14 its members.  And if no member has authorized them to be

15 heard, which is what the RFA response on behalf of the

16 committee says, then the committee doesn't -- it doesn't --

17 there is no effect to any of its statements and it shouldn't

18 be heard.  It shouldn't be propounding 2,400 discovery

19 requests.

20        THE COURT:  Where is the response?  I know I saw

21 it.  I know I read it.  Where is the response to the RFA?  Can

22 someone tell me what it's attached to?

23        MR. SCHIAVONI:  (Indiscernible) declaration,

24 Exhibit 5.

25        THE COURT:  Okay.  This is interesting.  So in a

1 different context I held that the coalition had to supply a

2 Rule 30(b)(6) witness over an objection that it was not an

3 entity and somehow couldn't speak as an entity, that it was a

4 collection of people.

5          MR. RYAN:  We had not made that objection, Your

6 Honor.

7          THE COURT:  I am just trying to be -- you know,

8 consistency is always good, so I am just trying to think about

9 this.  This is a slightly different context, and maybe it is

10 being consistent saying that the committee is speaking for the

11 committee and not its individual members.  It is somewhat

12 difficult to understand how a committee could have a position

13 divorced from its members and if it can what that means.

14          MR. RYAN:  It's not, Your Honor, a position

15 divorced from its members.  It's whether, when a committee

16 speaks, all of its members are bound by that exact statement.

17 When Mr. Molton speaks he doesn't bind counsel.

18          MR. SCHIAVONI:  But he has to speak on behalf of

19 someone.

20          MR. RYAN:  Mr. Schiavoni, please, let me finish.

21          THE COURT:  But doesn't it matter what you're

22 speaking on?

23          MR. RYAN:  When Mr. Molton speaks he doesn't bind

24 any -- I'm sorry.

25          THE COURT:  Doesn't it matter what you are speaking

1  on then, I guess, and what it is you're saying?

2         MR. RYAN:  The committee speaks on positions about

3  which it cares about, about which it believes it effects those

4  within the entire Roman Catholic Church, about which effect

5  all chartered organizations.  It has spoken on all of those

6  repeatedly.

7         THE COURT:  Well I don't think that the committee,

8  necessarily, can speak on what the entire Catholic Church

9  thinks because its members are not the entire the Catholic

10 Church.  Its members are its members.

11        MR. RYAN:  Correct.

12        THE COURT:  So it can't -- so whether these are

13 matters of interest to the entire Catholic Church or every

14 chartered organization doesn't mean it speaks on behalf of all

15 of them.

16        MR. RYAN:  That is absolutely correct, Your Honor.

17 When the committee speaks it has identified issues that it

18 believes are of concern.  It speaks on behalf of itself, but

19 raises those issues to be considered by the court just like

20 any other committee.  An official committee of creditors, an

21 official committee of tort claimants does not speak on behalf

22 of any member of their committee.  They speak on issues on

23 behalf of people that they are looking out for.

24        Now with official committees there are fiduciary

25 duties and I will admit that that is a slightly different

1  animal.  The role of an ad hoc committee is when an ad hoc

2  committee of noteholders speaks it doesn't bind an entire

3  indenture.  It doesn't bind the individual creditors on that

4  committee.  It says this committee has these positions and you

5  should give us weight because we are comprised of people who

6  have skin in the game.

7        THE COURT:  It doesn't, but when it ultimately

8  takes a position to support or not support the plan if a

9  member disagrees with the committee it gets off the committee

10 on those ultimate issues.

11       MR. RYAN:  It has that option.

12       THE COURT:  And they may continue until there is an

13 ultimate decision, parties may disagree and you're having

14 negotiations among the committee members, and you get off the

15 committee if you want to file your own objection or oppose

16 what the committee is doing; at least that is my experience

17 with ad hoc committees.  That is different than an official

18 committee.

19       MR. RYAN:  True, but members of the committee have

20 also filed joinders, but the absence of the joinder doesn't

21 mean they're not supporting that position either.  You can't

22 infer the negative on that, Your Honor.  That is just how ad

23 hoc committee's operate.  The point of Mr. Schiavoni's

24 discovery was to try and trigger the death trap, to be an ah-

25 ha.  You speak on behalf of every Catholic Church in America,

1 you said so, so I now can trigger the death trap.

2     MR. SCHIAVONI:  Actually it was not.  The point was

3 to show that I don't think any of the diocese, not a single

4 one, supports the position that Mr. Ryan is taking here

5 because this is exactly what happened with the Methodists;

6 none of the churches supported taking this kind of position.

7     This, sort of, statement about how these committees

8 work it runs completely at odds. If you look closely at In Re

9 Washington Mutual Judge Walrath is referring to this very type

10 of issue there.  She is saying that because the membership is

11 at will the committee can't bind its members absent their

12 consent.  It's for precisely that reason she says.  She goes

13 onto say, continuing the sentence, that,

14     "Generally all members must agree on any position

15 the committee takes."

16     That is the normal situation.  I am aware of no

17 case that says that a committee can operate in a vacuum where

18 none of its members, you know, endorse, ratify, adopt the

19 statements its making and the positions it's taking.  Here,

20 we're faced with a particularly parallel situation because

21 this committee is run by and counseled by an entity which is

22 not even a diocese; it's an insurance company with interests

23 that are adverse to its own members with respect to the plan.

24     THE COURT:  Well that is an issue that I --

25     MR. RYAN:  Mr. Schiavoni is speaking --

1          THE COURT:  -- don't know that I can deal with or

2    should deal with.  In terms of the documents that have been

3    provided to Mr. Schiavoni that are responsive to Rule 2019

4    about authority those documents need to be filed with the

5    court.  That is what it says.  So they need to be filed.

6          MR. RYAN:  We're happy to do that, Your Honor.

7          THE COURT:  The consequence of the opt-out

8    provision in this plan is something we will have to deal with,

9    but I don't know that it's a today issue.  It will have

10   whatever consequence it has.  If it's too cute we will deal

11   with that, Mr. Kurtz's words.

12         So where does this leave me in terms of the actual

13   discovery disputes in Item 1?

14         MR. RYAN:  There are two pieces of discovery.  One

15   is a subpoena that Century issued to Catholic Mutual and the

16   other is the Boy Scouts request for a 30(b)(6) deposition of

17   the Roman Catholic Ad Hoc Committee.  The topics that Century

18   seeks taken under the auspices of plan confirmation discovery

19   are all topics he could have taken discovery on in October.

20   There was a close-off for fact discovery, Your Honor, on

21   confirmation issues with two very narrow exceptions in

22   October.

23         The issue written discovery and then the timely

24   notice of fact deposition to be completed.  While we all

25   missed those deadlines, the timely noticed deposition was

1  November 24th.  Nothing prevented Mr. Schiavoni from issuing

2  any of the discovery he has issued to Catholic Mutual prior to

3  that.  The only thing that changed is he changed sides.  That

4  is not a chance to go back and take discovery you tactically

5  chose not to.  You live with those decisions.  So it's too

6  late for his discovery as a threshold matter.

7          The same applies to the Boy Scouts discovery.  They

8  want to go into governance as it relates to the plan they

9  should have taken that discovery or noted this deposition in

10  November.  They chose not to do so.  A large swap specifically

11  on the Boy Scouts purports to be voting discovery.  Your

12  Honor, it can't have any relevance.  The Roman Catholic

13  chartered organizations are in Class 9.  The Boy Scouts voting

14  declaration says Class 9 has voted 69 percent, it has accepted

15  the class under 1126.

16          What purpose is served by conducting a witch hunt

17  into what the Roman Catholic Ad Hoc Committee may or may not

18  have said on how to vote for the plan.  They got the class.

19  Its harassment, even if it wasn't untimely.  All the reasons

20  Your Honor wanted to have and preserve the -- take voting

21  discovery were to be if there were credible allegations of

22  untoward behavior.  They are in an accepting class.  Even if

23  they told everybody to vote no and they all voted no, guess

24  what, 69 percent voted yes.  It is what it is.  So that is

25  just flat out unnecessary and to proceed with it is

1  harassment.  The same goes for Century.  They don't need that

2  voting discovery either.  It's not relevant to the issues at

3  hand for confirmation.

4         Finally, Your Honor, the last topic on which they

5  seek discovery is my firm's representation.  Again, we don't

6  see how that is relevant.  If Your Honor wants a substantive

7  discussion on my firm's representation Mr. Seibel is prepared

8  to walk Your Honor through that presentation.

9         THE COURT:  Thank you.

10        Let me hear why voting discovery is relevant with

11 respect to the committee, Mr. Kurtz.

12        MR. KURTZ:  Thank you, Your Honor.  I was actually

13 raising my hand to say that we had gone with two types of

14 discovery, voting discovery.  The reason we were asking for

15 voting discovery is we had been hearing that the ad hoc

16 committee was sending out what we thought were inappropriate

17 communications that could impact the vote.  At the time we

18 served the discovery we didn't have Class 9 consent.  We are

19 prepared now to move forward on voting discovery based on that

20 case.

21        I do feel like I have to comment on the notion of

22 harassing.  We literally served three document requests and

23 one deposition notice with five topics weighed against the ad

24 hoc committee's 4,900 RFA's and dozens of requests and dozens

25 of deposition topics, a little difficult to listen to.

1          The second group related to composition, and that

2    was really what we have been talking about this afternoon with

3    Your Honor.  I think, you know, I'm a still a little bit

4    confused.  It -- I don't think it matters whether 12 of the 13

5    have sanctioned the objections and the litigation.  I think

6    they are all deemed to be there unless and until they

7    withdrawal themselves.  So maybe we don't need the discovery.

8          There is an overlap, but as Mr. Schiavoni has been

9    discussing about whether anyone is authorizing the conduct,

10   but I think that is better raised when we get to the next

11   motion which is the ad hoc committee's motion to compel where

12   they are now seeking discovery as opposed to trying to fend

13   off discovery.  So unless Mr. Ryan is going to tell me that

14   somehow there is some dice and slice way for him to represent

15   the committee members then we probably don't need that

16   discovery.

17          THE COURT:  Okay.  Mr. Schiavoni, what about your

18   discovery?

19          MR. SCHIAVONI:  Your Honor, we have -- we were not

20   in a position where this ad hoc committee, whatever it may be,

21   was an objector until we got their expert reports, what we

22   did, which was very late in the game.  I don't think one can

23   say that the narrow discovery we served was premature as a

24   result.  We ought to be able to defend ourselves from some of

25   the assertions and allegations that the experts are making in

1  opposition to our settlement.  You know, hence, I think, the

2  premature objection is wrong for that reason.

3          On the voting issue specifically it's the vote here

4  is inconsistent with the objection that is being made.  We

5  have statements that went out by the Methodists in support of

6  the vote.  We think identical statements went out on behalf of

7  the Catholic committees that run at odds with positions that

8  Catholic Mutual is having the committee, otherwise, take and

9  that we ought to be able to put in as admissions to defend

10 ourselves in connection with the settlement.  We don't think

11 that those documents would be very burdensome for them to have

12 to produce at all.  They are all centralized in one location.

13         In our response we walked through the specific

14 requests.  You know, we don't have many here, but it can't be

15 -- again, perhaps, you know, what Mr. Kurtz just said perhaps

16 this is better discussed in the context of the discovery that

17 is being sought by the committee itself, the discovery that we

18 sought back, but it can't be that the committee can go forward

19 with demands for production of every abuse claim and all sorts

20 of positions that we might have on it, on every abuse claim

21 when a targeted request, just Catholic Mutual, for could we

22 please have the information you have on the abuse claims that

23 have been tended to you so that we know what they are.

24         It can't be that we could be blocked from getting

25 that information, but meanwhile the committee could go forward

1  with requests served on, you know, the weekend of New Year's

2  Eve, you know, seeking 1,800 different written requests for

3  information on different abuse claims.

4         You know, we served, I think, seven requests

5  related to the abuse claims that have been tendered.  There is

6  no assertion that there is any burden for Catholic Mutual to

7  have produced this information.  We would think if it's good

8  for the goose it ought to be good for the gander.  The same

9  with respect to the other requests that we have sought that

10 seek purely factual information that goes to what their

11 objections are.

12         THE COURT:  Okay.  But why wasn't the information -

13 - I mean we did have deadlines for discovery.  So why wasn't

14 this discovery served before if it was important?

15         MR. SCHIAVONI:  Catholic Mutual -- the Catholic

16 entities were working together with us with the Methodists

17 towards a common settlement.  We were working cooperatively.

18 Mr. Ryan's help in that regard, the structure that he came up

19 with for a Catholic/Methodist settlement was instrumental in

20 bringing about, we think, you know, the success of the plan

21 overall.  We are immensely grateful to Mr. Ryan and all his

22 assistance in the architecture he came up with for this.

23         I have to say, we did not anticipate that an

24 insurance company holding itself out as a Catholic entity

25 would interject itself here and try to block the settlement.

1  They have not produced -- it's the only insurance company in

2  the mediation that has failed to produce a single insurance

3  policy.  It's just simply not something we anticipated, Your

4  Honor.

5          If it's the case that, you know, we should have

6  anticipated and served discovery nonetheless on these folks

7  and, hence, we should be blocked from discovery the same ought

8  to flow with respect to the Catholic Committee.  None of this

9  discovery that they served couldn't have been served before.

10 They could have served requests about what claims they thought

11 were covered under our policies, they could have served

12 requests about what claims hit our policies and what our

13 policies are.  All of that they could have served earlier

14 also.

15         THE COURT:  What's the relevance of the policies

16 issued by Catholic Mutual to its insureds, to this bankruptcy,

17 and to confirmation, in particular?

18         MR. SCHIAVONI:  It flows from the objections that

19 they've served on us and the discovery they served on us.  But

20 to the extent there's a significant issue here about missing

21 policies, lost policies, to the extent there's a policy in

22 place, and it's like we don't think -- I mean, to be clear, we

23 don't think any of this discovery ought to go forward, all

24 right, against us.  But if you're going to allow this

25 discovery to go forward against us and you're going to allow

1  these experts to ultimately testify against us, we ought to be

2  able to defend ourselves.

3       And one way we can defend ourselves is to say,

4  look, you know, wherever Catholic Mutual issued a policy, we

5  didn't issue a policy at the same time if it's, you know, to

6  the extent that coverage is otherwise lost; the Catholic

7  Mutual coverage is in place there.

8       And, again, I'd be the first to say that we don't

9  think this, like, these -- this blunderbuss discovery that's

10 all out of proportion to the case and completely unnecessary,

11 given the terms of the settlement, ought to go forward against

12 the settlement insurers.  And if that's the case, we could

13 live with it not having discovery against Catholic Mutual and

14 the Catholic entities.  But if it's going to go forward

15 against both, you know, against us, it's like we need some way

16 to defend ourselves.

17           THE COURT:  Okay.  I'm going to -- I'll hear the

18 second motion before I decide this one.

19       But it's not always -- reciprocal is not always

20 reciprocal.  Sometimes the things that one party asks are

21 relevant and the other party is not.  So --

22           MR. RYAN:  Your Honor?

23           THE COURT:  Mr. Ryan?

24           MR. RYAN:  I would like to respond before we get to

25 the rest of the motions.

1          THE COURT:  Okay.

2          MR. RYAN:  Catholic Mutual is not an insurer of Boy

3 Scouts or a single local council.  Catholic Mutual insurance

4 policies are issued by Catholic Mutual to Catholic entities.

5 This Court has no jurisdiction over an insurance policy that a

6 Catholic charter purchased from Catholic Mutual or any other

7 insurance company.

8          Charters are not debtors.  Catholic Mutual is not a

9 debtor.  These policies, you have no jurisdiction over, as an

10 absolute threshold matter.  As a matter of relevance, what

11 relevance is it?  What claims an insurer of a nondebtor has

12 gotten, that has no bearing on what Century is doing.

