## IN THE UNITED STATES BANKRUPTCY
## COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |

### GIRL SCOUTS OF THE UNITED STATES OF AMERICA'S OBJECTION TO DEBTORS' SECOND MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

Girl Scouts of the United States of America ("Girl Scouts") by and through the undersigned counsel, hereby submits this objection (the "Objection") to the Debtors' *Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 7832] (the "Plan")[1] filed by the above-captioned debtors, Boy Scouts of America ("Boy Scouts") and Delaware BSA, LLC (together, the "Debtors") in the above-captioned chapter 11 bankruptcy case.  In support of this Objection, Girl Scouts states as follows:

### PRELIMINARY STATEMENT

Girl Scouts objects to the Boy Scouts' Plan because Girl Scouts is being treated more poorly than all other commercial creditors under the Plan, receiving, at most, a 70% recovery on its claim compared to nearly the 100% recovery available to other commercial creditors.  The effect of the Boy Scouts' proposed treatment is to allow all other Class 7 Non-Abuse Litigation Claimants the opportunity to recover 100% of their Allowed Claims, while limiting Girl Scouts' Class 7 recovery to at best no more than 70% of an Allowed Claim and, in the worst case

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed in the Plan.

scenario, an even lower recovery that could approach zero on account of a multi-million dollar

Allowed Claim.  This disparate treatment is impermissible under Section 1123(a)(4) of the

Bankruptcy Code.

Girl Scouts trademark litigation against the Boy Scouts is familiar to this Court.  The fact

that Boy Scouts is displeased with Girl Scouts' asserting their rights in the trademark litigation

does not permit or justify Boy Scouts' discriminatory treatment in the Plan.

## BACKGROUND

### A.  Girl Scouts' Claim Against Boy Scouts

1.      For over a century, Girl Scouts has established itself as the preeminent, best-

known provider of leadership development services for American girls.  Girl Scouts is a national,

nonprofit organization that was incorporated in 1915 and congressionally chartered under 36

U.S.C. § 80301 on March 16, 1950.  It is currently the largest girl-led leadership development

organization for girls in the world, with over 2 million current active Girl Scouts, and its iconic

GIRL SCOUTS program is both well-known and highly regarded.  Founded in 1912 by Juliette

Gordon Low in Savannah, Georgia, Girl Scouts promotes, encourages and inspires girls to

develop courage, confidence, and character through a variety of activities and practical skills

programs.

2.      Boy Scouts is a congressionally chartered corporation under 36 U.S.C. § 30901

that was established to provide youth development services and programs for boys.  While both

Girl Scouts and Boy Scouts are congressionally chartered corporations that offer services to

American youth, the two organizations are not associated with one another, and never have been.

3.      Prior to the Petition Date, the Boy Scouts took actions that infringe upon certain

trademarks of the Girl Scouts, which include federally registered marks, common law rights in

each of its federally registered trademarks, as well as in all variations of GIRL SCOUTS that Girl Scouts has used in connection with girls leadership development services and related products or services, and any related trade dress and other designations of source, including "Scout" in the context of services to girls (collectively, hereinafter, the "Girl Scout Marks").

4.      As a result of Boy Scouts' infringing actions, on November 6, 2018, Girl Scouts filed an action against Boy Scouts in the Southern District of New York, in the case captioned as *Girl Scouts of the U.S. v. Boy Scouts of Am.*, No. 18-10287 (the "Trademark Action").  Through the Trademark Action, Girl Scouts seeks injunctive relief and monetary damages, including, but not limited to, corrective marketing damages, disgorgement of profits, and attorneys' fees.

5.      After decades of ignoring and failing to curb a significant child abuse problem, the weight of current and future abuse claims by survivors forced the Debtors to file for bankruptcy protection on February 18, 2020 (the "Petition Date").

6.      On March 10, 2020, Girl Scouts filed its *Motion for Relief from the Automatic Stay to Resume Trademark Action* [D.I. 157] (the "Lift Stay Motion"), seeking relief from this Court to resume the Trademark Action to (a) adjudicate Girl Scouts' request for post-petition injunctive relief, (b) liquidate and allow the post-petition damages claim, and (c) liquidate and allow the pre-petition damages claim.

7.      Unsurprisingly given past experience, Boy Scouts opposed Girl Scouts' Lift Stay Motion.  *See* D.I. 320.  Girl Scouts pressed forward and after a contested hearing before the Bankruptcy Court, the Court made clear that the stay would be lifted; the only question was when.  Thereafter, Girl Scouts and Boy Scouts discussed and agreed upon stipulated relief from the automatic stay as set forth in the *Stipulation Granting Limited Relief From the Automatic*

*Stay with Respect to the Trademark Action of Girl Scouts of the United States of America* [D.I. 477] (the "Stipulation").

