IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) (Jointly Administered) |
| Debtors. | Ref. Docket Nos. 7832, 7996 |
| | **Objection Deadline: February 4, 2022** **Hearing Date: February 22, 2022 at 10:00 a.m. ET** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ARCHBISHOP OF AGAÑA (BANKR. D. GUAM 19-00010) TO THE SECOND MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

The Official Committee of Unsecured Creditors appointed in *In re: Archbishop of Agaña, a Corporation Sole* (Bankr. D. Guam 19-00010 (the "Guam Committee") hereby submits this objection (the "Objection") to the *Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (the "Plan") [Dkt. No. 7832], and respectfully states as follows:

### INTRODUCTION

The Plan is unconfirmable. The Debtors' attempt to confirm a Plan that has been completely overhauled post-solicitation does not satisfy due process. If that was not enough, the Plan infringes upon the jurisdiction of bankruptcy courts across the country and impermissibly disposes of assets of other bankruptcy estates without paying anything to creditors of those estates.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

The Guam Committee's constituency is comprised primarily of survivors of sexual abuse (the "Guam Survivors") that are creditors in the bankruptcy case filed by the Archbishop of Agaña, a corporation sole (the "Archdiocese"). The Plan purports to, among other things, effectuate releases of more than seventy (70) Guam Survivors' claims in the Archdiocese's bankruptcy case and dispose of property of the Archdiocese's bankruptcy estate that might be used to pay those claims. Without their claims or the valuable estate property that the Debtors seek to trade for their own purposes, Guam Survivors—***individuals who were sexually abused as children***—will recover dramatically less than the recovery to which they are legally entitled and that they morally deserve.

Many Guam Survivors were abused by an Archdiocesan priest or employee who also served the Boy Scouts of America (the "BSA") in a leadership capacity ("Scoutleaders") on the island of Guam. The Archdiocese and BSA thus have ***separate liability as joint tortfeasors*** for their own, independent negligent acts and omissions that caused harm to Guam Survivors. Although Guam Survivors are actively mediating for compensation for the Archdiocese's portion of liability,[2] the Plan purports to release, enjoin, and channel Guam Survivors' Abuse Claims[3] against the Archdiocese. Further, the Plan purports to release and enjoin the Guam Survivors' direct action rights against BSA Insurers that arise under Guam law.

The Guam Committee objects to confirmation of the Plan on the following grounds: (i) the Plan impermissibly provides the Archdiocese with a nonconsensual third-party release; (ii) the Plan disposes of the Archdiocese's estate's property in violation of the automatic stay in the Archdiocese's bankruptcy case and in contravention of foundational principles of insurance law;

---

[2] *See Order Granting Motion Directing Mediation and Appointing the Honorable Robert J. Faris to Serve as Mediator* (Bankr. D. Guam 19-00010, Aug. 28, 2019, Dkt. No 227); *Status Report* (Bankr. D. Guam 19-00010, Aug. 25, 2021, Dkt. No. 661).

[3] All terms not defined herein shall have the meanings ascribed to them in the Plan.

(iii) the Debtors materially modified the Plan post-solicitation to significantly broaden the scope of protections afforded to Chartered Organizations, including the Archdiocese; and (iv) the Plan violates due process by allowing the Archdiocese—without notice to the Guam Survivors—to dispose of its assets in exchange for claim releases.

For the reasons described herein, and many others,[4] the Guam Committee urges the Court to refrain from confirming the Plan.

## BACKGROUND

1.      On January 16, 2019, the Archdiocese filed a petition for relief under chapter 11 of title 11 of the United States Code.

2.      The Archdiocese is an insured under multiple insurance contracts issued to the Boy Scouts of America (the "BSA Insurance Policies"). The Archdiocese's contract rights under the BSA Insurance Policies are highly valuable assets of the Archdiocese's bankruptcy estate and its creditors.

3.      The BSA acknowledges that the Archdiocese is a Chartered Organization of the BSA and that Chartered Organizations are insured under the BSA Insurance Policies by January 1, 1976.[5]

4.      The Archdiocese acknowledges that the BSA Insurance Policies are an asset of the Archdiocese's estate. The Bankruptcy Court for the District of Guam approved a stipulation between the Guam Committee and Archdiocese indicating that the Insurance Policies are

---

[4] The Guam Committee joins in many of the arguments made in other objections to the Plan. For the sake of efficiency, the Guam Committee has refrained from elucidating each of those arguments in this Objection.

[5] Plan at Article A.I.57 (definition of "Chartered Organizations" includes faith-based organizations authorized by the BSA to operate, sponsor, or support Scouting units); *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (the "Disclosure Statement") [Dkt. No. 6445] at Article II.E.2 (. . . it is the BSA's position that Chartered Organizations were not named or additional insureds under any of the BSA's Insurance Policies prior to 1976. . ..”); *see also* Disclosure Statement at Article III.F.3.

property of the Archdiocese's bankruptcy estate and subject to the automatic stay applicable in the Archdiocese's bankruptcy case. *Final Order Approving Stipulation and Denying Derivative Standing Motion as Moot* (Bankr. D. Guam 19-00010, Sep. 10, 2021, Dkt. No 692).

5.      The Archdiocese is also a named insured under multiple insurance contracts issued to the Archdiocese (the "Archdiocese Insurance Policies") that are impacted by the Plan.[6]

6.      The following is a description of certain BSA Insurance Policies under which the Archdiocese claims to be insured:

| Policy Dates | Insurer | Policy Number | Limit Description |
|---|---|---|---|
| 1/1/1975-1/1/1976 | Hartford | 10CA43342E | $500,000 each occurrence |
| 1/1/1976-1/1/1977 | Hartford | 10CA43349E | $500,000 each occurrence |
| 1/1/1976-1/1/1977 | National Union | BE1151559 & BE1151554 | $10,000,000 each occurrence |
| 9/17/1976-9/17/1977 | Lloyds' & Companies | 76-10-08-02 | $5,000,000 each occurrence |
| 1/1/1977-1/1/1978 | Hartford | 10CA43359 E | $1,000,000 each occurrence |
| 1/1/1977-1/1/1978 | National Union | BE121P255 & BE1151590 * | $10,000,000 each occurrence |
| 1/1/1977-1/1/1978 | Am RE | M-1027493 | $500,000 each occurrence |
| 1/1/1978-1/1/1979 | INA | GLP706452 | $500,000 per occurrence |
| 1/1/1978-1/1/1979 | National Union | CE1157777 | $500,000 per occurrence |
| 1/1/1978-1/1/1979 | First State | 908854 | $10,000,000 per occurrence |
| 1/1/1979-1/1/1980 | INA | GLP706452 | $500,000 per occurrence |
| 1/1/1979-1/1/1980 | INA | XBC 151748 | $5,000,000 per occurrence |
| 1/1/1979-1/1/1980 | First State | 927616 | $5,000,000 per occurrence |
| 1/1/1980-1/1/1981 | INA | GLP706452 | $500,000 each occurrence |

