| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF RAMSEY | SECOND JUDICIAL DISTRICT |

| | |
|---|---|
| John Doe 180, | Judge: Elena L. Ostby |
| Plaintiff, | Case Type: 11. Personal Injury |
| | Court File No.: 62-CV-11-5545 |
| vs. | |
| The National Boy Scouts of America Foundation d/b/a The Boy Scouts of America, Northern Star Council Boy Scouts of America, Peter Stibal, The Boy Scouts of America, River Hills United Methodist Church, | **ORDER ON THE MOTIONS OF DEFENDANTS THE NATIONAL BOY SCOUTS OF AMERICA D/B/A THE BOY SCOUTS OF AMERICA, NORTHERN STAR COUNCIL BOY SCOUTS OF AMERICA, AND RIVER HILLS UNITED METHODIST CHURCH FOR SUMMARY JUDGMENT[1]** |
| Defendants. | |

The above-entitled matter came on for hearing before the Honorable Elena L. Ostby,

Judge of District Court, on May 28, 2013, on the Motions of Defendant The National Boy Scouts

of America Foundation d/b/a The Boy Scouts of America, Defendant Northern Star Council Boy

Scouts of America, and Defendant River Hills United Methodist Church for Summary Judgment,

at the Ramsey County Courthouse in the City of Saint Paul, Minnesota. Each of these Motions

was made pursuant to Rule 56 of the Minnesota Rules of Civil Procedure.

Jeff Anderson, Esquire, and Jared Shepherd, Esquire, of Jeff Anderson and Associates,

P.A., appeared on behalf of the Plaintiff. Louise Behrendt, Esquire, of Stich, Angell, Kreidler,

Dodge & Unke, P.A., appeared on behalf of Defendants The National Boy Scouts of America

Foundation d/b/a The Boy Scouts of America (hereinafter the "BSA") and Northern Star Council

Boy Scouts of America (hereinafter "NSC"). Stephen Plunkett, Esquire, of Bassford Remele,

appeared on behalf of Defendant River Hills United Methodist Church (hereinafter "River

Hills"). Defendant Peter Stibal (hereinafter "Mr. Stibal") did not appear.

---

[1] Hereinafter, collectively, the "Defendants."

**EXHIBIT A**

The matter was submitted to the Court upon the arguments of counsel, the memoranda of law, including affidavits and exhibits thereto, and all other pleadings and papers contained in the court file herein. The Court has reviewed and considered all of the foregoing and, upon the same,

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.    Defendants BSA and NSC's Motion for Summary Judgment is **DENIED.**

2.    Defendant River Hills's Motion for Summary Judgment is **DENIED.**

3.    The following Memorandum is herein incorporated as a part of this Order and constitutes the Court's Findings of Fact and Conclusions of Law to the extent necessary to support the Order.

4.    The mailing of a copy of this Order via electronic or U.S. mail to the attorneys of record shall constitute notice of its entry to the parties for all purposes.

DATED:  August 23, 2013

ELENA L. OSTBY
Judge of District Court

## MEMORANDUM

### I.    FACTS IN LIGHT MOST FAVORABLE TO THE NON-MOVING PARTY[2]

A.  Plaintiff's Complaint arises out of sexual abuse perpetrated against Plaintiff by Defendant
    Peter Stibal.  Mr. Stibal was Scoutmaster of BSA Troop 650, which is now known as
    Troop 3650, from 2003 until 2009, when he was expelled from scouting following a
    criminal investigation of child abuse.  Mr. Stibal was involved with BSA in a volunteer
    capacity from 1999 to 2009.  Plaintiff was a member of Troop 650 for some period of
    time while Mr. Stibal was Scoutmaster.

B.  Mr. Stibal was prosecuted and convicted of Criminal Sexual Conduct for the molestation
    of members of Troop 650 for events taking place during the years 2003 to 2008.  He is
    currently incarcerated at MCF-Stillwater.

C.  According to the deposition of Plaintiff, taken on November 7, 2012:

    1.  Plaintiff and his parents first met Mr. Stibal through the Boy Scouts program after
        Plaintiff's older brother began with the scouting program.

    2.  Plaintiff's parents, and especially his father, were good friends with Mr. Stibal.
        Mr. Stibal routinely spent time with Plaintiff and his family outside of scouting
        events.

    3.  Plaintiff believes the first time Mr. Stibal abused him was at a Boy Scout camp-
        out in 2007 when Plaintiff woke up to Mr. Stibal touching his genitalia and
        Plaintiff had to pull Mr. Stibal's hand away.

    4.  This first incident occurred in a building with an open sleeping area where there
        were other scouts and scout leaders in the building.

---

[2] On summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *McIntosh County Bank v. Dorsey & Whitney, LLP*, 745 N.W.2d 538, 545 (Minn. 2008).

5. Plaintiff did not report this or any future incident to anyone until the fall of 2009 when the police investigation into Mr. Stibal began.

6. Plaintiff felt uncomfortable telling his parents about any of the incidents because he was embarrassed.

7. Plaintiff believes there were a couple more incidents in 2007 at more camp-outs but he can't recall exactly when, though the circumstances were similar to the first incident where there were other scouts and adult leaders in a large, open sleeping area.

8. Plaintiff recalls other incidents of abuse in 2008, both during scouting-related events and outside of scouting-related events.

9. Plaintiff specifically recalls an incident that occurred after an Order of the Arrow event in 2008 when Mr. Stibal took all the scouts to his cabin for a camp-out after the ceremony was over; in this instance, Mr. Stibal abused Plaintiff while there was one other boy in the room but no other adults.

10. Plaintiff also specifically recalls an incident of abuse that occurred on a scouting trip to Stearns Camp in 2008 where there were other scouts and adults in the room at the time of the abuse.

11. Plaintiff recalls an incident in 2008, on a 4th of July family camping trip, where Mr. Stibal and Plaintiff were alone in Plaintiff's family's RV.

12. Plaintiff also recalls an incident in 2008 where he and his brother went on a camping trip to Canada with Mr. Stibal.

13. Plaintiff additionally recalls several incidents where Mr. Stibal and he rode together on an ATV during non-scouting events where Mr. Stibal was sitting behind Plaintiff and would continuously rub Plaintiff's genitalia over his clothes.

14. Plaintiff told Mr. Stibal to stop during all of the above incidents. While Mr. Stibal did typically stop, he would often begin again shortly thereafter. Plaintiff recalls having to tell Mr. Stibal to stop touching him several times a night on more than one occasion.

15. Plaintiff was a minor at all times relevant to the incidents upon which this lawsuit is based.

D. NSC was the local council for Troop 650 and River Hills was the chartering organization.

E. The Boy Scouts of America organization produces a significant amount of literature related to the functioning of Boy Scout troops at all levels of the organization. Several of these documents have been attached as exhibits to the Affidavit of Jared Shepherd, including the following: *The Council: How the Council Functions to Carry Out the Purposes of the Troop; The Chartered Organization Representative; Procedures for Maintaining Standards of Membership and Leadership, Including How to Deal With Allegations of Child Abuse;* Charter and Bylaws of the Boy Scouts of America; *The Scoutmaster Handbook; Guide to Safe Scouting for Unit Activities: A Unit Leader's Guide for Current Policies and Procedures; Boy Scouts of America Background Information on Child Abuse; Youth Protection Guidelines: Training for Volunteers Leaders and Parents; The Boy Scout Handbook; Camp Leadership: Guidelines on Youth Protection;* and the Boy Scouts of America Youth Application.

F.  While the Court will not go into great detail about the contents of these documents, they contain many guidelines, policies, procedures, and methods of control over the manner in which scouting activities are to take place, the way that scouting leaders and volunteers are to perform their tasks, and information specifically geared towards preventing and addressing the issue of sexual abuse of minors in the Boy Scouts program.

G.  The Boy Scouts of America Youth Application contains a section on the second page entitled "Boy Scouts of America Information for Parents."  This section contains language as follows:

1.  "Scouting's adult volunteers provide leadership at the unit, district, council, and national levels."

2.  "Chartered organizations agree to use the Scouting program in accordance with their own policies as well as those of the BSA.  The program is flexible, but major departures from BSA methods and policies are not permitted."

3.  "As a parent, you should be aware that . . . [t]wo registered adult leaders or one registered adult leader and a parent of a participant, one of whom must be 21 years of age or older, are required on all trips and outings. . . . [o]ne-on-one activities between youth members and adults are not permitted; personal conferences must be conducted in plain view of others."

