**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BOYS SCOUTS OF AMERICA AND | ) | Case No. 20-10343 (LSS) |
| DELAWARE BSA, LLC,[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Docket Refs: 7832, 8039 |

**OBJECTION OF MARKEL INSURERS TO SECOND MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

Markel Service, Incorporated, Claim Service Manager for Evanston Insurance Company ("**Evanston**") and Alterra Excess & Surplus Insurance Company ("**Alterra**") (collectively, the "**Markel Insurers**"), hereby objects to the *Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (the "**Plan**") [D.I. 7832].[2] In support hereof, the Markel Insurers respectfully state as follows:

*Introduction*

1.  The Markel Insurers provided the primary and first excess comprehensive general insurance policies to BSA for the year immediately preceding the Chapter 11 filing and have continued to provide primary level liability insurance through the pendency of the case. The Markel Insurers also wrote excess policies for the recent years prior to the Chapter 11 Cases. The Markel Insurers believe that a successful reorganization providing BSA an opportunity to continue its non-profit mission is the best outcome in this case. The reorganization, however, must respect the contractual rights of the Markel Insurers and other insurers, as well as protect claimants entitled

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) ("**BSA**") and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Lane, Irving, Texas 75038.

[2] Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Plan.

to recourse under applicable policies. In that regard, the Markel Insurers join the *Certain Insurers' Objection to Confirmation of the Debtors' Chapter 11 Plan* as it relates to the proposed Trust Distribution Protocols, governance of the Settlement Trust, and the proposed anti-insurer findings requested in connection with Plan confirmation.

2.   By this separate objection to the Plan, the Markel Insurers raise an important issue related to the fair and efficient handling of claims, in particular, Non-Abuse Litigation Claims arising in recent years, ranging from "slip and fall" cases to very serious personal injury. The Plan expressly purports to take away the Markel Insurers' ability to process and settle Non-Abuse Litigation Claims in the ordinary course of business as they would for any insured. This is an explicit and improper attempt to alter the terms of insurance contracts contrary to the Bankruptcy Code. Moreover, the Plan inserts the proposed Settlement Trustee – a designee of holders of Abuse Claims – into settlement of Non-Abuse Litigation Claims. An unauthorized imposition on contractual rights as matter of law, this particular Settlement Trustee and the governance structure are also particularly ill-suited for the authority granted to them under the Plan.

### *Markel Insurance Policies*

3.   Starting in 2012, the Markel Insurers issued several excess liability policies and a primary comprehensive general liability and first excess policy (the "**Policies**")[3] to BSA. The

---

[3] The Policies are voluminous and not attached to this Objection. As used here, the "**Primary Policy**" means the 2019 (Evanston) policy with a per occurrence limit of $1,000,000 and an aggregate limit of $10,000,000. "**Excess Policies**" means policies issued by Alterra or Evanston for each year before the petition date starting in 2012, with varying attachment points and policy limits.

Policies are designated as Specified Insurance Policies under the Plan, subject to different treatment because these policies cover both Abuse Claims and Non-Abuse Litigation Claims.

4.  As is standard for a comprehensive general liability insurance policy, the Primary Policy authorizes "settlement of any claim or suit as [Evanston] deems expedient." Primary Policy at 1. The Primary Policy also gives Evanston the right to defend in any suit against BSA that falls under the policy and requires BSA to cooperate with Evanston with respect to such claims. *Id.* at 1, 11. Similarly, the Excess Policies provide that the insurer may, in its discretion, "investigate and settle any claim or suit." The right of the insurer to settle claims in its discretion is fundamental to policies of this type and is different from other types of insurance, *e.g.*, medical malpractice, which often requires consent of the insured as a condition to settlement.

5.  The Primary Policy also only applies to covered liabilities established through "final judgments" or through written agreement by Evanston and BSA. Specifically:

> No action shall lie against [Evanston] unless, as a condition precedent thereto, BSA shall have fully complied with all the terms of this policy, nor until the amount of the insureds obligation to pay shall have been finally determined either by a final judgment against the insured or by written agreement of the insured, the claimant and [Evanston]. Any person or organization of the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.

*Id.* at 1, 11.

6.  Other than a generally applicable duty of good faith, only the arguable application of the automatic stay may limit the right of the Markel Insurers to settle and pay claims covered by the Policies. Early in this case, Evanston filed a motion to modify the automatic stay to clarify its ability to process, defend and settle claims during the pendency of this case [D.I. 686], which motion resulted in an agreed order [D.I. 987] (the "**Agreed Claims Order**"). Evanston continues to meet its duties and responsibilities under its 2019 – 2020 primary and excess policies consistent with the Agreed Claims Order.

3

*The Plan, Settlement Trust and Settlement Trustee*

7. Under Article IV.D.3.a. of the Plan, the "Settlement Trust shall have consent over any post-Effective Date settlement of any Non-Abuse Litigation Claim (such consent not to be unreasonably withheld) that is entitled to a recovery from the proceeds of Specified Insurance Policies." The Plan provision takes the interim expedient of the Agreed Claims Order and makes it both permanent and more onerous.

