## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 7832, 8683** |

## LUJAN CLAIMANTS' OBJECTION TO SECOND MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, AND JOINDER IN OBJECTION FILED BY GUAM COMMITTEE

COME NOW the Tort Claimants represented by Lujan & Wolff LLP ("Lujan Claimants")[1] and object to confirmation of Debtors Boy Scouts of America and Delaware BSA, LLC's (collectively "Debtors") Second Modified Fifth Amended Chapter 11 Plan of Reorganization. On September 30, 2021, Debtors filed the Solicitation Version of the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 6443), which was sent to creditors for vote. On December 18, 2021, during the voting period and just 10 days before the voting deadline, Debtors filed a Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 7832). Both the Modified and Second Modified Plans are collectively referred to as "the Plan." Lujan Claimants hereby object to confirmation of the Plan and join in and incorporate herein the Objection of the Official Committee of Unsecured Creditors for the Archbishop of Agana (Bankr. D. Guam 19-00010) to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 8683).

---

[1] See attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers for Lujan Claimants.

## I. BACKGROUND

Lujan Claimants are all survivors of childhood sexual abuse by the Boy Scouts, who were abused in the United States territory of Guam.  Survivors of child sexual abuse in Guam are different from Survivors who were abused in other states or territories.  Guam Survivors benefit from an open statute of limitations that does not close (the civil statute of limitations was eliminated the Guam Legislature in 2016) and have statutory direct action rights against insurers without having to sue the insured tortfeasor.  Almost all Guam survivors were sexually abused by Father Louis Brouillard, a scoutmaster who was in charge of Guam's swimming merit badge program and who was one of the most prolific child sexual abusers in scouting history.  Most Lujan Claimants were abused by Fr. Louis in his capacity as not only a scoutmaster or scout leader, but also in his capacity as a Catholic priest in settings completely unrelated to scouting.  Thus, most Lujan Claimants have abuse claims that have nothing to do with Debtors, but which appear threatened by the release in the Plan.  The chartered organization implicated in almost all Guam survivors' abuse is the Archbishop of Agana, a debtor in its own pending Chapter 11 bankruptcy action in the District Court of Guam.  Further, 70 Lujan Claimants had prepetition lawsuits against the Boy Scouts of America ("BSA") and therefore constitute more than twenty-five percent (25%) of the 275 prepetition lawsuits against Debtors at the time Debtors initiated this consolidated bankruptcy action.

Of the 73 Lujan Claimants who voted, 72 voted to reject the Plan and 1 voted to accept the Plan.  Notably, the sole voter who accepted the Plan is not pursuing compensation in the Archbishop of Agana bankruptcy case.  Of the 72 Lujan Claimants who voted to reject the Plan, about 70 have asserted scouting-related abuse claims against the Archbishop of Agana, including by filing a proof of claim in the Guam bankruptcy case, and all have claims against the Aloha Council.  Further, it is Lujan Claimants' belief that they have most, if not all, asserted claims against certain religious orders,

including the Capuchin Franciscans Province of St. Mary[2], Carmelite entities[3], and School Sisters of Notre Dame entities, none of which are or have ever been chartered organizations, yet are listed by Debtors as Potential Chartered Organizations Protected Parties and Limited Protected Parties. Nearly all Lujan Claimants have also asserted abuse claims against the Archbishop of Agana and the religious orders which are not related to scouting, e.g., abuse at Church or school by Fr. Louis in his priest capacity.

## II. ARGUMENT

After almost two years of litigating this bankruptcy case, at jaw-dropping expense to the estates of nonprofit BSA and virtually asset-less Delaware BSA, LLC, Debtors have solicited for vote a Plan that must be denied confirmation for plain failure to meet the requirements of the Bankruptcy Code, including but not limited to the reasons that follow. Lujan Claimants reserve their right to make additional arguments at the Confirmation Hearing.

### A.    THE PLAN IS UNCONFIRMABLE WITH NONDEBTOR RELEASES.

#### 1. The Court Lacks Subject Matter Jurisdiction over Survivor Claims against Nondebtors, such as Local Councils, Chartered Organizations, Insurers, and Other Entities.

Federal bankruptcy jurisdiction is set forth in 28 U.S.C. § 1334, which confers upon district courts "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a), (b). District courts may refer to a bankruptcy court any or all cases under title 11 or all proceedings arising under title 11 or arising in or related to a case under title 11. 28 U.S.C. § 157(a). "Proceedings 'related to' a title 11 case include causes of action owned by the debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), as well as suits

---

[2] (See Notice of Current & Potential Protected Parties & Limited Protected Parties ("Notice") at 515-16 (identifying corresponding local council as either "Aloha Council, BSA 104" or "Multiple Councils Included in Claim").)

[3] (See, e.g., Notice at 522 (identifying "CARMELITE NUNS" and identifying corresponding local council as either "Aloha Council, BSA 104" or "Multiple Councils Included in Claim").)

between third parties that conceivably may have an effect on the bankruptcy estate." In re Combustion Eng'g, Inc., 391 F. 3d 190, 226 (3d Cir. 2005) (citing Celotex Corp. v. Edwards, 514 U.S. 300, 308 n.5 (1995)).

In Pacor, Inc., 743 F. 2d 984 (3d Cir. 1984), the Third Circuit "set forth what has become the seminal test for determining 'related to' jurisdiction over third party claims." In re Combustion Eng'g, 391 F. 3d at 226. The Third Circuit stated in Pacor:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

743 F. 2d at 994 (italics in original) (internal citations omitted). While the language of the test appears broad, the facts of the case in Pacor demonstrated a "crucial limit on the legitimate exercise of subject matter jurisdiction." In re W.R. Grace & Co., 591 F. 3d 164, 171 (3d Cir. 2009).

In Pacor, John and Louise Higgins filed suit in Pennsylvania state court against Pacor, a distributor of chemical supplies, seeking damages caused by Mr. Higgins' work-related exposure to asbestos supplied by Pacor. 743 F. 2d at 986. In response, Pacor filed a third-party complaint impleading the Johns-Manville Corporation, which Pacor claimed was the original manufacturer of the asbestos. Id. Thereafter, Manville filed a Chapter 11 bankruptcy petition. Id. When Pacor tried to remove the Higgins lawsuit to the bankruptcy court where the Manville bankruptcy case was pending, the Third Circuit denied removal, holding that "the primary action between Higgins and Pacor would have no effect on the Manville bankruptcy estate, and therefore [cannot establish] 'related to' [jurisdiction over that suit]…." The Third Circuit stated, "At best, [the Higgins-Pacor lawsuit] is a mere precursor to the potential third party claim for indemnification by Pacor against

Manville.  Yet the outcome of the Higgins-Pacor action would in no way bind Manville, in that it could not determine any rights, liabilities, or course of action of the debtor."

In this case, the Court lacks subject matter jurisdiction over any claims of Lujan Claimants against the Archbishop of Agana.  While many Lujan Claimants filed prepetition civil lawsuits naming BSA and the Archbishop of Agana as codefendants, the plaintiffs' claims against the Archbishop of Agana have long been automatically stayed since January 2019, when the Archbishop of Agana filed its own Chapter 11 bankruptcy petition in the District Court of Guam.  That case is In re Archbishop of Agana, Bankruptcy Case No. 19-00010 (D. Guam).  The Guam federal court is under the appellate jurisdiction of the Ninth Circuit Court of Appeals, which has ruled that, while a discharge under Chapter 11 releases the debtor from personal liability for any debts, 11 U.S.C. 524(a), bankruptcy courts cannot release third parties of liability since, pursuant to 11 U.S.C. § 524(e), the "'discharge of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.'"  In re Lowenschuss, 67 F. 3d 1394, 1401 (9th Cir. 1995) (quoting 11 U.S.C. § 524(e)).  The Ninth Circuit has repeatedly held that section 524(e) precludes bankruptcy courts from discharging the liabilities of nondebtors.  Id. at 1401-02 (citing, e.g., Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.), 885 F. 2d 621, 626 (9th Cir. 1989); Underhill v. Royal, 769 F. 2d 1426, 1432 (9th Cir. 1985); Comm'l Wholesalers, Inc. v. Investors Comm'l Corp., 172 F. 2d 800, 801 (9th Cir. 1949)); see also In re Claar Cellars LLC, 623 B.R. 578, 593 (Bankr. E.D. Wash. 2021) (stating that "section 524(e) 'prevents a reorganization plan from inappropriately circumscribing a creditor's claims against a debtor's co-debtor or guarantors over the discharged debt.  Put differently, section 524(e) precludes a co-obligor of a bankrupt debtor from piggybacking on rights the debtor enjoys under the Bankruptcy Code, including the right to discharge or restructure indebtedness.  If a co-obligor seeks a discharge or to restructure its liability on a jointly liable claim, section 524(e) effectively requires the co-obligor to commence its own bankruptcy

case."). Accordingly, the Guam bankruptcy court's future discharge of the Archbishop of Agana's debt to certain Lujan Claimants shall have no effect on the liability of BSA on that debt and therefore shall have no effect on Lujan Claimants' claims against the BSA.

There is also no subject matter jurisdiction over Lujan Claimants' claims against the Boy Scouts of America Aloha Council ("the Aloha Council"). Again, while certain Lujan Claimants filed prepetition lawsuits naming BSA and the Aloha Council as co-defendants, the Aloha Council has never made any claim against the BSA for contribution or indemnification in connection with Lujan Claimants' claims. Similarly, the Court lacks subject matter jurisdiction over certain Lujan Claimants' claims against religious orders, including but not limited to claims against Capuchin Franciscan entities, Carmelite entities, and School Sisters of Notre Dame entities. Like the Aloha Council, none of the religious orders have ever filed any contribution or indemnification claim against the BSA relating to Lujan Claimants' claims.

As for the Lujan Claimants who have filed no civil lawsuits against a chartered organization, religious order, and/or local council, the Court lacks subject matter jurisdiction over these Lujan Claimants' claims against chartered organizations, religious orders, and the Aloha Council. Without any lawsuit against these nondebtors, it is obvious that any resolution of Lujan Claimants' claims against these nondebtors would be a mere precursor to a separate lawsuit against the BSA for any contribution or indemnification claims. Thus, the resolution of Lujan Claimants' claims against chartered organizations, religious orders, or the Aloha Council, either without a lawsuit or as part of a future lawsuit, would have no effect on Debtors' bankruptcy estate.

Regarding insurers, none of Lujan Claimants have filed a lawsuit against insurers seeking payment under BSA insurance policies. Under Guam law, Lujan Claimants each have a statutory right of direct action against such insurers, but no lawsuit has been yet brought against BSA insurers. Likewise, no lawsuits have been brought against the separate insurers of any local council, chartered

organization, or religious order.  Without any lawsuit against insurers, any resolution of Lujan Claimants' claims against an insurer (especially separate insurers of local councils, chartered organizations, or religious orders) would be a mere precursor to a separate lawsuit for indemnification or contribution against the BSA or its insurers.

