**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>BOY SCOUTS OF AMERICA<br>AND DELAWARE BSA, LLC[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>**Hearing Date: February 22, 2022 at 10:00 a.m.**<br>**Objection Deadline: February 7, 2022 at 4:00 p.m.** |

**UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF THE SECOND
MODIFIED FIFTH AMENDED PLAN OF REORGANIZATION FOR BOY SCOUTS OF
AMERICA AND DELAWARE BSA, LLC**

Andrew R. Vara, the United States Trustee for Region 3 ("U.S. Trustee"), through his

undersigned attorneys, objects to confirmation of the Second Modified Fifth Amended Plan of

Reorganization for Boy Scouts of America and Delaware BSA, LLC (the "Plan")[2] (D.E. 7832),

and states as follows:

**PRELIMINARY STATEMENT**

The U.S. Trustee is very aware of the difficult and painful history behind these chapter 11

cases and the great harm that the many abuse survivors have suffered in the years leading up to

these bankruptcy filings.  The U.S. Trustee also appreciates the challenging and painstaking

work by the Debtors, many insurers, and the representatives of abuse survivors to craft a plan

that presently contains approximately $2.6 billion in aggregate financial commitments to fund a

settlement trust along with many institutional and oversight reforms demanded by survivors.

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's
federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware
BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas
75038.

[2]     Capitalized terms shall have the same meaning given them in the Plan, Disclosure
Statement, or RSA Motion unless otherwise noted herein.  The Plan provisions relevant to this
Objection are included in **Exhibit A** attached hereto, which is incorporated herein by reference.

The U.S. Trustee has a statutory role in these cases as the watchdog of the bankruptcy system to ensure faithful and consistent application of the law, and therefore files this objection to the Plan for seven separate and independent reasons:

**First**, the Plan's non-consensual third-party releases, which release claims against numerous non-debtor parties (other than the Perpetrators of abuse), violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution. **Second**, the Plan's non-consensual third-party releases are not authorized by any provision of the Bankruptcy Code. **Third**, the Plan's non-consensual third-party releases do not comply with Third Circuit precedent. **Fourth**, the Plan impermissibly seeks to treat Plan provisions, and the Plan itself, as a "settlement" subject to the standards of Federal Rule of Bankruptcy Procedure 9019. **Fifth**, the Plan contains impermissibly broad exculpation provisions. **Sixth**, the Plan provides for the payment of certain professionals' fees and expenses without satisfying the standards of 11 U.S.C. § 503(b)(3) and contrary to existing rulings in this case. And **seventh**, the Debtors have not shown that the Plan meets the requirements of 11 U.S.C. § 1129(a)(7), which applies to non-profit entities.

## JURISDICTION

1.      Under 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District. This oversight is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See, e.g.*, *In re United Artists Theatre Co. v. Walton*, 315 F.3d 217, 225 (3d Cir. 2003) (holding that United States Trustees "protect the public interest by aiding bankruptcy judges in monitoring certain aspects of bankruptcy proceedings"); *U.S. Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary

interest); *see also* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. at 88 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6049 (United States Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena").

2.    Under 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in chapter 11 cases, and to file "in connection with hearings under [11 U.S.C. §§ 1125 and 1128] comments with respect to such plans and disclosure statements" whenever the U.S. Trustee considers it to be appropriate.  Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the issues raised in this pleading.

## STATEMENT OF FACTS

### General Background

3.    On February 18, 2020, the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code.  This Court subsequently entered an order jointly administering the cases. On March 5, 2020, the U.S. Trustee appointed the Creditors' Committee and Tort Claimants' Committee.

4.    With their petitions, the Debtors filed a plan and disclosure statement (D.E. 20 & D.E. 21) that proposed that the Debtors, Chartered Organizations, Insurers, and Local Councils would fund a trust for the payment of holders of "Abuse Claims"—a class of unsecured creditors with claims related to sexual abuse against not only the Debtors but also against various non-debtor third parties.  In exchange for their contributions to the trust, the contributing parties would receive releases and be protected by a channeling injunction.  The plan did not provide the holders of Abuse Claims with a choice to opt out of the proposed third-party releases.

5.    On March 1, 2021, the Debtors filed an amended plan (D.E. 2293) that provided for third-party releases of non-debtors by holders of Non-Abuse Claims.  Unlike Abuse Claim

holders, Non-Abuse Claim holders in voting classes were provided with the opportunity to opt out of the proposed third-party releases.

6.      On September 15, 2021, the Debtors filed their fifth amended plan.  D.E. 6212. As subsequently modified, this plan was approved for solicitation on September 29, 2021.

7.      On December 18, 202, the Debtors filed the Second Modified Fifth Amended Plan (D.E. 7832), which is the Plan currently before this Court.  The definition of Abuse Claim was materially modified to include claims for breach of fiduciary duty, gross negligence, and willful misconduct.  In addition, the new defined term "Scouting-related" was added so as to distinguish sexual abuse that is "attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting" from all other forms of sexual abuse for which an Abuse Claim holder might have a claim.  As non-Scouting-related claims are excluded from the definition of Abuse Claim, they fall within the definition of Non-Abuse Claim.

**Plan Release Provisions—Parties Receiving Releases**

8.      The Plan provides third-party releases and channeling injunctions to a broad universe of non-debtor Released Parties.  These include:

- The Debtors;
- Reorganized BSA;
- The Related Non-Debtor Entities;
- The Creditors' Committee and its members;
- The Tort Claimants' Committee and its members;
- The Future Claimants' Representative;
- The Coalition (as either a group of law firms or as thousands of individual members);[3]
- JPMorgan Chase;

---

[3]    The Plan defines the Coalition as an "*ad hoc* committee composed of thousands of holders of Direct Abuse Claims that filed a notice of appearance in the Chapter 11 Cases on July 24, 2020 at Docket No. 1040."

- The Settling Insurance Companies;[4]
- The Contributing Chartered Organizations (*i.e.*, all Chartered Organizations making a court-approved contribution to the Plan);[5]
- The Foundation;
- The Ad Hoc Committee of Local Councils and its members;
- The Creditor Representative;
- The Mediators; and
- Each of the above-named parties' Representatives.[6]

9.      The Plan's definition of Released Parties does not include Perpetrators or

Pachulski Stang Ziehl & Jones LLP and its Representatives.  In addition, the Plan's definition of

Released Parties is subject to Article X.J, which contains the Plan's release provisions.

10.      The Plan also releases claims against the following Protected Parties and Limited

Protected Parties, even though they are not included in the definition of Released Parties:

- Each Local Council, regardless of whether it contributes to the Plan, and its Representatives;

- The Participating Chartered Organizations (*i.e.*, all Chartered Organizations that do not object to the Plan and do not opt out by advising the Debtors); and
- The Opt-Out Chartered Organizations (*i.e.*, all Chartered Organizations that are not contributing to the Plan and either object to the Plan or opt out by advising the Debtors).

---

[4]    As of February 7, 2022, only Hartford ($787 million), Chubb/Century ($800 million), Clarendon Insurance ($16.5 million), and Zurich American Insurance ($52.5 million) have agreed to become Settling Insurance Companies.

[5]    As of February 7, 2022, The Church of Jesus Christ of Latter-day Saints ($250 million) and the United Methodist Ad Hoc Committee ($30 million) are the only Contributing Chartered Organizations.

[6]    The term "Representatives" includes, with respect to each Person, the following 28 broad categories, most of which are not separately defined in the Plan: "(a) predecessors, successors, assigns, subsidiaries, and Affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) respective heirs, executors, estates, and nominees."  The actual Representatives being released are unknown—and, with respect to future entities such as "heirs" and "estates," unknowable.  In the case of the Coalition, the definitions of Released Parties and Representatives could release each of the 28 categories of Representatives for each of the thousands of Coalition members.

11.     Perpetrators are not included in any of the Plan's release provisions.

**Plan Release Provisions—Parties Whose Claims Are Being Released**

*Non-Abuse Claims*

12.     Pursuant to Articles I.A.231 and X.J.4 of the Plan, each holder of a Claim of any kind will release each of the Released Parties and their Representatives, but holders of Non-Abuse Claims in voting classes may opt out. The Non-Abuse Claims that will be released include those that are "known or unknown, foreseen or unforeseen, [and] existing or hereinafter arising." *See* Article X.J.4.

