IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Re: D.I. 6443** |

**DUMAS & VAUGHN CLAIMANTS' OBJECTION TO CONFIRMATION OF THE SECOND MODIFIED FIFTH AMENDED PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC AND JOINDER TO THE OBJECTION OF THE <u>UNITED STATES TRUSTEE</u>**

**INTRODUCTION**

The Claimants represented by Dumas & Vaughn, LLC (the "D & V Claimants") object to confirmation of the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6443] ("the Plan"). The D & V Claimants are survivors of childhood sexual abuse who each filed a Sexual Abuse Survivor Proof of Claim.[1] All of the D & V Claimants have claims against nondebtor local councils; most have claims against and a chartered organization. Forty-six of the 67 have filed or are in the process of filing lawsuits in state court to preserve those claims.

**ARGUMENT**

The Plan should be denied confirmation for at least the following reasons. D & V Claimants reserve their right to make additional objections to Plan changes or proposed modifications and to make additional arguments at the Confirmation Hearing.

**I.    THE PLAN IS UNCONFIRMABLE WITH NONDEBTOR RELEASES.**

---

[1] See attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers for the D & V Claimants and the General Creditor claim number for one woman who was sexually assaulted when she was a young adult working at Philmont Scout Ranch, who filed a claim as a General Creditor, and is also a D & V Claimant.

1

### A. The Court Lacks Subject Matter Jurisdiction over Survivor Claims against Nondebtors, such as Local Councils, Chartered Organizations, Insurers, and Other Entities.

28 U.S.C. § 1334 creates bankruptcy court jurisdiction by conferring upon district courts "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a), (b). District courts may refer to a bankruptcy court any or all cases under title 11 or all proceedings arising under title 11 or arising in or related to a case under title 11. 28 U.S.C. § 157(a). "Proceedings 'related to' a title 11 case include causes of action owned by the debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), as well as suits between third parties that conceivably may have an effect on the bankruptcy estate." *In re Combustion Eng'g, Inc.*, 391 F. 3d 190, 226 (3d Cir. 2005) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.5 (1995)).

In *Pacor, Inc.*, 743 F. 2d 984 (3d Cir. 1984), the Third Circuit "set forth what has become the seminal test for determining 'related to' jurisdiction over third party claims." *In re Combustion Eng'g*, 391 F. 3d at 226. The Third Circuit stated in *Pacor*:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

743 F. 2d at 994 (italics in original) (internal citations omitted). The facts of *Pacor* demonstrated a "crucial limit on the legitimate exercise of subject matter jurisdiction." *In re W.R. Grace & Co.*, 591 F. 3d 164, 171 (3d Cir. 2009).

In *Pacor*, John and Louise Higgins filed suit in state court against Pacor, a distributor of chemical supplies, seeking damages for exposure to asbestos supplied by Pacor. 743 F. 2d at 986. In response, Pacor filed a third-party complaint impleading the Johns-Manville Corporation, the original manufacturer of the asbestos. *Id*. Thereafter, Manville filed a Chapter 11 bankruptcy petition. *Id*. When Pacor tried

to remove the Higgins lawsuit to the bankruptcy court, the Third Circuit denied removal, holding that "the primary action between Higgins and Pacor would have no effect on the Manville bankruptcy estate, and therefore [cannot establish] 'related to' [jurisdiction over that suit]…." The Third Circuit stated, "At best, [the Higgins-Pacor lawsuit] is a mere precursor to the potential third-party claim for indemnification by Pacor against Manville. Yet the outcome of the Higgins-Pacor action would in no way bind Manville, in that it could not determine any rights, liabilities, or course of action of the debtor."

