



January 31, 2022

Clerk of Court
U. S. Bankruptcy Court
District of Delaware
824 Market Street
Wilmington, DL 19801

IN RE:   BOY SCOUTS OF AMERICA AND DELAWARE BSA LLC
CHAPTER 11; CASE NO. 20-10343 (LSS)

Dear Clerk of Court:

Please file the enclosed, and present the motions to the Court for consideration:

[1] Notice of Filing ███████████████ Objections to Confirmation of Debtor's  Second  Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and  Delaware BSA, LLC [D.I. 7832] (together with all schedules and exhibits thereto, and as modified, amended, or supplemented, the "Plan").

[2]███████████████ Objections to Confirmation of Debtor's Second  Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and  Delaware BSA, LLC [D.I. 7832] (together with all schedules and exhibits thereto, and as modified, amended, or supplemented, the "Plan").

Thank you for your time and assistance.

Respectfully
███████████████



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | RE: D.I. 7832 |

## ██████████████████████ OBJECTIONS TO CONFIRMATION OF DEBTOR'S SECOND MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR <u>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC</u>

COMES NOW ██████████████████████ *pro se*, and OBJECTS to confirmation of *Debtor's Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 7832] (together with all schedules and exhibits thereto, and as modified, amended, or supplemented, the "Plan"), and shows the Court:

---

[1] The Debtors in the chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

██████████████ is Claimant ███ He was originally claimant ███ on the BSA's list.

# STATEMENT OF THE CASE

████████ initiated a tort action versus Patriots' Path Council, BSA[3] under

the laws of the State of New Jersey in the Civil Division of the Superior Court of

New Jersey, Morris County Vicinage, as docket number MRS-L-000123,[4] on

September 20, 2019, following months of attempts to reach a settlement related to

long term and egregious sexual abuse of Schwindler perpetrated by a

professional scout executive commissioned by the BSA who was employed by the

local Morris-Sussex Area Council, BSA at the time of the sexual abuse.[5]

The BSA filed for Chapter 11 protection with the Court on February 19,

---

[3] Patriots' Path Council, BSA is incorporated as a non-profit entity under the laws of the State of New Jersey for the sole purpose of "provid[ing] youth services through the execution of the charter of the National Council Boy Scouts of America," quoting from IRS Form 990 filed by the council with the Internal Revenue Service for calendar year 2019. [See D.I. 7790, page 7, FN 2]. Patriots' Path Council, BSA is Debtor's Council ████ and is the successor to previous Morris-Sussex Area Council, BSA.

[4] ████████ subsequently joined Saint Peter's Episcopal Church, and American Legion Post #59, both of Morristown, NJ as defendants to his state tort action. Both were chartered sponsoring organizations of BSA troops he belonged to during the time of his sexual abuse, and both had been named in his initial complaint.

[5] The local council cannot claim any defense against primary liability due to the fact that not only was the employee who abused ████████ the second-most senior employee of the council, it knew, or should have known that he had a history of abusing young males, because that was the reason he was transferred from the upstate NY local council where he had been previously employed. As noted in ████████ tort claim, the local council's actions harrassing ████████ and seeking to cover-up the abuse following termination of the abuser illustrates that the local council was aware of the fact that its employee had sexually abused ████████ In apportioning a share of liability to the three defendants in ████████ tort case, the local council undoubtedly bears at least 90%.

2

2020, and caused ███████████ tort action to be removed to the United States Bankruptcy Court for the District of New Jersey, where it was indefinitely adjourned shortly therafter. The BSA has insisted on the legal fiction that the 252 local councils are separate legal entities which are not part of the Chapter 11 action even though they exist solely to carry out the scouting program set forth in the BSA's national charter, and hold title to the overwhelming share of BSA related assets.[6] At the time of filing for bankruptcy protection, the BSA and its local councils were facing 275 tort actions worldwide. That amounted to approximately 1.08 lawsuits for each of the 252 local BSA Councils.[7] In each of these state tort actions, the BSA insisted that a lawsuit against one of its 252 local councils was essentially a lawsuit against the national council.

Since the BSA filed for Chapter 11 protection, approximately 81,925

---

[6] According to the by-laws of the BSA, the local councils are required to hold charters issued by the BSA. They are not permitted to offer any other programs or services other than those provided by the BSA, nor are they permitted to alter any of those programs. They are required to hire professional scouters who have been commissioned by the BSA. They are subject to forced merger or dissolution by the BSA. The assets of the local councils which are dissolved or merged are allocated at the direction of the BSA. In other words, the local councils are a legal fiction created for protection of assets and limitation of liability.

[7] Had the BSA, its local councils, and insurers been honest with themselves, they would have quickly and quietly reached negotiated settlements with these claimants, and made substantive changes to the organizational and operational structure of scouting so as to reduce or eliminate future sexual abuse of children, but the BSA was so narrowly focused on the same things it has always focused on [fundraising and accumulation of assets] that it has probably guaranteed its own demise. Greed will have that effect on things.

additional claims have been made concerning sexual abuse of minors by various individuals associated with the BSA, its local councils, and chartered sponsoring organizations. The overwhelming majority of these claims have been submitted through a small number of mass tort lawfirms as part of this action, but without also filing civil tort complaints within the various states. Most of these newly added claims are from individuals whose alleged abuse occurred in states with statutes of limitation which would preclude recovery of damages within the various state court systems.[8]

Following standard bankruptcy procedures, nine tort claimants were selected by the United States Trustee to represent the entire class of direct abuse claimants as the Tort Claims Committee [the TCC]. The TCC retained the legal services of Pachulski, Stang, Ziehl & Jones to represent the interests of all BSA sexual abuse victims.

