## Exhibit A

**TCC Term Sheet**

**THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS WITH RESPECT TO THE TCC SETTLEMENT DESCRIBED HEREIN, WHICH SHALL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY AND NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES AND THE EFFECTIVE DATE OF THE PLAN HAS OCCURRED. THIS TERM SHEET IS SUBJECT IN ALL RESPECTS TO MEDIATION PRIVILEGE, FEDERAL RULE OF EVIDENCE 408, AND ANY STATE LAW EQUIVALENTS.**

## The Tort Claimants Committee Settlement Term Sheet

This Settlement Term Sheet (this "***Term Sheet***"), among Official Committee of Tort Claimants (the "***TCC***"), Boy Scouts of America and Delaware BSA, LLC (together, the "***Debtors***"), the Coalition of Abused Scouts for Justice (the "***Coalition***"), the PFAU/Zalkin Claimants ("***PFAU/Zalkin***") the legal representative for future claimants (the "***FCR***" and, collectively with the TCC, PFAU/Zalkin and the Coalition, the "***Claimant Representatives***"), and the Ad Hoc Committee of Local Councils (the "***AHCLC***",[1] and collectively with the Debtors and the Claimant Representatives, the "***Parties***") describes the terms of a proposed settlement (the "***TCC Settlement***") in connection with the Chapter 11 cases (the "***Chapter 11 Cases***") of the Debtors and certain related disputes and other matters being resolved pursuant hereto. The attorneys representing holders of Direct Abuse Claims listed on Schedule 1 hereto (the "***State Court Counsel***"), including PFAU/Zalkin, agree to recommend to their clients who voted to reject the Plan to change such clients' votes to accept the Plan (as revised) in accordance with this Term Sheet. This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code. Capitalized terms used but not otherwise defined in this Term Sheet shall have the meanings assigned to them in the *Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 7832] (the "***December 18 Plan***").

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documents implementing the TCC Settlement, which remains subject to negotiation in all respects in accordance herewith. The definitive documents shall be in a form reasonably satisfactory to the Debtors and the Claimant Representatives. The Parties reserve all rights in the event an amended Plan is filed that is inconsistent with the terms of this Term Sheet.

---

[1] Notwithstanding anything to the contrary in this Term Sheet, the obligations and undertakings of the AHCLC in connection with this Term Sheet or the Agreement shall be no greater than the AHCLC's parallel obligations and undertakings under Section III of the Restructuring Support Agreement (including the "No Liability" subsection thereof) filed at Dkt. 5466-2.

| TERMS OF THE TCC SETTLEMENT |
|---|

| | |
|---|---|
| **Abuse Claim Definition** | The definition of "Abuse Claim" in the December 18 Plan shall be amended and restated as set forth on **Exhibit A**. The definition of "Mixed Claim" shall be added to the Plan as set forth on **Exhibit A**. |
| **Trust Distribution Procedures & Independent Review Process** | The TDP shall be amended to provide for an Independent Review Process as set forth on **Exhibit B** hereto.<br><br>The Trust Claim Provisions of the TDP will be amended to include the changes reflected in **Exhibit C** hereto.<br><br>Other changes to the Settlement Trust and TDP to reflect governance discussion, removal of Special Reviewer and to otherwise conform to this Term Sheet. |
| **Independent Review Option** | Abuse Claimants shall:<br>1. Elect to participate in the Independent Review Process or Continue through TDP process.<br>2. If an Abuse Claimant pursues a non-channeled Chartered Organization and the Settlement Trust settles with the Chartered Organization in question such that claims against it become channeled (a) the Settlement Trust shall provide notice of such settlement to any Abuse Claimants (as defined in the TDP) that are pursuing any non-channeled Chartered Organizations and (b) such Abuse Claimants shall have thirty (30) days from notice of the effectiveness of the Settlement Trust's settlement to select the Independent Review Process at that time.<br><br>Post-Effective Date Guardrails:<br><br>1. Insurance settlements with excess insurance will not be executed until after the initial deadline for filing independent review claims. Exceptions to this include: (i) settlements involving insurance with aggregate limits where the settlement is for 90% or more of the remaining aggregate limits; and/or (ii) a settlement that is proposed by the Settlement Trustee and approved by at least five (5) members of the STAC and the FCR on the condition that the Settlement Trustee supports the settlement and determines that the proposed settlement is in the best interests of the Settlement Trust and that one or more of the Specified Circumstances (to be set forth in a separate document) are present. In such circumstance, the Settlement Trustee may close the proposed settlement without Bankruptcy Court approval. Notwithstanding the above, if a STAC member dissents from approval of the proposed settlement and |

| TERMS OF THE TCC SETTLEMENT |
|---|

| | wants the Settlement Trustee to seek Bankruptcy Court approval of the proposed settlement, such approval shall be conditioned on the Bankruptcy Court finding that the proposed settlement is in the best interest of the Settlement Trust and that the Settlement Trustee has reasonably determined that one or more of the Specified Circumstances exist. |
|---|---|
| | 2. The Settlement Trust Agreement will provide that in assessing excess insurance settlements the Settlement Trustee and STAC will consider principally the interests of Abuse Claims (whether determined through the Independent Review Process or the TDP) that enhance the collection of excess insurance. |
| | 3. Excess insurance settlements must be supported by an independent expert opinion that the settlement value was fair in light of the expected liabilities against the insurance, unless de minimis. The Settlement Trust shall recover the cost of such expert opinion from the first dollars paid on account of such settlement. The expert must take into account the opinions of the holders of Independent Review claims whose claims are covered by the insurer at issue. |
| | 4. Unless the excess insurance settlement is for an aggregate limit excess policy settled at or above 90% of the available aggregate limit, the Settlement Trustee and STAC shall consider the opinions of claimants that opted for an Independent Review of their claims and who have a claim that is covered by the insurer at issue. |
| **Chartered Organizations** | The Plan shall be amended to provide for the following terms regarding the channeling of Abuse Claims against the Chartered Organizations:<br><br>**TCJC**.  Same terms as provided in the December 18 Plan, but PFAU/Zalkin may object solely to the definition of Abuse Claim as it pertains to TCJC.<br>**United Methodist Entities**.  Same terms as provided in the term sheet attached to the Eighth Mediator's Report [D.I. 7884].<br>**Roman Catholic Entities and Other Chartered Organizations**. Same terms as provided in the December 18 Plan (*i.e.*, opportunity to become Limited Protected Parties by not objecting to the Plan in addition to channeling of Abuse Claims covered by any insurance policy issued by a Settling Insurance Company); provided, however, that Other Chartered Organizations shall not become Protected Parties upon the making of the Supplemental LC Contribution by the Local Councils.  Prior to the Effective Date, no Roman Catholic Entity or Other Chartered Organization may become a Contributing Chartered |

| TERMS OF THE TCC SETTLEMENT |
|---|
| Organization absent a separate contribution to the Settlement Trust in an amount acceptable to each of the Claimant Representatives. Except as set forth below, after the Effective Date, no Roman Catholic Entity or Other Chartered Organization may become a Contributing Chartered Organization absent a separate contribution to the Settlement Trust in an amount acceptable to the Settlement Trustee and at least four (4) STAC members. If the Settlement Trustee recommends a settlement and the FCR approves of the proposed settlement, but the STAC does not approve the proposed settlement (irrespective of the STAC vote), then the FCR may seek Bankruptcy Court approval of the proposed settlement consistent with the terms of the Settlement Trust Agreement. The Settlement Trustee may appear and be heard in connection with any motion brought with respect to approval of any settlement. If the Settlement Trustee has approval from the STAC and desires to enter into a settlement with a Roman Catholic Entity or an Other Chartered Organization that results in such entity or organization becoming a Contributing Chartered Organization and any member of the STAC or the FCR does not support the Settlement and requests Bankruptcy Court approval, then the Settlement Trustee must seek Bankruptcy Court approval of such Settlement. If Bankruptcy Court approval is sought, the Settlement Trustee must provide notice to the affected parties and approval of the settlement shall be reviewed by the Bankruptcy Court under entire fairness standard and in the best interest of beneficiaries of the Settlement Trust. STAC members may hire counsel at the expense of the Settlement Trust to oppose any settlement before the Bankruptcy Court. <br><br> With regard to a new Chartered Organization Settlement, (i) a Chartered Organization Settlement shall be based on a substantial contribution from the Chartered Organization that takes into account the value of the claims against the Chartered Organization and the Chartered Organization's ability to pay (from assets and separate insurance), and (ii) where a settlement is made on behalf of more than one Chartered Organization (or its affiliated entities) and the funds are not coming directly from a Chartered Organization (or its affiliated entities) or an insurance company directly insuring the Chartered Organization (or its affiliated entities), the holders of claims that had maintained lawsuits against non-settling and unprotected Chartered Organizations (or its affiliated entities) will be permitted to opt out and maintain their lawsuit. <br> **Chartered Organizations that "Opt Out"**. Chartered Organizations that are not Contributing Chartered Organizations or Participating Chartered Organizations shall receive the same terms as provided in the December 18 Plan. |

| TERMS OF THE TCC SETTLEMENT |
| --- |

**Post-Confirmation Preliminary Injunction Extension**. As part of the consideration of a portion of the Supplemental LC Contribution, any Chartered Organization that is a Limited Protected Party shall enjoy an extension of the preliminary injunction for twelve (12) months ("Initial Injunction Term") following the Effective Date to afford such Chartered Organization an opportunity to negotiate an appropriate settlement with the Settlement Trust.

Extensions:

1. The twelve (12) months may be extended by the Settlement Trustee for six (6) months with approval of the majority of the STAC and the consent of the FCR as to Charters for which the Settlement Trustee articulates good cause for believing the Settlement Trust might settle with the Chartered Organization on a global basis provided that there shall be no extension of the injunction beyond the Initial Injunction Term, without the unanimous consent of the STAC and the FCR, as to Chartered Organizations that individually or in combination with other Chartered Organizations with which they are organizationally affiliated are named in fewer than 25 proofs of claims filed by survivors.

