## EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 20-10343 (LSS) |
| Boy Scouts of America and Delaware BSA, LLC, | Chapter 11<br>Jointly Administered |
| Debtors.[1] | **Re: Docket No. 7832** |

## THE ROMAN CATHOLIC AD HOC COMMITTEE'S OBJECTIONS TO CONFIRMATION OF DEBTORS' SECOND MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION

<table>
<tr><td>

**POTTER ANDERSON & CORROON LLP**

Jeremy W. Ryan (Bar No. 4057)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com

</td><td>

**SCHIFF HARDIN LLP**

Everett Cygal, *admitted pro hac vice*
David Spector, *admitted pro hac vice*
J. Mark Fisher, *admitted pro hac vice*
Neil Lloyd, *admitted pro hac vice*
Daniel Schufreider, *admitted pro hac vice*
Jin Yan, *admitted pro hac vice*
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600
Email: ecygal@schiffhardin.com
      dspector@schiffhardin.com
      mfisher@schiffhardin.com
      nlloyd@schiffhardin.com
      dschufreider@schiffhardin.com
      jyan@schiffhardin.com

</td></tr>
</table>

*Counsel for the Roman Catholic Ad Hoc Committee*

February 4, 2022

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

RELEVANT BACKGROUND ...............................................................................7

    A.    The Current Plan as it Relates to Roman Catholic Chartered Organizations ................................................................................7

    B.    The Channeling Injunction as it Relates to Roman Catholic Chartered Organizations ..............................................................11

    C.    The Settlement Trust and TDPs..............................................................13

    D.    The Solicited Plan ....................................................................................14

    E.    The Century Settlement and the Lack of Notice of the Plan ...........17

    F.    Plan Voting ...............................................................................................19

    G.    The Debtors and Chartered Organizations.........................................20

    H.    RCAHC's Expert Report .........................................................................21

ARGUMENT ...........................................................................................................21

    I.    The Proposed Plan Violates the U.S. Constitution .......................................21

    A.    The Court Lacks Subject Matter Jurisdiction, Personal Jurisdiction, and Constitutional Authority to Approve the Plan's Proposed Third-Party Releases or to Assign the Independent Policies..............................................21

    B.    Chartered Organizations Affected by the Plan Did Not Receive Constitutionally Adequate Notice ................................................26

    C.    The Court Lacks Jurisdiction to Alter Property Rights Amongst Non-Debtors ................................................................30

        i.    Chartered Organizations' Rights in the Debtors' Insurance Policies ........................................................30

        ii.    Chartered Organizations' Rights in the Local Council Policies and Their Own Independent Coverage ..............................................35

    D.    The Court Lacks Jurisdiction to Extinguish Chartered Organization's Rights as Non-Debtor Insureds Without Their Consent. ................................35

E.   The Court Lacks Jurisdiction to Extinguish Chartered Organizations' Claims and Causes of Action Related to their Independent Coverage.. ..........38

F.   For the Chartered Organizations That Received Notice, Service was Deficient in Several Respects ..........................................................................41

G.   The Court is Without Jurisdiction to Release Settling Insurers from Independent Obligations, Forces Chartered Organizations to Transfer Insurance Policies, or Assign Causes of Action Against Settling Insurers ...........................................................................................................................43

H.   The Proposed Plan and the Debtors' Plan Process Violates the Due Process Clause of the U.S. Constitution and Requires Resolicitation Under Section 1127(c) ...................................................................................50

II.   The Debtors, Local Councils and Settling Insurance Companies Fail to Meet the Standards for Non-Consensual Third-Party Releases. ...........................................53

A.   Class 9 Overwhelmingly Rejected Third Party Releases. ...............................55

B.   Roman Catholic Chartered Organizations Will Not Receive Payment in Full ...................................................................................................................56

C.   A Release of Independent Coverage is Not Necessary for a Reorganization and There Is No Identity of Interest with the Estate...............58

III.   The Plan is Not Feasible ............................................................................................59

IV.   The Scope of the Plan Injunction for Chartered Organizations Is Unknown and Potentially Illusory..................................................................................................70

V.   Additional Objection to the Proposed Plan...............................................................75

A.   The Proposed Plan Seeks to Expand the Reaches of Section 1141 of the Bankruptcy Code and Should Not be Approved...............................................75

B.   The Proposed Plan Discriminates Against the Roman Catholic Chartered Organizations in Violation of Section 1123(a)(4) of the Bankruptcy Code ...............................................................................................78

C.   The Proposed Plan Fails the Best Interests Test ................................................83

i.   Indirect Abuse Claims Will Not Receive a Recovery Under the Proposed Plan.....................................................................................85

ii.   Indirect Abuse Claimants Are Required to Forfeit Valuable Rights Under the Proposed Plan ........................................................86

D.      The Plan Violates the Automatic Stay Protecting the Property of the Estate of the Debtor Chartered Organizations ..................................................88

E.      The Debtors' Plan is Not Proposed in Good Faith ..........................................93

CONCLUSION......................................................................................................................96

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*A.H. Robins Co. v. Piccinin*,
    788 F.2d 994 (4th Cir. 1986) ............................................................89

*Baldwin v. Hale*,
    68 U.S. 1 ...............................................................................26, 41

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)....................................................................83

*Brassil v. Maryland Cas. Co.*,
    210 N.Y. 235 (1914) ....................................................................92

*Butner v. United States*,
    440 U.S. 48 (1979)....................................................................48, 89

*Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*,
    533 B.R. 734 (Bankr. N.D. Ill. 2015), rev'd on other grounds, 808 F.3d 1186 (7th Cir. 2015)
    ..............................................................................................31

*Callaway v. Benton*,
    336 U.S. 132 (1949).....................................................................22, 36

*Cent. Virginia Cmty. Coll. v. Katz*,
    546 U.S. 356 (2006)......................................................................22

*Chambers v. Baltimore & O. R. Co.*,
    207 U.S. 142 (1907).....................................................................26, 41

*Connelly v. State Farm Mut. Auto. Ins. Co.*,
    135 A.3d 1271 (Del. 2016) ..............................................................92

*Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*,
    84 F.3d 367 (10th Cir. 1996) .............................................................72

*Cromer v. Kraft Foods N. Am., Inc.*,
    390 F.3d 812 (4th Cir. 2004) ...........................................................26, 41

*Fayette Bank v. Nesser (In re Nesser)*,
    206 B.R. 357 (Bankr. W.D. Pa. 1997) ...................................................60

*Fed. Trade Comm'n v. Southwest Sunsites, Inc.*,
    665 F.2d 711 (5th Cir. 1982) .........................................................72-73

*First Fidelity Bank v. McAteer,*
    985 F.2d 114 (3d Cir. 1993)............................................................................. passim

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV,*
    209 F.3d 252 (3d Cir. 2000)........................................................................................44

*Fuentes v. Shevin,*
    407 U.S. 67 (1972)................................................................................................26, 41

*Gillman v. Continental Airlines (In re Continental Airlines),*
    203 F.3d 203 (3d Cir. 2000)........................................................................................54

*Girl Scouts of The United States v. Boy Scouts of America,*
    C.A. No. 18-cv-10287 (AKH) (S.D.N.Y.)..................................................................65

*Hartford Underwriters Ins. Co. v. Union Planters,*
    530 U.S. 1 (2000)........................................................................................................78

*In re A.H. Robins, Inc.,*
    880 F.2d 694 (4th Cir. 1989) ................................................................................ 55-56

*In re ACandS, Inc.,*
    311 B.R. 36 (Bankr. D. Del. 2004) .............................................................................93

*In re Adelphia Commc'ns Corp.,*
    364 B.R. ................................................................................................................ passim

*In re Adelphia Commc'ns Corp.,*
    364 B.R. .......................................................................................................................32

*In re Aegean Marine Petroleum Network, Inc.,*
    599 B.R. 717 (Bankr. S.D.N.Y. 2019) ................................................................ 4, 23, 35-36

*In re Aleris Int'l, Inc.,*
    No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 10, 2010)...........................50

*In re Am. Capital Equip., LLC,*
    688 F.3d 145 (3d Cir. 2012)..........................................................................60, 69, 93

*In re American Solar King Corp.,*
    90 B.R. 808 (Bankr. W.D. Tex. 1988).................................................................51, 53

*In re Ampace Corp.,*
    279 B.R. 145 (Bankr. D. Del. 2002) ...........................................................................75

*In re The Archbishop of Agaña,*
    No. 19-00010 (Bankr. D. Guam) ................................................................................88

*In re Archdiocese of Saint Paul & Minneapolis*,
    579 B.R. 188 (Bankr. D. Minn. 2017) ..................................................36, 38, 44, 47

*In re Bashas' Inc.*,
    437 B.R. 874 (Bankr. D. Ariz. 2010) ...................................................................61

*In re Blitz U.S.A., Inc.*,
    Case No. 11-13603 (PJW) (Bankr. D. Del. Jan. 30, 2014) [Docket No. 2152].....................56

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) .................................................................79

*In re Burns & Roe Enters.*,
    No. 00-41610, 2005 Bankr. LEXIS 3173 (Bankr. D.N.J. Feb. 17, 2005) ........................37, 49

*In re Canter*,
    299 F.3d 1150 (9th Cir. 2002) ...........................................................................71

*In re Carolina Commons Dev., LP*,
    No. 09-011230-8, 2010 WL 1965895 (Bankr. E.D.N.C. May 17, 2010) ...............................61

*In re Chadda*,
    2007 WL 3407375 (Bankr. E.D. Pa. Nov. 9, 2007).......................................... 59-60

*In re Combustion Engineering, Inc.*,
    391 F.3d 190 (3d Cir. 2004)......................................................................... passim

*In re Concrete Designers, Inc.*,
    173 B.R. 354 (Bankr. S.D. Ohio 1994).................................................................51

*In re The Diocese of Buffalo, N.Y.*,
    No. 20-10322 (Bankr. W.D.N.Y.) ......................................................................88

*In re The Diocese of Rochester*,
    No. 19-20905 (Bankr. W.D.N.Y.) ......................................................................88

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y 2019)..................................................................84

*In re Dow Corning, Corp.*,
    280 F.3d 648 (6th Cir. 2002) .................................................................... 54, 57-58

*In re Downtown Inv. Club III*,
    89 B.R. 59 (B.A.P. 9th Cir. 1988)......................................................................51

*In re Energy Future Holding Corp.*,
    527 B.R. 157 (D. Del. 2015)......................................................................79, 82

*In re Energy Future Holdings Corp.*,
  648 F. App'x 277 (3d Cir. Mar. 23, 2016) ....................................................... 78-79

*In re Flintkote Co.*,
  No. 04-11300 (JKF) (Bankr. D. Del. Nov. 26, 2007) [Docket No. 2845] .............................49

*In re Forty-Eight Insulations, Inc.*,
  133 B.R. 973 (Bankr. N.D. Ill. 1991), aff'd, 149 B.R. 860 (N.D. Ill. 1992) .................. passim

*In re Frascelle Enters., Inc.*,
  360 B.R. 435 (Bankr. E.D. Pa. 2007) ................................................................60

*In re G-I Holdings Inc.*,
  420 B.R. 216 (D.N.J. 2009) .........................................................................50-51

*In re G-I Holdings, Inc.*,
  514 B.R. 720 (Bankr. D.N.J. 2014) .................................................................76

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001) ................................................................54

*In re Global Ocean Carriers Ltd.*,
  251 B.R. 31 (Bankr. D. Del. 2000) .................................................................60

*In re Haukos Farms, Inc.*,
  68 B.R. 428 (Bankr. D. Minn. 1986) ...............................................................63

*In re Hercules Offshore, Inc.*,
  565 B.R. 732 (Bankr. D. Del. 2016) ...............................................................83

*In re Hereford Biofuels, L.P.*,
  466 B.R. 841 (Bankr. N.D. Tex. 2012) .............................................................49

*In re Imerys Talc Am.*,
  No. 19-10289 (LSS) (Bankr. D. Del. Jan. 28, 2021) [Docket No. 2864] ..............................49

*In re Inv. Co. of the Sw., Inc.*,
  341 B.R. 298 (10th Cir. B.A.P. 2006) ............................................................60, 66

*In re Ionosphere Clubs, Inc.*,
  156 B.R. 414 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994) .................................92

*In re Johns-Manville Corp.*,
  168 B.R. 618 (Bankr. S.D.N.Y 1986) ..............................................................55

*In re Las Vegas Monorail Co.*,
  462 B.R. 795 (Bankr. D. Nev. 2011) ..............................................................63

*In re LightSquared, Inc.*,
    534 B.R. 522 (S.D.N.Y. 2015) ....................................................................................79, 82

*In re Lowenschuss*,
    67 F.3d 1394 (9th Cir. 1995) ...............................................................................................27

*In re M & S Assocs., Ltd.*,
    138 B.R. 845 (Bankr. W.D. Tex. 1992) ...............................................................................63

*In re Mahoney Hawkes, LLP*,
    289 B.R. 285 (Bankr. D. Mass. 2002) .................................................................................57

*In re Mariner Post-Acute Network, Inc.*,
    267 B.R. 46 (Bankr. D. Del. 2001) .....................................................................................44

*In re Master Mortgage Investment Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994).........................................................................54, 56

*In re MCorp Fin., Inc.*,
    137 B.R. 219 (Bankr. S.D. Tex. 1992) ................................................................................84

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005)................................................................................................27

*In re Millennium Lab Holdings, II*,
    945 F.3d 126 (3d Cir. 2019).......................................................................................... passim

*In re Millennium Lab Holdings II, LLC*,
    Case No. 15-12284 (LSS), 2015 WL 13912124 (Bankr. D. Del. Dec. 15, 2015) .................55

*In re New Century TRS Holdings, Inc.*,
    407 B.R. 576 (D. Del. 2009)...............................................................................................78

*In re Pac. Lumber Co.*,
    584 F.3d 229 (5th Cir. 2009) ..............................................................................................27

*In re Paragon Offshore PLC*,
    No. 16-10386 (CSS), 2016 WL 6699318 (Bankr. D. Del. Nov. 15, 2016) .................... passim

*In re Petters Co.*,
    419 B.R. 369 (Bankr. D. Minn. 2009) ...........................................................................31, 36

*In re Pittsburgh Corning Corp.*,
    453 B.R. 570 (Bankr. W.D. Pa. 2011) ("A § 105 injunction is governed by the same
    standards applicable under Fed. R. Civ. p. 65.") .............................................................70, 77

*In re Pizza of Haw., Inc.*,
    761 F.2d 1374 (9th Cir. 1985) ............................................................................................60

*In re Platinum Oil Props.*,
    465 B.R. 621 (Bankr. D.N.M. 2011) .................................................................76

*In re Prudential Lines, Inc.*,
    107 B.R. 832 (Bankr. S.D.N.Y. 1989) ..............................................................89

*In re Purdue Pharma, L.P.*,
    2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021) .............................................. passim

*In re Purdue Pharma L.P.*,
    Case No. 19-23649 (RDD) (Bankr. S.D.N.Y Sept. 19, 2017), [Docket No. 3787].................56

*In re Quigley Co., Inc.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010).......................................................... 83-84

*In re Quorum Health Corp.*,
    Case No. 20-10766 (KBO) (Bankr. D. Del. June 30, 2020) [Docket No. 294]................55, 58

*In re Resorts Int'l, Inc.*,
    372 F.3d 154 (3d Cir. 2004)................................................................35, 40, 44, 48

*In re The Roman Catholic Church of the Archdiocese of New Orleans*,
    No. 20-10846 (Bankr. E.D. La.) .....................................................................88

*In re Roman Catholic Church of the Archdiocese of Santa Fe*,
    No. 18-10327 (Bankr. D.N.M.)......................................................................88

*In re Roman Catholic Diocese of Harrisburg*,
    No. 20-00599 (Bankr. W.D. Pa.) ....................................................................88

*In re The Roman Catholic Diocese of Norwich*,
    No. 21-20687 (Bankr. D. Conn.) ....................................................................88

*In re The Roman Catholic Diocese of Rockville Centre, New York*,
    No. 20-12345 (Bankr. S.D.N.Y.).....................................................................88

*In re The Roman Catholic Diocese of Syracuse, New York*,
    No. 20-30663 (Bankr. N.D.N.Y.) ...................................................................88

*In re Sound Radio Inc.*,
    103 B.R. 521 (D.N.J. 1989) ..........................................................................60

*In re SoyNut Butter Co.*,
    No. 17B14970, 2018 WL 3689549 (Bankr. N.D. Ill. Aug. 1, 2018) ................................37, 44

*In re SunEdison, Inc.*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017)...............................................................84

*In re Torgro Atl. City, LLC*,
  No. 08-13458, 2009 WL 1288367 (Bankr. D.N.J. May 7, 2009) ..................................... 62-63

*In re U.S. Concrete, Inc.*,
  No. 10-11407, 2010 WL 3493066 (Bankr. D. Del. July 29, 2010) .........................................50

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012) .................................................................................... passim

*In re W.R. Grace & Co.*,
  607 B.R. 419 (Bankr. D. Del. 2019) ...............................................................................31, 80

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013)...........................................................................................80, 90

*In re W. Real Estate Fund, Inc.*,
  922 F.2d 592 (10th Cir. 1990) ............................................................................................27

*In re Washington Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) .......................................................................... 79, 83-84

*In re Weathersfield Farms, Inc.*,
  34 B.R. 435 (Bankr. D. Vt. 1983).......................................................................................36

*In re Wedgewood Realty Group, Ltd.*,
  878 F.2d 693 (3d Cir. 1989)...............................................................................................70

*In re Williams*,
  346 B.R. 361 (Bankr. E.D. Pa. 2006) ..................................................................................70

*In re Young Broad. Inc.*,
  430 B.R. 99 (Bankr. S.D.N.Y. 2010)..............................................................................60, 67

*In re Zenith Electronics Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ............................................................................ 54, 57-59

*Loc. No. 93, Int'l Ass'n of Firefighters AFL-CIO C.L.C. v. City of Cleveland*,
  478 U.S. 501 (1986)......................................................................................................26, 41

*Louisiana World Exposition, Inc. v. Federal Ins. Co.*,
  832 F.2d 1391 (5th Cir. 1987) ...........................................................................................89

*MacArthur Co. v. Johns-Manville Corp.*,
  837 F.2d 89 (2d Cir. 1988)......................................................................................... passim

*Mallet & Co. Inc. v. Lacayo*,
  16 F.4th 364 (3d Cir. 2021) ......................................................................................... 71-72

*Martin v. Wilks*,
    490 U.S. 755 (1989)...................................................................................26, 42

*Matter of Cont'l Airlines, Inc.*,
    134 B.R. 536 (Bankr. D. Del. 1991) ...................................................................89

*Minoco Group of Cos. v. First State Underwriters Agency*,
    799 F.2d 517 (9th Cir. 1986) ...............................................................................89

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
    139 S. Ct. 1652 (2019)..........................................................................................36

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950)..........................................................................................26, 41

*Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*,
    322 B.R. 560 (M.D. Pa. 2005) ............................................................................93

*Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportsStuff, Inc.)*,
    430 B.R. 170 (B.A.P. 8th Cir. 2010)............................................................. passim

*Patriot Homes v. v. Forest River Housing, Inc.*,
    512 F.3d 412 (7th Cir. 2008) ...............................................................................72

*Patterson v. Mahwah Bergen Retail Group Inc. (In re Ascena)*,
    2022 WL 135398 (E.D. Va. Jan. 13, 2022) ................................................. passim

*Reno Air Racing Ass'n., Inc. v. McCord*,
    452 F.3d 1126 (9th Cir. 2006) .............................................................................72

*Sanders v. Airline Pilots Ass'n International*,
    473 F.2d 244 (2d Cir. 1972)................................................................................72

*Schmidt v. Lessard*,
    414 U.S. 473 (1974)........................................................................................ 72-73

*Schroeder v. City of New York*,
    371 U.S. 208 (1962)..........................................................................................26, 41

*Seagram-Distillers Corp. v. New Cut Rate Liquors*,
    221 F.2d 815 (7th Cir. 1955) ...............................................................................72

*Seattle-First Nat. Bank v. Manges*,
    900 F.2d 795 (5th Cir. 1990) ...............................................................................72

*St. Paul v. Home Depot*,
    Nos. 03 C 50389, 50390, 2004 WL 2075129 (N.D. Ill. 2004) .........................37, 45

*Stern v. Marshall*,
    564 U.S. 462 (2011) ............................................................................... passim

*Trulis v. Barton*,
    107 F.3d 685 (9th Cir. 1995) ........................................................................ 76

*U.S. Steel Corp. v. United Mine Workers of Am.*,
    534 F.2d 1063 (3d Cir. 1976) ....................................................................... 71

*United States Steel Corp. v. United Mine Workers*,
    519 F.2d 1236 (5th Cir. 1975) ...................................................................... 72

*United States v. Carolina Parachute Corp.*,
    907 F.2d 1469 (4th Cir. 1990) ...................................................................... 71

*United States v. Energy Res. Co., Inc.*,
    495 U.S. 545 (1990) ..................................................................................... 22

## STATUTES

11 U.S.C. § 362(a)(3) ................................................................................. 89-90, 92

11 U.S.C. § 363(b) ........................................................................................... 44

11 U.S.C. § 363(e) ........................................................................................... 49

11 U.S.C.§ 541(a)(1) ........................................................................................ 89

11 U.S.C. § 1125(a)(3) ..................................................................................... 93

11 U.S.C. § 1127(c) ...................................................................................... 50, 53

11 U.S.C. §§ 1129(a)(1), (a)(2) ....................................................................... 92

11 U.S.C. § 1129(a)(7) ............................................................................. 83-85, 88

11 U.S.C. § 1129(a)(11) ................................................................................ 59, 70

11 U.S.C. § 1141(a) ..................................................................................... 75-76

26 U.S.C. § 509 ................................................................................................ 20

§ 362(a) of the BANKRUPTCY CODE ................................................................ 89

§ 363 of the BANKRUPTCY CODE ................................................... 33, 44-45, 47

§ 541 of the BANKRUPTCY CODE ................................................................... 89

§ 541(a) of the BANKRUPTCY CODE ............................................................... 47

§ 1123(a)(4) of the BANKRUPTCY CODE ............................................................ passim

§ 1129(a)(10) of the BANKRUPTCY CODE ...................................................................5

§ 1141 of the BANKRUPTCY CODE ..................................................................... passim

§ 105 of the CODE ....................................................................................................36, 70

SUSAN N.K. GUMMOW, BANKRUPTCY AND INSURANCE LAW ......................................32

**OTHER AUTHORITIES**

According to the Disclosure Statement, Class 9 ..........................................................85

BANKRUPTCY RULE 9019 and
    § 363(b) ................................................................................................................33

Bar Date Order, (ii) .............................................................................................. 86-87

Century Notice, Para. 5 ..............................................................................................18

CONSTITUTION OF THE UNITED STATES .......................................................................2

Dana Goldstein, *"It's Chaos' as Schools Confront Omicron*, NEW YORK TIMES (Jan. 3, 2022),
    *available at* https://www.nytimes.com/2022/01/03/us/school-reopening-classrooms-
    omicron.html
    ............................................................................................................................65

Debtors' Disclosure Statement ***does not*** .....................................................................51

Disclosure Statement, Art. III.A.3.b ..........................................................................23

*Expert Report of Melissa S. Kibler* (the "Kibler Expert Report") ..............................21

FED. R. BANKR. P. 7065 ...............................................................................................70

FED. R. CIV. P. 65 ................................................................................................... 70-73

FED. R. CIV. P. 65(c) .............................................................................................6, 29

FED. R. CIV. P. 65(d)(1) .............................................................................................71

Gary Svirsky, Tancred Schiavoni, Andrew Sorkin, and Gerard Savarsse, *A Field Guide to
    Channeling Injunctions and Litigation Trusts*, 260 NEW YORK LAW JOURNAL (2018) ....36, 57

Gary Svirsky, Tancred Schiavoni, Andrew Sorkin, and Gerard Savarsse, *A Field Guide to
    Channeling Injunctions and Litigation Trusts*, 260 NEW YORK LAW JOURNAL (2018) ..........77

Plain English Summary, the Notice of Hearing to Consider Confirmation of the Modified Fifth
  Amended Chapter 11 ...............................................................................................................16

*Public Schools in Chicago Close as Teachers' Union Says Classroom Conditions Are Unsafe*,
  NEW YORK TIMES (January 4, 2022), *available at*
  https://www.nytimes.com/live/2022/01/04/world/omicron-covid-vaccine-tests;...................65

Releasing Parties *consented to the Third-Party Releases*..............................................................24

*Report of Michael L. Averill, CPCU, MBA* (the "Averill Expert Report") ...................................21

Request 1-478 ...............................................................................................................................74

Roman Catholic Entity, "Roman Catholic Independent Coverage"..................................................2

Rule 65(d) ................................................................................................................. 70, 72-74

Rule 65(d)'s ...................................................................................................................................74

Rule 65's ...............................................................................................................................70, 72

*Statement for the Modified Fifth Amended Chapter 11* ..................................................................14

U.S. CONST. Amendment 5 .............................................................................................................41

U.S. CONSTITUTION ........................................................................................................................21

Article III of the U.S. CONSTITUTION ................................................................................... passim

Due Process Clause of the U.S. CONSTITUTION ............................................................................50

*Voting Declaration*, at Ex. A .........................................................................................................56

The Roman Catholic Ad Hoc Committee (the "RCAHC")[2] objects to confirmation of the *Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, dated December 17, 2021 [Docket No. 7832] (the "Plan"), and respectfully states as follows:

## PRELIMINARY STATEMENT[3]

The Plan is animated by a fundamental goal: the Settling Insurance Companies want to be free of Scouting-related Abuse Claims forever.  To accomplish this goal, the Debtors and the Settling Insurance Companies ask the Court to approve a Plan that deals not just with the property of the Debtors (something utterly run of the mill) or even the Debtors' property and the property that the Local Councils are assigning to the Debtors (unusual in itself).  Instead, the Settling Insurance Companies demand that this Court invade and impair Chartered Organizations' own property–their own policies of insurance.  At a minimum, the Settling Insurance Companies demand from every Chartered Organization releases that eliminate the insurers' obligations under those policies for Scouting-related Abuse Claims.  Worse, for the vast majority of Chartered Organizations, the Plan proposes to actually assign the Chartered Organizations' own property (and all rights attendant thereto) to the Settlement Trust.  This is not some incidental or fringe benefit; it is a principal plank of the Settling Insurance Companies' ask of Debtors, as they are

---

[2]  The RCAHC was formed in June 2021 to advance the interests of Chartered Organizations affiliated with the Roman Catholic Church, many of which are unrepresented, have no notice of any Abuse Claims asserted against them, and have little to no appreciation for how the Debtors' Plan will adversely impact their insurance rights.  The RCAHC is comprised of a representative group of 10 Roman Catholic dioceses and archdioceses and Catholic Mutual Relief Society of America ("Catholic Mutual"), a not-for-profit corporation providing coverage for certain property and casualty risks to members constituting 112 of the 195 Roman Catholic dioceses and archdioceses in the United States.  The RCAHC's membership was disclosed in the *Second Amended Verified Statement of the Roman Catholic Ad Hoc Committee Pursuant to Bankruptcy Rule 2019* [Docket No. 7805] and will be updated with a further amended Rule 2019 statement that includes, per the Court's instruction, the RCAHC's bylaws as well as the resignation and removal of the Diocese of Ogdensburg and the Archdiocese of Atlanta, both of which resigned prior to the filing of this Objection.  The RCAHC does not have the power to bind any particular Roman Catholic Chartered Organization.  Each remaining member of the RCAHC understands that the Court may treat each member as being a party to this Objection.

[3]  Capitalized terms used in the Objection are defined herein or in the Plan, as applicable.

seeking to escape tremendous amounts of coverage that benefits Chartered Organizations and that was purchased independently of the Debtors and the Local Councils. For example, attached as Exhibit A hereto is a Law360 article, dated July 1, 2019, discussing (and attaching) a complaint filed by the Archdiocese of New York against, *inter alia*, Century and Harford seeking coverage for sexual abuse claims on policies dating back into the 1950's. These are policies over which this Court has no jurisdiction. No one can tell the Court how many other Chartered Organizations will fall prey to this proposed scheme, most of whom the Court has no jurisdiction over and who would be deprived of due process were the Court to endorse the taking of their property. The Plan cannot be confirmed because these actions violate both the U.S. Constitution and the Bankruptcy Code.

*First*, the Plan purports to affect the rights of *every* Chartered Organization. But the Court lacks subject matter and personal jurisdiction over the more than 35,000 Chartered Organizations who did not file a proof of claim. Those entities are complete strangers to these Chapter 11 Cases and just as other courts have rejected the attempts of debtors and creditors to affect the rights of third-parties, so too should this Court. The Plan would impose non-consensual, third-party releases against those strangers and would transfer their rights in their own property as well as in the Debtors' and Local Councils' insurance policies. Nor does the Court have subject matter jurisdiction over Chartered Organizations who filed proofs of claim in respect of those Chartered Organizations' own independently purchased insurance coverage (the "Independent Coverage" or "Independent Policies" and, when referring to an insurance policy purchased by a Roman Catholic Entity, "Roman Catholic Independent Coverage" or "Roman Catholic Independent Policies"). The Court cannot release the Settling Insurance Companies from any obligations or duties that they have under Independent Coverage; the Court cannot force Chartered Organizations to transfer to the Settlement Trust the Chartered Organizations' rights under the Independent Coverage; and the

Court cannot force Chartered Organizations to assign to the Settlement Trust any cause of action against Settling Insurance Companies in respect of that Independent Coverage.

If confirmed, the Plan purports to do all of this. While the RCAHC anticipates that the Debtors and their plan supporters will contend that there is nothing to see here and that the Plan is somehow a logical application of *In re Millennium Lab Holdings, II*, 945 F.3d 126 (3d Cir. 2019), the situation here bears no factual or legal resemblance to *Millennium.* Instead, the substantial impairment of third-party rights of complete strangers to this proceeding and the forced transfer of non-estate assets is more akin to the third-party, non-consensual releases rejected over the past few weeks as improper in *Patterson v. Mahwah Bergen Retail Group Inc. (In re Ascena)*, 2022 WL 135398 (E.D. Va. Jan. 13, 2022) and *In re Purdue Pharma, L.P.*, 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021). The Plan overreaches far beyond the Court's *in rem* jurisdiction. Nothing commends what the Debtors have proposed.

