**<u>EXHIBIT 1</u>**

29098154.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Hearing Date: TBD** <br> **Obj. Deadline: TBD** |

**JOINT FCR AND COALITION (I) MOTION FOR ENTRY OF AN
ORDER (A)(1) STRIKING PORTIONS OF BATES REBUTTAL REPORT
AND THE ENTIRE BATES SUPPLEMENTAL REPORT AND (2) PRECLUDING
TESTIMONY RELATED TO IMPROPER VALUATION OPINION OR (B) IN THE
ALTERNATIVE, GRANTING MOVANTS LEAVE TO SUBMIT A REBUTTAL
REPORT; AND (II) LIMITED OBJECTION TO CONFIRMATION OF THE PLAN**

James L. Patton, Jr., the duly-appointed legal representative for future claimants in the above-captioned cases (the "Future Claimants' Representative" or "FCR"), and the Coalition of Abused Scouts for Justice (the "Coalition," and together with the FCR, the "Movants"), by and through their undersigned counsel, hereby submit this: (I) motion (this "Motion") for entry of an order (A)(1) striking certain portions of the Bates Rebuttal Report and the entire Supplemental Bates Report (each as defined below) submitted by the above-captioned debtors and debtors in possession (the "Debtors"), and (A)(2) precluding related testimony from Bates White, LLC ("Bates White") in proceedings related to the *Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (as amended or modified, the "Plan")[2] or (B) in the alternative, granting Movants leave to submit a rebuttal report; and

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

(II) limited objection (this "Limited Objection") to confirmation of the Plan.  In support of this Motion and Limited Objection, the Movants respectfully state as follows:

## INTRODUCTION[3]

1.      The Movants, the Debtors, and the TCC have reached a global settlement with respect to the treatment of abuse survivors under the Plan, the Trust, and the TDP.  Under the global settlement, the Debtors have agreed not to seek a finding that abuse survivors will be paid in full using the Improper Valuation Opinion.  Nevertheless, the Movants understand that certain insurers may attempt to use the Improper Valuation Opinion to establish that abuse survivors are being paid in full and therefore are not entitled to any further insurance recovery.

2.      A valuation of Abuse Claims is not required to confirm the Plan, and the use of the Improper Valuation Opinion in the manner intended by the insurers would potentially devastate recoveries to abuse survivors.  Thus, while the Movants support the Plan and believe that it should be confirmed, they file this Motion and Limited Objection out of an abundance of caution to preserve their ability to challenge use of the Improper Valuation Opinion by any party to establish the value of Abuse Claims in connection with confirmation of the Plan.

3.      The use of the Improper Valuation Opinion in this manner would result in a *de facto* estimation of Abuse Claims supported by expert opinions disclosed for the first time in a rebuttal report filed over a month after expert reports were due.  Ironically, the Movants sought to estimate the Abuse Claims nearly ten (10) months ago through the Estimation Motion, but this motion was met with vehement opposition.  Had the Estimation Motion not been opposed, it is likely that the parties would at least now know the value of the Abuse Claims being channeled to the Settlement Trust under the Plan.

---

[3] Capitalized terms used but not defined in this Introduction shall have the meanings ascribed to them below.

4.      The Movants believe that the Plan should be confirmed, but not with a finding with regard to the aggregate amount of Abuse Claims based on the Improper Valuation Opinion. Accordingly, the portions of the Bates Rebuttal Report and the entire Supplemental Bates Report should be stricken.  Alternatively, if the insurers or any other party is truly committed to a full-blown estimation, due process requires, at a minimum, that the FCR and the Coalition be afforded a fair opportunity to respond and submit a rebuttal report regarding the aggregate value of Abuse Claims.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Movants consent to the entry of a final order by the Court solely in connection with this Motion and Limited Objection to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### A.      The Confirmation Proceedings

7.      On October 8, 2021, the Court entered the *Order (I) Scheduling Certain Dates and Deadlines in Connection with Confirmation of the Debtors' Plan of Reorganization,*

*(II) Establishing Certain Protocols, and (III) Granting Related Relief* [Docket No. 6528] (the "Initial Confirmation Scheduling Order") establishing a schedule governing discovery in connection with confirmation of the Plan (the "Confirmation Proceedings") and related protocols.

8.     On December 28, 2021, the Court entered an order modifying certain dates and deadlines in the Initial Confirmation Scheduling Order [Docket No. 7996] (the "Amended Confirmation Scheduling Order," and together with the Initial Confirmation Scheduling Order, the "Confirmation Scheduling Orders").    The Confirmation Scheduling Orders established the following deadlines (among others) in connection with the Confirmation Proceedings:

| Event | Deadline |
|---|---|
| Expert Reports Due | December 5, 2021 |
| Deadline for Parties to Identify Expert Witnesses Who Will Submit Rebuttal Expert Reports | December 17, 2021 |
| Rebuttal Expert Reports Due | January 5, 2022 |
| Deadline to Complete Depositions of Expert Witnesses | January 28, 2022 |
| Deadline to Identify Trial Witnesses | January 31, 2022 |

9.     A hearing to consider confirmation of the Plan (the "Confirmation Hearing") is currently scheduled to start on February 22, 2022.

10.     On January 4, 2022, the Debtors filed a preliminary tabulation of ballots cast for the Plan [Docket No. 8141] (the "Preliminary Voting Report").    Shortly thereafter, the Tort Claimants' Committee (the "TCC") filed a "status report" regarding the Plan and the preliminary solicitation results [Docket No. 8190] (the "TCC Status Report"), reiterating the TCC's position that the Plan cannot be confirmed.

11.     Among other things, the TCC Status Report asserts that the Plan is unconfirmable because the Plan's non-debtor, third-party releases do not satisfy the *Master Mortgage* factors. TCC Status Report ¶¶ 4-5.    The Debtors filed a response [Docket No. 8234] to the TCC Status

Report on January 11, 2022 ("Debtors' Responsive Report"), arguing that the Plan is confirmable

and will likely result in survivors receiving payment in full on account of their Abuse Claims.

**B.**     **The Expert Reports & Bates Deposition**

12.     On December 5, 2021, the Debtors served the *Expert Report of Charles E. Bates*

(the "Affirmative Bates Report").[4]   In the Affirmative Bates Report, Bates White provided an

opinion on the total value of Abuse Claims as of the Petition Date.

13.     Specifically, Bates White estimated that the aggregate value of Abuse Claims

against BSA and other BSA-related parties was between $2.4 billion and $7.1 billion, with a

midpoint of $4.75 billion.  Affirmative Bates Report ¶ 17.

14.     In arriving at this valuation, Bates White used an initial benchmark valuation of

$5.8 billion and then applied certain "plus" and "minus" factors to arrive at the estimated range.

*Id.* ¶¶ 65, 105.  Bates White noted that its Abuse Claims valuation remained unchanged from the

valuation it provided in the Spring of 2021[5] despite updates to proof-of-claim data and the

enactment of revival laws relaxing the statute of limitations for sexual abuse claims in certain

states.  *Id.*

15.     In addition to the Affirmative Bates Report, various other expert reports were

served by the TCC, certain insurers, and other parties in accordance with the Confirmation

Scheduling Orders, including the following (collectively, the "Non-Debtor Expert Reports"):

---

[4]  A copy of the Affirmative Bates Report is attached hereto as Exhibit B.

[5]  *See Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2594], p.5 (as amended or modified, the "Disclosure Statement") ("During its claim reconciliation process, Bates White established that there are approximately 82,500 unique, timely Proofs of Claims seeking personal injury damages on account of Abuse. Bates White estimates the value of the Abuse Claims is between $2.4 billion and $7.1 billion.").  This valuation analysis was also used to determine the Base Matrix Values for the TDP, which were embedded within the solicitation version of the Disclosure Statement [Docket No. 6445].  It is unclear whether the Debtors intend to revise the Base Matrix Values for the TDP.  The Movants reserve the right to challenge revisions to the TDP Base Matrix Values on any and all grounds.

(a) the *Expert Report of Katheryn R. McNally of the Claro Group, LLC* submitted by the TCC;

(b) the *Affirmative Expert Report of Marc C. Scarcella, M.A.* submitted by certain insurers; (c) the

*Expert Report of Dr. Jon R. Conte, Ph.D.* submitted by the TCC; and (d) the *Expert Report of*

*David H. Judd & Matthew K. Babcock of Berkeley Research Group* submitted by the TCC.

16.     As part of the Debtors' pivot to a "full pay" strategy, on January 5, 2022, one day

after the Preliminary Voting Report, the Debtors served the *Rebuttal Expert Report of Charles E.*

*Bates* (the "Bates Rebuttal Report")[6] purportedly for the purposes of rebutting the analyses and

opinions in the Non-Debtor Export Reports.

17.     In the Bates Rebuttal Report, Bates White provided a ***new*** opinion regarding the

aggregate value of Abuse Claims, stating that the value of such claims is most likely in the lowest

quartile of the range originally estimated by Bates White, *i.e.*, between $2.4 and $3.6 billion

(the "New Abuse Claim Valuation").  Bates Rebuttal Report ¶ 12.

18.     To arrive at the New Abuse Claim Valuation, Dr. Bates "re-examined" historical

settlements for penetration claims involving once-identified abusers ("Single Survivor Cases").

*Id.* ¶¶ 15, 50.  This re-examination led Dr. Bates to "discover" that certain cases he identified as

Single Survivor Cases involved repeat abusers.  *Id.* ¶ 51.

19.     As a result, Dr. Bates adjusted the $650,000 value for Single Survivor Cases used

to arrive at the $5.8 million benchmark in the Affirmative Report down to $212,500 in the Bates

Rebuttal Report.  *Id.* ¶ 16; *cf.* Affirmative Bates Report ¶ 35.  Dr. Bates' change to this critical data

point eliminated ***two thirds*** of the value assigned to the claims.

---

[6] On January 20, 2022, the Debtors served the *Errata to Expert Rebuttal Report of Charles E. Bates* (the "Errata"). For the avoidance of doubt, as used herein "Bates Rebuttal Report" refers to the revised report attached to the Errata. A copy of the Bates Rebuttal Report is attached hereto as Exhibit C.

6

20.     Various other parties submitted rebuttal reports on January 5, 2022, including the *Rebuttal to Expert Report of Charles E. Bates* served by the TCC (the "TCC Rebuttal Report"). The TCC Rebuttal Report challenges the Bates Affirmative Report on numerous bases and asserts that Bates White's Abuse Claim valuation is flawed because it places no value on over 30,000 Abuse Claims allegedly falling outside the statutes of limitations, among other things.  TCC Rebuttal Report pp. 9-14.

21.     The deposition of Dr. Bates (the "Bates Deposition") was initially scheduled to be held on January 25, 2022.  However, on January 23, 2022, the Bates Deposition was rescheduled to January 28, 2022.

22.     On January 26, 2022, just two days before the rescheduled Bates Deposition, the Debtors served the *Supplemental Expert Report of Charles E. Bates* (the "Supplemental Bates Report").[7]  In the Supplemental Bates Report, Dr. Bates ***again*** changed his valuation opinions, at the request of counsel, in three significant ways.  Supplemental Bates Report ¶ 3.

23.     **First**, Bates White was asked to provide a new aggregate benchmark value reflecting the "re-examined" and "updated" calculations described in the Bates Rebuttal Report (*i.e.*, the $212,500 Single Survivor Case valuation).  *Id.*

24.     **Second**, Bates White was asked by Debtors' counsel to incorporate a 20% downward adjustment to the benchmark value for Single Survivor Cases to account for "minus factor" one, the age of the survivor at the time they made their claim, lowering the Single Survivor Cases valuation from $212,500 to $170,000 and the aggregate benchmark valuation from $5.8 billion to $2.5 billion.  *Id.* ¶¶ 2-3; Bates Dep. at 53:16-25 ("Q.  Is it fair to characterize the valuation that is on Figure 1 of your supplemental report as a benchmark valuation involving abuse claims?

---

[7] A copy of the Supplemental Bates Report is attached hereto as Exhibit D.

. . . A.  It's a benchmark valuation using the value of 212,000 penetration-involved claims involving one-time abusers from my rebuttal report and 20 percent reduction for the age of the abuse claims."); Bates Dep. at 69:16-20 ("Q.  And is the average settlement for single-abuser penetration claims shown on Figure 1 of your rebuttal report $212,500?  A. Yes . . . that's right.").

25.  **Finally**, counsel to the Debtors asked Dr. Bates to add a calculation illustrating the potential value assigned to claims that Bates White determined were presumptively barred by the statute of limitations and valued at zero in the Affirmative Bates Report. *Id.* ¶ 2.  After accounting for the value of these claims, Bates White determined that the aggregate benchmark valuation should be increased by a total of approximately $1.3 billion.  *See id.* ¶ 10.

26.  The three adjustments described in the Supplemental Bates Report resulted in the aggregate benchmark value for Abuse Claims decreasing by $2 billion between the Affirmative Bates Report and Supplemental Bates Report, from $5.8 billion to $3.8 billion.  Affirmative Bates Report ¶ 35; Supplemental Bates Report ¶ 10.

27.  As explained below, the New Abuse Claim Valuation is, in reality, tardy expert disclosure disguised as a "supplemental" and "rebuttal" opinion.  Accordingly, the Movants request entry of an order:  (i) striking the New Abuse Claim Valuation as well as the methodology and opinions supporting it (the "Improper Valuation Opinion") from the Bates Rebuttal Report; (ii) striking the Supplemental Bates Report in its entirety; and (iii) precluding testimony related to the Improper Valuation Opinion from Bates White at the Confirmation Hearing or any other proceeding related to the Plan.

28.  In the alternative, the Movants requests that the Court enter an order permitting the Movants to produce their respective rebuttal expert reports with respect to the Improper Valuation Opinion.  Moreover, the Movants object to the confirmation of the Plan to the extent the Court

does not strike the Improper Valuation Opinion and to the extent that the Debtors are seeking a

finding that the aggregate value of the Abuse Claims is between $2.4 and $3.6 billion.

## ARGUMENT

I.    **The Bates Rebuttal Report and Supplemental Bates Report Fall Outside the Scope of Proper Rebuttal and Supplemental Opinion**

29.    Pursuant to the Confirmation Scheduling Orders, "[n]o witness shall be allowed to

give expert testimony in connection with the Confirmation Proceedings without timely, according

to the [deadlines in the Confirmation Scheduling Orders] submitting a report that satisfies the

requirements of Fed. R. Civ. P. 26(a)(2)(B) and sitting for a deposition, which may be attended by

any Participating Party."  Rule 26 of the Federal Rules of Civil Procedure requires expert reports

to contain, among other things, a "complete statement of all opinions the witness will express and

the basis and reasons for them[.]"  Fed. R. Civ. P. 26(a)(2)(B)(i).

30.    When a scheduling order allows rebuttal reports, as is the case here, "a party may

only submit an expert rebuttal 'if the evidence is intended *solely* to contradict or rebut evidence on

the same subject matter identified by another party.'"  *In re Asbestos Prod. Liab. Litig. (No. VI)*,

No. 09-CV-74351X, 2012 WL 661673, at *3 (E.D. Pa. Feb. 8, 2012) (emphasis added) (quoting

Fed. R. Civ. P. 26(a)(2)(c)).

31.    Similarly, a supplemental expert report is only appropriate in limited

circumstances, such as where the expert's prior report is defective in such a manner that the prior

report is misleading or to add information that was unavailable at the time of the initial report.

*Novartis Pharms. Corp. v. Actavis, Inc.*, No. CV 12-366-RGA-CJB, 2013 WL 7045056, at *7 (D.

Del. Dec. 23, 2013).  "[P]arties may not use their obligation to supplement as an excuse to violate

the clear terms of a scheduling order, unilaterally buying themselves additional time to make

disclosures, thereby unduly prejudicing other parties and potentially delaying the progress of a

case." *Vehicle IP, LLC v. Werner Enters., Inc.*, No. CV 10-503-SLR, 2013 WL 4786119, at *1 (D. Del. Sept. 9, 2013).

32.     Rebuttal reports and supplemental reports are not properly used to present new opinions or to strengthen the expert's existing opinions. *In re Asbestos Prod. Liab. Litig. (No. VI)*, 2012 WL 661673, at *3; *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (holding that rebuttal evidence is not "an opportunity for the correction of any oversights in the plaintiff's case in chief"); *Smithkline Beecham Corp. v. Ranbaxy Lab'ys, LTD.*, No. CV 03-2158 (MLC), 2006 WL 8459047, at *4 (D.N.J. Feb. 23, 2006) (stating that rebuttal testimony is "limited 'to that which is precisely direct to rebutting new matter or new theories presented by the defendant's case-in-chief'" and denying request to remedy defects in a party's initial expert report); *Raritan Baykeeper, Inc. v. NL Indus., Inc.*, No. CV 09-4117, 2021 WL 4864306, at *4 (D.N.J. Oct. 19, 2021) ("Rule 26(e) does not grant experts a second bite at the apple so they can deepen or strengthen existing opinions.").

33.     The Improper Valuation Opinion in the Bates Rebuttal Report is outside the scope of a proper rebuttal expert report.  In the Affirmative Bates Report, Bates White estimated the value of Abuse Claims to be between $2.4 billion to $7.1 billion.  Affirmative Bates Report ¶ 17. He further concluded that "it is not possible to narrow this range due to the uncertainty inherent in valuing 82,209 Abuse Claims with just a few hundred claims upon which to base that valuation." *Id.* ¶ 53.  Yet, this is precisely what Bates White did in the Bates Rebuttal Report.

34.     Based on his "re-examin[ation]" of data used to prepare the Affirmative Bates Report, Dr. Bates stated in the Bates Rebuttal Report that he "now believe[s] that the value of Abuse Claims is most likely in the lowest quartile of the range [he] originally estimated."  Bates Rebuttal Report ¶¶ 12, 15, 50; Bates Dep. at 193:19-194:17 ("Q.  In your December 5th, 2021,

affirmative report, it was your opinion that the estimated aggregate value of abuse claims as of the petition date was between 2.4 and $7.1 billion; is that right?  A.  Correct.  Q.  And it is still your opinion today that the range is between 2.4 and 7.1 billion; right? . . . A. There are ways in which the valuation could work out that would push it into the upper parts of the range; but I believe -- of the range, that would make it so that the upper end of the range still extends up to 7.1 billion; but the most likely outcomes, based on what I studied and what I examined here, say that the valuation should be in the lower quartile of that range.").

35.    The Improper Valuation Opinion is **not** intended to contradict or rebut any of the Non-Debtor Expert Reports.  Rather, the Debtors use the Bates Rebuttal Report to support the statement in the Debtors' Responsive Report that Holders of Abuse Claims will be paid in full under the Plan.

36.    The Supplemental Bates Report suffers similar defects and is entirely outside the scope of a proper supplemental report.  Notably, Dr. Bates admits that he prepared the Supplemental Report to make certain adjustments to the Abuse Claim valuation at the request of Debtors' counsel.  Supplemental Bates Report ¶¶ 2-3.

37.    These adjustments were **not** made to remedy misleading opinions in the Affirmative Bates Report or to address new information that was not available at the time Bates White prepared the Affirmative Bates Report.  Bates White uses the Supplemental Bates Report *solely* to bolster its opinion in the Bates Rebuttal Report that the value of Abuse Claims is most likely between $2.4 and $3.6 billion.  *See* Supplemental Bates Report ¶ 14 ("The analysis here also confirms my opinion set forth in my Rebuttal Report that the outcomes in the lower quartile of [the Abuse Claim valuation range], from $2.4 billion to $3.6 billion, are more likely than the higher portion of that range.").

38.     Because the Improper Valuation Opinion is included in the Bates Rebuttal Report solely to support a contention first made in the Debtors' Responsive Report rather than to contradict or rebut the Non-Debtor Expert Reports, it is outside the scope of a proper rebuttal expert report.   The Supplemental Bates Report, which is devoted entirely to bolstering Bates White's New Abuse Claim Valuation, is similarly flawed.

## II.     The Court Should Strike the Supplemental Bates Report in Its Entirety and the Improper Valuation Opinion from the Bates Rebuttal Report

39.     It is well established that a court has the inherent power to "control its docket to promote the efficient administration of justice" and enforce its own orders.   *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2013 WL 6048836, at *9 (Bankr. D.N.J. Nov. 8, 2013) (collecting cases); *see also Ray v. Eyster (In re Orthopedic "Bone Screw" Prods. Liab. Litig.)*, 132 F.3d 152, 156 (3d Cir. 1997).   The bankruptcy court's power to enforce its orders is also embodied in section 105(a) of the Bankruptcy Code.   11 U.S.C. § 105(a); *In re Protarga, Inc.*, 329 B.R. 451, 479 (Bankr. D. Del. 2005) ("Section 105(a) also provides that a bankruptcy court is authorized to issue any order, process or judgment necessary to carry out the provisions of the Bankruptcy Code, and "gives the bankruptcy court 'the power and the jurisdiction to enforce its valid orders.'") (citing *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 266 (3d Cir.1991)).

40.     The Court has discretion over the method of remedying untimely or otherwise improper expert disclosure.   *NJ Affordable Homes*, 2013 WL 6048836, at *9; *see also Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 242 (3d Cir. 2007) (holding that courts have broad discretion to ensure compliance with pretrial scheduling orders).   Numerous courts have concluded that the exclusion of expert reports or testimony is an appropriate sanction for a party's violation of discovery and other pre-trial orders.   *See, e.g., United States v. 68.94 Acres of Land, More or Less, Situate in Kent Cty., State of Del.*, 918 F.2d 389, 396–97 (3d Cir. 1990) (collecting cases

upholding the exclusion of expert reports and testimony for failure to comply with pre-trial orders); *Vehicle IP, LLC v. Werner Enterprises, Inc.*, No. CV 10-503-SLR, 2013 WL 4786119, at *1 (D. Del. Sept. 9, 2013) ("When expert testimony is not timely disclosed, the court has the authority to exclude it from evidence."); *Apotex, Inc. v. Cephalon, Inc.*, No. 2:06-CV-2768, 2014 WL 4933009, at *2 (E.D. Pa. Oct. 1, 2014) (striking supplemental expert report filed after the deadline for submission of expert reports in the scheduling order); *Reckitt Benckiser Inc. v. Tris Pharma, Inc.*, No. CIV.A. 09-3125 FLW, 2011 WL 6722707, at *9 (D.N.J. Dec. 21, 2011) (affirming order striking supplemental report filed in violation of scheduling order); *Intell. Ventures I LLC v. AT&T Mobility LLC*, No. CV 13-1668-LPS, 2017 WL 658469, at *6 (D. Del. Feb. 14, 2017) (striking portion of expert report interjecting a new theory of liability in support of plaintiff's case-in-chief in light of unfair prejudice to defendant).

41.     As discussed above, the Improper Valuation Opinion is an improper expert disclosure and should have been included in the Debtors' affirmative expert reports, which were due no later than December 5, 2021 under the Confirmation Scheduling Orders.  The Debtors' untimely disclosure of the Improper Valuation Opinion, which results in a nearly $4 billion downward adjustment to the estimated value of Abuse Claims, is *severely* prejudicial and fundamentally unfair to abuse claimants.

42.     The value of Abuse Claims is critical to these chapter 11 cases, impacting the parties' ongoing mediation efforts, the ability to obtain confirmation of the Plan, and the assets that are ultimately available to compensate abuse survivors for the damages that they have suffered, among other things.  The Movants and their respectively retained professionals, believe the Improper Valuation Opinion is significantly flawed and a dramatic departure from Bates White's opinions expressed in the Disclosure Statement and Affirmative Bates Report.  But, due

to the Debtors' failure to timely disclose the Improper Valuation Opinion under the Confirmation Scheduling Orders, the Movants are unable to provide expert rebuttal in response to the new opinions.

43.     This is particularly troubling given that certain of the Debtors' insurers may seize upon the opportunity to use the Improper Valuation Opinion as a *de facto* estimation proceeding to establish the aggregate value of Abuse Claims.  Use of the Improper Valuation Opinion in this manner ignores the requirements of section 502(c) of the Bankruptcy Code and Bankruptcy Rule 2002, and fixes the value of Abuse Claims *without* notice and the opportunity to be heard, flying in the face of due process.  *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

44.     To avoid the manifest prejudice resulting from the Debtors' untimely disclosure and procedurally defective use of the Improper Valuation Opinion, the Movants respectfully request that the Court exercise its discretion to:  (i) strike (a) the Improper Valuation Opinion from the Bates Rebuttal Report and (b) the entire Supplemental Bates Report, and (ii) preclude testimony related to the Improper Valuation Opinion in connection with confirmation of the Plan.

III.    **In the Alternative, the Court Should Grant the Movants Leave to Submit Their Respective Expert Rebuttal Reports**

45.     Alternatively, to the extent the Court declines to strike the Improper Valuation Opinion, the Movants seek leave to submit their respective rebuttal expert reports responding to the Improper Valuation Opinion notwithstanding the deadlines in the Confirmation Scheduling Orders.  The Court has discretion to grant a party leave to respond to new matters raised in a rebuttal or supplemental report.  *See Fed. Trade Comm'n v. Innovative Designs*, Inc., No. 2:16-

CV-01669-NBF, 2018 WL 3611510, at *4 (W.D. Pa. July 27, 2018) (granting leave to file a sur-rebuttal report to address new calculations and methodology used in a rebuttal report to evaluate central issues in the case); *U.S. v. Barnette*, 211 F.3d 803, 821 (4th Cir. 2000) ("den[ying] the defendant the opportunity to present surrebuttal evidence to rebut an 'obviously . . . new matter'" was error); *Louisiana Health Care Self Ins. Fund v. United States*, No. CIV.A. 12-766-JJB, 2014 WL 3720526, at *2 (M.D. La. July 25, 2014) ("[T]he decision of whether to allow a party to present evidence in rebuttal or surrebuttal is generally committed to the trial court's discretion.").

46.    As explained above, the Abuse Claim valuation is of critical importance in these chapter 11 cases. The Movants would suffer significant prejudice absent the opportunity to explain why the Improper Valuation Opinion is incorrect through a rebuttal report from their own expert. Given the work that Ankura has performed for the FCR to date, the Movants do not believe that the Confirmation Hearing would be significantly delayed if the Movants were permitted to submit expert rebuttal reports. Accordingly, if the Court does not strike the Improper Valuation Opinion, it should grant the Movants leave to submit separate rebuttal reports responding to the Improper Valuation Opinion.

## IV.    Movants Object to Plan Confirmation to the Extent that Any Party in Interest Seeks a Finding that the Aggregate Value of the Abuse Claims is Between $2.4 to $3.6 Billion

47.    Rule 3001(f) of the Federal Rules of Bankruptcy Procedure provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Thus, any party objecting to the claim has the burden of introducing evidence sufficient to rebut the presumption of validity. *See generally* COLLIER ON BANKRUPTCY ¶ 3001.09[2] (16th ed. 2019). No party has taken steps to challenge any of the 82,209 Abuse Claims filed in these chapter 11 cases. Consequently, each Abuse Claim currently constitutes a valid claim against the Debtors.

48.     Movants have always been well aware that liquidation of the Abuse Claims prior to confirmation is simply not possible, which is why they filed the Estimation Motion.[8] Section 502(c) of the Bankruptcy Code provides that the court "shall" estimate "any contingent or unliquidated" claims against a debtor if the "fixing or liquidation" thereof "would unduly delay the administration of the case." 11 U.S.C. § 502(c); *see A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1011-12 (4th Cir. 1986) (noting that the "duty of estimation . . . is not a permissive one" where liquidation would unduly delay reorganization); *In re A & B Assocs., L.P.*, No. 17-40185-EJC, 2019 WL 1470892, at *35 (Bankr. S.D. Ga. Mar. 29, 2019) ("[N]umerous bankruptcy courts have held that [e]stimation pursuant to Bankruptcy Code section 502(c) is mandatory where adjudication of the claim would unduly delay the administration of the bankruptcy case." (quotation marks omitted)); *In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005) ("[The estimation provision] of the Bankruptcy Code is drafted in mandatory terms. That is, any contingent or unliquidated claim 'shall' be estimated so long as the [fixing or liquidation] of the particular claim would 'unduly delay the administration of the case.'" (citing 11 U.S.C. § 502(c)).

49.     In essence, parties had one choice if they wanted to fix the aggregate number of Abuse Claims for confirmation purposes—they could have conducted an estimation process. Instead, there was vehement opposition to the Estimation Motion.[9]

50.     While bankruptcy courts have flexibility to estimate claims in an efficient manner under section 502(c) of the Bankruptcy Code, due process rights cannot be trampled upon. *In re Baldwin-United Corp.*, 55 B.R. 885, 889 (Bankr. S.D. Ohio 1985) ("[I]t is beyond question that

---

[8] *Motion of the Future Claimant's Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2391] (the "Estimation Motion").

[9] *See, e.g.*, Docket Nos. 2610, 2611, 2612, 2613 and 2614.

the substantive and procedural requirements of due process cannot be ignored in a[n estimation] proceeding[.]").  At a *minimum*, the Movants and other parties in interest must be provided notice and an opportunity to be heard before the Abuse Claims are estimated.  *See, e.g.*, *In re Lionel L.L.C.*, 2007 WL 2261539, at *6 (Bankr. S.D.N.Y. Aug. 3, 2007) (expanding debtor's proposed estimation procedures to provide for additional discovery and presentation time); *In re Adelphia Business Solutions, Inc.*, 341 B.R. 415, 418 (Bankr. S.D.N.Y. 2003) (holding that 20 days' notice was insufficient to satisfy due process given the magnitude of the claim at issue); *In re Baldwin-United*, 55 B.R. at 899 (implementing summary-trial procedures for estimation, including discovery, opening statements and closing arguments, and live examination of witnesses); *In re MacDonald*, 128 B.R. 161, 166-67 (Bankr. W.D. Tex. 1991) (tracking the estimation procedures of Baldwin-United); *In re Apex Oil Co.*, 92 B.R. 843 (Bankr. E.D. Mo. 1988) (employing discovery, examination of witnesses, briefing, and oral argument for estimation proceedings).

51.    Not a single Abuse Claim has been liquidated, and therefore, absent an estimation process that comports with due process, approximately 65,000 proofs of claims cannot be arbitrarily disregard, while discounting those that remain.  *See generally* Exhibits C and D.

52.    If findings regarding the aggregate value of Abuse Claims based on the Improper Valuation Opinion were made in connection with confirmation of the Plan, this Court would be the first ever to purport to determine the aggregate liability of sexual abuse claims—and the Court would be doing it based upon nothing more than certain improperly-submitted opinions included in two supplemental expert reports.

53.    To be clear, Movants continue to support the Plan and believe that it should be confirmed by the Court.  But Movants must oppose any attempt to fix the Debtors' liability for Abuse Claims in the manner proposed.

## **CONCLUSION**

WHEREFORE, the Future Claimants' Representative and the Coalition of Abused Scouts for Justice respectfully request that the Court enter an order granting the relief requested in the Motion and such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank*]

29017693.10

Dated: February 9, 2022            YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                   */s/ Robert S. Brady*
                                   Robert S. Brady (No. 2847)
                                   Edwin J. Harron (No. 3396)
                                   Kevin A. Guerke (No. 4096)
                                   Rodney Square
                                   1000 North King Street
                                   Wilmington, Delaware 19801
                                   Telephone: (302) 571-6600
                                   Facsimile: (302) 571-1253
                                   Email: rbrady@ycst.com
                                   eharron@ycst.com
                                   kguerke@ycst.com

                                   *Counsel to the Future Claimants' Representative*

                                   – and –

                                   MONZACK MERSKY AND BROWDER, P.A

                                   */s/ Rachel B. Mersky*
                                   Rachel B. Mersky (No. 2049)
                                   1201 North Orange Street, Suite 400
                                   Wilmington, Delaware 19801
                                   Telephone: (302) 656-8162
                                   Facsimile: (302) 656-2769
                                   E-mail: rmersky@monlaw.com

                                    – and –

                                   BROWN RUDNICK LLP
                                   David J. Molton, Esq. (admitted *pro hac vice*)
                                   Eric R. Goodman, Esq. (admitted *pro hac vice*)
                                   Seven Times Square
                                   New York, NY 10036
                                   Telephone: (212) 209-4800
                                   Email: dmolton@brownrudnick.com
                                           egoodman@brownrudnick.com

                                   – and –

29017693.10

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: sbeville@brownrudnick.com
       taxelrod@brownrudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*

## <u>EXHIBIT A</u>

## Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Ref. Docket No. ____** |

**ORDER (I) STRIKING (A) PORTIONS OF BATES REBUTTAL REPORT AND
(B) ENTIRE BATES SUPPLEMENTAL REPORT AND (II) PRECLUDING
<u>TESTIMONY RELATED TO IMPROPER VALUATION OPINION</u>**

Upon the motion (the "<u>Motion</u>")[2] filed by the Movants for entry of an order (i)(a) striking

certain portions of the Bates Rebuttal Report and the entire Supplemental Bates Report submitted

by the Debtors and (b) precluding related testimony from Bates White in connection with the

Confirmation Proceedings, or (ii) in the alternative, granting the Movants leave to submit rebuttal

reports; and this Court having reviewed the Motion and all pleadings related thereto; and this Court

having jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States

District Court for the District of Delaware, dated February 29, 2012; and this Court having found

that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a

final order consistent with Article III of the United States Constitution; and this Court having found

that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

and 1409; and it appearing that proper and adequate notice of the Motion has been given under the

circumstances and that no other or further notice is necessary; and upon the record herein; and

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

after due deliberation thereon; and this Court having determined that there is good and sufficient

cause for the relief granted in this Order, therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      The Improper Valuation Opinion is hereby stricken from the Bates Rebuttal Report.

3.      The Supplemental Bates Report is hereby stricken in its entirety.

4.      Testimony regarding the Improper Valuation Opinion shall be precluded at the
Confirmation Hearing and any other proceeding related to the Plan.

5.      The Court shall retain jurisdiction with respect to all matters arising from or related
to the interpretation or implementation of this Order.

## **EXHIBIT B**

### **Affirmative Bates Report**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC,

Debtors.[1]

Chapter 11

Case No. 20-10343 (LSS)

(Jointly Administered)

## EXPERT REPORT OF CHARLES E. BATES

## December 5, 2021

---

[1]    The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Confidential subject to Protective Order

Expert Report of Charles E. Bates, PhD

# Table of contents

I. Introduction ..................................................................................................................................4

    I.A. Qualifications .........................................................................................................................4

    I.B. Scope of charge .....................................................................................................................5

    I.C. Confidentiality ........................................................................................................................6

    I.D. Summary of opinions .............................................................................................................6

    I.E. Materials relied upon ...........................................................................................................11

II. Background .................................................................................................................................12

    II.A. The BSA's historical tort claims ..........................................................................................12

    II.B. Abuse Claims .....................................................................................................................16

    II.C. Potential outside comparables ...........................................................................................22

III. Benchmark Valuation ................................................................................................................24

IV. Valuation range ........................................................................................................................32

    IV.A. Plus Factors .....................................................................................................................32

        IV.A.1. Estimating future Abuse Claims from individuals who were minors at the time of the Bar
        Date based on Proof of Claim submissions ....................................................................35

        IV.A.2. Estimating repressed memory claims based on Proof of Claim submissions .............38

    IV.B. Minus Factors....................................................................................................................40

    IV.C. Combining Plus and Minus Factors ..................................................................................45

V. TDP matrix values ......................................................................................................................49

VI. Portion of valuation attributable to TCJC Abuse Claims ...........................................................53

Pậ @˘ Ấ Õ[ } -äã^} cã=ậÁ Ấ Ûˇ àb^&óậ[ Ấ Ú¦[ c^&cậ^Ấ Ú¦à^¦

Expert Report of Charles E. Bates, PhD

# List of figures

Figure 1: Historical resolutions since 2016 by size of payment to claimants ............................................................. 8

Figure 2: Unique and timely POC submissions with identified years of first abuse ................................................. 10

Figure 3: Historical resolutions by resolution year ................................................................................................. 13

Figure 4: Historical resolutions by size of payment to claimants ........................................................................... 13

Figure 5: Historical resolutions by number of repeat abuses ................................................................................. 14

Figure 6: Graph of average historical resolution value and count of claims by abuser ........................................... 14

Figure 7: Average settlement amount and count of claims by abuser and allegation categories .......................... 15

Figure 8: POC by allegation ................................................................................................................................... 17

Figure 9: POC by repeat abuser category .............................................................................................................. 17

Figure 10: Count of POC by age at first abuse occurrence .................................................................................... 18

Figure 11: Count of POCs by earliest identified year of abuse .............................................................................. 19

Figure 12: Abuse incidence by year of first abuse ................................................................................................. 20

Figure 13: Count of non-BSA relationships between abuser and abuse survivor .................................................. 21

Figure 14: Average per claim resolution value by claim count for other mass sexual abuse settlement funds ..... 23

Figure 15: POC abuser name status ....................................................................................................................... 24

Figure 16: Abuse Claim status as tort claims ......................................................................................................... 25

Figure 17: Age of first abuse occurrence ................................................................................................................ 25

Figure 18: Most severe abuse allegation for Abuse Claims to be assigned a benchmark value ........................... 26

Figure 19: Settlements by abuser for penetration allegations ................................................................................ 27

Figure 20: Summary statistics of penetration abuse settlements ........................................................................... 27

Figure 21: Ratios of the historical settlement average of repeated abuser claims to single abuser claims ........... 29

Figure 22: Summary of initial benchmark valuation ............................................................................................... 30

Figure 23: Number of abuse occurrences for benchmark valued Abuse Claims .................................................... 34

Figure 24: Reporting status of benchmark valued Abuse Claims ........................................................................... 34

Figure 25: Age at first abuse for benchmark valued Abuse Claims ........................................................................ 34

Figure 26: Abuse Claims by birth year and month ................................................................................................. 36

Figure 27: Abuse Claims by birth year and month since 1990 ............................................................................... 37

Figure 28: Forecast of future Abuse Claims by birth year and month .................................................................... 38

Figure 29: Comparison of age at time of filing for historical tort claims and Proof of Claim submissions ............. 41

Figure 30: Comparison of historical tort claims and Proof of Claim submissions by age bins .............................. 42

Figure 31: Historical tort claim mean resolution values by submission age bins .................................................... 42

Figure 32: Majority status of abusers for benchmark valued Abuse Claims .......................................................... 43

Figure 33: Tabulation of non-BSA relationships between abuser and abuse survivor for benchmark valued
Abuse Claims .......................................................................................................................................................... 43

Figure 34: Summary of valuation uncertainty factors ............................................................................................ 47

Figure 35: Mean historical tort resolution values for single abuser claims ............................................................ 50

Expert Report of Charles E. Bates, PhD

Figure 36: Portion of midpoint valuation attributable to TCJC Abuse Claims for BSA-related parties...................54

Figure 37: Summary of relevant academic literature on sexual abuse of boys ...................................................D-7

Expert Report of Charles E. Bates, PhD

# I. Introduction

(1)    On February 18, 2020 (the "Petition Date") the national organization of the Boy Scouts of America (the "BSA") and Delaware BSA, LLC (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.[2] According to Debtors, this case was filed to achieve two key objectives: to equitably compensate victims who were harmed during their time in Scouting, and to continue to carry out Scouting's mission for years to come.[3] This bankruptcy had the effect of staying pending sexual abuse-related litigation against the Debtors and provides Debtors with a forum to comprehensively resolve past sexual abuse claims in an organized manner.

(2)    By Order of this Court dated April 7, 2020 the Debtors were authorized to retain Bates White, LLC ("Bates White") as their Abuse Claims consultant and advisor.[4] In that capacity, Bates White has been asked by counsel to the Debtors to evaluate the claims data related to Sexual Abuse claims, as defined in the Bar Date Order, and advise as to the potential aggregate value of such and related issues.[5]

## I.A. Qualifications

(3)    I am Chairman of Bates White, which is an economic consulting firm with its primary office located in Washington, DC.  I specialize in the application of statistics and computer modeling to economic and financial issues, and I have extensive experience working on mass-tort claims and liability valuation issues.  I have 30 years of experience in a wide range of litigation and commercial consulting areas.

(4)    I received my PhD and MA in Economics from the University of Rochester and my BA in Economics and Mathematics, with high honors, from the University of California, San Diego.  I have taught courses in advanced statistical economic analysis and trade theory while on the faculty at Johns Hopkins University, and I have published papers on advanced topics in estimation theory in peer-reviewed journals.

---

[2]    Capitalized terms not directly defined in this document have the meaning ascribed to them in the Fifth Amended Plan and Amended Disclosure Statement [Doc 6214].

[3]    Debtors' Informational Brief Doc 4.

[4]    Doc 353. Bates White's engagement agreement for this matter was executed with counsel to the Debtors who are presently at White & Case LLP, but at the time of the retention were at Sidley Austin LLP.

[5]    Doc 695. The Bar Date was ultimately set as November 16, 2020.

Expert Report of Charles E. Bates, PhD

(5)     Prior to founding Bates White, I was a Vice President at A.T. Kearney. Prior to that, I was the Partner in Charge of the Economic Analysis Group at KPMG.

(6)     I have been retained as a valuation and estimation methodology expert in numerous mass tort matters over the last 30 years as detailed in my curriculum vitae, which is attached to this report as Appendix A. In addition to other relevant experience, my vitae include a listing of all of the publications I have authored within the past 10 years and all the cases in which I have testified, either at trial or deposition, within the past five years.

(7)     Bates White is remunerated by the Debtors at the rate of $1,250 per hour for my time. In addition to my own time, I directed other Bates White professionals who performed supporting work and analyses in connection with my preparation of this report.[6] Neither my compensation nor Bates White's compensation is contingent on the outcome of this matter.

## I.B. Scope of charge

(8)     Counsel to the Debtors has asked me to estimate the total value of its Abuse Claims as of the Petition Date[7] as though they were tort system claims against the BSA, assuming these claims were resolved at values consistent with the sexual abuse claims it resolved through the tort system prepetition. Counsel has asked that I consider in my evaluation all claims presented under the Abuse Claims Proof of Claim submissions and future claims related to acts committed prior to the Bar Date, limiting my estimate of future claims to abuse survivors who either suffered from repressed memory at the time of the Bar Date or who were minors as of the Bar Date.[8]

(9)     As part of that work, I have been asked by counsel for the Debtors to provide analysis of data regarding the BSA's historical resolutions of Abuse Claims and the trends evidenced by the Proof of Claim forms that have been submitted with respect to Abuse Claims. That work includes an evaluation of the data related to historical resolutions that was used to help develop the Trust Distribution Procedures claims matrix.

(10)    Separately, Bates White was asked by counsel for the Debtors to provide support in the processing and interpretation of data contained in the Proof of Claim forms submitted in connection with Abuse

---

[6]   Bates White's fees on this matter are based upon the time actually spent by each assigned staff member at their standard billing rate, on an hourly basis.

[7]   As noted in the Fifth Amended Plan and Amended Disclosure Statement, the Petition Date in this matter was February 18, 2020.

[8]   My understanding is that limiting any consideration of future claims derivative of acts committed prior to the Petition Date is consistent with this Courts' Bar Date order and the order defining Abuse Claims.

Expert Report of Charles E. Bates, PhD

Claims. That data processing and analysis is addressed in detail in the Expert Report of Makeda Murray ("Murray Report"). My analysis here relies on the data she assembled and processed.

(11)    As part of my work, I was also asked to provide the value of the Abuse Claims asserted against the Church of Jesus Christ of Latter-day Saints (the "TCJC"), which is supported, in part, based on claims identification process described in more detail in the Murray Report.

(12)    Bates White's work on this matter is ongoing. My work here is based on the information available to me as of the date of this report.

## I.C. Confidentiality

(13)    Bates White has read and agreed to abide by the Stipulated Confidential and Protective Order issued by this Court on June 8, 2020 [Doc 799; related Doc 613].

(14)    Much of the information on which this report is based is Confidential subject to the terms of the Stipulated Confidential and Protective Order. More specifically, the information on which this report is based relates to allegations made by (sexual) Abuse Claims who have submitted claim forms in the current Bankruptcy litigation as well related historical claims. This information is sensitive in nature and should be treated with care in addition to being subject to the protective restrictions from the Stipulated Confidential and Protective Order.

## I.D. Summary of opinions

(15)    The BSA is a non-profit corporation founded in 1910 and chartered by an act of Congress signed into law by President Woodrow Wilson on June 15, 1916.[9] Since its inception, more than 130 million young men and women have participated in the BSA's youth programs. More than 35 million adult volunteers have helped carry out the BSA's mission.[10] While the BSA's stated mission is the preparation of young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law, the BSA's own efforts to preclude morally flawed individuals from its ranks were imperfect. On rare occasions, episodes of sexual abuse occurred within or related to Scouting, some resulting in lawsuits asserting the BSA and its affiliated organizations were liable for the harm caused by the sexual abuse perpetrators.  Specifically, since 2016, 262 sexual abuse claims naming the BSA have been resolved for $170 million. Those historical resolutions involved payments for releases covering all of the BSA-related parties.

---

[9]    Debtors' Informational Brief Doc 4.
[10]    Debtors' Informational Brief Doc 4.

Expert Report of Charles E. Bates, PhD

(16)    In February 2020, the Debtors filed for bankruptcy protection, staying pending litigation against them, to give the Debtors a forum to comprehensively resolve Abuse Claims in a manner that would equitably treat all survivors and allow the BSA to continue its charitable mission to assist children in learning how to be self-sufficient, upstanding adults. As part of its reorganization proceedings, Debtors received at least one timely Proof of Claim from 82,209 unique individuals.[11] This represents vastly more claims than evidenced by the BSA's pre-Petition Date tort history. As described in the Bar Date Order, these Proofs of Claim relate to Abuse associated with the BSA or Scouting, which is broadly defined to include claims against the BSA and those against third parties such as Local Councils or Chartered Organizations that sponsored a troop or pack.

(17)    Based on the POC[12] data and historical settlement data available early in the spring of 2021, I estimated the aggregate value of the Abuse Claims as of the Petition Date was between $2.4 billion and $7.1 billion against the BSA and other BSA-related parties.  This historical settlement data was provided by Ogletree, the BSA's national coordinating counsel in prepetition tort litigation.  Here I also report on updated analyses based on the current "Tranche VI" POC data and the updated historical settlement data available now.[13] Specifically, this report is based upon the current information included in the POCs, an estimate of the number of admissible future claims related to acts committed before the Bar Date, the BSA's historically resolved sexual abuse tort claims, and publicly available information related to potential comparable settlements. As described in more detail below, most of that value relates to the Abuse Claims for which Proofs of Claim have already been filed, rather than claims that may be asserted in the future. My evaluation of the data provided in this case shows that the potential number of future claims—related to acts committed prior to the Petition Date where such future claims are limited to people who either suffered from repressed memory at the time of the Bar Date or who were minors as of the Bar Date—is small relative to the 82,209 unique and timely Proofs of Claim submitted prior to the Bar Date. The analyses of this report are consistent with and demonstrate the reasonableness of my initial valuation range, and as such, I see no basis to change my earlier valuation.

(18)    My estimated range is relatively broad primarily because of the uncertainty regarding how the BSA's 262  historical resolutions from 2016-2020 (the "Historical Settlements") align with the vastly larger quantity of 82,209 Abuse Claims in this matter.[14] This change in the scale of claims asserted is

---

[11]    As described in more detail in the Expert Report of Makeda S. Murray, MBA, there are many individuals who submitted more than one Proof of Claim form. For purposes of my analysis in this report I am considering the number of unique and timely claims: which is to say that I consider everyone who filed at least one timely Proof of Claim to have a single claim.

[12]    Throughout this report I use the terms "Proof of Claim" and "POC" to refer solely to the Proof of Claim forms submitted by or behalf of Abuse Claims and not Proof of Claim forms for other creditor classes.

[13]    The various Tranches of data refer to versions of the data described in more detail in the Expert Report of Makeda S. Murray, MBA. The relevant versions for this report are Tranche IV, which was the most current version as of the spring, and the latest Tranche VI version which incorporates submissions through July 2, 2021.

[14]    I also reviewed the available record on a larger set of historically resolved sexual abuse claims against BSA and related parties prior to Ogletree becoming counsel to BSA.  These earlier claims add little additional information, but what is

Expert Report of Charles E. Bates, PhD

indicative of a significant difference between the claims historically resolved and the Abuse Claims. All but a few of the 82,209 Abuse Claims could have been filed as tort claims in the past several decades closer in time to when the abuse occurred, had the abuse survivors chosen to do so. Further, over 80,300 of the abuse survivors have asked that their Abuse Claims remain private and confidential. These facts reveal a significant hesitancy on the part of the abuse survivors to bring forward their claims relative to prior tort claimants with public lawsuits, revealing a significant difference between the population of abuse survivors who filed Proofs of Claim and resolved tort claims prepetition. Moreover, even within the limited set of the Historical Settlements, there is wide variation in the values, ranging from four- and five-figure settlements to seven-figure settlements, even among claims with similar abuse patterns. This demonstrates that the characteristics of a specific claim have a substantial impact on the amount paid by the BSA—inclusive of other BSA-related parties such as the Local Councils and Chartered Organizations— to abuse survivors for the wrongful acts. The following table summarizes the wide range of the BSA claim resolutions since 2016.

**Figure 1: Historical resolutions since 2016 by size of payment to claimants**

| Payment size | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| Dismissed without payment | 11 | $0 | $0 |
| Four and five figure payments | 115 | $4,302,500 | $37,413 |
| Six figure payments | 94 | $30,007,000 | $319,223 |
| Seven figure payments | 42 | $135,865,000 | $3,234,881 |
| **Grand total** | 262 | $170,174,500 | $649,521 |
| **Median** | | | $100,000 |

(19)    To understand the source of this wide variation in the Historical Settlements, it is important to recognize that the source of harm are sexual abuse perpetrators who exploit their position within the BSA to gain access to their victims. The lawyers who have defended, prosecuted, and settled these cases did so with the understanding that fact finders would likely assign a larger value to the BSA in cases where they feel like the organization could have or should have done more to prevent the abuse. The BSA acknowledged in its first day information brief that "in the past, its efforts to protect youth participants have at times failed some of the very children such efforts were meant to protect."[15] The historical data show that the cases that the BSA paid the most to resolve are the ones where its protection efforts fell the shortest, indicating greater negligence. Such cases often involved serial abusers where action by the BSA may have been able to prevent future abuse. In contrast, the abusers identified on the current Proof of Claim submissions are most often not repeat offenders, but rather individuals who appear only once in the claims data.

---

available is consistent with the records kept by Ogletree.

[15]    Debtors' Informational Brief Doc 4, page 4.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

(20)     While 82,209 is a shocking number of claims, it is a small number in the context of an organization
that has served over 130 million youth, many of whom are still alive today.  Estimated rates within
the general population of the United States for the prevalence of sexual abuse in children 18 or
younger suggest it is unfortunately common. The studies Bates White has reviewed suggest that the
prevalence of non-familial abuse in minors ranges from 1% to 13%.[16] This means that at estimated
abuse rates, several million children would have been abused at least once by a non-family member
out of a typical population of 130 million children, irrespective of their participation in Scouting. But
a set of roughly 82,209 Scouting related claims, or slightly more with the inclusion of potential future
claims, as compared to a general prevalence rate of several million claims shows that participation in
Scouting contributed little to the overall sexual abuse risk of the youth that participated in Scouting.

(21)     Moreover, the Proof of Claim submissions demonstrate that the BSA policies and procedures
designed to protect scouts from sexual abuse that have been updated by taking advantage of the
technological[17] and societal changes[18] over recent decades have been successful at driving the already
small contribution to sexual abuse risk by participation in Scouting nearer to zero.  Figure 2 graphs
the number of Abuse Claims, as represented by the number of unique and timely POC submissions,
where each claim with an identifiable abuse time frame is counted in the year in which the abuse is
alleged to have first occurred. The chart shows the dramatic decline in the occurrence of abuse from a
perpetrator affiliated with the BSA over the years.[19]  This has important implications for the number
of potential future claims. The long-standing trend of falling counts of abuse means that the number
of individuals who were sexually abused prior to the Petition Date and were minors at the time of the
Bar Date likely numbers in just the hundreds (with 150 of such claims already having been filed on
behalf of people who were minors at the time of the Bar Date).

---

[16]   *See* Figure 37.

[17]   Key examples are the invention of inexpensive personal computers, the development of computer accessible databases,
internet information access and background check capability, and the invention of technology facilitating the creation of
age appropriate, tailored training materials.

[18]   Warren, Janet I. DSW Professor of Psychiatry and Neurobehavioral Sciences Institute of Law, Psychiatry, and Public
Policy University of Virginia, "Boy Scouts of America Volunteer Screening Database: An Empirical Review 1946–
2016," 2019. Exhibit 2 to the Debtor's Informational Brief, Doc 4.

[19]   The decline in Scouting participation accounts for only a small portion of this decline.  The incidence of abuse dropped
from over 7 per 10,000 Scouting participants in the late 1970s to less than one per 10,000 in the 2000s. See the body of
this report for details.

Expert Report of Charles E. Bates, PhD

**Figure 2: Unique and timely POC submissions with identified years of first abuse**



(22)   In addition to my aggregate valuation, I was asked to help develop the Matrix Values under the Trust Distribution Procedures incorporated in the Amended Plan. As described in more detail below, the Base Values, Aggregating Scaling Factors, and Mitigating Scaling Factors are derived from, and consistent with, the BSA's historical resolutions.

(23)   I was also asked to provide a quantification of the value of the Abuse Claims asserted against the TCJC. There is uncertainty regarding the identification of TCJC claims.  I have two definition of TCJC claims; those that directly identify the TCJC and those that encompass a broad range of Local that are most comprised of TCJC members.  Under the midpoint of my valuation range, the total aggregate value associated with the TCJC Abuse Claims with first abuse prior to 1976 is $177 million. It is important to recognize that this figure is an aggregate for the relevant set of Abuse Claims; the total value, which could potentially be attributable to any combination of BSA-related parties including the Debtors, Debtors' insurers, Local Councils, and the TCJC. The value of the Abuse Claims as to the TCJC in isolation would necessarily be only some share of this total.

(24)   The remainder of this report describes these opinions and their support in more detail.

Expert Report of Charles E. Bates, PhD

(25)    I reserve the right to modify and/or supplement this report if any new information and documents are provided to me that materially affect my opinions. Should additional new information be made available to me that would cause me to update my opinions, I will notify counsel to the Debtors.

(26)    I reserve the right to use additional graphics and exhibits in connection with the opinions expressed in this report.

## I.E. Materials relied upon

(27)    This report is based on data regarding the Abuse Claims submitted as part of the Proof of Claims docket, historical data regarding the resolution of similar claims by the BSA, other potentially comparable settlements, and information from academic literature on the prevalence and nature of such claims as cited throughout this report. Further information regarding the nature and processing of the Proof of Claim submissions and the historical data can be found in the Expert Report of Makeda S. Murray, MBA.

(28)    The list of the specific documents I have relied upon is provided in Appendix C.

Confidential subject to Protective Order

Expert Report of Charles E. Bates, PhD

# II. Background

(29)    According to the Debtors' Information Brief, [20]

> The Boy Scouts of America ("BSA") is a non-profit corporation founded in 1910 and
> chartered by an act of Congress signed into law by President Woodrow Wilson on June 15,
> 1916. The BSA holds a federal charter alongside other organizations distinguished for their
> service to the national community, including the American Red Cross, the Boys & Girls
> Clubs of America, and Little League Baseball. The BSA's mission is to prepare young people
> for life by instilling in them the values of the Scout Oath and Law and encouraging them to
> be trustworthy, kind, friendly and helpful. The BSA also trains young men and women in
> responsible citizenship, character development, and self-reliance through participation in a
> wide range of outdoor activities, educational programs, and, at older ages, career-oriented
> programs in partnership with community organizations. At the time of the BSA's chartering,
> Congress recognized the "importance and magnitude" of the BSA's work and observed that
> the BSA "tends to conserve the moral, intellectual, and physical life of the coming
> generation."
>
> Since its inception 110 years ago, more than 130 million young men and women have
> participated in the BSA's youth programs. More than 35 million adult volunteers have helped
> carry out the BSA's mission.3 The BSA's alumni are legion among our nation's business,
> political, and cultural leaders. Their legacy is the creation and support of Scouting units in
> virtually every corner of America and at U.S. military bases worldwide. Today, the BSA
> remains one of the largest youth organizations in the country and one of the largest Scouting
> organizations in the world, with approximately 2.2 million registered youth participants and
> approximately 800,000 adult volunteers.

## II.A. The BSA's historical tort claims

(30)    The BSA has been a defendant in lawsuits from hundreds of sexual abuse survivors asserting that the
BSA has some responsibility and liability for their injuries. Since 2016 and prior to the Petition Date,
262 sexual abuse claims naming the BSA had been resolved for a total of $170 million. It is my
understanding that none of these resolutions involve payments for final judgment of a verdict.  Figure
3 shows the number of claims resolved and the total settlements paid each year since 2016. My
understanding is that these resolution values reflect the settlement payment on behalf of all BSA-
related parties.

---

[20]    Debtors' Informational Brief Doc 4.

---

Expert Report of Charles E. Bates, PhD

**Figure 3: Historical resolutions by resolution year**

| Resolution year | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| 2016 | 20 | $12,575,000 | $628,750 |
| 2017 | 70 | $31,704,500 | $452,921 |
| 2018 | 47 | $55,905,000 | $1,189,468 |
| 2019 | 123 | $69,975,000 | $568,902 |
| 2020 | 1 | $15,000 | $15,000 |
| Unknown | 1 | $0 | $0 |
| **Total** | **262** | **$170,174,500** | **$649,521** |

(31)    As Figure 3 shows, these 262 claims were resolved for a mean payment of nearly $650,000 on average. What is not apparent from this table, however, is how varied these settlements were. In stark contrast to the mean, the median payment was $100,000, only one fifth of the mean. The median is another commonly used measure of typicality; it is the midpoint of a set of figures.  In contrast, another measure of typicality, the mean, is derived by summing up a set of values and dividing by the number of observations in the set. Having a median that is substantially different from the mean means that the data are "skewed", exhibiting substantial variation, with a small number of values having disproportionately large influence on the measurement of what is typical.

(32)    Figure 4 reveals the extent of that variation (skew). Sixteen percent of the historical settlements are seven figures or more ($1,000,000). And these high value settlements account for nearly 80% of the total amount paid to claimants. In other words: a relatively small portion of the historical claims account for most of the historical resolution dollars. These claims are attributable to a small number of egregious serial abusers who were adept at avoiding getting caught.

**Figure 4: Historical resolutions by size of payment to claimants**

| Payment size | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| Dismissed without payment | 11 | $0 | $0 |
| Four and five figure payments | 115 | $4,302,500 | $37,413 |
| Six figure payments | 94 | $30,007,000 | $319,223 |
| Seven figure payments | 42 | $135,865,000 | $3,234,881 |
| **Grand total** | **262** | **$170,174,500** | **$649,521** |
| **Median** | | | **$100,000** |

(33)    Analysis of the data demonstrates that the variation is not random. Of the claims where the abuser is known today, most of the historical cases (76% by count and 87% by payment) are attributable to abusers who appear more than once in the historical resolution data.[21]

---

[21]    The database of historical claims often does not include the name of the abuser for claims resolved prior to BSA's counsel Ogletree taking on the job of defending its sexual abuse claims.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 5: Historical resolutions by number of repeat abuses**

| Number of times abuser appears in historical cases 2016-2020 | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| 1 | 62 | $21,670,500 | $349,524 |
| 2-5 | 61 | $35,457,500 | $581,270 |
| 6+ | 139 | $113,046,500 | $813,284 |
| **Total** | **262** | **$170,174,500** | **$649,521** |

(34)  Further evaluation of the resolutions by abuser shows that claims related to a handful of serial abusers received substantially higher values than the claims associated with other abusers. Figure 6 below provides a graph of the historical resolution values by abuser. The highest claim values are associated with serial abusers.

**Figure 6: Graph of average historical resolution value and count of claims by abuser**



(35)  As the charts above show, historical settlement amounts varied greatly from claim to claim depending on the identity of the abuser and the circumstances of the abuse. The nature of the abuse also influenced the historical settlement values, though not to the same extent as abuser circumstance. The following table (Figure 7) provides the average settlement amounts associated with the alternative

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

abuse categories of (1) the 59 claims of abuse involving penetration of the claimant, (2) the 105 claims involving other sex acts of oral sex and masturbation, and (3) the 39 claims of abuse involving groping or touching, both clothed and unclothed.[22]  A fourth category of the 59 claims without identified abuse category are tabulated separately.  I also segmented the claims into five categories of abusers.  The first includes the 61 claims for which the identified abuser appears once in the historical data.  Categories two and four separate out two infamous repeat abusers at opposite ends of the settlement amount spectrum: the 69 claims associated with the abuser Louis Brouillard, which settled on average for less than $60,000 and the 16 claims associated with the abuser Thomas Hacker, which settled on average for $5.5 million. The third category includes the 115 claims associated with other repeat abusers.  The fifth category includes the 1 claim without abuser identified in the claims database.[23]

**Figure 7: Average settlement amount and count of claims by abuser and allegation categories**

| Abuser category | Penetration | Other sex acts | Groping/touching | Allegation not recorded | Overall |
|---|---|---|---|---|---|
| **One time abuser** | | | | | |
| Average settlement | $561,250 | $389,538 | $165,000 | $45,000 | $354,025 |
| Count of claims | 18 | 26 | 5 | 12 | 61 |
| **Louis Brouillard** | | | | | |
| Average settlement | $69,900 | $78,864 | $32,500 | $42,500 | $57,630 |
| Count of claims | 10 | 22 | 3 | 34 | 69 |
| **Other repeat abusers** | | | | | |
| Average settlement | $712,758 | $450,824 | $434,289 | $201,371 | $481,978 |
| Count of claims | 27 | 46 | 30 | 12 | 115 |
| **Thomas Hacker** | | | | | |
| Average settlement | $8,025,000 | $4,863,636 | - | $3,500,000 | $5,568,750 |
| Count of claims | 4 | 11 | - | 1 | 16 |
| **Abuser not recorded** | | | | | |
| Average settlement | - | - | $75,000 | - | $75,000 |
| Count of claims | - | - | 1 | - | 1 |
| **Overall average settlement** | $1,053,322 | $820,009 | $359,646 | $133,923 | $649,521 |
| **Total count of claims** | 59 | 105 | 39 | 59 | 262 |

---

[22]  Recognizing that there is a spectrum of abuse, any segmentation is done for the convenience and clarity it provides in analyzing claims of different severity. For certain analytical and presentational purposes, I have combined what are separate abuse categories on the POC, due to the limited number of historical settlements and abuse category identification ambiguity.

[23]  My understanding is that the identity of the abuser and the nature of the claims were known at the time of payment but is not recorded in the data.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

(36)    The settlement average is highest for claims of abuse involving penetration, followed by other sex acts, and then those involving groping/touching, which have the lowest average. That pattern is typical of the separate abuser categories, but at much different levels.

(37)    Other considerations also affect claim values but are not recorded consistently or sufficiently in the historical claims data to ascertain their impact on settlement amounts. These included, but are not limited to, the severity, duration, and frequency of the abuse, the number and age of perpetrators involved, the nature of coercion, threats, or violence involved with the abuse, the impact of the abuse on the life of the abuse survivor, and the existence and nature of other relationships the perpetrator may have had outside of Scouting. According to the BSA's defense counsel, these factors also impacted negotiations of the historical settlements and affected the final resolution of the claims. These case specific factors are reflected in the TDPs, as discussed further below.  Not all claimants are the same in this regard and those differences affect the outcomes of tort cases. And finally, different jurisdictions, judges, and juries will not evaluate claims in the same way. The same lawsuit that involves claims for pain and suffering or punitive damages will receive widely different results in courts across the country.

## II.B. Abuse Claims

(38)    As part of its reorganization proceedings, the BSA received at least one timely Proof of Claim from 82,209 unique individuals, vastly more Abuse Claims than the BSA received pre-Petition Date in the tort system.[24] Each of the 82,209 unique individuals (or their counsels) filled out a 12-page Proof of Claim questionnaire detailing their claim.  The POCs asked for information on many of the Abuse Claim attributes I referred to above that have historically affected the value of each Abuse Claim. The POCs request information including, but not limited to, background information for abuse survivor, their involvement with Scouting, the nature of the sexual abuse, the date of the incident(s) of abuse and age of abuse survivor at the time, the identity of the abuser(s) and their connection to Scouting, the frequency of abuse and where it occurred, if the abuse was disclosed by the abuse survivor around the time of the abuse and to whom it was disclosed, other relationships outside of Scouting between the abuser(s) and the abuse survivor, and the impact of the abuse on the life of the abuse survivor. Most POCs provided much, if not all, of the information requested. (See the report of Makeda Murray, MBA for details.) Moreover, these POC provide the sworn record for the existing Abuse Claims in this matter.  The following paragraphs provide some salient examples of the information provided on the POCs.

---

[24]   As described in more detail in the Expert Report of Makeda S. Murray, MBA, there are many individuals who submitted more than one Proof of Claim form. For purposes of my analysis in this report I am considering the number of unique and timely claims: which is to say that I consider everyone who filed at least one timely Proof of Claim to have a single claim.

---

Expert Report of Charles E. Bates, PhD

(39)  The POCs requested information on the nature of the alleged abuse.  The following is a tabulation of the most severe allegations of abuse documented in the POCs.  As the table shows, 93% of Abuse Claims provided information regarding the allegation of abuse.

Figure 8: POC by allegation

| Most severe allegation | Count of POC | % of total |
|---|---|---|
| 1. Penetration | 24,539 | 30% |
| 2. Oral Sex | 18,856 | 23% |
| 3. Masturbation | 13,022 | 16% |
| 4. Groping | 17,138 | 21% |
| 5. Touching-Unclothed | 1,879 | 2.3% |
| 6. Touching-Clothed | 1,294 | 1.6% |
| 7. Unknown/Unconfirmed | 3,817 | 4.6% |
| 8. Missing | 1,664 | 2.0% |
| Total | 82,209 | |

(40)  Over half of the POCs identified their abuser(s).  In notable contrast to the historical claims, in which 75% of claims involved repeat abusers, only 14% of Abuse Claims identified a repeat abuser.  Even considering only claims in which an abuser was named, nearly 77% of abusers appeared only once in 48,072 Abuse Claims with abusers identified.

Figure 9: POC by repeat abuser category

| Abuser category | Count of POC | % of total | % of known |
|---|---|---|---|
| Unidentified Abuser | 34,137 | 42% | |
| Abuser identified on one Abuse Claim | 37,069 | 45% | 77% |
| Abuser identified on 2 to 4 Abuse Claims | 7,220 | 9% | 15% |
| Abuser identified on 5 to 9 Abuse Claims | 2,353 | 3% | 5% |
| Abuser identified on 10 or more Abuse Claims | 1,430 | 2% | 3% |
| Total | 82,209 | | |

(41)  Ninety-two percent of POCs (75,512 of 82,209) identified their age at first abuse occurrence by providing both birth year and year(s) of abuse.  One half of one percent of these (411 of 75,512) identified their age as 18 or over.  For the rest, the average and median age at first abuse was 11 years old, eighty-seven percent (66,121 of 75,512) were 13 years old or younger.  The following figure illustrates the count of POCs by age.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 10: Count of POC by age at first abuse occurrence**



(42)  Ninety-three percent of POCs (76,051 of 82,209) also identified when the abuse occurred.  Figure 11 illustrates the number of POCs by the earliest year of identified abuse.  For reference, I have also included participation in Boy Scouts or Cub Scouts for each year.  The increase in alleged abuse prior to the 1970s is driven by two factors.  The first, as the figure shows, is the steady increase in participation in Boy Scouts or Cub Scouts from less than 500,000 in the early 1920s to a peak of nearly 4.5 million scouts at the beginning of the 1970s.[25]   The second is the result of data censoring due to mortality. The average age of an abuse survivor with year of first abuse before 1970 is 70 years old.  Many of the people who participated in Boy Scouts or Cub Scouts in the early decades of the 1920s, 1930s, 1940s, and even the 1950s were no longer alive at the time of the Bar Date.

---

[25]   I focus here on the population of Boy Scouts and Cub Scouts because those are the primary programs with youth typical for the ages of first abuse reported in the Abuse Claims POCs.  While some older participants also filed POCs, participants in those programs are generally of ages less subject to the reported abuse.

Expert Report of Charles E. Bates, PhD

**Figure 11: Count of POCs by earliest identified year of abuse**



(43)    The abuse year pattern is notable for its steep decline starting in the mid-1970s. The count of Abuse Claims as reflected in the POCs declines at an average of 9% per year starting in 1974. Participation differences account for only a small portion of the decline in the incidence of abuse. In particular, while the number of youths involved with Boy Scouts and Cub Scouts dropped from the mid-1970s through the mid-1980s, the participation rate effectively leveled off for a period into the early 2000s at roughly 3 million youth per year. During that time the count of Abuse Claims as reflected in the POCs continued to drop steeply. The incidence of abuse, measured as a rate, dropped from over 7 per 10,000 participants in the 1970s to less than one per 10,000 in the 2000s. Figure 12 tabulates the abuse incidence per 10,000 participants reflected in the POCs.

Confidential subject to Protective Order                                                      Page 19

Expert Report of Charles E. Bates, PhD

Figure 12: Abuse incidence by year of first abuse

| Year of first abuse | Average count of POC reported abuse incidence per year | Average annual participation | Abuse incidence rate per 10,000 participants |
|---|---|---|---|
| 1970-1974 | 2,822 | 4,284,186 | 6.6 |
| 1975-1979 | 2,227 | 3,092,400 | 7.2 |
| 1980-1984 | 1,681 | 2,755,823 | 6.1 |
| 1985-1989 | 1,298 | 2,989,841 | 4.3 |
| 1990-1994 | 986 | 3,022,346 | 3.3 |
| 1995-1999 | 690 | 3,058,123 | 2.3 |
| 2000-2004 | 371 | 2,922,168 | 1.3 |
| 2005-2009 | 182 | 2,532,200 | 0.7 |
| 2010-2014 | 84 | 2,315,425 | 0.4 |
| 2015-2019 | 36 | 2,086,565 | 0.2 |

(44)   The watershed event that appears key to the above documented reduction of abuse incidence apparent in the POC submissions was the establishment of the BSA Youth Protection Task Force in 1985. In the decades since, aided by the development of computer technology, the BSA expanded its education, detection, and prevention programs. The success of its youth protection programs is reflected in the dramatic 95% drop in the incidence rate of abuse documented by the reduction in the numbers of POCs alleging abuse that started after 1985. The impact of that reduction is huge; had BSA Youth Protection Program not been successful, so that abuse incidence within the BSA remained at the levels indicated by the POC submissions in the 1970s, I estimate there would have been 70,000 POCs with year of first abuse since 1985, instead of 11,000 for the POCs submitted.

(45)   The POCs also provided information on the number of non-BSA relationships the abuse survivor had with their abuser(s). Thirty percent of POCs (24,471 of 80,209) identify that they had a relationship outside of Scouting with their abuser(s). The POC questionnaire asked abuse survivors to identify by checking a box if their abuser(s) was also their (1) religious organization leader, member, volunteer, (2) family member or relative, (3) coach/athletics, (4) teacher, (5) neighbor, or (6) Other (please explain and add any other information you remember to the categories above.) The most common boxes checked were (1) religious organization leader, member, volunteer and (6) Other – typically identifying a member of the community or a friend of a family member. Figure 13 provides a tabulation of the count of POC by number of outside relationships identified.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 13: Count of non-BSA relationships between abuser and abuse survivor**

| Number of identified outside relationships | Count of POC | % of total |
|---|---|---|
| 0 | 57,738 | 70% |
| 1 | 20,860 | 25% |
| 2 | 3,029 | 3.7% |
| 3 | 480 | 0.6% |
| 4 | 74 | 0.1% |
| 5 | 21 | 0.03% |
| 6 | 7 | 0.01% |
| **Total** | **82,209** | |

(46)     As these examples illustrate, the POCs contain much information that is crucial for evaluating each Abuse Claim. The Trust Distribution Procedures ("TDP") in this matter are designed to use that information, as well as additional information that will be gathered by the Settlement Trustee to provide fair and equitable treatment for Allowed Abuse Claims providing substantially similar treatment to holders of similar, legally valid, and supported Abuse Claims. The Base Matrix Values and other TDP valuation factors were informed by the historical settlement data. As the description of the prior Section on the historical settlements data makes clear, in contrast to the much more comprehensive and consistently captured data of the POCs, the historical data can only provide guidance about the aggregate value of Abuse Claims. That data does not have enough detail from enough claims to determine the value of individual Abuse Claims. That would require a more thorough evaluation of each Abuse Claim's merits. That is the purpose of the TDP, which provide procedures for that evaluation that will result in a reasonable valuation of individual Abuse Claims consistent with the historical settlements.

(47)     The historical data does, however, provide valuation benchmarks that can used to evaluate the value of the Abuse Claims in aggregate, and allow us to derive a categorical framework for the valuation of claims under the TDPs. That can be done by using an average valuation applied to an aggregation of Abuse Claims. Just as the average of a group of historical claims does not determine the value of any one Abuse Claim, nonetheless, with the knowledge of the average value of the group and the number of Abuse Claims in the group, we can know the aggregate value of the group of Abuse Claims by multiplying the average value by the number of Abuse Claims. The following Section describes the valuation methodology I have used to estimate an aggregate valuation range for the Abuse Claims as though they were historical tort claims.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

## II.C. Potential outside comparables

(48)    In addition to the BSA's own historical resolution and POC data I considered publicly available information related to potential comparable settlements. These data are effectively a list of other sexual abuse mass claim settlement funds created by various organizations. Many of those are Catholic Diocese which have gone through bankruptcy, but the list also includes settlements from schools—including universities, municipalities, and medical professionals. This list was assembled by my staff and is an inclusive survey capturing all publicly reported mass settlements of sexual abuse cases we found.  The data include the publicly available record of the total settlement amount and the number of claims and then provide an estimated average per claim payment.[26]

(49)    Two things are evident from any review of these data. The first is that amongst all these potential comparables, there is no true outside comparable to the BSA matter in terms of scale. The second is that the average per claim value—obviously considering a host of case-specific factors such as the organizational responsibility, nature of abuse, and in some cases likely considerations related to ability to pay—varies a lot.

(50)    Regarding scale, the largest case recorded in that set is a class action against Dr. James Heaps, a former UCLA gynecologist that involved 6,600 class members and was for $73 million—which implies an average of just over $11,000—per claim. Outside of that one case, which has very different facts, no other includes more than 600 claims (the next highest is 564 individual claimants). This contrasts with the 82,209 POCs in this matter.

(51)    Regarding value, the per claim average ranges from just over $11,000 per claim to $8.5 million per claim. Even if one were to trim the most extremely outliers there are numerous cases where the per claim average ranges from low five figure settlements on seven figure settlements. Overall, these data have the feature that the average value is negatively correlated with the count of claims, which is to say those matters involving fewer total claimants have higher per claim values and those matters with more claims have lower per claim values. But even within a given size of settlement fund, as determined by the number of claims and the total settlement amount (inclusive of any considerations related to ability to pay and before accounting for any costs that would reduce claimant payments) there is a wide variety in the per claim value.  Figure 14 provides a graph of the average per claim value by the reported claim count.

---

[26]    No reduction is made for potential settlement fund or trust operating expenses.

---

Expert Report of Charles E. Bates, PhD

**Figure 14: Average per claim resolution value by claim count for other mass sexual abuse settlement funds**



(52)    While there is no close comparable or set of comparables amongst this list, the data illustrate that there is a wide range of reasonable per claim settlement amounts for large groups of sexual abuse cases.

Expert Report of Charles E. Bates, PhD

# III. Benchmark Valuation

(53)    I used a frequency-severity model to calculate my valuation range. The frequency (number) of Abuse Claims within each of several abuse categories is defined by the number of Proof of Claim submissions for each category.  The severity (value) is assigned to each category based on historical settlement benchmarks derived from the BSA's historical pre-petition resolutions of sexual abuse claims within the tort system. In this Section I explain how I segmented the POCs and selected the benchmark values for each category.  The number of useful categories is limited by the types of data affecting claim values in the historical data as described above in Section II.A.  Similarly, my benchmark selection is done recognizing the paucity and extreme skewness of the historical settlement values. These limitations mean there is the potential for significant uncertainty regarding how well the selected benchmark values represent the typical Abuse Claims within each category applied to the POCs.  I evaluate that uncertainty in the following Section.  Based on this benchmark valuation and the following Section I conclude that the value of POCs, valued as historical tort claims, is within the range I estimated based on the Tranche IV data in the early spring of 2021 of $2.4 billion to $7.1 billion as to the BSA and all BSA-related parties.  I also conclude that it is not possible to narrow this range due to the uncertainty inherent in valuing 82,209 Abuse Claims with just a few hundred claims upon which to base that valuation.

(54)    Initially, Abuse Claims that did not identify, by name, either in full or in part, an alleged abuser were set aside as a separate category and assigned a zero benchmark value. This was done with an understanding from the BSA's counsel that an abuse survivor must be able to identify the alleged abuser to have a viable tort case. For benchmark valuation purposes, 34,137 Abuse Claims were assigned a zero benchmark value for failure to name an abuser, leaving 48,072 Abuse Claims to be assigned the benchmark value. Figure 15 summarizes these results. Note that for these purposes the "named" total includes claims in both the first two rows: those that provided a full first and last name, and those that provided a partial, meaning either first or last name.

**Figure 15: POC abuser name status**

| Abuser name status | Count of POC |
|---|---|
| 1. Name provided | 30,501 |
| 2. Partial name provided | 17,571 |
| 3. Physical description only | 10,288 |
| 4. Unknown | 21,749 |
| 5. Missing (blank) | 2,100 |
| **Total** | **82,209** |
| **Subtotal (named)** | **48,072** |
| **Subtotal (unnamed)** | **34,137** |

Highly Confidential – Subject to Protective Order

(55)    Secondly, Abuse Claims that did not presumptively meet the statute of limitations requirements for a tort claim according to criteria provided by the BSA's defense counsel were set aside as a separate category and assigned a zero benchmark value. As described in more detail in the Murray Report, this evaluation was done on a claim-by-claim basis based on the state or states where the alleged abuse occurred and the birth date of the abuse survivor. If the abuse survivor reported multiple abuse states, the state with the most favorable statute of limitations to the abuse survivor was used. For benchmark valuation purposes, 31,215 Abuse Claims were assigned a zero value for failure to meet the statute of limitations required for a viable tort claim leaving 16,857 Abuse Claims to be assigned the benchmark value.[27]

Figure 16: Abuse Claim status as tort claims

| Abuse Claim status | Count of POC |
|---|---|
| [1] Named an abuser and presumptively barred | 31,215 |
| [2] Named an abuser and not presumptively barred | 16,857 |
| [3] = [1] + [2] Named an abuser | 48,072 |
| [4] Did not name an abuser | 34,137 |
| [5] = [3] + [4] Total Abuse Claims | 82,209 |

(56)    The 16,857 Abuse Claims for which the abuser was named and are not statute of limitations barred were segmented into two categories based on the age of the abuse survivor at the date of their first abuse occurrence. Consistent with the Court's definition of Abuse Claims, as provided on the POC, those 18 or older at the date of their first abuse (86 of 16,857 Abuse Claims) were assigned a benchmark value of zero, leaving 16,771 Abuse Claims to be assigned the benchmark value. This includes 792 Abuse Claims for which the abuser was named and are not statute of limitations barred but did not provide date of first abuse. For benchmark valuation purposes, these were included.

Figure 17: Age of first abuse occurrence

| Age at first abuse | Count of POC |
|---|---|
| 1–10 | 6,279 |
| 11–14 | 8,610 |
| 15–17 | 1,090 |
| 18+ | 86 |
| Unknown/Missing | 792 |
| Total | 16,857 |
| Claims to be assigned a benchmark value (excludes 18+) | 16,771 |

---

[27] Under the TDP and the Amended Plan claims can select an expedited distribution of $3,500 as part of the voting procedures. As of the time of the writing of this report the voting deadline has not yet passed. But if all of the claims which are assigned a $0 under the Bates White benchmark were to select such a distribution it would total $230 million. While this is a substantial sum, it is small relative to the overall estimation range.

Expert Report of Charles E. Bates, PhD

(57)    The 16,771 Abuse Claims for which the abuser was named and are not statute of limitations barred were segmented into four abuse categories based on their most severe abuse allegation. Abuse Claims involving sexual penetration set into the first category. Abuse Claims involving oral sex or masturbation were grouped together as a second category of other sex acts. Abuse Claims involving groping, touching-clothed, and touching-unclothed were grouped together into a single third category of grouping/touching. Claims that did not identify the nature of their abuse were grouped separately and were assigned a zero benchmark value for failure to identify their abuse, leaving 16,113 Abuse Claims to be assigned the benchmark value. These claims are the most like those that were resolved by the BSA, often in conjunction with its Insurance Companies, prior to these Chapter 11 Cases.

**Figure 18: Most severe abuse allegation for Abuse Claims to be assigned a benchmark value**

| Most severe abuse allegation | Count of POC |
|---|---|
| 1. Penetration | 5,645 |
| 2. Other sex act | 6,847 |
| 3. Groping/Touching | 3,621 |
| 4. Unknown/Missing | 658 |
| **Total** | **16,771** |
| Claims to be assigned a benchmark value (excludes 4. Unknown/Missing allegation) | 16,113 |

(58)    I selected the initial benchmark value by examining the historical settlement resolution summary values provided by the BSA's defense counsel Ogletree from the claims with the most severe abuse, those involving of sexual penetration. These involved 59 abuse survivors and 36 abusers from the lawsuits against the BSA resolved by Ogletree since 2016 when Ogletree took over as the BSA's counsel. The total value of these settlements was $62,145,974. As the primary source of settlement value variation is the identity of the abuser, I tabulated the settlement values in that manner on Figure 19 below.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 19: Settlements by abuser for penetration allegations**

| Abuser | Total Settlement | Number of abuse survivors | Average Settlement | Abuser | Total Settlement | Number of abuse survivors | Average Settlement |
|---|---|---|---|---|---|---|---|
| Carron | $0 | 1 | $0 | Smart | $300,000 | 1 | $300,000 |
| Desandre | $0 | 1 | $0 | Dabrow | $450,000 | 1 | $450,000 |
| Swank | $0 | 1 | $0 | Opalinski | $475,000 | 1 | $475,000 |
| Dennis | $29,474 | 2 | $14,737 | Astleford | $500,000 | 1 | $500,000 |
| George | $20,000 | 1 | $20,000 | Tomlinson | $1,300,000 | 2 | $650,000 |
| Blackwell | $25,000 | 1 | $25,000 | Malone | $1,700,000 | 2 | $850,000 |
| Schmidt | $25,000 | 1 | $25,000 | Empey | $965,000 | 1 | $965,000 |
| Brouillard | $699,000 | 10 | $69,900 | Watkins | $975,000 | 1 | $975,000 |
| Liberty | $100,000 | 1 | $100,000 | Libey | $3,900,000 | 4 | $975,000 |
| Rothschild | $100,000 | 1 | $100,000 | Hale | $1,000,000 | 1 | $1,000,000 |
| Philpott | $150,000 | 1 | $150,000 | Weaver | $1,200,000 | 1 | $1,200,000 |
| Martin | $325,000 | 2 | $162,500 | Leininger | $6,200,000 | 5 | $1,240,000 |
| Shafer | $175,000 | 1 | $175,000 | Fout | $1,595,000 | 1 | $1,595,000 |
| Pietz | $200,000 | 1 | $200,000 | Dunbar | $1,750,000 | 1 | $1,750,000 |
| Santos | $200,000 | 1 | $200,000 | Smith | $1,750,000 | 1 | $1,750,000 |
| Bowen | $225,000 | 1 | $225,000 | Hepp | $2,950,000 | 1 | $2,950,000 |
| Anderberg | $250,000 | 1 | $250,000 | Hacker | $32,100,000 | 4 | $8,025,000 |
| Conn | $250,000 | 1 | $250,000 | | | | |
| Momont | $262,500 | 1 | $262,500 | **Total** | **$62,145,974** | **59** | **$1,053,322** |

(59)   I calculated four different measures of central tendency for these settlements: the mean and the median first using each of the 59 abuse survivors as a measure of value, then again by each of the 36 abusers as a measure of value, provided in Figure 20. Each is informative about some aspect of the historical settlements. A comparison of the mean and median calculated either way illustrates the extreme skewness of the settlements as discussed in the prior Section; a large portion of the total value of the settlements is concentrated in a small portion of abuse survivors abused by a small number of egregious serial abusers.

**Figure 20: Summary statistics of penetration abuse settlements**

| Statistic | By abuser | By abuse survivor |
|---|---|---|
| Count | 36 | 59 |
| Median | $256,250 | $250,000 |
| Mean | $774,434 | $1,053,322 |
| Midpoint | $515,342 | $651,661 |

(60)   The principal question to address in using the historical settlements to value the Abuse Claims is: how well does the mix of claims in the historical record represent the composition of Abuse Claims? If

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

there are very few Abuse Claims like the historical claims that received high six- or seven-figure
settlements, the median a better indicator of the value of Abuse Claims.  In contrast, if the mix of
higher value and lower value Abuse Claims is like the historical claims, then the mean is a better
indicator of the value of Abuse Claims. As noted in paragraph (35), there are Abuse Claims
identifying a repeat abuser though they represent a lower portion of current Abuse Claims than in the
historical data.  This points to a compromise value between the median and mean as a reasonable
initial benchmark.  For this reason, I have selected $650,000 as my initial benchmark to value Abuse
Claims involving penetration sexual abuse.  In the following Section, I report on my analyses of the
range of uncertainty in using this initial benchmark as the basis to value Abuse Claims.  In the
remainder of this Section, I further segment the Abuse Claims to isolate Abuse Claims with
identifiable factors that would lower or increase the value of those groups relative to the initial
benchmark value. For aggregate estimation, I maintain the three broad abuse categories of (1)
penetration claims, (2) other sex acts including oral sex and masturbation, and (3) all groping and
touching abuse claims.

(61)    As illustrated in Figure 7, claims for other sex acts typically settled at lower amounts than claims
        involving penetration sexual abuse.  The overall mean for all other sex acts claims, including ones
        against both repeat abusers and abusers that appear only once, excluding Hacker is also very close to
        $350,000.  On this basis I set the discount to apply to the initial benchmark of $650,000 for the
        benchmark valuation of Abuse Claims involving other sex acts at 54%.  The discount for Abuse
        Claims involving groping/touching is even lower. I used the approximate relative value of the average
        of once-identified abuser claims for groping/touching claims to other sex act claims to set the
        benchmark discount to 27% of the initial benchmark—half again what was used for the other sex
        acts—as the initial benchmark discount of the group of groping/touching Abuse Claims.[28]

(62)    As also illustrated in Figure 7, there is a clear difference in value for claims involving abuse from a
        repeat abuser in contrast to a once identified abuser. Abuse Claims involving a repeat abuser were
        separately categorized and assigned a premium value 50% higher than once-identified abuser Abuse
        Claims.  I selected the size of this premium by examining the ratio of average settlements of historical
        repeated abuser claims to once-identified abuser claims.  The following table lists 12 variants of that
        ratio.

---

[28]    There are several notably high groping and touching act resolutions recoded in the settlement summary.  These are tied
        to a handful of repeat abusers who also committed more serious acts against other survivors. It is my understanding that
        those groping/touching cases had been either settled in conjunction with other cases brought against the same abuser, or
        that the values negotiated in these matters were influenced by the exposure stemming from the more serious acts
        committed against others. Because of this, I focused my analysis of the mean value or claims in this tier exclusive of
        those claims.

---

Expert Report of Charles E. Bates, PhD

**Figure 21: Ratios of the historical settlement average of repeated abuser claims to single abuser claims**

| Selection variant | Include zeros | | Exclude zeros | |
|---|---|---|---|---|
| | Penetration | All claims | Penetration | All claims |
| All repeat abusers | 226% | 210% | 188% | 189% |
| Excluding Hacker | 96% | 91% | 80% | 83% |
| Excluding Hacker and Brouillard | 127% | 136% | 106% | 124% |

(63)    For this purpose, I rely on the ratios provided by excluding the claims of the two most notorious serial abusers, Brouillard and Hacker, because of their disproportionate influence on these ratios as benchmarks for the Abuse Claims. Claims involving Brouillard account for 26% of the claims resolved by Ogletree on behalf of the BSA, whereas they only account for 0.08% of Abuse Claims. Claims involving Hacker account for over 50% of the value of settlements resolved by Ogletree on behalf of the BSA, whereas Abuse Claims naming Hacker only account for less than 0.05% of Abuse Claims. No other abusers have such an extreme influence on the historical settlements. The ratios excluding Hacker and Brouillard are better indicators of the typical premium attached to repeat abuser claims.

(64)    As illustrated in Figure 13, a sizeable portion of the Abuse Claims identify at least one non-BSA related relationship between their abuser(s) and the abuse survivor. A review of the historical settlements with value in the neighborhood of the initial benchmark value reveal no outside relationships. In contrast, many claims at the lower end of the value spectrum of historical settlements clearly do indicate a relationship outside of Scouting. A notable example is the claims involving Brouillard, who was a catholic priest and schoolteacher in addition to a Boy Scout troop leader. As illustrated in Figure 7, claims involving abuse by Brouillard received a deep discount relative to the initial benchmark value. As there is no consistent coding or recording of the number of outside relationships in the historical claims data, I cannot estimate from that data a reasonable discount to apply to all Abuse Claims with outside relationships. The only clear example is that of the claims involving Brouillard whose abuse survivors received less than 10% the initial benchmark value of repeat abuser claims. My understanding from Ogletree is that the Brouillard case is not typical due to a number of factors unique to those cases. Lacking further guidance from the historical data, I have selected a benchmark discount of 50% for Abuse Claims involving a single non-BSA relationship and a 75% discount for those with more than one non-BSA relationships.

(65)    Figure 22 is a summary of the calculation to arrive at an initial aggregate benchmark value of $5.8 billion from the initial benchmark of $650,000 and category discounts and premium scalars described above as applied to the 16,113 Abuse Claims to be assigned a positive initial benchmark value.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 22: Summary of initial benchmark valuation**

| Benchmark category and initial factor benchmark scalar | Category initial benchmark scalar calculation | [A] Count of POC | [B] Initial benchmark Abuse Claim value | [C] = [A] x [B] Initial aggregate benchmark value |
|---|---|---|---|---|
| **Penetration 100%** | | 5,645 | $550,255 | $3,106,187,500 |
| Once-identified abuser 100% | | | | |
| No other relationship 100% | 100% = 100% x 100% x 100% | 2,449 | $650,000 | $1,591,850,000 |
| One other relationship 50% | 50% = 100% x 100% x 50% | 1,480 | $325,000 | $481,000,000 |
| 2 or more relationships 25% | 25% = 100% x 100% x 25% | 332 | $162,500 | $53,950,000 |
| Repeat abuser 150% | | | | |
| No other relationship 100% | 150% = 100% x 150% x 100% | 697 | $975,000 | $679,575,000 |
| One other relationship 50% | 75% = 100% x 150% x 50% | 543 | $487,500 | $264,712,500 |
| 2 or more relationships 25% | 37.5% = 100% x 150% x 25% | 144 | $243,750 | $35,100,000 |
| | | | | |
| **Other sex acts 54%** | | 6,847 | $313,200 | $2,144,478,375 |
| Once-identified abuser 100% | | | | |
| No other relationship 100% | 54% = 54% x 100% x 100% | 3,241 | $351,000 | $1,137,591,000 |
| One other relationship 50% | 27% = 54% x 100% x 50% | 1,620 | $175,500 | $284,310,000 |
| 2 or more relationships 25% | 13.5% = 54% x 100% x 25% | 271 | $87,750 | $23,780,250 |
| Repeat abuser 150% | | | | |
| No other relationship 100% | 81% = 54% x 150% x 100% | 997 | $526,500 | $524,920,500 |
| One other relationship 50% | 40.5% = 54% x 150% x 50% | 603 | $263,250 | $158,739,750 |
| 2 or more relationships 25% | 20.25% = 54% x 150% x 25% | 115 | $131,625 | $15,136,875 |
| | | | | |
| **Groping/Touching 27%** | | 3,621 | $161,675 | $585,424,125 |
| Once-identified abuser 100% | | | | |
| No other relationship 100% | 27% = 27% x 100% x 100% | 2,006 | $175,500 | $352,053,000 |
| One other relationship 50% | 13.5% = 27% x 100% x 50% | 745 | $87,750 | $65,373,750 |
| 2 or more relationships 25% | 6.75% = 27% x 100% x 25% | 103 | $43,875 | $4,519,125 |
| Repeat abuser 150% | | | | |
| No other relationship 100% | 40.5% = 27% x 150% x 100% | 493 | $263,250 | $129,782,250 |
| One other relationship 50% | 20.25% = 27% x 150% x 50% | 238 | $131,625 | $31,326,750 |
| 2 or more relationships 25% | 10.125% = 27% x 150% x 25% | 36 | $65,813 | $2,369,250 |
| **Total** | | 16,113 | $362,198 | $5,836,090,000 |

(66)    I have labeled the $5.8 billion result of the calculation summarized in Figure 22 an "initial benchmark aggregate value" for an important reason. It is the first step in my determination of the valuation range of the Abuse Claims. As is clear from the prior discussion, there is much uncertainty regarding which portion of the few hundred historical settlements is most representative of the 82,209 Abuse Claims. If, for example, the claims defining the $250,000 median historical value discussed above, provide a better representation of the Abuse Claims than the claims valued at $650,000, then a more representative initial benchmark would be $250,000 instead of my selection of $650,000. The result

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

would be an aggregate valuation of $2.2 billion.  In contrast, recall that this benchmark valuation begins by assigning zero benchmark value to large number of Abuse Claims based on their failure to adequately identify their abuser or qualify for compensation as a tort claim for their failure to adhere to statute of limitations laws. If any of those were to true-up their Abuse Claim in some way, there would be more non-zero Abuse Claims. The following Section examines attributes of the Abuse Claims that could affect the applicability of the initial benchmark.

(67)    It is important to recognize that the benchmark valuation is not designed to affix the value of any individual Abuse Claim, but rather to provide an estimate for the entire set of Abuse Claims in the aggregate. This means that the benchmark valuation scenario cannot just simply be divided and assigned to small subsets of specific Abuse Claims. Large sets of Abuse Claims may be evaluated but smaller cuts of the data will not be representative. For example, the attributes driving Abuse Claim value within the benchmark itself, notably the statute of limitations treatment, are subject to regional concentration. Certain states with shorter lookback windows after survivors reach maturity will have far fewer valuable benchmark Abuse Claims, while states with entirely open windows will have more valuable benchmark Abuse Claims. However, we expect that, when evaluated on their individual merits under the TDPs' fact-finding process, some of the presumptively barred Abuse Claims will prove to have value, while some of those in areas that were allowed based on statue will likely prove to be less valuable than the average historical resolution. Because Local Councils are regionally concentrated, the benchmark valuation does not provide a direct basis on which to value each's individual set of Abuse Claims.

Confidential subject to Protective Order

Expert Report of Charles E. Bates, PhD

# IV. Valuation range

(68)    The Abuse Claims were evaluated based on the information provided in their Proof of Claim submissions. While all the submissions were considered, inclusive as of this point of amendments made through July 2, 2021, each survivor was evaluated only once. So, for example, a survivor who made an initial timely submission and then subsequently amended his Abuse Claim to indicate an abuser would be evaluated a single time as a survivor who had identified an abuser. The amount of Abuse Claims falling within given categories was initially evaluated based on the Proof of Claim data as it existed early spring of 2021, the so-called Tranche IV data. More recently I have evaluated the Abuse Claims falling within given categories based on the Tranche VI data.  These data are described in more detail in the Murray Report.

(69)    To test the applicability of the initial aggregate benchmark value to the Abuse Claims, I analyzed both the historical resolution data and bankruptcy Proof of Claim submission data used in the benchmark evaluation. I first outline the "Plus Factors" I considered, i.e., attributes that could indicate a value of Abuse Claims above the benchmark value.  I then outline the "Minus Factors" I considered, i.e. attributes that would lower the value of Abuse Claims above the benchmark value. I conclude this section with my estimate of the reasonable valuation range of the Abuse Claims.

## IV.A. Plus Factors

(70)    Of the seven Plus Factors I describe below, the first two had the greatest potential for indicating an aggregate value above the initial benchmark aggregate value when I did my estimate of the valuation range early last Spring.  The passing of a revival law in a state with currently many statute-of-limitations barred Abuse Claims (an aspect of Plus Factor) had the potential to move significant numbers of Abuse Claims from the no value category to one of the categories that have value between early Spring of 2021 and the confirmation date.  That did occur in four states. The remaining uncertainty for this Plus Factor is much lower now as little time remains for revival laws to be enacted before confirmation.  The second Plus Factor category (the potential for Abuse Claims that do not name their abuser to provide that name at some time) remains significant given the large number, over 34,000, of abuse survivors who did not identify their abuser. It is feasible that within a group that large, further investigation by abuse survivors or their counsels could reveal the currently unidentified abusers' names.

(71)    The remaining three Plus Factors have smaller potential to have an impact on increasing the value of Abuse Claims above the initial aggregate benchmark value.  That is because Plus Factors three to five only affect the size of the value for a portion of the Abuse Claims already assigned a benchmark value.  As the initial benchmark is already much larger than the median historical claim settlements, the potential of these last three Plus Factors to indicate an aggregate value much above the initial

Expert Report of Charles E. Bates, PhD

aggregate benchmark is limited.  Plus Factors Six and Seven (the potential for future claims by minors and those with memories respectively) affect the number of positive value Abuse Claims, but add relatively few.

(72)    **The first Plus Factor** is the potential that some jurisdictions would change their Statue of Limitations rules before the confirmation date, those rules would not be strictly enforced by some judges, or that claim revival laws would allow Abuse Claims that are presently presumptively barred on that basis of the presumed applicable state law.  This would increase the count of Abuse Claims to be valued.  Between May and July of 2021, after I first performed my valuation analysis, four states have enacted revival laws for sexual abuse claims: Arkansas, Louisiana, Maine, and Colorado.  This added an additional 3,671 Abuse Claims that were no longer time barred, of which 2,039 would then be assigned a positive benchmark value.[29]  This update alone added an additional $700 million to the initial benchmark aggregate value. In total there are 4,806 additional not barred Abuse Claims in the Tranche VI data than there were in the Tranche IV data.  The additional 1,135 Abuse Claims that are not time barred was the result of abuse survivors updating their POCs establishing an abuse occurrence in another state.

(73)    **The second Plus Factor** is the potential for Abuse Claims to identifying an abuser in cases where none is currently identified or providing another update to the information of their POC increasing the count of Abuse Claims that meet the criteria to be valued. This has happened over the last several months with an additional 963 Abuse Claims naming their abuser(s) where they were not previously (as reflected in the Tranche IV data).  Moreover, 1,292 additional Abuse Claims identified the nature of their abuse allegations and 2,729 Abuse Claims updated or added the requisite date fields used to establish an age at first abuse. As a result, 135 Abuse Claims that had previously been assigned zero value for year of first abuse 18 or older would be valued.

(74)    The largest settlements in the historical claims data often involved abuse survivors who were abused many times by notorious serial abusers.  By contrast, the Abuse Claims show many instances where the abuse survivors were abused many times by an abuser only identified once.  Such cases are not well represented in the historical settlement data, providing little guidance as to the impact of this claim attribute on value.  There is a potential that this attribute is undervalued in the benchmarking analysis as a result of the lack of data. **This is a third Plus Factor**.

---

[29] The remainder of these revived Abuse Claims would not be considered due to lack of abuser identity or abuse allegation.

Confidential subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 23: Number of abuse occurrences for benchmark valued Abuse Claims**

| Number of abuse occurrences | One identified abuser | Repeat abuser | Count of POC |
|---|---|---|---|
| One or unspecified | 4,730 | 1,220 | 5,950 |
| 2 to 10 | 5,749 | 1,706 | 7,455 |
| 11 to 50 | 1,418 | 660 | 2,078 |
| 51 to 100 | 243 | 194 | 437 |
| More than 100 | 107 | 86 | 193 |
| **Total** | **12,247** | **3,866** | **16,113** |

(75)    Many of the benchmark valued Abuse Claims assert that they reported their abuse to a third party, say a parent, friend, Scouting, police, spouse, or others. It is often not clear whether the notice was contemporaneous with the abuse or much later, which could have a significant difference on the BSA's and related parties' responsibility. This could also provide support in substantiating these claims as compared to claims that involved no contemporaneous reporting. The historical settlement data provide little guidance as to the impact of this claim attribute on value. There is a potential that this attribute could indicate a claim value above the benchmark on such Abuse Claims. **This is a fourth Plus Factor.**

**Figure 24: Reporting status of benchmark valued Abuse Claims**

| Reporting category | Count of POC |
|---|---|
| Told no one | 8,611 |
| Reported abuse | 7,502 |
| **Total** | **16,113** |

(76)    **As a fifth Plus Factor**, I note that there is the potential for an increase in claim value above the benchmark on Abuse Claims involving abuse survivors younger than ten at the time of first abuse. There are only a few of such Abuse Claims in the historical settlement data, but they account for nearly a quarter of the benchmark valued Abuse Claims. The historical settlement data provides little guidance as to the impact of this claim attribute on value. There is a potential that this attribute could indicate a value above the benchmark, particularly on repeat abuser Abuse Claims.

**Figure 25: Age at first abuse for benchmark valued Abuse Claims**

| Age at first abuse | Abused once or unspecified | Abused multiple times | Count of POC | Percent of POC |
|---|---|---|---|---|
| Under 8 | 452 | 941 | 1,393 | 9% |
| 8 or 9 | 840 | 1,581 | 2,421 | 15% |
| 10 to 14 | 3,851 | 6,730 | 10,581 | 66% |
| 15 to 17 | 471 | 561 | 1,032 | 6% |
| Missing | 336 | 350 | 686 | 4% |
| **Total** | **5,950** | **10,163** | **16,113** | **100%** |

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

### IV.A.1. Estimating future Abuse Claims from individuals who were minors at the time of the Bar Date based on Proof of Claim submissions

(77)    **A sixth Plus Factor** is the potential Future Abuse Claims from minors who were abused prior to the Petition Date and did not file Abuse Claims as of the Bar Date.  Not all abuse survivors were required to file Proofs of Claim prior to the Bar Date; minors at the time of the Bar Date and survivors subject to repressed memory may file claims after that date.  I used the unique and timely Proof of Claim submissions covering the "Extant Abuse Claims" as the basis for my estimate of potential future Abuse Claims from individuals who were abused prior to the Petition Date, but who were still minors at the time of the Bar Date. (I use the term Extant Abuse Claims here to mean ones who were subject to the Bar Date order and filed at least one timely Proof of Claim submission, as distinct from those who were not required to file a form prior to the Bar Date).

(78)    To estimate the population that were still minors as of the Bar Date I looked at the claiming trends already evident in people who were adults and had already filed Abuse Claims. My analysis here focused on an evaluation of the Extant Abuse Claims based on survivor birth year and month.[30] Methodologically I used the Abuse Claims filed by survivors who would have been eighteen at the time of the Bar Date in November 2020 (born before November 2002) to forecast Abuse Claims that may yet be filed by survivors born between November 2002 and February 2015. Anyone born after February 2015 would have been too young to have started any type of Scouting prior to the Petition Date in February 2020.

(79)    Figure 26 provides a graph of Extant Abuse Claims by birth year and month, with the Abuse Claims related to individuals who born before November 2002 depicted by blue dots, while those born after that time are plotted using green dots. Two trends are evident in this picture. One is the sharp decline in Abuse Claim counts over time for individuals born since 1960. The other is the fact that survivors born after November 2002 were not required to file POCs prior to the Bar Date, yet some did.

---

[30]    I use the minimum birth date and month across duplicate abuse claims with different dates of birth.

Expert Report of Charles E. Bates, PhD

**Figure 26: Abuse Claims by birth year and month**



Note: Excludes 554 Abuse Claims with unidentified birth date.

(80)  Figure 27 shows the same data as Figure 26—a depiction of the number of the Extant Abuse Claims by birth year and month—but limits the time frame to 1990 forward. This allows for a rescaling that better shows the drop off in Abuse Claims filed on behalf of individuals born after November 2002. Again, for this chart the Abuse Claims related to individuals who born before November 2002 depicted by blue dots, while those born after that time are plotted using green dots.

Highly Confidential – Subject to Protective Order

**Figure 27: Abuse Claims by birth year and month since 1990**



(81) I ran a regression on these data considering the full set of Extant Abuse Claims data for individuals born since 1960, controlling for the overall population of individuals involved in Scouting, and using a quadratic functional form. The sum of the upper end of the pointwise 95% confidence interval for the projected number of Future Abuse Claims coming from individuals born each month after November 2002 (but before February 2015) is 568. The sum of the lower end of the pointwise 95% confidence interval for the projected number of Future Abuse Claims coming from individuals born each month after November 2002 (but before February 2015) is 251. The actual number of predicted Future Abuse Claims is 407.

(82) Figure 28 depicts the pointwise 95% confidence intervals for my forecast of predicted Future Abuse Claims by month, related to pre-petition acts, for individuals born after November 2002. In this graph the red dots are the point estimate for the expected claim count for individuals born in each month and the black lines depict whisker bars showing the range of the pointwise 95% confidence intervals. The green dots depict the claims already filed.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

Figure 28: Forecast of future Abuse Claims by birth year and month



(83)  The range described earlier of 251 to 568 compares to roughly 156 Extant Abuse Claims that report
      birth dates post November 2002. Thus, this analysis indicates that there are at most several hundred
      potential Future Abuse Claims that could be filed after the Bar Date for individuals who were minors
      at the time of the Bar Date. There is a potential that this attribute could indicate a value above the
      benchmark, though in the context of 16,113 benchmark valued Abuse Claims this is not a significant
      addition.

## IV.A.2. Estimating repressed memory claims based on Proof of Claim submissions

(84)  **The seventh and final Plus Factor** is that individuals who were abused prior to the Debtors' Petition
      Date, but who could potentially establish in the future that they were subject to repressed memory
      leading up to and at the time of the Bar Date, may be compensable. My understanding is that whether
      repressed memory serves as a basis for admission of a claim in each state or territory is not universal;
      that the law on this issue is undecided. I also used the unique and timely Proof of Claim submissions

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

covering Extant Abuse Claims as the basis for my estimate of potential for such Future Abuse Claims. To the extent such claims are allowed, the Extant Abuse Claims indicate they should be rare.

(85)    In our review of the Proof of Claim submissions covering Extant Abuse Claims, Bates White noted that a limited number of the Abuse Claims referred to some form of past repression related to their abuse. We searched all of the Proof of Claim submissions related to the 82,209 unique and timely Abuse Claims for any reference to the terms "repress/repressed/repression," "amnesia," or "dissociated/dissociation." In total this search revealed approximately 700 records associated with individuals with Extant Abuse Claims made any prior reference to some form of repression. This represents well less than 1% of the 82,209 unique and timely Abuse Claims that refer to having dealt with some form of repression.

(86)    Some of those references do seem to squarely indicate prior repression of a nature that could allow for the possibility of a post-Bar Date claim had it persisted. For example, Claim No. 2490 states in his form: "I repressed the memory for awhile, but recently it resurfaced."

(87)    Further review of these 700 Abuse Claims, however, implies that many of these Abuse Claims could indicate some form of partial repression, not a situation where the survivor had no awareness of the act in its entirety. For example, Claim No. 13177 talks about having "repressed feelings for a long time and… nightmares" in a section of the form about the impact of the abuse. 168 of the identified Abuse Claims where the word "repressed" appears were filed by one law firm and used the term about some specific claim attribute, such as the timing or location saying: "Due to repressed memory, I do not presently recall all of the details concerning [the location of] my abuse. However, I expect that with the help of further discovery and the opportunity to reflect on my experience with newly discovered evidence, I may be able to recall these repressed memories and provide further details in support of my claim." Some then go on to provide some level of information about the location or other attribute.

(88)    As evidenced by the Extant Abuse Claims, the number of additional claims from repressed memory must be small. Though there is a potential that this attribute could indicate a value above the benchmark, in the context of 16,113 benchmark valued Abuse Claims this is not a significant addition.

(89)    In total, updates in the POCs of the abuse survivors from the creation of the Tranche IV data to the Tranche VI data added $570 million to the initial benchmark aggregate value.  This is in addition to the $700 million added as the result of the new revival statutes in the four states.  In all, changes in these first two Plus Factors between last March and today raised the initial aggregate benchmark value by $1.3 billion.  These were the two Plus Factors that I considered as having the greatest potential to raise the aggregate value of Abuse Claims above the benchmark by increasing the number

Expert Report of Charles E. Bates, PhD

of Abuse Claims that had value.  This observed increase is well within the potential increase I contemplated in my construction of the valuation range last spring.

(90)   Of the seven Plus Factors I describe below, the first two had the greatest potential for indicating an aggregate value above the initial benchmark aggregate value when I did my estimate of the valuation range early last Spring.  The remaining three Plus Factors have smaller potential to have an impact on increasing the value of Abuse Claims above the initial aggregate benchmark value. As the initial benchmark is already much larger than the median historical claim settlements, the potential of these last three Plus Factors to indicate an aggregate value much above the initial aggregate benchmark is limited.  Plus Factors Six and Seven (the potential for future claims by minors and those with memories respectively) affect the number of positive value Abuse Claims, but add relatively few.

## IV.B. Minus Factors

(91)   I also examined a series of "Minus Factors", i.e., those attributes of the claiming populations that would lower the value of Abuse Claims below the initial benchmark value. It is likely that the initial benchmark values for certain categories of claims are inflated. As illustrated in Figure 19, two-thirds of the recent historical settlements for claims involving sexual penetration are below the initial benchmark of $650,000. The average settlement of those claims was less than $170,000.  Recall that I selected the initial benchmark as the midpoint between the mean and the median. To the extent that the median is a better indicator of value for a large majority of Abuse Claims, there is significant potential for the aggregate settlement value to be less than the initial aggregate benchmark value.  The possibility of a valuation closer to the median is real.

(92)   There are characteristics of the Abuse Claims that weigh in favor of a lower, median-based valuation. The significant increase in claims filed against the BSA represents a break from the tort system process. Relative to the current pool of Abuse Claims, the BSA's historical data related to Abuse liability resolutions were stronger on both observable and unobservable characteristics. The following discussion on Minus Factors discusses why.

(93)   The first minus factor is the potential for a decrease in Abuse Claim value below benchmark due to differences in age composition of the current Abuse Claim population represented by the Proof of Claim as compared to the historically resolved tort claims. The historical settlement data shows that claims received higher value when they were brought closer-in-time to the incident of abuse.  The historical resolution data differ from the Proof of Claim submissions in that the former tended to file their claims at a younger age. Figure 29 provides a graphical comparison of the age at the time of claims resolution, in the case of the historical tort claims, and POC submission in the case of the Proof of Claim submissions covering Abuse Claims. It illustrates that the historical claims involved a

Expert Report of Charles E. Bates, PhD

significantly higher proportion of claims filed at a younger age than the age at which the abuse survivors submitted their Abuse Claims in the instant matter.

**Figure 29: Comparison of age at time of filing for historical tort claims and Proof of Claim submissions**



(94)    Figure 30 provides another representation of the same data with the data group by larger age bins. This graph clearly shows the distinction across the two sets of claims data.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 30: Comparison of historical tort claims and Proof of Claim submissions by age bins**



(95)    This age distinction is significant in that the historical resolution data show that claims filed closer to when the abuse occurred receive more value. As show in Figure 31, claims filed closer to when the abuse occurred receive more value.

**Figure 31: Historical tort claim mean resolution values by submission age bins**

| Age at filing | All allegations | Penetration claims | Other sex acts |
|---|---|---|---|
| Under 54 | $1,336,262 | $1,819,815 | $1,495,755 |
| 54 to 63 | $349,762 | $673,906 | $208,168 |
| Over 63 | $118,235 | $319,868 | $121,383 |

(96)    A second Minus Factor is that there is the potential for a lower Abuse Claim value below benchmark for Abuse Claims where the abuser(s) are other youths with no adults involved.  The historical settlement data provides little guidance as to the impact of this Abuse Claim attribute on value. Moreover, over 25% of benchmark valued Abuse Claims do not distinguish between abuse involving only other youths or with at least one adult involved.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 32: Majority status of abusers for benchmark valued Abuse Claims**

| Majority status of abuser(s) | Count of POC |
|---|---|
| At least one adult | 10,868 |
| Youth – no adult | 530 |
| Unspecified | 4,715 |
| **Total** | **16,113** |

(97)    A third minus factor is that there is a potential for a lower Abuse Claim value below benchmark from a failure of POCs to distinguish between circumstances when there is not a non-BSA relationship between the abuser and the abuse survivor and when the question has not been answered. On the section of the POC questionnaire requesting the abuse survivor to identify non-BSA relationships, six options were provided: (1) religious organization leader, member, volunteer, (2) family member or relative, (3) coach/athletics, (4) teacher, (5) neighbor, or (6) Other (please explain and add any other information you remember to the categories above.) Notably, there is not a check box for "no outside Scouting relationship". As is revealed by the response rate on other items on the POC questionnaire, a significant nonresponse to this question is possible. As Figure 33 shows, 61% of benchmark valued Abuse Claims checked no box in response to this question. There is a potential that a significant number of the 9,883 POCs that did not have a box checked were that way because this question was not answered, which if checked would have indicated a lower benchmark value.

**Figure 33: Tabulation of non-BSA relationships between abuser and abuse survivor for benchmark valued Abuse Claims**

| Number of outside relationship boxes checked | Count of POC | Percent of benchmark valued Abuse Claims |
|---|---|---|
| 0 | 9,883 | 61% |
| 1 | 5,229 | 32% |
| 2 | 842 | 5% |
| 3 to 6 | 159 | 1% |
| **Total** | **16,113** | **100%** |

(98)    The fourth and most significant Minus Factor is that there is the potential for a lower Abuse Claim value below benchmark from unobservable attributes of the abuse survivors that led them to not have filed a tort claim for the abuse they suffered. Clearly there is a great hesitancy among abuse survivors to have their Abuse Claims made public, as would be required as part of a lawsuit; only two percent of abuse survivors signed the POC in the manner required to allow the abuse survivors' Abuse Claims to be public. That small percentage is about the same scale of the number of tort claims brought against the BSA over the past years. I am not aware of any other tort where the vast majority of damaged parties were unwilling to file a lawsuit.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

(99)    Though we do not know why the choice was made not to file prepetition, it reflects an economic choice based on each abuse survivor's circumstances.  This means they (or a lawyer they consulted) viewed their prospects through litigation not being worth the time, stress, and effort.  That is, in economic terms, the expected costs did not warrant the expected benefits. At the size of the initial benchmark, $650,000, and the likely economic status of most abuse survivors, it is unlikely that the expected costs would typically have been high enough to be the reason for the decision not to sue. Instead, it is likely that the expected benefits, i.e., expected settlement values, were sufficiently lower leading to a decision not to pursue a lawsuit.  This indicates a significant potential for a lower aggregate value than the initial aggregate benchmark value.

(100)    A notable aspect of sexual abuse lawsuits is that the primary damage claim is for pain and suffering endured by the abuse survivor.  The types of claims that receive the highest compensation are those involving an abuse survivor who can engender the most sympathy from a jury.  Moreover, the credibility of the asserted Abuse Claims is derivative of the ability of the abuse survivor to explain the abuse they suffered. Their life and behaviors are subject to intense scrutiny. The following is a list of several categories of attributes that may explain why an abuse survivor did not file a lawsuit, which correspondingly lower the settlement value of a tort claim for sexual abuse.

     a.   Unobservable abuse survivor characteristics regarding case strength, viability, and credibility.

     b.   Unobservable abuse survivor privacy concerns and unwillingness or hesitancy to discuss the abuse outside of a context like the present bankruptcy where their privacy can be assured.

     c.   Unobservable ability of abuse survivor to fully articulate relevant facts and develop a tort case comparable to those prosecuted historically.

     d.   Unobservable abuse survivor characteristics/personal history affecting jury appeal.

(101)    Another notable aspect of sexual abuse lawsuits is that the potential for a punitive damage award is a significant driver of the size of jury awards, and hence the size of settlements. Without a credible threat of punitive damages, a common characteristic of the high value settlements, the tort value of sexual abuse cases is much lower; punitive damages are typically multiples of compensatory damages which include pain and suffering. The ability of a tort claimant to obtain a high punitive damage award depends on the right combination of judge, jury, jurisdiction, plaintiff, and a demonstrable failure of responsibility on the part of the BSA to have prevented the abuse. An absence of this combination of factors may have led to an unwillingness on the part of many abuse survivors not to have filed lawsuits.  In addition to the attributes outlined in the previous paragraph, there are also unobservable characteristics regarding the relative connection of the wrongful acts to the BSA and

willingness of parties to assign a significant share of fault to Scouting relative to the historically resolved tort cases.

(102)   Of the four Minus Factors I have identified, the first and the fourth have the greatest potential for indicating an aggregate value below the initial benchmark aggregate value. The fourth has the greatest potential to indicate a lower than benchmark value for Abuse Claims. Nearly, if not all, of the Abuse Claims could have been filed as tort claims prior to the Petition Date. Only 766 of the benchmark valued Abuse Claims did. The remaining 15,347 chose not to.

(103)   The first Minus Factor also has a significant potential for a value lower than the benchmark value. There are several thousand Abuse Claims from abuse survivors who are now over 63, many much older, and older than any of the historical survivors. Discounting the older Abuse Claims at the lower values indicated by the limited number of historical claims would lower their value 20% below benchmark. This likely understates the impact of survivor age as there are only two historical claims where the age of the abuse survivor at resolution was more than 70, one at 71, and one at 72. These were mid five figure settlements. However, there are 1,515 of the 16,113 benchmark valued Abuse Claims (9%) where the abuse survivors were over 70 at the date of submission, indicating an even larger reduction if five figure settlements are more the norm of claims made 60 or more years after abuse.

(104)   The second and third Minus Factors do not have the same potential for impact on decreasing the value of Abuse Claims below the initial aggregate benchmark value. That is because they likely only affect the value of a smaller portion of the Abuse Claims.

## IV.C. Combining Plus and Minus Factors

(105)   In Section III above, I described how the current Tranche VI data produce an initial aggregate benchmark value of $5.8 billion. Section IV discussed the Plus and Minus Factors regarding why that benchmark based on several hundred historical settlements is uncertain and why the actual value of Abuse Claims cannot be known more precisely than a wide range. Early last spring, my evaluation of the then-current Tranche IV Abuse Claims data and the BSA historical settlements data provided by Ogletree resulted in an initial aggregate benchmark value of $4.75 and a valuation range of $2.4 billion to $7.1 billion for the Abuse Claims. [31] Based on the updated Tranche VI and longer history of resolved claims, I still consider the relevant reasonable valuation range for Abuse Claims to be $2.4

---

[31]   At the time I performed my first benchmark analysis Bates White had identified roughly 82,350 unique and timely submissions. Most of the reduction in claim count between those earlier data and the present set involves the removal of Proof of Claim submissions that have since been withdrawn or marked as "VOID." The removal and voiding process was administered by Omni, the Debtors notice agent. My understanding is that most of the claims they removed were submissions made to the docket that were not actual Abuse Claims. Accordingly, these submissions generally lacked some, if not all the key criteria used in the benchmark valuation and their subsequent removal did not have a meaningful impact on my analysis.

Expert Report of Charles E. Bates, PhD

billion to $7.1 billion. This remains the range for two reasons: First, the change I observed on the initial aggregate benchmark value from the updated POC and historical settlement data is well within the amount contemplated by the initial range. These updates increased the frequency of benchmark valued Abuse Claims as a partial realization of the uncertainty identified as Plus Factors 1 and 2.  As a portion of the uncertainty about the number of barred Abuse Claims and unnamed abusers was resolved, it lowers the uncertainty remaining for these factors. In particular, there remains little time between now and confirmation for additional states to enact revival laws.  Thus, the remaining uncertainty regarding Plus Factor 1 primarily relates to the enforcement of statute of limitations laws. The upper end of the range designed to capture the uncertainty primarily from those two factors does not change as some of that uncertainty is resolved within the scope of uncertainty originally contemplated.

(106)    Second, the range encompasses the net impact of all the potential Plus and Minus Factors. We are yet to see any manifestation of the remaining uncertainty factors, the potential impact of which are dominated by the potential Minus Factors. In other words, the benchmark value change between the Tranche IV data and the Tranche VI data is a one-sided change in the benchmark. This is due to the natural asymmetry in the information updating process since much of the Plus-Factor risk relates to either i) Abuse Claim improvements that can and have been partially addressed through ongoing amendments to the POC data or ii) potential changes to Statute of Limitations rules that occur over time. In contrast, the Minus-Factor risk relates to Abuse Claim vetting that will determine how closely the current Abuse Claims align to the historical resolutions, something which is yet to be addressed in any meaningful way since I first estimated the valuation range.

(107)    As is clear from the discussions of the limits of applying data on several hundred historical settlements to the 82,209 Abuse Claims and the Plus and Minus Factors of the initial aggregate benchmark valuation, it is not possible to mathematically model the valuation range of the Abuse Claims precisely. Instead, I must rely on judgment informed by the uncertainty analyses I have performed regarding the direction (plus or minus) and order of magnitude (large or small) of the potential differences between the initial aggregate benchmark value and the tort value of the Abuse Claims.  Figure 34 summarizes my evaluation of the relative size of each uncertainty factor I analyzed.

Confidential subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 34: Summary of valuation uncertainty factors**

| Factor | Reference | Valuation component | Impact potential | Comment |
|--------|-----------|---------------------|------------------|---------|
| Plus Factor 1 | SOL enforcement or revivals | Frequency | Small | Little time remaining before confirmation |
| Plus Factor 2 | Unidentified abuser update | Frequency | Large | Partially realized since Tranche IV |
| Plus Factor 3 | Multiple abuse occurrences | Severity | Small | Relates to hundreds of Abuse Claims |
| Plus Factor 4 | Abuse reported | Severity | Small | Likely incorporated in benchmark value |
| Plus Factor 5 | Young abuse survivors | Severity | Small | Ambiguous |
| Plus Factor 6 | Bar Date minors | Frequency | Small | Relates to hundreds of Abuse Claims |
| Plus Factor 7 | Repressed memory Abuse Claims | Frequency | Small | Relates to hundreds of Abuse Claims |
| Minus Factor 1 | Age of survivors | Severity | Large | Relates to thousands of Abuse Claims |
| Minus Factor 2 | Youth on youth abuse | Severity | Small | Relates to hundreds of Abuse Claims |
| Minus Factor 3 | Identifying missing relationships | Severity | Small | Relates to hundreds of Abuse Claims |
| Minus Factor 4 | Unobserved hesitancy attributes | Severity | Large | Relates to nearly all Abuse Claims |

(108)   To evaluate the net effect of the uncertainty factors, I first considered a potential size of change at several alternative percentages, then engaged in a thought experiment to conceptually test what changes in the underlying facts would have to change for the valuation to be that percentage above or below the initial aggregate benchmark value. I considered the potential for increases of 10%, 25%, 50%, 75% and 100% above the initial aggregate benchmark valuation. I also considered the potential for decreases of 10%, 25%, 50%, 75% and 90%. A reasonable upper or lower uncertainty range from benchmark of 10% is easy to reject. Too many of the uncertainty factors could easily move the valuation by at least that much. At the other extreme, it is also easy to reject an upper bound as high as 100% from benchmark as that would require numerous states all to enact revival laws to double the number of benchmark valued Abuse Claims without any decrease in valuation from the Minus Factors. After accounting for the potential impact of the Minus Factors as well, any amount above 50% is remote. At the other extreme, it is also easy to reject a 90% decrease from benchmark, as that would require all Minus Factors to hold without any offset from Plus Factors. Moreover, given the several thousand repeat abusers with positive benchmark value, it also unlikely that the lower end of the valuation range is only 25% of the initial aggregate benchmark. Either a 25% increase or a 25% decrease is easily possible, indicating that the reasonable valuation range at the time of my initial evaluation early last Spring was 50% above to 50% below the initial aggregate benchmark of $4.75 billion, a range from $2.4 billion to $7.1 billion.

(109)   With that range in mind, the current thought experiment is whether the current data indicate a change from that evaluation. The lower end of that range is consistent with typical tort settlements near the median of the historical settlements as discussed above. As mentioned in the previous paragraph, there are several thousand repeat abuser cases with positive benchmark value making it unlikely that the tort valuation of Abuse Claims is less than $2.4 billion. On the other hand, I see no basis in the updated data to indicate a valuation above the upper end of the range of $7.1 billion. The biggest

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

uncertainty factor from last spring, the likelihood of additional state revival laws is small between now and confirmation.  My estimated valuation range of the Abuse Claims remains $2.4 to $7.1 billion.

(110)   To capture the full range, I produced a set of four forecast scenarios using the Tranche VI data: the initial aggregate benchmark value of $5.8 billion and then three versions of that same forecast scaled to:

     a.   the midpoint of the range: $4.75 billion;

     b.   the low end of the range: $2.4 billion; and

     c.   the high end of the range: $7.1 billion.

(111)   From an implementational standpoint this was accomplished by proportionally scaling up or down the values assigned to Abuse Claims under the benchmark. As previously noted, neither the benchmark valuation, nor these scenarios encompassing the forecast range, are designed to affix the value of any individual Abuse Claim. Rather they are intended to provide an estimate for the entire set of Abuse Claims in the aggregate.

Confidential subject to Protective Order

Expert Report of Charles E. Bates, PhD

# V. TDP matrix values

(112)    The Trust Distribution Procedures ("TDP") in this matter are designed to provide fair, equitable, and substantially similar treatment to holders of similar, legally valid, and supported Abuse Claims. The Base Matrix Values and other TDP valuation factors were informed by the same historical settlement data which inform my aggregate estimate. As noted above, however, the historical data can only provide guidance about the aggregate value of Abuse Claims or categorical values for certain types of claims. The determination of value for any one specific Abuse Claim requires a more thorough evaluation of each case on its own merits. The TDP provides procedures for a fulsome claim-specific evaluation on such a basis that will result in a reasonable valuation of individual Abuse Claims consistent with the historical settlements and will ensure substantially similar treatment across similar Abuse Claims.

(113)    The TDP—in addition to taking advantage of the information gathered through the POC process where applicable—calls for all Abuse Claims to make additional information available so that their Abuse Claim can be accurately valued on an individual basis. Under the TDP, the Settlement Trustee must develop an additional questionnaire. This questionnaire can be specifically focused on the evaluation criteria. The process also requires that Abuse Claim will produce certain additional documentation and agree to consent to further written or oral examination, under oath. As part of this process the abuse survivors must allow the Settlement Trustee the option to "obtain additional evidence from the abuse survivor or from other parties pursuant to the Document Obligations and shall consider supplemental information timely provided by the abuse survivor, including information obtained pursuant to the Document Obligations." The ability of the Settlement Trustee to make such requests for additional information, at the individual Abuse Claim level, are critical to allowing accurate claim-specific distribution amounts to be determined.  The Settlement Trustee will have at their disposal significant financial resources to perform this evaluation.

(114)    My understanding is that historically the Debtors' counsels did not apply mathematical formulae for valuing claims. Rather, the claims were considered on their merits against the backdrop of factors that include many of the ones already discussed here that could impact resolution and value. Even without having formulae in mind the result is that the historical values are correlated with certain key aspects of the claims. Indeed, as noted above, the historical values clearly move across a set of characteristics including the allegation, the abuser and his relationship to Scouting, the impact of the abuse, and the severity or nature and circumstance of the abuse within a given category. In order to ensure substantially similar treatment to holders of similar, legally valid and supported Abuse Claims on a go forward basis, it is necessary to adopt a single valuation framework that is consistent with the prior resolution history.

(115)    Because the Matrix is designed to value specific Abuse Claims, rather than estimate the entire group of Abuse Claims in the aggregate, the so-called Base Values were generated first with regards to only

Expert Report of Charles E. Bates, PhD

a subset of the historical resolution values. These values are not designed to necessarily be the average assigned to a given tier of Abuse Claim, but rather provide a jumping off or reference point, based on the historical resolutions, from which the current and future Abuse Claims can be valued.

(116)    The matrix provides, as its starting point values by most severe abuse allegation. This is done across a set of six different abuse categories: penetration; oral contact; masturbation; unclothed touching, clothed touching, and abuse that did not involve any touching. If an Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier. The historical reference point for Abuse Claims in each tier are those that identify a single, as opposed to a repeat, abuser. Single abuser claims were used for this Base Value because the majority of the Abuse Claims in the Proof of Claim submissions identify a unique abuser. Further, as discussed in more detail below, one of the explicit Aggravating Scaling Factors for Abuse Claims under the TDP is a factor for Abuse Claims tied to a repeat abuser.

(117)    Figure 35 below provides a tabulation of the mean claim values for historical abuse claims that were identified as having occurred against a non-repeat abuser as well as the assigned a base for each tier under the TDP.[32] These values, which exclude $0 resolutions, were developed with reference to the summary settlement data available to me at the time and in consultation with lawyer from Ogletree regarding the relative values of claims. The Base Value for the final tier was set in reference to the $3,500 Expedited Distribution.

**Figure 35: Mean historical tort resolution values for single abuser claims**

| Allegation tier[33] | Average historical resolution | Base Value |
|---|---|---|
| 1-Penetration | $673,500 | $600,000 |
| 2-Oral acts | $411,818 | $450,000 |
| 3-Masturbation | $302,333 | $300,000 |
| 4-Unclothed touching | $180,000 | $150,000 |
| 5-Clothed touching | N/A | $75,000 |
| 6-Other | N/A | $3,500 |

(118)    My understanding is that most historical resolutions involved adult-on-youth abuse. Consistent with the idea that the BSA and BSA-related parties are assigned a larger share of fault where the organization could have or should have done more to prevent the abuse, cases involving youth-on-youth abuse were assigned a lower value. The idea being that, all else equal, the BSA and other related parties have more direct control over and responsibility for the conduct of employees or adult volunteers than for other youth. From an implementational standpoint this was accomplished by

---

[32]    One claim listed as a non-repeat abuser was identified by Ogletree as known repeat abuser Gary/Garrett Hatfield.

[33]    More complete descriptions of each tier are provided in the TDP Matrix.

Highly Confidential – Subject to Protective Order

assigning Abuse Claims involving a youth perpetrator one tier lower value than a similar type of Abuse Claim involving an adult. The idea of stepping down a tier in this way was adopted on the basis of use in the Spokane diocese claims matrix.

(119)   After it is assigned a Base Value, under the TDP each Abuse Claim is to be scaled up or down (or not) on the basis of a series of Scaling Factors which can either decrease of increase the value of the Abuse Claim. The maximum value for each tier within the Matrix is the result of the product of the Base Value and the maximum possible result of all the potential Aggravating Scaling Factors. This means the maximum in each category is 4.5 times the Base Value since there are three potential Aggravating Scaling Factors and the Maximum Value for each is 1.5, 2.0, and 1.5 (1.5 x 2 x 1.5 = 4.5). The minimum value for any Abuse Claim in any tier is $0, since the Settlement Trustee has the latitude to assign a Mitigating Scaling Factor of anywhere between 0 and 1.

(120)   The Aggravating Scaling Factors were broken down into three categories meant to capture the key attributes that would drive the value of a Abuse Claim up relative to the Base Value. Those three factors are the Abuser Profile, the Nature of Abuse and Circumstances of the abuse, and the Impact of Abuse. As with the base values, these Scaling Factors were determined in reference to the historical resolution data.

(121)   The Abuser Profile scaling factor was developed by looking at the relative impact that having a repeat abuse had on historical claim values as compared to similar claims involving single abuser that were used for the original Base Values. In general, whether one looks at all claims in the aggregate, or within a specific abuse allegation tier like penetration claims, claims associated with repeat abusers receive, on average, up to twice as much as the single abuser claims that were used for purposes of establishing the base values for the matrix.[34] For example the overall average value, across all allegations, among the historical resolution claims identified as having involved a single abuser was roughly $350,000 while the average for those involving repeat abusers a bit over $700,000. Similarly, the average value of repeat abuser penetration claims is a bit over $1,200,000, or nearly double the Base Value for single abuser claims in that tier.

(122)   The Nature of Abuse and Circumstances Scaling factor and Impact of Abuse scaling factors were developed jointly by looking at the variation across values and with each being given equal weight.

---

[34]   Note that for purpose of this analysis we excluded from our considered the claims associated with two abusers considered to be extreme outliers: those related to Thomas Hacker, which settled on average for nearly $5 million, and those related to Louis Brouillard, which settled on average for less than $60,000. These two abusers were identified as being extreme cases by counsel for the Debtors. In addition, the data demonstrate that these abusers are outliers. The Hacker claims were paid, on average, more than twice as much as those related to the next highest paid abuser. On the other hand the Brouillard cases were paid atypically low amounts given the nature and breadth of the abuser. There are few claims in the current Proof of Claim form submissions that identify abusers who appear more than 15 times (Hacker had 20 historical resolutions and Brouillard over 70).

(123)    The Mitigating Scaling Factors in the aggregate were assigned a range of 0.0-1.0. This range allows the Settlement Trustee full latitude to adjust any current Abuse Claim value to accurately reflect its value relative to the historical resolutions used as a benchmark. The inputs that the Trustee is to consider in that regard generally relate to the Abuse Claim's strength with regard to Statue of Limitations, the relative responsibility of the BSA and BSA-related parties, as compared to the historical benchmark figures (and accordingly with reference to other potentially responsible parties), prior settlements and any other value limitation such as a charitable immunity defense, and the Absence of a Putative Defendant.

(124)    In regard to Statute of Limitations sub-component of the Mitigating Scaling Factors, the TDP incorporates a schedule that specifies appropriate ranges based on the identified abuse state or territory. It is important to recognize the Statute of Limitations is only one component of the Mitigating Scaling Factors.  In addition, the Trustee may consider any other limitations on the Abuse Claim's recovery in the tort system.

Expert Report of Charles E. Bates, PhD

# VI. Portion of valuation attributable to TCJC Abuse Claims

(125)   As described in more detail in the Murray Report, Bates White identified the subset of the 82,209 unique and timely Abuse Claims potentially associated with The Church of Jesus Christ of Latter-day Saints (the "TCJC") in three ways. First, Abuse Claims who directly identified the Mormon Church on at least one of their POC submissions were flagged. Meaning, for example, that an Abuse Claim who said his troop was chartered by the Mormon church (or some recognizable misspelling thereof), would be flagged. This first step really identified the set of Abuse Claims that, based on their own sworn Proof of Claim submissions, self-identified having a claim against the TCJC ("TCJC Abuse Claims"). In total this set of claims directly identifying the TCJC was 2,854 Abuse Claims.

(126)   Second, Abuse Claims that shared common characteristics with other sets of Abuse Claims that had already been flagged as being affiliated with the TCJC were also flagged as being potentially related to the TCJC. So, for example, an Abuse Claim who identified as the abuser an individual that was common to three other Abuse Claims—and where those others had identified the TCJC—were also flagged. Third, Abuse Claims that identified, on at least one of their POC submissions, a Local Council which was known to have been predominately affiliated with the TCJC (more than 50% of their members), were flagged. On the basis of all three sets of criteria, 7,716 of the 82,209 unique timely Abuse Claims were identified as being potentially associated with TCJC ("Potential TCJC Abuse Claims"). While the subset of the Abuse Claims identified based on the first step are those that self-identified having a claim against the TCJC, the full group including Abuse Claims from the third category almost assuredly include some Abuse Claims which were not affiliated with the TCJC (since there were troops sponsored by other Charted Organizations present in the Local Councils where TCJC charters included the majority of members).

(127)   As previously noted, my aggregate valuation is not designed to affix the value of any individual Abuse Claim. For that reason, the benchmark valuation scenario cannot just simply be divided and assigned to small subsets of specific Abuse Claims. In the case of the TCJC, however, the total Potential TCJC Abuse Claims are significant. In addition, these Abuse Claims, while subject to some degree of regional concentration, are not confined to any one particular jurisdiction; the Assigned TCJC Abuse Claims include many western states such as Idaho, which has a tighter statute of limitations window, and California, which has a much more open window. Thus, in this case, it is reasonable to look at the overall value assigned to these Abuse Claims as a point of reference for determining their relative value, in the aggregate, against all the BSA-related parties including the Debtors, Debtors' insurers, Local Councils, and Chartered Organization (in this case the TCJC).

(128)   Under the midpoint of my valuation range, the total aggregate value associated with the TCJC Abuse Claims is roughly $170 million, while the total aggregate value associated with the Potential TCJC Abuse Claims is roughly $640 million (inclusive of the $170 million for TCJC Abuse Claims). Counsel for the Debtors have advised me that such Abuse Claims may not have value directly as to

TCJC to the degree the first abuse occurred on or after 1976. Specifically, they advise that such Abuse Claims may be covered by the BSA's insurance or the BSA through an indemnity claim. The portion of the total value attributable to the TCJC Abuse Claims with a date of first abuse in or prior to 1975 is roughly $57 million. While the total value attributable to the Potential TCJC Abuse Claims with a date of first abuse in or prior to 1975 is roughly $300 million (inclusive of the $57 million for TCJC Abuse Claims).

**Figure 36: Portion of midpoint valuation attributable to TCJC Abuse Claims for BSA-related parties**

| Time Period | Total valuation (TCJC Abuse Claims) | Midpoint | Total valuation (Potential TCJC Abuse Claims) |
|---|---|---|---|
| Pre-1976 | $57,000,000 | $177,000,000 | $297,000,000 |
| 1976 and Post | $117,000,000 | $233,000,000 | $348,000,000 |

(129)    Further, it is important to recognize that these figures are aggregates for the relevant set of Abuse Claims; the figures represent the total value, which could potentially be attributable to any combination of BSA-related parties including the Debtors, Debtors' insurers, Local Councils, and the TCJC. The value of the Abuse Claims as to the TCJC in isolation would necessarily be only some share of this total.

(130)    My understanding is that the TCJC has agreed to a settlement of $250 million to fully resolve its share of liability for all the Abuse Claims. Given that the TCJC may have limited direct financial responsibility for the Abuse Claims with abuse that first occurred after 1975 and given that TCJC is only responsible for a share of financial responsibility on all Abuse Claims, that figure reasonably covers the TCJC's portion of Abuse Claims under the midpoint of my valuation range.

Charles E. Bates
December 5, 2021

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

# Appendix A. Curriculum Vitae

[This page left intentionally blank]

Pã @ʹ Ô[ } -ãʹ} ãæ¦Á Áˇ à bˢ &ő{ Áˊ¦[ őˆ&ãٍ^Áٍ¦åˢ¦

Expert Report of Charles E. Bates, PhD

# Appendix B. Protective order

[This page left intentionally blank]

Expert Report of Charles E. Bates, PhD

# Appendix C. Materials relied upon

Below is a list of materials I relied upon in reaching in my opinions. Should I identify any additional materials that were omitted from this list, I will supplement accordingly:

- **Expert Report of Makeda S. Murray, MBA (December 5, 2021), inclusive of the reliance materials listed therein**

- **Referenced filings from the BSA docket**

- **All other documents cited throughout the report, inclusive of the footnotes.**

- **Bates White-generated valuation models**
  - ☐ Valuation model (Tranche IV): Bates White BSA valuation model (Tranche 4) -- confidential -- for production.xlsx [BSA-PLAN_01642923]
  - ☐ Valuation model (Tranche VI): Bates White BSA valuation model (Tranche 6) -- confidential -- for production.xlsx [BSA-PLAN_01642924]

- **Other Bates White-generated materials**
  - ☐ External potential comparable injury file (11/30/2021): 2021.11.30 Bates White Potential Comparable Injury -- confidential -- for production.xlsx [BSA-PLAN_01642527]

- **The BSA membership data**
  - ☐ The BSA membership data (1999-2018): Membership by Council yearend 1999-2018_Analysis.xlsx [BSA-PLAN_01638934]
  - ☐ The BSA membership data (1911-2019): Membership Year End 1911 - 2019.xlsx [BSA-PLAN_01638935]
  - ☐ The BSA membership figures (1960-2017): 1960-2017_yrend_membership.xlsx [BSA-PLAN_01642496]

- **Academic literature**
  - ☐ J. Barth et al, "The current prevalence of child sexual abuse worldwide: a systematic review and meta-analysis," *International journal of public health* 58, no.3 (2013): 469-483. [BSA_PLAN_01642609 - BSA_PLAN_01642623]
  - ☐ M. Stoltenborgh et al, "A global perspective on child sexual abuse: Meta-analysis of prevalence around the world," *Child maltreatment* 16, no.2 (2011): 79-101. [BSA-PLAN_01642812 - BSA-PLAN_01642836]

Expert Report of Charles E. Bates, PhD

□ N. Pereda et al, "The prevalence of child sexual abuse in community and student samples: A meta-analysis," *Clinical psychology review* 29, no.4 (2009): 328-338. [BSA-PLAN_01642752 - BSA-PLAN_01642762]

□ Amy B. Silverman, Helen Z. Reinherz, and Rose M. Giaconia, "The long-term sequelae of child and adolescent abuse: a longitudinal community study," *Child abuse & neglect* 20, no.8 (1996): 709-723. [BSA-PLAN_01642797 - BSA-PLAN_01642811]

□ Kathleen C. Basile et al, "Prevalence and characteristics of sexual violence victimization among U.S. adults, 2001-2003," *Violence and victims* 22, no.4 (2007): 437-448. [BSA-PLAN_01642624 - BSA-PLAN_01642635]

□ Monica H. Swahn and Robert M. Bossarte, ""Gender, early alcohol use, and suicide ideation and attempts: findings from the 2005 youth risk behavior survey," *The Journal of adolescent health* 41, no.2 (2007): 175-181. [BSA-PLAN_01642845 - BSA-PLAN_01642851]

□ Donna E. Howard, and Min Qi Wang, "Psychosocial correlates of U.S. adolescents who report a history of forced sexual intercourse," *The Journal of adolescent health* 36, no.5 (2005): 372-379. [BSA-PLAN_01642726 - BSA-PLAN_01642733]

□ Harriet J. Rosenberg et al, "Single and multiple suicide attempts and associated health risk factors in New Hampshire adolescents," *Suicide & life-threatening Behavior* 35, no.5 (2005): 547-557. [BSA-PLAN_01642763 - BSA-PLAN_01642774]

□ David Finkelhor and Jennifer Dziuba-Leatherman, "Children as victims of violence: a national survey," *Pediatrics* 94, no. 4 (1994): 413-420. [BSA-PLAN_01642689 - BSA-PLAN_01642698]

□ Natalie Sachs-Ericsson et al, "Childhood sexual and physical abuse and the 1-year prevalence of medical problems in the National Comorbidity Survey," *Health psychology* 24, no.1 (2005): 32-40. [BSA-PLAN_01642775 - BSA-PLAN_01642783]

□ Glen A. Kercher and Marilyn McShane, "The prevalence of child sexual abuse victimization in an adult sample of Texas residents," *Child abuse & neglect* 8, no.4 (1984): 495-501. [BSA-PLAN_01642734 - BSA-PLAN_01642740]

□ Judith M. Siegel et al, "The prevalence of childhood sexual assault. The Los Angeles Epidemiologic Catchment Area Project," *American journal of epidemiology* 126, no.6 (1987): 1141-1153. [BSA-PLAN_01642784 - BSA-PLAN_01642796]

□ Marla E Eisenberg, Diann M. Ackard, and Michael D. Resnick, "Protective factors and suicide risk in adolescents with a history of sexual abuse," *The Journal of pediatrics* 151, no.5 (2007): 482-487. [BSA-PLAN_01642673 - BSA-PLAN_01642678]

□ Patricia A. Harrison and Gopalakrishnan Narayan, "Differences in behavior, psychological factors, and environmental factors associated with participation in school sports and other

Expert Report of Charles E. Bates, PhD

activities in adolescence," *The Journal of school health* 73, no.3 (2003): 113-120. [BSA-PLAN_01642708 - BSA-PLAN_01642716]

☐ Mark A. Lodico, Enid Gruber E, and Ralph J. DiClemente, "Childhood sexual abuse and coercive sex among school-based adolescents in a midwestern state," *The Journal of adolescent health* 18, no.3 (1996): 211-217. [BSA-PLAN_01642741 - BSA-PLAN_01642747]

☐ Diann M. Ackard and Dianne Neumark-Sztainer, "Date violence and date rape among adolescents: associations with disordered eating behaviors and psychological health," *Child abuse & neglect* 26, no. 5 (2002): 455-473. [BSA-PLAN_01642548 - BSA-PLAN_01642566]

☐ L. S. Bensley et al, "Self-reported abuse history and adolescent problem behaviors. I. Antisocial and suicidal behaviors," *The Journal of adolescent health* 24, no. 3 (1999): 163-172. [BSA-PLAN_01642636 - BSA-PLAN_01642645]

☐ Roberta A. Hibbard, Gary M. Ingersoll, and Donald P. Orr, "Behavioral risk, emotional risk, and child abuse among adolescents in a nonclinical setting," *Pediatrics* 86, no.6 (1990): 896-901. [BSA-PLAN_01642717 - BSA-PLAN_01642725]

☐ David E. Nelson, Grant K. Higginson, and Joyce A. Grant-Worley, "Using the youth risk behavior survey to estimate prevalence of sexual abuse among Oregon high school students," *The Journal of school health* 64, no.10 (1994): 413-416. [BSA-PLAN_01642748 - BSA-PLAN_01642751]

☐ David Finkelhor et al, "Sexually abused children in a national survey of parents: methodological issues," *Child abuse & neglect* 21,no.1 (1997): 1-9. [BSA-PLAN_01642699 - BSA-PLAN_01642707]

☐ Victoria L. Banyard and Charlotte Cross, "Consequences of teen dating violence: understanding intervening variables in ecological context," *Violence against women* 14, no.9 (2008): 998-1013. [BSA-PLAN_01642567 - BSA-PLAN_01642583]

☐ John Briere and Diana M. Elliott, "Prevalence and psychological sequelae of self-reported childhood physical and sexual abuse in a general population sample of men and women," *Child abuse & neglect 27*, no.10 (2003): 1205-1222. [BSA-PLAN_01642646 - BSA-PLAN_01642663]

☐ David Finkelhor et al, "Sexual abuse in a national survey of adult men and women: prevalence, characteristics, and risk factors," *Child abuse & neglect* 14, no.1 (1990): 19-28. [BSA-PLAN_01642679 - BSA-PLAN_01642688]

  □ Daniel P. Chapman et al, "Adverse childhood experiences and the risk of depressive disorders in adulthood," *Journal of affective disorders* 82, no. 2 (2004): 217-225. [BSA-PLAN_01642664 - BSA-PLAN_01642672]

■ **Youth protection information**

  □ The BSA youth protection timeline (11/15/2021): 2021.11.16 BSA youth protection timeline.xlsx [BSA-PLAN_01642526]

  □ The BSA youth protection timeline – word document (11/15/2021): 100 Years of Enhancing Efforts to Protect Youth - PRIVILEGED (09-28-2020) no links.docx [BSA-PLAN_01642501- BSA-PLAN_01642524]

  □ Youth protection resources memo (11/03/2021): Youth Protection Resources.docx [BSA-PLAN_01642529- BSA-PLAN_01642532]

Expert Report of Charles E. Bates, PhD

# Appendix D. Prevalence of sexual abuse among minors in the United States

(131)    With the goal of obtaining potential benchmarks for the prevalence of child sexual abuse among males in the United States, I have identified three major meta-analyses on this subject—Pereda et al. (2009), Stoltenborgh et al. (2011), and Barth et al. (2013).[35] Pereda et al. (2009) analyzes all self-report studies (excluding clinical samples) published in peer-reviewed scientific journals that reported sample size and prevalence of abuse by gender. It includes 65 such studies. The analysis in Stoltenborgh et al. (2011) extended Pereda et al. (2009) in two respects. First, it includes not only self-report studies but also informant studies (while still excluding clinical samples). Second, in addition to studies published in peer-reviewed scientific journals, it also includes research published as dissertations or book chapters. It includes a total of 217 studies. Barth et al. (2013) analyze all self-report studies with data collected after January 1, 2000, participants younger than 18 years of age and a sample size of at least 1,000 participants. Their analysis includes 55 studies.

(132)    Collectively, these three meta-analyses evaluate hundreds of individual studies of child and cover sexual abuses that occurred between 1910 and the early 2000s. Even a cursory review of the studies reveals that some of them bear little relevance or contain inadequate information to serve as useful benchmarks for assessing the prevalence of sexual abuse in this matter. I, therefore, asked my team to identify and remove those studies that meet the following criteria:

- Analyze sexual abuse of only females, or of males and females without providing a breakdown by gender;

- Focus on countries other than the United States;

- Are informant studies;

- Use samples of participants that are drawn from populations with narrow demographic and socioeconomic characteristics (as opposed to samples drawn from general male populations that are arguably more representative of the survivors), such as

    □ College students

    □ Children with autism, volunteers with physical and mental health conditions

    □ Clinicians/medical staff

---

[35]    J. Barth et al. "The current prevalence of child sexual abuse worldwide: a systematic review and meta-analysis," *International journal of public health* 58, no.3 (2013): 469-483.

M. Stoltenborgh et al. "A global perspective on child sexual abuse: Meta-analysis of prevalence around the world," *Child maltreatment* 16, no.2 (2011): 79-101.

N. Pereda et al. "The prevalence of child sexual abuse in community and student samples: A meta-analysis," *Clinical psychology review* 29, no.4 (2009): 328-338.

---

Expert Report of Charles E. Bates, PhD

&#x25A1;   US military

&#x25A1;   Incarcerated individuals

&#x25A1;   Homosexual men

(133)    Whether a given study satisfies one or more of the above criteria was determined using a three-step process. In the first step, my team reviewed the characterization of the study in the corresponding meta-analysis. If the authors of the meta-study indicated that the study meets at least one of the criteria, it was excluded. In the second step, my team reviewed the study's abstract. If the abstract indicated that the study meets at least one of the criteria, it was excluded. Finally, in the third step, my team reviewed the study in detail to determine whether it meets any of the criteria. If the more detailed review indicated that it does, it was excluded.

(134)    Overall, I identified 21 candidate studies for potential benchmarks. Summary information for these 21 studies is provided in Figure 37. The third column shows the prevalence rate of abuse among youths reported in each study. Most studies report this rate directly. For studies that report the prevalence rate for only some subset(s) of the sample, I calculated the implied prevalence rate in the full sample using the information provided in the study. For studies that asked about lifetime abuse, I calculated the implied prevalence rate specifically among youths. These calculations are described in the fourth column of Figure 37.

(135)    As apparent from the figure, there is significant variation in the reported prevalence rates of youth abuse. The prevalence rates for studies that defined abuse as penetration or a more severe act, shaded grey, range from 1.10% to 6.47%, with an average of 3.58%.[36] Those for studies that defined abuse as touching or more severe act, unshaded, range from 1.00% to 14.94%, with an average of 6.69%.

---

[36]    Pereda et al. (2009) find that 7.9% of men had suffered some form of sexual abuse prior to the age of eighteen. Stoltenborgh et al. (2011) find that 7.6% of males were victims of child sexual abuse.  Barth et al. (2013) find that 3% of boys are victims of forced intercourse and 6% are victims of contact abuse. Thus, prevalence rates from the 21 studies I identified are similar in magnitude (on average) to those included in each of the three meta-analyses.

Expert Report of Charles E. Bates, PhD

**Figure 37: Summary of relevant academic literature on sexual abuse of boys**

| Study[37] | Broadest comparable allegation in POC data | Prevalence of sexual abuse among youths | Notes on calculation of abuse rates | Adjusted prevalence of sexual abuse among youths |
|---|---|---|---|---|
| Silverman, Reinherz, and Giaconia (1996) | Penetration | 1.10% | Reported directly in study | 0.78% |
| Basile et al. (2007) | Penetration | 1.45% | The rate of lifetime abuse was 2.10% and 69.2% of participants were first victimized before the age of 18. 2.10% × 69.2% = 1.45% | 1.20% |
| Swahn and Bossarte (2007) | Penetration | 3.80% | Reported directly in study | 3.14% |
| Howard and Wang (2005) | Penetration | 5.10% | Reported directly in study | 4.21% |
| Rosenberg et al. (2005) | Penetration | 6.47% | Table 1 listed 5% of the 6,452 boys with no suicide attempts were sexually assaulted; 9% of the 773 boys with one suicide attempt were sexually assaulted; and 38% of the 238 boys with multiple suicide attempts were sexually assaulted. Therefore, the abuse rate was (5% × 6,452 + 9% × 773 + 38% × 238) / (6,452+ 773 + 238) = 6.47% | 5.34% |
| Finkelhor and Dziuba-Leatherman (1994) | Touching | 1.00% | In Table 2, they reported 1.0% contact sexual abuse and 0.0% rate among boys. Therefore, the sexual abuse rate was 1.0% + 0.0% = 1.0%. | 0.83% |
| Sachs-Ericsson et al (2005) | Touching | 2.00% | Reported directly in study | 1.65% |
| Kercher and McShane (1984) | Touching | 3.00% | Reported directly in study | 2.48% |
| Siegel et al (1987) | Touching | 3.80% | Reported directly in study | 3.22% |
| Eisenberg, Ackard, and Resnick, (2007) | Touching | 4.00% | Table 1 showed that 96% men reported no sexual abuse and, therefore, 4% were ever sexually abused. | 3.30% |
| Harrison and Narayan (2003) | Touching | 4.00% | Reported directly in study | 3.30% |
| Lodico, Gruber, and DiClemente (1996) | Touching | 4.10% | Reported directly in study | 3.38% |

---

[37] Complete reference to each academic study is included in Appendix C and my backup materials.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

| Study[37] | Broadest comparable allegation in POC data | Prevalence of sexual abuse among youths | Notes on calculation of abuse rates | Adjusted prevalence of sexual abuse among youths |
|---|---|---|---|---|
| Ackard and Neumark-Sztainer (2002) | Touching | 4.53% | All calculations here are based on Table 8 of the paper. There was a total of 38,763 boys (38,763 = 36,449+1,011+449+854). 2.4% of the 36,449 boys (875 = 2.4% × 36,449) with no date-related experience reported sexually abused by adults (2.4% = 1.2%+0.3%+0.3%+0.1%+0.2%+0.3%). 20.5% of the 1,011 boys (207 = 20.5% × 1,011) with date violence only reported sexually abused by adults (20.5% = 6%+1.3%+4.4%+2.3%+1.8%+4.7%). 39.6% of the 449 boys (178 = 39.6% × 449) with date rape only reported sexually abused by adults (39.6% = 11.1% +3.8% + 7.8% + 2.4% + 6.0% +8 .5%). 58.1% of the 854 boys (496 = 58.1% × 854) with date violence and rape reported sexually abused by adults (58.1% = 11.0% + 2.0% + 7.8% + 2.9% + 5.4% + 29.0%). Therefore, a total of 1,756 = 875 + 207 + 178 + 496, 4.53% = 1,756 / 38,763, boys were sexually abused by adults. | 3.88% |
| Bensley et al (1999) | Touching | 5.00% | 2.4% boys reported being sexually molested and 2.6% reported being (non-sexually) abused and sexually molested. The sexual abuse rate was 2.4% + 2.6% = 5.0% | 4.13% |
| Hibbard, Ingersoll, and Orr (1990) | Touching | 6.00% | Table 1 listed the sexual abuse only rate was 2.3% and the rate for physical and sexual abuse was 3.7%. Therefore, the total sexual abuse rate was 2.3% + 3.7% = 6.0%. | 4.95% |
| Nelson, Higginson, and Grant-Worley (1994) | Touching | 7.70% | Reported directly in study | 6.35% |
| Finkelhor et al (1997) | Touching | 9.00% | Reported directly in study | 7.43% |
| Banyard and Cross (2008) | Touching | 9.40% | Reported directly in study | 7.76% |
| Briere and Elliott (2003) | Touching | 14.20% | Reported directly in study | 11.72% |
| Finkelhor et al (1990) | Touching | 14.40% | In table 1, they reported 9.5% sexual intercourse; 4.5% touch, grab, kiss; and 0.4% oral sex, sodomy among men. Therefore, the sexual abuse rate was 9.5% + 4.5% + 0.4% = 14.4%. | 12.82% |
| Chapman et al (2004) | Touching | 14.94% | 54% of the 9,460 respondents are women, so there were 4,352 (4,352 = 9,460 × 46%) male respondents. Table 1 reported 650 sexual abuse cases among men. Therefore, the male sexual abuse rate was 650 / 4352 = 14.94% | 12.33% |

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

(136)    The prevalence rates in the third column of Figure 37 reflect abuse by all perpetrators—family members as well as non-family members. In contrast, I understand that the relevant type of abuse that survivors in this matter can receive compensation for is abuse caused by non-family perpetrators. Five studies include information on the victim's relationship to the perpetrator. Across these five studies, non-family perpetrators accounted for 70.80% to 89.00% of the abuses.[38] I used the study-specific percentage to adjust the prevalence rate shown in the third column. For the remaining studies, I adjusted the prevalence estimates shown in the third column by multiplying them by 82.53%, which is the average share of non-family perpetrators across the five studies. The adjusted prevalence rates are shown in the last column of Figure 37. The average adjusted prevalence rate for penetration or more severe acts, shaded grey, is 2.93%; the average adjusted prevalence rate for touching or more severe acts, unshaded, is 5.59%.

---

[38]    *See* '[Prevalence literature review summary.xlsx](Prevalence literature review summary.xlsx)' included in my backup materials.

---

**<u>EXHIBIT C</u>**

**Bates Rebuttal Report**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**REBUTTAL EXPERT REPORT OF CHARLES E. BATES**

**January 5, 2022**

**Errata as of January 19, 2022**

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Confidential subject to Protective Order

Rebuttal Expert Report of Charles E. Bates, PhD

# Table of contents

I. Introduction ........................................................................................................................................1

    I.A. Qualifications...........................................................................................................................1

    I.B. Scope of charge ......................................................................................................................2

    I.C. Confidentiality.........................................................................................................................2

    I.D. Summary of opinions..............................................................................................................3

    I.E. Materials relied upon ............................................................................................................13

II. Claro's analysis overstates the total value of BSA's Abuse Claims manyfold ...................................14

    II.A. Claro's claims about the Bates White's valuation methodology are incorrect and unfounded ...............32

    II.B. The TDP provide a reasonable basis on which to value the BSA Sexual Abuse Claims for purposes of the Plan. ...........................................................................................................................35

III. Portion of valuation attributable to TCJC Abuse Claims in Claro Report.........................................41

IV. Scarcella Report misidentifies the source of uncertainty and conflates issues related to fixed value TDP with discretionary TDP ................................................................................................................43

V. BRG Report uses an arbitrary valuation figure ................................................................................47

Appendix A. Updates to abuser frequency category in BSA-PLAN_01635877...................................A-1

Appendix B. Materials relied upon ..................................................................................................B-1

Rebuttal Expert Report of Charles E. Bates, PhD

# List of figures

Figure 1: Updated Average settlement amount and count of claims by abuser and allegation categories .............5

Figure 2: Claro study group of historical BSA resolved claims by size of payment to claimants ...........................7

Figure 3: Characteristics of claims in the Claro study group ...............................................................................18

Figure 4: Apparent Single Survivor Cases that further research revealed involved a repeat abuser ...................21

Figure 5: Illustration of potential filing selection bias .........................................................................................25

Figure 6: Hypothetical Abuse Claim filing threshold simulation..........................................................................26

Figure 7: Summary of valuation uncertainty factors (Figure 34 of Bates affirmative report)................................30

Figure 8: Graph of average historical resolution value and count of claims by abuser ........................................36

Figure 9: TDP simulation results for Abuse Claims grouped by TDP payment size ..............................................40

Figure 10: TDP simulation results for Abuse Claims grouped by TDP payment size ...........................................40

Figure 11: Applying Claro Apportionment Scenarios to Claro Report's Valuation total for TCJC claims..............41

Figure 12: Updated abuser frequency category by settlement claim number ...................................................A-1

Rebuttal Expert Report of Charles E. Bates, PhD

# I. Introduction

(1)     I submitted a report in this proceeding on December 5, 2021 ("Affirmative Report"). In that Affirmative Report, I provided an estimate of the total value of the Abuse Proofs of Claim asserted against the Debtors (the "Abuse Claims") as of the Petition Date at tort values. Based on the POC[2] data and historical settlement data available early in the spring of 2021, I estimated the aggregate value of the Abuse Claims as of the Petition Date was between $2.4 billion and $7.1 billion against the BSA and other BSA-related parties. In my affirmative report, I also provide opinions about the Base Matrix Values contained in the Trust Distribution Procedures ("TDP") and the portion of claims and loss potentially attributable to The Church of Jesus Christ of Latter-day Saints (the "TCJC").

(2)     On December 5, 2021, experts retained by the Official Tort Claimants Committee ("TCC"), certain remaining insurers, the Roman Catholic Ad Hoc Committee, and the United Methodist Ad Hoc Committee submitted reports on a range of topics. Many of those reports dealt with issues related to estimation and topics addressed in my Affirmative Report. Counsel to the Debtors has asked me to review these expert reports and the analyses and opinions contained therein and respond to those that relate to the analyses and/or opinions included in my December 5, 2021 expert report.

## I.A. Qualifications

(3)     I am Chairman of Bates White, which is an economic consulting firm with its primary office located in Washington, DC. I specialize in the application of statistics and computer modeling to economic and financial issues, and I have extensive experience working on mass-tort claims and liability valuation issues. I have 30 years of experience in a wide range of litigation and commercial consulting areas.

(4)     I received my PhD and MA in Economics from the University of Rochester and my BA in Economics and Mathematics, with high honors, from the University of California, San Diego. I have taught courses on economic analysis, the theory of value, advanced statistical and econometric analysis, and trade theory. I was an instructor at the Rochester Institute of Technology, the University of California, San Diego, and was on the faculty of Johns Hopkins University for seven years. I have published papers on advanced topics in estimation theory in peer-reviewed journals.

---

[2]     Throughout this report I use the terms "Proof of Claim" and "POC" to refer solely to the Proof of Claim forms submitted by or behalf of Abuse Claims and not Proof of Claim forms for other creditor classes.

Rebuttal Expert Report of Charles E. Bates, PhD

(5)    A more complete description of my qualifications and experience is provided in Section I.A of the Affirmative Report and a complete copy of my Curriculum Vitae is attached to that report as Appendix A.

## I.B. Scope of charge

(6)    Counsel to the Debtors has asked me to review certain reports submitted at the request of the Official Tort Claimants Committee ("TCC"), certain remaining insurers, the Roman Catholic Ad Hoc Committee, and the United Methodist Ad Hoc Committee and respond to those that relate to the analyses and/or opinions included in my December 5, 2021, expert report. In this report I respond to the certain opinions presented in the following reports exchanged in this matter:

   a.    The December 5, 2021, Expert Report of Katheryn R. McNally of the Claro Group LLC (the "Claro Report")

   b.    The December 5, 2021, Affirmative Expert Report of Marc C Scarcella, M.A. (the "Scarcella Report")

   c.    The December 5, 2021, Expert Report of Dr. Jon R. Conte

   d.    The December 5, 2021, Expert Report of David H. Judd & Matthew K. Babcock of Berkley Research Group (the "BRG Report")

(7)    Bates White's work on this matter is ongoing. My work here is based on the information available to me as of the date of this report. Unless otherwise noted, in this report, as in my affirmative report "Expert Report of Charles E. Bates" dated December 5, 2021, "BSA" refers to the BSA inclusive of other BSA-related parties such as the Local Councils and Chartered Organizations and all BSA-related entities.

## I.C. Confidentiality

(8)    Bates White has read and agreed to abide by the Stipulated Confidential and Protective Order issued by this Court on June 8, 2020 [Docket 799; related Docket 613].

(9)    Much of the information on which this report is based is Confidential subject to the terms of the Stipulated Confidential and Protective Order. More specifically, the information on which this report is based relates to allegations made by (sexual) Abuse Claims who have submitted claim forms in the current Bankruptcy litigation as well related historical claims.[3] This information is sensitive in nature

---

[3]    Capitalized terms not otherwise defined have the meaning as defined in the Fifth Amended Plan and Amended

Rebuttal Expert Report of Charles E. Bates, PhD

# I.D. Summary of opinions

(10)    There are three opinions in the Claro Report that relate to my opinions, analyses, and expertise in this matter. They are:

> Claro Opinion 1: The low end of a reasonable range of claim value for all BSA Sexual Abuse Claims in the aggregate is estimated to be between $24.76 billion and $30.41 billion.

> Claro Opinion 2: The Bates White Disclosure Statement Valuation of $2.4 billion - $7.1 billion is inconsistent with settlement amounts agreed to by BSA prior to commencement of its chapter 11 cases and is not supported by disclosed methodology.

> Claro Opinion 3: The valuation methodology proposed in the TDP is fundamentally flawed and is not a reasonable basis on which to value the BSA Sexual Abuse Claims for purposes of the Plan.

(11)    I disagree with all three of these Claro Opinions. All are fatally flawed by the same fundamental error: Claro ignores the large selection bias inherent in using values from a highly selected group of 29 plaintiff verdicts and 517 settlements to draw inference on the value of 82,209 Abuse Claims, which were filed under different conditions and represent a broader and more diverse claim pool. Further, Claro repeatedly claims to be valuing the claims "conservatively" when they in fact do the opposite.

(12)    Moreover, based on my review of the 29 verdicts, further review of the settlement history, and further analysis of the economics of sexual abuse claim filings, I now believe that the value of the Abuse Claims is most likely in the lowest quartile of the of the range I originally estimated, that is, most likely between $2.4 and $3.6 billion.

(13)    The 29 exemplar plaintiff verdicts of the Claro study group highlight the stark differences between the fact profiles of tried sexual abuse claims in contrast to the historical settled BSA-related claims on the one hand, and the even starker differences with the current Abuse Claims on the other hand.

(14)    The tried cases where the plaintiff was successful are characterized by a clear and obvious institutional failure, the abuse being uncovered and reported to the police soon after it occurred, and with most survivors initiating litigation within a few years of the abuse.

---

Disclosure Statement.

---

    a.   Of the 29 plaintiff verdicts, at least 21 involved a paid employee of the institution whereas the Abuse Claims involved abusers who overwhelmingly consisted of unpaid volunteers. For 22 of the cases, the abuse was uncovered shortly after the abuse occurred and 75% initiated litigation within a few years of when the abuse ended.  In contrast, less than 13% of the BSA settled cases were litigated with 10 years after the abuse ended and, even more starkly, less than 1% of Abuse Claims filed a POC within 10 years of the abuse.

    b.   Seventeen of the plaintiff verdicts involved survivors 18 years old or less at the time litigation commenced, with the average age at time of litigation for all 29 verdicts being 21. In contrast, the average age at litigation of the BSA settled claims is 48, with none over 72.  For the Abuse Claims, the average age at filing a POC was 55, with 10% at least 70 years old.

    c.   Most strikingly different from litigated claims where over 90 percent of claims involved repeat abusers, less than 15 percent of Abuse Claims involve repeat abusers.[4] Moreover, 85 percent of Abuse Claim Survivors never reported their abuse to the police or to Scouting.

(15)   Having observed these stark differences between Claro's exemplar verdicts, the BSA settled claims, and the Abuse Claims, I re-examined the historical settlements for abusers identified as having abused only a single survivor ("Single Survivor Cases") to ascertain what distinguished high six- and seven-figure settlements for once identified abusers from the lower valued ones. In doing this work I discovered that 38 of the cases I reported in my affirmative report as Single Survivor Cases in fact involved a repeat abuser.  These newly-identified repeat abuser cases included all but one of the claims that were settled for over $375,000.  This one exception was a former employee of the New Hampshire council, a case that fits the profile of the plaintiff verdicts. The remaining 16 Single Survivor Cases in the 262 historical settlements report on Table 5 of my affirmative report have a resolution average of $150,000.  In contrast, the 38 cases I now know to be repeat abuser cases have a resolution average of $335,000.

(16)   This update to the historical settlement data is important as it points to a more significant value distinction between the Single Survivor Cases and those involving repeat abusers. This is illustrated in Figure 1 below which is an update to Figure 7 of my affirmative report.[5]  It now shows a three-fold difference between these categories within the 262 historical BSA settlements resolved by the BSA defense counsel Ogletree.  The difference is slightly larger if I use the full ten-year BSA settlement

---

[4]   Out of 344 historical settlement of the Claro historical settlement study group with a known abuser name, 318 are associated with repeat abusers.

[5]   A table listing the claims in the historical resolution data that were revealed to be repeat abuser cases on the basis of additional analysis is included as Appendix A to this report.

Rebuttal Expert Report of Charles E. Bates, PhD

history that Claro used in its study.  There, the difference between Single Survivor Cases and repeat abuser cases is greater than three-fold, with the Single Survivor Cases' settlement average being $140,000 whereas the "Other repeat abusers" settlement average being $460,000.  The median settlement amount of the Single Survivor cases is $100,000.

**Figure 1: Updated Average settlement amount and count of claims by abuser and allegation categories[6]**

| Abuser category | Penetration | Other sex acts | Groping/touching | Allegation not recorded[7] | Overall |
|---|---|---|---|---|---|
| **One time abuser** | | | | | |
| Average settlement | $212,500 | $177,000 | $25,000 | $37,500 | $150,219 |
| Count of claims | 4 | 8 | 1 | 3 | 16 |
| **David Bruce Smith** | | | | | |
| Average settlement | $1,750,000 | | | | $1,750,000 |
| Count of claims | 1 | | | | 1 |
| **Louis Brouillard** | | | | | |
| Average settlement | $69,900 | $78,864 | $25,625 | $43,636 | $57,630 |
| Count of claims | 10 | 22 | 4 | 33 | 69 |
| **Other repeat abusers** | | | | | |
| Average settlement | $668,674 | $454,919 | $382,937 | $137,614 | $462,054 |
| Count of claims | 40 | 66 | 37 | 15 | 158 |
| **Thomas Hacker** | | | | | |
| Average settlement | $8,025,000 | $4,863,636 | $3,500,000 | | $5,568,750 |
| Count of claims | 4 | 11 | 1 | | 16 |
| **Abuser not recorded** | | | | | |
| Average settlement | | | $75,000 | $0 | $37,500 |
| Count of claims | | | 1 | 1 | 2 |
| **Overall average settlement** | $1,053,322 | $810,053 | $406,163 | $69,552 | $650,036 |
| **Total count of claims** | 59 | 107 | 44 | 52 | 262 |

(17)    There are clear distinctions and similarities between the Abuse Claims, the BSA historical settlements, and the Claro study group of plaintiff verdicts.  The similarities are that all involve various allegations of sexual abuse by non-family member adults on minors, with rare exceptions.[8]  As tort claims, all are claims for pain and suffering, and the effects the abusers' actions had on the survivors' lives, as well as for punitive damages if possible. All assert an institution, here the BSA, had some oversight duty that makes it responsible for at least some share of the harm caused by the abusers' actions.  That is where the distinctions arise.  For the same harm to a survivor, in one circumstance the BSA may have little if any responsibility for the harm done by an unknown sexual abuser (i.e., a volunteer or one-time abuser)—having done all it could reasonably have done to protect

---

[6]    Note that this is an update of figure 7 from my Affirmative Report.

[7]    Includes one settled claim of zero dollars noted as "Multiple various abuse claims."

[8]    Three percent of Abuse Claims are for minor-on-minor abuse.

Rebuttal Expert Report of Charles E. Bates, PhD

the survivor while carrying on its charitable mission with a volunteer organization—while in another circumstance the BSA may have significant responsibility for the harm done because the abuser was, or could have been, known as such by the organization, but failed to identify its need to act.

(18)    The cases of the Claro plaintiff verdict study group are primarily of the latter type, with the average institutional liability share being two thirds of the compensatory awards to the survivors. However, the three cases in Claro's study in which the BSA was a defendant show results at the opposite sides of the institutional responsibility spectrum. In one case, the BSA was held 100 percent liable for a $7,000,000 verdict for its failure to remove a scout leader for several years after the survivor's parents wrote a letter to accusing the abuser of pedophilia. In contrast, at the lower end of the responsibility scale, the BSA was held 5 percent liable and required to pay $25,000 to each of three survivors, for its failure to enforce its rules not allowing adults to be alone with a minor, with the jury assessing 75 percent of liability to the perpetrator, another 8 percent to the spouse of the abuser, and the final 12 percent of liability to the parents of the survivors. In the third case, the BSA was held 60 percent liable for its failure to not prevent a repeat abuser from abusing several children, with the local council being assigned 15 percent liability share and the Mormon Church Entities being assigned a 25 percent liability share. Further, the BSA was assessed a large punitive damage verdict for failure to act to prevent the abuse to the survivor. Though there is no clear difference in the sexual abuse or harm done by the abusers in these three cases, the value of the cases against the BSA, and BSA-related parties, was very different based on each jury's assessment of the BSA's responsibility to prevent the abuse.

(19)    The BSA historical settlements also cover a wide range of possibilities between these two extremes of institutional responsibility. Figure 2 shows the wide range of amounts paid by the BSA to resolve the 573 resolved cases in the Claro study group of historical BSA litigated claims (note that the Claro report refers to this group as 517 as it sets aside the 54 zero payment resolutions). The differences have less to do with the types of abuse and harm done than the portion of responsibility attributed to the BSA – the full range of allegations occur in all payment size categories. The BSA settlements to survivors of two notorious repeat abusers Hacker and Brouillard illustrate the opposite sides of the institutional responsibility spectrum within this data. At the one extreme, Hacker was identified as a potential abuser by the BSA in the 1960s yet was able to manipulate his way around the BSA youth protection programs over the subsequent two decades to gain access to and abuse dozens of boys. The BSA faced the prospect of a sequence of trials, each with the prospect of punitive damages, all with multiple survivors each validating the testimony of the other about the abuse they suffered at the hands of Hacker. Hacker himself asserted the BSA should have stopped him. The BSA faced the prospect of being assessed by juries a large portion of the responsibility for multiple multimillion dollar verdicts. The seven-figure settlements paid to 16 survivors of abuse by Hacker account for over 50 percent of the money the BSA paid to only six percent of litigating survivors since 2016.

Rebuttal Expert Report of Charles E. Bates, PhD

**Figure 2: Claro study group of historical BSA resolved claims by size of payment to claimants**

| Payment size | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| Dismissed without payment | 56 | $0 | $0 |
| Four and five figure payments | 218 | $8,687,249 | $39,850 |
| Six figure payments | 234 | $75,641,500 | $323,254 |
| Seven figure payments | 65 | $181,765,000 | $2,796,385 |
| Grand total | 573 | $266,093,749 | $464,387 |
| Median | | | $100,000 |

(20)    In contrast, the BSA settlements to 69 survivors abused by Brouillard were comprised of mostly mid-five-figure payments, reflective of the BSA facing the prospect of being assessed by juries a small portion of the responsibility for multiple verdicts. The age and profile of abuse allegations against Brouillard are not materially distinguishable from those against Hacker. Both repeatedly abused dozens of children. What was different from Hacker was the prospect of the jury-assigned responsibility share. Survivors of abuse by Brouillard account for one fourth of all resolutions with litigating survivors since 2016, but only 2 percent of the money the BSA to survivors since then.

(21)    I conclude from these differences that it is not statistically reliable to value the Abuse Claims with simple average values from the study groups without accounting for how the compositional difference affect the value of claims. This is the well-known statistical estimation problem called "selection bias." This is seen here in the significance of the differences in the composition of survivor characteristics between the study group of the Claro verdicts, the study group of the BSA historical resolutions, and the Abuse Claims on the one hand, as well as the large differences in the claim values within and between the study groups of the Claro verdicts and the BSA historical resolutions on the other hand. Each of the characteristics identified in paragraph (14) clearly affects the ability of a litigating survivor to establish the responsibility share of the BSA and the differences associated with these characteristics must be considered to value the Abuse Claims.

(22)    Selection bias occurs when individuals or groups in a study differ systematically from the population of interest leading to a systematic error in an association or outcome. Here, the verdicts Claro uses as a study group, which total just 29 claims, are purposely selected to be successfully tried cases against institutions held responsible for some acts committed by abusers. Claro demonstrates an awareness that verdict amounts were subject to selection bias, though it is never given that name. This is obvious because of the way Claro adjusts the 29 verdict amounts to value Abuse Claims, rather than using the verdict amounts directly to value Abuse Claims. But Claro's adjustment does not sufficiently account for the selection bias of the verdicts. Claro only adjusts the verdicts so that they are equivalent to BSA historical settlement averages. What Claro fails to address is that the BSA settlements are also a highly selected group, and their average value also suffers from selection bias. The BSA settlements are the small fraction of sexual abuse occurrences that resulted in lawsuits. Notably, they are dominated by cases involving repeat abusers. That fact alone introduces a significant selection bias

Rebuttal Expert Report of Charles E. Bates, PhD

akin to using verdicts in place of settlements. In contrast to the high fraction of settlements involving claims with repeat abusers, only 13 percent of Abuse Claims involve identifiable repeat abusers. The Abuse Claims are mostly Single Survivor Cases involving survivors who never reported their abuse to Scouting or the police and told no one of their abuse for years. As shown above, the BSA settlements for such cases are lower than the repeat abuser claims. This means the chance of a liability finding against the BSA or the liability share of BSA must be lower for single victim cases. Accordingly, the value associated with such cases would be lower.

(23)   Claro Opinion 1 is wrong because the Claro analysis overstates the total value of BSA's Abuse Claims manyfold. Accounting for the selection bias of the verdicts and historical settlements leads to the proper conclusion that the value of the Abuse Claims is between $2.4 billion and $7.1 billion, and for the reason I articulate in this report, most likely less than $3.6 billion.

(24)   Second, Claro Opinion 2 is wrong because the Bates White Disclosure Statement Valuation of $2.4 billion - $7.1 billion is consistent with settlement amounts agreed to by BSA prior to commencement of its chapter 11 cases. Claro errs in ignoring the large selection bias of valuing claims that were never pursued in the tort system prior to bankruptcy.  To be consistent with the historical settlements, the valuation of Abuse Claims must consider how the Abuse Claims differ from the settled claims, not blindly apply the historical average settlement as Claro does. The scenario-based methodology described in the Disclosure Statement provides a reasonable basis for that evaluation and how the differences between the Abuse Claims and the settlements affect the valuation of the Abuse Claims. Claro is wrong to say the disclosed methodology does not support the disclosed valuation range.  For reference, the Amended Disclosure statement says:

> *To arrive at the valuation range, Bates White considered multiple scenarios… all of the scenarios are based on a frequency and severity valuation model where the number of current Abuse Claims (frequency) alleging a particular Abuse (severity) is measured against the attributes described above, which, when combined with historical data regarding resolution of Abuse Claims, allows Bates White to project the value of the Claims.*[9]

The use of scenarios constructed by frequency-severity modeling is a well-established, commonly-employed method among actuaries and other analysts for purposes of insurance loss forecasting and estimating litigation claims.

(25)   Note, moreover, this is the same the methodology employed by Claro for its study, albeit, as indicated above, that Claro does not consider all the necessary factors to account for the difference between the verdict study group and the Abuse Claims. Though Claro never references it by name, the Claro study uses a frequency-severity model with plus and minus factors identified, and, where noted, implemented to adjust the selected severity benchmark.  Claro begins with a benchmark population of

---

[9]    *See* Amended Disclosure statement [Docket 6214] at page 91.

Rebuttal Expert Report of Charles E. Bates, PhD

claims to value (frequency = 46,916) and a benchmark value for each claim from a verdict average (severity = $4.3 million) and multiplies the two to obtain a benchmark value of $88 billion. Claro then identifies a series of "minus factors" (downward adjustments) and "plus factors" (identified whenever the Claro report refers to as assumption as "conservative".) Claro then reduces the verdicts-based severity benchmarks downward by the application of a series of minus factors until the reduced benchmarks result in an average valuation approximately equal to the simple average of the BSA historical settlements. The Claro study ends with an implicit, though crucial, assumption that the benchmark frequency population of 46,916 Abuse Claims have the same valuation characteristics of the BSA historical settlements. This mistake leads Claro to conclude the value of the Abuse Claims is over $25 billion (= 46,916 Abuse Claims × BSA Settlement average of $513,000). Had Claro critically evaluated the implicit assumption of the applicability of the simple historical settlement average to the Abuse Claims as I did, Claro would have found that there remained significant selection bias in the average BSA settlement and that further significant downward adjustments of the severity benchmarks were required to properly value the Abuse Claims.

(26)    Contrary to Claro's third opinion, the TDP provides a reasonable basis on which to value the BSA Sexual Abuse Claims for purposes of the Plan. Claro assert the TDP are unreasonable based on four supporting conclusions that are incorrect and without merit, each of which I address in the body of this report. The appropriate evaluation of the reasonableness of the Settlement Trust is whether the Settlement Trust pays Abuse Claims, fairly and equitably, reasonable amounts relative to the harm to the survivor, the responsibility of the BSA, accounting for state laws apropos of each Abuse Claim. Overall, the TDP are reasonable because they set values consistent with the aggregate BSA Abuse Claim valuation range of $2.4 billion to $7.1 billion.

(27)    It is not possible to know the value of each Abuse Claim until after its evaluation by the Settlement Trustee. Though many of the aggravating factors and SOL mitigating factors are known for many of the Abuse Claims as documented in their POCs, other aggravating and mitigating factors are not ascertainable from the face of the POCs, and the mitigating scalars related to BSA's responsibility share are virtually unknown at this time. We can, however, calculate how alternative hypothetical average values for the unknown scalars affect the value assigned to Abuse Claims by Settlement Trust. This provides a test of the reasonableness of the Settlement Trust; if scalar amounts that appear reasonable considering what we know about the Abuse Claims result in TDP values consistent with the aggregate BSA Abuse Claim valuation range of $2.4 billion to $7.1 billion, then the Settlement Trust and TDP are also reasonable.

(28)    To test the effect of different aggravating and mitigating scalars on the face value of Abuse Claims run through the Settlement Trust, I created a BSA Trust simulation model that uses the rules of the TDP to assign values to each Abuse Claim based on what is known about each Abuse Claim and a hypothetical set of aggravating and mitigating scalars to account for unknown Abuse Claim attributes. To assist in the reasonableness assessment of the hypothetical scalars I also created a tort system

Rebuttal Expert Report of Charles E. Bates, PhD

simulation to model the economics of claim filing in litigation and its implications for the pattern of claim filings against the BSA. The tort system simulation is useful because it informs me about the effect of certain Abuse Claim characteristics important for the determination of the TDP scalars, notably the BSA potential responsibility share mentioned above, on the number and value of BSA settlements. For this purpose, I calibrated the tort system simulation to match the number of Abuse Claims and the number and average value of historical settlements. I then set mitigating and aggravating scalars of the Trust simulation to test what average values of those scalars would be needed to have the Trust make payments consistent with the tort system simulation. The Trust simulation modelling exercise indicates that if the average level of the BSA responsibility share scalars of the Trust is about 10 percent for Abuse Claims for Single Survivor Cases and the net of aggravating and mitigating scalars for repeat abuser Abuse Claim is 125 percent, then the Trust will spend about $3.4 billion paying claims at values consistent with simulated BSA-entities responsibility shares needed to match the historical filing and settlement pattern.

(29)    These levels for the Trust mitigating and aggravating scalars are reasonable and appropriate for the Trust to properly account for the tort system values of the Abuse Claims. As described in the body of this report, the tort system simulation shows that the Abuse Claims represent a wider – and overall lower – range of valuation than the BSA historical settlements. The fact that such a high proportion of the Abuse Claims were never recruited to file tort claims, yet so many have come forward in this bankruptcy proceeding, means there must be a tort system valuation threshold below which plaintiff law firms will not invest the time nor money to recruit the Abuse Claims in the same manner they recruit so many other torts. This bankruptcy proceeding with the prospect of a settlement trust has drastically reduced the costs to plaintiff law firms to prosecute the Abuse Claims against the BSA. It made recruiting of survivors a profitable enterprise to launch and invest.

(30)    Significantly higher scalars do not reconcile with the historical filing and settlement pattern. At higher valuations, I believe recovery attorneys would have been working hard to recruit these claims for years and there would have been many more historical BSA settlements. I believe this because of my work in other mass torts. For example, by way of comparison, I know from my work on *Garlock,* mesothelioma claimants receive on average less than $600,000 in tort system recoveries.[10] Yet recovery attorneys advertise daily on television and other media advertisements to recruit a couple thousand mesothelioma claims every year. If the case economics of the typical Abuse Claims supported tort system recoveries of that level, I believe many thousands of Abuse Claims would have already been filed as tort claims. To wit: there are over 27,000 Abuse Claims unrestricted by statute of limitations that could have filed a lawsuit but did not. These survivors are typically high school graduates in their mid-fifties, half of whom are unemployed or retired. Several hundred thousand dollars would make a difference in their lives. Yet no wide scale effort was made by recovery

---

[10]    *See* Exhibit 28 of Expert Report of Charles E. Bates, PhD from *Garlock.* Trial exhibit GST-0996, *In re Garlock Sealing Technologies LLC, et al.*, No. 10-31607 (Bankr. W.D.N.C. Feb. 15, 2013).

Rebuttal Expert Report of Charles E. Bates, PhD

attorneys to recruit these Abuse Claims until this bankruptcy matter. For these reasons, I believe that the average BSA responsibility share for Abuse Claims is more likely less than 10% than greater than 10%.

(31)    The simulations not only show that the TDP are clearly reasonable in their valuation of Abuse Claims, they demonstrate that the vast majority of Abuse Claims would receive no compensation for their abuse but for a trust set up as part of this bankruptcy proceeding, consistent with the fact that so many of the Abuse Claims were never pursued through litigation.[11] More generally, as I and others have opined in other settings,[12] the tort system is neither as fair nor as equitable to mass tort claimants as a well-designed bankruptcy settlement trust. The tort system is more akin to a lottery than a fair compensation system, paying widely varying amounts to similarly situated claimants with comparable claims against a defendant. In contrast, a well-designed trust like the Settlement Trust, properly accounts consistently and equitably for claim attributes that should affect claim value. Notably, and particularly critical here, the Settlement Trust can properly compensate the tens of thousands of Abuse Claims whose value is below that of the filing threshold and who would never be compensated in the tort and will not receive any compensation should a Settlement Trust not be set up for that purpose. Abuse Claims with a once-identified abuser will be associated with low percentage mitigating scalars in large part, due to the lack of institutional responsibility by BSA. That determines a reasonable payment reflective of the BSA's appropriate responsibility those Abuse Claims, an amount however, that is below the threshold required to warrant the investment of plaintiff law firms to recruit and represent such Abuse Claims in the tort system.

(32)    As the Claro verdict study group reveals, the institutional share of responsibility is a critical factor determining the value of a sexual abuse claim against an institution. As I discussed in paragraph (18) above, the three BSA related verdicts show how the BSA's responsibility share is a central component in determining if the BSA has any liability for a sexual abuse claim and, if so, how much, from a four- or five-figure value up to a seven-figure value. The tort system simulation illustrates the how there could be so many Abuse Claims and, relative to the number of Abuse Claims, so few tort filings and settlements. Given, as Claro has shown in its verdict study, the potential for at least a seven-figure return for a credible sexual abuse lawsuit if high institutional responsibility can be established by the plaintiff, it must be the case that the average liability responsibility share of the BSA is low. The BSA settlement data also supports this conclusion. Note that for cases that were filed against the BSA, 50 percent of lawsuits were resolved for a payment of $100,000 or less, at an average payment of $32,000. That amount is less than 2% of the adult-on-minor sexual abuse verdict benchmark of $1.88 million used by Claro. As described above, filed cases were a selected group

---

[11]    This does not mean that the claims are necessarily meritless, but rather that their individual tort system value is below the value required for an individual retention to be profitable for a plaintiff's attorney. For more on this see the discussion starting at paragraph 54.

[12]    See the Declaration of Charles E. Bates, PhD, adversarial proceeding docket #238 *In re DBMP LLC* Adv. Pro. No. 20-03004 (JCW)  (Bankr. W.D.N.C. Feb. 23, 2021).

with sufficiently high expected outcomes. As the historical results show, establishing a high enough institutional responsibility for the BSA by a plaintiff is difficult and only occurs in rare cases. In summary, considering all these factors, the verdicts of the Claro study group, the historical BSA settlements, and the results of the simulation modeling, it is more likely that the average BSA responsibility share of claims for which it holds any responsibility is less than 10 percent than more than 10 percent, much less if considering the entire population of Abuse Claims.  Following from the tort simulation model, which has an average 9% BSA responsibility to all the claims for which Claro attaches value, the valuation of the Abuse Claims is more likely below $3.5 billion than above it, meaning the value of Abuse Claims is more likely in the lower quartile of my original valuation range than in the higher portion of the range.

(33)     Claro offers an opinion as to the portion of Abuse Claim value attributable to TCJC Abuse Claims. In formulating that opinion, Claro fails to consider that only a portion of the valuation of claims potentially involving TCJC would be attributable to TCJC. That is, TCJC would not be responsible for 100% of the value of Abuse Claims that implicated it.  Some of that responsibility would fall to the BSA and Local Councils, a fact that Claro acknowledges and uses in other sections of its report. Claro further fails to consider that some portion of the amounts attributable to the TCJC may also be subject to coverage under BSA's insurance policies. Any reasonable treatment of those considerations would bring the top end figure assigned to TCJC below $250 million.

(34)     Moving on to the other reports, first, the Scarcella Report misidentifies the source of uncertainty and conflates issues related to fixed value TDP with discretionary TDP. His misunderstanding of how the Settlement Trust is to be administered leads him to a false comparison between the proposed Settlement Trust and certain asbestos trusts.  Those asbestos trusts have had to lower their payment rates because they did not have the discretion nor mandate to pay lower value claims lower amounts. In contrast, the Settlement Trust is designed to use aggravating and mitigating scalars to account for Abuse Claim attributes that affect their value.  Properly interpreted, his critique highlights the importance of having claims evaluated on their merits and not simply paid scheduled amounts.  I agree that appropriate evaluation of individual claims is necessary to ensure that the TDPs fairly compensate claimants in full.

(35)     Second, though the BRG Report largely addresses issues that I am not opining upon in this case, it does include a section on the "Value of Survivor Claims" that purports to produce a valuation range for Abuse Claims of roughly $7.6 billion - $9.3 billion "for purposes of [their] Adjusted Local Council Liquidation Analysis."[13] This figure is produced by valuing 41,750 claims that identify a Local Council on their POCs.[14] The BRG analysis purports to evaluate those 41,750 claims by applying the TDP Base Matrix Values and some of the TDP scalars, but not others. It clearly

---

[13]   BRG Report, pp. 33–34.

[14]   BRG Report, p. 33.

overvalues claims manyfold making essentially the same error as Claro by ignoring the selection bias in valuing Abuse Claims with settlements. This is a flawed approach that is inconsistent with how the TDP will eventually be applied, inconsistent with the Claro Report—which was also submitted on behalf of the TCC—and inconsistent with my estimate of the value of Abuse Claims.

(36)    The following report provides the support for these and the remainder of my rebuttal opinions. I turn first to the Claro report.

## I.E. Materials relied upon

(37)    This report is based on data and information I considered as part of my Affirmative Report and the materials listed in Appendix B.

Rebuttal Expert Report of Charles E. Bates, PhD

# II. Claro's analysis overstates the total value of BSA's Abuse Claims manyfold

(38)     There are three opinions in the Claro Report that relate to my opinions, analysis, and expertise in this matter. They are:

>     Claro Opinion 1: The low end of a reasonable range of claim value for all BSA Sexual Abuse Claims in the aggregate is estimated to be between $24.76 billion and $30.41 billion.

>     Claro Opinion 2: The Bates White Disclosure Statement Valuation of $2.4 billion - $7.1 billion is inconsistent with settlement amounts agreed to by BSA prior to commencement of its chapter 11 cases and is not supported by disclosed methodology.

>     Claro Opinion 3: The valuation methodology proposed in the TDP is fundamentally flawed and is not a reasonable basis on which to value the BSA Sexual Abuse Claims for purposes of the Plan.

(39)     I disagree with all three of these opinions in the Claro Report. All three are fatally flawed by the same fundamental error: Claro ignores the large selection bias inherent in using simple average values from a highly selected group of 517 settlements in an attempt to draw inference on the value of 82,209 Abuse Claims, which were filed under different conditions and represent a broader claim pool. In this section, I address selection bias and how Claro and BRG come to incorrect conclusions about Abuse Claim valuation by not accounting for the selection bias of settled claims.

(40)     Selection bias occurs when individuals or groups in a study differ systematically from the population of interest leading to a systematic error in an association or outcome. Here, the verdicts Claro uses as a study group, which total just 29 claims, are purposely selected to be successfully tried cases against institutions held responsible for the acts committed by abusers. They are cases where the institutional share of assigned loss will be atypically high. They are cases where the survivor reported their abuse, the abuser was caught, and primarily cases where litigation commenced relatively soon after the abuse was discovered. The abuser was often an employee of the institution sued. The link between the abuser and the institutional responsibility was clear to the jury in these cases. In contrast, only a small portion of Abuse Claims was anyone involved with Scouting or the police told of the abuse. The abusers identified in the Abuse Claim were, except in rare circumstances, volunteers who did not work for the BSA and were rarely caught. The link between the abuser and the institutional responsibility is tenuous for most Abuse Claims.

(41)     The fact that verdicts generally are not a random sample of claims and the selection bias in verdicts have been well documented in the Law and Economics literature (*see*, e.g., Priest and Klein 1984 and

Wittman 1995, 1988).[15] Selection bias must be properly addressed in deriving statistical inferences.[16] Only a small fraction of claims end up in trial. It is difficult and risky to draw statistical inferences about general claims from verdicts, because they only account for a small percentage of the population and are not selected randomly.[17] Particularly, cases with potentially large awards are more likely to end in trial.[18] Thus, simply taking the average of the verdict amounts, without accounting for the selection bias, is likely to overestimate the average compensation for general claims.

(42)   The point regarding selection bias in verdicts, and in lead cases in mass torts in general, is not merely an academic one. The economics facing plaintiffs' attorneys mean that it makes the most sense to focus their early efforts in a mass tort on cases with the highest expected damages. There are numerous examples of mass torts for which the verdicts associated with the marquee cases that were first pursued by plaintiffs and the plaintiffs' bar were orders of magnitude higher in value than the per claim value associated with the subsequent group resolution of those tort claims. Consider the example of Roundup (glyphosate), which is a common herbicide. There were three high-profile plaintiff tort verdicts against its manufacturer, Bayer-Monsanto. Just the compensatory component of those verdicts, post-appeal, averaged over $10 million each.[19] In 2021 a global settlement in principle was reached which would pay approximately 100,000 pending cases $100,000 each.[20] This would be over 100 times less than the headline verdict values post-appeal (over 200 times less than headline verdict values pre-appeal) and post removal of punitive awards. Vioxx (rofecoxib), a drug used to treat patients with arthritis and other conditions causing chronic or acute pain, is another example.

---

[15]   George L. Priest and Benjamin Klein, "The Selection of Disputes for Litigation," *Journal of Legal Studies* 13, no. 1 (1984): 1–55.

Donald Wittman, "Is the Selection of Cases for Trial Biased?," *Journal of Legal Studies* 14, no. 1 (1985): 185–214.

Donald Wittman, "Dispute Resolution, Bargaining, and the Selection of Cases for Trial: A Study of the Generation of Biased and Unbiased Data," *Journal of Legal Studies* 17, no. 2 (1988): 313–352.

[16]   National Research Council, "Reference Manual on Scientific Evidence: Third Edition," 2011, Washington, DC: The National Academies.

James J. Heckman, "Micro Data, Heterogeneity, and the Evaluation of Public Policy: Nobel Lecture," *Journal of Political Economy* 109, no. 4 (2001): 673–748.

[17]   George L. Priest and Benjamin Klein, "The Selection of Disputes for Litigation," *Journal of Legal Studies* 13, no. 1 (1984): 2.

Theodore Eisenberg, "Testing the Selection Effect: A New Theoretical Framework with Empirical Tests," *Journal of Legal Studies* 19, no. 2 (1990): 337.

[18]   Donald Wittman, "Dispute Resolution, Bargaining, and the Selection of Cases for Trial: A Study of the Generation of Biased and Unbiased Data," *Journal of Legal Studies* 17, no. 2 (1988)" 313–352.

[19]   Notably, the pre-appeal compensatory figures averaged more than twice as much. *See*:

*Dewayne Johnson v. Monsanto Co*., No. CGC-16-550128 (Cal. Ct. App. July 20. 2020);

Pretrial Order No. 164: Amended Judgment, *In re Roundup Products Liability Litigation*, No. 16-md-2741-VC (N.D. Cal. July 17, 2019);

Order (1) Denying Motions of Defendant for JNOV and (2) Conditionally Granting Motions of Defendant for New Trial, *Alva and Alberta Pilliod v. Monsanto Co. et al.*, No. RG17-862702 (Cal. Alameda County Ct. July 19, 2019).

[20]   *See* Bayer, "Bayer Announces Agreements to Resolve Major Legacy Monsanto Litigation," press release, June 24, 2020, https://media.bayer.com/baynews/baynews.nsf/id/Bayer-announces-agreements-to-resolve-major-legacy-Monsanto-litigation.

---

Rebuttal Expert Report of Charles E. Bates, PhD

The first verdict against its manufacturer, Merck and Co., awarded the plaintiff $24.5 million in compensatory damages.[21] The second verdict against Merck was for $4.5 million in compensatory damages.[22] Several months before Merck's global settlement, a jury returned another verdict, for $20 million in compensatory damages.[23] Notwithstanding the average verdict amount of more than $16 million across the three identified headline verdicts, the global settlement that involved about 60,000 claims paid, on average, $81,000 per claim.[24] This is about 200 times less than the average headline verdict.[25]

(43)    As an initial matter, the verdicts proposed for inclusion as reviewed by Dr. Conte do not appear to be analogous to the Abuse Claims.  Dr. Conte opined that cases were properly included because they often involve "an adult offender who is an employee" of an institution and the institution allegedly "failed to adequately screen the adult or to supervise and monitor."  This points to a high degree of selection bias, as the selection criteria assumed that the appropriate claims were those involving a higher degree of institutional responsibility.  Indeed, Dr. Conte opined that abuse claims were properly excluded "because there is no institutional share of compensatory damages."  The selection bias built into this process is not surprising given that Dr. Conte admittedly did no analysis to categorize potential comparable verdicts himself, rather, he simply adopted the proposed comparable verdicts provided to him by counsel to the TCC.

(44)    The extent of the selection bias across the 29 verdicts contained in the Claro study group relative to the BSA historical resolutions, and particularly the current Abuse Claims reflected in the proofs of claim, is stark. The 29 exemplar plaintiff verdicts of the Claro study group are selected to be ones where the plaintiff won at trial. These are cases where the plaintiff and their attorney elected to go through that process and then had a successful outcome. I reviewed the information Claro provided associated with these outcomes and performed additional research on these cases. My review showed that most of the Claro study group cases were ones characterized by a clear and obvious institutional failure. Most of those cases involved claims against employees, which, all else equal, are related to the institution having a higher degree of control or at least responsibility for the actions of the abuser. Most of the Claro study group cases also involved the abuse being uncovered, reported or discovered

---

[21]    The punitive damages were $229 million, although they were later reduced because Texas tort laws impose caps on punitive damages. *See* "Ernst v. Merck Vioxx Trial: Massive Verdict for Plaintiff; Knock-Out Punch for Merck?" *Drug Injury Watch*, August 20, 2005, https://www.drug-injury.com/druginjurycom/2005/08/ernst_v_merck_v.html.

[22]    The punitive damages were $9 million. *See*  "Vioxx Plaintiff Gets $13.5 Million in Damages," NBC News, April 12, 2006, https://www.nbcnews.com/health/health-news/vioxx-plaintiff-gets-13-5-million-damages-flna1c9468817.

[23]    The punitive damages were $27.5 million. *See* "Jury Awards $20 Million to Idaho Man in Latest Merck Vioxx Trial," CNBC, March 12, 2007, https://www.cnbc.com/2007/03/12/jury-awards-20-million-to-idaho-man-in-latest-merck-vioxx-trial.html.

[24]    *See* Lewis Krauskopf, "Merck Agrees to Pay $4.85 Billion in Vioxx Settlement," Reuters, November 9, 2007, https://www.reuters.com/article/us-merck-vioxx-settlement/merck-agrees-to-pay-4-85-billion-in-vioxx-settlement-idUSL0929726620071109.

[25]    Although the first two verdicts were eventually reversed on appeal, the reversal occurred only *after* the global settlement was reached. *See* "Merck Wins Appeals in Three Vioxx Cases," CNBC, May 29, 2008, https://www.cnbc.com/id/24875089.

---

Rebuttal Expert Report of Charles E. Bates, PhD

soon after it occurred and survivors initiating litigation within a few years of the abuse. In fact, seventeen of the plaintiff verdicts involved survivors 18 years old or less at the time litigation commenced, with the average age at time of litigation for all 29 verdicts being 21. In contrast, the average age at litigation of the BSA settled claims is 48, with none over 72.  For the Abuse Claims, the average age at filing a POC was 55, with 10% at least 70 years old. Most strikingly different from litigated claims, 85 percent of Abuse Claims involve abusers who are only identified once in either the POCs or the BSA historical settlements and 85 percent of Abuse Claim Survivors never reported their abuse to the police or to Scouting. In addition, over 79 percent of verdicts in the Claro verdict study group are from states with the potential for highest verdict awards and only 7 percent from states with the lowest award potential.[26] Figure 3 below highlights some of the key characteristics associated with the strong claims that comprise the 29 verdicts in the Claro study group.

---

[26]    For my work in *Garlock*, I classified states into three groups based on the size of observed wrongful death awards in every state.  I use that classification here.  I provide a tabulation of the state classifications in the appendix to this report. See paragraph 130 of my Affirmative report in *Garlock*.

Rebuttal Expert Report of Charles E. Bates, PhD

**Figure 3: Characteristics of claims in the Claro study group**

| Claro reference number | Abuser institutional relationship | Knowledge of abuse | Garlock state category | Years from abuse end to litigation | Plaintiff age at time of litigation |
|---|---|---|---|---|---|
| 17 | Employee | Reported or discovered | High | 0 | 16 |
| 18 | Employee | Reported or discovered | High | 2 | 11 |
| 20 | Employee | Reported or discovered | High | 7 | 23 |
| 22 | Employee | Not reported, not discovered | High | 8 | 23 |
| 24 | Volunteer | Unclear | High | 2 | 9 and 14 |
| 26 | Employee | Reported or discovered | High | 3 | 18 |
| 28 | Volunteer | Reported or discovered | High | 1 | 15 |
| 29 | Volunteer | Not reported, not discovered | Low | 35 | 49 |
| 30 | Employee | Reported or discovered | High | 1 | 15 |
| 31 | Unclear | Reported or discovered | High | 27 | 36 |
| 32 | Volunteer | Reported or discovered | High | 4 | 16 to 23 |
| 33 | Employee | Reported or discovered | High | 1 | 15 |
| 34 | Employee | Reported or discovered | Low | 46 | 61 |
| 35 | Employee | Reported or discovered | High | 0 | 10 |
| 36 | Employee | Reported or discovered | High | 4 | 11 and 15 |
| 38 | Employee | Reported or discovered | High | 2 | 18 |
| 39 | Employee | Reported or discovered | High | 3 | 14 to 16 |
| 40 | Employee | Reported or discovered | Medium | 39 | 53 |
| 58 | Employee | Unclear | Medium | 6 | Less than 21 |
| 64 | Volunteer | Not reported, not discovered | Medium | 23 | 38 |
| 70 | Employee | Reported or discovered | High | 0 | 5 |
| 71 | Employee | Unclear | Medium | 9 | 19 |
| 75 | Employee | Reported or discovered | High | 2 | 18 |
| 77 | Volunteer | Not reported, not discovered | High | 16 | 26 |
| 78 | Another user of the facility | Reported or discovered | High | 2 | 13 |
| 80 | Employee | Reported or discovered | High | 1 | 20 |
| 81 | Employee | Reported or discovered | High | 3 | 9 and 11 |
| 89 | Employee | Reported or discovered | High | 1 | 10 |
| 92 | Employee | Reported or discovered | High | 1 | 5 to 8 |

(45)    Consider, for example, the second case in the above figure, no. 18—Nevaeh Thompson v. New York City Department of Education, and Antonio K'Tori. This case involves the largest verdict amount against an institution among the 29 verdicts in the Claro study group. The jury awarded the survivor $16 million for personal injury and past pain and suffering, 85% of which (i.e., $13.6 million) was

Rebuttal Expert Report of Charles E. Bates, PhD

assigned to the New York City Department of Education and K'Tori, who was the principal at the survivor's public school. The survivor alleged that she was sexually assaulted and/or molested by one of her teachers, Mr. Watts, more than 100 times during the 2007–08 and 2008–09 school years. She sued in June 2011, alleging that the defendants were negligent in their retention and supervision of Watts. Watts had faced similar allegations of sexual assault while serving as assistant principal at another New York public school, and was demoted to teacher and transferred to the survivor's school.

(46)   As another example, consider case no. 70—Jane Doe v. Bright Horizons Family Solution. A 5-year old survivor, whose identity appear to have been kept confidential, disclosed to her mother that she was sexually abused by a music teacher employed at her preschool center. Her parents sued the center within a few months of the disclosure, alleging that the center failed to ensure the survivor's safety when it allowed other teachers to routinely leave the classroom for significant periods of time, rendering the perpetrator the only adult in the room with children. The jury ruled that the center was vicariously liable for the wrongful acts committed by its employee and awarded the survivor $3 million in compensatory damages.

(47)   Claro acknowledges that verdict amounts were subject to selection bias, though selection bias is never explicitly discussed. This is obvious because of the way Claro adjusts the 29 verdict amounts to value Abuse Claims. The report proceeds to first calculate that the average amount attributed to the institutional defendants in these 29 verdicts was $4.3 million. To account for the unrepresentativeness of verdicts, Claro makes a series of adjustments to the verdict averages to conclude that the average value of Abuse Claims is $525,000 to $650,000, about the same as the historical settlement average. That is, Claro estimates that the selection bias of using the 29 verdicts to value the Abuse Claims is 7 to 8 times that which one would have obtained by using the historical settlement average. Finding comfort in the similarity between the adjusted verdict averages[27] and having determined there are 46,916 valuable Abuse Claims, Claro estimates the total value of the Abuse Claims as $25 billion (= $525,000 × 46,916) to $30 billion (=$650,000 × 46,915).

(48)   Notably, the first step in the Claro adjustment to account for the selection bias in verdicts involves reducing the verdict values using the TDP Aggravating Scalar Factors. These scalars are three criteria with values set to one for Single Survivor Cases with typical severity and impact of abuse: a maximum of up to 1.5 for severity of abuse, a maximum of up to 1.5 for the impacts of abuse, and a maximum of up to 2.0 for a repeat abuser. Claro adjust the verdicts downward as though the original verdicts were at the maximum value for all three scalars, the product of which is 4.5, rescaling them as though the typical Abuse Claim would have combined average aggravating scalar of 2.75. Claro

---

[27]   On page 32 of Claro's report, Claro states: "In order to assess the overall reasonableness of the Claro Valuation, results were compared to amounts paid by BSA for similar claims using data provided by BSA. Overall, the Claro Valuation is consistent with the Historical BSA Settlements." If that is Claro's standard to judge the reasonableness of "Claro Valuation", I am puzzled why Claro spent 16 pages of Claro's report making a series of adjustments and calculations to ostensibly account for the differences between verdicts and settlements. Why not skip the verdict selection and step-by-step adjustments and go straight to using the settlement average? The result is the same.

chose this value because it was halfway between the starting value of the product of the aggravating scalars, which is 1.0, and the maximum of 4.5. This choice is not an intermediate, balanced choice because it is in the middle of the range from minimum to maximum. Rather, it forces all Abuse Claims to be assigned values of repeat abuser claims; under the TDP, the maximum possible value of the aggravating scalars for a Single Survivor Case is 2.25 (=1.5 × 1.5.) A value of 2.75 requires the abuser to have been identified at least twice as an alleged abuser. Further, it forces all repeat abuser Abuse Claims to be valued as though they had some atypical additional impact from either or both the severity of impact of abuse factors. (2.75 = 2.0 × 1.375)

(49)     What Claro fails to recognize is that the BSA settlements are also a highly selected group dominated by cases involving repeat abusers and therefore reliance on the BSA settlements must also account for this selection bias. The BSA settlements are subject to a selection bias as significant as would occur in using verdicts in place of settlements. The reason the BSA settlements are a highly selected group derives from the economics of sexual abuse cases. A sexual abuse claim rarely has any institutional tort value unless there is a deep-pocketed or well-insured institution that can be held liable for the harm of the abuser. Such claims also require a credible basis to establish the institution knew, or should have known, and should have done something it did not do to prevent the abuse. That is why most of the prepetition settlements against the BSA involved repeat abusers. This factor establishes credibility to the assertion that the BSA should have known. It also adds credence to the allegations of the survivor, sometimes made many years after they were abused, providing a corroborating account of another survivor who was abused by the same abuser.

(50)     Having observed these stark differences between Claro's exemplar verdicts, the BSA settled claims, and the Abuse Claims, I re-examined the historical settlements for the cases listed as Single Survivor Cases to ascertain what distinguished high six- and seven-figure settlements for these cases from the lower valued ones. In doing so, I incorporated updates pertaining to abuser frequency information, as described in the Murray Rebuttal Report, as to whether the abusers associated with claims that were marked as Single Survivor Cases in the available 517 positive value settlements comprising the BSA historical resolution data relied upon by Claro, to determine if they were truly Single Survivor Cases or were associated with repeat abusers. By incorporating this work, I was able to identify abuser names in the BSA settled claims that also appear in the current Proof of Claim data, indicating a pattern of repeat abuse. In addition to the updated information from the Murray Rebuttal Report, I also conducted searches for reports or press releases associated with the remaining Single Survivor Cases to see if they contained references to additional survivors associated with the abuser.[28]

(51)     In performing this work, I discovered that 38 of the cases I reported in my affirmative report as Single Survivor Cases in fact involved a repeat abuser. Because my report considered the resolution over the

---

[28]    This additional research involved internet searches of the identified abuser names. During my review of the search results, I also considered the location and timing information for the settled claim to help validate my findings.

last five years while the Claro report considered the resolutions over the last ten years, the count impact on the Claro study group of resolved BSA claims is even higher. In total, 61 of the claims Claro considers that are marked as Single Survivor Cases turn out to involve repeat abusers. Of that total 45 of the Single Survivor Cases are related to abusers who appear in the POCs, 15 are ones that were identified as repeat abusers based on additional research, and 1 is related to an abuser who appears twice in the set of 573 claims as well as in the POC data (though only once in the 262 resolutions from the last five years which formed the basis of my analysis in my Affirmative Report). Figure 4 provides a summary of these results. Appendix A provides a list of the of the cases initially marked as Single Survivor Cases that in fact involved a repeat abuser.

**Figure 4: Apparent Single Survivor Cases that further research revealed involved a repeat abuser**

| Update Category | Count of Claims (including $0 settlements) | Average Resolution Amount (including $0 settlements) | Count of Claims (excluding $0 settlements) | Average Resolution Amount (excluding $0 settlements) |
|---|---|---|---|---|
| Abuser name found in POC data | 45 | $365,000 | 41 | $400,000 |
| Abuser name appears twice in the set of 573 claims | 1 | $140,000 | 1 | $140,000 |
| Additional research indicates repeat abuser | 15 | $240,000 | 13 | $275,000 |
| **Total** | **61** | **$330,000** | **55** | **$365,000** |

(52)    These newly-identified repeat abuser cases included all but one of the previously categorized as Single Survivor claims that were settled for over $375,000.  This one exception was a former employee of the New Hampshire council, a case that fits the profile of the plaintiff verdicts. The remaining 16 Single Survivor Cases in the 262 historical settlements report on Table 5 of my affirmative report have a resolution average of $150,000.  In contrast, the 38 cases I now know to be repeat abuser cases have a resolution average of $335,000 (30 cases with an average of $400,000 excluding no payment resolutions.)

(53)    In contrast to the high fraction of settlements involving claims with repeat abusers, only 13% of Abuse Claims involve identifiable repeat abusers. The Abuse Claims mostly involve abusers who are identified only once and most told no one of their abuse for years and never told Scouting or the police. As shown in my Affirmative Report, the BSA settlements for such cases are lower than the repeat abuser claims. This means the chance of a liability finding against the BSA or the liability share of BSA would also be lower for single victim cases.

(54)    The selection bias in settlement data and the fact that the settlements involve more high value cases follows from the economics of litigation. Not all potential claims resulted in a lawsuit. Only a small fraction of them did. Which claimants choose to litigate is a selection process that is not random, because the decision to sue is the result of characteristics of certain claims that other potential claims

do not share.[29] Such characteristics could be both monetary and non-monetary, such as the expected compensation from the lawsuits, pecuniary costs of litigation, risk preference of the claimant, and emotional responses in litigation.[30] Generalizing all factors into expected benefit and expected cost, a claimant will sue if the expected benefit exceeds the expected cost of the suit.[31] This means the settlements, from claimants who decided to litigate, will typically have a higher expected value compared to other potential claims.

(55)     Another party in the suit-selection process is the plaintiff attorney, who needs to decide whether to accept retention of a potential case. The plaintiff attorney chooses cases that have a positive expected return, which is the expected benefit minus the expected cost.[32] That is because plaintiff attorneys are paid on a contingency fee basis, i.e., plaintiffs pay a percentage of the settlement/verdict amount to their attorneys. Thus, the plaintiff attorney's expected benefit is a direct derivative of the settlement/verdict amount, which depends on the potential award and the chances of getting a settlement or winning in trial. Correspondingly, plaintiff attorneys pursue the cases with higher potential awards and better chances of winning among all potential claims.[33]

(56)     The differences between the Abuse Claims and Claro's study groups, (the 29 verdicts, and the 517 historical settlements,) are so significant that 98% of the Abuse Claims never filed a lawsuit. The study groups consist entirely of tort claims that were successful at obtaining a payment from an institutional defendant. Claro's exclusion of zero payment resolutions increases the selection bias from another unobservable feature of the different claim populations. The verdicts are preselected to have only plaintiff trial victories. The historical resolutions have 51 of 573 cases resolved without payment from the BSA. Claro excludes these zero payment resolutions, presumably to bring the historical resolutions data more in line with the selected verdicts data; including the zero-dollar settlements reduces the average value of historical resolutions to $465,000, below the adjusted verdict average. However, the basic claim attributes of those 51 claims appear no different than the paid claims. Further, there is no apparent difference between them and the 46,916 Abuse Claims that Claro values. That means that it is likely that the 46,916 also have zero value claims as well, and for the

---

[29]    Theodore Eisenberg and Henry S. Farber, "The litigious plaintiff hypothesis: case selection and resolution," *RAND Journal of Economics* 28, no. 0 (1997): S92–S112.

[30]    Theodore Eisenberg and Henry S. Farber, "The litigious plaintiff hypothesis: case selection and resolution," *RAND Journal of Economics* 28, no. 0 (1997): S92–S112.
        Peter H. Huang and Ho-Mou Wu, "Emotional Responses in Litigation," International Review of Law and Economics 12, no. 1 (1992): 31–44.

[31]    Louis Kaplow and Steven Shavell, "Economic analysis of law," In *Handbook of public economics* 3, ed. Alan J. Auerbach and Martin Feldstein (Elsevier, 2002), 1661–1784.

[32]    Jean Tirole, *The Theory of Industrial Organization* (Cambridge, Mass: MIT Press, 1988).

[33]    *See, e.g.*, Henry S. Farber and Michelle J. White, "Medical malpractice: an empirical examination of the litigation process," *RAND Journal of Economics* 22, no. 2 (1991): 199–217 at 200 and 214; Herbert M. Kritzer, "Contingency fee lawyers as gatekeepers in the civil justice system," *Judicature* 81, no. 1 (1997): 22–29; David A. Hyman and Charles Silver, "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," *Vanderbilt Law Review* 59, no. 4 (2006): 1085–1136 at 1102, 1103, and 1117–1118.

---

Rebuttal Expert Report of Charles E. Bates, PhD

reasons discussed below, likely in higher proportion than in the historical resolution since over 45,000 of these Abuse Claims never filed a lawsuit. Though Claro purportedly accounts for several claim attributes that would affect the size of settlements relative to its verdict study group, it never addresses the selection bias created by using lawsuit average verdicts or settlements as a basis for valuing claims that could have filed lawsuits but choose not to. This is the Minus Factor Four that I discussed in my Affirmative Report.

(57)    Here is a simple numerical example that illustrates how selection bias can lead to a false valuation conclusion based on study group averages:

(58)    Assume plaintiff law firm K requires an expected minimum recovery of $80,000 on a sexual abuse case to cover its costs. It charges for its work a contingency fee of 40 percent of any recovery. Presented with the opportunity of a case with damages of $200,000 that is within the statute of limitations, K takes the case. If instead the case is outside of the statute of limitations in a Gray 1 state where K expects only a 50/50 chance of getting a favorable statute of limitations ruling on the case, the expected value of the case would be 50% × $200,000 = $100,000, and K's expected recovery would be only $40,000.  Because this is below K's minimum recovery of $80,000, K would not accept retention of this case. Assume a second case comes along in the Gray 1 state with damages of $400,000. K can settle the case for a 50% discount and meet the return threshold: the expected settlement is 50% × 400,000=$200,000, which gives K a contingency fee of $80,000, meeting the minimum recovery threshold, so K accepts the case retention.  For a Gray 3 state, assuming a 75% discount for a case presumptively barred by the state's statute of limitations, K would accept neither of the prior two cases unless not presumptively barred but would accept a presumptively barred case if that case would have been worth $800,000 if not barred.  This case's settlement value in a Gray 3 state is $200,000 (= 25% of $800,000), sufficient to cover K's minimum recovery threshold, so K accepts this case.  The Gray states may have many cases like the lower value case of Open status, but they would never get accepted for representation by K and would never result in a lawsuit.

(59)    Note, however, that even if the retention threshold was the same for all law firms and Survivors at $200,000, the observed settlements would sometimes be below $200,000. That is because the retention decision is made based on expectations about the eventual resolution of an uncertain outcome. To use a familiar gambling game to illustrate, the expected value of a spin of a roulette wheel is 18, whereas the outcomes vary anywhere from 0 to 36. A fair-odd's bet that a spin of the roulette wheel yields a number bigger than 10 is typically a winner, though not always. In the example above K takes the retention so long as the expectation is that the case will resolve for at least $200,000. In a particular case, there are chances that the resolution will be above or below that amount. The actual BSA settlements are more highly skewed than portrayed in this example and in the discussion of the filing threshold below due to the higher variance of outcomes relative to expectations.

Rebuttal Expert Report of Charles E. Bates, PhD

(60)     This illustration demonstrates that the cases that would be litigated, either to verdict or settlement, are only those with sufficiently high expected value to meet the expected recovery threshold for the plaintiff's attorney even accounting for potential defenses to liability.  Thus, the sample set of either verdicts or settlements excludes lower value claims entirely.  Applying the selection principle illustrated here generally, lawsuit settlement averages will overstate the population average value inclusive of cases that were never filed because there is an expected valuation threshold that must be exceeded for cases to be filed as lawsuits. For populations where values are highly skewed, with many below the acceptable cost threshold, many claims will not be filed and the settlement average of the ones that are filed are biased above the population mean; the more highly skewed, the greater the bias.

(61)     This applies to the Abuse Claims. As I discussed in my Affirmative Report, even the limited sample of the BSA historical settlements is highly skewed. In addition to the inherent uncertainty of litigation, as is clear from both my report and the Claro Report, this is due to numerous claim attributes that can affect the value of a claim. Some affect the size of damages, some affect the likelihood that the plaintiff would prevail at trial, some affect the likelihood of a case passing legal thresholds required to make it to trial, and some affect the liability share that would be assigned to the BSA in that eventuality. Given the data limitations here, it is not possible to measure each effect separately or parse the contribution of each attribute to the outcomes represented in the BSA historical settlements. We know, however, that their combined effect creates a selection bias that is large, and we know the direction of the bias, meaning the settlement average overstates the average Abuse Claim value. We know this because 80,000 Abuse Claims could have been tort claims. An entrepreneurial plaintiff's bar that publicizes tort opportunities and recruits large numbers of claims across a variety of torts, had been unwilling to invest in recruiting sexual abuse claims against the BSA until the bankruptcy filing changed the case economics. With that change, the recruiting investment can pay off and was pursued vigorously resulting in vastly more bankruptcy claims than lawsuits filed in the 10 years prior to the petition date.

(62)     To illustrate the potential for the filing selection bias illustrated above to have a large impact on claim valuation and the difference between the number of tort claims filed and the number of Abuse Claims, I have created a simulation extending the selection bias example above to 47,000 hypothetical, sufficiently documented Abuse Claims.[34] For the simulation, I select $1.8 million[35] as the average potential verdict amount for a typical cross-section of 47,000 claims with various abuse allegations and other severity attributes. For this simulation, I bifurcate the valuation factors into two categories that would affect the settlement values of these claims: the expected share of relative liability that would be assigned to the BSA for open SOL status Abuse Claims and the expected discount of

---

[34]   A copy of the simulation model is included in my backup material.

[35]   For reference note that on Table 6 of the Claro report, the average Mid Base Value verdict from the mix of allegations in their selected group of 46,916 claims to be valued is $1.88 million. I use $1.8 million in this example for ease of presentation.

Rebuttal Expert Report of Charles E. Bates, PhD

settlements based on the Abuse Claims' statute of limitations status. The liability shares are assumed to cover the spectrum of possibilities from 1% to 100%, Category A claims cover the upper portion of the range, scaling down from 100%, and are assumed to have an average BSA share that is 2/3rds the full institutional verdict share. This results in an average value of $1.2 million in Open states for category A claims. Category B claims are assumed to have an average BSA share that is half that of the category A claims ($600,000), Category C half that again ($300,000), and Category D half of Category C ($150,000). The hypothetical Abuse Claims are also assigned into five statute of limitations status categories as used in the TDP, with relative values assigned to No statute of limitations limitation (Open at 100%), Grey 1 (50%), Gray 2 (30%), Gray 3 (10%) and Closed (1%). The following table provides the hypothetical settlement values of the 20 combinations of Categories A through D and the statute of limitations categories.

**Figure 5: Illustration of potential filing selection bias**

Hypothetical BSA average share of $1.8 million by category

| SOL status | Settlement discount | D – 1/12 value | C – 1/6 value | B – 1/3 value | A – 2/3 value |
|---|---|---|---|---|---|
| | | **$150,000** | **$300,000** | **$600,000** | **$1,200,000** |
| Open | **100%** | $150,000 | $300,000 | $600,000 | $1,200,000 |
| Gray 1 | **50%** | $75,000 | $150,000 | $300,000 | $600,000 |
| Gray 2 | **30%** | $45,000 | $90,000 | $180,000 | $360,000 |
| Gray 3 | **10%** | $15,000 | $30,000 | $60,000 | $120,000 |
| Closed | **1%** | $1,500 | $3,000 | $6,000 | $12,000 |

(63)    Adopting the filing threshold assumption of the example above, I assume for this simulation that claims with a value below $200,000 would not have been filed. This is to capture the economic reality that for survivors and law firms, there is a threshold below which the payoff is not worth the emotional and financial cost to the survivor and the financial cost to the plaintiff law firm. That threshold may not be $200,000, and it is likely not the same for everyone, but there is some threshold. In the table above I have highlighted in orange the value combinations that are below the assumed threshold.

(64)    Continuing the simulation, in the table below I have reverse engineered a distribution of 47,433 hypothetical Abuse Claims by allocating them among the 20 attribute categories to obtain 517 claims that would have been brought and resulted in lawsuits and settlements. The 47,433 claims used in the simulation is the sum of the 46,916 Abuse Claims that Claro values and the 517 positive value historical resolutions included in the historical BSA resolutions that Claro considers (the claims from Survivors who litigated and settled with BSA prior to the BSA bankruptcy filing). The allocation of the 47,433 claims across the 20 category combinations was designed to satisfy two conditions:

▪    First, the proportion of claims for each statute of limitations status category had to be consistent with the proportions in the POC data.

Rebuttal Expert Report of Charles E. Bates, PhD

- Second, the number of claims above the filing value threshold of $200,000 had to equal 517 and the average settlement had to be approximately $510,000.[36] To achieve this second objective, I posited a proportion of claims within each of the categories A through D.

(65)  The upper panel of Figure 6 presents the resulting allocation. It shows the count of each type of claims, defined by the combination of the statute of limitations status and the categories of A through D. As before, the cells highlighted in orange indicate claims that would not have been filed because their expected value is below the assumed threshold. The lower panel of Figure 6 provides the relevant summary statistics. Statistics pertaining to claim counts are based on the upper panel of the figure; statistics pertaining to dollar valuations are results of both the counts, listed in the upper panel of Figure 6, and the corresponding values, listed in Figure 5. By design, the simulation produces 517 settlements, totaling $262.2 million, which translates into an average of $510,000 per settled claim.

**Figure 6: Hypothetical Abuse Claim filing threshold simulation**

| | | Category percentage and number of claims | | | | |
|---|---|---|---|---|---|---|
| Claims % | SOL status | D – 1/12 value | C – 1/6 value | B – 1/3 value | A – 2/3 value | Total |
| | | 97.5% | 1.3% | 0.8% | 0.4% | 100% |
| 35% | Open | 16,251 | 217 | 130 | 65 | 16,662 |
| 15% | Gray 1 | 6,764 | 90 | 54 | 27 | 6,935 |
| 13% | Gray 2 | 6,113 | 81 | 49 | 24 | 6,267 |
| 27% | Gray 3 | 12,635 | 168 | 101 | 51 | 12,955 |
| 10% | Closed | 4,499 | 60 | 36 | 18 | 4,613 |
| **Total count** | | 46,262 | 616 | 370 | 185 | 47,433 |
| Count below threshold | | 46,262 | 400 | 186 | 68 | 46,916 |
| Count of lawsuits | | 0 | 217 | 184 | 116 | 517 |
| Total settlements | | $- | $65,000,000 | $94,200,000 | $103,000,000 | $262,200,000 |
| Average settlement | | $- | $300,000 | $510,000 | $880,000 | $510,000 |
| Abuse Claim total value | | $3,416,200,000 | $26,000,000 | $15,100,000 | $6,300,000 | $3,463,600,000 |
| Abuse Claim average value | | $74,000 | $65,000 | $81,000 | $92,000 | $74,000 |

(66)  The bankruptcy filing of the BSA greatly diminishes the filing threshold. Costly claim-by-claim litigation is to be replaced with a much less costly administrative trust where claims can be resolved confidentially. Mass recruiting of Abuse Claims becomes a profitable enterprise with depositions, legal battles, and negotiations replaced by claim forms and values set by TDP. In the simulation, all the additional 46,916 hypothetical Abuse Claims that were not brought as tort claims in the example above will submit POCs to be evaluated by the Settlement Trust. Valued on the same basis as the lawsuits, the hypothetical 46,916 Abuse Claims have a simulated value of $3.46 billion. In contrast,

---

[36]  The values specified here are not unique as there are three amounts to be specified, namely the percentage of claims from each category A to C, and two constraints: (1) the total number of claims with positive settlements is 517 and (2) the settlement average is $510,000. The different combinations of values that satisfy these constraints produce nearly identical simulation results.

Rebuttal Expert Report of Charles E. Bates, PhD

the simulated value of the tort settlements is $262,200,000. If we were to ignore (as Claro did) the selection bias created by the filing threshold, and directly applied the settlement average of $510,000 to 46,916 Abuse Claims, we would erroneously conclude that their value was $25 billion. At its core, this is what Claro did, overvaluing the actual Abuse Claims manyfold.

(67) This is a simulation. We do not actually know the number of Abuse Claims that fall within each of categories A through D and the corresponding BSA responsibility shares. We do not know the actual discounts associated with statute of limitations status, though the values used in the simulation are within the range of values set forth in the TDPs as discounts to use for the TD for various jurisdictions.[37] Moreover, we do not have the data required to replace the values I used in this simulation with statistical estimates based on data. The historical data are too sparse and clearly are not representative of the vast majority of Abuse Claims for the reasons discussed above.

(68) We are, however, not without guidance regarding the value of the Abuse Claims. When calibrated to the BSA historical settlements and filings, the simulation model is reasonable representation of the economics incentives and their consequences for the decision of Abuse Claim Survivors and their counsels to file lawsuits.  We know that several hundred lawsuits were filed and settled with a wide variety of settlement amounts. As shown in Figure 2, about 10 percent were zero-dollar resolutions, another 10 percent were seven figure settlements, 40 percent with an average resolution of $40,000, and the remaining 40 percent were resolved for just over $300,000. We also know that over 80,000 Abuse Claims were filed in the instant matter, which could have been filed as tort claims in the past. This means there must be a very large selection bias caused by a filing threshold. When presented with an avenue for recoveries at greatly reduced cost relative to litigation, entrepreneurial lawyers were willing to invest and recruit 80,000+ Survivors, who, for their part, saw an avenue for compensation without the same litigation burden as was present prepetition. My understanding based on the Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Preliminary Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC is that preliminary indications are that 7,919 Direct Abuse Claims indicated they would take the $3,500 expedited distribution.  This represents slightly less than 15% of the claims that returned ballots and slightly less than 10% of the 82,209 unique and timely claims. Given that this Declaration was filed within the last 24 hours and is still preliminary, Bates White's analysis of this information is ongoing. While we do not yet have enough information to draw conclusions about the characteristics of these claims, this election shows immediately that a meaningful set of claims are willing to take a low value.  Further, the Whitaker declaration shows that only 53,888 of the 82,209 unique and timely

---

[37] In litigation the statute of limitations discount is likely to be different case-by-case and may depend in part on the expected liability share levels. This is because a case with a high liability share in conjunction with a particularly egregious pattern of abuse is a case where judges have been more likely to decline to apply the statute of limitations at the outset of the case or, as in the highest-value cases faced by the BSA, left for the jury to decide. (Kerry Lewis, Thomas Hacker)

claims submitted valid votes for or against the Plan. While Whitaker's declaration suggests that some number of the uncounted votes were untimely or incorrectly submitted, up to 28,321 claimants did not take the time to vote at all. This is despite an extensive noticing and solicitation process conducted by Debtors and plaintiffs' attorneys alike, both directly and indirectly through high profile public forums.[38]

(69)     Moreover, we know there are large differences between the historically litigated claims and the Abuse Claims, most notably, the high proportion of repeat abusers in the historical claims in contrast to the high proportion of apparent single victim abusers in the Abuse Claims. This difference points to a potential source of the filing threshold: establishing that the BSA is liable for the actions of an abuser is more difficult and less valuable if the plaintiff cannot establish the abuser also abused other Survivors. Sufficiently so that the likely value of litigating a claim against the BSA was not worth the effort to most Survivors in the tort system.

(70)     We also have evidence of the selection bias and a change filing threshold for plaintiff law firms, i.e. a change in behavior as to what claims they were willing to represent pre- and post-petition in this specific tort and as it relates to claims filed against BSA. This is supported by statements and actions taken by some of the plaintiff law firms themselves in this case. Kosnoff Law, PLLC filed a Verified Statement Pursuant To Rule Of Bankruptcy Procedure 2019 ("Kosnoff 2019").[39] Kosnoff Law, along with two other firms AVA Law Group and Eisenberg Rothweiler, under the auspices of a group called Abused in Scouting or AIS is the most prolific representative of Abuse Claims in this matter. The Kosnoff 2019 identifies over 15,000 Abuse Claims that Kosnoff Law says it represents. That same Kosnoff 2019, while discussing the process of recruiting claims for the bankruptcy states that "While that advertising effort slowly developed, Mr. Kosnoff reached out to men who had contacted Kosnoff Law years earlier seeking representation, but whose cases the firm had declined due to statute of limitations issues."[40] This is a clear indication that Mr. Kosnoff was more selective pre-petition in terms of which individuals he was willing to represent. It is notable that of the 15,000 current Abuse Claims that Kosnoff Law says it represents, roughly 70% are now presumptively barred based on the statute of limitations analysis (i.e. would fall in either a closed or Grey state and be beyond the age since majority at which claims are allowed in those jurisdictions) and thus had reduced prospects of recovery in the tort system. The example engagement agreement provided in connection with the Kosnoff 2019 provides further evidence that Kosnoff Law, AVA Law Group, and Eisenberg Rothweiler differentiated between potential representation in this bankruptcy case and more generally. That agreement states that the firms are "committing to represent you **only** in connection with the February 18, 2020 bankruptcy filing, or a related global resolution of sex abuse

---

[38]   *Declaration of Shannon R. Wheatman, Ph.D in Support of Procedures for Providing Direct Notice and Supplemental Notice Plan to Provide Notice of Bar Date to Abuse Survivors* [Docket 556]; Supplemental Notice Plan [Docket 557-1]; *Affidavit of Service* [Docket 7999].

[39]   Docket 5924.

[40]   Docket 5924, p. 4.

Rebuttal Expert Report of Charles E. Bates, PhD

claims against BSA."[41] Clearly, the filing threshold for which claims Kosnoff Law is willing to represent has moved.

(71) This point regarding Kosnoff Law is significant. The Claro valuation assigns at least $3.75 billion, 15% of its total valuation, to Abuse Claims readily identifiable on the Kosnoff 2019. Notably, over 10,000 of the claims that go into making up that total are presumptively barred according to the Claro analysis. The economics of case filing for other law firms are not materially different than those faced by Kosnoff Law.

(72) Confronted with these facts, I chose the valuation approach described in my Affirmative Report and summarized in the Disclosure Statement. I identified a core set of claims that were not statute of limitations barred and appeared to have all the requisite attributes to have been litigated claims, but for the costs of litigation. I assigned them a benchmark value derived from the historical settlements and then evaluated the appropriateness of using those values considering alternative claim attributes that would affect the number or value (frequency or severity, using the terms of my Affirmative Report) of valuable claims. I considered the potential for more valuable claims, most notably the relaxing of statute of limitations or further identification of abusers (Plus Factors.) I also considered factors that would affect the value of claims, most notably the valuation bias created by the filing threshold discussed above (Minus Factor 4.) On that basis I concluded that the value of Abuse Claims was in the wide range of $2.4 to $7.1 billion, wide because of the inherent uncertainty of valuing 82,209 claims from a highly selected study group of several hundred BSA historical settlements. This is a reasonable approach, appropriate for the available data and information regarding historical settlements and the Abuse Claims. What I have seen of the other experts and additional historical settlement, as well as the additional analyses I performed since I issued that report and discuss here leads me to the conclusion that the value of the Abuse claims is likely in the lower quartile of the $2.4 to $7.1 billion range I estimated previously.  Claro's opinion 2 is incorrect.

(73) Confronted with the same information, Claro took a different approach, looking outside the scope of the BSA's litigation history to sexual abuse verdicts including other institutions. As it turned out, this approach was not helpful for understanding the value of the Abuse Claims. With the assistance of lawyers of the TCC and Dr. Jon Conte, as referred to above, Claro selected the 29 verdicts of Claro's study group with which to value the Abuse Claims. This is an even more highly selected and unrepresentative group than the 517 historical BSA settlements Claro also evaluated. Recognizing that verdicts were not representative of settlements, Claro adjusts the verdicts until the valuation average matches the mid-six-figure settlement average. Multiply that by the 46,916 Abuse Claims

---

[41] *See* Exhibit B to the Kosnoff 2019, which is a copy of the "Professional Employment Agreement" for clients retained under the moniker Abused in Scouting by Kosnoff Law, AVA Law Group, and Eisenberg Rothweiler.
"II. Scope of Representation: By signing this Engagement Agreement, you understand and agree that AIS Counsel is committing to represent you **only** in connection with the February 18, 2020 bankruptcy filing, or a related global resolution of sex abuse claims against BSA. You have the right to terminate the representation at any time, subject to our right to recoup fees and expenses as provided by law." (Emphasis original).

Rebuttal Expert Report of Charles E. Bates, PhD

Claro assigns value gives $25 billion. Claro never addresses the selection bias and its implication for valuation incumbent in the facts that 80,000+ Abuse Claims only filed claims after the costs to the Survivors and their attorneys of filing were greatly reduced relative to the tort system. As a result, Claro overvalues the Abuse Claims manyfold. Claro's estimates are unreliable and Claro's opinion 1 is incorrect.

(74)    The new information provided by the Claro verdict study group, the updated repeat abuser status of many of the high value BSA historical settlements, and the simulation model analysis has shed additional light on the likely impact of the plus and minus factors associated with my affirmative report Abuse Claim valuation.  For reference, the following is a reprint of Figure 34 of my affirmative report that summarizes the valuation uncertainty factors I considered.

**Figure 7: Summary of valuation uncertainty factors (Figure 34 of Bates affirmative report)**

| Factor | Reference | Valuation component | Impact potential | Comment |
|---|---|---|---|---|
| Plus Factor 1 | SOL enforcement or revivals | Frequency | Small | Little time remaining before confirmation |
| Plus Factor 2 | Unidentified abuser update | Frequency | Large | Partially realized since Tranche IV |
| Plus Factor 3 | Multiple abuse occurrences | Severity | Small | Relates to hundreds of Abuse Claims |
| Plus Factor 4 | Abuse reported | Severity | Small | Likely incorporated in benchmark value |
| Plus Factor 5 | Young abuse survivors | Severity | Small | Ambiguous |
| Plus Factor 6 | Bar Date minors | Frequency | Small | Relates to hundreds of Abuse Claims |
| Plus Factor 7 | Repressed memory Abuse Claims | Frequency | Small | Relates to hundreds of Abuse Claims |
| Minus Factor 1 | Age of survivors | Severity | Large | Relates to thousands of Abuse Claims |
| Minus Factor 2 | Youth on youth abuse | Severity | Small | Relates to hundreds of Abuse Claims |
| Minus Factor 3 | Identifying missing relationships | Severity | Small | Relates to hundreds of Abuse Claims |
| Minus Factor 4 | Unobserved hesitancy attributes | Severity | Large | Relates to nearly all Abuse Claims |

(75)    Readdressing first the plus factors, nothing in the Claro or other affirmative expert reports provides any new information that affects my consideration of the plus factors.  The only change of which I am aware is that the North Carolina Supreme Court has invalidated the state's revival law, reinstituting statute of limitations for sexual abuse claims.  This reduces the SOL status of approximately 2,000 Abuse Claims from North Carolina.  The most significant plus factor for consideration of its impact on the simulation model results is Plus Factor 2, the potential for Abuse Claims that currently have not identified their abuser to do so in the future.  If Claro's assumption that 25 percent of Abuse Claims that currently only provide a description of their abuser will later properly identify an abuser, this would add an additional $324 million to the Abuse Claim value, which would not materially impact my benchmark valuation.

(76)    Turning now to the minus factors, Minus Factor 1 would have a significant impact on the Abuse Claim value as described in my affirmative report. The additional relevance for this report is that it increases the likelihood that the BSA responsibility share is below 10 percent.  Over 35 percent of the

Abuse Claims were for Survivors first abused by 1970 and 10 percent by 1960.  That amount passage of time from abuse to litigation is unprecedented in the Claro Study group and rare in the BSA historical settlements.  It clearly raises obstacles to any Survivor who attempts to prosecute a claim asserting BSA responsibility for the abuse they suffered.

(77)    I have identified an additional minus factor since my affirmative report, Minus Factor 5.  Its potential impact is large.  Over 79 percent of verdicts in the Claro verdict study group are from states with the potential for highest verdict awards and only 7 percent states with the lowest potential.[42]   In contrast, only 50% of Abuse Claims are from states with the highest potential verdicts and 25 percent are from the states with the lowest potential verdicts.  What drives the difference in wrongful death verdicts for the various states is each states potential for non-economic damages, particularly relevant for sexual abuse lawsuits. The prevalence of high verdict states in the Claro verdict study group is another consequence of litigation economics.  Claro failed to account for this selection bias in its calculation of the benchmark verdicts.  It would lower those benchmarks.  The implication is that the value of Abuse Claims below the filing threshold is likely lower than indicated by the simulation model.  For example, if the average verdict potential in the simulation illustrated in Figure 6 is $1,200,000 instead of $1,800,000, the simulated value of Abuse Claims is reduced to $2.3 billion.

(78)    Minus Factor 4 is the subject of much of this report.  My work in understanding the selection bias of the Claro verdict study group and further analysis of the historical BSA settlements has revealed the economic forces that explain the pattern of the BSA tort claims for sexual abuse and bankruptcy filings of Abuse Claims.  That work led me to create the simulation described above to model the effect of the economic filing threshold phenomenon and how it affects the number of tort claims filed.  Notably, it reveals the importance of the size of the average BSA responsibility share in determining the observed filing pattern.

(79)    As the Claro verdict study group reveals, the institutional share of responsibility is a critical factor determining the value of a sexual abuse claim against an institution.  As I discussed in paragraph (18) above, the three BSA related verdicts show how the BSA's responsibility share is a central component in determining if the BSA has any liability for a sexual abuse claim and, if so, how much, from a four- or five-figure value up to a seven-figure value.  The tort system simulation above illustrates the how there could be so many Abuse Claims and, relative to the number of Abuse Claims, so few tort filings and settlements.  Given, as Claro has shown in its verdict study, the potential for at least a seven-figure return for a credible sexual abuse lawsuit if high institutional responsibility can be established by the plaintiff, it must be the case that the average liability responsibility share of the BSA is low.  The BSA settlement data also supports this conclusion. Note that for cases that were filed against the BSA, 50 percent of lawsuits were resolved for a payment of

---

[42]    For my work in *Garlock*, I classified states into three groups based on the size of observed wrongful death awards in every state.  I use that classification here.  I provide a tabulation of the state classifications in the appendix to this report. See paragraph 130 of my Affirmative report in *Garlock*.

Rebuttal Expert Report of Charles E. Bates, PhD

$100,000 or less, at an average payment of $32,000. That amount is less than 2% of the adult-on-minor sexual abuse verdict benchmark of $1.88 million used by Claro. As described above, filed cases were a selected group with sufficiently high expected outcomes. As the historical results show, establishing a high enough institutional responsibility for the BSA by a plaintiff is difficult and only occurs in rare cases. In summary, considering all these factors, the verdicts of the Claro study group, the historical BSA settlements, and the results of the simulation modeling, it is more likely that the average BSA responsibility share of claims for which it holds any responsibility is less than 10 percent, than more than 10 percent, much less if considering the entire population of Abuse Claims. Following from the tort simulation model above, which has an average 9% BSA responsibility to all the claims for which Claro attaches value, the valuation of the Abuse Claims is more likely below $3.5 billion than above it, meaning the value of Abuse Claims is more likely in the lower quartile of my original valuation range than in the higher portion of the range.

## II.A. Claro's claims about the Bates White's valuation methodology are incorrect and unfounded

(80)   Claro's opinion 2 is also incorrect in stating that methodology for Bates White's forecasting, including relevant inputs and assumptions, was not disclosed.[43] Notwithstanding the fact that Claro was yet to receive my Affirmative Report at the time the Claro Report was prepared, the Amended Disclosure statement already identified Bates White's methodology as one based on scenario analysis and using a frequency and severity valuation model. Specifically, the Amended Disclosure statement says:

> *To arrive at the valuation range, Bates White considered multiple scenarios... all of the scenarios are based on a frequency and severity valuation model where the number of current Abuse Claims (frequency) alleging a particular Abuse (severity) is measured against the attributes described above, which, when combined with historical data regarding resolution of Abuse Claims, allows Bates White to project the value of the Claims.*[44]

(81)   Frequency-severity modeling is a commonly employed method among actuaries for purposes of insurance loss forecasting and in the context of estimating future litigation claims.[45] In my experience,

---

[43]   Claro Report, pp. 34–35.

   The Tranche IV valuation model was produced in late October in response to a subpoena filed by the TCC. The produced valuation model contained the relevant Bates White Valuation Factors, along with the detailed application of those factors to the unique and timely set of Sexual Abuse Claims identified in the Tranche IV data.

[44]   *See* Amended Disclosure statement [Docket 6214] at page 91.

[45]   *See, e.g.*, Edward W. Frees, Richard A. Derrig and Glenn Meyers. *Predictive Modeling Applications in Actuarial Science*; Volume 1: Predictive Modeling Techniques. Cambridge University Press: 2014 at 138 ("Many insurance datasets feature information about frequency, how often claims arise, in addition to severity, the claim size. ... Frequency-severity modeling is important in insurance applications because of features of contracts, policyholder behavior, databases that insurers maintain, and regulatory requirements."); Erik Bolviken. *Computation and Modelling*

Rebuttal Expert Report of Charles E. Bates, PhD

some form of frequency-severity modeling is the most used form of estimation in mass tort bankruptcies. I have used a form of this modeling in numerous bankruptcy cases including *In re Kaiser Gypsum Company* and *In re Garlock Sealing Technologies* and in my work testifying before the Senate Judiciary Committee on the economic viability of the Trust Fund proposed under S.852, the Fairness in Asbestos Injury Resolution (FAIR) Act. Further, Claro itself employs a version of frequency-severity modeling to arrive at its estimate.

(82)    Scenario analysis, also referred to as scenario modeling, scenario prediction, or scenario planning, is a well-established method for evaluating potential outcomes in the face of uncertainty.[46] I regularly use scenario modeling in conjunction with a frequency-severity approach when evaluating potential contingencies when advising companies as part of their financial disclosure requirements under GAAP and IFRS. It is a recognized approach to quantifying the effects of "epistemic" uncertainty; i.e., uncertainty arising from "known unknowns" that cannot be described adequately in statistical terms. For example, an academic article that provides a systematic treatment of uncertainty and has been cited more than 2,000 times notes that "[a] much-used analytical tool to deal with the deep uncertainties of the unknown (and unknowable) future is to use scenarios as plausible descriptions of how the system and its driving forces may develop."[47] Similarly, recognizing that "[u]ncertainties arise due to insufficient knowledge about the constituents and the boundary conditions of the problem or system at hand," a publication devoted to analysis of environmental problems explains that "[s]cenarios offer a convenient form to tally knowns and unknowns and to organize the latter into a suitable form for systematic study."[48]

(83)    Claro also claims that "[i]t is unclear in the Amended Disclosure Statement the extent to which Bates White valued any claims other than 16,600 claims that it 'focused its valuation on.'"[49] As noted above, the Bates White valuation model produced in this matter contains the inputs and assumptions related to how these claims have been valued. Further, both the Disclosure Statement and my Affirmative Report make it clear that I considered alternative scenarios around the benchmark modeling, some affecting the average values ("severity") and some affecting the number of valuable

---

[   ]    *in Insurance and Finance*. Cambridge University Press: 2014 at 279 ("Actuarial modelling in general insurance is usually broken down on claim size (next chapter) and claim frequency (treated here).")

[46]    Underscoring the general acceptance of this method is the fact that review articles now exist that summarize the scholarly research in this area. *See, e.g.*, Chermack, Thomas J., Susan A. Lynham, and Wendy E. A. Ruona. "A Review of Scenario Planning Literature." *Futures Research Quarterly* 72 (2001): 7–32; Amer, Muhammad, Tugrul U.Daim, Antonie Jetter. "A review of scenario planning." *Futures* 46 (February 2013): 23–40; Tourki, Yousra, Jeffrey Keisler, and Igor Linkov. "Scenario analysis: a review of methods and applications for engineering and environmental systems." *Environment Systems & Decisions* 33 (2013): 3–20.

[47]    W.E. Walker, P. Harremoës, J. Rotmans, J.P. van der Sluijs, M.B.A. van Asselt, P. Janssen & M.P. Krayer von Krauss. "Defining Uncertainty: A Conceptual Basis for Uncertainty Management in Model-Based Decision Support." *Integrated Assessment* 4, No. 1 (2003): 5–17.

[48]    Ferenc L. Toth. "Dealing with Surprises in Environmental Scenarios" in Joseph Alcamo (ed.). *Environmental Futures: The Practice of Environmental Scenario Analysis*. Elsevier: 2008 at 170.

[49]    Claro Report, p. 35.

---

Rebuttal Expert Report of Charles E. Bates, PhD

claims ("frequency")[50]. Both make explicit reference to factors that could drive the value up or down and both refer to a potential 50% increase or decrease in the valuation. Note from Figure 7 that four of the plus factors identified in my affirmative report are factors that would increase the number of valuable claims above the core 16,113 Abuse Claims used to construct the initial benchmark aggregate value.  These are the plus factors identified in Figure 7 where the column labeled "Valuation component" has the entry "Frequency."  In the discussion of each of these four plus factors in my affirmative report, I clearly state that each would represent an increase in the number of Abuse Claims that would meet the criteria to be valued.  It is a misrepresentation to assert that my valuation analysis only includes the value of 16,113 claims; that was merely an intermediate step in the valuation study to ascertain the valuation range of all 82,209 Abuse Claims. My valuation study correctly identifies those Abuse Claims that appear facially meet the criteria as potential tort claims. It then addresses, though my analysis of plus and minus factors how the number and average value of valuable claims could be different than the benchmark of Abuse Claims that appear facially meet the criteria as potential tort claims.

(84) Claro's comment is particularly disingenuous as Claro misapplies the distinction between whether a plus or minus factor should be applied as a frequency or a severity adjustment. As referenced in paragraph (25) of the summary above, though Claro never references it by name, the Claro study uses, as I did in my study, a frequency-severity model with plus and minus factors identified, and, where noted, implemented to adjust the selected severity benchmark, albeit Claro does not consider all the necessary factors to account for the difference between the verdict study group and the Abuse Claims. Apropos the current discussion, Claro treats the two minus factors of (1) lack of abuser identification and (2) failure to be within the state's statute of limitations laws as though they were only severity factor discounts.  From the standpoint of tort system valuation and decision for a plaintiff's attorney to accept a sexual abuse case for retention, these should be characterized as minus factors that reduce the frequency of valuable tort claims.  It is reasonable to assume that once retained and pursued as litigated claims, they would require discounts to settle, However, as follows from the discussion of the filing threshold above, claims with expected settlement discount below the filing threshold will not be retained and filed.  This means that by in large, these two minus factors identified by Claro as severity reductions are frequency reductions. Where Claro reduces its valuation to account for this factor, it should be reducing the number of claims.  Had Claro properly accounted for these two minus factors as downward frequency adjustments, it too would have identified less than 17,000 Abuse Claims as facially meeting the criteria for consideration as tort claims.

(85) Lastly, Claro claims that "the Bates White Disclosure Statement Valuation produces results that are lower than the amounts historically paid by BSA to resolve sexual abuse claims, even if every single BSA Sexual Abuse Claim except for the 16,600 'focused on' by Bates White are valued at $0."[51]

---

[50] *See* Figure 34 of my Affirmative Report.
[51] Claro Report, p. 35.

Rebuttal Expert Report of Charles E. Bates, PhD

Correct, and that is what Claro would also have determined had it properly accounted for the selection bias of valuing Abuse Claims with either verdicts or historical settlement. From a valuation perspective, what Claro has done is not different than applying the average price of homes in a select zip code, say 90210, which is Beverly Hills where the average home prices is over $4 million, to all the homes in the United States. That mistakes would lead to the conclusion that the value of the 139 million homes in the United States was $556 trillion. In fact, the actual number is less than a one tenth of that. Given that the number of Abuse Claims that did not file a lawsuit is so much larger than the number that did, it should not be surprising that their average value is much lower than litigated claims that settled or successfully went to verdict.

## II.B. The TDP provide a reasonable basis on which to value the BSA Sexual Abuse Claims for purposes of the Plan.

(86)  Claro's third opinion is that "the valuation methodology proposed in the TDP is fundamentally flawed and is not a reasonable basis on which to value the BSA Sexual Abuse Claims for purposes of the Plan."[52] This opinion is without merit and incorrect. Claro cites four conclusions to support Opinion 3. All four conclusions are meritless and either incorrect or irrelevant. They are:

> 3.1  The TDP Base Matrix Value and Maximum Matrix Value are less than the Historical BSA Settlements.

> 3.2  The application of discounts for legal defenses is inappropriate when using settlement figures as Base Matrix Values.

> 3.3  It inconsistently applies discounts for BSA Sexual Abuse Claims alleging abuse by a minor.

> 3.4  The discounts applied related to the statute of limitations are not supported by Historical BSA Settlements.

I will address each in turn.

(87)  Claro's supporting conclusion 3.1 is both incorrect and irrelevant. There are many settlements that are less than the Base Matrix Values. For example, 3/4ths of historical resolutions for identifiable penetration allegations are for less than $600,000, which is the TDP Base Matrix Value for penetration allegation Abuse Claims. While it is true that there are a handful of settlements above the Maximum Matrix Value, nearly all are associated with a single settlement of the numerous Survivors of the notorious abuser Thomas Hacker. These cases were resolved in the face of the unique circumstance of a series of trials all with the prospect of significant punitive damages. As shown in Figure 6 of my affirmative report, nearly all other cases, even those involving other notorious repeat

---

[52]  Claro Report, p. 2.

Rebuttal Expert Report of Charles E. Bates, PhD

abusers, settled for well below the Maximum Matrix Value. This figure is replicated below for
reference.

**Figure 8: Graph of average historical resolution value and count of claims by abuser**



(88)   Whether true or not, Claro's supporting conclusion 3.1 is irrelevant. The differences in the settlements
of cases involving the most egregious abusers are reflective of the lottery-like aspect of the tort
system that a settlement trust TDP is designed to correct. A goal of the TDP is to bring fairness and
equal compensation to similarly situated claims. Paying all claims according to the worst legal
circumstances for the defendant is clearly not fair. The Settlement Trust is designed to pay all
similarly situated claims from the perspective of harm to the survivor and responsibility of the BSA,
while accounting for state tort laws, the same amount. Relative to the tort system, some of the
similarly situated claims will be paid more and some will be paid less by the Settlement Trust. The
fairness and equality goals of the Settlement Trust require this.

(89)   Claro's supporting conclusion 3.1 is also irrelevant because the Settlement Trust is designed to
compensate all qualifying Survivors, including the vast number of Survivors whose claim values were
below their filing threshold, as explained above. Settlements for claims with these characteristics are
not observed in the historical settlement data as such claims were never filed as tort claims. As

discussed above, the selection bias caused by the filing threshold resulted in the historical settlement average being well above the typical value of Survivors claims whose values were below the filing threshold. The average BSA trust settlement should be significantly less than the average historical settlement and Base Matrix Value by allegation category and hence the TDP benchmark values if the trust is properly administered according to the TDP.

(90)   Claro's supporting conclusion 3.2 is irrelevant because Claro mischaracterizes the TDP. The Base Matrix Values are not an average amount reflective of a particular mix of settlements incorporating discounts for legal defenses. The Base Matrix Values do not account for the effect of any attributes of a claim more than once. As explained in paragraph 115 of my affirmative report, "[t]hese values are not designed to necessarily be the average assigned to a given tier of Abuse Claim, but rather provide a jumping-off or reference point, based on the historical resolutions, from which the current and future Abuse Claims can be valued." Notably, the Base Matrix Values incorporate the high level of institutional responsibility associated with the BSA historical settlements around $600,000. This is a level of BSA responsibility that is well above the level required to exceed the filing threshold for claims to be filed as lawsuits against the BSA. Clearly the BSA responsibility share for the vast majority of Abuse Claims must be lower. As illustrated by the simulation summarized in Figure 5 and in the filing threshold example of paragraphs (58) and (62), the same value can be associated with alternative fact patterns, some of them with discounts for legal defenses and others without. There is a tradeoff between alternative attributes, some of which increase the claim value relative to a benchmark settlement and others that decrease it. In the examples above, alternative combinations of SOL status and relative liability share result in the same settlement amount, including claims without any discount for legal defenses. A higher BSA liability share for an Abuse Claim subject to an SOL discount can result in the same settlement amount of an Abuse Claims with a lower BSA liability share, but no SOL discount. Clearly, the proper application of the TDP to the valuation of a particular Abuse Claim needs to consider the Base Matrix Values as being associated with a benchmark case that meets the SOL requirements for the state of that Abuse Claim. A tradeoff between the BSA's relative responsibility incorporated in the other mitigating scales and the SOL status scale can result in the same payment. Claro has not properly characterized the administration of the Settlement Trust and, hence, Claro's supporting conclusion 3.2 is irrelevant.

(91)   Claro's supporting conclusion 3.3 is incorrect and irrelevant. Contrary to Claro's assertion, the TDP consistently applies discounts for BSA Sexual Abuse Claims alleging abuse by a minor. The Abuse Types are consistently assigned one valuation tier less for allegations involving a minor abuser than an adult abuser. Claro asserts that this is inconsistent because the percentage drop in valuation from one tier to the next lower is not the same for each abuse tier. I am not aware of any principle of fairness or equity that would require the percentage drop from one tier to the next to be the same. Claro's evaluation criteria are spurious and irrelevant.

Rebuttal Expert Report of Charles E. Bates, PhD

(92)    Claro's supporting conclusion 3.4 that the discounts applied related to the statute of limitations are not supported by Historical BSA Settlements is without merit and not supported by the analysis Claro cites. Claro advances a comparison of the settlement averages of Open, Gray 1, Gray2, and Gray 3 SOL status settlements as a test of the impact of SOL Status on settlement value. But since Claro ignores, or is ignorant of, the selection bias created by the filing threshold, Claro is unaware that the observed settlement averages of filed claims cannot be informative on their own of the impact of SOL Status on settlement value. The simple filing threshold example of paragraph (58) illustrates why. Note that for all three cases considered in the example, the observed settlements are for $200,000. Unobserved are the attributes of these three cases that indicate the difference in case quality. The comparison of the settlements alone tells us nothing about the statute of limitations discount.

(93)    There is insufficient data regarding the BSA settlements to have any hope of reliably detecting the settlement discount associated with the Gray states. Claro removes claims whose SOL status were <u>not</u> Open at the time of settlement to obtain the result of any discount for Gray status claims. There is no reasonable justification for that exclusion. Claro calls this "conservative" as it lowers Claro's number and appears to validate Claro's analysis. It is neither conservative nor validating. It shows that something else, something unobserved, is a bigger factor in determining the settlement averages. The principle of a settlement discount for a claim without Open SOL status is sound. Claro's test is not.

(94)    As shown here, Claro's four supporting conclusions are incorrect and do not support Claro's opinion that the valuation methodology proposed in the TDP is fundamentally flawed and is not a reasonable basis on which to value the BSA Sexual Abuse Claims for purposes of the Plan. The appropriate evaluation of the reasonableness of the Settlement Trust is whether the Settlement Trust pays Abuse Claims, fairly and equitably, reasonable amounts relative to the harm to the Survivor, the responsibility of the BSA, accounting for state laws apropos of each Abuse Claim. Overall, the application of the TDP should set values consistent with the aggregate BSA Abuse Claim valuation range of $2.4 billion to $7.1 billion, assuming the Abuse Claims are what the POCs represent them to be.

(95)    It is not possible to know what the valuation of each Abuse Claim will be until after its evaluation by the Settlement Trustee. Though many of the aggravating factors and SOL mitigating factor are known for many of the Abuse Claims as documented in their POCs, the mitigating scalars related to the BSA's responsibility share are virtually unknown. Moreover, the application of many of the aggravating and mitigating factors will depend on the Settlement Trustee's assessment of additional evidence. Hence, we cannot know at this time the value the Settlement Trust will assign the Abuse claims. We can, however, test what must occur as the net effect of the unknown scalars for the Settlement Trust to fall within the valuation range. If those amounts are reasonable considering what we know about the Abuse Claims, then the Settlement Trust and TDP are also reasonable.

Rebuttal Expert Report of Charles E. Bates, PhD

(96)   To test the effect of different aggravating and mitigating scalars on the face value of Abuse Claims run through the Settlement Trust, I created a BSA Trust simulation model that uses the rules of the TDP to assign value to each Abuse Claim based on what is known about each Abuse Claim and a hypothetical set of aggravating and mitigating scalars to account for unknown Abuse Claim attributes. The model values the 82,209 Abuse Claims based on known claim attributes set forth in the POCs. I modeled the SOL mitigating factors based on the SOL status of each Abuse Claim based on the age and abuse state of each survivor when known. After creating a set of standardized abuser names, I assigned to each Survivor the appropriate Abuse Profile category based on the number of times each abuser appeared in total between the historical resolutions data and the Abuse Claims. To account for particularly egregious behavior and to achieve the highest value for each Abuse Claim accounting for its other attributes, I assigned to each Abuse Claim whose abuser was in the historical resolutions data a premium of 50 percent, in addition to the Abuser Profile and Abuse Occurrences aggregating factors. I then created two summary average scalars to simulate the net effect of the BSA mitigating responsibility scalars and aggravating scalars, one for abusers with no other known accusations of abuse and one for those that were accused more than once. I assigned every Abuse Claim that did not qualify for payment for lack of required information the Expedited Value of $3,500. Finally, I also assigned the Expedited Value of $3,500 to any Abuse Claim whose Allowed Abuse Claim Calculus resulted in an amount less than $3,500.

(97)   I then set mitigating and aggravating scalars of the Trust simulation to the average values those scalars would need to be to have the Trust make payments consistent with the tort system simulation described above.  I set a mitigating scalar for all Single Abuser Cases to 10%, reflective of BSA's likely low average responsibility for these Abuse Claims.  I set the mitigating and aggravating scalars for the repeat abuser claims so that the average adjustment for repeat abuser Abuse Claims increased their Settlement Trust payment to 125 percent of the Base Matrix Value.  The results are tabulated below in Figure 9.  It shows that at these settings the Settlement Trust would pay Abuse Claims $3.5 billion. It also shows the wide variety of payment sizes that will be made by the Settlement Trust. Hundreds of the worst abuse cases will receive seven figure payments, and thousand of others will receive six payments, both consistent with a higher level of BSA responsibility than would be typical for the Abuse Claims.  This is consistent with the observed filing pattern and historical settlements. To that point, Figure 10 shows the same results bifurcated between claims with BSA Settlement Payments above the assumed tort system filing threshold of the trust simulation model of $200,000. This simulation produces results consistent with just over 4,000 Abuse Claims that would otherwise be filed as tort claims with a settlement average of $540,000, consistent with the historical average. Also consistent with the historical filing pattern, over 78,000 Abuse Claims are valued at less than the assumed filing threshold.  These are the claims for which the Settlement Trust is their only foreseeable path to compensation.

Rebuttal Expert Report of Charles E. Bates, PhD

**Figure 9: TDP simulation results for Abuse Claims grouped by TDP payment size**

| Payment size | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| Expedited claim payment | 34,378 | $120,000,000 | $3,500 |
| Four and five-figure payments | 41,889 | $810,000,000 | $19,000 |
| Six figure payments | 5,555 | $2,030,000,000 | $365,000 |
| Seven figure payments | 387 | $500,000,000 | $1,286,000 |
| **Grand Total** | **82,209** | **$3,450,000,000** | **$42,000** |

**Figure 10: TDP simulation results for Abuse Claims grouped by TDP payment size**

| Payments exceeding $200,000 filing threshold | Payment size | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|---|
| NO | Expedited claim payment | 34,378 | $120,000,000 | $3,500 |
| NO | Four and five-figure payments | 41,889 | $810,000,000 | $19,000 |
| NO | Six figure payments | 1,772 | $270,000,000 | $154,000 |
| **NO** | **Subtotal** | **78,039** | **$1,200,000,000** | **$15,000** |
| YES | $200,000 and above | 4,170 | $2,250,000,000 | $540,000 |
| | **Grand Total** | **82,209** | **$3,450,000,000** | **$42,000** |

(98)   These levels for the Trust mitigating and aggravating scalars are reasonable and appropriate for the Trust to properly account for the tort system values of the Abuse Claims.  As described above, the tort system simulation shows that the Abuse Claims represent a wider – and overall lower – range of valuation than the BSA historical settlements.  The fact that such a high proportion of the Abuse Claims were never recruited to file tort claims, yet so many have come forward in this bankruptcy proceeding, means there must be a tort system valuation threshold below which plaintiff law firms will not invest the time nor money to recruit the Abuse Claims in the same manner they recruit so many other torts. This bankruptcy proceeding with the prospect of a settlement trust has drastically reduced the costs to plaintiff law firms to prosecute the Abuse Claims against the BSA.  It made recruiting of Survivors a profitable enterprise to launch and invest.

Confidential subject to Protective Order

Rebuttal Expert Report of Charles E. Bates, PhD

# III. Portion of valuation attributable to TCJC Abuse Claims in Claro Report

(99)     According to the Claro Report "Claro was provided with a list of 2,402 BSA Sexual Abuse Claims associated with the TCJC."[53] Claro uses that list to identify the subset of the 82,209 claims that are TCJC claims, states the portion of those that were amongst its set of valued claims (1,554), and goes on to note that those claims "represent $691.63 million - $784.88 million of the total Claro Valuation."[54] Notwithstanding the other issues identified in this report related to the total Claro Valuation—which are significant and cause it to be inflated manyfold—Claro's TCJC figure fails to consider that only some share of its own total valuation as to all BSA-related parties would be attributable to TCJC. Claro further fails to consider that some portion of the amounts attributable to the TCJC may also be subject to coverage under BSA's insurance policies.

(100)    The failure of Claro to acknowledge that the TCJC would bear financial responsibility for only some share of the valuation for TCJC claims is striking and contradictory to other opinions in Claro's report. Section IV of the Claro Report provides both an allocation of the Claro Valuation to BSA insurance and, as part of that work, an apportionment of the valuation among BSA-related entities. In Section IV, the Claro Report provides three potential apportionment scenarios which assign 0%, 16.67%, and 33.33% to the Charter Organizations collectively, a group that would include the TCJC.[55] While Claro describes those scenarios as "illustrative" it is notable that the highest share any of them contemplates a Charter Organization bearing is 1/3 of the total.[56] If one were to apply that same 1/3 share—the highest Claro deemed necessary for illustrating the value of insurance—it would result in the portion of the total Claro Valuation being assigned to TCJC being $228.24 million - $259.01 million. Figure 11 provides a table that summarizes the calculations involved with applying Claro's "Apportionment Scenario" Charter Organization shares to Claro's total valuation for the TCJC claims.

**Figure 11: Applying Claro Apportionment Scenarios to Claro Report's Valuation total for TCJC claims**

| Valuation scenario | Reported Claro Valuation total for TCJC claims | Claro Valuation Apportionment Scenario 3 | Claro Valuation Apportionment Scenario 2 | Claro Valuation Apportionment Scenario 1 |
|---|---|---|---|---|
| Percent assigned to Chartered Organizations | N/A | 33.33% | 16.67% | 0.00% |
| Claro low range figure | $691.63 | $230.54 | $115.27 | $0.00 |
| Claro high range figure | $784.88 | $261.63 | $130.81 | $0.00 |

---

[53]  Claro, p. 34.
[54]  *Ibid.*
[55]  Claro, p. 43.
[56]  *Ibid.*

Rebuttal Expert Report of Charles E. Bates, PhD

(101)    Clearly any further reduction of the apportionment shares below the highest share from
        "Apportionment Scenario 3" of the Claro Report, and consistent with the other scenarios presented,
        would bring the top end figure below $250 million. Similarly, any reduction in the total Claro
        Valuation presented in the Claro Report of 3.5% or more would push the figures in Apportionment
        Scenario 3 below $250 million. Finally, any allocation to insurance that assigned at least 3.5% of the
        total Claro Valuation that would otherwise go to the TCJC share of this subset of claims to BSA
        insurance or indemnities, would bring the top end figure assigned to TCJC below $250 million.

Rebuttal Expert Report of Charles E. Bates, PhD

# IV. Scarcella Report misidentifies the source of uncertainty and conflates issues related to fixed value TDP with discretionary TDP

(102)   The Scarcella Report is subject to a fundamental error in that it misidentifies the source of uncertainty in the valuation of the current Abuse Claims both in the aggregate and individually. The report states that "The TDP creates a significant level of uncertainty surrounding the quantum of post-confirmation claim liability…."[57] This statement fails to recognize the fact that there is uncertainty about the value of the Abuse Claims now. This is the reason why I provide such a broad valuation range—$2.4 billion to $7.1 billion—in my Affirmative Report.

(103)   It is not that the TDP are creating uncertainty, rather there is currently uncertainty around the valuation of the Abuse Claims, in the aggregate, and even more so, at an individual level. The determination of value for any one specific Abuse Claim requires a more thorough evaluation of each case on its own merits This uncertainty is the very reason the TDP calls for gathering additional information, vetting, and the use of discretion in the determination of future individual claim values and they do not simply purport to fix a single value to each claim based on some already known observable characteristic. The Scarcella Report is asking for the TDP to provide certainty to the Remaining Insurers (as defined in the Scarcella Report) when no such certainty exists for any other party in the case at this time. The Remaining Insurers do face uncertainty, but so did the insurers and other parties who settled. And to a degree so do individual Abuse Claims who cannot know for sure how their claim will compare to the others submitted nor how much will eventually be recovered from parties yet to contribute including the Remaining Insurers. The TDP do not eliminate this uncertainty, but they do provide a systematic framework for resolving it.

(104)   The Scarcella Report notes that "it is common for administrative settlement trusts to receive a higher rate of less meritorious claim submissions as compared to the tort system."[58] As discussed earlier in this report, we have already seen through the application of the POC process, a multi-fold increase in the number of claims brought forward as compared to the pre-petition tort system.[59] In such a circumstance, simply applying fixed historical average values to all the Abuse Claims would result in an overvaluation of the claiming pool. This is why the TDP in this case are structured as they are and call for the appropriate application of scalars to account for aggravating and mitigating factors.

---

[57]   Scarcella Repot, p. 8.

[58]   Scarcella Report, p. 7.

[59]   In paragraphs 31 and 32 the Scarcella Report suggests that the Settlement Trust will incentivize increased claiming relative to what would have happened in the tort system, but this again misplaces the source of risk. Given the bankruptcy and POC process, increased claiming has already occurred. The BSA and all its insurers, whether settling or not, already face more claims than they did. Scarcella Report, p. 15-16.

(105)   The Amended Plan and the TDP have several mechanisms to address the differences in the strength
        of the current Abuse Claims relative to the prior historical settlements. Notably, the Amended Plan
        allows for Abuse Claims to vote for an Expedited Distribution of $3,500. My understanding based on
        the Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation
        of Votes and Preliminary Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter
        11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC is that preliminary
        indications are that 7,919 Direct Abuse Claims indicated they would take the $3,500 expedited
        distribution._This represents slightly less than 15% of the claims that returned ballots and slightly less
        than 10% of the 82,209 unique and timely claims. Given that this Declaration was filed within the last
        24 hours and is still preliminary, Bates White's analysis of this information is ongoing.

(106)   The TDP also provide for a screening mechanism, the Initial Evaluation Criteria, that are designed to
        filter out non-meritorious claims. The Allowed Abuse Claims remaining after these processes will
        then be subject to the application of both Aggravating Scaling Factors and Mitigating Scaling Factors
        to those claims which are valued. As discussed elsewhere in this report, it is my expectation that—
        given the strong selection bias in the historical resolutions as compared to the current set of POC
        claims—the average combined Aggravating Scaling Factor and Mitigating Scalar Factor will be
        significantly less than one.[60] Thus, the very "discretionary interpretation" that the Scarcella Report at
        times criticizes is one of the solutions to the potential problems the Scarcella Report warns against
        that can result in the overvaluation of claims.[61][62] The range of values allowed within the TDP is a
        feature. Within each tier within the Matrix, between the Base Values and the combined Mitigating
        Scaling Factors and Aggravating Scaling Factors, the Settlement Trustee has latitude to adjust any
        current Abuse Claim value to accurately reflect its value relative to the historical resolutions used as a
        benchmark. That discretion will need to be appropriately applied, but it allows for the TDP to produce
        appropriate claim-specific values.

(107)   The Scarcella Report identifies a supposed "moral hazard" stating that "the Settlement Trust does not
        bear any downside risk of overvaluing claims."[63] I disagree. The Settlement Trustee who is charged
        with administering the TDP has no incentive to overvalue claims. He has a fiduciary obligation to all
        valid Abuse Claimants. Misapplication of the Settlement Trustee's discretion in applying the
        Aggravating Scaling Factors and Mitigating Scaling Factors would result in a redistribution of value
        among the Abuse Claims that would disadvantage certain Abuse Claims to the detriment of others.
        This would be inconsistent with the Settlement Trustee's fiduciary obligation to Abuse Claimants, as

---

[60]   In essence I agree with the theme of the Scarcella Report's point that "values…from the administrative settlement trust
       should be lower than what would otherwise be paid to an inherently smaller set of more credible claims." But critically I
       think this is true in the aggregate and not necessarily on an individual basis, as that full passage states, as some high
       value claims are likely to still exist. Scarcella Report, p. 7.

[61]   Scarcella Report, p. 8.

[62]   Note that accounting for the variation in value we expect to see with the broader group of Abuse Claims is in conflict
       with the Scarcella Report.

[63]   Scarcella Report, p. 15.

Rebuttal Expert Report of Charles E. Bates, PhD

overseen by the Settlement Trust Advisory Committee.  Thus, the Settlement Trustee would not be "willing to make decisions without concern for downside risk or cost."

(108)    In relation to its point on moral hazard the Scarcella Report also states that "since claim valuations will likely be tendered to Remaining Insurers for payment, the Settlement Trust has an economic incentive to overvalue claims to maximize insurance recoveries." Again, the Settlement Trustee charged with administering the TDP has no such incentive. While some Abuse Claims will likely be tendered to Remaining Insurers, as the Scarcella Report itself also notes, some insurers have already settled. For Abuse Claims that would be covered by such settling insurers, the Settlement Trustee is in effect spending money from a fixed pool of assets. Increasing the value of those Abuse Claims will not increase the value of the assets available to pay them. Moreover, because the TDP cap the value of the most valuable Abuse Claims, if the Settlement Trustee were to simply scale up the value of all Abuse Claims, he would be disadvantaging the most meritorious Abuse Claims. Any attempt by the Settlement Trustee to inflate values by misuse of their discretion in applying the Aggravating Scaling Factors and Mitigating Scaling Factors, or any overvaluation of Abuse Claims, would result in a redistribution of value among the Abuse Claims inconsistent with the Settlement Trustee's fiduciary obligations. Thus, the risk of the moral hazard the Scarcella Report purports to identify would be born not just by the Remaining Insurers and other Non-Protected Parties it identifies, but also by the most meritorious Abuse Claims whose counsel will be participating in the process via the Settlement Trust Advisory Committee and who are charges of the Settlement Trustee.

(109)    The Scarcella Report incorrectly suggests that the application of factors under Bates White's aggregate valuation approach are inconsistent with the TDP.[64]  As an initial matter, the benchmark valuation and TDP are consistent; both are informed by the BSA's prepetition approach to assessing and settling claims. This suggestion also misunderstands the Bates White benchmark valuation approach which yields the aggregate estimate in my Affirmative Report. That valuation approach necessarily differs from the simple application of the TDP to all the current Abuse Claims as the correct application of the TDP requires a claim-by-claim valuation and application of the criteria which calls for additional information that is not available to any party at this time. Rather than trying to assign the correct value to each Abuse Claim, as described in more detail in my Affirmative Report, my valuation range was generated with reference to a smaller subset of the current Abuse Claims that, taking their current POC submissions at face value, look the most like more selective historical resolutions and applying values that are consistent with those more selective cases to those apparently stronger cases. I then considered potential plus and minus factors around that base benchmark model. Those factors, namely two of the plus factors, explicitly include an accounting for the potential in changes in the number of claims that can identify an abuser and the idea that not all apparently statue barred claims will receive $0 compensation. Critically, that range also considers the

---

[64]    See Scarcella Report paragraphs 34 and 35, e.g. "the Bates White approach may differ from the TDP in ways that could result in the BW Estimates being lower than other TDP-based estimates." Scarcella Report, p. 17.

Rebuttal Expert Report of Charles E. Bates, PhD

main minus factor, which is that with further information the average value assigned to current Abuse Claims could be closer to, or below, the median value for the historical resolutions. [65]

(110)     Finally, the Scarcella Report is incorrect in suggesting that Trusts inherently overpay. While it is true that there are a significant number of trusts that have over time reduced their payment percentages, indicating that they paid more claims than originally estimated, this is largely a feature of long-tailed trusts like those in asbestos with two features: i.) significant future claims; and ii.) fixed payment valuations. Here, with the POC process, the number of future Abuse Claims is likely to be small. Further, as noted in the Scarcella Report itself, the value of Abuse Claims is not fixed for each claim tier, but rather will be subject to scaling relative to historical resolutions. Even asbestos trusts with significant future claims that feature more variation in claim valuation, such as the Western Trusts and the Garlock Trust, have generally raised their payment percentages rather than lowered them.

---

[65]    For more on this see the discussion of selection bias throughout Section II.

Rebuttal Expert Report of Charles E. Bates, PhD

# V. BRG Report uses an arbitrary valuation figure

(111)    The BRG Report largely addresses issues that I am not opining upon in this case. The BRG Report does, however, include a section on the "Value of Survivor Claims" that purports to produce a valuation range for Abuse Claims of roughly $7.6 billion - $9.3 billion "for purposes of [their] Adjusted Local Council Liquidation Analysis."[66] This figure is produced by valuing 41,750 claims that identify a Local Council on their POCs.[67] The BRG analysis purports to evaluate those 41,750 claims by applying the TDP Base Matrix Values and some of the TDP scalars, but not others. This is a flawed approach that is inconsistent with how the TDP will eventually be applied, inconsistent with the Claro Report—which was also submitted on behalf of the TCC—and inconsistent with my estimate of the value of Abuse Claims.

(112)    No party has the information needed to fully apply the TDP scalars at this time. By applying some scalars and not others, the BRG Report has assumed an aggregate value of 1.0 for the scalars it does not directly consider. The BRG Report provides no support for making this assumption. Moreover, this assumption is flawed. As discussed earlier in this report, the selection bias inherent in the BSA-related pre-petition historical resolutions, relative to the current set of Abuse Claims represented by the POCs, means that we should expect that the average combined Aggravating Scaling Factor and Mitigating Scalar Factor will be significantly less than one. While multiplying the Abuse Claims by the Base Values and certain select scalars, but not others, arithmetically produces a number, that number does not represent a reliable estimate of what the tort value of these claims would be nor what they will eventually receive under the TDP. The correct application of the TDP requires a claim-by-claim valuation and application of the relevant criteria and requires additional information that is not available to any party at this time. Further, as discussed elsewhere in this report, those TDP values will only be applied to claims that do not opt for an Expedited Distribution as part of their vote under the Amended Plan and to claims that pass the Initial Evaluation Criteria and are determined to be Allowed Abuse Claims.

(113)    A valuation of only the claims that directly identify a Local Council on their POCs does not make sense and is inconsistent with the valuation approach taken in the Claro Report and my own estimate.

(114)    The "Value of Survivor Claims" presented in the BRG Report also fails to recognize that the Local Councils would bear only some share of the loss for their claims and a portion of the loss attributable to the Local Councils for such claims may also be subject to coverage under BSA's insurance policies. The TDP is designed to produce a value as to all BSA-related parties and TDP Base Matrix Values that the BRG Report uses were derived with reference to settlements on behalf of all BSA-related parties. This means that only some share of the total valuation as to all BSA-related parties

---

[66]    BRG Report, pp. 33–34.
[67]    BRG Report, p. 33.

would be attributable to the Local Councils. This failure is striking in that Section IV of the Claro Report provides both an apportionment of the valuation among BSA-related entities, including Local Councils, and an allocation to insurance. Notably, as discussed in Section III of this report, the highest share of the total loss Claro contemplates assigning to the Local Council's collectively in any of its Apportionment Scenarios is 1/3.

(115)    The Value of Survivor Claims presented in the BRG Report does not represent a valid estimate of the value of the Abuse Claims in any context.

Rebuttal Expert Report of Charles E. Bates, PhD

_Charles E. Bates_

_____
Charles E. Bates

January 5, 2022
_____
Date

Rebuttal Expert Report of Charles E. Bates, PhD

# Appendix A. Updates to abuser frequency category in BSA-PLAN_01635877

### Figure 12: Updated abuser frequency category by settlement claim number

| Claim Number | Abuser(s) Full Name | Settlement Confirmation | Original Abuser Frequency Category | Updated Abuser Frequency Category | Reason for Update |
|---|---|---|---|---|---|
| 8 | Donald Leonard Keys | $400,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 9 | Richard Fred Swendiman | $250,000 | 0-1 | 2-4 | Additional research indicates repeat abuser |
| 10 | Richard Demers | $25,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 15 | Jerold Mackinnon | $10,000 | 0-1 | 2-4 | Additional research indicates repeat abuser |
| 16 | Garrett (Gary) Hatfield | $1,970,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 28 | Dustin Hedrick; C Dunbar | $1,750,000 | 0-1 | 2-4 | Additional research indicates repeat abuser |
| 31 | Wallace Schrade | $112,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 33 | Paul Longway | $125,000 | 0-1 | 10+ | Abuser name found in POC data |
| 34 | Earl Belke | $425,000 | 0-1 | 2-4 | Additional research indicates repeat abuser |
| 36 | Ray Gillespie | $115,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 49 | Gary Blackwell | $25,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 53 | Mike Dean; Tom Carron; Quentin Thompson | $0 | 0-1 | 2-4 | Abuser name found in POC data |
| 60 | Donald McShannock | $5,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 63 | Robert Spencer | $300,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 64 | Kirby Blanchard | $75,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 68 | Joseph Mackey | $100,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 70 | Jerome Kubic; Ron Smith | $475,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 71 | Randall Shafer | $175,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 72 | Dale Astleford | $500,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 74 | Andrew Momont | $262,500 | 0-1 | 2-4 | Additional research indicates repeat abuser |

Rebuttal Expert Report of Charles E. Bates, PhD

| 80 | Charles Lawrence Shattuck | $280,000 | 0-1 | 2-4 | Additional research indicates repeat abuser |
|---|---|---|---|---|---|
| 81 | Gary Lee Gephart | $75,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 83 | Michael Stachowski | $0 | 0-1 | 2-4 | Additional research indicates repeat abuser |
| 91 | John George | $20,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 94 | Fred Swank | $0 | 0-1 | 2-4 | Abuser name found in POC data |
| 95 | Chris Hernandez; Ed Avila; Andrea Ponce; Manuel Ponce; Johnny Barajas; Kyle Kaye | $0 | 0-1 | 2-4 | Abuser name found in POC data |
| 97 | Gary Monroe | $2,150,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 106 | James Hale; Thomas Seifert | $1,000,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 111 | Bruce DeSandre | $0 | 0-1 | 2-4 | Abuser name found in POC data |
| 112 | Garrett Piland | $0 | 0-1 | 2-4 | Additional research indicates repeat abuser |
| 114 | Ron "Argie" Guinto | $150,000 | 0-1 | 2-4 | Additional research indicates repeat abuser |
| 128 | Thomas Erickson | $385,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 161 | Fleming Royal Weaver | $1,200,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 223 | Gilbert Gauthe | $275,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 256 | Arthur Patrick Lewis | $20,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 258 | Larry Stevens | $22,500 | 0-1 | 5-9 | Abuser name found in POC data |
| 259 | Charles "Charlie" Riley | $22,500 | 0-1 | 2-4 | Abuser name found in POC data |
| 261 | Thomas Hampton | $22,500 | 0-1 | 2-4 | Abuser name found in POC data |
| 298 | Alan Delay & Steven Hill | $140,000 | 1 | 10+ | Abuser name found in POC data/Appears multiple times in BSA-PLAN_01635877 |
| 310 | Arnold Codispoti | $950,000 | 1 | 10+ | Abuser name found in POC data |
| 312 | Peter Stibal | $550,000 | 1 | 2-4 | Abuser name found in POC data |
| 357 | Leon Lestage | $62,500 | 1 | 2-4 | Abuser name found in POC data |
| 362 | Ronald Becker | $8,000 | 1 | 5-9 | Abuser name found in POC data |
| 374 | Michael Connelly; James E. Pacitto | $175,000 | 1 | 2-4 | Abuser name found in POC data |
| 383 | Peter Poorman | $30,000 | 1 | 2-4 | Additional research indicates repeat abuser |

Rebuttal Expert Report of Charles E. Bates, PhD

| 398 | Larry Van Dyke | $97,500 | 1 | 2-4 | Additional research indicates repeat abuser |
|---|---|---|---|---|---|
| 412 | Gregory Ritter | $500,000 | 1 | 2-4 | Abuser name found in POC data |
| 435 | Delbert Shaw | $50,000 | 1 | 2-4 | Abuser name found in POC data |
| 440 | Jim Moore | $275,000 | 1 | 5-9 | Abuser name found in POC data |
| 451 | Donald Sanschagrin | $25,000 | 1 | 2-4 | Abuser name found in POC data |
| 452 | Merlin Nagler | $50,000 | 1 | 2-4 | Additional research indicates repeat abuser |
| 483 | Alton Parady | $750,000 | 1 | 2-4 | Abuser name found in POC data |
| 506 | Joseph Laurita | $50,000 | 1 | 2-4 | Additional research indicates repeat abuser |
| 513 | Chase Panem | $375,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 514 | Al S. Stein | $2,300,000 | 1 | 2-4 | Abuser name found in POC data |
| 541 | Floyd David Slusher | $300,000 | 1 | 5-9 | Abuser name found in POC data |
| 548 | Eugene Thorne | $60,000 | 1 | 2-4 | Abuser name found in POC data |
| 552 | Drake Harkness | $95,000 | 1 | 2-4 | Abuser name found in POC data |
| 571 | Gregory A. Benson | $350,000 | 1 | 2-4 | Abuser name found in POC data |
| 572 | Norman Leach | $70,000 | 1 | 2-4 | Additional research indicates repeat abuser |
| 577 | Vincent Ariaz | $155,000 | 1 | 2-4 | Additional research indicates repeat abuser |
| **Average Settlement Confirmation** | | **$330,164** | | | |

Rebuttal Expert Report of Charles E. Bates, PhD

# Appendix B. Materials relied upon

Below is a list of materials I relied upon in reaching in my opinions. Should I identify any additional materials that were omitted from this list, I will supplement accordingly:

- **Expert Report of Makeda S. Murray, MBA (December 5, 2021), inclusive of the reliance materials listed therein**

- **Rebuttal Expert Report of Makeda S. Murray, MBA (January 5, 2022), inclusive of the reliance materials listed therein**

- **Expert Report of Charles E. Bates (December 5, 2021), inclusive of the reliance materials listed therein**

- **Opposing expert reports and materials**

  - Expert Report of Katheryn R. McNally of the Claro Group LLC (December 5, 2021), inclusive of the reliance materials listed therein: BSA_Claro_Report 20211205 (executed).pdf

  - Affirmative Expert Report of Marc C Scarcella, M.A. (December 5, 2021), inclusive of the reliance materials listed therein: 2021.12.05 Affirmative Report of Marc Scarcella – BSA.pdf

  - Expert Report of Jon R. Conte, Ph.D. (December 5, 2021), inclusive of the reliance materials listed therein: 12-5-21 BSA - TCC's expert report – Conte.pdf

  - Expert Report of David H. Judd & Matthew K. Babcock of Berkley Research Group (December 5, 2021), inclusive of the reliance materials listed therein: BRG Expert Report.pdf

- **Referenced filings from the BSA docket**

  - [5919] BSA - UNREDACTED Kosnoff Law 2019 Statement.pdf

  - Subpoena filed by the TCC requesting production of documents related to the valuation model

  - Amended disclosure statement

- **Bates White-generated valuation models**

  - Trust simulation model (Tranche VI): Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx

- **Sources providing information on repeat abusers in the BSA historical settlements data**

  - (INSTANCES_OF_CHILD_SEXUAL_ABUSE_ALLEGEDLY_PERPETRATED_BY_MEMBERS_OF_THE_CHURCH_OF_JESUS_CHRIST_OF_LATTER-DAY_SAINTS-2017-06.pdf (mormonleaks.io))

Rebuttal Expert Report of Charles E. Bates, PhD

☐ Richard-Fred-Swendiman.pdf (andersonadvocates.com)

☐ Lowell Man Sentenced for Indecent Assault of Child at Chelmsford Camp | Chelmsford, MA Patch

☐ Oregon Man Files $5 Million Suit Against Boy Scouts For Sexual Abuse | Jefferson Public Radio (ijpr.org)

☐ Ex-Boy Scout sues BSA, says Scoutmaster molested him - Albuquerque Journal (abqjournal.com)

☐ Former police explorer reaches $500,000 settlement with Rohnert Park in lewd texts case (pressdemocrat.com)

☐ Ronald Guinto - Boy Scouts Sex Abuse Lawsuit (childmolestationattorneys.com)

☐ New York Sexual Abuse | Adam Horowitz Sexual Abuse Blog (adamhorowitzlaw.com)

☐ Man sentenced for sodomy of child at Boy Scout day camp in Trussville | The Trussville Tribune

☐ Ex-Cub Scouts 'den mom' charged with kiddie porn after grooming boy (nypost.com)

☐ Washington lawsuit accuses 13 of Boy Scouts abuses (mynorthwest.com)

☐ Inside the 'perversion files': Larry Van Dyke - Documents - Los Angeles Times (latimes.com)

☐ New Wash. lawsuit accuses 13 of Boy Scout abuses (usatoday.com)

☐ South Florida Man Sues Boy Scouts Claiming He Was Sexually Abused – NBC 6 South Florida (nbcmiami.com)

☐ Boy Scouts' opposition to background checks let pedophiles in - Los Angeles Times (latimes.com)

☐ Dozens of Teenage Boy Scout Explorers Have Been Sexually Abused by Cops; Should Scouts Share the Blame? | News | Phoenix | Phoenix New Times | The Leading Independent News Source in Phoenix, Arizona

☐ 405 Mass. 618 (1989), Commonwealth v. Dockham - Massachusetts - Case Law - VLEX 616599678

☐ SN&R • Scouts' dishonor: Boy Scouts of America blame the victim in cringeworthy legal defense against Sacramento sexual abuse lawsuit (newsreview.com)

■ **Additional documentation for 29 Claro Benchmark verdicts (provided in Production)**

■ **Records from other litigation**

☐ Report of Charles E. Bates, PhD: Trial exhibit GST-0996, *In re Garlock Sealing Technologies LLC, et al.*, No. 10-31607 (Bankr. W.D.N.C. Feb. 15, 2013)

Rebuttal Expert Report of Charles E. Bates, PhD

☐ Dewayne Johnson v. Monsanto Co., No. CGC-16-550128 (Cal. Ct. App. July 20. 2020)

☐ Pretrial Order No. 164: Amended Judgment, In re Roundup Products Liability Litigation, No. 16-md-2741-VC (N.D. Cal. July 17, 2019)

☐ Order (1) Denying Motions of Defendant for JNOV and (2) Conditionally Granting Motions of Defendant for New Trial, *Alva and Alberta Pilliod v. Monsanto Co. et al.*, No. RG17-862702 (Cal. Alameda County Ct. July 19, 2019)

☐ Bayer, "Bayer Announces Agreements to Resolve Major Legacy Monsanto Litigation," press release, June 24, 2020, https://media.bayer.com/baynews/baynews.nsf/id/Bayer-announces-agreements-to-resolve-major-legacy-Monsanto-litigation

☐ "Ernst v. Merck Vioxx Trial: Massive Verdict for Plaintiff; Knock-Out Punch for Merck?" *Drug Injury Watch*, August 20, 2005, https://www.drug-injury.com/druginjurycom/2005/08/ernst_v_merck_v.html

☐ "Jury Awards $20 Million to Idaho Man in Latest Merck Vioxx Trial," CNBC, March 12, 2007, https://www.cnbc.com/2007/03/12/jury-awards-20-million-to-idaho-man-in-latest-merck-vioxx-trial.html

☐ "Merck Agrees to Pay $4.85 Billion in Vioxx Settlement," Reuters, November 9, 2007, https://www.reuters.com/article/us-merck-vioxx-settlement/merck-agrees-to-pay-4-85-billion-in-vioxx-settlement-idUSL0929726620071109

☐ "Merck Wins Appeals in Three Vioxx Cases," CNBC, May 29, 2008, https://www.cnbc.com/id/24875089

☐ "Vioxx Plaintiff Gets $13.5 Million in Damages," NBC News, April 12, 2006, https://www.nbcnews.com/health/health-news/vioxx-plaintiff-gets-13-5-million-damages-flna1c9468817

■ **Academic literature**

☐ Amer, Muhammad, Tugrul U.Daim, Antonie Jetter. "A review of scenario planning." *Futures* 46 (February 2013): 23–40.

☐ Bølviken, Erik. *Computation and Modelling in Insurance and Finance*. Cambridge University Press: 2014.

☐ Chermack, Thomas J., Susan A. Lynham, and Wendy E. A. Ruona. "A Review of Scenario Planning Literature." *Futures Research Quarterly* 72 (2001): 7–32.

☐ Eisenberg, Theodore, "Testing the Selection Effect: A New Theoretical Framework with Empirical Tests," *Journal of Legal Studies* 19, no. 2 (1990): 337.

☐ Theodore Eisenberg and Henry S. Farber, "The litigious plaintiff hypothesis: case selection and resolution," *RAND Journal of Economics* 28, no. 0 (1997): S92-S112.

Rebuttal Expert Report of Charles E. Bates, PhD

☐  Edward W. Frees, Richard A. Derrig and Glenn Meyers. *Predictive Modeling Applications in Actuarial Science*; Volume 1: Predictive Modeling Techniques. Cambridge University Press: 2014.

☐  James J. Heckman, "Micro Data, Heterogeneity, and the Evaluation of Public Policy: Nobel Lecture," *Journal of Political Economy* 109, no. 4 (2000): 673-748.

☐  Peter H. Huang and Ho-Mou Wu, "Emotional Responses in Litigation," International Review of Law and Economics 12, no. 1 (1992): 31-44.

☐  Louis Kaplow and Steven Shavell, "Economic analysis of law," In *Handbook of public economics* 3, ed. Alan J. Auerbach and Martin Feldstein (Elsevier, 2002), 1661-1784.

☐  George L. Priest and Benjamin Klein, "The Selection of Disputes for Litigation," Journal of Legal Studies 13, no. 1 (1984): 1-55.

☐  National Research Council, "Reference Manual on Scientific Evidence: Third Edition," 2011, Washington, DC: The National Academies.

☐  Tirole, Jean, *The Theory of Industrial Organization* (Cambridge, Mass: MIT Press, 1988).

☐  Toth, Ferenc L. "Dealing with Surprises in Environmental Scenarios" in Joseph Alcamo (ed.). *Environmental Futures: The Practice of Environmental Scenario Analysis*. Elsevier: 2008.

☐  Yousra Tourki, Jeffrey Keisler, and Igor Linkov. "Scenario analysis: a review of methods and applications for engineering and environmental systems." *Environment Systems & Decisions* 33 (2013): 3–20.

☐  W.E. Walker, P. Harremoës, J. Rotmans, J.P. van der Sluijs, M.B.A. van Asselt, P. Janssen & M.P. Krayer von Krauss. "Defining Uncertainty: A Conceptual Basis for Uncertainty Management in Model-Based Decision Support." *Integrated Assessment* 4, No. 1 (2003): 5–17.

☐  Donald Wittman, "Is the Selection of Cases for Trial Biased?," *Journal of Legal Studies* 14, no. 1(1985): 185-214.

☐  Donald Wittman, "Dispute Resolution, Bargaining, and the Selection of Cases for Trial: A Study of the Generation of Biased and Unbiased Data," *Journal of Legal Studies* 17, no. 2 (1988): 313-352.

☐  Henry S. Farber and Michelle J. White, "Medical malpractice: an empirical examination of the litigation process," *RAND Journal of Economics* 22, no. 2 (1991): 199–217.

☐  Herbert M. Kritzer, "Contingency fee lawyers as gatekeepers in the civil justice system," *Judicature* 81, no. 1 (1997): 22–29.

Rebuttal Expert Report of Charles E. Bates, PhD

 

 

 

 

- □   David A. Hyman and Charles Silver, "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," *Vanderbilt Law Review* 59, no. 4 (2006): 1085–1136.

**All other documents cited throughout the report, inclusive of the footnotes.**

## EXHIBIT D

**Supplemental Bates Report**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**SUPPLEMENTAL EXPERT REPORT OF CHARLES E. BATES**

**January 25, 2022**

---

[1]     The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Confidential subject to Protective Order

Supplemental Expert Report of Charles E. Bates, PhD

# I. Benchmark valuation incorporating one time abuser settlement amount from Rebuttal Report

(1)  In my December 5, 2021, report ("Affirmative Report"), I calculated an initial aggregate benchmark value based on an initial benchmark claim value of $650,000 for one time abuser penetration claims,[2] and noted that "[i]f, for example, the claims defining the $250,000 median historical value discussed above, provide a better representation of the Abuse Claims than the claims valued at $650,000, then a more representative initial benchmark would be $250,000 instead of my selection of $650,000."[3] In my January 5, 2022, rebuttal report ("Rebuttal Report"), I provided an update to Figure 7 from the Affirmative Report based on my re-examination of the historical settlements.[4] That update showed that the average settlement amount for penetration claims involving once-identified abusers is $212,500.[5]

(2)  Counsel to the Debtors has asked me to provide a version of the aggregate benchmark value reflecting the updated value for penetration claims involving one time abusers reflected in my Rebuttal Report. In addition, counsel to the Debtors has asked me to incorporate the adjustment for Minus Factor 1, the minus factor that accounts for the lower value due to the age of the survivor at the time they make their claim. As described in paragraph 103 of the Affirmative Report, this adjustment would result in a reduction of 20% for the benchmark claim value. In paragraph 66 of the Affirmative Report, I also noted that my initial benchmark valuation "begins by assigning zero benchmark value to large number of Abuse Claims based on … statute of limitations laws." Counsel has asked me to provide a version of the aggregate benchmark value that illustrates the potential impact of including such claims.

(3)  Figure 1 provides a replication of Figure 22 from my Affirmative Report after replacing the benchmark Abuse Claim value for penetration claims involving once-identified abusers ("Single Survivor Cases") with the $212,500 value from my Rebuttal Report and then reflecting the 20% reduction due to Minus Factor 1.[6] This results in the benchmark value for penetration claims involving one time abuser of $170,000 = 80% × $212,500 and the benchmark value for penetration claims involving repeat abuser of $780,000 = 80% × $975,000.[7] Making these adjustments results in an aggregate value of $2.5 billion.

---

[2]  Affirmative Report, Figure 22.

[3]  Affirmative Report, ¶ 66.

[4]  Rebuttal Report, Figure 1.

[5]  As described in the Rebuttal Report, this average excludes the settlement of a former local council employee.

[6]  Capitalized terms not otherwise defined have the meaning as defined either in my prior Affirmative Report or Rebuttal Report.

[7]  In the initial aggregate benchmark value provided in my Affirmative Report, the value for repeat abuser claims was set

Supplemental Expert Report of Charles E. Bates, PhD

**Figure 1: Summary of benchmark valuation using value of $212,500 for penetration claims involving one time abuser from my Rebuttal Report and 20% reduction for age of Abuse Claims**

| Benchmark category and factor benchmark scalar | Category benchmark scalar calculation | [A] Count of POC | [B] Benchmark Abuse Claim value | [C] = [A] x [B] Aggregate benchmark value |
|---|---|---|---|---|
| **Penetration 100%** | | **5,645** | **$235,470** | **$1,329,227,500** |
| Once-identified abuser | | | | |
| No other relationship 100% | 100% = 100% x 100% | 2,458 | $170,000 | $417,860,000 |
| One other relationship 50% | 50% = 100% x 50% | 1,494 | $85,000 | $126,990,000 |
| 2 or more relationships 25% | 25% = 100% x 25% | 337 | $42,500 | $14,322,500 |
| Repeat abuser | | | | |
| No other relationship 100% | 100% = 100% x 100% | 688 | $780,000 | $536,640,000 |
| One other relationship 50% | 50% = 100% x 50% | 529 | $390,000 | $206,310,000 |
| 2 or more relationships 25% | 25% = 100% x 25% | 139 | $195,000 | $27,105,000 |
| | | | | |
| **Other sex acts 54%** | | **6,847** | **$136,628** | **$935,491,950** |
| Once-identified abuser | | | | |
| No other relationship 100% | 54% = 54% x 100% | 3,241 | $91,800 | $297,523,800 |
| One other relationship 50% | 27% = 54% x 50% | 1,628 | $45,900 | $74,725,200 |
| 2 or more relationships 25% | 13.5% = 54% x 25% | 275 | $22,950 | $6,311,250 |
| Repeat abuser | | | | |
| No other relationship 100% | 54% = 54% x 100% | 997 | $421,200 | $419,936,400 |
| One other relationship 50% | 27% = 54% x 50% | 595 | $210,600 | $125,307,000 |
| 2 or more relationships 25% | 13.5% = 54% x 25% | 111 | $105,300 | $11,688,300 |
| | | | | |
| **Groping/Touching 27%** | | **3,621** | **$66,492** | **$240,767,100** |
| Once-identified abuser | | | | |
| No other relationship 100% | 27% = 27% x 100% | 2,006 | $45,900 | $92,075,400 |
| One other relationship 50% | 13.5% = 27% x 50% | 749 | $22,950 | $17,189,550 |
| 2 or more relationships 25% | 6.75% = 27% x 25% | 104 | $11,475 | $1,193,400 |
| Repeat abuser | | | | |
| No other relationship 100% | 27% = 27% x 100% | 493 | $210,600 | $103,825,800 |
| One other relationship 50% | 13.5% = 27% x 50% | 234 | $105,300 | $24,640,200 |
| 2 or more relationships 25% | 6.75% = 27% x 25% | 35 | $52,650 | $1,842,750 |
| **Total** | | **16,113** | **$155,495** | **$2,505,486,550** |

(4)    The updated average value from my Rebuttal Report of the Single Survivor Cases (those involving only once-identified abusers) brings further clarity to the selection bias of using the same average without distinguishing between repeat and one-time abusers. To illustrate the importance of

---

at $975,000, 150% the value of Single Survivor Cases. For purposes of my calculations here I leave the benchmark Abuse Claim value for repeat abuser cases unchanged at $975,000, corresponding to the value obtained by virtue of the reclassification of repeat abuser and Single Survivor Cases in my Rebuttal Report. This is in contrast to the example provided in ¶ 66 of my Affirmative Report where I calculate the aggregate benchmark value of $2.2 billion by reducing the single abuser benchmark value to $250,000 and maintaining the repeat abuser factor benchmark scalar at 150%.

Supplemental Expert Report of Charles E. Bates, PhD

distinguishing between Single Survivor Cases and repeat abusers for valuing the Abuse Claims, I created Figure 2 from the historical settlements for penetration claims of the last five years prior to the petition date. It shows the percentage of resolutions divided into four value categories.[8] It illustrates the extreme bimodal distribution of the resolution amounts. Very few claims are valued at middle of the value distribution—values are either high, reflective of a high responsibility share for the BSA, or much lower, reflective of a small BSA responsibility share for the harm done to the survivor by an abuser (and relatively little responsibility imparted onto BSA and BSA-related parties). With all but a single exception, which involves an employee of a Local Council where the BSA-related parties are more likely to face a more significant responsibility share,[9] the Single Survivor resolutions are in the lowest value category of Figure 2. The median of penetration abuse resolution amounts reported in my Affirmative Report falls in the lowest value category, whereas the mean falls in the highest category.[10] Given the large difference in percentage of Single Survivor Cases  in the Abuse Claims and the historical settlements, for valuation purposes it is essential to recognize the impact that this kind of selection and not just apply the same average derived from the historical data to both types of Abuse Claims. Because the Abuse Claims contain far more Single Survivor Cases than the historical settlements, it is not appropriate to simply apply the average value of all historical settlements to value the Abuse Claims.

---

[8]    A version of this figure that divides resolutions into six value categories is included in Appendix A.

[9]    *See* my Rebuttal Report, ¶ 15.

[10]    The median reported in Figure 20 of my Affirmative Report is $250,000; the mean is $1,053,322.

Supplemental Expert Report of Charles E. Bates, PhD

**Figure 2: Bimodal distribution of historical resolutions for penetration claims**



(5)    In the calculations presented here I also account for the potential positive value associated with Abuse Claims presumptively barred based on statute of limitations by reproducing a version of Figure 1 above for each set of claims in the various statute-of-limitations tiers set forth in by Schedule 1 to the Trust Distribution Procedures (Docket 6443, p. 163). Figure 3 through Figure 6 show, for each statute-of-limitations category, the count of claims and the corresponding aggregate amount based on scaling the relevant benchmark Abuse Claim value by the midpoint of the statute-of-limitations discount range specified in the Trust Distribution Procedure Schedule.

(6)    Figure 3 shows the amount for claims in Grey 1 states on the basis of applying a 60% discount factor to the benchmark figures above. This results in the benchmark value for penetration claims involving one time abuser of $102,000 = 60% × 80% × $212,500 and the benchmark value for penetration claims involving repeat abuser of $468,000 = 60% × 80% × $975,000.

Supplemental Expert Report of Charles E. Bates, PhD

**Figure 3: Summary of aggregate amount using $212,500 value for penetration claims involving one time abuser and 20% reduction for age of Abuse Claims—Grey 1 states (60% discount factor)**

| Category and factor scalar | Category scalar calculation | [D] Count of POC | [E] Abuse Claim average | [F] = [D] x [E] Aggregate amount |
|---|---|---|---|---|
| **Penetration 100%** | | **2,272** | **$140,668** | **$319,597,500** |
| **Once-identified abuser** | | | | |
| No other relationship 100% | 60% = 100% x 100% x 60% | 980 | $102,000 | $99,960,000 |
| One other relationship 50% | 30% = 100% x 50% x 60% | 619 | $51,000 | $31,569,000 |
| 2 or more relationships 25% | 15% = 100% x 25% x 60% | 135 | $25,500 | $3,442,500 |
| **Repeat abuser** | | | | |
| No other relationship 100% | 60% = 100% x 100% x 60% | 283 | $468,000 | $132,444,000 |
| One other relationship 50% | 30% = 100% x 50% x 60% | 191 | $234,000 | $44,694,000 |
| 2 or more relationships 25% | 15% = 100% x 25% x 60% | 64 | $117,000 | $7,488,000 |
| | | | | |
| **Other sex acts 54%** | | **2,956** | **$84,310** | **$249,221,610** |
| **Once-identified abuser** | | | | |
| No other relationship 100% | 32.4% = 54% x 100% x 60% | 1,426 | $55,080 | $78,544,080 |
| One other relationship 50% | 16.2% = 54% x 50% x 60% | 660 | $27,540 | $18,176,400 |
| 2 or more relationships 25% | 8.1% = 54% x 25% x 60% | 109 | $13,770 | $1,500,930 |
| **Repeat abuser** | | | | |
| No other relationship 100% | 32.4% = 54% x 100% x 60% | 457 | $252,720 | $115,493,040 |
| One other relationship 50% | 16.2% = 54% x 50% x 60% | 258 | $126,360 | $32,600,880 |
| 2 or more relationships 25% | 8.1% = 54% x 25% x 60% | 46 | $63,180 | $2,906,280 |
| | | | | |
| **Groping/Touching 27%** | | **1,488** | **$41,006** | **$61,016,895** |
| **Once-identified abuser** | | | | |
| No other relationship 100% | 16.2% = 27% x 100% x 60% | 816 | $27,540 | $22,472,640 |
| One other relationship 50% | 8.1% = 27% x 50% x 60% | 298 | $13,770 | $4,103,460 |
| 2 or more relationships 25% | 4.05% = 27% x 25% x 60% | 47 | $6,885 | $323,595 |
| **Repeat abuser** | | | | |
| No other relationship 100% | 16.2% = 27% x 100% x 60% | 221 | $126,360 | $27,925,560 |
| One other relationship 50% | 8.1% = 27% x 50% x 60% | 90 | $63,180 | $5,686,200 |
| 2 or more relationships 25% | 4.05% = 27% x 25% x 60% | 16 | $31,590 | $505,440 |
| **Total** | | **6,716** | **$93,781** | **$629,836,005** |

(7)    Figure 4 shows the amount for claims in Grey 2 states on the basis of applying a 37.5% discount factor to the benchmark figures above. This results in the benchmark value for penetration claims involving one time abuser of $63,750 = 37.5% × 80% × $212,500 and the benchmark value for penetration claims involving repeat abuser of $292,500 = 37.5% × 80% × $975,000.

**Figure 4: Summary of aggregate amount using $212,500 value for penetration claims involving one time abuser and 20% reduction for age of Abuse Claims—Grey 2 states (37.5% discount factor)**

| Category and factor scalar | Category scalar calculation | [G] Count of POC | [H] Abuse Claim average | [I] = [G] x [H] Aggregate amount |
|---|---|---|---|---|
| **Penetration 100%** | | **1,984** | **$84,423** | **$167,494,688** |
| Once-identified abuser | | | | |
| No other relationship 100% | 37.5% = 100% x 100% x 37.5% | 914 | $63,750 | $58,267,500 |
| One other relationship 50% | 18.75% = 100% x 50% x 37.5% | 533 | $31,875 | $16,989,375 |
| 2 or more relationships 25% | 9.375% = 100% x 25% x 37.5% | 121 | $15,938 | $1,928,438 |
| Repeat abuser | | | | |
| No other relationship 100% | 37.5% = 100% x 100% x 37.5% | 222 | $292,500 | $64,935,000 |
| One other relationship 50% | 18.75% = 100% x 50% x 37.5% | 153 | $146,250 | $22,376,250 |
| 2 or more relationships 25% | 9.375% = 100% x 25% x 37.5% | 41 | $73,125 | $2,998,125 |
| | | | | |
| **Other sex acts 54%** | | **2,749** | **$51,070** | **$140,390,213** |
| Once-identified abuser | | | | |
| No other relationship 100% | 20.25% = 54% x 100% x 37.5% | 1,353 | $34,425 | $46,577,025 |
| One other relationship 50% | 10.125% = 54% x 50% x 37.5% | 643 | $17,213 | $11,067,638 |
| 2 or more relationships 25% | 5.0625% = 54% x 25% x 37.5% | 94 | $8,606 | $808,988 |
| Repeat abuser | | | | |
| No other relationship 100% | 20.25% = 54% x 100% x 37.5% | 399 | $157,950 | $63,022,050 |
| One other relationship 50% | 10.125% = 54% x 50% x 37.5% | 219 | $78,975 | $17,295,525 |
| 2 or more relationships 25% | 5.0625% = 54% x 25% x 37.5% | 41 | $39,488 | $1,618,988 |
| | | | | |
| **Groping/Touching 27%** | | **1,329** | **$25,441** | **$33,811,678** |
| Once-identified abuser | | | | |
| No other relationship 100% | 10.125% = 27% x 100% x 37.5% | 733 | $17,213 | $12,616,763 |
| One other relationship 50% | 5.0625% = 27% x 50% x 37.5% | 275 | $8,606 | $2,366,719 |
| 2 or more relationships 25% | 2.53125% = 27% x 25% x 37.5% | 35 | $4,303 | $150,609 |
| Repeat abuser | | | | |
| No other relationship 100% | 10.125% = 27% x 100% x 37.5% | 194 | $78,975 | $15,321,150 |
| One other relationship 50% | 5.0625% = 27% x 50% x 37.5% | 78 | $39,488 | $3,080,025 |
| 2 or more relationships 25% | 2.53125% = 27% x 25% x 37.5% | 14 | $19,744 | $276,413 |
| **Total** | | **6,062** | **$56,367** | **$341,696,578** |

Supplemental Expert Report of Charles E. Bates, PhD

(8)    Figure 5 shows the value for claims in Grey 3 states on the basis of applying a 17.5% discount factor to the benchmark figures above. This results in the benchmark value for penetration claims involving one time abuser of $29,750 = 17.5% × 80% × $212,500 and the benchmark value for penetration claims involving repeat abuser of $136,500 = 17.5% × 80% × $975,000.

**Figure 5: Summary of aggregate amount using $212,500 value for penetration claims involving one time abuser and 20% reduction for age of Abuse Claims—Grey 3 states (17.5% discount factor)**

| Category and factor scalar | Category scalar calculation | [J] Count of POC | [K] Abuse Claim average | [L] = [J] x [K] Aggregate amount |
|---|---|---|---|---|
| **Penetration 100%** | | **4,352** | **$39,563** | **$172,179,438** |
| Once-identified abuser | | | | |
| No other relationship 100% | 17.5% = 100% x 100% x 17.5% | 1,959 | $29,750 | $58,280,250 |
| One other relationship 50% | 8.75% = 100% x 50% x 17.5% | 1,139 | $14,875 | $16,942,625 |
| 2 or more relationships 25% | 4.375% = 100% x 25% x 17.5% | 313 | $7,438 | $2,327,938 |
| Repeat abuser | | | | |
| No other relationship 100% | 17.5% = 100% x 100% x 17.5% | 494 | $136,500 | $67,431,000 |
| One other relationship 50% | 8.75% = 100% x 50% x 17.5% | 350 | $68,250 | $23,887,500 |
| 2 or more relationships 25% | 4.375% = 100% x 25% x 17.5% | 97 | $34,125 | $3,310,125 |
| | | | | |
| **Other sex acts 54%** | | **5,332** | **$23,537** | **$125,500,253** |
| Once-identified abuser | | | | |
| No other relationship 100% | 9.45% = 54% x 100% x 17.5% | 2,602 | $16,065 | $41,801,130 |
| One other relationship 50% | 4.725% = 54% x 50% x 17.5% | 1,292 | $8,033 | $10,377,990 |
| 2 or more relationships 25% | 2.3625% = 54% x 25% x 17.5% | 206 | $4,016 | $827,348 |
| Repeat abuser | | | | |
| No other relationship 100% | 9.45% = 54% x 100% x 17.5% | 769 | $73,710 | $56,682,990 |
| One other relationship 50% | 4.725% = 54% x 50% x 17.5% | 395 | $36,855 | $14,557,725 |
| 2 or more relationships 25% | 2.3625% = 54% x 25% x 17.5% | 68 | $18,428 | $1,253,070 |
| | | | | |
| **Groping/Touching 27%** | | **2,825** | **$11,129** | **$31,438,024** |
| Once-identified abuser | | | | |
| No other relationship 100% | 4.725% = 27% x 100% x 17.5% | 1,505 | $8,033 | $12,088,913 |
| One other relationship 50% | 2.3625% = 27% x 50% x 17.5% | 678 | $4,016 | $2,723,018 |
| 2 or more relationships 25% | 1.18125% = 27% x 25% x 17.5% | 94 | $2,008 | $188,764 |
| Repeat abuser | | | | |
| No other relationship 100% | 4.725% = 27% x 100% x 17.5% | 361 | $36,855 | $13,304,655 |
| One other relationship 50% | 2.3625% = 27% x 50% x 17.5% | 153 | $18,428 | $2,819,408 |
| 2 or more relationships 25% | 1.18125% = 27% x 25% x 17.5% | 34 | $9,214 | $313,268 |
| **Total** | | **12,509** | **$26,310** | **$329,117,714** |

Supplemental Expert Report of Charles E. Bates, PhD

(9)    Figure 6 shows the amount for claims in Closed states on the basis of applying a 5.5% discount factor to the benchmark figures above. This results in the benchmark value for penetration claims involving one time abuser of $9,350 = 5.5% × 80% × $212,500 and the benchmark value for penetration claims involving repeat abuser of $42,900 = 5.5% × 80% × $975,000.

**Figure 6: Summary of aggregate amount using $212,500 value for penetration claims involving one time abuser and 20% reduction for age of Abuse Claims—Closed states (5.5% discount factor)**

| Category and factor scalar | Category scalar calculation | [M] Count of POC | [N] Abuse Claim average | [O] = [M] x [N] Aggregate amount |
|---|---|---|---|---|
| **Penetration 100%** | | **1,511** | **$11,707** | **$17,688,688** |
| Once-identified abuser | | | | |
| No other relationship 100% | 5.5% = 100% x 100% x 5.5% | 618 | $9,350 | $5,778,300 |
| One other relationship 50% | 2.75% = 100% x 50% x 5.5% | 442 | $4,675 | $2,066,350 |
| 2 or more relationships 25% | 1.375% = 100% x 25% x 5.5% | 137 | $2,338 | $320,238 |
| Repeat abuser | | | | |
| No other relationship 100% | 5.5% = 100% x 100% x 5.5% | 148 | $42,900 | $6,349,200 |
| One other relationship 50% | 2.75% = 100% x 50% x 5.5% | 130 | $21,450 | $2,788,500 |
| 2 or more relationships 25% | 1.375% = 100% x 25% x 5.5% | 36 | $10,725 | $386,100 |
| | | | | |
| **Other sex acts 54%** | | **1,838** | **$6,796** | **$12,490,187** |
| Once-identified abuser | | | | |
| No other relationship 100% | 2.97% = 54% x 100% x 5.5% | 836 | $5,049 | $4,220,964 |
| One other relationship 50% | 1.485% = 54% x 50% x 5.5% | 494 | $2,525 | $1,247,103 |
| 2 or more relationships 25% | 0.7425% = 54% x 25% x 5.5% | 94 | $1,262 | $118,652 |
| Repeat abuser | | | | |
| No other relationship 100% | 2.97% = 54% x 100% x 5.5% | 206 | $23,166 | $4,772,196 |
| One other relationship 50% | 1.485% = 54% x 50% x 5.5% | 160 | $11,583 | $1,853,280 |
| 2 or more relationships 25% | 0.7425% = 54% x 25% x 5.5% | 48 | $5,792 | $277,992 |
| | | | | |
| **Groping/Touching 27%** | | **1,017** | **$3,363** | **$3,420,104** |
| Once-identified abuser | | | | |
| No other relationship 100% | 1.485% = 27% x 100% x 5.5% | 553 | $2,525 | $1,396,049 |
| One other relationship 50% | 0.7425% = 27% x 50% x 5.5% | 222 | $1,262 | $280,220 |
| 2 or more relationships 25% | 0.37125% = 27% x 25% x 5.5% | 56 | $631 | $35,343 |
| Repeat abuser | | | | |
| No other relationship 100% | 1.485% = 27% x 100% x 5.5% | 116 | $11,583 | $1,343,628 |
| One other relationship 50% | 0.7425% = 27% x 50% x 5.5% | 56 | $5,792 | $324,324 |
| 2 or more relationships 25% | 0.37125% = 27% x 25% x 5.5% | 14 | $2,896 | $40,541 |
| **Total** | | **4,366** | **$7,696** | **$33,598,978** |

Supplemental Expert Report of Charles E. Bates, PhD

(10)    Figure 7 combines the results from the figures above and reports an aggregate amount for all claims, including those presumptively barred due to statute of limitations.

**Figure 7: Summary of aggregate amount using $212,500 value for penetration claims involving one time abuser and 20% reduction for age of Abuse Claims—all claims regardless of statue-of-limitations status**

| Category and factor scalar | Category scalar calculation | [P] = [A]+[D]+[G] +[J]+[M] Count of POC | [Q]=[R]/[P] Abuse Claim average | [R] = [C]+[F]+[I]+[L]+[O] Aggregate amount |
|---|---|---|---|---|
| **Penetration 100%** | | **15,764** | **$127,264** | **$2,006,187,813** |
| **Once-identified abuser** | | | | |
| No other relationship 100% | | 6,929 | $92,386 | $640,146,050 |
| One other relationship 50% | | 4,227 | $46,027 | $194,557,350 |
| 2 or more relationships 25% | | 1,043 | $21,421 | $22,341,613 |
| **Repeat abuser** | | | | |
| No other relationship 100% | | 1,835 | $440,218 | $807,799,200 |
| One other relationship 50% | | 1,353 | $221,771 | $300,056,250 |
| 2 or more relationships 25% | | 377 | $109,516 | $41,287,350 |
| | | | | |
| **Other sex acts 54%** | | **19,722** | **$74,186** | **$1,463,094,212** |
| **Once-identified abuser** | | | | |
| No other relationship 100% | | 9,458 | $49,552 | $468,666,999 |
| One other relationship 50% | | 4,717 | $24,506 | $115,594,331 |
| 2 or more relationships 25% | | 778 | $12,297 | $9,567,167 |
| **Repeat abuser** | | | | |
| No other relationship 100% | | 2,828 | $233,347 | $659,906,676 |
| One other relationship 50% | | 1,627 | $117,772 | $191,614,410 |
| 2 or more relationships 25% | | 314 | $56,512 | $17,744,630 |
| | | | | |
| **Groping/Touching 27%** | | **10,280** | **$36,036** | **$370,453,800** |
| **Once-identified abuser** | | | | |
| No other relationship 100% | | 5,613 | $25,058 | $140,649,764 |
| One other relationship 50% | | 2,222 | $12,000 | $26,662,966 |
| 2 or more relationships 25% | | 336 | $5,630 | $1,891,711 |
| **Repeat abuser** | | | | |
| No other relationship 100% | | 1,385 | $116,766 | $161,720,793 |
| One other relationship 50% | | 611 | $59,820 | $36,550,157 |
| 2 or more relationships 25% | | 113 | $26,358 | $2,978,411 |
| **Total** | | **45,766** | **$83,899** | **$3,839,735,824** |

(11)    The calculations provided here reflect one way to account for the impact of two of the plus and minus factors detailed in my Affirmative Report. In particular, these calculations provide a quantification of the potential impact of explicitly accounting for both Plus Factor 1—some claims subject to statutes

Supplemental Expert Report of Charles E. Bates, PhD

of limitations may have some value—and Minus Factor 1—the difference in average claimant age across the historical resolution and the POC data.

(12)     One of the things these tables show is the offsetting nature of some of the plus and minus factors. These tables provide a demonstration of how the net impact of factors will determine the ultimate outcome. On its own, accounting for Plus Factor 1 on the basis of the TDP schedule, as is done here, raises the value above the initial benchmark. Accounting just for the higher age and recently identified lower value of the once-identified abuser claims within the historical resolutions reduces the value below the initial benchmark. No one plus or minus factor should be applied in isolation without consideration of the other plus and minus factors. After application of these two factors, there remain additional plus factors that if considered only in isolation of the minus factors, which would be improper, could indicate a value for the Abuse Claims well above the $3.8 billion total presented at the bottom of Figure 7. Most significantly is Plus Factor 2 of my Affirmative Report, the plus factor that accounts for the fact that many of the Abuse Claims which have not identified their abusers may do so as part of any claim to the BSA Trust. As explained in my Affirmative Report, that over 30,000 claims have not provided the name of their abuser in their POC submission means the potential for Plus Factor 2 to indicate a higher value is large.

(13)     There also remain minus factors that, if considered only isolation of the plus factors, which would also be improper, could indicate a value for the Abuse Claims well below the $3.8 billion total presented at the bottom of Figure 7. Most notably, Minus Factor 4 of my Affirmative Report and Minus Factor 5 of my Rebuttal Report have large potential to indicate a lower Abuse Claim value. As discussed in my Reports, the resolved historical sexual abuse claims against the BSA are a highly selected group with likely higher value than the Abuse Claims generally.

(14)     I continue to believe that the value of the Abuse Claims remains uncertain and is best reflected by an estimation range. Any final valuation figure should reflect a consideration of the net impact of all the potential plus and minus factors. The calculations provided here, and my ongoing analysis, are consistent with my earlier analysis. The analysis here also confirms my opinion set forth in my Rebuttal Report that outcomes in the lower quartile of that range, from $2.4 billion to $3.6 billion, are more likely than the higher portion of the range.

Supplemental Expert Report of Charles E. Bates, PhD

## II. Additional potentially representative claim-specific valuation scenarios

(15)    Counsel to the Debtors has also asked me to produce certain additional claim-specific files consistent with an aggregate $3.6 billion valuation [11] that forms the top end of the lowest quartile of my original range. Specially, I was asked to produce five sets of claim-level values:

      a.    A file with claim-level amounts corresponding to Figure 1 and Figure 3 – Figure 6 above but rescaled to $3.6 billion;

      b.    Two files with exemplary TDP claim-level values: the first file underlying the TDP simulation in my Rebuttal Report and the second file with claim-level values rescaled to $3.0 billion prior to the application of the $3,500 expedited payment;

      c.    A file with exemplary claim-level values based on my initial aggregate benchmark value of $5.8 billion but rescaled to $3.6 billion; and

      d.    A file with exemplary claim-level values based on the Claro Report Scenario A Valuation of $24.8 billion but rescaled to $3.6 billion.

(16)    In my Rebuttal Report I noted that based on my ongoing work—and in particular based on additional information provided as part of the December 5, 2021, Expert Report of Katheryn R. McNally of the Claro Group LLC filed on behalf of the TCC (the "Claro Report") regarding the types of abuse cases that are successfully taken to verdict against institutional defendants—I now believe that the aggregate value of the Abuse Claims as of the Petition Date is most likely to fall in the lower quartile of my full estimation range. The analysis provided above reaffirms this. Meaning that the aggregate value of these claims against the BSA and other BSA-related parties is most likely between $2.4 billion and $3.6 billion. The files produced in conjunction with this report represent a rescaling of claim-level values that are already available to the experts in this matter consistent with an aggregate valuation of approximately $3.6 billion.

(17)    In response to counsel's request a.) above, I have reproduced here the TDP simulation from my Rebuttal Report. That TDP simulation results in Abuse Claims in the aggregate being paid $3.45 billion, of which $120 million is for 34,378 Abuse Claims assigned $3,500 that otherwise would be assigned zero value because they did not provide the information needed to value the claims under the TDP simulation. [12] An additional $28 million of the $3.45 billion is for payments to 12,266

---

[11]    In this report—as in my Affirmative Report and Rebuttal Report—"BSA" valuations refer to the BSA inclusive of other BSA-related parties such as the Local Councils and Chartered Organizations and all BSA-related entities. Bates White's work on this matter is ongoing. My work here is based on the information available to me as of the date of this report.

[12]    See Section II.B of my Rebuttal Report, with results summarized in Figure 9 and Figure 10. Supporting materials related to this analysis, including claim level detail, were already produced in conjunction with my Rebuttal Report.

Supplemental Expert Report of Charles E. Bates, PhD

Abuse Claims that otherwise would be valued at less than $3,500 under the TDP simulation to bring their simulated TDP payment up to $3,500. I have also produced a version of this file where the claim-level values have been rescaled to produce an aggregate valuation of $3.0 billion before applying the $3,500 expedited payment.

(18)    In response to counsel's request b.) above, I am providing a version of the Tranche VI initial aggregate benchmark value of $5.8 billion scaled to an aggregate value of $3.6 billion. As part of my Affirmative Report, I already produced copies of valuation scenarios consistent with the $5.8 billion initial aggregate benchmark value that had been rescaled down to $2.4 billion and up to $7.1 billion, which represented the lower and upper end of my valuation range. The file produced here simply represents another rescaling within that range.

(19)    In response to counsel's request c.) above, I am providing a version of the Claro Report Valuation Scenario A scaled to an aggregate value of $3.6 billion. The work behind this scenario is more complex. While the supporting files for Claro's Valuation Scenario A contain a claim-specific amount for each of 82,209 Abuse Claims, they do so on the basis of a slightly different version of the data than the complete Tranche VI data. The Claro Group provided an updated Valuation Scenario A in its rebuttal (Claro Rebuttal, p. 53). My review of the data used for the updated valuation revealed that it differs from the complete Tranche VI data I provided in conjunction with my Affirmative Report. The differences are not material, but they do mean that the claims across the two data sets do not always have the same information, including their identifying claim number.

(20)    In order to evaluate the analysis produced along with the Claro Report, I instructed my team to create a mapping of Claro's simplified deduplicated Tranche VI data to the actual Tranche VI data. Each unique record in the Claro Report is mapped to a unique record in the deduplicated Tranche VI data. This allows the Claro Valuation Scenario A to be tied to a claims data set that incorporates information across all POC submissions for each timely Abuse Claim.

(21)    This report is based on data and information I considered as part of my Affirmative Report and Rebuttal Report. Supporting files for each of these five valuation scenarios are produced in conjunction with this report. My qualifications are summarized in my Affirmative Report and all the others disclosures contained in that report apply to my work here.

Supplemental Expert Report of Charles E. Bates, PhD

(22)    Bates White has read and agreed to abide by the Stipulated Confidential and Protective Order issued by this Court on June 8, 2020 [Docket 799; related Docket 613]. Much of the information on which this report is based, as well as my prior Affirmative Report and Rebuttal Report, is Confidential subject to the terms of the Stipulated Confidential and Protective Order.


_____          January 25, 2022
Charles E. Bates                                         _____
                                                                    Date

Supplemental Expert Report of Charles E. Bates, PhD

# Appendix A. Additional figures

**Figure 8: Bimodal distribution of historical resolutions for penetration claims (six value categories)**

