# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:*<br><br>BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC,[1]<br><br>　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>Objection Deadline: February 9, 2022[2]<br>Hearing Date: February 22, 2022 at 10:00 a.m. (ET)<br><br>**RE: Docket No. 7832** |

**LIMITED OBJECTION OF THE TORT CLAIMANTS' COMMITTEE TO
FINDINGS RELATED TO THE VALUATION OF ABUSE CLAIMS
IN CONNECTION WITH CONFIRMATION OF SECOND MODIFIED
FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR
<u>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC</u>**

The official committee of survivors of childhood sexual abuse (the "<u>Tort Claimants' Committee</u>") hereby files this limited objection (the "<u>Limited Objection</u>") for the purpose of requesting that the Court refrain from making findings with respect to the aggregate value of the claims (the "<u>Abuse Claims</u>") of sexual abuse survivors in these cases (the "<u>Survivors</u>") in connection with confirmation of the *Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* and *Amended Plan*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] By agreement with the Debtors, the Tort Claimants' Committee was provided with an extension until February 9, 2022, to file its objection to confirmation of the Plan.

*Supplement* [Docket No. 7832] (the "Plan")[3] proposed by the Boy Scouts of America (the "BSA") and its affiliate Delaware BSA, LLC (together with the BSA, the "Debtors"). In support of this Limited Objection, the Tort Claimants' Committee respectfully represents as follows:

## I.

## PRELIMINARY STATEMENT

1.  The Tort Claimants' Committee has reached a global settlement with the Debtors, the Future Claims Representative (the "FCR"), and the Coalition with respect to, among other things, the treatment of Survivors under the Plan, the Trust and the Trust Distribution Procedures (the "TDP"). Pursuant to that settlement, the Tort Claimants' Committee supports confirmation of the Plan, subject to the incorporation of the global settlement in and confirmation of the Plan as modified by the settlement.

2.  The Trust that will be formed under the terms of the Plan currently provides for in excess of $2.5 billon to compensate Survivors under the terms of the Trust and the TDP. Moreover, there is substantial additional insurance – in particular, excess insurance – that the Trust will seek to recover post-confirmation to further compensate Survivors. Confirmation of these extraordinary and unique cases will mean, therefore, that there is a path forward to maximize Survivor recoveries. There is no alternative to confirmation of the Plan that provides this possibility.

3.  The Tort Claimants' Committee files this Limited Objection for the sole purpose of requesting that the Court refrain from making any findings that Survivors will be paid in full,

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Plan.

DOCS_LA:342174.7 85353/002

or substantially in full, under the Plan, based on the valuation opinions offered by Dr. Charles E. Bates of Bates White, LLP (the "Bates White Valuation") or otherwise.

4.      Pursuant to the global settlement, the Debtors will not seek such a finding, nor will the FCR or the Coalition, and such a finding is not required in order for this Court to confirm the Plan.  Indeed, a valuation of the Abuse Claims at this juncture is both unnecessary and premature as these claims will be valued, post-confirmation, pursuant to the terms of the Trust and TDP.  Notwithstanding, certain insurers are expected to argue that, based on the Bates White Valuation, Survivors have been paid in full and, therefore, they have no right to any further insurance recovery, whether that recovery be from primary or excess policies.

5.      It is critical to Survivors, and the preservation of their rights and ability to be fairly compensated under the Plan, Trust, and TDP, that the Court refrain from making findings as to the aggregate value of the Abuse Claims in connection with confirmation of the Plan that could be used as a sword by the insurers to assert that the Trust and Survivors are not entitled to insurance recoveries to which they would otherwise be entitled.

## II.

### THE BATES WHITE VALUATION OF THE ABUSE CLAIMS IS UNRELIABLE AND INCONSISITENT WITH THE TDP AND THE BSA'S HISTORICAL SETTLEMENT VALUES

6.      Prior to the global Plan settlement being reached, the Debtors presented an aggregate valuation of the Abuse Claims in these cases based on the Bates White Valuation for the purpose of satisfying one of the several factors of *In re Master Mortgage Inv. Fund*[4] – i.e.,

---

[4] 168 B.R. 930 (Bankr. W.D. Mo. 1994).

whether the Plan would pay all or substantially all of Survivors' claims – to support the granting of non-debtor releases under the Plan.

7. The Bates White Valuation, as set forth in the Disclosure Statement, was initially between $2.4 billion and $7.1 billion, but crept downward as a result of a series of new opinions issued by Dr. Bates following solicitation of the Plan and the prospect of a contested confirmation with the representatives of the Survivors, to what was most recently described as a "most likely" range of $2.4 billion to $3.6 billion. While the Debtors will not seek a finding based on the Bates White Valuation that Survivors' claims are paid in full, or substantially in full, it is anticipated that the insurers will attempt to use the Bates White Valuation range of $2.4 billion to $3.6 billion to argue that Survivors' claims are satisfied in full under the Plan such that they are not entitled to any additional recovery. This outcome would eviscerate the rights of the Trust and Survivors, and should not be allowed, especially in light of the fatal flaws in the Bates White Valuation.

