```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3                                     .    Chapter 11
     IN RE:                           .
                                      .    Case No. 20-10343 (LSS)
4    BOY SCOUTS OF AMERICA AND        .
     DELAWARE BSA, LLC,               .
5                                     .
                                      .    Courtroom No. 2
6                                     .    824 North Market Street
                                      .    Wilmington, Delaware 19801
7                                     .
                        Debtors.      .    Friday, February 11, 2022
8    . . . . . . . . . . . . . . . .       12:00 P.M.

9                    TRANSCRIPT OF STATUS CONFERENCE
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                    UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12
     For the Debtor:          Derek Abbott, Esquire
13                            MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                              1201 North Market Street, 16th Floor
14                            Wilmington, Delaware 19899

15                            - and -

16                            Jessica C. Lauria, Esquire
                              Glenn Kurtz, Esquire
17                            WHITE & CASE LLP
                              1221 Avenue of the Americas
18                            New York, New York 10020

19
20   Audio Operator:          Brandon J. McCarthy

21   Transcription Company:   Reliable
                              1007 N. Orange Street
22                            Wilmington, Delaware 19801
                              (302)654-8080
23                            Email:  gmatthews@reliable-co.com

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
25
```

APPEARANCES (Cont'd):

For Tort Claimants:          Richard Pachulski, Esquire
                             Alan Kornfeld, Esquire
                             PACHULSKI STANG ZIEHL & JONES LLP
                             10100 Santa Monica Blvd., 13th Floor
                             Los Angeles, California 90067

For the Roman Catholic       Jeremy Ryan, Esquire
Ad Hoc Committee:            POTTER ANDERSON & CORROON LLP
                             Hercules Plaza
                             1313 North Market Street, 6th Floor
                             P.O. Box 951
                             Wilmington, Delaware 19801

For the Ad Hoc               Richard Mason, Esquire
Committee of Local           WACHTELL, LIPTON, ROSEN & KATZ
Councils:                    51 West 52nd Street
                             New York, New York 10019

For the Coalition of         David Molton, Esquire
Abused Scouts for            BROWN RUDNICK LLP
Justice:                     7 Times Square
                             New York, New York 10036

For Numerous Firms and       Irwin Zalkin, Esquire
Claimants:                   THE ZALKIN LAW FIRM, P.C.
                             1441 Broadway, Suite 3147
                             New York, New York 10018

For Zalkin and Pfau          Thomas Patterson, Esquire
Cochran:                     KTBS LAW LLP
                             1801 Century Park East, 26th Floor
                             Los Angeles, California 90067

For Guam Abuse               Delia Lujan Wolff, Esquire
Survivors:                   LUJAN & WOLFF LLP
                             238 Archbishop FC Flores
                             Suite 300
                             Hagatna, Guam 96910

For AIG Companies:           James Hallowell, Esquire
                             Mitchell Karlan, Esquire
                             GIBSON DUNN & CRUTCHER LLP
                             200 Park Avenue
                             New York, New York 10166

1   <u>APPEARANCES (Cont'd)</u>:

2
    For the U.S. Trustee:      David Buchbinder, Esquire
3                              UNITED STATES DEPARTMENT OF JUSTICE
                               OFFICE OF THE UNITED STATES TRUSTEE
4                              844 King Street, Suite 2207
                               Lockbox 35
5                              Wilmington, Delaware 19801

6
    For the FCR:               Kami Quinn, Esquire
7                              GILBERT LLP
                               700 Pennsylvania Avenue, Suite 400
8                              Washington, DC 20003

9
    For Allianz Global         Ryan Smethurst, Esquire
10  Risks:                     MCDERMOTT WILL & EMERY LLP
                               The McDermott Building
11                             500 North Capital Street, NW
                               Washington, DC 20001
12
    For Jane Doe:              Mark Desgrosseiliers, Esquire
13                             CHIPMAN BROWN CICERO & COLE LLP
                               1313 North Market Street, Suite 5400
14                             Wilmington, Delaware 19801

15
    For Oracle America:        Amish Doshi, Esquire
16                             DOSHI LEGAL GROUP, P.C.
                               1979 Marcus Avenue, Suite 210E
17                             Lake Success, New York 11042

18  For Abuse Survivors:       Gilion Dumas, Esquire
                               DUMAS & VAUGHN, LLC
19                             3835 NE Hancock Street, Suite GL-B
                               Portland, Oregon 97212
20
    Appearing Pro Se:          Jason Turner
21

22

23

24

25

1          (Proceedings commence at 11:59 a.m.)

2          THE COURT:  Good morning, counsel.  This is Judge

3 Silverstein.  We're here in the Boy Scouts of America

4 bankruptcy case, 20-10343.

5          I will turn it over to Mr. Abbott.

6          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

7 of Morris Nichols here for the debtors.

8          Your Honor, I thought we would start with a quick

9 update.  There have been some significant developments since

10 we were last before the court.  So I will turn it over to Ms.

11 Lauria, if I may, Your Honor.

12          THE COURT:  Thank you.

13          Ms. Lauria.

14          MS. LAURIA:  Thank you, Your Honor.  Jessica

15 Lauria, White & Case, on behalf of the Boy Scouts of America.

16          Your Honor, as Mr. Abbott just previewed and as you

17 have undoubtedly seen on the docket, we have had some very

18 significant updates in the Chapter 11 case.

19          What I would propose to do, Your Honor, is too

20 briefly, or as briefly as I can, because I know there are a

21 lot of parties that want to be heard today, walk the court

22 through where we're at with respect to those updates.  I would

23 like the opportunity to propose to the court, because I think

24 it will inform the discussion as we go through today's status

25 conference, where the debtors are at with respect to the

1  timeline and adjustments that may need to be made, and then

2  hand off the podium.

3          I will note that Mr. Kurtz is present today in the

4  courtroom and Mr. Kurtz will be prepared to walk the court

5  through and the parties through the debtor's views of the

6  confirmation trial itself including a timeline for that,

7  introduction of evidence, et cetera.  If I may, Your Honor, I

8  would like to give you the update.

9          THE COURT:  Yes.

10          MS. LAURIA:  Thank you, Your Honor.

11          As the court may have seen and as the parties are

12  undoubtedly aware Wednesday night, just 36 hours ago, the

13  debtors filed the eleventh mediator's report; that is at

14  Docket No. 8772.  That mediator's report, Your Honor, and it's

15  not overstating it, was a monumental breakthrough in this

16  Chapter 11 case.  It is the result of, at least by my count,

17  15 days of in-person mediation over the course of the last

18  five or so weeks plus countless zoom hours devoted by all

19  parties that signed the settlement termsheet to reaching an

20  agreement.  Those were late nights for those of us on the East

21  Coast and early mornings for those of us on the West Coast,

22  and sometimes late nights and early mornings for all of us.

23  So it was a tremendous effort that was put into that

24  termsheet.

25          It represents an agreement between the debtors, the

1  coalition, the FCR, and the Ad Hoc Committee of Local Councils

2  with the tort claimants committee.  Mr. Patterson, on behalf

3  of Mr. Zalkin and Mr. Pfau, his clients, they are also a party

4  to that settlement termsheet, as well as numerous other state

5  court lawyers including Mr. Hurley and Mr. Smola you heard

6  from at the disclosure statement hearing.  Everyone worked

7  tremendously hard.  We thank everyone for their efforts.

8        I should also note, Your Honor, while it's not

9  apparent from the face of the termsheet, we would not have

10  reached that settlement without the assistance of our settling

11  insurance companies and, in particular, their legal advisors

12  who are with us every step of the way.  We really appreciate

13  their efforts as well as the efforts of the chartered

14  organizations, the settled chartered organizations, who were

15  just tremendously beneficial to the process.

16        That settlement, Your Honor, truly does achieve the

17  debtor's dual objective for this Chapter 11 case.  The

18  preservation of the mission of the Boy Scouts for future

19  generations as well as equitable compensation for survivors of

20  sexual abuse.

21        Now because many of the terms of the termsheet do

22  come into play when we think about next steps and the overall

23  schedule, and there are some complexities in the termsheet, I

24  am going to walk through a handful of the issues that were

25  resolved there.  This is just a summary, I know there's a lot

1   of folks on the zoom today that if I get this wrong they're

2   going to raise their hand and correct me.  I will appreciate

3   that.  I am not going to go through everything, Your Honor,

4   but I do think there are some very important points for me to

5   point out and for us to consider as we work through this

6   status conference.

7          First, Your Honor, as you may have seen if you had

8   the opportunity to review the termsheet, Exhibit D to the

9   termsheet includes a youth protection plan.  The Boy Scouts of

10  America are dedicated to building on their current youth

11  protection program with the goal of becoming (indiscernible)

12  really the platinum standard in youth protection.  We

13  developed a robust set of initiatives that are reflected in

14  that Exhibit D which were the result of extensive discussions,

15  extensive discussions that we rerunning alongside the

16  mediation and these were directed discussions between

17  survivors of sexual abuse, subject matter experts, the

18  management team at the Boy Scouts of America, as well as

19  volunteers at both the local and national level.

20         I do need to just pause and express our

21  appreciation for the engagement of what is called the survivor

22  working group.  This is a group of survivors that are

23  affiliated with the coalition.  We have been meeting with them

24  since November.  I also need to express our sincere thanks to

25  the TCC survivors who are very active in this effort including

1  the co-chairs of the TCC, Dr. Kennedy and Mr. Humphrey.  They

2  were just instrumental in these discussions and without them

3  we could not have reached the point where we're at on Exhibit

4  D.  So Exhibit D is extremely important to the organization

5  and to the survivors.

6          Let me turn to the legal issues because that,

7  frankly, is going to save the court and maybe the estates

8  millions of dollars in terms of briefing and trial time.

9          Legal issue one that was resolved through the

10  termsheet is the abuse claims definition.  We spent a lot of

11  time on that.  The changes don't reflect, frankly, the amount

12  of time. It's very similar to what was in the plan of

13  reorganization that's currently on file, but the court will

14  recall at the disclosure statement hearing Mr. Patterson, in

15  particular, and others raised issues with the scope of the

16  abuse claims definition and concerns about this court's

17  jurisdiction to enter a channeling order that channels overly

18  broad defined term for abuse claims.  We have now worked with

19  those objecting parties to ensure that the abuse claims

20  definition, and this was always our intention, that it truly

21  does relate to abuse related to scouting in particular.

22          We have also agreed to add a feature that was

23  originally in the Century termsheet and that is the definition

24  of mixed claims.  That mixed claims concept has been on the

25  table for some time, it had not been incorporated into the

1  plan specifically other than through the Century termsheet.

2  We have agreed to add that to the plan and this provides

3  further clarity on claims that may involve not only scouting

4  related abuse, but other related abuse to clarify that it's

5  the scouting related abuse that's getting channeled to the

6  trust in a mixed claim scenario.  That was important to the

7  parties.

8          The other critically important issue to the

9  creditor representatives, particularly the previously

10 objecting creditor representatives, was the treatment of

11 chartered organizations under the plan and in particular --

12 I'm not talking about TCJC or the Methodists which have

13 reached resolution for their own financial contribution, but

14 for other chartered organizations that have not yet reached

15 resolution on their financial contribution to the trust.

16         You will recall, Your Honor, that the December 18th

17 plan for the post 1976 time period provided for a channeling

18 injunction for the other chartered organizations and, in

19 addition, for the pre-1976 time period it provided a

20 channeling injunction for abuse claims for chartered

21 organizations to the extent that there was a settling insurer

22 that insured those claims.  For all other pre-1976 claims we

23 had a difference between the Catholic organizations, which

24 have exposure for pre-1976 uninsured or not insured by a

25 settling insurer abuse claim, and all other chartered orgs.

1          For all other chartered orgs the local councils

2    were providing a contribution that would, essentially, cover

3    the chartered orgs other than the Catholics for that period of

4    time. You would have seen many, many, many objections from the

5    objecting creditor representatives to that structure.  They

6    expressed to us very clearly that they felt that that

7    structure did not satisfy the legal requirements for third-

8    party releases in this jurisdiction and that it was

9    unacceptable to them.

10          We mediated with them and came to a resolution that

11   all chartered orgs other than the TCJC and the Methodists,

12   whether its Catholics or chartered orgs of another

13   demonization, or a civic organization, for that pre-1976 time

14   period for uninsured or not insured by a settling insurance

15   company the chartered organizations do need to reach their

16   agreement with the settlement trust in terms of a channeling

17   injunction covering those abuse claims.

18          That supplemental local council contribution that

19   was in the plan before it's still in the plan, but now that

20   supplemental local council contribution is being utilized to

21   provide the other chartered orgs with a 12 month injunction

22   post-plan effective date to give them the opportunity to reach

23   a resolution with the settlement trust.  That 12 months can be

24   extended pursuant to the conditions in the termsheet, but we

25   have given those parties the opportunity in the timeline and

1  the breathing room to reach that resolution.

2        Frankly, Your Honor, we don't know that this

3  effects all that many chartered orgs because I am talking

4  about a limited universe of claims; again, pre-1976.  So it

5  needed to be a chartered organization that actually was

6  involved with scouting pre-1976 and that has claim exposure

7  that's either uninsured by the Boy Scouts or not insured by

8  one of our settling insurers.  So it's not a huge universe,

9  but it is critically important to our creditor representatives

10  that they have the ability to negotiate and meet, frankly, the

11  Third Circuit standards with respect to those chartered

12  organizations.

13        Next, Your Honor, the termsheet -- moving onto the

14  TDP's and the trust itself.  The termsheet provides for a new

15  independent review process.  This independent review process,

16  which is detailed in the exhibits to the termsheet, we have

17  provided quite a bit of detail on that, will provide survivors

18  with the most severe claims the opportunity to have an

19  enhanced review of those claims and receive an enhanced

20  recovery in the circumstances where that is appropriate.

21        The creditor representatives, and I don't want to

22  steal their thunder, have spent significant time working

23  through trust governance issues.  They have reached agreement

24  on the members of the settlement trust advisory committee

25  that's embodied in the termsheet and they have also agreed to

1  announce the appointees for the settlement trustee.  It will

2  not be the prior appointee that was in the prior draft of the

3  plan (indiscernible).  They have agreed that they will

4  announce a new settlement trustee on Monday as well as the

5  claims administrator; that is Monday, February 14th.

6          There were a number of thorny issues on the

7  document sharing.  Those issues parties spent a lot of time on

8  that.  That is detailed in an exhibit to the termsheet.  This

9  was critically important particularly for counsel for the

10  survivors to ensure not only that the trust has appropriate

11  documentation, but also they have appropriate access to

12  discovery particularly those that do have the most severe

13  claims to prove-up their claims.

14          Your Honor, I will just briefly mention, because it

15  may tie-in to some of the remarks that Mr. Kurtz makes when we

16  turn to actually talking about the nuts and bolts of the

17  confirmation hearing itself, the term sheet does grapple with

18  the Bates White expert report and Bates White supplemental

19  report.  That is a very complicated issue candidly, but I will

20  try to be pretty simple about it.

21          The creditor representative do not agree with the

22  Bates White analysis.  The debtors don't agree with the

23  creditor representative's analysis, but we have all agreed to,

24  essentially, disagree on that.  We have agreed that the

25  debtors are not going to seek any binding determination of the

1  debtors aggregate abuse liability by the Bates White report or

2  otherwise, but we have all agreed to work together to

3  demonstrate that this plan satisfies the legal requirements

4  for third-party releases in the Third Circuit including that,

5  and I'm going to quote the termsheet because this language was

6  very important, we all worked really hard on it,

7           "The plan and the amended TDP are a mechanism

8  (which includes the agreed financial contributions and the

9  rights transferred to the trust to pursue non-settling

10 insurance companies and chartered organizations) that

11 collectively provides for payment of all or substantially all

12 of the abuse claims."

13          That is at page 10.  That is important and it

14 really does come into play as we think through our

15 confirmation trial.

16          Next, and just two more points, Your Honor, one

17 that is critically important to the Boy Scouts.  As you know,

18 and you've heard me say this for upwards of a year if not

19 more, the Boy Scouts have severe liquidity issues.  That is

20 due to the professional fees, candidly, of this case, the

21 length of the case, the COVID-19 pandemic, but, frankly, we're

22 running on fumes.

23          The plan has always provided that the proceeds from

24 the sale of the distribution center and scouting would be

25 contributed to the trust.  Due to the debtor's liquidity

1   situation the creditor representatives have agreed that the

2   debtors are able to use those proceeds if needed and in a

3   sharing concept to support the debtor's liquidity when they

4   emerge from bankruptcy.  That is a tremendous help to the

5   debtors.  It doesn't mean we can prolong this case.  It

6   actually means we can just get through this case.

7             Finally, Your Honor, and I've left out a number of

8   provisions, but it is on the docket and folks can review the

9   termsheet, this is all in exchange for the creditor

10  representatives accepting the BSA's contribution to the trust,

11  accept the local council contribution to the trust, accepting

12  the Hartford, Century, Zurich, Clarendon contributions, as

13  well as the contributions from the TCJC and the Methodists.

14            So as you can imagine, Your Honor, that does take

15  tremendous litigation issues off of the court's table and we

16  do believe that this is slated to save these bankruptcy

17  estates literally millions of dollars of trial expense.

18            Your Honor, that is the termsheet.  In light of all

19  that I wanted to put on the table what the debtor's proposal

20  is for moving forward unless there are any questions on the

21  termsheet itself.

22            THE COURT:  No, thank you. I appreciate the high-

23  level summary and pleased to say I picked up, I think, all of

24  those points, but, yes, let's move to your proposal.

25            MS. LAURIA:  Sure, Your Honor.  So what's

1 critically important here, from the debtor's perspective and

2 the creditors' representative perspective, and I don't mean to

3 speak for Mr. Pachulski or Mr. Molton, but we understand, and

4 it makes sense, that the TCC and the coalition, as well as

5 state court counsel want the ability to communicate with the

6 survivor community as a whole and discuss with their clients,

7 those clients that voted against the plan, or did not vote

8 with respect to the plan, give then the opportunity to cast a

9 ballot that accepts the plan.

10      As you know, we were scheduled to start our

11 confirmation hearing on February 22nd.  That would not provide

12 a lot of time for that communication both on an aggregate

13 level for what I understand are intended to be town hall

14 meetings or even on an individual level between state court

15 counsel and their respective clients.  We have to balance that

16 against, again, the debtor's liquidity position and the need

17 to get out of bankruptcy.

