## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. Docket No.  8780** |

## SUPPLEMENT TO APPENDIX TO CERTAIN INSURERS' OBJECTION
## TO CONFIRMATION OF DEBTORS' CHAPTER 11 PLAN

Respectfully submitted,

Dated: February 14, 2022
    Wilmington, DE

By: */s/ Deirdre M. Richards*
    Deirdre M. Richards (DE Bar No. 4191)
    FINEMAN KREKSTEIN & HARRIS PC
    1300 N. King Street
    Wilmington, DE 19801
    Telephone: (302) 538-8331
    Facsimile: (302) 394-9228
    Email: drichards@finemanlawfirm.com

    -and-

    **FORAN GLENNON PALANDECH PONZI**
    **&**
    **RUDLOFF P.C.**
    Susan N.K. Gummow (admitted *pro hac vice*)
    222 N. LaSalle St., Suite 1400
    Chicago, Illinois 60601
    Telephone: (312) 863-5000
    Facsimile: (312) 863-5009
    Email: sgummow@fgppr.com

    -and-

---

[1]    The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (admitted *pro hac vice*)
James Hallowell (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Email: mrosenthal@gibsondunn.com
jhallowell@gibsondunn.com
kmartorana@gibsondunn.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Matthew G. Bouslog (admitted *pro hac vice*)
3161 Michelson Drive
Irvine, California 92612
Telephone: (949) 451-3800
Facsimile: (949) 451-4220
Email: mbouslog@gibsondunn.com

*Attorneys for the AIG Companies*

## TABLE OF CONTENTS

| Document Title | # |
|---|---|
| Expert Report of Charles E. Bates | 101 |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

## EXPERT REPORT OF CHARLES E. BATES

## December 5, 2021

---

[1]   The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Confidential subject to Protective Order

Expert Report of Charles E. Bates, PhD

# Table of contents

I. Introduction ................................................................................................................................4

    I.A. Qualifications ......................................................................................................................4

    I.B. Scope of charge .................................................................................................................5

    I.C. Confidentiality ....................................................................................................................6

    I.D. Summary of opinions .........................................................................................................6

    I.E. Materials relied upon .......................................................................................................11

II. Background ..............................................................................................................................12

    II.A. The BSA's historical tort claims .....................................................................................12

    II.B. Abuse Claims .................................................................................................................16

    II.C. Potential outside comparables .......................................................................................22

III. Benchmark Valuation ............................................................................................................24

IV. Valuation range .....................................................................................................................32

    IV.A. Plus Factors .................................................................................................................32

        IV.A.1. Estimating future Abuse Claims from individuals who were minors at the time of the Bar
        Date based on Proof of Claim submissions ...................................................................35

        IV.A.2. Estimating repressed memory claims based on Proof of Claim submissions .............38

    IV.B. Minus Factors ...............................................................................................................40

    IV.C. Combining Plus and Minus Factors ..............................................................................45

V. TDP matrix values ..................................................................................................................49

VI. Portion of valuation attributable to TCJC Abuse Claims .......................................................53

#101

Expert Report of Charles E. Bates, PhD

# List of figures

Figure 1: Historical resolutions since 2016 by size of payment to claimants ..........................................................8

Figure 2: Unique and timely POC submissions with identified years of first abuse ...............................................10

Figure 3: Historical resolutions by resolution year........................................................................................................13

Figure 4: Historical resolutions by size of payment to claimants ...............................................................................13

Figure 5: Historical resolutions by number of repeat abuses .....................................................................................14

Figure 6: Graph of average historical resolution value and count of claims by abuser ...........................................14

Figure 7: Average settlement amount and count of claims by abuser and allegation categories ...........................15

Figure 8: POC by allegation .............................................................................................................................................17

Figure 9: POC by repeat abuser category.......................................................................................................................17

Figure 10: Count of POC by age at first abuse occurrence...........................................................................................18

Figure 11: Count of POCs by earliest identified year of abuse ....................................................................................19

Figure 12: Abuse incidence by year of first abuse ........................................................................................................20

Figure 13: Count of non-BSA relationships between abuser and abuse survivor ....................................................21

Figure 14: Average per claim resolution value by claim count for other mass sexual abuse settlement funds .....23

Figure 15: POC abuser name status................................................................................................................................24

Figure 16: Abuse Claim status as tort claims .................................................................................................................25

Figure 17: Age of first abuse occurrence ........................................................................................................................25

Figure 18: Most severe abuse allegation for Abuse Claims to be assigned a benchmark value............................26

Figure 19: Settlements by abuser for penetration allegations .....................................................................................27

Figure 20: Summary statistics of penetration abuse settlements ...............................................................................27

Figure 21: Ratios of the historical settlement average of repeated abuser claims to single abuser claims ...........29

Figure 22: Summary of initial benchmark valuation .....................................................................................................30

Figure 23: Number of abuse occurrences for benchmark valued Abuse Claims.....................................................34

Figure 24: Reporting status of benchmark valued Abuse Claims...............................................................................34

Figure 25: Age at first abuse for benchmark valued Abuse Claims............................................................................34

Figure 26: Abuse Claims by birth year and month .......................................................................................................36

Figure 27: Abuse Claims by birth year and month since 1990 ....................................................................................37

Figure 28: Forecast of future Abuse Claims by birth year and month ........................................................................38

Figure 29: Comparison of age at time of filing for historical tort claims and Proof of Claim submissions .............41

Figure 30: Comparison of historical tort claims and Proof of Claim submissions by age bins...............................42

Figure 31: Historical tort claim mean resolution values by submission age bins.....................................................42

Figure 32: Majority status of abusers for benchmark valued Abuse Claims .............................................................43

Figure 33: Tabulation of non-BSA relationships between abuser and abuse survivor for benchmark valued
Abuse Claims......................................................................................................................................................................43

Figure 34: Summary of valuation uncertainty factors ...................................................................................................47

Figure 35: Mean historical tort resolution values for single abuser claims ...............................................................50

**#101**

Expert Report of Charles E. Bates, PhD

Figure 36: Portion of midpoint valuation attributable to TCJC Abuse Claims for BSA-related parties...................54

Figure 37: Summary of relevant academic literature on sexual abuse of boys ...................................................D-7

#101

# I. Introduction

(1)   On February 18, 2020 (the "Petition Date") the national organization of the Boy Scouts of America (the "BSA") and Delaware BSA, LLC (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.[2] According to Debtors, this case was filed to achieve two key objectives: to equitably compensate victims who were harmed during their time in Scouting, and to continue to carry out Scouting's mission for years to come.[3] This bankruptcy had the effect of staying pending sexual abuse-related litigation against the Debtors and provides Debtors with a forum to comprehensively resolve past sexual abuse claims in an organized manner.

(2)   By Order of this Court dated April 7, 2020 the Debtors were authorized to retain Bates White, LLC ("Bates White") as their Abuse Claims consultant and advisor.[4] In that capacity, Bates White has been asked by counsel to the Debtors to evaluate the claims data related to Sexual Abuse claims, as defined in the Bar Date Order, and advise as to the potential aggregate value of such and related issues.[5]

## I.A. Qualifications

(3)   I am Chairman of Bates White, which is an economic consulting firm with its primary office located in Washington, DC.  I specialize in the application of statistics and computer modeling to economic and financial issues, and I have extensive experience working on mass-tort claims and liability valuation issues.  I have 30 years of experience in a wide range of litigation and commercial consulting areas.

(4)   I received my PhD and MA in Economics from the University of Rochester and my BA in Economics and Mathematics, with high honors, from the University of California, San Diego.  I have taught courses in advanced statistical economic analysis and trade theory while on the faculty at Johns Hopkins University, and I have published papers on advanced topics in estimation theory in peer-reviewed journals.

---

[2]   Capitalized terms not directly defined in this document have the meaning ascribed to them in the Fifth Amended Plan and Amended Disclosure Statement [Doc 6214].

[3]   Debtors' Informational Brief Doc 4.

[4]   Doc 353. Bates White's engagement agreement for this matter was executed with counsel to the Debtors who are presently at White & Case LLP, but at the time of the retention were at Sidley Austin LLP.

[5]   Doc 695. The Bar Date was ultimately set as November 16, 2020.

#101

Expert Report of Charles E. Bates, PhD

(5)     Prior to founding Bates White, I was a Vice President at A.T. Kearney. Prior to that, I was the Partner in Charge of the Economic Analysis Group at KPMG.

(6)     I have been retained as a valuation and estimation methodology expert in numerous mass tort matters over the last 30 years as detailed in my curriculum vitae, which is attached to this report as Appendix A. In addition to other relevant experience, my vitae include a listing of all of the publications I have authored within the past 10 years and all the cases in which I have testified, either at trial or deposition, within the past five years.

(7)     Bates White is remunerated by the Debtors at the rate of $1,250 per hour for my time. In addition to my own time, I directed other Bates White professionals who performed supporting work and analyses in connection with my preparation of this report.[6] Neither my compensation nor Bates White's compensation is contingent on the outcome of this matter.

## I.B. Scope of charge

(8)     Counsel to the Debtors has asked me to estimate the total value of its Abuse Claims as of the Petition Date[7] as though they were tort system claims against the BSA, assuming these claims were resolved at values consistent with the sexual abuse claims it resolved through the tort system prepetition. Counsel has asked that I consider in my evaluation all claims presented under the Abuse Claims Proof of Claim submissions and future claims related to acts committed prior to the Bar Date, limiting my estimate of future claims to abuse survivors who either suffered from repressed memory at the time of the Bar Date or who were minors as of the Bar Date.[8]

(9)     As part of that work, I have been asked by counsel for the Debtors to provide analysis of data regarding the BSA's historical resolutions of Abuse Claims and the trends evidenced by the Proof of Claim forms that have been submitted with respect to Abuse Claims. That work includes an evaluation of the data related to historical resolutions that was used to help develop the Trust Distribution Procedures claims matrix.

(10)    Separately, Bates White was asked by counsel for the Debtors to provide support in the processing and interpretation of data contained in the Proof of Claim forms submitted in connection with Abuse

---

[6]    Bates White's fees on this matter are based upon the time actually spent by each assigned staff member at their standard billing rate, on an hourly basis.

[7]    As noted in the Fifth Amended Plan and Amended Disclosure Statement, the Petition Date in this matter was February 18, 2020.

[8]    My understanding is that limiting any consideration of future claims derivative of acts committed prior to the Petition Date is consistent with this Courts' Bar Date order and the order defining Abuse Claims.

#101

Claims. That data processing and analysis is addressed in detail in the Expert Report of Makeda Murray ("Murray Report"). My analysis here relies on the data she assembled and processed.

(11)   As part of my work, I was also asked to provide the value of the Abuse Claims asserted against the Church of Jesus Christ of Latter-day Saints (the "TCJC"), which is supported, in part, based on claims identification process described in more detail in the Murray Report.

(12)   Bates White's work on this matter is ongoing. My work here is based on the information available to me as of the date of this report.

## I.C. Confidentiality

(13)   Bates White has read and agreed to abide by the Stipulated Confidential and Protective Order issued by this Court on June 8, 2020 [Doc 799; related Doc 613].

(14)   Much of the information on which this report is based is Confidential subject to the terms of the Stipulated Confidential and Protective Order. More specifically, the information on which this report is based relates to allegations made by (sexual) Abuse Claims who have submitted claim forms in the current Bankruptcy litigation as well related historical claims. This information is sensitive in nature and should be treated with care in addition to being subject to the protective restrictions from the Stipulated Confidential and Protective Order.

## I.D. Summary of opinions

(15)   The BSA is a non-profit corporation founded in 1910 and chartered by an act of Congress signed into law by President Woodrow Wilson on June 15, 1916.[9] Since its inception, more than 130 million young men and women have participated in the BSA's youth programs. More than 35 million adult volunteers have helped carry out the BSA's mission.[10] While the BSA's stated mission is the preparation of young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law, the BSA's own efforts to preclude morally flawed individuals from its ranks were imperfect. On rare occasions, episodes of sexual abuse occurred within or related to Scouting, some resulting in lawsuits asserting the BSA and its affiliated organizations were liable for the harm caused by the sexual abuse perpetrators.  Specifically, since 2016, 262 sexual abuse claims naming the BSA have been resolved for $170 million. Those historical resolutions involved payments for releases covering all of the BSA-related parties.

---

9    Debtors' Informational Brief Doc 4.
10   Debtors' Informational Brief Doc 4.

Expert Report of Charles E. Bates, PhD

(16)    In February 2020, the Debtors filed for bankruptcy protection, staying pending litigation against them, to give the Debtors a forum to comprehensively resolve Abuse Claims in a manner that would equitably treat all survivors and allow the BSA to continue its charitable mission to assist children in learning how to be self-sufficient, upstanding adults. As part of its reorganization proceedings, Debtors received at least one timely Proof of Claim from 82,209 unique individuals.[11] This represents vastly more claims than evidenced by the BSA's pre-Petition Date tort history. As described in the Bar Date Order, these Proofs of Claim relate to Abuse associated with the BSA or Scouting, which is broadly defined to include claims against the BSA and those against third parties such as Local Councils or Chartered Organizations that sponsored a troop or pack.

(17)    Based on the POC[12] data and historical settlement data available early in the spring of 2021, I estimated the aggregate value of the Abuse Claims as of the Petition Date was between $2.4 billion and $7.1 billion against the BSA and other BSA-related parties.  This historical settlement data was provided by Ogletree, the BSA's national coordinating counsel in prepetition tort litigation.  Here I also report on updated analyses based on the current "Tranche VI" POC data and the updated historical settlement data available now.[13] Specifically, this report is based upon the current information included in the POCs, an estimate of the number of admissible future claims related to acts committed before the Bar Date, the BSA's historically resolved sexual abuse tort claims, and publicly available information related to potential comparable settlements. As described in more detail below, most of that value relates to the Abuse Claims for which Proofs of Claim have already been filed, rather than claims that may be asserted in the future. My evaluation of the data provided in this case shows that the potential number of future claims—related to acts committed prior to the Petition Date where such future claims are limited to people who either suffered from repressed memory at the time of the Bar Date or who were minors as of the Bar Date—is small relative to the 82,209 unique and timely Proofs of Claim submitted prior to the Bar Date. The analyses of this report are consistent with and demonstrate the reasonableness of my initial valuation range, and as such, I see no basis to change my earlier valuation.

(18)    My estimated range is relatively broad primarily because of the uncertainty regarding how the BSA's 262  historical resolutions from 2016-2020 (the "Historical Settlements") align with the vastly larger quantity of 82,209 Abuse Claims in this matter.[14] This change in the scale of claims asserted is

---

[11]    As described in more detail in the Expert Report of Makeda S. Murray, MBA, there are many individuals who submitted more than one Proof of Claim form. For purposes of my analysis in this report I am considering the number of unique and timely claims: which is to say that I consider everyone who filed at least one timely Proof of Claim to have a single claim.

[12]    Throughout this report I use the terms "Proof of Claim" and "POC" to refer solely to the Proof of Claim forms submitted by or behalf of Abuse Claims and not Proof of Claim forms for other creditor classes.

[13]    The various Tranches of data refer to versions of the data described in more detail in the Expert Report of Makeda S. Murray, MBA. The relevant versions for this report are Tranche IV, which was the most current version as of the spring, and the latest Tranche VI version which incorporates submissions through July 2, 2021.

