**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | Re: D.I. 6445, 6528, 7832, 7996 |

**LIMITED OBJECTION OF THE ZALKIN LAW FIRM, P.C. AND PFAU COCHRAN
VERTETIS AMALA PLLC TO TREATMENT OF TCJC IN DEBTORS' SECOND
MODIFIED FIFTH AMENDED PLAN OF REORGANIZATION**

The Zalkin Law Firm, P.C. ("Zalkin") and Pfau Cochran Vertetis Amala PLLC ("PCVA"

and together with Zalkin, the "Firms") are parties – as are the Debtors, Ad Hoc Committee of Local

Councils, TCC, Coalition, and FCR – to a global plan settlement term sheet (the "Global

Settlement") of today's date, notice of which is being concurrently filed with the Court.  Consistent

with the terms of the Global Settlement, the Firms reserved the right to file a limited objection (this

"Limited Objection") to the treatment of TCJC in the *Second Modified Fifth Amended Chapter 11*

*Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 7832] (the

"Plan").[1]  Specifically, the Firms oppose the TCJC Settlement and the Plan's definition of "Abuse

Claim" (which follows therefrom) to the extent it has the effect of releasing the non-Scouting-

related portion of Mixed Claims against the TCJC.

In support of this Limited Objection, the Firms rely on the concurrently filed *Declaration of*

*Jason P. Amala* (the "Amala Declaration"), and reserve the right to supplement this Limited

Objection as necessary in light of further modifications to the TCJC Settlement and the Plan's

treatment of TCJC.

---

[1]    Unless otherwise defined, capitalized terms have the meaning ascribed to them in the Plan.  Statutory references are to the Bankruptcy Code (the "Code") unless context otherwise requires.

1

## I. PRELIMINARY STATEMENT

1.       Mixed Claims are claims against Chartered Organizations that have both Scouting-related and non-Scouting-related sexual Abuse components.  The Firms have consistently maintained the position that the non-Scouting-related portion of a Mixed Claim cannot lawfully be released or channeled without the express consent of the holder of such Mixed Claim.  The Global Settlement adopts this position as to every Chartered Organization and every Settled Insurer otherwise protected by the Plan's proposed Channeling Injunction – everyone, that is, except TCJC.  Notwithstanding uniform agreement from every party to the Global Settlement, and despite extensive case law and even clear direction received from the Court at the hearing on the Debtors' Disclosure Statement,[2] TCJC insists that the TCJC Settlement must release and channel Mixed Claims against TCJC in their entirety – *i.e.*, both Scouting-related and non-Scouting-related.

2.       Caught in the middle of this impasse between the Firms and the TCC on the one hand and the TCJC on the other, the Debtors have determined to maintain the provisions incorporating TCJC's position in the Plan, but have agreed that the Firms may object to those provisions to the extent they purport to release the non-Scouting-related portion of Mixed Claims against TCJC.  It is thus up to this Court to resolve the lawfulness and propriety of this special Plan treatment being afforded to TCJC.

3.       Zalkin represents fourteen Abuse survivors that identify TCJC as a responsible Chartered Organization.  Amala Decl., ¶ 7.  PCVA represents forty-three Abuse survivors that

---

[2]    *See* Tr. of Hrg. 24:18-25:15, Sept. 22, 2021 ("THE COURT: I do think it's a confirmation issue, but I do think Ms. Dumas' example is illustrative of issues we are going to have to deal with.  And I -- but I think there are some separate issues there, in terms of the scope, in terms of the example where the perpetrator was a member of the church, leader of the choir, pastor, and then also had a position with the BSA.  I don't think anybody is suggesting that the church would be absolved of liability for non Boy Scouts related liability for that perpetrator's abuse, if there is any liability, not to suggest one way or the other.  But we are going to have that issue where there are multiple capacities.  And certainly, I'm not reading the plan to suggest that anything beyond Boy Scout related abuse is encompassed in any channeling injunction or any release.  Now I recognize that still may have issues with respect to the Boy Scout related channeling and release.  But I view those as two fundamentally different issues and I thought it was clear.  But Mr. Patterson [counsel to the Firms], if you have language to suggest that you think makes it more clear, particularly with respect to the non Boy Scout related liability of any protected party, please work with the debtors on that.").

identify TCJC as a responsible Chartered Organization.  *Id*.  In the aggregate, the Debtors' claims

expert, Makeda S. Murray of Bates White, LLC, estimates that TCJC may bear some responsibility

for approximately 7,716 Abuse Claims filed in this Chapter 11 Case.  *See* Expert Rep. of Makeda

S. Murray, MBA, at 8 fig.2.[3]

4.      The TCJC Settlement purports to resolve all Abuse Claims asserted against TCJC

(including Mixed Claims) in exchange for a $250 million contribution to the Settlement Trust.  The

TCJC Settlement purports to channel all present and future Abuse liabilities asserted against the

TCJC "in connection, in whole or in part with TCJC's involvement in, or sponsorship of, one or

more Scouting units."  Plan Supp., Ex. K (TCJC Settlement Agreement and Release), at ¶ 6 § BB

(definition of "TCJC Abuse Claim") & ¶ 12 § IV.A. (channeling all TCJC Abuse Claims to the

Settlement Trust).  According to the testimony of its Rule 30(b)(6) designee, Paul Rytting, TCJC's

position is that this provision channels even ***non-Scouting-related*** Abuse Claims for which TCJC

is responsible exclusively to the Settlement Trust so long as those claims are even "in part related

to Scouting."  *See* Rytting Dep. 42:15-44:25, Nov. 29, 2021.[4]  In TCJC's view, these provisions of

the TCJC Settlement dictate that when a perpetrator affiliated with TCJC abuses a child in both

Scouting and non-Scouting-related activities, the entire Abuse liability, including the non-

Scouting-related portion, is channeled to the Settlement Trust.

5.      TCJC is an independent nondebtor, unaffiliated with the Debtors, and, according to

the testimony of its corporate representative, unquestionably solvent and fully capable of satisfying

in full all claims for Abuse that might successfully be made against it.  Rytting Dep. 145:23-

150:25.  TCJC's liability for non-Scouting-related Abuse rests on its own independent misconduct

---

[3]  A true and correct copy of the Expert Report of Makeda S. Murray is attached as <u>Exhibit 1</u>.  Because the report has
been designated by the Debtors as confidential, it is being filed under seal in accordance with the *Protective Order*
and may be re-filed in unsealed/redacted form following consultation with the Debtors.

[4]  A true and correct copy of an excerpt of Mr. Rytting's deposition transcript of is attached as <u>Exhibit 2</u>.  Because the
transcript has been designated by TCJC as highly confidential, it is being filed under seal in accordance with the
*Protective Order* and may be re-filed in unsealed/redacted form following consultation with TCJC.

for which TCJC is separately and independently responsible under applicable nonbankruptcy law. The use of these Chapter 11 Cases to discharge TCJC's non-Scouting-related liabilities to thousands of claimants solely because those claimants have also been abused by TCJC-affiliated perpetrators in Scouting is an abuse of chapter 11.

6.      Extensive Third Circuit case law – including *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019), *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), and *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984) – makes clear that this Court lacks subject matter jurisdiction to release the independent, non-Scouting-related liability of nondebtor TCJC.  The liability of TCJC for non-Scouting Abuse is independent, not derivative of that of the Debtors.[5]  Since its liability is independent, no third party release may absolve TCJC of its non-Scouting-related liabilities.

7.      The Global Settlement expressly recognizes that no Chartered Organization or Settling Insurer aside from TCJC is entitled to discharge non-Scouting-related liabilities in this Chapter 11 Case.  There is no basis for maintaining an exception for the TCJC.  Indeed, TCJC's connection to this reorganization effort is even more attenuated that that of almost any other party, given that TCJC has severed its relationship as a Chartered Organization with all Scouting

---

[5]  The critical distinction in this regard is between derivative liability and direct (or independent) liability.  In *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137 (2009), Justice Stevens explained this distinction:  "When a bankruptcy proceeding is commenced, the bankruptcy court acquires control of the debtor's assets and the power to discharge its debts.  A bankruptcy court has no authority, however, to adjudicate, settle, or enjoin claims against nondebtors that do not affect the debtor's estate.  Because Travelers' insurance policies were a significant asset of the Manville bankruptcy estate, the Bankruptcy Court had the power to channel claims to the insurance proceeds to the Manville Trust.  But this by no means gave it the power to enjoin claims against nondebtors like Travelers that had no impact on the bankruptcy estate."  557 U.S. at 160-61 (Stevens, J., dissenting).  He went on to note: "That the Bankruptcy Court was without authority to enjoin independent actions was well understood by both Manville and Travelers during their settlement negotiations.  In Manville's memorandum in support of the Insurance Settlement Agreement, it clarified that it did 'not seek to have [the Bankruptcy] Court release its Settling Insurers from claims by third parties based on the Insurer's own tortious misconduct towards the third party' but rather sought only to release the insurers 'from the rights Manville might itself have against them or rights derivative of Manville's rights under the policies being compromised and settled.' [ ]  This understanding reflected not only the basic fact that the settlement was between Manville and its insurers (and not third parties), but also the parties' knowledge that the 'Second Circuit [had held] that the bankruptcy courts lack power to discharge 'independent' claims of third parties against nondebtors.'"  *Id.* at 161 (citations omitted).

programs, including those of the Debtors, as of December 31, 2019.  Disc. Stmt. at 49.  TCJC is

simply exploiting this Chapter 11 Case to non-consensually buy a release of non-Scouting-related

Abuse liabilities by making a contribution to the Settlement Trust that is acceptable to the Debtors.

But if TCJC wants to resolve non-Scouting-related liabilities, it must settle with the Abuse

survivors holding those claims, not the Debtors, and it must resolve those liabilities based on tort

system values, not TDP values.

## II.  RELEVANT BACKGROUND

8.      The Firms have decades of experience representing survivors of childhood sexual

abuse.  *See generally* Amala Decl. ¶¶ 3–6.  Of the two Firms' 1,276 claimants in the Chapter 11

Case, 57 assert claims against the TCJC.  *Id.* at ¶ 7.  In addition, the Firms have worked closely

with other plaintiffs' law firms in connection with this Chapter 11 Case, including law firms that

represent claimants asserting claims against TCJC.

9.      The clearest demonstration of TCJC's overreach in attempting to absolve itself of

non-Scouting-related liability under the Plan comes from an examination of the actual facts of

actual claims filed in this Chapter 11 Case.  Two such claims – involving a New Jersey victim (the

"AWKO Claimant") and an Arizona victim (the "PCVA Claimant") – are described below.[6]

10.     The AWKO Claimant was a Boy Scout in the Moorestown TCJC troop and a

congregant of the Moorestown TCJC from about 1983 to 1984.  Compl. at ¶¶ 5, 59-60 & 83.

During that time, he was sexually abused by David James Borg, who served as the Scout leader for

the Boy Scout troop and also as a volunteer and Young Men's President for TCJC's non-Scouting-

related youth program.  *Id.* at ¶¶ 7-8, 56, 68-69, 74-75  83-84.  Borg groomed and abused the

AWKO Claimant both in Borg's capacity as a Boy Scout leader and in Borg's non-Scouting

---

[6]  The AWKO Claimant is represented by Aylstock Witkin Kreis & Overholtz, PLLC, which filed a timely and
publicly-available complaint on his behalf in New Jersey.  *See* Amala Decl. ¶ 8 & Ex. A (the "Complaint").  The
PCVA Claimant is represented by PCVA.

capacity as TCJC's Young Men's President. *Id.* at ¶¶ 9-10, 83-84 & 86-89. The grooming and abuse took place at Borg's home when it was used for Scout meetings and activities, and at properties and facilities owned by TCJC during and after Scout meetings, Scout camping trips, and Scout physical training. *Id.* at ¶¶ 90 & 92. Borg's grooming and abuse also took place at TCJC activities unrelated to Scouting, including at Borg's home when it was used for non-Scouting-related meetings, games, and other youth activities sponsored by TCJC and its Young Men's program, and at properties and facilities owned by TCJC and used for non-Scouting-related TCJC youth activities, meetings, camping trips, and other non-Scouting youth events. *Id.* at ¶¶ 91 & 93.

11.    TCJC had actual or constructive notice that Borg was a danger to children. *Id.* at ¶¶ 94-98. Specifically, TCJC knew about and concealed sexual abuse by Borg in his capacity as Young Men's President and Scout leader. *Id.* at ¶ 104. Despite this knowledge, TCJC selected Borg to serve as Scout leader in the Boy Scout troop and also as Young Men's President in the non-Scouting church youth program. *Id.* at ¶¶ 105-106 & 72-73. Borg then abused the AWKO Claimant in both the Scouting and non-Scouting activities sponsored by Moorestown TCJC. *Id*. at ¶¶ 9-10, 83-84 & 86-93.

12.    The PCVA Claimant was a Boy Scout from approximately 1987 to 1992 in a troop sponsored by TCJC in Mayer, Arizona. Amala Decl., ¶ 9. He was abused by a Scout volunteer, Robert Gene Metcalf, in approximately 1987. *Id.* at ¶ 10. TCJC knew or reasonably should have known Metcalf posed a danger to children because Metcalf was arrested in California for sexually abusing a child in 1974 and was arrested a second time in Arizona in 1979 for anally raping a boy. *Id.* As a result of the 1979 conviction, Metcalf was sentenced to six years in prison and excommunicated from TCJC. *Id.* But after he was released from prison, TCJC allowed Metcalf to return to the church and to serve as a Scout volunteer. *Id.*

13.    After his release from prison, Metcalf met the PCVA Claimant's mother through the Mayer TCJC and the two got married. *Id.* at ¶ 11. Metcalf then abused the PCVA Claimant – *i.e.*,

his stepson – and the PCVA Claimant's brothers in contexts unrelated to Scouting, in addition to abusing the PCVA Claimant in connection with Scouting. *Id*.

14.     With approximately 7,716 TCJC-related Abuse Claims on file in this Chapter 11 Case, there are undoubtedly countless additional examples of TCJC Mixed Claims.  TCJC faces independent and direct (not derivative) liability to these claimants under applicable nonbankruptcy law, yet is asking this Court to bar these victims from suing TCJC even for sexual abuse that is not Scouting-related.

### III.  ARGUMENT

15.     There is an unbroken chain of authority in the Third Circuit stretching back forty years that circumscribes bankruptcy court authority to issue non-consensual releases of independent claims against nondebtors.  Beginning with the seminal 1984 holding in *Pacor*, 743 F.2d 984 (rejecting third party releases of Manville distributors asbestos liability), the case law continues through *Continental Airlines*, 202 F.3d at 212-13 (rejecting third party releases of directors and officers for security law violations), *In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 382 (3d Cir. 2002) (rejecting release of friction-product co-nondebtor defendants), *Combustion Engineering*, 391 F.3d 190 (rejecting non-consensual release of nondebtor affiliates' asbestos liabilities), *W.R. Grace & Co. v. Chakarian*, 591 F.3d 164 (3d Cir. 2009) (rejecting non-consensual release of State of Montana statutory liability), *In re W.R. Grace & Co.*, 900 F.3d 126 (3d Cir. 2018), and *Millennium*, 945 F.3d 126 (finding constitutional authority for the bankruptcy court to enter a final order non-consensually releasing liabilities of shareholders, directors, and officers in connection with Debtor's pre-bankruptcy loan agreement and determining that the challenge to the bankruptcy court's statutory authority to do so was equitably moot on the facts of the case).

16.     The TCJC Settlement defies this authority by seeking to channel to the Settlement Trust TCJC's direct and independent liability for non-Scouting-related Abuse, so long as the victim also in some measure suffered Abuse related to or involving Scouting.  If, for example, a boy signs

up for both choir and Boy Scouts at TCJC, and a volunteer, employee, or religious figure of TCJC

sexually abuses him in both settings as part of one overall course of conduct, TCJC will claim the

protection of the Channeling Injunction for the entire claim.  *See* Rytting Dep. 42:15-44:25.  These

are not mere hypotheticals – as the two claims described above demonstrate.  They are actual

claims brought by actual survivors against TCJC, and they would be barred under the unique,

TCJC-only exception the Court is being asked to bless.

17.     Even in *Purdue*, where Judge Drain initially allowed non-consensual nondebtor

releases, Judge Drain narrowed the proposed release of third-party claims against the Sacklers to

exclude claims unrelated to the conduct of the debtor:

> I will require section 10.7(b) of the plan, which provides for the release of
> third-party claims against the shareholder released parties, to be further
> modified to state that a Debtor's conduct, or a claim asserted against the
> Debtor, must be a legal cause of the released claim, or a legally relevant
> factor to the third-party cause of action against the shareholder released
> party, for the third-party claim to be subject to the release.

*In re Purdue Pharma L.P.*, 633 B.R. 53, 105 (Bankr. S.D.N.Y. 2021), *reversed*, 2021 WL 5979108

(S.D.N.Y. Dec. 16, 2021).  So too here, the Court must narrow the scope of the TCJC-related

Abuse Claims to be channeled to the Settlement Trust to exclude the non-Scouting-related portion

of Mixed Claims.

18.     The impropriety of TCJC's attempt to have non-Scouting-related liability channeled

to the Settlement Trust is further demonstrated by the TDPs themselves, which discount claims to

the extent "the perpetrator also had a familial relationship with the Abuse Claimant," TDP Art.

VIII, § E(i)(a), or where abuse occurred "outside of the[] Scouting relationship," including

"through a separate affiliation, such as a school, or a religious organization," *id*. Art. VIII,

§ E(i)(b).  Thus, the Debtors' TDP expert opined that a key factor in calculating awards from the

Settlement Trust will be "whether the alleged sexual abuse occurred during, or resulted from, a

Scouting activity." Expert Rep. of Michael Burnett ¶ 41.[7] The Debtors' expert then gave an

example of how claims may be valued lower – or even rendered valueless – to the extent they are

not tied directly to Scouting:

> If the alleged perpetrator's abuse of the claimant was unrelated to any
> Scouting activity, the Trustee could deem the claim not allowed for
> valuation. The alleged abuser's association with Scouting would be
> unrelated to the alleged abuse. Further, if the alleged abuse was very
> attenuated from a Scouting activity, we would expect the Trustee to apply
> an appropriate mitigating factor in the lower end of the range, thus rendering
> the claim statistically insignificant. For example, if the abuser and claimant
> were members of the same church and the abuse occurred during religious
> practices or church-related or church-sponsored activities, not during any
> Scouting activities, then the coincidence of the abuser's and the claimant's
> involvement in Scouting would be unrelated to the alleged abuse. [*Id.*]

19.     In other words, to the extent that the non-Scouting-related portion of Mixed Claims

against TCJC are channeled to the Settlement Trust, nondebtor TCJC's independent liability will

have been unlawfully and improperly discharged and yet the claimant will receive reduced or no

compensation for the non-Scouting-related harm. Thus, the AWKO Claimant will not be

compensated to the extent the grooming and abuse took place at TCJC activities unrelated to

Scouting, including at his perpetrator's home when it was used for non-Scouting-related activities

sponsored by TCJC and its Young Men's program, yet TCJC will nonetheless be fully released.

Similarly, the PCVA Claimant will be uncompensated to the extent the abuse is traceable to his

"familial relationship" with his stepfather Scout volunteer – even though TCJC allowed his

stepfather to return to the church and serve as a Scout volunteer even after having excommunicated

him following his prison sentence for anally raping a different child.

20.     These sordid facts demonstrate the unlawfulness and impropriety of what TCJC is

asking this Court to release and channel. To permit a solvent non-debtor such as TCJC to buy an

---

[7] A true and correct copy of the Expert Report of Michael Burnett is attached as <u>Exhibit 3</u>. Because the report has been designated by the Debtors as confidential, it is being filed under seal in accordance with the *Protective Order* and may be re-filed in unsealed/redacted form following consultation with the Debtors.

unlawful release of independent, non-Scouting-related liability is a clear abuse of the chapter 11 process.

## IV. CONCLUSION

For all the foregoing reasons, the Firms respectfully request that the Court condition approval of the TCJC Settlement and the Plan on modifications conforming the scope of the releases and Channeling Injunction afforded to TCJC therein to that afforded other Chartered Organizations, and grant such other relief as the Court deems just and proper.

