**EXHIBIT 1**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 20-10343 (LSS)**<br><br>(Jointly Administered) |

**DECLARATION OF MICHAEL J. MERCHANT IN SUPPORT OF THE CHURCH OF**
**JESUS CHRIST OF LATTER-DAY SAINTS' ("TCJC")**
**MOTION TO EXCLUDE ANY TESTIMONY OR EVIDENCE OFFERED BY OR**
**THROUGH MS. KATHERYN R. MCNALLY WITH RESPECT TO TCJC**

I, Michael J. Merchant, hereby declare:

1.      I am the Director at the law firm Richards, Layton & Finger, P.A., and am admitted to appear in this case on behalf of my client, the Church of Jesus Christ of Latter-Day Saints, a Utah corporation sole ("TCJC").  I submit this declaration in support of TCJC's *Motion to Exclude Any Testimony or Evidence Offered by or Through Ms. Katheryn R. McNally with Respect to TCJC* ("Motion").  I verified the source of all documents contained in the Exhibits to the Motion.

2.      Exhibit A is the Expert Report of Katheryn R. McNally, dated December 5, 2021.

3.      Exhibit B is Ms. McNally's Rebuttal Report to the Expert Report of Charles E. Bates, dated January 5, 2022.

4.      Exhibit C is the transcript of Ms. McNally's deposition in the above-captioned matter, dated February 3, 2022.

---

[1]      The Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Date Filed 2/10/22
Docket No. 8787

Dated: February 10, 2022

Respectfully submitted,

*/s/ Michael J. Merchant*
**RICHARDS, LAYTON & FINGER, P.A.**
Michael J. Merchant (No. 3854)
Brett M. Haywood (No. 6166)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  merchant@rlf.com
        haywood@rlf.com

# Exhibit A

# *In re:*
# *Boy Scouts of America*
# *and*
# *Delaware BSA, LLC,*
# *Debtors*

Expert Report of Katheryn R. McNally

of

The Claro Group, LLC

December 5, 2021

**Confidential Pursuant to Protective Order**

**Confidential Pursuant to Protective Order**

# Table of Contents

I.  INTRODUCTION……………………………………………………………….………………...........1

II.  CLARO VALUATION OF BSA SEXUAL ABUSE CLAIMS……………………………………...2

   A.  T6 Database Accuracy Testing………………………………………………………………3

   B.  Valued BSA Sexual Abuse Claims…………………………………………………………4

      i.  No Allegation Claims…………………………………………………….....................5

      ii.  Additional Potential Duplicate Claims………………………………………………...6

      iii.  Missing Information Claims………………………………………………………….7

      iv.  Potentially Released Claims…………………………………………………………7

      v.  Adult BSA Sexual Abuse Claimants…………………………………………………8

   C.  Reasonableness of Claimant Population……………………………………………………11

      i.  Scale of BSA Sexual Abuse Claims…………………………………………………11

      ii.  Scope of BSA Sexual Abuse Claims………………………………………………12

   D.  Claro Valuation Methodology………………………………………………………………13

      i.  Claro Base Claim Values……………………………………………………………14

         1. Aggravating Factors…………………………………………………………18

      ii.  Claro Discount Scaling Factors……………………………………………………21

         1. Statute of Limitations ………………………………………………………22

         2. No Scouting Affiliation……………………………………………………26

         3. Other Relationships With Abuser……………………………………………27

         4. Partial Abuser Identification………………………………………………28

         5. Youth Abuser………………………………………………………………29

         6. Prior Recoveries From Non-BSA-Related Entities…………………………30

      iii.  Results……………………………………………………………………..………31

   E.  Comparison of Claro Valuation to Historical BSA Settlements……………………………32

   F.  TCJC Sexual Abuse Claims………………………………………………………………34

III.  OTHER CLAIM VALUATIONS FOR BSA SEXUAL ABUSE CLAIMS………………………34

   A.  Bates White Disclosure Statement Valuation Contradicts BSA's Own Evidence of Claim Value…………35

   B.  Trust Distribution Procedures………………………………………………………………36

      i.  TDP Matrix Values Are Less Than Historical BSA Settlements……………………………37

      ii.  Application of Discounts for Legal Defenses Is Inappropriate When Using Settlement Figures As TDP Matrix Values……………………………………………………………38

      iii.  Inconsistent Application of Discount for Youth Abuser Claims……………………………39

      iv.  Discounts for Statute of Limitations Not Supported by Historical BSA Settlement……………40

IV.  ALLOCATION OF CLARO VALUATION FOR BSA SEXUAL ABUSE CLAIMS TO INSURANCE COVERAGE ………………………………………………………………………41

   A.  Allocable BSA Sexual Abuse Claims………………………………………………………42

   B.  Apportionment of Claro Valuation…………………………………………………………43

   C.  National Council Coverage and Local Council Coverage……………………………………45

      i.  National Council Coverage…………………………………………………………45

      ii.  Local Council Coverage……………………………………………………...…....46

*(Continued on next page)*

**Confidential Pursuant to Protective Order**

**Table of Contents (cont'd.)**

D.  Allocation of Valued BSA Sexual Abuse Claims to Available Coverage …………………………………..47

E.  Discounted Allocation of Claro Valuation to Hartford……………………………………….…..…………50

V.  DATA AND DOCUMENTS CONSIDERED………………………………………….……………………..51

VI.  EMPLOYMENT AND PROFESSIONAL QUALIFICATIONS……………………………………...............51

VII. OVERALL SUMMARY OF OPINIONS…………………………………………...…………………………..52

**Confidential Pursuant to Protective Order**

## I.    INTRODUCTION

I am a Managing Director of The Claro Group, LLC ("Claro"), which has been retained by the Official Tort Claimants' Committee (the "TCC") in the chapter 11 cases of the Boy Scouts of America and BSA Delaware, LLC ("Debtors" or "BSA") to provide valuation services with respect to the sexual abuse claims filed against the Debtors as part of the bankruptcy case. These sexual abuse claims may involve BSA, one or more of its local councils, or one or more of its chartered organizations (collectively referred to, with BSA, as "BSA-Related Entities").

As part of this case, I was asked to analyze claims filed in the chapter 11 cases by over 82,000 survivors of alleged sexual abuse against BSA ("BSA Sexual Abuse Claims" or "BSA Sexual Abuse Claimants") and provide opinions on a reasonable valuation range for the BSA Sexual Abuse Claims in the aggregate. I was also asked to review the Bates White LLC ("Bates White") valuation presented in the Amended Disclosure Statement ("Bates White Disclosure Statement Valuation")[1] and the proposed Trust Distribution Procedures ("TDP") attached to the Modified Fifth Amended Chapter 11 Plan of Reorganization (the "Plan").[2] Further, I was asked to calculate each historical general liability insurer's allocable share of such BSA Sexual Abuse Claim values under certain coverage and allocation methodology assumptions provided to me by counsel.[3,4]

### Summary of Opinions

Based on the analysis and the assumptions included herein, my opinions are as follows:

Opinion 1:    The low end of a reasonable range of claim value for all BSA Sexual Abuse Claims in the aggregate is estimated to be between $24.76 billion and $30.41 billion.

---

[1] Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, Article V – The Chapter 11 Cases, Section N - Description of Abuse Claims and the Valuation of Abuse Claims filed September 30, 2021 [Docket No. 6445].

[2] Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, Exhibit A – *Trust Distribution Procedures for Abuse Claims* filed September 30, 2021 [Docket No. 6443].

[3] I was not asked to develop any opinions related to the valuation of sexual abuse claims that have been or will be filed after the Proof of Claim filing deadline (November, 16, 2020) or the allocation of those claim values to historical insurance policies.

[4] In this Report, I refer to Claro where certain information was gathered or analyses were performed by Claro personnel under my direct supervision.  This is my Report and contains my opinions, and I personally supervised all Claro personnel who worked under my direction in connection with the preparation of this Report.

Opinion 2:    The Bates White Disclosure Statement Valuation of $2.4 billion - $7.1 billion is inconsistent with settlement amounts agreed to by BSA prior to commencement of its chapter 11 cases and is not supported by disclosed methodology.

Opinion 3:    The valuation methodology proposed in the TDP is fundamentally flawed and is not a reasonable basis on which to value the BSA Sexual Abuse Claims for purposes of the Plan.

Opinion 4:    The undiscounted allocation of the Claro Valuation to Hartford is $1.70 billion - $5.00 billion and the discounted allocation of the Claro Valuation to Hartford is $1.19 billion - $3.75 billion.

The analyses and opinions contained herein are based on information available to me as of the date of this Report, unless otherwise noted. I understand that Bates White continues to receive claim updates from Omni Agent Solutions ("Omni") due to supplemented Proof of Claim forms ("POC Forms") and that Bates White's reconciliation and deduplication of the claims data is ongoing. Further, I understand that timely-filed POC Forms may be supplemented in the future and more claim details may be provided by claimants as part of any potential fund distribution procedures, and as such, the details regarding alleged injury dates, the nature of the alleged abuse, and other claim or claimant attributes may develop over time. Material updates or changes to this information may impact the analyses contained herein and/or my opinions. I reserve the right to amend or supplement this Report based on information made available to me subsequent to the date of this Report.

## II.    CLARO VALUATION OF BSA SEXUAL ABUSE CLAIMS

For purposes of arriving at an aggregate claim valuation for the BSA Sexual Abuse Claims ("Claro Valuation"), Claro implemented a five-step approach:

A.    Evaluate the degree to which the claim database provided to Claro for purposes of this Report (the "T6 Database") accurately and comprehensively reflects the information contained in the POC Forms ("T6 Database Accuracy Testing");

B.    Identify BSA Sexual Abuse Claims to be valued as part of the analysis ("Valued BSA Sexual Abuse Claims");

C.    Assess whether the scale and scope of BSA Sexual Abuse Claims are directionally reasonable given available information ("Reasonableness of Claimant Population");

2

Confidential Pursuant to Protective Order

D. Apply valuation methodology based on generally-accepted principles in litigation risk assessment and case and claim valuation ("Claro Valuation Methodology"); and

E. Compare Claro Valuation to comparable historical settlements to check for reasonableness of results, leveraging available information for observed settlements in comparable cases.

As with most claim valuations, certain valuation inputs are inherently uncertain and perfect information on each of the BSA Sexual Abuse Claims is not available. Given this landscape, developing a single point estimate for all BSA Sexual Abuse Claims in the aggregate would be inappropriate. The Claro Valuation was developed with the objective of determining an estimate for the low end of a reasonable range of claim value for all BSA Sexual Abuse Claims in the aggregate.

Further, the Claro Valuation is intended to capture only the estimated share of claim value attributable to BSA-Related Entities. The Claro Valuation Methodology was developed to remove the estimated share of claim value attributable to the perpetrator or any non-BSA-Related Entity. The Claro Valuation includes claim value attributed to all BSA-Related Entities, which is the same basis upon which Bates White prepared its Bates White Disclosure Statement Valuation.

### A.    T6 Database Accuracy Testing

Counsel to the TCC at Pachulski Stang Ziehl & Jones LLP ("TCC Counsel") provided to me a copy of a claims database, referred to as the Tranche 6 or T6 Database, that I understand was provided to TCC Counsel by Bates White.[5] The T6 Database contains 117,037 records, with 34,828 of those records identified as duplicates by Bates White in a separate file,[6] leaving 82,209 records not identified as duplicates. For purposes of my analysis, Claro disregarded the 34,828 claims identified by Bates White as duplicates and limited the analysis to only those 82,209 records not identified as duplicates.[7]

Claro understands that many fields were taken from data extracted directly from the POC Forms by Omni, certain information was "standardized" or "normalized" by Omni and Bates White, and certain fields were added by Bates White. In order to test the degree to which the T6 Database accurately and comprehensively reflects the information contained in the POC Forms and confirm its reliability for purposes of Claro's analysis, Claro performed a statistical sampling of the 82,209 BSA Sexual Abuse Claims. Claro performed a simple random sample of 383 records to test from the T6 Database in order to

---

[5] I received the T6 Database in the form of an Excel workbook titled 'BSA POC Reviewed data for mediation (Tranche 6) -- confidential -- for mediation use only xlsx' on 11/27/2021 from TCC Counsel. The T6 Database included claims data extracted from Omni as well as fields added by Bates White. The claims data is as of August 4, 2021.

[6] 'BSA POC Reviewed data for mediation_deduplicated (Tranche 6) -- confidential -- for mediation use only (1) xlsx'

[7] I understand that additional records may be identified as duplicates by Bates White or other parties after the creation of the T6 Database, and that Sexual Abuse Claimants may supplement their POC Forms after the creation of the T6 Database.

**Confidential Pursuant to Protective Order**

achieve a 95% confidence interval and 5% margin of error in the results. Full detail on Claro's sampling methodology, sampled records, and sampling results is attached hereto as <u>Appendix A</u>.

Overall, out of 54,003 tested claimant fields (383 sampled records * 141 fields tested per sampled record), Claro identified 809 inconsistencies. This represents a 1.5% inconsistency rate. The majority of observed inconsistencies fell into one of the following categories:

- Fields that failed to capture data that was provided in response to other questions in the POC Form,[8] and

- The "Age at first abuse" overstated the claimant's age at the time of abuse by one year. [9]

The number of inconsistencies observed in the T6 Database is not unusual given the scale and scope of the BSA Sexual Abuse Claims. Further, the vast majority of observed inconsistencies, if corrected, would either serve to increase claim values using the Claro Valuation Methodology or would not impact claim values using the Claro Valuation Methodology, so Claro considered the T6 Database reliable for purposes of developing a conservative valuation of the BSA Sexual Abuse Claims. Claro did not make adjustments for the observed inconsistencies in its valuation, which I consider to be a conservative approach.

### B. <u>Valued BSA Sexual Abuse Claims</u>

In order to develop a conservative (i.e. low-end) valuation estimate for the BSA Sexual Abuse Claims, Claro first developed procedures to identify whether there were any BSA Sexual Abuse Claims in the T6 Database that would not be valued as part of its analysis. Certain BSA Sexual Abuse Claims were removed for purposes of Claro's analysis because the BSA Sexual Abuse Claimant did not provide certain details with respect to their claim, because the POC Form responses indicated it was potentially a duplicate to another BSA Sexual Abuse Claim, or because the BSA Sexual Abuse Claimant may have already released their claim against the BSA. Many of these claimants would likely face significant legal hurdles in the tort system and may not be compensable under the TDP, and in an effort to develop a conservative valuation estimate, Claro has excluded them for purposes of its analysis. BSA Sexual Abuse Claimants that allege

---

[8] For example, to the extent a BSA Sexual Abuse Claimant did not provide a response to POC Form Part 4 Question E that asked "Where were you at the time you were sexually abused (city, state, territory, and/or country)?," but did provide such information in their description of the abuse or elsewhere, such information may not have been captured in the [Location 1 of Abuse?] field in the T6 Database.

[9] The "Age at first abuse" field had a 43% discrepancy rate, likely due to differences in age calculation methodology. Where a specific age is listed in the POC Form, Claro relied on the age identified. Where an age is not listed, Claro calculated the age at first abuse as the difference between the date of first abuse and the birth date, rounding down any partial years. In the majority of these discrepancies (149 of 163), Claro identified a one year discrepancy between the results of its testing and data reported in the T6 Database.

**Confidential Pursuant to Protective Order**

they were abused as an adult[10] were also removed for purposes of Claro's analysis, for reasons discussed below in Section II.B.v of this Report.

BSA Sexual Abuse Claims excluded from my valuation, subject to further review or additional information provided by the BSA Sexual Abuse Claimant, include:

i.    POC Forms that did not contain allegations of sexual abuse ("No Allegation Claims");

ii.   BSA Sexual Abuse Claims potentially requiring further review for duplicate status ("Additional Potential Duplicate Claims");

iii.  BSA Sexual Abuse Claims lacking information on location of abuse, date of abuse, or abuser ("Missing Information Claims");

iv.   BSA Sexual Abuse Claimants who may have potentially released claims against BSA ("Potentially Released BSA Sexual Abuse Claims"); and

v.    BSA Sexual Abuse Claimants who allege they experienced abuse as an adult ("Adult BSA Sexual Abuse Claimants").

BSA Sexual Abuse Claimants may supplement their claims to provide additional information in the future,[11] and such updated information may warrant inclusion as a Valued BSA Sexual Abuse Claim.

### i. No Allegation Claims

Of the 82,209 BSA Sexual Abuse Claims, 7,631 did not contain responses to questions pertaining to allegations of abuse.[12]  These claims do not meet the definition of Abuse Claims under the Plan,[13] and therefore these claims were excluded for purposes of my analysis, leaving 74,578 records for further review. I consider this to be a conservative approach, as these BSA Sexual Abuse Claimants may supplement their claims to provide additional information in the future.

---

[10] For purposes of this Report, Claro has assumed BSA Sexual Abuse Claimants become an adult on their 18th birthday.

[11] Fed. R. Bankr. Proc. 3001 & TDP, Article VII.A

[12] BSA Sexual Abuse Claimant did not check any of the checkboxes for POC Form Part 4 Question M (i), "What did the sexual abuse involve?" and did not check the checkbox for Part 4 Question M (ii) "The sexual abuse involved photographs or video."

[13] Per the Plan ""Abuse" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

Confidential Pursuant to Protective Order

## ii.  Additional Potential Duplicate Claims

I understand from TCC Counsel that, given the number of POC Forms filed in this matter that the work to identify duplicate claims is ongoing. As part of its analysis, Claro analyzed 82,209 BSA Sexual Abuse Claims to identify records that may require further review as potential duplicates, whether unintentionally submitted by a BSA Sexual Abuse Claimant, their attorney, or other party. Details of the methodology used to identify Additional Potential Duplicate Claims is attached hereto as <u>Appendix B</u>.

Of the 82,209 BSA Sexual Abuse Claims, Claro identified 2,624 as Additional Potential Duplicate Claims (3.2%). Of these, only 874 contained allegations of sexual abuse. Additional Potential Duplicate Claims were removed for purposes of Claro's analysis, based on an increased likelihood that they may be deemed duplicate claims or otherwise deemed not allowed, leaving 73,704 records for further review.

This observed rate of Additional Potential Duplicate Claims (3.2%) falls in line with publicly-reported rates of potential duplicate or fraudulent claim filings in other high-profile cases. The procedures to identify potentially fraudulent claims are substantially similar to those used to identify Additional Potential Duplicates in Claro's analysis. The Gulf Coast Claims Facility ("GCCF") was created to compensate individuals and businesses for damage caused by the Deepwater Horizon oil spill. Out of nearly 1.1 million claim filings, the GCCF identified that nearly 18,000 appeared fraudulent (1.6%).[14] Additionally, an October 2003 U.S. Department of Justice audit report related to the September 11th Victim Compensation Fund (VCF) found that 2.15% of claim filings had been identified as potentially fraudulent.[15] In the USC Student Health Center Litigation Settlement, a class action settlement stemming from allegations of sexual abuse against former USC physician Dr. George M. Tyndall, M.D ("USC Settlement"), the claim administrator identified 6.8% of claim filings as potential duplicates.[16] In the USC matter, however, this rate included claimants that only submitted a single claim form to the extent their name had already been pre-identified as a member of the class through no effort of their own and therefore did not reflect duplicate submissions. The majority of class members in the USC matter were pre-identified, meaning it is reasonable to expect that many of the observed duplicates were not the result of one claimant filing more than one claim. BSA did not pre-identify any claimants with respect to sexual abuse as part of the bankruptcy case. As such, I would not expect the percentage of Additional Potential Duplicate Claims in this case to be as high as the percentage of observed duplicates in the USC Settlement.

---

[14] See Nora Freeman Engstrom, Retaliatory RICO and the Puzzle of Fraudulent Claiming, 115 MICH. L. REV. 639 (2017).
[15] See U.S. Department of Justice Audit Report, The September 11 Victim Compensation Fund of 2001, October 2003. Subsequent US DOJ Audit Reports did not note prevalence of potentially fraudulent filings.
[16] Declaration of Jennifer M. Keough Regarding Settlement Administration Status and Tier 1, 2, and 3 Claim Award Distribution filed March 24, 2021.

**Confidential Pursuant to Protective Order**

### iii.  Missing Information Claims

In order to develop a conservative estimate for the BSA Sexual Abuse Claims, Claro removed claims that did not contain a location of abuse,[17] did not contain the date of abuse or their age at the time of abuse, [18] or did not contain a full name, partial name, or physical description of their abuser. [19] The foregoing components of the BSA Sexual Abuse Claims are information necessary to determine the validity and value of such claims. Of the BSA Sexual Abuse Claims not already removed, 26,462 are missing one or more of these elements of information and were therefore excluded from my analysis, leaving 47,242 BSA Sexual Abuse Claims. I consider this to be a conservative approach, as the BSA Sexual Abuse Claimants may supplement their claims to provide additional information in the future.

### iv.  Potentially Released Claims

BSA Sexual Abuse Claims for which BSA already received a release of liability are valued at $0 in Claro's analysis. Similarly, such claims are not eligible for payment under the proposed TDP.[20] In order to identify the BSA Sexual Abuse Claims where BSA may have already received a release of claim liability, I examined responses to two questions in the POC Form specifically related to prior payments for the sexual abuse at issue. The first question solicited whether any payment had been received[21] and the second question solicited how much the BSA Sexual Abuse Claimant received and from whom.[22]

Claro first isolated claims where the BSA Sexual Abuse Claimant responded "yes" to the first question regarding whether any prior payment had been received. These BSA Sexual Abuse Claims were further reviewed:

- BSA Sexual Abuse Claims that indicate a prior payment from BSA or readily identifiable BSA-Related Entity were removed for purposes of Claro's analysis. This includes settlement payments, payments for therapy or counseling, or any other funds transferred from BSA or a readily identifiable BSA-Related Entity;

---

[17] Per field [Location 1 of Abuse?] in the T6 Database.
[18] Per fields [Abuse Start Date], [Abuse End Date] and [Age at first abuse] in the T6 Database.
[19] Per field [Abuser name categorization] in the T6 Database.
[20] Boy Scouts of America, *Trust Distribution Procedures for Abuse Claims*, Article VII – Claims Allowance Process, Section C – Settlement Trustee Review Procedures, Paragraph 1 – Initial Evaluation Criteria.
[21] POC Form Part 6 Question C asks, "Have you received any payments related to the sexual abuse you have described in this Sexual Abuse Survivor Proof of Claim from any party, including BSA?"
[22] POC Form Part 6 Question C(i) asks, "If yes, how much and from whom?"

- BSA Sexual Abuse Claims that provided blank, vague or unclear responses as to how much they received and from whom are assumed to have received a prior abuse payment from a BSA-Related Entity and were removed for purposes of Claro's analysis; and

- BSA Sexual Abuse Claims that indicate a prior payment from an entity that is not BSA or readily identifiable as a BSA-Related Entity were not removed for purposes of Claro's analysis, but are addressed in Section II.D.ii.6 of this Report.

Claro then examined claims where the BSA Sexual Abuse Claimant responded "no" to the first question regarding whether any prior payment had been received, but gave a response to the question asking how much the BSA Sexual Abuse Claimant received and from whom. These BSA Sexual Abuse Claims were further reviewed:

- BSA Sexual Abuse Claims that indicate a prior payment was made from BSA or a readily identifiable BSA-Related Entity were removed for purposes of Claro's analysis;

- BSA Sexual Abuse Claims that indicate money was exchanged but do not specify the source were removed for purposes of Claro's analysis;

- BSA Sexual Abuse Claims that do not clearly indicate money was exchanged were not removed for purposes of Claro's analysis; and

- BSA Sexual Abuse Claims that indicate a payment was made by an entity that is not BSA or readily identifiable as a BSA-Related Entity were not removed for purposes of Claro's analysis, but are addressed in Section II.D.ii.6 of this Report.

