```
 1                   UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                       . Chapter 11
                                  . Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND    .
     DELAWARE BSA, LLC,           . (Jointly Administered)
 5                                .
                                  . Courtroom 2
 6                                . 824 Market Street
            Debtors.             . Wilmington, Delaware 19801
 7                                .
                                  . Friday, February 18, 2022
 8   . . . . . . . . . . . . . . . 12:00 p.m.

 9                   TRANSCRIPT OF ZOOM HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10              CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Derek C. Abbott, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                             1201 North Market Street
                               16th Floor
14                             Wilmington, Delaware 19899

15                             -and-

16                             Jessica C. Lauria, Esquire
                               Glenn M. Kurtz, Esquire
17                             WHITE & CASE LLP
                               1221 Avenue of the Americas
18                             New York, New York 10020

19   (APPEARANCES CONTINUED)
     Electronically
20   Recorded By:              LaCrisha Harden, ECRO

21   Transcription Service:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1    APPEARANCES (CONTINUED):

2    For the Tort
     Claimants' Committee:       Richard M. Pachulski, Esquire
3                                Alan J. Kornfeld, Esquire
                                 PACHULSKI STANG ZIEHL & JONES, LLP
4                                10100 Santa Monica Boulevard
                                 13th Floor
5                                Los Angeles, California 90067

6
     For AIG, on behalf of
7    Certain Insurers:           Keith R. Martorana, Esquire
                                 James Hallowell, Esquire
8                                GIBSON DUNN & CRUTCHER, LLP
                                 200 Park Avenue
9                                New York, New York 10166

10
     For Hartford Accident
11   and Indemnity Company:      Philip D. Anker, Esquire
                                 WILMER CUTLER PICKERING HALE
12                                 AND DORR, LLP
                                 7 World Trade Center
13                               250 Greenwich Street
                                 New York, New York 10007
14

15   For The Zalkin Law
     Firm, PC, and Pfau
16   Cochran Vertetis
     Amala, PLLC:                Thomas E. Patterson, Esquire
17                               KTBS LAW, LLP
                                 1801 Century Park East
18                               26th Floor
                                 Los Angeles, California 90067
19

20   For the Coalition of
     Abused Scouts for
21   Justice:                    David J. Molton, Esquire
                                 BROWN RUDNICK, LLP
22                               Seven Times Square
                                 New York, New York 10036
23
                                 Eric R. Goodman, Esquire
24                               601 Thirteenth Street, NW
                                 Suite 600
25                               Washington, DC 20005

1  APPEARANCES (CONTINUED):

2  For the Future
   Claimants'
3  Representative:              Robert S. Brady, Esquire
                                YOUNG, CONAWAY, STARGATT
4                                 & TAYLOR, LLP
                                1000 North King Street
5                               Wilmington, Delaware 19801

6  For the Ad Hoc
   Committee of Local
7  Councils of the Boy
   Scouts of America:          Richard G. Mason, Esquire
8                              WACHTELL, LIPTON, ROSEN & KATZ
                               51 West 52nd Street
9                              New York, New York 10019

10 For the Roman Catholic
   and United Methodist
11 Ad Hoc Committee:           Jeremy W. Ryan, Esquire
                               POTTER ANDERSON & CORROON, LLP
12                             1313 North Market Street
                               6th Floor
13                             Wilmington, Delaware 19801

14 For the US Trustee:         David L. Buchbinder, Esquire
                               OFFICE OF THE UNITED STATES TRUSTEE
15                             J. Caleb Boggs Federal Building
                               844 King Street
16                             Suite 2207, Lockbox 35
                               Wilmington, Delaware 19801
17
   For Jane Doe:               Mark L. Desgrosseilliers, Esquire
18                             CHIPMAN BROWN CICERO & COLE, LLP
                               Hercules Plaza
19                             1313 North Market Street
                               Suite 5400
20                             Wilmington, Delaware 19801

21 For Certain Tort
   Claimants represented
22 by Lujan & Wolff, LLP:      Delia Lujan Wolff, Esquire
                               LUJAN & WOLFF, LLP
23                             238 Archbishop Flores Street
                               Suite 300, DNA Building
24                             Hagatna, Guam

25

1 | <u>APPEARANCES (CONTINUED)</u>:

2 | For Century Indemnity
Company:                    Tancred Schiavoni, Esquire
3 |                             O'MELVENY & MYERS, LLP
                             Times Square Tower
4 |                             7 Times Square
                             New York, New York 10036
5 |
For Allianz Global
6 | Risks US Insurance
Company:                    Ryan S. Smethurst, Esquire
7 |                             MCDERMOTT WILL & EMERY, LLP
                             The McDermott Building
8 |                             500 North Capitol Street, NW
                             Washington, DC 20001
9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1

2

INDEX

3

MOTIONS:                                                        PAGE

Agenda
Item 1:   Debtors' Motion for Entry of an Order              7
          Approving Supplemental Notices Regarding
          Plan Modifications
          (D.I. 8823, filed 02/15/22)

          Court's Ruling:                                     76

Agenda
Item 2:   Status Conference                                   85


Transcriptionist's Certificate                                111

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced at 12:02 p.m.)

2        THE COURT:  Good afternoon, counsel.  This is

3   Judge Silverstein.  We're here in the Boy Scouts of America,

4   Bankruptcy Case 20-10343.

5        I will turn it over to debtor's counsel.

6        MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

7   of Morris Nichols here on behalf of the debtors.

8        Your Honor, we did, this morning, file an amended

9   notice of agenda.  I wanted to make sure the court has that

10  or got that.

11       THE COURT:  Maybe, but I think I'm good.  I've got

12  the motion, I've got two objections and a certification of

13  counsel.

14       MR. ABBOTT:  That's it, Your Honor.

15       Just quickly, with respect to the certification of

16  counsel, I want to apologize to the court, and

17  Mr. Buchbinder, Mr. Ryan, Mr. Martorana, if that certificate

18  led them to conclude that we were asking the court to enter

19  that order without the hearing.  There was a creature of the

20  form left in there.  We just -- really, that was intended to

21  be a notice of our proposed order after discussions with the

22  parties.

23       THE COURT:  I expected --

24       MR. ABBOTT:  Our apologies on that.

25       THE COURT:  It's okay.  I expected a revised form

1   of order and I didn't read this as resolving anyone's

2   objections.

3          MR. ABBOTT:  Thank you, Your Honor.

4          Now I will just turn the podium over to Ms.

5   Lauria.  Thanks again, Your Honor, before I do that for

6   agreeing to reschedule this to noon to accommodate parties

7   other commitments.

8          I will turn it over to Ms. Lauria.

9          THE COURT:  Ms. Lauria?

10         MS. LAURIA:  Thank you, Your Honor.  For the

11  record Jessica Lauria, White & Case, on behalf of the debtor.

12         I do want to reiterate the thanks that Mr. Abbott

13  just expressed because this was, in part, due to a conflict

14  that I had with the LTL matter.

15         I would also like to thank Mr. Pachulski.  He

16  doesn't realize this, but his firm loaned me the conference

17  room that I am sitting in to conduct this hearing at the

18  Bankruptcy Court here in New Jersey in the courthouse there.

19  So thank you, Mr. Pachulski and your firm for giving me this

20  opportunity to use this conference room.

21         Your Honor, I am going to start with the motion

22  for approval of the supplemental noticing to Class 8 and to

23  the chartered organizations.  What I would like to do, Your

24  Honor, is first talk to the court about why we elected to

25  file a motion.  It's not that we wanted to have another full-

1  blown disclosure statement hearing, but I wanted to walk

2  through why it is that we actually filed the motion and how

3  we view the effected parties in light of the statutory

4  provisions, the rule provisions and the applicable case law.

5  Then I will talk through what we did in terms of

6  communications with the potential parties in interest with

7  respect to these notices.  Then, of course, answer any

8  questions that the court may have.

9       So just to start then with why it is we elected

10  the filed motion.  You will recall, Your Honor, in the wake

11  of our -- I guess it was towards the end of hearing last

12  Friday, we informed the court that we would go back and take

13  another very careful look at Section 1127 of the Code,

14  Section 1125 of the Code, as well as the case law thereunder

15  and form a view as to whether that supplemental disclosure

16  was necessary.

17       As the court is well aware Section 1127 does

18  permit a debtor to modify a plan, both before and after

19  confirmation.  We are here before you today on a pre-

20  confirmation modification to the plan.  Section 11127(c) says

21  that we must comply with the rules of Section 1125 and

22  Section 1125(b) says that if we're going to solicit votes,

23  and I'm going to come back to the concept of solicitation,

24  but 1125(b) says that if there is a solicitation there are,

25  in effect, three requirements that need to be met: one, there

1    needs to be written disclosure; two, there needs to be

2    bankruptcy court approval; and, three, that needs to occur

3    after notice and a hearing.

4            So that is why we have maintained the adequate

5    information finding in the order and I am going to turn to

6    the case law in their application of these three principals

7    in 1125 as well as bankruptcy Rule 3019 that leads us to

8    where we are with the motion.

9            With that, Your Honor --

10           THE COURT:  Excuse me for a moment, Ms. Lauria.

11           MS. LAURIA:  Sure.

12           THE COURT:  I inadvertently left something on my

13   desk that I need to get for this argument.  So give me a

14   moment, just a moment, stay right there and let me get it.

15           MS. LAURIA:  No problem.  Sure.

16       (Pause)

17           THE COURT:  Okay.  I'm sorry.  Please continue.

18           MS. LAURIA:  No problem, Your Honor.

19           So we re-reviewed the statutory provisions, we

20   went back and looked at Bankruptcy Rule 3019(a) which talks

21   about the need -- which talks about acceptances with respect

22   to a plan being deemed to apply to a plan as modified unless

23   there is an adverse change to the treatment of a claim, and

24   then we went back and looked at the case law that has been

25   promulgated thereunder.

1        I think we may have informed Chambers of this,

2  Your Honor, I do have a very brief demonstrative chart that I

3  would like to use for purposes of the argument because I

4  think it helps synthesize where the cases come out and,

5  essentially, the decision matrix that the debtor's utilized

6  in both coming up with the notices as well as deciding to

7  file the motion.

8        So Ms. Warner from White & Case has the chart on

9  her screen and I'm wondering, Your Honor, if it would be

10  acceptable if we could do a screen share of that chart.

11        THE COURT:  Yes, give us a moment.

12        MS. LAURIA:  Thank you.  It's Blair Warner for

13  purposes of (indiscernible).

14        Okay.  So as I mentioned, Your Honor, this is very

15  simple, it's very high-level, but we think it's important for

16  the court and the parties to understand not only the case

17  law, but also how we got here.  I'm going to start with

18  actually walking through our analysis of the disclosure

19  issues under the cases.  These are cases that were cited in

20  our pleading and cases that I have no doubt that the court is

21  very much aware of.

22        The question that we were presented with was in

23  what circumstance does a plan modification require some sort

24  of additional disclosure.  The cases fall into, essentially,

25  three categories.

1          he first one is the one that I suspect most of us

2    are very much familiar with which is there's a material and

3    adverse change in the treatment of our particular claim under

4    a plan and that material and adverse change, and this is key,

5    Your Honor, would cause a creditor who has voted to accept

6    the plan to reconsider the acceptance of the plan.

7          That concept is clear not only in the face

8    of 3019(a), but also in the American Solar King case, as well

9    as, I think, virtually every case that has grappled with this

10   issue.  If you have a material and adverse change to

11   treatment of a plan and you have an accepting creditor you

12   need to consider whether or not that accepting creditor

13   should be re-solicited and then whether they need

14   supplemental disclosure under 1125 in connection with that

15   re-solicitation.

16          The second occurrence that comes up in the case

17   law for purposes of requiring additional disclosure is when

18   accepting votes -- when you are actually asking previously --

19   this is actually a typo, previously rejecting creditors to

20   change their rejecting vote to accept the plan.  That, you

21   will see in the American Solar King case, and it's been cited

22   multiple times for the proposition that you need supplemental

23   disclosure under 1125 if you are asking a previously

24   rejecting creditor to accept the plan.  Again, apologies for

25   the typo in this chart.

1          Now I will note, Your Honor, that that's not a

2    universally held view.  The Simplot case, which is one that

3    we have cited in the papers and I have cited it, actually, to

4    the court a few times, essentially, says that if you have got

5    a previously rejecting creditor who you are now asking to

6    accept the plan you don't need to provide them with

7    additional disclosure.

8          Nonetheless, there are cases that do say you do

9    need to provide them with disclosure under 1125.  Again, in

10   this instance we are not talking about a re-solicitation.  We

11   are simply talking about asking a rejecting creditor to

12   change their vote with respect to the plan.

13         The second issue -- excuse me, Your Honor, the

14   third issue that comes up in connection with supplemental

15   disclosure really isn't under the 1125 context.  We have

16   labeled here as other considerations.  You might call it due

17   process, but it's the same sort of noticing concept that you

18   have anytime that you're doing something under the bankruptcy

19   code which is if I'm effecting a party and I'm seeking some

20   sort of order from the court at some point, as a result of

21   that I need to provide that party with notice.

22         So that is the universe of three instances that we

23   have seen in the case law that suggests that there should be

24   some sort of supplemental disclosure.  Because in the

25   American Solar King case the first two before you there,

1   again, material and adverse treatment that would cause an

2   accepting creditor to potentially reconsider or, two, you're

3   asking a rejecting creditor to now accept the plan American

4   Solar King tells us that that does require some sort of

5   supplemental disclosure under 1125.

6          Your Honor, you may disagree with that, of course,

7   but that is why and this is in response to, at least, one of

8   the objections that I have seen in an informal comment we

9   received from the United States Trustee.  This is ultimately

10  why we proceeded by motion and we have declined the

11  opportunity to remove the adequate disclosure language from

12  the form of order that was submitted to the court.

13         Now what I would like to do, Your Honor, if I may,

14  is actually talk about these principals, these three

15  principals in the context of the individuals that are the

16  subjects of the two notices before the court.  The survivors,

17  which, I would like to start with, I will then move to the

18  chartered organizations.  I should also note, Your Honor,

19  that at least some of the objecting insurers, I think, have

20  indicated to us that they do have an objection with respect

21  to the supplemental notices.  So while they don't appear on

22  this chart I am happy to walk through these three principals

23  with respect to the insurers as well.

24         So starting with the survivors, Your Honor, as I

25  explained at the last hearing we do not believe that the plan

1  modifications resulting from the TCC resolution are in any

2  way materially adverse to the survivors' treatment under the

3  plan.

4         First of all, the solicitation version of the

5  disclosure statement and plan was very clear on its face and

6  we repeatedly advised parties that the debtors would be

7  seeking additional settlements in connection with this case

8  and that we would, in fact, do that.

9         The recovery chart in the disclosure statement,

10 which, again, the disclosure statement is Docket No. 6431,

11 the recovery chart in the disclosure statement very clearly

12 disclosed to survivors that they're anticipated recoveries in

13 this case would be between 10 to 63 percent; that was based

14 upon the high and low end of the Bates White range, and that

15 it would also be up potentially 100 percent if you consider

16 the additional insurance rights and additional settlements

17 that were possible under the plan.

18        We stayed true to that, Your Honor.  The debtors

19 still stand behind that disclosure.  It certainly has not

20 gone down.  In our view it has only gone up from not only the

21 additional settlements that we very clearly advised parties

22 that we would be seeking, but also as a result of the changes

23 that were being made to the plan as a result of the TCC

24 settlement; namely, the change to the abuse claim definition

25 which tightens that up, makes it conform with applicable law,

1  but also narrows the channeling injunction and clarifies that

2  the survivors' claims against chartered organizations are

3  going to -- that have nothing to do with scouting are not

4  effected by our plan of reorganization.  That is all a good

5  thing.  So, again, we don't see any material and adverse

6  treatment of any of the survivor claims.

7          There is, and I just want to pause on this for a

8  moment because I think there is some confusion about the

9  independent review provisions of the plan.  At least we have

10 received some feedback in the implications of the costs to

11 actually seek the independent review.  I want to be really

12 clear about this, individuals do not need to pay $20,000 or

13 any other dollar amount to seek a recovery and to receive a

14 recovery from the trust.

