**<u>EXHIBIT 1</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

### DEBTORS' RESPONSE TO CERTAIN INSURERS' MOTION *IN LIMINE* TO EXCLUDE OPINION TESTIMONY OF DEBTORS' WITNESSES NANCY GUTZLER AND MICHAEL BURNETT

Boy Scouts of America ("BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 case (together, the "Debtors"), by and through their undersigned counsel, hereby file this *Response to Certain Insurers' Motion in Limine to Exclude Opinion Testimony of Debtors' Witnesses Nancy Gutzler and Michael Burnett* (Dkt. No. 8779) (the "Motion") and respectfully show the Court the following:

### PRELIMINARY STATEMENT

Contrary to the Certain Insurers' contentions, (1) Ms. Gutzler's opinions **_will not_** be used by the Debtors to "press this Court for rulings on insurance-related issues," but instead are being proffered to support the confirmation of the Plan, including the settlements and nonconsensual

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

third-party releases contained therein,[2] and (2) Mr. Burnett is certainly qualified to provide an opinion on the Trust Distribution Procedures as Mr. Burnett has worked for both policyholders ***and insurers*** for over two decades evaluating the compensability of sexual-abuse claims (Mot. ¶ 1).  As such, the Certain Insurers' motion should be denied in whole.

**Nancy Gutzler**.  The Certain Insurers contend that Ms. Gutzler's expert opinions as they relate to the Certain Insurers' rights and obligations (1) are not relevant for confirmation and (2) improperly rely on assumptions provided by counsel.  Both contentions are meritless.

First, the Certain Insurers argue that Ms. Gutzler's opinion regarding whether the Plan satisfies certain requirements for nonconsensual third-party releases included in the Plan (the "Release Allocation") is providing opinions on "insurance coverage issues" (Mot. ¶ 18); this is simply false.  As the Certain Insurers note, the Court will not make decisions on insurance coverage issues, (Mot. ¶ 1) and the Debtors are not seeking any such ruling.  To be clear, the Debtors have long understood this Court's instructions that its findings concerning Plan confirmation will be made solely in the context of confirmation: "[W]hatever decisions I have to make in the context of a case I make.  And if I have to make a decision under 1129, I've made it in the confirmation context.  Maybe it's an adjudication of something and maybe it's not. . . . [B]ut I can't fend off every view that a state court judge has about what I did or didn't do. . . . So then I decide certain things that I have to decide in the context in which I have to decide it.  This is confirmation." *In re Boy Scouts of America*, No. 20-10343 (Tr.) (May 19, 2021) at 169-170.

---

[2]    At confirmation, the Debtors will provide evidence that several factors espoused in *In re Master Mortgage Investment Fund*, 168 B.R. 930 (Bankr. W.D. Mo. 1994) with respect to non-consensual third-party releases have been met, one of those factors being that the Plan will pay in full, or substantially in full, all of the Abuse Claims.  Ms. Gutzler's opinions will assist the Court in establishing whether this factor has been met; and thus, her opinions are undoubtedly relevant.

The Debtors are not seeking, through Ms. Gutzler's opinions or otherwise, to have this Court make any insurance coverage determinations.

Rather, the Debtors are offering Ms. Gutzler's opinions concerning current settlement trust contributions and potential recoveries from unsettled insurers in relation to potential overall liability to aid the Court's assessment of factors relevant to Plan confirmation.  Specifically, Ms. Gutzler's opinions that relate to the Certain Insurers will be offered for purposes of aiding the Court's evaluation of certain factors relevant to approval of the non-consensual third-party releases contemplated by the Plan.  Ms. Gutzler opines that between the (1) contributions to the Trust to date and (2) potential recovery from non-settling insurers, the Plan provides Abuse Claimants a mechanism to obtain payment of all or substantially all of their claims at the aggregate range of liability set forth by Dr. Bates.  Therefore, Ms. Gutzler's opinions are directly relevant to the Court's assessment of a Plan containing third-party releases.[3]  Any argument that Ms. Gutzler's opinions will only "serve to draw insurance coverage disputes into the upcoming confirmation hearing" (Mot. ¶ 5) is completely unfounded.

Second, the Certain Insurers contend that Ms. Gutzler's opinions should be excluded because she relies on assumptions provided by counsel in performing the Release Allocation. Courts across the country routinely allow expert testimony that relies on assumptions of counsel. Any challenge to the assumptions relied upon by Ms. Gutzler goes to the weight this Court will place on Ms. Gutzler's opinions, not the admissibility.  Thus, that is not a basis to strike Ms. Gutzler's expert opinion.

---

[3]    *See id.* at 935 (noting that courts may consider, among other factors, whether "[t]he plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction" in evaluating third-party releases).

**<u>Michael Burnett</u>**.  Certain Insurers' Motion also seeks to exclude Mr. Burnett's expert testimony not on relevance, but solely on his qualifications.  Delaware courts, however, liberally construe the qualification requirement, which can be met by a broad range of knowledge, skills, and training.  Mr. Burnett has an extensive background in evaluating sexual abuse claims on behalf of insurers and defendants in litigation, thus giving him the knowledge, skills, and training to provide his expert testimony, as well as to rebut Certain Insurers' experts' opinions.

Over the past 20-plus years, Mr. Burnett has evaluated literally "thousands" of sexual abuse claims on behalf of insurers, religious organizations, schools, and others.  He is frequently and typically consulted as an expert when the defendant insured and its insurer are evaluating the case for settlement in litigation.  Given his experience, he is abundantly (and uniquely) qualified to opine that the Trust Distribution Procedures ("<u>TDPs</u>") are consistent with industry custom and practice—*i.e.*, that the TDPs mirror the evaluation that is performed by insurers and defendants in evaluating abuse claims in the tort system.  Further, Mr. Burnett is qualified to rebut the opinions of the Certain Insurers' experts –  Bitar, Treacy, Scarcella and Harrington – who, like Mr. Burnett, are providing testimony related to whether the TDPs reflect the same considerations given in the tort system.

Finally, Mr. Burnett's expert testimony should not be excluded on the basis that any Local Rules were violated during his deposition testimony.  Finding no other basis on which to disqualify Mr. Burnett, Certain Insurers' improperly attempt to exclude his testimony on the meritless contention that Mr. Burnett was "coached" during his deposition.  The record, however, reflects that Certain Insurers contentions are baseless.

Certain Insurers' Motion should be denied in its entirety.

## ARGUMENT AND AUTHORITIES

I.    **Ms. Gutzler's Opinions Are Admissible And Relevant To The Confirmation Of The Debtors' Plan.**

Although Ms. Gutzler offers expert testimony on several topics, the Certain Insurers only seek to exclude Ms. Gutzler's opinions with respect to her Release Allocation.[4]  Certain Insurers contend that the Release Allocation opinion is: (1) irrelevant to the confirmation of the Debtors' Plan; and (2) inadmissible legal conclusion because Ms. Gutzler relies on assumptions provided by counsel.[5]  Both contentions are meritless.

### A.    Ms. Gutzler's Release Allocation Is Directly Relevant to Plan Confirmation.

Although the Certain Insurers acknowledge that the Court has made clear that it will not determine coverage issues, the Certain Insurers nonetheless contend that the Debtors are seeking such a ruling.  (Mot. ¶ 1).  As noted above, that is simply false.  The Certain Insurers do not identify any request by the Debtors that the Court decide insurance coverage issues.  Rather, the Certain Insurers conclude, without basis, that "allocation of Debtors' abuse liability to and between Certain Insurers" would constitute "adjudicat[ion of] insurance coverage issues."  (Mot. ¶ 17).

Contrary to Certain Insurers' assertion, presentation of an expert insurance allocation does not invite adjudication of insurers' rights or obligations.  Allocation refers to the process of

---

[4]    Certain Insurers' Motion *does not* seek to exclude all of Ms. Gutzler's opinions, rather only Ms. Gutzler's opinions regarding insurance allocation *as it relates to Certain Insurers*.  (Mot. ¶¶ 5-6).  Notably, Certain Insurers agree that Ms. Gutzler's insurance allocation opinions "may be admissible with respect to other issues such as the Court's consideration of settlements by the Settling Insurers." (*Id.* at ¶ 2).  As such, only the Release Allocation is the subject of this motion.

[5]    For the avoidance of doubt, Certain Insurers do not assert in their Motion that Ms. Gutzler is not qualified to offer her testimony.  Nor could they.  Ms. Gutzler is the Vice President at KCIC, a consulting firm that focuses on providing quantitative, litigation and strategic consulting services to corporate policyholders.  Ms. Gutzler has over 30 years of experience providing financial and litigation support, including expert testimony related to the allocation of claims.  *See* Dkt. No. 8780, Ex. 1, Gutzler Report ¶ 5-7.

determining the amount of total liability that could be the responsibility of applicable insurance when certain assumptions are followed.[6]  Taking into consideration the contributions to date by the Debtors, Local Councils, the Settling Insurers, and Contributing Chartered Organizations, Ms. Gutzler's Release Allocation values the ***potential, post-confirmation*** recovery from the Non-Settling Insurers, including the Certain Insurers. The allocation performed by Ms. Gutzler would not have this Court decide whether the Certain Insurers are actually liable for the amounts set forth in the Release Allocation.

Instead, the Debtors are offering Ms. Gutzler's Release Allocation to aid the Court in determining that the nonconsensual third-party releases in the Plan are appropriate and should be approved.  Ms. Gutzler's opinions directly address whether "[t]he plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction,"[7] a factor that the Court may consider in assessing the Plan's third-party releases. The Certain Insurers do not argue in their Motion that evidence concerning third-party releases is irrelevant to confirmation.  Nor could they, as the Certain Insurers effectively conceded the relevance of the Plan's third-party releases to confirmation when they extensively briefed the issue in their objection to the Plan.[8]   The Certain Insurers' relevance objection to Ms. Gutzler is meritless and should be denied.

### B.    Ms. Gutzler's Opinions Properly Relied on Assumptions, As Every Expert Does.

The Certain Insurers also contend that Ms. Gutzler's Release Allocation should be excluded because it relies on assumptions provided by counsel and is therefore inadmissible

---

[6]    Dkt. No. 8780, Ex. 1, Gutzler Report ¶ 56.

[7]    *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)

legal opinion.  (Mot. ¶ 6).  This is contrary to black-letter law as "*Daubert* does not preclude testimony merely because it may be based upon an assumption." *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 U.S. Dist. LEXIS 120892 at \*29 (E.D. Penn. July 29, 2015). Critically, although the Certain Insurers contend that Ms. Gutzler's opinions as to the Certain Insurers are inadmissible "because they are based upon unverified assumptions provided by Debtors' counsel," (Mot. at 6), the Certain Insurers do not object to the Settlement Allocation as inadmissible—even though the same assumptions are used in both allocations.  (Mot. ¶ 2).

As a threshold matter, none of the cases cited by the Certain Insurers support their assertion that insurance allocation opinions are legal conclusions or inadmissible.[9]  It is not surprising that Certain Insurers were not able to find case law to support their contentions, as insurance-allocation expert opinions are common, widely accepted, and admitted into evidence. *See, e.g., Mine Safety Appliances Co. v. AIU Ins. Co.*, No. CV N10C-07-241 MMJ, 2015 WL 5829461, at \*11 (Del. Super. Ct. Aug. 10, 2015) (discussing that insurer's expert opinions on allocation were properly considered.); *Brauer Supply Co. 542(g) Asbestos Pers. Injury Tr. v. Atlanta Intern. Ins. Co.*, No. 4:09-CV-1640-JAR, 2012 WL 33088, at \*3 (E.D. Mo. Jan. 6, 2012) (denying insurer's motion to strike policyholder expert's opinion on allocation of asbestos claims to insurance policies finding that the opinion was reliable enough to aid a jury); *Viking Pump, Inc. v. Century Indem. Co.*, No. CV10C06141FSSCCLD, 2013 WL 7098824, at \*12 (Del. Super.

---

[8]    Certain Insurers' Objection to Confirmation of Debtors' Chapter 11 Plan [Dkt. 8695] at 36-48.

[9]    *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 294 (3d Cir. 2012) (holding expert's opinion in anti-trust action was properly excluded as unreliable); *Berckeley Inv. Grp., Ltd v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (holding an expert in the securities industry was allowed to opine on the custom and practice of the industry but not as to the ultimate legal conclusion of whether plaintiff complied with its legal obligations); *McCrink v. Peoples Benefit Life Ins. Co.*, No. 2:04-CV-01068, 2005 WL 730688, at \*3 (E.D. Pa. Mar. 28, 2005) (holding insurance expert was not allowed to opine on legal conclusions such as whether terms in an insurance policy were ambiguous or whether the defendant met its burden of proof).

Ct. Oct. 31, 2013), *order clarified*, No. CV10C06141FSSCCLD, 2014 WL 1305003 (Del. Super. Ct. Feb. 28, 2014) *and aff'd in part, rev'd in part sub nom. on other grounds* (permitting expert testimony on pro-rata allocation under insurance policies when there are non-cumulation clauses).[10]    Moreover, insurers (even some of the Certain Insurers) routinely retain similar experts to prepare similar insurance allocations[11] and, like Ms. Gutzler's opinions, these insurance allocations take into consideration certain assumptions related to how the insurance policies will respond to claims.[12]

As noted above, the Debtors are not asking this Court to make any coverage determinations based on the assumptions used and Ms. Gutzler is ***not*** offering a legal opinion as to these assumptions—what the applicable trigger of coverage should be, what exclusions apply, how many occurrences apply to the Abuse Claims, or what coverage defenses apply.    To the extent the Certain Insurers object to Ms. Gutzler's use of assumptions in her opinions, this is a challenge to the weight to be given to Ms. Gutzler's testimony, not its admissibility.    *In re Mushroom*, 2015 U.S. Dist. LEXIS 120892 at *30 ("Courts have found that 'most contentions that expert assumptions are unfounded go to the weight, not the admissibility, of the testimony,

---

[10]    *See also R.T. Vanderbilt Co. v. Hartford Accident & Indem. Co.*, 171 Conn. App. 61, 284, 156 A.3d 539, 659, 2017 Conn. App. LEXIS 59, *305 (Mar. 7, 2017) (allowing expert testimony on allocations to multiple insurance carriers for asbestos claims*); Cannon Elec., Inc. v. Ace Prop. & Cas. Co.*, 2021 Cal. Super. LEXIS 7423, *210 (Aug. 18, 2021) (admitting insurers' expert opinions on allocation for contribution and indemnity); *RSR Corp. v. Int'l Ins. Co.*, No. CIV.A. 3:00-CV-0250-, 2009 WL 927527, at *10 (N.D. Tex. Mar. 23, 2009), *aff'd*, 612 F.3d 851 (5th Cir. 2010) (relying in part on expert report regarding allocation to insurance policies in establishing excess coverage to a policyholder).

[11]    *Granite State Ins. Co. v. Clearwater Ins. Co.*, 2014 U.S. Dist. LEXIS 44573 at *19-20 (S.D.N.Y. Mar. 31, 2014) ("The unaffiliated insurers, the other AIG companies, and Granite State "retained the Brattle Group ("Brattle") to assist the carriers in preparing calculations for the various global settlement offers that were made to Federal Mogul.").

and a district court has discretion . . . to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.').  And the Certain Insurers had the right to either retain their own expert or will have the opportunity at the confirmation hearing to cross-examine Ms. Gutzler with respect to the assumptions used in her deposition or at trial. *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408,414 (3d Cir. 2002) ("Thus, a party confronted with an adverse expert witness who has sufficient, though perhaps overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.").  For this additional reason, the Certain Insurers have no basis to strike Ms. Gutzler's Release Allocation and their motion should be denied.

## II.    Mr. Burnett Is Qualified, And His Opinions Are Admissible.

The Certain Insurers also move to strike the expert testimony of Mr. Burnett, but the Certain Insurers do not challenge the relevance of Mr. Burnett's opinions to the confirmation hearing as the Certain Insurers retained experts to opine on the same or similar issues relating to the TDPs.  Instead, the Certain Insurers contend that Mr. Burnett is not qualified to provide opinions related to the TDPs, ignoring the decades of experience he has in advising insureds ***and insurers*** on the settlement of sexual abuse claims.  The Certain Insurers' argument should be summarily rejected.

### A.    Mr. Burnett Is Unquestionably Qualified To Render Opinions Regarding Whether the TDPs Reflect Industry Standard And Practice.

Courts have held that the expert qualification requirement should be interpreted liberally and that such qualification can be met by a "broad range of knowledge, skills, and training."

---

[12]  *Id.* ("Brattle's estimates factored 'changing assumptions'…. It then allocated the amounts of potential liability across all the policies potentially exposed…. Brattle was also not ever asked or instructed . . . to perform a substantive coverage analysis. Nor was Brattle asked to analyze the likely outcome of the coverage litigation or the likely contribution of each insurance policy to a litigated judgment. The Brattle spreadsheets simply

*Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (overruling lower court's determination and finding that an expert was qualified, reasoning that qualification "requires that the witness possess specialized expertise," the qualification requirement is interpreted liberally, and can be met by a "broad range of knowledge, skills, and training . . .") (citing *Schneider*, 320 F.3d 396, 404 (3d Cir. 2003)); *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (discussing Federal Rule of Evidence 702's requirements for expert testimony of qualification, reliability and fit, "[q]ualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." (citing *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993)).  "An expert should not be excluded 'simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'" *Sonos, Inc. v. D&M Holding*, 297 F. Supp. 3d 501 (D. Del. 2017).  To the contrary, the inquiry is "flexible" and any dispute between the parties about the experts' area of expertise or experience should be resolved by the jury.  *Id.*

Here, Mr. Burnett has an extensive range of knowledge, skills, and training that make him more than qualified to provide his expert testimony as well as to rebut the Certain Insurers' expert's opinions.  Mr. Burnett's opinions—both affirmative and rebuttal in response to the Certain Insurers' experts—are summarized as follows:

> The TDPs provide reasonable principles, procedures, and data factors to evaluate the veracity of sexual abuse claims and to determine appropriate valuation of sexual abuse claims. In addition, it is my opinion, based on my considerable experience in consulting on and evaluating abuse claims, that the TDPs are consistent with how litigation defendants and their insurers assess the credibility

reflected Brattle's modeling of variables and scenarios . . . to assist the carriers in developing global settlement offers.").

and appropriate value of sexual abuse claims when those claims are presented in a traditional litigation context. [13]

Mr. Burnett is able to opine that the factors considered in order to value abuse claims under the TDPs are consistent with factors used in valuation of abuse claims in the tort context because of his 20-plus years of experience evaluating abuse claims on behalf of insurers, religious entities, schools, and others.[14]   Mr. Burnett's unique experience in this regard is reflected not only in his expert report and C.V.[15] (which was conspicuously omitted from Certain Insurers' Motion), but a fact to which he also testified.[16]:

> Q: Do you have expertise in sexual abuse claim valuation?
> A: Yes.
> Q: Would you describe that expertise for us, please.
> A: I have been working on sexual abuse claims for probably about 26 years now. And about 19 years ago I started compiling a database of sexual abuse claim resolution values, verdicts and settlements and – or other claims where people -- where there was no verdict or settlement for a variety of reasons. And so I've compiled that database for a number of years now. I use that database to assist in my valuation of claims –sexual abuse claims.
> …
> Q: Approximately how many sexual abuse claims have you valued in your 26 years of experience with sexual abuse claims?
> A: They would number in the thousands. In a variety of different capacities, as coverage counsel, as a consultant for insurance companies or policyholders, in a number of different capacities.

Rather than question Mr. Burnett on his qualifications, the Certain Insurers focused their deposition questions to Mr. Burnett on his valuation database (which, as Debtors' counsel stated at Mr. Burnett's deposition, is not within the scope of his expert designation here).[17]   Although

---

[13]   Dkt. No. 8780, Ex. 1, Burnett Rep. at ¶ 3; *see also* Ex. A (Burnett Rebuttal Rep.) at ¶ 5.

[14]   *Id.* at 2.

[15]   Ex. B (Burnett C.V.)

[16]   Ex. C (Burnett Dep.) at 14:12-15:2, 16:7-14.

[17]   Dkt. No. 8780, Ex. 1 (Burnett Report) at 7 n.5 ("I have not been asked to opine on whether the TDPs reflect a proper valuation for these claims, which I understand is being addressed by other experts.").

included in his C.V. and highlighted in his expert report, the Certain Insurers did not appear to spend much time, if any, understanding the scope of Mr. Burnett's consulting work to determine whether he is qualified to render his opinions in this case.  Because the Certain Insurers failed to elicit this relevant information at the deposition, a declaration is included in this response.

Mr. Burnett has been consulting on behalf of religious entities, schools, non-profit organizations, and insurers in order to evaluate and value sexual abuse claims in the litigation and pre-litigation context for the past 26 years.[18]  In the last year alone, Mr. Burnett has evaluated and valued more than 500 abuse claims.[19]  In his capacity as an abuse claims consultant, he primarily evaluates abuse claims in the context of litigation.[20]  He has been retained on behalf of an insurer of Catholic Dioceses as an abuse evaluation consultant on hundreds of cases since at least 2004, where he routinely evaluates abuse claims in litigation and pre-litigation matters.[21]

In evaluating a claim in litigation, Mr. Burnett examines the information that has been developed in litigation or pre-suit investigation to analyze and value the claim.[22]  He is "well versed with types of claims abuse claimants make, and the various applicable defenses that are used by defendants in litigating abuse claims" as well as "the types of discovery routinely requested by defense counsel in their defense of sexual abuse claims."[23]  As part of his

---

[18]  Ex. H (Burnett Decl., ¶ 2).

[19]  *Id.* at ¶ 3.

[20]  *Id.* at ¶ 5.

[21]  *Id.* at ¶ 6.

[22]  *Id*. at ¶ 5.

[23]  *Id.*

evaluation, he "perform[s] a comprehensive review of the factual record developed, including the any information provided by the claimants (whether written oral), any evaluation reports, and any defense counsel reports . . . to develop a comprehensive assessment of the alleged abuse and any applicable defenses thereto, in order to determine a range of appropriate settlement values for [his] clients."[24]

This consulting work, which Mr. Burnett has been performing for the past 26 years, makes him abundantly and uniquely qualified to render an opinion regarding whether (1) whether "[t]he TDPs provide reasonable principles, procedures, and data factors to evaluate the veracity of sexual abuse claims and to determine appropriate valuation of sexual abuse claims; and (2) "the TDPs are consistent with how litigation defendants and their insurers assess the credibility and appropriate value of sexual abuse claims when those claims are presented in a traditional litigation context."[25]

Mr. Burnett is also an author of a monograph on sexual abuse issues, which provides "opinions about how they should be properly handled and the role of insurers and the role of insureds in the proper handling of claims, the understanding of those claims, and to give some opinions about how to best prevent abuse claims from a risk management standpoint and to properly handle claims if that – if there is sexual abuse."[26]  He is also a regular speaker and author on the subject of the proper handling of abuse claims.[27]

Based on the foregoing, the Certain Insurers' challenge to Mr. Burnett's qualifications in this regard is entirely without basis.  Mr. Burnett would not have been retained **by insurers**,

---

[24]   *Id.*

[25]   Dkt. No. 8780, Ex. 1, Burnett Rep. at ¶ 3.

[26]   *Id.* at 23:17-24:11.

religious organizations, schools, and others over the past 20-plus years as an abuse claim evaluation consultant on "thousands" of abuse claims if he was not qualified to render such opinions.[28]

The Certain Insurers suggest that because Mr. Burnett has never defended an underlying sexual abuse claim, he is not qualified in determining what factors should be considered in valuing those types of claims.  (Mot. ¶¶ 20, 22).  By the Certain Insurers' same logic, no insurance company would be qualified to assess sexual abuse claims since, like Mr. Burnett, they do not themselves defend underlying sexual abuse claims.

Finally, although the Certain Insurers' criticisms of Mr. Burnett's experience are unfounded, any such challenges go to the weight, not the admissibility of Mr. Burnett's testimony.  *See United States v. Rutland*, 372 F.3d 543, 546 (3d Cir. 2004) ("The past experience of expert witness properly influences the weight the testimony should receive."); *Kannankeril v. Terminex Int'l*, 128 F.3d 802, 809 (3d Cir. 1997) ("If the expert meets the liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility"); *McCullock v. H.B. Fuller*, 61 F.3d 1038, 1042 (2nd Cir. 1995) (disputes as to the strength of an expert's credentials go to the weight, no the admissibility of his testimony).

**B.**    **Mr. Burnett is Qualified To Rebut The Opinions Of Bitar, Treacy, and Scarcella** *As They Relate To Whether The TDPs Reflect The Same Considerations As The Tort System.*

The Certain Insurers also challenge Mr. Burnett's rebuttal opinions as to their own retained experts—Karen Bitar, Dr. Eileen Treacy, and Marc Scarcella.  In so doing, Certain

---

[27]    Ex. B (Burnett C.V.).

[28]    Ex. C (Burnett Dep.) at 24:15-25:6.

Insurers ask this Court to determine these experts' relative qualifications and credibility based solely on their titles—ignoring entirely the substance of Mr. Burnett's rebuttal opinions.

Mr. Burnett challenged each expert's opinions *to the extent that they concluded that the TDPs do not provide the same protections as the tort system.*[29]  Mr. Burnett was critiquing these opinions not as a physician or an economist, but as a sexual abuse claims consultant with decades of experience evaluating and settling abuse claims in the tort system.   *See* Ex. A (Burnett Rebuttal Rep.) at 2 ("After reviewing the expert reports of Harrington, Bitar, Treacy and Scarcella, I remain of the opinion that the TDPs are reasonable factors utilized in the determination of whether a sexual abuse claim is legally valid and credible, and in the assessment of liability and claim valuation.").   As set forth below, Mr. Burnett is fully qualified to rebut these experts' opinions, and the Certain Insurers' objections to Mr. Burnett's opinions are not grounds to exclude his testimony.

***Karen Bitar.***   The Certain Insurers retained Karen Bitar to opine that the TDPs are not consistent with litigation practice.[30]   Given Mr. Burnett's considerable experience in valuing "thousands" of different sexual abuse claims for insurers, schools, religious organizations and others over the past 20- years, primarily in the context of litigation, and as a frequent author and lecturer on the topic of valuing abuse claims,[31] he has the requisite qualifications necessary to opine that the TDPs reflect the same considerations as those assessed in litigation, including how

---

[29]   *See generally* Ex. A (Burnett Rebuttal Rep.).

[30]   *See* Ex. D (Bitar Rep.) at 2 ("It is my opinion . . . that the TDPs eliminate critical procedural protections in the adjudicative process, do not provide for neutral decisionmakers, and differ substantially in the process and method of calculating and paying damages. Defendants in sexual abuse cases routinely rely upon these protections to evaluate whether a claim for sexual abuse is likely to succeed and to determine how much, if anything, a defendant is willing to pay to resolve a sexual abuse claim.").

[31]   Ex. B (Burnett C.V.); *see also* Dkt. No. 8780 (Burnett Rep.) at ¶¶ 4-6.

those claims are evaluated by insurers and defendants for purposes of settlement.[32]  To the extent that the Certain Insurers take issue with Mr. Burnett's status as a sexual abuse claims consultant as opposed to a litigation attorney, those complaints go to the weight of his testimony, not its admissibility.  *See Rutland*, 372 F.3d at 546; *Kannankeril*, 128 F.3d at 809; *McCullock*, 61 F.3d at 1042.

**Dr. Eileen Treacy.**  The Certain Insurers retained Dr. Treacy to opine that the TDPs should be modified to require claimant interviews and objective medical testing for all 82,000 claimants.[33]  Mr. Burnett is not challenging Dr. Treacy's opinion as a clinician—*i.e.*, whether those evaluations are necessary from a medical perspective—but whether they are necessary, practical, reasonable, or indeed helpful in the litigation and TDP context.[34]  Mr. Burnett provides several examples from his personal experience of claims in which objective testing of the claimant was not necessary or was even unhelpful to the case.[35]  To the extent the Certain Insurers seek to challenge those examples, that challenge again goes to the weight, not the admissibility of Mr. Burnett's testimony.  *See Rutland*, 372 F.3d at 546; *Kannankeril*, 128 F.3d at 809; *McCullock*, 61 F.3d at 1042.

**Marc Scarcella.**  The Certain Insurers originally retained Mr. Scarcella to opine on several criticisms of the TDPs in relation to the tort system, including: (1) that the TDPs impose less deterrents than the tort system, (2) that the TDPs do not have a rigorous examination of the claim as compared to the tort system, (3) that there is moral hazard created by the STAC and FCR oversight of the Trustee; and (4) that the Trust may experience an increase in unmeritorious

---

[32]  *See* Ex. A (Burnett Rebuttal Rep.) at 12-15.

[33]  Ex. D (Treacy Rep.).

[34]  *See* Ex. A (Burnett Rebuttal Rep.) at 16.

claims compared to the tort system.[36]   Mr. Burnett responded to these opinions not as an economist, as he did not perform any valuation of the claims, but as an expert who has consulted in thousands of settlements of sexual abuse claims in the tort system.   In his critique, he compared the examination of the claimants and the information required of Abuse Claimants under the TDPs as compared to what information is usually obtained in the tort system.[37]   He also addressed whether in his experience there are significant deterrents to an abuse claimant proceeding with litigation, and the problems with trying to determine whether an abuse claim is "meritorious," whether in the tort system or the TDPs.   This is most certainly within Mr. Burnett's wheelhouse of experience.   *See* Section III(A) *supra*.   With respect to the moral hazard opinion, Mr. Burnett's response was based on the ethical obligations of the Settlement Trustee, which Mr. Scarcella overlooked entirely.[38]   This opinion does not require experience as an economist, as the Certain Insurers suggest.

**Scott Harrington**.   Mr. Harrington was retained by the Certain Insurers to opine on "the Plan's potential impact on their contractual rights and scope ('quantum') of liability."[39]   To the extent Mr. Harrington's opinions are even appropriate expert opinions at all, and are not purely legal conclusions about what rights the Certain Insurers are afforded by the policy or whether they are affected,[40] Mr. Burnett offers a proper rebuttal.   As an experienced and specialized

---

[35]   *Id.*

[36]   Ex. F (Scarcella Rep.) at 7, 9, 16.  Mr. Scarcella also opined in his original and rebuttal report regarding the valuation of the claims.  Mr. Burnett was not retained to opine on valuation.  *See* Dkt. No. 8780 Ex. 1 (Burnett Rep.) at 7 n.5.  That is being addressed by Mr. Charles Bates.

[37]   Ex. A (Burnett Rebuttal Rep.) at 19-20.

[38]   Ex. A (Burnett Rebuttal Rep.) at ¶ 62.

[39]   Ex. G (Harrington Rep.) at 2.

[40]   Debtors reserve the right to challenge the admissibility of Mr. Harrington's opinions at trial.

claims consultant on the value of abuse claims and a former coverage lawyer, Mr. Burnett is uniquely qualified to opine about how insurers typically evaluate abuse claims in the tort system, and whether the TDPs have really impaired those rights.[41]   Any complaint the Certain Insurers have regarding the assumptions provided to Mr. Burnett regarding the policies at issue go to the weight, not the admissibility, of his testimony.[42]   *See In re Mushroom*, 2015 U.S. Dist. LEXIS 120892 at *30.

C.    **Certain Insurers' Contention That Mr. Burnett Was Coached During His Deposition Is Misleading and Certainly Not a Basis On Which To Exclude His Testimony.**

Certain Insurers' contention that Mr. Burnett was "coached" during his deposition is misleading, as they intentionally omit the deposition testimony where Mr. Burnett confirms his answers to questions were not discussed.   The Delaware Rules state that it is improper for counsel to "coach" a deponent off the record regarding deposition testimony already given or anticipated.   DEL. BANKR. L. R. 7030.   Delaware courts have interpreted this rule to find that it is improper for an attorney to advise the deponent on how to testify.   *Deutschman v. Beneficial Corp*, C.A. No. 86-595-MMS, Memo Op. (D. Del. Feb. 20, 1990).   In their motion, Certain Insurers omit this key testimony where Mr. Burnett confirms that he was not given any instruction or advice on how to answer questions.

---

[41]   Ex. A (Burnett Rebuttal Rep.) at 3-11.

[42]   In critiquing the assumptions on policy evidence provided by KCIC, Certain Insurers miss the point.   Mr. Burnett was rebutting the opinion provided by Mr. Harrington that the Plan would "eviscerate non-setting insurers' right to participate in the defense and settlement."   Ex. A (Burnett Rebuttal Rep.) at 3.   The information provided by KCIC was very specific: "a majority of the policies issued to the BSA (the National Counsel policies) between 1962 and 2007 do not include a duty to defend but instead, only a duty to reimburse."   *Id.* at 3 & n.3.   Certain Insurers have offered no facts on which to dispute this.   While it is generally true that a *primary* insurer may have a right and duty to defend, here BSA's *excess insurers* do not generally have that right and duty.   Because a majority of the policies issued to the BSA are excess policies, they are also (by a majority) reimbursement policies.   They may have a right to *associate* in the defense, but that is not the same right as the duty to *control* the defense.   Certain Insurers' counsel failed to appreciate this distinction during Mr. Burnett's deposition.   *See generally* Ex. C (Burnett Dep.) at 227:13-228:2, 277:6-279:11.

Mr. Burnett's deposition began at 11:00 am ET.  Breaks were taken throughout, including a short break from 8:31 p.m. to 8:36 p.m.—at which time Mr. Burnett's deposition had gone on for nine-and-a-half hours. During this short break, Mr. Burnett and counsel were discussing how late into the evening it was getting, and counsel informed Mr. Burnett that after opposing counsel was finished with questioning that she would likely have a few follow up questions at which time the deposition would conclude and they could go home.  While counsel identified those follow-up questions for Mr. Burnett, at no time during this break (or any other break), did counsel "coach," tell or even discuss the answers that Mr. Burnett would give during his testimony. Indeed, Mr. Burnett repeatedly stated as much at the conclusion of his deposition:

> Q:  Did you rehearse the answers with her?
> **A:  I did not.**
> Q:  What else was said?
> A:  **Well, I know we talked about it being a long day.  We talked about it being late at night—I mean, you know, late in the day.** [43]
> ***
> Q:  Did Ms. Dubose speak with you at other points in the day during breaks other than the last one?
> A:  **No.  I mean, we talked about going to the restroom, getting stuff for lunch. But, no, there was no coaching, there was no rehearsing answers or anything like that**. [44]
> ***
> Q: Did you have any discussions with Ms. DuBose about the substance of your testimony during my questioning this morning?
> **A: No.**
> Q: Nothing?
> **A: No.** [45]

---

[43]    Ex. C (Burnett Dep.) at 388:1-7.

[44]    *Id.* at 389:14-21.

[45]    *Id.* at 390:13-19.

The Certain Insurers' citation to Mr. Burnett's deposition transcript is intentionally incomplete to insinuate that some violation of the Local Rules occurred.  It did not.  Mr. Burnett's expert testimony should not be excluded on this meritless basis.

## CONCLUSION

For all the foregoing reasons, Ms. Gutzler's and Mr. Burnett's opinions are relevant and admissible.  Ms. Gutzler's opinions are relevant to the precise issues raised in Certain Insurers' Objection and are not impermissible legal conclusions.  Despite the Insurers' contentions to the contrary, Mr. Burnett is unquestionably qualified, and his opinions are relevant to the issue of whether the TDPs reflect the same criteria used in evaluation of sexual abuse claims in the litigation context.  Moreover, Mr. Burnett's expert testimony should not be excluded on the baseless claim that any Local Rule was violated—such contentions have no merit.  This Court should deny the Certain Insurers' Motion in its entirety.

Dated:  February 17, 2022
       Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Paige N. Topper*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email:  dabbott@morrisnichols.com
       aremming@morrisnichols.com
       ptopper@morrisnichols.com

– and –

**HAYNES AND BOONE, L.L.P.**

Ernest Martin, Jr.
Adrian Azer
Carla Green
2323 Victory Ave., Suite 700
Dallas, Texas 75219
Telephone:  (214) 651-5000
Email:  ernest.martin@haynesboone.com
       adrian.azer@haynesboone.com
       carla.green@haynesboone.com

*ATTORNEYS FOR THE DEFENDANTS, DEBTORS,
AND DEBTORS IN POSSESSION*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| | (Jointly Administered) |
| Debtors. | |

**APPENDIX IN SUPPORT OF DEBTORS' RESPONSE TO CERTAIN INSURERS'**
**MOTION *IN LIMINE* TO EXCLUDE OPINION TESTIMONY OF DEBTORS'**
**WITNESSES NANCY GUTZLER AND MICHAEL BURNETT**

| Exhibit | Description |
|---|---|
| A | Rebuttal Expert Report of Michael Burnett |
| B | Burnett Curriculum Vitae |
| C | Excerpts of Deposition of Michael Burnett |
| D | Expert Report of Karen Y. Bitar |
| E | Affirmative Report of Eileen C. Treacy, Ph.D |
| F | Affirmative Expert Report of Marc C. Scarcella, M.A. |
| G | Expert Report of Professor Scott E. Harrington |
| H | Declaration of Michael Burnett |

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

**REBUTTAL EXPERT REPORT OF MICHAEL BURNETT**

**Introduction**

1.     My December 5, 2021 expert report analyzed whether the Trust Distribution Procedures ("TDPs") proposed by the Debtors reflect the same criteria that litigation defendants and their insurers generally consider in evaluating sexual abuse claims when those claims are brought in a litigation context.[2] As an expert with extensive experience in the defense of sexual abuse claims and related coverage matters, I have collaborated with coverage counsel and defense counsel in the litigation of sexual abuse claims. I have also served as counsel and consultant for policyholder defendants in both sexual abuse claims and coverage matters. The TDPs are consistent with factors and mechanisms that I, along with defense counsel and coverage counsel, regularly rely upon to determine the credibility and value of sexual abuse claims in litigation.

2.     In my December 5, 2021 expert report, I concluded that the TDPs are reasonable factors utilized in the determination of whether a claim is legally valid and credible, and in the assessment of liability and claim valuation.  I also concluded that defendants and their insurers regularly rely upon procedures and factors such as those laid out in the TDPs to inform their decisions about the credibility and value of sexual abuse claims asserted against their insureds.  I

---

[1]     The Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] I incorporate by reference my professional qualifications, the documents and information I considered, my statement of independence, the compensation for my time, and my opinions from my report.

concluded that the TDP Claims Matrix, Aggravating Scaling Factors and Mitigating Scaling Factors are reasonable tools in the sexual abuse claim valuation process, as they reflect historical sexual abuse claim resolution data and metrics. Defendants and their insurers regularly rely on such targeted, data-driven and supportable valuation factors and claim procedures to make informed decisions about sexual abuse claim resolution – from a liability and defense cost perspective in the litigation context.

3.      Four experts submitted expert reports on behalf of the Non-Settling Insurers: Professor Scott E. Harrington, Ph.D. ("Harrington"), Karen Y. Bitar, J.D. ("Bitar"), Eileen C. Treacy, Ph.D. ("Treacy") and Marc C. Scarcella, M.A. ("Scarcella"). Collectively, the opinions of these experts stand for the proposition that the Settlement Trustee's use of the TDPs to resolve over 82,000 sexual abuse claims in the BSA bankruptcy would prejudice the Non-Settling Insurers' interests, and that only through the traditional adversarial tort litigation system would their interests be protected.

4.      After reviewing the expert reports of Harrington, Bitar, Treacy and Scarcella, I remain of the opinion that the TDPs are reasonable factors utilized in the determination of whether a sexual abuse claim is legally valid and credible, and in the assessment of liability and claim valuation. It is also my opinion that, contrary to the opinions of the Non-Settling Insurers' experts, the TDPs provide robust protection of the Non-Settling Insurers' interests and are consistent with how litigation defendants and their insurers determine the credibility and appropriate value of sexual abuse claims when those claims are presented in a traditional litigation context.

**Overview**

5.      The overarching theme of these experts' opinions is that the Non-Settling Insurers' interests will only be protected through the adversarial nature of the traditional tort litigation system. These opinions are based on an unfounded and somewhat provincial belief that only the adversarial nature of the common law system ferrets out the truth and affords protections to defendants and their insurers. These opinions ignore the insurer-friendly mechanisms in the TDPs that protect defendants' and insurers' interests. These opinions also ignore the efficacy of other forms of litigation and claim resolution. Indeed, many of these alternative forms of dispute resolution are employed throughout the United States regularly, including by insurers and reinsurers. The TDPs incorporate several forms of dispute resolution that are, arguably, superior to the tort litigation system in the context of sexual abuse claims. These experts' opinions also set forth non-unique criticisms of the TDPs, incorrectly stating that the criticisms of the TDPs and its processes would be cured in the tort litigation system when, in reality, the speculative concerns are as present in the tort system as they purportedly are in the TDP system. They preemptively question both the character and competency of the Settlement Trustee, assigning myriad improper impulses and attitudes that, even if they were accurate, are equally present among decisionmakers in the tort system. Critically important also is that the experts appear to be unaware of or give short shrift to the unique challenges presented by sexual abuse claims, be they resolved in the traditional common law tort litigation system or otherwise. These dynamics are all set against the backdrop of jurisprudence in which every court that has adjudicated the issue of harm and damages resulting from childhood sexual abuse has found that sexual abuse of a child is inherently and immediately injurious to the child.

**Harrington's Report**

6.      Harrington opines, "I conclude—notwithstanding Plan language that might be argued to preserve certain of insurers' rights—that the Plan as written cannot be regarded as insurance neutral.  The Plan would significantly prejudice non-settling insurers' contractual rights and significantly increase their potential liability compared to that which would exist without the Plan."  I disagree with this opinion, as further explained below.

**Harrington Opinion: The Plan is Inconsistent with Basic Principles of Risk Transfer.**

7.      As noted above, Harrington opines that the TDPs could jeopardize the rights of Non-Settling Insurers and that only through the adversarial process of the tort system may that be avoided.  Much of Harrington's report sets forth an academic discussion of the role of liability insurance in the risk transfer endeavor.  However, ultimately, at its core, insurance protects against the risk of fortuity.  Both the insurer and insured seek to leverage that risk in the risk transfer marketplace. Contracts of insurance set forth insuring agreements, limitations, terms, conditions, exclusions and other verbiage to set forth and, ideally, protect the rights and interests of both parties to the contract.  Harrington's discussion is overly insurer-oriented at the expense of the rights of insureds under policies of insurance.  He devotes considerable discussion to "the role of liability insurers in investigating, defending, and settling claims; and the economic rationales for the insured's duty to assist and cooperate with the insurer in the defense of claims."  He devotes no discussion, however, to a basic principle of risk transfer – that  insurers have a reciprocal duty to not prejudice their insureds' interests.  Subjecting the Debtors to a plan that would require an adversarial process to resolve over 82,000 claims would be untenable, costly, fraught with incalculable risk and would be prejudicial to their insureds' interests. The Debtors would be unable "to equitably compensate victims who were harmed during their time in Scouting and continue to carry out Scouting's mission for future generations."  It would be impractical for the Debtors to litigate all 82,000+ claims through the traditional adversarial tort system.

**Harrington Opinion: The Plan is not Insurance Neutral Because it Prejudices the Contractual Rights of Insurers.**

8.      Harrington opines that the Plan would "eviscerate non-settling insurers' rights to participate in defense and settlement."  First, however, a majority of the policies issued to the BSA (the National Counsel policies) between 1962 and 2007 do not include a duty to defend but, instead, only include a duty to reimburse.[3]  Second, critical to Harrington's opinion is the concept of "prejudice."  The core of his opinion is that insurers whose policies *do* include a right to participate in the defense and settlement are prejudiced because they are denied the particular *manner* of defense and determination of settlement value – a traditional adversarial litigation paradigm. However, even if it could be said that the non-settling insurers are denied a participation characterized by protracted, adversarial and costly litigation, Harrington does not demonstrate how the non-settling insurers are thereby *prejudiced*. In fact, as noted below, the TDPs protect the non-settling insurers' rights to have their interests represented in the acquisition of information and materials through an investigatory and discovery process that informs the validity and credibility

---

[3] I was provided this information by KCIC.

of claims and ensures a data-driven valuation of credible claims. The Settlement Trustee will determine claim credibility and value utilizing the factors, information and materials that insurers and their insureds regularly use in the tort litigation context. Thus, they are not prejudiced at all in the TDP claim resolution process.

9.      Contrary to Harrington's opinions, nothing about the TDPs constitutes a lack of cooperation of the insured Debtors under the Plan and TDPs. Instead, the TDPs merely provide a different paradigm for defense and settlement. The "laboring oars" of "cooperation" are taken by the claimants and the Settlement Trustee. The TDPs require claimants to produce information and materials, and the Settlement Trustee – a third party neutral – is required to assimilate and assess the information to determine credibility and value. If anything, absent the traditional adversarial defense paradigm, the TDPs are more "one-sided" in favor of the insured Debtors and their insurers.  They place significant early burdens on claimants to produce evidence, documents, witnesses, records; and to submit to medical or psychological examinations, among many other things. And then, after all that, only if claimants provide sufficient support for their claims may they proceed to the stage where they may receive an award. The standards are not minimal. In terms of the information, evidence and witnesses, the standards are the same or similar as those found in the tort litigation context. The difference is that the TDPs provide a more streamlined and less expensive means of obtaining the evidence.  The transaction costs to non-settling insurers will likely be significantly less.

10.      The TDPs offer a unique mutually advantageous system to resolve sexual abuse claims asserted against the Debtors – mutually advantageous to the Debtors and their insurers. Contrary to Harrington's opinions, the TDPs will not prejudice the non-settling insurers. Instead, the TDPs likely will result in the non-settling insurers being burdened with significantly less exposure.  Essentially, the TDPs are a form of alternative dispute resolution (ADR).  The TDPs draw from a number of claim resolution systems that are more expeditious, efficient and cost-effective alternatives to the adversarial system.  These include the continental legal system, arbitration and public entity dispute resolution.

11.      In addition, many litigants and stakeholders (including insurers) in the adversarial tort system turn to ADR to effect a more expedited and cost-effective resolution of their claims.[4] One form of ADR is arbitration.  Because of cost-effectiveness and other efficiencies, many insurers and reinsurers utilize arbitration as a form of dispute resolution, to avoid the costs and risk of protracted litigation in the adversarial tort system.  Similar to arbitration, the TDPs provide for a significantly more expeditious and cost-effective means to resolve claimants' sexual abuse claims.  As in arbitration, the TDPs provide for sworn statements, documents, interrogations or interviews, medical examinations, production of medical and other records; and the Debtors and possibly third party litigants submit documents to an arbitrator who then decides based on what has been provided.  As with an arbitrator, under the TDPs the Settlement Trustee may question a party or witness, or permit limited testimony.  The parties place much greater trust in the arbitrator.  Transaction costs are significantly lower.  Awards are limited and more predictable.

---

[4] In fact, I understand that many of the pre-bankruptcy claims against the BSA proceeded to mediation or other ADR.

12.     In many respects, the TDPs mimic the tort system, but without the costly adversarial process that may be appropriate for other personal injury claims, commercial litigation and contract disputes.  The initial filing is like a complaint.  Sworn written statements are like affidavits, requests to admit and interrogatories.  Sworn oral statements are like depositions. Requests for documents are like requests to produce.  These all provide a significant measure of investigatory and discovery rights to the Debtors and their insurers, except that these all go to the Settlement Trustee rather than the Debtors and their insurers.  The Trustee, similar to an arbitrator or a continental law judge, assimilates the evidence and documents to investigate and decide the case.

13.     In fact, the TDPs provide protections to the Debtors and their insurers that the adversarial tort system does not.  The TDPs include procedures that mimic protections afforded public entity defendants in sexual abuse claims, "front-loading" the accumulation of information and supporting documentation rather than subjecting the parties to protracted discovery and motion practice to discern sufficient facts to assess credibility of the claim and claim valuation.  For example, in many jurisdictions, a child sexually abused in a public school must comply with stringent requirements just to be eligible to seek recovery.  Similar to the TDP Article IV Claimant Eligibility procedures, a public school claimant must typically file a formal written notice of claim as an eligibility prerequisite to filing a lawsuit.  As with the TDPs, the notice of claim must notify the school district of the nature of the abuse, the manner in which the district or one of its agents was wrongful, the injuries caused, and a demand for compensation.  The notice of claim must be filed in a relatively short time period, often within 60 to 90 days after the injury, to be eligible to file suit against the public entity.  Similar to the bar date burden placed on claimants under the TDPs, if a public school claimant does not file a notice of claim within the limit, he is precluded from filing a lawsuit in most states.  Similar to the TDPs, if the claimant does file a timely notice of claim by the bar date, the school district will investigate.  The claimant typically cannot file suit until the district denies his claim or takes no action for a set period of time.  Then, the claimant is subject to a relatively short limitations period within which to file suit—often only one year.  In addition, claims against public school districts often are subject to damages caps – sometimes only $250,000 – and typically there is no provision for punitive damages.  The TDPs similarly provide "front-loaded" burdens on claimants to sign written claims with supporting documentation and evidence by the bar date.  As with a public school district investigation, the Settlement Trustee then accumulates information, documents, sworn statements, records, interviews and potentially even documents and information from third parties.  Similar to the public school paradigm, there is a "cap" on the award that the Settlement Trustee may award a claimant, and a claimant could even receive no award. Harrington thus is incorrect that non-settling insurers will be prejudiced by a purported deprivation of rights to defend and settle.

14.     In fact, contrary to Harrington's opinion, the TDP system eliminates considerable risk to the Debtors' insurers. The TDP requires a kind of fact-based pleading format of allegations, in which sufficient facts and supporting documentation must be alleged and sworn to in the very earliest stage of the claim to apprise the Trustee of the nature of the claim and to establish eligibility to proceed to the next level.  As in fact-based pleading jurisdictions, the claim and issues are focused early in the process and the investigation, discovery, dispositive factors and settlement are narrowed.  The Trustee's investigation and discovery is thereby focused and limited to what is initially pled by the claimant.  Contrary to Harrington's opinion, there is greater cost to the claimants, as they are burdened with the task to allege a factually sufficient and supported claim

in the beginning of the process. They will not be able to merely put the Debtors and Trustee on notice of a claim and then engage in broad discovery to find support for their claim.

**Harrington Opinion: The Plan Causes Inflation of Allowed Claim Amounts.**

15.    Harrington renders a bold opinion to the effect that allowing the insurer to control or at least have the right and opportunity to participate in the defense and settlement of claims also inhibits possible agreements between policyholders and plaintiffs that could benefit those parties at the insurer's expense. Harrington provides no factual support for this opinion. He essentially suggests that without the non-settling insurers' active participation in more traditional and adversarial tort litigation, the Settlement Trustee is more likely to collude with claimants and their attorneys to inflate the allowed amounts that he would determine. He opines that the Trustee would be incentivized to maximize payments so as to maximize the Trust assets. There is no factual support for this unfounded opinion. There is no reason to assume that the Trustee would use anything other than the TDPs and his professional ethics to guide him in the determination of awards.

**Harrington Opinion: The Plan's Stipulations of Appropriate, Fair, and Equitable Claim Amounts and Good Faith Would Prejudice Non-Settling Insurers.**

16.    I disagree with this opinion. Article X.M.1. expressly states that except for the Insurance Assignment and the Bankruptcy Code, applicable law and the findings of the bankruptcy court in the Confirmation Order, "nothing in the Plan shall modify, amend or supplement, or interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights or obligations under an Insurance Policy…and the rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of the Plan documents…shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law." The Non-Settling Insurers have all of their contractual rights preserved and those rights will be determined in a subsequent coverage action.

**Harrington Opinion: The Plan Increases Volume of Claims and Attendant Costs to Non-Settling Insurers.**

17.    Harrington opines that the volume of claims which would purportedly increase non-settling insurers' quantum of liability are due to the existence of the Plan. I agree that the volume of claims increased compared to the pre-bankruptcy period, but I disagree as to (a) the cause of the increase of the volume of claims and (b) the effect on non-settling insurers. The bankruptcy increased the volume of claims, which were asserted before the Plan was created. This increase is not due to lowering the threshold to establish negligence against the BSA or eliminating a robust proof process, as Harrington suggests the Plan does, but because the Plan permits all claimants to come forward, not just those that would have an individually profitable claim for a plaintiff's attorney working on a contingency fee.

18.    Although the volume of claims may have increased compared to the pre-bankruptcy period, it is not necessarily true that the attendant costs to non-settling insurers would necessarily increase. These claims have been brought and now exist, and the TDPs propose an efficient way to resolve these claims. The TDPs place a greater burden on claimants than the adversarial tort

system to adequately allege a plausible claim early in the process, by a particular bar date. This process eliminates much of the risk to the Debtors and their insurers in the tort system. Under Article IV of the TDPs, even if there is no applicable statute of limitations defense, a claimant could be denied eligibility if he does not submit a completed and signed Direct Abuse Claim, with evidence and supporting documentation of the alleged abuse, by the bar date. In addition, under the tort system, if a claimant is subject to federal court procedures allowing notice pleading or in a notice pleading state, he typically is able to go forward unless no set of facts could possibly support his claim. However, the TDPs subject all sexual abuse claimants to the more demanding requirements of fact-based pleading of their cases, regardless of whether the jurisdiction is a notice-pleading or a fact-pleading jurisdiction. Moreover, the TDPs present an even more stringent standard than fact-based pleading jurisdictions. The TDPs require evidence and documentary support of the alleged abuse to survive as an "Allowed Claim," not merely fact-based allegations. Moreover, as discussed elsewhere in this report, because the TDPs are subject to maximum values, the insurers' risk of a catastrophic judgement against the BSA—and thus the insurers' quantum of liability— is exponentially *lowered*. The TDPs eliminate the costly adversarial process and the specter of damages awards in the tort system that are not limited by tiers and metrics built into the TDP process.

19.    Additionally, the increased volume of claims may also be due to the opening up and elimination of statutes of limitations in numerous jurisdictions, along with the enactment of reviver windows to allow even long time-barred claims to be filed. Thousands of claims that were otherwise time-barred were revived by eliminated or expanded statutes of limitations and reviver windows.

**Harrington Opinion: The Plan Increases Volume of Claims Through Assignment of Insurance Policies Issued by Non-Settling Insurers.**

20.    Harrington opines that the Plan's Insurance Assignment would assign non-settling insurers' policies issued to the Debtors to the Settlement Trust without the non-settling insurers' consent, which would adversely impact the non-settling insurers. However, the Settlement Trust stands in the shoes of BSA in bankruptcy. Now, BSA is the Debtor. Other entities' policies would also be assigned to the Settlement Trust. Harrington complains that there is little or no guidance about apportionment among the various policies assigned to the Settlement Trust in claims that implicate the Debtors and other entities. This is a non-unique criticism. The assignment of insurance policies from the Debtors and others presents no unique problems or issues regarding appropriate indemnification or coverage for legal expenses or other costs. In the tort litigation context, similar issues arise regarding which entities are liable, the percentage of their liability, policies and policy periods implicated by an insured's tort, and the number and limits of implicated policies issued by varied insurers. Formulas must be used to assess applicability of policies and limits by referencing applicable exclusions and concomitant available limits and sub-limits. Insurance coverage law often governs the appropriation of liability to various insurers. Harrington merely references a challenge that always exists in litigation where multiple policies and insurers are implicated. The Settlement Trust now stands in the shoes of the bankrupt BSA, but BSA remains the insured under the policies issued by non-settling insurers. The Plan makes clear that no policy provisions or applicable law changes merely because policies are assigned to a Settlement Trust. The Debtors still enjoy their rights and coverages under the policies of insurance. If anything, compilation of the policies of the Debtors and other associated entities likely would

make it easier to effect an appropriate, fair and legal way to proportionately reimburse or indemnify the Debtors for relevant claims when multiple policies are implicated by a claim.

**Harrington Opinion: The Plan Would Adversely Affect Liability Insurance Markets.**

21.     Harrington opines that the TDPs do not preserve insurers' rights to enjoy the "quantum of liability" that they estimated when they underwrote and sold policies of insurance to the Debtors. He essentially laments that the lack of an adversarial process prejudices the Non-Settling Insurers' interests and subjects them to greater exposure than they intended to assume when they entered into risk transfer relationships with the Debtors. He extrapolates to opine that this will adversely affect liability insurance markets. The reality, however, is that many bankruptcies result from underlying mass tort risks that were unforeseen when policies of insurance were sold to insureds.  Mass torts and "long-tail claims" such as environmental contamination, asbestos, breast implant complications and sexual abuse, among others, were neither contemplated nor accounted for in the underwriting and pricing of insurance coverage in a bygone era.  Many insurers also did not account for the erosion of charitable immunity protections for insureds such as the Debtors, or for the explosion of litigation seeking recovery for difficult-to-quantify mental and emotional distress.  Religious and nonprofit entities no longer enjoy the benevolent reputations they once did (which rendered them attractive insurable risks), especially those who serve minors.  Insureds such as the Debtors face an uphill battle defending themselves against sexual abuse claims. Not only was sexual abuse a fortuitous risk of liability that was not contemplated by insurers, but the other dynamics noted above (*e.g.*, erosion of the charitable immunity defense, etc.) are themselves fortuities that adversely impact the quantum of liability that was calculated by insurers when they issued policies of insurance. Thus, it is more likely that the torts arising out of childhood sexual abuse are what led to adverse impacts upon the quantum of liability and liability insurance markets, not the TDPs. But, ultimately, this is why people and entities purchase insurance – to leverage against unforeseen risks.

22.     In fact, contrary to Harrington's opinions, whether one designates systems like the TDPs as "ministerial" or "administrative" or something else, the TDPs provide the most cost-effective and efficient means to resolve tens of thousands of sexual abuse claims in the BSA Bankruptcy.  Even more than other "long tail" mass tort claims, sexual abuse claims present a unique challenge.  Unlike environmental contamination, asbestos or breast implants, for example, there is typically no discernable evidence of the injurious acts.  Experts can test soil and water samples to measure environmental contamination; experts and discovery can reconstruct corporate practices and commerce, test for asbestos fibers, trace employment histories to confirm that a claimant was exposed to asbestos or chemicals.  A woman can produce medical records which evidence that she was implanted with breast implants and/or that such implants were removed. However, sexual abuse typically happens behind closed doors.  There are usually no witnesses to the abuse.  Perpetrators rarely confess to abusing a child. Victims generally do not carry permanent physical scars of abuse. Children rightly perceive that disclosing their abuse can cause injurious repercussions, and so they often do not come forward for decades.  Perpetrators are often revered members of the community who were once lauded for their devotion to children. Their access as clerics or scouting volunteers imbued them with a cachet of respectability. Children were seen as unreliable witnesses; an accused adult was believed, not a child.  Under these circumstances, the traditional adversarial tort system presents an unwieldy, costly and risky paradigm for claim resolution.  This is because in other mass torts, lack of evidence often hampers a claimant's ability

to demonstrate the existence of elements of compensable tort liability. However, in sexual abuse claims, especially since many states have relaxed or eliminated statutes of limitation or opened reviver windows to permit the filing of otherwise time-barred claims; litigants and stakeholders in these matters understand that the lack of evidence is to be expected and often is not a death knell to sexual abuse claims. Under these difficult circumstances, the TDPs provide a much more efficient and cost-effective means to acquire evidence and information than tort litigation.

23.    Contrary to Harrington's unfounded legal conclusion that the TDPs establish "a framework that approaches strict liability, with little or no consideration of negligence," no aspect of the TDP factors constitutes strict liability. And, contrary to Harrington's opinions and the three other experts' opinions, the TDPs lay out all the information required and the elements of negligence liability. The $3,500 Expedited Distribution is not "a form of strict liability." In fact, that is an option afforded a person who attests under penalty of perjury that he was abused, with evidence and supporting documentation. It is a *de minimis* nuisance value settlement that benefits the Debtors and the non-settling insurers by providing a quick means of resolution. Even a successful, un-appealed dismissal under the tort system would usually cost significantly more than $3,500 to achieve. In fact, proposed TDPs of The Hartford included an expedited distribution of $500. Insurers acknowledged the concept of an expedited distribution as an efficient and cost-effective means to "buy their peace." Moreover, to provide perspective, even if all of the approximately 82,500 claimants survived the eligibility phase and each accepted $3,500 Expedited Resolutions to resolve their claims, the cost would be approximately $289 million, significantly less than the estimated range of $2.4 billion to $7.1 billion in estimated resolution payments. Presumably, non-settling insurers would be thrilled with such a result. Additionally, it is my understanding that the $3,500 Expedited Distribution would be paid directly from contributions to the settlement trust, and would not be presented to any non-settling insurer. Thus, non-settling insurers would have no responsibility for these Expedited Distributions.

24.    In addition, Harrington's report is contradictory. He opines that the TDPs reflect "little or no consideration of negligence" (another legal conclusion), yet then proceeds to recite the general criteria for evaluating non-expedited Trust Submission Claims found in Article VII.C.2. The general criteria require: identification of alleged acts of abuse, identity or description of the alleged abuser, information that the alleged abuse occurred during a Scouting activity or resulted from involvement in Scouting Activities, the claimant's age or date of abuse, and the venue or location of the alleged abuse. These general criteria are, in fact, mirror elements of a negligence claim. As noted by Ms. Bitar in her expert report, the elements of negligence are: the existence of a duty, the breach of the duty, causation, and damages. The criteria of Scouting Activities, location and abuser are considerations of duty. Arguably, if abuse occurred during scouting activities or resulted from involvement in scouting, especially at a location or venue where scouting activities occurred, and by a person involved in scouting, the element of a duty to protect and supervise minors would be sufficiently pled. That the abuse occurred is a consideration of, or is potentially indicative of, a breach of such duty. If the claimant was harmed by the abuse, causing discernable injuries or harm, such as the types of harm contemplated in the TDPs, then all the "considerations" of potential negligence would be present or at least potentially present. In fact, courts across the country that have adjudicated the issue have universally found that an adult's sexual contact or engagement with a minor is inherently and immediately injurious and requires no evidence to support such a finding. I have over 26 years of extensive experience working on sexual abuse claims as coverage counsel, mediator, policyholder consultant/counselor, defense counsel, and

valuation and resolution consultant. In my experience, these general criteria are the "considerations" of elements of negligence liability that factor into assessment of validity, credibility, liability and valuation of sexual abuse claims. It is puzzling that Harrington declares that the TDPs set forth little or no considerations of negligence only to contradict himself in the next paragraph with the listing of the general criteria that constitute considerations of negligence.

25.     Moreover, Harrington compounds his mistake when he opines that the "only one possible effect of negligence" is found in Article VIII of the TDPs, where it is set forth as a Scaling Factor; and that nowhere else is "evidence of negligence … otherwise relevant." As noted above, the general criteria in Article VII constitute "considerations" of negligence. The effect and relevance of negligence, as determined by whether evidence of the general criteria exists, is that it determines whether a claim is deemed an Allowed Claim or Disallowed Claim, as set forth in Article VII. It makes sense that evidence of negligence would be a Scaling Factor. The type of evidence and extent of negligence would be a factor utilized by defendants and their insurers in the assessment and valuation of sexual abuse claims, and in the determination of whether to settle such a claim.

26.     In addition, Harrington's opinion that there is only "minimal criteria" for payment of Abuse Claims is incorrect. Article VIII sets forth a detailed Claims Matrix and Scaling Factors. The Matrix is comprised of six tiers of abuse, with attendant base values and maximum values in each tier. Each tier provides detailed descriptions of abuse types that fall into the respective tiers. Five of the six tiers include delineations between adult-perpetrated and youth-perpetrated abuses. There are three sets of Aggravating Scaling Factors, each with three to four descriptions of criteria that fall within each set, and each with an assigned numerical multiplier. There are four sets of Mitigating Scaling Factors, each with multiple descriptions of criteria that fall within each set, and each with an assigned range of mitigating multipliers, some of which are mandatory. Not only are there myriad criteria, but there are predictable multipliers – aggravating and mitigating – in numerical values that the Debtors and their insurers may reference as guides to a predictable range of values. In fact, the use of well-defined and extensive criteria and numerical multipliers lends a definable metric to the valuation calculus that is usually absent in the tort system. Without criteria and numerical multipliers, claim valuation and settlement negotiations are endeavors often beset by the shifting sands of guesswork and unscientific and vague notions of a claimant's appetite for pursuing his claim; or attempts to determine what a trier of fact might find at trial or the summary judgment phase of litigation. Sexual abuse claims are volatile and emotionally-charged. They are difficult to defend against. In my experience, triers of fact are usually personally offended by the facts and evidence of potential negligence that purportedly enabled the abuse. In my experience, the detailed, well-founded, defined and extensive criteria of the Matrix and Scaling Factors in Article VIII would be welcome by both defendants and their insurers. They provide tangible and predictable bases for claim valuation in a way that the adversarial tort system does not. Finally, the Matrix and Scaling Factors produce a defined and finite range of claim values from $0 to $2.7 million. This provides predictability and limitations on exposure that are simply not available in the adversarial tort system. In the tort system, defendants are subject to the vagaries of even impartial judges and juries who are confronted with horrific claims of sexual abuse and serious harm to children. Multi-million dollar verdicts and settlements in the tort system in such claims are not uncommon. Some of those verdicts and settlements involve the Boy Scouts. Thus, the $2.7 million maximum payment for the most serious abuse, based on the Matrix and Scaling Factors, is well within the highest exposure sexual abuse defendants and their insurers have

endured and continue to face in the adversarial tort system.  In my experience, the discretion of the Settlement Trustee, constrained by the parameters established in the Matrix and Scaling Factors, is much more favorable than the discretion of triers of fact who may be traumatized themselves over evidence and witness testimony confronting them at trials and in the motion for summary judgment phase.

27.    Harrington speculates that permitting claimants whose claims are mitigated because of the statute of limitations to defer their acceptance or rejection of the amount offered – for up to 12 months – will increase payments.  It is unclear how dramatically that provision of the TDPs will affect total outlays.  However, the provision adroitly factors in part of the calculus that defendants and their insurers in the tort system engage in when valuating sexual abuse claims and negotiating settlements of such claims.  In my experience, when the conventional wisdom is that a state legislature likely will open up the statute of limitations, it affects claim values in that jurisdiction.  All the stakeholders – claimants, defendants, insurers, third parties, mediators – all factor that contingency into the calculus.  I have worked on claims in which insurers placed a premium on the resolution value so as to bring the claim to a close and buy their peace in a jurisdiction where the legislature's enactment of plaintiff-friendly amendments to limitations statutes seems imminent.

28.    Finally, Harrington renders a series of opinions to the effect that the various provisions in the TDPs will essentially increase the quantum of liability calculated by non-settling insurers, "further expanding insurers' liability beyond that contemplated in the contracts as written, underwritten, and priced."  This is perhaps an elegant way to describe the non-settling insurers' attempts to mitigate the negative impact of their wagers in the risk transfer enterprise.  Despite their best efforts to quantify the risk they assumed in the risk transfer transaction, and to underwrite and price their products accordingly, they are confronted with claims that may increase their "quantum of liability."  Actuaries, insurance experts, underwriters, claims directors, lawyers, brokers, third-party administrators and the like may have contributed to the non-settling insurers' calculus of risk and pricing.  At that time, perhaps the expansion of litigation and costs of litigation beyond traditional norms had not occurred.  Perhaps the erosion of charitable immunity had not occurred or was not fully anticipated.  Likely, they did not contemplate the emergence of long-tail mass tort risks.  Perhaps aggregate limits were not yet widely used, or claims-made policies with retroactive dates had not yet been widely marketed.  Perhaps the need for relevant revisions to insuring agreement language and limitations and exceptions to coverage were not yet fully appreciated.  Many policies probably did not include sexual misconduct exclusions.  All of these dynamics underscore the fundamental nature of insurance as a leverage against fortuitous risk.  The sexual abuse crisis that has created a demand upon insurance limits was a fortuity precisely because it was likely unexpected and thus unaccounted for in the quantum of liability analysis.  The irony is that the non-settling insurers have an opportunity to submit to tangible metrics and limitations in the TDPs that will *mitigate* their potential exposure to "liability beyond that contemplated in the contracts as written, underwritten, and priced."  My experience is that insurers and their insureds regularly avail themselves of arbitration, mediation, informal settlement negotiations and other forms of alternative dispute resolution to mitigate that risk.  The TDPs offer that same opportunity, and Harrington's opinions do not advance the cause of that opportunity.

**Bitar's Report**

29.     Bitar's opinions are that "the TDPs eliminate critical procedural protections in the adjudicative process, do not provide for neutral decision-makers, and differ substantially in the process and method of calculating and paying damages." She also opines that "the TDPs assume all claims are valid, assume the defendant is liable, and focus almost entirely on the amount of money a claimant will be paid, all assumptions that are not allowed in and do not exist in the tort system."

30.     While the TDPs are not an identical replacement of the tort system, the TDPs provide impressive mechanisms to mimic, to the extent possible, what would be discovered in a litigation context in order to assist the Settlement Trustee in valuing the allowed credible claims, similar to how liability and damages are assessed in the adversarial tort system. Moreover, I disagree that the TDPs eliminate protections in the tort system and do not have neutral decision-makers. Indeed, Bitar's opinions that the TDPs assume all claims are valid and that the Debtors are liable and that the focus is almost entirely on how much a claimant will be paid are unfounded and incorrect. It is true that the Settlement Trustee is not defense counsel and is thus not tasked with vigorously defending the claims submitted to the TDP process. Contrary to Bitar's opinion, however, the Settlement Trustee is a kind of third-party neutral who – analogous to a judge in the continental system of jurisprudence – investigates, assesses liability, valuates and, according to the TDPs, only pays to resolve legally valid Allowed Claims supported by evidence and documentation. There is no reason to believe that the Settlement Trustee would be anything but fair, impartial and neutral.

31.     Bitar, along with the other experts, imply or outright opine that the Settlement Trustee cannot be trusted to be neutral. Bitar opines that the Trustee is incentivized to award larger awards to claimants so as to maximize the Settlement Trust assets. It appears that, confronted with TDPs that expressly provide for that which she opines is lacking, Bitar's default is an opinion to the effect that the Settlement Trustee will not dispatch his duties to apply the TDP procedures as an impartial neutral. These opinions are completely unfounded and unsupported, both by a complete lack of evidence and by logic. Moreover, Bitar's opinion is a non-unique criticism. It could just as easily be said that the Trustee is incentivized to award lesser amounts to maintain the Trust assets.

32.     If anything, claimants would have a more compelling argument that the Trustee is not neutral and may prejudice them in the dispatch of his duties. This is because the TDPs impose a burden on claimants to produce evidence and documentation in support of their claims in the first instance. Just as in the tort system, under the TDPs, the burden remains on the claimant to prove a *prima facie* case *by a preponderance of the evidence*. Unlike the tort system, however, the Trustee is empowered to disallow a Direct Claimant's Direct Abuse Claim at the initial eligibility phase if it is untimely filed or incomplete because not supported by evidence and documentation and signed under penalty of perjury. This is arguably a one-sided benefit that favors the Debtors and their insurers because, unlike the tort system, the Trustee's disallowance of a claim is akin to his *sua sponte* dismissal of the claim without any potentially responsible party filing a motion to dismiss.

33.     Bitar incorrectly opines that the TDPs do "not bear any evidentiary burden" and that they are not subject to cross-examination. However, Article IV clearly requires, among other things, that a claimant sign a sworn statement about his alleged abuse and requires that it be

supported by evidence and supporting documentation. Failure to do that results in disallowance of his claim. Further, Article V provides that the Trustee shall provide the claimants access to non-privileged, otherwise discoverable documents, something akin to the application of federal rules in some jurisdictions, in which litigants are required to exchange documents and information even absent a litigant's formal request. Article V provides for a Document Agreement through which the Trustee can provide the Settlement Trust with documents, witnesses, or other information as part of the Trustee's investigatory and discovery responsibilities. Article VII requires the claimant to meet his burden of proving general criteria – essentially facts that would constitute evidence of negligence. Article VII further provides that the Trustee may disallow a claimant's claim if he deems it to be fraudulent, or if it does not meet the evidentiary standard in the General Criteria of Article VII.

34.     Bitar's opinions on disposition of claims in the tort system are grossly overstated. She supports her opinions with overstated findings of law, speaking in absolutes. Contrary to Bitar's opinion, the "safeguard" of dismissal if a claimant cannot present evidence of negligence is not lost under the TDPs. Under Article VII, if a claim is not disallowed in the Initial Evaluation, "the Settlement Trustee will evaluate the following factors to determine if the evidence related to the Submitted Abuse Claim is credible and demonstrates, by a preponderance of the evidence, that the Submitted Abuse Claim is entitled to a recovery and should be allowed." The general criteria to be demonstrated by a preponderance of the evidence are: the alleged abuse; the alleged abuser, identified by name or by description; the connection to Scouting, in which the claimant must show that he was abused during a Scouting activity or resulted from a Scouting activity; the date of abuse and the claimant's age at the time of the abuse; and the location of the abuse. Only if the Trustee determines that the claimant satisfies the evidentiary standard of a preponderance of the evidence will his claim be deemed an Allowed Claim. Contrary to Bitar's opinion, not only is the "safeguard" protection of dismissal not lost under the TDPs, it is arguably stronger. The Trustee can *sua sponte* disallow (essentially dismiss) a claimant's claim if he deems that the claimant has not satisfied the evidentiary burden by a preponderance of the evidence that the general criteria, elements of negligence liability, are present, even absent the Debtors' motion to dismiss.

35.     Bitar opines that the TDPs are deficient because they do not treat a statute of limitations defense as an absolute bar to recovery but, rather, as a Mitigating Scaling Factor that, at most, may mitigate the base value to .01, but not 0. Bitar states as an absolute that an untimely claim will be dismissed. My experience is that, even when that happens, often it is a dismissal without prejudice, providing a road map and a blueprint on how to remedy pleading errors in an amended complaint. Also, statutes of limitation and statutes of repose across the country are in a state of flux. That dynamic is accounted for in the chart that categorizes states by the status of their limitations defense. Claimants and litigants are often afforded wide latitude to amend their pleadings to allege new or different facts or to plead them in a more indefinite way so as to avoid a limitations bar. To represent a potential limitations defense with a Mitigating Scaling Factor of 0 would not accurately reflect the instability of the defense and the many ways that the absolute bar of a limitations defense can be avoided by claimants. In my experience, even where there has been a strong statute of limitations defense in a sexual abuse claim, some courts will not apply the law to dismiss the claim. Even where it is ultimately applied, the cost to achieve that win at the trial court or appellate court level sometimes exceeds the value of the claim. Such a win is often a pyrhhic victory, "winning the battle but losing the war." This dynamic is reflected in a Mitigating

Scaling Factor discount that is not absolute, but accurately accounts for the increasing difficulty in getting dismissal on the statute of limitations defense, and thus the discount only tops out at 0.1.

36.     Bitar opines that the TDPs do not define what it means for a Submitted Abuse Claim to be entitled to a recovery. She criticizes the TDPs for not defining what exactly the Trustee must find by a preponderance of the evidence. Again, this is a non-unique criticism. In the tort system, the trier of fact deliberates whether the plaintiff proved his case by a preponderance of the evidence. If so, the jury – the decisionmaker – decides in favor of the plaintiff and awards damages they believe are appropriate. As in the tort system, the claimant makes his case to the Trustee and, as the decisionmaker, the Trustee decides whether the claimant proved his case by a preponderance of the evidence. The only difference is that under the TDPs, the Trustee is the trier of fact, not a judge or jury.

37.     The answer to Bitar's question about what the Trustee must find by a preponderance of the evidence is set forth clearly in Article VII. Contrary to Bitar's opinion, the TDP process does, in fact, place virtually the same burden on the claimant and subjects him to the same standard in the assessment of liability as that which is found in the tort system. The claimant must prove his case to the trier of fact/decisionmaker (the Trustee) *by a preponderance of the evidence* that he was sexually abused and that the Debtors were negligent and that the Debtors' negligence caused his harm. As with a trier of fact in the tort system (judge or jury), under the TDPs, if the trier of fact (Trustee) determines that the claimant proved by a preponderance of the evidence that the Debtors were negligent and their negligence caused him to be abused, then the trier of fact determines what, if any, damages the claimant should receive. This too is determined by the standard of preponderance of the evidence. In other words, under the TDPs – just as in the tort system – if the decisionmaker/trier of fact determines that the claimant proved by a preponderance of the evidence that he was abused as a result of the Debtors' negligence, then that decisionmaker/trier of fact determines whether he is *entitled to a recovery* of an award of damages.

38.     Again, Bitar's opinion appears to be that if the determination of liability by a preponderance of the evidence and the determination of damages by a preponderance of the evidence did not emerge from the *adversarial* process of the tort system, then the determination is not legitimate. That constitutes an indictment of the many ways – alternative to the tort system – in which triers of fact and decisionmakers assess liability and damages in ways other than through a costly and protracted adversarial process.

39.     Nevertheless, to more specifically answer Bitar's question about what exactly the Trustee must determine by a preponderance of the evidence to determine whether a claimant is entitled to a recovery under the TDPs, we turn to the "factors" set forth in Article VII. Under Article VII, at the end of the evaluation process, the Trustee may determine that a claimant is entitled to a recovery if he has demonstrated by a preponderance of the evidence: (a) that he was sexually abused; (b) by an abuser he can identify by name or describe as someone affiliated with Scouting; (c) and that the abuse was connected to Scouting (either during a Scouting activity or that the abuse resulted from involvement with Scouting); (d) his age at the time of the abuse and/or the dates of the alleged abuse; and (e) the location of the alleged abuse. As someone who has worked on numerous sexual abuse claims, Bitar knows that it is exceedingly rare for there to be eyewitness testimony of childhood sexual abuse perpetrated behind closed doors, and that perpetrators very rarely confess to such crimes, and that victims generally do not come forward

until well into adulthood.  Thus, as Bitar knows, triers of fact impose burdens upon claimants to prove by a preponderance of the evidence certain facts that support their claim of having been sexually abused.  The factors set forth in Article VII are exactly the types of facts that both the tort system and the TDP process places on claimants to demonstrate by a preponderance of the evidence.  If documents and information submitted by the Debtors to the Trustee corroborate the claimant's account (especially if the accused abuser was a known abuser identified in the IV files), then the Trustee has even more information to determine whether the claimant has proven his case by a preponderance of the evidence.  It is the same type of evidence mined in the tort system, the same preponderance of the evidence standard, the same elements to be proved to demonstrate entitlement to a recovery.  The aspect of the TDP process that is missing is the costly adversarial process that prejudices defendants and their insurers by increasing the quantum of liability through increased transaction costs and the specter of damages awards in the tort system that are not limited by tiers and metrics built into the TDP process.  In my extensive experience handling and working on sexual abuse claims in many different capacities, the detailed procedures and factors set forth in the TDPs are what defendants and their insurers regularly assess through the lens of the preponderance of evidence standard.

40.    Bitar's report is also contradictory.  After erroneously lamenting the absence in the TDPs of protections found in the tort system and limitations on recovery, Bitar completely contradicts herself by acknowledging the existence of these very things in the TDPs, but distracts the reader from these contradictions by dropping them in footnotes 33 and 34 of her report.

41.    Bitar criticizes the TDP awards as generalized, compared to the "individualized assessments of damages and settlement values in the tort system."  This criticism ignores that (a) the TDP values are developed from the historical awards and settlements Debtor paid pre-petition; and that (b) the TDPs are highly individualized by category of abuse and a variety of mitigating and aggregating factors, which leads the Trustee to develop an individualized assessment of damages and liability on a large scale.

42.    Bitar also finds fault with the TDPs Expedited Distribution of $3,500 as payment without proof.  Bitar ignores that this option mimics litigation defendants' and their insurers' common practice of offering litigants an "early out," which provides for an expedited and cost-efficient resolution, even in cases where there may be viable defenses to such claims. The amount offered as an Expedited Distribution ($3,500) is vastly cheaper than abuse cases are typically litigated.  As Bitar acknowledges, most abuse cases are settled, rather than tried.  The expedited amount essentially represents an early settlement in litigation, before evidence is taken.

**Treacy's Report**

43.    Treacy is an impressively-credentialed psychologist with decades of experience, expertise and service in the court system, working in the arena of sexual abuse.  Nevertheless, Treacy's opinion that the TDPs are deficient because she believes they do not adequately guard against the potential for false claims motivated by the allure of secondary gain are not unique to

the TDPs.  The same dynamics are present in the tort system or in any dispute resolution system that addresses sexual abuse and the potential for compensation, especially where the majority of claimants are people who allege sexual abuse from often decades earlier.

44.    Treacy gives short shrift to the Article VII provisions designed to arm the Trustee with as much information and evidence as possible to assess credibility of the alleged abuse and alleged damages.  Included among those provisions is the requirement that the claimant submit to examinations if requested by the Trustee, including by health care professionals, and to produce all records in his possession, custody or control.  This would clearly include medical and psychological records.  My experience is that the recommendations of objective psychological testing and interviews by psychologists experienced in the field of sexual abuse are quite common.

45.    There is no reason to believe that the TDP provisions for examinations, production of records and sworn written and oral statements would be insufficient to acquire the requisite information to assist the Trustee in making a determination regarding credibility and damages.  More importantly, however, Treacy's opinions as to the purported deficiencies in the TDPs are unfounded and her recommendations to remedy the alleged deficiencies are impractical in an action involving over 82,000 claims of alleged sexual abuse.  As noted above, the Article VII provisions empower the Trustee to require a claimant to submit to examinations as part of the evidentiary and evaluation phase of the TDP process.  Also, that a claimant is motivated by secondary financial gain does not support a conclusion that his claim is fraudulent.  I worked on a claim in which the claimant acknowledged that, by and large, his life had been happy.  However, he had terrible memories of being abused as a teenager by his Catholic priest, and it had caused him emotional distress; it was "a cloud" on an otherwise sunny life.  He was unapologetic that he only wanted money.  Investigation and minimal discovery supported the credibility of his claim, but he was only motivated by financial gain.  In multiple claims I worked on in Florida, an athletic trainer had sexually abused several high school athletes.  During the course of investigation and discovery, the trainer's abuses were confirmed.  Nevertheless, at mediation, one of the young men and his mother both began yelling the iconic line from the movie *Jerry Maguire*, "Show me the money!"  He was clearly motivated by monetary gain, but there was no doubt that he had been sexually abused as a teenager.

46.    It is also my experience that often the types of in-depth objective testing and interviews recommended by Treacy may be unnecessary in the dispute resolution process.  If sufficient evidence already exists that support the allegation of abuse or, conversely, that appear to render it not credible, it is not always necessary to go to the time and expense of such examinations.  Treacy advocates for the "Rolls Royce" of forensic evaluation, but my experience is that defendants and their insurers in the tort system typically are satisfied with less costly and time-consuming examinations by psychologists and other mental health professionals.  Although these practitioners may not possess the breadth of sexual abuse expertise advocated by Treacy, that level of attention may not be necessary in every case, especially when medical examinations and records, mental health assessments and treatment records, and other records, either sufficiently corroborate a claimant's story or indicate that the claimant is untruthful.  In my experience, insurers and their insureds in the tort system often forego such in-depth analysis to avoid the added time and transaction costs.  This is especially true if it will lead to more costly and time-consuming discovery and evidentiary disputes with modest measurable gain.  These dynamics apply equally to the TDP process.  Subjecting every one of the 82,000+ claimants to interviews by a panel of

specially trained experts and objective testing to assess the impact of sexual abuse on each claimant is likely cost-prohibitive and impractical.

47.     I have worked on many large groups of sexual abuse claims (some numbering in the hundreds).  In none of those cases did the defendants and/or their insurers request such testing and examinations.  In fact, my experience is that in these cases, if there is a belief that a claim is credible, harm is deemed inevitable.  In fact, courts across the U.S. have found that sexual abuse of a minor is inherently and immediately injurious.  Finally, once armed with the kind of information and testing recommended by Treacy, it is not always clear what to do with it.  In some cases I worked on that seemed not credible, I requested an IME and more in-depth testing along the lines of what Treacy recommends, especially when I was coverage counsel representing insurers of defendant institutions.  Sometimes, we acquired confirmation that the claim was *actually credible*, but we had also armed plaintiff's counsel with compelling evidence supporting the claim.  In a related sense, even if the testing and interviews recommended by Treacy are undertaken, what does a defendant and its insurer do with that information?  At trial, nobody wants to be the defense attorney who appears to "blame the victim" or who cannot disprove the abuse but appears to take a seemingly dismissive attitude that a claimant's damages are not really due to the abuse but to other stressors in his life, maybe the result of family dysfunction.  That can also play into the hands of the plaintiff if such arguments contribute to the evidence of what made the claimant particularly vulnerable and an "easy target."  Also, the use of such information does not tend to endear a trier of fact to the insured.  The same is true for the use of such information in depositions.  I have worked on cases in which a cross-examining attorney used such information to pursue intrusive and offensive lines of questioning, resulting in the emboldening of the claimant and her attorney to not settle.  The result was a much higher resolution cost.

48.     The only scenario in which the Trustee could not request an examination is where an Abuse Claimant elects an Expedited Distribution.  Again, as described above, this is similar to early resolution in the tort system.  This type of expedited resolution would similarly occur before any type of medical examination or deposition in a litigation context.

**Scarcella's Report**

49.     Contrary to Scarcella's highly conditional opinions to the effect that the TDPs will result in the inclusion of a high number of unmeritorious claims, my experience has been that, to the extent it is possible to accumulate definitive evidence in sexual abuse claims, such claims generally are ultimately determined to be credible.  As noted above, sexual abuse claims are inherently difficult to assess because abuse happens behind closed doors and it often takes years before a victim discloses his abuse.  Unlike mass long-tail torts like asbestos or environmental contamination, sexual abuse does not carry discernable, tangible proof of the tort.  There are no asbestos fibers in the lungs, no leaching chemicals to trace from an insured's plant to an adjacent third party's property.  There are no manufacturing histories and employment records to verify and place a negligent party or victim at a particular location engaged in a particular activity at a particular time.  In this regard, long-tail mass sexual abuse claims are unique.  Compounded by the general consensus (both founded and unfounded) that such allegations are overwhelmingly truthful, it can be exceedingly difficult to discern the difference among purportedly truthful and purportedly untruthful allegations.

50.     Contrary to Scarcella's opinion that high transaction costs deter claimants with less meritorious claims from asserting them, my experience is that – while plaintiffs' counsel may be less willing to fund (on a contingency basis) those claims that are not foreseen as profitable to firm, that does not speak to whether the claims are meritorious. They simply may not be the type of claims that would merit a large enough award to entice a plaintiffs' firm to fund considerable litigation costs on an independent basis. This does not mean that the claims are invalid or have no merit outside of the bankruptcy process now that they have been brought. Lowering the transaction costs has just made it easier to bring valid claims. In the litigation context, especially in notice-pleading jurisdictions, a sexual abuse claimant can allege vague, fluid facts and factual scenarios that survive motions to dismiss because, even if their current allegations ultimately prove untrue, they generally can demonstrate that there is some set of facts or factual scenarios that could possibly support the claim. Even in fact-based pleading jurisdictions, in sexual abuse claims, pleaded facts may include lack of memory, trauma-inducing confusion, and many other facts that are notable in their lack of clarity. And, even in fact-based pleading jurisdictions, complaints are amended to "clean up the pleadings."

51.     Conversely, the TDPs require claimants to file claims in a manner similar to fact-based pleading, in which they must set forth the particulars of the claim, supported by evidence and supporting documentation, and must do so by a bar date. As noted above, the fact-based and evidence-supported requirements are analogous to the public entity paradigm, in which a public school student who alleges he was abused has a narrow window within which to file a formal notice of claim that sets forth the claim particulars. Similar to the public entity scenario, the TDPs require filing of a more detailed claim by a bar date or they will be precluded from advancing to the next stage, regardless of what the applicable statute of limitations is. In the tort system, this higher up-front "cost of entry" into the claim resolution system is unusual. While the onus on the claimant is higher under the TDPs, the TDPs do not require a claimant to find counsel who assesses the case to independently be at a high enough value to be profitable on a contingency-fee basis.

52.     For the reasons identified above, while I agree that bankruptcy process may have increased the number of claims relative to the tort system, this does not speak to the merits of those claims. Nor is it necessarily true that insurers will pay significantly more than they would in the tort system. The Trustee has considerable discretion to use aggravating and mitigating factors to limit the Abuse Claims without any particular claim raising to the level of a significant payout. In this context, Scarcella's experience informed by asbestos claims is less relevant and less applicable to the mass long-tail sexual abuse claim paradigm. Scarcella does not appear to have any expertise valuing sexual abuse claims in the tort system.

53.     In fact, the initial TDP phase that requires claimants to timely file a sworn claim on penalty of perjury supported by evidence and documentation is part of the winnowing process. If the claim is not complete with signature, claim particulars and supporting evidence and documentation, as in the public entity paradigm, they are precluded from participating in or being evaluated at the next phase.

54.     Contrary to Scarcella's opinions, the TDPs arguably impose a *more* "robust examination and qualification process" with "evaluation thresholds and rigorous evidentiary scrutiny" than the adversarial tort system. Beginning at the very initial stage of the TDP process, the claimant must submit a more factually-pled and supported claim than the tort system requires,

even in fact-based pleading jurisdictions. As noted above, the tort system permits a claimant to file a vague initial pleading and then rely on an adversarial, often contentious, costly and protracted discovery and motion for summary judgment phases of the tort system. In the TDP system, on the other hand, claimants are required to submit more detailed and supported initial pleadings. Contrary to Scarcella's opinions, these threshold requirements likely have the effect of reducing, not expanding, the volume of claims submitted to the TDP system. Unfortunately, opening up of statutes of limitations and the plaintiff bar's intensive advertising has increased the volume. These claims now exist and they must be resolved, either through the TDPs or in the tort system. In my opinion, the TDPs offer far more advantages and protections to the BSA and their insurers than the tort system.

55.    And, after a more rigorous initial pleading phase under the TDPs vis-à-vis the tort system, the investigatory and discovery phases of the TDPs is more expeditious, focused and cost-effective than the typical expansive and boundless discovery phase of the tort system. The Trustee is not engaging in a fishing expedition. The Trustee is not using discovery to vet other theories of recovery, he is not using discovery to harass the Debtors and their insurers. As written, the TDPs arm the Trustee with investigatory and discovery mechanisms to accumulate information and evidence – or not, if it does not exist – to evaluate the claim at the Article VII phase of the process and then to valuate the claim at the Article VIII phase. The process is not an adversarial discovery endeavor monitored by sometimes overwhelmed judges. And, often, different judges are assigned to different phases of the tort system: one that oversees discovery, another that adjudicates dispositive motions, and another who presides over trial. The tort system can at times look something akin to "herding cats" – feuding cats. By contrast, the TDP process is a streamlined, focused, cost-effective and efficient process driven by the decisionmaker/trier of fact. The Trustee reviews the adequacy of the initial pleading, requests discovery of necessary records and documents, takes or facilitates the provision of sworn written and oral testimony, and may seek additional records from third parties and supplemental discovery. Then, if a claimant does not choose the Expedited Distribution, the Trustee evaluates the submissions under the detailed guidance of Article VII to assess whether, by a preponderance of the evidence, the claimant has demonstrated the existence of five factors that mimic the elements of negligence tort liability. Then, if the claimant's and others' submissions meet the preponderance of the evidence standard to demonstrate the five factors that indicate negligence that caused abuse, only by that process does the Trustee make the determination that the claim is eligible for recovery. As noted above, this process is much more likely to quickly and efficiently and cost-effectively produce evidence that informs the assessment of liability against the Debtors, and only then does the trier of fact (the Trustee) use the evidence to determine the Allowed Amount. That valuation analysis is limited and constrained by metrics and valuation tiers that likely will result in lower values than volatile jury determinations. (An Oregon jury in 2010 rendered a $19.9 million verdict in a sexual abuse claim against the Boy Scouts, $1.4 million in compensatory damages and $18.5 million in punitive damages.). The $2.7 million maximum award under the Matrix and Scaling Factors leads to a much more predictable and manageable quantum of liability than the tort system, where judges and juries have rendered at times enormous verdicts in sexual abuse cases. By extension, those verdicts have led to higher settlement values because the relevant large verdicts inform the calculus of settlement values. The TDPs divorce the claim resolution process from the vagaries of emotionally-outraged triers of fact and at times unlimited verdicts comprised of large compensatory awards for both large economic damages components and non-economic damages for mental and emotional distress plus uninsurable large punitive damages awards. Under the tort

system, therefore, to avoid potential bad faith litigation, insurers may be pressured to settle for up to excess policy limits to avoid subjecting their insureds to extra-limits judgments that include large uninsurable punitive damages awards in tragic, emotionally-triggering claims that are scaled upon sometimes mountains of evidence that reflect lifetimes of horrendous damages.

56.     Oddly, Scarcella opines that the TDP claim valuation procedures create "uncertainty surrounding the quantum of post-confirmation claim liability" based on estimates of potentially $2.4 billion to $73.2 billion;" and that the valuation procedures are "vaguely defined," comprised of "abstract guidelines," and are impacted by "Scaling Factors on claim values that can range from $3,500 to $2,700,000." He also opines that the impact of the Scaling Factors lacks transparency.  Scarcella's opinions are inherently contradictory.  Even if his opinions of uncertainty, vague definitions and abstract guidelines were true (which they are not), the mere existence of such constraints and measures lends significantly more valuation certainty and limiting parameters than the typical *ad hoc* tort system claim valuations negotiated at mediation or at the conclusion of bruising discovery and loss of dispositive motions.  If it goes to trial, especially following an uncertain and often "mixed bag" of rulings at the motions *in limine* stage, a trier of fact often evaluates the evidence to find that the claimant demonstrated by a preponderance of evidence that the insured was negligent.  By mere virtue of the fact that abuse happened on their premises, during Scouting activities, by an agent of the Scouts, it may be deemed that BSA "knew or should have known" of the foreseeable risk that the claimant would be sexually abused.  Of course, juries often refract their analysis of these claims through a 21st Century lens, assuming and assigning knowledge and foreseeability standards to abuse that actually occurred during a bygone era when such "knowledge" and "foreseeability" may not have been known.

57.     Moreover, in footnote 16 in his report, Scarcella sets forth one estimate that 80% of the post-confirmation claim liability is already known.  That means that, despite Scarcella's opinion in the narrative about uncertainty as to "the quantum of post-confirmation claim liability," he acknowledges that 80% of that quantum is already known, or at least capable of being known at this stage.  In addition, the Scaling Factors do not lack transparency.  Each Scaling Factor assigns capped numerical multipliers that reflect a particular defense or damages evidence or evidence of negligence, among others.  The Trustee must apply applicable Scaling Factors under various circumstances but may use his discretion to determine what multiplier to assign – up to the cap. Thus, the ultimate value amount can be ascertained by reviewing the claim facts and thereby determining the Scaling Factor multipliers that were applied by the Trustee.  There is a logic and a calculus to the exercise.  The procedures are neither "vaguely defined" nor "abstract guidelines." In fact, the Matrix and Scaling Factors and narrative of Article VIII provide details about what factors into the values in each tier, and each tier reflects a predictable range of potential values, with a cap of a maximum value.  The mere fact that there is a known range of potential values ($3,500 to $2,700,000) shows that it is not vague, undefined, uncertain, abstract, and lacking in transparency.  And, the low end of the value range – $3,500 – is the same for each Expedited Distribution, in which the claimant has to comply with preliminary measures.  That is, by definition, a value tied to a set of requirements.  Indeed, Scarcella incorporates the TDP Claims Matrix and SOL Scaling Factors into his report as Figures 2 and 3.

58.     As previously stated in this report, the Matrix and Scaling Factors provide extensive guidance to the Trustee to valuate claims according to the facts of abuse and surrounding circumstances pled, not the potential of unquantified emotional influence and the desire to exact

punitive correction upon the insured. Scarcella even contradicts himself when he acknowledges in Section 2.2 of his report that, "[t]he TDP Claims Matrix and Scaling Factors outline the parameters for valuating individual claims." Contrary to his prior opinion, in 2.2 of his report, Scarcella discusses the metrics of Base Matrix Values, Maximum Matrix Values, varying abuse types and corresponding valuation tiers and Scaling Factors that adjust values up or down depending on the characteristics of each claim. He does not endeavor to reconcile this acknowledgement of the transparently-articulated details, data points and metrics with his prior opinion that the valuation parameters are uncertain, vague and abstract. Even the Trustee's discretion as to how much of the numerical multiplier to assign is limited and capped, and is to be based on the claim facts he has accumulated in the evaluation process.

59.    Again contradicting his earlier opinion of an untethered TDP valuation process is Scarcella's discussion of the "SOL Scaling Factors," in which he acknowledges the "incremental structure and guidance to the Settlement Trustee;" and, the classification of the strengths of each state's statute of limitations defense, "four of the five categories still allow for discretion within a range of discounted factors." Even the accommodation of the Trustee's discretion is limited.

60.    Contrast all these details and parameters in the TDP valuation analysis with vague, abstract, uncertain and un-transparent valuation of claims in the tort system. At mediation or informal settlement negotiations, there are few "guiding principles." There may be often-guesstimate claim reserves, *ad hoc* settlement authority extended to defense counsel; and, ultimately, recorded numbers that memorialize each side's incremental movements during "horse trading" that is untethered from any particular set of metrics or guidance at mediation.

61.    Scarcella makes much of the estimates of range of abuse claim liability -- $2.4 billion to $7.1 billion, which he correctly observes reflect the varying "post-confirmation application and quantification of the TDP allowance and Scaling Factors." However, this is precisely why the TDP process provides for a Settlement Trustee to bring a third-party neutral's unbiased assessment of claim values. Until that process is underway, when the Trustee will evaluate the details of each claim, there will be uncertainty as to the ultimate quantum of liability. That is a non-unique criticism, as the same uncertainty would exist under the tort system if that system were used to resolve the claims at varying values. The difference is that the TDP process is more transparent, detailed and reflective of the exigencies of each claim, abuse type, and other factors discussed above.

62.    Scarcella also opines that the TDP process presents a risk of inflated post-confirmation claim liability based on the purported presence of a moral hazard that the Trustee will, at best, not appreciate the "downside" of his valuation decisions. His opinion, at worst, suggests that the Trustee will intentionally assign inflated values to claims that implicate the non-settling insurers' policies, will steer claims into non-settling insurers' policy periods, and will be unduly influenced by the STAC and FCR to inflate values and disproportionately attach the non-settling insurers' limits so as to maximize and maintain the Settlement Trust assets. First, there is no support for this opinion and no reason to believe that the Trustee would be guided by anything other than the Plan and TDPs and a stringent set of professional ethics. Scarcella opines that the Trustee will be incentivized to "an increased level of claiming relative to the tort system." It is, again, important to note that the tort system offers no solace to the Debtors and their insurers, as there is little predictability in how a jury may assess liability and damages against the BSA.

**Conclusions**

Contrary to the opinions of the non-settling insurers' experts, the TDPs provide a more efficient and cost-effective method to resolve sexual abuse claims in a manner that will inure to the benefit of the Debtors and their insurers.

The TDPs provide all the protections of the tort system, but not the cost and risk associated with an adversarial system in the realm of sexual abuse claim resolution.

TDP processes mimic the investigatory and discovery phases of the tort system. The initial bar date and disallowed determination of claims that have not complied with the threshold requirements is akin to the motion to dismiss phase. The Expedited Distribution is akin to an early cost-of-defense settlement before discovery (although the $3,500 value is far less than any cost of defense). The Article VII evaluation phase is akin to a bench trial, and arbitration or dispute resolution under the continental system. Valuation under Article VIII is a detailed, well-defined process by which the Settlement Trustee applies numerous valuation guidelines and metrics to render predictable, more modest resolution values than what could be expected in the tort system.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

Dated: January 5, 2022

_Michael Burnett_
_____
[SIGNATURE]
Michael Burnett

# EXHIBIT B

# *Michael T. Burnett*
## *CURRICULUM VITAE*

**6300 ROYAL ABERDEEN**
**CHARLOTTE, NC 28277**
**(704) 241-4082**
**mtburnett@BurnettRCI.com**

**BURNETT RISK CONTROL INTERNATIONAL, LLC (formerly GILEAD JUSTICE)**
2/03—Present **Founder/President**                                                    Charlotte, NC

- ❖ Assesses risk of sexual abuse and other perils, and assesses the effectiveness of existing safety and risk control mechanisms.
- ❖ Develops and implements child safety and risk control programs that assist religious and nonprofit organizations to prevent sexual abuse and other causes of injury and losses.
- ❖ Prepares child safety and other risk control policies and procedures for religious and nonprofit organizations and other organizations.
- ❖ Assists with proper handling of sexual abuse claims and other liability claims.
- ❖ Serves as an expert witness in sexual misconduct claims and related insurance and reinsurance disputes.
- ❖ Provides expert sexual abuse claim valuations and resolution strategy services.
- ❖ Experienced mediator resolving sexual abuse claims.
- ❖ Provides insurance and coverage consulting services.

**LORD, BISSELL & BROOK**
7/95—2/03 *Attorney*                                                                Chicago, IL

- ❖ Supervised and managed clergy misconduct, complex declaratory judgment litigation, commercial litigation and civil rights, employment, construction defect, environmental coverage, municipal liability, nursing home liability and professional liability litigation.
- ❖ Consistently achieved favorable settlements in arbitrations, mediations, court-scheduled settlement conferences, pre-trial conferences and other forms of settlement negotiations.
- ❖ Extensive general and coverage litigation and other insurance coverage practices involving all aspects of the London Market and other domestic and international insurers.
- ❖ Reviewed and analyzed umbrella, excess, general liability, errors and omissions, property, crime, personal lines and professional liability insurance policies.
- ❖ Drafted client opinion letters and reports with insurance coverage and liability analysis.
- ❖ Established loss, expense and defense reserves and case budgets based on analysis of liability and damages exposure.
- ❖ Insurance consulting and policy drafting and re-drafting.
- ❖ Drafted and argued dispositive motions; drafted responsive pleadings.
- ❖ Engaged in written and oral discovery, trial preparation and appellate process.
- ❖ Extensive pro bono legal assistance.

**CASSIDAY, SCHADE & GLOOR**
7/92—7/95 *Attorney*                                                                Chicago, IL

- ❖ Handled all aspects of general litigation practice, insurance defense litigation, environmental coverage disputes and other coverage-related practice, products liability litigation and Structural Work Act litigation.
- ❖ Won virtually all Motions for Summary Judgment filed before various courts.
- ❖ Composed coverage opinion letters and reports to clients in coverage matters.
- ❖ Conducted numerous successful settlement negotiations.
- ❖ Conducted all aspects of discovery including taking and defending discovery depositions, and drafting discovery requests and responses.
- ❖ Drafted pleadings and dispositive motions.

*MTBurnett*
*Curriculum Vitae*
*Page 2*

|  |  |
|---|---|
| | **PETERSON & ROSS** |
| 9/89—6/92 | *Attorney*                                                    Chicago, IL |

- ❖ Handled complex commercial litigation, insurance defense, complex environmental coverage disputes, insurance fraud, products liability and Structural Work Act litigation.
- ❖ Represented international insurers in complex 160-site environmental coverage litigation in jurisdictions across the country.
- ❖ Drafted pleadings and written discovery and argued dispositive motions in insurance coverage, insurance defense and products liability cases.
- ❖ Composed opinion letters and recommendations to clients in complex commercial litigation.
- ❖ Conducted and defended discovery depositions.

|  |  |
|---|---|
| | **HOLY CROSS ASSOCIATES** |
| 7/85—7/86 | **Lay Ministry**                                                 Avondale, AZ |

- ❖ Director of Agua Fría Food and Clothing Bank.
- ❖ Director of ecumenical minister's organization that provided food, housing and transportation assistance to indigent populations.
- ❖ Raised funds and community awareness for food, clothing, housing, employment and transportation needs of impoverished and transient populations.
- ❖ Managed operations and volunteers that provided food and clothing assistance to indigent populations.
- ❖ Volunteered at Andre House, a Catholic Worker House providing housing, employment and food for homeless and transient populations.

## EDUCATION

**UNIVERSITY OF NOTRE DAME LAW SCHOOL**                Notre Dame, IN
*Juris Doctor,* May, 1989.

*Honors/Activities:* Dean's Honor List; Moot Court; established initial Loan Forgiveness Program; Notre Dame London Law Program, 1987-88; Legal Aid Clinic; Faculty Research Assistant; Social Justice Forum; inner city Galilee Program participant; Street Law instructor.

**UNIVERSITY OF NOTRE DAME**                                Notre Dame, IN
*B.A. in Government, With Honors,* May, 1985.

*Honors/Activities:* Dean's Honor List; Notre Dame Scholar; Matich Scholarship; Dailey Scholarship; Pi Sigma Alpha, National Political Science Honor Society; Ireland Foreign Studies Program, 1982-83; Washington Semester Program, Spring 1984; Speech and Debate Team.

## BAR ADMISSIONS AND AFFILIATIONS

Admitted to: Illinois Bar, November, 1989; Northern District of Illinois, December, 1989; Central District of Illinois, September, 1991. Member: Chicago, Illinois State and American Bar Associations; Chicago Volunteer Legal Services.

# *Michael T. Burnett*
## SPEECHES AND PUBLICATIONS

Contributing author to 2002 update volume of *Coverage and Liability Issues in Sexual Misconduct Claims Book*.

Speech to New York Catholic Conference, Albany, New York, November 2002, "*Keys to Successful Settlements*" in clergy sexual abuse claims.

Panelist and speaker on the topic of "*The Child Abuse Crisis*," at the Religious/Nonprofit Industry Sessions of the 41st Risk and Insurance Management Society (RIMS) Annual Conference in Chicago, April 2003.

Panelist and speaker on the topic of "*Settlement Agreements/ADR/Mediation*," at the First National Conference on Clergy Abuse at the Benjamin N. Cardozo School of Law in New York City, April 2003.

Panelist and speaker on the topic of "*The Gilead Center*," at the New Jersey Catholic Conference, Piscataway, New Jersey, May 2003.

Panelist and speaker on the topic of "*Alternative Dispute Resolution for Clergy Sexual Abuse and Other Abuse Claims,*" at the Center for International Legal Studies Conference on "The Law, the Lawyer, and Alternative Dispute Resolution" in Heidelberg, Germany, May 2003.

Panelist and speaker on the topic of "*The Gilead Center*" at the Southeast Region of the National Diocesan Defense Attorneys Conference, Orlando, Florida, June 2003.

Panelist and speaker on the topic of "*The Gilead Center*," and resolving clergy sexual abuse claims, at the Texas Catholic Conference, San Antonio, Texas, October 2003.

Attendee and forum participant, involved in discussions regarding various issues and approaches and strategies to resolve clergy sexual abuse claims, Common Ground, Miami, Florida, January 2004.

Attendee, participant and exhibitor involved in discussions and presentation regarding issues, approaches and strategies in the resolution of clergy sexual abuse and other liability claims, The National Catholic Risk Retention Group's Winter Meeting, Ft. Lauderdale, Florida, February 2004.

Panelist and speaker on the topic of "*The Gilead Center*," and resolving clergy sexual abuse claims, at the Pennsylvania Catholic Conference, Harrisburg, Pennsylvania, May 2004.

Panelist and speaker on the topic of "*Responding to Allegations and Incidents of Abuse*," at the 2004 Nonprofit Risk Management Institutes-10th Anniversary Conference, Washington, D.C., October 2004.

Presenter on the topic of "*Common Themes In Sexual Misconduct Claims Against Religious Entities,*" at the 4th Annual Common Ground, Phoenix, Arizona, January 2005.

Attendee and exhibitor regarding The Gilead Center, The National Catholic Risk Retention Group Winter Meeting, Scottsdale, Arizona, January-February 2005.

Attendee and exhibitor regarding The Gilead Center, The National Catholic Risk Retention Group Winter Meeting, Ft. Lauderdale, Florida, January 29-31, 2006.

Panelist and speaker on the topic of "*Liability for the Church—Commentary on Evolving Issues*", 2006 Fifth Bi-Annual Convocation, sponsored by Arthur J. Gallagher & Company Religious & Nonprofit Practices Group, Itasca, Illinois, May 22-24, 2006.

Attendee and exhibitor regarding The Gilead Center, The National Catholic Risk Retention Group Winter Meeting, San Diego, California, January, 2007.

Panelist and presenter on the topic of "*Resolution of Sexual Misconduct Claims in the Catholic Church*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, Columbus, Ohio, November 13, 2007.

Attendee and exhibitor regarding The Gilead Center, The National Catholic Risk Retention Group Winter Meeting, Ft. Lauderdale, Florida, January 27-29, 2008.

Attendee and panelist on the topic of "*The Charter—Five Years Later*", 2008 Sixth Bi-Annual Convocation, sponsored by Arthur J. Gallagher & Company Religious & Nonprofit Practices Group, San Antonio, Texas, May 7-8, 2008.

Panelist and presenter on the topic of "*Resolution of Sexual Misconduct Claims in the Catholic Church*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, Boston, Massachusetts, July 29, 2008.

Panelist and presenter on the topic of "*Resolution of Sexual Misconduct Claims in the Catholic Church*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, Orlando, Florida, December 9, 2008.

Attendee and exhibitor regarding The Gilead Center, The National Catholic Risk Retention Group Winter Meeting, Ft. Lauderdale, Florida, January 27-29, 2009.

Keynote speaker, on the topic of "*A Holistic Approach to Safe Environments*," Symposium on Moral Misconduct and Safe Environments, sponsored by Arthur J. Gallagher & Company Religious & Nonprofit Practices Group and Sisters of Mercy Mid-Atlantic Community, Inc., Gwynedd Mercy Academy High School, Philadelphia, Pennsylvania, October 12, 2009.

Attendee and exhibitor regarding The Gilead Center, The National Catholic Risk Retention Group Winter Meeting, Orlando, Florida, January 31- February 2, 2010.

Panelist and speaker, on the topic of "*What?  It's NOT over?  The Latest on Sexual Misconduct Liability in the Marketplace,*" 2010 Seventh Bi-Annual Convocation, sponsored by Arthur J. Gallagher & Company Religious and Nonprofit Practices Group, Nashville, Tennessee, May 11-12, 2010.

Author, "*Comprehensive Loss Prevention and Risk Control Program for Religious and Non-Profit Entities, Presented in the Context of the Sexual Misconduct Experience*," Monograph, Burnett Risk Control International, LLC, August 2010.

Author, "*Proactive and Comprehensive Risk Control for Church Entities,*" Fall 2010 National Catholic Report, Volume 14, No. 2, The National Catholic Risk Retention Group Newsletter, September 2010.

Panelist and presenter on the topic of "*Elements of a Proactive and Integrated Risk Control Program*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the Texas Catholic Conference, Diocese of Austin, Austin, Texas, October 13, 2010.

Presenter, "*A Tale of Two Dioceses: Lessons in Effective Loss Prevention, Risk Control and Claims Management*," 2011 The National Catholic Risk Retention Group Winter Meeting, Ft. Lauderdale, Florida, January 30-February 2, 2011.

Panelist and presenter on the topic of "*Elements of a Proactive and Integrated Risk Control Program*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the Illinois Catholic Conference and insurance brokers and claims specialists, Chicago, Illinois, June 21, 2011.

Panelist and presenter on the topic of "*Elements of a Proactive and Integrated Risk Control Program*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the California and Oregon Catholic Conferences, attorneys, insurance brokers and claims specialists, Diocese of San Jose, California, October 11, 2011.

Attendee and exhibitor regarding Burnett Risk Control International, The National Catholic Risk Retention Group Winter Meeting, Orlando, Florida, January 29-January 31,2012.

Panelist and presenter on the topic of "*Elements of a Proactive and Integrated Risk Control Program*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the Missouri Catholic Conference, and other dioceses and archdioceses in the Midwest, attorneys, insurance brokers and claims specialists, Diocese of Jefferson City, Missouri, December 13, 2012.

Attendee and exhibitor regarding Burnett Risk Control International, The National Catholic Risk Retention Group Winter Meeting, St. Petersburg, Florida, February 3-February 5, 2013.

Panelist and presenter on the topic of "*Mediation and Alternative Dispute Resolution in the Catholic Church*," Risk Management and Legal Defense Workshop, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the Massachusetts Catholic Conference and representatives from other dioceses and archdioceses in New England, attorneys, insurance brokers and claims specialists, Archdiocese of Boston, Braintree, Massachusetts, July 23, 2013.

Panelist and presenter on the topic of "*Mediation and Alternative Dispute Resolution in the Catholic Church*," Risk Management and Legal Defense Workshop, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the New Jersey and New York Catholic Conferences and representatives from other surrounding dioceses and archdioceses, attorneys, insurance brokers and claims specialists, Archdiocese of Newark, New Jersey, November 20, 2013.

Attendee and exhibitor regarding Burnett Risk Control International, The National Catholic Risk Retention Group Winter Meeting, Ft. Lauderdale, Florida, January 26-January 29, 2014.

Panelist and presenter on the topic of "*Mediation and Alternative Dispute Resolution in the Catholic Church*," Risk Management and Legal Defense Workshop, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the Indiana Catholic Conference and representatives from other dioceses and archdioceses in the Midwest, attorneys, insurance brokers and claims specialists, Archdiocese of Indianapolis, Indianapolis, Indiana, June 25, 2014.

Panelist and presenter on the topic of "*Elements of a Proactive and Integrated Risk Control Program*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the California and Oregon Catholic Conferences, attorneys, insurance brokers and claims specialists, Diocese of San Jose, California, October 25, 2014.

Attendee and exhibitor regarding Burnett Risk Control International, The National Catholic Risk Retention Group Winter Meeting, St. Petersburg, Florida, January 25-January 27, 2015.

Panelist and presenter on the topic of "*Elements of a Proactive and Integrated Risk Control Program*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the Pennsylvania and New Jersey Catholic Conferences, attorneys, insurance brokers and claims specialists, Archdiocese of Philadelphia, Pennsylvania, June 17, 2015.

Expert Panelist, Napa Think Tank on Temporal Administration—*Thought Leadership Event*—2015, expert presentation and discussion regarding the experience of sexual abuse victims, the Church's liability for clergy sexual abuse and cyber risk, sponsored by Arthur J. Gallagher & Company and Patterson Buchanan Fobes & Leitch Inc. P.S., Napa, California, July 28-29, 2015.

Contributing Author, "*Risks New & Old — A Fresh Perspective:  Lessons Learned and Moving Forward*," White Paper, The Napa Think Tank on Temporal Administration — 2015.

Author, "*Updated Comprehensive Loss Prevention and Risk Control Program for Religious and Non-Profit Entities, Presented in the Context of the Sexual Misconduct Experience*," Monograph, Burnett Risk Control International, LLC, July 2015.

Panelist and presenter on the topic of "*Elements of a Proactive and Integrated Risk Control Program*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the Louisiana and Texas Catholic Conferences, attorneys, insurance brokers and claims specialists, Diocese of Lafayette, Louisiana, November 10, 2015.

Attendee and exhibitor regarding Burnett Risk Control International, The National Catholic Risk Retention Group Winter Meeting, Phoenix, Arizona, January 24-January 26, 2016.

Panelist and presenter on the topic of "*Mediation and Alternative Dispute Resolution in the Catholic Church*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of Catholic dioceses in the New Jersey Catholic Conference and other dioceses and archdioceses in the Mid-Atlantic Region, attorneys, insurance brokers and claims specialists, Archdiocese of Newark, New Jersey, October 25, 2016.

Panelist and presenter on the topic of "*Mediation and Alternative Dispute Resolution in the Catholic Church*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of the Massachusetts Catholic Conference and other dioceses and archdioceses in New England, attorneys, insurance brokers and claims specialists, Archdiocese of Boston, Massachusetts, November 30, 2016.

Attendee and exhibitor regarding Burnett Risk Control International, The National Catholic Risk Retention Group Winter Meeting, St. Petersburg, Florida, January 29-January 31, 2017.

Panelist and presenter on the topic of "*Mediation and Alternative Dispute Resolution in the Catholic Church*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of the Pennsylvania Catholic Conference and other dioceses and archdioceses in surrounding states, attorneys, insurance brokers and claims specialists, Diocese of Harrisburg, Pennsylvania, October 18, 2017.

Attendee and exhibitor regarding Burnett Risk Control International, The National Catholic Risk Retention Group Winter Meeting, St. Petersburg, Florida, January 28-January 30, 2018.

Panelist and presenter on the topic of "*Mediation and Alternative Dispute Resolution in the Catholic Church*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of the California Catholic Conference and other dioceses and archdioceses in surrounding states, attorneys, insurance brokers and claims specialists, Diocese of Oakland, California, May 30, 2018.

Author of opinion letter published in *Commonweal*, Volume 145, Number 6, March 23, 2018, providing commentary and perspective on the article "A Time to Judge," by Terry Eagleton, that was published in the February 23, 2018 edition of *Commonweal*.  Burnett, Michael.  Letter.  "A Time to Judge."  The Editors of *Commonweal*.  *Commonweal*, March 23, 2018.  p.4.

Author of opinion letter published in *Commonweal*, Volume 145, Number 11, June 15, 2018, providing commentary and perspective on the article "Cast a Cold Eye," by Terry Eagleton, that was published in a prior edition of *Commonweal*.  Burnett, Michael.  Letter.  "Cast a Cold Eye."  Eagleton, Terry.  *Commonweal*, June 15, 2018.  pp. 2-4.

Panelist and presenter on the topic of "*The Sexual Abuse Scandal:  Where Do We Go From Here?  A Call to Resolution, Healing and Renewal*," Seminar on Litigation Management/Risk Control Issues Facing Catholic Dioceses, sponsored by The National Catholic Risk Retention Group, for representatives of the Illinois Catholic Conference and other dioceses and archdioceses in surrounding states, attorneys, insurance brokers and claims specialists, Archdiocese of Chicago, Illinois, November 8, 2018.

Attendee and exhibitor regarding Burnett Risk Control International, The National Catholic Risk Retention Group Winter Meeting, Tucson, Arizona, January 26-January 28, 2019.

Participant, Leadership Roundtable–Catholic Partnership Summit, "focusing on the 'twin crises: a crisis of sexual abuse and a crisis of leadership failures that covered up abuse and led to distrust."  Washington, D.C., February 1-February 2, 2019.

Author of article, "A Faith-Driven Approach to Sexual Abuse in the Catholic Church," *The National Catholic Report*, providing perspective from experience resolving sexual abuse claims in the Catholic Church, and elements of a successful program, spring 2019.

Panelist and speaker, "*Successful Strategies for Addressing the Child Victims Act (CVA)*," Executive Forum for Nonprofits, sponsored by the Gallagher Religious Practice / Nonprofit Practice, for leaders of nonprofits and religious entities.  New York, New York, September 25, 2019.

Exhibitor (partnered with Duff & Phelps), Diocesan Fiscal Managers Conference.  Chicago, Illinois. September 29 — October 2, 2019.

Panelist and presenter on the topic of "*A Better Approach to Reducing Risk and Responding to Sexual Abuse Allegations*" and "*Mitigating and Responding to Sexual Abuse Allegations in the School Setting,*" sponsored by and participating with Kroll, a Division of Duff & Phelps, at the Annual Meeting of Chief Financial Officers, Risk Managers, Internal Auditors and Procurement Directors, sponsored by the Council of the Great City Schools.  Austin, Texas, November 13, 2019.

Panelist and presenter on the topic of "*Compassionate Resolution of Sexual Abuse Claims Through Fair and Just Compensation,*" sponsored by the Archdiocese of Kansas City, Kansas, for representatives of Catholic dioceses and religious orders in Kansas.  Archdiocese of Kansas City, Kansas, November 21, 2019.

Attendee and exhibitor regarding Burnett Risk Control International, The National Catholic Risk Retention Group Winter Meeting, Tampa, Florida, January 26-January 28, 2020.

# EXHIBIT C



Transcript of the Testimony of

**MICHAEL BURNETT**

January 17, 2022

**IN RE BOY SCOUTS AND DELAWARE BSA**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

```
 1            IN THE UNITED STATES BANKRUPTCY COURT

 2             FOR THE DISTRICT OF DELAWARE

 3                      -    -    -

 4   IN RE:                    : CHAPTER 11

 5   BOY SCOUTS OF AMERICA AND   : CASE NO.

 6   DELAWARE BSA, LLC,         : 20-10343 (LSS)

 7           Debtors.          : (Jointly Administered)

 8                      -    -    -

 9

10

11           Remote videotaped deposition of MICHAEL

12   BURNETT, held via videoconference on Monday, January

13   17th, 2022, beginning at approximately 11:00 Eastern

14   Time, the proceedings being recorded

15   stenographically by Jennifer Billstein-Miller,

16   Registered Merit Reporter, Certified Realtime

17   Reporter, Certified Court Reporter-NJ, and

18   transcribed under her direction.

19

20

21

22

23

24                      COPY

25
```

IN RE BOY SCOUTS AND DELAWARE BSA

MICHAEL BURNETT

Page 2

```
1        A P P E A R A N C E S
2
3    On Behalf of Debtor:
          DEREK C. ABBOTT, ESQ.
          MORRIS, NICHOLS, ARSHT & TUNNELL
4         1201 North Market Street, 18th Floor
          Wilmington, Delaware 19899-1347
5    -and-
          RENZA DEMOULIN, ESQ.
6         MICHAEL JAOUDE, ESQ.
          WHITE & CASE, LLP
7         1221 Avenue of the Americas
8         New York, New York 10020
9    On Behalf of Tort Claimants:
          ALAN KORNFELD, ESQ.
10
          PACHULSKI STANG ZIEHL JONES, LLP
11        10100 Santa Monica Boulevard, 13th Floor
          Los Angeles, California 90067
12
     On Behalf of the Coalition of Abused Scouts for
13   Justice:
          CAMERON D. MOXLEY, ESQ.
14        BROWN RUDNICK LLP
          601 Thirteenth Street NW, Suite 600
15        Washington, DC 20005
16
17   On Behalf of The Witness:
18        NATALIE DUBOSE, ESQ.
          ERNEST MARTIN, ESQ.
19        HAYNES BOONES
          OFFICE OF THE UNITED STATES TRUSTEE
20        844 King Street, Suite 2207
          Lockbox 35
21        Wilmington, Delaware 19801
22
23   On Behalf of Gemini Insurance Company:
          JOHN BAAY, ESQ.
24        GIEGER LABORDE & LAPEROUSE
          701 Poydras Street, Suite 4800
25        New Orleans, Louisiana 70139
```

Page 4

```
1    APPEARANCES CONT'D
2
     On Behalf of Allianz Global Risks US Insurance
3    Company:
          RYAN SMETHURST, ESQ.
4         MCDERMOTT WILL & EMORY, LLP
          The McDermott Building
5         500 North Capitol Street NW
          Washington DC 20001-1531
6         (202) 756-8036
7         rsmethurst@mwe.com
8    On Behalf of Pfau Cochran Vertesis Amala PLLC
     and Zalkin Law Firm, P.C.:
9         ROBERT J. PFISTER, ESQ.
          KTBS Law LLP
10        1801 Century Park East, 26th Floor
          Los Angeles, California  90067
11        (310) 407-4000
          RPfister@ktbslaw.com
12
13   On Behalf of Travelers:
14        MEGAN D. HALTER, ESQ.
          REGER RIZZO DARNALL, LLP
15        1521 Concord Pike, Suite 305
          Brandywine Plaza West
16        Wilmington, Delaware 19801
          (302) 477-7100
17        mhalter@regerlaw.com
18   On Behalf of Indian Harbor Insurance Company:
19        PAMELA MINETTO, ESQ.
          MOUND COTTON WOLLAN & GREENGRASS LLP
20        30A Vreeland Road Suite 210
          Florham Park, NJ  07932
21        (973) 494-0603
          PMinetto@moundcotton.com
22
23
24
25
```

Page 3

```
1    APPEARANCES CONT'D
2
3
     On Behalf of The Church of Jesus Christ of
4    Latter-day Saints:
          JESSE SHERMAN, ESQ.
5         LATHAM & WAKINS, LLP
          1271 Avenue of the Americas
6         New York, New York 10020-1401
7
     On Behalf of JPMorgan Chase Bank, N.A.:
8         SARAH CORNELIA, ESQ.
          NORTON ROSE FULBRIGHT US LLP
9         2200 Ross Avenue, Suite 3600
          Dallas, Texas 75201-7932
10
11
     On Behalf of Old Republic Insurance Company:
12        RYAN T. SCHULTZ, ESQ.
          FOX SWIBEL LEVIN & CARROLL LLP
13        200 W. Madison Street, Suite 3000
          Chicago, Illinois 60606
14        (312) 224-1200
          rschultz@foxswibel.com
15
16   On Behalf of Liberty Mutual
17        SAMUEL N. RUDMAN, ESQ.
          PRESTON BRUNO, ESQ
18        CHOATE, HALL & STEWART LLP
          Two International Place
19        Boston, MA  02110
          (617) 248-4034
20        srudman@choate.com
21   On Behalf of Traders and Pacific Insurance
     Company, Endurance American Specialty Insurance
22   Company, and Endurance American Insurance
     Company:
23        MARIA BENEDEK, ESQ.
          COZEN O'CONNOR
24        1201 North Market Street, Suite 1001
          Wilmington, Delaware 19801
25        (302) 295-2024
          MBenedek@cozen.com
```

Page 5

```
1    APPEARANCES CONT'D
2
     On Behalf of National Surety Corporation and
3    Interstate Fire & Casualty Company:
4         TODD C. JACOBS, ESQ.
          BRADLEY RILEY JACOBS PC
5         500 W. Madison Street, Suite 1000
          Chicago, IL  60661
6         (312) 281-0295
          tjacobs@bradleyriley.com
7
8    ALSO PRESENT:
          CHRIS WEISS CALHOON, Legal Videographer
9
          MEGAN D. HALTER, ESQ.
10        JOHN BUCHEIT, ESQ.
          KIM MARKKAND, ESQ.
11        KONRAD KREBS, ESQ.
          KRISTIAN ROGGENDORF, ESQ.
12        MATTHEW HAMERMESH, ESQ.
          MICHAEL HRINEWSKI, ESQ.
13        KEVIN GUERKE, ESQ
          PAUL ESKER, ESQ.
14        RON GORSICH, ESQ.
          ROUVEN KETZER, ESQ.
15        NICHOLAS PULAKOS
          SUSAN GUMMOW, ESQ.
16        TAVI FLANAGAN, ESQ.
17
18
19
20
21
22
23
24
25
```

IN RE BOY SCOUTS AND DELAWARE BSA

Page 14

1   which is Exhibit 1.
2           Now, you are the founder and
3   president of Burnett Risk Control
4   International, LLC, correct?
5       A.   Yes.
6       Q.   And through Burnett Risk Control,
7   LLC, you provide expert and consulting
8   valuation, litigation, and coverage services
9   specifically relating to sexual abuse claims;
10  is that correct?
11      A.   Yes.
12      Q.   Do you have expertise in sexual abuse
13  claim valuation?
14      A.   Yes.
15      Q.   Would you describe that expertise for
16  us, please.
17      A.   I have been working on sexual abuse
18  claims for probably about 26 years now.  And
19  about 19 years ago I started compiling a
20  database of sexual abuse claim resolution
21  values, verdicts and settlements and -- or
22  other claims where people -- where there was no
23  verdict or settlement for a variety of reasons.
24          And so I've compiled that
25  database for a number of years now.  I use that

Page 15

1   database to assist in my valuation of claims --
2   sexual abuse claims.
3       Q.   Have you done valuations of sexual
4   abuse claims in mass tort cases or matters?
5       A.   Yes.
6       Q.   Can you tell us which matters.
7       A.   I can tell -- there are a couple
8   of -- I can't tell you about, but the most
9   recent one in terms -- well, I take that back.
10          A couple of years ago, I was
11  retained by the Roman Catholic Church in Hawaii
12  to valuate a number of claims in an insurance
13  dispute there where the insurer was contesting
14  coverage for the underlying claims that had
15  been resolved already.
16          And so they brought me in to
17  determine the reasonableness of those claims.
18  And I worked -- I've worked on a reinsurance
19  dispute several -- a number of years ago
20  involving many, many underlying sexual abuse
21  claims from all over the country.  That was a
22  reinsurance dispute between the cedent and the
23  reinsured.
24          I have been retained on a
25  consultancy basis recently in a couple of

Page 16

1   matters that I can't disclose that involve
2   bankruptcies with numerous underlying sexual
3   abuse claims.  And then other matters as well
4   that I don't know if they would fall into the
5   category of mass torts, but numerous underlying
6   claims.
7       Q.   Approximately how many sexual abuse
8   claims have you valued in your 26 years of
9   experience with sexual abuse claims?
10      A.   They would number in the thousands.
11  In a variety of different capacities, as
12  coverage counsel, as a consultant for insurance
13  companies or policyholders, in a number of
14  different capacities.
15      Q.   And all of those capacities have been
16  since you've been the principal or the
17  president of Burnett Risk Control
18  International, correct?
19      A.   Well -- and also when I was coverage
20  counsel at Lord, Bissell & Brook in Chicago, we
21  represented Lloyd's of London in the London
22  Market of insurers.  And there were quite a few
23  at that time as well.
24      Q.   Did you in -- when you worked at
25  Lord, Bissell, were you acting as a counsel to

Page 17

1   the insurers in connection with --
2       A.   Yes.
3       Q.   -- in connection with the matters
4   that involve valuation of sexual abuse claims?
5       A.   Well, I was coverage counsel.  And so
6   I was involved in determinations of coverage
7   and occasionally coverage disputes.
8           But in the course of that work,
9   I became pretty intimately involved in a number
10  of the underlying claims and brought my
11  national perspective to a number of matters
12  that involved underlying claims where we had
13  either accepted coverage or were operating
14  under a reservation of rights.
15      Q.   Over the last --
16      A.   So mediation --
17      Q.   Go ahead.
18      A.   So mediation and underlying -- I
19  mean, mediation or informal settlement
20  negotiations, that kind of thing.
21      Q.   Over the last 26 years, have you
22  worked exclusively in the sexual abuse field?
23      A.   Not exclusively.  When I was at Lord,
24  Bissell, I also worked on a number of other
25  casualty and property claims.

IN RE BOY SCOUTS AND DELAWARE BSA

MICHAEL BURNETT

Page 22

1     Q.   Have you written numerous articles on
2  sexual abuse claim issues?
3     A.   Yes.
4     Q.   Can you give us a brief summary
5  overview of the articles that you have written
6  on sexual abuse claim issues?
7     A.   The overview would be that it's more
8  often than not about risk control issues
9  involving sexual abuse.  On a -- well, COVID
10  has gotten in the way.  But on a regular basis,
11  the National Catholic Risk Retention Group has
12  brought me on as a panelist on kind of a
13  quarterly basis with a number of other people
14  that involve a variety of different topics that
15  involve the Catholic Church and -- for people
16  like risk managers, insurance directors, and
17  things like that.
18            So I'll give a presentation on
19  the types of things that they should be
20  involved in in terms of risk management issues
21  to prevent sexual abuse and to be able to
22  identify red-flag behaviors.  And if someone is
23  abused, that they will understand the types of
24  things that they should be doing to properly
25  handle those claims.

Page 23

1     Q.   Are you a contributing author to a
2  sexual abuse compendium?
3     A.   I was.  That was a version that came
4  out in -- I want to say 2002 maybe.  And then
5  there were several additions after that, after
6  I left Lord, Bissell.  And I'm not sure that
7  they're still doing updated versions of that.
8  But I was involved in, I think, the second
9  edition of that compendium.
10     Q.   What was the subject matter of that
11  compendium?
12     A.   There were a number of different
13  issues.  Lord, Bissell put it together for our
14  clients.  And it addressed a variety of
15  different liability and coverage issues
16  associated with sexual abuse.
17     Q.   Have you authored a monograph on
18  sexual abuse issues?
19     A.   I have.
20     Q.   Are you still periodically updating
21  that monograph?
22     A.   I am, yes.
23     Q.   What is the general subject matter of
24  that monograph?
25     A.   The subject matter is to introduce

Page 24

1  the reader to -- in a broad sense to the
2  problem of sexual abuse and to the variety of
3  issues that are involved and to give a series
4  of opinions about how they should be properly
5  handled and the role of insurers and the role
6  of insureds in the proper handling of claims,
7  the understanding of those claims, and to give
8  some opinions about how to best prevent abuse
9  from a risk management standpoint and to
10  properly handle claims if that -- if there is
11  sexual abuse.
12     Q.   Let me turn to your report, which
13  we've marked as Exhibit 1, to paragraph 5 on
14  page 2.
15            Mr. Burnett, are you regularly
16  retained by various entities, including the
17  entities listed in paragraph 5, to value sexual
18  abuse claims?
19     A.   Yes.
20     Q.   Do those entities that retain you to
21  value sexual abuse claims include religious
22  entities, schools, insurers, administrators,
23  attorneys, mediators, insurance brokers, risk
24  managers, financial service companies, and
25  others?

Page 25

1     A.   Yes.
2     Q.   You said -- when I asked you how many
3  times you've estimated the value of sexual
4  abuse claims, you said thousands.
5            Did I hear you correctly?
6     A.   Yes.
7     Q.   Now, in your expert report on page 3,
8  still on paragraph 5, you talk about the
9  priority BRCI database of verdicts and
10  settlements and sexual abuse claims.
11            BRCI is the abbreviation for
12  Burnett Risk Control International, your firm,
13  correct?
14     A.   Yes.
15     Q.   Let me call your attention to
16  Exhibit 4, the excerpts from your webpage at
17  page 13.
18            First is page 13, an excerpt
19  from your webpage that describes the Burnett
20  database.
21     A.   Yes.
22     Q.   Would you, for the record, briefly
23  describe what the Burnett database is and how
24  it is used.
25     A.   Do you want me to read from that --

IN RE BOY SCOUTS AND DELAWARE BSA

Page 226

1  the top of page 18, where it specifically says
2  that "the trustee may assign a mitigating
3  scaling factor in the range of 0 to 1.0, except
4  as specifically provided below, to each abuse
5  claim to eliminate or decrease the proposed
6  allowed claim amount for such claim," and then
7  it goes into the discussion of what factors --
8  you know, how he might want to -- what would
9  encapsulate that discretion, whether or not by
10  preponderance of the evidence they've
11  demonstrated that the perpetrator accessed the
12  victim as an employee, agent, those kinds of
13  things.
14           And then also on 19, in the
15  middle of the page where it says, "The
16  settlement trustee may consider any further
17  limitations on the abuse claimant's recovery in
18  the tort system."
19      Q.   So either alone or in combination,
20  it's your understanding that those mitigating
21  factors allow the settlement trustee to apply a
22  mitigating factor in cases in which the BSA has
23  a low level of responsibility; is that correct?
24      A.   I believe so.
25      Q.   To your understanding, those

Page 227

1  mitigating factors allow the settlement trustee
2  to apply a mitigating factor that's as low as
3  10 percent, correct?
4      A.   I think as low as 0.
5      Q.   As low as 0, right?
6      A.   Yeah.  Under Section E, yes.
7      Q.   Fair to say that, in your opinion --
8  strike that.
9           Turning back to your rebuttal
10  report, please, sir, which I think is
11  Exhibit 3, take a look at page 3, please.
12      A.   Okay.
13      Q.   Do you see that in paragraph 8,
14  second sentence, there is a statement about
15  whether some of BSA's policies included a duty
16  to defend?
17      A.   Yes.
18      Q.   And that's followed by Footnote 3,
19  right?
20      A.   Yes.
21      Q.   And Footnote 3 says the information
22  you relied on there was provided by KCIC?
23      A.   Yes.
24      Q.   Who is KCIC, sir?
25      A.   The person I spoke with was Nick --

Page 228

1  and I don't know how to pronounce his last
2  name -- from KCIC.
3      Q.   How did it come to be that you spoke
4  with Nick at KCIC about the BSA's insurance
5  policies?
6      A.   It was one of the resources that was
7  suggested to me because I did not look at any
8  of the policies but I wanted to understand what
9  types of policies were involved.
10      Q.   What questions did you ask Nick on
11  the call?
12      A.   Well, I wanted to know whether or not
13  there were claims that had self-insured
14  retentions, whether they were indemnity
15  policies or duty to defend policies.  That kind
16  of thing.
17      Q.   I think the first thing you said was
18  whether there were claims with SIRs.  Is that
19  right?
20      A.   Yes.
21      Q.   Why was it important for you to
22  understand that as part of your opinions in
23  this case?
24      A.   Because that makes a difference to
25  me -- in my experience, makes a lot of

Page 229

1  difference in the resolution of sexual abuse
2  misconduct claims against institutional
3  defendants.  I do an awful lot of work with the
4  National Catholic Risk Retention Group that
5  issues indemnity policies with fairly
6  substantial self-insured retentions, and that
7  makes a big difference in terms of the analysis
8  of the claim by the carrier and what kinds of
9  strategy were used and when the carrier may
10  become involved, obviously an associate with
11  the claim, that kind of -- there's a lot of
12  those issues that factor into it as opposed to
13  a situation with a ground-up dollar-one duty to
14  defend.
15      Q.   Take a look at paragraph 11 of your
16  rebuttal report, please.
17      A.   Okay.
18      Q.   Do you see in Footnote 4 you say you
19  understand that many of the prebankruptcy
20  claims against the BSA proceeded to mediation
21  or other ADR?
22      A.   Yes.
23      Q.   What was the basis for your
24  understanding on that source, sir?
25      A.   I think that may have been from

Page 274

1  claims and it's at least in part generated by
2  mass tort advertising, don't you think that
3  that leads towards having some more safeguards
4  put in the TDPs?
5      A.   To me, if the TDPs have safeguards in
6  them already -- and I looked at that -- then I
7  don't know why the volume of claims would make
8  a difference.  If you are applying the same
9  process to each and every claim, then I don't
10  know why it would make a difference whether
11  that's a hundred claims or a thousand claims.
12      Q.   Don't you think with 82,000 there
13  might be some reason to suspect that some of
14  them are nonmeritorious when you get up to
15  those kind of numbers?
16          MS. DUBOSE:  Objection.  Calls
17      for speculation.
18          THE WITNESS:  There could be.  I
19      mean, that would be speculative.  There
20      could be.  But if you've got reasonable
21      mechanisms in place through the TDPs to
22      ferret those out, then I still don't
23      understand why the volume would make a
24      difference.
25

Page 275

1  BY MR. JACOBS:
2      Q.   Just as a practical matter, having to
3  review 82,000 claims, don't you think that sort
4  of the quality control impact of that is going
5  to be pretty strained?
6      A.   It's a huge task.
7          MS. DUBOSE:  Again, objection.
8      Calls for speculation.
9          Go ahead.
10          THE WITNESS:  Sorry.
11  BY MR. JACOBS:
12      Q.   You can answer.
13      A.   It's -- there's no doubt that going
14  through 82,000 claims will take time and
15  effort.  It's a lot.
16      Q.   Okay.  Did you do any study as to
17  whether Eric Green and his company have the
18  wherewithal to do a review of 82,000 claims?
19      A.   I did not.
20      Q.   Is that something that would have
21  been important to you in determining the
22  reasonableness of the TDPs, whether the
23  settlement trustee had the capacity to do it?
24      A.   Well, I didn't know who was being
25  proposed, and my understanding is there hasn't

Page 276

1  been a final determination yet.  And so I think
2  that, if I had decided who I thought it might
3  be and then gone through that process, it would
4  have been a somewhat speculative process.
5          But to me, I was focused more on
6  whether or not the TDPs as presented to me were
7  a reasonable method to resolve sexual abuse
8  claims in bankruptcy, irrespective of who
9  the -- who the trustee would be.
10      Q.   Would you agree with me that who the
11  trustee is pretty important?
12      A.   I think it's important.  You want to
13  make sure it's somebody who's competent, who's
14  ethical, who's up to the task.
15      Q.   And neutral?
16      A.   Neutral.
17      Q.   Unbiased?
18      A.   Unbiased.
19      Q.   And that's in part because the
20  Boy Scouts won't be there to defend the claims,
21  will they?
22      A.   No.
23      Q.   And the insurers won't be there to
24  defend the claims either, will they?
25      A.   No.  But they have the ability to

Page 277

1  stand on their right under the policies.
2      Q.   Is it your understanding that primary
3  insurance -- you were an insurance coverage
4  lawyer in a former life, correct?
5      A.   That's correct.  I think I still am.
6      Q.   And still are.  Is it your
7  understanding the primary insurance policy
8  generally have a duty to defend?
9      A.   Certainly a lot of them do.  The ones
10  that I typically work on are indemnity policies
11  and they don't have a duty to defend.  But I
12  know, obviously, a lot do.
13      Q.   Yeah, many primary policies have a
14  duty to defend, correct?
15      A.   Yes.
16      Q.   And many excess policies have the
17  right to participate in the defense, don't
18  they?
19      A.   To be associated with -- yes.
20      Q.   So I saw that footnote from -- that
21  you've got from KCIC that the majority of the
22  policies don't have.  Did you do any
23  investigation to determine whether that was
24  right or not?
25      A.   I did not.

IN RE BOY SCOUTS AND DELAWARE BSA

Page 278

1    Q.   Okay.  Whose case -- I'm sorry.  Go
2  ahead.
3    A.   I spoke with Nick for the purpose of
4  finding out what -- you know, what that was.
5    Q.   Okay.  And do you know -- do you
6  remember what Nick's last name is?
7    A.   It begins with an S.  I don't.
8    Q.   In your experience, do access
9  policies typically have the right to be
10 involved with the defense if their layer is
11 going to be impacted?
12   A.   Typically, yeah.
13   Q.   So is it what the KCIC person told
14 you somewhat surprising?
15   A.   What that -- about duty to defend
16 policies or --
17   Q.   No.  Let's pull it up, the KCIC.  So
18 you say in your report -- this is your rebuttal
19 report, which is Exhibit 3 -- on page 3, "A
20 majority of the policies issued to the BSA (the
21 National Council policies) between 1962 and
22 2007 do not include a duty to defend but
23 instead only a duty to reimburse."
24       Do you see that?
25   A.   I do.

Page 279

1    Q.   That's not correct, is it?
2    A.   That's what I was told.
3    Q.   Well, your experience, though, would
4  be many primary policies do have a duty to
5  defend, correct?
6    A.   That's correct.
7    Q.   And most excess policies have a right
8  to participate in the defense, correct?
9        MS. DUBOSE:  Objection.  Calls
10       for speculation.  Assumes facts not in the
11       record.
12       THE WITNESS:  I have not seen
13       the involved policies.  So I can't speak
14       to that with respect to the ones that are
15       involved in this matter.
16 BY MR. JACOBS:
17   Q.   But when Nick from KCIC told you
18 this, did it seem a little odd to you?
19       MS. DUBOSE:  Same objection.
20       THE WITNESS:  I would say given
21       the date range, it seems a little unusual
22       to me, but I have no reason to believe
23       that he was giving me false information.
24       I'm not sure what his -- why he would do
25       such a thing.

Page 280

1        But yeah, to your point, given
2  the date going back to 1962, it's my
3  experience that most of those policies,
4  primary policies, would be duty to defend
5  policies.  Not the London ones that I
6  worked with, but London -- the London
7  program that I worked with is somewhat
8  unusual.
9  BY MR. JACOBS:
10   Q.   I could represent to you that my
11 clients' policies here, which are excess
12 policies, all have a right to participate in
13 the defense, and they're actually quoted in
14 Dr. Harrington's report.
15       Did you ask Nick where this came
16 from?  I mean, were you curious?
17   A.   My understanding was that his company
18 had done an analysis and some archaeological
19 work to try to piece together coverage and that
20 they had looked at the policies and the
21 coverages, and he was representing to me what
22 they had found.
23   Q.   Well, if you assume with me that the
24 excess carriers have -- at least certain of the
25 excess carriers have a right to participate in

Page 281

1  the defense and they're not included in the
2  TDPs, that's taking away a coverage, an
3  insurance right, isn't it?
4        MS. DUBOSE:  Objection.  Calls
5        for legal conclusion.
6        THE WITNESS:  I would say that
7        under the TDPs, that the insurance
8        carriers have a right to stand on the
9        terms and conditions of their policies and
10       that there's nothing in the TDPs --
11       explicitly says that nothing amends them,
12       changes them, or in any way takes away
13       their rights.
14       So if the carriers felt that
15       their rights were somehow being -- you
16       know, their right to participate in the
17       defense was somehow abrogated, then they
18       would have the option to decline coverage.
19 BY MR. JACOBS:
20   Q.   So in your view, if the policy has a
21 right to participate in the defense and that
22 right is taken away, will you have a basis to
23 deny coverage?
24       MS. DUBOSE:  Objection.  Calls
25       for legal conclusion.  Outside the scope.

IN RE BOY SCOUTS AND DELAWARE BSA

MICHAEL BURNETT

Page 386

```
1              MR. JACOBS:  Object to the form
2     of the question.
3              MR. RUDMAN:  Todd, you're on
4     mute.  I don't think your objections are
5     getting recorded.  Or, Todd, I should say
6     I can't hear you.
7              MS. DUBOSE:  I heard them.
8              MR.RUDMAN:  I apologize.
9              MR. JACOBS:  Objection.  Both
10     questions were leading.
11  BY MS. DUBOSE:
12     Q.   Do you have any independent knowledge
13  beyond what you have read from Mr. Azer about
14  the development of the TDPs?
15     A.   No.
16     Q.   Who would have a better idea of
17  the -- how the TDPs came to exist, yourself or
18  Mr. Azer?
19     A.   Mr. Azer.
20              MS. DUBOSE:  No further
21     questions.
22              THE VIDEOGRAPHER:  Anyone else?
23              MR. JACOBS:  I have one
24     follow-up question, Mr. Burnett.
25                  - - -
```

Page 387

```
1           E X A M I N A T I O N
2                  - - -
3   BY MR. JACOBS:
4      Q.   How do you know Mr. Azer has better
5   knowledge than you do?
6      A.   Because, in reading his deposition
7   testimony, he discussed having worked on the
8   TDPs and exchanging drafts.  I was not part of
9   that process.  I did not help with it.  I only
10  know what I know about it from reading his
11  deposition testimony.
12     Q.   So you just read his deposition?
13     A.   Yes.
14     Q.   Did you talk to Ms. DuBose during the
15  break?
16     A.   Yes.
17     Q.   What did you say to each other?
18     A.   She said she was going to ask me a
19  series of questions, not many.  And she asked
20  the ones that she suggested she was going to
21  ask.
22     Q.   So she told you what the questions
23  were?
24     A.   She just told me what she wanted to
25  ask to clarify things.
```

Page 388

```
1      Q.   Did you rehearse the answers with
2   her?
3      A.   I did not.
4      Q.   What else was said?
5      A.   Well, I know we talked about it being
6   a long day.  We talked about being late at
7   night -- I mean, you know, late in the day.
8              MR. JACOBS:  I'm just going to
9      say it's completely improper to be talking
10     to the witness during the deposition,
11     Natalie.  So we're going to reserve our
12     rights on that as well.
13              MS. DUBOSE:  I don't agree with
14     that, but we can take it up --
15              MR. JACOBS:  Why not?  It's in
16     the protocol.
17              MS. DUBOSE:  He's our retained
18     expert.  You may be entitled to understand
19     what the discussions are, but, at least as
20     far as I'm aware, we're not prohibited
21     from -- from communicating with the
22     witness.  Maybe I have a misunderstanding
23     about that.
24              MR. CHRISTIAN:  Great American
25     objects based on the violation of the
```

Page 389

```
1   agreed protocol, the Court's order in this
2   case.
3              MR. KORNFELD:  And the TCC also
4   objects.  This is a violation of all
5   Delaware protocol.  You cannot talk to a
6   witness about the substance of testimony
7   during a deposition in a Delaware Federal
8   Court deposition.
9              MR. SMETHURST:  Mr. Burnett, did
10  Ms. DuBose speak with you at other points
11  in the day during breaks other than the
12  last one?
13              THE WITNESS:  No.
14              MR. KORNFELD:  Did Ms. DuBose
15  speak to you during my questioning on a
16  break?
17              THE WITNESS:  No.  I mean, we
18  talked about going to the restroom,
19  getting stuff for lunch.  But, no, there
20  was no coaching, there was no rehearsing
21  answers or anything like that.
22              MR. KORNFELD:  On one of the
23  breaks when I was asking questions, did
24  Ms. DuBose tell you that you're not a
25  valuation expert and you're to say you're
```

IN RE BOY SCOUTS AND DELAWARE BSA

MICHAEL BURNETT

Page 390

1  not a valuation expert in response to any
2  question that touched on valuation, or
3  something to that sum and substance?
4      **THE WITNESS:  No.  I knew I was**
5  **not a valuation expert.**
6          MR. KORNFELD:  Did Ms. DuBose
7  talk to you about the fact that you're not
8  a valuation expert on any --
9      **THE WITNESS:  Not that I recall.**
10         MR. KORNFELD:  Not this morning?
11     **THE WITNESS:  I wouldn't need to**
12 **be told that.**
13         MR. KORNFELD:  Did you have any
14 discussions with Ms. DuBose about the
15 substance of your testimony during my
16 questioning this morning?
17     **THE WITNESS:  No.**
18         MR. KORNFELD:  Nothing?
19     **THE WITNESS:  No.**
20         MR. KORNFELD:  We'll reserve all
21 rights at this point.
22         THE VIDEOGRAPHER:  Are we
23 concluded for today?  Shall I take us off
24 video?
25         MS. DUBOSE:  I have nothing

Page 391

1  further.
2          THE VIDEOGRAPHER:  Okay.  That
3  concludes --
4          MR. KORNFELD:  Hold on one
5  minute.  Before we go off of video, I want
6  to repeat for the record that, due to
7  improper instructions, we are keeping this
8  deposition open, and we reserve the right
9  to go to the Court and ask for relief if
10 there is not a consensual agreement to
11 bring this witness back to answer the
12 questions that he was instructed on.
13         MS. DUBOSE:  I will take that up
14 at another time.
15         THE VIDEOGRAPHER:  And that
16 concludes the deposition for today at
17 8:44 Eastern Time.
18              -  -  -
19         (Whereupon, the deposition
20   was concluded at 8:44 p.m.)
21              -  -  -
22
23
24
25

Page 392

1              ATTORNEY'S NOTES
2                 -    -    -
3  -------------------------------------------------
4  -------------------------------------------------
5  -------------------------------------------------
6  -------------------------------------------------
7  -------------------------------------------------
8  -------------------------------------------------
9  -------------------------------------------------
10 -------------------------------------------------
11 -------------------------------------------------
12 -------------------------------------------------
13 -------------------------------------------------
14 -------------------------------------------------
15 -------------------------------------------------
16 -------------------------------------------------
17 -------------------------------------------------
18 -------------------------------------------------
19 -------------------------------------------------
20 -------------------------------------------------
21 -------------------------------------------------
22 -------------------------------------------------
23 -------------------------------------------------
24 -------------------------------------------------
25

Page 393

1              CERTIFICATE
2      I HEREBY CERTIFY that the
3  proceedings, evidence and objections are
4  contained fully and accurately in the
5  stenographic notes taken by me upon the
6  deposition of MICHAEL BURNETT, taken on
7  January 17, 2022 and that this is a true
8  and correct transcript of same.
9
10
11
12        *Jennifer Billstein-Miller*
13        Jennifer Miller, RMR, CCR, CRR
14        and Notary Public
15
16
17
18
19
20      (The foregoing certification of
21 this transcript does not apply to any
22 reproduction of the same by any means
23 unless under the direct control and/or
24 supervision of the certifying reporter.)
25

# EXHIBIT D

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

In re:

BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC,[1]

        Debtors.

Chapter 11

Case No. 20-cv-10343 (LSS)

(Jointly Administered)

**Expert Report of Karen Y. Bitar**

**December 5, 2021**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## Table of Contents

I.  INTRODUCTION                                                              1
    A. QUALIFICATIONS                                                         1
    B. ASSIGNMENT                                                             1
    C. MATERIALS CONSIDERED                                                   2
    D. STATEMENT OF OPINIONS                                                  2
    E. SUMMARY OF OPINIONS                                                    2

II. DIFFERENCES IN THE ADJUDICATIVE PROCESS                                   4
    A. THE ADVERSARIAL PROCESS OF THE TORT SYSTEM                             4
    B. THE LIMITED PROCESS OF THE TDPS                                        7

III. DIFFERENCES CONCERNING THE DECISION-MAKER                               11
    A. THE TORT SYSTEM REQUIRES A NEUTRAL DECISION-MAKER                     11
    B. THE TDPS DO NOT REQUIRE A NEUTRAL DECISION-MAKER                      11

IV. DIFFERENCES CONCERNING THE FINAL STEPS IN THE
    ADJUDICATIVE PROCESS: THE CALCULATION AND PAYMENT OF
    DAMAGES OR SETTLEMENT AMOUNTS TO PLAINTIFFS OR
    CLAIMANTS, AND APPEALS                                                   12
    A. INDIVIDUALIZED ASSESSMENTS OF DAMAGES AND SETTLEMENT
       VALUES IN THE TORT SYSTEM                                             12
    B. THE TDPS' CLAIMS MATRIX AND APPEALS UNDER THE TDPS                    13

## I.    INTRODUCTION

### A.    Qualifications

1.    My name is Karen Y. Bitar.  I am a litigation partner at Seyfarth Shaw LLP.  With approximately 900 lawyers across 17 offices, Seyfarth provides litigation, advisory, and transactional legal services to clients worldwide.  I am a resident in the firm's New York office and am co-chair of the firm's white collar and internal investigations practice group.  I am also a member of the firm's National Trial team.  Prior to private practice I began my career as an Assistant District Attorney in Brooklyn, New York where I investigated and prosecuted violent felony offenses including sex crimes.  My tenure there ended as a member of the Homicide Bureau.

2.    I have extensive experience representing institutions in sexual abuse cases.  I have been involved in defending institutional defendants for close to a decade.  I am currently representing numerous institutions, of various religious faiths, as well as certain non-denominational schools and camps in approximately 40 cases of childhood sexual abuse.  I practice primarily in New York.  New York recently enacted the Child Victim Act, a revival statute which extended the statute of limitations for victims of childhood sexual abuse to age 55.  I am a member of the New York City CVA Steering Committee, assembled by the Court and comprised of both plaintiff and defense counsel who are tasked with providing recommendations and assistance to the Court on the administration of CVA cases.  The Committee was instrumental in drafting the Case Management Orders currently utilized in New York City for the administration of all CVA claims.  Prior to enactment of the CVA, I represented several institutions in high-profile lawsuits brought by victims of claimed sexual abuse, including a New York-based university in a multi-part lawsuit and a movie production company where the acts of its eponymous founder led to numerous individual lawsuits, as well as a RICO class action alleging a sexual enterprise as between the institution and others.

3.    I received my JD from the Temple University School of Law.  Prior to that, I completed my AB in political philosophy at Vassar College.  My curriculum vitae is appended to this report as **Exhibit 1**, and a list of my publications over the last 10 years is appended to that exhibit as **Appendix A**.  I have not previously testified as an expert witness.  I am being compensated for my time at a rate of $925 per hour.  My compensation does not depend on the opinions expressed in this report or the outcome of any proceeding in which my testimony may be submitted.

### B.    Assignment

4.    I have been asked by counsel for Liberty Mutual Insurance Company, on behalf of itself and a group of other insurers, to opine on whether and how the proposed procedures outlined in the Trust Distribution Procedures (the "TDPs") of the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (Dkt. 6443) (the "Plan") differ from the procedures that govern the litigation of sexual abuse cases in the tort system.

C.    **Materials Considered**

5.    In preparing this report, I have reviewed the TDPs, portions of the Plan, and portions of the Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (Dkt. 6445), dated September 30, 2021.  The opinions expressed in this report are based on my review of those materials and my experience defending sexual abuse cases in the tort system.  A list of the sources of information and materials I considered in forming my opinions is presented in **Exhibit 2**.

D.    **Statement of Opinions**

6.    It is my opinion, based on my review of the identified materials and my experience defending sexual abuse cases in the tort system, that the TDPs eliminate critical procedural protections in the adjudicative process, do not provide for neutral decision-makers, and differ substantially in the process and method of calculating and paying damages.  Defendants in sexual abuse cases routinely rely upon these protections to evaluate whether a claim for sexual abuse is likely to succeed and to determine how much, if anything, a defendant is willing to pay to resolve a sexual abuse claim.  By eliminating these critical protections, the TDPs assume all claims are valid, assume the defendant is liable, and focus almost entirely on the amount of money a claimant will be paid, all assumptions that are not allowed in and do not exist in the tort system.

E.    **Summary of Opinions**

7.    There are important differences between the procedures that govern the litigation of sexual abuse claims in the tort system and the proposed procedures outlined in the TDPs.  In short, the TDPs eliminate critical procedural protections that defendants in sexual abuse cases routinely rely upon, and which inform both (a) whether a claim for sexual abuse is likely to succeed and (b) how much, if anything, a defendant may pay to resolve a sexual abuse claim.  For present purposes, it is useful to group the differences into three categories:

    i.)  Differences concerning the adjudicative process:

        a.  In the tort system, sexual abuse claims are subject to an adversarial process. Both parties are usually represented by counsel, and the proceedings are subject to rules of civil procedure and evidence, which apply equally to both parties. Critically, the plaintiff bears the burden of proving each of the elements of his or her claim.  The defendant also has the opportunity to disprove the elements of the plaintiff's claim or to prove that an affirmative defense applies, which would serve to limit, or preclude entirely, a plaintiff's recovery.  Further, in the tort system, there is a defendant who is incentivized to vigorously defend against claims.

2

    b.  Under the TDPs, there is no adversarial process.  The Settlement Trustee[2] exercises his sole discretion to allow claims based on the information that he chooses to review.  The exercise of his discretion is governed by various proposed procedures that bear little resemblance to the adversarial process of the tort system.  There is no defendant in the TDP process, and the Settlement Trustee is not incentivized to vigorously defend claims.  Instead, the Settlement Trustee is tasked with managing a pool of funds that will ultimately be paid out to claimants.

ii.) <u>Differences concerning the decision-maker(s)</u>:

    a.  In the tort system, sexual abuse cases are litigated before a neutral judge, and, if necessary, tried before an impartial jury.  Where the parties deem it advantageous they may choose to engage in settlement negotiations and utilize a mediator to facilitate settlement.  Under either of these circumstances the factual and legal bases for any sexual abuse claim will be examined by a third-party neutral.

    b.  Under the TDPs, the sole decision-maker is not required to be neutral.

iii.) Differences concerning the calculation and payment of damages or settlement <u>amounts to plaintiffs or claimants, and appeals</u>:

    a.  In the tort system, a plaintiff bears the burden of proving his or her damages by a preponderance of the evidence.  When cases settle, the negotiations—and the ultimate amount that institutions may agree to pay—reflect the parties' judgments about the risk of whether, following the adversarial process described above, an impartial jury might find the defendant liable, and, if so, how much it would award in damages.  Those judgments are informed by materials exchanged during the discovery process and other individualized factors, which often are the subject of detailed expert testimony.  Either party may appeal any final judgment, and appeals are heard by a panel of neutral judges.

    b.  Under the TDPs, a claimant generally does not bear any evidentiary burden.  Whatever facts and other information they choose to provide is largely at their own discretion, and whatever narrative they choose to provide is not subject to cross examination.  Any award the claimant may receive is determined largely by a matrix, which is crafted to permit the Settlement Trustee to consider only a limited range of individualized information, without the benefit of expert testimony, and to provide the Settlement Trustee wide and unfettered discretion on any number of issues.  Only the claimant can seek reconsideration of the Settlement Trustee's decision or de novo review by a court of competent jurisdiction.

---

[2] Unless otherwise specified, capitalized terms in this report carry the meaning assigned to them by the TDPs, or if not defined therein, by the Plan.

8.      These differences, alone and in combination, result in claims being treated much more favorably under the TDPs than they would be in the tort system.  A few examples show how.  In the tort system, if a plaintiff cannot present admissible evidence that the institution was negligent (and therefore bears some responsibility for the alleged abuse) his or her claim will be dismissed before trial.  Under the TDPs, however, this safeguard is lost.  Instead, evidence of negligence by the institution is a "scaling factor" that is not a prerequisite for any recovery, but rather a factor that may enhance the amount that a claimant will receive.  However, the absence of any such evidence—which would preclude a claim going forward under the tort system—does not result in the disallowance of the claim (or even any reduction of the claim's base value) under the TDPs.

9.      Similarly, in the tort system, if a plaintiff's claim is untimely, then the claim will be dismissed.  Under the TDPs, the timeliness of the claim is another "scaling factor," which may reduce the amount that a claimant will receive by an amount which is determined by the Settlement Trustee within a wide range, but which does not result in the disallowance of the claim.

10.     Finally, under the TDPs, a claimant can elect to receive $3,500 without any review of the merits of his or her claim.  The claimant merely needs to file a Proof of Claim and attest to its accuracy under oath to secure an "Expedited Distribution."  There is no analogous mechanism for an automatic recovery in the tort system.

11.     These opinions and the following analysis are based on my knowledge, experience, and review of the current version of the TDPs and the Plan.  I reserve the right to update my opinions should additional information be provided to me.[3]

## II.     DIFFERENCES IN THE ADJUDICATIVE PROCESS

### A.    The Adversarial Process of the Tort System

12.     In the tort system, claims of sexual abuse are subject to an adversarial process.  Usually, both sides are represented by counsel, and the case proceeds according to the applicable rules of civil procedure.  The plaintiff bears the burden of proving each of the elements of his or her claim, and the defendant has the opportunity to disprove the elements of the claim, or to prove that an affirmative defense applies.  *See generally Henderson v. Shinseki*, 562 U.S. 428, 440 (2011) (explaining that "ordinary civil litigation" is "adversarial," and the plaintiffs must "gather the evidence that supports their claims and generally bear the burden of production and persuasion").

---

[3] I understand that there has been some deposition testimony about the TDPs.  I have not yet had the opportunity to review that testimony because the depositions were held within the last week.  I also understand that additional depositions may take place after I file this report which may concern the TDPs.  I reserve the right to update this report if appropriate and/or to include such information in any supplemental or rebuttal report I may file.

13.    The rules of civil procedure and evidence govern how the parties attempt to prove their claims and defenses.  In the tort system, there are various opportunities for the defendant to have the plaintiff's claim dismissed.

14.    A sexual abuse claim against an institution is negligence based.  Typical claims alleged in sex abuse cases include negligent hiring of an employee or negligent supervision of an employee or volunteer.  Thus, in cases alleging sexual abuse a plaintiff must prove each and every element of a negligence claim: duty, breach, causation, and damages.  If he or she cannot prove each element of the claim, the claim against the institution will fail.

15.    More specifically, in cases concerning sexual abuse claims against institutions, the litigation often focuses on a few key issues.  Generally speaking, institutions are not strictly liable for sexual abuse committed by their employees or other individuals associated with them, such as volunteers.

16.    Generally speaking, an institution cannot be held vicariously liable, based on a theory of respondeat superior, for the alleged personally-motivated tortious conduct and acts of sexual abuse of its employee or other associated individual.  An employer may be vicariously liable for tortious acts of its employees or other individuals only if those acts were committed in furtherance of the employer's business and within the scope of employment.  Sexual abuse is a clear departure from the scope of employment, committed solely for personal reasons, and unrelated to the furtherance of an employer's business.  Generally speaking, the doctrine of respondeat superior is not an applicable basis to hold an institution liable.

17.    Thus, if the law is correctly applied, strict liability and respondeat superior claims generally do not survive a motion to dismiss.  The TDPs do not appear to have a mechanism to ferret out these baseless claims.  In fact, under Article I of the Plan, the definition of "abuse" includes respondeat superior claims.[4]

18.    Instead, to prevail in a sexual abuse case against an institution, the plaintiff must typically prove that the institution itself was negligent—e.g., that it acted unreasonably in hiring the employee or by failing to adequately supervise the employee or volunteer that committed the alleged act of sexual abuse, or by retaining (i.e., not dismissing) the employee or volunteer.

19.    To establish a cause of action based on negligent hiring, negligent retention, or negligent supervision, it must be shown that the institution knew or should have known of the employee, volunteer or other associated individual's propensity for the type of conduct which caused the injury.  The propensity requirement applies equally to claims for negligent retention, training, supervision and hiring.

20.    Thus, in the tort system, where a plaintiff cannot assert factual allegations that the institution knew or should have known of the employee or volunteer's propensity for the

---

[4] Plan § I.A.18.

conduct that caused plaintiff's injuries, complaints are properly dismissed at the motion to dismiss stage.  Again, this pleading safeguard is lost under the TDPs, which appear to provide no mechanism to analyze the actual elements of any filed claims.[5]

21.    In my experience, the statute of limitations is another important issue in sexual abuse cases against institutions.  *See, e.g.*, *Henderson*, 562 U.S. at 440 ("In ordinary civil litigation, plaintiffs must generally commence their suits within the time specified in a statute of limitations . . . .").  Although the statute of limitations for sexual abuse claims differ from state to state, the consequence of bringing an untimely claim is the same: if a claim is untimely, then the claim will fail.  The same is not true under the TDPs, where untimely claims may be reduced, but not disallowed.[6]

22.    If the plaintiff files a prima facie complaint, then the parties proceed to discovery.  Both sides are entitled to take discovery, and discovery sometimes reveals that the plaintiff will not be able to carry his or her burden of proving negligence.  In my experience, robust discovery is an extremely important tool in assessing the value of a case.

23.    The information gleaned from plaintiffs and third parties in discovery can be critical to the survival of a plaintiff's claims or to the mitigation of a damages award.  By way of example, where a plaintiff claims to have endured abuse that would constitute a "Tier 1" claim under the TDPs, but did not have any documentation—medical, psychological, or otherwise—to support these claims, and produces no documents or other information otherwise evidencing what impact the abuse had on his or her life, the *lack of evidence*, where such abuse should manifest itself in some degree of corroboration, would be telling in a tort system.  A defendant institution can ensure that these materials are aggressively pursued during discovery, and the Court can play a critical role in requiring production from plaintiffs and of third-party documents not within possession of a plaintiff.  Once the totality of that evidence is collected, either party is free to argue what the evidence, or lack thereof, demonstrates.  There is no equivalent process in the TDPs.

24.    While the procedures in the TDPs seem to allow for a mechanism to secure documents beyond what a plaintiff may have in their possession,[7] that does not compare to the access to third-party discovery available in the tort system.  Nor do the TDPs incentivize engaging in any discovery beyond what a plaintiff provides; the Settlement Trustee is given wide and unchecked latitude to require as much, or as little, documentary or other support for a claim as he chooses.

25.    In the tort system, after discovery, the defendant has the opportunity to move for summary judgment.  If the plaintiff has not identified evidence to support each element of his or her claim—e.g., that the institution was somehow responsible for the alleged sexual

---

[5] *See, e.g.*, TDPs §§ IV–VII.

[6] *Id.* § VIII.E.(iii); *id.* at Sched. 1 (providing that the lowest scaling factor for the statute of limitation is .01).  The one exception is for Indirect Abuse Claims, which may be barred by the statute of limitations.  *See id.* § IV.B.(3).(c).  When discussing the TDPs' treatment of the statute of limitations throughout the report, I am referring to the procedures relevant to Direct Abuse Claims.  *See, e.g.*, *id.* § VIII.E.(iii).

[7] *See id.* § VII.A.

abuse—then the claim will be dismissed.  Similarly, if discovery reveals that an affirmative defense bars the claim—e.g., that the alleged abuse occurred outside the limitations period—then the claim will be dismissed.  The same is not true under the TDPs, where there are no defendants who can move for summary judgment, and where claims are generally not barred for the reasons they would be in the tort system.

26.     If a case survives summary judgment, it proceeds to trial.  The parties' presentations are subject to the rules of evidence, and the facts are determined by an impartial judge or jury.

27.     Finally, under the tort system after a final judgment, litigants are afforded certain rights to appeal any judgment.  There is no equivalent right under the TDPs.  Instead, only the claimant is permitted to seek de novo review from a court of competent jurisdiction.[8]

28.     Each of the evidentiary burdens and procedural rules described above tends to (i) discourage the filing of fraudulent claims, (ii) give defendants an opportunity to achieve the dismissal of fraudulent claims, and (iii) weed out claims that are factually or legally deficient (even if they are not fraudulent) by virtue of the ability to file dispositive motions and to engage in a fulsome discovery process.  These processes are the bulwark of an adversarial system and are, for all intents and purposes, ignored under the TDPs.

## B.     The Limited Process of the TDPs

29.     The process prescribed by the TDPs differs from the tort system's process in several material ways.  For starters, there is no adversarial process, and the parties are not separately represented by counsel.  Instead, under the TDPs, the Settlement Trustee exercises his discretion to determine whether to "allow[]" a sexual abuse claim.[9]  In certain instances (i.e., Expedited Distribution), moreover, the Trustee must allow the claim even without doing an investigation if the claimant merely alleges that he satisfies certain criteria.[10]

30.     The "Claims Evaluation" process under the TDPs has three key steps.  First, the Settlement Trustee conducts an "Initial Evaluation" to confirm that a claim is procedurally proper under the TDPs.  A claim survives this "initial evaluation" if (i) the Proof of Claim or Trust Claim Submission is "substantially and substantively" completed, and signed under penalty of perjury, (ii) the claim was submitted before the Bar Date, and (iii) the claim has not previously been resolved via litigation or settlement with a protected party.[11]

---

[8] *See id.*

[9] *See id.* § VII.B.

[10] *Id.* § VI.

[11] *Id.* § VII.C.1.

31.     This initial evaluation is not adversarial, and it apparently does not require the Settlement Trustee to make any judgments about the merits of a claim.  Indeed, the process appears to be ministerial in nature.

32.     If a claim survives the initial evaluation, then the Settlement Trustee evaluates the "General Criteria for Evaluating Submitted Abuse Claims" (the "General Criteria").[12] Under the General Criteria, the Settlement Trustee considers five factors "to determine if the evidence related to the Submitted Abuse Claim is credible and demonstrates, by a preponderance of the evidence, that the Submitted Abuse Claim is *entitled to a recovery* and should be allowed."[13]  The TDPs do not further define what it means for a claim to be "entitled to a recovery," so it is not clear what the Settlement Trustee must find by "a preponderance of the evidence."[14]

33.     The five factors that the Settlement Trustee must consider are whether the claimant has: (i) identified alleged acts of abuse that he or she suffered, (ii) identified his or her alleged abuser or provided information about the alleged abuser, (iii) provided information showing that the alleged abuse had a connection to scouting, (iv) identified the date of the alleged abuse, or his or her age at the time, and (v) identified the location of the abuse.[15] If, after considering these factors, the Settlement Trustee concludes that a claim "meets the evidentiary standard in the General Criteria," and that none of the claimants' submissions are deceptive or fraudulent, then he must allow the claim.[16]

34.     To make a Trust Claim Submission, a claimant must submit responses to a questionnaire—the contents of which are yet to be determined by the Settlement Trustee and which must be approved by the STAC and Future Claimants' Representative—along with an executed "agreement," the contents of which are generally undefined.[17]  A claimant is to produce records in his possession relating to the abuse, including documents relating to other settlements or awards from other sources he has received, or expects to receive, and must also agree to produce any further records and documents which may be requested by the Settlement Trustee.[18]  The claimant is also to cooperate in any examination by a healthcare professional, should it be requested by the Settlement Trustee, and consent to a written or oral examination under oath if requested by the Settlement Trustee.[19]  The Settlement Trustee may, but is expressly not required to, obtain additional evidence from other parties.[20]  At bottom, other than turning over

---

[12] *Id.* § VII.C.2.

[13] *Id.* (emphasis added).

[14] *Id.*

[15] *Id.*

[16] *Id.* § VII.C.3.

[17] *Id.* § VII.A.

[18] *Id.*

[19] *Id.*

[20] *Id.*

documents he *may* have, and completing a questionnaire and signing the "agreement," a claimant has no further discovery obligations. Moreover, the TDPs give the Settlement Trustee complete discretion to evaluate an Abuse Claim on a very limited record and with no oversight. This is also inconsistent with a tort system's adversarial process.

35.    Again, the evaluation of the General Criteria is not adversarial, and neither party has the right to make arguments about what the evidence shows. The degree to which the evidence matters and what precisely the Settlement Trustee must find are also unclear. For example, if the Settlement Trustee finds that any of the first three factors "are not satisfied," then a claim will be disallowed.[21] The Settlement Trustee appears to have discretion to disallow a claim, or not, that does not meet the other two factors.[22]

36.    Although the TDPs suggest that the General Criteria somehow bear on whether a claim is "legally valid,"[23] they do not resemble the elements that a plaintiff would be required to prove to prevail in the tort system. For example, the General Criteria do not call for any consideration of whether the Debtors were negligent or otherwise legally responsible for any act of alleged abuse, which is a condition precedent to liability in the tort system. Similarly, although the Settlement Trustee must consider the date of the abuse, the TDPs do not say that untimely claims should receive no recovery.[24] On the contrary, a claim apparently can be allowed even if it fails to identify the date and location of the alleged abuse, which would make it impossible to evaluate which statute of limitations applies and whether the claim is barred.

37.    The third key step under the TDPs requires the Settlement Trustee to value allowed claims according to a "Claims Matrix."[25] Under the Claims Matrix, all types of abuse are divided into six tiers, each of which is assigned a "Base Matrix Value" and a "Maximum Matrix Value."[26]

38.    After assigning a claim to a tier of abuse, the Settlement Trustee considers two sets of "Scaling Factors."[27] "Aggravating Scaling Factors" are factors which may result in an award above the base value associated with a particular tier of abuse.[28] "Mitigating

---

[21] *Id.* § VII.C.4.

[22] *See id.*

[23] *See id.* § VII.B.

[24] The TDPs actually go so far as to permit Direct Abuse Claimants, whose claims may be reduced due to the scaling factor relating to the statute of limitations defense, to defer the determination of their proposed claims for a period of up to twelve months to see if their relevant statute of limitations might be revived. *Id.* § VII.H. I am unaware of any jurisdiction or tort system which would allow for this election.

[25] *Id.* §§ VII.E, VIII.

[26] *Id.* § VIII.A.

[27] *Id.* § VIII.C.

[28] *Id.* § VIII.D.

Scaling Factors" are factors which tend to reduce the value of a claim, and may result in an award that is less than the base value associated with a particular tier of abuse.[29]

39.     In Section IV, I discuss how the TDPs' system for calculating and paying damages differs from the tort system's approach.  For present purposes, however, three features of the payment system illustrate important differences in the adjudicative process.

40.     First, under the TDPs, evidence of the Debtors' negligence or responsibility for the abuse is an aggravating factor, which could increase the value of a claim above the base value.[30]  In the tort system, evidence of negligence is an element of a plaintiff's claim.  Absent such evidence, the claim should be dismissed.

41.     Second, under the TDPs, a claim's untimeliness is a mitigating factor, which may reduce a claimant's recovery, but which does not bar the claimant from recovering.[31]  In the tort system, an untimely claim would be barred as a matter of law.

42.     Third, under the TDPs, a claimant can opt-out of the General Criteria altogether by electing to take an Expedited Distribution of $3,500.[32]  To qualify for an Expedited Distribution, a claimant must merely satisfy the initial criteria, and the TDPs do not allow any examination of the merits of his or her claim.  There is no analogous mechanism for an automatic recovery in the tort system.

43.     Finally, the TDPs have no defendant.  Instead, the Settlement Trustee oversees a pool of funds that will ultimately be paid out to claimants, and as such, is not incentivized to defend against claims.[33]

44.     In short, the TDPs' process for evaluating claims of sexual abuse differs in several important ways from the tort system.  There is no meaningful adversarial process, it is not clear what evidentiary burden (if any) the claimant has to carry, and the criteria used to determine whether a claim should be allowed do not resemble the elements of negligence claims in the tort system.[34]  There are also no opportunities for the defendant to marshal evidence or argue that the claim is legally deficient.  And unlike the tort system where there is a defendant incentivized to defend against claims, the Settlement Trustee is not

---

[29] *Id.* § VIII.E.

[30] *Id.* § VIII.D.(ii).d.

[31] *Id.* § VIII.E.(iii).

[32] *Id.* § VI.

[33] I recognize that the TDPs do require the Settlement Trustee to establish procedures to detect and prevent fraudulent claims. *Id.* § VII.I.  But this mandate is quite general—only specifically requiring that the Settlement Trustee institute auditing—and does not upset the fact that the Settlement Trustee oversees a fund that exists to ultimately pay out funds to claimants.

[34] While I recognize that the "Settlement Trustee may consider any further limitations on the Abuse Claimant's recovery in the tort system" in mitigating a claim's value, *id.* § VIII.E.(ii), that provision is discretionary rather than mandatory, and does not appear to upset the specific treatment of the statute of limitations as a mitigating factor (rather than a bar on recovery) and negligence as an aggravating factor (rather than a requirement for recovery).

incentivized to vigorously evaluate and defend against claims.  Instead, the Settlement Trustee oversees a pool of funds that will ultimately be paid out to claimants.

### III.    DIFFERENCES CONCERNING THE DECISION-MAKER

#### A.    The Tort System Requires a Neutral Decision-Maker

45.    In the tort system, the key decision-makers are third-party neutrals.  They are selected according to rules of civil procedure, and their conduct may be regulated by various ethical rules, all of which seek to ensure their impartiality.

46.    Until trial, the judge is the key decision-maker in the tort system.  He or she presides over discovery and resolves any attempt by the defendant to dismiss the case prior to trial.  Most states provide for the random assignment of judges to tort claims, and every state that I am aware of requires judges to recuse themselves if they cannot impartially preside over a case.  If a party believes that the judge has some personal interest in the case, and is not impartial, then that party can move to have the judge recused.

47.    If a sexual abuse case proceeds to trial, then the facts usually are found by a jury.  Every state that I am aware of prescribes a set of procedures that are designed to ensure that the jury is impartial.  If a party believes that a potential juror cannot be impartial, then that party can move to strike the juror for cause.  Similarly, both parties may strike a particular number of jurors without cause, which they do if they suspect a juror may not be sympathetic to their case (even if the juror may appear to be impartial).

48.    Ultimately, the tort system thus requires (i) an impartial judge, and (ii) an impartial jury, which is selected with input from both sides.  In my experience, both sides litigate and evaluate their cases in light of their knowledge that they cannot count on the judge or the jury to have any special sympathy for their side.  At the end of the day, the facts and the law will be decided by a neutral decision-maker.

#### B.    The TDPs Do Not Require a Neutral Decision-Maker

49.    The TDPs do not require a neutral-decision maker.  The sole decision-maker under the TDPs is the Settlement Trustee, who is not required to be neutral.[35]

50.    As discussed above, every claimant who satisfies certain minimum criteria can elect to take an Expedited Distribution of $3,500, without having to prove any part of his or her claim.  Each claimant who elects to do so effectively gets to unilaterally adjudicate

---

[35] While I recognize that the TDPs are "founded" in part on the principle of "independence of the Settlement Trust and Trustee," *id.* § I.B.6, the TDPs themselves do not specify the criteria for determining independence and provide no additional detail on this score.  The Plan suggests that such independence prohibits the Settlement Trustee from: (i)  holding a financial interest in, or acting as an attorney or agent for, the Reorganized BSA and affiliated parties; and (ii) acting as an attorney for or otherwise representing any person holding a claim in these Chapter 11 cases. *See* Plan, Ex. B § 5.6(a).  Those requirements are not equivalent to requiring a neutral decision-maker.

whether or not his or her claim should be allowed.  Not even the Settlement Trustee passes on the merits of the claim.

51.  Any attempt to institute an analogous regime in the tort system would be unconstitutional.  For example, a state may not permit one party to modify the rights of another simply by certifying that he or she is entitled to the relief sought.  Doing so "violates the Court's longstanding teaching that ordinarily no man can be a judge in his own case." *Chrysafis v. Marks*, 141 S. Ct. 2482, 2482 (2021) (internal quotation omitted).

52.  In sum, the decision-maker under the TDPs is different from the impartial decision-makers required by the tort system.

**IV.    DIFFERENCES CONCERNING THE FINAL STEPS IN THE ADJUDICATIVE PROCESS: THE CALCULATION AND PAYMENT OF DAMAGES OR SETTLEMENT AMOUNTS TO PLAINTIFFS OR CLAIMANTS, AND APPEALS**

A.    **Individualized Assessments of Damages and Settlement Values in the Tort System**

53.  In the tort system, awards of damages are highly individualized.  Critically, a plaintiff is entitled to damages only if he or she prevails on each element of his or her claim at trial and defeats any affirmative defenses raised by the defendant.

54.  If the plaintiff prevails on liability, then he or she also bears the burden of proving his or her damages by a preponderance of the evidence.  Given the nature of sexual abuse claims, the nature of a plaintiff's damages are necessarily individualized.  For example, if a plaintiff claims that he or she suffers from mental or physical health issues as the result of sexual abuse, that claim is often the subject of competing expert testimony.

55.  In the tort system, most cases are dismissed or settled before trial.  Any settlement in the tort system, however, is negotiated against the backdrop of the adjudicative process and the neutral decision-makers described above.  Therefore, when a plaintiff or a defendant values his or her case, that valuation is informed by each side's assessment of (i) how a neutral decision-maker is likely to rule on attempts by the defendant to dismiss the case, and (ii) whether a jury will likely find in the plaintiff's favor.

56.  The parties' assessments likewise take into account the final step in the adjudicative process: appeals.  Appeals in the tort system usually are heard by a randomly assigned panel of neutral appellate judges (or, in some cases, by a single judge).  Any settlement reflects the possibility that an appellate panel or judge will reverse what the parties might regard as a likely outcome below, usually on the basis of a legal error.

B.      **The TDPs' Claims Matrix and Appeals Under the TDPs**

57.     Under the TDPs, the amount of a payment to a claimant is determined by consulting the Claims Matrix.[36]

58.     As described above, the Claims Matrix divides the universe of abuse claims into six different tiers.[37]  It then assigns a base value and maximum value to each tier.  For each allowed claim, the Settlement Trustee exercises his discretion to determine which tier the claim belongs in.

59.     After assigning a claim to a tier, the Settlement Trustee applies certain "Scaling Factors."[38]  "Aggravating Scaling Factors," if they apply, increase the size of a claimant's recovery.[39]  There are three Aggravating Scaling Factors:  (i) the nature and circumstances of the abuse (e.g., whether the abuse was of "extended duration and/or frequency"), (ii) the abuser's profile, which includes whether "there is evidence of negligence" by the Debtors, and (iii) the impact of the abuse (e.g., whether it caused the claimant to suffer mental health issues).[40]

60.     There are four "Mitigating Scaling Factors," which, if they apply, reduce the size of a claimant's recovery.[41]  They are:  (i) whether the claimant has a non-scouting relationship with the alleged abuser (or another party is responsible for the alleged abuse), (ii) whether the claimant has received another settlement or award concerning the alleged abuse, (iii) whether the claim may be barred by a statute of limitations or repose, and (iv) whether a putative defendant would be absent at trial.[42]

61.     After considering all the Aggravating and Mitigating Scaling Factors, the Settlement Trustee multiplies them together to calculate a final award.[43]  An example helps to illustrate how.  A Tier 3 abuse claim has a base value of $300,000.[44]  If there is some evidence that the Debtors were negligent in respect of the alleged abuse, then a scaling factor of 2.0 may apply.[45]  If the claim is likely untimely, however, then the Settlement Trustee must consult a schedule and apply a mitigating adjustment depending on the state

---

[36] *Id.* § VIII.

[37] *Id.* § VIII.B.

[38] *Id.* § VIII.C.

[39] *See id.* § VIII.D.

[40] *Id.*

[41] *Id.* § VIII.E.

[42] *Id.*

[43] *Id.* § VIII.C.

[44] *Id.* § VIII.B.

[45] *Id.* § VIII.D.(ii).d.

in which the alleged abuse occurred.[46]  If the abuse allegedly occurred in Georgia, for example, and predated the limitations period, then the Settlement Trustee must apply a scaling factor between 0.5 and 0.7.[47]  If the Settlement Trustee applied a multiplier of 0.5 in the above hypothetical, then the total recovery would be $300,000 (that is, the base value of $300,000 x 2 for the aggravating factor x 0.5 for the mitigating factor).

62.    The preceding example shows how sharply the procedures proposed in the TDPs depart from the tort system's approach to resolving claims of sexual abuse.  In the tort system, proof of negligence is required for a plaintiff to prevail; it is not a factor that can enhance the amount of an award.  Similarly, if a claim is untimely, then it is barred altogether, and the plaintiff's claim will be dismissed.  The idea that some evidence of negligence can offset a claim's untimeliness has no basis under any regime of tort law that I have ever encountered.

63.    So too with the Claims Matrix more broadly.  In the tort system, the aggravating factors that it describes often would be the subject of extensive discovery, and often expert testimony.  It is hard to imagine how the Settlement Trustee can make informed, individualized judgments that would suffice in the tort system given the comparatively sparse supply of information, the absence of any expert testimony, and the fact that there will be no adversarial presentation of the issues.

64.    Finally, the TDPs envision a limited, one-sided process for review of the Settlement Trustee's initial decision.  If a claimant disagrees with the Settlement Trustee's determination, then he or she may apply to the Settlement Trustee for reconsideration or seek de novo review from a court of competent jurisdiction.  But there is no avenue for any party to seek a determination that the Settlement Trustee improperly allowed a claim or awarded too large a sum in damages.

Respectfully submitted,

*/s/ Karen Y. Bitar*
Karen Y. Bitar

---

[46] *Id.* § VIII.E.(iii).

[47] *Id.* at Sched. 1.

**EXHIBIT 1**

**Seyfarth**

# Karen Y. Bitar

**Partner**
Commercial Litigation
kbitar@seyfarth.com

New York
+1 (212) 218-5261



**Karen brings both enthusiasm and practicality to her work, and partners with her clients to achieve value-added results.**

# More About Karen

Karen focuses her practice on investigations and trials. She understands that a properly conducted investigation should nonetheless be conducted with an eye toward what may be ensuing litigation. Clients look to Karen for strategic advice on how to best manage a diverse array of matters in public and private entities of every type, and in situations where the entities' reputation and dollars are at risk.

Karen has been involved with many high-profile matters, and has written and been quoted extensively on the consequences of the recent #MeToo movement on federal securities laws, and with respect to recent changes in the civil law. This includes changes to the statutes of limitations in New York

and elsewhere. When Karen takes on a matter that is important to her clients, she owns it, and fully immerses herself into the matter.

Karen has tried approximately 40 cases, most to a jury. In addition to the criminal trials she has prosecuted, she has also defended a broker dealer in an insider trading case brought by the SEC, represented an international accounting firm in various cases involving alleged violations of GAAS and their related federal securities claims and state law claims, in addition to other trials. Karen enjoys trying cases, and brings that confidence to the table.

Clients receive the benefit of Karen's career path, which is as diverse as her practice. She began her career as an assistant district attorney in Brooklyn, New York,  where she routinely handled sex crimes and violent felony offenses, and concluded her tenure in the homicide bureau. From there, she served as in-house counsel at Ernst & Young LLP, where she defended the firm in areas relating to accounting and financial fraud, securities class actions, and professional liability. She later joined a major international law firm, where she continued to focus her practice in these and other areas, while also serving as the national co-chair of its securities litigation practice. Since joining Seyfarth in 2014, she has become actively involved in investigating and defending institutions with respect to allegations of sexual abuse, sexual harassment, whistleblower, and other workplace-related claims. Based on her experience working in both the public and private spheres, and in an in-house environment, Karen's background enables her to provide a unique perspective to her clients.

As a recognized practitioner in the Child Victim Act (CVA) space, the New York Deputy Chief Administrative Judge in charge of administering all CVA cases in New York City requested that Karen assist him as a liaison counsel to work with other counsel and other judicial districts to consider CVA case management parameters and to ensure CVA cases are handled in an efficient and uniform way.

At Seyfarth, Karen works with a multidisciplinary team that is well-versed in both the law and matters specific to her clients. She develops strategies that maximize value, while reducing the toll her retention has on her clients.

Karen truly enjoys her Seyfarth practice, particularly representing clients in connection with possible litigation, where they face new legal challenges and

matters. Each new client or new matter presents a clean slate and an opportunity to roll up her sleeves, provide creative solutions, and meet the needs of her client. Karen appreciates that there are so many like-minded people at Seyfarth who have the same dedication and commitment to their clients.

# Education

- AB, Vassar College
  Political Philosophy

- JD, Temple University School of Law

# Admissions

- Connecticut

- New York

# Courts

- US Court of Appeals, Second Circuit

- US Court of Appeals, Eleventh Circuit

- United States Court of Federal Claims

- US District Court, District of Connecticut

- US District Court, Eastern District of New York

- US District Court, Southern District of New York

# Related Services

Commercial Litigation

Employment

Securities & Fiduciary Duty Litigation

White Collar, Internal Investigations & False Claims

International Dispute Resolution

# EXPERIENCE

- Continued representation of film production company in high-profile parallel investigations by the NYAG, NYDA, Department of Justice (SDNY), and dismissal with prejudice of RICO class action and related claims

- Continued representation of New York-based Country Day School in various high-profile litigations involving harassment, whistleblowing, and sexual abuse claims

- Continued representation of New York-based university in recent high-profile case alleging sexual abuse, fraudulent concealment, and Title IX (Dismissed on motion, dismissal upheld by the Second Circuit, petition for *Certiorari* denied)

- Representation of certain national and international accounting firms in defending class action suits and professional negligence claims

- Banco Espirito Santo International, Ltd. v. BDO Seidman, LLP, Circuit Court Case No. 04-14009 CA 31 (five-month jury trial culminating in appellate reversal of judgment in all respects) BDO Seidman LLP v. Banco Espirito Santo International et. al, Nos. 3D09-324, 09-197, 07-2472 (Reversing Plaintiffs verdict in all aspects), Third District Court of Appeal Miami, Florida, June, 2010

- *In Re: Bankest Capital Corporation*, Debtor, Case No. 04-10941-BKC-AJC, Chapter 7

- *In Re John Alden Financial Corporation Securities Litigation*, 2003 US Dist. LEXIS 2554 (alleging violation of Federal Securities Law (Section 10(b)) (Restatement case; summary judgment granted for defendant on eve of trial)

- *SEC v. Moran*, 922 F. Supp. 867 (SDNY 1996) (insider trading case culminating in SEC enforcement action and defense verdict at trial)

- *Conopco v. McCreadie*, 826 F. Supp. 855, 40 F.3d 1239 (3d Cir. 1994) (professional negligence case culminating in trial)

# Related News & Insights

**MEDIA MENTIONS**    Dec 17, 2020

Karen Bitar and Sarah Fedner quoted in HR Dive

**LEGAL UPDATE**    Oct 27, 2020

CVA Litigation Update: Defendants File a Consolidated Challenge to Confidentiality Order Entered by the Court

**LEGAL UPDATE**    Aug 4, 2020

One-Year Extension of CVA Revival Window Signed Into Law

**LEGAL UPDATE**    Jun 16, 2020

Litigation Developments Regarding Child Victim Act Cases

# Recognitions

**RECOGNITION**    May 30, 2019

Seyfarth Earns Top Rankings in Legal 500 U.S. 2019

# Select Recognition

- Listed in New York *Super Lawyers* for Securities Litigation (Thomson Reuters) (2007–2010, 2013-2021)

- Recommended Attorney for Corporate Investigations and White-collar Criminal Defense, *The Legal 500* (Legalese Ltd.) (2019)

- Listed in New York Metro *Super Lawyers* "Top Women" for Securities Litigation (Thomson Reuters) (2015)

- Finalist Team Member, Most Effective Lawyer Award, Appellate Category, *Daily Business Review* (ALM Media Properties) (2010)

# Publications

**Books**

- "Jury Instructions," Chapter 10, ABA Section of Labor and Employment Law, *Trial Techniques For The Labor And Employment Law Practitioner* (2019)

- Co-Author, "Defending the Perceived 'Deep Pocket': The Auditors," a chapter of the Inside the Minds<sup>TM</sup>series *Best Practices for Securities Litigation, published for Leading Lawyers On Maintaining Regulatory Compliance, Reporting Financial Disclosures, and Working With Government Agencies* (February 2007)

**Articles**

- Co-Author, "The Event Driven #MeToo Lawsuit: An Update on the CBS Securities Class Action," *Legal Update*, Seyfarth Shaw LLP (February 11, 2020)

- Co-Author, "Proposed Legislation Seeks To Extend The CVA Revival Window For One Additional Year," *Legal Update*, Seyfarth Shaw LLP (January 21, 2020)

- Co-Author, "Claims Can Now Be Filed Under New Jersey's New Law For Asserting Child Sex Abuse Claims," *Legal Update*, Seyfarth Shaw LLP (December 2, 2019)

- Co-Author, "The #MeToo Movement and Securities Litigation," *Insights: The Corporate & Securities Law Advisor* (August 26, 2019)

- Author, "Filings Begin Under New York's Child Victim Act: Know The Rules," *Legal Update*, Seyfarth Shaw LLP (August 13, 2019)

- Co-Author, "New Jersey Legislation Extends Statute Of Limitations To Bring Child Sex Abuse Claims," *Management Alert*, Seyfarth Shaw LLP (June 11, 2019)

- Co-Author, "Recent Developments In Securities Litigation: The "Event Driven" Lawsuit," *Management Alert*, Seyfarth Shaw LLP (June 10, 2019)

- Author, "Child Victims Act: New law could open door to lawsuits against districts," *On Board - Legal Agenda*, New York State School Boards Association (March 18, 2019)

- Author, "The Significant Ramifications of New York's Child Victim Act," *Management Alert*, Seyfarth Shaw LLP (March 11, 2019)

- Author, "New York Child Victim Act is Now Law," *Legal Update*, Seyfarth Shaw LLP (January 29, 2019)

- Author, "The Child Victim Act: The Latest Developments as the Legislature Convenes," *Legal Update*,  Seyfarth Shaw LLP  (January 25, 2019)

- Author, "The NY Child Victim Act: An Election Night Update Which Will Impact Your Institution," *Management Alert*, Seyfarth Shaw LLP (November 9, 2018)

- Author, "The NY Child Victim Act: Important New Developments May Impact Your Institution," *Management Alert*, Seyfarth Shaw LLP (August 23, 2018)

- "The NY Child Victim Act: What You Now Need to Know," *Management Alert*, Seyfarth Shaw LLP (March 6, 2018)

- "Opinion: MSU Faces Legal Risk as Culpability Questions Are Raised in the Nassar Scandal," *The National Law Journal* (February 22, 2018)

- "Manhattan District Attorney's Office Forms New 'Work-Related Sexual Violence Team'," *Legal Update*, Seyfarth Shaw LLP (January 31, 2018)

- Co-Author, "Much-Needed Certainty and Transparency Created by DOJ's New FCPA Corporate Enforcement Policy," *Legal Update*, Seyfarth Shaw LLP (December 15, 2017)

- "The NY Child Victim Act: What You Need to Know," *Management Alert*, Seyfarth Shaw LLP (September 14, 2017)

- "A New and Important Development in Insider Trading Law," *Legal Update*, Seyfarth Shaw LLP (September 8, 2017)

- "The Future of Dodd-Frank: Where is it Going?," *One Minute Memo*, Seyfarth Shaw LLP (June 26, 2017)

- Co-Author, "Title IX Enforcement and Interpretation: The Winds of Change are Blowing," *Management Alert,* Seyfarth Shaw LLP (December 28, 2016)

- "Salman v. United States Broadens Some Contours of Insider Trading Law, but Leaves Others Uncertain," *One Minute Memo*, Seyfarth Shaw LLP (December 13, 2016)

- "FCPA Compliance---Recent Department of Justice Initiatives," *Legal Update*, Seyfarth Shaw LLP (September 13, 2016)

- Co-Author, "Consumer Financial Protection Bureau's First Major Enforcement Action, and What the $210 Million Settlement Means," *The Banking Law Journal*, Volume 29, Number 8, 713 (September 2012)

- Co-Author, "The Consumer Financial Protection Bureau: The New Sheriff in Town," *The Banking Law Journal*, Volume 29, Number 8, 702 (September 2012)

- Co-Author, "Insider Trading: A New SEC Rule and an Important New Case," *Securities Regulation Law Journal* (Winter 2001)

- Co-Author, "Second Circuit Rejects Its Own Scienter Standard," *Insights* (September 2000)

- Co-Author, "California Courts Strike Another Blow to SEC Insider Trading Enforcement Efforts," *Insights* (October 2000)

- Co-Author, "Pleading Scienter in Securities Fraud Class Actions," *New York Law Journal* (October 14, 1999)

- Co-Author, "Avoiding Insider Trading Liability When Selling Company Stock," *Review of Securities & Commodities Regulation*, Standard & Poor's (January 27, 1999) abstracted in *Bowne Digest For Corporate & Securities Lawyers*, Bowne & Co. (July/August 1999)

- Co-Author, "Minimizing The Risk of Insider Trading Liability," *Corporation*, Aspen Law & Business (August 17, 1998)

- Co-Author, "Corporations Need To Police Trading By Insiders Now More Than Ever," *The Metropolitan Corporate Counsel* (November 1996)

- Co-Author, "Accounting Liability: Narrowing The Scope of Potential Plaintiffs," *The Metropolitan Corporate Counsel* (May 1995)

# Presentations

- Speaker, ABA Section of Litigation's 2020 Women in Insurance Network Virtual Regional CLE Program (November 5, 2020)

- Speaker, "#MeToo Litigation: Investigations Exposing Corporate Cultures of Complicity and Cover-Ups," ABA Section of Litigation's 2020 Corporate Counsel CLE Seminar (February 14, 2020)

- "FCPA Primer," Webinar (October 7, 2019)

- "The Significant Ramifications of New York's Child Victim Act:  What You Need to Know," Webinar (May 29, 2019)

- Presenter, "David v. Goliath v. David: An Opening Statements Showdown Between small Firm and Big Firm Litigators," Plenary Session of the 2019 Section of Litigation & Solo, Small Firm and General Practice Division CLE Conference (May 3, 2019)

- Drafter, "The Cost of Sexual Abuse Lawsuits: Protecting Your Institution," Investors Symposium (October 2018)

- Speaker, "Baylor University: A Case Study," 2nd Annual Title IX ExecuSummit (July 2017)

- Speaker, "Creating Solutions in Challenging Times," National Center's 44th Annual Conference for the Study of Collective Bargaining in Higher Education and the Professions, Hunter, The City University of New York (March 2017)(Discussion of age discrimination under federal law)

- Speaker, "College Sexual Assault: Protecting the Rights and Interests of the Victim and the Accused," ABA Criminal Justice Sections' Ninth Annual

Fall Institute (November 2016)

- Speaker, "Defending the Accountant Defendant –– Recent Developments in Accounting Liability Defense," Lecture presented at the Securities Litigation Seminar, New York, NY (December 1, 2006)

- Speaker, "Trends in Securities Litigation Post PSLRA," Deloitte & Touche Dispute Consulting Conference (August 2000)

# Media Mentions

- Quoted, "In Y.U. child sexual abuse case, a 'race against time' to get elderly witnesses on the record," *The Forward Association, Inc.* (April 5, 2021)

- Quoted, "Actress Drops Weinstein Claims For Ch. 11 Settlement Funds," *Law360* (April 2, 2021)

- Quoted, "Stockholders Can Sue Over CEO Speech, Judge Rules," *AgendaWeek* (January 27, 2020)

- Interviewed, "Child Victim Act Goes Into Effect," *Fox News at 6:00 PM* (August 14, 2019)

- Quoted, "NY State Courts Prepared for Flood of Lawsuits Under New Child Victims Act, Officials Say," *New York Law Journal* (August 13, 2019)

- Quoted, "Change to New York Sex-Abuse Laws Expected to Spur A Wave of Lawsuits," *The Wall Street Journal* (August 6, 2019)

- Quoted, "Boy Scouts could be hit with more sex abuse claims," *Associated Press* (April 24, 2019)

- Quoted, "New York Lawmakers to Back Lifting Restrictions on Child Abuse Victims' Right to Sue," *The Wall Street Journal* (January 28, 2019)

- Quoted, "Baylor legal fees skyrocket amid investigations, lawsuits related to sexual assault," *Waco Tribune-Herald* (September 7, 2018)

- Quoted, "Lurid Charges Against Ex-Dean Mark a Disturbing Turn in Michigan State's Nassar Scandal," *The Chronicle of Higher Education*

(March 27, 2018)

- Quoted, "Victim Testimony Raises Settlement Pressure in Nassar Suit," *The New York Times* (January 25, 2018)

# Civic & Charitable

- Community Service Society of New York (board member, executive committee, and development chair)

- Junior League, Greenwich, Connecticut, sustaining member

- NYC CVA Steering Committee member

Copyright © 2021 Seyfarth Shaw LLP. All Rights Reserved.

**Appendix A**

## <u>PUBLICATIONS</u>

**BOOKS:**

- "Jury Instructions," Chapter 10, ABA Section of Labor and Employment Law, Trial Techniques For The Labor And Employment Law Practitioner (2019)

- Co-Author, "Defending the Perceived 'Deep Pocket': The Auditors," a Chapter of the Inside the Minds ™Series Best Practices for Securities Litigation, published for Leading Lawyers On Maintaining Regulatory Compliance, Reporting Financial Disclosures, and Working With Government Agencies (February 2007)

**LEGAL UPDATES, ARTICLES AND ALERTS:**

- Co-Author, CVA Litigation Update: Defendants File a Consolidated Challenge to Confidentiality Order Entered by the Court  (Oct 27, 2020)

- Co-Author, One-Year Extension of CVA Revival Window Signed Into Law (Aug 4,2020)

- Co-Author, Litigation Developments Regarding Child Victim Act Cases (Jun 16, 2020)

- Co-Author, "The Event Driven #MeToo Lawsuit: An Update on the CBS Securities Class Action," Legal Update, Seyfarth Shaw LLP (February 11, 2020)

- Co-Author, "Proposed Legislation Seeks To Extend The CVA Revival Window For One Additional Year," Legal Update, Seyfarth Shaw LLP .(January 21, 2020)

- Co-Author, "Claims Can Now Be Filed Under New Jersey's New Law For Asserting Child Sex Abuse Claims," Legal Update, Seyfarth Shaw LLP  December 2, 2019)

- Co-Author,  "The #MeToo Movement and Securities Litigation," Insights: The Corporate & Securities Law Advisor (August 26,  2019)

- Author, "Filings Begin Under New York's Child Victim Act: Know The Rules," Legal Update, Seyfarth Shaw LLP (August 13,  2019)

- Co-Author, "New  Jersey Legislation Extends Statute Of Limitations To Bring Child Sex Abuse Claims," Management Alert, Seyfarth Shaw LLP (June 11, 2019)

- Co-Author, "Recent Developments In Securities Litigation: The "Event Driven" Lawsuit," Management Alert, Seyfarth Shaw LLP (June 10, 2019)

- Author, "Child Victims Act: New law could open door to lawsuits against districts," On Board - Legal Agenda, New York State School Boards Association (March 18, 2019)

- Author, "The Significant Ramifications of New York's Child Victim Act," Management Alert, Seyfarth Shaw LLP (March 11, 2019)

- Author,  "New York Child Victim Act is Now Law," Legal Update, Seyfarth Shaw LLP (January 29, 2019)

- Author, "The Child Victim Act: The Latest Developments as the Legislature Convenes," Legal Update, Seyfarth Shaw LLP (January 25, 2019)

- Author, "The NY Child Victim Act: An Election Night Update Which Will Impact Your Institution," Management Alert, Seyfarth Shaw LLP  (November 9,  2018)

- Author, "The NY Child Victim Act: Important New Developments May Impact Your Institution," Management Alert, Seyfarth Shaw LLP (August 23, 2018)

- "The NY Child Victim Act: What You Now Need to Know," Management Alert, Seyfarth Shaw LLP (March 6, 2018)

- "Opinion: MSU Faces Legal Risk as Culpability Questions Are Raised in the Nassar Scandal," The National Law Journal (February 22, 2018)

- "Manhattan District Attorney's Office Forms New 'Work-Related Sexual Violence Team'," Legal Update, Seyfarth Shaw LLP (January 31,  2018)

- Co-Author, "Much-Needed Certainty and Transparency Created by DOJ's New FCPA Corporate Enforcement Policy," Legal Update, Seyfarth Shaw  LLP (December 15, 2017)

- "The NY Child Victim Act: What You Need to Know," Management Alert, Seyfarth Shaw LLP (September 14, 2017)

- "A New and Important Development in Insider Trading Law," Legal Update, Seyfarth Shaw LLP (September 8, 2017)

- "The Future of Dodd-Frank: Where is it Going?," One Minute Memo, Seyfarth Shaw LLP (June 26, 2017)

- Co-Author, "Title IX Enforcement and Interpretation: The Winds of Change are Blowing," Management Alert, Seyfarth Shaw LLP (December 28,  2016)

- "Salman v. United States Broadens Some Contours of Insider Trading Law, but Leaves Others Uncertain," One Minute Memo, Seyfarth Shaw LLP  (December 13, 2016)

- "FCPA Compliance---Recent Department of Justice Initiatives," Legal Update, Seyfarth Shaw LLP (September 13,  2016)

- Co-Author, "Consumer Financial Protection Bureau's First Major Enforcement Action, and What the $210 Million Settlement Means," The Banking Law Journal, Volume 29, Number 8, 713 (September 2012)

- Co-Author, "The Consumer Financial Protection Bureau: The New Sheriff in Town," The Banking Law Journal, Volume 29, Number 8, 702 (September 2012)

- Co-Author, "Insider Trading: A New SEC Rule and an Important New Case," Securities Regulation Law Journal (Winter 2001)

- Co-Author, "Second Circuit Rejects Its Own Scienter Standard," Insights (September 2000)

- Co-Author, "California Courts Strike Another Blow to SEC Insider Trading Enforcement Efforts," Insights (October 2000)

- Co-Author, "Pleading Scienter in Securities Fraud Class Actions," New York Law Journal (October 14, 1999)

- Co-Author, "Avoiding Insider Trading Liability When Selling Company Stock," Review of Securities & Commodities Regulation, Standard & Poor's (January 27, 1999) abstracted in Bowne Digest For Corporate & Securities Lawyers, Bowne & Co. (July/August 1999)

- Co-Author, "Minimizing The Risk of Insider Trading Liability," Corporation, Aspen Law & Business (August 17, 1998)

- Co-Author, "Corporations Need To Police Trading By Insiders Now More Than Ever," The Metropolitan Corporate Counsel (November 1996)

- Co-Author, "Accounting Liability: Narrowing The Scope of Potential Plaintiffs," The Metropolitan Corporate Counsel (May 1995)

**EXHIBIT 2**

## <u>Materials Considered</u>[1]

**Filings**

Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (Dkt. 6443), Ex. A

Portions of the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (Dkt. 6443), including portions of Ex. B

Portions of the Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (Dkt. 6445)

**Cases**

*Henderson v. Shinseki*, 562 U.S. 428 (2011)

*Chrysafis v. Marks*, 141 S. Ct. 2482 (2021)

---

[1] I have also considered all materials cited in my report, to the extent not listed herein.

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| | (Jointly Administered) |
| Debtors. | |

## AFFIRMATIVE REPORT OF EILEEN C. TREACY, Ph.D.

### I.    Introduction

1.      The proposed Trust Distribution Procedures ("TDPs") in this matter are not adequate to ensure only reliable claims will be paid because they do not require interviews and objective testing of claimants.  From my perspective as a psychologist with 48 years of child sexual abuse clinical experience and as a court-appointed neutral who is frequently called upon to help courts and other governmental agencies investigate and evaluate the reliability of child sexual abuse allegations, interviews and objective testing are essential to assessing the reliability of the child sexual abuse allegations in this case.

2.      If the Court decides to adopt the proposed TDPs, the Court can require enhancements to the TDPs to help ensure that only reliable claims are paid.  To do so, the Court should make it conditional that there would be modifications to the TDPs that require the following:

> (i)      Claimant interviews by a neutral panel of psychologists with specialized training and expertise in child sexual abuse; and

> (ii)     Objective testing of each claimant to assess the impact of the alleged abuse on that claimant.

3.      Although claimant interviews and objective testing are essential clinically and for courts' reliability assessments, they appear to be especially important here.  For context, I reviewed 40 Proofs of Claim submitted in this case, as well as statistics taken from all Proofs of Claim.  My review of those materials suggest significant reliability concerns with at least some of the abuse claims in this case.  That reinforces my opinion that the TDPs as proposed are inadequate to ensure that only reliable claims are paid.

4.      In any assessment of sexual abuse, as well as other forensic and investigatory contexts, the role of a secondary gain motive is an important consideration (Briere, 1992; Hazelwood & Burgess, 2001; McGrath & Turvey, 2018; O'Donohue & Bowers, 2006). McGrath & Turvey (2018) defined secondary gain as "the achieving of, or attempting to achieve,

a goal not directly related to being treated for a particular symptom or illness. The gain can be just about anything, but it tends to be financial/material, emotional, revenge oriented, or to avoid responsibility" (p.37). Since 2003, all sexual abuse investigators in NYS (law enforcement, mental health, legal, and child protection) have been trained to consider a possible secondary gain motive when investigating the reliability of sexual abuse allegations (*i.e.*, what else could be going on here beside sexual abuse). *NYS Forensic Interviewing Best Practices* (2003, 2015).

5.      In this case, there is a high probability of false claims due to secondary gain motive for financial gain. This is because the Proofs of Claim in this case were submitted, at least in part, for the purpose of receiving payment. Where such a clear and pervasive secondary gain motive exists, it is even more important to have a meaningful process to assess reliability. In other words, in my experience as a child sexual evaluator, the secondary gain motives present in this case are ample reason to suspect the existence of false claims and compel the TDP enhancements (interviews and objective testing for all claimants) that I recommend.

## II.    Qualifications

6.      I have a Ph.D. in Psychology, with a specialization in Developmental Psychology from Fordham University.

7.      I have worked as a psychologist with children, families, and adults for 48 years.

8.      I have engaged in clinical research with resulting publications at Columbia University's College of Physicians and Surgeons. I was an Adjunct Assistant Professor at Lehman College, CUNY, in the Bronx for 33 years, while operating my consultation practice since 1984.

9.      My Consultation Practice involves training, conducting assessments, and expert testimony. I have conducted over 2,000 sexual abuse assessments for the Family, Criminal, and Civil courts. I have testified in those same courts as an expert in child sexual abuse/rape/developmental psychology over 650 times. In most of these matters, I served as a neutral for courts, child protective services, law enforcement or district attorneys and in those roles have been charged with evaluating the reliability of child sexual abuse or other sex crime allegations.

10.     I am one of the authors of the *NYS Children's Justice Task Force, NYS Forensic Interviewing Best Practices* (OCFS, 2015) and *NYS Forensic Interviewing Best Practices for Vulnerable Populations* (NYS Justice Center for the Protection of People with Special Needs, 2016). I was on the faculty of NYS Forensic Interviewing Best Practices from 2003-2016 and on the faculty of NYS Justice Center Forensic Interviewing from 2016-2019.

11.     Early in my career, I received extensive training from the U.S. Federal Bureau of Investigation concerning forensic investigations of child sexual abuse and other sex crimes, including with respect to evaluating the reliability of allegations of child sexual abuse. I have since extensively trained mental health, medical, legal, law enforcement, child protection, educational professionals throughout NYS since the 1980s.

12.     My C.V. is attached (Attachment 1).

**III.    Information Considered**

13.     I considered the following information specific to this case:

(i)      The TDPs;

(ii)     40 POCs solely for context; and

(iii)    Statistics regarding all POCs as reflected in the attachment (Attachment 2).

14.     My review of the 40 POCs for context suggested reliability concerns about incomplete information in the claimants' submissions; inconsistencies between the sexual abuse narratives and the boxes checked in the section in which specific sex acts are alleged; claims submitted by people other than the alleged victim; and an inability, based on the submissions, to rule out potential secondary gain motives for a false claim.

15.     The statistics across the entire population of POCs that I reviewed also indicated that clinically important information to assess reliability of the allegations was missing in many claimants' submissions:

(i)      Abuser Description – only about 33% of the POCs had data providing either a full name, partial name of physical description of the abuser;

(ii)     Location of the Abuse – 3,034 claims failed to provide a location of the abuse;

(iii)    Period of Abuse – There were 9,134 (around 11%) claims that are either missing any data about the period of abuse of state "unknown" or an ambiguous date range of the abuse; and

(iv)     Nature of the Abuse - there are 8,021 POCs (around 10%) that are either missing responsive abuse data or the data provided has been categorized on the BSA Processed Claim Data as being "Unknown/Unconfirmed".

16.     I identified 6 factors in the POC data in this case that I considered especially significant to assessing reliability.  For purposes of this report, I refer to these 6 factors as the ""Key Factors of Abuse".  In my clinical experience and in my work as an investigatory neutral, I often look to these Key Factors of Abuse, in addition to claimant interviews and objective testing, to gauge reliability. Those 6 Key Factors of Abuse are:

(i)      Previously Reported Abuse;

    (ii)    Abuse Narrative Provided;

    (iii)   POC Signed by Victim;

    (iv)   Presence of Threat;

    (v)    Abuse Progression; and

    (vi)   Presence of Grooming.

17.    Only 7% of all POCs in this case demonstrated all 6 Key Factors of Abuse in the POCs. 25% of the POC submissions showed 5 Key Factors of Abuse in the POCs. 50% of the POC claims demonstrated at least 4 Key Factors of Abuse. This information can be seen fully in Attachment 2 to this report.

18.    After my review of the 40 POCs and POC statistics for the entire population of BSA claims for context, it is my opinion that the proposed TDPs are inadequate to ensure that only reliable child sexual abuse claims are compensated. Specifically, the proposed TDPs do not require claimant interviews and objective testing that is used routinely in clinical practice, in court, and with other governmental agency investigations of the reliability of child sexual abuse allegations.

## IV.    Opinions

### A.    The TDPs should require interviews of every claimant

19.    Article VII.A of the TDPs requires claimants who do not elect the Expedited Distribution "consent to and agree to cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee ("**Trustee Interview**")." This provision does not appear to me to require claimant interviews.

20.    To deter fraud, all claimants should be interviewed. It is standard clinical practice to conduct interviews in the course of evaluating a sexual abuse allegation, particularly in a civil lawsuit when the allegations are being made many years after the alleged child sexual abuse and when a potential secondary gain motive may be present.

21.    In order to evaluate the validity and reliability of claimants' reports of sexual abuse, there must be interviews that specifically address sexual abuse dynamics (Sgroi, 1982; Sgroi, Blick, Samacki-Porter. 1982), as well as examining the claimants' respective family histories and the individuals' histories of other potential adverse childhood events (ACE: Filitti, Nordenberg, Williamson, Spitz, Edward, et. al., 1998).

22.    The interview process should include: a psycho-social history of each individual claimant; familial history of possible physical and/or sexual abuse, domestic violence, substance use, and mental illness; sexual abuse history; history of potential adverse childhood events; and

an examination of alternative explanations/rival hypotheses i.e., what else could be going here besides sexual abuse (NYS Forensic Interviewing Best Practices, 2015; Sattler, 1998).

23.     The sexual abuse dynamics that will be examined in the sexual abuse history include: engagement, sexual interaction, secrecy, disclosure, and suppression (Sgroi, 1982).  The dynamic of engagement has three prongs: 1) the offender has to gain access and opportunity to the child; 2) the offender has to establish him/herself in a trusted, authority position over the child; and 3) the offender has to begin the process of breaking down the child's inhibitors about sex in other words, normalizing sex (i.e., "grooming") (Craven, Brown, & Gilchrist, 2006; McAlinden, 2006; Wolf & Pruit, 2019).

24.     The sexual abuse dynamic of sexual interaction examines the initial sexual contact by the offender upon the child and the subsequent progression of sexual abuse behaviors over time (Collin-Vezina & Daigneault, 2013; Finkelhor & Brown, 1985; Sgroi, et. al., 1982). Secrecy is another sexual abuse dynamic that has to be evaluated during the interview process with each claimant.  Chronologically, secrecy overlaps the process of sexual interaction (Olfson, Marcillo, Wang & Blanco, 2013; Pipe & Goodman, 1991) .  Secrecy can be established by a direct or overt threat made by the abuser (e.g., "If you tell,--------- will happen") or if the child can implicitly perceive a negative outcome if he/she tells anyone about the sexual abuse (Alaggia, 2010).  Males sexual abuse victims may also have an implicit fear that people may have negative stereotypes about  being gay if the abuser was also male (Cermak & Molidar, 1996; Gil & Totty, 1999; Risin & Koss, 1987).  The victims' sense of shame and self-blame are significant elements in the maintenance of secrecy (Easton, Salzman, and Willis, 2014).

25.     The sexual abuse dynamic of disclosure is multi-dimensional and complex. Whether or not the sexual abuse is disclosed depends on a interplay of factors involving the child's characteristics, the family dynamics, the community and culture in which the child is embedded, as well as societal expectations (Alaggia, 2010).  The disclosure process is not the same for female and male victims (Alaggia, 2005) in that fewer males reveal their abuse during childhood, although a considerable percentage of female victims did not report their abuse until adulthood (Jonzon & Lindblad, 2004).  Generally, disclosures can be purposeful, accidental, or prompted/elicited, although there are other pathways for disclosures including behavioral and indirect verbal attempts, disclosures that are intentionally withheld, and disclosures triggered by memories (Alaggio, 2004).  The timing of the disclosure and type of disclosure are particularly important in assessing the reliability of the sexual abuse report (Manning, 1986).

26.     When the sexual abuse is disclosed, the sexual abuse dynamic of suppression is examined, in other words how is the victim and the victim's family reacting to the abuse disclosure.  If the victim's disclosure becomes known to the neighborhood or broader community, the response from that community can also impact the victim's ability to cope. Finkelhor & Browne (1989) proposed four traumagenic dynamics as the "core of the psychological injury inflected by abuse" (p.530).  The four dynamics were: traumatic sexualization, betrayal, stigmatization, and powerlessness.  Walsh, Fortier, and DiLillo (2010) conducted a review of thirty-nine studies about adult coping with sexual abuse.  They cited Finkelhor and Browne's traumagenic impact model as being very useful in conceptualizing

victims coping strategies, both adaptive and maladaptive.  Coping takes place over time, so one can expect to see changes in coping strategies over time

**B.    Objective testing of claimants**

27.    The TDPs do not require any objective testing of the child sexual abuse claimants.

28.    Objective testing is core to any psychological assessment of reliability and, in my experience, is almost always required by investigatory agencies and the courts faced with evaluating the reliability of this type of allegation.

29.    There are two objective and psychometrically validated tests that can accomplish this:  the Trauma Symptom Inventory-2 (TSI-2: PAR, 2011) and the Detailed Assessment of Posttraumatic Stress (DAPS: PAR, 2001).  These two tests have validity scales built-in to assess if the claimant is over-reporting or under-reporting symptoms (i.e., malingering).

**1.    Trauma Symptom Inventory – 2 (TSI-2)**

30.    The TSI-2 is a test that is widely used to assess reliability and to measure trauma symptoms and behaviors.

31.    According to the TSI-2 Test Manual, "This measure evaluates acute and chronic symptomatology, including, but not limited to, the effects of sexual and physical assault, intimate partner violence, combat, torture, motor vehicles accidents, mass casualty events, medical trauma, witnessing violence or other trauma, traumatic losses, and early experiences of child abuse or neglect.  It evaluates symptomology associated with trauma at any point in the respondent's lifespan; it does not link symptoms to a single stressor or specific point in time".

32.    The TSI-2 measures "a wide range of potentially complex symptomology, ranging from posttraumatic stress, dissociation, and somatization to insecure attachment styles, impaired self-capabilities, and dysfunctional behaviors".  The TSI-2 includes 2 validity scales, 4 factors, 12 clinical scales and 12 subscales.

| TSI -2 SCALES | DOMAIN EVALUATED |
|---|---|
| **The Validity Scales are:** | |
| Response Level (RL) | Bias toward under-reporting or denying symptoms |
| Atypical Response (ATR) | Bias toward over-reporting trauma-related symptoms |
| **The Factors are:** | |
| Self-Disturbance (SELF) | Difficulties associated with inadequate self-awareness and negative models of self and others |

Posttraumatic Stress (TRAUMA)     Posttraumatic stress and related anxiety and dissociation

Externalization (EXT)     Tendency to engage in dysfunctional or self-destructive behaviors when distressed

Somatization (SOMA)     See SOMA scale

**The Clinical scales/subscales are:**

Anxious Arousal (AA)     Anxiety and hyperarousal symptoms

Anxiety (AA-A)     Symptoms of anxiety

Hyperarousal (AA-H)     Symptoms associated with posttraumatic hyperarousal

Depression (D)     Cognitive, affective, or somatic symptoms of depression

Anger (ANG)     Angry thoughts, feelings, and behavior

Intrusive Experiences (IE)     Reliving/intrusion symptoms of posttraumatic stress

Defensive Avoidance (DA)     Avoidance of upsetting thoughts, feelings, or memories

Dissociation (DIS)     Depersonalization, derealization, detachment, amnesia, Identity splits

Somatic Preoccupation (SOM)     Somatic preoccupations and distress

Pain (SOM-P)     Aches and pains

General (SOM-G)     Generalized somatic complaints

Sexual Disturbance (SXD)     Sexual problems and behaviors

Sexual Concerns (SXD-SC)     Negative thoughts and feelings associated with sexuality

Dysfunctional Sexual Beh (SXD-DSB)     Problematic sexual behaviors

Suicidality (SUI)     Suicidal thoughts and behaviors

Ideation (SUI-I)     Negative thoughts and feelings associated with suicide

Behaviors (SUI-B)     Suicidal behaviors

Insecure Attachment (IA)     Difficulties or insecurities regarding close relationships with others

| | |
|---|---|
| Relational Avoidance (IA-RA) | Discomfort or avoidance regarding close relationships |
| Rejection Sensitivity (IA-RS) | Preoccupation with abandonment or rejection in relationships |
| Impaired Self-Reference (ISR) | Difficulties or insecurities regarding close relationship with others |
| Reduced Self-Awareness(ISR-RSA) | Lack of awareness of internal mental processes associated with a personal sense of self |
| Other Directedness (ISR-OD) | Overvaluing others; views and demands in the absence of sufficient self-reference |
| Tension Reduction Behavior (TRB) | Use of external activities (e.g., self-injury, bingeing) as ways to avoid or distract from upsetting internal states |

(Briere, 2011, Table 1.1 TSI-2 Scales, Subscales, and Factors, p.2)

### 2.    Detailed Assessment of Posttraumatic Stress (DAPS, PAR 2001):

33.    The DAPS is the second objective test used by psychologists and, in my experience, by investigatory agencies and courts to investigate and evaluate the reliability of child sexual abuse allegations.

34.    The DAPS is a 104-item test of trauma exposure and posttraumatic stress.  It is for use with individuals who may have experienced a significant traumatic event.

35.    The DAPS includes: 2 validity scales (i.e., Positive Bias (PB) and Negative Bias (NB); 4 trauma specification scales (i.e., Relative Trauma Exposure (RTE), Onset of Exposure (ONSET), Peritraumatic Distress (PDST), Peritraumatic Dissociation (PDIS); 5 Posttraumatic Stress Scales (i.e., Reexperiencing (RE), Avoidance (AV), Hyperarousal (AR), Posttraumatic Stress-Total (PTS-T), and Posttraumatic Impairment (IMP); and 3 Associated Features Scales (i.e., Trauma Specific Dissociation (T-DIS), Substance Abuse (SUB), and Suicidality (SUI).

36.    The DAPS validity scales are described as follows:

- **Positive Bias (PB)** – "evaluates the extent to which respondents deny low-level psychological symptoms or problems that most people would endorse to some degree. Individuals with high scores are likely to be especially defensive or avoidant, invested in presenting themselves as psychologically symptom-free, or otherwise unwilling to endorse commonly endorsed items" (DAPS Test Manual, p.2).

- **Negative Bias (NB)** – "Assesses willingness to endorse statistically unusual phenomena (e.g., going blind for several minutes at a time) or seemingly unlikely experiences (e.g.,

being able to read minds) that most individuals in the standardization sample rarely described.  High scores on this scale may reflect an attempt to present oneself as especially symptomatic, either as a "cry for help" or as a misrepresentation for secondary gain" (p.2).

- The **Trauma Specification Scales** are described as:

  o **Relative Trauma Exposure (RTE)** – "Represents the sum of the first 12 trauma exposure items of the DAPS trauma specification section.  High scores indicate that the respondent has experienced more types of potentially traumatic events in his or her life than most people in the standardization sample.  High scores may signal more complex trauma impacts and, by implication, risk of future victimization" (p. 2).

  o **Onset of Exposure (ONSET)** – "Single item that evaluates how recently the index trauma occurred, rated on a scale of 1 (in the last day) to 5 (a year ago or longer)".

  o **Peritraumatic Distress (PDIS)** – "Measures the extent of distress the respondent experienced in a variety of areas at the time of the trauma, including fear, horror, helplessness, guilt, and shame.  High scores indicate greater immediate traumatization and are often associated with greater overall posttraumatic stress" (p. 2).

  o **Peritraumatic Dissociation (PDIS)** – "Assesses the degree to which the respondent dissociated during the index traumatic event, primarily in terms of depersonalization or derealization.  High scores suggest a risk factor for more severe posttraumatic stress as well as a probable marker for general dissociative tendencies" (p. 2).

- The **Posttraumatic Stress Scales** are:

  o **Reexperiencing (RE)** – "Evaluates the re-experiencing symptom cluster of PTSD and ASD, including intrusive thoughts, flashbacks, memories, and dreams of the traumatic event, as well as psychological distress and autonomic to trauma-reminiscent events and stimuli.  Respondents with high scores are likely to be experiencing significant posttraumatic stress" (p.2).

  o **Avoidance (AV)** – "Assesses the avoidance responses found in PTSD and ASD, including attempts to avoid people, places, conversations, and situations that might trigger re-experiencing symptoms: attempts at thought suppression and feeling avoidance; and emotional numbness, foreshortened future, and loss of interest. Because the environment potentially contains many triggers for posttraumatic re-experiencing, some individuals with high scores seclude themselves and otherwise avoid certain social interactions" (p.2).

- o **Hyperarousal (AR)** – "Taps the autonomic hyperarousal cluster of PTSD and ASD symptoms, such as tension, sleeping difficulties, irritation, problems with attention and concentration, hyperalertness, hypervigilance, and heightened startle responses.  Individuals with elevated scores also may have some somatic complaints reflecting hyperarousal effects on the body" (p.2).

- **Posttraumatic Stress – Total (PTS-T) –** "Represents the sum of RE, AV, AR, and thus evaluates the overall severity of PTSD symptoms experienced by the respondent.  PTSD severity is categorized as **Mild**, **Moderate**, or **Severe** based on PTS-T score" (p.2).

- **Posttraumatic Impairment (IMP) –** "Assesses the psychosocial impairment associated with PTSD and ASD, including difficulties at work, school, social situations, or in relationships as a result of posttraumatic stress.  Individuals with elevated scores report the effects of trauma exposure as debilitation and as interfering with the capability to function of a daily basis" (p.2).

- The **Associated Features scales** are described as:

  - o **Traumatic Specific Dissociation (T-DIS)** – "Evaluates dissociative responses that are directly linked to the index event.  Taps those derealization, depersonalization and detachment symptoms that often follow exposure to overwhelming trauma.  Respondents with high scores are often distracted, emotionally "shut down" or "numb", and, in the time period immediately following the trauma, they may present as somewhat confused or out of touch with their immediate environment" (p.2).

  - o **Substance Abuse (SUB)** – "Measures respondents' self-reported recent use of drugs, including heroin, cocaine, stimulants, depressants, and marijuana, as well as signs of chronic alcohol abuse, including excessive drinking, blackouts, and social impairment.  Individuals with high scores may have serious alcohol and/or drug problems that may precede or follow their trauma exposure" (p.2).

  - o **Suicidality (SUI)** – "Measures suicidal motives, ideations, and behaviors, including wanting to end one's life; thinking, fantasizing, and making plans for suicide; threatening to kill oneself; engaging in dangerous acts in the hope of death; and reports of previous suicide attempts.  Elevated scores should always be followed up with a detailed suicide-risk interview" (p.3).

## V.    Recommendations

37.    The Court should require amendments to the TDPs to require interviews and objective testing for all claimants as a prerequisite to payment. This benefits claimants with legitimate claims and is necessary to ensure reliability of the true claims.

38.    Interviews and objective testing can help to address the issue of unreliable/fraudulent claims particularly when all claimants have a potential secondary gain

motive for false allegations.  In other words, one motive of the allegations in this case is to make financial gain.  The pervasive and significant presence of a potential secondary gain motive in this case underscores the need to enhance the TDPs to evaluate reliability of the claimants' allegations of child sexual abuse.

## VI.    Retention and Compensation

38.    Allianz Global Risks US Insurance Company, National Surety Corporation and Interstate Fire & Casualty Corporation (collectively, the "Allianz Insurers") engaged me, on behalf of themselves and other insurers objecting to Plan confirmation, to prepare this report.

39.    I am being compensated at a rate of $450/hour.

## VII.    Reservation of Rights

40.    I reserve my right to supplement this report because discovery in this matter is continuing.

41.    I also reserve my right to supplement this report to reflect depositions taken in this case.

/s/ Eileen C. Treacy

_____
Eileen C. Treacy, Ph.D.

Dated:  December 5, 2021

# REFERENCES

Alaggio, R. (2004).  Many ways of telling: Expanding conceptualizations of child sexual abuse disclosures.  *Child Abuse & Neglect, 28,* 1213-1227.

Alaggia, R. (2005).  Disclosing the trauma of child sexual abuse: A gender analysis.  *Journal of Loss and Trauma, 28,* 1213-1227.

Alaggia,R. (2010).  An ecological analysis of child sexual abuse disclosure: Considerations for the child and adolescent mental health. *Journal of the Canadian Academy of Child and Adolescent Psychiatry, 19(1),* 32-39.

Alaggia, R., Collin-Vezine, D., & Lateef, R. (2017).  Facilitators and barriers to child sexual abuse (CSA) disclosures: A research update (2000-2016).  *Trauma, Violence, & Abuse, 20(2),* 260-283.

Bradley, A. & Wood, J. (1996).  How do children tell?  The disclosure process in child sexual abuse.  *Child Abuse & Neglect, 20,* 881-891.

Briere, J.(1992).  Methodological issues in the study of sexual abuse effects.  *Journal of Consulting and Clinical Psychology, 60(2),* 196-203

Cermak, P. & Molidar, C. (1996).  Male victims of child sexual abuse.  *Child and Adolescent Social Work Journal, 13(5), 385-400.*

Collin-Vezina, D., Daigneault, I., Hebert, M. (2013).  Lessons learned from child sexual abuse research:  prevalence, outcomes, and preventive strategies. *Child and Adolescent Psychiatry and Mental Health, 7(22),* 1-9.

Craven, S., Brown, S., & Gilchrist, E. (2006).  Sexual grooming of children: Review of literature and theoretical considerations. *Journal of Sexual Aggression, 12(3)*, 287-299.

DeVoe E.R. & Faller, K.C. (1999).  The characteristics of disclosure among children who may have been sexually abused.  *Child Maltreatment (4),*217-227

Filitti, V.J., Nordenberg, D., Williamson, D.F., Spitz, A.M.  Edward, V, et.al. (1998).  Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults.  The Adverse Childhood Experiences (ACE) study. *American Journal of Preventive Medicine, 14,* 245-258.

Finkelhor, D. & Browne, A. (1985).  The traumatic impact of child sexual abuse: a conceptualization.  *American Journal of Orthopsychiatry,55(4)*, 530-541

Gill, M. & Totty, L.M. (1999).  Male survivors of childhood sexual abuse: A qualitative study and issues for clinical consideration.  *Journal of Child Sexual Abuse, 7(3)*), 19-33.

Goodman-Brown, T.B., Edelstein, R.S., Goodman, G.S., Jones, D.. & Gordon, D.S. (2003). Why children tell: A model of children's disclosure of sexual abuse. *Child Abuse & Neglect, 27,* 525-540.

Hazelwood, R. & Burgess, A. (2001).  False rape allegations.  *Practical Aspects in Rape Investigations,* CRC Press, 3rd Edition.

Jonzon, E.& Lindbald, F. (2004).  Disclosure, reactions, and social support: Findings from a sample of adult victims or child sexual abuse. *Child Maltreatment, 9,* 190- 200.

Lanning, K. (1986). Child molesters: A behavioral analysis.  National Center for Missing and Exploited Children in cooperation with the Federal Bureau of Investigation.

McAlinden, A.M.(2006).  Setting 'em up: Personal, familial, and institutional grooming in the sexual abuse of children.  *Social and Legal Studies, 15(3),* 339-362.

McElvaney, R., Greene, S., & Hogan, D, (2012).  Containing the secret of child sexual abuse. *Journal of Interpersonal Violence, 27,* 1155-1175.

McGrath, M. & Turvey, B. (2018).  False allegations and malingering: Fundamental Issues & Forensic Requirements,  *False Allegations: Investigative and Forensic Issues in Fraudulent Reports,* 37-63.

NYS Children's Justice Task Force, *NYS Forensic Interviewing Best Practices*  (NYS FIBP), OCFS, 2015.  Available at http://ocfs.state.nyenet/dps/pdf/NYSCJTFForensicInterviewBestPractice.pdf

NYS Justice Center for the Protection of People with Special Needs, *NYS Forensic Interviewing Best Practices – Vulnerable Populations,* 2016.

O'Donohue, W. & Bowers, A. (2006).  Pathways to false allegations of sexual harassment. *Journal of Investigative Psychology and Offender Profiling, 3(1),* 47-74.

Olfson, M., Marcillo, C., Wang, S., & Blanco, C. (2013).  Prevalence and correlates of child sexual abuse:  a national study.  *Comprehensive Psychiatry, 54,* 16-27.

Pipe, M. & Goodman, G, (1991). Behavioral implications for children's testimony. *Behavioral Sciences and the Law, 9(1),*33-41.

Sattler, J.M. (1998).  *Clinical and forensic interviewing of children and families: Guidelines for the mental*

*Health, education, pediatric, and child maltreatment fields.* Jerome M. Sattler, publisher..

Sgroi, S. (1982).  *Handbook of Clinical Intervention in Child Sexual Abuse.*  Lexington: NY.

Sgroi, S., Blick, L.R., & Samacki-Porter. F. (1982). A conceptual framework for child sexual abuse. *Handbook of clinical interventions in child sexual abuse, 9-37.*

Walsh, K., Fortier, M., & DiLillo, d. (2010).  Adult copying with Childhood Sexual Abuse: A theoretical and empirical review. *Aggressive Violent Behavior, 15(1),* 1-13.

Wolf, M.  & Pruit, D, (2019).  Grooming hurts too: The effects of types of perpetrator grooming and traumatic symptoms in adult survivors of child sexual abuse. *Journal of Child Sexual Abuse, 28(3),* 345-359.

# EXHIBIT F

**ROUX**
**ECA** Economic & Complex Analytics Practice

# Affirmative Expert Report of
# Marc C. Scarcella, M.A.

## Review and assessment of the proposed Plan of Reorganization and its impact on post-confirmation claim liability

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC.,

CASE NO. 20-10343 (LSS)

DEBTORS.

Signed by:

Marc C. Scarcella, M.A.

December 5, 2021

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER



# TABLE OF CONTENTS

**1. EXECUTIVE SUMMARY**                                                    **3**

  1.1 SUMMARY OF QUALIFICATIONS                                    3

  1.2 SCOPE OF CHARGE                                               5

  1.3 MATERIALS CONSIDERED                                          6

  1.4 SUMMARY OF OPINIONS                                           7

**2. PLAN AND TDP REVIEW**                                                 **10**

  2.1 SETTLEMENT TRUST ASSETS                                       10

  2.2 TDP CLAIMS MATRIX AND SCALING FACTORS                         11

  2.3 ESTIMATED RANGE OF ABUSE CLAIM LIABILITY                      14

  2.4 RISK OF INFLATED POST-CONFIRMATION CLAIM LIABILITY           15

**3. APPENDIX**                                                            **19**

  3.1 CURRICULUM VITAE                                             19

# TABLE OF FIGURES

**FIGURE 1: TDP CLAIMS MATRIX**                                            **11**

**FIGURE 2: SUMMARY OF AGGRAVATING SCALING FACTORS**                       **12**

**FIGURE 3: SOL SCALING FACTORS**                                          **13**

**FIGURE 4: SUMMARY OF ABUSE CLAIM LIABILITY ESTIMATES**                   **14**



# 1.  EXECUTIVE SUMMARY

## 1.1  SUMMARY OF QUALIFICATIONS

(1)     I am currently a Principal and Practice Lead for the Economic & Complex Analytics Practice (ECA) of Roux Associates, Inc. My professional experience consists of economic analysis and expert testimony in the context of litigation, public policy, and business strategy. My background includes numerous projects involving the application of quantitative methods in environmental and product liability litigation, including damages estimation related to class actions and mass torts claims.

### 1.1.1   EXPERIENCE SPECIFIC TO BANKRUPTCY REORGANIZATION

(2)     I have nearly twenty years of experience providing economic analysis and expert consultative services related to personal injury mass torts, including the forecasting of future incidence of latent disease and resulting liabilities. During my career, I have worked extensively in Chapter 11 bankruptcy proceedings involving the establishment of trusts pursuant to Section 524(g) of the United States Bankruptcy Code, 11 U.S.C. §524(g). I have worked on behalf of debtors, claimant representatives, creditor classes, insurers, and trustee boards in some of the largest asbestos-related bankruptcy cases and resulting settlement trusts of the past two decades.

(3)     Beginning in 2001, I worked as a Quantitative Data Analyst and Statistician for the Manville Personal Injury Trust at its claims processing facility, the Claims Resolution Management Corporation ("CRMC"). I then spent the balance of the decade working on behalf of Future Claim Representatives in asbestos bankruptcy reorganizations as a consultant at Analysis, Research, Planning Corporation ("ARPC").[1] During my time with ARPC, I also had the opportunity to consult to trustee boards of asbestos bankruptcy settlement trusts. Following my tenure with ARPC, I continued to consult in the areas of environmental and product liability as a member of Bates White Economic Consulting. While at Bates White, I worked on behalf of the

---

[1]     ARPC was subsequently acquired by Ankura Consulting Group, LLC.



debtors in both the Specialty Products Holdings Corporation ("SPHC")[2] and Garlock Sealing Technology, Inc., ("Garlock")[3] bankruptcy reorganizations.

(4)    Over the past decade, I have testified at state and federal legislative hearings on matters of asbestos bankruptcy trust claim data management, procedures, operations, and fund allocation, and have written numerous commentaries on the financial and procedural performance of the asbestos bankruptcy trust system.

(5)    Most recently, counsel for the debtor in the Camden Diocese bankruptcy filed a formal motion to retain me as an expert to estimate the value of survivor claims,[4] and earlier this year I prepared both affirmative and rebuttal expert reports in the Imerys Talc America bankruptcy on issues of claim valuation and plan confirmation.[5] In 2019, I provided an expert report and testimony on the estimation of present and future asbestos claim liability and resulting financial obligations to insurers in the Duro Dyne[6] bankruptcy, and in 2018 I offered an expert disclosure in the Oakfabco[7] bankruptcy on issues of voting claim valuations and procedures.

(6)    My approach to quantitative analysis is rigorous, objective, and grounded in generally accepted methodology. My curriculum vitae is attached as Appendix 3.1 and contains additional detail on my background and experience, including my prior expert testimony.

(7)    In preparing this report, I was assisted by staff that worked under my direction. Roux was compensated at the hourly rate of $540 for my time. Neither my compensation nor Roux's compensation for work related to this matter are contingent upon my opinions presented in the following report or upon the outcome of this matter.

---

[2]    *In Re Specialty Products Holding Corporation,* No. 10-11780-LSS (Bankr. DE)
[3]    *In Re Garlock Sealing Technologies,* No. 10-31607 (Bankr. WDNC)
[4]    *In Re The Diocese of Camden, New Jersey,* No. 20-21257 (Bankr. NJ)
[5]    *In Re Imerys Talc America, Inc.,* No. 19-10289 (Bankr. DE)
[6]    *In Re Duro Dyne National Corp,* No. 18-27963 (MBK), (Bankr. NJ)
[7]    *In Re Oakfabco, Inc.,* No. 15 B 27062 (Bankr. EDIL)



## 1.2 SCOPE OF CHARGE

(8)    As part of their proposed Plan of Reorganization (the "Plan"), the debtors Boy Scouts of America and Delaware BSA, LLC (collectively "Debtors" or "BSA") will establish a post-confirmation Settlement Trust[8] that is intended to qualify, value, and pay Abuse Claims[9] on behalf the BSA and certain other parties.[10] The Settlement Trust will be administered by a Settlement Trustee who would have authority over the execution of the Trust Distribution Procedures ("TDP") and its claim valuation guidelines,[11] in consultation with, and at times with the consent of, the Future Claim Representative ("FCR") and a Settlement Trust Advisory Committee ("STAC") consisting of seven plaintiff attorneys representing the interest of current Abuse Claims.

(9)    According to the Plan, the Settlement Trust will be funded from contributions from the BSA, Local Councils, Contributing Chartered Organizations, and proceeds from settling insurance policies (collectively "Settlement Trust Assets"). In addition to Settlement Trust Assets, the Plan proposes to assign and transfer the rights to remaining BSA and Local Council insurance policies ("Remaining Insurance Policies" or "Remaining Insurers") to serve as additional funding sources to pay compensable Abuse Claims as determined by the Settlement Trust.

(10)    Certain Remaining Insurers have raised several objections to Plan confirmation, including elements of the TDP claim valuation parameters that are overly vague and susceptible to broad interpretation that could significantly inflate the quantum of post-confirmation Abuse Claim liability at the unilateral discretion of the Settlement Trustee.[12] I have been retained by counsel

---

8    As defined in the 5th Amended Plan of Reorganization, Disclosure Statement, or TDP in the instant matter.
9    Ibid.
10    As defined by the Plan, the Settlement Trust will indemnify claims on behalf of the Local Councils and Contributing Chartered Organizations.
11    TDP, Article VII.B: *"The Settlement Trustee shall evaluate each Trust Claim Submission individually and will follow the uniform procedures and guidelines set forth below to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed."*
       Article VII.E: *"The Settlement Trustee may assign a mitigating Scaling Factor in the range of 0 to 1.0 except as specifically provided below to each Allowed Abuse Claim to eliminate or decrease the Proposed Allowed Claim Amount for such Claim."*
12    As defined in the 5th Amended Plan of Reorganization, Disclosure Statement, or TDP in the instant matter.



on behalf of certain Remaining Insurers[13] to review the Plan and TDP, including related BSA disclosures, and opine on:

- The potential shortcomings of the proposed TDP claim qualification and valuation parameters, and

- The extent to which the resulting post-confirmation claim valuations may significantly exceed the current liability estimates of the BSA and its experts, to the detriment of the Remaining Insurers and other Non-Protected Parties.

(11)   I have not been asked to offer any opinions regarding the availability of insurance coverage for the Debtors' present and future financial obligations. All opinions and findings herein are stated within a reasonable degree of professional certainty. I reserve the right to further supplement my findings if additional information, including discovery, become available or as confirmation and expert discovery continues in this matter.

## 1.3  MATERIALS CONSIDERED

(12)   In preparing this report, I reviewed various documents disclosed by the Debtors in the instant matter, including but not limited to:

- The Plan,

- The Disclosure Statement,

- The TDP, and

- The processed and deduplicated proof of claim ("POC") data as prepared and disclosed by the Debtors and their experts ("Processed BSA Claim Data")[14] containing 82,209 unique claimant records.

(13)   To the extent I relied upon additional documents, materials, or information for purposes of the forgoing analyses, such sources will be referenced and footnoted throughout this report.

---

[13]   Allianz Global Risks US Insurance Company, National Surety Corporation and Interstate Fire & Casualty Corporation (collectively, the "Allianz Insurers") retained me to prepare this report, on behalf of themselves and a group of other insurers objecting to plan confirmation.

[14]   According to BSA disclosures, the Tranche 6 Deduplicated claim data represented the most current iteration of these processed POC data and represent claims received by Omni as of July 2, 2021.



## 1.4  SUMMARY OF OPINIONS

(14)   The BSA Plan and TDP are designed to receive, process, review, and pay qualifying Abuse Claims under an administrative settlement structure that is expedited relative to the process of litigating similarly situated claims in the tort system. In contrast, the added transaction costs and burdens that the tort system imposes on prosecuting and proving a claim can often act as a deterrent to less meritorious claims and allow for a greater level of legal resources and scrutiny to be allocated to a smaller subset of more credible claims. As a result, it is common for administrative settlement trusts to receive a higher rate of less meritorious claim submissions as compared to the tort system. Moreover, without the rigorous process of examination and evidentiary scrutiny that claims are often subject to in the tort system, it can be a challenge for administrative trusts to differentiate and weed out the weaker, non-compensable claims under a process that relies on critical claim information that is self-reported, subjective, and difficult to refute or verify.

(15)   As such, for an administrative settlement trust to be effective, it is critical that the appropriate balance is achieved between expected claiming levels, claim qualification rates and individual claim values. Put simply, if an administrative settlement trust will:

- Inherently incentivize a greater level of claims by reducing the cost and burden to file, and

- Inherently qualify a higher rate of claims due an expedited process in which self-reported claim allegations are accepted at face value with little to no ability to properly examine, refute, or verify such representations, then

- The individual values that each claim receives from the administrative settlement trust should be lower than what would otherwise be paid to an inherently smaller set of more credible claims that would be contested, examined, and substantiated through the evidentiary rigors and processes of the tort system.

(16)   Alternatively, an administrative settlement trust can appropriately value individual claims at amounts commensurate to the tort system *if* a more robust examination and qualification process is established through an enhanced set of requirements and standards that more closely mimic the evaluation thresholds and rigorous evidentiary scrutiny of the tort system.



(17)    Moreover, an effective administrative settlement trust should reduce the uncertainty surrounding the quantum of post-confirmation claim liability by establishing either:

- A Valuation process with corresponding policies and valuation models[15] that are transparent as to the specific parameters and factors that will influence the clearly defined premiums and discounts each claim could receive, or

- A Valuation range per claim tier or category that more narrowly defines the upper and lower bounds of a qualifying claim value.

(18)    With respect to the BSA Settlement Trust, it is clear from the disclosures, estimates, and representations of the various parties that:

- The TDP creates a significant level of uncertainty surrounding the quantum of post-confirmation claim liability as various parties and their consultants have offered estimates ranging from **$2.4 billion to $73.2 billion** for what is a largely certain population of current and future Abuse Claims.[16]

- The TDP creates such claim valuation uncertainty by vaguely defining abstract guidelines related to the impact of certain Scaling Factors[17] on claim values that can range from $3,500 to $2,700,000.

- By not providing a more developed set of claim review policies and valuation models prior to confirmation, the Plan and TDP currently offer an insufficient level of guidance as to how the Scaling Factors will be implemented following confirmation.

- Moreover, the current lack of a transparent calculus to quantify the impact of such Scaling Factors renders the entire claim valuation process susceptible to broad discretionary interpretation and implementation of policies and valuation models that will not be developed until after Plan confirmation.

- Following Plan confirmation, the Settlement Trustee maintains unilateral authority to oversee and execute the TDP. However, the Settlement Trustee is required to consult with the STAC and FCR on certain matters of claim processing, including the selection

---

[15]    Valuation models are often used by mass settlement trusts to formulaically value individual claims given a certain set of factors. These formulaic models provide a valuation approach that minimizes the risk of arbitrary and inconsistent determinations across a mass number of individual claims. By minimizing inconsistent outcomes, these valuation models help ensure that individual claims are treated fairly and equitably.

[16]    The bankruptcy POC submission process has currently produced 82,209 unique claimants. While the parties disagree as to the expected level of future claim submissions, even the FCR suggests that the future Abuse Claims will only constitute up to 20% of ultimate post-confirmation claim liability. Therefore, even if the FCR estimates are correct, it would suggest that 80% of the claim submissions already exist and have provided substantial abuse allegation through the bankruptcy POC process.

[17]    The TDP includes both Aggravating Scaling Factors (*i.e.*, premiums) and Mitigating Scaling Factors (*i.e.*, discounts).



and replacement of the claims processor.[18] Such consultative rights of the FCR and STAC could influence policies and valuation models that the claim processors are asked to implement within the established confines of the TDP, which in turn, creates a dynamic of moral hazard because the FCR and STAC represent the very claims that stand to benefit from higher valuations.

- ▪ Ultimately, the moral hazard risk created by the TDP would be borne by the Remaining Insurers and other Non-Protected Parties that may be asked to compensate an inflated quantum of post-confirmation claim liability without authority, or even influence over the process from which the claims were valued.

(19)    As noted in my Scope of charge, none of the opinions presented herein represent an affirmative estimate of reasonable claim liability or endorsement of any amount of claim liability. Rather, the purpose of the report is to outline the procedural flaws in the TDP that could create an artificially inflated level of post-confirmation claim liability to the detriment of the Remaining Insurers and other Non-Protected Parties. A more detailed description of each of the points herein can be found in subsequent sections of the report.

---

[18]    TDP Section 5.13.



# 2. PLAN AND TDP REVIEW

## 2.1 SETTLEMENT TRUST ASSETS

(20)     The Plan and corresponding TDP intend to establish a post-confirmation Settlement Trust that will assume the liability for all current and future Abuse Claims. In turn, the Settlement Trust will be funded with nearly $1.9 billion in asset contributions including:

- At least $300 million in cash contributions from Local Councils ("Local Council Cash Contribution"),

- Unrestricted property contributions from Local Councils with an appraised value of $200M ("Local Council Property Contribution"),

- A Delaware statutory trust ("DST") contribution from the Local Councils in the form of a $100 million promissory note ("Local Council DST Note"),

- BSA cash and investment contributions totaling an approximate value of $90 million ("BSA cash contribution"),

- BSA promissory note in the principal amount of $80 million ("BSA Settlement Trust Note"),

- Other tangible assets from the BSA (*i.e.*, artwork, real estate, and other financial interests) totaling approximately $80 million ("BSA Asset Contribution"),

- $250 million in monetary contributions from The Church of Jesus Christ ("TCJC") as a Chartered Organization ("Chartered Organization Settlement Contribution"), and

- $785 million in settlement contributions from the Hartford ("Hartford Insurance Settlement").[19]

(21)     The Debtors are also seeking approval to assign and transfer the rights to Remaining Insurance Policies as additional potential funding sources for the Settlement Trust.

---

[19]     Includes a $787 million cash contribution less a $2 million Hartford Administrative Expense Claim.



## 2.2   TDP CLAIMS MATRIX AND SCALING FACTORS

(22)   The TDP Claims Matrix and Scaling Factors outline the parameters for valuing individual claims. The Claims Matrix sets Base Matrix Values and Maximum Matrix Values for each Abuse Type and corresponding valuation tiers ("Abuse Tier"). The Base Matrix Value per Abuse Tier will be adjusted up or down depending on certain characteristics of each individual claim (*i.e.*, Scaling Factors) not to exceed the applicable Maximum Matrix Value. Figure 1 summarizes the TDP Claim Matrix per Abuse Tier.

### FIGURE 1: TDP CLAIMS MATRIX

| Abuse Tier | Nature of Abuse / Abuse Type Description | Base Matrix Value | Maximum Matrix Value |
|---|---|---|---|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $600,000 | $2,700,000 |
| 2 | Oral Contact by Adult Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. Anal or Vaginal Penetration by a Youth Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $450,000 | $2,025,000 |
| 3 | Masturbation by Adult Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant. Oral Contact by a Youth Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | $300,000 | $1,350,000 |
| 4 | Masturbation by Youth Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant. Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator. | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator. Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation. Exploitation for child pornography. | $75,000 | $337,500 |
| 6 | Sexual Abuse-No Touching. Adult Abuse Claims. | $3,500 | $8,500 |



## 2.2.1    AGGRAVATING SCALING FACTORS

(23)    For Abuse Tiers 1-5, qualified Abuse Claims can be valued at amounts up to 4.5-times greater than the Base Matrix Value as calculated by specific Aggravating Scaling Factors that are outlined in the TDP and summarized in Figure 2.[20]

**FIGURE 2: SUMMARY OF AGGRAVATING SCALING FACTORS**

| Scaling Factor | Description / Example of Factor Consideration | Factor Value |
|---|---|---|
| Nature of Abuse | ▪ Extended duration and/or frequency of the Abuse;<br>▪ Exploitation of the Abuse Claimant for child pornography;<br>▪ Coercion or threat or use of force or violence, stalking; and<br>▪ Multiple perpetrators involved in sexual misconduct. | Up to 1.50 |
| Abuser Profile | ▪ **1.25** if the abuser was accused by at least one (1) other alleged victim of Abuse;<br>▪ **1.50** if the abuser was accused by five (5) or more other alleged victims of Abuse;<br>▪ **2.00** if the abuser was accused by ten (10) or more other alleged victims of Abuse; and<br>▪ **1.25** to **2.0** if there is evidence of negligence of a Protected Party (e.g., the inclusion of the perpetrator in the IV files (Volunteer Screening Database) for abuse reasons). | Up to 2.00 |
| Impact of the Abuse | ▪ **Mental Health Issues:** This includes anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or<br>▪ self-image, bitterness, suicidal ideation, suicide attempts, and hospitalization or receipt of treatment for any of the foregoing.<br>▪ **Physical Health Issues:** This includes physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of Abuse, reproductive damage, self-cutting, other self-injurious behavior, and hospitalization or receipt of treatment for any of the foregoing.<br>▪ **Interpersonal Relationships:** This includes problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy,<br>▪ lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.<br>▪ **Vocational Capacity:** This includes under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feelings of unworthiness, or guilt related to financial success.<br>▪ **Academic Capacity:** This includes school behavior problems.<br>▪ **Legal Difficulties:** This includes criminal difficulties, bankruptcy, and fraud. | Up to 1.50 |

## 2.2.2    MITIGATING SCALING FACTORS

(24)    In addition to Aggravating Scaling Factors that increase the individual claim values above the applicable Base Matrix Value, the Settlement Trustee has the discretion to apply discounts based on certain Mitigating Scaling Factors. However, when compared to the Aggravating Scaling Factors, certain Mitigating Scaling Factors are more broadly defined, and thus, allow for a greater level of discretion as to the circumstances that warrant a discount and the amount of such

---

[20]    Abuse Tier 6 allows for a Maximum Matrix Value that is approximately 2.5-times greater than the Base Matrix Value.



discount. For example, the Settlement Trustee *may* determine that the circumstances of a non-scouting relationship between the Abuse Claimant and the perpetrator (*e.g.*, a familial relationship, school affiliation, religious affiliation, athletic/youth sports affiliation, etc.) should mitigate the share of responsibility and subsequent damages owed by the BSA and other Protected Parties[21] for a particular claim. Likewise, the Settlement Trustee has the discretion to apply mitigating discounts for circumstances involving causes of action against other responsible Non-Protected Parties,[22] or prior recoveries that the claimant has received or will receive from Non-Protected Parties for the same instances of abuse. However, in neither example does the TDP provide any specific guidance as to the value of any applicable Mitigating Scaling Factor.

(25)    The one Mitigating Scaling Factor for which the TDP provides a narrower level of calculus relates to the Statute of Limitations or Repose ("SOL"). For this, the TDP categorizes each state by the Debtors' perception of its current, applicable law, including reviver statutes. Schedule 1 to the TDP provides a state-by-state classification into one of five SOL tiers. Figure 3 summarizes the SOL tiers and applicable Scaling Factors.

**FIGURE 3: SOL SCALING FACTORS**

| SOL Tier | Open | Gray 1 | Gray 2 | Gray 3 | Closed |
|---|---|---|---|---|---|
| Scaling Factor | 1.00 | 0.50-0.70 | 0.30-0.45 | 0.10-0.25 | 0.01-0.10 |

(26)    However, even though the SOL Scaling Factors provide a level of incremental structure and guidance to the Settlement Trustee, four of the five categories still allow for discretion within a range of discounted factors (*e.g.*, what makes one Gray 1 state receive a 50% discount while another Gray 1 state only receives a 30% discount?). Moreover, the TDP ultimately provides the Settlement Trustee discretion to reduce or eliminate any SOL Mitigating Scaling Factor for a particular Abuse Claim if the Settlement Trustee believes the circumstances of the abuse would result in the tolling of the SOL under applicable state law. Given the meaningful impact the SOL Scaling Factor can have on the ultimate value of many Abuse Claims, the Settlement Trustee and claim processor will likely have to implement an approach to evaluating the nuances of SOL exceptions to ensure consistent determinations that are fair and equitable across a broad range of

---

21    As defined in the 5th Amended Plan of Reorganization, Disclosure Statement, or TDP in the instant matter.
22    As defined in the 5th Amended Plan of Reorganization, Disclosure Statement, or TDP in the instant matter.



potential circumstances. As it stands now, such an approach would likely be developed and implemented post-confirmation in consultation with the retained claims processor and with input from the FCR and STAC.

## 2.3  ESTIMATED RANGE OF ABUSE CLAIM LIABILITY

(27)   The Plan and Disclosure Statement reference independent estimates of post-confirmation claim liability offered by the Debtors, FCR, and the Official Committee of Tort Claimants ("TCC"). The estimates range from $2.4 billion to $73.2 billion, representing a spread of more than $70 billion even though the parties agree that most of the ultimate claiming population has already filed a POC.[23] The fact that such a spread can exist between estimates of a population of Abuse Claims for which a majority have already submitted bankruptcy POCs, highlights the interpretive variability as to the post-confirmation application and quantification of the TDP allowance and Scaling Factors. Figure 4 summarizes the various estimates disclosed to date.

FIGURE 4: SUMMARY OF ABUSE CLAIM LIABILITY ESTIMATES

| Estimates | Debtors | FCR[24] | TCC | Range |
|---|---|---|---|---|
| Low estimate | $2.4B | $23.8B | $13.5B | $2.4B |
| High estimate | $7.1B | | $73.2B | $73.2B |

(28)   As Figure 4 illustrates, there is little consensus amongst the parties as to the quantum of post-confirmation claim liability, suggesting that there are stark differences in the expectations as to how the Settlement Trustee should interpret the TDP qualification requirements and the implementation of the Claim Matrix Scaling Factors. Clearly, the FCR and TCC believe that the TDP should be interpreted and implemented in a manner that is more liberal than the Debtors. However, once the Plan is confirmed, the Debtors will no longer have any involvement, and thus no ability or incentive, to advocate for what they believe is a reasonable range of claim liability. This leaves only the FCR and TCC as influence on the Settlement Trustee and the

---

[23]   Supra FN 16.
[24]   The consultants to the FCR have estimated $5 billion for Future Abuse Claim, or approximately 21% total Abuse Claim liability, which implies $23.8 billion in total Abuse Claim liability.



resulting policies and valuation models that will ultimately determine the quantum of post-confirmation claim liability.

## 2.4   RISK OF INFLATED POST-CONFIRMATION CLAIM LIABILITY

### 2.4.1   INHERENT MORAL HAZARD

(29)    In economics, a moral hazard occurs when a party does not assume the full downside risk or cost of its actions, and therefore is willing to make decisions without concern for downside risk or cost. In the context of the BSA Plan and resulting Settlement Trust, the moral hazard centers on the post-confirmation administration and implementation of the TDP under the direction of the Settlement Trustee and influence of the STAC and FCR.

(30)    Following Plan confirmation, the Settlement Trustee will assume the authority to administer the TDP through the retention of a claims processor and in consultation from the STAC and FCR. In conjunction with the retention of a claims processor, the Settlement Trust will likely develop a series of policies and valuation models within the existing framework of the TDP to achieve consistent outcomes and ensure equitable and fair treatment across tens of thousands of Abuse Claims. Given their respective consultative rights, the STAC and FCR can influence these policies and valuation models which, in turn, can impact the subsequent claim valuations of the Settlement Trust to the direct benefit of the claims whose interests the STAC and FCR represent. Further, the Settlement Trust does not bear any downside risk of overvaluing claims. In fact, since claim valuations will likely be tendered to Remaining Insurers for payment, the Settlement Trust has an economic incentive to overvalue claims to maximize insurance recoveries.

### 2.4.2   INHERENT INCREASE IN CLAIMING AND VALUATION

(31)    As noted in my Summary of opinions, the BSA Settlement Trust is intended to qualify and value claims in a manner that is expedited and less burdensome and costly as compared to claim resolutions in the tort system. By eliminating many of the economic costs and burdens of the tort system, the Settlement Trust will inherently incentivize an increased level of claiming relative



to the tort system but for the bankruptcy. Such an increased level of claiming created by the Settlement Trust will expose the Remaining Insurers to paying significantly more than they would have paid in the tort system.

(32)    Moreover, without the rigorous process of examination that claims are subject to in the tort system, it may be difficult for the Settlement Trust to differentiate and weed out the weaker claims that would otherwise not be compensable in the tort system, or at best compensable at lesser relative amounts. This is another factor that, combined with the increased level of claiming discussed above, exposes the Remaining Insurers to the risk of paying significantly more than they would have otherwise paid in the tort system.

### 2.4.3   SETTLEMENT TRUST VS. TORT VALUATIONS

(33)    TDP impact on the likely inflation of post-confirmation claim liability appears to have been quantified, in part, by the opposing claim valuation estimates previously discussed in Section 2.3. As summarized in Figure 4, the consultants for the Debtors, Bates White Economic Consultants ("Bates White"), produced estimates of Abuse Claim liability ranging from $2.4 billion to $7.1 billion ("BW Estimates"). According to the Disclosure Statement, the BW Estimates are based on four valuation factors consistent with BSA's historical claim resolution experience, and publicly available information related to potentially comparable settlements:[25]

- ▪ The severity of the alleged abuse (*i.e.*, Abuse Tiers).
- ▪ The alleged connection to Scouting, including (i) the victims affiliation to Scouting, (ii) alternative non-Scouting relationships between the victim and the abuser, (iii) whether the abuser was an adult or minor, and (iv) whether the abuser is alleged to have abused other involved in scouting.
- ▪ Whether the claim would be presumptively time-barred based on applicable law in the jurisdiction(s) of the alleged abuse(s).
- ▪ The level of credible support for the alleged abuse based on an examination of POC submissions related to (i) the amount of information provided relating to the nature of the abuse, (ii) whether anyone else knew about the abuse, (iii) whether the claim could

---

[25]    Disclosure Statement, pg. 90.



name at least one abuser, and (iv) whether the claim indicates that the abuse was reported to Scouting, law enforcement, or any other party.

(34) In many ways, the tort valuation factors as determined by Bates White are also consistent with certain conceptual elements of the TDP General Criteria and Scaling Factors. However, the application of such factors under the Bates White approach may differ from the TDP in ways that could result in the BW Estimates being lower than other TDP-based estimates. For example, according to the Disclosure Statement, the BW Estimates did not value POC submissions that failed to *identify, by name, either in full or in part, an alleged abuser*. While this valuation approach is conceptually consistent with the TDP General Criteria for Alleged Abuser Identification,[26] the TDP appears to be less restrictive by allowing claimants to also meet the standard by providing "…*specific information (e.g., a physical description of an alleged abuser combined with the name or location of the Abuse Claimant's troop about the alleged abuser such that the Settlement Trustee can make a reasonable determination that the alleged abuser was an employee, agent or volunteer of a Protected Party, the alleged abuser was a registered Scout, or the alleged abuser participated in Scouting or a Scouting activity and the Abuse was directly related to Scouting activities.*" According to the BSA Processed Claim Data, of the 82,209 unique POC submissions, only 56% provided a full or partial name of the abuser, while an additional 10% provided both a physical description of the abuser and troop detail.

(35) Likewise, according to the Disclosure Statement, the BW Estimates do not value claims that Bates White found to be presumptively time barred by applicable state SOLs, which would be a more restrictive application of SOLs than what is outlined in Schedule 1 of the TDP and summarized in Figure 3 above. As Figure 3 shows, the TDP does not apply a binary factor of 1 or 0 based on the presumptive SOL determination. Rather, the TDP will classify several states as "Gray" states as it relates to SOL, which allows claims in states where the applicable law is not clear on SOL to receive an incremental discounted value, rather than zero value.[27]

(36) Therefore, while the Bates White approach purports to be based on tort experience, it does not appear to be completely consistent with the TDP. In fact, the FCR testified during deposition in

---

[26]  As defined in the 5th Amended Plan of Reorganization, Disclosure Statement, or TDP in the instant matter.

[27]  *See* BSA-PLAN_01262462. MS Excel spreadsheet detailing claimant level valuations yielding total valuations ranging from $2.4 billion to $7.1 billion.



that he did not believe that *"Bates White based its valuation on the TDP at all."*[28] Moreover, the FCR further testified that the TDP was drafted by counsel to the Coalition of Abused Scouts for Justice ("Coalition") and was *"derived from the TDP and trust agreements that we've developed in mass torts over the last 30 or 40 years…".*[29]

(37)     Based on the statements of the FCR, and the subtle differences between the TDP and the valuation approach used by Bates White, it would appear that the BW Estimates attempt to more closely mirror a tort valuation rather than a TDP-based valuation. To that extent, the TDP-based estimates provided by consultants for the FCR and TCC would represent a significant inflation of post-confirmation claim liability above what could have been valued in the tort system but for the bankruptcy.

### 2.4.4    EXPERIENCE OF OTHER MASS TORT SETTLEMENT FUNDS

(38)     Based on my extensive experience analyzing the performance of asbestos bankruptcy trusts, I have found that it is common for administrative settlement trusts to experience a significant increase in claims and qualification rates that generate levels of gross claim liability that far exceed any reasonable quantum of pre-bankruptcy tort exposure.[30] As previously noted, the FCR has testified that the TDP in the instant mater was "derived from the TDP and trust agreements that we've developed in mass torts over the last 30 or 40 years…".[31] To the extent the FCR's testimony is accurate, the structural framework used in the TDP in this case may yield a similar inflation of post-confirmation claim valuations as compared to what BSA would have experienced in the tort system absent a bankruptcy filing.

---

[28]   Deposition Testimony of James Patton, *In Re: Boy Scouts and Delaware BSA, LLC,* November 30, 2021, pg. 58.
[29]   Ibid, pg. 73-74.
[30]   Scarcella, Marc C. and Peter R. Kelso. "A Reorganized Mess: The Current State of the Asbestos Bankruptcy Trust System." Mealey's Asbestos Bankruptcy Report 14, no. 7 (2015).
[31]   Supra FN 29.



# 3. APPENDIX

## 3.1 CURRICULUM VITAE

**SUMMARY OF EXPERIENCE**

Mr. Scarcella has nearly twenty years of experience as an economic consultant for litigation, specializing in quantitative methods and their applications in dispute resolution and strategic litigation management. He has extensive experience estimating economic damages and future financial risk associated with environmental, product, and commercial litigation in the context of mass torts, class actions, insurance coverage disputes, bankruptcy reorganizations, corporate litigation reserves and SEC reporting, and due diligence for structured financial transactions.

Mr. Scarcella has acted as a consulting or testifying expert on a number of complex insurance coverage disputes, class action settlements, and bankruptcy reorganizations where he has developed economic models for estimating current and future damages and potential insurance recoveries resulting from environmental and product liability claims, including projections of latent personal injuries, property damage, business interruption, and general loss valuation. Mr. Scarcella has applied his expertise in forecasting future loss and litigation risk to the areas of asbestos, silica, pharmaceutical and medical devices, water contamination, sports-related head trauma, tobacco litigation, and various deleterious substances and environmental toxins. Mr. Scarcella has also provided expert analysis in large-scale class action cases to assess the value and litigation risk associated with environmental and product liability across geographic regions.

Prior to joining Roux Associates, Inc. to lead the Economic & Complex Litigation practice, Mr. Scarcella was a Principal at Bates White. Prior to joining Bates White, Mr. Scarcella was Managing Director at Analysis Research Planning Corporation (ARPC), where he provided economic analyses and consultative services in 524(g) Chapter 11 bankruptcy reorganization in the areas of asbestos liability estimation and insurance allocation. This experience has made Mr. Scarcella a recognized expert on claim processing management and valuation for 524(g) asbestos personal injury and property damages bankruptcy trusts. He has testified on matters of trust transparency and potential plaintiff recoveries at both the state and federal level. Mr. Scarcella has also consulted on issues of process and policy management for other Qualified Settlement Funds (QSF) established from non-asbestos product liability litigation, including forecasting future financial obligations of class action QSFs resulting from the Fen-phen diet drug and Dow Corning breast implant litigations.



## SELECTED EXPERIENCE: LIABILITY ESTIMATION AND INSURANCE ALLOCATION ANALYSIS

- Expert on behalf of insurers in a bankruptcy reorganization involving the resolution of current and future talcum powder personal injury claims.

- Testifying expert on behalf of insurers in a coverage dispute involving the allocation of property damage and bodily injury claims resulting from environmental contamination from PCBs and other volatile organic compounds.

- Testifying expert on behalf of insurers in a 524(g)-bankruptcy reorganization to estimate future losses related to forecasted, latent asbestos personal injury claims and the allocation of such losses to applicable insurance coverage.

- Strategic consulting lead to assess the potential risk associated with alleged airborne contaminants.

- Litigation expert on behalf of an insurer in an arbitration matter involving the allocation of asbestos-related losses.

- Strategic consulting lead to assess the potential risk associated with sport-related head trauma

- Strategic consulting lead and litigation expert on behalf of an insurer to estimate potential economic damages in a public water contamination case.

- Litigation expert on behalf of insurer opining to the reasonableness of an underlying workplace-related wrongful death settlement.

- Litigation expert on behalf of insurer in a benzene-related coverage dispute requiring the allocation of historical and future projections of claim expenditures and indemnity.

- Litigation expert on behalf of an insured friction defendant in an asbestos-related insurance coverage dispute.

- Strategic consulting lead on behalf of a joint-defense group of insurers to analyze historical costs and exposure claims related to exposures to various deleterious substances.

- Litigation expert on behalf of insurer in an asbestos-related coverage dispute requiring allocation of both historical and future projections of product and premises claim expenditures and indemnity.

- Consulting lead for estimating future asbestos-related expenses and potential insurance receivables for a friction defendant's SEC financial disclosures.

- Technical consulting lead for modeling historical and future asbestos-related costs and corresponding insurance receivables on behalf of the future asbestos claimant representative in a 524(g)-bankruptcy reorganization.



## SELECTED EXPERIENCE: QUALIFIED SETTLEMENT FUND CLAIMS PROCESSING

- Procedures and policy development
- Reporting system development
- Claims valuation model development and analysis
- Exposure site list management
- Property damages claims administration
- Quality control management, including the development of a system of standards and auditing procedures

## EXPERT TESTIMONY

Mr. Scarcella has testified on matters of insurance allocation, 524(g) asbestos bankruptcy trust transparency, and potential plaintiff recoveries at both the state and federal level.

- Confirmation Hearing testimony *In Re Duro Dyne National Corp,* 18-27963 (MBK), in the United States Bankruptcy Court District of New Jersey, March 2019
- Estimation Hearing testimony *In Re Duro Dyne National Corp,* 18-27963 (MBK), in the United States Bankruptcy Court District of New Jersey, January 2019
- Trial testimony in *First State Insurance Company and Twin City Fire Insurance Company vs. ACE Property & Casualty Insurance Co., et al,* Montgomery County Court of Common Pleas, OH, September 2017
- Hearing testimony on H.B. 1428, Pennsylvania House Committee on Judiciary, PA, January 2016
- Hearing testimony, in *Poage vs. 3M Company, et al.,* Circuit Court for St. Louis, MO, August 2015
- Hearing testimony, in *Catlett vs. A.W. Chesterton Company, et al.,* Circuit Court for Hamilton County, TN, June 2015
- Hearing testimony on H.B. 1492, Texas House Judiciary and Civil Jurisprudence Committee, April 2015
- Hearing testimony on H.R. 526, the "Furthering Asbestos Claim Transparency (FACT) Act of 2015," US House Judiciary Committee's Subcommittee on Regulatory Reform, Commercial and Antitrust Law, February 2015
- Hearing testimony, in *Olin Corporation vs. Insurance Company of North America, et al.,* United States District Court for the Southern District of New York, January 2015
- Hearing testimony, American Bar Association's Task Force on Asbestos Litigation and the Bankruptcy Trusts, June 2013
- Hearing testimony on H.B. 1150, the "Fairness in Claims and Transparency Act," Pennsylvania



House Committee on Judiciary, April 2013

- Hearing testimony on A.B. 19, "Tort and Personal Injury Trusts," Wisconsin House Committee on Judiciary and Senate Committee on Judiciary and Labor, April 2013

- Hearing testimony on H.R. 982, the "Furthering Asbestos Claim Transparency (FACT) Act of 2013," US House Judiciary Committee's Subcommittee on Regulatory Reform, Commercial and Antitrust Law, March 2013

- Hearing testimony on H.R. 4369, the "Furthering Asbestos Claim Transparency (FACT) Act of 2012," US House Judiciary Committee's Subcommittee on Courts, Commercial and Administrative Law, May 2012

- Hearing testimony on H.B. 380, Ohio Senate Judiciary Committee, March 2012

- Hearing testimony on H.B. 380, Ohio House Judiciary and Ethics Committee, November 2011

- Hearing testimony on H.B. 2034, Texas House Judiciary and Civil Jurisprudence Committee, March 2011

- Deposition testimony in *Olin Corporation vs. Lamorak Insurance Company*, Cause No. 84-CV-1968, United States District Court for the Southern District of New York, October 2020

- Deposition testimony in *Certain London Market Company Reinsurers vs. Lamorak Insurance Company*, No. 1:18-cv-10534-NMG, In the United States District Court, District of Massachusetts, July 2020

- Deposition testimony in *Kuhlman Electric Corporation, et al., vs. The Travelers Indemnity Company, et al.,* Cause No. 25CI1:07-CV-00549-AHW, In the Seventh Circuit Court District of Mississippi, June 2020

- Deposition testimony in *Continental Casualty Company, et al., vs. J.M. Huber Corporation*, 2:13-CV-04298-CCC-JAD, In the United States District Court, District of New Jersey, August 2019

- Deposition testimony in *AIU Insurance Company, et al., vs, Philips Electronics North America, et al.,* 9852-VCS, In the Delaware Chancery Court, May 2019

- Deposition testimony in *Hogue, et al. vs. Allied Packing & Supply, Inc., et al.*, Superior Court of the State of California, County of Alameda, March 2019

- Deposition testimony in *Rickards vs. 3M Company, et al.,* In the Superior Court of the State of Maine, Oxford, March 2019

- Deposition testimony *In Re Duro Dyne National Corp,* 18-27963 (MBK), in the United States Bankruptcy Court District of New Jersey, January 2019

- Deposition testimony in the matter of *ITT, LLC vs. Nationwide Indemnity Company*, September 2018

- Deposition testimony in *Davis vs. 3M Company, et al.,* In the Circuit Court for Maury County, Tennessee, June 2018

- Deposition testimony in *Knutson vs. Air & Liquid Systems Corporation, et al.,* Superior Court of the State of California, County of Alameda, June 2018



- Deposition testimony in *Garcia vs. Colgate-Palmolive Company, et al.,* Superior Court of California, County of Los Angeles, May 2018

- Deposition testimony in *Olin Corporation vs. Insurance Company of North America, et al.,* United States District Court for the Southern District of New York, April 2018

- Deposition testimony in *Olin Corporation vs. Insurance Company of North America, et al.,* United States District Court for the Southern District of New York, January 2018

- Deposition testimony in *Defiore vs. Huntington Ingalls Inc., et al.,* Civil District Court for the Parish of Orleans, LA, September 2017

- Deposition testimony in *Robaey vs. Air & Liquid Systems Corporation, et al.,* Supreme Court of New York County, NY, November 2016

- Deposition testimony in *Haefele vs. Honeywell International, Inc., et al.,* Court of Common Pleas of Lorain County, OH, September 2016

- Deposition testimony in *Hayden vs. 3M Company, et al.,* Civil District Court for the Parish of Orleans, LA, July 2016

- Deposition testimony in *New York City Asbestos Litigation,* Supreme Court of New York County, NY, February 2016

- Deposition testimony in *Petersen vs. Industrial Supply Company, Inc., et al.,* Third Judicial District Court for Salt Lake County, UT, October 2015

- Deposition testimony in *Radiator Specialty Company vs. Arrowood Indemnity Company, et al.,* General Court of Justice, Superior Court Division of Mecklenburg County, NC, March 2015

- Deposition testimony in *Hill vs. Certainteed Corporation, et al.,* Superior Court of Los Angeles County, CA, November 2014

- Deposition testimony in *Muldoon vs. American Honda Motor Company, et al.,* Court of Common Pleas of Horry County, SC, October 2014

- Deposition testimony in *Andrews v. A.W. Chesterton, Inc.,* Third Judicial Circuit Court of Madison County, IL, September 2011

- Deposition testimony in *Christopher v. Armstrong Intern'l Inc.,* Circuit Court of Limestone County, AL, April 2011

- Deposition testimony in *Moore v. A.W. Chesterton, Inc.,* Third Judicial Circuit Court of Madison County, IL, April 2010

## PROFESSIONAL EXPERIENCE

Mr. Scarcella first began evaluating environmental and product liability claims in 2001 as the statistician and quantitative data analyst for the claims processing facility of the Johns-Manville Personal Injury Settlement Trust. Following his time with Manville, he joined ARPC, an economic consulting firm specializing in asbestos liability estimation for bankruptcy reorganization and



qualified settlement funds. During his tenure with ARPC, Mr. Scarcella had the opportunity to estimate current and future asbestos liability and associated insurance recoveries in asbestos bankruptcy proceedings for multiple companies including, but not limited to, Armstrong World Industries, Babcock and Wilcox, Federal-Mogul Corporation, Halliburton Co., Honeywell International Inc., Owens Corning, and United States Gypsum. Most recently, Mr. Scarcella was a Principal at Bates White, an economic consulting firm offering expert testimony and consultative services to law firms, Fortune 500 companies, and government agencies.

- Economic & Complex Analytics Group of Roux Associate, Inc.
  - Principal, August 2016 to present
- Bates White Economic Consulting, Washington, DC
  - Principal, 2015–July 2016
  - Manager, 2009–2015
- Analysis Research Planning Corporation (ARPC), Washington, DC
  - Managing Director (2009), Director (2005–2008), Senior Consultant (2004), Consultant (2002–2003)
- Quantitative Data Analyst, Claims Resolution Management Corporation (CRMC), Fairfax, VA, 2001–2002

**EDUCATION**

- MA, Financial Economics, American University
- BA, Economics, American University
- BA, Public Affairs, American University

**PUBLICATIONS**

- Scarcella Marc C., and Peter R. Kelso. "Dubious Distribution," U.S. Chamber Institute for Legal Reform, Mar. 2018.
- Scarcella Marc C., and Peter R. Kelso. "The Waiting Game: Delay and Non-Disclosure of Asbestos Trust Claims," U.S. Chamber Institute for Legal Reform, Dec. 2015.
- Ableman, Peggy L., Peter R. Kelso and Marc C. Scarcella. "A Look Behind the Curtain: Public Release of Garlock Bankruptcy Discovery Confirms Widespread Pattern of Evidentiary Abuse Against Crane Co." Mealey's Asbestos Litigation Report 30, no. 19 (2015).
- Ableman, Peggy L., Peter R. Kelso and Marc C. Scarcella. "The Consolidation Effect: New York City Asbestos Verdicts, Due Process and Judicial Efficiency." Mealey's Asbestos Litigation Report 30, no. 7 (2015).



- Scarcella, Marc C. and Peter R. Kelso. "A Reorganized Mess: The Current State of the Asbestos Bankruptcy Trust System." Mealey's Asbestos Bankruptcy Report 14, no. 7 (2015).
- Scarcella, Marc C., Peter R. Kelso, and Joseph Cagnoli, Jr. "Asbestos Litigation, Attorney Advertising & Bankruptcy Trusts: The Economic Incentives Behind The New Recruitment Of Lung Cancer Cases." *Mealey's Asbestos Litigation Report* 13, no. 4 (2013).
- Scarcella, Marc C. and Peter R. Kelso. "Asbestos Bankruptcy Trusts: A 2013 Overview of Trust Assets, Compensation & Governance." *Mealey's Asbestos Bankruptcy Report* 12, no. 11 (2013).
- Scarcella, Marc C., Peter R. Kelso, and Joseph Cagnoli, Jr. "The Philadelphia Story: Asbestos Litigation, Bankruptcy Trusts and Changes in Exposure Allegations from 1991–2010." *Mealey's Asbestos Litigation Report* 27, no. 19 (2012).
- Scarcella, Marc C. and Peter R. Kelso. "Asbestos Bankruptcy Trusts: A 2012 Overview of Trust Assets, Compensation & Governance." *Mealey's Asbestos Bankruptcy Report* 11, no. 11 (2012).
- Hartley, Kirk T., David C. Christian II, Marc C. Scarcella, and Peter R. Kelso. "Pre-Packaged Plan of Inequity: the financial abuse of future claimants in the T H Agriculture & Nutrition 524(g) asbestos bankruptcy." *Mealey's Asbestos Bankruptcy Report* 11, no. 4 (2011).
- Bates, Charles E., Charles H. Mullin, and Marc Scarcella. "The Claiming Game." *Mealey's Litigation Report: Asbestos* 25, no. 1 (2010).

## SELECTED SPEAKING ENGAGEMENTS

- "Claims Estimation and Data Analytics for Mass Tort Settlements." 2019 Perrin Mass Tort Global Settlement Architecture Conference, May 2, 2019.
- "The Triple Threat from PFAS-related Chemicals: Toxic Tort, Product Liability, and Environmental Cleanups." 2018 EECMA Annual Conference, Apr. 25–Apr. 27, 2018.
- "Get the Lead Out! Proactive Risk Measures in Response to America's Environmental Crisis." 2017 EECMA Annual Conference, Apr. 26–Apr. 28, 2017.
- The SEC Revised Compliance and Disclosure Interpretations (C&DIs): Time to Rethink Your Firm's Current Non-GAAP Measures, September 14, 2016
- "Leveling the Playing Field: Reform Issues Impacting U.S. Asbestos Litigation Risk." IntAP Technical Meeting, June 8–9, 2016.
- "Don't Get Burned on Your Reserves: Future Incidence of Latent Claims vs. Current Burn Rates." 2015 EECMA Annual Conference, Apr. 29–May 1, 2015.
- "NYCAL Filing and Verdict Trends." US Civil Justice Reform Group, Dec. 3, 2014.
- "Asbestos Bankruptcy and Tort Litigation Trends in 2014–2015." DRI Asbestos Defense Strategic Summit, Nov. 5, 2014.



- "The Garlock Ruling: Understanding the Impact and Applications in the Tort System." FETTI Annual Conference, Oct. 10, 2014.

- "The Economic Incentives Behind the New Recruitment of Lung Cancer Cases." Perrin Conferences Defense Asbestos Litigation Seminar, June 5, 2014.

- "Lung Cancer and Asbestos Litigation: The Science and Economics Behind the Recent Rise in Filings." 2014 EECMA Annual Conference, Apr. 30–May 2, 2014.

- "A Look Ahead to 2014: Open Issues in a Mature Litigation." Perrin Conferences Litigating Asbestos Cases in Today's Environment Conference, Dec. 12, 2013.

- "Emerging Asbestos Litigation Trends." Perrin Conferences Asbestos Defense Strategic Summit, Nov. 6, 2013.

- "Insurer & Policyholder Bankruptcy & Trust Transparency." FETTI 20th Annual Conference, Sept. 25–27, 2013.

- "NFL Concussion Litigation." 2013 EECMA Annual Conference, May 1–3, 2013

# EXHIBIT G

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) (Jointly Administered) |
| Debtors. | |

## Expert Report of Professor Scott E. Harrington

### I.    Overview

Debtors propose the *Modified Fifth Amended Chapter 11 Plan of Reorganization for the Boy Scouts of America and Delaware BSA, LLC* (the "Plan") with support of the Creditors' Committee, the Future Claimants' Representative, the Coalition of Abused Scouts for Justice, the Ad Hoc Committee of Local Councils, the Church of Jesus Christ of Latter-Day Saints, and Hartford.  According to the *Amended Disclosure Statement for the Modified Fifth Chapter 11 Plan of Reorganization* (the "Disclosure Statement")*,* the Plan purports to allow Debtors to achieve two objectives:  "(a) to timely and equitably compensate survivors of Abuse in Scouting, and (b) to ensure that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission" (p. 7).  The Disclosure Statement also states that the Plan "has been designed to maximize and expedite recovery to Abuse Survivors" (p. 8).

Non-settling insurers, whose policies would be assigned without their consent to the proposed Settlement Trust, object to the Plan.  They argue, *inter alia*, that the Plan is not insurance neutral and would instead interfere with a number of their contractual rights and inflate their "quantum of liability" (Disclosure Statement, pp. 271-277).  Debtors disagree.

The dispute highlights an inherent and fundamental source of conflict when debtors and representatives of various tort claimants negotiate a reorganization plan that relies in significant

part on liability insurance coverage to fund payments to claimants from a trust created for that purpose. Failure to reach agreement could cause debtors to liquidate (as BSA asserts in this case). In that event, liability insurers' obligations under policies issued to debtors would continue, given contractual provisions that require the insurer to meet its obligations regardless of the bankruptcy of the insured. To reach agreement, debtors and tort claimants must both view the proposed reorganization as improving their positions compared with having debtors liquidate and tort claimants rely on pursuing claims in the tort system that may be paid by liability insurance and any other available assets in the debtor's estate.

Debtors and tort claimants have incentives to negotiate a plan that would increase liability insurers' potential payments compared with amounts that would otherwise be available, making insurers worse off than without reorganization and increasing insurers' incentives to settle pre- or post-reorganization. Any ability to increase insurers' liabilities will make agreement among debtors and tort claimants more likely and—at insurers' expense—increase the potential benefits to debtors and tort claimants of agreement. If that occurs, both debtors and tort claimants would be better off than without agreement, but insurers would be worse off. It is therefore fundamentally important to appreciate these incentives and adequately safeguard insurers' interests.

Non-settling insurers[1] have retained me to evaluate the Plan's potential impact on their contractual rights and scope ("quantum") of liability. This evaluation requires consideration of

---

[1] Great American Assurance Company, f/k/a Agricultural Insurance Company; Great American E&S Insurance Company, f/k/a Agricultural Excess and Surplus Insurance Company; Great American E&S Insurance Company; AIG Companies; Allianz Global Risks US Insurance Company; Argonaut Insurance Company; Colony Insurance Company; Arrowood Indemnity Company; Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company; Clarendon America Insurance Company; The Continental Insurance Company; Columbia Casualty Company; General Star Indemnity Company; Liberty Mutual Insurance Company; Markel Insurance Company; National Surety Corporation; Interstate Fire & Casualty Company; Old Republic Insurance

the basic principles underlying liability insurance contract provisions; the role of liability insurers in investigating, defending, and settling claims; and the economic rationales for the insured's duty to assist and cooperate with the insurer in the defense of claims, the prohibition of assignment of policy rights without the insurer's consent, and contribution or equitable subrogation rights when more than one insurer may be obligated for indemnity and defense costs.

Based on my experience, expertise, and review of materials for this case (listed in Exhibit A), I conclude—notwithstanding Plan language that might be argued to preserve certain of insurers' rights—that the Plan as written cannot be regarded as insurance neutral. The Plan would significantly prejudice non-settling insurers' contractual rights and significantly increase their potential liability compared to that which would exist without the Plan.

I understand that discovery is ongoing, including depositions, that the Plan Supplement was just submitted, and that other documents have yet to be submitted (or have just been submitted). I reserve the right to supplement the opinions expressed in this report as additional information becomes available.

## II.    Qualifications

I am the Alan B. Miller Professor Emeritus of Health Care Management and Professor Emeritus of Insurance and Risk Management at The Wharton School, University of Pennsylvania. I transitioned to emeritus status effective July 1, 2021. During much of my career spanning more than four decades I have studied and taught in diverse areas of insurance, risk

---

Company; Traders and Pacific Insurance Company; Endurance American Specialty Insurance Company; Endurance American Insurance Company; Travelers Casualty and Surety Company, Inc.; American Zurich Insurance Company; American Guarantee and Liability Insurance Company; Steadfast Insurance Company; Munich Reinsurance America, Inc., f/k/a American Re-Insurance Company; and Gemini Insurance Company.

management, and finance, including, among others, principles of risk management and insurance, insurance economics, insurance regulation, property/casualty insurance company operations and finance, and insurance contract design and interpretation.

I have authored or co-authored over 85 scholarly articles and have authored or edited numerous books and monographs dealing with the economics, finance, operations, and regulation of insurance markets. I have published numerous articles on liability insurance economics and markets; on the determinants of insurance prices; on competition in insurance markets; on the effects of rate regulation on prices and availability of insurance coverage; on the causes of insurance affordability and availability problems; on the causes of insurance underwriting cycles and liability insurance crises; and on insurance company insolvency risk and solvency regulation. A number of my scholarly articles have received awards by national and international organizations. My co-authored textbook, *Risk Management and Insurance*, published by Irwin/McGraw-Hill, contains numerous chapters on business risk management, insurance markets, and insurance coverage.

I served during 2006-2018 as a co-editor of the *Journal of Risk and Insurance,* the premier academic journal specializing in risk and insurance. I have previously served as the President of the American Risk and Insurance Association, the leading scholarly association for professors and other researchers in risk management and insurance. I also have previously served as President of the Risk Theory Society, an international association of economists and actuaries who conduct insurance and related research.

My expert testimony before legislative, regulatory, and judicial bodies has considered the economics of insurance contract design and interpretation (including in the context of bankruptcy proceedings), the design of commercial insurance programs, insurance availability and

affordability problems, insurance pricing and underwriting, and insurance regulation.  I have testified on insurance matters before the U.S. Congress on six occasions.  The National Association of Insurance Commissioners, the umbrella organization for state insurance regulators, twice chose me to conduct funded research projects.

My complete curriculum vitae is attached as Exhibit B.  I am being compensated at my usual fee of $750 an hour.

## III.    Basic Principles of Risk Transfer and Insurance

My opinions are based on the economics of insurance and associated contractual terms for insurance policies in general and commercial liability insurance in particular.  The purchase of an insurance contract transfers specified risks of loss from the buyer to the insurance company.  When the insurer can reduce its overall risk by writing many policies for different types of risk in different areas (i.e., by spreading risk), the insurer is better able to bear risk than the policyholder.  The insurer can therefore charge a premium that is low enough to attract policyholders who are averse to risk but high enough to cover the insurer's expected costs from selling a policy and to produce a reasonable level of expected profit.  Both parties benefit from this transaction.

A number of factors limit and in some cases eliminate insurers' advantages in bearing risk:  (a) insurer operating expenses and capital costs are required to sell and distribute policies, which in turn require the insurer to charge higher premiums; (b) potential moral hazard, where the policyholder may take actions before or after a loss producing event that increases the potential cost of claims to the insurer and thus the premium needed to provide coverage; (c) potential adverse selection, whereby entities with greater potential for loss than contemplated by the insurer's pricing are more likely to buy a given type of coverage or buy higher limits of

5

coverage than those with less loss potential; and (d) non-diversifiable risk that arises from insured losses that are correlated across different policyholders, or for which the magnitude of predicted claim costs for the coverage period is highly uncertain. Numerous contract provisions and legal doctrines reduce or eliminate these problems and thus benefit both the policyholder that must pay for coverage and the insurer that must pay claims and incur other costs in selling and servicing policies.

Insurers have strong incentives to design contracts that enhance the insurability of risk and make coverage more attractive to customers. Fundamental contract design principles include: (a) broader coverage of potential claims increases the premium needed, (b) many or most buyers will not wish to pay a higher premium to insure certain types of contingencies, and (c) appropriate conditions for and limitations on coverage can increase its value to buyers.

Any insurer that tried to sell policies that covered virtually every type of claim under any condition would either lose money or have to charge a premium that would be too high to attract and retain customers. This practice also would be subject to severe adverse selection and moral hazard. Most liability insurance policies therefore contain a variety of policy provisions that limit the types of claims covered under the policy and seek to control the cost of claims that are covered.

One major method of tailoring insurance coverage is to define the types of claims and damages that the policy will cover (e.g., to define both bodily injury and property damage in liability insurance policies) and to specify the maximum amounts the insurer will pay for covered losses. A second major method of tailoring coverage is to exclude coverage for events that are either (a) uninsurable due to problems of moral hazard, adverse selection, positively correlated losses, and so on, or (b) more efficiently insured under a separate policy (coverage form). A

6

third major method of tailoring coverage is to make payment by the insurer contingent on policyholders' compliance with a variety of conditions stated in policies.

## IV.    Commercial General Liability Insurance

Commercial general liability ("CGL") insurance provides liability coverage to businesses.  The insurer agrees, according to specific contractual terms, to pay damages for bodily injury and property damage sought by third parties that have been injured by the organization's activities.  As I elaborate below, the "primary" CGL insurer in most instances has the right and duty to defend the insured against claims within the scope of coverage and assume the costs of such defense.  In conjunction with a duty to defend, primary CGL policies (and most other primary liability insurance policies) allocate the right to control defense and settlement of claims to the insurer rather than the insured.

Subject to all other terms, conditions, and exclusions set forth in the policies, CGL policies often provide coverage for damages because of bodily injury or property damage during the policy period that is neither expected nor intended by the insured and caused by an "occurrence".  The policies often include separate per-occurrence limits for bodily injury and property damage that specify the maximum indemnity that the insurer will pay for damages from a single covered occurrence as defined in the contract.  Commercial liability insurance policies may also include limits that cap an insurer's aggregate payments under the contract (or for each year in some multi-year contracts) for damages during the applicable period, regardless of the number of occurrences.

Aggregate limits reduce the insurer's risk of having to pay large amounts of damages due to multiple occurrences during the applicable period and reduce the premium that the insurer needs to charge.  Policyholders that desire greater protection against large losses from multiple

occurrences can negotiate higher aggregate limits from the primary insurer for a correspondingly higher price.  More typically, policyholders purchase additional coverage from one or more "excess" or "umbrella" insurers at a price that reflects the risk that losses will exceed the limits of primary insurance.  Excess/umbrella insurance typically covers claims in excess of the primary policy limits; i.e., once the relevant primary policy limits have been "exhausted." Policyholders (such as BSA) often purchase excess/umbrella insurance in "layers," with one or more insurers participating in each excess layer.

A.    *Insurers' Right to be Involved in the Insured's Defense and Settlement of Tort Claims*

Primary CGL policies often provide that the insurer has the right and duty to defend any suit against the insured seeking damages for a covered claim on account of bodily injury or property damage and may investigate and settle any claim or suit as it deems expedient.  Primary coverage may include a per occurrence deductible or a self-insured retention ("SIR"), both of which lower the premium needed to provide coverage.  Because deductibles and SIRs require the insured to bear at least part of the cost of any claim, they help reduce moral hazard and adverse selection.

With a per occurrence deductible, the insurer defends and settles the claim according to the contract, and the insured agrees to reimburse the insurer for payment of any claim up to the amount of the deductible.  The insured is often required to provide the insurer with a letter of credit backing its promise to reimburse the insurer.  With an SIR, absent specific endorsements the insurer is not responsible to pay indemnity unless the settlement of, or judgment on, the claim exceeds the amount of the SIR and the insured pays the full, applicable SIR amount.  Policies with SIRs typically do not require the insurer to pay for defense, or at most require an insurer to pay a portion of defense costs that is equal to the portion of indemnity the insurer ultimately pays

with respect to the claim after the claim is resolved and the SIR is applied.  The insurer has the right, however, to be associated in the defense of any claim with the potential to exceed the SIR.

If primary limits are exhausted, the primary insurer's obligation for providing a defense usually ceases.  Some excess/umbrella liability policies provide the excess insurer with the right and duty to defend claims, control the defense, and negotiate and settle claims.  Other excess/umbrella policies may not require the insurer to provide a defense, but they may include coverage of defense costs, and they typically allow the insurer the right and opportunity to associate with the defense of the claim with cooperation of the insured.

For example, the Excess Liability Policy issued to BSA by Interstate Fire & Casualty Company for the period March 1, 2003 to March 1, 2004 states (NS_BK-00010491):

A. Defense

  (1) At Our discretion, We may:
    (a)   Investigate any occurrence or claim, and
    (b)   Settle any claim or Suit of which We assume charge of the settlement or defense.

  (2) When insurance is available to the Insured under any Primary Insurance or Other Insurance, We will have the right and opportunity, although not the obligation, to associate with the insurers of those policies in the defense and control of any claim or Suit which, in Our opinion, may create liability under this policy.

  (3) We will assume charge of the settlement or defense of any claim or Suit against the Insured seeking damages to which this policy applies when the Primary Insurance and Other Insurance cease to apply because of exhaustion of their aggregate limits of insurance.

  (4) We will not be required to defend any claim or Suit after the applicable limit of this policy has been exhausted by payment of judgments or settlements.

As another example, the Excess Liability Policy issued to BSA by National Surety Corporation for the period March 1, 1996 to March 1, 1997 states (NA-BK-00010102):

> We shall not be obligated to assume charge of or participate in the settlement or defense of any claim made, or suit brought, or proceedings instituted against the insured.  However, We shall have the right and opportunity to be associated with the insured in the defense of any claim, suit or proceeding which, in Our opinion, may create liability under the terms of this policy.  If We assume such right and opportunity, We shall not continue to defend or participate in the defense of any claim or suit after the applicable limit of this policy has been exhausted.

Bundling provision of defense or coverage of defense costs with the insurer's obligation to pay damages for covered claims reduces risk to the insured of having to bear potentially large defense costs. Allowing insurers to control the defense or otherwise participate and associate in the defense of claims provides strong incentives for controlling the sum of expected indemnity and defense costs for potentially covered claims. An insurer whose policy covers payment of both defense and damages has an incentive to spend more on defense if it will assist in lowering the overall cost (defense and indemnity) of resolving a covered claim on behalf of the insured. Such cost control is consistent with the preferences of most insureds, because contractual arrangements that help minimize the expected total cost of indemnity and defense allow insurers to charge the lowest possible premiums. By keeping overall claim and defense costs low, insurers can charge lower premiums for coverage that meets the needs of insureds, thus expanding the amount of liability insurance purchased.

Insurers exercise their defense rights (in conjunction with defense counsel) by evaluating each individual suit or allegation in order to assess the insured's potential legal obligation (e.g., whether the insured had a duty to protect the claimant, whether the insured may have failed in that duty, whether that failure caused injury to the claimant, and the amount of any resulting damages). When deciding whether to bring suit, potential plaintiffs and plaintiffs' attorneys consider that insurers will investigate, defend, and negotiate settlements in view of the insured's potential liability and the costs of defense.[2]

If the insurer is paying damages, insureds would often have much less incentive to resist claims or negotiate lower settlements than the insurer. In order for insurers to provide coverage for indemnity and defense costs at attractive premiums, it is therefore important to allow the

---

[2] Underlying this process is the assumption that the trier of fact is neutral, unbiased, and conflict free.

insurer to control or at least participate in decisions regarding defense and settlement.  Allowing the insurer to control or at least have the right and opportunity to participate in the defense and settlement of claims also inhibits possible agreements between policyholders and plaintiffs that could benefit those parties at the insurer's expense, thus driving up costs and premiums over time, reducing the attractiveness of coverage to insurance buyers, and reducing the amounts of liability insurance purchased.

Primary CGL policies and excess/umbrella liability policies (either with specific language or because they incorporate primary policy terms) often include provisions that facilitate the insurer's defense obligations and rights and thereby help to control covered claim costs and achieve lower premiums over time.  In particular, and as suggested above, the insured is required to assist and cooperate with the insurer in the defense of claims and may be required to obtain the consent of its insurers before agreeing to settle claims.

As an example, the Interstate Fire & Casualty policy referenced above includes a provision "Assistance and Cooperation of the Insured", which states (NS_BK00010495-6):

> The Insured shall cooperate with Us in the investigation, settlement or defense of any claim or Suit, and take all necessary steps to protect the Insured's and Our interests. . . .  The Insured shall not at any time make or authorize an admission of liability or attempt to settle or otherwise dispose of any claim or Suit without Our written consent.

B.    *Assignment of Policy Rights*

Appropriate underwriting and pricing of coverage by an insurer requires consideration of (a) risk characteristics of the prospective insured that affect the expected costs of providing coverage (including the possibility of adverse selection), and (b) possible actions by the insured after the policy is issued that could increase expected costs (moral hazard).  In the latter case, the insurer needs to consider possible actions by the insured that could increase the potential frequency and severity of losses *before* any losses occur.  It also needs to consider possible

actions by the insured that could increase the ultimate magnitude of losses and/or defense and settlement costs *after* the occurrence of loss-causing events.

In each instance, the risk to the insurer depends in significant part on the behavior of the specific insured. Because of this specificity, most liability insurance policies, including many of the excess/umbrella policies issued by the non-settling insurers in this action, contain an "anti-assignment" provision, or incorporate such a provision from primary or other underlying insurance, that prohibits the insured from assigning its rights or interests under the policy without the insurer's consent

An assignment of rights without the insurer's consent could increase the insurer's risk beyond that contemplated when the policy was underwritten and priced by, for example, transferring coverage to an entity with a higher risk of loss, or that is less likely to take actions, assist, and cooperate with the insurer to help minimize the magnitude of damages, defense, and settlement costs from events that have already occurred.

In the case of liability insurance coverage of an insured's actions that are alleged to have already caused injury but have yet to be settled or adjudicated, neither the insured's liability nor the insurer's obligation, if any, to indemnify are fixed at the time of the alleged injury or any subsequent assignment of rights to the policy. They instead depend on the investigation, defense, negotiation, and settlement of the claim. An assignment of policy rights without the insurer's consent can increase the insurer's risk despite other policy provisions that limit its risk or condition coverage on certain actions by the insured. Incentives to comply with policy conditions, such as the duty for the insured to assist and cooperate with the insurer in defense could diminish following assignment, as could the insurer's ability to enforce relevant policy conditions. Moreover, the assignee could have interests that are adverse to the insurer, thereby

presenting a potential for conflict and increasing the cost and difficulty of claim evaluation and settlement by the insurer.

C.    *Contribution and Equitable Subrogation Rights*

A liability insurer generally has the right, under certain circumstances, to seek contribution or equitable subrogation from other insurers (or an insured) for payments it has made to settle and/or defend a claim against an insured.  The right of contribution or equitable subrogation typically arises when more than one insurer's policy provides coverage for a specific loss, and where, for some reason, an insurer has paid more than its equitable share of the loss (and/or defense).  The right of contribution or equitable subrogation is especially important in the context of liability claims where the alleged injury may span the coverage periods or otherwise implicate the coverage of multiple policies provided by multiple insurers.

The right of contribution or equitable subrogation helps achieve a more equitable distribution of costs among insurers in relation to coverage provided and premiums received so that some parties do not profit at the expense of others.  The right of contribution or equitable subrogation often helps to facilitate timely resolution and payment of claims to injured parties by encouraging cooperation among insurers in settlement, or by deferring to a separate action potentially time consuming and complex adjudication of possible disputes among insurers concerning the apportionment of costs and/or loss.  An insurer's underwriting and pricing decisions are made in a context where the insurer may be able to seek contribution or equitable subrogation for losses from other insurers, and where it may be subject to contribution or equitable subrogation claims from other insurers.

V.    **The Plan's Adverse Impact on Insurers' Rights and Quantum of Liability**

I have evaluated the Plan in light of the inherent potential for prejudice against liability insurers when a reorganization plan is developed and proposed by debtors and representatives of tort claimants.  The Plan and its Trust Distribution Procedures ("TDP") were developed without input from the non-settling insurers.  The Settlement Trust Advisory Committee ("STAC"), which would have various consent rights under the Plan, would be composed of tort claimants' representatives.

A.    *The Plan Assigns Insurance Rights Without Non-Settling Insurers' Consent*

The Plan's "Insurance Assignment" (p. 23) would assign and transfer to the Settlement Trust the rights to the Abuse Insurance Policies (defined on p. 5 as "BSA Insurance Policies and the Local Council Insurance Policies") of Debtors, Related Non-Debtor Entities, Local Councils, and Contributing Chartered Organizations, and, with the exception of Chartered Organization Reserved Policies,  Participating Chartered Organizations (p.30).   Article IX.A.3.j of the Plan states that "the Insurance Assignment is authorized as provided in the Plan, notwithstanding any terms of the policies or provisions of non-bankruptcy law that is (sic) argued to prohibit delegation, assignment, or other transfer of such rights . . . " (p. 97).

I understand that prior Bankruptcy Court rulings in Chapter 11 cases have authorized assignment of a debtor's insurance rights without insurers' consent.  This Plan, however, would assign rights beyond those of the Debtors without insurers' consent.  And, in any event, the Plan's assignment of the insurance rights of Debtors and attempt to assign the insurance rights of Local Councils and Participating and Contributing Chartered Organizations to the Settlement Trust without insurers' consent increases the importance of considering the potential adverse effects of the Plan on non-settling insurers.

In addition, and as discussed further below, Article X of the TDP ( p. 23) indicates that the Settlement Trustee would seek reimbursement for Insured Abuse Claims "from the applicable Non-Settling Insurance Company(ies) . . . ." It is my understanding that certain Local Council Insurance Policies do not include the BSA as an insured. The Plan and its TDP, however, provide no indication of whether and how any claims that could implicate both the BSA Insurance Policies and Local Council Insurance Policies, with rights assigned to the Settlement Trust without the insurers' consent, would be apportioned among the insurers implicated.

B.    *The Plan Would Eviscerate Non-Settling Insurers' Rights to Participate in Defense and Settlement*

According to the TDP: "The purpose of the Settlement Trust is to, among other things, assume liability for Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to employ procedures to allow valid Abuse Claims against the Debtors and Other Protected Parties . . . " (p. 1). The Settlement Trust would determine an allowed liability amount  (the "Allowed Claim Amount") for each Allowed Abuse Claim, and "obtain insurance coverage for the Allowed Claim Amount of such Allowed Abuse Claims that are Insured Abuse Claims  . . . ". Article VIII.A states (p. 14, also see Article IX.C., p. 21):

> The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for the Allowed Abuse Claim shall be deemed the Protected Parties' liability for such Direct Abuse Claim (*i.e.,* the claimant's right to payment for his or her Direct Abuse Claim), irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust . . . .

TDP Article X, "Rights of Settlement Trust Against Non-Settling Insurance Companies", states (p. 23):

> The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law. The Settlement Trustee shall have the ability to exercise all of the rights

15

and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of an Insured Abuse Claim. The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust.

These provisions indicate that: (a) the Settlement Trust would determine, without non-settling insurers' input, the amount of liability of Protected Parties, and (b) the Settlement Trust, in order to maximize its assets, would seek recovery for potentially insured claims from non-settling insurers for the full amount of that liability. The Plan would therefore fundamentally alter the contractual relationship between Debtors, other Protected Parties, and non-settling insurers. The relationship would be changed from one of the insureds' required assistance and cooperation with insurers in defense and settlement of claims to control costs, to one in which the Settlement Trust, as acting, advised, or controlled by representatives of current and future claimants, seeks to maximize recovery from the non-settling insurers.

C.      *The Plan Would Inappropriately Increase Non-Settling Insurers' Quantum of Liability*

Confirmation of the Plan in its present form would transform the risk transfer agreements as specified in the non-settling insurers' policies and increase significantly the potential "quantum of liability" of non-settling insurers for at least three related reasons. First, it would provide a strong basis for the Settlement Trust to assert that non-settling insurers should be bound by its determination of Allowed Abuse Claims and Allowed Claim Amounts while undermining the insurers' potential coverage defenses. Second, it would increase the volume of claims submitted to insurers. Third, it would provide the Settlement Trustee with substantial discretion to increase Allowed Claim Amounts. Each of these effects would increase non-settling insurers' potential quantum of liability and enhance the Settlement Trust's leverage in any settlement negotiations.

1.    The Plan's Stipulations of Appropriate, Fair, and Equitable Claim Amounts and Good Faith Would Prejudice Non-Settling Insurers

As noted, the Plan states that the Settlement Trust would seek reimbursement from non-settling insurers for the Allowed Claim Amounts.  Conditions precedent *r*, *s*, and *t* of Article IX.A.3 in the *Notice of Intended Modifications to Certain Conditions Precedent to Confirmation of the Debtors' Chapter 11 Plan of Reorganization* state:

> r.    (i) the procedures included in the Trust Distribution Procedures pertaining to the allowance of Abuse Claims and (ii) the criteria included in the Trust Distribution Procedures pertaining to the calculation of the Allowed Claim Amounts, including the Trust Distribution Procedures' Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the Trust Distribution Procedures), are appropriate and provide for a fair and equitable settlement of Abuse Claims based on the evidentiary record offered to the Bankruptcy Court; . . .

> s.    the right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party or a Limited Protected Party is the amount of such Abuse Claim as determined under the Trust Distribution Procedures . . . ; provided, however, that nothing herein shall determine that any insurer is obligated to pay the Debtors' or another Protected Party's or a Limited Protected Party's liability so determined under the Trust Distribution Procedures;

> t.    the Plan and the Trust Distribution Procedures were proposed in good faith and are sufficient to satisfy the requirements of . . . the Bankruptcy Code.

Article X.M.1 of the Plan indicates (p. 115, emphasis added):

> Except for the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable law, *the findings made by the Bankruptcy Court in the Confirmation Order*, or the findings made by the District Court in the Affirmation Order, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights or obligations under an Insurance Policy to the extent such rights and obligations are otherwise available under applicable law, and the rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of the Plan Documents, including the Plan, the Confirmation Order, and the Affirmation Order, or any provision thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

The "findings made by the Bankruptcy Court in the Confirmation Order" would presumably include conditions precedent *r*, *s*, and *t*, thus providing the Settlement Trustee with a Bankruptcy

Court order containing these conditions that the Settlement Trust would assert affect non-settling insurers' policy rights.

In addition, the Plan's definition of "Insurance Coverage Defense" (Definition 143, p. 24) is "subject to Article X.M", and Article V.N "Resolution of Abuse Claims" (p. 68) would make non-settling insurers' rights to raise a coverage defense "subject to Article X.M". As a result, the Settlement Trustee could assert that non-settling insurers' defense rights are constrained by conditions precedent *r*, *s*, and *t*.

Overall, the Plan would allow the Settlement Trustee to assert claims against non-settling insurers, including in coverage actions, that the Settlement Trust is entitled to be paid the full Allowed Claim Amount for each Allowed Abuse Claim on the basis that the Bankruptcy Court has determined that the Trust Distribution Procedures are appropriate, fair, equitable, and proposed in good faith, and that the Allowed Claim Amount establishes the amount of the Debtors' or other Protected or Limited Protected Parties' liability. The proviso in condition precedent *s* – that "nothing herein shall determine that any insurer is obligated to pay the . . . liability so determined" – would not preclude the Settlement Trust from making these assertions. Nor would this proviso prevent the Settlement Trust from asserting that non-settling insurers' coverage defenses are constrained by conditions precedent *r*, *s*, and *t*.[3]

    2.    <u>Increased Volume of Claims and Attendant Costs to Non-Settling Insurers</u>

The Plan provides for Expedited Distributions, Trust Submission Claims, Tort Election Claims under certain conditions, and, with the approval of the Settlement Trust, STAC Tort Election Claims. According to Abuse Claim consultant Bates White (Disclosure Statement, Exhibit D, p. 6): "Approximately 82,500 non-duplicative Claims alleging Abuse were timely

---

[3] In addition, Article X.M.3 of the Plan (p. 115) appears to disallow non-settling insurers from asserting any defenses or other rights post-confirmation that they had contested as part of objections to the Plan.

filed against BSA in the Chapter 11 Cases."  This compares with (Disclosure Statement, p. 59) approximately 275 civil actions asserting personal injury against the BSA and certain Local Councils and Chartered Organizations as of the Petition Date . . .".

It would strain credulity to deny that the proposed reorganization contributed to this explosion in claims by lowering the cost of making claims and increasing in many instances the likelihood and expected amount of payment to claimants, in conjunction with substantial advertising to potential claimants.  The Plan eliminates the need for claimants to seek damages in adversarial court proceedings where insurers are active participants in the investigation, defense, and settlement of claims with the assistance and cooperation of insureds.  Instead, the Plan sets minimal standards for recovery within a framework that approaches strict liability, with little or no consideration of negligence (apart from possibly increasing the Allowed Claim Amount—see below) and no participation by non-settling insurers.

Article VI of the TDP would authorize payment of an Expedited Distribution in the amount of $3,500 to every person who timely files a Proof of Claim attesting to alleged abuse and elects to accept that amount to resolve the claim (p. 8).  This would essentially create a form of strict liability for that amount based on the person's attestation.

Article VII.C.2 of the TDP sets forth general criteria for evaluating (non-expedited) Trust Submission Claims (pp. 10-11).  It only requires identification by the Abuse Claimant of:  (a) alleged acts of abuse, (b) the alleged abuser by name or description, (c) information that the alleged abuse occurred during a Scouting activity or "resulted from involvement in Scouting Activities" (p.11), (d) the Abuse Claimant's age or date of abuse, and (e) the venue or location of alleged abuse.

Article VIII of the TDP dealing with settlement of Trust Submission Claims mentions only one possible effect of negligence of a Protected Party on allowing a claim or determining the Allowed Claim Amount.  It simply indicates that the Allowed Claim Amount (through application of a Scaling Factor, see below) may be increased "if there is evidence of negligence of a Protected Party (*e.g.*, the inclusion of the perpetrator in the IV files (Volunteer Screening Database) for abuse reasons." (Article VIII.D(iii)d., p. 17).  There is no indication that any evidence of negligence of a Protected Party is otherwise relevant to allowing an Abuse Claim or proposing an Allowed Claim Amount.

The Plan's minimal criteria for allowance and payment of Abuse Claims would likely expose non-settling insurers to thousands of claims seeking reimbursement of the Allowed Claim Amount determined by the Settlement Trust.  It is probable that many of these claims would not be brought absent the Plan.  If they could not be brought absent the Plan, such claims would need to be pursued in the tort system with insurers participating in defense and settlement.  The Plan would require non-settling insurers to incur significant costs to investigate claims and to contest or negotiate coverage with the Settlement Trust for claims that would not have been brought absent the Plan.  It would therefore increase non-settling insurers' potential quantum of liability and increase pressure for them to reach global settlements with the Settlement Trust.

3.    Inflation of Allowed Claim Amounts

Paying $3,500 to resolve each Expedited Claim, and the Plan's procedures for Trust Distribution Claims, would likely result in payment for many claims above what would be paid, if anything, in the tort system absent the Plan.  With respect to Trust Distribution Claims,  Article VIII of the TDP (pp. 13-20) sets forth a matrix to be used in determining Allowed Claim Amounts.  The matrix includes a "base value" and "maximum value" for six categories of

alleged abuse.  The Settlement Trustee would be able to allow claims at amounts that vary from

the base values by applying, in his discretion, a number of "Scaling Factors" for "aggravating"

and "mitigating" circumstances.  The Scaling Factors would be multiplied together with the base

value to produce the Allowed Claim Amount, up to the maximum value.  Claimants who agreed

to resolve their claims for the Allowed Claim Amount would receive a "percentage payment" of

that amount, with the percentage determined by the Settlement Trustee with approval of the

STAC and FCR.  Claimants would receive additional payment if the percentage payment were

later increased.

Article V.N of the Disclosure Statement asserts (p.90):  "The matrix values in the Trust

Distribution Procedures and the values used to develop Bates White's Abuse Claim range of $2.4

billion to $7.1 billion are both based upon BSA's historically resolved Abuse Claims, and

publicly available information related to potentially comparable settlements."  Article V.N. of

the Disclosure Statement continues (p. 93, emphasis added):

> Across mass  torts, there is significant  selection  bias  regarding  which  cases
> are  filed relatively early in the lifespan of the tort, *when costs to plaintiffs are generally
> higher*, and which cases are pursued as the tort is more developed, *when costs to plaintiffs
> are lower*.  The significant increase in claims filed against the BSA represents a
> structural break in this process. Relative to the current pool of Abuse Claims, the BSA's
> historical data related to Abuse liability resolutions was stronger on observable, and likely
> also unobservable, characteristics.

The upshot of this statement, which reflects Debtors' expert's analysis, is that using historical

figures will likely overstate liability for the huge number of claims first asserted post-petition,

because those claims are on average likely to be weaker (e.g., less severe) than claims asserted

pre-petition.  As a result, the historical amounts purportedly used to develop the matrix could on

average be excessive for post-petition claims, even apart from the TDP's failure to consider

factors that would be relevant in an adversarial tort proceeding in which insurers were able to

exercise their contractual rights regarding defense and settlement with assistance and cooperation of the insured.

Moreover, evaluation of alleged abuse claims is inherently challenging in view of numerous factors, including a possible dearth of evidence, long lags between the alleged abuse and filing of a claim, fading and faulty memories, and lack of documented physical injury to the claimant (in contrast to mass torts involving diseases subject to medical verification). Despite the seeming specificity of the Plan's matrix and Scaling Factors, the Settlement Trustee's determination of the Allowed Claim Amounts would be inherently subjective and subject to considerable discretion.

Article VIII.D(iii) of the TDP, for example, deals with the Scaling Factor for the "Impact of Abuse". It states (p.17-18): "The Settlement Trustee will consider, along with any and all other relevant factors, whether the Abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from" (a) "Mental Health Issues", (b) "Physical Health Issues", (c) "Interpersonal Relationships", (d) "Vocational Capacity", (e) "Academic Capacity," and (f) "Legal Difficulties". The list includes dozens of specific issues, many of which would be difficult to verify and evaluate (and are likely experienced by a good number of adults over time without any connection to sexual abuse). There can be little doubt that application of such criteria would entail substantial discretion.

In addition to the exercise of discretion by the Settlement Trustee that could increase Allowed Claim Amounts, Article VII.H of the TDP (p. 13) would provide Abuse Claimants with the ability to defer their claims with the possibility of increasing payment. Abuse Claimants whose Allowed Claim Amounts were reduced by the Scaling Factor for application of a statute

of limitation or repose would be allowed to defer up to 12 months "the determination of their Proposed Allowed Claim Amount to see if statute of limitations revival legislation occurs . . . ".

Overall, the Settlement Trustee would have an incentive and ability to exercise discretion so as to increase Allowed Claim Amounts, which in turn would increase the amounts claimed against non-settling insurers, especially once an Allowed Claim Amount were to exceed any SIR or deductible in the relevant insurance contracts.  Increases in the Allowed Claim Amounts would also provide larger initial payments to claimants and their attorneys according to the payment percentage determined by the Settlement Trust.  Any concern with possible premature diminution of Settlement Trust Assets from higher payments would be mitigated by the potential for greater ultimate reimbursements from insurers.  The payment percentage also could be adjusted if needed to preserve Settlement Trust Assets despite larger Allowed Claim Amounts.

C.    *Effects on Insurers' Contribution and Equitable Subrogation Rights*

According to Plan Definition 136 (p.22):

"Indirect Abuse Claim" means a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, . . .

Contribution and equitable subrogation claims by non-settling insurers would therefore be considered Indirect Abuse Claims.

Article III.B.11 of the Plan (p. 54) specifies that Class 9 "consists of all Indirect Abuse Claims".  It would channel Indirect Abuse Claims against Protected Parties, which include Settling Insurance Companies, to the Settlement Trust, stating that such claims "shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents."  This language could imply that non-settling insurers who pay claims under policies with deductibles

23

would need to assert claims for reimbursement of the deductible amount against the Settlement

Trust, with payment possibly limited to the payment percentage.

Article X.G.5 of the Plan (p. 106) refers specifically to potential contribution or equitable

subrogation claims involving non-settling and settling insurers as follows:

> Contribution Claims. If a Non-Settling Insurance Company asserts that it has rights, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation or other similar claims directly or indirectly arising out of or in any way relating to such Non-Settling Insurance Company's payment of loss on behalf of one or more of the Debtors in connection with any Abuse Claim against a Settling Insurance Company (collectively, "Contribution Claims"), (a) such Contribution Claims may be asserted as a defense or counterclaim against the Settlement Trust in any Insurance Action involving such Non-Settling Insurance Company, and the Settlement Trust may assert the legal or equitable rights (if any) of the Settling Insurance Company, and (b) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such Non-Settling Insurance Company to the Settlement Trust shall be reduced by the amount of such Contribution Claims.

This provision seems to conflict with the previously noted Class 9 categorization of contribution

and equitable subrogation claims (p. 54), which would be "asserted exclusively against the

Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions

and procedures of the Settlement Trust Documents."

In any event, the Plan would replace the process through which contribution or equitable

subrogation rights are typically pursued, which often involves negotiation among insurers, with

the requirement that a non-settling insurer pursue its rights through costly litigation with the

Settlement Trust.  Moreover, if the Plan were approved, in any cases where Abuse Claims could

implicate multiple time periods, insurance policies, or both, the Settlement Trust would have the

incentive to allocate claims to non-settling insurers versus settling insurers in order to maximize

the value of trust assets, and the Plan would facilitate such behavior.

An additional and related question arises as to the possible treatment under the Plan of

any claims by non-settling insurers for indemnification under any applicable reinsurance

purchased from Hartford or other Settling Insurance Companies.  The Plan's definition of an

Indirect Abuse Claim (p. 22) includes an Abuse Claim for (emphasis added) "contribution,

*indemnity*, reimbursement, or subrogation . . . provided for under any prepetition settlement,

insurance policy, program or contract . . . ", with such claims channeled to the Settlement Trust

(p. 54).  This language raises the possibility that the Plan would inappropriately interfere with

contractual rights and obligations under such reinsurance.

## VI.    Potential Adverse Effects of Plan Confirmation on Claimants and Liability Insurance Markets

A key public policy concern in mass tort-related bankruptcies is how to allocate equitably

payments among current claimants with different amounts of compensable injuries and between

current and future claimants.  Insurers that are responsible for defense costs and indemnity for

covered claims generally have significant financial incentives not to "overpay" claimants with

weak evidence of causation or less severe injury.  They have strong incentives to consider

carefully evidence of the insured's behavior, injury causation, and severity of injury, and to

contest weak claims to reduce total costs.

In some cases, current claimants and their attorneys might have relatively strong

preferences for increasing and accelerating payments and fees, thus possibly dissipating funds

available to future claimants, including those that may be severely injured.  The appointment of

an FCR may not be sufficient to prevent bias on this dimension compared with what would occur

if insurers were allowed to participate in defense and settlement.  This possibility becomes more

likely when attorneys representing current claimants are closely involved in the design of a

reorganization plan.

Regardless of these incentive and equity issues, approval of a reorganization plan that

would abrogate or otherwise interfere with insurers' defense, investigation, settlement, and

contribution or equitable subrogation rights would adversely affect liability insurance markets by further expanding insurers' liability beyond that contemplated in the contracts as written, underwritten, and priced.  Beyond the adverse effects on non-settling insurers in this case, confirmation of a plan of reorganization that would abrogate or otherwise significantly diminish insurers' rights in contracts written in the past would increase liability insurers' uncertainty and potential liabilities under other historical policies and from writing new and renewal policies, with adverse effects on the availability, scope, and affordability of liability insurance.

_Scott E. Harrington_
_____

Scott E. Harrington

December 5, 2021

# EXHIBIT A

## Exhibit A

1.  National Surety Policy No. XLX-148-48-09
2.  National Surety Policy No. XLX-148-43-92
3.  National Surety Policy No. XXK-211-24-33
4.  National Surety Policy No. XXK-217-83-02
5.  National Surety Policy No. XXK-217-50-18
6.  National Surety Policy No. XXK-1462-6451
7.  National Surety Policy No. XXK-6767-9605
8.  National Surety Policy No. XXK-9534-9775
9.  National Surety Policy No. CSR-283-9507
10. National Surety Policy No. XXK-9551-6738
11. Interstate Fire & Casualty Policy No. XUO-1102139
12. Interstate Fire & Casualty Policy No. XUO-1102274
13. Interstate Fire & Casualty Policy No. XSO-1014504
14. Interstate Fire & Casualty Policy No. HFX-1002516
15. Interstate Fire & Casualty Policy No. HFX-1002550
16. Interstate Fire & Casualty Policy No. HFX-1002552
17. Interstate Fire & Casualty Policy No. HFX-7999-5585
18. Interstate Fire & Casualty Policy No. HFX-8207-5581
19. Insurance Company of North America Policy No. ISLG0283457
20. Insurance Company of North America Policy No. XCP 144965
21. Insurance Company of North America Policy No. XCP 144966
22. Insurance Company of North America Policy No. ISL G02931722
23. Insurance Company of North America Policy No. XCP145365
24. Mission National Insurance Policy No. MN027969
25. BSA-PLAN_00234909 – BSA-PLAN_00234918
26. BSA-PLAN_00250994 – BSA-PLAN_00251028
27. Docket No. 617; Debtors' Motion for Leave to File Debtors' Reply in Support of their Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief (with exhibits) filed 5/13/20
28. Docket No. 646; Supplemental Brief in Support of Century's Objection to Debtors' Motion for Entry of Revised Mediation Order filed on May 15, 2020 [DKT. 640] Seeking (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief filed 5/15/20
29. Docket No. 648; Motion for Leave to File Supplemental Memorandum in Support of the Limited Objection of Creditors First State Insurance Company and Twin City Fire Insurance Company and Party in Interest Hartford Accident and Indemnity Company to Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief filed 5/15/20
30. Docket No. 712; Declaration of Eric D. Green in Connection with Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief (with appendix) filed 5/28/20
31. Docket No. 712-1 (Green Declaration Appendix)
32. Docket No. 811; Transcript of Hearing dated 6/8/20

33.     Docket No. 6443; Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC filed 9/30/21

34.     Docket No. 6445; Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC filed 9/30/21

35.     Debtors' Responses and Objections to Propounding Insurers' First Set of Requests for Admissions to Debtors dated 10/18/21

36.     Debtors' Responses and Objections to Propounding Insurers' First Set of Interrogatories Directed to the Debtors dated 10/18/21

37.     Docket No. 6052; Certain Insurers' Supplemental Objeection to Motion for Approval of Debtors' Disclosure Statement

38.     Docket No. 6550; Notice of Intended Modifications to Certain Conditions Precedent to Confirmation of the Debtors' Chapter 11 Plan of Reorganization filed 10/18/21

39.     11/23/21 Dep. Tr. of Eric Green

40.     11/30/21 Dep. Tr. of James Patton

41.     12/1/21 Dep. Tr. of Bruce Griggs

# EXHIBIT B

December 2021

**Curriculum Vitae**
**Scott E. Harrington**

Alan B. Miller Professor Emeritus of                                     Tel: 610-525-3352
Health Care Management and Professor Emeritus              e-mail: harring@wharton.upenn.edu,
of Insurance and Risk Management                                 scottharringtonphd@gmail.com
The Wharton School, University of Pennsylvania       Address: 774 Mustin Ln, Villanova, PA 19085

**Education:** A.B., Economics, University of Illinois at Urbana-Champaign, 1975 (*summa cum laude*; Phi Beta Kappa); M.S., Finance, University of Illinois at Urbana-Champaign, 1976; Ph.D., Finance, University of Illinois at Urbana-Champaign, 1979

**Academic Appointments:** The Wharton School, University of Pennsylvania: Professor of Health Care Management, 2004-2021 (Department Chair, 2014-2020); Professor of Insurance and Risk Management, 2004-2013; Professor of Business and Public Policy, 2011-2020; Associate Professor of Insurance (with tenure), 1985-1988; Assistant Professor of Insurance, 1979-1985; Lecturer in Insurance, 1978-1979. University of South Carolina, The Moore School of Business: Professor of Insurance and Finance, 1988-2004; W. Frank Hipp Professor of Insurance, 2002-2004; Francis M. Hipp Distinguished Foundation Fellow, 1990-2002.

**Other Appointments and Affiliations:** Senior Fellow, Leonard David Institute for Health Economics; Adjunct Scholar, American Enterprise Institute.

**Expertise:** insurance economics, pricing, finance, regulation, contract design and interpretation; health insurance and health care finance

**Awards and Honors**

Robert I. Mehr Award, 2019, from the American Risk and Insurance Association for *Journal of Risk and Insurance* article published in 2009 judged to have best withstood the test of time with the greatest in the field of risk and insurance

National Association of Mutual Insurance Co. (NAMIC) Merit Society, Honorary Merit Award, 2015

Member, Federal Advisory Committee on Insurance, 2011-2013

National Association of Mutual Insurance Companies (NAMIC) Service Award, 2010

Alan B. Miller Professor (endowed chair), 2005-present

W. Frank Hipp Professor of Insurance (endowed chair), 2002-2004

Francis M. Hipp Distinguished Foundation Fellow, University of South Carolina, 1990-2002

Shin Award for Research Excellence (paper award), International Insurance Society Meeting, 2001

Spencer L. Kimball Award for article in *Journal of Insurance Regulation*, 1999

Moore School of Business Distinguished Researcher Award, 1998

Robert I. Mehr Award, 1998, from the American Risk and Insurance Association for *Journal of Risk and Insurance* article published in 1988 with the greatest ten-year impact in the field of risk and insurance

Alpha Kappa Psi - Spangler Award, 1996, from the American Risk and Insurance Association for *Journal of Risk and Insurance* article published in 1986 with the greatest ten-year impact (award shared with another article)

Robert C. Witt Research Award, 1996, for best article in the 1995 volume of the *Journal of Risk and Insurance*

Alpha Kappa Psi - Spangler Award, 1995, from the American Risk and Insurance Association for *Journal of Risk and Insurance* article published in 1985 with the greatest ten-year impact (award shared with another article)

President, Risk Theory Society, 1992

President, American Risk and Insurance Association, 1992

College of Business Administration Research Fellow, University of South Carolina, Fall 1992, Fall 1989

International Insurance Society Research Paper Award, 1992

Insurance Educator of the Year, 1990, Professional Insurance Agents Foundation

Ranked most productive scholar in risk management and insurance based on total pages published weighted by number of authors and journal impact (study appeared in *Journal of Risk and Insurance*, 1990)

*Journal of Risk and Insurance* Award for one of top three articles in 1986

Honorary Master of Arts, University of Pennsylvania, 1985

*Journal of Risk and Insurance* Award for one of top three articles in 1985

Second Prize, Actuarial Studies in Non-Life Insurance International Competition for Young Researchers, 1985

*Journal of Risk and Insurance* Award for one of top three articles in 1981

Paul Van Arsdell Award, Outstanding Undergrad. Teaching, Finance Department, University of Illinois, 1978

State Farm Companies Doctoral Dissertation Award, 1977

University of Illinois Bronze Tablet for academic excellence, Phi Beta Kappa, Phi Kappa Phi, 1974-1975

Valedictorian, Rock Falls High School, Rock Falls, Ill., 1971

**Teaching History**

*Undergraduate*: The U.S. Health Care System (Wharton), Risk Management (Wharton and South Carolina), Principles of Risk Management and Insurance (Wharton and South Carolina), Property-Liability Insurance and Insurer Management (Wharton and South Carolina), Life-Health Insurance and Insurer Management (Wharton), Introduction to Finance (South Carolina)

*Masters*: Financial Management of Health Care Institutions (Wharton), Risk Management (South Carolina), Money and Capital Markets (South Carolina), Risk and Insurance (Wharton)

*Doctoral:* Empirical Methods in Health Services Research (Wharton); Current Issues in Finance (South Carolina), Empirical Methods in Financial Research (South Carolina), Insurance Economics (Wharton); Moore School of Business Finance Doctoral Program Coordinator, 2001-2004

*Executive:* AXA (Wharton), Prudential Financial (Wharton), XL Capital / China Insurance Regulatory Commission (Wharton); KPMG Insurance (Wharton), Insurance Company Finance (South Carolina)

**Scholarly Journal Articles**

With Mark Pauly and Adam Leive, Losses (and Gains) from Health Reform for Non-Medicaid Uninsureds, *Journal of Risk and Insurance* 87 (March 2020): 41-66.

The Economics and Regulation of Captive Reinsurance in Life Insurance, *Journal of Insurance Regulation* 34(2016): 1-37.

With Mark Pauly and Adam Leive, "Sticker Shock" in Individual Insurance under Health Reform? *American Journal of Health Economics* 1(2015): 494–514.

With Mark Pauly, Private Health Insurance Exchanges, *Health Management, Policy and Innovation* 1 (2013): 61-71.

Medical Loss Ratio Regulation under the Affordable Care Act, *Inquiry* 50 (March 2013): 9-26.

The Dodd-Frank Act, Solvency II, and U.S. Insurance Regulation, *Journal of Financial Perspectives*, Inaugural Issue 1 (2013): 1-12. (Invited article.)

With Guy David, Population Density and Racial Differences in the Performance of Emergency Medical Services, *Journal of Health Economics* 29 (July 2010): 603-615.

U.S. Health Care Reform: The Patient Protection and Affordable Care Act, *Journal of Risk and Insurance* 77 (September 2010): 703-708. (Invited article.)

The Health Insurance Reform Debate, *Journal of Risk and Insurance* 77 (March 2010): 5-38. (Invited article. Earlier version distributed as American Enterprise Institute Working Paper No. 161, December 2009).

The Financial Crisis, Systematic Risk, and the Future of Insurance Regulation, *Journal of Risk and Insurance* 76 (December 2009): 785-819. (Invited article. Earlier version published as a *NAMIC Issue Brief*, September 2009).

2

With Patricia Danzon and Andrew Epstein, 'Crises' in Medical Malpractice Insurance: Evidence of Excessive Price-cutting in the Preceding Soft Market, *Journal of Banking and Finance* 32 (January 2008): 157-169.

With David Shrider, All Events Induce Variance: Analyzing Abnormal Returns When Effects Vary Across Firms, *Journal of Financial and Quantitative Analysis,* 41 (March 2007): 229-256.

With Karen Epermanis, Market Discipline in Property/Casualty Insurance: Evidence from Premium Growth Surrounding Changes in Financial Strength Ratings, *Journal of Money, Credit and Banking* 38 (September 2006): 1515-1544.

Tong Yu, Do Property/Casualty Insurance Underwriting Margins Have Unit Roots? *Journal of Risk and Insurance* 70 (December 2003): 715-734.

With Greg Niehaus, Capital, Corporate Income Taxes, and Catastrophe Insurance, *Journal of Financial Intermediation* 12 (October 2003): 365-389.

With Greg Niehaus, Capital Structure Decisions in the Insurance Industry: Stocks versus Mutuals, *Journal of Financial Services Research* 21 (February 2002): 145-163.

With Greg Niehaus, Enterprise Risk Management: The Case of United Grain Growers, *Journal of Applied Corporate Finance* 14 (Winter 2002): 71-80.

With Patricia Danzon, Workers' Compensation Rate Regulation: How Price Controls Increase Costs," *Journal of Law and Economics* 44 (April 2001): 1-36.

With Greg Niehaus, Government Insurance, Tax Policy, and the Availability and Affordability of Catastrophe Insurance, *Journal of Insurance Regulation* 19 (Summer 2001): 591-612.

With Patricia Danzon, Rate Regulation, Safety Incentives, and Loss Growth in Workers' Compensation Insurance, *Journal of Business* 73 (October 2000): 569-595.

Insurance Rate Regulation in the 20th Century (invited article), *Journal of Insurance Regulation*, Millennium Issue 19 (Winter 2000): 204-218.

With Greg Niehaus, Basis Risk with PCS Catastrophe Insurance Derivative Contracts, *Journal of Risk and Insurance*, 66 (March 1999): 49-82.

With Greg Niehaus, Race, Redlining, and Automobile Insurance Prices, *Journal of Business*, 71 (July 1998): 433-469.

With Martin Grace, Risk-Based Capital and Solvency Screening in Property-Liability Insurance: Hypotheses and Empirical Tests, *Journal of Risk and Insurance*, 65 (June 1998): 213-243.

With Martin Grace and Robert Klein, Identifying Troubled Life Insurers: An Analysis of the NAIC FAST System, *Journal of Insurance Regulation*, 16 (Spring 1998): 249-290.

Insurance Derivatives, Tax Policy, and the Future of the Insurance Industry (invited paper), *Journal of Risk and Insurance* , 64 (December 1997): 719-725.

With Julie Cagle, Insurance Supply with Capacity Constraints and Endogenous Insolvency Risk, *Journal of Risk and Uncertainty*, 11 (December 1995): 219-232.

With Steven Mann and Greg Niehaus, Insurer Capital Structure Decisions and the Viability of Insurance Derivatives, *Journal of Risk and Insurance*, 62 (September 1995): 482-508.

With J. David Cummins and Robert W. Klein, Insolvency Experience, Risk-Based Capital, and Prompt Corrective Action in Property-Liability Insurance, *Journal of Banking and Finance*, 19 (June 1995): 511-528.

With Patricia Danzon, Price Cutting in Liability Insurance Markets, *Journal of Business* 67 (October 1994): 511-538.

State Decisions to Limit Tort Liability: An Empirical Analysis of No-Fault Automobile Insurance Laws, *Journal of Risk and Insurance*, 61 (June 1994): 276-294.

With Helen Doerpinghaus, The Economics and Politics of Automobile Insurance Rate Classification, *Journal of Risk and Insurance* 60 (March 1993): 59-84.

With J. David Cummins and Greg Niehaus, An Economic Overview of Risk-Based Capital Requirements for the Property-Liability Insurance Industry, *Journal of Insurance Regulation* 11 (Summer 1993): 427-447.

With Greg Niehaus, Dealing with Insurance Availability and Affordability Problems in Inner Cities: An Analysis of the California Proposal, *Journal of Insurance Regulation* 10 (Summer 1992): 564-584.

Auto Insurance in Michigan: Regulation, No-Fault, and Affordability, *Journal of Insurance Regulation* 8 (Winter 1991): 144-183.

With S. Travis Pritchett, Automobile Insurance Reform in South Carolina, *Journal of Insurance Regulation* 9 (June 1990): 422-445.

The Relationship Between Voluntary and Involuntary Market Rates and Rate Regulation in Automobile Insurance, *Journal of Risk and Insurance*, 57 (March 1990): 9-27.

With J. David Cummins, The Relationship Between Risk and Return: Evidence for Property-Liability Insurance Stocks, *Journal of Risk and Insurance*, 55 (March 1988): 15-31.

With Robert E. Litan, Causes of the Liability Insurance Crisis, *Science*, 239 (February 12, 1988): 737-741.

A Note on the Impact of Auto Insurance Rate Regulation, *Review of Economics and Statistics*, 69 (February 1987): 166-170.

With J. David Cummins, The Impact of Rate Regulation on Property-Liability Insurance Loss Ratios: A Cross-Sectional Analysis with Individual Firm Data, *Geneva Papers on Risk and Insurance*, 12 (January 1987): 50-62.

With Jack Nelson, A Regression-Based Methodology for Solvency Surveillance in the Property-Liability Insurance Industry, *Journal of Risk and Insurance*, 53 (December 1986): 583-605.

Estimation and Testing for Functional Form in Pure Premium Regression Models, *ASTIN (Actuarial Studies in Non-Life Insurance) Bulletin*, 16, Supplement (April 1986): S31-S43.

With J. David Cummins, Property-Liability Insurance Rate Regulation: Estimation of Underwriting Betas Using Quarterly Profit Data, *Journal of Risk and Insurance*, 52 (March 1985): 16-43.

The Impact of Rate Regulation on Prices and Underwriting Results in the Property-Liability Insurance Industry: A Survey, *Journal of Risk and Insurance*, 51 (December 1984): 577-623.

The Impact of Rate Regulation on Automobile Insurance Loss Ratios: Some New Empirical Evidence, *Journal of Insurance Regulation*, 3 (December 1984): 182-202.

The Relationship Between Risk and Return: Evidence for Life Insurance Stocks, *Journal of Risk and Insurance*, 50 (December 1983): 587-610.

New York Regulation of General Agency Expense Allowances, *Journal of Risk and Insurance*, 49 (December 1982): 564-582.

Operating Expenses for Agency and Nonagency Life Insurers: Further Evidence, *Journal of Risk and Insurance*, 49 (June 1982): 229-255.

Stock Life Insurer Shareholder Dividend Policy and Holding Company Affiliation, *Journal of Risk and Insurance*, 48 (December 1981): 550-576.

**Other Articles**

Stabilizing Individual Health Insurance Markets with Subsidized Reinsurance, *Penn LDI Issue Brief*, September 2017.

U.S. Health Care Reform, in Daniel Schwarcz and Peter Siegelman, eds., *Research Handbook on the Economics of Insurance Law* (Elgar Publishing Ltd, 2015).

The Financial Condition and Operation of CO-OP Plans, *Penn LDI / Robert Wood Johnson Foundation Issue Brief*, February 2015.

The Use of Deciphering the Data: Health Insurance Rates and Rate Review, *Penn LDI / Robert Wood Johnson Foundation Data Brief*, June 2014.

Regulation and Supervision of Insurance SIFIs, in John Biggs and Matthew Richardson, eds., *Modernizing Insurance Regulation* (Wiley, 2014).

With Greg Niehaus and Tong Yu, Insurance Price Volatility and Underwriting Cycles, in Georges Dionne, ed., *Handbook of Insurance*, 2nd ed. (Kluwer Academic, 2013).

With Georges Dionne, Insurance and Insurance Markets, in Mark Machina and W. Kip Viscusi, eds., *Handbook of the Economics of Risk and Uncertainty* (Elsevier, 2013).

Cost of Capital for Pharmaceutical, Biotechnology, and Medical Device Firms, in Patricia Danzon and Sean Nicholson, eds., *The Handbook of the Economics of the Biopharmaceutical Industry* (Oxford University Press, 2012).

Facilitating and Safeguarding Regulation of Private Health Insurance in Advanced Market Economies, in *Private Voluntary Health Insurance In Development: Friend or Foe,* Alexander Preker, Richard Scheffler, and Mark Bassett, eds. (The World Bank, 2006).

Rethinking Disaster Policy After Hurricane Katrina, in *On Risk and Disaster: Lessons from Hurricane Katrina* Ronald Daniels, Donald Kettl, and Howard Kunreuther, eds. (University of Pennsylvania Press, 2006).

Tort Liability, Insurance Rates, and the Insurance Cycle, *Brookings-Wharton Papers on Financial Services: 2004,* Richard Herring and Robert Litan, eds. (Brookings Institution Press, 2004).

Market Discipline in Insurance and Reinsurance, in *Market Discipline: The Evidence Across Countries and Industries*, C. Borio, et al., eds. (MIT Press, 2004).

Capital Adequacy in Insurance and Reinsurance, in *Capital Adequacy Beyond Basel: Banking, Securities, and Insurance*, Hal Scott, ed. (Oxford University Press, 2004).

Effects of Prior Approval Regulation in Automobile Insurance, in J. David Cummins, ed., *Deregulating Property-Liability Insurance* (Washington, D.C.: AEI-Brookings Joint Center for Regulatory Studies, 2002).

With Tom Miller, Competitive Markets for Individual Health Insurance (invited article), *Health Affairs – Web Exclusive*, October 23, 2002: W359-W362.

Repairing Insurance Markets, *Regulation: Cato Review of Business and Government*, 25th Anniversary Issue 25 (Summer 2002).

Rethinking Disaster Policy, *Regulation: Cato Review of Business and Government* 23, 1 (Spring 2000): 40-46.

An Historical Overview of Federal Involvement in Insurance Regulation, Peter Wallison, ed., *Optional Federal Chartering of Insurance* (Washington, D.C.: American Enterprise Institute, 2000).

With Greg Niehaus, Volatility and Underwriting Cycles, in *The Handbook of Insurance*, Georges Dionne, ed. (Boston, Mass.: Kluwer Academic, 2000).

With Patricia Danzon, The Economics of Liability Insurance, in *The Handbook of Insurance*, Georges Dionne, ed. (Boston, Mass.: Kluwer Academic, 2000).

With Greg Niehaus, Race and Availability / Affordability Problems in Urban Automobile Insurance Markets, in *Alternative Approaches to Insurance Regulation*, Robert Klein, ed. (Kansas City, Mo.: National Association of Insurance Commissioners, 1998).

With J. David Cummins and Greg Niehaus, Risk-Based Capital Requirements for Property-Liability Insurers: A Financial Analysis, in *The Financial Dynamics of the Insurance Industry,* Edward I. Altman and Irwin T. Vanderhoof, eds. (New York: New York University Salomon Center, 1995).

Taxing Low Income Households in Pursuit of the Public Interest: The Case of Compulsory Automobile Insurance, in *Insurance, Risk Management, and Public Policy*, Sandra Gustavson and Scott Harrington, eds. (Boston, Mass.: Kluwer Academic, 1994).

The Solvency of the Insurance Industry, in *Proceedings of the 28th Annual Conference on Bank Structure and Competition*, Herbert Baer and Douglas Evanoff, eds. (Chicago, Ill.: Federal Reserve Bank of Chicago, 1992).

With Greg Niehaus, Policyholder Runs, Contagion, and Life Insurer Insolvency Risk: Hypotheses and Preliminary Evidence, *Proceedings of the 1992 Meeting of the International Insurance Society*, 1992.

Public Policy and Property-Liability Insurance, *The Regulation and Financial Condition of Insurance Companies*, Richard Kopke, ed. (Boston: Federal Reserve Bank of Boston, 1992).

With Patricia Danzon, The Demand for and Supply of Liability Insurance, in *Contributions to Insurance Economics*, Georges Dionne, ed. (Boston, Mass.: Kluwer, 1992): 564-584.

Policyholder Runs, Life Insurance Company Failures, and Insurance Solvency Regulation, *Regulation: Cato Review of Business and Government* 15 (Spring 1992): 27-37.

Rate Suppression (Presidential Address), *Journal of Risk and Insurance*, 59 (June 1992): 185-202.

Should the Feds Regulate Insurance? *Regulation: Cato Review of Business and Government* 14 (Spring 1991): 53-61.

With J. David Cummins and Robert Klein, Cycles and Crises in Property/Casualty Insurance: A Background Discussion and Summary and Policy Implications, in *Cycles and Crises in Property-*

*Liability Insurance:  Causes and Implications for Public Policy*, J. David Cummins, Scott Harrington, and Robert Klein, eds. (Kansas City, Mo.: National Association of Insurance Commissioners, 1991); edited version reprinted in *Journal of Insurance Regulation*, 10 (Fall 1991): 50-93.

With Patricia Danzon, Price-Cutting in Liability Insurance Markets, in *Cycles and Crises in Property-Liability Insurance:  Causes and Implications for Public Policy*, J. David Cummins, Scott Harrington, and Robert Klein, eds. (Kansas City, Mo.: National Association of Insurance Commissioners, 1991).

With Georges Dionne, An Introduction to Insurance Economics, in *Foundations of Insurance Economics: Readings in Economics and Finance*, Georges Dionne and Scott Harrington, eds. (Boston, Mass: Kluwer Academic, 1991).

Liability Insurance: Volatility in Prices and in the Availability of Coverage, in *Tort Law and the Public Interest*, Peter Schuck, ed. (New York, N.Y.: W.W. Norton, 1990).

A Retrospective on the Liability Insurance Crisis, *CPCU Journal*, 43 (March 1990): 17-28.

With Jack Van Derhei, Pension Plan Asset Reversions, *Trends in Pensions*, John Turner and Daniel Beller, eds. (Washington, D.C.: U.S. Government Printing Office, 1989).

Prices and Profits in the Liability Insurance Market, in *Liability: Policy and Perspectives*, Robert Litan and Clifford Winston, eds. (Washington, D.C.: The Brookings Institution, 1988).

The Relationship Between Standard Premium Loss Ratios and Firm Size in Workers' Compensation Insurance, in J. David Cummins, ed., *Workers' Compensation Insurance Pricing* (Boston, Mass.: Kluwer-Nijhoff, 1988).

With J. David Cummins, Econometric Forecasting of Automobile Insurance Paid-Claim Costs, in *Strategic Planning and Modeling in Property-Liability Insurance*, J. David Cummins, ed. (Boston, Mass.: Kluwer-Nijhoff Publishing, 1984).

**Books and Monographs**

With Eti Baranoff and Greg Niehaus, *Risk Assessment* (Malvern, Pa.: American Institute for Chartered Property Casualty Underwriters / Insurance Institute of America, 2005).

With Greg Niehaus, *Risk Management and Insurance*, 2nd Edition (Burr Ridge, Ill.: Irwin / McGraw-Hill, 2004).

*Optional Federal Chartering of Property-Casualty Insurance Companies* (Downer's Grove, Ill.: Alliance of American Insurers, 2002).

With members of the U.S. Shadow Financial Regulatory Committee, *Reforming Bank Capital Regulation – A Proposal by the U.S. Shadow Financial Regulatory Committee* (Washington, D.C.: American Enterprise Institute, 2000).

*Insurance Deregulation and the Public Interest* (Washington, D.C.: AEI-Brookings Joint Center for Regulatory Studies, 2000).

With Greg Niehaus, *Risk Management and Insurance* (Burr Ridge, Ill.: Irwin / McGraw-Hill, 1999); Canadian and Chinese editions were later published.

With Patricia Danzon, *Rate Regulation of Workers' Compensation Insurance:  How Price Controls Increase Costs* (Washington, D.C., American Enterprise Institute, 1998).

With Martin Grace and Robert Klein, *An Analysis of the FAST Solvency Monitoring System* (Kansas City, Mo:  National Association of Insurance Commissioners, 1995).

With S. Travis Pritchett, Helen Doerpinghaus, and Greg Niehaus, *An Economic Analysis of Workers' Compensation in South Carolina*  (Columbia, S.C.: Division of Research, College of Business Administration, University of South Carolina, 1994).

Co-Editor with Sandra Gustavson, *Insurance, Risk Management, and Public Policy:  Essays in Honor of Robert I. Mehr* (Boston, Mass.: Kluwer Academic, 1994).

Co-editor with Georges Dionne, *Foundations of Insurance Economics: Readings in Economics and Finance* (Boston, Mass.: Kluwer Academic, 1991).

Co-editor with J. David Cummins and Robert Klein, *Cycles and Crises in Property/Casualty Insurance: Causes and Implications for Public Policy* (Kansas City, Mo.: NAIC, 1991).

*Auto Insurance in Michigan: Regulation, No-Fault, and Affordability*  (Midland, Mich.: The Mackinac Center, 1989).

Co-editor with J. David Cummins, *Fair Rate of Return in Property-Liability Insurance* (Boston, Mass.: Kluwer-Nijhoff and S. S. Huebner Foundation, 1986).

With Patricia Danzon, *An Evaluation of Solvency Surveillance in the Property-Liability Insurance Industry* (Schaumberg, Ill.:  Alliance of American Insurers, 1986).

With Dan McGill and Robert Zelten, *Regulation 49 and the Public Interest* (New York, N.Y.: Life Insurance Council of New York, 1980).

**Opinion-Editorial, Business Press, and Miscellaneous Publications**

Will Paul Ryan's Obamacare replacement work for people with pre-existing conditions? *Forbes Blog*, January 28, 2017.

How the Largest Obamacare CO-OP Went Broke, *Forbes Blog*, October 12, 2015.

Effects of the ACA's 3Rs on the Bottom Line, Parts I&II, *LDI Blog*, July 29-30, 2015.

Risk Corridors and Budget Neutrality, *Health Affairs Blog,* May 14, 2014.

Demonizing the Insurance Industry is Not the Answer, with John Lott, *Fox Forum*, March 19, 2010.

Raising Costs Isn't Health Care Reform, *Washington Examiner*, Dec. 23, 2009.

The Real Consequences of Health Insurance Overhaul, *The American*, Dec. 22, 2009.

Congress's Long-Term Care Bomb, *Wall Street Journal*, Dec. 13, 2009.

Competition and Health Insurance, *Wall Street Journal*, Nov. 6, 2009.

The Adverse Selection Problem, *Medical Progress Today*, Oct. 30, 2009.

The AARP Paradox, *The American*, Oct. 2, 2009.

Fact-checking the President on Health Insurance, *Wall Street Journal*, Sept. 14, 2009.

Health Co-ops:  Slow Road to Government Care, *Wall Street Journal*, August 19, 2009.

What the States' Experience with Mandates Should Tell Us about Universal Healthcare Coverage, *The American*, August 11, 2009.

Reform Needs Healthy Life Incentives, *Wall Street Journal*, June 29, 2009.

The Public Plan Would Be the Only Plan, *Wall Street Journal*, June 15, 2009.

Moral Hazard and the Meltdown, *Wall Street Journal,* May 23, 2009.

With Greg Niehaus, United Grain Growers:  Enterprise Risk Management and Weather Risk, *Risk Management & Insurance Review* 6 (Fall 2003): 193-208 (Case; plus Teaching Note, 209-217).

With Emily Johnson and David Shrider, Economics White Paper, *The Forum for Corporate Conscience*, Tribble Creative Group, 2003.

Deregulating the Insurance Industry:  The Key to Providing Quality, Cost-effective Consumer Protection, *The State Factor*, American Legislative Exchange Council, 2002.

Ratings Show Sanford is No Closet Liberal, *The State*, June 21, 2002.

With Tom Miller, Insuring Against Terror, *National Review On-Line*, November 5, 2001.

With Tom Miller, Disaster Assistance & Government Insurance, in *Cato Handbook for Congress*,  The Cato Institute, Washington, D.C., 2001 and 2003 editions.

Are Insurance Cycles Obsolete? *Risques – Les cahiers de l'assurance*, 41 (January-March 2000):  63-66 (in French).

Taxes and the High Cost of Catastrophe Insurance:  The Case for Tax-Deferred Reserves, Competitive Enterprise Institute Insurance Reform Project, October 1999.

With Tom Miller, Reinsurance Proposal Troubling; Instead, Ease Regulations on Private Insurers, *USA Today*, September 17, 1999.

With Steven Mann and Greg Niehaus, Unbundling Catastrophe Risk, *The Risk Financier* (September 1997).

With J. David Cummins and Robert W. Klein, Cycles and Crises, *Best's Review* (P-C Ed.), January 1992.

With S. Travis Pritchett, State's Auto Insurance System Requires Complete Overhaul, *The Greenville News*, October, 21, 1991.

Fact vs. Fiction on Advisory Rates, *Best's Review* (P-C ed.), October 1989.

With Walter Olson, Canute's Revenge: Proposition 103 and its Aftermath, *Institute for Civil Justice Reform News Letter*, The Manhattan Institute, February 1989; edited versions published as Punishment for Tort Reformers, *The Journal of Commerce*, March 1, 1989 and The Real Culprit in the Insurance Crisis, *San Francisco Chronicle*, April 7, 1989.

Taking the Initiative in California, *Best's Review* (P-C ed.), October 1988.

Bans on Rating Variables: Some Answers, *National Underwriter, Property-Casualty and Employee Benefits Edition*, November 14, 1988, p. 43.

The Insurance Industry and Tort Reform, *Legal Backgrounder*, Washington Legal Foundation, September 16, 1988.

Antitrust Suits May Damage P & C Insurers, *National Underwriter, Property-Casualty and Employee Benefits Edition*, June 6, 1988, p. 32.

Insurance Company Profitability Scrutinized, *National Underwriter, Property-Casualty and Employee Benefits Edition*, February 8, 1988, p. 40.

Discussion of G. Dionne, 'Adverse Selection and Repeated Insurance Contracts,' *Geneva Papers on Risk and Insurance*, 8 (October 1983): 333-335.

Comment on J. Gragnola, 'Strategic Planning for Insurance: The Experience of Allstate Insurance Company,' in Strategic Planning for Insurance: Planning at the Company's Level, *Etudes et Dossiers Nr. 60*, The Geneva Association, 1982.

## Reports and Unpublished Manuscripts

Economic Perspectives on the Restatement of the Law on Liability Insurance Project, SSRN-id2941892, March 20, 2017.

Systemic Risk and Regulation:  The Misguided Case of Insurance SIFIs, October 2016.  Earlier version available from American Action Forum.

The Use of Captive Reinsurance in Life Insurance, *American Council of Life Insurers*, May 2014.

The Continuing Debate on Health Insurance Reform, Networks Financial Institute Policy Brief, 2011-PB-09.

Insurance Regulation and the Dodd-Frank Act, Networks Financial Institute Policy Brief, 2011-PB-01, March 2011.

Incentivizing Comparative Effectiveness Research, January 2011.

Regime Change for Health Insurance Regulation:  Rethinking Rate Review, Medical Loss Ratios, and Informed Competition, American Enterprise Institute, December 2010.

Federal Chartering of Insurance Companies:  Options and Alternatives for Transforming Insurance Regulation, Networks Financial Institute Policy Brief, 2006-PB-02, March 2006.

With Howard Kunreuther, Neil Doherty, Paul Kleindorfer, Mark Pauly, et al., *TRIA and Beyond: Terrorism Risk Financing in the U. S.,* Wharton Risk Management and Decisions Processes Center, August 2005.

With David Appel and Richard Lord, *The Agricultural Research, Extension and Education Reform Act of 1998 Section 535 Crop Insurance Study,* Milliman & Robertson, Inc., 1999.

Working Group of the Griffith Foundation for Insurance Education, Proposal for Risk Management and Insurance Program at The Ohio State University, 1997.

With Neil Doherty, Investment Incentives, Bankruptcies and Reverse Convertible Debt, Wharton School, University of Pennsylvania, revised May 1997.

Discussion of 'Insurance Guaranty Funds:  Issues and Perspectives' and 'Risk and the Capital of Insurance Companies, Competitive Enterprise Institute Conference on Insurance Regulation, 1996.

With Greg Niehaus,  An Economic Analysis of Territorial Rating in Automobile Insurance, University of South Carolina, June 1993.

Competition and Regulation in the Automobile Insurance Market, prepared for the ABA National Institute on Insurance Competition and Pricing in the 1990s, Baltimore, Maryland, June 1990.

Rate Regulation, No-Fault, and the Automobile Insurance Affordability Problem, January 1989.

Regulation and Subsidies in the Automobile Insurance, May 1988.

The Liability Insurance Crisis: Causes and Implications for Insurance Regulation, prepared for annual meeting of the Reinsurance Association of America, Tucson, Arizona, May 1988.

Rate Regulation, Profitability, and Pricing Behavior in Property-Liability Insurance: Review and Analysis, prepared for Aetna Life and Casualty Corporation, November 1981.

**Selected Presentations, Speeches, and Panels**

American Enterprise Institute, presentation on individual health insurance market competition and stability, at event "Health Care that Matters:  Real Choices for Real Competition, Washington, D.C., December 4, 2018.

Leonard Davis Institute of Health Economics and Penn Wharton Public Policy Initiative, presentation on Republican health care reform proposals at forum "Health Reform and the Future of the Individual Insurance Market, Washington, D.C., March 7, 2017.

American Enterprise Institute, presentation on Republican health care reform proposals, at event What's Next for Health Care?, Washington, D.C., December 12, 2016.

Department of Risk Management and Insurance, Georgia State University, presentation on the misguided case for insurance SIFIs at Bowles Symposium on Systemic Risk, Atlanta, GA, November 3, 2016.

American Action Forum, presentation on the misguided case of insurance SIFIs at conference Regulating the Regulator:  Ensuring the FSOC Designation Process Captures True Systemic Risk, Washington, D.C., September 22, 2016.

Leonard David Institute of Health Economics, The Strange Tale of ACA CO-OPS, Health Insurance Exchange Conference, Philadelphia, PA, April 8, 2016.

American Enterprise Institute session on Affordable Care Act CO-OPs, presentation on the financial status of CO-OPs, Washington, D.C., October 22, 2015.

National Bureau of Economic Research Insurance Program, discussant of R. Koijen and M. Yogo, Shadow Insurance, Cambridge, MA, March 1, 2014.

Panelist, Socratic Panel: Dodd-Frank and the Regulation of Insurance Companies, hosted by Harvard Law School, Program on International Financial Studies, Dec. 11, 2013, Washington, D.C.

U.S. Health Insurance and Healthcare Reform, Conference on the Law and Economics of Insurance, Insurance Law Center, University of Connecticut School of Law, October 4, 2013, Storrs, Ct.

America's 2013 National Policy Forum, "Unintended Consequences of Regulation:  Rethinking MLR," Washington, D.C., March 13, 2013.

The Health Management Academy Senior Executive Forum & GE Administrative Fellows Meeting, "Value Creation through Bundled Payments," Phoenix, AZ, Feb. 1-2, 2013.

Humana Infusion Program, presentation on health care reform, Louisville, KY, July 26, 2012.

America's Health Insurance Plans Institute 2012, panelist in plenary session "Thinking Forward: Doorways to Health System Change, Salt Lake City, UT, June 22, 2012.

America's Health Insurance Plans Compliance Forum, presentation on medical loss ratio regulation and rate review, Salt Lake City, UT, June 20, 2012.

CPI's 3rd Annual Conference on Risk Sharing and Innovative Contracting Models for Bio/Pharmaceuticals, "The Future of Manufacturer-Payer Risk Sharing in the United States:  An Economic Perspective," Philadelphia, PA,  March 23, 2012.

NYU Stern Salomon Center for the Study of Financial Institutions, Conference on Alternative Designs for a Modern Insurance Regulatory Structure, "Insurance Regulation, the Dodd Frank Act, and the Too Big to Fail Problem, New York, NY, March 2, 2012.

America's Health Insurance Plans Executive Leadership Summit, "Key Trends, Directions, and Future Issues," Phoenix, AZ, Feb. 2, 2012.

National Organization of Life-Health Guaranty Associations Annual Legal Seminar, Insurance and the Dodd-Frank Act, July 21, 2011.

Kauffman Foundation Legal Seminar, Accountable Care Organizations, Laguna Niguel, Cal., July 8, 2011.

America's Health Insurance Plans Compliance Seminar, San Francisco, Cal., June 15, 2011.

Geneva Association 38th General Assembly, Systemic Risk in Insurance, Rio de Janeiro, Brazil, May 22, 2011.

Networks Financial Institute, 7th Annual Insurance Reform Summit, Insurance and the Dodd-Frank Act, Washington, D.C., March 15, 2011.

Health Management Academy Senior Executives Forum, Effects of Health Care Reform on Providers and Payers and , Washington, D.C., March 25, 2011.

Health Management Academy Government Relations Officer Forum, Effects of Health Care Reform on Providers and Payers, Washington, D.C., February 9, 2011.

National Association of Mutual Insurance Companies Policy Summit, The Future of Insurance Regulation and Health Care Reform, the Dodd-Frank Act and the 2010 Election, Washington, D.C., January 21, 2011.

American Enterprise Institute Conference, Beyond Repeal and Replace, presentation on health insurance regulation under health care reform, Washington, D.C., December 8, 2010.

Petrie-Flom Center for Health Law Policy, Biotechnology and Bioethics at Harvard Law School, conference Should Congress Repeal the McCarran-Ferguson Act, presentation on insurance antitrust exemption, November 12, 2010.

Brokers and Reinsurers Marketing Association, presentation on health care reform, New York, N.Y., November 30, 2010.

University of Pennsylvania Law Review Symposium on health care reform, presentation on minimum medical loss ratios and rate review; Philadelphia, October 28, 2010.

Free Market Forum, Hillsdale College, presentation on ways to drive down health care costs, October 1, 2010.

AMCOMP (American Society of Workers Comp Professionals) Seminar, presentation on health care reform, New York, N.Y., September 14, 2010.

Property Casualty Insurers of America Association Board of Governors Meeting, presentation on healthcare and financial reform, Williamsburg, Va., July 20, 2010.

Louisiana Workers Compensation Corporation Board of Directors, presentation on healthcare reform, San Francisco, Cal., July 13, 2010.

American Enterprise Institute and National Chamber Foundation, symposium on U.S. Regulatory Policy and Free Markets, presentation on healthcare reform and health insurance regulation, Washington, D.C., July 8, 2010.

American Society of Health Economists Meeting, "Stochastic Frontier Analysis of Hospital Mortality," paper presentation, Ithaca, N.Y., June 22, 2010.

International Insurance Society Meeting, plenary address on healthcare reform, Madrid, Spain, June 7, 2010.

National Council on Compensation Insurance Annual Issues Meeting, presentation on healthcare reform, Orlando, Florida, May 6, 2010.

National Council of Insurance Guaranty Funds, presentation on systemic risk and financial reform, San Francisco, Cal., April 29, 2010.

World Insurance Forum Meeting, panel on systemic risk and insurance regulation, Bermuda, March 16, 2010.

Property/Casualty Insurer Joint Industry Forum, panel on systemic risk and insurance regulation, New York, N.Y., January 12, 2010.

"Cost of Capital for Pharmaceutical, Biotechnology, and Medical Device Firms," conference for *The Handbook of the Economics of the Biopharmaceutical Industry*, Philadelphia, November 20, 2009.

"How Private Health Insurance Really Works," American Enterprise Institute, Conference on "Private Health Insurance Markets:  Facts, Fables, and Fiction,"  Washington, D.C., October 21, 2009.

"The Financial Crisis, Systemic Risk, and the Future of Insurance Regulation," National Association of Mutual Insurance Companies Annual Meeting, Atlanta, Georgia, September 21, 2009.

"Remarks on Health Insurance Reform," Health Management Academy CEO Forum, Laguna Beach, Cal., August 6, 2009.

"Public Plan Option:  Competitor or Predator," American Enterprise Institute, Conference on "The Five (not so) Easy Pieces of Health Care Reform," Washington, D.C., June 4, 2009.

Networks Financial Institute, 6th Annual Insurance Reform Summit, presentation on systemic risk in insurance, March 4, 2009.

Discussant of "The Effects of 'Consumer-Directed' Health Insurance on the Use of Medical Care Services and Cost of Care," Southeastern Health Economics Study Group, Birmingham, Al., October, 2008.

American Health Economic Association, Population Density and Racial Differences in the Performance of Emergency Medical Services, Durham, N.C., June 2008.

International Health Economists Association, paper presentation, Are there Racial Disparities in Emergency Medical Services?  Evidence from Mississippi, and paper discussant, Copenhagen, Denmark, July 2007.

International Insurance Workshop, Hitotsubashi University, Non-Life Insurance Institute of Japan, and Research Institute of Nipon Life Insurance Company, presentations on insurance company solvency, capital regulation, and design of optimal capital standards, Tokyo, Japan, March 2007.

National Association of Mutual Insurance Companies Policy Summit, presentations on insurance regulatory reform and the insurance industry's antitrust exemption, New Orleans, February 2007.

Southeastern Health Economists workshop, paper presentation, Are there Racial Disparities in Emergency Medical Services:  Evidence from Mississippi, Coral Gables, Fl., September 2006.

American Enterprise Institute Colloquium on regulatory reform, presentation on insurance rate deregulation, Washington, D.C., September 2006.

AEI-Brookings Institution Judicial Education Program, lectures on insurance markets and regulation, Washington, D.C., September 2006.

American Society of Health Economists, presentation on cost of capital and research and development intensity for biotechnology, pharmaceutical, and medical device firms, Madison, WI, June 2006.

Networks Financial Institute 3rd Annual Insurance Summit, presented paper on optional federal chartering of insurance, Washington, D.C., March 1, 2006.

Natural Disaster Insurance, panelist NBER Insurance Project meeting, February 10, 2006, Cambridge.

National Symposium on Risk and Disasters, sponsored by the University of Pennsylvania and the Communications Institute, panelist, December 1, 2005, Washington, D.C.

The 11th Annual Thomas W. Langfitt, Jr., Memorial Health Policy Symposium, Consumer-Directed Care: Where Will This Road Take Us? panelist, November 29, 2005.

National Symposium on Terrorism Risk Insurance, sponsored by Wharton, RAND, U.S. Department of Homeland Security, University of Southern California, and the Communications Institute, panelist, Washington, D.C., October 7, 2005.

World Congress on Risk and Insurance Economics meeting, presented paper Soft and Hard Markets in Medical Malpractice Insurance (co-authored with Patricia Danzon and Andrew Epstein), Salt Lake City, Utah, August 10, 2005.

South Carolina Property Insurance Forum, presentation on homeowner's insurance markets in catastrophe prone areas, Charleston, S.C., June 24, 2005.

National Symposium on the Future of Terrorism Risk Insurance, sponsored by Wharton, RAND, U.S. Department of Homeland Security, University of Southern California, and the Communications Institute, panelist, Los Angeles, June 20, 2005.

Reinsurance Association of America Current Issues Forum, panelist, Philadelphia, May 24, 2005.

Kaiser Foundation web-telecast on medical malpractice reform, panelist, Washington, D.C., February 5, 2005.

NAIC Symposium, State Insurance Regulation:  Ensuring Solvency, Transparency, and Competitiveness in a Global Insurance Market, presentation on regulatory modernization, Washington, D.C., February 24, 2004.

National Bureau of Economic Research Insurance Project, discussant, Cambridge, Mass., February 7, 2004.

Brookings / Wharton Conference on Public Policy Issues Confronting the Insurance Industry, presented paper Tort Liability, Insurance Rates, and the Insurance Cycle, Washington, D.C., January 9, 2004.

Bank for International Settlements and Federal Reserve Bank of Chicago Conference on Market Discipline:  The Evidence Across Countries and Industries, presented paper Market Discipline in Insurance and Reinsurance, Chicago, Ill., October 31, 2003.

Harvard / Swiss Re colloquium on risk-based capital and market discipline, Cambridge, Mass., June 10, 2003.

51st Annual Antitrust Section Spring Meeting, presentation on The Future of the McCarran-Ferguson Act and Federal Chartering for the Insurance Industry, Washington, D.C., April 4, 2003.

Forum for Corporate Conscience, Economics session facilitator, Charlotte, N.C., March 2003.

National Conference of Insurance Legislators, session on medical malpractice insurance crisis and tort reform, Savannah, Georgia, February 22, 2003.

National Association of Life-Health Insurer Guaranty Associations Annual Meeting, Optional Federal Chartering and Insurance Guaranty Funds, Washington, D.C., November 1, 2002.

Cato Institute Forum, Terrorism Insurance: Is There a Role for Government, Washington, D.C., September 21, 2002.

Swiss Re Risk Management Network Meeting, Zurich, September 2, 2002.

National Conference of State Legislators, Modernizing Automobile Insurance Regulation, Denver, July 26, 2002.

Harvard / Swiss Re Colloquium on risk-based capital, paper presentation, Cambridge, June 2002.

National Association of Independent Insurers Fall Legislative Conference, Chicago, October 2001.

NAIC Working Group on competition and regulation, August 2001.

International Insurance Society, paper presentation, Vienna, July 2001.

National Bureau of Economic Research Insurance Project, paper presentation, Cambridge, Mass., February 16, 2001.

AEI-Brookings Joint Center for Regulatory Studies Conference on Insurance Rate Regulation, paper presentation, Washington, D.C., January 18, 2001.

American Finance Association, paper presentation, New Orleans, La., January 2001.

American Enterprise Institute Symposium on National Chartering for Insurance Companies, discussant, Washington, D.C., December 14, 2000.

Prudential Securities Conference on "Riding Cycles," Washington, D.C., October 4, 2000.

Wharton/Aon Conference on Capitalization of the Property-Casualty Insurance Industry, paper presentation, Philadelphia, September 27, 2000.

American Risk and Insurance Association Annual Meeting, paper presentations, 1980-93, 1995-97, 2000.

AEI-Brookings Joint Center for Regulatory Studies Conference on Insurance Deregulation, paper presentation, Washington, D.C., February 17, 2000.

National Bureau of Economic Research Insurance Project (discussant), Cambridge, Mass., February, 2000.

American Enterprise Institute Conference on Optional Federal Chartering and the Regulation of Insurance, paper presentation, Washington, D.C., June 3, 1999.

Risk Theory Society, paper presentations, 1979, 1980, 1983 (by co-author), 1984, 1989, 1996, 2000 (by co-author), 2001

Fifth International Conference on Insurance Solvency and Finance, paper presentation, London, 1997.

Southern Risk and Insurance Association, paper presentations, 1988, 1990, 1995, 1996 (discussion panel)

Wharton Financial Institutions Center Conference on Risk Management in Insurance Firms, Philadelphia, 1996.

National Association of Independent Insurers Annual Meeting, 1996.

Competitive Enterprise Institute Conference on Issues in Insurance Regulation, Washington, D.C., 1996.

NBER Conference on Property/Casualty Insurance (discussant), Cambridge, Mass. 1995.

Thirteenth Annual Conference on Economic Issues in Workers Compensation, paper presentation, Philadelphia, Pa., 1994.

NAIC Conference on Issues in Insurance Regulation, Washington, D.C., 1994.

International Conference on Insurer Solvency, paper presentation, Wharton School, Philadelphia, 1994.

International Insurance Society (discussion group moderator, 1992-94, paper presentation, 1992)

Michigan Association of Insurance Companies, 1992.

Federal Reserve Bank of Chicago Conference on Bank Structure and Competition, paper presentation, 1992.

Eastern Finance Association, paper presentation, 1992.

American Law and Economics Association, paper presentation, 1991.

Third Annual International Conference on Insurer Solvency, paper presentation, Rotterdam, The Netherlands, 1991.

Federal Reserve Bank of Boston Conference, The Financial Condition and Regulation of Insurance Co., paper presentation, 1991.

American Bar Association, Tort and Insurance Practice Section, paper presentation, 1990.

Professional Insurance Agents Legislative Conference, 1990.

Western Risk and Insurance Association,  paper presentation, 1989.

Financial Management Association, 1988 (discussant), 1990.

Reinsurance Association of America, Tucson, Arizona, paper presentation, 1988.

American Association of Insurance Services, Charleston, S.C., 1987.

Brookings Institution Conference on Legal Liability, paper presentation, Washington, D.C., 1987.

ASTIN Colloquium, paper presentation, Biarritz, France, 1985.

Fifth Annual Conference on Economic Issues in Workers' Compensation, paper presentation, New York, N.Y., 1985.

Conference on Strategic Planning for Insurance, paper presentation, sponsored by the Geneva Association and the S. S. Huebner Foundation, London, England, 1982.

Geneva Association and the Association of Property-Casualty Insurance Economists, discussant, Allied Social Science Meetings, New York, N.Y., 1982.

**Research Grants and Funded Research**

Leonard Davis Institute and Robert Wood Johnson Foundation, Stabilizing Individual Health Insurance Markets with Subsidized Reinsurance, 2017.

Center for Applied Real Estate Education and Research, Moore School of Business, Federal Taxes, Insurance Company Capital, and the Price of Catastrophe Insurance (with Greg Niehaus), 1999.

An Economic Analysis of  Workers' Compensation in South Carolina (with Travis Pritchett, Greg Niehaus, and Helen Doerpinghaus), University of South Carolina, College of Business Administration Business Partnership Foundation, 1993-1994.

University of South Carolina, College of Business Administration, Economic Analysis of Insurance Company Insolvencies and Solvency Screening Systems, from the National Association of Insurance Commissioners, 1992-1993.

University of South Carolina, College of Business Administration, Economic Analysis of Liability Insurance Pricing, from the National Association of Insurance Commissioners, 1989-1990.

University of South Carolina, College of Business Administration Business Partnership Foundation, Economic Analysis of Michigan Automobile Insurance Market, from the Mackinac Center, 1989.

**Testimony at Government Hearings**

Permanent Subcommittee on Investigations, Committee on Homeland Security and Government Affairs U.S. Senate, written and oral testimony on "Review of the Affordable Care Act Health Insurance CO-OP Program," March 10, 2016.

Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services, U.S. House of Representatives, presented written and oral testimony on "Implementing Title I of the Dodd-Frank Act: The New Regime for Regulating Systemically Important Nonbank Financial Institutions," May 16, 2012.

Subcommittee on Health, Committee on Energy and Commerce, U.S. House of Representatives, presented oral and written testimony on "PPACA's Effects on Maintaining Health Coverage and Jobs: A Review of the Health Care Law's Regulatory Burden," June 2, 2011.

Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, Committee on Financial Services, U.S. House of Representatives, presented oral and written testimony on "How Should the Federal Government Oversee Insurance?" May 14, 2009.

Committee on Banking, Housing, and Urban Affairs, United States Senate, presented oral and written statement at hearing, Perspectives on Insurance Regulation, July 18, 2006.

National Conference of Insurance Legislators, Property/Casualty Insurance Committee Hearing on Model Rate Regulation Modernization Act, Santa Fe, N.M, November 21, 2003, on behalf of Allstate Insurance, State Farm Insurance, National Association of Independent Insurers, and National Association of Mutual Insurance Companies.

California Department of Insurance, Workshop on Generic Rating Factor Determinations, San Francisco, Cal., August 22, 2002, on behalf of National Association of Independent Insurers and Personal Insurance Federation of California.

Subcommittee on Capital Markets and Insurance, House Financial Services Committee, on proposed backstop for terrorism insurance / reinsurance, Washington, D.C., October 25, 2001.

National Conference of Insurance Legislators Hearing of the Property-Casualty Insurance Committee on Personal Lines Rate and Form Deregulation, Hilton Head, S.C., March 1, 2001.

Hearing on acquisition of Executive Risk Insurance Co. by Chubb Insurance Group, Delaware Department of Insurance, Wilmington, Del., June, 1999, on behalf of Chubb Insurance Group.

Hearing on proposed automobile insurance regulation in Michigan, Lansing, Mich., March, 1996, on behalf of State Farm and Michigan Association of Insurance Companies.

Hearing on Proposed Underwriting Restrictions in Texas, January, Austin, Tex., 1995, on behalf of Allstate Insurance.

RH-318 Hearings on Restrictions on Automobile Insurance Rate Classification in California, October, 1993, on behalf of Farmers Insurance Group and Safeco Insurance Group.

State Farm Fire and Casualty, et al. v. Superintendent of Insurance, Maine Bureau of Insurance, Regarding Proposed Rule 650 Concerning Allocation of Workers' Compensation Insurance Residual Market Deficit, Portland, Me., 1992, on behalf of State Farm Insurance Company.

RH-292 Hearings on Alleged Insurance Redlining, before California Insurance Deputy Commissioner Steven Miller, Los Angeles, Cal.,. August 19, 1991, on behalf of Barger and Wolen.

Auto Insurance: Regulation, No-Fault, and Affordability, Michigan Senate Committee, Lansing, Mich., February 20, 1990.

Consolidated Hearings on California Proposition 103, before the Honorable William J. Fernandez, San Francisco, Cal., January 8-9, 1990, on behalf of Chubb Insurance Group.

Competition and Rate Service Organizations, before the National Association of Insurance Commissioners Committee on the Role of Advisory Organizations, Washington, D.C., April 4, 1989, on behalf of American Insurance Association, National Association of Independent Insurers, and the National Association of Mutual Insurance Companies.

Maryland Legislature Joint Subcommittee on Auto Insurance Regulation and Affordability, Annapolis, Md., January 1989.

Competition in the Property-Liability Insurance Industry, before the Virginia Legislature Joint Subcommittee on Reinsurance, the Limited Antitrust Exemption, and Availability and Affordability of Liability Insurance, Richmond, Va., November 1988, on behalf of American Insurance Association.

Competition in the Reinsurance Industry, before the Virginia Legislature Joint Subcommittee on *Reinsurance*, the Limited Antitrust Exemption, and Availability and Affordability of Liability Insurance, Richmond, Va., August 1988, on behalf of Reinsurance Association of America.

**Expert Testimony and Amici Briefs**

*Kelly & Kelley, LLC, Derivatively on Behalf of Health Care Service Corporation v. Individual Defendants and Nominal Defendant Health Care Service Corporation*; In the Circuit Court, Twentieth Judicial Circuit, St. Clair County, Illinois, Case No. 15-CH-695; expert disclosure, October 1, 2021; deposition, November 2, 2021.

*In re: IMERYS TALC AMERICA, INC., et al., Debtors*, Chapter 11, Case No. 19-10289(LSS); expert report, August 13, 2021; deposition, October 13, 2021.

*Finch, Ann v. Sentry Casualty Company, et al.*, State of South Carolina Court of Common Pleas, County of Richland, Fifth Judicial Circuit, Case No. 2019-CP-40-03003; deposition, December 22, 2020.

Brief for *Amicus Curiae* Professor Scott E. Harrington in Support of Appellee for Affirmance, United States Court of Appeals for the Eleventh Circuit, *Oscar Insurance Company of Florida against Blue Cross and Blue Shield of Florida, Inc. Et al.,* Appeal from the United States District Court for the Middle District of Florida, Case No. 6:18-CV-01944; February 25, 2020.

Brief of *Amici Curiae* Economists In Support Of Petitioners in the Supreme Court of the United States, *Maine Community Health Options v. United States,* No. 18-1023; No. 18-1028; No. 18-1038; September 6, 2020. (Co-author.)

*Sinclair Oil Corporation v. Allianz Underwriters Insurance Company et al.,* Case No. 2008MR000602. Circuit Court of Madison County, Illinois, Third Judicial District; Declaration, December 16, 2019.

*State of West Virginia ex rel. Patrick Morrisey, Attorney General v. Wells Fargo Insurance Services of West Virginia, Inc., f/k/a Accordias of West Virginia, Inc., and Wells Fargo Insurance Services USA, Inc.*, In the Circuit Court of Hancock County, West Virginia, Civil Action No. 05-C-115-W; affidavit, November 2015; deposition, January 29, 2016.

*Lincoln Jones et al. v. Travelers Casualty Insurance Company of America*, In the United States District Court Northern District of California San Jose Division, Case No. 5:13-cv-02390-LHK; expert report, December 19, 2014; rebuttal report, February 2015; deposition, Feb. 25, 2015.

*American International Group, Inc., et al. v. ACE INA Holdings, Inc., et al.*, In the United States District Court for the Northern District of Illinois, Eastern Division,  Case No. 07 CV 2898 and Case No. 09 CV 2026; declaration, April 26, 2011; supplemental declaration, October 6, 2011; third declaration, November 3, 2011.

*Fireman's Fund Insurance Company v. Hartford Accident and Indemnity Company* (In the United States District Court for the Northern District of Ohio Western Division, Case No. 3:03CV7168), report, August 9, 2010; deposition, August 17, 2010.

*DOD Technologies, Inc. vs. Mesirow Insurance Services, Inc. and John Doe Companies 1-10* (In the Circuit Court of Cook County, Illinois, County Department, Chancery Division, No. 08 CH 40734), affidavit, July 6, 2010.

*In re:  The Flintkote Company and Flintkote Mines Limited, Debtors* (In the U.S. Bankruptcy Court for the District of Delaware, Chapter 11, Case No. 04-11300), affidavit, April 2010.

*Hogan Marren, Ltd. vs. HUB International Limited* (In the Circuit Court of Cook County Illinois, County Department, Chancery Division, No. 05 CH 1355), affidavit, January 11, 2010; deposition, February 1, 2010.

*In Re: Marsh & McClennan Companies, Inc., Securities Litigation* (United States District Court Southern District of New York, Civil Action No. 04-CV-08144 (SWK)), expert report; rebuttal report; and deposition, October 9, 2009.

*Robert L. Johnson, Sr., et al., vs. Allstate Insurance Company* (In the United States District Court for the Southern District of Illinois, No.: 3:07-CV-00781-MJR-PMF), expert report, August 25, 2009; deposition, October 6, 2009; supplemental expert report, April 26, 2011; deposition, May 13, 2011.

*In Re:  ASARCO LLC, et al., Debtors* (In the United States Bankruptcy Court for the Southern District of Texas Corpus Christi Division, Case No. 05-2127), declaration, July 2009.

*State of Connecticut v. Accordia, Inc.*, Doc. No. HHD-CV-07-4027314S (X09), deposition, April 10, 2009, trial testimony, December 1, 2009.

*In Re: Thorpe Insulation Company, et al.* (In United States Bankruptcy Court , Central District of California, Los Angeles Division, Case No.: 2:07-19271-BB), declaration, January 8, 2009.

*M. Diane Koken, Insurance Commissioner of the Commonwealth of Pennsylvania, in Her Capacity as Liquidator of Reliance Insurance Company v. Deloitte & Touche LLP and Jan A. Lommele* (In the Commonwealth of Pennsylvania, Civil Action Law, Docket No. 734 MD 2002), expert report, September 2007; deposition, December 6, 2007.

*In Re: Insurance Brokerage Antitrust Litigation* and *In Re: Employee-Benefit Insurance Brokerage Antitrust Litigation* (United States District Court, District of New Jersey, Civil Action No. 04-5184 (FSH) and Civil Action No. 05-1079 (FSH) ), expert report, April 2006; deposition, May 18, 2006.

*John Crane, Inc. vs. Admiral Insurance Company, et al.* (Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 04 CH 08266), deposition, October 14, 2005.

*St. Paul Fire and Marine Insurance Company v. A.P.I., Inc. v. the Home Insurance Company, et al.* (State of Minnesota, Ramsey County District Court File No. C9-02-8084), deposition, June 13-14, 2005.

*Continental Casualty Co, American Casualty Co. of Reading, Pa,  v. Robert K. Keasbey Co.* (and others, Supreme Court of the State of New York, County of New York, Index No. 601037/03), expert report, January 3, 2005; deposition, February 9, 11, 2005; trial testimony, August 25-26, 2005.

*National Fair Housing Alliance Inc., et al. v. The Prudential Insurance Company of America and Prudential Property & Casualty Insurance Company* (United States District Court for the District of

Columbia, Civil Action No. 1:02-CV-2199), expert report, October 18, 2004; deposition, January 6-7, 2005.

*Allstate Insurance Company and Sterling Collision Centers, Inc. v. Greg Abbot, in his official capacity as Attorney General of Texas, et al.* (United States District Court, Northern District of Texas, Case No. 3:03-CV-2187-K), expert report on vertical integration of insurers into collision repair, February 29, 2004; deposition, July 9, 2004; trial testimony, September 23, 2004.

*Wilson v. Brawn of California, Inc.* (Superior Court, State of California, County of San Francisco, No. 404454), trial testimony on the economic features of insurance, April 18, 2003.

*Alumax, Inc.*, et al. v. Allianz, et al. (Civil Action No. 98-3222, Circuit Court of Jefferson County, Alabama), affidavit on pricing and regulation of workers' compensation insurance programs, November 14, 2001.

*CR/PL Management Co.*, et al., v. Allianz, et al. (No. 98 CH 01635, Circuit Court of Cook County, Illinois, County Department, Chancery Division), affidavit on pricing and regulation of workers' compensation insurance programs, August 29, 2001.

*Dow Chemical Co. v. Fireman's Fund Insurance Co., et al.* (No. 96 CV 10298 BC, U.S. District Court for the Eastern District of Michigan), report (September 7, 2000) and deposition testimony (January 25-26, May 29-30, and June 19, 2001) on the economics of general liability insurance and coverage interpretation.

*Foodarama Supermarkets, Inc.*, et al. v. Allianz, et al. (Docket No. L-3556-97, Superior Court of New Jersey), affidavit on pricing and regulation of workers' compensation insurance programs, October 25, 2000.

*Bristol Hotel Asset Company, et al. v. Allianz, et al.* (Civil Action No. 972240-CIV-MORENO, U.S. District Court for the Southern District of Florida) and *American Association of Retired Persons, et al. v. National Surety Corp., et al.* (Civil Action No. 98-820589-CZ, State of Michigan Wayne County Circuit Court) deposition, July 7, 2000 and July 31, 2000.

*American Association of Retired Persons, et al. v. National Surety Corp., et al.* (Civil Action No. 98-820589-CZ, State of Michigan Wayne County Circuit Court), affidavit on pricing and regulation of workers' compensation insurance programs, May 31, 2000.

*Bristol Hotel Asset Company, et al. v. Allianz, et al.* (Civil Action No. 972240-CIV-MORENO, U.S. District Court for the Southern District of Florida), declaration on pricing and regulation of workers' compensation insurance programs, February 16, 2000.

*Sandwich Chef of Texas, et al. v. Allianz, et al.* (Civil Action No. H-98-1484, U.S. District Court for the Southern District of Texas), report (September 28, 1999) and deposition (October 15, 1999) on pricing and regulation of workers' compensation insurance programs.

*Aetna Casualty v. Dow Chemical and American Guaranty and Liability Company, et al.* (No. 93 CV 73601 DT, U.S. District Court for the Eastern District of Michigan), report (May 27, 1998) and deposition (September 17-18, 1998) on the economics of general liability insurance and coverage interpretation.

*Donna Scully et al. v. Nationwide Mutual Insurance Company, et al.* (Case No. LB-2704, Circuit Court of the City of Richmond), deposition (September 25, 1998) and trial testimony (October 20, 1998) on punitive damages for mutual insurance entities.

*Toledo Housing Center, et al. v. Nationwide Mutual Insurance Company, et al.* (No. 93-1685, Common Pleas Court of Lucas County, Ohio), affidavit and deposition (April 2 and July 25, 1997) on the economics of homeowners' insurance

*The State of South Carolina, ex relatione, T. Travis Medlock, Attorney General v. National Council on Compensation Insurance, et al.* (94-CP-23-2428, Common Pleas Court of Country of Greenville, South Carolina), affidavit (1996) and report on workers' compensation servicing carriers (1998).

**Editorial Boards, Other Board Memberships, and Advisory Committees:** Co-Editor, *Journal of Risk and Insurance*, 2006-2018; Editorial Board, *International Journal of Health Care Economics and Management,* 2018-2020; Associate Editor, *Geneva Risk and Insurance* Review, 2009-2015; Associate Editor, *Journal of Risk and Insurance*, 1985-2006; Associate Editor, *Journal of Financial Services Research*, 1994-99; Board of Advisors, *Regulation: Cato Review of Business and Government*, 1999-2009; Adjunct Scholar, American Enterprise Institute, 2009-present; Funded Consumer Liaison, National

Association of Insurance Commissioners, 2004; Adjunct Scholar, the Cato Institute, 2002-2009; Shadow Insurance Regulation Committee, 1999-2000; Shadow Financial Regulatory Committee, 1998-2005; ABA Antitrust Section Insurance Committee, 2003; Working Group of the Griffith Foundation for Insurance Education, 1996-97; Advisory Committee to Insurance Guaranty Fund Task Force, National Association of Insurance Commissioners, 1992-93; Board of Directors, American Risk and Insurance Association, Inc., 1986-93; Staff Advisory Committee on the Reinsurance Industry, U.S. Senator Joseph Biden, 1989; Academic Advisory Board, Center for Research on Risk and Insurance, University of Pennsylvania, 1985-88; S. S. Huebner Foundation for Insurance Education, Administrative Board, 1985-1988; Corroon & Black National Risk Management Panel, 1986-1989.

**Academic Associations:**   American Risk and Insurance Association (Board Member, 1986-93; Chair, Journal Awards Committee, 1987; Vice President, 1990; Annual Meeting Program Chair, 1990; Chair, New Editor Search Committee, 1991; President-Elect, 1991; President, 1992; Chair, Nominations Committee, 1993; Immediate Past President, 1993; Risk Theory Society (Secretary, 1991; President, 1992; Past President, 1993; New Editor Search Committee, 2018)

**Dissertations Chaired:**   Rocky Lee, Pharmaceutical Drug Pricing and Innovation, University of Pennsylvania, 2013; Vladimir Zdorovtsov, Essays on Overnight Return Reversals and Extended Hours Trading, University of South Carolina, 2004; Tong Yu, Essays on the Financing and Underwriting of Property-Liability Insurance, University of South Carolina, 2001; Karen Epermanis, Best's Rating Changes and Insurer Revenue Growth, University of South Carolina, 2000; Julie Cagle, Premium Volatility in Liability Insurance Markets, University of South Carolina, 1993; Chong Lee, Economies of Scale and Scope for Direct Writers in the Property-Liability Insurance Industry, University of Pennsylvania, 1989; Jack Nelson, The Impact of Corporate Affiliation on Life Insurance Company Capital Structure Decisions, University of Pennsylvania, 1987; Beom-ha Jee, A Comparative Analysis of Alternative Risk Classification Models in Automobile Insurance, University of Pennsylvania, 1987;  Peter Beresford, The Impact of Life Insurance Cost Disclosure, University of Pennsylvania, 1984.

# EXHIBIT H

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC[1]<br><br>　　　　　Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**DECLARATION OF MICHAEL BURNETT IN SUPPORT OF
THE DEBTORS' RESPONSE TO CERTAIN INSURERS' MOTION
*IN LIMINE* TO EXCLUDE OPINION TESTIMONY OF DEBTORS'
WITNESSES NANCY GUTZLER AND MICHAEL BURNETT**

I, Michael Burnett, being duly sworn, state the following under penalty of perjury:

1.　　　　I am the president of Burnett Risk Control International, LLC (formerly GILEAD JUSTICE) in Charlotte, NC, a company I founded in 2003.

2.　　　　In this capacity, among other work that I perform, I am routinely retained as a consultant on behalf of religious entities, schools, non-profit organizations, and insurers to evaluate and value sexual abuse claims in the litigation and pre-litigation context. I have done this work for 26 years.

3.　　　　In the last year alone, I have evaluated and valued more than 500 abuse claims.

4.　　　　In my capacity as a consulting expert, I am primarily evaluating abuse claims in the context of litigation, although I have also been retained to do valuations in arbitrations, pre-litigation disputes, and in due diligence and underwriting matters.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

5.      I am well versed with types of claims abuse claimants make, and the various applicable defenses that are used by defendants in litigating abuse claims.  I am also very familiar with the types of discovery routinely requested by defense counsel in their defense of sexual abuse claims.  When I evaluate an abuse case on behalf of an insurer or defendant to determine an appropriate valuation, particularly in the context of considering an appropriate settlement in litigation, I use the information that has been developed as part of the case or pre-suit investigation in order to analyze and value the claim.  As part of that process, I perform a comprehensive review of the factual record developed, including any information provided by the claimants (whether written or oral), any evaluation reports, and any defense counsel reports.  I utilize all that information to develop a comprehensive assessment of the alleged abuse and any applicable defenses thereto, in order to determine a range of appropriate settlement values for my clients.

6.      I have been retained on behalf of an insurer of Catholic Dioceses as an abuse evaluation consultant on hundreds of cases since at least 2004, where I routinely perform this type of evaluation on abuse claims in litigation or pre-litigation matters.

I declare under penalty of perjury under the laws of the United States, that the foregoing statements are true and correct.

Dated: February 17, 2022                    Respectfully submitted,

Michael Burnett

4878-8848-8207 v.2