```
1                   UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3    IN RE:                        .  Chapter 11
                                   .  Case No. 20-10343 (LSS)
4    BOY SCOUTS OF AMERICA AND     .
     DELAWARE BSA, LLC,            .  (Jointly Administered)
5                                  .
                                   .  Courtroom 2
6                                  .  824 Market Street
              Debtors.            .  Wilmington, Delaware 19801
7                                  .
                                   .  Thursday, February 24, 2022
8    . . . . . . . . . . . . . .  .  4:03 p.m.

9                    TRANSCRIPT OF ZOOM HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10               CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:             Jessica C. Lauria, Esquire
                                  WHITE & CASE LLP
13                                1221 Avenue of the Americas
                                  New York, New York 10020
14

15   For the US Trustee:          David L. Buchbinder, Esquire
                                  OFFICE OF THE UNITED STATES TRUSTEE
16                                J. Caleb Boggs Federal Building
                                  844 King Street
17                                Suite 2207, Lockbox 35
                                  Wilmington, Delaware 19801
18
     (APPEARANCES CONTINUED)
19
     Electronically
20   Recorded By:                 Brandon J. McCarthy, ECRO

21   Transcription Service:       Reliable
                                  The Nemours Building
22                                1007 N. Orange Street, Suite 110
                                  Wilmington, Delaware 19801
23                                Telephone: (302) 654-8080
                                  E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1    <u>APPEARANCES (CONTINUED)</u>:

2    For the Coalition of
     Abused Scouts for
3    Justice:                    David J. Molton, Esquire
                                 BROWN RUDNICK, LLP
4                                Seven Times Square
                                 New York, New York 10036
5

6    For the Tort
     Claimants' Committee:       Richard M. Pachulski, Esquire
7                                PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Boulevard
8                                13th Floor
                                 Los Angeles, California 90067
9

10   For the Future
     Claimants'
11   Representative:             Robert S. Brady, Esquire
                                 YOUNG, CONAWAY, STARGATT
12                                 & TAYLOR, LLP
                                 1000 North King Street
13                               Wilmington, Delaware 19801

14   For The Zalkin Law
     Firm, PC, and Pfau
15   Cochran Vertetis
     Amala, PLLC:                Thomas E. Patterson, Esquire
16                               KTBS LAW, LLP
                                 1801 Century Park East
17                               26th Floor
                                 Los Angeles, California 90067
18

19   For AIG, on behalf of
     Certain Insurers:           James Hallowell, Esquire
20                               GIBSON DUNN & CRUTCHER, LLP
                                 200 Park Avenue
21                               New York, New York 10166

22   For the Roman Catholic
     and United Methodist
23   Ad Hoc Committee:           Jeremy W. Ryan, Esquire
                                 POTTER ANDERSON & CORROON, LLP
24                               1313 North Market Street
                                 6th Floor
25                               Wilmington, Delaware 19801

1                            INDEX

2    MOTIONS:                                        PAGE

3    Agenda
     Item 1:  Letter to The Honorable Laurie Selber        4
4              Silverstein, Chief Judge re Certain
               Insurers' Status Update
5
              Court's Ruling:                             38
6

7    Transcriptionist's Certificate                       41

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 4:03 p.m.)

2               THE COURT:  Good afternoon, counsel.

3               This is Judge Silverstein.  We're here for a

4   quickly called hearing, at my request, in Boy Scouts,

5   Bankruptcy Case 20-10343.

6               And I called this hearing after receiving the

7   letter from Certain Insurers, with respect to the failure to

8   designate the settlement trustee in a timely fashion, and an

9   apparent inability to do that.  And since then, I've noticed

10  that I have gotten a flurry of papers; apparently, we can all

11  quickly put things together when it's in our interests to do

12  so, but I am troubled, quite frankly, by the fact that the

13  deadlines that this Court has imposed keep getting

14  disregarded and I don't understand why that continues to be

15  the case.

16              And this decision, in particular, this inability

17  to make this decision, in particular, for me, does not bode

18  well for a functioning STAC, once the -- once, if a plan a

19  confirmed, these trust -- this trust agreement goes into

20  effect.  So, it raises multiple issues for me and I'm

21  struggling with what input I want on this, quite frankly,

22  because I'm not sure what input there should be on failure to

23  comply with Court-imposed deadlines and an inability of

24  parties to choose between two what appear to be eminently

25  qualified people and any other candidates that might be out

1  there that are qualified.

2          So, I'll hear from the parties, but I am thinking

3  the parties have forfeited their right to choose who the

4  trustee is because they haven't designated one, and I should

5  choose, which quite frankly, is not my job.  And I also would

6  like to understand, or make sure I know who's on this

7  committee that's so dysfunctional and why I should permit

8  that committee to be the post-organization, assuming there

9  is one, STAC.  And, actually, as I'm saying it, it don't

10  want to hear about that second issue; that's something, I

11  guess I'll decide when it comes to the decision to decide,

12  but I can tell you right now, I'm troubled by the.

13          So, let me hear -- I read the debtors' response.

14  I agree with the debtor in this response.  I agree with the

15  debtor that they are sort of stuck.  Maybe they're stuck

16  because they delegated or agreed to permit this committee to

17  make the decision, but nonetheless, they are sort of hanging

18  there, because they're not the decision-makers.

19          So, I'm not sure I really need to hear from

20  Ms. Lauria, but I'm happy to and then I'll hear from

21  Mr. Molton and then I'll hear from Mr. Pachulski.

22          Ms. Lauria?

23          MS. LAURIA:  Thank you, Your Honor.

24          Can you hear me?

25          THE COURT:  I can.

1          MS. LAURIA:   Thank you.

2          Your Honor, I think our pleading pretty much

3    summed it up, both, the pleading that was filed on Friday,

4    where we announced the two, what we understood were the

5    finalist candidates, as well as our pleading today, where the

6    debtor took the position that, at this point, the best we

7    have is a majority, but not the 5:2 vote, with respect to

8    the STAC.

