IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) (Jointly Administered) |
| Debtors. | Ref. Docket Nos. 8683, 8813 |
| | **Objection Deadline: February 25, 2022** **Hearing Date: March 14, 2022 at 9:00 a.m. ET** |

**SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ARCHBISHOP OF AGAÑA (BANKR. D. GUAM 19-00010) TO THE THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

The Official Committee of Unsecured Creditors appointed in *In re: Archbishop of Agaña, a Corporation Sole* (Bankr. D. Guam 19-00010 (the "Guam Committee") hereby submits this supplemental objection (the "Supplemental Objection") to the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (the "Plan" or "February 15 Plan") [Dkt. No. 8813], and respectfully states as follows:

### INTRODUCTION

The Debtors' plan cannot be confirmed. While the Debtors modified the Plan to make it more palatable to joint tortfeasors, the Plan continues to violate the rights of more than seventy survivors of sexual abuse on the island of Guam. These survivors (the "Guam Survivors") are creditors in a bankruptcy case filed by the Archbishop of Agaña, a corporation sole (the "Archdiocese"). On February 4, 2022, the Guam Committee filed an Objection to the Second

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Modified Fifth Amended Chapter 11 Plan of Reorganization ("February 4 Objection"), Dkt. No. 8683. On February 15, 2022 BSA filed the current iteration of the Plan, the Third Modified Fifth Amended Chapter 11 Plan of Reorganization ("February 15 Plan" or "Plan"). BSA did <u>not</u> modify the Plan to resolve the Guam Committee's objections. Thus, the Guam Committee incorporates and refers the Court back to each of the objections set forth in its February 4 Objection.[2] In addition, the revisions filed on February 15 <u>further broaden</u> the scope of improper nonconsensual releases of the Guam Survivors' Claims against the Archdiocese.

The numerous material modifications to the September 30, 2021 version of the Plan sent out for creditor vote ("Solicitation Version") purport to release and enjoin the claims of Guam Survivors against a non-debtor third party and impermissibly dispose of the Archdiocese's estate assets that might be used to pay such claims, all in contravention of the statutory and constitutional limits of this Court's authority and in violation of fundamental notions of fairness and due process.[3]

The Court's amended scheduling order [Dkt. No. 8830] provides that supplemental objections "shall be strictly limited to modifications to the Plan and Plan documents filed on February 15, 2022 and the identity of the Settlement Trustee and Claims Administrators to be

---

[2] Debtors purported to modify the Plan to allow Opt-Out Chartered Organizations to retain their rights in insurance policies issued by the Settling Insurance Companies directly to the Opt-Out Chartered Organizations, but never made corresponding changes to the Settling Insurer Injunctions or release provisions. *See* Plan Article X.H.2. *Compare* Blackline of Plan Article V.G.g.iii. Further, even if it remained an Opt-Out Chartered Organization, the Archdiocese would be enjoined from asserting its rights to coverage as an additional named insured and/or additional insured under insurance policies issued by the Settling Insurance Companies to BSA. Plan Article X.H.2. In addition, the Plan unambiguously releases coverage for Abuse Claims under insurance policies issued directly to the Archdiocese if the Archdiocese becomes a Participating Chartered Organization. *See* Plan Article X.H.2 and Article X.G.1. Finally, the Plan would still enjoin and release the Guam Survivors' Abuse Claims covered under any allegedly preserved insurance policies issued by the Settling Insurance Companies directly to the Archdiocese. *See* Plan Article X.F.1; Article X.F.3; Article X.J.3; Article V.G.g.iii.

[3] *See Notice of Filing of Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization and Blackline Thereof* [Dkt. Nos. 7833, 7833-1] and *Notice of Filing of Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization and Blackline Thereof* [Dkt. Nos. 8814 and 8814-1 (hereinafter, the "Notice of Plan" and the "Blackline of Plan," respectively)].

disclosed on February 18, 2022" and that "existing objections to the Plan shall remain in effect." A number of the Plan references in the Guam Committee's February 4 Objection are now inaccurate as a result of the Debtors' subsequent modifications. If requested, the Guam Committee will provide the Court a revised objection that corrects the now outdated references in the February 4 Objection. However, the substance of the February 4 Objection still stands in its entirety. Pursuant to the Court's amended scheduling order, this Supplemental Objection is limited to only those substantive modifications in the Plan version filed for the first time on February 15.

The Guam Survivors suffered abuse as a result of the negligent acts and omissions of at least two separate joint tortfeasors: the Boy Scouts of America (BSA)[4] and the Archdiocese. Nearly all Guam Survivors were abused by one or more individuals employed by the Archdiocese who also simultaneously held leadership positions for BSA ("Scoutleader(s)") on the island of Guam. The Guam Survivors hold claims against the Archdiocese and also against BSA, each for their own, independent acts and omissions that combined to create indivisible injuries. Each organization had separate supervisory responsibility over the perpetrator(s). The Archdiocese's liability is not derivative of BSA's. Further, the Guam Survivors are not asserting Archdiocesan liability based only on its status as a Chartered Organization of BSA. The Archdiocese *employed* the BSA-affiliated perpetrators(s) in many instances. In addition, many Guam Survivors were abused by the same individual *both* during religious activities and during BSA functions. The February 15 Plan creates a new definition of "Mixed Claim" addressing this particular scenario, but the modifications do not resolve the Plan's ambiguity of whether such Claims might be released and enjoined against the Archdiocese for non-Scouting Abuse. Instead,

---

[4] The Guam Survivors also have claims against BSA's councils and/or affiliated entities. For simplicity, the Guam Committee refers to BSA councils and affiliates in combination with BSA as "Boy Scouts of America" or BSA.

