## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 20-10343 (LSS) |
| Boy Scouts of America and Delaware BSA, LLC,[1] | Chapter 11 |
| Debtors. | Jointly Administered |
| | **Re: Docket Nos. 8686 & 8813** |

## THE ROMAN CATHOLIC AD HOC COMMITTEE'S SUPPLEMENTAL OBJECTION TO CONFIRMATION OF THE DEBTORS' THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION

**POTTER ANDERSON & CORROON LLP**

Jeremy W. Ryan (Bar No. 4057)
Aaron H. Stulman (Bar No. 5807)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
        astulman@potteranderson.com

**SCHIFF HARDIN LLP**

Everett Cygal, *admitted pro hac vice*
David Spector, *admitted pro hac vice*
J. Mark Fisher, *admitted pro hac vice*
Neil Lloyd, *admitted pro hac vice*
Daniel Schufreider, *admitted pro hac vice*
Jin Yan, *admitted pro hac vice*
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600
Email: ecygal@schiffhardin.com
        dspector@schiffhardin.com
        mfisher@schiffhardin.com
        nlloyd@schiffhardin.com
        dschufreider@schiffhardin.com
        jyan@schiffhardin.com

*Counsel for the Roman Catholic Ad Hoc Committee*

February 25, 2022

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ..........................................................................................................................3

I.    The Plan's Proposed Deathtrap Targeting Chartered Organizations Is Without
      Precedent and Violative of the Bankruptcy Code ...........................................................3

      A.    The Deathtrap Violates Section 1123(a)(4) ......................................................4

      B.    The Deathtrap Violates the Good Faith Requirement of Section
            1129(a)(3) .........................................................................................................8

II.   The Revised Injunction Language Is Still Impermissibly Vague ...............................10

III.  The Revised Injunction Highlights the Problems with the Policy Buybacks
      and Non-Consensual Third Party Releases in Favor of Settling Insurers...................12

      A.    The Insurance Buyback Violates Established Precedent .................................12

      B.    Insurance Coverage for Lost or Missing Policies Is Not Speculative ............13

      C.    Chartered Organizations Are Being Deprived of their Additional
            Insured Rights in Missing Policies .................................................................16

      D.    Non-Consensual Releases Related to Missing Policies Are Improper ...........17

IV.   The Revised Injunction Illuminated the Unfairness of Non-Consensual
      Releases of Local Councils ..........................................................................................18

V.    Independent Coverage Is Still Being Impermissibly Impaired and Non-
      Consensual Releases Related to Such Impairment Must be Denied............................19

VI.   Notwithstanding the Debtors' Notice of Errata, the New Plan Still Requires an
      Assignment of Chartered Organizations' Rights Against Non-Settling
      Insurance Companies ....................................................................................................20

VII.  Impermissible Rule 2004 Discovery............................................................................21

VIII. Reservation of Rights....................................................................................................22

CONCLUSION.........................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abex Corp. v. Maryland Cas. Co.*,
   790 F.2d 119 (D.C. Cir. 1986) ........................................................................... 14

*Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*,
   75 F.3d 1048 (5th Cir. 1996) ............................................................................. 14

*Burroughs Wellcome Co. v. Commercial Union Ins. Co.*,
   632 F. Supp. 1213 (S.D.NY. 1986) ............................................................. 14-15

*Central Ill. Light Co. v. Home Ins. Co.*,
   795 N.E.2d 412 (Ill. App. Ct. 3d Dist. 2003) ............................................. 14-15

*Century Indem. Co. v. Aero-Motive Co.*,
   254 F. Supp. 2d 670 (W.D. Mich. 2003) ..................................................... 15-16

*Clendenin v. Benson*,
   117 Cal. App. 674 (Cal. App. 1931) ................................................................. 15

*Coltec Ind. Inc. v. Zurich Ins. Co.*,
   No. 99 C 1087, 2002 WL 31185789 (N.D. Ill. 2002) .................................. 14-15

*Diplomat Homes, Inc. v. Commercial Standard Ins. Co.*,
   394 F. Supp. 558 (W.D. Mo. 1975) ................................................................... 15

*Emons Ind., Inc. v. Liberty Mut. Fire Ins. Co.*,
   545 F. Supp. 185 (S.D.N.Y. 1982) .................................................................... 14

*Falcon v. Nw. Mut. Life Ins. Co.*,
   No. CV 19-404, 2020 WL 7027482 (W.D. Pa. Nov. 30, 2020) .......................... 13

*Gillman v. Continental Airlines (In re Continental Airlines)*,
   203 F.3d 203 (3d Cir. 2000) .............................................................................. 18

*In re GNC Holdings, Inc.*,
   Case No. 20-11662 (KBO) (Bankr. D. Del. Sept. 15, 2020) [Docket No. 1154] .................... 6

*In re Adelphia Commc'ns Corp.*,
   364 B.R. 518 (Bankr. S.D.N.Y. 2007) ............................................................... 13

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................. 5

*In re Affordable Auto Repair, Inc.*,
    2020 WL 6991012 (Bankr. C.D. Cal. Sept. 2, 2020).............................................. 6-7

*In re Allegheny Int'l, Inc.*,
    118 B.R. 282 (Bankr. W.D. Pa. 1990) ..................................................................7

*In re Am. Capital Equip. LLC*,
    688 F.3d 145 (3d Cir. 2012)..................................................................................9

*In re Arch Coal, Inc.*,
    Case No. 16-40120-705 (Bankr. E.D. Mo. July 6, 2016) [Docket No. 1334] ..........6

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004)..............................................................................8-9

*In re Dana Corp.*,
    412 B.R. 53 (Bankr. S.D.N.Y. 2008) ....................................................................6

*In re Drexel Burnham Lambert Grp., Inc.*,
    140 B.R. 347 (S.D.N.Y. 1992)..............................................................................6

*In re Emerald Oil, Inc.*,
    Case No. 16-10704 (KG) (Bankr. D. Del. Mar. 22, 2017) [Docket No. 1147] .......6

*In re Emerge Energy Servs. LP*,
    No. 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ..............5

*In re Excel Maritime Carriers Ltd.*,
    2013 WL 5155040 (Bankr. S.D.N.Y. Sept. 13, 2013).........................................10

*In re Excel Maritime Carriers Ltd.*,
    Case No. 13-23060 (Bankr. S.D.N.Y. Nov. 27, 2013) [Docket No. 450] ...............6

*In re Forty-Eight Insulations, Inc.*,
    133 B.R. 973 (Bankr. N.D. Ill. 1991) .................................................................12

