**<u>EXHIBIT A</u>**

```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

                                    .   Chapter 11
IN RE:                              .
                                    .   Case No. 15-11357 (CSS)
MOLYCORP, INC., et al,              .
                                    .   Courtroom No. 6
                                    .   824 Market Street
                                    .   Wilmington, Delaware 19801
                                    .
                        Debtors.    .   Friday, January 8, 2016
. . . . . . . . . . . . . . . . .


                        TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
                  UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtors:            Edmon L. Morton, Esq.
                            M. Blake Cleary, Esq.
                            YOUNG, CONAWAY, STARGATT
                             & TAYLOR, LLP
                            Rodney Square
                            1000 North King Street
                            Wilmington, Delaware 19801

                            Lisa G. Laukitis, Esq.
                            Paul D. Leake, Esq.
                            George R. Howard, Esq.
                            Bryan Kotliar, Esq.
                            JONES DAY, LLP
                            222 East 41st Street
                            New York, New York 10017
(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Leslie Murin, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES: (Continued)

For the Debtors:                    Robert W. Hamilton, Esq.
                                    JONES DAY, LLP
                                    325 John H. McConnell Boulevard
                                    Suite 600
                                    Columbus, Ohio 43215

                                    Joseph M. Tiller, Esq.
                                    JONES DAY, LLP
                                    77 West Wacker
                                    Chicago, Illinois 60601

For the U.S. Trustee:               David L. Buchbinder, Esq.
                                    Linda Casey, Esq.
                                    OFFICE OF THE U.S. TRUSTEE
                                    844 North King STreet, Unit 35
                                    Wilmington, Delaware 19801

For the Official Committee
of Unsecured Creditors:             William Bowden, Esq.
                                    ASHBY & GEDDES
                                    500 Delaware Avenue
                                    Wilmington, Delaware 19801

                                    Luc A. Despins, Esq.
                                    PAUL HASTINGS, LLP
                                    75 East 55th Street
                                    New York, New York 10022

For the 10 Percent
Noteholders:                        Laura Davis Jones, Esq.
                                    PACHULSKI, STANG, ZIEHL
                                     & JONES, LLP
                                    919 North Market Street, 17th Floor
                                    Wilmington, Delaware 19801

                                    Gregory A. Horowitz, Esq.
                                    Thomas M. Mayer, Esq.
                                    Andrew M. Dove, Esq.
                                    KRAMER, LEVIN, NAFTALIS
                                     & FRANKEL, LLP
                                    1177 Avenue of the Americas
                                    New York, New York 10036

(Appearances Continued)

```
APPEARANCES:   (Continued)

For Oaktree:                    Andrew Remming, Esq.
                                MORRIS, NICHOLS, ARSHT
                                 & TUNNEL, LLP
                                1201 North Market Street
                                Suite 1800
                                Wilmington, Delaware 19801

                                Andrew LeBlanc, Esq.
                                MILBANK, TWEED, HADLEY
                                 & MCCLOY, LLP
                                28 Liberty Street
                                New York, New York 10005

For the Pension Benefit
Guaranty Corporation:           Deborah J. Bisco, Esq.
                                PENSION BENEFIT GUARANTY
                                 CORPORATION
                                Office of the Chief Counsel
                                1200 K Street, N.W., Suite 340
                                Washington, D.C. 20005

For the County of San
Bernardino:                     Joseph H. Huston, Jr., Esq.
                                STEVENS & LEE
                                1105 North Market Street, Suite 700
                                Wilmington, Delaware 19801

For Ironshore Indemnity,
Inc.:                           Jason C. Powell, Esq.
                                FERRY JOSEPH
                                824 Market Street, Suite 1000
                                Wilmington, Delaware 19801

For UMB Bank as 10 Percent
Note Trustee:                   William W. Kannel, Esq.
                                MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
                                 & POPEO, PC
                                One Financial Center
                                Boston, Massachusetts 02111

                                Thomas D. Walsh, Esq.
                                MARSHALL, DENNEHEY, WARNER, COLEMAN
                                 & GOGGIN
                                1007 North Orange Street
                                Nemours Building, Suite 600
                                Wilmington, Delaware 19801

(Appearances Continued)
```

APPEARANCES:   (Continued)

For Westchester Fire
Insurance:                      Jason D. Angelo, Esq.
                                Gary D. Bressler, Esq.
                                MCELROY, DEUTSCH, MULVANEY
                                 & CARPENTER, LLP
                                300 Delaware Avenue, Suite 770
                                Wilmington, Delaware 19801

For Wells Fargo,
Collateral Agent:               J. Cory Falgowski, Esq.
                                REED SMITH, LLP
                                1201 Market Street, Suite 1500
                                Wilmington, Delaware 19801

For United Steelworkers:        David R. Hock, Esq.
                                COHEN, WEISS & SIMON, LLP
                                330 West 42nd Street, 25th Floor
                                New York, New York 10036

                                Susan Kaufman, Esq.
                                LAW OFFICE OF SUSAN KAUFMAN

APPEARANCES VIA TELEPHONE:

For the United States:          David DeCelles, Esq.
                                U.S. DEPARTMENT OF JUSTICE - CIVIL

For Wilmington Trust, NA,
DIP Agent:                      Ronald A. Hewitt, Esq.
                                COVINGTON & BURLIG, LLP

For Lexon Insurance:            Wendy A. Kinsella, Esq.
                                HARRIS BEACH, PLLC

For Ironshore Indemnity:        Lee E. Woodard, Esq.
                                HARRIS BEACH PLLC

INDEX

                                                  Page

BID PROCEDURES MOTION

        Presentment and Argument                  7

        Court Decision                         26,31

RESOLVED MOTIONS TO SEAL, ETC.                   32

DISCLOSURE STATEMENT

        Presentment and Argument                 34

        Court Decision                           66

1          (Proceedings commence at 12:10 p.m.)

2          (Call to order of the Court)

3               THE COURT:  Please be seated.

4               Mr. Leake, good afternoon.

5               MR. LEAKE:  Good afternoon, Your Honor.  Paul Leake

6      from Jones Day on behalf of the debtors.

7               Your Honor, I'm happy to report that we've reached

8      agreement on two out of the three motions that were on for

9      today, that's on exclusivity and on bid procedures.  That's  a

10     real milestone for the case.  So, before I get to the terms of

11     -- or my colleague gets to the terms of that agreement, I'd

12     just like to thank you for putting us on the track on mediation

13     to get to where we are.

14              I, especially, also want to thank Judge Drain.  He's

15     done a tremendous job.  When it became clear that we were not

16     going to reach a global settlement of all the issues, he put us

17     on a path of, okay, let's try to see if we can do what we've

18     all been calling the "backup plan."  The backup plan intention

19     was:  Resolve as much as you possibly can and leave for

20     confirmation the rest of the fight.  And that's what we have

21     successfully done, and we thank him for his efforts in that.

22              And then, third, I do want to thank all the parties

23     around the table.  Reaching this deal was a lot of commitment

24     on a lot of people's part and a lot of perseverance, and

25     debtors appreciate the efforts that everybody made.

```
 1            So I want to hand the podium over to my colleague Ms.
 2    Laukitis.  She's going to walk through the terms of this
 3    agreement, what -- of what we call the "backup plan" on
 4    exclusivity and on bid procedures.  And after that, we'll turn
 5    the podium over to our colleague, as well, on the disclosure
 6    statement motion.  Thank you.
 7            THE COURT:  You're welcome.
 8        (Participants confer)
 9            MR. MORTON:  Sorry, Your Honor.  Just one moment.
10    We're trying to make it so we have divergence.
11            THE COURT:  Sure, that's fine, Mr. Morton.
12            MS. LAUKITIS:  Hi, Your Honor.  Lisa Laukitis from
13    Jones Day on behalf of the debtors.
14            I have a revised version to hand up to the Court that
15    just fixes one typo that was in a footnote.
16            THE COURT:  All right.  Okay.
17        (Participants confer)
18            THE COURT:  I ask everyone on the phone to please mute
19    your phone; I am getting some background noise from people who
20    are participating on the phone.
21            Go ahead.
22            MS. LAUKITIS:  Your Honor, with respect to the
23    debtors' motion to approve the bid procedures, we are pleased,
24    as Mr. Leake said, to say that we've resolved all of the
25    objections that we received with respect to the bid procedures,
```

1    save one.  I'll get to that at the end.

2         But for now, I wanted to walk Your Honor through the

3    changes, the additional changes since the time that the debtors

4    filed their reply to the bid procedures and disclosure

5    statement objections that had been made, in order to reach

6    agreement with the 10 Percent Noteholder group and the

7    creditors' committee.

8         I'm going to go through these changes categorically,

9    rather than through -- go through the black-line, if it's okay

10   with you.

11        THE COURT:  That's fine.

12        MS. LAUKITIS:  I think it would be more efficient and

13   help people follow exactly what the relief is that's being

14   granted.

15        With respect to consent rights and consultation

16   rights, the 10 Percent Noteholders were granted consultation

17   party status with respect to all assets that are being offered

18   for sale, not just the Mountain Pass assets.

19        The 10 Percent Indenture Trustee was also added as a

20   consultation party.

21        The committee was given consent rights for any changes

22   to the bid procedures, the waiver of the bid procedures

23   requirements, changes to what constitutes a qualified bid,

24   changes to the auction rules, as well.

25        The committee was given consent rights to the debtors'

1  entry into stalking horse agreements.

2           There is a statement that -- and the committee's

3  consent must be exercised in good faith and reasonably for the

4  sole purpose of maximizing value for creditors.  And it

5  provides that if there is a dispute with respect to the

6  committee's failure to grant consent, it can be brought before

7  the Court on one business day's notice, and no deference is to

8  be given to the committee's judgement in refusing to grant the

9  consent.

10          Extensive participation rights have been granted to

11 PJT, the advisers to the creditors' committees.  They can

12 participate in any calls where the -- where Miller Buckfire is

13 giving substantive to feedback to bidders, and Miller Buckfire

14 will coordinate with them in advance to obtain their feedback

15 with respect to bids.

16          PJT is also able to independently communicate with

17 bidders, as long as Miller Buckfire is present for those

18 communications.

19          The debtors have agrees to provide regular updates

20 with respect to the sale process, with respect to Houlihan and

21 PJT Partners.  PJT Partners and Houlihan will promptly inform

22 the debtors of any concerns they have with respect to the sale

23 process and work cooperatively to ameliorate those concerns in

24 real time.

25          With respect to the creditors' committee's claims that

1   have been filed under seal in connection with their standing

2   motion, the debtors in Oaktree have agreed not to oppose the

3   standing motion.

4           The debtors retain the right to seek settlement of the

5   claims pursuant to the plan, and all parties' rights to object

6   are expressly reserved.

7           If the entire company sale trigger has been met and

8   Oaktree's claims are disallowed in whole or in part, the

9   debtors can close the sale and any amounts relating to the

10  portion of claims that were disallowed shall be escrowed,

11  pending appeal. If the entire company sale trigger has not been

12  met and Oaktree's claims are disallowed in whole or in part,

13  the debtors will not proceed with confirmation, and the bid

14  procedures will no longer apply.

15          With respect to exclusivity, the exclusivity will be

16  extended to the confirmation hearing on the plan.

17          With respect to the 9019 aspects of the plan that's on

18  file, there's agreement that if the alternative treatment

19  provisions, which are essentially the "deathtrap," are in

20  place, the debtors cannot seek approval of the plan pursuant to

21  9019, but rather, the Court must consider the merits of the

22  underlying causes of action.  However, if there is no

23  deathtrap, and those provisions are removed, the debtors can

24  seek approval of the settlement under 9019.

25          If the debtors delete the provisions relating to the

1    deathtrap, exclusivity and the motions of the 10 Percent

2    Noteholders and the creditors' committee to terminate

3    exclusivity will be teed up again before the Court

4    automatically on five business days' notice, depending on the

5    Court's availability, and the burden of proof on that will be

6    balanced among the parties.

7          With respect to the 10 Percent Noteholders' right to

8    credit bid, there are various changes to the credit bid

9    language to provide.  It will be consistent with the underlying

10   collateral agency agreements.

11         There are reservations of rights with respect to

12   challenges to the liens on claims of the 10 Percent Noteholders

13   and with respect to the 506(c) surcharge.

14         There are clarifications regarding what the 10 Percent

15   Noteholders' credit bid would need to constitute in order to

16   constitute a qualified bid, including that it doesn't need to

17   contain proof of financing or have a deposit.

