**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered |

**HARTFORD'S BRIEF IN SUPPORT OF CONFIRMATION OF
THE THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN
OF REORGANIZATION FOR
<u>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC</u>**

BAYARD, P.A.
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, DE 19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
Email: efay@bayardlaw.com
　　　　gflasser@bayardlaw.com

RUGGERI PARKS WEINBERG LLP
James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
1875 K Street, N.W., Suite 600
Washington, D.C.  20006-1251
Tel:  (202) 469-7750
Fax:  (202) 469-7751

WILMER CUTLER PICKERING HALE
　　AND DORR LLP
Philip D. Anker (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, N.Y.  10007
Tel:  (212) 230-8890
Fax:  (212) 230-8888

Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (admitted *pro hac vice*)
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Attorneys for Hartford Accident and Indemnity Company, First State Insurance Company,
Twin City Fire Insurance Company, and Navigators Specialty Insurance Company*

---

[1]　　　The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT .................................................................................................................3

    I.      The Hartford Settlement And Insurance Policy Buy Back Comply With The Bankruptcy Code And Should Be Approved .............................................................3

           A.      The Hartford Settlement Falls Well Within The Range Of Reasonableness ...................................................................................................................3

           B.      The Sale Of The Hartford Policies Free And Clear Of All Interests Should Be Approved ................................................................................................5

           C.      Hartford Is A Good-Faith Purchaser Of The Policies And Is Entitled To The Protections Of Section 363(m) ...........................................................11

           D.      The Hartford Administrative Expense Claim Should Be Allowed............12

    II.     Under The Controlling Law Of This Circuit, And The Facts And Circumstances Of This Case, The Court May And Should Approve The Plan's Non-Debtor Release And Injunction Provisions ......................................................................13

           A.      The Court Has The Authority and Jurisdiction To Approve The Non-Debtor Releases And Injunctions.................................................................16

           B.      Under Controlling Third Circuit Law, The Bankruptcy Code Provides Substantive Authority For This Court To Approve A Non-Consensual Non-Debtor Release And Injunction .........................................................19

            C.      On the Facts and Circumstances of This Case, The Plan's Non-Debtor Releases and Injunctions Meet The Standards For Approval ...................25

CONCLUSION.............................................................................................................34

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings, Inc.),*
No. 20-1402, 2021 WL 3145612 (D. Del. July 26, 2021) ..........................................29, 33

*Carr v. Jacobs (In re New Century TRS Holdings, Inc.),*
No. 12-288, 2013 WL 1196605 (D. Del. Mar. 25, 2013), *aff'd*, 544 F. App'x 70 (3d Cir. 2013)....................................................................................19

*Devan v. Simon DeBartolo Grp., L.P. (In re Merry-Go-Round Enters., Inc.),*
180 F.3d 149 (4th Cir. 1999) .................................................................................12

*Factory Mut. Ins. Co. v. Panda Energy Int'l, Inc. (In re Hereford Biofuels, L.P.),*
466 B.R. 841 (Bankr. N.D. Tex. 2012)...................................................................8

*Gillman v. Continental Airlines (In re Continental Airlines),*
203 F.3d 203 (3d Cir. 2000)......................................................................... *passim*

*In re Dow Corning Corp.,*
198 B.R. 214 (Bankr. E.D. Mich. 1996) ................................................................9

*In re Forty-Eight Insulations, Inc.,*
149 B.R. 860 (N.D. Ill. 1992) ................................................................................9

*In re Genesis Health Ventures, Inc.,*
266 B.R. 591 (Bankr. D. Del. 2001) .....................................................................30

*In re Global Indus. Techs., Inc.,*
645 F.3d 201 (3d Cir. 2011)..................................................................................22

*In re LTL Management, LLC,*
No. 21-30589 (MBK), 2022 WL 596617 (Bankr. D.N.J. Feb. 25, 2022).........................32

*In re Mallinckrodt PLC,*
No. 20-12522, 2022 WL 404323 (Bankr. D. Del. Feb. 8, 2022) ............................... *passim*

*In re Millennium Lab Holdings II, LLC,*
575 B.R. 252 (Bankr. D. Del. 2017), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd*, 945 F.3d 126 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020) .............18, 22, 25

*In re Millennium Lab Holdings II, LLC,*
591 B.R. 559 (D. Del. 2018), *aff'd*, 945 F.3d 126 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020) ...................................................................................18, 22

*In re Millennium Lab Holdings II, LLC*,
945 F.3d 126 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020) ........... 16, 17, 18, 22-23

*In re Millennium Lab Holdings, II, LLC*,
No. 15-12284 (Bankr. D. Del. Dec. 15, 2015) .................................................22, 26, 29, 31

*In re Petters Co.*,
419 BR. 369 (Bankr. D. Minn. 2009) ................................................................................9

*In re Purdue Pharma L.P.*,
633 B.R. 53 (Bankr. S.D.N.Y. 2021), *vacated on other grounds*, 635 B.R.
26 (S.D.N.Y. 2021) ..................................................................................................32, 33

*In re Purdue Pharma, L.P.*,
635 B.R. 26 (S.D.N.Y. 2021), *appeal filed*, No. 22-90 (2d Cir. Jan. 18,
2022) ...................................................................................17, 18, 23, 24, 32

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) ..................................................................................23

*In re Sunland, Inc.*,
No. 13-13301, 2014 WL 7011747 (Bankr. D.N.M. Dec. 11, 2014) ...................................9

*In re Trans World Airlines, Inc.*,
322 F.3d 283 (3d Cir. 2003) ..................................................................................9

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011), *aff'd in part*, 587 B.R. 606 (D. Del.
2018), *aff'd*, 972 F.3d 228 (3d Cir. 2020) ..........................................................29

*In re Wash. Mut., Inc.,*
461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part on other grounds*,
No. 08-12229, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) ............................ 18-19

*Kane. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
843 F.2d 636 (2d Cir. 1988) ..................................................................................20, 21, 22

*Key3Media Grp., Inc. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*,
336 B.R. 87 (Bankr. D. Del. 2005), *aff'd*, No. 05-828, 2006 WL 2842462
(D. Del. Oct. 2, 2006) ..................................................................................... 3-4

*MacArthur Co. v. Johns-Manville Corp (In re Johns-Manville Corp.)*,
837 F.2d 89 (2d Cir. 1988) ..................................................................................7, 8

*Menard-Sanford v. Mabey (In re A.H. Robins Co.)*,
880 F.2d 694 (4th Cir. 1989) ..................................................................................20, 21, 22

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
  139 S. Ct. 1652 (2019) ........................................................................24

*Myers v. Martin (In re Martin)*,
  91 F.3d 389 (3d Cir. 1996) ...........................................................3, 4, 12

*Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportStuff, Inc.)*,
  430 B.R. 170 (B.A.P. 8th Cir. 2010) ..........................................................9

*Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Corp.)*,
  327 F.3d 537 (7th Cir. 2003) ...................................................................9

*Reading Co. v. Brown*,
  391 U.S. 471 (1968) ............................................................................12

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham
  Lambert Grp., Inc.)*,
  960 F.2d 285 (2d Cir. 1992) ........................................................20, 21, 22

*St. Paul v. Home Depot*,
  No. 03-50389, 2004 WL 2075129 (N.D. Ill. Sept. 14, 2004) ...........................9

*Stanziale v. U.S. Risk Ins. Grp., Inc. (In re NovaPro Holdings, LLC)*,
  No. 16-50435, 2018 WL 2102323 (Bankr. D. Del. May 4, 2018), *aff'd*,
  No. 18-766, 2019 WL 1324950 (D. Del. Mar. 25, 2019), *aff'd*, 815 F.
  App'x 655 (3d Cir. 2020) .......................................................................4

*Stern v. Marshall*,
  564 U.S. 462 (2011) ........................................................................17, 18

*Stinnett v. LaPlante (In re Stinnett)*,
  465 F.3d 309 (7th Cir. 2006) ..................................................................8

*United Artists Theatre Co. v. Walton*,
  315 F.3d 217 (3d Cir. 2003) ...............................................................23, 30

*U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*,
  426 B.R. 114 (Bankr. D. Del. 2010) ..........................................................29

## STATUTES

11 U.S.C. § 105 ...........................................................................8, 22, 24

11 U.S.C. § 363 ............................................................................. *passim*

11 U.S.C. § 503 ................................................................................12

11 U.S.C. § 507 ................................................................................12

11 U.S.C. § 524 .................................................................................................21, 23, 24, 25

11 U.S.C. § 541 .................................................................................................................6, 8

28 U.S.C. § 157 ....................................................................................................................18

28 U.S.C. § 1334 ..................................................................................................................18

Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106 ......................................25

McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 ..........................................................9

## OTHER AUTHORITIES

4 *Collier on Bankruptcy* ¶ 503.06 (16th ed. 2021) ........................................................12

H.R. Rep. No. 103-835 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340 ........................................25

Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively, "Hartford") respectfully submit this brief in support of confirmation of the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8813] (as it may be further amended, the "Plan") filed by the Boy Scouts of America and Delaware BSA, LLC (collectively, "BSA" or "Debtors") on February 15, 2022.

