**<u>Exhibit Q-1</u>**

**Revised Form of Restated 2012 Bond Documents**

**You may access a full and complete copy of the Form of Restated 2012 Bond Documents, free of charge, at <u>https://omniagentsolutions.com/bsa-plansupplement</u>.**

**PROPOSED FINAL VERSION 3/2/2022**
**PRIVILEGED AND CONFIDENTIAL**
**FOR MEDIATION PURPOSES ONLY**
**SUBJECT TO F.R.E. 408**

AMENDED AND RESTATED
SERIES 2012 BOND PURCHASE AND LOAN AGREEMENT

among

THE COUNTY COMMISSION OF FAYETTE COUNTY (WEST VIRGINIA),

BOY SCOUTS OF AMERICA,

ARROW WV, INC.,

and

JPMORGAN CHASE BANK, N.A.

Dated as of [_____], 2022

The County Commission of Fayette County (West Virginia)
Commercial Development Revenue Bond
(Arrow WV Project), Series 2012

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION ............................................. 2

Section 1.1    Definitions.................................................................................. 2
Section 1.2    Rules of Construction ............................................................. 18
Section 1.3    Accounting Terms; GAAP...................................................... 18

ARTICLE II REPRESENTATIONS AND WARRANTIES ........................................ 19

Section 2.1    Representations and Warranties of the Issuer........................ 19
Section 2.2    Representations and Warranties of the Borrower and Arrow WV ...................... 21

ARTICLE III THE BOND............................................................................ 24

Section 3.1    Amendment and Restatement of the Original Bond............................. 24
Section 3.2    Terms of the Bond .................................................................. 24
Section 3.3    Bond to be Issued in Registered Form; Registration and Transfer..................... 25
Section 3.4    Purchase as a Loan.................................................................. 26
Section 3.5    Optional Redemption of the Bond and Prepayment of the Note ........................ 26
Section 3.6    Conditions Precedent .............................................................. 27

ARTICLE IV LOAN OF PROCEEDS TO BORROWER............................................... 29

Section 4.1    Repayment of Loan.................................................................. 29
Section 4.2    Amounts Payable .................................................................... 29
Section 4.3    No Set-Off............................................................................... 30
Section 4.4    Prepayments............................................................................ 30
Section 4.5    Credits Against the Note ......................................................... 30
Section 4.6    Additional Payments upon Determination of Taxability; Excess Cash Sweep Prepayments ...................... 30
Section 4.7    Assignment ............................................................................. 31
Section 4.8    Payments Assigned ................................................................. 32

ARTICLE V [RESERVED] ........................................................................ 33

ARTICLE VI BORROWER'S COVENANTS ........................................................ 33

Section 6.1    Affirmative Covenants............................................................ 33
Section 6.2    Negative Covenants ................................................................ 36
Section 6.3    Financial Covenants ............................................................... 41

ARTICLE VII TAX COVENANT.................................................................... 43

Section 7.1    Tax Covenant .......................................................................... 43

i

ARTICLE VIII EVENTS OF DEFAULT ................................................................... 43

Section 8.1    Events of Default ................................................................. 43
Section 8.2    Remedies of Holder ............................................................ 46
Section 8.3    Payments After Default; No Waiver .................................... 46
Section 8.4    No Remedy Exclusive.......................................................... 47

ARTICLE IX LIMITATION OF LIABILITY; INDEMNIFICATION ...................................... 47

Section 9.1    Limitation of Issuer's Liability ........................................... 47
Section 9.2    Indemnification by Borrower............................................... 47
Section 9.3    Issuer, Commissioner, Attorneys, Officers, Employees and Agents of
               Issuer Not Liable ............................................................. 49

ARTICLE X MISCELLANEOUS ......................................................................... 49

Section 10.1   Assignment ....................................................................... 49
Section 10.2   Notices ............................................................................. 50
Section 10.3   Amendments ..................................................................... 51
Section 10.4   UCC Financing Statements................................................. 51
Section 10.5   No Third Party Beneficiary................................................. 52
Section 10.6   Miscellaneous ................................................................... 52
Section 10.7   References to the Bond Ineffective After Bond Paid............. 53
Section 10.8   No Implied Waiver ............................................................ 53
Section 10.9   Issuer Representative ........................................................ 53
Section 10.10  Borrower Representative ................................................... 53
Section 10.11  USA PATRIOT Act ............................................................ 53
Section 10.12  Maximum Rate.................................................................. 54
Section 10.13  No Fiduciary Duty ............................................................ 54
Section 10.14  Amendment and Restatement ............................................ 55
Section 10.15  Final Agreement................................................................ 55

LIST OF SCHEDULES AND EXHIBITS

<u>SCHEDULES</u>:

| | | |
|---|---|---|
| Schedule 1.1(a) | – | Conservation Easements |
| Schedule 1.1(b) | – | Disclosed Matters |
| Schedule 2.2(m) | – | Subsidiaries |
| Schedule 6.2(a) | – | Existing Indebtedness |
| Schedule 6.2(b) | – | Existing Liens |

<u>EXHIBITS</u>:

| | | |
|---|---|---|
| Exhibit A | – | Form of Bond |
| Exhibit B | – | Form of Promissory Note |
| Exhibit C | – | Form of Compliance Certificate |

**THIS AMENDED AND RESTATED SERIES 2012 BOND PURCHASE AND LOAN AGREEMENT** dated as of [_____], 2022, among THE COUNTY COMMISSION OF FAYETTE COUNTY (WEST VIRGINIA), acting for and on behalf of Fayette County, West Virginia, a political subdivision of the State of West Virginia (the "Issuer"), JPMORGAN CHASE BANK, N.A., a national banking association, as lender and purchaser of the Bond (the "Lender"), BOY SCOUTS OF AMERICA, a non-profit federally chartered corporation (the "Borrower"), and ARROW WV, INC., a West Virginia nonprofit corporation ("Arrow WV").

W I T N E S S E T H:

**WHEREAS**, the Issuer is authorized to exercise all the powers set forth in the Industrial Development and Commercial Development Bond Act, Chapter 13, Article 2C of the Code of West Virginia of 1931, as amended (the "Act"), to issue revenue bonds for the purpose of financing a "commercial project" as authorized by the Act;

**WHEREAS**, Arrow WV is a Subsidiary (as defined herein) of the Borrower and Arrow WV owns and operates a facility that is a "commercial project" as defined in the Act;

**WHEREAS**, the Issuer, the Borrower, Arrow WV and the Lender are parties to the Bond Purchase and Loan Agreement, dated as of March 9, 2012 (as amended by the First Amendment to Bond Purchase and Loan Agreement, dated as of March 2, 2017 and the Second Amendment to Bond Purchase and Loan Agreement, dated as of March 21, 2019, the "Original Bond Purchase and Loan Agreement"), pursuant to which the Issuer issued and sold to the Lender and the Lender purchased from the Issuer (i) the Commercial Development Revenue Bond (Arrow WV Project), Series 2012, in the original principal amount of $175,000,000 (the "Original Bond");

**WHEREAS**, the proceeds of the sale of the Original Bond were loaned by the Issuer to the Borrower to, *inter alia*, acquire, construct, and equip the Summit Bechtel Family National Scout Reserve located in Fayette County, West Virginia and Raleigh County, West Virginia, and the Borrower agreed to repay such loan on the terms and conditions set forth in the Original Bond Purchase and Loan Agreement;

**WHEREAS**, simultaneously with the issuance of the Original Bond, the Borrower executed and delivered to the Issuer a promissory note to evidence its obligations thereunder to make payments sufficient to pay the Original Bond, and the Issuer assigned such promissory note to the Lender to secure the Original Bond;

**WHEREAS**, on February 18, 2020, the Borrower filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, on [_____], 2022, the Bankruptcy Court entered an order (the "Confirmation Order") approving and confirming the [_____] Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (the "Chapter 11 Plan"), and [_____], 2022 is the effective date of the Chapter 11 Plan (the "Effective Date");

**WHEREAS**, in accordance with the Confirmation Order and the Chapter 11 Plan, and subject to the terms and conditions set forth herein, the parties hereto desire to enter into this

Agreement to (i) amend and restate the Original Bond Purchase and Loan Agreement in the form of this Agreement, (ii) amend and restate the Original Bond in the form of <u>Exhibit A</u> and (iii) amend and restate the promissory note in respect of the Original Bond in the form of <u>Exhibit B</u>.

**NOW**, **THEREFORE**, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS AND RULES OF CONSTRUCTION**

**Section 1.1**    <u>**Definitions**</u>. As used in this Agreement, the following terms have the following meanings:

"<u>2010B Bond</u>" means the bond issued pursuant to the 2010B Bond Documents.

"<u>2010B Bond Documents</u>" means the "Bond Documents" as defined in the 2010B Bond Purchase and Loan Agreement.

"<u>2010B Bond Purchase and Loan Agreement</u>" means the Amended and Restated Series 2010B Bond Purchase and Loan Agreement, dated as of the date hereof, among the Issuer, the Lender, the Borrower and Arrow WV, as the same may be further amended, restated, supplemented or otherwise modified from time to time.

"<u>Act</u>" has the meaning set forth in the recitals hereto.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person. The parties hereto agree that no local council of the Boy Scouts of America is an Affiliate of the Borrower for purposes of this Agreement.

"<u>Agreement</u>" means this Amended and Restated Series 2012 Bond Purchase and Loan Agreement, as the same may be further amended, restated, supplemented or otherwise modified from time to time.

"<u>Amendment Transactions</u>" means the execution, delivery and performance by each of the Borrower, Arrow WV and the Issuer of the Bond Documents to which it is to be a party, and the issuance of the Bond.

"<u>Anti-Corruption Laws</u>" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"<u>Arrow WV</u>" has the meaning set forth in the preamble hereto.

"<u>Available Cash</u>" means, as of any Excess Cash Test Date, the unrestricted Cash and balance sheet investments owned by the Borrower that are not subject to legally enforceable restrictions on the use or disposition of such assets for a particular purpose, determined on a pro

forma basis after having given effect to the principal payment, if any, due on February 15 of the following year under the BSA Settlement Trust Note, if applicable.

"Bond" means the Commercial Development Revenue Bond (Arrow WV Project), Series 2012, of the Issuer in the form of Exhibit A, issued pursuant to this Agreement in the original principal amount of $[145,662,101], and dated the Closing Date.

"Bond Counsel" means Steptoe & Johnson PLLC, or any other firm nationally recognized on the subject of municipal bonds acceptable to the Holder.

"Bond Documents" means this Agreement, the Bond, the Note, the Guaranty Agreement, the Collateral Documents and the Tax Certificate.

"Bond Registrar" has the meaning set forth in Section 3.3(b).

"Bond Registration Books" has the meaning set forth in Section 3.3(b).

"Bond Resolution" has the meaning set forth in Section 2.1(c).

"Borrower" has the meaning set forth in the preamble hereto.

"Borrower Representative" means any one or more of the persons at the time designated to act on behalf of the Borrower by written certificate furnished to the Holder containing the specimen signature of such person and signed on behalf of the Borrower by its [Chief Scout Executive, Assistant Chief Scout Executive & CFO, Manager-Treasury Department, or Team Leader-Cash Management][1].

"BSA Settlement Trust Note" means the secured promissory note, dated [_____], 2022, in the principal amount of $80,000,000 issued by the Borrower to the settlement trust established pursuant to the Chapter 11 Plan, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"Business Day" means any day on which the Holder is open for the purpose of conducting a commercial banking business.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or finance leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP (for the avoidance of doubt, subject to Section 1.3).

"Cash" means legal tender of the United States of America.

"Closing Date" means [_____], 2022.

---

[1] NTD: Titles to be confirmed.

"Code" means the Internal Revenue Code of 1986, as amended, including applicable treasury regulations thereunder. All references herein to the Code or any particular provision or section thereof shall be deemed to refer to any successor, or successor provision or section, thereof, as the case may be.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of the Borrower or any Subsidiary, now existing or hereafter acquired, that may at any time be, become or be intended to be, subject to a security interest or Lien in favor of the Collateral Agent, on behalf of itself and the other secured creditors, to secure all or a portion of the Obligations.

"Collateral Agent" means JPMorgan Chase Bank, N.A., in its capacity as "Secured Party" under the Security Agreement for the benefit of the Lender, the affiliates of the Lender who are owed any of the Secured Obligations (as defined in the Security Agreement) and the Issuer, and any of their assignees that are owed any of the Secured Obligations (as defined in the Security Agreement).

"Collateral Documents" means, collectively, the Intercreditor Agreements, the Security Agreement, the Mortgages, any control agreements and any other agreements, instruments and documents executed in connection with the Original Security Agreement, the Security Agreement or this Agreement that are intended to create, perfect or evidence Liens to secure the Obligations, including, without limitation, all other security agreements, pledge agreements, control agreements, assignments, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by the Borrower, any Subsidiary or any of their respective Affiliates and delivered to the Collateral Agent, in each case, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"Consolidated Debt Service Coverage Ratio" means, at any date, the ratio of (a) the Consolidated Operating Surplus for the Rolling Period ended on the most recent Test Date, divided by (b) the sum of (i) the Consolidated Interest Expense for such Rolling Period plus (ii) the Consolidated Required Amortization for such Rolling Period.

"Consolidated Interest Expense" means, for any period, total interest expense (including that attributable to Capital Lease Obligations) of the Borrower, its Subsidiaries and its Affiliates for such period with respect to all outstanding Indebtedness of the Borrower, its Subsidiaries and its Affiliates (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Swap Agreements in respect of interest rates, to the extent such net costs are allocable to such period in accordance with GAAP), calculated for the Borrower, its Subsidiaries and its Affiliates on a consolidated basis for such period in accordance with GAAP; provided that, for purposes of calculating Consolidated Interest Expense hereunder, (x) all interest expense in respect of the BSA Settlement Trust Note shall be excluded and (y) for the avoidance of doubt all interest expense in respect of the Bond, the 2010B Bond, the Loans and the Foundation Loan shall be included.

"Consolidated Operating Surplus" means, for any period of determination, without duplication, of the sum of the following, determined on a consolidated basis for the Borrower, its Subsidiaries and its Affiliates: (i) Unrestricted Change in Net Assets – Controlling Interest during such period; plus (ii) to the extent deducted in determining Unrestricted Change in Net Assets – Controlling Interest during such period, (1) income tax expense, (2) Consolidated Interest Expense, (3) all amounts attributable to depreciation and amortization expense, (4) extraordinary non-cash charges for such period, (5) any other non-cash charges for such period, including any fresh start adjustments, (6) restructuring expenses arising from the Borrower's bankruptcy proceeding and the Chapter 11 Plan and (7) capital expenditures.

"Consolidated Required Amortization" means, for any period of determination, without duplication, an amount equal to the sum of all scheduled principal payments of Funded Debt during such period, including, without limitation, (i) payments made in respect of the Bond, the 2010B Bond and the Loans, (ii) payments made to fund the Core Value Cash Pool and (iii) payments made in respect of the Foundation Loan.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Core Value Cash Pool" has the meaning assigned to such term in the Chapter 11 Plan.

"County" has the meaning set forth in Section 2.1(a).

"Credit Agreement" means the Amended and Restated Credit Agreement, dated as of the date hereof, among JPMorgan Chase Bank, N.A., as lender, Boy Scouts of America, as borrower, and Arrow WV, as guarantor, as the same may be amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"Date of Taxability" means the earliest date as of which interest on the Bond shall have been determined to be includable in the gross income of any Holder or prior Holder as a result of a Determination of Taxability.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means the Fixed Interest Rate plus 4.00% per annum.

"Determination of Taxability" means, and shall be deemed to have occurred on, the first to occur of the following:

(a)    on the date when the Borrower or Arrow WV files any statement, supplemental statement or other tax schedule, return or document which discloses that an Event of Taxability shall have in fact occurred;

(b)    on the date when the Holder or any prior Holder notifies the Issuer and the Borrower that it has received a written opinion by an attorney or firm of attorneys of

recognized standing on the subject of tax-exempt municipal finance to the effect that an Event of Taxability shall have occurred unless, within 180 days after receipt by the Issuer and the Borrower of such notification from the Holder or any prior Holder, the Issuer or the Borrower shall deliver to each Holder and prior Holder (A) a ruling or determination letter issued to or on behalf of the Borrower by the Commissioner or any District Director of Internal Revenue (or any other governmental official exercising the same or a substantially similar function from time to time) or (B) a written opinion by an attorney or firm of attorneys of recognized standing on the subject of tax-exempt municipal finance to the effect that, after taking into consideration such facts as form the basis for the opinion that an Event of Taxability has occurred, an Event of Taxability shall not have occurred;

(c)    on the date when the Issuer or the Borrower shall be advised in writing by the Commissioner or any District Director of Internal Revenue (or any other government official or agent exercising the same or a substantially similar function from time to time) that, based upon filings of the Issuer or the Borrower, or upon any review or audit of the Issuer, Arrow WV or the Borrower or upon any other ground whatsoever, an Event of Taxability shall have occurred; or

(d)    on that date when the Issuer or the Borrower shall receive notice from any Holder or prior Holder that the Internal Revenue Service (or any other government official or Issuer exercising the same or a substantially similar function from time to time) has assessed as includable in the gross income of such Holder or any prior Holder the interest on the Bond paid to such Holder or prior Holder due to the occurrence of an Event of Taxability;

*provided*, *however*, that no Determination of Taxability shall occur under clauses (c) or (d) above unless the Issuer, Arrow WV and the Borrower have been afforded the opportunity, at their expense, to contest any such assessment; and *provided further* that no Determination of Taxability shall occur until such contest, if made, has been finally determined; and *provided further* that upon demand from the Holder or any prior Holder, the Borrower shall immediately reimburse such Holder or prior Holder for any payments such Holder (or any prior Holder) shall be obligated to make as a result of the Determination of Taxability during any such contest.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 1.1(b).

