<u>**Exhibit R-2**</u>

**Blackline Pages of Revised Form of Restated Credit Facility**

**You may access a full and complete copy of the Form of Restated Credit Facility Documents, free of charge, at <u>https://omniagentsolutions.com/bsa-plansupplement</u>.**

**PROPOSED FINAL VERSION 13/52/2022**
**PRIVILEGED AND CONFIDENTIAL**
**FOR MEDIATION PURPOSES ONLY**
**SUBJECT TO F.R.E. 408**

AMENDED AND RESTATED CREDIT AGREEMENT

dated as of

[_____], 2022

between



BOY SCOUTS OF AMERICA,
as the Borrower,

ARROW WV, INC.,
as a Guarantor

and

JPMORGAN CHASE BANK, N.A.



102860182.14
102860182.15

Table of Contents

Page

**ARTICLE I. DEFINITIONS** ………………………………………………………...1

SECTION 1.01.  DEFINED TERMS ............................................................ 2
SECTION 1.02.  CLASSIFICATION OF LOANS ........................................ 25
SECTION 1.03.  TERMS GENERALLY ..................................................... 25
SECTION 1.04.  ACCOUNTING TERMS; GAAP ...................................... 25
SECTION 1.05.  INTEREST RATES; BENCHMARK NOTIFICATION ........... 26
SECTION 1.06.  LETTERS OF CREDIT ..................................................... 26
SECTION 1.07.  DIVISIONS ..................................................................... 27

**ARTICLE II. THE CREDITS** ............................................................. **27**

SECTION 2.01.  TERM LOANS ................................................................ 27
SECTION 2.02.  LOANS AND BORROWINGS. .......................................... 27
    (a)    Initial Type ...................................................... 27
    (b)    Limitation on Interest Periods .......................... 27
SECTION 2.03.  [RESERVED] .................................................................. 28
SECTION 2.04.  [RESERVED] .................................................................. 28
SECTION 2.05.  INTEREST ELECTIONS. .................................................. 28
    (a)    Conversion and Continuation ........................... 28
    (b)    Delivery of Interest Election Request ................ 28
    (c)    Contents of Interest Election Request ............... 28
    (d)    Automatic Conversion ...................................... 29
    (e)    Limitations on Election ..................................... 29
SECTION 2.06.  [RESERVED] .................................................................. 29
SECTION 2.07.  REPAYMENT OF LOANS; EVIDENCE OF DEBT. ............... 29
    (a)    Lender Records ............................................... 29
    (b)    Prima Facie Evidence ...................................... 29
    (c)    Request for a Note ........................................... 29
    (d)    Amortization ................................................... 29
SECTION 2.08.  PREPAYMENT OF LOANS. ............................................. 31
    (a)    Optional Prepayment ....................................... 31
    (b)    Excess Cash Sweep ......................................... 31
    (c)    Notice of Prepayment; Application of Prepayments ... 32
SECTION 2.09.  AMENDMENT FEES; LETTER OF CREDIT FEES ............... 32
SECTION 2.10.  INTEREST. ..................................................................... 33
    (a)    CBFR Borrowings ........................................... 33
    (b)    SOFR Borrowings ........................................... 33
    (c)    Default Interest ............................................... 33
    (d)    Payment of Interest ......................................... 33
    (e)    Computation ................................................... 33
SECTION 2.11.  ALTERNATE RATE OF INTEREST; ILLEGALITY ............... 33
SECTION 2.12.  INCREASED COSTS. ....................................................... 35
    (a)    Change In Law ................................................ 35

