# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Boy Scouts of America and Delaware BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | Re: Dkt. Nos. 8677, 8684, 8699 |

## STATEMENT OF THE CREDITORS' COMMITTEE IN SUPPORT OF CONFIRMATION OF THE DEBTORS' THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION [DKT. NO. 8813] AND IN RESPONSE TO OBJECTIONS THERETO

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, TX 75038.

KL2 3267380.4
03/02/2022

The Official Committee of Unsecured Creditors (the "**Creditors' Committee**") of Boy Scouts of America and Delaware BSA, LLC (collectively, the "**Debtors**") by and through its undersigned counsel, hereby submits this statement (the "**Statement**") in support of the Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization [Dkt. No. 8813] (the "**Plan**"),[1] and in response to the objections of the Markel Insurers [Dkt. No. 8684], Old Republic Insurance Company ("**Old Republic**") [Dkt. No. 8699] and Eric Pai, as Administrator of the Estate of Jarred Pai ("**Mr. Pai**") [Dkt. No. 8677].[2]

## PRELIMINARY STATEMENT

1. The Debtors' general unsecured creditors have been waiting more than two years for this day to arrive. While the Debtors did not file for bankruptcy to address non-abuse-related liabilities, general unsecured creditors (much like the abuse claimants) have borne much of the cost of the bankruptcy cases. These general unsecured creditors include vendors waiting for invoices to be paid, retirees waiting for pension checks, and non-abuse litigation claimants seeking recompense for injuries incurred on the Debtors' properties, among others. General unsecured creditors are the backbone of the Debtors' business, many of whom have been and will continue to provide the necessary support for the BSA to continue operating and fulfilling its longstanding charitable mission going forward. These same creditors have waited patiently while the Debtors attempted to resolve their abuse liabilities through extensive mediation and litigation with various different constituencies over the last twenty-four months – with the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[2] The U.S. Trustee also objected to the inclusion of the Creditor Representative in the definition of "Exculpated Parties," asserting that the Creditor Representative should not receive an exculpation as it does not come into existence until the Effective Date of a Plan. The Debtors have confirmed that on the Effective Date, the Creditor Representative will be added as an insured party to the Reorganized Debtors' director and officer insurance policy. On this condition, the Creditors' Committee has agreed that the Creditor Representative can be removed from the definition of Exculpated Parties, which is now reflected in the amended Plan.

Debtors' abuse liabilities now appropriately addressed through the Plan, it is time for the Plan to be confirmed and distributions to all unsecured creditors to finally commence.

2.  Nearly every aspect of these Chapter 11 Cases has been bitterly contested – except for the JPM / Creditors' Committee Settlement. No objector contests that the Debtors' non-abuse general unsecured creditors are entitled to recover substantially in full on account of their claims. The few objections raised with respect to general unsecured creditors concern discrete mechanical aspects of the JPM / Creditors' Committee settlement, not the substance of the settlement itself nor the treatment of general unsecured creditors. This only underscores the reasonableness of the JPM / Creditors' Committee Settlement, and strongly favors a swift confirmation of the Plan.

## RELEVANT BACKGROUND

3.  After being constituted in early March 2020, the Creditors' Committee (through its professionals) conducted, among other things, a detailed investigation into the Debtors' assets and certain prepetition transactions involving JPMorgan, the Debtors' prepetition secured lender. As a result of that investigation, the Creditors' Committee ultimately reached two conclusions.

4.  <u>First</u>, the Creditors' Committee determined that potentially valuable estate causes of action existed related to (i) the prepetition incurrence of substantial secured obligations; (ii) the granting of additional security interests on the eve of bankruptcy (and in the face of a wave of substantial liability stemming from abuse claims); and (iii) the creation, capitalization and financing of non-debtor Arrow WV, Inc., along with related transfers and transactions. The Creditors' Committee ultimately determined that these prepetition financing transactions might be subject to avoidance as fraudulent transfers, and the payments made in connection with these transactions could be recovered for the benefit of the Debtors' estates. However, as with all litigation claims, success is not assured, and as set forth in additional detail in the Debtors' reply

in support of confirmation (the "**Debtors Reply**"), the Creditors' Committee determined that there was also potential risk inherent underlying any fraudulent transfer litigation – favoring negotiations over a potential settlement of these claims with the potential defendants in that litigation.