13 Catholic Mutual policies aren't being brought back.  Catholic

14 Mutual policies aren't the fibers that make up the patchwork

15 quilt of an injunction that's being offered in this case.

16 They are policies outside of this Court's jurisdiction.  This

17 Court doesn't have the jurisdiction to inquire into those

18 claims histories and it's irrelevant to these cases.

19 Completely irrelevant.

20          THE COURT:  Well, whether or not I have

21 jurisdiction over those policies, I don't think it's

22 equivalent to saying it may not be relevant.  I don't know.

23          MR. RYAN:  Well, I don't think they're relevant,

24 but I don't even think you have jurisdiction to order

25 discovery into them.

1          THE COURT:  Yeah, I've got jurisdiction over the

2   discovery issues that I think are relevant, even if I may not

3   have jurisdiction over a policy; I'm disagreeing there.  But

4   we'll see.

5          Let's go --

6          MR. RYAN:  That's fine.

7          THE COURT:  Let's go on to the next thing.

8          MR. ABBOTT:  Your Honor, again, Derek Abbott from

9   Morris Nichols.  I think when the parties that we just heard

10  from are talking about the next motion, they're referring to,

11  actually, Agenda Item 5, which is the RCAHC's motion to compel

12  from other parties.  So, that's a little out of agenda order.

13  Most of the agenda relates, one way or another, to discovery

14  regarding Mr. Ryan's client, but I think Number 5 is the one

15  that folks want to hear.  And if that's the case, I guess it's

16  back to Mr. Ryan, if that's where the parties and the Court

17  think we ought to go next.

18         MR. SCHIAVONI:  Your Honor, if I could just close -

19  -

20         MR. RYAN:  Yeah.  Your Honor, I had --

21         THE COURT:  Mr. Ryan?

22         MR. RYAN:  I was going to say, Your Honor, I had --

23  Mr. Schulman from the TCC and I had discussed and we were fine

24  with proceeding in the order of the agenda.  So, the next item

25  on the agenda was Hartford's letter to quash ours, but

 1  following that, there are the Zurich and Hartford letters,

 2  with respect to the TCC.  And Mr. Schulman and I had discussed

 3  that it might make more sense, since his issues are more

 4  limited, to deal with those first.

 5            THE COURT:  No, I want to --

 6            MR. SCHIAVONI:  Your Honor, if I could -- I'm

 7  sorry, Your Honor --

 8            THE COURT:  Mr. Schiavoni?

 9            MR. SCHIAVONI:  -- I didn't use the hand button.

10  Sorry about that.

11            Your Honor, just to very quickly close out on the

12  first motion, request numbers 10 and 11 go to the formation of

13  the committee and the authority of the committee.  And some of

14  the -- two of the topics, with regard to the 30(b)(6), go to

15  the same thing:  the authority of the committee to act and

16  some of our RFAs also go to that.

17            What essentially happened was the committee

18  answered the specific request that they chose, just those two

19  RFAs that are in our papers, saying that they didn't have

20  authority and it would bind their members.  But we did serve

21  this other discovery around the issue that they declined to

22  answer that also goes to the same issue of the authority and

23  the formation of the committee, which we would suggest is none

24  -- is relevant for all the reasons we argued before.

25            MR. RYAN:  Your Honor, I thought we disposed of

1  that when we agreed to file the bylaws.  This is all 2019-

2  focused discovery and if I understood your ruling, the filing

3  of the bylaws.

4          THE COURT:  Yeah, I think it is.  And, you know,

5  kind of something I probably said before, which is that I

6  don't know what authority any attorney on this Zoom cast has

7  to represent their clients, okay.  I don't have everybody's

8  retainer letters in front of me.  I don't have their

9  declarations from their clients saying, Yeah, you can

10  represent me and you can say what you're saying today.

11          I just don't see how these kinds of inquiries are

12  something that I -- I don't know what I do with that.

13          MR. SCHIAVONI:  Your Honor, you do have those

14  submissions.  They were required as part of the voting under

15  the 2019 --

16          THE COURT:  No, I don't have yours, Mr. Schiavoni.

17  I have nothing from your client that says that you can say

18  what you're saying today or you can take the positions that

19  you're saying.  I assume you have authority.  I assume you

20  have --

21          MR. SCHIAVONI:  I'm not talking --

22          THE COURT:  -- retainer letter.

23          MR. SCHIAVONI:  I'm not representing a committee

24  and, you know, I'm signing my pleadings on behalf of my

25  specific client.

1          THE COURT:  Yeah, but I don't know that you have

2    authority to represent them or that you have a retainer letter

3    or anything or that you don't have a conflict with your

4    client.

5          So, that's what I'm saying, is that what you're

6    asking me to do, I'm not sure that it's different just because

7    there's an ad hoc committee out there versus an individual

8    attorney who's representing an individual client.  As long as

9    they comply with Rule 2019, as long as a committee complies

10   with Rule 2019, I'm not sure I get to go beyond that to

11   question the wisdom, if you will, of the people you're

12   associated with or the wisdom of who your chair is or the

13   wisdom of the counsel that you've chosen to retain.

14         Okay.  Let's move on.  Let's go to -- let's stick

15   with the related issues.  Let's go to -- if the next dispute -

16   - okay.  I have Number 5 being the Roman Catholic motion on

17   the 30(b)(6) depositions of the debtors, Century, Chubb,

18   Hartford, and Zurich.

19         MR. ABBOTT:  That's correct, Your Honor.

20         MR. RYAN:  Thank you, Your Honor.  Jeremy Ryan,

21   again, on behalf of the Roman Catholic Ad Hoc Committee.

22         Your Honor, when the Century settlement was

23   announced and the plan was revised, there were two fundamental

24   changes that were not in the plan or in the disclosure

25   statement that were solicited out and they were this:  number

1  one, the default injunction available to charter organizations

2  was changed; it went from a full, post-1976 (indiscernible)

3  nothing and nothing pre-1976, to a patchwork only for the

4  Roman Catholic Church, at this point.

5          But the full injunction was taken away and the only

6  way you can tell what is enjoined, Your Honor, is by looking

7  at paragraph 11 of the Century term sheet, which is embodied

8  in the plan.  And the only way to determine what claims are

9  enjoined is by answering the magic question:  Is it an abuse

10  claim under a policy issued by a settling insurer that covers

11  abuse claims for insureds and co-insureds?

12          That's the injunction, Your Honor; it's a question.

13          Our discovery is trying to answer that question.

14  To date, no one can tell me, or will tell me, if an abuse

15  claim in 1968 in Sioux City, Iowa, will be enjoined or not.

16          We're entitled to take discovery of those who come

17  up with the settlement or join into it to say, what does this

18  injunction language mean, and you tell me which policies you

19  issued fit into this language that you created.  We tried to

20  do it by written discovery, and so when Mr. Schiavoni refers

21  to thousands and thousands of requests for admissions,

22  absolutely, Your Honor, because this injunction is abuse claim

23  and policy specific.  It invites 84,000 coverage questions on

24  over 5,000 policies.

25          We would just like to know what the scope of the

1  injunction is.  That's all we're asking for on the first part

2  of our discovery.  So, we asked every settling carrier, policy

3  by policy:  Does this policy cover abuse claims against

4  insureds and co-insureds?

5         We can't get an answer.  They didn't want to answer

6  it in written discovery --

7         THE COURT:  Well, aren't you asking a coverage

8  question?  Because we have lawsuits, pre-petition lawsuits

9  disputing that, in many cases, the insurers have no coverage

10 obligations; notwithstanding, that the BSA may be a named

11 insured.

12        MR. RYAN:  It may be a coverage question, Your

13 Honor, but it's how the injunction works.  It's their

14 mousetrap.  I can't sit here today, nor can -- nor will any

15 insurers tell me, nor do you have any idea whether an abuse

16 claim in 1968 in Sioux City, Iowa, is supposed to be enjoined

17 under this plan.

18        THE COURT:  Do you think that makes --

19        MR. RYAN:  A proper injunction is not --

20        THE COURT:  Do you think that makes the plan

21 unconfirmable?

22        MR. RYAN:  Oh, it absolutely does, Your Honor.

23        THE COURT:  Then why don't you just argue that?

24        MR. RYAN:  We are going to argue that, but, Your

25 Honor, if you're going to confirm the plan, we're entitled to

 1  know what the injunction is you're issuing.  We're entitled to

 2  know what claims against us are being channeled.  We're

 3  entitled to know that when Your Honor enters the injunction.

 4          That's a fair question.

 5          THE COURT:  Well, if the --

 6          MR. RYAN:  Every other mass tort case, you know

 7  when you enter that confirmation order.  I have an asbestos

 8  claims against a protected party.  Channel.  There's no other

 9  mass tort that says, if you have a claim against a protected

10  party, it is channeled if, and only if, there's an insurance

11  policy that covers you.  Not one that we've been able to find.

12          This is their language, Your Honor.  We're entitled

13  to ask if every settling insurer, what you think this is

14  providing.  We've gotten denials wrapped around objections,

15  wrapped around specific objections.  We're entitled to ask

16  someone from each of these settling insurers:  What injunction

17  do you think you were providing with this settlement?

18          We're entitled to ask that of Boy Scouts.  So,

19  that's the first question that we're trying to get answered.

20  And did we issue an enormous amount of policies?

21          Yes.

22          You know why?

23          Because they're buying each and every one of those

24  policies back.  Those policies will be gone, but we will not

25  know whether they are agreeing that they provide coverage and,

1  therefore, an injunction.  But our rights will be gone --

2          UNIDENTIFIED:  That's not true.

3          MR. RYAN:  -- with those policies.  So, that's the

4  first question.  We're entitled to ask that, Your Honor.

5  We're entitled to ask that of those who designed the mousetrap

6  and we're entitled to ask that of those who put their name to

7  it on behalf of the debtor to support the mousetrap.  What

8  injunction do you think is going on under your plan and under

9  your settlements?

10          So, that's the first question.  The second question

11 is, does this plan, if you are a settling insurer, releases

12 the settling insurer, not just for their obligations under

13 policies that they issued to local councils or to Boy Scouts,

14 but a chartered organization's own insurance.  And it only

15 touches Roman Catholic entities at this point, as far as we're

16 concerned.  It actually touches every chartered organization.

17          But if we bought a policy with our own money from

18 Century, we are being forced to release claims against

19 Century.  We're being forced to transfer parts of those

20 policies to the settlement trust.  We're being forced to

21 transfer any and all causes of action that may relate to that

22 policy, relating to what's being released to the settlement

23 trust.  Our own individual policies are being raided.

24          If they want to propose it like that, that's fine.

25 My question is:  Which policies?

1           You want to come and affect the policies that I

2   bought with my own money, you have to tell me which policies.

3   To a carrier, the response has been:  We can't possibly do

4   that search.  We can't tell you the policies we -- of your own

5   property, that we are trying to forcibly take away from you.

6           That's a fair question, Your Honor.  They're asking

7   you to come into a church and take away the church's own

8   insurance policy, but not tell you what policies.  And they

9   tell us, it's too hard; the scope is too burdensome.

10          We didn't ask for them to try and compromise our

11  own insurance.  They have chosen to do that.

12          THE COURT:  And where --

13          MR. RYAN:  If they can't answer the question as to

14  what property rights they're taking away from us --

15          THE COURT:  And where in the plan does it say that?

16          MR. RYAN:  It is the body -- it's easiest found,

17  Your Honor, in paragraphs 9, 10, and 11 of the Century term

18  sheet.  Paragraph 9, Catholic Church, on a policy, if bought

19  from Century, is required to release Century for all Scouting

20  claims under its own policy.

21          In paragraph 10, that portion of the policy is

22  being assigned to the settlement trust.  In paragraph 10, all

23  causes of action relating to that partial assignment are being

24  assigned to a settlement trust.

25          In paragraph 9, we are forced to release all

1  claims, extra contractual claims that we may have against

2  Century under our own policy.  These aren't local council

3  policies.  These aren't debtor policies.  This is our own

4  property that they are asking this Court to impair and take

5  away.

6              THE COURT:  And which --

7              MR. RYAN:  And we've asked a simple question --

8              THE COURT:  And which -- the defined term --

9              MR. RYAN:  -- tell me what property you're taking

10 away.

11             THE COURT:  Which defined releasing party do you

12 fall into in paragraph 9?

13             MR. RYAN:  The default would be limited, protected

14 party.  Limited protect party, Your Honor, and it's romanette

15 (ii).  Any policy -- romanette (a) is BSA and local council

16 policies and romanette (ii) is any other policy issued by a

17 settling insurer.

18             THE COURT:  And you're saying an opt-out is a

19 limited, protected party?

20             MR. RYAN:  Yes, it is.  And someone who doesn't

21 object is a limited, protected party.

22             THE COURT:  That's different.

23             MR. RYAN:  An opt-out loses the full, post-1976

24 injunction, but it gets the patchwork quilt and it is forced

25 to assign its own policies to the trust and it's forced to

1  release Century on its own policies.

2          MR. KURTZ:  And, Your Honor, if you're going to

3  spend a lot of time thinking about that, it doesn't happen to

4  be true.  But others that are more familiar with the

5  interworkings of the policies can provide that information to

6  Your Honor, if you would like.

7          THE COURT:  So, a limited, protected party, at

8  least what I'm reading, means a participating chartered

9  organization, not an opt-out.

10          If you're participating, isn't that voluntary?

11          MR. RYAN:  Your Honor, the way the plan works, no.

12  The way the plan works is every charter gets the patchwork

13  quilt injunction, period.  Full stop.

14          THE COURT:  Okay.

15          MR. RYAN:  Charters that don't object get the full

16  1976-on injunction and the patchwork quilt.  Charters that

17  contribute money get a full injunction.

18          THE COURT:  Uh-huh.

19          MR. RYAN:  You can't do worse than the patchwork

20  quilt from 1909 to the petition date.  Within that, in

21  romanette (ii) requires you, you compromise your rights and

22  any insurance policy a settling insurer may have written --

23          THE COURT:  So, even though you --

24          MR. RYAN:  -- and that's after romanette (i), which

25  is --

1        THE COURT:  So, even though a chartered

2  organizations opposes it, you're saying that they are being

3  forced to either release parties or contribute an insurance

4  policy?

5        MR. RYAN:  That is correct, Your Honor; their own

6  policies.  I'm not even talking about additional insured

7  rights right now and BSA and local councils.

8        THE COURT:  Uh-huh.

9        MR. RYAN:  I'm talking about a policy that the

10  church down the street bought with its own money from Century.

11  This plan purports to take a large chunk of that policy away

12  and all sorts of claims, rights and obligations, and causes of

13  action it has against this carrier if that carrier happens to

14  also sell BSA back a policy.

15        THE COURT:  Okay.  Well, that -- I'm going to have

16  to be taken through that.  That wasn't my reading, or at least

17  after reviewing all of the discovery dispute and the papers

18  filed in connection with this discovery dispute.

19        So, what do we do in the situation -- I looked at

20  the discovery requests and I looked at the, you know, every

21  policy, everything, and the objections that I think it

22  probably can't be done between now and confirmation -- let's

23  assume it's relevant -- I'm not sure that it can be done

24  between now and confirmation.  So, if I don't permit the

25  discovery, there may be consequences to that if the discovery

1  is relevant and if the discovery -- and if somebody would try

2  to use discovery that they didn't produce, but ...

3         MR. RYAN:  It's not just identification of

4  policies, Your Honor.  We're entitled to ask Boy Scouts what

5  they were thinking when they agreed to this term --

6         THE COURT:  That's different.  To me, that's --

7         MR. RYAN:  -- and (indiscernible) charters --

8         THE COURT:  To me that's a different issue.  To me

9  that, yes, should you be able to say, how did this term get --

10  you know, what's this term mean, generally, and how are you

11  interpreting it generally and how does it work generally and

12  you want to ask general questions about the plan, I think you

13  can ask those questions.