8.      The Court entered an order approving the Stipulation on April 24, 2020 [D.I. 485] (the "Stay Relief Order").  Since the entry of the Stay Relief Order, the Trademark Action has proceeded in accordance with the Stay Relief Order.[2]

9.      On November 12, 2020, Girl Scouts filed its proof of claim in the Bankruptcy Case, which is identified as Claim No. 11246 (as amended, supplemented or modified from time to time, the "Proof of Claim").  The Proof of Claim was filed in an abundance of caution as pursuant to the Stay Relief Order the claims of the Girl Scouts will be adjudicated and liquidated in the Trademark Action pursuant to the Stay Relief Order.

10.      As previously noted, Girl Scouts' claim involves three distinct types of damages, which are described and summarized below.  *See* Proof of Claim; *see also*, 15 U.S.C. §1117(a) ("When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office…shall have been established in a civil action arising under this Act, the plaintiff shall be entitled…to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."). Girl Scouts currently estimates its claim to amount to no less than $18 million.

11.      First, Girl Scouts has a claim for corrective advertising.  This claim relates to money spent by Girl Scouts to implement a marketing strategy to correct the confusion caused in the public by the Boy Scouts' use of  "Girl Scouts," "Scouting" and similar terms once they

---

[2] In connection with the Stay Relief Order, Girl Scouts' claims shall be adjudicated and liquidated in the Trademark Action.  Girl Scouts reserves its rights under the Stay Relief Order, and the confirmation of any proposed plan in the Boy Scouts bankruptcy cases cannot impair or improve the adjudication and liquidation of the claims and rights of the Girl Scouts, or the defenses of the Boy Scouts, in the Trademark Action.  Upon circulation of a draft confirmation order by Boy Scouts, Girl Scouts will review the proposed order and submit language to ensure these rights are expressly and appropriately preserved and Girl Scouts respectfully submits that such language should be included in any proposed confirmation order.

began marketing their boys-only programs to girls.  Supporting evidence of Girl Scouts'
infringement claims is  rampant confusion, including the fact that the public at times incorrectly
thought Girl Scouts and Boy Scouts had merged or that Girl Scouts no longer existed. This is of
course not true.  Girl Scouts was forced to launch a corrective marketing campaign to combat
this confusion created by Boy Scouts' infringing conduct.  The claim for corrective advertising is
no less than $6,761,833.32.

12.     Second, Girl Scouts has a claim for disgorgement of Boy Scouts' profits obtained
based on Boy Scouts' infringement of the Girl Scouts Marks.  Boy Scouts cannot profit from its
willful violation of the Lanham Act, and as such Girl Scouts is entitled to disgorgement of its ill-
gotten profits.  *See id.* Girl Scouts estimates that its claim for disgorgement of profits is no less
than $4,998,301.00.

13.     Finally, Girl Scouts holds a claim for the costs of the Trademark Action,
including reasonable attorneys' fees.  *Id.*; 15 U.S.C. 1117(a); *see generally*, *Sleepy's LLC v.
Select Comfort Wholesale Corp.*, 909 F.3d 519, 531 (2d Cir. 2018) (awards of attorneys' fees are
statutorily allowed under the Lanham act); *Benihana of Tokyo, LLC v. Benihana Inc.*, 771 Fed.
Appx. 71, 72 (2d Cir. 2019).  Girl Scouts estimates that its claim for attorneys' fees and costs is
no less than $5.6 million and this claim continues to grow as the litigation continues.
Furthermore, of this amount, approximately 40% of the claim, plus all of the ongoing increases
of this amount, is a post-petition administrative expense claim

**B.  <u>The Plan</u>**

14.     On December 18, 2021, the Debtors filed the Second Modified Fifth Amended
Chapter 11 Plan of Reorganization.  D.I. 7832.

4883-5333-3260\5

15.     Despite numerous revisions and amendments to the Plan, Girl Scouts' treatment

under the Plan has not been modified.

16.     The Girl Scouts' claims that are currently being liquidated and allowed in the

Trademark Action are classified together with other Non-Abuse Litigation Claims in class 7.