---

[6] Article X.H (Insurance Entity Injunction for Settling Insurance Companies).

| Policy Dates | Insurer | Policy Number | Limit Description |
|---|---|---|---|
| 1/1/1980-1/1/1981 | Allianz | UMB 599346 | $5,000,000 per occurrence |
| 1/1/1980-1/1/1981 | Aetna | 01XN2438WCA | $10,000,000 per occurrence; $10,000,000 Aggregate |
| 1/1/1981-1/1/1982 | INA | ISC1353 | $500,000 per occurrence |
| 1/1/1981-4/1/1982 | Transit | UMB 964076 | $5,000,000 per occurrence |
| 1/1/1981-1/1/1983 | First State and Underwriters | 931255 & 931255A | $10,000,000 per occurrence |
| 1/1/1981-1/1/1983 | First State and Underwriters | 931257 & 931257A | $10,000,000 per occurrence |

7.      Guam Survivors filed approximately 150 claims in the Archdiocese's bankruptcy case that also implicated or named BSA as a joint tortfeasor.[7] There are at least 70 claims still pending against *both* the Archdiocese and BSA ("Joint Tortfeasor Claims").

8.      The Joint Tortfeasor Claims create liability not only for the Archdiocese and BSA, but also for insurers that issued liability policies covering the Joint Tortfeasor Claims, including the Archdiocese Insurance Policies and the BSA Insurance Policies that name Chartered Organizations, which includes the Archdiocese,[8] as an insured.

9.      In 2017, the Archdiocese began submitting claims to insurers that issued BSA Insurance Policies ("BSA Insurers") and insurers that issued Archdiocese Insurance Policies ("Archdiocese Insurers").[9] Certain BSA Insurers acknowledged potential coverage for the Archdiocese against the claims asserted in the Archdiocese's Bankruptcy Case.[10]

10.     Chartered Organizations (including the Archdiocese) are described as "named insureds" under certain BSA Insurance Policies and as "additional insureds" under other BSA

---

[7] *See* Claim No. 6436 at Ex. A.

[8] *See* Plan at Article I.A.57; Plan at Ex. K.

[9] *See Memorandum in Support of Motion for Derivative Standing* at p. 6 (Bankr. D. Guam 19-00010, July 22, 2021, Dkt. No 616) and *Declaration of Robert T. Kugler* at Ex. C-D (Dkt. No 617)

[10] *See, e.g., Memorandum in Support of Motion for Derivative Standing* at p. 6-7 (Bankr. D. Guam 19-00010, July 22,2021 Dkt. No 616) and *Declaration of Robert T. Kugler* at ¶¶ 9-10 and Ex. D to Kugler Dec. at p. 2 (Dkt. No 617).

Insurance Policies. For example, a policy endorsement issued by First State Insurance Company

under which Hartford acknowledged a potential insurance obligation to the Archdiocese states:

> It is agreed that the Named Insured is as follows:
>
> Boy Scouts of America
> National, Regional and All Local Councils
>
> All Scout Officials, Professional and Non-Professional Employees, Sponsors & Charter
> Organizations, Donors & Volunteer Workers (whether registered or not) solely with
> respect to scouting activities and as excess over other valid and collectible insurance,
> Certificate Holders by specific request, any Leasing Dealer as respects Automobiles
> leased by Boy Scouts of America.[11]

11.    On November 13, 2020, the Archdiocese filed a proof of claim in the BSA

Bankruptcy asserting (i) claims for contribution as to any Abuse Claims for which the

Archdiocese contributes payment in its chapter 11 case, and (ii) claims for coverage as an

insured under the BSA Insurance Policies.[12]

12.    BSA proposed a Modified Fifth Amended Chapter 11 Plan of Reorganization on

September 30, 2021.[13] This was the solicitation version of the plan sent out for a vote by BSA's

creditors ("Solicitation Version").

13.    On December 18, 2021, after the Solicitation Version was circulated for vote, and

only ten (10) days prior to the voting deadline on the Solicitation Version,[14] the Debtors filed the

Plan.

---

[11] *See, e.g., Memorandum in Support of Motion for Derivative Standing* at p. 6 (Bankr. D. Guam 19-00010, July 22, 2021, Dkt. No 616) and *Declaration of Robert T. Kugler* at ¶ 9 and Ex. D to Kugler Dec. at p. 2 (Dkt. No 617).

[12] The Archdiocese's claim is not merely an unliquidated claim for contribution and/or indemnity, but is also a claim to the Archdiocese's rights as an insured under the BSA Insurance Policies. *See* Claim No. 6436.

[13] *See Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 6443].

[14] *See Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with*

14.     The Plan contains numerous material modifications to the Solicitation Version that profoundly impact the rights of the Debtors' creditors, including the Guam Survivors.[15]

15.     A confirmation hearing on the Plan is currently scheduled for February 22, 2022.

## ARGUMENT

A bankruptcy court can only confirm a Ch. 11 plan of reorganization if "[t]he plan complies with the applicable provisions of [title 11]." 11 U.S.C. § 1129(a)(1). The Plan cannot be confirmed because it fails to comply with title 11 in at least the four (4) ways described herein.

## I.  The Plan Impermissibly Provides the Archdiocese with a Nonconsensual Third-Party Release

The Plan purports to enjoin and release Guam Survivors' Joint Tortfeasor Claims against the Archdiocese without Guam Survivors' consent. The Archdiocese and BSA are independently liable to the Guam Survivors for their own acts of negligence, as separate institutions with their own supervisory responsibility over the perpetrators. Yet, through a dozen or more convoluted definitions, overly broad injunctions and buried claim releases, the Plan purports to eliminate the rights of Guam Survivors to pursue Joint Tortfeasor Claims against the Archdiocese for the Archdiocese's own acts and omissions resulting in their abuse, without the Archdiocese providing any compensation to the Guam Survivors for its share of liability.

Bankruptcy courts do not have statutory authority to confirm bankruptcy plans containing nonconsensual third-party releases of direct claims. *See In re Purdue Pharma, L.P.*, --- B.R. ---, No. 21 cv 7532, 2021 WL 5979108, *47-48 (S.D.N.Y. Dec. 16, 2021) (considering at length and ultimately rejecting each of Bankruptcy Code sections 105(a), 1123(b)(6), 524(e), 1123(a)(5),

---

*Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [Dkt. No. 6438] (the "Solicitation Order") at p. 5-6.

[15] *See Notice of Filing of Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization and Blackline Thereof* [Dkt. No. 7833].

and 1129(a)(1) as the source of any statutory authority to enter nonconsensual third-party releases); *see also In re Cont'l Airlines*, 203 F.3d 203, 214 & n. 11 (3d Cir. 2000) (declining to establish a rule regarding "the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible" in light of the plan's failure to pass muster under even the most flexible tests, and noting that "several of the bankruptcy courts in our Circuit have stated that non-debtor releases are permissible only if consensual, at least with respect to direct (as opposed to derivative) claims"); *cf. In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019 ("exacting standards" must be satisfied for nonconsensual third-party releases and "[s]etting too low a bar for the exercise of bankruptcy court authority could seriously undermine Article III"). Neither 11 U.S.C. § 105(a) nor any other provision of Title 11 authorizes a bankruptcy court to grant non-consensual releases of direct claims against non-debtors.[16] Further, when the Third Circuit has addressed the bankruptcy court's *statutory* authority to impose non-debtor releases, "it overturned bankruptcy orders granting them." *In re Purdue,* 2021 WL 5979108 at *60 (collecting cases).