H.  The document entitled *Camp Leadership:  Guidelines on Youth Protection,* contains language that states that "[i]t is also at camp that the responsibilities for caring for the Cub Scouts, Boy Scouts, Varsity Scouts and Venturers becomes a 24-hour-a-day duty."

I.  The record also contains other documents such as Bylaws of the Northern Star Council, Boy Scouts of America (A Corporation Organized Under the Laws of the State of

6

Minnesota); The Annual Charter Agreement Between River Hills United Methodist Church and the Northern Star Council, BSA; and *Scout Committee Titles and Responsibilities: Troop Committee Responsibilities.*

J. The Court will not go into great detail about the contents of these documents but they contain information about the relationship between BSA, NSC, and River Hills.

K. The document entitled *Scout Committee Titles and Responsibilities* contains a section entitled "Chartered Representative or Scouting Coordinator," which states that one responsibility is to "[u]se Two-Deep Leadership."

L. According to the depositions of James G. Terry, an Assistant Chief Scout Executive and Chief Financial Officer with the BSA National Council at the time of his depositions,[3] taken March 10th and 11th, 2011, in the cases of *Jack Doe 7, et al. v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, et al.,* Multnomah County, Oregon, Case No. 0806-09176, and *Jack Doe I v. LDS, BSA*:

1. The Boy Scouts of America National Council is the governing body of the Boy Scouts of America program.

2. The BSA has the right to refuse registration to an adult leader that a local council may want to register.

3. The BSA grants the local council a license to operate.

4. The local council grants the local organization a charter to operate the scouting program, and if the local council does not agree to follow the rules and regulations as set forth by the BSA, the local organization could lose its charter.

5. The BSA reserves the right to approve or disapprove the annual re-registration of a local council.

---

[3] The Court has no knowledge of whether Mr. Terry still holds these positions.

6. The BSA leaves no room for discretion on the part of a charter organization or a Troop Committee to change the requirements of the formation of a Troop Committee or the terms of the advancement and rank of scouts.

7. The BSA sets standards and expects that every level below the national council will enforce those standards.

8. The ultimate enforcement of BSA standards is with the BSA National Council.

9. Prior to June 1st, 2010, youth protection guideline training was not a mandatory element of becoming a registered adult leader with BSA.

10. As of June 1st, 2010, the BSA mandates that as a condition of membership with the BSA, adult leaders must undergo youth protection training.

11. The chief source of revenue for the BSA comes from the collection of registration fees and supply group sales.

12. The collection fees come indirectly from the scouts by passing through the local council, which holds the funds in escrow for the national organization.

13. Supply group sales include the sale of uniforms, literature, equipment, and ancillary products related to the Boy Scout program.

M. According to the deposition of John Andrews, a Scout Executive for NSC at the time of his deposition,[4] taken on November 13, 2012, for the case at bar:

1. NSC holds a charter from BSA to support scouting in a 25-county area, including Dakota County, where Troop 650 was chartered, and encompasses about 500 troops.

2. The BSA sets policy for the local councils and the chartered organizations.

---

[4] The Court has no knowledge of whether Mr. Andrews still holds this position.

3. The ultimate authority of the operation of a troop, i.e. whether its charter is renewed or not, is vested in the BSA.

4. As Scout Executive of NSC, Mr. Andrews had the right to revoke the charter of an organization if they did something that is not in keeping with the rules and regulations of the BSA.

5. Representatives of local councils serve on the BSA National Council.

6. All amendments to NSC's bylaws must be approved by the BSA.

7. Chartered organizations, such as River Hills, hold a charter straight from the BSA National Council and are chartered partners to the NSC in the sense that NSC is there as a partner to the chartered organization to help them provide scouting to children.

8. Local councils, such as NSC, and chartered organizations, such as River Hills, could not exist without each other.

9. At the behest of BSA, NSC has responsibilities to chartered organizations to, for example, provide training to the chartered organization.

10. The chartered organizations sign an agreement detailing their responsibilities for the mission, of outreach or serving and delivering the scouting program to children, of providing the annual re-chartering of the Troop, and of signing the adult leader applications.

11. The Troop Committees hold elections to choose its members and the members are approved by the chartered partners.

12. Scoutmasters are leaders but not members of the Troop Committees.

13. The BSA's leadership requirements for scout leaders include meeting an age requirement and subscribing to the rules and regulations of the BSA.

14. Since 2003, BSA has mandated background checks on all adult leaders. If volunteers change positions at all within the organization, they must fill out a new application and undergo a new background check.

15. NSC urges its parents to follow the rule of no one-on-one contact outside the context of scouting activities and if NSC becomes aware of a scout leader who is spending time outside of scouting in one-on-one situations with members of scouting, NSC tells the leader that the rule applies to that leader anytime, anywhere.

16. The BSA youth protection guidelines are comprised of: Two-Deep Leadership; separate sleeping accommodations; teaching children to recognize, resist and report abuse; an internal screening process of background checks; adult youth protection training so that other adults can recognize when somebody is behaving in an odd or inappropriate fashion; and parent guidebooks.

17. According to Mr. Andrews, Two-Deep Leadership policy violations and separate sleeping accommodation policy violations present the opportunity for sexual abuse.

18. For the most part, and depending upon the circumstances, when there is an allegation of a youth protection guideline violation, the violator is suspended. This is particularly true if there is a violation of the rule of separate sleeping accommodations, because, according to Mr. Andrews, "then, it's just, you know, you're gone."

10

19. Typically there is not an investigation of an alleged policy violation because the "violation of the rules is a violation of the rules," and there is a range of degrees of response from a reprimand to a removal.

20. There are no exceptions to the rule that there are to be no youth in adult tents, unless it is the boy's parent or legal guardian.

N. According to the deposition of Michael Althoff, a member of River Hills United Methodist Church and Charter Organization Representative for Troop 650 at the time of his deposition,[5] taken on August 23, 2012, in the case of *John Doe 170 v. The National Boy Scouts of America Foundation d/b/a The Boys Scouts of America, et al.,* Ramsey County, Minnesota:

1. Mr. Althoff was a member of River Hills for thirty years.

2. Mr. Althoff was the Charter Organization Representative for Troop 650 from 1993 to the date of his deposition.

3. Mr. Althoff was the liaison between Troop 650 and River Hills.

4. Mr. Althoff was involved with the rechartering of Troop 650.

5. An adequate description of his role as Charter Representative was the head of the scouting department.

6. River Hills publicizes the fact that Troop 650 operates and meets at River Hills.

7. One of his responsibilities is to sign off on forms when new adult leaders sign up and then to pass those forms on to NSC.

8. He reported to the Church minister (Duane Sarazin at the time of the relevant events) regarding the affairs of Troop 650 on a yearly basis.

---

[5] The Court has no knowledge of whether Mr. Althoff is still a member of River Hills or still holds this position.

9. He was not familiar with a document entitled *Training of Charter Organization Representative* and testified that he had never seen it before.

10. He was familiar with a document entitled *Charter Organization Representative* that he received when he became Charter Organization Representative but he had not reviewed the document since he took that position in 1993.

11. He volunteered for the position of Charter Organization Representative but does not recall anyone approving him for that position nor did he fill out an application to be placed in that position.

12. In 1993, Mr. Althoff attended a one-day training class for Charter Organization Representatives through the Dan Patch District.

13. Mr. Althoff did not encourage training of the Troop Committee members, nor did he have a policy established in order to track training of Troop Committee members.

14. He was a voting member of the Dan Patch District, which is part of the NSC.

15. He occasionally participated in camping activities with the Troop.

16. During Mr. Stibal's tenure as Scoutmaster from 2003-2009, he never spoke with the Committee Chair or the Troop Committee about Mr. Stibal's fitness to be Scoutmaster.

17. Prior to the police report in 2009, Mr. Althoff never received a report regarding inappropriate behavior by Mr. Stibal.

18. Mr. Althoff did receive questions from a member of River Hills, who had a nephew in the Troop, about Mr. Stibal holding meetings with Troop members at his home.

19. Mr. Althoff assumed that there was always another adult there when Mr. Stibal had meetings at his home but he never followed up on this issue other than to relay the information to Jim Brummer.

20. It would be a violation of scout policy if Mr. Stibal had been holding meetings at his home without another leader present.