8. Specifically, this provision is an explicit and improper alteration of the Markel Insurers' contractual rights. The provision inserts a stranger, the Settlement Trustee, into resolution of ordinary course claims and confers upon him authority not even held by the named insured under the relevant policies. The Settlement Trustee's power to withhold consent is final, subject only to a nebulous "not to be unreasonably withheld" standard with no ready enforcement mechanism. In effect, the Plan places the Settlement Trustee into the role of judge in this instance – similar to the Court's role under the Agreed Claims Order.

9. The actual proposed Settlement Trustee, and the governance mechanism of the Settlement Trust, are far from neutral, but rather empower persons with an interest in maximizing recovery on Abuse Claims only. The Settlement Trust Agreement submitted with the Plan is being executed "for the benefit of the holders of [Abuse Claims]." *See* Settlement Trust Agreement [D.I. 7832], at 180. Under Section 1.2 of the Settlement Trust Agreement, the stated purposes of the Settlement Trust all relate to Abuse Claims. The Settlement Trust Agreement states that "the Trust shall hold, manage, protect and monetize the Trust Assets . . . in accordance with the terms of the Trust Documents for the benefit of the Beneficiaries." *Id.* at 181. "Beneficiaries," in turn, is defined under Section 1.6 as "holders of Abuse Claims." *Id.* at 182. There is no mention in the Settlement Trust Agreement of Non-Abuse Litigation Claims.

10. The Plan names Eric Green as the initial Settlement Trustee. *See* Plan, Article IV.E. The proposed Settlement Trustee is a designee of the Abuse Claimants. He is supervised by the Settlement Trust Advisory Committee, whose members consist solely of lawyers who not only represent Abuse Claimants, but do so on contingency fee, putting themselves in financial competition with Non-Abuse Litigation Claimants. The committee members were selected solely by the Coalition and Tort Claimants' Committee without any input from the insurers, even though the Plan provides that the members are to be "reasonably acceptable" to BSA. *See* Plan § IV.F.1.

11. The insurers' concerns with Eric Green serving as the Settlement Trustee are well documented. Mr. Green admits that he does not see the role of Settlement Trustee as "neutral." *See* Green Dep. Tr., at 88:23-25, 89:1-6. The Court previously declined to appoint Mr. Green as a mediator in this case. Yet, under the Plan, Mr. Green has sole authority to approve or disapprove settlements of Non-Abuse Litigation Claims.

12. Unnecessary as a practical matter, this Plan provision will frustrate efficient administration of the Policies; will likely delay settlements and complicate settlement negotiations themselves; and will put the Settlement Trustee in a position of inappropriate leverage with respect to settlements of Non-Abuse Litigation Claims.

### *The Plan Improperly Purports to Modify Contractual Relationships*

13. The Court has previously noted in this case that the Bankruptcy Code does not authorize alteration of contracts. *See* May 19, 2021 Hr'g Tr., at 168:25-169:3; Disclosure Statement Article II.L [D.I. 6445]. The Court's observation on this point is consistent with fundamental bankruptcy law. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004); *In re Crippin,* 877 F.2d 594, 598 (7th Cir. 1989) ("[B]ankruptcy courts do not have the power to rewrite contracts."); *In re WorldCorp, Inc.*, 252 B.R. 890, 897 (Bankr. D. Del. 2000) (holding that

court may not "rewrite [a] contract to include terms that a party wishes it had bargained for, but did not, prior to execution of the agreement").

14.     Regarding settlement of Non-Abuse Litigation Claims, the Plan is explicit in its alteration of the Markel Insurers' contract rights. The applicable policies, cited above, authorize "settlement of any claim or suit as [Evanston] deems expedient" and permit the Markel Insurers to "investigate and settle any claim or suit." The Plan purports to change these clear contractual rights to the following:

> The Settlement Trust shall have consent over any post-Effective Date settlement of any Non-Abuse Litigation Claim (such consent not to be unreasonably withheld) that is entitled to a recovery from the proceeds of the Specified Insurance Policies.

Plan, § IV.D.3.a. This provision is a clearly drafted change to the insurance contract that is clearly impermissible under established law.

15.     The fundamental analysis applies whether the relevant policies are viewed as executory contracts governed by Bankruptcy Code section 365 or simply as property rights held by the debtor. Bankruptcy law cannot change property rights or contracts. *See Butner v. United States*, 440 U.S. 48, 54 (1979); *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 492-93 (3d Cir. 1997). The United States Supreme Court in *Butner* emphasized that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner*, 440 U.S. at 55. The fact that an interested party is in bankruptcy does not render a different analysis unless there is some federal interest that requires a different result. *Id.* Looking to *Butner*, the Third Circuit in *Integrated Solutions* held that the "nonbankruptcy law defines the nature, scope and extent of the property rights that come into the hands of the bankruptcy estate" and that the "trustee does not have greater rights in the property of the estate than the debtor had before filing bankruptcy." *Id.* (citations omitted). *See also In re Nashville White*

*Trucks, Inc.*, 5 B.R. 112, 117 (Bankr.M.D.Tenn.1980) (holding that the Bankruptcy Code does not grant a debtor greater rights and powers under a contract than he had outside of bankruptcy).