Thus, the Court lacks subject matter jurisdiction over Lujan Claimants' claims against nondebtors and the Plan cannot be confirmed with the nonconsensual release of Lujan Claimants' claims against nondebtors.

### 2.  Even if Subject Matter Jurisdiction Exists, the Bankruptcy Code Does Not Authorize Nondebtor Releases.

Assuming that subject matter jurisdiction exists over Lujan Claimants' claims against nondebtors, the Bankruptcy Code provides no authority for the release of these claims.  The claims are specifically against local councils, chartered organizations, religious orders, and insurers.

The Third Circuit recognizes that "[s]ection 524(e) of the Bankruptcy Code makes clear that the bankruptcy discharge of a debtor, by itself, does not operate to relieve non-debtors of their liabilities." In re Continental Airlines, 203 F. 3d 203, 211 (3d Cir. 2000).  Nowhere in the Bankruptcy Code is there express statutory authority to enjoin a third-party's claim against a nondebtor outside the context of asbestos.  Id.  In fact, only one section of the Bankruptcy Code expressly allows a bankruptcy court to enjoin third-party claims against nondebtors without the consent of those third parties, and that is 11 U.S.C. § 524(g), which authorizes such an injunction only in cases involving injuries arising from the manufacture and sale of asbestos.  In re Purdue Pharma, L.P., 21 cv 7532 (CM), 2021 WL 5979108, at *49 (S.D.N.Y. Dec. 16, 2021).

The statutory language and history of section 524(g) reveal that "Congress believed that Section 524(g) created an exception to what would otherwise be the applicable rule of law."  In re Purdue Pharma, 2021 WL 5979108, at *49.  Section 524(g)(4)(A)(ii) states:  "*Notwithstanding the provisions of section 524(e)*, such an injunction may bar any action directed against a third party who

is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor." 11 U.S.C. § 524(g)(4)(A)(ii) (italics added).  Section 524(e) states:  "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).  The word "notwithstanding" in section 524(g) suggests that the injunction authorized by that section would be barred by section 524(e), if not for Congress' enactment of section 524(g).    In re Purdue Pharma, 2021 WL 5979108, at *49.   "Plainly, Congress made a decision to limit the scope of the experimenting [with nondebtor releases and injunctions] that was 'reportedly' to be happening (and that was in fact happening) in other [non-asbestos] industries.  And it left to itself, not the courts, the task of determining whether and how to extend a rule permitting non-debtor releases 'notwithstanding the provisions of section 524(e)' into other areas."  Id. at *51.  Yet, since 1994, Congress has made no such extensions of the trust/injunction mechanism to non-asbestos bankruptcies.  Id.

In Purdue Pharma, 2021 WL 5979108, at *70, the district court vacated confirmation of the plan of reorganization, holding that there is no authority under the Bankruptcy Code to permit the nonconsensual release of third party claims against nondebtors that are direct claims based on the individual liability of the nondebtors and which do not derive from the liability of the debtor.  The Purdue court defined "direct claims" as "claims that are not derivative of [the debtor's] liability, but are based on the [nondebtor's] own, individual liability, predicated on their own alleged misconduct and the breach of duties owed to claimants other than [the debtor].  'Direct' claims are based upon a 'particularized' injury to a third party that can be directly traced to a non-debtor's conduct."  Id. at *48.  In contrast, "derivative claims" are "claims that would render the [nondebtors] liable because of [the debtor's] actions (which conduct may or may not have been committed because of the

[nondebtors]).  'Derivative' claims are those that seek to recover from the estate indirectly' on the

basis of [the debtor's] conduct,' as opposed to the non-debtor's own conduct."  Id. (quoting In re

Johns-Manville Corp., 517 F. 3d 52, 62 (2d Cir. 2008).

Here, the Court lacks jurisdiction over Survivors' direct claims against nondebtors, such as

local councils, chartered organizations, and other entities such as religious orders that are being swept

up in this case even though they are neither a local council nor chartered organization.  Survivors'

claims against these nondebtors are based on the independent liability of these nondebtors and are

not dependent on a finding of either Debtor's liability.  In other words, a Survivor can succeed in

proving a local council's or chartered organization's liability based on the tortious conduct of such

local council or chartered organization.  For instance, a court may find a local council or chartered

organization liable for child sexual abuse, and, at the same time, find that the BSA is not liable for

the same child sexual abuse.

In Juarez v. Boy Scouts of America, Inc., an action alleging child sexual abuse, the court

described the tortious liability of a defendant:

> A tort … involves a violation of a legal duty, imposed by statute, contract or
> otherwise, owed by the defendant to the person injured.  Without such duty, an injury
> is "damnum absque injuria"—injury without wrong.  Thus, in order to prove facts
> sufficient to support a finding of negligence, a plaintiff must show that defendant had
> a duty to use due care, that he breached that duty, and that the breach was the
> proximate or legal cause of the resulting injury.   ….
> … [Courts have adopted a] multi-element duty assessment in determining
> whether a particular defendant owed a tort duty to a given plaintiff.  These factors
> include:  (1) the foreseeability of harm to the injured party; (2) the degree of certainty
> that the injured party suffered harm; (3) the closeness of the connection between the
> defendant's conduct and the injury suffered; (4) the moral blame attached to the
> defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the
> burden to the defendant; and (7) the consequences to the community of imposing a
> duty to exercise care, with resulting potential liability.

81 Cal. App. 4th 377, 401 (2000) (citations omitted).  The particular defendant's above-described

duty and liability is not dependent on anyone else's misconduct, negligence, or other liability.  In

fact, the court held that the pretrial record did not conclusively eliminate the possibility of the BSA's

liability, but it did show that there were no triable issues of fact with respect to the Church's liability stemming from the Scouts' use of Church property to hold troop meetings.  Id. at 413.  The court further held that the plaintiff failed to proffer material facts to support his claim against the Church alleging premises liability, as the plaintiff failed to claim that there were facts that put or should have put the Church on notice of the molestation, nor did the plaintiff claim the Church could have taken effective steps to prevent the sexual molestation.  Id.

In Roe No. 1 v. Boy Scouts of America Corp., the plaintiff sued the BSA and local council for child sexual abuse he suffered by his stepfather who was also the assistant scoutmaster for his troop.  147 Conn. App. 622, 631 (2014).  The appellate court affirmed the trial court's grant of a summary judgment motion in favor of the BSA and local council, finding no genuine issue of material fact since the plaintiff failed to present evidence to counter the defendants' evidence that, under the organizational structure of the Boy Scouts, the local chartered organization is responsible for the selection and supervision of troop leaders.  Id. at 642.  The court reached this conclusion based on its finding that the BSA and local council were not in control of the situation and that it was the local chartered organization that was responsible for selecting and supervising its adult volunteers.  Id. at 644.

In L.P. v. Oubre, the court held that the plaintiffs, parents of a child sexually abused in scouting, adequately pleaded a cause of action for negligence against the BSA and local council.  547 So.2d 1320, 1323-24 (La. Ct. App. 1989).  The court found that the plaintiffs adequately pleaded a duty owed by the BSA and local council, alleging that, under the auspices of the BSA, the local council undertook to promote, administer, and supervise the boy scout program in their community; that the local council know or should have known that the scoutmaster had sexually molested troop members; that the defendants failed to investigate the scoutmaster's background, failed to supervise

him and the scouts themselves and failed to inform the parents of the scoutmaster's sexual abuse of troop members. Id. at 1323-24.

In N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 175 Wash. App. 517, 530 (2013), the court held that for the plaintiff, a former scout, to show that the church had a duty, based on a special relationship, to protect him from sexual molestation, he did not need to prove that the church had prior specific knowledge that the scout leader posed a threat. After considering allegations that the church selected the scoutmasters and adult volunteers for the troop, the church chapel was the registered meeting place for the troop, the church actively encouraged children of the congregation to participate in scouting and it paid for the boys' participation in the troop, the church held out the abusive scoutmaster as a youth leader who could be safely trusted with children, the church owned a scouting cabin where the boys participated in meetings and scouting activities away from the custody and protection of their parents, the scoutmaster sometimes took the plaintiff to the cabin outside of meeting times and molested him there, and the scoutmaster also molested the plaintiff after scout meetings, the court found that the church had a protective relationship with the former scout that gave rise to a duty to protect him from foreseeable harm. Id. at 532-33. In contrast, the court found that the BSA and local council did not have a protective relationship with the former scout that gave rise to a duty to protect him from foreseeable harm. Id. at 534-35.

As the above sampling of cases demonstrate, a nondebtor's liability is based on its own conduct and relationship with the child. The liabilities of a local council, chartered organization, or other entities such as religious orders do not derive from or depend upon the liability of the BSA. As Survivors' claims against these non-directors are based on nondebtors' direct, individual liability and are not derivative of the BSA's liability, the Court lacks jurisdiction to release Survivors' direct claims against these nondebtors. Accordingly, the Plan must be denied confirmation.

### 3.    Assuming the Bankruptcy Code Authorizes Nondebtor Releases, the Releases in the Plan Fail under Third Circuit Precedent and Master Mortgage.

In the Third Circuit, bankruptcy courts look to several factors in determining whether to grant a nonconsensual release and permanent injunction of a third party's claim against a nondebtor.  In re Continental Airlines, 203 F. 3d at 217 n.17.   Although the Third Circuit declined to establish its own rule regarding the conditions under which nondebtor releases and permanent injunctions are appropriate or permissible, the Third Circuit has considered the propriety of nondebtor releases under tests established by sister Circuits that authorize such releases and injunctions, and has rejected such releases and injunctions as failing to meet the hallmarks of permissible nonconsenual releases— fairness, necessity to the reorganization, and specific factual findings to support these conclusions, id. at 214—and reasonable consideration given in exchange for the release and permanent injunction, id. at 215.