*Abuse Claims*

13.     Holders of Abuse Claims will release each of the Released Parties (if they also have Non-Abuse Claims) and the Protected Parties and Limited Protected Parties and their "successors and assigns" (with regard to their Abuse Claims), as well as all of those parties' myriad Representatives—but can only opt out of releases that are not related to sexual abuse. *See* Articles X.F, X.J.3 & X.J.4.

14.     The Abuse Claims that will be released include those that are "known or unknown, . . . foreseen or unforeseen, [and] existing or hereinafter arising." *See* Article X.J.3. Abuse Claims include Future Abuse Claims, which include claims of which the holder "was not aware . . . as a result of 'repressed memory.'" *See* Articles I.A.18 & I.A.124.

**Plan Injunction Provision Related to Releases**

15.     The Plan also enjoins all holders of Claims subject to Article X.J.'s release provisions from, among other things, "commencing, . . . continuing in any manner, [and] . . . enforcing" any action against any Released Party—except that Non-Abuse Claim holders are not enjoined "from taking any action arising out of, or related to, any act or omission of a Released

Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct." *See* Article X.L.1. There is no similar carve-out for Abuse Claim holders to take any action against Protected Parties or Limited Protected Parties arising from a criminal act or an act that constitutes fraud, gross negligence, or willful misconduct.

**Plan Settlement Provisions**

16.    The Plan includes a number of provisions that treat the Plan itself, the distributions thereunder, the Plan Documents, the Trust Distribution Procedures, and even the confirmation order, as a "settlement" that is subject to approval under Bankruptcy Rule 9019. *See* Articles III.B.3 through III.B.9; V.S; V.S.1; V.U; & IX.A.3.s.

**Plan Provisions Regarding Exculpation**

17.    Article X.K of the Plan, when coupled with the definition of Exculpated Party in Article I.A.114, provides exculpation for not only estate fiduciaries but also certain non-estate fiduciaries, and has a temporal scope that includes prepetition periods and possibly post-Effective Date periods.

18.    Article X.L.2, entitled "Injunction Related to Exculpation," enjoins not claims falling under the Exculpation provision, but claims that are discharged or released under other Plan provisions. This injunction also enjoins certain affirmative defenses.

**Plan Provision Regarding Compensation of the Coalition's Professionals' Fees**

19.    Article V.T of the Plan authorizes the payment of the Coalition Professionals' fees and expenses without complying with the Bankruptcy Code provisions governing the payment of administrative expenses.

**ARGUMENT**

## I.    Confirmation Standard

20.    A chapter 11 plan may not be confirmed unless this Court finds that the plan complies with the provisions of 11 U.S.C. § 1129(a).[7]  A plan proponent bears the burden of proof with respect to each element of section 1129(a).  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 598-99 (Bankr. D. Del. 2001).

## II.    The Plan Cannot Be Confirmed Because it Contains Non-Consensual Third-Party Releases That Violate the Fifth Amendment's Due Process Clause

21.    The Plan cannot be confirmed because it violates the due process rights of both holders of Non-Abuse Claims and holders of Abuse Claims.

### A.    Litigation rights against non-Debtors are property interests protected by the Due Process Clause.

22.    Under the Fifth Amendment's Due Process Clause, "[n]o person shall . . . be deprived of . . . property, without due process of law[.]"  U.S. Const., amend. V.  The right to due process is "a concept rooted in fairness and applicable to bankruptcy through the Fifth Amendment[.]"  *Wright v. Owens Corning*, 679 F.3d 101, 107 n.6 (3d Cir. 2012).

23.    Due process requires **(1)** notice "appropriate to the nature of the case" and "of such nature as reasonably to convey the required information," and **(2)** a meaningful opportunity to be heard. *Mullane v. Central Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950).  To be adequate for due process purposes, "[t]he notice must be of such nature as reasonably to convey the required information." *Id.*  In addition, "'[t]he fundamental requisite of due process of law is the opportunity to be heard'"—but "[t]his right to be heard has little reality or worth unless one

---

[7]    If an impaired class does not vote for a plan and the plan proponent seeks confirmation under section 1129(b)'s "cramdown" provision, the plan must still comply with every provision of section 1129(a) other than (a)(8).

is informed of the matter pending and can choose for himself whether to appear or default, acquiesce or contest." *Id.*

24.    A cause of action for damages is a property interest protected by the Constitutional guarantee of due process. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause.") (citing *Mullane*, 339 U.S. at 311, 313 & 315); *see also id.* at 429 ("This Court traditionally has held that the Due Process Clauses [of the Fifth and Fourteenth Amendments] protect civil litigants who seek recourse in the courts . . . as plaintiffs attempting to redress grievances."); *Martinez v. California,* 444 U.S. 277, 281–82 (1980) ("Arguably, the cause of action for wrongful death that the State has created is a species of 'property' protected by the [Fourteenth Amendment's] Due Process Clause."); *Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 209 (1958) (holding that the Fifth Amendment's Due Process Clause imposes "constitutional limitations upon the power of courts . . . to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause").

25.    As a result, "if a claimant is not afforded due process, a plan of reorganization and confirmation order that purport to discharge claims will not do so." *Owens Corning*, 679 F.3d at 107 n.6; *see also id.* at 107 ("Inadequate notice accordingly 'precludes discharge of a claim in bankruptcy.'") (quoting *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995)).

26.    Even assuming that this Court ever has authority outside of 11 U.S.C. § 524(g)[8] to extinguish direct claims of a debtor's creditor against non-debtors without such creditor's

---

[8]    Even in an asbestos-related bankruptcy case under section 524(g), the court does not have an unfettered equitable authority to release claims against non-debtors. Rather, the court may issue

consent—which the U.S. Trustee does not concede—the Plan's release provisions do not provide affected claimants with adequate notice or an ability to be heard, and as a result they violate the Fifth Amendment's Due Process Clause.

  **B.**  **The Plan extinguishes non-debtor claims without adequate notice.**

  27.  Under Article X.J.4, holders of Non-Abuse Claims (including those who also hold Abuse Claims) are deemed to release the Released Parties of their Non-Abuse Claims "to the maximum extent permitted by applicable law, as such law may be extended subsequent to the Effective Date," unless they opt out, or, in the case of creditors in unimpaired classes, file an objection. The claims and causes of action they will be deprived of include those that are "unknown," "unforeseen," and "hereinafter arising." *See* Article X.J.4. Article X.J.4 also provides, through the definition of Releasing Claim Holder, that employees and other persons and entities who are related to a creditor that is a Releasing Claim Holder (the "Related Releasing Parties" become a Releasing Claim Holder themselves. Because such Related Releasing Parties are not themselves creditors or interest holders of the Debtors, they almost certainly did not receive service of the confirmation hearing notice or any other document that would have notified them that releases would be imposed on them.

  28.  Under Article X.J.3, holders of Abuse Claims would release the Protected Parties and Limited Protected Parties of all claims related to sexual abuse "to the maximum extent permitted by applicable law, as such law may be extended subsequent to the Effective Date," with no ability to opt out. This mandatory release accompanies the Plan's channeling injunction, which directs all Abuse Claims to the Settlement Trust. *See* Article X.F.

---

a channeling injunction only as to claims that meet certain narrow factual criteria, and only where the plan satisfies an extensive set of additional procedural requirements. *See In re Combustion Eng'g. Inc.,* 391 F.3d 190, 238 (3d Cir. 2004).

29.     Under Article X.L.1, holders of Non-Abuse Claims and holders of Abuse Claims are "expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from," among other things, commencing or continuing with any action "in any forum" against "any Released Party or its property or successors or assigns." The only exception is for Non-Abuse Claims relating to "any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct."

30.     Although they are not at all clear, the apparent effect of Articles X.J.3 and X.L on Abuse Claim holders—including Future Abuse Claim holders who are not yet aware they have a claim—is that they will be foreclosed from asserting any sexual abuse claims related to Scouting against not only the Protected Parties and Limited Protected Parties, as indicated in Article X.J.3, but also the Released Parties. And the claims and causes of actions they will lose include those that are "unknown," "unforeseen," and "hereinafter arising." *See* Article X.J.3.

31.     The scope of the Plan's release provisions is so broad that the universe of parties that will be released, and the universe of parties whose claims will be extinguished, is unknown (and probably unknowable).

32.     Non-consensual third-party releases and injunctions such as those contained in the Plan have recently been described as: "represent[ing] the worst of [an] all-too-common practice, as they have no bounds"; having "sheer breadth [that] can only be described as shocking"; "shielding an incalculable number of individuals associated with [the] Debtors in some form"; "clos[ing] the courthouse doors to an immeasurable number of potential plaintiffs"; and "protecting corporate insiders who had no role in the reorganization of the [Debtors]." *Patterson v. Mahwah Bergen Retail Grp., Inc.*, No. 3:21cv167, 2022 WL 135398, at *3 (E.D.