In this case, the Court lacks subject matter jurisdiction over claims of D & V claimants against nondebtors. Among other reasons discussed below, to the extent those claims are filed in or have been removed to federal district courts in in Oregon, Washington, California, Idaho, Montana, they are under the appellate jurisdiction of the Ninth Circuit Court of Appeals. The Ninth Circuit has ruled that, while a discharge under Chapter 11 releases the debtor from personal liability for any debts, 11 U.S.C. 524(a), bankruptcy courts cannot release third parties of liability since, pursuant to 11 U.S.C. § 524(e), the "'discharge of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.'" *In re Lowenschuss*, 67 F. 3d 1394, 1401 (9th Cir. 1995) (quoting 11 U.S.C. § 524(e)). The Ninth Circuit has repeatedly held that section 524(e) precludes bankruptcy courts from discharging the liabilities of nondebtors. *Id*. at 1401-02 citing, *e.g.*, *Am. Hardwoods,Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*, 885 F. 2d 621, 626 (9th Cir. 1989); *Underhill v. Royal*, 769 F. 2d 1426, 1432 (9th Cir. 1985); *Comm'l Wholesalers, Inc. v. Investors Comm'l Corp*., 172 F. 2d 800, 801 (9th Cir. 1949)); see also In re Claar Cellars LLC, 623 B.R. 578, 593 (Bankr. E.D. Wash. 2021) (stating that "section 524(e) precludes a co-obligor of a bankrupt debtor from piggybacking on rights the debtor enjoys under the Bankruptcy Code, including the right to discharge or restructure indebtedness. If a co-obligor seeks a discharge or to restructure its liability on a jointly liable claim, section 524(e) effectively requires the co-obligor to commence its own bankruptcy case.").

There is also no subject matter jurisdiction over D & V Claimants' claims against local councils or chartered organizations. Whether D & V Claimants already filed lawsuits naming these third parties

as defendants or not, no local council or chartered organization has made a claim against the BSA for contribution or indemnification in connection with D & V Claimants' claims. Any resolution of D & V Claimants' claims against these nondebtors would be a "mere precursor" to a separate lawsuit against the BSA for contribution or indemnification claims. Thus, the resolution of D & V Claimants' claims against chartered organizations and/or local councils would have no effect on Debtors' bankruptcy estate.

  **B.**  **The Bankruptcy Code Does Not Authorize Nondebtor Releases.**

Assuming that subject matter jurisdiction exists over D & V Claimants' claims against nondebtors, the Bankruptcy Code provides no authority for the release of these claims. The claims are specifically against local councils and chartered organizations.

The Third Circuit recognizes that "[s]ection 524(e) of the Bankruptcy Code makes clear that the bankruptcy discharge of a debtor, by itself, does not operate to relieve non-debtors of their liabilities." *In re Continental Airlines*, 203 F. 3d 203, 211 (3d Cir. 2000). 11 U.S.C. § 524(g) is the only section of the Bankruptcy Code that expressly allows a bankruptcy court to enjoin third-party claims against nondebtors without the consent of those third parties. Section 524(g) authorizes such an injunction only in cases involving injuries arising from the manufacture and sale of asbestos. *In re Purdue Pharma, L.P.*, 21 cv 7532 (CM), 2021 WL 5979108, at *49 (S.D.N.Y. Dec. 16, 2021). "Congress believed that Section 524(g) created an exception to what would otherwise be the applicable rule of law."

In *Purdue Pharma*, 2021 WL 5979108, at *70, the district court vacated confirmation of the plan of reorganization, holding that there is no authority under the Bankruptcy Code to permit the nonconsensual release of third-party claims against nondebtors that are direct claims based on the individual liability of the nondebtors and which do not derive from the liability of the debtor. The *Purdue* court defined "direct claims" as "claims that are not derivative of [the debtor's] liability, but are based on the [nondebtor's] own, individual liability, predicated on their own alleged misconduct and the breach of duties owed to claimants other than [the debtor]. 'Direct' claims are based upon a 'particularized' injury to a third party that can be directly traced to a non-debtor's conduct." *Id*. at *48.