---

[8] This is not an insignificant fact. These individuals did not come forward on their own until mass tort lawyers engaged in a massive advertising campaign so as to increase the lawyers' paydays. Whatever the individual reasons for having not come forward, and the reality is that jurisdictional statutes of limitation undoubtedly played a major role, there is no question that the sheer numbers have over-shadowed everything else in this case. Based upon the annual audit report by the United States Catholic Bishops detailing the 4,228 "new sexual abuse allegations" brought in 2020 against the church, over 90% were brought by many of the same mass tort law firms, and the overwhelming majority of claims were either unsubstantiated, or unable to be proven. Approximately 20% were substantiated. There is small reason to assume that these mass tort law firms have been any more diligent concerning claimants in this case.

Over considerable objection, the Court authorized a small group of mass tort attorneys, styling themselves as the Coalition of Abused Scouts for Justice [the Coalition] to have an official role within the negotiations related to arriving at a just and equitable resolution for both the BSA and all creditors, including the sexual abuse claimants. One of the stated aims of the Coalition from the outset was to position itself so as to "take over" the direction of the case and ultimate reorganization plan.

The BSA and Coalition produced the Plan which was presented to the parties for consideration beginning in October, 2021. The TCC, which was essentially cut out of the negotiations by the BSA and Coalition, has adamantly opposed confirmation of the Plan for four primary reasons:

1. The local councils [which hold the overwhelming majority of the BSA's assets] are being protected from future litigation, while not being required to liquidate assets sufficient to contribute to a settlement trust for the sexual abuse claimants proportionate to their potential liability within the state tort systems.

2. The chartered sponsoring organizations are being protected from future litigation, while not being required to liquidate assets sufficient to contribute to a settlement trust for the sexual abuse claimants proportionate to their potential liability within the state tort systems.

3. The companies which have provided insurance coverage to the BSA and local councils are being protected from future litigation, while only paying a small fraction to a settlement trust for the sexual abuse claimants proportionate to the actual liability they would face within the state tort systems.

4. The Plan does not provide any meaningful steps to address the

structural organizational deficiencies which have contributed to 112 years of abuse of minors within scouting.

The Court has spent considerable time addressing numerous arguments related to virtually all facets of solicitation of votes and discovery since the Plan was officially released for voting. One of the primary disputes has concerned accusations of unethical/improper actions by two members of the mini-coalition styled as Abused in Scouting [AIS].[9] Timothy Kosnoff was the founder of both AIS and the Coalition. Kosnoff withdrew from the Coalition, but one of his AIS partners, Kenneth Rothweiler [of Eisenberg Rothweiler] became the primary voice of the Coalition as to preparing the Plan, and conducting negotiations. Kosnoff has vehemently opposed approval of the Plan, and has been outspoken in his opposition. Both the BSA and Rothweiler have engaged in a scorched earth campaign against anyone opposed to the Plan - especially including Kosnoff and the TCC.[10]

The Court received numerous letters from sex abuse claimants who indicated that there were major questions about how ballots were designed,

---

[9] The contracts signed by claimants with members of this coalition of lawfirms calls for the lawfirms to receive 40% of all settlements, plus recovery of their costs associated with representation.

[10] The allegations of wrongdoing were aimed more at the Pachulski lawfirm than at the TCC members, but so many slurs and outright lies about the TCC have been made by Rothweiler and the BSA that it is appropriate to simply refer to the TCC and its legal representatives together.

provided, and counted, as well as complaints from AIS clients [and a few *pro se* parties] about receiving a steady stream of communications from Rothweiler essentially demanding that votes be cast to accept the Plan. Virtually no communications were submitted complaining about the actions of either Kosnoff or the TCC. The complaints about Kosnoff and the TCC have almost all been generated by Rothweiler and the BSA. In fact, the animosity between the BSA and Kosnoff has become nothing more than an unseemly schoolyard shouting match.

Schwindler sought discovery in the form of admissions and production of documents or information from the BSA and Patriots' Path Council, BSA prior to the Court's imposed October 8, 2021 deadline for fact discovery. Neither party answered or objected to Schwindler's discovery request prior to the Court's November 5, 2021 deadline for production of most discovery, and in fact, never answered or objected even after Schwindler sought orders from the Court finding the statements to be admitted as a matter of law, and compelling production of documents or information.

1. Therefore, each and every fact set forth in ███████████ initial tort complaint and proof of claim filed in this action stands admitted as a matter of law.

2. Using the information provided in the Plan at Article VIII.A [Claims Matrix and Scaling Factors - the TDPs], the BSA and Patriots' Path Council, BSA have admitted that ███████████ sexual abuse falls under Tier 1, and is scaled upward to the maximum allowable claim value pursuant to factors set forth at D(i)a, and (iii)a-f; placing his claim value

7

at $2,700,000. This is approximately the amount ████████ could have expected to receive within the state tort process.

In response to numerous problems and complaints, the Court extended the voting deadline from December 15, 2021 to December 28, 2021. Of 82,209 possible votes, the preliminary voting report showed a total of 53,888 [66.67% of eligible voters] were received and recorded by Omni Solicitation Agents. 39,401 votes were received to confirm the Plan, with 14,487 votes to reject the Plan. 7919 voters opted to accept the $3,500 expedited payment. The percentage of all votes to accept the Plan is 73.12%. Consistent with the behavior of the BSA and Omni throughout this process, the preliminary report of voting results was not produced as ordered by the Court prior to the close of business on January 4, 2022.