2. The eighteen months may be extended by the Settlement Trustee for six (6) months with unanimous approval of the STAC and consent of the FCR where the Settlement Trustee is negotiating to finalize settlements with a Chartered Organization.

3. The twenty-four (24) months may be extended only by the Settlement Trustee with unanimous approval of the STAC and the consent of the FCR, along with approval of the Bankruptcy Court.

4. Within thirty (30) days after expiration of the Initial Injunction term and each extension thereof, the Settlement Trustee shall publish a list of the Chartered Organizations that are subject to the preliminary injunction following the expiration of the prior period.

5. Any of these extensions may be extended by the Settlement Trustee with the unanimous consent of the STAC and the FCR.

**TDP Releases**. The TDP Releases shall be revised to be consistent with the amended definition of "Abuse Claim" and the Independent Review Process so that distributions from the Settlement Trust to the holders of Abuse Claims shall be limited to the following releases (i) each of the Contributing Chartered Organization for any Abuse Claim, (ii) each of the Participating Chartered Organizations for Post-1975 Chartered Organization Abuse Claims, and (iii) all Chartered Organizations for any Abuse Claims covered by any insurance policy

| TERMS OF THE TCC SETTLEMENT | |
|---|---|
| | issued by a Settling Insurance Company.  Other than (i) through (iii) in the preceding sentence and holders of Direct Abuse Claims that make the Expedited Distribution Election (which TDP release shall remain the same as filed on December 18), holders of Direct Abuse Claims shall be able to recover the full amount of their trust distribution from the Settlement Trust on account of their Direct Abuse Claims without further releasing Chartered Organizations. **Participating Chartered Organizations**.  The December 18 Plan shall be amended to clarify that any Chartered Organization that is a member of an ad hoc group that objects to the Plan shall not be a Participating Chartered Organization. TDP and Settlement Trust Consent, Settlement, and Amendment Procedure to be revised to make consistent with this Term Sheet. |
| **Existing Insurance Settlements** | **Hartford Settlement**.  Same terms as provided in the December 18 Plan subject to addition of "free and clear" provisions provided below. Settlement amount of $787 million to be supported by each of the Claimant Representatives. **Century Settlement**.  Same terms as provided in the December 18 Plan subject to addition of regulatory approval condition set forth below.  Settlement amount of $800 million to be supported by each of the Claimant Representatives. **Zurich Settlement**.  Same terms as provided in the December 18 Plan. Settlement amount of $52.5 million to be supported by each of the Claimant Representatives. **Clarendon Settlement**.  Same terms as provided in the December 18 Plan.  Settlement amount of $16.5 million to be supported by each of the Claimant Representatives. |
| **New Insurance Settlements** | **Prior to the Effective Date**.  Prior to the Effective Date, no Insurance Company shall become a Settling Insurance Company absent the prior written consent of the Debtors and each of the Claimant Representatives. **After the Effective Date**.  Except as set forth below, the Settlement Trustee may settle with Insurers with approval of at least (4) STAC members.  If the Settlement Trustee recommends a settlement and the FCR approves of the proposed settlement, but the STAC does not approve the proposed settlement  (irrespective of the STAC vote), then the FCR may seek Bankruptcy Court approval of the proposed settlement consistent with the terms of the Settlement Trust Agreement.  The Settlement Trustee may appear and be heard in connection with any motion brought with respect to approval of any settlement.  If the Settlement Trustee has approval from the STAC and desires to enter into a Settlement with an Insurer, and  any non-consenting STAC member or the FCR requests, the Settlement Trustee shall seek Bankruptcy Court approval of the proposed |

| TERMS OF THE TCC SETTLEMENT | |
|---|---|
| | settlement. If Bankruptcy Court approval is sought, the Settlement Trustee must provide notice to the affected parties and approval of the settlement shall be reviewed by the Bankruptcy Court under entire fairness standard and in the best interest of beneficiaries of the Settlement Trust. STAC members may hire counsel at the expense of the Settlement Trust to oppose any settlement before the Bankruptcy Court. **Findings and Orders**. The Findings and Orders set forth in Article IX.A.3.k, Article IX.A.3.j, Article IX.A.3.r, Article IX.A.3.s, Article IX.A.3.t, and Article IX.A.3.u shall not be modified, waived, or amended absent the prior written consent of each of the Claimant Representatives. The Findings and Orders set forth in Article IX.A.3 of the Plan shall be amended to add the following Finding as a condition precedent to the confirmation of the Plan, which Finding shall not be modified, waived, or amended absent the prior written consent of each of the Claimant Representatives: The Base Matrix Values in the Trust Distribution Procedures are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes. |
| **Insurance Settlement Proceeds** | The proceeds of any sale of any Abuse Insurance Policies, including the full settlement amount, shall be contributed to the Settlement Trust under the Plan "free and clear" of all liens, claims, encumbrances, and other rights of any nature, whether at law or in equity, and other "interest," under sections 363 and 1141 of the Bankruptcy Code, of any additional insured or any other person or entity in such Abuse Insurance Policies. Article IX of the December 18 Plan shall be amended to make this a condition precedent to confirmation of the Plan that cannot be waived absent the prior written consent of each of the Claimant Representatives. |
| **Century Regulatory Approval** | Acknowledging that the Debtors will not agree to conditioning regulatory approval upon approval of the Century Settlement, and acknowledging that Century will not agree to seek regulatory approval for the Century Settlement, we require the following:<br>1. Century will provide to the TCC and the Coalition the quarterly financial statement due to be filed with the Pennsylvania Insurance Department on March 1 (anticipated filing February 24), which will account for Century's share of the $800 million payment contemplated by the Century Settlement.<br>2. Century will provide the Department with the finalized Century Settlement Agreement and Plan of Reorganization in advance of an anticipated meeting with the Department following the filing of the financial statement and offer to |

| TERMS OF THE TCC SETTLEMENT | |
|---|---|
| | answer any questions the Department may have about the Agreement.<br>3. The Debtors will provide notice of the confirmation hearing, along with the Plan and operative exhibits, including the Century and Chubb Term Sheet (or subsequent finalized settlement documents) on the regulators responsible for oversight of Century, including but not limited to the Department of Insurance for the State of Pennsylvania and its Commissioner.<br>4. The Debtors will serve notice of entry of the Confirmation Order, notice of entry of the Affirmation Order, and notice of the Effective Date on the same parties in paragraph 3 of this section served with notice of the confirmation hearing. |
| **Contributing Chartered Organization Settlement Contribution** | Contributing Chartered Organization Settlement Contribution shall no longer result in the Other Chartered Organizations becoming Contributing Chartered Organizations under the Plan.<br><br>The $15 million cash component of the Supplemental LC Contribution and the $25 million increase in the DST Note shall both be reallocated and become the consideration given for the extension of the preliminary injunction. The $100 million Settlement Growth Payment from the BSA and Local Councils shall facilitate the protections to certain Chartered Organizations under the Plan but shall not be reduced or credited. |
| **BSA Settlement Contribution** | The Plan shall be modified such that any cash proceeds of the sale of Scouting U and the National Distribution Center will be included in the calculation of Net Unrestricted Cash and Investments rather than treated as separate contributions to the Settlement Trust. The cash retained by Reorganized BSA will be lowered from $53 million at the end of April to $42 million at the end of May and $33 million at end of June and thereafter (the "New Threshold"). If BSA has received the proceeds of the National Distribution Center, then to the extent that the amount of cash to be retained by Reorganized BSA is below the New Threshold and to the extent the amount of cash to be retained by Reorganized BSA is above $39 million at the end of April, $28 million at the end of May or $19 million at the end of June (the "Sharing Threshold"), the amount of cash retained by Reorganized BSA will be reduced by 50% of the difference between the initially calculated amount and the Sharing Threshold with such reduction capped at $7 million.<br><br>For example, if the BSA was set to retain $29 million at the end of June (i.e. $10 million more than the Sharing Threshold) it would be reduced by $5 million to only retain $24 million. |

| TERMS OF THE TCC SETTLEMENT | |
|---|---|
| | |
| **Expert Reports** | • The Debtors' confirmation submissions, including any proposed Confirmation Order, will provide that:<br>(1) the Expert Report of Charles E. Bates, dated December 5, 2021, the Rebuttal Expert Report of Charles E. Bates, dated January 5, 2022, and the Supplemental Expert Report of Charles E. Bates, dated January 25, 2022 (collectively, the "<u>Bates Report</u>") and any aggregate amount of liability for Abuse Claims supported or presented by Debtors in connection with confirmation:<br>    o has not been agreed to by any other party;<br>    o its estimate of the Debtors' potential liability was not the result of a contested hearing or other adversarial process; and<br>    o its conclusions are not a binding estimation of the Debtors' liability, nor are the Debtors or the Settlement Trust bound to its allocation of liability to insurance.<br>(2) the Expert Report of Nancy A. Gutzler, dated December 5, 2021, the Supplemental Expert Report of Nancy A. Gutzler, dated December 29, 2021, Rebuttal Expert Report of Nancy A. Gutzler, dated January 5, 2022, and the Second Supplemental Report of Nancy A. Gutzler, dated January 27, 2022 (collectively, the "<u>Gutzler Report</u>");<br>    o has not been agreed to by any other party,<br>    o its estimates of the Debtors' potential liability, and insurance allocations, were not the result of a contested hearing or other adversarial process, and<br>    o its conclusions are not a binding estimation of the Debtors' liability and insurance allocations.<br>(3) the actual amount of the liability of the Debtors for Abuse Claims will be liquidated and determined pursuant to the TDP and Trust Agreement (subject to all of the terms and conditions of the Plan).<br>• The Debtors shall consult with Claimant Representatives in good faith on the form of any proffers or statements of direct testimony to be provided by Dr. Bates and Ms. Gutzler in connection with the confirmation hearing, and such proffers will be truthful and consistent with their own opinions and support the positions that (i) the Debtors have satisfied the applicable legal standards for the approval of the non-debtor releases, injunctions, and the settlements in the Plan, and (ii) the Plan and amended TDP are a mechanism (which includes the agreed financial contributions and the rights transferred to the Trust to pursue non-Settling Insurance Companies and Chartered Organizations) that collectively |