***Second***, while the non-consensual, third-party releases fail here for the same reasons that they failed in *Ascena* and *Purdue,* the Plan has another constitutional flaw: the Debtors failed to provide constitutionally adequate notice for the Plan itself. The Plan was materially revised on December 18, 2021—the provisions that purport to require all Chartered Organizations to release the Settling Insurance Companies and transfer property rights and causes of action in respect to their own property—the Independent Coverage—and to grant non-consensual releases were all new. The Solicited Plan (defined *infra* at ¶ 13)—the plan that was solicited after a multi-day Disclosure Statement hearing—contained none of these provisions because all of these provisions first appeared as part of the $800 million Century and Chubb Companies Term Sheet (defined *infra* at ¶ 4)— on December 14, 2021. The Debtors provided no effective notice to the more than 50,000 Chartered Organizations whose rights would be affected, including the over 35,000

Chartered Organizations who did not file proofs of claim.

The notice that was given failed to meet the basic the requirements of constitutionally required due process.  During the Disclosure Statement hearing, the Court recognized that the lack of sophistication of volunteer Chartered Organizations and the Byzantine complexity of the Solicited Plan meant that Chartered Organizations needed to be provided with a plain English explanation of their plan treatment.  The Debtors' December 2021 notice efforts failed to describe the impact of the Century and Chubb Companies Term Sheet on Chartered Organizations.  The Debtors did not undertake any effort to explain how the treatment of Chartered Organizations changed, much less mention the purported transfer of their insurance rights and causes of action to the Settlement Trust.  The Modified Plan Notice (defined *infra* at ¶ 22)— was not in plain English; rather, the Debtors simply cut and pasted large sections of the Plan verbatim, even though the Plan was replete with complicated and nested defined terms.  Indeed, as late as one day before the original voting deadline, the Debtors were sending out solicitation packages with the *September 2021 plan*.  Docket No. 8378.

As in *Ascena*, no amount of monetary contribution can buy Debtors and their plan supporters out of the strictures of the Due Process Clause of the Constitution.  *Ascena*, 2022 WL 135398, at *20 (observing that "[t]hird party releases are not a merit badge," "participation trophy," or "gold star") (quoting *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 726-27 (Bankr. S.D.N.Y. 2019).

*Third*, the Debtors and the Local Councils cannot meet controlling standards for non-consensual third-party releases in this Circuit.  This is so because Class 9 claims are channeled to the Settlement Trust; that class overwhelmingly indicated opposition to granting third-party releases, even on a consensual basis—so there is no overwhelming support *from* the channeled

class.  Local Councils are providing no consideration to Class 9 claimants for the releases that they demand.  Roman Catholic Entities are specifically excluded from the benefits of the Local Council contributions; and the only reason that Roman Catholic Entities will receive *any* release at all is because they are being deprived of their rights as additional insureds under the BSA Insurance Policies and the Local Councils Insurance Policies, and, amazingly, the purported forced contributions of their own Independent Coverage.

Nor will the Roman Catholic Entities receive payment, let alone payment in full, for their claims, because the Trust Distribution Procedures limit payment of an Indirect Abuse Claim only to those amounts that the "Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such Claim for which the Settlement Trust would have liability."  Moreover, the Trust Distribution Procedures do not allow for any late-filed claims by Class 9 claimants because Future Abuse Claims are limited to Direct Abuse Claims.  Most Class 9 claimants who filed proofs of claim did so as a precautionary measure, something evident from the record, as the known survivor claims pool as of the Petition Date numbered in the low thousands.  After the Bar Date, the Direct Abuse Claims exceeded 84,000, all of which will implicate a Chartered Organization as the troop sponsor.  Despite this, Debtors have made *no effort* to alert Chartered Organizations about the existence of these claims, choosing instead to keep the blinders on Chartered Organizations.

**Fourth**, the Plan is not feasible under section 1129(a)(10) of the Bankruptcy Code.  There is no reasonable basis to believe that the Debtors can mistreat Chartered Organizations as they intend, expect full-throated support from those mistreated Chartered Organizations, and nevertheless reverse the historical decline of participation in Scouting and grow sufficiently to meet their future financial commitments.

**Fifth**, the scope of the Channeling Injunction that benefits Roman Catholic Chartered

Organizations is unknown and potentially illusory, and accordingly, violates Fed. R. Civ. P. 65(c). At minimum, as the Debtors, the Settling Insurance Companies, and this Court have all noted, the language in the Plan requires legal conclusions as to coverage of 84,000 Direct Abuse Claims with respect to unknown thousands and thousands of Insurance Policies.

*Sixth*, the Plan purports to bind Chartered Organizations who did not file proofs of claim and are well outside of what section 1141 of the Bankruptcy Code provides.

*Seventh*, the Plan unfairly discriminates against Roman Catholic Chartered Organizations in violation of section 1123(a)(4) of the Bankruptcy Code. Indeed, the Plan has singled out Roman Catholic Chartered Organizations for less favorable treatment than other members of Class 9 for no discernable reason, much less a reason that would satisfy the Debtors' obligation to treat all creditors in good faith. Roman Catholic Chartered Organizations are *the only* affiliated group of Chartered Organizations who are not being protected against Abuse Claims. Thousands of Chartered Organizations who were required to make no monetary contribution received greater protection, including a group of Chartered Organizations that according to Debtors themselves had *more* alleged Abuse Claims than those against Roman Catholic Chartered Organizations. Collectively, the alleged abuse claims directed at Chartered Organizations who would receive substantial protection under the Plan without making any contribution at all (beyond what should be for every Chartered Organization on a voluntary basis a sufficient contribution—the loss of their insurance rights under the BSA Insurance Policies and Local Council Insurance Policies and their indemnification rights against the Debtors and the Local Councils) well exceeds the alleged Abuse Claims directed against Roman Catholic Chartered Organizations. And at the same time that the Plan targets Roman Catholic Chartered Organizations for future Abuse Claims, it annihilates the very insurance rights that may be their principal source of protection from financial

ruin (the very "fund survivor litigation while annihilating rights" strategy about which the RCAHC objected during the restructuring support agreement and Disclosure Statement processes and which initially led the Debtors to acknowledge and to provide some limited protections for Chartered Organizations).

The Plan is simply unconfirmable because it violates the Constitution, the Bankruptcy Code, and applicable law.

## RELEVANT BACKGROUND

**A.  The Current Plan as it Relates to Roman Catholic Chartered Organizations**

1.      Under the Plan, the Roman Catholic Chartered Organizations[4] have three options: (i) object to the Plan and become "Opt-Out Chartered Organizations"; (ii) do nothing and, by default, become "Participating Chartered Organizations";[5] or (iii) pay to become "Contributing Chartered Organizations."

2.      In terms of levels of protection, a summary of the treatments and impact on Roman Catholic Independent Organizations from least to greatest impact and protection is:

a.      Opt-Out Chartered Organization – Only Abuse Claims that are "covered under insurance policies" issued by the Settling Insurance Companies are channeled.  The Opt-Out Chartered Organization is forced to non-consensually release all Settling Insurance Companies under Roman Catholic Chartered Organization's Independent Policies.

b.      Participating Chartered Organization – Same injunction for Abuse Claims prior to 1976, full channeling of all Abuse Claims arising from 1976 forward.  In addition to the non-consensual releases of

---

[4] "Chartered Organization" is defined by the Plan as "each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units." Plan, Art. I. A.57.

[5] The terms Participating Chartered Organization and Limited Protected Party are interchangeable because the definition of Limited Protected Party covers only Participating Chartered Organizations. Plan, Art. I.A. 164.

Settling Insurance Companies, the Participating Chartered Organization is deemed to assign to the Settlement Trust the Roman Catholic Chartered Organization's Independent Policies and all causes of action related thereto as concerning Abuse Claims.

c.    Contributing Chartered Organization – A full Channeling Injunction for all Abuse Claims. The Contributing Chartered Organization consents to the releases and assignment of Roman Catholic Chartered Organization's Independent Policies.[6]

3.    The chart below takes the Court through the Plan provisions that apply for each of those three scenarios. It is important for the Court to be mindful that Chartered Organizations possess (or may in the future possess) Indirect Abuse Claims, which are a subset of Abuse Claims, and which would include claims for reimbursement, indemnity, contribution, etc. because Roman Catholic Chartered Organizations are being forced to release those Indirect Abuse Claims against Settling Insurance Companies, who are Protected Parties. *See* Plan, Art. I.A. Sec. 18, 142, 221 and 258.

| TREATMENT OPTIONS OF ROMAN CATHOLIC CHARTERED ORGANIZATIONS UNDER THE PLAN | | |
|---|---|---|
| | **Release Received** | **Rights Lost** |
| **Participating Chartered Organization**<br><br>**\*Limited Protected Party\*** | **No Objection/Deemed Consent**<br><br>• All holders of Abuse Claims shall release all of the Limited Protected Parties from all Post-1975 Chartered Organization Abuse Claims. Plan, Art. X.J.3.<br><br>• All holders of Abuse Claims shall release each of the Participating Chartered | **No Objection/Deemed Consent**<br><br>• The sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Settlement Trust. Plan, Art. X.F.1.[7] Abuse Claims includes Indirect Abuse Claims that Chartered Organizations hold.<br><br>• All Persons that have held or asserted, that hold or assert, or that |

[6]   To be clear, with respect to all *Other* Chartered Organizations, the Plan deems them to be Contributing Chartered Organizations (without the requirement of any monetary contribution) and deems them to consent to the releases and assignments (regardless of whether they actually received adequate notice or in fact consented).

[7]   "For the avoidance of doubt, the sole recourse of any holder of an Abuse Claim covered by any insurance policy issued by a Settling Insurance Company shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents." *Id.*

| | | |
|---|---|---|
| | Organizations with respect to Abuse Claims that arose prior to January 1, 1976 and are not covered by any insurance policy issued by a Settling Insurance Company. Plan, Art. X.J.3. | may in the future hold or assert any claim or cause of action against any Insurance Company in any way connected with any Abuse Insurance Policy or other insurance policy issued by a Settling Insurance Company covering Abuse Claims shall be enjoined.  Plan, Art. X.H.2. |
| | | • Participating Chartered Organization Insurance Assignment.  Plan, Art. I.A.189.[8]  This provision assigns all of the Chartered Organizations' Abuse Insurance Policies, the Settling Insurer Policy Rights, the Insurance Settlement Agreements and claims thereunder and proceeds thereof, the Insurance Actions, and the Insurance Action Recoveries.  Plan, Art. V.S.1.c. |
| | | • The Participating Chartered Organization Insurance Assignment also includes an assignment of the Chartered Organizations' rights in the Settling Insurer Policy Rights.[9]  Plan, Art. I.A.259. |
| | | • Any and all Claims asserted in the Chapter 11 Cases by Participating Chartered Organizations shall be deemed withdrawn with prejudice.  Plan, Art. V.S.1.d. |
| **Opt-Out Chartered Organization** | **Objection/Non-Consensual**<br><br>• All holders of Abuse Claims shall release all of the Opt-Out Chartered Organizations from all Opt-Out Chartered | **Objection/Non-Consensual**<br><br>• "All Abuse Claims against insured and co-insureds covered under ***any insurance policies issued by the Settling Insurance Companies*** shall |

---

[8]  "Participating Chartered Organization Insurance Assignment" means any and all of the Participating Chartered Organizations' rights in and to (a) the Participating Chartered Organization Insurance Action; (b) the Insurance Action Recoveries; (c) the Insurance Settlement Agreements and claims thereunder and proceeds thereof; (d) the Abuse Insurance Policies (but not the policies themselves) issued by Settling Insurance Companies; and (e) Settling Insurer Policy Rights."  Plan, Art. I.A.189.

[9]  "Settling Insurer Policy Rights" means any and all of the Participating Chartered Organizations' and Contributing Chartered Organizations' rights to any proceeds or Causes of Action attributable to ***any insurance policies*** issued by a Settling Insurance Company that cover Abuse Claims.  Plan, Art. I.A.259.

| | | |
|---|---|---|
| | Organization Abuse Claims. Plan, Art. X.J.3.[10] | be channeled under <u>Article X.F.1</u> and released under <u>Article X.J.6</u> as provided in the Insurance Settlement Agreements." Plan, Art. X.F.2.<br><br>• "For the avoidance of doubt, the sole recourse for any holder of an Abuse Claim covered by ***any insurance policy issued by a Settling Insurance Company*** shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents." Plan, Art. X.F.1.<br><br>• All Persons that have a claim "against any Insurance Company based upon…any Abuse Insurance Policy ***or other insurance policy issued by a Settling Insurance Company covering Abuse Claims***…" shall be enjoined. Plan, Art. X.H.2.[11]<br><br>• "For the avoidance of doubt, holders of Abuse Claims covered by any insurance policy issued by a Settling Insurance Company shall, and shall be deemed to, release and discharge the Settling Insurance Companies for such Claims." Plan, Art. X.J.3. |
| **Contributing Chartered Organizations**<br><br><br>**\*Protected Party\*** | **No Objection Plus Payment**<br><br>• All holders of Abuse Claims shall release all of the Protected Parties from all Abuse Claims. Plan, Art. X.J.3. | **No Objection Plus Payment**<br><br>• The sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Settlement Trust. Plan, Art. X.F.1.[12] Abuse Claims includes Indirect |

---

[10] "Opt-Out Abuse Claim" means "any Abuse Claim against an Opt-Out Chartered Organization that is alleged to have occurred prior to the Petition Date (including prior to January 1, 1976) that is covered under an insurance policy issued by a Settling Insurance Company with respect to such coverage for such Abuse Claims." Plan, Art. I.A.181.

[11] "Insurance Policies" means "any and all known and unknown" insurance policies currently or previously in effect before the Petition Date naming the Debtors, the Local Councils, or the Chartered Organizations. Plan, Art. I.A.151. Insurance Policies includes Non-Abuse Insurance Policies. *Id.*

[12] "For the avoidance of doubt, the sole recourse of any holder of an Abuse Claim covered by any insurance policy issued by a Settling Insurance Company shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents." *Id.*

|  |  | Abuse Claims that Chartered Organizations hold. |
|  |  | • All Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim or cause of action against any Insurance Company in any way connected with any Abuse Insurance Policy or other insurance policy issued by a Settling Insurance Company covering Abuse Claims shall be enjoined.  Plan, Art. X.H.2. |
|  |  | • Chartered Organizations' rights in the Abuse Insurance Policies, the Settling Insurer Policy Rights, the Insurance Settlement Agreement and claims thereunder and proceeds thereof, the Insurance Actions and Insurance Action Recoveries.  Plan, Art. I.A.76; Plan, Art. V.S.1.b. |
|  |  | • Chartered Organization rights in the Settling Insurer Policy Rights are also being stripped.  Plan, Art. I.A.259; Plan, Art. V.S.1.b. |
|  |  | • Any and all Claims asserted in the Chapter 11 Cases by Contributing Chartered Organizations shall be deemed withdrawn with prejudice. Plan, Art. V.S.1.d. |

**B.** **The Channeling Injunction as it Relates to Roman Catholic Chartered Organizations**

4.      The baseline concept for the Channeling Injunction, as it applies to Roman Catholic Chartered Organizations is most succinctly stated in the Term Sheet for Century and the Chubb Companies [Docket No. 7745, Ex. A] (the "Century and Chubb Companies Term Sheet"):

> all Abuse Claims against insureds and co-insureds covered under insurance policies issued by the Settling Insurers shall be channeled under the Settling Insurer Policy Injunction and released.

Century and Chubb Companies Term Sheet, Sec. 11.

5.      The specific Plan language for the Channeling Injunction that applies to Roman Catholic Chartered Organizations is:

> (c) the sole recourse of any holder of an Abuse Claim against a Limited Protected Party **if such Abuse Claim is covered under any insurance policy issued by any Settling Insurance Company**, shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party, (d) the sole recourse of any holder of an Opt-Out Abuse Claim against an Opt-Out Chartered Organization on account of such Opt-Out Abuse Claim shall be to and against the Settlement Trust […]

Plan, Art. X.F. (emphasis added).

6.      Opt-Out Abuse Claims are limited to an "Abuse Claim against an Opt-Out Chartered Organization that is alleged to have occurred prior to the Petition Date (including prior to January 1, 1976) **that is covered under an insurance policy issued by a Settling Insurance Company with respect to such coverage for such Abuse Claims**."  Plan, Art. I.A.181 (emphasis added).

7.      In both instances, the Channeling Injunction is only conceptual.  Reference must be made to each specific Abuse Claim, Insurance Policies that might provide coverage must be located and reviewed, and then a determination of coverage must be made before the claim can be channeled.  The Plan and all related documents are silent as to the actual procedures for making a determination of whether any Abuse Claim against Chartered Organizations will be channeled and the rights of the Chartered Organization or the holder of the Abuse Claim to appeal such a determination.  Nor does the Plan identify the person, entity, or adjudicator tasked with the responsibility for making this determination.

8.      Because all other Chartered Organizations are, or are deemed to be, Contributing Chartered Organizations under the Plan, these injunction provisions can apply *only to* Roman

Catholic Chartered Organizations.

### C. **The Settlement Trust and TDPs**

9.      The Trust Distribution Procedures (the "TDPs"), attached as Exhibit A to the Plan, propose to create the Settlement Trust that will, among other things, assume liability for all Abuse Claims and administer the Settlement Trust Assets to holders of Allowed Abuse Claims.  TDPs, Art. I.

10.      However, as drafted, the TDPs will disallow claims filed after the Bar Date by Roman Catholic Chartered Organizations from receiving distributions and will subordinate Indirect Abuse Claims to Direct Abuse Claims.  TDPs, Art. IV.B ("***In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant*** to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, ***including any rights with respect to timing, amount, percentage, priority, or manner of payment***.") (emphasis added).

11.      Any recovery on account of an Indirect Abuse Claim would be automatically and functionally capped.  *Id.*

   a.      [N]o Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability.

   b.      ***[I]n no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim***.") (emphasis added).

   c.      The Trust Distribution Procedures establish a number of draconian requirements that create barriers (if not eliminate the possibility) for Indirect Abuse Claimants to receive any recovery under the Plan.

12.      There is no provision for the assertion, review, or allowance of Indirect Abuse Claims that arise after the Bar Date.

**D. The Solicited Plan**

13.    On September 30, 2021, after a lengthy multi-week hearing to approve the Debtors' Disclosure Statement, the Debtors filed both the *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6445] (the "Disclosure Statement") and the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6443] (the "Solicited Plan"). Chartered Organizations that filed proofs of claim were (and remain) classified as Class 9 creditors.

14.    At the hearing to consider the Disclosure Statement, on September 28, 2021, when discussing the need for a "plain English" document to be included with the solicitation package, the Court stated that "this is a very important issue, these chartered organizations and their ability to understand what's happening, especially given the way this [Plan] is structured. And as with many things in this case, [the Plan is] complex and I don't know that there's a lot of precedent for this. So communications with the chartered organizations needs to be helpful." Sept. 28, 2021 Hr'g Tr. 265:25, 257:1-7.

15.    The RCAHC, along with the United Methodist Ad Hoc Committee (the "UMAHC"), took the laboring oar to ensure that the plain English document was created and that that document accurately described the treatments being afforded to all Chartered Organizations, whether entitled to vote or not. *See, inter alia,* Sept. 21, 2021 Hr'g Tr. 59, 169; Sept. 22, 2021 Hr'g Tr. 16, 42, 46, 55; Sept. 23, 2021 Hr'g Tr. 104-106. Attached as Exhibit 12 to the Order approving the Disclosure Statement [Docket No. 6438] was the summary of Chartered Organizations' options under the BSA's Chapter 11 Plan (the "Plain English Summary").

16.    Under the **Solicited** Plan, a Chartered Organization had three options:

    i.    <u>Option #1 (Default Treatment)</u> – A Chartered Organization that chose Option #1[13] and did not object to the plan would retain all of its rights in the BSA Insurance Policies and Local Council Insurance Policies issued before January 1, 1976, while receiving a full release and Channeling Injunction for Abuse Claims arising January 1, 1976 forward;

    ii.    <u>Option #2 (Contributing Chartered Organization Treatment)</u> – A Chartered Organization could negotiate a contribution to the Settlement Trust and receive a full release and Channeling Injunction for all Abuse Claims.  In exchange, the Chartered Organization would waive all of its rights in all BSA Insurance Policies and Local Council Insurance Policies; or

    iii.    <u>Option #3 (Opt-Out)</u> – A Chartered Organization that chose Option #3 and opted out by: (i) objecting to the prior plan; or (ii) informing the Debtors of an intent to opt out would not receive any release or Channeling Injunction.[14]  However, the opting-out Chartered Organization would retain all its rights in all BSA Insurance Policies and Local Council Insurance Policies.

Plain English Summary [Docket No. 6438, Ex. 12].

17.    The three material differences (collectively, the "<u>Material Modifications</u>") between the Solicited Plan and the current Plan are:

    a.    the **Solicited** Plan did not require Chartered Organizations to release Settling Insurance Companies for Chartered Organizations'

---

[13]  As defined and described in the Plain English Summary.

[14]  The Plain English Summary provided that a Chartered Organization may opt-out of the Plan up until the confirmation hear, but the Opt-Out Election Form included with the Plain English Summary provided that such election must be made before the Plan objection deadline.  These inconsistencies prevent the Charted Organizations from understanding how the Plan affects their rights.

Independent Policies, but the current Plan requires all Chartered Organizations to give that non-consensual release;

b.  the **Solicited** Plan did not transfer rights in the Chartered Organizations' Independent Policies to the Settlement Trust, but the current Plan makes the transfer of those rights the default, unconsented to treatment for Roman Catholic Chartered Organizations;

c.  the **Solicited** Plan's clearly articulated scope of the proposed Channeling Injunction was eliminated and replaced with the undetermined scope of the current Channeling Injunction ("covered under an insurance policy").

18.    The Disclosure Statement and the *Notice of Current and Potential Protected Parties and Limited Protected Parties*, dated September 30, 2021, and posted on the Debtors' noticing and service agent, Omni Agent Solutions' ("Omni") website,[15] indicates that there are likely more than 50,000 Chartered Organizations affected by the Plan. *See* Disclosure Statement at 23-24, 95.[16]    Approximately 14,000 contingent and unliquidated indemnification and contribution Claims have been filed against the Debtors, most of which would be included in Class 9 Indirect Abuse Claims, and the majority of which were filed by Chartered Organizations. *Id.* at 95.    Accordingly, there were in excess of 35,000 Chartered Organizations which would be affected by the Plan but who have not filed claims against the Debtors.

19.    Between October 12, 2021 and October 15, 2021, the Debtors and Omni served the Plain English Summary, the *Notice of Hearing to Consider Confirmation of the Modified Fifth Amended Chapter 11 Plan of Boy Scouts of America and Delaware BSA,* LLC [Docket No. 6639] (the "Confirmation Notice"), and the full Class 9 solicitation package, on the approximately 14,000 Chartered Organizations who filed claims and were permitted to vote in Class 9. *See* Docket No.

---

[15] https://casedocs.omniagentsolutions.com/cmsvol2/pub_47373/57922e1c-30f6-4f05-9919-9ba0fc99f4d2_BSA_Current_and_Potential_Protected_Parties_and_Limited_Protected_Parties_011422.pdf

[16]    At the February 1, 2022 Hearing, counsel for Hartford stated that he had heard that the number of Chartered Organizations might be as high as 100,000. *See* Feb. 1, 2022 Hr'g Tr. 81:14-17.

7999. Omni also served all Chartered Organizations with the Plain English Summary of the Solicited Plan and the Confirmation Notice. *Id.* The over 35,000 Chartered Organizations not entitled to vote on the Plan were not given any opportunity to indicate whether they supported or opposed non-consensual releases, much less whether they consented to have an Article I court decide non-core claims, unlike Class 9 Chartered Organizations which had an "opt-out" box as part of their ballot, though no Class 9 Chartered Organization was told that filling out the "opt-out" would be argued by Debtors to be consent to an Article I court deciding non-core claims.

**E.** **The Century Settlement and the Lack of Notice of the Plan**

20.    On December 14, 2021, the Debtors filed the *Seventh Mediator's Report*, which announced the Century and Chubb Companies Term Sheet. That same day the Debtors also filed the *Notice of Seventh Mediator's Report* [Docket No. 7772] (the "Century Notice"), which the Debtors contend was a "plain English, not advocacy piece" that set out the essential terms of the settlement and which was mailed to all Chartered Organizations. December 21, 2021 Hr'g. Tr. 94:10-15. Omni filed an affidavit of service indicating that the Century Notice was mailed out via first-class mail to Chartered Organizations. Docket. No. 8169.

21.    The asserted plain english Summary in paragraph 5 of the Century Notice was the following:

> As reflected in the Century and Chubb Companies Term Sheet, the Parties have also agreed to an additional contribution from the BSA and Local Councils on behalf of Chartered Organizations, which consists of: (a) an additional $40 million contribution to the Settlement Trust (the "Supplemental LC Contribution"), made up of an additional $15 million contribution from the Local Councils (in addition to the $500 million current cash and property contributions under the Plan) and an increase of the DST Note from $100 to $125 million; and (b) an additional payment of up to $100 million from the BSA and Local Councils attributable to growth in BSA membership over the coming years on account of Chartered Organizations' continued sponsorship of Scouting units (the "Settlement Growth Payment Cap"). Please see the Century and

              Chubb Companies Term Sheet, including sections 10, 13, and 16, for a description of the protections afforded to Chartered Organizations.

Century Notice, Para. 5.

22.      On December 18, 2021, after filing the Plan, the Debtors also filed a *Notice of Filing of Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization and Blackline Thereof* [Docket No. 7834] (the "<u>Modified Plan Notice</u>").  The Modified Plan Notice did include a cut and paste of the modified injunctions, including the Channeling Injunction, and the modified releases.  But there was no plain English summary of those changes nor was there a highlighting of the Material Modifications.  The affidavit of service for the Modified Plan Notice [Docket No. 8170] indicates that the Modified Plan Notice was served on December 20, 2021, largely by first-class mail.  It is unclear from the service list attached to that affidavit of service, which refers only to a served party as either a "Voting Party" or "Matrix", whether all Chartered Organizations were in fact served.

23.      Notwithstanding the Court's concerns voiced at the Disclosure Statement hearing about the complexity of the documents in these cases and the need for communications to Chartered Organizations to be helpful, there is nothing on the docket to indicate that a plain English summary of the Plan or the Material Modifications was prepared, filed, or sent to Chartered Organizations.  Certainly the Debtors did not reach out to the RCAHC for assistance in preparing such a plain English summary.

24.      The Modified Plan Notice was mailed eight (8) calendar days before the voting deadline with an intervening religious holiday.  At the time of the mailing, the objection deadline for the Plan was January 4, 2022, which was the only deadline Chartered Organizations would have been aware of pursuant to the Confirmation Notice.

25.      Notwithstanding the filing of the Plan and the Material Modifications, the Debtors

continued to serve the **Solicited** Plan through December 27, 2021 despite the filing of the Plan. *See* Docket No. 8378.

**F.  Plan Voting**

26.    On January 4, 2022, Omni filed the Preliminary Tabulation Summary,[17] attached as Exhibit A to the *-Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Preliminary Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for the Boy Scouts of America and Delaware BSA, LLC* [Docket No. 8141].  The Preliminary Tabulation Summary demonstrated that, with respect to BSA, 73.12% of Class 8 voted to accept the Plan and only 63.99% of Class 9 voted to accept the Plan.  Therefore, the Preliminary Tabulation Summary concluded that Class 9 voted to reject the Plan.

27.    The Preliminary Tabulation Summary showed that 5,918 of the 7,200 votes in Class 9 opted-out of the Releases (or 82.2%) and that 21,172 of the 53,888 votes in Class 8 opted-out of the Releases (or 39.3%).

28.    On January 18, 2022, Omni filed the Final Tabulation Summary,[18] attached as Exhibit A to the *Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Final Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan or Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 8345].  The Final Tabulation Summary demonstrated that, with respect to BSA, 73.57% of Class 8 voted to accept the Plan and only 69.57% of Class 9 voted to accept the Plan.  Therefore, the Final Tabulation Summary concluded that Class 9 voted to accept the Plan.

29.    The Final Tabulation Summary showed that 5,500 of the 6,710 votes (or 82.0%) in

---

[17]  As defined therein.
[18]  As defined therein.

Class 9 opted-out of the Releases.  For Class 8, 21,174 of the 53,596 votes (or 39.5%) in Class 8 opted-out of the Releases.

###### G. **The Debtors and Chartered Organizations**

30.    The Debtors have made it clear to the Court that Chartered Organizations are the "lifeblood of scouting."[19]  Scouting depends on uncompensated volunteers at Chartered Organizations like Roman Catholic archdioceses, dioceses, churches, and schools who are ill-equipped to deal with the incredibly complex Plan, whose terms are dramatically changing with respect to the impairment of two clusters of important insurance property rights.

31.    As of the Petition Date, the Debtors, as well as certain Local Councils[20] and Chartered Organizations, were named as defendants in more than 275 lawsuits in various state and federal courts across the United States related to historical acts of sexual abuse in its programs. *See Debtors' Informational Brief* [Docket No. 4, Art. I].  In advance of the Petition Date, the Debtors were aware of approximately 1,700 pending or asserted claims of abuse against the Debtors or a Local Council.  *Id*. at Art. III.C.

32.    Historically, claims against the Debtors, Local Councils, and Chartered Organizations were litigated and administered solely by the Debtors.  *Id*. at Art. III.C.2.

33.    The Debtors assert that, starting in 1978, they began to provide insurance coverage under its commercial, general-liability insurance policies to certain Chartered Organizations.  *Id*. at Art. III.3.b.

---

[19] July 7, 2021 Hr'g Tr. at 68:4.