8. In this regard, the Bates White Valuation suffers from numerous fundamental flaws rendering it inaccurate and unreliable, including for the following reasons:

9. *First*, Dr. Bates is an asbestos claim expert. He has no experience in valuing sexual abuse claims and is unqualified to opine as to the value such claims in these cases. The Bates White Valuation fails to consider the unique and particularized nature of sexual abuse claims that make these claims inherently different from other personal injury or mass tort claims.

10.     *Second*, Dr. Bates' valuation figures decreased over time. The downward progression and shifts in the Bates White Valuation leading up to confirmation of the Plan highlight the unreliability of Dr. Bates' conclusions:

   a. In the spring of 2021, Dr. Bates' initial benchmark valuation was $4.75 billion, with a range of $2.4 billion to $7.1 billion – which is the valuation range utilized by the Debtors in the Disclosure Statement.[5]

   b. On December 5, 2021, Dr. Bates issued an expert report, where his benchmark valuation was increased to $5.8 billion, with the valuation range remaining at $2.4 billion to $7.1 billion.[6]

   c. On January 5, 2022 (with an errata being issued on January 19, 2022), Dr. Bates provided a rebuttal report whereby he created hypothetical simulations (both arriving at values of just under $3.5 billion) to opine that his revised valuation range would "most likely" be in the lowest quartile of his initial range, from $2.4 billion to $3.6 billion.[7]

   d. Then, on January 25, 2022, Dr. Bates issued a supplemental report, providing both a $2.5 billion benchmark amount and a $3.8 billion amount, depending on the modifications he made to his scenarios.[8]

---

[5] Disclosure Statement at 90-91; Expert Report of Charles E. Bates, dated December 5, 2021 ("Bates White Initial Report") at 47, ¶¶ 105, 108.

[6] Bates White Initial Report at 30, Figure 22 & ¶ 66; p. 7, ¶ 17.

[7] Rebuttal Expert Report of Charles E. Bates, dated January 5, 2022 ("Bates White Rebuttal Report") at 3, ¶ 12; 26, Figure 6 (tort simulation); 40, Figure 9 (TDP simulation).

[8] Supplemental Expert Report of Charles E. Bates, dated January 25, 2022 ("Bates White Supplemental Report") at 1, ¶ 3 ($2.5 billion); at 9-10, ¶ 11, Figure 7 ($3.8 billion). The Bates White Supplemental Report was submitted over 7 weeks after the Court-approved expert report submission deadline of December 5, 2021 and nearly 3 weeks after the Court-approved rebuttal report submission deadline of January 5, 2022, and was not circulated until the

4

11.     *Third*, Dr. Bates himself describes the Bates White Valuation as a "thought experiment," and his new, revised low valuation range is based on hypothetical simulations that he admittedly "reversed engineered."[9]

12.     *Fourth*, the low valuation range and benchmark valuation of $5.8 billion is based on Dr. Bates assigning zero value to over 30,000 claims (over 2/3 of those that would have otherwise been valued) solely on the grounds they were presumptively barred by the statutes of limitation and he therefore did not consider then to be "viable tort claims"[10] – notwithstanding clear evidence (including evidence of the BSA's own prior practices[11] and Dr. Bates' own outside comparable cases[12]) that out-of-statute child sexual abuse claims are often resolved for significant amounts, and the treatment of such claims as having value under the TDP.[13]

13.     *Fifth*, in reaching his $5.8 billion benchmark valuation, Dr. Bates also inappropriately rejected the use of BSA historical settlement averages as a proper benchmark for future claim values, employed inconsistent methodology for placing benchmark claim values on allegation groupings, failed to adjust historical BSA settlements to account for inflation, and

---

evening of January 25th, just 2 days prior to Dr. Bates' January 28th deposition.  The late submission of the Bates White Supplemental Report was inappropriate.

[9] Bates White Initial Report at 47-48, ¶¶ 108 & 109 (describing his analysis to reach his valuation range as a thought experiment); Bates White Rebuttal Report, at 25, ¶¶ 63-64 (describing his tort simulation as reverse-engineered).

[10] Bates White Initial Report at 25, ¶ 55 & Figure 16.

[11] Griggs Testimony at 180:24 – 181:7; Historical BSA settlement information prepared by the BSA's national coordinating counsel, Ogletree Deakins.

[12] Bates White Initial Report at 22-23, ¶¶ 48-52.

[13] TDP, Article VIII, Section E.iii. at 19 (using scaling factors to value presumptively time-barred claims); Schedule 1 (setting forth the TDP scaling factors for statutes of limitations by state).