18      So what the debtors would propose is that we push

19 the start of the confirmation hearing back to March 1st.  I

20 understand, Your Honor, from, I think it was, a hearing last

21 week that you had already reserved days of that week.  We

22 would propose to push the confirmation hearing to start back

23 until March 1st with one exception, and Mr. Kurtz is going to

24 go over this.  I just don't want to leave this hanging, the

25 debtors have one critical witness who -- Mr. Bruce Griggs from

1  the Ogletree firm, that actually is lead lawyer in a trial

2  that starts on February 28th and he would be out-of-pocket

3  literally most of March.  So we would propose to, at least,

4  put him up prior to March 1st.  Again, Mr. Kurtz can go over

5  that.

6         Assuming a March 1st start date we would propose

7  the following dates, kind of, building up to that date.  This

8  Monday we would propose to file the plan, the trust

9  distribution procedures, and the settlement trust agreement. I

10 think all of the parties to the termsheet, while I think folks

11 are exhaustive, they've been working around the clock, they

12 have committed to continuing to work to get those documents

13 done and get them filed.  So we would file those documents on

14 Monday, February 14th.

15        Thursday, February 17th we would propose, as a

16 supplemental objection deadline, with respect to the

17 modifications to the plan.  There is one exception to that and

18 that is for those chartered organizations who now -- you know,

19 their releases are now being changed with respect to that --

20 excuse me, the pre-1976 time period.  This would be the non-

21 Catholics, non-Methodists, non-TCJC chartered orgs; those that

22 believed under the February 18th plan they were getting their

23 channeling injunction funded by the supplemental local council

24 contribution for that time period.  They no longer are -- we

25 would ask that they have a slightly longer date so that we

1  could actually notice them out.

2           February 17th would be the supplemental objection

3  deadline that we would propose.  Monday, February 21st, a

4  business day or so later the debtor and other supporting would

5  file briefs in support of the plan.  And then we would propose

6  February 28th as a deadline for the direct abuse claimants

7  that wish to now cast a ballot or that wish to change their

8  vote to get that into Omni no later than February 28th.

9           We would propose February 28th as the opportunity

10  for, again, these other chartered organizations to provide any

11  objection, and we hope they don't, but to that change in the

12  release.  To the extent chartered organizations, as a result

13  of the change in the release, now wish to be opt-out chartered

14  organizations we would propose setting February 28th for that

15  date and then, again, the very next day, March 1st, we would

16  propose as the start of the confirmation hearing.

17           I'm sure folks are going to have a lot to say about

18  everything I just said, Your Honor, but that is what we would

19  propose for purposes of the next step and the timeline.  As I

20  mentioned, Mr. Kurtz is prepared, at the appropriate time, to

21  walk through the actual confirmation trial and how we propose

22  to proceed.

23           THE COURT:  Thank you.

24           Mr. Mason.

25           MR. MASON:  Yes.  Thank you, Your Honor.

1          Can you hear me?

2          THE COURT:  I can.

3          MR. MASON:  Thank you.  Your Honor, for the record

4   Richard Mason of Wachtell, Lipton, Rosen & Katz for the Ad Hoc

5   Committee of Local Councils.

6          I just want to reinforce and support what Ms.

7   Lauria said.  The ad hoc committee was intensively involved in

8   the negotiation of the termsheet that was filed with the

9   mediator's report.  We were very, very pleased to execute it

10  and we believe that it represents an historic development in

11  these Chapter 11 cases for the benefit of scouting and

12  survivors.

13         Like all other mediation parties who were involved

14  in this stage we probably know every single square inch of Mr.

15  Gallagher's offices and all of his (indiscernible).  We owe

16  him a debt of gratitude for his tireless efforts in bringing

17  the parties together.  In particular, on behalf of the local

18  councils, the ad hoc committee, all of the youth, and the

19  staff, and the volunteers involved in our effort we want to

20  thank the tort claimants committee and its advisors and

21  associated state court counsel for their incredibly hard work

22  to get to a deal.  We had our disagreements with them during

23  this process, but they were always very professional and we

24  appreciate their round the clock efforts to come to this

25  resolution.

1          We agree with Ms. Lauria's schedule and look

2   forward to the start of the confirmation hearing in addressing

3   the remaining objections if we can't resolve them in the

4   meantime through further mediation.

5          Thank you, Your Honor.

6          THE COURT:   Thank you.

7          Ms. Quinn.

8          MS. QUINN:   Good afternoon, Your Honor.   Kami Quinn

9   from Gilbert on behalf of the FCR.

10          I just wanted to add to the chorus of thanks to our

11   mediation partners for working with us and working around the

12   clock to reach this deal.   I know it has been a long road and

13   we are all very pleased to be here.   We also just wanted to

14   note our support for the debtor's timeline.   We think it is

15   time to move forward and to get compensation to the survivors

16   as soon as we can.

17          There is just one other quick note that I want to

18   make.   It is a long and complicated deal, so I just wanted to,

19   sort of, make a slight modification to one of Ms. Lauria's

20   characterizations.   I think what the parties have agreed with

21   respect to the trustee is to engage in an interview process

22   and choose the best candidate for the job.   I think Ms. Lauria

23   said it would not be Mr. Green. I think Mr. Green may still be

24   a candidate for the job, but the parties have agreed to work

25   together to choose the best candidate.

1          THE COURT:  Thank you.

2          Mr. Pachulski.

3          MR. PACHULSKI:  Thank you so much, Your Honor.

4  Richard Pachulski of Pachulski Stang Ziehl & Jones on behalf

5  of the TCC.

6          Your Honor, Ms. Lauria is correct, this was a very

7  long and torturous process, but I think its been -- it will be

8  great for the case, frankly.  We spent, I think, nearly two

9  months trying to get to this position.

10          I do want to go through and explain, just for a

11  moment, how the TCC came on board because for those who had

12  listened to town halls there were three general issues that

13  the TCC felt were critical in making a determination that it

14  was satisfactory to go forward with a resolution.  So I just

15  want to summarize that and explain how we got there.  It was

16  not easy, there was a lot of dispute, but everyone worked

17  extremely hard, night and day, to get there.

18          The first leg of what we were looking for, Your

19  Honor, was a path to fair compensation.  As I believe I have

20  stated on a couple of calls there was a -- we did not believe

21  that some of the arrangements were necessarily in the best

22  interest of the survivors in terms of fair compensation, but

23  we came to the conclusion that those should stay in place.

24          With that said, Your Honor, there is still the --

25  there were still a number of charters and insurance companies

1  that had to be dealt with.  We felt that it was going to be

2  critical that the various claimant representatives had a say

3  in that which is very clear from the termsheet.  That was

4  going to be the best way that we could get maximum

5  compensation which is what we believe the survivors are

6  absolutely entitled to in this case.  So the claimant

7  representatives are involved both pre-effective date and,

8  obviously, post-effective date through the trust process.

9         The second part, Your Honor, was the trust itself.

10 The TCC has various concerns about some of the independence

11 issues that were raised.  We insisted that the trustee and the

12 claims administrators, frankly, be independent, that the

13 process be fairly pursued on behalf of the survivors and, in

14 fact, as Ms. Lauria stated, there is now a process of what we

15 call an enhanced review for those survivors who, frankly, have

16 what we refer to as high-value claims.  So it was critical

17 that that happen to in terms of getting a fair independent

18 trust process post-effective date.

19         The third, which Ms. Lauria stated, was critical

20 to, I think, everybody in the case, but it was only a

21 disagreement as how to get there, was on youth protection.

22 Mr. Kennedy, Mr. Humphrey spent enormous time trying to get a

23 fair result.  The Boy Scouts had certain perspectives as to

24 how transparency would work.  We had certain perspectives on

25 that.  And, frankly, after a lot of hard work and, frankly, an

1   issue I thought was going to be extremely difficult to

2   resolve, the parties came up with what we think is an

3   extremely fair youth protection process so that what happened

4   in the past will likely not happen in the future.

5           So those were the three major lags of what we were

6   looking for in the stool to get resolution and we believe that

7   the work of all the parties got us to that position.

8           Now the issue is the hard work, in some respect,

9   Your Honor, because the TCC feels very strongly, as the state

10  court counsel who represent members of the TCC, that we need

11  to change the votes and we need to get the information out

12  because the plan that was on file is very different then the

13  plan that's been enhanced through the negotiation process

14  particularly with respect to the three areas that I have now

15  stated on the record.

16          We believe that it will be a process that will be

17  hard to get all done by February 28th, but everybody on our

18  side is motivated to do it terms of town halls, in terms of

19  speaking to clients and instructing them why it's better.  We

20  suspect there will be some who will still continue with no

21  votes, but we are cautiously optimistic with the vast majority

22  of who we can get to because, again, with only two weeks left,

23  if that's what Your Honor orders, effectively, till February

24  28th will take a fair amount of time.

25          We are -- we were concerned about moving the date,

1  but in fairness to the objecting parties it has to be moved,

2  we believe.  We totally support the position of the debtor

3  with respect to the move.  We have stated even when we were

4  opposing the plan that we preferred it not be moved, but I

5  don't think there is much choice in this case to move it the

6  approximate week that is being suggested by the debtor.  We

7  spoke to the debtor about that, at least my partner, Alan

8  Kornfeld, did last night.  So we are totally supportive of the

9  debtor's position with respect to that.

10          I would like to just mention one issue that we

11  would like an extension on.  Ms. Lauria had gone through some

12  of the dates.  There were some motions in limine that were

13  filed, I believe, last night.  One, for instance, was Kathryn

14  McNally who is one of our experts.  Her deposition hasn't even

15  been concluded yet.  We would ask that just as now the

16  responses to the motion in limine would have to be five days

17  before the trial.  So if it was March 1st we would just go

18  back the five days, but we don't think anyone is prejudiced

19  and, frankly, what I suspect would happen is after her

20  deposition, for instance, there would be new additions to the

21  motion in limine that had been filed.

22          So for a variety of reasons her deposition had been

23  continued.  I suspect it will be continued till approximately

24  February 18th.  So we would request that the response date on

25  any motions in limine that be filed be five days before the

1  trial date, whatever date Your Honor deems appropriate.

2          I am happy to answer any other questions, but I

3  think the TCC is extremely pleased at where we are with the

4  debtor and the other claimant representatives, Your Honor.

5          THE COURT:  Thank you.  Motions in limine was on my

6  list of things to discuss.  I want to make -- so we will come

7  back to that.  I want to make sure I understand what motions

8  in limine are still relevant given the settlements.

9          Mr. Molton.

10          MR. MOLTON:  Thank you, Judge.  Can you hear me?

11          THE COURT:  I can.

12          MR. MOLTON:  David Molton of Brown Rudnick, Your

13  Honor, for the Coalition of Abuse Scouts for Justice.

14          Judge, we too are extremely coming before Your

15  Honor on this day.  It is a seminal moment in this case.

16  We've had a number of them.

17          From day one, from the founding of the coalition,

18  we have had two principals that have guided us.  Number one,

19  no survivor left behind.  Number two, payment to survivors

20  within their lifetime and soon.

21          As Your Honor knows, the plan that the coalition

22  built with its other mediation parties over the past six

23  months did just this regarding what we call our principal

24  number one, no survivor left behind.  The plan, as modified

25  with the TCC, termsheet doesn't change that.  So we are very

1 happy going forward with the platform that was built with a

2 lot of hard work.  And I know Ms. Lauria referred to the

3 mediations over just the past few weeks, but if you add up all

4 the past seven months, Your Honor, it's quite remarkable the

5 amount of time, effort and good faith that has gone to coming

6 to this day.

7         However, Your Honor, principal number two is still

8 in play, payment to survivors within their lifetime or as soon

9 as possible.  That is going to be an issue you are going to

10 hear later today I'm sure.  I know the debtor has proposed a

11 very modest adjournment to allow for all parties to have their

12 rights and to take a look at the new pleadings that have been

13 filed.

14         I am not going to predict, but you may hear from

15 the insurer's requests for longer time.  Again, Your Honor,

16 we're almost two years into this case, almost the two year

17 anniversary.  Clearly one of the things I want to impart and

18 leave with Your Honor, as Your Honor considers those requests

19 in terms of getting this confirmation hearing teed up and done

20 is remember the 80,000 survivors out there who filed proof of

21 claims.  They are watching and looking forward to having this

22 process come in front of Your Honor and be decided.

23         Your Honor remembers very well, as Your Honor

24 knows, the very difficult circumstances that have been faced

25 in this case and how we have been faced with almost

1  unprecedented challenging landscape.  I do want to note that

2  in light of one of the most difficult circumstances that we

3  have all seen we are able to get to this point and at the

4  present time approximately three quarters, just under three

5  quarters, of all survivors voted in favor of the plan that the

6  coalition built; again, under very challenging circumstances.

7          As Ms. Lauria mentioned, immediately after the

8  vote, mediations continued to resolve the issues with the

9  dissenting survivors and the TCC, everybody engaged in those

10  in absolute good faith, Your Honor.  The amount of time that

11  was spent, I think, was understated by Ms. Lauria in terms of

12  people rolling up their sleeves and being available to respond

13  in real time, in minutes, to join mediation sessions that

14  lasted hours.  I thank everybody on this zoom call that I see

15  and don't see for all their efforts in getting us there.

16          Your Honor, the TCC settlement means that the plan

17  now has the support of every estate fiduciary.  The coalition,

18  which delivered tens of thousands of votes in favor of the

19  plan, and with respect to the voting motion that you just

20  heard the debtors talk about and Mr. Pachulski elude to, you

21  know, will increase the percentage, you know, above 80 percent

22  or even more, Your Honor.

23          The settlement builds on the previous settlements

24  negotiated by the coalition, the local councils, the BSA,

25  Hartford, Century, Zurich, Claredon, the Church of The Latter

1  Day Saints, those settlements remain intact, those settlements

2  are in this plan.  Those settlements will provide for $2.7

3  billion in compensation to survivors.  Again, Your Honor, and

4  I know you've heard it from me before, the largest sexual

5  abuse compensation fund in the history of the United States.

6        I do also want to thank everybody on scouting

7  safety and youth safety protections the coalition had put

8  together, a survivor working group, months ago that has been

9  working with the Boy Scouts and then joined with the TCC in

10  the last few months in coming together with what is a

11  remarkable and groundbreaking youth protection plan that is

12  part of the plan going forward.  I want to congratulate all of

13  the parties who worked so hard on those difficult, but

14  extremely important issues.

15        One last thing I know people have been talking

16  timing with respect to the selection of the settlement trustee

17  or trustees.  There is a number of, handful, half a dozen or

18  so just top notch candidates that are being interviewed, Your

19  Honor, over the next day or so.  I know Ms. Lauria had

20  mentioned timing that she would like to announce the

21  settlement trustee early next week.  If that is the case, we

22  hope it's the case, but in any event, Your Honor, the

23  designated top members will be meeting and interviewing those

24  candidates.

25        To the extent that they need additional time to

1  consider and come to a consensus, and I think it's important

2  that consensus is the important thing here in a deadline,

3  should not affect or impair that consensus if just a few more

4  days are necessary to arrive at it.  I just want to put a

5  stake down on that that, you know, aspirationally that may be

6  something that we're looking forward to, but, again, we're

7  looking to a consensus candidate to include in the trust

8  documents as the trustee.

9           In any event, Judge, we really appreciate the time,

10 the work and the effort, and most of all Your Honor's patience

11 which has been just remarkable.  And looking forward to

12 progressing this case further towards a successful resolution

13 for the benefit of all those men out there.

14           Thank you, Judge.

15           THE COURT:  Thank you.

16           Mr. Patterson.

17           MR. PATTERSON:  Thank you very much, Your Honor.

18 Good afternoon.

19           Your Honor, we are not an institutional player the

20 way the coalition and the TCC are, but I think because of the

21 nature of the people who represent and some of the positions

22 we had articulated we were invited to participate in the

23 mediation process.

24           Years ago when we were camping my wife joked that

25 she didn't know she had married a Boy Scout and now she's

1 fully persuaded that she has married the Boy Scouts.  It has

2 certainly been an overwhelming effort over the past period of

3 time.

4          Your Honor, we went into the mediation on the basis

5 of our articulated positions that the court has heard that

6 chartered organizations being released should pay for the

7 release, that the abuse claims definition should be confined

8 to what the court has jurisdiction over, that severe claims

9 should receive an enhancement to their compensation given the

10 severity and that the governance of the trust should reflect

11 the balancing of different interests among the constituent of

12 claimants and their differences.

13          So we are professional and on behalf of our clients

14 delighted that the termsheet recognizes those priorities.  We

15 also went in believing that some of the incumbent arrangements

16 could be revisited or tested.  We did test them and became

17 persuaded, as Mr. Molton articulated, that there were other

18 interests within the trust that felt very strongly that the

19 incumbent arrangements should remain in place to satisfy their

20 priorities for significant distributions in the near term.

21          So we exceeded to that priority and worked within

22 the existing structure to try to satisfy the objectives that

23 we went in with.  And in satisfying those objectives we

24 believed that we were articulating positions not just held by

25 our parochial selves or our individual clients, but also by a

1  fairly broad range of survivors whose voices maybe were not

2  being properly advanced by the process.

3           Given our limited role, Your Honor, and -- I want

4  to speak less than everybody else, so I will just stop there

5  and thank the court and the other participants for their

6  efforts in this process.

7           THE COURT:  Thank you.

8           Mr. Turner, you have had your hand up for some

9  time.

10          MR. TURNER:  Yeah, I just wanted to touch on

11 something really quick if I could.  Its, obviously, no secret

12 that myself and Mr. Taylor have started an unofficial survivor

13 support group.  Few of us feel that Mr. Rothweiler being on

14 the settlement trustee advisory council is unfair.  Myself

15 personally believe, and I want this on record too, that

16 because myself and Mr. Taylor have been pretty outspoken about

17 our opposition to this appearing in court in December we are

18 afraid that there might be some form of retribution in the

19 settlement.

20          You can ask Mr. Van Arsdale, I had a full-on panic

21 attack with him on the phone yesterday when I saw this because

22 I am one of the more severe cases.  I actually have not been

23 able to finish updating my claim form because I have a panic

24 attack every time I think about finishing it.

25          The fact that an independent review requires

1  $20,000, some firms may be able to cover that, but I have had

2  conversations with people yesterday, other survivors, who are

3  going it alone, they don't have the other substantiating proof

4  to provide for that because it was 40, 50 years ago.  And as

5  Mr. Molton stated twice, the coalition doesn't want to leave

6  any survivor behind, but unfortunately this creates a pretty

7  unfair dichotomy of the haves and the have nots for people who

8  might be going it alone.

9           This is a sex abuse case.  This is not the grapes

10  of wrath.  A lot of us feel that that is not fair at all to

11  some of us.  I just wanted that on record.