[14]    I also reviewed the available record on a larger set of historically resolved sexual abuse claims against BSA and related parties prior to Ogletree becoming counsel to BSA.  These earlier claims add little additional information, but what is

---

**#101**

indicative of a significant difference between the claims historically resolved and the Abuse Claims. All but a few of the 82,209 Abuse Claims could have been filed as tort claims in the past several decades closer in time to when the abuse occurred, had the abuse survivors chosen to do so. Further, over 80,300 of the abuse survivors have asked that their Abuse Claims remain private and confidential. These facts reveal a significant hesitancy on the part of the abuse survivors to bring forward their claims relative to prior tort claimants with public lawsuits, revealing a significant difference between the population of abuse survivors who filed Proofs of Claim and resolved tort claims prepetition. Moreover, even within the limited set of the Historical Settlements, there is wide variation in the values, ranging from four- and five-figure settlements to seven-figure settlements, even among claims with similar abuse patterns. This demonstrates that the characteristics of a specific claim have a substantial impact on the amount paid by the BSA—inclusive of other BSA-related parties such as the Local Councils and Chartered Organizations— to abuse survivors for the wrongful acts. The following table summarizes the wide range of the BSA claim resolutions since 2016.

**Figure 1: Historical resolutions since 2016 by size of payment to claimants**

| Payment size | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| Dismissed without payment | 11 | $0 | $0 |
| Four and five figure payments | 115 | $4,302,500 | $37,413 |
| Six figure payments | 94 | $30,007,000 | $319,223 |
| Seven figure payments | 42 | $135,865,000 | $3,234,881 |
| Grand total | 262 | $170,174,500 | $649,521 |
| Median | | | $100,000 |

(19)    To understand the source of this wide variation in the Historical Settlements, it is important to recognize that the source of harm are sexual abuse perpetrators who exploit their position within the BSA to gain access to their victims. The lawyers who have defended, prosecuted, and settled these cases did so with the understanding that fact finders would likely assign a larger value to the BSA in cases where they feel like the organization could have or should have done more to prevent the abuse. The BSA acknowledged in its first day information brief that "in the past, its efforts to protect youth participants have at times failed some of the very children such efforts were meant to protect." [15] The historical data show that the cases that the BSA paid the most to resolve are the ones where its protection efforts fell the shortest, indicating greater negligence. Such cases often involved serial abusers where action by the BSA may have been able to prevent future abuse. In contrast, the abusers identified on the current Proof of Claim submissions are most often not repeat offenders, but rather individuals who appear only once in the claims data.

available is consistent with the records kept by Ogletree.

[15]    Debtors' Informational Brief Doc 4, page 4.

**#101**
Highly Confidential – Subject to Protective Order

(20)    While 82,209 is a shocking number of claims, it is a small number in the context of an organization that has served over 130 million youth, many of whom are still alive today.  Estimated rates within the general population of the United States for the prevalence of sexual abuse in children 18 or younger suggest it is unfortunately common. The studies Bates White has reviewed suggest that the prevalence of non-familial abuse in minors ranges from 1% to 13%.[16] This means that at estimated abuse rates, several million children would have been abused at least once by a non-family member out of a typical population of 130 million children, irrespective of their participation in Scouting. But a set of roughly 82,209 Scouting related claims, or slightly more with the inclusion of potential future claims, as compared to a general prevalence rate of several million claims shows that participation in Scouting contributed little to the overall sexual abuse risk of the youth that participated in Scouting.

(21)    Moreover, the Proof of Claim submissions demonstrate that the BSA policies and procedures designed to protect scouts from sexual abuse that have been updated by taking advantage of the technological[17] and societal changes[18] over recent decades have been successful at driving the already small contribution to sexual abuse risk by participation in Scouting nearer to zero.  Figure 2 graphs the number of Abuse Claims, as represented by the number of unique and timely POC submissions, where each claim with an identifiable abuse time frame is counted in the year in which the abuse is alleged to have first occurred. The chart shows the dramatic decline in the occurrence of abuse from a perpetrator affiliated with the BSA over the years.[19]  This has important implications for the number of potential future claims. The long-standing trend of falling counts of abuse means that the number of individuals who were sexually abused prior to the Petition Date and were minors at the time of the Bar Date likely numbers in just the hundreds (with 150 of such claims already having been filed on behalf of people who were minors at the time of the Bar Date).

---

[16]   *See* Figure 37.

[17]   Key examples are the invention of inexpensive personal computers, the development of computer accessible databases, internet information access and background check capability, and the invention of technology facilitating the creation of age appropriate, tailored training materials.

[18]   Warren, Janet I. DSW Professor of Psychiatry and Neurobehavioral Sciences Institute of Law, Psychiatry, and Public Policy University of Virginia, "Boy Scouts of America Volunteer Screening Database: An Empirical Review 1946–2016," 2019. Exhibit 2 to the Debtor's Informational Brief, Doc 4.

[19]   The decline in Scouting participation accounts for only a small portion of this decline.  The incidence of abuse dropped from over 7 per 10,000 Scouting participants in the late 1970s to less than one per 10,000 in the 2000s. See the body of this report for details.

#101

Expert Report of Charles E. Bates, PhD

**Figure 2: Unique and timely POC submissions with identified years of first abuse**



(22)    In addition to my aggregate valuation, I was asked to help develop the Matrix Values under the Trust Distribution Procedures incorporated in the Amended Plan. As described in more detail below, the Base Values, Aggregating Scaling Factors, and Mitigating Scaling Factors are derived from, and consistent with, the BSA's historical resolutions.

(23)    I was also asked to provide a quantification of the value of the Abuse Claims asserted against the TCJC. There is uncertainty regarding the identification of TCJC claims.  I have two definition of TCJC claims; those that directly identify the TCJC and those that encompass a broad range of Local that are most comprised of TCJC members.  Under the midpoint of my valuation range, the total aggregate value associated with the TCJC Abuse Claims with first abuse prior to 1976 is $177 million. It is important to recognize that this figure is an aggregate for the relevant set of Abuse Claims; the total value, which could potentially be attributable to any combination of BSA-related parties including the Debtors, Debtors' insurers, Local Councils, and the TCJC. The value of the Abuse Claims as to the TCJC in isolation would necessarily be only some share of this total.

(24)    The remainder of this report describes these opinions and their support in more detail.

#101

Expert Report of Charles E. Bates, PhD

(25)    I reserve the right to modify and/or supplement this report if any new information and documents are provided to me that materially affect my opinions. Should additional new information be made available to me that would cause me to update my opinions, I will notify counsel to the Debtors.

(26)    I reserve the right to use additional graphics and exhibits in connection with the opinions expressed in this report.

## I.E. Materials relied upon

(27)    This report is based on data regarding the Abuse Claims submitted as part of the Proof of Claims docket, historical data regarding the resolution of similar claims by the BSA, other potentially comparable settlements, and information from academic literature on the prevalence and nature of such claims as cited throughout this report. Further information regarding the nature and processing of the Proof of Claim submissions and the historical data can be found in the Expert Report of Makeda S. Murray, MBA.

(28)    The list of the specific documents I have relied upon is provided in Appendix C.

Confidential subject to Protective Order

**#101**

Expert Report of Charles E. Bates, PhD

# II. Background

(29)    According to the Debtors' Information Brief, [20]

> The Boy Scouts of America ("BSA") is a non-profit corporation founded in 1910 and chartered by an act of Congress signed into law by President Woodrow Wilson on June 15, 1916. The BSA holds a federal charter alongside other organizations distinguished for their service to the national community, including the American Red Cross, the Boys & Girls Clubs of America, and Little League Baseball. The BSA's mission is to prepare young people for life by instilling in them the values of the Scout Oath and Law and encouraging them to be trustworthy, kind, friendly and helpful. The BSA also trains young men and women in responsible citizenship, character development, and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older ages, career-oriented programs in partnership with community organizations. At the time of the BSA's chartering, Congress recognized the "importance and magnitude" of the BSA's work and observed that the BSA "tends to conserve the moral, intellectual, and physical life of the coming generation."
>
> Since its inception 110 years ago, more than 130 million young men and women have participated in the BSA's youth programs. More than 35 million adult volunteers have helped carry out the BSA's mission.3 The BSA's alumni are legion among our nation's business, political, and cultural leaders. Their legacy is the creation and support of Scouting units in virtually every corner of America and at U.S. military bases worldwide. Today, the BSA remains one of the largest youth organizations in the country and one of the largest Scouting organizations in the world, with approximately 2.2 million registered youth participants and approximately 800,000 adult volunteers.

## II.A. The BSA's historical tort claims

(30)    The BSA has been a defendant in lawsuits from hundreds of sexual abuse survivors asserting that the BSA has some responsibility and liability for their injuries. Since 2016 and prior to the Petition Date, 262 sexual abuse claims naming the BSA had been resolved for a total of $170 million. It is my understanding that none of these resolutions involve payments for final judgment of a verdict. Figure 3 shows the number of claims resolved and the total settlements paid each year since 2016. My understanding is that these resolution values reflect the settlement payment on behalf of all BSA-related parties.

---

[20]    Debtors' Informational Brief Doc 4.

---

Confidential subject to Protective Order

**#101**

Expert Report of Charles E. Bates, PhD

**Figure 3: Historical resolutions by resolution year**

| Resolution year | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| 2016 | 20 | $12,575,000 | $628,750 |
| 2017 | 70 | $31,704,500 | $452,921 |
| 2018 | 47 | $55,905,000 | $1,189,468 |
| 2019 | 123 | $69,975,000 | $568,902 |
| 2020 | 1 | $15,000 | $15,000 |
| Unknown | 1 | $0 | $0 |
| **Total** | **262** | **$170,174,500** | **$649,521** |

(31)    As Figure 3 shows, these 262 claims were resolved for a mean payment of nearly $650,000 on average. What is not apparent from this table, however, is how varied these settlements were. In stark contrast to the mean, the median payment was $100,000, only one fifth of the mean. The median is another commonly used measure of typicality; it is the midpoint of a set of figures.  In contrast, another measure of typicality, the mean, is derived by summing up a set of values and dividing by the number of observations in the set. Having a median that is substantially different from the mean means that the data are "skewed", exhibiting substantial variation, with a small number of values having disproportionately large influence on the measurement of what is typical.

(32)    Figure 4 reveals the extent of that variation (skew). Sixteen percent of the historical settlements are seven figures or more ($1,000,000). And these high value settlements account for nearly 80% of the total amount paid to claimants. In other words: a relatively small portion of the historical claims account for most of the historical resolution dollars. These claims are attributable to a small number of egregious serial abusers who were adept at avoiding getting caught.

**Figure 4: Historical resolutions by size of payment to claimants**

| Payment size | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| Dismissed without payment | 11 | $0 | $0 |
| Four and five figure payments | 115 | $4,302,500 | $37,413 |
| Six figure payments | 94 | $30,007,000 | $319,223 |
| Seven figure payments | 42 | $135,865,000 | $3,234,881 |
| **Grand total** | **262** | **$170,174,500** | **$649,521** |
| **Median** | | | **$100,000** |

(33)    Analysis of the data demonstrates that the variation is not random. Of the claims where the abuser is known today, most of the historical cases (76% by count and 87% by payment) are attributable to abusers who appear more than once in the historical resolution data.[21]

---

[21]    The database of historical claims often does not include the name of the abuser for claims resolved prior to BSA's counsel Ogletree taking on the job of defending its sexual abuse claims.

#101
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 5: Historical resolutions by number of repeat abuses**

| Number of times abuser appears in historical cases 2016-2020 | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| 1 | 62 | $21,670,500 | $349,524 |
| 2-5 | 61 | $35,457,500 | $581,270 |
| 6+ | 139 | $113,046,500 | $813,284 |
| **Total** | **262** | **$170,174,500** | **$649,521** |

(34)   Further evaluation of the resolutions by abuser shows that claims related to a handful of serial abusers received substantially higher values than the claims associated with other abusers. Figure 6 below provides a graph of the historical resolution values by abuser. The highest claim values are associated with serial abusers.

**Figure 6: Graph of average historical resolution value and count of claims by abuser**



(35)   As the charts above show, historical settlement amounts varied greatly from claim to claim depending on the identity of the abuser and the circumstances of the abuse. The nature of the abuse also influenced the historical settlement values, though not to the same extent as abuser circumstance. The following table (Figure 7) provides the average settlement amounts associated with the alternative

**#101**
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

abuse categories of (1) the 59 claims of abuse involving penetration of the claimant, (2) the 105 claims involving other sex acts of oral sex and masturbation, and (3) the 39 claims of abuse involving groping or touching, both clothed and unclothed.[22]  A fourth category of the 59 claims without identified abuse category are tabulated separately.  I also segmented the claims into five categories of abusers.  The first includes the 61 claims for which the identified abuser appears once in the historical data.  Categories two and four separate out two infamous repeat abusers at opposite ends of the settlement amount spectrum: the 69 claims associated with the abuser Louis Brouillard, which settled on average for less than $60,000 and the 16 claims associated with the abuser Thomas Hacker, which settled on average for $5.5 million. The third category includes the 115 claims associated with other repeat abusers.  The fifth category includes the 1 claim without abuser identified in the claims database.[23]

**Figure 7: Average settlement amount and count of claims by abuser and allegation categories**

| Abuser category | Penetration | Other sex acts | Groping/touching | Allegation not recorded | Overall |
|---|---|---|---|---|---|
| **One time abuser** | | | | | |
| Average settlement | $561,250 | $389,538 | $165,000 | $45,000 | $354,025 |
| Count of claims | 18 | 26 | 5 | 12 | 61 |
| **Louis Brouillard** | | | | | |
| Average settlement | $69,900 | $78,864 | $32,500 | $42,500 | $57,630 |
| Count of claims | 10 | 22 | 3 | 34 | 69 |
| **Other repeat abusers** | | | | | |
| Average settlement | $712,758 | $450,824 | $434,289 | $201,371 | $481,978 |
| Count of claims | 27 | 46 | 30 | 12 | 115 |
| **Thomas Hacker** | | | | | |
| Average settlement | $8,025,000 | $4,863,636 | - | $3,500,000 | $5,568,750 |
| Count of claims | 4 | 11 | - | 1 | 16 |
| **Abuser not recorded** | | | | | |
| Average settlement | - | - | $75,000 | - | $75,000 |
| Count of claims | - | - | 1 | - | 1 |
| **Overall average settlement** | $1,053,322 | $820,009 | $359,646 | $133,923 | $649,521 |
| **Total count of claims** | 59 | 105 | 39 | 59 | 262 |

[22]  Recognizing that there is a spectrum of abuse, any segmentation is done for the convenience and clarity it provides in analyzing claims of different severity. For certain analytical and presentational purposes, I have combined what are separate abuse categories on the POC, due to the limited number of historical settlements and abuse category identification ambiguity.

[23]  My understanding is that the identity of the abuser and the nature of the claims were known at the time of payment but is not recorded in the data.

(36)    The settlement average is highest for claims of abuse involving penetration, followed by other sex acts, and then those involving groping/touching, which have the lowest average. That pattern is typical of the separate abuser categories, but at much different levels.

(37)    Other considerations also affect claim values but are not recorded consistently or sufficiently in the historical claims data to ascertain their impact on settlement amounts. These included, but are not limited to, the severity, duration, and frequency of the abuse, the number and age of perpetrators involved, the nature of coercion, threats, or violence involved with the abuse, the impact of the abuse on the life of the abuse survivor, and the existence and nature of other relationships the perpetrator may have had outside of Scouting. According to the BSA's defense counsel, these factors also impacted negotiations of the historical settlements and affected the final resolution of the claims. These case specific factors are reflected in the TDPs, as discussed further below. Not all claimants are the same in this regard and those differences affect the outcomes of tort cases. And finally, different jurisdictions, judges, and juries will not evaluate claims in the same way. The same lawsuit that involves claims for pain and suffering or punitive damages will receive widely different results in courts across the country.