DATED:  February 9, 2022

By:  */s/ David M. Klauder*
_____

BIELLI & KLAUDER, LLC
David M. Klauder, Esquire (No. 5769)
1204 N. King Street
Wilmington, DE 19801
Phone: (302) 803-4600
Fax: (302) 397-2557
Email: dklauder@bk-legal.com

KTBS LAW LLP
Thomas E. Patterson (*pro hac vice*)
Daniel J. Bussel (*pro hac vice*)
Robert J. Pfister (*pro hac vice*)
Sasha M Gurvitz (*pro hac vice*)
1801 Century Park East, Twenty-Sixth Floor
Los Angeles, California 90067
Telephone    310-407-4000
Email: tpatterson@ktbslaw.com;
    dbussel@ktbslaw.com;
    rpfister@ktbslaw.com;
    sgurvitz@ktbslaw.com

*Counsel to each of The Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC*

**Exhibit 1**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>           Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**EXPERT REPORT OF MAKEDA S. MURRAY, MBA**

**December 5, 2021**

---

[1]    The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Confidential subject to Protective Order

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

# Table of contents

I. Introduction ........................................................................................................................... 3

    I.A. Qualifications ............................................................................................................... 3

    I.B. Scope of charge ........................................................................................................... 5

    I.C. Confidentiality .............................................................................................................. 6

    I.D. POC Data Summary ..................................................................................................... 6

    I.E. Documents and materials relied upon ......................................................................... 8

II. Background ....................................................................................................................... 10

III. Overview of data collection and standardization procedure ............................................. 11

IV. Manual review and standardization of POC data ............................................................. 14

    IV.A. Abuser identification fields ...................................................................................... 15

    IV.B. Abuse location fields ............................................................................................... 16

    IV.C. Scouting unit fields .................................................................................................. 17

    IV.D. Chartered Organization fields .................................................................................. 17

    IV.E. Local Council fields .................................................................................................. 19

    IV.F. Abuse Timing and Frequency fields ......................................................................... 21

    IV.G. Abuse Allegation fields ............................................................................................ 23

V. Statute of Limitations analysis ......................................................................................... 24

VI. De-duplication of Abuse Claims data ............................................................................... 26

VII. Identification of records associated with major Chartered Organizations ....................... 29

VIII. The BSA historical settlement claims processing ........................................................... 31

Appendix A. Curriculum vitae of Makeda Murray ................................................................... 1

Appendix B. Protective order ................................................................................................. 1

Appendix C. Materials relied upon ......................................................................................... 1

Appendix D. Relevant Chartered Organization search terms.................................................. 1

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

# List of figures

Figure 1. The BSA's POC database production counts ............................................................................7

Figure 2. The BSA's POC Counts for select Chartered Organizations ...................................................8

Figure 3. Historical resolutions since 2016 by size of payments to claimants ........................................8

Figure 4: Example of Abuse Claims identified as duplicates..................................................................27

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

# I. Introduction

(1)  On February 18, 2020 (the "Petition Date"), the national organization of the Boy Scouts of America (the "BSA") and Delaware BSA, LLC (collectively, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.[2] According to the Debtors, this case was filed to achieve two key objectives: equitably compensate abuse Survivors who were harmed during their time in Scouting and continue to carry out Scouting's mission for years to come.[3] Filing for bankruptcy had the effect of staying pending sexual abuse-related litigation against the Debtors and provided the Debtors with a forum to comprehensively resolve past sexual Abuse Claims in an organized and consistent manner.

(2)  By Order of this Court dated April 7, 2020, the Debtors were authorized to retain Bates White as their Abuse Claims consultant and advisor.[4] In that capacity, Bates White was asked by White & Case, Counsel to the Debtors, to provide expert testimony regarding the data processing and standardization of the BSA's Proofs of Claim ("POCs") submitted by Abuse Survivors during the organization's bankruptcy proceeding.

## I.A. Qualifications

(3)  I am a Manager at Bates White, LLC, an economic consulting firm based in Washington, DC, that specializes in providing advanced economic, financial, and econometric analysis to law firms, companies, and government agencies. I work in the Environmental and Product Liability Practice, where I lead teams on matters involving damages estimation, asbestos liability valuation, and forecasting. I manage the preparation and analysis of large, complex data sets used in expert testimony and by counsel in both litigation and settlement. I specialize in data analysis and management, and have worked on matters related to the asbestos, insurance, automotive parts, and manufacturing industries.

(4)  I received my BA and BS *summa cum laude* from the College of Arts and Sciences at Howard University in 2007, where I was a awarded a full academic scholarship. In 2014, I earned an MBA in Strategic Management from The Wharton School at the University of Pennsylvania. Appendix A contains my curriculum vitae.

---

[2]  Capitalized terms not directly defined in this document have the meaning ascribed to them in the Fifth Amended Plan and Amended Disclosure Statement [Doc 6214].

[3]  Debtors' Informational Brief [Doc 4].

[4]  Doc 353. Bates White's engagement agreement for this matter was executed with counsel to the Debtors who are presently at White & Case LLP, but at the time of the retention were at Sidley Austin LLP.

---

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

(5)    My work often involves the assessment and preparation of data for use in liability valuation and damages estimation matters. I have developed databases of unique claims and provided explanations regarding the method used to process and standardize data. My experience includes the standardization, processing, and analysis of claims data, as well as the preparation of indemnity and defense cost forecasts for asbestos and other liabilities. I have worked for clients in a myriad of industries, and I use the same methods for my analyses regardless of who retains me.

(6)    Highlights of my involvement in other Bates White matters include the following:

- Managed the process to quantify the amounts incurred and paid by an auto manufacturer involved in an arbitration dispute with its insurance carrier over alleged product liability claims.

- Managed the competitive benchmarking analyses and evaluated the pay shortfall for a client engaged in a tri-party arbitration procedure as a result of a contract salary dispute.

- Processed and analyzed large, complex data sets to assess the number and value of pending and future personal injury claims related to the Takata airbag recall.

- On behalf of ACE Bermuda Insurance Ltd., managed the processing and analysis of 3M Company's claims data stemming from allegedly defective masks and respirators, for use in an arbitration proceeding brought by 3M Company against the ACE Bermuda-Form policies.

- Forecasted future product liabilities and built allocation models for various companies to assist them in insurance valuation, financial reporting, and litigation.

- Led data analyses and provided consulting support on a number of cases regarding product liability and damages estimation.

(7)    Bates White is remunerated by the Debtors at a rate of $560 per hour for my time. In addition to my own time, I directed other Bates White professionals who performed supporting work and analyses in connection with this report.

(8)    Bates White's fees are not dependent upon or related to the outcome of these proceedings.

(9)    Bates White's offices are located at 2001 K Street NW, North Building, Suite 500, Washington, DC 20006. I can be reached by mail addressed to Makeda Murray at that location, by email at makeda.murray@bateswhite.com and by telephone at 202.652.4391.

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

## I.B. Scope of charge

(10)    In September 2019, the BSA asked Bates White, in our capacity as its Abuse Claims consultant and advisor, to estimate the total value of its (sexual) Abuse Claims as of the Petition Date, as though they were tort system claims that were being resolved at values consistent with the sexual Abuse Claims the organization had resolved in the past. The firm was also asked by counsel for the Debtors to provide analysis of data regarding the Debtors' historical resolutions of abuse claims, as well as claiming trends evidenced by the Proof of Claim forms that have been submitted with respect to Abuse Claims in this Chapter 11 bankruptcy proceeding. Those issues are addressed more fully in the Expert Report of Dr. Charles E. Bates ("Bates Report"). In support of that work, and to facilitate better understanding of the Abuse Claims on behalf of other parties, Bates White was asked to provide support in the processing and interpretation of data contained in the Sexual Abuse Proof of Claim Forms filed by Survivors.

(11)    As part of that work, I was asked by counsel for the BSA to provide expert testimony regarding the method Bates White undertook to process and standardize the POCs submitted by Survivors in this matter. To that end, Bates White performed the following work:

1.  Evaluation, processing, and provision of summary tabulations regarding the Sexual Abuse Proof of Claim submissions.

    A.  Programmatic and manual review of the Sexual Abuse POC submissions and compilation of records into a single database to be used by Bates White, as the Debtors' Abuse Claims valuation expert, in disclosures and for other purposes, as well as be provided to the mediation parties for their analysis.

    B.  Analysis and provision of summary tabulations based on the Sexual Abuse POC submission data.

    C.  Deduplication of the BSA Proof of Claim records to produce a database of the unique Abuse Claims that were filed on or before the Bar Date of November 16, 2020, in this case.

2.  Identification of Abuse Claims that referenced specific Chartered Organizations and Local Councils as additional potentially responsible parties in their POC submissions; identify records that were potentially associated with major BSA Chartered Organizations.

3.  Processing of the BSA's historical settlements data to be used as an input for setting Abuse Claim values in the BSA valuation model

(12)    Bates White's work on this matter is ongoing. My work here is based on the information available to me as of the date of this report.

Highly Confidential – Subject to Protective Order

## I.C. Confidentiality

(13)    Bates White has read and agreed to abide by the Stipulated Confidential and Protective Order issued by this Court on June 8, 2020 [Doc. 799; related Doc. 613].

(14)    Much of the information on which this report is based is confidential and subject to the terms of the Stipulated Confidential and Protective Order. More specifically, the information on which this report is based relates to allegations made by Abuse Survivors who have submitted claim forms in the current bankruptcy litigation as well as related historical claims. This information is sensitive in nature and should be treated with care in addition to being subject to the protective restrictions from the Stipulated Confidential and Protective Order.

## I.D. POC Data Summary

(15)    The most recent set of data that Bates White produced with regard to the Abuse Claims, known as the "Tranche VI data," reflects 82,209 unique and timely Abuse Claims. These data are based on the Proof of Claim ("POC") submissions received by Omni, the Debtors noticing agent, as of July 2, 2021, and reflect a total of 117,037 records. Those 117,037 records consolidate down to 82,209 for two reasons. First, many of the records reflect duplicate submissions. Second, for purposes of my analysis, Abuse Claims were only considered timely if the individual had made at least one POC submission prior to or on the Bar Date. The most recent data that Dr. Bates is relying on in his expert report are referred to here as "Tranche VI" because this latest data set represents the sixth iteration of data that Bates White has produced in this matter.

(16)    The POC submissions that form the basis of these data were based on a specific form approved by this Court for use by Abuse Survivors.[5] While that form was specifically designed to facilitate the gathering of information that would be useful for evaluating such Abuse Claims, that information is not necessarily immediately available in a format that lends itself to programmatic evaluation. For example, question Part 4.K., which solicits information regarding when the abuse occurred, allows for open-ended, long-form text responses that are impossible to easily utilize in analyses.[6] Converting information from this format into data that can be readily analyzed is a complicated and necessarily imperfect process. But it is my opinion that the Tranche VI data provide an accurate and best available representation of those submissions.

---

[5]    Sexual Abuse Proof of Claim form – "For purposes of this Sexual Abuse Survivor Proof of Claim, the term Sexual Abuse Survivor refers to a person who was sexually abused before turning eighteen (18) years of age."

[6]    Sexual Abuse Proof of Claim form, Part 4.K. – "When did the first act of sexual abuse take place? If you do not remember the calendar date, what school grade were you in at the time and what season of the year was it (spring, summer, fall, winter), and what age were you when it started? If the sexual abuse took place over a period of time, please state when it started and when it stopped. If you were sexually abused by more than one sexual abuser indicate when the sexual abuse by each of the sexual abusers started and stopped."

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

(17)    I understand that the Tranche VI data are being used by Dr. Bates in the Bates Report to estimate the total value of the BSA's Abuse Claims as of the Petition Date, based on evaluating them as if they were tort system claims against the BSA. Additionally, Dr. Bates is using the Tranche VI data in other related analyses that he will detail in his report.

(18)    In addition to the Tranche VI data, Bates White produced four other databases of the BSA's POC information under mediation, Tranches I–III and V, as well as a fifth database, Tranche IV, that I understand has been produced as part of discovery. These data are referred to as Tranches because each subsequent data production represented an increasing portion of the Abuse Claim submissions to date. Given that there was a lag in processing POC submissions to produce these data sets, the titles were intended to make clear that the data sets were not complete. Those data were first produced to the mediation parties on the dates shown in Figure 1 (and as Tranche IV was produced again as part of litigation discovery on November 13, 2021).

Figure 1. The BSA's POC database production counts

| Database | Records as of date | Record count | Production date | Unique & timely Abuse Claim count |
|---|---|---|---|---|
| Tranche I | 11/12/2020 | 26,779 | 12/8/2020 | N/A |
| Tranche II | 12/17/2020 | 51,210 | 12/19/2020 | N/A |
| Tranche III | 12/31/2020 | 96,251 | 1/2/2021 | N/A |
| Tranche IV | 2/8/2021 | 100,964 | 2/19/2021 | 82,358 |
| Tranche V | 3/31/2021 | 106,117 | 4/17/2021 | 82,458 |
| Tranche VI | 7/2/2021 | 117,037 | 7/28/2021 | 82,209 |

(19)    Using Tranche VI of the BSA POC data, Bates White also identified records and corresponding unique and timely Abuse Claims that were potentially associated with the BSA's Chartered Organizations. While the recorded Chartered Organization, or Chartered Organizations in the case of Abuse Claims that listed more than one, can be identified directly in the data, additional work was performed to flag the records, and the corresponding unique and timely Abuse Claims, potentially associated with several of the largest Chartered Organizations.

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

**Figure 2. The BSA's POC Counts for select Chartered Organizations**

| Chartered Organization* [7] | Record count | Unique & timely Abuse Claim count |
|---|---|---|
| Church of Jesus Christ of Latter-day Saints | 9,884 | 7,716 |
| Catholic Church | 9,415 | 7,046 |
| Methodist Church | 7,256 | 5,665 |
| Episcopal Church | 1,192 | 962 |
| Knights of Columbus* | 404 | 298 |
| Kiwanis Club* | 258 | 204 |
| Faegre Diocese* | 130 | 107 |

(20)    Additionally, Bates White processed the BSA's historical settlements from 2016 to 2020 for use in setting average Abuse Claim values in the BSA valuation model.

**Figure 3. Historical resolutions since 2016 by size of payments to claimants**

| Payment size | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| Dismissed w/out payment | 11 | $0 | $0 |
| Four and five figure payments | 115 | $4,302,500 | $37,413 |
| Six figure payments | 94 | $30,007,000 | $319,223 |
| Seven figure payments | 42 | $135,865,000 | $3,234,881 |
| **Grand Total** | **262** | **$170,174,500** | **$649,521** |
| **Median** | | | **$100,000** |

(21)    The remainder of this report describes the data standardization, statute of limitations analysis, Chartered Organization Abuse Claims identification, and the BSA's historical settlements processing in greater detail.

(22)    I reserve the right to modify and/or supplement this report if any new information and documents are provided to me that materially affect my opinions. Should any new information be made available to me that would cause me to update my opinions, I will notify Counsel to the BSA.

(23)    I reserve the right to use additional graphics and exhibits in connection with the opinions expressed in this report.

## I.E. Documents and materials relied upon

(24)    In producing these data, I have relied primarily on the following information:

---

[7] For the organization names in Figure 2 that are followed by an asterisk, it should be noted that those Chartered Organizations did not request unique and timely counts so only the full Tranche VI record count was provided to them.

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

1.  POC data extracts (Excel files containing transcriptions of Survivor responses to POC questions) downloaded from Omni Agent Solutions ("Omni"), the Debtors' claims noticing agent

2.  The POC form submissions (received as pdfs from Omni)

3.  Statute of Limitations translation tables received from Ogletree Deakins ("Ogletree"), the BSA's current National Coordinating Counsel

4.  Lists of past and current Chartered Organization information from the BSA

5.  Files containing the BSA's historical settlements information from Ogletree.

(25)  A more complete list of the materials I have relied upon is provided in Appendix C.

Highly Confidential – Subject to Protective Order

# II. Background

(26)    The BSA is a national youth organization founded in 1910 and chartered by Congress in 1916.[8] The BSA's mission is to "prepare young people to make ethical and moral choices over their lifetimes" by instilling in them a duty to help other people and be trustworthy, loyal, friendly, and kind.[9] Scouting helps young people build character and learn to be of service to others, while providing invaluable mentorship and guidance. More than 130 million Americans have participated in the organization since its inception more than 110 years ago, and it currently serves 2.2 million registered youth participants.

(27)    The BSA's programs serve members between the ages of 5 and 21 and are divided by age and activity. The organization consists of roughly 81,000 individual scouting units or troops, governed by more than 250 Local Councils, which are separate, independent organizations. The BSA's scouting units are operated by approximately 41,000 Chartered Organizations that implement the program for youth within their communities.

(28)    The BSA has been a defendant in lawsuits from hundreds of sexual abuse Survivors asserting that the BSA has some responsibility and liability for their injuries. In February 2020, the BSA filed for Chapter 11 bankruptcy with the stated goals of providing equitable compensation to Survivors of abuse and preserving its mission.

---

[8]    Debtors' Informational Brief Doc 4.

[9]    Boy Scouts of America website- https://www.scouting.org/about/

---

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

# III. Overview of data collection and standardization procedure

(29)    For an Abuse Claim to be considered in the BSA's bankruptcy proceeding, each Survivor was required to submit a Sexual Abuse Survivor POC form[10] to Omni Agent Solutions ("Omni"), the BSA's claims noticing agent. This could be done by either mailing the completed POC form to Omni or electronically uploading the completed POC form to Omni's online portal.

(30)    Once a POC form was submitted, Omni assigned the POC a claim number, transcribed the information provided on said form using either an optical character recognition ("OCR") method, or in cases where the OCR method could not be applied, Omni reviewed and entered the data from such POCs. Omni reviewed and verified the POC data that was extracted from the POCs. Omni then compiled the data from all received POC forms into a single database, where each row represented a submitted POC form, and each column recorded the responses to a given question on the form. Omni compiled this information on a rolling basis, which means that at any given point in time, the Omni data extract contained all POCs it had received and transcribed through that point.

(31)    The POC form contained six sections, labeled Parts 1–6, that contained a combination of question formats ranging from simple "Check the box" to more open-ended "Long-form text" formats like "Please describe what happened to you...". Attached as Appendix D is a copy of the Court-approved POC form covering Abuse Claims that shows all the sections and questions.

(32)    As part of our role as the Debtors' Abuse Claims consultant and advisor, we were tasked with reviewing the submitted POCs (which were downloaded from Omni as a Microsoft Excel workbook) and producing extracts of standardized data that could be more readily used in analyses by all mediation parties. To that end, in November 2020, Bates White, in conjunction with the mediation parties, decided on a shortlist of standardized data fields[11] that we would produce in Microsoft Excel format. While all the information related to a given submission, including the actual form itself and the Omni OCR transcription, is available to the relevant parties via the Omni portal, we used a combination of programmatic and manual review to ensure that the key data fields were available in a useful analytical format.

(33)    To produce the first standardized Abuse Claims database (Tranche I) on December 8, 2020, Bates White reviewed and standardized the responses for all POC forms that were available in the Omni database as of a November 12, 2020, download. It should be noted that at that time, due to the large number of filings and the associated manual review process, there was up to a one-month lag between

---

[10]    Sexual Abuse Proof of Claim form – "For purposes of this Sexual Abuse Survivor Proof of Claim, the term Sexual Abuse Survivor refers to a person who was sexually abused before turning eighteen (18) years of age… This Sexual Abuse Survivor Proof of Claim is only for people who were sexually abused before turning eighteen (18) years of age and where the sexual abuse (defined below) occurred on or before February 18, 2020."

[11]    *2020.11.25 DRAFT proposed data field standardization list---for mediation only.xlsx* produced to the mediation parties on November 25, 2020.

---

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

the Omni data extract download date and the Tranche production date. In subsequent Tranche database productions, Bates White reviewed and standardized the responses for submitted POC forms that were *new* to the Omni data extract, where new in this context also includes amended Abuse Claims since the previously produced Tranche database (i.e., only records that had not yet been reviewed).

(34)   From a practical perspective, the manual review of the 110,000+ records was a time-intensive endeavor that required a large review team and a set of review rules to minimize subjectivity and improve the uniformity of the standardized responses. For each wave of records to be reviewed, the team under my direction created separate Excel workbooks, each containing the information for up to 250 records. Each workbook was assigned to a reviewer who manually standardized the responses to the agreed-upon key questions. Manual standardization focused primarily on the following fields: abuse dates, abuse frequency, abuser identity, abuse location, troop information, Local Council, and Chartered Organization. In Section IV of this report, I provide a more thorough explanation of the standardization protocols used in this case.

(35)   Upon review completion of a given wave of records, Bates White compiled the manually reviewed Excel workbooks into a single database of POC records and performed additional, programmatic field cleaning. During the Tranche VI iteration of this process, Bates White also removed POC records that Omni had flagged as withdrawn or voided before deduplicating the data to produce the Tranche VI unique and timely Abuse Claims database. For valuation purposes, Bates White consolidated the information provided across duplicate submissions provided by a single Survivor based on the protocols noted below such that we always took populated values over missing values and ultimately removed Abuse Claims that were filed after the Bar Date.

(36)   When consolidating fields for duplicate submissions, Bates White kept all the information provided by any version of the duplicate records for fields where the information could not easily be processed by a mathematical function. For example, the data include:

1.   All named Local Councils

2.   All troop and chartered organization information

3.   All abuser information

4.   All abuse locations.

(37)   When consolidating information in fields that did lend themselves to cross-record evaluation, Bates White collapsed the duplicate records and kept information based on the following protocol:

1.   Most severe allegation

2.   Earliest date of first abuse & latest date of last abuse

Highly Confidential – Subject to Protective Order

3.  Highest abuse frequency.

(38)  Bates White also kept *either* (a) the latest valid (i.e., prior to the Bar Date) filing date associated with a given Abuse Claim or, if all records associated with the Abuse Claim were filed after the Bar Date, (b) the earliest filing date.

(39)  In Section V of this report, I provide additional detail on the deduplication process that was used to consolidate the records into unique and timely Abuse Claims.

Highly Confidential – Subject to Protective Order

# IV. Manual review and standardization of POC data

(40)    Bates White's manual review of the BSA POC data involved examining and standardizing the transcribed fields provided in the Omni data extract. Bates White established certain standardization protocols for these fields, as detailed below, to minimize subjectivity and interpretation while maximizing ease of use.