In total, 65 claims were excluded for purposes of Claro Valuation due to the possibility that BSA may have already received a release of claim liability in connection to those claims, leaving 47,177 BSA Sexual Abuse Claims. I consider this to be a conservative approach as some of these claims may be determined to be not released after review of additional documentation (or lack thereof).

### v.  Adult BSA Sexual Abuse Claimants

On May 26, 2020, the Bankruptcy Court entered an order establishing a bar date for POC Forms ("Bar Date Order[23]). By the Bar Date Order, the Bankruptcy Court set the deadline by which Abuse Claims must be filed with the Court and also approved the notice ("Abuse Claims Bar Date Notice") that was mailed to

---

[23] Order, Pursuant to 11 U.S.C. § 502(B)(9), Bankruptcy Rules 2002 and 3003(C)(3), and Local Rules 2002-1(E), 3001-1, and 3003-1, (I) Establishing Deadlines for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, (III) Approving Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Survivors, and (IV) Approving Confidentiality Procedures for Abuse Survivors [Docket No. 695].

Confidential Pursuant to Protective Order

known survivors and the form of the proof of claim ("Sexual Abuse Survivor Proof of Claim Form") that survivors would use to file their claim with the Bankruptcy Court. The Abuse Claims Bar Date Notice and the Sexual Abuse Survivor Proof of Claim Form are annexed to the Bar Date Order as Exhibit 2 and Exhibit 7, respectively.

On pages 2 and 3 of the Abuse Claims Bar Date Notice, it provides that "[y]ou have a Sexual Abuse Claim if you experienced sexual abuse in Scouting, as described below. The sexual **abuse must have occurred on or before February 18, 2020** [emphasis in original]" and "[a]s stated above, do not file a Sexual Abuse Survivor Proof of Claim if . . . you have a claim arising from sexual abuse and you were at least eighteen (18) years of age at the time the sexual abuse began, you should consult the Notice of Deadlines Requiring Filing of Proof of Claim and file a General Proof of Claim (Official Bankruptcy Form 410)." The "Official Bankruptcy Form 410" is not Sexual Abuse Survivor Proof of Claim Form.

Similarly, on page 1 of the Sexual Abuse Survivor Proof of Claim Form, it expressly provides that "[f]or purposes of this Sexual Abuse Survivor Proof of Claim, the term Sexual Abuse Survivor refers to a person who was sexually abused before turning eighteen (18) years of age."

In light of the Bankruptcy Court's Bar Date Order and the related notice, I did not include "Adult Abuse Claims" in my valuation of claims.

Despite the limitation of Sexual Abuse Claims to survivors of childhood sexual abuse, the TDP assigns a TDP Matrix Value to "Adult Abuse Claims" of up to $8,500. Because 99.3% of the BSA Sexual Abuse Claims indicate the survivor was a minor at the time the abuse occurred, Claro's methodology was developed to estimate a conservative valuation for those claims specifically. While the overall methodology to value claims brought by Adult BSA Sexual Abuse Claimants would be the same, the inputs and assumptions would vary in certain respects.

There have been several high-profile sexual abuse matters in recent years that involved sexual abuse of adults that resolved for average claim payments above $250,000 (Harvey Weinstein survivors,[24] OSU Dr. Strauss survivors[25]) with some exceeding $1,000,000 (USC Dr. Tyndall survivors,[26] UCLA Dr.

---

[24] Harvey Weinstein survivors settled for an average of over $300,000 per claimant, with the most serious allegations resulting in payouts of $500,000 or more. Reference: "Harvey Weinstein: Court Agrees $17m Payout for Accusers," *BBC*, January 26, 2021, https://www.bbc.com/news/business-55791641. Accessed December 2, 2021.

[25] In 2020, The Ohio State University agreed to pay nearly $47 million to 185 survivors of sexual abuse, an average of $252,000 per claim. Reference: "Lawsuits Against Ohio State University Over Sex Abuse By a Team Doctor are Dismissed," *NPR*, The Associated Press, September 22, 2021, https://www.npr.org/2021/09/22/1039899108/ohio-state-sex-abuse-doctor-richard-strauss. Accessed December 2, 2021.

[26] In 2021, The University of Southern California agreed to pay $852 million to 710 survivors of sexual abuse, an average of $1.2 million per claim. . Reference: Romo, V., "USC Agrees to $852 Million Settlement to End Sex Abuse Litigation," *NPR*, March 25, 2021, https://www.npr.org/2021/03/25/981435791/usc-agrees-852-million-settlement-to-end-sex-abuse-litigation. Accessed December 2, 2021.

**Confidential Pursuant to Protective Order**

Heaps survivor[27]). Further, BSA previously resolved two claims involving abuse that occurred when the survivor was an adult, paying one survivor as much as $1.5 million in total.[28] Adult BSA Sexual Abuse Claimants have a maximum value under the proposed TDP of only $8,500, reflecting up to a 99.7% reduction as compared to TDP Matrix Values[29] for minor survivors.  No support was provided for the de minimis claim valuations for adult survivors.

While the Adult BSA Sexual Abuse Claims may warrant a discount compared to BSA Sexual Abuse Claims made by minors, I have reviewed nothing in the record or elsewhere to indicate that a discount in line with that applied by the TDP is appropriate.

Claro excluded an additional 261 Adult BSA Sexual Abuse Claimants from its valuation, leaving 46,916 BSA Sexual Abuse Claims. Table 1 below summarizes the BSA Sexual Abuse Claims excluded from the Claro Valuation.

Table 1: BSA Sexual Abuse Claims Excluded From Claro Valuation

|  | BSA Sexual Abuse Claims |
| --- | --- |
| **Total BSA Sexual Abuse Claims** | **82,209** |
| Less: No Allegation Claims | 7,631 |
| Remaining BSA Sexual Abuse Claims | 74,578 |
| Less: Additional Potential Duplicate Claims | 874 |
| Remaining BSA Sexual Abuse Claims | 73,704 |
| Less: Missing Information Claims | 26,462 |
| Remaining BSA Sexual Abuse Claims | 47,242 |
| Less: Potentially Released Claims | 65 |
| Remaining BSA Sexual Abuse Claims | 47,177 |
| Less: Adult BSA Sexual Abuse Claims | 261 |
| **Valued BSA Sexual Abuse Claims** | **46,916** |
| *Total BSA Sexual Abuse Claims Excluded From Claro Valuation* | *35,293* |

Claro valued 46,916 BSA Sexual Abuse Claims for purposes of this Report ("Valued BSA Sexual Abuse Claims"). Although 35,293 timely-filed BSA Sexual Abuse Claims are not assigned a value for

[27] In 2019, University of California Los Angeles agreed to pay $2.25 million to a woman who alleged sexual abuse from Dr. James Heaps. Reference: Chavez-Martinez, M., "UC settles for millions after allegations against former UCLA doctor James Heaps," *Daily Bruin*, July 15, 2019, https://dailybruin.com/2019/07/15/uc-settles-for-millions-after-allegations-against-former-ucla-doctor-james-heaps. Accessed December 2, 2021.
[28] See claimant numbers 142 and 107 in Historical BSA Settlement file "BSA-Plan_01635877 xlsx"
[29] Boy Scouts of America, *Trust Distribution Procedures for Abuse Claims*, Article VIII – Claims Matrix and Scaling Factors, Paragraph B - Claims Matrix.

Confidential Pursuant to Protective Order

purposes of this Report ("BSA Sexual Abuse Claims Not Valued"), these BSA Sexual Abuse Claimants may supplement their claims to provide additional information in the future, and such updated information may warrant such claims' inclusion as a Valued BSA Sexual Abuse Claim. Further, BSA has previously resolved many claims with profiles similar to those excluded for purposes of Claro's analysis here (e.g., survivors of abuse as an adult and claims missing abuser, date, or location information),[30] indicating that these claims may have value. For these reasons, I consider the 46,916 Valued BSA Sexual Abuse Claims to be a conservative number.

### C.  Reasonableness of Claimant Population

Prior to estimating claim value of the 46,916 Valued BSA Sexual Abuse Claims, Claro assessed the reasonableness of these claims with regards to both scale (e.g. number of claimants) and scope (e.g. nature of allegations) based on information including historical membership data, published studies related to the prevalence of childhood sexual abuse, known or suspected abusers and survivors identified by BSA, and historical BSA settlements.

### i.  Scale of BSA Sexual Abuse Claims

Claro developed two approaches to assess the reasonableness of the number of BSA Sexual Abuse Claims filed against BSA as part of this proceeding, which are described in more detail in Appendix C attached hereto. Given the impossibility of determining the exact number of living survivors of sexual abuse that occurred at a scouting activity or that resulted from involvement in scouting activities ("BSA Sexual Abuse"), Claro employed two methodologies: a top-down approach ("Top-Down Survivor Estimate Approach") and a bottom-up approach ("Bottom-Up Survivor Estimate Approach").

- Top-Down Survivor Estimate Approach: This approach quantifies the universe of potential living survivors of BSA Sexual Abuse by starting with the total number of living participants in BSA's youth programs (an estimated 96.2 million) and isolating the subset that may have been subject to BSA Sexual Abuse.  According to the Center for Disease Control, it is estimated that 1 out of the every 13 males (7.7%) experience childhood sexual abuse,[31] [32] meaning that

---

[30] BSA provided data showing resolved claims with two survivors of abuse as an adult, one claim missing an abuse location and three claims missing all information on abuse. 'BSA-Plan_01635877 xlsx'.

[31] "Preventing Child Sexual Abuse," *Centers for Disease Control and Prevention*, 2021, https://www.cdc.gov/violenceprevention/-pdf/can/CSA-Factsheet_508.pdf. Accessed December 2, 2021.

[32] Sexual Abuse Claims are not limited to male survivors, but male survivors represent the vast majority (94.55%). This figure assumes the denominator is the 82,209 non-duplicate claims considered for valuation, including the 10 claimants who checked the box for both male and female.

**Confidential Pursuant to Protective Order**

there are an estimated 7.4 million living participants in BSA's youth programs that experienced childhood sexual abuse. While an estimated 41%[33] of abuse occurs at the hands of either family members or strangers, this leaves 59% of abuse that occurs at the hands of non-family members known to the survivor, such as through relationships established among scouting. This translates to 4.4 million living participants in BSA's youth programs. While this estimate is not intended to capture only abuse associated with the BSA, the total number of BSA Sexual Abuse Claims represents only 1.88% of this total, rendering the number of BSA Sexual Abuse Claims statistically reasonable under the Top-Down Survivor Estimate Approach.

- Bottom-Up Survivor Estimate Approach: This approach quantifies the universe of potential living survivors of BSA Sexual Abuse by starting with the total number of historical adult BSA volunteers and then estimating the number of BSA participants that may have been abused by the subset of adult BSA volunteers that were also sexual abusers. In this approach, I estimate there are roughly 179,000 living survivors of BSA Sexual Abuse. I consider this to be a conservative estimate for the reasons discussed in Appendix C. The total number of BSA Sexual Abuse Claims represents only 45.9% of this estimate. The number of BSA Sexual Abuse Claims is statistically reasonable under the Bottom-Up Survivor Estimate Approach.

Based on these analyses, it is my opinion that the number of BSA Sexual Abuse Claims is statistically reasonable.

### ii. Scope of BSA Sexual Abuse Claims

Given the number of historical sexual abuse settlements entered into by BSA, there is a baseline of information which can inform expectations as to the scope of BSA Sexual Abuse Claims that BSA could expect to receive as part of the claim filing process in this case. BSA has provided a spreadsheet listing 517 historical settlements with sexual abuse survivors going back to 2010 ("Historical BSA Settlements").[34] The spreadsheet includes a number of details for each settlement such as the age of survivor, years of abuse, year of settlement, amount of settlement, nature of abuse, as well as other details related to the survivor, abuser, and location of abuse.

---

[33] "Children and Teens: Statistics," Rape, Abuse & Incest National Network (RAINN), 2021, https://www.rainn.org/statistics/-children-and-teens. Accessed December 2, 2021.
[34] This figure excludes 56 settlements listed with a $0 settlement amount. See file 'BSA-Plan_01635877 xlsx'.

**Confidential Pursuant to Protective Order**

Table 2 below compares the distribution of the nature of abuse, where known, among the Historical BSA Settlements versus that of the Valued BSA Sexual Abuse Claims.[35]

Table 2: Nature of Abuse: Historical BSA Settlements vs. Valued Sexual Abuse Claims

| | Nature of Abuse, Where Known | | | |
| | Historical BSA Settlements | | Valued BSA Sexual Abuse Claims | |
| | Number | Share | Number | Share |
|---|---|---|---|---|
| Penetration | 64 | 28.8% | 14,936 | 31.8% |
| Oral Sex | 64 | 28.8% | 12,225 | 26.1% |
| Masturbation | 46 | 20.7% | 8,216 | 17.5% |
| Groping | 30 | 13.5% | 9,652 | 20.6% |
| Touching - Unclothed | 10 | 4.5% | 990 | 2.1% |
| Touching - Clothed | 8 | 3.6% | 679 | 1.4% |
| No Touching - Photography | - | 0.0% | 218 | 0.5% |
| No Touching - Other | - | 0.0% | - | 0.0% |
| **Total** | **222** | **100%** | **46,916** | **100%** |

The percentage of claims specific to each nature of abuse is similar and the distribution of the nature of abuse among Valued BSA Sexual Abuse Claims is consistent with the distribution observed among the Historical BSA Settlements.

### D.  Claro Valuation Methodology

Applying well-established litigation risk assessment techniques,[36,37] Claro has assisted clients in the valuation of thousands of individual sexual abuse claims in recent years and in the valuation of tens of thousands of mass tort claims of various types. Claro utilizes these litigation risk assessment techniques for purposes of valuing the Valued BSA Sexual Abuse Claims at issue in this case, which consists of two steps:

1.  Estimating the total damages for which BSA-Related Entities may be held liable in the tort system, if litigated and the plaintiff were to prevail, leveraging available information for observed verdicts, awards, or judgments in comparable cases ("Claro Base Claim Values"); and

---

[35] Of the 517 total Historical BSA Settlements, 295 Historical BSA Settlements are listed with no known nature of abuse.
[36] Friedman, A., "An Analysis of Settlement," *Stanford Law Review* 22, no. 1 (1969).
[37] Victor, M.. "Decision Tree Analysis: A Means of Reducing Litigation Uncertainty and Facilitating Good Settlements*," Georgia State University Law Review* 31, no.4 (2015).

**Confidential Pursuant to Protective Order**

2.  Identifying legal hurdles to establishing liability in the tort system and utilizing available data, experts, and/or counsel expertise to develop discount factors for such legal hurdles ("Claro Discount Scaling Factors").

Claro's procedure and methodology for each of these steps is detailed in Section II.D.i (Claro Base Claim Values) and Section II.D.ii (Claro Discount Scaling Factors) of this Report.

### i.  Claro Base Claim Values

Damages estimates for purposes of claim valuation properly reflect the total amount for which the defendant(s) may be held liable, before any claim or settlement discounts (similar to an estimated verdict, award, or judgment). Negotiated settlement values already reflect discounts for relevant claim defenses (i.e. legal hurdles to establishing liability in the tort system),[38] and therefore it would be improper to use settlement values and then further discount those values by the same claim defenses already factored into the settlement amount.

For example, BSA has provided detail on prior settlements for sexual abuse claims entered into between 2010 and 2020. These settlements include many claims that were outside of the statute of limitations at the time of settlement and therefore the negotiated settlement would already factor the statute of limitations discount into the settlement value. It would be improper to use such settlement amounts as the basis from which to apply further discounts related to statute of limitations.

As such, the first step of Claro's methodology is to estimate total damages for which BSA-Related Entities may be held liable in the tort system, if litigated and the plaintiff were to prevail. In an effort to establish objective, data-driven Claro Base Claim Values, Claro performed research to create an initial list of verdicts, awards, or judgments in potentially comparable matters.[39] Using the platform VerdictSearch,[40] Claro compiled a list of cases involving allegations of sexual abuse.[41] For a full list of search results see

---

[38] Aaron, M. C., "Finding Settlement with Numbers, Maps, and Trees," The Handbook of Dispute Resolution. Chapter 13. (2004).

[39] Heavin, H. and Keet, M., "A Spectrum of Tools to Support Litigation Risk Assessment: Promise and Limitations," *Canadian Journal of Law and Technology* 15, no.2 (2017).

[40] Per VerdictSearch.com, "VerdictSearch is the only verdict reporter that solicits feedback from the winning and losing attorneys. VerdictSearch.com uses consistent data-collection criteria across all jurisdictions, so when you compare cases, you will get comprehensive and unbiased analysis." Verdict Search is provided by ALM, a business-to-business information and intelligence media company that provides legal data to customers and is under the Law.com umbrella. Law.com is a media platform powering over 18 online U.S. national and regional award-winning legal publications that deliver news, rankings, reports, and strategy.

[41] Claro performed broad searches using the following search terms: 'sexual abuse,' 'molestation,' 'diocese,' 'archdiocese,' and 'Boy Scouts.'

**Confidential Pursuant to Protective Order**

Exhibit 1. From this list, cases were considered for potential inclusion in Claro's analysis if they met the following criteria:

- Case resulted in a verdict, award, or judgment (i.e., not a settlement);
- Case included a verdict, award, or judgment against an institutional defendant (i.e., not only individuals); and
- Case involved allegations of sexual abuse.

The resulting list of verdicts in potentially comparable cases ("Potential Verdict Comp Cases") is attached hereto as Exhibit 2. Based on information from TCC Counsel and the expert opinion of Dr. Jon Conte, Claro utilized in its analysis the verdicts that involved allegations, survivor profiles, and legal issues sufficiently similar to the BSA Sexual Abuse Claims to be considered a comparable case for valuation purposes ("Verdict Comp Cases"). Such designation for each case can also be found in Exhibit 2.[42] Potential Verdict Comp Cases excluded from the Verdict Comp Case list fall into one or more of the following categories:

- Foster care abuse and claims against children's welfare agencies;
- Cases alleging a failure of a medical professional to identify or report sexual abuse of a survivor outside of such medical setting;
- Claims involving a survivor described as "mentally retarded," "mentally disabled," "special needs," or a "mental patient" in the VerdictSearch case description; or
- Claims involving a survivor that alleged sexual abuse exclusively as an adult.

For Verdict Comp Cases, Claro determined the share of compensatory damages awarded to the survivor (excluding punitive damages, pre-judgment interest, and post-judgment interest) that was apportioned to institutional defendants[43] in order to develop a list of values from Verdict Comp Cases to analyze for purposes of developing Claro Base Claim Values ("Verdict Comp Values").[44] The list of Verdict Comp Case information contained 65 total verdicts where institutional shares of compensatory damages could be identified.

---

[42] Case numbers 23 and 46 on Exhibit 2 of Dr. Conte's report were subsequently identified as not including a verdict, award, or judgment against an institutional defendant and were therefore excluded for purposes of Claro's analysis. Case numbers 59 and 61 on Exhibit 2 of Dr. Conte's report were reviewed by Claro, but were not found in the results of Claro's VerdictSearch research methodology and therefore were excluded for purposes of Claro's analysis.

[43] Including corporate entities, educational institutions or school districts, not-for-profits, religious organizations, hospitals or other medical providers, local government entities, or other organizational entities.

[44] I could not determine the institutional share of compensatory damages for 14 out of the 79 total Verdict Comp Cases, and therefore these 14 cases are excluded from Verdict Comp Values.

**Confidential Pursuant to Protective Order**

To the extent the share of compensatory damages apportioned to institutional defendants was not ascertainable from the information provided in the VerdictSearch results, other documents sent by TCC Counsel as well as data available on Jury Verdict Alert[45] were used to fill gaps in information.[46] Documents sent by TCC Counsel included court documents and case summaries found through their own research and are listed in the Data and Documents Considered attached hereto as Exhibit 3.

While it is possible that in the tort system BSA-Related Entities could have been found liable for punitive damages, pre-judgment interest, or post-judgment interest, for any number of the BSA Sexual Abuse Claims, for purposes of this analysis, Claro has excluded these amounts from the Verdict Comp Values analyzed to develop Claro Base Claim Values. I consider this to be a conservative approach.

Further, in an effort to value only BSA-Related Entities' share of potential liability for the Valued BSA Sexual Abuse Claims, Claro did not include the full amount of compensatory damages in the Verdict Comp Cases, but rather only the share apportioned to the institutional defendants.  For purposes of this analysis Claro has excluded amounts apportioned to the abuser from the Verdict Comp Values analyzed to develop the Claro Base Claim Values. Chart 1 below is a scatterplot showing inflation-adjusted Verdict Comp Values over time.

Chart 1: Inflation-Adjusted Average Verdict Comp Values Per Plaintiff



---

[45] Jury Verdict Alert, "California Jury Verdicts," online, https://www.juryverdictalert.com//.
[46] In the four cases where Jury Verdict Alert was relied upon, VerdictSearch provided the same total verdict amount and verdict apportionment. Jury Verdict Alert was only used to identify compensatory and punitive damages amounts. Jury Verdict Alert and VerdictSearch had the same results for total verdict and verdict apportionment.

**Confidential Pursuant to Protective Order**

As shown in Chart 1 above, even after adjusting for inflation,[47,48] there is a notable upward trend in the Verdict Comp Values.[49] For purposes of valuing claims in 2021, it would be inappropriate to disregard the observed trend in the amount of compensatory damages awarded against institutional defendants. Therefore, in order to account for this trend and given that the available Historical BSA Settlements cover the period 2010-2020, Claro has only included Verdict Comp Values during or after 2010 for purposes of developing Claro Base Claim Values.  There are 32 Verdict Comp Values during or after 2010, 29 of which involve the sexual abuse of a minor by an adult. Verdict Comp Values are summarized in Exhibit 4.

The average inflation-adjusted Verdict Comp Value during or after 2010 for abuse committed by an adult perpetrator is $4,323,051.[50] Given that Claro was not able to reliably ascertain the nature of the alleged abuse for each of the Verdict Comp Values, Claro has assumed for purposes of this analysis that all claims involved penetration. I consider this to be a conservative approach.[51]  In order to leverage this data point to develop Claro Base Claim Values for other allegation categories, Claro utilized the relative values used in the TDP.[52] For example, the TDP has a TDP Base Matrix Value for Penetration of $600,000 and a TDP Base Matrix Value for Oral Sex of $450,000,[53] representing a 25% discount, so Claro applied a 25% discount to the Claro Base Claim Value for Penetration to arrive at the Claro Base Claim Value for Oral Sex.

---

[47] Claro used the following source to calculate inflation-adjusted amounts from the date of verdict, award, or judgement: "Consumer Price Index (CPI) for All Urban Consumers, (1982-84=100), Not Seasonally Adjusted," *U.S. Bureau of Labor Statistics*, 2021, https://www.bls.gov/regions/new-england/data/consumerpriceindex_us_table.htm. Accessed December 2, 2021.

[48] Friedman, A., "An Analysis of Settlement," *Stanford Law Review* 22, no. 1 (1969).