15          There is an independent enhanced review process

16 for the absolute most severe claims, claims that are so

17 severe that $20,000 really covers the trust costs of

18 reviewing those claims, and, frankly, the survivors would be

19 entitled to receive multiples of that $20,000 in order to go

20 into that independent review process.  But the $20,000 is not

21 a cost of entry, it's simply to compensate the trust for its

22 time in reviewing the most severe claims and enables those

23 claim holders to receive an enhanced recovery under the plan.

24          So, again, for survivors you will see we have got

25 no in the material and adverse treatment.  So that is not the

1  reason we have got the Class 8 notice.

2          Next --

3          THE COURT:  Let me ask this question with respect

4  to that.  My real question about whether there is a --

5  whether I can make a finding that there is not a material

6  adverse change can I make this finding that there is no

7  material and adverse change revolves around the reallocation

8  of recoveries from non-settling insurers from 100 percent of

9  it going to the trust to now after recoveries of cost and

10 expenses, and something else, the 80/20 allocation and then

11 the subsequent 70/30 allocation.

12         How can I know or how is it knowable for an

13 individual claimant whether that reallocation of recoveries

14 from non-settling insurers is favorable or not for any

15 particular creditor?

16         MS. LAURIA:  Sure, Your Honor.  Two responses to

17 that; one, with respect to the motion before you today and,

18 two, I will take a shot at responding to the substance as

19 well.

20         As we sit here today we're not asking you to find

21 that the prior votes on the plan shall be deemed to be votes

22 on the amended plan.  We will be seeking that in connection

23 with confirmation.  What we are doing today, though, is

24 asking for court approval of the disclosure and that is

25 simply because under 1125 if we determine 1125 applies it

1  says I need to have notice and a hearing and bankruptcy court

2  approval before sending that piece of paper out.  That is

3  part one.

4          With respect to your specific question in large

5  part the non-settling insurers are excess insurers.  So there

6  isn't a per se entitlement to recovery from those insurers

7  for each and every individual that has a claim with respect

8  to the trust.  That is why we have allocated to the

9  independent review, enhanced review process because, again,

10  these are the most significant claims that would, in effect,

11  reach into that excess -- those excess layers.  Again, Your

12  Honor, we will be prepared and we will -- we understand the

13  question and we will be prepared to brief that question with

14  respect to this Class 8.

15          What I would argue, Your Honor, is I don't know

16  that you necessarily need to get there because we are

17  proposing to send the Class 8 notice out to everyone.  And

18  for the first reason it is, again, under the second category

19  we are asking previously rejecting creditors to vote to

20  accept the plan.  Now that is the result -- let me actually

21  take a step back and just remind the court of what the

22  composition was of acceptances to rejections.

23          We had around 53,000 votes that were cast with

24  respect to the Class 8 class; 73.57 percent accepted, 26.43

25  percent rejected.  That 26 percent equates to 14,166

1  claimants.  So those are the folks that were actually truly

2  focused on in this category are the rejecting creditors.  We

3  are asking the rejecting creditors to actually accept the

4  plan.

5          That 14,000 -- those 14,000 votes 8,400 of those

6  were actually cast by master ballots and that master ballot

7  voting behavior was largely associated with the state court

8  counsel that were right at the table with us negotiating the

9  TCC termsheet with us and that our state court counsel that

10 stayed in close contact with the TCC.  So those are the folks

11 that we think we need to -- that we are really targeting in

12 terms of vote changes.  That said, Your Honor, we do think

13 that we should go ahead and send Class 8 out to -- the

14 Class 8 notice out to all Class 8 members, not just

15 the 14,166 that voted to reject the plan.

16          I suppose if we ended up having -- and we're

17 allowing everybody to change their votes, we just don't think

18 a re-solicitation is necessary here.  If folks want to change

19 their votes by that March 4th deadline we think that makes

20 sense and I would also, Your Honor, just go back to Simplot

21 decision which, by the way, also quoted the American Solar

22 King case that said, and this is, I think, the overriding

23 principal that should apply as we're thinking about the

24 solicitation rules, who we're sending ballots to and -- by

25 the way, we're not sending ballots, we're just sending

1    notices and instructing people how to change their vote.

2                Simplot tells us, and this is at page 13,

3                "The code is designed to encourage consensual

4    resolution of claims and disputes through the plan

5    negotiation process including pre-confirmation modification.

6    The rules applicable to such modification should be read and

7    interpreted consistently to that end."

8                That is how we are viewing exactly what we are

9    looking at here today.  We are trying to encourage

10   resolution, but we are also being practical about where we

11   are at in the case.  From a timeline perspective you have

12   heard a lot about that, also the cost of doing a re-

13   solicitation both from a time and pure money perspective.  We

14   have already invested millions of dollars into the original

15   solicitation process.  So we think providing this notice is

16   consistent with 112, 1127, 3019, and the applicable case law,

17   but we are going to send it to everybody in that class.

18               That, by the way, Your Honor, probably also covers

19   off -- you know, we said no in terms of other considerations

20   for the survivors; although, if you had the opportunity to

21   look at the notice I think it does a nice job of describing

22   in plain English the plan changes.  So I do think there is

23   another consideration or, in effect, a due process component

24   of describing to the survivor constituency the plan changes

25   in that manner.

1          That, Your Honor, brings me to the chartered

2   organizations.  Before I dive into the chart I want to just

3   take a step back and make sure that we all are on a level set

4   in terms of chartered organizations versus Class 9 indirect

5   abuse claims.

6          Class 9 indirect abuse claims are not one in the

7   same with the chartered organizations. Class 9 indirect abuse

8   claims include not only the chartered organizations, but also

9   local councils that asserted claims against the debtors and

10  insurers that asserted claims against the debtors.

11         The chartered organization claims are related to

12  alleged indemnity pertaining to sexual abuse claims.  And

13  while I haven't reviewed all of the proofs of claim there

14  were 12,350 chartered organization claims filed against the

15  BSA.  The vast, vast majority of them did not attach

16  documentation to demonstrate their right to indemnity.  Most

17  of them just simply attached an attachment saying they

18  believed they had a right to indemnity or contribution, and

19  that they were asserting that right under the proof of claim

20  form.  In fact, I think TCJC may have been one of the only

21  chartered organizations that actually offered documentation

22  or attached documentation to its proof of claim form.

23         Nonetheless, you know, we elected not to --

24         THE COURT:  I'm not sure why that matters.  I am

25  not sure why that matters.  Why do you think that is

1  important?

2          MS. LAURIA:  I will get there because, Your Honor,

3  from the debtor's perspective we elected not to take action

4  with respect to the indirect abuse claims through one of two

5  means.  One, we didn't file objections to the claims as

6  containing insufficient documentation.  The reason that is,

7  is because if you look at the plan's mechanics for chartered

8  organizations unless you opt-out of the treatment afforded to

9  the participating chartered orgs under the plan you are

10  waiving your right to the indirect abuse claim.

11          So, in other words, we didn't evaluate those

12  claims, we went ahead and provided ballots to those claimants

13  and permitted those claimants to vote with respect to the

14  plan, but they are waiving their right to the indirect abuse

15  claim unless they opt-out.  That is simply because they are

16  getting a channeling injunction with respect to that post-

17  1976 time period as well as the pre-1976 chartered org time

18  period -- excuse me, settling insured time period.  That was

19  the *quid pro quo* -- one of the *quid pro quo's* with respect to

20  those direct abuse claims.

21          So I wanted to just point that out, Your Honor,

22  because we think that is important as we think about the

23  chartered org indirect abuse claims.  When we look at that

24  class in terms of chartered organizations votes with respect

25  to the plan around 7,800 of them voted with a 76.4 percent

1 acceptance rate.  It's a little different then the final

2 voting report that was filed, Your Honor, because votes have

3 come in after the fact, namely from the Methodists, that the

4 voting agent has continued to tabulate and part of the relief

5 that we're seeking in this motion is authority -- excuse me,

6 the relief that we sought through the last order that the

7 court entered was authority to accept those late filed

8 ballots from, namely, the Methodist entities, but that is an

9 accepting class.

10       And so, again, applying our three factor, three

11 prongs of the legal standard with respect to chartered

12 organizations, as I explained last Friday, and we maintain

13 today, we have not changed the treatment of Class 9 claims

14 with respect to charters, with respect to local councils,

15 with respect to the insurers.  The treatment of the claims,

16 and that is specifically what 3019 speaks to, that is

17 specifically what 1125 speaks to, we have not changed the

18 treatment of their claims.

19       Similarly, I am not asking the rejecting creditors

20 in Class 9 to vote to accept the plan.  I think that is

21 important, Your Honor, because as we think about, for

22 example, the objection that was filed by Mr. Ryan,

23 Mr. Ryan -- the parishes within the Ad Hoc Committee of Roman

24 Catholic Churches that he represents -- by the way, there are

25 two Ad Hoc Committee of Roman Catholic Churches, but within

1  his constituency the parishes that we have been able to link

2  back to Mr. Ryan's constituency all of them, 100 percent of

3  them, reject the plan.

4          I am not asking for those to -- I would love it if

5  his constituents would like to change their votes, but I am

6  not asking for them to change their votes.  I am not

7  soliciting them to change their votes.  I do think --

8          THE COURT:  This is interesting.  So explain to me

9  what you think the differences between soliciting and asking

10  someone to change their vote, and just sending out a notice

11  saying you can change your vote.

12          MS. LAURIA:  Right.  So that brings me to what I

13  would call the other consideration because the circumstance

14  with respect to the chartered organizations doesn't fall

15  squarely within 1125, 1127, or 3019.  The issue with the

16  other considerations is that the material factor for a

17  chartered organization is this concept of opt-out.  Whether

18  the chartered organization wants to opt-out of the treatment,

19  really opt-out of the channeling injunction provisions with

20  respect to the plan itself.

21          You will recall, Your Honor, and I think you made

22  this observation last Friday that the solicitation version of

23  the disclosure statement effectively provided what the

24  chartered organizations have today under the modifications to

25  the plan; although, the plan has actually been enhanced from

1   that version *vis-à-vis* them because the local councils have

2   now made a contribution to afford the chartered organizations

3   a 12-month preliminary injunction so they can resolve if they

4   so choose their pre-1976 uninsured or not insured by a

5   settling insurer liability.

6           As Your Honor observed, the September 30th of the

7   disclosure statement and plan effectively provided what we

8   had today and also afforded chartered organizations the

9   opportunity to opt-out of the treatment.  Opt-out means they

10   are preserving their indirect abuse claims as well as they

11   would only be receiving the benefit of the channeling

12   injunction to the extent of the settled insurance and no

13   more.

14           On December 14th, in connection with the Century

15   agreement that was reached, so about two and a half months

16   after the launch of solicitation the local councils agreed to

17   provide supplemental consideration for the chartered

18   organizations other than the Catholics to get them a full and

19   complete channeling injunction across time.  That held true

20   for the two weeks up until the voting deadline which was

21   December 28th.  So we had a two-week period of time of the

22   nearly three months of solicitation where the chartered orgs

23   would have received a full and complete release for that

24   entire period of time.

25           When we cut the deal, as the court knows, and I

1   won't belabor it, with the TCC and the objecting plaintiffs

2   they made it very clear that they didn't believe that that

3   was legal.  And as a result that time period per-1976

4   uninsured were not insured by a channeling injunction, it was

5   back to the chartered organization to seek a resolution as

6   they did in the original plan.

7            So in our view, Your Honor, because of that, I'm

8   going to call it, flip-flop, because that is, in fact, what

9   it was, and that two-week time period where chartered

10  organizations may have been under the impression that their

11  indirect abuse claim did not matter and that they were

12  getting a full and complete channeling injunction and,

13  therefore, didn't need to exercise their opt-out right that

14  they were fine with the provisions of the plan, and the

15  releases that were being afforded to chartered organizations

16  there is a possibility that those organizations elected to

17  stay in the plan treatment and not opt-out.  We do think it's

18  important to advise them of that.

19           If the chartered organization then elects to opt-

20  out they are preserving their indirect abuse claim which

21  means they may actually view the plan differently and view

22  their vote differently, but its only if their opt-out

23  creditors in the debtor's view.  We don't think it makes

24  economic sense to opt-out, but we are affording, you know, at

25  the request of various chartered organizations parties the

1  ability to do that.  So that is why we ultimately elected to

2  provide the notice to charters because the changes over time

3  have been complicated.

4         We do, as I explained last Friday and as the

5  court's order reflected, want to afford them the opportunity

6  to opt-out if they so choose.  We don't think that is the

7  right idea, but they may choose and if they want to opt-out

8  they very well may want to change their vote and the debtor

9  doesn't want to prevent parties from doing that.

10         So that is how we view the chartered

11  organizations.  Again, Your Honor, we will be in a position

12  to demonstrate, in connection with confirmation, that the

13  votes that were cast with respect to the plan, including as

14  modified, should be votes cast on a plan that is before the

15  court for confirmation.  Today we are here before you on a

16  disclosure issue.

17         The parties have asked -- well I should say the

18  objecting parties, the United States Trustee, the insurers,

19  and Mr. Ryan in particular have asked that we remove the

20  finding from the proposed form of order on adequate

21  information and this is why we have maintained it because as

22  we read the case law there may be some basis for us to get

23  that court ruling.  We certainly did not want to send, in

24  light of issues that we brought before the court in this

25  case -- by the way, Ms. Warner, you can take the slide

1   down -- in light of issues that we have brought before the

2   court in the past concerning communications from an official

3   email or mail address.  These notices would be coming from

4   Omni Claims Agent.

5           So even if the court concludes that we're

6   authorized to send them without making a specific 1125 or

7   adequate information finding we just simply did not feel

8   comfortable going forward sending these notices that are not

9   just notice of a motion filing, but actually had plain

10  English description to people's clients without bringing it

11  to everyone's attention. So that is that piece.

12          Let me just briefly address the insurers and then

13  I want to close out with a handful of, I guess, observations.

14          With respect to the insurers we understand that

15  the insurers have comments, and I will come to in a moment

16  what we, sort of, did to suss out folks views with respect to

17  the notices.  The insurers did have comments on these

18  notices.  These notices were not geared toward the insurers.

19  They are geared toward chartered organizations and they're

20  geared towards survivors.  Quite frankly, I mentioned the

21  fact that Class 9 did include insurers.

22          By my count there were 54 insurers that voted in

23  Class 9; 51 of them were acceptances because they were

24  affiliated with the four settling insurers that we have right

25  now.  There were three rejections.  Not surprisingly, those

 1  were affiliated with the non-settling insurers. I am not

 2  asking non-settling insurers to change their votes.

 3          When you think about due process and other

 4  considerations the non-settling rejecting insurers are

 5  represented by extremely sophisticated counsel as we all

 6  know.  They're receiving notice of everything on the 2002

 7  list.  I think they're probably all present at this hearing

 8  here today.  So the insurers were really not who we targeted

 9  this noticing to.

10          So, Your Honor, let me just briefly outline who we

11  actually -- sort of the process that we went through to get

12  comments to the extent we were able with respect to the two

13  notices.  Again, following the hearing, and I apologize if

14  there is background noise, Your Honor, it sounds like there

15  is a cart going down the hallway outside of this conference

16  room.  Following the hearing we researched, we prepared the

17  notices, we sent those out to all of the objecting parties.

18  We also sent those out and settling parties, but we also sent

19  those out to all of the chartered organizations that we were

20  aware of that have counsel that have appeared in this case.

21          So 22 chartered organization sets of lawyers did,

22  in fact, receive the notice.  We sent a draft to that batch

23  as well as the objecting and consenting parties on February

24  the 13th.  We sent another draft around on February the 16th.

25  As I understand it separate and apart from Mr. Ryan and the

1  other objecting parties of which there were two meets and

2  confers, the White & Case team also had five, if not more,

3  separate phone calls with individuals representing chartered

4  organizations.