9          Your Honor, we are as disappointed as you are with

10   how this process has transpired.  I know there was a letter

11   filed this afternoon suggesting that -- I think this was

12   filed by the Coalition -- suggesting that the debtor was, in

13   fact, in breach of the TCC term sheet.  And I would just

14   remind the Court and the parties that the TCC term sheet that

15   was filed at Docket Number 8772 actually provided on page 12

16   of 46 of the PDF of the term sheet, itself, that the

17   settlement trustee, there would be only one.  It was very

18   specific on that point.  And the two claims administrators

19   would be announced in a notice that was to be filed with the

20   Bankruptcy Court on February 14th.

21          At the hearing on, I believe it was February 11th,

22   when we announced the settlement to the Court, this was

23   following that eleventh mediator report, I believe at the

24   request of the creditor representatives, Your Honor agreed to

25   provide them with a deadline of February 18th, not

1  February 14th, which was what was agreed upon in the term

2  sheet, itself.

3          So, while I understand that there are members of

4  the creditors' representatives that were disappointed with

5  the debtors filing today, at the end of the day, frankly,

6  they were in breach of, I think, the deadlines that were in

7  the TCC term sheet, as well as this Court's order.

8          We appreciate you actually convening the parties

9  on an expedited basis.  We need to move on from this issue.

10          As you said, Your Honor, both candidates are

11  eminently qualified, but former Judge Houser happened to have

12  a fourth revote among the creditor representatives and I

13  think with that, Your Honor, unless you have more questions

14  for us, I'll leave it at that and let the creditor

15  representatives respond to what has transpired here.

16          THE COURT:  So, I'm curious.  Former Judge Houser

17  had a fourth revote.

18          What did former Judge -- is it Levi or Levy --

19  what was the vote he had?

20          MS. LAURIA:  Levy.

21          So, I think the three that did not vote in favor

22  of Ms. Houser, voted in favor of Mr. Levy.  So, there were

23  not -- I believe the insurers had a suggestion in their

24  letter that this was, to quote one of my partners, a "junk

25  ball" in terms of who the trustee was, based upon a meet-and-

1 confer.

2          From the debtors' perspective, we disclosed who we

3 believed were the two candidates, the two finalist

4 candidates.  From the debtors' perspective, we don't believe

5 we should be going beyond those two finalist candidates.

6 Those are the two that were put in front of the parties and

7 the Court by February 18th, which was the Court-imposed

8 deadline.  But, again, it's my understanding that there were

9 four in favor of Houser and three in favor of Mr. Levy.

10          THE COURT:  Thank you.  Mr. Molton?

11          MR. MOLTON:  Your Honor, David Molton, for the

12 Coalition of Abused Scouts for Justice.

13          Judge, I tried to collect my notes here in a very

14 short period of time.  I hope I'm going to be able to answer

15 questions.  And if you have any questions for me, Judge, feel

16 free to ask them.

17          We, Your Honor, we got the debtors' filing when it

18 was filed and we ran to get a note to Your Honor trying to

19 explain our position.  Throughout this case, Your Honor,

20 we've been engaged in good faith to move this case.

21          I said to Your Honor in October or September of

22 2020:  Watch what we do.

23          And I think we have proved to Your Honor, time and

24 time again, how we, with the debtors, with the local

25 councils, and others, moved this case in good faith, against

1  all odds, to a point where it can get confirmed.

2           I feel a little bit ambushed today, Your Honor,

3  and to the extent that Your Honor called me first and looking

4  at me first, I hope I'm not in the, you know, the gun's eye

5  view of a view that really has no basis in fact.

6           Our people have been working nonstop, 24/7 to get

7  this done, Your Honor.

8           Among other things, when the vote came in, and the

9  vote, as Your Honor knows, was under 75 percent, we, along

10 with the debtor and the other plan supporting parties, you

11 know, basically rolled up our sleeves and went to work to

12 bring the TCC and the Objecting Plaintiffs onboard with a

13 plan that can be confirmed.  Your Honor, part of that was

14 negotiating a term sheet with the TCC and with the Pfau

15 Zalkin Group that would do that.

16          And Your Honor knows, because it's been reported

17 to Your Honor what an arduous and lengthy task that was, but

18 the parties did it.  They did it over the course of, I think

19 it was three working-week sessions in Los Angeles, numerous

20 around-the-clock mediations with Mr. Gallagher, and that

21 resulted in a heavily negotiated term sheet, a heavily

22 negotiated term sheet that was signed by the debtors, the

23 local councils, the Coalition, the TCC, the FCR, and Pfau

24 Zalkin.

25          One of the critical issues, Your Honor, that was

1   negotiated, as is part of that term sheet, and the reason, I

2   gather, why we're here, was is the composition of a

3   Settlement Trust Advisory Committee, Your Honor.  The plan

4   that was solicited and received over 74 percent of the vote

5   of the survivors, gave the Coalition five of the seven seats

6   on that STAC, as you know, to be picked by the various

7   constituencies with two to the TCC.

8           The term sheet changed that structure.  We sat

9   down, we rolled up our sleeves and we negotiated a

10  differently negotiated STAC, Your Honor, that contains seven

11  individuals; three of whom to be collected by the Coalition,

12  three of whom to be selected by the TCC, one of which was

13  selected by the Pfau Zalkin Group.

14          A critical part of this change, Your Honor -- and

15  I'm going to get to something else that Your Honor didn't

16  mention, but I want to bring up -- a critical part of this

17  change, however, was the requirement that certain actions

18  require a consensus of both of those, what was before warring

19  parties, warring creditor groups.  They didn't agree.  The

20  TCC had objected to the plan and we were plan supporters.

21  And that was for five of the seven STAC members to vote in

22  favor of certain actions that included the selection of the

23  settlement trustee and the claims administrator, which had

24  to be selected by at least five members of the STAC, with a

25  reasonable consent of the FCR.

1       The Coalition, Your Honor, would not, and did not,

2  agree to a settlement, under which the four members appointed

3  by the TCC or Pfau Zalkin, could act by themselves with

4  respect to these important choices.  And that includes the

5  selection of professionals, and I'll get to that, too, in a

6  minute, as well.