new Plan language suggests that the Debtors primarily added the Mixed Claim definition to appease certain Chartered Organizations concerned about potentially losing coverage under their own insurance policies, and that the Debtors may not actually be narrowing the scope of the Plan's nonconsensual third-party, non-debtor claim releases for the Archdiocese's portion of fault. Indeed, at least with respect to Participating Chartered Organizations and Contributing Chartered Organizations, the Plan now compels all parties to "agree to cooperate to enforce . . . the Channeling Injunction to eliminate all or a portion of the Mixed Claims against the applicable Chartered Organizations."[5] The February 15 Plan therefore potentially compels BSA and the Archdiocese to argue that the Plan releases certain of the Guam Survivors' Mixed Claims in entirety. Even assuming that the Plan could now be construed to preserve the Archdiocese's liability for abuse occurring during church activities, the "Mixed Claim" concept glosses over the fact that the Guam Survivors have rights against the Archdiocese for abuse *during BSA functions* that the Plan cannot validly release under the standards adopted by the Third Circuit Court of Appeals. Thus, the new Mixed Claim category does not remedy the Plan's fundamental failings.

The Guam Committee objects to the Plan on the following grounds:

1.      The Plan impermissibly provides the Archdiocese with a nonconsensual third-party release. *See* February 4 Objection [Dkt. No. 8683] at 7-18 (discussing factors for evaluating third-party, non-debtor claim releases).

2.      The Plan disposes of the Archdiocese's estate's property in violation of the automatic stay in the Archdiocese's bankruptcy case in Guam. The Archdiocese has stipulated and agreed that the policies issued to BSA, under which the Archdiocese is insured, are assets of

---

[5] Article X.G.1.b.

the Archdiocese's estate and are protected by the automatic stay.[6] *See* February 4 Objection [Dkt. No. 8683] at 19-20.

3. The Plan provisions releasing certain insurers of BSA and the Archdiocese, and purporting to retroactively rescind these insurers' obligations to the Archdiocese, violate fundamental principles of insurance law. *See* February 4 Objection [Dkt. No. 8683] at 20-23. The Guam Survivors have vested rights in the proceeds of the insurance policies that the Plan purports to sell back to the Settling Insurance Companies free and clear of any claims to proceeds. *Id*. Moreover, the sale of these assets is not necessary to BSA's reorganization. *See* February 4 Objection [Dkt. No. 8683] at 15-16.

4. The Debtors materially modified the Plan after the vote on the Solicitation Version to broaden the scope of protections afforded to Chartered Organizations, including the Archdiocese, without appropriate notice to individual Guam Survivors. *See* February 4 Objection [Dkt. No. 8683] at 23-25.

5. The Plan violates due process by allowing the Archdiocese – without notice to Guam Survivors – to dispose of its estate assets in exchange for claim releases. *See* February 4 Objection [Dkt. No. 8683] at 25-28. Further, the February 15 modifications to the Plan *incentivize* the Archdiocese to agree to transfer assets of its estate in violation of due process, in exchange for additional, improper releases of Guam Survivors' Abuse Claims, by offering the Archdiocese: (1) a new Limited Protected Party Injunction against all Abuse Claims for at least twelve (12) months, with the opportunity for an extension; and (2) the opportunity to turn in certain categories of Claims for coverage under insurance policies issued directly to the Archdiocese by the Settling Insurers (insurance policies that are assets of the Archdiocese's

---

[6] *See* Final Order Approving Stipulation and Denying Derivative Standing Motion as Moot, *In re: Archbishop of Agaña, a Corporation Sole*, No. 19-00010 (Bankr. D. Guam, Sep. 10, 2021) (Dkt. No. 692).

estate and <u>not</u> assets of BSA's estate in whole or in part) while simultaneously compelling BSA and the Archdiocese to take action to try to "eliminate all or a portion of" the Guam Survivors' Abuse Claims that may implicate such coverage.

6.      The February 15 Plan also expands even further the scope of the impermissible, nonconsensual third-party releases in numerous respects. The Plan will enjoin more than seventy (70) pending Abuse Claims that have been filed against the Archdiocese in its own bankruptcy proceedings in Guam, with no monetary contribution by the Archdiocese to pay such Abuse Claims, if the Archdiocese agrees to transfer certain insurance rights against the Non-Settling Insurance Companies. Further, these enjoined Abuse Claims need not even be insured under any of the insurance policies issued directly to BSA or its affiliates. The Debtors also broadened the scope of releases protecting Opt-Out Chartered Organizations, which will apply to the Archdiocese if the Archdiocese does not agree to transfer its insurance rights prior to the supplemental Plan objection deadline.

8.      The Plan amendments require the Court to issue unsupported and improper new findings and conclusions.

The Guam Committee does not seek to prevent or further delay a BSA reorganization. However, it is necessary that any BSA plan preserve the rights of the Guam Survivors against the Archdiocese and preserve the assets of the Archdiocese's estate. The Guam Survivors are entitled to compensation from the Archdiocese for the Archdiocese's portion of fault for the Guam Survivors' injuries. This Court cannot validly order the nonconsensual release of the Guam Survivors' claims filed in the Archdiocese's bankruptcy before BSA even filed for Chapter 11 protection, nor dispose of the assets of the Archdiocese's estate without approval of the United States District Court for the District of Guam.

**BACKGROUND**

The Guam Committee refers the Court to the background set forth in its February 4 Objection [Dkt. No. 8683] at p. 3-7. This Supplemental Objection incorporates the terms and definitions set forth therein, including for Joint Tortfeasor Claims and BSA Insurers. As used in this Supplemental Objection, Joint Tortfeasor Claims refers to the more than seventy (70+) claims still pending against *both* the Archdiocese and BSA out of the approximately 150 claims filed in the Archdiocese's bankruptcy that implicate or name BSA as a joint tortfeasor.