*In re Longview Power, LLC*,
    Case No. 13-12211 (Bankr. D. Del. Mar. 16, 2015) [Docket No. 1861]................6

*In re MCORP Fin., Inc.*,
    137 B.R. 219 (Bankr. S.D. Tex. 1992) ..................................................................7

*In re Molycorp, Inc.*,
    Case No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) ..................................3, 6

*In re MPM Silicones, LLC*,
    874 F.3d 787 (2d Cir. 2017)..................................................................................6

*In re SelectBuild Illinois, LLC*,
No. 09-12085, 2015 WL 3452542 (Bankr. D. Del. May 28, 2015)........................................12

*In re Trident Holding Co., LLC*,
Case No. 19-10384 (Bankr. S.D.N.Y. Mar. 25, 2019) [Docket No. 852] ................................6

*In re Washington Mutual, Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ........................................................................................6

*In re Washington Prime Group, Inc.*,
Case No. 21-31948 (Bankr. S.D. Tex. July 8, 12, Aug. 25, 2021) ...........................................6

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ..............................................................................5, 8, 18

*MAPCO Alaska Petrol. v. Central Nat'l. Ins. Co.*,
795 F. Supp. 941 (D. Alaska 1991) ................................................................................ 14-15

*Northeast Utilities v. Century Indemnity Co.*,
No. X03CV 980495496S, 1999 WL 476274 (Conn. Super. Ct. June 21, 1999) ....................14

*Pearl Assur. Co. v. School Dist.*,
212 F.2d 778 (10th Cir. Colo. 1954)......................................................................................14

*Remington Arms Co. v. Liberty Mut. Ins. Co.*,
810 F. Supp. 1420 (D. Del. 1992).................................................................................. 14-15

*Rodgers v. Prudential Ins. Co.*,
267 Cal. Rptr. 499 (Cal. App. 1990).......................................................................................14

*Rubenstein v. Royal Ins. Co. of Am.*,
694 N.E.2d 381 (Mass. App. Ct. 1998) ..................................................................................14

*U.S. Steel Corp. v. United Mine Workers of Am.*,
534 F.2d 1063 (3d Cir. 1976)..................................................................................................11

*UNR Ind., Inc. v. Continental Ins. Co.*,
682 F. Supp. 1434 (N.D. Ill. 1988) .........................................................................................14

**STATUTES**

11 U.S.C. § 1123.........................................................................................................................4

11 U.S.C. § 1125.......................................................................................................................12

11 U.S.C. § 1127.......................................................................................................................12

11 U.S.C. § 1129.............................................................................................................4, 8, 10

Fed. R. Civ. P. 65 ................................................................................................................... 11

Fed. R. Bankr. P. 2004 ......................................................................................................... 12

**Other Authorities**

David A. Skeel, Jr., *Distorted Choice in Corporate Bankruptcy*,
    130 Yale Law J. 366 (2020)…………………………………………………………….6, 9

The Roman Catholic Ad Hoc Committee (the "RCAHC") objects to confirmation of the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, dated February 15, 2021 [Docket No. 8813] (the "New Plan") and hereby supplements (the "Supplemental Confirmation Objection") *The Roman Catholic Ad Hoc Committee's Objections to Confirmation of Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization* [Docket No. 8686] (the "Confirmation Objection"),[2] and respectfully states as follows:

## PRELIMINARY STATEMENT[3]

The New Plan contains significant revisions aimed squarely at Chartered Organizations, the volunteer lifeblood on whose continued support the Debtors' very existence depends.[4]  Two changes in particular, targeting the RCAHC and its members in the New Plan's deathtrap provision and taking away Contributing Chartered Organization status from tens of thousands of Chartered Organizations, have magnified and sharpened the focus on the impermissible aims that the Debtors seek to achieve with the deathtrap.  Put simply, the Debtors intend to scare Chartered Organizations from the legitimate protection of their own property rights, or any other well-founded objection to any provision of the New Plan, by threatening them with an undisclosed consequence:

If you object, your full 1976 forward Channeling Injunction is forfeited and there will be years in which Abuse Claims against you will not be channeled or released.  But we will not tell you what years those are.  Proceed at your own risk.

---

[2] For the avoidance of doubt, the RCAHC does not waive any of the arguments set forth in the Confirmation Objection, to the extent such arguments are not discussed herein, all of which are fully preserved.

[3] Capitalized terms used in this Supplemental Confirmation Objection are defined herein, the Confirmation Objection, or the New Plan, as applicable.

[4] The RCAHC acknowledges that the most egregious change, taking away Contributing Chartered Organization status from tens of thousands of Chartered Organizations, did not affect Roman Catholic Chartered Organizations because the plan has been hostile to Roman Catholics for quite some time.

That is simply impermissible under the Bankruptcy Code. There is neither basis nor justification to condition the treatment of a Chartered Organization on its appropriate defense of its own property and rights. The sheer scope of how many Chartered Organizations, most over which the Court has no jurisdiction, are affected by the New Plan, and subject to the deathtrap, is unprecedented and demonstrates the Debtors' lack of good faith towards Chartered Organizations.

The New Plan also revises the baseline injunction applicable to all Chartered Organizations for pre-1976 Abuse Claims and also to Opt-Out Chartered Organizations for 1976 forward Abuse Claims. Those revisions still fall short of the specificity required for an injunction to be issued under Rule 65 because the injunction requires references to thousands of other documents to determine the scope and applicability of the injunction vis-à-vis Chartered Organizations. What the revisions do make clear, as opposed to prior versions of the plan, is that for thousands of Abuse Policies, Chartered Organizations are being stripped of their additional insured rights and releasing insurers without receiving anything in return—no channeling of Abuse Claims that might be covered under those Abuse Policies nor any claim for the property rights the New Plan seeks to take away.

In addition, for those same unchanneled Abuse Claims, Chartered Organizations are being forced to release their indemnity and contribution claims against the Local Councils. Local Councils organized the troops, installed and protected predators as scoutmasters, and operated the camps where so much of the alleged abuse took place. Chartered Organizations will be abandoned to the tort system, stripped of their rights and insurance.

For these reasons the New Plan cannot be confirmed as it is currently proposed. The rights of Chartered Organizations must be protected.

**ARGUMENT**

I.    **The Plan's Proposed Deathtrap, Which Targets Chartered Organizations, Is Unprecedented and Violates the Bankruptcy Code**

"Ridiculous, unacceptable…The deathtrap based on the objection is unacceptable."