18         There's a provision that provides that, if the Court

19   enters and order finding that, on consummation of the plan,

20   Oaktree has received recovery in excess of 100 percent of its

21   claim, the portion of their recovery that would provide them

22   with over 100 percent recovery, whether it's pro rata, whether

23   that is the pro rata portion of equity in Mountain Pass

24   relating to a credit bid, or cash relating to the payment of

25   the Oaktree equipment reserve price, it would be held in

1    escrow, pending resolution of any appeals to the order of this

2    Court by Oaktree.

3          We have an agreement with the 10 Percent Noteholders

4    to postpone, for consideration, the issue of how the debtors

5    should evaluate a 10 Percent Noteholder credit bid, for

6    purposes of evaluating a bid that would ultimately -- a credit

7    bid that may ultimately lead to a structure dismissal against a

8    cash bid that would enable the debtors to confirm a plan.  But

9    we have agreed to delay any argument on those issues until the

10   time that we have a credit bid or a cash bid that would enable

11   confirmation of a plan.

12         There's also consent rights that have been granted

13   with respect to changes to the bid procedures that would deal -

14   - that would affect the 10 Percent Noteholders' right to credit

15   bid and other rights they have within the bid procedures and

16   newer [sic] consent rights have been granted to the 10 Percent

17   Noteholder Trustee.

18         With respect to Oaktree's rights under the bid

19   procedures, Oaktree has retained a right to seek to credit bid,

20   and all partied have retained the right to object.

21         If Oaktree submits a credit bid, the committee gains

22   consent rights with respect to any lowering of the entire

23   company sale trigger.

24         There's a provision that provides, if the Oaktree

25   equipment is not sold, Oaktree has a reasonable time after a

1    closing of the sale of Mountain Pass to remove its equipment.

2          And Oaktree has an express right to withdrawal its

3    vote if there's a material change in the plan, including with

4    respect to evaluation and all parties' rights with respect to

5    that are reserved.

6          On the topic of tax attributes, there have been the

7    addition of various references to informing parties -- bidders

8    informing parties as to what their intentions are with respect

9    to the tax attributes, as well as an amendment to the form APA

10   agreement to have parties make an election whether they intend

11   to bid or involve a transaction that would have an impact on

12   the NOLs.

13         There's clarity that the debtors will evaluate the

14   impacts on NOLs in connection with the evaluation and

15   comparison of bids.

16         And there's an express agreement to consult with the

17   consultation parties on the structure of the transaction and

18   the impact that it would have on the preservation of NOLs.

19         In the miscellaneous categories, there's a

20   clarification that the debtors will not close a sale

21   transaction under the bid procedures unless the Bankruptcy

22   Court confirms the plan or another plan of reorganization that

23   provides Oaktree with the same treatment and benefits as the

24   plan, including, without limitation, the escrow provision and

25   the releases, but subject in all respects to the Bankruptcy

1    Court's ruling on the challenge causes of action.

2            There's a clarification that the Mountain Pass sale

3    may be consummated outside of a plan.

4            There is a reservation of rights with respect to the

5    language in one of the footnotes that -- related to the pension

6    plan, that the assertions there are not binding on the

7    consultation parties.

8            Finally, there's two points just to make on the record

9    that are not reflected in the bid procedures.  So the

10   steelworkers have been granted consultation rights with respect

11   to the Mountain Pass assets.  And finally, just as a

12   clarification with respect to the pension plan, where the bid

13   procedures say that we will -- the debtors will take into

14   account the assumption of liabilities, it includes the fact

15   that the debtors will take it into account at the proposed

16   assumption of the pension plan.  Those two clarifications

17   resolve any objections that the steelworkers and the PBGC had

18   with respect to the bid procedures.

19           I don't know if anyone has any additional comments

20   that they would like to make or clarifications with respect to

21   the agreement that we had.

22           THE COURT:  Okay.

23           MR. KANELL:  I have one, Your Honor.

24           William Kanell for the 10 Percent Notes Indenture

25   Trustee.  We sometimes get forgotten about.

1           My understanding of the arrangement we reached this

2    morning was that was, with respect to the consent rights that

3    were granted the 10 Percent Noteholders' Committee, they would

4    also extend to the 10 Percent Noteholder Indenture Trustee, to

5    the extent our interest diverged from that of the 10 Percent

6    Noteholders.  And that did not make it in there, Your Honor.

7    And I think it will now.

8           MS. LAUKITIS:  Yes.

9           MR. KANELL:  Thank you.

10           THE COURT:  I'm sorry, I didn't hear.  Debtors agree?

11           MS. LAUKITIS:  Yes.

12           THE COURT:  Okay.

13           MR. MAYER:  This is just a technical change, Your

14    Honor.  Tom Mayer for the 10 Percent Noteholder Group.

15           Paragraph 18 of the document provides for modification

16    of bidding procedures, generally, and it needs to have an

17    except clause; it says "except as set forth in Paragraph 9," so

18    the Paragraph 18 can't be used to take away the consent rights

19    of the 10 Percent Noteholders with respect to the Mountain Pass

20    credit bid provisions.  I think that's a technical drafting

21    point; I don't really have --

22           MS. LAUKITIS:  That's fine, Your Honor.

23           THE COURT:  Okay.  Anyone else?  Mr. Despins?

24           MR. DESPINS:  Very briefly, Your Honor.  That was an

25    excellent summary of the deal.  I would just point out that the

1    claims that the committee is asserting is not only -- the

2    claims are not only in terms of disallowance of Oaktree's

3    claim, but there are actually affirmative recovery claims, as

4    well.  But that's -- that's et for another day, but I just

5    wanted to clarify that.  Thank you.

6            THE COURT:  Okay.  Thank you.

7            MS. LAUKITIS:  Your Honor, that would leave one

8    remaining objection with respect to the bid procedures, and I

9    can handle that now --

10           THE COURT:  Okay.

11           MS. LAUKITIS:  -- if you would like.

12           THE COURT:  That's fine.

13           MS. LAUKITIS:  We received two objections from surety

14   bond providers, and we included language in the bid procedures

15   that provided that qualified bids would include, when parties

16   are bidding on Mountain Pass, an agreement to obtain the

17   necessary permits and the financial assurances associated with

18   such permits, and to provide financial assurances if the

19   parties are able to back those financial assurances.

20           The sureties came to us and requested that additional

21   language be added that all qualified bidders would provide

22   financial assurances to the surety bond providers within one

23   day after submitting their qualified bids.

24           We proposed that we treat the surety bond issue

25   similarly to an adequate assurance issue, where only the

1    successful bidder would provide financial assurance information

2    to the bond providers, and they would have a period of time to

3    review that and come to the sale and confirmation hearing and

4    object, to the extent that they have any issue with the

5    information that has been provided, and the surety bond

6    providers have told us that isn't sufficient.

7         We feel like that adequately protects their interests.

8    There's not a requirement that these surety bond providers

9    provide the bonds for any purchaser.  The purchaser is free to

10   obtain a bond from another surety bond provider.  But we were

11   willing, in the nature of settlement, to provide them with that

12   information for the successful bidder.

13        I would note that, with the change to the schedule,

14   the auction is set to occur on March 4th, while the

15   confirmation hearing is not set to occur until March 28th.  So

16   we believe that that gives the surety bond providers more than

17   adequate time to evaluate the information.  And it saves an

18   unnecessarily burdensome process for all bidders who may not

19   ultimately be successful, who provide and go through that

20   information with the surety bond providers.

21        THE COURT:  All right.  Does anyone wish to be heard?

22        MS. KINSELLA:  (Via Telephone) Yes, Your Honor.  This

23   is Wendy Kinsella from Harris Beech, PLLC, representing

24   Ironshore Indemnity, Inc., Lexon Insurance Company, and Bond

25   Safeguard Insurance Company.

1          We understand what the debtors have set forth, Your

2    Honor, and we don't believe that it adequately addresses our

3    concerns.

4          In this instance, we are asking that the bidder

5    provide documents when they're being determined to be a

6    qualified bid, evidencing that it has sufficient financial

7    resources to replace any bonds that are required for the

8    transfer of permits.

9          These binding assurance documents, we have requested

10   that they be provided one day after a bid is designated as a

11   qualified bid, and we are certainly willing to enter into an

12   appropriate confidentiality agreement.

13         We are not asking to be a consultation party, Your

14   Honor, but we believe that, as a surety, we're in a unique

15   position to analyze the financial circumstances of these

16   bidders and realistically assist the debtors in the auction

17   process to make them aware if there's any red flags or other

18   issues that may prevent the bidders from being qualified, in

19   terms of a transfer of the permits.

20         It's very difficult, after the auction has occurred,

21   Your Honor, to then go back and say, well, the successful

22   bidder gave the highest and best offer, but now we're seeing

23   some red flags in terms of their financial assurances, the

24   replacement bonds, or letters of credit that may be required in

25   order for the municipalities to transfer the various bonds.

1          So the reality is these financial bond assurance

2     documents are being provided to multiple parties and the

3     consultation parties.  It would not be an undue burden on the

4     debtors.  We believe, in fact, it would assist the debtors, if

5     there are any issues, to know those in advance of the auction.

6     And we believe that this is a very minor concession, Your

7     Honor, to allow us to assist in that process.

8          MS. LAUKITIS:  Your Honor, the only thing that I would

9     say in response --

10          THE COURT:  Hang -- I'm sorry.  Hang on.

11          MS. LAUKITIS:  Sorry.

12          THE COURT:  You got someone behind you.

13          MR. BRESSLER:  Hi.

14          THE COURT:  I can't see who it is.

15          MR. BRESSLER:  Gary Bressler for Westchester Insurance

16     -- Fire Insurance.  We also filed objections to the bidding

17     procedures.

18          Your Honor, we do have language that Lexon presented

19     to the debtor, as well as the language we presented to the

20     debtor for the bidding procedures, if Your Honor would like to

21     at least have it at this time to see what we've proposed.  If

22     Mr. Angelo, from my office, can present it to Your Honor, hand

23     it up to Your Honor, I would appreciate it.

24          THE COURT:  Okay.  I'll look at the language.  I think

25     I understand the point, but it's certainly helpful to look at

1    the language.  Thank you.  Where am I looking?

2          MR. BRESSLER:  Well, we have provided two different

3    colors.  Two comments came from Lexon, that we support, and the

4    rest of the comments, which I believe are red, came from us.

5          (Participants confer)

6          MS. LAUKITIS:  Your Honor, if I might.  As I'm

7    reviewing this, I just wanted to put a few things on the

8    record.

9          One is that it appears the sureties have renewed their

10   request to become a consultation party, but the debtors do not

11   believe it's appropriate.  Their changes go beyond the most

12   recent version of -- the most recent request that we have

13   received, which is why I want to address it, to include

14   language with respect to the posting of permits and lists and

15   so forth in the data room.  We've already covered that in the

16   order in response to their objections, so we don't think that

17   we need to have that language here.

18         MR. BRESSLER:  Your Honor, we did provide -- I -- it

19   could be the counsel for the debtor focused on Lexon's request,

20   but we provided counsel to the debtor, yesterday, with the same

21   highlighted document that we handed up to Your Honor now.  So

22   we certainly made counsel to the debtor aware of all of these

23   changes that we're requesting.  If they've made a change

24   already that we're unaware of that's in this, then they can

25   address this.  So it may be that we're just unaware of the

1    particular change.  But these changes shouldn't be a surprise

2    to counsel for the debtor because we did provide it to them

3    last night.

4              Having said that, we agree that we need the documents,

5    not just a description of the financial assurances, as Lexon

6    has put forth, so it can really be determined whether or not

7    somebody can provide the financial assurances.

8              Also, it's to the advantage of the sureties to get

9    them sooner rather than later because, if we do see issues, it

10   would be beneficial to the debtor, before the bids, before the

11   auction, to know if we see issues concerning a particular

12   bidder, so the debtor, hopefully, would consider that in

13   determining what is the highest and best bid, or would approach

14   the bidder to try to resolve that issue ahead of time, so that

15   the bidder could solve our concerns before the auction, rather

16   than having to deal with it afterwards, when somebody is

17   declared the debtor, and there aren't other people still

18   available to bid in the auction, the auction having taken place

19   already.