## PRELIMINARY STATEMENT

As this Court is aware, Hartford has entered into a settlement agreement with the Debtors (the "Hartford Settlement"), supported by the Ad Hoc Committee of Local Councils (the "AHCLC"), the Coalition of Abused Scouts for Justice (the "Coalition"), and the Future Claimants' Representative (the "FCR"), under which Hartford will contribute $787 million to the trust for holders of Abuse Claims to be created under the Debtors' Plan (the "Settlement Trust" or "Trust").[2]  The Tort Claimants Committee (the "TCC"), along with several law firms representing abuse claimants, including Pfau Cochran Vertetis Amala PLLC, The Zalkin Law Firm, P.C., and Hurley McKenna & Mertz, P.C. (collectively, "Pfau/Zalkin/Hurley"), have now also joined in supporting the Hartford Settlement.  To be approved, the Hartford Settlement need only fall above the lowest point in the range of reasonableness.  As the extensive support among the claimant groups shows, the Hartford Settlement easily meets that liberal standard.

More broadly, the Plan should be confirmed.  The Plan and the settlements it incorporates, including the Hartford Settlement, will permit BSA to continue to pursue its century-long charitable mission, while providing at least $2.7 billion for Abuse Claims—to Hartford's knowledge, by far the largest fund for sexual abuse claims in history.  And that is

---

[2]    Capitalized terms not defined herein shall have the meanings set forth in the Plan.

1

before even considering the additional funds that the Debtors or the Trust may recover in the future through litigation or settlements with other Chartered Organizations and Insurance Companies.

In light of that substantial accomplishment, all three of the principal representatives for claimants—the Coalition, the FCR and the TCC—support the Plan, as do Pfau/Zalkin/Hurley and many other leading counsel for abuse claimants who have appeared separately in this case. The great majority of abuse claimants evidently agree as well:  Even before the Debtors reached agreement with the TCC, Pfau/Zalkin/Hurley, and other claimants' counsel on modifications to the Plan that increase anticipated recoveries for claimants and bolster the programs to prevent future abuse (the "TCC Settlement"), nearly 75% of holders of Direct Abuse Claims who voted chose to accept the Plan.  That support will almost certainly increase now that the TCC and additional counsel for abuse claimants have agreed to recommend that holders of Abuse Claims who voted against the Plan change their votes to accept it.

Against this backdrop, the primary objections to confirmation of the Plan are meritless. For example, the objections filed by the Roman Catholic Ad Hoc Committee (the "RCAHC") and a few other Chartered Organizations that are in bankruptcy, or by their creditors, are fundamentally misguided.  Nothing in the Plan requires any Chartered Organization to release or assign its rights in any insurance policy issued to it.  All Chartered Organizations, including any Roman Catholic entity, may opt out from the release and assignment of any such rights.  Indeed, in recognition of the automatic stay applicable in their own Chapter 11 cases, Chartered Organizations that are in bankruptcy are presumed to opt out—and thus retain all insurance rights under policies issued to them—whether or not they affirmatively do so.  And even Chartered Organizations that opt out are protected against any Abuse Claim covered by an

2

insurance policy issued by a Settling Insurance Company—all such Abuse Claims are channeled to the Trust.

The objections filed by a distinct minority of the holders of Direct Abuse Claims and the U.S. Trustee likewise lack merit. Those objectors principally argue that the Plan's releases and related injunctions protecting settling parties are unlawful. To the contrary, this Court (acting in tandem with the District Court) has jurisdiction and authority to approve the releases and to issue the injunctions; under the controlling law of this Circuit, the Bankruptcy Code permits such relief so long as it is both necessary for BSA's reorganization and fair to the claimants; and the unusual facts and circumstances present here are sufficient to satisfy this legal test.[3]

## ARGUMENT

I. **THE HARTFORD SETTLEMENT AND INSURANCE POLICY BUY BACK COMPLY WITH THE BANKRUPTCY CODE AND SHOULD BE APPROVED**

### A. The Hartford Settlement Falls Well Within The Range Of Reasonableness

Under the law of this Circuit, the Court may approve the Hartford Settlement, including the settlement of the claims of the Debtors' estates related to the policies Hartford issued to BSA and the Local Councils and the sale of those policies to Hartford pursuant to § 363(b) of the Bankruptcy Code, as long as the settlement and sale constitute a sound exercise of the Debtors' business judgment. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (courts normally "defer to the … judgment" of the debtor in possession to enter into a settlement "so long as there is a legitimate business justification"); *Key3Media Grp., Inc. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*, 336 B.R. 87, 93 (Bankr. D. Del. 2005) (courts "generally give[]

---

[3] In addition, some Insurance Companies that have not settled have filed objections focusing principally on the Plan's proposed Trust Distribution Procedures (the "TDPs") and related findings sought in connection with confirmation. As provided in the Hartford Settlement Agreement, Hartford takes no position on the TDPs or these proposed findings.

deference to a Debtor['s] business judgment in deciding whether to settle a matter"), *aff'd*, No. 05-828, 2006 WL 2842462 (D. Del. Oct. 2, 2006).  In evaluating a debtor's decision to enter into a settlement, courts consider "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Martin*, 91 F.3d at 393.  The court need not decide the claims or defenses that would be asserted in litigation, as if it were adjudicating the underlying dispute on the merits.  Rather, reflecting the federal policy favoring settlements in bankruptcy, the court must only "consider[] the range of reasonable litigation outcomes and determin[e] if the settlement falls above the lowest point in the range."  *Stanziale v. U.S. Risk Ins. Grp., Inc. (In re NovaPro Holdings, LLC)*, No. 16-50435, 2018 WL 2102323, at *9 (Bankr. D. Del. May 4, 2018), *aff'd*, No. 18-766, 2019 WL 1324950 (D. Del. Mar. 25, 2019), *aff'd*, 815 F. App'x 655 (3d Cir. 2020).

The evidence to be presented by the Debtors will show that the Hartford Settlement represents a sound exercise of the Debtors' business judgment and falls well within the range of reasonableness.  The Debtors agreed to settle with Hartford only after months of intense, arm's-length negotiations with the assistance of mediators appointed by this Court, following years of contested coverage litigation.  And, notably, the principal claimant representatives all agree that the Hartford Settlement is reasonable.  The Coalition, FCR, and TCC support the settlement.[4]

---

[4]     *See Eleventh Mediators' Report* [D.I. 8772], Ex. A (hereinafter "TCC Term Sheet") at 1, 6.  The Lujan Claimants nevertheless argue that the Hartford Settlement is unreasonable because Hartford supposedly agreed initially to pay $787 million without obtaining protection against claims for coverage by Chartered Organizations or so-called "direct action" claims by claimants themselves.  *See Lujan Claimants' Supplemental Objection to Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Joinder in Objections of United States Trustee and Guam Committee* [D.I. 9031] at 13.  The Lujan Claimants are mistaken.  From the outset, the term sheet for the Hartford Settlement required that the Plan provide for "an assignment to the Trust of, or otherwise resolve to the Parties' satisfaction, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford" and that Hartford be "included as a releasee in any form of release attached to the [TDPs] . . . such that Claims for coverage for Claims for Abuse are not made under Abuse Insurance Policies issued by Hartford by, or as a result of Claims of Abuse made by, holders of Abuse Claims who receive payment from the Trust."  *See Sixth Mediators' Report* [D.I. 6210-1], Ex. A (Term Sheet), ¶¶ (viii) and

4

That broad support for the Hartford Settlement is understandable. If there were no settlement, Hartford would have substantial defenses to coverage, including that BSA breached its duty to cooperate with Hartford and other conditions to coverage; that the Abuse Claims arise out of a single occurrence; and that BSA and the Local Councils expected the injuries for which they seek coverage.[5] By BSA's own admission, "Hartford [has] raised a number of defenses that, if successful, would substantially reduce or even eliminate coverage for the Abuse Claims."[6] Moreover, "continuing to litigate against Hartford would not only drain the Debtors' limited resources," but "could also create a substantial risk that Hartford would ultimately pay significantly less toward Abuse Claims than it would under the Hartford Insurance Settlement Agreement—and some risk that Hartford would pay nothing."[7]

Given all of this, the Debtors' determination that $787 million is a fair and reasonable amount for Hartford to pay to resolve the claims against it easily satisfies the deferential standard for approval of settlements in bankruptcy.

### B. The Sale Of The Hartford Policies Free And Clear Of All Interests Should Be Approved

Section 363(f) of the Bankruptcy Code provides that estate property may be sold "free and clear of any interest in such property of an entity other than the estate" if any one of five specified conditions is met. 11 U.S.C. § 363(f)(1)-(5). The sale of the Hartford policies to Hartford free and clear of all third-party interests in the policies satisfies this statutory test.

---

(xi). The term sheet also specified that if any other insurer settled and obtained broader releases than those specified in the term sheet, Hartford would obtain "the benefit of those broader releases." *Id.* ¶ (vii).

[5]    *See* Complaint, *Hartford Accident and Indemnity Co., et al. v. Boy Scouts of America, et al.*, Adv. Proc. No. 20-50601 (LSS) (Bankr. D. Del.)

[6]    *See Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6445] ("Disclosure Statement") at 111.

[7]    *See Disclosure Statement* at 111.