"Dividing Person" has the meaning assigned to such term in the definition of "Division."

"Division" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Division Successor" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division. A Dividing

Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"DST" means the [Delaware statutory trust] under Article V.Y and the DST Agreement (as defined in the Chapter 11 Plan) for the purposes set forth therein.

"Effective Date" has the meaning set forth in the recitals hereto.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to (a) the environment, (b) preservation or reclamation of natural resources, (c) the management, Release or threatened Release of any Hazardous Material or (d) with respect to exposure to Hazardous Materials, health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(a)(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any ERISA Affiliate of any

liability with respect to the withdrawal or partial withdrawal of the Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition upon the Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in critical status, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning set forth in Section 8.1.

"Event of Taxability" means a change in law or fact or the interpretation thereof, or the occurrence or existence of any fact, event or circumstance (including, without limitation, the taking of any action by the Issuer or the Borrower, or the failure to take any action by the Issuer or the Borrower, or the making by the Issuer or the Borrower of any misrepresentation herein or in any certificate required to be given in connection with the issuance, sale or delivery of the Bond) which has the effect of causing interest paid or payable on the Bond to become includable, in whole or in part, in the gross income of the Holder or any prior Holder for federal income tax purposes.

"Excess Cash Sweep Prepayment" has the meaning set forth in Section 4.6(b).

"Excess Cash Test Date" means (i) December 31, 2024 and (ii) December 31 of each successive calendar year until December 31, 2031.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"Fiscal Year" means, with respect to the Borrower, the 12-month period ending December 31 of each calendar year or such other annual fiscal accounting period for the Borrower as may be applicable.

"Fixed Interest Rate" means a rate of 2.94% per year.

"Foundation Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, by and among the Lender, the Borrower, Arrow WV and the National Boy Scouts of America Foundation, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Foundation Loan" means the loan made under the Foundation Loan Agreement.

"Foundation Loan Agreement" means the Credit Agreement, dated as of the date hereof, by and between the Borrower and the National Boy Scouts of America Foundation, a District of Columbia nonprofit corporation, as amended, restated, supplemented and/or otherwise modified from time to time.

"Funded Debt" of any Person means, without duplication, the sum of the following, to the extent constituting Indebtedness, determined on a consolidated basis for such Person in accordance with GAAP: (i) all obligations of such Person for borrowed money; (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (iii) all obligations of such Person upon which interest charges are customarily paid; (iv) all obligations of such Person in

respect of the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business and overdue deferred purchase price obligations); (v) all Capital Lease Obligations of such Person; and (vi) all obligations of such Person under any Swap Agreement; provided that, for purposes of calculating Funded Debt hereunder, all obligations under the BSA Settlement Trust Note shall be excluded. The Funded Debt of any Person shall include the Funded Debt of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Funded Debt provides that such Person is not liable therefor. The amount of the obligations of the Borrower or any Subsidiary in respect of any Swap Agreement shall, at any time of determination and for all purposes under this Agreement, be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time giving effect to current market conditions notwithstanding any contrary treatment in accordance with GAAP.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation (including any obligations under an operating lease) of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation (including any obligations under an operating lease) of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranty Agreement" means the Guaranty Agreement, dated as of the date hereof, executed by Arrow WV in favor of the Lender, and any other agreement pursuant to which any other Person provides a Guarantee of the Obligations.

"Hazardous Materials" means: (a) any substance, material, or waste that is included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste," "toxic substances," "toxic materials," "toxic waste," or words of similar import in any Environmental Law; (b) those substances listed as hazardous substances by the United States Department of Transportation (or any successor agency) (49 C.F.R. 172.101 and amendments thereto) or by the

Environmental Protection Agency (or any successor agency) (40 C.F.R. Part 302.4 and amendments thereto); and (c) any substance, material, or waste that is petroleum, a petroleum breakdown product, or a petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas or radon.

"Holder" means the Lender or any future registered owner of the Bond as permitted hereunder.

"Indebtedness" of any Person means, without duplication:

> (a)    all obligations of such Person for borrowed money or with respect to deposits or advances of any kind;

> (b)    all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

> (c)    all obligations of such Person upon which interest charges are customarily paid;

> (d)    all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person;

> (e)    all obligations of such Person in respect of the deferred purchase price of property or services (excluding trade payable incurred in the ordinary course of business and overdue deferred purchase price obligations);

> (f)    all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed;

> (g)    all Guarantees by such Person;

> (h)    all Capital Lease Obligations of such Person;

> (i)    all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty;

> (j)    all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

> (k)    all obligations of such Person under any Swap Agreement;

> (l)    all obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which lease is required or is permitted to be classified and accounted for as an operating lease under GAAP but which is intended by the parties thereto for tax,

bankruptcy, regulatory, commercial law, real estate law and all other purposes as a financing arrangement; and

(m)    all other amounts (other than accruals, deferred revenue, deferred taxes, and reserves such as those established for litigation) which are required by GAAP to be included as liabilities on a consolidated balance sheet of such Person.

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of the obligations of the Borrower or any Subsidiary in respect of any Swap Agreement shall, at any time of determination and for all purposes under this Agreement, be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time giving effect to current market conditions notwithstanding any contrary treatment in accordance with GAAP.

"Intercreditor Agreements" means, collectively, the Foundation Intercreditor Agreement and the Settlement Trust Intercreditor Agreement.

"Issuer" has the meaning set forth in the preamble hereto.

"Issuer Representative" means any one of the persons at the time designated to act on behalf of the Issuer by written certificate furnished to the Borrower containing the specimen signatures of such persons and signed on behalf of the Issuer by its President or by the Clerk of the Issuer.

"Lender" has the meaning set forth in the preamble hereto.

"Leverage Ratio" has the meaning set forth in Section 6.3(b).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidity" means, as of any date of determination, the sum, on a consolidated basis, without duplication, of the following: (i) the Borrower's, its Subsidiaries' and its Affiliates' cash and cash equivalents, short-term investments and other investments to the extent readily marketable which, in each case, are not subject to any Lien (other than a Lien created under the Collateral Documents or the Lien securing the Foundation Loan) and not subject to any restriction on transfer or use imposed by the applicable donor, grantor or applicable law; *plus* (ii) the Borrower's, its Subsidiaries' and its Affiliates' cash and cash equivalents, short-term investments and other investments to the extent readily marketable which are subject to a Lien securing Indebtedness of the Borrower but are otherwise not subject to any restriction on transfer or use

imposed by the applicable donor, grantor or applicable law other than the payment of the Indebtedness secured thereby; provided, however, notwithstanding anything to the contrary contained in the forgoing, "Liquidity" shall not include cash or cash equivalents maintained as cash collateral for letters of credit subject to the sole dominion and control of a third party pursuant to a control agreement, collateral assignment or other agreement restricting the transfer or use thereof (for the avoidance of doubt, in the case of "springing" control agreement, only after such third party's control has been activated).

"Liquidity Coverage Ratio" has the meaning set forth in Section 6.3(a).

"Loans" means the "Loans" as defined in the Credit Agreement.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations or condition, financial or otherwise, of the Borrower, (b) the validity or enforceability of any Bond Document or (c) the rights of or remedies available to the Lender or the Issuer under any Bond Document.

"Material Indebtedness" means Indebtedness (other than arising in connection with the Bond Documents but including, without limitation, obligations in respect of one or more Swap Agreements) of any one or more of the Borrower and the Subsidiaries in an aggregate principal amount exceeding $1,000,000. Material Indebtedness shall specifically include the Indebtedness arising in connection with the Credit Agreement, the 2010B Bond Documents and any Subordinated Indebtedness.

"Maximum Rate" has the meaning set forth in Section 10.12(a).

"Moody's" means Moody's Investors Service, Inc. or any successor thereto.

"Mortgage" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Collateral Agent, for the benefit of the Holder and the other secured creditors, on real property of either the Borrower or Arrow WV, including any amendment, restatement, modification or supplement thereto.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Note" means the amended and restated promissory note of the Borrower in the form of Exhibit B, issued in favor of the Issuer and assigned to the Lender pursuant to this Agreement in the original principal amount of $[145,662,101].

"Obligations" means all obligations, indebtedness, and liabilities of the Borrower and Arrow WV to the Issuer arising pursuant to any of the Bond Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including, without limitation, the obligation of the Borrower to repay the Note, interest on the Note and all fees, costs, and expenses (including attorneys' fees, costs and expenses) provided for in the Bond Documents.

"Original Bond Purchase and Loan Agreement" has the meaning set forth in the recitals hereto.

"Original Bond" has the meaning set forth in the recitals hereto.

"Other Applicable Indebtedness" has the meaning set forth in Section 4.6(b).

"Payment of the Bond" means payment in full of the Bond and the making in full of all other payments due and payable pursuant to this Agreement at the time of such payment.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Encumbrances" means:

(a)      Liens for taxes, assessments or other charges imposed by a Governmental Authority that are not yet due or are being contested in compliance with Section 6.1(d);

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in compliance with Section 6.1(d);

(c)      Liens arising by reason of deposits with, or the giving of any form of security to, any Governmental Authority that are (1) required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, (2) granted to enable any Person to maintain self-insurance or to participate in any funds established to cover any insurance risks, or (3) granted to secure obligations arising in connection with workers' compensation, unemployment insurance, pensions or profit sharing plans or other social security plans or programs;

(d)      deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)      Liens on or in property given, granted, bequeathed or devised by the owner thereof existing at the time of such gift, grant, bequest or devise, *provided* that (i) such Liens consist solely of restrictions on the use thereof or the income therefrom, or (ii) such Liens secure Indebtedness which is not assumed by the Borrower or any Subsidiary and such Liens attach solely to the property (including the income therefrom) which is the subject of such gift, grant, bequest or devise;

(f)      judgment Liens in respect of judgments that do not constitute an Event of Default under Section 8.1(k);

(g)      easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected

property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

(h)    Liens, defects, irregularities of title and encroachments on adjoining real property as normally exist with respect to real property similar in character to the real property involved and which do not materially adversely affect the value of, or materially impair, the real property affected thereby for the purpose for which it was acquired or is held by the owner thereof;

(i)    Liens arising from filing UCC financing statements regarding leases permitted by this Agreement;

(j)    leases or subleases entered into by Borrower or a Subsidiary in good faith with respect to its property not used in its business and which do not materially interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

(k)    leases of real property owned by the Borrower or a Subsidiary for office space, food service facilities, gift shops, other similar specialty services, or employee rental apartments provided that such leases do not materially interfere with the ordinary conduct of business of the Borrower or any Subsidiary, do not materially decrease the value of the real property subject to such lease, and are entered into by the Borrower or Subsidiary in good faith;

(l)    statutory and common law landlords' liens under leases to which Borrower or one of the Subsidiaries is a party;

(m)    customary Liens (including the right of set-off) in favor of banking institutions encumbering deposits held by such banking institutions incurred in the ordinary course of business; and

(n)    (i) conservation easements granted by Borrower's Affiliate, Arrow WV encumbering 12 tracts of property owned by Arrow WV at The Summit Bechtel Reserve located in Fayette County, West Virginia and Raleigh County, West Virginia and more particularly described on Schedule 1.1(a) and (ii) "Right of First Refusal" provision of Section 5C of the 1978 Boundary Waters Canoe Area Wilderness Act (P.L.) 95-495, 92 Stat. 1652) encumbering a portion of Borrower's "Northern Tier" real property located at 14790 Moose Lake Road, Ely, MN 55731;

*provided* that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)      investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)      investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)      fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)      money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; and

(f)      other investments made in accordance with the Borrower's or a Subsidiary's investment policy which has been approved by Borrower's Executive Board of Directors or the investment committee of such board and any amendments or other modifications to any such investment policy which have been approved by the Borrower's Executive Board of Directors or the investment committee of such board.

"Person" means an individual, partnership, corporation, trust, unincorporated organization, association, joint venture, joint-stock company, or a government or political subdivision thereof.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Potential CDSCR Default" has the meaning set forth in Section 8.1(p).

"Potential Liquidity Default" has the meaning set forth in Section 8.1(o).

"Principal Amount" means the principal amount of the Bond outstanding from time to time.

"Project" means the development and construction of the roads, water lines, sewer lines and camp site improvements on the Summit National Scout Reserve located in Fayette County, West Virginia and Raleigh County, West Virginia which is owned by Arrow WV.

"Redetermination Date" means: (a) in relation to any December 31 Test Date, the next March 31; and (b) in relation to any June 30 Test Date, the next September 30.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of any substance into the environment.

"Requirement of Law" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person, and (b) any statute, law (including common law), treaty, rule regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests.

"Rolling Period" means the period of 12 consecutive calendar months ending on the last day of each June or December, as applicable.

"S&P" means S&P Global Ratings, and any successor thereof.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea Region of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Security Agreement" means the Fourth Amended and Restated Security Agreement, dated as of the date hereof, among the Borrower, Arrow WV, the Lender, the Issuer and the Collateral Agent, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Settlement Trust</u>" means the trust organized under the laws of the state of Delaware and established under Article IV and the Settlement Trust Agreement (as defined in the Chapter 11 Plan) for the purposes set forth therein.

"<u>Settlement Trust Intercreditor Agreement</u>" means that certain Intercreditor Agreement, dated as of the date hereof, by and among the Lender, the Borrower, Arrow WV and the Settlement Trust, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Subordinated Indebtedness</u>" means Indebtedness of the Borrower or any Subsidiary that is: (a) incurred on terms and conditions satisfactory to the Lender, (b) evidenced by documentation satisfactory to the Lender, and (c) subordinated to the Obligations pursuant to a written subordination agreement satisfactory to the Lender and on terms and conditions satisfactory to the Lender.

"<u>subsidiary</u>" means, with respect to any Person (the "<u>parent</u>") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date.

"<u>Subsidiary</u>" means any subsidiary of the Borrower. The term "Subsidiary" shall not include (i) any local council of the Borrower unless the accounts of such local council are required to be consolidated with those of the Borrower in the Borrower's consolidated financial statements or (ii) the DST.

"<u>Swap Agreement</u>" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided* that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"<u>Tax Certificate</u>" means the Tax Regulatory Agreement executed and delivered by the Issuer, the Borrower and Arrow WV as of the date hereof, and effective as of the Effective Date, in connection with the simultaneous "reissuance" for federal income tax purposes of both the Bond and the 2010B Bond as a result of the amendments to the terms thereof provided for in this Agreement and in the 2010B Bond Purchase and Loan Agreement, respectively, as the same may be amended, supplemented, replaced or otherwise modified from time to time.

"<u>Taxable Rate</u>" means a per annum rate equal to 1.49 times the Fixed Interest Rate.

"<u>Test Date</u>" has the meaning set forth in <u>Section 6.3(a)</u>.

"<u>Test Date Tax Opinion</u>" means a written opinion of Bond Counsel, in form and substance satisfactory to the Borrower and the Lender in their reasonable discretion, that opines that the retesting of the Liquidity Coverage Ratio and/or the Leverage Ratio on a Redetermination Date

shall not cause the interest paid or payable on the Bond to become includable, in whole or in part, in the gross income of the Holder or any prior Holder for federal income tax purposes.

"Unrestricted Change in Net Assets – Controlling Interest" means, for any period, the consolidated unrestricted revenues less unrestricted expenses plus net assets released from restriction. Unrestricted Change in Net Assets – Controlling Interest includes operating results from the general operations fund and board designed fund for the Borrower, its Subsidiaries and its Affiliates.

"Warehouse and Distribution Center" means that certain parcel of real property owned by the Borrower located at 2109 and 2121 Westinghouse Boulevard, Charlotte, North Carolina 28269, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

### Section 1.2    Rules of Construction.

(a)    Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders, and words of the neuter gender shall be deemed and construed to include correlative words of the masculine and feminine genders.

(b)    The table of contents, captions and headings in this Agreement are for convenience only and in no way define, limit or describe the scope or intent of any provisions or Sections of this Agreement.

(c)    All references herein to particular "Articles," "Sections," "Exhibits" and "Schedules" are references to Articles, Sections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specifically provided.

(d)    Any capitalized terms used herein and not otherwise defined shall have the meaning given such terms in the other Bond Documents.

### Section 1.3    Accounting Terms; GAAP

(a)    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if after the date hereof there occurs any change in GAAP or in the application thereof on the operation of any provision hereof and the Borrower notifies the Lender that the Borrower requests an amendment to any provision hereof to eliminate the effect of such change in GAAP or in the application thereof (or if the Lender notifies the Borrower that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

(b)     Notwithstanding anything to the contrary contained herein, any change in accounting for leases pursuant to GAAP resulting from the adoption of Financial Accounting Standards Board Accounting Standards Update No. 2016-02, Leases (Topic 842) ("FAS 842"), to the extent such adoption would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect prior to the adoption of FAS 842, such lease shall not be considered a capital lease (whether or not such operating lease was in effect on such date), and all calculations, definitions and deliverables under this Agreement or any other Bond Document shall be made, construed or delivered, as applicable, in accordance therewith.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

**Section 2.1     Representations and Warranties of the Issuer**. The Issuer hereby represents and warrants to, and agrees with, the Borrower, Arrow WV and the Lender as follows:

(a)     The Issuer is the governing body of Fayette County, West Virginia (the "County"), and is acting for and on behalf of the County under the Act. The Issuer is authorized to issue revenue bonds in accordance with the Constitution and the laws of West Virginia, including the Act, and to use the proceeds thereof to make loans to finance "commercial projects" within the meaning of the Act.

(b)     The Issuer has full power and authority to issue the Bond pursuant to the Act and to carry out and consummate all transactions contemplated by the Bond Documents.