| | (d) | Participations | 68 |
| SECTION 9.05. | SURVIVAL | | 68 |
| SECTION 9.06. | COUNTERPARTS; INTEGRATION; EFFECTIVENESS | | 69 |
| SECTION 9.07. | SEVERABILITY | | 70 |
| SECTION 9.08. | RIGHT OF SETOFF | | 70 |
| SECTION 9.09. | GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF | | |
| | PROCESS. | | 70 |
| | (a) | Governing Law | 70 |
| | (b) | Jurisdiction | 70 |
| | (c) | Venue | 71 |
| | (d) | Service of Process | 71 |
| SECTION 9.10. | WAIVER OF JURY TRIAL | | 71 |
| SECTION 9.11. | HEADINGS | | 71 |
| SECTION 9.12. | MAXIMUM INTEREST RATE. | | ~~71~~72 |
| | (a) | Limitation to Maximum Rate; Recapture | ~~71~~72 |
| | (b) | Cure Provisions | 72 |
| SECTION 9.13. | NO DUTY | | 72 |
| SECTION 9.14. | NO FIDUCIARY RELATIONSHIP | | 72 |
| SECTION 9.15. | CONSTRUCTION | | 73 |
| SECTION 9.16. | INDEPENDENCE OF COVENANTS | | 73 |
| SECTION 9.17. | USA PATRIOT ACT | | 73 |
| SECTION 9.18. | CONFIDENTIALITY | | 73 |
| SECTION 9.19. | COLLATERAL RELATED PROVISIONS | | 74 |
| SECTION 9.20. | [RESERVED] | | 74 |
| SECTION 9.21. | AMENDMENT AND RESTATEMENT | | 74 |
| SECTION 9.22. | REAFFIRMATION AND GRANT OF SECURITY INTERESTS | | 75 |
| SECTION 9.23. | FINAL AGREEMENT | | 75 |

LIST OF SCHEDULES AND EXHIBITS

SCHEDULES:

| | | |
|---|---|---|
| Schedule 1.01(b) | – | Conservation Easements |
| Schedule 2.17 | -- | Existing Letters of Credit |
| Schedule 3.06 | – | Disclosed Matters |
| Schedule 3.11 | – | Subsidiaries |
| Schedule 3.17 | – | Mortgaged Property |
| Schedule 6.01 | – | Existing Indebtedness |
| Schedule 6.02 | – | Existing Liens |

EXHIBITS:

| | | |
|---|---|---|
| Exhibit A | – | Form of Compliance Certificate |
| Exhibit B | – | Form of Interest Election Request |
| Exhibit C-1 | – | U.S. Tax Certificate (For Foreign Lenders that are not Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit C-2 | – | U.S. Tax Certificate (For Foreign Participants that are not Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit C-3 | – | U.S. Tax Certificate (For Foreign Participants that are Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit C-4 | – | U.S. Tax Certificate (For Foreign that are Partnerships for U.S. Federal Income Tax Purposes) |

AMENDED AND RESTATED CREDIT AGREEMENT (this "Agreement"), dated as of [_____], 2022, by and among BOY SCOUTS OF AMERICA, as the borrower, ARROW WV, INC., a West Virginia non-profit corporation ("Arrow WV"), as  a guarantor, and JPMORGAN CHASE BANK, N.A., as the lender.

W I T N E S S E T H:

WHEREAS, the Borrower and the Lender entered into (i) that certain Credit Agreement, dated as of August 11, 2010 (as amended by that certain First Amendment to Credit Agreement, dated as of November 5, 2010, that certain Second Amendment to Credit Agreement, dated as of November 11, 2011, that certain Third Amendment to Credit Agreement, dated as of March 9, 2012, that certain Fourth Amendment to Credit Agreement, dated as of April 25, 2016, that certain Fifth Amendment to Credit Agreement, dated as of March 2, 2017, that certain Sixth Amendment to Credit Agreement, dated as of February 15, 2018 and that certain Seventh Amendment to Credit Agreement, dated as of March 21, 2019, the "2010 Credit Agreement"), and (ii) that certain Credit Agreement, dated as of March 21, 2019 (as amended, restated or otherwise modified prior to the date hereof, the "2019 Credit Agreement" and, together with the 2010 Credit Agreement, the "Original Credit Agreements"), pursuant to which, collectively, the Lender provided the Borrower with a term loan, a revolving line of credit and certain other extensions of credit as set forth therein;

WHEREAS, to secure the obligations arising under or related to the Original Credit Agreements, the Borrower, Arrow WV and the Secured Party, on its own behalf and on behalf of the other Secured Creditors, entered into that certain Third Amended and Restated Security Agreement, dated as of March 21, 2019 (which amended and restated that certain Second Amended and Restated Security Agreement, dated as of March 9, 2012, which amended and restated that certain Amended and Restated Security Agreement, dated as of November 10, 2010, which amended and restated that certain Security Agreement, dated as of August 11, 2010, the "Original Security Agreement");