5. <u>Second</u>, the Creditors' Committee concluded that certain of the Debtors' "core" assets should be available to general unsecured creditors whose claims were incurred in the pursuit of the Debtors' charitable mission. These core assets included, among other things, valuable real property (namely, the Debtors' high adventure bases) which could be monetized to satisfy the claims of non-abuse general unsecured creditors. Accordingly, the Creditors' Committee believed that the Debtors' non-abuse general unsecured creditors were entitled to recover substantially the full amount of their claims from the Debtors' core assets.

6. After conducting its initial investigation, the Creditors' Committee spent several months in mediation with the Debtors, JPMorgan and other stakeholders, trying to reach agreement on a plan construct that would adequately compensate the Debtors' non-abuse general unsecured creditors on account of their core claims. The Debtors ultimately agreed that non-abuse general unsecured creditors were entitled to recover from the Debtors' core assets, asserting that "[t]his alignment of core assets with core creditors is unique" to non-abuse general unsecured creditors. *Debtors' Omnibus Reply in Support of Disclosure Statement* [Dkt. No. 4105], ¶ 36.

7. Through the mediation, the Creditors' Committee ultimately reached a settlement with the Debtors and JPMorgan regarding the ultimate treatment of general unsecured creditors under the Plan, embodied in term sheet attached to the *First Mediator's Report* [Dkt. No. 2292] (the "**Settlement Term Sheet**"). The Settlement Term Sheet provided for JPMorgan to agree to

refinance its debt on favorable terms, providing exit financing to the Debtors and much needed post-reorganization liquidity, and further provided for the following treatment of holders of non-abuse general unsecured claims:

- <u>Class 5 Convenience Claims:</u> Holders of Allowed General Unsecured Claims of less than $50,000 will be paid in full, in cash, on the effective date (or whenever such claims are allowed). General Unsecured Creditors with claims in excess of $50,000 may also elect to reduce their claims to $50,000 and participate in the convenience class.

- <u>Class 6 General Unsecured Claims:</u> Holders of Allowed General Unsecured Claims will receive their pro rata share of the $25,000,000 Core Value Cash Pool, which will be funded in 4 semi-annual installments beginning 6 months after the Effective Date. The Debtors estimated that Class 6 claimants would recover between 75-95% on account of their claims. Disclosure Statement [Dkt. No. 6445], at 27.

- <u>Class 7 Non-Abuse Litigation Claims:</u> Holders of Non-Abuse Litigation Claims will retain the ability to assert their claims against available insurance coverage, and may recover in full on account of their claims. In the event any Non-Abuse Litigation Claim is not covered by applicable BSA insurance or there is a shortfall in BSA's applicable insurance for such Non-Abuse Litigation Claim, the holder of an Allowed Non-Abuse Litigation Claim may elect to have such Claim treated as a Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of its Allowed Non-Abuse Litigation Claim and (b) $50,000. Non-Abuse Litigation Claims settled or reduced to judgment prior to the Effective Date will be paid directly by the applicable insurer; after the Effective Date, Non-Abuse Litigation Claims will be either paid directly by the applicable insurer or by the Settlement Trust if the implicated insurance policy has been settled by the Settlement Trust. In either case, the Debtors estimated that Class 7 claimants would recover 100% on account of their claims. Disclosure Statement [Dkt. No. 6445], at 28.

8. The Settlement Term Sheet further provided for the Debtors' Pension Plan to be assumed without modifications. Settlement Term Sheet, at 6. As set forth in further detail in the Debtors' Reply, assumption of the Pension Plan avoids potentially complex and costly litigation over the Debtors' pension liabilities and preserves the Pension Plan for the benefit of its participants.

9. The terms of the Settlement Term Sheet were then incorporated into the Debtors' Plan (and remain essentially unchanged, putting aside minor modifications to facilitate the transfer of Specified Insurance Policies to the Settlement Trust).