14         But the specific policy questions, I don't see how

15  anybody, quite frankly, could be prepped for that anyway.

16         MR. RYAN:  Well, Your Honor, and if the answer is,

17  we can never tell you what policies we're taking away from

18  you, it's too tough of a question; I'm entitled to that

19  record.  They are taking away the church's own policies, and

20  if they can't tell me what policies they're going to do,

21  because their records can't do it, then they need to tell this

22  Court, Your Honor, we are taking away third parties' property

23  rights, left and right, and we can't tell you what property

24  rights we're actually taking away.

25         I'm entitled to make that record.  I'll take those

1   answers.  I know for a fact none of them are going to tell me

2   what policies are actually compromising, but I'm entitled to

3   the record that they won't tell anybody, including this Court,

4   what third-party property rights are being taken away in this

5   plan.

6           So, those are the two topics, Your Honor, that

7   we're looking for.  And the third frustration, which, you

8   know, I'll let the TCC speak to, as well, the plan doesn't

9   incorporate a single one of these term sheets that refers to

10  insurance settlements.  They were due in a plan supplement due

11  on November 30th.  One draft agreement was filed.  One.  Two

12  days later, or the next day -- I can't remember the exact

13  chronology -- that was the Hartford's.  The Hartford's witness

14  walked away from that draft settlement agreement.  Wouldn't

15  testify about it.  Hadn't seen it.  Wasn't signed.  Wasn't in

16  the settlement agreement.

17          We sit here today, Your Honor, February 1, you have

18  a plan that incorporates settlement agreements, eight-hundred-

19  million-dollar settlement agreements, into a plan.  Your Honor

20  is being asked to approve entry into those settlement

21  agreements.  I would like the opportunity to take depositions

22  of those who enter into settlement agreements after they do

23  so.

24          I would not like to have those settlement

25  agreements produced mid-confirmation and then scramble for

1  depositions and try to reformulate objections.  Because if

2  experience teaches us one thing in this case, if we look at

3  the Hartford term sheet to the draft Hartford settlement

4  agreement, things move a lot.  There are conditions precedent

5  in the draft Hartford settlement agreement that weren't in

6  their term sheet.

7         The Century term sheet says "more material terms to

8  come."

9         So, not only do I want to take the discovery we

10  talked about to answer those questions, I would also like to

11  take a deposition on a finalized settlement agreement.  I

12  asked Boy Scouts, When might those be forthcoming?

13         I was told, An ETA, itself, was mediation

14  privileged.

15         THE COURT:  Well, I'm going to ask that question.

16         MR. RYAN:  So, Your Honor, when are we going to

17  have this trial?

18         THE COURT:  I'm going to ask that question and I

19  would like a response.

20         You may continue, Mr. Ryan.

21         MR. RYAN:  So, not only would we like the

22  depositions -- and going back to what Mr. Schiavoni said, we

23  issued a lot of RFAs.  The carriers answered them.  They

24  didn't move for a protective order.  We haven't moved to

25  compel on those; we've moved on.

1        So, we're only here talking about limited

2   depositions.  So, we'd like them on those topics, but we also

3   don't want to close those depositions, close discovery, and

4   have to formulate an objection until we have had a chance to

5   see a final settlement agreement on an eight-hundred-million-

6   dollar settlement that is *de facto* under this plan, and had

7   the time to review it, depose someone on it, and then see how

8   we'd have to work that into our objection.  That's not going

9   to happen by Friday.

10        So, I don't know what Your Honor does about that,

11  but we are being placed in a fundamentally unfair position

12  that, frankly, violates due process.  There's a billion --

13  over a billion six in settlements for which we yet to see a

14  signed agreement, and we're supposed to go to trial in three

15  weeks.

16        THE COURT:  Okay.  Thank you.

17        Mr. Kurtz?

18        MR. KURTZ:  Thank you, Your Honor.  Let me try to

19  approach this in three general ways.  And the first is, I just

20  want as a backdrop, to note, that the ad hoc committee has

21  been incredibly aggressive on discovery.  The debtors have

22  been incredibly cooperative on discovery.  We have provided

23  numerous witnesses, innumerable documents and other responses.

24  So, we've been pretty principled and pretty cooperative, and

25  when we got to these ones, we made a decision that they

1  weren't appropriate.

2          I will say that we did offer to produce a witness

3  to speak to the debtors' business judgment, in effect, in

4  considering the items that have been raised.  And so, it's

5  worth noting the difference between the level of discovery

6  provided and the cooperation of the debtors and the ad hoc,

7  and I appreciate Your Honor's remark that everything is not

8  reciprocal, but we are pretty far past that model with what

9  we've done versus what they've done.

10          The second general response to this is, is it

11  really falling into a standing issue.  And it's worth -- I

12  sort of saved some of this because I think it's more relevant

13  to their ability to affirm that we seek discovery, as compared

14  to defending against discovery, where, the fact that we served

15  you is maybe standing enough.  So, you know, I want to be

16  clear because Mr. Ryan made some remarks that made me think I

17  haven't been clear enough.  The ad hoc committee has no

18  independent standing, absent its representation of its

19  members, and so it is speaking for those members.  And once it

20  speaks for those members, that has consequences under the

21  plan.

22          Mr. Ryan says there's a death trap and it's sort of

23  not been set properly.  He doesn't have standing to determine

24  what the parties intend in the plan.

25          I've been clear with him what we intend.  He's

1 moving at his own risk and can't raise any sort of *estoppel*

2 issue later that he didn't understand that the plan proponents

3 intend to treat every member of any objecting chartered

4 organization and every member of the ad hoc committee as

5 objecting parties as an opt-out, chartered organization.  So,

6 I don't want to have to hear later that there was some

7 question about that.

8         That also, though, when you couple that with the

9 RFA responses, calls into question, maybe, their ability to

10 seek discovery at all, even though we've been providing it.

11 And if they're saying they're not bound -- and I don't know

12 what that means, not to be bound.  The real issue -- you're

13 not really bound, other than you're representing parties and

14 when you represent parties, you speak for them.  And so, when

15 you come to court and you raise objections or you propound

16 discovery, you're doing so for them; you're not doing so for

17 yourself.

18         As enjoyable as it might be for attorneys to just

19 act as private attorney generals and issue discovery and raise

20 litigation issues, it doesn't work that way.  So, they are

21 clearly working for who they're working for.

22         If they're going to take the position that somehow

23 they don't speak for anybody, then they're not entitled to

24 discovery.  I don't think they can take that position, but I

25 also don't think they can take the two conflicting positions

1  between Your Honor -- before Your Honor, which is that we

2  don't speak for anybody, but give us discovery.  I think

3  they're going to have to land on one of those.

4       And then the third response I want to offer is

5  really on the merits, and at least as it relates to the

6  requests that were briefed in the motion to compel as against

7  the debtor, there were two issues, really, not three.  And the

8  first is -- and this is their word -- the scope of the

9  channeling injunction, with respect to Roman Catholic

10  chartered organizations.  And, by the way, I just feel like I

11  have to note that when Mr. Ryan talks about getting every

12  single policy and seeks witnesses prepped on every single

13  Roman Catholic chartered organization, he seemed to be acting

14  for a much broader group than the group he represented to Your

15  Honor that he was acting for.  So, another place I don't think

16  he can have it both ways.  I don't think he can only represent

17  13 entities and then seek discovery with respect to every

18  Roman Catholic chartered organization, Your Honor.

19       There's three issues that come up substantively in

20  connection with these requests.  The first is that the request

21  for testimony interpreting a legal document, which we believe

22  is totally unambiguous, is not appropriate.  And we cited a

23  number of cases that confirmed that you don't get 30(b)(6)

24  witnesses to explore legal contentions or interpretations of

25  legal documents.

1        If there had been an ambiguity in a way that it

2   became a factual dispute, as opposed to a question of law,

3   that might be a way to speak to a negotiator, but that's not

4   what we have here.  That's not certainly been demonstrated and

5   it's not true.  And so, we're not required to produce a

6   witness to offer our legal conclusions or to interpret

7   unambiguous contracts and, in fact, the only way one could

8   prepare for that is for an attorney to sit with a witness and

9   then the witness would then claim privilege on the answers

10  anyway.

11        Having said that, I don't believe that the ad hoc

12  committee has any confusion about what the terms say.  But we,

13  nonetheless, have offered to sit with them and answer

14  reasonable questions so that they understand what it is that

15  the provisions say or don't say.  But we're not required to go

16  find a witness, provide them with legal opinions, and then

17  produce a witness to speak to legal opinions.

18        The second issue that comes up here, and this is

19  really what Mr. Ryan spent the most time with and seems to

20  want to deal with, is they want us to identify, to use his

21  language, the abuse claims against the insurers and co

22  insurers, which are covered under insurance policies issued by

23  the settling insurers.  And of course there is no abuse claims

24  I'm aware of against insurers or coinsurers.  Maybe he's

25  talking about coverage litigation.  Maybe he made a mistake in

1  the topic that he asked for.  I don't understand it.

2          But if I were to read through it to find something

3  that maybe he would have intended, then he's asking for the

4  identification of which of the abuse claims hit into which of

5  the policies.  And that is a mapping exercise.  And the

6  mapping exercise would be to take 82,000 proofs of claim and

7  apply them across what I understand to be 1900 insurance

8  policies.  And the date of that is available, to perform that

9  analysis is equally available to the ad hoc committee, as it

10  is available to the debtors and everybody else in this case.

11          The ad hoc committee has no right to put the

12  debtors to work to undertake an analysis, based on data

13  equally available to the ad hoc committee, so that they can

14  save time, mapping the claims themselves.  If this is an area

15  that they have an interest in, then they ought to perform the

16  analysis with the data that they have.

17          And then relatedly, and Your Honor noted this, as

18  well, we could not conceivably prepare a witness to testify in

19  a mapping exercise of 82,000 claims to 1900 policies.  No one

20  in the world could memorize that information.  So, it's never

21  going to be appropriate for a deposition.

22          It could have been appropriate for an

23  interrogatory, though, I don't think we have to respond, given

24  the -- we could have, under the Federal Rules, just cited them

25  to the data and let them done it themselves.  Mr. Ryan said,

1   well, they tried to get it through RFAs.  Again, I don't think

2   the debtors would have an obligation to undertake this

3   analysis in response to RFAs or otherwise, but it also is not

4   accurate.  There are no RFAs that went through the exercise

5   that they're demanding through a 30(b)(6) witness.  So, that

6   category doesn't work.

7           And then the last category is, what policies, what

8   are the claims they hid into the Roman Catholic policies?

9           And the initial response to that is, the debtors

10  don't have the Roman Catholic policies.  Interestingly, again,

11  they're talking about the Roman Catholic policies, for those

12  that they don't purport to represent, which is the churches

13  across the country.  And Mr. Ryan, two or three times, said,

14  These are our policies, our property.

15          Well, because they are their policies, we don't

16  have access to them and so we can't map for them how 82,000

17  claims reaches into their policies because they haven't given

18  us their policies.  And even had they done so, for the reasons

19  I just discussed in connection with the prior topic, that is

20  not something we have to do.  There is no right of an ad hoc

21  committee to compel the debtors to perform an analysis for

22  them, that they can perform themselves based on equal access

23  to the same data that that works.

24          And, likewise, as I mentioned before, even if we

25  had the policies, and we don't, and even if we were required

1  to perform the analysis, and we're not, you still could not

2  produce a witness that could speak to it, because nobody could

3  memorize, in this case, 82,000 claims mapped to whatever

4  number of policies the Roman Catholic policies have, that they

5  have elected not to disclose to us.

6           So, we don't think we owe any of this discovery.

7  We did agree to produce a witness, but not on these topics.

8           THE COURT:  Okay.  Let me ask this, when are we

9  going to see final agreements from the insurance companies,

10 with which the debtor has settled?

11          MR. KURTZ:  My understanding, Your Honor, is that,

12 as part of a mediation, there are other facets, other parties

13 and other facets that are being developed and because of that,

14 the agreements have not left the mediation room.

15          I am probably not the right person to answer, and

16 I, in particular, need to be careful, as I'm not sure what,

17 exactly, is mediation or not.  But it has certainly not been -

18 - what I can tell you is the debtors are not holding

19 information and refusing to produce it in order to delay or

20 prejudice.  It's because it's still subject to mediation.

21          Mr. Schiavoni probably has more chapter and verse

22 than I do on that one, Your Honor.

23          MR. SCHIAVONI:  If I may, Your Honor, I can give

24 you a little information on that.

25          THE COURT:  Okay.

1          MR. SCHIAVONI:  So, Tanc Schiavoni for Century.

2          Your Honor, it may be an epic understatement that

3   we call this a term sheet in the first place, given that it's,

4   I don't know, 30 pages long and, you know, it uses 30 or 40

5   defined terms.  This is an extremely -- if one wants to call

6   it a term sheet, it is extremely robust.  The final agreement

7   is really going to change the word term sheet and have

8   agreement on it.

9          But what's holding it up?

10         I will, in the most measured of terms -- I'm

11  looking for a way to phrase it -- but I heard Mr. Ryan say

12  that he was told that mediation was holding it up.  We worked

13  with him very hard on this agreement to get closed with the

14  Methodists.  We didn't have any of these questions somehow,

15  with regard to the Methodists, where there wasn't an insurance

16  company involved with the representation of the committee.

17  Now that we have one, some other things have come up.  But

18  what's holding it up?

19         We have asked Mr. Ryan for comments -- we asked him

20  on Thursday -- and if he doesn't want -- if he's not going to

21  give us comments, fine.  We're just going to have to -- we'll

22  go ahead without it.  But we thought that would be the most

23  productive way to kind of close any remaining, open issue with

24  him, in a way that got the case done.  So, if he could get us

25  comments today or tomorrow, that would dramatically facilitate

 1 getting this finished; otherwise, we will move with

 2 extraordinary haste to get it done.

 3           THE COURT:  Okay.  Let me hear from --

 4           MR. SCHIAVONI:  Your Honor, I would like to be

 5 heard on the merits of the discovery --

 6           THE COURT:  Yes.

 7           MR. SCHIAVONI:  -- but I wasn't sure whether --

 8 should I be heard now on that?

 9           THE COURT:  Yes.

10           MR. SCHIAVONI:  Okay.  Thank you.

11           Your Honor, suffice it to say that the -- from our

12 perspective, Mr. Ryan has grossly mischaracterized our

13 settlement agreement.  I can't imagine that he would have

14 supported the settlement agreement if it was as he described

15 it, with respect to the Methodists, who it would apply the

16 same weight to.

17           An opt-out is not a limited, protected party.  He

18 has mixed the terms together and, you know, applied them in a

19 way that doesn't -- it's just simply not how the agreement

20 works at all.  We've endeavored in our response to sort of try

21 to deal with these issues directly and, you know, that's set

22 forward at Document 8597 on pages 4 and 5.  We talk

23 specifically about some of the conundrums about how he's

24 presented this and provided citations to it.

25           There's nothing being taken away from a charter

1  that opts out of the settlement.  If it doesn't -- like, in

2  essence, what Mr. Ryan is complaining about is that he's been

3  given injunctions without having to pay anything and he's

4  unhappy that they're not broader under those circumstances.

5          But he's mischaracterized, in essence, these

6  assertions that things are being taken away from someone who

7  opts out -- who doesn't opt-out, rather.  It's really -- it's

8  just not how the settlement agreement works.

9          There are two things that the committee contends it

10 needs this 30(b)(6) for.  One, it says it needs to ask

11 questions about the scope of the channeling injunction, with

12 regard to the Catholic chartered organizations and which abuse

13 claims are going to be paid and whatnot.  The other topic is

14 what insurance policies issued to the Roman Catholic entities

15 are being compromised.  These are, in general, how these two

16 term -- these -- that the discovery sort of breaks out.