17.     The Plan proposes the following treatment for Class 7 Claims:

> Except to the extent that a holder of an Allowed Non-Abuse Litigation Claim agrees
> to less favorable treatment of such Claim, in full and final satisfaction, settlement,
> release, and discharge of, and in exchange for, each Allowed Non-Abuse Litigation
> Claim, each holder thereof shall, subject to (i) the holder's ability to elect
> Convenience Claim treatment as provided in the following sentence and (ii) the
> terms and conditions of Article IV.D.3 (as applicable), retain the right to recover
> up to the amount of such holder's Allowed Non-Abuse Litigation Claim from
> (x) available insurance coverage or the proceeds of any Insurance Policy, including
> any Abuse Insurance Policy or Non-Abuse Insurance Policy, (y) applicable
> proceeds of any Insurance Settlement Agreements, and (z) co-liable non-debtors (if
> any) or their insurance coverage. Solely to the extent that the holder of an Allowed
> Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on
> account of such Allowed Claim after exhausting its remedies in respect thereof,
> such holder may elect to have the unsatisfied portion of its Allowed Claim treated
> as an Allowed Convenience Claim and receive cash in an amount equal to the lesser
> of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation
> Claim and (b) $50,000.

Plan, Art. III(B)(9).  To summarize, under the terms of the Plan, the recovery of Non-

Abuse Litigation Claimants is limited to (1) payments by any applicable insurance

policies, (2) payments by any co-liable non-debtor parties, and (3) up to $50,000 from the

Debtors on account of any deficiency in recoveries after application from the

aforementioned two sources.

18.     The Debtors assert that there is sufficient insurance coverage to pay the Non-

Abuse Litigation Claims in full:

> Specifically, the Debtors have three policies that remain available: (1) a primary
> Directors and Officers Liability insurance policy issued by RSUI; (2) an umbrella
> Directors and Officer Liability policy issued by Markel; and (3) a cyber-insurance
> policy issued by Beazley. The RSUI policy has aggregate limits of liability of $10
> million, of which approximately $5 million in limits are remaining. The Markel

6

policy has aggregate limits of liability of $10 million, which is fully available. And the Beazley policy has aggregate limits of liability of $15 million, of which approximately $10 million in limits are remaining. RSUI and Beazley are presently providing the BSA coverage for its defense counsel.

D.I. 4108, 76.

19.     Based on the information Girl Scouts has received from the Debtors, it appears that certain portions of Girl Scouts' claims against the Boy Scouts, including the disgorgement of Boy Scouts' ill-gotten profits, may not be covered by the applicable insurance policies.  As noted in the limited response Girl Scouts filed regarding the Debtors' motion seeking approval of a settlement with certain insurers [D.I. 6870], because Boy Scouts will have no out-of-pocket liability on Girl Scouts' claims, and only limited insurance proceeds are available to satisfy Girl Scouts' claims, there is a substantial risk the Boy Scouts could compromise or otherwise void applicable insurance coverage, leaving Girl Scouts without a recovery.  As further pointed out in the same filing, Boy Scouts could remedy this deficiency by providing for reorganized Boy Scouts to satisfy any deficiency in the insurance coverage available to satisfy Girl Scouts claims. Boy Scouts has not implemented this simple measure that would have avoided the need for Girl Scouts to file this objection.

## ARGUMENT

**A.  The Plan Cannot be Confirmed Because It Violates the Requirements of 11 U.S.C. § 1123(a)(4)Unfairly Discriminates Against the Girl Scouts.**

20.     To confirm a Chapter 11 plan, the Bankruptcy Court must find that the plan complies with each of the requirements set forth in Section 1129(a) of the Bankruptcy Code. One such requirement, Section 1129(a)(1), requires that "[t]he plan complies with the applicable provisions of" Title 11. Section 1129(b)(1) provides that a Chapter 11 plan must, among other requirements, "not discriminate unfairly, and [be] fair and equitable, with respect to each class of

claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

21.     Section 1123(a)(4) of the Bankruptcy Code provides that a Plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."

22.     Courts have interpreted this section to mean that (1) all class members must be subject to the same process for claim satisfaction; (2) all class members' claims must be of "equal value" and be paid through the same pro rata distribution or payment percentage procedures; and (3) all class members must give up the same consideration for their distribution under the plan.  *See In re W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2012) (collecting cases). Although exact equality is not required, approximate equality must exist. *Id.*

23.     As noted above, the information Girl Scouts has received on the applicable insurance policies indicate that at least a portion of its claim will not be covered by the applicable policies, including its claim for disgorgement of ill-gotten profits.  As a result, the proposed treatment under the Plan immediately reduces the recovery of Girl Scouts by at least $5 million dollars – approximately 30% of its total claim.