Regardless, the nonconsensual third-party releases proposed by the Plan do "not pass muster under even the most flexible tests for the validity of non-debtor releases" and do not satisfy the "hallmarks of permissible non-consensual releases—fairness [and] necessity to the reorganization." *See In re Cont'l Airlines*, 203 F.3d at 214.

### A. The Plan Releases the Archdiocese and Enjoins Guam Survivors' Claims Against the Archdiocese

On December 18, 2021, after solicitation of the vote and with only ten (10) days left before expiration of the voting deadline, the Debtors modified the Plan to enjoin all Abuse

---

[16] In *Millennium Lab Holdings II*, the Third Circuit addressed this Court's constitutional authority to confirm plans with non-debtor releases but did not consider statutory limitations on the exercise of a bankruptcy court's authority under § 105(a).

Claims against any insureds under any Insurance Policies issued by a Settling Insurance Company.[17] The Plan was also modified to enjoin all "Opt-Out Abuse Claims" against "Opt-Out Chartered Organizations," which includes all Abuse Claims covered by Insurance Policies issued by Settling Insurance Companies with respect to coverage for such Abuse Claims.[18] The Plan's channeling injunction expands even further the scope of claims released against Opt-Out Chartered Organizations beyond "Opt-Out Abuse Claims."[19] Further, the Plan now provides that "Abuse Claims against [a debtor in bankruptcy] shall be subject to the injunction applicable to Opt-Out Abuse Claims."[20]

If the Archdiocese were to "Opt-In" to the Plan by agreeing to transfer its rights in the Abuse Insurance Policies to the Trust,[21] the Archdiocese would be further released from Post-1975 Chartered Organization Abuse Claims as a "Participating Chartered Organization" receiving the protections afforded to a "Limited Protected Party."[22] This would result in the

---

[17] Plan at Article X.F.2 ("All Abuse Claims against insureds and co-insureds covered under any insurance policies issued by the Settling Insurance Companies shall be channeled under Article X.F.1 and released under Article X.J.6.. . . ").

[18] Plan at Article I.A.77 (". . . Abuse Claims against [a debtor in bankruptcy] shall be subject to the injunction applicable to Opt-Out Abuse Claims . . ..); Article I.A.18 (Abuse Claims include claims against Opt-Out Chartered Organization that relate to scouting-related abuse); Article I.A.181 ("Opt-Out Abuse Claim" includes any Abuse Claim against an Opt-Out Chartered Organization covered under an insurance policy issued by a Settling Insurance Company with respect to such coverage for such Abuse Claims"); Article X.F.1 (". . . [the holder of an Abuse Claim] shall have no right whatsoever at any time to assert such Opt-Out Abuse Claim against any Opt-Out Chartered Organization or any property or an interest in property of any Opt-Out Chartered Organization."); Article X.J.3 (". . . all holders of Abuse Claims shall . . . release . . . each and all of the Opt-Out Chartered Organizations . . .").

[19] Plan at Article X.J.3 (releasing Opt-Out Chartered Organization Abuse Claims against Opt-Out Chartered Organizations as well as "all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Opt-Out Chartered Organization Abuse Claims").

[20] Plan at Article I.A.77.

[21] The BSA Insurance Policies and Local Council Insurance Policies compromise the "Abuse Insurance Policies" under the Plan. Plan at Article I.A.20.

[22] Plan at Article I.A.164 and Article I.A.187.

additional release of Abuse Claims that are not insured under a Settling Insurance Company Policy but involve Abuse that first occurred on or after January 1, 1976 and that arose, in whole or in part, from Scouting-related Abuse.[23] The Plan also provides for a release of any Participating Chartered Organization "with respect to any Abuse Claims that arose prior to January 1, 1976 and are not covered by any insurance policy issued by a Settling Insurance Company," although these do not appear to be covered by the Channeling Injunction.[24] Finally, if the Archdiocese were to become a Protected Party prior to the Plan objection deadline, the Plan would purport to enjoin *any* Abuse Claim against the Archdiocese, regardless of whether it is insured under an Insurance Policy issued by a Settling Insurance Company.

The Plan defines an "Abuse Claim" to encompass any Claim against a Protected Party, Limited Protected Party or Opt-Out Chartered Organization that is "attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Scouting-related Abuse."[25] The Plan therefore purports to release and enjoin Guam Survivors from pursuing Joint Tortfeasor Claims in the Archdiocese's Bankruptcy Case, without the Archdiocese providing any compensation to the Guam Survivors for its share of liability.[26] The Plan does not require that the holders of Abuse Claims provide consent for the injunctions it contains, and holders of Abuse Claims "shall be deemed to" release the Protected Parties, Limited Protected Parties, Participating Parties, and Opt-Out Chartered Organizations to the extent set forth in Article X(J)(3).

---

[23] Plan at Article I.A.202 (Post-1975 Chartered Organization Abuse Claim is an Abuse Claim relating to Abuse alleged to have first occurred on or after January 1, 1976); Article X.F.1 (". . . [the holder of an Abuse Claim] shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim against a Limited Protected Party or any property or any interest in property of any Limited Protected Party . . ..") ; Article X.J.3 (". . . all holders of Abuse Claims shall . . . release . . . each and all of the Limited Protected Parties . . .").

[24] Plan at Article X.J.3.

[25] Plan at Article I.A.18.

[26] *Supra* n. 17,  n. 18, n. 19, n. 20, n. 21, n. 22, n. 23, n. 24, and n. 25.

**B.    The Proposed Third-Party Releases Do Not Meet Minimal Standards of Fairness and Necessity to the Reorganization**

In the Third Circuit, bankruptcy courts consider several factors when deciding whether to enjoin a non-consenting creditor's claims against a non-debtor. *In re Cont'l Airlines*, 203 F.3d at n.17*; see also In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo 1994).[27] The following analysis of the relevant factors demonstrates that the Court does not have authority under Section 105(a) of the Bankruptcy Code to issue the injunctions proposed by the Plan.