O. According to the deposition of James ("Jim") Brummer, taken August 12, 2012, in the case of *John Doe 170 v. The National Boy Scouts of America Foundation d/b/a The Boy Scouts of America, et al.,* Ramsey County, Minnesota:

1. Mr. Brummer served as the Troop Committee Chair for Troop 650 from 2004 to 2010.

2. In operating Troop 650, the Troop Committee used a document entitled *Scout Committee Titles and Responsibilities.*

3. He saw his role of Committee Chair as to coordinate adult activities and to make sure the Committee was facilitating the Troop the best way they could.

4. According to Mr. Brummer, "there's a manual for everything in the Boy Scouts."

5. NSC was responsible for performing criminal background checks on adult volunteers.

6. Adult leaders had responsibility for safety, security, and youth protection, among other things.

7. Mr. Brummer knew that Mr. Stibal had his favorite scouts in the program as early as 2004. Mr. Brummer also knew that Mr. Stibal would get to know the scouts' families, then get the families' permission to do non-scouting related activities

with their sons or the entire family, and every couple of years he would move on to another set of scouts and/or families.

8. As early as 2005, Mr. Brummer spoke to Mr. Stibal about not showing favoritism to particular scouts during scouting-related activities. These conversations took place on several occasions, including individual conversations with Mr. Stibal and discussions at Troop Committee meetings at-large.

9. The behaviors in which Mr. Stibal was engaging that were prompting these concerns included frustrating scouts or trying to put them on the sidelines as opposed to being inclusive, as to almost force them away.

10. Mr. Brummer observed Mr. Stibal engaging in "horseplay" with scouts in the Troop, such as roughhousing, wrestling, pillow fights on camping trips, and things of that nature.

11. Mr. Brummer knew that Mr. Stibal was regularly spending one-on-one time with scouts outside of scouting-related activities as early as 1996 when Mr. Brummer joined the Troop.

12. Mr. Brummer recalls having at least two face-to-face conversations with Kathy Gregg where Ms. Gregg stated that she was concerned that Mr. Stibal may be involved in activities that would be concerning to her, though she never shared anything specific with him.

13. Mr. Brummer also recalls that during at least one Troop Committee meeting, adult leader Toni Ann Tschida expressed concern about Mr. Stibal violating the Two-Deep Leadership policy.

14. Mr. Brummer remembers having a conversation with Mr. Stibal about his potential violation of the Two-Deep Leadership policy because, first, he was concerned that Mr. Stibal would be accused of something, and second, he was concerned for youth protection. Mr. Stibal responded that he was following the policy.

15. Mr. Brummer did not speak to any of the scouts in the Troop about whether or not the Two-Deep Leadership policy was being followed.

16. Mr. Brummer claims that Troop 650 followed the Two-Deep Leadership policy "to a T."

P. According to the deposition of Steve Widmer, Assistant Scoutmaster during the relevant events, taken on November 7, 2012:

1. Mr. Widmer observed Mr. Stibal putting the boys in headlocks, rubbing their heads, giving them "wedgies," and on at least one occasion holding onto a scout and rubbing his back to comfort him after the scout became scared by a campfire story.

2. Mr. Widmer remembers another adult volunteer speaking with him at Many Points camp about seeing scouts coming out of Mr. Stibal's tent and, on at least one occasion, Mr. Widmer himself witnessed a scout coming out of Mr. Stibal's tent.

3. Mr. Widmer spoke with Mr. Stibal about this issue and told him regardless of the reason or whether there was another adult in his line of sight, this behavior "stops now."

4. Mr. Widmer did not speak to Jim Brummer about this incident.

5. Mr. Widmer recalls having a conversation with Doug Knutson about Mr. Stibal violating the rule against one-on-one contact at another Many Points camp in a later year than the incident described above.

6. Mr. Widmer also observed an incident where he saw Mr. Stibal holding a young scout's hand inside Mr. Stibal's tent and he loudly made the comment, "I hope there is another adult in there," and saw a slight nod from the scout.

7. After this incident, Doug Knutson said to Mr. Widmer "that has got to stop," but Mr. Widmer never followed up on it.

Q. According to the deposition of Curt Hannaman, an Assistant Scoutmaster at the time of the relevant events, taken on November 14, 2012:

1. Mr. Hannaman considered Mr. Stibal a close, personal friend and has known him since Mr. Hannaman was about 12 years old.

2. Mr. Hannaman knew Mr. Stibal had favorite kids in the Troop.

3. Mr. Hannaman observed Mr. Stibal engaging in horseplay with the boys in the Troop, including wrestling, roughhousing, and giving back rubs.

4. Mr. Hannaman observed Mr. Stibal violate the Two-Deep Leadership policy and the policy against one-on-one contact at least once or twice.

5. Mr. Hannaman was trained to contact the Troop Liaison when he observed policy violations but he did not report his observations to Mr. Brummer.

6. Toni Ann Tschida spoke to Mr. Hannaman about the incident where she observed one of the young scouts coming out of Mr. Stibal's tent early in the morning; he believes this was at the 2006 Many Points Camp.

R. According to the deposition of Kathy Berger, a registered adult volunteer with Troop 650 at the time of the relevant events, taken on June 28, 2012, in the case of *John Doe 170 v. The Boys Scouts of America Foundation d/b/a The Boys Scouts of America, et al.,* Ramsey County, Minnesota:

    1. Mr. Stibal was a member of Ms. Berger's church, Mary Mother of the Church in Burnsville, MN, and he occasionally volunteered with her there, though she did not know him before her sons became involved in scouting.

    2. One of her children who was a member of Troop 650 told her that Mr. Stibal liked to tickle everybody and that it hurt when Mr. Stibal tickled him.

    3. Ms. Berger told her son to tell Mr. Stibal to stop and after her son did so, it never happened again.

    4. Ms. Berger was aware that Mr. Stibal spent time alone with scouts outside of scouting-related activities and often invited scouts to engage in such activities.

    5. Mr. Stibal approached Ms. Berger at a Mini Point Camp to tell her about the incident where a young scout was observed by adult leader Toni Ann Tschida leaving Mr. Stibal's tent in the morning and that Ms. Tschida told Mr. Stibal that she would report him for a violation of the Two-Deep policy.

    6. Ms. Berger spoke with Ms. Tschida about the incident and Ms. Tschida relayed that she was fine with the resolution of the problem, i.e. that the scout had thereafter been placed in a tent with two senior troop leaders.

    7. Ms. Berger recalls this incident occurring at the 2008 Mini Point Camp.

S. According to the Affidavit of Mother Doe 180:

    1. Plaintiff became involved in the Boy Scouts when he was 10 or 11 years old.

2. To her recollection, the only information she received from the BSA was the packet her son received when he became involved in scouting. She and her husband read and signed the information provided on sexual abuse.

3. She was not aware of the BSA's Two-Deep Leadership policy until October of 2009, nor was she aware of the rule against one-on-one contact until October 2009. She states that now knowing these rules and their application in scouting, she recognizes that, in her experience, these rules were not followed within the Troop.

4. On scouting trips and events, when she knew she was unable to protect her son from harm, she entrusted Plaintiff's care to the BSA and the local Troop to protect him.

5. She would not have allowed her son to participate in scouting if she knew that the policies designed by the BSA to protect children, including from sexual abuse, were not going to be followed.

T. The IV Files are a set of files maintained by the BSA which contain information compiled by the BSA regarding allegations of improper conduct by adult volunteers within the BSA system.

U. According to IV Files from Minnesota produced through discovery in this case, BSA was aware that sexual abuse has occurred subsequent to or in relation to the following scenarios:

1. Violation of the separate sleeping accommodations policy;

2. Knowledge of a pattern of behavior exhibited by a perpetrator scout that should have been acted upon earlier; and

3. In sleeping conditions where adults and scouts shared the same open floor space.

## II.   CONCLUSIONS OF LAW

### A. Summary Judgment Standard

Rule 56.02 of the Minnesota Rules of Civil Procedure provides the following:

> A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03; *see also Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn. 1993).

Summary judgment is mandatory against a party who fails to establish an essential element of the claim if that party has the burden of proof because this failure renders all other facts immaterial. *Bebo v. Delander,* 632 N.W.2d 732, 737 (Minn. Ct. App. 2001). "The [non-moving] party may not rest upon mere averments or denials [in his] pleading but must present specific facts showing there is a genuine issue for trial." Minn. R. Civ. P. 56.05. "Speculation, general assertions, and promises to produce evidence at trial are not sufficient to create a genuine issue of material fact for trial." *Nicollet Restoration, Inc. v. City of St. Paul,* 533 N.W.2d 845, 848 (Minn. 1995) (citations omitted).