16.     Outside of the bankruptcy context, courts in the Third Circuit have made clear that a court's role is to interpret a contract, but the court lacks authority to modify a contract. *See Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991), *aff'd*, 988 F.2d 414 (3d Cir. 1993). The power to write and rewrite a contract belongs solely to the parties to the contract, absent illegality, mistake, fraud, duress or unconscionability. *Id.* ("Courts do not rewrite contracts to include terms not assented to by the parties.").

17.     Bankruptcy courts across the country, including in the Third Circuit, have applied non-bankruptcy law to reach the same result. *See In re WorldCorp, Inc.*, 252 B.R. 890, 897 (Bankr. D. Del. 2000); *In re Best Mfg. Grp. LLC*, 2012 WL 589643, at *6 (Bankr. D. N.J. 2012) ("Where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written."); *In re EES Lambert Assocs.*, 62 B.R. 328, 336 (Bankr. N.D. Ill.1986).

18.     Courts have also held that a bankruptcy court's equitable powers do not entitle the court to create substantive rights that are otherwise unavailable under the Bankruptcy Code or to expand the contractual obligations of parties. *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993). The First Circuit held that section 105(a) of the Bankruptcy Code[4] does not authorize bankruptcy courts "to create substantive rights that are otherwise unavailable under the Code, or to expand the contractual obligations of parties." *Id.* The First Circuit, looking to Third Circuit law, held that because section 105(a) is not a source of substantive rights, a bankruptcy court's order compelling a secured creditor—who had entered into agreement with unsecured creditors to

---

[4] Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

split monies realized under its security interest—to pay unsecured creditors' portion of proceeds over to estate for distribution pursuant to Bankruptcy Code priorities was legitimate only if another provision of the Code or other applicable law entitled the estate to receive the funds. *Id.* (citing *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir.1992)).

19. Under Bankruptcy Code section 541(a)(1), an insurance policy is property of the estate and the above-outlined principles apply equally to insurance contracts. *See In re Keck, Mahin & Cate,* 241 B.R. 583 (Bankr. N.D. Ill. 1999); *Cissel v. Am Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975). For example, in *Cissel*, the Sixth Circuit denied a bankruptcy trustee's attempt to seek to force payment from insurance absent a judgment or a settlement agreement to which the insurer consented. 521 F.2d at 792. One bankruptcy court explicitly rejected a plan where an insurer was stripped of its rights to defend claims. *See* Transcript of Ruling *In re The Wallace & Gale Co.,* No. 85-4-0092 (Bankr. D. Md. July 22, 1998). In rejecting the plan at issue in *In re Wallace*, the Court focused on the fact "that the cornerstone of the Plan is the wrenching away of the[ ] controls bargained for by the carriers [and] placing these same controls in the hands of the persons suing the Debtor." *Id.*

20. Even if the Court did not have voluminous precedent to look to in this regard, the same result would be clear under a basic statutory analysis. Nothing in either Bankruptcy Code section 365 or 541 alters or authorizes alteration of the relevant terms of the Policies. Under Bankruptcy Code section 1123, a plan may provide for "modification of a lien" or "modification of any indenture or similar instrument." 11 U.S.C. § 1123(a)(5)(E), (F). A plan may "modify the rights of holders of secured claims." 11 U.S.C. § 1123(b)(5). But, aside from liens and debt instruments, the Bankruptcy Code notably does not authorize alteration of other contracts.

21. These specific statutory provisions are consistent with the basic binding effect of a confirmed Chapter 11 plan. Section 1141(a) provides that a confirmed plan binds "the debtor, any

entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder or general partner. . . ." 11 U.S.C 1141(a). Significantly, the Markel Insurers fit in none of these categories. Regardless, the structure, specific statutory authorizations with their limitations, and the statutorily delimited binding effect of a confirmed plan, all reinforce the truism that the core job of Bankruptcy Courts is the "restructuring of the debtor-creditor relationship," *Stern v. Marshall,* 564 U.S. 462, 497 (2011), not a general reordering of the debtor's property rights for the benefit of its constituents. The attempt in the Plan to rewrite BSA's insurance contracts and rights is an impermissible overreach.

### *Conclusion*

22. The Markel Insurers request that the Court deny approval of the Plan pending modification of the Plan to address the concerns raised in this Objection.

Dated: February 4, 2022.

          **GREENBERG TRAURIG, LLP**

          */s/ Dennis A. Meloro*
          Dennis A. Meloro, #4435
          1007 North Orange Street, Suite 1200
          Wilmington, Delaware 19801
          Telephone: (302) 661-7395
          Facsimile: (302) 661-7165
          melorod@gtlaw.com

          and

                **BROWNSTEIN HYATT FARBER SCHRECK, LLP**

<u>*/s/ Michael J. Pankow*</u>
Michael J. Pankow, #21212
410 17th Street, Suite 2200
Denver, Colorado 80202
Telephone: (303) 223-1100
Facsimile: (303) 223-1111
mpankow@bhfs.com


*Attorneys for Markel Service, Incorporated, Claim Service Manager for Alterra Excess & Surplus and Evanston Insurance Company*