Regarding fairness, a plan provision is unfair if it releases the liabilities of nondebtors without providing additional compensation to a creditor being forced to release claims against nondebtors. In re Continental Airlines, 203 F. 3d at 213 (citing AOV Indus., Inc., 792 F. 2d 1140, 1154 (D.C. Cir. 1986)).   Here, the Plan is unfair to Survivors who are being forced to give up claims against local councils, chartered organizations, and other entities while receiving little to nothing in exchange.  Although the 251 local councils may contribute funds to the Settlement Trust, there is no allocation of specific local council funds to Survivors who have claims against such local council; instead, the funds from all local councils are simply provided to the Settlement Trust for general payment of unknown debts (Trust expenses, compensation to Survivors?).  For example, the Aloha Council may contribute approximately $1.3 million to the Settlement Trust, yet none of that money is being allocated to the almost 200 Survivors (including Lujan Claimants) who have claims against the Aloha Council.  Even if the $1.3 million was allocated only to Survivors with claims against the Aloha Council, the average payout to the Survivor is less than $7,000, which is a pittance for

12

compensating the horrific claims at issue in this case, i.e., child sexual abuse.  As for chartered organizations and other entities such as religious orders, except for The Church of Jesus Christ ("the TCJC") and potentially the United Methodist Church, these nondebtors are paying absolutely nothing in exchange for release of liabilities for post-1975 claims, claims insured by Settling Insurance Companies, and pre-1976 claims to the extent that such releases are supported by additional compensation from BSA and/or the local councils.  The release of these nondebtors without their payment of compensation is undoubtedly unfair to Survivors who have claims against these nondebtors, including Lujan Claimants.  Assuming that a chartered organization or other entity agrees in the future to provide a substantial contribution of their funds in exchange for releases and permanent injunctions, the nonconsensual releases and injunctions will still be unfair as, except in the case of the TCJC, these funds will go toward the general pot in the Settlement Trust and are not reserved to compensate only Survivors who have claims against these nondebtors, resulting in these Survivors receiving little to nothing in exchange for the release of their claims.  As for insurers, the release and permanent injunction of claims to collect from non-settling insurers, including direct action claims (such as Lujan Claimants' direct action claims), are obviously unfair as these insurers are providing no compensation whatsoever and may never provide compensation in the future, despite the best efforts of the Settlement Trustee to pursue payment owed under insurance policies issued by non-settling insurers.  Even with settling insurers, such as Century and Chubb and Hartford, the releases are unfair as the implicated coverage limits and liabilities greatly exceed the actual settlement amounts contributed by these settling insurers.  Given the fact that the primary insurance policies of Century and Hartford were mostly non-aggregate and mostly covered $500,000 per occurrence for each policy year, and that these same settling insurers provided non-aggregate excess insurance coverage of up to $2 million per occurrence, Debtors will be unable to prove the fairness of a Century and Chubb release in exchange for their mere payment of $800 million, and Debtors

will be unable to prove the fairness of a Hartford release in exchange for mere payment of $787 million. The payments by local councils and settling insurers are also unreasonable given their liability exposure, the substantial assets of nondebtors where the assets are disclosed, and Debtors' failure to disclose the assets of nondebtors such as settling insurers. Debtors will fail to meet their burden of demonstrating fairness and reasonable consideration.

Additionally, the release and permanent injunction of Survivors' claims against nondebtors are certainly unnecessary to the success of Debtors' reorganization. Debtors have admitted multiple times, even in testimony before this Court, that the BSA Toggle Plan is feasible. Debtors proposed the Toggle Plan, which releases no nondebtors (and certainly not local councils, chartered organizations, insurers, and religious orders) and permanently enjoins no claims against nondebtors, in their Second Amended, Third Amended, and Fourth Amended Plans. (D.I. 2592, 5368, 5484, respectively.) Notably, nondebtors, including but not limited to chartered organizations, have previously expressed their attraction to a plan that would preserve third party claims against nondebtors. (See, e.g., TCJC's Objection to Second Amended Plan (D.I. 3263) at 11-12 (stating that, unlike Global Resolution Plan, hypothetical chapter 7 liquidation would not enjoin chartered organization from pursuing valuable insurance rights in BSA insurance policies)[4]; Joinders of Roman Catholic Archbishop of Los Angeles and its Related BSA-Chartered Organizations and Roman Catholic Diocese of Brooklyn, New York to TCJC Objection to Disclosure Statement (D.I. 4092, 6044).) As the Guam Committee has argued, Debtors' successful reorganization does not depend on Lujan Claimants losing their right to be compensated in debtor Archbishop of Agana's bankruptcy case, including from the Archbishop's personal assets and separate insurance, especially as this treatment was not automatic or granted to debtor chartered organizations or objecting chartered

---

[4] In light of their settlement with Debtors, the TCJC later withdrew its objection and supplemental objection to the amended disclosure statement. (D.I. 6233.)

organizations in the original Modified Fifth Amended Plan, which is the only Solicitation Version disclosed to Survivors for vote.  As Debtors admittedly can successfully reorganize without nonconsensual releases and permanent injunctions of third party claims against nondebtors, confirmation of the Plan with nonconsensual nondebtor releases and injunctions must be denied.

Although the Third Circuit has not explicitly adopted factors set forth in In re Master Mortgage Investment Fund, Inc., 168 B.R. 930 (Bankr. W.D. Mo. 1994), courts in the Third Circuit have considered Master Mortgage factors in determining whether to grant nonconsensual releases and permanent injunctions of third party claims against nondebtors.  See, e.g., In re Wash. Mut., Inc., 442 B.R. 314, 349 (Bankr. D. Del. 2011); In re Indianapolis Downs, LLC, 486 B.R. 286, 303 (Bankr. D. Del. 2013); In re Millennium Lab Holdings, II, LLC, 575 B.R. 252, 272 (Bankr. D. Del. 2017). The factors are:

> (1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.
> (2) The non-debtor has contributed substantial assets to the reorganization.
> (3) The injunction is essential to reorganization.  Without the it [sic], there is little likelihood of success.
> (4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes has "overwhelmingly" voted to accept the proposed plan treatment.
> (5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

In re Master Mortgage, 168 B.R. at 935.  Here, the Master Mortgage factors do not support release and injunction of Survivors' claims against local councils, chartered organizations, insurers, and religious orders.

There is no identity of interest between Debtors and local councils, chartered organizations, insurers, and religious orders.  BSA admits that BSA, local councils, and chartered organizations are "three entirely separate legal entities" who, although having a common goal of youth character development as expressed in the Scouting Program, have no control over the other.  (Notice of Filing

of Ex. A to Objection to Adequacy of Debtors' Disclosure Statement (Decl. of National E. Marshall) (D.I. 3949-1) at 5 (describing relationship between BSA, local councils, and chartered organization).) Each local council is separately incorporated nonprofit organization which raises and disburses its own funds and has its own board of directors.  (Id.)  BSA itself claims that it is chartered organizations, and not BSA and local councils, who directly administer the Scouting Program at the troop level and who own and operate the troops or units.  (Id. at 5-6.)  Further, Debtors have not disclosed an indemnity relationship with the Aloha Council or any of the chartered organizations or religious orders.  As for insurers, a direct action against insurers will not deplete BSA's estate, but in fact does the opposite by compensating Survivors with insurance proceeds, thereby preserving estate assets.  Accordingly, this factor weighs against nondebtor releases and injunctions.

In the Plan, none of the nondebtors are contributing substantial assets to compensate Survivors.  The local councils collectively are failing to contribute more than $1 billion in unrestricted net assets to compensate Survivors, (Amended Disclosure Statement (D.I. 6445) at 431), despite the filing of over 82,000 proofs of claim for child sexual abuse, Debtors' estimated range of total value of abuse claims at $2.4 billion to $7.1 billion, (id. at 34), the Future Claimants' Representative's forecast of future claims liability of approximately $5 billion, (id. at 95), and the Settlement Trust's compensation of not only Direct Abuse Claims for which a proof of claim was timely filed in this case but also Direct Abuse Claims against local councils for which no proof of claim was timely filed, (Plan Ex. A (TDP at 5) (D.I. 7832) at 149).  The TCC's analysis (based only on 41,750 proofs of claim that identified a local council) shows that current total direct abuse claims against local councils are valued between approximately $7 billion to $41 billion and that the local councils are contributing only 4.56% to 24.47% of their unrestricted net assets to pay Survivors. (Amended Disclosure Statement (D.I. 6445) at 431.)  Specifically, the TCC found that the Aloha Council has direct abuse claim liability (based on 175 unique proofs of claim, 75 of which are Lujan

Claimants') between $69,713,750 and $314,910,450, yet is only contributing $1,338,358, or between 1.9% to 8.57% of its unrestricted net assets.  (Id. at 427.)  Again, except for the TCJC and potentially the United Methodist Church, none of the chartered organizations are contributing any of their assets to compensate Survivors for the release of Survivors' claims against them.  In exchange for debtor Archbishop of Agana's release of post-1975 liability and apparent release of pre-1976 liability, the Archbishop is paying nothing, even though most Lujan Claimants are creditors in the Archbishop's bankruptcy case, the Archbishop has personal assets valued at tens of millions of dollars, the Archbishop has its own insurance policies, and none of these assets are being contributed to the BSA Settlement Trust to pay Survivors with claims against the Archbishop.  Lujan Claimants should not be restricted from recovering in the Guam bankruptcy case, especially since they clearly are not receiving something of "indubitably equivalent value" to replace their released claims against the Archbishop.  In re Charles Street African Methodist Episcopal Church of Boston, 499 B.R. 66, 102 (Bankr. D. Mass. 2013) (objection of "sole affected creditor" to plan weighs in favor of rejecting a nondebtor release where the plan does not replace the nonconsensual release with something of "indubitably equivalent value to the affected creditor").  Like almost all chartered organizations, no religious order is paying a penny in exchange for release of Survivor claims against them.  Debtors have failed to provide any information justifying release of these entities, such as a supposed status as chartered organizations, and have failed to provide any information regarding religious orders' assets to demonstrate a substantial contribution by any of them.  As concerns Lujan Claimants with claims against the Catholic Church, the chartered organization was the Archbishop of Agana, and not religious orders such as the Capuchin Franciscans, Carmelites, or School Sisters of Notre Dame.  Similarly, Debtors have failed to disclose any information on insurers' assets to prove a substantial contribution justifying release and permanent injunction of claims, including direct action claims not only against settling insurers but also non-settling insurers who may never contribute to the

Settlement Trust.  Given the billions in dollars of insurers' exposure and liability, especially since the insurance policies provided non-aggregate limits until the mid-1980s, Debtors will be unable to show a substantial contribution by the insurers.  As Lujan Claimants are not being adequately protected or compensated for release and injunction of their direct action claims against insurers, they clearly are not receiving anything of indubitably equal value to replace their direct action rights. This factor weighs heavily against release and injunction of third party claims against nondebtors.

As explained earlier, the nonconsensual release and permanent injunction of third party claims against nondebtors are not necessary to Debtors' successful reorganization, as Debtors continue to maintain that the BSA Toggle Plan, containing no third party releases or injunctions, is a feasible plan for their reorganization.  This factor strongly supports rejection of release and injunction of third party claims against nondebtors.