Va. Jan. 13, 2022) (vacating confirmation order, severing release provisions from plan, ordering case to be reassigned to a bankruptcy judge in another division, and remanding for further proceedings). As a result, they "offend[] the most fundamental precepts of due process." *Id.*

33.     The interplay of Articles X.J.3, X.J.4, X.F, and X.L would be difficult enough for a sophisticated claimant to interpret; these provisions are probably impenetrable for both Non-Abuse Claim holders and Abuse Claim holders—most of whom are unsophisticated, many of whom are elderly, and some of whom are incarcerated. As a result, even after a thorough reading of the Plan the parties whose claims are being released will likely be unable to decipher the Plan's myriad release and injunction provisions to determine what claims they are being compelled to release or which parties are receiving releases. It is even less likely that they would understand that these provisions extinguish their claims against non-Debtor entities.

34.     Thus, the Plan's release provisions do not give either Non-Abuse Claim holders or Abuse Claim holders the notice required by the Due Process Clause, because they do not reasonably convey the required information to those whose rights are being extinguished. This is particularly true with regard to any claim holder that is not actually served with the Plan—including those that do not presently know they have a claim. Extinguishing the claim of any person not presently on notice that they have a claim against the Debtors, much less a claim against any of the legion of non-debtors and their many Representatives, would be a particularly egregious violation of the Due Process Clause.

**C.     The non-consensual releases violate the Due Process Clause because they extinguish litigation rights without the opportunity to be heard.**

35.     The Plan violates the due process rights of holders of both Abuse and Non-Abuse Claims because they are forced to relinquish their litigation rights without any opportunity to choose whether to litigate or to settle their claims. *See Duke Power Co. v. Carolina Env't Study*

*Grp., Inc.*, 438 U.S. 59, 94 (1978) (recognizing the deprivation of a "state-created right to recover full compensation for tort injuries" is a cognizable property right subject to due process analysis) (Stewart, J., concurring).

36.     This is true even if the Plan's release provisions reflect a settlement between the Debtors and the non-debtors receiving releases because "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party . . . without that party's agreement." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986).   The law "does not sanction efforts by trial judges to effect settlements through coercion," *Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985), and a court cannot impose a "settlement" on a party over that party's objection. *United States v. Ward Baking Co*., 376 U.S. 327, 334 (1964) (holding that a court could not enter a purported "consent" judgment without the government's actual consent).

37.     This is because thee "deep-rooted historical tradition that everyone should have his own day in court" is a fundamental right guaranteed by the Due Process Clause.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (*quoting Martin v. Wilks*, 490 U.S. 755, 762 (1989)).

38.     Thus, subject only to very limited exceptions not relevant here, the Due Process Clause protects litigants from being forced into settlements to which they have not consented. *See, e.g.*, *Ortiz*, 527 U.S. at 847 (1999) (holding that mandatory class action settlement of asbestos litigation violated due process rights of non-consenting plaintiffs).

39.      In *Ortiz*, the Supreme Court recognized that a narrow exception to this principle exists "in certain limited circumstances" such as "where a special remedial scheme exists

expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or

probate," and for limited-fund class actions under Rule 23(b)(1)(B). *Ortiz*, 527 US at 841, 846.

40.    The Court's reference to a "special remedial scheme" in *Ortiz* arose in the context

of discussing the principle that normally one is not bound by an *in personam* judgment in a

litigation in which he is not designated as a party or made a party by service of process. *Ortiz*,

527 U.S. at 846; *Martin*, 490 U.S. at 761.  Bankruptcy differs because the court exercises *in rem*

jurisdiction over the debtor's estate; thus, neither service of process nor personal notice is

necessary for a bankruptcy court to discharge a debtor's debts. *Hanover Nat'l Bank v. Moyses*,

186 U.S. 181, 192 (1902).  "A bankruptcy court is able to provide the debtor a fresh start . . .

despite the lack of participation of all of his creditors, because the court's jurisdiction is premised

on the debtor and his estate, ***and not on the creditors***." *Tennessee Student Assistance Corp. v.*

*Hood*, 541 U.S. 440, 447 (2004) (emphasis added).

41.    By contrast, where a bankruptcy court purports to enjoin a non-debtor's direct

claim against a non-debtor—as opposed to a claim against a debtor's estate property—

bankruptcy's "special remedial scheme" is "insufficient to sustain" such an order. *In re Johns-*

*Manville Corp.*, 600 F.3d 135, 153 n.13 & 154 (2d Cir. 2010) ("*Manville IV*").

> When such claims fall outside bankruptcy's remedial scheme, it is proper to
> require the application of analogous due process principles of "class action
> settlements." *Id*. at 154.  And as the Supreme Court has explained, "[i]n the
> context of a class action predominantly for money damages we have held that
> absence of notice and opt out violates due process." *Wal-Mart Stores, Inc. v.*
> *Dukes*, 564 U.S. 338, 363 (2011) (emphasis added).  This is because "a class
> action is an exception to the usual rule that litigation is conducted by and on
> behalf of the individual named parties only."  Id. at 348; see also id. at 364
> (emphasizing "the need for plaintiffs with individual monetary claims to decide
> for themselves whether to tie their fates to the class representatives' or go it
> alone") (emphasis in original).

42.    Nor could this "settlement" be coerced under an analogous rules-based framework

of a class action. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597-98 (1997).  At least

14

twice, the Supreme Court rebuffed attempts by courts to address a national asbestos litigation crisis in ways that would bind class action plaintiffs without permitting them a chance to decline the settlement. *Ortiz*, 527 U.S. at 845-48; *Amchem Prods.*, 521 U.S. at 597-98. The Supreme Court has held that in adjudicating claims for monetary damages, "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class . . . ." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

43.    The same due process concerns apply here. Yet no class action has been certified.

44.    Because the Plan's broad and impenetrable release provisions violate the due process rights of Non-Abuse Claim holders, Abuse Claim holders, and Related Releasing Parties, so the Plan cannot be confirmed.

## III.    The Plan Cannot be Confirmed Because There is no Authority in the Bankruptcy Code for the Non-Consensual Release of Claims Against Non-Debtor Third Parties

45.    The Plan also cannot be confirmed because it purports to grant non-consensual releases of claims against non-debtors, which is not authorized by any provision of the Bankruptcy Code.

### A.    No Bankruptcy Code provision authorizes the releases contained in the Plan.

46.    Section 1129(a)(1) prohibits confirmation of a plan that does not comply with "applicable provisions" of the Bankruptcy Code.

47.    Although the treatment of Abuse Claims in Article X.J.3 and Non-Abuse Claims in X.J.4 are styled as "releases," when combined with the Article X.F channeling injunction and Article X.L injunction, the Plan would effectively discharge the liabilities—especially those related to sexual abuse—of the non-debtor Released Parties, Protected Parties, and Limited Protected Parties. However, no Bankruptcy Code provision authorizes the bankruptcy court to discharge the debts of a non-debtor.

48.    Indeed, Code section 524(e) specifically provides to the contrary: "[a] discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." *See* 11 U.S.C. § 524(e).

49.    Congress authorized bankruptcy courts to impose non-debtor releases in one narrow circumstance:  in asbestos-related cases, where the plan can enjoin claims against a specified set of non-debtors.  *See* 11 U.S.C. § 524(g);[9] *see also Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1402 n.6 (9th Cir. 1995) ("The numerous requirements of § 524(g) make it clear that this subsection constitutes a narrow rule specifically designed to apply in asbestos cases only, where there is a trust mechanism and the debtor can prove, among other things, that it is likely to be subject to future asbestos claims.").

50.    Section 524(g) authorizes bankruptcy courts to enjoin actions against a subset of third parties where the debtor establishes trusts to which all asbestos claims are channeled—and even then only to the extent the third party "is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor."  11 U.S.C. § 524(g)(2)(B)(i) & (4)(A)(ii).