In contrast, "derivative claims" are "claims that would render the [nondebtors] liable because of [the debtor's] actions (which conduct may or may not have been committed because of the [nondebtors]). 'Derivative' claims are those that seek to recover from the estate indirectly' on the basis of [the debtor's] conduct,' as opposed to the non-debtor's own conduct." *Id*. (quoting *In re Johns-Manville Corp.,* 517 F. 3d 52, 62 (2d Cir. 2008).

Here, there is no authority for the Court to exercise jurisdiction over D & V Claimants' direct claims against nondebtor local councils and chartered organizations. Claims against these nondebtors are based on the independent liability of these nondebtors and not dependent on a finding of either Debtor's liability. D & V Claimants can succeed in proving a local council's or chartered organization's liability based on the direct, not derivative, tortious conduct of such local council or chartered organization.

For example, D&V Claimants 19491, 17941, 16274, 16268, and 18773 ("Brock Claimants") have strong, direct claims against Oregon's Cascade Pacific Council (CPC) for sexual abuse by Assistant Scoutmaster Clyde Brock between 1965 and 1968. Claimants 17941, 16274, and 16268 are brothers, were all abused by Brock (often at the same time), and all filed lawsuits to preserve their state claims prior to Debtor filing for bankruptcy. All Brock Claimants have filed lawsuits against CPC. Brock also abused a fourth brother, who resolved his lawsuit against Debtor and CPC in 2015. The Brock Claimants' proofs of claim and attached documentation, including deposition testimony and Brock's Ineligible Volunteer file ("IV File"), indicate that the local council CPC knew that they were in danger of being sexually abused. Prior to and during their abuse, an officer of CPC knew Brock took photographs of nude Scouts, had boys over to his house and giving them baths, and had pornography laying around for boys to see at his house. That officer testified at a deposition that members of the troop committee were "suspicious" that Brock was molesting boys. Even so, CPC did not remove Brock from Scouting until spring 1968, after he was accused of molesting at least 12 boys in the troop. According to Brock' IV File, members of CPC had admonished Brock at least twice for his inappropriate conduct with boys in the years prior to removing him from Scouting. Despite these admonitions and suspicions of child

molestation, in 1966 CPC nominated Brock for the Silver Beaver Award, Boy Scouts' highest volunteer award. After Debtor and CPC finally kicked him out in 1968, CPC instructed Brock to say he resigned due to health issues and "s[aw] no reason why he shouldn't be recognized at the 50th anniversary celebration" of the CPC. CPC did not report him to the police.  Three years later, Brock was indicted and convicted for sexually abusing three more boys.

These Claimants claims against CPC are direct, not derivative.  There is no indemnity agreement between CPC and BSA that makes BSA automatically liable for CPC's conduct towards these Claimants. The Court does not have jurisdiction over the claims against CPC.

Likewise, an example of a direct claim against a chartered organization, is D&V Claimant 51733's claim against the Church of Christ charter organization.  Claimant 51733 was molested by Scoutmaster Frederick Thomas between 1979 and 1982.  His troop was chartered by the West Angeles Church of God in Christ.  The abuse occurred at the church and on official Scouting camping trips. Thomas was also a choir volunteer and a minister at the Church.  Claimant witnessed him molest numerous other boys in the troop, under the guise of playing a Scout game that required him to "inspect" their bodies.  Due to Thomas's multiple leadership roles in the Church, his role as a Scoutmaster, and the frequency of the abuse, it is likely Thomas had many other victims.  Claimant51733 has not filed a lawsuit in state court because of the bankruptcy stay, so has not done any discovery.  But based on the facts known so far, it is reasonable to believe that, because of Thomas's leadership roles for the church, and the fact that much of the abuse happened on church premises, if discovery were allowed, the Church of Christ would face substantial direct liability, separate and in addition to Debtor's liability.  BSA has no derivative liability for these claims because there is no indemnity agreement between the Church of Christ and BSA.