The final voting report was not substantially different from the preliminary voting report, but the BSA has sought to contend that the reason for receiving less than the 75% vote to confirm sought has been the "awful, mean, terrible" tweets of Mr. Kosnoff, and the falsification of master ballots by those law forms which opted to use that method of voting. As with the 112 years of sexual abuse within the BSA, not once has anyone associated with that organization taken the time to look in the mirror to honestly evaluate how things got to be this way. Like a small child accused of wrongdoing, the BSA points at everyone

except itself.  **The plan should not be confirmed.**

## SPECIFIC OBJECTIONS TO CONFIRMATION

### Expedited Payment Votes Skewed The Voting

Votes from those opting to accept the $3,500 expedited payment should not be counted as part of the same class as the rest of the direct abuse claimants because they are representative of a block of claimants with questionable claims from states in which they would be prohibited from receiving any payment in a tort action under the laws of those states.  This sub-class of direct abuse claimants was solicited by the mass tort lawfirms for the sole purpose of increasing their payout, while enabling them to take control of the case away from the TCC as representative for all tort claimants.  Each of these individuals is contributing approximately $1,400 to one of the mass tort lawfirms in exchange for delivering "yes" votes and $2,100 in "free" money without ever having to substantiate the validity of their claims.  Counting the votes of individuals who will not have to substantiate the validity of their claims not only dilutes the votes of those with valid claims, it significantly undermines confidence in the integrity of the voting process.  It also creates due process and equal protection problems related to the rest of the sexual abuse claimants by requiring them to pass through a review

process which the sub-class is exempted from completing.

The fact that 17.47% of the votes were cast by individuals who opted for the expedited payment option, and that 86.9% of this sub-class were votes to accept, should be sufficient proof that that this sub-class was created for the sole purpose of "taking control of" the case. If the 6882 expedited payment accept votes are deducted from the 39,401 votes to accept, and the 922 expedited payment reject votes are deducted from the 14,487 votes to reject, the totals become 32,519 to accept and 13,565 to reject. This reduces the percentage of votes to accept the Plan to 71.5%, and that is well below the percentage required for confirmation of a plan in which third party releases are being sought.

## Pre-Petition Tort Claimants Not Differentiated

The Plan makes no provision for differentiating between those individuals like ▇▇▇▇▇▇ who followed the laws of the states in which their abuse occurred, and timely filed tort actions within the courts of those states prior to the filing of the BSA's petition for Chapter 11 reorganization, and those who took no action until after Chapter 11 protection was sought. Failing to differentiate between these two classes violates the equal protection clause of the 14th Amendment to the United States Constitution. There can be no argument that

individuals who have "put their money and name of the line" to initiate legal action prior to the BSA's declaration of bankruptcy not only have valid claims, they have claims which would have produced significantly more compensation within the state tort systems than they could possibly expect in even the most generous bankruptcy proceeding. These pre-Chapter 11 sex abuse claimants should be treated differently than all other sex abuse claimants in this case.

1. In ████████ case, the BSA and Patriots' Path Council, BSA have conceded the validity and legal viability of his sex abuse claim by having neither responded to, nor objected to his discovery requests.

2. Assuming for the sake of argument that the trust distribution provisions [TDPs] set forth in the Plan are reflective of what a claim such as Schwindler's would have yielded as a settlement in the New Jersey Superior Court, there is no legal reason for discounting that amount, because the ONLY reason Schwindler has not received an award of $2,700,000 within the tort system is that the BSA prevented his case from proceeding against the local council.

3. 100% of the active tort actions like ████████ against the BSA and its local councils prior to February 19, 2020, were in states which have [or had at the time] open statutes of limitations for bringing a tort action for childhood sexual abuse. Each of those claimants should receive an award at 100% of whatever the value of their claim would have been within the state tort systems [using the TDPs] if the BSA had not prevented those claims from proceding.

4. The claims of each of the individuals who had properly filed tort claims prior to the BSA's bankruptcy filing should be paid first by the settlement trustee.

## Time-Barred Claims Improperly Being Accepted

The Plan provides for recoveries by sex abuse claimants from 41 jurisdictions where their claims would be time-barred in the state's tort system. While it might seem unfair, the reality is that the United States of America is a federal republic where the local jurisdictions set their own laws concerning things like statutes of limitations regarding torts. There is simply no authority in the law to require insurers or anyone else to pay claims which are time-barred. The real reason that these sex abuse claimants are included in the Plan is that the mass tort lawfirms specifically solicited claims which they knew had no value within the state tort systems, but if they could get them included within the Plan, the mass tort law firms would significantly increase their profits, and be in a position to control the case. Votes for or against the Plan from sex abuse claimants from the 41 other-than-open jurisdictions should not be counted at all, but if they are to be counted, they should be counted at a different rate than both those who were tort claimants pre-petition, and those sex abuse claimants who are from the 12 open jurisdictions.

1. The Plan subdivides the sex abuse claimants into 5 categories under the TDPs: Open [100%]; Gray 1 [50-70%]; Gray 2 [30-45%]; Gray 3 [10-25%]; and Closed [1-10%].

2. If it was necessary to permit time-barred claims to be accepted, voting should have been similarly differentiated to recognize the differing interests of the sub-categories.

3. A realistic voting scale should have been: Pre-Petition Claims [100%]; Open [75%]; Gray 1 [67%]; Gray 2 [50%]; Gray 3 [25%]; Closed [10%].

Equal protection does not mean that everyone everywhere is treated the same. It means that all similarly situated individuals are treated the same as all other similarly situated individuals. The Constitution doesn't change so that mass tort lawyers can have more claims to "represent" in bankruptcy. Individuals whose claims arise in states with time-bars are similarly situated to others whose cases arise in states with time-bars. They are not similarly situated with those whose actions arise in states without time-bars, nor are any of those who had no pending tort action prior to the Chapter 11 filing similarly situated with those like ▮▮▮▮▮▮▮▮ who had such pending actions. The Plan's failure to differentiate between these different sub-classes of sex abuse claimants violates the 14th Amendment of the United States Constitution.