| TERMS OF THE TCC SETTLEMENT | |
|---|---|
| | provides for payment of all, or substantially all, of the Abuse Claims. |
| | • The Debtors will support the assertion that the value ranges set forth in the TDP are consistent with and based on the Debtors' historical Abuse Claims settlement values. |
| | • No party will be prohibited from offering any other estimate of the Debtors' potential liability or allocation of that liability to insurance, or from filing a limited objection to the Plan relating solely to the Bates Report, provided that the Claimant Representatives shall consult with the Debtors in good faith on the form of any proffers, declarations, or statements of direct testimony, provided further that the Debtors and Claimant Representatives will in all events support, and will not dispute, the positions that: (i) the Debtors have satisfied the applicable legal standards for the approval of the non-debtor releases, injunctions, the settlements in the Plan, and (ii) the Plan and amended TDP are a mechanism (which includes the agreed financial contributions and the rights transferred to the Trust to pursue non-Settling Insurance Companies and Chartered Organizations) that collectively provides for payment of all, or substantially all, of the Abuse Claims. |
| | • The Debtors will not argue that the Bankruptcy Court must or should make any findings concerning the aggregate amount of the Debtors' liability for Abuse Claims to confirm the Plan and will not support the entry of any such findings. To the extent any finding purporting to find or establish the aggregate amount of the Debtors' liability for Abuse Claims is made, any Claimant Representative may withdraw their support of the Plan on that basis. |
| **Youth Protection** | The Youth Protection Plan shall be in the form attached hereto as **Exhibit D**. |
| **Document Sharing Agreement** | The term sheet for the Document Sharing Agreement shall be in the form attached hereto as **Exhibit E**. |
| **Settlement Trust Advisory Committee** | The Settlement Trust Advisory Committee (the "STAC") shall be composed of seven (7) individuals identified below, three (3) of whom shall be selected by the Coalition, three (3) of whom shall be selected by the TCC, and one (1) who shall be selected by Pfau/Zalkin. All STAC members shall be reasonably acceptable to the Debtors, which consent shall not be unreasonably withheld.

STAC members:
1. Adam Slater
2. Sean Higgins |

| TERMS OF THE TCC SETTLEMENT | |
|---|---|
| | 3.  Kenneth M. Rothweiler<br>4.  Deborah Levy (alternate)<br>5.  Jordan Merson<br>6.  Paul Mones<br>7.  Christopher Hurley<br>8.  Peter Janci (alternate)<br>9.  Irwin Zalkin<br>10. Michael Pfau (alternate) |
| **Settlement Trustee and Claims Administrators** | There will be one Settlement Trustee and two Claims Administrators. The Settlement Trustee and Claim Administrators will be identified in a notice filed with the Bankruptcy Court no later than February 14, 2022. |
| **Settlement Trustee and Claims Administrators Selection** | The proposed members of the STAC and the FCR will interview all proposed Settlement Trustee and Claims Administrator candidates. The Settlement Trustee and Claims Administrators will be selected only if approved by at least five (5) members of the STAC and with the reasonable consent of the FCR. |
| **Hiring of Settlement Trust Professionals** | The Settlement Trustee will decide on the hiring of counsel or other professionals.  The hiring of counsel or other professionals relating to or to be paid the Settlement Trust shall be approved by at least five (5) members of the STAC. |
| **STAC Consent** | Where STAC consent is required under the Settlement Trust Agreement for matters other than the selection of the Settlement Trustee and Claim Administrators and the hiring of counsel or other professionals, such consent may be obtained with the support of four (4) members of the STAC or more.  The FCR's consent rights, as set forth in the Settlement Trust Agreement, shall remain unchanged in all respects, except as otherwise set forth in this Term Sheet. |
| **Future Claimants' Representative** | The Settlement Trust Agreement shall provide for the continuation of the Future Claimants' Representative to represent the interests of holders of Future Abuse Claims.   The initial Future Claimants' Representative shall be James L. Patton, Jr. so long as he is the Future Claimants' Representative in the Chapter 11 Cases as of the Effective Date. |
| **Payment of Coalition and PFAU/Zalkin Restructuring Expenses** | The TCC and PFAU/Zalkin shall not object to the granting of a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, for the reimbursement and/or payment of the Coalition Restructuring Expenses.  The Coalition shall not object to the granting of a motion filed pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, for the reimbursement and/or payment of the PFAU/Zalkin Restructuring |

| TERMS OF THE TCC SETTLEMENT | |
|---|---|
| | Expenses. The Debtors shall pay (i) Coalition Restructuring Expenses, in accordance with the December 18 Plan, but in an aggregate amount not exceed $21 million and (ii) PFAU/Zalkin Restructuring Expenses in an aggregate amount not to exceed $3.5 million, provided, however, that the PFAU/Zalkin Restructuring Expenses shall be paid from Settlement Trust Assets. |
| **TCC Support for the Amended Plan** | The TCC shall support the confirmation of the Debtors' Plan, as amended to be consistent with this Term Sheet and withdraw any pending discovery. For the avoidance of doubt, the TCC will not be required to withdraw any expert reports deemed necessary by the TCC to support the confirmation of the Plan and the approval of the TDP. |
| **State Court Counsel Support of the Amended Plan and Voting Motion** | The State Court Counsel shall recommend that their clients who voted to reject the December 18 Plan that such clients change their votes to accept the Amended Plan and use best efforts to facilitate, but not guarantee, such changed votes. State Court Counsel agree to join or otherwise support the Debtors' motion to accept certain modified votes related to Plan settlements, including the terms of this Term Sheet. |
| **Fiduciary Out by the Debtors, TCC, and FCR** | Notwithstanding anything in this Term Sheet and TCC Settlement to the contrary, no term or condition of this Term Sheet and TCC Settlement shall require the BSA, the TCC, or the FCR to take or refrain from taking any action that it determines in good faith would be inconsistent with its fiduciary duties under applicable law. |

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have duly executed this Term Sheet as of the last date indicated below.

**The Official Committee of Tort Claimants**     **BSA (as defined)**

By: _John P Humphrey Jr_                    By: _____

Name: _John P Humphrey Jr_                   Name: _____

Title: _Co-Chairman, TCC_                    Title: _____

Date: _2/9/22_                               Date: _____

IN WITNESS WHEREOF, the Parties have duly executed this Term Sheet as of the last date indicated below.

**The Official Committee of Tort Claimants**　　　**BSA (as defined)**

By: _____　　　　By: _____/s/ Roger C. Mosby_____

Name: _____　　　　Name: _____Roger C. Mosby_____

Title: _____　　　　Title: _____President and CEO_____

Date: _____　　　　Date: _____February 9, 2022_____

**FUTURE CLAIMANTS REPRESENTATIVE**

In my capacity as Future Claimants Representative, I consent to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _Robert Brady_

Dated: _2/9/22_

**COALITION OF ABUSED SCOUTS FOR JUSTICE**

The Coalition consents to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____

**PFAU/ZALKIN CLAIMANTS**

By: _____

Dated: _____

By: _____

Dated: _____

**AD HOC COMMITTEE OF LOCAL COUNCILS**

The AHCLC consents to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____

In my capacity as Future Claimants Representative, I consent to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____


**COALITION OF ABUSED SCOUTS FOR JUSTICE**

The Coalition consents to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: *Eric Goodman*

Dated: 2-9-2022


**PFAU/ZALKIN CLAIMANTS**

By: _____

Dated: _____


By: _____

Dated: _____


**AD HOC COMMITTEE OF LOCAL COUNCILS**

The AHCLC consents to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____

**FUTURE CLAIMANTS REPRESENTATIVE**

In my capacity as Future Claimants Representative, I consent to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____


**COALITION OF ABUSED SCOUTS FOR JUSTICE**

The Coalition consents to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____


**PFAU/ZALKIN CLAIMANTS**

By: _____*AZakin*_____

Dated: _____2/9/2022_____


By: _____

Dated: _____


**AD HOC COMMITTEE OF LOCAL COUNCILS**

The AHCLC consents to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____

**FUTURE CLAIMANTS REPRESENTATIVE**

In my capacity as Future Claimants Representative, I consent to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____

**COALITION OF ABUSED SCOUTS FOR JUSTICE**

The Coalition consents to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____

**PFAU/ZALKIN CLAIMANTS**

By: _____

Dated: _____

By: _____

Dated: February 9, 2022

**AD HOC COMMITTEE OF LOCAL COUNCILS**

The AHCLC consents to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____

**FUTURE CLAIMANTS REPRESENTATIVE**

In my capacity as Future Claimants Representative, I consent to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____


**COALITION OF ABUSED SCOUTS FOR JUSTICE**

The Coalition consents to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _____

Dated: _____


**PFAU/ZALKIN CLAIMANTS**

By: _____

Dated: _____


By: _____

Dated: _____


**AD HOC COMMITTEE OF LOCAL COUNCILS**

The AHCLC consents to the Debtors' execution of the Term Sheet and entry into the TCC Settlement.

By: _RDMason, its chair_

Dated: _2/9/22_

# EXHIBIT A

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, *respondeat superior*, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such) or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon. Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting-related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations. For the avoidance of doubt, (i) a Claim alleging Abuse shall not be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "Abuse Claim" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, TCJC, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Mixed Claim**" means an Abuse Claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting ("Non-Scouting Abuse"). A claim shall not be treated as a Mixed Claim unless and until Scouting Abuse allegations have been asserted through a Proof of Claim, the Complaint, sworn discovery or testimony.