[20] Local Councils are defined as, "collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on Exhibit G hereto, 'supporting organizations' within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including 'troops,' 'dens,' 'packs,' 'posts,' 'clubs,' 'crews,' 'ships,' 'tribes,' 'labs,' 'lodges,' 'councils,' 'districts,' 'areas,' 'regions,' and 'territories') associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing."  Plan, Art. I.A.169.

H. **RCAHC's Expert Report**

34.     The RCAHC has disclosed two experts, one concerning feasibility and one concerning insurance.  On December 17, 2021, the RCAHC served the *Expert Report of Melissa S. Kibler* (the "Kibler Expert Report") on the Participating Parties.  The Kibler Expert Report opines on the Plan's feasibility and concluded that confirmation of the Plan is likely to be followed by liquidation or the need for further financial reorganization.  *See* Docket No. 7975.

35.     On December 5, 2021, the RCAHC served the *Report of Michael L. Averill, CPCU, MBA* (the "Averill Expert Report") on the Participating Parties.  The Averill Expert Report opines on several insurance topics, including (i) Local Council Insurance Policies, generally, (ii) whether Chartered Organizations and BSA volunteers were provided with coverage under insurance policies purchased by Local Councils, (iii) policy forms available in the 1960s and 1970s to BSA and Local Councils, and (iv) limits of insurance under policies in the 1960s and 1970s.  *See* Docket No. 7573.

## ARGUMENT

## I.     The Proposed Plan Violates the U.S. Constitution.

36.     The proposed Plan violates the U.S. Constitution in at least two overarching ways.  ***First***, the Court lacks jurisdiction to, *inter alia*, bind non-parties, affect (and impair) third-parties' property rights, and affect (and impair) third-parties' rights, claims and causes of actions against non-debtors.  ***Second***, the proposed Plan and the Debtors' process of proceeding with their proposed Plan violates the Constitution's requirement that parties be afforded due process.

### A.     The Court Lacks Subject Matter Jurisdiction, Personal Jurisdiction, and Constitutional Authority to Approve the Plan's Proposed Third-Party Releases or to Assign the Independent Policies.

37.     It is axiomatic that this Court "must have jurisdiction over a claim to release it." *Ascena*, 2022 WL 135398, at *15.  That is so because when a bankruptcy court *extinguishes* a

claim through a release, that action "amounts to an adjudication of the claim for *Stern* purposes." *Id*. at \*16; *see also In re Purdue Pharma, L.P.*, 2021 WL 5979108, at \*41 ("There really can be no dispute that the release of a claim 'finally determines' that claim.  It does so by extinguishing the claim, so that it cannot be adjudicated on the merits. A nonconsensual third-party release is essentially a final judgment against the claimant, in favor of the non-debtor, entered 'without any hearing on the merits.'").

38.    A bankruptcy court has *in rem* jurisdiction over the debtor's property and the disposition of that property.  *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 362 (2006) ("Bankruptcy jurisdiction, at its core, is *in rem*.").  And while "bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships," *United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990), "third-party claims belong to third parties, not the debtor's estate."  *Ascena*, 2022 WL 138398, at \*16; *see also id.* (bankruptcy court "has no *in rem* jurisdiction over third-party claims not against the estate or property of the estate.").

39.    Thus, "[a]s general rule, a bankruptcy court has no power to say what happens to property that belongs to a third party, even if that third party is a creditor or otherwise is a party in interest." *Aegean*, 599 B.R., at 723 (citing *Callaway v. Benton*, 336 U.S. 132, 136-41 (1949)).  Nor is mere inclusion of releases "in the Plan" sufficient to bootstrap an unconstitutional ask by a debtor into constitutional assent by a third-party:  "To claim that the Bankruptcy Court can fully extinguish these claims based solely on their inclusion in the Plan—without any hearing on them or any findings about them—amounts to arguing that courts need not have the authority to extinguish claims so long as they provide no procedural safeguards in extinguishing the claims. Obviously, this cannot be."  *Ascena*, 2022 WL 135398, at \*16; *see also id.* at \*17 ("Debtors' argument that bankruptcy courts must be able to confirm plans even if those plans affect other

cases has it backwards."); *Purdue*, 2021 WL 5979108, at *41 ("Debtors and their affiliated non-debtor parties cannot manufacture constitutional authority to resolve a non-core claim by the artifice of including a release of that claim in a plan of reorganization.").

40.    The Plan on its face purports to affect the rights of *every* Chartered Organization. According to the Debtors, there are more than 50,000 Chartered Organizations.  Disclosure Statement, Art. III.A.3.b.  While several thousand filed proofs of claim, subjecting themselves to the *personal* jurisdiction of this Court, more than 35,000 Chartered Organizations filed no proof of claim at all. (See *supra* at ¶ 18).

41.    There is no constitutional or statutory basis for this Court to affect, *without notice or consent*, the rights of a single one of the 35,000 Chartered Organizations who filed no proof of claim and are not before this Court.  In *Ascena*, the district court expressly rejected the contention that *inaction* by a potentially affected party was sufficient under the Constitution to qualify as consent to jurisdiction of an Article I court to adjudicate a non-core claim.  *Ascena*, 2022 WL 135398, at *18 (while courts "can discern the implication of consent to a non-Article III court based on a party's *actions*," they cannot find "consent based on *inaction*") (emphasis in original).

42.    It is beyond debate that the impairment and purported assignment of Chartered Organizations' insurance rights in *non-Debtor* property—the Independent Coverage—exceeds this Court's authority as circumscribed by *Stern*.  *Aegean*, 599 B.R. at 723.

43.    Specifically, as in *Ascena*, it is pellucid that the impairment of Chartered Organizations' insurance rights in the *non-Debtor* insurance of Local Councils, is a non-core proceeding.  It is no different from the abuse-of-process claim held non-core in *Stern* itself.

44.    Moreover, just as in *Ascena,* it is unconstitutional to deprive a third-party of its rights to have an Article III Court adjudicate non-core claims without its consent.  There, the

bankruptcy court held that mere notice and the opportunity to opt out *of* the Plan was insufficient to imply consent to the bankruptcy court's *approval of* non-consensual third-party releases. *Ascena*, 2022 WL 135398, at *18. The district court flatly disagreed, holding that there was no consent to jurisdiction to adjudicate non-core claims and ultimately severing and discarding the third-party releases:

> the Bankruptcy Court erred as a matter of law in finding that failure to return the opt-out form could constitute consent to Article I adjudication. The Bankruptcy Court relied on the fact that the Releasing Parties received notice and an opportunity to opt out of the Third-Party Releases as the basis for consent. (Bankr. Confirm. Op. at 31-33.) But, the Bankruptcy Court made this determination in the context of whether the Releasing Parties *consented to the Third-Party Releases*, not the threshold question of whether they consented to having the Bankruptcy Court adjudicate the released claims. This will not suffice to support a finding of consent to Article I adjudication for all of the Releasing Parties.

*Id.* (emphasis added).

45.     Here, the Court lacks subject matter and personal jurisdiction over the more than 35,000 Chartered Organizations who did not file a proof of claim. As in *Ascena,* the Plan would impose non-consensual, third-party releases against those strangers and would transfer their property rights in BSA Insurance Policies and Local Council Insurance Policies. This Court lacks the authority to adjudicate those claims without consent. And just as in *Ascena*, there is no evidence of any consent by the 35,000 Chartered Organizations that did not file proofs of claim.

46.     As to the Chartered Organizations who *did* file proofs of claim, *Ascena*'s teachings still apply because merely failing to return an opt-out form is not *action* that can form the basis for an inference of consent to Article I adjudication of non-core claims; as in *Ascena,* failing to return an opt-out form is simply *inaction*. *Ascena*, 2022 WL 135398, at *18.

47.     The Court accordingly cannot release Settling Insurance Companies from any obligations or duties that they have under this Independent Coverage; the Court cannot force

Chartered Organizations to transfer to the Settlement Trust the Chartered Organizations' rights under this Independent Coverage; and the Court cannot force Chartered Organizations to assign to the Settlement Trust any cause of action against Settling Insurance Companies in respect to that Independent Coverage.

48.    Because there was no consent by any Chartered Organization to this Court's adjudication of non-core claims—including the extinguishment of those claims through non-consensual third-party releases and forced transfer of property rights—this Court lacks subject matter jurisdiction and constitutional authority to confirm the Plan, so long as the Plan includes those releases and transfers.

49.    To the extent the Debtors suggest *Millennium* holds otherwise, *Millennium* involved a completely different set of facts and circumstances.  There, a hold-out creditor threatened to scuttle the debtor's plan, which included hundreds of millions of dollars from other creditors.  This substantial cash infusion would in turn have enabled the debtor to meet its obligations to the federal government (a required payment with a deadline) and thereby continue to receive the federal reimbursements essential to the debtor's business.  *Millennium*, 945 F.3d at 137.  The parties were sophisticated, the claims released were narrow, and the Court's factual findings were extensive.  *Id.*  None of these things is present here.  Instead, the Debtors purport to give the Settling Insurance Companies gold stars forged from the confiscated rights of absent third-parties as a reward for paying millions of dollars to the Settlement Trust.  Since the Debtors contended *before* they reached the settlement with Century that the **Solicited Plan** was feasible and confirmable, there is no basis for the Debtors to contend afterwards that the settlement with Century is somehow essential, much less that the non-consensual third-party releases are.  *See Millennium*, 945 F.3d at 140 ("our holding today is specific and limited" — "under the particular

facts of this case, the Bankruptcy Court's conclusion that the release provisions were *integral to the restructuring* was well-reasoned and well-supported by the record").

**B.      Chartered Organizations Affected by the Plan Did Not Receive Constitutionally Adequate Notice.**

50.      *Ascena* is instructive for a second reason.  The Plan was fundamentally modified on December 18, 2021 following the Debtors' agreement to the Century and Chubb Companies Term Sheet.  But the entities whose rights would be affected by those modifications were never given adequate notice.

51.      In tossing out grossly overbroad, non-consensual third-party releases, the court in *Ascena* started with first principles:

> This appeal implicates the most fundamental right guaranteed by the due process clause in our judicial system: the right to be heard before the loss of one's rights. "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' " *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (*quoting Baldwin v. Hale*, 68 U.S. 1 Wall. 223, 233 (1863)). "And, the Supreme Court has explained that the particular constitutional protection afforded by access to the courts is 'the right conservative of all other rights, and lies at the foundation of orderly government.' " *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 817 (4th Cir. 2004) (*quoting Chambers v. Baltimore & O. R. Co.*, 207 U.S. 142, 148 (1907)). Furthermore, "[t]his right ... has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Schroeder v. City of New York*, 371 U.S. 208, 212 (1962) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). Relatedly, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement." *Loc. No. 93, Int'l Ass'n of Firefighters AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986). This is so, because the general rule provides "that a person cannot be deprived of his legal rights in a proceeding to which he is not a party." *Martin v. Wilks*, 490 U.S. 755, 759 (1989); *see also id.* at 762 ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.").

2022 WL 135398, at *1 (parallel Supreme Court reporter citations omitted).

52.     The reason for the return to first principles in *Ascena* was the very nature of non-consensual third-party releases themselves:

> Third-party releases, such as those at issue here, carry much controversy, for they are a "device that lends itself to abuse." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). Indeed, several Courts of Appeals (the Fifth, Ninth and Tenth Circuits) prohibit the use of third-party releases. *See, e.g., In re Pac. Lumber Co.*, 584 F.3d 229, 251-53 (5th Cir. 2009); *In re Lowenschuss*, 67 F.3d 1394, 1401-02 (9th Cir. 1995); *In re W. Real Estate Fund, Inc.*, 922 F.2d 592, 600-02 (10th Cir. 1990). And a District Judge in the Southern District of New York recently concluded in a thoughtful opinion that no statutory basis exists for their use. *In re Purdue Pharma, L.P.*, 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021).

*Id.* at *2.

53.     And while the Court in *Ascena* acknowledged that other courts (including expressly, the Third Circuit) allow non-consensual, third-party releases, "[o]ther circuits that permit their use likewise reserve their utilization for the rare or exceptional case. *See, e.g.*, *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019) (directing that "courts considering such releases do so with caution .... [and] with the utmost care and to thoroughly explain the justification for any such inclusion")." *Ascena*, 2022 WL 135398, at *2 (brackets and ellipses by the court).

54.     Concerning the specific third-party releases at issue in *Ascena*, the court was unsparing:

> The Third-Party Releases at issue in this case represent the worst of this all-too-common practice, as they have no bounds. The sheer breadth of the releases can only be described as shocking. They release the claims of at least hundreds of thousands of potential plaintiffs not involved in the bankruptcy, shielding an incalculable number of individuals associated with Debtors in some form, from every conceivable claim — both federal and state claims — for an unspecified time period stretching back to time immemorial. In

> doing so, the releases close the courthouse doors to an immeasurable number of potential plaintiffs, while protecting corporate insiders who had no role in the reorganization of the company. Yet, the Bankruptcy Court — acting with its limited Article I powers — extinguished these claims with little or no analysis.

*Ascena*, 2022 WL 135398, at *3.[21]

55.    Concerning the notice provided in *Ascena*, the court concluded that "[t]he Bankruptcy Court did not order that any notice or opt-out forms be sent to all of the Releasing Parties, including the current and former employees, consultants, accountants or attorneys of Debtors, their affiliates, lenders, creditors or interest holders. Nor did it even examine other possible causes of action released." *Ascena*, 2022 WL 135398, at *7.

56.    Here, the Debtors failed to provide constitutionally adequate notice for the Plan itself.  The Plan was materially revised on December 18, 2021, and the provisions that purport to require Chartered Organizations to transfer property rights and causes of action in respect to their own property and to grant non-consensual releases were all new.  The Solicited Plan— that is, the one that was solicited after a multi-day Disclosure Statement hearing—contained none of these provisions for the simple reason that they first appeared as part of the $800 million Century and Chubb Companies Term Sheet in mid-December 2021.  *See* Century and Chubb Companies Term Sheet, § 10.  The mere suggestion in the Disclosure Statement that the Plan could be further revised is insufficient to comply with Debtors' due process obligations—the issue is not whether anyone who received the Disclosure Statement had adequate notice about the *potential for* further changes, but rather whether there was adequate notice about those changes themselves after they occurred.

---

[21] At various times over the past several months, Settling Insurance Companies have claimed that they could not be expected to pay tens or hundreds of millions of dollars to resolve disputes in respect to their coverage to Debtors and Local Councils, only to find themselves exposed to further claims from abuse survivors or Chartered Organizations. But those expectations are both unreasonable and entitled to no consideration by the Court for the simple reason that the Settling Insurance Companies failed to obtain the consent of the third-parties whose rights they purport to obliterate.

There plainly was not.

57.    As *Ascena* makes clear, constitutionally adequate notice should, at a minimum, "describe the released claims or the rights given up by the absent Releasing Parties." 2022 WL 135398, at *30. It is simply insufficient to "[d]escribe[e] the bankruptcy action and generally stat[e] that the absent party would release all claims" because that notice "does not identify the specific claims subject to release. It does not 'describe the action and the plaintiffs' rights in it.'" *Id*.

58.    As was made clear during the February 1, 2022 hearing, the Debtors and Century cannot explain to the Court the scope of the injunction that they are seeking. What is enjoined if a claim is "covered under an insurance policy" issued by a Settling Insurance Company? The Debtors and Century have said that the interpretation of this phrase calls for a legal conclusion, that to answer the question would require divulging privileged communications and, most incredibly, to determine what is enjoined will require coverage litigation for each Abuse Claim against a Roman Catholic Chartered Organization. As discussed further below, a "wait and see" injunction is flatly inconsistent with Rule 65(c). Simply put, the Debtors and the Settling Insurance Companies are unable to level *with the Court* about what they are asking to be enjoined. And if they will not tell the Court, it is obvious that they have not told anyone else, including the RCAHC, which has repeatedly inquired.

59.    The little notice that the Debtors did give concerning the Plan failed to meet the basic requirements of due process. During the Disclosure Statement hearing, the Court recognized that in light of the lack of sophistication of Chartered Organizations and the Byzantine complexity of the Solicited Plan (there are *many* defined terms), Chartered Organizations needed to be provided with a plain English explanation of their plan treatment. *See, inter alia,* Sept. 28, 2021

Hr'g Tr. 265:25, 257:1-7.  The Modified Plan Notice was not in plain English, but instead cut and pasted large sections of the Plan verbatim into the notice, even though the Plan was, again, replete with complex defined terms.  *See* Modified Plan Notice.  Nor did the Debtors undertake *any effort* to explain how the treatment of Chartered Organizations changed, much less mention the purported transfer of their insurance rights and causes of action to the Settlement Trust.  Indeed, as late as one day before the voting deadline, Omni was distributing the *September 2021 Plan*.  *See* Docket No. 8378.

60.     The Debtors also served their notice of the settlement with Century.  *See* Docket No. 7745.  And while the Debtors contend that *this* notice was a plain English disclosure *of the Century Settlement*, nothing in the notice would alert an unsophisticated Chartered Organization that its own insurance policies would be affected, much less alert that Chartered Organization to the other Plan changes.  The notice only disclosed the amounts that Century and the Local Councils were paying as part of that settlement.

61.     In short, there was no effort to update the Disclosure Statement or to provide any plain English summary of the Material Modifications to the Plan and the impact of the Century and Chubb Companies Term Sheet.

62.     Nor did any of the Debtor's notice—not the Disclosure Statement itself, not the Solicited Plan, not the current Plan, and not anything following the filing of the Plan—contain any information "about agreeing to Article I adjudication."  *Ascena*, 2022 WL 135398, at *19.  As the Court in *Ascena* made clear, constitutionally deficient notice means that there was no consent to the adjudication of third-party rights.  The same is true here.  The Plan is unconfirmable.

## C.     The Court Lacks Jurisdiction to Alter Property Rights Amongst Non-Debtors.

### i.     Chartered Organizations' Rights in the Debtors' Insurance Policies

63.     The Chartered Organizations have independent contractual rights with the Settling

Insurance Companies separate and apart from the Debtors or the Local Councils in the Independent Coverage and Independent Policies. As "case law recognizes[,] … any individual insured has a contractually-distinct status that runs directly between itself and the insurer." *In re Petters Co.*, 419 B.R. 369, 376 (Bankr. D. Minn. 2009), *quoted in, e.g.*, *Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 533 B.R. 734, 734-35 (Bankr. N.D. Ill. 2015), *rev'd on other grounds*, 808 F.3d 1186 (7th Cir. 2015). Consequently, "the right to receive payment on a covered claim [is] the property of that insured itself." *In re Petters Co.*, 419 B.R. at 376; *see also In re Caesars Entm't Operating Co.*, 533 B.R. at 734-35 (quoting this language from *In re Petters Co.*, 419 B.R. at 376); *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 978 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860 (N.D. Ill. 1992) (finding additional insured to have separate legal and equitable interests in the debtors' policies including the right to make direct claims against the insurer). In addition, as explained in *In re SelectBuild Illinois, LLC*, third parties identified as additional insureds with respect to a debtor's insurance policy have "independent contractual rights" against the insurer. No. 09-12085, 2015 Bankr. LEXIS 1790, 2015 WL 3452542, at *1 (Bankr. D. Del. May 28, 2015) (citing, for support, *Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportsStuff, Inc.)*, 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010)).

64. These independent property and contract rights preclude a finding that the Chartered Organizations' additional insured rights are merely derivative of a debtor's rights. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 364 B.R. at 527 (explaining that additional insureds' rights to payments from insurers pursuant to "their own policy entitlements" would be received from the insurers "as a contractual entitlement, not from the property being sold, as a kind of in rem right, and would be independent of anything the Estate sought or received"); *see also In re W.R. Grace & Co.*, 607 B.R. 419, 424 (Bankr. D. Del. 2019) ("[I]f a plaintiff's claim against a third party is

not based upon the debtor's liability and the third party's liability to the debtor but, rather, an entirely independent claim held by the plaintiff directly against the third party, then the plaintiff's claim is nonderivative.").

65.    Because an additional insured's rights to a policy are not derivative of the debtor's rights, the bankruptcy court is without jurisdiction to adjudicate determinations with respect to those rights. *See In re SportsStuff, Inc.*, 430 B.R. at 178 (deciding that a bankruptcy court did "not have the jurisdiction or authority to impair or extinguish" the independent contractual rights of additional insured when it approved a settlement agreement between the debtor and certain insurers).[22] While a bankruptcy court may exercise jurisdiction over a debtor's interest in such a policy, "'the interests of the co-insured, a nondebtor, are not property of the estate ... and [t]o hold otherwise would allow the court to impair a third party's contract and property rights.'" *In re SportsStuff, Inc.*, 430 B.R. at 178 n.15 (quoting Susan N.K. Gummow, Bankruptcy and Insurance Law Manual 166 (2d ed. 2007)).[23]

---

[22] While the Second Circuit held in *MacArthur* that the bankruptcy court had authority to enjoin a coinsured from seeking direct claims against the debtor's insurer, it made its determination that it "had jurisdiction over an 'insured vendor's' rights in the debtor's insurance policies because those rights [were] 'completely derivative' of the debtor's rights as the named insured." *In re SportsStuff, Inc.*, 430 B.R. at 177 (thusly construing *MacArthur*). Here, in contrast, the Roman Catholic Chartered Organizations have independent, non-derivative rights in the BSA Insurance Policies and the Local Council Insurance Policies.

[23] Even if a co-insured's rights are entirely derivative of the Debtors' insurance rights (which they are not, and particularly they cannot be with respect to their own non-Debtor, non-Local Council Policies), at a minimum, the Debtors are required to adequately protect such rights as additional insureds. *See MacArthur*, 837 F.2d at 94 (approving debtor's sale of tort claims policy back to insurer pursuant to Section 363(f) for this reason); *In re Adelphia Commc'ns Corp.*, 364 B.R. at 528–29 (thusly reading MacArthur). As the Second Circuit explained in *MacArthur*, "[i]t has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition." 837 F.2d at 94. Thus, rights of an additional insured must be adequately protected, even if the possibility of a recovery is highly speculative. *See id.* at 91, 94. Here, the Plan makes no provision, let alone adequate protection, for the Chartered Organizations' rights under the BSA Insurance Policies or the Local Council Insurance Policies. Instead, the Plan proposes to strip the Chartered Organizations of all of their property interests as additional insured in the BSA Insurance Policies and the Local Council Insurance Policies (apparently at the insistence of Chubb and Century), leaving the Chartered Organizations without claims or the adequate protection mandated by the Bankruptcy Code.

66.     The rationale of these cases accords with the bankruptcy court's approach in *Adelphia*.  In *Adelphia*, the debtor sought approval of a settlement with its insurers for a D&O policy buy back under Section 363, which policies also provided coverage to the debtor's directors and officers.  364 B.R. at 520.  The bankruptcy court found that the sale was appropriate under Bankruptcy Rule 9019 and Section 363(b) but found that the directors and officers had independent property rights under the policies vis-à-vis the carrier.  *Id.* at 527.  Reasoning that the power to cleanse "interests" under Section 363(f)(5) applied only to the debtor's property, and the directors' and officers' rights under the policies were not derivative of the debtor's right, the court concluded that these rights could only be extinguished if the additional insureds received a full third party release and all claims against them were subject to a channeling injunction.  *Id.* at 527-28.  Put simply, at least in *Adelphia*, the court found no authority, and refused, to extend Section 363(f) to reorder the property rights between an additional insured and a debtors' insurance carrier.

67.     Here, the Plan does just what *Adelphia* prohibited.  Objecting Chartered Organizations will be stripped of their property rights in not only the BSA Insurance Policies and the Local Council Insurance Policies but permanently enjoined from making claims against the Settling Insurance Companies under their own policies for Abuse Claims through the Chartered Organization Insurance Rights Impairment[24] and the Additional Insured Rights Impairment.[25]  If a Chartered Organization does not object, it is still subject to the forced Chartered Organization Insurance Rights Impairment and the Additional Insured Rights Impairment.  Only a Chartered Organization that settles and pays to become a Contributing Chartered Organization receives a full release and Channeling Injunction for consenting to the Chartered Organization Rights Impairment

---

[24]  As defined in Docket No. 7864.

[25]  *Id.*

and Additional Insured Rights Impairment.  Thus, in any scenario that does not involve a payment by a Chartered Organization, that Chartered Organization will be subject to the Chartered Organization Insurance Rights Impairment and the Additional Insured Rights Impairment and lose their own property rights.  In short, only a Chartered Organization that becomes a Contributing Chartered Organization will receive the treatment that *Adelphia* required for additional insured without mandating contribution—the Debtors and the Insurers are attempting to require Chartered Organizations to pay for what the case law, particularly *Adelphia*, says is their right.  A plan with this requirement cannot be confirmed.

68.    In fact, an injunction similar to the Chartered Organization Insurance Rights Impairment and the Additional Insured Rights Impairment was requested—and denied—in *Adelphia*.  *Id.* at 528-30.  Noting that insurance injunctions had been issued in certain mass tort bankruptcy cases (particularly asbestos cases), the court held that a channeling injunction in favor of an insurance carrier should only be issued where the specific injunction will "make or break" a successful reorganization.  *Id.* (citing to and applying rationale of Metromedia in evaluating channeling injunctions).  That the affected insurance policies will significantly help to satisfy massive estate liabilities is just not enough.  *Id.*

69.    Here, the Debtors cannot argue that the Chartered Organization Insurance Rights Impairment and the Additional Insured Rights Impairment are "make or break" injunctions. Indeed, the Solicited Plan permitted a Chartered Organization to opt-out and retain its rights under the BSA Insurance Policies and the Local Council Insurance Policies and only divested those rights with respect to either (i) Contributing Chartered Organizations (ii) non-objecting Chartered Organizations for pre-1976 claims only.  It was only in the Chubb/Century settlements and the Plan that the Chartered Organization Insurance Rights Impairment and the Additional Insured

Rights Impairment became forced on objecting Chartered Organizations.

>    ii.    **Chartered Organizations' Rights in the Local Council Policies and the Their Own Independent Coverage**

70.    The aforementioned principles were developed when the insurance policies at issues are policies procured by a debtor.  They must apply in even greater force when the Court is asked to alter rights in insurance policies to which the debtor is a stranger (*e.g.*, either the Chartered Organizations' own Independent Coverage or the Local Council Insurance Policies) and, thus, over which the Court has no *in rem* jurisdiction. *Accord Aegean,* 599 B.R. at 723.

71.    In addition, it is not appropriate to impair the Chartered Organizations' insurance rights arising from policies issued to Local Councils, who are not even debtors.  The Court lacks jurisdiction over that non-debtor property, even if the Local Councils consent to contributing their policies to the Settlement Trust.  *See In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004) ("Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.").

72.    Moreover, the Plan and its feasibility do not rely in any way shape or form on future insurance recoveries achieved through the Chartered Organization Insurance Rights Impairment and the Additional Insured Rights Impairment.  Indeed, reviewing the financial projections in support of the Plan, it is clear that the Plan requires sufficient levels of membership.  *See infra* Section III.  Thus, it simply cannot be said that the Chartered Organization Insurance Rights Impairment and the Additional Insured Rights Impairment are the lynchpins of the Plan and, therefore, like the proposed insurer injunction in *Adelphia*, they cannot not be approved.

>    D.    **The Court Lacks Jurisdiction to Extinguish Chartered Organizations' Rights as Non-Debtor Insureds Without Their Consent.**

73.    "Bankruptcy jurisdiction, at its core, is *in rem*." *Katz*, 546 U.S., at 362.  Thus, "[a]s a general rule, a bankruptcy court has no power to say what happens to property that belongs to

a third party, even if the third party is a creditor or otherwise is a party in interest." *Aegean* 599 B.R., 723 (citing *Callaway v. Benton,* 336 U.S. 132, 136-41 (1949)); *see also In re Combustion Engineering, Inc.*, 391 F.3d 190, 224-25 (3d Cir. 2004) ("But as the statute makes clear, § 105 does not provide an independent source of federal subject matter jurisdiction.").

74.     By the same token, filing for bankruptcy does not give a debtor greater property rights than it would have had outside of bankruptcy. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("The estate cannot possess anything more than the debtor itself did outside bankruptcy."); *see also In re Weathersfield Farms, Inc.*, 34 B.R. 435, 439-40 (Bankr. D. Vt. 1983) ("[T]he bankruptcy court has no power to enlarge the debtor's rights under applicable nonbankruptcy law."); *see also* Gary Svirsky, Tancred Schiavoni, Andrew Sorkin, and Gerard Savarsse, *A Field Guide to Channeling Injunctions and Litigation Trusts*, 260 NEW YORK LAW JOURNAL, at 2 (2018) (acknowledging the jurisdictional limitations on the bankruptcy court's ability to channel claims against non-debtors).

75.     Chartered Organizations' insurance rights are their own property rights and *not* property of the Debtors' estates. *Petters*, 419 B.R. at 376 ("The case law recognizes that any individual insured has a contractually-distinct status that runs directly between itself and the insurer. This makes the right to receive payment on a covered claim the property of that insured itself.").

76.     Even where, as here, there are multiple insured parties under the BSA Insurance Policies and the Local Council Insurance Policies, "the bankruptcy estate owns only the debtor's interest, not the co-insured's interest." *In re Archdiocese of Saint Paul & Minneapolis*, 579 B.R. 188, 202 (Bankr. D. Minn. 2017); *accord SportStuff*, 430 B.R., at 178 n.15 ("[W]hile the bankruptcy court may exercise jurisdiction over (a liability insurance) policy, the interests of the

co-insured, a nondebtor, are not property of the estate.  To hold otherwise would allow the court to impair a third party's contract and property rights."); *Adelphia*, 364 B.R., at 527 (additional insureds' rights to payment from insurers pursuant to "their own policy entitlements" would be "independent of anything the Estate sought or received"); *In re Forty-Eight Insulations*, 133 B.R., at 978 (additional insured had separate legal and equitable interests in the debtors' policies, including the right to make direct claims against the insurer); *St. Paul v. Home Depot*, Nos. 03 C 50389, 50390, 2004 WL 2075129, at *2 (N.D. Ill. 2004) ("The debtor's contractual interest in the insurance policy is property of the estate, while Home Depot's is not.  They are co-insured with separate contractual claims against St. Paul for defense and payment of judgments or settlement until the policy limits are exhausted.").  *See generally* Insurance Issues in Bankruptcy: A Collier Monograph ¶ 3.03[2][d] (2014) ("The more common approach holds that a co-insured's interest in a debtor's policy is not property of the bankruptcy estate.  As these contract rights do not belong to the debtor, they cannot be impaired by a bankruptcy court.").