5

applied a duplicate discount to Abuse Claims that identified other relationships with an abuser, all of which methodological flaws resulted in a reduced aggregate valuation.[14]

14.     *Sixth*, Dr. Bates' latest "most likely" valuation range of $2.4 billion to $3.6 billion is based on a significantly downward adjusted average settlement value for penetration claims of $212,500 (compared to Dr. Bates' initially utilized average of $673,500 and the TDP's average of $600,000, which Dr. Bates helped to develop), which he arrived at by using a sample size of only four claims to extrapolate a value for approximately 35,000 claims.[15] This approach lacks a valid methodological basis and is unreliable.

15.     *Seventh*, Dr. Bates' latest low valuation range reflects a 90% discount to Abuse Claims grounded on his unsubstantiated hypothesis that the Debtors would only have a 10% or lower share of liability for the abuse described in the Abuse Claims (which, in part, is based on Dr. Bates' unsupported assumption that a 90% discount should be applied to all sexual abuse claims that named a single abuser, which would apply to most of the Abuse Claims filed in these cases),[16] and that no tort claim would be brought in the tort system unless it was valued above $200,000, or would result in payment of at least $80,000 to plaintiff's counsel.[17] These assumptions are without sufficient statistical or analytical support, rendering Dr. Bates' valuation opinion unreliable.

---

[14] Rebuttal to Expert Report of Charles E. Bates, Bates White, LLC by Katheryn R. McNally, The Claro Group, LLP, dated January 5, 2022, at 5.

[15] Bates White Supplemental Report at 1, ¶ 3; 5, Figure 1; 9, Figure 7.

[16] Bates White Rebuttal Report at 39-40, ¶¶ 96-98.

[17] Bates White Rebuttal Report at 10-11, ¶ 30.

16. *Lastly*, the Bates White Valuation is based on values that are inconsistent with, and significantly lower than, the values set forth in the TDP. The TDP values are themselves significantly lower than the BSA historical settlement averages. For example, the BSA settlement average for a penetration claim is over $1.2 million. The TDP ascribes a base matrix value of $600,000. Dr. Bates' latest valuation range is based on a value of $212,500 (which was lowered from his initial valuation figure of $673,500). The Bates White Valuation is inconsistent with and lower than both the TDP and the BSA's own settlement data, making it fatally flawed and unreliable.

### III.

### THE COURT NEED NOT DETERMINE THE VALUE OF ABUSE CLAIMS TO CONFIRM THE PLAN

17. The Tort Claimants' Committee's valuation of the Abuse Claims is based on the opinions of Katheryn R. McNally of The Claro Group, LLC (the "Claro Valuation"). The Claro Valuation significantly exceeds the Bates White Valuation and is consistent with the BSA's historical settlement values.[18]

18. The Tort Claimants' Committee believes that the Claro Valuation provides a more methodologically sound analysis than the Bates White Valuation. However, it is not necessary for this Court to make a determination as to the value of the Abuse Claims, or which of the valuation experts is right and which is wrong, in connection with confirmation of the

---

[18] Expert Report of Katheryn R. McNally, The Claro Group, LLP, dated December 5, 2021, at 1, 31-32 (Tables 12-14); § II.E at 32-34.

Plan. Rather, such claims will be valued, following confirmation, pursuant to the terms of the Plan, the Trust and the TDP.

19. Ms. McNally will testify in connection with Plan confirmation that the TDP values are less than the BSA's historical settlement values, that, until the claims are valued in the TDP process, the Debtors' liability cannot be known with certainty, and that it is premature to make a determination as to the value of the Abuse Claims at this juncture.

20. The Debtors do not need to make a showing under the *Master Mortgage* factors that the Abuse Claims are paid in full, or substantially in full, to confirm the Plan. To the contrary, in light of the global Plan resolution, and the unique nature of these cases, so long as the Debtors meet the other requirements for confirmation, the Plan may be confirmed.

**IV.**

**A FINDING THAT ABUSE CLAIMS WOULD BE PAID IN FULL, OR SUBSTANTIALLY IN FULL, IN CONNECTION WITH CONFIRMATION OF THE PLAN IS NOT APPROPRIATE**

21. Pursuant to the Plan settlement, the amount of the Debtors' liability for the Abuse Claims will be liquidated and determined pursuant to the Plan, TDP and Trust Agreement. It is thus critical to the Survivors that the Court not make any findings in connection with confirmation of the Plan as to the value of the Abuse Claims that could be used by insurers or other parties to assert that the Trust and Survivors are not entitled to access insurance to which they would otherwise be entitled.

**V.**

**CONCLUSION**

22. For all of the foregoing reasons, the Tort Claimants' Committee respectfully requests that the Court refrain from making any findings that the Abuse Claims are paid in full, or substantially in full, in connection with confirmation of the Plan.

Dated: February 9, 2022     PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 90073) (admitted pro hac vice)
Alan J. Kornfeld (CA Bar No. 130063) (admitted pro hac vice)
Debra I. Grassgreen (CA Bar No. 169978) (admitted pro hac vice)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email:  rpachulski@pszjlaw.com
           akornfeld@pszjlaw.com
           dgrassgreen@pszjlaw.com
           joneill@pszjlaw.com

*Counsel for the Tort Claimants' Committee*