12           THE COURT:  Thank you.

13           Mr. Turner, I appreciate your input.  I do want to

14  say that people who are represented, and Mr. Turner, I believe

15  you are, need to --

16           MR. TURNER:  Yes, by Mr. Van Arsdale.

17           THE COURT:  -- appear through counsel.  And at the

18  confirmation hearing that is what I will expect that if you

19  have counsel you are to appear through counsel.  If your

20  counsel has not filed an objection then your counsel hasn't.

21           MR. TURNER:  I apologize.  I just wanted that on

22  record.

23           THE COURT:  You don't need to apologize.  I am just

24  letting people know, and will have a further pretrial, but I

25  think this is a good time to let people know that if you are

1  represented by counsel then I expect you to appear and

2  participate through counsel and I will recognize counsel.  Of

3  course, I am only going to recognize counsel who have filed a

4  timely objection.

5          Those who do not have counsel I will hear on a pro

6  se basis, and we will figure out how that will happen and when

7  that will happen.  But I wanted to -- I think it's appropriate

8  to let people know in advance of the confirmation hearing that

9  if they're represented by counsel they need to appear through

10 counsel.

11         I will also say that recently there were a couple

12 of filings by corporate entities through, think one was a

13 letter, one may have been some sort of other document, through

14 a CEO or a shareholder of the corporate entities.  Corporate

15 entities must appear through counsel.  So if those parties are

16 in the virtual courtroom please know that our local rules

17 require Delaware counsel, but I think any rules require

18 corporate entities to appear through counsel.  Please obtain

19 counsel.  Again, I want to let you know in advance.

20         Mr. Hallowell.

21         MR. HALLOWELL:  Thank you, Your Honor.

22         Can you hear me okay?

23         THE COURT:  I can.

24         MR. HALLOWELL:  Thank you.  Jim Hallowell of Gibson

25 Dunn & Crutcher representing AIG and speaking on behalf of

1 certain insurers.

2        Your Honor, I want to state at the outset that the

3 insurers have been a significant player, as you know, in these

4 plan proceedings and this is the first that we are hearing of

5 the proposed schedule set forth by the debtor and it is,

6 obviously, not the first that other parties are hearing of

7 this proposed schedule.

8        I think it's important to mention to Your Honor

9 that we had a meet and confer with all parties.  There were

10 hundreds of participants on the zoom and at that time we were

11 candid that we would request an adjournment of the

12 confirmation hearing.  When we asked about that issue with

13 counsel for the debtors we were told that they would object to

14 that and we heard nothing further.

15        It seems that there has been a decision made to

16 request an adjournment of the confirmation hearing by the

17 debtor and other parties.  Whenever that decision was made the

18 insurer should have been informed and it would have been

19 perfectly appropriate for one of those counsel to contact me;

20 nobody did.

21        Your Honor, we request an adjournment of at least

22 three weeks and perhaps more, at least three weeks to March

23 15th.  We don't make this request lightly, but we believe that

24 it is warranted by the circumstances here. Your Honor, given

25 what we are dealing with, given the importance of the issues

1  involved, given what you have heard from the survivors, nobody

2  should be compressed in these proceedings.  There is just too

3  much at stake here, Your Honor, to not get it right.  What we

4  are talking about here is a compression of an incredibly large

5  magnitude.

6          Just to give you an example, the debtors are

7  talking about putting their plan, which they have a termsheet

8  of, but which nobody has seen.  They are talking about putting

9  their plan out on February 14th and our supplemental

10  objections would be due three days later on February 17th.

11  Your Honor, you also have the admission from Mr. Pachulski

12  that whatever this new plan is going to be is very different

13  from the plan that is currently before Your Honor and that you

14  have received nearly a hundred pages of objections on from us.

15          So just taking that as one example it's clear to us

16  that we need significantly more time then what is being

17  proposed by the debtors.  And given that this is the first

18  we're hearing of it, it may be more appropriate for the

19  parties to meet and confer on the issue and then have a

20  further discussion with Your Honor as to what the appropriate

21  schedule should be.

22          If you will hear me further, Your Honor, I want to

23  take you through some of the other reasons why we request an

24  extension here.  The first reason that I want to talk about it

25  the improper extensions of the plan objection deadline that

1  were granted by the debtors to certain parties in this case

2  and how that effects where we are now.

3         The TCC settlement termsheet was filed five days

4  after the certain insurers filed their confirmation objections

5  and it was filed late because the TCC and other parties to the

6  termsheet, including the FCR, the coalition and the Pfau,

7  Zalkin claimants, obtained improper and undisclosed extensions

8  from the debtor of the deadline for their confirmation

9  objections from February 4th to February 9th.

10        It is crucial to note that the termsheet was

11  intentionally teed to the plan objection deadline because the

12  TCC, coalition, FCR and Pfau, Zalkin claimants have also

13  submitted plan objections in parallel with the termsheet.  The

14  deadline extensions were in contravention of this court's

15  scheduling order, Docket 6528, Paragraph 15.

16        Even more egregiously, Your Honor, at the hearings

17  you conducted on Tuesday, February 1st and Thursday, February

18  3rd you reaffirmed the immovability of the February 4th plan

19  objection deadline.  Nevertheless, Your Honor, the debtors and

20  plan proponents went forward with those extensions saying

21  nothing about them to the court until the afternoon of the

22  deadline and saying nothing at all to the certain insurers.

23         The result has been five days used by the TCC, FCR

24  and coalition to devise new and prejudicial plan provisions in

25  response to the arguments made by the certain insurers in

1  their timely filed brief.  And five days in this whole process

2  that have been taken from the insurers.  We are here asking

3  for an adjustment of time, Your Honor, they just took.

4           Here is how all of it happened:

5           On Tuesday, February 1st you said to Mr. Ryan

6  "objections are due when they're due."  You stated further "I

7  am not extending an objection deadline."  That is the

8  transcript, page 108.

9           The debtor, the TCC, the FCR, and the coalition

10  were all present at that hearing.  We now know that some of

11  them may have had their secret extensions from the debtor in

12  hand at that time.  All of them heard what you said.  Not one

13  of those parties raised with you then that they believed they

14  had or were going to obtain a binding extension from the

15  debtors.  The insurers knew nothing of this.

16           By the end of the day on February 2nd, if not

17  sooner, the debtor has now admitted that it had agreed to

18  extensions with each of the TCC, FCR, coalition and

19  Pfau/Zalkin group despite the statements you made at the

20  February 1st hearing a despite the plain terms of the

21  scheduling order.

22           On February 3rd the court held another hearing.

23  You were emphatic on the issue of extensions, Your Honor.  You

24  said "let me make clear, even though I permit certain

25  discovery, the objection deadline has not been extended for

1  any party."  That is the transcript at page 14.

2         The debtor, the TCC, the FCR, the coalition,

3  Pfau/Zalkin were all present at that hearing.  They all had

4  extensions in hand at this time and they said nothing to you.

5  The insurers, of course, were left completely in the dark.

6  The next day the insurers, the Roman Catholics and many other

7  parties filed timely objections.  That same day, outside the

8  presence of the other parties, the debtors finally

9  acknowledged to you want they had done.  You made your

10  unhappiness clear to them, but you let the extensions go

11  forward, probably a foregone conclusion since filings were,

12  otherwise, due that day.

13         For the record, the debtors and the other parties

14  still said nothing about this to the insurers.  It wasn't

15  until the Saturday after the objections were due when the

16  insurers were on file that the we noticed that the TCC and

17  others were not, that we learned what the debtor had one.  And

18  learning about it required a series of emails from me that

19  ultimately we found at that time that the plan objection

20  deadline was extended to February 9th for certain parties.

21  These unauthorized improper and secret extensions have had

22  immediate consequences.  Without them the termsheet which

23  we're talking about now, which is accompanied by tailored and

24  strategic objections, would have been filed merely a week ago.

25         Now this still would not be enough time to afford

1   the insurers adequate time to review and challenge all the

2   changes in the new plan, but it is simply beyond a doubt that

3   that time, which was lost to everyone, and to the court, and

4   the insurers especially, through extensions that should not

5   have been granted cannot be used to prejudice the insurers.

6   That is what is happening here, Your Honor.  This episode

7   alone warrants an extensive adjournment of the schedule.

8           I want to talk briefly about the new plan

9   provisions; although it sounds to me that Your Honor has a

10  good grasp on them.

11          As everyone on this zoom has conceded there will be

12  material and substantial changes to the proposed plan.  Those

13  changes go to the core of the issues the insurers have

14  contested in these proceedings for months including that the

15  TDP's and the proposed findings that impermissibly alter the

16  rights of the insurers under their insurance contracts are not

17  only still in the document, but expanding.

18          We can't even examine the actual changes made to

19  the plan because we don't have an amended plan yet.  It's

20  clear that the changes that will be made to the plan are not

21  changes that are designed to resolve the objections raised by

22  the insurers, Your Honor; rather, they will make what is

23  already an objectionable plan even more objectionable.

24          The insurers are entitled to a fair opportunity to

25  examine and address the new plan provisions when they come out

1   and then an appropriate time to fashion and submit objections

2   to those new plan provisions and then an appropriate time to

3   schedule and participate in an evidentiary hearing.  Things

4   like taking Mr. Griggs out of turn next week while all of this

5   is going on really make no sense at all to the insurers.

6            I want to talk briefly about some of the things

7   that the parties have already mentioned:

8            First, the new TDP's.  The termsheet makes clear

9   that the debtor and the plan proponents have meaningfully

10  amended the TDP's.  They have admitted as much.  This is an

11  area of concern to the insurers given the objections we have

12  raised already, and we don't even know at this point how the

13  amendments are going to be carried forward.

14           These new TDP's were, obviously, the product of

15  substantial negotiations over the last several weeks, if not

16  months.  Your Honor has ruled that TDP negotiations are not

17  subject to the mediation privilege and that the insurers are

18  entitled to discovery of those negotiations.

19           It shouldn't surprise you, Your Honor, that the

20  insurers have had no discovery as to any of the negotiations

21  that have taken place over the last six weeks and we should be

22  permitted to have it.  This is an additional reason why the

23  confirmation hearing needs to be extended by, at least, three

24  weeks and likely more.

25           I want to talk briefly about the proposed new

1   finding.  As Your Honor knows, the insurers have objected

2   consistently to the special proposed findings required as a

3   condition precedent to confirmation of the debtor's plan.  The

4   court has expressed some skepticism yourself about those

5   findings and it would have been reasonable to expect that as

6   we approach the plan confirmation hearing perhaps those

7   proposed findings would have been resolved one way or another

8   and left off the table.

9           The new plan called for in the termsheet doesn't

10  remove the proposed findings; rather, it adds to them with a

11  new finding.  The insurers, obviously, take issue with the new

12  finding and we are entitled to additional discovery on that

13  issue as well as an adequate opportunity to fashion our

14  objections to the plan in that regard.

15          The parties have mentioned the new settlement

16  trustee.  It seems that the only thing we have learned at

17  today's hearing about the new settlement trustee is that there

18  is a complete lack of clarity, maybe there will be no new

19  settlement trustee, but we won't know until February 14th and

20  at that time we will have to examine the qualifications of

21  that trustee, assess any potential objections and adequately

22  respond.  The notion that we could do so in three days really

23  doesn't make any sense at all given everything else that is

24  going on.

25          There was some discussion of the Bates White report

1  and how difficult that was for mediating parties to address in

2  a termsheet.  I want to talk for just a minute about that.

3          As detailed in the insurer's objection, while the

4  debtors and plan proponents have had since February 4th, the

5  testimony and opinions of the debtor's expert Dr. Bates

6  support the insurers' objections that unless substantially

7  modified the TDP's will result in claim values that exceed the

8  values historically paid by the debtors prior to bankruptcy.

9  Indeed, Dr. Bates concluded that a downward mitigating scaler

10  of 90 percent would need to be applied to the vast majority of

11  claims for the TDP's to achieve results in line with the

12  debtor's pre-bankruptcy experience.

13          The debtors have now done an extraordinary about

14  face with regard to one of their own experts.  This eleventh

15  hour of about face was a required term of the termsheet

16  entered into between the debtor, the TCC and the other parties

17  just now.  As detailed in a section entitled "expert reports"

18  the termsheet now dictates the contents of the testimony that

19  Dr. Bates can provide to this court about his opinions.

20          Your Honor, there is no precedent for anything like

21  this and the insurers should be entitled to a full review of

22  the circumstances that have led to this situation regarding

23  Dr. Bates and likely additional discovery as well.

24          I want to mention, briefly, another provision of

25  the termsheet.  Although the debtors have made an issue of

1  their financial condition the termsheet makes clear that the

2  coalition will seek a substantial contribution award now $21

3  million.  In addition, the Pfau/Zalkin claimants will seek a

4  recovery of $3.5 million for the settlement trust.  If these

5  payments can be funded, Your Honor, an adequate extension of

6  the schedule can be funded as well.

7       Your Honor, I want to talk briefly about what we

8  feel is going on here.  I want to be respectful to all of the

9  parties here.  What seems to be going on is that there is an

10 egregious overreach occurring.  The claimants, once again,

11 have taken control of drafting the amended TDP's and the other

12 critical plan provisions. The result is inflated claim values

13 that do not relate to the debtors pre-bankruptcy experience.

14 This is an effort to put a thumb on the scales of future

15 coverage litigation and it's a misuse of the bankruptcy

16 process.

17       The insurers have participated in these proceedings

18 in good faith, but the path dictated by the termsheet is not

19 one of agreed resolution.  It is a path of only further

20 reasonable and well-grounded objections from the insurers to

21 confirmation of this now amended plan.

22       Your Honor, we are mindful that we made a previous

23 request to extend the schedule.  You granted it and we know

24 that you don't grant extensions to a schedule lightly.  The

25 circumstances here are exceptional and they are not the result

1    of anything the insurers have done or failed to do.

2    Adjournment of the confirmation hearing by at least three

3    weeks is compelled by the significant revisions to the plan,

4    by the unfair conduct of the debtors and the plan proponents

5    and by due process and fundamental fairness.

6             THE COURT:  Let me ask you, Mr. Hallowell, I wrote

7    down in terms of discovery that you think you need, discovery

8    with respect to the new finding that is in the termsheet, Dr.

9    Bates, and I actually had a question as to whether his expert

10   testimony was going to be offered because, quite frankly, I'm

11   confused about this arrangement.  You said something else, but

12   I didn't get that down.

13            I want to understand what discovery you think you

14   need as opposed to time to review and file supplemental

15   objections on legal issues or additional legal issues.

16            MR. HALLOWELL:  I think that I want to make sure

17   you heard is the TDP's.

18            THE COURT:  The TDP's generally.

19            MR. HALLOWELL:  Yes.  Remember, Your Honor, we were

20   entitled to substantial discovery with regard to the

21   negotiations that occurred with regard to the TDP's that

22   existed prior to this amendment.  Your Honor, the insurers are

23   entitled to the same discovery with regard to the amended

24   TDP's.

25            THE COURT:  So the parallel process of this

1 independent review option.

2          MR. HALLOWELL:  Right, which is an amendment to the

3 TDP's.  How did that come about?  How was that negotiated?

4 The debtors kept a log of their TDP negotiations for the first

5 set of TDP's.  A log of the second set of TDP's would be

6 useful and would help us with regard to our discovery efforts,

7 but I think depositions are going to be likely as well.

8          I think I also mentioned we may need discovery with

9 regard to the settlement trustee.  If the settlement trustee

10 remains Mr. Green we've already taken discovery with -- I'm

11 sorry, Professor Green.  We have already taken discovery with

12 regard to Professor Green.

13          THE COURT:  Thank you.

14          MR. HALLOWELL:  There could be other areas of

15 discovery, this is all that we have been able to resolve in

16 the last 36 hours.

17          THE COURT:  So I was hoping some of the revisions

18 would have checked boxes off your list, but you are saying its

19 adding more.

20          MR. HALLOWELL:  Exactly the opposite direction,

21 Your Honor.  We were astounded how far away from us

22 (indiscernible).

23          THE COURT:  Okay.  Ms. Dumas?

24          Thank you, Mr. Hallowell.

25          MS. DUMAS:  Yes, thank you, Your Honor.

1          My firm represents several claimants and we filed

2     objections to the plan.  I have one small point to raise.

3          With regard to what you've been asked to do, to

4     change the schedule, one of the things was to extend the

5     voting deadline or to reopen the voting deadline.  And I would

6     ask that you consider, as part of that, to require BSA to make

7     public or to share the breakdown of votes for their local

8     councils and chartered organization.

9          I think that you raised that once, but it is a

10    requirement that it is up to the debtors to make that a part

11    of their showing and I would ask that you make that -- them

12    part of your expressed ruling on the scheduling issue.  It

13    would help with the issues before you at the confirmation

14    hearing.  On behalf of the people who are objecting to the

15    plan.  We need to know that information.

16          THE COURT:  Thank you.  Mr. Buchbinder?

17          MR. BUCHBINDER:  Thank you, Your Honor.

18          Proposing to change the votes of parties who have

19    not given the authority to their counsel to change their votes

20    for a plan that has not yet been filed is patently

21    inappropriate.  At least the debtor seems to have recognized

22    in its earlier comments, that the threshold issue is the

23    filing of its third modified, fifth amended plan, or perhaps

24    we should just start calling it a sixth amended plan.

25          Rather than talking about filing motions to

1  designate voting or anything else that we haven't seen yet,

2  what the debtors should be filing is its motion that complies

3  with Section 1127, which would cover many of the issues that

4  have been raised by counsel and which counsel for the debtors

5  do seem to acknowledge are there.  But the one aspect of

6  Section 1127 that they appear to be missing is compliance with

7  Section 1127(c), which is (indiscernible) section and I'll

8  read it.

9          The proponent of a modification shall comply with

10  Section 1125 of this Title, with respect to the plan, as

11  modified.

12          You've heard much discussion this morning from both

13  sides, that the modifications of December 18th, which were

14  discussed in many of the objections, as well as today, and the

15  modifications made less than two days ago, are material.

16  Frankly, Your Honor, I've been studying a term sheet from the

17  other night, and other than the fact that the abuse claim adds

18  two new sentence that appear to invite lots of litigation, and

19  the charter provisions have been changed so that chartered

20  organizations can be even more confused, what this also needs

21  is a supplemental disclosure statement.

22          We don't need to go back to square one, but the

23  debtor needs to explain how these proposed revisions improve

24  the plan for the Class 8 or Class 9 parties and how it

25  resolves some of the other issues that have been referred to

1  in this discussion, as what's missing here is disclosure for

2  provisions that have been described in some of the occasions

3  as "Byzantine" and the "Byzantine complexity of this case" and

4  the myriad of impenetrable language, or as one other objection

5  has put it, the "no third-party left behind" Act.