## II.B. Abuse Claims

(38)    As part of its reorganization proceedings, the BSA received at least one timely Proof of Claim from 82,209 unique individuals, vastly more Abuse Claims than the BSA received pre-Petition Date in the tort system.[24] Each of the 82,209 unique individuals (or their counsels) filled out a 12-page Proof of Claim questionnaire detailing their claim. The POCs asked for information on many of the Abuse Claim attributes I referred to above that have historically affected the value of each Abuse Claim. The POCs request information including, but not limited to, background information for abuse survivor, their involvement with Scouting, the nature of the sexual abuse, the date of the incident(s) of abuse and age of abuse survivor at the time, the identity of the abuser(s) and their connection to Scouting, the frequency of abuse and where it occurred, if the abuse was disclosed by the abuse survivor around the time of the abuse and to whom it was disclosed, other relationships outside of Scouting between the abuser(s) and the abuse survivor, and the impact of the abuse on the life of the abuse survivor. Most POCs provided much, if not all, of the information requested. (See the report of Makeda Murray, MBA for details.) Moreover, these POC provide the sworn record for the existing Abuse Claims in this matter. The following paragraphs provide some salient examples of the information provided on the POCs.

---

[24]    As described in more detail in the Expert Report of Makeda S. Murray, MBA, there are many individuals who submitted more than one Proof of Claim form. For purposes of my analysis in this report I am considering the number of unique and timely claims: which is to say that I consider everyone who filed at least one timely Proof of Claim to have a single claim.

#101

Expert Report of Charles E. Bates, PhD

(39)   The POCs requested information on the nature of the alleged abuse.  The following is a tabulation of the most severe allegations of abuse documented in the POCs.  As the table shows, 93% of Abuse Claims provided information regarding the allegation of abuse.

Figure 8: POC by allegation

| Most severe allegation | Count of POC | % of total |
|---|---|---|
| 1. Penetration | 24,539 | 30% |
| 2. Oral Sex | 18,856 | 23% |
| 3. Masturbation | 13,022 | 16% |
| 4. Groping | 17,138 | 21% |
| 5. Touching-Unclothed | 1,879 | 2.3% |
| 6. Touching-Clothed | 1,294 | 1.6% |
| 7. Unknown/Unconfirmed | 3,817 | 4.6% |
| 8. Missing | 1,664 | 2.0% |
| Total | 82,209 | |

(40)   Over half of the POCs identified their abuser(s).  In notable contrast to the historical claims, in which 75% of claims involved repeat abusers, only 14% of Abuse Claims identified a repeat abuser.  Even considering only claims in which an abuser was named, nearly 77% of abusers appeared only once in 48,072 Abuse Claims with abusers identified.

Figure 9: POC by repeat abuser category

| Abuser category | Count of POC | % of total | % of known |
|---|---|---|---|
| Unidentified Abuser | 34,137 | 42% | |
| Abuser identified on one Abuse Claim | 37,069 | 45% | 77% |
| Abuser identified on 2 to 4 Abuse Claims | 7,220 | 9% | 15% |
| Abuser identified on 5 to 9 Abuse Claims | 2,353 | 3% | 5% |
| Abuser identified on 10 or more Abuse Claims | 1,430 | 2% | 3% |
| Total | 82,209 | | |

(41)   Ninety-two percent of POCs (75,512 of 82,209) identified their age at first abuse occurrence by providing both birth year and year(s) of abuse.  One half of one percent of these (411 of 75,512) identified their age as 18 or over.  For the rest, the average and median age at first abuse was 11 years old, eighty-seven percent (66,121 of 75,512) were 13 years old or younger.  The following figure illustrates the count of POCs by age.

#101
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 10: Count of POC by age at first abuse occurrence**



(42)    Ninety-three percent of POCs (76,051 of 82,209) also identified when the abuse occurred.  Figure 11 illustrates the number of POCs by the earliest year of identified abuse.  For reference, I have also included participation in Boy Scouts or Cub Scouts for each year.  The increase in alleged abuse prior to the 1970s is driven by two factors.  The first, as the figure shows, is the steady increase in participation in Boy Scouts or Cub Scouts from less than 500,000 in the early 1920s to a peak of nearly 4.5 million scouts at the beginning of the 1970s.[25]   The second is the result of data censoring due to mortality. The average age of an abuse survivor with year of first abuse before 1970 is 70 years old.  Many of the people who participated in Boy Scouts or Cub Scouts in the early decades of the 1920s, 1930s, 1940s, and even the 1950s were no longer alive at the time of the Bar Date.

---

[25]    I focus here on the population of Boy Scouts and Cub Scouts because those are the primary programs with youth typical for the ages of first abuse reported in the Abuse Claims POCs.  While some older participants also filed POCs, participants in those programs are generally of ages less subject to the reported abuse.

---

**#101**

Expert Report of Charles E. Bates, PhD

**Figure 11: Count of POCs by earliest identified year of abuse**



(43)    The abuse year pattern is notable for its steep decline starting in the mid-1970s. The count of Abuse Claims as reflected in the POCs declines at an average of 9% per year starting in 1974.  Participation differences account for only a small portion of the decline in the incidence of abuse. In particular, while the number of youths involved with Boy Scouts and Cub Scouts dropped from the mid-1970s through the mid-1980s, the participation rate effectively leveled off for a period into the early 2000s at roughly 3 million youth per year. During that time the count of Abuse Claims as reflected in the POCs continued to drop steeply.   The incidence of abuse, measured as a rate, dropped from over 7 per 10,000 participants in the 1970s to less than one per 10,000 in the 2000s.  Figure 12 tabulates the abuse incidence per 10,000 participants reflected in the POCs.

#101
Pã @ãÁÕ[}-äã^}cãeÁ ÂÛ˙ àb^&o¼{ÁÛ¦[c^&cã^ÁÛ¦à^¦

Expert Report of Charles E. Bates, PhD

**Figure 12: Abuse incidence by year of first abuse**

| Year of first abuse | Average count of POC reported abuse incidence per year | Average annual participation | Abuse incidence rate per 10,000 participants |
|---|---|---|---|
| 1970-1974 | 2,822 | 4,284,186 | 6.6 |
| 1975-1979 | 2,227 | 3,092,400 | 7.2 |
| 1980-1984 | 1,681 | 2,755,823 | 6.1 |
| 1985-1989 | 1,298 | 2,989,841 | 4.3 |
| 1990-1994 | 986 | 3,022,346 | 3.3 |
| 1995-1999 | 690 | 3,058,123 | 2.3 |
| 2000-2004 | 371 | 2,922,168 | 1.3 |
| 2005-2009 | 182 | 2,532,200 | 0.7 |
| 2010-2014 | 84 | 2,315,425 | 0.4 |
| 2015-2019 | 36 | 2,086,565 | 0.2 |

(44)    The watershed event that appears key to the above documented reduction of abuse incidence apparent in the POC submissions was the establishment of the BSA Youth Protection Task Force in 1985. In the decades since, aided by the development of computer technology, the BSA expanded its education, detection, and prevention programs. The success of its youth protection programs is reflected in the dramatic 95% drop in the incidence rate of abuse documented by the reduction in the numbers of POCs alleging abuse that started after 1985. The impact of that reduction is huge; had BSA Youth Protection Program not been successful, so that abuse incidence within the BSA remained at the levels indicated by the POC submissions in the 1970s, I estimate there would have been 70,000 POCs with year of first abuse since 1985, instead of 11,000 for the POCs submitted.

(45)    The POCs also provided information on the number of non-BSA relationships the abuse survivor had with their abuser(s). Thirty percent of POCs (24,471 of 80,209) identify that they had a relationship outside of Scouting with their abuser(s). The POC questionnaire asked abuse survivors to identify by checking a box if their abuser(s) was also their (1) religious organization leader, member, volunteer, (2) family member or relative, (3) coach/athletics, (4) teacher, (5) neighbor, or (6) Other (please explain and add any other information you remember to the categories above.) The most common boxes checked were (1) religious organization leader, member, volunteer and (6) Other – typically identifying a member of the community or a friend of a family member. Figure 13 provides a tabulation of the count of POC by number of outside relationships identified.

**#101**
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 13: Count of non-BSA relationships between abuser and abuse survivor**

| Number of identified outside relationships | Count of POC | % of total |
|---|---|---|
| 0 | 57,738 | 70% |
| 1 | 20,860 | 25% |
| 2 | 3,029 | 3.7% |
| 3 | 480 | 0.6% |
| 4 | 74 | 0.1% |
| 5 | 21 | 0.03% |
| 6 | 7 | 0.01% |
| **Total** | **82,209** | |

(46)   As these examples illustrate, the POCs contain much information that is crucial for evaluating each Abuse Claim. The Trust Distribution Procedures ("TDP") in this matter are designed to use that information, as well as additional information that will be gathered by the Settlement Trustee to provide fair and equitable treatment for Allowed Abuse Claims providing substantially similar treatment to holders of similar, legally valid, and supported Abuse Claims.  The Base Matrix Values and other TDP valuation factors were informed by the historical settlement data.  As the description of the prior Section on the historical settlements data makes clear, in contrast to the much more comprehensive and consistently captured data of the POCs, the historical data can only provide guidance about the aggregate value of Abuse Claims. That data does not have enough detail from enough claims to determine the value of individual Abuse Claims.  That would require a more thorough evaluation of each Abuse Claim's merits. That is the purpose of the TDP, which provide procedures for that evaluation that will result in a reasonable valuation of individual Abuse Claims consistent with the historical settlements.

(47)   The historical data does, however, provide valuation benchmarks that can used to evaluate the value of the Abuse Claims in aggregate, and allow us to derive a categorical framework for the valuation of claims under the TDPs.  That can be done by using an average valuation applied to an aggregation of Abuse Claims.  Just as the average of a group of historical claims does not determine the value of any one Abuse Claim, nonetheless, with the knowledge of the average value of the group and the number of Abuse Claims in the group, we can know the aggregate value of the group of Abuse Claims by multiplying the average value by the number of Abuse Claims. The following Section describes the valuation methodology I have used to estimate an aggregate valuation range for the Abuse Claims as though they were historical tort claims.

**#101**
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

## II.C. Potential outside comparables

(48)    In addition to the BSA's own historical resolution and POC data I considered publicly available information related to potential comparable settlements. These data are effectively a list of other sexual abuse mass claim settlement funds created by various organizations. Many of those are Catholic Diocese which have gone through bankruptcy, but the list also includes settlements from schools—including universities, municipalities, and medical professionals. This list was assembled by my staff and is an inclusive survey capturing all publicly reported mass settlements of sexual abuse cases we found.  The data include the publicly available record of the total settlement amount and the number of claims and then provide an estimated average per claim payment.[26]

(49)    Two things are evident from any review of these data. The first is that amongst all these potential comparables, there is no true outside comparable to the BSA matter in terms of scale. The second is that the average per claim value—obviously considering a host of case-specific factors such as the organizational responsibility, nature of abuse, and in some cases likely considerations related to ability to pay—varies a lot.

(50)    Regarding scale, the largest case recorded in that set is a class action against Dr. James Heaps, a former UCLA gynecologist that involved 6,600 class members and was for $73 million—which implies an average of just over $11,000—per claim. Outside of that one case, which has very different facts, no other includes more than 600 claims (the next highest is 564 individual claimants). This contrasts with the 82,209 POCs in this matter.

(51)    Regarding value, the per claim average ranges from just over $11,000 per claim to $8.5 million per claim. Even if one were to trim the most extremely outliers there are numerous cases where the per claim average ranges from low five figure settlements on seven figure settlements. Overall, these data have the feature that the average value is negatively correlated with the count of claims, which is to say those matters involving fewer total claimants have higher per claim values and those matters with more claims have lower per claim values. But even within a given size of settlement fund, as determined by the number of claims and the total settlement amount (inclusive of any considerations related to ability to pay and before accounting for any costs that would reduce claimant payments) there is a wide variety in the per claim value.  Figure 14 provides a graph of the average per claim value by the reported claim count.

---

[26]    No reduction is made for potential settlement fund or trust operating expenses.

---

#101

Expert Report of Charles E. Bates, PhD

**Figure 14: Average per claim resolution value by claim count for other mass sexual abuse settlement funds**



(52)    While there is no close comparable or set of comparables amongst this list, the data illustrate that there is a wide range of reasonable per claim settlement amounts for large groups of sexual abuse cases.

**#101**
Pã @˘ÁÕ[ } -ã^} cã¥Á ÁÛ¯ àb˘&o¢{ ÁÛ¦[ c^&cæ^ÁÛ¦â^¦

Expert Report of Charles E. Bates, PhD

# III. Benchmark Valuation

(53) I used a frequency-severity model to calculate my valuation range. The frequency (number) of Abuse Claims within each of several abuse categories is defined by the number of Proof of Claim submissions for each category. The severity (value) is assigned to each category based on historical settlement benchmarks derived from the BSA's historical pre-petition resolutions of sexual abuse claims within the tort system. In this Section I explain how I segmented the POCs and selected the benchmark values for each category. The number of useful categories is limited by the types of data affecting claim values in the historical data as described above in Section II.A. Similarly, my benchmark selection is done recognizing the paucity and extreme skewness of the historical settlement values. These limitations mean there is the potential for significant uncertainty regarding how well the selected benchmark values represent the typical Abuse Claims within each category applied to the POCs. I evaluate that uncertainty in the following Section. Based on this benchmark valuation and the following Section I conclude that the value of POCs, valued as historical tort claims, is within the range I estimated based on the Tranche IV data in the early spring of 2021 of $2.4 billion to $7.1 billion as to the BSA and all BSA-related parties. I also conclude that it is not possible to narrow this range due to the uncertainty inherent in valuing 82,209 Abuse Claims with just a few hundred claims upon which to base that valuation.

(54) Initially, Abuse Claims that did not identify, by name, either in full or in part, an alleged abuser were set aside as a separate category and assigned a zero benchmark value. This was done with an understanding from the BSA's counsel that an abuse survivor must be able to identify the alleged abuser to have a viable tort case. For benchmark valuation purposes, 34,137 Abuse Claims were assigned a zero benchmark value for failure to name an abuser, leaving 48,072 Abuse Claims to be assigned the benchmark value. Figure 15 summarizes these results. Note that for these purposes the "named" total includes claims in both the first two rows: those that provided a full first and last name, and those that provided a partial, meaning either first or last name.

**Figure 15: POC abuser name status**

| Abuser name status | Count of POC |
|---|---|
| 1. Name provided | 30,501 |
| 2. Partial name provided | 17,571 |
| 3. Physical description only | 10,288 |
| 4. Unknown | 21,749 |
| 5. Missing (blank) | 2,100 |
| **Total** | **82,209** |
| Subtotal (named) | **48,072** |
| Subtotal (unnamed) | **34,137** |

#101
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

(55)   Secondly, Abuse Claims that did not presumptively meet the statute of limitations requirements for a tort claim according to criteria provided by the BSA's defense counsel were set aside as a separate category and assigned a zero benchmark value. As described in more detail in the Murray Report, this evaluation was done on a claim-by-claim basis based on the state or states where the alleged abuse occurred and the birth date of the abuse survivor. If the abuse survivor reported multiple abuse states, the state with the most favorable statute of limitations to the abuse survivor was used. For benchmark valuation purposes, 31,215 Abuse Claims were assigned a zero value for failure to meet the statute of limitations required for a viable tort claim leaving 16,857 Abuse Claims to be assigned the benchmark value.[27]

**Figure 16: Abuse Claim status as tort claims**

| Abuse Claim status | Count of POC |
|---|---|
| [1] Named an abuser and presumptively barred | 31,215 |
| [2] Named an abuser and not presumptively barred | 16,857 |
| [3] = [1] + [2] Named an abuser | 48,072 |
| [4] Did not name an abuser | 34,137 |
| [5] = [3] + [4] Total Abuse Claims | 82,209 |

(56)   The 16,857 Abuse Claims for which the abuser was named and are not statute of limitations barred were segmented into two categories based on the age of the abuse survivor at the date of their first abuse occurrence. Consistent with the Court's definition of Abuse Claims, as provided on the POC, those 18 or older at the date of their first abuse (86 of 16,857 Abuse Claims) were assigned a benchmark value of zero, leaving 16,771 Abuse Claims to be assigned the benchmark value. This includes 792 Abuse Claims for which the abuser was named and are not statute of limitations barred but did not provide date of first abuse. For benchmark valuation purposes, these were included.