(41)    Each field in Omni's data extract contained a response to a specific question on the POC form. For example, *AbuseLocation* in the Omni database reflects responses to question 4.E. of the POC form ("Where were you at the time you were sexually abused (city, state, territory, and/or country?)"). Bates White is aware that the information that satisfies a given question on the POC may be found in other places on the POC or inferred from information produced in response to other POC questions. However, the goal with these data was for the standardization to reflect and provide the most accurate representations of Survivors' POC responses based on the information provided for each question. To that end, the team reviewed each field independently and refrained from making subjective inferences or attempting to "fill in the blanks" using information found elsewhere on the POC when the response to a given question was unclear. Anecdotally, during a working session to review responses, the team came across a reference to "Greenville" that did not include state information. Based on an internet search, we found Greenvilles in South Carolina, North Carolina, Ohio, Texas and California. For reasons like this, if a Survivor's POC submission included a response like "Greenville" and was missing state information, the standardized state data entry associated with that response was coded as "Unknown." As noted above, the question on abuse location on the POC form (Part 4.E.) asks for state information in addition to city.

(42)    As a result of our independent review of POC responses, there are inconsistencies in Survivor responses that are reflected in the Bates White coded fields. For example, sometimes checkbox-based responses conflict with the contextual information provided in associated long-form response fields. For example, in response to question Part 4.L.i., which invited Survivors to "provide a description in your own words and/or use the checkboxes below," a Survivor may have checked the box to indicate "I was sexually abused once," but then reported 10 occurrences of abuse in the associated text-response field ("If you were sexually abused more than once, please state how many times (if you recall)"). The Bates White coded fields would reflect this discrepancy.

(43)    As a general rule, for the purposes of this standardization exercise, I have differentiated between responses that do not provide the requisite information ("Unknown") and no response or a blank data field ("Missing"). Consider again the example of "Greenville" above. Because there was a response in regard to location, but that response did not clearly identify a state, abuse state was treated as "Unknown" and recorded as "YY". This is distinct from an Abuse Claim that simply did not include a response to the question. An Abuse Claim with a blank response field for this question would be treated as having a "Missing" abuse state and the field would be coded as "ZZ".

Expert Report of Makeda S. Murray, MBA

(44)    All processed POC data are subject to revision based on updated information as Bates White continues to implement quality control and incorporate feedback.

## IV.A. Abuser identification fields

(45)    The following abuser-related fields in the Tranche data sets were coded based on the information provided in POC Parts 4.A.–4.D., which asked for details that aid in the identification of the Survivors' sexual abuse perpetrators.

1.  **"Abuser unknown?"** flag: This field is "1" for any POC where the abuser(s) were not identified *by name or partial name* in the response to Part 4.B. ("Please name each person who sexually abused you in relation to your involvement in Scouting...")

2.  **Abuser Name** field**s**: These fields contain abuser name(s), if provided in Part 4.B.

    A.  If the response included a partial name, the missing portion of the name is coded as "UNKNOWN." For example, if a Survivor reported that their abuser's last name was Jackson but did not provide the abuser's first name, the corresponding abuser name field is coded as "UNKNOWN JACKSON."

3.  **"Is Abuser [#] an adult or minor?"** fields: These fields indicate whether the corresponding sexual abuser was identified as an adult or a youth in Part 4.B., either explicitly using those terms or implicitly based on reported age and/or physical descriptors.

    A.  If this information was not provided, we populated this field based on information provided in *Abuser Position,* the Survivor's response to Part 4.D., and the raw Omni Abuser Name field:

    i.   Scoutmaster—Assumed adult, with the understanding that in rare cases it is possible for someone under the age of 18 to be a Scoutmaster.

    ii.  Assistant Scoutmaster—Assumed adult, with the understanding that it is possible for someone under the age of 18 to be an Assistant Scoutmaster.

    iii. Den Leader—Assumed adult.

    iv.  Scout—Assumed youth, with the understanding that Eagle Scouts and descriptors such as "older scout" may be someone 18 or older.

4.  **Abuser name categorization**: This field is coded based on responses to POC Part 4.B. and indicates the highest level of abuser detail provided in the response, in the following order of priority:

    A.  **"Name provided"**—The response included a full abuser name.

    B.  **"Partial name provided"**—The response included a partial abuser name.

---

Highly Confidential – Subject to Protective Order

C. **"Physical Description only"**—The response did not include a (full or partial) abuser name but instead listed physical descriptors that might help identify the abuser. Physical descriptors include some combination of race, gender, age, height, weight, mannerisms, etc. This determination is subjective and likely has minor variations across Abuse Claims and reviewers.

D. **"Unknown"**—The response did not include a full or partial abuser name or a physical description. An example of a response that would be coded as "Unknown" is "I do not recall."

E. **"Missing"**—The field was blank (there was no response).

5. **Abuser Position** field: Contains the highest Scouting position of the sexual abuser(s) based on the Survivor's response to Part 4.D. This field was coded based on the corresponding boxes checked by the Survivor on the POC form, and contains one of the following categories (listed in order of priority):

A. Adult Scout leader in my Scouting unit

B. Adult Scout leader not in my Scouting unit

C. Youth Scout in my Scouting unit

D. Youth Scout not in my Scouting unit

E. Camp personnel (e.g., camp staff) not in my Scouting unit

F. I don't know

G. Other

H. Missing (Bates White classification for no response)

# IV.B. Abuse location fields

(46)  The following fields were coded based on the information provided in POC Part 4.E., which asked where the sexual abuse occurred.

1. **"Location [#] of abuse?"** fields: These fields contain the location(s) where the sexual abuse took place. During processing, we abbreviate location names such that the fields contain:

A. A two-letter abbreviation for a US state

B. A two-letter abbreviation for a US territory

C. A three-letter ICD code for non-US countries (if the abuse took place outside of the United States).

Highly Confidential – Subject to Protective Order

D.   "YY" to indicate that the response did not contain relevant information (e.g., the field may have read "At the abuser's home" or "I don't remember")

E.   "ZZ" to indicate that the field was blank.

For Abuse Claims that provided multiple locations, the location list was ordered such that the location appearing first was the location that provided the Abuse Claim with the most generous statute of limitations status (i.e., "Not barred"). As an example, for a given Abuse Claim with two abuse locations, one of which resulted in a "Barred" categorization and another that resulted in a "Not Barred" categorization, the location assigned as *Location 1 of Abuse* was the state that produced the "Not Barred" result. In Section IV.H. we discuss the statute of limitations analysis in greater detail.

## IV.C. Scouting unit fields

(47)   The following fields were coded based on information provided in POC Part 4.G., which asked for details about the Survivors' Scouting units during the time of sexual abuse.

(48)   **BW troop number**: Troop Number reflects the troop the Survivor was involved with *at the time of the abuse*.

1.   The word "Troop" could be affiliated with a Pack, Den, or Explorer unit number instead of Boy Scout Troop number. If a Survivor reported multiple levels of scouting, we assumed the Survivor misinterpreted the question and provided their overall scouting involvement rather than *at the time of the abuse*. We therefore coded just the Boy Scout troop number.

2.   For Abuse Claims that did not provide a troop number (regardless of whether the raw text field was blank or contained irrelevant information), troop number is coded as 9999.

(49)   **BW troop state**: The location(s) in which the Survivor's troop was based *at the time of the abuse*.

1.   This field was standardized using the procedure detailed in para (46), except that for records that provided multiple troop locations, the troop location list has not been sorted; the locations appear in the order in which they were transcribed.

## IV.D. Chartered Organization fields

(50)   The following fields were coded based on the information in POC Part 4.H., which asked for details about the organizations that sponsored the Survivors' Scouting units during the time of sexual abuse.

Highly Confidential – Subject to Protective Order

(51)     **Name of Chartering/Sponsoring Organization** fields: Contain the names of the organization(s) that sponsored the Survivor's troop(s).

(52)     **Chartering/Sponsoring Organization Category** fields: Contain the general category of the corresponding Chartered Organization.

1.   **"Church – [denomination]"**—Used to classify any religious organization, identified by denomination, where possible.

   A.   If the POC response indicated that the Chartered Organization may have belonged to more than one religious denomination, this field is coded to include all denominations named. For example, if a response indicated "A Lutheran or Mormon Church," this field is coded as "CHURCH – LUTHERAN OR TCJC."

2.   **"School – [education level]"** – Any educational facility.

   A.   If the POC provided the level of schooling ("Elementary," "Middle," "High"), said level is reflected in this field. If no education level was provided, this field is coded as "SCHOOL – OTHER."

      v.   **"Civic"**—Any nonprofit, not-for-profit or community organization such as American Legion, YMCA, Salvation Army, community/recreation centers, etc.

      vi.   **"Private Business"**—Any for-profit business.

      vii.   **"Military"**—Entities affiliated with the US military (most commonly military bases).

      viii.   **"Other"**—Organization type that cannot be categorized as one of the above.

      ix.   **"Unknown"**—The POC response indicated the chartered organization was unknown.

      x.   **"Missing"**—The POC response field was blank (no response was provided).

(53)     **Chartering/Sponsoring Organization State** fields: Contain the location in which the corresponding chartered organization was based.

1.   These fields are standardized according to the protocol detailed in para (46). Bates White was asked to flag records that were potentially associated with certain Chartered Organizations that had significant historical relationships with the BSA, such as the Church of Jesus Christ of Latter-day Saints, the Catholic Church, and the Methodist Church. This identification was performed using a multi-step methodology that relied, in part, on the above fields. The process is described in greater detail in Section VII.

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

# IV.E. Local Council fields

(54)    The following fields were coded based on the information in POC Part 4.I., which asked for details about the Local Council affiliated with the Survivors' Scouting units during the time of sexual abuse. These fields were used to determine the relevant liability for the more than 250 Local Councils in the BSA organization. In cases where a Survivor listed more than one Local Council, all are listed.

(55)    Given the BSA's long history, the number and names of Local Councils have changed over time: councils have been renamed, some have been disbanded, some have merged into larger councils, and other have split into multiple councils. To illustrate that point, I provide the following examples:

1.  Merge: The Local Council that is now known as Golden Gate Area was created by the merger of the San Francisco Bay Area, Alameda, and Mount Diablo Silverado councils in June 2020.[12]

2.  Disbandment: In 2014, the Central New Jersey Local Council disbanded due to financial difficulties, and control over that jurisdiction was given to neighboring councils.[13]

3.  Renaming: Birmingham Area Council was renamed to Central Alabama Council in 1996.[14]

4.  Split: In 1968, the Staten Island Local Council split, with some of its jurisdiction being controlled by Greater New York, and the remainder being spun into a new Local Council, GNY Staten Island.[15]

(56)    To accurately map historical Local Council names to current Local Council names, Bates White created a translation table documenting (a) a full list of all current Local Councils and (b) a list of each Local Council's previous name(s) and sub-councils prior to any mergers, splits, and/or renaming. This translation table was constructed using a combination of online research and instruction/documents from counsel. The Local Council names were then searched for in each Survivor's response to POC Part 4.I., creating a preliminary Local Council assignment.

(57)    In cases where none of the Local Council names appear in the Survivor's response, Bates White assigned a preliminary Local Council based on one of the following criteria:

1.  **Local council number**—Each Local Council, whether current and historical, is assigned a unique identifying number. Often Survivors listed the number associated with their council rather than its name. Using the translation table, the team was able to populate Local Council name for that subset of records.

---

[12]    https://ggacbsa.org/history/

[13]    https://web.archive.org/web/20131213125856/http://www.cnjcscouting.org/index.php/download_file/view/801/1/

[14]    https://web.archive.org/web/20071019130425/https://www.honorpub.com/scout-e-zine/vol04/council_history/al_history.htm

[15]    Council Change History 1950-Present (FINAL).xlsx

---

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

2. **Location identifiers**—Rather than naming a Local Council, many Survivors instead indicated their council's jurisdiction. Preliminary Local Councils were assigned to these Abuse Claims on the basis of a web or online search of the BSA website using a combination of city, state, and/or zip code.[16] In cases where the Survivor mentioned a camp name, a council was assigned using this name and the Abuse Location fields. The methodology for Local Council identification and standardization was different from our general approach of independently processing the Survivor response because of the Preliminary Injunction Stipulation that the Debtors agreed to and the plaintiff groups' interest in Local Council assignments.

3. **Unknowns**—In some cases, Survivors provided responses indicating that they did not know what Local Council they belonged to or responses that could not be interpreted. In these cases, our preliminary Local Council assignment was "Unknown."

4. **Missing**—In cases where Survivors did not respond to the question, the preliminary Local Council assignment was "Missing."

(58)    Depending on the Survivor's interpretation of POC Part 4.I., the response may have listed the name of the Local Council affiliated with the Survivor's troop, the Local Council responsible for overseeing the abuse location, both, or neither. To confirm our preliminary assignments, each Abuse Claim was sent to its corresponding Local Councils; each council was tasked with verifying whether the Abuse Claim would fall under its jurisdiction, and if not, indicating which council the Abuse Claim should be assigned to, if known. In cases where a Local Council indicated an Abuse Claim belonged to a different council, the Abuse Claim was assigned to both the original and the newly indicated council.

(59)    Lastly, Abuse Claims were, at times, manually assigned based on research done by the BSA, third parties, Local Councils, or other relevant parties.

(60)    Using the aforementioned information, final Local Council assignments were created, resulting in two fields:

1. **Historical Local Council Name:** The name of the Local Council indicated by the Survivor

2. **Current Local Council Name:** The Local Council currently responsible for the jurisdiction previously served by the Historical Local Council.

---

[16]    The BSA Local Council locator - https://www.scouting.org/about/local-council-locator/

---

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

## IV.F. Abuse Timing and Frequency fields

(61)  The following fields were coded based on the information in POC Parts 4.K.–4.L., which asked for details regarding when the first act of sexual abuse took place, as well as the frequency with which the sexual abuse occurred.

(62)  **Abuse Start Date** and **Abuse End Date**: These fields contain information about when the sexual abuse began and ended. The POC question pertaining to abuse timing allowed for a long-form text response. As a result, Survivors provided responses in many timing formats, including exact dates, years with a seasonal indicator, ambiguous decade ranges, age(s), grade(s), and/or combinations of any of these. Our manual review protocol employed the following prioritization for recording abuse start and end dates:

1.  Record exact date, if available.

2.  Record year and month, if available, and no exact date was provided.

3.  Record year and season, if available, and no exact date or year and month was provided.

4.  Record year, if available, and no exact date, year and month, or year and season combinations were provided.

5.  Record age, if available, and no exact date or year was provided.

6.  Record grade, if available, and no exact date, year or age was provided.

(63)  To the extent that multiple of the above formats were provided, and they appeared to conflict with one another, the manual reviewers standardized the higher-priority format of the timing information, following the prioritization set forth above, and did not make any subjective attempts to reconcile the discrepancy. For example, if a response read, "I was 17 years old and in 1st grade," manual reviewers recorded the provided age.

(64)  When coding some variation of a year, the manual reviewers standardized the information in full date form according to the table provided below:

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

| Format | Start date | End date |
|---|---|---|
| Year only (no further detail) | 1/1/XXXX | 12/31/XXXX |
| 19XXs | 1/1/19X0 | 12/31/19X9 |
| EARLY 19XXs | 1/1/19X0 | 12/31/19X3 |
| MID 19XXs | 1/1/19X4 | 12/31/19X6 |
| LATE 19XXs | 1/1/19X7 | 12/31/19X9 |
| [Month] 19XX | [Month #]/1/19XX | [Month #]/[Final day of month]/19XX |
| Winter 19XX | 1/1/19XX | 3/31/19XX |
| Spring 19XX | 4/1/19XX | 6/30/19XX |
| Summer 19XX | 7/1/19XX | 9/30/19XX |
| Fall 19XX | 10/1/19XX | 12/31/19XX |

(65)  When coding some variation of an age or grade, the manual reviewers recorded the provided number in a separate field. The recorded age and grade fields were later used in processing to calculate a start and end year using the Survivor's birth year, if provided. The standardization/calculation protocols for responses that provided only ages or grades were defined as follows:

1.  For responses from which the manual review extracted an age (or ages), we calculated an interim abuse start year as year of birth (if provided) plus youngest age provided, and we calculated an interim abuse end year as year of birth (if provided) plus oldest age provided.

2.  For responses from which the manual review extracted a grade (or grades), we calculated an interim abuse start year as year of birth (if provided) plus 5 plus lowest grade provided, and we calculated an interim abuse end year as year of birth (if provided) plus 5 plus highest grade provided. (We assume that children are 6 years old in first grade.)

3.  The resulting start and end years were then standardized in full date form according to the methodology detailed for the "Year(s) Provided" descriptor in the table above.

(66)  POC responses varied in the number of data points provided. For responses that provided a year range or a list of years, we coded abuse start date as the standardized full date corresponding to the earliest date/year/age/grade provided and abuse end date as the standardized end date corresponding to the latest date/year/age/grade provided.

(67)  **Abuse dates categorization**: This field contains the format of the abuse dates as they were provided in the POC response. If a Survivor provided an abuse start date and end date in different formats, the more exact format (as defined by the priority level listed above) is recorded. For example, if a response read "The abuse started when I was nine, and ended in Summer 1976," this field was coded as "YEAR AND SEASON PROVIDED."

(68)  **Age at first abuse**: This field is generated based on the first numeric age of abuse recorded using the response to Part 4.K. For records where abuse age was not recorded (either because it was not

Highly Confidential – Subject to Protective Order

provided or because the response contained a higher-priority date format), *Age at First Abuse* was calculated as the difference between the year reflected in the *Abuse Start Date* field and the Survivor's year of birth, if both of these data points were provided.

(69)   **Intermittent abuse flag**: This field is coded as "1" for responses that indicated that the abuse occurred over multiple non-continuous time periods.

(70)   **Number of times abused**: This field contains the minimum number of times the abuse occurred, if a Survivor provided this information in response to Part 4.L. of the POC form. During processing, the following standardization procedures were applied:

1.   For responses that provided a range or a set of multiple values, this field contains the minimum numeric value provided (e.g., if a response read "5–10 times," this field is coded as "5").

2.   For records that checked the box to indicate "*I was sexually abused once*" (Part 4.L.i.), did *not* check the box to indicate "*I was sexually abused more than once*" (Part 4.L.i.), and provided no additional information in the long-form text field, this field is coded as "1."

(71)   This "Number of times abused" field is identical to the *Min abuse count* field in the Tranche data.

## IV.G. Abuse Allegation fields

(72)   **BW abuse allegation**: This field contains the most severe allegation indicated by the Survivor based on their checkbox responses to POC Part 4.M.i.

(73)   **Provided abuse description (long-form)**: This flag indicates whether a Survivor provided a long-form text response (in addition to their checkbox responses) regarding the type(s) of abuse they experienced. Bates White recognizes that this field may contain helpful supplemental information, but after multiple attempts at standardizing the allegations contained in this field, it became clear that there was no method of doing so that would allow us to consistently pull allegation information with any degree of precision or certainty.

(74)   Although the POC form provided a framework for more uniform question responses, there were numerous opportunities for long-form text expression that was difficult to consistently interpret and codify based on our pre-defined protocols. We implemented a methodology that limited the potential for error in standardization and produced six data sets that provided parties in this bankruptcy proceeding with information that was consistent and easy to use.

Highly Confidential – Subject to Protective Order

# V. Statute of Limitations analysis

(75)   In addition to our data standardization efforts, Bates White created a field that flags records that are presumptively barred based on the applicable Statutes of Limitations in the named abuse state(s). Our analysis involved comparing a record's processed birth date, abuse location, and abuse date fields to a list of Statute of Limitations ("SOL") criteria for US states provided by Ogletree. This table of state-specific SOL criteria effectively provides an age to maturity before which claims can be presumptively brought in a given state or territory. In recent years, many states have been refining their SOLs. The SOL translation table that was used in Tranche VI to determine presumptively (not) barred status was revised by Ogletree to incorporate updates to SOL criteria that had been made by states since the Tranche IV production. Some states currently have open revival windows, which in effect means that there is no time limit with regard to how long ago the abuse event occurred. Bates White's record-level presumptive SOL evaluation was conducted on the basis of all of the available recorded abuse states and territories, the Survivor's current age, and the date since last abuse.

(76)   **SOL flag**: This field contains the Bates White calculated SOL status, based on the applicable SOL(s) in the provided Location(s) of abuse.

1. The Ogletree SOL table contains information on current and prior Statutes of Limitations that are applicable in US states. These criteria may include, among other things, current Survivor age, years since discovery of injury, and whether the state has implemented a revival window. (If a state has implemented a revival window, all records alleging abuse in that state are presumptively not barred.)

2. Bates White calculated each Survivor's age based on their date of birth to compare against each named abuse state's statutes

   A. For records that did not provide a date of birth, we estimated current Survivor age by first calculating the average age at first abuse for all records that provided abuse timing and date of birth information, then subtracting that average age from the Survivor's year of first abuse.

3. Bates White then applied the SOL criteria for each of the states a record provided in the Location of Abuse fields. In instances where multiple abuse states were provided and the different state statutes resulted in different SOL statuses ("Barred" versus "Not Barred"), we kept the "Not Barred" Statute of Limitation status.

   A. For international locations and US territories, Bates White applied the US federal SOL criteria.

4. If multiple sets of SOL criteria were available for a particular state (these typically included statutes from earlier time periods), Bates White applied each of these sets to records that name the

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

given state. If the multiple sets of criteria produced varying status results, we kept the "Not Barred" SOL status.

Highly Confidential – Subject to Protective Order

# VI. De-duplication of Abuse Claims data

(77)   Throughout this Chapter 11 bankruptcy process, Survivors have been able to amend their previously filed POCs, if desired, by submitting an amendment cover page along with a revised POC form and/or other supplemental documents. While some Abuse Claims used the amendment cover sheet, others submitted multiple Proof of Claim forms. When Omni received these amendments, it either updated the existing claim number or added a new record entry for the amendment, complete with a new claim number.