[49] Regression analysis performed by Claro confirmed an upward trend in the Verdict Comp Values. Regression analysis is a set of statistical processes for estimating the relationships between a dependent variable (e.g., Verdict Comp Value) and one or more independent variables (e.g., time).

[50] The impact of a minor abuser on claim value is addressed in Section II.D.ii.5 of this Report.

[51] The nature of abuse is not known for every Verdict Comp Case and some or many may only involve non-Penetration (e.g., lower value) allegations. To the extent Claro includes Verdict Comp Values with non-Penetration allegations (e.g., lower value cases) to inform the Claro Base Claim Value for Penetration Claims, I consider this to be a conservative assumption.

[52] Comprehensive list of TDP Base Matrix Values and Claro calculated Discount % are as follows: Penetration $600,000, Oral Sex $450,000 (25%), Masturbation $300,000 (50%), Touching-Unclothed $150,000 (75%), Touching-Clothed or Exploitation for Child Pornography $75,000 (87.5%), No Touching $3,500 (99.42%).

[53] Boy Scouts of America, *Trust Distribution Procedures for Abuse Claims*, Article VIII – Claims Matrix and Scaling Factors, Paragraph B - Claims Matrix.

**Confidential Pursuant to Protective Order**

Utilizing this methodology, Claro calculated the Claro Base Claim Values summarized in Table 3 below. For reasons discussed in Section II.D.i.1 of this Report, I will refer to these as the "Claro High Base Claim Values."

Table 3: Claro High Base Claim Values

| Tier | Nature of Abuse | Claro High Base Claim Value |
|:---:|:---|---:|
| 1 | Penetration | $4,323,051 |
| 2 | Oral Sex | $3,242,289 |
| 3 | Masturbation / Groping | $2,161,526 |
| 4 | Touching-Unclothed | $1,080,763 |
| 5 | Touching-Clothed / Photography | $540,381 |
| 6 | No Touching | $25,218 |

### 1.  **Aggravating Factors**

The Claro High Base Claim Values in Table 3 above summarize an estimate of total damages for which BSA-Related Entities may be held liable in the tort system, if litigated and the plaintiff were to prevail, based only on the nature of abuse (e.g., penetration, oral sex, etc.). In my experience, the severity of the abuse is appropriately evaluated not only based on the nature of the abuse as summarized above but also by other attributes such as the frequency of the abuse, the number of abusers, and the impact of such abuse on the survivor. These are often referred to as "aggravating factors" – attributes of the claim being made that may drive up claim value, all else equal.

This is corroborated by the TDP. The following factors, referred to as the TDP "Aggravating Scaling Factors," are explicitly addressed in the TDP[54]:

- Nature of Abuse and Circumstances (Scaling Factor up to 1.5), including:
    - Extended duration and/or frequency of the Abuse;
    - Exploitation of the Abuse Claimant for child pornography;
    - Coercion or threat or use of force or violence, stalking; and
    - Multiple perpetrators involved in sexual misconduct.

---

[54] Boy Scouts of America, *Trust Distribution Procedures for Abuse Claims*, Article VIII – Claims Matrix and Scaling Factors, Paragraph D - Aggravating Scaling Factors.

**Confidential Pursuant to Protective Order**

- Abuser Profile (Scaling Factor up to 2.0)
    - Number of accusers; and
    - Evidence of negligence of a Protected Party (e.g. the inclusion of the perpetrator in the IV files for abuse reasons)
- Impact of the Abuse (Scaling Factor up to 1.5), including:
    - Mental Health Issues
    - Physical Health Issues
    - Interpersonal Relationships
    - Vocational Capacity
    - Academic Capacity
    - Legal Difficulties

In total, the TDP provides for a total scaling factor up to 4.5 if the maximum scaling factor is applied for each category listed above ("Maximum TDP Aggravating Scaling Factor"). Application of the Maximum TDP Aggravating Scaling Factor is the mechanism by which the TDP's Maximum Matrix Value[55] is achieved. For example, the TDP's Base Matrix Value for Penetration is $600,000. Applying the Maximum TDP Aggravating Scaling Factor of 4.5 results in the TDP's Maximum Matrix Value for Penetration of $2.7 million ($600,000 * 4.5 = $2.7 million). This calculation holds true for the remaining TDP Tiers as well.

Many of the Verdict Comp Cases include or may include one or more attributes that would be captured under the TDP's Aggravating Scaling Factors, and therefore it would be inappropriate to apply an additional upward scaling factor of 4.5 to Claro Base Claim Values derived from Verdict Comp Values in order to capture the impact of such attributes on claim valuation. This would effectively result in double-counting some or all of the impact of such Aggravating Scaling Factors. As such, Claro has taken the opposite approach, which is to develop a Claro Low Base Claim Value that reduces the Claro High Base Claim Value by a factor of 4.5, consistent with the TDP, in an effort to develop an estimated Base Claim Value for BSA Sexual Abuse Claims that have no Aggravating Scaling Factors. Because it is unlikely all of the Verdict Comp Cases would warrant the maximum TDP Aggravating Scaling Factor, I consider this to be a conservative approach.

---

[55] Boy Scouts of America, *Trust Distribution Procedures for Abuse Claims*, Article VIII – Claims Matrix and Scaling Factors, Paragraph B - Claims Matrix.

**Confidential Pursuant to Protective Order**

A summary of the Claro Low Base Claim Values and Claro High Base Claim Values is shown below in Table 4.

Table 4: Claro Low Base Claim Values and Claro High Base Claim Values

| Tier | Nature of Abuse | Claro Low Base Claim Value | Claro High Base Claim Value |
|------|-----------------|---------------------------:|----------------------------:|
| 1 | Penetration | $960,678 | $4,323,051 |
| 2 | Oral Sex | $720,509 | $3,242,289 |
| 3 | Masturbation / Groping | $480,339 | $2,161,526 |
| 4 | Touching-Unclothed | $240,170 | $1,080,763 |
| 5 | Touching-Clothed / Photography | $120,085 | $540,381 |
| 6 | No Touching | $5,604 | $25,218 |

Some BSA Sexual Abuse Claims warrant no Aggravating Scaling Factors and some BSA Sexual Abuse Claims warrant all Aggravating Scaling Factors, but many fall somewhere in between. The Claro Valuation of BSA Sexual Abuse Claims is intended to provide an estimate for the low end of a reasonable range of claim value for all BSA Sexual Abuse Claims in the aggregate, and not a precise valuation for each BSA Sexual Abuse Claim individually. Because the Claro Low Base Claim Value undervalues claims relative to aggravating factors in the aggregate, and the Claro High Base Claim Value overvalues claims relative to aggravating factors in the aggregate, a midpoint estimate ("Claro Mid Base Claim Value") is appropriate. Table 5 below includes the Claro Mid Base Claim Value, which is the midpoint between the Claro Low Base Claim Value and the Claro High Base Claim Value.

Table 5: Claro Mid Base Claim Values

| Tier | Nature of Abuse | Claro Mid Base Claim Value |
|------|-----------------|---------------------------:|
| 1 | Penetration | $2,641,865 |
| 2 | Oral Sex | $1,981,399 |
| 3 | Masturbation / Groping | $1,320,932 |
| 4 | Touching-Unclothed | $660,466 |
| 5 | Touching-Clothed / Photography | $330,233 |
| 6 | No Touching | $15,411 |

**Confidential Pursuant to Protective Order**

By use of a midpoint estimate, the Claro Mid Base Claim Values account for a more reasonable presence of Aggravating Scaling Factors among the Valued BSA Sexual Abuse Claims. As such, these Claro Mid Base Claim Values were used to estimate claim values for BSA Sexual Abuse Claims in the aggregate.

Using the Claro Mid Base Claim Values, the total estimated damages for the 46,916 Valued BSA Sexual Abuse Claims, prior to application of Claro Discount Scaling Factors, is $88.23 billion, [56] as summarized in Table 6 below.

Table 6: Total Estimated Damages of Valued BSA Sexual Abuse Claims

| Tier | Nature of Abuse | Claro Mid Base Claim Value | Number of Valued BSA Sexual Abuse Claims | Total Estimated Damages |
|---|---|---|---|---|
| 1 | Penetration | $2,641,865 | 14,936 | $39,458,891,957 |
| 2 | Oral Sex | $1,981,399 | 12,225 | $24,222,597,458 |
| 3 | Masturbation / Groping | $1,320,932 | 17,868 | $23,602,419,707 |
| 4 | Touching-Unclothed | $660,466 | 990 | $653,861,526 |
| 5 | Touching-Clothed / Photography | $330,233 | 897 | $296,219,085 |
| 6 | No Touching | $15,411 | - | $0 |
| | **Total** | **$1,880,680** | **46,916** | **$88,233,989,733** |

### ii.  Claro Discount Scaling Factors

The generally-accepted approach to claim valuation, and as corroborated by the TDP (although inappropriately applied in the TDP, as discussed in Section III.B of this Report), damages are reduced to reflect potential claim weaknesses and/or legal defenses.[57] These discount factors vary from case to case and from claimant to claimant. For purposes of valuing the Valued BSA Sexual Abuse Claims, Claro applied Claro Discount Scaling Factors in each of the following areas:

1. Statute of Limitations

2. No Scouting Affiliation

---

[56] Before application of caps on tort liability in certain jurisdictions. I understand from TCC Counsel that certain tort laws exist in Massachusetts and in Ohio that may limit claim recoveries in the tort system to $20,000 and $250,000, respectively, and therefore I have used the minimum of these amounts or the Claro Base Claim Values for claims in those states. Further, I understand from TCC Counsel that BSA has immunity from claims arising out of abuse in Massachusetts prior to 1971, and therefore Claro has valued such claims at $0 for purposes of its analysis.

[57] Victor, M.. "Decision Tree Analysis: A Means of Reducing Litigation Uncertainty and Facilitating Good Settlements," *Georgia State University Law Review* 31, no.4 (2015).

**Confidential Pursuant to Protective Order**

3. Other Relationship With Abuser

4. Partial Abuser Identification

5. Youth Abuser

6. Prior Recoveries from Non-BSA-Related Entities

Claro Discount Scaling Factors are applied to the relevant subset of Valued BSA Sexual Abuse Claims as identified, in part, through fields found in the T6 Database. The Claro Discount Scaling Factor for No Scouting Affiliation and the adjustment for Prior Recoveries from Non-BSA-Related Entities could not be applied without also referring to an extract of POC Form responses from Omni ("Omni Export"), which contains the most comprehensive set of responses to questions on the POC Form, as the T6 Database did not contain all of the fields from the POC Form that were relevant. Relying only on fields found in the T6 Database would have resulted in over-application of Claro Discount Scaling Factors and an artificially low claim valuation, and therefore Claro considered the responses found in the Omni Export. Please see Section II.D.ii.2 of this Report for further discussion on this topic.

## 1. <u>Statute of Limitations</u>

The statute of limitations for damages for personal injury based on childhood sexual abuse varies by jurisdiction. In my experience, to the extent a sexual abuse claim falls outside of the relevant statute of limitations to bring a civil claim, it warrants a claim valuation discount. This reflects the increased likelihood that the defendant may prevail in its defense of the claim and an increased risk of $0 recovery to the claimant. Higher risk of $0 recovery warrants a higher claim discount, as all else equal, there is a lower expected value (damages * likelihood of recovery) of the claim. [58]

Certain claims fall within the relevant statute of limitations simply due to the date of abuse and the age of the survivor at the time of abuse, and other claims are brought in jurisdictions with no statute of limitations. Many of the latter are a result of recently-reopened statutes due to legislative reform, sometimes in the form of "revival windows" wherein a claimant may bring an otherwise time-barred claim. On the other hand, certain jurisdictions have relatively strict application of relevant statute of limitations with little to no legal avenues to circumvent it. In the TDP, these are referred to as "Open" states and "Closed" states, respectively. Any state, including "Closed" states, has the ability to become an "Open" state to the extent the state legislature passes legislation reopening the statute. As noted in the Amended Disclosure Statement, five states have implemented some version of a revival window just during the pendency of this chapter 11

---

[58] In statistics and probability analysis, the expected value is calculated by multiplying each of the possible outcomes by the likelihood each outcome will occur and then summing all of those values. Reference: Bowerman, B. and O'Connell, R. (2007). *Business Statistics in Practice* (4th ed.). McGraw-Hill/Irwin.

**Confidential Pursuant to Protective Order**

case, and more may be expected. [59] Therefore, even claims in "Closed" states have value, as there is a risk that the claim may no longer be time-barred at some point in the future.

As also addressed in the TDP, several states fall on a spectrum between these two categories, to varying degrees allowing plaintiffs to make legal arguments related to fraudulent concealment or the application of the "discovery rule" to circumvent the statute of limitations. These states are categorized in the TDP as "Gray 1," "Gray 2," and "Gray 3," reflecting the range of states in which it is relatively easier to circumvent the statute of limitations (Gray 1 states) to states in which it is relatively more difficult to circumvent the statute of limitations (Gray 3 states). The TDP contemplates varying the statute of limitations discount by state based on this categorization ("SOL Tier"). While this approach may be intuitive in concept, it is not supported by the Historical BSA Settlement data.

In an effort to provide data-driven inputs for Claro Discount Factors related to the statute of limitations, TCC Counsel reviewed each of the Historical BSA Settlements and determined whether each would have fallen within or outside the relevant statute of limitations at the time the action, if any, was commenced and the settlement was reached. Based on data provided by TCC Counsel, over 50% of the Historical BSA Settlements involved claims that were likely outside of the statute of limitations, though none of those involved claims in "Closed" SOL states. For Historical BSA Settlements that occurred when the claim was outside of the statute of limitations, settlements were categorized pursuant to the SOL Tiers assigned to each state on Schedule 1 of the TDP (e.g. Gray 1, Gray 2, Gray 3, or Closed), unless the settlement occurred prior to a revival window in a state now assigned an SOL Tier of "Open." The results of such analysis provided empirical data that enables Claro to quantify the degree to which claims outside of the statute of limitations resolve for lower amounts than claims within the statute of limitations.

---

[59] See Amended Disclosure Statement, Article V – The Chapter 11 Cases, Section N – Description of Abuse Claims and the Valuation of Abuse Claims.

**Confidential Pursuant to Protective Order**

Details of the TCC Counsel methodology for this analysis and the results thereof are attached hereto as Exhibit 5 and a summary of the Historical BSA Settlements is attached hereto as Exhibit 6. Table 7 below summarizes the average Historical BSA Settlement by SOL Tier. [60]

Table 7: Historical BSA Settlements by SOL Tier

| SOL Tier | Historical BSA Settlements | | |
|---|---|---|---|
| | Number of Settlements | Nominal Settlement Average | Proportion of Open Statute / Within SOL |
| **Open Statute / Within SOL** | **103** | **$525,223** [A] | **1.0** [A]/[A] |
| **Outside of SOL** | | | |
| Gray 1 | 92 | $304,332 [B] | 0.58 [B]/[A] |
| Gray 2 | 7 | $142,143 [C] | 0.27 [C]/[A] |
| Gray 3 | 40 | $286,125 [D] | 0.54 [D]/[A] |
| Closed | 0 | N/A [E] | N/A [E]/[A] |
| **Outside SOL subtotal** | **139** | **$290,924** [F] | **0.55** [F]/[A] |
| **Unknown SOL Status** | **162** | **$287,961** | |
| **Settled Outside SOL Prior to Revival Window** | **27** | **$1,098,741** | |
| **Excluded Historical BSA Settlements** | **86** | **$1,107,459** | |
| **Total Historical BSA Settlements** | **517** | **$514,688** | |

For purposes of my analysis of the SOL Tier of Historical BSA Settlements summarized above, I excluded two clusters of settlements that I understand from TCC Counsel have unique characteristics as they relate to SOL.[61] If these settlements were included in Claro's analysis, the Proportion of Settlement Average for Claims Within SOL would be higher for each SOL Tier, resulting in higher claim values in Claro's analysis. As such, I consider this to be a conservative approach.

Analysis of Historical BSA Settlements indicates that, on average, claims in Gray 3 states are not paid meaningfully less (i.e. not discounted more heavily) than claims in Gray 1 states. While Claro's analysis of Gray 2 settlements as compared to Open Statute / Within SOL claims was not sufficient to make an assessment as to the appropriateness of the Mitigating Scaling Factors Proposed by the TDP due to the lack of data, Claro's analysis of Gray 1 and Gray 3 settlements suggests the TDP's entire methodology of varying its Mitigating Scaling Factor by SOL tier is inappropriate as the average settlement amounts

---

[60] Historical BSA Settlements with a settlement amount of $0 were excluded from this analysis.

[61] I understand from TCC Counsel that a cluster of settlements in Illinois in 2018 and 2019 were resolved in the course of a litigation in which plaintiffs received a favorable ruling related to SOL, despite otherwise being outside of the statute of limitations. Further, 70 settlements in Guam in 2018-2020 that were inside the SOL were resolved for lower-than-average settlement values and reflect facts specific to the abuser and another potential institutional defendant. Including the Guam claims in the analysis of SOL Discount Factors would have resulted in these claims comprising over a third of those settled within SOL, deflating the settlement average for claims within SOL, further increasing the Proportion of Open Statute / Within SOL Settlement Average, and increasing the resulting claim valuations in Claro's analysis. I consider this a conservative approach.

**Confidential Pursuant to Protective Order**

actually paid by BSA prior to this chapter 11 case for claims in Gray 1 states versus claims in Gray 3 states is nearly the same. The Historical BSA Settlement data indicates that the SOL Discount Scaling Factors should not vary for claims in Gray 1, Gray 2, and Gray 3 states and I have relied on average discount observed among all such claims to inform the SOL Discount Scaling Factor for those SOL Tiers. Given the lack of Historical BSA Settlements in a Closed state, Claro relied upon the Mitigating Scaling Factors proposed by the TDP. The SOL Discount Scaling Factors used in Claro's analysis ("Claro SOL Discount Scaling Factors") are summarized in Table 8 below.

Table 8: Claro SOL Discount Scaling Factors

| SOL Tier | TDP Mitigating Scaling Factor | Claro SOL Discount Scaling Factor |
|---|---|---|
| **Open Statute / Within SOL** | 1.0 | 1.0 |
| **Outside of SOL** | | |
| Gray 1 | .5 - .7 | .55 |
| Gray 2 | .3 - .45 | .55 |
| Gray 3 | .1 - .25 | .55 |
| Closed | .01 - .1 | .01 - .1 |

In order to develop a range for the low end of a reasonable range of claim value for BSA Sexual Abuse Claims, Claro also calculated a scenario using the Mitigating Scaling Factors as proposed by the TDP.  For purposes of developing a range, Claro used the midpoint of the TDP SOL Mitigating Scaling Factors and the midpoint of the Claro SOL Discount Scaling Factors where a range exists. For purposes of this Report, I refer to these as the TDP SOL Discount Scaling Factors and the Claro SOL Discount Scaling Factors, respectively, as summarized in Table 9 below.

Table 9: TDP SOL Discount Scaling Factors and Claro SOL Discount Scaling Factors

| SOL Tier | TDP Mitigating Scaling Factor (midpoint) | Claro SOL Discount Scaling Factor |
|---|---|---|
| **Open Statute / Within SOL** | 1.0 | 1.0 |
| **Outside of SOL** | | |
| Gray 1 | .6 | .55 |
| Gray 2 | .375 | .55 |
| Gray 3 | .175 | .55 |
| Closed | .055 | .055 |

**Confidential Pursuant to Protective Order**

This range of  Discount Scaling Factors was applied to Valued BSA Sexual Abuse Claims to reduce claim value for Valued BSA Sexual Abuse Claims outside of the statute of limitation.

### 2.  No Scouting Affiliation

The TDP contemplates that, in order to receive payment, claimants must demonstrate that abuse occurred at a scouting activity or that the abuse resulted from involvement in scouting activities ("Scouting Affiliation Criteria").[62] I agree that it is appropriate to only place value to those claims for which BSA may be held liable, and for purposes of my analysis I will assume claims that do not meet the Scouting Affiliation Criteria ("No Scouting Affiliation Claims") are valued at $0.

Importantly, this criteria does not limit TDP eligibility only to *claimants* with a scouting affiliation, but rather to those claims that allege *abuse* affiliated with scouting activities. Because the POC Form and the responses to questions on the POC Form do not in all cases make it clear whether this criteria is met, as many of them only address whether the *claimant* has a scouting affiliation, a more detailed review was necessary to estimate the percentage of claimants without a scouting affiliation whose *abuse* was affiliated with scouting activities. There is not a question on the POC Form or in the T6 Database that indicates whether a BSA Sexual Abuse Claimant meets the Scouting Affiliation Criteria and therefore, for purposes of my analysis, I have accounted for No Scouting Affiliation Claims using the following methodology:

1. BSA Sexual Abuse Claims that indicate a scouting relationship through a checkbox on the POC Form are assumed to meet the Scouting Affiliation Criteria[63,64];

2. BSA Sexual Abuse Claims that did not indicate a scouting relationship through a checkbox on the POC Form were sampled pursuant to the steps below to determine the proportion that may meet the Scouting Affiliation Criteria;

    a. Select a random sample of BSA Sexual Abuse Claims that did not indicate a scouting relationship through a checkbox on the POC Form;

---

[62] Boy Scouts of America, *Trust Distribution Procedures for Abuse Claims*, Article VII – Claims Allowance Process, Section C – Settlement Trustee Review Procedures, Paragraph 2 – General Criteria for Evaluating Submitted Abuse Claims.

[63] If one of the following fields was checked, the Sexual Abuse Claim was treated as meeting the Scouting Affiliation Criteria in the TDP: [HadScoutingAffiliation], [WasBoyScout], [WasCubScout], [WasExploringScout], [WasSeaScout], [WasVenturingScout], [WasOtherScout], [WasAbuseTypeBoyScouts], [WasAbuseTypeCubScouts], [WasAbuseTypeExploringScouts], [WasAbuseTypeVenturingScouts], [WasAbuseTypeSeaScouts], [WasAbuseTypeOther].

[64] Not all relevant fields were found in the T6 Database and had to be located in the Omni Export.

b.  For each sampled BSA Sexual Abuse Claim, assess whether the Scouting Affiliation Criteria is met as described in other field(s) in the POC Form responses[65];

c.  Calculate the percentage of sampled records that do not meet the Scouting Affiliation Criteria ("Claro Scouting Affiliation Discount Scaling Factor"); and

d.  Apply the Claro Scouting Affiliation Discount Scaling Factor to those Valued BSA Sexual Abuse Claims that did not indicate a scouting relationship through a checkbox on the POC Form.

Of the 82,209 BSA Sexual Abuse Claims, 1,569 with allegations of sexual abuse did not indicate a scouting relationship through a checkbox on the POC Form.[66,67] Of the 46,916 Valued BSA Sexual Abuse Claims, 726 did not indicate a scouting relationship through a checkbox on the POC Form. In order to achieve a 95% confidence level and 5% margin of error, I sampled 309 of these BSA Sexual Abuse Claims to estimate the proportion that described sexual abuse that met the Scouting Affiliation Criteria. If the POC Form described abuse that occurred at a scouting activity or abuse that resulted from involvement in scouting activities, Claro considered it to meet the Scouting Affiliation Criteria.

Of the sampled records, 88% met the Scouting Affiliation Criteria and therefore Claro conservatively applied a .85 Claro Scouting Affiliation Discount Scaling Factor to the 726 Valued BSA Sexual Abuse Claims that did not indicate a scouting relationship through a checkbox on the POC Form. More details on the sampling methodology, sampled records, and sampled results can be found attached hereto as Appendix D.