5       We have attempted to incorporate all of the

6  comments that we received from the chartered organizations

7  into the notice including Mr. Ryan's, but I point this out

8  because I think we have been under the perception that

9  Mr. Ryan has really spoken for the chartered orgs, but there

10 are, in fact, many other law firms representing the chartered

11 orgs.  We didn't just take into account his comments

12 particularly in light of the fact that that was not really

13 our target constituency.  Our target constituency were those

14 chartered orgs that may have already supported the plan or

15 voted in favor or didn't opt-out of the treatment and needed

16 to understand that opt-out treatment.

17      In the context of those conversations it did come

18 to light that there was an iota in the plan that was filed

19 that we are going to be correcting.  One of the chartered org

20 lawyers pointed that out for us and maybe at some point

21 during this hearing I will find it.  I thought I had it

22 printed out right before me.  It's a very brief, I found it,

23 Your Honor, iota, but it applies to the participating

24 chartered organization insurance assignment.  This, again,

25 participating chartered orgs are assigning their rights to

1  their policies in exchange for getting the chartered

2  organization treatment.

3        With respect to the sub-part (a) of that

4  definition, its definition 201, they were signing over their

5  insurance actions.  That should have said insurance actions

6  related to abuse claims that first occurred on or after

7  January 1st, 1976 because that is the component of their

8  insurance that they are contributing their rights to the

9  trust.

10        So I didn't want someone to say that there was a

11 gotcha or that we missed that point.  Thank you, I am not

12 sure which chartered org made that comment to us, but we did

13 get the comment and then we did incorporate it.  So that was

14 the process that we went through, Your Honor.  We have done

15 our best to incorporate everybody's comments.  We recognize

16 that time is tight. Mr. Ryan has made that point to us a

17 number of times but we also can't afford to lose days.

18        Omni is on the line today.  We have talked to them

19 about how quickly they could get the notices printed and

20 mailed.  They have indicated to us that if the notices are

21 done this afternoon they can have them printed by mid-day

22 tomorrow and mailed out by mid-day tomorrow so that claimants

23 would receive them in the mail next week.

24        One other quick point, Your Honor, the order that

25 we had submitted to the court that the court signed had the

1   opt-out deadline at February 28th.  One of the comments that

2   we received from the chartered organizations is that that

3   should be married up with just the voting deadline that the

4   court set.  So we would like to change that deadline to

5   March 4th.

6           I think, Your Honor, that concludes -- I am just

7   looking at my notes to see if I have missed anything else.

8   One other point, and I hate to raise this, but I feel that I

9   must, there was a comment in Mr. Ryan's pleading, and

10  Mr. Buchbinder had indicated this to us as well, sort of

11  chastising the debtor and plan proponents for not filing the

12  plan, technically, on February 14th.  We did file it at

13  three o'clock in the morning on February 15th and there has

14  been some chastisement of the debtors for middle of the night

15  filings.

16          I just want to remind everyone we don't

17  particularly enjoy filing in the middle of the night either.

18  Our team spent multiple all-nighters trying to get the

19  documents in filing condition, that's probably why there was

20  an iota. Our team did not watch the Super Bowl game, we

21  didn't celebrate Valentine's Day which was the next day.  We

22  worked all the way through.  And as a reminder it's not just

23  up to the debtor.  We're negotiating and trying to maximize

24  consensus with the FCR, the coalition, the TCC, the Ad Hoc

25  Committee of Local Councils, Mr. Patterson and his client, as

1 well as several other state court lawyers.

2          So, Your Honor, that concludes my remarks with

3 respect to the noticing motion.  Happy to answer any

4 questions, but I wanted you to know how we got here, why we

5 ultimately filed the motion, what our analysis is and, again,

6 we're just asking for authority to send out the notices and

7 the information contained in the notices.  We will address

8 with the court, at a later time, the deemed acceptances or

9 the deemed votes on the plan in light of the modifications;

10 although, I did preview that for you today.

11          THE COURT:  Okay.  I guess I am viewing this

12 hearing a little differently than I expected and really all

13 you are seeking today is approval to send out the two notices

14 of a supplemental voting deadline or a supplemental

15 disclosure, and a finding from me that those two forms

16 contain adequate information.

17          MS. LAURIA:  That's correct, Your Honor.  This was

18 not intended to be, what I will, sort of, casually refer to

19 as, an 1127 motion or an 1127 order.  We think those issues

20 are best addressed in connection with the totality of the

21 confirmation issues that will be before you.

22          THE COURT:  Okay.  I will hear from others first

23 in support, if you feel a need to add something, and then I

24 will hear from the objectors.

25          Mr. Pachulski, I assume you're in support.

1          MR. PACHULSKI:  I am very much in support, Your

2    Honor.  I thank you very much. Richard Pachulski of Pachulski

3    Stang Ziehl & Jones on behalf of the TCC.

4          And while we were delighted to accommodate

5    Ms. Lauria in our offices we would have done it even if we

6    were still opposing the plan.  And if anybody who opposes or

7    supports needs it in the future we will also accommodate

8    them, Your Honor.  So I appreciate that and apologize if

9    there is background noise for Ms. Lauria.

10          I want to make some fairly quick comments, but I

11   think they're all important.

12          Number one, the TCC believes very strongly that

13   while some of the changes are material they're all positive.

14   I want to put something in perspective because I think it's

15   really important.  The parties that really pushed for changes

16   were the TCC and the, what I refer to as, the Zalkin Group.

17   We both felt very strongly that the plan had to be amended to

18   benefit the survivors.  That is what was done in this case

19   and that is why we believe that in terms of any theory of re-

20   solicitation it's not appropriate because while it may be

21   material it's not adverse as demonstrated by the cases.

22          Now Your Honor asked a very fair question, and

23   we'll deal with it down the road, about the independent

24   review.  So I want to make a couple of things clear because

25   that is an issue that there has been a great deal of

1 | discussion about.

2 |       The independent review is, in our view, the TCC's

3 | view, who looks out for those who have -- and there is no

4 | insignificant abuse claim, they're all significant, but some

5 | are, frankly, more horrific then others.  The independent

6 | review was to deal with those claims and particularly, and I

7 | think this is important, to appropriately get at the excess

8 | insurance.

9 |       Now here is the reality at this point, Your Honor,

10 | the TDP has approximately $2.7 billion available for the

11 | survivors.  Now some of that, I'm not an insurance expert, I

12 | haven't reviewed all the policies, some of that may have come

13 | from the settlement of Century and Hartford as also excess, I

14 | don't know all of that. I know some might have, but there is

15 | not a single, to my knowledge, excess insurance carrier that

16 | has settled.

17 |       The independent review fund, let's call it, has

18 | zero in it.  And there is no guarantee that it will have the

19 | money, but the fact of the matter is, Your Honor, is that we

20 | believe that the fairest way and the greatest likelihood of

21 | getting money in that pot is through the independent review

22 | process which is one of the reasons this was put together and

23 | pursued by the TCC and the Zalkin Groups.  Its, in many

24 | cases, the independent review is like a mini trial which is

25 | why there's a cost and we thought it was unfair that that

1  cost would be absorbed by people in the TDP.

2          We're not excluding anyone from participating who

3  thinks it is fair.  We're not saying if you believe you have

4  an appropriate claim you can go into the independent review.

5  There are some claims that clearly will not do it because it

6  probably is not going to be beneficial, but we have to deal

7  with the reality that there are certain claims that would hit

8  the excess and there are certain claims that would not hit

9  the excess.

10          That was all taken into account when we came up

11  with the independent review process which was not an issue

12  that was, you know, pursued by the debtor.  It was pursued by

13  the survivors who were participating through the mediation

14  process.  I wanted Your Honor to appreciate that and also

15  because we heard Your Honor loud and clear, we have provided

16  that the trustee would have certain opportunities to waive a

17  portion of the $20,000 fee because we know that some parties

18  may not have it and we heard Your Honor -- at least our

19  impression was you had a concern about that.  We have tried

20  to come up with ways to deal with that in the final plan

21  document.

22          The third issue I want to just put out there,

23  because I'm very sensitive about solicitation issues, is the

24  BSA, from my understanding, is not soliciting.  That is what

25  Ms. Lauria had said.  As part of the term sheet what's there

1   is the TCC and state court counsel are, effectively,

2   soliciting.  We're doing town halls we agreed to do it.  We

3   feel very strongly that votes should be changed because the

4   plan is dramatically better then what was filed back in

5   December and because of that we are going to solicit unless

6   Your Honor or someone else says it would be inappropriate.

7           We made it clear, I think, when we described the

8   termsheet at the last hearing, it's very clear in there that

9   that is going to be done and we intend to do it until

10  somebody tells us, most particularly, Your Honor, that we

11  can't.  So we are going to do that.

12          The fourth matter, and I appreciate what

13  Ms. Lauria stated at the end, I am a huge football fan, but I

14  missed parts of the game because people were working around

15  the clock, and fortunately I have a very thoughtful wife who

16  gave me a pass while we were on a 15 hour mediation.  None of

17  us got us, there were 50 of us.  It was very intense, we knew

18  we were hitting a deadline, the debtor was pushing us as hard

19  as the debtor possibly could to get it done and we decided we

20  had to take the risk to get it ready, that we were going to

21  miss it by a couple of hours.

22          I, as one of those 50 people, apologize to the

23  court that it took the time.  We worked through the weekend.

24  We started early in the morning Pacific Time and, frankly, we

25  did not end until eleven at night pacific time on the 14th.

1  So we understood, Your Honor.  We take your orders very, very

2  seriously, but with 50 people editing documents that were

3  hundreds of pages long it just wasn't realistic to deal with

4  it any other way and for that I am one to apologize for that

5  on behalf of the TCC.

6          The last issue, Your Honor, and though it was not

7  addressed by Ms. Lauria, it was not lost on me with respect

8  to the insurers objections and one of their objections is the

9  disclosure with respect to our firm. I am in this case

10 because I am very serious about our firm doing the right

11 thing *vis-à-vis* the TCC.

12         We made it very clear, very clear to all the

13 parties that we were not going to make the exculpation or the

14 issue with respect to potential claims against us relating to

15 the Kosnoff email, that we were going to have to deal with

16 that, but we were not in any respect ever, ever going to make

17 it a condition of the plan.  We did not discuss it or

18 negotiate it until the very end when we asked the debtor if

19 they wanted to deal with it.  If the debtor said no it would

20 have ended. The debtor said no, we have done our

21 investigation, we understand what has happened, and we would

22 like to get it resolved.  It was put in the plan very clearly

23 that we would get the exculpation after the investigation,

24 that we would provide a substantial amount which we're proud

25 that it will go to the youth protection.

1      It still has to be approved by Your Honor.  It is

2  going to have to be done through, effectively, a 9019

3  through 1123(a), but if Your Honor denies it, but confirms a

4  plan then that is what will happen.  We are not holding it

5  up.  We did not ask -- tell the debtor in any way that we

6  would hold up the plan.  We were sensitive and did not raise

7  it until the very, very last minute because we had to edit

8  the plan.  So I don't think its "material."  It absolutely

9  has to be disclosed and we disclosed it.

10     And with that, Your Honor, I would strongly

11 support that Your Honor enter the order requested by the

12 debtor in this case.  I would be happy to answer any other

13 question Your Honor has.

14     THE COURT:  Thank you.  I don't have any

15 questions.

16     And let me, I guess, comment or clarify that my

17 question about whether the independent review option and the

18 recoveries was material is a wholly different question from

19 whether it might be a good resolution of claims, and of

20 issues between and among claimants and a way to maximize

21 recoveries.  I don't know, but I think a change can both be

22 beneficial overall, but as to any particular creditor it may

23 or may not be, I'm not sure.

24     So I'm not suggesting it wasn't an appropriate

25 negotiated option to resolve objections that were outstanding

1  from various parties, that may be, and it may meet a

2  settlement standard or it -- if that's the appropriate

3  standard, but I still have a question on a particular

4  claimant, *vis-a-vis* a particular claimant, whether or not the

5  change is something that a claimant might want to consider

6  with respect to their vote.

7         But I'm hearing responses already, I'm open to

8  that issue, I just wanted to clarify.  Don't let anyone think

9  that that means that the independent review option may not be

10  a confirmable option, it's just a question.

11         MR. PACHULSKI:  Your Honor, I totally understand

12  Your Honor's position on that and totally respect it and

13  think Your Honor's raising it is extremely fair.

14         We believe that -- or at least I believe in

15  particular that the independent review option is material.

16  I'm not going to try to argue it's not, but I think, after

17  Your Honor hears the testimony relating to independent

18  review, I believe you will find that it is beneficial to the

19  survivors in this case as a whole.

20         But, you're right, it's not for today.  It will

21  come up, I'm sure the independent review will be discussed in

22  detail, and we believe in doing it that -- and we -- again,

23  we believe we represent the interests of all of the survivors

24  and we believe that it was beneficial to the survivors as a

25  group, not to just a small segment of them, but that will be

1   for us to have to demonstrate at the confirmation hearing.

2           I appreciate Your Honor's comments on that.

3           THE COURT:  Okay.  Thank you.

4           Mr. Martorana?

5           MR. MARTORANA:  Good afternoon, Your Honor.  Can

6   you hear me okay?

7           THE COURT:  I can.

8           MR. MARTORANA:  I am one of the objectors, so I

9   didn't know if there was someone in support that you still

10  wanted to hear from, but otherwise I'm happy to go.

11          THE COURT:  Let me find out if there's others in

12  support.  Mr. Anker?

13          And then I'll come back to you, Mr. Martorana.

14          MR. MARTORANA:  Thank you, Your Honor.

15          MR. ANKER:  Your Honor, Philip Anker, Wilmer

16  Cutler Pickering Hale and Dorr.  I'll just be a minute.

17          I just want to underscore -- and I realize that

18  this is not, I think, to Your Honor the most critical issue,

19  but I want to underscore the point Ms. Lauria made and

20  Mr. Pachulski made.

21          I'm getting old and it's rare that I'm working at

22  1:15 in the morning, but I signed off on Monday -- Tuesday

23  morning, at 1:15 in the morning, and there were maybe 50 or

24  more lawyers still on the line; Mr. Patterson was on the

25  line, Mr. Pachulski was on the line.  There were lawyers for

1  Century, the FCR, Mr. Brady, Mr. Zalkin himself.  There were

2  so -- the Coalition, Mr. Goodman.  People were working around

3  the clock to get this done and get it done right.

4          I think there's always a chance as we look through

5  the documents we'll find more, you know, errors and erratas

6  that need to be corrected, but the suggestion -- and any

7  suggestion that Ms. Lauria and her team or anyone else was

8  not working in good faith to get this done and get it done

9  timely is really belied by the facts, and I think it is

10  important that the Court understand that.  And I really do

11  want to commend Ms. Lauria and her team; they really worked

12  hard on this.

13          So that's all I have to say, Your Honor.  Thank

14  you.

15          THE COURT:  Thank you.

16          Mr. Patterson?

17          MR. PATTERSON:  Thank you, Your Honor.  I just

18  wanted to address a couple of points about the independent

19  review process and augment a couple of things that

20  Mr. Pachulski said, all of which I completely agree with.

21          And the fact that the excess award fund would not

22  have any funds at confirmation was a very material fact in

23  trying to put a mechanism in place.  And in the negotiations

24  and calibrations among the various state court counsel and

25  claimant representatives, it was made very clear that the

1    general trust fund, if I can call it that, and the claimants

2    who go through the TDP, should not be in a position where

3    they were subsidizing this arrangement, and in fact they

4    should be in a position where they stood to benefit from it

5    and they do benefit from it in three ways.

6            The first, Your Honor, is that, with respect to

7    comprehensive insurance settlements or individual recoveries

8    by claimants, 20 percent of those amounts will flow into the

9    general trust to be enjoyed by the TDP claimants.

10            Second, Your Honor, because of the way independent

11    review works, if someone has a large TDP claim, let's say two

12    and a half million dollars, and opts for an independent

13    review, if they achieve an independent review award, then the

14    effect of that is that their TDP claim is now effectively

15    reduced and capped at $1 million and the remainder goes

16    against the excess fund.  So it reduces the dilutive effect

17    of significant claims against the TDP and, obviously, those

18    significant claims are ones that will have a major effect on

19    dilution.