7       Simply put, they needed at least one Coalition-

8  appointed STAC member to join them and this, effectively,

9  what we considered to require consensus candidates --

10 consensus candidates to be selected, and that's what we were

11 working for.

12      We had two weeks, Judge, to conduct interviews and

13 deliberate with respect to these matters and we interviewed

14 extraordinary candidates, including the two extraordinary

15 candidates that are left before Your Honor.

16      We did agree to the selection of the Honorable

17 Michael Regan, retired, and the Honorable Diana Walsh,

18 retired, as claims administrators.  The STAC worked.

19      However, they were at an impasse with respect to

20 the remaining trustee candidates:  Judge Houser and Judge

21 Levy.  Neither one of them were able to obtain the requisite

22 five affirmative votes that the term sheet required and that

23 was negotiated over weeks.

24      Your Honor knows that the debtor today, two weeks

25 after the execution and filing of the term sheet, filed its

1  notice designating Judge Houser had been designated as

2  settlement trustee, subject to the views of the Court.  And

3  we welcome that, Your Honor, "subject to the views of the

4  Court," because in the end, you are the arbiter of all of

5  this.

6        But the process of selecting a settlement trustee,

7  consistent with 1104(b), requires consensus and pursuant,

8  right now, to an agreement that brought on, importantly, the

9  TCC and the Coalition into a means of going forward within

10  this case, all question said in our letter is the debtors had

11  no authority to make this selection outside of the heavily

12  negotiated terms, Your Honor, of the term sheet.

13        Again, we -- I'm looking at my letter, Judge.  I

14  don't see I said "breach" anywhere in there, and I know

15  Ms. Lauria has accused me of that.  I think we said

16  "derogation."  But it was, their selection was in derogation

17  of that term sheet.

18        Judge, we worked really hard, but, you know, both

19  of these candidates have great merits.  Judge Levy, among

20  other things, Duke Law School, a former dean; current

21  president of ALI, has actually revised -- worked on model

22  penal law revisions concerning sexual abuse, has had

23  experience in trust administration, which is no small matter.

24        This is an "80,000, unique proof of claim" trust,

25  with three, almost $3 billion in it.

1           Judge Houser has unbelievable experience, as

2   well.   The STAC members considered both of them, looked at

3   them, and made their decisions based on what they had in

4   front of them.   Were unable to come to the consensus that was

5   agreed to by way of the term sheet, and accordingly, we found

6   ourselves where we were on Friday.

7           We worked all weekend in mediation to try to

8   resolve this and all I can report is, so far, we were

9   unsuccessful in that mediation.   I know the FCR, who has

10  consent rights also, has filed a letter, as well.

11          And I will say on behalf of the Coalition, Judge,

12  in this case, where you had a complicated, significant trust

13  with almost $3 billion, we've noted that there are many other

14  trusts of much smaller size that contain two trustees, not

15  one trustee.

16          We agreed to one trustee; that's in the term

17  sheet.   We also agreed to a 5:2 vote; we were unable to come

18  to that.

19          I am authorized by the Coalition, and I think the

20  FCR has also made the recommendation, that the easiest way to

21  skin this cat is to have two trustees in this case, to use

22  the talents and experiences of both of these well-qualified,

23  exceptional individuals.

24          Some of the trusts, Your Honor, that have two or

25  three trustees, Your Honor will know of.   Some of them are in

1  this court; others are across the country:  Armstrong, BMW,

2  Flintkote -- some of the cases we've talked about --

3  (indiscernible), Kaiser Aluminum, NARCO, Owens, PCC, et

4  cetera.

5          In any event, Judge, you know, we are not happy

6  we're in this situation.  Again, if Your Honor has seen

7  anything from the Coalition since we first got involved in

8  this case, is we work hard.  We work with integrity.  We keep

9  our hands clean.  And we try to do the best job we can.

10          I'm not here going to be throwing dirt at anybody.

11  We are trying to do our job and what I called, Judge, and I

12  think you've adopted, to the extent, from me and others,

13  (indiscernible) generous case.  One of the hardest cases we

14  have ever seen.

15          I do want to note, Your Honor, that in the TCC

16  filing that was filed today, contains a little bit of other

17  sleight of hand that we, you know, in the 20 minutes we got

18  to read it, tries to abrogate the very hard-fought

19  negotiations that were worked out in a term sheet signed by

20  all those parties to that term sheet, and filed with this

21  Court.

22          Among other things, Judge, the 5:2 vote -- and I'm

23  looking at Exhibit A, where they're seeking to clarify the

24  trust agreement, but actually, they're slipping in re-trades,

25  we had required, and part of the reason we got together,

1  Judge, on the 5:2, is to deal with getting consensus,

2  consensus on trustee selection, claims administrator

3  selection, as well as, Judge, trust professional selection.

4        If you read page 29, paragraph 5.15(c) of

5  Exhibit A to the TCC's filing, they make -- that's where that

6  supermajority comes into play.  So, this was a hard-fought

7  provision, Judge, that allowed us to join hands with which

8  was then, you know, people with the different positions

9  regarding the plan, allowing this case to move forward.

10       But if Your Honor looks at page 33,

11 Section 6.8(b), we have a new term that, basically, on

12 page 33 of Exhibit A, eviscerates that supermajority and

13 allows the 4:3 decision to rule, with respect to selection of

14 successor claims administrators, and professionals of the

15 trust.

16       Again, Judge, this is what we have been dealing

17 with, with a negotiated term sheet, and then attempts, such

18 as what we view, happened today to abrogate those hard fought

19 good faith negotiations.

20       I don't know, Judge, if you have any questions.  I

21 tried very, very hard in a very short period of time to

22 address what I see are your concerns.  Needless to say,

23 nobody wanted what happened on Friday to happen.  We've tried

24 very hard throughout this case to meet all deadlines and to

25 work with the debtors and our plan-support parties in pushing

1  this case forward, but we hit an impasse on that issue.