**ARGUMENT**

In addition to each of the objections set forth in the Guam Committee's February 4 Objection, the Guam Committee objects to the Plan because it does not comply with title 11 in the following respects.

**I.    The Plan Expands the Scope of Impermissible, Nonconsensual Third Party Releases**

The Plan impermissibly purports to enjoin and release Guam Survivors' Joint Tortfeasor Claims against the Archdiocese without the consent of Guam Survivors. Even before the February 15 modifications, the proposed third-party releases did "not pass muster under even the most flexible tests for the validity of non-debtor releases." *See In re Cont'l Airlines*, 203 F.3d 203, 214 & n. 11 (3d Cir. 2000). Under the December 28 iteration of the Plan ("December 28 Plan"), without doing anything, or making any contribution, the Archdiocese would be released from any "Opt-Out Chartered Organization Abuse Claims," meaning all Abuse Claims insured under insurance policies issued by Settling Insurance Companies. Under the December 28 Plan, if the Archdiocese "opted in" to become a Limited Protected Party, the Archdiocese would be further protected from all "Post-1975 Chartered Organization Abuse Claims," which would include all Abuse Claims that alleged abuse after January 1, 1976, regardless of whether they were insured under insurance policies issued by Settling Insurers. Now the February 15 Plan

purports to also grant a limited injunction of *all* Abuse Claims against Limited Protected Parties for at least twelve (12) months, regardless of when the Abuse occurred and regardless of whether such Abuse Claim would be covered under *any* insurance policy issued by a BSA Insurer.[7]

Therefore, the Plan will enjoin the Abuse Claims of any Guam Survivors covered under any insurance policy issued by a Settling Insurer, with no contribution by the Archdiocese in respect of such Abuse Claims.[8] This injunction was not in the Solicitation Version. Further, if the Archdiocese agrees to transfer certain insurance rights to the Trust, the Plan will also (1) enjoin permanently all Abuse Claims that are not insured under a Settling Insurer Policy but involve Abuse that first occurred on or after January 1, 1976 and (2) temporarily enjoin any Abuse Claim against the Archdiocese, to provide the Archdiocese time to negotiate a contribution to the Trust and thereby gain Protected Party status and become permanently protected from all Abuse Claims.

Even assuming the Court has statutory authority to authorize nonconsensual third-party, non-debtor claim releases, the proposed expanded claim releases cannot satisfy any of the factors considered by bankruptcy courts in the Third Circuit. *See* February 4 Objection [Dkt. No. 8683] at 7-18. Moreover, these expanded injunctions are a transparent effort by the Debtors to incentivize the Archdiocese to agree to transfer assets of the Archdiocese's estate, without approval of the court in Guam, and in violation of the Guam Survivors' due process rights. In fact, the Archdiocese is the only Roman Catholic Chartered Organization that is expressly called out in the Plan by name as a Chartered Organization to which these injunctions apply,

---

[7] Plan Article X.F.2. *See also* Plan Article I.A.177.

[8] On February 15, the Debtors further modified the Plan to clarify that an insurance policy shall be deemed to provide coverage for Abuse Claims against a Chartered Organization if, among other things, the policy includes the Chartered Organization by name or categorically covers chartered organizations, charters, sponsoring organizations or sponsors, as insureds or additional insureds. Blackline of Plan at Article X.F.2.

underscoring the importance of the Guam Survivors' direct rights against the Archdiocese and all insurers of the Archdiocese, and the intentional efforts undertaken in this bankruptcy proceeding to craft releases purportedly eliminating the Archdiocese's portion of liability for the Abuse.[9]

The Plan now includes the following objectionable modifications that alter and expand the scope of the impermissible, nonconsensual third-party releases provided in previous iterations of the Plan.

### A.    The Plan Expands the Scope of Injunctions Applicable to Abuse Claims covered under insurance policies issued by Settling Insurance Companies

The Debtors modified the definition of "Opt-Out Chartered Organizations" to clarify that the Opt-Out Chartered Organizations will be released from any Abuse Claims covered under insurance policies issued by Settling Insurance Companies[10] and modified the Channeling Injunction to state that, "for purposes of administering the Channeling Injunction and releases" in the Plan, any liability insurance policy (except an automobile policy or director's and officer's policy) "shall be automatically deemed to 'cover' or provide 'coverage' for an Abuse Claim against a Chartered Organization" if: (1) the insurance policy includes Chartered Organizations, either by name or by referring to Chartered Organizations categorically; (2) was in effect at the time of the Abuse; and (3) does not exclude all abuse or molestation.[11] The Debtors also modified the Plan to provide that a Settling Insurance Company and/or its insureds may attempt

---

[9] *See* Plan at Article V.S.1.e. ("Notwithstanding the foregoing, no Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date (including the Archbishop of Agaña, a Corporation Sole) shall be treated as a Participating Chartered Organization unless it advises Debtor's counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, provided, however, that such Chartered Organizations shall be deemed an Opt-Out Chartered Organization and Opt-Out Chartered Organization Abuse Claims against such Chartered Organizations shall be Channeled to the Settlement Trust").

[10] Blackline of Plan at Article I.A.196.