*In re Molycorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016), Hr'g Tr. 67:3, 69:4.[5]

1.    The deathtrap is not designed to foster consent by encouraging creditors to vote on a plan, instead it is a procedural coercion designed to stamp out any defense of the basic rights of tens of thousands of non-voting, non-party Chartered Organizations whose independent property and rights are being impaired under the New Plan.  The RCAHC has been unable to locate a single case where a bankruptcy court approved a deathtrap triggered by the filing of an ***objection*** to a plan as opposed to plans where the deathtrap trigger is based on ***voting***.

2.    While there has always been a deathtrap feature in various versions of the Fifth Amended Plan, in the New Plan, the Debtors and the plan proponents have sharpened it with respect to the RCAHC in the revised definition of Opt-Out Chartered Organization.  Plan Art. I.A.199.  Then they amplified its *in terrorem* effect when they made it applicable to every Chartered Organization other than the TCJC and the UMAHC by taking away Chartered Organizations' treatment as Contributing Chartered Organizations (where they had little incentive to object) and treating them as Participating Chartered Organizations (where the burdens and impairment are the same but the protections of the Channeling Injunction are greatly diminished, changing the calculus).

---

[5]  The hearing transcript is attached hereto as <u>Exhibit A</u>.

3.     The deathtrap contained in the New Plan impermissibly violates at least two sections of the Bankruptcy Code and is an unprecedented use of an atypical plan feature.  Having scoured the relatively minimal universe of reported cases on this issue, the RCAHC is unaware of *any* confirmed plans that feature a deathtrap that would take away rights of a claimant (and, as here, even non-creditors) based upon a party's *objection* to a plan.  Every attempt at an objection-based deathtrap of which the RCAHC is aware has been rejected or withdrawn post-objection.  And for good reason.  Indeed, none of the typical justifications proffered by proponents of a deathtrap is applicable here and every case when a deathtrap has been approved is easily distinguished from the one contained in the New Plan.  Instead of fostering resolution among the parties and eliminating the expense associated with a cramdown, the deathtrap in the New Plan is designed to stamp out dissent by all Chartered Organizations, including non-voting Chartered Organizations, and to procedurally coerce them into silence.

4.     As the Court is aware, the RCAHC raised objections to the December 17th Plan based upon, *inter alia*, sections 1123(a)(4) and 1129(a)(3) of the Bankruptcy Code.  *See* Confirmation Obj. ¶¶ 172-179, 204-207.  Given the Debtors' acknowledged "flip flop" in treatment of the Chartered Organizations, the broadening of the scope of the deathtrap to include all Chartered Organizations (including those non-voting Chartered Organizations), and the targeted attack against the RCAHC and its members by changes contained in the New Plan, the New Plan magnifies the effect of the deathtrap provision.  Therefore, the RCAHC supplements its Confirmation Objection concerning this discrete issue.

### A.  The Deathtrap Violates Section 1123(a)(4)

5.     Section 1123(a)(4) of the Bankruptcy Code provides that a chapter 11 plan must "provide the same treatment for each claim or interest of a particular class…."  Section 1123(a)(4) has been analyzed by courts in connection with the approval or denial of deathtrap provisions.  In

4

that regard, courts have stated that "[t]here is no prohibition in the Code against a plan proponent offering different treatment to a class depending on whether it votes to accept or reject the plan." *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (citing *In re Drexel Burnham Lambert Group, Inc.*, 140 B.R. 347, 350 (S.D.N.Y. 1992) (plan which provided warrants to accepting classes but not to rejecting class was not unfairly discriminatory and could be confirmed)).  The court in *Adelphia* similarly stated that a deathtrap provision is not inconsistent with any provision of the Bankruptcy Code, with the significant qualification that it is "applicable if (but only if) the inducement is to give a stakeholder **more** than it would be entitled to, rather than to threaten to take an existing right away."  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 275-76 (Bankr. S.D.N.Y. 2007) (emphasis added).

6.      Indeed, there are cases that stand for the proposition that a deathtrap provision whereby an out-of-the-money creditor class receives a "gift" if the class votes to accept a plan and receives no (or less of a) distribution if the class rejects the plan is permissible under the Bankruptcy Code.  *See, e.g.*, *In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *16 (Bankr. D. Del. Dec. 5, 2019) (confirming plan that gifted a distribution to out-of-the-money unsecured creditors if the class voted to accept the plan); *Adelphia*, 368 B.R. at 275-76 (approving a deathtrap provision that provided out-of-the-money equity holders with a distribution in exchange for voting in favor of the plan); *Zenith*, 241 B.R. at 105 (confirming plan that gifted a distribution to out-of-the-money bondholders if the class voted to accept the plan).

7.      Courts' justifications for approving deathtrap provisions such as these rest primarily on (i) avoiding the expense and uncertainty of a cramdown fight; and (ii) encouraging the Bankruptcy Code's overall policy of fostering consensual plans of reorganization.  *Id.*  "Stated

somewhat differently, there is a valid and legitimate business purpose for the disparate treatment."

*In re Affordable Auto Repair, Inc.*, 2020 WL 6991012, at \*1 (Bankr. C.D. Cal. Sept. 2, 2020).

8.    However, the RCAHC is aware of no case where a court has approved a deathtrap provision that is tied to prohibiting parties from **objecting** to a plan.[6]  It appears that every attempt has either been overruled or withdrawn post-objection.[7]  For example, in *Molycorp*, Judge Sontchi denied the Debtors' attempt to utilize the deathtrap in this manner, specifically stating that it was "ridiculous" and "unacceptable."  Hr'g Tr. 67:3.  There, the Debtors attempted to bind the hands of the creditors' committee and an indenture trustee by forfeiting rights for their constituencies if

---

[6]  *Cf. In re Emerald Oil, Inc.*, Case No. 16-10704 (KG) (Bankr. D. Del. Mar. 22, 2017) [Docket No. 1147] (approving deathtrap provision providing a distribution if the targeted class **voted** to accept a plan where 99.78% of the targeted class voted in favor of the plan and the U.S. Trustee was the only objecting party); *In re Longview Power, LLC*, Case No. 13-12211 (Bankr. D. Del. Mar. 16, 2015) [Docket No. 1861] (approving deathtrap provision providing a distribution if the targeted class **voted** to accept a plan); *In re MPM Silicones, LLC*, 874 F.3d 787, 792 (2d Cir. 2017) (affirming, in part, bankruptcy court's approval of deathtrap provision providing payment in full in cash without make-whole if noteholders **voted** to accept the plan, and replacement notes with ability to litigate make-whole dispute if noteholders **voted** to reject); *In re Drexel Burnham Lambert Grp., Inc.*, 140 B.R. at 350-51 (affirming bankruptcy court's approval of deathtrap provision providing distribution if the targeted class **voted** to accept a plan); *In re Arch Coal, Inc.*, Case No. 16-40120-705 (Bankr. E.D. Mo. July 6, 2016) [Docket No. 1334] (approving deathtrap provision providing distribution to individual claimants that **voted** to accept a plan and no distribution to claimants that **voted** to reject); *In re Dana Corp.*, 412 B.R. 53, 62 (Bankr. S.D.N.Y. 2008) (approving differing recovery in the settlement context whereby unsecured creditors received 100% recovery and settling creditors received less); *In re Washington Mutual, Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011) (in the settlement context, approving differing treatment of creditors conditioned on granting a release).