20             Also, it would be important to us to know what all the

21   bidders are proposing, so we can consider whether the financial

22   assurances being proposed by some bidders are much better than

23   those being proposed by the others.  I'm not saying that should

24   be -- the Court should determine that is determinative of how

25   the auction comes out, but it should at least be a

1   consideration.

2          I also want to mention that almost all of the language

3   that we put in here was taken from another case where

4   Westchester Fire Insurance was involved.  I understand each

5   case is different, and they're different debtors, but it was

6   the same counsel that represented the debtors in the other case

7   where it was agreed to.

8          I further wanted to mention the things we heard from

9   the debtors why they didn't want our language was it creates an

10  undue burden and they want to streamline the process.  I would

11  submit to Your Honor that, with everything that's going on in

12  these bidding procedures, for the debtor to just provide us the

13  financial assurance documents they get is not a huge burden

14  with what's going on in this case.

15         Debtors' counsel had inadvertently said, I believe,

16  that we were requiring each bidder in our proposal to send it

17  to us.  That's not what we're requiring.  The bidding

18  procedures just call for the debtor to turn it over to us, so

19  there's not an undue burden on the bidders.

20         Also, they raised the issue maybe a bidder wouldn't

21  want you to see this information.  I would submit that, with

22  what -- there are not parties in this case seeing this

23  information that's subject to improper nondisclosure.  Allowing

24  us to see the assurances that bidders are proposing as to how

25  their going to deal with the issues to get the permits is not

1    something that should keep anyone from bidding.

2         The reason we've asked to be a consulting party is

3    because we think, as to these particular issues, the financial

4    assurances, the debtor ought to at least hear what we have to

5    say.

6         We also don't believe and would submit that the debtor

7    shouldn't be able to unilaterally change the bidding procedures

8    as to the financial assurances, which directly affect us and

9    which are important to us, without our consent or a court

10   order.  They want to lock us out of the process, so they can

11   change the very terms that are important to us in the bidding

12   procedures without us being involved.

13        We also asked to see a list of the permits that

14   they're going to provide to buyers.  I don't see any reason why

15   that would be a huge burden on the debtor.  And there may be

16   one or two other small changes in our proposal if Your Honor

17   has questions about it.

18        MS. LAUKITIS:  Your Honor, with respect to the list

19   that they just requested, we have put that provision in the

20   order and have agreed that we would provide that 14 days before

21   the bid deadline, so I think that issue should be resolved.

22        With respect to their request to be a consultation

23   party, we think that just is -- absolutely goes beyond what

24   they should be entitled to and is, indeed, burdensome and would

25   be a distraction to the process.  Being a consultation party

1    involves getting copies of all bids that are received,

2    attending the auction, being consulted with respect to who the

3    bidders are, and we think it's just not appropriate for them to

4    have that right.

5         With respect to the financial assurances, Your Honor,

6    in every single case that involves a sale, there is an aspect

7    of a party who is bidding on assets having to provide to the

8    debtors and their advisers and to -- and in this case, it will

9    be to the committee and to the 10 Percent Noteholder Group, and

10   all of their advisers -- financial assurances of their ability

11   to close a deal.  So we are all, collectively, very well-

12   equipped to evaluate whether a party has the financial capacity

13   to come through on the obligations it would be required to, in

14   the event it was a successful bidder.  So, while I appreciate

15   the surety bonds' offer of help, I think we're well-equipped to

16   evaluate that, and they can retain their rights to object to

17   the extent that they disagree.

18        I would note for the record that the debtor has bonds

19   currently in place that are fully collateralized.  So we are

20   particularly incentivized to make sure that we only choose a

21   bidder that has the financial capability to replace those

22   financial assurances with bonds of their own, and it's

23   something we very much have our eye on and, as fiduciaries,

24   we'll make sure it's adequately addressed.

25        THE COURT:  All right.

1          MR. BRESSLER:  Your Honor, may I respond to a couple

2     of the comments?

3          THE COURT:  Yeah.

4          MR. BRESSLER:  It's true that they changed the

5     procedures to say that they would give a list of the permits,

6     but only in the room that we don't have access to, so it

7     doesn't give us the list.  We asked, separately, if they would

8     provide the list to us, and so far, the answer had been no.

9          And I think the financials -- the financial assurances

10    the debtor mentioned has the ability to close are something

11    slightly different than what we're talking about.  We're

12    talking about the financial assurances that have to be provided

13    in order -- when they make applications to take over the

14    permits or -- to take over the permits, which is different and

15    it relates to the environmental laws in giving the proper

16    environmental protections that have to be given in connection

17    with the mine, owning a mine.

18         THE COURT:  Okay.

19         MR. BRESSLER:  I don't know if counsel for Lexon also

20    has anything further to say in response.

21         MS. KINSELLA:  This is Wendy Kinsella, Your Honor.

22         I don't; I agree with what was just said, that the,

23    you know, financial assurances to close a deal may be a

24    different analysis than the analysis that needs to be done with

25    respect to replacement of the surety bonding, the letter of

1  credit, if there are environmental concerns regarding a

2  particular bidder in other facilities that they may be

3  operating, or a particular bidder may be permit-blocked, or

4  otherwise, something that would impair their ability to

5  ultimately close the deal.  And we believe those issues should

6  be vetted well prior to them being declared the highest and

7  best bidder at an auction.

8          THE COURT:  Thank you.

9          MS. LAUKITIS:  Your Honor, one clarification.

10         We have no issue sharing the lists with them.  That's

11  what we're posting in the data room.  So that should not be a

12  controversial point.

13         THE COURT:  All right.  All right.  Well I'm going to

14  overrule the objection to the extent it hasn't already been

15  accommodated by the debtors.  I think the debtors have done

16  more than enough that's sufficient to provide notice to the

17  surety bond holders of what those financial assurances may be

18  or may not be between the declaration of a winning bidder at

19  the auction and a sale hearing date.  And I don't see any

20  reason that the debtors need the assistance of the sureties in

21  order to evaluate whether there are sufficient financial

22  assurances in this company.  And the debtors are in this

23  business, they understand this business, they know what the

24  issues are, and they're more than capable of taking care of

25  this situation.  Too many cooks spoil the pot, I think, is the

1    term.  But in any event -- the meal?  Whatever.

2            UNIDENTIFIED:  The pot.

3            THE COURT:  There are enough people involved in this

4    process, and frankly, I have concerns.  Every time you add

5    someone to the process, confidential or otherwise, you

6    increase, by a factor of more than one, the risk that something

7    might inappropriately happen.  And between the committee, the

8    10 Percent, the Indenture Trustee, the debtors, and all of

9    their professionals, that's more than enough to be involved.

10           And with regard to the proposed language -- oh, to

11   being -- so consultation party is a big problem.  They

12   certainly don't need to be a consultation party.  They don't

13   need the information from qualified bidders; they can wait

14   until a bid is actually chosen as the winning bid.

15           There's nothing that I think they can add to the

16   process between when bids are deemed qualified and the actual

17   that will help in any meaningful way; it's not necessary.  So

18   there's no reason it can't want.  And there is an extensive

19   amount of time between the auction and the sale date in order

20   to get comfortable or uncomfortable with the financial

21   assurances and to do something about that.  So, I'll overrule

22   the objections.

23           MR. BRESSLER:  Your Honor, may I ask one question, if

24   I may?

25           THE COURT:  Uh-huh.

1          MR. BRESSLER:  I don't recall something specifically

2     saying that all of the financial -- maybe they've added it --

3     that all the financial assurance information will be turned

4     over to us in connection with the winning bidder after the

5     auction.

6          THE COURT:  I thought I heard counsel say that on the

7     record.

8          MR. BRESSLER:  But I'm not sure it's in the bidding

9     procedures yet.  Maybe if they add --

10         MS. LAUKITIS:  It's not the bidding procedures because

11    it was offered as a settlement offer to resolve your

12    objections.  We can add it to the bidding procedures or we can

13    rely on the record that we will provide that.

14         THE COURT:  I think the record is sufficient; you

15    don't need to add it to the bidding procedure.

16         MR. BRESSLER:  Thank you, Your Honor.

17         THE COURT:  You're welcome.

18         MS. LAUKITIS:  Your Honor, with respect to the final

19    version of the bid procedures and submitting the order, there

20    are two open issues that I think we need to take off line.

21         We received the dates for confirmation from chambers

22    just very shortly before coming in, and the current date you

23    proposed goes beyond the current DIP maturity.  And I believe

24    that Oaktree is not available at the moment, so we need to

25    reach out to them and figure out what a new DIP maturity would

1    mean --

2            THE COURT:  All right.  Well --

3            MS. LAUKITIS:  -- not just for Oaktree's consent with

4    respect to a new date, but with timing of closing on a sale and

5    the debtors' need for liquidity.  So we'll have to come back to

6    you on that and --

7            THE COURT:  All right.  I just -- as I mentioned in

8    our chambers conference, I am completely unavailable the week

9    of the 14th.  I'm on -- I'm out of the office.  And the week of

10   the 21st, I have a preexisting trial in the EFH matter, and

11   it's an expedited matter that needs to be taken care of before

12   they can go to closing, and I think it's $4 billion, so it's

13   not a small amount of money.  Although, this is a big case too,

14   and we are -- I am very cognizant of that.

15           So the best I can do for you, really, is the 28th.

16   And I understand that puts -- I knew when I said that, that

17   that would raise this issue with regard to Oaktree.  So I'm

18   aware of that, but I simply don't see the room.  I'm already

19   double-booking you on the 28th with what will be the fourth or

20   fifth day of that trial, hoping that the trial will be over by

21   then, and if not, we'll figure out what to do.  So I just don't

22   have the time.

23           MS. LAUKITIS:  Understood, Your Honor.  And we

24   appreciate you accommodating us within your schedule.  So we'll

25   have to circle up among the parties and come back to chambers

1    with proposed date on DIP maturity.

2          It also relates to the effective date of the extension

3    of exclusivity, because there's an open discussion point as to

4    whether it would terminate as of the confirmation hearing date

5    or as of some -- as of the earlier date that we had hoped that

6    the confirmation would occur.  So we'll circle up on those

7    points and submit and order to chambers later today.

8          THE COURT:  All right.  Okay.  Subject to the

9    resolutions read into the record, the rulings that the Court

10   has made, the changes to the bid procedures, and the

11   reservations in connection with scheduling and how that might

12   affect the maturities, et cetera, I was about to approve the

13   bidding procedures, but Mr. Falgowski is here, so I'll give him

14   a moment.

15         MR. FALGOWSKI:  Your Honor, I apologize for being the

16   last one to stand up and interrupt you.  Just very quickly, for

17   the record, Cory Falgowski from Reed Smith on behalf of Wells

18   Fargo, the collateral agent.

19         Your Honor, we filed a simple reservation of rights,

20   just to clarify that.  Nothing in the bid procedures was

21   altering or impairing the collateral agent's rights under the

22   collateral agency agreement.  We don't think that's a

23   controversial proposition, but we just haven't seen the last --

24   latest version of the bid procedures.  I don't expect that this

25   is a controversial proposition of this juncture, but I just

1    wanted to confirm the understanding of the debtors' counsel.

2    We hadn't had an opportunity to finalize our discussion on

3    that.

4            MS. LAUKITIS:  That's fine, Your Honor.

5            THE COURT:  Okay.

6            MR. FALGOWSKI:  Thank you.

7            THE COURT:  Thank you.

8            All right.  I'll approve the bid procedures.

9            MS. LAUKITIS:  Thank you.

10            MR. MORTON:  Your Honor, that takes us, I believe

11    then, to Item Number 8, which is disclosure statement.  As the

12    parties noted, exclusivity is -- the exclusivity objections

13    have been resolved in connection with what was placed on the

14    record of the hearing, so I presume that order will follow as

15    soon as we circle up the other issues that we're talking about,

16    as far as dates, Your Honor.

17            So Item Number 8 on the agenda is the disclosure

18    statement.  And I just have two quick housekeeping matters, and

19    then I'll turn the podium over to Mr. Howard from Jones Day.