The policies that Hartford is purchasing (the "Hartford Policies") are property of the Debtors' estates.  The Hartford Policies include those policies that Hartford issued to BSA as the first named insured (the "Hartford BSA Policies"), which are obviously property of the Debtors' estates.[8]  *See* 11 U.S.C. § 541(a)(1).  In addition, with the agreement of the Local Councils, the Plan provides for each Local Council to assign any policies Hartford issued to it as the first named insured ("Hartford Local Council Policies") to the Debtors' estates.[9]  Under the Hartford Settlement, Hartford will also buy back the Hartford Local Council Policies that are so assigned to the Debtors and that thereby become property of the Debtors' estates.  *See id.* § 541(a)(7).[10]

The RCAHC objects that the alleged rights of Roman Catholic Chartered Organizations as additional insureds under the Hartford Policies are property interests that belong to the Chartered Organizations, not to the Debtors' bankruptcy estates, and that the Court thus lacks jurisdiction and authority to approve a sale of the Hartford Policies free and clear of those interests.[11]  The Official Committee of Unsecured Creditors appointed in the bankruptcy case of the Archbishop of Agaña (the "Guam Committee"), joined by the claimants represented by Lujan & Wolff LLP (the "Lujan Claimants", and together with the Guam Committee, the "Guam Claimants"), similarly argues that the Archbishop is an additional insured under policies issued to BSA; that, under the law of Guam, the Guam Claimants have direct rights of action under

---

[8]    *See* Hartford Insurance Settlement Agreement § VI.A.1, attached as Ex. 1 to *Notice of Filing of Exhibits I-1 and J-1 to Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization and Redlines Thereof* [D.I. 8816-1] ("Hartford Insurance Settlement Agreement").  The term "Hartford BSA Policies" has the meaning set forth in the Hartford Insurance Settlement Agreement.

[9]    *See* Plan § V.S.4.

[10]    *See* Hartford Insurance Settlement Agreement § VI.A.2.  The term "Hartford Local Council Policies" has the meaning set forth in such Agreement.

[11]    *See The Roman Catholic Ad Hoc Committee's Objections to Confirmation of Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization* [D.I. 8686] ("RCAHC Objection") at 30-38, 43-50.

those policies; and that no such policies can be sold free and clear of the supposed interests of the Archbishop and those claimants.[12]  These arguments fundamentally misapprehend § 363(f).

Section 363(f) addresses the situation in which both the estate and an "entity other than the estate" hold an "interest" in property.  It specifies that, in such a circumstance, the estate may sell the property "free and clear" of that third party's "interest."  11 U.S.C. § 363(f).  The objectors' contention that bankruptcy courts may not affect non-debtor third parties' interests in estate property thus flies in the face of the statute's plain language.

A non-debtor's rights as an additional insured in (or as a claimant entitled to bring a direct action under) an insurance policy issued to a debtor are precisely the kinds of "interests" that § 363(f) addresses.  Courts have repeatedly held that a debtor may sell such insurance policies back to the insurer that issued them free and clear of any alleged rights of third parties, including additional insureds.  The Second Circuit so held in its seminal decision emerging from the Johns-Manville asbestos bankruptcy, *MacArthur Co. v. Johns-Manville Corp (In re Johns-Manville Corp.)*, 837 F.2d 89 (2d Cir. 1988).  In approving a settlement between Johns-Manville and its insurers that enjoined additional insureds from suing insurers under the relevant policies, the Second Circuit reasoned that Johns-Manville could sell the policies to insurers pursuant to § 363(f) free and clear of all "interests" of any "additional insured" under the policies.  *Id.* at 91-94.  Like the RCAHC here, the distributor in *Manville* argued that its interest as an additional insured was "a contractual right solely between it and the non-debtor insurance companies" and that, "because its own rights are separate from Manville's," "the Bankruptcy Court lacked

---

[12]    *See Objection of the Official Committee of Unsecured Creditors for the Archbishop of Agana (Bankr. D. Guam 19-00010) to the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8683] ("Guam Committee Objection") at 20-23; *Lujan Claimants' Objection to Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, and Joinder in Objection filed by Guam Committee* [D.I. 8708] ("Lujan Claimants' Objection") at 24-39.

jurisdiction and authority to enjoin suits against Manville's insurers." *Id.* at 91-92. But the Second Circuit held otherwise. Although it acknowledged that the additional insured held direct contractual rights against the insurers, the court concluded that § 363(f) authorized a sale of the policies free and clear of the distributor's "interest" in the policies as an additional insured and that § 105(a) authorized an injunction enjoining the distributor from asserting that interest against the insurers. *Id.* at 93-94. As the court explained, the additional insured's "rights as an insured vendor are completely derivative of [the debtor's] rights as the primary insured." *Id.* at 92-94. The same is true here: The Chartered Organizations' alleged rights as additional insureds under policies issued to BSA and the Local Councils are likewise derivative in that the Chartered Organizations are covered only in their capacity as sponsors of Scouting; so, too, any rights of the Guam Claimants to sue the Debtors' insurers are derivative of the Debtors' rights in that they arise only because of the policies issued by those insurers to the Debtors.[13]

Numerous other cases likewise hold that a debtor's estate may sell its insurance policies back to the insurer free and clear of any interests of third parties, including both additional insureds and claimants, like the Guam Claimants here, with purported state-law rights to bring direct actions against the insurer. *See, e.g.*, *Factory Mut. Ins. Co. v. Panda Energy Int'l, Inc. (In re Hereford Biofuels, L.P.)*, 466 B.R. 841, 857-859 (Bankr. N.D. Tex. 2012) (holding that additional insured's alleged rights under debtor's insurance policies were "simply an *interest* in the [policies], of which the sale was made free and clear"); *In re Dow Corning Corp.*, 198 B.R.

---

[13]    The Lujan Claimants argue that the Debtors have no remaining rights in, and therefore cannot sell to Hartford, the policies issued by Hartford to BSA for policy periods in 1976 and 1977 because BSA released those policies. *See Lujan Claimants' Objection* at 41-42. The short answer is that BSA disputes that it released the policies. *See* Disclosure Statement at 62, 111. BSA's claimed ongoing rights under these policies constitute property of the estate that the Debtors can sell. *See* 11 U.S.C. § 541(a)(1) (property of the estate includes "all legal or equitable interests of the debtor"); *Stinnett v. LaPlante (In re Stinnett)*, 465 F.3d 309, 312-313 (7th Cir. 2006) ("[I]nsurance contracts in which the debtor has an interest at the time the petition is filed constitute property of the estate for purposes of § 541(a).").

214, 233-238, 244-245 (Bankr. E.D. Mich. 1996) (holding that debtor's insurance policies could be sold free and clear of all "interests" of claimants asserting tort claims against debtor covered by the policies, including claimants having state-law rights to bring a "direct action" against insurer); *In re Sunland, Inc.*, No. 13-13301, 2014 WL 7011747, at *3-4 (Bankr. D.N.M. Dec. 11, 2014) (same); *see also In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-290 (3d Cir. 2003) (holding that sale of airline's assets was free and clear of all "interests," including successor-liability claims, and construing "interests" broadly to include "obligations that are connected to, or arise from, the property being sold"); *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Corp.)*, 327 F.3d 537, 545 (7th Cir. 2003) ("interests" should be given "broad interpretation"; holding that debtor's sale of real property was free and clear of tenant's leasehold interest in the property). The RCAHC and the Guam Claimants cannot point to any contrary authority.[14]

The Hartford Policies may be sold free and clear of the interests of any alleged additional insureds or other entities (including any holders of Direct Abuse Claims) in the policies because

---

[14]    The few cases on which the RCAHC and the Guam Claimants rely are inapposite. For example, in *In re Forty-Eight Insulations, Inc.*, 149 B.R. 860 (N.D. Ill. 1992), the court held that a debtor who was an *additional insured* under certain policies issued to its non-debtor parent as the primary insured could not sell those policies back to the insurer free and clear of the parent's rights, and distinguished *Manville* on that basis. *Id.* at 861-865. The other cases cited by the RCAHC are even further afield. *See, e.g., Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re SportStuff, Inc.)*, 430 B.R. 170, 174-176, 179-180 (B.A.P. 8th Cir. 2010) (not a § 363 sale; declining to approve settlement enjoining non-debtor additional insureds from suing settling insurers where additional insureds' interests were not adequately protected and distinguishing *Manville* on that basis); *In re Petters Co.*, 419 BR. 369, 375-379 (Bankr. D. Minn. 2009) (not a § 363 sale; lifting automatic stay to permit directors and officers to seek recovery of policy proceeds under debtors' D&O policy); *St. Paul v. Home Depot*, No. 03-50389, 2004 WL 2075129 (N.D. Ill. Sept. 14, 2004) (not a § 363 sale; declining to order that all proceeds of policy be paid to debtor in contravention of non-debtor additional insured's liquidated right to proceeds for settlements it had already paid).