(c)     The Issuer has duly authorized (i) the issuance of the Bond; (ii) the loan of the proceeds of the Original Bond to the Borrower to finance the Project, as provided in the Original Bond Purchase and Loan Agreement; (iii) the execution, delivery and due performance of this Agreement and the Bond; and (iv) the taking of any and all action as may be required on the part of the Issuer to consummate the transactions contemplated hereby. The Issuer has approved the form of the Bond, the Note and the Security Agreement. The fully executed Bond, the executed Note duly endorsed to the order of the Lender, fully executed counterparts of this Agreement and certified copies of the resolutions adopted by the Issuer authorizing the Issuer's undertakings contemplated hereby (collectively, the "Bond Resolution") shall be delivered to the Lender by the Issuer on the Closing Date in the respective forms heretofore submitted to the Lender and approved by the Lender, with only such changes or modifications thereof as the Lender, the Borrower and the Issuer shall agree upon.

(d)     So long as the Bond is outstanding, the Issuer will not issue or sell any other bonds, notes or other obligations (other than the 2010B Bond and the promissory note issued pursuant to the 2010B Bond Documents) the principal, premium, if any, or interest of which may be payable in whole or in part from the revenues derived from payment by the Borrower pursuant to this Agreement and the Note.

(e)     To the knowledge of the Issuer, there is no action, suit, proceeding or investigation at law or in equity or before or by any court, public board or body pending or threatened against or affecting the Issuer, or to the best of the knowledge of the Issuer any basis therefor, wherein an unfavorable decision, ruling or finding would adversely affect any of the transactions contemplated

by this Agreement, or which, in any way, would adversely affect the validity of any of the Bond Documents or any other agreement or instrument to which the Issuer is a party and which is used or contemplated for use in consummation of the transactions contemplated hereby.

(f)     The execution and delivery of and performance by the Issuer of the Bond and the other Bond Documents to which it is a party and the other agreements and instruments contemplated hereby in compliance with the provisions hereof and the endorsement and pledge of the Note as aforesaid will not conflict with, or constitute on the part of the Issuer a breach of or a default under, any existing law, administrative regulation, decree, court order or any provision of any legislative act or constitutional or other proceeding applicable to or establishing or relating to the establishment of the Issuer or its affairs or resolutions or any agreement, indenture, mortgage, lease or other instrument to which the Issuer is subject or by which it is or may be bound.

(g)     All action on the part of the Issuer necessary for the making and performance of the Bond and the other Bond Documents to which it is a party and the other transactions on the part of the Issuer contemplated hereby or thereby has been duly and effectively taken. All consents, authorizations and approvals of, or filings or registrations with, all governmental or regulatory bodies required of the Issuer for the making and performance of the Bond and the other Bond Documents to which it is a party, and the transactions contemplated hereby and thereby, have been duly and effectively taken.

(h)     All requirements and conditions specified in the Act, the bylaws or other organizational documents of the Issuer and all other laws and regulations applicable to the adoption of the Bond Resolution, the execution, delivery and issuance of the Bond and the execution and delivery of the other Bond Documents to which the Issuer is a party, have been fulfilled.

(i)     The Issuer shall take all action and do all things which it is authorized by law to take and do in order to perform and observe all covenants and agreements on its part to be performed and observed under the Bond and the other Bond Documents to which it is a party and in order to provide for and to assure payment of the Bond and the interest thereon when due, but solely in accordance with and subject to the limitations contained in the Bond and the other Bond Documents to which it is a party.

(j)     The Issuer shall not alter, amend or repeal the Bond Resolution, or, without the prior written consent of the Holder, agree to any alteration or amendment of this Agreement, or take any action impairing any authority, right or benefit given or conferred by the Bond Resolution or the Bond Documents.

(k)     The Bond and the other Bond Documents to which the Issuer is a party are legal, valid and binding obligations of the Issuer; provided, however, that the Bond shall be a limited obligation of the Issuer in accordance with the Act, and it is expressly provided that the Bond, and the interest thereon, shall not constitute or become Indebtedness of the Issuer and shall not give rise to any pecuniary liability of the Issuer.

Section 2.2    <u>Representations and Warranties of the Borrower and Arrow WV</u>. Each of the Borrower and Arrow WV makes the following representations as the basis for its respective undertakings hereunder:

(a)    The Borrower and each of the Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business and activities as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required. The Borrower and Arrow WV have been determined to be and are exempt from federal income taxes under Section 501(a) of the Code. The Borrower and Arrow WV have not impaired their status as exempt organizations as described in Section 501(c)(3) of the Code.

(b)    The Amendment Transactions to be entered into by the Borrower are within the Borrower's corporate powers and have been duly authorized by all necessary corporate and, if required, member or sponsor action on behalf of the Borrower. This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Bond Document to which the Borrower is a party, when executed and delivered by Borrower, will constitute, a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c)    The Amendment Transactions (i) do not, as to the Borrower and Arrow WV, require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect, (ii) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of the Borrower or Arrow WV or any order of any Governmental Authority applicable to the Borrower or Arrow WV, (iii) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or Arrow WV or its assets evidencing any Material Indebtedness or that would otherwise have a Material Adverse Effect, or give rise to a right thereunder to require any payment to be made by the Borrower or Arrow WV, and (iv) will not result in the creation or imposition of any Lien on any asset of the Borrower or Arrow WV other than the Liens created under this Agreement, the 2010B Bond Purchase and Loan Agreement or the Collateral Documents.

(d)    The Borrower has heretofore furnished to the Lender its audited consolidated balance sheet and statement of operations as of and for the fiscal year ended December 31, [2018]. Such financial statements present fairly, in all material respects, the financial position and results of operations of the Borrower and the Subsidiaries as of such dates and for such periods in accordance with GAAP. Except as disclosed in the financial statements referred to above or the notes thereto (including the disclosure of changes in the market value of investments set forth therein) and except for the Disclosed Matters and as otherwise publicly disclosed in the Chapter 11 Plan or the proceedings relating thereto, after giving effect to the Amendment Transactions, none of the Borrower or the Subsidiaries has, as of the Closing Date, any material contingent

liabilities, unusual long-term commitments or unrealized losses. Since December 31, [2018], there has been no change that has resulted in a Material Adverse Effect.

(e)     Each of the Borrower and the Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its operations, except for (i) minor defects in title that do not interfere with its ability to conduct its operations as currently conducted or to utilize such properties for their intended purposes and (ii) Liens and other encumbrances permitted by Section 6.2(b). Each of the Borrower and the Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business and activities, and the use thereof by the Borrower and the Subsidiaries does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(f)     There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of the Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any of the Bond Documents or the Amendment Transactions.

(g)     Except for the Disclosed Matters and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, neither the Borrower nor any of the Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(h)     Since the date of this Agreement, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

(i)     Each of the Borrower and the Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

(j)     Neither the Borrower nor any of the Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

(k)     No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. The present value of future benefits under each Plan did not, as of the date of the most recent actuarial valuation, exceed the total value of the assets of such Plan for valuation purposes.

(l)      The Borrower has disclosed to the Lender and the Issuer all agreements, instruments and corporate or other restrictions to which the Borrower or any of the Subsidiaries is subject, and all other matters known to any of them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower to the Lender or the Issuer in connection with the negotiation of this Agreement or any other Bond Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(m)      As of the Closing Date, Borrower has no Subsidiaries except as reflected on Schedule 2.2(m).

(n)      Each of the Borrower and the Subsidiaries maintain with financially sound and reputable insurers, insurance with respect to its properties and business against such casualties and contingencies and in such amounts as are usually carried by businesses engaged in similar activities as the Borrower and the Subsidiaries and located in similar geographic areas in which the Borrower and the Subsidiaries operate.

(o)      Neither the Borrower nor any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations U or X of the Board of Governors of the Federal Reserve System) and no part of the proceeds from the sale of the Original Bond was used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.

(p)      The Collateral Documents are effective to create in favor of Collateral Agent for the benefit of the Issuer, as security for the Obligations, security interests in the Collateral. The security interests and other Liens created by the Collateral Documents in that portion of the Collateral in which a security interest may be perfected by the filing of a financing statement under the Uniform Commercial Code is perfected and rates first in priority with respect to all other Liens.

(q)      The Borrower does not directly, nor indirectly through one or more intermediaries, Control any local council of the Boy Scouts of America as of the Closing Date. As of the Closing Date, the Borrower is not under common Control with any local council of the Boy Scouts of America.

(r)      The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and directors and to the knowledge of the Borrower, its employees and agents, are in compliance with applicable Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in the Borrower or any Subsidiary being designated as a Sanctioned Person.   None of (i) the Borrower, any Subsidiary or any of their respective directors, officers or, to the knowledge of the Borrower or any such Subsidiary, its

employees, or (ii) to the knowledge of the Borrower or any Subsidiary, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the transactions contemplated hereby, is a Sanctioned Person.

All of the above representations and warranties shall survive the execution and delivery of this Agreement and the issuance of the Note.

## ARTICLE III
## THE BOND

**Section 3.1**    **Amendment and Restatement of the Original Bond**. Upon the satisfaction of the conditions precedent set forth in Section 3.6, the Original Bond is, without any further action required on the part of any other Person, deemed to be automatically amended to conform to and have the terms provided in Exhibit A. If requested by the Holder, the Issuer will issue a replacement Bond in exchange for the Original Bond. In reliance upon the representations, warranties and agreements herein contained, and subject to the conditions herein set forth, at or before 12:00 p.m., Dallas, Texas time, on the Closing Date or at such other time and date as may be mutually agreed upon by the parties hereto: (a) the Issuer agrees to enter into this Agreement and the other Bond Documents to which it is to be a party, and to pledge the Note, endorsed without recourse to the order of the Lender, to the Lender; (b) the Lender agrees to enter into this Agreement and the other Bond Documents to which it is to be a party; and (c) the Borrower agrees to enter into this Agreement and the other Bond Documents to which it is to be a party, and to consent to the pledge of the Note to the Lender, endorsed without recourse to the order of the Lender, as security for the Bond.

**Section 3.2**    **Terms of the Bond**.

(a)    The Bond shall be dated as of the Closing Date, and shall be payable in the amounts and on the dates set forth in the Bond. All unpaid principal of the Bond shall be due and payable on [_____], 2032[2].

(b)    Interest shall accrue on the Principal Amount of the Bond at the Fixed Interest Rate on the basis of a 30-day month/360-day year.

(c)    Upon the occurrence of a Determination of Taxability, then, from and after the Date of Taxability, the interest rate used to calculate interest on the Bond shall be the Taxable Rate. After a Determination of Taxability and upon demand of the Holder or any prior Holder of the Bond, the Issuer shall pay to such Holder or prior Holder, but only from amounts provided by the Borrower pursuant to Section 4.6(a), such additional amount as shall be necessary to provide that interest on the Bond shall have been payable at the Taxable Rate from the Date of Taxability.

(d)    The Holder shall, if requested by the Borrower, have an attorney-in-fact, qualified to practice before the Internal Revenue Service, designated by the Borrower for the purpose of appealing or challenging any Event of Taxability; provided, however, the Borrower provides indemnity reasonably satisfactory to the Holder against any additional tax liability, penalties or interest that may result from any such appeal. All reasonable legal fees, costs and expenses of such

---

[2] NTD: This will be the date that is 10 years after the effective date of the Chapter 11 Plan.

appeal shall be paid by the Borrower. In the event a final judgment or order shall have been entered within 180 days of the Event of Taxability finding, as a final determination, that no Event of Taxability has indeed occurred, the Holder shall reimburse to the Borrower all supplemental interest that has been paid on the Bond, and no additional supplemental interest shall be payable unless and until an Event of Taxability shall subsequently occur. Notwithstanding anything in this subsection to the contrary, the right of the Borrower to challenge any Event of Taxability shall terminate if no such final judgment or order shall have been entered within 180 days after the occurrence of the Event of Taxability, unless the Holder shall otherwise agree, and after the expiration of such 180-day period without the entry of a final judgment or order, the Bond shall immediately bear interest at the Taxable Rate. In addition, unless the Borrower shall otherwise provide reasonable indemnification to the Holder, the right of the Borrower to challenge any Event of Taxability shall terminate if the exercise of such right would cause any tax return of the Holder to be inaccurate or would delay the timely filing thereof or would in the Holder's opinion result in an adverse impact on its tax returns.

(e)     Upon a Determination of Taxability, the Issuer shall also pay, but only from amounts provided by the Borrower pursuant to <u>Section 4.6(a)</u>, to such Holder or to any prior Holder upon demand of such Holder or prior Holder any taxes, interest, penalties or other charges assessed against or payable by such Holder or prior Holder and attributable to such Determination of Taxability and all reasonable administrative, out of pocket and other expenses incurred by such Holder or prior Holder which are attributable to such event, including, without limitation, the costs incurred by such Holder or prior Holder to amend any of its tax returns, notwithstanding the repayment of the entire principal amount of the Bond or any transfer or assignment of the Bond.

(f)     Notwithstanding the foregoing, from and after the occurrence of an Event of Default, until such time as such Event of Default has been waived by the Holder, the Bond shall bear interest at the Default Rate. To the extent permitted by law, interest shall accrue on any overdue payment of interest or principal at the Default Rate.

### Section 3.3     <u>Bond to be Issued in Registered Form; Registration and Transfer</u>.

(a)     The Bond shall be issuable in typewritten form as a fully registered Bond without coupons. The Bond shall be substantially in the form attached hereto as <u>Exhibit A</u> with such appropriate variations, omissions and insertions as are permitted or required by this Agreement, and may have endorsed thereon such legends or text as may be necessary or appropriate to conform to any applicable rules and regulations of any governmental authority or any usage or requirements of law with respect thereto.

(b)     JPMorgan Chase Bank, N.A., is hereby appointed as the registrar for the Bond (the "<u>Bond Registrar</u>") and as such shall keep books for the registration and for the registration of transfer of the Bond as provided in this Agreement (the "<u>Bond Registration Books</u>"). The transfer of the Bond may be registered upon the Bond Registration Books only upon surrender thereof to the Bond Registrar together with an assignment duly executed by the registered owner or its attorney or legal representative in such form as shall be satisfactory to the Bond Registrar. Upon such registration of transfer, the Issuer shall execute and deliver at the earliest practicable time in exchange for the Bond a new bond registered in the name of the transferee, in an aggregate

principal amount equal to the principal amount of the Bond and maturing in the same principal installments and bearing interest at the same rate.

(c)       The Bond surrendered in any such exchange or registration of transfer shall forthwith be cancelled by the Bond Registrar. The Bond Registrar may make a charge which shall be paid by the Borrower for every registration of transfer sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such registration of transfer, and such charge shall be paid before any such new bond shall be delivered. The Bond Registrar shall not be required to make any registration of transfer of the Bond during the 15 days immediately preceding an interest payment date on the Bond or, in the case of any proposed redemption of the Bond, after the Bond or any portion thereof has been called for redemption.

(d)       The person in whose name the Bond shall be registered upon the Bond Registration Books shall be deemed and regarded as the absolute owner thereof for all purposes, and payment of or on account of the principal of and interest on the Bond shall be made only to the registered owner thereof or his registered assigns. All such payments shall be valid and effectual to satisfy and discharge the liability upon the Bond, including the interest thereon, to the extent of the sum or sums so paid.

(e)       Upon any registration of transfer of the Bond or of any interest therein, the transferee or any subsequent transferee, if the transfer to it in all respects complies with the requirements of this Section 3.3, and if it is duly registered as owner as herein provided, shall be deemed the Holder for purposes of this Agreement and shall succeed to the rights and be bound by the obligations of the Lender hereunder, including without limitation the provisions of this Section 3.3 relating to transfer of the Bond. Immediately upon any registration of transfer of the Bond or of any interest therein, the new Holder shall give written notice of such transfer to the Borrower.

(f)       The Bond Registrar may resign upon 30 days' prior written notice to the Issuer and the Borrower. The Issuer also reserves the right to remove the Bond Registrar and appoint a successor Bond Registrar. Upon the resignation or removal of any Bond Registrar, the Issuer shall either act as or designate a successor to act as Bond Registrar.

Section 3.4    **Purchase as a Loan**. The Lender represents that it (1) purchased the Original Bond for its own account as a loan and has no present intention of reselling or disposing of the Bond or engaging in any "distribution" thereof (as that term is used in the Securities Act of 1933, as amended, and the regulations of the Securities and Exchange Commission thereunder) and (2) is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended.

Section 3.5    **Optional Redemption of the Bond and Prepayment of the Note**.

(a)       The Bond is subject to optional redemption, in whole or in part, at the option of the Borrower, in the event the Borrower elects to prepay the Note. Any prepayment pursuant to this Section 3.5(a) shall be made by the Borrower taking, or causing the Issuer to take, the actions required (i) for Payment of the Bond, in the case of prepayment of the Note in whole, or (ii) to

effect prepayment of less than all of the Bond according to its terms in the case of a partial prepayment of the Note.

(b)    To exercise the option granted in Section 3.5(a), the Borrower shall give written notice to the Issuer and the Holder which shall specify therein (i) the date of the intended prepayment of the Note, which shall not be less than 90 days from the date the notice is given and (ii) the principal amount of the Note to be prepaid, and when given, such notice shall be irrevocable by the Borrower.

**Section 3.6    Conditions Precedent**. This Agreement, the Bond, and the other Bond Documents shall become effective only upon satisfaction (or waiver by the Lender) of each of the following conditions:

(a)    Execution and Delivery of the Bond Documents.  The Lender (or its counsel) shall have received executed copies of the Bond Documents, all in form acceptable to the Lender.

(b)    Corporate Authorization. The Lender (or its counsel) shall have received evidence of the due authorization, execution and delivery of the Bond Documents by the parties thereto.