WHEREAS, on February 18, 2020 (the "Petition Date"), the Borrower filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and at such time all revolving commitments and term loan commitments were terminated pursuant to the terms of the Original Credit Agreements and, as of the date hereof, the Lender has no commitment to extend any loans or issue any additional Letters of Credit, pursuant to the terms of the Original Credit Agreements;

WHEREAS, on [_____], 2022, the Bankruptcy Court entered an order (the "Confirmation Order") approving and confirming the Chapter 11 Plan (as defined below), which order was affirmed by the United Stated District Court for the District of Delaware on [_____], 2022; and

WHEREAS, in accordance with the terms of the Confirmation Order and the Chapter 11 Plan, the Borrower, the Guarantor and the Lender desire (i) to convert the outstanding principal amount of all loans outstanding under the 2010 Credit Agreement into a single term loan

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in the foregoing clause (a) hereof, Other Taxes.

"Intercreditor Agreements" means, collectively, the Foundation Intercreditor Agreement and the Settlement Trust Intercreditor Agreement.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.05.

"Interest Payment Date" means (a) with respect to any CBFR Loan, the first day of each March, June, September and December and the Maturity Date, and (b) with respect to any SOFR Loan, the last day of each Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a SOFR Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period and the Maturity Date.

"Interest Period" means, with respect to any SOFR Loans, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter, as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (iii) no Interest Period may extend beyond the Maturity Date. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"Issuer" means The County Commission of Fayette County (West Virginia), acting for and on behalf of Fayette County, West Virginia, a political subdivision of the State of West Virginia, its successors and assigns.

"LC Collateral Account" has the meaning assigned to such term in Section 2.17(h).

"LC Disbursement" means any payment made by the Lender pursuant to a Letter of Credit.

"LC Exposure" means, at any time, without duplication, the sum of the aggregate undrawn amount of all outstanding Letters of Credit at such time plus the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.

"Lender" means JPMorgan Chase Bank, N.A., and it successors and assigns.

"Letter of Credit Agreement" means any agreement or letter of credit application, in each case, executed and delivered by the Borrower in connection with the Existing Letters of Credit and all modifications, extensions or amendments thereto.

"Letters of Credit" means the letters of credit issued pursuant to the Original Credit Agreements and shall include each Existing Letter of Credit, and the term "Letter of Credit" means any one of them or each of them singularly, as the context may require.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidity" means, as of any date of determination, the sum, on a consolidated basis, without duplication, of the following: (i) the Borrower's, its Subsidiaries' and its Affiliates' cash and cash equivalents, short -term investments and other investments to the extent readily marketable which, in each case, are not subject to any Lien (other than a Lien created under the Collateral Documents or the Lien securing the Foundation Loan) and not subject to any restriction on transfer or use imposed by the applicable donor, grantor or applicable law; *plus* (ii) the Borrower's, its Subsidiaries' and its Affiliates' cash and cash equivalents, short -term investments and other investments to the extent readily marketable which are subject to a Lien securing Indebtedness of the Borrower but are otherwise not subject to any restriction on transfer or use imposed by the applicable donor, grantor or applicable law other than the payment of the Indebtedness secured thereby; provided, however, notwithstanding anything to the contrary contained in the forgoing, "Liquidity" shall not include cash or cash equivalents maintained as cash collateral for letters of credit subject to the sole dominion and control of a third party pursuant to a control agreement, collateral assignment or other agreement restricting the transfer or use thereof (for the avoidance of doubt, in the case of "springing" control agreement, only after such third party's control has been activated).

"Loan Documents" means this Agreement, the Security Agreement, the Guaranty Agreement, the Collateral Documents and all other documents now or hereafter executed and/or delivered pursuant to or in connection with this Agreement or the Original Credit Agreements.

"Loan Obligations" means all obligations, indebtedness, and liabilities of the Borrower to the Lender arising pursuant to any of the Loan Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including, without limitation, the obligation of the Borrower

agreement, or other organizational or governing documents of such Person, and (b) any statute, law (including common law), treaty, rule regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests.