10. The Plan further provides non-abuse general unsecured creditors with the ability to opt-out of granting a release of non-Debtor third parties pursuant to Article X.J.4 of the Plan (see Definition 247, "Releasing Claim Holder") and provides that non-abuse general unsecured creditors' claims against Local Councils, Chartered Organizations and Insurance Companies are not released pursuant to the Plan (provided that holders of Non-Abuse Litigation Claims must release claims against Local Councils and other insureds in order to receive payment from the Settlement Trust). Additionally, the Debtors and their Estates agreed to release all holders of General Unsecured Claims, Non-Abuse Litigation Claims and Convenience Claims from all Avoidance Actions. Plan, Art.X.J.1.b.[3]

11. Accordingly, the Plan represents a heavily negotiated settlement of complex issues attendant to the Creditors' Committee and its constituency that would otherwise be the subject of time-consuming and costly litigation.

12. Creditor support for the JPM / Creditors' Committee settlement is clearly reflected in the voting results for Classes 5-7 of the Plan, with each class accepting the Plan and Classes 5 and 6 voting nearly unanimously in favor of the Plan.[4] Since reaching the JPM /

---

[3] In response to the objections of the Markel Insurers, Old Republic, and Mr. Pai, the Debtors have further revised the Plan to clarify that the Settlement Trustee does not have consent rights over settlements of Non-Abuse Litigation Claims impacting only Specified Primary Insurance Policies. [Dkt. No. 8814-1], p. 73-74. As discussed herein, the Creditors' Committee has proposed to the Debtors certain other modifications to the Plan to address additional concerns raised by Mr. Pai, and anticipates that those changes will be reflected in a revised version of the Plan to be filed prior to the commencement of the confirmation hearing.

[4] *Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding Solicitation of Votes and Final Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 8345], Exh. A. at 2.

Creditors' Committee settlement, the Creditors' Committee (and its constituency) have continuously – but efficiently – supported the Debtors' efforts to move these cases towards confirmation despite the time it took for other settlements to fall into place. The Creditors' Committee is now optimistic that, with the announcement of the global settlement with the TCC, there will be a largely consensual confirmation hearing, paving a pathway for the Debtors' long-awaited exit from bankruptcy.

13. While the Creditors' Committee represents only the interests of the Debtors' non-abuse general unsecured creditors, the Creditors' Committee has been supportive of the Debtors' efforts to adequately and fairly compensate their other unsecured creditors, including holders of Direct Abuse Claims. The Creditors' Committee strongly believes that, in the face of the myriad Plan settlements and supporters, the Plan now clearly allows the Debtors to achieve their twin aims of fully compensating holders of Direct Abuse Claims and allowing the BSA to emerge from bankruptcy and continue to fulfill its charitable mission.

## RESPONSE TO OBJECTIONS

14. As noted above, it is telling that only a few objectors take issue with discrete aspects of the JPM / Creditors' Committee settlement as embodied in the Plan. The Creditors' Committee understands that many of these objections will be addressed in detail in the Debtors' Reply, so the Creditors' Committee will not duplicate the Debtors' efforts on that front in this Statement. Rather, the Creditors' Committee thought it important to provide brief responses to a few of the objections to the mechanical terms of the JPM / Creditors' Committee settlement – particularly as it pertains to the interplay between the Non-Abuse Litigation Claims and the Settlement Trust.

15. First, the Markel Insurers and Old Republic assert that allowing the Settlement Trustee to have consent rights over settlements of Non-Abuse Litigation Claims violates their

rights under their respective insurance policies. Markel Insurer Objection, ¶¶ 7-12; Old Republic Objection, ¶¶ 12-14. In response to these objections, the Plan has been revised to clarify that the Settlement Trustee does not have consent rights over settlements of Non-Abuse Litigation Claims that are asserted against Specified Primary Insurance Policies, and that the Settlement Trustee only has consent rights over settlements impacting Specified Excess Insurance Policies. The Creditors' Committee further understands that additional language is being discussed and negotiated among the Debtors, these objecting insurers, and various other case constituents to potentially further address the objectors' concerns on these fronts.