17         As to the first question, the plan and the term

18 sheet really speak for themselves in this regard and that's

19 what the answer is going to be, regardless.  If Your Honor

20 opts to decide to let the debtor answer some questions about

21 it, so be it, but the answers are right in the plan and

22 they're right in the term sheet.  There's not a separate

23 deposition that's necessary here or that's really, ultimately,

24 going to be proportionate to the needs of the case when we're

25 trying to work through the remaining discovery that we

1  otherwise have.

2          The determinations of what specific claim will be -
3  - how it will be dealt with under a specific policy, that's
4  got to be made in the context of the specific claim and the
5  specific policy.  We tried to give as much answer on this as
6  we could on the 1827 requests for admission that were served
7  on us.  We literally spent hundreds of hours much we brought a
8  team in over the New Year's weekend.  They worked throughout
9  that weekend and through the week.  And what they did was they
10 gave particularized responses, with regard to each of the
11 policies.

12          The situation with regard to the policies is
13 different, based on different terms and different -- and facts
14 going to the existence of the policies and we provided
15 different information with regard to different requests with
16 respect to those 1800 requests.  We aren't able, on a request
17 for admission, to reach the ultimate issue on how a particular
18 claim was dealt with, because each claim is different.

19          And we did, however, serve requests on the Catholic
20 chartered group, informally, by letters; informally, by phone
21 requests; and then, ultimately, formally, by the requests we
22 served, saying, could you please help us out, please cooperate
23 with us, please aid us by giving us the list of the claims
24 that have been asserted against your churches so we can take a
25 look at them and assess them.

1        We were stonewalled right down the line.  We didn't

2   get responses to the letters.  We didn't get responses to the

3   requests.  And they moved to quash the requests, themselves,

4   that were served on them.

5        So, we did our best and we spent hundreds of hours

6   responding to those requests for admission.  By putting a

7   30(b)(6) witness, you know, in the box to answer questions on

8   the fly about individual claims is just -- it's not going to

9   add much.  It's like those questions have to be addressed on a

10  claim-by-claim basis.

11       But to be clear, the term sheet says that if

12  there's a dispute about the application of the injunction on

13  specific claims, the parties can seek a court ruling in that

14  regard.  That's Section 15(c) of the term sheet.

15       The term sheet also provides that in the event the

16  injunction does not apply for any reason, all parties' rights

17  under the relevant insurance parties, is preserved.  That's

18  also Section 15(d).

19       Against that backdrop, the committee's request or

20  sort of, you know, assertion of purported uncertainty and

21  confusion, is no basis for calling for depositions that seek

22  legal conclusions and contentions about hypothetical claims

23  there.  It's like, the answers are really in the plan and in

24  the term sheet.

25       It's not unusual, in any way, you know, in these

1  kinds of cases, for a broad release to be granted with respect

2  to policies.  All the time in mass tort cases, policies are

3  released on a known and unknown basis, because that's the fact

4  pattern we end up being presented with.

5          On the other area, the second topic that the

6  committee contends it needs discovery about, the purported

7  impairment -- the questions about what other policies are

8  being impaired, or compromised, I think, is the word they

9  used, there's no impairment of the policies owned by a Roman

10  Catholic organization that has not -- you know, that's opted

11  out or, I'm sorry, that's not opted out.

12          We go through, in the letter we submitted to Your

13  Honor, you know, I think seven different conundrums that have

14  been asserted here, you know, only because precision here is

15  so important (indiscernible) walk through them all, but

16  there's seven in the letter and I think, you know, we gave

17  some careful thought on it.  It's like, if it was necessary

18  for us to adopt a response like this as an interrogatory, it's

19  like, that's something we would be willing to consider.

20          I don't think it makes any sense at all to put a

21  witness in the box to answer, like, purely, you know, like,

22  legal conclusions about these terms, essentially, when they've

23  been misrepresented in the first place.

24          Under the term sheet, all of the chartered

25  organizations insured by Century or any Chubb company,

1  including the members of this committee, whoever they might

2  be, will receive a release of Scouting-related abuse claims

3  that are covered by the Century policies as a result of the

4  settlement agreement.  There's no waiver or assignment of

5  anything that's required by a charter that decides to opt-out

6  to receive that benefit.

7            There is no set of circumstances in which this, you

8  know, the committee or any other chartered organization, is

9  being compelled to assign its rights related to the insurance

10 policies, directly or indirectly, here that have decided to

11 opt-out.  All the charters are going to receive a significant

12 benefit, to the extent that they're Century insureds or

13 insureds of Hartford or Zurich, whether or not they choose to

14 participate.

15           Those who choose to participate and not object, are

16 going to receive benefits beyond the others.  That's how the

17 plan is designed.  And whether or not they want those is for

18 them to decide.  But the way Mr. Ryan has characterized the

19 settlement agreement is just at odds with this playing of

20 terms of what the settlement agreement says and it's not

21 necessary to have a deposition to flush that out.

22           Thank you, Your Honor.

23           THE COURT:  Thank you.

24           I have one question.  You said that you had a team

25 come in over New Years and they spent hundreds of hours

1  devising responses to discovery.  I wasn't clear that it was

2  interrogatories or what, but I don't see any of that work

3  product in anything that's been submitted to me.

4           So, what am I missing?

5           I see the responses to the interrogatories and I

6  see the response to the admissions, which they're all the

7  same, which is, basically, if I could read it -- it's so small

8  -- but, you know, we can't truthfully admit or deny, et

9  cetera, for the admissions.

10          And so, I'm just trying to figure out what I'm

11 missing.  Were there responses to discovery that were not that

12 were actual substantive responses?

13          MR. SCHIAVONI:  Yeah, the responses were to the

14 requests for admission.  I'm not exactly sure what you've got

15 in front of you.  Those were the ones where there were 1800 of

16 them.  You know, there were a number of individual ones that

17 would be the same.  There were others that were different.  It

18 required a review of the individual policies, themselves.

19          THE COURT:  Okay.

20          MR. SCHIAVONI:  I've got -- my colleague -- I'm

21 going to give you an admission now I'm a little embarrassed

22 about, but, like, I did take New Year's Eve off, but my

23 colleague Mary Beth was, you know, hard at work from Simpson

24 Thacher on the Chubb requests; she's the one who went through

25 those.

1         Ms. Forshaw, you could you just point us to where

2    those are in the collection.

3         MS. FORSHAW:  Your Honor, the requests for

4    admission break into three categories, the 1837.  A team of

5    people went through the policy documents that have been in the

6    debtors' data room forever -- the Catholic Ad Hoc Committee

7    has had access to them -- and we determined where a policy

8    existed, where a policy was missing and there's no

9    documentation, so we couldn't say whether there was or wasn't

10   coverage, and we determined where policies were canceled.

11        And there might have been other variables, but we

12   went through and pointed the Committee to what the

13   documentation basically said, and as Mr. Schiavoni said, we

14   couldn't say whether an individual claim was or wasn't covered

15   because you need the facts of the claim.

16        THE COURT:  Okay.

17        MS. FORSHAW:  I hope that helps.

18        THE COURT:  Yes.  Thank you.

19        So, within the responses to the requests for

20   admission, which are in an incredibly tiny font, there might

21   be several variations of the response; that's what I'm

22   hearing.

23        MS. FORSHAW:  Correct.

24        THE COURT:  Gotcha.

25        MS. FORSHAW:  Correct.

1             THE COURT:  Okay.

2             MS. FORSHAW:  Most of these policies are missing,

3    Your Honor; despite the good faith searches of both, the

4    debtor and Century and Chubb.

5             THE COURT:  Okay.  Thank you.

6             MS. FORSHAW:  Sure.

7             THE COURT:  Okay.  Let me hear from Mr. Plevin.

8             MR. PLEVIN:  Good afternoon, Your Honor.  Mark

9    Plevin for the Zurich insurers.

10            We actually moved to quash Mr. Ryan's deposition

11   notice before he moved to compel testimony.  So, maybe we got

12   ahead of him on that.

13            And just to be clear, there is no motion to compel

14   further answers to RFAs against Zurich and there's no further

15   -- there's no motion to compel further responses to document

16   production to Zurich.  So, we're talking just about the

17   deposition notice.

18            And we went through, in our letter to you, and went

19   through the various topics, as we did back in, I think it was

20   November when we were dealing with the depositions previously,

21   and pointed out the technical deficiencies in the requests.

22   And interestingly, to me, when Mr. Ryan filed his paper

23   yesterday, he didn't respond to any of those arguments.  He

24   simply said in a footnote, I think it was Footnote 1, that

25   he's resting on something.  I'm not sure exactly what he's

1    resting on, but there's no response to the technical points

2    that we made about the impropriety of the topics and the

3    deficiencies in the topics.  And so, I think our motion to

4    quash essentially stands uncontested and not responded to and

5    could be granted on that basis.

6              Now, if you look at the question that Mr. Ryan says

7    that he's trying to get to, which is, and I think I wrote this

8    down correctly, they want us to say what the injunction

9    language means.  That is, as Mr. Kurtz pointed out, a question

10   that seeks legal conclusions, contention testimony, and here,

11   inevitably, disclosure of attorney-client communications and

12   attorney-client work product, and so it's not proper.

13             And there's really no other argument that he makes.

14   I mean, everything else we said in our letter brief to Your

15   Honor is uncontested.  We did point out that many of the

16   topics are so broad, vague, and ambiguous that they don't meet

17   the Rule 30(b)(6) requirement that the topics be described

18   with reasonable particularity or painstaking specificity.

19             He's asking us to provide testimony on topics that

20   we just don't have any information about, such as local

21   council policies, which my clients did not issue and, you

22   know, all policies of insurance issued to Roman Catholic

23   entities, which he never specified.  And it is curious, and I

24   think Mr. Kurtz pointed this out, that if the ad hoc committee

25   consists of 12 or 13 Dioceses or Archdioceses, they never

1  asked us to do a search just for those; they asked us to do a

2  search for all Roman Catholic entities, and as has been

3  represented to the Court, there are literally thousands of

4  those.

5          And then when you get to the settlement issues,

6  because there are a few topics here that do address

7  settlement, and we address those in paragraph 5 of our letter

8  towards the end, those topics are improper.  They don't state

9  with reasonable particularity the matters for examination.

10  They ask a Zurich witness to summarize or analyze the terms of

11  the term sheet or the policies issued by Zurich to interpret

12  and apply the term sheet and its provisions to hypothetical or

13  actual facts.

14          And because this was done in a mediation, not only

15  would we have to disclose attorney-client privilege and

16  attorney-client work product, we would have to disclose

17  mediation communications, as well.  And so, from a technical

18  perspective, the topics are all deficient.  No effort was made

19  in the letter that was filed yesterday to support or contest

20  any of the points that we made, and we think our motion to

21  quash should be granted and his motion to compel should be

22  denied.

23          THE COURT:  Okay.  Mr. Ruggeri?

24          MR. RUGGERI:  Thank you, Your Honor.  James Ruggeri

25  for Hartford.

1          Judge, we're in a little different situation,

2   though, I join in all the comments made by prior counsel,

3   including Mr. Kurtz.  The mapping exercise would be impossible

4   to do.  And the topics that Mr. Ryan noticed couldn't be

5   broader, including all policy of insurance issued to Roman

6   Catholic entities.

7          We talked to Mr. Ryan about the question that he

8   posed to the Court and I said, you need to tell me which claim

9   and I need to know the facts of the claim and then I can go

10  look to see if my client issued a policy to that local council

11  or the chartered organization and then you need to map the

12  allegations of that claim against the policy, if we issued

13  one.  You have to do that for 82,000.

14         And you've heard the parties speak in this

15  courtroom, which is the number of chartered organizations,

16  I've heard a low number of 40,000 and a high number of over

17  100,000.  It just can't possibly be done.

18         I would urge the Court to read Century's letter

19  that it offered yesterday at Document 8597, and it actually

20  goes on pages 4 through 6, that goes chapter and verse.  And

21  to the extent that Mr. Ryan wanted help in interpreting the

22  Century term sheet, they provide that help there, including

23  saying:

24         "Under no set of circumstances is the committee or

25  any chartered organization being compelled to assign rights to

1  insurance policies issued directly to any chartered

2  organization."

3           It could not be clearer and it's clear from the

4  term sheet, itself, as well.  Judge, my client, as Zurich, we

5  actually moved to quash before Mr. Ryan filed his motion to

6  compel.

7           Again, for better or for worse, I did present a

8  witness to testify with regard to the Hartford term sheet,

9  which is short, by comparison, to the Century term sheet, but

10 it's eight, single-spaced pages long.  My witness Michael

11 Hotaling, a Hartford senior vice president, testified for six

12 and a half hours on December 2nd and gave 303 pages of

13 testimony.

14          If the Court looks at the motion to compel filed by

15 Mr. Ryan, you see that with regard to Hartford, he really only

16 talks about paragraph 5 of the Hartford term sheet and that's

17 the, what he's referred to as the "most favored nations"

18 provision with regard to scope of releases.  He says Hartford,

19 through its "most favored nation" clause in Section 7 of the

20 Hartford term sheet, is availing itself of the same

21 injunctions and releases that Century negotiated for.

22          Okay.  In fact, as Mr. Ryan tells the Court he

23 understands what Section 7 says, that if another settling

24 insurer gets broader protection by way of releases, so does

25 Hartford.  It couldn't be more clear what the Hartford term

1 sheet provides and it couldn't be more clear that Hartford

2 presented its witness on December 2nd, Mr. Hotaling, to

3 testify on the Hartford's term sheet, including Section 7, and

4 he was peppered at length for six and a half hours about the

5 Hartford term sheet, including Section 7, I believe, at page

6 93 of the testimony, to name one example.

7          So, no one prevented them from having free reign to

8 ask questions about the Hartford term sheet.  What you can't

9 get, and Rule 38(2) makes this clear, you don't get a do-over.

10 You don't get a do-over, absent leave of Court.  You can't ask

11 the same witness for a second deposition on the same questions

12 that you asked the first time.  There are Delaware cases to

13 that effect, too.  Some say if they meet the burden, they get

14 the second deposition.  Others say, you don't get the second

15 deposition.  But the Rule is darn clear, there is no

16 boogeyman, with regard to the Century term sheet.

17          But with regard to that term sheet, Sections 9, 10,

18 and 11 of the term sheet, all my client can do is point Mr.

19 Ryan to that Century term sheet.  We didn't draft it.  We

20 didn't negotiate it.  I don't have personal knowledge of it,

21 outside what Mr. Ryan and I both can read.

22          That is no basis to ask for a second deposition of

23 Hartford when he's demonstrated to the Court in his motion

24 that he understands full well what my term sheet provides and

25 my witness has testified about my term sheet.

1        Thank you, Your Honor.

2        THE COURT:  What about Hartford's settlement

3  agreement versus the term sheet?

4        MR. RUGGERI:  Your Honor, I think what I would say

5  with regard to that is that, as Mr. Kurtz said, the parties

6  are working hard to finalize those settlement agreements.  I

7  think I'm not telling tales out of school.  Perhaps no one is

8  more frustrated than I -- maybe Mr. Anker -- that the Hartford

9  settlement has not been produced in published form.

10        But I will say, with regard to the comparison of

11  the draft settlement agreement that we filed on November 30th,

12  which was before the Hartford deposition, my client didn't run

13  from it.  What my client said at the deposition is, That's not

14  our settlement agreement.  We didn't file that.  We work on

15  that.  That's not our work product, so I can't add anything.