24.     Conversely, the remaining claimants in Class 7 consist of "approximately forty five wrongful death or personal injury claims as well as less than ten other litigation claims …" none of which are subject to any such limitations.  D.I. 4108, 210, n. 68.  As a result, while most, if not all, of the remaining claimants in Class 7 have the opportunity to recover up to 100% of their claim, Girl Scouts is limited to, at best, recovery of 70% of its claim and just as likely a much smaller percentage.  This is a significant disparity and violates the requirements of Section 1123(a)(4). *In Re Resorts Int'l*, 145 B.R. 412, 467 (Bankr. D.N.J. 1990) ("Even though neither

8

the Code nor the legislative history precisely defines the standards of equal treatment, the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members."); *Schroeder v. New Century Liquidating Trust (In re New Century)*, 407 B.R 576, 592 (D. Del. 2009) (reversing confirmation of a plan that resulted in some claimants in a class receiving 130% distribution on their claim and others receiving 100% distribution on their claim).

25.    The Debtors have asserted that the requirements of Section 1123(a)(4) are met because it "does not require that all claimants within a class recover the same amount; rather, "[w]hat matters . . . is . . . that they have equal opportunity to recover on their claims." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013). Additionally, class members with "stronger claims, or stronger defenses, than others . . . may be classified together so long as their claims are substantially similar and their treatment is approximately equal."  D.I. 4105, ¶¶ 38-39.

26.    Here, however, the issue is not the strength or weakness of the claims and defenses that will result in the liquidated value of the claim.  Instead, the Plan <u>immediately</u> limits the maximum recovery of Girl Scouts by 30% or more regardless of the strength or weakness of the underlying claim, or the final adjudicated value of the claim.  Conversely, the remaining Non-Abuse Litigation Claimants are entitled to pursue and recover the full amount of their claims.  This is impermissible disparate treatment.

27.    The Debtors further argue that the fact that Girl Scouts' may only be able to recover a percentage of their allowed claim while other claimants recover 100% of their claim is not disparate treatment, because "the Plan affords every member of Class 7—including GSUSA—the same opportunity to recover the full amount of their allowed claim against any insurance coverage *available to such claimant*."  D.I. 4105, ¶ 41 (emphasis in original).  This is

9

4883-5333-3260\5

incorrect.  Providing for disparate payment to claimants in the same class based on the existence

or non-existence of insurance to cover such claims is improper.  *See In re City Homes III LLC*,

564 B.R. 827, 868-869 (Bankr. Md. 2017) (refusing to confirm a plan providing up to 100%

recover for certain insured claimants where uninsured claimants were limited to a pro rata

distribution of $300k).

28.     The Debtors are not entitled to confirm a Plan which limits Girl Scouts'

maximum recovery to 70% or substantially less of its claim while permitting other claimants in

the same class the ability to recover 100% of their claims.

29.     Additionally, although Girl Scouts' claims for corrective advertising and

attorneys' fees are arguably covered by the insurance policies, such coverage has not been

stipulated to by the insurance companies.  The Debtors have the ability to compromise these

policies (e.g., by settling with insurers) prior to any payment being made to Girl Scouts, with no

ability for Girl Scouts to restrict such action or recover any lost funds as a result of these actions.

Additionally, there is no guaranty that the coverage will be sufficient to cover such claims by the

time such claims are finally adjudicated.  Indeed, the coverage may be completely extinguished

by Boy Scouts' own attorneys' fees in the Trademark Action.  These contingencies further

increase the probability of the Girl Scouts' claim being paid at an even lower percentage.

In contrast, the other Class 7 non-abuse tort claimants are subject to different insurance policies

whose total policy limits, including the various tranches of excess policies, are so vastly larger

than the total potential exposure of the Boy Scouts that an allowed claim of the other Class 7

non-abuse tort claimants will recover 100% on their claims.  Hence, Boy Scouts have set forth a

plan where Class 7 claimants with allowed claims are mathematically ensured a 100% payout

while Girl Scouts' will at best recover 70% and likely even less on account of any allowed claim.

4883-5333-3260\5

This disparate treatment is impermissible under section 1123(a)(4) of the Bankruptcy Code and the Plan cannot be confirmed with respect to Girl Scouts' treatment without a backstop by reorganized Boy Scouts of any deficiency on Girl Scouts' recoveries.

Dated:  February 4, 2022

**DORSEY & WHITNEY (DELAWARE) LLP**

*/s/ Eric Lopez Schnabel*
Eric Lopez Schnabel (DE Bar No. 3672)
Alessandra Glorioso (DE Bar No. 5757)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone:  (302) 425-7171
Facsimile:  (302) 425-7177
E-mail:  schnabel.eric@dorsey.com
          glorioso.alessandra@dorsey.com

-and-

DORSEY & WHITNEY LLP

Bruce R. Ewing (*pro hac vice*)
Eric Lopez Schnabel (DE Bar No. 3672)
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 415-9200
Facsimile:  (212) 953-7201
E-mail:  ewing.bruce@dorsey.com
          schnabel.eric@dorsey.com

***Counsel to Girl Scouts of the United States of America***

4883-5333-3260\5