**1.    There is No Identity of Interests Between the Debtors and the Archdiocese**

There is no identity of interests between the BSA and the Archdiocese such that the claims against the Archdiocese are equivalent to claims against the BSA or would deplete the BSA's assets. The Archdiocese and the BSA are separate organizations. The Archdiocese's liability is not derivative of the BSA's liability either. Many Guam Survivors were abused by one or more individuals simultaneously serving as Scoutleaders *and* as employees or volunteers of the Archdiocese.[28] The Guam Survivors were abused both during church functions and BSA activities. The Plan definition of "Abuse Claim" purports to encompass the Guam Survivors' entire mixed claim against BSA and the Archdiocese, as one arising "in whole or in part" from

---

[27] The Master Mortgage factors have been applied by courts in this District in deciding whether to grant a third-party release of estate claims as part of a plan. *See In re Washington Mut., Inc.*, 442 B.R. 314, 349 (Bankr. D. Del. 2011); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (stating that courts in Delaware follow the *Master Mortgage* factors, sometimes called "*Zenith* factors," in deciding whether to grant a third-party release of estate claims as part of a plan) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (applying *Master Mortgage* factors to third-party releases of estate claims against nondebtors)); *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017); see also *In re Millennium Lab Holdings II*, No. 15- 12284 (Bankr. D. Del. Dec. 12, 2015) [Docket No. 206], hearing transcript at 17:9-24:18 (*Master Mortgage* factors applied to proposed nonconsensual creditor release of nondebtors).

[28] Nearly all of the Joint Tortfeasor Claims concern abuse by individuals simultaneously employed by the Archdiocese and serving in a leadership capacity for BSA.

Scouting-related Abuse.[29] As a result, the Guam Survivors' entire claim might be enjoined, even if some of the abuse occurred solely in connection with church functions. Even if the Plan definition of "Abuse Claim" were limited to only that portion of a Guam Survivors' claim concerning abuse during BSA activities, the BSA and the Archdiocese *each* bear their own liability for such abuse. The independent acts of negligence of both the Archdiocese and BSA resulted in the alleged sexual abuse of over 150 youth in Guam under the auspices of both the BSA and the Archdiocese. The Archdiocese and BSA have *entirely separate liability* to Guam Survivors as a result of their independent acts or omissions. Each organization negligently retained and/or supervised the individuals that abused the Guam Survivors.

In addition, as a Chartered Organization, the Archdiocese assumed an independent duty of care to scouts in Guam under its sponsorship. Indeed, the National Catholic Committee on Scouting, an entity affiliated with the BSA, has described the Chartered Organization relationship as akin to a "franchise" where "the units Chartered to a Catholic institution are owned by that organization," such that the Catholic institution retains control over its BSA troop(s) membership and programming.[30] The Chartered Organization also retains control over the selection of BSA leaders.[31] Abuse occurred within the Chartered Organization's premises and during BSA activities that it sponsored. Chartered Organizations may be liable for abuse

---

[29] Plan at Article I.A.18 ("Abuse Claim" is defined to include any liquidated or unliquidated Claim against a Protected Party, a Limited Protected Party or an Opt-Out Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly or indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date . . .").

[30] http://www.nccs-bsa.org/pdf/letters/NCCS.20170208.Press.Release.pdf

[31] As BSA clarified in 2000, "[n]o adult leader can be appointed without approval of the sponsoring institution, the local Council . . . that oversees Scouting in the geographical area in question, and Boy Scouts of America." Petitioner's Brief in *Boy Scouts of America v. Dale*, 530 U.S. 640, 2000 WL 228616, at *4 (Feb. 28, 2000).

occurring in connection with BSA activities regardless of whether the perpetrator was employed by or otherwise formally affiliated with the Chartered Organization.[32]

The claims against the Archdiocese do not threaten to deplete the assets of the Debtors' bankruptcy estate either.[33] Nothing prevents the BSA and the Settling Insurance Companies from resolving BSA's liability for the Joint Tortfeasor Claims while preserving the Guam Survivors' claims against the Archdiocese. This factor weighs definitively against approval of the nonconsensual third-party releases the Archdiocese would receive under the Plan.

### 2. There is No Contribution by the Archdiocese for the Archdiocese's Liability to the Guam Survivors

The Plan does not propose *any* contribution of assets by the Archdiocese to secure the protections afforded to it under the Plan, let alone a "substantial contribution." The Archdiocese need not make any contribution of assets to the Guam Survivors in order to become a "Limited Protected Party" because the Plan affords such protections so long as the Archdiocese "opts in" by transferring its insurance rights under the Abuse Insurance Policies to the Settlement Trust.[34] Further, the Plan, as modified *after* solicitation of the vote, would release all Abuse Claims covered under an insurance policy issued by a Settling Insurance Company, regardless of

---

[32] *See, e.g.,* Order on the Motions of Defendants in *John Doe 180 v. Boy Scouts of America et al.*, Court File No. 62-CV-11-5545 (slip opinion) (Ramsey Ct. D. Ct. August 23, 2013) at p. 27-28 (denying motion for summary judgment of BSA sponsor/chartering organization River Hills United Methodist Church on claims arising from abuse during scouting activities, describing several bases upon which a jury could find the Church liable for the abuse), attached as Ex. A.

[33] The BSA Policies do not have aggregate limits for Abuse Claims and the Archdiocese and BSA's independent acts and omissions may implicate separate "per occurrence" limits under the BSA Policies. Even if the BSA Policies are interpreted to require limit sharing between insureds, the proposed settlements with the Settling Insurance Companies do not threaten to exhaust the per occurrence limits of the BSA Policies or otherwise endanger BSA's available insurance proceeds to resolve claims.

[34] Plan at Article I.A.164 (Limited Protected Parties are Participating Chartered Organizations); Article I.A.187 (a debtor in bankruptcy shall become a Participating Chartered Organization only if it advises Debtor's counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment).

whether the Archdiocese has "opted in" to become a Limited Protected Party by agreeing to transfer its insurance rights to the Settlement Trust.[35]

Further, there is no Plan provision for payment of Guam Survivors' claims against the Archdiocese by the Archdiocese's insurers, even though the Archdiocese's insurers are directly liable to Guam Survivors under Guamanian territorial law. 22 Guam Code Ann. § 18305.[36] Even if the Settling Insurance Companies were purporting to make contributions on behalf of all other insureds to the Settlement Trust (and they are not), the proposed releases are far broader than only those claims (or those portions of claims) insured under Insurance Policies issued by the Settling Insurance Companies. Indeed, as a Limited Protected Party, the Archdiocese would appear to be released from all pre-1976 Abuse Claims as well as Post-1975 Chartered Organization Abuse Claims, in addition to claims covered by Insurance Policies issued by Settling Insurance Companies, all without any contribution whatsoever.[37] In addition, the Plan does not provide any separate source of funding or mechanism for payment of Abuse Claims against Chartered Organizations, let alone Abuse Claims against Chartered Organizations that employed the perpetrator.

---

[35] Plan at Article X.F.2.

[36] Guam is a "direct action" jurisdiction – a claimant may bring suit against a liability insurer directly. The Guam Survivors are not required to first secure judgments against the BSA or Archdiocese to have rights against their insurers. See 22 Guam Code Ann. § 18305 ("On any policy of liability insurance the injured person or his heirs or representatives shall have a right of direct action against the insurer within the terms and limits of the policy, whether or not the policy of insurance sued upon was written or delivered in Guam, and whether or not such policy contains a provision forbidding such direct action, provided that the cause of action arose in Guam. Such action may be brought against the insurer alone, or against both the insured and insurer.")