The evidence presented must be viewed in a light most favorable to the non-moving party. *Vieths v. Thorpe Finance Co.,* 232 N.W.2d 776 (Minn. 1975). The non-moving party in a motion for summary judgment must present specific facts showing genuine issues for trial. *Marose v. Hennameyer,* 347 N.W.2d 509 (Minn. Ct. App. 1984); *Thiele v. Stitch,* 425 N.W.2d 580, 583 (Minn. 1988). The evidence cannot be merely colorable, but must be significantly

probative. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-250 (1986). This must be established by substantial evidence. *Pischke v. Kellen,* 384 N.W.2d 201 (Minn. Ct. App. 1986). "The district court's function on a motion for summary judgment is not to decide issues of fact, but solely to determine whether genuine factual issues exist." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 70 (Minn. 1997) (citations omitted). The court is "not required to ignore its conclusion that a particular piece of evidence may have no probative value, such that reasonable persons could not draw different conclusions from the evidence presented." *Id.* Rather, "the district court's inquiry is 'whether there is a need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Id.* at 69 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250).

A motion for summary judgment may be granted only if, after viewing the evidence in the light most favorable to the nonmoving party, movant has sustained his burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Sauter v. Sauter,* 244 Minn. 482, 70 N.W.2d 351 (1955). The Minnesota Supreme Court noted in *Sauter:*

> It is essential to bear in mind that the moving party has the burden of proof and that the nonmoving party has the benefit of that view of the evidence which is most favorable to him. The salutary purpose and useful function of summary judgment proceedings as a means of securing the just, speedy, and inexpensive determination of the action, Rule 1, is well recognized, but resort to summary judgment was never intended to be used as a substitute for a court trial or for a trial by jury where any genuine issue of material fact exists. In other words a summary judgment is proper where there is no issue to be tried but is wholly erroneous where there is a genuine issue to try.
>
> The controlling words Genuine issue and Material fact need no amplification since they best speak for themselves. Their application in determining whether there is an absence of a Genuine issue as to a Material fact requires a careful scrutiny of

the pleadings, depositions, admissions, and affidavits, if any, on file. Since, however, all factual inferences must be drawn against the movant for summary judgment, it follows that, even where the movant's supporting documents are uncontradicted, they may in themselves be insufficient to sustain his burden of proof.

*Id.* at 484-5 (citations omitted).

"Summary judgment is a 'blunt instrument' and should not be employed to determine issues which suggest that questions be answered before the rights of the parties can be fairly passed upon. It should be employed only where it is perfectly clear that no issue of fact is involved, and that it is not disirable [sic] nor necessary to inquire into facts which might clarify the application of the law." *Donnay v. Boulware,* 275 Minn. 37, 45, 144 N.W.2d 711, 716 (1966) (citation omitted).

    *B. Claims of Plaintiff*

As an initial matter, the Court notes that throughout the arguments on the Motions of BSA, NSC and River Hills for Summary Judgment regarding Plaintiff's individual counts, there is a standing issue regarding the nature of the relationships between the Troop Committee members and/or Mr. Stibal and Defendants BSA, NSC, and River Hills. There are genuine issues of material fact regarding the nature of these relationships that must be resolved by the jury.

First, Plaintiff contends that the Troop Committee leaders, including Brummer, Widmer, and Hannaman, were agents of BSA and NSC who operated through the chartered organization, River Hills; that the adult leaders are agents of the BSA and NSC when they act on their behalf; and that as agents of BSA and NSC, Troop Committee members' knowledge of Mr. Stibal's "red

flag"[6] activities is imputed to BSA and NSC as the principals of the Troop Committee member agents.

"A principal-agent relationship results 'from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act.'" *Urban ex rel. Urban v. American Legion Post 184,* 695 N.W.2d 153, 160 (Minn. Ct. App. 2005) (citing Restatement (Second) of Agency § 1 (2004); *see also Plate v. St. Mary's Help of Christians Church,* 520 N.W.2d 17, 20 (Minn. Ct. App. 1994) (noting Minnesota courts have adopted the Restatement definition of agency), *review denied* (Minn. Oct. 14, 1994)). "An agency relationship may be established even though the parties did not call it an agency relationship and did not intend the legal consequences of such relationship." *Matter of Ins. Agents' Licenses of Kane,* 473 N.W.2d 869, 873 (Minn. Ct. App. 1991) (citing *A. Gay Jenson Farms Co. v. Cargill, Inc.,* 309 N.W.2d 285, 290 (Minn. 1981)). "Under the law of agency, an agent's knowledge may be imputed to the principal." *Doe 169 v. Brandon,* No. A12-1721, 2013 WL 2302023 at *6 (Minn. Ct. App. May 28, 2013) (unpublished) (citing *Sussel Co. v. First Fed. Sav. & Loan Ass'n of St. Paul,* 307 Minn. 199, 201, 238 N.W.2d 625, 627 (1976)). "Whether the relationship exists is a question of fact and the party alleging the existence of the agency has the burden of proof." *White v. Boucher,* 322 N.W.2d 560, 566 (Minn. 1982) (citing *Sinna v. Sperry Realty & Investment Co.*, 181 Minn. 183, 232 N.W. 5 (1930); *Farnum v. Peterson-Biddick Co.*, 182 Minn. 338, 234 N.W. 646 (1931)).

Plaintiff argues that Troop Committee leaders consented to acting as agents of BSA and NSC by completing an application issued and approved by NSC and by participating in leader training. Plaintiff further contends that the adult leaders act as agents of BSA and NSC when

---

[6] Plaintiff routinely uses this description to encompass all of Mr. Stibal's actions that Plaintiff claims should have alerted the relevant persons and parties to Mr. Stibal's tendency to act in a way that made him a risk to perpetrate sexual abuse on the minor scouts.

they plan and carry out scouting programs and take responsibility for safety, security and youth protection. Finally, Plaintiff maintains that the BSA and NSC had control over the Troop leaders as a result of the following: 1) by not allowing troops to alter the requirements for the Troop Committee or the advancement of scouts; and 2) through BSA's standards and policies governing the selection and management of leaders, which detail the conduct and manner of leadership to be followed by adult leaders in virtually all scouting activities.

BSA and NSC argue that the Court should declare as a matter of law that the leaders of Troop 650 are not agents of BSA or NSC because they claim that the evidence is conclusive that neither BSA nor NSC assumed any control, or the right to control, the who, what, where and when of any specific individual scouting activity beyond the broad mandates of the application and approval process and the guidelines contained in the BSA's handbooks and guidebooks.

The Court disagrees that this issue can be decided as a matter of law and concludes that whether the Troop Committee members were agents of BSA and NSC is a question of fact for the jury to resolve.

River Hills argues that while Plaintiff states that the local Troop leaders are agents of all Defendants at pages 28 and 45 of his Memorandum in Opposition, the entirety of Plaintiff's argument is based on the alleged agency relationship that exists between the Troop leaders and BSA and NSC and that Plaintiff has provided no evidence justifying the agency relationship he claims exists between the Troop Committee and River Hills specifically, rather than against the Defendants generally. (River Hills Reply Mem. Supp. Summ. J. 15.)

The Court finds that genuine issues of material fact exist as to whether the Troop Committee members and adult leaders were agents of River Hills. For example, there is evidence in the record that Michael Althoff, who is both a member of River Hills and the Charter

Organization Representative for Troop 650, was the liaison between the Troop and River Hills, was involved with the rechartering of Troop 650, and had some responsibility to encourage continued training of Troop Committee members, but did not do so. Furthermore, Mr. Althoff agreed that an adequate description of his role as Charter Representative was the head of the scouting department. Therefore, while Plaintiff does carry the burden of proof to establish an agency relationship, the facts taken in the light most favorable to Plaintiff present genuine issues for the jury to resolve.

Second, Plaintiff contends that Mr. Stibal was in employment relationships with BSA, NSC, and River Hills.[7] "The traditional factors determining whether an employment relationship exists are: (1) [t]he right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the right of the employer to discharge." *Builders Commonwealth, Inc. v. Dep't of Employment and Econ. Dev.*, 814 N.W.2d 49, 57 (Minn. Ct. App. 2012) (citing *Wise v. Denesen Insulation Co.*, 387 N.W.2d 477, 479 (Minn. Ct. App. 1986)). The right to control the means and manner of performance is the most important factor. *Id.* at 58-9 (citing *Wangen v. City of Fountain*, 255 N.W.2d 813, 815 (Minn. 1977)). "The nature of the relationship of the parties is to be determined from the consequences which the law attaches to their arrangements and conduct rather than the label they might place upon it." *Id.* at 57 (quoting *Speaks, Inc. v. Jensen*, 309 Minn. 48, 51, 243 N.W.2d 142, 145 (1976)). "The Right of control, and not necessarily the exercise of that right, is the test of the relation of master and servant." *Frankle v. Twedt*, 234 Minn. 42, 47 N.W. 2d 482, 485 (1951).