The fourth factor—creditor approval of the release and permanent injunction—is "the single most important factor."  In re Master Mortgage, 168 B.R. at 938.  The Third Circuit has identified as a "key consideration[]" "whether affected parties overwhelmingly have agreed to accept the proposed treatment."  In re Continental Airlines, 203 F. 3d at 217 n.17 (listing Master Mortgage factors).  In chapter 11 non-asbestos cases where third party releases have been approved, courts have interpreted overwhelming creditor support to mean that at least 90% of affected voting creditors accept the plan.  See In re Wool Growers Cent. Storage Co., 371 B.R. 768, 777 (Bankr. N.D. Tex. 2007) ("Most courts have held that factor four [of the Master Mortgage factors] is satisfied when over ninety percent of the impacted creditors approve the plan."); In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660, 674 (Bankr. D.D.C. 1992) (citing to overwhelming support of plan with releases as indicative of "good faith"; "Of the 64 creditors voting—other than partners of the debtor—62 voted for the plan or roughly 97%.").  Here, the Final Voting Report reveals that only **73.57%** of voting Survivors (i.e., Class 8 Direct Abuse Clams holders) voted to accept the Plan, thus

showing that, overall, Debtors **LOST THE VOTE** of Survivors.  (Decl. of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding Solicitation of Votes & Final Tabulation of Ballots Cast (D.I. 8345) Ex. A at 2.)  Debtors similarly lost the vote of Class 9 Indirect Abuse Claims holders, of whom only 69.57% of voters voted to accept the plan.  (Id.)  When viewing the voting outcome in greater detail, it will undoubtedly show that many affected creditors losing claims against specific local councils, chartered organizations, insurers, and other entities like religious orders, voted to reject the Plan, thereby showing a failure by Debtors to obtain the overwhelming support of affected creditors for Plan releases against these specific nondebtors.  For instance, Lujan Claimants have no doubt that, of the 82,000+ Survivors who have filed proofs of claim here, they are the vast majority of Survivors in this case who have claims against the Archbishop of Agana and religious orders such as the Capuchin Franciscans, Carmelites, and School Sisters of Notre Dame in Guam.  In fact, of the nearly 200 Survivors who have asserted claims against the Aloha Council, Lujan Claimants constitute more than 37% of such Survivors.  As 73 of the 75 Lujan Claimants voted, and all but one of the 73 voted to reject the Plan, it is clear that, as affected creditors with claims against these nondebtors, Debtors lost the vote to support release and injunction of claims against the Archbishop of Agana, the religious orders, *and* the Aloha Council, meaning they failed to obtain at least 90% voter acceptance of the treatment in the Plan.  Debtors should be required to file or present publicly a breakdown of the vote by claims against local councils, chartered organizations, insurers, and other entities such as religious orders, which will reveal the extent of the lost vote by affected creditors. Having failed to win overwhelming support from affected creditors, this most important factor of the Master Mortgage factors mandates rejection of the Plan's nonconsensual release and permanent injunction of third party claims against nondebtors.

The fifth factor—payment of all or substantially all of the claims—is also not met by the Plan, as Debtors estimate that, if Direct Abuse Claims are valued at $7.1 billion, Survivors will

recover payment of 10 to 21% on their claims, plus additionally insurance rights that hypothetically are expected to yield up to 100% recovery. (Amended Disclosure Statement (D.I. 6445) at 29.) Debtors also estimate that, if Direct Abuse Claims are valued at the very low end at $2.4 billion, Survivors will recover payment of 31 to 63% on their claims, plus additional insurance rights that hypothetically are expected to yield up to 100% recovery. (Id.) Lujan Claimants dispute Debtors' grossly low estimated value of Direct Abuse Claims. Even if Debtors' valuation is correct, the Plan still fails to provide for payment of all or substantially all of Survivors' claims. See In re Wool Growers, 371 B.R. at 778 (finding the fifth factor, full or almost full payment of the affected claims, not satisfied where affected creditors will recover, at best, 60 to 70% of their claims). This is especially true as to Lujan Claimants who will lose their ability to pursue claims against the Aloha Council, Aloha Council's separate insurers, the Archbishop of Agana and its separate insurers, and BSA insurers. The factor strongly disfavors nonconsensual release and injunction of third party claims against nondebtors.

As the Master Mortgage factors weigh heavily against approval of nonconsensual releases of third party claims against nondebtors, the Plan must be denied confirmation.

**B.    THE PLAN FAILS THE BEST INTEREST OF CREDITORS TEST.**

Pursuant to the best interest of creditors test set forth in section 1129(a)(7), a Chapter 11 plan cannot be confirmed unless the plan provides each dissenting, impaired creditor at least as much as the creditor would be paid if the debtor liquidated under Chapter 7. In a Chapter 7 liquidation, nondebtor releases are not permitted. See, e.g., In re Mrs. Weinberg's Kosher Foods, 278 B.R. 358, 365-66 (Bankr. S.D.N.Y. 2002) (holding in this chapter 7 case that bankruptcy courts may not use a channeling injunction to enjoin a creditor from prosecuting direct claims against a nondebtor); In re Optical Tech., Inc., 216 B.R. 989, 990-94 (M.D. Fla. 1997) (adopting Master Mortgage but striking the actual releases contained in the debtors' liquidating plan because "where ... a plan of

reorganization provides for the total liquidation of the debtor, the factors of Master Mortgage cannot be met").

A plan of reorganization is unconfirmable for violating the best interests of creditors test, where the plan requires that creditors who are entitled to a Chapter 7 liquidation distribution must release nondebtors in order to receive any payment under the Chapter 11 plan.  In re Conseco, Inc., 301 B.R. 525, 527-28 (Bankr. N.D. Ill. 2003).

Here, the Plan fails the best interest of creditors test because the Plan releases Survivors' claims against and enjoins them from suing nondebtors and requires that, in order to receive a distribution under the Plan, the Survivor must sign a release of all Protected Parties (such as local councils, contributing chartered organizations, and settling insurers) and chartered organizations. (Plan (D.I. 7832) Ex. A at 8-9, 12, 21-22.)  As Survivors can only receive payment under the Plan if they sign a release of their claims against local councils, chartered organizations, and settling insurers, the Plan deprives them of their claims against these nondebtors, which they would still be able to retain in a chapter 7 liquidation.  Furthermore, the Insurance Entity Injunction prohibits Survivors from recovering payment under insurance policies issued by Non-Settling Insurers, thereby precluding Lujan Claimants from exercising their statutory rights to file direct actions against these Non-Settling Insurers.  Since, in a Chapter 7 liquidation, Survivors would be able to pursue their claims against local councils, chartered organizations, and settling and non-settling insurers of such nondebtors, the Plan clearly fails to pay Lujan Claimants at least as much as they would be paid if Debtors liquidated under Chapter 7.

Perhaps most sinister is that the Plan precludes Lujan Claimants, who are also creditors in the ongoing bankruptcy case of the Archbishop of Agana, from recovering compensation through the Archbishop of Agana bankruptcy case, despite the fact that they have proofs of claim in that Guam bankruptcy case filed since 2019, several months *before* Debtors filed this consolidated

action.  These Lujan Claimants, at least 70 in number, appear to be enjoined in the Plan from seeking compensation from debtor charted organizations (who are treated as opt-out chartered organizations), as the Plan's Channeling Injunction provision states that "the sole recourse of any holder of an Opt-Out Abuse Claim against an Opt Out Chartered Organization on account of such Opt-Out Abuse Claim shall be to and against the Settlement Trust … and such holder shall have no right whatsoever at any time to assert such Opt-Out Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Charted Organization."  (Plan Art. X.F.1.)  The Plan further provides a reservation:  "Notwithstanding anything to the contrary in this Article X.F, the Channeling Injunction shall not enjoin:  … the rights of holders of Abuse Claims that are not Opt-Out Abuse Claims to assert such Abuse Claims against any Opt-Out Chartered Organization (unless such Opt-Out Chartered Organization becomes a Protected Party under Article IV.1)[.]"  (Plan Art. X.F.3.)  This appears to mean that the channeling injunction enjoins Lujan Claimants from asserting against debtor Archbishop of Agana claims for abuse that occurred post-1975, even though they already have timely filed proofs of claim which are subject to disposition, including allowance or disallowance, before Chief Judge Frances Tydingco-Gatewood[5] of the District Court of Guam.  Similarly, the Plan's Insurance Entity Provision prohibits Survivors with claims of abuse post-1975 from pursuing compensation from insurance, except the Injunction shall not enjoin "the rights of any Person to assert or prosecute (i) an Abuse Claim against an Opt-Out Chartered Organization to the extent that such Claim is not under an insurance policy issued by a Settling Insurance Company …."  (Plan Art. X.H.2, 3.d.)  It is unclear whether the Insurance Entity Injunction prohibits Survivors from seeking insurance compensation from post-1975 BSA insurance or from a Settling Insurance Company, but a reasonable interpretation is that

---

[5] Chief Judge Tydingco-Gatewood is only one of two judges out of 94 chief judges in the United States who must also sit as Chief Bankruptcy Judge.  See https://www.gud.uscourts.gov/attorneys/hon-frances-tydingco-gatewood-chief-judge.

the Injunction enjoins Lujan Claimants from seeking compensation from post-1975 BSA insurance, or from a Settling Insurance Company.  In effect, the Plan appears to give debtor chartered organizations, including debtor Archbishop of Agana, Limited Protected Party status (i.e., immunity from post-1975 abuse claims), even though they have "opted out" by objecting, as the Archbishop of Agana has done here.  Incredibly, the Plan also appears to release the Archbishop of pre-1976 liability.  (Guam Committee Objection (D.I. 8683) at 14 n. 37 (citing Plan Art. X.J.3).  This is entirely unfair as Lujan Claimants have pursued their abuse claims by filing civil lawsuits against the Archbishop since as early as 2017 and then by filing proofs of claim in the Archbishop's bankruptcy case.  Further, this is unfair treatment of Lujan Claimants, as the Archbishop of Agana has its own personal assets, its own non-BSA insurance, and its separate rights to post-1975 BSA insurance as an additional insured.  Not only is this treatment unfair, but it is also clearly unnecessary to Debtors' successful reorganization, as the Solicitation Version of the Plan did not grant Limited Protected Party status, much less pre-1976 release of liability, to an objecting debtor chartered organization, thereby allowing Lujan Claimants to pursue claims against the objecting Archbishop of Agana for post-1975 and pre-1976 abuse.  This change in the treatment of Lujan Claimants occurred merely 10 days before the voting deadline, with the filing of the Second Modified Fifth Amended Chapter 11 Plan, as to which Debtors gave no additional disclosure to creditors, even though the Second Modified Plan provided vastly worse treatment for Survivors with post-1975 abuse claims against debtor chartered organizations.  In a Chapter 7 liquidation, Lujan Claimants with timely filed proofs of claim in the Archbishop of Agana bankruptcy case would not be restricted from receiving compensation from the Guam bankruptcy case; they would maintain their claims to be paid from the Archbishop's personal assets and they would be able to pursue compensation from the Archbishop's non-BSA insurance, as well BSA insurance based on the Archbishop's status as an additional insured.