---

[9]    Section 111(b) of the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, which added section 524(g) to the Bankruptcy Code, included an uncodified "rule of construction" stating that "[n]othing in [the subsection of the Reform Act that added section 524(g)] shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."  108 Stat. 4117 (1994).  Even though it was not codified in the United States Code, its publication in the Statutes at Large gives that rule of construction the force of law.  *See United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993); *see also* 1 U.S.C. § 112 ("The United States Statutes at Large shall be legal evidence of laws[.]").  Section 524(g) was intended to protect reliance interests and to provide certainty to the asbestos trusts established under the *Manville* model before the 1994 legislative amendment; it was *not* an endorsement of the use of channeling injunctions in non-asbestos contexts.  *See Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts,* GAO Report No. 11-819, at 8 n.13 (Sept. 2011) ("Lingering concerns as to whether the injunction issued as part of [the Johns-Manville Corporation's] plan could withstand all challenges underscored the 1994 amendment modeled after this approach.") (referring to trust and channeling injunction model affirmed by *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89 (2d Cir. 1988)).

Because that was the only exception created by Congress there are no other exceptions, and no new exceptions can be created by the courts. *Cf. Law v. Siegel*, 571 U.S. 415, 424 (2014) ("The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions.").

51.     There is an obvious justification for section 524's limitations: "it is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders." *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 600 (10th Cir. 1990), *modified sub nom. Abel v. West*, 932 F.2d 898 (10th Cir. 1991). "Together, the language of these sections [524(a) and (e)] reveals that Congress sought to free the debtor of his personal obligations while ensuring that no one else reaps a similar benefit." *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992).

52.     Congress knew when it enacted section 524(g) that "there were non-asbestos bankruptcies with thousands of claimants and nationwide implications," and even knew of "the 'experimentation' with *Manville*-like relief that was beginning in other industries." *See In re Purdue Pharma L.P.*, No. 21-7532, 2021 WL 5979108, at **66 (S.D.N.Y. Dec. 16, 2021). Nevertheless, "Congress declined to make this extraordinary form of relief—relief that ran counter to the fundamental purpose of the Bankruptcy Code—available in circumstances other than asbestos bankruptcies." *Id*.

53.     Despite having had numerous opportunities since enacting section 524(g) to amend the Bankruptcy Code to provide for non-consensual third-party releases in non-asbestos cases, Congress has never done so. This 27-year silence "speaks volumes." *Id*. Congress's decision not to provide in the Code for non-consensual third-party releases in non-asbestos cases

means Congress did not intend such releases to be granted.  *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there") (internal citations omitted).  As an involuntary "third-party release" is simply a discharge by one non-debtor of another non-debtor, it is prohibited in non-asbestos cases by sections 524(e) and (g).

54.    Statutory authorization to discharge non-debtors cannot be found in Code section 105(a), because that provision only allows courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).  As the Third Circuit has held, "section 105(a) has a limited scope [and] does not 'create substantive rights that would otherwise be unavailable under the Bankruptcy Code.'" *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 211 (3d Cir. 2000) (quoting *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992)).  As no Bankruptcy Code provision allows for non-consensual third-party releases, there is no provision to "carry out" through section 105(a).

55.    In addition, "[i]t is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'" *Law v. Siegel*, 571 U.S. at 421 (quoting 2 Collier on Bankruptcy ¶ 105.01[2] at 105-6 (16th ed. 2013)). Because sections 524(e) and (g) prohibit the discharge of a non-debtor's obligations, section 105(a) cannot be used to "contravene [those] specific statutory provisions."  *Id*.

56.    Statutory authority for non-consensual non-debtor releases also cannot be found in 11 U.S.C. § 1141.  That Code section, entitled "Effect of confirmation," does not guide the court's pre-confirmation evaluation of the plan's contents.

57.     Section 1141(a) generally provides that, after confirmation, a plan's provisions bind creditors regardless of whether their claim is impaired and even if they did not vote to accept the plan.  But section 1141(a) simply describes what happens after the bankruptcy court has confirmed a chapter 11 plan.  *In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458, 463 (6th Cir. 1991) ("The effect of confirmation under the plan language of § 1141(a) is to bind all parties to the terms of a plan of reorganization.").  It has no bearing on whether the plan contains provisions that preclude it from being confirmed.

58.     A general provision like section 1141(a) cannot override specific Code provisions such as section 524(e).  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (holding that a specific prohibition or permission trumps a more general provision). "If Section 1129(a)(1)'s instruction that a plan must comply with all applicable provisions of the Bankruptcy Code means anything, the Court cannot approve a [plan provision] that is clearly prohibited by another, more specific part of the Bankruptcy Code." *In re AMR Corp.*, 497 B.R. 690, 696-97 (Bankr. S.D.N.Y. 2013) (denying approval of an executive severance payment in a plan that did not comply with section 503(c)(2), even though the payment was a condition precedent to the plan going effective).

59.     In addition, in interpreting section 1141 this Court must consider all of its subsections, not just subsection (a).  Section 1141(d), which addresses the scope of the discharge available under a plan, specifically provides that, "[e]xcept as otherwise provided in [] subsection [(d)]," the confirmation of a plan either discharges or does not discharge the debtor under specified circumstances.  Nothing in section 1141(d) "otherwise" provides that confirmation of a plan discharges anyone but the debtor from any liabilities under any circumstances.  And Congress defined the term "debtor" as applying only to "[a] person or

municipality concerning which a case under [the Bankruptcy Code] has been commenced." 11 U.S.C. § 101(13). If Congress had intended references to the debtor's discharge to apply to any entity other than the one in bankruptcy, it would have said so.

      **B.**    **No decision of the Supreme Court or Third Circuit has found statutory authorization for the releases contained in the Plan.**

      60.    Although the Supreme Court has never addressed whether the Bankruptcy Code contains any statutory authority for granting non-consensual third-party releases, it has rendered several decisions that are relevant to the issue.

      61.    For example, the Supreme Court has described the Bankruptcy Code as "a comprehensive scheme" in which Congress "deliberately targeted specific problems with specific solutions." *RadLAX*, 566 U.S. at 645 (internal quotation omitted); *see also Purdue Pharma*, 2021 WL 5979108, at *51.

      62.    In addition, the Supreme Court has regularly held that the bankruptcy court's equitable powers—whether invoked through section 105(a) or otherwise—"can only be exercised within the confines of the Bankruptcy Code," and so cannot be used to take an action inconsistent with specific Code provisions. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988); *see also Law v. Siegel*, 571 U.S. at 421; *Purdue Pharma*, 2021 WL 5979108, at *51, *52.

      63.    The Supreme Court has held that there is no "'rare case' exception" to Bankruptcy Code provisions enacted by Congress. *See Czyzewski v. Jevic Holdings Corp.*, 137 S. Ct. 973, 986 (2017); *id.* at 987 ("We cannot 'alter the balance struck by the statute,' not even in 'rare cases.'") (quoting *Law v. Siegel*); *see also Purdue Pharma*, 2021 WL 5979108, at *52 ("[T]he protections explicitly afforded by the Bankruptcy Code cannot be overridden in a 'rare' case, even if doing so would carry out certain bankruptcy objectives.") (quoting *Jevic*).

64.    Although the Third Circuit has recently held that the bankruptcy courts have authority to enter a final judgment confirming a plan containing non-debtor release provisions, for purposes of the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), the Third Circuit has never directly addressed the underlying question of whether there is any authority in the Bankruptcy Code for discharging a non-debtor's debts in a non-asbestos case. *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 133, 140 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020) (holding that bankruptcy courts have constitutional authority to confirm a plan containing non-debtor releases, but declining to reach the issue of whether such releases "violate the Bankruptcy Code"); *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (vacating order confirming plan with non-debtor releases and remanding for further proceedings "to supplement the factual record," but "defer[ring] consideration of the merits of" arguments regarding the "lawfulness" of a non-asbestos channeling injunction); *Continental*, 203 F.3d at 214 n.11 (reversing confirmation of order containing releases and injunctions against non-debtors in non-asbestos case as "clearly invalid under any standard," and declining to "speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration"); *see also Purdue Pharma*, 2021 WL 5979108, at *60 ("The Third Circuit [] has not identified any section of the Bankruptcy Code that authorizes [] non-debtor releases.").

65.    Indeed, the Third Circuit has held that "[t]he Bankruptcy Code does not explicitly authorize the release and permanent injunction of claims against non-debtors" except in section 524(g) (*Continental*, 203 F.3d at 211), and has overturned bankruptcy court orders that granted non-debtor releases as not being authorized by the Bankruptcy Code. *See Combustion Eng'g*, 391 F.3d at 238 (vacating the channeling injunction in an asbestos case where the requirements

of section 524(g) were not met); *Continental*, 203 F.3d at 217 (reversing order confirming plan in non-asbestos case that contained non-debtor releases due to the absence of "a sufficient evidentiary *and legal* basis . . . under any of the standards adopted by courts that have evaluated non-debtor releases and permanent injunctions") (emphasis added); *see also Purdue Pharma*, 2021 WL 5979108, at *60 ("On those occasions when the Third Circuit did address a bankruptcy court's statutory authority to impose non-debtor releases, it overturned bankruptcy court orders granting them.") (citing *Combustion Eng'g* and *Continental*).