### C. The Releases in the Plan Fail under Third Circuit Precedent and *Master Mortgage*.

In the Third Circuit, bankruptcy courts look to several factors in determining whether to grant a nonconsensual release and permanent injunction of a third party's claim against a nondebtor. *In re*

*Continental Airlines*, 203 F. 3d at 217 n.17.  The Third Circuit declined to establish its own rule but has considered the propriety of nondebtor releases under tests established by sister Circuits, and rejected such releases and injunctions that fail to meet the hallmarks of permissible nonconsensual releases: fairness, necessity to the reorganization, and specific factual findings to support these conclusions (*Id*. at 214); reasonable consideration given in exchange for the release and permanent injunction (*Id*. at 215).

Regarding fairness, a plan provision is unfair if it releases the liabilities of nondebtors without providing additional compensation to a creditor being forced to release claims against nondebtors.  *In re Continental Airlines*, 203 F. 3d at 213 (citing *AOV Indus., Inc*., 792 F. 2d 1140, 1154 (D.C. Cir. 1986)).  Here, the Plan is unfair to D&C Claimants who will be forced to give up claims against local councils and chartered organizations in exchange for little or nothing from those organizations.  The payments by local councils and settling insurers are also unreasonable given their liability exposure, the substantial assets of nondebtors, and Debtors' failure to disclose the assets of nondebtors such as settling insurers.  Debtors will fail to meet their burden of demonstrating fairness and reasonable consideration.

For example, the Cascade Pacific Council (CPC) in Oregon, is a named Defendant in state court lawsuits filed by D & V Claimants 19491, 17941, 16274, 16268, 18773, and 44934.  According to the Plan, CPC has over $53 million in total assets and over $34 million in what BSA admits are "unrestricted net" assets.  According to the TCC's Exhibit G of the Disclosure Statement, there were at 475 bankruptcy proofs of claim identifying CPC as the local council, with a TDP value of between $101M and $585M.  Under the Plan, CPC will contribute a total of $10M.  Even if that $10M is allocated only to Survivors with claims against the CPC, it amounts only to approximately 1.7 to 10% of the TDP value of the claims against the CPC, despite the CPC having another $24M in unrestricted assets and another $19M in assets not proven to be restricted.

As for chartered organizations except for the TCJC and potentially the United Methodist Church, these nondebtors are paying absolutely nothing in exchange for release of liabilities for post-1975 claims, claims insured by Settling Insurance Companies, and pre-1976 claims to the extent that such releases are

supported by additional compensation from BSA and/or the local councils. The release of these nondebtors without their payment of compensation is unfair to D & V Claimants and other Survivors.

As for insurers, the release and permanent injunction of claims to collect from non-settling insurers are obviously unfair as these insurers are providing no compensation whatsoever and may never provide compensation in the future, despite the best efforts of the Settlement Trustee to pursue payment owed under insurance policies issued by non-settling insurers. Even with settling insurers, such as Century and Chubb and Hartford, the releases are unfair as the implicated coverage limits and liabilities greatly exceed the actual settlement amounts contributed by these settling insurers. The primary insurance policies of Century and Hartford were mostly non-aggregate and mostly covered $500,000 per occurrence for each policy year. These insurers provided non-aggregate excess insurance coverage of up to $2 million per occurrence. Given these policy terms, Debtors will be unable to prove the fairness of a Century and Chubb release in exchange for payment of only $800 million and a Hartford release in exchange for payment of only $787 million.

As for the second hallmark, the release and permanent injunction of D & V Claimants' claims against nondebtors are certainly unnecessary to the success of Debtors' reorganization. Debtors have admitted multiple times, even in testimony before this Court, that the BSA "Toggle Plan" is feasible. In their Second Amended, Third Amended, and Fourth Amended Plans, Debtors proposed the Toggle Plan, which did not release nondebtor local councils, chartered organizations, or insurers and did not permanently enjoin claims against these nondebtors. [D.I. 2592, 5368, 5484] Debtors' successful reorganization does not depend on D & V Claimants losing their right to be compensated by other nondebtor tortfeasors, including from chartered organization's personal assets and separate insurance.