## Bankruptcy Law Does Not Authorize Release Of Third Parties From Liability

The Plan releases numerous third parties from future liability related to the sexual abuse claims. The 252 local councils, which are not really third parties, but are in fact wholly owned subsidiaries of the BSA, are released from liability in exchange for making "voluntary" contributions towards the settlement trust. Chartered sponsoring organizations are released in two different ways - by

assigning their insurance policies covering sexual abuse which occurred after

January 1, 1976 to the settlement trust, or by making a monetary "contribution" to

that fund for sexual abuse which occurred prior to that date. The companies

which provided insurance to the BSA, the local councils, or the chartered

sponsoring organizations are released if they negotiate a "settlement" with the

Coalition and BSA to "buy back" those policies at a discounted rate.

Leaving aside the fact that the word "contribution" is being used in the

same euphemistic fashion the mob uses for extending "protection" to small

businesses, etc., as noted by United States District Judge Coleen McMahon of the

Southern District of New York in the case *In re Purdue Pharma L.P.*, No.

7:21-cv-08566-CM, 2021 WL 5979108 (S.D.N.Y Dec. 16, 2021), nothing in

bankruptcy law provides for the release of third parties from future litigation as

provided for in the BSA Plan.

In the *Perdue Pharma* case, certain of the objectors[11] appealed the

Bankruptcy Court's confirmation order to the District Court for the Southern

District of New York. On appeal, the issues included whether a bankruptcy court

---

[11] The objectors included, among others, the United States Trustee, as well as the states of California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia.

is statutorily authorized to grant non-consensual releases of direct (non-derivative) claims by third parties against non-debtors in connection with the confirmation of a chapter 11 bankruptcy plan. After examination of the relevant text of the Bankruptcy Code, Judge McMahon concluded that the Bankruptcy Code, in its express terms, by its silence, and by a purported grant of "residual authority," does not authorize such non-consensual, non-debtor releases, and therefore the Bankruptcy Court lacked statutory authority to impose the shareholder release contemplated by the Purdue plan. Specifically, the District Court held that each of the sections cited by the Bankruptcy Court confers on a bankruptcy court only the power to enter orders that carry out other, substantive and explicit provisions of the Bankruptcy Code, and that none of them create any substantive rights that authorizes the action taken by the Bankruptcy Court.

Judge McMahon's analysis of the express terms of the Bankruptcy Code addressed the sections cited by the *Perdue Pharma* Bankruptcy Court. The District Court analogized section 1123(b)(6) to section 105(a)'s authorization of "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]" and determined that if section 105(a) does not confer any substantive authority on the Bankruptcy Court, then section

1123(b)(6) cannot be read to confer such authority either.  Concerning section 1123(a)(5), Judge McMahon reasoned that (1) the release of claims against non-debtors falls outside the scope of section 1123(a)(5), and (2) section 1123(a)(5) does not authorize a bankruptcy court to approve something simply because doing so would ensure funding for a plan; that is, "the mere fact that the money is being used to fund implementation of the plan does [not] give a bankruptcy court statutory authority to enter an otherwise impermissible order in order to obtain that funding." Finally, the District Court also determined that section 1129(a)(1), like the cited sections of 1123, confers no substantive right that could be used to substantiate the release of claims against non-debtors.[12]

As to the issue of "residual statutory authority," the Judge McMahon concluded that such authority does not exist because there is nothing in the Bankruptcy Code that specifically authorizes the releases contemplated by the

---

[12] The District Court also noted that the releases at issue are inconsistent with the Bankruptcy Code for at least two reasons. First, because the releases discharge a non-debtor from debts that Congress specifically said could not be discharged by a debtor in bankruptcy and that "[r]eading the Bankruptcy Code as authorizing a bankruptcy court to discharge a non-debtor from fraud liability — something it is strictly forbidden from doing for a debtor — cannot be squared with the fact that Congress intended that the Bankruptcy Code 'ensure that all debts arising out of fraud are excepted from discharge no matter what their form." *In re Purdue Pharma*, 2021 WL 5979108, at *48 (citing *Archer v. Warner*, 538 U.S. 314, 321 (2003)).  As Judge McMahon noted, the legislative history of section 524(g) indicates that Congress explicitly assigned to itself, and not the courts, the task of determining whether and how to permit non-debtor releases outside of the asbestos context.

plan, and that the Bankruptcy Court is effectively being asked to insert a right that does not appear in the Bankruptcy Code in order to achieve a bankruptcy objective, and that is an outcome that is prohibited by *In re Dairy Mart*[13] and *Metromedia*.[14]

Judge McMahon's decision has already begun to influence jurists in other jurisdictions. On December 20, 2021, four days after Judge McMahon rendered the *Purdue Pharma* decision, District Judge David Novack in the Eastern District of Virginia heard oral argument challenging the release and exculpation provisions contained in the *Ascena Retail Group, Inc.*[15] debtors' confirmed liquidating plan. Citing Judge McMahon's decision, Judge Novack indicated that he is inclined to strike the third-party releases at issue, although they were described as "consensual" and criticized what he viewed as the common application of arguable "unique" facts to justify such releases. Beyond the doubtful legality of the releases provided under the Plan, there are factual issues related to each of the three groups identified for releases.

## The Local Councils Should Not Be Treated As Third Parties Or Released From Liability

[13] *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.* (In re Dairy Mart Conveniences Stores), 351 F. 3d 86, 92 (2d Cir. 2003).

[14] *Deutsche Bank v. Metromedia Fiber Network, Inc.* (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 142 (2d Cir. 2005).