# EXHIBIT B

## Independent Review Process

# Independent Review Option

The Trust Distribution Procedures ("TDPs") shall be amended to provide for an Independent Review Option. This option presents an opportunity for a survivor to have an independent, neutral third party (selected from a panel of retired judges with tort experience maintained by the Trust) (a "Neutral") make a settlement recommendation (the "Settlement Recommendation") to the Trustee designated in the TDPs (the "Trustee"), seeking to replicate to the extent possible the amount a reasonable jury might award for the survivor's claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the claim under applicable law and applying the same standard of proof that would apply under applicable law. The Settlement Recommendation determined by the Neutral, if accepted by the Trustee (an "Accepted Settlement Recommendation"), shall be the allowed amount of the claim in accordance with the Plan against (i) the Debtors, (ii) other Protected Parties, and (iii) Chartered Organizations. The survivor must assign its Abuse Claim against any Chartered Organization to the Trust as a condition to receiving the Accepted Settlement Recommendation, including any rights to pursue the insurance coverage of the Chartered Organizations, and the Trust shall have the ability to assert and/or resolve any such claims assigned to it consistent with the Plan. The Neutral may not make a Settlement Recommendation that exceeds a maximum of a multiple of five (5) times the maximum value associated with that category of claim in the TDP.

The Trust shall maintain a fund for the sole purpose of funding the portion of Accepted Settlement Recommendations that are in excess of $1 million (the "Excess Award Fund"). The Excess Award Fund shall be funded with certain proceeds from the Trust's collection of insurance policy proceeds from non-settling insurers as set forth below.[1]

If the Trustee declines to follow the Neutral's recommendation as to the Allowed Claim Amount for an Independent Review Claim (a "Recommendation Rejection"), within forty-five (45) days after the holder being served notice of the Recommendation Rejection, the holder of such Direct Abuse Claim may commence a lawsuit in any court of competent jurisdiction against the Settlement Trust to obtain the Allowed Claim Amount of the Direct Abuse Claim. Such Abuse Claimant shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or claim denied. If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Abuse Claimant, *provided that* any amount of such Allowed Claim Amount in excess of the maximum claim award hereunder based on the category of claim shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Direct Abuse Claims that are Allowed Abuse Claims as liquidated under the TDPs (excluding Claims liquidated under this provision or under Article XII (regarding Tort Election Claims).

---

[1] The sources of recovery for the fund are (i) the Debtors' or Local Counsels' non-settled shared insurance policies excess of the primary layer of coverage, and (ii) certain Chartered Organizations' separate non-settled insurance rights, collectively referred as Responsible Insurers, below.

If the Neutral makes an Accepted Settlement Recommendation of $0 due to the statute of limitations or a finding of no liability, the survivor shall receive nothing from the Trust and shall remain barred from proceeding against any Protected Party on account of their claim. The Accepted Settlement Recommendation shall supersede the determination of the amount of the claim under the TDP, whether higher or lower.

If the Neutral makes an Accepted Settlement Recommendation of less than $1 million, then the Settlement Recommendation shall be paid by the Trust in accordance with the TDP, including any applicable payment percentage, and the survivor shall receive nothing from the Excess Award Fund.

If the Neutral makes an Accepted Settlement Recommendation of $1 million or more, then the survivor shall receive (i) an allowed claim against the Trust equal to $1 million (the "Trust Share"), to be paid pursuant to the TDP and subject to any applicable payment percentage from Trust Assets other than the Excess Award Fund, and (ii) an allowed claim against the Trust equal to the amount of the Settlement Recommendation in excess of the Trust Share (the "Excess Award Share") which shall be paid exclusively from the Excess Award Fund as set forth below.

The costs associated with the independent review shall be paid by the survivor and not the Trust, including the cost of any deposition and mental health exam and the valuation by the Neutral. Such obligation shall be offset by the administrative fee paid by the survivor. Recovery of such costs may be sought from any insurer subject to the applicable terms and conditions of any insurer's policy, to the extent such costs constitute reasonable and necessary costs payable under an applicable non-settled insurance policy, and the Trust may reimburse the survivor for such costs to the extent that the non-settled insurance policy reimburses the Trust. Such recoveries will be distributed to survivors as set forth below.

**Requirements for Obtaining a Neutral Settlement Recommendation.**

(1)     Sexual Abuse Survivor Proof of Claim signed and dated by the survivor, with completion of all applicable fields, including the substantive narrative of the sexual abuse and damages (to be completed at the time of submission to the Neutral or after the completion of discovery).

(2)     Payment to the Trust of an administrative fee in the amount of $10,000 at the time of the election for Independent Review and a further additional administrative fee in the amount of $10,000 immediately prior to the Neutral's review. Any claimant that elects not to proceed with the Neutral's review after the opportunity to pursue discovery shall not be required to pay the second $10,000 and shall not be precluded from pursuing their claim under the TDP (as if no election to pursue an Independent Review had been made).

(3)     Confirmation that the survivor was in a Scouting unit by: (a) claimant's name on a roster; (b) evidence that the survivor was in a Scouting unit or attended a Scouting-related event where the sexual abuse occurred (a non-exclusive list of ways of satisfying the showing are: a photograph, a membership card, or document that reflects the survivor's rank in a Scouting unit); or (c) a sworn statement by a third party witness (who will agree to a deposition by the Neutral, if requested) that the survivor was in a Scouting unit or attended a Scouting-related event where the sexual abuse occurred.

(4)      Survivor must provide evidence that the perpetrator was in a Scouting unit, worked or volunteered with a Scouting unit, worked or volunteered with a Local Council, Chartered Organization or the BSA, or worked or volunteered at a Scouting-related event where the sexual abuse occurred (a non-exclusive list of ways of satisfying the showing are: the perpetrator's name being on a Scouting roster, a photograph of the perpetrator, or a sworn statement by a third party witness who will agree to a deposition if requested by the Neutral).

(5)      Survivor must provide evidence that the claim is timely under the applicable statute of limitations, including satisfying any recognized exception to the relevant statute of limitation under the applicable state law.

(6)      Survivor provides evidence that one or more of the BSA, Local Council or Chartered Organization was negligent or is otherwise liable on account of an Abuse Claim, and evidence regarding the survivor's damages (such as medical and counseling records and/or a sworn statement from a family member, significant other, or relative who, in each case, will agree to a deposition by the Neutral) or benchmark judgments or settlements relevant to the damages claimed. Damages must be supported by an expert report (the cost of which shall be paid by the survivor).

(7)      Survivor shall be entitled to discovery consistent with the Plan Term Sheet and forthcoming Document Sharing Appendix.

(8)      Survivor shall be subject to up to a single sworn six-hour interview, mental health examination or supplemental signed and dated interrogatory responses at the discretion of the Neutral or upon the reasonable request of a Responsible Insurer.

(9)      In making her determination, the Neutral will consider and apply any defense that would otherwise be available in the tort system.

**<u>Insurer Participation</u>.**

(1)      The Trust will provide prompt notice to any potentially responsible non-settling insurer(s) ("<u>Responsible Insurers</u>") of any claim for which the survivor has elected the Independent Review Option.

(2)      Any Responsible Insurer shall be given a reasonable opportunity to participate in the Independent Review. Any Responsible Insurer who chooses to participate may review and comment on the Neutral's evaluation, including attending any interview or deposition. Any Responsible Insurer may raise and present any potentially applicable defenses to the Abuse Claim to the Neutral, at their own expense. Such defenses must be considered and evaluated, as reasonably appropriate, by the Neutral.

(3)      Upon the Trustee's receipt of the Settlement Recommendation from the Neutral, the Trustee shall provide notice and seek consent from any applicable Responsible Insurer.

(4)      If the Trustee determines that the Settlement Recommendation is reasonable and the Responsible Insurer refuses to pay all or a portion of the Accepted Settlement Recommendation for which it is responsible, then the Trustee may exercise any and all rights available to it under applicable law, and the Trustee expressly reserves any and all rights against the Responsible Insurer, including but not limited to agreeing to the Settlement Recommendation and pursuing the Responsible Insurer for any available remedy including, but not limited to breach of contract and bad-faith.

(5)      The Trust shall have the right to pursue the Accepted Settlement Recommendation through any appropriate legal mechanisms.

**Nature of the Settlement Recommendation**.

The Plan shall provide as a condition of the Channeling Injunction that the channeling of an Abuse Claim does not affect the liability of any person that is not expressly protected by the Channeling Injunction and/or any portion of an Abuse Claim that is subject to the definition of Mixed Claim in the Plan.

**Collection of the Settlement Recommendation**.

The Trust (as assignee) shall be free to collect on the basis of the Accepted Settlement Recommendation, and associated costs of the Independent Review process, from any Responsible Insurer that refuses to pay all or a portion of the Accepted Settlement Recommendation for which it is responsible in such a manner as it sees fit, including by seeking coverage for one or more Accepted Settlement Recommendations on a consolidated basis and to enter into comprehensive settlements with any Responsible Insurer. To the extent allowed under applicable state law, the BSA and Local Councils shall reasonably cooperate with the Trustee in the foregoing (it being understood that the foregoing cooperation shall not require the expenditure of funds), including consenting to entry of a non-recourse judgment limited solely to the recovery of insurance proceeds from any Responsible Insurer to the extent doing so would not violate the terms of the applicable policy or applicable law. In addition, the Trustee may seek the cooperation of the applicable Chartered Organization. Funds collected from the Responsible Insurer shall be allocated to the survivor and the Excess Award Fund as follows:

(1)    Collections Applicable to Identified Awards:
- Amounts awarded that are applicable to the expenses incurred by claimants in seeking the Independent Review, or that are awarded for any bad faith claim will be allocated 100% to the survivor.
- Amounts awarded from any policy of a Responsible Insurer that does not have applicable aggregate limits will be allocated 100% to the survivor.
- Amounts collected in satisfaction of the Accepted Settlement Recommendation from any policy that has applicable aggregate limits shall be awarded 80% to the survivor, with the balance contributed to the general Trust until the survivor has collected 80% of the Excess Award Share. Thereafter policy proceeds shall be divided 70% to the survivor and 30% to the general Trust until the survivor has received the full amount of the Excess Award Share.