77.     Because the Court lacks jurisdiction over Chartered Organizations' separate and independent insurance rights, it cannot approve the insurance settlements providing for a sale of those rights back to the Settling Insurance Companies without Chartered Organizations' consent. *Compare In re SoyNut Butter Co*., No. 17B14970, 2018 WL 3689549, at *4 (Bankr. N.D. Ill. Aug. 1, 2018) (rejecting settlement that would have released rights of non-debtor co-insureds who were "afford[ed] equal and independent rights to seek indemnification and defense") *and Forty-Eight Insulations*, 133 B.R. at 976 (rejecting settlement that would extinguish rights of non-debtor co-insured) *with In re Burns & Roe Enters.*, No. 00-41610, 2005 Bankr. LEXIS 3173, at *17 (Bankr. D.N.J. Feb. 17, 2005) (approving policy buyback between insured and insurer when rights of other non-settling insureds were preserved).

37

78.     Similarly, the Court cannot transfer the Independent Coverage to the Settlement Trust absent their consent.  *See Archdiocese of St. Paul & Minneapolis*, 579 B.R. at 197 (rejecting plan provision transferring insurance interests into settlement trust where parishes' indemnification and contribution claims were impaired by transfer and parishes did not consent to such transfer).

79.     In sum, it is well-settled that while the Court has the power to dispose of the Debtors' property rights under the BSA Insurance Policies, that power ***does not*** extend to Chartered Organizations' rights under the same policies as additional insureds.  There is no legal basis for the Court to impair the non-debtor Chartered Organizations' rights as additional insureds under the non-debtor Local Councils' insurance policies.

80.     And even further removed is the Court's ability to affect Chartered Organizations' rights under their very own insurance policies.  Unless and until Chartered Organizations provide consent (which has never been sought because there has been no due process notice of the purported forced assignments), the Court cannot dispose of Chartered Organizations' rights under any of those three sets of insurance policies.

### E.     The Court Lacks Jurisdiction to Extinguish Chartered Organizations' Claims and Causes of Action Related to their Independent Coverage.

81.     As the Debtors acknowledged in their notices to Chartered Organizations regarding the Plan, Chartered Organizations also have claims arising from Abuse Claims, including claims against the Local Councils and insurers for contribution, indemnity, and bad faith failure to defend. The Plan purports to release and channel those claims in violation of Article III of the U.S. Constitution.

82.     Under *Stern*, "bankruptcy courts may violate Article III even while acting within their statutory authority in 'core' matters" such as plan confirmation.  *Millennium,* 945 F.3d, at

135.  Indeed, "Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

83.    The Third Circuit has interpreted *Stern* to provide that a bankruptcy court acts within constitutional bounds only where it resolves a matter that is "integral to the restructuring of the debtor-creditor relationship," as determined by looking at the content of the proceeding at issue.  *Millennium,* 945 F.3d at 135-37; *see also Ascena*, 2022 WL 135398, at *25 ("[T]he Constitution limits bankruptcy courts – as non-Article III courts – to adjudicating only matters integral to a bankruptcy proceeding.").

84.    As is the case with Chartered Organizations' third-party insurance rights, "third-party claims belong to third parties, not the debtor's estate." *Ascena*, 2022 WL 135398, at *16. Accordingly, the bankruptcy court "has no *in rem* jurisdiction over third-party claims not against the estate or property of the estate." *Id.*; *see also Combustion Eng'g*, 391 F.3d at 233 (section 105(a) "does not permit the extension of a channeling injunction to the non-derivative claims against non-debtors"); *Forty-Eight Insulations*, 133 B.R. at 978 (named insured has the "right to make direct claims on the insurers if the conditions of the policies are satisfied" and that the insured "has rights to be defended and to indemnification that do not depend upon a prior resolution of any claim against [the debtor]"); Insurance Issues in Bankruptcy: A Collier Monograph ¶ 3.03[2][d] (2014) ("[A] bankruptcy court cannot enter orders (such as channeling injunctions) barring claims against insurers of a co-insured entity.").

85.    Here, the Plan injunctions and releases of Chartered Organizations' non-core claims against non-debtors run afoul of *Stern*.  Chartered Organizations may have state law claims

against insurers based on policies or extra-contractual claims based on insurers' bad faith actions. Chartered Organizations may also have claims against Local Councils for contribution and indemnity.  A non-debtor's claim against another non-debtor arising from a prepetition Abuse Claim is not an action that stems from the bankruptcy itself nor is it something that would necessarily be resolved in the claims allowance process (as the claims are not against the Debtors but rather third parties).  These are classic non-core claims that this Court cannot adjudicate.  *See Purdue*, 2021 WL 5979108, at *40 (noting that *Stern* "did not say that a bankruptcy court could finally dispose of non-core proceedings as long as they were 'integral to the restructuring of the debtor-creditor relationship'"); *Ascena*, 2022 WL 135398, at *13 (*Stern* "mandates that bankruptcy courts only have the constitutional authority to adjudicate core claims, even if Congress has granted them the statutory authority to resolve other claims").

86.     Nor are the releases and injunctions of Chartered Organizations' claims integral to the restructuring of the debtor-creditor relationship.  As explained above, this case is not like *Millennium*, where absent a release of contributing non-debtors, liquidation rather than reorganization would have been the debtor's sole option.  945 F.3d at 137.  Here, by contrast, the Debtors can reorganize without the need for additional non-debtor contributions and releases, as demonstrated by the toggle plan they filed earlier in these cases.  In fact, a significant number of the Debtors' creditors have expressed a preference for that outcome.

87.     Ultimately, "Debtors and their affiliated non-debtor entities cannot manufacture constitutional authority to resolve a non-core claim by the artifice of including a release of that claim in a plan of reorganization."  *Purdue*, 2021 WL 5979108, at *41; *accord Resorts Int'l,* 372 F.3d, at 161 ("Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization."); *Ascena*, 2022 WL 135398, at *17

("Article III simply does not allow third-party non-debtors to bootstrap any and all of their disputes into a bankruptcy case to obtain relief.").   Accordingly, the Court cannot extinguish Chartered Organizations' non-core claims against other non-debtors.

### F. For the Chartered Organizations That Received Notice, Service Was Deficient in Several Respects.

88.      Even assuming, *arguendo*, that the Court has the authority to impair Chartered Organizations' rights, it should nonetheless decline to exercise that authority because the Debtors failed to give Chartered Organizations due notice of such impairment and an opportunity to object. Such failure arises to the level of a constitutional violation of Chartered Organization's due process rights.  *See* U.S. Const. Amend. 5.

89.      "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'"  *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 68 U.S. 1 Wall. 223, 233 (1863)).  "And, the Supreme Court has explained that the particular constitutional protection afforded by access to the courts is 'the right conservative of all other rights, and lies at the foundation of orderly government.'"  *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 817 (4th Cir. 2004) (*quoting Chambers v. Baltimore & O. R. Co.*, 207 U.S. 142, 148 (1907)).  Furthermore, "[t]his right ... has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest."  *Schroeder v. City of New York*, 371 U.S. 208, 212 (1962) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

90.      "[P]arties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement."  *Loc. No. 93, Int'l Ass'n of Firefighters AFL-CIO C.L.C. v. City of*

41

*Cleveland*, 478 U.S. 501, 529 (1986).  This is so, because the general rule provides "that a person cannot be deprived of his legal rights in a proceeding to which he is not a party."  *Martin v. Wilks*, 490 U.S. 755, 759 (1989); *see also id.* at 762 ("A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.").

91.    The raid on Chartered Organizations' property rights without any notice is the exact evil the Constitution and the Due Process Clause prohibit.  While it appears that certain Chartered Organizations received copies of the Plan and a blackline to the prior plan version, Chartered Organizations received no plain English explanation of the material changes to the Plan occasioned by the Insurance Settlement Agreements, particularly the Century and Chubb Companies Insurance Settlement Agreement.[26]    *See* Docket No. 8170.  It cannot be disputed that such explanations are necessary, given that the Debtors provided similar ones for prior plan versions.  *See* Docket No. 6438-1 at Ex. 12; Docket No. 7999 at Ex. R.  Further, these prior notices to Chartered Organizations are not sufficient because they fail to advise Chartered Organizations of the changes made to the latest Plan version that impair Chartered Organizations own insurance policies.  These notices also fail to inform Chartered Organizations of the full universe of claims that Chartered Organizations hold, including extra-contractual claims against insurers, despite such claims being encompassed by the Plan's broad releases and injunctions.  These notices, along with the Disclosure Statement, also fail to advise Chartered Organizations that under the Plan, they are giving up the right to have an Article III rather than Article I court adjudicate their claims against non-debtors.  *See Ascena*, 2022 WL 135398, at *19 (opt-out notice was deficient where it

---

[26] As discussed further below in Section I.H, these material modifications require additional disclosure and re-solicitation.

lacked information about agreeing to Article I adjudication).

92.     And the Court must be cognizant what ineffective, inscrutable notice was served, was served by U.S. Mail on December 20, 2021.  That was just days before the voting deadline and fourteen days prior to the only objection deadline Chartered Organizations had been served with—January 4, 2021.  There is a reason that the Bankruptcy Code and the Bankruptcy Rules require significantly more notice of a proposed plan and objection deadline than what the Debtors did here.  And that does not even take into account the two intervening holidays between service and the only objection deadline Chartered Organizations were served with.

93.     Even when a bankruptcy court has jurisdiction over the property dealt with in the plan, due process requires sufficient time.  When a plan proposes to transfer and impair property over which the bankruptcy court has no jurisdiction, certainly even more notice must be required.

94.     Chartered Organizations are volunteer entities that lack the sophistication or resources to fully appreciate the intricacies of a bankruptcy plan of reorganization, let alone the inscrutable Plan that the Debtors have proposed.  It is simply unrealistic and unreasonable to expect Chartered Organizations to understand the stakes involved when the Debtors have not given them specific information, in a form that lay persons could understand, on what their risk is, what particular policies cover or potentially cover those risks, and what particular claims they have or may have and are being asked to release.  Due process requires that, at a minimum, Chartered Organizations easily understand that the Debtors and the Settling Insurance Companies seek to take away the Chartered Organizations' property rights, particularly property rights over which this Court has no jurisdiction over absent knowing consent—the Independent Coverage.

**G.     The Court Is Without Jurisdiction to Release Settling Insurers from Independent Obligations, Forces Chartered Organizations to Transfer Insurance Policies, or Assign Causes of Action Against Settling Insurers.**

95.     As discussed above, the Court has *in rem* jurisdiction over the Debtors' property

only, not third parties' property.  Accordingly, the Debtors' cannot use section 363 of the Bankruptcy Code to sell Chartered Organizations' property rights.  *See* 11 U.S.C. § 363(b) ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property *of the estate*") (emphasis added); *see also Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 263 (3d Cir. 2000) (recognizing that non-estate property is not subject to a section 363 sale); *In re Mariner Post-Acute Network, Inc.*, 267 B.R. 46, 60 (Bankr. D. Del. 2001) (recognizing that the bankruptcy court lacks jurisdiction over property that is not part of the debtor's estate); *SoyNut*, 2018 WL 3689549, at *4 (declining to approve settlement and buyback and noting that where additional insureds were entitled to seek indemnification and defenses until policy limits were exhausted, those additional insureds' rights "are not implicated under section 363(b)" and those rights "certainly cannot be diminished by a 'free and clear' sale of Estate property under section 363(f)").

96.     Nor can the Debtors and Settling Insurance Companies manufacture jurisdiction by having the Local Councils and Chartered Organizations assign their policies to the Debtors' estates. *Resorts*, 372 F.3d at 161 ("Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.").  Indeed, even if the non-BSA insurance policies themselves are assigned to the Debtors' estates, that assignment does not carry with it Chartered Organizations' independent rights, which would remain non-debtor property that is not under the Court's jurisdiction.

97.     Here, there are multiple insured parties under the BSA Insurance Policies and the Local Council Insurance Policies, and "the bankruptcy estate owns only the debtor's interest, not the co-insured's interest." *Archdiocese of Saint Paul & Minneapolis*, 579 B.R., at 202; *accord SportStuff*, 430 B.R., at 178 n.15; *Adelphia*, 364 B.R., at 527 (additional insureds' rights to

44

payment from insurers pursuant to "their own policy entitlements" would be "independent of anything the Estate sought or received"); *Forty-Eight Insulations*, 133 B.R., at 978, *aff'd*, 149 B.R. 860 (N.D. Ill. 1992) (additional insured had separate legal and equitable interests in the debtors' policies, including the right to make direct claims against the insurer); *Home Depot*, 2004 WL 2075129, at *2 ("The debtor's contractual interest in the insurance policy is property of the estate, while Home Depot's is not.  They are co-insured with separate contractual claims against St. Paul for defense and payment of judgments or settlement until the policy limits are exhausted.").  *See generally Insurance Issues in Bankruptcy: A Collier Monograph* ¶ 3.03[2][d] (2014) ("The more common approach holds that a co-insured's interest in a debtor's policy is not property of the bankruptcy estate.  As these contract rights do not belong to the debtor, they cannot be impaired by a bankruptcy court.").

98.     Again, the Plan runs afoul of *Adelphia*, discussed above.  The Debtors' only have rights as an insured under the BSA Insurance Policies and has no ownership of the rights of the Chartered Organizations as independent rights as additional insureds thereunder.  The Debtors' rights are even more attenuated on the Local Council Insurance Policies as additional insureds.  In neither case are the Chartered Organizations' rights derivative of the Debtors' rights.  Yet objecting Chartered Organizations will be stripped of their property rights by the proposed Section 363 sale of not only the BSA Insurance Policies, but also the Local Council Insurance Policies which were not even owned by the Debtors on the Petition Date.  If a Chartered Organization does not object, it is still subject to the forced Chartered Organization Insurance Rights Impairment and the Additional Insured Rights Impairment.

99.     Only a Chartered Organization that settles and pays to become a Contributing Chartered Organization receives a full release and Channeling Injunction for consenting to the

Chartered Organization Rights Impairment and Additional Insured Rights Impairment.  Thus, in any scenario that does not involve a payment by a Chartered Organization, that Chartered Organization will be subject to the Chartered Organization Insurance Rights Impairment and the Additional Insured Rights Impairment and lose their own property rights.  In short, only a Chartered Organization that becomes a Contributing Chartered Organization will receive the treatment that *Adelphia* required for additional insured without mandating contribution – the Debtors and the Insurers are attempting to require Chartered Organizations to pay for what the case law, particularly *Adelphia*, says is in their right.  A plan with this requirement cannot be confirmed.

100.    The Debtors previously indicated that they believe *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988) "supports their position on assignment of rights under shared insurance policies."  Docket No. 5759 at 76.  They are mistaken for two separate reasons.  *First*, *MacArthur* is inapplicable on its facts.  *Second*, *MacArthur* on its own facts is inconsistent with the Bankruptcy Code.

101.    In *MacArthur*, the bankruptcy court approved insurance settlements that transferred the debtor's insurance policies to a settlement fund for asbestos claimants, relieved the insurers of all obligations under those policies, and enjoined further litigation against the insurers.  *Id.* at 90.  A vendor claimed that it was a coinsured under the subject policies and objected to the settlements on the ground that those settlements impaired its contractual rights and argued that the bankruptcy court lacked jurisdiction to do so.  *Id.* at 92.  The Second Circuit disagreed.

102.    The *MacArthur* court characterized the purported interest under the vendor endorsements provision as "highly speculative," since the endorsements "only" covered "liabilities resulting from the Vendor's status as a distributor of Manville's products."  *Id.* at 92.  Here, by

contrast, Chartered Organizations are *conceded* to be co-insureds under the BSA Insurance Policies and the Local Council Insurance Policies and accordingly have concrete, independent rights to coverage that are not "derivative" of their relationship with the BSA or the Local Councils.

103.    Moreover, the rationale in *MacArthur* is unsound and was thoroughly deconstructed in *Forty-Eight Insulations*:

> The *MacArthur* court, therefore, dealt with MacArthur's rights under the policy endorsement as if they were somehow property of the debtor, within the jurisdiction of the bankruptcy court. Even on the facts in that case, it is hard to follow the Second Circuit's reasoning. Under section 541(a) of the bankruptcy code, only "legal or equitable interests of the debtor" become property of the estate. In *MacArthur*, as here, the issue was a non-debtor's interests in an insurance policy. Another party's interests do not become property of the estate, and therefore cannot be sold under section 363, which deals with sales of only property of the estate. Nor do we understand how a named insured's rights against an insurer are derivative in the same way as a tort claimant's. A tort claimant has a claim against the debtor that can be dealt with in bankruptcy. The claimant's rights against insurers, like his or her rights against other assets of the debtor, depend entirely upon the success of the claim against the debtor. So it may be fair to say that a tort claimant's rights against the insurer are derivative. It might be clearer to say simply that tort claimants have no "legal or equitable interest" in the insurance policy in the first place, any more than they do in other property of the estate, so that their property rights are not impaired by a settlement of the debtor's claim to coverage.
>
> MacArthur, and FWC here, however, do have "legal or equitable interests" in the policies. FWC is a named insured with the right to make direct claims on the insurers if the conditions of the policies are satisfied. It has rights to be defended and to indemnification that do not depend upon a prior resolution of any claim against Forty-Eight. And providing an alternate remedy does not create a power to deprive FWC of those rights without its consent.

*Forty-Eight Insulations*, 133 B.R. at 978; *see also SportStuff*, 430 B.R. at 178 n.15 (following *Forty-Eight Insulations*); *Archdiocese of St. Paul & Minneapolis*, 579 B.R. at 198 (same).

104.    The principles underlying *Forty-Eight Insulations* are accepted as general state law insurance law principles that govern the scope of the property of the Debtor's estate.  *Butner v. United States*, 440 U.S. 48 (1979).  The decision from the court in *Magnetek, Inc. v. Travelers Indem. Co.* is informative. 2019 WL 3037080 (N.D. Ill. July 11, 2019).  In the *Magnetek* decision, a named insured dealing with long tail contamination claims, Fruit of the Loom ("FOTL"), entered into a policy buyback settlement with its insurer, Travelers, that purported to extinguish coverage for both the insured and "any Person insured by any of the Policies."  *Id.*  UMC, (a former subsidiary of FOTL) qualified as "any Person insured by any of the Policies," and UMC's subsequent owner, Magnetek, later sued Travelers for coverage after Travelers declined to defend and indemnify the subsidiary based on the buyback.

105.    The *Magnetek* court rejected Travelers' argument, stating:

> The problem with Traveler's argument is that at the time of execution of the 2004 Settlement and Release Agreement, FOTL no longer owned or controlled UMC (plaintiff), one of the named insureds, having sold it in 1986. Thus, absent something in the [Stock Purchase Agreement] or Environmental Agreement, FOTL had no authority to release UMC's rights under the policies.

*Id.* at 13 (citing *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 979 (Bank. N.D. Ill. 1991).

106.    This Court should follow *Forty-Eight Insulations* and its progeny, and to the extent it finds any factual alignment, decline to follow *MacArthur* and its overly expansive view of bankruptcy jurisdiction over nondebtor property, a view at odds with Third Circuit precedent.  *See Resorts*, 372 F.3d at 161 (bankruptcy courts are vested with "limited jurisdiction" and "neither the bankruptcy court nor the parties can write their own jurisdictional ticket"); *Combustion Eng'g*, 391 F.3d at 228 ("[T]he boundaries of bankruptcy jurisdiction cannot be extended simply to facilitate a particular plan of reorganization.").

107.     The Debtors also rely on *In re Hereford Biofuels, L.P.*, 466 B.R. 841 (Bankr. N.D. Tex. 2012), but *Hereford* does not support eliminating the contractual rights of non-consenting creditors against non-debtor third parties either.  In *Hereford*, the court rejected the claim of a non-debtor third party (the parent company of the debtor), that its property rights as a co-plaintiff with the debtor in a separate action against the debtor's insurers were infringed when the debtor sold its claims to insurers to finance its bankruptcy estate.  *See id.* at 859.  But the parent was not a named insured and claimed its right to the insurance proceeds solely by virtue of its parent relationship with the debtor—a position that the court rejected as grounds for sharing in the insurance proceeds. *See id.* at 856.  Additionally, the court emphasized that the insurance policy at issue was a property policy and the court's ruling was predicated on the fact that the debtor owned the underlying real property that the insurance policy covered.  *Id.*  The insurance policies at issue here do not insure real property owned by the Debtors, and, as such, *Hereford's* narrow ruling provides no basis for the Debtors' requested relief.

108.     Even if the Court could somehow sell Chartered Organizations' property rights over their objections, section 363(e) requires that Chartered Organizations' receive adequate protection for their interests.  11 U.S.C. § 363(e); *see also In re Flintkote Co.*, No. 04-11300 (JKF) (Bankr. D. Del. Nov. 26, 2007) [Docket No. 2845] (policy buyback between insured and insurer expressly preserved right of co-insured to assert claim to the settlement proceeds); *In re Burns & Roe Enters.*, 2005 Bankr. LEXIS 3173 at *8 (to extent any person has interest in settled policies, that interest will attach to sale proceeds); *In re Imerys Talc Am.*, No. 19-10289 (LSS) (Bankr. D. Del. Jan. 28, 2021) [Docket No. 2864] (the "Insurance Entity Injunction" explicitly provides that it will not impair in any way "the rights of any co-insured of the Debtors."); *Allied Products*, 288 B.R. at 538 (denying approval for policy buyback where terms of sale did not allow claims to be asserted

against proceeds and no other form of adequate protection was provided); *Adelphia*, 364 B.R. at 527-528 (directors' and officers' independent property rights as additional insureds under the policies vis-à-vis the carrier could not be extinguished under Section 363(f) absent a full third-party release and channeling injunction to protect them from all claims).

109.     Here, the Insurance Settlement Agreements and policy buybacks do not preserve Chartered Organizations' interest in the proceeds of those settlements.  While the Debtors have contended that Chartered Organizations' insurance rights will be preserved through their ability to assert Indirect Abuse Claims against the Settlement Trust, that is simply not the case.  *See* Docket No. 4105 at ¶ 55.  The Insurance Entity Injunction would enjoin the ability of Chartered Organizations to exercise their *direct* rights to the proceeds of the subject insurance policies.  These direct rights are not adequately protected by the Plan when (1) holders of Indirect Abuse Claims stand to recover *nothing* under the TDPs and (2) even if Chartered Organizations could recover under the TDPs, that recovery would be subordinate to the rights of direct claimants and subject to the Settlement Trust's payment percentage.

**H.     The Proposed Plan and the Debtors' Plan Process Violates the Due Process Clause of the U.S. Constitution and Requires Resolicitation Under Section 1127(c).**

110.     The Plan cannot be confirmed unless the votes of Chartered Organizations are resolicited by appropriate, plain English disclosure and they have an opportunity to vote or object to confirmation.  When a plan is modified, "[t]he proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified."  11 U.S.C. § 1127(c).  "If the amendments are material and adversely affect the way creditors are treated, § 1127 requires a new disclosure statement and balloting of the amended plan."  *In re G-I Holdings Inc.*, 420 B.R. 216, 256 (D.N.J. 2009); *accord In re U.S. Concrete, Inc.*, No. 10-11407, 2010 WL 3493066, at *3 (Bankr. D. Del. July 29, 2010); *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664,

at *32 (Bankr. D. Del. May 10, 2010); *see also* 7 Collier on Bankruptcy ¶ 1127.03 (16th ed. 2021) ("Read literally, subsection 1127(c) requires a court to approve any modification that takes place after approval of the disclosure statement. This ensures the adequacy of the disclosure statement as it relates to the modified plan.").  "If there is any question concerning adequacy of information previously furnished, the plan proponent must obtain a court order concerning adequate information." *In re Concrete Designers, Inc.*, 173 B.R. 354, 356 (Bankr. S.D. Ohio 1994).  A plan modification is material where the modification "so affects any creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance." *G-I Holdings*, 420 B.R. at 256 (citing 9 Collier on Bankruptcy ¶ 3019.01 (15th ed. rev. 2009)); *see also In re American Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) ("The severity of the modification need not be such as would motivate a claimant to ***change*** their vote—only that they would be apt to ***reconsider*** acceptance.") (emphasis in original); *In re Concrete Designers, Inc.*, 173 B.R. 354, 356-58 (Bankr. S.D. Ohio 1994) (denying confirmation where modification of terms of dividend to unsecured creditors required new disclosure).

111.    There is no dispute that the Debtors' Disclosure Statement ***does not*** disclose any modifications, let alone material ones, because as its title suggests, it was the disclosure statement for a ***prior*** plan version.  Indeed, Exhibit A to that disclosure statement contains the version of the plan filed at Docket No. 6443, while the Debtors' current Plan is at Docket No. 7832.  *See In re Concrete Designers*, 173 B.R. at 358 ("Without a question, the Court must approve a disclosure statement as containing adequate information ***about the relevant plan*** before the disclosure statement is disseminated.") (emphasis in original); *In re Downtown Inv. Club III*, 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988) (vacating order modifying plan where the debtor never filed a disclosure statement for the modified plan and the motion for modification could not serve as a substitute for

a disclosure statement).

112.    Here, further disclosure is necessary because the Debtors' latest Plan materially and adversely modifies the treatment of Chartered Organizations in the three significant ways as set forth in paragraph 17 *supra*.  Unlike the Solicited Plan now impairs the independently purchased insurance rights of Chartered Organizations under ***their own policies*** non-consensually. Previously, the Plan affected only the BSA Insurance Policies and the Local Council Insurance Policies.  Now, however, as a result of the Insurance Settlement Agreements and the corresponding changes to the Plan, the definition of Insurance Policies has been broadened to include within its scope Chartered Organizations' own and separate insurance policies.  *See* Plan, Art. I.A.151.  It is clear that millions of dollars of coverage under Chartered Organizations' own Insurance Policies are disturbed by the Plan's insurance assignments, releases, and Insurance Entity Injunction, even though the scope of coverage under these policies are not well defined (or even admitted by the Settling Insurance Companies).  The Material Modifications eliminate Chartered Organizations' rights to defense and indemnity under their own policies for Abuse Claims, and Chartered Organizations have not received clear, plain English disclosure of these Material Modifications to be able to understand that they are likely facing coverage litigation against the Settling Insurance Companies as well as the Settlement Trust.

113.    The prejudice to Chartered Organizations stemming from the lack of disclosure of the Material Modifications is exacerbated by the fact that Chartered Organizations have not even received basic information regarding what claims may be asserted against them based on the confidential proofs of claim filed or information on the scope of insurance coverage that they have. Indeed, as noted above, very few Chartered Organizations have had Abuse Claims filed or threatened against them.  They have not had any reason to retain counsel, much less attempt to

slog through the convoluted and now stale disclosure statement to attempt to understand how the Debtors' Plan may affect those rights. As set forth in paragraph 14 *supra*, the Court has recognized the importance of plain English disclosures to Chartered Organizations and that kind of clear disclosure was noticeably absent from the Modified Plan Notice. At a minimum the Material Modifications rise to the level that a Class 9 Indirect Abuse Claimant would want to reconsider their vote. *See In re American Solar King Corp.*, 90 B.R. at 824. Those Claimants were sent a first class mailing eight (8) calendar days before the voting deadline with intervening holidays. Not only does section 1127(c) require resolicitation and disclosure of the Material Modifications in the Plan, the due process requirements in the Constitution require clear and sufficient notice to be provided to Chartered Organizations. *See supra* paragraphs 56-62. Accordingly, the Plan cannot be confirmed unless and until the Debtors adequately disclose the Material Modifications made to the Plan that adversely affect Chartered Organizations and re-solicit Chartered Organizations' votes.

## II.     The Debtors, Local Councils and Settling Insurance Companies Fail to Meet the Standards for Non-Consensual Third-Party Releases.

114.     The Plan is patently unconfirmable because it is premised on releasing the claims of non-debtor parties, including those of the Chartered Organizations, against other non-debtor parties, in particular the Settling Insurance Companies and Local Councils, without providing the releasing parties with meaningful recoveries for their claims or requiring the insurers to make any contribution to the Settlement Trust. The requested relief would be an unprecedented use of section 105(a), inconsistent with well-established Third Circuit precedent concerning non-debtor releases.

115.     Non-consensual third-party releases and injunctions are allowed under Third Circuit precedent only when there are special factual findings demonstrating those releases are

both necessary for the reorganization and fair.  *Millennium*, 945 F.3d, 139 ("Our precedents regarding non-consensual third-party releases and injunctions in the bankruptcy plan context set forth exacting standards that must be satisfied if such releases and injunctions are to be permitted, and suggest that courts considering such releases do so with caution."); *see also In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-607 (Bankr. D. Del. 2001) (rejecting third party release of debtor's management where they contributed no assets to the reorganization and there was no showing that absent an injunction in favor of management, the reorganization stood little chance of succeeding).

116.    The Third Circuit permits third-party releases only in "extraordinary cases" and based upon specific findings that support the "hallmarks" of (a) fairness, (b) necessity to the reorganization, and (c) fair consideration given in exchange for the releases.  *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 217 (3d Cir. 2000).

117.    In deciding whether such relief is permissible, courts in this jurisdiction consider the factors initially described in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994), and adopted in *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999), which require (1) an identity of interest between the debtor and the released party; (2) a "substantial contribution" to the reorganization made by the released party; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) the impacted classes overwhelmingly vote to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.  *Zenith Electronics Corp.*, 241 B.R. at 110; *see also In re Dow Corning, Corp.*, 280 F.3d 648, 658 (6th Cir. 2002).

118.     Here, the non-consensual releases fail for the following reasons.  ***First***, Class 9 overwhelmingly opposed the non-consensual releases.  ***Second***, Roman Catholic Class 9 creditors will not be paid in full.  ***Third***, none of the contributions being made by the Local Councils or the Settling Insurance Companies provide value to Class 9 creditors and thus, cannot be substantial. Finally, with respect to releases of claims under the Independent Coverage, there is no identity of interest with the Debtors; in fact it is the opposite.