6           So, we need some additional disclosure here.  And I

7  appreciate the fact that the debtor seems to recognize some of

8  the other issues.

9           But with respect to the new TDPs, I would like to

10  make reference to one point that Mr. Hallowell touched on, and

11  that is the fee for the independent review.  For an abuse

12  survivor, to request an independent review, they have to pay a

13  fee of $10,000.

14           I don't know of any Court in this country that

15  requires a filing fee of $10,000 to initiate a tort case.

16  That is an impediment to not seek an independent review of

17  claims and makes the entire concept somewhat illusory.

18           Now, the attempt to change the votes without

19  consent is just another slap in the face to the survivors, who

20  have waited for this small form of justice for years, for

21  their chance to get a vote.  The individual votes, and even

22  the master ballots, conferred no authority upon counsel to

23  change their clients' votes.

24           As I have reminded the parties and the Court at

25  multiple times over the past many months, this is not a

1   bondholder case.  This is not an equity case, where a tranche

2   or tranches of debt or equity have provided authority to an

3   indenture trustee, or similar person, to vote their claim in

4   interest.

5           This vote is precious to the survivors.  The Boy

6   Scouts will respond, as they already have, that they don't

7   have time and they don't have the money.  But this is the

8   consequences of their own actions, not anyone else's; not the

9   survivors, not the insurers, not anyone else.

10          For many decades, the Boy Scouts have shirked from

11  accepting the consequences of their actions.  That's why we

12  have all been here for almost two years.  Today is no

13  different.

14          Thank you, Your Honor.

15          THE COURT:  Thank you.

16          Mr. Ryan?

17          MR. RYAN:  I'd like to begin, Your Honor, with what

18  I think everyone acknowledges, which is the plan that we

19  haven't seen, that hasn't been filed, the appropriate

20  settlement agreements that yet to exist will bear no relation

21  to the plan that was solicited last fall, and it will bear no

22  relation to the plan that was mailed to people without a

23  disclosure last December.

24          The debtors have just acknowledged that more time

25  is needed.  Let's do this right, Your Honor.  Let's do this

1  with due process.

2            There's no way Your Honor can rely on a vote, you

3  can't tell me that the September 30 plan as being an

4  acceptance or rejection of something that bears no relation to

5  it five or six months later.

6            Mr. Buchbinder was right; you can modify and

7  modify.  You need to disclose.  There needs to be adequate

8  information.

9            What charter has gotten adequate information?

10            What they got was a term sheet, which hasn't been

11  served on them, that pulled the rug out from underneath them,

12  from what they were given in December.  And what they were

13  given in December bears no relation.

14            Now, in December, you've got an explanation of "we

15  don't need to re-solicit, Judge, because this has only gotten

16  better for charters."  Other than the Roman Catholics,

17  everyone -- everyone is getting a full channeling injunction

18  for all time.

19            Well, for 40,000 charters, the rug has just been

20  pulled out from underneath them and they may not even know it.

21  So, they need to know.  And, frankly, the Roman Catholic

22  charters are entitled to know some basic information.

23            Ms. Lauria tried to minimize it, saying, it's not a

24  huge universe of charters affected.  Well, we know that over

25  half the claims are pre-1976, so half the claims are

1  implicated.  We know that there is somewhere between 40,000

2  and 100,000 charters historically.  My guess is most of the

3  defunct ones are affected by this pre-1976 treatment.

4         Adequate information must allow someone to make an

5  informed decision under 1125.  There are two features that a

6  charter must now decide:  do I want to object to the plan, and

7  if so, trigger the opt-out?

8         First, they need to know, what does the plan now

9  provide them, because for most, they had a full channeling

10 injunction for all time.  Now, they need to know what is this

11 pre-1976 channeling injunction?  What am I getting now that's

12 reduced from what I was getting?

13        Second, they need to know the consequence of an

14 opt-out.  What is the difference between a full, post-1976

15 injunction?  And what is in the opt-out, which is whatever's

16 written in the Century term sheet.

17        To make an informed decision as to whether to

18 accept the plan or to object to a plan, you need to know what

19 you're getting and what you give up, if you object or if you

20 vote no, and the plan is defeated.  It is not fair to tell

21 people there's an opt-out and tell them, We can't tell you and

22 won't tell you what the consequence of that opt-out is.

23        And as we sit here today, Judge, no one on this

24 screen will tell you what the difference is between a full,

25 post-1976 channeling injunction is and the one that's only

1  governed by what coverage provides -- what policies provide

2  coverage for abuse claims.

3         So, how does any charter make an informed decision,

4  without the consequence of an opt-out?  How does any charter

5  make an informed decision about what they're actually getting,

6  pre-1976?

7         They're giving up things.  They're giving up their

8  right for whatever these uncovered years are.  And we know

9  from history, Judge, the Boy Scouts have traditionally

10 maintained there's not a lot of pre-1976 coverage.

11        Now, today, we're just told it's not a lot of

12 people who are going to be affected, which would imply there's

13 lots of pre-1976 coverage.  I don't know.  No one will tell

14 us; we've asked.

15        What they are giving up for those years where

16 there's not coverage, they're giving up their historical

17 indemnity rights against the local councils, who will be

18 getting a free release from the charters.  The charters are

19 entitled to know this.  The charters are entitled to know that

20 even in those years where there's coverage, if there's a mixed

21 claim, a brand new concept in the plan, that if it's a

22 settling insurer, their duties under policies the churches

23 bought are significantly reduced.

24        None of this yet, Judge, was in any plan that's

25 been solicited.  None of this has been disclosed.  None of

1  this is in plain English.

2          THE COURT:  Well, at any time this current plan a

3  throwback to the December plan in terms of the chartered

4  organizations and the pre-'76 period.  There may be some

5  changes, and we have the mixed claims, and I get that, but

6  isn't the chartered, pre-'76, a throwback to what was

7  solicited?

8          MR. RYAN:  No, Your Honor.  What was solicited was,

9  you get nothing pre-1976 and post-1976, it's all-or-nothing.

10          What was solicited didn't affect your own insurance

11  rights from settling insurers.

12          We can't look at one little thing and say, Judge,

13  we always said there was an opt-out, because the opt-out, the

14  death trap is different.  You could understand the difference

15  between a full, post-1976 channeling injunction, and none.

16  All-or-none; that's -- that, you can make an informed decision

17  on.  How do you make an informed decision between a full,

18  post-1976 channeling injunction and something else?

19          Well, we won't tell you what that "something else"

20  is; it's a legal conclusion.  It's privileged.

21          THE COURT:  Well, that's your discovery issues.  I

22  understand that.

23          MR. RYAN:  I hear you, Your Honor, but it also goes

24  to adequate information and the ability to make an informed

25  decision; that's what 1125 requires.

1          How do I know if it's worth it to object and

2    trigger the opt-out if I don't know what I lose?

3          So, Your Honor, where we are, there needs to be

4    adequate information.  That's a secondary issue.  But where we

5    are today is the plan that has yet to be filed, that they want

6    to go on trial in three weeks, incorporating agreements that

7    don't exist, and they want to, then, use votes on two prior

8    plans ago, six months ago, that everyone acknowledges bears no

9    relation to the plan when we started the trial.

10          Due process requires to do things right when you

11    have moved this much.  We are already continuing.  We all know

12    that now.  Why don't we take the time to do this right?

13          My creditors have a vote on the plan that is going

14    to be put before the Court.  We took a look, or I briefly took

15    a look and tried to listen.  I still didn't hear from Ms.

16    Lauria's timeline when we're going to see insurance

17    settlements.

18          They are literally incorporated into the plan,

19    Judge.  We've been asking for months now:  When are we going

20    to see insurance settling?

21          We don't have a plan.  I echo everything          Mr.

22    Hallowell said about the inadequacy of the schedule they

23    propose.  We should propose a schedule that starts with, when

24    can a confirmation hearing occur that affords people due

25    process?

1          Let's work backgrounds.  We have taken a lot of

2 discovery.  We don't need two more months of discovery.  I

3 think four to five weeks, maybe six weeks, probably gets us

4 there.  But let's take a time to do that right.

5          And I share some of Mr. Hallowell's frustration.

6 You know, we spent time and money taking the deposition of Mr.

7 Green, when, apparently, that was a nullity.  We have been

8 dragged through a process doing things when, behind the

9 curtain, everyone else knows something else is going on.

10          That's not fair.  It's not fair to the carriers.

11 And it's not fair to the Roman Catholic Ad Hoc Committee.

12          You know, I'll note, Judge, that the term sheet has

13 a new provision, that the plan will be amended to provide that

14 any ad hoc committee that objects to the plan, binds its

15 members.  So, we have a double-standard now in the case.  If I

16 speak, I bind all my members.

17          Mr. Mason never binds his members.  Mr. Molton

18 never binds his members.

19          I'll take that standard.  But they may have to

20 accept that standard, too.  We can't have a double-standard

21 for standing to raise issues.  It can't be a standard that if

22 you're for things, you have standing; if you're against them,

23 you have a higher level of standing and different

24 consequences.

25          That's the kind of gamesmanship that's going on,

1  Your Honor; trying to put internal provisions in a plan to

2  scare away the objections.  To scare away legitimate discourse

3  about where the plan is going.

4         So, with that, Your Honor, we will join in and echo

5  Mr. Hallowell's comments.  I don't have anything further

6  (indiscernible) further questions.

7         THE COURT:  Thank you.

8         Ms. Wolff?

9         MS. LUJAN WOLFF:  Hello, Your Honor.  I am just

10 readying my camera.  Okay.

11        Yes, Your Honor.  I join in Ms. Dumas' request to

12 require that the debtors produce, as part of the voting

13 report, the breakdown of the vote, as to local council and

14 chartered organizations.

15        The debtors were able to do this days after the

16 voting deadline.  They did produce that to participating

17 parties, but it was never produced to the Court, to my

18 knowledge.  It was never publicly revealed.

19        I believe that they can do that again.  They should

20 be required to do that again and to make it public.

21        That's especially important, for my clients, Your

22 Honor, because I believe that as to, for instance, as to the

23 chartered organizations for Guam, who is the debtor in its own

24 case, the Archbishop of Hagatna.  That my client's votes would

25 be determinative of whether or not the archbishop would

1  receive a release, as my clients are the overwhelming

2  majority, if not all, of the affected creditors who would be

3  enjoined from pursuing their claims against the Archdiocese;

4  incredibly, in the Archdiocese's own, pending, Chapter 11

5  bankruptcy case in Guam.

6           And so, I believe that it's critical.  It's -- it

7  would be required for them to meet their burden under the

8  Code, under Third Circuit precedent, for them to prove that

9  the overwhelming support of the affected creditors was

10  attained in order to get the plan confirmed.

11           I also join in the comments of Mr. Buchbinder.

12           Thank you, Your Honor.

13           THE COURT:  Thank you.

14           I'd like to hear a specific response to the request

15  by Ms. Wolff and Ms. Dumas.  I don't know that I -- I'm not

16  going to comment on whether it's required to confirm the plan,

17  but I would like to know why it shouldn't be produced to those

18  parties.  I would, of course, encourage a reach-out to both,

19  Ms. Dumas and Ms. Wolff, with respect to their objections and

20  any possible resolutions.

21           Mr. Desgrosseilliers?

22           MR. DESGROSSEILLIERS:  Yes, Your Honor.  Thank you.

23  I don't want to belabor the record, but I didn't want my

24  silence here to imply, somehow, that our objection had been

25  resolved.  My client -- and I represent one survivor of

1  significant abuse in Connecticut -- and she has a proceeding

2  still going on, a case still going on in State Court against

3  nondebtor entities.  She was carved out from the injunction.

4       We have very serious concerns about the requested

5  injunction, the channeling injunction, with respect to

6  nondebtor entities and this Court's ability (audio

7  interference) factual support for that injunction, with

8  respect to my client's defendants -- nondebtor defendants.

9       And we also have significant -- raise significant

10  issues with respect to the releases and the ability of this

11  Court to grant those releases.  I just didn't want the Court

12  to think that those objections have somehow been resolved with

13  the TCC resolution they had.

14       And we would certainly welcome any discussions with

15  the debtors to resolve that objection.  We have not had any

16  discussions, to date, with respect to those objections.

17       But, Your Honor, that's it.  I didn't want to

18  belabor the record, but I didn't want my presence and silence

19  to somehow imply that we were resolved.

20       THE COURT:  Thank you.

21       And I'm not assuming anyone's resolved until they

22  tell me they're resolved.

23       Okay.  Well, I have both, Ms. Lauria and

24  Mr. Kurtz, with their hands up.  Who wants to go first?

25       MS. LAURIA:  Your Honor, this is Jessica Lauria.

1  I'll start with respect to what I'll call the non-discovery,

2  non-confirmation trial-related issues and then I'll hand it

3  off to Mr. Kurtz to address the discovery-related issues.

4          You know, just to state a very basic principle that

5  I think all of us restructuring lawyers are aware of, and that

6  is bankruptcy favors resolution.  And while I understand that

7  we now have two specific constituencies:  the Ad Hoc Committee

8  of Roman Catholic Churches and the carriers, who are not in

9  favor of what's currently on the table -- and I'll come back

10  to the Roman Catholic situation, because I'm a little

11  mystified by that -- it is important to note that whether the

12  carriers or the Catholics are happy with how the Boy Scouts

13  Chapter 11 proceeding resolving itself is not, in our view,

14  what is relevant for today, or even at the confirmation

15  hearing.

16          We want to look at what is best for the estate, for

17  the reorganization process, and critically important, the

18  survivor constituency, as a whole, which is by far, the

19  largest creditor constituency in the cases.

20          Let me address a handful of the statements that

21  were made.  First, Mr. Hallowell's statement about the

22  debtors' announcement at today's hearing concerning our

23  willingness to move the confirmation hearing by one week.

24          Last night at 11:30 p.m., we were advised by the

25  supporting creditor group that they would not support the

1  debtor going forward on the 22nd; notwithstanding the fact

2  that the debtors have consistently and repeatedly told parties

3  we needed to go forward on that day.

4          Those are our co-proponents, or our co-supporters

5  of the plan.  We understood that it was very important to them

6  to have adequate time to, as I said earlier, advise the

7  survivors as to where the plan is at and talk with their

8  clients about that.  We understood that.

9          So, first thing this morning at 8:30 a.m. Eastern,

10  we were on the phone with our clients, informing our clients

11  of that request.  It took us up until the hearing to work

12  through that time period.  I apologize that we did not have

13  the opportunity to approach Mr. Hallowell.  I would have

14  thought he would have been happy about that announcement, but

15  that's how those events transpired.

16          With respect to the purported improper objection

17  deadline that was granted to the TCC and the FCR, there was

18  nothing nefarious about that, Your Honor.  The mediation team,

19  which includes myself, thought that we were acting in a manner

20  that was consistent with local practice and what we have done

21  previously in these cases.  We clearly were not communicating

22  with our respective litigation teams that were attending the

23  discovery status conferences.

24          There was no, again, nefarious intent there.  There

25  was to be no negative intent inferred from that action.

1          What we knew as a mediation team was that we had

2   not reached a deal with critical constituencies by the time of

3   the objection deadline.  Had the TCC filed its objection

4   deadline on that date, quite frankly, we would have seen

5   several hundred pages and a bell that could not be unrung.

6          Rather than forcing the parties to continue to work

7   on those objections, we continue to mediate and that's how we

8   reached the groundbreaking resolution that you heard about,

9   ostensibly, today.

10          UNIDENTIFIED:  Groundbreaking?  Everyone is (audio

11   interference).

12          MS. LAURIA:  In any event, I will, with respect to

13   some of the other statements that were made, I'm not going to

14   go to the merits of various statements that Mr. Hallowell

15   made, and others, with respect to their issues with the actual

16   terms of the term sheet, itself.  I'll note, and

17   Mr. Kurtz may speak more to this, the additional finding

18   that's in the term sheet, there's already been extensive

19   discovery.

20          The finding is basically that -- not basically --

21   it is, that the base metric value are based on, and consistent

22   with the debtors' historical (indiscernible) for litigation

23   outcomes.  We have had discovery on that for the last several

24   months.  That shouldn't be a surprise.

25          Going to your question, Your Honor, on the requests

1  by Ms. Dumas and this rule on the local council, chartered

2  organization information, that information was produced.

3  Both, Ms. Dumas and Ms. Lopez, as I understand it, are

4  participating parties.  That was produced to them, I believe,

5  within three days of the voting deadline in December.  It is

6  in the data room.

7          We have discussed, I think across two different

8  hearings and two different meet-and-confers, back in the month

9  of December, the fact that the debtors would produce that

10 data, that they would produce it.  As I take their request

11 today, they simply want to see that data in a public forum.

12         We can discuss that with Omni, the voting

13 (indiscernible).  As I sit here now, I don't have any

14 objection to that request.  They're right; it's been done.

15 It's been in the data room for them to see for many weeks now.

16         With respect to Mr. Buchbinder and his request for

17 additional disclosure, let me be clear, Your Honor.  From the

18 debtors' perspective, and I believe the creditor

19 constituencies will readily agree with this, we're giving

20 additional time to change votes, not because we believe a re-

21 solicitation is required here.  There was no material and

22 adverse change to the Class 8, direct-abuse claimants by this

23 term sheet.

24         Rather, we understand that it is important for this

25 survivor community to have their voices heard through the

1  ballot box and to express their support for this plan.  It

2  would be tragic if we were held to the prior vote and if that

3  vote swayed Your Honor in deciding that the largest sexual

4  abuse claims trust ever created could not be confirmed because

5  you did not have sufficient survivor support in front of the

6  Court.

7          We think that these survivors have the right to be

8  heard, to have their votes changed.  There was no suggestion

9  that this would be made by their counsel, without

10 consultation; rather, the same rules would apply, that applied

11 with respect to the original solicitation.

12         And as I believe I've indicated, and Mr. Pachulski

13 has even said it as well, both, the Coalition and the TCC are

14 contemplating town hall meetings, and I understand it, early

15 next week, and State Court counsel would like the opportunity

16 to consult with their clients.

17         THE COURT:  What about Class 9?

18         MS. LAURIA:  I was going there with Mr. Ryan's

19 comments next.  First, Your Honor, the Class 9 treatment has

20 not changed.  The treatment of their claims has not changed.

21         What has changed for chartered organizations,

22 which, again, in the debtors' view, aren't necessarily the one

23 in the same as Class 9.  Chartered organizations, to Your

24 Honor's point, we have a throwback in the current plan to what

25 we had previously.