**Figure 17: Age of first abuse occurrence**

| Age at first abuse | Count of POC |
|---|---|
| 1–10 | 6,279 |
| 11–14 | 8,610 |
| 15–17 | 1,090 |
| 18+ | 86 |
| Unknown/Missing | 792 |
| Total | 16,857 |
| Claims to be assigned a benchmark value (excludes 18+) | 16,771 |

---

[27]   Under the TDP and the Amended Plan claims can select an expedited distribution of $3,500 as part of the voting procedures. As of the time of the writing of this report the voting deadline has not yet passed. But if all of the claims which are assigned a $0 under the Bates White benchmark were to select such a distribution it would total $230 million. While this is a substantial sum, it is small relative to the overall estimation range.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

(57)    The 16,771 Abuse Claims for which the abuser was named and are not statute of limitations barred
were segmented into four abuse categories based on their most severe abuse allegation.  Abuse
Claims involving sexual penetration set into the first category.  Abuse Claims involving oral sex or
masturbation were grouped together as a second category of other sex acts.  Abuse Claims involving
groping, touching-clothed, and touching-unclothed were grouped together into a single third category
of grouping/touching.  Claims that did not identify the nature of their abuse were grouped separately
and were assigned a zero benchmark value for failure to identify their abuse, leaving 16,113 Abuse
Claims to be assigned the benchmark value. These claims are the most like those that were resolved
by the BSA, often in conjunction with its Insurance Companies, prior to these Chapter 11 Cases.

**Figure 18: Most severe abuse allegation for Abuse Claims to be assigned a benchmark value**

| Most severe abuse allegation | Count of POC |
|---|---|
| 1. Penetration | 5,645 |
| 2. Other sex act | 6,847 |
| 3. Groping/Touching | 3,621 |
| 4. Unknown/Missing | 658 |
| **Total** | **16,771** |
| Claims to be assigned a benchmark value (excludes 4. Unknown/Missing allegation) | 16,113 |

(58)    I selected the initial benchmark value by examining the historical settlement resolution summary
values provided by the BSA's defense counsel Ogletree from the claims with the most severe abuse,
those involving of sexual penetration.  These involved 59 abuse survivors and 36 abusers from the
lawsuits against the BSA resolved by Ogletree since 2016 when Ogletree took over as the BSA's
counsel.  The total value of these settlements was $62,145,974.  As the primary source of settlement
value variation is the identity of the abuser, I tabulated the settlement values in that manner on Figure
19 below.

#101
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 19: Settlements by abuser for penetration allegations**

| Abuser | Total Settlement | Number of abuse survivors | Average Settlement | Abuser | Total Settlement | Number of abuse survivors | Average Settlement |
|--------|-----------------|---------------------------|--------------------|--------|-----------------|---------------------------|--------------------|
| Carron | $0 | 1 | $0 | Smart | $300,000 | 1 | $300,000 |
| Desandre | $0 | 1 | $0 | Dabrow | $450,000 | 1 | $450,000 |
| Swank | $0 | 1 | $0 | Opalinski | $475,000 | 1 | $475,000 |
| Dennis | $29,474 | 2 | $14,737 | Astleford | $500,000 | 1 | $500,000 |
| George | $20,000 | 1 | $20,000 | Tomlinson | $1,300,000 | 2 | $650,000 |
| Blackwell | $25,000 | 1 | $25,000 | Malone | $1,700,000 | 2 | $850,000 |
| Schmidt | $25,000 | 1 | $25,000 | Empey | $965,000 | 1 | $965,000 |
| Brouillard | $699,000 | 10 | $69,900 | Watkins | $975,000 | 1 | $975,000 |
| Liberty | $100,000 | 1 | $100,000 | Libey | $3,900,000 | 4 | $975,000 |
| Rothschild | $100,000 | 1 | $100,000 | Hale | $1,000,000 | 1 | $1,000,000 |
| Philpott | $150,000 | 1 | $150,000 | Weaver | $1,200,000 | 1 | $1,200,000 |
| Martin | $325,000 | 2 | $162,500 | Leininger | $6,200,000 | 5 | $1,240,000 |
| Shafer | $175,000 | 1 | $175,000 | Fout | $1,595,000 | 1 | $1,595,000 |
| Pietz | $200,000 | 1 | $200,000 | Dunbar | $1,750,000 | 1 | $1,750,000 |
| Santos | $200,000 | 1 | $200,000 | Smith | $1,750,000 | 1 | $1,750,000 |
| Bowen | $225,000 | 1 | $225,000 | Hepp | $2,950,000 | 1 | $2,950,000 |
| Anderberg | $250,000 | 1 | $250,000 | Hacker | $32,100,000 | 4 | $8,025,000 |
| Conn | $250,000 | 1 | $250,000 | | | | |
| Momont | $262,500 | 1 | $262,500 | **Total** | **$62,145,974** | **59** | **$1,053,322** |

(59)  I calculated four different measures of central tendency for these settlements: the mean and the median first using each of the 59 abuse survivors as a measure of value, then again by each of the 36 abusers as a measure of value, provided in Figure 20. Each is informative about some aspect of the historical settlements. A comparison of the mean and median calculated either way illustrates the extreme skewness of the settlements as discussed in the prior Section; a large portion of the total value of the settlements is concentrated in a small portion of abuse survivors abused by a small number of egregious serial abusers.

**Figure 20: Summary statistics of penetration abuse settlements**

| Statistic | By abuser | By abuse survivor |
|-----------|-----------|-------------------|
| Count | 36 | 59 |
| Median | $256,250 | $250,000 |
| Mean | $774,434 | $1,053,322 |
| Midpoint | $515,342 | $651,661 |

(60)  The principal question to address in using the historical settlements to value the Abuse Claims is: how well does the mix of claims in the historical record represent the composition of Abuse Claims? If

#101
Highly Confidential – Subject to Protective Order

there are very few Abuse Claims like the historical claims that received high six- or seven-figure settlements, the median a better indicator of the value of Abuse Claims.  In contrast, if the mix of higher value and lower value Abuse Claims is like the historical claims, then the mean is a better indicator of the value of Abuse Claims. As noted in paragraph (35), there are Abuse Claims identifying a repeat abuser though they represent a lower portion of current Abuse Claims than in the historical data.  This points to a compromise value between the median and mean as a reasonable initial benchmark.  For this reason, I have selected $650,000 as my initial benchmark to value Abuse Claims involving penetration sexual abuse.  In the following Section, I report on my analyses of the range of uncertainty in using this initial benchmark as the basis to value Abuse Claims.  In the remainder of this Section, I further segment the Abuse Claims to isolate Abuse Claims with identifiable factors that would lower or increase the value of those groups relative to the initial benchmark value. For aggregate estimation, I maintain the three broad abuse categories of (1) penetration claims, (2) other sex acts including oral sex and masturbation, and (3) all groping and touching abuse claims.

(61)    As illustrated in Figure 7, claims for other sex acts typically settled at lower amounts than claims involving penetration sexual abuse.  The overall mean for all other sex acts claims, including ones against both repeat abusers and abusers that appear only once, excluding Hacker is also very close to $350,000.  On this basis I set the discount to apply to the initial benchmark of $650,000 for the benchmark valuation of Abuse Claims involving other sex acts at 54%.  The discount for Abuse Claims involving groping/touching is even lower. I used the approximate relative value of the average of once-identified abuser claims for groping/touching claims to other sex act claims to set the benchmark discount to 27% of the initial benchmark—half again what was used for the other sex acts—as the initial benchmark discount of the group of groping/touching Abuse Claims.[28]

(62)    As also illustrated in Figure 7, there is a clear difference in value for claims involving abuse from a repeat abuser in contrast to a once identified abuser. Abuse Claims involving a repeat abuser were separately categorized and assigned a premium value 50% higher than once-identified abuser Abuse Claims.  I selected the size of this premium by examining the ratio of average settlements of historical repeated abuser claims to once-identified abuser claims.  The following table lists 12 variants of that ratio.

---

[28]    There are several notably high groping and touching act resolutions recoded in the settlement summary.  These are tied to a handful of repeat abusers who also committed more serious acts against other survivors. It is my understanding that those groping/touching cases had been either settled in conjunction with other cases brought against the same abuser, or that the values negotiated in these matters were influenced by the exposure stemming from the more serious acts committed against others. Because of this, I focused my analysis of the mean value or claims in this tier exclusive of those claims.

#101

Expert Report of Charles E. Bates, PhD

**Figure 21: Ratios of the historical settlement average of repeated abuser claims to single abuser claims**

| Selection variant | Include zeros | | Exclude zeros | |
|---|---|---|---|---|
| | Penetration | All claims | Penetration | All claims |
| All repeat abusers | 226% | 210% | 188% | 189% |
| Excluding Hacker | 96% | 91% | 80% | 83% |
| Excluding Hacker and Brouillard | 127% | 136% | 106% | 124% |

(63)  For this purpose, I rely on the ratios provided by excluding the claims of the two most notorious serial abusers, Brouillard and Hacker, because of their disproportionate influence on these ratios as benchmarks for the Abuse Claims. Claims involving Brouillard account for 26% of the claims resolved by Ogletree on behalf of the BSA, whereas they only account for 0.08% of Abuse Claims. Claims involving Hacker account for over 50% of the value of settlements resolved by Ogletree on behalf of the BSA, whereas Abuse Claims naming Hacker only account for less than 0.05% of Abuse Claims. No other abusers have such an extreme influence on the historical settlements. The ratios excluding Hacker and Brouillard are better indicators of the typical premium attached to repeat abuser claims.

(64)  As illustrated in Figure 13, a sizeable portion of the Abuse Claims identify at least one non-BSA related relationship between their abuser(s) and the abuse survivor. A review of the historical settlements with value in the neighborhood of the initial benchmark value reveal no outside relationships. In contrast, many claims at the lower end of the value spectrum of historical settlements clearly do indicate a relationship outside of Scouting. A notable example is the claims involving Brouillard, who was a catholic priest and schoolteacher in addition to a Boy Scout troop leader. As illustrated in Figure 7, claims involving abuse by Brouillard received a deep discount relative to the initial benchmark value. As there is no consistent coding or recording of the number of outside relationships in the historical claims data, I cannot estimate from that data a reasonable discount to apply to all Abuse Claims with outside relationships. The only clear example is that of the claims involving Brouillard whose abuse survivors received less than 10% the initial benchmark value of repeat abuser claims. My understanding from Ogletree is that the Brouillard case is not typical due to a number of factors unique to those cases. Lacking further guidance from the historical data, I have selected a benchmark discount of 50% for Abuse Claims involving a single non-BSA relationship and a 75% discount for those with more than one non-BSA relationships.

(65)  Figure 22 is a summary of the calculation to arrive at an initial aggregate benchmark value of $5.8 billion from the initial benchmark of $650,000 and category discounts and premium scalars described above as applied to the 16,113 Abuse Claims to be assigned a positive initial benchmark value.

**#101**

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 22: Summary of initial benchmark valuation**

| Benchmark category and initial factor benchmark scalar | Category initial benchmark scalar calculation | [A] Count of POC | [B] Initial benchmark Abuse Claim value | [C] = [A] x [B] Initial aggregate benchmark value |
|---|---|---|---|---|
| **Penetration 100%** | | 5,645 | $550,255 | $3,106,187,500 |
| **Once-identified abuser 100%** | | | | |
| No other relationship 100% | 100% = 100% x 100% x 100% | 2,449 | $650,000 | $1,591,850,000 |
| One other relationship 50% | 50% = 100% x 100% x 50% | 1,480 | $325,000 | $481,000,000 |
| 2 or more relationships 25% | 25% = 100% x 100% x 25% | 332 | $162,500 | $53,950,000 |
| **Repeat abuser 150%** | | | | |
| No other relationship 100% | 150% = 100% x 150% x 100% | 697 | $975,000 | $679,575,000 |
| One other relationship 50% | 75% = 100% x 150% x 50% | 543 | $487,500 | $264,712,500 |
| 2 or more relationships 25% | 37.5% = 100% x 150% x 25% | 144 | $243,750 | $35,100,000 |
| | | | | |
| **Other sex acts 54%** | | 6,847 | $313,200 | $2,144,478,375 |
| **Once-identified abuser 100%** | | | | |
| No other relationship 100% | 54% = 54% x 100% x 100% | 3,241 | $351,000 | $1,137,591,000 |
| One other relationship 50% | 27% = 54% x 100% x 50% | 1,620 | $175,500 | $284,310,000 |
| 2 or more relationships 25% | 13.5% = 54% x 100% x 25% | 271 | $87,750 | $23,780,250 |
| **Repeat abuser 150%** | | | | |
| No other relationship 100% | 81% = 54% x 150% x 100% | 997 | $526,500 | $524,920,500 |
| One other relationship 50% | 40.5% = 54% x 150% x 50% | 603 | $263,250 | $158,739,750 |
| 2 or more relationships 25% | 20.25% = 54% x 150% x 25% | 115 | $131,625 | $15,136,875 |
| | | | | |
| **Groping/Touching 27%** | | 3,621 | $161,675 | $585,424,125 |
| **Once-identified abuser 100%** | | | | |
| No other relationship 100% | 27% = 27% x 100% x 100% | 2,006 | $175,500 | $352,053,000 |
| One other relationship 50% | 13.5% = 27% x 100% x 50% | 745 | $87,750 | $65,373,750 |
| 2 or more relationships 25% | 6.75% = 27% x 100% x 25% | 103 | $43,875 | $4,519,125 |
| **Repeat abuser 150%** | | | | |
| No other relationship 100% | 40.5% = 27% x 150% x 100% | 493 | $263,250 | $129,782,250 |
| One other relationship 50% | 20.25% = 27% x 150% x 50% | 238 | $131,625 | $31,326,750 |
| 2 or more relationships 25% | 10.125% = 27% x 150% x 25% | 36 | $65,813 | $2,369,250 |
| **Total** | | 16,113 | $362,198 | $5,836,090,000 |

(66)    I have labeled the $5.8 billion result of the calculation summarized in Figure 22 an "initial benchmark aggregate value" for an important reason. It is the first step in my determination of the valuation range of the Abuse Claims. As is clear from the prior discussion, there is much uncertainty regarding which portion of the few hundred historical settlements is most representative of the 82,209 Abuse Claims. If, for example, the claims defining the $250,000 median historical value discussed above, provide a better representation of the Abuse Claims than the claims valued at $650,000, then a more representative initial benchmark would be $250,000 instead of my selection of $650,000. The result

#101
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

would be an aggregate valuation of $2.2 billion.  In contrast, recall that this benchmark valuation begins by assigning zero benchmark value to large number of Abuse Claims based on their failure to adequately identify their abuser or qualify for compensation as a tort claim for their failure to adhere to statute of limitations laws. If any of those were to true-up their Abuse Claim in some way, there would be more non-zero Abuse Claims. The following Section examines attributes of the Abuse Claims that could affect the applicability of the initial benchmark.

(67)    It is important to recognize that the benchmark valuation is not designed to affix the value of any individual Abuse Claim, but rather to provide an estimate for the entire set of Abuse Claims in the aggregate. This means that the benchmark valuation scenario cannot just simply be divided and assigned to small subsets of specific Abuse Claims. Large sets of Abuse Claims may be evaluated but smaller cuts of the data will not be representative. For example, the attributes driving Abuse Claim value within the benchmark itself, notably the statute of limitations treatment, are subject to regional concentration. Certain states with shorter lookback windows after survivors reach maturity will have far fewer valuable benchmark Abuse Claims, while states with entirely open windows will have more valuable benchmark Abuse Claims. However, we expect that, when evaluated on their individual merits under the TDPs' fact-finding process, some of the presumptively barred Abuse Claims will prove to have value, while some of those in areas that were allowed based on statue will likely prove to be less valuable than the average historical resolution. Because Local Councils are regionally concentrated, the benchmark valuation does not provide a direct basis on which to value each's individual set of Abuse Claims.