(78)   Many Survivors did not submit an amendment cover page when amending previously submitted POC forms or providing supplemental documentation. Since Omni could not distinguish these amendments from new Abuse Claims, Omni treated these submissions as new records and assigned them unique claim numbers.[17] In turn, because they appeared as "new" records in the Omni data extract, different Proofs of Claim filed by the same Survivor were manually reviewed and standardized by Bates White multiple times. Because these submissions were not in fact unique Abuse Claims, but instead contained additional or updated information for preexisting Proofs of Claim submissions, Bates White undertook a process to merge and consolidate the information contained across all POC records that mapped to the same Survivor—that is, consolidating key fields for duplicative POCs—to generate a database of unique Abuse Claims that precluded the same Survivor from appearing multiple times in the data sets being used for valuation purposes.

(79)   Because information entered on a POC can vary in terms of completeness, spelling, nicknames, etc., Bates White identified duplicate records by evaluating information across the following seven personally identifying information fields:

1.   First name

2.   Last name

3.   Birth month and year

4.   Last four digits of Social Security Number

5.   Phone number

6.   Email

7.   Zip code

(80)   Bates White identified as duplicates any set of records that had matching information in at least four of the aforementioned seven fields. This method for identifying duplicates catches instances where,

---

[17]   Note that in some cases, Survivors submitted identical forms, sometimes close in time, sometimes not. In other cases, supplemental filings were submitted that included additional or different information.

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

for example, a Survivor submits two different POCs with the same first name, last name, phone number, and email address, but leaves the last four digits of their Social Security Number missing on one of the POCs. If a more restrictive method were used to identify duplicates, such as using only first name, last name, birth year and month, and last four digits of Social Security Number, the two POCs in this scenario would not be identified as duplicates.

(81)    In addition to the above criteria, Bates White also identified duplicates based on fields included by Omni that track explicit amendments. These fields identify either (a) the prior claim number the current Abuse Claim is intended to amend (*amendsclaimno*) and/or (b) the subsequent claim number that was submitted to amend the current Abuse Claim (*amendedbyclaimno*). These fields were used to further identify potential duplicates that were not identified using the above criteria. The figure below shows an example of six Abuse Claims that were identified as duplicates using the criteria discussed above.

**Figure 4: Example of Abuse Claims identified as duplicates**

| Claim number | Last name | First name | Last 4 SSN | Date of birth | Zip code | Email | Phone # | Date received | Amended by | Amends |
|---|---|---|---|---|---|---|---|---|---|---|
| 90128-A | FULL LAST | FIRST | | 1/1/1900 | 22222 | REDACTED@GMAIL. COM | 555-555-5555 | 44151 | 109624 | |
| 74896-A | LAST | FIRST | | 1/1/1900 | 22222 | REDACTED@GMAIL. COM | | 44149 | 100027 | |
| 100027-A | LAST | FIRST | | 1/1/1900 | 22222 | REDACTED@GMAIL. COM | | 44214 | 115661 | 74896 |
| 109620-A | FULL LAST | FIRST | 1234 | 1/1/1900 | 22222 | ALSO_REDACTED@ GMAIL.COM | 555-555-5555 | 44298 | 109624 | 90128 |
| 109624 | FULL LAST | FIRST | 1234 | 1/1/1900 | 22222 | ALSO_REDACTED@ GMAIL.COM | 555-555-5555 | 44298 | | 90128 |
| 115661 | LAST | FIRST | | 1/1/1900 | 22222 | REDACTED@GMAIL. COM | | 44342 | | 100027 |

(82)    Following the identification of duplicate records, Bates White consolidated the information contained in key POC response fields into a single Abuse Claim that kept the following information below:

1.  All abuser identity information provided

2.  All abuse locations provided

3.  All troop numbers and troop locations provided

4.  All Chartered Organization information provided

5.  All Local Council information provided

6.  Earliest Abuse Start Date

7.  Latest Abuse End Date

8.  Highest abuse frequency

---

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

9.  Most severe abuse allegation

10. Most inclusive SOL status (i.e., if any of the duplicate records were flagged as presumptively not barred, the consolidated Abuse Claim was also flagged as presumptively not barred)

11. All affirmative responses to the following checkbox questions: *Survivor Involvement in Scouting?*, *Other contact/relationship with abuser*, *Impact of abuse*, *Abuse involved,* and *Reported abuse*, among others.

Highly Confidential – Subject to Protective Order

# VII. Identification of records associated with major Chartered Organizations

(83)    Bates White undertook the identification of records potentially associated with each major Chartered Organization. To identify records that implicated a given Chartered Organization group, we took the following steps:

- **Step 1**: Performed a string search for terms related to the Chartered Organization group across a subset of potentially relevant fields, including raw text fields from the Omni data extract, and the processed Chartered Organization name, category, and state fields.[i] The list of text fields is provided in Appendix D.

  □ Bates White developed a list of search terms based primarily on the organization name and words commonly used in the context of the organization. The list would include the name of the organization, abbreviations, potential misspellings, and alternative names. For example, to identify records affiliated with the Church of Jesus Christ of Latter-day Saints, Bates White searched for "Church of Jesus Christ of Latter-day Saints," "Later-day Saints," "LDS Ward," and "Mormon Church," among other terms.

  □ Any record containing a relevant term in one of the text fields we searched was flagged as identifying the given organization.

- **Step 2**: Flagged records that mapped to chapters/groups listed in supplemental entity-level files provided by the BSA or compiled using publicly available data.

  □ For the Church of Jesus Christ of Latter-day Saints (TCJC), the BSA provided a list of Local Councils with high percentage Church membership as of 2017. Records belonging to Local Councils with greater than 50% TCJC membership for Boy Scout units were flagged as associated with the TCJC Saints.

  □ For the Catholic Church, Bates White obtained a publicly available list of large Catholic churches by state and performed a string search based on this list to flag records that (a) named a church on the list and (b) listed a state that mapped to the state of the associated church name.

  □ In addition, the BSA provided lists of names and associated states, Local Councils, and troop numbers for entities affiliated with the Methodist Church, the Episcopal Church, the Baptist Church, and the Catholic Church. Records that matched an entity on these lists based on any of the following field combinations were flagged as associated with the organization group:

    ▪ Chartered organization name and troop state

    ▪ Chartered organization name and Local Council

Highly Confidential – Subject to Protective Order

- ■ Chartered organization name, sponsor/troop state and Local Council.

Records identified in Steps 1 and 2 above were treated as "base" records. This set of records was subsequently used to identify "secondary" records that shared common characteristics with the "base" records in Step 3.

- ■ **Step 3**: Identified "secondary" records as ones that named either:

  - ☐ An *abuser* (full name) that appears three or more times among the "base" records.

  - ☐ A *troop number* and *troop state* combination that appears five or more times among the "base" records.

  - ☐ A *Chartered Organization name* that appears three or more times among the "base" records.[18]

- ■ **Step 4**: Reset flags for records that appeared to be improperly identified in Steps 2 and 3 detailed above. The reset flag was generated using the abuse organization category fields generated during POC data processing.

  - ☐ For religious organizations, the reset flag required that a record explicitly name a religious organization of a *different* denomination and *never* names the denomination in question. This flag was then used to reset only records that do not directly name the relevant religious organization (and thus were only flagged in Step 2 and/or 3). For example, if a Survivor explicitly stated that their abuse took place at an LDS Church but provided only a Methodist Chartered Organization, this record would not be reset.

  - ☐ For civic organizations, the reset flag required that a record explicitly name a religious organization, an educational institution, or the military, and *never* name a civic organization. This flag was then used to reset only records that did not directly identify the relevant civic organization (and thus were only flagged in Step 2 and/or 3). For example, if a Survivor explicitly stated that their abuse took place at a VFW hall but indicated *only* an Episcopal Chartered Organization, this record would not be reset.

(84)   During deduplication, we collapsed the major Chartered Organization identification flags associated with a given Abuse Claim, such that if any record associated with a given Abuse Claim was flagged for a certain Chartered Organization, the composite Abuse Claim was also flagged for that organization.

---

[18] Secondary identification of claims on the basis of common Chartering Organization name was done for religious Chartering Organizations only (with the exception of Faegre Diocese, for which we were provided a fulsome list of individual entity names). In general, religious organizations were the only organization type where the name of the organization did not always include an indication of the denomination.

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

# VIII. The BSA historical settlement claims processing

(85)   Bates White requested and received data on the BSA's historical abuse settlements from Ogletree Deakins, the Debtors' national coordinating counsel for sexual abuse-related litigation since 2016. Ogletree provided Bates White with two Excel workbooks during the course of this matter that we have relied upon and processed for valuation purposes. The first of these was received on February 21, 2021, and included information on 262 historical abuse claims filed against the BSA from 2016 to 2020. The second file was received on November 29, 2021, and contained the previous 262 claims plus an additional to 311 historical claims from the same period, for a total of 573 historical settlements between 2011 and 2020.

(86)   Bates White performed basic standardization on these claims data for use in analysis. Below, I outline how we processed the following fields for each historical claim in the two files.

(87)   **Claimant name**: We split claimant names into first and last name and removed special characters, nicknames, and information provided in parentheticals.

(88)   **Claimant birth year**: For claims where the claimant birth date is unknown or missing, "1900" was used as the birth year.

(89)   **Age at abuse**: For claims where the claimant age at abuse is unknown or missing, "99" was used as the age at abuse.

(90)   **Abuse state**: The state field was standardized such that:

1.   A two-letter abbreviation was used for a US state, or

2.   A two-letter abbreviation was used for a US territory, or

3.   A three--letter ICD code was used for non-US countries (if the abuse took place outside of the United States).

4.   "ZZ" was used to indicate that the field was blank.

(91)   **Abuse years**: We extracted the first year of abuse and last year of abuse from the abuse year range provided in the files. For ambiguous date ranges, we used the earliest possible year as the abuse start year and the latest possible year as the abuse end year. For example, a claim with the years "1960s–1970s" would have a start year of "1960" and an end year of 1979.

(92)   **Abuse allegation**: The abuse allegations are categorized in the same way as the POC database. For claims where allegation was missing, the field was set to "8. Missing."

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

(93)    **Number of abuse occurrences**: Where the frequency of abuse was unknown or missing, this field was left blank.

(94)    **Abuser name**: We split the abuser's name into first and last name for each distinct abuser named in the claims, while also performing basic standardization and removing special characters and aliases.

(95)    **Whether the abuser was an adult or youth**: This field was already standardized in the data.

(96)    **Number of historical claims brought against abuser**: For claims with multiple abusers, the maximum number of historical claims brought against all the named abusers was used.

(97)    **Resolution year**: For claims where the resolution year was unknown or missing, we used "9999" as the year.

(98)    **Settlement amount**: This field was already standardized in the data.

(99)    **Current legal status of claim**: We corrected minor typos in this field.

_____

Makeda S. Murray
December 5, 2021

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

# Appendix A. Curriculum vitae of Makeda S. Murray, MBA

## A.1. Summary of experience

Makeda Murray works in the Environmental and Product Liability Practice, where she leads teams on matters involving damages estimation, asbestos liability valuation, and forecasting. She supports testifying experts, provides consulting support, and manages the preparation and analysis of large, complex data sets used to support expert testimony and counsel in both litigation and settlement. Ms. Murray specializes in data analysis and management and has worked on matters related to the asbestos, insurance, automotive parts, and manufacturing industries.

Prior to joining Bates White, Ms. Murray was a senior actuarial analyst for a leading global professional services firm, where she evaluated pension benefit redesign options, developed yearly funding and expense valuation results, and analyzed claims data for corporate clients.

## A.2. Education

- MBA, Strategic Management, The Wharton School–University of Pennsylvania
- BS, Mathematics, Howard University (*summa cum laude*)
- BA, Economics, Howard University (*summa cum laude*)

## A.3. Professional experience

- Bates White Economic Consulting
  - Manager, 2018–present
  - Senior Consultant, 2014–2017
- Senior Actuarial Analyst, Willis Towers Watson, 2007–2012

Highly Confidential – Subject to Protective Order

## A.4. Selected Bates White experience

- Supported the testifying expert and managed the team tasked with quantifying the amounts incurred and paid by an auto manufacturer involved in an arbitration dispute with its insurance carrier over alleged product liability claims.

- Managed the team conducting competitive benchmarking analyses and evaluating the pay shortfall for a client engaged in a tri-party arbitration procedure as a result of a contract salary dispute.

- Managed the analytical team and supported the consulting experts in their estimation of the value and allocation of pending and future claims in *In re Midwest Generation, LLC, et al.*, No. 12-49218 (Bankr. N.D. Ill.).

- Supported the testifying expert and managed the litigation support team in *Cannon Electric, Inc., now known as ITT Cannon, Inc., et al. v. ACE Property and Casualty Company, et al.,* No. BC 290354 (Super. Ct. Cal. L.A. Cty. Ct.).

- Led data team and provided consulting support on reinsurance matter involving dispute over covered claims, as well as amounts owed and to be reimbursed by the reinsurer.

- Provided support to the consulting expert and managed team that processed and analyzed large, complex data sets to assess the number and value of pending and future personal-injury claims related to the Takata airbag recall.

- Supported the testifying expert during arbitration proceedings on behalf of ACE Bermuda Insurance Ltd. regarding an arbitration claim by 3M Company against their ACE Bermuda-Form policies stemming from allegedly defective masks and respirators.

- Developed forecasting model used to estimate potential future asbestos-related liabilities based on historical claims. Evaluated the impact of applying various deductible provisions on said liabilities, in support of a large insurance company involved in mediation proceedings.

- Forecasted future product liabilities and built allocation models for various companies to assist them in insurance valuation, financial reporting, and litigation.

- Led data analyses and provided consulting support on a number of cases regarding product liability and damages estimation.

## A.5. Selected consulting experience

- Managed benefits analyses, data validation, and valuation projects by establishing workable timelines, delegating tasks/responsibilities, and ensuring the timely completion of work product.

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

- Analyzed and validated data for the de-risking initiative of a Fortune 500 company; the result was a pension obligation reduction of more than $20 billion.

- Evaluated benefit redesign options for companies with large pension plan obligations, collectively saving clients millions in projected benefit obligations.

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

# Appendix B. Protective order

[This page left intentionally blank

Confidential

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

# Appendix C. Materials relied upon

- **The BSA's Sexual Abuse Proof of Claim form (7/9/2020):** 823352_BSA_FINAL_Abuse_POC_Fillable.pdf [BSA-PLAN_01642536 - BSA-PLAN_01642547]

- **Omni data extracts:**
  - □ Tranche 1 (11/12/2020): SearchExport_11_12_2020_16_08_40_PM_UTC.xlsx [BSA-PLAN_01642857]
  - □ Tranche 2 (12/17/2020): SearchExport_12_17_2020_14_18_57_PM_UTC.xlsx [BSA-PLAN_01642858]
  - □ Tranche 3 (12/31/2020): SearchExport_12_31_2020_19_14_52_PM_UTC.xlsx [BSA-PLAN_01642859]
  - □ Tranche 4 (2/8/2021): SearchExport_02_08_2021_14_35_04_PM_UTC.xlsx [BSA-PLAN_01642854]
  - □ Tranche 5 (3/31/2021): SearchExport_03_31_2021_02_46_59_AM_UTC.xlsx [BSA-PLAN_01642855]
  - □ Tranche 6 (7/6/2021): SearchExport_07_06_2021_20_27_31_PM_UTC.xlsx [BSA-PLAN_01642856]

- **Omni supplemental files:**
  - □ Omni claims received report used in Tranche 4 production (2/15/2021): Claims recd by Hard copy and uploaded report 021521 v2.xlsx [BSA-PLAN_01642852]
  - □ Omni date received report used in Tranche 6 production (7/20/2021): Date Received Report 072021 v2.xlsx [BSA-PLAN_01642853]

- **Ogletree materials on Statute of Limitations:**
  - □ SOL translation table from Ogletree (7/16/2021): BW SOL Translation Table_2021.07.16 Ogletree (rev).XLSX [BSA-PLAN_01642901]

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray. MBA

- ☐ SOL translation memo from Ogletree (1/4/2021): 01-04-21 Ogletree BSA 50 State SOL Revival Research Memo.DOCX [BSA-PLAN_01642860]

- ☐ SOL translation table from Ogletree (1/4/2021): 01-04-21 Ogletree Updated BW SOL Translation Table w Notes.XLSX [BSA-PLAN_01642898]

- **■ Chartered Organization files:**

  - ☐ Church of Jesus Christ of Latter-day Saints rebuttal PPT and claims lists (provided on 8/4/21):

    - ■ BSA -  Mediation Presentation [Insurance] (122395753.6).pptx [BSA-PLAN_01638938-BSA-PLAN_01638950]

    - ■ BSA - Mediation Presentation [Claims Analysis].pptx [BSA-PLAN_01638953- BSA-PLAN_01638982]

    - ■ BSA - Claims against Top 10 COs - 2021.05.12.xlsx [BSA-PLAN_01638952]

    - ■ 2021 05 06 BSA Bankruptcy Claims--Sorted by Category (Claim Numbers Only).xlsx [BSA-PLAN_01638937]

  - ☐ List of the BSA's current Chartered Organization membership percentages (8/2/2021): BSA - Chartered Organization Membership (2021.07.15) 1500.xlsx [BSA-PLAN_01638951]

  - ☐ Catholic Ad Hoc Committee supplemental claims list (10/4/2021): BSA - Select Catholic Church Claims - 2021.09.30 EXTERNAL.xlsx [BSA-PLAN_01638993]

  - ☐ The BSA's list of Catholic churches (4/1/2021): Catholic-Church-Roman_ALL_1999-2021_04012021.xlsx [BSA-PLAN_01638994]

  - ☐ Wikipedia list of large Catholic churches & their states (4/2/2021): List of Catholic churches.xlsx [BSA-PLAN_01639001]

  - ☐ The BSA's lists of Knights of Columbus organizations:

    - ■ Version 1, used for Catholic search (4/1/2021): Catholic-Knights-of-Columbus-Roman_ALL_1999-2021_04012021.xlsx [BSA-PLAN_01638995]

    - ■ Version 2, used (in addition to version 1) for KOC-only search (10/20/2021): Chartered Organization Listing_Code 084_Knights-of-Columbus-Roman-Catholic_With_Units_10202021.xlsx [BSA-PLAN_01638998]

  - ☐ List of Faegre Diocese (9/20/2021): Diocese - FDBR Clients as of 9.17.21.xlsx [BSA-PLAN_01639000]

  - ☐ The BSA's list of Episcopal churches (7/20/2021): Chartered Organizaion Listing_024-214-Episcopal Church-EC-Reformed_1999-2021_07202021.xlsx [BSA-PLAN_01638996]

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray. MBA

  ☐ The BSA's list of Kiwanis Club organizations (8/2/2021): Chartered Organization Listing_083 - Kiwanis International_1999-2021_08012021.xlsx [BSA-PLAN_01638997]

  ☐ The BSA's list of high-percentage TCJC Local Councils (11/25/2020): BSA list of Local Councils with high-percentage TCJC membership: Copy of LDS vs BSA Youth December 2017.xlsx [BSA-PLAN_01638999]

  ☐ The BSA's list of Methodist churches (12/29/2020): UNITED_METHODIST_CHURCH_026_1999-2020_BSA_12292020.xlsx [BSA-PLAN_01639002]

  ☐ The BSA's comprehensive list of Chartered Organizations by year (3/31/2021):

    ■ File 1: Unit Charter Org History by Year - File 1.csv [BSA-PLAN_01639003]

    ■ File 2: Unit Charter Org History by Year - File 2.csv [BSA-PLAN_01639004]

    ■ File 3: Unit Charter Org History by Year - File 3.csv [BSA-PLAN_01639005]

■ **The BSA's historical settlements files**

  ☐ Historical settlements spreadsheet from Ogletree (2/21/2021): 2021.02.21 BSA Historical Settlements (OD rev) -- CONFIDENTIAL -- for Mediation Use Only.xlsx [BSA-PLAN_01642525]

  ☐ Historical settlements spreadsheet (2010-2020) (11/29/2021): 2021-11-24  BSA Historical Settlements 2020-2010 Sort (OD UNredacted Rev5 - w BW Data) - CONFIDENTIAL.XLSX [BSA-PLAN_01642528]

■ **The BSA's Local Council file**

  ☐ Council change history file (6/30/2021): 9.7.2_BSA - Council Change History 1950-Present (FINAL).xlsx [BSA-PLAN_01642533]

■ **Bates White-generated materials based on relied-upon materials**

  ☐ Bates White data field standardization list (11/25/2021): 2020.11.25 DRAFT proposed data field standardization list---for mediation only.xlsx [BSA-PLAN_01642535]

  ☐ Bates White state and country translation table: BW state_country translation table.xlsx [BSA-PLAN_01642902]

  ☐ Bates White Local Council translation table: Bates White Local Council translation table.xlsx [BSA-PLAN_01642534]

Highly Confidential – Subject to Protective Order

- ❑ Bates White Local Council file used in Chartered Organization claims identification process: LC name and number translation table (11/25/2020): 2020.11.25 LC translation.xlsx [BSA-PLAN_01638936]

- ❑ SOL translation table used in Tranche VI production: Bates White BSA SOL translation table (Tranche 6) – confidential.xlsx [BSA-PLAN_01642900]