### 3.  Other Relationships With Abuser

As discussed above, the Verdict Comp Cases include cases where the survivor had a relationship with the abuser separate and apart from the connection to the institutional defendant, such as a family friend, and therefore, to some extent, the Claro Base Claim Values already account for potential reduced liability for the institutional defendant(s) on account of the separate relationship.

However, many BSA Sexual Abuse Claimants indicate other relationships with the abuser that may implicate another potential institutional defendant. Further, some BSA Sexual Abuse Claimants indicate

---

[65] Claro reviewed the full POC Form for each sampled claim to determine whether the claimant described "abuse occurred at a scouting activity or that the abuse resulted from involvement in scouting activities."

[66] No allegations of sexual abuse are identified where the BSA Sexual Abuse Claimant did not check any of the checkboxes for POC Form Part 4 Question M (i), and did not check the checkbox for Part 4 Question M (ii) "The sexual abuse involved photographs or video."

[67] Of the 1,569 BSA Sexual Abuse Claims with allegations of sexual abuse that did not indicate a scouting relationship through a checkbox on the POC Form, an additional 843 were excluded from the Claro Valuation pursuant to methodology addressed in Section II.B. of this Report.

**Confidential Pursuant to Protective Order**

other relationships with the abuser that are closer in nature than those observed in the Verdict Comp Cases (such as a family member). BSA's share of potential liability for these BSA Sexual Abuse Claims should be further reduced from Claro Base Claim Values to account for the possibility that BSA-Related Entities may be apportioned a lower share of the liability in these instances.  The POC Form asked the claimant whether they had any relationship with the sexual abuser outside of scouting, and claimants could check one or more of the following boxes[68]:

- Religious organization leader, member, volunteer
- Family member or relative
- Coach/athletics
- Teacher
- Neighbor
- Other

Given these relationships may warrant a 0% apportionment of liability to BSA-Related Entities or still result in a 100% apportionment of liability to BSA-Related Entities, depending on the specifics of the claim, I have applied a midpoint .50 Discount Scaling Factor for each additional relationship disclosed in the POC Form responses ("Claro Other Relationship Discount Scaling Factor").

### 4.  Partial Abuser Identification

BSA Sexual Abuse Claimants that identified their abuser in the POC Form were put into one of three categories by Bates White, as reflected in the T6 Database:

1. Full Name Provided
2. Partial Name Provided
3. Physical Description Only

All Valued BSA Sexual Abuse Claims fall into one of these three categories, as BSA Sexual Abuse Claims that did not provide this level of information were excluded for purposes of Claro's analysis, as discussed in Section II.B.iii above.  In the tort system, BSA Sexual Abuse Claimants that cannot identify their abuser would almost certainly face additional legal hurdles, however, they may also have the benefit of document discovery and time in order to ascertain their abuser's identity.  Further, the TDP only requires

---

[68] POC Form Part 4 Question Q asks, "Did you have any relationship with your sexual abuser outside of Scouting? Check all that apply:"

**Confidential Pursuant to Protective Order**

sufficient information to determine that the BSA Sexual Abuse Claimant's abuse is connected to scouting and does not require a full name in order to be eligible for payment. No further discounts are contemplated in the TDP for partial abuser identification to the extent such a connection to scouting is established.

It is uncertain what percentage of the BSA Sexual Abuse Claimants would be able to ascertain their abuser's identity if their claim were in the tort system, or what percentage may meet the TDP's criteria related to abuser identification; however, the more information a BSA Sexual Abuse Claimant has about their abuser (for example, a partial name as opposed to only a physical description), the more likely they would be able to establish their abuser's identity and the more likely the TDP administrator may be able to connect the abuse to scouting, all else equal. For purposes of this analysis, Claro assumes that more than half, but not all, BSA Sexual Abuse Claimants that know at least part of their abuser's name would meet these thresholds, and that less than half, but more than zero, BSA Sexual Abuse Claimants that were only able to provide a physical description would meet these thresholds.

Claro applied a midpoint .75 Discount Scaling Factor to Valued BSA Sexual Abuse Claims that only provided a partial name of their abuser, and applied a midpoint .25 Discount Scaling Factor to Valued BSA Sexual Abuse Claims that only provided a physical description of their abuser.

### 5. <u>Youth Abuser</u>

In order to determine whether a Discount Scaling Factor would be appropriate for BSA Sexual Abuse Claims that involve a youth abuser, Claro analyzed Verdict Comp Values and Historical BSA Settlements.

Among the Verdict Comp Values during or after 2010, those that allege abuse by a minor abuser as compared to an adult abuser were 47% lower, on average, as summarized in Table 10 below.

Table 10: Average Verdict Comp Values by Abuser Profile

| Abuser Profile | Number of Cases | Verdict Comp Values 2010 and Later *(Inflation-Adjusted)* | |
| --- | --- | --- | --- |
| | | Average | Proportion of Average for Adult Abuser |
| Adult Abuser | 29 | $4,323,051 | |
| Minor Abuser | 3 | $2,305,284 | 0.53 |
| **Total** | **32** | **$4,133,886** | |

Among the Historical BSA Settlements, those that allege abuse by a minor abuser as compared to an adult abuser were only 10% lower, on average, as summarized in Table 11 below.

Table 11: Average Historical BSA Settlement by Abuser Profile

| Abuser Profile | Historical BSA Settlements (Inflation-Adjusted) | | |
| --- | --- | --- | --- |
| | Number of Claims | Average | Proportion of Average for Adult Abuser |
| Adult Abuser | 489 | $573,030 | |
| Minor Abuser | 18 | $514,048 | 0.90 |
| Unknown | 10 | $521,544 | 0.91 |
| **Total** | **517** | **$569,980** | |

Consistent with the observed discount among the Verdict Comp Values during or after 2010, Claro has assigned a Discount Scaling Factor of .5 to BSA Sexual Abuse Claims alleging abuse by a youth abuser. I consider this to be a conservative approach.

## 6. Prior Recoveries From Non-BSA-Related Entities

As discussed above in Section II.D.ii.3 of this Report, Claro's methodology is developed to evaluate BSA-Related Entities' share of potential liability for the BSA Sexual Abuse Claims.

While Claro has already taken into account potential liability of non-BSA-Related Entities for the BSA Sexual Abuse Claims in Claro's valuation methodology, in an effort to develop conservative claim valuations, Claro also analyzed the extent to which claimants received prior payments from non BSA-Related Entities. These include payments from religious organizations, schools, youth organizations, perpetrators, and other sources.

Following the methodology described in Section II.B.iv above, to the extent a BSA Sexual Abuse Claimant clearly indicates a prior payment from an entity that is not BSA or readily identifiable as a BSA-Related Entity, Claro subtracted the payment amount (where available[69]) from its final claim value. In total, 79 prior abuse payments from non-BSA-Related Entities totaling $16.04 million were subtracted from the claim valuations to arrive at the Claro Valuation.

---

[69] If the claimant provided an estimated range, the upper end of the range provided was used. If no amount was provided, no correlating adjustment was made to the final claim value.

**Confidential Pursuant to Protective Order**

### iii. **Results**

Using the two-step Claro Valuation Methodology as detailed in Sections II.D.i and ii, Claro calculated a claim value for each of the 46,916 Valued BSA Sexual Abuse Claims. The Claro Valuation for each Valued BSA Sexual Abuse Claimant is attached hereto as Exhibit 7. The resulting Claro Valuation is based on Claro Mid Base Claim Values and provides an estimate for both TDP Low SOL Discount Scaling Factors ("Claro Valuation Scenario A") and Claro High SOL Discount Scaling Factors ("Claro Valuation Scenario B"). The results are summarized in Table 12, shown below.

Table 12: Claro Valuation Results

| | Estimated Damages | Discounts | | Claro Claim Valuation |
| --- | --- | --- | --- | --- |
| | | Amount | Percentage | |
| **Claro Valuation Scenario A** | **$88.23** | **($63.48)** | **-71.94%** | **$24.76** |
| **Claro Valuation Scenario B** | **$88.23** | **($57.82)** | **-65.53%** | **$30.41** |

*\* Amounts in table above expressed in billions*

For each scenario, the average Claro Valuation among all BSA Sexual Abuse Claims and among the Valued BSA Sexual Abuse Claims is summarized in Table 13 below.

Table 13: Average Claro Valuation per BSA Sexual Abuse Claim

| | Claro Valuation (in billions) | Average Claro Valuation | |
| --- | --- | --- | --- |
| | | 46,916 Valued BSA Sexual Abuse Claims | All 82,209 BSA Sexual Abuse Claims |
| **Claro Valuation Scenario A** | **$24.76** | **$527,684** | **$301,145** |
| **Claro Valuation Scenario B** | **$30.41** | **$648,223** | **$369,936** |

Confidential Pursuant to Protective Order

For each scenario, the average Claro Valuation among Valued BSA Sexual Abuse Claims, broken down by abuse type, is summarized in Table 14 below.

Table 14: Average Claro Valuation by Abuse Type

| Tier | Nature of Abuse | Valued BSA Sexual Abuse Claims | Average | | Aggregate (in billions) | |
|------|----------------|-------------|-----------|-----------|-----------|-----------|
| | | | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B |
| 1 | Penetration | 14,936 | $735,332 | $902,767 | $10.98 | $13.48 |
| 2 | Oral Sex | 12,225 | $559,257 | $690,131 | $6.84 | $8.44 |
| 3 | Masturbation / Groping | 17,868 | $373,308 | $457,115 | $6.67 | $8.17 |
| 4 | Touching-Unclothed | 990 | $187,808 | $225,172 | $0.19 | $0.22 |
| 5 | Touching-Clothed / Photography | 897 | $90,055 | $112,397 | $0.08 | $0.10 |
| 6 | No Touching | - | N/A | N/A | N/A | N/A |
| | **Average/Total** | **46,916** | **$527,684** | **$648,223** | **$24.76** | **$30.41** |

For each scenario, the Average Claim Value for Valued BSA Sexual Abuse Claims, broken down by SOL Tier, is summarized in Table 15 below.

Table 15: Claro Valuation by SOL Tier

| SOL Tier | Valued BSA Sexual Abuse Claims | Average | | Aggregate (in billions) | |
|----------|-------------|-----------|-----------|-----------|-----------|
| | | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B |
| Open/Within SOL | 16,938 | $1,006,971 | $1,006,971 | $17.06 | $17.06 |
| Gray 1 | 6,934 | $493,856 | $452,681 | $3.42 | $3.14 |
| Gray 2 | 6,057 | $279,910 | $410,581 | $1.70 | $2.49 |
| Gray 3 | 13,689 | $175,495 | $551,656 | $2.40 | $7.55 |
| Closed | 3,298 | $54,149 | $54,149 | $0.18 | $0.18 |
| **Average/Total** | **46,916** | **$527,684** | **$648,223** | **$24.76** | **$30.41** |

As shown in the table above, over $17 billion of the Claro Valuation relates to Valued BSA Sexual Abuse Claims that are within the statute of limitation.

### E.  Comparison of Claro Valuation to Historical BSA Settlements

In order to assess the overall reasonableness of the Claro Valuation, results were compared to amounts paid by BSA for similar claims using data provided by BSA. Overall, the Claro Valuation is consistent with the Historical BSA Settlements.

Confidential Pursuant to Protective Order

The overall average Historical BSA Settlement since 2010, before adjusting for inflation, is $514,688. The inflation-adjusted average Historical BSA Settlement is $569,985, which falls within the range of the Claro Valuation for Valued BSA Sexual Abuse Claims ($527,684 - $648,223).

Valued BSA Sexual Abuse Claims include claims in a "Closed" SOL Tier, which are the most heavily discounted, however, there are no such claims in the Historical BSA Settlements. In order to make a more appropriate comparison, I excluded claims in a "Closed" SOL Tier from the Claro Valuation to arrive at a revised range, for comparison purposes only, of $563,488 - $693,142. The inflation-adjusted average Historical BSA Settlement amount falls within this range. Table 16 below summarizes the comparison of Historical BSA Settlements to the Claro Valuation.

Table 16: Claro Valuation Compared to Historical BSA Settlements

|  | All SOL Tiers | Excluding "Closed" SOL Tier |
|---|---|---|
| Average Claro Valuation (in billions) | $527,684 - $648,223 | $563,488 - $693,142 |
| Average Historical BSA Settlement (nominal) | $514,688 | $514,688 |
| Average Historical BSA Settlement (inflation-adjusted) | $569,980 | $569,980 |

Table 17 below compares the average Claro Valuation for all Valued BSA Sexual Abuse Claims to the average Historical BSA Settlement based on the nature of alleged abuse, where known, both including and excluding claims in a "Closed" SOL Tier. Details of the average Historical BSA Settlements by nature of abuse are attached hereto as Exhibit 8.

Table 17: Claro Valuation Compared to Historical BSA Settlements by Abuse Type

| Tier | Nature of Abuse | Average Historical BSA Settlement | | Valued BSA Sexual Abuse Claims | | Valued BSA Sexual Abuse Claims Excluding "Closed" SOL Tier | |
|---|---|---|---|---|---|---|---|
|  |  | Nominal | Inflation-Adjusted | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B |
| 1 | Penetration | $1,103,429 | $1,227,715 | $735,332 | $902,767 | $789,689 | $970,881 |
| 2 | Oral Sex | $1,029,198 | $1,123,326 | $559,257 | $690,131 | $593,682 | $733,535 |
| 3 | Masturbation / Groping | $547,423 | $599,907 | $373,308 | $457,115 | $398,701 | $488,861 |
| 4 | Touching-Unclothed | $158,895 | $174,272 | $187,808 | $225,172 | $197,840 | $237,401 |
| 5 | Touching-Clothed / Photography | $60,000 | $65,379 | $90,055 | $112,397 | $96,415 | $120,503 |
| 6 | No Touching | N/A | N/A | N/A | N/A | N/A | N/A |

33

**Confidential Pursuant to Protective Order**

The Claro Valuation is lower than the amounts actually paid by BSA in the tort system to resolve claims involving Penetration, Oral Sex, or Masturbation / Groping. These represent 96% of Valued BSA Sexual Abuse Claims. The Claro Valuation is slightly higher than the average Historical BSA Settlement for claims involving touching, whether clothed or unclothed, which represent 4% of Valued BSA Sexual Abuse Claims.

### F.   TCJC Sexual Abuse Claims

I understand that a subset of the BSA Sexual Abuse Claims are associated with The Church of Jesus Christ of Latter-day Saints (the "TCJC") in its capacity as a chartered organization.  Claro was provided a list of 2,402 BSA Sexual Abuse Claims associated with the TCJC ("TCJC Sexual Abuse Claims").[70]  Claro identified these 2,402 TCJC Sexual Abuse Claims among the 82,209 BSA Sexual Abuse Claims and determined that 848 were not valued for purposes of this Report. The 1,554 TCJC Sexual Abuse Claims that are Valued BSA Sexual Abuse Claims represent $691.63 million - $784.88 million of the total Claro Valuation, as summarized in Table 18 below.

Table 18: Claro Claim Valuation of TCJC Sexual Abuse Claims

|  | Claro Valuation Scenario A | Claro Valuation Scenario B |
|---|---|---|
| TCJC Sexual Abuse Claims | $691.63 | $784.88 |

*\* Amounts in table above expressed in millions*

### III.   OTHER CLAIM VALUATIONS FOR BSA SEXUAL ABUSE CLAIMS

I understand that to date, two separate valuations or valuation methodologies have been presented in this case:

1.  Bates White Disclosure Statement Valuation; and
2.  The TDP (the "TDP Valuation Methodology").

The Bates White Disclosure Statement Valuation provides valuation results in the form of a range, with commentary around attributes considered for valuation purposes, but does not provide full detail on

---

[70] "20211126_TCJC Claims.xlsx"

valuation methodology, inputs, or assumptions.  The Bates White Disclosure Statement Valuation results are inconsistent with known settlement values paid by BSA for similar claims and is not supported by a disclosed methodology.

The TDP contains detail on methodology, inputs, and assumptions, but does not provide valuation results in any form. Material inputs used in the TDP Valuation Methodology are inappropriate and the methodology is fundamentally flawed.

Each of these two valuations serves as an inappropriate measure of claim value of the BSA Sexual Abuse Claims at issue in this case.

### A.    Bates White Disclosure Statement Valuation Contradicts BSA's Own Evidence of Claim Value

As noted above, the Bates White Disclosure Statement Valuation provides valuation results in the form of a range but does not provide sufficient detail to evaluate its methodology, inputs, or assumptions. Unless and until such detail is provided, Claro's assessment of the Bates White Disclosure Statement Valuation is limited to the reasonableness of its results. Claro reserves the right to revise this assessment if additional details on methodology, inputs, or assumptions are provided.

It is unclear in the Amended Disclosure Statement the extent to which Bates White valued any claims other than 16,600 claims that it "focused its valuation on."[71]  These 16,600 claims were isolated by Bates White because they "are not presumptively barred and identify, by name, either in full or in part, an alleged abuser." This limitation was applied despite data from TCC Counsel indicating that over 50% of the Historical BSA Settlements falling outside of statute of limitations at the time the action, if any, was commenced and the settlement was reached.

Setting aside other potential flaws in its methodology, the Bates White Disclosure Statement Valuation produces results that are lower than the amounts historically paid by BSA to resolve sexual abuse claims, *even if* every single BSA Sexual Abuse Claim except for the 16,600 "focused on" by Bates White are valued at $0 (e.g. placing $0 value on any claim that falls into an SOL Tier other than Open or that fails to at least partly name their abuser). A summary of the average Bates White Disclosure Statement Valuation per BSA Sexual Abuse Claim is shown in Table 19 below.

---

[71] Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, Article V – The Chapter 11 Cases, Section N - Description of Abuse Claims and the Valuation of Abuse Claims filed September 30, 2021 [Docket No. 6445].

Confidential Pursuant to Protective Order

Table 19: Average Bates White Disclosure Statement Valuation per BSA Sexual Abuse Claim



| Average Bates White Low Estimate: $2.4B | | | Average Bates White High Estimate: $7.1B | | | Average Historical BSA Settlement | |
|---|---|---|---|---|---|---|---|
| 82,209 Claims | 46,916 Claro Valued Claims | 16,600 "Focus" Claims | 82,209 Claims | 46,916 Claro Valued Claims | 16,600 "Focus" Claims | Nominal | Inflation-Adjusted |
| $29,194 | $51,155 | $144,578 | $86,365 | $151,334 | $427,711 | $514,688 | $569,980 |

In my opinion, the Bates White Disclosure Statement Valuation directly contradicts BSA's own evidence with regards to claim valuation based on settlement data and does not reflect fair settlement value for the 82,209 BSA Sexual Abuse Claims or even those 16,600 claims "focused on" by Bates White.

## B. **Trust Distribution Procedures**

The stated purposes of the TDP include determining an Allowed Claim Amount for each Allowed Abuse Claim and facilitating the distribution of the Settlement Trust, among other things.[72,73] My understanding is that the TDP was not used to develop claim valuation estimates used for purposes of the Amended Disclosure Statement, but may be used after the Settlement Trust is established as a means to allocate the available funds among Allowed Abuse Claims.

The TDP provides detailed methodology for calculating an Allowed Claim Amount for each Allowed Abuse Claim, and states it was developed with the "intention of **achieving a fair and reasonable Abuse Claim valuation range** in light of the best available information, considering the settlement, verdict and/or judgments **that Abuse Claimants would receive in the tort system** against the Protected Parties **absent the bankruptcy** [emphasis added]."

Despite its "intention," the methodology contained therein renders it inappropriate as a source for reasonable valuations for BSA Sexual Abuse Claims for the following reasons:

- The TDP Base Matrix Value and Maximum Matrix Value are less than the Historical BSA Settlements;

- The application of discounts for legal defenses is inappropriate when using settlement figures as Base Matrix Values;

---

[72] Defined terms in this Section III.B take on the meaning defined in the TDP
[73] Boy Scouts of America, *Trust Distribution Procedures for Abuse Claims*, Article I – Purpose and General Guidelines

Confidential Pursuant to Protective Order

- It inconsistently applies discounts for BSA Sexual Abuse Claims alleging abuse by a minor; and

- The discounts applied related to the statute of limitations are not supported by Historical BSA Settlements.

### i.  TDP Matrix Values Are Less Than Historical BSA Settlements

A common principle when estimating the fair value of an entity's liabilities is to apply what is referred to as the "fair value hierarchy."[74] Fair value hierarchy that prioritizes the inputs to valuation models developed to measure fair value of an asset or liability. The three levels of the fair value hierarchy are as follows[75]:

• Level 1 — Unadjusted quoted prices for identical assets or liabilities in active markets;

• Level 2 — Inputs other than quoted prices in active markets for identical assets and liabilities that are observable either directly or indirectly for substantially the full term of the asset or liability; and

• Level 3 — Unobservable inputs for the asset or liability, which include management's own assumption about the assumptions market participants would use in pricing the asset or liability, including assumptions about risk.

The fair value hierarchy would indicate that, in order to assess the fair value for a liability, one should first look to quoted prices for identical liabilities in active markets.  While it reads overly clinical to think about claim values for sexual abuse claims as "prices" for "liabilities" or to think about sexual abuse claim payments as a "market," it stands to reason – and is supported by the fair value hierarchy – that in order to determine a fair value for the Valued BSA Sexual Abuse Claims at issue in this case, it is reasonable to prioritize inputs that inform us as to what amounts were paid for the same, or similar, liabilities in the past.

As discussed above, significant data has been provided by BSA related to its historical settlements with sexual abuse survivors, including a list of 517 prior settlements with amounts paid by BSA to resolve each claim as well as other factors potentially relevant to valuation, such as nature of abuse, where known.

---

[74] The fair value hierarchy is an accounting concept used to properly assess the fair value of an asset or liability under GAAP (Generally Accepted Accounting Principles). The topic is covered in Financial Accounting Standards Board [FASB], 2020, 820-10.

[75] Financial Accounting Standards Board [FASB], online, https://www.fasb.org/web/xbrl_inline_files/FASB_IllustrativeFair-ValueMeasurementsDRAFT.html.

**Confidential Pursuant to Protective Order**

Table 20 below compares the average and maximum amounts paid historically by BSA to resolve sexual abuse claims involving an adult perpetrator to the TDP Matrix Values.[76],[77]

Table 20: TDP Matrix Values Compared to Historical BSA Settlements

| | | Abuse of Minor by Adult Perpetrator | | | | | |
|---|---|---|---|---|---|---|---|
| | | Historical BSA Settlements (nominal) | | TDP Matrix | | % Reduction | |
| Tier | Nature of Abuse | Average | Maximum | Base Value | Maximum | Base Value | Maximum |
| 1 | Penetration | $1,128,379 | $9,600,000 | $600,000 | $2,700,000 | 47% | 72% |
| 2 | Oral Sex | $1,042,110 | $7,400,000 | $450,000 | $2,025,000 | 57% | 73% |
| 3 | Masturbation / Groping | $548,828 | $4,800,000 | $300,000 | $1,350,000 | 45% | 72% |
| 4 | Touching-Unclothed | $168,216 | $1,000,000 | $150,000 | $675,000 | 11% | 33% |
| 5 | Touching-Clothed / Photography | $63,571 | $300,000 | $75,000 | $337,500 | -18% | -13% |
| 6 | No Touching | N/A | N/A | $3,500 | $8,500 | N/A | N/A |

As shown in the table above, TDP Base Matrix Value for Touching-Clothed claims vary by less than 20% compared to amounts historically paid by BSA for claims alleging a similar category of abuse type; however, for Penetration, Oral Sex, and Masturbation / Groping claims – which represent over 95% of the Valued BSA Sexual Abuse Claims filed in this case – the TDP Matrix Value represents a discount of roughly half (or more). While the data in the table above is limited to claims of sexual abuse of a minor by adult perpetrators for comparison purposes, a similar disparity exists for Penetration, Oral Sex, and Masturbation claims among claims of sexual abuse of a minor by minor perpetrators as well.[78]

A comparison of the Maximum TDP Matrix Value to the upper end of settlement amounts historically paid by BSA demonstrates that the TDP Matrix also fails to capture the full value of the most valuable cases.