20            And third, Your Honor, the effort was to -- you

21    know, to maximize the ability to comply with excess

22    reinsurance and recover from it.  And we were certainly aware

23    of the insurers' objection to the TDP.  It is not possible to

24    put in place a mechanism that we have for independent review

25    in connection with every proof of claim in the case, Your

1  Honor, it wouldn't be cost effective, but with respect to the

2  excess insurance claims we put in place a very expensive and

3  rigorous mechanism to ensure that the -- to the greatest

4  extent that we could, that the insurers' arguments with

5  respect to the existing TDP could be addressed with respect

6  to the excess reinsurance.

7          And finally, Your Honor, I just wanted to address

8  the administrative fee.  And you will note in the notice that

9  Ms. Lauria's firm has prepared it provides -- and the TDP

10 itself provides that the trustee may waive the fee in whole

11 or in part in appropriate circumstances.  But, candidly, Your

12 Honor, when you raised this with me last week when it

13 initially came up, I had kind of a disconnect because,

14 frankly, it was always my client's anticipation that, with

15 respect to clients that adopt or elect to go through

16 independent review, the state court counsel will be advancing

17 that fee, it will not be a burden on the individual, the

18 survivor that elects that.  And that is certainly the

19 anticipation of my clients and in talking to other state

20 court counsel who are curious about the mechanism, I've

21 passed that on as well and I think that that's their

22 expectation as well.

23          So I did just want to add those additional points,

24 Your Honor, in connection with the independent review.  And,

25 obviously, I'm happy to ask any questions -- answer any

1  questions, pardon me, that the Court may have.

2          THE COURT:  Thank you.  I do have one question

3  that your discussion of the million dollar cap on the general

4  fund raised.

5          In the summary of the changes that's going out to

6  the Class 8 claimants, it says -- and I'm on page 3 at

7  paragraph 9 -- one, two, three -- third bullet point, it says

8  that it -- the independent option provides holders an

9  opportunity -- or it will be used to determine the amount of

10  the claim against the BSA and other protected parties up to a

11  maximum of five times the maximum value associated with that

12  category of direct abuse claims.

13          And I actually didn't read a cap into the

14  Article 13 of the plan for independent review, so maybe I'm

15  reading that wrong, but --

16          MR. PATTERSON:  Your Honor, I'm just looking for

17  my copy of the plan and I'm not finding it real quick.  Let

18  me find it, Your Honor, because I want to give the Court an

19  accurate answer, I don't want to be imprecise.

20          THE COURT:  That's fine.  And what I'm looking at

21  is Article 13(a).

22          MR. GOODMAN:  Your Honor, Eric Goodman, Brown

23  Rudnick, on behalf of the Coalition, I happen to know the

24  answer to the question.  So --

25          THE COURT:  You happen to know it?

1          MR. GOODMAN:  -- for the benefit of scrambling to

2    find it, I do.  The plan provides that anything above the 5X

3    number is entirely subordinated to the prior payment in full

4    of every single direct abuse claim that would be channeled to

5    the trust.

6          So, in the unlikely circumstance that there was

7    money left over at the very end of the day after everything

8    had been administered, in that circumstance, then you would

9    have -- the subordinated claims could get paid.  I think that

10   that's how it's ultimately drafted.

11         MR. PATTERSON:  Yes, Your Honor.  I want to thank

12   Mr. Goodman for that.  That was my recollection, but there

13   were some moving parts with respect to that in the

14   negotiation and so I wanted to be certain.  I now have it in

15   front of me and Mr. Goodman is exactly correct.

16         THE COURT:  Okay.  I'm sure -- I'm still not sure

17   that -- so it can be over the five times --

18         MR. PATTERSON:  Yes, Your Honor, the award itself

19   can exceed that amount --

20         THE COURT:  That's what I thought.

21         MR. PATTERSON:  -- but it was felt -- it was felt

22   in the negotiation that there should be some limitation on an

23   individual survivor's recovery as part of the balancing and

24   calibration.  And so that's where we put a limit on the

25   actual recovery for that survivor in advance of all the

1 claims being paid in full.

2           THE COURT:  Right.  And what I didn't really

3 understand when I read that is how any -- using the maximum

4 values, how anybody was really going to be -- you know, five

5 times the maximum value is a lot.  It's not five times --

6           MR. PATTERSON:  It would be 13 --

7           THE COURT:  -- the face value --

8           MR. PATTERSON:  -- and a half million dollars.

9           THE COURT:  Yeah.

10          MR. PATTERSON:  It would be 13 and a half million

11 dollars for that particular class.  But it is possible with

12 respect to other kinds of abuse that that amount could be

13 exceeded.  But, anyway, it was felt that that was an

14 appropriate limitation to put on the individual's recovery

15 before other people were paid.

16          THE COURT:  Okay.  Okay, thank you.

17          MR. PATTERSON:  Thank you, Your Honor, and thank

18 you, Mr. Goodman.

19          THE COURT:  And thank you, Mr. Goodman.

20          Mr. Brady?

21          MR. BRADY:  Yes, thank you, Your Honor.  Good

22 afternoon.  Robert Brady for the FCR.

23          And I won't belabor the record, but just to

24 comment that the FCR is very pleased that the major survivor

25 constituencies were able to come together and agree on a plan

1   that we believe is improved for survivors.  So the FCR

2   supports this amended plan.  We urge the Court to approve the

3   notices today and to keep this schedule, and it's time to

4   start working on confirmation of this amended plan.

5            Thank you, Your Honor.

6            THE COURT:  Thank you.

7            Mr. Molton?

8            MR. MOLTON:  Judge, thank you, David Molton for

9   the Coalition.  If I have any noise, I'm sorry.  I'm actually

10  down the hall from Ms. Lauria and we're experiencing the same

11  noise.  But I also -- it just makes me laugh when I heard

12  Mr. Goodman, I want to thank him as well, on Monday night

13  during that marathon session, and I fully support Ms.

14  Lauria's statement on it.  I actually fell asleep at about

15  1 o'clock and I was glad that Mr. Goodman was on for the

16  Coalition throughout the entire marathon.

17           Just for the sake of the record, Judge, I want to

18  correct -- make sure that the record is correct.  I know that

19  there was some discussion, I forget by whom, it may have been

20  Mr. Pachulski, that the insurance settlements thus far have

21  been primary.  There are two insurance settlements, just for

22  the sake of the record, that are excess, as I understand it,

23  Your Honor, the Zurich settlement at $52.5 million and the

24  Clarendon settlement at 16.5, that's $69 million.  And those,

25  Your Honor, are part of the -- those were part of the first

1  pre-amended plan.  It was an amended plan, but the one -- the

2  iteration before this one and those were and remain allocated

3  to the general TDP fund.

4        I do want to also note that we support the

5  debtors' request regarding the notices here, Your Honor.

6        Thank you.

7        THE COURT:  Thank you.

8        Mr. Mason?

9        MR. MASON:  Yes.  Thank you, Your Honor, Richard

10  Mason, Wachtell, Lipton, Rosen & Katz, for the Ad Hoc

11  Committee of Local Councils.

12        I just didn't want to let my silence here suggest

13  otherwise, but I wanted to let the Court know that the Ad Hoc

14  Committee was intensively involved in the discussions and

15  negotiations with regard to both the term sheet and the

16  definitive documents that were filed in the wee hours of

17  Tuesday.

18        I'm also pleased to say that I outlasted Mr. Anker

19  and Mr. Molton until 2:00 a.m. before I fell asleep, and I

20  think others were still working.

21        So we're wholeheartedly in support of the plan

22  modifications and would respectfully urge the Court to

23  approve the supplemental notices, so that they can go out and

24  we can move toward the beginning of the confirmation hearing

25  more than two years into this case.

1          Thank you very much, Your Honor.

2          THE COURT:  Thank you.

3          Okay, Mr. Martorana.

4          MR. MARTORANA:  Good afternoon, Your Honor, Keith

5   Martorana of Gibson, Dunn & Crutcher on behalf of the AIG

6   Companies and the other certain insurers.

7          Your Honor, as Ms. Lauria noted, there were a

8   number of changes that the debtors made to the notices

9   overnight, which were intended to address our comments, and

10  we are in fact very appreciative of that.  But at the end of

11  the day, Your Honor, the comments we sent over were only the

12  issues that, to say otherwise, jumped off the page when we

13  reviewed hundreds of pages of changes over the past 72 hours.

14         Several of these changes, like the Pachulski

15  settlement, were not even included in the term sheet that was

16  previously filed, so we didn't have advance notice of that.

17         Your Honor, we have no idea whether these notices,

18  even as modified, satisfy adequate notice as contemplated by

19  Section 1125 of the bankruptcy code.

20         Rule 2002(b) exists for a reason; it's intended to

21  give all parties and the Court, frankly, sufficient time to

22  review lengthy and complex documents, provide thoughtful

23  disclosure -- or disclosure amendments, and then have Your

24  Honor call balls and strikes on the adequacy of such

25  disclosure at a hearing.

1        Your Honor, we're working as fast as possible to

2   get through these changes, but there's simply not enough to

3   ensure that, quote, "adequate notice is being given in the

4   supplemental notices at this time."

5        And as just one example, Your Honor, last night,

6   as I was working on our forthcoming supplemental objection, I

7   made it through the plan appendix regarding document sharing.

8   This appears at page 2 of Docket Number 8815-1, and the

9   redline from the prior version appears at Document

10  Number 8815-2, page 2.

11       Your Honor, just flipping through this redline, I

12  can tell you that there's only one word, the word "document,"

13  that hasn't changed in the first nine pages, and the rest of

14  the document is, honestly, not that much better.  There's

15  extremely limited discussion of this document in the proposed

16  notices.  And the reality is, maybe there doesn't need to be

17  more extensive discussion.

18       We do know that this document concerns the

19  transmission of highly confidential information as in between

20  the debtors, the local councils, and the trust, including

21  rosters that would include the names of Scouts, and that

22  might or might not be important to voting claimants.

23       The point is, we just don't know and I don't

24  believe we've had enough time at this point to really

25  consider that.  And, again, this is just one example.

1          Today, several parties have discussed the separate

2    issue with respect to the reallocation of excess insurer

3    proceeds between the excess fund and the general trust fund,

4    and I don't think there's any way to know today whether this

5    negatively impacts individual abuse claimants.  Perhaps,

6    overall, it's beneficial to most, but it may not be for all.

7    And given the proposed split of the excess insurer proceeds

8    and that there may in fact not be any pre-1972 excess

9    policies remaining that haven't settled, it very well might

10   affect claimants that don't opt in to the independent review.

11         And I understand that Mr. Patterson said that 20

12   percent of the excess insurer funds will flow into the

13   general fund, but previously 100 percent of the excess

14   insurer proceeds would have flowed into the general fund.

15         So, Your Honor, to be clear, the certain insurers,

16   we do not oppose the mailing of these notices even in their

17   current form and we don't oppose entry of an order approving

18   that now.  It's the 1125 adequate notice finding in the

19   proposed order that we believe is not appropriate at this

20   time and under these circumstances.

21         And I fully understand the rationales that

22   Ms. Lauria laid out for why the debtors think they need to

23   get an 1125 adequate notice finding, and, if needed, they can

24   get that finding at confirmation, if appropriate.  We don't

25   understand why it needs to happen at this time.  And frankly,

1  Your Honor, if as Ms. Lauria and Mr. Pachulski says there are

2  no material adverse changes to the claimants, I don't think

3  there's any need for an 1125 finding at all.

4         With that, Your Honor, I'm happy to take any

5  questions you might have.

6         THE COURT:  Let me ask you this.  Is an 1125

7  finding an interim ruling?  On confirmation, can somebody

8  raise that regardless of whether I've entered an order

9  approving it?

10        I say that -- again, it's dangerous to think out

11 loud, but the way you've argued it sort of prompted that

12 question.  And because the 1129 standards say you have to

13 comply with all the provisions of the rule, I'm just

14 wondering, is it a final -- is it a final ruling or is it an

15 interim ruling?

16        MR. MARTORANA:  Your Honor, I -- I mean, my sense

17 would be that, once you enter it, it's a final ruling, but I

18 don't see why -- I mean, when we do prepackaged cases and we

19 do a -- you know, a combination disclosure statement approval

20 and confirmation hearing 60 days into a case or whatever the

21 time line is, that finding is not made prior to the

22 solicitation, that finding is made at confirmation, and I

23 don't see why it needs to happen now as opposed to at

24 confirmation.

25        THE COURT:  Thank you.

1          Mr. Ryan?

2          MR. RYAN:  Thank you, Your Honor.

3          First, we echo what Mr. Martorana just said.  We

4 thought we had a clear understanding last week, we thought

5 when we asked to be included in the order that was entered on

6 Tuesday morning it was clear, just send this stuff out,

7 let's -- there's an expedited time frame, let's get it out.

8          We'll deal with it at confirmation, whether it's

9 adequate notice, whether it's adequate information, but,

10 please, given how short the time frames are, put stuff in the

11 mail as promptly as possible.  And that's just not what has

12 happened here, Your Honor, and that's why we think any

13 findings under 1125 are just patently unfair, to find now

14 that there's adequate information, given the short amount of

15 time we've had to review these documents.  And, like

16 Mr. Martorana, every time you go through it, something new

17 pops out.

18          So we don't think -- and we could be done with

19 this hearing in two minutes if we just remove those findings

20 and tell the debtors to go send stuff in the mail, and we'll

21 reserve for confirmation what was adequate and what was not.

22 But if they want that comfort order, then we're going to have

23 to address some issues.

24          With respect to the discussion about there's been

25 no change to the treatment of chartered organizations, a

1   myopic focus on the recovery chart and the disclosure

2   statement ignores the realities of this case, it ignores the

3   practical, real-world quid pro quo that was put out to

4   people, which was support this plan and you, chartered

5   organizations, will get claims against you channeled.  There

6   was no quid pro quo of you're going to get a recovery.

7           What was the bait in this plan for charters was

8   the channeling injunction they would receive.  That's

9   undeniable.  And, as Ms. Lauria said, the changes over time

10  have been complicated and probably none more so than with

11  respect to chartered organizations.  Nowhere in the September

12  plan, Your Honor, was there this concept of the insurance

13  assignment or the insurance rights contribution.  So that is

14  something that takes away property rights of chartered

15  organizations that's never been solicited.

16          So, to me, when a plan changes and takes away your

17  property rights as part of a quid pro quo, that's a material

18  change that's adverse because you have to give up something

19  you weren't getting in September.

20          And I think, as Mr. Patterson's explanation said,

21  this heightened or expedited or whatever review standard it

22  is, it's to gain unfettered access to excess insurance.  And

23  it's not to gain unfettered access to excess insurance in

24  years in which abuse claims against chartered organizations

25  are channeled; it's to gain unfettered access to excess

1  insurance in every year possible.  So that's going to take me

2  to, Your Honor, to the complexity of this plan and the need

3  for a plain English disclosure.

4       Ms. Lauria described her notice of errata, which

5  she needs to -- and the notice of errata needs to be made to

6  Definition 201, participating chartered organization

7  insurance assignment.  And she says the subsection (a) needs

8  to be amended to make it clear that the participating

9  chartered organization insurance actions only refer to those

10  against the settling insurers, they do not refer to non-

11  settling insurers.

12       The problem in the complexity of the plan, Your

13  Honor, is right above that is the definition of participating

14  chartered organization insurance actions.  At the end of 200,

15  the last sentence, "For the avoidance of doubt, no cause of

16  action of the participating chartered organizations, or any

17  of them, against any settling insurance company shall be

18  deemed an insurance action, except for any cause of action

19  arising from or related to an insurance settlement

20  agreement."

21       So the notice of errata we're going to get that

22  carves out non-settling insurance companies from 201 is

23  fundamentally at odds with the definition of participating

24  chartered organization insurance action in 200.