2        That impasse was disclosed.  The names of the

3  trustees, the two potential trustees was disclosed.  We tried

4  over the weekend to resolve it.  We weren't able to do that,

5  and debtor filed its notice today and that finds us here

6  right now.

7        So, Judge, I don't know if you have any questions

8  of me.  I am more than happy to answer them.  Again, we have

9  two really terrific people that can add, really, expertise

10  and value to this trust going forward, and whose reputations

11  are just impeccable.

12        Thank you, Judge.

13        THE COURT:  Thank you.

14        Well, this is not a question I had coming into it,

15  but since you led me to the paragraph, 5.16(c), "Trustees and

16  STAC's Employment of Professionals," with the two persons

17  who, as you recognize, have these very excellent credentials

18  in front of everyone, am I reading this correctly, that the

19  STAC gets consent rights or maybe veto rights over the

20  professionals they choose to hire?

21        MR. MOLTON:  Judge, that's what was negotiated in

22  the term sheet, Judge.

23        THE COURT:  And why should that be?

24        MR. MOLTON:  Your Honor --

25        THE COURT:  Why in the world should that be?

1          MR. MOLTON:  Your Honor, from our position, it's

2    important that, you know, in terms of the circumstances of

3    this case, that the Trust continue to have independence and

4    not be, you know, not have a situation where you have

5    professionals who, otherwise, you know, may not be

6    acceptable to some of the STAC members on either side, for

7    whatever reason, are hired by the trustee.

8          There's lots of people out there, Your Honor, who

9    can do the job, and that was the agreement that the parties

10   reached and all the signatories to the TCC term sheet,

11   signed.

12         THE COURT:  Okay.  So, I hear the answer, but I

13   don't understand, in concept, why the STAC members should

14   dictate who a trustee gets to work with and chooses their

15   trusted advisor -- not an advisor to the STAC -- but the

16   advisor to the trustee.  Why isn't the trustee empowered to

17   choose who they think is appropriate, the counsel they think

18   is appropriate, and the counsel they choose to work with?

19         MR. MOLTON:  Judge, I think they are able to, but

20   in accordance with the agreements that were reached, and

21   those go both ways, I mean, Judge, you're looking --

22         THE COURT:  I hear it.  I hear the answer.

23         I'm just thinking, in concept, I don't get it.  I

24   just don't get it as a concept.

25         MR. MOLTON:  Judge --

1           THE COURT:  We can leave it for another day, but
2   I'll tell you what, the dysfunction of this Committee
3   already, okay, who can't come to an agreement on one of two
4   very qualified candidates, as I'm hearing from the parties,
5   doesn't bode well.  And this trustee, whoever it is going to
6   be, assuming a plan gets confirmed, is going to be hamstrung
7   by a Committee that can't agree on even, between qualified
8   people.  That's all I have to say.
9           Mr. Pachulski?
10          MR. PACHULSKI:  Thank you, Judge --
11          THE COURT:  And Mister -- oh, wait a second --
12  Mr. Molton, because I selected you first, I don't have a
13  bull's eye on you more than I have on Mr. Pachulski, more
14  than I have on anybody.
15          Mr. Pachulski?
16          MR. MOLTON:  Judge, I -- thank you, Judge.
17          I thought I caught a glance in your eyes, Your
18  Honor, so ...
19          THE COURT:  That's Zoom, right?  Okay.
20          MR. PACHULSKI:  Thank you, Your Honor.
21          Richard Pachulski of Pachulski Stang Ziehl &
22  Jones, on behalf of the TCC.  And I have a hunch, Your Honor,
23  that you have a bull's eye on all of us, so I'm not -- I
24  don't think Mr. Molton should feel alone; I think all of us
25  are there together.

1            And I'd like to direct a few issues, some that

2   Your Honor has already commented on.  I agree with Mr.

3   Molton that the STAC interviewed a number of really talented

4   candidates.  There wasn't just two.  People have spent weeks

5   coming up with potential candidates.

6            I think at the end, and again, neither Mr. Molton

7   nor I were involved in the interview process -- I think it

8   was between 8 and 10, from what I understand.  And, Your

9   Honor, I will tell you, because I was heavily involved in the

10  mediation process.  I was every -- went every day, every

11  minute.  It was a very difficult process and sometimes you

12  make deals because they're complicated and you don't take

13  into account all consequences of those deals.

14           And one of the things with 20/20 hindsight I

15  deeply regret is that we didn't have a dispute mechanism -- a

16  dispute resolution mechanism.

17           But we are where we are and Your Honor has noted

18  that, and I will get to what Mr. Molton has stated, with

19  respect to dispute resolution and why what we propose, even

20  though it's not for today, I think would be helpful to deal

21  with the context.

22           I will respond to one thing that Ms. Lauria said,

23  and Mr. Molton disputed.  There is a breach of the term

24  sheet.  I don't care what anybody says.  We can debate why

25  that is, but I was the one, if Your Honor recalls, who said

1  on February 11, I don't think we can meet the 14th.  And I

2  was getting emails at that time from people that scheduling

3  was becoming difficult, and Your Honor thoughtfully had given

4  us until February 18th, which date had not been agreed to.

5         And so, the debtor, frankly, had to do something.

6  And to put this in perspective, Your Honor, it's the debtors'

7  plan.  It's not Mr. Molton's plan.  It's not the Coalition's

8  plan.  It's not my plan.  It's not the TCC's plan.  It's the

9  debtors' plan.

10         And I kind of -- in fairness to the debtor, the

11  date wasn't missed because of the debtor; it was missed

12  because an agreement couldn't be reached because of a

13  supermajority requirement.  And the debtors wanted to see if

14  it could get resolved, and it did not get resolved, and the

15  debtor, under 1129(a)(5), as the proponent, has to disclose

16  the identity of the party that it should be, and in this

17  particular case, they have identified retired Judge Houser,

18  who is, everyone agrees is a superior candidate.  I suspect

19  Mr. Levy is also a superior candidate, but they made the

20  determination based on a 4:3 vote with no dispute resolution

21  provided for in the agreement.