[11] Blackline of Plan at Article X.F.3.

to establish that "*other* insurance policies cover Abuse Claims for purposes of the Channeling Injunctions and Releases" (emphasis added).[12]

By allowing Settling Insurance Companies and/or their insureds (e.g., Chartered Organizations) to attempt to establish that other, unnamed insurance policies cover or insure Abuse Claims, the Plan fails to provide creditors adequate information about the scope of the proposed injunctions and releases granted to Opt-Out Chartered Organizations and Limited Protected Parties. Further, the Plan purports to release the Guam Survivors' Abuse Claims even if they are insured under only the Archdiocese's own insurance policies issued by the same Settling Insurance Companies, because the Plan provides that a liability policy issued by the Settling Insurance Companies "shall be automatically deemed to 'cover' or provide 'coverage' for an Abuse Claim against a Chartered Organization" if it includes the Chartered Organization by name.[13]

Thus, even as to Opt-Out Chartered Organizations, the Plan purports to enjoin (1) all Abuse Claims covered under any insurance policies issued to BSA by the Settling Insurance Companies that name the Archdiocese as an insured or additional insured; (2) all Abuse Claims covered under any insurance policies issued to the Archdiocese by the Settling Insurance Companies; and (3) all Abuse Claims that the Settling Insurance Companies and/or Archdiocese establish are insured under other, unidentified insurance policies.

---

[12] Blackline of Plan at Article X.F.3.

[13] Blackline of Plan at Article X.F.3. This is clarified in the Supplemental Disclosure [Dkt. No. 8904] at p. 6 ("Abuse Claims against Opt-Out Chartered Organizations will be channeled to the Settlement Trust if a Settling Insurance Company issued a liability policy (other than an automobile policy or director's and officer's policy) that does not specifically exclude abuse or molestation (i) to the BSA or a Local Council that includes the Opt-Out Chartered Organization, or (ii) directly to the Opt-Out Chartered Organization for the period that a claimant alleges to have been abused").

National Union is a significant insurer for the Guam Survivors' sexual abuse claims.[14] While National Union (AIG) currently is not a Settling Insurance Company, the Plan would purport to release not only every Abuse Claim covered under insurance policies issued directly to BSA, but also every Abuse Claim covered under insurance policies issued directly to the Archdiocese (even if the Archdiocese remains an "Opt-Out Chartered Organization" by refusing to transfer its insurance rights). National Union is currently offering $12,000,000 to resolve the Guam Survivors' Claims against the Archdiocese under insurance policies issued directly to the Archdiocese.[15] The Guam Committee contends this proposed settlement is inadequate and is actively negotiating National Union's trust contribution in Guam.[16] If National Union became a Settling Insurance Company after Plan confirmation, through another Plan amendment, or as a result of a Plan provision allowing the Archdiocese to claim other unidentified policies are implicated, then all Abuse Claims covered by National Union's policies issued to the Archdiocese would also be released against the Archdiocese. These insurance policies are assets of the Archdiocese's estate, not BSA's, and the release of these Abuse Claims (and of the insurance assets to pay them)[17] is not necessary to BSA's reorganization.

The February 15 modifications also expand the universe of Settling Insurance Companies, further broadening the scope of released claims against the Archdiocese to

---

[14] *See* First Amended Disclosure Statement for First Amended Chapter 11 Plan of Reorganization Proposed by the Archbishop of Agaña, *In re: Archbishop of Agaña, a Corporation Sole*, No. 19-00010 (Bankr. D. Guam) [Bankr. D. Guam Dkt. No. 714] (hereinafter, "Disclosure Statement of the Archbishop of Agaña"), at 32. (discussing policy limits).

[15] Disclosure Statement of the Archbishop of Agaña at 33.

[16] *See* Disclosure Statement for Chapter 11 Plan of Reorganization Proposed by The Official Committee of Unsecured Creditors, *In re: Archbishop of Agaña, a Corporation Sole*, No. 19-00010 (Bankr. D. Guam) [Bankr. D. Guam Dkt. No. 718] (hereinafter, "Disclosure Statement of the Official Committee of Unsecured Creditors"), at 23.

[17] *See* note 2, *supra*.

encompass any Abuse Claims that would be insured under any insurance policies issued by Zurich and/or Clarendon, including any Abuse Claims insured under policies issued to the Archdiocese by Clarendon, the Zurich Insurers and/or the Zurich Affiliated Insurers, as defined by the Plan.[18]

Finally, the February 15 modifications eliminate language indicating the Abuse Claims are released only to the extent to which such Abuse Claim would be covered under insurance policies issued by Settling Insurance Companies. In the definitions of "Opt-Out Chartered Organization Abuse Claims," and "Pre-1976 Chartered Organization Abuse Claims," the caveat "with respect to such coverage for such Abuse Claims" has been removed from the end of the definitions.[19] Similarly, in the "Channeling Injunction" definition and certain other applicable Plan provisions, the same limitation was removed with respect to Abuse Claims against Limited Protected Parties covered under any insurance policy issued by the Settling Insurance Companies and with respect to Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations.[20]

If an "Abuse Claim" involved incidents of sexual abuse both within and outside of the policy period for an insurance policy issued by a Settling Insurance Company, the Abuse Claim arguably would have been released and enjoined only to the extent that it concerned incidents of sexual abuse during the Settling Insurance Company's applicable policy period under the December 28 Plan. With the removal of this limitation, the injunction against "Opt-Out Chartered Organization Abuse Claims" extends to the entire Abuse Claim, including any incidents of Abuse not falling within the Settling Insurance Company's policy periods.

---

[18] Blackline of Plan at Article I.A.274.

[19] Blackline of Plan at Article I.A.195 and Article I.A.220.

[20] Blackline of Plan at Article I.A.56; Article IV.C.1; Article IV.C.2.

**B.** **The Plan Creates a Limited Protected Party Injunction Against All Abuse Claims and Potentially Eliminates Insurance Coverage for Claims under the Injunction**

The February 15 Plan adds a new Limited Protected Party Injunction to provide Limited Protected Parties at least twelve months to negotiate for permanent protection from all Abuse Claims:

> The Limited Protected Party Injunction shall stay the prosecution of any Abuse Claim that was commenced prior to or after the Effective Date against a Chartered Organization through the later of (a) forty-five (45) days after the resolution of the Abuse Claim that is subject to the Independent Review under the Trust Distribution Procedures or (b) the Limited Protected Party Injunction Date.