[7]  In *GNC Holdings, Inc.*, the Debtors attempted to force a similar deathtrap provision onto creditors—a distribution would be available to unsecured creditors only if they did not object to a proposed sale or plan. Case No. 20-11662 (KBO) (Bankr. D. Del. Sept. 15, 2020) [Docket No. 1154].  That provision was removed in connection with a settlement before the Court had the opportunity to strike it down as impermissible. *Id.* Likewise, in *In re Arch Coal*, the debtors originally proposed a deathtrap that would have provided less of a distribution to unsecured creditors if unsecured creditors voted against the plan **or** the creditors committee **objected** to the plan.  *See* David A. Skeel, Jr., *Distorted Choice in Corporate Bankruptcy*, 130 Yale Law J. 366, 414-15 (2020) (discussing the *Arch Coal* case and its deathtrap provision).  However, this coercive conduct was removed from the final version of the plan and the bankruptcy court approved a different deathtrap that was tied to voting and possibly the release of third-party claims. *In re Arch Coal, Inc.*, Case No. 16-40120-705 (Bankr. E.D. Mo. July 6, 2016) [Docket No. 1334]; *cf. In re Trident Holding Co., LLC*, Case No. 19-10384 (Bankr. S.D.N.Y. Mar. 25, 2019) [Docket No. 852] (removing deathtrap provision providing distribution if the targeted class **voted** to accept a plan and no distribution to claimants that **voted** to reject prior to confirmation); *In re Washington Prime Group, Inc.*, Case No. 21-31948 (Bankr. S.D. Tex. July 8, 12, Aug. 25, 2021) July 8, 2021 Hr'g Tr. 12:7-13, July 12, 2021 Hr'g Tr. 25:7-12, 27:10-16, Aug. 25, 2021 Hr'g Tr. 14:4-9 [Docket Nos. 345, 357 & 940] (criticizing a voting-based deathtrap, raising concern as to whether the proposed deathtrap was unduly coercive and permissible under the Bankruptcy Code, to which the debtors later excised from the proposed plan); *In re Excel Maritime Carriers Ltd.*, Case No. 13-23060 (Bankr. S.D.N.Y. Nov. 27, 2013) [Docket No. 450] (removing deathtrap provision providing distribution if the targeted class voted to accept a plan).

they filed objections.  During argument, committee counsel noted that such a provision was unprecedented and that the proponents did not cite one case "where unsecured creditors have lost their distributions because committee members or a committee has objected to the plan."  *Id.* at 46:10-21.  In striking this deathtrap provision, the Court noted that the plan proponents were attempting to rob a constituency of a recovery if it objected to the plan on legitimate bases and that it would be problematic to prohibit those objections.  *Id.* at 66:16-20, 67:14-18.

9.      Similarly, the court rejected a deathtrap in *Affordable Auto Repair* because the deathtrap rewarded individuals within a class who voted to accept the plan with a better distribution than those in the same class who voted to reject the plan, notwithstanding whether the class as a whole votes to accept or reject the plan.  2020 WL 6991012, at *2.  This structure "would not appear on its face to have a valid and legitimate business purpose: even though cramdown expense is not avoided because Class 4 as a whole voted to reject the plan, the minority to Class 4 members who voted to accept the plan nevertheless reap rewards through superior treatment of their claims."  *Id.*[8]

10.      Here, an objection to the New Plan by any Chartered Organization explicitly prevents it from becoming a Participating Chartered Organization, Limited Protected Party, or Contributing Chartered Organization, and strips the baseline rights afforded to Chartered Organizations under the New Plan.  *See, e.g.*, Art. I.A.196 (definition of Opt-Out Chartered Organization); Art. I.A.199 (definition of Participating Chartered Organization).  In addition, Participating Chartered Organizations cannot object to the "Document Appendix and obligations thereunder."  *Id.* at I.A.203.  The Document Appendix, among many provisions, preapproves and

---

[8] Early cases utilizing deathtrap provisions were also struck down as inappropriate and coercive.  *See, e.g.*, *In re MCORP Fin., Inc.*, 137 B.R. 219, 236 (Bankr. S.D. Tex. 1992); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 304 n.15 (Bankr. W.D. Pa. 1990).

authorizes Rule 2004 discovery from any Chartered Organization. *See* Docket No. 8815, Ex. D-1, ¶ 9. Therefore, even the most innocuous objection to the New Plan, like objecting to the preapproval of a broad 2004 request against all Chartered Organizations, would disqualify a Chartered Organization from ever becoming a Participating Chartered Organization, Limited Protected Party, or Contributing Chartered Organization.

11.    Through this deathtrap, the Debtors are attempting to coerce and punish Chartered Organizations for pursuing their fundamental and statutory rights to object to the New Plan. Because the deathtrap provision in the New Plan is not tied to voting for or against the New Plan, the Debtors could not have included it for the purpose of avoiding the expense and uncertainty of a cramdown fight or to encourage the Bankruptcy Code's overall policy of fostering consensual plans of reorganization. *Zenith*, 241 B.R. at 105. Moreover, this is ***not*** a gifting case where Chartered Organizations are entitled to nothing under the proposed plan.[9] It clear that there is no valid or legitimate business purpose for the New Plan's deathtrap, as is required by courts that approve deathtraps, and this Court should not create new law by permitting an unprecedented invasion of parties' basic rights to raise legitimate objections to a plan. Doing so would be "ridiculous."

### B.  The Deathtrap Violates the Good Faith Requirement of Section 1129(a)(3)

12.    For similar reasons as stated above, the New Plan has not been proposed in good faith and fails to satisfy section 1129(a)(3) of the Bankruptcy Code. *See* Confirmation Obj. ¶¶ 204-207. As detailed in the Confirmation Objection, a plan cannot be confirmed unless it is proposed in good faith. 11 U.S.C. § 1129(a)(3); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 246

---

[9] Indeed, the deathtrap provision also violates the best interests test of section 1129(a)(7) for the reasons discussed in the Confirmation Objection. *See* Confirmation Obj. ¶¶ 180-189.