20            The first is just that we have filed a motion to seal

21    portions of our reply in support of the disclosure statement

22    reply, as well as a motion to shorten, and a motion for leave

23    to exceed the page limits.  So I have those three orders, if I

24    may --

25            THE COURT:  Yeah.

1          MR. MORTON:  -- hand them up.

2          THE COURT:  There are several, actually, motions to

3    file under seal that are up for today, right; several agenda

4    items.  Do we have orders for all of them?

5          MS. DAVIS JONES:  Yes, Your Honor.  Laura Davis Jones

6    from Pachulski, Stang, Ziehl & Jones.

7          Matter 1 was our motion to file under seal, and I have

8    that; we can hand up as well.

9          THE COURT:  Okay.  Very good.  Mr. Bowden?

10         MR. BOWDEN:  Yes, Your Honor.  I have a proposed form

11   of order to hand up to the Court.

12         THE COURT:  All right.  Mr. Remming?

13         MR. REMMING:  Your Honor, we also filed a motion to

14   seal portions for our reply and a --

15         THE COURT:  Come on up.

16         MR. REMMING:  -- motion for leave to file.

17    (Laughter)

18         THE COURT:  Everybody come on up.  We'll have a Bench

19   and Bar meeting.

20         Thank you.

21         MR. BOWDEN:  Thank you, Your Honor.

22         THE COURT:  You're welcome.

23    (Participants confer)

24         MR. MORTON:  Your Honor, hopefully that onslaught has

25   taken care of everything, but if one is missed, we'll obviously

1    work with Ms. Gadson to get it redelivered to chambers.

2            THE COURT:  Okie doke.

3            MR. MORTON:  The only other small housekeeping --

4            THE COURT:  Hang on, just -- wait a minute.  Wait a

5    minute.

6            MR. MORTON:  I'm sorry?

7            THE COURT:  Let me actually sign them.

8        (Pause in proceedings)

9        (Participants confer)

10            THE COURT:  I think I may have signed some twice, so

11    just ...

12        (Laughter)

13        (Participants confer)

14            THE COURT:  I've signed all of those orders.  Thank

15    you.

16            MR. MORTON:  Thank you, Your Honor.

17            The only other housekeeping matter is George Howard

18    from Jones Day has drawn the unlucky straw to walk everyone

19    though the disclosure statement, but his *pro hac vice* motion,

20    as yet, is unsigned, so we move orally, so he can be heard at

21    today's hearing.

22            THE COURT:  All right.

23            MR. MORTON:  Thank you, Your Honor.

24        (Participants confer)

25            MR. HOWARD:  Good afternoon, Your Honor.  George

1   Howard from Jones Day on behalf of the debtors.

2           Before you this afternoon is the motion to approve the

3   debtors' disclosure statement and the related notices and

4   procedures to solicit votes to accept or reject the plan.

5   Despite the size of the cases, we only had eight formal

6   objections files to the disclosure statement.

7           I'm happy to report I think the vast majority of those

8   have now been resolved.  We filed a heavy red-line of the

9   disclosure statement on Wednesday, and I'll walk through, at a

10  high level, changes that have been made, but it's my

11  understanding those changes have resolved, I think, almost all

12  of the requests for additional information to be included in

13  the disclosure statement.

14          That would include the sureties, who are reserving

15  just on the release as a confirmation issue.

16          UMB, also on the disclosure statement and solicitation

17  procedures changes they asked for.  There's also an issue about

18  language they wanted in the plan that is not yet resolved, but

19  that's, also, I think for a later time.

20          The PBGC has, I think, mostly been resolved, except

21  for wanting to proceed with an objection as to the release

22  provisions.

23          And then we have the objection from the committee that

24  was joined by the 10 Percent Holders and the USW, which, I

25  think, also, most of the information requests have been

1    withdrawn, but there are some issues that I'll address at the

2    end that I think are still open.

3        Just to start, to make a record for the case, I wanted

4    to begin with the general standard for the approval of a

5    disclosure statement, although I know everyone is familiar with

6    it.  Section 1125 of the Bankruptcy Code requires that a

7    disclosure statement contain adequate information; that

8    generally means information sufficient to a lot of creditors

9    and interestholders to make an informed decision on whether to

10   vote to accept or reject the plan.

11       In determining whether a disclosure statement provides

12   adequate information, a court may consider the complexity of

13   the case, the benefit of additional information, the cost of

14   providing additional information.  And courts have broad

15   discretion to determine what constitutes adequate information

16   on a case-by-case basis.

17       Here, the disclosure statement is over 130 pages.  It

18   begins with a general overview of the debtors and a preliminary

19   statement described at a high level.  This was actually in

20   response to a comment from the U.S. Trustee.  It goes back and

21   forth with the organizational chart we attached to the

22   disclosure statement to describe the various needs and

23   priorities of the debtors, their businesses.

24       It goes on to describe the two alternatives here in

25   the plan:  The sale, and the stand-alone reorg, if we're unable

1    to achieve a sale.

2         The bid procedures in the disclosure statement will,

3    obviously, be revised this afternoon to accommodate all of the

4    changes that have been agreed upon this morning.

5         Then it discusses at a high level the treatment of

6    claims under the plan, how intercompany claims are dealt with,

7    the proposed settlement with Oaktree, and the standards for the

8    approval of a settlement by this Court under Bankruptcy Rule

9    9019.

10        We have tables summarizing estimated amount of claims

11   and creditor recoveries in the various classes.

12        The disclosure statement then proceeds in -- and I'll

13   just do this very quickly -- similar fashion to most disclosure

14   statements:  It explains the voting process and how parties can

15   opt out of the releases in the plan.  It provides an overview

16   of the debtors' history, corporate structure, business

17   operations, describes the events leading up to the commencement

18   of these cases, the material events during these cases.  Then

19   it describes the material terms of the plan itself.  And then

20   it discusses the standards for the Court's approval of the

21   plan, the valuation, protections, liquidation analysis, a

22   variety of risk factors, tax consequences, and applicable

23   federal and state securities laws.

24        So, based on the extensive amount of information in

25   the disclosure statement, the debtors submit it contains more

1    than adequate information and satisfies the requirements of

2    Section 1125 of the Bankruptcy Code.

3         There were also various notices and solicitation

4    procedures attached to the proposed order that we filed on

5    Wednesday.  I think, except with respect to one issue the

6    committee raised on disallowing Oaktree's votes -- or claims

7    for voting purposes -- excuse me -- we didn't receive any other

8    really comments to those that we didn't take.  So I'm going to

9    ask the Court to approve those.

10         And obviously, we'll have to incorporate the new time

11   line for Your Honor, and there's order on that.

12         So, as to the objections, Your Honor, we had attached

13   to our reply a chart that was sent out, and I've updated that

14   just to mark what's resolved, and I though that might be the

15   easiest was to walk through what is and is not still an open

16   issue.

17         THE COURT:  Okay.

18         MR. HOWARD:  May I approach?

19         THE COURT:  Yes.  Thank you.

20    (Pause in proceedings)

21    (Participants confer)

22         MR. HOWARD:  Okay.  Your Honor, do you also have a

23   copy of the red-line of the disclosure statement we filed on

24   Wednesday?

25         THE COURT:  Nope.

1          MR. HOWARD:  Would you like one?

2          THE COURT:  Sure.

3          MR. HOWARD:  Okay.

4     (Laughter)

5          THE COURT:  Thank you.

6          MR. HOWARD:  Okay.  So I will, again, do this

7     relatively quickly, Your Honor.  I think most of this should be

8     relatively noncontroversial.  And unless Your Honor has

9     specific questions as we go through, I'll just sort of flip

10    through the changes as they relate to the objections that were

11    filed.

12         So first up were the objections of Ironshore, Lexon,

13    and Bond Safeguard Insurance Co., which we call the "sureties,"

14    which, I believe Westchester Fire Insurance Company made

15    similar requests.

16         We added provisions in Section 6(b)(3) of the

17    disclosure statement to describe the information that the

18    sureties were requesting, and I believe that resolves their

19    objection.  And then they are reserving to object to the extent

20    of the release provisions as a confirmation issue.  So I

21    believe that resolves the first two matters on the chart.

22         Next is UMB.  Mostly this was about the, sort of,

23    mechanics of actually soliciting votes and counting votes, the

24    solicitation process.  So we made changes to the order and

25    solicitation procedures to address UMB's objection in that

1   respect, and I believe that resolves their objection to the

2   disclosure statement.  Although, as I noted at the opening,

3   they still have an open issue on some language for the plan,

4   which the debtors would like to just deal with that sort of at

5   a later stage and not get hung up on that today.

6           For the Pension Benefit Guaranty Corporation, I think

7   where we are here in this, this was still moving this morning,

8   but what the debtors would propose is there's some slightly

9   modified language that will go in the front section of the

10  disclosure statement in Section 2(d)(2) that describes,

11  generally, the pension plan at Magnequench International, Inc.;

12  and that the debtors, if there's a stand-alone reorg, would

13  plan to continue that pension plan.

14          And that the provision in the back of the disclosure

15  statement, which was in 11(c), which described, actually, the

16  specific language in the plan on how the pension would be dealt

17  with and how the PBGC claims would be dealt with, we would pull

18  that out of the disclosure statement and just leave those

19  issues as issues to be dealt with at confirmation.

20          I think the PBGC, it is my understanding, they still

21  want to press their objection today that we can't approve the

22  disclosure statement with the release provisions as they are,

23  and it remains our position that the releases are an issue for

24  confirmation and that shouldn't hold up approval of the

25  disclosure statement today.

1          The United States Trustee is next.  First, I want to

2     thank the Office of the United States Trustee.  They were a

3     very willing partner to work with us.  And a number of the

4     changes Your Honor will see on the disclosure statement came

5     from clarifications or questions that the Office of the United

6     States Trustee had.

7          There are a number of changes, so I'm not going to run

8     through all of them, but they're listed out in the chart here;

9     all of the changes we made and the objections resolved, it goes

10    on for about three pages.

11         What really remains, and it was a couple -- you know,

12    it was like about five points in the objection, but I think

13    it's really two issues.  And one is the release, and the other

14    one is sort of the operation of the deathtrap gift provision in

15    the plan, and I'll talk about that in just a minute when I

16    address the committee's objections.

17         So then the next three, really, I think all go

18    together; the USW, the Ad Hoc 10 Percent Holder Group joined in

19    the objection from the creditors' committee.  It's my

20    understanding that we've really resolved a number of sort of

21    the information-type objections in there, with the revisions

22    we've made to the disclosure statement, and the committee just

23    has a few open items.  Again, I think it's the

24    release/deathtrap/gift sort of related provisions in the plan.

25    So, to the end of that, let me just, very briefly, address

1   those points.

2         I think, on the releases themselves, those are, to our

3   mind, a very clear issue that's resolved in confirmation.  And

4   I know that Your Honor made that determination in the <u>EFH</u> case

5   at the disclosure statement stage, that the release provisions

6   would be -- would not hold up approval of the disclosure

7   statement, and would be approved -- or dealt with at the

8   confirmation stage, and I would ask the Court to make the same

9   finding today.

10        On the operation of the gift or the deathtrap or -- I

11  guess it wraps into the settlement, too, and how that structure

12  works in the plan.  I think -- you know, our first answer on

13  that is that they're -- we don't know what's going to happen on

14  that yet.  And there are scenarios where Your Honor never has

15  to make a decision about that provision.

16        I know parties have taken a very strong view right now

17  that the plan is unacceptable, and there will be objections and

18  all this other stuff.  But we very might well get to a stage in

19  this case where that is not the case, and Your Honor doesn't

20  have to deal with this question about the operation of how the

21  gift works, and whether it should go away if the committee

22  objects.  And I think it is entirely appropriate to just

23  approve the disclosure statement today, as it is, and reserve

24  those issues for everyone to argue about at the confirmation

25  stage.

1          I think, if Your Honor does want to get into the meat

2     of how those provisions operate today, the way we would suggest

3     you look at it is that it is really a pure gift from Oaktree;

4     that is their property that they are giving away to the General

5     Unsecured Creditors of Molycorp, Inc., and it is entirely

6     appropriate for them to put whatever conditions they want on

7     that gift of their property.

8          And I know that Milbank, I think, has some additional

9     points they want to make on that.  But that would be our

10    position, and that's why we think the disclosure statement

11    should be approved and those issues reserved to be addressed at

12    the confirmation hearing.