The Lujan Claimants argue that, under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, § 363(f) of the Bankruptcy Code is "reverse preempted" by the law of Guam. *See Lujan Claimants Objection* at 24-34. But, in their own telling, all Guam law does is give the Lujan Claimants an interest in the policies issued to BSA, just as the law of all states acknowledges that additional insureds and other third parties may have rights under liability policies issued to someone else. Yet, as discussed, the courts have repeatedly held that § 363(f) authorizes the sale of policies issued to a debtor free and clear of any such interests of third parties. The Lujan Claimants cite no case holding that the law of any state or territory, let alone the law of Guam, renders § 363(f) ineffective.

the requirements for such a sale under § 363(f) have been met.  Specifically, the policies may be

sold free and clear of any interests of the Local Councils, Contributing Chartered Organizations

and Participating Chartered Organizations because those entities have consented to the sale.  11

U.S.C. § 363(f)(2).  Those policies also may be sold free and clear of any interests of any Opt-

Out Chartered Organizations, such as the Archbishop of Agaña and any objecting Roman

Catholic Chartered Organizations, or of the Guam Claimants, because any alleged rights to

coverage under the policies that such Chartered Organizations may have as additional insureds,

and any alleged "direct-action" rights of the Guam Claimants, are "in bona fide dispute" and/or

because the Chartered Organizations and the Guam Claimants "could be compelled, in a legal or

equitable proceeding, to accept a money satisfaction of such interest[s]."  *Id.* § 363(f)(4)-(5).[15]

To the extent that any objecting Chartered Organization may be entitled to adequate

protection of any valid interest in the policies, *see* 11 U.S.C. § 363(e), any Opt-Out Chartered

Organization's interest in a Hartford Policy will be fully protected.  The Plan channels any

Abuse Claim against a Chartered Organization (including an Opt-Out Chartered Organization)

that is covered by a policy issued by a Settling Insurance Company to the Trust and enjoins

holders of such Abuse Claims from suing the Chartered Organization.[16]  The Channeling

Injunction thus provides Opt-Out Chartered Organizations with protection against Abuse Claims

---

[15]     The Lujan Claimants' arguments to the contrary are unpersuasive.  They contend that § 363(f)(4) does not permit the sale of the Hartford Policies free and clear of their alleged interests in the policies because their rights under Guam's direct-action statute are supposedly not disputable.  *See Lujan Claimants' Objection* at 36.  But they admit that not a single one of the Lujan Claimants has ever brought a direct action against any of the Debtors' insurers, let alone prevailed in any such action.  *Id.* at 6. The Lujan Claimants also argue that § 363(f)(5) does not permit the sale of the Hartford Policies free and clear of their alleged interests because "the Plan provides no money satisfaction to [the] Lujan Claimants."  *Id.* at 36.  But, in fact, the Plan does provide for the Trust to pay money in satisfaction of all valid Direct Abuse Claims.  In any event, § 363(f)(5) permits the sale of property in which a debtor's estate has an interest free and clear of the interests of any third party so long as the third party "could be" compelled to accept a money satisfaction in "a legal or equitable proceeding," whether or not it is actually paid in cash in the debtor's bankruptcy case.  11 U.S.C. § 363(f)(5).

[16]     *See* Plan §§ I.A.195, 1.A.196 (definitions of "Opt-Out Chartered Organization" and "Opt-Out Chartered Organization Abuse Claims"); *id.* § X.F.1.

that is at least equivalent to the protection against Abuse Claims they would otherwise receive as additional insureds under policies issued by Settling Insurance Companies.  So, too, any supposed interest of the Guam Claimants in any such policies—and the Lujan Claimants admit that none of them has ever brought a direct action against an insurer, let alone recovered any amount on any such claim[17]—are fully protected, since those claimants can pursue their claims against the Settlement Trust, which will be funded with a minimum of $2,700,000,000.

Finally, to the extent that certain non-settling insurers claim to have rights of contribution, subrogation, or indemnification against Hartford, those rights are likewise protected.[18]  The Hartford Insurance Settlement Agreement requires the Trust to reduce any judgment it may obtain against any such non-settling insurer if the non-settling insurer is entitled to a sum certain from Hartford as a result of any right it may have to contribution, subrogation, indemnification, or the like.[19]

### C.    Hartford Is A Good-Faith Purchaser Of The Policies And Is Entitled To The Protections Of Section 363(m)

The Hartford Settlement was negotiated at arm's length among the Debtors, the AHCLC, the Coalition, the FCR, and Hartford, all advised by experienced counsel, following years of coverage litigation between Hartford and BSA.  Those hard-fought negotiations led Hartford to agree to increase its original settlement amount of $650 million to $787 million.  Hartford is accordingly a "good faith" purchaser of the Hartford Policies within the meaning of § 363(m) and entitled to the protections thereof.  Indeed, no objector argues to the contrary.

---

[17]    *Lujan Claimants' Objection* at 6 ("Regarding insurers, none of [the] Lujan Claimants have filed a lawsuit against insurers seeking payment under BSA insurance policies.").

[18]    *See Certain Insurers' Objection to Confirmation of Debtors Chapter 11 Plan* [D.I. 8695] at 68-69.

[19]    *See* Hartford Insurance Settlement Agreement § VI.E.

**D.      The Hartford Administrative Expense Claim Should Be Allowed**

The Court should approve the provision in the Hartford Settlement and Plan for

allowance of the $2 million Hartford Administrative Expense Claim.  That agreed amount

represents a compromise of the damages Hartford asserts it has suffered as a result of the

Debtors' failure to seek approval of the parties' initial settlement agreement executed on April

15, 2021 (the "Initial Settlement Agreement"), as Hartford maintains the Debtors were required

to do.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996).  To the extent allowed,

that claim for damages for breach of a post-petition contract would, of course, be entitled to

priority as an administrative expense of the Debtors' estates.  *See* 11 U.S.C. §§ 503(b)(1)(A),

507(a)(2); *Reading Co. v. Brown*, 391 U.S. 471 (1968); *Devan v. Simon DeBartolo Grp., L.P. (In

re Merry-Go-Round Enters., Inc.)*, 180 F.3d 149, 155-156 (4th Cir. 1999); 4 *Collier on

Bankruptcy* ¶ 503.06 (16th ed. 2021).

To be sure, the Debtors might dispute in litigation that their failure to seek approval of

the Initial Settlement Agreement, as well as their filing of an inconsistent plan, breached their

obligations under the Initial Settlement Agreement and their implied duties of good faith and fair

dealing.  But the agreed amount of the Hartford Administrative Expense Claim, $2 million,

represents a substantial reduction in the overall damages Hartford would assert if the matter were

litigated, including the additional $137 million that Hartford agreed to pay under the current

Hartford Settlement (which provides for a settlement payment of $787 million, rather than the

Initial Settlement Agreement's $650 million) and the substantial legal fees and expenses

Hartford incurred in response to the Debtors' actions.

Because the amount of the Hartford Administrative Expense Claim reflects a negotiated

compromise that is part of the parties' overall settlement, the Debtors' business judgment

(supported by the Coalition, the FCR, and the TCC) is entitled to the same deferential standard of review as for settlements generally, under which the compromise should be upheld as long as it is above the lowest point on the range of reasonableness.  The agreed $2 million Hartford Administrative Expense Claim, which pales in comparison to Hartford's claimed damages and the $787 million that Hartford has agreed to contribute to the Trust, readily satisfies that standard.  Again, no objector argues to the contrary.

II.    **UNDER THE CONTROLLING LAW OF THIS CIRCUIT, AND THE FACTS AND CIRCUMSTANCES OF THIS CASE, THE COURT MAY AND SHOULD APPROVE THE PLAN'S NON-DEBTOR RELEASE AND INJUNCTION PROVISIONS**

Various parties argue that the Court may not approve the Plan's third-party releases, Channeling Injunction, and other injunctions protecting the non-debtor Local Councils, Chartered Organizations, and Settling Insurance Companies.  These objections lack merit.

Contrary to the arguments of the RCAHC[20] and a few other Chartered Organizations (or their creditors), the Plan's releases and injunctions do not deny those Chartered Organizations any rights to insurance they may have under any policies issued to them.  Under the Plan, any Chartered Organization, including any Roman Catholic entity, can "opt out" of being a Participating Chartered Organization (or a Contributing Chartered Organization) and from releasing or assigning to the Trust any rights that it may have under any policies issued to it by any Insurance Company.[21]  An Opt-Out Chartered Organization will retain its rights to coverage under all such policies.[22]  The Plan thus does not take away any protection that an Opt-Out Chartered Organization would otherwise have under any policies it purchased.  Just the opposite,

---

[20]      *See* RCAHC Objection at 21-59.

[21]      *See* Plan §§ I.A.196, I.A.199 (definitions of "Opt-Out Chartered Organization" and "Participating Chartered Organization"), V.S.1.g.iii.