(c)    Opinion of Bond Counsel.  The Lender (or its counsel) shall have received an opinion or opinions of Bond Counsel satisfactory to the Lender that (i) interest on the Bond will be excluded from gross income for federal income tax purposes; (ii) interest on the Bond will not be an item of tax preference for purposes of the federal alternative minimum income tax imposed on individuals; and (iii) interest on the Bond will be exempt from taxation by the State of West Virginia, except inheritance, estate and transfer taxes.

(d)    Formation Documents. The Lender (or its counsel) shall have received a certificate of the Borrower having as attachments true and correct copies of documents relating to the formation of the Borrower and its bylaws and a certificate of Arrow WV having as attachments true and correct copies of documents relating to the formation of Arrow WV and its bylaws.

(e)    Bond Resolution. The Lender (or its counsel) shall have received a copy, duly certified by the Clerk of the Issuer, of the Bond Resolution.

(f)    Security Agreement.  The Lender (or its counsel) shall have received an executed copy of the Security Agreement signed by the Borrower, Arrow WV and the Issuer together with: (i) all documents and instruments, including Uniform Commercial Code financing statements and amendments, required by law or reasonably requested by the Lender to be filed, registered or recorded to create or perfect the Liens intended to be created under the Security Agreement, and (ii) the results of the search of the Uniform Commercial Code (or equivalent) filings, tax Liens and judgment Liens made with respect to the Borrower in each jurisdiction (A) in which it is organized, and (B) where it has its chief executive office or has had its chief executive office within the last four months prior to the Closing Date; and copies of the financing statements (or other documents) disclosed by such search and evidence reasonably satisfactory to the Lender that the Liens indicated by such financing statements (or other documents) are permitted by Section 6.2(b)  or have been released or will be released on the Closing Date.

(g)    <u>Pledged Notes</u>. The Lender shall have received each promissory note (if any) pledged to the Lender pursuant to the Collateral Documents endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(h)    <u>Collateral Assignments</u>. The Lender shall have received a collateral assignment of any mortgage or deed of trust held by the Borrower covering any Mortgaged Property.

(i)    <u>Real Property</u>. The Lender shall have received, with respect to each parcel of Mortgaged Property, each of the following, in form and substance reasonably satisfactory to the Lender:

(i)    a Mortgage on such property or an amendment to the existing Mortgage;

(ii)    assignments of all rents, leases, permits, licenses, utility rights and other privileges related to such property;

(iii)    collateral assignments of all construction documents, property management agreements, development agreements, leasing agreements, and security deposits, and subordination of such agreements as requested by the Lender;

(iv)    (x) a flood determination certificate issued by the appropriate Governmental Authority or third party indicating whether such property is designated as a "Special Flood Hazard Area" as designated on maps prepared by the Federal Emergency Management Agency and (y) to the extent such flood determination certificate indicates to the satisfaction of the Lender that no Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) is in a "Special Flood Hazard Area" as designated on maps prepared by the Federal Emergency Management Agency, then upon the Lender's request, Borrower shall execute and deliver an amendment to the applicable Mortgage in form and substance reasonably satisfactory to the Lender sufficient to cause any such property previously excluded from such Mortgage to become Mortgaged Property;

(v)    if any such parcel of real property is determined by the Lender to be in a "Special Flood Hazard Area" as designated on maps prepared by the Federal Emergency Management Agency, a flood notification form signed by the Borrower and evidence that flood insurance is in place for the building and contents, all in form, substance and amount satisfactory to the Lender;

(vi)    evidence of release of the Liens described in item [2] on <u>Schedule 6.2(b)</u> (other than Liens in favor of the Lender on Mortgaged Property or Permitted Encumbrances), or evidence that the Borrower is in good faith contesting and diligently pursuing a resolution of such Liens; and

(vii)    all existing appraisals as may be requested by the Lender and all existing environmental reports (including all available Phase I Environmental Site Assessment reports and Phase II Environmental Site Assessment reports), and any other existing reports, audits, studies or certifications associated therewith, in each case, in the Borrower's possession in connection with such real property.

(j)     Intercreditor Agreements. The Lender (or its counsel) shall have received a counterpart of each of the Foundation Intercreditor Agreement and the Settlement Trust Intercreditor Agreement (each in form and substance reasonably satisfactory to Lender) signed on behalf of each party thereto.

(k)     Fees. The Lender shall have received its pro rata portion of the JPM Exit Fee (as defined in the Chapter 11 Plan), and any other amounts due and payable to it, in each case pursuant to the terms of the Chapter 11 Plan.

(l)     Final Order. The Bankruptcy Court shall have entered a final order reasonably satisfactory to the Lender confirming the Chapter 11 Plan and all conditions to the effectiveness of the Chapter 11 Plan shall have been satisfied or waived.

(m)     [Other. The Borrower shall have delivered to the Lender or Bond Counsel such other documentation, certificates and opinions as may be reasonably required by the Lender or Bond Counsel, as applicable.]

## ARTICLE IV
## LOAN OF PROCEEDS TO BORROWER

**Section 4.1     Repayment of Loan**. On the Closing Date, to evidence its obligation to repay the Bond, the Borrower shall deliver the Note to the Issuer for assignment to the Lender as security for the Payment of the Bond. The Issuer hereby assigns such Note to the Lender without recourse and shall also execute the form of endorsement affixed to the Note.

**Section 4.2     Amounts Payable**. The Borrower shall make all payments required under the Bond as and when the same become due and shall promptly pay to the Holder all other amounts necessary to pay principal of and interest on the Bond, including any other payments required by the Bond, as and when the same become due (whether at maturity, by acceleration or otherwise), on the dates and in the amounts set forth in the Bond, subject to any pro rata adjustments pursuant to Section 4.6(b). Payments shall be made in lawful money of the United States of America at the office of the Lender in Dallas, Texas, or at such other place as the Holder may direct in writing. Any amount at any time paid to the Holder as the payment of principal of or interest on the Bond as the same become due shall be credited against the Borrower's obligation hereunder and under the Note as of the date such obligation is due (but subject to collection of any instrument, draft, check or order for payment received by the Holder). If such amount should be sufficient to pay at the times required the principal of and interest on the Bond then remaining unpaid accrued and to accrue through final Payment of the Bond, the Borrower shall not be obligated to make any further payments hereunder or under the Note but only if the same constitutes Payment of the Bond. To effectuate any payment due under this Agreement, the Borrower hereby authorizes the Lender to initiate debit entries to any deposit account of the Borrower maintained with the Lender and to debit the same to such account. This authorization to initiate debit entries shall remain in full force and effect until the Lender has received written notification of its termination in such time and in such manner as to afford the Lender a reasonable opportunity to act on it provided that no notice of termination may be given if a Default exists. The Borrower acknowledges (a) that such debit entries may cause an overdraft of any such account which may result in the Lender's refusal to honor items drawn on any such account until adequate deposits are made to any such account; (b) that the Lender is under no duty or obligation to initiate any debit entry for any purpose; and (c)

that if a debit is not made because any such account does not have a sufficient available balance, or otherwise, the payment may be late or past due.

**Section 4.3     No Set-Off**. The obligation of the Borrower to make the payments required by the Note shall be absolute and unconditional. The Borrower will pay without abatement, diminution or deduction (whether for taxes or otherwise) all such amounts regardless of any cause or circumstance whatsoever including, without limitation, any defense, set-off, recoupment or counterclaim that the Borrower may have or assert against the Issuer, the Lender, any Holder or any other Person.

**Section 4.4     Prepayments**. The Borrower shall have the option to prepay the Note, resulting in an optional redemption of the Bond, in whole or in part, as set forth in Section 3.5.

**Section 4.5     Credits Against the Note**. To the extent that principal of or interest on the Bond shall be paid, there shall be credited against the unpaid principal of or interest on the Note, as the case may be, an amount equal to the principal of or interest on the Bond so paid. If the principal of and interest on and other amounts payable under the Bond shall have been paid sufficiently that Payment of the Bond shall have occurred, then the Note, ipso facto, shall be deemed to have been paid in full, the Borrower's obligations thereon shall be discharged (with the exception of the obligation of the Borrower to make certain payments which may subsequently arise as a result of a Determination of Taxability which shall survive notwithstanding Payment of the Bond) and the Note shall be cancelled and surrendered to the Borrower.

**Section 4.6     Additional Payments upon Determination of Taxability; Excess Cash Sweep Prepayments**.

(a)     Additional Payments upon Determination of Taxability.

(i)     In the event of a Determination of Taxability, and upon demand of the Holder or any prior Holder, the Borrower shall pay to such Holder or prior Holder such additional amount as shall be necessary to provide that interest on the Bond shall have been payable at the Taxable Rate from the Date of Taxability.

(ii)     Upon a Determination of Taxability, the Borrower shall also pay to the Holder or to any prior Holder upon demand of such Holder or prior Holder any taxes, interest, penalties or other charges assessed against or payable by such Holder or prior Holder and attributable to such Determination of Taxability and all reasonable administrative, out of pocket and other expenses incurred by such Holder or prior Holder which are attributable to such event, including, without limitation, the costs incurred by such Holder or prior Holder to amend any of its tax returns, notwithstanding the repayment of the entire principal amount of the Bond or any transfer or assignment of the Bond.

(iii)     The obligation of the Borrower contained in this Section 4.6(a) with respect to the payment of amounts required to be paid shall survive the termination of this Agreement and the payment in full of the Note or the Bond.

(b)     Excess Cash Sweep.

(i)    If Available Cash exceeds $75,000,000 (the amount of such excess being referred to as "Excess Cash") on any Excess Cash Test Date, then, as soon as reasonably practicable but in no event later than 30 days after such Excess Cash Test Date, the Borrower shall remit (the "Excess Cash Sweep Prepayment") to the Lender an amount equal to 25% of the Excess Cash (the "Excess Cash Amount"); *provided*, *however*, that the Borrower shall have no obligation to remit any Excess Cash Sweep Prepayments until the last Distribution (as defined in the Chapter 11 Plan) is made on account of Allowed General Unsecured Claims (as defined in the Chapter 11 Plan) under the terms of the Chapter 11 Plan (the occurrence of which shall be determined by the Borrower in good faith).

(ii)    Each Excess Cash Sweep Prepayment shall be accompanied by a certificate signed by a Financial Officer certifying the manner in which the Excess Cash and the Excess Cash Sweep Prepayment were calculated, as reasonably determined by the Borrower in good faith. If there is no Excess Cash on an applicable Excess Cash Test Date, such certificate shall certify only that no Excess Cash existed on the applicable Excess Cash Test Date.

(iii)    Notwithstanding the foregoing, if at the time that any Excess Cash Sweep Prepayment would be required, the Borrower is required to offer to prepay or repurchase any other Indebtedness outstanding at such time that is secured by a Lien on the Collateral ranking pari passu with the Lien securing the Bond pursuant to the terms of the documentation governing such Indebtedness (with the Excess Cash Amount (such Indebtedness required to be offered to be so repurchased, "Other Applicable Indebtedness"), then the Borrower may apply the Excess Cash Amount on a pro rata basis (determined on the basis of the aggregate outstanding principal amount of the Bond and Other Applicable Indebtedness at such time) to the prepayment of such Other Applicable Indebtedness; *provided*, that in no event shall the aggregate amount of the prepayment of the Bond and such Other Applicable Indebtedness exceed the Excess Cash Amount; *provided*, *further*, that (A) the portion of the Excess Cash Amount allocated to the Other Applicable Indebtedness shall not exceed the amount of the Excess Cash Amount required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Excess Cash Amount shall be allocated to the Bond in accordance with the terms hereof to the prepayment of the Bond and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Bond that would have otherwise been required pursuant to this Section 4.6(b) shall be reduced accordingly.

## Section 4.7    Assignment.

(a)    In order to provide security for the payment of principal of and interest on the Bond, the Issuer hereby pledges, assigns, transfers and sets over to Lender and its successors and assigns and any subsequent Holder of the Bond all of the Issuer's right, title and interest (including beneficial interest) in and to this Agreement and the Note, including, but not limited to, all payments of principal and interest due and to become due from the Borrower under this Agreement and the Note, whether made at their respective due dates or as prepayments permitted or required by this Agreement, together with full power and authority, in the name of the Issuer or otherwise, to demand, receive, enforce, collect or receipt for any or all of the foregoing, to endorse or execute

any checks or other instruments or orders, to file any claims and to take any action which the Holder may deem necessary or advisable in connection therewith, and the Issuer hereby irrevocably appoints the Holder attorney-in-fact of the Issuer for such purposes, which appointment is coupled with an interest and is irrevocable; provided, however, that the Issuer shall continue to have all the rights, together with the Holder, contained in the following sections of this Agreement:

        (i)     Article IX (pertaining to the Issuer's right to release and indemnification and limitations on the liability of the Issuer and its members, officers, employees, etc.);

        (ii)     Section 10.3 (pertaining to the Issuer's right to receive notices); and

        (iii)     Section 10.7 (pertaining to the Issuer's right to reimbursement of certain fees, costs and expenses).

        (b)     The Lender or any subsequent Holder may take or release other security, may release any party primarily or secondarily liable for any indebtedness secured hereby, may grant extensions, renewals or indulgences with respect to such indebtedness, and may apply any other security therefor held by it to the satisfaction of such indebtedness without prejudice to any of its rights hereunder. Nothing herein contained and no act done or omitted by the Holder pursuant to the powers and rights granted it herein shall be deemed to be a waiver by the Holder of its rights and remedies under the Bond or this Agreement. The right of the Holder to collect such indebtedness and to enforce any other security therefor held by it may be exercised by the Holder either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

        (c)     Neither the assignment of the Issuer's right hereunder nor any action or inaction on the part of the Lender or any subsequent Holder shall, without its written consent, constitute an assumption on its part of any obligation of any other person under this Agreement or the Note, nor shall the Lender or any subsequent Holder have any obligation to make any payment to be made by the Issuer hereunder on the Note or the Bond, or to present or file any claim, or to take any other action to collect or enforce the payment of any amounts which have been assigned to the Lender or any subsequent Holder or to which it may be entitled under this assignment at any time or times. No action or inaction on the part of the Issuer shall adversely affect or limit in any way the rights of the Lender or any subsequent Holder under this assignment or under this Agreement or the Note.

        Except as set forth above, the Issuer agrees that it will not during the term of this Agreement sell, assign, transfer or convey any of its interest in this Agreement or the Note.

        **Section 4.8**    **<u>Payments Assigned</u>**. If no Event of Default shall have occurred, the Borrower and the Issuer agree that all funds assigned hereunder shall be paid and applied as follows:

        (a)     each payment to be made pursuant to the Note shall be paid by the Borrower directly to the Holder on or before the due date of such payment under this Agreement, and shall be applied in accordance with the terms of the Bond;

(b)     all amounts prepaid by the Borrower pursuant to Section 3.5 shall be paid to the Holder and applied to the redemption of the Bond as provided in the Bond; and

(c)     all other funds assigned hereunder shall be applied as provided in this Agreement and the Bond.

If any "Event of Default" under this Agreement shall have occurred, all funds covered by this Agreement shall be paid to the Holder who shall hold all funds received and shall apply the same in the manner specified in Section 8.3 and in the Bond.

<h1 style="text-align:center">ARTICLE V<br>[RESERVED]</h1>

<h1 style="text-align:center">ARTICLE VI<br>BORROWER'S COVENANTS</h1>

**Section 6.1     Affirmative Covenants**.

(a)     Financial Statements and Other Information.

(i)     Annual Audit. Within 180 days after the end of each fiscal year of the Borrower (commencing with the fiscal year ending December 31, 2022, *provided* that with respect to the fiscal year ending December 31, 2022, the financial information shall only be required to cover the period commencing on the Effective Date and ending on December 31, 2022), the Borrower will furnish to the Lender its audited consolidated balance sheet and related statements of operations as of the end of and for such year, setting forth in each case (other than for the fiscal year ending December 31, 2022) in comparative form the figures for the previous fiscal year, all reported on by an independent public accountants of recognized standing (without any qualification or exception as to the scope of such audit other than with respect to any upcoming maturity of indebtedness or financial covenant compliance) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower, its Subsidiaries and certain of its Affiliates on a consolidated basis in accordance with GAAP consistently applied.

(ii)     Quarterly Financial Statements. Within 45 days after the end of each March, June, and September of each year (commencing with the first full fiscal quarter ending after the Effective Date), the Borrower will furnish to the Lender its balance sheet and related statements of operations as of the end of and for the month then ended and the then elapsed portion of the fiscal year, setting forth, in the case of the balance sheet only, in comparative form the figures for the corresponding period of the previous fiscal year (provided that no comparative figures shall be included for such financial statements delivered during the fiscal years ending December 31, 2022 and December 31, 2023), and all (A) in form and substance substantially similar to the "Boy Scouts of America Consolidated Financial Statements for the period ending [_____], 20[__] (Unaudited)" previously provided to the Lender by the Borrower, and (B) certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries referenced in such financial statements in accordance with

sound accounting principles consistently applied, subject to normal year-end adjustments and the absence of footnotes.

(iii)    <u>Compliance Certificate</u>. Concurrently with any delivery of financial statements under clause (i) or (ii) above, the Borrower will furnish to the Lender a certificate of a Financial Officer in substantially the form of <u>Exhibit C</u> (A) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (B) setting forth reasonably detailed calculations demonstrating compliance with Section 6.3 and (C) stating whether any change in GAAP or in the application thereof has occurred since the date of the Borrower's audited financial statements referred to in Section 2.2(d) and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(iv)    <u>Additional Information Relating to the Project or the Collateral</u>. Promptly following any request therefor, the Borrower will furnish to the Lender such other information regarding the operations, affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of any Bond Document, and any Collateral as the Lender or the Issuer may reasonably request.