"Reuters" means, as applicable, Thomson Reuters Corp, Refinitiv, or any successor thereto.

"Rolling Period" means the period of twelve (12) consecutive calendar months ending on the last day of each June and December, as applicable.

"S&P" means S&P Global Ratings, and any successor thereof.

"Sanctioned Country" means, at any time, a country, region, or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimeathe so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea Region of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union member state or Her Majesty's Treasury of the United Kingdom other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission of the U.S.

"Secured Parties" means (a) the Collateral Agent, (b) the Lender, (c) each provider of Banking Services, to the extent the Banking Services Obligations in respect thereof constitute Obligations, (d) each counterparty to any Swap Agreement, to the extent the obligations thereunder constitute Obligations, (e) the beneficiaries of each indemnification obligation

(i)    the Lender determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR Rate or the Term SOFR Rate, as applicable, for such Interest Period; or

(ii)    the Lender determines the Adjusted Term SOFR Rate or the Term SOFR Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to the Lender of making or maintaining its SOFR Loans (or SOFR Loan) included in such Borrowing for such Interest Period;

then the Lender shall give notice thereof to the Borrower by telephone, fax or through an Electronic System as provided in Section 9.01 as promptly as practicable thereafter and, until (x) the Lender notifies the Borrower that the circumstances giving rise to such notice no longer exist and (y) the Borrower delivers a New Interest Election Request in accordance with the terms of Section 2.05, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a SOFR Borrowing shall be ineffective and any such SOFR Borrowing shall be repaid or converted into a CBFR Borrowing on the last day of the then current Interest Period applicable thereto.

(b)    If the Lender determines that any Requirement of Law has made it unlawful, or if any Governmental Authority has asserted that it is unlawful, for the Lender or its applicable lending office to make, maintain, fund or continue any SOFR Borrowing, or any Governmental Authority has imposed material restrictions on the authority of the Lender to purchase or sell, or to take deposits of, dollars in the interbank offering market, then, on notice thereof by the Lender to the Borrower, any obligations of the Lender to make, maintain, fund or continue SOFR Loans or to convert CBFR Borrowings to SOFR Borrowings will be suspended until the Lender notifies the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower will upon demand from the Lender, either prepay or convert all SOFR Borrowings of the Lender to CBFR Borrowings, either on the last day of the Interest Period therefor, if the Lender may lawfully continue to maintain such SOFR Borrowings to such day, or immediately, if the Lender may not lawfully continue to maintain such Loans.  Upon any such prepayment or conversion, the Borrower will also pay accrued interest on the amount so prepaid or converted.

(c)    Notwithstanding anything to the contrary herein or in any other Loan Document (and any Swap Agreement shall be deemed not to be a "Loan Document" for purposes of this Section 2.11(c)), if a Benchmark Transition Event has occurred, Lender may, by notice to Borrower, amend this Agreement to establish an alternate rate of interest for the Benchmark that gives due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) the then-evolving or prevailing market convention for determining a benchmark rate as a replacement for the then current Benchmark at such time (the "Alternate Rate"); Borrower acknowledges that the Alternate Rate may include a mathematical adjustment using any then-evolving or prevailing market convention or method for determining a spread adjustment for the replacement of the Benchmark (which may include, if any Benchmark already contains such a spread, adding that spread to the Alternate Rate). The Lender may further amend this Agreement by such notice to Borrower to make technical, administrative or operational changes

applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 2.14(f)(ii)(A)</u>, <u>Section 2.14 (f)(ii)(B)</u> and <u>Section 2.14 (f)(ii)(D)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of <u>Exhibit BC-1</u> to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "<u>U.S. Tax Compliance Certificate</u>") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form

W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit BC-2 or Exhibit BC-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit BC-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower at the time or times prescribed by law and at such time or times reasonably requested by the Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower as may be necessary for the Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

(g)    Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this

(e)      to the extent constituting Indebtedness, deferred compensation payable to directors, officers or employees of the Borrower and the other Loan Parties;