16. Second, the Markel Insurers and Old Republic further argue that the Settlement Trustee is "not neutral" as they will be settling claims for both Abuse Claimants and Non-Abuse Litigation Claimants. Markel Insurer Objection, ¶¶ 7-12; Old Republic Objection, ¶¶ 12-14. Indeed, the language surrounding the treatment of the holders of Non-Abuse Litigation Claims by the Settlement Trust (if applicable) was the subject of extensive mediation, and ultimately the Creditors' Committee became comfortable that the terms of the Plan would not impede settlements of Non-Abuse Litigation Claims. In fact, settlements of Non-Abuse Litigation Claims would actually make it easier for the Settlement Trustee to fully liquidate the underlying insurance policies for the benefit of abuse claimants. Additionally, the Settlement Trustee has a duty to treat holders of Abuse Claims and Non-Abuse Litigation Claims fairly and equally, with the Plan provisions specifically designed to ensure that the involvement of the Settlement Trust would not have an economic impact on the treatment of and distributions to holders of Non-Abuse Litigation Claims. Plan, Art. IV.D.3.b.

17. Finally, Mr. Pai – the administrator of the estate of a holder of a Non-Abuse Litigation Claim –also raised concerns regarding the treatment of Non-Abuse Litigation Claims

under the Plan, particularly the Settlement Trustee's consent rights over settlements and the process by which that consent would be obtained. Counsel to the Creditors' Committee reached out to counsel to Mr. Pai to discuss and clarify the terms of the Plan, including (i) identifying the language reflected in the last-filed version of the Plan providing that the Settlement Trustee's consent over settlements under the Specified Primary Insurance Policies was not required under any circumstances, and (ii) noting that, regardless of whether the Settlement Trustee does or does not have consent rights over a particular settlement or judgment, that should not impact the ability of a Non-Abuse Litigation Claimant to recover on account of their claim as provided for in the Plan. Counsel to Mr. Pai further raised concerns that the Plan and the Trust Distribution Procedures did not articulate a process by which the Settlement Trustee's consent over proposed settlements or judgments could be obtained. In response to these concerns, the Creditors' Committee proposed to the Debtors (and other case constituents) additional modifications to the corresponding section of the Plan that would provide such a process, and a mechanism for holders of Non-Abuse Litigation Claims to seek relief from the Court if they believe the Settlement Trustee's consent was unreasonably withheld. The Creditors' Committee understands that the Debtors are supportive of these revisions and are discussing them with other parties in interest. The Creditors' Committee believes that this is an appropriate and efficient resolution of the concern raised by Mr. Pai, and to the extent that these modifications are not incorporated into the next version of the Plan, reserves the right to argue that the Plan should be modified accordingly at the Confirmation Hearing.

## RESERVATION OF RIGHTS

18.     The Creditors' Committee reserves all rights to supplement this Statement in advance of the confirmation hearing, respond to any supplemental objections to the Plan or to any modifications to the Plan, and to address any such issues at the confirmation hearing.

## CONCLUSION

For the reasons set forth herein, the Creditors' Committee respectfully submits that the Plan should be confirmed, and any objections thereto overruled.

| | |
|---|---|
| Dated: March 2, 2022<br>Wilmington, Delaware | Respectfully submitted,<br><br>**REED SMITH LLP**<br><br>By:  */s/ Mark W. Eckard*<br>Kurt F. Gwynne (No. 3951)<br>Mark W. Eckard (No. 4542)<br>1201 Market Street, Suite 1500<br>Wilmington, DE 19801<br>Telephone: (302) 778-7500<br>Facsimile: (302) 778-7575<br>E-mail: kgwynne@reedsmith.com<br>E-mail: meckard@reedsmith.com<br><br>-and-<br><br>**KRAMER LEVIN NAFTALIS**<br>   **& FRANKEL LLP**<br>Thomas Moers Mayer<br>Rachael Ringer<br>Natan M. Hamerman<br>Jennifer R. Sharret<br>Megan M. Wasson<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Telephone: (212) 715-9100<br>Facsimile: (212) 715-8000<br>E-mail: tmayer@kramerlevin.com<br>E-mail: rringer@kramerlevin.com<br>E-mail: nhamerman@kramerlevin.com<br>Email: jsharret@kramerlevin.com<br>E-mail: mwasson@kramerlevin.com<br><br>*Counsel to the Official Committee of Unsecured Creditors* |