16  You're talking to the wrong person with regard to that.

17  That's not our settlement agreement.

18        But I, too, am frustrated.  We're working hard to

19  finalize the settlement agreement.  Everyone is mindful of the

20  February 22nd date.  I don't think I can add to what has

21  already been said about that in terms of the parties'

22  awareness and working very, very hard and diligently to

23  finalize those settlement agreements.

24        THE COURT:  Okay.  Thank you.

25        Mr. Ryan, do you have any -- I'll give you an

1 opportunity to respond and we'll close out Number 5, as well

2 as a few others, I believe.

3             MR. RYAN:  Sure.  Sure, Your Honor.

4             As a preliminary matter, I'm happy to wait for the

5 Hartford term sheet to be turned into a final settlement

6 agreement (indiscernible) deposition.  I'm happy to wait for

7 all of these carriers to give us final settlement agreements.

8 You still haven't heard when we're going to see those.  So,

9 that question that you asked has remained unanswered after

10 another hour of argument.  But we'll wait until all of that is

11 done and then just -- and then take the depositions on those.

12             With respect to Mr. Schiavoni, he went into pretty

13 great length about what was going on in the mediation.  I'll

14 tell you this, Judge, we asked he and Ms. Forshaw repeatedly

15 why can't they just say, if what he said is true, that a

16 charter's own insurance policies purchased with its own money

17 from Century are not being impaired, why can't they just say:

18 Not being impaired.

19             If that was true, Judge, then let's put it in the

20 agreement:  a charter's own policies are unimpaired.

21             But you didn't hear that, Judge.  Not one bit.  So,

22 that's the truth.  That's how we read the settlement and we

23 believe we read it right, because we've asked Century and

24 Chubb to say, please, just tell us that the Archdiocese of New

25 York's own policies are unimpaired by what you're doing here.

1  That would alleviate a lot of problems, but they haven't said

2  it.  They won't say it.

3          With respect to the actual language that Mr. Kurtz

4  didn't understand, that was a quote from Century's term sheet.

5  Century's term sheet said on the release date, all abuse

6  claims against insureds and co-insureds covered under

7  insurance policies issued by the settling insurers, shall be

8  channeled under the settling insurer policy injunction and

9  released.

10          I didn't make that language up.  I didn't misquote

11  it.  I have asked every person who's a party to these

12  agreements that had that language in it what it means.  What

13  you've been told today is it calls for a legal conclusion.

14  The injunction calls for a legal conclusion.  The injunction

15  would require us to figure out what claims are actually

16  enjoined.  The injunction calls for attorney-client,

17  privileged information.

18          What kind of injunction is this, Judge?

19          If no one can say to you or me what is enjoined,

20  without revealing privileged information, or it's going to

21  have to be determined in another court of law down the road,

22  let's make that record.  And if that's their language, that's

23  fine.  We're entitled to ask those questions.  And if they

24  want to have those responses, that's fine, but you should know

25  if that's their response, that they can't even sit before you

1  and tell you what claims are enjoined.

2          With respect to mapping, we took the deposition of

3  Mr. Whittman last week for the debtors.  He testified that

4  there had been an analysis of what claims are covered under

5  what policies.  So, I can't be that arduous to produce it or

6  to testify about it if Mr. Whittman has seen it.

7          And as Mr. Schiavoni won't even comment to his

8  insurance settlement agreement, we're not a party to that.

9  It's not our obligation to comment on his documents.  We're

10  not signing them.  We're not negotiating them.  He's doing

11  that completely without us.

12          At the end of the day, Judge, we're entitled to

13  make a record that the injunction they have embeds legal

14  conclusions, before the scope of the injunction can be

15  determined.  We're entitled to make on the record the enormity

16  of the relief that they're asking.

17          And so, when we ask for all Roman Catholic

18  entities, Your Honor should be aware of what this injunction

19  is actually doing.  And they go, the questions maybe go beyond

20  who's just affected on my committee, but Your Honor should

21  know how deep, wide, and massive the scope of this injunction

22  is.  So massive they can't tell you who's enjoined.

23          Now, we're aware of the opt-out effect that Mr.

24  Kurtz talked about at the beginning of his thing and we've

25  accepted those consequences.  I think we've established now

1  that for the people on my committee, we know the position the

2  debtor is going to take with respect to opt-outs for those

3  people on the committee.  We also left it with the Court at

4  the beginning of the hearing that the Court is going to make

5  the ultimate determination as to what the effects of that are.

6  So, our people do have standing.

7          The policies that the Archdiocese of New York

8  bought is being impaired.  The Archdiocese and Diocese bought

9  blanket coverage to cover their Parishes.  What Century is

10  doing is reaching into -- and it doesn't depend on you being a

11  chartered organization buying a policy -- but non-charters who

12  bought policies with additional insured endorsements, they

13  cover charters.  Their policies are being affected, too.

14  That's how broad the scope of what's being requested is.

15          So, all we're asking, Judge, is a simple time to

16  sit down and get answers from these carriers.  And if they

17  want to say, legal conclusion, we don't know.  We can't

18  possibly tell you what policies we're impairing, that's fine.

19  We just want to make that record.  That's what we told Mr.

20  Plevin.  We had meet-and-confers which were very productive

21  with him.  We've said, these are the information we're going

22  for.  This is what the deposition is.  It may be a one-hour

23  deposition, but everything that you've heard from Mr.

24  Schiavoni, Mr. Ruggeri, and Mr. Plevin is going to hold true.

25  You're going to get a whole lot of objections, instructions

1  not to answer, based on privilege.  That's fine.

2         If they don't want to tell you or me what the

3  injunction does, that's fine, but we're entitled to get those

4  answers.  We're entitled to take depositions on eight-hundred-

5  million-dollar settlement agreements that are embodied in the

6  plan.  There can be no other way to allow us to make a record,

7  than to give us the depositions.  It can't be that someone can

8  do an eight-hundred-million-dollar insurance buyback and

9  escape a deposition on that settlement agreement.

10         So, you know, Your Honor, I see Mr. Schulman's hand

11  is raised, so I would like to also let him weigh in on this

12  because the TCC also has a vested interest in these

13  depositions.  But I'll note, again, Your Honor, we still don't

14  know when we're going to see these agreements.  And are we

15  going to see them before trial so we can depose and formulate

16  objections or not.

17         THE COURT:  Thank you.  Mr. Schulman?

18         MR. SCHULMAN:  Thank you, Your Honor.  And good

19  afternoon, Jeffrey Schulman from Passage, LLP, coverage

20  counsel to the TCC.  The motions made by Hartford and Zurich

21  to quash are not yet up on today's agenda, but there is some

22  overlap between the motions against the TCC and those that

23  you've heard.  So, to the extent that the Court was preparing

24  to make rulings with regard to the motion against the ad hoc

25  committee, I would ask that the Court would like to hear from

1  the TCC with respect to the TCC insurer issues, which I would

2  submit are, certainly, they're not identical.  There is some

3  overlap in terms of what we are seeking, perhaps some

4  different reasons for why we're seeking it.  So, I would ask

5  for the Court's direction on it.

6         THE COURT:  Are those -- those are 6 and 7, right?

7         UNIDENTIFIED:  Your Honor, I think the Hartford

8  number is Agenda Item 2, the Hartford motion to quash --

9         THE COURT:  Okay.

10        UNIDENTIFIED:  -- and our filings made it Document

11 8455.  It is a Hartford motion for to quash.  I do think we

12 should be heard first and I don't agree that there's

13 substantial overlap between the TCC's ask and the ad hoc's ask

14 of Hartford.

15        THE COURT:  Okay.  Well, we're going to take a

16 break, a five -- a seven-minute break.  It's 4:23.  We'll come

17 back at 4:30.

18        And we're completed with Number 5 and then we'll go

19 back to Number 2 and the Movants can present their motion.

20        We're in recess.

21    (Recess taken at 4:24 p.m.)

22    (Proceedings resumed at 4:32 p.m.)

23        THE COURT:  This is Judge Silverstein.  We're going

24 to go back on the record.  And, before we get started, Mrs.

25 Johnson reminded me that I wanted to let parties know that

1  with respect to confirmation, which starts on the 22nd, that

2  will be a complete day, but on the 23rd, which is a Wednesday,

3  we'll be breaking at 1 o'clock, picking up the next day, on

4  the 24th.  And then, on the 28th, I currently have a one-day

5  trial in a consumer matter that's been scheduled since, I

6  think, last August.  It is still on, they're telling us.  So,

7  unless that resolves, we will not have this hearing on Monday

8  the 28th.

9         MR. ABBOTT:  Your Honor, thank you.  Derek Abbott,

10  again, for the debtors.  And I'm happy to take this up with

11  chambers separately, but it was not clear to us how many

12  consecutive days other than now the 28th, it sounds like, the

13  Court had reserved.  It might be helpful for folks to know

14  that.

15         THE COURT:  Well, I wanted to talk to people about

16  that and to -- I noticed that witness lists were just filed

17  yesterday.  So I think I need to look at those and we need to

18  have a chat, but -- which we will do.  When are we --

19         MR. ABBOTT:  Your Honor, I know we had talked about

20  a final pretrial conference at some point.  Obviously, that

21  may have been --

22         COUNSEL:  We have a hearing set for February 9th at

23  10:00 a.m.

24         MR. ABBOTT:  But I'm happy to do it sooner than

25  that or, if that's the time that the Court would prefer to do

1  it, that's fine too.

2          THE COURT:  We can talk about it then.  We do have

3  a final pretrial on the 18th, but, no, we don't have to wait

4  until then.  And I'll give some thought to it and I'd like the

5  parties to give some thought to it as well, given the number

6  of witnesses that have been listed, as to what's realistic and

7  really whether that number of witnesses are going to be

8  called.

9          MR. ABBOTT:  Thank you, Your Honor.  I appreciate

10  the guidance.

11          THE COURT:  Mr. Buchbinder, I see that your hand is

12  -- and I know your hand has been up, so let me hear from you

13  before we move on to the next matter.

14          MR. BUCHBINDER:  Thank you, Your Honor.  David

15  Buchbinder on behalf of the United States Trustee.  We do not

16  have a position to assert with respect to this afternoon's

17  motion, but I do have a few observations I'd like to quickly

18  make.

19          First, much of today's discussion seems to be based

20  upon the assumption or supposition that the plan before the

21  Court has been or will be confirmed, and that certainly is not

22  the case as we sit here today.

23          Second, with respect to timing, I just want to

24  point out that the Century/Chubb term sheet was originally

25  filed an exhibit to the mediator's report that was filed on

 1  December 13th.  Only if you have that report and have looked

 2  at the exhibits would you know there's a term sheet there

 3  because it doesn't appear anywhere else on the docket.  The

 4  substantive portions of the term sheet appear to have been

 5  incorporated into the debtors' second modified fifth amended

 6  plan that was filed on Friday, December 18th, and a redline

 7  was also filed at docket entry 7833.

 8          A very cursory scroll through docket entry 7833

 9  would reveal that the substantial modifications made to the

10  plan were made primarily by changing many of the definitions

11  and provisions related to the chartered organizations, the

12  subtleties and nuances of which I won't speak to today, but

13  those are where the most significant changes appear.

14          As the Court has noted, no final settlement

15  agreement has been filed with the Court to date.  And I simply

16  want to close by reminding the Court that the objection

17  deadline for the plan for the nonparticipating parties is this

18  Friday and the objection deadline for the participating

19  parties is next Monday, February 7th.

20          Thank you, Your Honor.

21          THE COURT:  Thank you.  Okay.

22      (Pause)

23          THE COURT:  Okay, so we're back at Agenda Item

24  Number 2.  Mr. Ruggeri?

25          MR. RUGGERI:  Thank you, Your Honor.  James

1  Ruggeri, again, for Hartford.

2            Your Honor, Hartford moved to quash on January 24th

3  of 2022.  We did that by way of a letter brief and in the

4  letter brief we set forth again that -- the details regarding

5  the Mike Hotaling deposition on behalf of Hartford.

6            I would note initially that the move to quash the

7  dep notices of both the TCC and the Roman Catholic Ad Hoc

8  Committee, I saw a two-page -- three-page response from the

9  TCC and I didn't see any response from the Roman Catholic Ad

10  Hoc Committee.

11            With regard to a procedural issue, Your Honor, we

12  think that the TCC's request to take the deposition, the

13  second deposition of Hartford falls within the rule of -- Rule

14  30(a)(2), and the case law is pretty clear that you don't get

15  a second deposition if the deposition is cumulative or you had

16  ample opportunity to ask questions the first time, or it's

17  outside the bounds of discoverable discovery, proper

18  discovery.

19            Mr. Hotaling sat there on December 2nd for six and

20  a half hours, 303 pages, and patiently answered questions.

21  There were lots -- 36 topics, I think, and the TCC and we

22  winnowed it down a bit by way of a stipulation.  Then, you

23  know, that was in -- the 36 topics were in the notice filed

24  November 16th, 2021.

25            And then on January 20th, 2022, we received another

 1  notice from the TCC listing five topics.  Your Honor, they are
 2  literally the same topics as those among the 36 topics that
 3  the TCC served back in November of 2021.  Topic one, the BSA
 4  plan settlements, including term sheets, that's covered by
 5  topics 1, 4, and 6 of the TCC's 11/16 notice.  And that 11/16
 6  notice is at Docket 7258-1.
 7        Topic 2 of the January 20 notice, identity of
 8  insurance policies included in the BSA plan settlements;
 9  that's covered by topics 11 and 13 of the November 16th
10  notice.
11        Topic 3, drafts of settlement agreements, that's
12  covered by topics 4 and 6 of the November 16th notice.
13        Topic 4, Hartford's indirect abuse claims, that's
14  covered by topic 10 of the November 16th notice.
15        Topic 5, the determination of who will testify on
16  Hartford's behalf; again, that's privileged, but to the extent
17  that you're counting to see the overlap, that's covered by
18  topic 36 of the November 16th notice.
19        We're 21 days away, we know that.  We have lots of
20  work to do.  We shouldn't spend our time, Your Honor,
21  repeating topics that were covered in prior depositions.  I
22  will note that just yesterday -- maybe it was a backhanded
23  compliment, maybe not, but I did appreciate what the TCC said
24  about Hartford in its paper that it filed against Zurich, and
25  that's at Docket 8581.  It made the point that Hartford,

1   unlike perhaps others, but we provided fundamentally relevant

2   testimony on discoverable topics.  We did, we did at length on

3   December 2nd, and we shouldn't have to do it again.

4          Your Honor, when you look at the opposition to my

5   motion to quash, it doesn't talk about the topics in the dep

6   notice that the TCC served on January 20th.  It says that

7   there were these two related issues, it calls them, and what

8   they go to is the draft settlement agreement that the debtors

9   filed with a plan supplement on November 30th.  That's Docket

10  7517 at 10.

11         And you heard it again today.  They said Hartford's

12  witness ran away from the draft document -- or draft

13  settlement agreement.  They didn't run away at all, Your

14  Honor.  That draft settlement agreement was marked as Exhibit

15  3 during the Hotaling deposition on December 2nd.  And even

16  though Mr. Hotaling said I haven't seen it, we didn't work on

17  it, I didn't negotiate it, counsel for the deposing party

18  spent nine pages of the transcript peppering him with

19  questions about that draft settlement agreement.

20         Your Honor, I think the punch line from that

21  testimony and why you don't need to reconvene the deposition

22  to do what the TCC asks the Court to let it do again, which is

23  to pepper him with more questions about that draft settlement

24  agreement, it's not Hartford's draft.  I mean, Mr. Hotaling's

25  testimony couldn't be any clearer that he couldn't testify to

1   that document, which was filed a couple of days before his

2   December 2nd deposition, he couldn't testify any more than

3   read the document, just as the TCC's counsel and just as the

4   ad hoc committee's counsel was able to do.