[37] If the Diocese become a Contributing Chartered Organization by agreeing to transfer its insurance interests in the BSA Policies, the channeling injunction would extend, at minimum, to all Post-1975 Chartered Organization Abuse Claims as well as any Abuse Claims insured under the Insurance Policies issued by Settling Insurance Companies. Plan at Article X.F.2. Further, the Plan proposes to release against the Participating Chartered Organizations any "Abuse Claims that arose prior to January 1, 1976 and are not covered by any insurance policy issued by the Settling Insurer." In other words, Limited Protected Parties appear to be released for all Abuse Claims, both pre-1976 and post-1975. Plan at Article X.J.3.

Guam Survivors' claims against the Archdiocese are fundamentally different in nature from BSA survivors' claims against the BSA. Guam Survivors should be entitled to seek recovery through the Archdiocese's bankruptcy case rather than being lumped together with tens of thousands of survivors with claims only against BSA. By enjoining Guam Survivors' claims against the Archdiocese and Settling Insurance Companies, the Plan allows the Archdiocese and BSA Insurers to completely skirt their liabilities to the Guam Survivors.

This factor weighs strongly against approval of the nonconsensual third-party releases the Archdiocese would receive under the Plan. *See In re Charles Street African Methodist Episcopal Church of Boston*, 499 B.R. 66, 102 (D. Mass. Bankr. 2013) (objection of "sole affected creditor" to plan weighs in favor of rejecting a non-debtor release where the plan does not replace the nonconsensual release with something of "indubitably equivalent value to the affected creditor"); *In re Hoffinger Indus., Inc.*, 321 B.R. 498, 514 (E.D. Ark. 2005) (release did not meet Master Mortgage test because the plan failed to provide for payment of the creditor "specifically and perhaps pointedly affected by the injunction").

### 3.  The Injunction is Not Essential to Reorganization

The Plan's injunction against and release of the Guam Survivors' Joint Tortfeasor Claims is not "integral to the restructuring of the debtor-creditor relationship." *Stern v. Marshall*, 564 U.S. 462, 497 (2011). The Settling Insurance Companies can secure releases of liability on behalf of the Debtors, as well as their affiliated entities, while leaving undisturbed the Guam Survivors' rights against the Archdiocese and its insurers. Indeed, it defies logic that releases not even incorporated in the Solicitation Version of the Plan might now be deemed integral to its success. Further, any releases that a Chartered Organization can wait until the disclosure deadline to "opt in" to receiving could never be considered necessary to the Debtor's reorganization. While the Settling Insurance Companies may prefer to obtain full releases on

behalf of any Chartered Organizations insured under the BSA Policies, that is not necessary to the *Debtors'* reorganization. *In re Continental Airlines*, 203 F.3d 203, 215 (3d Cir. 2000) (rejecting non-debtor releases in part because of absence of any evidence in the record "to even imply that the success of the Continental Debtors' reorganization bore any relationship to the release and permanent injunction of Plaintiff's class action").

Nor is it necessary to the Debtors' reorganization that the Archdiocese release its rights for coverage under the BSA Insurance Policies or that the Guam Survivors' direct action rights to BSA Insurance Policies proceeds be enjoined. This overly broad injunction of claims against all Chartered Organizations violates the rights of Guam Survivors in the Archdiocese's bankruptcy—as against the Archdiocese and the BSA Insurers. The volume of claims in the BSA's bankruptcy, and the Settling Insurance Company's resulting preference for full policy buy backs, does not warrant trampling Guam Survivors' rights against the Archdiocese and the BSA Insurers.

This factor also weighs against approval of the nonconsensual third-party release the Archdiocese would receive under the Plan.

### 4.   Creditors Have Not Overwhelmingly Voted to Accept the Plan

The Plan does not have "overwhelming creditor support" of the creditor class impacted by the nonconsensual third-party releases, which includes the Guam Survivors. Importantly, creditors have not yet had the opportunity to consider it. The Solicitation Version, which also included nonconsensual third-party releases, failed to obtain overwhelming creditor support.[38]

---

[38] *See Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Final Tabulation of Ballots Case on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* at Ex. A, "Final Tabulation Summary" (the "Final Voting Report") [Dkt. No. 8345-1]; *See also The Official Committee of Tort Claimants' Status Report re: Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 8190] at ¶¶ 4-5.

Since then, the Plan has been materially modified from the Solicitation Version.[39] These modifications include substantial alterations to the scope of releases provided to the Archdiocese and other Chartered Organizations. Because creditors, including the Guam Survivors, have not yet had the opportunity to consider all the new nonconsensual third-party releases provided for by the Plan or vote on the Plan; they cannot have provided overwhelming support for the Plan. *In re Lower Bucks Hosp*., 571 Fed. Appx. 139, 144 (3d Cir. 2014) (concluding that, because release was not adequately disclosed, "it is impossible to conclude that a large majority of the [class] supported the Plan and acquiesced to the release of their potential claims against [third party]").

Setting aside the material modifications made to the Plan post-solicitation, the Debtor has failed to establish that there is "overwhelming creditor support" of the creditor class impacted by the nonconsensual third-party releases. Notably, the Debtor has not provided to creditors voting data by council. If the Debtors have voting data for the Aloha Council pertinent to whether the Debtor has "overwhelming" creditor support for its Plan, the Debtors should produce it.

This factor cannot be properly weighed until creditors have an opportunity to consider the post-solicitation alterations to the scope of the injunctions and releases for Chartered Organizations in the Plan. In the meantime, the Court should not presume that Guam Survivors "overwhelmingly" voted in favor of releasing all their claims against both the Archdiocese and the BSA after fighting for years—sometimes decades—for the right to assert them and to affect change in the Catholic Church in Guam.

This factor weighs strongly against the nonconsensual third-party releases provided for by the Plan.

---

[39] *See Notice of Filing of Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization and Blackline Thereof* [Dkt. No. 7833].

> **5.** **The Plan's Injunctions and Releases Subvert the Will of Guam's Legislature**

In addition to these *Master Mortgage* factors, public policy considerations weigh heavily against confirmation of a Plan that would purport to release the Guam Survivors' claims against the Archdiocese. In 2016, the territory of Guam enacted Public Law 33-187 to repeal statutes of limitation relating to claims arising from child sexual abuse. Facing over 200 lawsuits, in January of 2019, the Archdiocese filed for bankruptcy. The Guam Survivors timely and courageously asserted their claims relating to child sexual abuse against the Archdiocese, seeking to hold the Archdiocese accountable for its responsibility in the extraordinary harm caused on the island of Guam over 60+ years. The Plans' proposed release of Guam Survivors' Joint Tortfeasor Claims would bar the adjudication of these claims in the Archdiocese's bankruptcy case, thereby infringing upon the jurisdiction of the Bankruptcy Court for the District of Guam and undermining the will of the Guam legislature, and by extension, the people of Guam.