---

[7] The determination of this issue is critical to Plaintiff's claims of Negligent Retention and Negligent Supervision under Count II and Vicarious Liability under Count IV.

The existence of an employment relationship is a mixed question of law and fact. *Wise,* 387 N.W.2d at 479. "Whether an employment relationship exists is an issue of fact when the evidence is disputed." *Olson v. First Church of Nazarene,* 661 N.W.2d 254, 261 (Minn. Ct. App. 2003) (citing *Stenvik v. Constant,* 502 N.W.2d 416, 420 (Minn. Ct. App. 1993), *review denied* (Minn. Aug. 24, 1993)). "Once the controlling facts are determined, the question whether a person is an employee becomes one of law." *Lakeland Tool & Eng'g, Inc. v. Engle,* 450 N.W.2d 349, 352 (Minn. Ct. App. 1990) (citation omitted).

In the case at bar, the evidence is highly disputed as to whether an employment relationship existed between Mr. Stibal and any of the other Defendants. BSA and NSC claim that Mr. Stibal was not an employee because of the following reasons: they did not select Mr. Stibal as Scoutmaster; they had no right of control over him; they did not pay Mr. Stibal as a Scoutmaster; they did not provide him with materials or tools; and they did not control the premises where Mr. Stibal volunteered. These are disputed issues of fact with a considerable volume of evidence to the contrary. The only undisputed fact is that none of the Defendants paid Mr. Stibal, who was a volunteer. However, this is neither the only nor the controlling factor as to whether Mr. Stibal was in an employment relationship with any of the other Defendants for the purposes of maintaining claims of Negligent Retention/Supervision and Vicarious Liability.

While it may be true that BSA and NSC did not personally select Mr. Stibal as Scoutmaster, there is significant evidence in the record that in addition to the approval and recommendation of the Troop Committee and local council, these entities have final approval of all employees and volunteers under the Boy Scouts of America umbrella, the most compelling evidence of which is BSA's argument to the Supreme Court of America in *Boy Scouts of America v. Dale,* 530 U.S. 640 (2000). BSA stated that "[n]o adult leader can be appointed

25

without approval of the sponsoring institution, the local Council (such as petitioner Monmouth Council) that oversees scouting in the geographical area in question, and Boy Scouts of America." (*Dale,* 530 U.S. 640, Pet'r's Br. *4.) Here, the sponsoring institution would be River Hills, the local council would be NSC and, of course, the Boy Scouts of America is the BSA.

There is further evidence in the form of the many manuals, handbooks, policy guidelines, and the deposition testimony of both John Andrews, a Scout Executive for NSC, and James Terry, an Assistant Chief Scout Executive and Chief Financial Officer with the BSA National Council, to suggest that BSA and NSC had significant control over the means and manner of Mr. Stibal's performance. BSA/NSC and River Hills variously point fingers at one another or at the Troop Committee itself as to who was actually in control, but the facts are in sufficient dispute, and the evidence is significant enough, to have created genuine issues of material fact as to whether any or all of these entities had the right to control the means and manner of Mr. Stibal's performance.

There is also significant evidence in the record supporting the contention that BSA and NSC did provide materials and tools to Mr. Stibal to carry out his duties as Scoutmaster and that they controlled the premises where Mr. Stibal volunteered, at the very least it seems almost certain that they controlled the camps where the sexual abuse of Plaintiff occurred. These disputed facts present genuine issues of material fact for the jury to decide. Furthermore, BSA and NSC clearly had the right to discharge Mr. Stibal, as it was these entities that ultimately terminated his scouting privileges when the allegations of abuse came to light. Therefore, the Court cannot say as a matter of law that Mr. Stibal was not in an employment relationship with either BSA or NSC.

River Hills claims that it was not in an employment relationship with Mr. Stibal because there is no dispute that Mr. Stibal was not a River Hills employee. This is a circular argument not supported by the case law. The test for whether an employment relationship exists is not the label placed on the relationship by the parties but rather the consequences the law attaches to their arrangement. *Builders Commonwealth, Inc. v. Dep't of Employment and Econ. Dev.,* 814 N.W.2d at 57.

River Hills claims that Mr. Stibal has had no connection to River Hills other than the fact that the Church chartered Troop 650 and the Troop held its meetings at River Hills. However, this ignores several fact issues. First, reasonable people could conclude that River Hills could place limitations on or have control over Troop 650's activities or actions in order for the Troop to continue to be sponsored by the Church. Furthermore, it is not clear whether Troop 650 itself is part of River Hills because of the chartering structure and responsibilities River Hills may have taken on by chartering the Troop and the involvement of Michael Althoff as Charter Organization Representative. When a church tells the community that it is supporting an organization or activity, its credibility as a religious organization holds considerable sway within the community and the Court cannot say as a matter of law that it bears no responsibility for the actions of Troop 650. Therefore, there are fact issues as to whether River Hills had control over Mr. Stibal's means and manner of performance that must be resolved by the jury.

Second, there are fact issues as to whether River Hills provided Mr. Stibal with materials and tools with which to perform his duties as Scoutmaster. River Hills admits the following: it gave Troop 650 a place to meet and store things; it supported the scouting program by allowing the Troop to conduct fundraisers; the Church took pride in "being there" for the Troop as a congregation if the Troop had other needs; River Hills's pastor was sometimes asked to discuss

Eagle Scout projects with the Troop members and was occasionally invited to give invocations or prayers at scouting events; and the Church was sometimes involved in fundraisers. Whether these activities amount to River Hills providing Troop 650 or Mr. Stibal with materials and tools is another fact issue for the jury to resolve.

Third, River Hills provided a location for Troop 650 to hold its meetings, and while none of the alleged abuse occurred on Church property or at an event singularly sponsored by the Church, Plaintiff first came into contact with Mr. Stibal through scouting activities which were only possible because of the Church's position as a charter organization for a BSA troop. This presents another fact issue for the jury.

Fourth, in terms of the right to discharge, it would be a rather hollow argument for River Hills to claim that it had no power to discharge. Hypothetically speaking, if the BSA and NSC had decided not to terminate Mr. Stibal's adult volunteer status based on the allegations of sexual abuse by Mr. Stibal, does River Hills then contend that they would have had no choice but to allow an accused child abuser to continue on with Troop 650? Following this argument to its logical conclusion, River Hills would apparently have no control over whether it decided to continue to charter Troop 650 under any circumstances. This is an argument that the fact-finder must decide and provides factual support for River Hills's right to discharge.

Therefore, in regard to BSA, NSC, and River Hills, there are genuine issues of material fact as to whether Mr. Stibal was in an employment relationship with these Defendants and the Court cannot grant their Motions for Summary Judgment on this basis.

However, regardless of the resolution of the above matters, the Court must still evaluate whether Plaintiff's claims should be dismissed as a matter of law or whether genuine issues of material fact exist which preclude such an outcome.

1. <u>Count II:  Negligent Retention and Supervision – Defendants BSA, NSC, and River Hills[8]</u>

Negligent retention occurs when "during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment." *Yunker v. Honeywell, Inc.,* 496 N.W.2d 419, 423 (Minn. Ct. App. 1993), *review denied* (Minn. April 20, 1993) (citation omitted).  Unlike a claim for negligent supervision or vicarious liability, a claim for negligent retention does not depend on whether the employee's act was within the scope of employment.  *Olson v. First Church of Nazarene,* 661 N.W.2d 254, 264 (Minn. Ct. App. 2003).