As the Plan releases Lujan Claimants' claims against nondebtors, without Lujan Claimants' consent, and requires such release in order for them to be paid at all (including from BSA's personal assets), the Plan fails to meet the best interests of creditors test as to Lujan Claimants and must be denied confirmation.

## C.    THE PLAN IMPERMISSIBLY VIOLATES LUJAN CLAIMANTS' DIRECT ACTION RIGHTS AGAINST INSURERS AND TREATS LUJAN CLAIMANTS UNEQUALLY.

Under Guam law, 22 GCA § 18305, Lujan Claimants have a right of direct action against insurers of persons or entities liable for personal injury, including BSA, local councils, and chartered organizations.  Yet, the Plan disregards Lujan Claimants' statutory right to directly sue insurers of liable persons or entities.  If confirmed, the Plan wrongly enjoins Lujan Claimants from suing both settling and non-settling insurers and fails to adequately protect and compensate Lujan Claimants.  Further, the Plan treats Lujan Claimants unequally compared to survivors of abuse who lack prejudgment direct action rights against insurers.

### 1.    Pursuant to the McCarran-Ferguson Act, Lujan Claimants Have the Power to Exercise Direct Action Rights against Insurers, as Guam's Direct Action Statute Reverse Preempts Bankruptcy Code Provisions that Do Not Specifically Relate to the Business of Insurance and that Operate to Invalidate, Impair, or Supersede the Right of Direct Action under Guam Law.

In 1945, Congress passed the McCarran-Ferguson Act "to restore the supremacy of the States in the realm of insurance regulation."  United States Dep't of Treasury v. Fabe, 508 U.S. 491, 500 (1993).  This federal statute was enacted in response to the United States Supreme Court's decision in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944), which held that an insurance company that conducted a substantial part of its business across state lines was engaged in interstate commerce and thereby was subject to the antitrust laws.  Id. at 499.  The holding in South-Eastern Underwriters was widely viewed as a threat to state power to tax and regulate the insurance industry.  Id. at 499-500.  To allay these fears, Congress moved quickly to enact the McCarran-

Ferguson Act which "makes its mission very clear:  'Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.'"  <u>Id.</u> at 500 (quoting 15 U.S.C. § 1011).  A year after passage of the Act, the Supreme Court observed of the federal statute:  "Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance.'"  <u>Id.</u> at 500 (quoting <u>Prudential Ins. Co. v. Benjamin</u>, 328 U.S. 408, 429 (1946)).  Congress achieved this purpose, first, "'by removing obstructions which might be thought to flow from [Congress'] own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation,'" and, second, "'by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it "shall be subject to" the laws of the several states in these respects.'"  <u>Id.</u> (quoting <u>Prudential Ins.</u>, 328 U.S. at 429-30).

Section 2(b) of the McCarran Ferguson Act provides:  "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  As used in the Act, the term "State" includes the several States, Alaska, Hawaii, Puerto Rico, **Guam**, and the District of Columbia. 15 U.S.C. § 1015.  A federal statute is reverse preempted under the Act if (1) the federal statute does not specifically relate to the business of insurance, (2) the state statute was enacted for the purpose of regulating the business of insurance, and (3) the federal statute would invalidate, impair, or supersede the state statute.  <u>In re PRS Ins. Group, Inc.</u>, 294 B.R. 609, 612 (Bankr. D. Del. 2003) (citing, e.g., <u>In re Amwest Ins. Group</u>, 285 B.R. 447, 451 (Bankr. C.D. Cal. 2002)).  To the extent that the Plan prohibits Lujan Claimants from directly suing

insurers of the BSA, local councils, chartered organizations, or any entity against whom Lujan Claimants or any of them have a claim, the Plan violates the McCarran-Ferguson Act.

The first factor is met in this case, as "there is no question that the Bankruptcy Code does not specifically relate to the business of insurance." In re Advanced Cellular Systems, 235 B.R. 713, 719 (1999). The Supreme Court has explained that "[m]any federal statutes with potentially pre-emptive effect, such as the bankruptcy statutes, use general language that does not appear to 'specifically relate' to insurance." Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 42 (1996). In fact, the Bankruptcy Code expressly states that a domestic insurance company is not eligible for relief as a debtor. PRS Ins. Group, 294 B.R. at 612 (citing 11 U.S.C. § 109(b)(2)). In PRS Ins. Group, the Delaware Bankruptcy Court concluded that "the Bankruptcy Code does not specifically relate to the business of insurance." Id.

Review of the specific Plan provisions supports the conclusion that the Bankruptcy Code provisions cited by Debtors do not specifically relate to the business of insurance. The Plan provides that, pursuant to section 1123(b) of the Bankruptcy Code, holders of Abuse Claims shall discharge and release all claims against Protected Parties, including settling insurers of Debtors, and the property of Protected Property, including the insurers of local councils (as all local councils are Protected Parties), regardless of whether the local council-only insurer is a settling or non-settling insurer.[6] (Plan Art. X.J.3.) The Plan further provides for an Insurance Entity Injunction to be issued,

---

[6] The Plan states:

As of the Effective Date …, pursuant to section 1123(b) of the Bankruptcy Code, … all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release:  (a) each and all of the Protected Parties and their respectively property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims ….

(Plan Art. X.J.3.)

pursuant to the equitable jurisdiction and power of the Bankruptcy Court and District Court under section 105(a) of the Bankruptcy Code, to facilitate the Insurance Assignment, protect the Settlement Trust, and preserve Settlement Trust Assets.  (Plan Art. X.H.1.)  The Insurance Entity Injunction in the Plan enjoins holders of Abuse Claims from pursuing claims, including but not limited to commencing an action, against any Insurance Company.[7]  (Plan Art. X.H.2.)  The Plan further provides for a channeling injunction, pursuant to the exercise of jurisdiction and power of the Bankruptcy Code and District Court under section 105(a) of the Bankruptcy Code, to preserve and promote the settlements contemplated by and provided for in the Plan, including the Abuse Claim Settlement, the Insurance Settlements, and the TCJC Settlement, and to supplement, where necessary, the injunctive effect of the Discharge.  (Plan Art. X.F.1.)  The Channeling Injunction provides that the sole recourse of any holder of an Abuse Claim against a Protected Party, Limited Protected Party (on account of a Post-1975 Chartered Organization Abuse Claim or where the Abuse Claim is covered by a policy issued by a Settling Insurance Company), or Opt-Out Chartered Organization, shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party, Limited Protected Party, Opt-Out Chartered Organization or any property or interest of any such Protected Party, Limited Protected Party, or Opt-Out Chartered

---

[7] The Insurance Entity Injunction provision in the Plan states:

Subject to the terms of Article X.E and Article X.F, except for Opt-Out Chartered Organizations with respect to Non-Settling Insurance Companies and Participating Chartered Organizations with respect to Non-Settling Insurance Companies coverage for Abuse Claims that arose prior to January 1, 1976, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim or cause of action (including any Abuse Claim or any claim for or respecting any Settlement Trust Expense) against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Abuse Insurance Policy or other insurance policy issued by a Settling Insurance Company covering Abuse Claims, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim or cause of action ….

(Plan Art. X.H.2.)

Organization.  (Plan Art. X.F.1.)  Further, the Plan states that all Abuse Claims against insureds and co-insureds covered under any insurance policies issued by the Settling Insurance Companies shall be channeled under Article X.F.1 and released under Article X.J.6 as provided in the Insurance Settlement Agreements.  (Plan Art. X.F.2.)  Notwithstanding anything to the contrary in Article X.F, the Channeling Injunction shall not enjoin the rights of holders of Abuse Claims to assert such an Abuse Claim against the Settlement Trust in accordance with the Trust Distribution Procedures, a Limited Protected Party to the extent such Abuse Claims arose prior to January 1, 1976, and are not covered by any insurance policy issued by a Settling Insurance Company, an Opt-Out Chartered Organization to the extent such Abuse Claim is not covered by any insurance policy issued by a Settling Insurance Company, or an Opt-Out Chartered Organization unless it becomes a Protected Party.  (Plan Art. X.F.3.)

As discussed above, the Plan cites sections 105(a) and 1123(b) of the Bankruptcy Code as providing authority to prohibit survivors' direct action rights against insurers.  However, neither section 105(a) nor section 1123(b) specifically relate to the business of insurance.

Section 105(a) of the Bankruptcy Code provides:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).  Debtors cite the equitable jurisdiction and power of the Bankruptcy Court and District Court under section 105(a) as authorizing the Insurance Entity Injunction and Channeling Injunction, which both prohibit creditors from bringing actions or claims against insurers of Protected Parties, including BSA, all local councils, and certain chartered organizations.  However, the Third Circuit held in In re Combustion Eng'g, Inc., that section 105(a) does not give the court the power to create substantive rights that would otherwise be unavailable under the Bankruptcy Code, and

vacated the channeling injunction.  391 F. 3d 190, 238 (3d Cir. 2004).  In In re Continental Airlines, the Third Circuit rejected as extra-statutory the provision in a plan of reorganization that released claims against former and current directors of debtor Continental, and that permanently enjoined shareholder actions against them, finding that the Bankruptcy Code "does not explicitly authorize the release and permanent injunction of claims against non-debtors, except in one instance not applicable here."  203 F. 3d 203, 211 (3d Cir. 2000).  That one instance is asbestos cases.  In fact, as noted earlier, the Third Circuit has never identified any section of the Bankruptcy Code that authorizes nondebtor releases in non-asbestos cases.  Since, by its terms, section 105(a) clearly does not specifically relate to the business of insurance, the Third Circuit has held that section 105(a) does not allow for the creation of substantive rights not otherwise available under the Bankruptcy Code, and the Third Circuit has acknowledged that the Bankruptcy Code only explicitly authorizes the release and permanent injunction of claims against nondebtors only in asbestos cases, the only reasonable conclusion is that section 105(a) is not a federal statute that specifically relates to the business of insurance, including allowing the release and permanent injunction of claims against insurers in non-asbestos cases.

Turning to section 1123(b), that statute provides:

(b) Subject to subsection (a) of this section, a plan may—
    (1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;
    (2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;
    (3) provide for—
        (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
        (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;
    (4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

(5) modify the rights of holders of secured claims, other than a claim secured by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

(6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

11 U.S.C. § 1123(b). Like section 105(a), the language of section 1123(b) contains no express reference to insurance, including any provision allowing a release and permanent injunction of claims against insurers. Section 1123(b) simply lays out in detail what a plan of reorganization may contain. In re Purdue Pharma, 2021 WL 5979108, at *62. Similar to section 105(a), section 1123(b) is not a statute that specifically relates to the business of insurance.