66. The Third Circuit has recognized that section 524(e) is applicable to third party releases in plans. In *Continental*, the Third Circuit was presented with third party releases in favor of the debtors' directors and officers and were not based on a contractual guarantee of the debtors' debts. It concluded that those releases "amounted to nothing more than a lockstep discharge of non-debtor liability and fall squarely into the section 524(e) prohibition." *Continental*, 203 F.3d at 217.

67. In addition, with regard to section 524(e) the Third Circuit has explained—in an opinion addressing the release of non-debtors' liability in connection with confirmation of a plan—that, "[w]hile it is true that the bankruptcy court's confirmation of the plan binds the debtor and all creditors vis-a-vis the debtor, it does not follow that a discharge in bankruptcy alters the right of a creditor to collect from third parties." *First Fid. Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993) (*citing* 11 U.S.C. § 524(e)).

68. The Third Circuit has also held that section 105(a) does not authorize the bankruptcy court to create substantive rights that do not otherwise exist under the Bankruptcy Code. *See Combustion Eng'g*, 391 F.3d at 238; *Continental*, 203 F.3d at 211.

69.     Like section 524(a)(1) and (2)—which provide that a discharge voids any judgment for personal liability against the debtor and enjoins any actions to "collect, recover or offset any such debt as a personal liability of the debtor"—Articles X.J.3 and X.J.4 of the Plan enjoin actions against non-debtor Released Parties, Protected Parties, and Limited Protected Parties to pursue "all Abuse Claims and any and all Claims and Causes of Action whatsoever . . . arising from or related in any way to such Abuse Claims."  This is precluded as to non-debtors in non-asbestos cases by section 524(g).

70.     Thus, the release of Non-Abuse Claims and Abuse Claims is "a lockstep discharge of non-debtor liability and fall[s] squarely into the section 524(e) prohibition." *Continental*, 203 F.3d at 217; *see also Western Real Estate Fund*, 922 F.2d at 601-02 (holding that a "permanent injunction that effectively relieves the nondebtor from its own liability to the creditor" is an impermissible discharge of a non-debtor that violates section 524(e)).

71.     As there is no statutory authority for non-consensual third-party non-debtor releases and related injunctions in a non-asbestos case, the Plan cannot be confirmed.

IV.     **The Plan Cannot Be Confirmed Because its Non-Consensual Release of Claims Against Non-Debtor Third Parties Do Not Comply With Third Circuit Precedent**

72.     The Plan also cannot be confirmed because it provides for non-consensual releases by Non-Abuse Claim holders and Abuse Claim holders of non-debtor third parties without complying with the standards established by the Third Circuit.

A.     **The Releases Under Article X.J.4 of the Plan Include Non-Consensual Releases**

73.     There can be no dispute that the releases of Abuse Claims against the non-debtor Released Parties, Protected Parties, and Limited Protected Parties are non-consensual because the Plan provides no ability for any party holding such claims to avoid giving such releases.

However, certain releases by holders of Claims falling under Article X.J.4 of the Plan are also non-consensual.

74.     The Plan provision entitled "Releases by Holders of Claims," set forth in Article X.J.4, addresses releases to be imposed on holders of all "Claims," which is specifically defined to include Abuse Claims as well as Non-Abuse Claims.[10]  *See* Article I.A. 59.  These releases will be deemed to be given in favor of all Released Parties by each "Releasing Claim Holder," which is defined in the Plan as including **(a)** all holders of Claims that vote to accept the Plan and do not opt out of the releases; **(b)** all holders of Claims that are presumed to accept the Plan, unless they file a timely objection; **(c)** all holders of Claims that vote against the Plan and do not opt out of the releases; and **(d)** twenty-two categories of Related Releasing Parties, including all current and formers employees of the holders of Claims in categories (a) through (c), all affiliates, and such vague and ill-defined categories as "agents," "consultants," "representatives," and "other professionals."  *See* Article 1.A.231.[11]

75.     There will be no affirmative consent to the Releases by Holders of Claims from those who are presumed to accept the Plan, or who vote to reject the Plan, or are a Related Releasing Party.  In addition, those who are presumed to accept the Plan, or are a Related Releasing Party will not even be able to opt out.  The Related Releasing Parties will very likely not even have received notice that they will have releases imposed upon them.

---

[10]   Although Abuse Claim holders are provided with the ability to opt out of giving releases under Article X.J.4, they will be releasing their Abuse Claims against the same Released Parties, among others, under the Channeling Injunction in Article X.F and the Releases by Holders of Abuse Claims in X.J.3, without any ability to opt out.

[11]   The definition of Releasing Claim Holder does not include creditors in voting classes from whom no ballot is received.  *See* Article 1.A.231.

76.    To the extent the Releases by Holders of Claims are being forced on parties without their affirmative consent, they are non-consensual.[12]  *See Emerge Energy Servs. LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019); *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004); *In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999); *see also Mahwah Bergen Retail Grp.*, 2022 WL 135398, at *31; *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr, S.D.N.Y. 2017); *In re Chassix Holdings*, 533 B.R. 64, 79-80 (Bankr. S.D.N.Y. 2015).

77.    There are additional issues with respect to the releases deemed from Related Releasing Parties, which include all current and former employees of all Releasing Claim Holders.  Not only is there no affirmative consent from any of these Related Releasing Parties, but these parties also cannot opt out of giving the release.   Indeed, the vast majority of them will not even receive notice of the confirmation hearing or otherwise be notified that they will have releases imposed on them in favor of numerous non-debtors.  Therefore, such release provisions violate the due process rights of the Related Releasing Parties.[13]  *See* Argument II *supra*.

78.    Under the holding of *Emerge Energy*, *Washington Mutual*, and the other cases cited above, because the Releases by Holders of Claims include releases of claims against non-

---

[12]    Not all reported decisions from this District have required affirmative consent. *See In re Indianapolis Downs, LLC*, 486 B. R. 286, 304-05 (Bankr. D. Del. 2013); *U.S. Bank N.A. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144 (Bankr. D. Del 2010).  In *Spansion*, the ruling was limited to unimpaired classes that were "being paid in full." *Id.* at 144.

[13]    Although the Related Releasing Parties are said to be giving releases "in their respective capacities as such," the meaning of that phrase is not set forth in the Plan. *See* Article I.A.231. Even if it was set forth, those releases are still being imposed on the Related Releasing Parties without their consent, and without notice and an opportunity to be heard.

debtor held by parties without their affirmative consent—and, in the case of the Related

Releasing Parties, without their notice—the Plan is unconfirmable.

> **B.      The Plan Does Not Meet the Requirements for Non-Consensual Releases, If They Are Ever Permissible**

79.      The leading Third Circuit case on non-consensual third-party releases is

*Continental*, which did not rule on whether such releases are ever permissible in bankruptcy but

did set forth the standards that would have to apply if they were ever permissible.

80.      The Third Circuit surveyed cases from various circuits as to when, if ever, a non-

consensual third-party release is permissible.   The court acknowledged that several Circuits do

not allow such non-consensual releases under any circumstances,[14] while other Circuits "have

adopted a more flexible approach, albeit in the context of extraordinary cases," such as mass tort

cases.[15]  *See Continental*, 203 F.3d at 212.

81.      The Third Circuit ultimately determined that the proposed releases in that case,

which enjoined shareholder lawsuits against debtors' directors and officers, did "not pass muster

under even the most flexible test for the validity of non-debtor releases." *Id.* at 214.   Therefore,

the court determined that it "need not speculate on whether there are circumstances under which

we might validate a non-consensual release that is both necessary and given in exchange for fair

consideration." *Id.* at 214, n.11.  The court, however, did describe the "hallmarks of permissible

---

[14]    *See, e.g.*, *Lowenschuss*, 67 F.3d at 1401; *In re Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995); *Western Real Estate Fund*, 922 F.2d at 600-02; *but see Blixeth v. Credit Suisse*, 961 F.3d 1074, 1084-85 (9th Cir. 2020) (holding 11 U.S.C. § 524(e) did not preclude approval of "exculpation clause" extending to non-debtor third parties).

[15]    *See, e.g.*, *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992)); *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 702 (4th Cir. 1989); *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.*), 843 F.2d 636, 640, 649 (2d Cir. 1988).

non-consensual releases" to be "fairness, necessity to the reorganization, and special factual findings to support these conclusions." *Id.* at 214.