The *Master Mortgage* factors also provide guidance. Although the Third Circuit has not explicitly adopted the factors set forth in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994), courts in the Third Circuit have considered *Master Mortgage* factors. *See, e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 349 (Bankr. D. Del. 2011); *In re Indianapolis Downs, LLC*, 486

B.R. 286, 303 (Bankr. D. Del. 2013); *In re Millennium Lab Holdings, II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017).

The factors are:

(1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.
(2) The non-debtor has contributed substantial assets to the reorganization.
(3) The injunction is essential to reorganization. Without the it [sic], there is little likelihood of success.
(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes has "overwhelmingly" voted to accept the proposed plan treatment.
(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

*In re Master Mortgage*, 168 B.R. at 935. Here, the *Master Mortgage* factors do not support release and injunction of Survivors' claims against local councils, chartered organizations, and insurers.

Factor one, identity of interests, weighs against granting nonconsensual releases and permanent injunctions. According to BSA, the BSA, local councils, and chartered organizations are "three entirely separate legal entities" who have no control over each other. Notice of Filing of Ex. A to Objection to Adequacy of Debtors' Disclosure Statement (Decl. of National E. Marshall), D.I. 3949-1, at 5. Each local council is separately incorporated nonprofit organization which raises and disburses its own funds and has its own board of directors. *Id*. BSA itself claims that chartered organizations, not BSA and local councils, directly administer the Scouting Program at the unit level and own and operate the Scouting units. *Id*. at 5-6. Debtors have not disclosed an indemnity relationship with local councils or chartered organizations.

Factor two also weighs against nondebtor releases and injunctions because none of the nondebtors are contributing substantial assets to compensate Survivors. The local councils collectively are contributing less than $1 billion in unrestricted net assets to compensate Survivors. Amended Disclosure Statement, D.I. 6445, at 431. The TCC's analysis (based only on 41,750 proofs of claim that identified a local council) estimates that current total direct abuse claims against local councils have a TDP value of

approximately $7 billion to $41 billion, but local councils are contributing only 4.56% to 24.47% of their unrestricted net assets to pay Survivors. *Id.*

Likewise, except for the TCJC and potentially the United Methodist Church, none of the chartered organizations are contributing any of their assets to compensate Survivors for the release of Survivors' claims. In exchange for release of post-1975 liability and apparent release of pre-1976 liability, chartered organizations other than the TCJC and Methodist Church will pay nothing. Regardless of their own liability to Survivors and regardless of what assets these organizations own, including insurance policies, these organizations will not contribute anything to the Settlement Trust in exchange for a release of all liability. D & V Claimants should not be restricted from pursuing claims against these chartered organizations, especially since they clearly are not receiving something of "indubitably equivalent value" to replace their released claims against the chartered organizations. *In re Charles Street African Methodist Episcopal Church of Boston*, 499 B.R. 66, 102 (Bankr. D. Mass. 2013) (objection weighs in favor of rejecting a nondebtor release where the plan does not replace the nonconsensual release with something of "indubitably equivalent value to the affected creditor").

Factor three weighs against third-party releases and injunctions. As discussed above, the nonconsensual release and permanent injunction of third-party claims against nondebtors are not necessary to Debtors' successful reorganization, because the BSA Toggle Plan is a feasible alternative.