[15] No. 20-33113-KRH (Bankr. E.D. Va. filed July 23, 2020).

Leaving aside the real-world fact that the local councils are not anything but wholly owned subsidiaries of the BSA, the reality is that not a single instance of sexual abuse occurred at the national council level, and not a single abuser was employed as either a professional scouter or volunteer directly by the national council. 100% of the sexual abuse occurred under the auspices of the various local councils. There is no rational or logical explanation for exonerating the entities which oversaw the actual sexual abuse in at least an indirect fashion. As has been pointed out repeatedly throughout the course of this case, the overwhelming majority of BSA assets are held by the so-called local councils. The BSA's sole reason for taking over all the lawsuits from its erstwhile subsidiary local councils was to protect those assets held by those local councils, and this is also the reason for the Plan granting releases to these ostensibly non-debtor third parties.

In ███████ case, the relationship between the sexual abuse and the local council was direct and there can be no argument as to the local council's liability. The abuser was a professional scouter who was employed as a district executive by the Morris-Sussex Area Council, BSA. He was not only the second senior-most employee of the council, he served as the council's camp director. As if this relationship was not sufficient to impute liability to the local council, that

council knew that the perpetrator had been transferred from a previous local council because he had been known to be involved in the sexual abuse of another young male member of scouting. There is no jury in the world which would not find the local council liable. This is especially true given the fact that professional employees of that local council subsequently harrassed and retaliated against Schwindler as part of a cover-up of the local council's culpability.

The Plan provides for all the local councils to be released from all liability in exchange for their combined "voluntary" $500,000,000 cash contribution to the settlement [and *maybe* an additional $100,000,000 in the future]. The Patriots Path Council, BSA was facing one or two tort actions prior to the BSA's Chapter 11 filing. The BSA claims that Patriots' Path Council now faces 197 claims valued between $69,887,850 and $317,497,125. [That's between $354,760 and $1,611,660 per claimant]. The "contribution" offered by Patriots' Path Council, BSA is $3,704,240 [$18,803 per claimant].

The BSA claims that Patriot's Path Council, BSA only has unrestricted assets of $7,830,214. This is an "interesting" claim since the council owned five summer camps at the time the BSA made this determination. The primary camp [Mount Allamuchy] is the same one where ▇▇▇▇▇▇ was repeatedly sexually abused [among numerous other locations during two different calendar years].

Allamuchy is 997 acres along Interstate 80 in an area due west of New York City where undeveloped land sells for an average of between $10,000 and $20,000 per acre. Simple math yields a value of between $9,970,000 and $19,940,000 for the camp. Needless to say, the lower value still exceeds the supposed total assets of the council by over two million dollars.

If the Patriot's Path Council, BSA had been required to answer ███████ tort claim within the original state court, it would have been a fairly simple matter to prove to the local court that the valuation of assets being reported is far short of the actual value, and if the Patriots' Path Council, BSA had been forced into bankruptcy by the various tort actions brought against the local council, all of the assets would have been potentially available as part of a settlement.

The Plan envisions Patriots' Path Council, BSA retaining $4,125,974 in assets. The BSA and Patriots' Path Council, BSA have admitted that the council maintained its own insurance policies throughout entire time of the existence of all three of the local councils which were merged into the Patriots' Path Council, BSA, and that these policies were in addition to those for the BSA in general. Assuming that the local council was forced to liquidate while facing the state court claims, even without insurance coverage or contributions from chartered sponsoring organizations, each of the current 197 claimants would have received

an average of $39,747. Add just $30,000,000 in insurance coverage [which is well below the amount the BSA admits was in force for Patriots' Path Council, BSA], and average settlement for the 197 claimants rises to $192,031.

What possible explanation can be provided for presenting a reorganization plan which leaves Patriots' Path Council, BSA with $4,215,794 in assets, and the 197 claimants against that council with average settlements of $32,846? Afterall, the 197 claimants against Patriots' Path Council would stand to receive **$6,901 more** from the liquidation of the council - even before adding in a penny of insurance or chartered sponsoring organization monies.

The explanation is simple. **This plan is not about compensating the victims of sexual abuse by BSA actors. It is all about finding ways to preserve the overwhelming majority of BSA assets.** The BSA's assumption of the defense of all the claims against the local councils brought about the necessity of declaring bankruptcy, because the BSA knew full well that it had insufficient assets to cover even a small portion of the liability for claims against the councils. By taking this action, the BSA **deliberately** created the largest and most complex bankruptcy proceding in history.

The reality is that most of the 252 local councils were not facing any sexual abuse claims in the state courts at the time the BSA filed for bankruptcy. The only

local councils which faced potentially significant liability were those located within the 12 open jurisdictions. For the sake of argument, if we assume that a fourth of all BSA local councils [63] are located within the open jurisdictions, each of those councils was facing an average of 4.3 claims. Many of those councils had more than sufficient assets and insurance to satisfy the claims against them in February of 2020. Using the BSA's original estimate of how many additional claims would arise following bankruptcy, those 63 local councils faced a potential 1,200 additional claims because there was no reason for more to have been brought without the BSA itself filing for bankruptcy.

If there were in fact an additional 1,200 claims brought against those 63 local councils, each would have faced 23.4 sexual abuse claims.[16] Even with this number of claims, many of the local councils within these open jurisdictions would still have been able to manage liability using assets on hand and insurance coverage.[17] This is especially true given that the liability would have been shared by the far smaller number of chartered sponsoring organizations. A worst case scenario for these 63 local councils would have been that some of them would likely have been forced into bankruptcy in precisely the same fashion as were a

---

[16] Each of the 252 local councils is currently facing 325 sexual abuse claims - with most of those claims being legally time-barred within the local jurisdictions.