(2)    Settlement with potentially Responsible Insurers that Fully Release a Policy or Policies:

80% of the proceeds derived from a comprehensive settlement with a Responsible Insurer shall be contributed to the Excess Award Fund and 20% of the proceeds derived from a comprehensive settlement with an Responsible Insurer shall be general Trust funds available to pay all survivors; provided that once all holders of Excess Award Shares (other than holders of Late Claims) have received (or been reserved for an amount equal to) 80% on account of their Excess Award Shares, 70% shall be contributed to the Excess Award Fund and 30% shall be general Trust funds available to pay all survivors. For the avoidance of doubt, collections from separate insurance of a Chartered Organization received as part of a comprehensive Chartered Organization settlement shall go to the general Trust, for distribution to claimants with claims pursuant to IX.F of the TDPs against the Chartered Organization.

**Payment of Excess Award Shares**.

The Excess Award Fund shall be used to pay the Excess Award Shares that would otherwise be paid from insurance coverage that has been settled or exhausted. The Excess Award Fund will be allocated and paid on account of such Excess Award Shares subject to a payment percentage calculated specifically for the Excess Award Fund. Once the Excess Award Shares are paid in full, the remaining funds in the Excess Award Fund shall become general Trust funds available to pay all survivors.

**Administrative Guidelines**.

Survivors (other than holders of Future Abuse Claims) will have until January 1, 2023 to pay the $10,000 administrative fee and elect to submit their claim for Independent Review.

Any Future Abuse Claim that elects Independent Review after January 1, 2023, shall recover shall be entitled to recover (i) against Responsible Insurer to the same degree as survivors that filed claims prior to January 1, 2023, (ii) from any Excess Award Fund reserved from any settled insurance applicable to their Abuse Claims, or (iii) share in a pro rata basis to the same degree as any Abuse Claim submitted prior to January 1, 2023 in any recovery from an insurer that is not settled at the time a determination is made by the Neutral on the Abuse Claim. Other than reserving for and paying future claims on the basis described above, the Trust will have no duty to reserve or make distributions to any survivors who file claims after January 1, 2023 ("Late Claims") except that should the Late Claim opt for Independent Review the Excess Award Share attributable to such Late Claim may share on a pro rata basis to the same degree as any Abuse Claim submitted prior to January 1, 2023 in any recovery from an insurer that is not settled at the time a Settlement Recommendation is made by the Neutral on the Late Claim. The last date to file a Late Claim for Independent Review shall be January 1, 2026.

If a Neutral's Settlement Recommendation determines that a Chartered Organization not protected by the Channeling Injunction is responsible for all or a portion of liability for an Abuse Claim assigned to the Trust, at the request of the claimant, the Settlement Trustee may in its discretion, assign back to the claimant all rights to pursue the Chartered Organization and its insurers for the allocated portion of liability established through the independent review procedures. The claimant in his discretion may then bring an action in any court of competent jurisdiction against the Chartered Organization and its insurers to recover the allocated portion of liability and any additional damages, including punitive damages against the Chartered Organization and extra-contractual damages against the affected insurers that may be assessed by the court. Any recovery by way of judgment or settlement will be first applied to reimburse the claimant for his fees and expenses in prosecuting the claims and the remainder will be allocated in accordance with the independent review procedures, provided that any punitive or extra-contractual damages shall be awarded solely to the claimant.

TCC, Coalition, FCR and Zalkin/Pfau consent required to any amendments made to TDP to implement Independent Review or associated guardrails.

## EXHIBIT C

Each Abuse Claimant that does not make the Expedited Distribution Election and instead elects to pursue recovery from the Settlement Trust pursuant to these TDP must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein (each, a "Trust Claim Submission"). In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (i) complete under oath a questionnaire to be developed by the Settlement Trustee and submitted to the STAC and the Future Claimants' Representative for approval and such signature and oath must be of the Abuse Claimant individually (or an executor); (ii) produce all records and documents in his or her possession, custody or control related to the Abuse Claim, including all documents pertaining to all settlements, awards, or contributions already received or that are expected to be received from a Protected Party or other sources; and (iii) execute an agreement to be provided or made available by the Settlement Trust with the questionnaire (1) to produce any further records and documents in his or her possession, custody or control related to the Abuse Claim reasonably requested by the Settlement Trustee, (2) consent to and agree to cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee) (a "Trustee Interview"); and (3) consent to and agree to cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee. The questionnaire shall be approved by the STAC but, at a minimum, will require that the Abuse Claimant confirms his/her name, date of birth, home address, dates of abuse, frequency of abuse, level of abuse. The date on which an Abuse Claimant submits (i), (ii) and (iii) above to the Settlement Trust shall be the "Trust Claim Submission Date". No recovery will be provided to an Abuse Claimant that does not submit a questionnaire. The Abuse Claimant's breach or failure to comply with the terms of his or her agreement made in connection with his or her Trust Claim Submission shall be grounds for disallowance or significant reduction of his or her Abuse Claim. To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "Submitted Abuse Claim"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Document Obligations and shall consider supplemental information timely provided by the Abuse Claimant, including information obtained pursuant to the Document Obligations. Non-material changes to the claims questionnaire may be made by the Settlement Trustee with the consent of the STAC and the Future Claimants' Representative.

# EXHIBIT D

## Youth Protection Plan

Non-Monetary Commitments. The BSA will not compromise the safety of our youth, volunteers, and employees. We are all responsible and must hold each other accountable to provide a safe environment for all participants. Safety is a value that must be taught and reinforced at every opportunity and nothing is more important than protecting our Scouts from abuse. BSA is dedicated to becoming the Gold Standard in abuse prevention. Because of this commitment, we are and will always seek to bolster our abuse prevention efforts. In furtherance of these efforts, the BSA shall take the following actions to promote healing and reconciliation and to continue the BSA's efforts to prevent abuse from occurring in Scouting in the future:

1) Hire a Youth Protection Executive ("YPE"): No later than six months from the Effective Date, retain a youth protection executive with extensive expertise in the prevention, recognition, and response to abuse within institutions, whose responsibilities shall include all aspects of youth protection, including:[1]

   a) Youth protection policies and training.

   b) Monitoring compliance with training requirements.

   c) Implementing and monitoring the youth protection champions in Local Councils, as part of an overall effort to adopt best practices and drive standardization of youth protection measures among Local Councils and Chartered Organizations.

   d) Advocating for continued, embedded youth protection culture in the BSA, among adults and Scouts.

2) On or as soon as practicable following the Effective Date, form a Youth Protection Committee ("YPC"): The BSA shall form a committee including members from the BSA, Local Councils, Chartered Organizations, and nominees of the Tort Claimants' Committee, and nominees of the Survivors Working Group. Assuming there are a sufficient numbers willing to serve on the YPC, members nominated by the Tort Claimants' Committee and the Survivors Working Group shall be in equal numbers, respectively, and shall, in combination, be at least half the total membership of the YPC. The YPE will present to the YPC no less than twice per year.

   a) The BSA will present to the YPC on the BSA's current Youth Protection Program (the "Youth Protection Program"), including regarding the implementation of the actions set forth below, as soon as practical, but no later than six months from the Effective Date.

   b) The BSA will report annually to the YPC on changes to BSA's Youth Protection Program, compliance in the field, and trends of abuse identified and addressed during the period between meetings. This report shall also be shared with the Organization (defined below) and each Local Council's Executive Commitee.

   c) To the extent reasonably practicable, it is intended that the YPC be involved in all aspects of youth protection at the BSA, through discussion, consultation and review with the YPE.

---

[1]  In advance of the hiring, the BSA intends to establish an ad hoc selection committee, which shall include at least one survivor nominated by the SWG and at least one survivor nominated by the TCC. The BSA further intends that the YPE will report to the Chief Scout Executive or Assistant Chief Scout Executive.

3) Update Existing Policies:

   a) Update Scouting's Barriers to Abuse: All adults staying overnight in connection with a Scouting activity must be registered as a leader or adult program participant.[2]

   b) Update criminal background checks on all registered leaders every two years. All camp staff at long-term overnight camps and day camps will be registered as camp staff so as to receive a criminal background and VSD check annually. Camp staff will also be required to attend BSA's Understanding and Preventing Youth on Youth Abuse Training during staff training and before they work with youth members at camp.

   c) Update policies and procedures related to, and provide additional guidance on, inappropriate physical and verbal interactions, gift-giving and the supervision of bathroom and shower areas.

   d) Consolidate all aspects of the BSA's youth protection materials into a "Youth Protection Manual" and "Adult Leadership Manual" or similar structure to put requirements and resources in a centralized location. These materials should be consolidated and updated within 12 months of the Effective Date, in coordination with the YPE and the YPC.

   e) Update the BSA website main menu to specifically highlight BSA's abuse prevention requirements, policies for conduct with youth, trainings and reporting procedures.