119.     Before turning to those factors, the RCAHC reminds the Court that the non-consensual releases bind all Chartered Organizations, not just the Chartered Organizations voting in Class 9.  There is nothing in the record that could allow the Court to infer the consent and overwhelming support of those Chartered Organizations.  They were not entitled to vote, they were not provided an opt-out opportunity with respect to third party releases, they were not told that an Article I court would be deciding their non-core claims, and they were not given any effective notice of the non-consensual releases in favor of the Settling Insurance Companies.

### A.     Class 9 Overwhelmingly Rejected Third Party Releases

120.     The overwhelming acceptance standard has its roots in *Master Mortgage*, which was noted in prior cases such as *In re Johns-Manville Corp.*, 168 B.R. 618 (Bankr. S.D.N.Y 1986) and *In re A.H. Robins, Inc.*, 880 F.2d 694 (4th Cir. 1989).  Reliance on overwhelming acceptance gives the court comfort that there is extraordinary support of creditors for who are affected by extraordinary plan provisions such as mandatory releases of third-parties.

121.     Historically, courts approving non-consensual third-party releases have had the benefit of pointing to creditor support of such plans in excess of 90% in favor.  *See, e.g.*, *In re Millennium Lab Holdings II, LLC*, Case No. 15-12284 (LSS), 2015 WL 13912124 (Bankr. D. Del. Dec. 15, 2015) (over 93% in number and amount voted of affected creditors accepted the plan); *In re Quorum Health Corp.*, Case No. 20-10766 (KBO) (Bankr. D. Del. June 30, 2020) [Docket No.

294] (100% and 99.94% of class 4 and class 5 claimants voted to accept, respectively); *In re Blitz U.S.A., Inc.*, Case No. 11-13603 (PJW) (Bankr. D. Del. Jan. 30, 2014) [Docket No. 2152] (95.29% of the holders of Blitz Personal Injury Claims in Class 4(a) and 100% of the holders of Blitz Personal Injury Claims in Class 4(b) voted to accept the plan); *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y Sept. 19, 2017), [Docket No. 3787] (96.01% in number of holders of claims in voting class voted to accept the plan), *In re Master Mortg. Inv. Fund*, 168 B.R. 930, 938 (Bankr. W.D. Mo. 1994) (94.8% of class 5 voted in favor of the plan, 93.4% of Class3A in number and 96.2% in amount voted in favor of the plan); *In re A.H. Robins Co., Inc.*, 880 F.2d 694 (4th Cir. 1989) (94.38% of claimants voted to accept the plan).

122.    Here, however, the opposite is true.  Rather than just assume that a vote in favor of the Plan was support for third party-releases, the Debtors polled Class 8 and Class 9 creditors, those being channeled, as to whether they actually were in favor of the third-party releases.

123.    For Class 9, the answer was a resounding NO.  An overwhelming majority of Class 9 creditors, 81.97% or 5,500 of the 6,710 voting, elected to opt-out of the releases in Article X.J.4 of the Plan. *See Voting Declaration*, at Ex. A.  That rejection was not an aberration.  21,174 Class 8 voters, or 39.5% opted out of third-party releases.

124.    The numbers do not lie.  The Court cannot infer overwhelming acceptance of third-party releases when 81.97% and 39.5% of the affected classes affirmatively told this Court they did not consent to them.  To the contrary, the only conclusion the Court can draw is that there is a lack of meaningful support among affected creditors for third-party releases.  That alone is fatal to the releases that the Local Councils and Settling Insurance Companies seek to impose upon Roman Catholic Chartered Organizations.

**B.    Roman Catholic Chartered Organizations Will Not Receive Payment in Full**

125.    The proposed treatment of releasing parties falls considerably short of *Zenith*'s

requirement that a plan provide payment of "all or substantially all of the claims of the class or classes affected by the injunction." *In re Zenith Electronics Corp.*, 241 B.R. at 110; *Dow*, 280 F.3d at 358 (same); *see also In re Mahoney Hawkes, LLP*, 289 B.R. 285, 301 (Bankr. D. Mass. 2002) (finding that non-debtor releases were inappropriate under the fifth *Zenith* factor where classes with affected claims stood to recover a range of 24-100% and 3-17% under the plan).

126.    Roman Catholic Chartered Organization's Indirect Abuse Claims will be channeled to the Settlement Trust.  The Settlement Trust's TDPs are specifically designed to ensure that an Indirect Abuse Claim will never be paid close to full, if it is even paid at all.

127.    Because Roman Catholic Chartered Organizations have contractual rights against the Settling Insurance Companies that are being stripped away, in order for their Indirect Abuse Claim to be paid in full, the Settlement Trust must provide a similar level of protection. *See Forty-Eight Insulations*, 133 B.R. at 976 ("Most important, however, the channeling order, whatever benefits it might confer, would not be the same thing as FWC's contractual rights against the insurers, which would be extinguished. If FWC does not choose to relinquish those rights, then the settlement would impair FWC's rights, even if the economic effect were otherwise ameliorated."). Among the most basic rights an insured has under a contract of insurance is the right to a defense from its carrier.  Taking away Roman Catholic Chartered Organizations' insurance exposes them to the potential for defense costs.

128.    Indeed, it is undeniable that the costs of defense are a significant expense for those against whom claims are asserted and thus, would be a significant component of an Indirect Abuse Claim. *Cf.* Gary Svirsky, Tancred Schiavoni, Andrew Sorkin, and Gerard Savarsse, *A Field Guide to Channeling Injunctions and Litigation Trusts*, 260 NEW YORK LAW JOURNAL, at 2 (2018) ("[e]ven if a tort defendant is confident in its defenses, channeling injunctions cut off the costs of

defending weak or bogus claims (which nevertheless engender litigation costs").

129.    Here, however, the TDPs will never pay one penny of defense costs included as part of an Indirect Abuse Claim. That is because the TDP, in back to back sentences, limits an Indirect Abuse Claim to those amounts paid to a Direct Abuse Claimant.  "[N]o Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability.  Further, **in *no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim*.**" TDPs Art. IV.B.3 (emphasis added).

130.    Thus, an Indirect Abuse Claimant will not receive that to which it was entitled under its contract of insurance, which the court in *Forty-Eight Insulations* recognized as being a permanent economic impairment.  A settlement trust that is specifically designed to pay only part of a channeled claim is specifically contrary to the requirement of *Zenith*, *Dow* and their progeny.

**C.    A Release of Independent Coverage is Not Necessary for a Reorganization and There Is No Identity of Interest with the Estate**

131.    As the Third Circuit recognized in *Millennium,* the concern that releases will be approved in plans because those with the checkbooks demand them "is not without force."  *Id.,* 945 F.3d at 139.  In other words, there must be a showing of something more substantial just than a demand for a release coupled with funds to be utilized in a plan.  That showing cannot be made with respect to the Settling Insurance Companies' demands to be released from the Independent Coverage.

132.    An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release."  *Indianapolis Downs*, 486 B.R. at 303.  There are no indemnification agreements between the Debtors and the Protected Parties such that a lawsuit against the Protected Parties would be in essence a lawsuit against the Debtors.  *See, e.g.*, *In re*

*Quorum Health Corp.*, Case No. 20-10766 (KBO) (Bankr. D. Del. June 30, 2020) [Docket No. 556 ¶¶ 29-30, 82-84] (approving non-consensual third-party releases due, in part, to indemnification agreements in favor of the debtors' directors and officers).

133.    The Debtors have absolutely no interest in the Independent Coverage. It is not and has never been an asset available for their benefit. It is not insurance coverage to which they are entitled. A demand on the Independent Coverage does not affect the assets of the Debtor's estate available to pay creditors. The Debtors do not have to reimburse or indemnify the Settling Insurance Companies if a demand is made on the Independent Coverage.

134.    The Settling Insurance Companies demand to get a release on the Independent Coverage, property over which this Court lacks jurisdiction, as a condition to their buy-back is precisely the gamesmanship the Third Circuit warned against in *Millennium*. Absent compelling factual evidence establishing an identity of interest with the Independent Coverage, a legal entitlement to that coverage and a necessity to access that coverage for a reorganization, the Debtors cannot meet this prong of *Zenith*.

### III.    The Plan Is Not Feasible.

135.    The Court cannot confirm the Debtors' proposed Plan unless it "is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor or any successor to the debtor under the plan[.]"  11 U.S.C. § 1129(a)(11). The Court has an affirmative, independent obligation to ensure that the proposed Plan is feasible. *See In re Chadda*, 2007 WL 3407375, at *3 (Bankr. E.D. Pa. Nov. 9, 2007) ("To allow confirmation, the bankruptcy court must make a specific finding that that the plan as proposed is feasible.") (quotation omitted). For the Court to do so, a plan proponent must provide credible and specific evidence and demonstrate feasibility by a preponderance of the evidence. *In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012) ("The debtor bears the burden of proof on this inquiry, and must show by a preponderance

of the evidence that a reorganization plan is feasible."); *In re Global Ocean Carriers Ltd.*, 251

B.R. 31, 46 (Bankr. D. Del. 2000); *In re Frascelle Enters., Inc.*, 360 B.R. 435, 453 (Bankr. E.D.

Pa. 2007) ("[T]he plan proponent must demonstrate there is a reasonable assurance of compliance

with plan terms.").

136.    Indeed, a finding of feasibility must be made based on ***objective evidence*** and not

the subjective views or mere optimism of the Debtors.  *See In re Sound Radio Inc.*, 103 B.R. 521,

524 (D.N.J. 1989) ("All income projections must be based on concrete evidence of financial

progress, and must not be speculative, conjectural or unrealistic."); *In re Inv. Co. of the Sw., Inc.*,

341 B.R. 298, 313 (10th Cir. B.A.P. 2006) (overturning confirmation of a plan that was based on

"we can do it" testimony rather than objective projections); *In re Young Broad. Inc.*, 430 B.R. 99,

129, 136 (Bankr. S.D.N.Y. 2010) (stating that "the feasibility test is firmly rooted in predictions

based on objective fact"); *In re Pizza of Haw., Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (the

feasibility requirement "prevent[s] confirmation of visionary schemes which promise creditors and

equity security holders more under a proposed plan than the debtor can possibly attain after

confirmation."); *Chadda*, 2007 WL 3407375, at *4 ("Sincerity, honesty and willingness are not

sufficient to make the plan feasible, and neither are visionary promises.").  Future projections,

while indicative of feasibility, "must not be speculative, conjectural, or unrealistic."  *In re Young

Broad. Inc.*, 430 B.R. at 129 (citation omitted).  For example, "a glaring discrepancy between the

facts surrounding past performance and activity and predictions for the future is strong evidence

that a debtor's projections are flawed and the plan is not feasible."  *Id.* (quotation omitted).  Where

financial projections do not stand up to scrutiny, the plan will be found not to be feasible.  *See,

e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (plan not feasible where

funding source was based on "wholly speculative litigation proceeds"); *Fayette Bank v. Nesser (In*

*re Nesser)*, 206 B.R. 357, 368 (Bankr. W.D. Pa. 1997) (finding that a plan was not feasible where debtor's business projections were "speculative and inaccurate").

137.    In assessing the feasibility of a plan, bankruptcy courts may consider the following factors: (i) the adequacy of the capital structure; (ii) the earning power of the business; (iii) economic conditions; (iv) the ability of management; (v) the probability of the continuation of the same management; and (vi) any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the plan. *In re Paragon Offshore PLC*, No. 16-10386 (CSS), 2016 WL 6699318, at *16 (Bankr. D. Del. Nov. 15, 2016); *see also In re Bashas' Inc.*, 437 B.R. 874, 916 (Bankr. D. Ariz. 2010) ("A court may not confirm a plan if its feasibility depends on future refinancing, unless there is an adequate evidentiary showing that such refinancing is likely to occur."); *In re Carolina Commons Dev., LP*, No. 09-011230-8, 2010 WL 1965895, at *2 (Bankr. E.D.N.C. May 17, 2010) (finding a debtor's plan to be unfeasible due to its reliance on commercially unreasonable assumption inconsistent with "current commercial market conditions"). Moreover, "balance sheet solvency at emergence is not a feasibility requirement. Rather, solvency is merely a factor considered where relevant." *Paragon Offshore*, 2016 WL 6699318, at *17 (citing *In re W.R. Grace & Co.*, 475 B.R. at 163 n.137).

138.    In *Paragon Offshore*, the Court denied confirmation because the proposed plan was not feasible based on the evidence presented. The Court found that (i) the debtors' business plan was based upon unrealistic assumptions, (ii) the debtors would run out of cash altogether or breach their financial covenants if the proposed plan were confirmed, and (iii) the debtors failed to establish that they will be able to refinance their debt at maturity in five years. *Id.* at *1. The Court further found that the debtors needed $150 million to $200 million in additional cash in order to survive the challenging business environment of off-shore oil and gas production and

refinance their debt five years later.  *Id.*  Of note, Judge Sontchi found that the debtors' dayrate and utilization assumptions of their rigs were aggressive and not achievable, in part, because the debtors were not currently achieving their projected rates.  *Id.* at *20.  The Court noted that the debtors did not review third-party reports and other secondary market data to corroborate the debtors' assumptions.  *Id.*  Judge Sontchi also held that the debtors' rig utilization assumptions were unsupportable because there was no reason to believe that the debtors could outperform the market.  *Id.* at *23-24.  Finally, the Court agreed with the objectors' expert in finding that the debtors would run out of cash and breach the liquidity covenants in their debt facility within two years under the proposed plan.  *Id.* at *28.

139.    Likewise, in *Young Broadcasting*, the court found that the projections in the proposed business plan were overly aggressive in comparison to competitors in the industry: "The key deficiency in the Debtors' business plan is that the projected rate of growth in revenue necessarily presumes either a substantial improvement in the industry, increased industry market share within 2.5 years of emerging from bankruptcy, or both." *Id.* at 136.  The debtors' projections included a contracted operating budget, deferred capital expenditure spending and no capital expenditure budget for its biggest broadcasting station.  *Id.* at 135.  The projections also included a growth rate that the court found to be "aggressive and unrealistic." *Id.* at 132.  These idealistic projections caused the court to question the "key issue in determining feasibility" of that plan, which was the debtors' ability to pay the debt when it matured either through a sale of the company or refinancing.  *Id.* at 129-30.

140.    Finally, in *Torgro*, the bankruptcy court denied confirmation on feasibility grounds because the debtor's projections of yearly revenue increases were unrealistic.  *In re Torgro Atl. City, LLC*, No. 08-13458, 2009 WL 1288367, at *10 (Bankr. D.N.J. May 7, 2009).  The court

found that "[a]lthough it is difficult to determine with certainty whether" a significant downturn in the debtor's industry would "continue for an extended period," the debtor improperly assumed in its projections that the industry had bottomed out, and had "not accounted for and has not presented a strategy for the possibility that business will continue to decline." *Id.*; *see also In re Haukos Farms, Inc.*, 68 B.R. 428, 436-37 (Bankr. D. Minn. 1986) (finding the debtor's plan which assumed a quick recovery in the industry was not confirmable where the debtor's "industry [was] in a period of severe economic depression, with no significant abatement likely in the foreseeable future"); *In re M & S Assocs., Ltd.*, 138 B.R. 845, 852 (Bankr. W.D. Tex. 1992) (denying confirmation based upon lack of feasibility of the plan which was based "on the long shot possibility of a drastic improvement in the real estate market").

141.    As mentioned above, a key factor courts consider in determining whether a proposed Chapter 11 plan is feasible is the adequacy of the reorganized debtor's capital structure. *See, e.g.*, *Paragon Offshore*, 2016 WL 6699318, at *16; *Torgro Atl. City*, 2009 WL 1288367, at *8 ("Courts have listed several factors to consider during a Chapter 11 plan's feasibility determination, including… the adequacy of the debtor's capital structure."). Where a debtor has too much debt under its plan to allow the debtor to meet its long-term capital needs (*e.g.*, where a debtor will be unable to either pay its debts at maturity or refinance its debts at maturity), the debtor's capital structure under the plan is inadequate and the plan is not feasible. *See In re Las Vegas Monorail Co.*, 462 B.R. 795, 803 (Bankr. D. Nev. 2011) (denying confirmation where under the debtor's plan, there was "simply too much debt to allow [the debtor] to meet its long-term capital needs.").

142.    Here, the Debtors face a significant and realistic risk that they will be unable to satisfy their financial obligations while maintaining sufficient liquidity and capital resources, and

therefore, it is likely that the proposed Plan will be followed by liquidation or further need for reorganization. The Plan, which contradicts historical trends and is founded upon unsupported and visionary optimism, is not feasible.

143.   ***First***, as described in detail in the Kibler Report, the Debtors' projections are inconsistent with the Debtors' historical trends and their 2021 performance in many significant areas.  *See generally* Kibler Report at 11-36.  With respect to membership growth, a key factor supporting Debtors' liquidity needs, the Debtors' projections are asymmetric to their historical figures as well as the current market realities.  *See, e.g.*, Whittman Supplemental Report, Ex. C, at 21 ("BSA has experienced declining membership over the last decade . . . ."); BSA-PLAN_01023260 (President and CEO of BSA stating "[a]t the end of August [2021] we are about the same level as Scouts were in 1936."); BSA-PLAN_01371052-56 (Philmont NEC Retreat Debrief, stating "Our Brutal Facts" that BSA has had "45 years of membership declines"); Dec. 9, 2021 Hunt Dep. Tr., 121:13-16 (confirming that BSA has experienced 45 years of membership declines); *see also* BSA-PLAN_01371057 (noting "Chartering organizations relationships are frayed" and that chartering model is at risk "given heightened focus on abuse exposure"); Dec. 7, 2021, Whittman Dep. Tr. (same);  BSA-PLAN_00561023-26 (noting that "45% of newly recruited Cub Scouts drop out in 90 days" and that "Eagle Scout brand does not speak to these families."). The Debtors predict that Cub Scouts' membership, for example, will grow between 2% and 4% from 2022 to 2025, but Cub Scouts' membership has ***never*** grown by even 2% with the only growth for the program coming in 2016 at 0.1%.  *Id.* at 13.  The more recent trend in Cub Scouts' membership is also not one of growth, but of significant decline—the Debtors now expect a decline of 17% for 2021, which is in stark contrast to their projected 6% decrease from the Debtors' Disclosure Statement filed only months ago on September 30, 2021.  *Id.*  These same trends, both

64

historical and recent, are prevalent in the Debtors other programs as well.  *Id.*[27]

144.    Indeed, and unfortunately, it is reasonable to assume that 2021 represented a newly normalized environment given some level of COVID-related restrictions may be in place for the foreseeable future.  Kibler Report at 17.  In contrast, and contrary to the recent and current lessons from the Delta and Omicron variants of COVID-19, the Debtors optimistically, but without objective support, believe that COVID-19 will readily become manageable and in the rearview mirror.  *See id.* at n.22 (noting Mr. Whittman and Mr. Hunt stated that the Debtors' projections reflect an expectation that "COVID will continue to retreat and/or become manageable and not have a significant impact on our ability to recruit new members" and that the Debtors believe "COVID will be behind us" during the projection period) (quoting Hunt Dep. Tr., 49:20-25, 50:11-22; December 13, 2022 Whittman Deposition at 129:6-24).[28]  It is therefore unreasonable, and unsupportable by both historical and current realities, to assume the level of membership growth that the Debtors project.  *See, e.g.*, *In re Paragon Offshore PLC*, 2016 WL 6699318, at *1 (Bankr. D. Del. Nov. 15, 2016) (denying confirmation due to a lack of feasibility because the debtors' projections were based upon unrealistic assumptions).

145.    The Debtors' projections with respect to supply revenue, High Adventure Base ("HAB") revenue, unit charter fee revenue, contributions and bequests, other revenues, other expenses, and capital expenditures are also inconsistent with historical and current trends, and

---

[27] While it is true that opening up Scouting to females increases the potential population of Scouts, the Debtors' ability to sustain and grow membership in that new market demographic it is untested, and it is equally unreasonable to depend on any significant influx of members based on the ability to recruit females in light of competition threats from Girl Scouts of the USA, among other barriers to entry.  Indeed, Girl Scouts and BSA have already been embroiled in litigation over recruiting.  *See, e.g.*, *Girl Scouts of The United States v. Boy Scouts of America*, C.A. No. 18-cv-10287 (AKH) (S.D.N.Y.).

[28] *See also Public Schools in Chicago Close as Teachers' Union Says Classroom Conditions Are Unsafe*, NEW YORK TIMES (January 4, 2022), *available at* https://www.nytimes.com/live/2022/01/04/world/omicron-covid-vaccine-tests; Dana Goldstein, *"It's Chaos' as Schools Confront Omicron*, NEW YORK TIMES (Jan. 3, 2022), *available at* https://www.nytimes.com/2022/01/03/us/school-reopening-classrooms-omicron.html.

unrealistic under the circumstances.  The Debtors project approximately 20% increases from current levels in supply revenue per youth member, but do not substantiate any basis for the significant departure from historical revenue.  *See* Kibler Report at 22-24.  Similarly, the Debtors provided no support for the assertion that they will be successful in turning an operational loss of $6 to $10 million annually at the Summit HAB into a cash flow generator.  *Id.* at 28.  As with many of the Debtors' other projections, they anticipate increasing unit charter fees by 100% in 2023, significantly more aggressively than historical and even recent increases.  The Debtors are also relying on approximately $12 million in contributions and bequests in 2023 through 2025, far in excess of their historical average of about $8 million.  *Id.* at 30.  In 2020 and 2021, contributions and bequests dropped to $7 million and $5 million, respectively.  *Id.*  The Debtors provide no evidence to support these aspirational gifts.  Indeed, Mr. Whittman admits that "there is a lack of such commitments today[.]"  Rebuttal Report at 4.  Finally, the Debtors project a 68% increase in "other revenues" in 2022, providing little support, plans, or details for the increase, $2.5 million per year in unspecified cost savings, providing no evidentiary support, and $4.5 million in capital expenditures when their historical average is $13.3 million.  *Id.* at 32-36.

146.    Each of the adjustments made in the Kibler Report to address the above-described disparities is reasonable, based on the Debtors' own historical results, and represents the realities that the Debtors face now and in the future.  In contrast, the Debtors' projections are incongruent with historical performance and market realities.  These aspirational projections amount to significantly overstated liquidity that, if accounted for properly, demonstrate that the proposed Plan is not feasible.[29]  *See, e.g.*, *id.* at 25, 27, 29-30, 32 (demonstrating that the Debtors' projections

---

[29] Further demonstrating BSA's unsupported optimism is its conclusory belief that it will obtain growth through untested programs such as family camping and year-round recruiting.  *See* Whittman Rebuttal Report, pp. 10-11. While these programs *could* assist in growth, their potential for success is merely conjectural and based upon the "we can do it" approach rejected by the court in *In re Inv. Co. of the Sw., Inc.*, 341 B.R. at 313.

are overstated by tens of millions of dollars).

147.    While Mr. Whittman suggests that the Debtors *could* take steps to mitigate potential downside scenarios and liquidity concerns raised in the Kibler Report, *see* Rebuttal Report at 6, the Debtors have not analyzed, let alone demonstrated their reasonableness or achievability.  It is clear that the Debtors' projections, while aspirational, are speculative, conjectural and unrealistic, and therefore, the plan is not feasible.  *See, e.g.*, *Young Broad*, 430 B.R. at 129 (Future projections, while indicative of feasibility, "must not be speculative, conjectural, or unrealistic."); *Chadda*, 2007 WL 3407375, at *4 ("Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises.").

148.    ***Second***, the feasibility of the Debtors' Plan largely depends on their ability to maintain a sufficient level of membership.  Indeed, the Debtors admit that "[i]f the number of new members and returning members is substantially reduced from current projections, the Debtors could lack the means to meet their operational needs or otherwise emerge from bankruptcy." Disclosure Statement at 14; *see also* Aug. 12, 2021 Hr'g Tr. 186:8-9 (Mr. Whittman acknowledging that a "key factor" for feasibility of the Debtors' plan and projections relate to membership levels).  But the growing adverse impact to the Debtors' liquidity based on negative historical and current membership trends alone would reduce available cash by $36 million by 2025.  *See* Kibler Report at 18, Table 4.  Additionally, the RCAHC currently opposes the Plan due to the Plan's treatment of Roman Catholic Chartered Organizations.  It is therefore unreasonable to assume that the Roman Catholic Entities will continue to support Scouting programs and more likely that they will cease serving as Chartered Organizations, resulting in the potential loss of many of the approximately 111,000 members in Catholic-chartered units, almost 12% of Scouting

membership, in addition to losses of units chartered by other denominations.  *Id.* at 19.[30]  Indeed, in January 2020, the Church of Jesus Christ of Latter-day Saints withdrew as Chartered Organizations, resulting in the loss of approximately 400,000 members.  *Id.*

149.    This is not an abstract concern.  Mr. Hunt acknowledged the possibility of Chartered Organization disaffiliation and the harm it would cause to the BSA's ability to meet its critical membership projections, but offered nothing more than speculative optimism about how Debtors would overcome those disaffiliations.  Hunt Dep. Tr. 208:23-25, 209:1-4; 209:9-25, 210:1-18.  Moreover, Whittman's supplemental report specifically incorporates and relies on BSA documents acknowledging the "risks" associated with membership erosion.  Whittman Supplemental Report, Ex. C, at 45 ("Membership erosion – unmitigated shortfalls in membership would have a negative impact on operating surplus and free cash flow across registration fees and supply.").  Despite this acknowledgment of this risk, the Debtors' projections do not contemplate any significant Chartered Organization disaffiliation with Scouting,[31] an overarching assumption that is not based on current realities, and therefore, is unreliable for projection purposes.

150.    ***Third***, as demonstrated in the Kibler Report at Table 1, and under the various membership and assumption scenarios discussed therein, the Debtors likely may violate the

---

[30]  Mr. Whittman admits in his deposition that even though the UMAHC has settled with the Debtors and now supports the Plan, if it were to advise or direct its member churches to continue supporting Scouting units, not all individual churches would do so.  Jan. 20, 2021 Whittman Dep. Tr., 33:14-23.  There is still a risk that Methodist Churches would leave Scouting just as there is a risk that Catholic Churches would do the same, creating a significant risk factor for membership totals moving forward.

Additionally, Mr. Whittman incorrectly posits that the Kibler Report "rests on the premise that both the United Methodists and Roman Catholics opposed the Plan and were threatening to leave Scouting[.]"  Rebuttal Report at 2.  If just the Roman Catholic Chartered Organizations disaffiliated with Scouting, the Debtors would have dire liquidity issues.

[31]  Mr. Whittman also confirmed that a resolution between the RCAHC and the Debtors would further mitigate a risk factor and would have an overall positive effect on the feasibility of the Debtors' proposed Plan regardless of whether or not the Roman Catholic COs make a financial contribution to the settlement trust.  Jan. 20, 2021 Whittman Dep. Tr., 40:21-25, 41:1-20.

liquidity covenant incorporated in their loan agreements *as early as 2022*, violate their debt service coverage covenant *as early as 2023*, and have no liquidity *as early as 2024*. The Plan, as proposed, is simply not feasible under any of these scenarios. Finally, the Debtors make no attempt to discuss, let alone support, their ability to pay off or refinance their debt at maturity.[32]  *See, e.g.*, *Paragon Offshore*, 2016 WL 6699318, at *17 (holding that the plan was not feasible, in part, because the Debtors failed to establish that they will be able to refinance their debt at maturity five years from the proposed confirmation date).[33]

151.    The Kibler Report is consistent with the Debtors' historical performance and current market realities, and should be relied upon by the Court.  *See* Kibler Report, ¶¶30-40; *see also* BSA-PLAN_01371052-068; Hunt Dep. Tr., 121:13-16.  It demonstrates that the Debtors' projections are merely aspirational and unrealistic.  It further demonstrates that the Debtors will likely be unable to meet their financial obligations to service the secured debt contemplated under the Plan and will likely breach the related financial covenants in the near-term.  The Debtors themselves acknowledge that they will "be highly leveraged at emergence" and "will need to quickly offset any shortfall to the business plan with cost reductions and/or additional fundraising." Whittman Supplemental Report, Ex. C, at 45; *see also* BSA-PLAN_01371052-56 (stating that the Debtors "will exit bankruptcy with a staggering level of debt . . . with virtually no safety net.").

152.    In contrast to the Kibler Report, the Whittman Report and Rebuttal Report are rife

---

[32] This is particularly concerning given the high leverage and increasing debt service requirements through and beyond 2025.  *See* Kibler Report, ¶ 29; *see also* Whittman Supplemental Report, Ex. C, at 159 (detailing significant increase in JPM Secured Debt amortization beginning in 2024).  In response, Whittman simply speculates that BSA *could* engage in unspecified cost reductions, target unidentified donors, apply unknown service charges, or sell off assets to try and address liquidity issues.  These speculative steps are insufficient to support feasibility.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145 at 156 (plan not feasible where funding sources are speculative).

[33]    Highlighting the lack of any concrete plans and unsupported optimism, Mr. Whittman concludes on pure speculation that any liquidity issues that arise if Ms. Kibler is correct could be addressed simply by selling unspecified BSA assets securing the JP Morgan debt to unknown buyers on unstated terms.  Whittman Rebuttal Report, at 6.

with inconsistencies and unsupported assumptions.  As Mr. Whittman testified, he has not seen any feasibility analysis, in his work on behalf of companies, where the business plan created did not satisfy the test for feasibility under the Bankruptcy Code.  Jan. 20, 2021 Whittman Dep. Tr., 46:20-25, 47:1-13 (Q: [W]ith your work on behalf of, I beg your pardon, either companies in bankruptcy or companies in stress situations, have you come across a circumstance in which a feasibility analysis was performed and the downside scenario showed that either the plan or the proposed restructuring was not feasible. A: "I'm not sure if I've seen that in a specific feasibility analysis for the purposes of satisfying the tests in the bankruptcy code.").[34]  The proposed Plan does not satisfy section 1129(a)(11) of the Bankruptcy Code and should not be confirmed.