1          We had attempted to provide a substantial

2   contribution through the local councils to get them a release

3   for the pre-1976, uninsured or not insured by a settling

4   insurer time period.  We had extreme objections to that.

5          By the way, I should note Mr. Ryan's own objection

6   addressed that point by asserting that it was essentially

7   unfair to treat the Catholics exactly the same way they're

8   going to be treated in the current plan, except for better,

9   because the local council contribution is now going to a 12-

10  month injunction in favor of both, the Catholics and the

11  chartered organizations.

12         But that is actually better for Mr. Ryan's client

13  than the current plan, but we are throwing back to the prior

14  plan, in terms of the treatment of that pre-1976 time period.

15         We do think that while it's now a (indiscernible)

16  issue, it is an issue with respect to how the releases are

17  being treated for those chartered orgs and for an objection

18  perspective.  And so, if the chartered orgs wish to have an

19  extended objection deadline, the debtor has agreed that that

20  extended objection deadline should be granted.  But the

21  treatment is still the same both, in the plan and in the TDPs.

22         I think, Your Honor, that concludes, at least, my

23  opponent of this.  I know Mr. Kurtz wants to be heard on

24  discovery issues.

25         If the Court has questions, I'm also happy to

1  answer them.

2          THE COURT:  I'm looking at the treatment under the

3  plan and it may be that the treatment is the same, but the

4  release and the channeling injunction are different.

5          You know, I've said this before, I've given the

6  debtor some leeway as to what plan they want to present and

7  how they want to do it.  And, quite frankly, I haven't looked

8  at 1127(c).  I thought about whether additional disclosure

9  needs to go out versus whether a modification is material or

10 not.

11          But, again, I'm assuming the debtors have made

12 these considerations and that they have an ability to defend

13 the way that they are presenting this and the way they believe

14 it, and we'll find out if there are still objections in that

15 regard.

16          You have a -- okay, so you said you were going to

17 file the plan on Monday, I believe?

18          MS. LAURIA:  That's correct, Your Honor.  The plan,

19 the TDPs reflecting the amendments that are set forth in the

20 exhibits to the term sheet, as well as the settlement trust

21 agreement.

22          I believe Mr. Ryan also raised the -- I think he

23 was referring for the settlement agreements with the settling

24 insurers, that the incorporation of the term of the settlement

25 term sheets and some settlement agreements, those would also

1   be filed on Monday, Your Honor.

2           THE COURT:  Okay.  Mr. Kurtz?

3           MR. KURTZ:  Thank you, Your Honor.

4           Glenn Kurtz from White & Case, on behalf of the

5   debtors.  I might -- I will address, to some extent, the issue

6   of discovery, but I think that primarily, I wanted to be heard

7   on the requests for an adjournment, beyond the adjournment

8   that we've already agreed to and requested from Your Honor.

9           We've been through this exercise, as Your Honor

10  knows, quite a few times.  As I think Your Honor will recall,

11  some of the specifics, but I think that they may be worth

12  repeating, that the debtors' financial condition is really a

13  driver here and we're really a "melting ice cube" debtor, as I

14  think everybody knows.  It was originally contemplated that

15  the debtors would make a cash contribution to the trust as we

16  got to the end of March, and I think that's where we are with

17  the present schedule we're requesting; that was dropping to

18  zero, and that's still the case.

19          At some point, then, of course after that, it's

20  just money that's coming out of the estate, as it tries to

21  continue to operate long enough to emerge and continue into

22  its mission.  So, we really have a very critical situation for

23  the debtors.  That's something that should matter to people,

24  except those that are maybe dedicated to the destruction of

25  the Boy Scouts.

1          In terms of, you know, why people need time or

2    don't need time, we know that the objectors know their

3    positions here; in fact, the objectors articulated them with

4    great detail today, with even less time than they would have

5    at the trial, which will be starting in more than two weeks

6    from now.

7          They don't need time.  They will do the same job,

8    whether we start on March 1 or whether we start some period

9    after that and, frankly, even if we started some period before

10   that.  The debtors do think we could have gone forward, but we

11   are trying to accommodate the interests, as best we can, while

12   balancing the interests of the estate and the interests of

13   getting the survivors that actually support the plan and the

14   position to get compensated in the relative near future.

15         We know that the objectors here, being represented

16   by the counsel for certain insurers and for the Roman

17   Catholics, are using delay as a strategy; in fact, I think

18   most of the argument that's occurred today for an adjournment

19   was based, in large part, on some extensions on objections.  I

20   don't have chapter and verse on that.  I would not presume to

21   have characterized Your Honor's reactions to that

22   circumstance.

23         THE COURT:  Mr. Hallowell was correct.

24         MR. KURTZ:  Okay.  But I don't know -- I mean, I do

25   know why that would be an issue, maybe for Your Honor and Your

1 Honor's clerks.

2         I don't know why that's an issue for the insurers.

3 The only reason I heard it could have been an issue is because

4 it was somehow hiding a settlement.

5         It wasn't hiding a settlement.  It was an

6 extension, as Ms. Lauria noted, to accommodate some time to

7 achieve a settlement that hadn't been achieved and couldn't be

8 achieved, prior to the time that the objections were otherwise

9 due.  And so I don't know why an extension on an objection,

10 that ultimately, then, never gets filed, is a reason for

11 adjourning a trial, with respect to the objections that did

12 get filed by parties that represent different interests.

13         There was some arguments made about Dr. Bates.  I

14 will confirm that Dr. Bates will testify at trial.  He's been

15 deposed.  They have his testimony.

16         If they believe for some reason that his testimony

17 is inconsistent with present findings -- and we disagree with

18 that -- that's for another day.  That's not an extension

19 issue; that's a cross-examination issue.

20         They indicated that they want some discovery.  I

21 don't think there's discovery that's still appropriate in the

22 case.  I think there's been an enormous amount of discovery.

23 A taxing amount of discovery.  Discovery that has been a

24 direct contributor and a material contributor to the financial

25 condition of the debtors now.

1           And so, they know what they need to do.  Most of

2    these things are legal arguments and inferential arguments

3    they were already making.  I don't think anybody needs to open

4    up the mediation now to figure out the back-and-forth on how

5    people agree to get final resolutions with the TCC.

6           They have what they need to have on this.  The

7    values are going to be what they are, as presented through

8    evidence to Your Honor, and then as determined by Your Honor.

9           And then the last thing I say about the request for

10   adjournment is, settlements are encouraged.  They are also

11   pretty commonplace.  I think everybody watches the settlements

12   coming through the door, even at the start of a confirmation

13   hearing.  Courthouse-step settlements.

14          And I don't believe that it would be productive to

15   adopt positions that every time people reach settlements, you

16   reset the calendar in any case, but particularly, in a case

17   with a melting debtor and, particularly, in a case where Your

18   Honor has been hearing the objections and will continue to

19   hear the objections in the same basic format, whether we go on

20   time or whether we go at any other date.  You have been

21   hearing about them for as long as I've been involved in the

22   case.  It's been very little.

23          And I would venture to say that you will not find,

24   really, a single, additional argument than what you've already

25   read and what you've already heard about today, whether we

1 start it tomorrow, whether we start it on March 1.

2           So, we have had accommodations and we ask that the

3 Court accommodate just a one-week extension, subject to, which

4 we -- we're eventually going to get to, hopefully, a

5 discussion about what we're going to do at trial.  And when we

6 get to that discussion, I can come back to this.

7           But Bruce Griggs, who is the national coordinating

8 counsel for Boy Scouts, in connection with the historical

9 settlements and litigations for survivors, as you know, is on

10 trial, or will be on trial during the course of our trial.  He

11 did agree to make himself available on February 25th.  So that

12 would be one witness that we could start within the framework

13 and the calendar of where we were before.

14           I heard a complaint about taking him out of order.

15 He's actually, not per se, out of order, as far as anybody is

16 concerned, other than the debtors, since the debtors are

17 entitled to put their witnesses on in whatever order the

18 debtors choose to put their witnesses on.  It's not unusual,

19 in any way, shape, or form, to accommodate witness schedules

20 and trial, especially non-party witnesses, and especially,

21 unpaid, non-party witnesses, who also have their own

22 obligations to show up at court somewhere.

23           So, we do have the one modification to the March 1

24 start date, and that's been supported by those that were

25 looking for a little bit of time, at least on our end of the

1  equation, to have a single witness go on February 25th.  So,

2  we would ask that we start the trial, for purposes, at least,

3  of one witness -- and, again, I shouldn't say "at least" --

4  only for purposes of one witness, Bruce Griggs, on

5  February 25th, and then, otherwise, we start on March 1st.

6           THE COURT:  Okay.  Thank you.

7           And tell me again, Mr. Griggs is the debtors'

8  coordinating counsel for --

9           MR. KURTZ:  For --

10           THE COURT:  -- the underlying coverage or

11  underlying survivor lawsuits?

12           MR. KURTZ:  Right.  Right.

13           He's the national coordinating counsel in defending

14  the Boy Scouts in claims that were made by the survivors.  And

15  he is, therefore, been the one making recommendations and

16  understand historical settlements.

17           And Your Honor has probably picked up on this, and

18  you're going to pick up on this some more, but given certain

19  findings and certain other issues, the basis for the

20  historical settlements is proving to be a pretty key issue in

21  these bankruptcy cases.

22           THE COURT:  And Mr. Griggs has been deposed on

23  this?

24           MR. KURTZ:  Yes, he has; quite a while ago, Your

25  Honor.

1          THE COURT:  Okay.

2          THE WITNESS:  Certainly, weeks ago, and I think

3  towards the earlier parts of the deposition schedule.  So,

4  they have had his documents and they have gotten his

5  deposition long ago.

6          And they would have been deposing, and they would

7  have been cross-examining him in the ordinary course.  So,

8  there's no -- there's actually no prejudice or change

9  whatsoever; it's the rest of the trial that we're asking to be

10 moved by a short period of time.  He actually probably would

11 drop in about where he would have dropped in, had we kept with

12 the current schedule.

13          THE COURT:  Mr. Pachulski?

14          MR. PACHULSKI:  Thank you so much, Your Honor.

15          Richard Pachulski of Pachulski Stang Ziehl & Jones,

16 again, for the TCC.

17          Your Honor, you've been extraordinarily patient, as

18 have others, so I don't want to take a lot of time, but I do

19 want to respond to three quick matters.  First, one of the

20 things that has not, I think, been made as clear as maybe

21 should be, and the reason that we're so sensitive about the

22 timing is, as compared to Century, Hartford, and others who

23 have settled, which are fixed amounts, the Boy Scouts' amount

24 is going to keep going down.

25          And in terms of getting fair compensation, I

1  understand everyone's concern on the timing and the like, but

2  it's costing, ultimately, the survivors millions of dollars

3  because of the ultimate BSA contribution, which is one major

4  reason that we prefer the dates be moved as little as

5  possible.

6          Second, Your Honor, there's been a lot of

7  discussion about the voting and changing the voting.  We

8  believe, which is one reason we don't believe that the re-

9  solicitation is necessary, is that the modifications to the

10 plan have been to the positive.  In traditional cases when

11 there's been re-solicitation, it's been to the negative.

12         And because we think it's been to the positive, we

13 think it's important that the Court know that what parties

14 want to stay firm with their vote, whether it be yes or no,

15 and what parties -- what survivors want to change their vote.

16         Their lawyers are not going to be doing anything

17 differently than what was done before.  If they had the right

18 to vote for their clients, they would -- will.  And if they

19 don't have that right, they won't.  And so, it's going to be

20 no different than what we saw previously.

21         The third issue is going to be a confirmation

22 issue, Your Honor, but I do want to make it clear as to why it

23 came about, because there was a lot of negotiation about this

24 particular issue, is there is a cost, which has been stated

25 before with respect to enhanced review.  If you're in the TDP,

1  you're in the TPD.  You don't have to pay anything

2  additionally for it.

3         But if a survivor wants enhanced review, because

4  they think they have a high-value claim, if you didn't have a

5  cost, it would cost the trust a fortune and certain people

6  would be paying for it that get no benefit out of it.  So,

7  it's completely voluntary.  If you want to join enhanced

8  review, because you think you're entitled to an enhanced

9  review and you're a high-value claim, you can do that.

10         If you don't believe that, you simply stay in the

11  traditional TPD.  But there has to be a cost, for you're going

12  to be -- and I'm doing this just for information, not because

13  we're litigating it today -- but we had to come up with

14  something that was fair, so that people are not paying for

15  something that they have decided on their own not to take

16  advantage of, if they think it is to their advantage.

17         So, I wanted to, at least, clarify that issue, Your

18  Honor, because it was important to the negotiations.

19         THE COURT:  It's helpful for me to know what the

20  parties intended by this parallel proceeding, because I was

21  wondering about that and why everyone, why the independent

22  review option isn't simply the option, isn't simply the TPD.

23         I'll give that some thought, but it's interesting

24  to hear what was envisioned by adding this other option, the

25  independent review option.

1       MR. PATTERSON:  Your Honor, may I speak to that

2  briefly?

3       THE COURT:  Mr. Patterson?

4       MR. PATTERSON:  Just to maybe provide a little bit

5  of context, the independent review alternative was made

6  available for certain claims on an optional basis for a number

7  of reasons and to satisfy a number of priorities.

8       But one of the things about the independent review

9  process is its rigor.  In order to obtain an award out of that

10 process, the survivor has to show liability and has to prove

11 damages, has to consent to a position, perhaps, a hearing,

12 perhaps the insurers will be present -- they're invited.  They

13 have to have evidence of damages and, perhaps, a medical

14 assessment, mental settlement.

15      So, the rigor is intended to test whether or not

16 the claim truly has underlying validity.  And in that context,

17 would be -- would receive a substantial award in the parallel

18 tort system.  And so, it is intended to provide that

19 alternative for certain claims that can make that showing.

20      The general TDP processes do not envision or

21 require the same level and rigor of showing and evidence with

22 regard to those determinations, in order to maintain a

23 relatively lower-cost environment for claims that are not

24 going to receive as much money.  So, it's a parallel system

25 that awards higher amounts for claims that can meet those

1  higher standards, Your Honor.

2        The twenty-thousand-dollar fee, payable in two

3  parts:  one at the outset and once when the review, itself,

4  starts, was intended to offset the cost to the trust of the

5  review, itself, so that it would be survivor-borne.

6        And because the outcome might be a negative one,

7  it's not simply possible to offset that against the ultimate

8  award; that would have been our preference.

9        But I understand the questions and issues that

10  Mr. Buchbinder and others have raised, with regard to the

11  10,000, post-10,000, and I think the Court can be assured that

12  those of us, including Mr. Pachulski and Mr. Molton, the

13  debtors, and others who have participated in inventing this,

14  will give serious consideration to the manner in which it is

15  structured.

16        THE COURT:  Thank you.

17        MR. PATTERSON:  I hope that's responsive to the

18  Court's questions.

19        THE COURT:  It's helpful to the understanding of

20  the genesis of the independent review option and the positive

21  characterization that you and Mr. Pachulski have of it.  I

22  suspect somebody could make a negative characterization of

23  either it or the TDP on a relative basis.

24        Mr. Buchbinder?

25        MR. BUCHBINDER:  Thank you, Your Honor.

1          I'll be brief.  I want to speak, again, to the

2   disclosure statement issue, suggesting that the debtors start

3   from square one with a new disclosure statement.  But with

4   respect to the amendments on the term sheet that was filed on

5   February 9th, I think that the Class 8 and Class 9 creditors

6   deserve an explanation as to how these proposed plan

7   amendments will affect their claims.

8          On the definition, the new definition of "abuse

9   claim" and "mixed claims"; frankly, Your Honor, I can't

10  understand it for the life of me and I've been reading these

11  things for, well, a couple of years, at least.  And I think

12  some explanation of what is intended there and what it fixes

13  would be very helpful to the parties being asked to

14  potentially change their vote.

15         Let me give an example.  Many of the objections

16  that have been filed by personal injury claims, have raised

17  the 1129(a)(7) issue in the context that in a Chapter 7, there

18  wouldn't be a third-party release and they would retain their

19  rights against insurance carriers and against the perpetrators

20  of the activities and the other parties involved.  And that's

21  not something they get with this plan.

22         So, I don't know if the new definition fixes it or

23  makes it worse or puts it somewhere in the middle, but from

24  (indiscernible) reading of those two sentences and the new

25  definition of mixed claims -- and I don't need someone to

1  explain it to me here today; I need you to explain it to the
2  people who are voting:  What does it mean?  What does it do,
3  in plain English.  Does it resolve some of those objections or
4  is it just an invitation for more lawsuits at a later point in
5  time in different places.  Tell us what it means and what it
6  does.

7          And for the changes to the chartered organizations,
8  the same thing; we don't need to start from square one, but we
9  need to address these amendments for those two classes and
10 then if we're going to ask them to change their vote, they're
11 changing it based on adequate information and it's not based
12 on, Well had a town hall with our attorneys and they told us
13 this is a good deal and we should vote for us.

14         If they should vote for us and it makes the vote
15 better, tell us in a supplemental disclosure statement.  It
16 doesn't have to be long.  We don't have to start from square
17 one.  And we can probably hear that on an expedited notice and
18 we could still work within the time frame of three to six
19 weeks.

20         And, you know, once again, this timing, it's all of
21 the Boy Scouts' causation and their own consequences.  They
22 wasted three months last summer, fighting two inconsistent
23 plan support agreements that they, themselves, entered into.
24 And they shouldn't sit here today, after making all these
25 changes and complain to the people still objecting, that it's

1   our fault and the case is melting.

2          They have to accept the consequences of their

3   actions and I stress, again, it's not a bondholder case and

4   the votes of these people are precious and it's what they have

5   waited for, for years to do and they need to have their chance

6   to change their vote to yes or no or maybe, and they need to

7   be told what these new provisions do for them, because no one

8   understands what's going on here.

9          Thank you, Your Honor.

10          THE COURT:  Thank you.

11          Mr. Hallowell?

12          MR. HALLOWELL:  Your Honor, I'll be brief.

13          First, in his description of the alternative TDPs,

14   Mr. Patterson has made the point that the certain insurers

15   have been making for months:  there is no reason why the

16   regular TDPs cannot include exactly the same rigor that the

17   alternative TDPs include.

18          Second, Your Honor, I want to briefly address the

19   situation with Mr. Griggs.  First of all, this is the first

20   we're hearing, even though we had a meet-and-confer yesterday,

21   that there were issues with regard to the availability of Mr.

22   Griggs.  We don't believe that Mr. Griggs should be taken out

23   of turn.