Confidential subject to Protective Order

#101

Expert Report of Charles E. Bates, PhD

# IV. Valuation range

(68)     The Abuse Claims were evaluated based on the information provided in their Proof of Claim submissions. While all the submissions were considered, inclusive as of this point of amendments made through July 2, 2021, each survivor was evaluated only once. So, for example, a survivor who made an initial timely submission and then subsequently amended his Abuse Claim to indicate an abuser would be evaluated a single time as a survivor who had identified an abuser. The amount of Abuse Claims falling within given categories was initially evaluated based on the Proof of Claim data as it existed early spring of 2021, the so-called Tranche IV data. More recently I have evaluated the Abuse Claims falling within given categories based on the Tranche VI data.  These data are described in more detail in the Murray Report.

(69)     To test the applicability of the initial aggregate benchmark value to the Abuse Claims, I analyzed both the historical resolution data and bankruptcy Proof of Claim submission data used in the benchmark evaluation. I first outline the "Plus Factors" I considered, i.e., attributes that could indicate a value of Abuse Claims above the benchmark value.  I then outline the "Minus Factors" I considered, i.e. attributes that would lower the value of Abuse Claims above the benchmark value. I conclude this section with my estimate of the reasonable valuation range of the Abuse Claims.

## IV.A. Plus Factors

(70)     Of the seven Plus Factors I describe below, the first two had the greatest potential for indicating an aggregate value above the initial benchmark aggregate value when I did my estimate of the valuation range early last Spring.  The passing of a revival law in a state with currently many statute-of-limitations barred Abuse Claims (an aspect of Plus Factor) had the potential to move significant numbers of Abuse Claims from the no value category to one of the categories that have value between early Spring of 2021 and the confirmation date.  That did occur in four states. The remaining uncertainty for this Plus Factor is much lower now as little time remains for revival laws to be enacted before confirmation.  The second Plus Factor category (the potential for Abuse Claims that do not name their abuser to provide that name at some time) remains significant given the large number, over 34,000, of abuse survivors who did not identify their abuser. It is feasible that within a group that large, further investigation by abuse survivors or their counsels could reveal the currently unidentified abusers' names.

(71)     The remaining three Plus Factors have smaller potential to have an impact on increasing the value of Abuse Claims above the initial aggregate benchmark value.  That is because Plus Factors three to five only affect the size of the value for a portion of the Abuse Claims already assigned a benchmark value.  As the initial benchmark is already much larger than the median historical claim settlements, the potential of these last three Plus Factors to indicate an aggregate value much above the initial

#101

aggregate benchmark is limited.  Plus Factors Six and Seven (the potential for future claims by minors and those with memories respectively) affect the number of positive value Abuse Claims, but add relatively few.

(72)    **The first Plus Factor** is the potential that some jurisdictions would change their Statue of Limitations rules before the confirmation date, those rules would not be strictly enforced by some judges, or that claim revival laws would allow Abuse Claims that are presently presumptively barred on that basis of the presumed applicable state law.  This would increase the count of Abuse Claims to be valued.  Between May and July of 2021, after I first performed my valuation analysis, four states have enacted revival laws for sexual abuse claims: Arkansas, Louisiana, Maine, and Colorado.  This added an additional 3,671 Abuse Claims that were no longer time barred, of which 2,039 would then be assigned a positive benchmark value.[29]  This update alone added an additional $700 million to the initial benchmark aggregate value. In total there are 4,806 additional not barred Abuse Claims in the Tranche VI data than there were in the Tranche IV data.  The additional 1,135 Abuse Claims that are not time barred was the result of abuse survivors updating their POCs establishing an abuse occurrence in another state.

(73)    **The second Plus Factor** is the potential for Abuse Claims to identifying an abuser in cases where none is currently identified or providing another update to the information of their POC increasing the count of Abuse Claims that meet the criteria to be valued. This has happened over the last several months with an additional 963 Abuse Claims naming their abuser(s) where they were not previously (as reflected in the Tranche IV data).  Moreover, 1,292 additional Abuse Claims identified the nature of their abuse allegations and 2,729 Abuse Claims updated or added the requisite date fields used to establish an age at first abuse. As a result, 135 Abuse Claims that had previously been assigned zero value for year of first abuse 18 or older would be valued.

(74)    The largest settlements in the historical claims data often involved abuse survivors who were abused many times by notorious serial abusers.  By contrast, the Abuse Claims show many instances where the abuse survivors were abused many times by an abuser only identified once.  Such cases are not well represented in the historical settlement data, providing little guidance as to the impact of this claim attribute on value.  There is a potential that this attribute is undervalued in the benchmarking analysis as a result of the lack of data. **This is a third Plus Factor**.

---

[29] The remainder of these revived Abuse Claims would not be considered due to lack of abuser identity or abuse allegation.

Expert Report of Charles E. Bates, PhD

**Figure 23: Number of abuse occurrences for benchmark valued Abuse Claims**

| Number of abuse occurrences | One identified abuser | Repeat abuser | Count of POC |
|---|---|---|---|
| One or unspecified | 4,730 | 1,220 | 5,950 |
| 2 to 10 | 5,749 | 1,706 | 7,455 |
| 11 to 50 | 1,418 | 660 | 2,078 |
| 51 to 100 | 243 | 194 | 437 |
| More than 100 | 107 | 86 | 193 |
| **Total** | **12,247** | **3,866** | **16,113** |

(75)    Many of the benchmark valued Abuse Claims assert that they reported their abuse to a third party, say a parent, friend, Scouting, police, spouse, or others.  It is often not clear whether the notice was contemporaneous with the abuse or much later, which could have a significant difference on the BSA's and related parties' responsibility. This could also provide support in substantiating these claims as compared to claims that involved no contemporaneous reporting.  The historical settlement data provide little guidance as to the impact of this claim attribute on value.  There is a potential that this attribute could indicate a claim value above the benchmark on such Abuse Claims.  **This is a fourth Plus Factor.**

**Figure 24: Reporting status of benchmark valued Abuse Claims**

| Reporting category | Count of POC |
|---|---|
| Told no one | 8,611 |
| Reported abuse | 7,502 |
| **Total** | **16,113** |

(76)    **As a fifth Plus Factor**, I note that there is the potential for an increase in claim value above the benchmark on Abuse Claims involving abuse survivors younger than ten at the time of first abuse. There are only a few of such Abuse Claims in the historical settlement data, but they account for nearly a quarter of the benchmark valued Abuse Claims.  The historical settlement data provides little guidance as to the impact of this claim attribute on value.  There is a potential that this attribute could indicate a value above the benchmark, particularly on repeat abuser Abuse Claims.

**Figure 25: Age at first abuse for benchmark valued Abuse Claims**

| Age at first abuse | Abused once or unspecified | Abused multiple times | Count of POC | Percent of POC |
|---|---|---|---|---|
| Under 8 | 452 | 941 | 1,393 | 9% |
| 8 or 9 | 840 | 1,581 | 2,421 | 15% |
| 10 to 14 | 3,851 | 6,730 | 10,581 | 66% |
| 15 to 17 | 471 | 561 | 1,032 | 6% |
| Missing | 336 | 350 | 686 | 4% |
| **Total** | **5,950** | **10,163** | **16,113** | **100%** |

#101
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

### IV.A.1. Estimating future Abuse Claims from individuals who were minors at the time of the Bar Date based on Proof of Claim submissions

(77)     **A sixth Plus Factor** is the potential Future Abuse Claims from minors who were abused prior to the Petition Date and did not file Abuse Claims as of the Bar Date.  Not all abuse survivors were required to file Proofs of Claim prior to the Bar Date; minors at the time of the Bar Date and survivors subject to repressed memory may file claims after that date.  I used the unique and timely Proof of Claim submissions covering the "Extant Abuse Claims" as the basis for my estimate of potential future Abuse Claims from individuals who were abused prior to the Petition Date, but who were still minors at the time of the Bar Date. (I use the term Extant Abuse Claims here to mean ones who were subject to the Bar Date order and filed at least one timely Proof of Claim submission, as distinct from those who were not required to file a form prior to the Bar Date).

(78)     To estimate the population that were still minors as of the Bar Date I looked at the claiming trends already evident in people who were adults and had already filed Abuse Claims. My analysis here focused on an evaluation of the Extant Abuse Claims based on survivor birth year and month.[30] Methodologically I used the Abuse Claims filed by survivors who would have been eighteen at the time of the Bar Date in November 2020 (born before November 2002) to forecast Abuse Claims that may yet be filed by survivors born between November 2002 and February 2015. Anyone born after February 2015 would have been too young to have started any type of Scouting prior to the Petition Date in February 2020.

(79)     Figure 26 provides a graph of Extant Abuse Claims by birth year and month, with the Abuse Claims related to individuals who born before November 2002 depicted by blue dots, while those born after that time are plotted using green dots. Two trends are evident in this picture. One is the sharp decline in Abuse Claim counts over time for individuals born since 1960. The other is the fact that survivors born after November 2002 were not required to file POCs prior to the Bar Date, yet some did.

---

[30]    I use the minimum birth date and month across duplicate abuse claims with different dates of birth.

#101

Expert Report of Charles E. Bates, PhD

**Figure 26: Abuse Claims by birth year and month**



Note: Excludes 554 Abuse Claims with unidentified birth date.

(80)    Figure 27 shows the same data as Figure 26—a depiction of the number of the Extant Abuse Claims by birth year and month—but limits the time frame to 1990 forward. This allows for a rescaling that better shows the drop off in Abuse Claims filed on behalf of individuals born after November 2002. Again, for this chart the Abuse Claims related to individuals who born before November 2002 depicted by blue dots, while those born after that time are plotted using green dots.

**#101**
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 27: Abuse Claims by birth year and month since 1990**



(81) I ran a regression on these data considering the full set of Extant Abuse Claims data for individuals born since 1960, controlling for the overall population of individuals involved in Scouting, and using a quadratic functional form. The sum of the upper end of the pointwise 95% confidence interval for the projected number of Future Abuse Claims coming from individuals born each month after November 2002 (but before February 2015) is 568. The sum of the lower end of the pointwise 95% confidence interval for the projected number of Future Abuse Claims coming from individuals born each month after November 2002 (but before February 2015) is 251. The actual number of predicted Future Abuse Claims is 407.

(82) Figure 28 depicts the pointwise 95% confidence intervals for my forecast of predicted Future Abuse Claims by month, related to pre-petition acts, for individuals born after November 2002. In this graph the red dots are the point estimate for the expected claim count for individuals born in each month and the black lines depict whisker bars showing the range of the pointwise 95% confidence intervals. The green dots depict the claims already filed.

**#101**
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

Figure 28: Forecast of future Abuse Claims by birth year and month



(83)   The range described earlier of 251 to 568 compares to roughly 156 Extant Abuse Claims that report
       birth dates post November 2002. Thus, this analysis indicates that there are at most several hundred
       potential Future Abuse Claims that could be filed after the Bar Date for individuals who were minors
       at the time of the Bar Date. There is a potential that this attribute could indicate a value above the
       benchmark, though in the context of 16,113 benchmark valued Abuse Claims this is not a significant
       addition.

### IV.A.2. Estimating repressed memory claims based on Proof of Claim submissions

(84)   **The seventh and final Plus Factor** is that individuals who were abused prior to the Debtors' Petition
       Date, but who could potentially establish in the future that they were subject to repressed memory
       leading up to and at the time of the Bar Date, may be compensable. My understanding is that whether
       repressed memory serves as a basis for admission of a claim in each state or territory is not universal;
       that the law on this issue is undecided. I also used the unique and timely Proof of Claim submissions

#101
Highly Confidential – Subject to Protective Order

covering Extant Abuse Claims as the basis for my estimate of potential for such Future Abuse Claims. To the extent such claims are allowed, the Extant Abuse Claims indicate they should be rare.

(85)    In our review of the Proof of Claim submissions covering Extant Abuse Claims, Bates White noted that a limited number of the Abuse Claims referred to some form of past repression related to their abuse. We searched all of the Proof of Claim submissions related to the 82,209 unique and timely Abuse Claims for any reference to the terms "repress/repressed/repression," "amnesia," or "dissociated/dissociation." In total this search revealed approximately 700 records associated with individuals with Extant Abuse Claims made any prior reference to some form of repression. This represents well less than 1% of the 82,209 unique and timely Abuse Claims that refer to having dealt with some form of repression.

(86)    Some of those references do seem to squarely indicate prior repression of a nature that could allow for the possibility of a post-Bar Date claim had it persisted. For example, Claim No. 2490 states in his form: "I repressed the memory for awhile, but recently it resurfaced."

(87)    Further review of these 700 Abuse Claims, however, implies that many of these Abuse Claims could indicate some form of partial repression, not a situation where the survivor had no awareness of the act in its entirety. For example, Claim No. 13177 talks about having "repressed feelings for a long time and… nightmares" in a section of the form about the impact of the abuse. 168 of the identified Abuse Claims where the word "repressed" appears were filed by one law firm and used the term about some specific claim attribute, such as the timing or location saying: "Due to repressed memory, I do not presently recall all of the details concerning [the location of] my abuse. However, I expect that with the help of further discovery and the opportunity to reflect on my experience with newly discovered evidence, I may be able to recall these repressed memories and provide further details in support of my claim." Some then go on to provide some level of information about the location or other attribute.

(88)    As evidenced by the Extant Abuse Claims, the number of additional claims from repressed memory must be small. Though there is a potential that this attribute could indicate a value above the benchmark, in the context of 16,113 benchmark valued Abuse Claims this is not a significant addition.

(89)    In total, updates in the POCs of the abuse survivors from the creation of the Tranche IV data to the Tranche VI data added $570 million to the initial benchmark aggregate value.  This is in addition to the $700 million added as the result of the new revival statutes in the four states.  In all, changes in these first two Plus Factors between last March and today raised the initial aggregate benchmark value by $1.3 billion.  These were the two Plus Factors that I considered as having the greatest potential to raise the aggregate value of Abuse Claims above the benchmark by increasing the number

#101

of Abuse Claims that had value.  This observed increase is well within the potential increase I contemplated in my construction of the valuation range last spring.

(90)   Of the seven Plus Factors I describe below, the first two had the greatest potential for indicating an aggregate value above the initial benchmark aggregate value when I did my estimate of the valuation range early last Spring.  The remaining three Plus Factors have smaller potential to have an impact on increasing the value of Abuse Claims above the initial aggregate benchmark value. As the initial benchmark is already much larger than the median historical claim settlements, the potential of these last three Plus Factors to indicate an aggregate value much above the initial aggregate benchmark is limited.  Plus Factors Six and Seven (the potential for future claims by minors and those with memories respectively) affect the number of positive value Abuse Claims, but add relatively few.

## IV.B. Minus Factors

(91)   I also examined a series of "Minus Factors", i.e., those attributes of the claiming populations that would lower the value of Abuse Claims below the initial benchmark value. It is likely that the initial benchmark values for certain categories of claims are inflated. As illustrated in Figure 19, two-thirds of the recent historical settlements for claims involving sexual penetration are below the initial benchmark of $650,000. The average settlement of those claims was less than $170,000.  Recall that I selected the initial benchmark as the midpoint between the mean and the median. To the extent that the median is a better indicator of value for a large majority of Abuse Claims, there is significant potential for the aggregate settlement value to be less than the initial aggregate benchmark value.  The possibility of a valuation closer to the median is real.

(92)   There are characteristics of the Abuse Claims that weigh in favor of a lower, median-based valuation. The significant increase in claims filed against the BSA represents a break from the tort system process. Relative to the current pool of Abuse Claims, the BSA's historical data related to Abuse liability resolutions were stronger on both observable and unobservable characteristics. The following discussion on Minus Factors discusses why.