- ❑ SOL translation table used in Tranche IV production: Bates White BSA SOL translation table (Tranche 4) – confidential.xlsx [BSA-PLAN_01642899]

- ❑ Bates White deduplicated Tranche data

  - ▪ Valuation model data (Tranche 4): Bates White BSA reviewed POC deduplicated data (Tranche 4) -- confidential -- for production.xlsx [BSA-PLAN_01642921]

  - ▪ Valuation model data (Tranche 6): Bates White BSA reviewed POC deduplicated data (Tranche 6) -- confidential -- for production.xlsx [BSA-PLAN_01642922]

- ▪ **Miscellaneous**

  - ❑ State and country codes

    - ▪ List of world nations and their country codes (8/25/2021): Country Codes List - ISO ALPHA-2, ISO ALPHA-3 and Numerical Country Codes - Nations Online Project.pdf [BSA-PLAN_01642903- BSA-PLAN_01642915]

Highly Confidential – Subject to Protective Order

Expert Report of Makeda S. Murray, MBA

# Appendix D. Relevant Chartered Organization search terms

| Field name | Field description | Omni (Raw) field or processed (BW) field |
|---|---|---|
| scoutingwhen | Scouting When | Raw |
| boyscoutinfo | Boy Scout Information | Raw |
| cubscoutinfo | Cub Scout Information | Raw |
| exploringscoutinfo | Exploring Scout Information | Raw |
| seascoutinfo | Sea Scout Information | Raw |
| venturingscoutinfo | Venturing Scout Information | Raw |
| otherscoutinfo | Other Scout Information | Raw |
| identifyabusers | Identify Abusers | Raw |
| nonabuseleaders | Non-Abuse Leaders | Raw |
| abuserinfo | Abuser Information | Raw |
| abuselocation | Abuse Location | Raw |
| abusetypeother | Abuse Type Other | Raw |
| abusescoutingunitandlocation | Abuse Scouting Unit And Location | Raw |
| abuseorganization | Abuse Organization | Raw |
| abuselocalcouncilname | Abuse Local Council Name | Raw |
| abuseatscouteventinfo | Abuse At Scout Event Information | Raw |
| abuseatscoutotherinfo | Abuse At Scout Other Information | Raw |
| abusefirstinfo | Abuse First Information | Raw |
| abusedmultiplesinfo | Abused Multiples Information | Raw |
| abuseinvolvedinfo | Abuse Involved Information | Raw |
| reportabusetoothers | Report Abuse To Others | Raw |
| hadrelelsewherewithotherinfo | Had Relationship Elsewhere With Other Information | Raw |
| anyoneknowsabuseinfo | Anyone Knows Abuse Information | Raw |
| abusesurvivorotherinfo | Abuse Survivor Other Information | Raw |
| historical_lc | Historical Local Council Name | BW |
| current_lc | Current Local Council Name | BW |
| abuseorgname1 | Name of Chartering/Sponsoring Organization 1 | BW |
| abuseorgcategory1 | Chartering/Sponsoring Organization Category 1 | BW |
| abuseorgstate1 | Chartering/Sponsoring Organization State 1 | BW |
| abuseorgname2 | Name of Chartering/Sponsoring Organization 2 | BW |
| abuseorgcategory2 | Chartering/Sponsoring Organization Category 2 | BW |
| abuseorgstate2 | Chartering/Sponsoring Organization State 2 | BW |
| abuseorgname3 | Name of Chartering/Sponsoring Organization 3 | BW |
| abuseorgcategory3 | Chartering/Sponsoring Organization Category 3 | BW |
| abuseorgstate3 | Chartering/Sponsoring Organization State 3 | BW |
| abuseorgname4 | Name of Chartering/Sponsoring Organization 4 | BW |
| abuseorgcategory4 | Chartering/Sponsoring Organization Category 4 | BW |
| abuseorgstate4 | Chartering/Sponsoring Organization State 4 | BW |

Confidential

Expert Report of Makeda S. Murray. MBA

---

Highly Confidential – Subject to Protective Order

**Exhibit 2**



*Highly Confidential*

Transcript of the Testimony of

**PAUL RYTTING**

November 29, 2021

**IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

1

2                 UNITED STATES BANKRUPTCY COURT

3                   FOR THE DISTRICT OF DELAWARE

4                          -   -   -

5     IN RE:                      : CHAPTER 11

6     BOY SCOUTS OF AMERICA AND   : CASE NO.

7     DELAWARE BSA, LLC,          : 20-10343 (LSS)

8         Debtors.               : (Jointly Administered)

9                          -   -   -

10                 ***HIGHLY CONFIDENTIAL***

11                         -   -   -

12

13

14                 Remote videotaped deposition of

15    PAUL RYTTING, held via videoconference on Monday,

16    November 29, 2021, beginning at approximately

17    10:13 a.m. Eastern Standard Time, the proceedings

18    being recorded stenographically by Gail Inghram

19    Verbano, Registered Diplomate Reporter, Certified

20    Realtime Reporter, Certified Shorthand

21    Reporter-CA (No. 8635), and transcribed under her

22    direction.

23                    **ORIGINAL**

24

25

```
 1   this term sheet; and that -- but I don't know if

 2   this is the -- constitutes a final agreement.

 3                   So my understanding is that there

 4   are several steps that need to take place before

 5   this is a final, binding settlement term sheet.

 6         Q.        But is it your understanding that

 7   this, insofar as TCJC is concerned, contains the

 8   final terms of its settlement with BSA?

 9                   MR. MALIONEK:  Objection to

10       form; and the same caution to the witness.

11         A.        Yes.

12         Q.        The term sheet requires a cash

13   contribution of $250 million.  Are you familiar

14   with that?

15                   MR. MALIONEK:  Can you point

16       that out to him in the document, please.

17                   MR. NASATIR:  Sure, 36 of 44.

18       For you it would be page 3 of 11.

19                   MR. MALIONEK:  Fine.  Thank

20       you.  It's helpful to have it in context.

21       Which line are you referring to?

22                   MR. NASATIR:  If you look at

23       the far left side, you'll see subjects.

24       I'm looking at the cash contribution to

25       the settlement trust.
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

```
 1                    MR. MALIONEK:  Thank you.

 2                    Did you want to reask your

 3          question?  I'm sorry to interrupt you.  I

 4          just want to make sure the witness had it

 5          in context.

 6                    MR. NASATIR:  Sure.  This is

 7          where real time would be really helpful

 8          because I forgot my question.

 9                    MR. MALIONEK:  If you'd like

10          Gail to repeat it for you, maybe she

11          could.

12             (Record read.)

13                    MR. MALIONEK:  Objection to

14          form.

15          A.     Yes.

16          Q.     Is it your understanding that TCJC

17     has the ability to pay the 250 million?

18          A.     Yes.

19          Q.     Is TCJC receiving any funds to pay

20     the 250 million from any third party such as

21     insurers or other entities?

22                    MR. MALIONEK:  Objection to

23          form.

24          A.     Not to my knowledge.

25          Q.     Do you understand your knowledge
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

```
 1    here represents knowledge of TCJC in terms of a
 2    30(b)(6) deposition?
 3         A.    Yes.
 4         Q.    Do you have any understanding as
 5    to the consequences of getting a release from --
 6    or excuse me.  Let me ask -- let's go to page 6
 7    of 11, which is also 39 of 44.
 8              Do you have any understanding
 9    about what a channeling injunction is?
10              MR. MALIONEK:  Objection to
11         form.
12              MR. NASATIR:  I should ask this
13         separate -- differently.  Let me ask it
14         this way.
15         Q.    What does TCJC understand a
16    channeling injunction to do?
17              MR. MALIONEK:  Objection to
18         form.
19         A.    I'm happy to read the channeling
20    injunction section of the term sheet if that's
21    what you're asking, but that is my -- that's my
22    knowledge of what the channeling injunction is.
23         Q.    Is it your -- sorry.
24              Is it TCJC's understanding that if
25    they receive a channeling injunction no -- no
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

```
 1    abuse claimants will be able to make a claim

 2    against TCJC on account of its involvement in

 3    Boy Scouts and abuse suffered thereunder?

 4                  MR. MALIONEK:  Objection to

 5         form; and I'll instruct the witness not to

 6         answer to the extent it calls for

 7         revealing attorney-client privileged

 8         communications.

 9                  If you know otherwise, please

10         feel free to respond.

11         A.       Yeah, my understanding is, and I'm

12    reading from the channeling injunction section of

13    the TCJC term sheet, that:

14                  "Any abuse claim in connection

15         in whole or in part with TCJ's

16         involvement in or sponsorship of one or

17         more scouting units, including any claim

18         that has been asserted or may be amended

19         to assert in a proof of claim alleging

20         abuse, whether or not timely filed in the

21         Chapter 11 cases, shall be permanently

22         channeled to the settlement trust under

23         the plan and such TCJC abuse claim shall

24         thereafter be asserted exclusively

25         against the trust and may not proceed in
```

1          any manner against TCJC in any forum

2          whatsoever including any state, federal,

3          or non-US court or any administrative or

4          arbitral forum and are required to pursue

5          such TCJC abuse claims solely against the

6          settlement trust and shall be processed,

7          liquidated, and paid in accordance with

8          the terms, provisions, and procedures of

9          the settlement trust documents."

10          Q.     Okay.  I appreciate you reading

11     that.  I just want to understand what does TCJC

12     believe the impact of the channeling injunction

13     will be on existing and future abuse claims?

14                MR. MALIONEK:  Objection to

15          form; and same instruction to the witness

16          not to answer to the extent that it

17          reveals attorney-client privileged

18          communications.  But if you know

19          otherwise, please feel free to answer.

20          A.     I thought I answered it, because

21     our understanding is the same as has been set

22     forth in the term sheet, that any and all claims

23     are channeled to the settlement trust and that

24     past, current, and future claims are to be

25     resolved by the settlement trust.

1              MR. NASATIR:  Do you want to

2      just agree that you can have a standing

3      objection that says don't reveal

4      attorney-client privileged information?

5              MR. MALIONEK:  No, thank you.

6              MR. NASATIR:  I thought it was

7      worth a try.  All right.

8              THE VIDEOGRAPHER:  Is it

9      possible to have the deponent close his

10     blind?  The sun is coming through and he's

11     looking a bit silhouette.  Thank you.

12             That's a little better.  Thank

13     you.

14        Q.    Mr. Rytting, did you attend any

15  mediation sessions with the BSA regarding

16  settlement?

17        A.    I attended -- I don't think -- no,

18  I did not attend any mediation sessions.

19             I was present for about an hour

20  with one of Latham's -- one of our legal counsel.

21  I met the -- two of the mediators and there were

22  some discussions.

23             I met some of the Boy Scout legal

24  team and that was it.

25        Q.    When was that?

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

1    that we were grateful for the years that we were

2    able to serve but we were going to not renew his

3    membership as a member of that national

4    committee.

5          Q.      And TCJC has ceased to be a

6    chartering organization for BSA; is that right?

7          A.      Yes.

8          Q.      Has TCJC had any communications

9    with BSA's board regarding the TCJC settlement

10   outside of counsel being present?

11         A.      I don't know.

12               MR. NASATIR:  I don't have any

13      more questions at this time.  Thank you,

14      Mr. Rytting.

15                    EXAMINATION

16   BY MR. PFISTER:

17         Q.      Good afternoon, sir.  My name is

18   Rob Pfister.  I'm with the law firm of KTBS Law

19   LLP.  I represent the Zalkin Law Firm P.C. and

20   the PCVA Law Firm.

21               How are you today?

22         A.      I'm -- I'm just wonderful.

23         Q.      I'm glad to hear it.  I have a few

24   follow-up questions.  If you could for me, please

25   take out Exhibit 5, which was the disclosure

 1   statement.  I think it may have been Tab 5 in

 2   your binder.

 3                    MR. MALIONEK:  Mr. Pfister,

 4       you're not able to go on video?

 5                    MR. PFISTER:  I am here.

 6           Q.       And if we could go back to the

 7   portion of the Exhibit 5 that counsel previously

 8   was looking at.  It starts at page 123 of 441.

 9                    That's the one.  And, Mr. Rytting,

10   if you can let me know when you have that in

11   front of you or when you're looking at it.

12           A.       I'm looking at it.

13           Q.       Okay.  So this was the -- just to

14   orient you, this was the discussion or the

15   questioning regarding the 7,700 claims that the

16   debtors identified regarding -- that were

17   allegedly attributable to the TCJC's involvement

18   with scouting and your testimony that that number

19   was inflated, erroneous and not an accurate

20   number.

21                    Do you recall that testimony?

22           A.       Yes.

23           Q.       And when you were asked questions

24   about why that number was, in your view,

25   erroneous, do you recall that you read from the

```
 1    third paragraph here that begins "TCJC

 2    fundamentally disagrees"?

 3                    MR. MALIONEK:  Objection to

 4        form.

 5        A.      I recall reading this third

 6    paragraph, yes.

 7        Q.      Okay.  So you agree -- this --

 8    this third paragraph that begins "TCJC

 9    fundamentally disagrees," you agree with the

10    statements and assertions that are made in this

11    third paragraph, would that be fair?

12                    MR. MALIONEK:  When you say --

13        I just want to make sure that I

14        understand, Counsel, if you don't mind.

15                    The term "you" was defined by

16        Iain to mean TCJC, and so I just want to

17        make sure that we have a clear

18        understanding of how you're defining it

19        when you ask your questions.

20                    MR. PFISTER:  Of course, so I'm

21        going to use the same idea that "you"

22        means the TCJC itself; and when I'm

23        referring to the witness personally, I

24        will say "you personally."

25        Q.      Is that fair, Mr. Rytting?
```

```
 1        A.      Yes.

 2                MR. MALIONEK:   Thank you.

 3        Q.      Okay.  So let me first ask, and

 4   we're -- again, we're looking at Exhibit 5

 5   page 123 of 441.  The heading at the top is "TCJC

 6   settlement agreement."  We're looking at the

 7   third paragraph that says, "TCJC fundamentally

 8   disagrees."

 9                And my -- so with that

10   orientation, my question is:  Do you agree that

11   this sets out the TCJC's position with respect to

12   the number of abuse claims -- BSA-related abuse

13   claims against the TCJC?

14                MR. MALIONEK:   Objection to

15        form.  And I want to caution the witness

16        not to answer in any way that would reveal

17        attorney-client privileged communications.

18        A.      Yeah, my response is that this

19   statement, this paragraph reflects many factors

20   going into the TCJC settlement.  And other than

21   that any communications or feeds about that is

22   something that I have spoken to legal counsel

23   regarding.

24        Q.      Okay.  And then do you

25   personally -- that is, the witness -- do you
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

1    agree with the statements in this paragraph, the

2    third paragraph here?

3                    MR. MALIONEK:  Objection to

4        form.  Did you say that you signed on --

5        I'm sorry, counsel -- to the -- that sort

6        of omnibus 30(b)(6) notice?

7                    MR. PFISTER:  We filed our own

8        30(b)(6) notice and adopted everybody

9        else's 30(b)(6) topics.

10                   MR. MALIONEK:  Right.  You

11       didn't file a notice to take Mr. Rytting's

12       deposition in his personal capacity.

13                   MR. PFISTER:  I did not.  I'm

14       just asking Mr. Rytting if he personally

15       has any disagreement with this paragraph.

16                   MR. MALIONEK:  Objection to

17       form.  It's outside the scope of any

18       30(b)(6), and this is not, then, The

19       Church's testimony but he can answer.

20       A.      Yeah, I don't have any reason to

21   disagree with the statements in this paragraph.

22       Q.      So I'd like to take you through

23   specifically the -- it looks like the fourth

24   sentence, which starts with "namely," comma.

25                   So, again, obviously read the

```
 1    entire paragraph if you need to but I'm going to

 2    start with the -- the fourth sentence that says,

 3    "Namely, TCJC reviewed"?

 4                    MR. MALIONEK:  The fifth

 5        sentence, Counsel?

 6                    MR. PFISTER:  Is it the fifth?

 7        I miscounted.  It's the fifth.

 8        A.      Okay.

 9        Q.      Okay.  And this sentence in

10    particular, or this sentence -- strike that.

11                    This sentence you read as when you

12    were answering why the 7,700 claims, that number

13    was inflated and erroneous and not an accurate

14    number.

15                    Do I recall that correctly?

16        A.      I believe I testified to that --

17    to that -- to some extent, yes.

18        Q.      Okay.  So let me -- let's go

19    through each of the items that are listed in this

20    fifth sentence.

21                    So TCJC reviewed the 7,700 claims

22    for duplicates.

23                    Do you know how many duplicates

24    TCJC found in the 7,700 claims?

25                    MR. MALIONEK:  I object to form
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

```
 1          and instruct the witness not to answer to

 2          the extent it reveals attorney-client

 3          privileged communications.  But if you

 4          know independently, you can answer.

 5               A.     No.

 6               Q.     The next clause of the sentence

 7     is, "Whether any of the claims were previously

 8     settled."

 9               Do you know how many of the 7,700

10     claims had been previously settled?

11                    MR. MALIONEK:  Same objection

12          and same instruction.

13               A.     And same response:  No.

14               Q.     Next clause says, "Whether there

15     was a legitimate connection to TCJC."

16               How many claims did you -- of the

17     7,700 did you determine did not have a legitimate

18     connection to TCJC?

19                    MR. MALIONEK:  Same objection

20          and same instruction.

21               A.     I don't know.

22               Q.     Okay.  Do you know what legitimate

23     connection to TCJC means here?

24                    MR. MALIONEK:  Same objection,

25          same instruction.
```

```
 1              A.      Yeah, I didn't draft this

 2    document, so I would only be speculating what the

 3    drafters of the document might be suggesting by

 4    those words.

 5              Q.      Okay.  I don't want your

 6    speculation.  So -- but do you have any

 7    understanding, aside from pure specification, as

 8    to what this might mean about whether there was a

 9    legitimate connection to TCJC?

10                      MR. MALIONEK:  Given that the

11         witness just said he would only be

12         speculating, object to form.

13              A.      I would only be speculating.

14              Q.      Okay.  The next clause says,

15    "Whether the claims were barred by statutes of

16    limitations."

17                      Do you know how many of the 7,700

18    claims TCJC believes are barred by the statute of

19    limitations?

20                      MR. MALIONEK:  Again, objection

21         to form and same instruction not to answer

22         to the extent you only know based on

23         attorney-client privileged communications.

24         But if you have independent knowledge, you

25         can answer.
```

```
 1           A.      No.

 2           Q.      The next clause is, "Whether the

 3   claims should be covered by insurance."

 4                   Do you know how many of the claims

 5   of the 7,700 claims TCJC believes should be

 6   covered by insurance?

 7                   MR. MALIONEK:  Same objection;

 8      same instruction.

 9           A.      No.

10           Q.      And then the final clause is,

11   "Whether the alleged perpetrator is or was

12   affiliated with TCJC."

13                   Do you know how many of the 7,700

14   claims involved alleged perpetrators who were not

15   affiliated with the TCJC?

16                   MR. MALIONEK:  Same objections.

17      Same instruction.  And I also object

18      because that's not the final clause.

19                   The final clause is "among

20      other factors."  But if you mean the

21      penultimate clause, then same objection,

22      same instruction, and the witness can

23      answer if he has independent knowledge.

24           A.      I do not have any independent

25   knowledge.
```

```
 1              Q.      And then the final sentence of
 2    this paragraph is, "Out of the 7,700 claims
 3    identified by the debtors, TCJC's analysis found
 4    that only 324 claims may potentially have value
 5    in the tort system."
 6                      Do you see that?
 7              A.      Yes.
 8              Q.      Is it the TCJC's testimony that
 9    there are at least 324 filed claims in the Boy
10    Scouts of America bankruptcy case that may have
11    value in the tort system?
12                      MR. MALIONEK:  Same objection
13         and I'll instruct the witness not to
14         answer to the extent it's -- the answer is
15         based on attorney-client privileged
16         communications.
17              A.      I don't have any independent
18    knowledge outside of communication with legal
19    counsel.
20              Q.      I'd like to next turn to the next
21    paragraph.  It begins, "Based on this
22    analysis" --
23                      Do you see that?
24              A.      Yes.
25              Q.      Now, I'd like to turn specifically
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

1   to the second sentence.  I'm going to read it and

2   I'll ask you if I read it correctly, okay.  "In

3   addition to sharing the results and underlying

4   data of the aforementioned analysis conducted by

5   TCJC, TCJC also provided the relevant mediation

6   parties with an overview of its historical

7   settlements and an analysis relating to the

8   potential tort system values for certain direct

9   abuse claims."

10              Did I read that correctly?

11       A.    You did.

12       Q.    What overview of historical

13  settlements did TCJC provide to other mediation

14  parties?

15              MR. MALIONEK:  Objection to

16       form, and I'll instruct the witness not to

17       answer if the answer is based only on

18       attorney-client privileged communications;

19       and I also object and instruct the witness

20       not to reveal anything that reveals

21       mediation communications.

22              Other than with respect to the

23       TDP's -- as consistent with the Court's

24       ruling.

25              MR. PFISTER:  Was there any

1          portion of that that you're allowing the

2     witness to answer?

3                    MR. MALIONEK:  Yes.

4          Q.    Okay.  Subject to your counsel's

5     instructions, can you provide any answer to my

6     question?

7          A.    Everything regarding sharing this

8     data and analysis with parties in the bankruptcy

9     has come to me by conversations with legal

10    counsel.