## ii. Application of Discounts for Legal Defenses Is Inappropriate When Using Settlement Figures As TDP Matrix Values

A fundamental tenet of negotiated settlements is that they reflect not only the quantum of potential damages, but also the inherent uncertainty as to whether the defendant will be found liable for such damages.[79] Claims for which the parties estimate the defendant has the highest likelihood of being held liable will command

---

[76] Historical BSA Settlement figures shown are nominal.

[77] Includes survivors with age unknown, which are assumed to be minors. I consider this to be a conservative approach.

[78] The TDP Base Matrix Value for minor survivors of abuse by a minor is 48% lower than the observed average among Historical BSA Settlements for Penetration claims and 61% lower for Oral Sex claims. There is one Historical BSA Settlement involving Masturbation / Groping, which settled for $25,000 compared to the TDP Base Matrix Value of $150,000.

[79] Friedman, A., "An Analysis of Settlement," *Stanford Law Review* 22, no. 1 (1969).

**Confidential Pursuant to Protective Order**

the highest cents on the dollar in a negotiated settlement; similarly, exposures for which the parties estimate the defendant has the lowest likelihood of being held liable will command the lowest cents on the dollar.[80]

When a sexual abuse survivor brings a claim against a defendant, whether by lawsuit or otherwise, such claimant has the option (assuming a willing counterparty) to negotiate a settlement with the defendant before a trier of fact makes a determination as to the claimant's damages and whether the defendant is liable for those damages.[81] Institutional defendants, meaning organizations or entities that are not the abuser (e.g., teacher) but that are alleged to have some liability for the alleged abuse (e.g., school district), could have a number of available defenses to the claim depending on the claim facts and jurisdiction. These often include defenses such as statute of limitations. At trial, sexual abuse survivors could recover the full amount of their damages from the defendant or they could recover nothing. Settlements enable the sexual abuse survivor to receive a defined payment, albeit typically less than the full amount of their potential damages, without such risk.

As described above, settlement values already take into account discounts for claim defenses. For example, data provided by TCC Counsel indicates that over 50% of the Historical BSA Settlements were entered into by BSA when the claim was already outside of the relevant statute of limitations (See Table 22), and therefore such settlements would have reflected a related discount. Despite the fact that the Historical BSA Settlements, and the settlement averages shown in Table 20 above, already reflect reductions for available claim defenses, the TDP uses Base Matrix Values even lower than those already-discounted settlement averages and then *further discounts those amounts for potential claim defenses such as statute of limitations,* effectively double-discounting the claim values. This methodological error renders the TDP unreliable as a source for reasonable claim valuation.

Given that the TDP applies discounts for claim defenses, the TDP Matrix Values from which any discounts are taken should be based on total damages (e.g. potential award, verdict, or judgment) as opposed to settlement values.

### iii.    Inconsistent Application of Discount for Youth Abuser Claims

The discount applied to BSA Sexual Abuse Claims under the TDP for claims that involve a minor abuser varies greatly by claim and is either 0%, 25%, 33%, or 50%, depending on the nature of abuse. The discounts applied under the TDP for claims that involve a minor abuser are summarized in Table 21 below.

---

[80] Calihan, R., Dent, J., and Victor, M., "The Role of Risk Analysis in Dispute and Litigation Management", American Bar Association 27th Annual Forum on Franchising, (2004).

[81] Aaron, M. C., "Finding Settlement with Numbers, Maps, and Trees," The Handbook of Dispute Resolution. Chapter 13. (2004).

**Confidential Pursuant to Protective Order**

Table 21: TDP Discounts for BSA Sexual Abuse Claims Involving Minor Abuser

| Nature of Abuse | TDP Base Matrix Value | | |
|---|---|---|---|
| | Adult Abuser | Minor Abuser | Discount |
| Penetration | $600,000 | $450,000 | 25% |
| Oral Sex | $450,000 | $300,000 | 33% |
| Masturbation | $300,000 | $150,000 | 50% |
| Touching - Unclothed | $150,000 | $75,000 | 50% |
| Touching - Clothed / Photography | $75,000 | $75,000 | 0% |
| No Touching | $3,500 | $3,500 | 0% |

The TDP does not provide a basis for such inconsistent application of claim value reductions, which is not supported by available Historical BSA Data and renders the TDP unreliable for purposes of valuing BSA Sexual Abuse Claims where the abuser was a minor.

### iv.    Discounts for Statute of Limitations Not Supported by Historical BSA Settlements

With respect to the Mitigating Scaling Factor proposed by the TDP for statute of limitations, the TDP fails to incorporate observable inputs from similar liabilities (e.g., Historical BSA Settlements).  As discussed in Section II.D.ii.1 of this Report and shown in Table 22 below, Claro's analysis of Historical BSA Settlements indicates that, on average, claims in Gray 3 states are not paid meaningfully less (i.e. not discounted more heavily) than claims in Gray 1 states. Claro's analysis of Gray 1 and Gray 3 settlements suggests the TDP's entire methodology of varying its Mitigating Scaling Factor by SOL tier is inappropriate as the average settlement amounts actually paid by BSA prior to this chapter 11 case for claims in Gray 1 states versus claims in Gray 3 states is nearly the same. The Historical BSA Settlement data indicates that the SOL Discount Scaling Factors should not vary for claims in Gray 1, Gray 2, and Gray 3 states.

**Confidential Pursuant to Protective Order**

Table 22: TDP SOL Mitigating Scaling Factor Compared to Historical BSA Settlements by SOL Tier

| SOL Tier | Historical BSA Settlements | | | TDP Mitigating Scaling Factor |
| --- | --- | --- | --- | --- |
| | Number of Settlements | Nominal Settlement Average | Proportion of Open Statute / Within SOL | |
| **Open Statute / Within SOL** | 103 | $525,223 | 1.0 | 1.0 |
| **Outside of SOL** | | | | |
| Gray 1 | 92 | $304,332 | 0.58 | .5 - .7 |
| Gray 2 | 7 | $142,143 | 0.27 | .3 - .45 |
| Gray 3 | 40 | $286,125 | 0.54 | .1 - .25 |
| Closed | 0 | N/A | N/A | .01 - .1 |
| **Outside SOL subtotal** | **139** | **$290,924** | **0.55** | |
| **Unknown SOL Status** | **162** | **$287,961** | | |
| **Settled Outside SOL Prior to Revival Window** | **27** | **$1,098,741** | | |
| **Excluded Historical BSA Settlements** | **86** | **$1,107,459** | | |
| **Total Historical BSA Settlements** | **517** | **$514,688** | | |

The TDP is unreliable for purposes of estimating "a fair and reasonable Abuse Claim valuation range in light of the best available information, considering the settlement, verdict and/or judgments that Abuse Claimants would receive in the tort system against the Protected Parties absent the bankruptcy." The valuation structure proposed by the TDP rests on fundamentally flawed methodology and fails to incorporate observable inputs from Historical BSA Settlements.

## IV.    ALLOCATION OF CLARO VALUATION FOR BSA SEXUAL ABUSE CLAIMS TO INSURANCE COVERAGE

I understand that BSA is seeking contribution from certain insurers to fund payment to BSA Sexual Abuse Claimants, Indirect Abuse Claimants, [82] and Future Abuse Claims. [83] In order to inform the Court as to each insurer's share of the Claro Valuation presented above, Claro performed an allocation of those amounts to historical general liability policies issued to BSA and many of its Local Councils. [84] Claro performed the following analyses:

1.   Identified Valued BSA Sexual Abuse Claims as well as the Claro Valuation, trigger date, and Local Council for each, where available ("Allocable BSA Sexual Abuse Claims");

---

[82] As defined in the Plan.
[83] As defined in the Plan.
[84] As defined in the Plan.

2. Apportioned Claro Valuation for Allocable BSA Sexual Abuse Claims among BSA-Related Entities, including BSA, Local Councils, and Chartered Organizations[85] ("Apportionment of Claro Valuation Estimate");

3. Input policy information for both BSA ("National Council Coverage") and Local Councils ("Local Council Coverage); and

4. Performed allocation of Allocable BSA Sexual Abuse Claims to National Council Coverage and Local Council Coverage ("Allocation of BSA Sexual Abuse Claims to Available Coverage").

### A.  Allocable BSA Sexual Abuse Claims

For purposes of the allocation of BSA Sexual Abuse Claims, Claro identified the BSA Sexual Abuse Claims that met the following criteria:

- The BSA Sexual Abuse Claim is a Valued BSA Sexual Abuse Claim (e.g. the BSA Sexual Abuse Claim was not removed for purposes of the Claro Valuation); and
- Contains an abuse date in the T6 Database.[86]

BSA Sexual Abuse Claims that met this criteria are considered Allocable BSA Sexual Abuse Claims. For each Allocable BSA Sexual Abuse Claim, Claro also identified the relevant Local Council(s), where available.[87] Table 23 below summarizes the Allocable BSA Sexual Abuse Claims.

Table 23: Allocable BSA Sexual Abuse Claims

|  | Number of Claims | Claro Valuation Scenario A | Claro Valuation Scenario B |
|---|---|---|---|
| Valued Sexual Abuse Claims | 46,916 | $24,756,813,020 | $30,412,047,912 |
| Allocable BSA Sexual Abuse Claims | 46,851 | $24,736,575,051 | $30,380,891,858 |

---

[85] As defined in the Plan.
[86] Per field [Abuse Start Date]. There were 65 Valued BSA Sexual Abuse Claims without abuse date information and therefore were excluded from the analysis.
[87] Per field [Historical Local Council Name] in the T6 Database.

**Confidential Pursuant to Protective Order**

I consider this to be a conservative approach for the following reasons:

- 35,293 timely-filed BSA Sexual Abuse Claims Not Valued were excluded for purposes of Claro's allocation to insurance coverage. These BSA Sexual Abuse Claimants may supplement their claims to provide additional information in the future, [88] and such updated information may warrant such claim's inclusion as a Valued BSA Sexual Abuse Claim; and

- BSA Sexual Abuse Claims that did not contain an abuse date in the T6 Database were excluded for purposes of Claro's allocation to insurance coverage, although these claimants may supplement this information in the future.[89]

Further, this allocation does not include liability related to Indirect Abuse Claims and does not include liability related to Future Abuse Claims.

### B. Apportionment of Claro Valuation

The Claro Valuation is the aggregate claim value for all BSA-Related Entities, however insurance policies only insure losses or liabilities of the entity(ies) named as insureds ("Named Insureds") in the policy.

- Policies listing BSA as a Named Insured insure BSA's share of losses or liabilities;

- Policies listing Local Councils as Named Insureds insure Local Councils' share of losses or liabilities; and

- Policies listing Chartered Organizations as Named Insureds insure Chartered Organizations share of losses or liabilities.

Not all BSA-Related Entities are Named Insureds on all policies at issue in this case, and therefore it is necessary to apportion the Claro Valuation among BSA-Related Entities to determine what share of liabilities may potentially be covered under and allocable to policies that insure BSA, Local Councils, and Chartered Organizations, respectively.

In order to provide the Court with illustrative insurance allocation scenarios, at the direction of TCC Counsel I assumed a range of apportionment scenarios among the BSA-Related Entities:

- Claro Valuation Apportionment Scenario 1:
  - 100% to BSA;
  - 0% to Local Councils; and

---

[88] Fed. R. Bankr. Proc. 3001 & TDP, Article VII.A

[89] *Ibid*.

- o    0% to Chartered Organizations.
- Claro Valuation Apportionment Scenario 2:
  - o    66.67% to BSA;
  - o    16.67% to Local Councils; and
  - o    16.67% to Chartered Organizations.
- Claro Valuation Apportionment Scenario 3:
  - o    33.33% to BSA;
  - o    33.33% to Local Councils; and
  - o    33.33% to Chartered Organizations.

The results of the apportionment of Claro Valuation Scenario A and Claro Valuation Scenario B are summarized in Table 24 below.[90]

Table 24: Summary of Apportionment Among BSA-Related Entities

|  | Apportionment Scenario 1 | Claro Valuation Scenario A | Claro Valuation Scenario B |
|---|---|---|---|
| National Council | 100.00% | $24,736,575,051 | $30,380,891,858 |
| Local Councils | 0.00% | $0 | $0 |
| Chartered Organizations | 0.00% | $0 | $0 |
| Total | 100.00% | $24,736,575,051 | $30,380,891,858 |

|  | Apportionment Scenario 2 | Claro Valuation Scenario A | Claro Valuation Scenario B |
|---|---|---|---|
| National Council | 66.67% | $16,491,050,034 | $20,253,927,905 |
| Local Councils | 16.67% | $4,122,762,509 | $5,063,481,976 |
| Chartered Organizations | 16.67% | $4,122,762,509 | $5,063,481,976 |
| Total | 100.00% | $24,736,575,051 | $30,380,891,858 |

|  | Apportionment Scenario 3 | Claro Valuation Scenario A | Claro Valuation Scenario B |
|---|---|---|---|
| National Council | 33.33% | $8,245,525,017 | $10,126,963,953 |
| Local Councils | 33.33% | $8,245,525,017 | $10,126,963,953 |
| Chartered Organizations | 33.33% | $8,245,525,017 | $10,126,963,953 |
| Total | 100.00% | $24,736,575,051 | $30,380,891,858 |

Amounts above were used for insurance allocation purposes, as further detailed in Section IV.D below.

---

[90] Totals may not tie due to rounding.

Confidential Pursuant to Protective Order

### C.  National Council Coverage and Local Council Coverage

For purposes of my Report, Claro performed an allocation of the Claro Valuation to both National Council Coverage and Local Council Coverage.

### i.  National Council Coverage

As early as 1935, BSA began purchasing general liability insurance to protect itself from a number of risks, including claims of sexual abuse or sexual misconduct.[91] In the years since, BSA purchased first-dollar primary insurance policies from various insurance companies. From at least 1969 through today, BSA also purchased umbrella and/or excess liability insurance policies. This coverage was issued by various insurers in multiple periods with different limits, attachment points, and coverage provisions. Additionally, certain primary and umbrella policies from 3/1/1986 to 3/1/2019 are considered "Fronting Policies." Fronting Policies include policies that have deductibles that match the policy limits, ultimately shifting the responsibility back to the insured. Lastly, multiple insurance policies contain a "Sexual Abuse Exclusion," which may impact the availability of coverage for BSA Sexual Abuse Claims.

For purposes of this Report, Claro relied on Schedule 2 to the Plan for coverage details, subject to the following assumptions:

- Unknown Occurrence Limits: Schedule 2 lists the occurrence limit as "Unknown" for certain policies. At the direction of TCC Counsel, Claro excluded these policies from its analysis.

- Unknown Aggregate Limits: Schedule 2 lists the aggregate limit as "TBD" for certain primary policies between 3/1/1986 and 3/1/2008. At the direction of TCC Counsel, I assumed these policies are not subject to aggregate limits.

- Erosion: Schedule 2 does not contain policy erosion information, and as such Claro relied on other documents detailing limit erosions by policy from 1/1/1983 through 3/1/2020 ("Evidence of Policy Erosion").[92]

- Settled Coverage: Schedule 2 does not reflect policies that have been released, in part or in full, pursuant to settlement agreements between BSA and the insurer.[93]

---

[91] Debtors' Informational Brief, Section C. Child Sexual Abuse Claims against BSA, Section 3. Insurance page 35
[92] "7.6.4_1983-1986 Exhaustion Presentation.pdf," "7.6.2_1986-2020 Exhaustion Presentation.pdf," "[6154] BSA - Knight Settlement Motion.pdf," "[6155] BSA - Romero Settlement Motion.pdf," "Hartford Agreement 1976-1977.pdf," and "Lehr Settlement Motions.pdf."
[93] Confidential Settlement Agreement and Release between and among BSA and Hartford Accident and Indemnity Co., Confidential Settlement Agreement and Release between and among BSA and Twin City Fire Insurance Company and First State Insurance Company, Confidential Settlement and Release is entered into by and among BSA and National Union Fire Insurance Company of Pittsburgh, Pa.

**Confidential Pursuant to Protective Order**

While there is evidence to suggest that at least some of the multi-year policies issued to BSA provide a separate policy limit for each of the annual periods,[94] Claro assumed a single policy limit for the entire multi-year policy period if detailed as such on Schedule 2, based on direction from TCC Counsel.

From 1971 through 1977, the National Council Coverage included certain Local Councils as additional Named Insureds. Further, beginning in 1978, BSA implemented the General Liability Insurance Program, or "GLIP," under which BSA agreed to include all Local Councils as well as Chartered Organizations as additional Named Insureds on the National Council Coverage.  To the extent National Council Coverage included Local Councils as additional Named Insureds, those policies are also considered Local Council Coverage for purposes of Claro's analysis.

### ii.  Local Council Coverage

In addition to the National Council Coverage that included some or all Local Councils as additional Named Insureds, many Local Councils purchased separate general liability insurance policies. Local Council Coverage has not been identified for all Local Councils or for all years. The majority of policies issued to Local Councils were first-dollar primary insurance policies from various insurance companies. Local Council Coverage was issued by various insurers in multiple periods with different limits, attachment points, and coverage provisions. For purposes of this Report, Claro relied on Schedule 3 to the Plan for coverage details, subject to the following assumptions:

- Unknown Occurrence Limits: Schedule 3 lists the occurrence limit as "Unknown" for certain policies. At the direction of TCC Counsel, Claro excluded these policies from its analysis.

- Unknown Aggregate Limits: Schedule 3 lists the aggregate limit as "Unknown" for all policies. At the direction of TCC Counsel, I relied on a prior coverage listing for aggregate limits for Local Council Coverage.[95]

- National Council Coverage: As discussed above, certain National Council policies also included some or all Local Councils as additional Named Insureds. Schedule 3 does not include National Council policies that provide coverage to some or all Local Councils. At the direction of TCC Counsel, I relied on a prior coverage listing[96] to identify these policies and included them in the Local Council Coverage.

---

[94] The Evidence of Policy Erosion shows erosion amounts specific to annual periods for certain policies, and for certain multi-year policies, the total policy erosion exceeds the total policy limit if we assume the limit is not annualized.

[95] "BSA Local Council Policy Listing for Coalition_data as of 2021-2-11 xlsx"

[96] *Ibid.*

**Confidential Pursuant to Protective Order**

### D.  Allocation of BSA Sexual Abuse Claims to Available Coverage

Based on instructions from TCC Counsel, Claro's allocation incorporates the following parameters:

- Trigger Date: TCC Counsel instructed me to assume the trigger period, meaning the date or dates used to determine responsive coverage for each claim, is a date of first abuse trigger. Using a date of first abuse trigger, policies in place on the date of first abuse for each BSA Sexual Abuse Claim are triggered. I understand that agreements exist between BSA and Insurance Company of North America and Century Indemnity Company that dictate claims will be allocated to coverage using a date of first abuse trigger.[97]

- Occurrence: TCC Counsel instructed me to perform allocations under two separate assumptions regarding occurrence:

    o  Scenario 1: Each BSA Sexual Abuse Claim ("each survivor") is considered to be a separate occurrence, each entitled to a separate per occurrence limit, subject to aggregate limits where applicable

    o  Scenario 2: Each incident of abuse ("each incident") is considered to be a separate occurrence, each entitled to a separate per occurrence limit, subject to aggregate limits where applicable[98]

I understand that the interpretation of occurrence may depend on policy language interpretation as well as case law, which varies by jurisdiction.

As is customary in cases such as these, I referred to insurance coverage dispute guidebooks, case rulings, and other materials in conjunction with the allocation instructions I was provided. Please refer to the Data and Documents Considered for a listing of these sources.

Consistent with these instructions, Claro allocated the Claro Valuation for each Allocable BSA Sexual Abuse Claim to the triggered coverage, observing each policy's attachment point, limit of liability, and aggregate limit where applicable. Only amounts apportioned to BSA were allocated to National Council Coverage and only amounts apportioned to Local Councils were allocated to Local Council Coverage.[99],[100]

---

[97] Settlement Agreement Regarding Sexual Molestation Claims, Paragraph 7 "First encounter rule."
[98] Claro calculated a median of 3 abuse incidents using the field [number of times abused] in the T6 data (where available). Based on this calculation, Claro assumed each Allocable BSA Sexual Abuse Claimant had 3 incidents of abuse, and therefore 3 separate occurrences of equal claim value, under Occurrence Scenario 2.
[99] If an Allocable BSA Sexual Abuse Claim identified more than one historical Local Council, Claro relied on the Local Council with the earliest start date for purposes of allocation to insurance coverage.
[100] No coverage is available for Allocable BSA Sexual Abuse Claims that did not identify a Local Council and had a first abuse date that pre-dates the GLIP coverage.

**Confidential Pursuant to Protective Order**

Amounts apportioned to Chartered Organizations were allocated only to "GLIP" policies in the National Council Coverage.

In each allocation, Claro made the following assumptions at the direction of TCC Counsel:

- If no known coverage is in place during a given Allocable BSA Sexual Abuse Claimant's first date of abuse, related amounts are retained by BSA-Related Entities;

- If insufficient coverage is in place during a given Allocable BSA Sexual Abuse Claimant's first date of abuse, whether because the claim value exceeds available occurrence limits or due to exhaustion of aggregate limits, related amounts are retained by BSA-Related Entities;

- Amounts allocated to Fronting Policies are retained by BSA;

- Amounts allocated to policies with a Sexual Abuse Exclusion are retained by BSA; and

- Allocable BSA Sexual Abuse Claims that do not name a Local Council in their POC Form are limited to available Local Council Coverage under GLIP policies, if such policies are triggered by their date of first abuse.

By insurer allocation results are attached hereto as <u>Exhibits 9a and 9b</u>. By BSA-Related Entity, by insurer allocation results are attached hereto as <u>Exhibits 10a and 10b</u>. By policy allocation results are attached hereto as <u>Exhibits 11a and 11b</u>. By BSA-Related Entity, by policy allocation results are attached hereto as <u>Exhibits 12a and 12b</u>. The results of these allocations are summarized in Table 25 below.[101]

---

[101] Amounts shown for Hartford Insurance Group reflect amounts allocated to policy limits that are not subject to a settlement agreement and release with BSA. Amounts shown as Retained by BSA include amounts allocated to insolvent coverage, coverage subject to a settlement agreement and release with BSA, Fronting Policies, policies with a Sexual Abuse Exclusion, and uninsured/underinsured periods.