25       Go to Article 5, section (s)(1)(C), which is where

1  the participating chartered organization settlement

2  contribution is.  It's clear from the language of the plan

3  that the idea is to get unfettered access from,

4  romanette (i), the abuse insurance policies, the settling

5  insurance policy rights, and the insurance settlement

6  agreements.  Abuse insurance policies, Your Honor, that does

7  not make any reference to non-settling.  What is going in

8  that assignment are all rights with respect to all policies,

9  at least as I read it.

10        And I only point that out to say it's

11  extraordinarily complex.  I'm not sure I understand from the

12  notice of errata that was announced today to the Court by the

13  lawyers who've lived with these documents that I understand

14  what's going on there.  So I raise that, Your Honor, because

15  if all of these lawyers don't understand and the documents

16  are unclear as to rights being taken away from chartered

17  organizations, don't you think chartered organizations are

18  entitled to a plain English, clear discussion as to what

19  exactly is going on?  A taking away of rights that was not

20  subject to any prior disclosure.  This didn't exist in

21  September.

22        So that, Your Honor -- and that's just -- to go to

23  Mr. Martorana's point, that's all we can find in the time we

24  had and the things to get raised on today's hearings.  We're

25  not saying delay the proceedings, we're saying just don't

1  make any findings.  Let's give everyone a couple of weeks,

2  send out what they want to send, then let's make some

3  decisions as to, at the end of the day, the plan before the

4  Court, whether it's been disclosed, whether people made

5  informed choices, but let's get on with it.

6          But if we are going to have those findings, Your

7  Honor, then we have to revisit the time being afforded

8  people.

9          It is Friday, we were told that maybe by Saturday

10 afternoon they may deposit 50, 60, 70,000 pieces of mail at a

11 mail-sorting facility on a Saturday afternoon, of a holiday

12 weekend.  No mail will be processed or delivered on Monday.

13 Deadlines start next Friday.

14         Let's just assume for a second, which is

15 reasonable in light of the performance of the post office

16 during COVID, that they don't start processing on Saturday

17 afternoon or they don't process all 80,000.  Processing of

18 mail will begin on Tuesday.  Deadlines occur next Friday.

19         So are we going to assume that the post office is

20 magically going to do everything overnight on documents that

21 are hundreds of pages?  I don't think that's a reasonable

22 assumption for this Court to make and there's no evidence to

23 suggest otherwise.

24         I got to the office this morning, I got my mail, I

25 had four services from Prime Clerk and -- two services from

1   Prime Clerk and two services from a law firm four blocks away

2   in town, one certificate of service that arrives on

3   February 18th was February 10, the other three were

4   February 11th.  Two pieces of mail, Your Honor, that were

5   still in ordinary mail-sized envelopes took seven days to go

6   four blocks.

7           There is no way, if we're going to have findings

8   today about adequacy of notice on the record before you --

9   and there is no record, but commonsense, wisdom and living in

10  the world we live in today, we are sending out packages with

11  notices that will not arrive until after deadlines happen or

12  that will arrive even for the voting with maybe a day or two,

13  to act, to digest, to look at a disclosure that doesn't

14  contain any disclosure about the participating organization

15  insurance assignment.

16          And what's in there, Your Honor -- and we've only

17  had a chance to look at what the debtors have done recently

18  from last night -- but I point out, because one thing we did

19  ask was the plan now provides that direct abuse claimants and

20  the settlement trust, all of them, will have preapproved

21  rights under Rule 2004 to issue discovery without ever coming

22  back to this court.  Whether that's going to happen or not,

23  Your Honor, we'll leave for another day, but let's just --

24  let's just say it hasn't been disclosed, because what they

25  did was they cut and paste a piece of the plan into this

1  notice.  And in there it talks about 2004, it doesn't tell

2  you what 2004 is, the broad powers that the court-approved

3  data would have, and it says, if you want to look at

4  something further, there's a defined term document appendix.

5          So then you've got to go to the plan, find the

6  term document appendix, which is defined, but it doesn't tell

7  you where you find it.  Then you've got to go back to the

8  table of contents to find that it's an appendix to the plan.

9  I don't know if they're planning on serving all those

10  appendixes, they haven't said.

11          That's what's going out, Your Honor.  If they want

12  to send it out, that's fine, but let's have our confirmation

13  hearing start on March 9th.  If they want findings, then they

14  need to actually provide the notice required under the code

15  and under the law.

16          And, Your Honor, I don't have anything further,

17  unless you have questions.

18          THE COURT:  I don't have anything.  Thank you.

19          Mr. Buchbinder?

20          MR. BUCHBINDER:   Thank you, Your Honor, Dave

21  Buchbinder on behalf of the U.S. Trustee.

22          I would like to start by reading a paragraph

23  from -- two paragraphs from last Friday's transcript.  "The

24  debtors should consider" -- and this is at page 83, line 8 --

25  "The debtors should consider whether additional disclosure is

1  appropriate.  It might be under 1120 -- what was

2  it -- 1120(c), I think it was.  This gives them a little bit

3  more time to get that out there.

4       "And I'll say this, people have commented, I think

5  appropriately, at different times throughout this case that

6  this is complex, and I would say it's an understatement.  It

7  of course requires due process, but to the extent there is

8  going to be an appeal of whichever way I come down on

9  confirmation, due process shouldn't add to that appeal."

10      Let me start there, Your Honor.  And I would like

11 to also -- I would like to go back in time to last weekend.

12 To follow through with Mr. Martorana and Mr. Ryan's comments,

13 frankly -- and the other insurers -- frankly, we were all

14 ready to sign off on a notice on Monday morning.  And it did

15 not have, as I recall at that time, the 1125 findings.

16      The communications went silent and the next thing

17 we saw was the motion that was filed seeking a hearing today.

18 This notice could have actually gone out a week ago but for

19 the debtors' actions.

20      And with respect to the holier-than-thou comments

21 of all counsel who had to work over the weekend,

22 respectfully, you only had to work over the weekend because

23 the Court put your feet to the fire and told you that you had

24 to take the documents and file them in final form so people

25 knew what they were looking at.  And when they were filed

1  early on Tuesday morning, it took me almost seven hours to

2  review quickly the roughly 1,000 pages of material, if you

3  include the settlement agreements, and I'm a trained

4  professional and I think I have a pretty good idea of what

5  I'm looking at.

6         So I want to remind everybody for the umpteenth

7  time that this is not a case about bondholders who can give a

8  letter of direction to the indenture trustee, this is not a

9  case about a tranche of shareholders who can do the same

10 thing, this is a case about 82,500 people who suffered

11 earlier in their lives, decades ago.  If we can't figure out

12 what's going on, how in the hell can they figure out what's

13 going on?

14        Secondly, this case is not just about the Catholic

15 church and the Methodist church, it's about thousands of VFW

16 halls and American Legion halls and police departments.  One

17 of the objections talks about a police department.  They

18 don't know what's going on either and this plan continues to

19 be a moving target.

20        So let's talk a little bit more about due process.

21 If you want a finding that this several-page document

22 contains adequate protection, under Rule 2002, that requires

23 28-day notice of the time to object.  And I'm not suggesting

24 that we're going there at this point in time and I'll pass

25 that up, but that is the basic rule.

1    Our Class 8 and many of our Class 9 creditors are

2  not sophisticated financial people, as I have repeatedly

3  noted.  Many of the survivors over the past several months

4  have sent letters to the court, complaining about how they

5  have received no communication from their lawyers.  And then

6  there are the incarcerated persons whom, no matter how hard

7  we tried to deal with this at the disclosure statement

8  hearing, it would appear that most institutions have

9  different rules and it is very difficult for the incarcerated

10 persons to get their mail at all, especially when it's a

11 package of a thousand pages.  So let's talk about that due

12 process for a minute.

13    Now, let's go back to the changes.  The U.S.

14 Trustee made some requests and I would agree that, except for

15 the 1125 finding, many of them have been accounted for.  The

16 debtor did make some effort to describe the changes in the

17 plan.  The U.S. Trustee had suggested last Friday that

18 perhaps the debtor could contain some examples, they did not.

19    The U.S. Trustee posed the question yesterday if

20 the notice could disclose how the revisions monetarily

21 improve the plan for the Class 8 creditors, if at all.  And

22 you heard here today, well, they don't.  Okay.

23    And with respect to voting, the order that was

24 submitted, I believe, reinstates the voting procedures

25 strictly, which is a positive, but I heard here earlier in

1  the presentation that the only option that's being given is

2  for people to change their no votes to yes votes.

3          Excuse me, these changes are substantial.  If

4  someone wants to change a no vote -- a yes vote to a no vote,

5  they should have that right too.  These people have waited

6  years to make this vote and you're proposing to take it away

7  from them.  This isn't a bondholder case, this isn't an

8  equity case.

9          If you want to sign the order, Your Honor, sign it

10 without the 1125 findings at this time, and people should be

11 allowed to change a yes to a no just as much as they can

12 change a no to a yes.

13          And to say that asking people to vote is not a

14 solicitation, I either fell down Alice's looking glass or I

15 woke up in 1984.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          Mr. Desgrosseilliers?

19          MR. DESGROSSEILLIERS:  Your Honor, thank you.  Can

20 you hear me okay?  I just want to make sure the connection is

21 working.

22          THE COURT:  I can.

23          MR. DESGROSSEILLIERS:  Thank you.  For the record,

24 Mark Desgrosseilliers on behalf of a claimant and a member of

25 Class 8, Jane Doe.

1          Mr. Buchbinder referenced a police department that

2    was in my client's objection and I raise my issues today --

3    and I agree, by the way, with the others who have objected to

4    the specific court findings today.  I don't think they're

5    appropriate and I think they should be reserved for

6    confirmation with respect to the disclosures.  And, if the

7    Court is inclined to give any relief, it should be, as the

8    Court I think had suggested, on an interim basis to allow the

9    notices to go out to the extent necessary.

10          With respect to the disclosures, however, I

11   continue to think that and believe that the disclosures are

12   particularly inadequate with respect to Class 8 in that

13   claimants like my client, I think, could not understand,

14   because it took me a while to understand and with the help

15   of, frankly, the TCC counsel, the effect of the channeling

16   injunction on post-1976 claimants.

17          I think there needs to be additional disclosure

18   about that, including an explanation in plain English about

19   the effect of the channeling injunction itself in that

20   claimants like my client will not be able to recover against

21   those chartered organizations, irrespective of whether the

22   chartered organizations or, in my client's case, the other

23   defendants had actually filed a claim against the debtors by

24   the bar date.  My read of the plan is that it prohibits all

25   such claims and they're all channeled to the settlement

1  trust.  I think that's an important disclosure.

2          Two additional minor disclosures I think that need

3  to be made was with respect to attorneys' fees.  There are

4  disclosures about the accommodations Mr. Pachulski's firm

5  made to resolve the issues that they have resolved.  I think

6  one additional disclosure would be whether or not that

7  accommodation includes the -- I think Mr. Pachulski's firm

8  had already generously agreed to make it a ten percent

9  reduction or ten percent donation of fees, just clarification

10  on that point.

11          There are additional fees, attorneys' fees to be

12  paid, some of which are being paid out of the settlement

13  trust.  And to the extent that we are disclosing or the

14  debtors are proposing to disclose positives for the trust, I

15  think the negatives to the trust, including the payment of

16  those fees, of course subject to the Court's approval, should

17  also be disclosed.

18          Your Honor, those were my limited comments based

19  on the time we had to review them, but I think, in

20  conclusion, really I think the Court would be best served to

21  either not make the finding or make it on an interim basis

22  and we can deal with this at confirmation, as Mr. Ryan and

23  others have suggested.

24          Thank you, Your Honor.

25          THE COURT:  Thank you.

1          Ms. Lujan Wolff?

2          MS. LUJAN WOLFF:  Good afternoon, Your Honor,

3    Delia Lujan Wolff representing certain survivors of abuse.

4          And I agree with the comments of the objectors.

5    If the Court is inclined to - well, I also agree with the

6    insurers that opposition to the plan should also be included

7    in the notice and I think the notice -- that opposition

8    should include the opposition of certain holders of direct

9    abuse claims.  Right now, the insurers' proposed language

10   only includes certain chartered organizations and the trustee

11   and the insurers.

12         And so I think it's important for survivors to

13   know that there are other survivors out there who also oppose

14   this plan.  Thank you.

15         THE COURT:  Thank you.

16         Mr. Schiavoni?

17         MR. SCHIAVONI:  Your Honor, Tancred Schiavoni for

18   Century Indemnity.

19         I would like to make sort of a basic point here,

20   and it's all a practical one, embedded in the same point, is

21   that the RCAHC, the Roman -- or the group that's calling

22   itself the Roman Catholic Ad Hoc Committee, is

23   extraordinarily well represented, but just as a background

24   here, if the Court remembers how we came to where we are,

25   it's this committee and the Methodist Committee were acting

1  together to move forward on, essentially, the settlement that

2  is embodied now in the plan.

3          Mr. Ryan represented both groups, concurrently, in

4  those discussions and they were extensive and they went on

5  for a long period of time.

6          The Methodist Ad Hoc Committee, which Mr. Ryan

7  represented, reached an agreement.  It's now -- they're now

8  in the plan.  He was extensively involved in that -- in the

9  agreement they reached.

10          The difference between these two committees, the

11  Catholic -- the so-called Roman Catholic Committee, the

12  (indiscernible) did not reach agreement, is that the Roman

13  Catholic Committee is chaired by an insurance company; not a

14  church, but an insurance company.  And their lead counsel,

15  otherwise, the Schiff Hardin firm, is their long-term

16  insurance coverage counsel.

17          When the deal was finally done here, they didn't

18  close.  Mr. Ryan, one would think, arguably had adequate

19  information to make the decision, on behalf of the Methodist

20  Committee, to go forward.

21          The so-called Roman Catholic Committee, which

22  didn't go forward, when it did finally file its objection,

23  disclosed that a number of its members -- and there aren't

24  many members, to start with, that are not an insurance

25  company -- resigned entirely.  The ones -- the solvent

1  diocese that filed a joinder is one.  One diocese filed a

2  joinder to that Committee.  That's apparently an affirmative

3  statement that they were going forward.

4         There were two bankrupt dioceses that also filed

5  joinders.  I'm not sure they really understand the plan,

6  because they sort of, like, are treated differently entirely.

7         So, we have someone now speaking up, you know, in

8  essence, sort of against this disclosure, who was extensively

9  involved in putting together these documents, who had an

10 opportunity to comment throughout the staging of the

11 Methodist deal.

12        Now, what also happened after that, two hearings

13 before this one, there was an exchange about how these terms

14 worked.  We asked at that hearing for comments, written

15 comments to -- like, if there was anything unclear, any

16 suggestion that rights were being taken away that shouldn't

17 have been, we asked at the hearing for Mr. Ryan to give us

18 written comments.  We said that would move the process along

19 to the term sheets that had been exchanged.

20        And on the record -- and I'm not revealing

21 anything that happened in mediation -- on the record of that

22 hearing, he said, No, he wouldn't give us written notice, and

23 we didn't get written notice.

24        Since then, this supplemental notice was sent out.

25 It was given to him.  He hasn't had weeks, but he did have

1  time.  He was asked for written comments if there's something

2  inadequate about it.  There's, honestly, hardly anybody on

3  this group call who knows more about this settlement and

4  these terms, because he represented a client who's

5  consummated it, than Mr. Ryan.

6          He was asked to give us written comments.

7  Ms. Boelter then had a meet-and-confer with him yesterday.

8  We had a full opportunity to present his written comments.

9  If he thought there was disclosure in there, that it was

10  missing, he had an opportunity to come forward and give it to

11  us.

12          He gave some very amorphous and ambiguous

13  statements on the call but didn't give us one line of written

14  comments.  If anything, Ms. Boelter, I can assure you, has

15  made 100 percent clear, that if there's some disclosure in

16  here that somebody thinks is missing, she's open to providing

17  it, okay.

18          That's not what we got yesterday and it's not what

19  we got right away, you know, as part of Mr. Ryan's argument,

20  that, like, we need to add this or we need to add that.