22         Now, Your Honor, just as there had been comments

23  about the prior trustee in the agreement, anyone could

24  object.  Mr. Molton could object.  Any party could object.

25  But it is, at least in my career, not for the Court to make

1  the determination.  It's not for the Court to edit.

2        It's for the Court's determination to state if

3  something is confirmable or not confirmable.  And if it's not

4  confirmable, the parties can either fix it, or it stays non-

5  confirmable.

6        So, to create a situation where, suddenly, the

7  Court is going to make that determination, will mean that

8  people can pose a number of different alternatives.  The

9  debtor has chosen it.  The TCC supports it.

10        There have been lots of discussions over this

11  particular issue, but why is it important in this context?

12        Let me deal with a couple of issues.  Number one,

13  with respect to two trustees, the TCC has been consistent.

14  The debtor has been consistent, from what I understand, that

15  two trustees will not work.

16        If you did -- if Your Honor said, No, let's have

17  two trustees here as the FCR says, we would have to

18  completely redraft the TDP and the trust agreement.

19        Who has the authority?  Would the two have to vote

20  and if it's a tie, who's in charge of the budget?  Who's in

21  charge of the oversight?

22        It would have to be changed and, frankly, the TCC

23  would object to it.  We never anticipated that there would be

24  two trustees.  That there would be one trustee that --

25  Mr. Molton says there's an agreement, but on the other hand,

1  we should now have two trustees, which is not the agreement.

2  And I think we would have to sit down and then redo the TDP

3  and the trust agreement in that regard.

4          But let's deal with the most important issue,

5  which is another reason that we support the debtors'

6  designation.  We've heard -- the TCC, for instance, is having

7  a town hall today.  The TCC had a town hall last week, where

8  we said that we've always referred to three legs of the

9  stool, relating to compensation, youth protection, and the

10  Trust, itself.

11          During that town hall, we said there would be a

12  resolution by the 18th that was -- and the town hall was on

13  the 17th.

14          There will be another one today.  Are we to say:

15  We don't know -- that's a material fact -- who's going to be

16  the trustee?

17          Good, bad, or indifferent, the debtor has

18  designated a trustee and we can go today and say there is

19  one.  If someone doesn't like it, they can object to it.  But

20  it's made very clear that there is a trustee.  If there isn't

21  one, when is that going to be decided, at confirmation?

22          It's very clear in the Code that the debtor is

23  required, prior to the confirmation hearing, to designate.

24  Are we going to have a trial -- is that going to be a trial

25  now?  So, to put it very clearly, Your Honor, we cannot deal

1  with the voting and not have the trustee.  The Court will

2  have to decide on confirmation.  Anyone can object to it.

3          To have trustees makes no sense.  This is not --

4  Mr. Molton has cited 1104; that relates to selection of a

5  Chapter 11 Trustee, not with respect to a settlement trustee.

6          The parties can come up with any mechanism they

7  want to, but at this point, there is an impasse.

8          And let me comment on the other issue, which is

9  why, I think, what we proposed -- and I know Mr. Molton says,

10  it is surprising that it was proposed -- Mr. Molton is well

11  aware that this was a potential issue.  This didn't just show

12  up out of nowhere.

13          There are provisions in the trustee agreement and

14  in the TDP that relates to dispute resolution.  Now, one of

15  the reasons we agreed, being the TCC, to -- and, again, in

16  every case, almost every case I know of, the trustee picks

17  who their professionals are.

18          In this case, the TCC is prepared to say, okay,

19  there has been a lot that has gone on in this case.  If the

20  trustee wants to pick someone and the STAC cannot get 5:2,

21  first instance, 4:3, the trustee can file a motion to

22  approve it and the other side can object, just like we do

23  selection of professionals.

24          I'm not offended by that.  The TCC is not offended

25  by that.

1           The Court should decide if there is an issue, but

2   no party should be able to hold up the trustee's selection,

3   where the trustee cannot even go to court and seek the

4   approval.

5           There are mechanisms, Your Honor, if you look at

6   the agreement -- I know that you have looked at them

7   carefully -- just as an example, if the trustee wants a

8   settlement and you have a majority of the STAC saying no

9   settlement, and the FCR agrees to the settlement, the FCR can

10  bring a motion to pursue the settlement over the objection

11  of a majority of the STAC, where the Court would make that

12  determination.

13          There is no reason in the world that there should

14  be, if you're not going to allow the trustee to pick their

15  own professionals, to at least have a mechanism that this

16  Court can hear out the trustee, and the other side may say

17  there's a conflict or there's a massive problem, and this

18  Court can make a determination, just like you do, with

19  respect to retention of professionals.

20          But I will tell you this, Your Honor, and this

21  is -- I think the people on the STAC are trying to do the

22  best they can -- but to create a mechanism that is a

23  supermajority, that you can't go to the Court when there's a

24  dispute, you will -- I don't care how good people are, how

25  capable they are, that will result in gridlock, and that's

1  what we have right now.

2          And I think what the debtor has made the

3  determination to do is to stop that gridlock in this case and

4  tell those parties who may want to change their vote by

5  March 9, because I believe that's the date, that they can go

6  forward and change the vote with the knowledge of all of the

7  changes to the plan, including who the trustee should be.

8          And so, it is the TCC's very strong position,

9  particularly with a town hall coming up, that it's been

10  designated, that anyone who wants, can object to retired

11  Judge Houser, that this Court will make the decision.

12          But to create a mechanism where we will not know

13  who it is and, potentially, two trustees, makes no sense,

14  because it's the debtors' right under 1129(a)(5) to

15  designate, particularly, when we have missed the

16  February 18th date, for whatever reason.

17          The TCC picked STAC members.  The Coalition

18  picked STAC members.  Mr. Patterson's client picked a STAC

19  member.  They didn't agree; that's what we know of.  And to

20  stay in gridlock or start a new process of interviews, will

21  only move the date, and that would be to the detriment of

22  everybody, because every day that passes by, this Trust is

23  going to get less money from the Boy Scouts, even assuming

24  they survive.