Plan Article X.F.2. *See also* Plan Article I.A.177 (Limited Protected Party Injunction date is twelve months following the Effective Date, as may be extended pursuant to the Settlement Trust Agreement, "to afford Participating Chartered Organizations an opportunity to negotiate an appropriate settlement with the Settlement Trust and become a Contributing Chartered Organization").

In contrast, the December 28 Plan proposed to enjoin against Limited Protected Parties (1) the Post-1975 Abuse Claims and (2) any Abuse Claims covered under an insurance policy issued by a Settling Insurer. Now this Limited Protected Party Injunction will enjoin every one of the 70+ pending Joint Tortfeasor Claims asserted against the Archdiocese in its bankruptcy proceedings, with no notice to Guam Survivors, if the Archdiocese agrees to transfer certain insurance rights to the trust without approval from the bankruptcy court in Guam[21] and in violation of the Guam Survivors' due process rights.[22] Further, while this is purportedly for

---

[21] As explained in the Guam Committee's February 4 Objection, any attempted transfer of estate assets violates the automatic stay in the Archdiocese's bankruptcy. *See* 11 U.S.C. § 362; 28 U.S.C. § 1134; 11 U.S.C. § 541

[22] Approximately 150 proofs of claim were asserted against the Archdiocese in its bankruptcy proceeding that involved one or more incidents of Scouting-related Abuse. February 4 Objection at p. 5 ¶ 7. At least

twelve months, it may also be extended for some undefined period of time pursuant to the Settlement Trust Agreement, apparently with no notice to creditors whose claims are suddenly enjoined.[23]

In addition, it appears that this new Limited Protected Party Injunction may fall within the Plan's "Post-Confirmation Interim Injunction" section.[24] The Post-Confirmation Interim Injunction provides that "any Claim that would be released or subject to the Channeling Injunction . . . shall be stayed and enjoined pending satisfaction of such conditions," and this section has now been modified to include references to the Limited Protected Party Injunction Date.[25] The February 15 Plan also now provides that, "[t]o the extent a court determines that a claim against such Chartered Organization is subject to the Post-Confirmation Interim Injunction . . . the Settling Insurance Companies shall have no further obligation with respect to such claim."[26] It is unclear, then, whether the Archdiocese's rights in insurance policies issued to the Archdiocese (and assets of only its estate) are going to be released even if the Archdiocese never becomes a Contributing Chartered Organization by making a satisfactory monetary contribution to the Trust. The Limited Protected Party Injunction therefore not only bars all Abuse Claims against the Archdiocese for at least twelve months if the Archdiocese "opts in" by transferring insurance rights, but also arguably releases the Archdiocese's rights to coverage under its own insurance policies issued by the Settling Insurance Companies for all Abuse Claims, regardless of whether the injunction against all Abuse Claims becomes permanent.

---

70 claims are still pending against *both* the Archdiocese and BSA. *Id.* Other claims were settled with BSA prior to the BSA's filing for Chapter 11 protection.

[23] Plan at Article I.A.177.

[24] Plan at Article X.D.

[25] Plan at Article X.D.

[26] Plan at Article X.G.e

As with the other proposed nonconsensual third-party releases and injunctions, this Limited Protected Party Injunction does not satisfy the factors considered by bankruptcy courts in the Third Circuit. The Debtors cannot demonstrate that the injunction meets minimal standards of fairness and necessity to the reorganization. *In re Cont'l Airlines*, 203 F.3d 203, 214 & n. 11 (3d Cir. 2000). The Guam Committee refers the Court to and incorporates the more detailed analysis of factors for third-party releases set forth in the February 4 Objections (Dkt. No. 8683 at 11-19) but will briefly address the relevant factors in light of this new Limited Protected Party Injunction.

### 1. Identity of Interests

There is no identity of interest between BSA and the Archdiocese – they are separate organizations and independent joint tortfeasors, and the Archdiocese's liability is not derivative of BSA's either.[27] The Archdiocese assumed certain duties to the Guam Survivors as a Chartered Organization of BSA, but the Archdiocese also has liability for negligently employing, retaining and supervising its employees and agents, including those that committed acts of sexual abuse and molestation during BSA activities.[28]

### 2. Necessity to the Reorganization

The Debtors and the BSA Insurers may resolve the Debtors' liability while preserving the rights of Guam Survivors against the Archdiocese. This Limited Protected Party Injunction cannot be considered integral to the success of the Debtors' reorganization because the

---

[27] In the Third Circuit, bankruptcy courts tasked with evaluating whether nonconsensual third-party releases are permissible use as guideposts the factors first described in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994): (1) an identity of interest between the debtor and the released party; (2) a "substantial contribution" to the reorganization made by the released party; (3) the essential nature of the injunction to the reorganization; (4) the impacted classes overwhelmingly vote to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction. *See In re Cont'l Airlines*, 203 F.3d 203, 217 & n.17 (3d Cir. 2000); *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 584 (D. Del. 2018), *aff'd sub nom In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019).

[28] February 4 Objection at 11-13.