(3d Cir. 2004) ("Courts and commentators have recognized the good faith requirement provides an additional check on a debtor's intentional impairment of claims.").  While the Bankruptcy Code does not define good faith, the Third Circuit has instructed that "the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *Id.* at 247; *see also In re Am. Capital Equip. LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (Bankruptcy Code's objectives include discouraging debtor misconduct and achieving fundamental fairness and justice).

13.    With the latest turn of the New Plan, it is even clearer that the Debtors, at the behest of the Settling Insurance Companies (among possibly others), are targeting Chartered Organizations generally, and the RCAHC specifically.  Generally, the Debtors "flip-flopped" on the treatment of Chartered Organizations—first, giving them Contributing Chartered Organization status if they did not object; and now, taking that away in the New Plan, to give them a 12-month temporary injunction in order to negotiate a financial contribution to get back to what was previously their baseline treatment.  Moreover, tens of thousands of these Chartered Organizations cannot vote and may not timely get served with the New Plan.  Tying constantly evolving treatment to an objection-based deathtrap is unduly coercive and cannot be considered proposed in good faith.  Indeed, it is this "procedural coercion" that Professor Skeel criticized as cutting off parties' and the court's access to information by silencing a potentially important source of information, especially when unsophisticated parties will be affected by the proceedings.  *See* David A. Skeel, Jr., *Distorted Choice in Corporate Bankruptcy*, 130 YALE LAW J. 366, 399-400 (2020) (in the context of RSAs that prohibit parties from lodging objections to a plan).  That is exactly what the New Plan provides—procedural coercion to silence objecting parties from sharing potentially important information for all parties, including those unsophisticated parties.

9

14.     Specifically, the Debtors included in the New Plan the following direct attack targeted at the RCAHC: "any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization."  Plan Art. I.A.199.  To be sure, this provision was added to punish the members of the RCAHC by forcing them into being Opt-Out Chartered Organizations and in the process to lose potentially valuable rights.[10]  These are not the actions of a debtor who is attempting to encourage consensus through a voting-based deathtrap provision.  These are bad faith actions to muzzle objections and stamp out dissent.

15.     The Court should not permit the use of a deathtrap to silence objectors who raise legitimate concerns and seek to enforce their rights under the Bankruptcy Code.  This deathtrap is "unacceptable."

**II.     The Revised Injunction Language Is Still Impermissibly Vague**

16.     While the Debtors have laudably tried to improve on baseline injunction language (the "Baseline Injunction") that they and others previously conceded required legal opinions and coverage actions to determine its scope and applicability, the clarification of that language in what is now Article X, Section F.3 of the New Plan is still impermissibly vague and cannot be approved. *See generally,* Confirmation Obj. ¶¶ 153-165.

17.     The Baseline Injunction is the operative injunction for both Opt-Out Chartered Organizations and Participating Chartered Organizations for pre-1976 Abuse Claims and the injunction Opt-Out Chartered Organizations receive for 1976 forward.  Thus, it will apply to

---

[10]  *See In re Excel Maritime Carriers Ltd.*, 2013 WL 5155040 (Bankr. S.D.N.Y. Sept. 13, 2013) (stating, in the context of a motion by the creditors' committee to terminate exclusivity, "I appreciate that one of the objections that would be raised to the current plan is that it is not being proposed and sought in good faith under 1129(a)(3) of the Bankruptcy Code…[and if] the unsecured creditors are left with only a deathtrap provision…, a court might well be inclined to say that, one way or another, whether it's under the LaSalle case or Section 1129(a)(3), something is wrong at confirmation…").

50,000+ Chartered Organizations and implicates decades of policies purchased by the BSA and hundreds of Local Councils.

18.    The actual Baseline Injunction language remains the same: "Abuse Claims against insureds and co-insureds **<u>covered</u>** under any insurance policies issued by the Settling Insurance Companies shall be channeled under Article X.F.1 and released under Article X.J.6 as provided in the Insurance Settlement Agreements."  Plan Art. X.F.3 (emphasis added).  However, the New Plan deems a policy to "cover" an Abuse Claim if the policy:

   **a.**  includes the Chartered Organization by name or categorically (which categories exclude volunteers, which is what Chartered Organizations are); and

   **b.**  the policy was in effect at the time the Abuse Claim arose; and

   **c.**  there is no exclusion for sexual abuse.

*Id.*

19.    The problem remains that to determine if an Abuse Claim is channeled and released, a party must locate and review potentially applicable insurance policies issued by the Settling Insurers to BSA or one of hundreds of Local Councils to see what the terms of the policies contain.  There are thousands and thousands of such policies.  Thus, the Baseline Injunction makes references to thousands and thousands of documents and sends parties on a scavenger hunt to track down documents not in their possession to see if an Abuse Claim might be channeled.

20.    However, Rule 65(d) is clear.  Every order granting an injunction must describe in reasonable detail what is enjoined and **<u>must not</u>** refer to other documents to do so.  Fed. R. Civ. P. 65(d)(1)(C).  Like "shall," "must" is mandatory language with which a court and parties have to comply.  The Third Circuit enforces this requirement of specificity and invalidates injunctions which fail to comply.  *U.S. Steel Corp. v. United Mine Workers of Am.*, 534 F.2d 1063, 1078 (3d Cir. 1976).

21.     It is this vagueness that also renders what little notice and disclosure the Debtors made about the ramifications of the deathtrap as inadequate for purposes of sections 1125 and 1127 of the Bankruptcy Code.   As currently formulated, the deathtrap gives Chartered Organizations a choice—be silent and receive a full channeling and release of all 1976 forward Abuse Claims or, if they object, the vague, Baseline Injunction in Article X, Section F.3.

22.     Judge Sontchi rightfully identified an objection triggered deathtrap as being ridiculous and unacceptable in *Molycorp*.   An objection triggered deathtrap where the consequences are undisclosed and unknown is far worse.  It is offensive at a minimum and illegal under Rule 65.

## III.    The Revised Injunction Highlights the Problems with the Policy Buybacks and Non-Consensual Third-Party Releases in Favor of the Settling Insurers

23.     The revised injunction language in the New Plan now makes clear that the buyback of Settling Insurers policies eliminates the Chartered Organizations rights as additional insureds in a manner inconsistent with *Adelphia*, *Forty-Eight Insulations*, and *SelectBuild Illinois* because Chartered Organizations are receiving nothing in return for certain of the buybacks.  Because they are receiving nothing in return, the non-consensual releases Chartered Organizations must give Settling Insurers violates Third Circuit precedent on such releases.