13         So, with that, I think I'd like to hear from the other

14    objectors to see if I missed anything, and I'll reserve my

15    right to come back out and address any remaining opening

16    points.

17         I don't know, would you like to go, Mr. LeBlanc?

18         And Milbank, I think, will briefly address the

19    deathtrap.

20    MR. LEBLANC:  Good afternoon, Your Honor.  Andrew

21    LeBlanc of Milbank, Tweed, Hadley & McCloy, on behalf of

22    Oaktree.

23         And Your Honor, just to put a little bit more color on

24    the deathtrap provision that's contained in the disclosure

25    statement, we agree that this is a confirmation issue.  But I

1    think it's important for the Court to understand the set of

2    circumstances that would have to exist at confirmation, were

3    this ever to become relevant.

4         And to begin, because we're doing this toggle plan,

5    where there's a sale process going on at the same time as the

6    disclosure statement and the solicitation of a plan, the first

7    is that there would have to be no sale of the debtors' assets.

8    So we start with that.

9         The second would be that all creditors would have to

10   have voted -- or the creditor constituencies would have had to

11   have vote in favor -- voted in favor of the plan because the

12   issue, as I understand it -- they're not -- they're -- the

13   objections don't go to the provisions of the deathtrap that say

14   that, if the creditors reject the plan, that they don't get

15   consideration, but rather, it's only the additional conditions

16   that, in addition to the creditors voting to support, that

17   there not be objections from other parties; specifically, the

18   committee and the 10 Percent Noteholders.  So that's the second

19   thing that would have to happen, is the creditors would have to

20   accept the treatment -- their treatment under the plan.  But

21   parties would have, nonetheless, had to press their objections.

22        The third thing that would have to happen is the

23   Court, Your Honor, would have had to have resolved objections

24   to Oaktree's claims in favor of Oaktree, either through

25   settlement or through litigation, found that our claims are

1    allowable because, under the bid procedures and under the plan,

2    to the extent that our claims are not allowed, then the plan

3    simply goes away, in a scenario where we are -- we're not

4    selling the company, but instead, doing the stand-alone

5    restructuring.

6            And then, finally, you would have to have a

7    circumstance where the committee and the 10's, or the committee

8    or the 10's would have to be pursuing, still, objections to the

9    plan of reorganization, notwithstanding that Oaktree's plans --

10   claims have been allowed, that the creditors voted in support,

11   that the sale process didn't lead to a sale of the entire

12   company.  All of those things would have to happen.

13           And under those circumstances, that's the only

14   circumstance under which, at that point in time, Oaktree would

15   say, you're not legally entitled to anything as a general

16   unsecured creditor because the Court has reached all these

17   conclusions, and therefore, you get nothing.

18           Because the whole point of the gift here -- and it's

19   the same thing as a provision that requires or eliminates a

20   gift in the event that the class objects -- is to avoid the

21   expense, the delay, the distraction, of having to deal with

22   confirmation issues; either objections or cramdown of an out-

23   of-the money creditor constituency.

24           If we have to deal with those issues, whether through

25   a rejecting class, or through dealing with objections

1    notwithstanding the acceptance of the class, then we haven't

2    got the benefit of our bargain, we haven't gotten any value for

3    giving away value to the unsecureds.

4            And that's the reason we think this is entirely

5    permissible, particularly -- we'll argue the merits of it when

6    we get to confirmation.  But at the disclosure statement stage,

7    because there's all of these things that have to happen, we

8    think it's entirely permissible to include this in the

9    disclosure statement.

10           It doesn't make the plan patently unconfirmable to say

11   that, if we offered a gift, and it is rejected, either through

12   objection or through a vote, that you don't get the gift.

13   That's all it intends to do.  And that's what the provision

14   provides, and we think it's entirely appropriate, Your Honor.

15           Happy to answer any questions if the Court has them,

16   or address any issues after the objectors.

17           MR. DESPINS:  Good afternoon, Your Honor.  Luc Despins

18   with Paul Hastings on behalf of the committee.

19           I'll address the deathtrap in a second.  But I wanted

20   to echo Mr. Leake's comments about Judge Drain.  I have to say

21   that, you know, he was available and worked really hard on

22   this.  He was available weekends evenings.  So I just want to

23   echo his comments on that.

24           Now to turn to the disclosure statement, I -- it is a

25   little bit awkward because we're consenting to the bidding

1    procedure, and we're not objecting to the extension of

2    exclusivity, but I want to make sure it's clear, and it's clear

3    in the bidding procedure itself -- themselves that the

4    committee and the 10's are not supporting the plan, and will

5    object to the plan.

6            So let me go to the issue of the -- we have various

7    issues regarding the disclosure statement that won't take very

8    long.  But let me jump in, right away, into the issue of the

9    deathtrap.

10            The deathtrap we're talking about, first of all, it's

11   unprecedented.  And the debtors have been very candid, this is

12   Oaktree's, you know, again, borrowing the debtors' pen to put

13   provisions in the plan that they want to test with the Court,

14   to see if the Court is going to bite or not.  And I think the

15   Court should really not approve this.

16            One, it's unprecedented.  I have never seen it, they

17   don't cite a case, where unsecured creditors have lost their

18   distributions because committee members or a committee has

19   objected to the plan.  And let me start with the basic issue.

20   I mean, I -- as somebody who represents a lot of committees, I

21   find this really outrageous.

22            Let's talk about the committee member.  The committee

23   member, today, says, I think I would like to object to the

24   plan, but if I object, unsecured creditors lose a distribution,

25   so that compels me to resign from the committee, so I can

1    object.

2            We can't have these types of provisions that bind or

3    attempt to control fiduciaries, either because they're

4    compelled -- that's why I hope the U.S. Trustee will pick up on

5    that.  This is their playground.  The fact that committee

6    members would be economically compelled to resign just creates

7    chaos in Chapter 11, that's the first thing.

8            Now, as far as the committee itself, the committee has

9    fiduciary duties to do the right thing, and cannot be put in --

10   and cannot be put in a position where the -- where its

11   constituents are losing distribution because it's objecting.

12           And by the way, the argument that, don't worry, this

13   will not pan out because this will only happen at the end,

14   everything is going to happen at the end, Your Honor.  There's

15   going to be a trial -- well, subject to Your Honor's

16   availability and willingness to do it that way, but there's

17   going to be a trial on the merit of the Oaktree claims, on the

18   merit of the committee claims against Oaktree at the same time

19   as confirmation.  So we are objecting at that time.  There's no

20   --

21           THE COURT:  Let me interrupt you for a minute.  I --

22   Ms. Gadson should have given you dates for the trial.

23           MR. DESPINS:  Oh, I don't have those.

24           THE COURT:  Oh, okay.  March 8, 10, and 11.

25           MR. DESPINS:  Well, I --

1          THE COURT:  We can talk about that later.

2          MR. DESPINS:  Yeah, because I --

3          THE COURT:  I'm not asking you --

4          MR. DESPINS:  I don't --

5          THE COURT:  -- to do it at the podium?

6          MR. DESPINS:  Because I don't think we can operate

7     with those dates, but okay.  I appreciate Your Honor providing

8     me those dates.  But the way the bid procedures are supposed to

9     work is this is supposed to happen at -- as part of

10    confirmation.

11         But you're just -- Your Honor, conceptually, to have a

12    plan provision -- and that's why this is an issue today, not an

13    issue for voting.  To put committee members in a position where

14    they are incentivized to resign from the committee, so, again,

15    they can do the right thing; for example, indenture trustees or

16    their constituents, by objecting to the plan, is just -- I

17    can't -- you know, I -- I can't stress how troubling that is, I

18    can't stress enough how troubling that is.

19         Then there's the other provision, which says that --

20    and that's why it's very clear what -- it was very helpful that

21    counsel for the debtors made it very clear that the creditors

22    are not getting -- that's their position -- are not getting any

23    distributions from the debtors.  I'm not sure we agree with

24    that because that assumes that Oaktree has good claims, et

25    cetera, et cetera, but -- so there's no distribution coming

1   from -- under the Jones Day construct, the creditors are not

2   getting any distributions from the debtors.

3         But if you're a creditor, and you think you have a

4   claim against the D's and O's, you need to release that claim,

5   in order to get a distribution.  This is done, Your Honor, on

6   an individual basis.  So, if you check the box saying, I refuse

7   to release the D's and O's, you lose your distribution from

8   Oaktree.  That, Your Honor, is coercive, it's -- I -- again, I

9   don't want to get too excited about this, but I cannot believe

10  that this type of provision should be tolerated, and that's a

11  fundamental point.

12        It's very different from a class being told, if you

13  vote as a class against, you know -- that has been approved by

14  other courts; I agree with that.  But other courts that have

15  looked at deathtraps have always said that it's a no-no to lose

16  your distribution because of somebody else's conduct, or in the

17  context of releases from releasees that are not getting any --

18  or not giving you any value.  It's one thing when they're

19  giving you value, but when they're not, as is stipulated by the

20  debtors in the context of the D's and O's, that that cannot

21  work.

22        Now let's turn to other points in the disclosure

23  statement, Your Honor.  The first point, Your Honor, is that --

24  and it goes to the same issue, these warrants.  They're saying,

25  well, we're giving you these very valuable warrants, or that --

1    in the disclosure statement, Your Honor, there is not a word

2    about the value of these warrants.

3          Remember that the debtors insisted on releasing their

4    valuation.  It was very important for the disclosure statement

5    hearing and for the creditors to see the valuation.  But at the

6    same time, they're saying, here are the warrants, you guys

7    figure out how much they are worth.  I've never seen a

8    disclosure statement that does not value the currency being

9    given to creditors.

10         And by the way, the people who are receiving this,

11   some of them are mom-and-pop.  They don't know how to value

12   these assets.

13         I have an idea as to why the debtor is staying clear

14   of what -- valuing these warrants, given their valuation.  But

15   clearly, they have to step up to the plate and say, we value

16   these warrants, and they're worth X.

17         Right now, Your Honor, the disclosure statement says

18   that people in Class, I think it's 5A, which is the class

19   involving the bondholders, are getting zero distribution;

20   that's what it says.  Footnote:  Oh, that's not counting what

21   they're getting from Oaktree.  But there's no disclosure of

22   what that is worth.

23         Next point, Your Honor --

24         THE COURT:  I thought you only had one point when we

25   met in chambers.

1        MR. DESPINS:  No, I have -- I just -- this won't be

2    long, Judge, I --

3        THE COURT:  Okay.

4      (Laughter)

5        MR. DESPINS:  And this is a point I was making, which

6    is:  We need a general reservation of rights in the disclosure

7    -- sorry, in the disclosure statement approval order, with two

8    types of points:

9        One is what I call "litigation arguments."  In the

10   disclosure statement -- I'll give you an example, I think it's

11   on Page 50 -- Jones Day says the directors and officers cannot

12   be liable because they're exempt under 102(b)(7) of Delaware

13   corporate law.  Well, that's wrong because 102(b)(7) only

14   applies to directors, not officers.

15       But there are a bunch of these things, and we can't go

16   line by line and remove them.  There has to be a general

17   statement that says -- that should say the debtors' statements

18   in the disclosure statement will not be used against the

19   committee in the litigation on the basis that the Court has

20   found that the disclosure statement contains adequate

21   information.  So, if they have that, we don't need to do a line

22   by line.  But I'm giving you one example; there are many

23   others, Your Honor.

24       The other type of general reservation you want -- we

25   want to have, Your Honor, is -- and he actually acknowledged

1    that, but I just want to be clear -- that we don't want to be

2    whipsawed here, where we show up at confirmation and they say,

3    well, that was a disclosure statement issue.

4         So anything relating to valuation, for example,

5    liquidation analysis, we believe that there are numerous issues

6    with these documents.  If they're confirmation issues, they're

7    confirmation issues, but we need to make that clear, that

8    there's a clear reservation of right.

9         Another point, Your Honor, is that the disclosure

10   statement needs to be revised to reflect the bidding procedures

11   that have been agreed to.  I'll give you just an example of

12   that -- I hope that they're not debating that, but I'll give

13   you an example of that.

14        They say that the settlement can be supported because

15   it avoids litigation costs.  Well, we know that's not true

16   because there's going to be a litigation; they consented to

17   standing.  That's one example of why the disclosure statement

18   needs to be revised to reflect the current state of affairs.