[22]      *See* Plan §§ V.S.1.g.iii, X.H.2.d(i)(e).

the Plan affords an Opt-Out Chartered Organization an additional *benefit* it does not currently have:  The Plan channels to the Trust all Scouting-related Abuse Claims covered under any insurance policy issued to any Opt-Out Chartered Organization by a Settling Insurance Company and enjoins holders of such Abuse Claims from pursuing them against the Opt-Out Chartered Organization.[23]

To be sure, if a Chartered Organization wants the additional releases and injunctive protection afforded to a Participating Chartered Organization, it will have to release, and/or assign to the Trust, its rights to certain insurance (and if it wants to obtain the even greater protection afforded a Contributing Chartered Organization, it will have to make a monetary contribution to the Trust).  But that is up to the Chartered Organization itself.  The Plan does not take away any right of a Chartered Organization under any policy issued to it by fiat.  It simply allows a Chartered Organization that wants to do so to settle, in whole or in part, the claims against it.  Contrary to the RCAHC's colorful rhetoric, nothing about this amounts to an improper "deathtrap."[24]

So, too, nothing in the Plan impairs the rights of the handful of Chartered Organizations that are themselves in bankruptcy, or the rights of their creditors, under any insurance policies issued to those Chartered Organizations, notwithstanding the objections to confirmation filed by one such Chartered Organization and by the creditors (the Guam Claimants) of another such Chartered Organization.[25]  Precisely because the automatic stay is in effect in the bankruptcy

---

[23]       *See* Plan § X.F.1.

[24]       *See The Roman Catholic Ad Hoc Committee's Supplemental Objection to Confirmation of the Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization* [D.I. 9028], at 3-10.

[25]       *See Joinder of the Norwich Roman Catholic Diocesan Corporation to the Roman Catholic Ad Hoc Committee's Objection to the Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization* [D.I. 8688] at 1-3; *Guam Committee Objection* at 19-23; *Lujan Claimants' Objection* at 40-41.

cases of these Chartered Organizations, the Plan makes clear that no Chartered Organization in bankruptcy will be deemed a Participating Chartered Organization and thus deemed to have released or assigned any rights under any policy purchased by that Chartered Organization, unless it affirmatively elects in writing to do so.[26] Thus, just as with other Opt-Out Chartered Organizations, the Plan is not taking away any "property right" in insurance issued to any Chartered Organization that is now in bankruptcy. While the Guam Claimants object that the debtor in their bankruptcy case, the Archbishop of Agaña, should not be able to elect to become a Participating Chartered Organization, that is an issue for the court presiding over that Chartered Organization's bankruptcy case, not this Court, to address if and when the Archbishop of Agaña ever seeks authority (surely on notice to the Guam Claimants) to make that election under § 363.

To the extent that the third-party releases and injunctions present real issues in this case, they therefore do so principally, if not exclusively, with respect to the relatively small subset of holders of Direct Abuse Claims who have objected to confirmation because they would like to retain the ability to sue Local Councils, Chartered Organizations, or other third parties. Below we address the three key aspects of those objections: (1) whether this Court has subject-matter jurisdiction and (in tandem with the District Court) constitutional and statutory authority to enter final judgment approving the third-party releases and issuing the Channeling Injunction; (2) whether the Bankruptcy Code permits the entry of the third-party releases and Channeling Injunction; and (3) if so, whether that relief is appropriate here. The answer to the first two questions is yes, as a matter of law in this Circuit. And under the specific facts and

---

[26]    *See* Plan §§ I.A.196, I.A.199 (definitions of "Opt-Out Chartered Organization" and "Participating Chartered Organization").

circumstances of this case, as they will be presented at the confirmation hearing, the answer to the third question is also yes.

A.    **The Court Has The Authority and Jurisdiction To Approve The Non-Debtor Releases And Injunctions**

At the outset, this Court has the constitutional and statutory authority to enter final judgment confirming a plan that contains a non-consensual non-debtor release or injunction where, as here, the Court is "resolving a matter integral to the restructuring of the debtor-creditor relationship." *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 137 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020). In *Millennium*, the Third Circuit affirmed this Court's confirmation of a plan containing non-debtor releases, holding that the Court had the constitutional power to approve those releases because they were critical to the success of the plan. The court explained that without the plan's release of claims against non-debtor shareholders, the shareholders would not have been willing to contribute the funding necessary to settle enterprise-threatening litigation and make the plan feasible. *Id.* at 137-140. The release provisions were therefore "integral to the restructuring" of the debtor-creditor relationship, and "[c]onsequently, the bankruptcy court was constitutionally authorized to confirm the plan in which those provisions appeared." *Id.* at 140. As discussed below, the Debtors' evidence at the confirmation hearing will show that the non-debtor release and injunction provisions in the Plan here are likewise critical to the Debtors' restructuring and that the Court therefore has constitutional authority to enter final judgment approving them as a "matter integral to the restructuring of the debtor-creditor relationship." *Id.* at 137.

In arguing to the contrary, many of the objectors rely on *Purdue*, in which a district court outside this Circuit disagreed with *Millennium* and held that bankruptcy courts lack constitutional authority to enter final judgment confirming a plan containing a non-debtor release

16

or injunction.  *In re Purdue Pharma, L.P.*, 635 B.R. 26, 80-81 (S.D.N.Y. 2021), *appeal filed*, No. 22-90 (2d Cir. Jan. 18, 2022).  But, while the district court in *Purdue* was free to disagree with *Millennium*, this Court, of course, is not.  *Millennium* sets forth the law of this Circuit.  And it rejected the very analysis on which *Purdue* relied.

In *Purdue*, the district court read the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), to hold that "bankruptcy courts have the power to enter a final judgment only in proceedings that 'stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process.'"  *Purdue*, 635 B.R. at 81 (quoting *Stern*, 564 U.S. at 499).  According to the district court*, Stern* "did not say that a bankruptcy court could finally dispose of non-core proceedings as long as they were 'integral to the restructuring of the debtor-creditor relationship.'"  *Id.*

But *Millennium* expressly rejected that reading of *Stern*:  "Had the *Stern* Court meant its 'integral to the restructuring' language to be limited to the claims-allowance process, it would not have said that a bankruptcy court may decide a matter when a 'creditor has filed a claim, because *then* … the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship.'"  945 F.3d at 138 (quoting *Stern*, 564 U.S. at 497).  As *Millennium* explained, "[t]hat phrasing [in *Stern*] makes clear that the reason bankruptcy courts may adjudicate matters arising in the claims-allowance process is because those matters are integral to the restructuring of debtor-creditor relations, not the other way around."  *Id.*

The Third Circuit has thus rejected the reading of *Stern* that animated the district court's decision in *Purdue*.  Another bankruptcy judge in this district recently recognized as much:  In confirming a plan containing non-consensual third-party releases, Judge Dorsey acknowledged

17

*Purdue* but held that it was contrary to the law of this Circuit. *See In re Mallinckrodt PLC*, No. 20-12522, 2022 WL 404323, at *13-14 & n.70 (Bankr. D. Del. Feb. 8, 2022).

Even if this Court could depart from the Third Circuit's holding in *Millennium*, that holding is correct. While a bankruptcy court may not have authority to issue a final judgment *adjudicating* a non-core claim, it has both constitutional and statutory authority to confirm a plan of reorganization that *settles* the claim. Indeed, bankruptcy courts routinely enter final orders approving settlements of non-core claims (for example, a settlement of a state-law claim by a debtor asserting that its counterparty, pre-petition, breached a contract between the two parties) or confirming plans that embody such settlements. That the bankruptcy court might not be able to enter a final judgment if such a claim were litigated does not alter the controlling rule of law: Confirmation of a plan settling the claim is a core proceeding for which there is bankruptcy jurisdiction and as to which a bankruptcy court may enter final judgment as a matter of both constitutional law and statute. *See* 28 U.S.C. § 157(b)(2)(L)-(M); *id.* § 1334(b); *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272-273 (Bankr. D. Del. 2017) (the standards for approving non-debtor releases "do not ask the bankruptcy judge to examine or make rulings with respect to the many claims that may be released"; "[a]n order confirming a plan with releases, therefore, does not rule on the merits of the state law claims being released"), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd*, 945 F.3d 126 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2805 (2020); *In re Wash. Mut., Inc.,* 461 B.R. 200, 215-216 (Bankr. D. Del. 2011) (noting that "there is a fundamental difference between approval of a settlement of claims … and a ruling on the merits of the claims" and that "a court does not have to have jurisdiction over the underlying claims in order to approve a compromise of them"), *vacated in part on other grounds*, No. 08-12229, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012); *Carr v. Jacobs (In re New Century TRS Holdings,*

*Inc.)*, No. 12-288, 2013 WL 1196605, at *3 n.2 (D. Del. Mar. 25, 2013) (stating that "[a]pproval

of a settlement is 'core' to the bankruptcy code"), *aff'd*, 544 F. App'x 70 (3d Cir. 2013).

The same is true here:  Confirmation of the Plan and approval of the settlements in it are

core proceedings arising in a case under the Bankruptcy Code.  This Court thus has constitutional

and statutory authority to enter a final order confirming the Plan regardless of whether it would

have authority to adjudicate the claims that are settled and enjoined under the Plan.

In any event, the question whether this Court may enter final judgment confirming a plan

containing non-debtor releases and injunctions is ultimately academic in this case.  As a

condition precedent to the occurrence of the Effective Date, the Plan provides that the District

Court must enter an "Affirmation Order" affirming confirmation of the Plan and issuing or

affirming the issuance of the Channeling Injunction in favor of the Protected Parties and Limited

Protected Parties.[27]  Accordingly, even if any uncertainty existed under the law of this Circuit

concerning the Court's constitutional authority to enter final judgment confirming the Plan—and

none does—entry of the Affirmation Order will moot the issue.