(b)    <u>Notices of Material Events</u>. The Borrower will furnish to the Lender written notice of the following promptly upon any Financial Officer or any other executive officer or director of the Borrower or Arrow WV obtaining knowledge thereof:

(i)    <u>Default</u>. The occurrence of any Default;

(ii)    <u>Notice of Proceedings</u>. The filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Subsidiary that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(iii)    <u>ERISA Event</u>. The occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and the ERISA Affiliates in an aggregate amount exceeding $100,000; and

(iv)    <u>Material Adverse Effect</u>. Any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this <u>Section 6.1(b)</u> shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

(c)    <u>Existence; Conduct of Operations</u>. The Borrower will, and will cause each of the Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and not-for-profit status and, except where failure to do so could not reasonably be expected to have a Material Adverse Effect, the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names necessary to the conduct of its operations.

(d)    <u>Payment of Obligations</u>. The Borrower will, and will cause each of the Subsidiaries to, pay its Indebtedness and other obligations before the same shall become delinquent or in default, except (i) where (A) the validity or amount thereof is being contested in good faith by appropriate proceedings, (B) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (C) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation and (D) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect and (ii) for the failure to pay when due up to an aggregate amount not to exceed $100,000 of accounts payable at any time outstanding if (A) no action has been taken to enforce collection of such obligations and (B) the failure to make payment could not reasonably be expected to result in a Material Adverse Effect.

(e)    <u>Maintenance of Properties</u>. The Borrower will, and will cause each of the Subsidiaries to, keep and maintain all property material to the conduct of its business and activities in good working order and condition, ordinary wear and tear excepted.

(f)    <u>Insurance</u>. The Borrower will, and will cause each of the Subsidiaries to, maintain, with financially sound and reputable insurance companies insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by Persons of established repute engaged in the same or similar operations operating in the same or similar locations. Notwithstanding the foregoing, the Borrower or any Subsidiary may self-insure if such self-insurance (i) is in amounts not less than what is reasonable based on the operations and locations of the Borrower and its Subsidiaries, (ii) is adequate to protect its property and operations, and (iii) is prudent under the circumstances; provided, however, that the Borrower and the Subsidiaries may not self-insure any of their property, plant and equipment. The Borrower will furnish to the Lender or the Issuer, upon request of the Lender or the Issuer (as applicable), information in reasonable detail as to the insurance so maintained. Each general liability insurance policy shall name the Issuer as additional insured.

(g)    <u>Books and Records; Inspection and Audit Rights</u>. The Borrower will, and will cause each of the Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. The Borrower will, and will cause each of the Subsidiaries to, permit any representatives designated by the Lender who have agreed in writing to be bound to the confidentiality provisions hereof for the benefit of the Borrower and each of its Subsidiaries, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested. Notwithstanding the foregoing, neither the Borrower nor any of its Subsidiaries shall be required to produce that portion of any books or records that could reasonably be expected to disclose any material entitled to an attorney-client privilege.

(h)    <u>Compliance with Laws and Agreements</u>. The Borrower will, and will cause each of the Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property (including, without limitation, all applicable Environmental Laws) and all agreements binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(i)    <u>Further Assurances</u>. The Borrower and Arrow WV will execute any and all further documentation and take all such further actions, which may be required under any Requirement of Law, or which the Lender may reasonably request, to effectuate the transactions contemplated by the Bond Documents. Subject to the terms of the Collateral Documents, the Borrower will execute any and all further documents, financing statements, fixture filings, mortgages, deeds of trust, control agreement, agreements and instruments, and take all such further actions which may be required under any Requirement of Law, or which the Lender may reasonably request, to effectuate the transactions contemplated by the Bond Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Collateral Documents or the validity or priority of any such Lien, all at the expense of the Borrower. The Borrower also agrees to provide to the Lender, from time to time upon request, evidence reasonably satisfactory to the Lender as to the perfection and priority of the Liens created or intended to be created by the Collateral Documents.

(j)    <u>Banking Relationship</u>. In an effort to assure the soundness of the Amendment Transactions, the Borrower will and will cause each Subsidiary to establish and maintain its primary banking depository and disbursement relationship with the Lender.

(k)    <u>IRS Form</u>. On or before the Closing Date, the Borrower will provide the Lender and the Issuer evidence of the completion and arrangements for filing of Internal Revenue Service Form 8038 with respect to the issuance of the Bond and any supplements, or certificates related, to the Tax Certificate reasonably requested by the Issuer or the Lender.

**Section 6.2    <u>Negative Covenants</u>.**

(a)    <u>Indebtedness</u>. The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(i)    Indebtedness created under the Bond Documents and the 2010B Bond Documents;

(ii)    Indebtedness set forth in <u>Schedule 6.2(a)</u>, Indebtedness incurred after the date hereof under commitments described on <u>Schedule 6.2(a)</u> and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof or result in an earlier maturity date or decreased weighted average life thereof;

(iii)    Indebtedness of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof or result in an earlier maturity date or decreased weighted average life thereof; <u>provided</u> that (A) such Indebtedness is incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement and (B) the aggregate principal amount of Indebtedness permitted by this clause (iii) shall not exceed $50,000,000 at any time outstanding;

(iv)    Indebtedness arising in connection with Swap Agreements permitted by Section 6.2(g).

(v)      to the extent constituting Indebtedness, deferred compensation payable to directors, officers or employees of the Borrower and the Subsidiaries;

(vi)      cash management obligations and Indebtedness incurred by the Borrower or any Subsidiary in respect of netting services, overdraft protections and similar arrangements, in each case entered into in the ordinary course of operations in connection with cash management and deposit accounts and not involving the borrowing of money;

(vii)      Indebtedness arising in connection with the Credit Agreement;

(viii)      loans and advances from the Borrower to Arrow WV in an aggregate principal amount not to exceed $500,000,000; *provided* that such loans and advances are evidenced and governed by documentation reasonably acceptable to the Lender and the proceeds of such loans and advances are used by Arrow WV to finance the Project;

(ix)      liabilities for contributions to self-insurance or shared or pooled risk insurance programs of the Borrowers and its Subsidiaries required or permitted to be maintained under Section 6.1(f);

(x)      Subordinated Indebtedness in an aggregate principal amount not to exceed $20,000,000 outstanding at any time;

(xi)      Indebtedness under the BSA Settlement Trust Note in a principal amount not to exceed $80,000,000 plus any interest added to such principal amount by payments in kind;

(xii)      Indebtedness under the Foundation Loan Agreement in a principal amount not to exceed $42,800,000;

(xiii)      Indebtedness arising out of letters of credit issued to purchase goods in the ordinary course of the Borrower's or its Subsidiaries' business; and

(xiv)      Indebtedness arising out of letters of credit in an aggregate principal amount not to exceed $10,000,000.

(b)      Liens. The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(i)      Liens created under the Collateral Documents, the other Bond Documents and the 2010B Bond Documents;

(ii)      Permitted Encumbrances;

(iii)      any Lien on any asset (and the accessions thereto and the product and proceeds thereof) of the Borrower or any Subsidiary set forth in Schedule 6.2(b); provided that (A) such Lien shall not apply to any other asset of the Borrower or any Subsidiary and (B) such Lien

shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(iv)    Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (A) such security interests secure Indebtedness permitted by Section 6.2(a)(iii), (B) such security interests and the Indebtedness secured thereby are incurred prior to or within 120 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed 90% of the cost of acquiring, constructing or improving such fixed or capital assets and (D) such security interests shall not apply to any other property or assets of the Borrower or any Subsidiary;

(v)    other Liens securing Indebtedness or other obligations in an aggregate principal amount not to exceed $500,000 at any time outstanding; provided that the aggregate book value of all assets encumbered by all the Liens permitted under this clause (v) shall not exceed $500,000, with the book value of an asset determined at the time of the granting of the Lien therein;

(vi)    a second priority Lien on the Arrow Intercompany Note securing Indebtedness under the Foundation Loan Agreement;

(vii)    second priority Liens on the inventory, accounts receivable (other than the Arrow Intercompany Note), Cash and the real property constituting the Borrower's headquarters as of the Effective Date, in each case securing Indebtedness under the BSA Settlement Trust Note;

(viii)    Liens securing Indebtedness permitted under Section 6.2(a)(xiii); *provided* that such Liens extend only to the goods so purchased; and

(ix)    Liens on cash and cash equivalents securing Indebtedness permitted under Section 6.2(a)(xiv).

(c)    Fundamental Changes.

(i)    The Borrower will not, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve. The Borrower will not, and will not permit any of the Subsidiaries to, engage to any material extent in any operations other than the operations of the type conducted by the Borrower and the Subsidiaries on the date of execution of this Agreement and operations reasonably related thereto.

(ii)    The Borrower will not, nor will it permit any of its Subsidiaries to, consummate a Division as the Dividing Person, without the prior written consent of the Lender. Without limiting the foregoing, if any Subsidiary that is a limited liability company consummates a Division (with or without the prior consent of the Lender as required above), each Division Successor shall be required to comply with the obligations set forth in Section 6.1(i) and the other further assurances obligations set forth in the Bond Documents.

(d)    Investments, Loans, Advances, Guarantees and Acquisitions. The Borrower will not, and will not permit any of the Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any

Equity Interests in or evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except:

(i)       Permitted Investments;

(ii)      Swap Agreements permitted by Section 6.2(g);

(iii)     loans and advances to officers, directors, and employees of the Borrower and the Subsidiaries made in the ordinary course of operations for travel and entertainment expenses, relocation costs and similar purposes up to a maximum for all such loans and advances of $250,000 in the aggregate at any one time outstanding;

(iv)      endorsements of items for collection or deposit in the ordinary course of business;

(v)       loans and advances to Arrow WV in an aggregate principal amount not to exceed $500,000,000; *provided* that such loans and advances are evidenced and governed by documentation reasonably acceptable to the Lender and the proceeds of such loans and advances are used by Arrow WV to finance the Project and such loans and advances evidenced by one or more promissory notes pledged and delivered to the Lender; and

(vi)      in addition to the investments otherwise permitted by this Section 6.2(d), the Borrower and the Subsidiaries may acquire Equity Interests in or other securities of, make loans or advances to, Guarantee any obligations of, or make any other investment in, any other Person if the aggregate amount expended to make all such investments consummated under the permissions of this clause (vi) shall not exceed an amount equal to $500,000; *provided* that, as of the date of any such investment and after giving effect thereto, no Default shall exist or result therefrom.

(e)       Asset Sales. The Borrower will not, and will not permit any of the Subsidiaries to, sell, transfer, lease or otherwise dispose of any asset, except:[3]

(i)       sales or other dispositions of used or surplus equipment, inventory and Permitted Investments in the ordinary course of operations;

(ii)      other sales, transfers and other dispositions of assets in the ordinary course of operations of the Borrower or the Subsidiaries; provided that (A) all sales, transfers and other dispositions made under the provisions this clause (ii) shall be made (x) for fair value, (y) for at least 90% cash consideration, and (z) in compliance with Section 6.2(i); and (B) the proceeds of any disposition permitted under this clause (ii) are retained by the Borrower and used to acquire other assets to be used in the operations of the Borrower or the Subsidiaries;

---

[3] NTD: Ability to sell the HQ subject to ongoing discussion.

(iii) sales or other dispositions of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on the Bond or the Obligations and are disposed of in accordance with such specific restriction;

(iv) (A) leases by the Borrower or a Subsidiary of the type described in clause (k) of the definition of Permitted Encumbrances and (B) the grant or conveyance of conservation easements by Arrow WV of the type described in clause (n) of the definition of Permitted Encumbrances;

(v) the BSA Settlement Trust Contribution (as defined in the Chapter 11 Plan); and

(vi) other sales, transfers and dispositions of assets not permitted by any other clause of this Section 6.2(e), *provided* that the aggregate fair market value of the assets sold under the permissions of this clause (vi) may not exceed $1,000,000 per fiscal year.

(f) Sale and Leaseback Transactions. The Borrower will not, and will not permit any of the Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its operations, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for (i) any such sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 90 days after the Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset and (ii) the sale-and-leaseback of the Warehouse and Distribution Center in accordance with the provisions of the Chapter 11 Plan.

(g) Swap Agreements. The Borrower will not, and will not permit any of the Subsidiaries to, enter into any Swap Agreement, except (i) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure and (ii) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

(h) Restricted Payments; Certain Payments of Indebtedness. The Borrower will not, nor will it permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so. The Borrower will not, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution, subject to the Bond Documents (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i) payment of Indebtedness related to the Bond Documents, the 2012 Bond Documents and the Loan Documents (as defined in the Credit Agreement);

(ii)     payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness other than payments in respect of Subordinated Indebtedness prohibited by the subordination provisions thereof;

(iii)     payment of Indebtedness constituting pension plan liabilities arising under a Plan;

(iv)     refinancing of Indebtedness to the extent permitted by Section 6.2(a);

(v)     payment of Indebtedness under the BSA Settlement Trust Note;

(vi)     payment of Indebtedness under the Foundation Loan Agreement; and

(vii)     payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness.

(i)     <u>Transactions with Affiliates</u>. The Borrower will not, nor will it permit any Subsidiary, to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (A) transactions are at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (B) any loan, advance, or Guarantee permitted by <u>Section 6.2(d)(v)</u> or <u>(vi)</u>, (C) any Restricted Payment permitted by <u>Section 6.2(h)</u>, (D) any incurrence of Subordinated Indebtedness owing to an Affiliate permitted by <u>Section 6.2(a)(x),</u> and (E) the lease of the Summit Bechtel Family National Scout Reserve by Arrow WV to the Borrower.

(j)     <u>Change in Fiscal Year</u>. The Borrower will not change the manner in which either the last day of its fiscal year or the last days of the first three fiscal quarters of its fiscal year is calculated.

**Section 6.3     <u>Financial Covenants</u>**.

(a)     <u>Minimum Liquidity</u>. Beginning with December 31, 2022, the Borrower shall not permit Liquidity as of the last day of any June or December for which quarterly or annual financial statements (as applicable) and a compliance certificate were delivered or required to be delivered pursuant to <u>Section 6.1(i)</u>, <u>(ii)</u> and <u>(iii)</u>, respectively (each a "<u>Test Date</u>") to be less than the amount set forth in the table below opposite such Test Date.

| Test Date | Liquidity |
|---|---|
| December 31, 2022 | $20,000,000 |
| June 30, 2023 | $35,000,000 |
| December 31, 2023 | $47,500,000 |
| June 30, 2024 | $35,000,000 |
| December 31, 2024 | $39,000,000 |
| June 30, 2025 | $30,000,000 |

| Test Date | Liquidity |
|---|---|
| December 31, 2025 | $35,000,000 |
| June 30, 2026 | $25,000,000 |
| December 31, 2026 | $30,000,000 |
| June 30, 2027 | $21,000,000 |
| December 31, 2027 | $26,000,000 |
| June 30, 2028 | $16,000,000 |
| December 31, 2028 | $22,000,000 |
| June 30, 2029 | $12,000,000 |
| December 31, 2029 | $18,000,000 |
| June 30, 2030, and each Test Date occurring on June 30 thereafter | $12,000,000 |
| December 31, 2030 and each Test Date occurring on December 31 thereafter | $18,000,000 |

(b)     Consolidated Debt Service Coverage Ratio. Beginning with the Rolling Period ending as of December 31, 2022, the Borrower shall not permit its Consolidated Debt Service Coverage Ratio for any Rolling Period ending as of any Test Date to be less than (a) for each Test Date occurring on or before December 31, 2023, 1.00 to 1.00, (b) for the Test Dates occurring June 30, 2024 and December 31, 2024, 0.80 to 1.00, (c) for each Test Date occurring during the period from and including June 30, 2025 to and including December 31, 2027, 1.00 to 1.00 and (d) for each Test Date occurring on or after June 30, 2028, 1.20 to 1.00.

(c)     Additional Financial Covenants. In the event the Borrower shall enter into, assume or otherwise become bound by or obligated under any agreement creating or evidencing any Indebtedness, the terms of this Agreement shall, without any further action on the part of the Borrower, the Lender, or the Issuer, be deemed to be amended automatically to include each Additional Financial Covenant contained in such agreement; *provided*, *however*, that this Agreement shall not be amended to include any Additional Financial Covenant if Bond Counsel determines that the inclusion of such Additional Financial Covenant would adversely affect the exclusion of interest on the Bond from gross income for federal income tax purposes. The Borrower further covenants to promptly execute and deliver at its expense an amendment to this Agreement in form and substance satisfactory to the Lender evidencing the amendment of this Agreement to include such Additional Financial Covenants, provided that the execution and delivery of such amendment shall not be a precondition to the effectiveness of such amendment but shall merely be for the convenience of the parties hereto. Upon the date that any Additional Financial Covenant is no longer binding on the Borrower under the terms of the original agreement which created or evidenced the applicable Indebtedness, the terms of this Agreement shall, without

any further action on the part of the Borrower or the Lender, be deemed to be amended automatically to delete such Additional Financial Covenant from this Agreement. For purposes of this Agreement, the term "Additional Financial Covenant" means any financial covenant, event of default or similar restriction applicable to the Borrower (regardless of whether such provision is labeled or otherwise characterized as a covenant) the subject matter of which either (A) is similar to that of the covenants in this Section 6.3, but contains one or more percentages, amounts or formulas that in the sole judgment of the Lender is more restrictive than those set forth herein or more beneficial to the holder or holders of such other Indebtedness (and such covenant, event of default or similar restriction shall be deemed an "Additional Financial Covenant" only to the extent that it is more restrictive or more beneficial), or (B) is different from the subject matter of the covenants in this Section 6.3 and measures the financial performance of the Borrower utilizing financial statement components.