(f)      cash management obligations and Indebtedness incurred by the Borrower or any other Loan Party in respect of netting services, overdraft protections and similar arrangements, in each case entered into in the ordinary course of operations in connection with cash management and deposit accounts and not involving the borrowing of money;

(g)      Indebtedness arising in connection with the Notes, the Bonds and the Bond Purchase Agreements provided that the Borrower has furnished the Lender copies of all the documentation executed in connection with the Notes and the Bonds, including, without limitation, (i) an opinion of counsel for the Issuer that the Bonds are exempt from federal and State of West Virginia taxation and that the Issuer has not designated the Bonds as a "qualified tax exempt obligations" under Section 356265(b) of the Internal Revenue Code, (ii) evidence that the Notes have been assigned by the Issuer to secure the obligations arising in connection with the Bonds and that such assignment constitutes a first priority, perfected security interest in favor of the holders of the Bonds, (iii) the Bond Purchase Agreements and (iv) the Bonds.;

(h)      loans and advances from the Borrower to Arrow WV in an aggregate principal amount not to exceed $500,000,000 provided that such loans and advances are evidenced and governed by documentation reasonably acceptable to the Lender and the proceeds of such loans and advances are used by Arrow WV to finance the Project;

(i)      liabilities for contributions to self-insurance or shared or pooled risk insurance programs of the Borrowers and the other Loan Parties required or permitted to be maintained under Section 5.06 of this Agreement;

(j)      Subordinated Indebtedness in an aggregate principal amount not to exceed $20,000,000 outstanding at any time;

(k)      Indebtedness under the BSA Settlement Trust Note in a principal amount not to exceed $80,000,000 plus any interest added to such principal amount by payments in kind;

(l)      Indebtedness under the Foundation Loan Agreement in a principal amount not to exceed $42,800,000;

(m)      Indebtedness arising out of letters of credit issued to purchase goods in the ordinary course of the Borrower's or any other Loan Party's business; and

(n)      Indebtedness arising out of letters of credit in an aggregate principal amount not to exceed $10,000,000.

Section 6.02.  Liens.  The Borrower will not, and will not permit any other Loan Party to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)      Liens created under the Loan Documents;

# ARTICLE VII.

## Financial Covenants

Until the Obligations have been Fully Satisfied, the Borrower covenants and agrees with the Lender that:

Section 7.01.  Minimum Liquidity.  Beginning with December 31, 2022, the Borrower shall not permit Liquidity as of the last day of any June or December for which quarterly or annual financial statements (as applicable) and a compliance certificate were delivered or required to be delivered pursuant to Section 5.01(a), (b) and (c), respectively (each a "Test Date"), to be less than the amount set forth in the table below opposite such Test Date.

| Test Date | Liquidity |
|---|---|
| December 31, 2022 | $~~47,000,000~~20,000,000 |
| June 30, 2023 | $~~40,000,000~~35,000,000 |
| December 31, 2023 | $~~54,000,000~~47,500,000 |
| June 30, 2024 | $~~42,000,000~~35,000,000 |
| December 31, 2024 | $39,000,000 |
| June 30, 2025 | $30,000,000 |
| December 31, 2025 | $35,000,000 |
| June 30, 2026 | $25,000,000 |
| December 31, 2026 | $30,000,000 |
| June 30, 2027 | $21,000,000 |
| December 31, 2027 | $26,000,000 |
| June 30, 2028 | $16,000,000 |
| December 31, 2028 | $22,000,000 |
| June 30, 2029 | $12,000,000 |
| December 31, 2029 | $18,000,000 |
| June 30, 2030, and each Test Date occurring on June 30 thereafter | $12,000,000 |
| December 31, 2030 and each Test Date occurring on December 31 thereafter | $18,000,000 |

Section 7.02.  Consolidated Debt Service Coverage Ratio.  Beginning with the Rolling Period ending as of December 31, 2022, the Borrower shall not permit its Consolidated Debt

OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; <u>PROVIDED</u> THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR WITH RESPECT TO (III), ABOVE, ARE CAUSED BY ANY ACT OR OMISSION OF ANY INDEMNITTEE OR ARE UNRELATED TO THIS AGREEMENT OR ARE FIRST CAUSED OR EXACERBATED AFTER FORECLOSURE OR A DEED IN LIEU OF FORECLOSURE AT ANY MORTGAGED PROPERTY. WITHOUT LIMITING ANY PROVISION OF ANY LOAN DOCUMENT, EXCEPT WITH REGARD TO (III), ABOVE, IT IS THE EXPRESS INTENTION OF THE PARTIES HERETO THAT EACH INDEMNITEE SHALL BE INDEMNIFIED FROM AND HELD HARMLESS AGAINST ANY AND ALL LOSSES, LIABILITIES, CLAIMS, DAMAGES, PENALTIES, JUDGMENTS, DISBURSEMENTS, COSTS, AND EXPENSES (INCLUDING ATTORNEYS' FEES, COSTS AND EXPENSES) ARISING OUT OF OR RESULTING FROM THE SOLE OR CONTRIBUTORY NEGLIGENCE OF SUCH INDEMNITEE; PROVIDED FURTHER THAT THIS <u>SECTION 9.03(b)</u> SHALL NOT APPLY WITH RESPECT TO TAXES OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS, DAMAGES, ETC. ARISING FROM ANY NON-TAX CLAIM.

(c)     <u>Waiver of Damages</u>.  To the extent permitted by applicable law, the Borrower shall not assert, and the Borrower waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, incidental, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, the Loan Documents or any agreement or instrument contemplated hereby, the Financing Transactions, any Loan or the use of the proceeds thereof.

(d)     <u>Payments</u>.  All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

Section 9.04.   <u>Successors and Assigns</u>.

(a)     <u>Successors and Assigns</u>.  The provisions of this Agreement are binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Indemnitee), except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Indemnitee), Participants (to the extent provided in <u>paragraph (c)</u> of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Lender any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     <u>Assignment</u>.  Lender may, without the prior consent of the Borrower but with notice to the Borrower if no Default exists, assign to one or more assignees all, but not a portion, of its rights and obligations under this Agreement provided that no such assignment shall, as of the date of the assignment and as long as no Default exists, cause the Borrower to pay

(x)    A Participant shall not be entitled to receive any greater payment under Sections 2.12 or 2.14 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(xi)    Pledge.  Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for Lender as a party hereto.

Section 9.05.  Survival.  All covenants, agreements, representations and warranties made by the Borrower in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Obligations have been Fully Satisfied.  The provisions of Sections 2.12, 2.13, 2.14 and 9.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration of the Letters of Credit or the termination of this Agreement or any provision hereof.

Section 9.06.  Counterparts; Integration; Effectiveness.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereofTHIS AGREEMENT AND THE OTHER LOAN DOCUMENTS EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDE ANY AND ALL PREVIOUS COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BOY SCOUTS OF AMERICA

By: _____
           Name:
           Title:

ARROW WV, INC.

By: _____
           Name:
           Title:

JPMORGAN CHASE BANK, N.A.

By: _____
           Name:
           Title:   Authorized Officer

LIST OF SCHEDULES AND EXHIBITS

SCHEDULES:

Schedule 1.01(b)   –    Conservation Easements
Schedule 2.17      --   Existing Letters of Credit
Schedule 3.06      –    Disclosed Matters
Schedule 3.11      –    Subsidiaries
Schedule 3.16      –    Mortgaged Property
Schedule 6.01      –    Existing Indebtedness
Schedule 6.02      –    Existing Liens

EXHIBITS:

Exhibit A        –   Form of Compliance Certificate
Exhibit B        –   Form of Interest Election Request
Exhibit C-1      –   U.S. Tax Certificate (For Foreign Lenders that are not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit C-2      –   U.S. Tax Certificate (For Foreign Participants that are not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit C-3      –   U.S. Tax Certificate (For Foreign Participants that are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit C-4      –   U.S. Tax Certificate (For Foreign that are Partnerships for U.S. Federal Income Tax Purposes)

SCHEDULE 1.01(b)
TO
BOY SCOUTS OF AMERICA
CREDIT AGREEMENT

<u>CONSERVATION EASEMENTS</u>

[_____][12]

---

[12] NTD: To be provided.