5           It's debtors' draft, it's not Hartford's draft, and

6   if it needed to be any more clear that when debtor filed the

7   draft settlement agreement with its supplements on November

8   30th, 2021, they introduced it with a big, important notice

9   and that important notice said this is a draft, it's subject

10  to review and comment by the other parties.  And, if that

11  weren't enough, when you got to the actual draft settlement

12  agreement, they dropped a footnote 1 that again said this is a

13  draft, it doesn't -- you know, this is not the definitive

14  agreement, all parties reserve the right to review and

15  comment.

16          It's not our draft and, Your Honor, we think it's a

17  real waste of time and money to present a witness -- and this

18  is the only topic that the TCC raised in opposition to our

19  motion to quash, to convene a deposition for Mr. Hotaling to

20  again say didn't draft it, didn't negotiate it, I don't know

21  anything more about this than what I can read from the

22  document itself, Your Honor.

23          There are no grounds to take a second deposition of

24  Mr. Hotaling in regard to a draft settlement agreement that's

25  not Hartford's settlement agreement, Your Honor.  Thank you.

1            THE COURT:  Thank you.

2            Mr. Schulman?

3            MR. SCHULMAN:  Thank you, Your Honor, and good

4    afternoon once again, Jeffrey Schulman for the TCC.

5            Your Honor, Mr. Ruggeri spent the majority of his

6    time addressing issues that are not issues at all.  There is

7    one discovery dispute between Hartford and the TCC.

8            Hartford was deposed on December 2nd.  That is

9    true, I was there; I deposed Mr. Hotaling on behalf of the

10   TCC.  Mr. Ruggeri is correct that prior to that date Hartford

11   and the TCC negotiated and executed a detailed stipulation

12   that was intended to streamline that deposition and even to

13   address some evidentiary issues we anticipate at the upcoming

14   confirmation hearing.  And, prior to that date, Hartford

15   agreed to produce a witness regarding its six-page settlement

16   term sheet, and in fact did produce Mr. Hotaling on that

17   subject.  And we questioned Hartford by Mr. Hotaling on that

18   subject and all other subjects with one exception, and that

19   one exception was a 91-page document entitled "Draft of the

20   Hartford Insurance Settlement Agreement" that was filed the

21   day before.

22           Now, granted, only 47 pages of that document are

23   the actual agreement and the remainder is various exhibits and

24   schedules.  And in all candor, Your Honor, my expectation

25   between the time when it was filed and the morning of Mr.

1  Hotaling's deposition was that I was going to have to study

2  with due dispatch that document because Mr. Hotaling was going

3  to come prepared to know that document better than I.

4         And, much to my surprise, as cited in our papers,

5  Mr. Hotaling was presented with that document and he testified

6  that he hadn't seen it, he testified that he had no knowledge

7  of it, he testified he was not involved in negotiating it and

8  that he, on behalf of Hartford, was not prepared to testify

9  it.

10         So the TCC now seeks a continued deposition of

11 Hartford, whether by Mr. Hotaling or otherwise, solely on the

12 issues relating to this agreement.

13         And I would submit to Your Honor that Hartford --

14 in Hartford's motion it acknowledges that it needs to produce

15 a witness on that topic for three reasons, both in the letter

16 and as just reaffirmed by Mr. Ruggeri.  The first is that

17 Hartford opens its motion by claiming that the discovery

18 sought by the TCC falls into three categories.  One, issues

19 previously raised and abandoned at the last deposition.  We

20 now know and Mr. Ruggeri acknowledges that that's not what

21 happened.  Two, issues that are over-broad and abusive.  The

22 draft settlement agreement cannot be argued to be over-broad

23 or abusive, or questions with regard to that document.  Or,

24 three, issues relating to documents Hartford had no role in

25 preparing.

1        And I think that's where the nuance and the hair

2   has again been split today, because now there appears to be a

3   distinction between documents that the Hartford actually

4   prepared versus documents that the Hartford might ultimately

5   read and review and endorse.  We don't know, other than what

6   the document says and that it is a draft of the Hartford

7   Insurance settlement agreement, who prepared it, who drafted

8   which parts of it, how close it is to a final.  We know that

9   there are significant differences between the six-page term

10  sheet and the 47-page settlement agreement.  And we tried to

11  ask Hartford by Mr. Hotaling about that document and he wasn't

12  prepared to do so.

13        The answer was not I'm not prepared to do so

14  because we didn't prepare -- we, Hartford, didn't draft and

15  had no role in drafting this document, it was I'm not prepared

16  to do so because I, Mr. Hotaling, had not reviewed the

17  document and was not involved in the negotiations.

18        Number two, Hartford later argues that this 91-page

19  document filed with the court is not finalized and that,

20  quote, "there is no final agreement yet on which a witness

21  could properly testify," end quote.

22        The problem with that argument, Your Honor, is that

23  the original term sheet, the six-pager, about which Hartford

24  previously produced the witness and gave testimony, also was

25  not final.

1          So there's going to be a path here.  There's a path

2    from the six-page term sheet, about which Hartford testified,

3    to a 40-plus-page draft settlement agreement, about which

4    Hartford has not yet testified, to at some day in the future,

5    a day that nobody knows when yet, there will be another

6    version, presumably a final and executed version, of that

7    Hartford settlement agreement, to which, as of right now,

8    nobody is going to be entitled to acquire.

9          The fact that it was a term sheet or the fact that

10   it's a draft, that this draft preceded that term sheet,

11   suggests that the former, the term sheet, is less final than

12   the latter, the draft on which we would like to now question

13   Hartford.  But Hartford testified about that draft term sheet.

14   So the idea that Hartford need only produce a witness to

15   testify about final documents is plainly inconsistent with how

16   discovery has otherwise proceeded in this case.

17         Third, Hartford says that it need not produce a

18   witness regarding a draft -- this draft term -- this draft

19   settlement agreement because any draft documents are protected

20   by mediation privilege.  But, once again, the term sheet was

21   not final and was prepared in mediation, yet Hartford rightly

22   produced a witness to testify about that.

23         At bottom, Your Honor, Hartford's designee may

24   testify that it had no involvement in the drafting of the

25   insurance settlement agreement, meaning Hartford, and that the

1   task was performed either entirely by the debtor, entirely by

2   the debtor and Hartford's counsel, or others, but the TCC is

3   entitled to ask those questions and get those answers under

4   oath so as not to be ambushed at the upcoming confirmation

5   hearing.

6           So the TCC respectfully requests that Hartford be

7   compelled to produce a witness as soon as possible solely on

8   the issues relative to the draft settlement agreement filed

9   with this court on November 30th at Docket 7515.

10          I'm happy to answer any questions, Your Honor.

11          THE COURT:  I guess the only question I have is,

12  then are you going to want another deposition once we get a

13  final settlement agreement?

14          MR. SCHULMAN:  That would, in all candor, be the

15  expectation, Your Honor, yes.  And if the final settlement

16  agreement came out today, that would certainly address all of

17  those concerns.  But I think, as Mr. Ryan suggested, we are

18  staring down the barrel of the confirmation hearing where we

19  do not have any final settlement agreements and, not only do

20  we not have any final settlement agreements, we don't have --

21  we have this path of crumbs that, as I said, goes from a six-

22  page term sheet to a 47-page draft to something else, and

23  maybe multiple somethings else, and we just don't know.

24          So, as I sit here today, Your Honor, I could not

25  represent to the Court that, if we got a deposition of

1   Hartford tomorrow on the draft that we now have, that we would

2   not want one of Hartford on Friday if on Thursday evening we

3   were alerted to their execution of a final agreement.

4            THE COURT:  Thank you.

5            Mr. Ruggeri?

6            MR. RUGGERI:  Thank you, Your Honor.  James

7   Ruggeri, again, for Hartford.

8            Your Honor, Mr. Schulman refers to the Hartford

9   term sheet, and of course that term sheet is fundamentally

10  different than the draft settlement agreement filed by the

11  debtors as a draft, subject to everyone else's review and

12  comment.  The term sheet was not a draft term sheet, it was

13  actually filed under the cover of the sixth mediator's report.

14  And in the report the difference, of course, is, as the

15  mediators advised the Court, the parties, plural, including

16  Hartford, have agreed on the terms of a settlement and it

17  attaches the term sheet reflecting the terms of that agreement

18  in principle.  That is fundamentally different than what we're

19  dealing with with regard to a draft document.

20           And Mr. Hotaling, again, couldn't have been

21  clearer, Hartford didn't draft that document, Hartford didn't

22  approve that document, Hartford is not going to have any

23  testimony on that document.  That's all been covered, that's

24  all been established.  That was a filing made by debtors as a

25  draft settlement agreement in connection with the plan

1  supplement.

2          I guess, if they wanted to find out why that draft

3  settlement was filed, they'd probably have to ask that of

4  debtors, but not of Hartford.  Hartford didn't make that

5  filing.

6          So, again, it's a waste of time and money to

7  convene a deposition to repeat the testimony that was given

8  the first time around on December 2nd.  That's not going to

9  change, Your Honor, that's the testimony and those are the

10  facts with regard to Hartford's participation in that draft

11  settlement agreement.

12          THE COURT:  Okay.  And my recollection is that I've

13  got the deposition testimony of Mr. Hotaling.

14          MR. RUGGERI:  You do have excerpts, Your Honor,

15  yes.

16          THE COURT:  Page 91.  Okay.  I will take another

17  look at that, but, Mr. Schulman, if you're going to get the

18  same answers you got before, then what is the point of another

19  deposition of Mr. Hotaling?

20          MR. SCHULMAN:  Well, Your Honor -- and, again, what

21  I'm hearing today is -- I believe I'm hearing for the first

22  time and the impression we received on our end from the

23  testimony was that Mr. Hotaling was testifying on behalf of

24  Mr. Hotaling.  If in fact -- and I'm happy to have this

25  conversation with Mr. Ruggeri offline, but if it's Hartford's

1  position that Hartford did not see any one of these 91 pages

2  and saw it for the first time on the evening of November 30th

3  when it was filed on the docket, that may close the issue at

4  least with regard to this document if in fact they are as much

5  -- if Hartford is as much of a stranger to the document as the

6  TCC.

7              So I'm happy to have that conversation with Mr.

8  Ruggeri offline and continue to try to avoid what I was hoping

9  to avoid today, which is have to argue this motion before Your

10  Honor.

11              THE COURT:  Okay.  Well, I'll let you all have that

12  discussion because I'm probably going to rule on all these

13  things tomorrow.  So I'll let you have that discussion.

14              MR. SCHULMAN:  Thank you, Your Honor.

15              MR. RUGGERI:  Thank you, Your Honor.

16              THE COURT:  Thank you.  Okay, so that's number 2.

17  3 is Mr. Plevin's motion, which really -- Mr. Plevin, if my

18  recollection is right, you're saying this really morphed into

19  what we've already covered in terms of number 5?

20              MR. PLEVIN:  I think that's correct, Your Honor.

21  Our motion to quash the 30(b)(6) notice, as I said before, it

22  was filed before the committee's motion to compel, so I think

23  we've covered that.

24              THE COURT:  Okay.  And the same, Mr. Plevin, is

25  true for number 4 on the agenda, which is Zurich's motion to

1  compel -- I'm sorry, which is Zurich's motion under Rule 37  -

2  - oh, no --

3          MR. PLEVIN:  We've not talked about that motion.

4          THE COURT:  Right, we haven't.  So that's next on

5  the agenda.

6          MR. PLEVIN:  Okay.  And I can be -- I think I can

7  be quick on this because it's not that complicated.

8          This is about document requests only, Your Honor,

9  and only -- well, four document requests and one interrogatory

10  to the Roman Catholic Ad Hoc Committee.  And, you know, one of

11  them was -- one of the interrogatories was all documents

12  concerning the factual basis for their potential objections to

13  the settlement, the Zurich settlement and the Zurich term

14  sheet.  I guess, even if you were to grant our motion on this,

15  we're probably not going to get a response any sooner than we

16  will when they file objections to the plan, if they file

17  objections to the plan.

18          So I don't know if it makes sense to go much

19  further on that, but I would say that the other document

20  requests ask for documents that support their objections.  And

21  of course we were hoping to get all this material earlier, so

22  that we could have taken any depositions before last Friday's

23  deadline for taking depositions, but I still think that we're

24  entitled to have production of documents that support any

25  objections they have and any documents they intend to rely on

1  at the confirmation hearing to support any objection to the

2  Zurich settlement.

3          I will point out, as I did earlier, that when the

4  committee filed its paper yesterday it did not respond to our

5  motion to compel at all.  So I think it can be treated as not

6  contested and granted on that basis.

7          The one interrogatory that is at issue is an

8  interrogatory where we ask them to describe in detail all of

9  their objections to the settlement.  And, again, I think

10 that's another one that will probably just be overtaken by

11 events.  So, you know, while I do want to see the documents

12 that support whatever it is that -- whatever position they're

13 going to take, I think that perhaps you should just maybe

14 order them to -- in any objection they file on Friday or

15 Monday to be specific about the grounds for their objection to

16 the Zurich settlement.

17         There were other arguments we made about the

18 discovery not being premature because we filed it on the

19 deadline and we couldn't have waited any further; that the

20 discovery was not overly broad because it was narrowly

21 targeted to the settlement; and that, because we asked only

22 about the factual basis or bases, we were steering very clear

23 of anything that was privileged.  But I think, as a practical

24 matter, I've suggested how you might deal with this motion.

25         THE COURT:  Thank you.

1       Mr. Ryan?

2       MR. RYAN:  Your Honor, yeah, we did note in what we

3  filed yesterday that we stood by our objections in the actual

4  discovery as it being premature.  It's hard to tell, Mr.

5  Plevin, what the basis of our objections are going to be if

6  they won't sit for a deposition and tell us what their

7  settlement does.  So I think we have a cart-before-the-horse

8  problem, Your Honor, which is it's hard to know exactly what

9  our objections are until people answer questions about their

10  settlements, which we also haven't seen because the Zurich

11  settlement agreement doesn't exist yet.

12       THE COURT:  Okay.  Well, objections are due when

13  they're due.  So -- and I do think, while your client doesn't

14  have all the information they may want at this point in time,

15  they can formulate certain objections to this plan.  So I'm

16  not extending an objection deadline.  I'll deal with

17  supplemental objections or whatever, depending upon what

18  discovery may or may not show or fashion or be had, but I'm

19  not hearing an objection -- I'm not hearing a response to the

20  motion to compel that says your client shouldn't have to

21  produce documents that support on a factual basis any

22  objection it might file.

23       MR. RYAN:  We're happy to do that, Your Honor.

24  We're just not going to be in a position to finalize an

25  objection to the Zurich settlement agreement until one exists.

1          THE COURT:  Okay.  So that's 4.  Number 5 -- I'll

2   be ruling on all these probably tomorrow, I want to get

3   through them.

4          Number 5 -- we did number 6 -- is Zurich's motion -

5   - or is that the one I just did?

6          MR. PLEVIN:  No.  Your Honor --

7          THE COURT:  No, that was 4.  Yeah.

8          MR. PLEVIN:  -- this motion -- this is our motion

9   to quash the TCC's deposition notice to Zurich.

10          THE COURT:  Okay, yes.

11          MR. PLEVIN:  Your Honor, I'm happy to report that

12   through the meet-and-confer process, although we were served

13   with a 32-topic deposition, we were able to narrow this down

14   considerably to just six topics which are in dispute, and we

15   did go through those in detail in our letter.

16          And, again, you know, some of these may seem

17   technical, but they are -- you know, we're lawyers, it's

18   important to do things right.  The rules provide us with

19   certain rights and protections, and we have certain

20   privileges, and these topics just don't meet the applicable

21   standard.