The application of these factors compels the conclusion that the Plan contains an impermissible third-party release of the Archdiocese. BSA is capable of reorganizing without impacting the rights of Guam Survivors against the Archdiocese. The Guam Survivors are entitled to seek compensation in Guam from the Archdiocese and the Archdiocese's insurers, and this Court lacks authority to enjoin their continuing efforts to do so pursuant to court-sanctioned mediation efforts in the Bankruptcy Case in Guam. Survivors of childhood sexual abuse should not be the first bankruptcy creditors—involuntary creditors in the first instance who suffered some of the worst human trauma imaginable—to have broad, nonconsensual third-party releases forced upon them simply to allow the organization that allowed their abuse to emerge with a fresh start. This is particularly true under instant circumstances where none of the requisite factors for third-party releases have been satisfied. The Plan should not be confirmed.

II. **The Plan's Disposal of the Archdiocese's Estate Property Violates the Automatic Stay in Place in the Archdiocese's Bankruptcy Case and Contravenes Insurance Law and the Guam Survivors' Vested Rights**

The Plan purports to dispose of the Archdiocese's bankruptcy estate's rights in insurance policies issued by the Settling Insurance Companies, which would not only violate the automatic stay in place in the Archdiocese's bankruptcy case, but would also extinguish Guam Survivors' rights to recover under such Insurance Policies in contravention of well-established insurance law.

*a.   The Plan violates the automatic stay in the Archdiocese's bankruptcy case*

The Plan provides for a release of the Archdiocese's and Guam Survivors' rights to recover insurance proceeds under insurance policies issued by Settling Insurance Companies.[40] The Plan also requires this Court to approve a proposed repurchase ("buyback") by the Settling Insurance Companies of certain Insurance Policies that cover the Joint Tortfeasor Claims held by Guam Survivors, free and clear of all interests of any person.[41]

When the Archdiocese filed for bankruptcy on January 16, 2019, all of its assets, including the Archdiocese's rights under the Insurance Policies, became part of its bankruptcy estate pursuant to 11 U.S.C. § 541[42] and subject to automatic stay provided for by 11 U.S.C. § 362:

> Property of the estate is defined in § 541 as "all legal or equitable interests of the debtor in property (wherever located) as of the commencement of the case." It includes intangible or contingent interests of the debtor as well as intangible property itself. If these insurance proceeds are property of the bankruptcy estates, the litigation and arbitration proceedings, to the extent they seek

---

[40] Plan at Article X.F.2 ("All Abuse Claims against insureds and co-insureds covered under any insurance policies issued by the Settling Insurance Companies shall be channeled under Article X.F.1 and released under Article X.J.6.. . . ").

[41] Plan at Article V.S.4; Article IX.A.3.o-p; Article X.H.

[42] *Final Order Approving Stipulation and Denying Derivative Standing Motion as Moot* (Bankr. D. Guam 19-00010, Sep. 10, 2021, Dkt. No 692).

monetary judgments or reach monetary settlements payable from the proceeds, would be acts to obtain property of the estate.[43]

28 U.S.C. § 1134 provides that:

> (e) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction—
>
> > (1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate

The Archdiocese agrees the proceeds of the BSA Insurance Policies are assets of its estate.[44] The Archdiocese's estates assets are subject to the jurisdiction of the District Court of Guam. 28 U.S.C. § 1134. While this is an unusual case in which the anticipated actions of one bankruptcy debtor (BSA) will impact the estate of another bankruptcy debtor (the Archdiocese), there exists no bankruptcy-to-bankruptcy exception for violations of the automatic stay.[45] Accordingly, the Plan cannot dispense of assets of the Archdiocese's estate without the consent of the Bankruptcy Court for the District of Guam and any attempt to do so is void *ab initio*. *See* 28 U.S.C. § 1134 and 11 U.S.C. § 541.

> #### b. *The Plan infringes the rights of Guam Survivors in the BSA Insurance Policies*

An insurer and insured cannot terminate a liability policy "to the prejudice of a claimant's rights which have already vested." 2 Couch on Ins. § 31:49.

As explained in the Second Restatement of Contracts § 311 at Comment e:

> Effect of loss under insurance policy. The terms of the promise may make the beneficiary's right irrevocable in whole or in part or only upon a condition. Thus a reserved power to change the beneficiary of a life insurance policy terminates on the death of the

---

[43] *In re Metro. Mortg. & Sec. Co., Inc.*, 325 B.R. 851, 855 (Bankr. E.D. Wash. 2005).

[44] *See Final Order Approving Stipulation and Denying Derivative Standing Motion as Moot* (Bankr. D. Guam 19-00010, Sep. 10, 2021, Dkt. No 692).

[45] *Palmdale Hills Prop., LLC v. Lehman Commer. Paper, Inc.* (*In re Palmdale Hills Prop., LLC*), 654 F.3d 868, 875-76 (9th Cir. 2011) (actions taken by one debtor in its bankruptcy case that affect the rights of another debtor in its bankruptcy case violate the automatic stay in the latter debtor's bankruptcy case).

insured. In general the power of promisor and promisee to vary the duty to a beneficiary under other types of insurance policies is understood to be subject to a similar limitation: *when an insured loss occurs, the power to vary the terms of the policy with respect to that loss is terminated.*

(Emphasis added).

**Illustration:**

5. A contracts with B for liability insurance covering any person operating A's automobile with A's permission. C incurs liability covered by the policy. Thereafter A and B agree to rescind the policy. *The attempted rescission does not affect the rights of C or the person to whom he is liable.*

Restatement (Second) of Contracts § 311, cmt. e.

Guam Survivors have known, pending claims against the Archdiocese and the BSA, and thus have vested rights in the BSA Insurance Policies providing coverage for their Joint Tortfeasor Claims. Guam Survivors also have direct action rights against the BSA Insurers pursuant to Guamanian territorial law. 22 Guam Code Ann. § 18305. The plan proponents' attempt—buried in the bowels of a convoluted Plan—to dispose of Guam Survivors' rights under the Insurance Policies that provide coverage for injury relating to child sexual abuse should not be permitted. *See CX Reinsurance Co. Ltd. v. Johnson*, 252 Md. App. 393, 259 A. 3d 174, 191 (2021), *cert granted*, No. 283, SEPT. TERM, 2021, 2021 WL 6425541 (Md. Dec 8, 2021) ("To permit an insurer and insured to enter into an agreement to defeat the injured party's rights under the policy would defy logic."); *Cosmopolitan Mut. Ins. Co. v. Lumbermen's Mut. Cas. Co.*, 20 N.Y.2d 145, 152-53, 228 N.E.2d 893, 895 (1967) (finding attempted retroactive policy cancellation ineffective to eliminate rights of injured third parties, because when the insurer was notified of the accident, "the risk assumed had fully matured into a responsibility" of the insurer,

and a policyholder cannot agree to eliminate such vested rights unless the policyholder is "prepared to take the place of" the insurer).[46]

Even if the Guam Survivors did not have direct action rights against the BSA Insurers and known, pending claims that fully vest their rights in any policy proceeds, the Plan violates basic insurance principles by purporting to eliminate the Archdiocese's insurance rights without its consent. Even if the Archdiocese does not "opt in" to the transfer of its insurance rights to the Trust, the Plan proposes to enjoin any claims the Archdiocese makes to the proceeds of its own insurance policies and Guam Survivors' claims for coverage under the insurance policies.[47] It is a basic principle of insurance law that "[a] mutual rescission of a liability policy by the insurer and the named insured does not abrogate the accrued rights of the omnibus insureds without their consent." 2 Couch on Ins. § 31:49.