BSA and NSC argue that even if an employment relationship is found between Mr. Stibal and BSA and NSC, and even if Mr. Stibal's "red flag" activities should have provided notice that Mr. Stibal was unfit for his duties, Plaintiff's claim for Negligent Retention should fail because there is no evidence that BSA or NSC had any knowledge of these activities.  BSA and NSC state, and it is undisputed, that as soon as they were informed by the police of the accusations of sexual abuse against Mr. Stibal in October 2009, he was immediately terminated from his position and banned nationwide from scouting, and therefore, there is no evidence that Mr. Stibal was negligently retained in his position as a Scoutmaster of Plaintiff's Troop.  However, this argument fails to take into account Plaintiff's contention that the Troop leaders were aware of Mr. Stibal's "red flag" activities years prior to Mr. Stibal's termination, and that these leaders were agents of the BSA and NSC.  If so, the knowledge of the Troop leaders may be imputed to BSA and NSC for purposes of liability under a negligent retention theory.  As the Court has

---

[8] Count II originally asserted a claim for Negligent Hiring as well; however, Plaintiff conceded this claim against all Defendants in his Memorandum in Opposition to Defendants Boy Scouts of America, Northern Star Council and River Hills United Methodist Church's Motion for Summary Judgment.  (Pl.'s Mem. Opp'n Summ. J. 2, n.1.)

already discussed, there are genuine issues of material fact regarding these matters that must be resolved by the jury. There are further issues of genuine fact as to whether knowledge of those "red flag" activities did provide notice that Mr. Stibal was unfit for his duties as Scoutmaster, and whether BSA, NSC or its agents should have taken action beyond just speaking to Mr. Stibal about his violations of established policy. Therefore, the Court cannot grant BSA and NSC's Motion for Summary Judgment on Plaintiff's Negligent Retention claim against them.

River Hills argues that generalized complaints about Mr. Stibal not complying with policy, without more, are insufficient to sustain Plaintiff's Negligent Retention claim because there is no evidence that River Hills had knowledge of any alleged policy violations, i.e. the "red flag" activities, and because River Hills did not know, and had no reason to know, that Mr. Stibal would engage in sexual contact with a scout.

This argument is substantively the same as BSA and NSC's argument and the Court's conclusion regarding it is the same. There are fact issues that require resolution by a fact-finder that preclude the Court from ruling on this issue as a matter of law. Therefore, the Court cannot grant River Hills's Motion for Summary Judgment on Plaintiff's Negligent Retention claim against it.

Next, the Court must consider the Defendants' Motions for Summary Judgment on Plaintiff's claims of Negligent Supervision. "Negligent supervision is the failure of an employer to exercise ordinary care in supervising the employment relationship so as to prevent foreseeable misconduct of an employee from causing harm to others." *First Church of Nazarene,* 661 N.W.2d at 264-5 (citing *M.L. v. Magnuson,* 531 N.W.2d 849, 858 (Minn. Ct. App. 1995), *review denied* (Minn. July 20, 1995)). A claim for negligent supervision derives from the doctrine of

*respondeat superior* and a plaintiff must show that the actions of the employee occurred within the scope of employment. *Id.*

The Court goes into a thorough discussion of foreseeability in the context of negligence in the analysis of Plaintiff's claims of Negligence against the Defendants under II.B.2 below and addresses the factual disputes relevant to whether the abuse by Mr. Stibal occurred during the scope of employment in the analysis of Plaintiff's Vicarious Liability claims against the Defendants under II.B.3. below and will not go into further detail on these issues here. At this point, it is sufficient to say that there are genuine issues of material fact that preclude the Court from granting summary judgment to the Defendants on Plaintiff's claims of Negligent Supervision.

Therefore, for the foregoing reasons, the Court denies the Defendants' Motions for Summary Judgment on Plaintiff's claims of Negligent Retention and Negligent Supervision under Count II of the Complaint.

### 2.  Count III:  Negligence – Defendants BSA, NSC, and River Hills

There are four basic elements of a negligence claim:  1) existence of a duty of care; 2) breach of that duty; 3) proximate causation; and 4) injury. *Bjerke v. Johnson,* 742 N.W.2d 660, 664 (Minn. 2007) (citing *Schmanski v. Church of St. Casimir of Wells,* 243 Minn. 289, 292, 67 N.W.2d 644, 646 (1954)). "Duty is a threshold question '[b]ecause a defendant cannot breach a nonexistent duty.'" *Glorvigen v. Cirrus Design Corp.,* 816 N.W.2d 572, 582 (Minn. 2012) (quoting *Domagala v. Rolland,* 805 N.W.2d 14, 22 (Minn. 2011)).  In most cases, the existence of a duty of care is a question of law for the court. *Bjerke,* 742 N.W.2d at 664.

Plaintiff claims that Defendants owed a duty to Plaintiff under two theories of direct negligence:  1) Defendants assumed a duty of reasonable care to Plaintiff; and 2) Defendants had

a duty to protect Plaintiff from harm because of their special relationship with Plaintiff and the abuse was foreseeable.

First, the Court will address Plaintiff's claim that Defendants assumed a duty to Plaintiff. It is "well established that one who voluntarily assumes a duty must exercise reasonable care or he will be responsible for damages resulting from his failure to do so." *Isler v. Burman*, 232 N.W.2d 818, 822 (Minn. 1975). "Whether a duty has been assumed is a question of fact." *Ironwood Springs Christian Ranch, Inc. v. Walk to Emmaus*, 801 N.W.2d 193, 199 (Minn. Ct. App. 2011) (internal footnote omitted) (citing *Abresch v. Northwestern Bell Tel. Co.*, 246 Minn. 408, 416, 75 N.W.2d 206, 212 (1956)).

Plaintiff argues that all Defendants voluntarily assumed a duty of reasonable care to Plaintiff by soliciting his involvement in Boy Scouts. Plaintiff contends that Defendants undertook an affirmative duty to care for the minor Plaintiff during scouting activities by representing the safety and fitness of their programs as embodied by their policies and procedures. Plaintiff further maintains that Defendants erected a structure of approvals, certifications, standards, and training to fulfill the duty they had assumed and alleges that due to their actions, Defendants owed Plaintiff a reasonable duty of care and a duty to protect Plaintiff. Plaintiff has provided an extensive set of exhibits in opposition to Defendants' Motions for Summary Judgment and those exhibits contain a significant volume of evidence in support of these assertions.

BSA concedes that the issue of whether its creation of Youth Protection Guidelines amounts to the voluntary assumption of a duty to protect is one of first impression in Minnesota. Therefore, the Court finds that genuine issues of material fact exist as to whether any or all of the

Defendants voluntarily assumed a duty of reasonable care to Plaintiff and it is not appropriate for the Court to decide this issue as a matter of law; the trier of fact must make this decision.

Next, the Court will look at Plaintiff's claim that Defendants owed Plaintiff a duty to protect because a special relationship existed between Defendants and Plaintiff and because the abuse of Plaintiff was foreseeable. The court in *Bjerke* stated that "[a]lthough we have generally stated that the existence of a duty is a question of law, this would not foreclose the possibility that there may be situations in which the facts necessary to establish a special relationship are in dispute and should be submitted to the jury." 742 N.W.2d 660 at 667 n. 4; *see also Lundman v. McKown,* 530 N.W.2d 807, 820 (Minn. Ct. App. 1995) ("Where the facts are not in controversy, the existence of duty is a question of law). "Generally, no duty is imposed on an individual to protect another from harm, even when she 'realizes or should realize that action on [her] part is necessary for another's aid or protection.'" *Id.* at 665 (quoting *Delgado v. Lohmar,* 289 N.W.2d 479, 483 (Minn. 1979)). "A duty to protect will be found, however, if (1) there is a special relationship between the parties; and (2) the risk is foreseeable." *Id.* (citing *Erickson v. Curtis Inv. Co.,* 447 N.W.2d 165, 168–69 (Minn. 1989)). Typically when a special relationship giving rise to the duty to protect is found, "the plaintiff is in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare." *Donaldson v. Young Women's Christian Ass'n of Duluth,* 539 N.W.2d 789, 792 (Minn. 1995).

There are three types of special relationships. The first arises from the status of the parties, such as parent and child. *Bjerke,* N.W.2d at 665 (citing *Delgado,* 289 N.W.2d at 483–84; Restatement (Second) of Torts §§ 314A, 315 (1965)). The second is "when an individual, whether voluntarily or as required by law, has 'custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection.'" *Id.* (quoting

33

*Harper v. Herman,* 499 N.W.2d 472, 474 (Minn. 1993); Restatement (Second) of Torts § 314A
(1965)). The third

> arises when an individual assumes responsibility for a duty that is
> owed by another individual to a third party. For example, one has a
> duty to act when he 'undertakes, gratuitously or for consideration,
> to render services to another which he should recognize as
> necessary for the protection of a third person or his things,' and
> liability will be imposed if (1) his failure to act increases the risk of
> harm; (2) he undertook a duty owed by the other to the third party;
> or (3) the harm is suffered because the other or the third person
> relied on the undertaking.