While Debtors rely only upon sections 105(a) and 1123(b) as authority for the release and permanent injunction of claims against insurers, the Future Claimants' Representative ("FCR") and Coalition of Abused Scouts for Justice ("the Coalition") have cited as authority for such release and injunction section 1123(a)(5) of the Bankruptcy Code. (Joint Reply of FCR & Coalition in Support of Debtors' Disclosure Statement [D.I. 6246] at 26.) Section 1123(a)(5) provides:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—
…
(5) provide adequate means for the plan's implementation, such as—
(A) retention by the debtor of all or any part of the property of the estate;
(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;
(C) merger or consolidation of the debtor with one or more persons;
(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;
(E) satisfaction or modification of any lien;
(F) cancellation or modification of any indenture or similar instrument;
(G) curing or waiving of any default;
(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;
(I) amendment of the debtor's charter; or
(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for

30

existing securities, or in exchange for claims or interests, or for any other appropriate purpose ....

11 U.S.C. § 1123(a)(5).  Section 1123(a) "contains a laundry list of things that a plan can include in order to make sure that resources are available to implement the plan – any of which can be ordered by a bankruptcy court."  In re Purdue Pharma, 2021 WL ___ at *63.  However, as plainly seen from the language, insurance is nowhere mentioned in the statute.  "Injunctions against the prosecution of third-party claims against non-debtors [including insurers], and the release of such claims, are nowhere to be found on that list."  Id. at *64.  Section 1123(a)(5) does not by itself confer any substantive right.  Id.  Nor does it confer any special power on a bankruptcy court.  Id.  "Finally, and most important, Section 1123(a)(5) does not authorize a court to give its imprimatur to something the Bankruptcy Code does not otherwise authorize, simply because doing so would secure funding for a plan.  Nothing in Section 1123(a)(5) suggests that the debtor has the right to secure sufficient funds for implementation by any means necessary."  Id.

Admittedly, in In re Federal-Mogul Global Inc., 684 F. 3d 355, 369 (3d Cir. 2012), the Third Circuit held that section 1123(a) preempts state law.  In that case, the issue was whether a debtor could transfer its insurance rights to a section 524(g) asbestos trust notwithstanding the policies' anti-assignment provisions.  Id. at 366.  In holding that section 1123(a) permitted the debtor to transfer its insurance rights to the asbestos trust, the Court did not consider the McCarran-Ferguson Act and whether section 1123(a) is a federal statute that specifically relates to the business of insurance.  Instead, the Court recognized that section 1123(a) "by its express terms does not displace other portions of the Bankruptcy Code."  Id. at 371.  Only in considering section 1123(a) in conjunction with section 524(g), which permits injunctions of claims against insurers in asbestos cases, did the Court reach its conclusion regarding preemption.  As there is no statutory authority in the Bankruptcy Code allowing the release and permanent injunction of third party claims against insurers outside the

asbestos context, section 1123(a) standing alone cannot be construed as specifically relating to the business of insurance.

Clearly, Congress knows how to craft legislation that specifically references insurance, as it did in enacting section 524(g), which provides that, notwithstanding the provisions of section 524(e), the bankruptcy court may order an injunction barring claims against third parties that arise by reason of "the third party's provision of insurance to the debtor or a related party."  11 U.S.C. 524(g). Congress has never enacted a bankruptcy statute similar to section 524(g), permitting an injunction of claims against insurers in non-asbestos bankruptcy cases.  Rather, except as stated in section 524(g), the rule governing all non-asbestos bankruptcy cases (such as Debtors' case), is section 524(e) which provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity, for such debt."  Therefore, considering 1123(a) in a non-bankruptcy case subject to the rule in section 524(e), these Bankruptcy Code provisions cannot be construed as specifically relating to the business of insurance.

Regarding the second factor, the Supreme Court has stated that "[t]he broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance."  United States Dep't of Treasury v. Fabe, 508 U.S. 491, 505 (1993) (quoting Black's Law Dictionary 1236, 1286 (6th ed. 1990), and holding that an Ohio statute reverse preempted the federal statute under the McCarran-Ferguson Act to the extent that it protected policyholders).  "Statutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly are laws regulating the 'business of insurance.'"  SEC v. Nat'l Securities, Inc., 393 U.S. 453, 460 (1969).  In Fabe, the Court.  508 U.S. at 493.  The Supreme Court has identified three criteria to determine whether a state law regulates the business of insurance:  (1) "whether the practice has the effect of transferring or spreading a policyholder's risk"; (2) "whether the practice is an integral part of the policy relationship

between the insurer and the insured"; and (3) "whether the practice is limited to entities within the insurance industry." Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982). Although none of the Pireno factors are necessarily determinative, an examination of the factors may lead to a finding that state law regulates the business of insurance. Am. Bankers Ins. Co. of Fla. v. Inman, 436 F. 3d 490, 493 (5th Cir. 2006).

In Evans v. TIN, Inc., Civil Action Nos. 11-2067, 11-2068, 11-2069, 11-2182, 11-2348, 11-2351, 11-2417, 11-2949, 11-2985, 11-2987, 11-3018, 11-3021, 11-3048, 11-3049, 12-18, 11-3050, 2012 WL 2343162, at *10 (E.D. La. June 20, 2012), the Eastern District of Louisiana court held that the Louisiana Direct Action Statute ("LDAS") is a statute that was enacted for the purpose of regulating the business of insurance:

> First, the LDAS regulates risk by subjecting all policy disputes regarding [insurance] coverage to the possibility of a jury trial. Second, the LDAS forms an integral part of the insurer-insured relationship because it controls how disputes regarding [insurance] coverage will be resolved. Finally, the LDAS only applies with respect to claims asserted under polic[ies] or contract[s] of liability insurance and it is, therefore, limited to entities within the insurance industry.

Id. (internal quotations omitted). The Fifth Circuit has also recognized that "Louisiana's direct action statute is arguably a state law regulating insurance, [and that] the McCarran Ferguson Act may allow it to trump federal law …."

Guam's Direct Action Statute, found at 22 GCA § 18305, is virtually identical to the LDAS[8], stating:

> On any policy of liability insurance the injured person or his heirs or representatives shall have a right of direct action against the insurer within the terms and limits of the policy, whether or not the policy of insurance sued upon was written or delivered in Guam, and whether or not such policy contains a provision forbidding such direct

---

[8] The LDAS provides in part:

> The injured person or his survivors or heirs …, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy … This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana ….

Evans, 2012 WL 2343162, at *6 (quoting La. Rev. Stat. Ann. § 22:1269).

action, provided that the cause of action arose in Guam.  Such action may be brought
against the insurer alone, or against both the insured and insurer.

22 GCA § 18305.  Like the LDAS, Guam's Direct Action Statute regulates risk by subjecting all

policy disputes regarding insurance coverage to the possibility of a jury trial, Guam's Direct Action

Statute forms an integral part of the insurer-insured relationship because it controls how disputes

regarding insurance will be resolved, and Guam's Direct Action Statute only applies with respect to

claims asserted under policies or contracts of liability insurance and it is, therefore, limited to entities

within the insurance industry.  Thus, the second factor is met.

As for the third factor, the Supreme Court has defined the terms "invalidate," "impair," and

"supersede."  Humana, Inc. v. Forsyth, 525 U.S. 299, 311 (1999).  "The term 'invalidate' ordinarily

means 'to render ineffective, generally without providing a replacement rule or law.' …  And the

term 'supersede' ordinarily means 'to displace (and thus render ineffective) while providing a

substitute rule.'"  Id.  Here, Debtors are applying sections 105(a) and 1123(b) to prohibit survivors

and anyone else from directly suing insurers of Debtors, local councils, chartered organizations, and

any other entity that receives a form of protected party status.  Permitting this application of the

Bankruptcy Code will surely invalidate, impair, and/or supersede Guam's Direct Action Statute as it

is applied to survivors of child sexual abuse in Guam.  If Debtors are granted their requested

injunction, then survivors, including Lujan Claimants, will be prevented from enjoying the direct

action rights granted them by the Guam Legislature, which Congress has charged with regulating the

business of insurance.  They will no longer be allowed to sue insurers for the abuse they suffered,

even though there is coverage to pay for their abuse.  The third factor is undisputedly met.

As the Plan runs afoul of the McCarran-Ferguson Act, which requires that Guam's Direct

Action Statute reverse preempt conflicting Bankruptcy Code provisions that do not specifically relate

to insurance and thus preserves Lujan Claimants' right to directly sue insurers, the Plan must be

denied confirmation.

**2.  Even if the McCarran-Ferguson Act Does Not Apply, the Sale or Transfer of Insurance Policies of Nonprofit Boy Scouts of America Remain Subject to and Cannot Impair Guam's Direct Action Statute.**

Although the Plan identifies settlements with insurers without actually providing written settlement agreements, the Plan clearly includes settlements with insurers for the sale of BSA's rights to insurance policies pursuant to section 363 of the Bankruptcy Code.  However, under 11 U.S.C. § 363(d)(1), a sale of property in the case of a nonprofit debtor, such as the BSA, must comply with applicable nonbankruptcy law.

The leading treatise on insurance law explains why the extinguishment of Lujan Claimants' direct action rights as part of insurance policy buybacks cannot be approved by this Court:

> A completed surrender and cancellation of an insurance policy terminates the contract, and the parties are relieved from any liability that might otherwise accrue under the policy, though not from liability already accrued.
> …  Where the contract of insurance provides for liability to third persons, the insurer and the insured cannot terminate such a contract by their voluntary action to the prejudice of a claimant's rights which have already vested.  …
> A mutual rescission of a liability policy by the insurer and the named insured does not abrogate the accrued rights of the omnibus insureds without their consent. …
> A provision in a liability policy giving the injured person a right of action over against the insurer cannot be cancelled by the insurer, even with the consent of the insured, after the injured person's identity has been established.

*Couch on Ins.* § 31:49 (3d ed. 2020).

The insurer and insured cannot agree to modify the rights of the injured person against the insurer, including by cancelling the provision in the contract giving the injured person a right of action against the insurer, because the terms of Guam's Direct Action Statute are deemed to be part of every liability insurance policy governed by Guam law whether or not the parties expressly agree to its terms.  Decade's Monthly Income & App. Fund v. Whyte & Hirschbeck, S.C., 173 Wis. 2d 665, 676 (1993) (interpreting Wisconsin direct action statute similar to Guam's).  An insurer and insured may not rescind a liability policy after a known loss.  Society Ins. v. Capitol Indem. Corp., 260 Wis. 2d 549, 555-56 (Ct. App. 2003); In re Estate of Gardinier, 40 N.J. 261 (1963); Rauch v.