82.    The Third Circuit recently stated that its precedents "set forth exacting standards that must be satisfied if such releases and injunctions are to be permitted." 945 F.3d at 139 (citing *Continental*, 203 F.3d at 214 & *Global Indus. Techs.*, 645 F.3d at 206).

83.    The bankruptcy courts in this District have fleshed out the "hallmarks of permissible non-consensual releases" identified in *Continental*. In *Genesis Health Ventures*, the court held that a plan provision that released claims of any creditors or equity holders against the senior lenders for any act or omission in connection with the bankruptcy cases and reorganization process required factual showings under *Continental* that the releases were necessary for the reorganization and were given in exchange for fair consideration. 266 B.R. at 607. The court elaborated that "necessity" under *Continental* requires a showing that: **(i)** the success of the debtors' reorganization bears a relationship to the release of the non-consensual non-debtor parties; and **(ii)** the non-debtor parties being released from liability have provided "a critical financial contribution to the debtors' plan" in exchange for the receipt of the release. *Id.* A financial contribution is considered "critical" if, without the contribution, the debtors' plan would be infeasible. *Id.*

84.    The *Genesis* court further held that the fairness of a release is determined by examining whether non-consenting non-debtors are receiving reasonable consideration in exchange for the release. *Id.* at 608. In most instances, this will entail examining the proposed dividend that non-consenting creditors will receive under a plan that contains the releases compared to what they would receive under a plan that does not contain the releases. *Id.*; *see also Spansion*, 426 B.R. at 144 (applying same factors).

85.     The *Genesis* court found that the senior lenders had made a financial contribution

to the plan, which allowed the debtors to make the 7.34% distribution to the unsecured creditors,

who otherwise would be "out of the money."  266 B.R. at 608.  But ultimately the court found

that such contribution was not enough, because "even if the threshold *Continental* criteria of

fairness and necessity for approval of non-consensual third-party releases were marginally

satisfied by these facts . . . . [the] financial restructuring plan under consideration here would not

present the *extraordinary circumstances* required to meet even the most flexible test for third

party releases."  *Id.* (emphasis added).

86.     Here, the Debtors have not met their burden to establish "extraordinary

circumstances," or that the high threshold necessary for approval of non-consensual third-party

releases—to the extent they are even permissible outside of asbestos cases—has been met with

respect to each of the many non-debtor parties that would receive a non-consensual release of

Non-Abuse Claims and Abuse Claims.

87.     The Plan lacks even a cursory discussion of why the non-debtor releases are

necessary to the Debtors' reorganization and whether they are being given in exchange for fair

consideration, as required under *Continental* and its progeny.[16]  While some of the Released

Parties, Protected Parties, and Limited Protected Parties have made large financial contributions

to the Settlement Trust in furtherance of confirmation, many have not.  For example, even

though a Local Council may be making no contribution, or an insufficient contribution, they will

---

[16]   Although the U.S. Trustee respectfully disagrees with the Third Circuit's holding in
*Millennium* that there may be instances under *Stern v. Marshall*, 564 U.S. 462 (2011), in which a
bankruptcy court possesses constitutional authority to enter final judgment to extinguish non-
debtors' state law claims against other non-debtors, at a minimum, the Third Circuit has held that
constitutional authority exists only when a third-party release is "integral to the restructuring of
the debtor-creditor relationship."  *Millennium*, 945 F.3d at 129 (quoting *Stern*, 564 U.S. at 497).

nevertheless gain the benefit of a release from holders of Abuse Claims. There is also no evidence that the majority of the other "Protected Parties"—such as affiliates of settling insurance companies that themselves did not file for bankruptcy or settle, and those companies' current and former directors, officers, lawyers, and accountants—have contributed anything of value to the reorganization. As the Debtors cannot satisfy the *Continental/Genesis* factors as to such parties, those parties cannot receive releases under the Plan.

88.    Non-consensual third-party releases of non-debtors cannot simply be had for the asking. "Third-party releases are not a merit badge that somebody gets in return for making a positive contribution to a restructuring. They are not a participation trophy, and they are not a gold star for doing a good job. Doing positive things in a restructuring case—even important positive things—is not enough. Nonconsensual releases are not supposed to be granted unless barring a particular claim is important in order to accomplish a particular feature of the restructuring." *Mahwah Bergen Retail Group*, 2022 WL 135398, at *20 (quoting *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 726-27 (Bankr. S.D.N.Y. 2019)).

89.    The Plan's inclusion of "Representatives" in the list of parties being released is particularly egregious. The definition of "Representatives" has no bounds. It includes "predecessors" and "successors," presumably from the beginning of time until the end of days. It includes "subsidiaries[] and Affiliates," presumably including subsidiaries of subsidiaries and Affiliates of Affiliates. It includes former officers, directors, employees, and many more categories of unknowable figures from the long history of the Released Parties, Protected Parties, and Limited Protected Parties. And it even includes the "heirs" of all of the parties receiving releases. In sum, the "Representatives" category acts as a dragnet that would release thousands of unknown persons and entities from liability for Non-Abuse Claims and Abuse Claims.

90.    The Debtors certainly cannot specify any critical financial contribution made by each of the myriad "Representatives" that will receive releases under the Plan.  Indeed, in *Continental* the Third Circuit expressly rejected the release of the debtors' officers and directors, finding that there was "no evidence that the non-debtor D&Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a releasee of liability[.]"  *Continental*, 203 F.3d at 215.

91.    In addition, Plan's release provisions purport to release future conduct of persons who do not yet exist.  For example, the Creditor Representative will not come into existence until the Effective Date, yet is a Released Party under the Plan.  The Debtors cannot meet their burden of proving that the unknown Creditor Representative will meet the Third Circuit's criteria for analyzing third-party releases.

92.    Similarly, the Released Parties, Protected Parties, and Limited Protected Parties will be released "to the maximum extent permitted by applicable law, as such law may be extended subsequent to the Effective Date" from, among other things, "any and all Claims . . . whatsoever," even Claims that are "unknown" and "hereinafter arising," including Future Abuse Claims.  *See* Articles X.J.3 & X.J.4.  The Debtors cannot possibly carry their burden of proving that releases of claims that do not yet exist, or are based on conduct related to laws that do not yet exist, meets the relevant standard.

93.    Even though the Perpetrators are rightly excluded from the parties receiving releases, as it stands now the Plan would nonetheless continue to shield thousands of unknown persons just because they can fit themselves within one of the almost 100 defined categories of Released Parties, Protected Parties, and Limited Protected Parties—and their Representatives.

94.     The Debtors should not be allowed to force creditors—especially those holding Abuse Claims—to release non-debtors from liability; a permanent injunction limiting the liability of non-debtor parties, if allowed at all, is a rarity that should not be considered absent a showing of "extraordinary circumstances." *See Continental*, 203 F.3d at 212; *see also In re Tribune Co.,* 464 B.R. 126, 178 (Bankr. D. Del. 2011) (interpreting *Continental* to allow non-consensual releases only in "extraordinary cases."); *Genesis*, 266 B.R. at 608.

95.     As the Debtors cannot meet their burden of proof with regard to the *Continental/Genesis* factors, the Plan cannot be confirmed.

## V.     The Plan Cannot be Confirmed Because it is Not a Settlement Subject to Approval Under Bankruptcy Rule 9019

96.     The Plan also cannot be confirmed because it purports to contain "settlements" and to be itself a "settlement" with Non-Abuse Claim holders and Abuse Claim holders that have no formal agreements with the Debtor and the many non-debtors receiving releases.

97.     Code section 1123(b)(3)(A) allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest *belonging to the debtor or to the estate*." 11 U.S.C. § 1123(b)(3)(A) (emphasis added). Thus, section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims other parties may have against it. *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 409, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest *belonging* to the debtor or to the estate. It is significant that there is no parallel authorization regarding claims *against* the estate.") (emphasis in original) (quoting section 1123(b)(3)(A)) (internal citation omitted). The resolution of claims against the Debtor is governed by sections 1129 and 1141.

98.     Section 1123(b)(3)(A) also does not authorize a plan proponent to "settle" claims that a debtor's creditors hold against it, or claims that a debtor's creditors hold against non-debtor parties.

99.     In addition, while a plan may incorporate one or more negotiated settlements, a plan is not itself a settlement.  Sending a plan to impaired creditors for a vote is not the same thing as parties negotiating a settlement among themselves.