The fourth factor, creditor approval, clearly weighs against release and permanent injunction and is "the single most important factor." *In re Master Mortgage*, 168 B.R. at 938. The Third Circuit has identified as a "key consideration[]" "whether affected parties overwhelmingly have agreed to accept the proposed treatment." *In re Continental Airlines*, 203 F. 3d at 217 n.17. In chapter 11 non-asbestos cases where third-party releases have been approved, courts have interpreted "overwhelming" creditor support to mean that at least 90% of affected voting creditors accept the plan. *See In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 777 (Bankr. N.D. Tex. 2007) ("Most courts have held that factor four [of the *Master Mortgage* factors] is satisfied when over ninety percent of the impacted creditors approve the

plan."); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 674 (Bankr. D.D.C. 1992) (citing to overwhelming support of plan with releases as indicative of "good faith"; "Of the 64 creditors voting—other than partners of the debtor—62 voted for the plan or roughly 97%."). Here, the Final Voting Report reveals that only 73.57% of voting Survivors (*i.e.*, Class 8 Direct Abuse Clams holders) voted to accept the Plan, thus showing that, overall, Debtors *lost the vote* of Survivors. Decl. of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding Solicitation of Votes & Final Tabulation of Ballots Cast, D.I. 8345, Ex. A at 2. Debtors similarly lost the vote of Class 9 Indirect Abuse Claims holders, of whom only 69.57% of voters voted to accept the plan. *Id*.

A major problem with the Plan is that Debtors have not broken down the vote results by local council, chartered organizations, or other affected third parties. Without this breakdown, Debtors cannot meet their burden to prove that each of these third parties made "substantial contribution" (the second factor), let alone that a "substantial majority" of creditors voted in favor. So far, Debtors have not made public this breakdown. For example, if only 60% of Claimants with claims against local council CPC voted to accept the Plan, that is not a substantial majority and nowhere near an overwhelming majority of the class of creditors that is (or should be) impacted by CPC's contribution.

The fifth factor, payment of all or substantially all of the claims, is not met by the Plan and therefore weighs against third-party releases and injunctions of claims. Debtors estimate that, if Direct Abuse Claims are valued at $7.1 billion, Survivors will recover payment of only 10 to 21% on their claims, plus additionally "insurance rights" that may someday yield up to 100% recovery. Amended Disclosure Statement, D.I. 6445, at 29. D & V Claimants dispute Debtors' grossly low estimated value of Direct Abuse Claims. Even if Debtors' valuation is correct, the Plan still fails to provide for payment of all or substantially all of Survivors' claims. *See In re Wool Growers*, 371 B.R. at 778 (finding the fifth factor, full or almost full payment of the affected claims, is not satisfied where affected creditors will recover, at best, 60 to 70% of their claims).

The Plan should not be confirmed because all five *Master Mortgage* factors weigh heavily against

approval of nonconsensual releases of third-party claims against nondebtors.

## II.     THE PLAN FAILS THE BEST INTEREST OF CREDITORS TEST.

Under the best interest of creditors test in section 1129(a)(7), a Chapter 11 plan cannot be confirmed unless the plan provides each dissenting, impaired creditor at least as much as the creditor would be paid if the debtor liquidated under Chapter 7.  In a Chapter 7 liquidation, nondebtor releases are not permitted.  *See*, *e.g.*, *In re Mrs. Weinberg's Kosher Foods*, 278 B.R. 358, 365-66 (Bankr. S.D.N.Y. 2002) (holding in this chapter 7 case that bankruptcy courts may not use a channeling injunction); *In re Optical Tech., Inc.*, 216 B.R. 989, 990-94 (M.D. Fla. 1997) (adopting *Master Mortgage* but striking the actual releases contained in the debtors' liquidating plan because "where … a plan of reorganization provides for the total liquidation of the debtor, the factors of *Master Mortgage* cannot be met").

A plan of reorganization is unconfirmable for violating the best interests of creditors test where the plan requires that creditors who are entitled to a Chapter 7 liquidation distribution must release nondebtors in order to receive any payment under the Chapter 11 plan.  *In re Conseco, Inc.*, 301 B.R. 525, 527-28 (Bankr. N.D. Ill. 2003).