[17] The local councils within these 12 jurisdictions are the wealthiest in the BSA "empire."

22

small number of Catholic diocese, and like those diocese, those local councils would have been significantly reorganized.

If in fact a number of those open jurisdiction councils had been forced into bankruprcy, the resultant procedings would not have been particularly complicated. There would not have been hundreds of insurers involved, and even those like Hartford and Century which would have faced claims in many, if not most of these cases, the worst case total liability would have been manageable, and far less subject to dispute. There would not have been tens of thousands of chartered sponsoring organizations being asked to "contribute" to a general fund which has little to nothing to do with each such organization's culpability.[18] If any of these local councils faced such liability that they were

---

[18] ██████████ case has two such chartered sponsoring organizations: American Legion Post #59, and St. Peter's Episcopal Church. As far as can be ascertained, his claim is the only one involving either of those organizations. Why should either of these organizations "contribute" a reasonable amount to a settlement fund which will not benefit Schwindler specifically when they can get a pass by making a minimal "contribution" to a general settlement fund? They face no bad publicity from being identified as part of a local tort action in the town in which they are located. Yet, in Schwindler's case, he was not only "recruited and delivered" to his abuser by a leader of the BSA troop at St. Peter's, he was abused multiple times at numerous places inside St. Peter's church building, and when his abuser decided he needed even more access to abuse ██████ than he had at St. Peter's, he arranged for Schwindler to transfer his membership to a troop sponsored by American Legion Post #59, where the scoutmaster of that troop would facilitate almost unlimited access to ██████ - going so far as to drive him to the local scout camp repeatedly. It should be intuitively obvious to the most casual of observers that neither of these chartered sponsoring organizations would want any part of the facts made public in a local court.

required to liquidate, the BSA would have been able to consolidate them with neighboring local councils as it has done repeatedly throughout its history. Most important of all, the BSA would not have suffered the [probably] fatal blow to it's reputation or ability to survive. There is one reason, and one reason only that the BSA did not permit the system to work - **the goal was not about compensating the victims of sexual abuse by BSA actors. It was and is all about finding ways to preserve the overwhelming majority of BSA assets.**

The actions of Patriots' Path Council, BSA during the past few months clearly illustrate this point. The rule in bankruptcy is that debtors are not permitted to dispose of any assets without the explicit permission of the Court, but by adhering to the fiction that the local councils are not really part of the BSA, Patriots' Path Council, BSA recently disposed of the 1,250 acre [with 250 acre lake] Sabbatis High Adventure Camp located in the Adirondack Mountains of upstate New York in what can only be characterized as a questionable deal. The "purchaser" paid an "undisclosed amount" for the camp, and "lent" the camp back to the local council for "at least" the next five years. This is fraud, plain and simple. It is flagrant hiding of assets to prevent their use to satisfy legitimate claims against the [true] estate. Normal people go to prison for engaging in such actions. The BSA [and Patriots' Path Council, BSA] expects to get a "free pass"

because it is such a "wholesome" organization that contributes so much value to American society.

The BSA insists that it needs the local councils to retain assets so that they can continue to offer the scouting experience [presumably without the endemic sexual abuse of participants]. Again, ignoring the fact that not a single one of the local councils is anything but a wholely owned and operated subsidiarity of the BSA, an examination of the Patriots' Path Council, BSA provides some pursuasive arguments as too why the assets being retained are far greater than anything reasonably necessary to carrying out the BSA mission.

The Morris-Sussex Area Council, BSA owned and operated one camp 60 years ago [when ▮▮▮▮▮▮▮ sexual abuse occurred]. That camp, Allamuchy, initially had 9 regular camp sites and 2 primitive camping sites [which were seldom used] in 1960. It had a 350 person dining lodge with professional kitchen, 5 winterized cabins with kitchens, a ranch style ranger's residence, 5 room medical cabin, administration building [with office, conference room and bunkroom], and a storage/maintenance building. ▮▮▮▮▮▮▮ was part of the team which established 3 additional regular campsites in 1961. The camp operated an 8 week long camping season with an average of 325 campers per week [2,600 per year]. The local council covered a two county area in northwest

New Jersey. It was the smallest local council by membership in northwest New Jersey.

The Watchung Area Council, BSA was to the north and east of the Morris-Sussex Area Council, BSA in Union and Middlesex Counties. It operated a 450 acrea summer camp which served a similar number of scouts during an 8 week summer camping season. The Central New Jersey Council, BSA was immediately south of the Morris-Sussex Area, BSA. It also had its own camp and offered a similar number of scouts a summer camping experience. All together, these three councils served a total of approximately 7,800 scouts at summer camp each year. Without going into details, the Central New Jersey Council, BSA to the south of Morris-Sussex Area Council, BSA was disbanded by the BSA, with the northern third of that council in Somerset County being added to the council formed by merging Morris-Sussex Area Council, BSA with Watchung Area Council, BSA to form the Patriots' Path Council, BSA. None of these ostensibly independent local councils made the decison to "reorganize" on its own. The decision was solely the BSA's,[19]

As noted above, the Patriots' Path Council, BSA owns [we'll "pretend" it

---

[19] One wonders how a nationally chartered corporation could force two or three ostensibly independent local corporations to merge unless those local corporations are not actually independent, but are wholly owned subsidiaries.

didn't really sell the Sabbatis Camp since it retains use of the camp] 5 summer camps, but it only operates one of those camps as a full-time summer camp: Allamuchy. Not a single new camp site has been developed there over the past 60 years. Not a single new structure has been added to the camp. In fact, nothing significant has changed concerning the physical plant at the camp since the rifle and archery ranges were relocated 55 years ago [by ███████ - when he was serving as Camp Commissioner] to accommodate the building of Interstate 80. Allamuchy now offers a 6 week summer camping season, with an average of under 300 campers per week [1800 campers per year].