4) Review and Enhance Training Materials:

   a) Perform a comprehensive review of Youth Protection training to ensure the training is clinically evidence- and research-based and reflective of survivor-informed experiences, including but not limited to:

      i) Grooming techniques and case examples that demonstrate the need for early detection and reporting of suspected predatory behavior.

      ii) Use of more scenario-based training to help engage the learner and apply the information to "real life" scenarios, including the use of "safety moments" for youth members and adult leaders and parents based upon actual incidents.

      iii) Updated content on youth-to-youth abuse prevention, including how to identify and interrupt inappropriate behaviors that can lead to abuse.

      iv) The evaluation will be performed by the YPE in consultation with an independent organization (the "Organization") with experience in evidence-based empirical research on the prevention of childhood abuse and neglect, including sexual abuse of

---

[2]    Cub Scout Programs (Overnight): Cub Scout parents or legal guardians taking part in an overnight program with their own child are not required to register as leaders but must review the BSA's Barriers to Abuse with a unit leader before the activity. Cub Scout youth can only attend with and must be supervised by their own parent or legal guardian at all times, or a registered adult member of the BSA who is attending with their child. A registered leader must be present at any time the parent or legal guardian is with other youth members other than their own. Cub Scout camping is limited to a Local Council's designated locations with appropriate facilities and Barriers to Abuse materials will be prominently posted at all locations for such programs.

children. The YPC will have the opportunity to interview entities and reasonable consent rights in the BSA's selection of the Organization.[3]

v) The materials shall be evaluated and updated by the YPE, in consultation with the Organization or a successor organization, every two years.

b) Create and implement an annual refresher youth protection course for all leaders and parents who accompany Scouts on Scouting activities. The refresher will include but shall not be limited to reinforcing core content and BSA polices, including Scouting's Barriers to Abuse requirements, reporting and responding to policy violations and reports of abuse. In addition, the refresher will include advanced information based on recent incident trends and technological advances implicating youth protection issues, including changes in the last year.

5) Conduct Additional Policy Review and Evaluation:

a) The BSA will further work with the Organization to evaluate key issues, including but not limited to:

i) How the BSA's Youth Protection requirements are implemented at the local level.

ii) Key roles in the organization that need advanced youth protection training.

iii) Strategies to ensure there are no gaps between member registration dates and training expiration dates.

iv) The extent to which monitoring and supervision practices are understood, implemented, and enforced in Scouting programs, including in various Scouts programs (including camps and High Adventure Base programs).

v) Potential risks unique to specific Scouting programs, including programs where youth assume leadership and/or employment positions.

vi) Additional guidelines for overnight activities, including tenting and lodging and cabin accommodations.

vii) Potential risks relating to female Scouts.

viii) Attitudes and behavior towards diverse Scouts and cultures.

---

[3]   The YPE shall solicit RFPs to serve as the Organization, which shall include qualified entities recommended by the YPC's members. The BSA has retained Praesidium, which has performed work to date regarding the BSA's Youth Protection Program. The BSA has stated that it will recommend that the YPE inrerview Praesidium to serve as the Organization. The TCC and Survivors Working Group have no objection to the YPE interviewing Praesidium to serve as the Organization.

ix) How Local Councils and Chartered Organizations can provide a trauma-informed response to individuals who come forward to report abuse and identify necessary resources for this function.

x) Potential additional camp-specific risks and policies and procedures.

b) The evaluation will be provided to the YPE and YPC on the specific issues above, as well as its assessment of the current Youth Protection Program. Specific recommendations for additional reasonable improvements to the Youth Protection Program will be considered and implemented by the BSA.

c) Changes to the Youth Protection Program will be reflected on the BSA's website and training will be reasonably adjusted to reflect changes.

d) The items recommended and adopted, as well as the items recommended and rejected or modified by the BSA, will be reported to the Organization, the YPC, and each Local Council's Executive Committee, along with the reasoning behind any rejected or modified recommendations.

6) Further Focus on Youth Protection as Part of Scouting Programming:

a) The BSA will work with subject-matter experts to continue to review, develop and implement youth protection training to help Scouts learn to recognize abuse, react to protect themselves, and tell a trusted adult. This will be embedded and required at every rank in each program of Scouting. Materials will include meeting plans and resources for youth, parents, and leaders. These rank advancement requirements will be age-appropriate and may include opportunities for Scouts to learn about subjects such as smart choices online (cyber bullying/grooming); being an upstander not a bystander; grooming techniques and sexual abuse; safe touch and unsafe touch; sexual peer pressure; sexual abuse in the family; bullying and hazing; and other expert-informed subjects.

b) The BSA will designate one month per year to emphasize the importance of youth protection and preventing child sexual abuse throughout Scouting programs. This annual campaign will be dedicated to raising awareness and preventing child abuse within Scouting and throughout society. This focused campaign will be implemented at the unit, council, and national level.

7) Enhance Incident Reporting:

a) The BSA, together with the YPE, shall provide confidential quarterly summary reports to the NEC, Audit and Risk Management Committee, and YPC (including the Organization), on all child sexual abuse incidents that result in a youth or adult offender being placed on the Volunteer Screening Database.

b) Incidents that result in a youth or adult offender being placed on the Volunteer Screening Database for child sexual abuse must be reported to the affected Troop's parents,

volunteers associated with the affected Troop, and the affected Charter Organization. [4] The Local Council will provide notification to its Executive Committee. Notification will also be provided to the the YPE, YPC, and the Organization as part of the summary reports required by 7(a).

8) Enhance Auditing Requirements: Local Councils will be required to submit evidence of compliance with youth protection and membership standard guidelines, including training, incident review and reporting. The evidence will be provided to the YPE, the Organization, and the YPC. The YPE shall work with the Organization to assess this compliance, and shall provide the YPC with its and the Organizations conclusions in that regard.

9) Form Unit Leader Working Groups: In connection with the YPC, Local Councils, and Chartered Organizations establish unit leaders' working groups to regularly identify, discuss and develop additional ways to protect youth in Scouting, which could include, for example:

a) Improving the implementation of Scouting's Barriers to Abuse to help prevent incidents in the areas with higher risk potential.

b) Appropriate supervision during nighttime or sleep hours, bathroom and shower facilities.

c) Observed inappropriate youth behavior.

d) How to continuously reinforce youth safety to parents, youth and leaders.

e) Standardization of best practices across Local Councils and Chartered Organizations.

10) Expand Survivor Representation:

a) As required by the BSA by-laws, an otherwise qualified survivor of abuse in Scouting shall be nominated to serve and shall be placed on the National Executive Board of the BSA. (The criteria for selecting this Board member will be the same as the criteria for the other Board members.)

b) The BSA and AHCLC will recommend that each Local Council agree to nominate and place an otherwise qualified survivor of abuse in Scouting on their local council board at all times. (The criteria for selecting these Board members will be the same as the criteria for the other board members.)

c) It is the intention of the BSA and the AHCLC that the presence of Survivors on such boards is emblematic of a sincere effort to listen to survivors' voices. In addition, the BSA and Local Councils will explore with the YPC additional measures to expand survivor representation, including recruiting survivors to the BSA and Local Council boards.

11) Promote Survivor Recognition and Remembrance:

a) In consultation with the YPC, design and install a place of remembrance for all child sexual abuse survivors at a prominent location at each of the BSA's High Adventure Bases, which

---

[4] To protect survivors and encourage reporting, such reports will provide notification that a youth protection violation and removal occurred, but will not describe the specific incident. To the extent possible, such notification will occur prior to any parent meeting.

will serve as a nationally recognized statement of BSA's commitment to recognize the abuses of the past and to prevent abuse in the future. The BSA shall encourage Local Councils to consider similar opportunities.

b) Create a Survivor-Focused Path to Eagle Scout, where pursuit of Eagle requirements was not continued because of Abuse-related reasons. Input from the YPC will be solicited.

c) Survivor Scouter Pin: In consultation with the YPC, create a recognition, e.g. the "Phoenix" award, to honor survivors that despite the pain and suffering they endured as a youth, were able to break through the despair and provide value and honor to themselves and their community.

12) Support a Youth Protection Seminar: The BSA, under the leadership of the YPE, will coordinate with Local Councils and Chartered Organizations to plan a Youth Protection Seminar for Scout Executives, volunteer leaders and other key constituents, to foster sharing of best practices and information regarding youth protection trends.

13) Volunteer Screening Database

a) The BSA will work with the YPC to assess how the names of adult perpetrators of child sexual abuse in Scouting and other information can be made public or used in connection with a database accessible to other youth serving organizations. Specifically, the BSA agrees to work with the YPC on a protocol that makes confirmed past child abusers in Scouting, and future confirmed child abusers in Scouting, publicly known.

b) The protocol will take into account factors including: (i) the desire to make public adult perpetrators of child sexual abuse in Scouting; (ii) adequate protections for survivor identities; (iii) consideration regarding the protection of third parties, including survivor family members and volunteers; (iv) a notification process regarding any publication; (v) issues related to privacy and liability related to publication; and (vi) the potential appointment or retention of an appropriate neutral party to supervise the evaluation and review of the VSD.

c) The BSA will take a leadership role and re-engage with other YSOs and agencies including but not limited to the National Center for Missing and Exploited Children to explore the feasibility of and advocate for a shared national database of adults who have been excluded from working with youths for youth protection related offenses.

d) The Trust Agreement shall be modified to provide the Settlement Trustee with the authority to request an order of the Bankruptcy Court relating to the publication of materials included in the VSD, no earlier than one year after the Effective Date. The Plan shall be amended to specifically provide that the Bankruptcy Court retain jurisdiction to adjudicate such request. All parties in interest, including the Reorganized Debtors, shall have the right to object to and contest any request made by the Settlement Trustee.

14) Prospective Reporting:

a) The BSA is committed to working with the YPC to discuss and improve transparency and accountability with respect to any future instances of sexual abuse, including the

dissemination of information relating to abuse statistics, consistent with practices of other youth-serving organizations, and what information may be appropriately made available on the BSA's website.

b) The BSA also agrees to work with the YPC on a protocol to ensure that at the request of a Scout parent or legal guardian, summary information regarding youth or adult offenders being placed on the Volunteer Screening Database for child sexual abuse for a specific Troop or unit is provided. The BSA agrees to finalize this protocol no later than 6 months following the Effective Date.