## IV.    The Scope of the Plan Injunction for Chartered Organizations Is Unknown and Potentially Illusory.

153.    When a debtor seeks an injunction pursuant to Section 105 of the Code, the requirements of Fed. R. Civ. P. 65 ("Rule 65"), as made applicable by Fed. R. Bankr. P. 7065 ("Rule 7065"), apply.  *See W.R. Grace*, 475 B.R. 34 (D. Del. 2012) (considering whether the channeling injunction under the plan ran afoul of Fed. R. Civ. P. 65(d)); *In re Pittsburgh Corning Corp.,* 453 B.R. 570, 601 (Bankr. W.D. Pa. 2011) ("A § 105 injunction is governed by the same standards applicable under Fed. R. Civ. P. 65."); s*ee also In re Wedgewood Realty Group, Ltd.*, 878 F.2d 693, 701 (3d Cir. 1989); *In re Williams,* 346 B.R. 361, 371-72 (Bankr. E.D. Pa. 2006).  Accordingly, Rule 65's strict requirements are applicable to the channeling injunction sought here.  *In re W.R. Grace & Co.*, 475 B.R., at 96 (upholding injunction, stating that "consistent with Rule 65(d), the channeling injunction provides enough specificity and reasonable detail, without any

---

[34]  *See, e.g.*, Aug. 12, 2021 Hr'g Tr. 227 (Mr. Whittman testifying that the Debtors' projections did not consider what would happen if 25% of its current members left scouting); *see also* Sept. 21, 2021 Hr'g Tr. 57:19-24 (Mr. Mason: "The BSA, as Mr. Whittman has testified to previously, has liquidity issues. It's got liquidity today, but if you extend out the timeline beginning in two weeks and extending thereafter there are severe issues starting next year. And even that would depend on the successful fall recruiting season and a fundraising season.").

reference to a complaint or other documents, that is sufficient to put all involved parties on notice of what is prohibited").

154.    To comply with Rule 65, an injunction sought by a debtor must state its terms specifically and "describe in reasonable detail—**and not reference to the complaint or other document**—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1); *U.S. Steel Corp. v. United Mine Workers of Am.*, 534 F.2d 1063, 1078 (3d Cir. 1976) (vacating injunction, in part, for lack of specificity); 2 Collier on Bankruptcy ¶ 105.03[4][c] (16th ed. 2021) (citing *In re Canter*, 299 F.3d 1150 (9th Cir. 2002)); *United States v. Carolina Parachute Corp*., 907 F.2d 1469, 1475 (4th Cir. 1990).

155.    The proposed Channeling Injunction for Roman Catholic Chartered Organizations violates the black letter of the rule.  One can only determine if an Abuse Claim is channeled by reviewing an external document—the Insurance Policies issued by the Settling Insurance Companies—and then making a legal conclusion as to whether the applicable policy covers the claim.  *See* Jan. 26, 2022 Eric Green Dep. Tr. 24:5-13 (testifying that "it refers back to multiple defined terms, so I can't answer specifically. But usually a claim covered under an insurance policy in general, not specifically with respect to this trust, means that there is a claim for which an insurance policy provides coverage.").

156.    There is a reason for that bright line requirement in Rule 65.  Parties must know precisely the conduct enjoined from the four corners of the injunction so they do not run afoul of the injunction.  The Third Circuit just recently invalidated an injunction that lacked sufficient specificity in *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 369 (3d Cir. 2021).  In *Mallet*, the court invalidated a temporary injunction designed to protect trade secrets because the injunction issued by the trial court failed to adequately identify the trade secrets sought to be protected.  *Id.* at 380.

The court cautioned on remand that "an injunction ought not to leave too much 'guesswork' for [parties] 'to determine if [they are] engaging in activities that violate the injunction[.]'" *Id.* at 388-89 (quoting *Patriot Homes v. Forest River Housing, Inc.*, 512 F.3d 412, 415 (7th Cir. 2008)).

157.    The purpose of the specificity requirement is to: (i) "prevent uncertainty and confusion on the part of those faced with injunctive order, and [thus] to avoid the possible founding of a contempt citation on a decree too vague to be understood," and (ii) "ensure that sufficient information is placed on the record so that 'an appellate tribunal [will] know precisely what it is reviewing.'" *Mallet & Co. Inc.*, 16 F.4th at 379 (alteration in original) (*quoting Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).

158.    The purpose of prohibiting an injunction from referring to "other documents" is to ensure that the parties are able "'to interpret the injunction from the four corners of the order' as required by Rule 65(d)." *Fed. Trade Comm'n v. Southwest Sunsites, Inc.*, 665 F.2d 711, 724 (5th Cir. 1982) (quoting *Sanders v. Airline Pilots Ass'n International,* 473 F.2d 244, 247 (2d Cir. 1972)); *see also Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 371, 34 (10th Cir. 1996) (applying strict compliance with Rule 65's prohibition on outside references); *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1236, 1246 (5th Cir. 1975) (applying strict compliance with Rule 65 as a matter of due process, and holding that injunction's reference to parties' collective bargaining agreement violated Ruel 65); *Seattle-First Nat. Bank v. Manges*, 900 F.2d 795, 799-800 (5th Cir. 1990) ("Thus, although reference to the magistrate's findings and recommendation and to the TRO clearly would give the . . . defendants specific guidance as to the prohibited behavior, the order fails to comply with Rule 65(d).").[35]

---

[35] While some circuits have allowed reference to extraneous documents, those instances have been limited and narrow in application.  *See Reno Air Racing Ass'n., Inc.* v. McCord, 452 F.3d 1126, 1132-33 (9th Cir. 2006) (recognizing strict prohibition against reference to "other documents" but acknowledging incorporation by reference in limited scenarios such as when the document is attached to the order); *Seagram-Distillers Corp. v. New Cut Rate Liquors*,

159.    Any other rule would offend "basic fairness [which] requires that those enjoined receive explicit notice of precisely what conduct is outlawed."  *Schmidt*, 414 U.S. at 476 (emphasizing the need for strict enforcement of Rule 65(d)).

160.    Here, the Debtors have proposed an injunction that fails to meet the requirements of Rule 65 because it references external documents, insurance policies, rendering parties completely unable to  "to interpret the injunction from the four corners of the order as required by Rule 65(d)."  *Fed. Trade Comm'n v. Southwest Sunsites, Inc.*, 665 F.2d at 724 (internal quotations omitted).   Both the Century and Chubb Companies Term Sheet and the Plan provide that "All Abuse Claims against insured and co-insureds covered under any insurance policies issued by the Settling Insurance Companies shall be channeled under <u>Article X.F.1</u> and released under <u>Article X.J.6</u> as provided in the Insurance Settlement Agreements."  *See* Plan, Art. X.F.2; Century and Chubb Companies Term Sheet, Sec. 11 ("Abuse Claims against insured and co-insureds covered under any insurance policies issued by the Settling Insurance Companies shall be channeled under the Settling Insurer Policy").  It is completely unclear *which* Abuse Claims are "covered under insurance policies issued by the Settling Insurers."  In fact, Century admits that this is completely unclear from the documents: "Those determinations will be made in the context of specific claims against specific insureds or co-insureds when they are presented in the future.  If there is a dispute about the application of the injunction to a specific claim, the parties can seek a court ruling."  *See* Letter Brief from S. Stamoulis to the Hon. Laurie S. Silverstein, dated January 31, 2022 [Docket No. 8597].  To interpret the scope of the injunction, parties-in-interest will have to not only consult numerous insurance policies, but they will also have to litigate over whether those policies cover

---

221 F.2d 815, 821 (7th Cir. 1955) (permitting reference to extraneous contracts because despite reference, the order enabled the reader to know what was being enjoined).

Abuse Claims.

161.    In addition, the Debtors admitted that terms in the injunction are vague and ambiguous:

> **Request 1-478**
>
> "[For each applicable policy] admit that Abuse Claims against insureds or co-insured are covered under the policy."
>
> **Response to Request for Admission Nos. 1-478**
>
> "The Debtors object to the terms 'insureds' and 'co-insureds' as used in each Request because ***they are vague, ambiguous, and undefined*** in the Requests or in the Modification Motion or in the Debtors' Second Modified Fifth Amended Plan of Reorganization (Dkt. 7832) . . . ."
>
> *See* Debtors' Objections and Responses to the Roman Catholic Ad Hoc Committee's Request for Admission to the Debtors (emphasis added).

162.    The Debtors' proposed injunction cannot possibly meet Rule 65(d)'s requirement to describe the enjoined conduct in "reasonable detail" when the Debtors themselves admit the terms used in it are vague and ambiguous.  Indeed, the universal refrain has been that to determine the scope of the Channeling Injunction will require a determination of insurance coverage.  In other words, this is an injunction that by its very terms requires further litigation before the scope of the injunction can be determined.  The duty of the Court in entering an injunction is to provide specificity as to enjoined acts, not to set the table for further litigation. As a result, the terms of the injunction do not comply with Rule 65(d) and cannot be approved.

163.    Also fatal is the fact that the Plan and related documents provide no guidance on what person or court is charged with determining whether an Abuse Claim is channeled.  The Settlement Trust and the TDPs do not discuss this responsibility.  And if the Settlement Trustee were charged with making a coverage determination, would that determination be binding on the

Settling Insurance Company?  In the case of a mixed claim, where an abuser may have been affiliated with a Chartered Organization in a role in addition to Scouting, will that bind the Settling Insurance Company to cover the non-Scouting claim under the exact same policy?  Debtors provide no clue, much less an explanation.

164.    If it is not the Settlement Trustee or if a Settling Insurance Company will not agree to be bound by the Settlement Trustee, what is the procedure then?  Does a court decide the coverage issue?  If so, what court?  Against, Debtors are silent.

165.    An injunction that requires a legal conclusion to determine its scope and provides no mechanism to determine that legal conclusion is the opposite of specific and definite.  It is a construct for chaos, the very outcome that Rule 65 forbids.

## V.    Additional Objections to the Proposed Plan.

### A. The Proposed Plan Seeks to Expand the Reaches of Section 1141 of the Bankruptcy Code and Should Not Be Approved.

166.    Section 1141 of the Bankruptcy Code governs the effect of confirmation and specifies the scope of a debtor's discharge upon confirmation.  Section 1141(a) provides that a confirmed chapter 11 plan is binding upon "the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan."  11 U.S.C. § 1141; *In re Ampace Corp.*, 279 B.R. 145, 153 (Bankr. D. Del. 2002) ("All parties are bound by the terms of a confirmation plan of reorganization pursuant to 1141(a)").

167.    The reaches of section 1141 are critical and represent the explicit outer-limits of a confirmed plan's binding effect.  This Congressional charge is tied to the notions of due process

and *res judicata* and must be respected.  *See, e.g.*, 8 COLLIER ON BANKRUPTCY ¶ 1141.02

(16th 2021) ("***Subject to the requirements of due process***, a confirmed plan is binding upon every

entity that holds a claim against or interest in the debtor even though a holder of a claim or interest

is not scheduled, has not filed a claim, does not receive a distribution under the plan or is not

entitled to retain an interest under the plan.") (emphasis added); *id.* ("The confirmation order binds

the world to the extent the plan touches the debtor, its rights, assets or obligations as of the

confirmation date, ***subject to constitutional due process limitations***.") (emphasis added).

168.     Indeed, because a confirmation order operates as a final judgment, all questions that

could have been raised pertaining to the confirmed plan are barred, and the confirmation order

terminates all rights of those it binds, except the rights provided in the plan or confirmation order.

*See In re Platinum Oil Props.*, 465 B.R. 621, 638 (Bankr. D.N.M. 2011) ("When a party listed in

section 1141 receives proper notice, even if that party has not accepted the plan or had a different

understanding of the plan's terms or effects, that party will still be bound by its terms under the

doctrine of *res judicata*"); *In re G-I Holdings, Inc.*, 514 B.R. 720, 747-48 (Bankr. D.N.J. 2014)

(restating that the plan binds a broad list of entities pursuant to section 1141 and the doctrine of

*res judicata* applies to confirmation orders, binding creditors to the terms of a confirmed plan).

Consequently, parties who would be bound by a confirmed plan under section 1141 must object

to the plan if they do not wish to be bound.  *See, e.g.*, 8 COLLIER ON BANKRUPTCY ¶ 1141.02

(16th ed. 2021) (citing *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995)).

169.     However, a debtor does not have authority to expand the reaches of section 1141 to

bind a debtor's non-creditors.  11 U.S.C. § 1141(a).  Significantly, section 1141 does not bind

entities that are not creditors or other parties-in-interest.  *See, e.g.*, 8 COLLIER ON

BANKRUPTCY ¶ 1141.02 (16th ed. 2021) (citing cases that held that the IRS and SEC were not

"creditors" that could be bound by the terms of a confirmed plan). Moreover, "a court cannot approve an injunction that unlawfully impairs rights of parties that may not vote on the channeling injunction, *e.g.* insurers' contribution, indemnification, reimbursement, or subrogation rights may not be impaired." Gary Svirsky, Tancred Schiavoni, Andrew Sorkin, and Gerard Savarsse, *A Field Guide to Channeling Injunctions and Litigation Trusts*, 260 NEW YORK LAW JOURNAL, at 3 (2018) (citing *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 611 (Bankr. W.D. Pa. June 16, 2011)).

170.    Here, the Debtors are seeking to explicitly expand and "supplement" section 1141 of the Bankruptcy Code in the Plan. *See* Plan, Art. X.F. (Channeling Injunction) ("Notwithstanding anything to the contrary herein, to preserve and promote the settlements contemplated by and provided for in the Plan, including the Abuse Claims Settlement, the Insurance Settlements, and the TCJC Settlement, ***and to supplement, where necessary, the injunctive effect of the Discharge as provided in sections 1141*** and 524 of the Bankruptcy Code….") (emphasis added). This request is in direct contravention to section 1141 of the Bankruptcy Code as well as the Court's guidance on this issue. *See* Sept. 28, 2021 Hr'g Tr. 141:16-142:5 (stating that the Court does not have authority to bind parties other than those specifically mentioned in section 1141 and suggesting that the Debtors "mirror the Code").

171.    Non-creditor Chartered Organizations are outside the scope of section 1141 of the Bankruptcy Code. From a due process perspective, the Debtors cannot broaden section 1141 of the Bankruptcy Code in order to attempt to bind non-creditors of the Debtors. Tens of thousands of non-creditor Chartered Organizations, including an unknown amount of Roman Catholic Chartered Organizations, did not file proofs of claim against the Debtors because they are not creditors and should not have their unrelated property rights impinged by the Debtors' proposed Plan. Additionally, the Debtors are attempting to bind Chartered Organizations to the Plan that

would confiscate their contractual indemnity rights arising from Chartered Organizations' own policies and the Additional Insured Rights Impairment.  Roman Catholic Chartered Organizations have no possibility to vote on the Additional Insured Rights Impairment because even if they voted to reject the Plan, their indemnity rights will still be impaired by a Settling Insurer.  *See, e.g.*, Plan, Art. X.H.  Any attempt to expand section 1141 violates the explicit provisions of the Bankruptcy Code and the requirements of due process.

### B. The Proposed Plan Discriminates Against Roman Catholic Chartered Organizations in Violation of Section 1123(a)(4) of the Bankruptcy Code.

172.    The proposed Plan fails to satisfy section 1123(a)(4) of the Bankruptcy Code with respect to Chartered Organizations that voted to reject because it singles out those Chartered Organizations and treats them differently than all other Chartered Organizations.  Section 1123(a)(4) provides that, absent a creditor's consent to less favorable treatment, a chapter 11 plan must "provide the same treatment for each claim or interest of a particular class . . . ."  11 U.S.C. § 1123(a)(4).  Courts are to enforce this provision according to its plain language.  *See In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 592 (D. Del. 2009) (citing *Hartford Underwriters Ins. Co. v. Union Planters*, 530 U.S. 1, 6 (2000)).

173.    Section 1123(a)(4) "embodies the principle that all similarly situated creditors in bankruptcy are entitled to equal treatment."  *In re Energy Future Holdings Corp.*, 648 Fed. App'x 277, 283 (3d Cir. Mar. 23, 2016).  In construing "equal treatment" under section 1123(a)(4), courts have interpreted "equal treatment" to mean that (i) all class members must be subject to the same process for claim satisfaction, (ii) all class members' claims must be of "equal value" through the application of the same pro rata distribution or payment percentage procedures to all claims, and (iii) *all class members must give up the same degree of consideration for their distribution under the plan*.  *In re W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir.

2013); *see also In re LightSquared, Inc.*, 534 B.R. 522, 537 (S.D.N.Y. 2015) (finding that equal treatment has two facets: first, all class members must receive equal value; and second, each class member must pay the same consideration in exchange for its distribution); *In re Breitburn Energy Partners LP*, 582 B.R. 321, 357-58 (Bankr. S.D.N.Y. 2018) (reiterating the view that section 1123(a)(4) requires equality of treatment, not outcome, and finding that proposed plan that provided all members within class an opportunity to subscribe to rights offering, pursuant to which any subscribing member would receive equity interest in reorganized debtor, did not violate section 1123(a)(4) though class members that elected not to subscribe would receive nothing under plan).

174.    The Third Circuit has instructed courts analyzing a reorganization plan's equality of distribution to "consider the bankruptcy scheme as an integrated whole in order to evaluate whether Plan confirmation is warranted." *W.R. Grace*, 475 B.R., at 121 (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 241 (3d Cir. 2004)).  Although section 1123(a)(4) may not expressly apply to bankruptcy settlements outside of a plan context, courts have found that "fidelity" to section 1123(a)(4)'s requirements to be an important factor when considering approval of a proposed settlement.  *Energy Future Holdings*, 648 Fed. App'x, at 284 ("[C]ore bankruptcy principles, such as the absolute priority rule and the equal treatment rule, which apply in the plan confirmation process, are not categorically applied in the settlement context….This does not mean, however, that such rules can be ignored.  Indeed, a settlement's fidelity to the requirements of the Bankruptcy Code will generally be the most important factor in determining whether a settlement is fair and equitable."); *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (permitting differing treatment to a creditor who agrees to settle instead of litigating in the context of section 1123(a)(4)); *In re Energy Future Holding Corp.*, 527 B.R. 157, 168 (D. Del. 2015)

(holding that a plan did not violate section 1123(a)(4) because each noteholder had the opportunity to decline the settlement offer and litigate its claim). Indeed, "perfect or precise equality is not required—only approximate equality." *W.R. Grace & Co.*, 475 B.R. 34, at 121 (D. Del. 2012); *In re W.R. Grace & Co.*, 729 F.3d 311, 327-28 (3d Cir. 2013) ("Therefore, differences in the timing of distributions and other procedural variations that have a legitimate basis do not generally violate section 1123(a)(4) unless they produce a substantive difference in a claimant's opportunity to recover.").

175.    In *W.R. Grace*, the court found that the plan (and its trust distribution procedures) satisfied the requirements for equal treatment under section 1123(a)(4) of the Bankruptcy Code because all indirect claimants were treated the same. *Id.*, 475 B.R., at 130-31 (walking through the trust distribution procedures that are applicable for all indirect claimants and stating that "[n]o indirect claimant under [the plan] will take a different route—all claimants will follow the same track to recovery"). The court further found that "all similarly situated indirect claimants here are giving up the same degree of consideration—the possibility that they could receive a higher award in the tort system, or inversely, a lower award—in order to participate in the Joint Plan and receive a definitively set amount of distribution from the trust." *Id.* at 133.

176.    However, the Debtors' Plan provides disparate treatment for the Chartered Organizations and is therefore distinguishable from the plan in *W.R. Grace*. Under the proposed Plan, the Chartered Organizations are not "Protected Parties" or "Limited Protected Parties." To become Protected Parties, the Chartered Organizations would need to be "Contributing Chartered Organizations," which include Chartered Organizations that have settled with the Debtors. *See* Plan, Art. I.A.77. To become Limited Protected Parties, the Chartered Organizations would need to be "Participating Chartered Organizations," which would require the Chartered Organizations

to stand down from pursing an objection to confirmation of the proposed Plan.  *See* Plan, Art. I.A.187.  The Plan further provides that all "Other Chartered Organizations" (which excludes the TCJC, Methodists, and Catholics) who do not object to the proposed Plan "are Participating Chartered Organizations ***and shall automatically become Contributing Chartered Organizations*** upon the Effective Date in accordance with the Other Chartered Organization Settlement ***and shall be deemed to have made the Participating Chartered Organization Settlement Contribution.***" *Id.* (emphasis added).  Given the settlements reached by the TCJC and the Methodists, the only Chartered Organization-holdouts are the Roman Catholic Chartered Organizations.  And because they are objecting to the Plan, they are not going to be considered "Participating Chartered Organizations."  Even if the Roman Catholic Chartered Organizations did not object to the proposed Plan, and were considered Participating Chartered Organizations under the proposed Plan, they would not "automatically" become Contributing Chartered Organizations like all Other Chartered Organizations because the proposed Plan, by its terms, treats Roman Catholic Chartered Organizations worse than all Other Chartered Organizations.

177.    Moreover, none of the Other Chartered Organizations need to financially contribute to the Settlement Trust—instead, they are each "deemed" to have made the Participating Chartered Organization Settlement Contribution.  The implicit assumption is that the Roman Catholic Chartered Organizations would need to contribute financially and refrain from objecting to the proposed Plan in order to receive the protections that all Other Chartered Organizations are receiving for nothing.[36]

---

[36]  Under the proposed Plan, claims against Protected Parties are enjoined and channeled to the Trust.  *See* Plan, Art. X.F.  Additionally, all holders of Abuse Claims are required to release the Protected Parties for all claims.  *Id.* at Art. X.J.3.

178.     This scheme singles out the Roman Catholic Chartered Organizations and does not provide them with equal treatment as required by section 1123(a)(4).  *See, e.g.*, *W.R. Grace*, 475 B.R., at 121 (holding that all class members must give up the same degree of consideration for their distribution under the plan to satisfy section 1123(a)(4)'s equal treatment).  Indeed, the Roman Catholic Chartered Organizations are required to make financial contributions in order to potentially become Protected Parties but all Other Chartered Organizations in Class 9 do not.  The Debtors do not justify this differing treatment. In fact, courts have suggested that the Plan's imposition of a death trap on Roman Catholic Chartered Organizations violates section 1124(a)(4). *In re Allegany Int'l., Inc.*, 118 B.R. 282, 304 n.15 (Bankr. W.D. Pa. 1990) ("[T]here is no authority in the Bankruptcy Code for discriminating against classes who vote against a plan of reorganization."); *In re MCorp Financial, Inc.*, 137 B.R. 219, 236 (Bankr. S.D. Tex. 1992) (following *Allegany*).

179.     Even if the Debtors attempt to argue that the Other Chartered Organizations are receiving better treatment in the context of a "settlement," the Roman Catholic Chartered Organizations were not offered the same opportunity—that is, the ability to become Protected Parties by simply refraining from objecting to the proposed Plan.  *See, e.g.*, *In re Energy Future Holding Corp.*, 527 B.R. 157, 168 (D. Del. 2015) (holding that the plan did not violate section 1123(a)(4) because each noteholder had the opportunity to decline the settlement offer and litigate its claim); *In re LightSquared, Inc.*, 534 B.R. 522, 537 (S.D.N.Y. 2015) (finding that equal treatment has two facets: first, all class members must receive equal value; ***and second, each class member must pay the same consideration in exchange for its distribution***).  All Other Chartered Organizations were given the status as Protected Parties for nothing, and the Roman Catholic Chartered Organizations were not given the same "settlement" opportunity in violation of section

1123(a)(4).  The Debtors cannot, and do not, justify the disparate treatment afforded to the Roman Catholic Chartered Organizations.  The Plan cannot be confirmed for this separate, independent ground.

### C.  The Proposed Plan Fails the Best Interests Test

180.    The Plan violates Section 1129(a)(7), which "is an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation."   7 COLLIER ON BANKRUPTCY ¶ 1129.02[7] (16th ed. 2020); 11 U.S.C. § 1129(a)(7) (A plan can only be confirmed if impaired creditors that have rejected the plan "will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.") (the "Best Interests Test").  The Best Interests Test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

181.    In accordance with the express language of section 1129(a)(7), the Court must consider the value of the property that each dissenting creditor will keep under a proposed plan versus that of the property that it would have retained in a hypothetical chapter 7 case.  *In re Quigley Co., Inc.*, 437 B.R. 102, 144-45 (Bankr. S.D.N.Y. 2010).  "In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation."  *In re Hercules Offshore, Inc.*, 565 B.R. 732, 765 (Bankr. D. Del. 2016) (citing *In re Washington Mut., Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011)).  In the context of non-consensual and unreciprocated third-party releases, the Best Interests Test requires the court to value any third-party claims held

and being released by impaired creditors and compare that value to what the creditor is receiving in the relevant bankruptcy case. *See Quigley Co.*, 437 B.R. at 145 ("'[G]iving at least liquidation value to each creditor requires protection of the [c]hapter 7 right to pursue non-debtor actions.'") (citation omitted); *see also In re Ditech Holding Corp.*, 606 B.R. 544, 614-15 (Bankr. S.D.N.Y 2019) (finding debtors to have failed the Best Interests Test due to their failure to account for the claims and defenses that certain consumer creditors would retain under Section 363(o) in a chapter 7 case). On its face, a chapter 11 plan that releases third-party claims of an impaired creditor who is not receiving any recovery does not comply with Section 1129(a)(7) and cannot be confirmed. *See In re SunEdison, Inc.*, 576 B.R. 453, 457 n.4 (Bankr. S.D.N.Y. 2017) (holding that creditors who would not receive distributions in *either* chapter 11 or 7 would not be bound by a plan's non-consensual releases of claims that would otherwise be retained in a chapter 7 case); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation."). Finally, a plan of reorganization "may not be confirmed where the evidence is not sufficient on which to base an independent factual determination that the proposed plan is in the best interests of the creditors pursuant to § 1129(a)(7)." *In re MCorp Fin., Inc.*, 137 B.R. 219, 228 (Bankr. S.D. Tex. 1992).

182.    The Roman Catholic Chartered Organizations are not receiving or retaining what they would receive in a chapter 7 liquidation of the Debtors, namely their rights as additional insureds under the Local Council Policies and as insureds under ***their own policies***. In exchange for forfeiting their rights under their own insurance policies and their rights as additional insureds, the Chartered Organizations are likely receiving nothing in return and will be stripped of the

policies that were intended to defend them.

### i.  Indirect Abuse Claims Will Not Receive a Recovery Under the Proposed Plan.

183.    According to the Disclosure Statement, Class 9 Indirect Abuse Claims are unknown, but expected to receive 10-21% or 31-63% "plus additional insurance rights"[37] and are "expected to yield up to 100% recovery." Disclosure Statement at 255.  The Liquidation Analysis, attached as Exhibit D to the Disclosure Statement, does not present any analysis related to Class 9 Indirect Abuse Claims, so it is unclear how the Debtors can satisfy the requirements of section 1129(a)(7) with respect to Class 9 Indirect Abuse Claims.  *See generally* Disclosure Statement, Ex. D, at 14, 20, 23-24.

184.    If a Class 9 Indirect Abuse Claimant was to receive a recovery, the proposed Plan is clear that Indirect Abuse Claimants' rights are subordinated to Direct Abuse Claims.  The TDPs state as follows:  "***In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant*** to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, ***including any rights with respect to timing, amount, percentage, priority, or manner of payment***."   TDP Art. IV.B (emphasis added).

185.    Additionally, any recovery on account of an Indirect Abuse Claim would be automatically capped in at least two ways.  *Id.* ("In addition, ***no Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid*** to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability. Further, ***in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount***

---

[37]  Under the proposed Plan, as discussed above, Roman Catholic COs will be stripped of their insurance policies and rights, so this reference appears outdated or false.

*of the related Direct Abuse Claim*.") (emphasis added).

186.    Finally, the Trust Distribution Procedures establish a number of draconian requirements that create barriers (if not eliminate the possibility) for Indirect Abuse Claimants to receive any recovery under the Plan.  Principally, Indirect Abuse Claimants must (i) have filed a claim in accordance with Bar Date Order, (ii) establish *to the satisfaction of the Settlement Trustee* that the claim is not otherwise subject to disallowance, (iii) establish *to the satisfaction of the Settlement Trustee* that Indirect Abuse Claimant paid the liability, (iv) release the Protected Parties from liability, (v) demonstrate that Indirect Abuse Claims are not barred by Statute of limitations, and (vi) demonstrate that they do not owe Debtors indemnity obligations.  *See id.* (emphasis added).

### ii.    Indirect Abuse Claimants Are Required to Forfeit Valuable Rights Under the Proposed Plan.

187.    As detailed above, Chartered Organizations will be stripped of their insurance policy rights as additional insureds and the Independent Coverage.  The Plan provides for an Insurance Entity Injunction that prevents "all Persons" from asserting any claims "against any Insurance Company" "in any way connected with any Abuse Insurance Policy *or other insurance policy issued by a Settling Insurance Company covering Abuse Claims*[.]"  Plan, Art. X.H.2 (emphasis added).  The Debtors propose to enjoin the Roman Catholic Chartered Organizations from utilizing *their own policies as well as their rights as additional insureds* under the Local Council Insurance Policies to defend themselves in any future litigation.  *See* Plan, Art. X.J.3 (requiring that "holders of an Abuse Claim covered *by any insurance policy issued by a Settling Insurance Company* shall, and shall be deemed to, release and discharge the Settling Insurance Companies from such Claims.") (emphasis added).  That is made even more clear by the exception to the Insurance Entity Injunction that would allow the Roman Catholic Chartered Organizations

to utilize their rights under any Abuse Insurance Policy that was issued by a Non-Settling Insurance Company. *Id.* (stating that the injunction shall not impair "the rights, if any, of any Opt-Out Chartered Organization under any Abuse Insurance Policy that was issued by a Non-Settling Insurance Company").[38]  In fact, the proposed Plan provides that the Channeling Injunction shall not enjoin "rights of holders of Abuse Claims to assert such an Abuse Claim against…(ii) an Opt-Out Chartered Organization to the extent such Abuse Claim is not covered by any insurance policy issued by a Settling Insurance Company."  Plan, Art. X.F.3.b.  Therefore, it is without question that the proposed Plan robs Chartered Organizations of their insurance rights.