24          We'll emphasize a couple of things, Your Honor.

25   First, we were discussing in our meet-and-confer yesterday

1  with the debtors, the appropriateness of submitting direct

2  testimony by declaration.  The debtors seemed to want that.

3  We suggested it be on a witness-by-witness basis, and if the

4  debtors want to submit a declaration for Mr. Griggs, that

5  would strike me as a perfect solution to the problem that you

6  confront.

7           In terms of the cross-examination of Mr. Griggs, I

8  will remind Your Honor that this is a remote proceeding.  It's

9  likely to be a remote proceeding for some time to come, and we

10 can work out an accommodation where Mr. Griggs can be cross-

11 examined remotely, in accordance with whatever schedule this

12 Court sets.  We think that that is a more fair and more

13 appropriate resolution of the availability concerns with

14 regard to Mr. Griggs.

15          THE COURT:  But how is it taking him out of turn,

16 Mr. Hallowell, in the sense that the debtors are going to put

17 on whoever -- they could have put him on first.  I mean, how

18 is it taking somebody out of turn?

19          MR. HALLOWELL:  If we don't start the trial until

20 March 1st, Your Honor, but we're having an examination of Mr.

21 Griggs on February 25th, then we're taking him out of turn; we

22 are taking him days before the rest of the trial.

23          We're hoping, Your Honor, that we aren't starting

24 the trial on March 1st and that we're starting it much later,

25 and we believe that's appropriate.  And if that's what Your

1  Honor rules, then it is particularly inappropriate to have Mr.

2  Griggs have his trial testimony occur so early in the

3  proceedings.

4        And we think, Your Honor, that if Your Honor agrees

5  with us and provides the scheduling accommodation that I think

6  all parties need here, that we'll be able to find another

7  solution with regard to Mr. Griggs, and we're happy to meet-

8  and-confer with regard to that.

9        THE COURT:  Okay.

10       MR. HALLOWELL:  I'll just conclude, kind of --

11       THE COURT:  I think you had another point and I

12 interrupted.

13       MR. HALLOWELL:  I did, and it's going to be very,

14 very short, and that is despite what they told us, the

15 insurers do not support the destruction of the Boy Scouts and

16 the insurers do not employ delay as a strategy.

17       Thank you.

18       THE COURT:  Okay.  Well, the debtors have requested

19 an extension of time and the only question now is how much and

20 how much is appropriate?

21       And the stated reason for the extension from the

22 debtors is to give the survivors, but it should be all abuse

23 claimants, an opportunity, if they choose, to change their

24 votes, which should require an opportunity for they and their

25 counsel to have a plan in place, to understand the plan, and

1 the either new treatment or new plan provisions and TDP

2 provisions and options that are available to them.

3          And as for the chartered organizations, for them to

4 understand their vote, in terms of their treatment as a member

5 of Class 9, and the consequence of not, either not opting out

6 or opting out of the chartered organization treatment, which

7 has fluctuated over the course of the last few months.  There

8 is no debate that that -- that the options of the chartered

9 organizations has changed, changed back, and changed again.

10          And people need to be able to meaningfully make

11 choices and then -- I forget, is it Omni or Prime Clerk --

12 whoever our voting agent is, needs to be able to have the time

13 to accurately reflect the vote and any changes in the vote

14 that may occur.

15          And I do agree with what Mr. Buchbinder and others

16 have said, which is that the survivors here want their vote.

17 They want to exercise their vote, as we saw in the first round

18 of voting, and it's meaningful to them, and it's, perhaps,

19 more than just a vote from a commercial creditor.

20          So, in order to permit a meaningful -- an

21 opportunity to meaningfully consider the changes that have

22 been made, I think, is at least a two-week extension.

23          The -- I'm not -- I do believe that the insurance

24 companies, certain insurers who have spoken up, and Roman

25 Catholic Committee should have time to review the changes, as

1    well.  I do think a lot of the arguments that they will make

2    are legal arguments or, there, a variation of an argument

3    that's already been put forth.

4           I don't know how much actual discovery will need to

5    be done and I don't think it ought to be, though, a

6    significant amount of discovery.  And we're not going to

7    rehash discovery that's already been done.

8           So, we're going to start on March 9th.  That

9    assumes that the plan is filed on Monday, that the settlement

10   agreements are filed on Monday, that the revisions to the TDPs

11   are filed on Monday, and that everything that has to be filed

12   on Monday, is filed on Monday, that was stated was going to

13   be.  If that doesn't happen, we will revisit this again.

14          I agree that in bankruptcy, this idea of floating

15   settlements and last-minute settlements is quite common, but

16   at some point, the documents need to be final and people need

17   to have the benefit of them.

18          I'm not suggesting that there could not be another

19   settlement between now and the date; that there's something

20   that can be settled.  And I would also hope that this

21   additional time would be used to reach out to those objectors

22   to see if there can be some resolution of their objections.

23          But I think it's fair to say that this has been

24   enough of a moving target, enough so that, certainly, the

25   representatives of the survivors want an opportunity to speak

1  with their clients and the chartered organizations should have

2  an opportunity to see where this has landed for them.

3          This is also unique, in that the default for

4  chartered organizations is not that they're out, but it's that

5  they're in, and they are contributing certain rights and

6  getting certain benefits, but I think they need the

7  opportunity to review the current state of play.

8          The debtors should consider whether additional

9  disclosure is appropriate.  It might be under 1120 -- what was

10  it? -- 1127(c), I think it was.  This gives them a little bit

11  more time to get that out there.

12          And I'll say this, people have commented, I think

13  appropriately, at different times throughout this case, that

14  this is complex, and I would say that's an understatement.

15  It, of course, requires due process, but to the extent there

16  is going to be an appeal of whichever way I come down on

17  confirmation, due process shouldn't add to that appeal.

18          I would like to understand, and it doesn't have to

19  be today -- I'll give the parties an opportunity to speak --

20  how the trial is going to progress; how witnesses are going to

21  come in; what *motions in limine* are really still on the --

22  still have to be resolved; what -- I thought it was

23  interesting, I think I also have *motions in limine* from

24  parties who are neither plan proponents, nor objectors.  Is

25  that appropriate -- I don't know -- but how we're going to

1  proceed.

2           And I am hoping there will be -- and I am

3  expecting, and I have no doubt, there will be cooperation, so

4  that when we start, it runs smoothly.

5           As for Mr. Griggs, why don't you all talk about

6  that and let's see if there can be an accommodation to his

7  schedule, so that he can be appropriately presented and

8  crossed, however that's going to be.  And, you know, I

9  understand his competing obligation, but let's see what can be

10  done.

11           Mr. Kornfeld?

12           MR. KORNFELD:  Good afternoon, Your Honor, and

13  thank you very much.  For the record, Alan Kornfeld, for the

14  TCC.

15           I wanted to, first, say in response to your

16  question about the conduct of the trial, the parties have met-

17  and-conferred as Mr. Hallowell pointed out.  That process, as

18  far as the TCC is concerned, should and will continue, and we

19  will do our best to streamline, consensually, and make the

20  trial as efficient as we can in this complex, multiparty case.

21           So, that's the first point, and we hear Your Honor

22  on that point.

23           Second of all, with respect to your question about

24  what *motions in limine* are still pending, based on the filings

25  last night, and, frankly, I haven't read all of them, and

1  those that I have read, I've just skimmed, there are a

2  significant number of *motions in limine* and, prior to that,

3  there were objections to certain portions of Dr. Bates' report

4  and testimony filed by both, the TCC and the FCR and

5  Coalition, which are really styled as objections,

6  appropriately, but also raise many of the same types of issues

7  that would be part of *motions in limine*; in essence, they're

8  evidentiary motions.

9        With respect to the *motions in limine* that were

10  filed last night, the *motions in limine* that seek to exclude

11  portions or all of Ms. McNally's testimony -- she's the TCC

12  valuation expert -- their motions against Mr. Coleman, who is

13  a TCC insurance-coverage expert, who was offered for limited

14  purposes.  There's motions against Ms. Getzler, against   Mr.

15  Burnett, who are debtor experts.  There's motions against Mr.

16  Avril, who is an expert for the Catholics.

17        So, there are extensive *motions in limine*, some of

18  which may be able to be resolved through discussion, including

19  the discussion that the Court has raised about the gating

20  question of what is still relevant and then what needs to be

21  decided.  And some of which will need to be, frankly, Your

22  Honor, brought before Your Honor to decide.

23        We are going to have those discussions as part of

24  our meets and meetings and conferring with respect to the

25  conduct of the trial.  But I would suggest, Your Honor, that

1  the date on which oppositions to any *motions in limine* that

2  are still extant after the meet-and-confer process, be

3  extended until about March 4 or thereabouts, depending on what

4  Your Honor wishes.

5          THE COURT:  Well, let me ask you this question, Mr.

6  Kornfeld.  For example, many of these motions in limine were

7  directed at TCC experts.  Given that the TCC is now on board,

8  am I going to be getting testimony from these TCC experts?

9          MR. KORNFELD:  You are, Your Honor, because here's

10  the issue.  The issue is what are you going to be asked to

11  find about valuation.  As you heard from Ms. Lauria in her

12  opening remarks, there is a stipulation between the TCC, the

13  Coalition, and the FCR about what Dr. Bates will be saying and

14  what Dr. Bates will be presenting to Your Honor, and, as Ms.

15  Lauria stated what we've agreed is that the plan and amended

16  TDP are a mechanism which provides a path to potentially over

17  time a full recovery for survivors, along with, of course, the

18  2.7 or so billion dollars that has already been liquidated.

19  But it's a mechanism; it's not full payment right now.

20          Our concern, Your Honor, is, frankly, this.  The

21  insurers like Dr. Bates' testimony because Dr. Bates'

22  testimony ends up getting to a value that is far lower than

23  what the TDPs provide.  If Dr. Bates' testimony is found by

24  Your Honor to be the value, the insurers will then argue that

25  there has been a finding by this Court that there is full

1  payment.  As a result of that full payment, survivors' ability

2  to access insurance, in particular excess insurance, will be

3  eviscerated and eliminated.

4         So we don't want that finding, the insurers do want

5  that finding, that's why the insurers have filed a fulsome --

6  based on my skim -- a fulsome objection to Ms. McNally, who

7  will testify that the TDPs provide a value that is less than

8  historical settlements.  So they don't want you to hear from

9  her, they want you to hear from Dr. Bates.

10        So the stipulation that the FCR, the Coalition, the

11 debtors, and the TCC reached was, as Ms. Lauria aptly put it,

12 we have respectfully agreed that, while we are supporters and

13 plan proponents and will advocate for confirmation of this

14 plan, we disagree about what should be the findings that are

15 made in connection with the plan.  And our disagreement is

16 really a disagreement with Dr. Bates in the first instance,

17 but it's really with the insurers and that ultimate finding of

18 what you'll be asked to find by the insurers that there's full

19 payment.  And, Your Honor, if you find that, survivors'

20 ability to recover fairly and equitably and obtain the

21 compensation they should be entitled to is gone.

22        So, in essence, I was -- I didn't want to get too

23 heavily into the substance, I realize I did to a certain

24 degree, but I wanted you to understand the significance of the

25 Dr. Bates and Ms. McNally issue that you're going to hear

1  about.

2          THE COURT:  Fascinating.  Okay.  Everybody wants

3  findings and maybe people may not want all their findings.

4          Okay.  Mr. Karlan.

5          MR. KARLAN:  Thank you, Your Honor.  This is my

6  maiden voyage appearance in this case and I'm happy to be

7  here.  I'm with Gibson, Dunn, Mr. Hallowell's partner, and

8  appearing for AIG.

9          Your Honor, I don't think today is the day you want

10 to get into this Bates morass too deeply, but if I could get

11 three sentences in in response to what has been said.

12         The new finding that we've made reference to that's

13 in the term sheet is basically a finding that Dr. Bates'

14 opinions are wrong.  And what's novel about it is that Dr.

15 Bates is of course the debtors' expert, who apparently is

16 being thrown under the bus by the debtors in the term sheet.

17         The term sheet represents, you know, a very unusual

18 agreement between adversaries in a litigation, the debtors on

19 the one hand and claimants on the other, to curate and highly

20 edit what testimony the debtors' expert will be permitted to

21 give, even contrary to what is in his reports.  I'll leave it

22 for Your Honor to judge whether that's just unusual or maybe

23 even more sinister than just unusual.  But that's what the

24 fight is about.  Your Honor is going to need a chiropractor or

25 a contortionist to separate and unbend the debtor, Ms.

1   McNally, and the TCC at the confirmation hearing because the

2   debtor is going to be, I guess, undercutting its own expert's

3   testimony.

4          On the issue of what's been eviscerated, at some

5   point, Your Honor, I guess we'll have to read -- or we'll get

6   the opportunity to read the brilliant cross-examination of Ms.

7   McNally at her deposition by Mr. Kurtz.  She was eviscerated

8   by him and it will be interesting to see whether he is now

9   going to stand up and say she's the greatest thing since

10  sliced bread at the confirmation hearing.

11         Mr. Kornfeld is right about one thing, the debtors

12  do like Dr. Bates' opinions, but he's wrong about why we like

13  them, we like them because they're the truth.  And the best

14  evidence that they're the truth is that what the debtor and

15  everybody was supporting until this, you know, eleventh hour,

16  11:59, unholy alliance deal got cut in the term sheet.

17         Thank you, Your Honor.

18         THE COURT:  Thank you.  Well, I won't make any

19  comment on that.  I will note that I flagged the issue, it

20  jumped off the page.

21         Mr. Snethurst.

22         MR. SNETHURST:  Thank you, Your Honor.  Can you

23  hear me?

24         THE COURT:  I can.

25         MR. SNETHURST:  Thank you for hearing me, Your

1 | Honor.  I'm Ryan Snethurst on behalf of Allianz and, on behalf
2 | of Allianz and the certain insurers.

3 | We filed two motions in limine last night
4 | addressing two TCC witnesses, one Roman Catholic witness and
5 | two debtor witnesses.  I do think Your Honor needs to hear
6 | these motions, unless these anti-insurer findings magically go
7 | away and unless we can make some headway on that in the
8 | conferrals that Mr. Kornfeld has referenced. And we welcome
9 | those discussions, Your Honor, but they've gone nowhere to
10 | date.

11 | I think Your Honor needs to hear the motions and I
12 | encourage you to read them.  They are -- if you're inclined to
13 | grant them, they are a way to narrow this trial, materially
14 | so.

15 | And the final point I'll make, Your Honor, briefly,
16 | is that with all the discussion of extensions of time and
17 | adjournments, there should be no extension of time on a
18 | deadline that's passed, which was yesterday's deadline to file
19 | motions in limine.  There should be no more motions in that
20 | respect can be filed in this case.

21 | Thank you, Your Honor.

22 | THE COURT:  Thank you.  I have not had an
23 | opportunity to review any of the motions in limine that were
24 | filed yesterday, I just noted that they were filed -- I just
25 | noted who they were filed by.  And, yes, I have not extended

1  the deadline for filing of motions in limine, so I don't

2  expect to get anymore.

3           Mr. Kurtz?

4           MR. KURTZ:  Thank you, Your Honor.  I had

5  originally raised my hand just for two matters, one was the

6  imminent nature we have the new interim objection dates and

7  the voting deadline dates, which I'll get to in a second;

8  another was to talk about whether it's appropriate to hear

9  some trial practice issues right now.  But let me at least

10 start really, really briefly.

11          The Bates White -- no one is changing opinions or

12 feeding opinions.  Your Honor will hear that when Your Honor

13 hears it and Your Honor will make whatever findings Your Honor

14 believes are appropriate given the record that is presented to

15 you.

16          And I will say that from the debtors' perspective

17 we do not believe that any findings made about payment

18 substantially in full in connection with 1129(a) has any

19 binding effect to the benefit of the insurers.  We believe

20 that the determinations as to value of each individual claim

21 have been aggregated, when that exercise is complete, is the

22 sole province of the trust.  And so we don't really see the

23 concern.

24          And I couldn't help but notice Your Honor's

25 observation about findings, everybody has got findings, I

1  guess the insurers don't want certain findings that impact

2  them in the future and then they want other ones that will.

3  We'll get to that, it will be a significant issue, but I want

4  it to be clear that we don't see how an 1129(a) finding about

5  the prospect of payment in full could somehow handcuff the

6  trust in its work here.

7           In terms of trial practice, I appreciate Your

8  Honor's optimism; I wish I shared it a little more.  We had a

9  meet-and-confer yesterday.  I think there's issues we're not

10 going to be able to resolve.  I would -- maybe if Your Honor

11 has a few moments, I can be brief about it

12           THE COURT:  Okay.

13           MR. KURTZ:  Okay.  So, obviously, our objective

14 here is an efficient and a swift trial, and so we tried to

15 come up with the ways that we thought we could get the record

16 in and in appropriate way, given the concerns you've already

17 heard about in terms of our financial condition.

18           And, you know, we looked at the original allocation

19 of trial dates that you gave us, thought that with breaks and

20 maybe even a couple days that went a little later, depending

21 upon where a witness was, maybe that was adding up to about 50

22 hours.  So we proposed to maybe get an agreement on 50 hours

23 for trial.

24           And I suspect that may not be Your Honor's

25 practice, but it's certainly a practice that's pretty widely

1  deployed in Delaware.  Anybody who wants to walk over to the

2  Chancery Court is going to get one week except in a very

3  special case.  We all try the cases this way and never have a

4  problem with it.  It's always an interesting exercise for the

5  last two hours.  But the evidence that's important gets put in

6  pretty early, it's highlighted, everybody knows what it is,

7  and I think it's a pretty good way to keep people's feet to

8  the fire.

9         We proposed that -- it wasn't accepted -- we also

10 proposed to just split it 50-50.  We have a burden of proof,

11 there's ways to argue who gets more time, but, in my

12 experience, everybody splits it.  And so we thought it would

13 be appropriate to split it, I'm not sure we got a real answer

14 on that.  So that's one of the issues.

15        Another time-saving idea, of course, was to skip

16 openings.  Now, Your Honor is going to have had an enormous

17 amount of paper addressing these issues, Your Honor has heard

18 these arguments in so many contexts, and I believe that you

19 understand these issues probably better than we do and

20 probably don't need an opening.  But, obviously, whatever is

21 helpful to Your Honor is what we'll all do, but it's a lot of

22 time and we think we should get right to the evidence.  Again,

23 a pretty common -- in a bench trial, a pretty common way to

24 proceed.  In a jury trial, it's different; in a bench trial,

25 people don't really need to do that.