(93)   The first minus factor is the potential for a decrease in Abuse Claim value below benchmark due to differences in age composition of the current Abuse Claim population represented by the Proof of Claim as compared to the historically resolved tort claims. The historical settlement data shows that claims received higher value when they were brought closer-in-time to the incident of abuse.  The historical resolution data differ from the Proof of Claim submissions in that the former tended to file their claims at a younger age. Figure 29 provides a graphical comparison of the age at the time of claims resolution, in the case of the historical tort claims, and POC submission in the case of the Proof of Claim submissions covering Abuse Claims. It illustrates that the historical claims involved a

#101

Expert Report of Charles E. Bates, PhD

significantly higher proportion of claims filed at a younger age than the age at which the abuse survivors submitted their Abuse Claims in the instant matter.

**Figure 29: Comparison of age at time of filing for historical tort claims and Proof of Claim submissions**



(94)    Figure 30 provides another representation of the same data with the data group by larger age bins. This graph clearly shows the distinction across the two sets of claims data.

#101
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 30: Comparison of historical tort claims and Proof of Claim submissions by age bins**



(95)    This age distinction is significant in that the historical resolution data show that claims filed closer to when the abuse occurred receive more value. As show in Figure 31, claims filed closer to when the abuse occurred receive more value.

**Figure 31: Historical tort claim mean resolution values by submission age bins**

| Age at filing | All allegations | Penetration claims | Other sex acts |
|---|---|---|---|
| Under 54 | $1,336,262 | $1,819,815 | $1,495,755 |
| 54 to 63 | $349,762 | $673,906 | $208,168 |
| Over 63 | $118,235 | $319,868 | $121,383 |

(96)    A second Minus Factor is that there is the potential for a lower Abuse Claim value below benchmark for Abuse Claims where the abuser(s) are other youths with no adults involved.  The historical settlement data provides little guidance as to the impact of this Abuse Claim attribute on value. Moreover, over 25% of benchmark valued Abuse Claims do not distinguish between abuse involving only other youths or with at least one adult involved.

#101
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 32: Majority status of abusers for benchmark valued Abuse Claims**

| Majority status of abuser(s) | Count of POC |
|---|---|
| At least one adult | 10,868 |
| Youth – no adult | 530 |
| Unspecified | 4,715 |
| **Total** | **16,113** |

(97) A third minus factor is that there is a potential for a lower Abuse Claim value below benchmark from a failure of POCs to distinguish between circumstances when there is not a non-BSA relationship between the abuser and the abuse survivor and when the question has not been answered. On the section of the POC questionnaire requesting the abuse survivor to identify non-BSA relationships, six options were provided: (1) religious organization leader, member, volunteer, (2) family member or relative, (3) coach/athletics, (4) teacher, (5) neighbor, or (6) Other (please explain and add any other information you remember to the categories above.) Notably, there is not a check box for "no outside Scouting relationship". As is revealed by the response rate on other items on the POC questionnaire, a significant nonresponse to this question is possible. As Figure 33 shows, 61% of benchmark valued Abuse Claims checked no box in response to this question. There is a potential that a significant number of the 9,883 POCs that did not have a box checked were that way because this question was not answered, which if checked would have indicated a lower benchmark value.

**Figure 33: Tabulation of non-BSA relationships between abuser and abuse survivor for benchmark valued Abuse Claims**

| Number of outside relationship boxes checked | Count of POC | Percent of benchmark valued Abuse Claims |
|---|---|---|
| 0 | 9,883 | 61% |
| 1 | 5,229 | 32% |
| 2 | 842 | 5% |
| 3 to 6 | 159 | 1% |
| **Total** | **16,113** | **100%** |

(98) The fourth and most significant Minus Factor is that there is the potential for a lower Abuse Claim value below benchmark from unobservable attributes of the abuse survivors that led them to not have filed a tort claim for the abuse they suffered. Clearly there is a great hesitancy among abuse survivors to have their Abuse Claims made public, as would be required as part of a lawsuit; only two percent of abuse survivors signed the POC in the manner required to allow the abuse survivors' Abuse Claims to be public. That small percentage is about the same scale of the number of tort claims brought against the BSA over the past years. I am not aware of any other tort where the vast majority of damaged parties were unwilling to file a lawsuit.

Highly Confidential – Subject to Protective Order

(99)   Though we do not know why the choice was made not to file prepetition, it reflects an economic choice based on each abuse survivor's circumstances.  This means they (or a lawyer they consulted) viewed their prospects through litigation not being worth the time, stress, and effort.  That is, in economic terms, the expected costs did not warrant the expected benefits. At the size of the initial benchmark, $650,000, and the likely economic status of most abuse survivors, it is unlikely that the expected costs would typically have been high enough to be the reason for the decision not to sue.  Instead, it is likely that the expected benefits, i.e., expected settlement values, were sufficiently lower leading to a decision not to pursue a lawsuit.  This indicates a significant potential for a lower aggregate value than the initial aggregate benchmark value.

(100)   A notable aspect of sexual abuse lawsuits is that the primary damage claim is for pain and suffering endured by the abuse survivor.  The types of claims that receive the highest compensation are those involving an abuse survivor who can engender the most sympathy from a jury.  Moreover, the credibility of the asserted Abuse Claims is derivative of the ability of the abuse survivor to explain the abuse they suffered. Their life and behaviors are subject to intense scrutiny. The following is a list of several categories of attributes that may explain why an abuse survivor did not file a lawsuit, which correspondingly lower the settlement value of a tort claim for sexual abuse.

> a.   Unobservable abuse survivor characteristics regarding case strength, viability, and credibility.
>
> b.   Unobservable abuse survivor privacy concerns and unwillingness or hesitancy to discuss the abuse outside of a context like the present bankruptcy where their privacy can be assured.
>
> c.   Unobservable ability of abuse survivor to fully articulate relevant facts and develop a tort case comparable to those prosecuted historically.
>
> d.   Unobservable abuse survivor characteristics/personal history affecting jury appeal.

(101)   Another notable aspect of sexual abuse lawsuits is that the potential for a punitive damage award is a significant driver of the size of jury awards, and hence the size of settlements. Without a credible threat of punitive damages, a common characteristic of the high value settlements, the tort value of sexual abuse cases is much lower; punitive damages are typically multiples of compensatory damages which include pain and suffering. The ability of a tort claimant to obtain a high punitive damage award depends on the right combination of judge, jury, jurisdiction, plaintiff, and a demonstrable failure of responsibility on the part of the BSA to have prevented the abuse. An absence of this combination of factors may have led to an unwillingness on the part of many abuse survivors not to have filed lawsuits.  In addition to the attributes outlined in the previous paragraph, there are also unobservable characteristics regarding the relative connection of the wrongful acts to the BSA and

willingness of parties to assign a significant share of fault to Scouting relative to the historically resolved tort cases.

(102)    Of the four Minus Factors I have identified, the first and the fourth have the greatest potential for indicating an aggregate value below the initial benchmark aggregate value. The fourth has the greatest potential to indicate a lower than benchmark value for Abuse Claims. Nearly, if not all, of the Abuse Claims could have been filed as tort claims prior to the Petition Date. Only 766 of the benchmark valued Abuse Claims did. The remaining 15,347 chose not to.

(103)    The first Minus Factor also has a significant potential for a value lower than the benchmark value. There are several thousand Abuse Claims from abuse survivors who are now over 63, many much older, and older than any of the historical survivors. Discounting the older Abuse Claims at the lower values indicated by the limited number of historical claims would lower their value 20% below benchmark. This likely understates the impact of survivor age as there are only two historical claims where the age of the abuse survivor at resolution was more than 70, one at 71, and one at 72. These were mid five figure settlements. However, there are 1,515 of the 16,113 benchmark valued Abuse Claims (9%) where the abuse survivors were over 70 at the date of submission, indicating an even larger reduction if five figure settlements are more the norm of claims made 60 or more years after abuse.

(104)    The second and third Minus Factors do not have the same potential for impact on decreasing the value of Abuse Claims below the initial aggregate benchmark value. That is because they likely only affect the value of a smaller portion of the Abuse Claims.

## IV.C. Combining Plus and Minus Factors

(105)    In Section III above, I described how the current Tranche VI data produce an initial aggregate benchmark value of $5.8 billion. Section IV discussed the Plus and Minus Factors regarding why that benchmark based on several hundred historical settlements is uncertain and why the actual value of Abuse Claims cannot be known more precisely than a wide range. Early last spring, my evaluation of the then-current Tranche IV Abuse Claims data and the BSA historical settlements data provided by Ogletree resulted in an initial aggregate benchmark value of $4.75 and a valuation range of $2.4 billion to $7.1 billion for the Abuse Claims. [31]  Based on the updated Tranche VI and longer history of resolved claims, I still consider the relevant reasonable valuation range for Abuse Claims to be $2.4

---

[31]    At the time I performed my first benchmark analysis Bates White had identified roughly 82,350 unique and timely submissions. Most of the reduction in claim count between those earlier data and the present set involves the removal of Proof of Claim submissions that have since been withdrawn or marked as "VOID." The removal and voiding process was administered by Omni, the Debtors notice agent. My understanding is that most of the claims they removed were submissions made to the docket that were not actual Abuse Claims. Accordingly, these submissions generally lacked some, if not all the key criteria used in the benchmark valuation and their subsequent removal did not have a meaningful impact on my analysis.

Expert Report of Charles E. Bates, PhD

billion to $7.1 billion. This remains the range for two reasons: First, the change I observed on the initial aggregate benchmark value from the updated POC and historical settlement data is well within the amount contemplated by the initial range. These updates increased the frequency of benchmark valued Abuse Claims as a partial realization of the uncertainty identified as Plus Factors 1 and 2.  As a portion of the uncertainty about the number of barred Abuse Claims and unnamed abusers was resolved, it lowers the uncertainty remaining for these factors. In particular, there remains little time between now and confirmation for additional states to enact revival laws.  Thus, the remaining uncertainty regarding Plus Factor 1 primarily relates to the enforcement of statute of limitations laws. The upper end of the range designed to capture the uncertainty primarily from those two factors does not change as some of that uncertainty is resolved within the scope of uncertainty originally contemplated.

(106)    Second, the range encompasses the net impact of all the potential Plus and Minus Factors. We are yet to see any manifestation of the remaining uncertainty factors, the potential impact of which are dominated by the potential Minus Factors. In other words, the benchmark value change between the Tranche IV data and the Tranche VI data is a one-sided change in the benchmark. This is due to the natural asymmetry in the information updating process since much of the Plus-Factor risk relates to either i) Abuse Claim improvements that can and have been partially addressed through ongoing amendments to the POC data or ii) potential changes to Statute of Limitations rules that occur over time. In contrast, the Minus-Factor risk relates to Abuse Claim vetting that will determine how closely the current Abuse Claims align to the historical resolutions, something which is yet to be addressed in any meaningful way since I first estimated the valuation range.

(107)    As is clear from the discussions of the limits of applying data on several hundred historical settlements to the 82,209 Abuse Claims and the Plus and Minus Factors of the initial aggregate benchmark valuation, it is not possible to mathematically model the valuation range of the Abuse Claims precisely. Instead, I must rely on judgment informed by the uncertainty analyses I have performed regarding the direction (plus or minus) and order of magnitude (large or small) of the potential differences between the initial aggregate benchmark value and the tort value of the Abuse Claims.  Figure 34 summarizes my evaluation of the relative size of each uncertainty factor I analyzed.

Confidential subject to Protective Order

Expert Report of Charles E. Bates, PhD

**Figure 34: Summary of valuation uncertainty factors**

| Factor | Reference | Valuation component | Impact potential | Comment |
|--------|-----------|---------------------|------------------|---------|
| Plus Factor 1 | SOL enforcement or revivals | Frequency | Small | Little time remaining before confirmation |
| Plus Factor 2 | Unidentified abuser update | Frequency | Large | Partially realized since Tranche IV |
| Plus Factor 3 | Multiple abuse occurrences | Severity | Small | Relates to hundreds of Abuse Claims |
| Plus Factor 4 | Abuse reported | Severity | Small | Likely incorporated in benchmark value |
| Plus Factor 5 | Young abuse survivors | Severity | Small | Ambiguous |
| Plus Factor 6 | Bar Date minors | Frequency | Small | Relates to hundreds of Abuse Claims |
| Plus Factor 7 | Repressed memory Abuse Claims | Frequency | Small | Relates to hundreds of Abuse Claims |
| Minus Factor 1 | Age of survivors | Severity | Large | Relates to thousands of Abuse Claims |
| Minus Factor 2 | Youth on youth abuse | Severity | Small | Relates to hundreds of Abuse Claims |
| Minus Factor 3 | Identifying missing relationships | Severity | Small | Relates to hundreds of Abuse Claims |
| Minus Factor 4 | Unobserved hesitancy attributes | Severity | Large | Relates to nearly all Abuse Claims |

(108)   To evaluate the net effect of the uncertainty factors, I first considered a potential size of change at several alternative percentages, then engaged in a thought experiment to conceptually test what changes in the underlying facts would have to change for the valuation to be that percentage above or below the initial aggregate benchmark value. I considered the potential for increases of 10%, 25%, 50%, 75% and 100% above the initial aggregate benchmark valuation. I also considered the potential for decreases of 10%, 25%, 50%, 75% and 90%. A reasonable upper or lower uncertainty range from benchmark of 10% is easy to reject. Too many of the uncertainty factors could easily move the valuation by at least that much. At the other extreme, it is also easy to reject an upper bound as high as 100% from benchmark as that would require numerous states all to enact revival laws to double the number of benchmark valued Abuse Claims without any decrease in valuation from the Minus Factors. After accounting for the potential impact of the Minus Factors as well, any amount above 50% is remote. At the other extreme, it is also easy to reject a 90% decrease from benchmark, as that would require all Minus Factors to hold without any offset from Plus Factors. Moreover, given the several thousand repeat abusers with positive benchmark value, it also unlikely that the lower end of the valuation range is only 25% of the initial aggregate benchmark. Either a 25% increase or a 25% decrease is easily possible, indicating that the reasonable valuation range at the time of my initial evaluation early last Spring was 50% above to 50% below the initial aggregate benchmark of $4.75 billion, a range from $2.4 billion to $7.1 billion.

(109)   With that range in mind, the current thought experiment is whether the current data indicate a change from that evaluation. The lower end of that range is consistent with typical tort settlements near the median of the historical settlements as discussed above. As mentioned in the previous paragraph, there are several thousand repeat abuser cases with positive benchmark value making it unlikely that the tort valuation of Abuse Claims is less than $2.4 billion. On the other hand, I see no basis in the updated data to indicate a valuation above the upper end of the range of $7.1 billion. The biggest

**#101**
Highly Confidential – Subject to Protective Order

uncertainty factor from last spring, the likelihood of additional state revival laws is small between now and confirmation.  My estimated valuation range of the Abuse Claims remains $2.4 to $7.1 billion.

(110)   To capture the full range, I produced a set of four forecast scenarios using the Tranche VI data: the initial aggregate benchmark value of $5.8 billion and then three versions of that same forecast scaled to:

    a.   the midpoint of the range: $4.75 billion;

    b.   the low end of the range: $2.4 billion; and

    c.   the high end of the range: $7.1 billion.

(111)   From an implementational standpoint this was accomplished by proportionally scaling up or down the values assigned to Abuse Claims under the benchmark. As previously noted, neither the benchmark valuation, nor these scenarios encompassing the forecast range, are designed to affix the value of any individual Abuse Claim. Rather they are intended to provide an estimate for the entire set of Abuse Claims in the aggregate.

# V. TDP matrix values

(112)    The Trust Distribution Procedures ("TDP") in this matter are designed to provide fair, equitable, and substantially similar treatment to holders of similar, legally valid, and supported Abuse Claims. The Base Matrix Values and other TDP valuation factors were informed by the same historical settlement data which inform my aggregate estimate. As noted above, however, the historical data can only provide guidance about the aggregate value of Abuse Claims or categorical values for certain types of claims. The determination of value for any one specific Abuse Claim requires a more thorough evaluation of each case on its own merits. The TDP provides procedures for a fulsome claim-specific evaluation on such a basis that will result in a reasonable valuation of individual Abuse Claims consistent with the historical settlements and will ensure substantially similar treatment across similar Abuse Claims.