11         Q.    Okay.  So there's no testimony you

12    can give me today subject to your counsel's

13    instructions, about what overview of historical

14    settlements TCJC provided in the mediation

15    process; is that correct?

16         A.    That is correct.

17         Q.    Okay.  The second part of the

18    sentence that I read includes that one other item

19    that was provided is, "An analysis relating to

20    potential tort system values for certain direct

21    abuse claims."

22                What analysis relating to

23    potential tort system values for certain direct

24    abuse claims did TCJC provide to other mediation

25    parties?

```
 1                    MR. MALIONEK:  Same objection,
 2        same instruction to the witness.
 3            A.      Those analysis and the method and
 4     process were communicated to me through legal
 5     counsel.
 6            Q.      So there's no testimony you can
 7     give me today consistent with your lawyer's
 8     instructions and consistent with your knowledge
 9     and the source of that knowledge regarding the
10     potential tort system values that were shared
11     with other mediation parties in connection with
12     arriving at $250 million settlement; is that
13     correct?
14            A.      Yes, that is correct.
15            Q.      How many claims is TCJC resolving
16     for the $250 million settlement amount?
17                    MR. MALIONEK:  Same objection,
18        same instruction to the witness.
19            A.      I don't know.
20            Q.      Is TCJC -- is the number of claims
21     that TCJC is resolving for its $250 million
22     settlement amount more than 10,000 claims?
23                    MR. MALIONEK:  Same objection,
24        same instruction.
25            A.      I don't have any information
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

1   outside conversations with legal counsel.

2          Q.    So sitting here today, you can't

3   tell me whether for -- in exchange for its

4   payment of $250 million, TCJC is resolving more

5   than 10,000 BSA-related sexual abuse claims?

6                  MR. MALIONEK:  Objection to

7       form.

8          A.    Yeah, I can't tell you without

9   compromising attorney-client privilege.

10         Q.    And you couldn't tell me by the

11  same token, sitting here today, whether BSA is

12  resolving more than 20,000 -- pardon me.  Let

13  me -- I said BSA.  Let me strike that and I'll

14  reask the question.

15                 You couldn't tell me, sitting here

16  today, whether in exchange for its $250 million

17  settlement payment, that TCJC is resolving more

18  than 20,000 BSA-related sexual abuse claims; is

19  that correct?

20                 MR. MALIONEK:  Objection to

21      form, because your question is, you

22      couldn't tell me.  As you know, I made a

23      prior objection to form and instructed the

24      witness not to answer to the extent it

25      reveals anything that comes from

1    attorney-client privileged communications.

2    So -- I'm not sure how he can answer that

3    question.

4              MR. PFISTER:  He can answer the

5    question by telling me whether, consistent

6    with your instructions, which, by the way,

7    I believe, are improper, we'll likely be

8    going to the court on, whether consistent

9    with your instructions he can provide even

10   the most basic information about what this

11   $250 million is intended to resolve.  I

12   don't think he can tell -- he's already

13   testified he can't tell me whether it's

14   going to resolve 10,000 claims.  Now I'm

15   asking about 20,000 claims.

16             So I'll repeat my question, if

17   it's helpful, but when I say you can't

18   tell me, I want to be clear, it means he

19   can't tell me, following your

20   instructions.  So let me rephrase it again

21   or let me repeat it again, rather, and

22   we'll see if he can follow -- if he can

23   tell me consistent with your instructions.

24             MR. MALIONEK:  So rather than

25   just repeat it, why don't you rephrase it

```
 1         so that you include all of those caveats

 2         because that was the problem with your

 3         question the first time.

 4                   MR. PFISTER:  Well, I don't

 5         believe there was a problem with my

 6         question the first time, and if you want

 7         to ask questions, you'll get the chance

 8         after I do.  But I'm going to ask the

 9         question the way I prefer to ask it.

10         Q.      Which is, sitting here today, you

11   can't tell me, consistent with your counsel's

12   instructions and consistent with the preparation

13   you did to testify today, whether in exchange for

14   the $250 million that the TCJC is paying under

15   this settlement agreement, whether the TCJC is

16   resolving more than 20,000 BSA-related sexual

17   abuse claims; is that correct?

18                   MR. MALIONEK:  So that's a

19         different question because now you built

20         in my caveats.  Objection to form.  Same

21         instruction.

22         A.      Any information that I have as to

23   the number of claims that the $25 million is

24   seeking -- $250 million is seeking to settle has

25   come to me by communications with legal counsel.
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

```
 1          Q.      And consistent with your counsel's

 2   instructions, you aren't providing testimony on

 3   that today; correct?

 4          A.      I will not be providing testimony

 5   today.

 6                  MR. PFISTER:  Thank you.

 7                  Next let me introduce an --

 8          I'll turn to a slightly different topic,

 9          regards The Church's solvency.  Let me ask

10          the exhibit technician, and I apologize if

11          I do this incorrectly, but we've

12          previously uploaded a document called

13          "10/18/2021 TCJC responses into Zalkin and

14          Pfau Cochran RFPs."

15                  If the exhibit technician can

16          mark that as Exhibit 20, I would

17          appreciate it.

18                       -   -   -

19          (Whereupon, Rytting Exhibit 20 was

20          marked for identification.)

21                       -   -   -

22   BY MR. PFISTER:

23          Q.      That's the document.  You should

24   have it on your screen there.  It's called The

25   Church of Jesus Christ of Latter-day Saint's
```

 1    Responses and Objections to the Zalkin Firm,

 2    P.C.'s and Pfau Cochran Vertetis Amala PLLC's

 3    Request for Production of Documents.

 4                    Do you see that on your screen?

 5         A.    Yes.

 6         Q.    Thank you.

 7                    MR. NASATIR:  Can I ask the

 8         exhibit technician to scroll to page 17.

 9         Q.    I'm going to ask a preliminary

10    question which is:  Have you seen this document

11    before, to your knowledge?

12                    MR. MALIONEK:  Objection to

13         form.  It's a 21-page document and you

14         showed him the first page and then the

15         17th page, so if you want to give him

16         time to be able to actually review the

17         document just for context then he could

18         probably answer your question.

19         Q.    I'll stand on my question:  Have

20    you seen the document before?

21                    MR. MALIONEK:  Same objection.

22         A.    Could I ask the document

23    technician to scroll to the end of the document,

24    please.

25                    So is page 20 the final signature

1    line?

2            Q.      I believe it's page 21.  There's

3    no verification attached.

4            A.      Then I don't recall seeing this

5    document.

6            Q.      Okay.  Understood.

7                    So let's go back to page 17, and

8    I'm going to read you first request for

9    production Number 10 and I'll -- my question will

10   be have I read it correctly.

11                   "Produce documents sufficient to

12   show your financial wherewithal to satisfy in

13   full your allocable share of liability for all

14   abuse claims asserted against you in the

15   Chapter 11 cases."

16                   Did I read that correctly?

17           A.      Yes.

18           Q.      And then in the response to

19   request for Number 10 -- to request for

20   production Number 10, there are certain

21   objections in the first paragraph.  But I'm going

22   to read the second paragraph and I'm going to ask

23   you if I read that correctly.

24                   "Subject to and without waiving

25   the foregoing objections, the Church will not

1    produce documents in response to this request

2    because they are irrelevant.  In any event, The

3    Church responds that it is solvent and for any

4    abuse cases in which The Church is alleged to

5    have liability, it would be able to satisfy all

6    claimed liability for such claims known by the

7    Church in the event of an adverse judgment."

8              Did I read that correctly?

9         A.    Yes.

10         Q.    Do you -- and that is the TCJC --

11    do you agree that The Church is solvent and for

12    any abuse cases in which The Church is alleged to

13    have liability, the Church would be able to

14    satisfy all claimed liability for such claims

15    known by the Church in the event of an adverse

16    judgment?

17              MR. MALIONEK:  Object to form

18         because it's -- it's two questions.  But

19         I'll instruct the witness not to answer to

20         the extent that the basis for his

21         knowledge is only attorney-client

22         privileged communications.  But if you

23         know otherwise, you can testify.

24         A.    It is my understanding that The

25    Church is solvent and for any abuse cases in

Page 149

1    which The Church is alleged to have liability it

2    would be able to satisfy all claimed liability

3    for such claims known by the Church in the event

4    of an adverse judgment.

5          Q.      Thank you.

6                  Request Number 11, I'm going to

7    read the question.  I'll ask you if I read it

8    correctly.  "Produce documents sufficient to show

9    your financial wherewithal to satisfy in full

10   liability for all abuse claims asserted against

11   you if there is no channeling injunction."

12                 Did I read that correctly?

13         A.      Yes.

14         Q.      Okay.  Then if we can go to the

15   next page to the response, once again, there's

16   two paragraphs.  I'm going to omit the first

17   paragraph, which is the objections.

18                 I'm going to read the second

19   paragraph and I'll ask you if I read it

20   correctly.

21                 "Subject to and without waiving

22   the foregoing objections, the Church will not

23   produce documents in response to this request

24   because they are irrelevant.

25                 "In any event The Church responds

```
 1    that it is solvent and, for any abuse cases in
 2    which The Church is alleged to have liability, it
 3    would be able to satisfy all claimed liability
 4    for such claims known by the Church in the event
 5    of an adverse judgment."
 6                   Did I read that correctly?
 7         A.      Yes.
 8         Q.      And, once again, this time I'll
 9    break the question into two because I -- in
10    response to the form objection.
11                   Once again, it is your testimony
12    that The Church is solvent; is that correct?
13         A.      Yes.
14                   MR. MALIONEK:  Objection to
15      form, asked and answered.
16         Q.      Okay.  And, once again, it is your
17    testimony that, "For any abuse cases in which the
18    Church is alleged to have liability, it would be
19    able to satisfy all claimed liability for such
20    claims known by the Church in the event of an
21    adverse judgment."
22                   Is that correct?
23                   MR. MALIONEK:  Objection to
24      form, asked and answered.
25         A.      Yes.
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC      Highly Confidential
PAUL RYTTING

Page 151

```
 1              Q.      Okay.  I'd like to turn to a

 2   slightly different topic, and this regards The

 3   Church's status as a single corporate entity.

 4              I understand -- well, let me ask

 5   you:  Is it correct that there are various

 6   subunits within The Church, such as wards and

 7   stakes?  Are you familiar with those -- with that

 8   terminology?

 9              MR. MALIONEK:  Objection; form.

10        A.      Yes.

11        Q.      Okay.  But notwithstanding such

12   subunits, such as wards and stakes, is it correct

13   that the entity that you are appearing on behalf

14   of here today -- that is "The Church of Jesus

15   Christ of Latter-day Saints "-- is a single

16   corporate entity -- is a single corporate entity,

17   end quote?

18              MR. MALIONEK:  I object to

19        form.  I object because this is outside

20        the scope of any of the 30(b)(6) topics,

21        and so any answer that the witness gives

22        would not be The Church's answer.