**Confidential Pursuant to Protective Order**

Table 25: Summary of Allocation to Available Coverage ($)

| | Insurance Allocation of Claro Valuation (in billions) Each Survivor = Occurence | | | | | |
|---|---|---|---|---|---|---|
| | Apportionment Scenario 1 | | Apportionment Scenario 2 | | Apportionment Scenario 3 | |
| | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B |
| Hartford Insurance Group | $4 08 | $5 00 | $3 00 | $3 69 | $1 89 | $2 33 |
| All Other Solvent Available Coverage | $9 71 | $11 77 | $8 10 | $9 89 | $6 22 | $7 58 |
| Retained by BSA | $10 95 | $13 61 | $13 64 | $16 80 | $16 63 | $20 47 |
| **Total** | **$24.74** | **$30.38** | **$24.74** | **$30.38** | **$24.74** | **$30.38** |

| | Insurance Allocation of Claro Valuation (in billions) Each Incident of Abuse = Occurence | | | | | |
|---|---|---|---|---|---|---|
| | Apportionment Scenario 1 | | Apportionment Scenario 2 | | Apportionment Scenario 3 | |
| | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B |
| Hartford Insurance Group | $4 04 | $4 99 | $2 89 | $3 55 | $1 70 | $2 09 |
| All Other Solvent Available Coverage | $11 54 | $14 34 | $9 21 | $11 42 | $6 52 | $8 09 |
| Retained by BSA | $9 15 | $11 06 | $12 63 | $15 41 | $16 51 | $20 20 |
| **Total** | **$24.74** | **$30.38** | **$24.74** | **$30.38** | **$24.74** | **$30.38** |

The results of this allocation, expressed as a percentage of the Claro Valuation, are summarized in Table 26 below.

Table 26: Summary of Allocation to Available Coverage (%)

| | Insurance Allocation of Claro Valuation (in billions) Each Survivor = Occurence | | | | | |
|---|---|---|---|---|---|---|
| | Apportionment Scenario 1 | | Apportionment Scenario 2 | | Apportionment Scenario 3 | |
| | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B |
| Hartford Insurance Group | 16 5% | 16 5% | 12 1% | 12 2% | 7 6% | 7 7% |
| All Other Solvent Available Coverage | 39 3% | 38 7% | 32 8% | 32 5% | 25 1% | 25 0% |
| Retained by BSA | 44 3% | 44 8% | 55 1% | 55 3% | 67 2% | 67 4% |
| **Total** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

| | Insurance Allocation of Claro Valuation (in billions) Each Incident of Abuse = Occurence | | | | | |
|---|---|---|---|---|---|---|
| | Apportionment Scenario 1 | | Apportionment Scenario 2 | | Apportionment Scenario 3 | |
| | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B |
| Hartford Insurance Group | 16 4% | 16 4% | 11 7% | 11 7% | 6 9% | 6 9% |
| All Other Solvent Available Coverage | 46 7% | 47 2% | 37 2% | 37 6% | 26 4% | 26 6% |
| Retained by BSA | 37 0% | 36 4% | 51 1% | 50 7% | 66 7% | 66 5% |
| **Total** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

Confidential Pursuant to Protective Order

### E.  Discounted Allocation of Claro Valuation to Hartford

At the direction of TCC Counsel, Claro applied a discount to amounts allocated to Hartford Insurance Group ("Hartford) to reflect the potential impact of various coverage defenses asserted by Hartford, as detailed in the Expert Report of Mark H. Kolman, dated December 5, 2021 ("Kolman Report"). In the Kolman Report, Mr. Kolman opines that a discount of 25% - 30% is appropriate for the amounts allocated to policies issued by Hartford ("Hartford Coverage Discount").

Table 27 below summarizes the amounts allocated to policies issued by Hartford after application of the Hartford Coverage Discount.

Table 27: Summary of Allocation To Hartford After Application of Hartford Coverage Discount

| | Insurance Allocation of Claro Valuation (in billions) Each Survivor = Occurence | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Apportionment Scenario 1 | | Apportionment Scenario 2 | | Apportionment Scenario 3 | |
| | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B |
| **25% Hartford Coverage Discount** | | | | | | |
| Hartford Insurance Group | $4 08 | $5 00 | $3 00 | $3 69 | $1 89 | $2 33 |
| Less: 25% Hartford Coverage Discount | ($1 02) | ($1 25) | ($0 75) | ($0 92) | ($0 47) | ($0 58) |
| **Discounted Allocation to Hartford (25%)** | **$3.06** | **$3.75** | **$2.25** | **$2.77** | **$1.41** | **$1.75** |
| **30% Hartford Coverage Discount** | | | | | | |
| Hartford Insurance Group | $4 08 | $5 00 | $3 00 | $3 69 | $1 89 | $2 33 |
| Less: 30% Hartford Coverage Discount | ($1 22) | ($1 50) | ($0 90) | ($1 11) | ($0 57) | ($0 70) |
| **Discounted Allocation to Hartford (30%)** | **$2.85** | **$3.50** | **$2.10** | **$2.59** | **$1.32** | **$1.63** |

| | Insurance Allocation of Claro Valuation (in billions) Each Incident of Abuse = Occurence | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Apportionment Scenario 1 | | Apportionment Scenario 2 | | Apportionment Scenario 3 | |
| | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B | Claro Valuation Scenario A | Claro Valuation Scenario B |
| **25% Hartford Coverage Discount** | | | | | | |
| Hartford Insurance Group | $4 04 | $4 99 | $2 89 | $3 55 | $1 70 | $2 09 |
| Less: 25% Hartford Coverage Discount | ($1 01) | ($1 25) | ($0 72) | ($0 89) | ($0 43) | ($0 52) |
| **Discounted Allocation to Hartford (25%)** | **$3.03** | **$3.74** | **$2.17** | **$2.67** | **$1.28** | **$1.57** |
| **30% Hartford Coverage Discount** | | | | | | |
| Hartford Insurance Group | $4 04 | $4 99 | $2 89 | $3 55 | $1 70 | $2 09 |
| Less: 30% Hartford Coverage Discount | ($1 21) | ($1 50) | ($0 87) | ($1 07) | ($0 51) | ($0 63) |
| **Discounted Allocation to Hartford (30%)** | **$2.83** | **$3.49** | **$2.02** | **$2.49** | **$1.19** | **$1.47** |

**Confidential Pursuant to Protective Order**

## V.    DATA AND DOCUMENTS CONSIDERED

A full list of the data and documents Claro considered for the purposes of this Report is attached hereto as Exhibit 3, and includes the following categories:

- Excel detail of timely-filed BSA Sexual Abuse Claims as organized and supplemented by Bates White;

- POC Forms and exports of claim details from Omni, the Debtors' claims administrator;

- Certain documents filed in this proceeding, including the Amended Disclosure Statement, the Plan, and other documents further detailed in Exhibit 3;

- Excel listing prepared by the Debtors of certain settlements entered into prior to the chapter 11 proceeding for the period 2010-2020 between BSA and sexual abuse claimants;

- VerdictSearch and other information on potentially comparable cases, as provided by TCC Counsel;

- Excel listings of National Council insurance policies and various Local Council insurance policies, including those attached as Schedule 2 and Schedule 3 to the Plan, along with prior coverage listing produced by BSA and coverage maps depicting the National Council insurance policies; and

- Detail of policy erosions for National Council policies.

## VI.    EMPLOYMENT AND PROFESSIONAL QUALIFICATIONS

I am qualified to render the opinions expressed herein based on my education, training, knowledge, and experience in the fields of economic damages quantification and statistical analysis.

I am a Managing Director in the Disputes, Claims and Investigations group at The Claro Group, LLC, supporting clients on complex business disputes and litigation. Claro's team of CPAs, MBAs, and finance professionals has deep experience assisting clients with data analyses and damages calculations in complex litigation. Our expertise includes claims quantification, damages quantification, claims estimation, and insurance policy allocation services over a wide range of situations, including expert testimony.

I earned a BS in Finance from Miami University in 2004 and an MBA from the University of Chicago Booth School of Business in 2009. I am currently a Managing Director at Claro, where I have been employed since its inception in September 2005. My entire career has been focused on financial consulting services, specializing in providing complex claims consulting. I also serve as an Adjunct Lecturer of Statistics and Economics at Northwestern University. My resume is attached hereto as Exhibit 13.

**Confidential Pursuant to Protective Order**

Over the course of my career, I have assisted over one hundred clients on a wide range of issues. I previously have been retained as an expert witness as well as in an expert consulting capacity. The underlying matters have included high-profile class action cases, damages quantification under the False Claims Act, environmental contribution and recovery matters under CERCLA, insurance recovery matters, and creditor-debtor disputes, among others. I have extensive experience in the valuation of sexual abuse claims and the allocation of related liabilities to insurance coverage, providing these services in connection with several of the largest and highest-profile matters in recent history, including Michigan State University/Nassar and University of Southern California/Tyndall. I have also been retained on behalf of The Official Committee of Unsecured Creditors to provide expert testimony on sexual abuse claim valuation in the Diocese of Rochester's chapter 11 proceeding. My role and services provided varies, but typically involves the valuation or quantification of damages or amounts in dispute, requiring data analysis, expenditure review and quantification, statistical modeling, and/or allocation of damages among insurance policies (where applicable). While each matter has its own facts, the analyses Claro performed for purposes of this Report relied upon standard procedures and methodologies typically relied upon in valuation and insurance policy allocation contexts. I have not provided testimony as an expert at trial or by deposition during the previous four years. Claro's employment in the Debtors' chapter 11 case has been approved by the Bankruptcy Court, by order entered October 8, 2021 [Dkt. No. 6527], and Claro's compensation will be in accordance with the Court's order.

## VII.    OVERALL SUMMARY OF OPINIONS

Based on the analysis and the assumptions included herein, my opinions are as follows:

Opinion 1:    The low end of a reasonable range of claim value for all BSA Sexual Abuse Claims in the aggregate is estimated to be between $24.76 billion and $30.41 billion.

Opinion 2:    The Bates White Disclosure Statement Valuation of $2.4 billion - $7.1 billion is inconsistent with settlement amounts agreed to by BSA prior to commencement of its chapter 11 cases and is not supported by disclosed methodology.

Opinion 3:    The valuation methodology proposed in the TDP is fundamentally flawed and is not a reasonable basis on which to value the BSA Sexual Abuse Claims for purposes of the Plan.

Opinion 4:    The undiscounted allocation of the Claro Valuation to Hartford is $1.70 billion - $5.00 billion and the discounted allocation of the Claro Valuation to Hartford is $1.19 billion - $3.50 billion.

This Report is intended to make clear which of the facts and matters are within my own knowledge and which are not.  I believe that the facts stated herein are true insofar as they are within my own knowledge and the opinions and findings expressed herein represent my true and complete professional opinion.  The analyses and findings contained herein are subject to change as more data, documents, or other information become available.

By

    Katheryn R. McNally

    Managing Director

    The Claro Group, LLC

Signed: _Katheryn R. McNally_

Dated: _12/5/2021_

53

# Exhibit B



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,**

      Debtors.

**Chapter 11**

**Case No. 20-10343 (LSS)**

**(Jointly Administered)**

# Rebuttal to Expert Report of Charles E. Bates, Bates White, LLC By Katheryn R. McNally, The Claro Group, LLC

# January 5, 2022

**Confidential Pursuant to Protective Order**

# Table of Contents

Introduction…………………………………………………………………………………………3

Claro Rebuttal to Bates White $5.8B Benchmark Valuation……………………………………4

    Summary of Bates White's Methodological Flaws……………………………………………5

    Bates White Failed to Value BSA Sexual Abuse Claims Falling Outside of the Statutes of Limitation………………………………………………………………………………………8

    Bates White Rejected the Use of the Historical BSA Settlement Average Without Basis………15

    Bates White Employed Inconsistent Methodology to Develop Benchmark Claim Values………21

    Bates White Failed to Use Sound Economic Analysis to Adjust Historical BSA Settlements to Account for Inflation……………………………………………………………………………28

    Bates White Improperly Double-Discounts for Other Relationships with the Abuser…………32

    The Corrected Bates White Benchmark Valuation is $24.4B………………………………36

Claro Rebuttal to Bates White Valuation Range………………………………………………40

    Summary of Methodological Flaws with Bates White's Valuation Range………………………41

    Bates White Provided No Methodological Support for its Valuation Range of $2.4B - $7.1B……42

    The High End of the Bates White's Valuation Range is Too Low…………………………………43

Bates White's Own Research of Potential Outside Comparables Contradicts its Valuation and Supports the Claro Valuation………………………………………………………………45

The Data Upon Which Bates White Relies is Inaccurate and its Valuation is Unreliable…………49

Using the Updated Tranche 6 Claim Data From Bates White Increases Claro's Valuation by 3.86%……………………………………………………………………………………………52

TCJC Claim Valuation………………………………………………………………………54

# Introduction

At the request of the Official Tort Claimants' Committee, Claro was asked to review the Expert Report of Charles E. Bates, filed December 5, 2021 ("Bates White Report"), and provide opinions with respect to the methodology and opinions contained therein, including inputs, assumptions, and data relied upon. Claro was also asked to consider whether any of the information contained in the Bates White Report warranted an update to Claro's valuation of the BSA Sexual Abuse Claims. Unless otherwise specified, defined terms herein take on the same meaning as in my Report filed December 5, 2021.

I understand that discovery is still ongoing in this matter and I reserve to supplement or amend this Report.



# Claro Rebuttal to Bates White $5.8B Benchmark Valuation



**Confidential Pursuant to Protective Order**

4

# Summary of Bates White's Methodological Flaws

- In order to develop its Benchmark valuation of $5.8B, Bates White erroneously:

  › Placed $0 value on over 30,000 BSA Sexual Abuse Claims falling outside of the statutes of limitation, despite substantial evidence that such claims have value, resulting in a reduced aggregate valuation[1]

  › Rejected the use of historical settlement averages as a proper benchmark for future claim values without providing sufficient support to do so, resulting in a reduced aggregate valuation

  › Employed inconsistent methodology for placing benchmark claim values on allegation groupings (Penetration, Other Sex Acts, Other Touching), resulting in a reduced aggregate valuation

  › Failed to adjust historical BSA settlements to account for inflation in order to develop benchmark claim values for BSA Sexual Abuse Claims, resulting in a reduced aggregate valuation

  › Applied a duplicate discount to BSA Sexual Abuse Claims that identified other relationships with abuser, resulting in a reduced aggregate valuation

**The Bates White Benchmark valuation of $5.8B employs faulty assumptions, places no value on a majority of the claims without adequate support, and is unreliable.**



[1] The total number of claims considered time-barred by Bates White is 53,988, however 31,215 of those named their abuser and would otherwise have been valued by Bates White except for its treatment of claims falling outside of the statutes of limitation.

**Confidential Pursuant to Protective Order**

5

# Summary of Bates White's Methodological Flaws

- The table below summarizes the results of adjustments made to the Bates White Benchmark valuation of $5.8B to correct for its unsupported assumptions, methodological inconsistencies, and economic errors

| Adjustment to Bates White Benchmark Valuation | Each Adjustment in Isolation[1] | | Cumulative Adjustments[2] | |
|---|---|---|---|---|
| | Revised Benchmark Valuation | Difference From Benchmark | Revised Benchmark Valuation | Difference From Benchmark |
| Bates White Benchmark Valuation | **$5.8B** | | **$5.8B** | |
| [A] Value BSA Sexual Abuse Claims Outside the SOL | $8.9B | $3.1B | $8.9B | $3.1B |
| [B] Consider Average Historical BSA Settlement Value as Benchmark | $9.5B | $3.6B | $14.5B | $8.6B |
| [C] Consistent Calculation of Non-Penetration Discount Scaling Factors | $6.9B | $1.1B | $17.2B | $11.4B |
| [D] Rely on Inflation-Adjusted Historical BSA Settlements | $6.5B | $0.7B | $19.1B | $13.2B |
| [E] Update Other Relationship Scaling Factor | $7.5B | $1.7B | **$24.4B** | $18.6B |
| **[F] All Adjustments Combined (A-E)** | **$24.4B** | $18.6B | | |

> **After adjustments to correct for unsupported assumptions, methodological inconsistencies, and economic errors, the Bates White Benchmark valuation is $24.4B.**

[1] Figures represent value of each adjustment in isolation, holding all else constant in the Bates White Benchmark valuation. For example, the Revised Benchmark Valuation presented for Adjustment [B] does not include any updates related to Adjustment [A].
[2] Figures represent the value of the cumulative adjustments, holding all else constant in the Bates White Benchmark valuation. For example, the Revised Benchmark Valuation presented for Adjustment [B] also includes updates related to Adjustment [A], but does not include updates related to Adjustments [C], [D], or [E].

the Claro group

**Confidential Pursuant to Protective Order**

6

# Summary of Bates White's Methodological Flaws



Cumulative Adjustments to Bates White Benchmark Valuation[1]

[1] Figures represent the value of the cumulative adjustments, holding all else constant in the Bates White Benchmark valuation.



Confidential Pursuant to Protective Order

Bates White Failed to Value BSA Sexual Abuse Claims Falling Outside of the Statutes of Limitation



**Confidential Pursuant to Protective Order**

# Bates White Failed to Value BSA Sexual Abuse Claims Falling Outside of the Statutes of Limitation

- Bates White states that over 30,000 BSA Sexual Abuse Claims are assigned zero value in its methodology based on "failure to meet the statute of limitation required for a viable tort claim"[1]

- Bates White does not provide any detail on what it means to be a "viable tort claim" or why claims outside of the statutes of limitation are invariably not "viable tort claims"

- There is no data to support the assumption that these claims have $0 value and there is substantial evidence suggesting these claims do have value and should be included in the Bates White valuation

- The possibility that these claims have value (in the absence of an additional "revival window") is not considered a "Plus Factor" informing the high end of the Bates White valuation range,[2] meaning that the high end of the Bates White valuation range of $7.1B fails to capture any value for claims outside of the statutes of limitation

[1] Per Paragraph 55 of the Bates White Report.
[2] Per Section IV.A of the Bates White Report.



**Confidential Pursuant to Protective Order**

9

# Bates White Failed to Value BSA Sexual Abuse Claims Falling Outside of the Statutes of Limitation

- The Bates White Report itself acknowledges the ability for certain claims to be viable despite statutory dates that would otherwise bar the claim (these are referred to as "repressed memory" claims in a separate section of the Bates White Report)[1]

- The Bates White list of other sexual abuse settlements ("Potential Outside Comparables") includes several hundred plaintiffs across multiple matters that were paid significant sums despite falling outside of the statutory SOL period.[2] For example, the Bates White Potential Outside Comparables include:

  › Settlements in The Ohio State University matter related to former University physician Dr. Strauss. These 2020 settlements average roughly $250,000 per claim and the settled claims fell outside of the SOL

  › Settlements in the Pennsylvania Roman Catholic diocese matter. These 2019 settlements average roughly $150,000 per claim and the settled claims fell outside of the SOL

- The Disclosure Statement itself, which includes Bates White's range of $2.4B - $7.1B, makes clear that "virtually all states recognize that abuse claims can be filed after the statutory limitations period has run under select circumstances, which vary from state to state"[3]

- That these claims have value is further evidenced by the TDP's use of SOL Mitigating Scaling Factors for claims in states considered Gray 1, Gray 2, Gray 3, or Closed[4]

[1] Per Paragraph 77 of the Bates White Report.
[2] BSA-PLAN_01642527
[3] Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, Article V – The Chapter 11 Cases, Section N - Description of Abuse Claims and the Valuation of Abuse Claims filed September 30, 2021 [Docket No. 6445].
[4] Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, Exhibit A – *Trust Distribution Procedures for Abuse Claims,* Schedule 1, filed September 30, 2021 [Docket No. 6443].

**Confidential Pursuant to Protective Order**

# Bates White Failed to Value BSA Sexual Abuse Claims Falling Outside of the Statutes of Limitation

- Most importantly, Bates White fails to use the data on which it purports to rely[1]

- The data on which Bates White relies makes clear that that claims falling outside of the statutes of limitation have value in the tort system and were valued by BSA

  › At least 45 of the historical BSA settlements listed on the historical BSA settlement spreadsheet upon which Bates White relied for its valuation are listed as explicitly falling outside of the statutory SOL at the time the claim was made[2]

    ▪ Dozens of others were listed as "Not Barred" in the spreadsheet of historical BSA settlements relied upon by Bates White, despite falling outside of the relevant statutes according to the SOL rules matrix used by Bates White to designate a SOL status to each of the 82,209 BSA Sexual Abuse Claims[3]

  › Over half of the historical BSA settlements from 2010 – 2020 fell outside of the SOL at the time the claim was made[4]

- In assigning $0 value to over 30,000 claims falling outside of the statutes of limitation, Bates White disregarded the very data on which it states it relied

[1] Per Appendix C: Materials Relied Upon of the Bates White Report.
[2] BSA-PLAN_01642525
[3] BSA-PLAN_01642901
[4] BSA-PLAN_01642528



**Confidential Pursuant to Protective Order**

11

# Bates White Failed to Value BSA Sexual Abuse Claims Falling Outside of the Statutes of Limitation

- Bates White does quantify these over 30,000 "SOL barred" claims as potentially worth $230M in a footnote, citing an expedited distribution value of $3,500 per claim under the TDP,[1] but fails to acknowledge these claims are not limited to expedited distribution values under the TDP and that, under the TDP, can be awarded as much as 70% of the value of a similar claim that falls within the SOL[2]

- The average settlement paid by BSA for claims falling outside the statutes of limitations, according to the very same historical settlement spreadsheet upon which Bates White relied, is over $2M per claim[3]

- Despite consistent evidence that claims falling outside the statutory SOL have value, and no cited evidence or support that they have zero value, Bates White nevertheless assigns a $0 value to over 30,000 such claims[4]

[1] Per Footnote 27 of the Bates White Report.
[2] Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, Exhibit A – *Trust Distribution Procedures for Abuse Claims,* Schedule 1, filed September 30, 2021 [Docket No. 6443].
[3] BSA-PLAN_01642525
[4] Per Paragraph 55 of the Bates White Report.

**Confidential Pursuant to Protective Order**

# Bates White Failed to Value BSA Sexual Abuse Claims Falling Outside of the Statutes of Limitation

- Claro used the Bates White valuation model and adjusted it to include claims falling outside of the SOL, holding all else constant

  › Given that Bates White did not value these claims at all and therefore did not propose any discount scaling factors related to SOL, Claro utilized the midpoint SOL Mitigating Scaling Factors from the TDP to discount claim values to account for their SOL status[1]

- Adding back claim value for claims falling outside of the SOL results in an adjustment to Bates White's Benchmark valuation from $5.8B to $8.9B[2]

> **Bates White improperly assigns zero value to at least $3.1B worth of BSA Sexual Abuse Claims despite uncontradicted evidence that such claims have value, resulting in an adjusted Benchmark valuation of $8.9B, which is in excess of the high end of the Bates White valuation range.**



[1] Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, Exhibit A – *Trust Distribution Procedures for Abuse Claims,* Schedule 1, filed September 30, 2021 [Docket No. 6443].
[2] See Exhibit 1 to this Rebuttal Report.

**Confidential Pursuant to Protective Order**

# Bates White Failed to Value BSA Sexual Abuse Claims Falling Outside of the Statutes of Limitation



Cumulative Adjustments to Bates White Benchmark Valuation[1]

[1] Figures represent the value of the cumulative adjustments, holding all else constant in the Bates White Benchmark valuation.