21          Where we're beginning with this is sort of a "lie

22  and wait" objection here that would be sprung upon us at

23  confirmation by a party who's extraordinarily well

24  represented, knows these terms extraordinarily well, and is,

25  you know, honestly operating here, not on behalf of all

1  charters, but on behalf of a committee that's chaired by an

2  insurance company, which has one, as far as I can see, a

3  diocese that's not in bankruptcy that is somehow provided

4  support.

5         The debtor has reached out to dozens of dioceses

6  and is engaged in a productive discussion with them and it's

7  reflected in how the vote went the last time around.  The

8  settlement here is -- this is a good deal, a positive deal

9  for the charters.

10        You know, we listened to what the Court had to

11 say, you know, or the exchanges -- not really the Court, but

12 really Mr. Ryan at the last two hearings about, you know, he

13 had asserted that the definition of "opt-out charters" was

14 the same as "participating charters."

15        That was -- he was mistaken, respectfully, in that

16 regard, and that led to a series of misunderstandings --

17 submitted a letter on it.  But in the settlement agreement

18 and in the plan, a lot of effort has went into it to make

19 clear, to clarify, even provide, you know, very, very clear

20 language in this regard, as an opt-out, someone gets to keep

21 all their rights.  They get to keep all their rights.

22        If they want to litigate in the tort system, they

23 get to do it, but as a participating charter, there are very

24 significant benefits that flow here.  Now, is there a change

25 on what happened to charters that would otherwise be called

1  "contributing charters"?

2         Yes.  Because of Mr. Ryan's objections, the

3  consensus was destabilized about whether or not the

4  contribution by the local councils was sufficient to support

5  a large group of the charters.  That's extremely unfortunate

6  and I don't think it's something, candidly, that the Diocese

7  would support.  It might have been something that the

8  insurance company committee chair supported, but it's not

9  something that the Diocese wanted to see happen.  It's not

10 something the Methodists wanted to see happen, but it

11 happened.

12        But that's a risk.  That risk was a risk that was

13 disclosed in the disclosure statement.  It was a specific

14 risk factor that, you know, in the disclosure statement that

15 local councils might not make all their contributions and

16 that that could have various consequences and that flowed

17 through.  But that was a disclosed risk on what occurred.

18        It's not a change in the architecture here of how

19 one would go from a participating chartered organization to a

20 contributing chartered organization if it contributed.  There

21 was always a risk that if a contribution wasn't made, that it

22 wasn't going to become a contributing charter.

23        As far as what the situation with the opt-out

24 charters are, it's clarified.  It's clear.  They get to

25 retain all their rights.

1          So, Your Honor, I speak in support of going

2   forward with this notice.  If there really is a comment that

3   they have, it should have been given to Ms. Lauria beforehand

4   and it should have been given to the Court so we could have a

5   fair consideration.  Ms. Lauria could decide whether or not

6   the debtor would voluntarily include it or not and/or the

7   Court could order it.

8          Thank you, Your Honor.

9          THE COURT:  Thank you.

10         Mr. Pachulski, and then I'm going to Ms. Lauria.

11         MR. PACHULSKI:  Thank you, Your Honor.  Mine is

12  very quick.

13         Counsel had asked, and just for purposes of

14  clarification, counsel had asked whether or not our firm, who

15  had made a commitment at the beginning of the case to provide

16  10 percent of our fees to effectively, the settlement trust,

17  if that has, in any way, changed because of the settlement,

18  and I wanted to put on the record, I don't think it's an

19  additional disclosure issue, but I wanted to put on the

20  record that that has not changed and it's completely

21  independent of the resolution that has been added to the

22  plan, Your Honor.

23         So, I didn't -- I think plenty of argument has

24  been made on the motion, but the question was asked and I

25  certainly wanted to answer it.

1              THE COURT:  Thank you.

2              MR. PACHULSKI:  Thank you.

3              THE COURT:  Ms. Lauria?

4              MS. LAURIA:  Thank you, Your Honor.

5         I want to start with Your Honor's question about,

6    is there such a thing as an interim 1125 ruling, because

7    you're exactly right; when you see our confirmation brief

8    under 1129(a)(2), as well as the proposed findings of facts

9    and conclusions of law, we will be asking you to confirm that

10   disclosure complied with Section 1125 of the Bankruptcy Code.

11   So, you hit the nail on the head there.

12        I'm sensitive to Mr. Schiavoni's point that we

13   feel like we're in a little bit of a gotcha with this one.

14   The objecting parties are saying you don't need the order.

15   You don't need the order.  And then they're going to turn

16   around and play gotcha and not participate in the disclosure

17   process when we get to the confirmation hearing.

18        That being said, Your Honor, frankly, we don't

19   have the time and we should not be devoting the resources to

20   another multi-day hearing with respect to disclosure.  We

21   have already sent out a several-hundred page disclosure

22   statement.  From the debtors' perspective, we just, in light

23   of the words in 1125 that say we needed to get Court approval

24   upon notice and a hearing, and in light of the prior concerns

25   in this case with official communications or official-looking

1  communications going out to the survivor constituency, and

2  importantly, people represented by counsel, we just simply

3  feel that we need some form of court order from the Court in

4  order to send these notices out, given that they have so much

5  plain-English disclosure in them and are simply not just the

6  distribution of a document.

7           So, again, I think we're open to fashioning the

8  order in whatever way the Court feels comfortable with, just

9  recognizing that when we come to the confirmation hearing, we

10  did work very hard to circulate these notices.  You know, we

11  took all of AIG's comments that were submitted, and I think

12  counsel conceded that point.

13          Counsel has raised more issues; those issues don't

14  have to do with, really, disclosure to Class 8 or to the

15  chartered organizations.  Gibson Dunn is a very sophisticated

16  law firm.  They had time to read the documents and fashion

17  their supplemental objection.

18          With respect to Mr. Ryan, he did --

19  Mr. Schiavoni's right; we did not receive written comments,

20  but we did receive 13 conceptual comments over a call last

21  night.  We worked very hard to try to incorporate those.  His

22  point about the insurance rights, contribution by chartered

23  orgs, that was incorporated in the blackline that was filed

24  last night in the second paragraph, under "summary of

25  modified plan changes."

1        And I apologize, Your Honor, I happen to be

2   looking at the blackline.  I think you had a clean in front

3   of you.  But I'm on page 2 of the blackline.  This is sort of

4   the second section.  That second paragraph says, you know, as

5   a result of these settlements -- this is under "summary of

6   modified plan changes" -- second paragraph:

7        "As a result of these settlements, the insurance

8   assignments and channeling injunctions in the modified plan

9   now include that, in exchange for a broader channeling

10  injunction, participating chartered organizations must assign

11  their independent insurance issued by settling insurance

12  companies, covering abuse claims, but only to the extent such

13  claims relate to Scouting."

14        So, that was our plain English attempt to put

15  right up front in this document, exactly the issue that

16  Mr. Ryan raised.  And I will also note, as I did previously,

17  and just to reiterate what Mr. Schiavoni said, Mr. Ryan does

18  now represent, frankly, a small universe of folks.  They have

19  all voted to object to the plan or reject the plan, I should

20  say, already.  He did file a very robust confirmation

21  objection and he'll have the opportunity to renew that at the

22  supplemental deadline.

23        Just a couple of other very quick points, Your

24  Honor, in response.  Mr. Desgrosseilliers, I think, was

25  looking for additional disclosures on the effect of the

1  channeling injunction for post-1976 claimants.  We have very

2  extensive channeling injunction disclosures with respect to

3  claimants in the original disclosure statement, so I think

4  we've, frankly, disclosed that one extensively.

5          And then with respect to Ms. Lujan Wolff, I think

6  we are fine with adding to the insurers' language that there

7  are other parties that also object to the plan.  I don't have

8  any problem with that.

9          So, with that, Your Honor, again, we're just

10 looking to get an order from you.  We will be asking for

11 an 1129(a)(2) finding down the road.

12         We don't want to play a game of gotcha, but also,

13 recognize, we just need to get these notices out, with an

14 appropriate order from this Court.

15         THE COURT:  Thank you.

16         Okay.  Well, I think it's a fair concern for the

17 debtors and, quite frankly, something we did not talk about

18 at the last hearing, with respect to approval by the Court.

19 As I went back and looked at 1125, 1127, and the relevant

20 rules, an issue that did pop up on my radar screen was, do we

21 need Court approval in advance of a solicitation of what is

22 going out?  It wasn't really something we discussed at the

23 last hearing, so I understand the reason for the filing of

24 the motion.

25         And I'm not as concerned, quite frankly, about

1  what's in these two documents.  I think it is -- it's

2  directed to the modifications that have been made that

3  affect, in some fashion, the two voting classes.  Those

4  parties who have, today, raised objections to the disclosure

5  are parties, in particular, the certain insurers and the

6  Roman Catholic Committee, are all over this case and they

7  don't need a disclosure statement to make any decisions about

8  whether they're going to change their vote or not change a

9  vote; they're going to do what they're going to do.

10          And the case law, I think, recognizes that when

11  parties have been involved as extensively as those two

12  parties have been, in particular, that the relevant

13  disclosure needed for those parties to make an informed

14  decision is minimal -- minimal additional.  And I have every

15  confidence that those parties, in particular, will be able to

16  fashion any supplemental objections that they want to file,

17  with respect to the plan.

18          My bigger concern, of course, is not those parties

19  who are represented by counsel, but parties who are not.

20  And, quite frankly, lawyers who are representing individual

21  claimants need to be responding to their claimants.  I don't

22  know how many times I have to say that.  If you have a client

23  who is calling you, emailing you, Tweeting at you, whatever,

24  you need to respond and provide them advice.  It's nobody

25  else's job to do that.

1      So, those who are represented need to be turning

2  to their lawyers.  And I think that this further disclosure

3  is sufficient for those lawyers to review and advise their

4  clients.  And if there's a question they have, pick up a

5  phone and ask a specific question to debtors' counsel or the

6  TCC counsel or some other counsel.

7      I am not concerned that the documents were filed

8  three hours into the early morning of the 15th.  I think it's

9  clear the tremendous work that was put in on these documents

10  between the day of the hearing and the time that they were

11  filed, and I have no concerns about the good faith of

12  everybody working towards the date that I provided.

13      I do agree with Mr. Buchbinder, however, that I

14  put people's feet to the fire and with a definitive date, by

15  which everything had to be filed; absent, which, I'm not sure

16  it would have been.  So, I recognize the definitive date, but

17  I'm not concerned about a few hours extra in evening, when,

18  at least those not working on the documents were not sitting

19  there waiting for them.

20      The one area that I have a concern about is the

21  chartered organizations' recognition of, and a time to

22  understand the change, and I think Ms. Lauria is correct in

23  her characterization, the flip-flop, with respect to, if not

24  the treatment, the -- technically, the options that chartered

25  organizations have and decisions they need to make.  And

1  that -- as well as an opportunity for claimants in Class 8,

2  the survivors, to be able to give some thought to the new

3  option that's out there and how it may or may not impact them

4  for independent review.

5          And we really are at a week after when I thought

6  notice would get to parties, because we didn't anticipate

7  this hearing today.  So, we're going to start the hearing,

8  the confirmation hearing now on the 14th; a few days later to

9  give parties a few more days to take a look at the newest

10 changes, which I think are warranted in this complex case.

11         And Ms. Lauria, you already said you were going to

12 extend the date for making an option or opting-out, I guess,

13 of the chartered organizations' default provision as a

14 participating chartered organization and that's appropriate.

15         I thought I had the timeline in front of me.  What

16 did I do with that?

17         MS. LAURIA:  Your Honor, right now, the voting

18 deadline has been scheduled, I believe, for March 4th.  We

19 were proposing to move the chartered organization opt-out

20 deadline also to March 4th.

21         Just, you know, one quick point, which is, again,

22 over 70,000 survivors in this case are represented by

23 counsel, who have been very well aware.  The TCC has already

24 provided two, I think two town halls and the Coalition has

25 also provided a town hall.

1          I understand, of course, your point about the

2   complexities and the hearing; again, just on behalf of BSA,

3   we would ask that we just try to stick to as tight a timeline

4   as possible because when get past that, you know, not only do

5   we need a confirmation order from you, but we need District

6   Court affirmance.

7          THE COURT:  Uh-huh.

8          MS. LAURIA:  So --

9          THE COURT:  And that's why I only moved it by five

10  days.

11         MS. LAURIA:  Okay.  Thank you, Your Honor.

12         THE COURT:  So -- and we're going to make the

13  deadline for -- so, it was March 4th with the revised voting

14  report three days later on March 7th.  So, we're going to

15  change that to March 7th for the voting deadline and the

16  chartered organizations to elect to become opt-outs, and then

17  three days later, the 10th, should be, then, sufficient for

18  Omni to do the revised, final voting report, which was the

19  increment under the previous order, so I'm assuming that's

20  still okay, and then we'll get started on the 14th.

21         MS. LAURIA:  And then, Your Honor, would objection

22  deadline and briefs in support -- the briefs in support were

23  March 2nd under the prior timeline and then the supplemental

24  objection deadline was February 25th.  I don't know if you

25  would want to do anything with those dates and deadlines;

1  obviously, the Court may want more time with those documents,

2  rather than less.

3          THE COURT:  Yeah, I'm not going to change the

4  dates for objections and replies.  I am more concerned with

5  the voting and the time for chartereds to look this over.

6          And if there needs to be some additional, small

7  filing because of the change in voting or whatever, we'll

8  deal with that.  But I'd like to have the other -- I know

9  that sounds backwards -- but I think I'd like to have the

10 supplemental plan objection deadlines stay where they are.

11 The parties that are involved are the ones that are going to

12 be filing supplemental objections.  You've had time.

13          MS. LAURIA:  Thank you, Your Honor.

14          We will prepare an appropriate form of order.  I

15 guess, Your Honor, maybe some guidance in terms of how you

16 would like us to proceed on the provision in the proposed

17 form of order on adequate information or would you like us to

18 just submit something to chambers and ...

19      (Pause)

20          THE COURT:  I will approve the way it's been

21 submitted and recognizing that the issue is going to come up

22 again at confirmation and I'll deal with it there, as well.

23          But recognizing that these supplemental

24 disclosures, while important, are really only disclosing the

25 additional, the changes; not going back to what was done

1   before and not pulling in what I think are, quite frankly,

2   extraneous issues, or not -- not central issues, let's put it

3   that way.  It's not pulling in every very well minor changes

4   that's been made.  I think these are sufficient.

5           MS. LAURIA:  Thank you, Your Honor.

6           Your Honor, before we transition to the -- I think

7   the next item on the agenda is the plan confirmation status

8   conference -- I guess I wanted to kick that off with one

9   observation and one request for the Court.

10          And then there is a hearing that I am involved in

11  going on, and if I could be excused after that, I would

12  appreciate it.  Mr. Kurtz is available to assist with the

13  rest of the hearing.

14          My one observation that segues into a request is

15  today is actually the two-year anniversary of the petition

16  date and that means Sunday is the two-year anniversary of the

17  last time we saw you in person, which was our first day

18  hearing.  And I know a question was raised at the last

19  hearing about whether the Court would consider an in-person

20  confirmation hearing and we certainly heard Your Honor's

21  response.

22          In light of the March 14th date, as well as just

23  the importance of the confirmation hearing, I wanted to put a

24  request back on the Court's table in terms of whether you

25  would be open to considering that.  I will tell you that I am

1   here in New Jersey in a Bankruptcy Court.  Mr. Molton, who I

2   think went back into court, gave a closing argument

3   yesterday -- we're adversaries, but he started his closing

4   argument by saying how nice it had been to be in court for a

5   trial over the course of the week -- and I wholeheartedly --

6   I don't agree with anything else he said during that closing

7   statement, but I do wholeheartedly agree with that.