25          So, with that, Your Honor, I would ask that Your

1   Honor allow the designation, allow the confirmation hearing

2   to go forward with retired Judge Houser.  Your Honor will

3   have to make that determination, if she is the appropriate

4   trustee.

5          But to have two trustees, or to be in gridlock, I

6   think is, frankly, irresponsible, at this time, on behalf of

7   all of the parties.

8          And I'm happy to answer any questions that Your

9   Honor may have.

10          THE COURT:  I don't have any questions.

11          I'll comment that there's one than one way to get

12   rid of gridlock.

13          MR. PACHULSKI:  That is true, Your Honor; I agree.

14          THE COURT:  There's kind of an easier way.

15          Mr. Brady?

16          MR. BRADY:  Thank you, Your Honor.

17          Robert Brady, on behalf of the FCR.  The FCR is in

18   a unique position here, Your Honor.  We have consent rights,

19   but only after a candidate achieves five votes from the STAC.

20          So, Mr. Patton (sic) did participate in all of

21   the interviews and has been aware of the negotiations among

22   the STAC members that resulted in a 4:3 impasse between two

23   very, very qualified candidates.

24

25          I won't get into the negotiations of the TCC term

1  sheet, Your Honor, but as you've heard, it was very, very

2  carefully negotiated.  The reason certain decisions have to

3  be a 5:2 vote was very important to the parties negotiating

4  that agreement.  So, if in the for instance, there's a

5  requirement of a 5:2 vote and the debtor simply gets to pick

6  who wins, then that 5:2 vote means nothing for the parties

7  that negotiated those protections in the term sheet.

8          The term sheet is clear on a lot of things, Your

9  Honor.  One thing it is clear on is the debtor doesn't get to

10  pick the trustee.  It has consent rights just like the FCR.

11          In the first instance, the beneficiaries of the

12  Trust, which is not uncommon in mass tort cases, Your

13  Honor -- this is not a charitable trust -- the beneficiaries

14  of the trust should have a say in who the trustee will be to

15  administer their money.  The money in the trust belongs to

16  the beneficiaries and so the trustee has a very important

17  role to administer the Trust in a fair and efficient way to

18  get the money out to the beneficiaries.

19          Interestingly, Your Honor, Mr. Pachulski raised no

20  dispute mechanism.  There is a dispute resolution mechanism

21  in the settlement trust agreement for a replacement trustee.

22  If there is to be a replacement trustee, there's a process

23  that needs to be followed, and if there's still no agreement,

24  the Court decides.

25          So, we think that is the most analogous situation

1  here, Your Honor.  There's no agreement to reach five votes

2  on any one candidate.  We think the Court should decide.

3          We think these are two very highly qualified

4  candidates.  They both have significant support from STAC

5  members.  They are both acceptable to the FCR.  I believe

6  they're both acceptable to the debtors.

7          That's why we suggested, Your Honor, let's appoint

8  them both.  Most trusts of this size will have multiple

9  trustees.  I know the agreement of the parties was one, but

10  one way to resolve the impasse is to appoint these two

11  qualified candidates, and I think their experience is often

12  similar, but some ways different, would work very well

13  together to have a very fair and efficient trust.

14          Your Honor has _Imerys_ in front of you.  You have

15  _Paddock_ in front of you.  Both are substantially smaller.

16  Both have three proposed trustees in the governance structure

17  for those trusts, so very common.

18          But, Your Honor, at bottom, we think the Court

19  should just decide this.  You have two good candidates in

20  front of you; both have significant support.  Both are

21  acceptable to the FCR, both are acceptable to the debtors.

22  The Court should hear from them and decide.

23          I'll note, Your Honor, in connection with the FCR

24  selection, when parties come forward with different

25  candidates, ultimately, it was Your Honor that decided the

1  FCR in some of the other cases.  So, we think the Court can

2  perform this role.

3        In effect, that's what Mr. Pachulski is saying.

4  If you put the debtors' candidate out there, people can

5  object, and Your Honor is going to have to decide anyway.

6        So, let's decide now between these two very well-

7  respected candidates who have great credentials, and we think

8  with both together, would be an incredible trustee

9  combination for a very large and important trust.

10        THE COURT:  Okay.  But there's a reason, Mr.

11  Brady, why I picked the FCR, and that's because the Code says

12  I pick the FCR.

13        MR. BRADY:  And, Your Honor, we would say --

14        THE COURT:  The Code doesn't say I pick a post-

15  confirmation trustee.  I have to, perhaps, approve them

16  under -- so, he has to meet certain standards, but it doesn't

17  say that.

18        MR. BRADY:  But, Your Honor, you could look to the

19  intent of the parties in the settlement trust agreement, that

20  if there is to be a replacement trustee, Your Honor would get

21  to decide that.

22        THE COURT:  Well, that's a good question, too, as

23  to whether I should, on this entity that's emerged and has

24  gone forward and is supposedly performing its duties, whether

25  it should come back to the Court.  That's a whole other

1  question, but I hear you.

2        Okay.  Mr. Patterson?

3        MR. PATTERSON:  Thank you very much, Your Honor.

4        Tom Patterson, for the Zalkin Pfau Council and, in

5  particular, in this case, Mr. Zalkin, the man in the middle.

6        Your Honor, the STAC members, in good faith,

7  interviewed a series of candidates and they were ultimately

8  unable to agree.  The debtors made a designation.

9        The plan provides that the designation will be

10  made by the debtor, subject to approval by the Bankruptcy

11  Court in the confirmation order, and that's the plan at

12  Article 4, Section E, and I think that's where we are.  The

13  debtors made a designation.  There's been a little flurry of

14  correspondence, what I would call initial responses to that.

15        We will have our confirmation trial.  I believe

16  that the Court will find the plan to be confirmable and one

17  of the decisions the Court will have to make in connection

18  with that is whether it's confirmable with the designation of

19  Judge Houser as the trustee.  I believe that we will urge the

20  Court to make that determination, but others can be heard on

21  it, but it's certainly premature today.