Archdiocese may opt in to receiving it on the Plan objection deadline, after vote solicitation, with no notice to the Archdiocese's creditors. If it were necessary to the Debtors' reorganization, it would not be an injunction that a third-party non-debtor could simply opt-in to receiving. While the BSA Insurers undoubtedly prefer to secure broad releases and insurance policy buybacks in order to eliminate potential future obligations to third-parties, their preference does not create necessity for the Debtors' reorganization. Insurers are not entitled to third-party claim releases or policy buybacks in exchange for satisfying their contractual obligations to policyholders. *See, e.g., In re Mahoney Hawkes, LLP*, 289 B.R. 285, 300-01 (Bankr. D. Mass. 2002) (rejecting third-party releases in part because insurer's contributions to the plan merely represented the "fulfill[ment] of its contractual obligations to the Debtor" and insurer obligated to turn over policy proceeds "notwithstanding its perceived need for an injunction"). Indeed, the BSA Insurers owe separate obligations to the Archdiocese and to the Guam Survivors that cannot be retroactively rescinded.  *See In re SportsStuff, Inc*., 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010) ("The Policies at issue do not distinguish between the named insured's or additional insured's rights to make claims under the policies . . . The bankruptcy court did not have the jurisdiction or authority to impair or extinguish these independent contractual rights"); *In re Forty-Eight Insulations, Inc*., 133 B.R. 973, 979 (Bankr. N.D. Ill. 1991) ("This Court concludes that it is not authorized by the bankruptcy code or non-bankruptcy law to enter an order that extinguishes a non-debtor's contract rights against its own insurers"); *Magnetek, Inc. v. Travelers Indem. Co*., No. 17C3173, 2019 WL 3037080, at *6 (N.D. Ill. 2019) (named insured lacked authority to agree to policy buyback releasing additional insured's rights); *CX Reinsurance Co. Ltd. v. Johnson*, 252 Md. App. 393, 259 A.3d 174, 191 (2021) ("To permit an insurer and insured to enter into an agreement to defeat the injured party's rights under the policy would defy logic."), *cert granted*, No. 283, SEPT. TERM, 2021, 2021 WL 6425541 (Md. Dec 8, 2021);

*Cosmopolitan Mut. Ins. Co. v. Lumbermen's Mut. Cas. Co*., 20 N.Y.2d 145, 152-53, 228 N.E.2d 893, 895 (1967) (concluding that a policyholder cannot agree to eliminate injured third party claimant's vested rights in an insurance policy unless the policyholder is "prepared to take the place of" the insurer); 2 Couch on Ins. § 31:49 (insurer and insured cannot terminate a liability policy "to the prejudice of a claimant's rights which have already vested").

### 3.    Substantial Contribution

The Archdiocese will not be making *any* monetary contribution in exchange for this new injunction, let alone the requisite "substantial" contribution for a nonconsensual third-party claim release. *See, e.g., In re Congoleum Cor*p., 362 B.R. 167, 181-82 (Bankr. D.N.J. 2007) (refusing to extend benefits of asbestos channeling injunction to party that proposed to pay $250,000, contribute additional insured rights under the Debtor's policies, and waive subrogation claims against the Debtor); *In re Cont'l Airlines*, 203 F.3d at 215 & n.17 ("we have found no evidence that the non-debtor D&Os provided a critical financial contribution to the Continental Debtors' plan").

In addition, the Plan does not provide any separate pool of Archdiocesan assets to pay the 70+ Guam Survivors' Abuse Claims against the Archdiocese that would purportedly be enjoined. *See In re Charles Street African Methodist Episcopal Church of Boston*, 499 B.R. 66, 102 (D. Mass. Bankr. 2013) (objection of "sole affected creditor" to plan weighs in favor of rejecting a non-debtor release where the plan does not replace the nonconsensual release with something of "indubitably equivalent value to the affected creditor"); *In re Firstenergy Sols. Corp*, 606 B.R. 720, 744 (Bankr. N.D. Ohio 2019) ("satisfying Dow Corning's fifth factor requires not merely the promise of a feasible reorganization, but rather a special accommodation for . . . any other creditors burdened by nondebtor releases being imposed upon them").

### 4. Overwhelming Creditor Approval

Because the Limited Protected Party Injunction was not included in the Solicitation Version, and the Archdiocese may opt in to receive it at any point before the modified Plan objection deadline, the Guam Survivors necessarily will not have an opportunity to object and cannot provide "overwhelming" support for it. *See In re Lower Bucks Hosp.*, 571 Fed. Appx. 139, 144 (3d Cir. 2014) ("In the absence of adequate disclosure, it is impossible to conclude that a large majority of the Bondholders supported the Plan and acquiesced to the release of their potential claims against [a non-debtor]."). Further, this factor should be considered from the standpoint of those creditors impacted by the nonconsensual releases, *i.e.*, that portion of BSA creditors with joint tortfeasor claims against Opt-Out Chartered Organizations and/or Participating Chartered Organizations that will be enjoined and released by the Plan without any compensation by the applicable Chartered Organization for its share of liability.[29]

### 5. Additional Considerations Weighing Against the Injunction

The proposed Limited Protected Party Injunction may halt ongoing negotiations with the Archdiocese and its insurers in Guam over the amount to be contributed to the Archdiocese's own settlement trust, while threatening to release entirely all Abuse Claims pending before the bankruptcy court in Guam. As a result, the proposed injunction would violate the Guam Survivors' rights against the Archdiocese in its own bankruptcy proceeding, obstruct the efforts of Guam Survivors to hold the Archdiocese accountable, and undermine the will of the legislature in Guam.

Each of the applicable factors, and the additional considerations described above, weigh heavily against granting the nonconsensual third-party releases proposed in the Plan.

---

[29] *See, e.g., In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1067 (5th Cir. 2012) (refusing to find the impacted group of creditors had voted in favor of the plan where so-called "majority" in favor of plan required votes by unaffected creditors).