### a.   The Insurance Buyback Violates Established Precedent

24.     The clear holdings of *Adelphia, Forty-Eight Insulations*, and *SelectBuild Illinois* are that a bankruptcy court lacks the jurisdiction to alter the property rights of an additional insured in insurance policies procured by debtors and, by simple extension, policies bought by non-debtors that are assigned to a debtor solely for the purposes of a buyback. *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 980 (Bankr. N.D. Ill. 1991); *In re SelectBuild Illinois, LLC*, No. 09-12085, 2015 WL 3452542, at *11 (Bankr. D. Del. May 28, 2015).  When there are additional insureds, a

12

policy may be bought back only if claims against the additional insured are channeled to the fund created from the buyback. *In re Adelphia Commc'ns Corp.*, 364 B.R. 518, 530 (Bankr. S.D.N.Y. 2007).

25.    Thus, in order to accomplish a buyback free and clear of the Chartered Organizations' additional insured rights, the law requires every Abuse Claim against a Chartered Organization that is covered by a policy subject to a buyback to be channeled.  That is not what is occurring in the New Plan.

26.    In these chapter 11 cases, there is a continuum of potential insurance coverage from known policies in the Debtors' and the Local Councils' possession to lost or missing policies for which insurance coverage can be established through other evidence such as declarations pages or marketing materials.

27.    The Baseline Injunction only channels the known policies for which an actual policy exists.  No Abuse Claims are channeled for the rest of the insurance coverage along the continuum that are being bought back free and clear of Chartered Organizations' potential interests.

**B.  Insurance Coverage for Lost or Missing Policies Is Not Speculative**

28.    The contents of a missing policy, in the absence of bad faith, may be proven by secondary evidence.  *See, e.g.*, *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F. Supp. 1420, 1426 (D. Del. 1992); *Falcon v. Nw. Mut. Life Ins. Co.*, No. CV 19-404, 2020 WL 7027482, at *8 (W.D. Pa. Nov. 30, 2020) (agreeing that the "standard of proof for an insured to demonstrate the terms of a missing insurance policy is by a preponderance of the evidence … including but not limited to testimony").

29.    In this case large numbers of decades-old policies issued to many Local Councils—policies that could in turn potentially provide coverage for many Chartered Organizations—have gone missing over the years; the unavailability of these polices is not the result of bad faith by any potential insured or additional insured.

30.    For that reason, secondary evidence can be used to demonstrate the existence of and terms of these Local Council policies in this case.  Courts across the country have recognized various types of secondary evidence acceptable for this purpose, including:

- Interoffice memoranda, correspondence, and email. *Remington Arms.*, 810 F. Supp. at 1427; *Emons Ind., Inc. v. Liberty Mut. Fire Ins. Co.*, 545 F. Supp. 185 (S.D.N.Y. 1982); *Northeast Utilities v. Century Indemnity Co.*, No. X03CV 980495496S, 1999 WL 476274, at *2 (Conn. Super. Ct. June 21, 1999); *Coltec Ind. Inc. v. Zurich Ins. Co.*, No. 99 C 1087, 2002 WL 31185789 (N.D. Ill. 2002).

- Unexecuted policy forms accompanied by a declarations page or other supporting evidence. *UNR Ind., Inc. v. Continental Ins. Co.*, 682 F. Supp. 1434 (N.D. Ill. 1988).

- Certificates of insurance. *MAPCO Alaska Petrol. v. Central Nat'l. Ins. Co.*, 795 F. Supp. 941 (D. Alaska 1991).

- Subsequent policies suggesting prior coverage was similar. *Emons Ind., Inc.*, 545 F. Supp. 185; *Northeast Utilities*, 1999 WL 476274.

- Records produced by insurance brokers, including ledgers or schedules of insurance. *Pearl Assur. Co. v. School Dist.*, 212 F.2d 778 (10th Cir. Colo. 1954); *Abex Corp. v. Maryland Cas. Co.*, 790 F.2d 119 (D.C. Cir. 1986); *Rubenstein v. Royal Ins. Co. of Am.*, 694 N.E.2d 381 (Mass. App. Ct. 1998).

- Premium invoices. *MAPCO Alaska Petrol., Inc.*, 795 F. Supp. 941.

- Proof of premium payment, such as checks. *UNR Ind., Inc.*, 682 F. Supp. 1434.

- Board of directors' meeting minutes. *Burroughs Wellcome Co. v. Commercial Union Ins. Co.*, 632 F. Supp. 1213, *modified by*, 642 F. Supp. 1020 (S.D.NY. 1986).

- Loss prevention surveys conducted by insurers. *Emons Ind., Inc.*, 545 F. Supp. 185.

- Specimen or sample policies used by the insurer during the policy period in question. *Rodgers v. Prudential Ins. Co.*, 267 Cal. Rptr. 499 (Cal. App. 1990); *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048 (5th Cir. 1996); *Central Ill. Light Co. v. Home Ins. Co.*, 795 N.E.2d 412 (Ill. App. Ct. 3d Dist. 2003).

14

- <u>Binders or cover notes.</u> *Diplomat Homes, Inc. v. Commercial Standard Ins. Co.*, 394 F. Supp. 558 (W.D. Mo. 1975).

- <u>Retrospective premium reports.</u> *Remington Arms Co.*, 810 F. Supp. 1420.

- <u>Reinsurance records.</u> *Central Ill. Light Co.*, 795 N.E.2d 412.

- <u>Broker "placing slips."</u> *Central Ill. Light Co.*, 795 N.E.2d 412.

- <u>Loss history cards.</u> *Coltec Ind. Inc.*, 2002 WL 31185789.

- <u>Schedules in umbrella or excess policies identifying the underlying primary policies.</u> *Century Indem. Co. v. Aero-Motive Co.*, 254 F. Supp. 2d 670 (W.D. Mich. 2003); *Burroughs Wellcome Co.*, 632 F. Supp. 1213.

- <u>Broker and underwriter correspondence.</u> *MAPCO Alaska Petrol., Inc.*, 795 F. Supp. 941; *Central Ill. Light Co.*, 795 N.E.2d 412.

- <u>Testimony of an insured or insurer's employee.</u> *Coltec Ind. Inc.*, 2002 WL 31185789; *Rodgers v. Prudential Ins. Co.*, 267 Cal. Rptr. 499 (Cal. App. 4th Dist. 1990); *Clendenin v. Benson*, 117 Cal. App. 674 (Cal. App. 1931).