19        Next, Your Honor, we need to say upfront on the

20   disclosure statement, and not wait until Page 17, that the

21   creditors in Class 5A are getting zero distribution, zero

22   percent distribution.  That put that on Page 17.  If you're

23   asking people to vote, they need to be told right upfront.  It

24   doesn't need to be first paragraph, but certainly, first page,

25   second page, but not on Page 17.

1          So, Your Honor, subject to these points and to the

2     deathtrap provision points that I've made -- sorry, I missed

3     one, which is that, because the committee is not going to

4     engage into a line-by-line edit of the disclosure statement, we

5     need to be able to send a letter approved by the Court under

6     1125 to our constituents.

7          It was ambitious, I thought the letter would be

8     finalized.  In fact, it looks like the 10 Percent folks want to

9     join in maybe some or part of the letter.  That work has not

10    been completed, but we know the disclosure statement needs to

11    be revised anyway, so we need to have a mechanism.  Well, we

12    will submit, obviously, to the constituents because they have

13    not seen it, other than the 10's, the letter; we'll submit to

14    Your Honor for review and approval.  I promise you, it's not

15    going to be a long letter; seven, six pages or so.  But we need

16    to have a letter to our constituents added in the package that

17    goes to the creditors.

18         So let me just make sure -- oh, yeah, the last point

19    related to that, Your Honor, is that the complaint we filed is

20    heavily redacted.  In our letter to constituents -- because we

21    need to tell them, we think we have claims, go and look at the

22    complaint -- we need to be able -- we need to be in a position,

23    not today, but shortly, to file an unredacted or largely

24    unredacted version of that complaint.

25         And I just want to make sure -- and I've already

1    talked to the debtors about this and to Oaktree, and I think

2    that we probably can agree to have a placeholder of Monday or

3    Tuesday of next week, so that, if there is no agreement, we

4    could come back to the Court.  But I think that, based on what

5    I heard, there's going to be agreement.  But that complaint

6    needs to be unsealed.

7            So, I -- Your Honor, these are the points I have with

8    respect to the disclosure statement.  Thank you.

9            THE COURT:  Thank you.

10           Anyone else?

11           MR. KANNEL:  Your Honor, William Kannel for UMB Bank

12    NA as indenture trustee on the 10's.

13           First of all, with respect to our objections that were

14    mostly related to solicitation issues, the debtor was very

15    accommodating, and those changes have all been made.

16           With respect to the deathtrap, I had mentioned that we

17    are often forgotten.  That was one place that Oaktree did not

18    forget us.  The 10 Percent Notes Trustee is included in the

19    deathtrap, and we certainly support Mr. Despins and the 10's

20    objection on that.

21           A deathtrap is particularly pernicious for an

22    indenture trustee.  Often, plans will, unintentionally

23    sometimes, impact the terms of an indenture, not in terms of

24    the claims against the estate, but in terms of the rights in

25    the indenture and the obligations in the indenture that set the

1    intermural obligations, if you will, between bondholders and

2    how they receive distributions.  And it would certainly be a

3    shame, and I will clearly outrage Mr. Despins, if I have to

4    object to a plan on that basis, and probably outrage my 10

5    Percent Noteholders, too.  So I just wanted to make sure the

6    Court is aware of that.

7        I think Mr. Despins has alluded to that, in terms of

8    the indenture trustees that are a member of his committee; I've

9    been in that position, as well.  It is a very difficult

10   position to put on an indenture trustee.  So, while I agree

11   with Mr. Despins, in terms of the deathtrap in its entirety and

12   why it is actually an issue at this point, and not just a

13   confirmation object, I wanted to bring to your attention its

14   unique impact on an indenture trustee like my client.  Thank

15   you.

16       MR. MAYER:  Your Honor, Tom Mayer of Kramer Levin for

17   the 10 Percent Noteholder group.  We support the committee in

18   their objection.  Thank you.

19       MS. BISCO:  Deborah Bisco for the Pension Benefit

20   Guaranty Corporation.

21       Much of our objection was resolved by the amended

22   disclosure statement, the Wednesday one, if we are going to

23   through multiple versions here, in providing additional

24   information about this multi-million-dollar pension plan.

25       The problem that remains is over-broad releases, not

1    uncommon in proceedings before this Court and others.  And

2    rather than rewrite the entire release exculpation injunction

3    provisions, there was an effort to do a carveout, which is in

4    the Wednesday version, at Page 83, but did not resolve things

5    entirely.  And that left matters unresolved here.

6         The releases of non-debtor in -- under the Third

7    Circuit, must be fair and must be necessary, neither of which

8    is present in this case.  And to boot, with pension plans,

9    there is a federal statutory provision that bars such releases

10   of the fiduciaries' pension plans, and which would be violated

11   by the language that is currently part of the disclosure

12   statement and of the plan.  And we would look to get that

13   prepared, so that the disclosure statement no longer states

14   there will be illegal conduct.  Thank you.

15        THE COURT:  Mr. Buchbinder.

16        MR. BUCHBINDER:  Good afternoon, Your Honor.  Dave

17   Buchbinder on behalf of the United States Trustee.

18        I do want to thank the parties for all the

19   improvements that have been made to the disclosure statement,

20   and that have addressed a number of the U.S. Trustee's issues.

21   But we believe that the disclosure statement remains

22   unapprovable today because it contains provisions that render

23   the plan patently unconfirmable.

24        The two provisions at issue today -- there are others

25   that were added by the revised plan, but we'll save the issue

1  of whether the warrants establish a non-voting class for the

2  confirmation hearing -- but we have the deathtrap and the

3  third-party release provision.

4         I would note that, in the revised pleadings the debtor

5  filed, the debtor actually became more aggressive in its

6  request for third-party releases.  I believe that the deathtrap

7  provision and the third-party release provision, they sort of

8  go hand and hand together in this case because their collective

9  effect is to prevent creditors and the fiduciaries from the

10  creditors from exercising their rights to vote against or

11  reject or object to the plan.

12         What the plan says, through the deathtrap provision

13  and the third-party release provision, is, unless you do what

14  we're telling you to do, you won't get anything, but you can

15  vote for it or against it.  So the deathtrap provision, it's

16  one thing to tell an individual creditor that, if they opt out

17  of third-party releases, they don't get a distribution, and

18  we've seen lots of those cases.  But this provision goes beyond

19  that.

20         This provision says that, if the fiduciaries for the

21  creditors, either through the creditors' committee or the

22  indenture trustee on behalf of the 10's, if either of the

23  fiduciary entities representing the creditors exercise their

24  rights, you, unsecured creditors, get nothing.  Nothing could

25  be more fundamentally unfair or inequitable than provisions

1    like this, that tell the creditors, you better vote for the

2    plan or you get nothing.

3          There is no democratic process involved, and the

4    effect of the deathtrap is to put the fiduciaries, the

5    committee and the indenture trustee, in a position where, if

6    they oppose the plan, someone could accuse them of violating

7    their duties because the deathtrap is quite clear that you get

8    nothing if you oppose the plan.  And on the other hand, if they

9    don't oppose the plan, they could be violating their duties

10    because there might be valid reasons to oppose the plan.  But

11    in any event, the effect of the provision is it muzzles them

12    from doing their job.

13          Now let's look at the third-party release provision,

14    especially as it is contained in the revised disclosure

15    statement.  The hallmark of third-party releases in this Court

16    and the Third Circuit is affirmative creditor consent, whether

17    we're looking at <u>Zenith</u>, whether we're looking at <u>Continental</u>

18    <u>Airlines</u>, whether we're looking at <u>Genesis</u>:  Affirmative

19    creditor consent.

20          So let's look at the various ways in which parties are

21    going to give third-party release provisions -- oh, and by the

22    way, Your Honor, one more small point on the deathtrap

23    provision.

24          An unsophisticated creditor reading this plan, who

25    reads the distributive provisions of the plan, isn't going to

1    know about the deathtrap because the deathtrap provision is
2    buried in the definitions to the plan.
3         Let's return to the third-party release clauses, and
4    let's remember the notion of affirmative creditor consent.
5    Well, you're getting third-party releases if you're deemed to
6    accept the plan.  That might be okay.
7         Number two, if you vote to accept the plan, that might
8    be okay, except there's no provision to vote for the plan and
9    opt out of the third-party releases.
10        The third one:  Fail to return your ballot.  Where is
11   the affirmative conduct there?  If I do nothing, I'm consenting
12   to the third-party releases.
13        Number four:  Return your ballot, but abstain from
14   voting.  My God, this is a real world.  If you are not going to
15   return your ballot, why are you going to -- why are going to
16   return you ballot if you're not going to vote?  That's absurd.
17   That's not affirmative creditor consent.
18        Number five:  Vote to reject the plan, but do not
19   check the appropriate box to opt out of the release provisions
20   in the plan.  Well, here, we have affirmative creditor conduct.
21   It's affirmative creditor conduct to opt out of the third-party
22   releases after rejecting the plan.  The only affirmative
23   creditor consent there is to give permission to do something
24   that the creditor -- that the plan proponents can't do in the
25   first place.

1        Finally -- this is a good one -- are deemed to reject

2    the plan, and do not complete and return the election form.

3    Again, like abstaining and not voting, if I'm deemed to reject

4    the plan, why would I bother to check the box that says I don't

5    want to be part of the third-party releases?  The only consent

6    required in this provision is consent to opt out of that which

7    is not permitted to begin with.

8        And so this plan is patently non-confirmable because

9    the collective effect of the deathtrap and the third-party

10   release provisions is to muzzle the creditors and the

11   fiduciaries from exercising their rights, and it should not be

12   approved.  Thank you, Your Honor.

13       MR. HUSTON:  Good afternoon, Your Honor.  May it

14   please the Court, Joseph Huston of Stevens & Lee on behalf of

15   the County of San Bernardino.

16       We don't have any objections to the disclosure

17   statement or what's been -- what's gone on here before.  We're

18   very grateful that the sureties have taken the lead in dealing

19   with the issues about financial assurances and all the rest of

20   that.

21       And I just wanted to make one comment, and not to

22   burden the record.  But in the amended disclosure statement, in

23   Section IV, B(3), there's a significant disclosure about the

24   Molycorp minerals asset sale and all of the environmental

25   requirements that will append to that.  And there is a

1    statement that says:

2            "It is anticipated that any purchaser of Mountain Pass

3            will continue to comply with all applicable

4            environmental rules and regulations."

5        And I just wanted to be clear on the record, it's a

6    requirement of the law that they will do that, not that it's

7    anticipated that they will.  Thank you, Your Honor.

8        THE COURT:  You're welcome.

9        Response?

10       MR. LEAKE:  Your Honor, Paul Leake from Jones Day on

11   behalf of the debtors.

12       I just want to address those three points that came

13   from Mr. Despins.  Like you, I was a little surprised by the

14   length of the list, so I'll focus only on three items and leave

15   it to anybody else to address anything else.

16       The first is, by far, the most important, the whole --

17   this whole idea of gifting and 9019.  I want to make sure that

18   we aren't using words to obfuscate or confuse the issues.  I

19   just want to be clear that, in the debtors' view, any

20   consideration going to the unsecureds under the plan is,

21   effectively, a settlement of any and all litigation against

22   Oaktree.

23       The way the -- what we call the "backup plan," which

24   was incorporated in the revised bid procedures that we

25   described earlier today, the way that works, one of the

1    agreements was, if the debtor has a deathtrap provision in a

2    plan, the debtor cannot pursue confirmation of that plan under

3    -- at least with respect to the give-up under 9019, unless --

4    you have to get to the consideration to the unsecureds in

5    whatever other mechanic you can.

6           So, to put a fine point on it, and the revised bid

7    procedures says this; that, if we amend the plan, and we

8    provide for no deathtrap, but you're just going to what we've

9    been calling a "settlement plan," and you say, here's the same

10   distributions to the unsecureds, but you get it, whether or not

11   you vote yes or no, that we can pursue under 9019.

12          And so I just didn't want -- I want to make to sure

13   that there wasn't any confusion on nomenclature, using the word

14   "gifting" versus something else.  That's how we look at what

15   this consideration is.