**B.      Under Controlling Third Circuit Law, The Bankruptcy Code Provides Substantive Authority For This Court To Approve A Non-Consensual Non-Debtor Release And Injunction**

Just as the law of this Circuit makes clear that this Court has subject matter jurisdiction to

determine whether to confirm the Plan and both constitutional and statutory authority to consider

whether to approve the third-party releases and related injunctions, Third Circuit precedent

establishes that the Bankruptcy Code authorizes non-debtor releases and injunctions where they

are necessary to the reorganization and fair.  The objectors' contrary arguments again conflict

with the controlling law of this Circuit.

---

[27]     *See* Plan §§ I.A.25, IX.B.1.

19

In *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000), the Third Circuit struck down a non-debtor release, but only because the lower court's decision lacked what the Third Circuit termed the "hallmarks" for such a release—"fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *Id.* at 214-217.  Addressing the validity of non-debtor releases as a question of first impression in this Circuit, the *Continental* court analyzed the relevant decisions from other circuits and concluded that the non-debtor release at issue "d[id] not pass muster under even the most flexible tests for the validity of non-debtor releases." *Id.* at 214.  The court accordingly determined that it "need not establish our own rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible." *Id.* at 214 & n.11.  But it made clear that such provisions may be authorized under circumstances like those involved in the *Manville*, *Robins,* and *Drexel* cases, where the "hallmarks of permissible non-consensual releases" are present. *Id.* at 214.

As *Continental* explained, in *Manville* and *Drexel*, "the Second Circuit upheld plans of reorganization containing releases and permanent injunctions of widespread claims against co-liable parties" in part because the plans "provided consideration to parties who would be enjoined from suing non-debtors."  203 F.3d at 212 (citing *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992), and *Kane. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 640, 649 (2d Cir. 1988)).  In *Robins*, "the Fourth Circuit likewise upheld non-debtor releases that were necessary to reorganization and were accompanied by consideration for mass tort claimants, provided in part by the non-debtors." *Id.* (citing *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 702 (4th Cir. 1989)).  "A central focus of these three reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties," where those "co-liable

parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible." *Id.* at 212-213.  Indeed, *Continental* distinguished a handful of lower-court decisions in the Third Circuit that had suggested that non-consensual non-debtor releases are impermissible on the ground that "[n]one of these cases … involved the mass litigation found in *Robins*, *Manville*, or *Drexel*."  203 F.3d at 214 n.11; *see also Mallinckrodt*, 2022 WL 404323, at *19 (approving non-debtor release and noting that "[h]ere, like in the *Manville*, *Robins*, and *Drexel* cases referred to in *Continental*, the 'central focus … has been the global settlement of massive liabilities against the debtors and co-liable parties'" (quoting *Continental*, 203 F.3d at 212-213)).

The Third Circuit acknowledged that the Ninth and Tenth Circuits had held that § 524(e) of the Bankruptcy Code bars non-debtor releases in all cases.  *Continental*, 203 F.3d at 212.  But it did not join those other circuits and hold the Continental non-debtor release invalid on that basis.  *Id.* at 214-217.  Instead, it merely held that the non-debtor release in the Continental plan was invalid "based on the [factual] record before us."  *Id.* at 215.

The Third Circuit explained that the district court had not considered "whether the release and permanent injunction were fair to Plaintiffs and were given in exchange for reasonable consideration."  203 F.3d at 215.  Rather, the Continental plan sought to release and permanently enjoin a class action against the debtors' directors and officers even though "Plaintiffs received no consideration in exchange for having their lawsuit[] permanently enjoined."  *Id.*  "On this basis alone, *Manville*, *Drexel*, and *Robins* are inapplicable."  *Id.*  As for "the necessity of the release and permanent injunction," the Third Circuit "[found] nothing in the record to even imply that the success of the Continental Debtors' reorganization bore any relationship to the release and permanent injunction of Plaintiffs' class actions."  *Id.*  "Unlike in cases such as *Manville*, *Drexel*, and *Robins*," there was "no evidence that the non-debtor D&Os provided a critical

financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability for Plaintiffs' claims." *Id.*

Thus, fairly read, *Continental* holds that bankruptcy courts have authority to enter third-party releases and related channeling injunctions where, unlike in that case, such relief is both necessary for the reorganization and fair. Of critical importance, the Third Circuit has itself read *Continental* as so "holding." In *In re Global Industrial Technologies, Inc.*, 645 F.3d 201 (3d Cir. 2011), the court of appeals, sitting en banc, explained that *Continental* "hold[s]" that a third-party injunction is "proper under § 105(a) if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair." *Id.* at 206.

Likewise, in *Millennium*, the Third Circuit affirmed this Court's order confirming a plan that released and enjoined an objecting creditor's fraud claims against non-debtor shareholders. Both this Court and the District Court upheld the non-debtor release and injunction, holding that they satisfied the "hallmarks of permissible non-consensual releases" set forth in *Continental*. *See* Dec. 11, 2015 Tr. of Court Decision re: Plan Confirmation at 16-26, *In re Millennium Lab Holdings, II, LLC*, No. 15-12284 (Bankr. D. Del. Dec. 15, 2015) [D.I. 206] (hereinafter "Millennium Bench Ruling"); *Millennium*, 575 B.R. at 272; *Millennium*, 591 B.R. at 573, 585-586. On appeal, the Third Circuit upheld plan confirmation on other grounds, but reiterated that non-debtor releases and injunctions are permissible if they are "'both necessary to the reorganization and fair'" and supported by "specific factual findings." *Millennium*, 945 F.3d at 139 (concluding that this Court had constitutional authority to approve the non-debtor release and dismissing the remaining issues on appeal as equitably moot). It added that, in approving such a non-debtor release in *Millennium*, "both the Bankruptcy Court and District Court exercised appropriate—indeed, exemplary—caution and diligence." *Id.*

Other Third Circuit decisions are in accord. *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003) (explaining that under *Continental*, the "hallmarks of permissible non-consensual releases" are "fairness, necessity to the reorganization, and specific factual findings," plus the "requirement[] that the releases were given in exchange for fair consideration" (internal quotation marks omitted)); *In re PWS Holding Corp.*, 228 F.3d 224, 247 (3d Cir. 2000) (explaining that *Continental* "did not treat § 524(e) as a per se rule barring any provision in a reorganization plan limiting the liability of third parties," but rather "concluded … the releases at issue were impermissible because the hallmarks of permissible non-consensual releases … [were] absent" (internal quotation marks omitted)).

On this issue as well, the objecting parties rely on *Purdue*, in which the out-of-Circuit district court vacated confirmation of a plan containing non-consensual releases and injunctions in favor of non-debtor directors, officers, and shareholders of the debtor (the Sacklers) on the ground that the Bankruptcy Code provides no statutory authority for that relief. *Purdue*, 635 B.R. 26. But to the extent *Purdue* holds that a non-debtor release is never permissible, it is contrary to the controlling law of this Circuit as set forth in *Continental* and its progeny.

Judge Dorsey recently so held in *Mallinckrodt*. There, he confirmed a plan containing non-consensual releases and injunctions barring the holders of opioid claims from suing various non-debtors, including the debtor's directors and officers. *See Mallinckrodt*, 2022 WL 404323, at *12-20. The court explained that it had substantive legal "authority to approve [the non-debtor releases] as both fair and reasonable" and found, based on the evidence presented at the confirmation hearing, that "the Opioid Releases satisfy the requirements set forth by the Third Circuit in *Continental*." *Id.* at *13, 20. Judge Dorsey acknowledged *Purdue*. *Id.* at *14 n.70. But he declined to follow that out-of-Circuit decision, explaining that "I am applying the law of the Third Circuit[,] which has recognized that bankruptcy courts do have statutory and

constitutional authority to approve a plan of reorganization that contains non-consensual third-party releases, *albeit*, only in extraordinary cases." *Id.*

Judge Dorsey's opinion in *Mallinckrodt* is significant for another reason as well:  It upheld third-party releases and an accompanying channeling injunction issued under § 105 of the Bankruptcy Code in a mass-tort case not involving asbestos.  Judge Dorsey thus rejected *Purdue's* view that § 524(g)'s explicit authorization of non-debtor releases and injunctions in asbestos cases creates a negative inference that the Code otherwise categorically bars such releases and injunctions.  *See* 635 B.R. at 91-94, 110-115.  Judge Dorsey's refusal to draw that negative inference is consistent with the Supreme Court's recent decision in *Mission Product*, which declined to draw such an inference in construing another Bankruptcy Code provision. *Mission Product* held that the Code's explicit protection of a patent licensee's rights upon rejection of a licensing agreement (*see* 11 U.S.C. §363(n)) did not imply that other licensees, such as trademark licensees, lose their rights upon rejection.  *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019).  Rather, the Court explained, Congress had enacted the specific provision for patents to respond to a judicial ruling that rejection terminated a patent license, and Congress' purpose was simply to clarify the correct treatment of patent licenses under the Code's general rule that rejection is only a breach of contract, not a termination.  *Id.* at 1663-1665.  So, too, here.  Congress made clear that, in enacting § 524(g), it was addressing a specific concern, namely, a "lingering uncertainty in the financial community as to whether the [*Johns-Manville*] injunction can withstand all challenges," and expressly admonished that "[n]othing in [§ 524(g)] sh[ould] be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."  H.R. Rep. No. 103-835, at 40 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3349; Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111(b), 108 Stat. 4106, 4117.