## ARTICLE VII
## TAX COVENANT

**Section 7.1**    **Tax Covenant**. The Issuer, the Borrower and Arrow WV covenant and agree that each shall at all times do and perform all acts and things permitted by law and this Agreement which are necessary in order to assure that interest paid on the Bond will be excluded from gross income of the Holders for federal income tax purposes and shall take no action that would result in such interest not being excluded from gross income for federal income tax purposes. Without limiting the generality of the foregoing, the Issuer, the Borrower and Arrow WV agree to comply with the provisions of the Tax Certificate, which are hereby incorporated herein. This covenant shall survive payment in full or defeasance of the Bond.

## ARTICLE VIII
## EVENTS OF DEFAULT

**Section 8.1**    **Events of Default**. The term "Event of Default" means any one or more of the following events:

(a)    the Borrower shall fail to make any payment on any obligation of the Borrower to (i) the Lender including, without limitation, any payments on the Note or (ii) the Issuer, when due and payable;

(b)    the Borrower shall fail to pay any interest on any Indebtedness or any fee or any other amount (other than an amount referred to in Section 8.1(a)) payable under this Agreement or any other Bond Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three days;

(c)    any representation, warranty or certification made or deemed made by or on behalf of the Borrower in or in connection with any Bond Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Bond Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)     the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Sections 6.1(b), 6.1(c), 6.1(g), 6.2 or 6.3(c);

(e)     the Borrower shall fail to observe or perform any covenant, condition or agreement contained in any Bond Document (other than those specified in Section 8.1(a), (b), (d), (o) or (p)), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Lender to the Borrower;

(f)     the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable;

(g)     any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due (and all applicable notices of default, if any, have been given and all applicable cure periods have expired), or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Subsidiary or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)     the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 8.1(h), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j)     the Borrower or any Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k)     one or more judgments for the payment of money in an aggregate amount in excess of $5,000,000 shall be rendered against the Borrower, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed by written agreement or court order, or any action shall

be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Subsidiary to enforce any such judgment;

(l)    an ERISA Event shall have occurred that, in the opinion of the Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and the ERISA Affiliates in an aggregate amount exceeding $1,000,000;

(m)    any Bond Document shall otherwise for any reason cease to be in full force and effect and valid, binding and enforceable in accordance with its terms after its date of execution, or the Borrower shall so state in writing;

(n)    any Lien purported to be created under the Collateral Documents in respect of assets that constitute a material portion of the Collateral shall cease to be, or shall be asserted by the Borrower not to be (other than, in each case, in accordance with its terms), a valid and perfected Lien on such Collateral, with the priority required hereby or thereby;

(o)    the Borrower shall fail to comply with the covenant set forth in Section 6.3(a); *provided* that if (i) Liquidity is less than the amount specified in Section 6.3(a) but equal to or greater than $10,000,000 as of any Test Date and (ii) a Test Date Tax Opinion has been delivered to the Lender at the same time as the financial statements are delivered to the Lender under Section 6.1(a)(i) or (ii) for the applicable Test Date, then an Event of Default shall not be deemed to exist under this clause (o) as of such Test Date (but an event of the type with the passage of time will become an Event of Default if not cured or waived shall have occurred and such event, herein called, a "Potential Liquidity Default"). If a Potential Liquidity Default exists with respect to a Test Date then, as of the Redetermination Date applicable to such Test Date, such Potential Liquidity Default shall be deemed to have been cured if the Liquidity, calculated as of such Redetermination Date based on the financial statements delivered under Section 6.1(a)(ii) for the period ending on such Redetermination Date, is equal to or greater than the amount specified in Section 6.3(a);

(p)    the Borrower shall fail to comply with the covenant set forth in Section 6.3(b); *provided* that (i) if the Consolidated Debt Service Coverage Ratio is less than the level specified in Section 6.3(b) as of any Test Date and (ii) a Test Date Tax Opinion has been delivered to the Lender at the same time as the financial statements are delivered to the Lender under Section 6.1(a)(i) or (ii) for the applicable Test Date, then an Event of Default shall not be deemed to exist under this clause (p) as of such Test Date (but an event of the type with the passage of time will become an Event of Default if not cured or waived shall have occurred and such event, herein called, a "Potential CDSCR Default"). If a Potential CDSCR Default exists with respect to a Test Date then, as of the Redetermination Date applicable to such Test Date,  such Potential CDSCR Default shall be deemed to have been cured if the Consolidated Debt Service Coverage Ratio, calculated as of such Redetermination Date based on the financial statements delivered under for the Section 6.1(a)(ii) for the period ending on such Redetermination Date, is greater than or equal to the level specified in Section 6.3(b) for the prior Test Date; or

(q)     the Lender reasonably determines that a Material Adverse Effect has occurred or a circumstance exists that could result in a Material Adverse Effect and such condition continues unremedied for a period of 30 days after notice thereof from the Lender to the Borrower.

The Issuer and the Borrower shall each notify the other and the Holder within five Business Days after either of them receives notice that an Event of Default has occurred with respect to the Borrower or the Issuer, or after either of them becomes aware that an Event of Default has occurred.

**Section 8.2      Remedies of Holder**. If any Payment of the Bond shall not have been made, whenever any Event of Default referred to in <u>Section 8.1</u> shall have happened and shall not have been waived, the Holder may take any one or more of the following remedial steps:

(a)     By written notice declare all installments of principal repayable pursuant to the Note for the remainder of the term thereof to be immediately due and payable, whereupon the same, together with accrued interest thereon as provided for in the Note, shall become immediately due and payable without presentment, demand, acceleration of maturity, protest, or any other notice whatsoever, all of which are hereby expressly waived by the Borrower; provided, however, that upon the occurrence of any event described in Section 8.1(h) or (i), the Note shall become immediately due without demand or acceleration.

(b)     Take whatever other action at law or in equity may appear necessary or desirable to collect the amounts payable pursuant to the Note then due and thereafter to become due, or to enforce the performance and observance of any obligation, agreement or covenant of the Borrower under this Agreement, the Security Agreement or under any of the other Bond Documents.

In the enforcement of the remedies provided in this <u>Section 8.2</u>, the Holder may treat all reasonable expenses of enforcement, including, without limitation, legal, accounting and required publication fees, costs  and expenses, as additional amounts payable by the Borrower then due and owing and the Borrower agrees to pay such additional amounts upon demand, the amount of such legal fees, costs and expenses to be without regard to any statutory presumption.

**Section 8.3      Payments After Default; No Waiver**. Any amounts collected pursuant to action taken under <u>Section 8.2</u> shall be paid to the Holder and applied to the payment of:

*first*, any fees, costs and expenses incurred by the Holder as a result of taking such action;

*second*, any interest which shall have accrued on any overdue interest on any accrued interest on any overdue principal of the Bond at the rate set forth in the Bond;

*third*, any overdue interest on the Bond;

*fourth*, any overdue principal of the Bond;

*fifth*, the outstanding principal balance of the Bond; and

*sixth*, if Payment of the Bond shall have been made, all remaining moneys as required by law.

**Section 8.4    No Remedy Exclusive**. No remedy herein conferred upon or reserved to the Holder is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute. No delay or omission to exercise any right or power accruing upon default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.

**ARTICLE IX**
**LIMITATION OF LIABILITY; INDEMNIFICATION**

**Section 9.1    Limitation of Issuer's Liability**. No covenant, agreement or obligation contained in any Bond Document shall be deemed to be a covenant, agreement or obligation of any past, present or future commissioner, officer, employee or agent of the Issuer in his individual capacity, and neither the commissioners of the Issuer nor any officer, employee or agent thereof executing any Bond Document shall be liable personally on such Bond Document or be subject to any personal liability or accountability by reason of the issuance thereof. No commissioner, officer, employee or agent of the Issuer shall incur any personal liability with respect to any other action taken by him pursuant to the Bond Documents or the Act or any of the transactions contemplated thereby provided he acts in good faith.

The Bond shall be a limited obligation of the Issuer. The principal and interest on the Bond shall be payable out of the revenues derived from this Agreement and the Note. The Bond and interest thereon shall never constitute an indebtedness of the Issuer, within the meaning of any constitutional provision or statutory limitation and shall never constitute or give rise to a pecuniary liability of the Issuer. Neither shall the Bond nor interest thereon be a charge against the general credit or taxing powers of the Issuer.

**Section 9.2    Indemnification by Borrower**. THE BORROWER SHALL AND HEREBY DOES INDEMNIFY AND HOLD HARMLESS THE ISSUER, THE BOND REGISTRAR, THE LENDER, ANY SUBSEQUENT HOLDER, AND ALL MEMBERS, OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES THEREOF (EACH AN "INDEMNIFIED PARTY" AND, COLLECTIVELY, THE "INDEMNIFIED PARTIES") ALL LOSSES, COSTS, DAMAGES, EXPENSES AND LIABILITIES OF WHATEVER NATURE, INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS' FEES, COSTS, EXPENSES, LITIGATION AND COURT COSTS, AMOUNTS PAID IN SETTLEMENT AND AMOUNTS PAID TO DISCHARGE JUDGMENTS (COLLECTIVELY REFERRED TO HEREINAFTER AS "LOSSES"), DIRECTLY OR INDIRECTLY RESULTING FROM, ARISING OUT OF OR RELATED TO ONE OR MORE CLAIMS, AS HEREINAFTER DEFINED, EXCLUDING ANY SUCH LOSSES OR CLAIMS THAT ARISE OUT OF AN ACT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY SUCH INDEMNIFIED PARTIES. WITHOUT LIMITING ANY PROVISION OF ANY BOND DOCUMENT, IT IS THE EXPRESS INTENTION OF THE PARTIES HERETO THAT EACH INDEMNIFIED PARTY SHALL BE INDEMNIFIED FROM AND HELD HARMLESS AGAINST ANY AND

ALL LOSSES, LIABILITIES, CLAIMS, DAMAGES, PENALTIES, JUDGMENTS, DISBURSEMENTS, COSTS, AND EXPENSES (INCLUDING ATTORNEYS' FEES, COSTS AND EXPENSES) ARISING OUT OF OR RESULTING FROM THE SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNIFIED PARTY. The word "Claims" as used herein means all claims, lawsuits, causes of action and other legal actions and proceedings of whatsoever nature including but not limited to claims, lawsuits, causes of action and other legal actions and proceedings involving bodily or personal injury or death of any person or damage to any property (including but not limited to persons employed by any of the Indemnified Parties and any other person) brought against any of the Indemnified Parties or to which any of the Indemnified Parties is a party, that directly or indirectly result from, arise out of or relate to (1) the transfer, sale, operation, use, occupancy, maintenance or ownership of the Project or any part thereof or (2) the execution, delivery or performance of this Agreement, the Note, the Security Agreement or any other related instruments or documents. The obligations of the Borrower under this Section 9.2 shall survive termination of this Agreement and apply to all Losses and Claims that result from, arise out of, or are related to any event, occurrence, condition or relationship prior to termination of this Agreement, whether such Losses and Claims are asserted prior to termination of this Agreement or thereafter.

Each Indemnified Party shall reimburse the Borrower for payments made by the Borrower pursuant to this Section 9.2 to the extent of any proceeds, net of all expenses of collection, actually received by such Indemnified Party from any insurance covering such Claims with respect to the Losses sustained. The Indemnified Parties shall have the duty to claim any such insurance proceeds and shall assign their respective rights to such proceeds, to the extent of such required reimbursement, to the Borrower.

In case any Claim shall be brought against any Indemnified Party in respect of which indemnity may be sought against the Borrower, then such Indemnified Party shall promptly notify the Borrower in writing of such Claim. Failure to notify the Borrower of such Claim shall not relieve the Borrower from any liability that the Borrower may have other than pursuant to this Section 9.2 and shall relieve the Borrower from liability the Borrower may have under this Section 9.2 only to the extent that such failure prejudices the Borrower. The Borrower shall have the right to assume the investigation and defense of such Claim, including the employment of counsel, which counsel shall be satisfactory to the Indemnified Parties, and shall pay all expenses of the investigation and defense of such Claim. If any action, suit or proceeding is brought against any Indemnified Party for any loss or damage for which the Borrower is required to provide indemnification under this Section 9.2, such Indemnified Party shall promptly notify the Borrower and the Borrower shall have the sole right and duty to assume, and shall assume, the defense thereof, with full power to litigate, compromise or settle the same in its sole discretion. Notwithstanding the foregoing, in the event the Indemnified Party is the Lender or the Issuer, in the event the Lender or the Issuer reasonably believes there are defenses available to it that are not being pursued, the Lender or the Issuer (as the case may be) may, in its sole discretion, hire independent counsel to pursue its own defense, and the Borrower shall be liable for the reasonable attorneys' fees, costs and expenses with respect to any such counsel. The Borrower shall not be liable for Losses resulting from settlement of Claims against an Indemnified Party unless the Borrower consents to that settlement. The obligations of the Borrower under this Section 9.2 shall survive any termination of this Agreement.

**Section 9.3    Issuer, Commissioner, Attorneys, Officers, Employees and Agents of Issuer Not Liable**. To the extent permitted by law, no recourse shall be had for the enforcement of any obligation, promise or agreement of the Issuer contained herein or in the other Bond Documents to which the Issuer is a party or for any claim based hereon or thereon or otherwise in respect hereof or thereof against any commissioner, officer, agent, attorney or employee, as such, in his/her individual capacity, past, present or future, of the Issuer or of any successor entity, either directly or through the Issuer or any successor entity whether by virtue of any constitutional provision, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise. No personal liability whatsoever shall attach to, or be incurred by, any commissioner, officer, agent, attorney or employee as such, past, present or future, of the Issuer or any successor entity, either directly or through the Issuer or any successor entity, under or by reason of any of the obligations, promises or agreements entered into between the Issuer and the Borrower, whether herein contained or to be implied herefrom as being supplemental hereto; and all personal liability of that character against every such commissioner, officer, agent, attorney and employee is, by the execution of this Agreement and as a condition of, and as part of the consideration for, the execution of this Agreement, expressly waived and released.

Notwithstanding any other provision of this Agreement, the Issuer shall not be liable to the Borrower or the Lender or any other person for any failure of the Issuer to take action under this Agreement unless the Issuer (a) is requested in writing by an appropriate person to take such action, (b) is assured of payment of, or reimbursement for, any reasonable expenses in such action, and (c) is afforded, under the existing circumstances, a reasonable period to take such action. In acting under this Agreement, or in refraining from acting under this Agreement, the Issuer may conclusively rely on the advice of its counsel.

**ARTICLE X**
**MISCELLANEOUS**

**Section 10.1    Assignment**.

(a)    Except with the prior written consent of the Holder, the rights and obligations of the Borrower under this Agreement shall not be assigned or otherwise transferred. Any such attempted assignment or transfer by the Borrower without such consent shall be null and void.

(b)    The Holder may, without the consent of the Borrower but with notice to the Borrower if no Default exists, transfer to one or more assignees all or a portion of its rights and obligations under this Agreement (including the Bond); *provided* that: (i) no such assignment shall, as of the date of the assignment and as long as no Default exists, cause the Borrower to pay any additional amounts hereunder that result from such assignment and which are not already contemplated by the terms of this Agreement and (ii) each such assignment shall be made in accordance with all applicable laws and regulations including applicable securities laws and regulations.

(c)    **Benefit of Agreement**. The Borrower intends that the representations, warranties and covenants made by the Borrower in this Agreement shall be for the equal benefit of the Issuer and the Lender hereunder.

**Section 10.2    Notices**. Except as may otherwise be provided in the applicable Bond Document, all demands, notices, approvals, consents, requests and other communications hereunder and under the other Bond Documents shall be in writing and shall be deemed to have been given (i) when delivered in person or by overnight courier or mailed by first class registered or certified mail, postage prepaid, or (ii) in the case of electronic mail, if the recipient confirms receipt by return electronic mail or "read" message. Any such communications shall be sent to:

(a)    if to the **Borrower** or **Arrow WV**:

    1325 West Walnut Hill Lane
    Irving, Texas 75038
    Attention: [_____]
    Telephone: [_____]
    Fax: (972)580-7896
    Email: [_____]

    with a copy to:

    Jonathan Michels
    White & Case LLP
    1221 Avenue of the Americas
    New York, New York 10020
    Telephone: (212) 819-8661
    Fax: (212) 354-8113
    Email: jmichels@whitecase.com

(b)    if to the **Issuer**:

    The County Commission of Fayette County
    P.O. Box 307
    Fayetteville, West Virginia 25840
    Attention: President
    Telephone: (304) 574-4290
    Fax: (304) 574-4255
    Email: [_____]

    with a copy to:

    John Stump, Esq.
    Steptoe & Johnson PLLC
    Chase Tower, 17th Floor
    707 Virginia Street East
    Charleston, West Virginia 25301
    Telephone: (304) 353-8196
    Fax: (304) 353-8181
    Email: John.Stump@Steptoe-Johnson.com

(c)      if to the **Lender**:

> 2200 Ross Avenue, 8th Floor
> Dallas, Texas 75201
> Attention: Todd Nordeen
> Telephone: (214) 965-2219
> Fax: (214) 965-2778
> Email: [_____]
>
> with a copy to:
>
> Benjamin Ratliff
> Norton Rose Fulbright US LLP
> 2200 Ross Avenue, Suite 3600
> Dallas, Texas 75201
> Telephone: (214) 855-7156
> Fax: (214) 855-8200
> Email: benjamin.ratliff@nortonrosefulbright.com

A duplicate copy of each notice, approval, consent, request or other communication given under any Bond Document by either the Issuer or the Borrower to the other shall also be given to the Lender. The Issuer, the Borrower and the Lender may, by notice given hereunder, designate any further or different addresses to which subsequent notices, approvals, consents, requests, or other communications shall be sent or persons to whose attention the same shall be directed.