102860182.14
102860182.15

SCHEDULE 2.17
TO
BOY SCOUTS OF AMERICA
CREDIT AGREEMENT

<u>EXISTING LETTERS OF CREDIT</u>

[_____][13]

---

[13] NTD: To be provided.

SCHEDULE 3.06
TO
BOY SCOUTS OF AMERICA
CREDIT AGREEMENT

<u>DISCLOSED MATTERS</u>

[_____][14]

---

[14] NTD: To be provided.

SCHEDULE 3.11
TO
BOY SCOUTS OF AMERICA
CREDIT AGREEMENT

<u>SUBSIDIARIES</u>

[_____][15]

---

[15] NTD: To be provided.

102860182.14
102860182.15

SCHEDULE 3.16
TO
BOY SCOUTS OF AMERICA
CREDIT AGREEMENT

MORTGAGED PROPERTY[16]

| Property/Site Name | Address | Owner | Description |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

---

[16] NTD: To be provided.

102860182.14
102860182.15

SCHEDULE 6.01
TO
BOY SCOUTS OF AMERICA
CREDIT AGREEMENT

<u>EXISTING INDEBTEDNESS</u>

[_____][17]

---

[17] NTD: To be provided.

SCHEDULE 6.02
TO
BOY SCOUTS OF AMERICA
CREDIT AGREEMENT

<u>EXISTING LIENS</u>

1.    UCC filings

| Secured Party | File Number | File Date | Subsequent Filings | Collateral | Action Required |
|---|---|---|---|---|---|
| **DEBTOR: BOY SCOUTS OF AMERICA** | | | | | |
| **Jurisdiction: Texas Secretary of State** | | | | | |
| | | | | | |
| | | | | | |
| **Jurisdiction: Dallas County, Texas** | | | | | |
| | | | | | |
| **Jurisdiction: Washington, DC** | | | | | |
| | | | | | |
| **DEBTOR: ARROW WV, INC.** | | | | | |
| **Jurisdiction: West Virginia Secretary of State** | | | | | |
| | | | | | |
| | | | | | |
| **Jurisdiction: Fayette County, West Virginia** | | | | | |
| | | | | | |
| **Jurisdiction: Raleigh County, West Virginia** | | | | | |
| | | | | | |
| **Jurisdiction: Dallas County, Texas** | | | | | |
| | | | | | |

EXHIBIT A
TO
BOY SCOUTS OF AMERICA
CREDIT AGREEMENT

<u>COMPLIANCE CERTIFICATE</u>

See attached.

COMPLIANCE CERTIFICATE[18]
for the
quarter ending _____ __, _____

To:    JPMorgan Chase Bank, N.A.
       2200 Ross Avenue, Eight Floor
       Dallas, Texas 75201

Ladies and Gentlemen:

  This Compliance Certificate (the "Certificate") is being delivered pursuant to Section 5.01(c) of that certain Credit Agreement (as amended, the "Agreement") dated as of [_____], 2022 among Boy Scouts of America (the "Borrower"), Arrow WV, Inc. and JPMorgan Chase Bank, N.A. (the "Lender").  All capitalized terms, unless otherwise defined herein, shall have the same meanings as in the Agreement.  All the calculations set forth below shall be made pursuant to the terms of the Agreement.

  The undersigned, an authorized financial officer of the Borrower in his capacity as such financial officer and not in his individual capacity, does hereby certify to the Lender that:

**1.**   **DEFAULT**

  No Default has occurred or, if a Default has occurred, I have described on the attached Exhibit "A" the nature thereof and the steps taken or proposed to remedy such Default.

|  |  | Compliance | | |
|---|---|---|---|---|
| **2.** | **SECTION 5.01 - Financial Statements and Records** | | | |
| (a) | Annual audited financial statements of the Borrower on a consolidated basis within 150 days after the end of each fiscal year end (together with Compliance Certificate). | Yes | No | N/A |
| (b) | Quarterly unaudited financial statements of the Borrower within 45 days after the end of each fiscal quarter of each fiscal year (together with Compliance Certificate). | Yes | No | N/A |

**3.**   **Debt**

  No additional Indebtedness except:

| | | | | | |
|---|---|---|---|---|---|
| Purchase money not to exceed: | | $50,000,000 | Yes | No | N/A |

---

[18] NTD: To be conformed.