22          The first topic is topic 4, which asks Zurich to

23   provide testimony on, quote, "the BSA plan settlements,"

24   unquote, including the Zurich settlement.  That is way too

25   broad under Rule 30(b)(6), it's not sufficiently specific.  It

1  asks Zurich to provide testimony on the settlements involving

2  other parties such as Century, Hartford, presumably the TCJC

3  others.  Any questions that would ask a Zurich witness to

4  summarize or analyze the terms of the Zurich term sheet or to

5  interpret its provisions, or apply them to actual or

6  hypothetical facts, would call for legal conclusions and

7  contention testimony, which is not permitted.

8         And then, again, as I said before, our settlement

9  was negotiated in a mediation and anything that happened in

10 mediation privileged and any discussions I had with my clients

11 about that are privileged.

12        And here, Your Honor, I think it's important to

13 note that my client spoke only with the mediator, Mr.

14 Gallagher.  I don't think that any of the people we negotiated

15 with even know my client's name because he spoke only to Mr.

16 Gallagher.  And I negotiated the terms of the term sheet with

17 representatives of the debtors, the Coalition, and the FCR.

18 That was done on Zoom calls that were initiated by Mr.

19 Gallagher and during which he was present, and every turn of

20 the document was transmitted through Mr. Gallagher.

21        And so there's nothing that my client can testify

22 to about the process without breaching mediation privilege or

23 attorney-client privilege, nor can he be called to testify

24 about what his interpretation of the document is or what our

25 contentions are about the meaning of terms in the document.

1        Moving on to topic 5 --

2        THE COURT:  What about --

3        MR. PLEVIN:  -- the identity --

4        THE COURT:  Let me ask you, Mr. Plevin, what about

5  Zurich's decision to enter into the settlement agreement, is

6  that not a topic -- is that not a topic that has been

7  requested?

8        MR. PLEVIN:  It is not a topic that has been

9  requested in those words.  I did point out that, you know, BSA

10 plan settlements is topic 4 and that's not sufficiently

11 particular.  Topic 5 is the policies -- and I'll get to that

12 in a second -- topic 6 is drafts of the settlement agreement,

13 which is privileged; topics 12 and 13 go into what we did in

14 the past, prepetition; and topic 31 asks us about how we

15 decided who our witness would be if we're compelled to

16 testify.

17        So I would say there's nothing that asks about

18 that.

19        THE COURT:  Because I was with you on topic 4 --

20 subject to hearing from Mr. Schulman, but I was with you on

21 topic 4 in terms of BSA plan settlements being too broad and

22 asking you about other settlements, et cetera.  I wasn't

23 buying the we can't say anything because it was all negotiated

24 in mediation, so we have nothing we could possibly say about

25 this agreement.  I -- you know, then maybe --

1          MR. PLEVIN:  Well --

2          THE COURT:  -- nobody can say anything about this

3   agreement and that's a problem.

4          MR. PLEVIN:  Well, I would say, Your Honor, that we

5   didn't list any of the 77 fact and expert witnesses who are on

6   the lists that were filed yesterday, so we're not planning to

7   call a witness.

8          You know, I think -- and actually what Zurich

9   thought about the settlement amount -- and I should make it

10  clear, it seems like Mr. Ryan's problem is the terms of the

11  settlement, it sounds like Mr. Schulman's problem is the

12  settlement amount.  Maybe he has a problem with the terms as

13  well, but certainly he's focused on the settlement amount --

14  the debtor is the one that has to show that the settlement is

15  within the lowest bound of the range of reasonableness.

16  That's not something that we have to prove, it's not something

17  that I think is relevant to how Zurich looked at or determined

18  what the amount of the settlement was, the debtor is the one

19  that has to prove that up.

20          And I will say, in all the time I've been doing

21  this, I've never had one of my client witnesses called to

22  testify about their process in entering into an agreement with

23  the debtor.  So I do question the relevance of that as a

24  threshold matter.

25          Just quickly going through the other topics.

1  Number 5 asks for the identity of all insurance policies

2  included in the settlement.  There's an Exhibit A that lists

3  all the policies.  Moreover, we presented -- we answered

4  interrogatories served by the TCC and listed all the policies,

5  the information about them, including the amount that had been

6  paid under the policies, which reduced the limits if that had

7  happened under a certain policy.

8          So I think we've already provided all of that

9  information that they could be seeking under topic 5.

10         Topic 6 is about drafts of the settlement

11 agreement.  And, again, I think drafts are mediation

12 privileged and any testimony about the drafts would either be

13 mediation privileged or reflect -- since I was the one who did

14 the negotiation, would reflect what I did and I'd have to

15 teach my client about that.

16         12 and 13, Your Honor, are about actual or proposed

17 settlements of your coverage obligations under the Zurich

18 policies.  I think that's also over-broad if it --

19         THE COURT:  Excuse me, Mr. Plevin.  Will everybody

20 please check your audio?  I'm hearing a lot of back chatter.

21     (Pause)

22         MR. PLEVIN:  I was going to say --

23         THE COURT:  I'm still hearing someone.

24     (Pause)

25         THE COURT:  Mr. Plevin?

1          MR. PLEVIN:  Your Honor, I was thinking -- I was

2    seeing if I could figure out who it was, but apparently not.

3          So topic 12 is about actual or proposed settlements

4    of our coverage obligations.  If that's seeking what we may

5    have done prepetition, then I think that falls under the

6    category of prepetition claims handling.  If it's about what

7    we did in the mediation, then it's mediation privilege, and I

8    think it's protected on that basis.

9          Topic 13 is about payments we made for defense or

10   indemnity concerning any abuse claims.  Again, that seems to

11   be squarely prepetition claims handling and not proportional

12   to the needs of the case because of that.  And the Court has

13   already ruled in this case and Imerys that that was out of

14   bounds.

15         And then, as I said, topic 31 seeks work product,

16   pure and simple, how did we decide who -- that Mr. X or Mr. Y

17   was going to be our witness.

18         `     I do want to say one other thing about this, which

19   is that -- and I got into this a second ago -- how Zurich

20   values its coverage is not legally relevant.  And it seems

21   like the TCC knows how to support its argument because in

22   connection -- and maybe we should do this separately, they

23   dealt with this in one letter, but when we said that we wanted

24   production of documents relating to the statement that the TCC

25   counsel said at a hearing that our settlement was less than

1  half because of their special counsel's analysis, we were

2  directed in the letter that got filed by the TCC yesterday to

3  a demand letter that was sent to us in the context of the

4  mediation, and I think they admit that it was a mediation

5  communication.

6        And I don't want to get into that, but I will say

7  that it's a letter that we got from counsel for the FCR on

8  behalf of the FCR and the committee and the Coalition, and it

9  sets forth an analysis, as a demand letter sometimes does.

10 They have the information -- you know, they're telling us on

11 the one hand that they need us to testify about how we reached

12 our settlement number and how we valued it and whether we were

13 paying X percent or Y percent of what we thought was

14 appropriate when they're telling us they already have this

15 information, that they were set forth and sent to us back in

16 September of '21.  And we do know that, because we settled

17 with the Coalition and the FCR, that they either changed their

18 mind or compromised on what they said in that letter.

19        So I don't understand -- I don't understand why

20 that letter was mentioned in their response yesterday.  I

21 think it comes really close to, if not exceeds -- or not

22 invades mediation privilege for them to have said what they

23 said about it.  We do not consent to its disclosure further.

24 But I don't think they need testimony from us, from my

25 witness, which has all the issues I've talked about, to

1    determine why they think this settlement may or may not meet

2    the Rule 9019 standard.

3                THE COURT:  Okay.  Thank you.

4                Mr. Schulman?

5                MR. SCHULMAN:  Thank you.  Again, Your Honor,

6    Jeffrey Schulman for the TCC.

7                Your Honor, while I was particularly struck by

8    something Mr. Plevin said with regard to topic 4 and I found

9    myself looking for one of the multitude of emails that Mr.

10   Plevin and I have exchanged over the last, I would say, week

11   or so, if not more, on these issues, because Zurich knows full

12   well that the scope of -- about which we want to inquire about

13   Zurich is the Zurich term sheet and how Zurich evaluated and

14   analyzed its coverage with respect to that term sheet, how it

15   arrived at the 52 and a half million dollar settlement.  I'll

16   get to that more specifically in a moment, but in case there

17   was -- it wasn't clear, I said the following to Mr. Plevin

18   just the other day.  Zurich is no longer a non-settling

19   insurer, so the TCC is entitled to discovery regarding the

20   settlement term sheet and evaluation issues now relevant given

21   the execution of that term sheet.  This is the very limited

22   and tailored discovery the TCC has been and will continue

23   seeking from Zurich.

24                So the idea that we're still talking about other

25   insurer term sheets today is not helpful because it's not

1  accurate.

2          And I'd like to -- let me say it this way.  Your

3  Honor, I've been at virtually every hearing and conference

4  before this Court in this case and this is the only -- only

5  the second time I've had the opportunity to address the Court.

6  And the reason, I think, is -- as the Court may recall, a

7  number of weeks back there were various motions to compel

8  involving non-settling insurers and the TCC and others, and

9  those motions, with the exception of those involving the TCC,

10 were all adjudicated and those involving the TCC were held in

11 abeyance, and that was because the TCC had been and was

12 continuing to work with non-settling insurers to resolve those

13 disputes.  And even though the order that this Court issued

14 was not directed at the TCC specifically, we have filed this

15 Court's order to the letter, which is why no non-settling

16 insurer or TCC issues have been brought before this Court

17 since.

18          We've been judicious about the discovery we've

19 sought from insurers and we've worked -- Your Honor probably

20 does not want to hear any more references to how people are

21 working are hard, so I'll just leave it at we've really tried

22 to resolve disputes that insurers have with us and we have

23 with them.

24          And I share that because I hope that it highlights

25 how fundamentally important discovery is that we are seeking

1   and that Zurich is trying to withhold, because Zurich was a

2   settling insurer and they are no longer.  They agreed to the

3   terms of a settlement or a term sheet that will become a

4   settlement by which Zurich would settle its BSA coverage

5   obligations for a payment of 52 and a half million dollars.

6   So we noticed Zurich for a deposition on that document and are

7   prepared to proceed with that deposition under terms similar

8   to that which we agreed to with Hartford, not to inquire about

9   prepetition claims handling, not to invade privilege, but to

10  learn how Zurich values the coverage it sold and so, once

11  again, the TCC will not be ambushed at the confirmation

12  hearing.

13          And let me give you some -- if I may give the Court

14  some examples.  Zurich presumably considered some number of

15  claims of the 82,000 claims to be within one or more of its

16  policy use, we'd like to ask about that.  Zurich presumably

17  ascribed a value to those particular claims; we'd like to ask

18  about that.  Zurich presumably allocated those claims and

19  those dollars to their various policies and we'd like to ask

20  about that.

21          And then presumably Zurich deemed some combination

22  of its policies impaired or exhausted to the tune of 52 and a

23  half million dollars, and we'd like to ask if and how they did

24  that to determine how 52 and a half million dollars, in

25  Zurich's mind, was the right number, not to ask about the bids

1    and asks between Zurich and the debtors, and not to ask for

2    legal conclusions or opinions or contentions about how words

3    are defined, but to arrive at an understanding of how Zurich

4    got to that number and why 52.4 versus 52.6 were not the right

5    numbers, but 52.5 was.  And Zurich remains unwilling to

6    produce a witness to testify on any component of that

7    document, how this sum was arrived at and, thus, whether or

8    not it's reasonable and constitutes a substantial contribution

9    to this settlement.

10            Now, at the same time, Zurich seeks to compel the

11    TCC to produce a witness to testify as to the reasonableness

12    of that settlement, and I've asked Zurich to explain how a

13    non-party stranger like the TCC, let alone an individual TCC

14    member, none of whom have law degrees that would be helpful

15    here, but how an individual TCC member can be prepared to

16    testify as to the reasonableness of the Zurich settlement

17    while Zurich need not testify as to the reasonableness of the

18    Zurich settlement or how it arrived at that number, that 52

19    and a half million dollar number, and I've received no answer.

20    And Zurich's motion doesn't explain how it split that hair and

21    Mr. Plevin doesn't split that hair this evening.

22            As discussed in the context of Hartford, the fact

23    that it's a draft doesn't matter; the fact that it was

24    negotiated in mediation doesn't matter.  The argument that the

25    TCC is looking to invade privilege is a red herring.  Zurich's

1  witness may testify that it didn't allocate any of that 52 and

2  a half million dollars to any particular policy or that, if it

3  did, it was done only in connection with or at the advice of

4  counsel.  But then the TCC knows Zurich's position and won't

5  be ambushed at confirmation.  And the analysis performed by

6  Zurich, which in its own mind justified that settlement at

7  that number, is not protected by the mediation privilege.

8            And, for its part, the TCC has not produced a

9  member of the committee to testify regarding the term sheet

10 because none of the survivors on the committee have or can be

11 prepared to give non-privileged testimony about that document.

12 And certainly, if Zurich shouldn't have to, there is certainly

13 no way that a blame it on the TCC could or should happen.  And

14 any documents that the TCC may have analyzed in Zurich's

15 coverage obligation were prepared by coverage counsel and in

16 the context of mediation.  I'm not called special very often,

17 but I'd like to think that Mr. Pachulski might have been

18 talking about me when he said that.  But it is those same

19 communications that the insurers do not want -- did not want

20 the TCC to produce based upon the assertion of mediation

21 privilege.  And I submit that lifting the privilege from the

22 documents prepared by coverage counsel for the insurers, the

23 debtor, the TCC, the FCR, and the Coalition in this case is

24 not a Pandora's box that any of them want opened, even

25 assuming we had time between now and February 22nd to open it.

1          And that last brings me to Mr. Pachulski's

2    statement, which has received much attention, for reasons I

3    still don't quite understand.  Zurich has known for months

4    that, according to insurance counsel's analysis, the purported

5    settlement of 52 and a half million dollars is deficient,

6    insufficient, it is not enough; it is not reasonable, it's not

7    substantial.  Zurich has that in writing and it has the

8    analysis that bears that out.  And, as stated in my papers, I

9    would be prepared to provide that letter to the Court.  It

10   appears that Mr. Plevin is still unwilling to consent to doing

11   so, but the shield-and-sword analogy was used by Mr. Plevin

12   multiple times, directed at the TCC.

13         And, with regard to the settlement, the TCC is not

14   using it as a shield or a sword and, with regard to that

15   settlement, the TCC doesn't know which of them it should be

16   holding yet.  And I'd like to think we will have a better

17   sense as to whether or not we will be holding a shield or a

18   sword at the confirmation hearing with respect to this

19   settlement once we have had an opportunity to inquire about it

20   from the individuals that call balls and strikes out.

21         So, once again, the idea that this involves

22   prepetition claims handling does not make it so.  It is

23   strictly about the arrival at this number, the analysis of

24   coverage and available coverage and allocation to coverage

25   that formulated and that informed and allowed Zurich to reach

1  that number.  That is all.  I'm not interested in claims

2  handling guidelines or how Zurich settled or analyzed cases

3  prepetition; that does not matter.  This Court has made very

4  clear that that is out of bounds and I have remained in bounds

5  and intend to do so.  But the 52 and a half million dollars is

6  well in bounds and if Zurich's testimony -- if the record is

7  replete with I don't know, I can't answer that on the advice

8  of counsel, that's privileged, I only know that from speaking

9  with counsel, that's fine, because then we know.  But I would

10 respectfully submit that we're entitled to ask those questions

11 and get those answers, so we know that those are the answers

12 starting on February 22nd.

13           I'm happy to answer any questions you may have.

14           THE COURT:  And you think Zurich's view of that

15 settlement rather than the debtors' view of the settlement is

16 something that's relevant to confirmation?