The Plan also proposes to eliminate any Participating Chartered Organization's rights in Insurance Policies issued by the Settling Insurance Companies *directly to the Chartered Organizations*, to the extent of coverage for any Abuse Claims.[48] Even more egregiously, if the Chartered Organization is an "Opt-Out Chartered Organization," the Plan still purports to enjoin

---

[46] *See also* Minn. Stat. Ann. § 60A.08 (West) (prohibiting any insurer and insured from agreeing to rescind a policy where the insurer has knowledge of claims against the insured that would remain unsatisfied due to the insured's financial condition); *Chandler v. Valentine*, 330 P.3d 1209, 1212-14 (Okla. 2014) (Oklahoma Stat. tit. 36 § 3625 prohibited insurer from cancelling liability policy after learning of pending claim).

[47] Plan at Article X.F.1 (channeling any Abuse Claim against a Protected Party); Article I.A.221 (Protected Parties includes the Settling Insurance Companies); Article X.H (Insurance Entity Injunction for Settling Insurance Companies). The Plan also impermissibly proposes to release and enjoin, for any debtors in bankruptcy, any "Opt-Out Abuse Claims," which includes Abuse Claims against the debtors in bankruptcy covered under the Insurance Policies issued by the Settling Insurance Companies, to the extent of such coverage for such claims. In other words, coverage is eliminated for the debtors in bankruptcy, even if they did not "opt in" to the transfer of their insurance rights.

[48] *See* Plan at Article X.H.2 (enjoining "all Persons from asserting any claim or cause of action against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Abuse Insurance Policy *or other insurance policy issued by a Settling Insurance Company covering Abuse Claims*," and excluding for Participating Chartered Organizations only claims "with respect to Non-Settling Insurance Companies coverage for Abuse Claims that arose prior to January 1, 1976") (emphasis added).

and release the Chartered Organization's insurance rights in policies issued by the Settling Insurance Companies directly to the Opt-Out Chartered Organization, not BSA.[49] In other words, the Plan proposes to eliminate the Archdiocese's (and Guam Survivors') rights not only in BSA Policies, but also in the insurance policies issued directly to the Archdiocese, or that otherwise insure the Archdiocese, to the extent of coverage for Abuse Claims from any Settling Insurance Companies. The Archdiocese's own policies are plainly assets of its estate, and cannot be disposed of without the Bankruptcy Court for the District of Guam's authorization.

Because the Plan disposes of the Archdiocese's assets in violation of the automatic stay applicable in the Archdiocese's bankruptcy case and applicable insurance law, the Plan should not be confirmed.

### III. The Plan Contains Material, Post-Solicitation Modifications Broadening the Scope of Releases and Injunctions for Chartered Organizations

The Plan was filed on December 18, 2021, ten days before the voting deadline for the Solicitation Version. Even a cursory glance at the Plan blackline filed on December 18, 2021 would reveal that the Plan proponents made dramatic changes to the treatment of Chartered Organizations and the scope of the releases and injunctions granted to Chartered Organizations, including the Archdiocese. Under the Solicitation Version, Abuse Claims would be enjoined only against "Limited Protected Parties" and "Protected Parties" and, notably, the Archdiocese was expressly excluded from status as a Limited Protected Party.[50] This injunction has now been

---

[49] *See* Plan at Article I.A.151 (Insurance Policies defined to include policies naming the Chartered Organizations as an insured (whether as the primary or an additional insured) or otherwise alleged to afford the Chartered Organizations insurance coverage); Article X.H.2 (enjoining "all Persons from asserting any claim or cause of action against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Abuse Insurance Policy or other insurance policy issued by a Settling Insurance Company covering Abuse Claims," and excluding "Opt-Out Chartered Organizations with respect to Non-Settling Insurance Companies").

[50] *See* Solicitation Version at Article I.A.176 (noting that those parties identified on Exhibit K to the Solicitation Version, Exhibit K including the Archdiocese, are not Participating Chartered Organizations);

expended to include Pre-1976 Chartered Organization Abuse Claims as well as all claims insured under any insurance policy issued by the Settling Insurance Companies.[51] The Plan was modified to enjoin all Abuse Claims against any insureds under any insurance policies issued by a Settling Insurance Company[52] and all "Opt-Out Abuse Claims" against "Opt-Out Chartered Organizations"[53] (*i.e.*, Chartered Organizations that objected to the Plan or did not consent to the transfer of their insurance rights under BSA Policies—which, by default, included the Archdiocese under the Solicitation Version). And, in the Plan's release provision, the Plan expanded even further the scope of claims released against "Opt-Out Chartered Organizations" to include various related claims.[54]

Critically, the Plan was also modified post-solicitation to provide that "Abuse Claims against [a debtor in bankruptcy] shall be subject to the injunction applicable to Opt-Out Abuse

Solicitation Version at Article I.A.157 ("Limited Protected Parties" are Participating Chartered Organizations); Solicitation Version at Article X.F.

[51] Plan at Article X.F.2

[52] Plan at Article X.F.2 ("All Abuse Claims against insureds and co-insureds covered under any insurance policies issued by the Settling Insurance Companies shall be channeled under Article X.F.1 and released under Article X.J.6.as provided in the Insurance Settlement Agreements").

[53] Plan at Article I.A.77 (". . . Abuse Claims against [a debtor in bankruptcy] shall be subject to the injunction applicable to Opt-Out Abuse Claims . . ..); Article I.A.18 (Abuse Claims include claims against Opt-Out Chartered Organization that relate to scouting-related abuse); Article I.A.181 ("Opt-Out Abuse Claim" includes any Abuse Claim against an Opt-Out Chartered Organization covered under an insurance policy issued by a Settling Insurance Company with respect to such coverage for such Abuse Claims"); Article X.F.1 (". . . [the holder of an Abuse Claim] shall have no right whatsoever at any time to assert such Opt-Out Abuse Claim against any Opt-Out Chartered Organization or any property or an interest in property of any Opt-Out Chartered Organization."); Article X.J.3 (". . . all holders of Abuse Claims shall . . . release . . . each and all of the Opt-Out Chartered Organizations . . .").

[54] Plan at Article X.J.3 (releasing Opt-Out Chartered Organization Abuse Claims against Opt-Out Chartered Organizations as well as "all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising form or related in any way to such Opt-Out Chartered Organization Abuse Claims"). Notably, there is no Plan definition for "Opt-Out Chartered Organization Abuse Claims" but presumably the Plan proponents intended to refer to "Opt-Out Abuse Claims."