*Id.* (quoting *Walsh v. Pagra Air Taxi, Inc.,* 282 N.W.2d 567, 571 (Minn.1979); Restatement
(Second) of Torts § 324A (1965)). Only the second and third types of special relationships are
relevant under the facts of this case.

"A special relationship may arise when one individual's safety has in some way been
entrusted to another and that the other has accepted that entrustment." *Laska v. Anoka County,*
696 N.W.2d 133, 138 (Minn. Ct. App. 2005) (citing *Erickson v. Curtis Inv. Co.,* 447 N.W.2d
165, 168 (Minn. 1989)). "'A special relationship may also arise where one accepts responsibility
to protect another, although there was no initial duty.'" *Id.* (quoting *Lundman v. McKown,* 530
N.W.2d 807, 820 (Minn. Ct. App.1995), *review denied* (Minn. May 31, 1995)).

Plaintiff maintains that BSA, NSC, and River Hills were all responsible for implementing
the Boy Scout program and were armed with the knowledge of the history of sexual abuse in
scouting; therefore, they were in the best position to protect the unsuspecting Plaintiff from the
harm imposed by Mr. Stibal. Plaintiff argues that in marketing their programs to Plaintiff and
emphasizing their youth protection protocols and the safety of their programming, these
Defendants encouraged Plaintiff's involvement in scouting and camping activities far from the

protection of his parents and his home. In doing so, Plaintiff claims that Plaintiff and his parents entrusted Plaintiff's safety to BSA, NSC and River Hills, who accepted that entrustment.

The Court finds that there is significant evidence in the record to support Plaintiff's claim. BSA produced a mountain of policies, procedures, and guidelines as to the protocols to be followed by district councils, such as NSC, and local charters, such as River Hills. The overwhelming message was that the Boy Scouts of America program, of which NSC and River Hills are a part, is one in which parents can feel safe turning their children over into the capable hands of mature, responsible adult leaders and mentors who can be trusted to protect their children during scouting activities. Additionally, there is evidence that Plaintiff's mother trusted that BSA, NSC, and River Hills would protect her son when he was in their care away from home and his parents.

Additionally, there is evidence that scouts were encouraged to form close personal relationships with their leaders in order to achieve the goals of the Boy Scouts program to mentor and provide moral guidance for the young men involved in the program. It appears to the Court that this is a core function of the Boy Scouts program and provides further evidence that a special relationship may have formed between Plaintiff and the Defendants. The Court therefore finds that this case presents genuine issues of material fact as to whether a special relationship was formed between Plaintiff and the Defendants.

Furthermore, in the very recent unpublished case of *Doe 169 v. Brandon,* No. A12-1721, 2013 WL 2302023 (Minn. Ct. App. May 28, 2013), the Minnesota Court of Appeals addressed the issue of whether a special relationship was necessary in order for a duty of reasonable care to have existed between a church and a member of the church youth group who was sexually abused by a volunteer working with the church youth group. The court found that the abused

boy did not need to present evidence of a special relationship because "'general negligence law imposes a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff.'" *Doe 169,* 2013 WL 2302023 at *6 (quoting *Domagala,* 805 N.W.2d at 23). While the facts are not directly on point with the case at bar, the Court finds the reasoning instructive.

In the instant case, the conduct of the Defendants in creating an environment where parents felt they could comfortably release their children into the care of the Boy Scouts program may have created a foreseeable risk that such trust could be taken advantage of by sexual predators who knew that young men in the program would be encouraged to trust and respect them.

Regardless of whether it is necessary for a special relationship to exist in order for a duty to exist, there must be foreseeability. There seems to be a spectrum for the analysis of whether an action was foreseeable. On the one hand, "[i]n determining whether a danger is foreseeable, courts look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility." *Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A.,* 582 N.W.2d 916, 918 (Minn. 1998). On the other hand, "[t]he test is not whether the precise nature and manner of the plaintiff's injury was foreseeable, but whether 'the possibility of an [incident] was clear to the person of ordinary prudence.'" *Domagala,* 805 N.W.2d at 27 (quoting *Connolly v. Nicollet Hotel,* 254 Minn. 373, 381-2, 95 N.W.2d 657, 664 (1959) (alteration not in original)). "Foreseeability of injury is a threshold issue related to duty that is ordinarily 'properly decided by the court prior to submitting the case to the jury.'" *Id.* (quoting *Alholm v. Wilt,* 394 N.W.2d 488, 491 n. 5 (Minn. 1986). However, "[i]n close cases,

36

the issue of foreseeability should be submitted to the jury." *Id.* (quoting *Whiteford by Whiteford,* 582 N.W.2d at 918). The case before the Court is just such a case.

There are several disputed facts that are material to the determination of foreseeability, making summary judgment as a matter of law inappropriate on the question of whether a duty to Plaintiff was owed by the Defendants. First, there are several disputed facts regarding the incident where Mr. Stibal had a scout sleep overnight in his tent, including, but not limited to, whether it occurred before the events involving Mr. Stibal's abuse of the Plaintiff and whether it was indeed a violation of the Two-Deep policy. Second, many of the same disputed facts exist in regard to two incidents where Mr. Stibal allegedly provided first-aid to a scout inside his tent. Third, taken in the light most favorable to the non-moving party, the following all raise questions of fact for the jury regarding whether Mr. Stibal's abuse of Plaintiff was foreseeable, including whether: 1) Troop Committee members knew that Mr. Stibal spent time alone with scouts outside of scouting activities; 2) an adult volunteer reported that Mr. Stibal was engaging in concerning activities; 3) Troop Committee members had observed or had knowledge that Mr. Stibal was engaging in behaviors such as tickling, wrestling, and giving "wedgies" and back rubs; 4) for several years before Mr. Stibal abused Plaintiff, Troop Committee members had observed or had knowledge that Mr. Stibal had favorite scouts and scout families which he focused on for two to three years at a time and then moved on to other scouts and their families, which Plaintiff claims is evidence of grooming. Based on the foregoing, the Court is precluded from finding as a matter of law that the Defendants did not owe Plaintiff a duty of care.

Regarding the remaining elements of a negligence claim, namely, breach of duty, causation, and damages, there are also genuine issues of material fact that prevent the Court from granting the Defendants' Motions for Summary Judgment on Plaintiff's Negligence claims.

"In a negligence action, whether a breach of a duty occurred is a question for the fact finder." *Wear v. Buffalo-Red River Watershed Dist.,* 621 N.W.2d 811, 815 (Minn. Ct. App. 2001) (citing *Smith v. Carriere,* 316 N.W.2d 574, 575 (Minn. 1982). If indeed a duty is found, there are several genuine issues of material fact that the jury will need to resolve on the question of whether that duty was breached. For example, there are genuine issues of material fact as to whether the Troop Committee members appropriately handled their knowledge of Mr. Stibal's "red flag" activities, i.e. should further investigation have taken place, should Mr. Stibal's actions have been reported to superior personnel within the Boy Scouts organization directly, and/or should Mr. Stibal have been terminated from his position as a Troop volunteer by the Troop Committee based on such violations.

Similarly, the question of causation in this case is also an issue for the jury to resolve.

> The question of proximate cause is normally for the jury to decide, and its decision will stand unless manifestly and palpably contrary to the evidence viewed as a whole and in the light most favorable to the verdict. It is only where the evidence is so clear and conclusive as to leave no room for differences of opinion among reasonable men that the issue of causation becomes one of law to be decided by the court.

*Vanderweyst v. Langford,* 303 Minn. 575, 576, 228 N.W.2d 271, 272 (1975) (citation omitted).

Defendants argue that because Plaintiff's parents were close, personal friends with Mr. Stibal, and because some of the incidents of abuse occurred outside of scouting-sponsored activities, the Defendants could not be the cause of Plaintiff's injuries as a matter of law. However, if the jury were to find that the Defendants owed Plaintiff a duty of care and subsequently breached that duty, the Court finds that reasonable minds could differ as to the type of relationship Plaintiff and his family would have had with Mr. Stibal had they known that the Defendants had taken action against or were investigating Mr. Stibal for the violation of scouting policies meant to prevent the possibility of sexual abuse of scouts. Therefore, the Court finds

that genuine issues of material fact exist as to whether a breach of a duty owed by the Defendants was the cause of any of Plaintiff's injuries, whether the abuse occurred during scouting-sponsored activities or not; however, this finding only applies to Mr. Stibal's abuse of Plaintiff which occurred after any "red flag" activities that may have established the Defendants' foreseeability of such abuse.[9]

In making this finding, the Court also rejects the Defendants' argument that Mr. Stibal's criminal acts break the chain of causation. It is true that "[a]s a general rule, a criminal act of a third person is an intervening efficient cause sufficient to break the chain of causation." *Hilligoss v. Cross Cos.,* 304 Minn. 546, 547, 228 N.W.2d 585, 586 (1975) (citing *Anderson v. Theisen,* 231 Minn. 369, 43 N.W.2d 272 (1950)). "However, to be a legally sufficient intervening cause, the criminal act itself must not be reasonably foreseeable." *Id.* (citing *Wallinga v. Johnson,* 269 Minn. 436, 131 N.W.2d 216 (1964); Restatement, Torts 2d, ss 302B, 448, 449). As discussed in detail above, the Court finds that genuine issues of material fact exist as to whether Mr. Stibal's criminal acts of sexual abuse against Plaintiff should have been foreseeable to the Defendants.