<u>Am. Fam. Ins. Co.</u>, 115 Wis. 2d 257, 267 (1983) ("[U]pon the happening of an accident, the injured party acquires an interest in the policy that cannot be foreclosed by litigation or agreement between the insurer and insured alone.").

The buyback of an insurance policy after an accident is a prohibited rescission or cancellation of the policy.  M. Quinn, The Insurance Buyback, 28 Ins. Litig. Rptr. 661, 666 (No. 18 2006) (insurance buyback not typical purchase of insurance policy but more like a rescission or cancellation of policy).  The buyback of insurance policies is not saved by section 363 because the Bankruptcy Code cannot preempt Guam's direct action insurance laws.  It is not saved by section 1123(a)(5), which authorizes a "sale" that might not otherwise be permitted under applicable bankruptcy law, because Guam law is not anti-sale; it is anti-rescission.  Any modification of policy terms among Debtors and insurers cannot rescind the policies or eliminate Lujan Claimants' and other direct action Survivors' statutorily fixed rights.

Further, the Court cannot approve sale of the insurance policies free and clear of Survivors' interests under section 363(f), as none of the subsections of section 363(f) can be satisfied.  Subsection (f)(1) does not apply because applicable nonbankruptcy law does not permit the sale of the policies free and clear of Lujan Claimants' direct action rights.  Subsection (f)(2) cannot be satisfied because Lujan Claimants absolutely do not consent to the insurance policy buybacks and Debtors have not and cannot offer any evidence of Lujan Claimants' consent.  Subsection (f)(3) is irrelevant because Lujan Claimants' direct action rights, while similar to liens, are not technically liens.  Subsection (f)(4) is not met as Lujan Claimants' direct action rights are established by Guam's Direct Action Statute and the rights established by that statute are not in dispute.  Subsection (f)(5) cannot be satisfied as the Plan provides no money satisfaction to Lujan Claimants for the extinguishment of their direct action interests in the policies.  Further, the policies applicable to Lujan

Claimants have no aggregate limits and, based on the present funding in the Plan, including insurance settlements, the Plan cannot provide Lujan Claimants full payment of their claims.

Additionally, the requirements of section 1123(a)(5)(D) of the Bankruptcy Code are not met. Section 1123(a)(5)(D) requires that a plan provide adequate means for its implementation, including a sale of estate property. This clause prohibits the violation of Guam law barring insurance policy buybacks for at least for reasons. First, the sale would frustrate Guam's Direct Action Statute, which preempts section 1123 under the McCarran-Ferguson Act. Second, Guam law prohibiting the post-occurrence modification of an injured person's rights is not anti-sale; it is anti-rescission. Third, section 1123(a)(5)(D), which was enacted in 1980, cannot apply to pre-enactment claims because retroactive application violates Lujan Claimants' Fifth Amendment property rights. More than 70 Lujan Claimants have direct action claims that accrued prior to 1980, when section 1123(a) was amended to add the phrase, "[n]otwithstanding any otherwise applicable nonbankruptcy law." Shipman v. Kenosha Unified School Dist., 57 Wis. 2d 697, 704-05 (1973). The application of this phrase retroactively to preempt Guam's Direct Action Statute abrogates Lujan Claimants' "substantive" causes of action against settling insurers in violation of Lujan Claimants' Fifth Amendment due process rights. United States v. Security Ind. Bank, 103 S. Ct. 407, 413-14 (1982); Malpeli v. Beneficial Fin. Co. (In re Malpeli), 7 B.R. 508, 511 (Bankr. N.D. Ill. 1980). Fourth, the Court cannot approve the insurance buyback settlements under section 1123(a)(5)(D) because its free and clear provision is limited to sales free of "liens." 11 U.S.C. § 1123(a)(5)(D). Lujan Claimants' interests in the insurance policies, while similar to liens, are not technically liens as they do not secure payment of a debt.

### 3. The Plan Fails to Adequately Protect and Compensate Direct Action Claimants for Their Interests in Insurance Policies.

Assuming the insurance policy buybacks are lawful sales under section 363(f), the Plan must provide Lujan Claimants with adequate protection and compensation for their interests in the

insurance policies.  11 U.S.C. § 363(e).  The word "interest," as used in section 363(f), is to be interpreted broadly.  Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.), 327 F. 3d 537, 545 (7th Cir. 2003)).  Lujan Claimants have an interest in BSA's (and other tortfeasors') insurance policies since they have prejudgment direct action rights against insurers under Guam law.  Prejudgment direct action claimants, like Lujan Claimants, are third party beneficiaries to insurance policies, Litton v. Ford Motor Co., 554 So. 2d 99, 103 (La. Ct. App. 1989) ("Under the well-established jurisprudence, the general public as a class is also a third party beneficiary of liability insurance coverage."), with rights in the policies that vest "at the time of the tort," Hayes v. New Orleans Archdiocesan Cemeteries, 805 So. 2d 320, 323 (La. Ct. App. 2001) ("The Direct Action Statute vests the injured party with rights at the time of the tort to institute an action directly against the insurer within the terms and limits of the policy.").[9]  An accrued cause of action, such as for negligence, is a vested property interest entitled to due process protection that accrues on the date of the plaintiff's injury.  Matthies v. Positive Safety Mfg. Co., No. 99-0431, 2000 WL 892825, at *3 (Wis. Ct. App. July 5, 2000) (citing Hunter v. Sch. Dist. Gale-Ettrick-Trempealeau, 97 Wis. 2d 435, 442, 445 (1980), and Martin v. Richards, 192 Wis. 2d 156, 206 (Wis. 1995)).

If the debtor's property is subject to an interest of another party, the debtor must provide adequate protection to the creditor.  In re Lee, 25 B.R. 135, 139 (Bankr. E.D. Pa. 1982).  The interest of the creditor must be adequately protected before the bankruptcy court will order turnover of these funds to the debtor.  Id.  The debtor bears the burden of proving the existence of adequate protection for the creditor's interest.  Id.  The court has the authority to condition or prohibit any sale of property as is necessary to provide adequate protection to the secured creditor's interest.  In re Collins, 180

---

[9] In cases brought under Guam's Direct Action Statute, the Supreme Court of Guam has relied upon Louisiana court decisions in cases brought under its similar LDAS.  See, e.g., Reyes v. First Net Ins. Co., 2009 Guam 17 ¶ 29 (citing Welch v. Crown Zellerbach Corp., 359 So. 2d 154, 156 (La. 1978), and Hannie v. Wall, 569 So. 2d 1044, 1050 (La. Ct. App. 1990

B.R. 447, 452 (E.D. Va. 1995). The commonly accepted method for adequately protected a secured creditor when a sale is authorized under section 363(f) is to order the liens or interest to attach to the proceeds of the sale. Id.

In this case, the Plan provides Lujan Claimants with zero compensation or protection for their interests in the insurance policies. There is no attempt in the Plan to compensate or protect Lujan Claimants for the loss of statutory rights granted by the Legislature of Guam to directly sue insurers for payment of their abuse claims. Despite their status as prejudgment direct action Survivors with interests in insurance policies, the Plan treats Lujan Claimants the same as all other Survivors who lack prejudgment direct action rights, as all insurance proceeds will be paid to all Survivors with allowed claims. Since the insurance proceeds will be shared among all Survivors, regardless of whether they have direct action rights, then, at the very least, prejudgment direct action Survivors, including Lujan Claimants, should be granted a priority right to proceeds of insurance policy buybacks. A priority right to the insurance proceeds is consistent with Guam's Direct Action Statute, as the Guam Legislature, in enacting its direct action statute, prioritized the ability of injured persons to recover payment from insurers by allowing them to directly sue insurers. As the Plan fails to provide Lujan Claimants with adequate protection and compensation for the loss of their direct action rights against insurers, as part of insurance policy buybacks, the insurance settlements (and any future insurance settlements between presently non-settling insurers with Debtors or the Settlement Trust) must be denied approval and the Plan must be denied confirmation.

### 4. The Plan Treats Lujan Claimants Unequally, Compared to Survivors who Lack Prejudgment Direct Action Rights.

Under section 1123(a)(4) of the Bankruptcy Code, "a plan shall— … provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Here, Lujan Claimants are not being provided equal treatment compared to Survivors

who lack direct action rights.  Lujan Claimants are being forcibly deprived of their direct action rights without any compensation or protection.  Yet, Survivors without direct action rights give up no such rights and then are treated the same as Lujan Claimants under the Plan.  As Lujan Claimants are being forced to give up more rights in exchange for the same treatment as Survivors who lack such rights, the Plan treats them unequally and it must be denied confirmation.

**D.     THE PLAN VIOLATES THE AUTOMATIC STAY IN THE ARCHBISHOP OF AGANA BANKRUPTCY CASE AND WRONGLY DIVESTS THE ARCHBISHOP OF ITS INTEREST IN BSA INSURANCE POLICIES.**

As argued by the Guam Committee, the Plan violates the automatic stay provided for by 11 U.S.C. § 362 in the Archbishop of Agana bankruptcy case by disposing of estate property including debtor Archbishop's rights and interest as an additional insured to BSA insurance policies.  The automatic stay protecting the Archbishop's estate property went into effect on January 16, 2019, when the Archbishop filed for bankruptcy.  The Archbishop's rights and interest in BSA insurance policies are part of the Archbishop's bankruptcy estate pursuant to 28 U.S.C. § 541, subject to the exclusive jurisdiction of the District Court of Guam, 28 U.S.C. § 1134.  As the Plan sells the Archbishop's interest in BSA insurance policies, including the Century and Hartford insurers' policies, and enjoins the Archbishop from making claims against BSA insurers, all without the consent of the Archbishop or the approval of the Guam bankruptcy judge, the Plan obviously violates the automatic stay since the sales and injunction are acts "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  The Plan cannot be confirmed when it violates the automatic stay of another bankruptcy action.

Even if the Archbishop of Agana were not in bankruptcy, the Plan is unconfirmable since it involves the wrongful exercise of jurisdiction over nondebtors' interests in BSA insurance policies.  A bankruptcy court lacks jurisdiction over property rights outside of the estate, and therefore lacks

jurisdiction over a nondebtor's rights to insurance proceeds. The filing for bankruptcy does not endow a debtor with greater property rights than it would have had outside of bankruptcy. Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1663 (2019). In relation to insurance, where there are multiple insured parties under a policy, "the bankruptcy estate owns only the debtor's interest, not the co-insured's interest." In re Archdiocese of St. Paul & Minneapolis, 579 B.R. 188, 202 (Bankr. D. Minn. 2017); see also In re Sportstuff, Inc., 430 B.R. 170, 178 n.15 (8th Cir. 2010) ("While the bankruptcy court may exercise jurisdiction over (a liability insurance) policy, the interests of the co-insured, a nondebtor, are not property of the estate. To hold otherwise would allow the court to impair a third party's contract and property rights."). Thus, the Court has jurisdiction only over Debtors' rights to the insurance policies, and not over nondebtors' rights to the insurance policies, including additional insureds such as the Archbishop of Agana. Lacking jurisdiction over nondebtors' interests in BSA insurance policies, the Court cannot sell the policies free and clear of the coinsureds' interests, including the Archbishop of Agana's interests, and cannot enjoin the coinsureds from exercising their rights as to the policies.