100.    A "settlement" is "an agreement ending a dispute or lawsuit."  Black's Law Dictionary (10th ed. 2014).  An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons."  Black's Law Dictionary (10th ed. 2014).

101.    Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee [or chapter 11 debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

102.    The decision of whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"  *Wash. Mut., Inc.*, 442 B.R. at 338

(quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).[17]   In contrast, plans are subject to the many requirements of Code sections 1123 and 1129.

103.    What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the plan context is different from what may be permissible under a plan.

104.    Here, Articles III.B.3 through 9 purport to treat the distributive provisions of the Plan as if they were a Rule 9019 "settlement."  In addition, Article V.S purports to make the Plan itself a general settlement under Rule 9019, Article IXA.3.s requires a confirmation finding that the Trust Distribution Procedures comply with Rule 9019, and Article V.U refers to the confirmation order itself as a "good faith compromise and settlement of Claims, Interests and controversies."  It would further appear that Articles V.S, V.U and IX.A.3.s are not limited to the settlement of claims belonging to the Debtors or the estates, so they propose a settlement that cannot be approved under section 1123(b)(3)(A).

105.    In light of the foregoing, the Plan cannot be confirmed as long as it contains any language suggesting that any Plan provision, or the Plan itself, is a "settlement" for purposes of section 1123(b)(3)(A) and Rule 9019.

## VI.    The Plan Cannot be Confirmed Because its Exculpation Provisions Are Impermissibly Broad Under Applicable Law

106.    Article X.K of the Plan provides an exculpation that is impermissibly broad.  It shields numerous parties that are not themselves estate fiduciaries, but are merely related to an estate fiduciary.  It exculpates actions and omissions "occurring on or before the Effective Date"

---

[17]   The standard for approval of a settlement under Rule 9019 is guided by the following criteria:  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citations omitted).

(which includes pre-petition periods), and may extend past the Effective Date by protecting the

Creditor Representative (who will not be appointed until that date) and the Reorganized BSA.

107.    In addition, the Plan provision entitled "Injunction Related to Exculpation" in

Article X.L.2 enjoins not exculpated claims, but claims discharged under Article X.E or released

under Article X.J, and further improperly enjoins the assertion of certain affirmative defenses

and counterclaims, as set forth in more detail below.

### A.    The Plan's definition of Exculpated Parties is overbroad because it is not limited to estate fiduciaries.

108.    The Plan's definition of Exculpated Parties is inconsistent with controlling case

law because it is not limited to estate fiduciaries.  *See* Article I.A.114.  In *In re PWS Holding*

*Corp.*, the Third Circuit considered whether an official committee of unsecured creditors could

be exculpated, and held that 11 U.S.C. § 1103(c) implies both a fiduciary duty and a limited

grant of immunity to members of the unsecured creditors' committee.  228 F.3d 224, 246 (3d

Cir. 2000).  This Court has repeatedly interpreted *PWS* as requiring a party's exculpation to be

based upon its status as an estate fiduciary.  *See In re Indianapolis Downs*, *LLC*, 486 B.R. 286,

304 (Bankr. D. Del. 2013); *Tribune*, 464 B.R. at 189; *Wash. Mut.*, 442 B.R. at 350-51; *In re PTL*

*Holdings LLC*, No. 11-12676 (BLS), 2011 WL 5509031, at *12 (Bankr. D. Del. Nov. 10, 2011).

109.    Contrary to the limits set forth in *PWS* and cases interpreting it, the Plan

definition of Exculpated Parties extends beyond estate fiduciaries to include all estate fiduciaries'

"current officers and directors, former officers and directors who served in such capacity during

the pendency of the Chapter 11 Cases but are no longer officers or directors as of the Effective

Date, employees, volunteers, agents, attorneys, financial advisors, accountants, investment

bankers, consultants, representatives, and other professionals[.]"  Article I.A.114.  Every

employee of the Debtors is not an estate fiduciary, nor is every employee of every member of the

Creditors' Committee or the Tort Claimants' Committee, or the law firms that represent the individual members of the committees. So none of them qualify for exculpation.

110.     The Plan cannot be confirmed unless its definition of Exculpated Parties is limited to: **(i)** the Debtors; **(ii)** the directors and officers of the Debtors who served during any portion of the cases; **(iii)** the Creditors' Committee; **(iv)** the Tort Claimants' Committee; **(v)** the members of Creditors' Committee and the Tort Claimants' Committee, in their capacity as such; **(vi)** the individuals who sat on each such Committee, in their capacity as such; **(vii)** the Future Claimants' Representative; and **(viii)** the professionals retained in these cases by the Debtors, the Creditors' Committee, the Tort Claimants' Committee, and the Future Claimants' Representative. *See Wash. Mut.*, 442 B.R. at 350-51 ("[An] exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers.").

**B.     The temporal scope of the Plan's exculpation provision is overbroad.**

111.     The temporal scope of the Exculpation provision in Article X.K is overly broad in two ways. **First**, it is not limited to actions and omissions taking place during the bankruptcy case, but instead extends back to pre-petition activity that cannot be covered by a plan exculpation provision. *See Wash. Mut.*, 442 B.R. at 350 (exculpations cover "actions in the bankruptcy case," not before the case was filed) (*citing PWS*, 228 F.3d at 246).

112.     **Second**, the temporal scope could be interpreted to provide a prospective exculpation that extends past the Effective Date to the Creditors Representative and the Reorganized BSA and related parties. Post-Effective Date entities cannot receive prospective immunity by way of exculpation, just as they cannot receive prospective immunity through a release. *See Wash. Mut.*, 442 B.R. at 348 ("The Liquidating Trust and its Trustee have not done

anything yet for which they need a release.  They will not even come into existence until the Plan

is confirmed.").

113.    The Plan should not be confirmed unless the exculpation provision is limited to

acts and omissions between the Petition Date and Effective Date.

**C.    The Exculpation Injunction enjoins the wrong type of claims, and impermissibly enjoins affirmative defenses.**

114.    The Plan provision entitled "Injunction Related to Exculpation" in Article X.L.2

does not actually enjoin claims that are exculpated under Article X.K.  Rather, it enjoins "all

holders of Claims that are the subject of Article X.K" from asserting claims for any liability or

obligation "that is discharged under Article X.E or released under Article X.J."  Article X.E of is

the provision that discharges the Debtors, and Article X.J. includes releases given by the Debtors

and holders of various types of claims.  It is not clear whether the wording of this injunction is

merely a drafting error, or is an attempt to expand the third-party release provisions of Article

X.J to cover all holders of Claims against the Debtors.

115.    The Exculpation Injunction also improperly enjoins the assertion of all setoffs, as

well as the affirmative defense of recoupment.  Under Third Circuit law, no Plan injunction[18]

should prevent a party from asserting a setoff that was exercised prior to plan confirmation, or

from asserting the defense of recoupment.  *See United States v. Continental Airlines (In re*

*Continental Airlines*), 134 F.3d 536, 541 (3d Cir. 1998) (holding that "the right of a creditor to

set-off in a bankruptcy reorganization proceeding must be duly exercised in the bankruptcy court

before the plan of reorganization is confirmed"); *Folger Adam Sec., Inc. v.*

---

[18]    The Plan Channeling Injunction and Insurance Entity Injunction also enjoin the assertion of all setoffs and the affirmative defense of recoupment.  *See* Article X.F.1(d) & Article X.H.2(d).

*DeMatteis/MacGregor, J.V.*, 209 F.3d 252, 261-63 (3d Cir. 2000) (preserving the defenses of recoupment and pre-petition setoffs in connection with section 363 sales).

116.     The Plan should not be confirmed unless the Exculpation Injunction is limited to enjoining claims exculpated under Article X.K and does not enjoin setoffs that were exercised prior to plan confirmation or the defense of recoupment.

## VII.     The Plan Cannot be Confirmed Because it Provides for Payment of the Coalition's Professional Fees Without Requiring Prior Court Approval

117.     The Plan also cannot be confirmed because it authorizes the payment of the Coalition Professionals' fees and expenses without complying with the Bankruptcy Code provisions governing the payment of administrative expenses.[19]

118.     Article V.T of the Plan contains the Debtors' agreement to reimburse the Coalition for the fees and expenses the Coalition Professionals[20] incurred during the entire pre-Effective Date period, up to $950,000 per month through the Effective Date followed by a $10.5 million lump sum payment on the Effective Date.