Here, the Plan fails the best interest of creditors test because the Plan releases Survivors' claims against, and enjoins them from suing, nondebtors and requires that, in order to receive a distribution under the Plan, the Survivor must sign a release of all Protected Parties (such as local councils, contributing chartered organizations, and settling insurers) and chartered organizations. [ D.I. 7832, Ex. A at 8-9, 12, 21-22.]  Because Survivors can only receive payment under the Plan if they sign a release of their claims against local councils, chartered organizations, and settling insurers, the Plan deprives them of their claims against these nondebtors, which they would have in a chapter 7 liquidation.  Since, in a Chapter 7 liquidation, Survivors would be able to pursue their claims against local councils, chartered organizations, and settling and non-settling insurers of such nondebtors, the Plan fails to pay D & V Claimants at least as much as they would be paid if Debtors liquidated under Chapter 7.

As the Plan releases D & V Claimants' claims against nondebtors, without D & V Claimants'

12

consent, and requires such release in order for them to be paid at all (including from BSA's personal assets), the Plan fails to meet the best interests of creditors test as to D & V Claimants and must be denied confirmation.

## III. JOINDER

D & V Claimants join in the objections to plan confirmation filed by the United States Trustee.

## IV. FUTURE MODIFICATIONS OR PLANS

The D & V Claimants object to any modifications to the existing Plan or new proposed plans that fail to resolve the objections raised in this objection.

## CONCLUSION

Based on the foregoing, D & V Claimants object to the Plan and ask the Court to deny confirmation.

**BIELLI & KLAUDER, LLC**

Dated: February 9, 2022
Wilmington, Delaware

*/s/ David M. Klauder*
David M. Klauder, Esquire (No. 5769)
1204 N. King Street
Wilmington, DE 19801
Phone: (302) 803-4600
Fax: (302) 397-2557
Email: dklauder@bk-legal.com

- and -

**DUMAS & VAUGHN, LLC**

Gilion C. Dumas, Esq., a*dmitted pro hac vice*
Ashley L. Vaughn, Esq., *admitted pro hac vice*
3835 NE Hancock St., Ste. GL-B
Portland, OR 97212
Phone: 503-616-5007
Fax: 503-616-5007
Email: gilion@dumasandvaughn.com
Email: ashley@dumasandvaughn.com

*Counsel to the D & V Claimants*

# APPENDIX A

The foregoing Objection was filed by the following creditors who each filed a Sexual Abuse Survivor Proof of Claim and are represented by Dumas & Vaughn, LLC. The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim.[2]

| | | | |
|---|---|---|---|
| 58703/105815 | 34947/105106 | 44207/105070 | 16268/104761 |
| 58685/105816 | 34531/105107 | 47925/105064 | 18773/112889 |
| 78021/105814 | 51733 | 46721 | 18838 |
| 54709 | 24486/105017 | 42607/105065 | 24567/104769 |
| 40260/105108 | 18072 | 44804/105072 | 41448 |
| 41100/105809 | 40722 | 14993/104762 | 55506/104767 |
| 39519/105016 | 42603 | 24322 | 21530/116694 |
| 45084/105063 | 41710/105069 | 51220 | 26054/112887 |
| 71146/90485 | 44937 | 39881/104772/ 11682/116693 | 55960/104771 |
| 29655 | 44934/112891 | 19348/104766 | 55175 |
| 37264/105810 | 55638/105066 | 46398 | 1979/119108 |
| 48079 | 41808/105073 | 32252/104770 | 38236 |
| 44156/105020 | 44159 | 40184/110048 | 436 – General Creditor number, adult victim |
| 41149/105813 | 39538/118406 | 64492/105945 | John Doe – late filed POC, approved by Court but no claim number assigned yet |
| 44153/105022 | 44222 | 42554/105071 | |
| 42623/105811 | 56947 | 19491/104765 | |
| 51644/51702 | 46393/105068 | 17941 | |
| 52861 | 45063 | 16274/104768 | |

---

[2] The additional numbers listed in each cell, following the slash, are the numbers assigned to each Claimant's amended Proof of Claim, where applicable.