So... Take three BSA local councils which served 7,800 scouts for summer camp 60 years ago, combine two and a half of them into one much larger council by geography [New Jersey only has 16 counties, and Patriots' Path Council, BSA serves almost a third of them], **increase the number of camps by 500% so that you can serve 30% fewer campers than just one [the smallest of the group] of those councils served 60 years ago.** It should go without saying that this is not a successful business plan, nor is it a mark of an organization which knows what it is doing - unless the business it is in is the accumulation of assets. The BSA has been losing membership at a significant pace for sixty years, while at the same time significantly increasing the assets held, and the compensation for its

professional employees.

Patriots' Path Council, BSA has much more than five times the number of assets it needs to serve the number of scouts it has, and it should be obvious that even if the membership were to grow by 30% [which is well beyond the realm of conceivability], Camp Mount Allamuchy, alone, is more than sufficient for the task. This being the case, Patriots' Path Council, BSA should not be seeking to retain $4,125,974. Quite honestly, standard business practices dictate that this local council should be merged with the current central and north New Jersey local councils into one, and only one service center, and one summer camp should be retained by that newly combined council, with all excess capacity assets liquidated for contributing to the settlement fund for sexual abuse claimants.

The BSA served over 4 million boys in scouting 60 years ago. It served fewer than 1 million last year. If the BSA wants its local councils to be released from liability, since the organization is serving fewer than one fourth the number of youth it was serving 60 years ago, part of the reorganization absolutely must be the reduction in the number of local councils to no more than one third the current number, with the complete liquidation of all the assets of two thirds of the current local councils, as well as the liquidation of all excess capacity camps,

properties, and investments.  Taking the total reported assets of Patriots' Path

Council, BSA as an average value for local councils, this would yield a minimum

additional contribution towards the trust of close to a billion and a half dollars.

## The Chartered Sponsoring Organizations Should Not Be Released From Liability

The Plan calls for tens of thousands of chartered sponsoring organizations

to be treated as third parties which will be released from future liability under

one of two scenarios: [1] by assignment of their insurance to the settlement trust

for claims of sexual abuse occurring after January 1, 1976, and [2] by making a

"voluntary contribution" to the settlement trust for claims before that date.  The

two largest chartered sponsoring organizations [The Church of Jesus Christ -

Latter Day Saints (TCJC) and the United Methodist Church (UMC)] have agreed to

participate as contemplated by the Plan.[20]

The fact that the majority of the chartered sponsoring organizations have

not agreed to participate in the Plan means that the settlement trust will have to

either forego receiving any contribution from those which do not participate, or

will be forced to continue negotiations and/or litigation after confirmation of the

---

[20] TCJC has agreed to a $250,000,000 contribution - which is restricted to those whose abuse occurred while members of BSA units sponsored by TCJC.  UMC has agreed to a $30,000,000 contribution.

Plan. The BSA and Coalition don't care about that minor detail. As long as they can get a quick resolution with the largest chartered sponsoring organizations, they have no problem leaving the majority of the small chartered organizations subject to continuing litigation.

Essentially, the Plan is structured in such a fashion that only those chartered sponsoring organizations which have centralized governing bodies and face substantial liability for sexual abuse claims have any motivation to participate in the Plan, because those entities will be able to receive a complete pass for contributions which in no way reflect what their liability would be in the tort system. This is especially true for the TCJC (which has severed all ties with the BSA) and the UMC, which is now by far the largest chartered sponsoring organization. These two organizations' financial support for the Plan are well below what their liability would be in the tort system. Given the fact that the UMC sponsored almost as many units as TCJC, one wonders how anyone can argue with a straight face that the UMC $30,000,000 contribution is reasonable when compared with the $250,000,000 of TCJC; especially since the UMC sponsored many more units in open jurisdictions.

The logical explanation for the BSA/Coalition acceptance of the UMC contribution offer is that there is virtually no way for the BSA to continue

operating without those UMC units. The BSA needs the UMC to continue sponsoring units, and since this reorganization has less than nothing to do with compensating those who've been sexually abused while in scouting, the BSA wants to give a pass to the UMC in order to guarantee that relationship continues.

Chartered sponsoring organizations which face only one [or a few] sexual abuse claims, such as those in ██████████ case, have no reason to contribute, or if they choose to do so, there is no reason for them to make substantial contributions. Taking the facts of ██████████ case and using the current TDPs, the total damages are roughly $2,700,000. Assuming that the local council bears 90% liability, the two chartered sponsoring organizations share 10% liability, or approximately $135,000 each. This is undoubtedly more than either has available, which means yet another insurance claim dispute. It is unreasonable to believe that the settlement trust would have any success obtaining these funds without litigation on ██████████ behalf, the reality is that ██████████ would have to continue his state tort action solely against these two organizations, and without the local council as a defendant, such a case becomes far more difficult to prosecute. There is simply no reason for either of these organizations to voluntarily contribute anything beyond a nominal amount, which would not be earmarked for ██████████ in any case, thus ██████████ claim would be reduced

in value, and the two organizations which facilitated the abuse will receive a pass.

Beyond the reality of ████████ case, one would reasonably wonder why any chartered sponsoring organization in a jurisdiction which is not one of the 12 open jurisdictions would want to be in any way involved with this Plan, except as related to the small number of claims which could conceivably be brought in the tort system. Why would such an organization which faced no potentially valid claims want to be involved? There are simply too many chartered sponsoring organizations with too many different situations for the Plan to properly apportion liability [which it clearly does not seek to do as seen with the disparate treatment of the UMC and TCJC].