15) Youth Protection Leadership

a) The BSA will continue to engage with youth protection experts to monitor best practices utilized by youth serving organizations, and will work with the YPC to continue to explore partnership opportunities, including with academic institutions and other youth protection organizations, to collaborate and share data, including consideration of factor-based analysis and other methodologies to prevent abuse. [5]

b) The BSA will work with the YPC to take a leadership role in youth protection, including:

i) Supporting federal legislation for certified volunteer programs, unsuitable leader reporting and a database for youth serving organizations or those added into database.

ii) Holding a meeting, at least once every two years, with recognized sexual abuse experts and other similarly situated organizations to discuss best practices and innovations in youth protection.

---

[5] The BSA and YPC shall consider the best way to utilize the redacted Proofs of Claim filed in the BSA chapter 11 cases, as well as information from the VSD.

# EXHIBIT E

**Document Sharing Agreement Term Sheet**

**Exhibit E – Document Sharing Agreement Term Sheet**

As a condition of this agreement, the Parties shall finalize by the commencement of the Confirmation Hearing a form of agreement pursuant to which documents and information can be obtained by the Settlement Trustee and holders of Direct Abuse Claims following the Effective Date (the "Document Agreement").

Other than as specifically provided in the paragraphs below, the Parties shall work in good faith to reach agreement on reasonable allocation of the costs of production with respect to BSA and Local Councils.

The Document Agreement shall provide for production to the Settlement Trustee of the following documents (or categories of documents).[1] Such productions shall be made on or prior to the Effective Date of the Plan (and as a condition to the Effective Date of the Plan) other than as provided below:

- From BSA:
  1. Documents produced in connection with the Chapter 11 Cases that relate[2] to the Abuse Claims (including documents produced by Local Councils in connection with the Preliminary Injunction);
  2. Documents pertaining to Abuse Claims that were open and unresolved as of the Petition Date in the possession of Debtors' National Coordinating Counsel, Ogletree Deakins;
  3. The Volunteer Screening Database to the extent it relates to sexual abuse in Scouting. The Trustee or the holder of an Abuse Claim may request that the BSA search any other categories contained within the Volunteer Screening Database with respect to an alleged perpetrator. BSA agrees that it will promptly conduct such a search and provide any records to the Trustee or the holder of an Abuse claim it may find with respect to the particular request.
  4. any of the Debtors' "Perversion" files, "Confidential" files and "Red Flag" files or files stored under any other name comprising records of individuals accused of sexual impropriety or abuse of minors in the Scouting Program ("Perversion Files"), in both redacted (redacting the names of all victims and their family

---

[1]   To the extent the foregoing identifies a document or type of document by name, such as the "Volunteer Screening Database" or the "Youth Protection Guidelines," the BSA and the Local Councils are required to produce the equivalent document or type of document if it has ever been known by a different name.  For example, the "Volunteer Screening Database" was previously known as the "Ineligible Volunteer" system. BSA is required to produce documents regarding the "Volunteer Screening Database" and the "Ineligible Volunteer" system to the extent it relates to sexual abuse in Scouting.  For instance, the "Volunteer Screening Database" was previously known as the "Ineligible Volunteer" system, so in the foregoing examples, BSA would be required to produce relevant documents from both the "Volunteer Screening Database" and the "Ineligible Volunteer" system.

[2]   The Parties shall negotiate in good faith the categories of documents produced in connection with the Chapter 11 Cases that do not "relate to Abuse Claims" and so do not need to be produced pursuant to this provision.

members, as well as all minors named in said files and their family members) and unredacted form;

5. All Documents necessary to secure the benefit of any insurance rights;
6. All of the following categories of documents to the extent they are in the possession of Ogletree Deakins and maintained in electronic form shall be produced on or prior to the Effective Date; provided that documents in these categories that are not in the possession of Ogletree Deakins can be requested from BSA on an as-needed basis:

   • Documents regarding the registration of all identified alleged perpetrators identified in a Proof of Claim;
   • Each yearly version of the Youth Protection Guidelines and the equivalent;
   • Each version of the Procedures for Maintaining Standards of Leadership and the equivalent;
   • Each version of the Scoutmaster Handbook, Boy Scout Handbook, Cub Scout Handbook, and similar Handbooks
   • Each version of "How to Protect Your Children from Child Abuse" and the equivalent;
   • Each version of the Procedures for Ineligible Volunteer File Deskbook and the equivalent;
   • Each version of Standard Local Articles of Incorporation and the equivalent;
   • Each version of the Standard Charter Agreement between a Local Council and a Charter Organization and the equivalent;
   • Each version of BSA Rules and Regulations and the equivalent; and
   • all Rosters.

• From Local Councils (to the extent not previously produced by the BSA):
   o Within 90 days of the Effective Date, all Local Councils shall produce all Rosters[3] in their possession, custody, or control corresponding to a list of claimants, alleged perpetrators, or Scouting units for which an allegation of Abuse has been made in a filed proof of claim (and shall provide a certification that, to the extent no such Rosters are produced by the Local Council, the Local Council was unable to find any Rosters related to such claimants, alleged perpetrators, or Scouting units); *provided that* Local Councils shall also search for and produce, upon a request (mechanics to be negotiated in good faith as part of the Document Agreement), other Rosters reasonably necessary for evaluation of any claim of Abuse in Scouting,
   o Evidence of insurance that could provide coverage for Abuse Claims and documents necessary to secure the benefit of any insurance rights;
   o Complaints, reports, files, or any similar documentation related to any Volunteer Screening Database (or the equivalent) related to sexual abuse in Scouting or by

---

[3] "Rosters" shall mean "historical troop and camp rosters that describe by name the Scouting youth, adult volunteers, or Scouting volunteers."

a Scout leader or volunteer, *provided that* the parties agree that privileged documents should be protected so as to preserve all insurance rights;

o Upon request to a Local Council, records regarding an alleged perpetrator in a Proof of Claim.

To the extent a holder of a Direct Abuse Claim is in possession of any material described above, the holder will request that BSA or a Local Council, as applicable, review the material, and BSA or the Local Council will authenticate the material, if authentic, and the holder of the Direct Abuse Claim will produce such material to the Settlement Trust.

The terms of the Preliminary Injunction as they relate to preservation of documents by Local Councils shall continue to apply to each Local Council until the Local Council has completed its document production obligations required by the Document Agreement.

The Local Councils are also required to search documents in their possession, custody, or control regarding any predecessor organization or prior Local Council that has since merged with a current Local Council.

The Plan shall provide that discovery pursuant to Rule 2004 or other applicable discovery rule has been authorized for the Settlement Trustee and holders of Direct Abuse Claims to obtain information from Chartered Organizations regarding documents that are reasonably calculated to lead to discovery of admissible evidence for the liquidation of Direct Abuse Claims (to the extent not previously by the BSA or the Local Councils), including, but not limited to:

- All Rosters corresponding to a claimant, alleged perpetrator, or Scouting units for which an allegation of Abuse has been made in a filed proof of claim;
- Evidence of insurance that could provide coverage for Abuse Claims, including insurance that is not a shared policy with the BSA or a Local Council;
- All records regarding each Scouting unit that is the subject of a Proof of Claim, including the charter application and any renewal application, the unit roster(s), meeting attendance sheets, trip permits, newsletters, files regarding the unit leader(s);
- Records regarding an alleged perpetrator in a Proof of Claim;
- The policies and procedures for preventing child sexual abuse or for handling allegations of child sexual abuse;
- Records regarding the organizational or hierarchy structure related to the supervision and governance of Scouting units

For the avoidance of doubt, the authorization of any discovery request pursuant to the above provision shall not be construed to deprive the recipient of such discovery request of any applicable privilege or immunity from discovery.

The Settlement Trustee and holders of Direct Abuse Claims shall be able to take whatever steps are necessary to enforce such discovery obligations of Chartered Organizations pursuant to FRBP 2004, FRCP 45, other court resolution processes, and under bankruptcy law and applicable nonbankruptcy law.

The Document Agreement shall provide the Settlement Trustee and holders of Direct Abuse Claims with the right and ability to pursue depositions, with all such depositions coordinated through the Settlement Trustee (mechanics to be negotiated in good faith). For all such depositions, the Trustee shall make a reasonable effort to coordinate all requests by holders of Direct Abuse Claims so as to minimize the number of depositions required. The costs to the Local Council of the first two depositions of the Local Council (including its prior managing agents where such agents' testimony will be binding on the Local Council under state or federal law) or its current employees shall be borne by the Local Council. For all subsequent depositions of a Local Council, the party seeking the deposition shall be responsible for all costs reasonably incurred by the Local Council. The parties will work in good faith the develop a cost-sharing mechanism with respect to depositions of BSA (including BSA's prior managing agents where such agents' testimony will be binding on BSA under state or federal law) or its current employees, to be memorialized in the Document Agreement.

Any holder of a Direct Abuse Claim who participates in such a deposition shall be required to review the prior deposition transcript(s) of the party or employee and make a good faith effort to avoid duplicate questioning. The holder of a Direct Abuse Claim who requests such a deposition shall have the right to participate in any meet and confer or motion practice regarding the requested deposition and may move forward with the deposition if the Trustee does not schedule the deposition within 60 days of the request, in all cases subject to the cost provisions in the paragraph above.

The holder of a Direct Abuse Claim shall be entitled to pursue and secure a subpoena from the appropriate court for the deposition of any percipient or fact witness related to their claim without limitation. However, the Trustee shall make a reasonable effort to coordinate such requests for a deposition of the same witness. Any holder of a Direct Abuse Claim who participates in such a deposition shall be required to review the prior deposition transcript(s) of the same witness and make a good faith effort to avoid duplicate questioning. The holder of a Direct Abuse Claim who requests such a deposition shall have the right to participate in any meet and confer or motion practice regarding the requested deposition and may move forward with the deposition if the Trustee does not schedule the deposition within 60 days of the request. The parties will continue to negotiate in good faith any scope or cost limitations with respect to former BSA and Local Council employees who are deposed as provided in this paragraph.