188.    If litigation is pursued against any of the Roman Catholic Chartered Organizations, they will need to spend money to defend themselves without the benefit of their own Insurance Coverage, and without any commitment from the Settlement Trust to reimburse or indemnify them.  Indeed, the Plan specifically contemplates, and does not enjoin, any Person from asserting or prosecuting an Abuse Claim against an Opt-Out Chartered Organization to the extent that such Claim is not covered under an insurance policy issued by a Settling Insurance Company.  *See* Plan, Art. X.H.3.d.  Should Chartered Organizations stand down on their objections and become a "Limited Protected Party", any Person may still assert or prosecute an Abuse Claim against them to the extent that it arose prior to January 1, 1976 and is not covered under an insurance policy issued by a Settling Insurance Company.  *Id.*  Either way, the proposed Plan fails the Best Interests Test.  By forcing Chartered Organizations to release claims against insurers, and relinquishing their rights as additional insureds under the BSA Insurance Policies and Local Councils Insurance Policies ***and*** forfeiting their rights under their own Independent Coverage, the Roman Catholic

---

[38]  Of course, the concept of the "Chartered Organization Reserved Policies" was excised entirely from the Plan.  *See* Docket No. 7834 at 21 (redline of prior plan).

Chartered Organizations are necessarily receiving less than they would receive in a chapter 7 liquidation

189.    Simply put, it seems likely that the Class 9 Indirect Abuse Claimants will receive no recovery under the proposed Plan while being forced to relinquish valuable rights and assets. Indeed, the Roman Catholic Chartered Organizations' ability to directly tender claims under the Scouting policies (either the Debtors', Local Councils', or their own) would provide an opportunity for *full* recovery, whereas Chartered Organizations currently stand to recover ***nothing*** under the Plan.  Of course, the Roman Catholic Chartered Organizations would have the ability to utilize these assets in a hypothetical chapter 7 liquidation.  For these reasons, the proposed Plan cannot be confirmed under section 1129(a)(7) of the Bankruptcy Code.

### D.  The Plan Violates the Automatic Stay Protecting the Property of the Estate of the Debtor Chartered Organizations.

190.    Currently, several Roman Catholic dioceses and archdioceses are debtors-in-possession in bankruptcies across the country, and some have filed claims against the Debtors. *See*, *e.g.*, *In re The Roman Catholic Church of the Archdiocese of New Orleans*, No. 20-10846 (Bankr. E.D. La.); *In re Roman Catholic Church of the Archdiocese of Santa Fe*, No. 18-10327 (Bankr. D.N.M.); *In re The Diocese of Buffalo, N.Y.*, No. 20-10322 (Bankr. W.D.N.Y.); *In re The Diocese of Rochester*, No. 19-20905 (Bankr. W.D.N.Y.); *In re The Roman Catholic Diocese of Syracuse, New York*, No. 20-30663 (Bankr. N.D.N.Y.); *In re Roman Catholic Diocese of Harrisburg*, No. 20-00599 (Bankr. W.D. Pa.); *In re The Roman Catholic Diocese of Rockville Centre, New York*, No. 20-12345 (Bankr. S.D.N.Y.); *In re The Roman Catholic Diocese of Norwich*, No. 21-20687 (Bankr. D. Conn.); *In re The Archbishop of Agaña*, No. 19-00010 (Bankr. D. Guam). Proceeding to divest these debtor Chartered Organizations of their property rights would amount to a willful violation of the automatic stay.

191.    Section 362(a) of the Bankruptcy Code provides, in relevant part, that "a petition filed under section 301 . . . of this title . . . operates as a stay, applicable to all entities, of -

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

11 U.S.C. § 362(a)(3).

192.    Whether a particular asset is property of the estate belonging to the debtor Chartered Organizations is governed by section 541 of the Bankruptcy Code, which defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C.§ 541(a)(1); *In re Prudential Lines, Inc.*, 107 B.R. 832, 837 (Bankr. S.D.N.Y. 1989). Section 541 is intended to be interpreted broadly and applies to property "wherever located and by whomever held." *Matter of Cont'l Airlines, Inc.*, 134 B.R. 536, 541 (Bankr. D. Del. 1991). The question of whether the debtor has an interest in property, thus making such property part of the estate is governed by state law. *Butner v. United States,* 440 U.S. 48, 54 (1979).

193.    As noted above, courts have uniformly held that insurance policies are property of a debtor's estate. *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) (stating that "[n]umerous courts have determined that a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction."), *cert. denied*, 488 U.S. 868 (1988); *see also First Fidelity Bank v. McAteer*, 985 F.2d 114, 116 (3d Cir. 1993); *Louisiana World Exposition, Inc. v. Federal Ins. Co.*, 832 F.2d 1391, 1399 (5th Cir. 1987); *Minoco Group of Cos. v. First State Underwriters Agency*, 799 F.2d 517, 519 (9th Cir. 1986); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1001 (4th Cir. 1986).

194.    With respect to insurance rights, such as proceeds and other contractual rights arising out of insurance policies, the general rule is that such rights are property of the estate to the

extent they may inure to the pecuniary benefit or detriment of the debtor. *In re W.R. Grace & Co.*, 475 B.R. 34, 81 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd,* 729 F.3d 311 (3d Cir. 2013), and *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) (noting the "general rule followed by most jurisdictions, including the Third Circuit, that the proceeds of a debtor's liability insurance policies are considered property of its bankruptcy estate" especially where the debtor has a right to coverage under such policy).

195.    The insurance policies issued to, or on behalf of, the debtor Chartered Organizations in connection with the BSA are valuable assets of the debtor Chartered Organizations' bankruptcy estates because they provide pecuniary benefit to the debtor Chartered Organizations' estates, and include (i) the debtor Chartered Organizations' insurance rights in their own insurance policies and (ii) their additional insured rights under policies procured by the Debtors and Local Councils.  These rights are protected by section 362(a)(3) of the Bankruptcy Code and may not be impacted by a third party absent relief from the automatic stay.

196.    Under the Plan, the debtor Chartered Organizations are treated separately from the other Chartered Organizations, in that the debtor Chartered Organizations are expressly deemed to have ***opted out*** of the Plan unless they submit a writing to the Debtors confirming their election to opt in to the Plan, whereas all other Chartered Organization are deemed to have ***opted in*** to the Plan without taking further action. *See* Plan, Art. I.A.187.

197.    Despite their status as opted-out Chartered Organizations who do not participate under the Plan, the Plan improperly impairs three important legal rights, or assets, of the debtor Chartered Organizations' bankruptcy estates: (i) their insurance rights; (ii) their additional insured rights; and (iii) their Indirect Abuse Claims against Protected Parties.

198.     Under the Plan, the broad Insurance Entity Injunction will bar the debtor Chartered Organizations from submitting direct claims and claims for indemnification and contribution to Settling Insurance Companies, as the Insurance Entity Injunction enjoins the submission of any claim against a Settling Insurance Company that arises out of, or that is in "any way connected with any Abuse Insurance Policy or other insurance policy issued by a Settling Insurance Company." *See* Plan, Art. X.H.2.  This prohibition will control irrespective of whether the debtors obtain relief from the stay in the debtor Chartered Organizations' chapter 11 cases and will result in the unilateral removal of valuable assets from the debtor Chartered Organizations' estates.  In addition, the debtor Chartered Organizations' estates will be forced to incur significant sums if they are required to defend Abuse Claims during the post-confirmation period without the benefit of indemnification and contribution rights against insurers.  None of the debtor Chartered Organizations have consented to stay relief.

199.     The debtor Chartered Organizations' rights under the Abuse Insurance Policies are also impaired by the insurance 363 sale because the sale is to be made "free and clear of all interests of any Person or Entity", without a carve-out that protects the interests of debtor Chartered Organizations.  *See* Plan, Art. V.S.3.

200.     As a result, the debtor Chartered Organizations will no longer be permitted to exercise their contractual right to defense and indemnity for liability arising out of an Abuse Claim against any Settling Insurance Company, even if the debtor Chartered Organizations remain opted-out of the Plan.  This loss of right to exercise contractual rights is clearly an attempt by the Debtors to obtain possession and control or property belonging to the debtor Chartered Organizations' bankruptcy estates.

201.    Finally, the Indirect Abuse Claims of debtor Chartered Organizations are also property of their bankruptcy estates. *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 436-37 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) ("A debtor's interests in property, including causes of action, are defined by state law.").  Practically every state provides either a common law or statutory cause of action against insurers acting in bad faith because such insurer settled with other insureds thereby exhausting the policy limits. *See, e.g.*, *Brassil v. Maryland Cas. Co.*, 210 N.Y. 235, 242 (1914); *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1275 (Del. 2016). Many of the debtor Chartered Organizations may have Indirect Abuse Claims against the Settling Insurance Companies, but because of the Insurance Entity Injunction, such claims will be enjoined without the consent of the debtor Chartered Organizations or the approval of their respective bankruptcy courts.

202.    Having established that the Debtor Chartered Organizations' Indirect Abuse Claims and, their insurance rights are property of their respective bankruptcy estates, any attempt to impair those rights is a violation of section 362(a)(3) of the Bankruptcy Code.  The Plan as it is currently drafted impermissibly impairs the rights of the Debtor Chartered Organizations, and consequently, the Plan is not confirmable.  11 U.S.C. §§ 1129(a)(1), (a)(2).

203.    In light of the forgoing, the RCAHC respectfully submits that the Court should deny confirmation of the Plan.  However, should the Court permit the Plan to be confirmed, at minimum, this Court's confirmation order should include a clear statement that, notwithstanding any provision of the Plan or any Insurance Settlement Agreement to the contrary, neither the Plan nor any Insurance Settlement Agreement, release or document delivered in connection therewith shall, absent (i) the written agreement of the debtor Chartered Organizations, and (ii) the approval of their bankruptcy courts, affect any of the property or insurance rights of any debtor Chartered

Organization.

### E. The Debtors' Plan is Not Proposed in Good Faith.

204.    A plan cannot be confirmed unless it is proposed in good faith.  11 U.S.C. §
1125(a)(3); *see also Combustion Eng'g*, 391 F.3d at 246 ("Courts and commentators have
recognized the good faith requirement provides an additional check on a debtor's intentional
impairment of claims.")  While the Bankruptcy Code does not define good faith, the Third Circuit
has instructed that "the important point of inquiry is the plan itself and whether such a plan will
fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Id.* at
247; *see also Am. Capital Equip.*, 688 F.3d at 154 (Bankruptcy Code's objectives include
discouraging debtor misconduct and achieving fundamental fairness and justice).

205.    The Plan is not proposed in good faith because its terms reflect the Debtors'
capitulation to the demands of certain Direct Abuse Claimants, the Settling Insurance Companies
and their counsel to the detriment of Chartered Organizations and other key stakeholders, who
were not invited to the bargaining table.  *See In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del.
2004) ("[G]iven the unbridled dominance of the [prepetition tort claimants'] committee in the
debtor's affairs and actions during the prepetition period, its continued influence flowing from its
majority status on the postpetition creditors committee, and the obvious self-dealing that resulted
from control of the debtor, it is impossible to conclude that the plan was consistent with the
objectives and purposes of the bankruptcy code."); *Off. Comm. of Unsecured Creditors of New
World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 571 (M.D. Pa. 2005) (debtors have an
"obligation to their creditors to propose a plan that is fair to all creditors and not to let one creditor
class dominate the formulation of a plan.").

206.    The Plan is overwhelmingly skewed against Chartered Organizations at the behest
of certain Direct Abuse Claimants, the Settling Insurance Companies in ways that push beyond

the clear legal boundaries of bankruptcy and nonbankruptcy law:

- The Plan allows the Settling Insurance Companies to strip Chartered Organizations of their independent insurance property even though the Debtors have no interest (the Chartered Organization's Insurance Policies), or only interest as an insured (BSA Insurance Policies) or additional insured (Local Council Insurance Policies).

- In exchange, the Plan offers a worthless Indirect Claim and requires a ransom to pay for a blanket protection of a release in Channeling Injunction against tort litigation and expensive coverage litigation against the Trust and Settling Insurers.

- The Plan would launder the Local Council Insurance Policies merely to resell them to strip off Chartered Organizations rights as independent additional insureds.

- The Plan denies due process to Chartered Organizations by denying Indirect Abuse Claims that were late-filed because Chartered Organizations never received any prior notice of claims or even threatened claims against them despite the Debtors' knowledge thereof.

- The Plan ignores the automatic stay applicable to other Chartered Organizations that are themselves Chapter 11 debtors.

- The Plan discriminates against Catholic Chartered Organizations by requiring a cash contribution for essential releases and protection provided for free to Other Chartered Organizations.

- The Plan lacks the overwhelming support of Chartered Organizations required by *Millennium;* indeed, many Chartered Organizations opted out of the releases.

- Chartered Organizations have yet to receive individualized notice from the Debtors informing them of abuse claims, even though the Debtors have access to those claims and information concerning which claims are associated with particular Chartered Organizations.

207.    In sum, the Plan sets up Roman Catholic Chartered Organizations to be the targets of future tort litigation by Abuse Claimants whose lawyers are funded by their share of Abuse Claim distributions.  The Plan simultaneously deprives the Chartered Organizations of their insurance shields of the Settling Insurance Companies duties to defend and indemnify them against this onslaught of litigation.  All of this was done by a suppression of claims information that deprived these volunteer organizations of information about their exposure to claims known only to the Debtors and other mediation parties that were bound not to disclose the claims to targeted

Chartered Organizations.  Hence, the Chartered Organizations lacked knowledge of the need to file proofs of claim or objections to the Plan to protect themselves from the seizure of their property.  The Chartered Organizations won't know what hit them if the Effective Date of this Plan and its overbroad third-party releases, injunctions and insurance buy-backs occurs.  This Court should not permit that because the Debtors' bad faith connects the dots for this shabby treatment of Chartered Organizations that the Debtor claimed were the life blood of Scouting.  As such, the Plan should not be confirmed.

## CONCLUSION

For the reasons stated herein, the RCAHC respectfully requests that the Court deny the confirmation of the Plan and grant such other relief as it deems appropriate.

Dated: February 4, 2022
Wilmington, Delaware

Respectfully submitted,

**POTTER ANDERSON & CORROON LLP**

/s/ *Jeremy W. Ryan*
Jeremy W. Ryan (Bar No. 4057)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com

-and-

**SCHIFF HARDIN LLP**

/s/ *Everett Cygal*
Everett Cygal, *admitted pro hac vice*
David Spector, *admitted pro hac vice*
J. Mark Fisher, *admitted pro hac vice*
Neil Lloyd, *admitted pro hac vice*
Daniel Schufreider, *admitted pro hac vice*
Jin Yan, *admitted pro hac vice*
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600
Email: ecygal@schiffhardin.com
          dspector@schiffhardin.com
          mfisher@schiffhardin.com
          nlloyd@schiffhardin.com
          dschufreider@schiffhardin.com
          jyan@schiffhardin.com

*Counsel for the Roman Catholic Ad Hoc Committee*

**EXHIBIT A**



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# NY Archdiocese Says Insurers Must Cover Sex Abuse Suits

By **Hailey Konnath**

Law360 (July 1, 2019, 9:00 PM EDT) -- The Archdiocese of New York, one of the biggest Catholic dioceses in the country, has hit more than 30 past and present insurers with a lawsuit demanding liability coverage for child sexual abuse suits the church expects to face in the wake of a new state law.

The Child Victims Act, signed into law in February, permits individuals who were sexually abused as children to sue their abusers, even though the statute of limitations typically bars such claims. Victims can file suit during a one-year window, which opens in August, according to the law.

The archdiocese has already received notice of petitions or lawsuits that will be filed in August, according to the 21-page complaint filed Friday in New York state court. But although the archdiocese has held liability insurance policies for decades, some insurers plan to dispute or deny coverage for those claims, it said.

In particular, Insurance Co. of North America, now part of Chubb North America, has said it won't cover one of the first suits to come down the pipeline, according to the complaint.

"The insurance coverage issues raised in this case not only affect the archdiocese, but also other religious organizations, schools, hospitals and other institutions throughout the state of New York," the archdiocese said. "The resolution of such issues could significantly impact the ability of such organizations to continue their operations and, at the same time, provide meaningful compensation to sexual abuse survivors."

The Archdiocese of New York encompasses 10 counties and is made up of 300 parishes and about 200 schools, according to the complaint. It also supports a handful of nonprofits that provide medical care, support for homeless and low-income families, the archdiocese said.

On Feb. 14, New York Gov. Andrew Cuomo signed the state's Child Victims Act into law.

"If the experience in other jurisdictions that have passed 'window' statutes is any indication, when the one-year 'window' opens pursuant to the CVA, numerous claimants who did not participate in the [2016 program] will likely assert claims and file suits against the archdiocese alleging sexual abuse and physical abuse and seeking damages," the archdiocese said.

The archdiocese has held liability insurance since the early 1950s, it said, and it is up to date on its premiums.

Earlier this year, the archdiocese received notice that an alleged victim had filed a suit, which will become effective in August. The archdiocese then passed along the suit to its insurer at the time of the alleged abuse in the 1970s: Insurance Co. of North America.

In May, Chubb sent a letter denying any obligation to defend or indemnify the archdiocese in the matter, saying the victim alleged "to have sustained injury that was expected and/or intended from the standpoint of the archdiocese." Such allegations don't "give rise" to Insurance Co. of North America's coverage per its policies, the company said in the letter.

In Friday's complaint, the archdiocese said that was not the case.

"Chubb and INA lack a reasonable basis to deny the duty to defend the archdiocese against the [suit] and ignore the terms of the insurance policies," it said. "The [suit] does not allege that the archdiocese unequivocally expected or intended all of the alleged injury."

Rather, the suit seeks to hold the archdiocese liable even though it may not have expected, intended or had knowledge of the abuse, the archdiocese said. Therefore, the insurance company has a duty to defend the archdiocese, it said.

Joseph Zwilling, a spokesman for the archdiocese, said in a statement provided to Law360 on Monday that Chubb's denial "leaves the archdiocese with no choice but to commence a lawsuit to ask the court to order Chubb to stand behind their insurance policies," Zwilling said.

Chubb declined to comment Monday.

The archdiocese is represented by James R. Murray, Jared Zola, Robyn L. Michaelson and James S. Carter of Blank Rome LLP.

Counsel information for the defendants wasn't immediately available Monday.

The case is The Archdiocese of New York v. Insurance Co. of North America et al., case number 653772/2019, in New York Supreme Court for the County of New York.

--Editing by Kelly Duncan.

All Content © 2003-2022, Portfolio Media, Inc.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE ARCHDIOCESE OF NEW YORK,

          Plaintiff,

against

INSURANCE COMPANY OF NORTH AMERICA,
AGCS MARINE INSURANCE COMPANY (F/K/A
INTERSTATE INDEMNITY COMPANY), AIU
INSURANCE COMPANY, AMERICAN EMPIRE
SURPLUS LINES INSURANCE COMPANY (F/K/A
GREAT AMERICAN SURPLUS LINES INSURANCE
COMPANY), ARROWOOD INDEMNITY COMPANY
(SUCCESSOR-IN-INTEREST TO ROYAL INDEMNITY
COMPANY AND F/K/A ROYAL INSURANCE
COMPANY OF AMERICA), CONTINENTAL
INSURANCE COMPANY (SUCCESSOR-IN-INTEREST
TO FIDELITY AND CASUALTY COMPANY OF NEW
YORK AND NIAGARA FIRE INSURANCE
COMPANY), EXECUTIVE RISK INDEMNITY INC.
(SUCCESSOR-IN-INTEREST TO AMERICAN EXCESS
INSURANCE COMPANY), FEDERAL INSURANCE
COMPANY, FIREMAN'S FUND INSURANCE
COMPANY, FIRST STATE INSURANCE COMPANY,
GREAT AMERICAN ASSURANCE COMPANY (F/K/A
AGRICULTURAL INSURANCE COMPANY), GREAT
AMERICAN INSURANCE COMPANY OF NEW YORK
(F/K/A AMERICAN NATIONAL FIRE INSURANCE
COMPANY), GREAT NORTHERN INSURANCE
COMPANY, HARTFORD UNDERWRITERS
INSURANCE COMPANY (F/K/A NEW YORK
UNDERWRITERS INSURANCE COMPANY),
HUDSON INSURANCE COMPANY, INDEMNITY
INSURANCE COMPANY OF NORTH AMERICA
(F/K/A INA INSURANCE COMPANY), LEXINGTON
INSURANCE COMPANY, CERTAIN LONDON
MARKET COMPANIES, MARKEL AMERICAN
INSURANCE COMPANY, MUNICH REINSURANCE
AMERICA (F/K/A AMERICAN RE-INSURANCE
COMPANY), NATIONAL FIRE INSURANCE
COMPANY OF HARTFORD (SUCCESSOR-IN-
INTEREST TO TRANSCONTINENTAL INSURANCE
COMPANY), NATIONAL SURETY CORPORATION,
NATIONAL UNION FIRE INSURANCE COMPANY OF

Index No.:

Date Summons filed: June 28,
2019

**SUMMONS**

PITTSBURGH, PA (SUCCESSOR-IN-INTEREST TO
LANDMARK INSURANCE COMPANY), OHIO
CASUALTY INSURANCE COMPANY, PACIFIC
EMPLOYERS INSURANCE COMPANY, ST. PAUL
SURPLUS LINES INSURANCE COMPANY, TIG
INSURANCE COMPANY (SUCCESSOR-IN-INTEREST
TO INTERNATIONAL INSURANCE COMPANY),
TWIN CITY FIRE INSURANCE COMPANY, CERTAIN
UNDERWRITERS AT LLOYD'S, LONDON,
WESTCHESTER FIRE INSURANCE COMPANY, and
VIGILANT INSURANCE COMPANY,

> Defendants.

**TO THE ABOVE NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the attached complaint of the Plaintiff in

this action and to serve a copy of your answer on the Plaintiff's attorneys at the address stated

below.

If this summons was personally delivered to you in the State of New York, you must

serve the answer within 20 days after service, excluding the day of service.  If this summons was

not personally delivered to you in the State of New York, you must serve the answer within 30

days after service of the summons is complete, as provided by law.

If you do not serve an answer to the attached complaint within the applicable time

limitation stated above, a judgment may be entered against you, by default, for the relief

demanded in the complaint.

The Plaintiff designates New York County as the place of trial.

The basis of venue is that one or more Defendants reside in New York County within the

meaning of CPLR § 503.

Dated:  New York, New York
        June 28, 2019

**BLANK ROME LLP**



By:_____
       James R. Murray
       Jared Zola
       Robyn L. Michaelson
       1271 Avenue of the Americas
       New York, New York 10020
       Telephone: (212) 885-5209
       Facsimile: (917) 591-8538
       jmurray@blankrome.com
       jzola@blankrome.com
       rmichaelson@blankrome.com

       James S. Carter
       (*pro hac vice* application to be submitted)
       1825 Eye Street NW
       Washington, DC 20006
       Telephone: (202) 420-3409
       Facsimile: (202) 420-2201
       jscarter@blankrome.com

       *Counsel for the Archdiocese of New York.*

TO:

AGCS Marine Insurance Company
225 W. Washington Street
Suite 1800
Chicago, Illinois 60606

AIU Insurance Company
175 Water Street
24th Floor
New York, New York 10038

American Empire Surplus Lines Insurance Company
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801

Arrowood Indemnity Company
c/o Corporation Service Company

3

251 Little Falls Drive
Wilmington, Delaware 19808

Continental Insurance Company
100 Matsonford Road, Suite 200
Radnor, Pennsylvania 19087

Executive Risk Indemnity Inc.
c/o CT Corporation System
1209 Orange Street
Wilmington, Delaware 19801

Federal Insurance Company
c/o CT Corporation System
150 West Market Street, Suite 1800
Indianapolis, Indiana 46204

Fireman's Fund Insurance Company
c/o CT Corporation System
818 W 7th Street, Suite 930
Los Angeles, California 90017

First State Insurance Company
c/o CT Corporation System
67 Burnside Avenue
East Hartford, Connecticut 06106

Great American Assurance Company
301 East 4th Street
Cincinnati, Ohio 45202

Great American Insurance Company of New York
301 East 4th Street, 24th Floor
Cincinnati, Ohio 45202

Great Northern Insurance Company
c/o CT Corporation System
150 West Market Street, Suite 1800
Indianapolis, Indiana 46204

Hartford Underwriters Insurance Company
c/o CT Corporation System
67 Burnside Avenue
East Hartford, Connecticut 06108

Hudson Insurance Company
c/o The Corporation Trust Company

4

1209 Orange Street
Wilmington, Delaware 19801

Certain Underwriters at Lloyd's, London
c/o Mendes & Mount
750 Seventh Avenue
New York, New York 10019

Indemnity Insurance Company of North America
c/o CT Corporation System
600 North 2nd Street, Suite 401
Harrisburg, Pennsylvania 17101

Insurance Company of North America
c/o CT Corporation System
600 North 2nd Street, Suite 401
Harrisburg, Pennsylvania 17101

Lexington Insurance Company
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

Lexington Insurance Company
Counsel, Legal Department
200 State Street
Boston, Massachusetts 02109

Certain London Market Companies
c/o Mendes & Mount
750 Seventh Avenue
New York, New York 10019

Markel American Insurance Company
c/o Richard R. Grinnan
4521 Highwoods Parkway
Glen Allen, Virginia 23060

Munich Reinsurance America
c/o Corporate Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

National Fire Insurance Company of Hartford
151 N. Franklin Street
Chicago, Illinois 60606

National Surety Corporation
225 W. Washington Street, Suite 1800,
Chicago, Illinois 60606

National Union Fire Insurance Company of Pittsburgh, PA
c/o Corporation Service Company
2595 Interstate Drive, Suite 103
Harrisburg, Pennsylvania 17110

Ohio Casualty Insurance Company
c/o Corporation Service Company
10 Ferry Street, Suite 313
Concord, New Hampshire 03301

Pacific Employers Insurance Company
c/o CT Corporation System
600 North 2nd Street, Suite 401
Harrisburg, Pennsylvania 17101

St. Paul Surplus Lines Insurance Company
c/o The Prentice-Hall Corporation System, Inc.
251 Little Falls Drive
Wilmington, Delaware 19808

St. Paul Surplus Lines Insurance Company
c/o Nicholas Seminara, President
445 Minnesota Street, Suite 900
St. Paul, Minnesota 55101

TIG Insurance Company
c/o CT Corporation System
818 West Seventh Street, Suite 930
Los Angeles, California 90017

Twin City Fire Insurance Company
c/o CT Corporation System
150 West Market Street, Suite 800
Indianapolis, Indiana 46204

Westchester Fire Insurance Company
c/o CT Corporation System
600 North 2nd Street, Suite 401
Harrisburg, Pennsylvania 17110

Vigilant Insurance Company
55 Water Street
New York, New York 10041

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

THE ARCHDIOCESE OF NEW YORK,

                Plaintiff,

against

INSURANCE COMPANY OF NORTH
AMERICA, AGCS MARINE INSURANCE
COMPANY (F/K/A INTERSTATE INDEMNITY
COMPANY), AIU INSURANCE COMPANY,
AMERICAN EMPIRE SURPLUS LINES
INSURANCE COMPANY (F/K/A GREAT
AMERICAN SURPLUS LINES INSURANCE
COMPANY), ARROWOOD INDEMNITY
COMPANY (SUCCESSOR-IN-INTEREST TO
ROYAL INDEMNITY COMPANY AND F/K/A
ROYAL INSURANCE COMPANY OF
AMERICA), CONTINENTAL INSURANCE
COMPANY (SUCCESSOR-IN-INTEREST TO
FIDELITY AND CASUALTY COMPANY OF
NEW YORK AND NIAGARA FIRE INSURANCE
COMPANY), EXECUTIVE RISK INDEMNITY
INC. (SUCCESSOR-IN-INTEREST TO
AMERICAN EXCESS INSURANCE COMPANY),
FEDERAL INSURANCE COMPANY,
FIREMAN'S FUND INSURANCE COMPANY,
FIRST STATE INSURANCE COMPANY, GREAT
AMERICAN ASSURANCE COMPANY (F/K/A
AGRICULTURAL INSURANCE COMPANY),
GREAT AMERICAN INSURANCE COMPANY
OF NEW YORK (F/K/A AMERICAN NATIONAL
FIRE INSURANCE COMPANY), GREAT
NORTHERN INSURANCE COMPANY,
HARTFORD UNDERWRITERS INSURANCE
COMPANY (F/K/A NEW YORK
UNDERWRITERS INSURANCE COMPANY),
HUDSON INSURANCE COMPANY,
INDEMNITY INSURANCE COMPANY OF
NORTH AMERICA (F/K/A INA INSURANCE
COMPANY), LEXINGTON INSURANCE
COMPANY, CERTAIN LONDON MARKET
COMPANIES, MARKEL AMERICAN
INSURANCE COMPANY, MUNICH
REINSURANCE AMERICA (F/K/A AMERICAN

Index No.

**COMPLAINT**

JURY TRIAL REQUESTED

RE-INSURANCE COMPANY), NATIONAL FIRE
INSURANCE COMPANY OF HARTFORD
(SUCCESSOR-IN-INTEREST TO
TRANSCONTINENTAL INSURANCE
COMPANY), NATIONAL SURETY
CORPORATION, NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PA
(SUCCESSOR-IN-INTEREST TO LANDMARK
INSURANCE COMPANY), OHIO CASUALTY
INSURANCE COMPANY, PACIFIC
EMPLOYERS INSURANCE COMPANY, ST.
PAUL SURPLUS LINES INSURANCE
COMPANY, TIG INSURANCE COMPANY
(SUCCESSOR-IN-INTEREST TO
INTERNATIONAL INSURANCE COMPANY),
TWIN CITY FIRE INSURANCE COMPANY,
CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON, WESTCHESTER FIRE INSURANCE
COMPANY, and VIGILANT INSURANCE
COMPANY,

                    Defendants.