1          Declarations instead of live testimony, that's
2   really commonplace.  I don't think we actually have an
3   objection to this, but we did say -- and also I believe
4   commonplace -- is that we put in the vast majority of the
5   testimony by direct through declarations.  But that people
6   will use their time, an allocated amount of time, so you're
7   very much incentivized to do it in an efficient way with some
8   amount of direct, the length of which would depend on the
9   importance of the issue and maybe how contested the issue
10  really is.  It probably would mean that the experts would get
11  a little longer in the live direct than some of the other
12  witnesses would.
13          I think the response that we got was you can do
14  declarations, no one is going to object to that -- it would be
15  kind of hard to object to that in a bench trial, but -- or you
16  can put on a witness that's live, but you can't do both.  I
17  think it's common to do both.  I also think, if we do a time
18  split, that people have to live with their own decisions and
19  it shouldn't really matter to people whether they allocate
20  some of their cross time to a brief direct or to -- or just
21  use their declaration.  So we think that's kind of sensible as
22  well.
23          We seem to be in agreement -- well, no, the last
24  issue I guess we're not really in agreement on is the experts.
25  So we had sort of proposed maybe reports would go in.  In

1   retrospect, I think maybe declarations should go in.  The

2   experts will be a little bit dense, there will be, obviously,

3   charts and tables and data, and things like that.  It might be

4   easier for Your Honor to read it as opposed to having it all

5   go on live.  So I'm not going to stand on the idea that it

6   goes in through expert reports, but of course I want to be

7   candid that any declaration is going to include significant

8   portions of the content of the expert reports.  That will

9   happen whether it's live or whether it's in a declaration, but

10  we seem to have a dispute on that.

11        The only other issues I think we had is we

12  suggested all the exhibits go in at the start of trial, except

13  where there's objections, and that those objections could be

14  addressed as a preliminary matter before starting trial.  I

15  didn't really get a per se objection.  I really think what I

16  got was concern about people running out of time, which is I

17  think probably a fair thing, but maybe we have more time now

18  that we've moved the schedule by a couple of weeks.  But I do

19  think it's -- nobody -- I think everybody agrees we're not

20  going to go through authentication exercises, nobody would

21  have the audacity to suggest that.

22        And so I think, if we have substantive, categorical

23  issues, we'll try to deal with them upfront.  It's easier if

24  they're in trial so that we can just reference them and I

25  think -- that's where I think we may actually get there.

1        And then we suggested a day or two for close,

2   probably two days, issue-based.  Those issues could be

3   identified by Your Honor since you're the one who needs to

4   understand and ask questions.  Otherwise, we would make

5   suggestions.  And I think there was no particular pushback,

6   other than nobody was sure they were prepared to commit.

7        I think the real issue there is some people

8   contemplated post-trial briefing.  I understand the benefit of

9   post-trial briefing, but that's just tacking on emergence

10  delay on the other side of a trial.  And so we're hoping that

11  with the proper record, with the pretrial materials, with

12  other ways to reference Your Honor to the record to make your

13  life easier, we can do away with something as formal as post-

14  trial briefing, except to the extent that Your Honor thinks

15  it's helpful, in which case we'll encourage it be done pretty

16  quickly even if it's painful for us and for everybody else who

17  has to make a submission.

18       And then the only other issue is, Your Honor has

19  already heard about Mr. Griggs.  We'll touch base with him,

20  hopefully he'll have some time that fits in his new schedule

21  without delaying.  And, if we can get that, hopefully, we'll

22  reach agreement; if we can't and we can't reach agreement, we

23  may have to be back, because he's a little foundational for

24  some of the pieces.  It would be very awkward to put him at

25  the very -- you know, after the rest of the evidence where

1  people will no doubt have to rely on his testimony in terms of

2  what was done historically and how it gets impacted.  And I

3  think it would be tiring and confusing for everybody if our

4  questions are along the lines of, subject to our demonstrating

5  this later, would it affect your opinion if Mr. Griggs was to

6  testify.  So we'll try to make that work for you and hopefully

7  we can find a way to do that consensually.

8            THE COURT:  Okay.

9            MR. KURTZ:  And then so the last thing was the

10 dates.  And people were trying to get me dates and I was -- it

11 was so staggered out that I was losing them.  And so maybe I

12 can pass this off to Ms. Lauria to make suggestions for

13 objection deadlines and for voting dates because I'm not sure

14 I followed them.

15           THE COURT:  Let me hear from --

16           MR. KURTZ:  Thank you, Your Honor.

17           THE COURT:  Thank you.  Let me hear from Mr. Karlan

18 first.

19           MR. KARLAN:  Thank you, Your Honor.  I'll just try

20 to tick these off in the sequence that counsel raised them.

21           Openings.  Judge, I have not been before you, so I

22 apologize, I don't know --

23           THE COURT:  I don't need an opening.

24           MR. KARLAN:  I'm sorry, Judge, I couldn't hear you.

25           THE COURT:  I do not need an opening.

1         MR. KARLAN:  Okay, then that's -- then I won't

2    press that.  We would like one, but it's up to you, obviously.

3    So that's that.

4         On direct testimony, we have no objection if the

5    debtor wishes to submit its direct testimony by declaration.

6    We may submit some of ours that way as well.  We would like to

7    have the right, if we think it's appropriate, to bring some of

8    the witnesses in live for direct testimony.  I'm using "bring

9    them in" in the colloquial sense because nobody is getting

10   brought anywhere.

11        But Mr. Kurtz is correct that what he and I are

12   having a little disagreement about, whether we should have the

13   right -- or whether he should have the right, really, to

14   submit a declaration and then put the witness up and say, now,

15   let me ask you 15 minutes of questions as if this were a

16   normal direct.  That seems inappropriate to me, but, again,

17   this is your courtroom, Judge.  You probably have tried a few

18   cases and probably know how you like it done, so you'll tell

19   us.  But we would suggest it be one or the other for the fact

20   witnesses.

21        The issue of declarations and live testimony and

22   reports becomes a little more controversial or sensitive for

23   us when it comes to experts.  And, not to put too fine a point

24   on it, it's really Bates --

25        THE COURT:  Bates.

1          MR. KARLAN:  -- that we're talking about.  I don't

2    want Mr. Bates testifying by declaration or live in a way that

3    runs away from, expands on, or twists around his reports.  So

4    we are going to offer Mr. -- sorry, Dr. Bates' reports in

5    evidence and we would ask that the Court be alert to confining

6    his testimony to what's in his reports.

7          I have written down here "evidence," what was that

8    about?  Oh, is that about documents?  Glenn, is that what I'm

9    supposed to talk about, evidence?

10          THE COURT:  Exhibits maybe?

11          MR. KARLAN:  Oh, the exhibits.  I'm sorry --

12          THE COURT:  That's what I've got.

13          MR. KARLAN:  -- exhibits, yeah.

14          THE COURT:  Exhibits maybe?

15          MR. KARLAN:  Thank you, Judge.  I told counsel

16    yesterday, as quickly as he can get us his case in chief, we

17    will immediately be back to him whether we have any

18    objections.  It's hard to believe in a case like this there

19    are going to be any evidentiary objections, but just send us

20    the documents and we'll get them back to you right away.

21          Closings sounds like openings, Judge.  What's your

22    -- what's your system?

23          THE COURT:  I would prefer closings orally --

24          MR. KARLAN:  Okay.

25          THE COURT:  -- and I don't --

1       MR. KARLAN:  Orally?

2       THE COURT:  Yep.  I don't need post-petition

3   briefing, unless I decide I do on a particular issue.

4       MR. KARLAN:  Okay.  And I think counsel were

5   thinking about, if it's acceptable to you, having a little

6   break before the oral closings.

7       THE COURT:  We might need a little break, yes, so

8   that it's organized and --

9       MR. KARLAN:  Yes, exactly.

10       THE COURT:  -- so that -- so that I have an

11   opportunity to think of my questions.  I have been known to

12   have a lot of questions.

13       MR. KARLAN:  That will make the closings more

14   valuable, I suspect, for everybody.

15       We'll get Griggs sorted out.  You've given us until

16   March 9th to start the trial.  I betcha -- I betcha we can

17   find a time for Mr. Griggs that will work for everybody.

18       THE COURT:  Okay.  Now, I recognize, obviously --

19   thank you, Mr. Karlan -- I recognize there are a lot more

20   objectors than just the certain insurers.

21       MR. KARLAN:  Sure.

22       THE COURT:  So -- and I'll hear from Mr. Ryan on

23   this, but we'll have to talk about, if it's going to be live

24   testimony or if it's going to be direct by declaration, which

25   streamlines things, but I have to have an opportunity to read

1   it ahead of time.  We'll have to talk about deadlines for

2   getting that in, but that can be -- that can be done.

3          In terms of supplementing declarations with short

4   direct, people have done it both ways.  I don't know that I

5   have a preference.  What I have -- I will say, I like to hear

6   experts and not attorneys.  So when attorneys step on their

7   expert witnesses, that's unhelpful, I'll say that.  It

8   shouldn't be the attorney's -- and this is, obviously, on

9   direct -- it shouldn't be the attorney's opinion, it should be

10  the expert's opinion, if you're going to put him on the stand.

11  If I'm hearing more from the attorney, I'm going to downplay

12  whatever it is.

13         Mr. Ryan?

14         MR. RYAN:  Thank you, Your Honor.  We are largely

15  in accord with what Mr. Karlan just laid out.  On the

16  declarations, the one question we had and what our suggestion

17  was, for those that come in, we wanted to give the Court time,

18  but also, you know, perhaps the morning of that person, that's

19  when we can present our objections to their testimony, to go

20  through that, so that there's not an undue burden to try and

21  do that too far ahead in advance.

22         Other than that, Your Honor, we pretty much are in

23  accord with what Mr. Karlan just laid out.

24         I did just want to turn back to your earlier ruling

25  and the -- just to comment on getting some sort of disclosure,

1  if the debtors are going to do a disclosure at the charters.

2  And just to note that we actually had -- you know, people may

3  forget this, but we had a very productive disclosure statement

4  hearing, getting plain-English disclosures out to the charters

5  and working with the debtors.

6          And I know Mr. Linder has run as far away from this

7  case as he can, but we did have a productive relationship back

8  then for this purpose to make sure.  So we certainly, on

9  behalf of the Roman Catholic Ad Hoc Committee, would offer to

10  do that again.  We have certainly the bones of a plain-English

11  statement, you know, if the debtors want to work to get

12  something out there that is in plain English for charters as

13  opposed to the denseness of this plan, we're happy to work

14  with them over the weekend on it.

15          THE COURT:  Thank you.

16          Mr. Buchbinder?

17          MR. BUCHBINDER:  Thank you, Your Honor, very

18  briefly.

19          First of all, this notion that there are two sides

20  here and the time should be split evenly is somewhat

21  fallacious.  Even though there are proponents and objectors,

22  the objectors to the plan are from multiple constituencies.

23  There are the insurers, there are the chartered organizations,

24  there are groups of individual personal injury claimants,

25  there's the Girl Scouts, there's ourselves; these are all

1  different constituencies.  So the notion that there should be

2  a time set aside and somehow those different constituencies

3  should carve up 25 or 30 hours is utterly fallacious.  However

4  much time it takes to try the case is how much time it takes

5  to try the case.

6          With respect to declarations, the concerns of the

7  U.S. Trustee -- and I acknowledge that we often have

8  confirmation testimony by declaration, it is a common practice

9  in Delaware -- the two concerns that I have here are, number

10 one, the full public access to the courts, the filing of

11 declaration and the proffer of declaration testimony may make

12 it difficult for a number of people who want to listen in to

13 the hearing.  I suppose, if we give them the information for

14 the Omni website so they can access the material, that might

15 resolve that issue.

16         But a secondary concern I have that would involve

17 our office is I'm anticipating that a significant number of

18 these declarations may have redactions and sealing issues in

19 them and they'll need to be vetted through us, and so we'll

20 need to review them in both redacted and un-redacted form when

21 they're filed and before they're used too, so that we can

22 resolve those issues beforehand and not tie up the Court's

23 time vetting sealing issues.

24         Those are my comments, Your Honor.  Thank you.

25         THE COURT:  Thank you for raising that issue.  I'm

1  not anticipating a closed courtroom, I'm not anticipating

2  sealing, quite frankly.  So, if those are issues, let me -- I

3  do need to know in advance.  I'm not thinking that the detail

4  of a particular claimant and who they are and what their

5  particular -- you know, the abuse or all of that is going to

6  be what I'm going hearing.  I'm not anticipating anything like

7  that at a granular basis.

8          So if we're going to have -- if anyone anticipates

9  that they are going to be proffering evidence that is

10  confidential and/or that would fit under the category of 107-

11  type information, then we need to figure that out in advance.

12  And certainly any declarations that are offered into evidence

13  will have to be put on the docket and should be put on the

14  Omni site, which I'm sure has all of the docket on it anyway,

15  so that parties can -- interested -- not necessarily parties,

16  but interested persons have access to it.  This is going to be

17  a public trial, as I think it should be, and I don't

18  anticipate any part of it being made private.

19          And so let me add to that that, to the extent that

20  there are individuals who have filed notices of intent to

21  participate, that cannot be done anonymously.  Okay?  If

22  you're going to choose to participate as an individual, as a

23  survivor in the trial, then that will be done on a public

24  basis.  I know no way to have that done on an anonymous or

25  confidential basis.

1           So, if parties have filed notices of intent to

2   participate, which I know some individuals have, and because

3   of the previous, I guess, orders in place, the Clerk's Office

4   redacted names and addresses of those parties, I actually

5   would like debtors' counsel to reach out to the individuals

6   and let them know that we'll be -- well, we'll be changing our

7   redactions.  Their names will become public in, let's say, a

8   week.  Their addresses we can still redact, but their names

9   will become public in a week.  So, if they don't wish to

10  participate on a public basis, they should withdraw their

11  notice to participate.  And I would like --

12          MR. ABBOTT:  Your Honor, Derek Abbott --

13          THE COURT:  -- the debtors to reach out, so people

14  are aware of that, if they're not on this Zoom.

15          MR. ABBOTT:  Your Honor, Derek Abbott.  I

16  appreciate that guidance, it's helpful.

17          While we're on that point, I think we all heard the

18  Court clearly say that, if you're represented by counsel, you

19  would appear through counsel.  So I think there's some folks

20  on that notice that may have filed them individually and

21  represented by counsel.  I don't think anything you've said

22  changes that.

23          THE COURT:  It doesn't.

24          MR. ABBOTT:  Just as a matter -- thank you -- just

25  as a matter of administration, we'll certainly do the reach-

1  out Your Honor suggested.  Rather than trying to include all

2  those notices of intent as related items on the agenda for the

3  confirmation hearing, we had contemplated that it might be --

4  the Court may want that list, obviously.  We thought we would

5  just include as a schedule and that that schedule would be

6  next to the back of that agenda and would have the names; as

7  Your Honor has just suggested, they would be public, and I

8  just want to confirm that that was acceptable.

9          THE COURT:  That's fine.  I've been -- I pulled

10  down a recent notice that you all filed on the docket and this

11  is what made us aware of individuals and who they are, and we

12  did some tracking of names that sounded familiar to see that

13  they were represented by counsel.  So that's what raised this

14  whole thing.

15          So, yes, I think it's fine to have a separate list

16  of all the participating parties, it can be attached to the

17  agenda.  I would like to have that.  But, yes, if there is an

18  individual who is represented on the notice of intent to

19  participate, they're not going to be permitted to participate.

20  Their counsel should have filed an objection.  And if -- and,

21  again, it won't be done on an anonymous basis.  I simply know

22  of no way to do that.

23          MR. ABBOTT:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          Mr. Desgrosseilliers?

1               MR. DESGROSSEILLIERS:  Your Honor, I think two

2   quick points.  One, I represent an individual and she has

3   appeared and continues to appear as Jane Doe, and that's how

4   she filed her lawsuit.

5               THE COURT:  That's fine.

6               MR. DESGROSSEILLIERS:  I presume that -- okay,

7   that's what --

8               THE COURT:  Because you're appearing -- counsel can

9   appear for Jane Doe --

10              MR. DESGROSSEILLIERS:  I understand.

11              THE COURT:  -- yeah, I'm fine with that.  It's

12  individuals --

13              MR. DESGROSSEILLIERS:  Thank you.

14              THE COURT:  -- actually appearing who we don't know

15  who they are, that can't work.

16              MR. DESGROSSEILLIERS:  And, sorry, the other point,

17  Your Honor, is more a procedural point.  I have not been party

18  to the discussions about preparation for the hearing as an

19  objecting party.  I just wanted to make sure whoever is

20  keeping the list -- I'm not going to raise an issue about it

21  and I don't think it will be a problem, but if they can

22  include me on the list that would probably be helpful.

23              THE COURT:  Obviously, debtors' counsel will circle

24  around with everyone who has filed an objection with respect

25  to exhibits, with respect to declarations, with respect to

1 | trial prep generally.

2 |         MR. DESGROSSEILLIERS:  Thank you, Your Honor.

3 |         THE COURT:  Mr. Kornfeld?

4 |         MR. KORNFELD:  Thank you, Your Honor.  I've

5 | distilled the questions from our group down to just a couple

6 | at this point.

7 |         First, is it correct that no part of the trial will

8 | be in person, that we will be virtual throughout the

9 | confirmation hearing?

10 |        THE COURT:  Unfortunately, yeah, I think so.  And

11 | especially with these many people because, if I had one person

12 | in the courtroom who tested positive, you know, I've wiped out

13 | the courtroom.  So -- and that actually pretty much happened

14 | to one of the teams in one of my colleague's trials.

15 |        So I think, unfortunately, that's where we are.

16 |        MR. KORNFELD:  We understand and thank you, Your

17 | Honor.

18 |        In terms of the conversation about direct of

19 | experts, we hear you about wanting to hear from the experts

20 | and understand what the experts are saying as opposed to what

21 | counsel is saying.  Do I understand you correctly, Your Honor,

22 | then to want to hear expert testimony on direct live, as

23 | opposed to through declaration?

24 |        THE COURT:  It's up to you.  It's up to you --

25 |        MR. KORNFELD:  Okay, very good.

1            THE COURT:  -- but if you're going to put your

2    witness on the stand, let him talk.

3            MR. KORNFELD:  Your Honor, that's where we come

4    out, as you know, I think in particular with experts that's

5    effective for the expert, for the Court, for all parties.

6            Your Honor, we had previously had on calendar a

7    final pretrial conference --

8            THE COURT:  Yeah.

9            MR. KORNFELD:  -- does the Court want to keep a

10   final pretrial conference on?