(113)    The TDP—in addition to taking advantage of the information gathered through the POC process where applicable—calls for all Abuse Claims to make additional information available so that their Abuse Claim can be accurately valued on an individual basis. Under the TDP, the Settlement Trustee must develop an additional questionnaire. This questionnaire can be specifically focused on the evaluation criteria. The process also requires that Abuse Claim will produce certain additional documentation and agree to consent to further written or oral examination, under oath. As part of this process the abuse survivors must allow the Settlement Trustee the option to "obtain additional evidence from the abuse survivor or from other parties pursuant to the Document Obligations and shall consider supplemental information timely provided by the abuse survivor, including information obtained pursuant to the Document Obligations." The ability of the Settlement Trustee to make such requests for additional information, at the individual Abuse Claim level, are critical to allowing accurate claim-specific distribution amounts to be determined.  The Settlement Trustee will have at their disposal significant financial resources to perform this evaluation.

(114)    My understanding is that historically the Debtors' counsels did not apply mathematical formulae for valuing claims. Rather, the claims were considered on their merits against the backdrop of factors that include many of the ones already discussed here that could impact resolution and value. Even without having formulae in mind the result is that the historical values are correlated with certain key aspects of the claims. Indeed, as noted above, the historical values clearly move across a set of characteristics including the allegation, the abuser and his relationship to Scouting, the impact of the abuse, and the severity or nature and circumstance of the abuse within a given category. In order to ensure substantially similar treatment to holders of similar, legally valid and supported Abuse Claims on a go forward basis, it is necessary to adopt a single valuation framework that is consistent with the prior resolution history.

(115)    Because the Matrix is designed to value specific Abuse Claims, rather than estimate the entire group of Abuse Claims in the aggregate, the so-called Base Values were generated first with regards to only

a subset of the historical resolution values. These values are not designed to necessarily be the average assigned to a given tier of Abuse Claim, but rather provide a jumping off or reference point, based on the historical resolutions, from which the current and future Abuse Claims can be valued.

(116)   The matrix provides, as its starting point values by most severe abuse allegation. This is done across a set of six different abuse categories: penetration; oral contact; masturbation; unclothed touching, clothed touching, and abuse that did not involve any touching. If an Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier. The historical reference point for Abuse Claims in each tier are those that identify a single, as opposed to a repeat, abuser. Single abuser claims were used for this Base Value because the majority of the Abuse Claims in the Proof of Claim submissions identify a unique abuser. Further, as discussed in more detail below, one of the explicit Aggravating Scaling Factors for Abuse Claims under the TDP is a factor for Abuse Claims tied to a repeat abuser.

(117)   Figure 35 below provides a tabulation of the mean claim values for historical abuse claims that were identified as having occurred against a non-repeat abuser as well as the assigned a base for each tier under the TDP.[32] These values, which exclude $0 resolutions, were developed with reference to the summary settlement data available to me at the time and in consultation with lawyer from Ogletree regarding the relative values of claims. The Base Value for the final tier was set in reference to the $3,500 Expedited Distribution.

**Figure 35: Mean historical tort resolution values for single abuser claims**

| Allegation tier[33] | Average historical resolution | Base Value |
|---|---|---|
| 1-Penetration | $673,500 | $600,000 |
| 2-Oral acts | $411,818 | $450,000 |
| 3-Masturbation | $302,333 | $300,000 |
| 4-Unclothed touching | $180,000 | $150,000 |
| 5-Clothed touching | N/A | $75,000 |
| 6-Other | N/A | $3,500 |

(118)   My understanding is that most historical resolutions involved adult-on-youth abuse. Consistent with the idea that the BSA and BSA-related parties are assigned a larger share of fault where the organization could have or should have done more to prevent the abuse, cases involving youth-on-youth abuse were assigned a lower value. The idea being that, all else equal, the BSA and other related parties have more direct control over and responsibility for the conduct of employees or adult volunteers than for other youth. From an implementational standpoint this was accomplished by

---

[32]   One claim listed as a non-repeat abuser was identified by Ogletree as known repeat abuser Gary/Garrett Hatfield.

[33]   More complete descriptions of each tier are provided in the TDP Matrix.

Expert Report of Charles E. Bates, PhD

assigning Abuse Claims involving a youth perpetrator one tier lower value than a similar type of Abuse Claim involving an adult. The idea of stepping down a tier in this way was adopted on the basis of use in the Spokane diocese claims matrix.

(119)   After it is assigned a Base Value, under the TDP each Abuse Claim is to be scaled up or down (or not) on the basis of a series of Scaling Factors which can either decrease of increase the value of the Abuse Claim. The maximum value for each tier within the Matrix is the result of the product of the Base Value and the maximum possible result of all the potential Aggravating Scaling Factors. This means the maximum in each category is 4.5 times the Base Value since there are three potential Aggravating Scaling Factors and the Maximum Value for each is 1.5, 2.0, and 1.5 (1.5 x 2 x 1.5 = 4.5). The minimum value for any Abuse Claim in any tier is $0, since the Settlement Trustee has the latitude to assign a Mitigating Scaling Factor of anywhere between 0 and 1.

(120)   The Aggravating Scaling Factors were broken down into three categories meant to capture the key attributes that would drive the value of a Abuse Claim up relative to the Base Value. Those three factors are the Abuser Profile, the Nature of Abuse and Circumstances of the abuse, and the Impact of Abuse. As with the base values, these Scaling Factors were determined in reference to the historical resolution data.

(121)   The Abuser Profile scaling factor was developed by looking at the relative impact that having a repeat abuse had on historical claim values as compared to similar claims involving single abuser that were used for the original Base Values. In general, whether one looks at all claims in the aggregate, or within a specific abuse allegation tier like penetration claims, claims associated with repeat abusers receive, on average, up to twice as much as the single abuser claims that were used for purposes of establishing the base values for the matrix.[34] For example the overall average value, across all allegations, among the historical resolution claims identified as having involved a single abuser was roughly $350,000 while the average for those involving repeat abusers a bit over $700,000. Similarly, the average value of repeat abuser penetration claims is a bit over $1,200,000, or nearly double the Base Value for single abuser claims in that tier.

(122)   The Nature of Abuse and Circumstances Scaling factor and Impact of Abuse scaling factors were developed jointly by looking at the variation across values and with each being given equal weight.

---

[34]   Note that for purpose of this analysis we excluded from our considered the claims associated with two abusers considered to be extreme outliers: those related to Thomas Hacker, which settled on average for nearly $5 million, and those related to Louis Brouillard, which settled on average for less than $60,000. These two abusers were identified as being extreme cases by counsel for the Debtors. In addition, the data demonstrate that these abusers are outliers. The Hacker claims were paid, on average, more than twice as much as those related to the next highest paid abuser. On the other hand the Brouillard cases were paid atypically low amounts given the nature and breadth of the abuser. There are few claims in the current Proof of Claim form submissions that identify abusers who appear more than 15 times (Hacker had 20 historical resolutions and Brouillard over 70).

#101

(123)    The Mitigating Scaling Factors in the aggregate were assigned a range of 0.0-1.0. This range allows the Settlement Trustee full latitude to adjust any current Abuse Claim value to accurately reflect its value relative to the historical resolutions used as a benchmark. The inputs that the Trustee is to consider in that regard generally relate to the Abuse Claim's strength with regard to Statue of Limitations, the relative responsibility of the BSA and BSA-related parties, as compared to the historical benchmark figures (and accordingly with reference to other potentially responsible parties), prior settlements and any other value limitation such as a charitable immunity defense, and the Absence of a Putative Defendant.

(124)    In regard to Statute of Limitations sub-component of the Mitigating Scaling Factors, the TDP incorporates a schedule that specifies appropriate ranges based on the identified abuse state or territory. It is important to recognize the Statute of Limitations is only one component of the Mitigating Scaling Factors.  In addition, the Trustee may consider any other limitations on the Abuse Claim's recovery in the tort system.

#101

Expert Report of Charles E. Bates, PhD

# VI. Portion of valuation attributable to TCJC Abuse Claims

(125)    As described in more detail in the Murray Report, Bates White identified the subset of the 82,209 unique and timely Abuse Claims potentially associated with The Church of Jesus Christ of Latter-day Saints (the "TCJC") in three ways. First, Abuse Claims who directly identified the Mormon Church on at least one of their POC submissions were flagged. Meaning, for example, that an Abuse Claim who said his troop was chartered by the Mormon church (or some recognizable misspelling thereof), would be flagged. This first step really identified the set of Abuse Claims that, based on their own sworn Proof of Claim submissions, self-identified having a claim against the TCJC ("TCJC Abuse Claims"). In total this set of claims directly identifying the TCJC was 2,854 Abuse Claims.

(126)    Second, Abuse Claims that shared common characteristics with other sets of Abuse Claims that had already been flagged as being affiliated with the TCJC were also flagged as being potentially related to the TCJC. So, for example, an Abuse Claim who identified as the abuser an individual that was common to three other Abuse Claims—and where those others had identified the TCJC—were also flagged. Third, Abuse Claims that identified, on at least one of their POC submissions, a Local Council which was known to have been predominately affiliated with the TCJC (more than 50% of their members), were flagged. On the basis of all three sets of criteria, 7,716 of the 82,209 unique timely Abuse Claims were identified as being potentially associated with TCJC ("Potential TCJC Abuse Claims"). While the subset of the Abuse Claims identified based on the first step are those that self-identified having a claim against the TCJC, the full group including Abuse Claims from the third category almost assuredly include some Abuse Claims which were not affiliated with the TCJC (since there were troops sponsored by other Charted Organizations present in the Local Councils where TCJC charters included the majority of members).

(127)    As previously noted, my aggregate valuation is not designed to affix the value of any individual Abuse Claim. For that reason, the benchmark valuation scenario cannot just simply be divided and assigned to small subsets of specific Abuse Claims. In the case of the TCJC, however, the total Potential TCJC Abuse Claims are significant. In addition, these Abuse Claims, while subject to some degree of regional concentration, are not confined to any one particular jurisdiction; the Assigned TCJC Abuse Claims include many western states such as Idaho, which has a tighter statute of limitations window, and California, which has a much more open window. Thus, in this case, it is reasonable to look at the overall value assigned to these Abuse Claims as a point of reference for determining their relative value, in the aggregate, against all the BSA-related parties including the Debtors, Debtors' insurers, Local Councils, and Chartered Organization (in this case the TCJC).

(128)    Under the midpoint of my valuation range, the total aggregate value associated with the TCJC Abuse Claims is roughly $170 million, while the total aggregate value associated with the Potential TCJC Abuse Claims is roughly $640 million (inclusive of the $170 million for TCJC Abuse Claims). Counsel for the Debtors have advised me that such Abuse Claims may not have value directly as to

#101

TCJC to the degree the first abuse occurred on or after 1976. Specifically, they advise that such Abuse Claims may be covered by the BSA's insurance or the BSA through an indemnity claim. The portion of the total value attributable to the TCJC Abuse Claims with a date of first abuse in or prior to 1975 is roughly $57 million. While the total value attributable to the Potential TCJC Abuse Claims with a date of first abuse in or prior to 1975 is roughly $300 million (inclusive of the $57 million for TCJC Abuse Claims).

**Figure 36: Portion of midpoint valuation attributable to TCJC Abuse Claims for BSA-related parties**

| Time Period | Total valuation (TCJC Abuse Claims) | Midpoint | Total valuation (Potential TCJC Abuse Claims) |
|---|---|---|---|
| Pre-1976 | $57,000,000 | $177,000,000 | $297,000,000 |
| 1976 and Post | $117,000,000 | $233,000,000 | $348,000,000 |

(129)    Further, it is important to recognize that these figures are aggregates for the relevant set of Abuse Claims; the figures represent the total value, which could potentially be attributable to any combination of BSA-related parties including the Debtors, Debtors' insurers, Local Councils, and the TCJC. The value of the Abuse Claims as to the TCJC in isolation would necessarily be only some share of this total.

(130)    My understanding is that the TCJC has agreed to a settlement of $250 million to fully resolve its share of liability for all the Abuse Claims. Given that the TCJC may have limited direct financial responsibility for the Abuse Claims with abuse that first occurred after 1975 and given that TCJC is only responsible for a share of financial responsibility on all Abuse Claims, that figure reasonably covers the TCJC's portion of Abuse Claims under the midpoint of my valuation range.

Charles E. Bates

Charles E. Bates
December 5, 2021

#101
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

# Appendix A. Curriculum Vitae

[This page left intentionally blank]

Expert Report of Charles E. Bates, PhD

# Appendix B. Protective order

[This page left intentionally blank]

Expert Report of Charles E. Bates, PhD

# Appendix C. Materials relied upon

Below is a list of materials I relied upon in reaching in my opinions. Should I identify any additional materials that were omitted from this list, I will supplement accordingly:

- **Expert Report of Makeda S. Murray, MBA (December 5, 2021), inclusive of the reliance materials listed therein**

- **Referenced filings from the BSA docket**

- **All other documents cited throughout the report, inclusive of the footnotes.**

- **Bates White-generated valuation models**

  - ☐ Valuation model (Tranche IV): Bates White BSA valuation model (Tranche 4) -- confidential -- for production.xlsx [BSA-PLAN_01642923]

  - ☐ Valuation model (Tranche VI): Bates White BSA valuation model (Tranche 6) -- confidential -- for production.xlsx [BSA-PLAN_01642924]

- **Other Bates White-generated materials**

  - ☐ External potential comparable injury file (11/30/2021): 2021.11.30 Bates White Potential Comparable Injury -- confidential -- for production.xlsx [BSA-PLAN_01642527]

- **The BSA membership data**

  - ☐ The BSA membership data (1999-2018): Membership by Council yearend 1999-2018_Analysis.xlsx [BSA-PLAN_01638934]

  - ☐ The BSA membership data (1911-2019): Membership Year End 1911 - 2019.xlsx [BSA-PLAN_01638935]

  - ☐ The BSA membership figures (1960-2017): 1960-2017_yrend_membership.xlsx [BSA-PLAN_01642496]

- **Academic literature**

  - ☐ J. Barth et al, "The current prevalence of child sexual abuse worldwide: a systematic review and meta-analysis," *International journal of public health* 58, no.3 (2013): 469-483. [BSA_PLAN_01642609 - BSA_PLAN_01642623]

  - ☐ M. Stoltenborgh et al, "A global perspective on child sexual abuse: Meta-analysis of prevalence around the world," *Child maltreatment* 16, no.2 (2011): 79-101. [BSA-PLAN_01642812 - BSA-PLAN_01642836]

Expert Report of Charles E. Bates, PhD

☐ N. Pereda et al, "The prevalence of child sexual abuse in community and student samples: A meta-analysis," *Clinical psychology review* 29, no.4 (2009): 328-338. [BSA-PLAN_01642752 - BSA-PLAN_01642762]

☐ Amy B. Silverman, Helen Z. Reinherz, and Rose M. Giaconia, "The long-term sequelae of child and adolescent abuse: a longitudinal community study," *Child abuse & neglect* 20, no.8 (1996): 709-723. [BSA-PLAN_01642797 - BSA-PLAN_01642811]

☐ Kathleen C. Basile et al, "Prevalence and characteristics of sexual violence victimization among U.S. adults, 2001-2003," *Violence and victims* 22, no.4 (2007): 437-448. [BSA-PLAN_01642624 - BSA-PLAN_01642635]

☐ Monica H. Swahn and Robert M. Bossarte, ""Gender, early alcohol use, and suicide ideation and attempts: findings from the 2005 youth risk behavior survey," *The Journal of adolescent health* 41, no.2 (2007): 175-181. [BSA-PLAN_01642845 - BSA-PLAN_01642851]

☐ Donna E. Howard, and Min Qi Wang, "Psychosocial correlates of U.S. adolescents who report a history of forced sexual intercourse," *The Journal of adolescent health* 36, no.5 (2005): 372-379. [BSA-PLAN_01642726 - BSA-PLAN_01642733]