23              MR. PFISTER:  Well, I disagree

24        with that instruction.  I think it does --

25        it goes -- it's a -- I'm asking about the
```

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

1       settlement agreement, because the

2       settlement agreement is resolving the

3       liability of The Church of Jesus Christ of

4       Latter-day Saints.

5                My question is just going to

6       whether that's resolving all liability.

7       It's a foundational question to whether

8       the $250 million settlement is resolving

9       all liability of The Church of Jesus

10      Christ of Latter-day Saints, including the

11      liability of any separate ward or stake.

12      So I'm just saying that for your benefit,

13      Counsel, in light of your objection and

14      letting you know that this is a

15      foundational question.

16                So let me just ask it that way.

17      Q.      The $250 million settlement that

18 The Church of Jesus Christ of Latter-day Saints

19 is entering into, is it correct that that is

20 resolving all liability for The Church itself

21 inclusive of any subunits of The Church, such as

22 wards, stakes and the like?

23                MR. MALIONEK:  Objection to

24      form.  Same objection as to this being

25      outside the scope and I'll instruct the

1          witness not to answer to the extent that

2          he only knows through -- if at all through

3          communications with counsel.

4          A.      Yes.

5          Q.      Thank you.

6                  Now, you work in the risk

7     management division; is that correct?

8          A.      Yes.

9          Q.      And you are only -- the risk

10    management division is aware of claims that are

11    reported by the various Church subunits up to the

12    risk management division.  Would that be a fair

13    statement?

14                 MR. MALIONEK:  Objection to

15         form and I'll instruct the witness not to

16         answer to the extent that your only

17         knowledge comes from attorney-client

18         privileged communications.

19         A.      Yes.

20         Q.      If there were claims of abuse that

21    were not reported up to the risk management

22    division, you, the witness, would not be aware of

23    those claims; is that correct?

24                 MR. MALIONEK:  Same objection

25         and instruction.

1          **CERTIFICATE OF SHORTHAND REPORTER**

2

3               I, Gail Inghram Verbano,

4     Registered Diplomate Reporter, Certified Realtime

5     Reporter, Certified Shorthand Reporter (CA) and

6     Notary Public, the officer before whom the

7     foregoing proceedings were taken, do hereby

8     certify that the foregoing transcript is a true

9     and correct record of the proceedings; that said

10    proceedings were taken by me stenographically and

11    thereafter reduced to typewriting under my

12    supervision; and that I am neither counsel for,

13    related to, nor employed by any of the parties to

14    this case and have no interest, financial or

15    otherwise, in its outcome.

16

17

18    *Gail L. Inghram Verbano*

19    Gail Inghram Verbano, CSR, RDR, CRR
      CA-CSR No. 8635

20

21

22

23

24

25

**Exhibit 3**

HIGHLY CONFIDENTIAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

## EXPERT REPORT OF MICHAEL BURNETT

1.  I am Michael Burnett. I am the founder and president of Burnett Risk Control International LLC ("BRCI"), a company I started in January 2003. I provide expert and consulting services in sexual abuse claims, coverage matters, and risk management consulting services associated with such claims. I have expertise in sexual abuse claim valuation and the attendant litigation of such claims, along with the coverage disputes and resolution of such claims. I have provided expert testimony and consulting services in insurance and reinsurance disputes involving underlying sexual abuse claims. My business address is 6300 Royal Aberdeen Court, Charlotte, North Carolina 28277. BRCI is a company through which I provide expert and consulting valuation, litigation and coverage services involving sexual abuse claims.

**Introduction and Assignment**

2.  In February 18, 2020, the national organization of the Boy Scouts of America (the "BSA") and Delaware BSA, LLC (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States

---

[1]     The Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

Bankruptcy Court for the District of Delaware.[2] Debtors have two key objectives in this case: to equitably compensate victims who were harmed during their time in Scouting and continue to carry out Scouting's mission for future generations.[3]

3. The stated purpose of the Trust Distribution Procedures ("TDPs") proposed by the Debtors is "to provide fair, equitable, and substantially similar treatment for Allowed Abuse Claims" and for "securing the just, speedy, and cost-efficient determination of every Abuse Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Abuse Claims."[4]

4. I have been retained by the Debtors principally to provide expert testimony regarding whether the TDPs reflect the same criteria that litigation defendants and their insurers generally consider in evaluating sexual abuse claims when those claims are brought in a litigation context.

**Summary of Opinions**

3. My overall opinion in this matter is that the TDPs provide reasonable principles, procedures, and data factors to evaluate the veracity of sexual abuse claims and to determine appropriate valuation of sexual abuse claims. In addition, it is my opinion, based on my considerable experience in consulting on and evaluating abuse claims, that the TDPs are consistent with how litigation defendants and their insurers assess the credibility and appropriate value of sexual abuse claims when those claims are presented in a traditional litigation context. I explain the bases of these opinions in the sections below.

**Qualifications**

4. I have a B.A. in Government from the University of Notre Dame and a J.D. from Notre Dame Law School. I have been an attorney licensed in the State of Illinois for over 32 years. I am a recognized expert on many aspects of sexual abuse claims and I am an experienced insurance coverage attorney. I have over 26 years of experience and expertise working on sexual abuse claims; including valuation of sexual abuse claims, coverage analysis and litigation, claim resolution strategy consulting, mediation, liability analysis, and risk management consulting and audit work, among other things.

5. I am retained primarily by religious entities, residential schools, insurers (and working with reinsurers), third-party administrators, attorneys, mediators, insurance brokers, risk managers, financial services companies, and others to valuate sexual abuse claims to assist in the expedited, cost-effective, and compassionate resolution of sexual abuse

---

[2]    Capitalized terms not directly defined in this document have the meaning ascribed to them in the Fifth Amended Plan and Amended Disclosure Statement [Doc 6214].

[3]    Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization [Doc 6445] at 7.

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

claims.  Since approximately December 2002, I have compiled the proprietary BRCI database of verdicts and settlements in sexual abuse claims throughout the world. There are well over 53,000 claims represented in the database. I use my database to calculate data-driven valuations which are used in settlement negotiations, mediations, and arbitrations. My valuations are also used in litigation of sexual abuse claims, to set sexual abuse claim reserves, to make coverage assessments, and to conduct audits, among other uses. In addition, I assess the reasonableness of settlements of underlying sexual abuse claims in insurance and reinsurance disputes. Such claims usually involve religious and non-profit entities.  My valuation metrics have also been used by insurance directors, brokers, and actuaries in the determination of placing and purchasing insurance.

6. I regularly give speeches and presentations, including panel presentations, and have participated in round table discussions on the topics of sexual abuse claims, liability and coverage issues, risk management issues involving prevention of sexual abuse and proper sexual abuse claims handling. I have written numerous articles and was a contributing author to a sexual misconduct compendium. I authored a monograph on sexual abuse issues, which I periodically update.

7. In addition to my qualifications highlighted here, I am attaching my curriculum vitae, which is attached to this report as Appendix A.  My curriculum vitae includes a listing of all of the publications I have authored within the past ten years.  I have not offered any testimony as an expert at trial or by deposition in the past four years.

8. Debtors are compensating me for my services in this matter at a rate of $500 per hour and $600 per hour for testimony.  My compensation is not contingent on the outcome of this matter.

9. I continue to review materials and documents related to this case and reserve the right to supplement this expert report based on any additional work that I may be asked to do.

**Documents Reviewed**

9. As part of my assignment, I have reviewed the Modified Fifth Amended Plan of Reorganization [Doc 6443], the Trust Distribution Procedures [Doc 6443], the Ordinary Course Professionals Order with Exhibits [Doc 354], the Connections Chart, the Declaration of Michael Burnett document.

**Background –** The following relevant TDP provisions form the basis of my opinion that the principles, procedures and factors are reasonable, and are factors and procedures that litigation defendants and their insurers consider to assess credibility and sexual abuse claim valuation in a litigation context.

10. **ARTICLE I  PURPOSE AND GENERAL GUIDELINES  A. <u>Purpose</u>.** The TDPs are designed to "allow valid Abuse Claims," "determine an allowed liability amount for each Allowed Abuse Claim," and to "obtain insurance coverage for…Claims that are Insured Abuse Claims." In addition, the TDPs are designed to "provide fair, equitable and substantially similar treatment for Allowed Abuse Claims" to secure "just, speedy, and

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

cost-efficient determination of every claim and provide "substantially similar treatment to holders of similar, legally valid and supported claims."

11. **B. General Principles.** of the TDP provides, in relevant part, the following principles:

    **1.** Objective Claim eligibility criteria;

    **2.** Clear and reliable proof requirements;

    **3.** Administrative transparency;

    **4.** A rigorous review and evidentiary process … to determine Allowed Claim Amounts in accordance with applicable law; [and,]

    **5.** Prevention and detection of any fraud…

\*   \*   \*

12. **ARTICLE II DEFINITIONS AND RULES OF INTERPRETATION    B. Definitions.**" defines **"Claims Matrix"** as "a table scheduling the six tiers of Abuse Types, and identifying the Base Matrix Value, and Maximum Matrix Value for each tier."

13. "**Base Matrix Value**" is defined as "the base case value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.C) to be used to value Abuse Claims and that may be identified in connection with the description of the Scaling Factors in Article VIII.C."

14. "**Maximum Matrix Value**" is defined as "the value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.B) that represents the maximum Allowed Claim Amount achievable through the matrix calculations for an Allowed Abuse Claim assigned to a given tier after application of the Scaling Factors described in Article VIII.C."

15. "**Scaling Factors**" is defined as "factors identified to consider with respect to each Abuse Claim and to apply to the Base Matrix Value for the applicable tier of Abuse Type for such Abuse Claim to arrive at its Proposed Allowed Claim Amount."

16. Under "**ARTICLE IV  CLAIMANT ELIGIBILITY**," to be eligible for compensation, a Direct Abuse Claimant must, among other things, "submit supporting documentation and evidence" of the abuse he allegedly suffered.

17. Under "**ARTICLE V GENERAL TRUST PROCEDURES  A.  Document Agreement.**," the TDP states that the Document Agreement may require other parties to provide "documents, witnesses, or other information."

18. Under "**ARTICLE V GENERAL TRUST PROCEDURES  B.  Document Access.**," the TDP provides that, pursuant to the Document Agreement, the Settlement Trust shall

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

afford access for Direct Abuse Claimants to relevant, otherwise discoverable non-privileged documents… including access to "IV files (the Volunteer Screening Database) and to all Troop Rosters…"

19. Under "**ARTICLE V GENERAL TRUST PROCEDURES E. Statute of Limitations or Repose.**," "[t]he statute of limitations, statute of repose, and the choice of law determination applicable to an Abuse Claim…shall be determined by reference to the tort system where such Abuse Claim was pending on the Petition Date…or where such Abuse Claim could have been…filed as asserted by the Abuse Claimant under applicable law."

20. "**ARTICLE VI EXPEDITED DISTRIBUTIONS A. Minimum Payment Criteria.** provides that a Direct Abuse Claimant may elect to receive "an expedited distribution of $3,500 (the "**Expedited Distribution**") to achieve an expeditious resolution of his Direct Abuse Claim, without having to submit additional information to the Settlement Trust. This is an option in lieu of pursuing recovery from the Settlement Trust under the **CLAIMS ALLOWANCE PROCESS** set forth in **ARTICLE VII**, below.

21. Under **A. Trust Claim Submission.** of **ARTICLE VII CLAIMS ALLOWANCE PROCESS**, an Abuse Claimant who does not elect to receive an Expedited Distribution can elect to "submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee," (a "**Trust Claim Submission**"). To make a Trust Claim Submission, an Abuse Claimant, in relevant part, must: (i) submit a sworn questionnaire; (ii) produce all records and documents related to the Abuse Claim, including those pertaining to compensation received or expected to be received from Protected Parties or other sources; (iii) execute an agreement 1) to produce further records and documents requested by the Settlement Trustee, 2) consent to any examination requested by the Settlement Trustee, and 3) consent to a sworn written and/or oral examination. In addition, the Settlement Trustee may obtain additional evidence and supplemental information.

22. **B. Claims Evaluation.** The TDP requires the Settlement Trustee to evaluate each claim individually according to well-documented procedures and guidelines to determine, based on the evidence compiled, whether a Submitted Claim should be allowed as a legally valid Allowed Abuse Claim or a legally invalid Disallowed Claim.

23. **C. Settlement Trustee Review Procedures. 1. Initial Evaluation Criteria.** The Settlement Trustee performs an Initial Evaluation based on criteria that: the Abuse Claimant's claim submission is completed and sworn; the claim was submitted timely; and, the claim was not previously resolved by litigation or settlement. If all three of these criteria are not met, the claim is disallowed.

24. **C. Settlement Trustee Review Procedures. 2. General Criteria for Evaluating Submitted Abuse Claims.** sets forth specific criteria for the Settlement Trustee to assess credibility of an Allowed Abuse Claim by a preponderance of evidence that the claim is entitled to recovery and should be allowed. The criteria include: identification of alleged acts of Abuse; identification of the alleged Abuser by full name or description, along with the name or location of the troop; information that demonstrates the Abuse occurred

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

during Scouting activity or resulted from involvement in Scouting activity; sufficient information regarding the age of the Abuse Claimant at the time of the Abuse and the date of the Abuse; and, the location of the Abuse.

25. **C.  Settlement Trustee Review Procedures. 3.  Submitted Abuse Claims That Satisfy the General Criteria.** Only if a Submitted Abuse Claim satisfies all these criteria will it be deemed an Allowed Abuse Claim.

26. **ARTICLE VIII  CLAIMS MATRIX AND SCALING FACTORS** sets forth the composition and details of the Claims Matrix and various aggravating and mitigating factors that the Settlement Trustee shall utilize in a carefully-subscribed claim-by-claim valuation analysis to determine a Proposed Allowed Claim Amount.

27. **A.  Claims Matrix and Scaling Factors.** broadly introduces the criteria comprised in the six-tiered **Abuse Types Claims Matrix**, including designations of Base Matrix Value, a Maximum Matrix Value and **Scaling Factors** that the Settlement Trustee to apply to the Base Matrix Value in the valuation calculus. These elements are intended to achieve "a fair and reasonable Abuse Claim valuation" based on settlements, verdicts, and judgments that Abuse Claimants could expect to receive in the tort system.

28. **B.  Claims Matrix.** sets forth six Abuse Type tiers that reflect the nature and severity of abuse. The Base Matrix Value for each tier constitutes the "default" claim value, reflecting historical values based on settlements and litigation results involving BSA-related parties. The Base Matrix Value may be adjusted by "Scaling Factors." The Maximum Matrix Value in each tier reflects the highest value that may be achieved after the Base Matrix Value has been adjusted by Scaling Factors.

1. **Tier 1** – Anal or vaginal penetration by an adult upon a minor claimant; including penile, digital or object penetration.

   - **Range: $600,000 to $2,700,000**

2. **Tier 2** – Oral sex by an adult upon a minor claimant; including oral contact between the mouth and penis, anus or vulva or vagina; OR anal or vaginal penetration by a youth upon a minor claimant; including penile, digital or object penetration.

   - **Range: $450,000 to $2,025,000**

3. **Tier 3** – Masturbation by an adult upon a minor claimant, including touching male or female genitals and involving masturbation of the abuser or claimant; OR oral sex by a youth upon a minor claimant; including oral contact between the mouth and penis, anus or vulva or vagina; OR anal or vaginal penetration by a youth upon a minor claimant; including penile, digital or object penetration.

   - **Range: $300,000 to $1,350,000**

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

4. **Tier 4 --** Masturbation by a youth upon a minor claimant, including touching male or female genitals and involving masturbation of the abuser or claimant; OR an adult's skin to skin touching of a minor claimant's sexual or other intimate parts.

- **Range: $150,000 to $650,000**

5. **Tier 5 –** A youth's skin to skin touching of a minor claimant's sexual or other intimate parts; OR any perpetrator's over the clothes touching of a minor claimant's sexual or other intimate parts.

- **Range: $75,000 to $337,500**

6. **Tier 6 –** Sexual abuse with no touching and adult abuse claims.

- **Range: $3,500 to $8,500**

29. **Aggregating Scaling Factors** enable upward valuation of the Base Matrix Value, based upon particularly severe abuse (up to 1.5); which may include extended duration and frequency of abuse, exploitation of the claimant for child pornography, coercion or threat or use of violence or stalking; and multiple perpetrators. If the alleged abuser is a known abuser, an aggravating scaling factor (in the range of 1.25 to 2.0) may additionally be applied. The impact of the abuse may be an additional aggravating scaling factor (up to 1.5). Aggravating impacts may include adverse effects on mental health, physical health, interpersonal relationships, vocational capacity, academic capacity, and legal difficulties.

30. **Mitigating Scaling Factors** enable a decrease of the Base Matrix Value in the range of 0 to 1.0. These may include absence of a Protected Party relationship or the presence of a responsible non-Protected Party; other settlements, awards, contributions, or limitations already received or to be received; applicable statutes of limitations or statutes of repose; and the absence of a putative defendant, a missing party that could result in an "empty chair" defense.

**Opinions**

31. **General Overview:** My opinion is that the TDPs set forth reasonable factors and mechanisms commonly considered by litigation defendants and their insurers to assess credibility of sexual abuse claims and to determine liability and proper valuation of sexual abuse claims.[5] The TDP procedures and factors are consistent with how abuse claims are evaluated by defendants and their insurers when they are brought in a litigation context.  The TDPs provide impressive mechanisms to mimic, to the extent possible, what would be discovered in a litigation context in order to assist the Settlement Trustee in valuating allowed credible claims.

---

[5] I have not been asked to opine on whether the TDPs reflect a proper valuation for these claims, which I understand is being addressed by other experts.

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

32. **ARTICLE IV CLAIM ELIGIBILITY** and **ARTICLE V  GENERAL TRUST PROCEDURES** and **ARTICLE VII  CLAIMS ALLOWANCE PROCESS** set forth "gatekeeping" provisions for the Settlement Trustee's accumulation of information, evidence, records and materials in the discernment of the "allowance" and credibility of a Direct Abuse Claimant's sexual abuse claim. These procedures include document production, sworn statements and questionnaires, interviews, and the opportunity for supplementary discovery; all akin to what defendants and insurers would seek in the discovery phase of litigation. The Settlement Trustee undertakes an initial evaluation of the claim submission to determine whether a claim is "legally valid" and thus "allowed," or legally invalid and, thus, "disallowed." If a claim is deemed valid and allowed, the Settlement Trustee then undertakes another evaluation to determine credibility of the claim by a preponderance of evidence, using detailed criteria that defendants and insurers would typically use in litigation.

33. **ARTICLE IV CLAIM ELIGIBILITY** provides for an efficient process that requires sexual abuse claimants to attest to the truth of their allegations and to corroborate their claim with supporting documentation and evidence. In a litigation context, defendants and their insurers rely upon informal fact-finding, independent investigation, and the discovery process to investigate the facts of the claim and the potential liability to defendants.  Article IV condenses that process, establishing the Settlement Trustee as almost a quasi-arbitrator who receives the claim, supporting documentation and evidence, and determines the eligibility of the claim. The Article IV demands placed on the claimant are, in a sense, similar to federal rules, in which litigants are now required to "fast-track" the discovery phase of litigation by producing information and documents even without formal interrogatories and requests to produce. This gatekeeping phase provides "clear and reliable proof requirements" as well as significant information and evidence that the Trustee can use to assess eligibility and the nature of the claim early in the process. And, as stated in **Article I PURPOSE AND GUIDELINES**, this process assists in the "Prevention and Detection of any fraud." These are all provisions and processes that litigation defendants and their insurers utilize in the litigation context, but at a more lengthy and costly adversarial trajectory.

34.  **ARTICLE V GENERAL TRUST PROCEDURES** establish gatekeeping procedures for the Settlement Trustee to accumulate the necessary documents, witnesses, information and evidence to make informed decisions about the legal validity and allowance of a claim once it is deemed eligible. Insurers and their insureds rely on their own records, interviews with the witness (where possible), and additional facts gained in the discovery process to compile sufficient information to determine claim validity and viability. The Trustee likewise receives this information but, arguably, in a more efficient process. The wisdom of the TDPs is that they require sexual abuse claimants to attest to the truth of their allegations and to corroborate their claim with supporting documentation and evidence early in the process, before the valuation phase.

35. **ARTICLE VI EXPEDITED DISTRIBUTION** establishes a reasonable mechanism for a Direct Abuse Claimant to extinguish his claim early in the process, if he has demonstrated eligibility, in lieu of pursuing the claims allowance process. For any number of reasons, a claimant may prefer to accept $3,500 as an expedited resolution of

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

his claim rather than endure the time and effort of pursuing the potential for a larger recovery at some unspecified time in the future after a much more rigorous process. It may be the proverbial "bird in the hand" for a claimant. This option mimics litigation defendants' and their insurer's common practices of effecting early and proactive measures to offer litigants an "early out;" which also provides for an expedited and cost-efficient resolution to dangerous and emotionally-charged sexual abuse claims and all the risks attendant to litigating such matters, even in cases where there may be viable defenses to such claims. In the litigation context, defendants and insurers employ these mechanisms on a regular basis to offer claimants opportunities to quickly resolve their claims as a means to avoid intrusive and emotionally triggering cross-examination in their depositions. These types of expedited distributions or payments are also employed in some class action litigation to enable class members to achieve an expedited benefit of the action. For example, in the breast implant class action, any woman who could demonstrate that she had her breast implants removed was afforded the option to receive a $3,000 base payment, even if she had not exhibited or suffered any adverse effects of the implants. The option provided an opportunity for insurers and insureds to "buy their peace" against even future claims by women who opted for the *de minimis* payments, even if they suffered adverse impacts of their breast implants at a later date.

36. **ARTICLE VII CLAIMS ALLOWANCE PROCESS** sets forth the more intensive gatekeeping provisions to ensure that a claimant who chooses to opt for the allowance process and claim valuation presents an allowed and credible claim. The provisions, again, mimic more in-depth compilation of information and evidence through the discovery process in the litigation context.  Defendants and their insurers rely on these types of formal discovery to engage in an ongoing and sometimes fluid assessment of liability, damages, and the claim value. These determinations are often balanced against the ever-increasing costs of protracted litigation. Article VII requires that a claimant who chooses this option must submit to the Trustee: i) a sworn questionnaire (something that could be likened to requests to admit); ii) all relevant records and documents (like requests to produce); iii) an executed agreement to produce further documents sought by the Trustee, consent to an examination (which could be likened to an IME or psychological evaluation), and a sworn written or oral examination (similar to answers to interrogatories, answers to requests to admit and deposition testimony). This provision also requires the claimant to submit to the Trustee's requests for further evidence and information, if the Trustee determines further information is necessary. All these are routine sources of information and requirements in the litigation context. Insurers and their insureds compile this information for determinations of claim viability, defensibility and valuation. When defendants and insurers retain me to produce claim valuation and valuation analysis, they typically provide answers to interrogatories, documents produced in discovery, information acquired through investigation, deposition transcripts, medical records, and IME reports. These all inform not just the defense against sexual abuse claims but also the valuation of abuse claims. These Article VII provisions all represent reasonable facsimiles of the information and evidence gathering phases of litigation which are routinely relied upon by defendants and their insurers in the litigation context.

37. These procedures are similar to how an insurer, on behalf of a defendant, would investigate the credibility of a claim, the liability exposure of their insured, and the

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

amount that they could expect to pay to resolve sexual abuse claims. If anything, these procedures are more efficient than the information gathering and discovery phase of litigation. The legal viability and credibility phases are condensed into the initial procedures and requirements placed upon the Settlement Trustee early in the process. The Settlement Trustee's role is more analogous to that of an arbitrator than a judge or a third-party neutral. The emphasis is on the abuse claimant producing a preponderance of evidence that he was abused by an agent of the BSA or Protected Parties during the course of Scouting activities.

38. The Document Agreement and Document Access procedures in Article IV mimic, to a large extent, the discovery process that would occur in a litigation context, but in an expedited fashion.  By the conclusion of the Article IV, Article V and Article VII processes, the Trustee will possess significant information on the claim and perform well-informed evaluations as to a claim's legal validity and credibility.  The Trustee will have acquired sufficient information to satisfy his need for assurance that a claim is valid and credible, similar to how a defendant or an adjuster would valuate a claim on behalf of an insurer in a litigation context. These procedures reduce the perils of "voluntary payments" or "excessive payments" by the Debtors.   Defenses that might typically be asserted in motions to dismiss or motions for summary judgment are, instead, acknowledged at the valuation stage in the form of mitigating scaling factors that may decrease the amount of payment.  While the TDPs do not contemplate the use of experts or pretrial motions as you would see in a litigation context, in my experience these are not the drivers for a determination of a claim's value in any event.  The impact on a claim's value is driven primarily by the facts, and the TDPs emulate to a large extent the fact discovery that would occur in a typical litigation context.

39. By the end of the Article VII Claims Allowance Process, the Trustee will have sufficient information to make a determination as to a claim's value, similar to what would be known in a litigation context at the conclusion of fact discovery.  The Trustee will have claimants' sworn statements and submissions, supplemented with an enormous amount of information from the Debtors and Local Councils, including, for example, troop rosters and the IV files from the Volunteer Screening Database, which will allow the Trustee to independently evaluate and corroborate claimant allegations, such as the claimants' connection to Scouting and the alleged perpetrator's involvement in Scouting. These documents, materials, facts, and sworn statements will provide the basis for the criteria for the Trustee's evaluation of an abuse claim similar to what would occur in the litigation context: the alleged acts of abuse; the identity or description of the alleged abuser; whether the alleged abuser was an employee, agent or volunteer of a Protected Party, or registered as a Scout or engaged in Scouting activity; the name and location of the claimant's troop; whether the abuse occurred during the course of Scouting activity; the date(s) of abuse; the claimant's age during the time of the abuse; and the location of the abuse.

40. **General Criteria: Alleged Abuser Identification.**  Notably, the Trustee may assess the credibility of a claim and the associated recovery to the claimant based on an identification of the alleged abuser either by name or by specific information about the troop and alleged abuser that is sufficient to allow the Trustee to make a reasonable

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

determination that the alleged abuser was an employee, agent or volunteer of a Protect Party, the alleged abuser was a registered Scout or participating in scouting activity and the Abuse was directly related to Scouting activities. Based on my experience, this is consistent with evaluation of an abuse claim in the litigation context. Often a victim, due to age and the passage of time, will not have an initial recollection of their abuser's name, but are able to identify them based on their role in scouting, or where the scout troop met, or their role in a religious organization, if any.

41. **General Criteria: Connection to Scouting**. The Trustee may assess the credibility of a Submitted Abuse Claim by ascertaining whether the alleged sexual abuse occurred during, or resulted from, a Scouting activity. Defendants and their insurers in litigation determine whether the insured defendant owed a duty of care to a claimant and breached that duty. If the alleged perpetrator's abuse of the claimant was unrelated to any Scouting activity, the Trustee could deem the claim not allowed for valuation. The alleged abuser's association with Scouting would be unrelated to the alleged abuse. Further, if the alleged abuse was very attenuated from a Scouting activity, we would expect the Trustee to apply an appropriate mitigating factor in the lower end of the range, thus rendering the claim statistically insignificant. For example, if the abuser and claimant were members of the same church and the abuse occurred during religious practices or church-related or church-sponsored activities, not during any Scouting activities, then the coincidence of the abuser's and the claimant's involvement in Scouting would be unrelated to the alleged abuse. The BSA and Protected Parties would not be expected to have a duty to protect the claimant in every aspect of his life and in every situation where he may encounter the abuser, no matter how attenuated the situation was from Scouting. The Trustee could seek information as to whether the abuse occurred during a Scout-sponsored camping trip or a Scout jamboree; or whether the abuse occurred immediately prior to, during or immediately after a scout meeting. The Trustee may inquire as to whether the perpetrator abused the claimant when he was chaperoning a Scouting activity. Was the activity one in which the claimant and/or the perpetrator was required to wear his Scouting uniform? If the abuse occurred at the perpetrator's home during the claimant's play date with the perpetrator's child or while being paid to mow the perpetrator's lawn, those would not be Scouting activities for which the BSA or a Protected Party would be expected to owe the claimant a duty of care. These are factual determinations that defendants and their insurers regularly make in litigation and, likewise, the TDPs provide procedures for the Trustee to do the same.