Confidential Pursuant to Protective Order

Bates White Rejected the Use of the Historical BSA Settlement Average Without Basis



**Confidential Pursuant to Protective Order**

# Bates White Rejected the Use of the Historical BSA Settlement Average Without Basis

- Bates White calculates the historical BSA settlement average for Penetration claims to be $1.053M per claim

- Citing a single attribute that varies between the claims historically settled by BSA and the current BSA Sexual Abuse Claims (number of accusers), Bates White rejects the use of the average settlement value as an indicator of value for the BSA Sexual Abuse Claims, instead using the midpoint between the average of $1.053M per claim and the median of $250,000 (midpoint of $1.053M and $250,000 = $650,000) to establish a Benchmark claim value for Penetration claims[1]

- Bates Whites' approach is inconsistent with its admission that, to the extent the mix of higher value and lower value claims is the same between historical BSA settlements and the BSA Sexual Abuse Claims, the average is a better indicator of value than the median[2]

- Bates White fails to provide a sufficient basis on which to base an opinion that the mix of higher value and lower value claims is *not* the same between historical BSA settlements and the BSA Sexual Abuse Claims and therefore fails to provide sufficient basis to reject the average as a measure of claim value

- Bates White's unsupported approach results in a reduced aggregate claim value for the BSA Sexual Abuse Claims

[1] Per Figure 20 of the Bates White Report.
[2] Per Paragraph 60 of the Bates White Report.



**Confidential Pursuant to Protective Order**

16

# Bates White Rejected the Use of the Historical BSA Settlement Average Without Basis

- Bates White identifies a number of factors that impact claim value,[1] including:
  - › Nature of abuse;
  - › Frequency of abuse;
  - › Duration of abuse;
  - › Damages/Impact of abuse;
  - › Age at the time of abuse;
  - › Age at the time of filing;
  - › Number of abusers;
  - › Age of abuser;
  - › Whether the abuser has other accusers;
  - › Whether the survivor reported the abuse to others contemporaneously; and
  - › Other relationships with the abuser

[1] Per Paragraph 37 of the Bates White Report.



**Confidential Pursuant to Protective Order**

# Bates White Rejected the Use of the Historical BSA Settlement Average Without Basis

- Of the 11 factors identified by Bates White, Bates White identifies a <u>single attribute</u> that varies between the historical and current sets of claims (number of accusers) and uses it as a basis to reject the use of the historical BSA settlement average,[1] despite:
    › The large number of factors impacting valuation;
    › Statistics showing that the percentage of claims falling in each nature of abuse category is consistent between the historical BSA settlements and the BSA Sexual Abuse Claims[2]; and
    › Bates White's acknowledgement that certain factors are actually *more severe* among the BSA Sexual Abuse Claims[3]
- Bates White does not perform any scenarios quantifying the valuation of the BSA Sexual Abuse Claims if the average is used as opposed to a midpoint between the average and the median
- Bates White fails to provide sufficient basis for its selection of the midpoint between the average and the median historical BSA settlement as opposed to the historical BSA settlement average as a more appropriate measure of claim value
- Bates White's unsubstantiated approach results in a undervaluation of the BSA Sexual Abuse Claims

[1] Per Paragraph 60 of the Bates White Report.
[2] Per Table 2 of the Claro Report.
[3] Per Paragraph 76 of the Bates White Report.



**Confidential Pursuant to Protective Order**

# Bates White Rejected the Use of the Historical BSA Settlement Average Without Basis

- Claro used the Bates White valuation model and adjusted it to assign a Benchmark value for Penetration claims of $1.053M (with corresponding increases to Other Sex Act and Other Touching Claims), holding all else constant

- <u>Adjustment in Isolation</u>: Updating claim value to reflect historical BSA settlement averages results in an adjustment to Bates White's Benchmark claim valuation from $5.8B to $9.5B[1]
    - › Holds all other Bates White assumptions and inputs constant
    - › Continues to assign $0 value to claims outside the SOL
    - › Does not adjust for any other improper methodologies or inputs used by Dr. Bates

- <u>Cumulative Adjustments</u>: In combination with the previously-addressed adjustment to include claims falling outside of the SOL, the revised Bates White Benchmark claim valuation is $14.5B[2]

> **Bates White rejects the use of the historical BSA settlement without basis, resulting in its Benchmark valuation of $5.8B undervaluing the BSA Sexual Abuse Claims by at least $3.6B.**



[1] See Exhibit 2 to this Rebuttal Report.
[2] See Exhibit 3 to this Rebuttal Report.

**Confidential Pursuant to Protective Order**

# Bates White Rejected the Use of the Historical BSA Settlement Average Without Basis



Cumulative Adjustments to Bates White Benchmark Valuation[1]

[1] Figures represent the value of the cumulative adjustments, holding all else constant in the Bates White Benchmark valuation.



Confidential Pursuant to Protective Order

20

Bates White Employed Inconsistent Methodology to Develop Benchmark Claim Values



**Confidential Pursuant to Protective Order**

# Bates White Employed Inconsistent Methodology to Develop Benchmark Claim Values

- After rejecting the use of a historical BSA settlement average as an appropriate benchmark for claim value for the BSA Sexual Abuse Claims alleging Penetration (as discussed above), Bates White calculates and applies the average for its other two abuse categories - Other Sex Acts and Other Touching

- Bates White does not provide a basis for why it uses a different statistical approach for these abuse categories

- Further, Bates White excludes certain groups of high dollar claims from its calculation of claim values for Other Sex Acts and Other Touching claims, and the designations of what claims are included vs. excluded for purposes of its calculation varies among each abuse category

- Bates White leaves in the low outlier claims (Guam) for purposes of calculating the average values for Penetration and Other Sex Act claims, despite stating elsewhere that these claims have a "disproportionate influence" on claim statistics given the large number of claims at a very low settlement value[1]

  › For example, the average claim value for Other Sex Act claims (representing over 40% of the claims valued by Bates White) would be nearly <u>24% higher</u> if Guam claims were similarly excluded

- Bates White's inconsistent, selective statistical approach results in an undervaluation of the BSA Sexual Abuse Claims

[1] Per Paragraph 63 of the Bates White Report.



**Confidential Pursuant to Protective Order**

# Bates White Employed Inconsistent Methodology to Develop Benchmark Claim Values

- Both Bates White's statistical approach and its use of settlement data in its calculations varies among the abuse categories, creating unexplained methodological inconsistencies that serve to reduce claim value of the BSA Sexual Abuse Claims

|  | Statistical Approach | Settlement Outliers per Bates White | | Other Multi-Accuser Claims |
|---|---|---|---|---|
|  |  | Guam Claims (low) | Hacker Claims (high) |  |
| Penetration | Midpoint of Average/Median | Include | Include | Include |
| Other Sex Acts | Average | Include | Exclude | Include |
| Other Touching | Average | Exclude | Exclude | Exclude |



# Bates White Employed Inconsistent Methodology to Develop Benchmark Claim Values

- Bates White compares the resulting settlement averages for each abuse category[1] to develop discount scaling factors for Other Sex Acts (.54) and Other Touching (.27)

  › Bates White compares its calculation of the <u>average</u> historical BSA settlement for Other Sex Act claims (<u>excluding</u> Hacker) of $350,000 to the <u>midpoint</u> claim value for Penetration (<u>including</u> Hacker) of $650,000 to arrive at a proportion of .54 ($350,000 / $650,000 = 0.54)

  › Bates White compares its calculation of the <u>average</u> historical BSA settlement for Other Touching claims (<u>excluding</u> Hacker and Guam) of roughly $175,000 to the <u>midpoint</u> claim value for Penetration (<u>including</u> Hacker and Guam) of $650,000 to arrive at a proportion of .27 ($175,000 / $650,000 = 0.27)

- These discount scaling factors are used to scale down Bates White's benchmark claim value for Penetration claims ($650,000) to arrive at benchmark claim values for Other Sex Act and Other Touching claims

  › Other Sex Act claims: $650,000 * .54 = $351,000

  › Other Touching claims: $650,000 * .27 = $175,500

[1] Except for Penetration, for which Bates White uses the midpoint between the average and the median (as discussed above).



Confidential Pursuant to Protective Order

# Bates White Employed Inconsistent Methodology to Develop Benchmark Claim Values

- The settlement averages/midpoints calculated by Bates White were derived using varied methodologies and inconsistent assumptions about which claims are included vs. excluded from the calculation. Therefore, the resulting settlement averages/midpoints are not appropriate for comparison or to develop appropriate "proportions" that inform discount scaling factors

- Using the settlement data provided by Ogletree on which Bates White relied for its valuation,[1] the table below shows the historical BSA settlement average and related proportions if both high and low outliers (Hacker and Guam claims) were either consistently included or consistently excluded

| | 2016+ BSA Settlements Per Ogletree | | | | | |
|---|---|---|---|---|---|---|
| | Include Guam & Hacker | | Exclude Guam & Hacker | | | |
| | Settlement Average | Proportion of Penetration Average | Settlement Average | Proportion of Penetration Average | Proportions Used by Bates White |
| Penetration | $1,053,322 | | $652,155 | | |
| Other Sex Acts | $820,009 | 0.78 | $428,693 | 0.66 | 0.54 |
| Other Touching | $359,646 | 0.34 | $386,908 | 0.59 | 0.27 |

- As demonstrated by the table above, Bates White's inconsistent methodology serves to reduce its discount scaling factors, which results in reduced claim valuations for Other Sex Act and Other Touching claims

[1] BSA-PLAN_01642525

Confidential Pursuant to Protective Order

the Claro group

# Bates White Employed Inconsistent Methodology to Develop Benchmark Claim Values

- Claro used the Bates White valuation model and adjusted it to reflect consistent treatment of outliers (both high and low) for Other Sex Act claims and Other Touching claims based on the Ogletree data

  › Claro performed two scenarios, one using discount scaling factors of .66 and .59 for Other Sex Act and Other Touching Claims, respectively (based on calculations <u>excluding both</u> Guam and Hacker), and the other using discount scaling factors of .78 and .34 (based on calculations <u>including both</u> Guam and Hacker)

- <u>Adjustment in Isolation</u>: Updating the discount scaling factors to reflect consistent treatment of outliers results in an adjustment to Bates White's Benchmark valuation from $5.8B to $6.9B[1]

  › Holds all other Bates White assumptions and inputs constant

  › Continues to assign $0 value to claims outside the SOL

  › Does not adjust for any other improper methodologies or inputs used by Dr. Bates

- <u>Cumulative Adjustments</u>: In combination with previously-addressed adjustments, the revised Bates White Benchmark claim valuation is $17.2B[3]

> **Bates White employs inconsistent methodology to develop benchmark claim values, resulting in its Benchmark valuation of $5.8B undervaluing the BSA Sexual Abuse Claims by at least $1.1B.**



[1] See Exhibit 4, using discount scaling factors of .78 and .34 for Other Sex Act and Other Touching Claims, respectively. The revised Bates White Benchmark valuation using discount scaling factors of .66 and .59, respectively, is $7.0B (see Exhibit 5).
[3] See Exhibit 6 to this Rebuttal Report.

**Confidential Pursuant to Protective Order**

# Bates White Employed Inconsistent Methodology to Develop Benchmark Claim Values



Cumulative Adjustments to Bates White Benchmark Valuation[1]

[1] Figures represent the value of the cumulative adjustments, holding all else constant in the Bates White Benchmark valuation.



**Confidential Pursuant to Protective Order**

27

Bates White Failed to Use Sound Economic Analysis to Adjust Historical BSA Settlements to Account for Inflation



Confidential Pursuant to Protective Order

# Bates White Failed to Use Sound Economic Analysis to Adjust Historical BSA Settlements to Account for Inflation

- Bates White fails to account for inflation in its calculation of the historical BSA settlement metrics used to derive claim values for purposes of both the TDP and its own Benchmark valuation[1]

- Given that many of the settlements utilized by Bates White in its valuation date back to 2016 and are for considerable sums, inflation is a material consideration for purposes of assessing claim value in 2021/2022

- In other mass tort contexts, including analysis supporting testimony before Congress related to the FAIR Act[2] and related publications,[3] Bates White (and Dr. Bates specifically) has inflation-adjusted historical settlement amounts in order to assess current claim values

- Bates White does not provide any explanation for why it fails to inflation-adjust historical BSA settlements for purposes of its Benchmark valuation methodology in this case

- Bates White's failure to adjust historical BSA settlements results in reduced claim valuations

[1] Adjusting historical settlements for inflation is a generally-accepted practice in mass tort claim valuation. See Dunbar, Frederick C. et al. (2004) Estimating Future Claims (pp. 155-159). Wayne, PA: Andrews Professional Books.
[2] See Charles Bates Oral Testimony from Senate Judiciary Committee and supporting Analysis of S. 852.Fairness in Asbestos Injury Resolution (FAIR) Act, pp. 45, 75.
[3] Bates, Charles E. and Charles H. Mullin. "Having Your Cake and Eating It Too?" MEALEY'S Asbestos Bankruptcy Report, Vol. 6 #4, November 2006, p. 3.

the Claro group

**Confidential Pursuant to Protective Order**

# Bates White Failed to Use Sound Economic Analysis to Adjust Historical BSA Settlements to Account for Inflation

- Claro used the Bates White valuation model and adjusted it to reflect the inflation-adjusted historical BSA settlements[1]

- <u>Adjustment in Isolation</u>: Updating the benchmark claim values to account for inflation results in an adjustment to Bates White's Benchmark valuation from $5.8B to $6.5B[2]
  - › Holds all other Bates White assumptions and inputs constant
  - › Continues to assign $0 value to claims outside the SOL
  - › Does not adjust for any other improper methodologies or inputs used by Dr. Bates

- <u>Cumulative Adjustments</u>: In combination with previously-addressed adjustments, the revised Bates White Benchmark claim valuation is $19.1B[3]

> **Bates White fails to adjust historical BSA settlements for inflation in order to develop its benchmark claim values, resulting in its Benchmark valuation of $5.8B undervaluing the BSA Sexual Abuse Claims by at least $0.7B.**

[1] For example, the midpoint of the average and median for Penetration claims before adjusting for inflation is $651,661, as used by Bates White. After adjusting for inflation, this figure would be $723,447. Inflation-Adjusted Settlement Amounts in 2021 dollars based on U.S Bureau of Labor Statistics Consumer Price Index (CPI) inflation data as of November 1, 2021.
[2] See Exhibit 7 to this Rebuttal Report.
[3] See Exhibit 8 to this Rebuttal Report.



**Confidential Pursuant to Protective Order**

# Bates White Failed to Use Sound Economic Analysis to Adjust Historical BSA Settlements to Account for Inflation



**Cumulative Adjustments to Bates White Benchmark Valuation[1]**

[1] Figures represent the value of the cumulative adjustments, holding all else constant in the Bates White Benchmark valuation.



**Confidential Pursuant to Protective Order**

Bates White Improperly Double-Discounts for Other Relationships with the Abuser



# Bates White Improperly Double-Discounts for Other Relationships with the Abuser

- In Bates White's calculation of its Benchmark valuation, it applies a 50% discount to claims that identify one non-BSA related relationship between the abuser and the survivor, and a 75% discount to those with more than one non-BSA relationship[1]

- Bates White's application of additional discounts for this attribute is inappropriate and serves to double-discount for this claim attribute

- Reduced claim values reflecting other relationships with the abuser are already factored into Bates White's Benchmark claim values

  - Bates White attempts to cite the low value settlements involving Brouillard, who was a priest and a teacher and therefore had other relationships with his survivors, as evidence that a discount should be applied, but fails to acknowledge that these low value settlements were *already included* in its calculation of the Benchmark claim values, resulting in reduced claim values

  - To illustrate this point, if Brouillard claims were excluded (given the other relationships with his survivors), Bates White's benchmark value for Penetration claims would be $852,010, compared to the discounted benchmark value of $650,000 it uses for purposes of its analysis (based on a calculated "midpoint" of the average and median of $651,661)

  - Therefore, related claim value discounts have already been factored into Bates White's analysis and an additional discount is duplicative, improper, and methodologically unsound[2]

[1] See Paragraph 64 of the Bates White Report.
[2] The historical BSA settlements have a similar proportion of claims involving other relationships with the abuser as found in the BSA Sexual Abuse Claims. Bates White states that 30% of the BSA Sexual Abuse Claims identify at least one other relationship with the abuser (see Figure 13 of the Bates White Report). Of the historical BSA settlements, over 26% of the settlements relate to Brouillard alone, before taking into account any other claims that involve other relationships with the abuser.



# Bates White Improperly Double-Discounts for Other Relationships with the Abuser

- Claro used the Bates White valuation model and adjusted it to remove the additional discounts for claims identifying additional relationships with the abuser

- <u>Adjustment in Isolation</u>: Removing the duplicate discount for other relationships with the abuser results in an adjustment to Bates White's Benchmark valuation from $5.8B to $7.5B[1]
  - › Holds all other Bates White assumptions and inputs constant
  - › Continues to assign $0 value to claims outside the SOL
  - › Does not adjust for any other improper methodologies or inputs used by Bates White

- <u>Cumulative Adjustments</u>: In combination with previously-addressed adjustments, the revised Bates White Benchmark claim valuation would be $24.4B[2]

> **Bates White inappropriately double-discounts claims that involve other relationships with the abuser, resulting in its Benchmark valuation of $5.8B undervaluing the BSA Sexual Abuse Claims by at least $1.7B.**



[1] See Exhibit 9 to this Rebuttal Report.
[2] See Exhibit 10 to this Rebuttal Report.

**Confidential Pursuant to Protective Order**

# Bates White Improperly Double-Discounts for Other Relationships with the Abuser



Cumulative Adjustments to Bates White Benchmark Valuation[1]

[1] Figures represent the value of the cumulative adjustments, holding all else constant in the Bates White Benchmark valuation.



**Confidential Pursuant to Protective Order**

35

The Corrected Bates White Benchmark Valuation is $24.4B



Confidential Pursuant to Protective Order

# The Corrected Bates White Benchmark Valuation is $24.4B

- Updating for all five of Bates White's methodological errors and omissions discussed in this Rebuttal Report, the revised Bates White Benchmark valuation is $24.4B

  › Inclusion of claims outside the SOL, discounted to reflect the TDP's SOL Mitigating Scaling Factors

  › Application of historical BSA settlement average for Penetration claims, as opposed to the midpoint between the average and the median

  › Consistent treatment of outliers (both high and low) to develop discount scaling factors for Other Sex Act and Other Touching claims

  › Adjusting historical BSA settlements to account for inflation in order to develop benchmark claim values for BSA Sexual Abuse Claims

  › Removing duplicate discount to BSA Sexual Abuse Claims that identified other relationships with abuser

**Confidential Pursuant to Protective Order**

37

# The Corrected Bates White Benchmark Valuation is $24.4B

- The table below summarizes the results of adjustments made to the Bates White Benchmark valuation to reflect its unsupported assumptions, methodological inconsistencies, and economic errors

| Adjustment to Bates White Benchmark Valuation | Each Adjustment in Isolation[1] | | Cumulative Adjustments[2] | |
|---|---|---|---|---|
| | Revised Benchmark Valuation | Difference From Benchmark | Revised Benchmark Valuation | Difference From Benchmark |
| Bates White Benchmark Valuation | **$5.8B** | | **$5.8B** | |
| [A] Value BSA Sexual Abuse Claims Outside the SOL | $8.9B | $3.1B | $8.9B | $3.1B |
| [B] Consider Average Historical BSA Settlement Value as Benchmark | $9.5B | $3.6B | $14.5B | $8.6B |
| [C] Consistent Calculation of Non-Penetration Discount Scaling Factors | $6.9B | $1.1B | $17.2B | $11.4B |
| [D] Rely on Inflation-Adjusted Historical BSA Settlements | $6.5B | $0.7B | $19.1B | $13.2B |
| [E] Update Other Relationship Scaling Factor | $7.5B | $1.7B | **$24.4B** | $18.6B |
| **[F] All Adjustments Combined (A-E)** | **$24.4B** | $18.6B | | |

> **Bates White's Benchmark valuation of $5.8B reflects unsupported assumptions, inconsistent methodology, and undervalues BSA Sexual Abuse Claims. The Bates White Benchmark valuation undervalues BSA Sexual Abuse Claims by $18.6B. The corrected Bates White Benchmark valuation is $24.4B.**

[1] Figures represent value of each adjustment in isolation, holding all else constant in the Bates White Benchmark valuation. For example, the Revised Benchmark Valuation presented for Adjustment [B] does not include any updates related to Adjustment [A].
[2] Figures represent the value of the cumulative adjustments, holding all else constant in the Bates White Benchmark valuation. For example, the Revised Benchmark Valuation presented for Adjustment [B] also includes updates related to Adjustment [A], but does not include updates related to Adjustments [C], [D], or [E].

the Claro group

# The Corrected Bates White Benchmark Valuation is $24.4B

- The Bates White adjusted Benchmark valuation is consistent with the Claro valuation and the FCR valuation



Comparison of BSA Sexual Abuse Claim Valuations [1]



[1] The FCR Implied valuation includes future abuse claims; the Corrected Bates White Valuation and Claro Valuation (Low) do not include future abuse claims.
[2] FCR Implied Valuation per Scarcella Report

**Confidential Pursuant to Protective Order**

# Claro Rebuttal to Bates White Valuation Range



**Confidential Pursuant to Protective Order**

# Summary of Methodological Flaws with Bates White Valuation Range

- The Bates White valuation range of $2.4B - $7.1B is unsupported and insufficient

  › Bates White provides no methodological support for its valuation range of $2.4B - $7.1B

  › The $1.3B difference between the upper-end of the range of $7.1B and Bates White's Benchmark valuation of $5.8B does not provide sufficient cushion to capture the value of claims not valued at all in Bates White's Benchmark valuation



# Bates White Provided No Methodological Support for its Valuation Range of $2.4B - $7.1B

- In order to develop its valuation range of $2.4B - $7.1B, Bates White applied a 50% increase/decrease to its original Benchmark valuation of $4.75B[1]

- The selection of 50% as the appropriate adjustment was described as a "thought experiment" by Bates White[2] and is not supported by any analysis, despite robust data at its disposal and many claim valuation inputs and assumptions that could have been varied to develop a data-supported range

  › For example, Bates White could have performed scenarios including vs. excluding claims that fall outside of the statutes of limitation, varying the benchmark claim values (mean vs. median vs. midpoint), or varying any number or size of possible claim discounts or premiums

- Bates White offered no analysis or support for its range of $2.4B - $7.1B

> **The Bates White valuation range of $2.4B - $7.1B lacks any methodological basis.**



[1,2] Per Paragraph 108 of the Bates White Report.

# The High End of the Bates White Valuation Range is Too Low

- The current Bates White Benchmark valuation of $5.8B:

  › Only values 16,771 claims of the 82,209 BSA Sexual Abuse Claims

  › Places no value on claims outside the SOL that have demonstrable value in the tort system and are valued under the TDP

  › Places no value on Future Abuse Claims

  › Places no value on BSA Sexual Abuse Claims that were excluded from its analysis for failure to provide certain allegation details, but may be supplemented with additional information (such as Abuser Name)

- Accepting the upper-end of Bates White's valuation range of $7.1B means accepting that $1.3B (the difference between the upper-end of the range of $7.1B and its revised Benchmark valuation of $5.8B) is sufficient value for:

  › All claims falling outside of the SOL that may be compensated under the TDP (of the 82,209 BSA Sexual Abuse Claims, Bates White identified 53,988 as falling outside of the SOL)

  › All Future Abuse Claims

  › Claims in states that enact "revival windows" (this alone has increased Bates White's Benchmark valuation by $700M since last year[1])

  › All claims that provide supplemental claim information going forward, resulting in increased valuations (this alone has increased Bates White's Benchmark valuation by $570M in the last year[2])



[1] Per Paragraph 72 of the Bates White Report.
[2] Per Paragraph 89 of the Bates White Report.