8           So, given the importance of the hearing, as well

9   as the fact that it does have a significant evidentiary

10  component, again, I just wanted to put the request -- I think

11  the insurers raised it last time -- but I wanted to let the

12  Court know, on behalf of the Boy Scouts, that we are, too,

13  interested in the Court's views on that as things continue to

14  evolve.

15          And I should say that the hearing that we're in

16  this week is a hybrid and the parties were restricted in the

17  number of folks they could bring in and everyone is wearing

18  masks, but -- except when speaking -- but I did just want to

19  put that back on your table.

20          THE COURT:  Thank you.  And, yes, I am jealous of

21  Judge Kaplan, who's having an in-person hearing, because

22  there is nothing I'd like better than to have in-person

23  hearings.  And maybe I'll speak to him about how it's going.

24          My concern is that, quite frankly, as I expressed

25  before, is that if, in fact, notwithstanding all the

1  precautions -- and we are still under an order that requires

2  social-distancing, although, I think it's three feet and not

3  six feet anymore, and masking, and we have plexi up, because

4  we had anticipated being back in court much before now -- my

5  concern is, if someone tests positive during the course of

6  this, have I wiped out an entire room of lawyers who now need

7  to quarantine.

8              So, that's the real concern.  But, you know, maybe

9  I'll give Judge Kaplan a call and see how it's going for him

10  and the logistics of what he's gone through.  Because there's

11  no question, I would prefer live.  I would prefer the

12  witnesses to be on the stand; although, they are within,

13  probably, four feet of me, the way that my courtroom is

14  arranged.  But there's nothing that I prefer, so, as I said,

15  maybe I'll call Judge Kaplan.

16              MS. LAURIA:  Well, thank you for your

17  consideration.

18              THE COURT:  Thank you.

19              MS. LAURIA:  Thank you for your consideration,

20  Judge.

21              THE COURT:  Yes.  And you're excused, if you need

22  to go back into the courtroom in front of Judge Kaplan.

23              MS. LAURIA:  All right.  Thank you very much.

24              THE COURT:  Uh-huh.

25              MS. LAURIA:  Thank you, Your Honor.

1          THE COURT:  Okay.

2          MR. ABBOTT:  Your Honor, I think we are now ready

3   to take up some of the, theoretically, final status

4   conference matters.  And I'll turn it over to Mr. Kurtz to

5   start with that process, Your Honor.

6          THE COURT:  Mr. Kurtz?

7          MR. KURTZ:  Thank you.

8          Good afternoon, Your Honor.  Glenn Kurtz from

9   White & Case, on behalf of the debtors.

10         We were able, obviously, last Friday with Your

11  Honor, to cover a lot of ground and so there's not that much,

12  I think, that remains in dispute, but there are a few items.

13         The first item is we inadvertently failed to

14  include in our prior scheduling order, dates for a number of

15  items, all within one line, but primarily witness lists, the

16  exchange of witness lists, and the exchange of exhibits.  We

17  would propose to have those due by all parties at the same

18  time on March 4.

19         I don't think I've gotten an objection on the date

20  and, Your Honor, whenever you want us to submit that is when

21  we will do that.

22         The objection that I got from, I believe, the

23  certain insurers and the ad hoc committee, for certain of the

24  Roman Catholic entities, was that the debtors would submit

25  their witness lists and their exhibit lists first, and then

1  the objecting parties would provide their lists days later.

2         We don't think that makes any sense at all.

3  This -- the prior order required a mutual exchange on the

4  same date.  There was an order Your Honor signed on October

5  8th that had the mutual exchange on the same date, and also

6  on December 18th.  It is, in fact, the certain insurers had

7  submitted, Your Honor will recall, a motion to extend the

8  trial date; submitted along with that, a proposed schedule,

9  and that proposed schedule, like all the other schedules,

10 contemplated and suggested that the parties would submit

11 their witness lists and their exhibits at the same time.  So,

12 actually, the objectors are changing their position in

13 raising this kind of dispute.

14         I think the parties, customarily, exchange at the

15 same time.  I can't think of any trial I've had in the

16 last 32 years, where it wasn't exchanged at the same time.

17 The insurers certainly don't need more time than we need;

18 everybody knows where they're going.  Everybody needs the

19 same amount of time and we don't think that that particular

20 deadline was inadvertently omitted from the proposed

21 schedule, would warrant a change in the treatment under all

22 the prior schedules, departure from customary practices, and

23 a departure from what the insurers, themselves, had proposed

24 and recognized that is a customary practice.  So, that's the

25 first issue.

1           A related issue, an item that is included in the

2    same line on prior scheduling orders was the pretrial order.

3    And I wasn't sure at this point how much was required for a

4    pretrial order.

5           We will be supplying the witness lists and the

6    exhibits, which are usually the most important pieces.  As

7    Your Honor knows, sometimes there's contentions and there's

8    argument and things like that.  In light of the extensive

9    briefing, I'm not sure that's a very useful exercise.

10           Parties do try to reach agreement on stipulations,

11   obviously.  I think that would be difficult here.  I sort of

12   think maybe the most productive way to get the stipulations

13   would be that when parties submit declarations, there's

14   probably a whole host of items that won't be disputed and,

15   therefore, will be, in effect, stipulated.

16           I am happy to work on stipulations, but,

17   ultimately, it's really up to Your Honor, what you would find

18   most helpful by way of a pretrial order, and whatever that

19   would be, we will supply, and we will put in whatever work it

20   takes to try to get to, hopefully, more than a stipulation

21   that recites the background facts that are contained in all

22   the pleadings.

23           And then the last item is the submission of

24   declarations and we would suggest that the declarations be

25   submitted on March 2nd.  We're okay, maybe, with anything

1 | reasonable.  We also think that objections to the content of
2 | any of the declarations should be submitted sometime after
3 | receiving.  We're not really wedded to a particular day, but
4 | I do think that if objections are going to be made, that they
5 | should be heard so that either, accommodations can be made,
6 | workarounds can be effected, or we can prepare for an
7 | argument in front of Your Honor.
8 | So, those are the only pretrial -- I do want to
9 | just put a placeholder down, and I think it's going to be led
10 | by, I think, the TCC, perhaps the Coalition -- somebody -- is
11 | the certain insurers have also, and I think Your Honor heard
12 | a preview of this last Friday, but they have served some
13 | discovery requests looking for mediation materials relating
14 | to the amended TDPs and I think that there are people who
15 | want to be heard on that.
16 | I think I will make some comments at an
17 | appropriate time but given that the debtors' primary interest
18 | at this point is the schedule, we may not be, you know, quite
19 | as argumentative about it, but I do have views on that, as
20 | well.  So, that's maybe for next on the list, but those are
21 | the items that we think are on, in terms of the pretrial
22 | conference portion of today's hearing.
23 | THE COURT:  Okay.  I have another topic to put on
24 | the list, which were the *motions in limine* that were filed
25 | and objections were due yesterday -- no -- were they due --

1          MR. KURTZ:  I thought, Your Honor, we had an

2    extension until February 25th.  Someone please correct me if

3    I'm wrong.

4          THE COURT:  Just with respect to one, Miss --

5          MR. KURTZ:  Okay.

6          MR. KORNFELD:  It was only -- Your Honor, Alan

7    Kornfeld --

8          THE COURT:  -- Nancy somebody.

9          MR. KORNFELD:  -- for the TCC.

10         It was Katie McNally was the 25th.  The rest of

11   the witnesses were yesterday.

12         MR. KURTZ:  Your Honor, I would defer to some

13   other representative.  I focused on the 25th because I'm

14   focused on Ms. McNally, and so I knew that that one had been

15   extended.

16         I think there's been -- I know there had been some

17   workarounds between Century and others and I think they

18   submitted a stip.  If there are other *motions in limine*

19   relating to witnesses, then I'm not the right person to speak

20   to it.

21         THE COURT:  Okay.  Well, I'd like whoever to speak

22   to it.

23         MR. SMETHURST:  Your Honor, this is Ryan

24   Smethurst.

25         May I be heard on this issue?

1          THE COURT:  Yes.

2          MR. SMETHURST:  Thank you, Your Honor.  I will be

3    very brief.

4          Ryan Smethurst, McDermott, for Allianz and certain

5    insurers.

6          We would like the *motions in limine* heard in

7    advance of the pretrial.  We reached out to the debtors and

8    understand there's agreement on that point.  So, it's my

9    suggestion that we schedule those for argument the week of

10   February 28th, perhaps the second half of that week, if the

11   Court's schedule permits.

12         THE COURT:  Were objections filed?

13         MR. SMETHURST:  There were objections filed

14   yesterday and Mr. Kornfeld is correct, that the McNally-

15   related objections are due on the 25th.

16         THE COURT:  Okay.

17         MR. KURTZ:  And, Your Honor, I'm now told that the

18   debtors did file their responses to the Gutzler (phonetic)

19   and Burnett (phonetic).  Hopefully, that now covers everybody

20   that was addressed towards the debtors; if not, I'll have to

21   ask someone, again, to interrupt me or respond, but we did --

22   we apparently did make those filings yesterday.

23         THE COURT:  Okay.

24         MR. SMETHURST:  Mr. Kurtz is correct, Your Honor,

25   and Mr. Kornfeld is correct, as well, that the only remaining

1  filing left to close the briefing on this is due on the 25th,

2  which is why we proposed, on behalf of the certain insurers,

3  to all of the affected *motion in limine* parties, that these

4  motions be argued the week of February 28th.

5         My understanding is the debtors do not object to

6  that.

7         THE COURT:  Okay.

8         UNIDENTIFIED:  That is correct, Your Honor.

9         THE COURT:  Okay.  We'll find a time for that.

10        MR. SMETHURST:  And that first date, Your Honor,

11 we'll contact chambers after further conferrals, but we would

12 like it to occur that week.  Thank you.

13        MR. KORNFELD:  And, Your Honor, just for the

14 record, the number of *motions in limine* have been pared down.

15 The ones that are still pending -- and somebody will correct

16 me if I miss any -- are Gutzler, Burnett, one against

17 Coleman, who's the TCC expert.  And then there will be the

18 motion to McNally and an objection to that.  So, McNally will

19 be pending, also, with respect to the certain insurers'

20 motion.

21        With respect to the stipulation that was

22 discussed, there was a stipulation with Century and Zurich,

23 that their *motions in limine*, with respect to McNally and

24 with respect to Coleman are withdrawn, without prejudice,

25 given the TCC settlement.  So, the good news is, at least a

1  number of the *motions in limine* have been pared down.

2          THE COURT:  What about Mr. Bates (phonetic) and --

3          MR. KURTZ:  Your Honor, just to make sure, I know

4  there was one for Dr. Bates --

5          THE COURT:  Yeah.

6          MR. KURTZ:  -- and I'm thinking that one is on

7  the 25th, but we are going to need to make sure.  I just

8  don't something to fall between the cracks.  I think the FCR

9  filed a motion to strike certain portions of Dr. Bates.  I

10  thought that was on the 25th.  I hope I'm right about that.

11          MR. KORNFELD:  Yeah, I believe that was a limited

12  objection and we also filed a limited objection to the plan,

13  but not a *motion in limine*; at least with respect to the TCC,

14  it's a plan objection that relates to Dr. Bates, but it's not

15  a *motion in limine*.

16          MR. KURTZ:  Right.  And the FCR raised some time

17  of motion.  I'm told that the time to respond was extended to

18  March 2nd.

19          THE COURT:  You guys need to watch this.  Nobody

20  told me and I had it on the 20th -- I had it on the calendar.

21          MR. KURTZ:  I apologize, Your Honor.

22          THE COURT:  Do you think the time to object to

23  Doctor -- the motion with respect to Dr. Bates is March 2nd?

24          MR. KURTZ:  That's what I'm told.  I hadn't

25  actually negotiated these.  I will say my understanding is

1    there's efforts between the parties to sort of figure out

2    these valuation-related issues in a way that might alleviate

3    some work for the Court.

4            But in any case, I do believe -- and somebody

5    should correct me if I'm wrong -- but I have been advised

6    that the time for us to file an opposition to -- well, for

7    purposes of the time to file a response to the TCC's limited

8    objection, with respect to Dr. Bates, always would have been

9    March 2nd, because that would have been a part of the reply

10   to confirmation objections.  I think people arranged to have

11   the FCR's related motion put on a parallel track.

12           MR. KORNFELD:  Your Honor, the TCC objection was

13   not extended; it is a plan objection.

14           THE COURT:  Right.

15           MR. KORNFELD:  Always envisioned, as Mr. Kurtz

16   said, that the response would be in connection with the plan

17   response.

18           THE COURT:  Well, that, I understand, but I had

19   the joint FCR-Coalition motion to strike or, alternatively,

20   to submit a rebuttal report, and that strikes me as a *motion

21   in limine* by another name.

22           MR. KURTZ:  I don't disagree with Your Honor;

23   that's how I read it, as well.

24           THE COURT:  Okay.

25           MR. BRADY:  And, Your Honor, Robert Brady for the

1  FCR.

2          We are in discussions with the debtor and the

3  Coalition on how to proceed with that.  So, we may have more

4  to tell the Court shortly.

5          THE COURT:  Okay.  So, I'm in the same position

6  that I was before with the deadline that's passed and

7  party -- a deadline for submission to the Court that's passed

8  and the parties negotiating their own side agreement without

9  seeking approval, and I'm not sure why that is continuing to

10  happen, but it is.

11          And, of course, if you come to me and say, We're

12  going to get this off your plate; that's different, okay?

13          MR. KORNFELD:  I understand, Your Honor, and I

14  will make sure that people are being a lot more careful about

15  this as we go forward.  I hope it will take it off your

16  plate.  If we don't, I hope that March 2nd is acceptable.  If

17  it's not, please let us know and we'll file whatever we need.

18          THE COURT:  No, I guess, you know, if I get it

19  when I get it, then I get to it when I get to it.  So, that's

20  the corresponding, you know, response.

21          Okay.  Mr. Buchbinder, I've seen your hand up for

22  a while.

23          MR. BUCHBINDER:  Thank you, Your Honor.

24          I wanted to speak briefly to the request to have

25  an open court hearing.  As much as I appreciate that, there's

1  a significant amount of public interest in this case.  There

2  are significant objectors who have filed significant

3  objections.

4          And just as a starting matter, I don't know how

5  just the principal players, the people they need with them

6  and all the reams and boxes of material they would bring into

7  court, would leave room for anyone else.  And, frankly, if

8  you start thinking about the logistics of all of that and the

9  public nature of the hearing, we are -- plus the concerns you

10 raised about COVID -- we are probably in a much better

11 position to continue the way we have, than we have been.

12          Perhaps, the Court, on an ad hoc basis, if you

13 felt it important enough for a witness to consider some form

14 of hearing, or if the situation continues to improve,

15 perhaps, the final arguments could be in person.  But I think

16 for, at the moment, I would think that continuing to hold

17 this hearing in a Zoom manner would be best for all parties

18 concerned and the public interest.

19          THE COURT:  Thank you.

20          And even if we had an in-person hearing, it will

21 be hybrid; so, it will be on Zoom, as well.  And parties

22 would be able to observe and/or participate by Zoom and,

23 certainly, public access-wise, that will be an option that's

24 available.  So, it will not be fully in person; it will be

25 hybrid.

1      Mr. Hallowell?

2      MR. HALLOWELL:  Thank you, Your Honor.

3      Jim Hallowell, counsel for AIG, on behalf of the

4  certain insurers.

5      Your Honor, the certain insurances continue to

6  prepare for the March 9 confirmation hearing, and as part of

7  today's status conference, we have a few items to update the

8  Court on and to request guidance, where it's appropriate.

9      The first item relates to the issue of the

10  pretrial order, the witness lists, and the exhibit lists.

11  Your Honor, we have had communication with counsel for the

12  debtors and other parties about that issue and I guess I'll

13  ask when it comes to dates, whether you'd like us to adjust

14  some of these dates in light of the new March 14th hearing

15  date.

16      So, for instance, the final pretrial conference is

17  currently scheduled to occur, subject to the Court's

18  availability, on March 8th.  But with the hearing date now

19  starting on the 14th, is there a different date that Your

20  Honor would prefer?

21      THE COURT:  No.  We'll keep it on the 8th and

22  because that way, if we have any last-minute things, we can

23  deal with them.