22        With regard to the idea of whether there should be

23  two trustees, I am grateful that my head did not actually

24  explode when the suggestion was made, and maybe I was prepped

25  for it by the correspondence, but it is somewhat alluded to;

1   the difficulty or challenge with two trustees, particularly

2   two trustees who there's no evidence, no each other, is that

3   there would have to be a calibration of their

4   responsibilities in the trust agreement and, God forbid, a

5   dispute resolution mechanism in the event that they were not

6   to come to agreement.  And so, the idea of two trustees is a

7   rather facile response to the situation in which we find

8   ourselves.  It is not a solution.  It is simply the creation

9   of a huge number of problems.

10          And we had the very same reaction that Your Honor

11  did, with regard to the selection of the trust professionals.

12  And there was a head-scratcher for Mr. Zalkin and myself; of

13  course, the trustee should select her or his professionals.

14  And it may well be appropriate to have the STAC approve

15  that, because the STAC has the interests of the survivors at

16  heart, the beneficiaries of the trust, and has a legitimate

17  role in ensuring that the professionals are competent and

18  qualified.  But in the event that the STAC can't come to a

19  decision with regard to that approval, then the trustee

20  ought to be able to move forward.

21          And with respect to certain decision-making

22  functions, where the consequence would be paralysis of the

23  trust, the trustee should be able to come to the Court and

24  show that her or his decision is defensible and have that

25  decision approved.  And so, we support the amendment to the

1  trust agreement that the TCC has urged; again, that's not a

2  today issue.  That will be for confirmation.

3          It may well be the case, Your Honor, that the

4  situation we find ourselves in is because you had -- and I

5  don't put myself, my clients in this situation, because we

6  were rather late to the party -- but you have people who have

7  spent a long time disagreeing with each other, who then

8  agreed to come together on a STAC.  And it may well be the

9  case that it was structurally forced on us, but the first

10  decision they had to make was the hardest one.  It might have

11  been better if they had ordered lunch for us or, you know,

12  decided on some easy ones to get some momentum, but I'm

13  afraid that's the situation we have found ourselves in.

14          And I actually have a fair degree of confidence

15  that the STAC will function going forward.  There are very

16  few situations that require 5:2; most are 4:3.  Even in

17  situations where the STAC doesn't approve something, the

18  trustee has the ability, in some cases, to come to court in

19  the event the STAC doesn't function.

20          And I think over time, people of goodwill,

21  integrity, and great capability will be able to act in a more

22  consensus-based fashion.  I just think the challenge was that

23  this was the first one out of the box and it was an important

24  one.  And maybe there wasn't enough buildup of relationships

25  in order to come to together on that.

1        So, I am optimistic for the STAC.  I am

2   optimistic for the trust.  And I am optimistic that the plan

3   can go forward and be considered by Your Honor with the

4   designation that the debtors has made and others can be

5   heard on it if they have legitimate concerns or legitimate

6   points that they want to raise, Your Honor.

7        So, this is regrettable.  It's disappointing.

8   It's embarrassing.  But it's, nevertheless, something that we

9   can get past and continue to move to confirmation of this

10  plan.

11       I'd be happy to answer any questions, Your Honor.

12       THE COURT:  Thank you.  I don't have any

13  questions.

14       Mr. Rothweiler, I see your hand, but I am not

15  going to call on you.  You have counsel.  You are in part of

16  the Coalition.

17       And I think consistent with the positions that I

18  have espoused with respect to confirmation, people who are

19  represented, I'm not going to be hearing from; I'm going to

20  be hearing from their counsel.

21       Mr. Hallowell?

22       MR. HALLOWELL:  Thank you, Your Honor.

23       I just wanted to raise a couple of issues.  I'm

24  speaking on behalf of the Certain Insurers; Mr. Hallowell,

25  for the AIG Company.

1       Your Honor, as you know, we brought this matter to

2   Your Honor attention and we brought the matter to your

3   attention, because this was yet another deadline that had not

4   been met.  And, Your Honor, we believe that we have been

5   prejudiced by the failure to meet this deadline and we

6   continue to be prejudiced.

7       What's clear from what you've heard over the last

8   50 minutes, Your Honor, is that there is not agreement among

9   the plan proponents, with regard to the plan that's been put

10  forward for confirmation.  There's been negotiation that's

11  been going on in the last 50 minutes of this hearing.

12      You asked, Your Honor, that the plan be finalized.

13  You wanted it to be finalized by February 15th.  The

14  extension was made to February 18th for naming of the

15  settlement trustee and the claim administrators, and that has

16  not happened, Your Honor.

17      A bunch of proposals have been put forward as to

18  how to move forward, but we should have been moving forward a

19  week ago and we're not moving forward, and it doesn't appear

20  that we're going to move forward anytime soon, absent some

21  agreement or resolution by Your Honor.  And I'll note that

22  the parties seem to be of different minds, as to whether you

23  can enforce a resolution.

24      Your Honor, I also want to mention, there was

25  discussion about whether or not a breach has occurred.

1  Mr. Pachulski has been clear about the matter.  There has

2  been a breach of the TCC settlement term sheet in Mr.

3  Pachulski's view.

4          Ms. Lauria stated that there was a breach.  And

5  Mr. Molton's letter states that the debtors, in derogation

6  and breach of the TCC term sheet, filed the notice indicating

7  that Judge Houser had been designated as the settlement

8  trustee.

9          So, Your Honor, on behalf of the insurers, we

10  simply note that we are prejudiced by this, and as you

11  resolve this issue, we believe it's fair for you to take into

12  account the prejudice that has occurred to us in setting

13  whatever future schedule gets set from here.

14          One other thing to note, Your Honor.  It seems

15  from the conversation that we're down to two settlement

16  trustee nominees; both former judges.  But I raised the issue

17  yesterday in our meet-and-confer and I asked if the Claimant

18  parties could confirm that we were down to only one of those

19  two possible settlement trustees.