**C.    The Plan Deletes Limitations on the Releases of Post-1975 Chartered Organization Abuse Claims**

The February 15 Version removed limitations on the scope of the "Post-1975 Chartered Organization Abuse Claim" injunction/releases for Participating Chartered Organizations. The December 28 Version was limited to:

> any Claim against a Participating Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from Abuse that occurred in connection, in whole or in part, with the Participating Chartered Organization's or its personnel's or affiliates' involvement in, or sponsorship of, one or more Scouting units . . . including any proportionate or allocable share of liability based thereon.

This limitation was removed from the February 15 Plan.[30] With the exception of the applicable dates of abuse, the scope of releases for Post-1975 Chartered Organization Abuse Claims is now restricted only to the extent set forth in the "Abuse Claim" definition. The Abuse Claim definition broadly encompasses any Claim that is attributable to, arises from, is based upon, relates to, or results from, directly or indirectly, or derivatively, alleged Scouting-related Abuse . . ."[31] This represents another improper expansion of the nonconsensual third-party claim releases.

**D.    The Plan Releases Limited Protected Parties from an Expanded Category of Claims**

In addition to the Limited Protected Party Injunction against all Abuse Claims, the Plan has been modified to broaden the permanent release for Limited Protected Parties beyond the Pre-1976 Chartered Organization Abuse Claims. Now the Plan forces a release by Guam Survivors of "all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, in law, equity or otherwise, whether

---

[30] Blackline of Plan at Article I.A.215.
[31] Plan at Article I.A.18.

for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Pre-1976 Chartered Organization Abuse Claims."[32] The Debtors added this same broad release after vote solicitation for Opt-Out Chartered Organizations and for Post-1976 Chartered Organization Abuse Claims in the December 28 Version, as noted in the Guam Committee's February 4 Objection.[33] These post-solicitation additions expand significantly the scope of releases forced upon the Guam Survivors.

### E.    The Abuse Claim Definition Includes Abuse Outside of BSA Activities

The Debtors modified the Plan on February 15 to introduce a "Mixed Claim" concept, but the Plan remains ambiguous as to whether the portion of a Mixed Claim not pertaining to Scouting-related abuse will be enjoined and released against the Archdiocese. The releases and injunctions apply to "Abuse Claims" (or to certain categories of Abuse Claims). While the Debtors also modified the Abuse Claim definition in the February 15 Plan, the revisions do not correspond to the distinctions between Scouting and non-Scouting abuse in the new Mixed Claim definition. The December 28 Plan stated that a Claim is an "Abuse Claim" if it "is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date . . .  including any proportionate or allocable share of liability based thereon."[34] Further, the December 28 Plan provided that no Claim alleging Abuse would be an "Abuse Claim" if it were "wholly unrelated to Scouting," but that "any Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, and each of their Representatives, is

---

[32] Blackline of Plan at Article X.J.3

[33] February 4 Objection at 9 & n. 19; February 4 Objection at 24 & n.54.

[34] Second Modified Fifth Amended Plan [ECF No. 7832] at Article I.A.18.

necessarily Scouting-related and shall be considered an Abuse Claim."[35] The December 28

version therefore enjoined all components of a Mixed Claim against a Chartered Organization –

for both church-related abuse and BSA-related abuse. *See also* February 4 Objections at 11-12.

The February 15 Plan strikes the language "in whole or in part" and modifies the

definition to state the following:

> For the avoidance of doubt, (i) a Claim alleging Abuse shall not be
> an "Abuse Claim" against a Protected Party, Limited Protected
> Party, or Opt-Out Chartered Organization or any of their respective
> Representatives if such Claim is unrelated to Scouting (except as
> provided in (iii) below, including the portion of any Mixed Claim
> that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be
> an "Abuse Claim" against a Protected Party, Limited Protected
> Party, or Opt-Out Chartered Organization or any of their respective
> Representatives (in their capacity as such) if such Claim is related
> to Scouting (including the portion of any Mixed Claim that is
> related to Scouting); (iii) any portion of a Mixed Claim alleging
> Abuse involving the Debtors, Reorganized BSA, Non-Debtor
> Entities, Local Councils, TCJC, or their respective Representatives
> (in their capacities as such) is necessarily Scouting-related and
> shall be considered an Abuse Claim; and (iv) any Claim against the
> Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils,
> or their respective Representatives (in their capacities as such)
> alleging Abuse is necessarily Scouting-related and shall be
> considered an Abuse Claim.[36]

The Abuse Claim definition still does not exclude the portion of any Mixed Claim that does not

relate to Scouting. Instead, the parenthetical exception "(except as provided in (iii) below,

including the portion of any Mixed Claim that is unrelated to Scouting)" is ambiguous as to

whether Mixed Claims may be Abuse Claims in entirety, and thus, arguably released and

enjoined in entirety. Either way, this ambiguity creates particular confusion for creditors in this

post-solicitation context as to whether the Debtors are proposing to release "Mixed Claims" in

whole or only in part. There is no legal basis for the Debtors to release portions of Claims against

---

[35] *Id.*

[36] Blackline of Plan at Article I.A.18.

Chartered Organizations that have nothing to do with Scouting or BSA. *See, e.g., In re Firstenergy Sols. Corp*., 606 B.R. 720, 739 (Bankr. N.D. Ohio 2019) ("The Court cannot banish ghosts that do not haunt the Debtor's house"). Yet other new Plan provisions suggest that the Debtors intend the Abuse Claim definition to encompass all portions of at least some Mixed Claims:

- Article X.G.1 (which is new in entirety) states under subpart (b): "Such Chartered Organizations are not barred from seeking defense and indemnification for that portion of Mixed Claims unrelated to Scouting under such insurance policies, with all parties reserving their rights as to whether such insurance policies apply and to what extent. All Parties agree to cooperate to enforce the Post-Confirmation Interim Injunction and the Channeling Injunction to eliminate all or a portion of the Mixed Claims against the applicable Chartered Organizations."