31.     Notably, courts also find testimony from insurance industry experts helpful in this context.  *E.g.*, *Aero-Motive Co.*, 254 F. Supp. 2d 670; *Coltec Indus. Inc.*, 2002 WL 31185789, at *9 (holding, based on insurance expert, existence of manuscript policies for finding of no-coverage).[11]

32.     The *Century Indem. Co. v. Aero-Motive* case is instructive.  245 F. Supp. 2d 670. There, insurers Century and One Beacon sought a declaratory judgment that they were not obligated to provide coverage to insureds for costs associated with clean-up of an environmentally contaminated site and, to that end, moved to exclude the insured's expert testimony regarding reconstruction of decades old missing insurance policies.  *Id.* at 676.  The insurers challenged this expert as unqualified, as providing legal conclusions, and as not reliable.  *Id.* at 677.

---

[11] An expert may not, of course, testify as to a legal conclusion.

33.     The court rejected each of these arguments in turn. *Id.* On qualification, the court found that the proffered expert was qualified because he had "significant experience in commercial insurance underwriting practices and ha[d] an historical knowledge of forms used and coverages offered in the commercial insurance industry [and had] performed insurance reconstruction services for clients in cases involving lost insurance policies." *Id.* at 676-677. The court next determined that the expert's testimony on reconstructing insurance policies was a factual issue for which expert testimony would assist the court. *Id.* at 677. And finally, the *Aero-Motive* court determined that an expert experienced in reconstructing lost insurance policies could provide reliable testimony. *Id.* at 678-79 (collecting cases where insurance reconstruction experts have been permitted to testify in other lost policy cases).

34.     Despite the inability of the Debtors and Local Councils to locate certain of these policies, there are well-established and relied upon methodologies for demonstrating the existence of such policies. Those missing policies are valuable assets that can be quantified and Chartered Organizations should not be deprived of such assets through the New Plan.

### C.    Chartered Organizations Are Being Deprived of their Additional Insured Rights in Missing Policies

35.     It is beyond dispute, based on the Debtors' own data room and document productions, that there is voluminous secondary evidence—of the sort accepted by courts—of insurance policies issued to numerous Local Councils. It is also beyond dispute that the Settling Insurance Companies are seeking to buyback and eliminate liability for these missing policies.

36.     The Baseline Injunction, however, does not channel or release Abuse Claims covered by missing policies. One can only determine the applicability of the Baseline Injunction if there is an actual policy to review—that is the plan language of Article X.F.3 of the Plan. But the law is clear that the buyback of a missing policy and the attendant non-consensual release of

the Chartered Organization's rights to coverage (even the most basic right of seeking to establish coverage) under missing policies can occur only if Abuse Claims that are covered by missing policies are also channeled.

37.      Nor is there any credible argument that Chartered Organizations are adequately protected for the loss of their rights in missing policies.  First, recent hearings in this case and statements by counsel have made it abundantly clear that Settlement Trust is not intending to pay one cent to Class 9 claims.  All money in the Settlement Trust will go to survivors, as it should. Even if the Settlement Trust intended to pay Class 9 claims, there is no ability to assert a future Indirect Abuse Claim.  There are 84,000 Direct Abuse Claims—claims of survivors who were scouts.  Every scout was in a troop, every troop had a Chartered Organization.  As the Court knows, less than 15,000 Indirect Abuse Claims were filed, almost all of them precautionary given the limited universe of known claims when the Debtors commenced these cases.  Most Chartered Organizations will not find out if there is a Direct Abuse Claim against them until some future date, when the Settlement Trust will be closed to them.

38.      The fix is clear.  Either Abuse Claims covered by missing policies must be channeled or missing policies cannot be the subject of a buyback free and clear of Chartered Organizations rights to coverage in those policies.

**D.  Non-Consensual Releases Related to Missing Policies Are Improper**

39.      Likewise, the non-consensual releases Chartered Organizations must give Settling Insurance Companies for missing policies violates Third Circuit precedent.  Chartered Organizations' claims against Settling Insurance Companies are being released and channeled to the Settlement Trust.

17

40.      *Zenith* requires channeled claims to be substantially paid in full.  *Zenith*, 241 B.R. at 110.  Chartered Organizations who are abandoned to defend themselves in the tort system for un-channeled Abuse Claims against them have claims for coverage that are being released and channeled.  Yet the Chartered Organization will receive little, if anything, from the Settlement Trust on account of those claims.

41.      *Continental* requires the non-consensual release to be fair.  *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 217 (3d Cir. 2000).  There is nothing fair to a Chartered Organization that is forced to release its claims to coverage against its insurance carrier and receives nothing in return for that release.

## IV.    The Revised Injunction Illuminated the Unfairness of Non-Consensual Releases of Local Councils

42.      The analysis is nearly identical with respect to Local Councils.  Under the New Plan and the Baseline Injunction, it is undeniable that there will be many years and thousands of Abuse Claims against Chartered Organizations that will not be channeled and for which Chartered Organizations will remain liable.  Chartered Organizations have contractual and common law rights to indemnity and contribution against the Local Councils, those were the organizations with which the Chartered Organizations contracted directly.  However, Chartered Organizations are being forced to release the Local Councils for those indemnity and contribution claims.  Yet they receive not one benefit from the contributions the Local Councils are making for releases—those contributions are being made for the benefit of survivors—as they should.

43.      Nonetheless, that does not excuse compliance with Third Circuit precedent.  To force Chartered Organizations to give releases, Chartered Organizations' claims vis-à-vis the Local Councils must be substantially paid in full.  Those claims will not be paid.  That is not fair to Chartered Organizations.  *Zenith* and *Continental* cannot be satisfied.  Local Councils are not

entitled to releases from Chartered Organizations related to Abuse Claims for which Chartered Organizations will remain liable.

**V.    Independent Coverage Is Still Being Impermissibly Impaired and Non-Consensual Releases Related to Such Impairment Must Be Denied**

44.    The New Plan contains revisions that the Debtors and Settling Insurance Companies assert removes the impairment of Opt-Out Chartered Organizations' independent coverage rights against Settling Insurance Companies.  *See* Plan Art. 1.A.196 (Revised definition of Opt-Out Chartered Organization: "Opt-Court Chartered Organizations shall not be required to provide assignments and releases with respect to insurance policies issued directly to an Opt-Out Chartered Organization.").[12]

45.    For Participating Chartered Organizations, however, such impairment remains, not just in the form of releases, but also in the actual forced assignment of their independent coverage. *See* Plan Art. I.A.275 (definition of Settling Insurer Policy Rights includes all rights of a Chartered Organization against Settling Insurance Company under independent coverage); Plan. Art. V.S.1.c (Participating Chartered Organization Settlement Contribution includes assignment to Settlement Trust of all Settling Insurer Policy Rights); Plan Art. X.G (rewriting terms of independent coverage); Plan Art. X.J.3 (Participating Chartered Organizations releases of Protected Parties, including Settling Insurance Companies); Plan Art. X.J.6 (incorporating releases from Insurance Settlement Agreements, all of which require releases for independent coverage).