16          The mechanic for getting to the unsecureds may be

17   affected by whether or not it's a deathtrap plan or just a

18   straight settlement plan, but doesn't change the ultimate

19   nature of the consideration.  It's a settlement with Oaktree.

20   That's, I think, critical, because I thought there was more

21   going on underneath -- in the comments from Mr. Despins.

22          Number two, on the warrants, very simply, we have no

23   issue of value under the warrants, based on the debtors'

24   valuation in the disclosure statement.  And if that's what you

25   would ask or require, we're prepared to do that.

1          Number three, on the letter, we have -- again, we have

2     no problem including a committee letter in our solicitation

3     materials.  But as we said in chambers, we just want to make

4     sure that we have a chance to look at it, and it's not

5     basically a second disclosure statement.  Those are my

6     comments, Your Honor.

7          THE COURT:  Thank you, Mr. Leake.

8          Mr. LeBlanc.

9     (Participants confer)

10          MR. LEBLANC:  I think, Your Honor -- what has been

11     said behind me is Mr. Despins comments about a reservation of

12     rights, that the language in the disclosure statement is not

13     binding any future litigation, that that's been agreed to by

14     the debtors --

15          MR. LEAKE:  That's fine with us, Your Honor.

16          MR. LEBLANC:   -- and the committee.  I --

17          THE COURT:  Well done.

18          MR. LEBLANC:  Thank you, Your Honor.

19     (Laughter)

20          MR. LEBLANC:  Doing my best, Your Honor, to get to

21     resolution.

22          Your Honor, there's -- I'm only going to talk about --

23     I'll talk about the combination of both the deathtrap provision

24     and the third-party releases.  But I do -- I want to go back to

25     and just to reiterate, what people will know at the time they

1    lodge an objection in this case:

2           They will know how the claims -- how the creditor

3    classes have already voted; they'll know that before they have

4    to object.  The way that the schedule is going to work, that

5    will be in -- the vote deadline will be in advance of the

6    objection deadline.  So the creditors' committee can choose not

7    to vote under those -- not to object under those circumstances.

8           They'll also know -- the final bid deadline is before

9    they'll have to object to the plan, particularly given the

10   additional time that we need to build in for the confirmation

11   hearing, beyond the week of the 14th of March.

12          So people will know how much people are bidding, third

13   parties are bidding on these assets, and they will know what

14   the creditors think of the consideration that Oaktree has

15   offered, in the event that there's no successful auction, and

16   we haven't reached the entire company sale trigger, and the

17   company is not being sold, but it, instead, is being

18   reorganized around the backup plan, in which Oaktree is going

19   to control the debtor on emergence.  So those things will be

20   known to people at the time that they're -- an election is made

21   whether or not to object to the plan.

22          And let me be clear.  We don't intend, by this

23   provision -- and we can make it clear if Your Honor wants us

24   to.  We don't intend -- intermural objections that don't affect

25   Oaktree are not the kinds of objections that would trigger the

1    deathtrap and the loss of value for creditors.  So, to the

2    extent that the 10's have an issue with another creditor body

3    or with their own creditor body, the trustee does, that's not

4    what's intended by this.  It's really only objections that

5    affect Oaktree and its recoveries.

6         And the reason that's important, Your Honor, is -- I

7    think you heard it.  What Mr. Despins was suggestion is:  What

8    if every committee member wants to object to the plan or --

9    wants to object to the plan, notwithstanding the fact that the

10   creditors have all voted in favor of it, or a sufficient

11   majority to satisfy the Bankruptcy Code.  He wants us to have

12   to litigate each and every one of those objections.

13        And then, if every member of the 10's committee, which

14   there's no reason they couldn't simply resign from that

15   committee -- as long as the trustee, at that point, isn't

16   objecting, it wouldn't be an issue under the deathtrap

17   provision.  But these people -- we may have to deal with dozens

18   and dozens of objections from parties, notwithstanding the fact

19   that the creditors voted in support of it, and notwithstanding

20   the fact that Your Honor will have made a ruling that they're

21   not entitled to any recovery, and we still have to deal with

22   them.

23        So, to say that we're trying to run roughshod over

24   people's fiduciary duties, I think, just misses the point.  The

25   point is that, in a circumstance where the creditors have

1    supported it, the Court has effectively concluded, or will have

2    concluded that they're not entitled to any recovery.

3           And we are nonetheless -- and to be clear, Mr. Despins

4    stood up and started by saying, well, this is Oaktree taking

5    the pen.  He's right.  The question is:  How much are we giving

6    away to other people that are not entitled to it as a matter of

7    law?  That's what the question is when you get to this

8    provision.  And so he's right, we do have the pen.  And what

9    has changed, we've taken --

10          THE COURT:  You know what?  I'd rather you not give

11   them anything than you squash the rights of fiduciaries.

12          MR. LEBLANC:  Your Honor, we're not intending to

13   squash the rights.

14          THE COURT:  Yeah, you are.  Yeah, you are.

15          MR. LEBLANC:  Well --

16          THE COURT:  You're trying to shut the committee --

17   you're trying to put the committee in an impossible situation,

18   where they have -- if they object to -- on legitimate bases,

19   you know, everybody has voted yes, they are robbing their

20   constituency of a recovery.  That's ridiculous.

21          MR. LEBLANC:  Well, Your Honor --

22          THE COURT:  Don't give them a recovery.  I'd rather

23   you not do it -- I'd rather you not give them a recovery.

24   Let's be upfront about what you're doing --

25          MR. LEBLANC:  Your Honor --

1          THE COURT:  -- than trying to say you're giving them a

2    recovery, and then saying that the committee fiduciary can't

3    object.  Ridiculous, unacceptable.

4          MR. LEBLANC:  Your Honor, would you like me to speak

5    to the releases --

6          THE COURT:  No, you don't need to worry about the

7    releases; the releases are fine.

8          MR. LEBLANC:  Okay.

9          THE COURT:  Well, they're fine for disclosure

10   statement purposes.

11         MR. LEBLANC:  Understood.

12         THE COURT:  We'll deal with the releases --

13         MR. LEBLANC:  Understood.

14         THE COURT:  -- at confirmation.  Releases are a

15   confirmation issue.

16         Also on affirmative conduct, you don't need

17   affirmative conduct to get a third-party release, at least not

18   in Courtroom Number 6, on the fifth floor.  Opt-out releases

19   are fine, so I'll overrule that objection.

20         MR. LEBLANC:  Okay.  And so, Your Honor, just so we're

21   clear, to the extent that the committee prosecutes an objection

22   after their claim -- after their constituency has affirmatively

23   supported the plan, what -- to allow for the solicitation of

24   the plan, Your Honor will require us to strike the provision

25   that would eliminate the recoveries to unsecured creditors,

1   even if the committee prosecutes the objection.

2          THE COURT:  Yes.  Yes.

3          MR. LEBLANC:  And I'm not negotiating with the Court,

4   but ...

5      (Laughter)

6          THE COURT:  It's fine.

7          MR. LEBLANC:  Even to the extent that we have to

8   incur, at that point -- even if we have to incur meaningful --

9          THE COURT:  I just had -- I just had a three-week

10   confirmation trial where everybody that objected was

11   unimpaired.  This happens.  You might have to litigate.  It's -

12   - you know, it's part of a confirmation issue.  It's how you --

13   you know, you're going to have a contested confirmation.

14          There might be provisions that, you know, people are

15   fine on voting yes or no; that is what it is.  But to say that

16   a fiduciary can't object, based on things, frankly, that, you

17   know, his creditors might not be focused on, I think is

18   problematic.

19          MR. LEBLANC:  Okay.  Your Honor, we hear you, we'll

20   obviously consider it with our client, and we understand the

21   Court's ruling.

22          THE COURT:  Okay.

23          MR. DESPINS:  There was one issue, Your Honor, that

24   I'm not sure you addressed, which is the situation where a

25   creditor -- if a creditor votes to not give a release to the

1    D's and O's, they lose their distribution.

2                THE COURT:  I think that's appropriate.

3                So you're going to value the warrants.

4                The deathtrap based on the objection is unacceptable.

5                The releases will be dealt with at the plan stage, but

6    affirmative conduct is not required; opt-out releases are

7    acceptable.

8                The reservation of rights has been agreed to.  Nothing

9    in the disclosure statement will be used, including valuation,

10   against the committee in any kind of litigation.

11               You're going to revise the bidding procedures --

12   you're going to revise the disclosure statement to reflect the

13   new bidding procedures.  Whether you have to characterize it

14   quite as Mr. Despins said or not, I -- I'm not going to weigh

15   in on.

16               I don't think it's necessary to move to a more

17   prominent place that unsecureds aren't going to receive a

18   distribution; I think it's okay the way it is.  It will

19   certainly be in Mr. Despins' letter.

20               I'm fine with the idea of a letter being submitted,

21   provided that it's acceptable to all parties and to me.  If

22   it's not acceptable, we can get together on the phone and talk

23   about any provisions that are objectionable whenever you submit

24   it to me.  It would probably be most helpful for me if it's

25   done under some sort of certification that indicates whether

1   there are any outstanding issues or not.

2          I will overrule the PBGC objection.  Again, the

3   releases will be dealt with at confirmation.

4          And I think I've dealt with the UMB objection to the

5   deathtrap by the ruling I've already made.

6          And of course, the 10's are in lockstep with Mr.

7   Despins.  So any rulings in connection with his objections

8   apply.

9          And I understood the County of San Bernardino to be

10  making, in effect, a reservation of rights, as opposed to an

11  objection.  So I think that's all the open issues.

12          MR. HOWARD:  I think that's right.  That matches my

13  list.

14      (Participants confer)

15          MR. LEAKE:  Your Honor, just one minute to consult

16  with the ...

17          THE COURT:  Yeah.

18      (Participants confer)

19          THE COURT:  Actually, can we take a short recess;

20  would that be acceptable?

21          MR. DESPINS:  No.

22      (Laughter)

23          THE COURT:  All right.

24          MR. DESPINS:  Just kidding, Your Honor.

25          MR. LEAKE:  Thank you, Your Honor.

1    (Recess taken at 1:40 p.m.)

2    (Proceedings resume at 1:48 p.m.)

3    (Call to order of the Court)

4        THE COURT:  Please be seated.

5        MS. LAUKITIS:  Your Honor, thank you for that brief

6    recess.  For the record it's Lisa Laukitis on behalf of the

7    debtors.

8        There was a little confusion based on some of the

9    statements that were made on the record as to what was going to

10   be included in the committee's letter, but we've -- we're on

11   the same page, and no need to involve Your Honor further.

12       We are going to circle up on the open issue with

13   respect to the deathtrap DIP maturity, and work to make the

14   revisions that have been discussed today, and we will endeavor

15   to submit revised versions of the orders to chambers.  I would

16   expect that would happen on Monday because of the sheer volume

17   of changes that need to be made, and how all of these matters

18   are tied together in many respects.

19       THE COURT:  Okay.  That's fine.

20       Should we talk about that scheduling?  Because I

21   thought I was accommodating what you wanted.

22   (Laughter)

23       THE COURT:  I really did.

24       MR. DESPINS:  Your Honor, I'm all in favor of speed,

25   that's wonderful, Judge.  But to have a full-blown trial on all

```
 1    the claims we have on March 7 or 8, I think is really -- you
 2    know, we --
 3          THE COURT:  Well, but I thought you -- I thought it
 4    had to be before confirmation.
 5          MR. DESPINS:  Before or at confirmation.  So here's
 6    what I think could be done, Your Honor.  And we are -- I just
 7    thought of this, I apologize for not raising it earlier.
 8          But if we bifurcated -- if -- for example, there are
 9    some that are fairly discrete legal issues.  For example, the
10    issue of original issue discount, the issue of the make-whole,
11    that's law, but some fact, but not a five-day trial on the
12    make-whole sum.  There will be some expert testimony.  That
13    could be done maybe in the later -- I forget which days you
14    mentioned in March; March 7, 8, 9 --
15          COUNSEL:  8, 10, 11.  8, 10, 11.
16          MR. DESPINS:  So perhaps it could be done 10 and 11,
17    at least begin then.  But to do the whole --
18          THE COURT:  But the problem is I just -- I can't -- I
19    don't have any time the next two weeks.  So --
20          MR. DESPINS:  Well --
21          THE COURT:  And I'm double booking you even on the
22    28th.  I'm doing the best I can.