24

In short, under controlling Third Circuit law, the Court has the statutory authority to confirm a plan containing a release of, and an injunction barring, claims against a non-debtor, so long as the release and injunction are both necessary to the reorganization and fair.  As discussed below, under the specific and extraordinary circumstances of this case, the third-party releases and injunctions here satisfy both of these requirements.

### C.  On the Facts and Circumstances of This Case, The Plan's Non-Debtor Releases and Injunctions Meet The Standards For Approval

In assessing whether a plan's third-party releases and injunctions are necessary to the reorganization and fair, courts often consider the so-called *Master Mortgage* factors:  (1) whether the injunction is "essential … to the reorganization"; (2) whether there is "an identity of interest between the debtor and the third party"; (3) whether the non-debtor is making a "substantial contribution … of assets to the reorganization"; (4) whether "a substantial majority of creditors … support the injunction"; and (5) whether the plan provides "for payment of all or substantially all of the claims of the class or classes affected."  *Millennium*, 575 B.R. at 272.  The evidence at the confirmation hearing will show that, under the particular and unusual facts and circumstances of this case, the Plan's non-debtor release and injunction provisions satisfy each of these factors.

*Necessity to the reorganization*.  The non-debtor releases and injunctions in the Plan are necessary to the Debtors' reorganization.  The cornerstones of the Plan are the settlements the Debtors have reached with the Local Councils, several Chartered Organizations, and the Settling Insurance Companies.  Those settlements are essential to achieving the two overarching goals of the reorganization:  (1) reaching a global resolution of Scouting-related Abuse litigation that will allow BSA and its partnering Local Councils and Chartered Organizations to continue the charitable mission of Scouting, and (2) obtaining contributions from the settling parties that will

provide meaningful compensation to the holders of Abuse Claims, without the delay and risk of continued litigation.

BSA itself can provide only a small fraction of the funding contemplated by the Plan.  Of the approximately $2.7 billion in funding for the Settlement Trust, more than $2.5 billion is being contributed by the Local Councils, the Settling Insurance Companies, TCJC, and the United Methodists.  And those settling parties would not be willing to make those contributions unless they obtain protection from Abuse Claims under the Plan, as the parties' settlement agreements make clear.[28]  Just as in *Millennium* and *Mallinckrodt*, these protections for settling non-debtors are necessary to the Debtors' reorganization.  *See Millennium Bench Ruling* at 21-23, 25-26 (the non-debtor releases and injunction were necessary to the reorganization because the released non-debtors would not have contributed the necessary funds without that protection); *Mallinckrodt*, 2022 WL 404323, at *15-16, *19-20 (same).

The objectors' contrary arguments do not withstand scrutiny.  Some objectors argue that the Debtors could simply return to the tort system and defend any Abuse Claims in court.[29]  But as Judge Dorsey explained in *Mallinckrodt* in response to a similar argument, "protracted and expensive litigation … would not help the victims … but would instead generate significant litigation costs that would drastically reduce the funds available to … creditors," while the Plan "puts money into the hands of … claimants."  2022 WL 404323, at *19.  The same is true here: The Plan's third-party releases and Channeling Injunction will generate a pot of $2.7 billion or more to compensate holders of Abuse Claims promptly and efficiently, rather than leaving them

---

[28]    *See, e.g.*, Hartford Insurance Settlement Agreement § II.B, II.C.  The TCC's insurance expert has likewise testified that "obtaining peace is important to insurance companies"; "[t]hey don't want to settle a case and then have it come back and bite them later."  *See* Kolman Dep. Tr. at 143:3-22 (Jan. 26, 2022).

[29]    *See Certain Insurers' Objection to Confirmation of Debtors Chapter 11 Plan* [D.I. 8695] at 47.

to the vagaries and delays sometimes found in the tort system.  Moreover, it will allow BSA to continue its charitable mission, which would be imperiled if BSA's critical partners—its Local Councils and Chartered Organizations—were left entirely unprotected and thus forced to limit or potentially end altogether their involvement in Scouting.

Similarly, some holders of Direct Abuse Claims suggest that the Plan should allow individual holders to opt out from receiving any distributions under the Plan and retain the right to sue Local Councils or Chartered Organizations in the tort system.  But a plan that did not provide complete peace to the Local Councils and Contributing Chartered Organizations would threaten those entities' critical support not only for such a plan, but also for BSA itself and its mission.  And the Plan has been modified to allow the claimants with the strongest claims potentially to pursue in the tort system those Chartered Organizations that do not settle and make an agreed contribution to help fund distributions to all holders of Abuse Claims.[30]

_Identity of interest_.  While they may be separate legal entities, there is a substantial "identity of interest" between BSA, on the one hand, and the Local Councils and Chartered Organizations, on the other.  The Local Councils and Chartered Organizations administer Scouting programs and sponsor troops.  Given the interdependence among BSA, the Local Councils, and the Chartered Organizations, and the degree to which their responsibility for Scouting-related Abuse Claims is intertwined, BSA's reorganization will surely be imperiled unless the Plan can provide meaningful protection for the Local Councils and settling Chartered Organizations.

_Substantial contribution by non-debtors_.  The Protected Parties and Limited Protected Parties are making substantial contributions to the Trust in exchange for the protection of the

---

[30]    _See_ TDP art. XII.E & XIII.N(iii).

Plan's injunctions and releases, including $787 million from Hartford, $800 million from Century, $68.5 million from other Settling Insurance Companies, $640 million from the Local Councils, $250 million from TCJC, and $30 million from the United Methodists. These contributions constitute the vast majority of the funding for the Settlement Trust and are essential to creating a multi-billion-dollar pot to compensate holders of Abuse Claims.

*Support of affected claimants*. A substantial majority of holders of Direct Abuse Claims (73.57%) have already voted to accept the Plan.[31] And that figure will almost certainly increase now that Pfau/Zalkin/Hurley and other claimants' counsel supporting the TCC Settlement have agreed to recommend that their clients vote to accept it.[32]

*Fair compensation for holders of channeled claims*. Finally, the funding for the Plan, including the substantial contributions provided by Hartford and the other Protected Parties, will provide fair compensation for the holders of Abuse Claims that are being channeled to the Trust. There appears to be a dispute between the Debtors' lead valuation expert, on the one hand, and the TCC, Coalition and FCR, on the other, as to whether the approximately $2.7 billion in funding already in place will be sufficient to pay all valid Abuse Claims. But, as the TCC acknowledges, this Court need not resolve that dispute.[33] Neither *Continental* nor its progeny require that the Plan provide payment in full of each Direct Abuse Claim at whatever levels the TDPs provide.

---

[31]    *See Declaration Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Final Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, [D.I. 8345], Ex. A (Tabulation Summary) at 1.

[32]    *See* TCC Term Sheet, at 1, 12.

[33]    *See Limited Objection of the Tort Claimants Committee to Findings Related to the Valuation of Abuse Claims in Connection with Confirmation of Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8768] at 8.

Rather, as this Court explained in *Millennium*, "the standard is whether the nonconsenting creditors receive reasonable compensation in exchange for the release." *Millennium Bench Ruling* at 23; *see also Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings, Inc.)*, No. 20-1402, 2021 WL 3145612, at *13 (D. Del. July 26, 2021) (in assessing whether a non-debtor release is permissible under *Continental*, courts consider "whether … 'the release is fair to the non-consenting creditors, *i.e.* whether the non-consenting creditors received reasonable compensation in exchange for the release'" (quoting *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144 (Bankr. D. Del. 2010))); *In re Tribune Co.*, 464 B.R. 126, 178, 203 (Bankr. D. Del. 2011) (courts "evaluate[] whether a non-consensual release fit[s] the 'hallmarks' discussed in *Continental* by considering whether … the non-consenting creditors received reasonable compensation in exchange for the release" (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-608 (Bankr. D. Del. 2001))), *aff'd in part*, 587 B.R. 606 (D. Del. 2018), *aff'd*, 972 F.3d 228 (3d Cir. 2020).

This standard—whether the compensation provided to non-consenting creditors is "fair" and "reasonable"—follows from *Continental* itself.  As the Third Circuit explained there, the question is whether a non-debtor release or injunction is "fair to [the objecting creditors]," a standard that focuses on whether the release or injunction is "given in exchange for reasonable consideration."  *Continental*, 203 F.3d at 215; *id.* at 213 (affected claimants should receive "adequate consideration"); *id.* at 214 n.11 (non-consensual releases may be valid if "given in exchange for fair consideration"); *see also United Artists Theatre*, 315 F.3d at 227 (standard under *Continental* is whether "the releases [are] given in exchange for fair consideration").