**Section 10.3    Amendments**. This Agreement, the Bond and the Note may not be terminated, modified or amended, and the Borrower will not take or omit to take any action, the taking or omission of which might result in any alteration or impairment of this Agreement, the Bond or the Note, without the prior written consent of the Holder. Any consent provided for in this Agreement which may be given by the Issuer shall not be valid unless approved in writing by the Holder and no offer made by the Borrower under this Agreement, the Bond, the Note or the Security Agreement shall be deemed accepted or rejected by the Issuer without such approval. In connection with any such amendment requested by the Borrower, the Holder may require the Borrower to deliver, at the Borrower's expense, an opinion of Bond Counsel to the effect that such amendment will not adversely affect the exclusion of interest on the Bond from gross income for Federal income tax purposes. In connection with any amendment or other modification of any Bond Document, the Borrower shall pay the Lender an amendment fee in an amount equal to the greater of (a) $3,000 plus the reimbursement of the Lender's reasonable costs or expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred in connection with any such amendment or other modification or (b) such other reasonable amount as the Lender may determine.

**Section 10.4    UCC Financing Statements**. The Holder may file any financing statements and any continuation statements and amendments to financing statements that are or may be necessary with respect to this Agreement and the assignment of the Issuer's rights hereunder under the Uniform Commercial Code as in effect in the State. The Borrower hereby (a) irrevocably appoints the Holder as its true and lawful attorney for such purpose, with full power of substitution,

and (b) ratifies and confirms all that such attorney or any substitute shall lawfully do by virtue hereof. If so requested by the Holder, the Borrower shall ratify and confirm all proper continuation statements and amendments to financing statements as may be designated in any such request.

**Section 10.5    No Third Party Beneficiary**. It is specifically agreed between the parties to this Agreement that it is not intended by any of the provisions of any part of this Agreement to make the public or any member thereof, other than as may be expressly provided herein, a third party beneficiary hereunder.

**Section 10.6    Miscellaneous**.

(a)      The Borrower agrees to pay (1) the reasonable fees, costs and expenses of the Issuer, counsel to the Issuer, the Lender, counsel to the Lender and Bond Counsel and all other fees, costs and expenses incidental to the issuance of the Bond, the costs of producing the documents referred to herein and the costs of amending, restating, amending and restating, extending, supplementing or otherwise modifying any of the documents referred to herein, (2) all taxes of any kind whatsoever lawfully assessed, levied or imposed with respect to the filings or recordings pursuant to the Bond Documents and the transactions contemplated by this Agreement, and (3) all costs of collection (including reasonable counsel fees, costs and expenses) in the event of a default in the payment of the principal of, or interest on the Bond or other charges payable under the Bond Documents.

(b)      The Lender shall furnish to the Issuer upon request (1) a statement of the amount of principal of the Bond outstanding and unpaid as of the date of such request and (2) such information as may be necessary to complete the annual audit of the Issuer as required by the Act or any other law, now or hereafter in effect.

(c)      This Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and the subsequent Holders and their respective successors and assigns. The representations, covenants and agreements contained herein shall continue notwithstanding the delivery of the Bond to the Lender.

(d)      If any provision of this Agreement shall be held invalid by any court of competent jurisdiction, such holding shall not invalidate any other provision hereof.

(e)      All matters relating to the Issuer, the Issuer's powers, the Issuer's obligations and similar matters relating to the Issuer under the terms hereof shall be governed by the applicable laws of the State of West Virginia and, to the extent permitted by the applicable laws of the State of West Virginia, all other matters hereunder shall be governed by the applicable laws of the State of Texas.

(f)      No indebtedness of any kind incurred or created by the Borrower shall constitute an indebtedness of the Issuer or the State of West Virginia or its political subdivisions, and no indebtedness of the Borrower shall involve or be secured by the faith, credit, or taxing power of the Issuer or the State of West Virginia or its political subdivisions.

(g)    The Bond Documents express the entire understanding among the parties and none of such instruments may be modified except in writing signed by the parties. No Bond Document may be modified before Payment of the Bond without the consent of the Holder.

(h)    This Agreement may be executed in several counterparts, each of which shall be an original, and all of which together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic communication shall be as effective as delivery of a manually executed counterpart of this Agreement.

**Section 10.7    References to the Bond Ineffective After Bond Paid**. Upon Payment of the Bond, all references in this Agreement to the Bond shall be ineffective and the Issuer and Holder of the Bond shall not thereafter have any rights hereunder, excepting those set forth in Section 8.2 and those that shall have theretofore vested and the right to receive payments pursuant to Section 3.2 as a result of a Determination of Taxability and the rights to the computation, reporting and payment of any rebate amounts and other payments under the Tax Certificate.

**Section 10.8    No Implied Waiver**. In the event any agreement contained in the Note or this Agreement should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach thereunder or hereunder. Neither any failure nor any delay on the part of the Lender or any subsequent Holder to exercise any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof, or the exercise of any other right, power or privilege.

**Section 10.9    Issuer Representative**. Whenever under the provisions of this Agreement the approval of the Issuer is required or the Issuer is required to take some action at the request of the Borrower, such approval shall be made or such action shall be taken by the Issuer Representative; and the Borrower, the Lender and any subsequent Holder shall be authorized to rely on any such approval or action.

**Section 10.10    Borrower Representative**. Whenever under the provisions of this Agreement the approval of the Borrower is required or the Borrower is required to take some action at the request of the Issuer, such approval shall be made or such action shall be taken by the Borrower Representative and the Issuer, the Lender and any subsequent Holder shall be authorized to act on any such approval or action; *provided* that the foregoing does not limit the actions that a Financial Officer of the Borrower is otherwise permitted to take as set forth in this Agreement.

**Section 10.11    USA PATRIOT Act**. The Lender is subject to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act") and hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, the Lender is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Patriot Act.

**Section 10.12 <u>Maximum Rate</u>**.

(a)    <u>Limitation to Maximum Rate: Recapture</u>. No interest rate specified in any Bond Document shall at any time exceed the Maximum Rate. As used herein, the term "Maximum Rate" means, at any time with respect to the Lender, the maximum rate of non-usurious interest under applicable law that the Lender may charge Borrower. The Maximum Rate shall be calculated in a manner that takes into account any and all fees, payments, and other charges contracted for, charged, or received in connection with the Bond Documents that constitute interest under applicable law. Each change in any interest rate provided for herein based upon the Maximum Rate resulting from a change in the Maximum Rate shall take effect without notice to Borrower at the time of such change in the Maximum Rate. For purposes of determining the Maximum Rate under Texas law, the applicable rate ceiling shall be the indicted rate ceiling described in, and computed in accordance with Section 303.003 of the Texas Finance Code.

(b)    <u>Cure Provisions</u>. No provision of any Bond Document shall require the payment or the collection of interest in excess of the maximum amount permitted by applicable law. If any excess of interest in such respect is hereby provided for, or shall be adjudicated to be so provided, in any Bond Document or otherwise in connection with this loan transaction, the provisions of this <u>Section 10.12</u> shall govern and prevail and neither Borrower nor the sureties, guarantors, successors, or assigns of Borrower shall be obligated to pay the excess amount of such interest or any other excess sum paid for the use, forbearance, or detention of sums loaned pursuant hereto. In the event the Lender ever receives, collects, or applies as interest any such sum, such amount which would be in excess of the maximum amount permitted by applicable law shall be applied as a payment and reduction of the principal of the obligations outstanding hereunder, and, if the principal of the obligations outstanding hereunder has been paid in full, any remaining excess shall forthwith be paid to the Borrower. In determining whether or not the interest paid or payable exceeds the Maximum Rate, Borrower and the Lender shall, to the extent permitted by applicable law, (a) characterize any non-principal payment as an expense, fee, or premium rather than as interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the entire contemplated term of the obligations outstanding hereunder so that interest for the entire term does not exceed the Maximum Rate.

**Section 10.13 <u>No Fiduciary Duty</u>**.

(a)    The Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that the Lender will not have any obligations except those obligations expressly set forth herein and in the other Bond Documents and the Lender is acting solely in the capacity of an arm's length contractual counterparty to the Borrower with respect to the Bond Documents and the transactions contemplated herein and therein and not as a financial advisor or a fiduciary to, or an agent of, the Borrower or any other Person. The Borrower agrees that it will not assert any claim against the Lender based on an alleged breach of fiduciary duty by the Lender in connection with this Agreement and the transactions contemplated hereby. Additionally, the Borrower acknowledges and agrees that the Lender is not advising the Borrower as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction. The Borrower shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated herein or in the other

Bond Documents, and the Lender shall have no responsibility or liability to the Borrower with respect thereto.

(b)     The Borrower further acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that the Lender, together with its Affiliates, is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, the Lender may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, the Borrower and other companies with which the Borrower may have commercial or other relationships. With respect to any securities and/or financial instruments so held by the Lender or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

(c)     In addition, the Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that the Lender and its Affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which the Borrower may have conflicting interests regarding the transactions described herein and otherwise. The Lender will not use confidential information obtained from the Borrower by virtue of the transactions contemplated by the Bond Documents or its other relationships with the Borrower in connection with the performance by the Lender of services for other companies, and the Lender will not furnish any such information to other companies. The Borrower also acknowledges that the Lender has no obligation to use in connection with the transactions contemplated by the Bond Documents, or to furnish to the Borrower, confidential information obtained from other companies.

**Section 10.14 <u>Amendment and Restatement.</u>** On the Closing Date, the Original Bond Purchase and Loan Agreement was amended and restated in its entirety in the form of this Agreement. The parties hereto acknowledge and agree that (i) this Agreement and the other Bond Documents, whether executed and delivered in connection herewith or otherwise, do not constitute a novation, payment or reborrowing, or termination of the Obligations or Indebtedness arising under the Original Bond Purchase and Loan Agreement and (ii) such Obligations and such Indebtedness are in all respects continuing (as amended and restated hereby) as part of the Obligations and the Indebtedness under this Agreement with only the terms thereof being modified as provided herein. Each reference to the "Agreement", the "2012 Bond Agreement", and the "2012 Bond Purchase Agreement" in any Bond Document shall be deemed to be a reference to this Agreement as amended in the form hereof.

**Section 10.15 <u>Final Agreement</u>**. THIS WRITTEN AGREEMENT EMBODIES THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDE ANY AND ALL PREVIOUS COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR

SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

**[The remainder of this page is intentionally left blank.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in their respective names, all as of the date first above written.

**BOY SCOUTS OF AMERICA**

By _____
[●]

By_____
[●]

**ARROW WV, INC.**

By _____
Its _____

**JPMORGAN CHASE BANK, N.A.**, as Lender

By _____
Todd Nordeen, Senior Vice President

**THE COUNTY COMMISSION OF FAYETTE COUNTY (WEST VIRGINIA)**

By     _____

            John H. Lopez, acting President

SCHEDULE 1.1(a)

<u>CONSERVATION EASEMENTS</u>

[___]<sup>4</sup>

---

[4] NTD: To be updated closer to the effective date of the Chapter 11 Plan.

SCHEDULE 1.1(b)

<u>DISCLOSED MATTERS</u>

[___]⁵

---

⁵ NTD: To be updated closer to the effective date of the Chapter 11 Plan.

SCHEDULE 2.2, Solo Page

SCHEDULE 2.2(m)

## SUBSIDIARIES

[___]<sup>6</sup>

---

<sup>6</sup> NTD: To be updated closer to the effective date of the Chapter 11 Plan.

SCHEDULE 3.06(m), Solo Page

SCHEDULE 6.2(a)

## EXISTING INDEBTEDNESS

1.    Amended and Restated Promissory Note, dated as of March 21, 2019, in the original principal amount of $350,000,000, executed by Arrow WV, Inc. and payable to Boy Scouts of America.

2.    The Letters of Credit listed on the next pages of this Schedule.

3.    [●][7]

---

[7] NTD: To be updated closer to the effective date of the Chapter 11 Plan.

**BOY SCOUTS OF AMERICA**
**LETTERS OF CREDIT**
**AS OF [_____], 2022[8]**

Boy Scouts of America - Trade Letters of Credit

| JPM Reference Number | Tenor | Currency | Liab Outstanding Amount | L/C Available Amount | Release Date | Expiry / Maturity Date | Beneficiary Name |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Boy Scouts of America - Standby Letters of Credit

| JPM Ref No | Currency | LC Outstanding Amount | Release Date | Expiry / Maturity Date | Beneficiary Name | Final Expiry Date |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

---

[8] NTD: To be updated closer to the effective date of the Chapter 11 Plan.

SCHEDULE 6.2(b)

EXISTING LIENS[9]

1.    UCC filings

| Secured Party | File Number | File Date | Subsequent Filings | Collateral | Action Required |
|---|---|---|---|---|---|
| **DEBTOR: BOY SCOUTS OF AMERICA** | | | | | |
| **Jurisdiction: Texas Secretary of State** | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

---

[9] NTD: To be updated closer to the effective date of the Chapter 11 Plan.

2.      Liens described in the table below:

| Date | Instrument No. | Address | Amount | By | Against | Reason |
|------|----------------|---------|--------|-----|---------|--------|
|      |                |         |        |     |         |        |
|      |                |         |        |     |         |        |

**EXHIBIT A**

<u>FORM OF BOND</u>

THE PRINCIPAL OF, REDEMPTION PREMIUM, IF ANY, AND INTEREST ON THIS BOND ARE LIMITED OBLIGATIONS OF THE ISSUER PAYABLE SOLELY FROM THE SOURCES AND SPECIAL FUNDS PLEDGED FOR ITS BENEFIT. NEITHER SHALL THIS BOND NOR INTEREST THEREON BE A CHARGE AGAINST THE GENERAL CREDIT OR TAXING POWERS OF FAYETTE COUNTY, WEST VIRGINIA.

No. R-1                                                                $[145,662,101]

**UNITED STATES OF AMERICA**
**STATE OF WEST VIRGINIA**

**THE COUNTY COMMISSION OF FAYETTE COUNTY (WEST VIRGINIA)**
**COMMERCIAL DEVELOPMENT REVENUE BOND**
**(ARROW WV PROJECT),**
**SERIES 2012**

Dated: [_____], 2022

THE COUNTY COMMISSION OF FAYETTE COUNTY (WEST VIRGINIA), acting for and on behalf of Fayette County, West Virginia, a political subdivision of the State of West Virginia (the "Issuer"), for value received, hereby promises to pay the principal amount of $[145,662,101] solely from the sources as hereinafter provided, to JPMORGAN CHASE BANK, N.A. (the "Bank"), with a final payment of all unpaid amounts on [_____], 2032[10]. Payment of the final installment of principal shall be made only upon the presentation and surrender hereof to JPMorgan Chase Bank, N.A. in Dallas, Texas, or its successor (the "Bond Registrar").

The Issuer also promises to pay, but solely from such sources, interest on the outstanding principal amount of this bond from the date of this bond until the principal amount hereof is paid in full, at the rate of 2.94% per year (the "Fixed Rate") (calculated on the basis of a 30-day month/360-day year). Interest shall be paid in monthly installments payable on the [___] day of each month, commencing [_____], 2022[11]. Principal shall be payable on the [___] day of each month in the amounts on the attached amortization schedule, commencing [_____], 2024[12].

Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Agreement (hereinafter defined).

Upon the occurrence of a Determination of Taxability (hereinafter defined), then, from and after the Date of Taxability, the interest rate used to calculate interest on this bond shall be a per annum rate equal to 1.35 times the Fixed Rate (the "<u>Taxable Rate</u>"). After a Determination of

---

[10] NTD: This will be the date that is 10 years after the effective date of the Chapter 11 Plan.
[11] NTD: This will be the date that is 1 month after the effective date of the Chapter 11 Plan.
[12] NTD: This will be the date that is 2 years after the effective date of the Chapter 11 Plan.

Taxability and upon demand of the Holder or any prior Holder of this bond, the Issuer shall pay to such Holder or prior Holder, but only from amounts provided by the Borrower pursuant to Section 4.6(a) of the Agreement, such additional amount as shall be necessary to provide that interest on this bond shall have been payable at the Taxable Rate from the Date of Taxability.

Upon a Determination of Taxability, the Issuer shall also pay, but only from amounts provided by the Borrower pursuant to Section 4.6(a) of the Agreement, to such Holder or to any prior Holder upon demand of such Holder or prior Holder any interest, penalties or other charges assessed against or payable by such Holder or prior Holder and attributable to such Determination of Taxability and all reasonable administrative, out of pocket and other expenses incurred by such Holder or prior Holder which are attributable to such event, including, without limitation, the costs incurred by such Holder or prior Holder to amend any of its tax returns, notwithstanding the repayment of the entire principal amount of this bond or any transfer or assignment of this bond.

Notwithstanding the foregoing, from and after the occurrence of an Event of Default, until such time as Event of Default has been remedied or otherwise waived by the Holder, this bond shall bear interest at the Default Rate. To the extent permitted by law, interest shall accrue on any overdue payment of interest or principal at the Default Rate.

All payments of principal of and interest on this bond shall be made to the Holder at its address as it appears on the Bond Registration Books of the Bond Registrar in lawful money of the United States of America.