EXHIBIT "A"

<u>DEFAULT</u>

[No Default has occurred.]

[I have described below the nature of the Default that has occurred and the steps taken or proposed to remedy such Default.]

[DESCRIPTION OF DEFAULT]

EXHIBIT B
TO
BOY SCOUTS OF AMERICA
CREDIT AGREEMENT

<u>INTEREST ELECTION REQUEST</u>

See attached.

# INTEREST ELECTION REQUEST

_____ ____, ____

JPMorgan Chase Bank, N.A.,
2200 Ross Avenue, 8th Floor
Dallas, Texas  75201

Ladies and Gentlemen:

The undersigned refers to the Credit Agreement dated as of [_____], 2022 among Boy Scouts of America (the "Borrower"), Arrow WV, Inc. and JPMorgan Chase Bank, N.A. (as otherwise modified from time to time, the "Credit Agreement").  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Borrower hereby gives the Lender notice pursuant to Section 2.05 of the Credit Agreement that the Borrower requests a conversion or continuation (a "Change") of the Borrowing or Borrowings specified on Schedule 1.

By its execution below, the Borrower represents and warrants to the Lender:

(i)    At the time of and immediately after giving effect to the requested Change, no Default exists; and

(ii)    The representations and warranties of the Borrower set forth in the Loan Documents are true and correct on and as of the date of the requested Change with the same force and effect as if such representations and warranties had been made on and as of such date except to the extent that such representations and warranties relate specifically to another date.

The instructions set forth herein are irrevocable, except as otherwise provided by the Credit Agreement.  A telecopy of these instructions shall be deemed valid and may be accepted and relied upon by the Lender and the Lender as an original.

BOY SCOUTS OF AMERICA

By:    _____
Name:_____
Title:_____

102860182.14
102860182.15

SCHEDULE 1
TO
<u>INTEREST ELECTION REQUEST</u>

| **Specify Term Loan** (2010 Existing Term Loan or 2010 Converted Term Loan) | **Current Type** (CBFR or SOFR) | **Current Principal Amount** | **Current Interest Period Expiration Date** | **Continue as (Type)** | **Convert to (Type)** | **New Interest Period Length** |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

102860182.14 102860182.15

EXHIBITS C-1 THROUGH C-4
TO
BOY SCOUTS OF AMERICA
CREDIT AGREEMENT

U.S. TAX COMPLIANCE CERTIFICATES

See attached.

EXHIBIT C-1

[FORM OF]

## U.S. TAX COMPLIANCE CERTIFICATE
### (For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Amended and Restated Credit Agreement dated as of [_____], 2022 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Boy Scouts of America (the "Borrower"), the other Loan Parties party thereto, and JPMorgan Chase Bank, N.A., in its capacity as Lender.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any promissory note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By: _____
   Name:
   Title:

Date: _____ __, 20[ ]

EXHIBIT C-2

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Amended and Restated Credit Agreement dated as of [_____], 2022 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Boy Scouts of America (the "Borrower"), the other Loan Parties party thereto, and JPMorgan Chase Bank, N.A., in its capacity as Lender.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.


[NAME OF PARTICIPANT]


By: _____
    Name:
    Title:

Date: _____ __, 20[  ]

EXHIBIT C-3

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Amended and Restated Credit Agreement dated as of [_____], 2022 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Boy Scouts of America (the "Borrower"), the other Loan Parties party thereto, and JPMorgan Chase Bank, N.A., in its capacity as Lender.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by a withholding statement together with an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By: _____
    Name:
    Title:

Date: _____ __, 20[  ]

EXHIBIT C-4

[FORM OF]

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Amended and Restated Credit Agreement dated as of [_____], 2022 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Boy Scouts of America (the "Borrower"), the other Loan Parties party thereto, and JPMorgan Chase Bank, N.A., in its capacity as Lender.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any promissory note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any promissory note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to the Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate prior to the first payment to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By: _____
    Name:
    Title:

Date: _____, 20[__]