17           MR. SCHULMAN:  I think both are squarely relevant,

18 Your Honor, yes.

19           THE COURT:  Okay.  Mr. Plevin?

20           MR. PLEVIN:  Your Honor, a couple of points.  One

21 is I didn't talk about our motion to compel because that's the

22 next agenda item, but -- and I do want to talk about that,

23 with Your Honor's permission, because Mr. Schulman has

24 essentially done so, but our motion to compel does not seek

25 30(b)(6) testimony.  So we did serve a 30(b)(6) notice and we

1   did not move to compel on it.  Mr. Schulman made the same

2   arguments to me that he made to you and we elected as part of

3   our meet-and-confer process not to move to compel the

4   deposition.  So he's already won on that, essentially, I don't

5   understand why that's here.

6           He says he wants to know how did Zurich get to the

7   number.  And, you know, to be flip, Zurich wanted to pay zero

8   for a settlement and couldn't persuade anybody on the other

9   side to do that.  So how did we get to 52.5 million?  It was a

10  mediation and it was a settlement.  And I don't want to go

11  beyond that, but Mr. Schulman says he doesn't want to know the

12  bid-and-ask, and there's really no way to get to how did you

13  get to 52.5 without understanding that it was a mediated

14  settlement among parties who had different perspectives.

15          As I mentioned, the letter that he referred to was

16  cosigned -- well, actually, it was signed by the FCR's counsel

17  on behalf of the TCC and the committee -- and the Coalition,

18  rather, and they wanted an amount, which Mr. Schulman now

19  thinks is the right amount and wants to get that amount from

20  us, we wanted to pay less.  And so it's a process of

21  bargaining.

22          I do think, Your Honor, the question you just asked

23  Mr. Schulman at the end is, I think, the most telling point.

24  What we -- how we value the settlement is not legally relevant

25  because it's not relevant to the Rule 9019 inquiry before the

1 Court.

2       If I could move on to our motion to compel, which,

3 again, was narrowed significantly through our meet-and-confer

4 process to two interrogatories and one document request.  And

5 with the two interrogatories we face sort of the same issue

6 that we did when I spoke before about our interrogatories to

7 the Roman Catholic committee, which is that we're asking the

8 committee to tell us all the reasons why they object to the

9 settlement.

10      And, again, I understand we're going to get that,

11 presumably, in objections later, very soon, but I did want in

12 particular to point out interrogatory number 2, which, you

13 know, was an interrogatory that we got on the deadline from

14 the TCC, whatever the deadline was to serve settlement-related

15 discovery, we got that as we were finalizing our own

16 interrogatories to them and I liked it.  And so I took their

17 interrogatory and just changed, you know, the word "does" to

18 "does not," et cetera, and served it back on them.

19      We went ahead and we gave a three-page answer to

20 that interrogatory.  They, on the other hand, refused to

21 answer what is essentially their own interrogatory.  One of

22 their objections was that it's a contention interrogatory.

23      Now, contention interrogatories are permitted,

24 that's why they're called contention interrogatories.  We've

25 all served them, we've all answered them.  I will admit that

1  as recently as earlier in this hearing I objected to

2  contention testimony from a 30(b)(6) witness, that's

3  completely different.  The problem with a 30(b)(6) contention

4  question is it requires a witness on the spot to do a legal

5  analysis.  But for counsel to do it in response to

6  interrogatories is permitted and has been permitted for

7  forever.  So I think we're entitled to an answer to

8  interrogatory number 2.  I think the fact that they objected

9  is just silly and, you know, again, it's their own

10  interrogatory.

11         Document number 6 is the one that we -- document

12  request number 6 is the one we talk about where counsel made

13  the statement in court about the fact that we weren't paying

14  enough in settlement.  We did point to a few cases where

15  counsel in a court hearing, in open court, had made a

16  statement about disclosing the substance of privileged

17  communications and the court said that was a waiver and,

18  therefore, discovery was allowed about that.  I think that's

19  exactly what happened here.

20         The committee says, well, it wasn't a -- these

21  cases aren't relevant because in those other cases it wasn't a

22  tort claimants committee and it wasn't special counsel and it

23  wasn't a sexual abuse claim.  And I would stipulate to all of

24  that, and I would stipulate it wasn't the Boy Scouts case and

25  it wasn't Your Honor's ruling in either of those cases, but

1  that's not how we do legal analysis.  The principle animating

2  each of those cases is exactly on point here and it says we're

3  entitled to production.

4        Now, if Mr. Schulman's answer is the only legal

5  analysis that took place that would be on a privilege log,

6  which he now has to disclose, is the demand letter that he

7  talked about from September of 2021, then I have that letter

8  and I have their analysis.  But if it's something else, I'm

9  entitled to it.  And at an absolute minimum, Your Honor, I'm

10 entitled to a privilege log, so I can see what they're

11 withholding and the grounds on which they're withholding it,

12 so I can decide whether to pursue a motion to compel

13 production of the documents on the privilege log.

14        So, unless you have any questions, Your Honor, I'm

15 finished.

16        THE COURT:  I had two questions, one going back to

17 the previous matter and then this one.

18        On this one, in the cases that you cited -- and it

19 could be in cases that then subsequently distinguish the ones

20 you cited -- weren't those more in an evidentiary context

21 rather than in either a status conference or some other

22 presentation to the Court?

23        MR. PLEVIN:  Well, the Sprint case, the first one

24 we mentioned, was an opening statement.  And I guess we all

25 learn early in our legal careers that opening statements are

1  not evidence.  So I would -- I think that's very akin to a

2  statement made at a status conference.

3          The other case, the -- I'm probably mispronouncing

4  this -- <u>Monguea Brown</u> (ph), that involved a summary judgment

5  motion where a supporting declaration was filed and disclosed

6  information.  So I guess that is evidentiary, but it was

7  relied on in a brief filed by the party.

8          I don't know that that makes a difference, Your

9  Honor, because the point of the waiver rule is that the

10 counsel in both of those cases was disclosing privileged

11 communication for what he or she thought was his or her

12 benefit to the court and then, when asked to produce other

13 information regarding that same statement, said, oh, no, it's

14 privileged.  And the ruling was, well, it might have been

15 privileged before, but you just told people about it in open

16 court or on the docket and, therefore, it's no longer

17 privileged.

18          THE COURT:  Okay.  And then with respect to the

19 TCC's request for Zurich deposition, there are multiple things

20 going on in the plan and at confirmation, and one of them is

21 the settlement, which encompasses releases, but there are

22 various standards that I'm going to have to find are met for

23 different parts of the plan.  So the settlement is one, which

24 is a 9019 standard, the releases is another, and the

25 channeling injunction may be a third.

1          So is it your contention that Zurich's view on what

2    it settled for couldn't be relevant to any three of those

3    standards?

4          MR. PLEVIN:  Well, I already explained what I

5    thought about the 9019.  For the release, I suppose the issue

6    is are we paying a sufficient amount of money to get whatever

7    release.  And we're also -- we also have a 363(f) buyback,

8    which is I think on a similar standard to the 9019 standard,

9    it's the business judgment of the debtor.

10         And, you know, I think you could answer that as an

11   absolute matter that, yes, $52.5 million is a lot of money to

12   spend.  The total limits that Zurich had at issue minus the

13   amounts that already have been paid, which reduce the limits,

14   is a matter that we've disclosed in our interrogatory answers

15   to the TCC, so they have that information.  And, again, I

16   think that's something the debtor is going to be presenting

17   evidence on and presenting argument on.

18         And I may have forgotten the third point, Your

19   Honor.

20         THE COURT:  No, that was -- that's it.  Thank you.

21         Mr. Schulman, I'll give you the last word.

22         MR. SCHULMAN:  Thank you, Your Honor.

23         With regard to the cases cited by Mr. Plevin and

24   addressed in my response, I think Your Honor hit it right on

25   the head.  The -- and I too will try not to butcher it too

1  badly, but the Monguea case does specifically refer to the

2  presentation of evidence, which this was not.

3          The Welded Construction case involves an audit, an

4  actual document where parties revealed that -- made

5  representations about what it said and what it did not say,

6  and the court said that a party cannot disclose as much as it

7  pleases and then claim privilege to the rest.  We haven't

8  disclosed anything.

9          With regard to the CP Kelco case, that involved

10  allegedly privileged documents used to arm its expert for

11  testimony.  So, again, this is the literal dangling of a

12  carrot in front of the trier of fact, making representations

13  about a document and what it says and what it does and how it

14  operates and then saying but I'm not going to show it to you

15  because it's privileged.  That did not happen here.

16          With regard to the second interrogatory, again, the

17  contentions of Zurich, by definition, are going to be very

18  different than any contentions that the TCC might have because

19  Zurich -- this is Zurich's deal, this is Zurich's settlement.

20  They arrived at this number; we are a stranger to it.

21          And Mr. Plevin's interrogatory response that he's

22  referring to actually shows how many open questions there are

23  of Zurich with regard to it, because in this fulsome

24  interrogatory response that he's referring to he mentions

25  taking into account a $1 million-per-occurrence SIR, very

1  attachment points in certain policies, total limits of

2  policies, prepetition erosion, uncertainties as to the amount

3  of abuse claims and severity mix of those claims, potential

4  coverage defenses, and he goes on.  So his fulsome response is

5  essentially a cornucopia of things that went into the pot and

6  got stirred around and resulted in a 52 and a half million

7  dollar settlement and we're just asking for the ingredients

8  that went into the pot, that's it.

9        And finally, Your Honor, again, there still seems

10 to be a prosecution of a claim that coverage counsel to any of

11 the committee's ad hoc or official, in this case, must now

12 disclose all of their special insurance counsel's analysis and

13 documents.  I don't think that's where this Court is going.  I

14 would submit that that's not where this Court would go or

15 should go or would want to go, because there have been a lot

16 of coverage counsel involved on behalf of a lot of different

17 groups for almost two years and we're talking about an

18 entirely new, additional case if all of the coverage counsel

19 were now required to start producing their privileged work

20 product in connection with this case.

21       And, once again, I would respectfully submit that

22 that is not a Pandora's box that we should be opening and is

23 not warranted either with respect to the TCC specifically or

24 any party, including Mr. Plevin and Zurich generally.

25       And, with that, I will rest on my papers and I

1  thank you for your time.

2           THE COURT:  Thank you.

3           Okay.  We're up to number 8, which I think we've

4  already covered.  This is Century's -- this is the cross-

5  motion on the 2019.  Okay, so we already covered that.

6           And then 9 is a motion to seal certain exhibits, to

7  which I did not get a response.  This is the Catholic -- the

8  Roman Catholic Ad Hoc Committee motion to seal.

9           MR. RYAN:  Yes, Your Honor, we had filed a seal

10 motion just because Century and Chubb had designated their

11 responses as confidential and we did not get a response from

12 Century when we asked under the local rules what they wanted

13 redacted.  So we felt compelled to continue to treat it as

14 confidential, but if Mr. Schiavoni, you know, has insights

15 now, we're happy to hear them.

16          MR. SCHIAVONI:  We don't object to it being sealed.

17          THE COURT:  I'm sure you don't.  Why don't you take

18 a look at it and see if there's any portion of anything that

19 can be unsealed, but, if not, I'll sign the -- I'll sign an

20 order approving that.

21          MR. RYAN:  Thank you, Your Honor.  And if Mr.

22 Schiavoni can tell us, just so we can comply with the local

23 rules, on what should be redacted and not redacted, that would

24 be wonderful and we'll take it from there.

25          THE COURT:  I'll let you all have that conversation

1  offline.

2           Okay.  I think that concludes the agenda.

3           MR. ABBOTT:  It does, Your Honor.

4           THE COURT:  Mr. Rizzo, I see your hand.

5           MR. RIZZO:  Yes, thank you, and good afternoon,

6  Your Honor.  I hesitate to prolong the hearing, I'm aware of

7  the hour, but in connection or perhaps in follow-up to the

8  discussion about sealing.  I represent Travelers Insurance

9  Companies and on behalf of certain excess insurers I'd like to

10 ask the Court to consider an inquiry that we have in the

11 nature of housekeeping or scheduling as it relates to some of

12 the upcoming filings.

13          THE COURT:  Okay.

14          MR. RIZZO:  Briefly, Your Honor, the certain

15 insurers will be filing their plan objection on Friday, under

16 the current schedule, that will be filed with the court under

17 seal, it will be served on the participating parties.  Under

18 our local rule, the sealing motion is going to be due

19 Wednesday -- and that's Wednesday the 9th -- with the redacted

20 version, proposed redacted version attached.

21          That plan objection, I can tell the Court, is very

22 much a living document right now.  And what do I mean by that?

23 We have expert and fact discovery depositions ongoing this

24 week, each day up to and including Friday, and those

25 depositions we expect will continue to inform the content of

1  the plan objection.  And so, as I said, we will have it in a

2  form to be filed Friday.  And the concern really is next

3  week's schedule and some of the deadline that are falling due,

4  including on February 10th when deposition designations come

5  due.

6           And so the thought is and the request is whether

7  the Court would consider relief from our local rule with

8  respect to the sealing motion such that if we could have time

9  to have that filed on Friday the 11th, that would allow for

10  what I would suggest would be a more thoughtful approach to

11  obtaining a complete consensus on redactions.  I think, under

12  the current schedule, we'll be hard-pressed to have anything

13  but really broad and expansive redactions, given the very

14  sensitive nature of many of the issues involved here, and

15  that's something the rule discourages.  And so our thought is

16  the process and, frankly, the parties would benefit from that

17  brief relief such that the redactions can be exchanged,

18  meaningfully analyzed and exchanged, meet-and-confers can take

19  place and a consensus achieved on those redactions.  And the

20  parties would benefit; obviously, everyone's resources are

21  really stretched to their limits.

22           And so that's really what I've been tasked to raise

23  with the Court and we're hoping that's something we could have

24  the Court consider at this time.

25           THE COURT:  Does anyone object to the request being

1  made by Mr. Rizzo?

2        (No verbal response)

3              THE COURT:  I don't hear it.

4              I haven't read our rules in a while and actually I

5  think that might have been fairly recently amended to make

6  certain that a motion to file under seal is promptly filed, as

7  opposed to having no deadline, if I have a vague recollection

8  of the rule.  I'm fine with that, that request for the few

9  additional days, and I'm encouraged that that will help people

10  be able to focus on what truly is confidential and should be

11  redacted and what can be of public record, with the hope that

12  -- well, with the expectation that as much as can be public is

13  public and only that which is truly confidential needs to be

14  redacted.  So I will grant that oral request for some relief

15  from our local rule.

16              Thank you, Mr. Rizzo.

17              MR. RIZZO:  Thank you, Your Honor.

18              THE COURT:  Is there anything else we can do today?

19              MR. ABBOTT:  Your Honor, Derek Abbott again.  You

20  mentioned you expected to rule on these matters tomorrow, I

21  just wanted to inquire whether you thought you would convene

22  the masses here to do that and if you had a time in mind.

23              THE COURT:  I don't, I need to look at my calendar.

24  I suspect it will be in the late-ish afternoon and we'll --

25              MR. ABBOTT:  Okay --

1          THE COURT:  -- let you know in the morning.

2          MR. ABBOTT:  -- that's helpful, Your Honor.

3    Terrific.  Thank you.

4          THE COURT:  Anything else?

5       (No verbal response)

6          THE COURT:  Okay.  Thank you, Counsel.  We are

7    adjourned.

8          COUNSEL:  Thank you, Your Honor.

9       (Proceedings concluded at 5:45 p.m.)

10

11

12                      CERTIFICATE

13

14      We certify that the foregoing is a correct transcript

15   from the electronic sound recording of the proceedings in the

16   above-entitled matter.

17
     /s/Mary Zajaczkowski              February 2, 2022
18   Mary Zajaczkowski, CET**D-531

19
     /s/William J. Garling             February 2, 2022
20   William J. Garling, CE/T 543

21
     /s/ Tracey J. Williams            February 2, 2022
22   Tracey J. Williams, CET-914

23

24

25