Claims."[55] The Plan was also modified post-solicitation to incorporate a release for Participating Chartered Organizations of any pre-1976 Abuse Claims not insured under Insurance Policies issued by the Settling Insurers.[56] Further, the Plan was modified post-solicitation to incorporate full releases of all Other Chartered Organizations, which are defined as all Chartered Organizations other than the Roman Catholic Church, the United Methodist Church and the Church of Jesus Christ of Latter Day Saints.[57]

Each of these changes were material modifications—and more than that, they reached to the very heart of the Guam Survivors' efforts to seek justice and recompense for their injuries. The Plan cannot be confirmed because the creditors were provided no notice whatsoever of Plan modifications that now purport to eliminate entirely their rights against non-debtors. *See In re Washington Mut., Inc.*, 442 B.R. 314 (D. Del. Bankr. 2011) (striking all non-consensual third-party releases from reorganization plan on the grounds that the release provision of the Plan was modified materially post-solicitation).

## IV. The Plan Violates Due Process by Allowing the Archdiocese—Without Notice to the Guam Survivors—to Dispose of its Estate's Assets in Exchange for Claim Releases

As an initial matter, the Archdiocese cannot opt-in to the Plan without satisfying the Bankruptcy Code's requirements that the Archdiocese: (i) obtain bankruptcy court approval before it effectuates the "use, sale, or lease" of estate property outside of the ordinary course; and (ii) obtain bankruptcy court approval prior to compromising or settling a claim. *See* 11 U.S.C. §§ 363 and 9019. As described in this section, by opting-in to the Plan, the Archdiocese would be

---

[55] Plan at Article I.A.77.

[56] Article X.J.3 (". . . all holders of Abuse Claims shall . . . release . . . each and all of the Limited Protected Parties . . .").

[57] *See* Plan at Article I.A.77 ("upon the Effective Date all Other Chartered Organizations shall be designated as Contributing Chartered Organizations"); Article I.A.183 (Other Chartered Organizations definition).

disposing of its rights in the BSA Insurance Policies and, to the extent of coverage for Abuse

Claims, in the Archdiocese Insurance Policies issued by the BSA Settling Insurance Companies,

in exchange for full releases of the Guam' Survivors Claims. The Archdiocese has done neither

in its bankruptcy case. Therefore, any attempt by the Archdiocese to do so is *ultra vires* and void.

*Id.*

Assuming the Archdiocese had sought, or could in the future seek, such approval, the

Plan nonetheless, in just one of its attacks on due process, allows bankruptcy debtors, including

the Archdiocese, to opt-in to the Plan as a Participating Chartered Organization on the same date

that objections to the Plan are due.[58] In order to opt-in, the Archdiocese merely has to agree to

make the Participating Chartered Organization Insurance Assignment,[59] which includes

transferring its rights under the Abuse Insurance Policies to the Settlement Trust.[60]

Participating Chartered Organizations are Limited Protected Parties under the BSA

Plan.[61] The Plan provides that Post-1975 Chartered Organization Abuse Claims against Limited

Protected Parties will be channeled and released.[62] The Plan further provides for releases to each

Participating Chartered Organization with "respect to Abuse Claims that arose prior to January 1,

---

[58] Plan at Article I.A.187; *Order Granting Certain Insurers' Motion to Modify the Confirmation Scheduling Order* (the "Amended Scheduling Order") [Dkt. No. 7996] (setting the plan objection deadline on February 4, 2022).

[59] Plan at Article I.A.187.

[60] The Archdiocese can also become a Contributing Chartered Organization by making the Participating Chartered Organization Insurance Assignment, thereby receiving the benefit of Guam Survivors' Joint Tortfeasor Claims being enjoined by the channeling injunction contained in Article X.F.1 and released pursuant to Article X.J.3. *See* Article I.A.77; Article X.F.1, and Article X.J.3. Even if the Archdiocese does not agree to make the Participating Chartered Organization Insurance Assignment, it will receive the benefit of the injunction applicable to Opt-Out Abuse Claims.

[61] Plan at Article I.A.164.

[62] Article X.F.1 (". . . [the holder of an Abuse Claim] shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim against a Limited Protected Party or any property or any interest in property of any Limited Protected Party . . .."); Article X.J.3 (. . . all holders of Abuse Claims shall . . . release . . . each and all of the Limited Protected Parties . . .).

1976 and are not covered by any insurance policy issued by a Settling Insurance Company," even though these Abuse Claims do not appear to be channeled to the Settlement Trust.[63]

In effect, if the Archdiocese becomes a Participating Chartered Organization merely by transferring certain of its insurance rights to the Settlement Trust, the Plan provides, through various mechanisms, for the disposal of Guam Survivors' interests in the BSA Insurance Policies and Archdiocese Insurance Policies, and for full broad-scale releases of Guam Survivors' Joint Tortfeasor Claims against the Archdiocese.

The Archdiocese does not have to provide notice to the Guam Survivors of its decision to opt-in to the Plan as a Participating Chartered Organization to receive the benefit of the protections provided to Limited Protected Parties, as its decision to do so must only be conveyed to "Debtors' counsel in writing" prior to the confirmation objection deadline.[64]

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The primary purpose of this procedural due process notice requirement is to ensure the "deprived person" a meaningful opportunity to be heard. *Id.* (internal citations omitted).

The Plan, by allowing the Archdiocese to opt-in to the Plan in without notice to the Guam Survivors of the impact such action would have on the Guam Survivors' interests in the BSA Insurance Policies and the Archdiocese Insurance Policies, and their right to pursue the Joint Tortfeasor Claims in the Archdiocese's bankruptcy case, completely sidesteps the "elementary and fundamental requirement" that deprived persons be provided notice of such deprivation and

---

[63] Article X.J.3.

[64] Plan at Article I.A.187.

an opportunity to be heard. Moreover, the Plan's notice failure is further compounded by the fact that the Plan has been materially modified post-solicitation,[65] providing another barrier to Guam Survivors' right to notice and an opportunity to be heard.

The Plan should not be confirmed because it completely fails to provide due process to those it would affect.

## CONCLUSION

WHEREFORE, the Guam Committee respectfully requests that the Court deny confirmation of the Plan.

Dated:      February 4, 2022               Respectfully submitted,
            Wilmington, Delaware
                                           HILLER LAW, LLC


                                           **/s/ Adam Hiller**
                                           Adam Hiller (DE No. 4105)
                                           300 Delaware Avenue, Suite 210, #227
                                           Wilmington, Delaware 19801
                                           (302) 442-7677 telephone
                                           ahiller@adamhillerlaw.com


                                           -and-

                                           Robert T. Kugler (MN #0194116)
                                           Edwin H. Caldie (MN #0388930)
                                           STINSON LLP
                                           50 South Sixth Street, Suite 2600
                                           Minneapolis, MN 55402
                                           (612) 335-1500
                                           robert.kugler@stinson.com
                                           ed.caldie@stinson.com

                                           *Attorneys for the Guam Committee*

---

[65] *See Notice of Filing of Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization and Blackline Thereof* [Dkt. No. 7833].