Finally, though not addressed in the arguments of the Defendants, the question of damages is also one for the jury. Therefore, for the foregoing reasons, the Court denies the Defendants' Motions for Summary Judgment on Plaintiff's claims of Negligence under Count III of the Complaint.

### 3. Count IV: Vicarious Liability – Defendants BSA, NSC, and River Hills

*Respondeat superior* is a common law doctrine wherein an employer may be vicariously liable for the torts of his employees committed during the course and scope of his employment.

---

[9] This finding similarly applies to Plaintiff's claim of Negligent Retention, which, unlike claims of negligent supervision, does not apply only to actions undertaken during the course of employment.

*Urban v. American Legion Dept. of Minnesota,* 723 N.W.2d 1, 4 (Minn. 2006) (citation omitted). "Respondeat superior liability is not based on fault of the employer, but rather is imposed based on a policy choice that liability for acts committed within the scope of employment ought to be allocated to employers as a cost of doing business." *Hagen v. Burmeister & Assocs., Inc.,* 633 N.W.2d 497, 504 (Minn. 2001) (citing *Fahrendorff ex rel. Fahrendorff v. North Homes, Inc.,* 597 N.W.2d 905, 910 (Minn. 1999). "The general policy, then, is that [the court] will not impose such liability unless there is some connection between the tort and the business such that the employer in essence assumed the risk when it chose to engage in the business." *Id.* (citing *Lange v. National Biscuit Co.,* 297 Minn. 399, 403, 211 N.W.2d 783, 785 (1973)). "[A]n employer is vicariously liable for an employee's intentional tortious acts when: (1) the tort is related to the employee's duties; and (2) the tort occurs within work-related limits of time and place." *Hagen,* 633 N.W.2d at 504 (citing *Fahrendorff,* 597 N.W.2d at 910).

The threshold question is whether Mr. Stibal was in an employment relationship with BSA, NSC and/or River Hills. As discussed at length above, there are genuine issues of material fact that preclude the Court from making this determination as a matter of law. If Mr. Stibal *is* found to have been in an employment relationship with any of the other Defendants at the time he sexually abused Plaintiff, the next question is whether that/those employer(s) can be held vicariously liable for Mr. Stibal's intentional acts of abuse.[10]

---

[10] As a preliminary matter, the Court finds that regardless of whether Mr. Stibal is found to have been in an employment relationship with Defendants, neither BSA, NSC nor River Hills can be held vicariously liable for actions taken by Mr. Stibal against Plaintiff during non-scouting activities as these occurred outside the scope of Mr. Stibal's possible employment with the Defendants. This conclusion equally applies to Plaintiff's claim of Negligent Supervision, which, as noted above, derives from the doctrine of *respondeat superior* wherein the events to which liability attaches must have occurred during the scope of employment. It is clear from the record that at least two of the incidents of abuse occurred during scouting activities but that several others occurred while on family vacations or during other non-scouting activities.

The first factor under the test from *Hagen* is whether the tort is related to the employee's duties. "'[A]n important consideration in determining whether an act is related to the duties of employment is whether the act was foreseeable.'" *C.B. ex rel. L.B. v. Evangelical Lutheran Church in America,* 726 N.W.2d 127, 135 (Minn. Ct. App. 2007) (quoting *Hagen,* 633 N.W.2d at 504). "Whether an employee's acts were foreseeable within the context of respondeat superior is a question of fact." *Hagen,* 633 N.W.2d at 505 (citing *Fahrendorff,* 597 N.W.2d at 910). "This standard of foreseeability is commonly proven, or a question of fact is raised, when a party establishes that the type of tortious conduct involved is a well-known industry hazard." *Id.* (citing *Fahrendorff,* 597 N.W.2d at 911). "Foreseeability for purposes of respondeat superior merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Frieler v. Carlson Marketing Group, Inc.,* 751 N.W.2d 558, 575 (Minn. 2008) (internal quotations omitted).

The Court cannot find as a matter of law that the sexual abuse of young men by adult male mentors is so unusual or startling that it would be unfair to include the loss resulting from it among other costs of the employer's business in light of the volume of incidences reported under such circumstances in recent decades, particularly those involving churches and the Boy Scouts. Furthermore, "[a]n employer can be responsible for the sexual misconduct and sexual assaults of its employees, even when such conduct was illegal or expressly prohibited by the employer, under respondeat superior." *Id.* (citing *Fahrendorff,* 597 N.W.2d at 912 (holding that group home operator could be liable for sexual assault of resident by program counselor under respondeat superior); *Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.,* 329 N.W.2d 306, 311 (Minn. 1982) (holding that clinic could be liable for sexual acts committed by

psychologist during therapy sessions under respondeat superior)). The Court also notes that the abuse that occurred during scouting-related activities took place while Mr. Stibal was carrying out the duties of his position, i.e. supervising the scouts on an overnight camping trip.

BSA and NSC argue that Mr. Stibal's conduct could not have been foreseeable to them because none of Mr. Stibal's "red flag" activities were reported to their organizations. However, this argument again ignores the possibility that the Troop Committee members and adult leaders of Troop 650 may have been agents of BSA and NSC, and, if so, their knowledge of Mr. Stibal's "red flag" activities may be imputed to BSA and NSC. Additionally, there is a multitude of evidence in the record upon which reasonable persons could conclude that BSA and NSC should have been well-aware that sexual abuse of scouting participants by adult troop members was a well-known industry hazard. The maintenance and application of the IV "Perversion" Files and the creation and implementation of the Two-Deep Leadership and one-on-one contact policies themselves indicates their awareness of the problem. In the context of vicarious liability, the Court cannot state as a matter of law that Mr. Stibal's actions were not foreseeable to BSA and NSC. This is a fact question for the jury to decide.

River Hills argues that because it never had access to or, for that matter, was even aware of the IV "Perversion" Files, Mr. Stibal's actions could not have been foreseeable to it. However, Troop Committee members were aware of Mr. Stibal's activities, which could have potentially alerted them to the possibility that Mr. Stibal may engage in sexual abuse of the minor scouting members. If the Troop Committee members were agents of River Hills, their knowledge of Mr. Stibal's activities may be imputed to them. Again, this presents genuine issues of material fact for the jury to decide and the Court cannot say as a matter of law that Mr. Stibal's actions were not foreseeable to River Hills in the context of vicarious liability.

Under the second factor of the *Hagen* test, the Court finds that there is no genuine issue of material fact as to whether the work-related time and place requirements are met for Defendants BSA and NSC during the scouting-sponsored activities for which vicarious liability may be found, as they occurred at camping events organized by BSA and NSC at campgrounds run by BSA and NSC. Therefore, the Court finds as a matter of law that these requirements are met under the *Hagen* test in regard to BSA and NSC.

However, there is a genuine issue of material fact as to whether the incidents of abuse that occurred during scouting-sponsored activities in fact occurred within work-related limits of time and place in regards to River Hills. River Hills claims that because none of the incidents occurred either at the Church itself or during a Church-sponsored activity, it cannot be held vicariously liable for Mr. Stibal's acts. This argument assumes that if River Hills was in an employment relationship with Mr. Stibal, the only place where his employment applied was on Church property or during Church-sponsored events, and did not generally apply to scouting-sponsored events. These are genuine issues of material fact for the jury to decide and the Court cannot make this determination as a matter of law.

Therefore, for the foregoing reasons, the Court denies the Defendants' Motions for Summary Judgment on Plaintiff's claims of Vicarious Liability under Count IV of the Complaint.

## III.    **DECISION**

The Motion of Defendants BSA and NSC for Summary Judgment is DENIED. The Motion of Defendant River Hills for Summary Judgment is DENIED.

**E.L.O.**

43