**E.      THE COURT LACKS JURISDICTION TO APPROVE THE SALE AND SETTLEMENT OF 1976 AND 1977 HARTFORD POLICIES, AS BSA PREVIOUSLY RELEASED ITS RIGHTS TO THESE POLICIES.**

Hartford has asserted before this Court that "Hartford A&I primary policies no. 10CA-43349E, for policy period January 1, 1976 to January 1, 1977, and no. 10CA43359E, for policy period January 1, 1977 to January 1, 1978, were released by BSA pursuant to a confidential settlement agreement." Hartford Accident & Indemnity Co. v. Boy Scouts of America, Case No. 20-50601-LSS, Compl. ¶ 90 (Bankr. D. Del. May 15, 2020). As BSA released these policies, and so is not entitled to coverage for sexual abuse claims, these policies (including any proceeds to cover sexual abuse claims) cannot be part of the bankruptcy estate in this case since BSA has no legal or equitable interests in these policies. 11 U.S.C. § 541. The same is true as to any other policies

released by BSA or limited as to coverage.    Accordingly, the Court lacks jurisdiction over these policies and cannot approve sales free and clear of others' interests (including local councils, chartered organizations including the Archbishop of Agana, and direct action Survivors including Lujan Claimants) in these policies.

**F.    THE PLAN IS NOT MADE IN GOOD FAITH AS BSA "GAMED THE SYSTEM" BY ESTABLISHING DELAWARE BSA, LLC, IN ORDER TO ALLOW BSA TO FILE FOR BANKRUPTCY WITHIN THE THIRD CIRCUIT INSTEAD OF THE FIFTH CIRCUIT.**

Under 11 U.S.C. § 1129(a)(3), a plan of reorganization may only be confirmed if the court finds that plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). In determining a debtor's good faith, a court should consider the following factors: "'(1) fosters a result consistent with the [Bankruptcy] Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) [exhibited] a fundamental fairness in dealing with the creditors.'" In re W.R. Grace & Co., 475 B.R. 34, 87-88 (Bankr. D. Del. 2012) (quoting Genesis Health Ventures, Inc., 266 B.R. 591, 609 (Bankr. D. Del. 2001).

Regarding the first factor, the Supreme Court has identified two purposes of Chapter 11 as: "(1) preserving going concerns; and (2) maximizing property available to satisfy creditors." In re W.R. Grace, 475 B.R. at 88 (citing Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999). Here, Delaware BSA, LLC was never a going concern and it will not be a going concern after confirmation of the Plan; it will be dissolved on the Effective Date. (Plan Art. V.F.) Delaware BSA, LLC, was incorporated under the laws of Delaware on July 11, 2019, only 7 months before Debtors filed for bankruptcy in Delaware. (Am. Disclosure Statement (D.I. 6445) at 49.) As it will dissolve on the Effective Date, the Plan is not made for the purpose of preserving Delaware BSA, LLC, as a going concern, which it never was. As discussed at length earlier, Debtors have failed to maximize property available to satisfy Survivors, as Debtors entered

into low policy buyback agreements with insurers and low settlements with local councils, and seek to release and enjoin Survivors' claims against nondebtors without Survivors' consent. This factor supports a finding of lack of good faith.

The second factor requires that the plan be proposed with honesty and good intentions, and that it have a "'reasonable hope of success.'" In re W.R. Grace, 475 B.R. at 88 (quoting In re Sun Country Dev., Inc., 764 F. 2d 406, 408 (5th Cir. 1985)). In determining whether a plan was proposed for honest and good reasons, courts routinely look to whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists. Id. In the case, Debtors have willfully abused the judicial process by violating the automatic stay protecting the bankruptcy estate of debtor Archbishop of Agana. Despite their awareness of the Guam bankruptcy case and that the Archbishop's interest in BSA insurance policies are part of the Archbishop's bankruptcy estate, Debtors persisted in preparing multiple plans (including the current Plan) which disposed of the Archbishop's interests in the policies. Further, Debtors filed the Plan just 10 days before the voting deadline, and failed to make further disclosures to Survivors of the material changes contained in the Plan. Debtors failed to disclose to Lujan Claimants that their rights to recover in the Guam bankruptcy case for scouting-related abuse were largely being extinguished by the Plan. Debtors' dishonesty and bad intentions demonstrate their bad faith in proposing the Plan.

As for the third factor, courts should consider if the debtor exhibited a fundamental fairness when dealing with its creditors. In re W.R. Grace, 475 B.R. at 89. This factor is satisfied when the plan treats all parties fairly and ensures that its confirmation comports with due process. Id. Debtors' Plan fails to treat all parties fairly, as it treats Lujan Claimants, who have and would lose under the Plan direct action rights to sue insurers, the same as other Survivors who lack such statutory rights, and fails to adequately compensate or protect Lujan Claimants for their interests in BSA insurance

policies. Debtors have also exhibited a fundamental unfairness when dealing with creditors, particularly Survivors. Debtors "gamed the system" by creating Delaware BSA, LLC, in order to allow BSA to file for bankruptcy in the Third Circuit pursuant to 28 U.S.C. § 1408(2), and to avoid having to file for bankruptcy within the Fifth Circuit, which does not permit nonconsensual releases and permanent injunctions of third party claims against nondebtors, see In re Pac. Lumber Co., 584 F. 3d 229, 252 (5th Cir. 2009). In doing so, Debtors relentlessly seek to deprive Survivors of their direct claims against nondebtors, which would not be permitted by a bankruptcy court in the Fifth Circuit. As Debtors are doing everything they can to leave no liable-for-child-sexual-abuse nondebtor behind, they have been fundamentally unfair to Survivors who would have been able to continue pursuing direct claims against at least local councils and chartered organizations if this case had been rightfully filed in the Fifth Circuit. This factor supports a finding of bad faith by Debtors.

As Debtors proposed this Plan without good faith, the Plan must not be confirmed.

## G.    THE PLAN FAILS TO PROPERLY CLASSIFY THE CLAIMS OF LUJAN CLAIMANTS.

Pursuant to section 1122 of the Bankruptcy Code, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Here, the Plan places prejudgment direct action Survivors, including Lujan Claimants, within the same class as Survivors who lack the statutory right to sue insurers without first obtaining a judgment and without having to name the insured. These direct action claimants are not substantially similar to other Survivors who have no interests in insurance policies, and therefore are not entitled to adequate protection or compensation from sales of insurance policies. In addition to having direct action rights, Lujan Survivors have an open civil statute of limitations to bring suit for child sexual abuse. They should be separately classified, as the Bankruptcy Code requires their different treatment.

**H.      EVEN IF LUJAN CLAIMANTS' CLAIMS ARE PROPERLY CLASSIFIED, THE PLAN TREATS SURVIVORS UNEQUALLY COMPARED TO OTHER CLASSES OF UNSECURED CREDITORS.**

"The Code does not require that all creditor classes be treated equally, only that there be a reasonable basis for any differentiation." In re Purdue Pharma, 2021 WL 5979108, at *71 (citing Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship), 21 F. 3d 477, 482-83 (2d Cir. 1994)).  Here, the unsecured creditor classes are not being treated equally under the Plan.  Class 6 General Unsecured Creditors have an estimated percentage recovery of 75 to 95%.  (Am. Disclosure Statement at 27.)  Class 7 Non-Abuse Litigation Claims are estimated to recover 100% of the value of their claims.  (Id. at 28.)  Class 8 Direct Abuse Claims have an estimated percentage recovery of 10 to 21% if the claims' total value (including future, unknown claims) is $7.1 billion, and an estimated percentage recovery of 31 to 63% if the claims value totals $2.4 billion.  (Id.)  Only Class 9 Indirect Abuse Claims might fare worse than Survivors, as their estimated recovery percentage is "Unknown."  (Id. at 30.)  There is no reasonable basis to give significantly worse treatment to Survivors, compared to General Unsecured Creditors and Non-Abuse Litigation Claims.  The horrors of child sexual abuse and its lingering effects cannot be overstated.  There is no reason that Non-Abuse Litigation Claims should have first dibs on BSA insurance proceeds, and then, where there is a shortfall, be guaranteed a cash payment of the lesser of the remaining unsatisfied portion of the claim and $50,000.  (Id. at 28-29.)  The Plan puts Survivors of child sexual abuse at the back of the line without reasonable justification.  The Plan should not be confirmed.

//

//

//

//

//

## III. CONCLUSION

Based on the foregoing, the Plan must be denied confirmation for multiple failures to comply with the Bankruptcy Code.

Dated: February 7, 2022.                     Respectfully submitted,

 /s/ Christopher D. Loizides
Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 North King Street, Suite 800
Wilmington, DE 19801
Phone: 302.654.0248
Email: Loizides@loizides.com

and

LUJAN & WOLFF LLP

 /s/ Delia Lujan Wolff
Delia Lujan Wolff
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Phone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email:  dslwolff@lawguam.com
*Attorneys for Lujan Claimants*

# APPENDIX A

The foregoing Lujan Claimants' Objection to Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Joinder in Objection Filed by Guam Committee was filed by the following creditors who each filed a Sexual Abuse Survivor Proof of Claim and are represented by Lujan & Wolff LLP.  The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim, including amendments thereto.

| | | | | |
|---|---|---|---|---|
| 248 | 2991 | 6824 | 25063 | 79403 |
| 1551 | 3051 | 7976 | 25069 | 79769 |
| 1670 | 3120 | 7977 | 33028 | 80328 |
| 1677 | 3385 | 8037 | 35352 | 80655 |
| 1746 | 3610 | 8038 | 35354 | 80982 |
| 1757 | 3612 | 10548 | 38591 | 87715 |
| 1765 | 3614 | 11250 | 40889 | 87757 |
| 1913 | 3616 | 11251 | 40890 | 96418 |
| 1953 | 4855 | 14187 | 45700 | 96419 |
| 2003 | 4857 | 15104 | 45702 | 103377 |
| 2010 | 4859 | 15139 | 48168 | 103378 |
| 2011 | 5646 | 17480 | 58317 | 4858 |
| 2394 | 5646 | 18860 | 58370 | 4860 |
| 2403 | 5648 | 18873 | 67267 | |
| 2433 | 5655 | 22872 | 67286 | |
| 2597 | 6432 | 22873 | 67293 | |
| 2840 | 6434 | 22874 | 73585 | |
| 2885 | 6823 | 23388 | 73607 | |