119.     At the September 29, 2021 hearing to consider approval of the Disclosure Statement, this Court stated as follows with regard to the approval and payment of such fees:

> "I will decide that on an appropriate motion, unrelated to the plan. I'm not going to glom on something to the plan that does not need to be decided in that context. I'm going to be judging that issue on all appropriate factors at the appropriate time. . . . I also think that it's best if lawyers who are looking to have their counsel paid have that issue divorced from the plan and a vote on the plan on a recommendation of their lawyer. . . . if the fees are a

---

[19]   The Plan defines an Administrative Expense Claim as being "of the kind specified under section 503(b)" and including Professional Fee Claims—which, in turn, is defined as "including a Claim for reimbursement and/or payment of Coalition Restructuring Expenses under Article V.T." *See* Article I.A, ¶¶ 23 & 217.

[20]   The Coalition Professionals are: **(i)** Brown Rudnick LLP; **(ii)** Robbins, Russell, Englert, Orseck & Untereiner LLP; **(iii)** Monzack, Mersky and Browder, P.A.; **(iv)** Province; and **(v)** Parsons, Farnell & Grein, LLP. *See* Article I.A.65.

condition precedent [to confirmation], someone had better be waiving them."

D.E. 6437 at 104:8-22.

120.    Notwithstanding this clear directive, the last sentence of Article V.T reads as follows: "The requirement that a separate motion be filed with the Bankruptcy Court shall not in any way prejudice or limit the payment of the Coalition Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4), and 503(b) of the Bankruptcy Code, Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law."

121.    In light of this language, Article V.T appears designed to evade this Court's directive that payment of the Coalition Professionals' fees and expenses must not be built into the Plan, but must instead require a separate motion pursuant to which this Court will both determine (*i.e.*, "limit") the amount of Coalition Professionals' fees and expenses that can be reimbursed, and authorize the payment of the allowed amount (*i.e.*, "prejudice" the payment of the amount not allowed).

122.    The Plan cannot be confirmed with Article V.T as it is currently drafted for several reasons, including but not limited to the following:

- The Coalition has not yet filed any declarations or other pleadings containing evidence that would enable this Court to determine at the Confirmation Hearing whether the proposed payments satisfy the substantial contribution requirements of section 503(b)(3) and (4);

- The Plan does not require the Coalition Professionals to make the necessary showing under the section 503(b)(3) and (4) substantial contribution standard (or any other standard, such as reasonableness under section 330) before receiving the $950,000 monthly payments and $10.5 million lump-sum payment;

- The Plan does not require the Coalition Professionals to submit any documentation—or file a separate motion and obtain an order of this Court— before they begin receiving the $950,000 monthly payments;

- The Plan does not contain or attach time records, expense detail, or other substantive information regarding the Coalition Professionals' actual fees and expenses to date or their estimated future fees and expenses;

- The Plan does not explain how the $950,000 monthly payment amount was calculated or why it is a reasonable estimate of the Coalition Professionals' fees and expenses between August 2021 and the future Effective Date;

- The Plan does not explain how the $10.5 million lump sum was calculated and its relationship, if any, to the $950,000 monthly payments;

- The Plan does not allocate the $950,000 monthly payments and $10.5 million lump sum payment among the various Coalition Professionals; and

- The Plan does not provide for future review of fees and expenses or a right to object.

123. In light of the foregoing, the Plan cannot be confirmed as currently drafted. The U.S. Trustee reserves all rights on this issue until such time as the Coalition complies with this Court's ruling and files a motion for approval of payment of its fees.

## VIII. The Plan Cannot be Confirmed Because the Debtors Have Not Shown That it Complies With the Best Interests of Creditors Test Under 11 U.S.C. § 1129(a)(7)

124. The Plan also cannot be confirmed because the Debtors have not shown that it complies with Code section 1129(a)(7), which requires that each holder of a claim or interest in an impaired class must either accept the plan or "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 . . . on such date." This is commonly referred to as the "best interests of creditors" test.

125. "The application of the best interest test involves a *hypothetical* application of chapter 7 to a chapter 11 plan." *In re Stone & Webster, Inc.*, 286 B.R. 532, 544 (Bankr. D. Del. 2002) (emphasis added). It does not require the bankruptcy court to speculate about whether a case might someday actually convert to chapter 7, either consensually or not.

126.    A plan cannot be confirmed under section 1129(a) unless the requirements of section 1129(a)(7) are met.  *See* 11 U.S.C. §§ 1129(a) ("The court shall confirm a plan only if all of the following requirements are met") & 1129(b)(1) (allowing confirmation "if all of the applicable requirements of subsection (a) . . . other than paragraph (8) are met").[21]

127.    If Congress had intended to exclude non-profit entities from the reach of section 1129(a)(7), it would have done so explicitly, as it did in section 1129(a)(16).

128.    The Plan does not refer to section 1129(a)(7) at all.  In Article IX.D of the Disclosure Statement (D.E. 6213), the Debtors asserted that, because under section 1112(c) non-profit corporations cannot be converted to chapter 7 without their consent, the Plan does not have to comply with the requirements of section 1129(a)(7).  That is an incorrect interpretation of the statutory language.

129.    Under section 1129(a)(7), this Court must compare the Plan's proposed treatment of an impaired class to what members of that class would receive if the Debtors were "liquidated under chapter 7" on the Plan's effective date—not what class members would receive if the Debtors were involuntarily converted to chapter 7 on that date.  As it is beyond dispute that the Debtors are eligible to be liquidated as chapter 7 debtors, the fact that they can only be converted to chapter 7 with their consent has no bearing on the section 1129(a)(7) comparison of the Plan to a hypothetical chapter 7 case.

130.    Bankruptcy courts regularly analyze section 1129(a)(7) when determining whether a non-profit entity's plan complies with the requirements of section 1129.  *See, e.g.*, *In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890*, 265 F.3d 869, 877 (9th Cir.

---

[21]    Section 1129(a)(7)'s requirements are "applicable" here for purposes of section 1129(b)(1) because the Debtors are eligible to be chapter 7 debtors.  *See* 11 U.S.C. § 109(b).

2001) (affirming determination that non-profit debtor's plan complied with section 1129(a)(7));

*In re St. Mary's Hosp., Passaic, N.J.*, No. 09-15619, 2010 WL 5126151, at *6 (Bankr. D.N.J.

Feb. 2, 2010) (holding that non-profit debtor's plan complied with section 1129(a)(7)); *In re*

*Save Our Springs (S.O.S.) All., Inc.*, 388 B.R. 202, 239 (Bankr. W.D. Tex. 2008) (holding that

non-profit debtor's plan complied with section 1129(a)(7), but denying confirmation due to lack

of feasibility), *aff'd*, 2009 WL 8637183 (W.D. Tex. 2009), *aff'd*, 632 F.3d 168 (5th Cir. 2011);

*In re Wabash Valley Power Ass'n*, No. 85-2238, 1991 WL 11004220, at *53 (Bankr. S.D. Ind.

Aug. 7, 1991), *aff'd*, 72 F.3d 1305 (7th Cir. 1995) (holding that non-profit debtor's plan

complied with section 1129(a)(7)); *In re Mandalay Shores Co-op. Hous. Ass'n*, 53 B.R. 609,

614-15 (Bankr. M.D. Fla. 1985) (holding that non-profit debtor's plan complied with section

1129(a)(7), but denying confirmation for failure to comply with section 1129(b)(1)'s "fair and

equitable" requirement and prohibition against unfair discrimination).

131.    In light of the foregoing, non-profit entities are not excepted from the

requirements of section 1129(a)(7).  As a result, the question of whether the Plan satisfies those

requirements is a factual determination this Court must make before the Plan can be confirmed.

As the Debtors have not attempted to prove that the Plan complies with section 1129(a)(7),

confirmation should be denied.

## CONCLUSION

132.    For the reasons set forth above, the Plan cannot be confirmed.

133.    The U.S. Trustee leaves the Debtors to their burden of proof, and reserves any and

all rights, remedies, and obligations to, *inter alia*: complement, supplement, augment, alter, or

modify this objection; file an appropriate Motion; and conduct any discovery as may be deemed

necessary or as may be required and to assert such other grounds as may become apparent upon

further factual discovery.

**WHEREFORE,** the U.S. Trustee respectfully requests that this Court issue an order

denying confirmation of the Plan and granting such other relief as this Court deems just.

Dated: February 7, 2022
       Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: */s/ David L. Buchbinder*
David L. Buchbinder, Esquire
Hannah M. McCollum, Esquire
Trial Attorneys
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)
david.l.buchbinder@usdoj.gov
hannah.m.mccollum@usdoj.gov