## The Plan Is Not Made In Good Faith

The reality remains that the local councils are wholly owned and operated subsidiaries of the BSA, and as such they should be joined to the Chapter 11 action, because any other result permits the BSA to shield assets from use for adequately compensating the sexual abuse victims, but this deficiency could be cured by an honest plan of reorganization. An honest reorganization plan would consolidate the local councils to a third the current number, reduce property assets to meet the actual needs of a much smaller BSA membership, reduce the

overall number of employees, and the compensation for those employees, both within the local councils and nationally to a ratio of employees to scouts approximately equal to that in place at the time of greatest membership 60 years ago. Most corporations seeking reorganization seek to emerge from bankruptcy with a leaner and meaner structure that is more tightly focused on the corporation's core business. The BSA's by-laws provide the authority to do all of the above. The Plan put forward by the BSA seeks to maintain the same flawed organizational structure without doing any of the above. This organizational and operational structure has proven to be inadequate for 112 years.

The BSA paints a completely unrealistic picture of its path moving forward. It is delusional to believe that the constantly declining membership will suddenly begin increasing simply because the BSA emerges from bankruptcy. The BSA touts the percentage increase in female membership as if a percentage increase from a tiny number to a less tiny number is significant. The BSA seeks to blame its membership woes on the pandemic, while remaining oblivious to the fact that pre-pandemic it was already serving fewer than a third the number of kids as it did 60 years ago. Disturbingly, the BSA has no clue how it can change the factors that have resulted in the largest child sexual abuse scandal in history. It swears it has changed, but nearly 20% of all claims are from after the implementation of

the BSA's new, improved child protection protocols.

The BSA also provides no reasoning to support its unsupported claim that the inclusion of girls in scouting is going to somehow fix the problem. One should ask why any parent of a boy would want their son to be part of an organization with a 112 year track record of molesting boys, and why the parent of any girl would allow their daughter to become a part of an organization with such a long history of sexual abuse? Does anyone really believe that putting boys and girls together will make for less sexual misconduct? Not only the negative aspect of this equation, but the BSA seems to assume that the Girl Scouts of America - which has never had a similar problem - is somehow not competition that needs to be taken into account.

There is simply no basis for believing that the BSA has any plan for moving forward beyond getting rid of the nuisance of these 82,209 sex abuse claims as expeditiously as possible before going back to business as before. Without a radical restructuring and downsizing of the organization, there is next to no possibility that the BSA won't continue facing sexual abuse claims, nor is there any likelihood that it will ever redirect its focus to the welfare of the youth it claims to serve as long as it continues to maintain its attentions on acquiring and maintaining assets. Again, the Patriots' Path Council, BSA now serves fewer than

30% of the number of kids than the old Morris-Sussex Area Council, BSA served by itself 60 years ago, and it has more than 500% of the facilities it had back then. [This council is two and a half times larger than the old Morris-Sussex Area Council, BSA.] The salaries of the professional scouts employed by the council have been inflated beyond all reason to where entry level employees are compensated at a rate above the local median wage.

Not only is nothing about the Plan submitted by the BSA and Coalition made in good faith, the probability is high that the BSA is doomed as an organization because of the failure to radically downsize and restructure to meet the reality of today's world. 2022 is not 1962. Scouting requires a significant commitment in time and effort by its members. A scout spends hours a week outside of unit meetings in order to learn skills and advance in rank. Regular activities such as hikes and camping trips are required. In 1962, boys were not faced with unlimited athletic opportunities, cellphones, social media, specialized interest activities and camps. There was scouting, and very little else to occupy a boy's time. Television and various sources of entertainment were limited. Even athletics were restricted to a few hours a week. Scouting is no longer the only game in town. The BSA doesn't seem to comprehend this fact. Youth in 2022 do not have the free time to commit to scouting like they did in 1962. That is simply

reality, and nothing the BSA says or does is likely to change the reality. A realistic plan would take this reality into consideration and include it as part of the focus going forward. Retaining excess assets is the precise opposite of what is necessary to respond to reality.

## The Proposed Trust Is Not Sufficiently Independent

One of the clearest indictions of the improper relationship between the BSA and the Coalition is the proposed appointment of Coalition lawyer Kenneth Rothweiler to the proposed trust oversight committee. ███████ submits that an attorney who represents any of the parties to this case has no business being on any committee associated with carrying out the Plan. Everyone knows that the trust is going to be a huge money-maker for those involved with operating it. That is the nature of trusts, but that doesn't mean that the Court can't require that the trust be absolutely independent, and require that it maximize payment of claims while keeping operating costs to a minimum.

# THE PLAN SHOULD NOT BE CONFIRMED

For the reasons set forth above, ███████ objects to confirmation of the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [D.I. 7832].

I certify that I have served copy of the within and above █████████

████████ Objections to Confirmation of Debtor's Second Modified Fifth

Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and

Delaware BSA, LLC [D.I. 7832] upon the parties by emailing same as follows:

**COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION:**
WHITE & CASE, LLP
Jessica C. Lauria
jessica.lauria@whitecase.com
Michael Andolina
mandolina@whitecase.com
MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
Derek C. Abbott
dabbott@morrisnichols.com
Paige Topper
ptopper@morrisnichols.com

**UNITED STATES TRUSTEE**
David L. Buchbinder
david.l.buchbinder@usdoj.gov
Hanna Mufson McCollum
hannah.mccollum@usdoj.gov

**COUNSEL FOR TORT CLAIMS COMMITTEE**
PACHULSKI, STANG, ZIEHL & JONES, LLP
James Stang
jstang@pszjlaw.com
James O'Neill
joneill@pszjlaw.com

This 1st day of February 2022.

—————