The Document Agreement shall contain reasonable provisions allowing the holder of a Direct Abuse Claim to request access from the Settlement Trustee to documents they will likely need to establish the validity and/or amount of their claim in order to obtain compensation under the Plan. The Document Agreement shall contain provisions to enable producing parties to avoid disclosure of privileged materials to the Settlement Trustee or any holder of a Direct Abuse Claim, and afford the Settlement Trustee and such Claim holders access to a court to challenge such claims of privilege, *provided that* BSA shall produce its documents to the Settlement Trustee regardless of claims of privilege. The BSA will insert additional language in the Document Agreement sufficient to ensure preservation of privileges.

For the avoidance of doubt, the Settlement Trust is responsible for creating a repository of documents and information, such as deposition transcripts, which is the foundational discovery

that the holder of a Direct Abuse Claim will likely need to establish the validity and/or amount of their claim in order to obtain compensation under the Plan. The Trustee has no authority to refuse to transmit a document or deposition request from the holder of a Direct Abuse Claim other than as necessary to protect privilege. Following transmittal of a request by the holder of a Direct Abuse Claim and the Trustee's effort to coordinate such request, the holder of a Direct Abuse Claim has the sole obligation to pursue the request and shall be responsible for the cost of doing so. Other than pursuing the documents outlined above and coordinating the requests of the holder of a Direct Abuse Claim, the Trustee shall not pursue the request of a holder of a Direct Abuse Claim and shall not pay any portion of the cost of a holder of a Direct Abuse Claim pursuing such a request. Other than pursuing the documents outlined above, the Trustee shall not pursue discovery for the benefit of a holder of a Direct of Abuse Claim and shall not be responsible for the cost of such discovery. If the Trustee determines not to pursue the documents outlined above, the holder of a Direct Abuse Claim shall have the right at their own expense to pursue that discovery, except that the holder of a Direct Abuse Claim may request reimbursement of their costs and reasonable attorney fees from the subject of the discovery requests in the event a court finds such reimbursement is warranted. For the avoidance of doubt, any discovery contemplated by this paragraph is not applicable to the BSA and Local Councils other than as provided in other paragraphs above.

During the life of the Settlement Trust, if the Settlement Trustee requests additional documents in the categories described above from a Local Council, the Local Council shall be obligated to provide documents to the Settlement Trust pursuant to the terms above to the extent (i) such documents are in their possession, custody and control and (ii) not already provided to the Settlement Trust.

The Settlement Trust is obligated to maintain and safeguard the documents and information in its repository until it gives notice of its belief that that there is no further need for these documents to establish claims against or by the Settlement Trust, and for an additional five years thereafter. At the end of the five years, the Settlement Trust shall give 120 days' notice of its intent to destroy its repository and give interested parties an opportunity to petition a court for access to the repository before it is destroyed. Any documents or information subject to such a petition shall not be destroyed until the request is fully resolved.

# SCHEDULE 1

## State Court Counsel

| FIRM | NOTICE ADDRESS | CLAIMS |
|---|---|---|
| ASK LLP | Attn: Joseph Steinfeld (jsteinfeld@askllp.com) 151 West 46th Street, 4th Floor New York, NY 10036 | 3277 |
| Andrews & Thornton, AAL, ALC | Andrews & Thornton Attn: Anne Andrews (aa@andrewsthornton.com) 4701 Von Karman Ave., Suite 300 Newport Beach, CA 92660 | 3009 |
| Bailey Cowan Heckaman PLLC | Attn: Aaron Heckaman (aheckaman@bchlaw.com) 5555 San Felipe St., Ste. 900 Houston, TX 77056 | 1026 |
| Christina Pendleton & Associates, PLLC | Attn: Staesha Rath (sr@cpenlaw.com) 1506 Staples Mill Rd., Suite 101 Richmond, VA 23230 | 309 |
| Cohen Hirsch LP (formerly Brooke F. Cohen Law, Hirsch Law Firm) | Attn: Brooke F. Cohen (brookefcohenlaw@gmail.com) Attn: Andrea Hirsch (andrea@thehirschlawfirm.com) 4318 Glenwick Lane Dallas, TX 75205 | 64 |
| Colter Legal PLLC | Attn: John Harnishfeger (john.harnishfeger@colterlegal.com) 1717 K St. NW, Suite 900 Washington D.C. 20006 | 162 |
| Crew Janci LLP | Attn: Peter Janci (peter@crewjanci.com) 1200 NW Naito Parkway, Suite 500 Portland, Oregon 97209 | 350 |
| Cutter Law, P.C. | Attn: Brooks Cutter (bcutter@cutterlaw.com) 4179 Piedmont Ave., 3rd Fl. Oakland, CA 94611 | 358 |
| Damon J. Baldone PLC | Attn: Damon J. Baldone (damon@baldonelaw.com) 162 New Orleans Blvd. Houma, LA 70364 | 471 |

| FIRM | NOTICE ADDRESS | CLAIMS |
|---|---|---|
| Danziger & De Llano LLP | Attn: Rod de Llano (rod@dandell.com) 440 Louisiana St., Suite 1212 Houston, TX 77002 | 1707 |
| Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. | Attn: Stewart J. Eisenberg (stewart@erlegal.com) 1634 Spruce Street Philadelphia, PA 19103 | 16869 |
| Forman Law Offices, P.A. | Attn: Theodore Forman (ted@formanlawoffices.com) 238 NE 1st Ave. Delray Beach, FL 33444 | 125 |
| Hurley McKenna & Mertz, P.C. | Attn: Evan Smola (esmola@hurley-law.com) 20 S. Clark St. Suite 2250 Chicago, IL 60603 | 3762 |
| Jason J. Joy & Associates, PLLC | Attn: Jason Joy (jason@jasonjoylaw.com) 909 Texas St., Ste. 1801 Houston, TX 770022 | 690 |
| Jeff Anderson & Associates | 366 Jackson St #100 St. Paul, MN 55101 | 792 |
| Junell & Associates PLLC | Attn: Deborah Levy (dlevy@junell-law.com) 3737 Buffalo Speedway, Ste. 1850 Houston, TX 77098 | 2918 |
| Krause & Kinsman Law Firm | Attn: Adam W. Krause (adam@krauseandkinsman.com) 4717 Grand Avenue #300 Kansas City, MO 64112 | 5981 |
| Levin Papantonio Thomas Mitchell Rafferty & Procter P.A. | Attn: Cameron Stephenson (cstephenson@levinlaw.com) 316 South Baylen St. Pensacola, FL 32502 | 44 |
| Linville Johnson & Pahlke Law Group | Attn: Robert Pahlke (rgp@pahlkelawgroup.com) 2425 Circle Dr., Ste. 200 Scottsbluff, NE 69361 | 71 |
| Marc J Bern & Partners LLP | Attn: Joseph Cappelli (jcappelli@bernllp.com) 60 East 42nd St., Ste. 950 New York, NY 10165 | 5893 |

| FIRM | NOTICE ADDRESS | CLAIMS |
|---|---|---|
| Merson Law PLLC | Attn: Jordan Merson<br>(jmerson@mersonlaw.com)<br>950 Third Avenue, 18th Floor<br>New York, New York 10022 | 314 |
| Motley Rice LLC | Attn: Daniel Lapinski<br>(dlapinski@motleyrice.com)<br>210 Lake Drive East, Suite 101<br>Cherry Hill, NJ 08002 | 343 |
| The Panitch Law Group, P.C. | Attn: Esther Panitch<br>(esther@panitchlawgroup.com)<br>4243 Dunwoody Club Drive, Suite 216<br>Atlanta, Georgia 30350 | 4 |
| Paul Mones, P.C. | Attn: Paul Mones<br>(paul@paulmones.com)<br>13101 Washington Blvd., Suite 128<br>Los Angeles, CA 90066 | 259 |
| Pfau Cochran Vertetis Amala PLLC | Attn: Michael Pfau<br>(michael@pcvalaw.com)<br>Attn: Jason Amala<br>(jason@pcvalaw.com)<br><br>Attn: KTBS Law LLP, Thomas E. Patterson<br>(tpatterson@ktbslaw.com)<br>1801 Century Park East, Twenty-Sixth Floor<br>Los Angeles, CA 90067 | 969 |
| Porter & Malouf P.A. | Attn: Timothy Porter<br>(tporter@portermalouf.com)<br>825 Ridgewood Rd.<br>Ridgeland, MS 39157 | 86 |
| Reich & Binstock LLP | Attn: Dennis Reich<br>(dreich@reichandbinstock.com)<br>4265 San Felipe St. #1000<br>Houston, TX 77027 | 336 |
| Slater Slater Schulman LLP | Attn: Adam P. Slater<br>(aslater@sssfirm.com)<br>488 Madison Avenue<br>20th Floor<br>New York, NY 10022 | 14170 |

| FIRM | NOTICE ADDRESS | CLAIMS |
|------|----------------|--------|
| Swenson & Shelley | Attn: Kevin Swenson (kevin@swensonshelley.com) 107 South 1470 East, Ste. 201 St. George, UT 84790 | 175 |
| The Moody Law Firm | Attn: Will Moody Jr. (will@moodyrrlaw.com) 500 Crawford St., Ste. 200 Portsmouth, VA 23704 | 677 |
| The Zalkin Law Firm, P.C. | Attn: Irwin Zalkin (irwin@zalkin.com)<br><br>Attn: KTBS LAW LLP, Thomas E. Patterson (tpatterson@ktbslaw.com) 1801 Century Park East, Twenty-Sixth Floor Los Angeles, CA 90067 | 125 |
| Weller Green Toups & Terrell LLP | Attn: Mitchell Toups (matoups@wgttlaw.com) 2615 Calder Ave. #400 Beaumont, TX 77702 | 974 |