Plaintiff the Archdiocese of New York (the "Archdiocese"), by and through its attorneys,

brings this Complaint against Insurance Company of North America ("INA"), AGCS Marine

Insurance Company (f/k/a Interstate Indemnity Company), AIU Insurance Company ("AIU"),

American Empire Surplus Lines Insurance Company (f/k/a Great American Surplus Lines Insurance

Company) ("American Empire"), Arrowood Indemnity Company (successor-in-interest to Royal

Indemnity Company and f/k/a Royal Insurance Company of America) ("Arrowood Indemnity"),

Continental Insurance Company (successor-in-interest to Fidelity and Casualty Company of New York

and Niagara Fire Insurance Company) ("Continental"), Executive Risk Indemnity Inc. (successor-in-

interest to American Excess Insurance Company) ("Executive Risk"), Federal Insurance Company

("Federal"), Fireman's Fund Insurance Company ("Fireman's Fund"), First State Insurance Company

("First State"), Great American Assurance Company (f/k/a Agricultural Insurance Company) ("Great

American Assurance"), Great American Insurance Company of New York (f/k/a American National

2

Fire Insurance Company), Great Northern Insurance Company ("Great Northern"), Hartford Underwriters Insurance Company (f/k/a New York Underwriters Insurance Company) ("Hartford Underwriters"), Hudson Insurance Company ("Hudson"), Indemnity Insurance Company of North America (f/k/a INA Insurance Company) ("IINA"), Lexington Insurance Company ("Lexington"), certain London Market Companies, Markel American Insurance Company ("Markel"), Munich Reinsurance America (f/k/a American Re-Insurance Company) ("Munich Re"), National Fire Insurance Company of Hartford (successor-in-interest to Transcontinental Insurance Company) ("National Fire"), National Surety Corporation ("National Surety"), National Union Fire Insurance Company of Pittsburgh, PA (successor-in-interest to Landmark Insurance Company) ("National Union"), Ohio Casualty Insurance Company ("Ohio Casualty"), Pacific Employers Insurance Company ("Pacific Employers"), St. Paul Surplus Lines Insurance Company, TIG Insurance Company (successor-in-interest to International Insurance Company) ("TIG"), Twin City Fire Insurance Company ("Twin City"), certain Underwriters at Lloyd's, London, Westchester Fire Insurance Company ("Westchester Fire"), and Vigilant Insurance Company ("Vigilant") (collectively, the "Insurers"), and alleges as follows:

## **BACKGROUND**

1.     This is a civil action for declaratory judgment and breach of contract relating to the Insurers' obligations pursuant to their respective insurance policies to provide coverage for claims and lawsuits against the Archdiocese based on allegations of childhood sexual abuse and to assist in compensating alleged victim-survivors.

2.     The insurance coverage issues raised in this case not only affect the Archdiocese, but also other religious organizations, schools, hospitals, and other institutions throughout the State of New York.  The resolution of such issues could significantly impact the ability

of such organizations to continue their operations and, at the same time, provide meaningful compensation to sexual abuse survivors.

3.      On February 14, 2019, Governor Andrew Cuomo of New York signed into law the Child Victims Act ("CVA").  The CVA revives liability for claims based on sexual abuse that were previously barred by the statute of limitations.  The CVA opens a one-year "window" for claimants to commence civil actions alleging revived sexual abuse claims.  The "window" in New York opens in August 2019.

4.      Prior to the enactment of the CVA, the Archdiocese undertook significant efforts to address allegations of sexual abuse.  As part of these efforts, the Archdiocese announced in 2016 its Independent Reconciliation and Compensation Program ("IRCP").   Through the IRCP, the Archdiocese addressed the allegations of sexual abuse of more than 300 victim-survivors of abuse.

5.      Despite these efforts, the Archdiocese is among the many institutions in New York that face potential liability due to the CVA for revived sexual abuse claims.  The CVA permits claimants who did not participate in the Archdiocese's IRCP to bring revived claims and suits against the Archdiocese alleging that the Archdiocese is liable for damages stemming from its purported negligence based on alleged sexual abuse of minors by clergy members.  Although the "window" has not opened, alleged victim-survivors have prematurely begun filing petitions and/or lawsuits against the Archdiocese, which will become effective once the "window" opens.

6.      The Archdiocese purchased liability insurance policies from the Insurers, paying premiums over the years.  The Insurers are obligated to provide coverage to the Archdiocese and other insureds under the liability policies for claims and lawsuits alleging sexual abuse and physical abuse.

7.      On information and belief, the Insurers, however, intend to dispute, limit, and/or deny coverage for claims and lawsuits alleging sexual abuse and physical abuse alleged against the Archdiocese, and certain Insurers have informed the Archdiocese that they intend to raise numerous

4

defenses to providing coverage.

## THE PARTIES

8.      The Archdiocese has been in existence since 1808 when it was canonically established as an unincorporated Catholic diocese by the Holy See of the Roman Catholic Church. Later established as an archdiocese by the Holy See, the Archdiocese of New York was incorporated under the New York Religious Corporations Law in 1981. The Archdiocese is comprised of ten counties—New York, Bronx, and Richmond counties in New York City and seven counties in the northern suburbs: Westchester, Rockland, Orange, Putnam, Dutchess, Ulster, and Sullivan counties. There are numerous separate not-for-profit corporations within the geographical boundaries of the Archdiocese that engage in religious, charitable and educational activities.  These services range from hospital and medical care to helping homeless families with meals, emergency shelter, and affordable housing.  Approximately 300 incorporated parishes and approximately 200 schools operate and provide services within this region, as well.

9.      Upon information and belief, Interstate Indemnity Company changed its name to AGCS Marine Insurance Company, which is a corporation organized under the laws of Illinois with its principal place of business in Chicago, Illinois and is licensed to operate in the State of New York. Upon information and belief, Interstate Indemnity Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

10.     Upon information and belief, AIU is a corporation organized under the laws of New York with its principal place of business in New York, New York.  Upon information and belief, AIU is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

11.     Upon information and belief, Great American Surplus Lines Insurance Company

5

changed its name to American Empire, which is a corporation organized under the laws of Delaware with its principal place of business in Cincinnati, Ohio.  Upon information and belief, Great American Surplus Lines Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

12.    Upon information and belief, Royal Indemnity Company merged into, and Royal Insurance Company of America changed its name to, Arrowood Indemnity, which is a corporation organized under the laws of Delaware with its principal place of business in Charlotte, North Carolina and is licensed to operate in the State of New York.  Upon information and belief, Royal Indemnity Company and Royal Insurance Company of America sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.   Arrowood Indemnity is a member of the Chubb Group of Insurance Companies.

13.    Upon information and belief, Fidelity and Casualty Company of New York and Niagara Fire Insurance Company merged into Continental, which is a corporation organized under the laws of Pennsylvania with its principal place of business in Chicago, Illinois and is licensed to operate in the State of New York.  Upon information and belief, Fidelity and Casualty Company of New York and Niagara Fire Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

14.    Upon information and belief, Executive Risk is a corporation organized under the laws of Delaware with its principal place of business in Wilmington, Delaware.  Upon information and belief, Executive Risk is licensed to operate in the State of New York and is a successor-in-interest to Executive Re Indemnity Inc., which is a successor-in-interest to ERIC Reinsurance Company, which is a successor-in-interest to American Excess Insurance Company, which sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-

6

survivors allege abuse.  Executive Risk is a member of the Chubb Group of Insurance Companies.

15.    Upon information and belief, Federal is a corporation organized under the laws of Indiana with its principal place of business in Indianapolis, Indiana.  Upon information and belief, Federal is licensed to operate in the State of New York, and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.  Federal is a member of the Chubb Group of Insurance Companies.

16.    Upon information and belief, Fireman's Fund is a corporation organized under the laws of California with its principal place of business in Chicago, Illinois.  Upon information and belief, Fireman's Fund sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

17.    Upon information and belief, First State is a corporation organized under the laws of Connecticut with its principal place of business in Boston, Massachusetts.  Upon information and belief, First State sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

18.    Upon information and belief, Agricultural Insurance Company changed its name to Great American Assurance, which is a corporation organized under the laws of Ohio with its principal place of business in Cincinnati, Ohio and is licensed to operate in the State of New York. Upon information and belief, Agricultural Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

19.    Upon information and belief, American National Fire Insurance Company changed its name to Great American Insurance Company of New York, which is a corporation organized under the laws of New York with its principal place of business in Cincinnati, Ohio.  Upon information and belief, American National Fire Insurance Company sold insurance policies providing

coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

20.     Upon information and belief, Great Northern is a corporation organized under the laws of Indiana with its principal place of business in Indianapolis, Indiana.  Upon information and belief, Great Northern is licensed to operate in the State of New York, and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.  Great Northern is a member of the Chubb Group of Insurance Companies.

21.     Upon information and belief, New York Underwriters Insurance Company changed its name to Hartford Underwriters, which is a corporation organized under the laws of Connecticut with its principal place of business in Hartford, Connecticut and is licensed to operate in the State of New York.  Upon information and belief, New York Underwriters Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

22.     Upon information and belief, Hudson is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.  Upon information and belief, Hudson is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

23.     Upon information and belief, INA Insurance Company changed its name to IINA, which is a corporation organized under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania and is licensed to operate in the State of New York.  Upon information and belief, INA Insurance Company and IINA sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

24.     Upon information and belief, INA is a corporation organized under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania and is licensed to operate in the State of New York.  Upon information and belief, INA sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.  INA is a member of the Chubb Group of Insurance Companies.

25.     Upon information and belief, Lexington is a corporation organized under the laws of Delaware with its principal place of business in Boston, Massachusetts.  Upon information and belief, Lexington sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

26.     Upon information and belief, certain London Market Companies that subscribed to liability policies that the Archdiocese purchased through Arthur J. Gallagher & Co. and its affiliates are organized under the laws of the United Kingdom with their principal places of business in London, England.  Upon information and belief, London Market Companies sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

27.     Upon information and belief, Markel is a corporation organized under the laws of Virginia with its principal place of business in Glenn Allen, Virginia.  Upon information and belief, Markel is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

28.     Upon information and belief, American Re-Insurance Company changed its name to Munich Re, which is a corporation organized under the laws of Delaware with its principal place of business in New Jersey and is licensed to operate in the State of New York.  Upon information and belief, American Re-Insurance Company sold insurance policies providing coverage to the

9

Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

29.    Upon information and belief, Transcontinental Insurance Company merged with National Fire, which is a corporation organized under the laws of Illinois with its principal place of business in Chicago, Illinois and is licensed to operate in the State of New York.  Upon information and belief, Transcontinental Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

30.    Upon information and belief, National Surety is a corporation organized under the laws of Illinois with its principal place of business in Chicago, Illinois.  Upon information and belief, National Surety is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

31.    Upon information and belief, Landmark Insurance Company merged with National Union, which is a corporation organized under the laws of Pennsylvania with its principal place of business in Harrisburg, Pennsylvania.  Upon information and belief, National Union is licensed to operate in the State of New York.  Upon information and belief, National Union and Landmark Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

32.    Upon information and belief, Ohio Casualty is a corporation organized under the laws of New Hampshire with its principal place of business in Boston, Massachusetts.  Upon information and belief, Ohio Casualty is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

33.    Upon information and belief, Pacific Employers is a corporation organized under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

10

Upon information and belief, Pacific Employers is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.  Pacific Employers is a member of the Chubb Group of Insurance Companies.

34.    Upon information and belief, International Insurance Company merged into TIG, which is a corporation organized under the laws of California with its principal place of business in Manchester, New Hampshire and is licensed to operate in the State of New York.  Upon information and belief, International Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

35.    Upon information and belief, Twin City is a corporation organized under the laws of Indiana with its principal place of business in Hartford, Connecticut.  Upon information and belief, Twin City is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

36.    Upon information and belief, St. Paul Surplus Lines Insurance Company is a corporation organized under the laws of Delaware with its principal place of business in Hartford, Connecticut.  Upon information and belief, St. Paul Surplus Lines Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

37.    Upon information and belief, certain Underwriters at Lloyd's, London that subscribed to liability policies that the Archdiocese purchased through Arthur J. Gallagher & Co. and its affiliates are organized under the laws of the United Kingdom with their principal places of business in London, England.  Upon information and belief, certain Underwriters at Lloyd's, London sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during

11

which the victim-survivors allege abuse.

38.     Upon information and belief, Westchester Fire is a corporation organized under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.   Upon information and belief, Westchester Fire is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.   Westchester Fire is a member of the Chubb Group of Insurance Companies.

39.     Upon information and belief, Vigilant is a corporation organized under the laws of New York with its principal place of business in Philadelphia, Pennsylvania.   Upon information and belief, Vigilant is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.   Vigilant is a member of the Chubb Group of Insurance Companies.

## JURISDICTION AND VENUE

40.     This matter falls within this Court's general original jurisdiction pursuant to Judiciary Law § 140-b and Article VI, § 7 of the New York Constitution.

41.     This Court has personal jurisdiction over the Insurers pursuant to N.Y. C.P.L.R. §§ 301, 302(a), and 311. At all times relevant herein, the Insurers transacted business within the State of New York and contracted to provide services within this State by insuring risks in New York.

42.     The Commercial Division of this Court has jurisdiction over this action pursuant to § 202.70 of the Rules of the Commercial Division in that the matter in controversy, exclusive of punitive damages, interest, costs, disbursements, and counsel fees claimed, exceeds $500,000, and involves the claims of declaratory relief and breach of contract.

43.     Venue is proper in this Court pursuant to N.Y. C.P.L.R. § 503 inasmuch as the Archdiocese has its principal place of business in New York County.

12

## INSURANCE POLICIES PURCHASED BY THE ARCHDIOCESE

44.     Upon information and belief, at various times from at least 1954 to the present, in consideration of premiums paid by or on behalf of the Archdiocese, the Insurers, among others, sold or acquired responsibility for primary general liability insurance policies, as well as certain umbrella and/or excess liability policies, including the policies listed in the attached Exhibit A (collectively, the "Insurance Policies").  The Insurance Policies provide coverage for the Archdiocese and, as indicated in the policies, certain incorporated parishes, schools, and other Roman Catholic entities as listed in the Official Catholic Directory and which lie within the Archdiocese's territory.

45.     Upon information and belief, the Insurance Policies provide valuable coverage for damages that the insured becomes legally obligated to pay through judgments or settlements because of bodily injury, including settlements or judgments based on claims and lawsuits alleging sexual abuse and physical abuse.

46.     Upon information and belief, many of the Insurance Policies also require the Insurers to pay defense costs and expenses, including attorney's fees, incurred by the insured in the investigation and defense of allegations by victim-survivors.  This obligation applies even if the allegations are groundless, false, or fraudulent.

47.     Upon information and belief, the Archdiocese timely paid all premiums due under the Insurance Policies.

## THE IRCP

48.     In or about October 2016, the Archbishop of New York announced the Independent Reconciliation and Compensation Program or, as it is referred to herein, the IRCP as part of its ongoing effort to bring healing and provide compensation to the victim-survivors who allegedly suffered sexual abuse as a minor by a priest or deacon of the Archdiocese.

49.     The program was independently administered by Mr. Kenneth Feinberg.  Mr.

13

Feinberg and his colleagues had complete autonomy in assessing the allegations and determining compensation for participating victim-survivors, if any, and the Archdiocese has abided by their determinations.

50.     As of April 2019, 323 victim-survivors of abuse have participated in the IRCP, and have received approximately $65 million in compensation. The victim-survivors who voluntarily participated in the IRCP provided full releases to the Archdiocese.

## CVA AND SEXUAL ABUSE CLAIMS

51.     Over the past several years, a number of states have passed so-called "window" statutes to allow claimants to assert previously time-barred claims alleging sexual abuse against schools, religious institutions, and other organizations that employed or supervised perpetrators. In such states, numerous claimants have brought suits, exposing defendants to enormous liabilities.

52.     Efforts in New York State have been underway for many years to pass a statute reviving the statute of limitations for time-barred claims of sexual abuse.

53.     As a result of these efforts, it was widely believed that New York would eventually pass a statute allowing sexual abuse victims to bring time-barred suits. Indeed, New York passed the CVA, which was signed by Governor Cuomo on February 14, 2019.

54.     The CVA allows claimants to file suits alleging sexual abuse that were previously barred by the statute of limitations by reopening the statute of limitations for a one-year period. The one-year "window" in New York opens in August 2019.

55.     If the experience in other jurisdictions that have passed "window" statutes is any indication, when the one-year "window" opens pursuant to the CVA, numerous claimants who did not participate in the IRCP will likely assert claims and file suits against the Archdiocese alleging sexual abuse and physical abuse and seeking damages.

56.     As a result of the CVA, the Archdiocese faces substantial potential liability for

14

damages for alleged injury from sexual abuse and physical abuse.

## NORMAN SUIT

57.    Although the "window" has not opened, individuals alleging claims based on sexual abuse against the Archdiocese have prematurely begun to file actions, which will become effective once the "window" opens.

58.    On or about April 18, 2019, the Archdiocese was served with a lawsuit entitled *John Michael Norman v. Archdiocese of New York, et al.*, which was filed in the Supreme Court of the State of New York, County of New York (the "Norman Suit"). A copy of the summons and complaint for the Norman Suit is attached as Exhibit B.

59.    The Norman Suit alleges negligence claims against the Archdiocese based on allegations that two clergy members sexually abused the claimant.

60.    The Norman Suit alleges that Father Arthur N. Fernando ("Father Fernando") abused the claimant from approximately 1972 through approximately 1973.

61.    The Norman Suit alleges that Rev. Monsignor Jeremiah Brennan ("Monsignor Brennan") abused the claimant for six months during 1974.

62.    The Norman Suit alleges claims against the Archdiocese sounding in negligence, including (1) "Negligent Hiring/Retention/Supervision/Direction," (2) "Negligence/Gross Negligence," and (3) "Negligent Infliction of Emotional Distress."

63.    In support of the negligence claims, the Norman Suit sets forth alternative allegations regarding the Archdiocese's alleged knowledge of the abuse. For example, the Norman Suit alleges that the Archdiocese "knew and/or reasonably should have known, and/or knowingly condoned, and/or covered up, the inappropriate and unlawful sexual activities of Father Fernando and Monsignor Brennan who sexually abused Plaintiff." Ex. B ¶ 21. Similarly, the Norman Suit alleges that the Archdiocese's "willful, wanton, grossly negligent and/or negligent act(s) of commission and/or

15

omission, resulted directly and/or proximately in the damage set forth herein at length."  *Id.* ¶ 46; *see also id*. ¶ 80.

64.     During the period of the alleged abuse, INA insured the Archdiocese pursuant to primary and excess insurance policies, some or all of which included a duty to defend.  For example, INA Policy GLP 336428, whose policy period runs from September 7, 1972 to January 1, 1974, states that INA has the duty to defend "even if the allegations of the suit are groundless, false, or fraudulent." The duty to defend arises whenever any of the allegations within the four corners of the underlying complaint potentially give rise to a covered claim.

65.     On or about April 29, 2019, the Archdiocese provided notice to INA pursuant to the Insurance Policies for which INA is responsible ("INA Insurance Policies") of the Norman Suit and provided a copy of the summons and complaint to INA.

66.     On or about May 14, 2019, Chubb North America ("Chubb"), on behalf of INA, sent a letter denying any obligation to defend or indemnify the Archdiocese against the Norman Suit (the "Denial Letter").  A copy of the Denial Letter is attached as Exhibit C.  As the Denial Letter shows, Chubb and INA relied exclusively on the allegations in the Norman Suit to formulate their coverage position.

67.     The Denial Letter states that the underlying "Plaintiff alleges to have sustained injury that was expected and/or intended from the standpoint of the Archdiocese.  These allegations do not give rise to an 'occurrence' under the INA Policies."

68.     Based on its determination that the Norman Suit solely alleged expected or intended injury, Chubb and INA denied that INA had any duty to defend the Archdiocese against the Norman Suit, stating that "Chubb has no defense and no indemnification obligations in connection with the Norman Action and denies coverage accordingly."

69.     Chubb and INA lack a reasonable basis to deny the duty to defend the

16

Archdiocese against the Norman Suit and ignore the terms of the Insurance Policies.  The Norman Suit does not allege that the Archdiocese unequivocally expected or intended all of the alleged injury. Instead, the Norman Suit makes alternative allegations that the Archdiocese knew *or* should have known of the improper conduct of Father Fernando and Monsignor Brennan.  The Norman Suit thus seeks to hold the Archdiocese liable even though the Archdiocese may not have expected or intended, or even had notice or knowledge of, the alleged abuse.

70.    Chubb and INA ignore that the Norman Suit does not identify who at the Archdiocese might have known of the abuse, what information was known to the Archdiocese, or when the Archdiocese was notified of the abuse.  Chubb admits in the Denial Letter that the Norman Suit fails to "allege or discuss whether such information [about the alleged abuse] was ever received by the Archdiocesan Service Corporation."

71.    To the extent that the Norman Suit alleges that the Archdiocese had knowledge of the alleged abuse, the Norman Suit fails even to allege that the Archdiocese actually knew or received notice of Father Fernando's or Monsignor Brennan's pedophilic propensities prior to the alleged abuse, thus leaving open the possibility that the Archdiocese neither expected nor intended the abuse, if at all, until some point after it started.

72.    Chubb and INA also ignore that the Norman Suit does not allege that the Archbishop expected or intended the alleged abuse.  Indeed, there has been no judicial determination that the Archbishop expected or intended the alleged abuse.  Accordingly, whether the injury alleged in the Norman Suit was expected or intended is a question of fact and INA must defend the Archdiocese unless and until a court determines by a final, non-appealable judgment that the Archbishop expected or intended the alleged abuse.

73.    Chubb and INA ignore the provision of the INA Insurance Policies that provides that "Assault and Battery shall be deemed an occurrence unless committed by or at the direction of the

17

Insured . . . ."  The Norman Suit, however, does not allege that the sexual abuse was committed by or at the direction of the Archdiocese.

74.    Contrary to Chubb's and INA's contentions, the allegations within the four corners of the Norman Suit do not unequivocally allege that the Archdiocese expected or intended all of the alleged abuse.  INA, therefore, has a duty to defend the Archdiocese.

## COVERAGE DISPUTE

75.    The Archdiocese has fulfilled all of its duties and conditions under each of the Insurance Policies, including cooperating with the Insurers' reasonable requests.

76.    The Archdiocese is entitled to all benefits provided by the Insurance Policies.

77.    On information and belief, the Insurers intend to dispute, limit, or deny coverage for sexual abuse claims and lawsuits asserted against the Archdiocese as result of the CVA.

## COUNT I

### Declaratory Judgment Against All Insurers – Sexual Abuse Claims

78.    The Archdiocese repeats and re-alleges each and every allegation contained in paragraphs 1 through 77 above with the same force and effect as though fully set forth herein.

79.    The Archdiocese seeks a judicial determination of the rights and duties of the Archdiocese and the Insurers with respect to an actual controversy arising out of the Insurance Policies.

80.    Pursuant to the terms of the Insurance Policies, the Insurers agreed to provide coverage for damages because of bodily injury, and defense costs and expenses.

81.    The claims and lawsuits alleging sexual abuse and physical abuse that will be asserted against the Archdiocese when the "window" opens, and the significant potential liability arising out of such claims and lawsuits, implicate the Insurance Policies, including the umbrella and excess Insurance Policies.

18

82.     An actual controversy of a justiciable nature presently exists between the Archdiocese and the Insurers regarding the proper construction of the Insurance Policies and the rights and obligations of the parties thereto.  The controversy is of sufficient immediacy and magnitude to justify the issuance of a declaratory judgment.

83.     The issuance of declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## COUNT II

### Breach of Contract Against INA

84.     The Archdiocese repeats and re-alleges each and every allegation contained in paragraphs 1 through 84 above with the same force and effect as though fully set forth herein.

85.     The Archdiocese incurred damages under the Insurance Policies for which INA is responsible.

86.     The INA Insurance Policies are valid and enforceable contracts providing insurance coverage for the damages incurred by the Archdiocese.

87.     The Archdiocese has given timely notice.

88.     The Archdiocese substantially performed all material obligations on its part to be performed under the INA Insurance Policies.

89.     INA has refused to accept its legal obligations to provide coverage for allegations and claims of sexual abuse against the Archdiocese.

90.     INA's failure and refusal to make payments due under the Insurance Policies constitute a breach of the Insurance Policies.

91.     As a direct and proximate result of INA's breach of the INA Insurance Policies, the Archdiocese is suffering damages equal to the sums it would be entitled to recover as benefits under the INA Insurance Policies.

19

## COUNT III

### Bad Faith Against INA

92.    The Archdiocese repeats and re-alleges each and every allegation contained in paragraphs 1 through 91 above with the same force and effect as though fully set forth herein.

93.    INA breached its duty to defend when it refused to defend the Archdiocese against the Norman Suit.

94.    INA's breach of its duty to defend on the basis of expected or intended injury lacked any arguable basis and constituted a bad faith denial of coverage.  No reasonable insurance company would, under the facts alleged in the Norman Suit, be expected to assert expected or intended injury as the basis for denying its duty to defend the Archdiocese.  INA's baseless denial of coverage and utter failure to investigate the claim amounted to complete abandonment of its insured and deprives the Archdiocese of the benefits of the liability coverage for which it paid premiums.

95.    As a direct and proximate result of INA's bad faith breach of its duty to defend, the Archdiocese has been forced to retain counsel and to prosecute this coverage action against INA and has incurred and will continue to incur attorneys' fees, costs, and disbursements.

### PRAYER FOR RELIEF

WHEREFORE, the Archdiocese prays for judgment as follows:

1.    On Count I, the Archdiocese requests that this Court enter a declaratory judgment in favor of the Archdiocese against each of the Insurers;

2.    On Count II, the Archdiocese requests that this Court enter a judgment awarding the payment of damages in an amount equal to the amount owed under the INA Insurance Policies, to be proven at trial, as well as pre- and post-judgment interest;

3.    On Count III, the Archdiocese requests that this Court enter a judgment awarding its attorneys' fees, costs, and disbursements in connection with INA's bad faith refusal to

20

defend the Archdiocese against the Norman Suit, in an amount to be proven at trial, as well as pre- and post-judgment interest;

        4.        Additionally, the Archdiocese requests such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

The Archdiocese requests a trial by jury on any issue so triable.

Dated:  New York, New York
        June 28, 2019

                              Respectfully submitted,

                              **BLANK ROME LLP**

By:  _____

                    James R. Murray
                    Jared Zola
                    Robyn L. Michaelson
                    1271 Avenue of the Americas
                    New York, New York 10020
                    Telephone: (212) 885-5209
                    Facsimile: (917) 591-8538
                    jmurray@blankrome.com
                    jzola@blankrome.com
                    rmichaelson@blankrome.com

                    James S. Carter
                    (*pro hac vice* application to be submitted)
                    1825 Eye Street NW
                    Washington, DC 20006
                    Telephone: (202) 420-3409
                    Facsimile: (202) 420-2201
                    jscarter@blankrome.com

                    *Counsel for the Archdiocese of New York*

21

## <u>CERTIFICATE OF SERVICE</u>

I, Jeremy W. Ryan, do hereby certify that on February 4, 2022, a copy of the foregoing **The Roman Catholic Ad Hoc Committee's Objections to Confirmation of Debtors' Second Modified Fifth Amended Chapter11 Plan of Reorganization** was served on the parties listed on the attached service list via email.


*/s/ Jeremy W. Ryan*_____
Jeremy W. Ryan (No. 4057)

**SERVICE LIST**

<u>**VIA EMAIL**</u>

<u>***Counsel to the Debtors***</u>
Derek C. Abbott, Esq.
Andrew R. Remming, Esq.
Paige N. Topper, Esq.
**MORRIS, NICHOLS, ARSHT**
**& TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Email: dabbott@morrisnichols.com
        aremming@morrisnichols.com
        ptopper@morrisnichols.com

<u>**VIA EMAIL**</u>

<u>***Counsel to the Debtors***</u>
Jessica C. Lauria, Esq.
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Email: jessica.lauria@whitecase.com

<u>**VIA EMAIL**</u>

<u>***Counsel to the Debtors***</u>
Michael C. Andolina, Esq.
Matthew E. Linder, Esq.
Blair M. Warner, Esq.
**WHITE & CASE LLP**
111 South Wacker Drive
Chicago, Illinois 60606
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        blair.warner@whitecase.com

<u>**VIA EMAIL**</u>

<u>***U.S. Trustee***</u>
David L. Buchbinder, Esq.
Hannah M. McCollum, Esq.
Office of the United States Trustee for the
District of Delaware
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
Email: david.l.buchbinder@usdoj.gov
        hannah.mccollum@usdoj.gov

**VIA EMAIL**

***Counsel to the Tort Claimants' Committee***
James I. Stang, Esq.
John A. Morris, Esq.
James E. O'Neill, Esq.
John W. Lucas, Esq.
**PACHULSKI STANG ZIEHL**
**& JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Email:  jstang@pszjlaw.com
         jmorris@pszjlaw.com
         joneill@pszjlaw.com
         jlucas@pszjlaw.com

**VIA EMAIL**

***Counsel to the Creditors' Committee***
Thomas Moers Mayer, Esq.
Rachael Ringer, Esq.
David E. Blabey, Jr., Esq.
Jennifer R. Sharret, Esq.
Megan M. Wasson, Esq.
**KRAMER LEVIN NAFTALIS**
**& FRANKEL LLP**
1177 Avenue of the Americas
New York, New York 10036
Email: tmayer@kramerlevin.com
         rringer@kramerlevin.com
         dblabey@kramerlevin.com
         jsharret@kramerlevin.com
         mwasson@kramerlevin.com

**VIA EMAIL**

***Counsel to the Future Claimants' Representative***
Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Sharon M. Zieg, Esq.
**YOUNG CONAWAY STARGATT**
**& TAYLOR, LLP**
1000 North King Street
Wilmington, Delaware 19801
Email: rbrady@ycst.com
         eharron@ycst.com
         szieg@ycst.com

**VIA EMAIL**

***Counsel to JPMorgan Chase Bank National Association***
Kristian W. Gluck, Esq.
**NORTON ROSE FULBRIGHT US LLP**
2200 Ross Avenue
Dallas, Texas 75201-7932
Email: kristian.gluck@nortonrosefulbright.com