11           THE COURT:  I want to -- it was scheduled for next

12   Friday.

13           MR. KORNFELD:  Yes.

14           THE COURT:  I want to keep that conference for next

15   Friday to see if we've got any issues that are coming up,

16   because you all are talking and, if we have anything that

17   anyone wants to bring up about trial prep or otherwise, I

18   think that would be helpful.  So let's keep that.  If there

19   are no issues and parties are talking and you don't need any

20   input, let me know.  But I think --

21           MR. KORNFELD:  Thank you, Your Honor.

22           THE COURT:  -- it might be helpful.  And then --

23   and maybe by then -- and it's a maybe -- I'll have had a

24   chance to at least take a first cut through all the motions in

25   limine and let you know what I want to do with those in terms

1  of hearing them or at least understanding those issues that

2  have been raised.

3          MR. KORNFELD:  Your Honor, I'm glad you raise that.

4  That was my last question.  On the schedule at present, the

5  oppositions to the motions in limine would be due for all

6  parties on February 17th.  I would submit that that date

7  should be extended to a date further down the line, depending

8  on your schedule and when you want to hear the motions.

9          THE COURT:  Well, let me ask you this question, Mr.

10  Kornfeld.  Other than slipping because we've -- because the

11  trial has been continued for a couple of weeks, what's needed

12  in terms of response time?  Is it just to give people a little

13  bit of a breather?

14          MR. KORNFELD:  It's that perhaps, number one.

15  There's so many of them, just to get through them and figure

16  out what we need to do, we actually do need that breather.

17          With respect to Ms. McNally, her first long day of

18  deposition was concluded, the parties agreed that she would

19  have a second day of deposition on allocation issues.  So her

20  deposition isn't even over yet.  It's slated, subject to

21  confirmation and scheduling, to take -- confirmation issues

22  with respect to the scheduling -- to take place on February

23  18th.  So I would ask that perhaps a week after that, whatever

24  the Friday is after that, that would be the date that

25  responses to the motions in limine are due.

1          THE COURT:  Okay, I'm not --

2          MR. SNETHURST:  May I be heard on this, Your Honor?

3          THE COURT:  Yes.

4          MR. SNETHURST:  Thank you.  Ryan Snethurst,

5  McDermott, Will & Emery, for Allianz and on behalf of certain

6  insurers.

7          Ms. McNally's deposition is continuing, so I think

8  perhaps Mr. Kornfeld has a point there, but the rest of these

9  motions should be briefed on the schedule.  It is prejudicial

10  to the insurers to have these extensions of time.  We met our

11  obligations under the schedule, we too have been working very

12  hard to do so, and to continue -- to grant extensions of time

13  on Your Honor's order is simply unfair.

14          THE COURT:  Well, it sounds like we're in agreement

15  on -- I've already forgotten her name --

16          MR. KORNFELD:  Ms. McNally.

17          THE COURT:  Ms. McNally, it sounds like we're in

18  agreement on that.  So I'll permit the extension because her

19  deposition is ongoing.

20          MR. SNETHURST:  As to her only, Your Honor?

21          THE COURT:  Yeah, I think as to her only.

22          MR. KORNFELD:  What date would you like, Your

23  Honor?

24          THE COURT:  I think you suggested a week and Mr.

25  Snethurst didn't object, so -- a week after the close of her -

1  - you said her deposition was on the 18th?

2        MR. KORNFELD:  It is on the 18th, so that would

3  make the response --

4        THE COURT:  The 25th?

5        MR. KORNFELD:  -- due the 25th, indeed.

6        MR. SNETHURST:  No objection.  Thank you, Your

7  Honor.

8        THE COURT:  Okay.  Getting back to Mr. Kurtz's

9  first point about a timed trial, I actually have not had one

10 as a judge, and I do think it's trickier when it's not a two-

11 party dispute to -- and be able to anticipate how long parties

12 need to present their case.

13        I really had anticipated this would go at least two

14 weeks for evidence and if the parties can come to some

15 agreement -- and it's not parties, major parties, it's all the

16 parties who filed an objection -- this is multi-party and even

17 among the claimants, as we know, they have different positions

18 and different concerns that have been expressed -- if there

19 can be -- I certainly would like there to be agreement on the

20 order in which parties are going and all of the documents, to

21 the extent possible.  And I am a hard copy person, so I do

22 want a set of exhibits, certainly all of those that are agreed

23 to prior to trial.  And then if there's a binder that has ones

24 that aren't agreed to, we can deal with that.

25        This hearing is not going to go on in perpetuity.

1  So, you know -- so while I'm not putting a time on it at this

2  point, I appreciate everyone's effort.  And I think, again,

3  everyone is a consummate professional here; you know how to

4  conduct trials.  I really don't believe at this point, when

5  we're on somewhat the eve of trial, that people are delaying

6  for delay's sake.

7          So I certainly have two weeks for evidence and

8  hopefully that's enough, but we'll see how it unfolds.

9          And, in that regard, I think all parties who are

10  going to put on their witnesses should think about whether

11  they have witnesses that are duplicating others and maybe go

12  with your best witness.  So just things to think about.

13          Ms. Lauria?

14          MS. LAURIA:  Thank you, Your Honor.  I just wanted

15  to return to I think the point where Mr. Kurtz was prepared to

16  hand things off to me to address -- not the dates for

17  (indiscernible) but the dates as we lead up to the start of

18  the confirmation hearing on March 9th.  We had thrown out a

19  few suggestions for the Court and the parties to consider.

20  And, again, this is all premised upon -- and we heard you loud

21  and clear -- the debtors filing all of the relevant documents

22  that Your Honor listed this upcoming Monday.  So we understand

23  that if that does not occur we're in a different world at that

24  point.

25          What we would propose, working off of that March

1  9th date, being sensitive to the fact that the Court is going

2  to need sufficient time to review any supplemental briefing,

3  in addition to the supportive briefs that have not yet been

4  filed, we would propose that we set a supplemental objection

5  deadline of February 25th, with briefs in support of the plan

6  and in response to all of the objections by March 2nd.  And,

7  again, that should give the Court a full week prior to the

8  start of that March 9th date to review all of the materials,

9  including the supporting materials.

10         I'm sensitive to what we've heard from the survivor

11  constituencies on voting, as well as Your Honor's comments

12  with respect to Class 9.  And incidentally, Your Honor, we

13  will go back and take another look at 1127(c) -- I believe

14  it's the Simplot decision, as well as Enron, that are

15  informative with respect to that analysis -- and we will

16  report back to the Court on that.

17         But we would propose setting the deadline for

18  changes to the ballots, if any, and we expect there to be

19  quite a few, to be received by Omni by March 4th -- again, I

20  don't think that's going to affect whether classes accept or

21  reject, it's just going to affect the percentage -- with the

22  Omni voting report coming in by March 8th.

23         THE COURT:  Okay.

24         MS. LAURIA:  And, Your Honor, we would propose to

25  prepare a very simple form of order reflecting these revised

1  dates.  We can circulate it to the parties and get it over to

2  chambers.

3          THE COURT:  Okay.  Mr. Karlan?

4          MR. KARLAN:  I just wanted to say, no objection to

5  those dates, Judge.

6          THE COURT:  Thank you.

7          Mr. Pachulski?  You're muted.

8          MR. PACHULSKI:  I apologize, Your Honor.  Richard

9  Pachulski of Pachulski Stang Ziehl & Jones on behalf of the

10  TCC.  A very quick matter.

11          I apologize, I didn't realize this would be an

12  issue, but I've seen some emails going back and forth during

13  the hearing that the interview process for the trustee and the

14  claims administrators may take a couple of extra days beyond

15  the 14th, just in terms of schedules of the people doing the

16  interviews and the interviewees.  I know that the plan has to

17  be on file by the 14th, but I wondered if we could put those

18  names as a supplement -- and, again, we haven't had a chance

19  to speak to the debtors about this yet  -- as some form of

20  supplement when the interviews are completed and the names can

21  be placed in the plan.

22          But I didn't anticipate this until I just saw the

23  emails, Your Honor.

24          THE COURT:  It sounds like we may need to.  That's

25  fine, there can be a supplement and -- but I would like those

1  interviews to take place as promptly as possible, so that that

2  supplement can be filed as soon as possible.

3       MR. PACHULSKI:  Understood, Your Honor.  The

4  mediator is coordinating the interviews, so I know there's a

5  lot going on.  So I don't know all of it, but I wanted to

6  raise it so we didn't have to run back to court if that did

7  become an issue.

8       THE COURT:  Okay.

9       MR. PACHULSKI:  Thank you, Your Honor.

10       THE COURT:  Mr. Karlan?

11       MR. KARLAN:  I don't want to be the hard guy, but

12  could we get some outside date for that?

13       THE COURT:  I would think that it should be filed

14  no later than the 18th, next week -- that the interviews

15  should be able to take place at some point next week and the

16  parties should circle up and get their consensus.

17       Hopefully, your candidates are all top-notch,

18  that's what I heard, so that the difficulty should be choosing

19  the best and not that people are saying someone is not

20  qualified.

21       MR. PACHULSKI:  I think that's correct, Your Honor.

22  I think it's just the timing of getting everybody together.

23  And I believe that February 18th would be -- would work fine

24  from what I'm seeing through some email traffic.

25       THE COURT:  Thank you.

1          MR. PACHULSKI:  Thank you, Your Honor.

2          THE COURT:  Mr. Molton?

3          MR. MOLTON:  Yes, Judge, just along those lines.  I

4  thought I had suggested that earlier and I'm glad we have

5  consensus on that.

6          One of the things I also understand is the

7  interviews that are really taking place are those for trustee.

8  My understanding is claims administrator will be something

9  that will be undertaken thereafter and, accordingly, I think

10 the -- with respect to the trust agreement, the name was of

11 the trustee, and, accordingly, I just want to put that flag

12 down as well.  I think that's the important name and that's

13 the important issue.  So --

14         THE COURT:  Okay.

15         MR. MOLTON:  -- because I think those are what the

16 interviews are being focused on.

17         THE COURT:  I was sort of assuming it was the

18 trustee and then the three -- is it three -- what's the name -

19 - the three --

20         MR. PACHULSKI:  Claims administrators.

21         THE COURT:  -- neutrals who are going to be part of

22 the independent review option, or are those not being

23 interviewed?

24         MR. MOLTON:  No, I don't believe that's even being

25 considered right now, Your Honor.

1        MR. PACHULSKI:  Your Honor, just for clarification,

2   my understanding is -- and I've heard this from different

3   members of the stack -- is that they would be interviewing for

4   the -- for the trustee and the claims administrator, it will

5   be their choice, but my understanding is both of those are

6   being interviewed and we would hope to put both the names in,

7   if they're chosen.  If it's just the trustee, I know that's

8   the key, but I think that they wanted to get resolved both the

9   claims administrators and the trustee.  But, if I'm incorrect,

10  someone can correct me on that, but that's been what I've been

11  told, and I was told they're in the negotiations.

12        MR. ZALKA:  Your Honor, Irwin Zalka.  That's my

13  understanding that we've been provided with names of trustee,

14  potential trustees and claims administrators, and that's who

15  will be interviewed -- or we anticipate interviewed.

16        THE COURT:  Okay.  Well, let me ask this then, when

17  are the neutrals that are going to be involved in the

18  independent review option going to be selected -- or suggested

19  or whatever?

20        MR. ZALKA:  I believe it's at the same time as the

21  trustee.

22        MR. PATTERSON:  No, that's not correct, Mr. Zalka -

23  -

24        MR. ZALKA:  Oh, I might be wrong.

25        MR. PATTERSON:  -- and if I could correct you.

1          MR. ZALKA:  Okay, I'm sorry.  I shouldn't be

2  speaking.  I'll let my attorney --

3          MR. PATTERSON:  No, the contemplation was that --

4  Your Honor, Tom Patterson from KTBS -- the contemplation is

5  that the trustee and the claims administrators would assemble

6  a panel of neutrals once they're put in place, if -- that was

7  the contemplation, Your Honor, because that would be their

8  expertise and their responsibility.

9          MR. MOLTON:  Your Honor, just --

10          MR. ZALKA:  I misunderstood.  I thought -- I'm

11  sorry, I thought we were talking about the claims

12  administrator.  I'm sorry.

13          THE COURT:  That's okay.

14          MR. MOLTON:  Your Honor, my understanding, it's

15  been a little bit of a moving target, but I think the best

16  thing to do is to let the stock members, prospective stack

17  members, meet, decide, and decide how they themselves want to

18  move forward.  My understanding is the names that were

19  submitted were for trustee names.  We had been talking about

20  two possible trustees and the question is whether that may or

21  may not occur.

22          But I think the goal is to get the trustee

23  situation resolved one way or another by the 18th, which I

24  hope and I expect will be a consensus pick of the highest

25  integrity and reputation, and then they move on with that

1  trustee in terms of, you know, getting other aspects of trust

2  administration conducted.

3          But I think what needs to be done is the trustee

4  needs to be selected or the trustees need to be selected and

5  go forward, and I think that's the important point and, you

6  know, the 18th is a good date for that.  And I think we should

7  leave it to our prospective stack members to decide how they

8  want to proceed on that basis.

9          THE COURT:  Okay.  We'll leave it there.

10          Anything else we can accomplish today?

11          MR. ABBOTT:  Yes, Your Honor, Derek Abbott.  I just

12  have a couple of much more mundane things that armies of folks

13  who have to support this whole effort care deeply about and I

14  think Your Honor may.

15          First, with respect to the exhibit binders, we had

16  some discussion about that.  We want to make sure that we are

17  doing what the Court wants and needs.  We have now a little

18  bit of additional time, but depending on the volume of these

19  things, it's going to take an awful long time to get them

20  assembled, printed, and provided.  So we had thought that the

21  Court's preference was a joint set of exhibit binders, perhaps

22  a joint set of agreed and a joint set of disputed.  We're just

23  going to need to work with the parties to build some dates in

24  there to make sure that that's all identified quickly enough

25  so that they can be produced, in terms of literally copied and

1 | assembled.

2 | So we'll work with the parties to do that, but I

3 | just wanted to make sure that was the Court's preference.

4 | THE COURT:  That's my preference.

5 | MR. ABBOTT:  Thank you, Your Honor.

6 | Separately, on deposition designations, what we

7 | understand the Court would prefer is one set of transcripts

8 | with color-coded designations and counter-designations, with

9 | each color representing the particular party with that

10 | concern.  But, again, I just wanted to confirm that, so

11 | everybody here heard that.

12 | THE COURT:  If that's possible, that is what I

13 | would prefer, one deposition, color-coded for different

14 | parties.  If there are too many different parties to do that,

15 | I guess I could get the separate deposition designations, but

16 | I would prefer not to.  I'd prefer to just be able to read

17 | straight through one time.

18 | MR. ABBOTT:  We'll do our best to try to --

19 | THE COURT:  See what you can do.

20 | MR. ABBOTT:  -- to do that.  Again, that is going

21 | to take some time.  So we'll work with the parties to make

22 | sure that we can do that quickly enough with these

23 | intermediate dates, but I just wanted to make sure that

24 | everybody was in agreement on what the Court wanted there.

25 | Thank you, Your Honor.

1           THE COURT:  Mr. Doshi?

2           MR. DOSHI:  Your Honor, if I may, Amish Doshi on

3   behalf of Oracle America, Inc.  I don't want to interrupt any

4   of this, but the question I wanted to raise is, where do

5   parties that have filed an objection not relating to anything

6   that was discussed today stand in terms of timing, so that

7   they're not sitting around for two to three weeks on issues

8   that were discussed today.

9           And, Your Honor, I represent Oracle America, Inc.,

10  and we have discrete issues, all the 365 issues --

11          THE COURT:  Okay.

12          MR. DOSHI:  -- relating to it.  So I'm simply

13  asking on behalf of everybody, but primarily parties such as

14  myself.

15          THE COURT:  Okay.  So Oracle has its usual type of

16  objection to assumption of its contract?

17          MR. DOSHI:  That is correct, Your Honor, as well as

18  cure issues and --

19          THE COURT:  As cure issues.

20          MR. DOSHI:  -- adequate assurance.

21          THE COURT:  Okay.

22          MR. DOSHI:  Basically, all the 365 issues.

23          THE COURT:  Okay.  So that's a good point and a

24  fair point.  So let's -- we'll need to pick a time that those

25  -- a day that those are going to be addressed.  And I've

1  already told you we've got two weeks from when I started.  So

2  let's -- I'll let the parties pick a time.  I'd like to know

3  and for you all to find out how many people are in that

4  category, so we know is that a half a day's worth of time, is

5  that a day's worth of time, or is it an hour's worth of time.

6          And I would suggest that Oracle's issues usually

7  get worked out, so people should talk to Mr. Doshi.  But let's

8  find out -- debtors find out what that universe of people in

9  that category are, so we certainly need to carve out time for

10 them if they do not want to sit through the entire

11 confirmation hearing.

12         MS. LAURIA:  Your Honor, that makes sense.  I think

13 there's approximately five or so objections of the 365 nature

14 and you're right, I think they do frequently get resolved, but

15 we will work with those parties to agree upon a date so that

16 they're not forced to sit through two weeks of trial.

17         THE COURT:  Thank you.

18         MS. LAURIA:  And we'll report back to the Court.

19         THE COURT:  Thank you.

20         MR. DOSHI:  Yes, Your Honor, we remain available on

21 behalf of Oracle America to discuss and hopefully resolve.

22         THE COURT:  Anyone else?

23     (No verbal response)

24         THE COURT:  Okay.  Well, thank you.  I think this

25 has been productive.  I will see all of you again next Friday,

1  the 18th, 10 o'clock Eastern time.

2          And I do not believe that I have anything under

3  consideration that I have not ruled on.  I want to make sure

4  that that's the case.  So, if somebody disagrees, please

5  contact Mrs. Johnson and let her know.  But I believe I

6  resolved all discovery disputes and the last one that I did

7  have under advisement was withdrawn.  So, if there's anything

8  I'm missing, please contact Mrs. Johnson.

9          We're adjourned then.  Have a good weekend.

10          COUNSEL:  Thank you, Your Honor.

11      (Proceedings concluded at 3:15 p.m.)

12

13                      CERTIFICATION

14          We certify that the foregoing is a correct

15  transcript from the electronic sound recording of the

16  proceedings in the above-entitled matter to the best of our

17  knowledge and ability.

18

19  /s/ Mary Zajaczkowski                 February 11, 2022
    Mary Zajaczkowski, CET-531

20

21  /s/ William J. Garling               February 11, 2022
    William J. Garling, CET-543

22

23  /s/ Tracey J. Williams               February 11, 2022
    Tracey J. Williams, CET-914

24

25
    Certified Court Transcriptionist
    For Reliable