☐ Harriet J. Rosenberg et al, "Single and multiple suicide attempts and associated health risk factors in New Hampshire adolescents," *Suicide & life-threatening Behavior* 35, no.5 (2005): 547-557. [BSA-PLAN_01642763 - BSA-PLAN_01642774]

☐ David Finkelhor and Jennifer Dziuba-Leatherman, "Children as victims of violence: a national survey," *Pediatrics* 94, no. 4 (1994): 413-420. [BSA-PLAN_01642689 - BSA-PLAN_01642698]

☐ Natalie Sachs-Ericsson et al, "Childhood sexual and physical abuse and the 1-year prevalence of medical problems in the National Comorbidity Survey," *Health psychology* 24, no.1 (2005): 32-40. [BSA-PLAN_01642775 - BSA-PLAN_01642783]

☐ Glen A. Kercher and Marilyn McShane, "The prevalence of child sexual abuse victimization in an adult sample of Texas residents," *Child abuse & neglect* 8, no.4 (1984): 495-501. [BSA-PLAN_01642734 - BSA-PLAN_01642740]

☐ Judith M. Siegel et al, "The prevalence of childhood sexual assault. The Los Angeles Epidemiologic Catchment Area Project," *American journal of epidemiology* 126, no.6 (1987): 1141-1153. [BSA-PLAN_01642784 - BSA-PLAN_01642796]

☐ Marla E Eisenberg, Diann M. Ackard, and Michael D. Resnick, "Protective factors and suicide risk in adolescents with a history of sexual abuse," *The Journal of pediatrics* 151, no.5 (2007): 482-487. [BSA-PLAN_01642673 - BSA-PLAN_01642678]

☐ Patricia A. Harrison and Gopalakrishnan Narayan, "Differences in behavior, psychological factors, and environmental factors associated with participation in school sports and other

**#101**

Expert Report of Charles E. Bates, PhD

activities in adolescence," *The Journal of school health* 73, no.3 (2003): 113-120. [BSA-PLAN_01642708 - BSA-PLAN_01642716]

☐ Mark A. Lodico, Enid Gruber E, and Ralph J. DiClemente, "Childhood sexual abuse and coercive sex among school-based adolescents in a midwestern state," *The Journal of adolescent health* 18, no.3 (1996): 211-217. [BSA-PLAN_01642741 - BSA-PLAN_01642747]

☐ Diann M. Ackard and Dianne Neumark-Sztainer, "Date violence and date rape among adolescents: associations with disordered eating behaviors and psychological health," *Child abuse & neglect* 26, no. 5 (2002): 455-473. [BSA-PLAN_01642548 - BSA-PLAN_01642566]

☐ L. S. Bensley et al, "Self-reported abuse history and adolescent problem behaviors. I. Antisocial and suicidal behaviors," *The Journal of adolescent health* 24, no. 3 (1999): 163-172. [BSA-PLAN_01642636 - BSA-PLAN_01642645]

☐ Roberta A. Hibbard, Gary M. Ingersoll, and Donald P. Orr, "Behavioral risk, emotional risk, and child abuse among adolescents in a nonclinical setting," *Pediatrics* 86, no.6 (1990): 896-901. [BSA-PLAN_01642717 - BSA-PLAN_01642725]

☐ David E. Nelson, Grant K. Higginson, and Joyce A. Grant-Worley, "Using the youth risk behavior survey to estimate prevalence of sexual abuse among Oregon high school students," *The Journal of school health* 64, no.10 (1994): 413-416. [BSA-PLAN_01642748 - BSA-PLAN_01642751]

☐ David Finkelhor et al, "Sexually abused children in a national survey of parents: methodological issues," *Child abuse & neglect* 21,no.1 (1997): 1-9. [BSA-PLAN_01642699 - BSA-PLAN_01642707]

☐ Victoria L. Banyard and Charlotte Cross, "Consequences of teen dating violence: understanding intervening variables in ecological context," *Violence against women* 14, no.9 (2008): 998-1013. [BSA-PLAN_01642567 - BSA-PLAN_01642583]

☐ John Briere and Diana M. Elliott, "Prevalence and psychological sequelae of self-reported childhood physical and sexual abuse in a general population sample of men and women," *Child abuse & neglect 27*, no.10 (2003): 1205-1222. [BSA-PLAN_01642646 - BSA-PLAN_01642663]

☐ David Finkelhor et al, "Sexual abuse in a national survey of adult men and women: prevalence, characteristics, and risk factors," *Child abuse & neglect* 14, no.1 (1990): 19-28. [BSA-PLAN_01642679 - BSA-PLAN_01642688]

Expert Report of Charles E. Bates, PhD

      ❑  Daniel P. Chapman et al, "Adverse childhood experiences and the risk of depressive disorders in adulthood," *Journal of affective disorders* 82, no. 2 (2004): 217-225. [BSA-PLAN_01642664 - BSA-PLAN_01642672]

- **Youth protection information**

      ❑  The BSA youth protection timeline (11/15/2021): 2021.11.16 BSA youth protection timeline.xlsx [BSA-PLAN_01642526]

      ❑  The BSA youth protection timeline – word document (11/15/2021): 100 Years of Enhancing Efforts to Protect Youth - PRIVILEGED (09-28-2020) no links.docx [BSA-PLAN_01642501- BSA-PLAN_01642524]

      ❑  Youth protection resources memo (11/03/2021): Youth Protection Resources.docx [BSA-PLAN_01642529- BSA-PLAN_01642532]

**#101**

Expert Report of Charles E. Bates, PhD

# Appendix D. Prevalence of sexual abuse among minors in the United States

(131)   With the goal of obtaining potential benchmarks for the prevalence of child sexual abuse among males in the United States, I have identified three major meta-analyses on this subject—Pereda et al. (2009), Stoltenborgh et al. (2011), and Barth et al. (2013).[35] Pereda et al. (2009) analyzes all self-report studies (excluding clinical samples) published in peer-reviewed scientific journals that reported sample size and prevalence of abuse by gender. It includes 65 such studies. The analysis in Stoltenborgh et al. (2011) extended Pereda et al. (2009) in two respects. First, it includes not only self-report studies but also informant studies (while still excluding clinical samples). Second, in addition to studies published in peer-reviewed scientific journals, it also includes research published as dissertations or book chapters. It includes a total of 217 studies. Barth et al. (2013) analyze all self-report studies with data collected after January 1, 2000, participants younger than 18 years of age and a sample size of at least 1,000 participants. Their analysis includes 55 studies.

(132)   Collectively, these three meta-analyses evaluate hundreds of individual studies of child and cover sexual abuses that occurred between 1910 and the early 2000s. Even a cursory review of the studies reveals that some of them bear little relevance or contain inadequate information to serve as useful benchmarks for assessing the prevalence of sexual abuse in this matter. I, therefore, asked my team to identify and remove those studies that meet the following criteria:

- Analyze sexual abuse of only females, or of males and females without providing a breakdown by gender;

- Focus on countries other than the United States;

- Are informant studies;

- Use samples of participants that are drawn from populations with narrow demographic and socioeconomic characteristics (as opposed to samples drawn from general male populations that are arguably more representative of the survivors), such as

  □ College students

  □ Children with autism, volunteers with physical and mental health conditions

  □ Clinicians/medical staff

---

[35]   J. Barth et al. "The current prevalence of child sexual abuse worldwide: a systematic review and meta-analysis," *International journal of public health* 58, no.3 (2013): 469-483.

M. Stoltenborgh et al. "A global perspective on child sexual abuse: Meta-analysis of prevalence around the world," *Child maltreatment* 16, no.2 (2011): 79-101.

N. Pereda et al. "The prevalence of child sexual abuse in community and student samples: A meta-analysis," *Clinical psychology review* 29, no.4 (2009): 328-338.

---

Confidential subject to Protective Order

   □ US military

   □ Incarcerated individuals

   □ Homosexual men

(133) Whether a given study satisfies one or more of the above criteria was determined using a three-step process. In the first step, my team reviewed the characterization of the study in the corresponding meta-analysis. If the authors of the meta-study indicated that the study meets at least one of the criteria, it was excluded. In the second step, my team reviewed the study's abstract. If the abstract indicated that the study meets at least one of the criteria, it was excluded. Finally, in the third step, my team reviewed the study in detail to determine whether it meets any of the criteria. If the more detailed review indicated that it does, it was excluded.

(134) Overall, I identified 21 candidate studies for potential benchmarks. Summary information for these 21 studies is provided in Figure 37. The third column shows the prevalence rate of abuse among youths reported in each study. Most studies report this rate directly. For studies that report the prevalence rate for only some subset(s) of the sample, I calculated the implied prevalence rate in the full sample using the information provided in the study. For studies that asked about lifetime abuse, I calculated the implied prevalence rate specifically among youths. These calculations are described in the fourth column of Figure 37.

(135) As apparent from the figure, there is significant variation in the reported prevalence rates of youth abuse. The prevalence rates for studies that defined abuse as penetration or a more severe act, shaded grey, range from 1.10% to 6.47%, with an average of 3.58%.[36] Those for studies that defined abuse as touching or more severe act, unshaded, range from 1.00% to 14.94%, with an average of 6.69%.

---

[36] Pereda et al. (2009) find that 7.9% of men had suffered some form of sexual abuse prior to the age of eighteen. Stoltenborgh et al. (2011) find that 7.6% of males were victims of child sexual abuse.  Barth et al. (2013) find that 3% of boys are victims of forced intercourse and 6% are victims of contact abuse. Thus, prevalence rates from the 21 studies I identified are similar in magnitude (on average) to those included in each of the three meta-analyses.

**Figure 37: Summary of relevant academic literature on sexual abuse of boys**

| Study[37] | Broadest comparable allegation in POC data | Prevalence of sexual abuse among youths | Notes on calculation of abuse rates | Adjusted prevalence of sexual abuse among youths |
|---|---|---|---|---|
| Silverman, Reinherz, and Giaconia (1996) | Penetration | 1.10% | Reported directly in study | 0.78% |
| Basile et al. (2007) | Penetration | 1.45% | The rate of lifetime abuse was 2.10% and 69.2% of participants were first victimized before the age of 18. 2.10% × 69.2% = 1.45% | 1.20% |
| Swahn and Bossarte (2007) | Penetration | 3.80% | Reported directly in study | 3.14% |
| Howard and Wang (2005) | Penetration | 5.10% | Reported directly in study | 4.21% |
| Rosenberg et al. (2005) | Penetration | 6.47% | Table 1 listed 5% of the 6,452 boys with no suicide attempts were sexually assaulted; 9% of the 773 boys with one suicide attempt were sexually assaulted; and 38% of the 238 boys with multiple suicide attempts were sexually assaulted. Therefore, the abuse rate was (5% × 6,452 + 9% × 773 + 38% × 238) / (6,452+ 773 + 238) = 6.47% | 5.34% |
| Finkelhor and Dziuba-Leatherman (1994) | Touching | 1.00% | In Table 2, they reported 1.0% contact sexual abuse and 0.0% rate among boys. Therefore, the sexual abuse rate was 1.0% + 0.0% = 1.0%. | 0.83% |
| Sachs-Ericsson et al (2005) | Touching | 2.00% | Reported directly in study | 1.65% |
| Kercher and McShane (1984) | Touching | 3.00% | Reported directly in study | 2.48% |
| Siegel et al (1987) | Touching | 3.80% | Reported directly in study | 3.22% |
| Eisenberg, Ackard, and Resnick, (2007) | Touching | 4.00% | Table 1 showed that 96% men reported no sexual abuse and, therefore, 4% were ever sexually abused. | 3.30% |
| Harrison and Narayan (2003) | Touching | 4.00% | Reported directly in study | 3.30% |
| Lodico, Gruber, and DiClemente (1996) | Touching | 4.10% | Reported directly in study | 3.38% |

---

[37]    Complete reference to each academic study is included in Appendix C and my backup materials.

Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

| Study[37] | Broadest comparable allegation in POC data | Prevalence of sexual abuse among youths | Notes on calculation of abuse rates | Adjusted prevalence of sexual abuse among youths |
|---|---|---|---|---|
| Ackard and Neumark-Sztainer (2002) | Touching | 4.53% | All calculations here are based on Table 8 of the paper. There was a total of 38,763 boys (38,763 = 36,449+1,011+449+854). 2.4% of the 36,449 boys (875 = 2.4% × 36,449) with no date-related experience reported sexually abused by adults (2.4% = 1.2%+0.3%+0.3%+0.1%+0.2%+0.3%). 20.5% of the 1,011 boys (207 = 20.5% × 1,011) with date violence only reported sexually abused by adults (20.5% = 6%+1.3%+4.4%+2.3%+1.8%+4.7%). 39.6% of the 449 boys (178 = 39.6% × 449) with date rape only reported sexually abused by adults (39.6% = 11.1% +3.8% + 7.8% + 2.4% + 6.0% +8 .5%). 58.1% of the 854 boys (496 = 58.1% × 854) with date violence and rape reported sexually abused by adults (58.1% = 11.0% + 2.0% + 7.8% + 2.9% + 5.4% + 29.0%). Therefore, a total of 1,756 = 875 + 207 + 178 + 496, 4.53% = 1,756 / 38,763, boys were sexually abused by adults. | 3.88% |
| Bensley et al (1999) | Touching | 5.00% | 2.4% boys reported being sexually molested and 2.6% reported being (non-sexually) abused and sexually molested. The sexual abuse rate was 2.4% + 2.6% = 5.0% | 4.13% |
| Hibbard, Ingersoll, and Orr (1990) | Touching | 6.00% | Table 1 listed the sexual abuse only rate was 2.3% and the rate for physical and sexual abuse was 3.7%. Therefore, the total sexual abuse rate was 2.3% + 3.7% = 6.0%. | 4.95% |
| Nelson, Higginson, and Grant-Worley (1994) | Touching | 7.70% | Reported directly in study | 6.35% |
| Finkelhor et al (1997) | Touching | 9.00% | Reported directly in study | 7.43% |
| Banyard and Cross (2008) | Touching | 9.40% | Reported directly in study | 7.76% |
| Briere and Elliott (2003) | Touching | 14.20% | Reported directly in study | 11.72% |
| Finkelhor et al (1990) | Touching | 14.40% | In table 1, they reported 9.5% sexual intercourse; 4.5% touch, grab, kiss; and 0.4% oral sex, sodomy among men. Therefore, the sexual abuse rate was 9.5% + 4.5% + 0.4% = 14.4%. | 12.82% |
| Chapman et al (2004) | Touching | 14.94% | 54% of the 9,460 respondents are women, so there were 4,352 (4,352 = 9,460 × 46%) male respondents. Table 1 reported 650 sexual abuse cases among men. Therefore, the male sexual abuse rate was 650 / 4352 = 14.94% | 12.33% |

#101
Highly Confidential – Subject to Protective Order

Expert Report of Charles E. Bates, PhD

(136)    The prevalence rates in the third column of Figure 37 reflect abuse by all perpetrators—family members as well as non-family members. In contrast, I understand that the relevant type of abuse that survivors in this matter can receive compensation for is abuse caused by non-family perpetrators. Five studies include information on the victim's relationship to the perpetrator. Across these five studies, non-family perpetrators accounted for 70.80% to 89.00% of the abuses.[38] I used the study-specific percentage to adjust the prevalence rate shown in the third column. For the remaining studies, I adjusted the prevalence estimates shown in the third column by multiplying them by 82.53%, which is the average share of non-family perpetrators across the five studies. The adjusted prevalence rates are shown in the last column of Figure 37. The average adjusted prevalence rate for penetration or more severe acts, shaded grey, is 2.93%; the average adjusted prevalence rate for touching or more severe acts, unshaded, is 5.59%.

---

[38]    *See* 'Prevalence literature review summary.xlsx' included in my backup materials.

---

#101