42. **General Criteria: Date and Age.** The TDPs also include provisions for the Trustee to determine the date(s) of alleged abuse and the age of the claimant at the time of the abuse. Defendants and their insurers in sexual abuse litigation regularly acquire this information to corroborate the claim. As with defendants and insurers, cross-checking these data points enables the Trustee to confirm that the claimant and alleged abuser were in that area at the time of the alleged abuse, that the Scout troop existed and engaged in Scouting activities at the time of the alleged abuse, and that the claimant was at an age where he would have participated in Scouting at the time of the alleged abuse. The Date and Age General Criteria of Article VII of the TDPs guides the Trustee to make similar determinations as to credibility and value that defendants and their insurers would make in litigation of sexual abuse claims.

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

43. **General Criteria: Location of Abuse.** The location of the abuse is another corroborating factor available to the Trustee to discern the credibility of a claim and the valuation of the claim. If the alleged abuse occurred on premises typically used by the Scouts to hold meetings or engage in Scouting activities, that suggests that the claim is more credible, as it confirms – or at least suggests – corroborating details concerning the claim and a connection to Scouting activity. Location also reflects upon the liability exposure of the BSA or Protected Parties. If the alleged abuse occurred while on premises used by the Scouts, it evidences the existence of a duty to protect Scouts while Scouting leaders led and supervised activities. Location of abuse is also something that defendants and insurers consider in claim valuation analysis. Location of abuse often impacts my valuation analysis of such claims. If abuse happened during a Scout-sponsored camping trip, especially at night while most of the participants were sleeping, the value of a claim often increases. In such situations, the abuser has a greater degree of control and the claimant would have little to no means to escape and could not avail himself of the protections of his parents and familial safety net.

44. **General Criteria: Identified Acts of Alleged Abuse.** These are among the most important factors considered by defendants and insurers in litigation. Obviously, more serious acts of abuse generally carry a greater resolution value. Violent penetrative abuse can cause severe injuries and bleeding and, at times, have led to permanent scars that are a permanent reminder of the trauma. There would be a greater likelihood of medical records or hospital visits that could corroborate such a claim. Also, injuries suffered by a claimant may be more memorable to family members, even if they did not know the true cause of the injury at the time. Also, violent and/or penetrative abuse is often experienced as being more violative, and thus the genesis or exacerbation of more severe mental and emotional distress. The extent of the harm caused by the abuse also factors into the aggravating factors to be considered by the Trustee, as outlined below.  The TDP processes that enable the Trustee to acquire this information mimic the investigation and discovery phases of litigation relied upon by defendants and insurers.

45. **Article VIII:** The Claims Matrix and Scaling Factors set forth in Article VIII are reasonable factors routinely relied upon by defendants and their insurers to determine claim values and how much they should expect to pay to resolve a sexual abuse claim. The six tiers (in descending order of severity) reasonably and functionally delineate among various types of abuse. The first three tiers comprise the most serious types of anal, vaginal and oral penetration; the abuse perpetrated by adults upon minors within the tiers are more serious. Tiers 3 and 4 involve genital masturbation between the minor claimant and adult or youth perpetrators. Tiers 5 and 6 involve over the clothes groping or fondling and abuse of adults. In each tier, there are gradations of severity depending on the age of the perpetrator and the nature of the abuse. These are common and relied upon delineations of abuse for valuation purposes when these claims are assessed in litigation. When clients, including defendants and insurers, retain me to valuate sexual abuse claims, they seek not just a valuation, but they also seek and rely upon my valuation analysis and the relevant indicia that support the valuation. Similarly, the Trustee will assimilate evidence and information in the Articles IV through VII processes to inform the Article VIII claim valuation process in this matter.  In this role, the Trustee will rely on the same kinds of information, factors and valuation analyses that defendants and their

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

insurers rely upon in the litigation context to make decisions about the value of the claim, among other things.

46. When an abuse claim is made in a litigation context, defendants and insurers rely on past experience and precedents in litigation, settlements, and claim resolution to provide supportable claim valuations for their use in determining how much to pay to resolve abuse claims. Similarly, the TDP Claims Matrix assigns Base Matrix Values anchored in relevant historical data derived from prior BSA-related claim resolution values. These data-driven values are not arbitrary but are, instead, directly relevant to the BSA and to the types of alleged harm and the types of alleged victims. In addition, the Maximum Matrix Value for each tier reflects adjustments based on Scaling Factors, which ensures a measure of predictability and consistency of claim values. Claimants abused at similar ages and are of similar backgrounds who have suffered similar abuses – even within the same tiers of abuse – will be treated similarly.

47. **Scaling Factors:** The TDP valuation procedures include Scaling Factors to adjust an initial Base Matrix Value higher or lower, depending on a variety of factors and circumstances. These scaling factors are also derived from evidence of the "BSA's and other putative Protected Parties' historical abuse settlements, litigation, outcomes, and other evidence supporting the Scaling Factors."[6] These data-driven adjustment factors support the reasonableness of their use in the valuation assessment. The more data and factors included in the valuation analysis, the better. Whether an adjusted valuation is derived through filters and searches applied "on the front end" of the process (as with my BRCI database process) or is applied on the "back end of the process" as a scaling factor (as in the TDP Claims Matrix approach), defendants and their insurers rely on these metrics to distinguish among varying claims – and sometimes seemingly similar claims – to support claims handling and settlement decisions and supportable valuations. When applied to a Base Matrix Value that represents a set of similar-tiered claims, scaling factors enable the Settlement Trustee to distinguish among these otherwise similar claims, for valuation purposes, similar to how defendants and insurers rely on the same metrics in evaluating similar claims in the litigation context. Reducing the scaling factors to numerical multipliers derived from valuation data specific to the BSA and Protected Parties provides the Settlement Trustee an easy and effective valuation metric replicating what occurs in the litigation context.

48. **Aggravating Scaling Factors:** The aggravating scaling factors which may enhance claim value include: duration and frequency of abuse; exploitation of the claimant for child pornography; coercion or threat or use of violence; multiple perpetrators; abuser profile; and impact of abuse. In my experience, each of these factors can have the effect of enhancing the resolution value of a claim.  Defendants and their insurers regularly consider these factors in the valuation of claims and the concomitant decisions regarding defensibility and costs of defense.

    1. **Duration of abuse:** I have worked on many claims involving sometimes even comparatively less serious abuse, yet the resolution value of the

---

[6] TDPs [Doc 6443] at 15.

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

claims has increased because of a lengthy period of abuse. Some victims have described that the long period of abuse transformed a series of traumatizing incidents of abuse into a traumatizing way of life. Their life experience over sometimes many years was of a regular trauma that became a debilitating stain upon their self-esteem. Through therapy, many victims come to appreciate that the abuse ceased to be a terrible event or events and, instead, became a defining trait of their personhood. When the period of abuse transcends stages of life, such as during the time that a child transitions from prepubescence into puberty, the long-term abuse adversely impacts a victim's experience of their developing sexuality. In such cases, the duration of abuse can become as impactful as the sexual acts themselves. Even when the frequency of abuse may not be extensive, the fact that the period of abuse itself goes on for a long time means that the victim proceeds through life navigating the constant specter of repeated sexual abuse, always "waiting for the other shoe to drop"…again. I have successfully advised defendants and insurers to settle claims of even otherwise comparatively less severe abuse for larger sums than they were initially prepared to pay *precisely* because the period of abuse, the duration of the abuse, spanned several years. I have been able to demonstrate through metrics in my database that the duration of abuse often results in higher claim values.

2. **Frequency of abuse:** Sometimes, there may be a relatively brief period of abuse, but the frequency and/or severity of the abuse may constitute an aggravating component of the severity of the claim and the claim value. For example, I have advised on several claims involving a month or two of abuse, but the compulsive nature of the abuser's proclivities manifested in dozens of abusive incidents in that relatively short time. If the abuse was something on the order of anal rape, the brief period of abuse is often devastating from the standpoint of harm and valuation.

3. **Exploitation and child pornography:** I have worked on several claims involving abuse accompanied by exploitation of the victim, in part, for the purpose of creating and disseminating pornographic images of the minor victim. In one case, investigation years after the victim's abuse revealed that pornographic images of him, created by the perpetrator while he abused the victim, had been shared on the internet over many years. The permanency of harm associated with such circumstances can greatly increase the resolution value of a claim. Even where pornographic images have not been trafficked, some perpetrators threaten to share the images with the public or the victim's family to extort their victims into continuing in the abusive relationship and remaining silent. Defendants and insurers that I have worked with and represented give great deference to the injurious impact such facts have on claim valuation, especially when considering the impact that such evidence likely would have on a jury or another trier of fact during the damages phase of a trial.

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

4.  Defendants and insurers consider the impact of *any* image created during a period of abuse or leading up to abuse. I worked on a series of claims in a case in which a religious leader took thousands of photographs of prepubescent girls. The vast majority of photos, many of which depicted fully-clothed girls from the chest to the knees, *did not meet the statutory definition of child pornography*. Nevertheless, collectively, the insurer and defense counsel and I decided to test my uncomfortably high valuations with a mock jury exercise in which only the photos of fully-clothed girls were displayed. The mock jury unanimously agreed that the photos used in the exercise were not pornographic under the statute, but they agreed that the photos were "very creepy." The mock jury also agreed that none of his superiors had reason to know that the leader engaged in this kind of misconduct. Nevertheless, despite the lack of any sexual abuse, they reached an eight-figure "verdict" because of the mere existence of the non-pornographic photos and because the religious leader who took the photos was a pedophile.

5.  **Threat of violence:** I have worked on many claims which involved weapon intimidation. Not only were minors sexually abused, but in some cases the abuse included an element of sadistic physical abuse. One claim involved an educator who meted out "corporal punishment" to a 17-year old boy. The acts included tying the boy up, blindfolding him and whipping him to "discipline" him for a minor transgression. It seemed obvious that the acts involved a sadistically sexual dimension and, ultimately, the perpetrator acknowledged that he had been acting out a sexual fantasy, not administering corporal punishment. The use of violence and a weapon increased the claim value, despite the fact that there had been no overt sexual touching, sexual talk or exposure.

6.  Many claims involve weapon intimidation in which the perpetrator brandished a gun as part of the abuse. Sometimes, the perpetrator accompanies the abuse with a threat that he will kill the child or his family if he discloses the abuse. This has been a particularly effective method with very young prepubescent children who fear that if they report the abuse their perpetrator will kill their family. In one case, the overt threat was only made the first time, but the perpetrator left the gun in full view of the child each time he abused him, a constant reminder of the threat. The terror and sometimes physical harm from violence or the threat of violence increases claim values in a litigation context.

7.  **Multiple perpetrators:** The presence of multiple abusers aggravates claim valuation in myriad ways. When multiple perpetrators abuse a child in tandem or simultaneously, the experience is more terrifying for the victim. The opportunity to escape is reduced. The overpowering presence of multiple men abusing them simultaneously is physically overwhelming. I worked on a claim in which a victim abused by two men – one a religious leader and one a lay person – described feeling like a "rag doll"

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

being sexually manhandled at a time in his life when he did not understand what was happening or why. When one abuser "passes off" a child to another abuser, the compensable tort now constitutes sexual trafficking. Many claims involve a second man in the room who does not touch the child, but who engages in voyeuristic behavior and masturbates while watching the other man abusing the child. Other times, another person in the room does not engage in sexual abuse but does and says nothing, thereby becoming an accessory.

8. The presence of multiple abusers exacerbates already difficult claims of sexual abuse, from both a liability and damages standpoint. Multiple abusers provide more ways in which the claimant can argue that an institution or employer negligently supervised or did not appreciate the "red flags" of not one, but two or more offenders. Multiple abusers also mean multiple witnesses. This can be especially damaging if the witnesses included a pastor, administrator, or person of responsibility over one of the other abusers. Often, when considering sexual abuse in an institutional setting or a master-servant context, questions include, "Where was the pastor," or "Where was the school principal?" or "Where was the store manager?" or "Where was the house parent?" When the answer is, "He was in the room," or "He knew what was happening but didn't want to get involved," it is bad. When the answer is, "He was participating in the abuse," from a liability and damages standpoint, the result is devastating. It mitigates the defensibility aspect of the claim. In addition, the adverse impact on the victim is more acute. Victims describe feeling like a sexual "plaything." The impact on their sexuality, promiscuity, trust issues, relationship issues, social anxieties and the like is exacerbated. Defendants and insurers understand that they will have to pay significantly more to extricate themselves from the lawsuit.

9. **Abuser Profile.** The TDPs include an Aggravating Scaling Factor that enables the Trustee to adjust the valuation upward in the event that an abuser has been accused multiple times: 1.25 if the abuser has been accused by at least one other victim; 150 if the abuser has been accused by at least 5 other victims; 2.0 if the abuser was accused by at least 10 other victims; and, 1.5 to 2.0 in the event evidence shows that a Protected Party was negligent. (e.g., the perpetrator was included in the IV files because he abused.) This is the type of factor that defendants and their insurers consider when assessing claim value. When an abuser has multiple victims, he arguably represents a more malignant cause of harm to a victim than an abuser who may have engaged in a single incident of opportunistic abuse. In addition, multiple victims could represent multiple incidents of the BSA's or Protected Party's inadequate supervision or failed opportunities to identify abusive proclivities, missed signs of a pattern and practice of abuse. If multiple victims accuse an abuser, that potentially reflects multiple negligent breaches of duties of care and failed opportunities to have prevented abuse of some victims.

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

10. **Impact of the Abuse.**  When assessing sexual abuse claim valuation in litigation, defendants and their insurers assess the damages aspect of liability exposure. Some sexual abuse victims – at least outwardly – seem to navigate life fairly well or integrate the abuse into their lives in a more manageable manner. Most victims, however, allege multiple common adverse impacts of the childhood sexual abuse. They allege myriad forms of mental and emotional distress, including Post-Traumatic Stress Disorder (PTSD) and other sequelae of trauma-induced distress, even years after their abuse.  They often allege relationship and trust issues, sexual dysfunction, anger and behavior problems, physical manifestation of emotional distress; physical injuries (sometimes permanent) due to severe penetrative abuse, flashbacks, low self-esteem, guilt, shame, humiliation, suicidal ideation, depression, anxiety, and many other manifestations of mental and emotional distress.  They often suffer from alcoholism and substance abuse issues, promiscuity and hyper- or hypo-sexuality, insomnia, nightmares, and numerous other physical ailments that are attributed to sexual abuse. They suffer relationship issues that inhibit their ability to engage in healthy emotionally and sexually intimate relationships; or they have trust issues and problems with authority which plague their ability to find and keep employment. They often reference precipitous drops in academic grades caused by the abuse and failures to attain higher education.  They often have been in trouble with the law, engaged in criminal activity, been incarcerated, or filed for bankruptcy. Many abuse victims have sought therapy and counseling, or have had medical and psychiatric care and the attendant costs of such treatments. Any one of these harms can increase the claim value.  Often, abuse victims allege multiple types of such harms.  Defendants and their insurers as a matter of course assess these damages to determine the value of a claim, especially when medical, psychological and educational records corroborate the damages.  Generally, the more serious the harm, the higher potential claim value.

49. **Mitigating Scaling Factors:** The presence of mitigating scaling factors provides for a reduction of the base value matrix in the event that there are circumstances that would mitigate the claim value.  Defendants and their insurers routinely adjust claim values based on liability exposure and other factors. Among potential mitigating scaling factors included in the TDPs are: absence of a Protected Party relationship; presence of a responsible non-Protected Party; prior settlements, awards, contributions, or limitations received or to be received; statutes of limitations or statutes of repose; and the absence of a putative defendant which could result in an "empty chair" defense at trial.

1. **Other responsible parties, settlements, awards, contributions, or limitations.**  I have been involved in many claims involving judgments and awards adjusted by courts to account for a jury's assessment of contributory negligence factors or prior settlements with other defendants. Defendants and their insurers consider will consider potential comparative and contributory negligence and may adjust the claim value based on

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

estimated or informed percentages of fault of multiple parties. Often, defendants and their insurers have adjusted claim values to reflect the prior settling out of other defendants and their insurers. In addition, many awards are adjusted by prior "high-low" agreements between the parties. In many of the claims, a jury finds an individual perpetrator guilty of abuse but not his employer or the institution of which he is an agent. A jury's award to the plaintiff is assessed against only the perpetrator, or against what could be called a "responsible non-Protected Party." (Unfortunately, in the case of a jury's judgment against the perpetrator alone, a victim often is unable to collect the judgment because the perpetrator is destitute and/or in prison, dead, senile or otherwise judgment-proof.) In some jurisdictions, the charitable immunity defense has survived the evolving erosion of this defense nationwide, or it remains in some more limited form. (In some jurisdictions, a charitable or nonprofit entity's maintenance of insurance affects whether or to what extent the charitable immunity defense applies.) In many claims, a responsible party may be a governmental entity, and sovereign immunity laws and damages caps limit the amount that a victim may recover from the public entity. Armed with mitigating scaling factors that account for the absence of a Protected Party relationship or the presence of a responsible non-Protected Party or the presence of other awards or limitations, the Settlement Trustee may adjust the valuation downward, much the same way that a defendant or insurer would adjust their share of a resolution value to reflect the contributions and liability exposure of co-defendants or other responsible parties in a litigation context. However, in this context, the role of the Settlement Trustee is more like that of an arbitrator than a trier of fact in litigation. It is a much more efficient and predictable approach. Rather than "making the case" to a judge or jury, either at trial or at the dispositive motion stage, and relying upon the uncertainty of the result; the Debtors' insurers know what the base value of a claim is, and know what factors may adjust a claim to the lower amount they would typically assign to the claim, based on available defenses and facts.

2. **Statutes of limitations and statutes of repose:** Obviously, these mitigating factors can have a profound effect on liability exposure and claim valuation. Just as with defendants and insurers in the litigation context, the Settlement Trustee can adjust a claim valuation downward by assigning a mitigating factor based on an often-conditional time-bar of a statute of limitation or the more absolute bar of a statute of repose. The case-by-case assessment of the ultimate viability of each claim ensures that the Trustee will apply the limitations laws of each jurisdiction to mitigate the value. Defendants and their insurers routinely include this analysis in the handling of sexual abuse claims, and they understand that when I valuate a claim for them, limitations analysis is a major component of the valuation. Numerous horrific claims in my database would normally have resulted in significant claim values but for the operation of a statute

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

of limitations or statute of repose that resulted in modest settlements or dismissal of the claim. Under these circumstances, often the modest claim value reflects a nuisance or costs of defense valuation. The $3,500 Expedited Distribution becomes particularly relevant in the context of a strong limitations defense.  Defendants and insurers regularly opt to settle sexual abuse claims for somewhat *de minimis* "nuisance" or "costs of defense" amounts because it likely represents a smaller expenditure than litigating such claims to dismissal on the statute of limitations defense. It also constitutes a leverage against the risk of a court's potential denial of a motion to dismiss or motion for summary judgment, with the potential for the making of "bad law;" especially since abuse claims are fraught with emotion and often are personally offensive to judges. It is not uncommon for courts to deny motions to dismiss founded on strong limitations defenses in the hope that the parties will settle. It is also not uncommon for victims to use the denial of the dispositive motion as a means to go forward and hope to effect a change in the law. Just as insurers in the litigation context often choose to settle such claims for a somewhat *de minimis* "nuisance" or "costs of defense" amount, the TDPs provide for a Direct Abuse Claimant to elect to receive the $3,500 Expedited Distribution. Resolution of claims with the Expedited Distribution at the conclusion of the eligibility phase, after a sworn statement corroborated by supporting documentation, efficiently puts the Debtors' insurers in a similar position as they would be in the litigation context to effect a nuisance value settlement. Further, to the extent that a claimant with a likely time-barred claim elects to have his claim valued by the Trustee, that claim would be significantly discounted under the scaling factors set forth in Schedule 1.  This mirrors how defendants and insurers routinely settle time-barred claims due to defense costs, or litigation uncertainty due to courts' increasing reluctance to dismiss claims outright on the basis of statute of repose or limitations defenses.

3.   In recent years, however, many state legislatures have expanded statutes of limitations to allow victims of childhood sexual abuse significantly more time within which to file lawsuits to recover for their sexual abuse and the damages it caused. Some state legislatures have eliminated statutes of limitations and statutes of repose for childhood sexual abuse. Many state legislatures have opened "reviver windows" of one, two or even three years during which claimants who allege they were abused as children may come forward and file lawsuits, regardless of how long ago their abuse occurred. To date, at least 21 jurisdictions have opened various types of reviver windows. With these changes to statutes of limitations, many insureds and insurers no longer enjoy the protections they once did under statutes of limitations. With the elimination of statutes of limitation and the opening of reviver windows in childhood sexual abuse claims, insurers and their insureds increasingly contend with claims for which there is little evidence of either a damning or exculpatory nature. Under these circumstances, the ability of insurers to investigate and assess the

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

credibility of sexual abuse claims and the liability and coverage issues is more important than ever. The Trustee may have to navigate a sometimes-complicated interplay of limitations defenses, much as defendants and insurers would in the litigation context, to assess the level of mitigation that may be assigned to a claim value, if any. Accordingly, it is logical that the statute of limitation and statute of repose is presented as a scaling factor, rather than an absolute bar on a claim.

4. **The "empty chair":** Insurers routinely consider – where it is available – the "empty chair" factor as a mitigating influence that they contemplate as their and their insured's contribution to a resolution amount.

- For example, in a recent Ohio claim involving an insured owner of an orphanage, a very young prepubescent female resident was raped by an older male resident of the orphanage. The insured's negligence was well-established due to the negligence of its employees, who did not follow supervisory policies and procedures. However, a county social services agency clearly had liability exposure because they repeatedly placed the girl in foster homes, group homes and orphanages (including the insured) in which she was repeatedly physically and sexually abused. In addition, after the sexual assault in the insured orphanage, the girl was placed in another orphanage where she was raped twice by older male residents. The social services agency enjoyed sovereign immunity protections (with an exception only for undefined "egregious misconduct"). The second orphanage clearly had liability exposure. Nevertheless, the girl, through her guardian *ad litem*, only sued the insured orphanage. The insurer and defense counsel contemplated whether they could bring in the social services agency and the second orphanage. Instead, I valued the claim with a "best claim value" accompanied by a range of values. The lower end of the range reflected the best settlement value in the event that the plaintiff would contend with "empty chairs" at trial. The high end of the range reflected the acceptable value in the event that the court would dismiss the social services agency and limit the admissibility of certain evidence at the motion *in limine* stage. At mediation, the insurer successfully pushed for settlement at the low end of my range, leveraging the specter of the "empty chairs" at trial. Plaintiff's counsel did not want to expand the scope of the litigation and complicate the lawsuit by adding the other stakeholders as parties. The empty chair factor mitigated the value and drove a favorable resolution vis-à-vis the insured and insurer that retained me. The Trustee has at his disposal the expressly articulated "empty chair" mitigating factor to account for an "empty chair" defense.

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

5. **Familial involvement:** When a perpetrator has another connection to or relationship with a victim that was the basis for his access to and abuse of the victim (responsible non-Protected Party), that is a mitigating factor that insurers consider in the valuation and handling of sexual abuse claims in the litigation context.

- In the past, I have participated in claims involving abuse against a defendant who was also a family relation to the victim. For example, in one claim, a boy was sexually abused by his revered uncle, who was a religious leader. The uncle abused the boy on a family vacation at an island resort, not on church premises or during religious rituals. My insurer clients relied on my valuation analysis and $0 claim valuation to deny coverage and refuse payment for the claim. As described in a TDP mitigating scaling factor, in this claim, the fact that the abuser was a religious leader was completely incidental to the abuse. The leader exploited his familial relationship with the boy to gain access to him and abuse him; he was able to abuse the boy because he was a trusted uncle, not because he was a trusted religious leader. The boy was not even a congregant of the church where the perpetrator was pastor. The familial relationship was akin to a "mitigating scaling factor" that had the effect of eliminating any value or payment for the claim.

### Conclusions

50. Based on my review and analysis as discussed in this report, it is my opinion that the Trust Distribution Procedures for sexual abuse claims in the BSA Bankruptcy are reasonable factors utilized in the determination of whether a claim is legally valid and credible, and in the assessment of liability and claim valuation, and mimic the considerations and determinations made in a litigation context.

51. It is also my opinion that defendants and their insurers regularly rely upon procedures and factors such as those laid out in the TDP to inform their decisions about the credibility and value of sexual abuse claims asserted against their insureds.

52. It is also my opinion that the TDP Claims Matrix, Aggravating Scaling Factors and Mitigating Scaling Factors are reasonable tools in the sexual abuse claim valuation process, as they reflect historical sexual abuse claim resolution data and metrics. The fact that these data and metrics are derived from and reflect BSA historical claim resolution values renders them particularly efficacious in the valuation calculus. Insurers rely on such targeted data-driven and supportable valuation factors and claim procedures to make informed decisions about sexual abuse claim resolution – from a liability and defense cost perspective.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

Highly Confidential – Subject to Protective Order

HIGHLY CONFIDENTIAL

Dated: December 5, 2021

_____
  Michael Burnett

Highly Confidential – Subject to Protective Order