**Confidential Pursuant to Protective Order**

# The High End of the Bates White Valuation Range is Too Low

- To make clear the insufficiency of $7.1B as the upper end of the valuation range, even if no adjustments are made to account for Bates White's methodological flaws, consider that Bates White only valued 16,771 of the 82,209 claims – 65,438 received $0 value

- If only 6% of these claims (roughly 3,760) either provide additional information to warrant inclusion in Bates White's valuation or are in states that enact a "revival window," then Bates White's Benchmark valuation would exceed the upper end of the Bates White valuation range. This is before even considering other factors, such as the inclusion of claims falling outside the SOL, inclusion of Future Abuse Claims, and methodological failures of the Bates White Benchmark valuation methodology discussed herein

**The $1.3B difference between the upper-end of the range of $7.1B and Bates White's Benchmark valuation of $5.8B does not provide sufficient cushion to capture the value of claims not valued at all in Bates White's Benchmark valuation.**



**Confidential Pursuant to Protective Order**

Bates White's Own Research of Potential Outside Comparables Contradicts its Valuation and Supports the Claro Valuation



# Bates White's Own Research Contradicts its Valuation and Supports the Claro Valuation

- Bates White performed research to develop a list of "Potential Outside Comparables"; however, it failed to disclose its research tools or its search parameters that would enable Claro to evaluate potential bias in the data gathered

- Bates White acknowledges that it was asked to value the BSA Sexual Abuse Claims as if they were in the tort system,[1] however in developing the list of cases that it deems "Potential Outside Comparables," it includes claims that were resolved explicitly *outside of the tort system*

  › For example, Bates White includes 4,153 claim settlements across 20 matters that occurred through a bankruptcy proceeding,[2] reflecting the debtor's ability to pay as opposed to true claim value in an arms-length negotiation

  › These are not relevant comparables for claims being valued in the tort system

- Bates White includes over 5,700 claims across 59 matters that were resolved outside the SOL,[3] despite placing $0 value on those claims in its own analysis

- Bates white includes over 100 claims across 12 matters resolved in MA and OH, where caps on tort liability may have resulted in reduced settlement value

- Bates White dedicates an entire paragraph to the UCLA class action settlement average of just over $11,000, but neglects to mention that several hundred claimants opted out of this class and their claims remain pending in litigation, and those that have settled to date each exceed $1M *per claim*[4]

- Bates White includes settlements going back to the 1980's without any adjustment for inflation, despite the lengthy passage of time and the notable uptick of claim values in recent history[5]



[1] Per Paragraph 8 of the Bates White Report.
[2] See Exhibit 11 to this Rebuttal Report for the Potential Outside Comparables identified by Bates White with information supplemented by Claro.
[3] See Exhibit 11 to this Rebuttal Report for the Potential Outside Comparables identified by Bates White with information supplemented by Claro.
[4] https://www.latimes.com/local/lanow/la-me-ln-ucla-gynecologist-sexual-abuse-settlement-20190708-story.html
[5] See Chart 1 of the Claro Report.

**Confidential Pursuant to Protective Order**

# Bates White's Own Research Contradicts its Valuation and Supports the Claro Valuation

- The Potential Outside Comparables compiled by Bates White contradict its own valuation and support the Claro Valuation, as shown by the average values per claim in the table below

| | Average Value per Claim |
|---|---|
| **All Bates White Potential Outside Comparables (Including Bankruptcy, Class Action, Tort Caps, and Claims Falling Outside SOL): Range of Nominal to Inflation-Adjusted** | **$474,944 - $610,065** |
| **Claro Valuation - Average Across 46,916 Valued Claims** | **$527,752 - $648,180** |
| **Bates White Valuation - Average Across 47,831 Non-Adult Abuse Claims That Named An Abuser[2]** | **$50,177 - $148,439** |

[1] Inflation-Adjusted Settlement Amounts in 2021 dollars based on U.S Bureau of Labor Statistics Consumer Price Index (CPI) inflation data as of November 1, 2021.
[2] Per Figure 16 of the Bates White Report, 48,072 BSA Sexual Abuse Claims named an abuser. Of those, 47,831 allege abuse as a minor (244 allege abuse as an adult, per Bates White).



**Confidential Pursuant to Protective Order**

# Bates White's Own Research Contradicts its Valuation and Supports the Claro Valuation

- The average settlement for claims falling <u>outside</u> of the statutes of limitation in Bates White's list of Potential Outside Comparables is $267,650, or $360,947 after adjusting for inflation[1, 3]

  › This is inconsistent with Bates White's $0 valuation of claims falling outside of the statutes of limitation, however, it is consistent with Claro's valuation of $256,880 - $445,526 for such claims

- The average settlement for claims falling <u>inside</u> of the statutes of limitation in Bates White's list of Potential Outside Comparables is $1,072,571, or $1,372,033 after adjusting for inflation[2, 3]

  › This is inconsistent with Bates White's $143,104 - $423,350 valuation of claims falling inside of the statutes of limitation, however, it is consistent with Claro's valuation of $1,006,971 for such claims

> **Bates White's own list of Potential Outside Comparables contradicts its valuation range of $2.4B - $7.1B and supports the Claro Valuations of $24.76B and $30.41B.**

[1] Inflation-Adjusted Settlement Amounts in 2021 dollars based on U.S Bureau of Labor Statistics Consumer Price Index (CPI) inflation data as of November 1, 2021.
[2] Inflation-Adjusted Settlement Amounts in 2021 dollars based on U.S Bureau of Labor Statistics Consumer Price Index (CPI) inflation data as of November 1, 2021.
[3] See Exhibit 11 to this Rebuttal Report for the Potential Outside Comparables identified by Bates White with information supplemented by Claro.



**Confidential Pursuant to Protective Order**



48

The Data Upon Which Bates White Relies is Inaccurate and its Valuation is Unreliable



# The Data Upon Which Bates White Relies is Inaccurate and its Valuation is Unreliable

- In the Claro Report, Claro noted that the "Age at first abuse" field in the T6 Database had a 43% discrepancy rate, due in significant part (149 of 163 inconsistencies) to an error in Bates White's age calculation[1]

- To test Bates White's data for accuracy, where a specific age is not listed in the POC Form, Claro calculated the age at first abuse as the difference between the date of first abuse [Abuse Start Date] and the birth date [BW Birth date]

- Without explanation, Bates White disregards the month of the birth date and instead attempts to calculate a person's age at first abuse using only the birth year, resulting in consistently overstated ages

  › For example, claimant number 968 gives a date of birth in December 1958 and a date of first abuse in July 1976. Based on this information, this claimant was 17 at the time of their first abuse. Bates White calculates their age to be 18 (1976-1958 = 18) and inappropriately considers them to be an Adult Abuse Claim and assigns $0 value

- This error remains in the updated Tranche 6 claims data used by Bates White for purposes of the Bates White Report

- "Age at first abuse" as inaccurately calculated by Bates White is the basis to identify Adult Abuse Claims, which are overstated in Bates White's analysis

  › 411 BSA Sexual Abuse Claims are categorized by Bates White as "18+"

  › If the month of birth and/or month of first abuse was considered, 96 of the 411 (23%) would be categorized as under 18 years of age, and should have been valued



[1] See Appendix A of the Claro Report.

# The Data Upon Which Bates White Relies is Inaccurate and its Valuation is Unreliable

- Bates White also relies on inaccurate age calculations to determine the Sexual Abuse Claimant's age at the time of filing their claim
- The age at the time of claim filing is a fundamental claim attribute relied upon by Bates White to determine whether a claim is presumptively barred[1]
- According to the summary of statutes of limitation by state prepared by Ogletree and relied upon by Bates White,[2] many jurisdictions have statutes of limitation rules for childhood sexual abuse survivors based around the number of years from the 18th birthday (e.g., 3 years from turning 18) or the survivor's age when the claim is made (e.g., age 55)
  - › For example, claim number 1262 has a date of birth in October 1965 and their claim was received in September 2020. Based on this information, this claimant was 54 at the time of their claim filing. Bates White calculates their age to be 55 (2020-1965 = 55). Because the abuse occurred in PA and the claimant filed their claim before age 55, the claim would not be presumptively time-barred[3]; however, Bates White inaccurately labels the claim as barred and assigns $0 value
- These rules were relied upon by Bates White when determining which claims were "presumptively barred" and therefore receive a $0 valuation by Bates White
- To the extent its claims database miscalculates claimant ages, it is unreliable for purposes of determining a claim's SOL status

**Inaccurate claimant age calculations render the Bates White valuation unreliable.**

[1] BSA-PLAN_01652380
[2] BSA-PLAN_01642901
[3] BSA-PLAN_01642901



Using the Updated Tranche 6 Claim Data From Bates White Increases Claro's Valuation by 3.86%



**Confidential Pursuant to Protective Order**

52

# Updated Tranche 6 Claim Data From Bates White

- As part of the materials produced in conjunction with its Report, Bates White provided an updated Tranche 6 claims data file ("Updated T6 Database") that was not made available prior to Claro issuing its Report on December 5, 2021. For example:

  › Both data sets include 82,209 BSA Sexual Abuse Claims, however 9,128 of the claim numbers are different between the T6 Database and the Updated T6 Database and appear to be different claims

  › Of the BSA Sexual Abuse Claims found in both the T6 Database and Updated T6 Database, 1,927 have an updated abuse location in the field [BW Abuse State]

  › Other fields were also subject to updates, presumably reflecting further data analysis by Bates White

- Using the same methodology detailed in the Claro Report and the updated Tranche 6 claims data, Scenario A and Scenario B of the Claro Valuation would have been $25.71B and $31.59B, respectively, representing a 3.86% increase compared to the Claro Valuations presented in the Claro Report[1]

|  | Scenario A | Scenario B |
|---|---|---|
| Original Valuation | $24,756,813,020 | $30,412,047,912 |
| Valuation with Updated T6 Data | $25,712,149,327 | $31,585,117,662 |

[1] See Exhibit 12 and 13 to this Rebuttal Report for the updated Claro Valuation Model.



**Confidential Pursuant to Protective Order**

53

# TCJC Claim Valuation



# Bates White Valuation of TCJC Claims

- In its Report, Bates White presented the valuation of 2,854 claims directly identifying the TCJC ("TCJC Abuse Claims") and 7,716 claims identified as being potentially associated with TCJC ("Potential TCJC Abuse Claims")

- The figures presented in the Bates White Report reflect the valuation of the TCJC Abuse Claims and Potential TCJC Abuse Claims in Bates White <u>outdated</u> $4.75B Benchmark valuation

- Bates White provides no basis or explanation for why it did not present valuation figures using its <u>current</u> $5.8B Benchmark valuation

- The table below summarizes the Bates White valuation of TCJC Abuse Claims and Potential TCJC Abuse Claims with the updated Benchmark valuation of $5.8B and with the upper end of its valuation range of $7.1B

| | Bates White Valuation Scenario | | |
|---|---|---|---|
| | **$4.75B (prior Benchmark)** | **$5.8B (current Benchmark)** | **$7.1B (high end of range)** |
| **TCJC Abuse Claims** | $173,277,710 | $212,897,750 | $259,916,565 |
| **Potential TCJC Abuse Claims** | $644,491,137 | $791,854,375 | $966,736,706 |



# Bates White Valuation of TCJC Claims

- The number of claims identified in the Bates White Report as TCJC Abuse Claims (2,854) or Potential TCJC Abuse Claims (7,716) is greater than the number of such claims relied upon for purposes of the Claro Report (2,402)

- TCJC Abuse Claims identified by Bates White are valued between $727M and $827M in the Claro Valuation[1,2]

- Potential TCJC Abuse Claims identified by Bates White are valued between $2.7B and $2.9B in the Claro Valuation[3,4]

|  | Claro Valuation Scenario A | Claro Valuation Scenario B |
|---|---|---|
| TCJC Abuse Claims | $727,473,389 | $826,727,038 |
| Potential TCJC Abuse Claims | $2,705,444,707 | $2,920,185,041 |

[1] Of the 2,854 TCJC Abuse Claims identified by Bates White, 330 are not found in the T6 Database used for purposes of the Claro Report. Of the 2,524 TCJC Abuse Claims found in this T6 Database, Claro determined that 910 were not valued for purposes of the Claro Report.
[2] Using the Updated T6 Database, the TCJC Abuse Claims identified by Bates White are valued between $745M and $849M in the Claro Valuation.
[3] Of the 7,716 Potential TCJC Abuse Claims identified by Bates White, 983 are not found in the T6 Database used for purposes of the Claro Report. Of the 6,733 Potential TCJC Abuse Claims found in this T6 Database, Claro determined that 2,439 were not valued for purposes of the Claro Report.
[4] Using the Updated T6 Database, the Potential TCJC Abuse Claims identified by Bates White are valued between $2.8B and $3.0B in the Claro Valuation.

**Confidential Pursuant to Protective Order**

This Rebuttal Report is intended to make clear which of the facts and matters are within my own knowledge and which are not. I believe that the facts stated herein are true insofar as they are within my own knowledge and the opinions and findings expressed herein represent my true and complete professional opinion. The analyses and findings contained herein are subject to change as more data, documents, or other information become available.

Claro reserves the right to supplement or amend this Rebuttal Report.

Katheryn R. McNally
Managing Director
The Claro Group, LLC



# Data & Documents Considered

- Data and documents listed in the Claro Report issued December 5, 2021

- Affirmative Expert Report of Marc. C. Scarcella, M.A., issued on December 5, 2021

- Bates White Report and related appendices, including materials listed on Appendix C. Materials relied upon

- Charles Bates Oral Testimony from Senate Judiciary Committee and supporting Analysis of S. 852.Fairness in Asbestos Injury Resolution (FAIR) Act

- Bates, Charles E. and Charles H. Mullin. "Having Your Cake and Eating It Too?" MEALEY'S Asbestos Bankruptcy Report, Vol. 6, #4, November 2006



# Exhibit C



Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

```
 1              ***HIGHLY CONFIDENTIAL***
 2          UNITED STATES BANKRUPTCY COURT
 3           FOR THE DISTRICT OF DELAWARE
 4                   -   -   -
 5   IN RE:                    : CHAPTER 11
 6   BOY SCOUTS OF AMERICA AND  : CASE NO.
 7   DELAWARE BSA, LLC,         : 20-10343 (LSS)
 8       Debtors.              : (Jointly Administered)
 9                   -   -   -
10
11
12              Remote videotaped deposition of
13   KATHERYN MCNALLY, Volume 1, held via
14   videoconference on Thursday, February 3, 2022,
15   beginning at approximately 10:03 a.m. Eastern
16   Standard Time, the proceedings being recorded
17   stenographically by Gail Inghram Verbano,
18   Registered Diplomate Reporter, Certified Realtime
19   Reporter, Certified Shorthand Reporter-CA (No.
20   8635), and transcribed under her direction.
21
22
23
24                          COPY
25
```

# REDACTED

REDACTED

REDACTED

# REDACTED

```
17        Q.    Have your opinions ever been
18  adopted by a trier of fact?
19        A.    They have not.
20              ATTORNEY KORNFELD:  Objection
21    as to form.
22  BY ATTORNEY KURTZ:
23        Q.    And how many times have you
24  testified before a trier of fact?
25        A.    I have testified in deposition
```

```
 1  once, and I have not testified at trial.
```

REDACTED

REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED

REDACTED

# REDACTED

REDACTED

Page 366

REDACTED

```
5        Q.    You did not do an analysis to
6   determine which -- how much of the share of each
7   of the BSA sex abuse claims would be ascribed to
8   TCJC?
9        A.    Correct.
```

REDACTED

REDACTED

Page 370

REDACTED

```
 6        Q.     As part of this paragraph, you
 7   don't say anything about being asked to analyze
 8   or assess the reasonableness of the TCJC
 9   settlement.  Am I right?  That's not in that
10   paragraph.
11        A.     Correct; I was not asked to do
12   that.
13        Q.     And you weren't asked to do that.
14   It's not just not in the paragraph; you weren't
15   asked to do that; correct?
16        A.     Correct.
17        Q.     Do you have any opinions on
18   whether the TCJC settlement is a reasonable
19   settlement?
20        A.     I have no opinion on that.
21        Q.     Do you have -- I'm sorry.  The
22   Wi-Fi blocked out, so I couldn't tell.  Did I
23   just cut you off?
24        A.     No.  You're good.
25        Q.     Okay.  Do you have any opinions
```

Page 371

```
 1   as to whether the TCJC settlement represents a
 2   substantial contribution to the settlement
 3   trust?
 4        A.     I have no opinion on that.
```

REDACTED

REDACTED

# REDACTED

REDACTED

24          A.      When you say the statements that
25    I make in my affirmative report, are you

1    referring to my presentation of the amounts
2    associated with claims that were identified as
3    TCJC claims among my Claro valuation or
4    something else?
5          Q.      I'll tell you what I'm referring
6    to is the -- let's call it the single paragraph
7    on page 34 of your initial report related to
8    TCJC sex abuse claims with Table 18.  That's
9    what I'm referring to.
10              Would you call that a ground-up
11    analysis?
12          A.      I would refer to the results
13    presented in Table 18, the results of a
14    ground-up analysis, yes.
15          Q.      And how many potential TCJC abuse
16    claims did you identify as part of your
17    analysis?
18          A.      I did not identify the TCJC
19    claims.  I was provided with the claim listing
20    from TCC counsel, which included 2,402 claims.
21              I cross-referenced those to the
22    82,209 claims that I evaluated.  Of those 2,402
23    claims, that were -- let's see here, 1,554 that
24    had -- that valued as part of my analysis.
25          Q.      Okay.  And the Footnote 70 refers

1    to an Excel spreadsheet.

2            Do you see that?

3        A.    I do.

4        Q.    That was the list that Claro was

5    provided of 2,402 BSA sex abuse claims?

6        A.    Correct.

7        Q.    Who provided that to you?

8        A.    Counsel to TCC.

9        Q.    How did they determine what was

10    in that spreadsheet?

11        A.    I don't know.

12        Q.    What factors did they use?

13        A.    I don't know.

14        Q.    What independent analysis did you

15    do to understand what was in that spreadsheet?

16        A.    I was not asked to do any, and I

17    did none.

18        Q.    Why?  Why did you not do any?

19        A.    I was not asked to.

20        Q.    Did you do any independent

21    analysis to determine the number of TCJC sex

22    abuse claims allege in the BSA bankruptcy?

23        A.    I did not.

24        Q.    Why not?

25        A.    I was not asked to.

REDACTED

7    BY ATTORNEY MALIONEK:

8        Q.    You describe on this page, you

9    say in Table 18, as to the numbers, you call

10    them TCJC sexual abuse claims.  What do you mean

11    by that?

12        A.    I mean the list of claims that

13    were identified on the list of 2,402 claims

14    provided to me by counsel.

15        Q.    Did you do any analysis to

16    determine if there were any potential TCJC abuse

17    claims?  In other words, abuse claims that may

18    have related to TCJC but were not on that list?

19        A.    I did not.

20        Q.    Why not?

21        A.    I wasn't asked to.

22        Q.    Do you believe it would have been

23    appropriate to do that?

24        A.    I wasn't asked to, so I have no

25    opinion on whether it would have been

1    appropriate or not.

REDACTED

REDACTED

# REDACTED

Page 394

REDACTED

Page 395

REDACTED

15          Q.      Do you have any specific
16   knowledge of which claimants in the BSA
17   bankruptcy are affiliated with the TCJC?
18          **A.      I have no knowledge of that other**
19   **than the list of 2,402 claims that was provided**
20   **to me by TCC counsel.  But I think there's been**
21   **other experts that have offered other opinions**
22   **on how many claims there are, but that's the**
23   **extent of my knowledge as to the identification**
24   **of TCJC claims.**
25          Q.      What do you mean by the extent of

Page 396

1    your knowledge?  Did you do anything to
2    determine how that list of 2,402 claims was put
3    together?
4          **A.      I did not.**
5          Q.      So how does that give you any
6    knowledge with respect to whether or not any of
7    those claimants are affiliated with TCJC?
8          **A.      What I understand from TCC**
9    **counsel is that those were a list of TCJC**
10   **claims, so that is my knowledge and I have**
11   **nothing beyond that.**
12         Q.      Your knowledge is what the TCC
13   counsel told you?
14         **A.      Correct.**
15         Q.      Do you have any specific
16   knowledge of which abusers in this case are
17   affiliated with TCJC?
18         **A.      I do not.**
                    REDACTED

REDACTED

18      Q.      For the valuation range that you
19  provide on page 34 of your report with respect
20  to the TCJC sexual abuse claims, does that
21  analysis assume that TCJC will be liable for the
22  entire value of all those claims related to
23  TCJC?
24      A.      Let me quickly turn to 34 just --
25  the values I've presented on Table 18 are the

1   claim values for all BSA related entities.
2       Q.      Okay.  So this is not the claims
3   value that would be apportioned -- that could be
4   apportioned specifically to TCJC; correct?
5       A.      Correct.  I give no opinion on
6   that.
7       Q.      You didn't do any analysis of how
8   much should be apportioned to TCJC of the value
9   of these claims; correct?
10      A.      Correct.
11      Q.      And why did you not conduct any
12  apportionment analysis with respect to that
13  range?
14      A.      I was not asked to.
15      Q.      So does this range then reflect
16  what would be the assumption that TCJC would be
17  responsible for the entirety of the claim -- of
18  these claims?
19      A.      No.
20      Q.      What does it reflect then?
21      A.      The values I've presented are the
22  claim values for all BSA related entities'
23  share, and I make no assumptions or assertions
24  as to what portion of those amounts may be
25  TCJC's responsibility share for those claims.

1       Q.      So far as your analysis is
2   concerned, you don't know if TCJC would be
3   responsible for or apportioned 50 percent of the
4   fault with respect to these claims; correct?
5       A.      Correct.
6       Q.      Or 33.3 percent?
7       A.      Correct.
8       Q.      Or 25 percent?
9       A.      Correct.
10      Q.      Or 1 percent?
11      A.      Correct.
12      Q.      You did no analysis of that?
13      A.      Correct.
14      Q.      You weren't asked to?  Correct?
15      A.      Correct.
16      Q.      And the same is true with respect
17  to your rebuttal report with respect to your
18  conclusions with respect to TCJC:  You did no
19  analysis whatsoever to try to apportion the
20  TCJC's portion of the liability of any of the
21  claims that you described there?
22      A.      Correct.

REDACTED

REDACTED

Page 402

REDACTED

19      Q.    Do you believe that Dr. Bates'
20  figure of 2,854 is correct and your number of
21  1,554 is wrong?
22      **A.    I have no opinion on that.**
23      Q.    You didn't analyze that?
24      **A.    No.**
25      Q.    And you didn't do any analysis

Page 403

1   with respect to whether or not the potential
2   TCJC abuse claims of 7,716 was -- is a correct
3   amount related to TCJC -- potentially related to
4   TCJC; correct?
5       **A.    Correct.**
6       Q.    You didn't analyze that; correct?
7       **A.    Correct.**
            REDACTED

REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

# REDACTED

REDACTED

# REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

# REDACTED

# REDACTED

# REDACTED

REDACTED

# REDACTED

# REDACTED

# REDACTED

# REDACTED