24      And I'm not sure we gave a time -- did we give a

25  time for that or was that just a request?

1          MR. HALLOWELL:  The order says, "10:00 a.m.,
2    subject to the Court's availability."

3          THE COURT:  Okay.  I'm available, so we'll do it
4    on March 8th at 10:00.

5          MR. HALLOWELL:  Thank you, Your Honor.

6          With that in mind, at least during the parties'
7    discussions, it seems to be fairly agreed among the parties
8    that the consensus was that the deadline for the final
9    pretrial order, the deadline for when it should be submitted
10   to the Court should be March 7th.

11         So, if that's appropriate for Your Honor, I'd
12   request that that date be effectively penciled into the
13   parties' plans.  And what I want to talk a little --

14         THE COURT:  That's fine.  I'd like it by noon on
15   the 7th -- noon, Eastern.

16         MR. HALLOWELL:  And, Your Honor, I think that gets
17   to the issue of the exhibit lists and the witness lists.  So,
18   the prior order that Mr. Kurtz refers to says, "Deadline to
19   submit joint pretrial order, witness, and exhibit lists."

20         We agree with Mr. Kurtz that the witness and
21   exhibit lists should be submitted to the Court at the same
22   time, and so if we're submitting them at the same time as the
23   pretrial order, that will be March 7th at noon.

24         Our issue is one of what should occur between the
25   parties in exchanging such lists among us before we can

1  assemble reasonable lists to submit to you.  And, Your Honor,

2  what we proposed to the debtors, in light of the fact that,

3  as you've mentioned on several occasions, that it's their

4  case and they're going to present their case, and in light of

5  the fact that it is often the case that a Plaintiff will

6  disclose their exhibit lists and their witness lists to the

7  other sides in advance of a sequenced disclosure from

8  Defendants or other parties, we propose that we do it in that

9  way.

10          And, Your Honor, we believe that if we could get

11  as much early exchange and as much organization as possible

12  among the parties, that we can limit and prepare lists that

13  will be reasonable for Your Honor to read.  And that's why

14  we've proposed that the debtor provide to the parties, their

15  lists on February 28th, which is a Monday.

16          We also had proposed that the objecting parties

17  provide an exchange of their own lists on Friday, March 4th.

18  That'll allow the weekend for meeting-and-conferring and,

19  hopefully, paring down those lists.

20          And, Your Honor, we think that kind of sequencing

21  and back-and-forth approach will allow everyone to organize

22  this case in a way that will be presentable to you.

23          THE COURT:  I have to say, it's the first time

24  that anybody has asked me to involved in that *minutiae* of how

25  the pretrial order is going to be put in front of me, quite

1  frankly, and I'm going to let you all work it out.  Usually,

2  someone takes ownership of the pretrial order is my

3  experience, and, you know, I'm going to let you all figure

4  that one out.

5            MR. HALLOWELL:  Thank you.

6            The next thing I want to turn to is the issue

7  related to discovery in connection with the amended plan.  On

8  March 14th [sic], the certain insurers sent letters to the

9  debtor and some of the plan proponents, asking each of them

10 to update their discovery responses.  This was in light of

11 the TCC settlement term sheet and the amended plan, which had

12 not yet come out at that point, that we heard about earlier.

13           Our requests are particularly in light of the TDPs

14 and the independent review process that you heard a lot

15 about.  And we believe, Your Honor, that the independent

16 review processes are (indiscernible) the TDPs.

17           So, Your Honor, the debtors and several of the

18 plan proponents have stated in writing that they will

19 supplement with additional productions, and we'd consider

20 that to be constructive.

21           THE COURT:  Uh-huh.

22           MR. HALLOWELL:  We are still in negotiations; we

23 are meeting-and-conferring with other plan proponents.  Those

24 plan proponents have not confirmed that they will make

25 additional productions.

1          We don't believe that this is an issue for Your

2   Honor today, but it was mentioned by Mr. Kurtz, and we wanted

3   to mention that we are happy to continue to meet-and-confer

4   and if there's a dispute on this issue, our proposal is that

5   we will be back before Your Honor quickly with written

6   arguments on the issues of disputed (indiscernible).

7          THE COURT:  Okay.  Thank you for the heads-up.

8          MR. HALLOWELL:  The next item I want to flag is

9   similar.  Last night, we did file a discovery-related motion

10  related to the depositions of Mr. Eisenberg and Mr.

11  Rothweiler and for the privilege log that was provided by the

12  Eisenberg Rothweiler firm.  We are not asking to argue that

13  motion today since it was only filed last night, but we

14  wanted to make sure that Your Honor knew it was on the

15  docket.

16         THE COURT:  Thank you.

17         I would ask that -- I'm forgetting who your local

18  counsel is -- please send me over a copy of it.

19         MR. HALLOWELL:  The next item I have on my list,

20  Your Honor, was the arguments over the *motions in limine*, but

21  I think that's been taken care of by the parties already.

22         The next item that I had, and this is in the date-

23  confirmation category, I think everybody recognizes that

24  today is the deadline for the disclosure of the settlement

25  trustee and I want to make sure.  First of all, I want to

1  confirm that today is, in fact, still the deadline for

2  disclosure of the settlement trustee?

3         THE COURT:  It is.

4         MR. HALLOWELL:  Okay.  And I just want to point

5  out that we may have additional discovery in connection with

6  the settlement trustee, once we know the identity of that

7  person.

8         The next item that I wanted to raise, Your Honor,

9  relates to voting reports.  We have had some discussion,

10 obviously, in the first part of today's hearing about the

11 process for voting.

12        During the previous round of voting, the parties

13 were provided with interim voting reports from Omni as voting

14 progressed.  The insurers were among the parties that were

15 entitled to receive those interim reports.

16        We simply request that interim reports be

17 distributed among the parties and that the insurers be

18 included in the receipt of those interim reports.  I don't

19 know if that's the parties' plan or if anything has been

20 discussed with regard to that, but that's the request that we

21 would make.

22        THE COURT:  Does the debtor have a response to

23 that or have we lost our responder?

24        MS. LUJAN WOLFF:  Your Honor, I think I can help

25 out on that.  If Your Honor recalls -- and, I'm sorry, this

1  is Delia Lujan Wolff, representing certain survivors of

2  abuse.  I apologize, my camera is off; I'm just having

3  connection issues.

4          But at the last hearing, Your Honor, if you may

5  recall, Ms. Gilion Dumas and I raised the issue of the voting

6  report and the need for, or our request that the debtors

7  provide, again, the breakdown of the survivor vote as to

8  local councils and chartered organizations.

9          And as Your Honor recommended or urged us to do,

10  we did confer on that, and there was agreement or a

11  commitment by the debtors to do the following.  And if I

12  could just read directly from their email, Ms. Laura

13  Baccash's email, which states that:

14          On account of your request, we will do the

15  following:  on or before Monday, February 21, produce a

16  highly confidential spreadsheet containing the breakdown of

17  the vote as to local councils and chartered organizations,

18  based on the results from the final voting report to all

19  participating parties.  And post-aversion of the spreadsheet

20  identified in this first bullet, what I just stated earlier,

21  removing identifying information, such as the individual

22  claimant names, but would have to leave a claim number on

23  Omni's website, as it's the debtors' information that the

24  filing of this report would be impossible, as the Excel file

25  is not easily changed into a PDF and such PDF would be in

1  excess of 3,500 pages.

2          The debtors further stated that it would do the

3  following:

4          On or before Friday, February 25, file a summary

5  table of the information in the spreadsheet identified above.

6          So, those would be regarding the breakdown of

7  survivor votes as to local councils and chartered

8  organizations.

9          And, further, Your Honor, debtors stated that they

10  will produce the same information related to the March 4

11  voting deadline, reflecting any updates; that is, the local

12  council, chartered organizations breakdown of the votes with

13  summary table.

14          And the debtors also stated that they will produce

15  the voting materials to participating parties and that's with

16  the understanding that parties would have opportunity to

17  conduct any voting discovery (indiscernible).  Thank you.

18          THE COURT:  Thank you.

19          Mr. Hallowell, I'm not -- some of that may go to

20  what you've requested and it may not, because I don't recall

21  all of what was provided before but let me suggest to you

22  that you reach out to the debtors.  And given the commitment

23  that they've made to Ms. Lujan Wolff, my guess is it's not an

24  issue.  If it becomes an issue, let me know.

25          MR. HALLOWELL:  Thank you, Your Honor; we will do

1  that.

2           The last item I had on my list related to the

3  written supplemental objections.  We have confirmed that

4  written supplemental objections are due Friday,

5  February 25th, and we know that you haven't had a long time

6  with the amended plan documents, but to the extent that there

7  are particular issues and questions that Your Honor has that

8  you would request that the parties would focus on in their

9  written briefing, we thought we'd take this opportunity to

10 ask you about that, and if there's any particular format of

11 briefing that would be most useful to the Court, we thought

12 we'd ask that, as well.

13          THE COURT:  No, I don't have anything with respect

14 to the format; except, I think to make it -- I'd like it

15 targeted on the supplement, okay, the new objections.  You

16 don't need to rehash old objections.

17          And I have had some time with the documents, but

18 in terms of argument, no.  And what, of course, I want every

19 party to focus on is the impact any modification or

20 supplement has on them, not something else.  Not something

21 they aren't.  Just advocate for yourself; don't advocate for

22 others.

23          MR. HALLOWELL:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          MR. HALLOWELL:  Just looking quickly through my

1  notes, I think that that's all I have.  I may have other

2  things as other people speak.

3            THE COURT:  Okay.  Thank you.

4            Mr. Kornfeld?

5            MR. KORNFELD:  Thank you, Your Honor.

6            For the record, Alan Kornfeld, for the TCC.  I

7  wanted to respond to just one of the items on Mr. Hallowell's

8  list, and that's the discovery dispute that he gave you a

9  little prequel of, and indicated that people are talking,

10 which they are; meeting-and-conferring, which they are;

11 trying to reach a resolution in good faith, which they are,

12 but indicated there might be something that gets brought

13 before you.

14            I agree this is a matter for another day, but I

15 just want to round out that prequel and give you another

16 minute or two of it.  The central dispute is whether

17 documents that have to do with the TDP and the settlement

18 trust that were exchanged in the mediation, that you've heard

19 a lot about today and have heard a lot about at every hearing

20 about how hard people were working and how many hours and how

21 many documents, whether those documents that were exchanged

22 are subject to discovery to the certain insurers is the

23 subject of what we've been discussing and, potentially, will

24 be the subject of the mediation of the dispute that you're

25 called upon to decide.

1              So, I know the Court has had the scope of the

2     mediation in front of it back in October.  I think there will

3     be the scope of mediation privilege potentially raised in

4     front of you in the very near future and, also, there are

5     issues of common interest that will be raised; potentially,

6     this could involve hundreds, perhaps more, documents that

7     were exchanged repeatedly in the mediation, through the

8     mediator, by the parties to the mediation.

9              So, an issue for another day, but I just wanted to

10    round out what we were talking about, Your Honor.

11             THE COURT:  Okay.  So, I'll go back and look at

12    what I said before on mediation and we'll starts from there.

13    If there's a dispute, and I'll let the parties know who may

14    not know, that I've got at least two letter opinions in

15    Imerys on common interest.

16             MR. KORNFELD:  Thank you, Your Honor.

17             That is all I had.

18             THE COURT:  Thank you.

19             Mr. Kurtz?

20             MR. KURTZ:  Thank you, Your Honor.

21             And I don't know if you'll accommodate this at

22    all.  We have might be a slightly different view on what's

23    appropriate for today.

24             THE COURT:  Okay.

25             MR. KURTZ:  We're worried about our schedule, and

1  I'll come back to that, but, obviously, we've been through an

2  exercise on mediation privilege, with respect to the TDPs.

3  And I think it's a pretty serious incursion into mediation,

4  but Your Honor decided it was warranted under, you know, the

5  arguments that were being made.  And I think things may have

6  changed a little bit, but I really wanted to try to figure

7  that out.

8           So, back then, there were alleges about collusion

9  and that, primarily, that the debtors had turned over the pen

10 and had no role in the TDPs.  And we believe that the

11 discovery that we then supplied, clearly, it refuted all

12 that.

13          Additionally, we had a very different alignment of

14 supporters and objectors; there was a much greater weight of

15 people that were looking to invade the privilege, than we

16 have now, as we've been able to whittle down objectors and

17 achieve settlements.  And the alignment may warrant a

18 different approach, as well.

19          Our issue is, if we had all the time in the world,

20 we'd be happy to see this get so forth worked through in the

21 ordinary course, but those that would make a motion to compel

22 may not have the same sense of urgency that we do.  And

23 depending on how long it takes for this to get briefed and

24 resolved, I don't want to end up with arguments that by the

25 time we get to the provision of any discovery that Your Honor

1  might order, that that would justify a further extension of

2  the schedule, which we think would be really problematic for

3  these debtors.

4         So, if Your Honor is sort of inclined to believe

5  that what you had done before is a governing rule that --

6  we're a little reluctant to do -- you know, we don't think

7  it's warrant, but we're all reluctant to provide any

8  discovery in any case, because there is a mediation order and

9  the mediating parties are taking a position that it covers,

10  and I think they're correct in that respect, subject only to

11  what Your Honor would do.  But what we don't want to have is

12  people who claim that there is a crunch of time and that they

13  should get an extension.

14         There's also an issue about depositions.  I mean,

15  whatever the documents say -- they're not going to say

16  anything that supports collusion or anything like that -- but

17  whatever they say, they can be addressed live with a witness.

18  I don't think it would ever warrant re-deposing witnesses.

19  And so, I'm not too worried, maybe, about that, but, you

20  know, we would probably not stand on our rights, to the

21  extent we have any say in a given mediation order, to the

22  extent that it would jeopardize our schedule.

23         So, I don't know if there's any guidance that you

24  could offer, but that's our guiding principle; our guiding

25  principle is our schedule.

1        THE COURT:  My guidance is, I don't anticipate

2  that it's going to be to facilitate any change in the

3  schedule, okay.  If you can't come to a resolution, bring it

4  to me promptly.

5        MR. KURTZ:  Thank you, Your Honor.

6        THE COURT:  If the dispute gets brought to me too

7  late in the game, it gets brought to me too late in the game.

8        MR. KURTZ:  Thank you very much, Your Honor.

9        THE COURT:  Yep.

10        MR. KURTZ:  You've been very helpful.

11        MR. KORNFELD:  Your Honor, the Court's planned

12  scheduling order provides for a very expedited letter brief,

13  procedure, and protocol, with respect to the resolution of

14  the discovery proceedings.

15        So, whether or not we reach a resolution, and I

16  think we'll know that by early next week, we will get this

17  briefed and before you, pursuant to that order and give it to

18  you for a quick resolution.  We certainly do not want delay,

19  also.

20        THE COURT:  Very good.

21        Okay.  Anything else?

22        MR. KURTZ:  Nothing for the debtors, Your Honor.

23        THE COURT:  Mr. Kornfeld, your hand is still up,

24  or is that just left over?

25        MR. KORNFELD:  I think it's just a remnant, Your

1    Honor.

2              THE COURT:  Okay.  Anyone else?

3         (No verbal response)

4              THE COURT:  Okay.  Thank you, Counsel, very much.

5              Then we're completed for today.  We're adjourned.

6              COUNSEL:  Thank you, Your Honor.

7         (Proceedings concluded at 2:48 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7

8    /s/ William J. Garling                    February 18, 2022

9    William J. Garling, CET-543

10   Certified Court Transcriptionist

11   For Reliable

12

13   /s/ Tracey J. Williams                    February 18, 2022

14   Tracey J. Williams, CET-914

15   Certified Court Transcriptionist

16   For Reliable

17

18   /s/ Mary Zajaczkowski                     February 18, 2022

19   Mary Zajaczkowski, CET-531

20   Certified Court Transcriptionist

21   For Reliable

22

23

24

25