20          And the answer that I got yesterday was:  That's a

21  good question.  So, I take that as a failure to comply.

22          So, Your Honor, if you can get confirmation from

23  this group that it will be one of those two individuals, I

24  think that's progress going forward, but it doesn't seem like

25  there's any consensus among this group.

1          The further consensus might be to ask:  Are these

2  parties going forward with a plan?

3          They have stated that each other is in breach and

4  we need to know, Your Honor, if these parties are going

5  forward with it.  Thank you.

6          THE COURT:  Thank you.

7          Mr. Ryan?

8          MR. RYAN:  Your Honor, I'll be brief.

9          I want to join in Mr. Hallowell's comments.  We

10  are also stuck on the sidelines being prejudiced by the

11  inability to make this decision.  I would note, Your Honor,

12  we were the only party that took the deposition of Mr. Green,

13  because we were keenly interested in who the settlement

14  trustee is going to be, because they're charged with

15  enforcement of the channeling injunction, so there are issues

16  that we care about with respect to that person.  So, I just

17  wanted to join in Mr. Hallowell's comments; I won't belabor

18  the record any further.

19          THE COURT:  Thank you.

20          Mr. Buchbinder?

21          MR. BUCHBINDER:  Thank you, Your Honor.

22          I am actually sort of dumbfounded that we're

23  having this discussion this afternoon, but I appreciate the

24  Court requesting the status hearing.  I will remind everyone

25  that tomorrow is the deadline that the Court set for parties

1 to file objections based on the term sheet and the

2 supplemental filings, which would include objections to the

3 qualifications of the settlement trustee or the claim

4 administrators.

5        Both of the settlement trustees appear to be

6 eminently qualified, but that's not really the issue here.

7        You know, sometimes you just have to step back

8 from the trees and take a look at the forest and use your

9 common sense.  We're sitting here for the better part of an

10 hour and we're listening to all these people tell us how much

11 time they spent negotiating this term sheet, weeks and weeks,

12 and here it is, weeks later, and they're telling us they

13 don't like the rules that they made for themselves, so,

14 Judge, change them today.

15        And I do have to emphasize with the debtor, but

16 what the debtor is proposing is to amend the plan again,

17 today, without notice to anybody, except the folks lucky

18 enough to be on this conversation and who saw the three

19 letters before this status conference.

20        I agree with Mr. Pachulski that the concept of two

21 trustees would require significant revisions to the trust on

22 distribution procedures.  I'll focus on the new proposal or

23 the independent review option.  The settlement trustee has

24 the right to accept or rejection a recommendation made by the

25 neutral person who's going to review the claim.  And if the

1  trustee rejects the settlement, the lucky claimant can go

2  file a lawsuit somewhere in 45 days.

3          So, if there's two trustees, which one is going to

4  be the better trustee to make recommendations or not make

5  recommendations?

6          That's just the tip of the iceberg, but again,

7  this is an attempt to amend the plan.  The parties don't like

8  the rules they made, and I think that, ultimately, where this

9  ends up for aware confirmation trial is it's a feasibility

10 issues.

11         And I will adopt the comments the Court made

12 earlier and thank you, Your Honor.

13         THE COURT:  Okay.  Well, here's what we're going

14 to do.  I scheduled this when I got the letter from

15 Mr. Hallowell; subsequently, the debtors' filing came in, as

16 did other filings that people made.

17         The debtor has proposed former Judge Houser.  It

18 is the debtors' plan.  I'm going to let that go forward.

19         If it's a breach and a party wants to file, I

20 guess, an objection by tomorrow, you can file your objection.

21         Let me make this comment.  We are heading into the

22 confirmation.  People should be taking issues off my plate;

23 they shouldn't be putting issues on my plate, especially if

24 you are the plan proponent or you support the plan.

25         There is only so much time between now and

1  confirmation to address the multiple issues I already have in
2  front of me, in terms of discovery disputes and *motions in*
3  *limine*, as well as all the objections that have been filed to
4  confirmation, and the responses are going to happen.

5         So, disappointing -- somebody used that word.
6  Embarrassing -- somebody used that word.  I'd adopt those, as
7  well.

8         And I'll say it for the third time,
9  notwithstanding Mr. Patterson's optimism, and an observation
10  that perhaps a difficult decision was the first one that had
11  to be made by this group, I think some of the other decisions
12  that this group may have to make in the future, assuming a
13  plan is confirmed, could be just as difficult.  And I don't
14  think this bodes well.

15         And I will be looking at the trust agreement and I
16  probably will be wondering at various points, as I'm reading
17  it, what the STAC's role should be; notwithstanding what it
18  may have been in every other trust, prior to this time,
19  since you have a trustee.

20         And maybe I'll find that everything that the STAC
21  has to do or it gives consent rights to or veto rights over,
22  is perfectly acceptable, and maybe I won't.

23         So, but I think this, quite frankly, just
24  highlighted the issue for me about sending parties off to a
25  trust with a trustee who's truly, what I'm hearing from

1   everyone, very well qualified, presumably independent -- I

2   haven't heard that they aren't; either choice -- and right

3   now, we're going forward with former Judge Houser, because

4   that's the debtors' plan.

5            And aside from some advisory committee or

6   advisory role, what should the role of the STAC be is

7   something I'll consider among, now, the various confirmation

8   issues that are in front of me.

9            Okay.  I appreciate everyone getting together on

10  such short notice today and this matter has been resolved for

11  now, going forward.

12           Obviously, anyone can determine if they want to

13  file an objection to the debtors' selection of the settlement

14  trustee on whatever grounds, but that's how we're going

15  forward.

16           So, thank you very much, and we're adjourned.

17           COUNSEL:  Thank you, Your Honor.

18       (Proceedings concluded at 5:01 p.m.)

19

20

21

22

23

24

25

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8    /s/ William J. Garling                    February 24, 2022

9    William J. Garling, CET-543

10   Certified Court Transcriptionist

11   For Reliable

12

13

14

15

16

17

18

19

20

21

22

23

24

25