- Article X.G.1 (which is new in entirety) states under subpart f: "The Settlement Trust shall cooperate with any ongoing efforts by such Chartered Organizations and/or the Settling Insurance Companies to establish that the Post-Confirmation Interim Injunction and the Channeling Injunction apply."

- Article V.G.1.g. provides that "[t]he rights of the Opt-Out Chartered Organizations provided under insurance policies issued directly to such organization are preserved, provided, that the Settling Insurance Companies and the Opt-Out Chartered Organizations may enforce and rely upon the channeling and release of Abuse Claims against an Opt-Out Chartered Organization as set forth herein, including as set forth in Section X.F.2, for all purposes.

It is unclear whether the Plan releases the portion of Mixed Claims that do not involve BSA or Scouting-related Abuse and, if so, to what extent. These new Plan modifications have further

clouded the issue. But, even if the Mixed Claim definition were to be construed as separating the church-related Abuse from the remainder of the released and enjoined Abuse Claim, the Court lacks authority to confirm a Plan releasing the Archdiocese from its own proportionate fault for the abuse suffered by Guam Survivors due to the negligent acts and omissions of the Archdiocese, including its negligent hiring, retention and supervision of individuals who perpetrated sexual abuse during Archdiocesan-sponsored BSA activities.

## II.    The Plan Incentivizes the Archdiocese to Transfer Estate Assets to the BSA Trust and to Secure Releases and Injunctions of Guam Survivors' Claims, in Violation of Due Process

As set forth in the Guam Committee's February 4 Objection, the Plan violates the Guam Survivors' rights to due process by allowing the Archdiocese to opt in any time before the Plan objection deadline to secure releases of Abuse Claims by agreeing to transfer assets of the Archdiocese's estate, without notice to creditors. Before February 15, if the Archdiocese agreed to transfer certain insurance rights that the Archdiocese acknowledges are assets of its estate, the Archdiocese could be protected from all Post-1975 Chartered Organization Abuse Claims and all claims covered by insurance policies issued by Settling Insurance Companies, without any monetary compensation provided to the Guam Survivors impacted by these injunctions. This would allow the Archdiocese to dispose of estate assets without approval from the District Court in Guam and without notice to the Archdiocese's creditors. The Plan's expanded injunctions, and new provisions concerning the Archdiocese's rights to coverage under its own insurance policies issued directly to the Archdiocese, were apparently included to incentivize the Archdiocese to transfer the assets of its estate without creditor notice and thereby secure releases of all Abuse Claims, without creditor notice, in violation of the Guam Survivors' due process rights. If the Archdiocese opted in before the Plan objection deadline, the February 15 Plan now authorizes the Archdiocese to turn in coverage claims for (1) non-Abuse Claims and (2) non-BSA related

portions of Mixed Claims, under policies issued directly to such by the Settling Insurance Companies, but then compels the "Parties" and the "Settlement Trust" to attempt to establish that the Guam Survivors' Claims fall within the Plan's Channeling Injunction and/or Post-Confirmation Interim Injunction (that they are still released in entirety, apparently).[37]

## III.    The Plan Requires the Court to Make Unsupportable Findings and Conclusions

The Debtors modified the Plan to require this Court to issue a finding that "the Base Matrix Values in the Trust Distribution Procedures are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes." Article IX.A.m. p. 120/304 of Dkt. No. 8814-1.[38] This proposed finding is unsupported and unfounded. Moreover, the Base Matrix Values in the Trust Distribution Procedures do not appear to account for the Archdiocese's own portion of fault.

The Debtors also modified the Plan to require a Bankruptcy Court finding that the proceeds of the sale of any Abuse Insurance Policies will be "free and clear" of all other interests of "any additional insured or any other person or Entity in such Abuse Insurance Policies."[39] As discussed in the Guam Committee's February 4 Objection, the Debtors cannot agree to retroactively cancel insurance coverage available to the Archdiocese.[40] The Guam Survivors have vested rights against the proceeds of Settling Insurer Policies that the Plan purports to sell back. Further, under Guam law, the Guam Survivors have direct action rights against the BSA Insurers for the proceeds of the Settling Insurer Policies. 22 Guam Code Ann. § 18305. The

---

[37] Plan at Article X.G.1.b and Article X.G.1.f. *See also* Article V.G.1.g.

[38] The lettering throughout this section appears to be in error, with "a" starting over again after "n."

[39] Plan Article IX.A.4.

[40] *See also In re SportsStuff, Inc., 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010)*; *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 979 (Bank. N.D. Ill. 1991); *Magnetek, Inc. v. Travelers Indem. Co.*, No. 17C3173, 2019 WL 3037080, at *6 (N.D. Ill. 2019).

Abuse Insurance Policies cannot be validly sold back free and clear of the Guam Survivors' rights.

## CONCLUSION

WHEREFORE, the Guam Committee respectfully requests that the Court deny confirmation of the Plan.

Dated:     February 25, 2022           Respectfully submitted,
        Wilmington, Delaware

HILLER LAW, LLC


 /s/ Adam Hiller
Adam Hiller (DE No. 4105)
300 Delaware Avenue, Suite 210, #227
Wilmington, Delaware 19801
(302) 442-7677 telephone
ahiller@adamhillerlaw.com

-and-

Robert T. Kugler (MN #0194116)
Edwin H. Caldie (MN #0388930)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
robert.kugler@stinson.com
ed.caldie@stinson.com

-and-

Christina D. Arnone (MO #62230)
STINSON LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106
(816) 842-8600
christina.arnone@stinson.com


*Attorneys for the Guam Committee*