46.    As the Court has noted, this Plan is highly unusual because the default is that all Chartered Organizations, even non-party Chartered Organizations not before the Court, are

---

[12] The RCAHC notes that the releases in Art. X.J.3 of the New Plan still provide that Opt-Out Chartered Organizations are releasing Settling Insurance Companies under the independent coverage.  Plan. Art. X.J.3 ("For the avoidance of doubt, holders of Abuse Claims covered by any insurance policy issued by a Settling Insurance Company shall, and shall be deemed to, release and discharge the Settling Insurance Companies for such Claims.").  Presumably, the Debtors will revise this language to be consistent with Art. I.A.196 of the New Plan.

19

deemed to be Participating Chartered Organizations (and under threat of a deathtrap).  The RCAHC believes that all of the objections raised in the Confirmation Objection with respect to the impairment of independent coverage remain outstanding.  The RCAHC takes the time to state this because statements by parties following the filing of the New Plan implied there was no longer any impermissible impairment of independent coverage rights.

47.     In addition, the Insurance Settlement agreements and the removal of impairment related to Opt-Out Chartered Agreements calls into question the appropriateness of non-consensual releases related to independent coverage in favor of the Settling Insurance Companies.

48.     Simply put, the Debtors cannot argue that the releases are necessary when the Settling Insurance Companies no longer require those releases from Opt-Out Chartered Organizations.  How can non-consensual releases from Chartered Organizations be necessary when the releases are only being asked of some Chartered Organizations?  Necessity is not taking as much as you can get.  Necessity is all or nothing.  That is no longer the case.

**VI.    Notwithstanding the Debtors' Notice of Errata, the New Plan Still Requires an Assignment of Chartered Organizations' Rights Against Non-Settling Insurance Companies**

49.     As part of the Notice of Errata filed on February 18, 2022 [Docket No. 8910], the Debtors amended the definition of Participating Chartered Organization Insurance Action to remove actions against Non-Settling Insurance Companies that arose prior to 1976.  The stated intent was that Participating Chartered Organizations were maintaining all of their rights against Non-Settling Insurance Companies for pre-1976 Abuse Claims.

50.     However, Art. V.S.1.c of the New Plan (entitled Participating Chartered Organization Settlement Contribution) requires that Participating Chartered Organizations assign to the Settlement Trust all rights in all Abuse Insurance Policies (which are all policies that cover Abuse Claims purchased by the Debtors or the Local Councils).  Plan Art. V.S.1.c. (Participating

20

Chartered Organizations must transfer all rights in Abuse Insurance Policies and take all steps necessary to do so).

51.     This conflict was pointed out to the Debtors prior to the filing of the Notice of Errata, but Plan Article V.S.1.c was not amended in Notice of Errata.  The RCAHC assumes that failure to amend was intentional.  Thus, the New Plan requires Participating Chartered Organizations sacrifice their rights against Non-Settling Insurance Companies.

52.     This makes sense because the entire point of the new Independent Review Option in the TDPs is to give the Settlement Trust and Direct Abuse Claimants unfettered access to Abuse Policies issued by Non-Settling Insurance Companies.  *See* TDP Art. XIII §§ K and L.  The Settlement Trust cannot have unfettered access if Chartered Organizations still have rights in the same policies.

53.     The import of this should not be lost on the Court.  Direct Abuse Claimants will have full recourse to the tort system against Chartered Organizations for un-channeled pre-1976 Abuse Claims.  Those Chartered Organizations, however, will no longer have the benefit of their additional insured rights in any Abuse Policies.  It is yet another instance where Chartered Organizations are stripped of their insurance rights while being abandoned to the tort system by the Debtors and the Local Councils.

## VII.    Impermissible Rule 2004 Discovery

54.     Article IV.W of the New Plan contains a provision that gives the Settlement Trust and every Direct Abuse Claimant the right to issue fully enforceable Bankruptcy Rule 2004 discovery to Chartered Organizations without any Court approval or oversight.

55.     The unchained nature of the authority being sought is laid out fully in Section 9 of the Document Appendix, which was completely rewritten in the New Plan.  The six categories of

discovery make it clear that the self-authorized discovery has nothing to do with liquidating a claim against the Debtors or Local Councils, but rather is designed to serve as pre-complaint discovery for Abuse Claims against Chartered Organizations.

56.    The Court should strike these provisions.

**VIII.    Reservation of Rights**

57.    In connection with the February 18 hearing before the Court and the matters set for that hearing, the RCAHC objected to findings under sections 1125 and 1127 of the Bankruptcy Code related to disclosure, service, and notice of the New Plan and the confirmation hearing on the New Plan.

58.    The Court indicated that, notwithstanding the entry of the requested order, parties would have the right to raise those issues again at the confirmation hearing.  The RCAHC is reserving its rights to do so.

*[Remainder of Page Left Intentionally Blank]*

## CONCLUSION

For the reasons stated herein, the RCAHC respectfully requests that the Court deny the confirmation of the Plan and grant such other relief as it deems appropriate.

Dated: February 25, 2022
       Wilmington, Delaware

Respectfully submitted,

**POTTER ANDERSON & CORROON LLP**

*/s/ Jeremy W. Ryan*
Jeremy W. Ryan (Bar No. 4057)
Aaron H. Stulman (Bar No. 5807)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
       astulman@potteranderson.com

-and-

**SCHIFF HARDIN LLP**

Everett Cygal, *admitted pro hac vice*
David Spector, *admitted pro hac vice*
J. Mark Fisher, *admitted pro hac vice*
Neil Lloyd, *admitted pro hac vice*
Daniel Schufreider, *admitted pro hac vice*
Jin Yan, *admitted pro hac vice*
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600
Email: ecygal@schiffhardin.com
      dspector@schiffhardin.com
      mfisher@schiffhardin.com
      nlloyd@schiffhardin.com
      dschufreider@schiffhardin.com
      jyan@schiffhardin.com

*Counsel for the Roman Catholic Ad Hoc Committee*