23          MR. DESPINS:  No, no, Your Honor --
24          THE COURT:  I can't, other people are --
25          MR. DESPINS:  -- I understand that.  But I think, at
```

1   the end of the day, we need to stop marching to Oaktree's drum

2   here.  Yeah, they have the DIP financing and all that.  But

3   this company is not going anywhere.  Actually, if I understand,

4   they're doing better now, or at least in the last few months.

5   So it's not like that this is a melting ice cube.

6        That doesn't mean we should have a trial in June, but

7   whether it's March 22nd or April 15th, this -- it's not going

8   to change the world.  And I think, you know, just like the DIP

9   financing, Your Honor, we need to tell Oaktree that, you know,

10  we'll do this in a rational way.  But to -- you're not going to

11  be happy with something that's rushed.

12       And I know what's going to happen.  If there's no

13  motion to dismiss and no motion for summary judgment, there

14  will be a lot of issues that will come up at this trial, and

15  it's going to be a mess, unless there's some structure to it.

16       MR. LEBLANC:  Your Honor, the last -- Andrew LeBlanc

17  on behalf of Oaktree.  The last several hours have all been

18  about a settlement that we reached that included exactly this:

19  Contemplated a trial before March 14th, or as soon as the Court

20  was available.  So I -- this is just a re-trade of what -- of

21  everything we've just done for the last several hours.

22       It is -- we don't want to jam anybody.  The committee

23  has been conducting its investigation, however, since

24  September.

25       THE COURT:  I think we'll -- we're just -- you're just

1    going to have to be ready, Mr. Despins.

2            MR. DESPINS:  I mean, Your Honor, what we had agreed

3    to is March 22nd, not March 14th.  That was the confirmation

4    hearing.  That -- at that time, there was going to be a trial

5    on these things.

6            MR. LEBLANC:  It was always the 14th, Your Honor.  DIP

7    maturity is the 22nd, confirmation hearing was always

8    contemplated on the 14th.  It was always contemplated that

9    these would be tried either before or consistent with or at the

10   same time as the confirmation hearing.  So it's really not --

11   we're taking out the confirmation issues on the 8th, 9th and --

12   the 8th, 10th, and 11th; we're moving those to the 28th.  And

13   therefore, we think this schedule has to -- should be

14   accommodated.  This is what we were negotiating towards, is to

15   have a quick resolution of the claims that they have been

16   investigating for months.

17           MR. DESPINS:  Yeah, but Your Honor, it's going to be -

18   - they're going to have expert testimony, there's going to be

19   expert discovery.  This is -- you know, there's a fraudulent

20   transfer aspect of this case, which is massive.  So that's --

21           THE COURT:  All right.  I'm -- I thought this was all

22   worked out.  I --

23           MR. LEBLANC:  We did.

24           THE COURT:  I'm flabbergasted.  I thought this was all

25   worked out.

1        MR. DESPINS:  Not the fact that the -- a full trial

2   will be done by the 14th.  I thought --

3        THE COURT:  Well, that's --

4        MR. DESPINS:  -- that what would be done by --

5        THE COURT:  The bid -- but that's what the bid

6   procedures said; the black-line I got that you agreed to said

7   on -- a hearing on the 14th.  How -- and --

8        MR. DESPINS:  Okay.  But now -- so now we're one week

9   shorter than that, correct?

10       THE COURT:  No.  It would -- if it were the 14th,

11  which is a Monday, before the 14th would be the week before

12  that, which is what I've just given you --

13       MR. DESPINS:  It was supposed to be --

14       THE COURT:  -- the 8th, 10th, and 11th.

15       MR. DESPINS:  It was supposed to be as part of

16  confirmation, Your Honor.  I don't think there's ever been an

17  agreement it would start before that.  I mean, we're not asking

18  -- again, we're not asking for something in June.  We're asking

19  -- I think -- Your Honor, I think you'll -- you will find that

20  it's not going to be productive to have something that's not

21  streamlined, but you know, obviously, it's your decision.

22       (Participants confer)

23       MR. LEAKE:  Your Honor, I want to make just one point

24  to make sure that the Court is aware of it.  As a matter of

25  liquidity, from the debtors' perspective, one of the reason

1    we're holding -- we really need to get this done along the time

2    line that we've been discussing and we thought we had agreement

3    to --

4        THE COURT:  But if you're going to have --

5        MR. LEAKE:  -- is that --

6        THE COURT:  How did you ever -- how can I have a trial

7    as a part of a one-day confirmation hearing with expert

8    testimony?

9        MR. DESPINS:  Well, I -- we never talked about a one-

10   day hearing.  I don't know where that came from.  We never

11   talked -- it was supposed to be a trial as part of

12   confirmation, and I thought this would be a week-long trial.

13   So I don't know where the one day came up, Your Honor.  I never

14   suggested that, that's --

15       THE COURT:  So we'll do it as part of the

16   confirmation, we'll start the 28th, and we'll finish by April

17   1st.  It will be in connection with confirmation and the sale.

18       MR. DESPINS:  That's fine, Your Honor.  Thank you.

19       THE COURT:  And I'll fit you in as best I can.

20       MR. LEAKE:  Your Honor, the one thing I just want to

21   make very, very clear is that we are -- as a matter of

22   liquidity, we can't go past what you're talking about right

23   now.  It -- we -- the DIP -- the way we've been going thus far

24   is we are -- we are still using DIP proceeds --

25       THE COURT:  Well, all you're -- all you're doing is

1   turning -- all you're doing is possibly -- all I'm -- all I did

2   -- just did was turn confirmation from a one-day hearing to a

3   multiple-day hearing.

4           MR. LEAKE:  Exactly.

5           THE COURT:  On the date --

6           MR. LEAKE:  As long as --

7           THE COURT:  I had already --

8           MR. LEAKE:  -- "multiple-day" doesn't mean, you know,

9   too much further because we literally --

10          THE COURT:  We'll be finished --

11          MR. LEAKE:  -- are looking at a cash flow --

12          THE COURT:  -- by April 1.  I will -- if we have to,

13  we'll do a clock.

14          MR. LEAKE:  Thank you, Your Honor.  I just wanted to

15  make it very clear about where we were on the DIP.  As a matter

16  of fact --

17          THE COURT:  If I -- we'll do it on the 28th, we'll

18  finish by April 1, and if it's necessary, we'll use a clock to

19  make sure we divvy up the time.  I don't know where I'm going

20  to fit you, but I'll fit you in.

21          MR. LEBLANC:  Your Honor, I would just suggest that we

22  keep those earlier dates and proceed -- this is what we

23  negotiated.  It says --

24          THE COURT:  Let me --

25          MR. LEBLANC:  -- all litigation --

1          THE COURT:  -- see what you --

2          MR. LEBLANC:  -- will be done prior to the conclusion

3     of the confirmation hearing --

4          THE COURT:  Right.

5          MR. LEBLANC:  -- which is contemplated to start on the

6     14th, and this is --

7          THE COURT:  But I can't give you the 14th.

8          MR. LEBLANC:  I don't -- we're not asking for the

9     14th.

10          THE COURT:  And I am giving you --

11          MR. LEBLANC:  You're giving us --

12          THE COURT:  -- what you negotiated for.  All

13     litigation by the conclusion of the confirmation hearing.

14          MR. LEBLANC:  Understood, Your Honor.  We just don't

15     think it needs to wait these additional several weeks, and then

16     push us into the three-day period, when Your Honor has time

17     earlier.  We think this has gone on long enough, we should have

18     this litigation at the earliest possible opportunity.  And we

19     don't know why, three days before or five days before, the --

20     what was contemplated to be the start of the confirmation

21     hearing should make any difference at all.  We haven't worked

22     out a schedule with the committee, but we certainly would --

23          THE COURT:  Let's do this, though.  Let's have a --

24     let's have a pretrial on the 11th, at 10.  We can do that by

25     telephone, to make sure we have a set schedule for that week of

1    the 28th.  And we will finish by April 1, period.  So it will

2    probably be -- just so you know -- and the 31st is out.  So it

3    will be four days.  I'll give you as much time as I can on

4    those four days, three and a half days -- aye yi yi -- three

5    and a half days; or, we can do this -- wait a minute.  We can

6    do this.

7            We can start the 8th, 10th, and 11th with what you're

8    ready to proceed, and then what you can't get done by the 8th,

9    10th, and 11th, we can then start with on the 28th.  Because

10   there are some things, like you said, the OID, the make-whole

11   might -- you might be able to proceed earlier, rather than

12   later.

13           MR. DESPINS:  Let me --

14           THE COURT:  I'm trying to give you enough time, but my

15   schedule is terrible.  I just --

16           MR. DESPINS:  No, I understand that, Your Honor.  And

17   we want to get these (indiscernible) off.  Let me do this.  I

18   think that it's great to talk about concepts and all that.  I

19   think Mr. LeBlanc and myself and others need to actually talk

20   about the schedule.  And once that happens, we -- and I am

21   committing --

22           THE COURT:  Okay.

23           MR. DESPINS:  -- to make those dates available --

24           THE COURT:  All right.

25           MR. DESPINS:  -- if we -- if it makes sense.

1          THE COURT:  I will hold -- I will hold then the 8th,

2     the 10th, and 11th.  I will pencil you in -- pencil you in -- I

3     will put you in for the 28th, 29th, the 30th, and April 1st.

4     None of those -- many of those days, you probably won't have

5     the whole day; I'm going to have to split time with other

6     matters, but those are the seven days I have.  I don't -- feel

7     free to use fewer than all of them.

8          (Laughter)

9          THE COURT:  I don't know what we're going to do.

10          MR. DESPINS:  Your Honor --

11          THE COURT:  We'll figure it out.

12          MR. DESPINS:  -- one clarification.  Is the mediation

13     with Judge Drain completed?  And I'm suggesting that it not be

14     completed.

15          THE COURT:  I don't know.

16          MR. DESPINS:  Because I think that --

17          THE COURT:  Well, do we need to have this discussion

18     on the record?

19          MR. DESPINS:  No.  I'm just saying that I don't think

20     he has filed a statement of completion.  If not, I think it

21     would be beneficial to just leave it like it --

22          THE COURT:  Judge Drain is in charge of your

23     medication.  I am not -- I have not been in communication with

24     him.  So whatever Judge Drain says, when he's done, he's done.

25          Should we have a call on Monday to follow up on all

1  this?

2          MR. DESPINS:  If --

3          THE COURT:  Would that work?

4          MR. DESPINS:  Yes, Your Honor.

5          THE COURT:  Ten o'clock okay?

6          MR. DESPINS:  Yes, Your Honor.

7          THE COURT:  We'll do it on the phone.  Let me make

8  sure that's okay.  Hang on.

9          MR. LEBLANC:  Your Honor, might I suggest a little

10  later, just so we have Monday?  Because most of us aren't going

11  to get back to our offices today.

12          THE COURT:  Okay.  That's fine.  Let me just ... I'm

13  wide open Monday, so 2?

14          MR. DESPINS:  Sure, Your Honor.

15          THE COURT:  Is 2 okay?  All right.  So we'll have a

16  status conference, that will be on the record, on January 11th

17  at 2 p.m.  If there are any open issues with the documents

18  you're going to work on over the weekend, we can address them

19  at that time, too.  Okay?

20          All right.  Anything else?

21          MR. LEAKE:  No, Your Honor.

22          THE COURT:  No.  Thank you.

23          MR. DESPINS:  Your Honor.  Your Honor?  Remember, the

24  order regarding the lease?

25          THE COURT:  Yes, I'm fine with that order, so -- but

1   it's not --

2          MR. DESPINS:  It's not complete.

3          THE COURT:  It's not complete.

4          MR. DESPINS:  We need names.  So we will resubmit that

5   on certification of counsel by Monday?

6          THE COURT:  That's fine.

7          MR. DESPINS:  Okay.  Thank you.

8      (Proceedings concluded at 2:01 p.m.)

9                          *****

CERTIFICATION

1

2          I certify that the foregoing is a correct transcript

3   from the electronic sound recording of the proceedings in the

4   above-entitled matter to the best of my knowledge and ability.

5

6

7

8   /s/ Coleen Rand                          January 8, 2016

9   Coleen Rand

10  Certified Court Transcriptionist

11  For Reliable