To be sure, *Continental*'s standard of "reasonable" or "fair consideration" may require payment in full in some cases—for instance, where the objecting creditor would unquestionably prevail in court outside bankruptcy on a claim against a solvent non-debtor and assuredly recover

100% of its judgment.  But in other cases, the objecting creditor may stand to recover less in the

tort system than the full amount it claims to be owed.  It may face obstacles to bringing suit, or

its claim may be subject to bona fide dispute—as to liability, damages, or both.  And even if the

objecting creditor is certain to prevail in litigation outside bankruptcy for the full amount of its

claim, the non-debtor may be unable to pay that amount, as where the non-debtor is insolvent or

facing competing demands from many other claimants.  In such cases, the question relevant to

approval of a third-party injunction is not whether the plan will necessarily pay the objecting

creditor's alleged claim in full, but whether the creditor will receive "reasonable compensation"

for the non-bankruptcy value of its claim—i.e., whether the creditor will be paid at least as much

as it would likely receive in the tort system, taking into account both litigation and collection (or

credit) risk.

Courts have approved non-debtor releases in such circumstances, even though the

objecting creditors would not be paid in full everything they claimed they were owed.  In

*Millennium*, for example, the lenders were owed $1.75 billion, but they were to be paid with new

debt and equity in the reorganized debtors, whose total enterprise value was estimated at little

more than $900 million.  *Millennium Bench Ruling* at 8, 24.  This Court nonetheless found that

"the value to be received by [the lenders] [was] reasonable compensation for [the] release" of

their claims against the debtors' non-debtor shareholders.  *Id.*  The Court stressed the uncertainty

that would exist if instead the claims were litigated:  "Without this settlement, this case turns into

litigation.  Inherent in that litigation is the uncertainty of success, expenses and delay in

obtaining recoveries."  *Id.* at 25.

Similarly, in *Mallinckrodt*, the court approved the plan's non-debtor release, even though

the plan would not pay the affected opioid claimants' alleged claims of trillions of dollars in full.

2022 WL 404323, at *15-20.  Rather, Judge Dorsey held that "the Opioid Releases satisfy the

requirements set forth by the Third Circuit in *Continental*" because "the Opioid Releases are

fair." *Id.* at *19-20.  As he explained, the "[non-debtor] releases [were] necessary" to reach a

"settlement … [that] will remove an existential threat to [the] Debtors' business while at the

same time ensuring that Opioid Claimants receive recoveries far in excess of what they could

obtain through continued litigation." *Id.* at *19.  And while the plan might not pay the objecting

creditor (Rhode Island) the full amount it claimed to be owed, it would receive more than its

claim (against the debtors' non-debtor CEO) was "likely to be worth" in non-bankruptcy

litigation.  *Id.* at *19-20, 32-33 (citing lack of "evidence of the value of [the objecting creditor's]

claim" or "evidence regarding the likelihood of a recovery on such claim," noting limited ability

to recover from D&O policy given competing claims and litigation costs); *id.* at *20 n.103

(concluding the non-debtor release satisfied *Master Mortgage* factor regarding "payment [of]

substantially all the claims of the affected class").  Given all the costs and uncertainties of

litigation, Judge Dorsey added that non-debtor releases are particularly appropriate in the context

of a mass-tort bankruptcy, where a small minority of objectors should not be permitted to prevent

a reorganization that would maximize value for the greatest number of creditors.  *Id.* at *19-20

("enabl[ing] [an objecting] creditor with a relatively small claim to hold up a $5 billion

bankruptcy … cannot be what the law intends"; "[o]n the contrary, the use of nonconsensual

non-debtor releases in this circumstance seems to be precisely the situation envisioned" by the

Bankruptcy Code).[34]

---

[34]       Only last week, Judge Kaplan stressed the same basic point in declining to dismiss the *LTL Management*
Chapter 11 case.  Noting how few asbestos claims had actually been litigated to judgment in the tort system against
any J&J entity, he had "little trouble finding that the chapter 11 filing serves to maximize the property available to
satisfy creditors by employing the tools available under the Bankruptcy Code to ensure that all present and future
tort claimants will share distributions."  *In re LTL Management, LLC*, No. 21-30589 (MBK), 2022 WL 596617, at
*7 (Bankr. D.N.J. Feb. 25, 2022).  In fact, Judge Kaplan cited this case as an example of the substantial recoveries
that can be negotiated in bankruptcy, noting that "[i]n recent weeks and months, we have seen comprehensive and
productive mediated settlements" in mass-tort bankruptcies, including "the Boy Scouts proposed settlement nearing
$3 billion."  *Id.* at *14.

In *Purdue*, the bankruptcy court also approved the non-debtor release even though the plan "[did] not provide anything close to enough to pay for all or substantially all of the asserted claims of the classes affected by the third-party claims release." *In re Purdue Pharma L.P.*, 633 B.R. 53, 107-108 (Bankr. S.D.N.Y. 2021), *vacated on other grounds*, 635 B.R. 26 (S.D.N.Y. 2021). As Judge Drain explained, "neither a [non-debtor] defendant's wealth nor the amount of claims asserted against it should dictate the fairness of a settlement without considering the claims' merits, the costs and delay of continued litigation, and risks relating to the collectability of any eventual judgments." *Id.* at 107. "More relevant than the prospect of full payment, therefore, is the Third Circuit's focus on the fairness of the settlement to the third-party claimants," a standard Judge Drain found readily satisfied. *Id.* (citing *Exide*, 2021 WL 3145612, at *13).

This case also readily satisfies the Third Circuit's standards of "fairness" and "reasonable consideration." As noted, the settlements embodied in the Plan will provide a pot of some $2.7 billion to pay Abuse Claims, by far the largest sum ever assembled to pay sexual abuse claims. And there will almost certainly be additional recoveries, as the Debtors or the Trust seek additional settlements with, or litigation judgments against, the numerous Insurance Companies and Chartered Organizations that have not yet settled.

In comparison, holders of Direct Abuse Claims would face at best an uncertain future in the tort system. BSA faced only 275 Abuse Claims in litigation on the Petition Date. For whatever reason, the vast majority of the 82,200 individuals who filed proofs of claim in this bankruptcy case never brought suit pre-petition. Many of these claimants would face challenges if the Plan were not confirmed and they had to proceed now for the first time in the tort system. A substantial number still do not have counsel or the counsel they have retained has agreed to

Case 20-10343-LSS    Doc 9096    Filed 03/02/22    Page 39 of 41

represent them only in this bankruptcy case, not in litigation in the tort system.[35]  Those who could nevertheless bring suit could face a variety of defenses, including those based on the applicable statute of limitations as well as those based on an absence of proof, either of Scouting-related abuse or that the defendant was negligent—i.e., that BSA or the applicable Local Council or Chartered Organization knew or had reason to know that the alleged perpetrator was an abuser.  Moreover, even if they prevailed in court, claimants could face difficulties in collecting judgments if continued abuse litigation against the Local Councils or Chartered Organizations, or other circumstances, rendered those defendants insolvent and unable to pay (and the defendants' carriers had defenses to coverage).

Accordingly, there is no basis to assume that holders of Direct Abuse Claims would recover more in the tort system than they will under the Plan.[36]  The Plan has been amended to allow those claimants with the strongest claims to seek additional distributions beyond those provided for under the TDPs and, indeed, potentially to return to the tort system to pursue their claims against non-settling Chartered Organizations.[37]  That all three principal representatives of claimants—the Coalition, the FCR, and the TCC—support the Plan speaks volumes that the Trust will be adequately funded to compensate holders of Direct Abuse Claims and provide a "fair" and "reasonable" outcome.

---

[35]    *See, e.g., Verified Statement of Kosnoff Law, PLLC Pursuant to Rule of Bankruptcy Procedure 2019* [D.I. 5924], Ex. B (AIS Professional Employment Agreement), at 1 (Section II – Scope of Representation) ("By signing this Engagement Agreement, you understand and agree that AIS Counsel is committing to represent you only in connection with the February 18, 2020 bankruptcy filing, or a related global resolution of sex abuse claims against BSA.").

[36]    Even some objectors have so acknowledged, describing the Plan as a "boon" for "[m]any claimants," "providing them the opportunity for some recovery where the tort system might leave them with none." *Limited Objection of Claimant "I.G." to Plan of Reorganization*, [D.I. 8692], ¶¶ 2-3.

[37]    *See* TCC Term Sheet at 2-3 & Ex. B; TDP art. XII.E & XIII.N(iii).

33

## **CONCLUSION**

For these reasons, and based on the evidence that will be presented by the Debtors at trial, the Court should confirm the Plan.

Date: March 2, 2022
  Wilmington, Delaware

BAYARD, P.A.

*/s/ Gregory J. Flasser*
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
Email: efay@bayardlaw.com
gflasser@bayardlaw.com

- and -

James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
RUGGERI PARKS WEINBERG LLP
1875 K Street, NW, Suite 600
Washington, D.C. 20003
Tel:  (202) 469-7750
Fax:  (202) 469-7751

- and -

Philip D. Anker (admitted *pro hac vice*)
WILMER  CUTLER  PICKERING  HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel:  (212) 230-8890
Fax:  (212) 230-8888

Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (admitted *pro hac vice*)
WILMER  CUTLER  PICKERING  HALE
AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Attorneys for Hartford Accident and*
*Indemnity Company, First State Insurance*
*Company, Twin City Fire Insurance*
*Company, and Navigators Specialty Insurance*
*Company*

35