This bond is one of the Commercial Development Revenue Bond (Arrow WV Project), Series 2012, issued pursuant to the Industrial Development and Commercial Development Bond Act, Chapter 13, Article 2C of the Code of West Virginia of 1931, as amended, and the Bond Purchase and Loan Agreement, dated as of March 9, 2012 (as amended and restated on [_____], 2022, and as may be further amended, restated, supplemented or otherwise modified from time to time, the "Agreement"), among the Issuer, the Bank, the Borrower and Arrow WV, Inc., for the purpose of providing funds, together with other available funds, to (a) acquire, construct and equip The Summit Bechtel Family National Scout Reserve and (b) pay certain fees, costs and expenses incurred in connection with the original issuance and sale of this bond. Pursuant to the Agreement, the Issuer has loaned the proceeds of this bond to the Borrower and the Borrower has issued its promissory note, dated March 9, 2012 (as amended and restated on [_____], 2022, and as may be further amended, restated, supplemented or otherwise modified from time to time, the "Note"), to the Issuer to evidence repayment of the loan.

This bond is secured by (a) an assignment to the Holder by the Issuer of substantially all of its rights in the Agreement and (b) the endorsement by the Issuer without recourse and pledge and delivery of the Note to the Holder. Reference is hereby made to the Agreement, the Note, the Guaranty Agreement and the Security Agreement and to all amendments thereto for a description of the provisions, among others, with respect to the nature and extent of such security and guarantee, the rights, duties and obligations of the Issuer, the Borrower and the Holder.

Executed copies of the Agreement, the Note and the Security Agreement are on file in the office of the Issuer. Reference is hereby made to such documents for the provisions, among others, with respect to the custody and application of the proceeds of this bond, the collection and

disposition of revenues, a description of the funds charged with and pledged to the payment of the principal of and interest on this bond, the nature and extent of the security, the terms and conditions under which this bond is or may be issued, the system of registration of this bond, the rights, duties and obligations of the Issuer and the rights of the Holder of this bond, and, by the acceptance of this bond, the Holder hereof assents to all of the provisions of such documents. The terms of this bond include those stated in the Agreement. To the extent any provision of this bond conflicts with the express provisions of the Agreement, the provisions of the Agreement shall govern and be controlling.

This bond is a limited obligation of the Issuer, the principal of and interest on which is payable solely from the revenues derived from the Agreement and the Note, which revenues have been pledged and assigned to secure the payment thereof. The Issuer shall not be obligated to pay the principal of or interest on this bond except from such revenues pledged and assigned therefor. Neither the faith and credit nor the taxing power of the State of West Virginia or any political subdivision or Issuer thereof is pledged to the payment of the principal of or interest on this bond, and this bond shall not be deemed to constitute a debt of the State of West Virginia or any political subdivision or agency thereof.

Pursuant to the Agreement, JPMorgan Chase Bank, N.A. is hereby appointed to act as the initial Bond Registrar. The transfer of this bond may be registered by the Holder hereof in person or by his attorney or legal representative at the principal office of the Bond Registrar, or its successors and assigns, but only in the manner and subject to the limitations and conditions provided in the Agreement. Upon any such registration of transfer, the Bond Registrar shall execute and deliver in exchange for this bond a new registered bond or bonds without coupons, registered in the name of the transferee or transferees, in denominations authorized by the Agreement and in the aggregate principal amount equal to the remaining outstanding principal amount of this bond, of the same maturity of principal installments and bearing interest at the same rate.

This bond may be redeemed in whole or in part at any time as at the option of the Borrower as provided in Section 3.5(a) of the Agreement. Any redemption in part shall be applied to reduce the principal installments of this bond in inverse order of their due dates or in such other manner agreed upon by the Issuer, the Borrower and the Holder. Notice of any call for redemption shall be given by the Issuer or by the Borrower on behalf of the Issuer to the Holder in writing at least 90 days prior to the redemption date.

This bond may be prepaid in whole or in part from Excess Cash Sweep Prepayments as provided in Section 4.6(b) of the Agreement. Any prepayment in part shall be applied to reduce the principal installments of this bond in inverse order of their due dates or in such other manner agreed upon by the Issuer, the Borrower and the Holder.

In certain events, on the conditions, in the manner and with the effect set forth in the Agreement, the unpaid principal of this bond may become or may be declared due and payable before the stated maturity thereof, together with interest accrued thereon.

All acts, conditions and things required to exist, happen and be performed precedent to the issuance of this bond do exist, have happened and have been performed in due time, form and

manner as required by law, and the issuance of this bond, together with all other obligations of the Issuer, does not exceed or violate any constitutional or statutory limitations.

**[The remainder of this page is intentionally left blank.]**

IN WITNESS WHEREOF, The County Commission of Fayette County (West Virginia) has caused this Bond to be signed by the manual or facsimile signature of its President, its seal to be affixed hereto or a facsimile of its seal to be printed hereon or affixed hereto and attested by its Clerk as of the dated date set forth above.

THE COUNTY COMMISSION OF FAYETTE COUNTY (WEST VIRGINIA)

[SEAL]

By _____

    John H. Lopez, acting President

Attest:

By: _____

    Clerk

**SCHEDULE OF PRINCIPAL AMORTIZATION**[13]

| Payment date | Required Principal Payment |
|---|---|
| [_____]/2024 | $[_____] |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| [_____]/2032 | Outstanding Principal |

---

[13] NTD: To be updated. The first payment date will be the date that is 2 years after the effective date of the Chapter 11 Plan, and the final payment date will be the new maturity date.

SCHEDULE OF PRINCIPAL AMORTIZATION (2012 BOND), Page 1

## REGISTRATION OF BOND AND TRANSFER OF BOND

This bond is initially registered to JPMorgan Chase Bank, N.A. who shall be the registered owner and the Bond Registrar. The transfer of this bond may be registered by the registered owner or its duly authorized attorney or legal representative upon presentation hereof to the Bond Registrar who shall make note of such transfer in the registration blank below.

| Date of Registration | Name of Registered Owner | Signature of Registrar |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

**REGISTRATION OF BOND AND TRANSFER OF BOND, Solo Page**

**EXHIBIT B**

AFTER THE ENDORSEMENT AND PLEDGE OF THIS NOTE AS HEREON PROVIDED, THIS NOTE MAY NOT BE ASSIGNED, PLEDGED, ENDORSED OR OTHERWISE TRANSFERRED EXCEPT TO A SUCCESSOR OR ASSIGNEE OF THE LENDER REFERRED TO IN THE AGREEMENT REFERRED TO HEREIN.

<u>AMENDED AND RESTATED PROMISSORY NOTE</u>

$[145,662,101]                                                                              [_____], 2022

FOR VALUE RECEIVED, Boy Scouts of America, a non-profit federally chartered corporation (the "Borrower"), by this promissory note (the "Note") promises to pay the principal sum of [ONE HUNDRED FORTY FIVE MILLION SIX HUNDRED SIXTY TWO THOUSAND ONE HUNDRED ONE] DOLLARS ($[145,662,101]) to the order of The County Commission of Fayette County (West Virginia) (the "<u>Issuer</u>") as set forth herein.

The Borrower promises to pay to the order of the Issuer accrued interest on the unpaid principal amount hereof from the date hereof until the principal amount hereof is paid in full, at the rate of 2.94% per year (the "<u>Fixed Rate</u>") (calculated on the basis of a 30-day month/360-day year). Interest shall be paid in monthly installments payable on the [___] day of each month, commencing [_____], 2022[14]. Principal shall be payable on the [___] day of each month in the amounts on the attached amortization schedule, commencing [_____], 2024[15]. All principal outstanding hereunder shall be due and payable on [_____], 2032[16].

This Note has been pledged and assigned to JPMorgan Chase Bank, N.A. (the "<u>Lender</u>"), and its successors and assigns as the Holder of the Issuer's Commercial Development Revenue Bond (Arrow WV Project), Series 2012 (the "<u>Bond</u>"). This Note is the "Note" referred to in the Amended and Restated Series 2012 Bond Purchase and Loan Agreement, dated as of [_____], 2022 (the "<u>Agreement</u>"), among the Issuer, the Lender, the Borrower and Arrow WV, Inc., and is entitled to the benefits and subject to the conditions thereof. Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Agreement.

Upon the occurrence of a Determination of Taxability then, from and after the Date of Taxability, the interest rate used to calculate interest on this Note shall be the Taxable Rate. After a Determination of Taxability and upon demand of the Holder or any prior Holder of the Bond, the Borrower shall pay to such Holder or prior Holder such additional amount as shall be necessary to provide that interest on this Note shall have been payable at the Taxable Rate from the Date of Taxability.

Upon a Determination of Taxability, the Borrower shall also pay to such Holder or to any prior Holder any taxes, interest, penalties or other charges assessed against or payable by such Holder or prior Holder and attributable to such Determination of Taxability and all reasonable

---

[14] NTD: This will be the date that is 1 month after the effective date of the Chapter 11 Plan.
[15] NTD: This will be the date that is 2 years after the effective date of the Chapter 11 Plan.
[16] NTD: This will be the date that is 10 years after the effective date of the Chapter 11 Plan.

administrative, out of pocket and other expenses incurred by such Holder or prior Holder which are attributable to such event, including, without limitation, the costs incurred by such Holder or prior Holder to amend any of its tax returns, notwithstanding the repayment of the entire principal amount of this Note or the Bond or any transfer or assignment of the Bond.

Notwithstanding the foregoing, from and after the occurrence of an Event of Default (as defined in the Agreement), until such time as an Event of Default has been remedied or otherwise waived by the Holder, this Note shall bear interest at the Default Rate. In addition, the Borrower agrees to pay a late fee on any payments past due for 15 or more days in an amount equal to 1% of the amount of payment past due. When any payment is past due for 15 or more days, subsequent payments shall first be applied to past due balances. This provision for late charges shall not be deemed to extend the time for payment or be a "grace period" or "cure period" that gives the Borrower a right to cure such default. Imposition of late charges is not contingent upon the giving of any notice or lapse of any cure period.

Each payment of principal and interest on this Note will be sufficient to enable the Issuer to pay when due the total amount of principal of (whether at maturity, upon acceleration or otherwise) and interest on the Bond. To the extent that principal of or interest on the Bond shall be paid, there shall be credited against unpaid principal of or interest on this Note, as the case may be, an amount equal to the principal of or interest on such Bond so paid. The principal of and interest on this Note are payable in immediately available funds of any coin or currency of the United States of America which on the respective dates of payment thereof shall be legal tender for the payment of public and private debts.

In addition, the Borrower agrees to pay in immediately available funds all other amounts at the time the Issuer may be required to pay the same pursuant to the Bond or the Agreement.

The obligation of the Borrower to make the payments required hereunder shall be absolute and unconditional without any defense, recoupment or right of set-off by reason of any default by the Issuer under the Agreement or for any other reason.

The Borrower has the option to prepay, at any time, the unpaid principal of the Note in whole or in part.

All prepayments shall be made in immediately available funds and with accrued interest to the date of prepayment and that any prepayment of the Note in part shall be applied to unpaid installments of principal in inverse order of their due date or otherwise as consented to by the Holder of the Bond. To exercise the option to prepay this Note, the Borrower shall give written notice to the Issuer and the Holder which shall specify therein the date of the intended prepayment of the Note, which shall not be less than 90 days.

Upon the occurrence of an Event of Default under the Agreement, the holder hereof may at its option declare the entire principal balance hereof and all accrued interest thereon to be due and payable. Interest shall accrue on any overdue payment of interest and any due and unpaid portion of the principal at a rate per annum equal to the Default Rate or the maximum interest rate allowed by law, whichever is lower.

The Borrower hereby promises to pay all costs of collection including reasonable attorneys' fees, costs, expenses and disbursements, without regard to any statutory presumption, in the case of default under this Note or the Agreement. The Borrower hereby waives presentment, protest and notice of protest or dishonor.

All matters hereunder relating to the Issuer, the Issuer's powers, the Issuer's obligations and similar matters relating to the Issuer shall be construed in accordance with the applicable laws of the State of West Virginia and, to the extent permitted by the laws of the State of West Virginia, all other matters shall be construed in accordance with the applicable laws of the State of Texas.

Each of the Borrower and the Issuer, by its execution of this Note, hereby agrees and consents to the amendment and restatement in its entirety of the promissory note dated March 9, 2012 (the "Original Note") in respect of the Original Bond, and upon the satisfaction of the conditions precedent set forth in Section 3.6 of the Agreement, the Original Note shall be deemed to be so amended, restated, superseded and replaced in its entirety by this Note effective as of the date hereof. It is the intention of each of the parties hereto that this Note does not constitute a novation of the obligations and liabilities under the Original Note.

**[The remainder of this page is intentionally left blank.]**

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed in its corporate name by its duly authorized officer all as of the day and year first above written.

BOY SCOUTS OF AMERICA

By     _____
                  [●]

By     _____
                  [●]

## ENDORSEMENT

Pay to the order of JPMorgan Chase Bank, N.A., without recourse, as the Holder of the Bond referred to in the within-mentioned Agreement, or upon transfer of the Bond pursuant to the Agreement, to the then Holder of the Bond, as security for such Bond. This endorsement is made and given without any warranty as to the authority or genuineness of the signature of the maker of the foregoing promissory note.

This ___ day of [_____] 2022.

THE COUNTY COMMISSION OF FAYETTE COUNTY (WEST VIRGINIA)

By: _____
John H. Lopez, acting President

## SCHEDULE OF PRINCIPAL AMORTIZATION[17]

| Payment Date | Required Principal Payment |
|---|---|
| [_____]/2024 | $[_____] |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| [_____]/2032 | Outstanding Principal |

---

[17] NTD: To be updated. The first payment date will be the date that is 2 years after the effective date of the Chapter 11 Plan, and the final payment date will be the new maturity date.

SCHEDULE OF PRINCIPAL AMORTIZATION (2012 NOTE), Page 1

**EXHIBIT C**

COMPLIANCE CERTIFICATE
for the
quarter ending _____ ___,_____

To:  JPMorgan Chase Bank, N.A.
     2200 Ross Avenue, 8th Floor
     Dallas, Texas 75201

Ladies and Gentlemen:

This Compliance Certificate (the "Certificate") is being delivered pursuant to Section 6.1 of the Amended and Restated Series 2012 Bond Purchase and Loan Agreement, dated as of [_____], 2022 (the "Agreement"), among The County Commission of Fayette County (West Virginia) (the "Issuer"), Boy Scouts of America (the "Borrower"), Arrow WV, Inc. and JPMorgan Chase Bank, N.A. (the "Lender"). All capitalized terms, unless otherwise defined herein, shall have the same meanings as in the Agreement. All the calculations set forth below shall be made pursuant to the terms of the Agreement.

The undersigned, an authorized financial officer of the Borrower in his capacity as such financial officer and not in his individual capacity, does hereby certify to the Lender that:

1.    **DEFAULT**

No Default has occurred or, if a Default has occurred, I have described on the attached Exhibit "A" the nature thereof and the steps taken or proposed to remedy such Default.

2.    **SECTION 5.01 - Financial Statements and Records**          Compliance

|     |     |     |
|-----|-----|-----|
| (a) | Annual audited financial statements of the Borrower on a consolidated basis within 150 days after the end of each fiscal year end (together with Compliance Certificate). | Yes  No  N/A |
| (b) | Quarterly unaudited financial statements of the Borrower within 45 days after the end of each fiscal quarter of each fiscal year (together with Compliance Certificate). | Yes  No  N/A |

3.    **Debt**

No additional Indebtedness except:

| | | |
|---|---|---|
| Purchase money not to exceed: Actual outstanding: | $50,000,000 $_____ | Yes  No  N/A |
| | $20,000,000 | Yes  No  N/A |

Subordinated Indebtedness not to exceed: Actual outstanding:                                    $_____

**4.**   **Liens**

    (a)    Other Liens securing Indebtedness or other Obligations not exceeding    $50,000,000

    (b)    Actual outstanding amount of Indebtedness or other obligation secured by other Liens (i.e., other than purchase money Liens):    $_____    Yes  No  N/A

**5.**   **Investments**

    (a)    Permitted loans and advances to employees for business expenses    $250,000

    (b)    Actual loans and advances to employees for business expenses    $_____    Yes  No

    (c)    Basket of other permitted investments, loans, etc. not to exceed:    $500,000

    (d)    Actual amount expended:    $_____    Yes  No

**6.**   **Minimum Liquidity** *(to be included in September 30 and March 31 Compliance Certificate only if cure was exercised for the prior quarter)*

    (a)    Unrestricted and Unencumbered cash, cash equivalents and marketable securities    $_____

    (b)    cash, cash equivalents and marketable securities pledged to secure Indebtedness    $_____

    (c)    Sum of lines (a) and (b)    $_____

    (d)    Required Minimum Liquidity    $_____    Yes  No

**7.**   **Consolidated Debt Service Coverage Ratio** *(to be included in September 30 and March 31 Compliance Certificate only if cure was exercised for the prior quarter)*

    (a)    Consolidated Operating Surplus    $_____

    (b)    Consolidated Interest Expense    $_____

    (c)    Consolidated Required Amortization    $_____

    (d)    sum of line (b) plus (c)    $_____

    (e)    Line (a) / Line (d)    ___ to 1.00

    (f)    Minimum Debt Service Coverage Ratio    [●] to 1.00    Yes  No

8.      **ATTACHED SCHEDULES**

Attached hereto as schedules are the calculations supporting the computation set forth above in this Certificate. All information contained herein and on the attached schedules is true and correct.

9.      **FINANCIAL STATEMENTS**

The financial statements attached hereto were prepared in accordance with GAAP and fairly present in all material respects (subject to year-end audit adjustments and absence of footnotes) the financial conditions and the results of the operations of the Persons reflected thereon, at the date and for the periods indicated therein.

10.     **CONFLICT**

In the event of conflict between this Certificate and the Agreement, the Agreement shall control.

IN WITNESS WHEREOF, the undersigned has executed this Certificate effective as of the date first written above.

BOY SCOUTS OF AMERICA

By: _____

Name: _____

Title: _____

C-3