## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC AND (II) OMNIBUS REPLY TO PLAN CONFIRMATION OBJECTIONS**

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
Glenn Kurtz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: jessica.lauria@whitecase.com
      gkurtz@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: dabbott@morrisnichols.com
      aremming@morrisnichols.com
      ptopper@morrisnichols.com

Dated: March 2, 2022
      Wilmington, Delaware

*Attorneys for the Debtors and Debtors in Possession*

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

<u>**TABLE OF CONTENTS**</u>

PRELIMINARY STATEMENT ......................................................................... 28

BACKGROUND ............................................................................................. 31

   I.     Prepetition Litigation Against the Debtors and Other Parties. ................... 31

   II.    Overview of Plan Negotiations and Settlements. ....................................... 40

ARGUMENT ................................................................................................... 44

   I.     The Settlements in the Plan Are Fair, Reasonable, in the Best Interests of the Debtors' Estates, and Demonstrate a Sound Exercise of the Debtors' Business Judgment. ................................................................................................... 45

        A.    The Insurance Settlements. ................................................................ 49

            1.    The Century and Chubb Companies Insurance Settlement. .................... 56

            2.    The Hartford Insurance Settlement Agreement. ...................................... 59

            3.    The Zurich Insurance Settlement. ............................................................ 62

            4.    The Clarendon Insurance Settlement. ...................................................... 63

        B.    The Sale of the Insurance Policies Free and Clear of Interests Should Be Approved. ........................................................................................ 63

        C.    The Trust Distribution Procedures. ................................................... 74

            1.    The TDP are Fair and Equitable and Should Be Approved Under Bankruptcy Rule 9019 and Section 1123(b) of the Bankruptcy Code. ...................................................................................................... 74

            2.    The Independent Review Option ............................................................. 83

            3.    The Protective Insurance Provisions ....................................................... 93

            4.    Indirect Abuse Claims. ............................................................................ 94

        D.    The Abuse Claims Settlement. ......................................................... 96

            1.    The Local Council Settlement Contribution under the Abuse Claims Settlement. ............................................................................................... 96

            2.    The Contributing and Participating Chartered Organization Settlement Contributions Under the Abuse Claims Settlement. ........... 100

        E.    The TCJC Settlement. .................................................................... 104

            1.    Probability of Success in Litigation. ..................................................... 104

            2.    The Likely Difficulties in Collection. .................................................... 106

            3.    The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It. ........................................ 107

            4.    The Paramount Interest of the Creditors. .............................................. 108

i

F.      The United Methodist Settlement Agreement. ............................................. 110

      1.    Probability of Success in Litigation. ...................................... 110

      2.    The Likely Difficulties in Collection. .................................... 111

      3.    The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It......................................... 111

      4.    The Paramount Interest of the Creditors. ............................... 112

G.      The JPM / Creditors' Committee Settlement....................................... 114

      1.    Probability of Success in Litigation. ...................................... 115

      2.    The Likely Difficulties in Collection. .................................... 117

      3.    The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It......................................... 117

      4.    The Paramount Interest of the Creditors. ............................... 118

H.      The Settlement of Restricted and Core Asset Disputes. .............................. 119

      1.    Probability of Success in Litigation. ...................................... 120

      2.    The Likely Difficulties in Collection. .................................... 121

      3.    The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It......................................... 121

      4.    The Paramount Interest of the Creditors. ............................... 122

I.      The PSZJ Settlement...................................................................... 123

J.      The Objection to the Reasonableness of the Insurance Settlements, TCJC Settlement, and Other Chartered Organization Settlements Should be Overruled. ...................................................................... 125

II.      The Scouting-Related Release and Channeling Injunction Should Be Approved. ................................................................................................. 126

A.      The Scouting-Related Release and Channeling Injunction. ........................ 129

B.      This Court Has Subject-Matter Jurisdiction to Confirm a Plan that Contains the Scouting-Related Release and Channeling Injunction............. 130

      1.    "Arising Under" Jurisdiction................................................. 131

      2.    "Arising In" Jurisdiction..................................................... 132

      3.    "Related to" Jurisdiction..................................................... 132

C.      This Court Has Both Constitutional Authority and Statutory Authority to Enter a Confirmation Order Approving the Scouting-Related Release and Channeling Injunction in the Plan........................................................ 144

D.      The Statutory Arguments Based on the *Purdue* Decision Should Be Overruled. .................................................................................... 146

E.     The Scouting-Related Release and Channeling Injunction Are Permissible and Warranted Under the Circumstances. .................................. 152

    1.   Each of the Master Mortgage Factors Have Been Satisfied in these Cases. ................................................................................. 153

    2.   The Debtors Have Met Their Factual Burden Under *Continental* and the Scouting-Related Release and Channeling Injunction Should be Authorized. .......................................................... 207

III.   The Consensual Release for the Released Parties Is Permissible. ........................... 212

IV.   Neither the Consensual Release Nor the Scouting-Related Release Violates the Due Process Rights of the Affected Claimants. ........................................................ 215

V.   The Debtor Releases, Exculpation, and Other Injunction Provisions Should Be Approved. ................................................................................................................. 217

A.    The Debtor Releases. .................................................................................. 219

B.    Exculpation. ................................................................................................ 222

C.    Injunctions. ................................................................................................. 225

VI.   The Plan Satisfies the Remaining Requirements for Confirmation Under Section 1129(a) of the Bankruptcy Code. .................................................................. 226

A.    Section 1129(a)(1):  The Plan Complies with Applicable Provisions of the Bankruptcy Code. ................................................................................. 227

    1.   The Claims and Interests Have Been Classified Properly in the Plan in Accordance with Section 1122 of the Bankruptcy Code. ................. 227

    2.   The Plan Complies with Section 1123(a) of the Bankruptcy Code. ....... 231

    3.   Section 1123(b): The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code. ....................... 246

B.    Section 1129(a)(2):  The Debtors' Compliance with Applicable Provisions of the Bankruptcy Code. .......................................................... 249

    1.   Section 1125:  Postpetition Disclosure Statement and Solicitation. ..... 250

    2.   Section 1126: Acceptance of the Plan. ................................................. 252

C.    Section 1129(a)(3):  The Plan Has Been Proposed In Good Faith and Not by Any Means Forbidden by Law ....................................................... 253

    1.   The Objections Raised by the Debtors' Insurance Companies under Section 1129(a)(3) Should be Overruled. ............................................. 257

    2.   The Plan and the TDP Were Negotiated in Good Faith and Through an Arm's-Length, Mediated Process. ................................................... 277

    3.   All Other Objections under Section 1129(a)(3) Should be Overruled. ............................................................................................ 289

D.      Section 1129(a)(4): The Payment for Certain Services or for Certain Costs and Expenses Is Subject to Court Approval ........................................ 294

E.      Section 1129(a)(5): The Debtors Have Disclosed Information Regarding Directors, Officers, and Insiders of the Debtors ......................... 296

F.      Section 1129(a)(6): Rate Changes—Inapplicable Provision. ...................... 297

G.      Section 1129(a)(7): The Best Interest Test Does Not Apply to the Debtors. .................................................................................................... 297

        1.      The Best Interest Test Does Not Apply to the Local Councils. ............ 298

        2.      The Plan Satisfies the Best Interest Test. ............................................. 299

        3.      There Are Additional Costs and Expenses That Would Be Incurred in a Chapter 7 Proceeding That Would Not Otherwise Be Liabilities Under the Plan. ...................................................................................... 303

        4.      Objections Asserting that the Plan Does Not Satisfy the Best-Interests Test in Accordance with Section 1129(a)(7) of the Bankruptcy Code Should Be Overruled ................................................ 308

H.      Section 1129(a)(8): Acceptance by Impaired Classes. ............................... 319

I.      Section 1129(a)(9): The Plan Provides for Payment in Full of Allowed Administrative and Priority Claims .............................................................. 320

J.      Section 1129(a)(10): Acceptance of the Plan by at Least One Impaired Class of Claims Have Accepted the Plan ....................................................... 321

K.      Section 1129(a)(11): The Plan Is Feasible. ................................................. 321

L.      Section 1129(a)(12): The Plan Provides for Payment of Statutory Fees ..... 334

M.      Section 1129(a)(13): Continuation of Retiree Benefits. ............................. 335

N.      Sections 1129(a)(14) and 1129(a)(15) Do Not Apply to Corporate Debtors. .................................................................................................... 335

O.      Section 1129(a)(16): Transfers to the Settlement Trust Have Been Made in Accordance with Non-Bankruptcy Law. ........................................ 335

P.      Section 1129(b): The "Cramdown" Requirements Are Inapplicable. .......... 337

Q.      Section 1129(c): The Plan Is the Only Plan ................................................. 337

R.      Section 1129(d): Principal Purpose of the Plan. ......................................... 337

S.      Section 1129(e): Small Business Case Plans—Inapplicable Provision. ....... 337

VII.      The Modifications to the Plan Do Not Require Resolicitation. ................................. 338

A.      The RCAHC and Guam Committee Lack Standing to Object to the Plan Modifications. ............................................................................................ 338

B.      The RCAHC and Guam Committee's Objections Are Moot. ...................... 339

     C.     The Plan Modifications are Neither Material nor Adverse and, Therefore, Do Not Require Resolicitation. .................................................... 342

     D.     The Debtors Have Complied With all Applicable Requirements Under Sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.............................................................................................................. 345

VIII.     The Plan Does Not Violate the Fifth Amendment's Due Process Clause Because It Does Not Permit Bankrupt Chartered Organizations to Transfer Their Interests in BSA Insurance Polices Absent Bankruptcy Court Approval. ................ 347

IX.     Responses to Other Objections to the Plan. ........................................................... 350

     A.     Objections Related to the Settlement Trust Governance Should be Overruled. ................................................................................................... 350

            1.     Objections to the Settlement Trustee. .................................................... 350

            2.     Objections to the STAC. ....................................................................... 352

     B.     The Objection to the Insurance Entity Injunction Should be Overruled. ..... 357

     C.     Objections to the Discharge Injunction and the Retention of Jurisdiction Provision. .................................................................................................. 362

RESERVATION OF RIGHTS ............................................................................................. 362

CONCLUSION ................................................................................................................... 363

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*In re 710 Long Ridge Rd. Operating Co. II*,
Bankr. Case No. 13-3653 (DHS), 2014 Bankr. LEXIS 863 (Bankr. D.N.J. Mar. 5, 2014)...163

*In re 710 Long Ridge Rd. Operating Co. II*,
(Bankr. D.N.J. Mar. 5, 2014) ......................................................................158, 163

*In re AAI Pharma*,
No. 05-11341 (PJW) (Bankr. D. Del. Feb. 22, 2006) ..........................................188

*In re ABB Lummus Glob. Inc.*,
No. 06-10401 (MFW) (Bankr. D. Del. June 29, 2006)........................................205

*In re Abeinsa Holding, Inc.*,
562 B.R. 265 (Bankr. D. Del. 2016) ..................................................................182

*In re ACandS, Inc.*,
311 B.R. 36 (Bankr. D. Del. 2004) .............................................................258, 259

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) .......................................................... passim

*In re Airadigm Comm'ns, Inc.*,
519 F.3d 640 (7th Cir. 2008) .....................................................................119, 178

*In re Aleris Int'l, Inc.*,
Case No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)...........188, 307

*In re Allegany Int'l., Inc.*,
118 B.R. 282 (Bankr. W.D. Pa. 1990) ................................................................209

*In re Am. Apparel, Inc.*,
No. 15-12055 (BLS), 2016 Bankr. LEXIS 3331 (Bankr. D. Del. Jan. 27, 2016).................195

*Am. Bank & Tr. Co. v. Jardine Ins. Servs. Tex., Inc. (In re Barton Indus., Inc.)*,
104 F.3d 1241 (10th Cir.1997) .........................................................................185

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)................................................................248, 249, 250

*In re America Fam. Enters.*,
256 B.R. 377 (D.N.J. 2000) ...........................................................119, 121, 138, 180

*In re American Solar King*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988) ........................................................303, 307

*In re Ames Dep't Stores, Inc.*,
    No. 93 CIV. 4014 (KMW), 1995 WL 311764 (S.D.N.Y. May 18, 1995) ...........................239

*In re AOV Indus., Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986) .......................................................198

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) ..........................................................17

*In re Armstrong World Indus., Inc.*,
    348 B.R. 136 (D. Del. 2006) ..........................................154, 196, 287

*ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*,
    650 F.3d 593 (5th Cir. 2011) .........................................................21

*In re Astria Health*,
    623 B.R. 793 (Bankr. E.D. Wash. 2021) ...........................................193

*In re Atlantic Gulf Cmtys. Corp.*,
    369 B.R. 156 (Bankr. D. Del. 2007) ................................................109

*In re Babcock & Wilcox Co.*,
    No. 00-10992, 2004 WL 4945985 (Bankr. E.D. La. Nov. 9, 2004) .......................239

*Bank of N.Y., Mellon Trust Co., N.A. v. Becker (In re Lower Bucks Hosp.)*,
    488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) ...............108

*In re Bashas' Inc.*,
    437 B.R. 874 (Bankr. D. Ariz. 2010) ...............................................317

*Bath Iron Works Corp. v. Congoleum Corp. (In re Congoleum Corp.)*,
    627 B.R. 62 (Bankr. D.N.J. 2021) ...............................................27, 156

*Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank, S.S.B.)*,
    201 B.R. 376 (E.D. Pa. 1996) .......................................................307

*In re Beyond.com Corp.*,
    289 B.R. 138 (N.D. Cal. 2003) ......................................................317

*In re Blitz U.S.A., Inc.*,
    No. 11-13603, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) ...........101, 121, 125

*In re Blitz U.S.A., Inc.*,
    No. 11-13603 (PJW), 2013 WL 6825607 (Bankr. D. Del. Nov. 12, 2013) ...............229

*Blixseth v. Credit Suisse*,
    961 F.3d 1074 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1394 (2021) ...................................194

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ..................................................................................201

*Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings Inc.)*,
    2021 U.S. Dist. LEXIS 138478 (D. Del. July 26, 2021) ......................................................205

*In re Camp Arrowhead, Ltd.*,
    451 B.R. 678 (Bankr. W.D. Tex. 2011) .................................................................................306

*In re Capmark Fin. Grp. Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) .......................................................................................20

*In re Catholic Diocese of Wilmington, Inc.*,
    No. 09-13560 (CSS) (Bankr. D. Del. Aug. 8, 2011).................................................................50

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995).........................................................................................101, 104, 105

*Cent. Virginia Cmty. Coll v. Katz*,
    546 U.S. 356 (2006).............................................................................................................111

*In re Centaur, LLC*,
    Bankr. Case No. 10-10799 KJC, 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) ............88

*In re Century Glove, Inc.*,
    No. 90-400, 1993 WL 239489 (D. Del. Feb. 10, 1993).......................................................307

*Century Indemnity Company v. Boy Scouts of America and Delaware BSA, LLC*,
    Case No. 21-1792 (3d Cir.)....................................................................................................31

*In re CFB Liquidating Corp.*,
    No. 01-45483 (RLE), 2012 WL 3929289 (Bankr. N.D. Cal. Sep. 7, 2012) ...........................28

*In re Chaparral Energy Inc.*,
    No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) ..........................................................182

*In re Charles St. African Methodist Episcopal Church of Bos.*,
    499 B.R. 66 (Bankr. D. Mass. 2013) ...................................................................................175

*Chemetron Corp. v. Jones*,
    72 F.3d 341 (3d Cir. 1995)...................................................................................................185

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ................................................................................192

*In re City Homes III LLC*,
564 B.R. 827 (Bankr. Md. 2017) ........................................................................203

*In re Claar Cellars LLC*,
623 B.R. 578 (Bankr. E.D. Wash. 2021) ............................................................301

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004)......................................................................... passim

*In re Comfort Co., Inc.*,
Bankr. Case No. 08-12305, 2009 WL 7146282 (Bankr. D. Del. Feb. 4, 2009) .....................96

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
60 B.R. 612 (Bankr. S.D.N.Y. 1986)............................................................21, 117

*In re Congoleum Corp.*,
(Bankr. D.N.J. Sep. 2, 2008)............................................................................255

*In re Congoleum Corp.*,
No. 03-51524, 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008) ........................213

*In re Conseco, Inc.*,
301 B.R. 525 (Bankr. N.D. Ill. 2003) ................................................................279

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ...........................................19, 136, 182, 197

*CoreStates Bank, N.A. v. United Chem. Techs., Inc.*,
202 B.R. 33 (E.D. Pa. 1996) ............................................................................287

*In re Crowe*,
No. 19-04406, 2021 WL 2212005 (Bankr. D. Ariz. June 1, 2021) ......................248

*In re Cybergenics Corp.*,
226 F.3d 237 (3d Cir. 2000)...............................................................................48

*Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*,
242 B.R. 147 (Bankr. D. Del. 1999) ...................................................................20

*In re Dana Corp.*,
412 B.R. 53 (S.D.N.Y. 2018)........................................................201, 203, 212

*David v. Weinstein Co. Holdings, LLC*,
2021 WL 979603 (D. Del. Mar. 16, 2021) ........................................................121

*In re Delaco Co.*,
  Bankr. Case No. 04-10899 (Bankr. S.D.N.Y. July 29, 2005 & Aug. 1, 2005)......................28

*In re Digerati Techs., Inc.*,
  No. 13-33264, 2014 WL 2203895 (Bankr. S.D. Tex. May 27, 2014) ..................................315

*In re Dow Corning Corp.*,
  198 B.R. 214 (Bankr. E.D. Mich. 1996) .............................................................24, 25, 39, 205

*In re Dow Corning Corp.*,
  244 B.R. 634 (Bankr. E.D. Mich. 1999) *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded,* 280 F.3d 648 (6th Cir. 2002) ............................................................................206

*In re Dow Corning Corp.*,
  255 B.R. 445 (E.D. Mich. 2000).................................................................166, 205, 206, 207

*In re Dow Corning Corp.*,
  280 F.3d 648 (6th Cir. 2002) ...............................................................................119, 120

*In re Dow Corning Corp.*,
  86 F.3d 482 (6th Cir. 1996) .......................................................................................41, 112

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
  871 F. Supp. 2d 143 (E.D.N.Y. 2012) ................................................................................185

*In re Drexel Burnham Lambert Grp.*,
  960 F.2d 285 (2d Cir. 1992)..............................................................................................195

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992)................................................................................196

*In re Drug Fair Grp., Inc.*,
  No. 09-10897 (BLS), 2010 Bankr. LEXIS 2984 (Bankr. D. Del. June 7, 2010)..................195

*In re Duro Dyne Nat'l Corp.*,
  No. 18-2793 (MBK) (Bankr. D.N.J. July 16, 2019) ...........................................................205

*In re Eagle-Picher Indus., Inc.*,
  1996 U.S. Dist. LEXIS 17160 (S.D. Ohio 1996)................................................................316

*In re Emerge Energy Servs. LP*,
  No. 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ...........................207

*In re Energy Future Holding Corp.*,
  527 B.R. 157 (D. Del. 2015)..............................................................................................203

*In re Envirodyne Indus., Inc.*,
  1993 WL 566565 (Bankr. N.D. Ill. Dec. 20, 1993) ............................................245

*In re Equan Realty Corp.*,
  Bankr. Case No. 08-14017 (RDD), 2009 WL 7193572 (Bankr. S.D.N.Y. Dec. 17, 2009)...114

*In re Exide Holdings, Inc.*,
  20-11157-CSS, 2021 WL 3145612 (D. Del. July 26, 2021)................................188

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ...................................................190

*In re Fed.-Mogul Global Inc.*,
  No. 01-10578 (JKF), 2007 Bankr. LEXIS 3940 (Bankr. D. Del. Nov. 8, 2007)..........154, 213

*In re Federal–Mogul Global Inc.*,
  No. 01-10578, 2007 WL 4180545 (Bankr. D. Del. 2007) ..................................307

*In re Flintkote Co.*,
  Bankr. Case No. 04-11300, 2012 Bankr. LEXIS 6006 (Bankr. D. Del. Dec. 21, 2012) .........28

*In re Frascella Enters., Inc.*,
  360 B.R. 435 (Bankr. E.D. Pa. 2007) .................................................221

*In re Freedom Rings, LLC*,
  No. 05-14268 (Bankr. D. Del. May 9, 2006) (CSS) ......................................103

*In re Friedman's, Inc.*,
  336 B.R. 891 (Bankr. S.D. Ga. 2005) ...................................................21

*Futuresource, LLC v. Reuters Ltd.*,
  312 F.3d 281 (7th Cir. 2002) .............................................................26

*In re Genco Shipping & Trading Ltd.*,
  513 B.R. 233 (Bankr. S.D.N.Y. 2014) .................................................108

*Gillman v. Continental Airlines (In re Continental Airlines)*,
  203 F.3d 203 (3d Cir. 2000)....................................................... passim

*Girl Scouts of the United States of America v. Boy Scouts of America*,
  No. 1:18-cv-10287 (S.D.N.Y. Nov 06, 2018)...........................................202

*In re Glob. Indus. Techs., Inc.*,
  645 F.3d 201 (3d Cir. 2011)....................................................... passim

*In re Global Indus. Techs., Inc.*,
  No. 02-21626, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013) ......................101

*Goldberg v. Tynan (In re Tynan)*,
  773 F.2d 177 (7th Cir. 1985) ...................................................................109

*In re Grace Christian Ministries, Inc.*,
  287 B.R. 352 (Bankr. W.D. Pa. 2002) ......................................................264

*In re Greate Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) ...........................................................196

*In re Haskell L.P.*,
  321 B.R. 1 (Bankr. D. Mass. 2005) .....................................................27, 44

*In re Hereford Biofuels, L.P.*,
  466 B.R. 841 (Bankr. N.D. Tex. 2012).................................................39, 43

*In re Heritage Organization, LLC*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007)................................................47, 48

*Honeywell Int'l, Inc. v. N. Am. Refractories Asbestos Personal Injury Settlement Trust (In re N. Am. Refractories Co.)*,
  542 B.R. 350 (Bankr. W.D. Pa. 2015) ......................................................319

*In re Horsehead Holding Corp.*,
  No. 16-10287 (CSS) (Bankr. D. Del. Sept. 9, 2016) ...............................182

*In re HRI Holding Corp.*,
  No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020) .............................195

*In re Imerys Talc Am., Inc.*,
  No.19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) ................................186

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) .................................................. passim

*In re Insys Therapeutics, Inc.*,
  No. 19-11292 (Bankr. D. Del.) (KG).....................................154, 186, 318

*In re Integrated Resources, Inc.*,
  147 B.R. 650 (Bankr. S.D.N.Y. 1992) ........................................................21

*Internal Revenue Serv. v. Kaplan (In re Kaplan)*,
  104 F.3d 589 (3d Cir. 1997).......................................................................287

*In re Jensen Farms et al.*,
  No. 12-20982 HRT (Bankr. D. Colo. Oct. 25, 2012) ...............................28

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987)................................................................198

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
987 F.2d 154 (3d Cir. 1993)........................................................196, 199

*In re Johns-Manville Corp.*,
551 B.R. 104 (S.D.N.Y. 2016)...............................................................184

*In re Johns-Manville Corp.*,
552 B.R. 221 (Bankr. S.D.N.Y. 2016), *aff'd*, 623 B.R. 242 (S.D.N.Y. 2020) .....185

*In re Johns-Manville Corp.*,
801 F.2d 60 (2d Cir. 1986).....................................................................162

*In re K.G. IM, LLC*,
620 B.R. 469 (Bankr. S.D.N.Y. Sept. 29, 2020)...................................20

*In re Kaiser Aluminum Corp.*,
343 B.R. 88 (D. Del. 2006)....................................................................213

*In re Kaiser Aluminum Corp.*,
No. 02-10429 (JFK), 7312, 2006 WL 616243 (Bankr. D. Del. Feb. 2006)..................119, 121

*In re Kaiser Aluminum Corp.*,
No. 02-10429 (JKF), 2006 Bankr. LEXIS 3945 (Bankr. D. Del. Feb. 6, 2006)...................154

*In re Kaiser Gypsum Co., Inc.*,
No 16-31602 (W.D.N.C. July 28, 2021).................................................318

*In re Key3Media Group, Inc.*,
336 B.R. 87 (Bankr. D. Del. 2005) .......................................................20

*Koelbl v. Glessing (In re Koelbl)*,
751 F.2d 137 (2d Cir. 1984)...................................................................221

*In re Lapworth*,
No. 97-34529, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 3, 1998) .......................218

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*,
329 B.R. 491 (D.N.J. 2005), *aff'd sub nom.*, 241 F. App'x 1 (3d Cir. 2007) .......................261

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982)................................................................................184

*In re Louise's Inc.*,
211 B.R. 798 (Bankr. D. Del. 1997) ......................................................19

*In re LTL Management, LLC*,
  Case 21-3058-MBK, Doc. 1572 (Bankr. D.N.J. Jan. 20, 2022) ...........................53, 54, 55, 56

*In re LTL Management, LLC*,
  Case No. 21-30589 (MBK) (Bankr. D.N.J. Feb. 25, 2022) ...................................................158

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
  837 F.2d 89 (2d Cir. 1988)....................................................................24, 38, 42, 43

*In re Majestic Star Casino, LLC*,
  716 F.3d 736 (3d Cir. 2013)....................................................................................109

*In re Mallinckrodt Plc*,
  No. 22-12522 (JTD) (Bankr. D. Del. Feb. 8, 2022)......................................115, 116, 183, 205

*In re Mallinckrodt*,
  No. 20-12522 (JTD) (Bankr. D. Del. Feb. 3, 2022)..............................................101, 153, 162

*In re Mangia Pizza Inv., LP*,
  480 B.R. 669 (Bankr. W.D. Tex. 2012) ...............................................................307

*In re Manville Forest Prod. Corp.*,
  209 F.3d 125 (2d Cir. 2000).................................................................................185

*In re Maremont Corp.*,
  601 B.R. 1 (Bankr. D. Del. 2019) ........................................................................224

*In re Maremont Corp.*,
  No. 19-10118 (KJC) (Bankr. D. Del. May 17, 2019) ...................................199, 318

*In re Marvel Entm't Grp., Inc.*,
  222 B.R. 243 (D. Del. 1998)............................................................................22, 188

*In re Marvel Entm't Grp., Inc.*,
  273 B.R. 58 (Bankr. D. Del. 2002) .........................................................................21

*In re Masonite Corp.*,
  No. 09-10844 (PJW), 2009 Bankr. LEXIS 4698 (Bankr. D. Del. May 29, 2009)................195

*In re Master Mortg. Inv. Fund, Inc.*,
  168 B.R. ..................................................................................................130

*MBank Dallas, N.A. v. O'Connor (In re O'Connor)*,
  808 F.2d 1393 (10th Cir. 1987) .............................................................................40

*In re Mcorp Fin., Inc.*,
  137 B.R. ..................................................................................................282

*In re Medford Crossings N., LLC,*
  Case No. 07-25115, 2011 WL 182815 (Bankr. D. N.J. Jan. 20, 2011) ...............................108

*In re Mesa Air Group, Inc.,*
  2011 WL 320466, 2011 Bankr. LEXIS 3855 (Bankr. S.D.N.Y. Jan. 20, 2011)...................308

*In re Millennium Lab Holdings II, LLC,*
  543 B.R. 703 (Bankr. D. Del. 2016) ...........................................................................123, 126

*In re Millennium Lab Holdings II, LLC,*
  562 B.R. 614 (Bankr. D. Del. 2016) ...........................................................................101, 176

*In re Millennium Lab Holdings II, LLC,*
  575 B.R. 252 (Bankr. D. Del. 2017), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd sub nom. In re
  Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019) .................................. passim

*In re Millennium Lab Holdings II, LLC,*
  591 B.R. 559 (D. Del. 2018)........................................................119, 123, 126, 163

*In re Millennium Lab Holdings II, LLC,*
  945 F.3d at 137 ............................................................................................ passim

*Miller v. Zurich Am. Ins. Co. (In re WL Homes LLC),*
  563 B.R. 512 (Bankr. D. Del. 2017) ............................................................................237

*In re Molycorp, Inc.,*
  No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) .........................................................210

*In re Motors Liquidation Co.,*
  585 B.R. 708 (Bankr. S.D.N.Y. 2018) ..................................................................185

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
  339 U.S. 306 (1950).........................................................................................184

*Myers v. Martin (In re Martin),*
  91 F.3d 389 (3d. Cir. 1996)........................................................................... passim

*Nat'l Hertiage Found., Inc. v. Highbourne Found., Inc.,*
  760 F. 3d 344 (4th Cir. 2014) ...............................................................................119

*In re Nat'l Truck Funding LLC,*
  588 B.R. 175 (Bankr. S.D. Miss. 2018)...........................................................303

*In re New Century TRS Holdings, Inc.,*
  450 B.R. 504 (Bankr. D. Del. 2011) ..........................................................................185

*In re New Century TRS Holdings, Inc.*,
  465 B.R. 38 (Bankr. D. Del. 2012) .......................................................184

*In re New Power Co.*,
  438 F.3d 1113 (11th Cir. 2006) ...........................................................307

*In re NII Holdings*,
  288 B.R. 356 (Bankr. D. Del. 2002) .....................................................287

*In re Nutritional Sourcing Corp.*,
  398 B.R. 816 (Bankr. D. Del. 2008) ................................................19, 21

*In re Nuverra Environmental Solutions, Inc.*,
  590 B.R. 75 (D. Del. 2018)....................................................................67

*Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*,
  322 B.R. 560 (M.D. Pa. 2005) ...........................................258, 259, 260

*Official Comm. Of Unsecured Creditors of Cybergencis Corp. ex rel. Cybergenics Corp. v. Chinery*,
  330 F.3d 548 (3d Cir. 2003)................................................................121

*Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.)*,
  913 F.2d 873 (11th Cir. 1990) .............................................................196

*In re Orleans Homebuilders, Inc.*,
  561 B.R. 46 (Bankr. D. Del. 2016) ......................................................192

*Pacor, Inc. v. Higgins*,
  743 F.2d 984 (3d Cir. 1984)...........................................................42, 104

*In re Parkview Hosp.*,
  211 B.R. 619 (Bankr. N.D. Ohio 1997) ..........................................69, 140

*In re Penn Cent. Transp. Co.*,
  596 F.2d 1102 (3d Cir. 1979)................................................................19

*In re PG&E Corp.*,
  No. 19-30088 (Bankr. N.D. Cal. Mar. 17, 2020)..................................199

*In re PNG Ventures, Inc.*,
  No. 09-13162, 2010 WL 2745952 (Bankr. D. Del. Mar. 12, 2010) .....192

*In re PNG Ventures, Inc.*,
  No. 09-13162 (Bankr. D. Del. Mar. 5, 2010)..............................158, 172

*In re Prussia Assocs.*,
  322 B.R. 572 (Bankr. E.D. Pa. 2005) .............................................................287

*In re Purdue Pharma L.P.*,
  633 B.R. 53 (Bankr. S.D.N.Y. 2021), *vacated on other grounds*, No. 21-cv-7532 (CM), 2021
  U.S. LEXIS 242236 (S.D.N.Y. Dec. 16, 2021)
  ....................................................................................................................227, 278

*In re Purdue Pharma L.P.*,
  No. 19-23649, 2021 WL 4240974 (Bankr. S.D.N.Y Sept. 17, 2021)....................278

*In re Purdue Pharma, LP*,
  2021 WL 5979108 (Bankr. S.D.N.Y. Dec. 16, 2021).........................................118

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)........................................................................ passim

*In re Quay Corp.*,
  372 B.R. 378 (Bankr. N.D. Ill. 2007) ..................................................................48

*Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*,
  308 F.3d 451 (5th Cir. 2002) ............................................................................255

*In re Regent Commc'ns, Inc.*,
  No. 10-10632 (KG), 2010 Bankr. LEXIS 5793 (Bankr. D. Del. Apr. 12, 2010) .................195

*In re Resorts Int'l, Inc.*,
  145 B.R. 412 (Bankr. D.N.J. 1990) ...................................................................204

*In re Resorts Int'l, Inc.*,
  372 F.3d 154 (3d Cir. 2004)..............................................................................104

*In re Roman Catholic Archbishop of Portland in Or.*,
  No. 04-37154, 2007 Bankr. LEXIS 1180 (Bankr. D. Or. Apr. 13, 2007) ...........................301

*In re Roman Catholic Archbishop of Portland in Oregon*,
  Bankr. Case No. 304-37154 1 (Bankr. D. Ore. Feb. 2, 2007) ................................28

*In re Roman Catholic Bishop of Stockton*,
  No. 14-20371, 2017 Bankr. LEXIS 102 (Bankr. E.D. Cal. Jan. 10, 2017)...........................317

*In re Roman Catholic Bishop of Stockton*,
  No. 14-20371, 2017 WL 118013 (Bankr. E.D. Cal. Jan. 10, 2017) .............................. passim

*In re Roman Catholic Church of Diocese of Tucson*,
  Bankr. No. 04-04721 (Bankr. D. Ariz. Sep. 21, 2005) .........................................50

*In re rue21, Inc.*,
   575 B.R. 314 (Bankr. W.D. Pa. 2017) ..............................................................137

*In re Sabine Oil & Gas Corp.*,
   555 B.R. 180 (Bankr. S.D.N.Y. 2016) ................................................................20

*Salisbury v. Ameritrust Tex., N.A. (In re Bishop Coll.)*,
   151 B.R. 394 (Bankr. N.D. Tex. 1993) ..............................................69, 140, 273

*In re Save Our Springs (S.O.S.) Alliance, Inc.*,
   388 B.R. 202 (Bankr. W.D. Tex. 2008) ......................................................69, 140

*In re Save Our Springs (S.O.S.) Alliance, Inc.*,
   632 F.3d 168 (5th Cir 2011) ...........................................................................288

*In re Scimeca Found., Inc.*,
   497 B.R. 753 (Bankr. E.D. Pa. 2013) ..............................................................27

*In re Seaside Eng'g & Surveyign*,
   780 F.2d 1070 (11th Cir. 2015) .......................................................................119

*In re SelectBuild Illinois*,
   No. 09-12085, 2015 WL 3452542 (Bankr. D. Del. May 28, 2015) ....................156

*In re Sentinel Mgmt. Grp.*,
   398 B.R. 281 (Bankr. N.D. Ill. 2008) .............................................307, 316, 317

*In re Sepco Corp.*,
   No. 16-50058 (Bankr. N.D. Oh. Mar. 24, 2020) ..............................................318

*In re SGL Carbon Corp.*,
   200 F.3d 154 (3d Cir. 1999) ...........................................................................221

*In re Sharon Steel Corp.*,
   86 B.R. 455 (Bankr. W.D. Pa. 1988) ...............................................................48

*In re SM 104 Ltd.*,
   160 B.R. 202 (Bankr.S.D.Fla.1993) ................................................................315

*SN Liquid., Inc. v. Icon Int'l, Inc. (In re SN Liquid., Inc.)*,
   388 B.R. 579 (Bankr. D. Del. 2008) ...............................................................113

*In re Southeastern Grocers, LLC*,
   No. 18-10700 (MFW) (Bankr. D. Del. May 14, 2018) .......................................182

*In re Specialty Equip. Co.*,
   3 F.3d 1043 (7th Cir. 1993) ...........................................................................120

*In re Sportstuff, Inc.*,
430 B.R. 170 (BAP 8th Cir. 2010) ...................................................................156

*In re Stallion Oilfield Servs.*,
No. 09-13562 (BLS), 2010 Bankr. LEXIS 4500 (Bankr. D. Del. Jan. 20, 2010).................195

*Stephan v. United States*,
319 U.S. 423 (1943) (per curiam) ....................................................................118

*In re Stone & Webster, Inc.*,
286 B.R. 532 (Bankr. D. Del. 2002) ................................................................213

*Matter of Sun Country Dev., Inc.*,
764 F.2d 406 (5th Cir. 1985) ..........................................................................223

*In re Sweetwater*,
57 B.R. 354 (D. Utah 1985) .....................................................................304, 305

*In re T-H New Orleans Ltd. P'ship*,
116 F.3d 790 (5th Cir. 1997) ..........................................................................287

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010) ......................................................... passim

*In re Temple Zion*,
125 B.R. 910 (Bankr. E.D. Pa. 1991) .............................................................288

*In re Texaco, Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988) ...............................................................287

*In re The Weinstein Co. Holdings, LLC*,
Case No. 18-10601 (MFW) (Bankr. D. Del. Jan. 26, 2021) ...............................160

*In re The Weinstein Company Holdings, LLC*,
No. 18-10601 (Bankr. D. Del. Jan. 26, 2021) ...................................................121

*Things Remembered, Inc. v. Petrarca*,
516 U.S. 124 (1995).......................................................................................104

*In re TK Holdings Inc.*,
17-11375 (Bankr. D. Del. 2018) ......................................................................126

*In re TK Holdings Inc.*,
Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ...............................160

*In re TK Holdings, Inc.*,
No. 17-11375 (BLS), 2018 Bankr. LEXIS 756 (Bankr. D. Del. Feb. 21, 2018) ...182, 195, 199

*In re Trans World Airlines, Inc.*,
  322 F.3d 283 (3d Cir. 2003)....................................................................................39

*In re Triad Guaranty Inc.*,
  No. 14-1464, 2016 WL 3523834 (D. Del. June 27, 2016) ............................................321, 323

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) .............................................29, 124, 125, 133

*In re Tribune Co.*,
  476 B.R. 843 (Bankr. D. Del. 2012), *aff'd as modified*, No. 08–13141 (KJC), 2014 WL
  2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015) 196

*In re Tribune Co.*,
  972 F.3d 228 (3d Cir. 2020)....................................................................................67

*U.S. Bank. Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion)*,
  426 B.R. 114 (Bankr. D. Del. 2010) ............................................................. passim

*In re U.S. Fidelis, Inc.*,
  481 B.R. 503 (Bankr. E.D. Mo. 2012)......................................................163, 164

*In re U.S. Truck Co.*,
  47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ....................287

*United States v. Energy Res. Co.*,
  495 U.S. 545 (1990)..............................................................................................287

*In re United Steel Enters., Inc.*,
  No. 03-50284 (NLW), 2009 WL 1025398 (Bankr. D. N.J. Jan. 15, 2009) .........................121

*In re USA Gymnastics*,
  Bankr. Case No. 18-09108 (Bankr. S.D. Ind. Dec. 16, 2021) [D.I. 1776]..............................44

*In re USA Gymnastics*,
  No. 18-09108 (Bankr. S.D. Ind. Dec. 16, 2021) [D.I. 1776 at 16] ..........................................27

*In re USA Gymnastics*,
  No. 18-09108-RLM-11 (Bankr. S.D. Ind. Dec. 16, 2021) [D.I. 1776]..................199

*In re USN Commc'ns, Inc.*,
  280 B.R 573 (Bankr. D. Del. 2002) ....................................................................307

*Verdetto v. State Farm Fire & Cas. Co.*,
  510 Fed. Appx. 209 (3d Cir. 2013)......................................................................255

*In re W. Asbestos Co.*,
   313 B.R. 832 (Bankr. N.D. Cal. 2003) ...............................................................213

*In re W.R. Grace & Co.*,
   386 B.R. 17 (Bankr. D. Del. 2008) .........................................................106, 112

*In re W.R. Grace & Co.*,
   412 B.R. 657 (D. Del. 2009) ..................................................................................111

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ..................................................................... passim

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3d Cir. 2013).................................................................166, 201

*In re W.R. Grace & Co.*,
   No. 01-1139 (JKF), 2011 WL 381942 (Bankr. D. Del. Jan. 31, 2011) ................................126

*In re Washington Mut., Inc.*,
   461 B.R. 200 (Bankr. D. Del. 2011) ......................................................................221

*In re Washington Mutual Inc.*,
   42 B.R. 314 (Bankr. D. Del. 2011) ......................................................................137

*In re Washington Mutual Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ...................................................... passim

*Winstar Holdings, LLC v. Blackstone Grp. L.P.*,
   No. 07-CV-4634, 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) ...........................104

*In re World Health Alts., Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) ...............................................19, 20, 47

*In re Yarway Corp.*,
   No. 13-11025 (Bankr. D. Del. Apr. 8, 2015) ..................................................318

*In re Yes! Entertainment Corp.*,
   316 B.R. 141 (D. Del. 2004) ..................................................................................88

*In re Z Gallerie, LLC*,
   No. 19-10488 (LSS) (Bankr D. Del. Mar. 11, 2019) ...........................................182

*In re Zenith Elec. Corp.*,
   241 B.R. ................................................................................................. passim

## STATE CASES

*Fuller-Austin Insul. Co. v. Highlands Ins. Co.,*
  135 Cal. App. 4th 958 (Cal. Ct. App. 2006) ........................................................234

## FEDERAL STATUTES

11 U.S.C. 541(d) ................................................................................................140

11 U.S.C. § 157 ..................................................................................................102

11 U.S.C. § 363(f) ...........................................................................................25, 37

11 U.S.C. § 363(f)(1)-(5) .....................................................................................36

11 U.S.C. § 363(f)(2) ......................................................................................26, 37

11 U.S.C. § 363(f)(4)-(5) .....................................................................................26

11 U.S.C. § 363(f)(5) ...........................................................................................39

11 U.S.C. § 502(b)(9) ............................................................................................6

11 U.S.C. § 507(a)(1) .........................................................................................300

11 U.S.C. § 524(g) ........................................................................117, 118, 249

11 U.S.C. § 541(a) .......................................................................................109, 110

11 U.S.C. § 541(a)(1) ...................................................................................25, 36, 112

11 U.S.C. § 541(a)(7) ......................................................................................25, 36

11 U.S.C. § 541(d) .........................................................................................69, 140

11 U.S.C. § 1123(b)(3)(A) ..........................................................19, 188, 190, 216

11 U.S.C. § 1126(a) ...........................................................................................220

11 U.S.C. § 1126(c) ..........................................................................159, 220, 285

11 U.S.C. § 1126(f) ...........................................................................................220

11 U.S.C. § 1126(g) ....................................................................................220, 282

11 U.S.C. § 1127(a) ...........................................................................................306

11 U.S.C. § 1141(d)(3) .......................................................................................120

11 U.S.C. § 1334(a) ...................................................................................102, 115

11 U.S.C. § 1334(b) ...................................................................41, 102, 104, 112

15 U.S.C. § 363(f) .................................................................................................37

15 U.S.C. § 1011-1015 .........................................................................................37

28 U.S.C. § 157(b)(2)(L) .............................................................................102, 115

28 U.S.C. § 1930 ...............................................................................................299

United States Code Title 11 § 1129, 11 U.S.C. §§ 101–1532 ...............passim

United States Code Title 28 § 157(b) ...............................................................18, 101

United States Code Title 28 § 1930 .................................................................300

Bankruptcy Code § 105(a) ...............................................................................passim

Bankruptcy Code § 330 ........................................................................................95

Bankruptcy Code § 362 ......................................................................................5, 6

Bankruptcy Code § 363 ...................................................................................passim

Bankruptcy Code § 363(b)................................................................20, 24, 247, 261

Bankruptcy Code § 363(b)(1) ..............................................................................19

Bankruptcy Code § 363(e) ............................................................................passim

Bankruptcy Code § 363(f) ...........................................................................passim

Bankruptcy Code § 363(m)..................................................................................28

Bankruptcy Code § 365 ...................................................................................215

Bankruptcy Code § 502 ..............................................................................66, 187

Bankruptcy Code § 502(j)....................................................................................67

Bankruptcy Code § 503(b)..................................................................247, 261

Bankruptcy Code § 507 ...................................................................................299

Bankruptcy Code § 510 ..................................................................................187

Bankruptcy Code § 524(e)..............................................................................passim

Bankruptcy Code § 542 ...................................................................187

Bankruptcy Code § 544 ...................................................................187

Bankruptcy Code § 545 ...................................................................187

Bankruptcy Code § 724(a) ...............................................................187

Bankruptcy Code § 1102 .....................................................................8

Bankruptcy Code § 1107(a) .................................................................7

Bankruptcy Code § 1108 .....................................................................7

Bankruptcy Code § 1109(b) .................................................................8

Bankruptcy Code § 1112(c) ..............................................................264

Bankruptcy Code § 1114 ...................................................................300

Bankruptcy Code § 1122 ............................................195, 196, 197, 200

Bankruptcy Code § 1123 ............................................19, 195, 196, 231

Bankruptcy Code § 1123(a) ......................................................199, 204

Bankruptcy Code § 1123(a)(1) ..................................................196, 200

Bankruptcy Code § 1123(a)(2) .........................................................200

Bankruptcy Code § 1123(a)(3) ..................................................200, 201

Bankruptcy Code § 1123(a)(4) .................................................... passim

Bankruptcy Code § 1123(a)(5) ..................................................212, 213

Bankruptcy Code § 1123(a)(6) ..................................................213, 214

Bankruptcy Code § 1123(a)(7) ..........................................214, 315, 316

Bankruptcy Code § 1123(b) ........................................................ passim

Bankruptcy Code § 1123(b)(1) .........................................................215

Bankruptcy Code § 1123(b)(2) ..................................................215, 216

Bankruptcy Code § 1123(b)(3)(B) .............................................216, 217

Bankruptcy Code § 1123(b)(6) .................................................... passim

Bankruptcy Code § 1124 ...................................................................200

Bankruptcy Code § 1125 ............................................................ passim

Bankruptcy Code § 1125(b) ...........................................................218

Bankruptcy Code § 1126 .............................................218, 220, 285

Bankruptcy Code § 1127 ............................................................ passim

Bankruptcy Code § 1129(a) .......................................195, 218, 302

Bankruptcy Code § 1129(a)(1) ...............................................102, 195

Bankruptcy Code § 1129(a)(2) .....................................217, 218, 220

Bankruptcy Code § 1129(a)(3) .................................................. passim

Bankruptcy Code § 1129(a)(4) ...................................247, 260, 261, 262

Bankruptcy Code § 1129(a)(5) ...................................263, 315, 316, 317

Bankruptcy Code § 1129(a)(5)(A)(ii) ..................................315, 316

Bankruptcy Code § 1129(a)(6) .............................................263, 264

Bankruptcy Code § 1129(a)(7) .................................................. passim

Bankruptcy Code § 1129(a)(7)(A) ..............................265, 277, 279

Bankruptcy Code § 1129(a)(8) .............................................285, 286

Bankruptcy Code § 1129(a)(9) .........................................................286

Bankruptcy Code § 1129(a)(10) .......................................................286

Bankruptcy Code § 1129(a)(11) ...................................287, 288, 289

Bankruptcy Code § 1129(a)(12) .......................................................299

Bankruptcy Code § 1129(a)(13) .......................................................300

Bankruptcy Code § 1129(a)(14) .......................................................300

Bankruptcy Code § 1129(a)(15) .......................................................300

Bankruptcy Code § 1129(a)(16) ...................................300, 301, 302

Bankruptcy Code § 1129(b) .............................................67, 257, 302

Bankruptcy Code § 1129(d) ................................................................................302

Bankruptcy Code § 1129(e) ................................................................................302

Bankruptcy Code § 1141 ..............................................................46, 120, 231, 233

ERISA § 4068(a) ..................................................................................................271

Pub. L. 103–394 § 111(b) ...................................................................................118

Securities Act § 5 ................................................................................................302

## FEDERAL RULES

Fed. R. Bankr. P. 3019 .......................................................................................306

Fed. R. Bankr. P. 9019 .................................................................................. passim

Federal Rules of Bankruptcy Procedure Rule 1015 .............................................7

Federal Rules of Civil Rule 65(d) ......................................................................320

Local Rules of Bankruptcy Rule 1015-1 ...............................................................7

The Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors") submit this (a) memorandum of law (the "Memorandum") in support of confirmation of the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*[2] (including all exhibits and schedules thereto and as amended, modified, or supplemented from time to time, the "Plan")[3] pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and (b) in response to objections, supplemental objections, joinders, and reservations of rights (the "Objections," and the parties who submitted objections, the "Objectors"). In further support of confirmation and this Memorandum, the Debtors intend to rely upon declarations (each as may be supplemented) to be submitted in support of confirmation of the Plan (collectively, the "Confirmation Declarations") and evidence presented at the Confirmation Hearing.

**The Debtors intend to file an initial form of the proposed Confirmation Order concurrently with the filing of this Memorandum. Given the importance of the confirmation issues before the Court, the Debtors believe that the opportunity for substantial dialogue with and review by the Court on the appropriate terms of the Confirmation Order is warranted. The Debtors intend to file the initial proposed Confirmation Order to open this dialogue for parties to consider as appropriate.**

**The proposed Confirmation Order shall remain subject to ongoing review and material revision in all respects. The Coalition, the TCC, the FCR, the Ad Hoc Committee,**

---

[2]   D.I. 8813, 8910.

[3]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan and the proposed Confirmation Order, each as applicable.

the Creditors' Committee, JPM, the Settling Insurance Companies, TCJC, and the UMAHC are each continuing to review the Confirmation Order, and each of their respective rights are reserved.

## PRELIMINARY STATEMENT

1.    The Debtors come before the Court, just over two years since the filing of the Chapter 11 Cases, to request confirmation of a plan of reorganization that incorporates a global resolution of Scouting-related sexual abuse claims against the Debtors and the non-debtor Local Councils and Chartered Organizations that carry out the Scouting mission, as well as certain settling insurance companies. The Plan, a tapestry of interrelated and interconnected settlements and compromises, will establish the largest sexual abuse compensation fund in the history of the United States – compromised of more than $2.7 billion in cash and property in addition to valuable rights to pursue additional recoveries against those parties that have not yet settled – and is supported by every single estate fiduciary and nearly every organized creditor group, including the Official Committee of Tort Claimants, the Future Claimants' Representative, the Coalition of Abused Scouts for Justice, the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Local Councils (the "LC Committee"), the Church of Jesus Christ of Latter-day Saints, the United Methodist Ad Hoc Committee – as well as agreements with JPMorgan Chase Bank, state court counsel representing a supermajority of abuse survivors, the BSA's largest insurers – Century and Hartford – and critical excess insurers – Zurich and Clarendon.

2.    The overwhelming consensus of support behind this Plan is monumental and is the product of now nearly eighteen months of intense, hard-fought mediation with a Court-appointed mediator. The fruit of these labors – the grand bargain – will resolve the overlapping liabilities and insurance rights of the protected parties and forms the backbone of the Plan. Unlocking the value

of these settlements requires confirmation of the Plan as a global resolution of all Abuse Claims against the protected parties.

3.      Central to the Plan is the implementation of a release of Scouting-related abuse claims as well as a complementary channeling injunction for the benefit of the Debtors, Local Councils, Chartered Organizations and certain Insurance Companies without which the Debtors' dual goals of (a) providing an equitable, streamlined, and certain process by which abuse survivors may obtain compensation for Abuse and (b) ensuring that the Reorganized BSA has the ability to continue its vital charitable mission, could not be achieved.

4.      Bankruptcy courts provide a unique forum in which parties in interest may participate with the goal of achieving a global resolution of liabilities. Unlike the tort system, which often employs a slower and more expensive process to resolve claims on a case-by-case basis, bankruptcy offers a comprehensive and expeditious resolution of interrelated tort claims against multiple parties that is both fair and equitable.

5.      Courts in this Circuit recognize the distinctive ability of bankruptcy courts to act as the central arbitrar in complex cases and the potential they have to grant parties customized relief under certain, limited circumstances – circumstances that these Chapter 11 Cases meet and exceed. Distinct from for-profit corporations, Scouting is a movement that is carried out through not only the Debtors but also the separate Local Councils chartered by the Debtors and a network of thousands of other independent non-profit organizations.  If a global resolution is not reached through this chapter 11 process, the country will be left with a fragmented Scouting movement and no fair or equitable resolution for the other parties in interest – primarily abuse survivors, most of whom will never be compensated outside of this Plan.

6.      Under the Plan, abuse survivors have an opportunity to receive payment for

Scouting-related abuse claims pursuant to an established method of liquidation under the Trust Distribution Procedures ("TDP"), which will provide them with a mechanism for substantial payment–far more than would be available outside of these cases.  And the Debtors and related parties will have the ability to continue to carry out the Scouting mission. The Plan has bridged the gaps between survivors of abuse, insurers, Chartered Organizations, and Local Councils.  It has garnered the support of every voting class, and a supermajority of survivors.

7. Despite the broad support that the Plan has achieved, as is often the case in large, complex cases with diverse interests, there remain a handful of plan opponents, including insurance companies, a small number of abuse survivors, a group that represents a dozen Roman Catholic dioceses that is chaired by its insurance company, and the United States Trustee.  Their objections principally relate to the Scouting-Related Release and Channeling Injunction. But such objections fail to appreciate the import of well-established Third-Circuit law, which authorizes nonconsensual third party releases under these very circumstances. Specifically, the objectors ignore that the releases are fair and necessary to the reorganization, as established in *Continental*. Indeed, the releases are the linchpin of most of the settlements embodied in, and essential to, the Plan. Other objections challenge the liquidation of claims pursuant to the TDP, including the independent review option, good faith, governance of the settlement trust, the sale of insurance policies, feasibility, and the best interest test.  Having been unwilling to join the ranks of the settling parties in these cases, these objectors are desperately seeking to defeat confirmation of the Plan and create chaos, resulting in a reality where most survivors will be left to a tort system that has already failed them, and will never recover anything.

8. As described below, in the record before the Court, the Confirmation Declarations that will be filed in advance of the confirmation hearing, the Voting Report (as defined below and

as will be supplemented on March 10, 2022), and as will be further established at the Confirmation Hearing, the Plan satisfies all applicable elements of section 1129 of the Bankruptcy Code and otherwise complies with all applicable sections of the Bankruptcy Code, Bankruptcy Rules, and non-bankruptcy law.

9.　　　The BSA cares deeply about all survivors of child abuse. The BSA understands that no apology can repair the damage caused by abuse or take away the pain that survivors have endured. Confirmation of the Plan, however, will provide the best avenue for abuse survivors to receive the financial compensation that they have long awaited. The Debtors respectfully request that the Plan be confirmed so that abuse survivors can receive the compensation that they deserve and the BSA and the other non-Debtor charitable entities can continue their charitable mission.

## BACKGROUND

## I.　　Prepetition Litigation Against the Debtors and Other Parties.

10.　　　For an overview of the facts relevant to the relief discussed herein and relating to these Chapter 11 Cases and the Plan, including the Debtors' non-profit operations, capital structure, and the circumstances preceding the Petition Date, such as prepetition litigation involving Abuse Claims, the Debtors refer the Court to the record of the Chapter 11 Cases, including the following:

> (a)　　the *Declaration of Brian Whittman in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration");[4]
>
> (b)　　the *Debtors' Informational Brief*;[5]
>
> (c)　　*The BSA's Opening Brief in Support of Motion for a Preliminary Injunction*

---

[4]　　D.I. 16.

[5]　　D.I. 4.

*Pursuant to Sections 105(a) and 362 of the Bankruptcy Code;*[6]

(d)     the *Declaration of Brian Whittman in Support of the BSA's Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code;*[7]

(e)     the *Declaration of Adrian C. Azer in Support of the BSA's Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code;*[8]

(f)     the *Declaration of Bruce A. Griggs in Support of the BSA's Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code;*[9]

(g)     the *Debtors' Motion, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, (III) Approve Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Victims, and (IV) Approve Confidentiality Procedures for Abuse Victims*, as supplemented;[10]

(h)     the *Order, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, (III) Approve Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Victims, and (IV) Approve Confidentiality Procedures for Abuse Victims* (the "Bar Date Order");[11]

(i)     the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting*

---

[6]     Adv. Pro. No. 20-50527, D.I. 7.

[7]     Adv. Pro. No. 20-50527, D.I. 8.

[8]     Adv. Pro. No. 20-50527, D.I. 9.

[9]     Adv. Pro. No. 20-50527, D.I. 11.

[10]    D.I. 18, 556, 557.

[11]    D.I. 695

*Related Relief*;[12]

(j) the *Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* (the "<u>Disclosure Statement Order</u>");[13] and

(k) the *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (the "<u>Disclosure Statement</u>").[14]

11. On February 18, 2020 (the "<u>Petition Date</u>"), the Debtors filed the Chapter 11 Cases as a result of the numerous and sharply increasing number of sexual abuse lawsuits brought the BSA as a defendant.  The Chapter 11 Cases were filed in an effort to globally resolve such liabilities instead of continuing to address sexual abuse litigation in the tort system on a case-by-case basis.  The prepetition lawsuits were not limited to the Debtors, but also named non-debtor entities that implement Scouting programs across the country—certain of the Debtors' affiliates, Local Councils, and Chartered Organizations.  Combined with an increase in the number of states opening their statutes of limitation for sexual abuse lawsuits, and the shared rights to insurance of Scouting-affiliated parties, it became clear that case-by-case litigation at the volume faced by the Debtors was an untenable threat to the future of Scouting.  In light of this, on the Petition Date the Debtors also sought—and obtained—the imposition of an injunction and stay against not only the Debtors, but against the Debtors' affiliates, Local Councils, and certain Chartered Organizations, which has been extended for the duration of these cases.[15]

---

[12] D.I. 2295.

[13] D.I. 6438.

[14] D.I. 6443.

[15] *See Boy Scouts of America v. A.A., et al.*, Adv. Pro. No. 20-50527 (LSS) [Adv. D.I. 54, 72, 77, 107, 116, 151, 162, 185, 199].

12.     The Debtors continue to operate their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases have been jointly administered for procedural purposes only pursuant to rule 1015 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

13.     On March 5, 2020, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Creditors' Committee") and the statutory committee of tort claimants (the "TCC") pursuant to section 1102 of the Bankruptcy Code.[16]  On April 24, 2020, the Court appointed James L. Patton, Jr. as the Future Claimants' Representative (the "FCR")[17] pursuant to sections 105(a) and 1109(b) of the Bankruptcy Code.

14.     On April 8, 2020, the Debtors filed their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs[18] (collectively and as may be modified, amended or supplemented from time to time, the "Schedules").

15.     On May 26, 2020, the Court entered the Bar Date Order[19] establishing certain deadlines and procedures associated with the filing of Claims in the Chapter 11 Cases, including, without limitation, special procedures for providing actual and constructive supplemental notice

---

[16]   *See* D.I. 141, 142.

[17]   D.I. 486

[18]   D.I. 375-78

[19]   D.I. 695

of such deadlines and procedures to known and unknown survivors of Scouting-related abuse. Pursuant to the Bar Date Order, the Court established (a) November 16, 2020 as the deadline for holders of prepetition Claims against the Debtors to file proofs of claim against the Debtors, (b) November 16, 2020 as the deadline for all holders of sexual abuse claims to assert claims against the Debtors, and (c) August 17, 2020 as the deadline for Governmental Units to assert any prepetition claims against the Debtors (collectively, the "Bar Dates").

16.     The Debtors served notice of the Bar Dates on all traditional creditors in the Chapter 11 Cases and developed an expansive publication and noticing plan (as defined in the Bar Date Order, the "Supplemental Notice Plan").  The Supplemental Notice Plan was comprised of an advertising campaign utilizing television, radio, magazines, newspapers, online media, and community outreach with plain English noticing.[20]  In addition to the Bar Dates, the Supplemental Notice Plan provided creditors with actual and constructive notice and information regarding (a) the commencement of the Chapter 11 Cases, (b) the fact that a claimants' rights against the BSA, Local Councils, and Chartered Organizations may be affected by the Chapter 11 Cases through releases or otherwise, and (c) the website maintained by the Debtors' Notice and Claims Agent (https://omniagentsolutions.com/BSA and www.OfficialBSAClaims.com), where abuse survivors and other creditors could file proofs of claim, request further noticing about the Chapter 11 Cases, and view other key documents and pleadings filed in the Chapter 11 Cases.

17.     Following entry of the Bar Date Order and during the claims-filing period, on June

---

[20]     D.I. 556, 1758.  The Debtors delivered notice of the Bar Dates to the Debtors' primary target audience of men 50 years of age or older with a reach (the estimated percentage of a target audience reached through a combination of media vehicles) of 95.8%, and an average estimated frequency (the estimated average number of opportunities an audience member has to see a notice) of 6.5 times.

9, 2020, the Court appointed a panel of mediators[21] to mediate a variety of issues and seek consensus and settlements with the constituencies involved in the Chapter 11 Cases in order to give further shape to a Plan that would be supported by key constituencies.[22]  Over the course of the next year, the Court-appointed mediator worked with the parties on a Plan and the settlement of related disputes.  The Plan was further modified as negotiations progressed, eventually resulting in the solicitation version filed on September 30, 2021.[23]  On September 21, 22, 23, 28, and 29, 2021, the Court held a hearing (the "Disclosure Statement Hearing"), which culminated with the approval of the *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC,*[24] filed on September 30, 2021 (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time including as further described herein, the "Disclosure Statement"), and entry of an order[25] (the "Disclosure Statement Order") with respect thereto.

18.     In accordance with the Disclosure Statement Order, the Court established certain procedures for (a) soliciting, receiving, and tabulating votes to accept or reject the Plan, including, without limitation, procedures with respect to survivors holding Direct Abuse Claims and procedures to provide notice and an opportunity to opt out of the Plan for Chartered Organizations, (b) voting to accept or reject the Plan, and (c) filing objections to the Plan (the "Solicitation Procedures").  The Disclosure Statement Order also set December 14, 2021 at 4:00 p.m. (Eastern

---

[21]   D.I. 812.

[22]   As of the date hereof, Mr. Timothy V.P. Gallagher is serving as the remaining Mediator in these Chapter 11 Cases (the "Mediator").

[23]   D.I. 6443.

[24]   D.I. 6445, 6547.

[25]   D.I. 6438.

Time) as the deadline to (a) vote to accept or reject the Plan (the "Voting Deadline"), (b) opt out of the consensual third party release set forth in Article X.J.4 of the Plan, (c) with respect to holders of Class 8 Direct Abuse Claims, make the Expedited Distribution Election, and (d) object to confirmation of the Plan. The Voting Deadline was extended by the Court[26] after the Debtors filed the December 18 Plan to December 28, 2021, at 4:00 p.m. (Eastern Time),[27] and was subsequently extended on a limited basis in light of the settlement reached with the TCC and supported by a supermajority of a state court counsel (the "TCC/Abuse Survivor Settlement") and associated Plan modifications to March 7, 2022 at 4:00 p.m. (Eastern Time) for holders of Direct Abuse Claims in Class 8 and Indirect Abuse Claims in Class 9[28] (the "Limited Extended Voting Deadline").

19. On or before October 15, 2021, in accordance with the Disclosure Statement Order, the Debtors, through their administrative agent, Omni Agent Solutions (the "Solicitation Agent"), caused the relevant Solicitation Packages (as defined in and approved by the Disclosure Statement Order) to be served on holders of Claims.[29] In particular, the Debtors solicited votes on the Plan from holders of Claims in Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims) (the "Voting Classes").[30] The Debtors also provided holders of Claims or Interests in Classes 1, 2 and 10 (the "Non-Voting Classes") with a

---

[26] D.I. 7665.

[27] D.I. 7607, 7608.

[28] D.I. 8904, 8905.

[29] *See Affidavit of Service* [D.I. 7999]; *Affidavit of Supplemental Service* [D.I. 8378] (together, the "Solicitation Affidavits").

[30] *See*, *generally*, Solicitation Affidavits.

copy of the Confirmation Hearing Notice and Non-Voting Status Notice (each as defined in the Disclosure Statement Order). All known parties in interest, including Voting and Non-Voting Classes, were served with the Confirmation Hearing Notice.[31] In addition to mailing, the Debtors engaged in supplemental noticing of the Confirmation Hearing and Voting Deadline, including newspaper and magazine publications and online media consisting of banner and social media advertising.[32]

20.     On November 30, 2021, the Debtors filed a supplement to the Plan[33] (together with all schedules and exhibits thereto, and as amended or revised on December 23, 2021,[34] January 29, 2022,[35] February 3, 2022,[36] and February 15, 2022, the "Plan Supplement").[37] As part of the Plan Supplement, the Debtors served notices[38] with respect to the potential assumption, assumption and assignment, or rejection of executory contracts and unexpired leases under the Plan. Following this, on February 24, 2022, the Debtors filed a notice designating former Judge Barbara J. Houser as the initial Settlement Trustee for purposes of Confirmation of the Plan.[39]

21.     The voting results confirm that there is significant consensus among creditors in

---

[31]    *Id.*; *see* Confirmation Hearing Notice [D.I. 6639].

[32]    *See Affidavit of Service of Publication* [D.I. 7761]; *see also Declaration of Shannon R. Wheatman, Ph.D Regarding Implementation of Publication Notice Plan to Provide Supplemental Notice of the Voting Deadline* [D.I. 8056].

[33]    D.I. 7515.

[34]    D.I. 7953.

[35]    D.I. 8567.

[36]    D.I. 8647.

[37]    D.I. 8815.

[38]    D.I. 7674, 7932, 8619.

[39]    D.I. 8981.

the Voting Classes in support of the Plan, and no Voting Class voted to reject the Plan as a whole.[40] In particular, against Debtor BSA, 73.57% of holders of Class 8 Direct Abuse Claims and 69.57% of holders of Class 9 Indirect Abuse Claims voted to accept the Plan. But, as noted above, the Court has approved a Limited Extended Voting Deadline for Class 8 and Class 9 that remains pending as of the date hereof, and the Debtors expect these percentages to increase in light of settlements reached with respect to and resulting in improvements to the Plan. Although the Debtors will not be able to file a revised Voting Report until after the filing of this Memorandum, the Debtors are encouraged by preliminary results.

22.     In connection with the TCC/Abuse Survivor Settlement, reached after the Voting Deadline and resulting modifications to the Plan filed on February 15, 2022, the Debtors obtained the Court's approval of supplemental disclosures (the "Supplemental Disclosures") for holders of Class 8 Direct Abuse Claims and all Chartered Organizations, including those holding Class 9 Indirect Abuse Claims, pursuant to section 1125 of the Bankruptcy Code.[41] The Supplemental Disclosures mailed to these parties on February 19, 2022, provided a summary of certain relevant Plan modifications, the Limited Extended Voting Deadlines and procedures related thereto, and an extended deadline by which Chartered Organization can elect to opt out of involvement as a Participating Chartered Organization under the Plan.[42]

23.     While the support of certain key constituencies such as the Creditors' Committee, the Coalition, Hartford, and TCJC was obtained prior to commencing solicitation on the Plan, as

---

[40]   *See Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Final Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8345] (the "Voting Report").

[41]   D.I. 8894.

[42]   D.I. 8904, 8905.

was reflected in the solicitation versions of the Plan and Disclosure Statement, the Debtors rightfully anticipated that further settlements would follow, all of which are set forth in greater detail below.

## II.   Overview of Plan Negotiations and Settlements.

24.    Following the Petition Date, the Debtors engaged in continuous negotiations with every major creditor constituency in these Chapter 11 Cases to formulate a global resolution that would timely and equitably compensate holders of Abuse Claims and enable the Debtors to emerge from bankruptcy with the ability to further the BSA's charitable mission with the support of the Local Councils and Chartered Organizations.  After extensive negotiations with parties of intensely varying interests and disputes, the BSA's contributions to the Settlement Trust consists of the following: (a) the BSA's Net Unrestricted Cash and Investments, (b) the BSA Settlement Trust Note in the principal amount of $80 million, (c) the BSA right, title, and interest in and to the Artwork, which are deemed to be valued at approximately $59 million, (d) the Warehouse and Distribution Center or the proceeds of the sale thereof, valued at approximately $11.6 million, (e) the BSA's interest in the Oil and Gas Interests, valued at approximately $7.6 million, (f) the Insurance Assignment, (g) the Debtors' Settlement Trust Causes of Action, and (h) the assignment of any Perpetrator Indemnification Claims held by the BSA.

25.    In addition to achieving consensus regarding the BSA's contribution, the Debtors— with the support of the LC Committee and critical Settlement Trust contributions from the Local Councils—have reached good-faith compromises and settlements with a majority of their key constituencies, including (a) JPM and the Creditors' Committee,[43] (b) the LC Committee, (c)

---

[43]    *See First Mediators' Report* [D.I. 2292].

Hartford,[44] (d) TCJC, (e) Century and Chubb Companies,[45] (f) Zurich Insurers and Zurich Affiliated Insurers,[46] (g) the United Methodist Entities,[47] (h) Clarendon,[48] and (i) the TCC and a supermajority of state court counsel[49] (collectively referred to herein as the "<u>Settlements</u>"). The aggregate cash contribution from the Settling Insurance Companies alone totals approximately $1.656 billion: (a) $800 million from Century and Chubb Companies, (b) $787 million from Hartford, (c) $52.5 million from Zurich, and (d) $16.5 million from Clarendon.[50]

(a)     **Local Councils.** The Local Councils have agreed to contribute, in the aggregate, (i) $500 million in cash or real property, (ii) the DST Note, a non-recourse interest-bearing promissory note in the principal amount of $100 million, and (iii) the Local Council Insurance Rights.[51] The Local Councils will also make the Chartered Organization Contribution to facilitate the protections being provided to the Participating Chartered Organizations, including with respect to the Post-Confirmation Channeling Injunction. This supplemental contribution includes the Supplemental LC Contribution of $40 million comprised of at least $15 million in cash or property (the "<u>LC Overage</u>") and the DST Note Increase over the prior $100 million amount of between $21 and $25 million, depending on the amount of the

---

[44]    *See Sixth Mediators' Report* [D.I. 6210]; *Affidavit of Service* [D.I. 6352].

[45]    *See Seventh Mediator's Report* [D.I. 7745]; *Affidavit of Service* [D.I. 7745].

[46]    *See Eighth and Ninth Mediator's Report* [D.I. 7929]; *Affidavit of Service* [D.I. 8171].

[47]    *See Eighth and Ninth Mediator's Report* [D.I. 7929]; *Affidavit of Service* [D.I. 8171].

[48]    *See Tenth Mediator's Report* [D.I. 8102]; *Affidavit of Service* [D.I. 8224].

[49]    *See Eleventh Mediator's Report* [D.I. 8772]. These summaries are qualified in their entirety by reference to the provisions of the specific Settlement attached to the Plan. To the extent that any discrepancies exist between the summaries in this Memorandum, the Plan, and the Settlements, the terms of the Settlements shall govern.

[50]    *See* Hartford Insurance Settlement Agreement [D.I. 8816]; Century and Chubb Companies Insurance Settlement Agreement [D.I. 8907]; Zurich Insurance Settlement Agreement [D.I. 8907]; Clarendon Insurance Settlement Agreement [D.I. 8907]. The general framework of each Insurance Settlement is the same. In exchange for its cash contribution, each Settling Insurance Company will (a) be a Protected Party under the Plan and receive the full benefit of the Channeling Injunction, (b) buyback all Abuse Insurance Policies (with certain limited exceptions), and (c) receive a mutual release from the other Protected Parties and Limited Protected Parties, FCR, the Coalition, and Settlement Trust from any Causes of Action and Claims relating or arising from the Abuse Insurance Policies, any other insurance policy issued by the Settling Insurance Companies covering Abuse Claims, the Chapter 11 Cases (or any related proceedings), all claims alleging Abuse against the Protected Parties, and any extra-contractual claims arising prior to the Effective Date related to any policy that a Settling Insurance Company issued concerning the Debtors or Scouting. In sum, the Insurance Settlements represent a full and final resolution of all disputes between the stakeholders regarding the Settling Insurance Companies' liability for Abuse Claims.

[51]    *See, generally,* Plan Ex. F.

LC Overage.[52]

(b) **JPM and the Creditors' Committee.** The JPM / Creditors' Committee Settlement resolves all issues and objections that could be asserted by the Creditors' Committee with respect to confirmation of the Plan and prospective lien challenges, and all claims or causes of action that might be brought by or on behalf of the Debtors' Estates. It provides for: (i) the assumption of the Pension Plan, (ii) allows the Debtors' Estates include distributions to holders of Allowed Convenience Claims, Allowed General Unsecured Claims, and Allowed Non-Abuse Litigation Claims, which are held by creditors who are core to the Debtors' charitable mission or whose Allowed Claims were incurred in furtherance of the mission, through the Core Value Cash Pool to be funded by Reorganized BSA, (iii) extensions of the maturity dates of the Prepetition Debt and Security Documents, including a two year moratorium on principal, which allows the Debtors to increase their contributions to the Settlement Trust, (iv) a $42.8 million term loan from BSA Foundation, which will be used by Reorganized BSA for working capital and general corporate purposes—thus freeing up consideration for the Settlement Trust, and (v) the appointment of a Creditor Representative on the Effective Date.[53]

(c) **Hartford.** Hartford will make a cash contribution of $787 million to the Settlement Trust in exchange for Protected Party status and the sale of the Hartford Policies to Hartford free and clear of the interests of third parties. Hartford will be granted a $2 million administrative expense claim. Hartford will also receive a mutual release from the other Protected and Limited Protected Parties.[54] The Debtors' settlement with Hartford also resolves certain disputes between them, providing Hartford with the right to an increased administrative expense claim in the event that certain actions are taken by the Debtors, and releases certain Prepetition Hartford Claims upon Hartford's initial settlement contribution payment.

(d) **TCJC.** TCJC has agreed to (i) contribute $250 million in cash to the Settlement Trust in exchange for Protected Party status under the Plan, (ii) waive, release, and expunge its TCJC Claims, and (iii) settle issues related to the TCJC Insurance Rights.[55]

(e) **Century and Chubb Companies.** Century and Chubb Companies will make a cash contribution of $800 million to the Settlement Trust in exchange for Protected Party status and the sale of the Century and Chubb Companies Policies to Century and Chubb Companies free and clear of the interests of third parties. Century and Chubb Companies will also receive a mutual release from the other Protected and

---

[52] *See, generally,* Plan.

[53] *See First Mediators' Report* [D.I. 2292].

[54] *See Sixth Mediators' Report* [D.I. 6210]; Hartford Insurance Settlement Agreement, Plan Ex. I-1.

[55] *See Sixth Mediators' Report* [D.I. 6210]; TCJC Settlement Agreement, Plan Ex. J-1.

Limited Protected Parties.[56]  The Debtors' settlement with Century and Chubb Companies also resolves certain other disputes and issues between the parties: Century and Chubb Companies will receive a release of the Prepetition Century and Chubb Companies Claims upon Century and Chubb Companies' initial payment of their settlement contribution and Century and Chubb Companies' Third Circuit appeal against the Debtors regarding the Bar Date Order has been stayed.

(f)     **Zurich Insurers and Zurich Affiliated Insurers.**  The Zurich Insurers and Zurich Affiliated Insurers will make a cash contribution of $52.5 million to the Settlement Trust in exchange for Protected Party status and the sale of the Zurich Insurer Policies to the Zurich Insurers free and clear of the interests of third parties.  The Zurich Insurers and Zurich Affiliated Insurers will also receive a mutual release from the other Protected and Limited Protected Parties.[57]

(g)     **United Methodist Entities.**  The ad hoc committee of United Methodists (the "UMAHC") shall (i) recommend to the United Methodist Entities to collectively contribute $30 million in cash to the Settlement Trust, plus certain insurance rights, (ii) consent to the waiver and release of any claims or causes of action of the United Methodist Entities against the Debtors, (iii) cooperate and participate in various Youth Protection and Scouting safety efforts, and (iv) work to strengthen and grow Methodist partnerships with Scouting through at least 2036.  In exchange, the United Methodist Entities will be Protected Parties under the Plan.

(h)     **Clarendon.**  Clarendon will make a cash contribution of $16.5 million to the Settlement Trust in exchange for Protected Party status and the sale of the Clarendon Policies to Clarendon free and clear of the interests of third parties. Clarendon will also receive a mutual release from the other Protected and Limited Protected Parties.[58]

(i)     **TCC / State Court Counsel.**  The TCC/Abuse Survivor Settlement was announced on February 9, 2022,[59] and incorporated into the Plan.  Key modifications relate to governance of the Settlement Trust, the addition of an optional Independent Review Option in the TDP in which holders of Direct Abuse Claims may participate, a modification to the scope of releases for Chartered Organizations, and clarifications to certain Plan terms, such as the definition of "Abuse Claim," and the Youth Protection Program.  The Youth Protection Program was the result of months of cooperative discussions and mediation sessions including survivors from the Survivors Working Group, affiliated with the Coalition, and survivors from the TCC, including TCC Co-Chairs Doug Kennedy and John Humphrey, as well as representatives from the BSA and Local Councils, and a number of youth protection

---

[56]  *See Seventh Mediator's Report* [D.I. 7745]; Century and Chubb Companies Insurance Settlement Agreement, Plan Ex. I-2.

[57]  *See Eighth and Ninth Mediator's Report* [D.I. 7929]; Zurich Insurance Settlement Agreement, Plan Ex. I-3.

[58]  *See Tenth Mediator's Report* [D.I. 8102]; Clarendon Insurance Settlement Agreement, Plan Ex. I-4.

[59]  D.I. 8772.

experts.

(j) **PSZJ Settlement.** The Debtors and the TCC and its Representatives have agreed to the PSZJ Settlement, which resolves, among other things, the alleged improper transmittal of a certain plaintiff firm's communications by PSZJ to thousands of survivors from the TCC's official email address. As part of this settlement, (i) PSZJ will (A) contribute $1.25 million in cash to the Reorganized BSA to be reserved for the Youth Protection Program and (B) write-off $750,000 of PSZJ's fees and (ii) the TCC and its professionals shall be designated as Exculpated Parties under the Plan.[60] The PSZJ Settlement does not prejudice the rights of any party in interest in these Chapter 11 Cases to object to PSZJ's final application for Allowance and payment of Professional Fee Claims.

## ARGUMENT

26. A chapter 11 plan can be confirmed if it satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence.[61] The Debtors have satisfied their burden under section 1129. This Memorandum is divided into nine parts based on topics in the following order:

(a) (1) the settlements should be approved under sections 363 and 1123(b) of the Bankruptcy Code, (2) the settlements, including the TDP, should be approved under Bankruptcy Rule 9019, and (3) the Settling Insurance Companies' buyback of certain Abuse Insurance Policies pursuant to the Insurance Settlement Agreements is permissible under section 363 of the Bankruptcy Code;

(b) (1) this Court has (i) subject-matter jurisdiction under sections 1334 and 157 of title 28 of the United States Code, (ii) statutory authority to enter an order under section 157(b) of title 28 of the United States Code, and (iii) constitutional authority under Article III to enter the Confirmation Order approving the Scouting-Related Release and Channeling Injunction, and (2) the Scouting-Related Release and Channeling Injunction satisfies *Continental* and the *Master Mortgage* factors;

(c) the Consensual Release should be approved;

---

[60] Plan Art. V.S.7.

[61] *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119-20 (D. Del. 2006) (hereinafter cited as "Armstrong I") (stating that a court must determine whether a plan meets the requirements of section 1129 in order to confirm such plan); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success, and is more than a visionary scheme." (internal quotations omitted)).

(d)  the Debtors complied with Due Process under the Fifth Amendment with respect to the Scouting-Related Release, Consensual Release, and Channeling Injunction;

(e)  the Debtor Releases, Exculpation, and Injunction provisions should be approved;

(f)  the remaining confirmation requirements under section 1129 of the Bankruptcy Code have been met;

(g)  the modifications to the Plan do not require resolicitation;

(h)  the Debtors complied with the Due Process Clause under the Fifth Amendment when they modified the Plan; and

(i)  certain objections related to the Settlement Trust governance and the Insurance Entity Injunction should be overruled.

27.  The Debtors respond to objection arguments in the section most relevant in this Memorandum.  For example, certain insurance-related objections are addressed in section 1129(a)(3).  If an issue is raised in multiple contexts, the Debtors have referred to the section wherein the Debtors' response can be found rather than reiterate the same analysis more than once. The list of objections is attached hereto as **Exhibit A**, and the Response Chart is attached hereto as **Exhibit B**.[62]  The Debtors reserve the right to supplement any response to an objection at the Confirmation Hearing.  For the reasons stated below, the Debtors demonstrate by a preponderance of the evidence that the Plan should be confirmed.

I.  **The Settlements in the Plan Are Fair, Reasonable, in the Best Interests of the Debtors' Estates, and Demonstrate a Sound Exercise of the Debtors' Business Judgment.**

28.  Section 1123(b) of the Bankruptcy Code states that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[63] "The standards for approval of a settlement under section 1123 are generally the same as those

---

[62]  The Response Chart cites to the relevant section of this Memorandum that addresses the particular argument raised in an objection.  Any objection not addressed in this Memorandum is answered in the Response Chart.

[63]  11 U.S.C. § 1123(b)(3)(A).

under [Bankruptcy] Rule 9019," which provides that courts may, after appropriate notice and a hearing, approve a "compromise or settlement."[64]  In addition, sections 363(b)(1) and 363(f) of the Bankruptcy Code permit a debtor in possession to dispose of property of the estate "other than in the ordinary course of business" after notice and a hearing, and to sell assets free and clear notwithstanding liens, claims, and interest of other parties in the property to be sold.[65]  Read together, these provisions of the Bankruptcy Code and Bankruptcy Rules provide the Court with broad discretion and authority to approve the settlements under the Plan and sales contemplated therein.

29.     Settlements are encouraged and "generally favored in bankruptcy" proceedings.[66] In evaluating a settlement, the Court should consider whether "the compromise is fair, reasonable, and in the best interest of the estate."[67]  "[T]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."[68] Moreover, the Court does not need to "have a mini-trial" of the underlying disputes or determine that the settlement is the best possible result for all parties.[69]  Rather, the Court need only "canvass

---

[64]  *In re Coram Healthcare Corp.*, 315 B.R. 321, 334 (Bankr. D. Del. 2004); Fed. R. Bankr. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008) ("[T]he standards for approving settlements as part of a plan of reorganization are the same as the standards for approving settlements under Fed. R. Bankr. P. 9019.").

[65]  *See* 11 U.S.C. §§ 363(b)(1), 363(f).

[66]  *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d. Cir. 1996); *see also In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979).

[67]  *In re Louise's Inc.*, 211 B.R. 798, 801 (Bankr. D. Del. 1997).

[68]  *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 257-58 (Bankr. S.D.N.Y. 2016) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

[69]  *In re W.R. Grace & Co.*, 475 B.R. 34, 77-78 (D. Del. 2012) (citing *Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.)*, 258 B.R. 119, 123 (D.N.J. 2000)).

the issues and see whether the settlement falls below the **lowest point in the range of reasonableness**."[70]  Whether a settlement should be approved under this provision lies within the bankruptcy court's sound discretion, particularly "in light of the general public policy favoring settlements."[71]

30.     Similarly, where a settlement contemplates the sale or use of estate property outside of the ordinary course, section 363(b) authorizes the Court to approve the settlement if it is a sound exercise of the debtor's business judgment.[72]  Courts "generally give deference to a debtor's business judgment" in settling a matter when deciding whether the settlement is "fair, reasonable, and in the best interest of the estate."[73]  And the business judgment standard recognizes that informed, good faith decisions by debtors should be ratified so long as they can be attributed to "any rational purpose."[74]  By applying this standard, courts recognize that a debtor is in the best

---

[70]     *Id*. at 78 (quoting *Travelers Cas. & Sur. Co. v. Future Claimants Representative*, No. Civ. A. 07-2785, 2008 WL 021088, at *5 (D.N.J. Mar. 25, 2008) (emphasis added).

[71]     *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010) (quoting *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y 1998)); *World Health Alts.*, 344 B.R. at 296.

[72]     *See Martin*, 91 F.3d at 395; *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (stating that the courts consider "a variety of factors" when "evaluating whether a sound business purpose justifies the use, sale or lease of property under [s]ection 363(b), . . .which essentially represents a business judgment test" (citing Collier on Bankruptcy § 363.02 (15th ed. 1997))).

[73]     *See, e.g.*, *In re Key3Media Group, Inc.*, 336 B.R. 87, 93, 95-96 (Bankr. D. Del. 2005); *Montgomery Ward*, 242 B.R. at 153-54 (use of assets outside the ordinary course of business permitted if "sound business purpose justifies such actions"); *In re K.G. IM, LLC*, , 620 B.R. 469, 487 (Bankr. S.D.N.Y. Sept. 29, 2020) ("[A]pproval of the [transaction] is consistent with the Protocol's spirit, in the best interests of the estate, and sought in the sound business judgment of the Debtors."); *U.S. Bank. Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion)*, 426 B.R. 114, 140 (Bankr. D. Del. 2010) (finding "[i]t is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors").

[74]     *See In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 78 (Bankr. D. Del. 2002); *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages discretion.").

position to make informed and educated decisions about its organization.[75]

31.     "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtors' conduct."[76]   Indeed, once a debtor demonstrates use of reasonable business judgment, the debtor's decision is presumed to have been made on "an informed basis, in good faith, and in the honest belief, that the action was in the best interest of the company."[77]

32.     In determining whether to approve a settlement, courts in the Third Circuit consider the following four "*Martin* factors":  (a) "the probability of success in litigation"; (b) "the likely difficulties in collection"; (c) "the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it"; and (d) "***the paramount interest of the creditors***."[78]   The Court should also consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."[79]   Accordingly, "the ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interests of the estate.'"[80]

33.     For the reasons set forth below, the Insurance Settlements, the TCJC Settlement,

---

[75]     *Marvel Entm't Grp.*, 273 B.R. at 78 ("'[U]nder the business judgment rule . . . a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching.' Thus, under the business judgment rule, a board's 'decision will not be disturbed if they can be attributed to any rational purpose' and a court 'will not substitute its own notions of what is or is not sound business judgment.'") (citations omitted); *In re Friedman's, Inc.*, 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005) (holding that the "business judgment rule is a 'policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges'") (quoting *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.20 (11th Cir. 1989)).

[76]     *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

[77]     *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *Johns-Manville Corp.*, 60 B.R. at 615-16 ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions").

[78]     *Martin*, 91 F.3d at 393 (emphasis added).

[79]     *Nutritional Sourcing*, 398 B.R. at 833 (quoting *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998)).

[80]     *Marvel*, 222 B.R. at 249 (quoting *Louise's*, 211 B.R. at 801); *see also In re Washington Mutual Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'") (citation omitted).

the United Methodist Settlement, the Abuse Claims Settlement, the JPM / Creditors' Committee Settlement, the Settlement of Restricted and Core Asset Disputes, and the PSZJ Settlement constitute good-faith compromises and settlements of claims, interests, and controversies among the parties thereto. Each settlement is fair, in the best interest of creditors, supported by an overwhelming majority of creditors and every statutory committee and group representing Survivor interests, including the Creditors' Committee, TCC, FCR, Coalition and a number of counsel directly representing creditors and survivors, falls within the range of reasonableness and should be approved pursuant to Bankruptcy Rule 9019 and sections 1123(b) and 363 of the Bankruptcy Code, and is a sound exercise of the Debtors' business judgment.

### A. The Insurance Settlements.

34. The Debtors, the Coalition, the TCC, FCR, and LC Committee, with the support of various counsel representing holders of Direct Abuse Claims, have reached global settlements with four insurance groups (the "Insurance Settlements"): (1) Century[81] and Chubb Companies,[82] (2) Hartford,[83] (3) Zurich Insurers[84] and Zurich Affiliated Insurers[85] (collectively, "Zurich"), and (4) Clarendon.[86] The total aggregate cash contribution to the Settlement Trust for the benefit of survivors from the Insurance Settlements is $1.656 billion, composed of: (a) $800 million from Century and Chubb Companies, (b) $787 million from Hartford, (c) $52.5 million from Zurich,

---

[81] Plan Art. I.A.51 (defining Century).

[82] Plan Art. I.A.60 (defining Chubb Companies).

[83] Plan Art. I.A.139 (defining Hartford).

[84] Plan Art. I.A.302 (defining Zurich Insurers).

[85] Plan Art I.A.301 (defining Zurich Affiliated Insurers).

[86] Plan Art. I.A.67 (defining Clarendon).

and (d) $16.5 million from Clarendon.[87]   The proceeds received from each Settling Insurance Company are well within the reasonable range of litigation outcomes if the Debtors and Settling Insurance Companies were to litigate the matters resolved pursuant to the Insurance Settlements, and far exceed the "lowest point in the range of reasonableness."[88] Each of the Insurance Settlements is the result of extensive good-faith, arms-length, and mediated negotiations between all of the parties and is a product of the sound exercise of not only the Debtors' business judgment, but also the judgment of an overwhelming majority of survivors' representatives – which would be the parties most harmed if the Plan is not confirmed and these settlements are not approved.

35.     After considering (a) the defenses raised by each of the insurers to their insurance-coverage obligations, (b) the cost of litigation to pursue these insurers for the Abuse Claims, (c) that the TCC, Coalition, and FCR—the parties representing the vast majority of the abuse survivors— as well as the LC Committee, all support these settlements, and (d) the significant contribution each of these insurance companies were making to the Settlement Trust for the benefit of abuse survivors, the Debtors determined that, in exercising their prudent business, these settlements, including the sales contemplated therein, are fair and reasonable and should be approved.

36.     The structure of each Insurance Settlement is generally the same.  In exchange for its cash contribution, each Settling Insurance Company will (a) be a Protected Party under the Plan and receive the full benefit of the Channeling Injunction, (b) buyback all the Abuse Insurance Policies they issued (with certain limited exceptions), and (c) receive a mutual release from the

---

[87]   *See* Plan Ex. I-2, Century and Chubb Companies Insurance Settlement Agreement § 3; Plan Ex. I-1, Hartford Insurance Settlement Agreement § IV.A; Plan Ex. I-3, Zurich Insurance Settlement Agreement § 2; Plan Ex. I-4, Clarendon Insurance Settlement Agreement § 2.

[88]   *W.R. Grace*, 475 B.R. at 77-78.

other Protected Parties and Limited Protected Parties, FCR, the Coalition, and Settlement Trust from any Causes of Action and Claims relating or arising from (i) the Abuse Insurance Policies,[89] (ii) any other insurance policy issued by the Settling Insurance Companies to the extent those policies provide coverage for Abuse Claims, (iii) the Debtors' Chapter 11 Cases (or any related proceedings), (iv) all claims alleging Abuse against the Protected Parties, and (v) any extra-contractual claims arising prior to the Effective Date related to any policy that a Settling Insurance Company issued concerning the Debtors or Scouting.[90]   Essentially, the Insurance Settlements represent a full and final resolution of all disputes between the stakeholders regarding the Settling Insurance Companies' liability for Abuse Claims.

37.     As set forth above, the Insurance Settlements contemplate the buyback of certain BSA Insurance Policies and Local Council Insurance Policies, as applicable.[91]   Applying a business judgment standard, courts in mass tort bankruptcy cases have approved insurance policy buybacks under sections 363(b) and (f) of the Bankruptcy Code.[92]   Here, the insurance buybacks are the key that unlocks billions of dollars in cash and other value for abuse survivors.   If the Insurance Settlements are not approved and the Debtors do not sell the BSA and Local Council

---

[89]     Plan Art. I.A.20 ("'Abuse Insurance Policies' means, collectively, the BSA Insurance Policies, and the Local Council Insurance Policies. Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies").

[90]     *See* Plan Ex. I-2, Century and Chubb Companies Insurance Settlement Agreement § 5.a; Plan Ex. I-1, Hartford Insurance Settlement Agreement § II.B.2; Plan Ex. I-3, Zurich Insurance Settlement Agreement § 4.a; Plan Ex. I-4, Clarendon Insurance Settlement Agreement § 4.a.

[91]     Pursuant to the settlement agreements, the Local Councils will assign the applicable Local Council Insurance Policies to the Debtors, which will sell them pursuant to section 363 of the Bankruptcy Code, as is discussed further herein.

[92]     *See, e.g., MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 837 F.2d 89, 93 (2d Cir. 1988) (affirming bankruptcy court "authority to approve the settlements and to channel claims arising under the Subject Policies to the proceeds of the settlement"); *In re Dow Corning Corp.*, 198 B.R. 214, 222 n.7 (Bankr. E.D. Mich. 1996) (stating that the proper test for approval of settlements under either Bankruptcy Rule 9019 or section 363(b) of the Bankruptcy Code is the business judgment standard).

Insurance Policies to the Settling Insurance Companies, the Estates and, to an even greater extent, abuse survivors will lose access to the largest settlement fund ever created for abuse survivors and will be forced to expend significant value litigating coverage issues and defenses with many insurers, resulting in significantly delayed recoveries (if any), as discussed in this section.

38.　　The other provisions of section 363 are also satisfied, and the sale contemplated by the Settlements should be approved.  As an initial matter, the Debtors are selling their own policies, which are property of their Estates.[93]  Additionally, with consent of the Local Councils, the Plan provides for each such Local Council to assign any policies of Settling Insurance Companies issued to it to the Debtors' Estates.[94]  These policies will become property of the Debtors' Estate pursuant to section 541(a)(7) and then the Settling Insurance Companies will buyback those insurance policies from Debtors' estates as part of the settlement and sale.[95]

39.　　Section 363(f)[96] of the Bankruptcy Code allows free and clear sales of such assets despite the liens, claims and interests of other parties in the property being sold subject to certain conditions, which the Debtors have satisfied.[97]  Specifically, as a part of each of their contributions

---

[93]　*See* 11 U.S.C. § 541(a)(1).

[94]　*See* Plan § V.S.4.

[95]　11 U.S.C. § 541(a)(7).

[96]　Section 363(f) of the Bankruptcy Code permits the Debtors to sell property free and clear of any interest in such property of an entity other than the estate, only if—
(1)　"applicable nonbankruptcy law permits sale of such property free and clear of such interest";
(2)　"such entity consents";
(3)　"such interest is a lien and the price at which the property is to be sold is greater than the aggregate of all liens on such property";
(4)　"such interest is in bona fide dispute"; or
(5)　"such entity could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such interest."
11 U.S.C. § 363(f).

[97]　*See Dow Corning*, 198 B.R. at 244 ("[I]t is clear that '§363 covers more situations than just sales involving liens'") (quoting *P.K.R. Convalescent Ctrs., Inc. v. Virginia (In re P.K.R. Convalescent Ctrs., Inc.)*, 189 B.R. 90, 94 (Bankr. E.D. Va. 1995)).

under the Plan, Local Councils,[98] Contributing Chartered Organizations,[99] and Participating Chartered Organizations[100] consented to the assignment, sale, and release of their interests in insurance policies issued by the Settling Insurance Companies. Therefore, such policies can be sold free and clear pursuant to section 363(f)(2).[101]

40. Additionally, the small subset of Opt-Out Chartered Organizations (which as of the time of this filing the Debtors believe account for less than 0.5% of all Chartered Organizations) that do not consent cannot prevent the overwhelming majority of other Chartered Organizations, Local Councils, and survivors from benefiting from these settlement agreements. The policies may be sold free and clear of any interests of any Opt-Out Chartered Organizations because any alleged rights to coverage under the policies that such Chartered Organizations may have as additional insureds (as well as any alleged "direct-action" rights of the Guam survivors) are "in bona fide dispute" and/or because the Chartered Organizations and the Guam survivors "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest[s]."[102] Each is described in more detail below.

41. The Plan also satisfies section 363(e) as it provides that all Chartered Organizations will receive adequate protection in exchange for the sale of their interests under these policies in

---

[98]    Plan Art. I.A.181 (defining Local Council Settlement Contribution).

[99]    Plan Art. I.A.85 (defining Contributing Chartered Organization Settlement Contribution).

[100]   Plan Art I.A.203 (defining Participating Chartered Organization Settlement Contribution).

[101]   *Futuresource, LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (citations omitted); *see also Pac. Cargo Servs.*, 2014 U.S. Dist. LEXIS 65721 at *29; *R Star Rests.*, 2010 Bankr. LEXIS 2831 at *11-12.

[102]   11 U.S.C. § 363(f)(4)-(5).

the form of the Scouting-Related Release and Channeling Injunction.[103]  The value received on account of the Channeling Injunction is more than adequate.[104]  Indeed, it is well established that a debtor can sell an insurance policy back to a carrier by "ensuring that [the additional or named insured] received suitable compensation" for its interests in the policy being sold, even over their objection.[105]  Despite having opted out of being a Participating Chartered Organization either directly or by objecting to the Plan, Opt-Out Chartered Organizations still receive a channeling injunction that more than replaces any coverage they may have had under the policies in question. Such channeling injunction is superior because it provides a release for claims that would otherwise be covered by the insurance and is not constrained by the limits of the coverage in question.  The channeling injunction also allows Opt-Out Chartered Organizations to avoid what would have been protracted and costly coverage litigation with the Settling Insurance Companies. This is not uncommon; courts have approved a nonconsensual third-party release and channeling injunction of non-debtors that were insured under an insurance policy being sold back to the

---

[103]  To be clear, an Opt-Out Chartered Organization is not releasing any rights in its own insurance policy that has been issued by a Non-Settling Insurance Company or Setting Insurance Company; it is only releasing a Settling Insurance Company for Abuse Claims under the BSA or Local Council Insurance Policy that it issued, which are subject to the buyback provisions in the Insurance Settlements.  *See* Plan Art. I.A.196.

[104]  *In re Haskell L.P.*, 321 B.R. 1, 6 (Bankr. D. Mass. 2005) ("Adequate protection may be provided by cash payments, additional or replacement liens, or such other relief as will result in the realization of the indubitable equivalent of such entity's interest in property.").

[105]  *Bath Iron Works Corp. v. Congoleum Corp. (In re Congoleum Corp.)*, 627 B.R. 62, 70 (Bankr. D.N.J. 2021); *see also In re Scimeca Found., Inc.*, 497 B.R. 753, 772 (Bankr. E.D. Pa. 2013) (holding that a party with an interest in estate property to be sold must be adequately protected when trustee sells property out of ordinary course of debtor's business).

insurance provider free and clear under section 363(f) of the non-debtor's interest.[106]  Finally, courts in this and other jurisdictions have approved insurance policy buyback arrangements as part of an overall process intended to effectuate the confirmation of a plan in mass tort cases.[107]

42.     Furthermore, as will be shown at the Confirmation Hearing, each of the Insurance Settlements is the product of good-faith, arms-length negotiations among the Debtors, the Settling Insurance Companies, the Coalition, FCR, TCC, and representatives of a vast majority of abuse survivors.  Each Settlement was negotiated without fraud or collusion but rather in mediation with all parties present and represented by experienced counsel and advisors.  Therefore, the Settling Insurance Companies are good-faith purchasers for value and are entitled to the protections afforded under section 363(m) of the Bankruptcy Code.

43.     As discussed above and as will be further shown at the Confirmation Hearing, the Debtors have evaluated each of the Insurance Settlements and have determined that entering into

---

[106]  *See, e.g.*, *In re Roman Catholic Bishop of Stockton,* No. 14-20371, 2017 WL 118013, at *9 (Bankr. E.D. Cal. Jan. 10, 2017) (relying upon Section 363 to confirm mass tort plan and releases and injunctions protecting additional insureds under debtor's insurance policies because those third-parties "would not release their interests under the Released Insurance Policies unless they obtained the benefits of the [releases and] Injunctions under the Plan, because to do so may have left them exposed to Channeled Claims, whether or not such Claims are valid and whether or not coverage exists under the Settling Insurers' Insurance Policies for such Claims"); Confirmation Order, *In re USA Gymnastics*, No. 18-09108 (Bankr. S.D. Ind. Dec. 16, 2021) [D.I. 1776 at 16] ("Third-parties with independent rights under or interests in the Debtor CGL Settling Insurance Policies also would not have consented to the elimination of their rights or interests in such policies without the protections of the Plan's releases and injunctions, which also constitute adequate protection as to these third-parties required by Sections 363(e) and (f) of the Bankruptcy Code.").

[107]  *See, e.g.*, *In re Flintkote Co*., Bankr. Case No. 04-11300, 2012 Bankr. LEXIS 6006, at *77-84 (Bankr. D. Del. Dec. 21, 2012) (listing orders approving policy buybacks in advance of confirmation of the plan in case involving numerous asbestos claims); *In re CFB Liquidating Corp*., No. 01-45483 (RLE), 2012 WL 3929289, at *8-14 (Bankr. N.D. Cal. Sep. 7, 2012) (order confirming plan involving insurance buybacks with several insurers in asbestos case); *In re Jensen Farms et al*., No. 12-20982 HRT (Bankr. D. Colo. Oct. 25, 2012) [D.I. 185] (approving buyback of policy in case involving listeria outbreak and wrongful death suits); *In re Roman Catholic Archbishop of Portland in Oregon*, Bankr. Case No. 304-37154 (ELPL) 1 (Bankr. D. Ore. Feb. 2, 2007) [D.I. 4535, 4537, 4539, 4541, 4543, 4545, 4548, 4550, 4559] (orders approving policy buybacks in advance of plan by several insurers in case involving numerous sex-abuse claims); *In re Delaco Co*., Bankr. Case No. 04-10899 (Bankr. S.D.N.Y. July 29, 2005 & Aug. 1, 2005) [D.I. 512, 513, 516, 519, 520, 521, 522] (orders approving policy buybacks in advance of plan by several insurers in case involving numerous product liability suits).

each of the Insurance Settlements is an exercise of the Debtors' (and most other interested parties') reasonable business judgment, is necessary for the Debtors' restructuring, is reasonable, in the best interest of the Estates, and justifies the Settling Insurance Companies' inclusion in the Scouting-Related Release and Channeling Injunction.

### 1. The Century and Chubb Companies Insurance Settlement.

44. The Century and Chubb Companies Insurance Settlement provides $800 million to the Settlement Trust to resolve Abuse Claims.[108]  For purposes of evaluating the Century and Chubb Companies Insurance Settlement (and each of the settlements with the insurers), as the Debtors will demonstrate at the Confirmation Hearing through their expert witnesses, Dr. Bates and Ms. Gutzler, the Debtors determined the portion of the aggregate liability of all of the Abuse Claims that would potentially be owed by Century and Chubb Companies.  In doing so, the Debtors ran multiple models and determined that the contributions made pursuant to the Century and Chubb Companies Insurance Settlement was within the range of reasonableness, taking into account the issues discussed above as well as the coverage defenses that Century has raised and Century's risk of insolvency.  The Debtors also considered the opinions and inputs from the TCC, the Coalition, FCR, and others who combined represent the vast majority of abuse survivors, all of which support the settlement.

### (a) Probability of Success in Litigation.[109]

45. As the Court is aware, Century has raised numerous and extensive coverage

---

[108]  Plan Ex. I-2, Century and Chubb Companies Insurance Settlement Agreement § 3.

[109]  The purpose of addressing this factor is "not to make findings of fact and conclusions of law but to canvass the issues to assess the risks associated with prosecuting the [litigation]."  *In re Tribune Co.*, 464 B.R. 126, 158 (Bankr. D. Del. 2011) (quoting *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 950 (Bankr. S.D.N.Y. 1994)).

defenses in its pleadings before this Court.[110]  Although the Debtors believe they have strong

arguments in favor of coverage and against the defenses asserted, it is possible that a court could

disagree, resulting in Century contributing less or nothing towards the Settlement Trust.  What is

certain, however, is that the Debtors and most, if not all, survivors would face significant,

protracted, and expensive litigation to secure any funds at all from the Century and Chubb

Companies outside of this Plan and settlement agreement.  Therefore, this factor weighs in favor

of approving the Century and Chubb Companies Insurance Settlement Agreement.

### (b)     The Likely Difficulties in Collection.

46.     In addition to these coverage issues, the Century and Chubb Companies Insurance

Settlement is also reasonable given the solvency risks associated with Century.  Simply put, there

is significant uncertainty regarding the Debtors' ability to collect from Century if this settlement

was not reached.

47.     As the Debtors will prove at the Confirmation Hearing, including through the

testimony of Ms. Gutzler, the vast majority of Century's exposure is allocated to Century

Indemnity Company, a run-off insurer paying claims under policies issued by Insurance Company

of North America.  This means that it is a solvent insurance company that manages and pays claims

under insurance policies for which Century Indemnity Company is responsible, but it is no longer

actively underwriting new business.  As such, Century Indemnity Company is not an income-

generating insurer through the continued receipt of premiums, and there is significant uncertainty

regarding the assets available to satisfy Century Indemnity Company's obligations to the Debtors

and their other policyholders.  Therefore, this factor weighs in favor of approving the $800 million

---

[110]  *See*, *e.g.* Century's Objections to Debtors' Disclosure Statement [D.I. 6065].

settlement.

### (c)  The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It.

48.    The nature and extent of the litigation that would need to be undertaken if the Century and Chubb Companies Insurance Settlement was not approved would be extremely complex, time consuming, and expensive and destroy value that would otherwise be immediately available to survivors under the agreement.  The delays associated with resolving coverage and defense issues with respect to each Abuse Claim that implicates a Century Policy would undermine a survivor's ability to be compensated through a centralized Settlement Trust process.

49.    Finally, the complexity, expense, and delays that would ensue without the Century and Chubb Companies Insurance Settlement Agreement are not speculative.  The Debtors were engaged in prepetition insurance coverage disputes with Century that have not yet gone to trial. There are also adversary proceedings, contested matters, and other disputes that were before this Court that have been resolved through the settlement.[111]  This factor weighs heavily in favor of approving this settlement.

### (d)  The Paramount Interest of the Creditors.

50.    Holders of Abuse Claims would lose as much as $800 million without the Century and Chubb Companies Insurance Settlement.  This agreement unlocks tremendous value for survivors, serving as the framework for other insurance settlements and enabling the Debtors to finalize a workable plan of reorganization.  Abuse survivors—many of whom have waited

---

[111] *See* Plan Ex. I-2, Century and Chubb Companies Insurance Settlement Agreement §§ 25, 36, 37 ("In consideration of the execution of this Agreement, the Settling Insurers and the Debtors have jointly moved to stay the appeal of the bar date order pending the Confirmation Order becoming a Final Order, which is captioned as follows: *Century Indemnity Company v. Boy Scouts of America and Delaware BSA, LLC*, Case No. 21-1792 (3d Cir.), on appeal to the United States Court of Appeals for the Third Circuit from the United States District Court for the District of Delaware, Case No. 20-00774.").

decades—will be able to receive the fair and equitable compensation to which they are entitled. The $2.7 billion in cash and property available to the Settlement Trust for distribution to survivors under the Plan would not be possible without the Century and Chubb Companies Insurance Settlement and it is in the paramount interests of creditors. The Century and Chubb Companies Insurance Agreement should be approved.

### 2. The Hartford Insurance Settlement Agreement.

51. Hartford is contributing $787 million[112] to the Settlement Trust in exchange for the Hartford Protected Parties being deemed a Settling Insurance Company under the Plan and a Protected Party under the Channeling Injunction.[113] As noted above and as the Debtors will demonstrate at the Confirmation Hearing through their expert witnesses, Dr. Bates and Ms. Gutzler, the Debtors conducted a fulsome evaluation of the amount of the Hartford Insurance Settlement and determined that the settlement represents a prudent and proper exercise of their business judgment and meets the *Martin* factors. As with all of the settlements in the Plan, the TCC, Coalition, and FCR, who represent the vast majority of survivors, support this settlement.

### (a) The Probability of Success in Litigation.

52. As this Court is aware, and as discussed in more detail in the Disclosure Statement, prior to the Petition Date, the BSA was engaged in extensive coverage litigation with Hartford and, among other things, sought to recover unreimbursed defense and settlement costs from Hartford as well as extra-contractual damages, statutory interest, and attorneys' fees and costs.[114]

---

[112] Hartford will also be granted an administrative expense claim in the amount of $2 million under the Settlement Agreement as a compromise of the alleged damages to Hartford related to the initial settlement agreement with Hartford, as set forth more fully in the Disclosure Statement. Plan Ex. I-1, Hartford Insurance Settlement Agreement § II.B.2.g. All other terms and provisions of the agreement that have incorporated into the Plan are set forth in the Hartford Insurance Settlement Agreement.

[113] Plan Ex. I-1, Hartford Insurance Settlement Agreement § IV.A.

[114] *See* Disclosure Statement Art. V.S.3.a.

Additionally, the BSA and Hartford had a dispute as to coverage under certain Hartford Policies.[115] Hartford has also disputed whether the secondary evidence that the Debtors gathered is sufficient to prove the existence and terms of certain missing policies.[116]  As the Court is no doubt aware, extensive litigation with Hartford continued after the Petition Date as well.  Resolving all of this litigation as part of this settlement is not only an added benefit for the Estate but demonstrates the difficult and protracted litigation any individual survivor may face in trying to secure just compensation outside of this Plan.[117]

(b)   <b>The Likely Difficulties in Collection.</b>

53.  The litigation costs associated with a protracted insurance dispute that would be necessary before any abuse survivor would be able to collect would be extensive, could jeopardize the Debtors' or the Settlement Trust's ability to secure funds in a meaningful way on any reasonable timeframe and may even prove impossible for most individual survivors.  Moreover, the Hartford Insurance Settlement resolves the issues left open with respect to the Initial Hartford Settlement Agreement.[118] Though the Debtors believe that they had no obligations thereunder, litigating issues with Hartford would have been expensive and time consuming, and divert funds away from creditors to support the litigation.[119]

---

[115]  *See* Disclosure Statement Art. II.F.

[116]  *See* Disclosure Statement Art. II.F.

[117]  *Hartford Accident and Indem. Co. & First State Ins. Co. v. Boy Scouts Am.*, Adv. Pro. No. 20-50601 (Bankr. D. Del. 2020); *see also* Disclosure Statement Art. V.R.2.

[118]  As further explained in the Disclosure Statement, the Debtors originally entered into a settlement with Hartford in April 2021 (the "Initial Hartford Settlement Agreement").  The terms of the Initial Hartford Settlement Agreement were not acceptable to certain critical parties in these Chapter 11 Cases, such as the TCC. *See* Disclosure Statement Art. II.A.

[119]  The Bankruptcy Court declined to make the Debtors' requested determination that the Debtors had no obligation to seek approval of, and had no obligations under, the Initial Hartford Settlement Agreement. *See* Aug. 19, 2021 Hr'g Tr. 7:16–20 (The Court: "Third, the RSA provides that the RSA approval order contain a finding and conclusion that, 'Debtors have no obligation to seek approval of and have no obligations under the [Initial] Hartford Settlement.' I cannot make the finding and conclusion requested.").

54.     The Hartford Insurance Settlement guarantees more than $787 million in funds to compensate claimants under the Settlement Trust.  In contrast, there is no guarantee that survivors would ever recover any meaningful amount from Hartford absent this agreement.  Therefore, the Debtors and more importantly survivors undoubtedly will experience collectability issues without the Settlement.

**(c)     The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It.**

55.     As discussed above in connection with the Century and Chubb Companies Settlement Agreement, this factor weighs heavily in favor of approving this settlement agreement. The prepetition litigation between the Debtors and Hartford demonstrates the complexity, expense, inconvenience, and delays that would result if their dispute were not resolved pursuant to the Hartford Insurance Settlement.  The coverage litigation between Hartford and the BSA, which began in 2018 in state court of Dallas County, Texas,[120] has continued for the past four years, and no result has been rendered.  As the Court is aware, the uncertainty, complexity, expense, inconvenience, and delays associated with the Texas litigation have only increased during these cases.

**(d)     The Paramount Interest of the Creditors.**

56.     The paramount interest of the creditors favors approval of the settlement for the same reasons stated above for Century.[121]  Holders of Abuse Claims will lose the ability to immediately access the $787 million without the Hartford Insurance Settlement and will face certain delay and an uncertain outcome in litigation.  Moreover, this settlement agreement is

---

[120]   Case No. DC-18-07313; Case No. 19-01318.

[121]   *See* Disclosure Statement Art. V.S.3.a.

supported by every major creditor constituency in these Chapter 11 Cases. Survivor interests should be paramount and the parties representing these interests overwhelmingly support all of the Insurance Settlements.

### 3. The Zurich Insurance Settlement.

57. Zurich has agreed to make a $52.5 million settlement payment in exchange for the same releases and protections provided to all Settling Insurance Companies under the Plan.[122] Based on the same analysis performed with respect to the Century and Hartford settlements, including the evaluation of Zurich's allocable share of the aggregate Abuse Claims' liability, the Debtors concluded that the settlement with Zurich represents a prudent and proper exercise of their business judgment, as the Debtors will demonstrate at the Confirmation Hearing through their expert witnesses, Dr. Bates and Ms. Gutzler.

58. As discussed above, the *Martin* factors support each of the Insurance Settlements in the Plan for similar reasons. Zurich, as an excess insurer, has raised different, but still significant, coverage defenses. Even if the Debtors were to prevail on these coverage issues, unresolved allocation disputes which would require a court and the parties to undertake a complex, expensive and hotly contested analysis of the insurance policies at issue and the merits of Abuse Claims, among other things. Accordingly, the extremely complex nature of the potential lengthy litigation with an uncertain outcome and collection risk on the part of individual survivors all support the finding that this settlement should be approved. Moreover, the Zurich Settlement is supported by the Debtors, the Coalition, FCR, TCC, and representatives of a vast majority of survivors, demonstrating that the Zurich Insurance Settlement is in the paramount interest of

---

[122] Plan Ex. I-3, Zurich Insurance Settlement Agreement § 2.

creters.

### 4.  The Clarendon Insurance Settlement.

59.     Clarendon has agreed to contribute $16.5 million in cash to the Settlement Trust to become a Settling Insurer under the Plan.[123]  Based on the same factors noted above, the Debtors concluded that the settlement with Clarendon represents a prudent and proper exercise of its business judgment, as the Debtors will demonstrate at the Confirmation Hearing through their expert witnesses, Dr. Bates and Ms. Gutzler.  Clarendon has asserted coverage defenses that are essentially the same as those that Zurich asserted.   Additionally, the Clarendon Insurance Settlement includes a mixture of both excess policies issued to the BSA and primary-layer policies issued to Local Councils.[124]  Any dispute with Clarendon carries with it inherent uncertainties, and there is no assurance that the Debtors would achieve a better result in expensive and lengthy litigation than the Clarendon Insurance Settlement.  Moreover, even without any guarantee of prevailing in such litigation, there is a collection risk even if the Debtors were able to prevail in coverage litigation. Finally, the Clarendon Insurance Settlement is in the paramount interest of all creditors as demonstrated by the fact that it is supported by the Debtors, the Coalition, FCR, TCC, and representatives of a vast majority of all survivors.  These factors all weigh heavily in favor of approving the Clarendon Insurance Settlement.

### B.  The Sale of the Insurance Policies Free and Clear of Interests Should Be Approved.

60.     Section 363(f) of the Bankruptcy Code provides that estate property may be sold "free and clear of any interest in such property of an entity other than the estate" if any one of five

---

[123]   *See* Plan Ex. I-4, Clarendon Insurance Settlement Agreement § 2.

[124]   *See* Plan Ex. I-4, Clarendon Insurance Settlement Agreement § 4.a.

specified conditions is met.[125]  This Court has jurisdiction over insurance policies that are property

of the debtor's estate.[126]  "It has long been the rule in th[e] [Third] Circuit that insurance policies

are considered part of the property of a bankruptcy estate."[127]  And "the proceeds of a debtor's

liability insurance policies are [also] considered property of its bankruptcy estate."[128]

61.    Here, the Abuse Insurance Policies[129] being sold—the BSA and Local Council

Insurance Policies—are property of the Debtors' Estate.  The BSA Insurance Policies being

purchased by the Settling Insurance Companies are certainly property of the Debtors' Estates.[130]

The Local Councils are assigning their interests in such policies to the Debtors prior to the Debtors'

free and clear sale of such policies.[131]

62.    As the Abuse Insurance Policies are, therefore, property of the Estate, section

363(f)[132] of the Bankruptcy Code permits the Debtors to sell them free and clear of any liens,

---

[125]  11 U.S.C. § 363(f)(1)–(5).

[126]  *Roman Cath. Bishop of Stockton*, 2017 WL 118013 at *1 ("The Insurance Policies are property of the Estate and therefore are subject to the exclusive core jurisdiction of this Court.").

[127]  *W.R. Grace*, 475 B.R. at 81 (citing *ACandS, Inc. v. Travelers Cas. & Sur. Co*., 435 F.3d 252, 260 (3d Cir. 2006)).

[128]  *Id*.

[129]  Plan Art. I.A.20 ("'Abuse Insurance Policies' means, collectively, the BSA Insurance Policies, and the Local Council Insurance Policies. Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies").  Pursuant to the Insurance Settlement Agreements, the Local Councils will assign the applicable Local Council Insurance Policies to the Debtors, who will sell them pursuant to section 363 of the Bankruptcy.

[130]  *See* 11 U.S.C. § 541(a)(1).

[131]  *See* 11 U.S.C. § 541(a)(7) ("[The] estate is comprised of . . . [a]ny interest in property that the estate acquires after the commencement of the case.").

[132]  Section 363(f) of the Bankruptcy Code permits the Debtors to sell property free and clear of any interest in such property of an entity other than the estate, only if—
(1)  "applicable nonbankruptcy law permits sale of such property free and clear of such interest";
(2)  "such entity consents";
(3)  "such interest is a lien and the price at which the property is to be sold is greater than the aggregate of all liens on such property";
(4)   "such interest is in bona fide dispute"; or
(5)  "such entity could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such  interest."
11 U.S.C. § 363(f).

claims and interests of other parties in the property being sold subject to certain conditions. The language of section 363(f) plainly addresses the situation in which both the estate and an "entity other than the estate" hold an "interest" in property. It specifies that, in such a circumstance, the estate may sell the property "free and clear" of that third party's "interest." 11 U.S.C. § 363(f). A non-debtor's rights as an additional insured (or as a claimant entitled to bring a direct action) in an insurance policy issued to a debtor are precisely the kinds of "interests" that section 363(f) addresses.[133]

63. *First*, pursuant to section 363(f)(2), a debtor may sell property free and clear where such entity has consented to the sale.[134] As discussed herein, the Debtors undertook an extensive noticing campaign and provided the opportunity for Chartered Organizations to opt out of being treated as a Participating Chartered Organization under the Plan. Those that did not opt out, including all Local Councils, Participating Chartered Organizations, and Contributing Chartered Organizations, are all affirmatively consenting to the sale of the Insurance Policies.[135]

64. *Next*, with respect to the very small number of Opt-Out Chartered Organizations, the Debtors may sell the policies free and clear of any alleged rights to coverage under the policies that such Chartered Organizations may have as additional insureds so long as the Opt-Out Chartered Organization receives adequate protection. The Debtors' may similarly sell free and

---

[133] The Lujan Claimants argue that, under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, § 363(f) of the Bankruptcy Code is "reverse preempted" by the law of Guam. *See* Lujan Claimants Obj. at 24-34. But, in their own telling, all Guam law does is give the Lujan Claimants an interest in the policies issued to BSA, just as the law of all states acknowledges that additional insureds and other third parties may have rights under liability policies issued to someone else. Yet, as discussed, the courts have repeatedly held that § 363(f) authorizes the sale of policies issued to a debtor free and clear of any such interests of third parties. The Lujan Claimants cite no case holding that the law of any state or territory, let alone the law of Guam, renders § 363(f) ineffective.

[134] 11 U.S.C. § 363(f)(2).

[135] *See* Plan Art. V.S.1.b (Contributing Chartered Organization Settlement Contribution); Plan Art. V.S.1.c, e (Participating Chartered Organization Settlement Contribution).

clear of any alleged "direct-action" rights or any other interests in the Debtors' property. Under

section 363(f)(4), a sale free and clear is appropriate where the interests are subject to a bona fide

dispute.[136] The Lujan Claimants[137] assert that section 363(f)(4) does not permit the sale of certain

policies of the Settling Insurance Companies free and clear of their alleged interests in the policies

because their rights under Guam's direct-action statute are supposedly not in dispute.[138] But they

admit that not a single one of the Lujan Claimants has ever brought or prevailed in a direct action

against any of the Debtors' insurers.[139] Numerous cases, following *Johns-Manville*, hold that a

debtor's estate may sell its insurance policies back to the insurer free and clear of any interests of

third parties, including both additional insureds and claimants, like the Lujan Claimants here, with

purported state-law rights to bring direct actions against the insurer.[140]

       65.     The Court need not determine if there such rights are in a bona fide dispute,

however, as the sales may also occur pursuant section 363(f)(5) because the Objectors may be

compelled to accept a money satisfaction of their interests.[141] Indeed, not only can the Lujan

---

[136] *See Johns-Manville Corp.*, 837 F.2d at 93 (holding that vendor's alleged rights under certain endorsements for indemnity for asbestos claims was in *bona fide* dispute because a dispute existed as to whether "the product liability limits on the policies to which the vendor endorsements attach have been exhausted").

[137] *See* Lujan Claimants' Obj. at 36 [D.I. 8708].

[138] *Id.*

[139] *Id.* at 6.

[140] *See, e.g.*, *In re Hereford Biofuels, L.P.*, 466 B.R. 841, 857-859 (Bankr. N.D. Tex. 2012) (holding that additional insured's alleged rights under debtor's insurance policies were "simply an interest in the [policies], of which the sale was made free and clear"); *Dow Corning.*, 198 B.R. at 233-238, 244-245 (holding that debtor's insurance policies could be sold free and clear of all "interests" of claimants asserting tort claims against debtor covered by the policies, including claimants having state-law rights to bring a "direct action" against insurer); *In re Sunland, Inc.*, Bankr. Case No. 13–13301 (TR), 2014 WL 7011747, at *4 (Bankr. D.N.M. Dec. 11, 2014) (same); *see also In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-290 (3d Cir. 2003) (holding that sale of airline's assets was free and clear of all "interests," including successor-liability claims, and construing "interests" broadly to include "obligations that are connected to, or arise from, the property being sold").

[141] *See, e.g.*, *In re Thorpe Insulation Co.*, Bankr. Case No. 07-19271 (BB) (Bankr. C.D. Cal. Nov. 25, 2008) [D.I. 1676, 1677]; *In re Burns and Roe Enters., Inc.*, Bankr. Case No. 00-41610 (RG) (Bankr. D.N.J. Feb. 17, 2005) [D.I. 1200].

Claimants be compelled to accept a money satisfaction of their interests – it is in fact the only potential interest they have in the policies.

66.     The Lujan Claimants' argument that section 363(f)(5) does not permit the sale of the Hartford Policies free and clear of their alleged interests because "the Plan provides no money satisfaction to [the] Lujan Claimants"[142] is not only factually incorrect but a misstatement of the law.  Section 363(f)(5) permits the sale of a property in which a debtor's estate has an interest free and clear of the interests of any third party so long as the third party "could be" compelled to accept a money satisfaction in "a legal or equitable proceeding."[143]  There is no requirement that the Plan provide them a direct "money satisfaction," as the Lujan Claimants would have this Court believe. That being said, the Plan does in fact provide the Lujan Claimants with compensation for their Direct Abuse Claims, including their "direct action" claims, which are not independent claimsi, but only a means of asserting the same Direct Abuse Claims to recover from the same insurance coverage.  The Lujan Claimants will be treated equally with all other survivors and have their Direct Abuse Claims paid pursuant to the TDP.

67.     Providing the Lujan Claimants with the same treatment as all other members in Class 8 is not only mandated by section 1123(a)(4) but satisfies the Debtors' obligation to provide adequate protection under section 363(e), which courts have acknowledged is a flexible concept.[144]

68.     The RCAHC (a) objects to the sale of the BSA Insurance Policies and Local Council Insurance Policies on the basis that the Plan seeks to impermissibly appropriate the rights of the Chartered Organizations as non-debtor insured parties under the BSA and Local Council

---

142   Lujan Claimants' Obj. at 36.

143   11 U.S.C. § 363(f)(5).

144   *See, e.g.*, *MBank Dallas, N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1396-97 (10th Cir. 1987) (providing that adequate protection is "a concept which is to be decided flexibly on the proverbial 'case-by-case' basis").

Policies and (b) asserts that the Court lacks jurisdiction over the Chartered Organizations' rights in the insurance policies and cannot approve the free and clear sale of the Chartered Organizations' rights in the BSA and Local Council Insurance Policies without the Chartered Organizations' consent or adequate protection, which is not provided.[145] The RCAHC further argues that the Debtors did not give the Chartered Organizations proper notice and an opportunity to object. These arguments fail because (a) this Court has jurisdiction to authorize the sale of the BSA and Local Council Insurance Policies to the Settling Insurance Companies under section 363 of the Bankruptcy Code and (b) the Debtors provided Chartered Organizations with adequate notice and an opportunity to object to the section 363 sale.

69.     The Court has jurisdiction over the sale of the Abuse Insurance Policies to the Settling Insurance Companies. As discussed above, the Abuse Insurance Policies[146] being sold are property of the Debtors' Estates. Therefore, the Debtors' present and future interest in the Local Council Settlement Contribution are sufficient to vest this Court with jurisdiction over the Local Council Insurance Policies.

70.     The rights under the Local Council Insurance Policies are not separate and apart from the Debtors but rather necessarily affect the Estates and, therefore, must fall within the Court's jurisdiction.[147] In mass tort cases such as *Dow Corning*, *Johns-Manville*, and *Burns and Roe*, the courts have recognized the essential role that the settlement of shared insurance policy

---

[145] RCAHC Obj. ¶¶ 73-109 [D.I. 8686].

[146] Plan Art. I.A.20 ("'Abuse Insurance Policies' means, collectively, the BSA Insurance Policies, and the Local Council Insurance Policies. Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies"). Pursuant to the Insurance Settlement Agreements, the Local Councils will assign the applicable Local Council Insurance Policies to the Debtors, who will sell them pursuant to section 363 of the Bankruptcy.

[147] *In re Dow Corning Corp.*, 86 F.3d 482, 495 (6th Cir. 1996) ("The threat posed to those insurance policies [of the debtor] if claims pending against Dow Chemical and Corning Incorporated are permitted to go forward in a separate manner supports a finding of 'related to' jurisdiction under Section 1334(b)").

rights play in achieving reorganization of a debtor and compensation to tort claimants, and the central need for "insurers who contribute to a trust or funds to satisfy tort claims have the comfort that they will not thereafter be sued and asked to contribute even more."[148]   Here, there is one "pot" of proceeds, and a host of parallel claims of the Debtors' Estate and third parties to the policies.[149]   This is precisely the situation in which the Court may exercise jurisdiction, as recognized in *Adelphia*:

> [F]undamentally, each of *Johns-Manville* and *Burns and Roe* was an asbestos case, attempting to deal with the unique problems present in mass torts cases—where it is often desirable, if not essential, to tap insurance policies to help create trusts or funds to provide a funding resource for the present and future tort claims that must be satisfied, and where addressing issues of that character is an important, if not wholly dominant, aspect of the bankruptcy case.[150]

71.   The Court, at the very least, has "related to" jurisdiction because any exercise of rights by a Chartered Organizations under the Local Council Insurance Policies would reduce the value of those policies available to the Debtors' Estate and the Debtors have an interest in preserving value under the Plan.   "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with *all matters* connected with the bankruptcy estate."[151]   Thus, the RCAHC's jurisdiction-related arguments should be overruled.[152]

---

[148]   *Adelphia*, 364 B.R. at 528.

[149]   *See id.* at 526.

[150]   *Id.* at 529.

[151]   *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis added); *see also* H. Rep. No. 95-595, 95th Cong., 1st Sess. at 43-48 (1977) ("Today, the rationale for withholding jurisdiction from the bankruptcy courts no longer exists, and the problems generated by limited jurisdiction demand a change in any comprehensive revision of the bankruptcy laws. . .   Witness after witness argued in favor of increased jurisdiction. The time for change in this aspect of bankruptcy law has come.").

[152]   The Debtors dismiss the RCAHC's assertion that the releases and injunctions of Chartered Organizations' claims are not integral to the debtor-creditor relationship.

72.     The RCAHC asserts that the Second Circuit's decision in *MacArthur* is inapplicable and unsound.  In that case, the Second Circuit found that it had jurisdiction over the insurance policies at issue,[153] as the insureds' rights under the policies were based on the conduct of the debtor, and the debtor's status as the primary insured and purchaser of the policies was significant.[154]  So too, here, as the Abuse Claims are at the core of the conduct that is the subject of the shared insurance.  The court also held that the bankruptcy court could properly approve the proposed settlements and channel the claims to the settlement trust (which was funded by proceeds of the policies) pursuant to sections 105(a) and 363(f) of the Bankruptcy Code.[155]  The other cases cited by the Debtors in support of this structure, in addition to *MacArthur*, all involve mass torts and a channeling injunction.[156]  The precise structure in which courts have recognized that the transfer of third party interests may be permissible is the structure of the Debtors' Plan, and where such parties are receiving adequate protection.

73.     As discussed above and contrary to the RCAHC's assertion, the BSA and Local Council Insurance Policies are not being sold free and clear without consent or adequate protection. Local Councils, Participating Chartered Organizations, and Contributing Chartered Organizations

---

[153]  *Johns-Manville Corp.*, 837 F.2d at 90-91.

[154]  *Id.*

[155]  *Id.* at 93-94.

[156]  *See, e.g.*, *Hereford Biofuels*, 466 B.R. at 858-59  (holding that a debtor's sale of its insurance policy rights over the objection of a co-insured was authorized, as the proceeds on any claim adjusted under the policy would properly have gone to the debtor even if the co-insured could assert a legitimate claim to the proceeds); *Roman Catholic Bishop of Stockton*, 2017 WL 118013 at *9 (relying upon section 363 to confirm mass tort plan and releases and injunctions protecting additional insureds under debtor's insurance policies); *In re Burns & Roe Enters.*, Bankr. Case No. 00-41610 (RG), 2005 Bankr. LEXIS 3173, at *34 (Bankr. D.N.J. 2005) (order approving settlement involving sale of debtors' interests in tort claims insurance policies in mass tort case with corresponding channeling injunction, where certain third party interests in the policies would attach to the proceeds of the sale).

are affirmatively consenting to the sale pursuant to the Plan.[157]  The Debtors provided the Court approved supplemental disclosure and opt-out election form that was broadly noticed to to approximately 69,000 Chartered Organizations (*i.e.*, each possible Chartered Organization where an address was available), in addition to the Chartered Organization noticing that occurred prior to the supplemental disclosure.  The structure of the Debtors' Plan provides the opportunity for Chartered Organizations to opt out of the Plan structure, and the Debtors provided robust notice of this.  Very few Chartered Organizations have opted out (approximately 340 as of the date of this Memorandum) of participation in the Plan and for which the Debtors' do not have consent to transfer their shared rights to the BSA and Local Council Insurance Policies Policies; however, as discussed above, section 363(f) would provide the basis for selling free and clear even where there is non-consent, and in all cases.[158]

74.     Contrary to RCAHC's assertions the Debtors have appropriately accounted for Opt-Out Chartered Organizations by providing adequate protection under sections 363(e) of the Bankruptcy Code.  Abuse Claims that are covered by the BSA and Local Council Policies subject to the buyback provisions of the Insurance Settlements will be channeled to the Settlement Trust.  While adequate protection in this circumstance often comes in the form of the interest attaching to the proceeds of such sale this is not the only method by which a non-debtor third party may be

---

[157]  *See* Plan Art. V.S.1.b (Contributing Chartered Organization Settlement Contribution); Plan Art. V.S.1.c, e (Participating Chartered Organization Settlement Contribution).

[158]  *Johns-Manville Corp.*, 837 F.2d at 90 ("We conclude that the Bankruptcy Court had jurisdiction over the insurance policies as property of the debtor's estate. Moreover, the court had authority to issue the injunctive orders pursuant to its power to dispose of a debtor's property free and clear of third-party interests and to channel such interests to the proceeds of the disposition.").

adequately protected.[159]  The Opt-Out Chartered Organizations are receiving the protection of the Channeling Injunction for the Abuse Claims that would have been covered under such policies this is more than adequate.

75.     None of this, however, applies to Opt-Out Chartered Organizations that own independent insurance policies.  Opt-Out Chartered Organizations are ***not*** assigning, selling, or releasing any rights in their own independent insurance policies issued by a Non-Settling or Settling Insurance Company—this is plainly stated, in bold, in the Plan:

> **[F]or the avoidance of doubt, nothing herein, including, without limitation, the Channeling Injunction in <u>Article X.F</u>, shall require an Opt-Out Chartered Organization to provide an assignment or release with respect to its rights under insurance policies issued directly to such organization, including those set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.  The rights of the Opt-Out Chartered Organizations provided under insurance policies issued directly to such organization are preserved . . . .[160]**

76.     The Opt-Out Chartered Organizations are also not being stripped of any rights to the BSA and Local Council Insurance Policies issued by Non-Settling Insurance Companies.  Simply put, the Debtors have a right to sell their property (the insurance policies) free and clear of the Opt-Out Chartered Organizations interests in such policies.  As adequate protection for such interests the Opt-Out Chartered Organizations are receiving a Channeling Injunction that covers the exact same claims the insurance policies would have covered – but is better in that it is not constrained by any of the policy limits of such settling insurance company policies.  If an Abuse Claim is subject to the Channeling Injunction, the entire Abuse Claim is channeled.  Accordingly,

---

[159]  *Haskell L.P.*, 321 B.R. at 6 ("Adequate protection may be provided by cash payments, additional or replacement liens, or such other relief as will result in the realization of the indubitable equivalent of such entity's interest in property."); *Roman Catholic Bishop of Stockton,* 2017 WL 118013, at *9; Confirmation Order, *In re USA Gymnastics*, Bankr. Case No. 18-09108 , at 16 (Bankr. S.D. Ind. Dec. 16, 2021) [D.I. 1776].

[160]  *See* Plan Art. V.S.1.g(iii).

the sale of the Abuse Insurance Policies satisfies the requirements of section 363(e) and (f).

77.     Finally, the RCAHC contends that the Debtors failed to give Chartered Organizations notice and an opportunity to object to the impairment of their shared interests in the BSA and Local Council Insurance Policies.[161]  This argument also fails.  The Debtors have provided ample notice of the Insurance Settlements and the Plan.  Throughout these Chapter 11 Cases, the Debtors announced each Insurance Settlement Agreement by a Mediator's report, served on all Chartered Organizations or potential Chartered Organizations for which an address was known, including approximately 69,000 Chartered Organizations.[162]  The Debtors have also complied with the Solicitation Procedures Order, which approved the form and manner of notice, and provided supplemental disclosures and an updated opt-out election process for Chartered Organizations after filing the Plan on February 15, 2022.[163]  The supplemental disclosures were subject to extensive comment by Chartered Organization representatives and approval by the Court.  The Disclosure Statement, filed on September 30, 2021, specifically provides that in the event the "Debtors sell to a Settling Insurance Company one or more BSA Insurance Policies issued by such Settling Insurance Company pursuant to section 363, 1123 and/or 1141" of the Code, the "rights, if any, of any Chartered Organizations under such BSA Insurance Policies will be treated in accordance with sections 363 and 1141 of the Bankruptcy Code and other applicable

---

[161]  RCAHC Obj. ¶¶ 88–94 [D.I. 8686].

[162]  *See, e.g.*, *Affidavit of Service* [D.I. 6352] (Hartford Insurance Settlement); *Affidavit of Service* [D.I. 7999] (solicitation packages); *Affidavit of Service* [D.I. 8169] (Century and Chubb Companies Insurance Settlement); *Affidavit of Service* [D.I. 8171] (Zurich Insurance Settlement); *Affidavit of Service* [D.I. 8224] (Clarendon Insurance Settlement).

[163]  Additionally, to the extent that a Chartered Organization is represented by counsel that filed a Notice of Appearance on the docket, such Chartered Organization has received notice of all filings provided to the parties on the Rule 2002 list.

law."[164]  The Disclosure Statement also explains that the ability of a Chartered Organization to retain its rights under Abuse Insurance Policies "is subject, in each case, to the terms of any proposed Insurance Settlement Agreement, which may provide that such Abuse Insurance Policies are being purchased by the Insurance Company free and clear."[165]

78.    Finally, the Debtors clearly gave Chartered Organizations an opportunity to object, which is evidenced by the RCAHC's objection itself.  Chartered Organizations received, sixteen days from the date of mailing, the supplemental disclosures to opt out of inclusion as a Participating Chartered Organization in the Debtors' modified Plan.[166]    Accordingly, the RCAHC's argument that Chartered Organizations did not receive notice and opportunity to object to the Insurance Settlement Agreements are without merit and should be overruled.

### C.    The Trust Distribution Procedures.

#### 1.    The TDP are Fair and Equitable and Should Be Approved Under Bankruptcy Rule 9019 and Section 1123(b) of the Bankruptcy Code.

79.    This Court should approve the Settlement Trust Documents[167] including, as

---

[164]  Disclosure Statement Art. II.E.6.  Pursuant to the Solicitation Procedures Order, voting Chartered Organizations received a booklet containing the Chartered Organization Notice, providing a plain English summary of each of the three options under the September 30 version of the plan for Chartered Organizations, a detailed question and answer section, opt-out election form, Confirmation Hearing Notice, and ballot. Non-voting Chartered Organizations were served the plain English Chartered Organization Notice, opt-out election form, and Confirmation Hearing Notice in a booklet form.  The Chartered Organization Notice was also posted on Omni's website.

[165]  Disclosure Statement Art. II.E.7.

[166]  *Order (I) Amending and Scheduling Certain Supplemental Dates and Deadlines in Connection with Confirmation of the Debtors' Plan of Reorganization and (II) Approving a Limited Supplemental Voting Deadline for Class 8 Direct Abuse Claims and Class 9 Indirect Abuse Claims* [D.I. 8830].

[167]  "Settlement Trust Documents" means (a) the Settlement Trust Agreement, (b) the Trust Distribution Procedures, (c) the Document Agreement, (d) the Confirmation Order, and (e) any other agreements, instruments and documents governing the establishment, administration and operation of the Settlement Trust, which shall be substantially in the forms set forth as exhibits hereto or in the Plan Supplement, as the same may be amended or modified from time to time in accordance with the terms thereof.  The Settlement Trust Agreement is between the BSA, Future Claimants' Representative, the Settlement Trustee, and the members of the Settlement Trust Advisory Committee (collectively, the "STAC").

relevant here, the TDP, as fair and equitable pursuant to Bankruptcy Rule 9019 and section 1123(b) of the Bankruptcy Code. As the evidence before the Court at confirmation will establish, the documents reflect a fair and reasonable compromise that is in the best interest of the Estates. After extensive good-faith negotiations described below, the Debtors have filed the TDP that emulate their prepetition practices for investigating, defending, and resolving Direct Abuse Claims in the tort system. Further, the TDP expressly preserve the contractual rights of the Non-Settling Insurance Companies. As such, the Court should approve the TDP as a fair and equitable settlement under Bankruptcy Rule 9019.

80.     Plans of reorganization (and their related documents) can and often do include settlements; indeed, courts routinely encourage it.[168] It is within a bankruptcy court's discretion to approve, pursuant to Bankruptcy Rule 9019, the procedures that provide the means to settle claims against the estate.[169]

81.     The procedures and criteria included in the TDP reflect a settlement of Abuse Claims brought against the estate.[170] The TDP provide the process for holders to liquidate their Abuse Claims instead of litigating in the tort system, pursuant to a distribution procedure that is designed to be fair and equitable.[171] Courts have recognized that a Debtor is required to manage

---

[168] Settlements and compromises are favored in bankruptcy proceedings as a means of "minimiz[ing] litigation and expedit[ing] the administration of a bankruptcy estate." *Martin*, 91 F.3d at 393 ; *see also World Health Alts.*, 344 B.R. at 296 .

[169] *See In re Heritage Organization, LLC*, 375 B.R. 230, 309 (Bankr. N.D. Tex. 2007) ("Under § 1126(b)(6), the Second Amended Plan may include a provision for the settlement of claims against the estate, where that settlement satisfies the standards for approval under Federal Rule of Bankruptcy Procedure 9019.").

[170] *See, e.g.*, *In re Quay Corp.*, 372 B.R. 378 (Bankr. N.D. Ill. 2007) (overruling a creditor's objection to inclusion of a Rule 9019 settlement in a plan); *Heritage Org.*, 375 B.R. at 308.

[171] *See* Disclosure Statement Art. II.A.

a case in a way that maximizes estate assets, which includes insurance,[172] and the TDP maximizes insurance assets, both settled and unsettled, for the greatest aggregate benefit to the Direct Abuse Claims. The benefits of the procedures and criteria in the TDP—including the prospect of a recovery for abuse survivors and avoiding expensive, complex litigation weigh in favor of approval.[173] Accordingly, the TDP should be approved as a settlement pursuant to Bankruptcy Rule 9019.

82.     The Certain Insurers object to approval of the TDP as a Bankruptcy Rule 9019 settlement on the grounds that Bankruptcy Rule 9019 cannot alter the substantive rights of non-consenting parties and the Debtors cannot use the Plan to "manufacture" authority the Debtors do not have.[174] The TDP under the Plan do not alter the Non-Settling Insurance Companies' substantive rights, as discussed below.

83.     The U.S. Trustee objects that Bankruptcy Rule 9019[175] does not apply to the TDP because the Abuse claimants have no formal agreement with any party to settle their claims.[176] The U.S. Trustee does not cite any cases in support of the assertion that Bankruptcy Rule 9019

---

[172]  *See, e.g.*, *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) (finding "[a] paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors" and thus, courts "enable [debtors in possession] to recover property on behalf of the bankruptcy estate") (citations omitted); *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988), subsequently aff'd, 871 F.2d 1217 (3d Cir. 1989) (determining that debtor-in-possession has a "duty to protect and to conserve property in his possession for the benefit of creditors.") (citing *In re Devers*, 759 F.2d 751, 754 (9th Cir. 1985)).

[173]  *Martin*, 91 F.3d at 393.

[174]  Certain Insurers Obj. ¶¶ 118-19 [D.I. 8695] (citing *In re Purdue Pharma, LP*, 2021 WL 5979108, at *40 (Bankr. S.D.N.Y. Dec. 16, 2021).

[175]  Bankruptcy Rule 9019 provides that, upon notice and a hearing, the Court "may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

[176]  U.S. Trustee Obj. ¶¶ 101, 104 [D.I. 8710].

requires an express settlement agreement between settling parties.[177]  Moreover, this formalistic approach overlooks that every major constituency representing Class 8 Claims support the Debtors' Plan, including its proposed treatment of the Abuse Claims under the TDP. A formal, independent agreement with each of the thousands of holders of Abuse Claims and parties in interest is neither practicable nor necessary for the Court to approve the TDP as a settlement pursuant to Bankruptcy Rule 9019 and make the corresponding finding under the Plan.

### (a)    Procedures for Resolving Direct Abuse Claims.

84.    The TDP provide three separate paths for resolving a Direct Abuse Claim: (a) the Expedited Distribution, (b) the Trust Claim Submission, and (c) the Independent Review Option. This combination of options to resolve Abuse Claims is consistent with the Debtors' prepetition practices.

### (1)    The Expedited Distribution.

85.    Certain holders of a Direct Abuse Claim may select an Expedited Distribution of $3,500, so long as they satisfy three criteria: the claimant (a) agrees to resolve their Abuse Claim in exchange for the Expedited Distribution, (b) has timely submitted a properly and substantially completed, non-duplicative proof of claim or future abuse claim, and (c) has personally signed this submission attesting to the truth of its contents under penalty of perjury, or supplements an existing proof of claim to provide such verification.[178]

86.    At Confirmation, the Debtors will demonstrate that the Expedited Distribution serves the same function as an "early out" option that is common practice for defendants, including

---

[177]  *See* U.S. Trustee Obj. ¶ 101 [D.I. 8710]; The U.S. Trustee's argument to the proposed finding focuses on section 1123(b)(3) but completely overlooks section 1123(b)(6) which provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title."  11 U.S.C. § 1123(b)(6).

[178]  Plan ex. A, Art. VI.A [D.I. 8813 at 161-62].

the BSA, and their insurers.[179]   An early out option is more cost-effective and efficient than litigating even a clearly invalid claim.  Defendants and their insurers tend to exercise this quick settlement option to save time and resources in litigation.

87.     The Expedited Distribution is fair, reasonable, and in the best interest of the estates because it preserves Settlement Trust resources for the benefit of holders of Abuse Claims who do not elect to participate in the Expedited Distribution.  Absent such a path, the Settlement Trust would otherwise be required to fully investigate and value "early out" claims for which the claimant would accept relatively minimal compensation.  This process would (a) decrease the amount available to compensate holders of Direct Abuse Claims and (b) likely substantially delay the time it will take for the Settlement Trust to evaluate over 82,200 Abuse Claims and compensate the legally valid and credible Abuse Claims.  Courts have approved similar provisions, even at much higher distribution awards.[180]

88.     Certain Insurers object to the Expedited Distribution as deviating radically from litigation in coverage courts, thereby violating insurer defense rights.[181]   As noted, the Expedited Distribution is entirely consistent with tort system practices.  Moreover, Certain Insurers' present-day objection to the Expedited Distribution is undermined by their prior support for a TDP

---

[179]   Fact and expert testimony will establish that the Debtors would have settled abuse claims for $3,500, or even more, with no investigation or evidence beyond a credible sworn statement providing the information that is sought by the POC form.

[180]   *See In re Roman Catholic Church of Diocese of Tucson*, Bankr. No. 04-04721, at ¶¶ 2.127, 12.4 (Bankr. D. Ariz. Sep. 21, 2005) [D.I. 887] (providing for payment of $15,000 for claims that had been objected to on statute of limitation grounds but were otherwise credible, without requiring evidentiary standards); *see also In re Catholic Diocese of Wilmington, Inc.*, No. 09-13560 (CSS) (Bankr. D. Del. Aug. 8, 2011) [D.I. 1493 Art. 10.6] (providing for payments of $75,000 or $25,000 for holders of abuse claims who had elected such treatment).

[181]   Certain Insurers' Objection at 65 [D.I. 8695].

containing an analogous expedited distribution option.[182]

   **(b)**  **The Trust Claim Submission.**

89.  Holders of Direct Abuse Claims may choose to pursue recovery by making a Trust Claim Submission. To date, each claimant must (a) complete and personally sign the Settlement Trustee's questionnaire under oath, (b) provide all documents relating to the Abuse Claim to the Trustee, and (c) agree to cooperate in further discovery if requested by the Trustee, including by providing documents and cooperating in any written, oral, or medical examinations.[183] Failure to timely make this required submission or cooperate with the Trustee's investigation is grounds for disallowance or significant reduction of the claim.

90.  The Settlement Trustee will consider the information received from the holder of the Abuse Claim (along with any additional information received) to make the allowance decision. The Settlement Trustee will evaluate the credibility and validity of the claim to determine whether it should be allowed. The Settlement Trustee must find that the evidence establishes, by a preponderance of the evidence, (a) the acts of abuse, (b) information sufficient to identify the abuser or confirm the connection of an abuser to Scouting or a Protected Party, (c) that the Abuse Claimant was abused during a Scouting activity, or that the Abuse resulted from involvement in Scouting activities, and that a Protected Party may bear legal responsibility, (d) the date of abuse and claimant's age at the time, and (e) the location of the abuse.[184] The failure to establish any of these criteria, which are sufficient to set forth a *prima facie* case of liability against a Protected

---

[182] As the evidence will establish at confirmation, at the time the Debtors were drafting the TDP, the Certain Insurers advocated for a model provided by Hartford, which also contained an expedited distribution. *See, e.g.,* BSA-Plan_01632052**.**

[183] Plan Ex. A, TDP Art. VII.A.

[184] *See* Plan Ex. A, TDP Art. VII.C.2.

Party for a Direct Abuse Claim, requires the Settlement Trustee to disallow the Direct Abuse Claim.

91.     If a claim is allowed, the Settlement Trustee then assigns a value based upon the Claims Matrix and Scaling Factors. A base value is set by the nature of abuse. The TDP then provides for individualized damages assessments based upon applicable aggravating or mitigating factors as is common in trust distribution procedures in sex abuse cases. Aggravating factors, resulting in increased claim values, include (a) whether the abuser was a repeat offender, (b) whether the abuse caused particularly severe effects, and (c) whether there was evidence that a Protected Party knew or should have known (i) that the Abuser had previously committed or may commit Abuse and failed to take reasonable steps to protect the survivor from that damage, or (ii) of the prior Abuse or the foreseeability of the risk of Abuse and failed to take reasonable steps to protect the survivor from danger. Claims may be reduced based on mitigating factors including (a) non-Scouting relationships or responsibility by a party other than the Protected Parties, (b) limitations to tort recovery, including whether payment has already been made on account of the claim, and (c) either a statute of limitations or repose applies.[185]

92.     At Confirmation, the Debtors will establish that the TDP for Trust Claim Submissions are fair, equitable, and consistent with the Debtors' prepetition practices in resolving tort claims. The TDP provides the Settlement Trustee with the same tools available in the tort system to evaluate a claim and provide for a robust assessment of a claim's validity and attributes. If a claimant establishes the General Criteria by a preponderance of the evidence, the Settlement Trustee will consider whether and how to settle such a claim. The Claims Matrix values and

---

[185] *See* Plan Ex. A, TDP Art. VIII.E.

scaling factors are consistent with and based upon the Debtors' prepetition resolution of Abuse Claims. The Debtors' expert, Dr. Bates, will testify at the Confirmation Hearing that the values for each category of Abuse Claim was based on historical BSA settlements consented to by the Debtors' insurers. The Debtors will also establish that the aggravating and mitigating factors are based on key attributes that would increase, or decrease, the value of abuse claims settled by the Debtors, with the consent of their insurers, prepetition.

93.     Some objecting parties argue that the TDP should not be approved because they differ from litigation in the tort system.[186]  The Debtors will establish at confirmation that such concerns are unfounded, and that the adversarial tort system is not uniquely capable of developing evidence and affording protections to defendants and insurers.  Indeed, courts recently have rejected the contention raised by Certain Insurers that the tort system provides the only fair and just pathway for resolving claims.[187]

94.     Moreover, although not identical, the TDP **do** mimic the tort system, including procedural safeguards, but at much lower administrative cost.  The TDP impose similar burdens of proof and discovery obligations on claimants as the tort system. While the ultimate determination of liability and damages may typically be determined by a jury in the tort system, historically, the Debtors did not take all Abuse Claims to trial; rather, virtually all claims addressed pre-bankruptcy were settled, typically with insurer consent.  Accordingly, any objections on these

---

[186]  Certain Insurers Obj. ¶¶ 36, 40, 45, 181 [D.I. 8695]; Everest Obj. ¶¶ 4-5 [D.I. 8672]; Claimant I.G. Obj. ¶ 4 [D.I. 8692].

[187]  *In re LTL Management, LLC*, Case 21-3058-MBK, Doc. 1572 (Bankr. D.N.J. Jan. 20, 2022) ("What the Court regards as folly is the contention that the tort system offers the **only fair and just pathway** of redress and that other alternatives should simply fall by the wayside…. There is nothing to fear in the migration of tort litigation out of the tort system and into the bankruptcy system.  Rather, this Court regards the chapter 11 process as a meaningful opportunity for justice, which can produce comprehensive, equitable, and timely recoveries for injured parties.  The bankruptcy courts offer a unique opportunity to compel the participation of all parties in interest… in a single forum with an aim of reaching a viable and fair settlement.")

grounds should be overruled.

95.     Certain Insurers object that the TDP circumvent discovery mechanisms available in the tort system, noting that nothing requires that the Settlement Trustee pursue discovery.[188] But this is no different than the tort system, where nothing **requires** defense counsel to pursue all potential avenues of discovery where such discovery is not warranted or economical. There is no reason to doubt that the Settlement Trustee will execute her fiduciary duties and use discovery tools as appropriate.

96.     Certain Insurers also object that the TDP allow for recovery without a finding of negligence.[189] Although inaccurate, to address this concern the Debtors have further clarified that, to be allowed, an Abuse Claim must establish the elements of negligence by a preponderance of the evidence. Indeed, the TDP were revised in the current Plan to note in the General Criteria that an Abuse Claimant must establish "by a preponderance of the evidence . . . that a Protected Party **may bear legal responsibility**."[190]

97.     Several objecting parties dispute the TDP Claims Matrix by arguing that (a) the base and maximum values are inconsistent with historical BSA settlements, (b) the scaling factors are unreasonable and/or not supported by the historical BSA settlement data, and (c) a claimant whose claim would otherwise be barred by a statute of limitations or statute of repose is subject to only a mitigating Scaling Factor.[191] Each of these objections to the Claims Matrix should be overruled.

---

[188]    Certain Insurers' Objection at 64[D.I. 8695].

[189]    *Id.*

[190]    *See* Plan Ex. A, TDP Art. VII.C.2(c).

[191]    Certain Insurers Obj. at 59-60 [D.I. 8695]; Everest Obj. ¶ 5 [D.I. 8672]; *Pro Se* Claimant Obj. ¶ e [D.I. 8658].

98.     The Debtors will establish at Confirmation that the Claims Matrix values and aggravating and mitigating scalars were selected to achieve a fair and reasonable valuation of Abuse Claims based on the Debtors' prepetition practices.[192]  The Base Matrix Values provide a reference point based on historical resolutions from which the current and future Abuse Claims can be valued, and that those base values, combined with the aggravating and mitigating scalars, will allow the Settlement Trustee to arrive at claim amounts wholly consistent with the Debtors' prepetition resolutions of Abuse Claims.  Furthermore, objections to the statutes of limitations and repose as a mitigating Scaling Factor misconstrue the TDP and are without merit.[193]  The Certain Insurers overlook that the TDP are based on the Debtors' historical practices, which included compensation for claims that may have been time-barred under applicable law.[194]

## 2.     The Independent Review Option

99.     Finally, holders of Direct Abuse Claims may elect to participate in the Independent Review Option, pursuant to which a claimant may elect to have an independent, neutral third party selected from a panel of retired judges with tort experience maintained by the Settlement Trust assess their claim and make a settlement recommendation to the Settlement Trustee.[195]  In issuing the Settlement Recommendation, the Neutral must apply the same standard of proof that would apply *under applicable law* and also affords the Responsible Insurers notice and the ability to

---

[192]  Plan Ex. A, TDP Art. VIII.A.

[193]  Certain Insurers' Obj. ¶ 40 [D.I. 8695].

[194]  Evidence at confirmation, including the testimony of the BSA's National Coordinating Counsel, Bruce Griggs, and Adrian Azer, will show that (i) the TDP were meant to emulate the BSA's practice, with insurers' consent, of compensating claims notwithstanding potential statute of limitations defenses, and (ii) statute of limitations or repose defenses did not function to bar recovery against BSA prepetition, and BSA historically paid, through settlement or adverse litigation outcomes, for time barred claims.

[195]  *Id.*

participate in every step of the process.[196]   The Independent Review Option provides an opportunity for increased recoveries, relative to the TDP's Trust Claim Submission, to holders of particularly high-value Direct Abuse Claims.

100.   *First*, because of the potential for increased exposure, the Independent Review Option explicitly allows for significant insurer participation throughout the entire process.[197] Specifically, the Independent Review Option requires that the Responsible Insurers:

(a)   receive prompt notice of any claim where the Direct Abuse Claimant has elected the Independent Review Option;

(b)   be given a reasonable opportunity to Participate in the Independent Review; and

(c)   receive notice of and request for ***consent to*** the Settlement Recommendation.[198]

101.   *Second*, because of the potential for higher recoveries and increased exposure, the Independent Review Option requires a more exacting and rigorous process than the Trust Claim Submission.[199]   A claimant (or a claimant's counsel) must advance administrative fees and provide detailed evidence of many of the same elements found in the General Criteria of Article VII as well as establish that the claim is not barred by statute of limitations.[200]   Specifically, claimants must:

(a)   Elect to participate in the Independent Review Option by January 1, 2023 [to be 6 months after Effective Date];

(b)   Complete and submit the Trust Claim submission by [6 months after Effective Date];

[196]   *Id.*

[197]   *See* Plan Ex. A, TDP Art. XIII.K

[198]   Plan Ex. A, TDP Art. XIII.K.

[199]   *See* Plan Ex. A, TDP Art. XIII.B-G

[200]   *Id.; see also* Michael Burnett Expert Report Regarding Revised TDP ¶ 5.

(c)    Complete and submit a Sexual Abuse Survivor Proof of Claim;

(d)    **Pay** administrative fees between $10,000-$20,000 (in two installments);[201]

(e)    Confirm that the Direct Abuse **Claimant was in Scouting** or attended a Scouting-related event where the Abuse occurred;[202]

(f)    Provide **evidence that the alleged perpetrator was in a Scouting** unit or worked or volunteered at a Scouting-related event;

(g)    Provide evidence that the **claim is timely under the statute of limitations** of the applicable state's law;

(h)    Provide **evidence of negligence** (or other liability) by either the BSA, Local Council, or Chartered Organization;

(i)    Provide **evidence of damages** sustained (such as medical and counseling records) supported by expert report, at claimant's own expense; and

(j)    Subject themselves to substantial discovery, including an up to six-hour interview, mental health examination, or supplemental interrogatory responses at the discretion of the Neutral **OR upon request of a Responsible Insurer, which the Insurer may then attend and participate in**.[203]

102.    Only after a Direct Abuse claimant satisfies the foregoing and the Responsible Insurer has an opportunity to participate and be heard does the Neutral issue a Settlement Recommendation, which may range from zero to a value in excess of the TDP's Maximum Matrix Value.[204]

103.    The fact that the Neutral is only issuing a Settlement Recommendation provides additional procedural guardrails to the process. This structure provides the Settlement Trustee (an

---

[201]  The Settlement Trustee may waive this fee based on the circumstances of a Direct Abuse Claimant. Further, any Direct Abuse Claimant may elect not to proceed with the Neutral's review after payment of the first $10,000 for discovery and prior to payment of the remaining $10,000 for the Neutral's review.

[202]  Such confirmation may be provided via (1) direct evidence of name on a roster, (2) other evidence of attendance at event, or (3) sworn statement by a third party subject to deposition.

[203]  *See* Plan Ex. A, TDP Art. XIII.B-G (emphasis added)

[204]  *Id.*, Article XIII.A. Any Settlement Recommendation excess of five times the Maximum Matrix Value shall be subordinate to "the prior payment by the Settlement Trust in full of all Direct Abuse Claims that are Allowed Abuse Claims as liquidated under the TDP . . ."

unquestionable third-party neutral in Judge Houser) an opportunity to independently evaluate the Settlement Recommendation and decide whether it is appropriate. The process also provides the Responsible Insurer an opportunity to evaluate whether the Settlement Recommendation is appropriate and, therefore agree to either pay or decline payment of the Direct Abuse Claim.

104.    If the Settlement Recommendation is accepted by the Settlement Trustee, the Responsible Insurer may elect to pay or may decline payment. If the Responsible Insurer elects not to pay, the Settlement Trustee is placed in the same position as a policyholder prepetition and may pursue remedies under the insurance policies against the Responsible Insurer.[205] Specifically, the Settlement Trustee has the right to pursue the Responsible Insurer for the full amount of the Settlement Recommendation, plus any bad-faith claims that may arise because of the Responsible Insurer's refusal to abide by their contractual obligations.[206] As with all options under the TDP, the insurer in question retains all its rights under the insurance policies in litigating such an dispute.[207]

105.    Given the foregoing, the Independent Review Option is fair and equitable because (a) it provides higher value Direct Abuse Claims an avenue to receive compensation that is reflective of the tort value of their claims; (b) it is consistent with the Debtors' prepetition practices, where high-value claims were subject to significant evaluation and discovery; and (c) the Responsible Insurers are integrated into the evaluation of the high-value claims and given

---

[205] *Id.*, Article XIII.K ("the Responsible Insurer refuses to pay all or a portion of the Accepted Settlement Recommendation for which it is responsible, then the Settlement Trustee may exercise any and all rights available to it under applicable law, and the Settlement Trustee expressly reserves any and all rights against the Responsible Insurer, including but not limited to agreeing to the Settlement Recommendation and pursuing the Responsible Insurer for any available remedy including, but not limited to breach of contract and bad-faith.").

[206] *Id.*

[207] *Id.*

significant say in the calculation of the Settlement Recommendation (if any), consistent with the tort system and the Responsible Insurers' policies.

106.    Notwithstanding the rigors of this process, the Certain Insurers object to the Independent Review Option, contending that (a) the Neutral is not "independent," even though the TDP requires the appointment of a retired jurist with relevant experience, (b) the Independent Review Option denies insurers' meaningful involvement, notwithstanding the **mandatory** language that a Responsible Insurer have notice and meaningful opportunity to participate in the process – "Any Responsible Insurer **shall** be given a reasonable opportunity to participate in the Independent Review," and (c) the Independent Review Option does not mirror the tort system and highlights the deficiencies in the TDP, even though all avenues for recovery under the TDP, including the Independent Review Option, reflect the Debtors' prepetition evaluation and defense of claims based on their varying values and the manner in which they were prosecuted.[208]  These arguments are entirely without merit and should be overruled.

107.    First, there is no reason to speculate that the Independent Review Option – or the Neutral as provided by the Independent Review Option – will not be neutral.  The panel from which the Neutral will be selected is comprised of retired judges with tort experience.[209]  So, unless the Certain Insurers are impugning the neutrality of retired jurists, the Certain Insurers' assertions are misplaced.  This critique also ignores the express guardrail for maintaining the neutrality of the Independent Review.  The Settlement Trustee – former Judge Houser, who all parties agree is eminently qualified and neutral – must approve of the Settlement Recommendation.[210]  Again,

---

[208]    *See* Certain Insurers' Supplemental Objection (¶¶ 39-54).

[209]    Plan Ex. A, TDP Art. XIII.A.

[210]    *Id.*, Article XIII.A.

unless the Certain Insurers are impugning the neutrality of Judge Houser, then their assertion is completely baseless. Thus, the Certain Insurers' first contention against the Independent Review Option is utterly unfounded.

108.    Second, the Certain Insurers wholly fail to credit their significant participation and consent rights under the Independent Review Option.[211]    As noted above, (a) the Responsible Insurers *must* be provided notice of each and every claim electing the Independent Review Option; (b) the Neutral *must* give the Responsible Insurer the "reasonable opportunity to participate in the Independent Review," including but not limited to participating in any discovery performed by the Neutral; (c) the Responsible Insurer has the right to comment on the Neutral's evaluation, including raising any potentially applicable defenses; (d) the Neutral *must* consider the defenses raised by the Responsible Insurer.[212] Further, the Neutral *must* seek the consent of the Responsible Insurer for any Settlement Recommendation.[213]    These participation and consent rights are what is expressly provided under the Certain Insurers' insurance policies and, as such, the Responsible Insurers are not being deprived of their contractual rights.

109.    Further, the Certain Insurers ignore that the Independent Review Option does not create any obligation for them to pay – the Neutral and Settlement Trustee only approve a Settlement Recommendation.[214]    The Responsible Insurer may decline the Settlement Recommendation and, in that circumstance, the Settlement Trustee has all of rights to pursue the Responsible Insurer, and, as with any coverage litigation following an award under the TDP, the

---

[211]    *See* Plan Ex. A, TDP Art. XIII.K.

[212]    *Id.*

[213]    *Id.*

[214]    *Id.*

Responsible Insurer has all its defenses that would otherwise be available under applicable law.[215] Nothing in the Independent Review Option changes that.

110.    Finally, the Certain Insurers' contention that the Independent Review Option proves the lack of rigor in the TDP is entirely false.[216]  Both the TDP and the Independent Review Option provide for a rigorous vetting process akin to the tort system and the difference between the requirements in the TDP and Independent Review Option is merely reflective of the Debtors' (with the participation of their insurers, as appropriate) prepetition evaluation of claims of varying values, as demonstrated by the following chart:

| Issue[217] | Complaint of Certain Insurers[218] | TDP | Independent Review Option |
|---|---|---|---|
| Defendant Role | Certain Insurers contend that neither the TDP nor the Independent Review option have any Defendant Role, effectively leading to default judgments in any amount "they deem appropriate." | The General Criteria and Scaling Factors generally set forth the criteria that the BSA's National Coordinating Counsel used in evaluating and defending claims. The application of these factors by the Settlement Trustee reflects the "Defendant Role." Furthermore, there is no dispute that the Settlement Trustee (Judge Houser) is a neutral who will impartially evaluate the claims. | The Independent Review Option establishes stringent standards for recovery, including defenses that the Neutral *must* consider.[219]  Further, the Neutral is obligated to allow the Responsible Insurer to participate and must take into consideration any defenses raised when issuing a Settlement Recommendation. |
| Prima Facie case | The Certain Insurers argue that the TDP do not require any showing of | The General Criteria specifically requires a claimant to make showing of "legal | The elements of a prima facie case of negligence are now fully encapsulated by |

[215]  *Id.*

[216]  *See* Certain Insurers' Supplemental Objections ¶ 16.

[217]  Issues related to the SIRs/deductibles and Judgment Reduction are addressed *supra* in section VI.C.1.

[218]  *See* Certain Insurers' Supplemental Objections ¶ 16, chart, generally.

[219]  *See* Plan Ex. A, TDP Art. XIII, generally.

| Issue[217] | Complaint of Certain Insurers[218] | TDP | Independent Review Option |
|---|---|---|---|
| | negligence and the Independent Review Option has a diluted negligence showing. | responsibility."[220] This was inserted into the TDP to address the Certain Insurers' concerns and directly rebuts their contention. | the Independent Review Option, specifically section G.[221] |
| Statute of Limitations | Certain Insurers argue that there is a diluted statute of limitations showing in the TDP that allows compensation for potentially barred claims. | The TDP's scaling factors, mirroring outcomes in the tort system, evaluate any statute of limitations defense, but also take into consideration any exceptions to the statute of limitations.[222] | As TDP, the Independent Review Option considers any statute of limitations defense and exceptions, but the burden is on claimant to provide evidence timeliness (including any applicable exception) under applicable state law.[223] |
| Fact Finder | Certain Insurers argue that the Neutral and Settlement Trustee chosen by plaintiff lawyers cannot replace a judge and jury. | As mentioned, the parties do not dispute the independence and qualifications of the Settlement Trustee (Judge Houser), and therefore this objection is without merit. The Certain Insurers also overlook that the overwhelming majority of abuse claims prepetition were resolved consensually and not by jury trial. | Same as TDP, but in addition, the Neutral is a retired judge and Certain Insurers offer no reason to speculate as to their impartiality. Further, as mentioned, the parties do not dispute the independence and qualifications of the Settlement Trustee and the Settlement Trustee must approve any Settlement Recommendation. |

---

[220] Plan Ex. A, TDP Art. VII.C.2.c ("if the evidence related to the Submitted Abuse Claim is credible and demonstrates, by a preponderance of the evidence, that the Submitted Abuse Claim is entitled to recovery and should be allowed . . . (c) The Abuse Claimant has provided information showing . . . that a Protected Party may bear legal responsibility.").

[221] Plan Ex. A, TDP Art. XIII.G.vi ("Direct Abuse Claimant provides evidence that one or more of the BSA, Local Council, or Chartered Organization was negligent or otherwise liable on account of a Direct Abuse Claim . . .").

[222] Plan Ex. A, TDP Art. IV.A & Art. V.E.

[223] Plan Ex. A, TDP Art.G.v.

| Issue[217] | Complaint of Certain Insurers[218] | TDP | Independent Review Option |
|---|---|---|---|
| | | | Thus, these two neutrals act in the same capacity of a Fact Finder. |
| Claimant Interview | Certain Insurers contend that the TDP have no required claimant interview and that the Independent Review Option has a diluted process. | The TDP specifically provide that the Settlement Trustee may require a claimant interview, but provides the Settlement Trustee discretion. This is commensurate with the BSA's prepetition practices which modulated the level of discovery based on the value of claims.[224] | The Independent Review requires claimant interviews and medical examinations. This interview and medical examination can be requested by the Neutral or *the Responsible Insurer*.[225] |
| Role of Insurer | Certain Insurers contend that they are denied their participation rights in the TDP and have diluted participation rights in the Independent Review Option. | All of the Certain Insurers' rights under their policies, including their right to participate are preserved in Article V.C of the TDP. The Settlement Trustee is free to engage the Certain Insurers in the evaluation of any Direct Abuse Claim.[226] | The Independent Review Option specifically provides that "Any Responsible Insurer *shall* be given a reasonable opportunity to participate in the Independent Review."[227] Thus, the Certain Insurers have all their participation rights in the Independent Review Option. |
| Appellate Right | Certain Insurers claim that the TDP, including the Independent Review, remove the Appellate Rights. | The TDP provide for a Settlement Trustee that is neutral. Further, the TDP do not obligate the insurers to pay and, if the insurers dispute their obligation to pay, then the | As with the TDP, the Independent Review Option does not obligate a Responsible Insurer to pay and the Responsible Insurer will have their |

---

224   Plan Ex. A, TDP Art.VII.A.

225   *See* Plan Ex. A, TDP Art. XIII, generally.

226   *Id.*, Art. V.C.

227   *Id.*

| Issue[217] | Complaint of Certain Insurers[218] | TDP | Independent Review Option |
|---|---|---|---|
| | | reasonableness of any resolution will be resolved in state court.[228] This provides for a review of the Settlement Trustee's determination. | payment obligations resolved in a state court if they refuse to pay – providing for review of the Neutral's and Settlement Trustee's determination. |
| Information Sharing/Document Appendix | Certain Insurers contend that the Document Appendix provides too much information to the Settlement Trust and the Direct Abuse Claimants. | Direct Abuse Claimants would be entitled to discovery of the same documents that they will have access via the Document Appendix. Indeed, the Document Appendix was modeled after what BSA was obligated to produce in prepetition litigation. Further, the Document Appendix specifically preserves all privileged information and that information cannot be shared with any Direct Abuse Claimant. | Same as TDP |
| Settlement | Certain Insurers argue that the TDP deprive them of the right to settle claims and approve settlements and the Independent Review Option provides only limited participation. | As mentioned above, the Certain Insurers' rights are preserved via Article V.C and Article X. The Settlement Trustee may consult with the insurers regarding values and, to the extent that the insurers contend that the contractual requirements of the policies are breached, their remedies are preserved. | As provided above, the Responsible Insurers are able to fully participate in the Independent Review Option in accordance with their rights under the applicable policies, and the Neutral is required to seek consent from Responsible Insurers. Further Insurers are not required under the Independent Review |

---

[228]   Plan Ex. A, TDP Arts. VII.G & XII.

| Issue[217] | Complaint of Certain Insurers[218] | TDP | Independent Review Option |
|---|---|---|---|
| | | | Option to make any payment, and their rights are preserved as in the TDP t. |

111. Because the Debtors have filed TDP that emulate the BSA's prepetition practices for investigating, defending, and resolving Direct Abuse Claims in the tort system, and because the rights of Non-Settling Insurance Companies under their respective policies are expressly preserved, the TDP are fair and equitable and should be approved by the Court under Bankruptcy Rule 9019.

### 3.    The Protective Insurance Provisions

112. Regardless of whether a Direct Abuse Claim is resolved through the Expedited Distribution, a Trust Claim Submission, or the Independent Review Option, the Plan preserves the rights, defenses, and remedies of the Non-Settling Insurance Companies through Article V.C and Article X of the TDP (collectively, the "Protective Insurance Provisions").

113. Article V.C is clear that the TDP are not modifying or impairing any rights of the Non-Settling Insurance Companies, stating, in relevant part:

> Nothing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under an Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of any Non-Settling Insurance Company relating to the TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

114. Article X. of the TDP similarly provides that "the Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies)

pursuant to the Insurance Policies and applicable law."

115.    The Non-Settling Insurance Companies wholly overlook these provisions. Simply put, Article V.C. of the TDP preserves whatever rights and obligations, if any, the Non-Settling Insurance Companies have under the Insurance Policies and Article X. of the TDP permits the Non-Settling Insurance Companies to assert those rights if the Settlement Trustee seeks to recover from one of them. Thus, the Non-Settling Insurance Company can exercise its remedy to deny coverage for any purported breach of the provisions of their insurance policies and litigate that in a subsequent insurance-coverage litigation.

116.    The Protective Insurance Provisions protect the Non-Settling Insurance Companies' rights and defenses with respect to any of the options available to the holder of a Direct Abuse Claim for resolving their Direct Abuse Claim, be it through a Trust Claim Submission, the Independent Review Option, or the election of the Expedited Distribution. Because the Non-Settling Insurance Companies are not prejudiced in any way by the TDP due to the Protective Insurance Provisions, the Non-Settling Insurance Companies do not have any reasonable grounds to assert that the TDP do not qualify as a "fair and equitable settlement."

### 4.    Indirect Abuse Claims.

117.    The TDP also provide a mechanism for the resolution of Indirect Abuse Claims that is fair and reasonable. Certain parties claim that Indirect Abuse Claims are subordinated or receive discriminatory treatment under the TDP because holders of Indirect Abuse Claims must make a showing, unlike holders of Direct Abuse Claims, that the (a) claims are not subject to disallowance under section 502 or subordination under sections 509(c) or 510 of the Bankruptcy Code and (b)

the claims complied with the Bar Date Order.[229]  The objecting parties also argue the TDP do not provide a mechanism for judicial review of the Settlement Trustee's decisions with respect to Indirect Abuse Claims as compared to the tort system alternative available to holders of Direct Abuse Claims.[230]

118.    *First*, the Plan and TDP do not unfairly discriminate against Indirect Abuse Claims because, among other reasons, holders of Indirect Abuse Claims are estimated to receive a recovery of up to 100% after accounting for contributions and insurance rights.[231]  The TDP make clear that Indirect Abuse Claims, including those sought pursuant to rights of subrogation or indemnification, will be paid on par with Direct Abuse Claims.[232]  Recoveries on account of Indirect Abuse Claims that are liquidated, non-contingent, and meet the criteria set forth in the TDP shall be subject to the same liquidation and payment procedures as the Settlement Trust would have afforded the holders of the underlying valid Direct Abuse Claims under the TDP.[233]  Moreover, to the extent the Indirect Abuse Claims become liquidated in the future, Indirect Abuse Claimants can seek reconsideration under section 502(j) of the Bankruptcy Code and may be able to recover, on account of such claim, against the Settlement Trust Assets.[234]

119.    *Second*, the prohibition against unfair discrimination applies only to a dissenting

---

[229]    RCAHC Obj. ¶¶ 10, 109, 184-186 [D.I. 8686]; Allianz Obj. ¶¶ 29, 37 [D.I. 8696].  The Certain Insurers join the arguments related to Indirect Abuse Claims in the Allianz Objection ¶ 154 n.175 [D.I. 8695].

[230]    Allianz Obj. ¶ 38 [D.I. 8696]; RCAHC Obj. ¶¶ 12, 109 [D.I. 8686].

[231]    *See* Disclosure Statement Art. II.H.

[232]    *See* Plan Ex. A, TDP Art. XI.A ("Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX hereof and shall be subject to **the same liquidation and payment procedures** as the Settlement Trust would have afforded the holders of the underlying valid Direct Abuse Claims pursuant to Articles VIII and IX hereof") (emphasis added); *see also* Disclosure Statement Art. II.H (providing that Indirect Abuse Claims and Direct Abuse Claims are estimated to receive the same percentage of recovery).

[233]    *See* Disclosure Statement Art. II.H, n.44.

[234]    Plan Ex. A, TDP Art. IV.B.2.

class that is subject to cram-down under section 1129(b) of the Bankruptcy Code.[235] The Indirect

Abuse Claims are not a dissenting class.[236] Consequently, there is no unfair discrimination.

Accordingly, the Plan and TDP do not unfairly discriminate against Class 9 at all.

### D. The Abuse Claims Settlement.

120. The Plan incorporates and reflects a proposed compromise and settlement of all

Scouting Released Claims, including all Abuse Claims against the Protected Parties, all Pre-1976

Chartered Organization Abuse Claims against the Limited Protected Parties, all Post-1975

Chartered Organization Abuse Claims against the Limited Protected Parties and Opt-Out

Chartered Organization Abuse Claims against Opt-Out Chartered Organizations.

### 1. The Local Council Settlement Contribution under the Abuse Claims Settlement.

121. On account of their own potential liability for Abuse Claims, the Local Councils

have agreed to contribute: (a) $500 million in cash and property, (b) the DST Note in the principal

amount of $100 million,[237] a non-recourse interest-bearing promissory note, (c) their own Local

Council Insurance Policies, and (d) material insurance rights in the BSA Insurance Policies.[238]

122. To determine the amount of the cash and property contributed to the Settlement

Trust from individual Local Councils, the LC Committee worked with Local Councils to build an

---

[235]  *See In re Tribune Co.*, 972 F.3d 228, 242 (3d Cir. 2020) ("Unfair discrimination applies . . . only to classes that dissent"); *In re Nuverra Environmental Solutions, Inc.*, 590 B.R. 75, 90-93 (D. Del. 2018) ("As noted above, in applying the Markell test, and identifying unfair discrimination, the analysis for determining whether the discriminatory treatment is unfair should be viewed by its effect on the dissenting class.")

[236]  *See Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Final Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8345-1]

[237]  Plan Art. I.A.114 (defining DST Note); *see* Plan, Art. V.Y; Plan Ex. F.  The DST Note is in the principal amount of $125 million but $25 million of the aggregate $125 million DST Note is being contributed by Local Councils for the benefit of Participating Chartered Organizations under the Plan.

[238]  *See* Plan Art. V.S.1.a.

allocation model that balanced the estimated liabilities of each Local Council, the effect of the different statute of limitations in each state, the financial ability of each Local Council to contribute and still maintain operations, and perceptions of each Local Council of their exposure and options related to resolving Abuse Claims.[239]

(a)      **Probability of Success in Litigation.**

123.    The Local Council Settlement Contribution resolves the uncertainty concerning, among other things, (a) the amount of the insurance coverage available to cover Abuse Claims against the Local Councils, (b) how such Abuse Claims would be allocated to the Local Council Insurance Policies, and (c) the BSA's and Local Councils' respective unallocated share/uninsured share of responsibility.[240]  The BSA delivers its programs through units generally formed pursuant to agreements between Local Councils and Chartered Organizations.  The Local Councils are named or additional insureds under a substantial portion of the BSA Insurance Policies.  The outcome of any litigation to determine the respective allocated/unallocated and/or uninsured share of responsibility for Abuse Claims is unclear.  Additionally, because each of the Local Councils is a non-profit organization, certain of their assets are alleged to be restricted and therefore could not

---

[239]  *Pro Se* Claimant Nos. SA-101730 & SA-47539 filed an objection with a conclusory statement providing that the Local Councils can contribute more to the Settlement Trust.  No additional facts or analysis to support this statement is included in the objection.  Consequently, *Pro Se* Claimant Nos. SA-101730 & SA-47539 has not rebutted the Debtors' prima facie showing of substantial contribution.  This objection on these grounds should be overruled.  *Pro Se* Claimant Nos. SA-101730 & SA-47539 Obj. at 1 [D.I. 8658].

[240]  *See* Plan Ex. F.

be transferred or used to pay for liabilities related to Abuse Claims.[241]  Litigation to determine the legitimacy of such restrictions would be expensive and time consuming.  The arguments set forth below with respect to the Debtors' Restricted Asset Settlement would apply equally to the Local Councils, which have a substantial amount of investments and real property that are subject to donor-related restrictions.  The Local Council Settlement Contribution offers an immediate sum certain for abuse survivors, whereas the Settlement Trust would be faced with lengthy and protracted litigation against Local Councils with an uncertain outcome.

### (b)    The Likely Difficulties in Collection.

124.    The Settlement Trust's ability to monetize the Abuse Insurance Policies and disburse such proceeds to abuse survivors could be reduced significantly without the Local Council insurance rights.  As explained above with respect to the Settling Insurance Companies, insurance coverage issues and defenses could create challenges in collecting proceeds to cover Local Council Scouting-related Abuse Claims.  In addition, there are about 251 Local Councils across the United

---

[241]  Donations that are made with a restriction as to use or purpose rather than for general charitable purposes are not property of a debtor's estate under 11 U.S.C. § 541 (d).  *See* 11 U.S.C. 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); *see In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 247 (Bankr. W.D. Tex. 2008) (finding restricted funds are not property of the estate); *In re Parkview Hosp.*, 211 B.R. 619, 636 (Bankr. N.D. Ohio 1997) (finding unrestricted donations commingled with restricted donations resulted in a restricted express trust, and was not property of the estate because the debtor-nonprofit hospital solicited donations for the restricted hospital development fund and donors believed their donations to the fund were restricted).  These restricted donations are treated as if in an implied charitable trust for the purpose of protecting the donor's restrictive intent.  *See* 15 Am. Jur. 2d Charities § 8 (2012) ("A condition attached to a gift may be considered as tantamount to imposing a trust, and if the condition involves application for charitable purposes, a charitable trust will result."); Restatement (Third) of Trusts § 28 cmt. a ("A disposition to such an institution for a specific purpose, however, such as to support medical research, perhaps on a particular disease, or to establish a scholarship fund in a certain field of study, creates a charitable trust of which the institution is the trustee for purposes of the terminology and rules of this Restatement"); *Salisbury v. Ameritrust Tex., N.A. (In re Bishop Coll.)*, 151 B.R. 394, 399 (Bankr. N.D. Tex. 1993) ("It is a basic tenet of the law of charitable trusts that beneficial charitable interests are inalienable . . . recognizing an absolute conveyance of trust assets would be violative of basic principles of charitable trust law and the donor's intent.").

States covering geographic areas of varying size, population, and demographics,[242] and each are in different financial situations. Some Local Councils may not have the ability to defend or pay amounts owed to the Abuse claimants for any uninsured liabilities, and if litigation continued against Local Councils, additional bankruptcies would likely result, resulting in additional delays, cost and expense. Importantly, even if Local Councils were hypothetically liquidated, the Local Council liquidation analysis will show that holders of Abuse Claims are receiving a greater recovery under the Plan than they would in such liquidation.

> **(c) The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It.**

125. Litigation involving the merits of Abuse Claims against each Local Council as well as insurance coverage issues related to Abuse Insurance Policies would be complex and expensive. This is in part due to the intertwined nature of the BSA and Local Councils with respect to the services provided and their Insurance Policies. The merits of the coverage and defense issues as well as the Abuse Claims would turn on nuances of the laws of various states, which would be time consuming and inconvenient for either the Settlement Trust or Abuse claimant to litigate to finality. Absent the Local Council Settlement Contribution, it is uncertain how these issues would be resolved, and the BSA would likely incur significant reputational damage as a result of litigation against Local Councils, including with respect to the BSA's ability to attract or maintain donors. Therefore, this factor weighs in favor of approving this settlement.

> **(d) The Paramount Interest of the Creditors.**

126. As the Debtors will show at the Confirmation Hearing, the Local Council Settlement Contribution is significant from a financial perspective in relation to the Local

---

[242] *See* Disclosure Statement Art. III.A.3.a.

Councils' aggregate assets and in relation to the Local Councils' aggregate uninsured liability for Abuse Claims. As the Debtors will show at the Confirmation Hearing, even without accounting for the substantial value attributable to the Local Councils' insurance contribution, the hefty $600 million contribution amounts to a substantial percentage of the Local Councils' aggregate unrestricted net assets. The settlement directly benefits holders of Abuse Claims that would otherwise have to wait—likely for many years—for the Settlement Trust to resolve litigation between the BSA, insurance companies, and Local Councils before receiving compensation. The Local Council Settlement Contribution also provides a global resolution of Scouting-related Abuse Claims against the Debtors and Local Councils, offering a centralized, streamlined, efficient, and equitable process for compensating abuse survivors. Importantly, without the ability to make these insurance-related contributions, the Settling Insurance Companies would not have agreed to settle, resulting in expensive and protracted litigation. While the Local Council Settlement Contribution stands on its own, it is also part of an interrelated group of settlement agreements that each serve as the backbone to the Plan and the global resolution of Abuse Claims and is supported by all supporting parties.

> **2.** **The Contributing and Participating Chartered Organization Settlement Contributions Under the Abuse Claims Settlement.**

127. The Chartered Organization Settlement Contributions[243] arrangement depends on whether (a) the Chartered Organization is either a Contributing or Participating Chartered Organization, (b) there is insurance covering the Abuse Claim and if such insurance policy was issued by either a Settling Insurance Company or Non-Settling Insurance Company, (c) the rights

---

[243] "Chartered Organization Settlement Contributions" includes the Participating Chartered Organization Settlement Contribution and the Contributing Chartered Organization Settlement Contribution under the Plan. *See* Plan Arts. I.A.85 (defining Contributing Chartered Organization Settlement Contribution), I.A.203 (defining Participating Chartered Organization Settlement Contribution).

to be transferred are under an Abuse Insurance Policy, and (d) the Chartered Organization has made a monetary contribution. The extent of the protections afforded each Chartered Organization under the Plan is set forth in the Scouting-Related Release and Channeling Injunction section below. The Local Councils and the BSA made further contributions on behalf of the Participating Chartered Organizations, including the Settlement Growth Payment,[244] and the Supplemental LC Contribution[245] which includes the LC Overage[246] and DST Note Increase.[247] The Local Councils agreed that the Supplemental LC Contribution would serve as consideration for, among other things, a twelve-month post-Effective Date interim injunction (subject to potential further extensions) that will afford Participating Chartered Organizations an opportunity to settle with the Settlement Trust regarding pre-1976 Abuse Claims that are not covered under either a BSA Insurance Policy or a Settling Insurance Company policy.[248] Additionally, a portion of the contributions of the Settling Insurance Companies are being contributed to the Settlement Trust in exchange for a very limited Scouting-Related Release and Channeling Injunction for Opt-Out Chartered Organizations. Taking into account the contributions related to the limited protections afforded Chartered Organizations who do not make their own monetary contribution, coupled with the insurance interests they are contributing to the Settlement Trust, and the fact that a structure

---

[244] *See* Plan I.A.264 (defining Settlement Growth Payment). Based on a 5.5% annual growth rate of BSA youth members and adult volunteers, the Settlement Growth payment will result in an additional $100 million contribution to the Settlement Trust by the end of 2036. *Id.*

[245] *See* Plan I.A.280 (defining Supplemental LC Contribution).

[246] *See* Plan I.A.172 (defining LC Overage).

[247] *See* Plan I.A.115 (defining DST Note Increase). In no circumstance will the DST Note Increase be more than $25 million (for an aggregate amount of $125 million) and, to the extent that the LC Overage is more than $15 million, the DST Note increase may be less than $25 million (though not less than $21 million). *Id.*

[248] *See* Plan Art. I.A.177 ("Limited Protected Party Injunction Date" means the twelve (12) month period following the Effective Date, as may be extended pursuant to the Settlement Trust Agreement, to afford Participating Chartered Organizations an opportunity to negotiate an appropriate settlement with the Settlement Trust and become a Contributing Chartered Organization.").

that allows for the contribution of insurance rights of these Chartered Organizations was a prerequisite to the settlements with Settling Insurance Companies providing the Settlement Trust with the ability to access more than $1.6 billion in insurance proceeds, the settlement is in the best interests of the Debtors and their estates and should be approved.

### (a)     Probability of Success in Litigation.

128.    Many of the insurance-related issues involve Chartered Organizations.  These issued include, among other things, (a) whether the Chartered Organizations were covered under the BSA Insurance Policies in 1976 and 1977, which only referred to "sponsors", (b) whether the Chartered Organizations need to meet certain deductibles for each occurrence under the BSA 1978 to 1980 Insurance Policies before they can access the proceeds thereunder, (c) whether Chartered Organizations would have primary access to the BSA Insurance Policies for pre-1984 Abuse Claims without an endorsement expressly providing that the Insurance Policies would be primary insurance for Chartered Organizations, (d) whether the Chartered Organizations are additional insureds under the Local Council Insurance Policies, (e) the amount of the insurance coverage available to cover Abuse Claims against the Local Councils and Chartered Organizations and how such Claims would be allocated under the applicable policies, and (f) the amount of the BSA's, Local Council's, or Chartered Organization's respective unallocated share and/or uninsured share of responsibility.  The outcome of these and other issues are complicated and uncertain.  Resolving these complicated insurance-related issues with the Chartered Organizations through the proposed settlement eliminates the time and expense that would be required to resolve these complex matters through litigation.

### (b)     The Likely Difficulties in Collection.

129.    Given that the results of potential litigation against the Chartered Organizations

with respect to Abuse Claims are uncertain, the difficulties in collection are substantial. There are

tens of thousands of Chartered Organizations across the United States.[249] Moreover, the financial

condition of each of the thousands of Chartered Organizations varies and could implicate issues

that involve their own independent insurance policies. Even if holders of Abuse Claims or the

Settlement Trust were successful in obtaining a judgment against a Chartered Organization, they

could face significant difficulties collecting from the Insurance Companies due to the intertwined

relationship between the Chartered Organizations and the Abuse Insurance Policies.

      **(c)**      **The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It.**

130.    As described above, litigation related to Abuse Claims against Chartered

Organizations, Chartered Organization coverage and defenses to such coverage under the Abuse

Insurance Policies would turn on nuances in state tort and insurance laws. This means that the

outcome of the litigation would vary from state to state. Extensive discovery and experts would

be needed to resolve these disputes. The expenses associated therewith would be tremendous,

especially given that the litigation against each Chartered Organization for every potential Abuse

claim would need to be conducted on a case-by-case basis. These considerations show that the

complexities and costs of litigating such matters to finality would be detrimental to abuse

survivors, as they would experience further delays and challenges to their ability to recover on

account of their Abuse Claims.

      **(d)**      **The Paramount Interest of the Creditors.**

131.    The Chartered Organization Settlement Contribution provides certainty as to how

Abuse Claims implicating the insurance policies issued by the Settling Insurance Companies

---

[249] *See* Disclosure Statement Art. III.3.b.

would be resolved. In the alternative, holders of Abuse Claims and/or the Settlement Trust would have to litigate those matters in a tort system where they are unlikely to collect on the same timeline, manner, and amount as would be available under the Chartered Organization Settlement Contribution under the Abuse Claims Settlement. Moreover, without the settlements related to Participating and Opt-Out Chartered Organizations, the Settling Insurance Companies would not have entered into settlements under the Plan to provide more than $1.6 billion of contributions to satisfy Abuse Claims. Each of the settlements within the Abuse Claims Settlement works in conjunction with, and is dependent upon, each of the other settlements in the Plan to provide a global resolution to Abuse Claims.

### E.    The TCJC Settlement.

132.    Under the TCJC Settlement, the TCJC will (a) contribute $250 million in cash to the Settlement Trust, (b) release any potential claims against the Debtors, Reorganized BSA, Settling Insurance Companies, or Settlement Trust, and (c) contribute its rights under valuable insurance policies.[250] TCJC's contribution will be used to pay abuse survivors with a claim against TCJC in addition to paying a pro rata share of Settlement Trust expenses. Any excess funds will be available to be distributed to other abuse survivors. The Debtors' expert, Dr. Bates, will testify that the $250 million contribution from TCJC reasonably covers TCJC's portion of Abuse Claims.

### 1.    Probability of Success in Litigation.

133.    The probability of success in litigation against TCJC to recover for its liabilities for Abuse Claims is uncertain. TCJC is in a unique position compared to other Chartered Organizations. TCJC had been an important Chartered Organization and partner of all Scouting

---

[250] *See* Plan Ex. J-1, TCJC Settlement Agreement §§ II.1.A, E.

programs around the world, including the BSA, from 1913 until December 31, 2019. For about 105 years, any TCJC activities between children and adults necessarily involved Scouting.[251] During this time, Scouting was the officially TCJC sponsored program for TCJC young men. Given this 105-year relationship and the level of involvement and participation by TCJC members, TCJC may have more exposure to Abuse Claims than other Chartered Organizations.

134. However, TCJC believes it may have its own claims and defenses to such exposure. Historically, in settlements with abuse survivors, TCJC has been apportioned only a portion of the total liability of any Abuse Claim, and TCJC submits that it has significant and potentially meritorious defenses to Abuse Claims that pose impediments to obtaining recoveries on behalf of holders of Abuse Claims.[252] Dr. Bates will testify that he identified 2,854 Proofs of Claim that explicitly self-identified as having a claim against TCJC. Additionally, Dr. Bates will testify he estimates that 7,716 of the 82,209 Abuse Claims filed in these Chapter 11 Cases may potentially be associated with TCJC under certain criteria.[253] TCJC argues that the vast majority of the potential 7,716 claims identified have no connection to TCJC or are invalid for other reasons as to TCJC.[254] TCJC believes that, based on its statistical sampling and analysis of TCJC's historical records, only 324 claims may potentially have value in the tort system, and between 534 and 1,379

---

[251]  While TCJC was integrated in Scouting, an adult interacting with youth would act on behalf of both TCJC and Scouting simultaneously. During the TCJC and BSA relationship, any TCJC interactions between youth and adults necessarily involved Scouting and, as a result, any abuse that occurred in that context involved Scouting.

[252]  *See* Disclosure Statement Art. V.S.4.a.

[253]  The 7,716 of the 82,209 Abuse Claims potentially associated with TCJC includes (a) the 2,854 proofs of claim that directly identified the Mormon Church, (b) Abuse Claims that shared common characteristics with other sets of Abuse Claims that had been flagged as being affiliated with TCJC (*e.g.*, an Abuse Claim who identified as the alleged abuser an individual that was common to Abuse Claims that had identified TCJC), and (c) Abuse Claims that identified on at least one proof of claim submission a Local Council that was predominately affiliated with TCJC..

[254]  *See* Disclosure Statement Art. V.S.4.a.

proofs of claim may be associated with TCJC.[255]

135.     Litigation over whether and the extent to which TCJC would have legal responsibility for such Abuse Claims is uncertain, as each Abuse Claim would need to be decided on a case-to-case basis and turn on questions of state law, including whether the TCJC bears a proportional share of liability for such Abuse Claims.  The daily operations of a scout troop were administered by TCJC pursuant to BSA guidelines, and each TCJC adult leader in Scouting had to be approved by the BSA.  Claims against TCJC and the Debtors are inextricably intertwined. Additionally, TCJC is an additional insured under certain BSA Insurance Policies, as detailed below.  Consequently, TCJC would only be responsible for a limited share of financial responsibility for the Abuse Claims associated with TCJC.

## 2.     The Likely Difficulties in Collection.

136.     Holders of Abuse Claims against TCJC would have significant difficulties in collecting either from the applicable Settling Insurance Companies for the reasons stated above or from TCJC with respect to uninsured amounts for Abuse Claims that arose prior to 1976.  With respect to Abuse Claims that arose prior to 1976, Dr. Bates will testify that he estimates the total valuation for the 2,854 Abuse Claims that identify TCJC in a proof of claim is $57 million. Although the Debtors' position is that the BSA Insurance Policy may not cover such pre-1976 TCJC Abuse Claims, TCJC believes it is covered because TCJC is an insured in at least some of the pre-1976 Local Council Insurance Policies.  As such, TCJC may not be responsible for all of the value of Abuse Claims that implicate it.

137.     TCJC's financial responsibility for post-1975 Abuse Claims may be further limited

---

[255]  *See* Disclosure Statement Art. V.S.4.a.

because such Abuse Claims may trigger coverage under the BSA Insurance Policies.[256]  Even assuming such post-1975 Abuse Claims are not covered under the BSA's Insurance Policies, TCJC would likely assert an indemnity claim against the BSA.  Prior to the Petition Date, TCJC asserted various liquidated and unliquidated indemnification claims against the Debtors relating to the defense and resolution of Abuse Claims that have been and may be asserted against TCJC in the tort system.[257]  The TCJC's asserted indemnification claims against the Debtors are in excess of $33 million.[258]  TCJC's potential indemnification claims could, if successful, potentially reduce any recoveries against TCJC on account of such Abuse Claims.  Absent the TCJC Settlement, TCJC could undertake actions that would deplete the pool of assets available to holders of Direct Abuse Claims.

### 3. The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It.

138.   It is undisputed that the litigation of Abuse Claims against TCJC would involve extensive discovery, motion practice, expert testimony, and possible trial practice for the same reasons stated with respect to the applicable Settling Insurance Companies and Chartered Organizations.  The insurance coverage issues and the veracity of each Abuse Claim are fact intensive and involve complex legal issues.  Since 1959, TCJC's participation steadily increased until the termination of its affiliation with the BSA.  For at least part of the time during which TCJC was a Chartered Organization, it shared certain co-insurance rights with the BSA under the BSA Insurance Policies.  Litigation regarding whether TCJC is covered under a pre-1976 BSA Insurance Policy would be highly disputed, protracted, and costly.

---

[256]   *See* Disclosure Statement Art. V.S.4.a.

[257]   *See* Disclosure Statement Art. V.S.4.a.

[258]   *See* Disclosure Statement Art. V.S.4.a.

139.    Each Abuse Claim would also necessarily entail an analysis of which party (the BSA/TCJC/Local Council/Perpetrator) bears responsibility and, if so, how much responsibility and whether the claims triggers coverage under a particular insurance policy.[259]    TCJC would be just one of multiple potentially liable parties.    On the one hand, TCJC would argue that an Abuse Claim is attributable to BSA or Local Councils, and on the other hand, the BSA or Local Councils would likely argue the Abuse Claim is attributable to TCJC.    Due to their unique relationship, the BSA and TCJC were inseparable in administering the Scouting program during their relationship. Resolving these disputes through litigation would result in significant cost and expense and result in delayed and uncertain recoveries to abuse survivors.

140.    Although there is some degree of regional concentration, the Abuse Claims are also not confined to any particular jurisdiction.    The Abuse Claims against TCJC allege abuse in many western states, such as Idaho, which have a tighter statute of limitations window.    Consequently, survivors will have challenges collecting in those jurisdictions absent the TCJC Settlement.    Every abuse survivor and/or Settlement Trust would likely need to engage in protracted litigation that could include extensive discovery (including seeking discovery in the form of documents and depositions from the BSA and Local Councils) in order to determine the value and allocation of responsibility with respect to each Abuse Claim prior to collection.

### 4.    The Paramount Interest of the Creditors.

141.    The TCJC Settlement directly provides a $250 million contribution to the Settlement Trust, which will be immediately accessible.[260]    The Debtors believe that the $250 million settlement amount is reasonable based on the Debtors' analysis of potential liability for

---

[259]    *See* Disclosure Statement Art. V.S.4.a.

[260]    *See* Plan Ex. J-1, TCJC Settlement Agreement §§ II.1.A-B.

certain Abuse Claims that may be attributable to TCJC.[261] Dr. Bates will testify that the tort system value of the 2,854 Abuse Claims that identified TCJC on a Proof of Claim are valued at approximately $170 million. Importantly, this estimate represents the total value which could potentially be attributable to any mix of BSA-related parties including the Debtors and Local Councils, and not solely the amount for which TCJC is responsible. The value of these Abuse Claims attributable solely to TCJC would necessarily be only some share of this $170 million total. When considering the 7,716 Abuse Claims that actually or could potentially implicate TCJC, based on location or other correlations with TCJC claims, Dr. Bates will testify the overall value of such claims is $297 million prior to 1976 and $348 million for 1976 and later. These amounts represent the total exposure on these Abuse Claims, not the amount of liability attributable to TCJC. And, as noted above, due to insurance and potential indemnity claims, the TCJC's potential liability/responsibility to pay amounts related to claims arising post-1975 is strongly disputed. Thus, the $250 million settlement amount is reasonable when considering TCJC's share of liability for all Abuse Claims, given there is some portion of the claims that would be subject to apportionment to other parties, insurance coverage or indemnity obligations. Pursuant to the terms of the TCJC Settlement, TCJC also agreed to waive all claims against, among others, the Debtors and Reorganized BSA, including various claims for indemnification and contribution from the BSA relating to the defense and resolution of Abuse Claims against TCJC.[262] Further, TCJC's cooperation is critical to accessing important and valuable insurance rights. As will be shown at the Confirmation Hearing, TCJC's $250 million contribution plus insurance rights and release of claims against the Debtors far exceeds the lowest rung on the range of reasonableness. The

---

[261] *See* Disclosure Statement Art. V.S.4.a.

[262] *See* Plan Ex. J-1, TCJC Settlement Agreement § III.A.

Settlement with the TCJC should be approved.

**F.     The United Methodist Settlement Agreement.**

142.    The United Methodist Entities are contributing $30 million in cash to the Settlement Trust, releasing claims against the Settling Insurance Companies and the Debtors, transferring the same rights as a Participating Chartered Organization including valuable rights under insurance policies, and agreeing to cooperate with the Debtors' youth protection efforts. In addition, the United Methodist Entities are agreeing to support the Debtors' growth, which is crucial for the Debtors' future ability to continue the mission of Scouting. Rather than threatening to disaffiliate with the BSA, the UMAHC has agreed to recommend that the General Commission on United Methodist Men continue its ongoing relationship with the BSA and to support Scouting through 2036. In exchange for all of these valuable contributions, the United Methodist Entities will become a Protected Party under the Scouting-Related Release and Channeling Injunction.[263]

**1.     Probability of Success in Litigation.**

143.    The prospect of success in litigation against the United Methodist Entities regarding their liabilities for Abuse Claims is uncertain for the same reasons stated above with respect to the Chartered Organizations. The merits of each Claim against a Methodist Church and any related claim the church may assert against the Debtors would nevertheless need to be decided on a case-by-case basis. Any such litigation would potentially involve resolving whether the BSA has an obligation to indemnify the United Methodist Entities for any injuries or damages arising out of official Scouting activities or out of the BSA membership standards. Absent the United Methodist Settlement, it is unclear how the insurance and indemnity issues would be resolved.

---

[263] *See* Plan Ex. J-1, United Methodist Settlement Agreement Term Sheet § 2.

144.     Moreover, there are other impediments that exist and create uncertainty with respect to litigation outcomes with the United Methodist Entities.  For example, the Abuse Claims that are potentially associated with the United Methodist Entities could be attributable to any combination of liable parties including, among others, the alleged perpetrator, parents, and BSA-related parties including the Debtors and Local Councils.

## 2.     The Likely Difficulties in Collection.

145.     As will be demonstrated at the Confirmation Hearing, there are many difficulties in collecting from the United Methodist Entities because they are a highly diffused group with a highly decentralized legal and organizational structure.   Typically, Chartered Organization agreements are entered into at the lowest level, such as a local parish.  Recoveries from actions against any particular parish would be very uncertain, and there is a risk that a particular United Methodist Entity might not be able to satisfy any uninsured portion of a valid Abuse Claim.  The United Methodist Entities may also have limited practical exposure to post-1975 Abuse Claims because such Abuse Claims may trigger coverage under the BSA Insurance Policies.  The United Methodist Entities have alleged that the BSA has an obligation to indemnify or hold them harmless for any injuries or damages arising out of official Scouting activities or out of BSA membership standards regardless of time period, including Abuse Claims that first occurred prior to January 1, 1976.  Moreover, the United Methodist Entities would not agree to (a) contribute the $30 million, (b) contribute valuable insurance rights, and (c) commit to continue to support Scouting absent the settlement.

## 3.     The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It.

146.     The same complex issues, expense concerns, inconveniences, and delays that arise with respect to Chartered Organizations apply to the United Methodist Entities and support

approving the United Methodists Settlement. Each Abuse Claim would inevitably entail a complicated, likely protracted analysis of which party bears responsibility and whether insurance covers the claims. Resolution of these disputes would inevitably require the BSA to produce witnesses and documents, causing the BSA to incur expense and distract the BSA in its efforts to successfully reorganize. Moreover, for at least part of the time during which the United Methodist Entities were Chartered Organizations, the United Methodist Entities shared certain co-insurance rights with the BSA under the BSA's Insurance Policies. Litigation regarding whether the United Methodists are covered under a pre-1976 BSA Insurance Policy would be expensive and time-consuming.

### 4. The Paramount Interest of the Creditors.

147. The United Methodist Settlement provides holders of Abuse Claims with access to $30 million now and without the need for litigation.[264] In essence, the contributions of the United Methodist Entities should be evaluated in comparison to the liabilities those contributions satisfy. Without the contributions, the United Methodist Entities would be Participating Chartered Organizations and enjoy a post-1976 channeling injunction for Abuse Claims and pre-1976 channeling injunction for Abuse Claims covered under an insurance policy issued by a Settling Insurance Company. Instead, because of their monetary contribution, the United Methodists will be Contributing Chartered Organizations and receive an incremental injunction for the pre-1976 period for Abuse Claims related to unsettled insurance or where there was no insurance at all – i.e, a limited subset of the claims. Thus, the United Methodist Settlement Contribution is substantial and meets the best interests of the Debtors and their estates. This is particularly true when taking

---

[264] *See* Plan Ex. J-2, United Methodist Settlement Agreement, Term Sheet § 2.a.i.

into account that claimants are better off with the settlement, as there is no guarantee that the United Methodist Entities would contribute more without the settlement. Absent the settlement, the Estates would incur more litigation costs and expenses litigating issues with the Methodists at confirmation, diminishing the ultimate value that would otherwise go to Abuse claimants. The United Methodist Settlement also requires the United Methodist Entities to waive and release any claims against the Debtors filed in these Chapter 11 Cases (which claims would be channeled to the Settlement Trust and paid out of those assets).[265]

148.    Additionally, ongoing support from the BSA's largest Chartered Organization is essential to the reorganization. The United Methodist Entities are a key part of the BSA's growth strategy and successful reorganization because the United Methodist Entities sponsor units representing approximately 20% of the BSA's youth membership.

149.    The United Methodist Entities commitment to support scouting through 2036 mitigates significant downside risk to the BSA's membership forecast. Lastly, abuse survivors are also benefitting from the agreement reached regarding youth protection. The settlement strengthens youth protection efforts, provides the opportunity for abuse survivors to be heard, and prioritizes a safe Scouting environment for all participants. The United Methodist Settlement requires the United Methodist Entities to cooperate with Youth Protection efforts, including, but not limited to, encouraging (a) all United Methodist U.S. Congregations involved with youth programming review and follow policies and procedures regarding best practices for youth protection, (b) all United Methodist Entities take any and all actions, with input from the Survivors Working Group, to enhance youth protection for United Methodist Entities engaged in Scouting,

---

[265]    *See* Plan Ex. J-2, United Methodist Settlement Agreement, Term Sheet § 2.a.iii.

and (c) all United Methodist Entities to provide each survivor who was a part of a Boy Scouts Troop or Cub Pack that the United Methodist Entities charter with opportunities to share their experience, suggestions, and recommendations.[266]

**G.   The JPM / Creditors' Committee Settlement.**

150.   Following the Petition Date, the Creditors' Committee, the TCC, and FCR raised with JPM and the Debtors, among other issues, potential challenges that the Creditors' Committee, the TCC, and FCR could bring with respect to the collateral securing the Debtors' prepetition credit facilities with JPM.  The Debtors, JPM, and the Creditors' Committee, with the active assistance of the Court-appointed Mediators, engaged in lengthy, extensive, good faith and arm's length negotiations to resolve these potential challenges.  The result of those mediation sessions was the entry into the JPM / Creditors' Committee Settlement on March 1, 2021.  While the TCC and FCR did not support the JPM / Creditors' Committee Settlement at that time, they later agreed to do so as part of the RSA.[267]  Subsequently, the JPM / Creditors' Committee Settlement was incorporated into the Plan, and is currently supported by all major claimant constituencies.[268]

151.   The JPM / Creditors' Committee Settlement provides that the Reorganized BSA and JPM will enter into Restated Debt and Security Documents on substantially similar terms to the Prepetition Debt and Security Documents except that, among other things, the maturity dates will be ten years after the Effective Date and principal will be payable in installments beginning two years after the Effective Date.[269]  JPM was also granted Allowed Claims on account of the Prepetition Debt and Security Documents; and the Creditors' Committee agreed not to challenge

---

[266]   *See* Plan Ex. J-2, United Methodist Settlement Agreement, Term Sheet § 2.a.vii.

[267]   *See* Restructuring Support Agreement ("RSA") ¶ 2 [D.I. 5466-2].

[268]   *See* Plan Art. V.S.2.

[269]   *See* First Mediators' Report, Ex. A, JPM / Creditors' Committee Settlement Term Sheet at 1.

those Claims and not pursue any other alleged Estate Causes of Action against JPM.  As a result of this settlement, JPM's secured claims—which totaled approximately $328,104,155 as of the Petition Date—will be paid in full.

152.    The JPM / Creditors' Committee Settlement provides that the General Unsecured Claims should be classified into three classes: (a) General Unsecured Claims; (b) Convenience Claims; and (c) Non-Abuse Litigation Claims.[270]   Holders of Allowed Unsecured Claims will receive their pro rata share of the Core Value Cash Pool that the Reorganized BSA will fund in four semi-annual installments of $6.25 million beginning 180 days after the Effective Date and concluding two years after the Effective Date.[271]   Holders of General Unsecured Claims or Non-Abuse Litigation Claims that have an Allowed Claim of $50,000 or less will become Convenience Class Claims, which are paid in full.[272]   General Unsecured Claimants can elect to be treated as Convenience Class claimants.

### 1.    Probability of Success in Litigation.

153.    The first factor favors the JPM / Creditors' Committee Settlement.  JPM is the prepetition lender to the BSA with respect to the 2010 credit facility, 2010 Bond, 2012 Bond, and 2012 revolver loan.  The Creditors' Committee, TCC, and FCR investigated potential claims against JPM related to such prepetition debt.  These parties had until March 12, 2021, pursuant to the Cash Collateral Order, to seek standing to assert claims against JPM with respect to the loans and bonds as well as JPM's security interest in the intercompany note that Arrow issued in favor

---

[270]   *See* First Mediators' Report, Ex. A, JPM / Creditors' Committee Settlement Term Sheet at 4.

[271]   *See* First Mediators' Report, Ex. A, JPM / Creditors' Committee Settlement Term Sheet at 4-5.

[272]   *See* First Mediators' Report, Ex. A, JPM / Creditors' Committee Settlement Term Sheet at 5.

of the BSA. A deed of trust on the Summit secures the intercompany note.[273] JPM, the Creditors'

Committee, and the Debtors engaged in extensive negotiations to resolve such potential claims

during mediation sessions. Ultimately, these parties agreed to a settlement that avoids litigating

all of those potential claims, provides significant value to holders of unsecured claims, and

provided a more certain resolution.

154. Initially, the TCC and FCR did not support the JPM / Creditors' Committee

Settlement and filed a standing motion that included five counts on March 12, 2021.[274] Both the

Debtors and JPM opposed the motion.[275] The counts alleged that (a) the intercompany note

between the BSA and Arrow is not a legitimate debt of Arrow to the BSA and should be

recharacterized as an equity or capital contribution, (b) JPM had no allowable claim against Arrow

and the Summit Bechtel Reserve is free and clear of any lien or security interest, (c) JPM's liens,

security interests, and claims on certain of the Debtors' assets were not valid, (d) JPM failed to

perfect its asserted liens, claims, and interests in certain of the Debtors' assets, and (e) certain

prepetition obligations that the Debtors owed to JPM (*i.e.*, accrued interest, fees, and expenses)

should not be paid.[276] After the hearing the standing motion, the Court issued an Order adjourning

---

[273] *See* Credit Line Deed of Trust, Jun. 30, 2010; First Amendment to Credit Line Deed of Trust, Mar. 21, 2019; Amended and Restated Promissory Note, Mar. 21, 2019; Collateral Assignment of Promissory Note and Credit Line Deed of Trust, Mar. 21, 2019.

[274] *Joint Motion of the Official Tort Claimants' Committee and Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [D.I. 2364] (hereinafter cited as "Standing Motion").

[275] *Debtors' Objection to Joint Motion of the Official Tort Claimants' Committee and Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [D.I. 2733]; *JPMorgan Chase Bank, National Association's Objection to Joint Motion of the Official Tort Claimants' Committee and Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [D.I. 2732]

[276] *See* Standing Motion.

the motion until after the Confirmation Hearing.[277]  JPM, the Debtors, the FCR, the Coalition, and

the TCC subsequently engaged in mediation to resolve their disputes.  If the parties litigated these

counts, JPM indicated that it would deny and defend any liability with respect to the previously-

described counts, leading to uncertainty as to how such claims would be resolved.  Therefore, this

factor favors approving the settlement.

### 2. The Likely Difficulties in Collection.

155.    The JPM / Creditors' Committee Settlement guarantees that holders of General

Unsecured Claims will receive the $25 million Core Value Cash Pool, providing them with an

estimated recovery of between 75% and 95%, and that holders of Convenience Claims will be paid

in full.  In connection with the settlement, JPM made concessions to the Debtors that were not

legally required, and those concessions are material to the Debtors' ability to pay those creditors

under the Plan.  For example, JPM agreed to an amortization holiday, which provides the Debtors

with additional liquidity that can be used to fund distributions to creditors as described in more

detail below.  Further, litigation challenging JPM's liens could create other collectability issues

for unsecured creditors.  If the liens are found to be invalid, then JPM would share in the general

unsecured claims recovery pool, decreasing the amount of funds available to pay other general

unsecured creditors.  Therefore, this factor weighs in favor of approving the JPM / Creditors'

Committee Settlement.

### 3. The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay of Attending to It.

156.    Any challenges to JPM's liens and claims under the prepetition debt would require

---

[277] *Order Adjourning Joint Motion of the Official Tort Claimants' Committee and Future* Claimants' *Representative for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estate* [D.I 5073].

the party to first obtain standing, which JPM would oppose. The issues raised in connection with a standing request includes the viability of the underlying claims to be raised if standing is granted.[278] The claims that would be asserted include avoidance actions, which relate to the validity of liens, require interpreting credit agreements and indentures, and raise valuation issues. Litigation to determine the validity of liens would require extensive fact discovery and expert testimony. If this Court were to grant standing and ultimately reach the merits of these claims, then the aggrieved party would have appellate rights, which could further prolong the case. Litigation under these circumstances would be complex, require the estate to expend additional resources with no guarantee of a return, and create the potential for substantial delay, jeopardizing both the Debtors' ability to successfully reorganize and creditors' recoveries. Unsecured claimants would be harmed in the end because their recoveries are not guaranteed to increase even if the liens are clawed back and JPM's claims are disallowed, and would certainly decrease if they do not prevail in the litigation as explained above.

### 4. The Paramount Interest of the Creditors.

157. The JPM / Creditors' Committee Settlement is in the best interest of the creditors. This agreement provides significant value to the BSA, holders of General Unsecured Claims, and holders of Abuse Claims. JPM agreed to a 24-month amortization holiday with the amortization deferred until maturity.[279] This amortization holiday defers approximately $28 million in principal payments, which provides the Reorganized BSA with the liquidity necessary to pay the $25 million Core Value Cash Pool to the holders of General Unsecured Claims, providing the General

---

[278] *See, e.g.*, *In re Centaur, LLC*, Bankr. Case No. 10-10799 KJC, 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (explaining that, under Third Circuit case law, "derivative standing requires . . . a colorable claim"); *In re Yes! Entertainment Corp.*, 316 B.R. 141, 145 (D. Del. 2004) (same).

[279] *See* First Mediators' Report, Ex. A, JPM / Creditors' Committee Settlement Term Sheet at 1-2.

Unsecured Claims with an estimated recovery between 75% and 95%. JPM also agreed to extend the maturity dates on each component of the Debtors' debt to ten years from the Effective Date and to maintain the current low interest rate structure, averaging 2.52% with 71% of the JPM debt being at a fixed rate.[280] The maturity extensions and low interest rates also allow the Debtors to make a larger contribution to the Settlement Trust than would otherwise be possible.

158. Additionally, the JPM / Creditors' Committee Settlement also permits certain junior debt to be issued and paid ahead of the JPM secured debt, specifically allowing for the $42.8 million Foundation Loan to be entered into on the Effective Date, virtually all of which is paid through scheduled amortization before the JPM debt matures. Principal and interest payments begin three months after the Effective Date or twenty-one months prior to the first required principal payments under the JPM secured debt.[281] The Foundation Loan, which provides the BSA with up to $42.8 million (the value of JPM's security interest in the Arrow Note), provides Reorganized BSA with critical capital to fund its operational needs and additional liquidity post emergence. And all significant creditor constituencies support the JPM / Creditors' Committee Settlement, showing that it is in the best interest of creditors.

## H. The Settlement of Restricted and Core Asset Disputes.

159. From the outset of these proceedings, the TCC has questioned the restrictions on the Debtors' assets. The TCC filed an adversary proceeding against the Debtors on January 8, 2021, seeking among other things to invalidate certain legal restrictions on certain cash and investments.[282] Among other things, the TCC challenged restrictions on the Debtors' Bank

---

[280] *See* First Mediators' Report, Ex. A, JPM / Creditors' Committee Settlement Term Sheet at 1-2

[281] *See* First Mediators' Report, Ex. A, JPM / Creditors' Committee Settlement Term Sheet at 1-2.

[282] TCC Complaint for Declaratory Judgement, Adv. Pro. No. 21-50032 [Adv. Pro. D.I. 1].

Account Cash, General Investment Funds, High Adventure Bases, and Donor Restricted Pledges receivable.[283]  Thereafter, the Debtors timely filed their answer.[284]

160.    The Debtors, the Coalition, the TCC, and FCR, with the active assistance of Court-appointed Mediators, subsequently engaged in lengthy, extensive, good faith and arm's length negotiations to resolve the dispute.  After months of mediation, the Debtors, the Coalition, the TCC, and FCR ultimately reached a settlement as to the Debtors' contribution to the Settlement Trust in connection with the Plan, the terms of which were memorialized in the RSA, which resolved the Restricted Asset Dispute.[285]  Even though the RSA expired by its terms on August 27, 2021, this settlement has been incorporated into the Plan, which is now supported by all major claimant constituencies.[286]

161.    The settlement provides that the Debtors will reduce the minimum amount of Unrestricted Cash and Investments that the Reorganized BSA will retain on the Effective Date from $75 million to $25 million (subject to potential variance as set forth in Article V.M. of the Plan).[287]  It also requires the BSA to issue the $80 million BSA Settlement Trust Note to the Settlement Trust.[288]  The Debtors also agreed to fund the $25 million Core Value Cash Pool and make the BSA Settlement Trust Contribution, including all of the Net Unrestricted Cash and Investments.[289]

### 1.    Probability of Success in Litigation.

---

[283]   TCC Complaint for Declaratory Judgement, Adv. Pro. No. 21-50032 [Adv. Pro. D.I. 1].

[284]   Debtors' Answer, Adv. Pro. No. 21-50032 [Adv. Pro. D.I. 16].

[285]   *See* RSA ¶¶ 1-2 [D.I. 5466-2].

[286]   *See* Plan Art. V.S.3.

[287]   *See* Plan Art. V.S.3.

[288]   *See* Plan Art. V.S.3.

[289]   *See* Plan Art. V.S.3.

162.     The TCC initiated the adversary proceeding regarding the Debtors' Identified Properties (attached as Exhibit E-1 to the Disclosure Statement) in January 2021.  The litigation centered around whether such properties (particularly the Restricted Cash and Investments) were subject to legal restrictions and, if not, whether the assets would otherwise be available to satisfy Abuse Claims.  The matter was ultimately stayed in July 2021 in connection with the RSA.[290]  Litigation regarding the restrictions on assets would be lengthy and costly, particularly given the discovery and expert analysis that would be required to establish or challenge the viability of the restrictions on the Debtors' assets.  Many of the properties or investments involved in this dispute were either donated or purchased decades ago, which would further complicate the discovery process and potentially require tracing of assets.  Further, the ultimate result of the litigation would be uncertain, as it would be both fact-intensive and involve interpreting the laws of various states.  Therefore, the first factor favors the settlement.

## 2.       The Likely Difficulties in Collection.

163.     Absent a settlement, it is likely that many of the restrictions on the property would be found to be valid or that the property would otherwise be found to be unavailable for distribution to creditors as it is core to the mission of the BSA.  The Debtors contend that such properties are subject to donor restrictions, were held in endowments and/or in charitable trusts, and are legally protected under state laws governing charities and other non-profit organizations.  Additionally, litigation over restrictions would risk potential challenges from various state Attorneys General or individual donors.  Therefore, creditors would likely face difficulties collecting even if they could prevail in litigation.  This factor favors settlement.

## 3.       The Complexity of the Litigation Involved and the Expense,

---

[290]     *See* Order Approving Stipulation Staying Adv. Pro., Adv. Pro. No. 21-50032 [Adv. Pro. D.I. 42].

**Inconvenience, and Delay of Attending to It.**

164.    This dispute would be complex, as it requires interpreting various state laws relating to restrictions on assets.  The ability of Claimants to access funds would be delayed if the Debtors and the TCC litigated these issues to conclusions, as there would be a substantial delay due to the extensive and burdensome discovery and expert analysis.  Many of the properties or investments that are the subject of this dispute were either donated or purchased decades ago, which further complicates the discovery process.  Any outcome of the adversary proceeding would likely be appealed, resulting in further delay.  Consequently, litigation would consume substantial Estate resources, including legal fees and expert fees for both the TCC and the Debtors.  Thus, this factor weighs in favor of approving the settlement.

### 4.    The Paramount Interest of the Creditors.

165.    As described above, the restricted asset settlement is plainly in the best interest of creditors.  Even if the TCC prevailed on certain counts in the restricted asset adversary proceeding, there was no guarantee that additional funds would be available for distribution to creditors as donors or state Attorneys General could intercede to challenge the distribution of restricted assets, the Court could find that such assets were core to the mission of the BSA, and the HABs were subject to the liens of JPM.  In the settlement, the BSA agreed to reduce the minimum amount of Unrestricted Cash and Investments to be retained by the Reorganized BSA on the Effective Date from $75 million to $25 million.  The $50 million concession was funded by the Debtors' agreement to use $50 million of Restricted Cash and Investments (out of the approximate $171 million of the Debtors' and Non-Debtor affiliates total restricted cash and investments) in accordance with the underlying donor restrictions during 2022 and 2023, allowing the Debtors to emerge with a lower balance of unrestricted cash and investments.  In addition, the BSA agreed to

issue the $80 million BSA Settlement Trust Note to the Settlement Trust. These were significant compromises offered by the BSA to resolve this dispute. The restricted assets of the Debtors were thoroughly vetted and challenged by the TCC, and the settlement which is embodied in the Plan is supported by all major creditor constituencies. Accordingly, the settlement of the restricted asset litigation is in the paramount interest of creditors and this factor weighs heavily in favor of approving the settlement.

## I.     The PSZJ Settlement.

166.    The Plan incorporates the settlement of all claims the Debtors have, or may have, against the TCC and its Representatives, including Pachulski Stang Ziehl & Jones LLP ("PSZJ"), regarding the alleged improper transmittal of communications from Timothy Kosnoff Esq. by PSZJ to thousands of survivors from the official TCC's email address, many of whom were not clients of Mr. Kosnoff, and related actions (the "PSZJ Actions").[291]  As part of this settlement, (a) the TCC and its professionals are Exculpated Parties under the Plan and (b) PSZJ will (i) contribute $1.25 million in cash to the Reorganized BSA to be reserved for the BSA's Youth Protection Program and (ii) write-off $750,000 of PSZJ's fees.[292]

167.    This settlement is reasonable, in the best interests of the Estates, and meets the *Martin* factors. Instead of continuing to litigate the issues related to the PSZJ Actions, the Debtors considered the fees expended by estate professionals as a result of the PSZJ Actions,[293] and determined that the settlement falls well within the range of reasonableness, particularly after taking into account (a) the expense and time required to litigate the issues, the nature and amount

---

[291]  *See* Plan Art. V.S.7.

[292]  *See* Plan Art. V.S.7.

[293]  The fees and costs incurred by the Debtors, the Creditors' Committee, and FCR in connection with the communications by Mr. Kosnoff is estimated to be approximately $1.2 million.

of damages to the Debtors on account of the TCC's actions, and (b) the PSZJ contribution to Reorganized BSA in support of the BSA's Youth Protection Program. Among other issues, the Youth Protection Program contemplates (a) hiring a Youth Protection executive with extensive experience in prevention of childhood abuse, (b) formation of a Youth Protection Committee composed of abuse survivors, and representatives of the BSA, Local Councils, and Chartered Organizations, and (c) an extensive review and update of existing policies.[294] In short, the settlement with the TCC provides reasonable compensation to the BSA and its stakeholders in light of the potential recoveries that could be obtained through continued litigation and brings finality with respect to the Debtors and the liabilities related to these Chapter 11 Cases.

168. The U.S. Trustee argues the PSZJ Settlement can be read to extinguish the right of parties in interest to review and object to PJSZ's final fee application under section 330 of the Bankruptcy Code.[295] The U.S Trustee is mistaken and misconstrues the Plan.[296] The Plan provides that, as part of the PSZJ Settlement, PSZJ shall write-off $750,000 of PSZJ's fees.[297] Nothing in the Plan extinguishes the right of parties to review and object to PJSZ's final fee applications. Thus, the Court should overrule this argument.

169. Similarly, Eisenberg Rothweiler objects, alleging that (a) PSZJ has leveraged its role as TCC counsel to obtain benefits for itself and (b) the exculpation clause, as it relates to PSZJ, has not been proposed in good faith and is designed to preclude Eisenberg Rothweiler from pursuing claims against PSZJ.[298] The Plan and Plan exhibits were fiercely negotiated and involved

---

[294] *See* Plan Ex. L, Youth Protection Program.

[295] *See* U.S. Trustee Suppl. Obj. ¶¶ 9-12 [D.I. 9015].

[296] The U.S. Trustee does not cite any provision in the Plan for this false assumption.

[297] *See* Plan Art. V.S.7.

[298] Eisenberg Rothweiler Obj. ¶¶ 17-22 [D.I. 9021].

numerous constituencies. Against this backdrop, PSZJ, as counsel to the TCC, needed to be able to negotiate without fear that their cooperation, or even participation, might expose them to litigation. An exculpation of parties who participate meaningfully in a bankruptcy case and in creating and supporting a plan of reorganization—solely with respect to their actions in connection with the case (and excepting fraud, gross negligence, and willful misconduct)—is commonplace.[299] PSZJ participated in good faith in formulating the Plan and should be entitled to protection afforded other professionals in the case. Further, the exculpation clause is reasonable in scope and not inconsistent with the Bankruptcy Code.[300] The Debtors believe issues related to the PSZJ Actions have been fairly resolved, and that individual fights between creditors in these Chapter 11 Cases should be left behind so that the Debtors and their Estates can move forward in the best interests of survivors. Thus, the Court should overrule Eisenberg Rothweiler's objection.

## J. The Objection to the Reasonableness of the Insurance Settlements, TCJC Settlement, and Other Chartered Organization Settlements Should be Overruled.

170. *Pro Se* Claimant Nos. SA-101730 and SA-47539 objected to the settlements based on the "value and limits of the insurance policies available with respect to Abuse Claims."[301] But all of the settlements under the Plan are reasonable and in the best interests of the Estates for the

---

[299] *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that exculpation clause in plan which provided that committee members and estate professionals had no liability to creditors or shareholders for their actions in the case except for willful misconduct or gross negligence merely conformed to the standard applicable to such fiduciaries and, therefore, did not violate any provision of the Code); *Washington Mutual*, 442 B.R. at 348 ("It is acceptable to provide exculpations for such parties for the role they played in the bankruptcy process, and the Court will approve appropriate ones in this case.").

[300] *See, e.g.*, *In re Comfort Co., Inc.*, Bankr. Case No. 08-12305, 2009 WL 7146282, at *12 (Bankr. D. Del. Feb. 4, 2009) (approving a plan's exculpation provision where each non-debtor party "that will benefit from the releases, exculpation and related injunctions . . . either shares an identity of interest with the Debtors, was instrumental to the successful prosecution of the[] Chapter 11 Cases and/or provided substantial consideration to the Debtors, which value will allow for distributions that would not otherwise be available but for the contributions made by such non-Debtor parties).

[301] *Pro Se* Claimant Nos. SA-101730 and SA-47539 Obj. ¶ (d) [D.I. 8658].

reasons stated above. The objecting *Pro Se* Claimant did not assert any facts or provide any analysis to explain why the settlements are unreasonable. Mere conclusory statements are insufficient to rebut the Debtors' prima facie showing as to the fairness and reasonableness of these settlements. Therefore, the *Pro Se* Claimant's objection to the settlements should be overruled.

## II. The Scouting-Related Release and Channeling Injunction Should Be Approved.

171. These Chapter 11 Cases present precisely the extraordinary circumstances that warrant approval of a nonconsensual third-party release set forth in Article X.J.3. of the Plan (the "Scouting-Related Release") and channeling injunction set forth in Article X.F. of the Plan (the "Channeling Injunction"). The Debtors have undertaken enormous efforts to secure overwhelming support for the Plan and substantial monetary contributions from interested and related parties. The significant settlement agreements and contributions, contingent upon parties receiving a release and the benefit of the Channeling Injunction, has enabled the Debtors to propose a Plan that (a) delivers a more than $2.7 billion fund for the benefit of survivors, the largest of its kind ever created, and (b) provides a mechanism that will result in payment of all or substantially all the estimated liabilities of the Abuse Claims. Without these releases and injunctions, the Debtors could not reorganize.

172. The structure of the Plan, and the only path to substantial recovery for abuse survivors and reorganization of the Debtors, depends upon approval of the Scouting-Related Release and Channeling Injunction. The parties that contributed to the more than $2.7 billion fund available to abuse survivors under this Plan would not have done so without the protections contained in their settlement agreements. Some abuse survivors have waited more than sixty years to get access to the compensation that they deserve. If this Plan fails and survivors return to the tort system, the vast majority will not recover anywhere close to the recoveries made available to

them under the Plan—if anything at all. Not only will survivors face the significant expense and delay inherent in litigating over 80,000 lawsuits, but they will be forced to do so while squaring off against the very "deep pocket" insurance providers that are now contributing to the Trust. Without these settlements, each of these insurers would be forced to divert the hundreds of millions of dollars in settlement funds that would now go to abuse survivors into a massive, protracted, complex litigation process that would go on for years. Beyond that, abuse survivors would be forced to pursue the settling Local Councils and Chartered Organizations in a race to the courthouse that would ultimately lead to lower recoveries for nearly all survivors. Many Local Councils and Chartered Organizations would likely be forced to file their own bankruptcies in the process, further delaying and diminishing compensation to survivors.

173.    Through the Settlement Trust and TDP, the Debtors, TCC, Coalition, and FCR, with contributions and assistance from the other Protected and Limited Protected Parties, have created a Plan that provides abuse survivors access to a centralized, efficient, inexpensive, and equitable forum to seek and obtain compensation to which they are entitled. The Plan converts what might otherwise be billions of dollars in litigation and administrative costs into an efficient and equitable compensation structure for survivors and provides an opportunity for a global resolution for the Debtors, the Settling Insurance Companies, Local Councils, and Chartered Organizations. Thus, the Plan allows the charitable mission of Scouting to continue as Congress envisioned when it chartered the BSA over a century ago.

174.    But the Plan will not work—and the abuse survivors will not have access to the resources of the Settlement Trust and the Debtors' charitable mission cannot continue—without the Scouting-Related Release and Channeling Injunction. These provisions are integral to the Debtors' ability to unlock $2.7 billion in cash and property and access to the valuable insurance

rights from the Protected and Limited Protected Parties. Such parties will only contribute to the Settlement Trust if they can resolve the risk to their organizations from Abuse Claims with finality. Moreover, if the Scouting-Related Release and Channeling Injunction are not structured as set forth in the Plan, it is unlikely that other parties will be willing to make significant contributions to the Settlement Trust going forward, which would deny the Settlement Trust the ability to settle with the remaining Non-Settling Insurance Companies and Chartered Organizations. Thus, failing to confirm the Plan with the necessary Scouting-Related Releases and Channeling Injunction would be devastating to abuse survivors as well as to Scouting.

175.    The Scouting-Related Release and Channeling Injunction are also necessary to provide adequate protection required by section 363 of the Bankruptcy Code to parties that assert an interest in the BSA's and Local Councils' Insurance Policies. If these Chartered Organizations do not receive the Scouting-Related Release and Channeling Injunction, the Debtors would be required to grant any another form of adequate compensation. In many cases, that would mean an interest in the proceeds from the BSA and Local Council insurance policy buybacks. However, that structure would redirect a portion of the $2.7 billion that has been set aside for holders of Abuse Claims, which would otherwise be available to abuse survivors. Survivors have made clear that they will not support a plan that does this. Therefore, the Plan instead provides adequate compensation in the form of the Channeling Injunction, channeling the Abuse Claims that might otherwise have been brought against such Chartered Organizations to the Settlement Trust. The structure of the Plan is also required by the Insurance Companies, whose settlements are dependent upon the release and injunctions. Every part of the Plan—including the overwhelming support of the ultimate beneficiaries, abuse survivors as well as the insurers and other protected parties—is intertwined and dependent upon the global resolution contemplated in the Plan, including, most

importantly, the Scouting-Related Release and Channeling Injunction.  Without them, the Plan will not work.

176.     Several parties, including the RCAHC, U.S. Trustee, Certain Insurers, and some individual claimants or claimant groups, have objected to the Scouting-Related Release.  These objections challenge (a) the Court's jurisdiction to approve the release and channeling injunction provisions over the objection of parties subject to the release and channeling injunction, (b) the Court's constitutional and statutory authority to approve the Plan containing the release and channeling injunction, and (c) whether the release and channeling injunction proposed in the Plan satisfies the "fair and necessary" standard articulated in *Continental*, after consideration of the *Master Mortgage* factors.  As explained below, all of the arguments raised in support of these Objections should be overruled.

**A.     The Scouting-Related Release and Channeling Injunction.**

177.     Under Article X.J.3. of the Plan, Abuse Claims are channeled to the Settlement Trust and will be reconciled and paid in accordance with the Settlement Trust Documents, including the TDP.  Holders of Abuse Claims are required to liquidate their Claims through the TDP and Settlement Trust rather than through litigation in the tort system against the Debtors, Reorganized Debtors, Settling Insurance Companies, Local Councils, Chartered Organizations,[302]

---

[302]   The extent to which a Chartered Organization is protected under the Scouting-Related Release and Channeling Injunction depends on whether it is an Opt-Out Chartered Organization, Participating Chartered Organization, or Contributing Chartered Organization, as described in section II.E.1.b.2. below titled "The Chartered Organizations' Contributions to the Settlement Trust."

Related Non-Debtor Entities,[303] and the Representatives[304] of each of the aforementioned.  There is no opportunity to opt out of the Scouting-Related Release and Channeling Injunction, which is in accordance with the law in this Circuit.[305]

## B. This Court Has Subject-Matter Jurisdiction to Confirm a Plan that Contains the Scouting-Related Release and Channeling Injunction.

178.     Under sections 157 and 1334 of title 28 of the United States Code, the Court has subject matter jurisdiction over three types of matters: (a) "proceedings arising under title 11," (b) "proceedings arising in a case under title 11," and (c) "proceedings related to a case under title 11."[306]  All three bases of jurisdiction apply here.

179.     Confirmation of a plan that contains third-party releases plainly falls within this Court's "arising under" or "arising in" jurisdiction.[307]  And, as set forth below, confirmation of

---

[303] "Related Non-Debtor Entities" means the Entities listed on Exhibit H, including non-debtor Affiliates of the Debtors that are directly or indirectly wholly owned by, or subject to the control of, the BSA. For the avoidance of doubt, Related Non-Debtor Entities do not include Local Councils or Chartered Organizations.  *See* Plan, Art. I.A.[227].  The Entities listed on Exhibit H are Arrow WV, Inc., Atikaki Youth Ventures Inc., Atikokan Youth Ventures Inc., BSA Asset Management, LLC, BSA Endowment Master Trust, Learning for Life, and National Boy Scouts of America Foundation.

[304] "Representatives" means, with respect to any Person, such Person's (a) predecessors, successors, assigns, subsidiaries, and Affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) respective heirs, executors, estates, and nominees, in each case solely in its capacity as such. *See* Plan, Art. I.A.249.

[305] *See, e.g.*, *In re Mallinckrodt*, No. 20-12522 (JTD) at 25 (Bankr. D. Del. Feb. 3, 2022) [D.I. 6347] (confirming a plan with a nonconsensual third-party release of and channeling injunction for trust personal injury claims related to debtor's opioid products); *In re Blitz U.S.A., Inc.*, No. 11-13603, 2014 WL 2582976, at *19-21 (Bankr. D. Del. Jan. 30, 2014) (confirming a plan with a nonconsensual third-party release of and channeling injunction for personal injury and wrongful death claims related to explosions involving debtor-manufacturer's defective gasoline cans); *In re Global Indus. Techs., Inc.*, No. 02-21626, 2013 WL 587366, at *39 (Bankr. W.D. Pa. Feb. 13, 2013) (confirming a plan with a nonconsensual third-party release of and channeling injunction for silica personal injury claims related to debtor's refractory products and materials).

[306] *See In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 621 (Bankr. D. Del. 2016); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)) (stating that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.").

[307] *See Millennium Lab II*, 562 B.R. at 621.

this Plan is appropriate because of the overlap and interrelationship between the Debtors, the Claims against them, and their property rights (including rights under Insurance Policies) and the claims against and property interests of the beneficiaries of the Scouting-Related Release and Channeling Injunction.  Thus, this Court has subject-matter jurisdiction to confirm the Plan, complete with the releases and channeling injunction therein.  Moreover, the Abuse Claims against non-Debtors channeled and released under the Plan fall squarely within this Court's "related to" jurisdiction, as they affect the assets of the Estates, notwithstanding whether there are releases and channeling injunctions therein.

180.    Each of these grounds for jurisdiction is addressed in turn.

### 1.    "Arising Under" Jurisdiction.

181.    This Court has subject-matter jurisdiction to confirm a Plan that releases and enjoins third-party Abuse Claims because it has subject matter jurisdiction over any matter "arising under" this "case" or "proceeding."[308]  Here, the case is under chapter 11, and the proceeding is confirmation of a plan of reorganization.  Confirmation of a plan is a "core" proceeding in a chapter 11 case filed under the Bankruptcy Code.[309]  Whether a chapter 11 plan can be confirmed is a legal question that arises under section 1129 of the Bankruptcy Code; and whether a release or channeling injunction therein should be approved is a determination made under sections

---

[308]  11 U.S.C. § 1334(a) (stating that "the district courts shall have original and exclusive jurisdiction of all cases under title 11"); 11 U.S.C. § 1334(b) (stating "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11"); 11 U.S.C. § 157 ("Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.").

[309]  28 U.S.C. § 157(b)(2)(L); *see also* 1 Collier on Bankruptcy ¶ 3.02 (16th ed. 2021) (stating that "[t]here has never been any doubt about the constitutional authority of a nontenured judge to enter final orders" in matters of administration, including confirmation of plan).

1129(a)(1), 1123(b)(6), and 105 of the Bankruptcy Code.[310]  Thus, this Court has "arising under" jurisdiction to confirm the Plan with the Scouting-Related Release and Channeling Injunction.

### 2. "Arising In" Jurisdiction.

182.    This Court also has "arising in" jurisdiction to confirm a plan providing for third-party releases and channeling injunctions for the same reason this Court has "arising under" jurisdiction.[311]  Confirmation of a plan arises in bankruptcy cases, and the proposed release and channeling injunction arise in and are an essential part of the Plan.  Indeed, without the proposed release and channeling injunction, the Plan will fail.  Further, the release and channeling injunction are narrowly tailored only to impact Scouting-related Abuse Claims, which were the impetus for the Debtors commencing these Chapter 11 Cases and which must be fully and finally resolved to allow the Debtors to reorganize successfully.  A comprehensive solution for Abuse Claims with respect to the Debtors and the Protected and Limited Protected Parties is a fundamental part of the Plan and a core issue before this Court.[312]  Thus, this Court also has "arising under" jurisdiction to confirm the Plan with a nonconsensual third-party release and channeling injunction.

### 3. "Related to" Jurisdiction.

---

[310]  11 U.S.C. § 1129(a)(1) (stating that a court can confirm a "plan [that] complies with applicable provisions of [the Bankruptcy Code]"); 11 U.S.C. § 1123(b)(6) (stating that "a plan may . . . include any other appropriate provision not inconsistent with the [Bankruptcy Code]."); 11 U.S.C. § 105(a( "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out provisions of [the Bankruptcy Code].").

[311]  See *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 261 (Bankr. D. Del. 2017), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd sub nom. In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019) (holding that confirmation of a plan that contains third-party releases is a proceeding "arising in and arising under title 11" and thus a core proceeding that the Court has jurisdiction over); *In re Freedom Rings, LLC*, No. 05-14268 (Bankr. D. Del. May 9, 2006) [D.I. 385] (CSS) ("[T]here is a jurisdictional nexus between the proposed release to non-Debtor third parties and the Debtor.  The entire Plan hinges on the releases, and the evidence is uncontroverted that without the releases, there is little prospect of confirming a Plan."); 1 Collier on Bankruptcy P 3.01 (16th 2021) (explaining that matters "arising under" title 11 include "confirmation of a plan under chapters 9, 11, 12 or 13").

[312]  *Millennium Lab,* 945 F.3d at 137 (holding that the bankruptcy court has constitutional authority to confirm a plan granting third-party releases when such releases are "integral to the restructuring of the debtor-creditor relationship.").

183.     The Court has "related to" jurisdiction" over all of the Abuse Claims being

channeled or released pursuant to the Plan.  An action is "related to" a bankruptcy case where "the

outcome of that proceeding could conceivably have any effect on the estate being administered in

bankruptcy," meaning that "the outcome could alter the debtor's rights, liabilities, options, or

freedom of action (either positively or negatively) and which in any way impacts upon the handling

and administration of the bankrupt estate."[313]  In other words, "[t]he 'related to' language of §

1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction

over more than simply proceedings involving the property of the debtor or the estate."[314]

184.     Here, the Abuse Claims subject to the Scouting-Related Release and Channeling

Injunction would undoubtedly have a direct and "conceivable" effect on the Debtors' estates and

the restructuring in at least four ways:  (a) there is an identity of interests between the Debtors and

the non-Debtors, including the Local Councils, Chartered Organizations, and insurance

companies, (b) directors and officers have potential indemnification and contribution rights related

to the Abuse Claims, (c) claims against Local Councils directly diminish property of the estate, as

the BSA has a contingent reversionary interest in Local Council properties, and (d) a judgment

against third parties covered under the BSA Insurance Policies will deplete Estate assets that are

to be distributed pursuant to the Plan.

(a)     **The Protected and Limited Protected Parties Share an Identity**

---

[313] *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original).  Although the Supreme Court has overruled certain aspects of the *Pacor* decision in *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995), the analysis of "related to" jurisdiction in *Pacor* remains controlling law that the Third Circuit continues to cite favorably.  *See In re Resorts Int'l, Inc.*, 372 F.3d 154, 164 n.6 (3d Cir. 2004).  The Supreme Court agreed with the *Pacor* court's analysis of the scope of "related to" jurisdiction in *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995).  *See also Combustion Eng'g*, 391 F.3d at 226.  The "key word . . . is 'conceivable.'  Certainty, or even likelihood, [of an effect on the estate] is not required."  *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No. 07-CV-4634, 2007 WL 4323003, at *1 n.1 (S.D.N.Y. Dec. 10, 2007) (quoting *In re Dow Corning Corp.*, 86 F.3d 482, 491 (6th Cir. 1996)).

[314] *Celotex Corp. v. Edwards*, 514 U.S. at 308 (quoting *Pacor*, 743 F.2d at 994).

**of Interest with the Debtors.**

185.     Abuse Claims are defined as involving "Scouting-related Abuse that occurred prior to the Petition Date."[315]   Indeed, the term "Scouting-Related Abuse Claim" is redundant, as all Abuse Claims must be "Scouting-Related" and have occurred prior to the Petition Date. Nevertheless, we refer to "Scouting-Related Abuse Claims" herein because so many of the Objections ignore the relationship.   The Plan, by definition, is narrowly tailored such that all provisions referring to and setting forth the treatment of an Abuse Claim (including the release or channeling provisions) are only applicable to Scouting-related Abuse Claims.[316] Claims for Abuse unrelated to Scouting are not part of the definition of Abuse Claim, are not released, are not channeled, and are not impacted in any way.[317]   This includes any portion of a Mixed Claim that is not Scouting-related.[318]   Claims unrelated to Scouting, including the Lujan and D & V Claimants' direct claims against a "religious organization" for claims of Abuse that are unrelated to Scouting, are not released, channeled, or impacted by the Plan.

186.     Because all Scouting-related Abuse Claims against a non-Debtor Protected Party, Limited Protected Party, or Opt-Out Chartered Organization, by definition, must involve Scouting, such claims may result in a Claim against the Debtors.   Moreover, Local Councils, the Related Non-Debtor Entities, and Chartered Organizations that would be the targets of such claims are integral to the BSA's Scouting mission.   As described above, Local Councils and Chartered Organizations directly deliver Scouting into communities across the country.   Local Councils organize, operate, and promote Scouting while Chartered Organizations, such as the United

---

[315]   Plan, Art. I.A.18 (defining Abuse Claim).

[316]   *Id*.

[317]   *Id*.

[318]   Plan, Art. I.A.184 (defining Mixed Claim).

Methodist Entities, sponsor local Scouting units. Local Councils, Chartered Organizations, Related Non-Debtor Entities, and the Debtors share a single, common purpose and mission: to instill core values in young men and women by delivering a Scouting program consistent with the BSA's congressional charter. A substantial portion of the Scouting program as it currently exists cannot be provided without the involvement of the Debtors, a Local Counsel, and a Chartered Organization.

187. Similarly, the Related Non-Debtor Entities are so intricately involved in the BSA's Scouting-related programs that an identity of interest exists between them and the Debtors. Neither the BSA nor the Related Non-Debtor Entities could further the BSA's mission through these essential Scouting-related programs on their own. The BSA serves as the national umbrella organization that provides critical nationwide support services for these programs, and the applicable Related Non-Debtor Entity, in turn, administers the particular Scouting-related program and works with local community organizations to initiate and maintain such program. The Debtors and the Related Non-Debtor Entities are united in delivering the Scouting program and have identical interests in resolving the Abuse Claims.

188. The close affiliation and devotion to a shared single charitable mission establishes an identity of interest, such that a judgment against a non-Debtor Protected or Limited Protected Party for an Abuse Claim "would in effect be a judgment or finding against"[319] the Debtors.[320] The fact that hundreds of prepetition suits name a Local Council and/or Chartered Organization as a co-defendant alongside the BSA in the Abuse-related cases involving Scouting further illustrates

---

[319] *In re W.R. Grace & Co.,* 386 B.R. 17, 31 (Bankr. D. Del. 2008).

[320] The Debtors reserve all rights and defenses with respect to all such alleged claims for indemnification, reimbursement, or contributions.

the interwoven nature of the relationship.

189.     Additionally, the BSA is "the real party defendant" in and has assumed a significant role in defending most abuse claims brought in the tort system against the BSA and certain Local Councils or Chartered Organizations.[321]   More specifically, as the Debtors will show at the Confirmation Hearing, the BSA and often its insurance providers facilitated the retention of the national coordinating and defense counsel for these matters, engaged in significant discovery, and paid not only litigation costs and expenses but, when appropriate, some or all of the cost to settle such cases.  The fact that thousands of proofs of claim filed against the Debtors also name a Local Council, Chartered Organization, or both again shows the continued interrelationship between the parties.

190.     In many cases, particularly most cases arising after 1975, the Debtors, Local Councils, Related Non-Debtor Entities, and Chartered Organizations share Insurance Policies. Consequently, resolution of a particular case involves payment from a common pool of insurance coverage.  A judgment against any of these parties will implicate available insurance coverage under such policies.  The same is true with respect to deductible payments.  The BSA and Local Councils often have joint responsibility for paying such deductibles.  Continued responsibility for such deductibles would not only have a direct and immediate effect on the Debtors and their Estates but would destroy the settlements that are essential to the Plan and the provision of over $2.7 billion of cash to abuse survivors thereunder.

191.     The Settling Insurance Companies are not willing to contribute nearly $2 billion to the Settlement Trust if they are not truly settling *all* of the potential exposure to the Scouting-

---

[321]  *A.H. Robins,* 788 F.2d at 999 ("This unusual circumstance it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.").

related Abuse Claims in question.  In order to secure finality on any Abuse Claim, the Scouting-related exposure for such claim must be resolved as to all Related Non-Debtor Entities, Chartered Organizations and Local Counsels.  Many of the Non-Settling Insurance Companies' policies similarly provide insurance coverage for the Related Non-Debtors Entities and their Representatives, and if they become a Settling Insurance Company in the future, as allowed under the Plan, they likely will require the same protections and finality.  As such, the Scouting-Related Release and Channeling Injunction are essential to preserving the current Plan settlements, allowing the Settlement Trust to obtain future settlements with insurers, and maximizing the recovery available to abuse survivors.  Given the shared identity of interests, the Court has jurisdiction to approve the Plan with the Scouting-Related Release and Channeling Injunction.

### (b) Potential Indemnification and Contribution Rights Related to Directors and Officers.

192.  Courts have approved third-party releases of claims to address indemnification rights and their effect on the estate.[322]  Without the release or channeling injunction, the Debtors' directors and officers may have Abuse Claims brought against them directly which could result in indemnification claims against the Debtors, even if the Debtors dispute the merits of such claims. Indeed, certain directors and officers have filed proofs of claim in these cases to assert a right of indemnification, reimbursement, and/or contribution against the Debtors for Scouting-related

---

[322]  *See, e.g., In re Medford Crossings N., LLC*, Case No. 07-25115, 2011 WL 182815, at *13 (Bankr. D. N.J. Jan. 20, 2011) ("[T]he potential liability arising from express indemnification provisions herein described as well as the identity of interests of Debtors and other third parties, confer related to jurisdiction in this case."); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) ("Thus, the Court will approve third party releases to align with indemnification obligations of the Debtors that existed before the filing of these bankruptcy cases by virtue of employment agreements, bylaws, retentions, or other loan agreements."); *Bank of N.Y., Mellon Trust Co., N.A. v. Becker (In re Lower Bucks Hosp.)*, 488 B.R. 303, 312 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) ("We conclude that the Bankruptcy Court had 'related to' jurisdiction over the third party release provision as part of LBH's plan of reorganization. This is because the filing of the class action against BNYM had an immediate effect on LBH's bankruptcy estate when it triggered BNYM's claim for defense costs against LBH.").

Abuse Claims. These parties rely on their indemnification agreements entered into with the BSA to argue that their contracts with the Debtors require the Debtors to advance litigation costs related to defending against Abuse Claims in a non-bankruptcy forum.[323] As a result, any Abuse Claims related to Scouting asserted against these director and officer non-Debtor Protected Parties could cause them to seek to collect from the Debtors or their property, thus having a "conceivable effect"[324] on the Estates. Accordingly, the existing indemnification and contribution rights demonstrate that the affected claims are sufficiently related to the issues before the Court.

> **(c)** **Abuse Claims and the Protected Parties' Related Indemnification Claims Against Local Councils Could Diminish the BSA Estate.**

193. The BSA's bylaws and rules and regulations as well as the form of bylaws for Local Councils grant the BSA a reversionary interest in Local Council's property under certain circumstances. Local Councils hold legal title to and have managerial control over their property and assets. Yet, the Debtors have a contingent,[325] reversionary interest in Local Council property,[326] which would become a possessory interest in the event that a Local Council was

---

[323]  This is true with respect to the Debtors' current and former directors and officers through employment contracts. The Debtors reserve all rights and defenses with respect to all such alleged claims for indemnification.

[324]  *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 226 (3d Cir. 2004).

[325]  The Debtors' estates hold the same interest in property that the Debtors held immediately prior to the petition date. 11 U.S.C. § 541(a) (providing that property of estate only includes a debtor's legal and equitable title to such property).

[326]  *See e.g., Goldberg v. Tynan (In re Tynan),* 773 F.2d 177, 179 (7th Cir. 1985) (following mortgage foreclosure proceeding, only the debtor's current interest in the real property—the statutory right of redemption—became property of the debtor's estate; the real property itself did not become part of the estate); *In re Atlantic Gulf Cntys. Corp.,* 369 B.R. 156, 163–65 (Bankr. D. Del. 2007) (noting that while the debtor had certain equitable interest in monies held in escrow, it did not hold all equitable interests and the filing of the bankruptcy case was not sufficient to divest the non-debtor parties of their interest in the escrow; therefore concluding that the escrow "is not property of the estate, even though the contingent interest that the Debtor has in the Escrow is property of the estate"); *see also In re Majestic Star Casino, LLC,* 716 F.3d 736, 758 (3d Cir. 2013) (noting that "[a]s a practical matter, rights to which a debtor asserts a property interest 'must be readily alienable and assignable,' to fulfill the equitable purpose of bankruptcy, which is to generate funds to satisfy creditors," and concluding that a corporate debtor's status as a qualified subchapter S corporation was not property of the estate given its lack of transferability (quoting *Westmoreland Human Opportunities, Inc. v. Walsh,* 246 F.3d 233, 250 (3d Cir. 2001))).

dissolved or its charter lapsed.  In that scenario, the BSA may use the Local Council's assets *for the benefit of Scouting*.  Examples of these governing documents state as follows:

(k)     **National BSA Bylaws**. "Upon termination of a local council charter or dissolution of a council, all rights of management and ownership of local council property shall become vested in the National Council [of Boy Scouts of America] for use in accordance with the Rules and Regulation of the Corporation. Local council articles of incorporation and bylaws shall include or be revised to incorporate this provision at the time of chartering or the next charter renewal."[327]

(l)     **Rules and Regulations**. "Consistent with the Bylaws, in the event of the dissolution of a council or the revocation or lapse of its charter, the Executive Committee may, at its option, authorize the National Council to assume charge of the affairs of the council and continue operation pending reorganization or re-establishment of the council or wind up the business of the council. All funds and property in the possession or control of such council must be applied to the payment of the council's obligations. Any surplus funds or property may thereafter be administered as deemed to be in the best interest of Scouting. . . . Any remaining assets obtained with funds raised in the name of Scouting must be redeployed for Scouting use in the local area. . . . Any property or funds acquired by the National Council upon the dissolution of a Scouting unit or local council will be administered so as to make effective, as far as possible, the intentions and wishes of the donors."[328]

"[I]n the event of the dissolution of the unit or council or revocation or lapse of its charter said funds will, after any claims against said funds are satisfied, be turned over to the Boy Scouts of America for use by the Boy Scouts of America for the benefit of Scouting in such locality and for the specific purpose for which the funds was granted."[329]

(m)     **Form of Local Council Bylaws**. "The corporation may hold title to real property and maintain accounts wherein securities or funds deposited in the corporation's name provided, however, in accordance with the Bylaws and Rules and Regulations of the Boy Scouts of America, such assets are deemed to have been raised or obtained for the benefit of Scouting and are subject to a constructive trust for the benefit of Scouting . . . real property or net proceeds from the conveyance of real property are subject to such a restriction in the event of the dissolution of the local council or the

---

[327]   BSA Bylaws Art. VI § 1, cl. 2.

[328]   Rules and Regulations, Art. III, Council or Unit Assets Upon Dissolution.

[329]   BSA Rules and Regulations, Art. III, Restricted Funds.

revocation or lapse of its charter."[330]

That contingent interest is property of the Debtors' Estates.[331]  As a result, any Abuse Claim that diminishes the assets of a Local Council **will also diminish** the assets of the Debtors' Estates. Because a claim that diminishes assets of the Debtors' Estates is "related to" the Debtors' bankruptcy cases, the Court has jurisdiction over all Abuse Claims against Local Councils, including Indirect Abuse Claims that insurers or others could assert against Local Councils.

194.    The same is true of indemnification claims brought by Chartered Organizations and their Representatives against Local Councils.  The form of charter agreement that all Local Councils enter into annually with all Chartered Organizations provides:  "The Local Council agrees to: . . . [i]ndemnify the Chartered Organization in accordance with the resolutions and policies of the National Executive Board of the Boy Scouts of America."[332]   Chartered Organizations have asserted that this provision requires that Local Councils indemnify them and their Representatives for Abuse Claims.[333]   Such a contractual indemnity claim results in "automatic" liability for the Local Council upon the assertion of any Abuse Claim against a Chartered Organization.  This establishes "related to" jurisdiction under Third Circuit precedent[334] for all Abuse Claims against Chartered Organizations and their Representatives because such claims will necessarily reduce the value of the Debtors' contingent reversionary interests in Local

---

[330]   Form of Local Council Bylaws, Art. X, Cl. 3.

[331]   11 U.S.C. § 541(a).

[332]   Form of Annual Unit Charter Agreement 2020.

[333]   Proof of Claim No. 12530 (asserting claim for indemnity, contribution, reimbursement and other claims relating to unliquidated Abuse Claims on account of certain contractual arrangements between the BSA and TCJC); *see also* Proof of Claim No. 12179 (same).

[334]   *In re W.R. Grace & Co.*, 412 B.R. 657, 667 (D. Del. 2009) (stating that "the action against the party seeking indemnification automatically result[s] in debtor's liability for indemnification . . . automatic indemnification creates "related to" jurisdiction").

Council property.

> **(d)** **A Judgment Against Third Parties Covered Under the BSA Insurance Policies Will Deplete Estate Assets That Are to be Distributed Pursuant to the Plan.**

195.    Bankruptcy court jurisdiction "is *in rem*" "at its core,"[335] as discussed above.  Here, the BSA Insurance Policies are Estate property, which provide coverage to the BSA, Local Councils, and certain Chartered Organizations.  Thus, all Abuse Claims that could be covered by BSA Insurance Policies fall within "related to" jurisdiction, as they directly impact property of the Debtors' estates.

196.    In 1971, certain Local Councils were added as additional insureds under the BSA's commercial general liability policies.  The BSA Insurance Policies were then amended in 1978 to include all Local Councils in the definition of the "Named Insured."  As both additional insureds and named insureds, Local Councils have the same rights as the BSA to the limits of liability under those policies; thus, the limits of liability are "shared" between the BSA and Local Councils.

197.    The same is true for Chartered Organizations and certain Related Non-Debtor Entities.  More specifically, the BSA Insurance Policies in 1976 and 1977 included "sponsors" as insureds, which would provide coverage for Chartered Organizations.  Starting in 1978, the policies were modified to name specifically Chartered Organizations as "insureds."  Thus, similar to Local Councils, post-1976 Chartered Organizations have the same rights as the BSA to the limits of liability under those policies, making them shared between the BSA, Local Councils, and Chartered Organizations.  The Related Non-Debtor Entities likewise are insureds under the BSA Insurance Policies and share in the rights to the proceeds of such policies.

---

[335]    *Cent. Virginia Cmty. Coll v. Katz*, 546 U.S. 356 (2006).

198.     Because of the shared nature of the insurance, which is an asset of the Estate, the Court has jurisdiction over Abuse Claims asserted against these Non-Debtor Protected and Limited Protected Parties covered under certain of the BSA Insurance Policies; claims against these parties directly affect the Debtors' Estate properties.[336]  If an abuse survivor asserts a claim against a co-insured non-Debtor, then such claimant will make a claim against the shared insurance to satisfy any judgments obtained.  In that circumstance, the amount of proceeds available to the Debtors' creditors, including abuse survivors, will be depleted.  This is the case even if the insurance is a "per-occurrence" policy, as claims based on the same occurrence against multiple covered parties are still subject to a limit that would be reduced each time amounts are paid.  Such dollar-for-dollar reduction of an estate's distributable assets necessarily adversely affects a debtor's reorganization and is sufficient to establish an identity of interest and, therefore, "related to" subject-matter jurisdiction.[337]  Additionally, as discussed above, because of the shared nature of the insurance, the settlements with the Settling Insurance Companies incorporated into the Plan are only possible on a global basis.

199.     As such, shared insurance alone establishes "related to" jurisdiction as to all covered Abuse Claims and the Court should exercise its jurisdiction to approve the Scouting-Related Release and Channeling Injunction as proper and necessary to provide the substantial

---

[336]  *See, e.g.*, *W.R. Grace*, 386 B.R. at 29 ("These two avenues, insurance indemnification and separate insurance paid for by the Debtors, further establish the direct impact on the estates occasioned by the Montana Actions against BNSF. Thus, the court has jurisdiction to consider whether to expand the preliminary injunction."); *In re Dow Corning Corp.*, 86 F.3d 482, 495 (6th Cir. 1996) ("Dow Corning's interest in the insurance policies at issue is property of its estate under the expansive definition set forth in 11 U.S.C. § 541(a)(1).  The threat posed to those insurance policies if claims pending against Dow Chemical and Corning Incorporated are permitted to go forward in a separate manner supports a finding of 'related to' jurisdiction under Section 1334(b)").

[337]  *See, e.g.*, *SN Liquid., Inc. v. Icon Int'l, Inc. (In re SN Liquid., Inc.)*, 388 B.R. 579, 583-84 (Bankr. D. Del. 2008) ("Depletion of insurance proceeds which results from indemnification for defense costs would adversely affect the Debtors' estate.").

recovery to abuse survivors available under the Plan.

200.    The Lujan Claimants argue that this Court does not have subject-matter jurisdiction over their claims against their non-debtor Local Council, the Aloha Council, any other "religious orders," or the relevant insurance provider.[338]  They assert that any pending or future lawsuits against these non-Debtors would not affect the Debtors' Estates, as they would be only a "precursor to a separate lawsuit for indemnification or contribution against the BSA or its insurers."[339]  The D & V Claimants make a similar argument with respect to their alleged claims against certain Local Councils and Chartered Organizations.[340]  In so doing, rather than supporting these assertions, the Lujan and D & V Claimants lay out the factual basis for why this Court ***does*** have jurisdiction to approve the Plan with the Scouting-Related Release and Channeling Injunction.

201.    These assertions demonstrate that all of the Scouting-related Abuse Claims subject to the Scouting-Related Release and Channeling Injunction are inextricably intertwined and implicate the Debtors.  If these claimants succeed in litigating their Abuse Claims, they will expose the Debtors to potential claims, deplete assets of the Estates, and prevent current or future settlement agreements with insurers to the extreme detriment of the Debtors and all survivors.[341]  This is precisely the problem solved by incorporating the Scouting-Related Release and Channeling Injunction into the Plan.[342]

202.    Because of the related and intertwined nature of Abuse Claims, the potential for

---

[338]   Lujan Obj. at 6.

[339]   Lujan Obj. at 6.

[340]   D & V Claimants Obj. at 6.

[341]   The BSA reserves all rights and defenses related to any alleged claims to indemnification from any related parties.

[342]   Any claims that the Lujan Claimants hold that are ***not*** Scouting-related Abuse Claims or Mixed Claims are not being channeled and released.  The Debtors assume for purposes of responding to their Objection that the Lujan Claimants are referring only to Scouting-related Abuse Claims or Mixed Claims.

such claims to be asserted against some combination of the Debtors, Local Councils, and Chartered Organizations, and the Debtors', Local Councils', Chartered Organizations' respective overlapping and/or joint insurance coverage, a global solution for all Scouting-related Abuse Claims is paramount. Moreover, the ability to continue the Scouting mission in the current format would be in peril. Emergence from chapter 11 without addressing such claims would preclude the Debtors and the interrelated entities from delivering the Scouting mission. This Court should overrule the D&V Claimants and Lujan Claimants Objections and exercise its jurisdiction to confirm the Plan that contains a nonconsensual third-party release and channeling injunction.[343]

C. **This Court Has Both Constitutional Authority and Statutory Authority to Enter a Confirmation Order Approving the Scouting-Related Release and Channeling Injunction in the Plan.**

203. Several claimants assert that this Court has neither statutory nor constitutional authority to enter a final order.[344] The Guam Committee, J. Doe, Rejecting PW Abuse Survivor, the U.S. Trustee and RCAHC argue that this Court lacks statutory authority to confirm a plan with nonconsensual third-party releases.[345] Indeed, J. Doe and RCAHC assert that this issue is noncore.[346] The law of the Third Circuit, however, is clear: bankruptcy courts have both "*constitutional* and *statutory*" authority to approve plans with nonconsensual third-party

---

[343] *See In re Equan Realty Corp*., Bankr. Case No. 08-14017 (RDD), 2009 WL 7193572, at *1 (Bankr. S.D.N.Y. Dec. 17, 2009) (noting that the confirmation of a plan is a "proceeding arising under title 11"); 1 Collier on Bankruptcy P. 3.01 (16th 2021) (explaining that matters "arising under" title 11 include "confirmation of a plan under chapters 9, 11, 12 or 13").

[344] J. Doe Obj. ¶¶ 30-31; RCACH Obj. at ¶¶ 45, 49; Rejecting PW Obj. ¶¶ 3-4; U.S. Trustee Obj. ¶¶ 48-59; Rejecting PW Obj. ¶¶ 3-4; Guam Committee at 7-8.

[345] J. Doe Obj. ¶¶ 30-31; U.S. Trustee Obj. ¶¶ 48-59; Rejecting PW Obj. ¶¶ 3-4; Guam Committee at 7-8; RCACH Obj. at ¶¶ 45, 49;.

[346] J. Doe Obj. ¶¶ 30-31; RCACH Obj. ¶¶ 45, 49.

releases.[347]  Bankruptcy judges can enter final orders in core proceedings, subject to a right to appeal to the district court.[348]  "Confirmations of plans" is one of sixteen core proceedings.[349]

204.     In addition, as Judge Dorsey recently explained in *Mallinckrodt*, "even in cases where a bankruptcy court exercises its 'core' statutory authority, it may be necessary to consider whether that exercise of authority comports with the Constitution."[350]  This determination requires "a bankruptcy court . . . [to] look to the content of the plan and determine whether the matter is integral to the debtor-creditor relationship."[351]

205.     Here, this Court has constitutional as well as statutory authority over the Scouting-Related Release and Channeling Injunction, which are "critical to the success of the [P]lan" because the Protected and Limited Protected Parties only made their contributions on the condition that the Scouting-related Abuse Claims that have been or could be alleged against them are fully and finally resolved through the Settlement Trust process.[352]  Consequently, the Settlements depend on approval of the release and channeling injunction.  Additionally, as discussed above, the Scouting-Related Release and Channeling Injunction are essential to provide adequate

---

[347]   *See Millennium Lab Holdings II,* 945 F.3d at 135, 137 (finding that the Bankruptcy Court indisputably had 'core' statutory authority to confirm the plan" containing nonconsensual third party releases and considering whether "that exercise of authority comports with the Constitution" by determining whether the matter is "integral to the debtor-creditor relationship"); *Mallinckrodt*, Case 20-12522-JTD, 30 n.69 ("I am applying the law of the Third Circuit which has recognized that bankruptcy courts do have statutory and constitutional authority to approve a plan of reorganization that contains non-consensual third-party release, *albeit,* only in extraordinary cases.").

[348]   *See* 28 U.S.C. § 1334(a) (granting district courts with original and exclusive jurisdiction in all bankruptcy cases); *Amended Standing Order of Reference* (D. Del. Feb. 29, 2012) (referring all bankruptcy cases and their attendant civil proceedings to bankruptcy judges).

[349]   28 U.S.C. § 157(b)(2)(L); *see also* 1 Collier on Bankruptcy ¶ 3.02 (16th ed. 2021) (stating that "[t]here has never been any doubt about the constitutional authority of a nontenured judge to enter final orders" in matters of administration, including confirmation of plan).

[350]   *In re Mallinckrodt PLC*, at 27 [D.I. 6347] (quoting *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 137).

[351]   *See id.*

[352]   *See id.*

protection to non-consenting Chartered Organizations to replace their interests in the BSA Insurance Policies being sold back to the Settling Insurance Companies. Without the Scouting-Related Release and Channeling Injunction, the entire Plan falls apart to the detriment of abuse survivors.

206. Further, the Debtors cannot resolve their "debtor-creditor relationship" with the holders of Abuse Claims in a vacuum. This is an extraordinary case where a global resolution of Scouting-related Abuse Claims against all of the protected parties is necessary due to the interrelated claims of non-debtors to assets of the estates, the interest of the debtors in certain of these non-debtors' property, and the impact on the debtors of the claims against non-debtors. Thus, the Scouting-Related Release and Channeling Injunction are integral to adjustment of the debtor-creditor relationship at the core of the Plan. Thus, this Court has statutory and constitutional authority to approve such provisions and the objections on these grounds should be overruled.

### D. The Statutory Arguments Based on the *Purdue* Decision Should Be Overruled.

207. The Guam Committee, J. Doe, Rejecting PW Abuse Survivor, and the U.S. Trustee rely on the out-of-circuit district court decision in *Purdue* to argue that a bankruptcy court does not have statutory authority to approve plans with nonconsensual third-party releases and channeling injunctions.[353] In particular, the U.S. Trustee cites section 524(g) and (e), section 105, and/or section 1141(a) and (d) to argue that bankruptcy courts cannot authorize nonconsensual third-party releases.[354] But the U.S. Trustee's position—and the *Purdue* decision on which it

---

[353] J. Doe Obj. ¶¶ 30-31; U.S. Trustee Obj. ¶¶ 48-59; Rejecting PW Obj. ¶¶ 3-4; Guam Committee at 7-8 [D.I. 8683].

[354] The D & V Claimants argue that the Court does not have "subject-matter jurisdiction" because their Abuse Claims against Local Councils and Chartered Organizations are pending in the Ninth Circuit, which relies on section 524(e) of the Bankruptcy Code to preclude nonconsensual third-party releases. D & V Claimants Obj. at 3. The Debtors' believe that this assertion is characterized improperly as a subject-matter jurisdiction argument when it is actually a statutory authority argument. Therefore, the merits of this argument is addressed in a paragraph [●] and should be overruled. D & V Claimants Obj. at 3.

relies—is contrary to binding Third Circuit case law.

208. First, section 524(g) does not prohibit nonconsensual third-party releases. Section 524(g) only establishes the procedures that must be followed if the third-party claim to be released is an asbestos-related liability.[355] The U.S. Trustee's assertion that Congress decided "not to provide in the Code for non-consensual releases in nonasbestos" cases[356] requires this Court to read words into a statute that are not there. As the U.S. Trustee himself points out, "Congress knew when it enacted section 524(g) that 'there were non-asbestos bankruptcies.'"[357] Yet, Congress did not include any limitation in section 524(g) (or in any other code section for that matter) on nonconsensual third-party releases outside of the asbestos context.

209. On the contrary, in passing section 524(g), Congress expressly indicated that it was not undoing the then-existing practice of bankruptcy courts granting non-debtor releases.[358] Congress included a rule of construction when it passed the public law that added section 524(g) to the Bankruptcy Code, which stated that nothing in the 1994 amendments to the Bankruptcy Code, *including section 524(g)*, "shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."[359] While the Office of the Law Revision Counsel did not include this rule of construction when it added section 524(g) to the United States Code, it is well-established that "the law" is the "statutes at large" — the text that Congress passed and the President signed — and the

---

[355] 11 U.S.C. § 524(g).

[356] U.S. Trustee Obj. ¶ 53.

[357] U.S. Trustee Obj. ¶ 51.

[358] Such releases were included in high-profile chapter 11 plans both involving asbestos, *Johns-Manville Corp.*, 837 F.2d at 93–94, and mass torts that did not involve asbestos, *A.H. Robins*, 880 F.2d at 702.

[359] Pub. L. 103–394 § 111(b).

subjective process of classifying and including the law in the United States Code "does not in any way affect [a] provision's meaning or validity."[360]  Viewed against this history, the U.S. Trustee is essentially requesting that this Court "write in" a prohibition for non-asbestos nonconsensual third-party releases even though such a prohibition does not exist in the statute and conflicts with the law Congress enacted when it established Section 524(g).  The Court should decline that invitation.

210.    Relying on *Purdue*, the U.S. Trustee reverts to section 524(e) to buttress its reliance on section 524(g), arguing that section 524(e) prohibits nondebtors from receiving a discharge.[361]  But section 524(e) only refers to "discharge" and not "releases," which bankruptcy courts in Delaware have recognized as two distinct concepts.[362]  Section 524(e) states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[363]  This section does not prevent a Plan from incorporating the release of a third party from its own liability on a debt that is part of a debtor's chapter 11 case; it just means that it does not happen by default upon the discharge of a debtor.  This is entirely consistent with decisions from the Third Circuit and this Court and the majority view (including the Sixth, Seventh, and Eleventh Circuits) that allow a plan to include the release of third parties liabilities

---

[360]  Office of the Law Revision Counsel, *About Classification of Laws to the United States Code*, https://uscode.house.gov/about_classification.xhtml.  *See Stephan* v. *United States*, 319 U.S. 423, 426 (1943) (per curiam) (the U.S. Code is only "prima facie" evidence of the law, while the Statutes at Large are "legal" evidence, and "the very meaning of 'prima facie' is that the Code cannot prevail over the Statutes at Large when the two are inconsistent.").

[361]  *In re Purdue Pharma, L.P.*, No. 21-cv-7532 (CM), 2021 WL 5979108, at *49 (S.D.N.Y. Dec. 16, 2021).

[362]  *Mallinckrodt*, No. 20-12522-JTD, at 30 n.69 ("While I am cognizant of the objection by the U.S. Trustee that Section 524(e) of the Code should be read to preclude non-debtor releases, I disagree with the notion that releases are the equivalent of a discharge.")

[363]  11 U.S.C. § 524(e).

in a debtor's case upon a showing of fairness and necessity.[364]

211.    The Third Circuit indicated in *Continental* that there is no statutory barrier to a chapter 11 plan including third party releases.[365]  Following that governing authority, this Court, like other courts in this Circuit, has utilized *Master Mortgage* factors, as articulated in *Continental*, as non-exclusive and disjunctive "helpful guideposts" to aid in determining if the third-party release in question meets the Third Circuit's standard.[366]  The *Master Mortgage* factors look at, among other things, whether the release is necessary for the reorganization, whether there is a mechanism for payment of all or substantially all of the claims affected under the third-party release, and whether the beneficiary of the release made a substantial contribution to the debtor's estate.[367]  Section 524(e) is not implicated or violated when those conditions are met because **more** than just the debtor's discharge is considered and required to release the third-party claims.[368]

---

[364]    *See e.g., In re Kaiser Aluminum Corp.,* No. 02-10429 (JFK), 7312, 2006 WL 616243, at *25 (Bankr. D. Del. Feb. 2006) (approving third party releases and channeling to a trust personal injury claims related to silica products asserted against third parties); *In re America Fam. Enters.,* 256 B.R. 377, 406-08 (D.N.J. 2000) (releasing and channeling to a trust consumer fraud claims asserted against third parties); *see also* See, e.g., *A.H. Robins,* 880 F.2d at 702 (releasing and channeling to trust personal injury claims related to birth control devices asserted against debtors' subsidiaries, affiliates, directors and officers); *Nat'l Hertiage Found., Inc. v. Highbourne Found., Inc.,* 760 F. 3d 344, 350 (4th Cir. 2014) ("the power to authorize non-debtor releases is rooted in a bankruptcy courrt's equitable authority); *In re Dow Corning Corp.,* 280 F.3d 648, 6661 (6th Cir. 2002) (Finding that section 524(e) "does not prohibit the release of a non-debtor" and enumerating seven factors appropriate for determining whether extraordinary circumstances exist such that "the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor."); *In re Airadigm Comm'ns, Inc.,* 519 F.3d 640, 657 (7th Cir. 2008) (same); *In re Seaside Eng'g & Surveyign,* 780 F.2d 1070, 1076-79 (11th Cir. 2015) (finding bankruptcy court's equitable authority under section 105 of the Bankruptcy Code "without more, authorizes such releases").

[365]    *Cont'l Airlines*, 203 F.3d at 211-12 (analyzing whether to approve the nonconsensual third-party release).

[366]    *Cont'l Airlines,* 203 F.3d at 217 (citing *Master Mortgage Investment Fund, Inc.,* 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *Millennium Lab Holdings II,* 591 B.R. at 584.

[367]    *Millennium Labs,* 575 B.R. at 272.

[368]    *See, e.g., In re Dow Corning Corp.,* 280 F.3d 648, 657-59 (6th Cir. 2002) (Finding that section 524(e) "does not prohibit the release of a non-debtor" and enumerating seven factors appropriate for determining whether extraordinary circumstances exist such that "the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor.").; *A.H. Robins,* 880 F.2d at 702 (releasing and channeling to trust personal injury claims related to birth control devices asserted against debtors' subsidiaries, affiliates, directors and officers); *In re Specialty Equip. Co.,* 3 F.3d 1043, 1047 (7th Cir. 1993).

Therefore, under the majority view and the law of this Circuit, section 524(e) does not limit a bankruptcy court's authority to grant a nonconsensual third-party release.[369]

212.    The U.S. Trustee's reliance on section 1141(a) and (d) is also misplaced and runs contrary to the law of this circuit.  Section 1141(a) states that "[e]xcept as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor . . . and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest . . . is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan."    Rather than disallow the practice, this section expressly contemplates and provides that confirmation of a plan can bind nonconsenting creditors.   In addition, the U.S. Trustee's argument regarding section 1141 relies upon the misconception that a discharge and a release are one and the same.  This is incorrect.  Indeed, debtors can still confirm a plan with releases even if there is no discharge under section 1141.[370]  For example, section 1141(d)(3) states that a debtor cannot receive a discharge if the debtor's plan provides for the "liquidation of all or substantially all of the property of the estate."[371]  However, this Court and courts in other jurisdictions have confirmed liquidating plans that release debtors[372] and non-

---

[369]    *In re Dow Corning Corp.,* 280 F.3d at 656 ("[T]he bankruptcy court, as a forum for resolving large and complex mass litigations, has substantial power to reorder creditor-debtor relations need to active a successful reorganization. . .Moreover, it is an 'ancient but very much alive doctrine . . .[that]. . .a creditor has no right to choose which of two funds will pay his claim.  Likewise, when a plan provides for the full payment of all claims, enjoining claims against a non-debtor so as not to defeat reorganization is consistent with the bankruptcy court's primary function.") (internal citation omitted).

[370]    11 U.S.C. § 1141(d)(3) (setting forth the circumstances under which confirmation does not discharge a debtor).

[371]    *Id.*

[372]    *See In re Blitz U.S.A.,* No. 11-13603 (PJW), 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014); *In re United Steel Enters., Inc.,* No. 03-50284 (NLW), 2009 WL 1025398 (Bankr. D. N.J. Jan. 15, 2009).

debtors alike.[373]  Therefore, the U.S. Trustee's objection on these grounds should be overruled.

213.    Lastly, the assertion that this Court cannot rely on section 105(a) to approve a third-party release is also incorrect.[374]  Section 105(a) is the source of broad equitable powers, and vests a bankruptcy court with the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out provisions of this title."[375]  The Third Circuit as well as lower courts have relied on section 105(a) of the Bankruptcy Code to approve third-party releases in the mass tort context in numerous cases.[376]  Indeed, section 105(a) is expressly designed to empower bankruptcy courts to adopt flexible remedies to carry out the provisions of the Bankruptcy Code.[377]

214.    The U.S. Trustee cites *Continental* for the proposition that section 105(a) "does not authorize the bankruptcy court to create substantive rights that do not otherwise exist under the Bankruptcy Code."[378]  But *Continental* ruled that courts are expressly authorized under section 105(a) to craft remedies such as nonconsensual third-party releases that are consistent with the

---

[373]    *In re The Weinstein Company Holdings, LLC,* No. 18-10601 (Bankr. D. Del. Jan. 26, 2021) [D.I. 3203]; *David v. Weinstein Co. Holdings, LLC,* 2021 WL 979603 (D. Del. Mar. 16, 2021) (affirming Bankruptcy Court's finding that nonconsensual third party releases of former officers and directors were necessary to Plan of liquidation because of indemnification obligations).

[374]    UST Obj. ¶ 54 [D.I. 8710].

[375]    *See* 11 U.S.C. § 105(a).

[376]    *See In re Glob. Indus. Techs., Inc.,* 645 F.3d 201, 206 (3d Cir. 2011) ("the Plan to be approved as designed (*i.e.,* with the inclusion of the Silica Injunction), the debtors needed to show that the Plan's resolution of silica-related claims is necessary or appropriate under 11 U.S.C. § 105(a), which, under our precedent, requires showing with specificity that the Silica Injunction is both necessary to the reorganization and fair.") (citing *Gillman v. Continental Airlines (In re Continental Airlines),* 203 F.3d 203 , 214 (3d Cir. 2000) (holding that a third-party injunction would only be proper under § 105(a) if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair); *see also In re Blitz U.S.A., Inc.,* 2014 WL 2582976 (Bankr. D. Del. 2014) (approving a channeling injunction under section 105(a) for tort claims relating to the Debtors' manufactured gasoline cans); *In re Kaiser Aluminum Corp.,* 2006 WL 616243 (Bankr. D. Del. 2006), *order aff'd,* 343 B.R. 88 (D. Del. 2006) (approving channeling injunctions under section 105(a) for mass tort claims); *In re Am. Family Enters,* 256 B.R. 377, 406–08 (D.N.J. 2000) (authorizing issuance of third-party release and channeling injunction for consumer fraud claims under section 105(a)).

[377]    *See Official Comm. Of Unsecured Creditors of Cybergencis Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 568 (3d Cir. 2003) (recognizing that bankruptcy courts "are able to craft flexible remedies, while not expressly authorized by the Code, effect the result the Code was designed to obtain.").

[378]    U.S. Trustee Obj. ¶ 54

overall intent of the Code—the successful and equitable reorganization of a debtor—even if they are not otherwise statutorily authorized.[379]  Indeed, although the *Continental* court stated that section 105(a) did not create substantive rights,[380] The Third Circuit went on to consider whether the nonconsensual third-party release was fair and necessary to the reorganization.[381]  Thus, the question of whether section 105(a) can create substantive rights is a *non-sequitur* when analyzing the authority to grant non-debtor releases.

215.    In addition to section 105(a), the Court's authority is established under section 1123(b)(6), which provides that a plan "may include any other appropriate provisions not inconsistent with the applicable provisions" of the Code.[382]  The Scouting-Related Release and Channeling Injunction are not inconsistent with any other provision in the Bankruptcy Code.  As explained above, no provision precludes nonconsensual third-party releases in the chapter 11 plan context.  Thus, the Guam Committee's, J. Doe's, the Rejecting PW Abuse Survivor's, and the U.S. Trustee's objections[383] to this Court's statutory authority to approve nonconsensual third-party releases fails.  This Court has statutory and constitutional authority to confirm the Plan with the Scouting-Related Release and Channeling Injunction provisions and the Objections should be overruled.

E.    **The Scouting-Related Release and Channeling Injunction Are Permissible and Warranted Under the Circumstances.**

216.    Under binding Third Circuit precedent, the Court should approve non-debtor

---

[379]    U.S. Trustee Obj. ¶ 54.

[380]    203 F.3d at 211, 215-17.

[381]    *Id*. at 215-17.

[382]    *See* 11 U.S.C. § 1123(b)(6).

[383]    J. Doe Obj. ¶¶ 30-31; U.S. Trustee Obj. ¶¶ 48-59; Rejecting PW Obj. ¶¶ 3-4; Guam Committee at 7-8.

releases and related channeling injunctions when (a) the non-debtor release and/or channeling injunction satisfy the hallmarks of fairness and necessity to the chapter 11 plan and are given in exchange for fair consideration[384] and (b) there are exceptional circumstances warranting such relief.[385]

217.    While this Court need go no further in approving the Scouting-Related Release and Channeling Injunction than to apply the "fair and necessary" standard articulated in *Continental* and subsequent Third Circuit authority, courts in this circuit have often considered the *Master Mortgage* factors as "helpful guideposts" to determine whether the "fairness and necessary" *Continental* standard has been met.[386] This standard has been satisfied here.

### 1.    Each of the Master Mortgage Factors Have Been Satisfied in these Cases.

218.    Courts in the Third Circuit have considered the following non-exclusive and disjunctive *Master Mortgage* factors in determining whether the fair and necessary standard has been met.[387]

---

[384] 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000) ((holding that a third-party injunction would only be proper under section 105(a) of the Bankruptcy Code if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair).

[385] *Cont'l Airlines*, 203 F.3d at 217 (citing *Master Mortgage Investment Fund, Inc.,* 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *Millennium Lab Holdings II*, 945 F.3d at 139.

[386] It is most common for bankruptcy courts to apply the *Master Mortgage* factors when considering approval approve of a debtor's release of third parties.  *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 303-04 (Bankr. D. Del. 2013) (citing *Master Mortgage*); *In re Spansion*, 426 B.R. 114, 142-43 (Bankr. D. Del. 2010) (same).  In *Millennium Labs,* this Court applied *Master Mortgage* to determine whether third-party releases should be approved in a plan.  *Millennium Labs*, 575 B.R. at 272 ("The *Master Mortgage* factors, like the *Dow* factors (or any other standard in circuits that permit third party releases), are a federal, judicially-created yardstick against which a [third-party] release is measured."); *see also Millennium Lab,* 591 B.R. 559, 584 (D. Del. 2018) (referring the *Master Mortgage* factors as "helpful guideposts"); *Millennium Lab*, 543 B.R. 703, 711 (Bankr. D. Del. 2016) ("In making that determination, I considered the factors articulated in *In re Master Mortgage*. . .but ultimately returned to the *Continental* hallmarks.").

[387] *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303-04 (Bankr. D. Del. 2013) (citing *Master Mortgage*); *In re Spansion*, 426 B.R. 114, 142-43 (Bankr. D. Del. 2010) (same).

(a) whether there is an identity of interest between the debtor and the third party such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

(b) whether the non-debtor made a substantial contribution of assets to the reorganization;

(c) the essential nature of the injunction to the reorganization to the extent that there is little likelihood of success without the injunction;

(d) whether a substantial majority of creditors agree to such injunction, specifically if the impacted class or classes "overwhelmingly" voted to accept the plan; and

(e) whether the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.[388]

The evidence will demonstrate that the Scouting-Related Release and the Channeling Injunction satisfy the fair and necessary hallmarks under *Continental*, as guided by the *Master Mortgage* factors, and thus, should be approved.[389]

### (a) Identity of Interests

219. Courts in this circuit have found that there is an identity of interest between a debtor and non-debtor on various grounds, including when: (a) claims asserted against a non-debtor would be paid ultimately from the proceeds of a debtor's insurance policy, (b) the debtors are obligated to indemnify, reimburse, or otherwise advance funds pursuant to a contractual arrangement with the non-debtor party, or (c) the debtor and non-debtor share a common goal of

---

[388] *Tribune Co.*, 464 B.R. at 186 (stating that "these factors are neither exclusive nor conjunctive requirements" and they simply provide guidance in this Court's determination of fairness).

[389] *See Cont'l Airlines,* 203 F.3d at 214 ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions[.]"); *In re Global Indus. Techs., Inc.,* 645 F.3d 201, 206 (3d Cir 2011) (explaining that the injunction must be "both necessary to the reorganization and fair"); *Millennium Lab Holdings,* 945 F.3D at 139 (same) (citing *Cont'l Airlines* and *Global Industrial*).

confirming the Plan and implementing a settlement of complex multi-party litigation.[390] Moreover, as explained above, the contingent interest of the BSA in property of Local Council likes establishes an identity of interests.

220.    Certain Insurers object to the Debtors' showing of an identity of interest on the basis that indemnification rights alone are insufficient.[391]  The Guam Committee makes a similar objection, largely based upon its fundamental misunderstanding of the Plan, including the treatment of Mixed Claims and the definition of Abuse Claims, as well as its assertion that the Archdiocese of Agaña does not share an identity of interest with the Debtors because claims asserted against the Archdiocese of Agaña "do not threaten to deplete the assets of the Debtors."[392] This ignores the fact that their attempt to exercise control over the Debtors' insurance coverage would necessarily interfere with the settlements that are fundamental to establishing the largest pool of funds ever compiled for abuse survivors as well as the Debtors' contingent reversionary interest in Local Council assets that these survivors would otherwise target.

221.    As explained above, however, the Debtors and non-Debtor parties potentially subject to the Scouting-Related Release and Channeling Injunction share several key commonalities and factors that courts in the Third Circuit have recognized as sufficient to prove an identity of interest with the Debtors.

222.    A suit against a non-Debtor party potentially subject to the Scouting-Related Release and Channeling Injunction is essentially a suit against the Debtors based on the shared

---

[390]    *See Blitz U.S.A.*, 2014 WL 2582976, at *6 (finding an identity of interest between the debtor and several other parties due to, among other things, indemnification obligations and shared insurance proceeds); *Tribune*, 464 B.R. at 187 (finding that debtors and releasees "share the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest" for purposes of the *Master Mortgage* factors).

[391]    Certain Insures' Obj. ¶ 100 [D.I. 8695].

[392]    Guam Comm. Obj. at 11-13 (citing no supporting case law) [D.I. 8683].

policies and, to the extent applicable, indemnification rights.[393]  It is wholly consistent with the hallmarks of fairness to include such parties in the release and channeling injunction in exchange for their substantial contributions, considering their close identity of interest with the Debtors.  As discussed in more detail below, because the Abuse Claims subject to the Scouting-Related Release and Channeling Injunction are narrowly tailored to those that would either be paid from the proceeds of the Debtors' insurance, would potentially subject the Debtors to indemnification claims or other derivative liability or demands, or are mandated by the settlement of complex multi-party litigation that is fundamental to the Plan, there is an identity of interest with the non-Debtor parties potentially subject to the Scouting-Related Release and Channeling Injunction to warrant inclusion in the Scouting-Related Release and Channeling Injunction.[394]

### (1) Local Councils

223.    Each of the Local Councils and certain Representatives thereof are either named directly or are additional insureds under the BSA Insurance Policies, as discussed above.  Nearly half of Local Councils have also asserted indemnification rights against the Debtors in proofs of claim.[395]

---

[393]  *See, e.g., In re TK Holdings Inc.,* 17-11375 (Bankr. D. Del. 2018) [D.I. 2109] ("There are indemnification obligations that are running in every possible direction; in addition, many, if not all of the release parties, including officer and directors of the debtor entities, are parties that would have meaningful indemnification rights . . . So, the fact of the matter is . . . litigation against the debtor is often litigation against multiple parties . . . I am satisfied that the identity of interest prong has been satisfied."); *See, e.g., In re W.R. Grace & Co.,* No. 01-1139 (JKF), 2011 WL 381942, at 7 (Bankr. D. Del. Jan. 31, 2011), *report and recommendation adopted,* 468 B.R. 81 (D. Del. 2012) (finding an identity of interest exists among the Debtors and the Asbestos Protected Parties such that an Asbestos PI Claim . . . asserted against any of the Asbestos Protected Parties gives rise to a Claim against the Debtors, including by the operation of law of indemnity (contractual or otherwise) and/or contribution . . .").

[394]  *In re Millennium Lab Holdings II, LLC,* 591 B.R. 559, 584 (D. Del. 2018) (referring to the *Master Mortgage* factors as "helpful guideposts" even if they are not dispositive); *In re Millennium Lab Holdings II, LLC,* 543 B.R. 703, 711 (Bankr. D. Del. 2016) ("In making that determination, I considered the factors articulated in *In re Master Mortgage* …, but ultimately returned to the *Continental* hallmarks.")

[395]  *See* Notice of Further Supplemental Stipulation Regarding Certain Local Council Indemnity, Contribution, and Related Claims [D.I. 1714] (each of the Local Council signatories to this stipulation asserted a claim against the Debtors for indemnity, contribution, reimbursement, or subrogation).

224. Without Local Councils, the BSA could not accomplish its charitable mission. Although they are legally independent, each Local Council must organize, operate, and promote Scouting in a manner consistent with the BSA's mission and with the BSA's charter, bylaws, rules and regulations, policies, and guidelines. They provide numerous services that are essential to Scouting, including, among other things, the recruiting of Chartered Organizations, funding of local Scouting programs, recruiting of Scouts and volunteer leaders, providing training, and operating the camps and facilities essential to deliver the Scouting mission. The Local Councils also are the point of contact for most donors to Scouting, maintaining donor relationships that are essential to ensuring the funding of Scouting programs nationwide.

225. The Local Councils are making a substantial contribution under the Plan, including, among other things, assignment of all interests in the BSA Insurance Policies, the Local Counsel Insurance Policies, and the Insurance Settlement Agreements, to the maximum extent permitted under applicable law. These contributions are critical to the Plan because of the interrelated nature of, and joint insurance coverage for, the Local Councils and the Debtors. Any ability for parties to pursue Abuse Claims against Local Councils outside of the Plan process would destroy the recovery for abuse survivors: absent a global resolution of the Abuse Claims, Local Councils would not agree to make their substantial financial contribution or contribute their substantial shared and individual insurance rights, without which $1.656 billion in insurance settlements would fall away.

226. There is also significant overlap between the Local Council Insurance Policies and the BSA Insurance Policies. Such overlap requires a global resolution of Scouting-related Abuse

Claims under the BSA and Local Council Insurance Policies.[396]

227.    In addition, as Scouting is the crux of the BSA's charitable mission and the core of its relationship with the Local Councils, Abuse Claims related to Scouting necessarily involve both a Local Council and the BSA.  Indeed, Local Councils have been expressly named as defendants in hundreds of prepetition lawsuits (and thousands of proofs of claim) alleging Scouting-Related Abuse.[397]  Thus, prior to the Petition Date, the BSA litigated and administered these cases on the Local Councils' behalf.  More specifically, the BSA would facilitate the retention of joint defense counsel, respond to the vast majority of discovery requests, coordinate with insurance carriers, and authorize and fund the payment of any settlement amounts related to the pending Abuse actions or similar, previously resolved Claims.  It is the unique relationship between the BSA and Local Councils, as described above, that warranted the BSA's involvement in these cases against Local Councils prior to the Petition Date, as an Abuse Claim related to Scouting that involves the Local Councils necessarily involves the BSA and its assets.  Courts have recognized that there is an identity of interest where litigation against third parties will deplete assets of the estate.[398]

228.    The BSA believes there is also an identity of interest between the Debtors and the Local Councils on the grounds that the BSA has a reversionary interest in the Local Council's property under certain circumstances.  The BSA has chartered 251 Local Councils.  Pursuant to the Bylaws, the BSA may revoke or refuse to renew a Local Council charter when the BSA

---

[396]   *See* Plan, Schedule 2 and 3.

[397]   *See* Amended Schedule 1 to Consent Order [Adv. D.I. 212].

[398]   *In re Spansion, Inc.*, 426 B.R. at 114, n. 47 ("The first *Zenith* factor requires an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.").

believes such action is in the best interest of Scouting.[399] In such circumstances, the articles of incorporation for the particular Local Council provide that such council will take the necessary actions to dissolve the entity.[400] Upon dissolution, the Local Council's property will be used to satisfy its liabilities and then all rights with respect to any remaining property that belonged to the dissolved Local Council will vest in the BSA. This nexus between the Local Councils' properties and the Debtors create an identity of interest that justifies including the Local Councils as Protected Parties in the Scouting-Related Release and the Channeling Injunction.

### (2) Chartered Organizations

229. The Scouting-Related Release and Channeling Injunction provided under the Plan are narrowly tailored to cover only those Abuse Claims against Contributing, Participating or Opt-Out Chartered Organizations. There is an identity of interest between these parties through a common mission, shared insurance policies, complex settlement agreements, and/or other contributions to the Plan and the Debtors' ongoing charitable mission. Certain Abuse Claims against Chartered Organizations are covered under certain BSA Insurance Policies, as discussed above. As such, Chartered Organizations have an interest in those assets of the Debtors. Chartered Organizations are also covered under certain Local Council Policies. The proceeds available under both the BSA Insurance Policies and Local Council Insurance Policies to compensate abuse survivors will decrease if holders of Abuse Claims could pursue the channeled Abuse Claims

---

[399] *See* BSA Bylaws, dated June 2019, Art. VI, Sec. 4 ("The Executive Committee may revoke or modify the charter of a local council at any time in its sole discretion when it is believed to be in the best interest of the Scouting movement.") (hereinafter referred to and cited as "<u>Bylaws</u>"); Bylaws, Art. VI, Sec. 3. ("The regional executive committee may, with the approval of the Executive Committee, refuse to renew a local council charter in any instance where it deems such action advisable in the interests of Scouting.").

[400] *See, e.g.,* Mobile Area Council Articles of Incorporation, Art. II. Duration ("The corporation shall have perpetual existence but shall take such action as may be necessary to dissolve in the event of the revocation or termination of its charter from the Boy Scouts of America, a corporation organized under Act of Congress.").

against a Chartered Organization in the civil tort system and ultimately receive payment from a BSA Insurance Policy or a Local Council Insurance Policy. To the extent that the proceeds of a Local Council Insurance Policy are diminished by payment on an Abuse Claim against a Chartered Organization, the Local Council's remaining policy coverage will likely also be diminished, thereby placing the Local Council at increased risk of having to respond to an Abuse Claim without complete coverage. Such an outcome may impair the Debtors' contingent reversionary interest in the Local Council's assets.

230.     There is also identity of interest between the Debtors and Chartered Organizations because an Abuse Claim alleged against a Chartered Organization that relates to Scouting will necessarily implicate the Debtors. Chartered Organizations partner with Local Councils to form the packs, troops, and other units that deliver the BSA's Scouting program. Individual Scouting units are typically run by representatives of the Chartered Organization. Consequently, abuse survivors often named Chartered Organizations in prepetition lawsuits (and in thousands of Proofs of Claim). Courts have recognized an identity of interest in such a circumstance.[401] Thus, there is an identity of interest between the Chartered Organizations and the BSA sufficient to justify the limited Scouting-Related Release and Channeling Injunctions applicable to such organizations.

231.     The Guam Committee argues that there is no identity of interest between the Archdiocese of Agaña and the BSA. Among other things, it asserts that Guam abuse survivors have direct claims against the Archdiocese of Agaña employees in connection with Abuse that occurred "both during church functions and BSA activities" and that the "Plan definition of 'Abuse Claim' . . . encompass[es] the Guam [s]urvivors' entire mixed claim against BSA and the

---

[401]  *Master Mortgage Investment Fund, Inc.*, 168 B.R. at 935.

Archdioceses" such that the "Guam [s]urvivors' entire claim might be enjoined even if some of the abuse occurred solely in connection with church functions."[402]  The Guam Committee further contends that liabilities against the Archdiocese do not threaten to deplete the assets of the Debtors' bankruptcy estate because the BSA can resolve the BSA's liability for the joint tortfeasor claims while preserving the Guam survivors' claims against the Archdiocese.[403]  Finally, the Guam Committee asserts that the Archdiocese and the BSA's independent acts could be "per occurrence" claims under the BSA Insurance Policies, which means that there is no limit and no risk to depleting estate assets.[404]

232.    The Guam Committee's arguments are based upon a fundamental misunderstanding of the Plan, the definition of Abuse Claim, the Debtors' insurance policies, and the complex settlement agreements incorporated into the Plan.  The Plan and Scouting-Related Release and Channeling Injunction is narrowly tailored to ***only*** channel Scouting-related Abuse Claims.  The Plan specifically carves out non-Scouting-related Abuse Claims, ***including the non-scouting related portion of a Mixed Claim***, remain unaffected.  Those claims remain unaffected under the Plan.

233.    Because the Plan only channels Scouting-related Abuse Claims, it is also incorrect for the Guam Committee to contend that the liabilities that are being channeled under the Plan may not deplete the assets of the Debtors' bankruptcy estate.  The ***only*** claims that are being channeled are Scouting-related Abuse Claims, and those claims necessarily could be asserted against the Debtors and thereby impair their assets.  Similarly, the Guam Committee mischaracterizes the

---

[402]   Guam Comm. Obj., at 11-13.

[403]   Guam Comm. Obj., at 11-13.

[404]   Guam Comm. Obj., at 11-13.

operation of the Plan when it contends that the BSA can resolve its liability for the joint tortfeasor claims while preserving the Guam survivors' claims against the Archdiocese. The Plan already protects such to the extent that they are (a) unrelated to Scouting, or (b) the non-Scouting related portion of a Mixed Claim. The Plan is carefully tailored **only** to reach Scouting-related Abuse Claims while being comprehensive in potentially encompassing **all** Scouting-related Abuse Claims.

234. For the Plan to be viable, it is essential that the Channeling Injunction must cover all Scouting-related Abuse claims, including such claims that would be covered by the Debtors' insurance. Even if the insurance applicable to a pertinent Scouting-related claim is from a "per-occurrence" policy (something the Guam Committee contends but not proven), diminution of the amounts available for each such occurrence would still reduce what is available for abuse survivors under the Plan. Most importantly, if there is no identity of interest and the Guam survivors have independent claims against the church for direct Abuse unrelated to Scouting, such claims are not impacted by the Plan or the Channeling Injunction, and Guam survivors are free to pursue such claims against the Archdiocese of Agaña. The fact that the Scouting-related Release and Channeling Injunction is specifically tailored not to cover such claims proves, rather than disproves, the identity of interest related to the Channeled Abuse Claims. Thus, Guam Committee's objection should be overruled.

### (3) TCJC

235. Until December 31, 2019, TCJC had been the largest Chartered Organization and partner of the BSA. During their robust relationship from 1913 to December 2019, the BSA's Scouting program was the official activity program for TCJC youth and consequently, the organizations became integrated with each other. Other Chartered Organizations did not share

such a deep connection with the BSA; virtually all youth involved in TCJC necessarily became part of Scouting. There are at least three pending abuse lawsuits related to Scouting that name TCJC as a co-defendant along with the BSA. Thousands of proofs of claim for Abuse related to Scouting assert that TCJC or its employees are jointly liable. TCJC and/or individuals affiliated with TCJC are named or additional insureds under certain of the BSA Insurance Policies for activities related to Scouting, as discussed above. In addition, TCJC asserts the BSA must indemnify, hold harmless, assume, and defend TCJC and its employees, officers, and directors on account of claims arising or alleged to have arisen out of the BSA activities or the acts or omissions of the BSA and/or its Local Councils, Chartered Organizations, or other affiliates in the use of real or personal property belonging to TCJC on various separate occasions. And the BSA defended many such claims prepetition.

236.     Moreover, the interrelated nature of TCJC and the Debtors is demonstrated by the fact that prior to leaving Scouting, TCJC used Scouting as its primary youth ministry and all of its members were encouraged to participate. The Abuse Claims that are related to TCJC arise from a common nucleus of facts involving the BSA and TCJC's indivisible conduct in administering the Scouting program during their 105-year relationship. As such, there is an identity of interest between the Debtors and TCJC under these circumstances.

237.     TCJC, along with the other parties to the settlement, has engaged in countless hours of mediation to reach the TCJC Settlement set forth in the Plan. The TCJC Settlement is a complex multiparty agreement that, in exchange for TCJC's $250 million contribution to the Settlement Trust, fully and finally resolves all Scouting related Abuse Claims against TCJC and TCJC's alleged Indirect Abuse Claims against the Debtors and other Protected Parties. A global resolution of Abuse Claims against TCJC and the Debtors is essential to the Insurance Settlements. As a

result, TCJC has an interest in confirmation of the Plan that is sufficient to establish an identity of interest between it and the Debtors.[405]

### (4) The United Methodist Entities

238. The United Methodist Entities are or have been Chartered Organizations. They have alleged that the BSA has an obligation to indemnify or hold them harmless for any injuries or damages arising out of official Scouting activities. Equally important, such entities are named or additional insureds under certain of the BSA Insurance Policies. Similar to TCJC, the United Methodist Entities have expended significant time and resources on mediation to reach a settlement agreement with the Debtors supported by the vast majority of abuse survivor representatives. Thus, the United Methodist Entities share a common goal of seeing the Plan confirmed and abuse survivors fairly compensated. Moreover, the United Methodist Entities remain integral to Scouting and their continued membership growth, sharing with the BSA a common goal of continuing the BSA's mission. Thus, there is an identity of interest between the members of the United Methodist Entities and the Debtors.

### (5) Insurance Companies

239. The Insurance Companies, including the Settling Insurance Companies, have issued certain BSA Insurance Policies, as discussed above.[406] The nature of the contractual relationship between the BSA and the Insurance Companies establishes an identity of interest between them. Allowing an Abuse Claim covered by a BSA Insurance Policy issued by an

---

[405] *See Tribune*, 464 B.R. at 187 (finding that debtors and releasees "share the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest" for purposes of the *Master Mortgage* factors).

[406] The Debtors incorporate all statements regarding the BSA Insurance Policies regarding the Settlement Insurance Companies that support that there is an identity of interest between the Protected Parties and the Debtors that justify this *Master Mortgage* factor.

Insurance Company to proceed outside of the Plan process would, among other things, diminish Estate assets, prevent the settlement agreements with such insurers, and eliminate significant contributions of cash being made available to survivors.

### (6)     Related Non-Debtor Entities

240.     The Related Non-Debtor Entities are additional insureds under the BSA Insurance Policies that are being contributed to the Settlement Trust. As such, Abuse Claims against them directly affect the BSA Insurance Policies.

241.     In addition, each of the Related Non-Debtor Entities share a common goal in the Debtors' restructuring and support the charitable mission of Scouting. Some Related Non-Debtor Entities are subsidiaries of the Debtors, and the others are under the BSA's control. Each of these Related Non-Debtor Entities play an essential role in the BSA's Scouting mission, including (a) providing nationwide programs for children in areas, such as anti-bullying and self-esteem, (b) working with Local Councils and donors to facilitate philanthropy and engage youth, and (c) managing operations. Their close involvement in Scouting has resulted in Abuse Claims being alleged against them. As such, a comprehensive solution for such Claims aligns with the Related Non-Debtor Entities' goals. Thus, an identity of interest exists between the Related Non-Debtor Parties and Debtors.

### (7)     Representatives of Protected Parties

242.     Certain Representatives are either named or additional insureds under the BSA Insurance Policies. These policies state that all affiliates and subsidiaries of the BSA, National Council, and Local Councils are covered parties. Consequently, claims against such Representatives would impact the proceeds of the BSA Insurance Policies. Further, certain Representatives have indemnification, reimbursement, and/or contribution rights from the

applicable Protected Party based on contractual arrangements or other governance documents, including (a) specific board actions or resolutions, (b) articles of incorporation or articles of organization, (c) bylaws and operating agreements, (d) employment agreements, (e) statute or common law, and (f) engagement or retention agreements. Although the Debtors reserve all rights in connection with the existence of such rights, a suit against a Representative will either be or likely result in a suit against the Debtors.

243. In addition, Chartered Organization and their Representatives may bring indemnification claims against Local Councils. As discussed above, Local Councils have agreed to indemnify Chartered Organizations in certain scenarios pursuant to charter agreements.[407] Chartered Organizations have asserted that this provision requires that Local Councils indemnify them and their Representatives. In this scenario, any Abuse Claim arising from indemnification obligations that diminishes a Local Council's assets diminishes the value of the BSA's Estate. Courts in the Third Circuit has recognized that there is an identity of interest in this scenario.[408]

244. Lastly, the Debtors and non-Debtor parties potentially subject to the Scouting-Related Release and Channeling Injunction have a further identity of interest due to their shared goal of implementing the restructuring in the Plan that will provide a meaningful recovery for abuse survivors and allow the BSA to continue its charitable mission. Many of the non-Debtor parties potentially subject to the Scouting-Related Release and Channeling Injunction spent countless hours and effort and expended significant resources negotiating the terms of the settlements under the Plan, thus demonstrating a vested interest in seeing the Plan confirmed.

---

[407] Form of Annual Unit Charter Agreement 2020.

[408] *Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

Courts have recognized a unified interest in a debtor's restructuring objectives as a basis to establish an identity of interest between the debtor and non-debtor parties benefitting from the release and channeling injunction.[409]

### (b) Substantial Contributions to the Settlement Trust

245. Confirmation of the Plan depends on (a) contributions of more than $2.575 billion from, or on behalf of, Settling Insurance Companies, Chartered Organizations, and Local Councils for or on behalf of parties that will benefit from the Scouting-Related Release and Channeling Injunction, and (b) the contribution of significant interests in and coverage rights under the applicable insurance policies. Without these substantial contributions from or on behalf of the Protected Parties, Limited Protected Parties, and Opt-Out Chartered Organizations, the Debtors would not be able to confirm the Plan, let alone fund the $2.7 billion Settlement Trust.

246. Importantly, the representatives of the majority of abuse survivors receiving distributions from the Settlement Trust were integral in negotiating the settlements and specifically, the amounts of contributions from each of the parties receiving the Scouting-Related Release and Channeling Injunction. These Claimant Representatives have determined that the settlement contributions required under the Plan are substantial with respect to each of the Protected parties and Limited Protected Parties receiving releases.

247. "It is within the bankruptcy court's discretion to determine whether the nature and size of the consideration rises to the level of a 'substantial' contribution."[410] A bankruptcy court

---

[409] *Coram Healthcare*, 315 B.R. at 335 ("Although the noteholders do not share an identity of interest with the estate on the matter of the litigation (unlike a debtor's insurance carrier or directors and officers who may have indemnification agreements with the debtor), as the largest creditors and preferred shareholders they do share a common goal of achieving a reorganization of the Debtors.").

[410] *In re rue21, Inc.*, 575 B.R. 314, 326 (Bankr. W.D. Pa. 2017) (finding a substantial contribution where there was valuable and material contribution to the estate though the success of the plan of reorganization was not contingent on the release at issue).

will consider the value of the contributions to the specific estate when determining whether the consideration provided constitutes a substantial contribution.[411] Courts in the Third Circuit have found that non-debtors have made substantial contributions to a Plan when they have contributed, among other things, cash, capital to cover operating shortfalls after a plan's effective date, rights assigned to a trust, and/or released claims against the debtor.[412]

248.    As is critical here, courts have considered nonconsensual third-party releases and channeling injunctions to be essential to a reorganization and fair when the success of a debtor's plan hinges on the third-party contributors receiving a release in exchange for their substantial contributions that make the Plan feasible.[413] Each of the parties' contributions to the Settlement Trust are addressed below.

### (1)    The Local Councils' Contributions to the Trust

249.    The Local Councils are contributing, among other things, (a) $500 million in cash and property in the aggregate, (b) the $100 million DST Note, (c) their own Local Council Insurance Policies,[414] and (d) material insurance rights in the BSA Insurance Policies[415] to the Settlement Trust in exchange for status as Protected Parties under the Scouting-Related Release

---

[411]  *In re Washington Mutual Inc.*, 42 B.R. 314, 348 (Bankr. D. Del. 2011); *In re Indianapolis Downs, LLC*, 486 B.R. at 304 (finding substantial contribution from senior management and holders of equity and debt instruments of the debtors where post-petition services were performed for the debtors without compensation).

[412]  *Millennium Lab*, 575 B.R. at 261 (finding that certain non-debtor parties' $325 million contribution in exchange for third-party releases constituted substantial contribution in satisfaction of the *Master Mortgage* factors); *Am. Family Enters.*, 256 B.R. at 406-08 (finding that a third party's contribution of more than $70 million to fund, in part, consumer fraud victim's fund, was a substantial contribution supporting protection under channeling injunction); *Blitz U.S.A.*, Case No. 11-13603 (PJW) (approving third party nonconsensual release and channeling injunction for protected parties, including, among others, (a) Walmart, which contributed more than $24 million to the personal injury trust and waived various claims and (b) certain insurers, who contributed more than $137 million to the personal injury trust).

[413]  *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 137.

[414]  Gutzler, Expert Report, at 7 (Dec. 5, 2021).

[415]  Gutzler, Expert Report, at 7 (Dec. 5, 2021).

and Channeling Injunction (as defined in the Plan, the "Local Council Settlement Contribution"). The Local Council Settlement Contribution results from significant and extensive mediation between the LC Committee, Coalition, TCC, FCR, and the Debtors. Each Local Council has signed a letter of intent to contribute the settlement amounts allocated thereto under the LC Committee allocation model.

250. This is separate and apart from the Supplemental LC Contribution being made on behalf of Chartered Organizations under the Chartered Organization Contribution.[416] This supplemental contribution to the Settlement Trust provides an aggregate of approximately $40 million in additional consideration, including cash and property of not less than $15 million and an increase in the principal amount of the DST Note between $21 and $25 million, and serves as consideration to facilitate the protections to certain Chartered Organizations, including with respect to the Post-Confirmation Interim Injunction. This supplemental contribution includes up to $100 million from BSA and Local Councils under a Settlement Growth Payment, with the amount payable depending on future membership growth.

251. The contributions from the Local Councils, which aggregate many hundreds of millions of dollars, are, therefore, manifestly substantial. By the same token, it must be recognized that there are inherent limits on the ability of Local Councils to contribute their assets because each of the Local Councils is itself a non-profit organization. As a result, the restricted assets of a Local Council cannot be included in any calculation of their contribution to the Settlement Trust because assets of a non-profit that are restricted for a particular purpose as a matter of law cannot be

---

[416] Plan, Art. I.A.59 (defining Chartered Organization Contribution to mean the Supplemental LC Contribution and the Settlement Growth Payment as consideration to facilitate the protections to certain Chartered Organizations, including with respect to the Post-Confirmation Interim Injunction).

transferred or used to pay for general liabilities, such as Abuse Claims.[417]  Indeed, Local Councils, because they are non-profit organizations, do not generate profit which would be indicative of an ability to contribute assets.  Rather, to fund a substantial portion of their operations, Local Councils rely on annual donations.  Inclusion of the Local Council Insurance Rights results in a further, material increase in the overall contributions.

252.     The Local Council Settlement Contribution is also structured to be substantial with respect to Local Councils individually.  Specifically, Local Councils' direct financial contributions to the Trust — totaling $515 million in cash and property — are allocated based on a formula developed by the LC Committee.  The results of this allocation can be seen in the Plan Supplement.[418]

253.     The LC Committee formula takes into account each Local Council's claims exposure, applicable statutes of limitation, and financial capability in determining its contribution amount.  Testimony at the Confirmation Hearing will establish that the LC Committee engaged in

---

[417]  Donations that are made with a restriction as to use or purpose rather than for general charitable purposes are not property of a debtor's estate under 11 U.S.C. § 541 (d).  *See* 11 U.S.C. 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); *see In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 247 (Bankr. W.D. Tex. 2008) (finding restricted funds are not property of the estate); *In re Parkview Hosp.*, 211 B.R. at 636 (finding unrestricted donations commingled with restricted donations resulted in a restricted express trust, and was not property of the estate because the debtor-nonprofit hospital solicited donations for the restricted hospital development fund and donors believed their donations to the fund were restricted).  These restricted donations are treated as if in an implied charitable trust for the purpose of protecting the donor's restrictive intent.  *See* 15 Am. Jur. 2d Charities § 8 (2012) ("A condition attached to a gift may be considered as tantamount to imposing a trust, and if the condition involves application for charitable purposes, a charitable trust will result."); Restatement (Third) of Trusts § 28 cmt. a ("A disposition to such an institution for a specific purpose, however, such as to support medical research, perhaps on a particular disease, or to establish a scholarship fund in a certain field of study, creates a charitable trust of which the institution is the trustee for purposes of the terminology and rules of this Restatement"); *Salisbury v. Ameritrust Tex., N.A.* (*In re Bishop Coll.*), 151 B.R. 394, 399 (Bankr. N.D. Tex. 1993) ("It is a basic tenet of the law of charitable trusts that beneficial charitable interests are inalienable . . . recognizing an absolute conveyance of trust assets would be violative of basic principles of charitable trust law and the donor's intent.").

[418]  Plan Supp. Ex. X-1, Revised Expected Local Council Settlement Trust Contributions [D.I. 8815].

extensive analysis of Local Council assets and liabilities as well as thousands of hours of dialogue with Local Councils to arrive at a formula that fairly and equitably allocates the Local Council Settlement Contribution and ensures the uniform participation of Local Councils necessary to facilitate the contribution of Local Council insurance rights under the Plan.

254.     Of course, each individual Local Council's contribution is worth far more than its allocated cash/property amount.  *First*, Local Councils all have rights to the BSA Insurance Policies, and many have individual Local Council Insurance Policies that are being contributed to the Trust.  Those policies have already resulted in billions of dollars from Settling Insurance Companies for the Settlement Trust, and are expected to produce even further proceeds post-confirmation.  Those amounts have not been individually allocated by Local Council, but are necessarily part of each Council's contribution.  *Second*, Local Council contributions under the $125 million DST Note are essentially allocated based on the size of the Local Council's employee base, as the DST Note is funded by a percentage of payroll from each Local Council.  Again, while these amounts have not been individually allocated by Local Council, they are part of the substantial contribution that each Local Council is making to the Settlement Trust, as the Debtors will demonstrate at the Confirmation.[419]

### (2)     The Chartered Organizations' Contributions to the Settlement Trust

255.     The level of protection with respect to the Scouting-Related Release and Channeling Injunction under the Plan for Chartered Organizations depends on (a) whether the

---

[419] Claimant Nos. SA-101730 & SA-47539 filed an objection with a conclusory statement providing that the Local Councils can contribute more to the Settlement Trust.  No additional facts or analysis to support this statement is included in the objection.  Consequently, Claimant Nos. SA-101730 & SA-47539 have not rebutted the Debtors' prima facie showing of substantial contribution.  This objection on these grounds should be overruled.  Claimant Nos. SA-101730 & SA-47539 Obj. at 1 [Docket No. 8658].

Chartered Organization is either a Participating, Opt-Out, or Contributing Chartered Organization, (b) whether there is insurance covering the Abuse Claim and if such insurance policy was issued by either a Settling Insurance Company or Non-Settling Insurance Company, (c) whether the rights to be transferred are under an Abuse Insurance Policy or the particular Chartered Organization's own policy, and (d) whether the Chartered Organization has made a monetary contribution on its own behalf. As explained below, the Contributing Chartered Organizations (TCJC and the United Methodist Entities), Participating Chartered Organizations, and Opt-Out Chartered Organizations have each made contributions to the plan, or contributions to the Plan were made on their behalf, warranting the respective relief requested as to each organization.

256. ***Contributing Chartered Organizations.*** All Abuse Claims against a Contributing Chartered Organization will be channeled to the Settlement Trust pursuant to the Channeling Injunction. Contributing Chartered Organizations will also be released from all Abuse Claims pursuant to the Scouting-Related Release.

257. In exchange for Abuse Claims being released and channeled to the Settlement Trust, Contributing Chartered Organizations will make a monetary contribution to the Settlement Trust, as well as voluntarily releasing their rights to any insurance policies issued to the BSA or the Local Councils, and such interests will be assigned to the Settlement Trust or otherwise sold back to the Settling Insurance Companies pursuant to applicable settlement agreements. Likewise, Contributing Chartered Organizations will release their rights to any independent insurance policies issued by Settling Insurance Companies with respect to coverage for Abuse Claims. In addition, in exchange for the protections of the Channeling Injunction, all Indirect Abuse Claims of Contributing Chartered Organizations are voluntarily waived.

258. TCJC and the United Methodist Entities have made substantial contributions,

including a monetary contribution, as described herein and as the Debtors will demonstrate at the Confirmation Hearing, and are therefore Contributing Chartered Organizations and Protected Parties under the Plan.[420]

259. ***TCJC's Contribution to the Settlement Trust***. TCJC has agreed to, among things, (a) contribute $250 million in cash to the Settlement Trust, (b) waive, release, and expunge its TCJC Claims, and (c) settle issues related to the TCJC Insurance Rights.[421] TCJC's contribution will be used to pay holders of Direct Abuse Claims against TCJC and to pay a pro rata share of Settlement Trust expenses. If there are excess funds after these payments, any express amounts will become available to other abuse survivors. This contribution is substantial, given their exposure for Abuse Claims and resources to pay such claims.[422]

260. The Debtors' expert identified only 2,854 proofs of claim that directly identify TCJC, as to be established at the Confirmation Hearing. In an effort to ensure that their analysis was exhaustive, the Debtors further examined the 82,209 unique and timely Direct Abuse Claims to determine if any others could potentially be associated with the TCJC. Three criteria were used to identify a total of 7,716 potential TCJC claims, these included: (a) proofs of claim were included if they directly identified TCJC on at least one of their proof of claim submissions; (b) proofs of claim were included if they identified (on at least one of their proof of claim submissions) a Local Council that was known to have high TCJC membership counts (more than 50% of their members) based information obtained from the BSA; and (c) proofs of claim that shared common

---

[420] All other Chartered Organizations may negotiate with the BSA and abuse survivor representatives (or the Settlement Trustee after the Effective Date) to make a substantial monetary contribution to the Settlement Trust and become Contributing Chartered Organizations under the Plan.

[421] *See* Plan Ex. J-1, TCJC Settlement Agreement.

[422] *Id.*

characteristics with other proofs of claim that had already been flagged as affiliated with TCJC based on (a) and (b) were also included as potentially related to TCJC.

261.     The aggregate estimated liability with respect to the 2,854 Abuse Claims that specifically identify TCJC is roughly $130 million (assuming that the liability with respect to all Abuse Claims is $3.6 billion), as the Debtors will demonstrate at the Confirmation Hearing. With the same assumption, the aggregate value of the 7,716 potential TCJC Abuse Claims (which is inclusive of the 2,854 claims) is roughly $490 million. These figures represent the total liability for TCJC Abuse Claims irrespective of how liability would be apportioned among any combination of the Debtors, the Debtors' insurers, Local Councils, Perpetrators, and TCJC. TCJC disputes both the 2,854 and 7,716 proof of claim totals, as discussed above, and estimates its exposure to be lower based on apportionment of liability, among other things. In view of these values, a contribution of $250 million is clearly substantial relatively to the TCC's total potential.

262.     ***United Methodist Entities' Contributions to the Settlement Trust***. Both the monetary and nonmonetary contributions from the United Methodist Entities establish that they are entitled to the benefit of the Scouting-Related Release and Channeling Injunction. The United Methodist Entities are contributing their rights in the BSA Insurance Policies and Local Council Insurance Policies. The United Methodist Entities will also pay $30 million to the Settlement Trust over the course of three years from the Effective Date of the Plan.[423] The United Methodist Entities are not a single centralized organization that can fund this contribution to the Settlement Trust. In order to raise those funds, the United Methodist Entities must engage in substantial fundraising efforts within their organization. In addition to those contributions, the United

---

[423]    *See* Plan Ex. J-2, United Methodist Settlement Agreement.

Methodist Entities have agreed to work with the BSA's survivor working group on youth protection initiatives and with the BSA and Local Councils to strengthen and grow the Scouting relationship for at least the next 15 years. Scouting will only continue if the BSA is able to continue to recruit new members and, under the Plan, that growth results in additional contributions to the Settlement Trust as a result of the Growth Payment. The United Methodist Entities are a key component of the BSA's growth strategy because the United Methodist Entities sponsor units representing approximately 20% of the BSA's total youth membership.

263.    In addition, Debtors considered, among other things, the proofs of claim that identified or are potentially associated with the United Methodists and the aggregate estimated amounts associated therewith to assess the contribution. The Debtors determined that the United Methodist's monetary and nonmonetary contributions are substantial.

264.    ***Participating Chartered Organizations***.    The $40 million Supplemental LC Contribution and the up to $100 million Settlement Growth Payment are being contributed to the Settlement Trust by the Local Councils and the BSA in exchange for the Scouting-Related Release, Channeling Injunction and Post-Confirmation Interim Injunction for Participating Chartered Organizations. Additionally, Participating Chartered Organizations are making the Participating Chartered Organization Settlement Contribution, which includes the Participating Chartered Organization Insurance Assignment.

265.    In accordance with the contributions listed above, Participating Chartered Organizations will voluntarily release their rights to any insurance policies issued to the BSA or Local Councils by the Settling Insurance Companies, and such interests will be assigned to the Settlement Trust or otherwise sold back to the Settling Insurance Companies pursuant to applicable settlement agreements. Participating Chartered Organizations also release any rights to coverage

under any insurance policies issued by a Settling Insurance Company for Abuse Claims. Participating Chartered Organizations also assign, among other things, any causes of action against non-settling insurance companies related to Abuse Claims that first occurred on or after January 1, 1976 to the Settlement Trust. Finally, all Indirect Abuse Claims of Participating Chartered Organizations are voluntarily waived.

266. Other nonmonetary contributions from Participating Chartered Organizations include the increased likelihood that they will continue sponsoring the BSA's Scouting mission in the future. Membership is an important driver of the BSA's financial performance, as membership impacts registration fees, supply operations, unit charter fees, as well as other revenues. The BSA delivers its programs through units generally formed pursuant to agreements between the Local Councils and Chartered Organizations, which constitute a wide range of civic and faith based community organizations as well as individual groups of parents. Moreover, unlike Contributing Chartered Organizations that enjoy broad releases and protections, as described above, because the contributions are more limited for Participating Chartered Organizations, the releases and injunctions are similarly limited. Taking all of this into account, including the insurance assignment, the monetary contributions made on behalf of Participating Chartered Organizations, and their continued support of the Debtors, and the more limited protections afforded Participating Chartered Organizations, their contribution is substantial.

267. Specifically, Participating Chartered Organizations are Limited Protected Parties under the Plan, meaning all Abuse Claims from and after 1976 that potentially implicate a Participating Chartered Organization will be channeled to the Settlement Trust and abuse survivors will release the Participating Chartered Organizations for such claims. Additionally, all pre-1976 Abuse Claims against a Participating Chartered Organization for which there is an insurance policy

issued by a Settling Insurance Company will also be channeled to the Settlement Trust, and abuse survivors will release Chartered Organizations for such claims. Abuse survivors will not be able to assert Scouting-related Abuse Claims channeled to the Settlement Trust directly against Participating Chartered Organizations.

268. Participating Chartered Organizations will also receive the protection of the Post-Confirmation Interim Injunction—a twelve-month injunction from prosecution of Abuse Claims beginning on the Effective Date (subject to further extension)—to afford Participating Chartered Organizations an opportunity to negotiate an appropriate contribution with the Settlement Trust to become a Contributing Chartered Organization.

269. ***Opt-Out Chartered Organizations***. Some of the contributions from the Settling Insurance Companies to the Settlement Trust are in exchange for a limited Scouting-Related Release and Channeling Injunction for Opt-Out Chartered Organizations. But in relation to the very limited protections provided to Opt-Out Chartered Organizations (described below), the contributions are substantial. Without the limited protections afforded Opt-Out Chartered Organizations, the Settling Insurance Companies would not have entered into the Insurance Settlements. Specifically, Opt-Out Chartered Organizations will remain liable for all Abuse Claims regardless of whether such Abuse Claims arose before or after January 1, 1976; provided, however, that Abuse Claims against Opt-Out Chartered Organizations will be channeled to the Settlement Trust if a Settling Insurance Company issued a liability policy (other than an automobile policy or director's and officer's policy) that does not specifically exclude abuse or molestation (i) to the BSA or a Local Council that includes the Opt-Out Chartered Organization, or (ii) directly to the Opt-Out Chartered Organization for the period that a claimant alleges to have been abused.

270.    Opt-Out Chartered Organizations will retain rights in BSA and Local Council Insurance Policies, except for any rights in insurance policies issued by any Settling Insurance Company, which policies are being sold back to the Settling Insurance Companies.  Opt-Out Chartered Organizations (and Settling Insurance Companies) are not releasing any rights under any insurance policies issued directly to Opt-Out Chartered Organizations.

### (3)    Hartford Contribution to the Settlement Trust

271.    Hartford is contributing $787 million to the Settlement Trust.  This contribution is substantial, and the protections afforded to the Hartford Protected Parties on account of the Scouting-Related Release and Channeling Injunction, given in exchange for such contribution, are necessary under the settlement agreement, an essential part of the Plan, and are consistent with the hallmarks of fairness given the allocation of liabilities to the Hartford Policies.  The Debtors and Supporting Parties considered, among other things, Dr. Bates' Abuse Claims exposure analysis and Ms. Gutzler's allocation analysis as well as Hartford's significant defenses to coverage and insolvency risk, as the Debtors will demonstrate at the Confirmation Hearing.  As discussed in detail in above, when taking the allocation analysis, the complexities of the insurance coverage and defenses, the difficulties in collecting anything outside of this settlement agreement, and the delays, inconvenience, and costs associated with litigating such coverage and defense issues to finality Hartford's contribution represents a substantial and very significant recovery for survivors.

272.    Moreover, the $787 million from Hartford is substantial in and of itself.  It is extremely unlikely that Hartford would ever pay close to this amount under its insurance policies to abuse survivors in the tort system.  Hartford may spend hundreds of millions on litigation, but the chances of individual survivors securing these funds to actually compensate them for abuse as this Plan is doing are miniscule to nonexistent.  Even more compelling, the $787 million

contribution is almost 30% of the total amount of cash currently being contributed to the Settlement Trust. Therefore, Hartford has substantially contributed to the Settlement Trust.

<strong>(4)    Century and Chubb Companies' Contribution to the Settlement Trust</strong>

273.     The Century and Chubb Companies are contributing $800 million to the Settlement Trust.[424]  This contribution is substantial for the same reasons discussed in relation to Hartford above.  The protections afforded Century and Chubb Companies on account of the Scouting-Related Release and Channeling Injunction, given in exchange for such contribution, are consistent with the hallmarks of fairness.  The Debtors and Supporting Parties considered, among other things, Dr. Bates' Abuse Claims exposure analysis and Ms. Gutzler's allocation analysis as well as Century and Chubb Companies' significant defenses to coverage, as discussed above and as the Debtors will demonstrate at the Confirmation Hearing.  In addition to all of the reasons discussed above, there is significant collection risk associated with pursing extensive drawn out litigation against these insurers.

274.     Moreover, the $800 million from Century and Chubb Companies is substantial in and of itself.  It is similarly extremely unlikely that Century and Chubb Companies would ever pay close to this amount under its insurance policies to abuse survivors in the tort system.  Again, while survivors could spend hundreds of millions on litigation, the chances of individual survivors securing funds to compensate them for abuse as this Plan does are virtually nonexistent.  Even more compelling, the $800 million contribution is almost 30% of the total amount of cash currently being contributed to the Settlement Trust.  Therefore, Century and Chubb Companies' contribution is substantial.

---

[424]  *See* Plan Ex. I-2, Century and Chubb Companies Insurance Settlement Agreement.

### (5) The Zurich Affiliated Insurers' Contribution to the Settlement Trust

275.    The Zurich Affiliated Insurers are contributing $52.5 million to the Settlement Trust.[425]   This contribution is substantial, and the protections afforded the Zurich Affiliated Insurers on account of the Scouting-Related Release and Channeling Injunction, received in exchange for such contribution, are consistent with the hallmarks of fairness given the allocation of liabilities to the Zurich Insurer Policies.  The Debtors and Supporting Parties considered, among other things, Dr. Bates' Abuse Claims exposure analysis and Ms. Gutzler's allocation analysis as well as the Zurich Affiliated Insurers' significant defenses to coverage, as discussed above and as the Debtors will demonstrate at the Confirmation Hearing.  Indeed, the $52.5 million is available now and does not require abuse survivors to pursue the Zurich Affiliated Insurers in the tort system to get access to a portion thereof.  The difficulties in collecting and the delays, inconvenience, and costs with litigating such coverage show that the Zurich Affiliated Insurers have substantially contributed to the Settlement Trust.

### (6) Clarendon's Contribution to the Settlement Trust

276.    Clarendon is contributing $16.5 million to the Settlement Trust.[426]   As with the Settling Insurance Companies set forth above, this contribution is substantial, and the protections afforded Clarendon on account of the Scouting-Related Release and Channeling Injunction, received in exchange for such contribution, are consistent with the hallmarks of fairness given the allocation of liabilities to the Clarendon Policies.  Included in their analysis, the Debtors and Supporting Parties considered, among other things, Dr. Bates' Abuse Claims exposure analysis

---

[425]   *See* Plan Ex. I-3, Zurich Insurance Settlement Agreement.

[426]   *See* Plan Ex. I-4, Clarendon Insurance Settlement Agreement.

and Ms. Gutzler's allocation analysis as well as Clarendon's significant defenses to coverage, as discussed above and as the Debtors will demonstrate at the Confirmation Hearing. Indeed, the $16.5 million is available now and does not require abuse survivors to pursue Clarendon in the tort system to get access to a portion thereof. The difficulties in collecting and delays, inconvenience, and costs with litigating such coverage and defense issues to finality discussed show that Clarendon has substantially contributed to the Settlement Trust.[427]

        **(7)**      **Related Non-Debtor Entities' and Representatives' Contributions to the Settlement Trust**

277.     Contributions to the Settlement Trust from or on behalf of each of the Related Non-Debtor Entities and Representatives are substantial, as the Debtors will demonstrate at the Confirmation Hearing through their expert witnesses, Dr. Bates and Ms. Gutzler. Specifically, a portion of the BSA Settlement Trust Contribution will be made on behalf of the Related Non-Debtor Entities and Representatives, including a portion of the Debtors' contribution of cash, the BSA Settlement Trust Note, certain Causes of Action, rights to certain properties such as artwork and buildings, insurance proceeds, indemnification claims against Perpetrators, and proceeds from the sale of certain properties. Additionally, each of the Related Non-Debtor Entities is an additional insured under the BSA Insurance Policies, which interests are being contributed to the Settlement Trust.

278.     As discussed above, the BSA receives services from Related Non-Debtor Entities, which are wholly-owned by or subject to the control of the BSA. While the Local Councils

---

[427] Claimant Nos. SA-101730 & SA-47539 filed an objection with a conclusory statement providing that the Local Councils can contribute more to the Settlement Trust. No additional facts or analysis to support this statement is included in the objection. Consequently, Claimant Nos. SA-101730 & SA-47539 have not rebutted the Debtors' prima facie showing of substantial contribution. This objection on these grounds should be overruled. Claimant Nos. SA-101730 & SA-47539 Obj. at 1 [D.I. 8658].

facilitate the Debtors' mission and are vital in reaching participants at a local level, the Related Non-Debtor Entities provide specialized services under shared services arrangements that are necessary to facilitate the BSA's national reach, including, among other things, investment and foundation management, management of national programs, lease transactions, and conference and training support functions.

279.    Additional contributions of the Related Non-Debtor Entities include:

(a)    Arrow WV, Inc., which owns a high adventure base operated by the Debtors, is a guarantor under the Foundation Loan payable to the BSA and will pledge the Arrow Intercompany Note as security, on a second lien basis, to secure the Foundation Loan. The Arrow Intercompany Note is a $350 million note from Arrow payable to the BSA. The proceeds from the loan and note will be used to fund the BSA's operations and ongoing obligations to the Settlement Trust.

(b)    Atikaki Youth Ventures, Inc. and Atikokan Youth Ventures operate and maintain the Canadian portion of the Northern Tier high adventure facility, which allows the BSA to offer recreational activities in the facilities parks, such as canoe trips, to the Scouts who visit.

(c)    Learning for Life provides nationwide values-based programs in the areas of character education, anti-bullying, life skills, self-esteem, and decision-making. Learning for Life is continuing to provide these programs, which are a core component of the BSA's charitable mission. The Debtors depend on Learning for Life for these programs.

(d)    BSA Asset Management, LLC ("BSAAM") is a Delaware limited liability company of which the BSA is the sole member. The BSA receives investment management and advisory services from BSAAM, which oversees management of the funds making up the various benefits programs and trusts of the BSA, along with providing management and investment services for the BSA's unrestricted endowment and donations to the BSA. BSAAM manages the BSA's and certain Local Councils' investments through the BSA Commingled Endowment Fund, LP (the "Endowment Fund"), which is a Delaware limited partnership and investment vehicle open only to the BSA, the Local Councils, and their affiliates for investing long-term funds. BSAAM is the general partner of the Endowment Fund. The BSA and certain Local Councils are limited partners of the Endowment Fund. Each limited partner receives units of partnership interest in proportion to, and in exchange for, its financial contributions to the Endowment Fund. In addition to its role as general partner of the Endowment Fund, BSAAM is the settlor of the BSA

Endowment Master Trust.

(e)    The BSA Endowment Master Trust is a nonprofit 501(c)(3) Delaware trust established under the laws of Delaware exclusively for the purpose of investing funds contributed to the Endowment Fund by the BSA and participating Local Councils. The BSA Endowment Master Trust is a multiple pooled account trust arrangement established to provide economies of scale and efficiency of administration to eligible entities that elect to invest their funds in the BSA Endowment Master Trust. In addition, the BSA Endowment Master Trust is also a limited partner of the Endowment Fund.

280. All of the Related Non-Debtor Entities in these cases are continuing their operations in the ordinary course in furtherance of the Debtors' charitable mission, and they each serve a critical purpose for the mission of Scouting. The Representatives, including directors and officers, have also contributed their efforts towards the Debtors' reorganization, as their entire objective has been to save this charitable organization from liquidating. Profits are not the motive for these parties. Instead, they are committed to the BSA continuing its Scouting mission, instilling virtues in young boys and girls across the country. Therefore, the Representatives and Related Non-Debtor Entities are providing substantial contributions to the Settlement Trust.

281. The Court in *Mallinckrodt* explained that releasing nondebtors who did not contribute directly was "fair" under *Continental* where the debtor "provided additional compensation in exchange for the releases of these non-debtors" and the "record suggests it is unlikely that there are any material claims for liability against these non-debtors that are being waived."[428] Most of the Related Non-Debtor Entities provide specialized services such as fundraising, investment, and management. Therefore, most of them are not named in pending

---

[428] *Mallinckrodt*, 2022 WL 404323, at *19.

lawsuits and do not have liability on Abuse Claims.[429]  Moreover, such contributions are substantial considering the value of the ***direct*** claims that would be raised against either a Representative, and most likely, the majority of the Related Non-Debtor Entities.  These parties do not have any material direct liabilities to a holder of an Abuse Claim.  Rather, such liability would be ***derivative*** of the Debtors.  Consequently, the contributions made on their behalf is substantial and consistent with cases in this Circuit.[430]

282.    Furthermore, "[s]ubstantial contribution" under *Master Mortgage* is intended to assess the fairness of a nonconsensual third-party release, which does not require every protected party to make a direct financial contribution.[431]  Courts in the Third Circuit consider whether adequate consideration has been provided in exchange for the release when assessing whether the substantial contribution factor has been met.  Although a direct financial contribution may evidence such consideration,[432] such a financial contribution is not necessary to satisfy the Third

---

[429]    As reflected on the Amended Schedule 2 to the Consent Order], Learning for Life and the National Boy Scouts of America Foundation are the only Related Non-Debtor Entities named in pending lawsuits.  There are approximately 75 lawsuits currently pending against those entities. [Adv. D.I. 213].  Some of the cases that name "National Boy Scouts of America Foundation" identify it with an "a/k/a" or "d/b/a"; *i.e.*, National Boy Scouts of America Foundation d/b/a the Boy Scouts of America or National Boy Scouts of America Foundation a/k/a The Boy Scouts of America.  It has also been erroneously identified as, Boy Scout Foundation of Greater New York, Inc. in some of the cases.

[430]    *See, e.g., In re Armstrong World Indus., Inc.*, 348 B.R. 136, 156 (D. Del. 2006) ("In light of the benefits provided, or to be provided, to the Asbestos PI Trust on behalf of each PI Protected Party, the Asbestos PI Permanent Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Asbestos Personal Injury Claims against any PI Protected Party."); *In re Fed.-Mogul Global Inc.*, No. 01-10578 (JKF), 2007 Bankr. LEXIS 3940, at *97 (Bankr. D. Del. Nov. 8, 2007) (finding that entry of injunction was fair and equitable "[i]n light of the substantial contributions to be made to the Trust by or on behalf of the Protected Parties"); *In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF), 2006 Bankr. LEXIS 3945, at *57-58 (Bankr. D. Del. Feb. 6, 2006) (finding that extension of channeling injunction to non-debtor protected parties was fair and equitable where debtors contributed $13 million to the trust on behalf of such parties).

[431]    *See, e.g., In re Mallinckrodt PLC* [D.I. 6347] (confirming plan and approving nonconsensual third party releases where directors and officers had not contributed to the trust directly but where opioid claimants received consideration in the form of a well-funded settlement trust).

[432]    *See, e.g., Cont'l Airlines*, 203 F.3d 215 (finding that the lower court failed to consider whether "the release and permanent injunction were fair to Plaintiffs and were given in exchange for reasonable consideration," which differed from mass tort cases in which nonconsensual third party releases were permissible, and finding "no evidence that the non-debtor D&Os had provided a critical financial contribution").

Circuit's standards for nonconsensual third party releases.[433]  Those standards have been met here.

### (c)  Essential to the Reorganization

283.    Courts in this Circuit recognize that third-party releases are essential where the releases are "critical to the success of the [p]lan" such that the plan depends on the non-debtor released parties making contributions to the plan in exchange for the releases.[434]  The facts and history of these Chapter 11 Cases are clear—the contributions from the Protected and Limited Protected Parties as well as the Opt-Out Chartered Organizations are critical to the Debtors' ability to restructure, and there is severe risk to the viability of the Debtors without such contributions and without the Scouting-Related Releases and Channeling Injunction.

284.    The Protected and Limited Protected Parties' and Opt-Out Chartered Organizations' contributions have formed the largest Settlement Trust in history for abuse survivors.  This alone underscores the extraordinary nature of these Chapter 11 Cases.  Their contributions are key to developing the mechanism in the Plan for the payment of all or substantially all of the Abuse Claims, as discussed below.  If the non-Debtor Protected and Limited Protected Parties had not agreed to provide their respective contributions to the Settlement Trust or contributed significantly less in the absence of the Scouting-Related Releases and Channeling Injunction, holders of Abuse Claims would realize significantly less value.  Holders of Abuse Claims would be compelled to pursue their claims in the tort system—at great expense, delay, and uncertainty.

285.    The Settlement Trust is absolutely critical to the global resolution of Abuse Claims.

---

[433]   *See, e.g., TK Holdings, Inc.,* No. 17-011375 (Bankr. D. Del. Feb. 21, 2018) (approving third party releases and releasing directors and officers who did not make a financial contribution); *In re Insys Therapeutics, Inc.,* No. 19-11292 (Bankr. D. Del.) (KG) [D.I. 1121] (same).

[434]   *In re Millennium Lab Holdings II, LLC,* 945 F.3d at 137; *see also Cont'l Airlines,* 203 F.3d at 215.

Indeed, the Plan can be successful only if the Scouting-Related Release and Channeling Injunction applies to all holders of Abuse Claims. Otherwise, the Plan simply does not work. Instead of the largest cash and property pool for survivors ever created there would be very little cash available for immediate distribution and significant ongoing lengthy litigation. Similarly, none of the settlements would be consummated without them as the absence of the release and injunction would make it impossible for the Protected and Limited Protected Parties that are making substantial contributions to the Settlement Trust to resolve finally the Abuse Claims related to Scouting.

286. Moreover, the Local Councils and Chartered Organizations have an interest in certain BSA Insurance Policies as covered entities. Consequently, the Debtors have to provide the Channeling Injunction as adequate protection compensation to certain Protected Parties and Limited Protected Parties.

287. Neither the Local Councils nor the Chartered Organizations are willing to consent to the transfer of their rights under the BSA Insurance Policies to the Settlement Trust unless the Scouting-related Abuse Claims against them are released and channeled to the trust, as a form of adequate compensation.

288. The Settling Insurance Companies would not have settled unless all of the third parties' interests in the policies are terminated and released. From a rational economic perspective, they would not settle only to face such Claims in the future for coverage from the protected Local Councils and/or Chartered Organizations or those suing them. A result to the contrary would be unfair. This is fundamentally why each of the settlements in the Plan are dependent on each other; a resolution of the issues involving the Settling Insurance Companies and the BSA Insurance Policies requires resolving issues with Local Councils and Chartered Organizations. Merely

contributing BSA Insurance Policies without addressing the Local Council's and Chartered Organization's rights thereunder would be for naught.

289.     The adequate compensation provided for the transfer of a Local Council's and Chartered Organization's rights under the BSA Insurance Policies is the protection and benefit of the Scouting-Related Release and Channeling Injunction.  Typically, a non-debtor party with an interest in an asset being sold has its interest transferred to the sales proceeds.  Here, however, granting the Protected and Limited Protected Parties a right to some of the insurance policy sale proceeds would reduce the compensation available to abuse survivors under the Settlement Trust.  This is not an outcome that the Debtors, the TCC, the Coalition, the FCR, or others are willing to accept.  The only way to provide the Local Councils and Chartered Organizations with "suitable compensation" for their lost insurance rights is to insulate them from the claims that the BSA Insurance Policies would have covered through the Scouting-Related Release and Channeling Injunction in the Plan.

290.     The Scouting-Related Release and Channeling Injunction bring finality to the pending and potential future lawsuits alleging Abuse related to Scouting.  The Debtors faced hundreds of lawsuits across the country prior to commencing chapter 11 proceedings, and most of the prepetition lawsuits filed named the BSA and Local Councils and/or Chartered Organizations as defendants.  As explained above, the identity of interest between the Debtors and the other Protected or Limited Protected Parties ensures that the effect of litigation against these parties will be substantial as to the Debtors even if the Debtors are not named in the litigation.  The likelihood of additional litigation is evidenced by the more than 82,200 proofs of claim that have been filed in these Chapter 11 Cases as of the Bar Date, and the majority of the proofs of claim named Local Councils and/or Chartered Organizations in addition to the BSA.  Continuous litigation would

drain both the Reorganized BSA's, Protected Parties', and Limited Protected Parties' respective assets and distract the Reorganized BSA, Local Councils, and Chartered Organizations from fulfilling the BSA's charitable mission of developing youth leaders of character and moral integrity.

291.    The increased litigation risk could also drive Local Councils and Charitable Organizations into bankruptcy.  This would be detrimental to the Reorganized BSA, which relies on (a) Local Councils to organize, operate, and promote Scouting in a manner consistent with the BSA's mission, charter, bylaws, rules and regulations, policies and guidelines and (b) Chartered Organizations for their sponsorship.  A potential Local Council bankruptcy also increases the risk that the PBGC terminate the Pension Plan and trigger an additional liability for the Reorganized BSA, affecting the amount of funds available to meet their Settlement Trust obligations.  Thus, the Scouting-Related Release and Channeling Injunction are necessary to ensure that the Debtors' restructuring objectives and go-forward obligations under the Plan are satisfied.

292.    Only bankruptcy provides the collective solution to the issue of massive defendants with a plethora of lawsuits, "which can produce comprehensive, equitable, and timely recoveries for injured parties… in a single forum with an aim of reaching a viable and fair settlement."[435] This is precisely what the Plan accomplishes in these Chapter 11 Cases.  The Plan and a comprehensive resolution for litigation related to Abuse Claims would not be possible without the release and injunction.[436]  As such, the proposed release and injunction provisions are necessary

---

[435] *In re LTL Management, LLC*, Case No. 21-30589 (MBK) at 27 (Bankr. D.N.J. Feb. 25, 2022).

[436] *See, e.g., 710 Long Ridge,* 2013 WL 886433, at *15-16 (approving third-party releases, in part, because "[s]imply put, without the releases, there is no chance of reorganization or recovery for any creditor."); *In re PNG Ventures, Inc.,* No. 09-13162 (Bankr. D. Del. Mar. 5, 2010) (approving third party releases where "plan would not happen" without them).

because the feasibility of the Plan depends on them, just as in the *Manville, Robins, Drexel*, and *Mallinckrodt* cases where the "central focus of these [cases] has been the global settlement of massive liabilities against the debtors and co-liable parties."[437]   Thus, the Scouting-Related Release and Channeling Injunction are essential to the Debtors' reorganization efforts.

### (d)      Significant Creditor Support

293.     The Plan including, significantly, the Channeling Injunction and Scouting-Related Release, is supported by the TCC, the Coalition, the FCR, state court counsel to holders of Direct Abuse Claims that support the Modified Plan implementing the settlement with the TCC, the Creditors' Committee, the Contributing Chartered Organizations, and the Participating Chartered Organizations.   Holders of Class 8 Direct Abuse Claims (73.57%) and Class 9 Indirect Abuse Claims (69.57% for BSA and 79.55% for Delaware BSA) have voted to accept the Plan, but the Voting Report filed on January 17, 2022, unavoidably paints an incomplete picture that does not reflect the significant and growing support for the Plan.[438]   As the Court is aware, on February 10, 2022, the Debtors announced the terms of a settlement with the TCC, with the support of certain state court counsel that previously opposed confirmation of the Plan and whose clients largely voted to reject the Plan (the "TCC/Abuse Survivor Settlement").[439]   The TCC/Abuse Survivor Settlement precipitated the filing of modifications to the Plan, and represents a watershed moment in the two years of these Chapter 11 Cases.   A supermajority of state court counsel now support the Plan, but the limited extended voting period remains ongoing as of the date of filing this

---

[437]   *See Mallinckrodt*, Bankr. Case No. 20-12522-JTD at 39 [D.I, 6347].

[438]   *See* 11 U.S.C. 1126(c) ("A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . .").

[439]   *See Eleventh Mediator's Report* [D.I. 8772].

Memorandum.  The Debtors anticipate that the forthcoming revised voting results to be filed on March 10 will demonstrate substantial additional support from holders of Direct and Indirect Abuse Claims.[440]  The Debtors submit that substantial weight should be given to the supermajority of statutory committees and representatives, and state court counsel representing abuse survivors that now support the Plan.

294.    More fundamentally, these voting results meet the statutory requirements of section 1126(c) of the Bankruptcy Code.[441]  Mass tort cases with a similar release and channeling injunction structure as the Scouting-Related Release and Channeling Injunction here have been approved with voting acceptance rates less than 90%, despite Certain Insurers' statement to the contrary.[442]  Certain Insurers object to the Scouting-Related Release and Channeling Injunction on the grounds that the acceptance rate has been higher in other cases, conveniently ignoring cases such as *TK Holdings*[443] and *Weinstein*[444] and overlooking the fact that the Bankruptcy Code does not require unanimous or even near-unanimous acceptance when approving nonconsensual releases and channeling injunctions.[445]  The Certain Insurers' objection in this regard must also be viewed in light of the interests they represent.  These insurers want this Plan to fail, not because

---

[440]   The Debtors note that over half of the rejecting votes by holders of Class 8 Direct Abuse Claims were affiliated with state court counsel that now support the Plan.

[441]   *See id.*

[442]   Certain Insurers' Objection ¶ 79 (defining "overwhelming" creditor support as "the support of at least 90 percent of affected creditors").

[443]   *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) [D.I. 2120] (approving third party release where 74-78.18% of the affected classes voted to accept the plan).

[444]   *In re The Weinstein Co. Holdings, LLC*, Case No. 18-10601 (MFW) (Bankr. D. Del. Jan. 26, 2021) [D.I. 3203] (approving third party releases where 82.98% of the affected class voted to accept the plan).

[445]   Certain Insurers' attempt to distinguish the 75% acceptance rate in *TK Holdings* also fails. Certain Insurers would have this Court discount the 75% acceptance rate in *TK Holdings* because, in that case, claimants were guaranteed full payment on their claims.  Certain Insurers' Objection [D.I. 8695] ¶ 84.  Indeed, Class 8 and Class 9 will receive payment in full.  Nevertheless, this factor has no bearing on the sufficiency of the acceptance rate and cannot stand to negate or distinguish this precedential authority.

they have the interests of any creditor in mind, but because they would be far better off if no survivor was ever compensated under the Plan and instead each survivor was forced back into litigation for years to come – litigation against the settling insurers and the other settling parties – litigation that benefits no one but these certain insurers. Arguments that the Plan should fail made in bad faith should be disregarded.

295. Objections from the Guam Committee that argue that the Plan has not received overwhelming creditor support are without proper context and should be overruled.[446] The Guam Committee, which represents approximately 0.0085%[447] of the class (less than 100 out of 82,000 survivors this Plan compensates for abuse), asserts that the Scouting-Related Release does not have the overwhelming support of Class 8 because the Guam abuse survivors did not have an opportunity to consider the modifications to the Plan.[448] This argument fails, as the Guam abuse survivors have received adequate notice of the modifications to the Plan and a limited extended voting deadline has been set for survivors to change their votes in light of the Plan, in their discretion.

296. The RCAHC asserts that Class 9 overwhelmingly opposed the nonconsensual third-party release, falling below 90% in other nonconsensual third-party release cases and the 75% threshold in asbestos cases. This argument fails for the same reasons set forth above. The voting results did not take into account, among other things, the settlement reached with the United Methodist Entities, in which the UMAHC has agreed to work to change United Methodist Entities'

---

[446] Guam Comm. Obj. at 16-17 [D.I. 8683]. The Lujan Claimants also raised a similar objection. Lujan Claimants Obj. at 7; Supp. Obj. at 4.

[447] Guam Comm. Obj. at 5 [D.I. 8683] (noting there are at least 70 claims pending against both the Archdiocese and the Debtors).

[448] Guam Comm. Obj. at 16-17 [D.I. 8683].

votes to accept the Plan. As with Class 8, the voting period for Class 9 has been extended on a limited basis to March 7. Further, the RCAHC argues that the number of opt-out elections from the Consensual Release shows that creditors do not support the Scouting-Related Releases. However, this argument confuses the issue. The Scouting-Related Release are separate from the consensual releases and conflating the two makes little sense. Therefore, this objection should be overruled.

297.     A small group of claimants should not be permitted to block the implementation of the largest fund to date to compensate sexual abuse survivors.[449] This is a "result that surely cannot be what the law intends."[450] "On the contrary, the use of nonconsensual non-debtor releases in this circumstance seems to be precisely the situation envisioned by Section 105(a)."[451] The overwhelming support of the official and unofficial constituencies affected by the Scouting-Related Release and the Channeling Injunction, in connection with the existing voting results (which the Debtors expect will increase with the forthcoming revised voting report) that already demonstrate overwhelming creditor support for the Plan, speaks for itself. Accordingly, the Scouting-Related Release and Channeling Injunction satisfy the "creditor support" factor under *Master Mortgage*.

> **(e)     The Plan Provides a Mechanism for Payment of All or Substantially All Affected Claims**

298.     Based upon the facts before the Court and as will be presented to the Court

---

[449]  *See Mallinckrodt*, Bankr. Case No. 20-12522-JTD [D.I. 6347], at 40-41.

[450]  *Id*. at 40.

[451]  *See e.g., In re Johns-Manville Corp*., 801 F.2d 60, 64 (2d Cir. 1986) ("[I]f the bankruptcy court may ever use its equitable powers under section 105(a) to enjoin actions pursued in other courts as 'concerning the administration of the estate' under section 157(b)(2)(A), it may exercise that power where there is a basis for concluding that rehabilitation, the very purpose for the bankruptcy proceedings, might be undone by the other action."); *see also In re Ionosphere Clubs Inc*., 98 Bankr. 174, 176-77 (Bankr. S.D.N.Y. 1989) ("The paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor.").

including the aggregate estimate of the potential amount necessary to compensate Abuse Claims in the amounts they deserve as well as the size of the largest cash and property pool ever compiled for survivors of over $2.7 billion, and the ability of the Settlement Trust and individual survivors to pursue significant unsettled insurance coverage in the billions of dollars and certain Chartered Organizations,[452] it is readily apparent that the Plan not only provides a mechanism for all, or substantially all of the survivors' Abuse Claims to be paid in full, but also is the only way most of them will get anything at all for their claims.

299.    The Plan's creation of a mechanism for payment of all or substantially all, of the Abuse Claims establishes the fairness of the third-party releases under *Master Mortgage*. Courts have applied various standards to determine whether a plan containing a nonconsensual third-party release and channeling injunction satisfies the fifth *Master Mortgage* factor in providing a mechanism for payment of all or substantially all of the claims in the affected Classes, with many such courts comparing what claimants will receive under the Plan as compared to what they could otherwise receive.[453]

300.    For instance, this Court in *Millennium* considered whether the dissenting claimant "received reasonable or fair compensation in exchange for the release," finding that the payments and distributions under the plan "dwarfed any recoveries for [such] claims in a wipeout liquidation."[454] Another Third Circuit court found the fifth *Master Mortgage* factor was established

---

[452]    Specifically, the Plan and the TDP provide that such further recoveries may be pursued both collectively by the Settlement Trust or individually through the Independent Review Option or directly in the tort system. *See* Plan Art. III.A, X, XI-XIII.

[453]    *See, e.g., Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 591 B.R. 559, 586 (D. Del. 2018); *In re 710 Long Ridge Rd. Operating Co. II*, Bankr. Case No. 13-3653 (DHS), 2014 Bankr. LEXIS 863, at *52 (Bankr. D.N.J. Mar. 5, 2014); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012).

[454]    *Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 591 B.R. 559, 586 (D. Del. 2018)

where the plan provided "at least a 33% recovery" to the affected class of claims, noting that such claims are "contingent, unliquidated, and will not be determined for several years, and it is therefore unclear what amount of their claims, if any, will be paid."[455]  Further supporting this finding was that, absent the third-party release, those claims' recovery would drop from 33% to 11%.[456] Another court took a similarly pragmatic view of the fifth *Master Mortgage* factor, noting that absent the plan's third-party releases, "there is no Plan. And no other plan will be presented. Instead, the Case eventually would be dismissed or converted to chapter 7."[457]  The court observed that, absent a plan, creditors would preserve the possibility of tort litigation, but noted that "it is unlikely that the [affected] creditors would receive a distribution anywhere close to that offered through the plan, if they obtain one at all," and that the plan provided for recovery without the risk, time, expense, and fees of tort litigation.[458]  The court concluded that the plan should be confirmed because, "despite the incredibly complex nature of the claims and the interests among the major parties in the case, a unique and singular opportunity has presented itself [the fund] offers a rare opportunity to actually serve the truly injured."[459]  So, too, will the Settlement Trust made available to Survivors through the Debtors' Plan.

301.     Regardless the standard, the Debtors' Plan provides a mechanism for payment of all or substantially all of the affected classes of claims.  The Plan includes multiple options and components for the payment of Abuse Claims, necessitated by the complexity of both determining

---

[455] *In re 710 Long Ridge Rd. Operating Co. II*, Bankr. Case No. 13-3653 (DHS), 2014 Bankr. LEXIS 863, at *52 (Bankr. D.N.J. Mar. 5, 2014)

[456] *Id.* at *50-51.

[457] *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012)

[458]   *Id.* at 520-21.

[459]   *Id.* at 521.

what any one individual claim is worth, and ensuring that there is a reliable and reasonable path for the Settlement Trust to act on behalf of all survivors. The Plan allows for recovery by both survivors with abuse lower value claims who seek an efficient and fair resolution of their claims, as well as those individual survivors with particularly high value claims who may wish to pursue them directly, allowing those survivors to receive the compensation, whether in cash, or through claims against unsettled insurance and Chartered Organizations. The Plan provides this mechanism in two parts.

302. *First,* the Plan establishes a fair and equitable means of determining the value of each Abuse Claim through the TDP. As discussed in more detail below, the terms of the TDP are the result of significant good-faith negotiation among the parties and represent a fair and equitable means of determining the value of each individual Abuse Claim.

303. To aid in the development of the TDP and determine an estimated aggregate value of the Abuse Claims, the Debtors retained one of the foremost experts in analyzing such information in Dr. Bates, who undertook an extensive analysis of the BSA's prepetition litigation, settlements, and significant additional information. Dr. Bates utilized this analysis to both estimate the reasonable aggregate value of all Abuse Claims based upon the information known at this time and to determine the base compensation amounts for certain types of claims, as well as the appropriate multiplying and mitigating factors the Trustee should consider when ultimately determining the value of an individual claim pursuant to the TDP.

304. Dr. Bates further undertook an economic analysis of the most reasonable, significant, and comprehensive data available to determine the value of these specific types of Abuse Claims against the Debtors, Local Counsel, and Chartered Organizations have had when previously brought against these parties in the tort system. Using this information, Dr. Bates

determined both an estimated aggregate value for such claims of between $2.4 and $7.1 billion and provided the TDP Base Matrix Values of between $75,000 and $600,000, and its maximum Matrix Values of between $337,500 and $2,700,000 to be utilized by the Trustee in determining the value of individual claims.

305.    After further analyzing the historic settlements, lawsuits, and additional information developed in part through the modifications to the TDP that resulted from the ongoing negotiations and settlements with the overwhelming majority of parties representing the interests of survivors, Dr. Bates further refined his opinion and concluded that the aggregate value of the Abuse Claims is most likely within lowest quartile of his range, that is, between $2.4 to $3.6 billion, with a midpoint of $3.0 billion.  Dr. Bates' economic analysis of the Abuse Claims and historical BSA settlements led him to conclude that the values of abuse claims are highly skewed between high and low value claims, with very few claims in the middle and that the vast majority of claims paid under the TDP claims matrix will receive payments of five figures or less.

306.    Although this Court can and should rely on Dr. Bates' aggregate valuation to confirm the Plan (as is regularly done in mass tort cases)—including in determining that the Plan creates a mechanism for the payment of all, or substantially all of the Abuse Claims in full, no one disputes that it is impossible to value each individual claim based upon the information currently available.  Only a comprehensive—and in the case of the Independent Review Option, an extremely rigorous—examination and analysis of each individual Abuse Claim through the TDP can and will determine the ultimate value of any individual claim.  This, however, is not

detrimental to this Court's finding that the fifth *Master Mortgage* factor is satisfied.[460]  Dr. Bates'

analysis on the valuation of all of the claims in the aggregate (based upon the prepetition

settlements and a detailed analysis of the information available in the proofs of claim) that the

aggregate value of Abuse Claims will be between $2.4 and $7.1 billion and that the value will most

likely prove to be in the lower quartile of this range, between $2.4 and $3.6 billion, can and should

be used for determining if the Plan provides a mechanism for the payment of all, or substantially

all of the Abuse Claims

307.　*Second*, the Plan provides the means and a mechanism to ensure that once the value

of each Abuse Claim is determined under the TDP, they will all, or substantially all, be paid in

full.  Because of the inherently complex and intertwined nature of the parties and their liabilities

for the Abuse Claims in this case, accomplishing this required the compilation of multiple options

specifically tailored to enable survivors to receive the compensation they deserve.

308.　The first and most complex piece of the puzzle was the creation of the largest cash

and property pool ever created for abuse survivors of over $2.7 billion in cash and property.  This

fund is the result of all of the extensive settlements and contributions that are set forth in the Plan

and discussed herein, which form the essential backbone of the Plan.  This unprecedented fund

will also increase over time, both from the Settlement Trust's ability to direct the investment of a

significant portion of this cash from the outset of the Trust's creation, and from the additional

funding from Reorganized BSA and Local Councils as Scouting grows in the future.  This fund

will enable the Settlement Trust to both pay a significant number of lower value claims,

---

[460]　*See In re Dow Corning Corp.*, 255 B.R. 445, 497 (E.D. Mich. 2000) (holding that nothing in the Bankruptcy Code requires unliquidated claims to be liquidated prior to confirmation, and noting that "[r]equiring a bankruptcy court to inquire as to the amount of consideration involved in each claim involving a disputed and unliquidated personal injury claim, especially in a mass tort situation, would be an unrealistic, unworkable and an unduly burdensome position for the bankruptcy court to be in."); *accord In re W.R. Grace & Co.*, 729 F.3d 311, 328-29 (3d Cir. 2013).

particularly those electing the Expedited Distribution of $3,500 (which was over 7,000 Abuse Claims at the time of this filing)[461] in cash, in full, as early as possible. The settlements will also provide the Settlement Trust with the funding it needs not only to undertake the task of valuing tens of thousands of claims, but also to monetize the non-cash assets available for distribution to survivors.

309.    This monetization of non-cash assets, including claims against non-settled insurance carriers (primarily the excess insurance provided by the Certain Insurers objecting to the Plan) and Chartered Organizations, is an important part of the mechanism the Plan creates for payment of all or substantially all of the Abuse Claims. Because of the nature of these claims and the need for the Settlement Trustee to further and fully determine the value of each claim through the TDP, including through the IRO, the best aggregate valuation of all Abuse Claims at this time is that it will fall in the range of between $2.4 and $7.1 billion, and most likely in the lower quartile of this range, of $2.4 to $3.6 billion. Through the settlements and contributions detailed in the Plan, the Debtors have compiled a pool of over $2.7 billion in cash and property to compensate survivors, clearly less than the range and even less than the midpoint of the most likely range of $3.0 billion. The mechanism for payment in full, however, does not stop here. The Plan has provided a mechanism for the Settlement Trust and survivors to secure everything they are owed from the parties that have not yet properly contributed to abuse survivors.

310.    The Debtors have done a detailed analysis of the available unsettled insurance that is both allocated to claims based upon the current valuation as well as unallocated unsettled insurance that is available if the TDP and/or Independent Review Option process determine that

---

[461]    Voting Report, at Ex. A (listing 7287 as the total Expected Distribution elections).

there are high value claims that reach the excess policies. The Debtors' analysis shows, as will be demonstrated at the Confirmation Hearing, that there is approximately $300-400 million of insurance coverage allocated to non-settled insurers as well as an additional approximately $4.3 billion of unallocated insurance limits.

311.    Before the Independent Review Option was incorporated into the TDP, the excess insurance companies (the very same ones that are now so adamantly opposed to the Plan) were receiving a windfall created by a cap on individual claims' recovery that was designed to ensure a more equitable distribution of funds before the total pool available was better established. Granting the Certain Insurers this windfall would have made it more difficult for survivors to collect unsettled excess insurance, even when it would have been appropriate that they have the opportunity to do so. This unintended consequence has now been corrected and all abuse survivors will be better off with the incorporation of the Independent Review Option.

312.    Accordingly, the $2.7 billion in cash, and the mechanism to secure whatever they are owed of the $300-400 million in allocated insurance and $4.3 billion in unallocated insurance creates a the potential for survivors to recover up to $7.3 billion in total cash and available insurance coverage. Nor is the Plan's mechanism to pay all, or substantially all, of the Abuse Claims in full dependent upon the unreasonable position that the Settlement Trust should or will collect all available insurance. The Plan provides for and contemplates the ability for the unsettled insurers and the Trustee to continue to work together in good faith and reach a reasonable settlement and contribution to the Trust. Indeed, the most likely aggregate value of Abuse Claims is between $2.4 and $3.6 billion with a midpoint of $3 billion, something easily achievable with the mechanism created by the Plan.

313.    The Plan, however, provides for the ability to pay Survivors all or substantially all

of what they are owed regardless of if the Abuse Claims are ultimately determined to be above this $3 billion midpoint. In addition to the $7.3 billion in cash and available insurance, there are approximately 30,000 proofs of claim that could potentially proceed to recover against an unsettled Chartered Organizations and thereby obtain any additional amounts owed to survivors from these entities or these entities' independent unsettled insurance. Thus, it is fair and reasonable to conclude that the Plan provides a mechanism for the payment of all, or substantially all, of the Abuse Claims no matter where in Dr. Bates' range of $2.4 to $7.1 billion the Abuse Claims' aggregate value is eventually set by the TDP and Independent Review Option processes.

314.    Under the TDP, survivors and their sophisticated counsel have essentially four options to secure payment in full under the mechanism created by the Plan.

315.    First, as discussed above, thousands of survivors have determined that, in many cases after years of delay, they are satisfied that their Abuse Claims have been acknowledged and have opted for the Expedited Distribution of $3,500 as payment in full for their claims. This is a valid and understandable choice by which those survivors fully resolve their claims. Moreover, most of the claims that elect this option (and many that elect to make a Trust Submission to the TDP) were likely not economically viable to pursue in the tort system. Thus, the Plan and its TDP are the only way such claimants will ever receive compensation.

316.    Second, survivors may make a Trust Submission to have their claims assessed by the Trustee pursuant to the TDP and its Claims Matrix. As set forth above, the TDP is designed to compensate Abuse Claims consistent with the BSA's compensation of such claims in the tort system prepetition. Thus, the TDP by design dictates that Abuse Claims are valued as they would outside of bankruptcy. In addition, for many claimants who did not feel they had the time or resources to pursue claims in tort, the efficient TDP system allows for payment where otherwise

they would receive none.  In the event that those claimants are dissatisfied with the allowed amount of such claims, they may elect to pursue liquidation of their claims against the trust in the tort system.[462]

317.     Third, survivors who believe that they have significantly higher value claims that would reach available excess insurance may elect to participate in the Independent Review Option, pursuant to which they will undergo a more rigorous evaluation of their claims that may include participation by the relevant insurance carriers.  If these claimants are given a reward in excess of $1 million, they will also have their ability to collect directly against unsettled excess insurance or the Excess Award Fund (or recover from a fund from global settlement with such insurers, as explained below) and thereby secure payment in full, or substantially in full, as is determined by this process.

318.     Fourth, survivors who believe that they have valuable claims against unsettled Chartered Organizations may, after the expiration of the Post Confirmation Interim Injunction, pursue those claims against such Chartered Organizations directly in the tort system and thereby recover whatever the tort system determines they are owed.

319.     Similarly, the TDP provides the Settlement Trust with the ability to globally pursue and settle with all unsettled insurance companies and Chartered Organizations for the benefit of all Abuse Claimants, including those within the standard Matrix Values and Independent Review Option.  Any settlement entered into by the Settlement Trust requires the exercise of the Trustee's fiduciary duty and approval of the STAC.  Any global resolution therefore will, by definition, have been determined by the Trustee and the STAC to provide for payment of all or substantially all of

---

[462]   Plan Art. XII.

the survivors' Abuse Claims.

320. As the Debtors will demonstrate at the Confirmation Hearing, in addition to the Plan's historic $2.7 billion settlement pool, these interrelated components of the Plan provide a mechanism for either the Settlement Trust or the individual survivors, or both, to pursue the over $4 billion in unsettled insurance and whatever liability unsettled Chartered Organizations may have. This is a fair and equitable mechanism for the payment of all, or substantially all of the Abuse Claims in full, and the Plan should be confirmed.

321. This Court's analysis of the fifth *Master Mortgage* factor must consider not only the payment offered under the Plan and TDP, but also the realities of its alternatives for the survivors. Absent the Plan, over 80,000 survivors are left to pursue their Abuse Claims in the tort system against unsettled insurance carriers, Local Councils, and Chartered Organizations, at substantial time and expense, and unclear recovery prospects. Any alternative to the Plan would result in protracted litigation benefiting no one but the Certain Insurers objecting to this Plan and to the extreme detriment of all Survivors, most of whom would receive nothing for their Abuse Claims if forced to obtain legal representation and each individually begin the prosecution claims in the tort system anew. Accordingly, the Plan satisfies the fifth *Master Mortgage* factor.[463]

322. Certain objecting parties' attempts to cast doubt on the valuation of Class 8 Direct Abuse Claims and Class 9 Indirect Abuse Claims are disingenuous and unfounded. The RCAHC objects that payment in full would require the Settlement Trust to preserve Indirect Abuse Claims'

---

[463] *See, e.g., W.R. Grace.*, 446 B.R. at 138-39 (approving nonconsensual third-party release provision in plan where, absent the release and settlement, the estate would incur substantial expenses and creditors' recovery after litigation was uncertain but recovery under the plan would be certain and significant); *In re PNG Ventures, Inc.*, No. 09-13162 (Bankr. D. Del. Mar. 5, 2010) [D.I. 368] (approving nonconsensual third-party release where, absence such release and settlement, unsecured creditors who were otherwise "out of the money," would receive a distribution under the plan).

rights against the Settling Insurance Companies and provide payment on account of defense costs.[464] The Plan, however, is not "taking away Roman Catholic Chartered Organizations' insurance[.]"[465] To the extent the RCAHC organizations (that have objected to the Plan) have their own insurance policies, they are not impacted by the Plan. With respect to BSA insurance policies under which RCAHC members have coverage, the RCAHC objections are likewise misguided. As the RCAHC concedes, its Chartered Organizations' Indirect Abuse Claims will be channeled to the Settlement Trust, and there would be no defense costs for such channeled claims. The Plan confers a significant benefit on Chartered Organizations such as the RCAHC members because the Scouting-Related Release and Channeling Injunction for Abuse Claims are broader than existing insurance coverage applicable to such claims. Indeed, it would be even more beneficial if any of the RCAHC members decided to opt back into inclusion as a Participating Chartered Organization, something the Debtors have provided they may do, despite their ongoing unfounded attacks on this Plan. To the extent there are mixed abuse claims resulting from RCAHC members' own conduct, and not purely related to Scouting, the Plan does not affect RCAHC insurance coverage, and in any event, RCAHC members are independently responsible for such acts irrespective of the Plan. Therefore, the RCAHC Objection on these grounds should be overruled.[466]

323. Even though Certain Insurers do not hold Class 8 or Class 9 claims that are affected by the Plan's Scouting-Related Release and Channeling Injunction, they argue that the Plan does not guarantee payment in full to Class 8 Claims due to a "fatal" disconnect between the Bates

---

[464] RCAHC Objection ¶¶ 125-130.

[465] RCAHC Objection ¶ 127.

[466] RCAHC Objection ¶¶ 125-130.

valuation range and the TDP.[467]  Certain Insurers' objection is not only irrelevant and unfounded, but should be viewed in the context in which it is made, *i.e.*, driven by a desire to block this Plan to the determinant of all survivors for their own exclusive benefit.  As Certain Insurers themselves note, Dr. Bates' economic analysis has led him to conclude that the majority of Abuse Claims will be adjusted by a substantial mitigating scalar,[468] so Certain Insurers' assertion that it is "all but a certainty under the proposed TDPs" that ultimate liability will exceed Dr. Bates' estimated range of aggregate liability is incorrect.  Certain Insurers' assertion that the TDP necessarily lead to inflated values presupposes that the Settlement Trustee will not apply the procedures' criteria appropriately or consistently with his fiduciary obligations.  Certain Insurers provide no reason to believe that would be the case or to cast such doubts on the ability of the Honorable Barbra Houser's (Ret.) to appropriately investigate and determine the Protected Parties' liability for such claims.  Certain Insurers' suggestion that Dr. Bates' valuation was revised downwards in response to preliminary voting results is likewise baseless and contrary to the record.[469]  As Dr. Bates' Rebuttal Report and deposition testimony have made clear and as he will further confirm at the Confirmation Hearing, Dr. Bates' valuation range remains the same as in the Disclosure Statement. Dr. Bates' opinion that the likely valuation of Abuse Claims will fall within the lower quartile of his valuation range is a result of additional research and analysis performed following review of the expert report of Katheryn McNally of the Claro Group.  Similarly, Dr. Bates' determination that the Certain Insurers were receiving an underserved windfall before the establishment of the Independent Review Option was made when he considered the newly-revised TDP that were the

---

[467]  Certain Insurers' Obj. ¶¶ 85, 86; *see generally, id*. ¶¶ 82-88.

[468]  Certain Insurers' Obj. ¶ 85 (citing Bates Rebuttal Report ¶¶ 53, 97, 98).

[469]  Certain Insurers' Obj. ¶¶ 83, 84.

result of the ongoing good faith negotiations between the parties and TCC/Abuse Survivor Settlement.

324.    Certain Plan supporters object to Dr. Bates' valuation and ask this Court to avoid making any finding that the Debtors' valuation of the Abuse Claims demonstrates substantial payment in full under *Master Mortgage*, arguing that such a finding means that abuse survivors "are not entitled to any additional recovery," "would eviscerate the rights of the Trust and Survivors,"[470] or would even be tantamount to an estimation proceeding.[471]   These objections primarily take issue with Dr. Bates' conclusion that the aggregate valuation of the Abuse Claims most likely falls within the lowest quartile of his valuation range.   The Debtors will establish at the Confirmation Hearing that these parties' various criticisms of Dr. Bates' methodology are unfounded.

325.    Much like the objecting insurance parties,[472] the TCC, FCR, and Coalition also share a misguided belief that this Court's confirmation order will dictate the outcome of a hypothetical insurance coverage litigation at some time in the future.   These Plan supporters' "limited objections" are nothing more than an overly cautious effort to forestall the supposedly catastrophic outcome that they speculate may result from a confirmation order premised on a finding that the Abuse Claims are paid substantially in full.   These limited objections should be disregarded, because they fundamentally misunderstand the scope and effect of this Court's confirmation order and Dr. Bates' opinion.[473]   Dr. Bates does not purport to determine the value

---

[470]   TCC Obj. at 3 [D.I. 8768].

[471]   FCR and Coalition Obj. [D.I. 8771]

[472]   *See, e.g.*, Everest ¶ 5 [D.I. 8672]; Certain Insurer Obj. ¶ 120 [D.I. 8695]; Certain Insurers Suppl. Obj. ¶ 80 [D.I. 9033].

[473]   The TCC's objection further misstates the terms of the parties' agreement.   The Debtors did not agree to refrain from seeking a finding that the Plan provides a mechanism that provides for payment of all, or substantially all of the Abuse Claims. What the Debtors agreed to, under the term sheet, was to "not argue that the Bankruptcy

of any individual Abuse Claim, nor does his aggregate valuation represent the ultimate total amount recoverable on account of the Abuse Claims. The entry of a confirmation order that relies on Dr. Bates' valuation would likewise not adjudicate the value of the Abuse Claims, either individually or in the aggregate. This Court has been clear that its decision under section 1129 in this case will be made solely in the confirmation context.[474] A finding that the fifth *Master Mortgage* factor has been met is not an adjudication of the merits of the Abuse Claims, nor is it in any way a determination of the maximum value all Abuse Claims may have once they have been properly run through the TDP.[475] A finding that the fifth *Master Mortgage* factor has been satisfied is the only reasonable conclusion this Court should reach based upon the information available at this time, the $2.7 billion in cash compiled through the settlements and the mechanism the Plan creates for the payment of all, or substantially all of the Abuse Claims under the TDP.

326. Ultimately, notwithstanding their "limited objections," the TCC, the Coalition, the FCR, and all of the survivor representatives supporting the Plan believe, support, and encourage

---

Court must or should make any findings concerning the aggregate amount of the Debtors' liability for Abuse Claims to confirm the Plan and [to] not support the entry of any such findings." [D.I. 8772-1] at 10. As the Court need not make a binding finding determining the exact amount of all Abuse Claims to confirm the Plan, the Debtors have not requested such a finding.

[474] *In re Boy Scouts of America*, No. 20-10343 (Tr.) (May 19, 2021) at 169-170 ("[W]hatever decisions I have to make in the context of a case I make. And if I have to make a decision under 1129, I've made it in the confirmation context. Maybe it's an adjudication of something and maybe it's not. . . . [B]ut I can't fend off every view that a state court judge has about what I did or didn't do. . . . So then I decide certain things that I have to decide in the context in which I have to decide it. This is confirmation.")

[475] *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272-73 (Bankr. D. Del. 2017) (Silverstein, J.) ("The [*Master Mortgage*] factors compel the bankruptcy judge to examine the terms of the plan of reorganization, the outcome of the solicitation of the plan and the necessity of the injunction to the success of the plan. These factors do not ask the bankruptcy judge to examine or make rulings with respect to the many claims that may be released by virtue of the third party releases. An order confirming a plan with releases, therefore, does not rule on the merits of the state law claims being released."); *see also In re Charles St. African Methodist Episcopal Church of Bos.*, 499 B.R. 66, 99 (Bankr. D. Mass. 2013) ("To reiterate, the matter before the Court is the confirmation of a plan, a unitary omnibus civil proceeding for the reorganization of all obligations of the debtor and disposition of all its assets. Confirmation of a plan is not an adjudication of the various disputes it touches upon . . . it is a total reorganization of the debtor's affairs in a manner available only in bankruptcy.")

the Court to find that the Plan creates, including through the TDP, a mechanism of the payment of all or substantially all of the Abuse Claims.[476]  Thus, this Court can and should find that the fifth *Master Mortgage* factor has been met.

> **2.** **The Debtors Have Met Their Factual Burden Under *Continental* and the Scouting-Related Release and Channeling Injunction Should be Authorized.**

327.    The Third Circuit has held that nonconsensual third-party releases and channeling injunctions, while not *per se* permissible, may be approved when a debtor sets forth specific factual evidence establishing that the releases are fair and necessary.[477]  In addition to being fair and necessary, non-consensual third-party releases are appropriate when a case presents "exceptional facts" to justify them.[478]  Although there is no bright line standard for what constitutes exceptional facts, mass tort cases present precisely the extraordinary circumstances that warrant an appropriate, non-consensual third-party release, as the debtors seek a global settlement in the face of massive complex litigation involving multiple parties.[479]  As set forth in the discussion of each of the *Master Mortgage* factors above, the Debtors have met their factual burden.

> **(a)** **Extraordinary Circumstances Justify the Scouting-Related Release and Channeling Injunction.**

328.    The facts and circumstances present in these Chapter 11 Cases are exceptional, and warrant the Court's approval of the Scouting-Related Release and Channeling Injunction.  Indeed, the goal for the Debtors, a non-profit organization, since the commencement of these Chapter 11

---

[476]  D.I. 8772-1 at 10.

[477]  *Millennium Lab II*, 945 F.3d at 139 ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions." (quoting *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000)).

[478]  *Millennium Lab II*, 945 F.3d at 29.

[479]  *See Cont'l Airlines*, 203 F.3d at 212 (recognizing that the "central focus" of mass tort cases, which contained far-reaching non-consensual releases of third parties "was the global settlement of massive liabilities.").

Cases has been to (a) provide an equitable, streamlined, and certain process by which abuse survivors may obtain compensation for Abuse and (b) ensure that the Reorganized BSA has the ability to continue its vital charitable mission. Instead of continuing to settle and prosecute claims on a case by case basis, the Debtors made the decision to resolve the Abuse Claims related to Scouting through a global resolution with all interested parties, which is exactly the effect of the Plan and the Scouting-Related Release and the Channeling Injunction, each of which is specifically tailored to resolve a single, cognizable issue – Abuse Claims.

329. Even more extraordinary is the interrelated nature of the parties afforded the protections of the Scouting-Related Release and the Channeling Injunction. As described above, the mission of Scouting is delivered through a three-part system made up of the BSA, the Local Councils and the Chartered Organizations. Critically important is the ability to resolve interrelated Abuse Claims against the entire Scouting movement from the BSA to the Local Councils to the Chartered Organizations in order to ensure that the mission continues. Through a common mission, shared insurance, and potential indemnification, these entities are inextricably related and their liabilities for Abuse Claims are intertwined such that a claim against one is often a claim against the other. Unlike any other mass tort case, these Chapter 11 Cases represent an extraordinary network of shared liability and a common nucleus of liability.

330. Indeed, the Settlement Trust is the largest in history for abuse survivors, and it would not be possible without the contributions from those protected by the Scouting-Related Release and Channeling Injunction, the non-Debtor Protected and Limited Protected Parties and Opt-Out Chartered Organizations. Their contributions are key to the creation of the mechanism in the plan for the payment of all or substantially all of the Abuse Claims, as discussed above. The non-Debtor Protected and Limited Protected Parties would not have agreed to make their

respective contributions to the trust (or would have contributed significantly less) without the Scouting-Related Release and Channeling Injunction in the Plan, thereby resulting in abuse survivors not receiving the compensation to which they are entitled. Courts have found nonconsensual releases and injunctions to be essential to the reorganization in circumstances where a non-debtor parties' monetary and/or nonmonetary contributions to the trust or estates were conditioned on a release and injunction being included in the plan.[480]

331.    In addition, the contributions to the Settlement Trust allow holders of Abuse Claims to receive compensation on a relatively expeditious timeline. Abuse survivors no longer need to maneuver their way through the tort system, which could be lengthy and costly and involve thorny insurance coverage disputes and allocation issues—indeed, a process likely so costly and time consuming for some that they would never pursue their claims or recover any compensation at all if left to the tort system to do so. The Settlement Trust mechanism provides an alternative to the tort system and ensures equitable compensation for survivors under the TDP. This trust structure works only if the Scouting-Related Release and Channeling Injunction applies as set forth in the Plan.

> **(b)    The Scouting-Related Release and Channeling Injunction Have the Hallmarks of Fairness and Necessity to the Reorganization.**

332.    As set forth above in the detailed discussion of the *Master Mortgage* factors, which courts use as guideposts to determine if these "hallmarks" of a permissible, non-consensual release are present, the Debtors have and will provide at the confirmation hearing evidence sufficient to

---

[480]    *See Airadigm,* 519 F.3d at 657; *see also Ingersoll,* 562 F.3d at 865 (affirming third-party release because "third-party would not have participated without the release, and its participation was 'essential' to the plan's success"); *Hotel 71 Mezz Lender,* 2015 WL 11255491, at *13 (affirming plan's third-party release as "essential" because, without it, distributions to creditors "would have been severely compromised"); *Roman Catholic Bishop of Stockton,* 2017 WL 118013, at *9 (third-party release and injunction were "essential" because third-parties "would not have made any contribution to the Plan without obtaining such releases and Injunctions").

make the specific factual findings that they have met the fairness and necessity standard. The Scouting-Related Release and Channeling Injunction are narrowly tailored to channel only Abuse Claims related to Scouting and only to the extent parties receiving the benefit of the Scouting-Related Release and Channeling Injunction contributed to the mechanism in the Plan to provide recovery for abuse survivors. All other claims that abuse survivors may have against parties other than the Debtors are unaffected. And of course, Perpetrators do not get the benefit of the Scouting-Related Release and Channeling Injunction. Courts have approved releases and injunction provisions that were similarly narrow in other chapter 11 cases.[481]

333.    As such, the Guam Committee's objection that the Scouting-Related Release and Channeling Injunction affects Guam abuse survivors' direct claims against the Archdiocese of Agana for abuse unrelated to Scouting should be overruled.[482]  "Abuse Claims" under the Plan excludes Claims against Protected Parties unrelated to Scouting (including the portion of any Mixed Claim unrelated to Scouting) and only includes Claims or portions of Mixed Claims alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, Protected Parties, Limited Protected Parties, and Opt-Out Chartered Organizations, or each of their Representatives.[483]  Further, each of the settlements was negotiated amongst a large and diverse group of constituencies. There were representatives for the current Abuse Claims – both the TCC and the Coalition representing a majority of the abuse survivors – the FCR for future Abuse Claim holders, Local Councils and Chartered Organizations, and the Settling Insurance Companies. Each of these parties had diverging interests and compromised to ensure the settlement terms were fair

---

[481]    *See Mallinckrodt*, Bankr. Case No. 12-12522 (JTD) [D.I. 6347].

[482]    Guam Comm. Obj. at 11 [D.I. 8683].

[483]    Plan Art. I.A.18.

and reasonable.

334.    Moreover, the Scouting-Related Releases and Channeling Injunction are essential to the Debtors' reorganization, and the contributing third parties "would contribute nothing to the reorganization" without such injunction and release. The global resolution embodied in the Plan and the recovery to abuse survivors is dependent on substantial contributions from third parties.[484] As such, the contributions are "inextricably intertwined" with the third-party releases and the success of the Plan.[485]  The BSA would be either forced to liquidate or take a drastically different path forward that could put the future of Scouting in peril.  Any such path would not only result in the inability for abuse survivors to be justly compensated for their claims but also likely result in the network of intertwined organizations open to further bankruptcies and liquidations.  Thus proving the essential nature of the provisions to the Debtors' reorganizations.[486]

335.    In sum, for all of the reasons stated above and based upon the specific factual evidence that has been, or will be, provided, the Court should conclude that all of the hallmarks of permissible, non-consensual releases are present—particularly given the extraordinary circumstances of this case—and the Scouting-Related Releases and Channeling Injunction are fair and necessary to the Debtors' reorganization.  Accordingly, the Court should confirm the Plan.

---

[484]   *In American Family Enters.*, 256 B.R. 377, 392 (D.N.J. 2000).

[485]   *Mallinckrodt*, Bankr. Case No. 20-12522-JTD at 30.

[486]   *See id.*

## III.    The Consensual Release for the Released Parties Is Permissible.

336.    Article X.J.4. of the Plan provides for the consensual third-party release (the "Consensual Release") of certain Claims and Interests against the Released Parties[487] by the Releasing Claim Holders.[488]    Courts in the Third Circuit "have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected."[489]    The U.S. Trustee argues that the Consensual Release is not consensual as to those who are presumed to accept the Plan or who vote to reject the Plan on grounds that affirmative consent is required.[490]    But this is ***not*** the law of the Third Circuit.  Indeed, a Delaware bankruptcy court has rejected similar arguments as recently as February 3, 2022,[491] and it should do so again here.

---

[487]    "Released Parties" means, collectively, the following Persons, in each case in its or their respective capacities as such: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Creditors' Committee; (e) the members of the Creditors' Committee in their capacities as such; (f) the Tort Claimants' Committee; (g) the members of the Tort Claimants' Committee in their capacities as such; (h) the Future Claimants' Representative; (i) the Coalition; (j) JPM; (k) the Settling Insurance Companies; (l) the Contributing Chartered Organizations, including TCJC; (m) the Foundation, in its capacity as lender under the Foundation Loan Agreement; (n) the Ad Hoc Committee; (o) the members of the Ad Hoc Committee in their capacities as such; (p) the Creditor Representative; (q) the Mediators; and (r) all of such Persons' Representatives, provided, however, that no Perpetrator is or shall be a Released Party; provided further, that the definition of "Released Parties" shall in all instances be subject to Article X.J of the Plan.  *See* Plan, Art. I.A.245.

[488]    "Releasing Claim Holder" means, collectively, (a) all holders of Claims that vote to accept the Plan and do not opt out of the releases set forth in Article X.J.4; (b) all holders of Claims that are presumed to accept the Plan, except for holders of such Claims that file a timely objection to the releases set forth in Article X.J.4 of the Plan; (c) all holders of Claims entitled to vote on the Plan and who vote against the Plan and do not opt out of the releases set forth in Article X.J.4 of the Plan; and (d) all of such Persons' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and all such Persons' respective heirs, executors, estates, servants and nominees, in their respective capacities as such. No holder of a Claim in a Class that is Impaired under the Plan will be deemed a "Releasing Claim Holder" to the extent such holder abstained from voting.  *See* Plan Art. I.A.247.

[489]    *In re Indianapolis Downs*, 486 B.R. at 305 (collecting cases approving "a release of third party claims against a non-debtor upon consent of the party affected"); *see also Spansion*, 426 B.R. at 144.

[490]    U.S. Trustee Obj. ¶ 75 [D.I. 8710].  The U.S. Trustee also refers to "Related Releasing Party" in its Objection, which is no longer reflected in the Plan.  Thus, any argument raised in opposition to the Consensual Release as it relates to the "Related Releasing Party" concept is moot and should be overruled.

[491]    *See Mallinckrodt PLC*, No. 20-12522 (JTD), 2022 WL 404323, at *23 (Bankr. D. Del. Feb. 8, 2022)

337. It is well-established that third-party releases are considered consensual (a) when a third party votes to accept the plan and does not opt out of the third-party release,[492] (b) when a third party votes to reject the plan but does not opt out of the releases,[493] and (c) when a third party is presumed to accept the plan and does not object to the third-party releases.[494] Contrary to the U.S. Trustee's objection, affirmative consent is not required.[495] Rather, courts in the Third Circuit recognize that a creditor who receives notice of an obligation to object or opt out and does not do so is deemed to consent.[496]

338. Here, the Releasing Claim Holders had sufficient notice of the Consensual Release and an opportunity to opt out. Each ballot included the full language of the Consensual Release in bold typeface and referenced the release eleven times:

> **IF YOU VOTE TO ACCEPT OR REJECT THE PLAN, YOU WILL BE RELEASING THE RELEASED PARTIES FROM ANY AND ALL CLAIMS/CAUSES OF ACTION TO THE**

---

[492] *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 286 (Bankr. D. Del. 2016) (recognizing that courts in the Third Circuit uphold plan provisions that provide each person who votes to accept the plan is deemed to consent to third party releases and approving same); *In re Washington Mutual Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) (describing an enforceable third-party release as one that is "based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan)") (internal citation omitted); *Indianapolis Downs*, 486 B.R. at 304 (same); *Coram Healthcare*, 315 B.R. at 336 (finding that voting in favor of a plan of reorganization that provides for a third-party release indicates consent to the release, even without an explicit election to opt-in to or out of the third-party release).

[493] *In re Chaparral Energy Inc.*, No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) [D.I. 237] (confirming plan and approving third party releases by holders of claims who voted to reject or abstained from voting and did not opt out); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr D. Del. Mar. 11, 2019) [D.I. 397] (confirming plan and approving third party releases for holders of claims that voted to reject the plan and did not opt-out); *In re TK Holdings, Inc.*, No. 17-11375 (BLS), 2018 Bankr. LEXIS 756, at *55 (Bankr. D. Del. Feb. 21, 2018) (same); *In re Horsehead Holding Corp.*, No. 16-10287 (CSS) (Bankr. D. Del. Sept. 9, 2016) [D.I. 1695] (same).

[494] *Mallinckrodt*, [D.I. 6347] at 48-49.

[495] *See, e.g.*, *In re Z Gallerie*, June 13, 2019 Hr'g Tr. 48:9-11 [D.I 384] ("With respect to third-party releases I'm prepared to find that they are consensual because of the opt-out box in the ballots.").

[496] *In re Southeastern Grocers, LLC*, No. 18-10700 (MFW) (Bankr. D. Del. May 14, 2018) [D.I. 487] (approving releases that required an opt-out for unimpaired creditors); *see Southeastern Grocers*, May 14, 2018 Hr'g Tr. 23:13-18 [D.I. 492] ("[T]here are many instances where a party's required to file a response. And if the party does not, that is deemed to be consent to the request. Why is this different? There was a notice given to all unimpaireds requiring them to object if they had an objection specifically to the releases. Why is that not consent?").

**EXTENT PROVIDED IN <u>ARTICLE X.J.4</u> OF THE PLAN UNLESS YOU "OPT-OUT" OF SUCH RELEASES. YOU MAY "OPT-OUT" OF SUCH RELEASES AND YOU MUST INDICATE SUCH "OPT-OUT" IN THE BALLOT.**[497]

Approximately 27,301 holders of Claims Plan opted out of such release, including holders of Claims who voted to accept the Plan, voted to reject the Plan and abstained from voting.[498] This shows that voting creditors were aware that they were "deemed to consent" "by their failure to act," which is a principle used "throughout the judicial system," including bankruptcy courts.[499] A claim holder's choice not to opt out of the Consensual Release demonstrates consent in these cases.

339. The same is true for the unimpaired creditors. Claimants in Classes 1 (Other Priority Claims) and 2 (Other Secured Claims) are being paid in full and were informed in clear and conspicuous language in a notice of non-voting status that the Plan contained a third-party release:

> **AS THE HOLDER OF A CLAIM THAT IS UNIMPAIRED UNDER THE PLAN, YOU ARE PRESUMED TO ACCEPT THE PLAN. YOU ARE ALSO CONCLUSIVELY PRESUMED TO GRANT THE 'RELEASES BY HOLDERS OF CLAIMS' (SET FORTH BELOW AND IN ARTICLE X.J.4 OF THE PLAN) UNLESS YOU TIMELY FILE AN OBJECTION TO THE PLAN IN ACCORDANCE WITH THE PROCEDURES BELOW.**[500]

340. In addition, the Confirmation Hearing Notice and Publication Notice each reference the Consensual Release and contain information about its scope or instructions on how to opt out

---

[497] *See Disclosure Statement Order,* Exs. 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, and 2-7.

[498] Voting Report, Ex. A (as may be supplemented or amended by the Final Voting Report to be filed on or around March 10, 2022).

[499] *Mallinckrodt PLC*, 2022 WL 404323, at *24.

[500] Disclosure Statement Order, Ex. 5.

(*i.e.*, file an objection).[501]  Creditors were given and had access to information about the Consensual Release and were on notice that failure to opt-out would be deemed consent, consistent with the law in this jurisdiction.  Thus, the U.S. Trustee's objection should be overruled, and the Consensual Release should be approved.

**IV.    Neither the Consensual Release Nor the Scouting-Related Release Violates the Due Process Rights of the Affected Claimants.**

341.    Due process requirements apply equally in bankruptcy cases as in all other cases, and a cause of action for damages is among the property interests that due process protects.[502]  Notice and a meaningful opportunity to be heard are essential conditions of constitutional due process.[503]  Whether due process requirements is met in a particular case depends on if the notice is reasonably calculated under the circumstances to apprise interested parties and affords them an opportunity to present their objection.[504]  And "[t]he proper inquiry in evaluating notice is whether a party acted reasonably in selecting means likely to inform persons affected, not whether each person actually received notice."[505]  Here, the notice provided to holders of Abuse Claims satisfies these requirements.

342.    Nevertheless, the U.S. Trustee argues that the Consensual Release and Scouting-

---

[501]    Disclosure Statement Order, Ex. 3 (attaching the Confirmation Hearing Notice that includes descriptions of the of the releases and channeling injunction and instructions for holders of claims to opt out of the releases); Ex. 4 (attaching the Publication Notice that includes the following bolded language: "The Plan proposes certain releases and injunctions in furtherance of the Plan. . . . For the specific terms and conditions of all the releases and injunctions provided for in the Plan, and the precise scope of the Claims and Demands to be channeled, please refer to the specific terms of the Plan, which can be obtained as described below.").

[502]    *See In re Johns-Manville Corp.*, 551 B.R. 104, 113 (S.D.N.Y. 2016); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

[503]    U.S. Trustee Obj. ¶¶ 22-44  [D.I. 8710].

[504]    *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

[505]    *In re New Century TRS Holdings, Inc.*, 465 B.R. 38, 48–49 (Bankr. D. Del. 2012) (quoting *In re Charter Co.*, 113 B.R. 725, 728 (M.D. Fla. 1990) (citing *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988)).

Related Release violate the Due Process Clause of the Fifth Amendment because the Releasing Claim Holders are extinguishing (1) their non-debtor claims without adequate notice and (2) their litigation rights without an "opportunity to be heard."[506] Neither of these arguments has any merit.

343.    First, the U.S. Trustee asserts that releasing parties do not know what "unknown" and "unforeseen" claims they are releasing under the Consensual Release and Scouting-Related Release provisions in the Plan.[507] But this argument overlooks the basic principle that claims can exist even if a claimant does not know about them.[508] A claimant has the responsibility of knowing his claims and asserting his rights.[509] It is unreasonable to expect (nor does the Due Process Clause require) the Debtors to inform every claimant what claim he or she would consider to be "unexpected" or "unknown."[510] Consistent with the Due Process Clause, the Debtors informed the Releasing Claim Holders about the claims being released. It is the holders' responsibility to ascertain whether they have claims fitting that description. Thus, the U.S. Trustee's objection on this ground should be overruled.

---

[506]    U.S. Trustee Obj. ¶¶ 22-34.

[507]    U.S. Trustee Obj. at ¶¶ 27, 30 [Docket No. 8710].

[508]    *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) (holding that an "unknown" creditor whose "interests are either conjectural or future" was still a claimant); *In re Manville Forest Prod. Corp.*, 209 F.3d 125, 129 (2d Cir. 2000) (stating that "a 'claim' may exist . . . even where the parties lack complete knowledge about the scope of its potential liability"); *In re Johns-Manville Corp.*, 552 B.R. 221, 241 (Bankr. S.D.N.Y. 2016), *aff'd*, 623 B.R. 242 (S.D.N.Y. 2020) (rejecting the creditor's argument that "it is impossible to provide future, unknown claimants with 'adequate due process notice of the need to assert a claim (which they do not [ ] know that they have'").

[509]    *In re Motors Liquidation Co.*, 585 B.R. 708 (Bankr. S.D.N.Y. 2018) (*citing In re Brooks Fashion Stores, Inc.*, 124 B.R. 436, 445 (Bankr. S.D.N.Y. 1991) (stating that "it is not the debtor's duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it"); *see also DPWN Holdings (USA), Inc. v. United Air Lines, Inc*., 871 F. Supp. 2d 143, 157 (E.D.N.Y. 2012) ("A claimant that receives notice of bankruptcy proceedings has a duty to reasonably investigate what debts it is owed."); *Am. Bank & Tr. Co. v. Jardine Ins. Servs. Tex., Inc. (In re Barton Indus., Inc.)*, 104 F.3d 1241, 1246 (10th Cir.1997) ("[C]reditors have a responsibility to take an active role in protecting their claims . . .").

[510]    *In re New Century TRS Holdings, Inc.*, 450 B.R. 504 (Bankr. D. Del. 2011) (holding that under due process requirements, the debtor need not be omnipotent or clairvoyant, but need only do what is reasonable under the circumstances to provide notice of claims bar date to ascertainable creditors).

344.     Next, the U.S. Trustee argues that the notices should have provided more explanation about the release.[511]  Yet, this "impenetrable" language that the U.S. Trustee describes as having failed to "reasonably convey the required information to those whose rights are being extinguished" is Court-approved and the U.S. Trustee did not object to this language prior to solicitation.  Moreover, the Court-appointed fiduciaries for creditors in these cases—the TCC, FCR, and Creditors' Committee—have not raised a due process objection to the releases and in fact support the Plan.  Thus, the U.S. Trustee's objection on this ground should be overruled.

345.     Finally, the U.S. Trustee claims that the Releasing Claim Holders did not have an opportunity to be heard.[512]  This is false.  As mentioned above, the Debtors sought and obtained Court approval of the ballots and notices sent to the Releasing Claim Holders and holders of Abuse Claims.[513]  Omni served the Solicitation Packages and notices to the Releasing Claim Holders and holders of Abuse Claims in accordance with the Disclosure Statement Order.  The Releasing Claim Holders had nearly ninety-days to either opt out or object to the releases contained in the Plan— significantly more time than that afforded to creditors in other mass tort cases.[514]  As such, holders of Claims had ample time to opt out and be heard on the releases.

## V.     The Debtor Releases, Exculpation, and Other Injunction Provisions Should Be Approved.

346.     Consistent with Section 1123(b)(6) of the Bankruptcy Code, which provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions

---

[511]   U.S. Trustee Obj. at ¶ 34 [D.I. 8710].

[512]   *Id*. at ¶¶ 35-44.

[513]   *See* Disclosure Statement Order.

[514]   *In re Imerys Talc Am., Inc.*, No.19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [D.I. 2863] (approving disclosure statement on January 27, 2021 and setting voting and opt out deadline of March 25, 2021 (fifty-seven days)); *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. Dec. 4, 2019) [D.I. 952] (approving disclosure statement on December 4, 2019 and setting opt out deadline of January 6, 2020 (thirty-three days)).

of [the Bankruptcy Code], the Plan contains release, exculpation, and injunction provisions necessary and appropriate to effectuate the Debtors' restructuring."[515]  Articles X.J.1. and X.J.2. of the Plan contain a release from the Debtors and their Estates of the (a) Released Parties,[516] (b) Certain Avoidance Actions,[517] and (c) Local Councils, Contributing Chartered Organizations, Participating Chartered Organizations, Opt-Out Chartered Organizations, and Settling Insurance Companies (collectively, the "Debtor Releases").  Article X.K. sets forth an exculpation provision with respect to the Exculpated Parties.[518]  And Article X of the Plan contains three injunction provisions under:  (a) the Injunction Related to the Releases, (b) the Injunction Related to Exculpation, and (c) the Insurance Entity Injunction.  Each of these provisions is necessary or appropriate to effectuate the Debtors' restructuring and are consistent with applicable Third Circuit

---

[515]  11 U.S.C. § 1123(b)(6).

[516]  "Released Parties" means, collectively, the following Persons, in each case in its or their respective capacities as such: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Creditors' Committee; (e) the members of the Creditors' Committee in their capacities as such; (f) the Tort Claimants' Committee; (g) the members of the Tort Claimants' Committee in their capacities as such; (h) the Future Claimants' Representative; (i) the Coalition; (j) JPM; (k) the Settling Insurance Companies; (l) the Contributing Chartered Organizations, including TCJC and the United Methodist Entities; (m) the Foundation, in its capacity as lender under the Foundation Loan Agreement; (n) the Ad Hoc Committee; (o) the members of the Ad Hoc Committee in their capacities as such; (p) the Creditor Representative; (q) the Mediators; and (r) all of such Persons' Representatives, provided, however, that no Perpetrator is or shall be a Released Party; provided further, that the definition of "Released Parties" shall in all instances be subject to Article X.J.

[517]  "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination or other Claims, causes of action or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes or common law, including preference and fraudulent transfer and conveyance laws, in each case whether or not litigation to prosecute such Claim(s), Cause(s) of Action or remedy(ies) were commenced prior to the Effective Date. Plan I.A.34.

[518]  "Exculpated Parties" mean, collectively, the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Creditors' Committee; (d) the members of the Creditors' Committee in their capacities as such; (e) the Tort Claimants' Committee; (f) the members of the Tort Claimants' Committee in their capacities as such; (g) the Future Claimants' Representative; and (h) the Creditor Representative; and (i) all of such Persons' current officers and directors, former officers and directors who served in such capacity during the pendency of the Chapter 11 Cases but are no longer officers or directors as of the Effective Date, employees, volunteers, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals. Plan Art. I.A.124.

law.  Thus, the release, exculpation, and injunction provisions should be approved for the reasons stated below.

## A.     The Debtor Releases.

347.     As set forth herein and will be further demonstrated at the Confirmation Hearing, the Debtor Releases should be approved for each of the Released Parties because it is a reasonable exercise of the Debtors' business judgment, in the best interests of the Estates, and satisfy the standards set forth in *Martin*.  Additionally, if applicable, the Debtor Releases satisfy the standard set forth in *Master Mortgage*.[519]  Moreover, no party has objected to the Debtor Releases.

348.     Section 1123(b)(3)(A) of the Bankruptcy Code provides for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[520]  Courts in this district have found that chapter 11 debtors are generally allowed to release claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's

---

[519]  *In re Exide Holdings, Inc.*, 20-11157-CSS, 2021 WL 3145612, at *14 (D. Del. July 26, 2021) (affirming debtor release because it was "a valid exercise of the debtor's business judgment, [and was] fair, reasonable, and in the best interests of the estate"); *In re Roman Catholic Bishop of Stockton*, No. 14-20371, 2017 WL 118013, at *8-9 (Bankr. E.D. Cal. Jan. 10, 2017) (confirming debtor releases in connection with insurers' buyback of policies because the debtor "exercised appropriate business judgment" in agreeing to the releases, which were "reasonable"); *In re Zenith Elec. Corp.*, 241 B.R. at 110 (*citing In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 935); *In re Spansion, Inc.*, 426 B.R. at 143 n.47 (*citing the Master Mortgage factors*); *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); accord Will v. Nw. Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor); *see also TMT Trailer Ferry, Inc.*, 390 U.S. at 424 (1968); In re Marvel Entm't Group, Inc., 222 B.R. 243 (D. Del. 1998) (proposed settlement held in best interest of the estate).

[520]  *U.S. Bank. Nat'l Ass'n v. Wilmington Tr. Co.* (*In re Spansion*), 426 B.R. 114, 143 (Bankr. D. Del. 2010).

business judgment, fair, reasonable, and in the best interests of the estate."[521]  Whether a debtor's release of third parties satisfies this standard is based on the facts and equities of each case.[522]  The *Martin* factors articulated above also guide courts in deciding whether a debtor's release should be approved.  In addition, certain decisions from this district apply the *Master Mortgage* factors, used when considering noncensensual releases, articulated above to evaluate the appropriateness of a debtor's releases.[523]

349.    Subject to certain exceptions outlined in the Plan, the Debtors and Estates are releasing the Released Parties for all Estate Causes of Action as well as any and all Claims and Interests as described further in Article X.J.1.a. of the Plan.  Holders of General Unsecured Claims, Non-Abuse Litigation Claims, and Convenience Claims are receiving a release from the Debtors and Estates for and from any and all Avoidance Actions under Article X.J.1.b. of the Plan.  The Debtors and the Estates are also releasing any and all claims and causes of action as further described in Article X.J.2. of the Plan against any of (a) the Local Councils and Contributing

---

[521]   *U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. at 143 ("[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."); *see also In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (stating that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan"); *In re AAI Pharma*, No. 05-11341 (PJW) (Bankr. D. Del. Feb. 22, 2006) (A debtor can "can elect to release claims as part of the plan and as part of the fresh start, concentrating on the business affairs and forgetting about litigation that may have questionable value or no value at all, just to settle past scores of charges and expressions of discontent." and "[T]he debtor should be given considerable latitude in addressing" whether to release claims as part of its plan.) [Docket No. 893];  *In re Aleris Intern., Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of the plan" as part of the plan negotiation process").

[522]   *See, e.g.*, *U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. at 143 (noting that "the record does not reflect that there is any pending litigation in [that] case that would be discontinued by such a release" and citing *In re DBSD North America, Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009), which "approv[ed] a debtor's release of third parties when the debtor testified that it was unaware of any significant potential claims that were being released," *aff'd in part*, 627 F.3d 496 (2d Cir. 2010)).

[523]   *See infra* n.[●].  *See Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

Chartered Organizations with respect to any Abuse Claims, (b) the Participating Chartered Organizations with respect to any Post-1975 Chartered Organization Abuse Claims, (c) the Participating Chartered Organizations with respect to any Pre-1976 Chartered Organization Abuse Claims, (d) the Opt-Out Chartered Organizations with respect to any Opt-Out Chartered Organization Abuse Claims, and (e) the Settling Insurance Company with respect to any coverage for Abuse Claims. The aforementioned parties will not receive a release for any post-Effective Date obligations under the Plan Documents or any related document.

350.     The Debtors, in their business judgement, have determined that the Debtor Releases are fair, reasonable, and in the best interests of the Debtors and the Estates. Extensive negotiations of the Plan, including the scope and breadth of the Debtor Release, took place months before the Plan was proposed to this Court. As will be demonstrated at the confirmation hearing, these negotiations were conducted at arm's length and in good faith during mediation, thus ensuring that the Debtor Release is equitable under the circumstances. The Debtor Release is also reasonable because the Debtors are not aware of any "significant potential claim" that they might have against the Released Parties. There is no "there is any pending litigation in [that] case that would be discontinued by such a release." And no party has alleged that "there is any serious cause of action out there that the debtor is giving up."

351.     But, nevertheless, the Debtor Release reflects important contributions, concessions, and compromises that the Released Parties have made while negotiating the various Settlements embodied in the Plan. The Debtors believe that the settlement parties would not have agreed to the terms in the various Settlements without the releases, including the Debtor Release. As a result, the Debtors, in their business judgment, determined that the Debtor Release is necessary to reach consensus on the Plan and is therefore critical to the Debtors' successful reorganization. Thus, the

Debtor Release is in the paramount interest of creditors, as it represents a global resolution of prepetition claims under the Plan, and should be approved under section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

352.    In evaluating the appropriateness of a debtor's releases, some courts in this Circuit have also applied the *Master Mortgage* factors.[524] To this end, the Debtors submit that the same factual findings discussed above justifying the issuance of the Channeling Injunction likewise support the approval of the Debtor Releases.[525]  For all the foregoing reasons, including the lack of any objection, the Debtors respectfully request that the Court approve the Debtor Releases.

**B.    Exculpation.**

353.    <u>Article X.K.</u> of the Plan provides, among other things, that each Exculpated Party[526] is exculpated from any Cause of Action for any claim relating to any act or omission from the Petition Date to the Effective Date relating to the Chapter 11 Cases, the Debtors, and certain other matters, except for acts or omissions that are judicially determined by Final Order to have arisen

---

[524]    *See In re Zenith Elec. Corp.*, 241 B.R. at 110 (*citing In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 935); *In re Spansion, Inc.*, 426 B.R. at 143 n.47 (*citing the Master Mortgage factors*); *see also In re Washington Mut. Inc.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that Master Mortgage factors are not exclusive or conjunctive requirements).

[525]    While there is substantial overlap between the parties covered by the Channeling Injunction and those covered by the Debtor Releases, certain parties subject to the Debtor Releases are not covered by the Channeling Injunction. The Debtors submit that the inclusion of such additional parties in the Debtor Release satisfies each of the *Master Mortgage* factors because, to the extent required and as will be further demonstrated at the Confirmation Hearing, such parties share an identity of interest with the Debtors, have made a substantial contribution to the Debtors' reorganization efforts, and the Debtor Releases were essential to the Debtors' restructuring efforts and approval of the Plan.

[526]    "<u>Exculpated Parties</u>" means, collectively, the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Creditors' Committee; (d) the members of the Creditors' Committee in their capacities as such; (e) the Tort Claimants' Committee; (f) the members of the Tort Claimants' Committee in their capacities as such; (g) the Future Claimants' Representative; and (h) all of such Persons' current officers and directors, former officers and directors who served in such capacity during the pendency of the Chapter 11 Cases but are no longer officers or directors as of the Effective Date, employees, volunteers, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals. Plan, Art. I.A.124.

from fraud, gross negligence, or willful misconduct. The exculpation provision of the Plan is standard, appropriate, and should be approved. Exculpation provisions are "commonplace" and do not affect the liability of third parties per se, but rather set a standard of care of gross negligence or willful misconduct in future litigation between a releasing party against an Exculpated Party for acts arising out of the Debtors' restructuring.[527]

354. The Debtors also believe that the exculpation is necessary to protect parties who have made substantial contributions to the Debtors' reorganization from collateral attacks related to their good faith acts or omissions in effecting the Debtors' successful restructuring during the Chapter 11 Cases.[528] Put simply, the Debtors could not have developed the Plan without the support and contributions of the Exculpated Parties, which will be proven to the Court at the confirmation hearing. Further, the scope of the exculpation is limited in time and subject matter and has no effect on liability resulting from gross negligence, actual fraud, or willful misconduct, as a court may determine pursuant to a final order.[529] Thus, the exculpation provision is consistent with applicable law and should be approved in connection with the Confirmation of the Plan.

355. Only the U.S. Trustee objects to the Plan's exculpation provisions, arguing the provisions includes certain non-estate fiduciaries.[530] Contrary to the U.S. Trustee's argument, the

---

[527] *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision is "a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code").

[528] *See In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (recognizing that "exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers in the chapter 11 case").

[529] *See* Plan Art. VIII.E.

[530] U.S. Trustee Obj. [D.I. 8710 ¶¶ 106-110]. The U.S. Trustee also objected to the temporal scope of exculpation periods and the type of claims to be released. These objections are now mooted in light of the Modified Plan.

Plan's definition of Exculpated Parties need not be limited to estate fiduciaries.[531] This is not the typical corporate reorganization. Here, the Exculpated Parties include volunteers who have continued to donate their time to the BSA, despite the uncertainties related to the Debtors' restructuring prospects. The volunteers are the lifeline of the BSA. They are the ones engaging directly with the youths, exemplifying the BSA's principles, and performing the day-to-day tasks that are essential to the nonprofit. Although these volunteers did not draft the Plan or Settlements, there is no requirement that an exculpated party play such a role. Instead, their actions must relate to the Debtors' restructuring efforts.[532] It is beyond dispute that continuing the Debtors' Scouting mission is essential to the Debtors' ability to emerge and for them to make their post-Effective Date obligations to the Settlement Trust. As discussed below, the Plan is feasible due to certain projections related to revenue growth, which includes increasing membership. The volunteers were key to the Debtors' ability to support their membership base during these Chapter 11 Cases. But there were some instances in which certain volunteers engaged with vendors, contract counterparties, and other third parties on matters related to these chapter 11 proceedings. Such volunteers should be protected from any disgruntled creditor or party in interest that might not be satisfied with the Plan or Settlement. Thus, it is wholly appropriate to include volunteers within

---

[531] *In re PNG Ventures, Inc.*, No. 09-13162, 2010 WL 2745952, at *17 (Bankr. D. Del. Mar. 12, 2010) (including in confirmation order that "the Disbursing Agent, together with its officers, directors, partners, employees, agents and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and Equity Interests, and all other parties in interest, from any and all causes of action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent (and each of its respective paying agents), by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence"); *In re Orleans Homebuilders, Inc.*, 561 B.R. 46, 54 (Bankr. D. Del. 2016) (granting exculpation of "the Reorganized Debtors").

[532] *In re Astria Health*, 623 B.R. 793, 799 (Bankr. E.D. Wash. 2021) ("The UST also contends that the class of parties included in the exculpation clause is improperly broad. Again, the court determines that this aspect of the clause is appropriate. Each of the covered parties played a significant role during these cases and engaged in conduct potentially subject to second guessing or hindsight-driven criticism.").

the exculpation due to its limited scope and purpose.

356.    Despite the plentiful instances when courts have approved exculpation for non-estate fiduciaries, the U.S. Trustee relies on *Washington Mutual* to argue that there is a bright line prohibition against exculpation for non-estate fiduciaries.[533]  The decision in *Washington Mutual*, however, relies on the Third Circuit's decision in *PWS*, which did not address exculpation in the context of non-fiduciaries.[534]  In fact, in *PWS*, the Third Circuit rejected any "per se rule barring any provision in a reorganization plan limiting the liability of third parties" while assessing a plan exculpation in that case.[535]  Rather, the Third Circuit held that where a plan seeks to limit liability, such provision must not eliminate liability for gross negligence or willful misconduct, and it must be considered given the particular circumstances at issue in the case.[536]

357.    The extension of the exculpation clause to non-estate fiduciaries is well within accepted limits and is a limited benefit that has been negotiated.[537]   A narrowly tailored exculpation of parties who participate meaningfully in a bankruptcy case and in creating and supporting a plan of reorganization—solely with respect to their actions in connection with the case (and excepting fraud, gross negligence and willful misconduct)—is warranted under the extraordinary facts of these Chapter 11 Cases; thus, the U.S. Trustee's objection on this point should be overruled.

## C.    Injunctions.

---

[533]  442 B.R. 314, 350-51 (Bankr. D. Del. 2011).

[534]  *See Washington Mutual*, 442 B.R. at 350 (citing *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir.2000)).

[535]  *In re PWS Holding Corp.*, 228 F.3d 224, 247 (3d Cir.2000).

[536]  *PWS*, 228 F.3d at 247.

[537]  *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1394, (2021) (reasoning "the [Exculpation] Clause does nothing more than allow the settling parties—including Credit Suisse, the Debtors' largest creditor—to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings").

358.     The Plan contains various injunctions essential to the Settlements:  (a) <u>Article X.H.</u> is the insurance entity injunction (the "<u>Insurance Injunction</u>"), (b) <u>Article X.I.</u> is the injunction against interference with the Plan (the "<u>Plan Injunction</u>"), and (c) <u>Article X.L.</u> is the injunctions related to the Consensual Release, Scouting-Related Release, and Exculpation.  The injunctions are necessary to preserve and enforce the releases and exculpation provisions in the Plan and are narrowly tailored to achieve that purpose.  The Third Circuit in *Continental* indicated that fairness and necessity principles, including the *Master Mortgage* factors, apply to both releases and the injunctions that effectuate such releases.[538]  As explained above, the releases are proper under applicable law, and, accordingly, the injunction provision tailored thereto should be approved.[539]

## VI.     The Plan Satisfies the Remaining Requirements for Confirmation Under Section 1129(a) of the Bankruptcy Code.

359.     To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[540]  As set forth below, the Plan satisfies all applicable elements of section 1129 of the Bankruptcy Code and

---

[538]     *See Continental,* 203 F.3d at 217 & n.17.

[539]     *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992); *see also In re TK Holdings, Inc.*, No. 17-11375 (BLS), 2018 Bankr. LEXIS 756, at *61 (Bankr. D. Del. Feb. 21, 2018) ("The injunctions are necessary to preserve and enforce the releases and are narrowly tailored to achieve that purpose."); *In re Regent Commc'ns, Inc.*, No. 10-10632 (KG), 2010 Bankr. LEXIS 5793, at *18-19 (Bankr. D. Del. Apr. 12, 2010) ("The injunction provisions set forth in Article X.F of the Plan are necessary to preserve and enforce the release, exculpation, non-debtor release and injunction provisions . . . of the Plan and are narrowly tailored to achieve that purpose."); *In re Drug Fair Grp., Inc.*, No. 09-10897 (BLS), 2010 Bankr. LEXIS 2984, at *16 (Bankr. D. Del. June 7, 2010) ("The injunction provision set forth in Section 9.2 of the Plan . . . is necessary to preserve and enforce the Release and the Exculpation, and the Injunction is narrowly tailored to achieve this purpose.").  Courts in this district routinely approve similar injunctions.  *See, e.g., In re Am. Apparel, Inc.,* No. 15-12055 (BLS), 2016 Bankr. LEXIS 3331, at *250 (Bankr. D. Del. Jan. 27, 2016); *In re HRI Holding Corp.*, No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020) [D.I. 816]; *In re Stallion Oilfield Servs.*, No. 09-13562 (BLS), 2010 Bankr. LEXIS 4500, at *70 (Bankr. D. Del. Jan. 20, 2010); *In re Masonite Corp.*, No. 09-10844 (PJW), 2009 Bankr. LEXIS 4698, at *66 (Bankr. D. Del. May 29, 2009).

[540]     *See Armstrong I*, 348 B.R. at 119–20 (stating that a court must determine whether a plan meets the requirements of section 1129 in order to confirm such plan); *TCI 2 Holdings*, 428 B.R. at 148 ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success, and is more than a visionary scheme." (internal quotations omitted)).

otherwise complies with all applicable sections of the Bankruptcy Code, Bankruptcy Rules, and non-bankruptcy law. Accordingly, the Plan should be confirmed.

## A. Section 1129(a)(1): The Plan Complies with Applicable Provisions of the Bankruptcy Code.

360. Section 1129(a)(1) of the Bankruptcy Code provides that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[541] The legislative history of section 1129(a)(1) explains that this provision incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code that govern classification of claims and contents of a plan, respectively.[542] Here, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code.

### 1. The Claims and Interests Have Been Classified Properly in the Plan in Accordance with Section 1122 of the Bankruptcy Code.

361. Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[543] A plan proponent has significant flexibility in classifying claims and interests into multiple classes under section 1122(a) of the Bankruptcy Code if there is a reasonable basis to do so[544] and all claims or interests designated to a particular class be substantially similar

---

[541] 11 U.S.C. § 1129(a)(1).

[542] H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); *see In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 223 (Bankr. D.N.J. 2000) ("The legislative history reflects that the applicable provisions of chapter 11 includes sections such as section 1122 and 1123, governing classification and contents of plan." (internal quotation marks omitted)).

[543] 11 U.S.C. § 1122(a).

[544] *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (explaining that a classification is proper as long as each class represents a voting interest "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992); *Olympia & York Fla. Equity Corp. v. Bank of N.Y.* (*In re Holywell Corp.*), 913 F.2d 873, 880 (11th Cir. 1990) (plan proponent allowed considerable discretion to classify claims and interests according to facts and circumstances of case so long as classification scheme does not violate basic priority rights or manipulate voting).

to each other.[545] It is not necessary that all substantially similar claims or interests be designated to the same class.[546]

362. With the exception of Administrative Expense Claims and Priority Tax Claims (which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy Code), the Plan provides for the separate classification of Claims and Interests based upon differences in the legal nature and/or priority of such Claims and Interests. More specifically, the Plan designates the following classes of Claims and Interests: (a) Class 1 (Other Priority Claims), (b) Class 2 (Other Secured Claims), (c) Class 3A (2010 Credit Facility Claims), (d) Class 3B (2019 RCF Claims), (e) Class 4A (2010 Bond Claims), (f) Class 4B (2012 Bond Claims), (g) Class 5 (Convenience Claims), (h) Class 6 (General Unsecured Claims), (i) Class 7 (Non-Abuse Litigation Claims), (j) Class 8 (Direct Abuse Claims), (k) Class 9 (Indirect Abuse Claims), and (l) Class 10 (Interests in Delaware BSA). The Claims or Interests in each Class are substantially similar to the other Claims or Interests in such Class.

363. In addition, valid business, legal, and factual reasons justify the classification structure set forth in the Plan. The classification scheme is based on the legal rights to the Debtors' property, the priority afforded under law to such rights, and the treatment of those rights, as have been agreed upon among the relevant settlement parties. For example, the Plan appropriately classifies separately Non-Abuse Litigation Claims, Convenience Claims, and General Unsecured Claims. Although each of the aforementioned are unsecured claims unrelated to Abuse, each

---

[545] *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006).

[546] *In re Tribune Co.*, 476 B.R. 843, 854–55 (Bankr. D. Del. 2012), *aff'd as modified*, No. 08–13141 (KJC), 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015).

category is based on distinct legal and factual circumstances.[547]  Non-Abuse Litigation Claims are different from General Unsecured Claims, which include those based on the Debtors' prepetition contractual obligations, trade payables, employee-related obligations, and rejection damages, among other things.  But the Non-Abuse Litigation Claims are claims related to threatened or pending litigation that does not relate to Abuse.  Convenience Claims are classified separately from General Unsecured Claims and Non-Abuse Litigation Claims because claimants holding such Convenience Claims have what would otherwise be a General Unsecured Claim in an amount of $50,000 or less, or have *consented* to their respective Claims being Allowed in an amount of $50,000 or less in full and final satisfaction thereof notwithstanding whether they have filed a proof of claim in an amount greater than $50,000.[548]

364.    The Lujan Claimants object to the Plan's classification of their Direct Abuse Claims, which are direct actions against an insurer, with claimants who do not have a right to sue an insurance company directly.[549]  *Pro Se* Claimant does not make an express classification argument but asserts that the Plan impermissibly fails to differentiate between claimants who filed prepetition state court actions against the BSA and those who did not.  These objections miss the mark.  In analyzing whether claims within a given class are substantially similar, "the focus of the classification [should be on] the legal character of the claim as it relates to the *assets of the*

---

[547]    *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004) ("Section 1122 of the Code provides that claims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes. In fact, the Third Circuit has approved separate classification of unsecured claims.") (citation omitted).

[548]    Plan. Art. I.A.72.

[549]    Lujan Obj. at 44 [D.I. 8708].  *Pro Se* Claimant [D.I. 8761] does not make an express classification argument, but asserts that the Plan impermissibly fails to differentiate between claimants who filed prepetition state court actions against the BSA and those who did not.  *See Pro Se* Claimant Obj. [D.I. 8761] at 10–11.

*debtor*."[550] Courts also look at the nature of the claim.[551] A plan proponent has considerably broad discretion in deciding how to classify claims.[552] The Direct Abuse Claims under the Plan exhibit the same effect on the bankruptcy estate—they seek recovery from the Settlement Trust for actions related to the BSA's sexual abuse liability. The nature of the Direct Abuse Claims are also the same—they arise out of allegations of sexual abuse from within the BSA's Scouting programs, and allege similar theories of recovery. The **claimants** in the Direct Abuse Claims class may have varying characteristics, as the Lujan Claimants and *Pro Se* Claimant suggest, but the **claims** are substantially similar. The Debtors have properly made a single class with respect to this group of claimants, notwithstanding that such claimants may have different rights against third parties in each state or territory in which the abuse occurred. The mere fact that there are variations in the rights that claimants hold with respect to their claims does not foreclose such claims from being classified together when such claims share similar characteristics. Moreover, just as courts have upheld separate classification for tort claimants in chapter 11 cases with multi-trust structures,[553] a single class is appropriate in a case with a single Settlement Trust.[554] For these reasons, there is a reasonable basis for the Debtors to classify together the claims of the Lujan Claimants and *Pro*

---

[550] *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986) (quoting *J.P. Morgan & Co. v. Mo. Pac. R.R.*, 85 F.2d 351, 352 (8th Cir. 1936)) (emphasis in original).

[551] *See* 7 Collier on Bankruptcy ¶ 1122.03[3] (16th ed. 2021) (noting that courts "look[] at the nature of the claim (e.g., senior or subordinated, secured or unsecured, and the relationship of the claim to property of the debtor).

[552] *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) ("It remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case.").

[553] *See, e.g.*, *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. Mar. 17, 2020) (classifying separately unsecured creditors whose recoveries were to come from different trusts); *In re TK Holdings Inc.*, No. 17-11375 (Bankr. D. Del. Feb. 21, 2018) [D.I. 2120] (same).

[554] *See, e.g.*, *In re USA Gymnastics*, No. 18-09108-RLM-11 (Bankr. S.D. Ind. Dec. 16, 2021) [D.I. 1776] (classifying abuse claims together whose recoveries were to come from the same trust); *In re Maremont Corp.*, No. 19-10118 (KJC) (Bankr. D. Del. May 17, 2019) [D.I. 241] (same).

*Se* Claimant[555] with other Direct Abuse Claims in Class 8. With respect to *Pro Se* Claimant's[556] argument that Direct Abuse Claims with pending prepetition actions should be treated differently, the Debtors note that, in *Combustion Engineering*, the court expressed concern with a two-trust structure that appeared to treat personal injury claimants disparately based on whether they opted in to a prepetition settlement.[557] Accordingly, the Plan's classification of Claims and Interests is consistent with the requirements of the Bankruptcy Code and is thus appropriate.[558]

> ## 2. The Plan Complies with Section 1123(a) of the Bankruptcy Code.

365. Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which every chapter 11 plan must comply. For the reasons stated below, the Plan fully complies with each requirement.

> ### (a) Section 1123(a)(1): Designation of Classes of Claims and Interests

366. Section 1123(a)(1) of the Bankruptcy Code requires a plan designate, subject to section 1122 and certain exceptions, classes of claims and classes of equity interests. As discussed above, the Plan designates ten (10) Classes of Claims and Interests of Claims and Interests as required under the Bankruptcy Code.[559] Accordingly, the Plan complies with section 1123(a)(1) of the Bankruptcy Code

> ### (b) Section 1123(a)(2): Unimpaired Classes.

---

[555] [D.I. 8761].

[556] [D.I. 8761].

[557] *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239–247 (3d Cir. 2004) (remanding for further consideration of good faith issues, among others, with respect to two-trust framework).

[558] *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (explaining that the determination of whether a classification scheme is reasonable "must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed . . . and treatment of claims under the plan") (internal citation omitted).

[559] *See* Plan § III.

367.     Section 1123(a)(2) of the Bankruptcy Code requires a plan to specify which classes of claims or interests are unimpaired by the plan.  Article III.B. of the Plan specifies that Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), and Class 10 (Interests in Delaware BSA) are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying the requirements of section 1123(a)(2) of the Bankruptcy Code.

### (c)     Section 1123(a)(3):  Treatment of Impaired Classes

368.     Section 1123(a)(3) of the Bankruptcy Code requires a plan to specify how it will treat impaired classes of claims or interests.  Article III of the Plan sets forth the treatment for each Class of Claims and Interests under the Plan, of which the following Classes are Impaired within the meaning of section 1124 of the Bankruptcy Code: Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims).[560] Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### (d)     Section 1123(a)(4): Equal Treatment Within Each Class

369.     Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide the same treatment for each claim or interest within a particular class, unless a holder of a claim or interest agrees to receive treatment that is less favorable than the treatment afforded to the other class members.  This "same treatment" standard only "requires equality of treatment, not equality of result."[561]  In practice, the "key inquiry under § 1123(a)(4) is not whether all of the claimants in a

---

[560]     *See* Plan § III.B.

[561]     *In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018).

class obtain the same thing, but whether they have the same opportunity" to recover.[562]

370.    The Plan satisfies section 1123(a)(4) of the Bankruptcy Code because each Class

of Claims or Interests receives the same treatment as every other Claim or Interest in such Class.

For example, Class 8 (Direct Abuse Claims) will be channeled to the Settlement Trust, where the

Claims will receive distributions in accordance with the Settlement Trust Documents.[563] Similarly,

Class 9 (Indirect Abuse Claims) will also be channeled to the Settlement Trust, to the extent such

claims are not waived, released, or expunged in connection with various contributions under the

Plan, and will thereafter be processed and liquidated pursuant to the Settlement Trust Documents.

Under the Plan, all Classes receive the same opportunity to recover on their Claims.

371.    The Objectors that raise "same treatment" challenges under section 1123(a)(4) do

not establish that their claims are, in fact, being treated unequally.  GSUSA asserts that the Plan

unfairly discriminates against GSUSA's claim in Class 7 (Non-Abuse Litigation Claims) because

it "immediately limits the maximum recovery . . . by 30% or more regardless of the strength or

weakness of the underlying claim or the final adjudicated value of the claim."[564]  GSUSA adds

that the Plan does not provide assurances that its claims are entitled to full coverage under the

applicable insurance policies while "the remaining Non-Abuse Litigation Claimants are entitled to

pursue and recover the full amount of their claims."[565]  GSUSA's argument is grounded in pure

speculation.  As an initial matter, GSUSA has an unliquidated, contingent, and disputed claim and

its success in the underlying lawsuit for its causes of action in its trademark action against the BSA

---

[562]   *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2018); *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims.").

[563]   *See* Plan § III.B.10.

[564]   GSUSA Obj. ¶ 26 [D.I. 8679].

[565]   *Id.* at 10.

is anything but guaranteed.[566]  As such, GSUSA presumes a particular recovery—and a lack of opportunity for recovery that is equal to other claimants in the class—for an amount yet to be proven if it exists at all.  For the GSUSA to even make this argument, it must assume that it will win its litigation outright, that it will obtain the exact damages demanded, that it will not settle within what the policy provides but will also then have a coverage dispute that it will lose, and that it will then will not recover on it claim.  Therefore, the GSUSA's argument is premised upon certain assumptions that it cannot prove that are not properly before this Court and it should be denied on these grounds.  Moreover, section 1123(a)(4) requires only that there be an equal opportunity for recovery—not equality of result or distribution ultimately received.[567]

372.    GSUSA relies on *City Holmes* for the proposition that "[p]roviding for disparate payment to claimants in the same class based on the existence or non-existence of insurance to cover such claims is improper."[568]  But *City Holmes* is distinguishable from these Chapter 11 Cases: there, the Debtors knowingly included uninsured claimants in a class with insured claimants

---

[566]  Litigation remains pending, but the District Court has suggested that it is likely to rule in favor of the BSA with respect to this matter. *Girl Scouts of the United States of America v. Boy Scouts of America*, No. 1:18-cv-10287 (S.D.N.Y. Nov 06, 2018), Sept. 15, 2021 Hr'g Tr. 25: 15-25 (District Court stated in its "temporary findings" that "that there has not been . . . created a likelihood of confusion by the Boy Scouts with respect to using Scouts BSA or Scouts . . ."); *see also Girl Scouts of the United States of America v. Boy Scouts of America*, No. 1:18-cv-10287 (S.D.N.Y. Nov 06, 2018), Sept. 15, 2021 Hr'g Tr. 15:17-19 (statement from the District Court that "[GSUSA] can't prevent the Boy Scouts from becoming co-ed and [GSUSA] can't prevent them from adopting a name that describes their new activity").

[567]  *See e.g.*, *In re Energy Future Holding Corp.*, 527 B.R. 157, 168 (D. Del. 2015) ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery.") (quoting *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)); *In re Wash. Mut., Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011) ("Providing different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4) . . . What is important is that each claimant within a class have the same opportunity to receive equal treatment."); *Ad Hoc Committee of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)*, 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.")

[568]  *See In re City Homes III LLC*, 564 B.R. 827, 868–69 (Bankr. Md. 2017) (refusing to confirm a plan providing up to 100% recovery for certain insured claimants where uninsured claimants were limited to a pro rata distribution of $300k).

and gave the uninsured claimants their pro rata share of $300,000 cash while the insured claimants could recover against insurance. This not the case here. Under the Plan, each Class 7 claimant has a right to recover the full amount of its allowed claim against applicable insurance. Unlike *City Holmes*, no claimant is being denied an opportunity to recover from any available insurance and the Debtors believe that all Non-Abuse Litigation Claims may trigger coverage under one or more applicable policies. Holders of Non-Abuse Litigation Claims are not compelled to accept cash to satisfy their claims. Thus, GSUSA's objection should be overruled.

373. In a similar vein, Claimant I.G. asserts that Class 8 creditors "hold fundamentally different economic rights against the various non-debtors" and asserts that grouping these creditors in the same class violates section 1123(a)(4)—because creditors with "superior claims against more solvent non-debtors are being compelled to relinquish those valuable claims for the same treatment as those without such claims."[569] The Lujan Claimants and the Guam Committee raise a similar objection on the grounds that their Class 8 Direct Claims are not being treated equally because other survivors in Class 8 lack direct action rights against insurers or other liable entities.[570] These Objections lack merit. The mere fact that certain holders of Direct Abuse Claims may hold stronger or superior claims against a particular third party than other members of the same class does not invalidate the Plan's classification scheme, invalidate the global settlements that are essential to reorganization and the fundamental tenant of the Bankruptcy Code, nor contravene the requirements of equal treatment.[571]

---

[569] Claimant I.G. Obj. ¶ 5.

[570] Lujan Claimants Obj. at 39-40; Guam Committee Obj. at 19.

[571] *In re Resorts Int'l, Inc.*, 145 B.R. 412, 448 (Bankr. D.N.J. 1990) (holding that class members with "stronger claims, or stronger defenses, than others . . . may be classified together so long as their claims are substantially similar and their treatment is approximately equal.").

374. Indeed, rather than support their objection and demand that their claims should be treated separately because they have direct action rights, section 1123(a)(4) requires the exact opposite, *i.e.*, that they be treated equally with other survivors in the class, and preempts any state direct action laws to the contrary. Section 1123(a) of the Bankrupt Code preempts "applicable nonbankruptcy law," such as the McCarran-Ferguson Act.[572] The Lujan Claimants have the same types of claims other survivors have against the Debtors and are covered by the same insurance policies that provide coverage for other Class 8 Direct Abuse Claims. Their direct action rights are not different claims against the Debtors that set them apart from other Class 8 survivors they are just a different means of getting to the same insurance coverage as all other survivors. It is a core tenet of the Bankruptcy Code, as codified in section 1123(a)(4), that there be no race to the courthouse or unique ability to recover from the Debtors' assets but rather that all creditors – here, the survivors in Class 8 – be treated equally as they are under the Plan.[573]

375. Section 1123(a)(4) does not require a plan to provide strict proportional equality of payments within a class of unliquidated claims or the Court to weigh the strengths and weaknesses of each and every claim so that each claim receives equal value.[574] All abuse survivors in Class 8 have the same opportunity to be compensated pursuant to the mechanism contemplated under

---

[572] 11 U.S.C. §1123(a).

[573] Indeed, the Plan's mechanism for resolving claims by channeling direct action claims and/or selling insurance policies back to insurers "free and clear" of any third-party interests has gained wide acceptance in mass-tort bankruptcy cases where these types of injunctions and insurance buybacks are essential for a successful reorganization. *See, e.g., In re Mallinckrodt Plc*, No. 22-12522 (JTD) (Bankr. D. Del. Feb. 8, 2022) [D.I. 6378] (confirming plan enjoining claims against insurers); *In re Duro Dyne Nat'l Corp.*, No. 18-2793 (MBK) (Bankr. D.N.J. July 16, 2019) [D.I. 784]; *In re ABB Lummus Glob. Inc.*, No. 06-10401 (MFW) (Bankr. D. Del. June 29, 2006) [D.I. 268]; *In re Dow Corning Corp.*, 198 B.R. 214, 244-45 (Bankr. E.D. Mich. 1996) (selling insurance policies free and clear of all interests of tort claimants covered by debtors' insurance policies). This stands in stark contrast to Lujan Claimants and the Guam Committee failing to cite a *single* case where the court held that the Guam Statute, or any analogous state law, preempted the Bankruptcy Code. Accordingly, the Court should overrule this objection.

[574] *In re Dow Corning Corp.*, 255 B.R 445, 505 (E.D. Mich. 2000) ("Section 1123(a)(4) is not to be interpreted as requiring precise equality of treatment, but rather some approximate measure [of equality.]").

Settlement Trust for their Direct Abuse Claims against the **_Debtors_**.[575]   That is all section

1123(a)(4) of the Bankruptcy Code requires, and the Plan satisfies that obligation.

376.    Third-party payments or contributions do not affect this inquiry.[576]   In _Exide_

_Holdings_, the court held that the Bankruptcy Code's requirement that creditors of equal priority

receive pro rata shares of the debtor's property does **_not_** apply to settlement payments or substantial

contributions from a third party.[577]   Settlement amounts from third parties could be allocated

among members of the class without regard to section 1123(a)(4) of the Bankruptcy Code.[578]

377.    Claimant I.G.'s reliance on _AOV Industries_ for the argument that the pooling and

third-party release features in the Plan violate section 1123(a)(4) because claimants hold different

economic rights against the various non-debtors[579] is misguided.   Claimant I.G. fails to

acknowledge the obvious impracticalities of applying this approach in these Chapter 11 Cases with

more than 80,000 asserted Direct Abuse Claims.[580]   In the context of a mass tort bankruptcy with

thousands of personal injury claims, _Dow Corning_ specifically noted that the "impractical rigidity

---

[575]   _See Exide Holdings_, 2021 U.S. Dist. LEXIS 138478, at *21.

[576]   _See Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings Inc.)_, 2021 U.S. Dist.
LEXIS 138478, at *21 (D. Del. July 26, 2021). In that case, the court held while the Bankruptcy Code requires
creditors of equal priority to receive pro rata shares of the debtor's property, the same does not hold true for
settlement payments or substantial contributions made by a third party. _Id._ at *21 (finding that "[n]othing in the
Bankruptcy Code requires a third party to make settlement payments or provide substantial contributions to
similarly situated creditors in equal or prorated amounts") (citing _Begier v. IRS_, 496 U.S. 53, 58 (1990)).  _Id._ (In
_Begier_, the settlement amount from third parties could be allocated among members of the class without regard
to section 1123(a)(4) of the Bankruptcy Code).

[577]   _Id._ at *21 ("Nothing in the Bankruptcy Code requires a third party to make settlement payments or provide
substantial contributions to similarly situated creditors in equal or prorated amounts") (citing _Begier v. IRS_, 496
U.S. 53, 58 (1990)).

[578]   _Id._

[579]   Claimant I.G. Obj. ¶ 5.

[580]   _In re Dow Corning Corp.,_ 244 B.R. 634, 668 (Bankr. E.D. Mich. 1999) _aff'd_, 255 B.R. 445 (E.D. Mich. 2000),
_aff'd and remanded,_ 280 F.3d 648 (6th Cir. 2002) ("Any attempt to practically apply the rule of _AOV_ . . . would
be unduly burdensome and would severely inhibit, if not eliminate the estate's ability to settle disputed and
unliquidated claims").

[of the *AOV* approach] . . . will be unworkable any time there is a class containing disputed and unliquidated claims."[581]  Moreover, "[r]equiring a bankruptcy court to inquire as to the amount of consideration involved in each claim involving a disputed and unliquidated personal injury claim, especially in a mass tort situation, would be an unrealistic, unworkable and unduly burdensome position for the bankruptcy court to be in."[582]

378.    And, while the Debtors believe they are not *required* to do this under section 1123(a)(4), they are still seeking to allocate third party cash contributions from TCJC and the United Methodist Entities as the current Contributing Chartered Organizations to the relevant holders of Direct Abuse Claims under the TDP.[583]  This incorporates a workable mechanism for holders of certain Direct Abuse Claims to recover against a Contributing Chartered Organization pursuant to a settlement.  Holders of Direct Abuse Claims with the ability to collect against a Contributing Chartered Organization are not relinquishing that right under the Plan and TDP.  Accordingly, Claimant I.G.'s argument lacks merit and should be overruled.[584]

379.    Finally, the RCAHC asserts that the Plan is an impermissible "deathtrap" that violates section 1123(a)(4) because a Chartered Organization that objects to the Plan loses its rights under the Plan.[585]  In doing so, "the Debtors are attempting to coerce and punish Chartered

---

[581]    *Id*. ("Under this scenario, the precise value will not be known.  And short of actually liquidating the claims, there is no way to determine whether a proposed settlement is offering to pay claimants the same percentage recovery on their respective claims.").

[582]    *In re Dow Corning*, 255 B.R. at 497.

[583]    Plan Ex. A, TDP § IX.F ("Source Affected Weighting").

[584]    Regardless, the Debtors believe they are providing a mechanism for the payment substantially in full of all Class 8 Direct Abuse Claims, as discussed above.  Also under the revised TDP, holders of Class 8 Direct Abuse Claims that believe they have significant claims against non-settling Chartered Organizations may take part in the Independent Review Process, which provides the opportunity to recover against non-settled Chartered Organizations.

[585]    RCAHC Suppl. Obj. ¶¶ 5-11.

Organizations for pursuing their fundamental and statutory right to object" to the Plan.[586]  And the RCAHC further asserts that this alleged "deathtrap" is not for a "legitimate business purpose" because voting for or against the plan is not "for the purpose of avoiding expense and uncertainty of a cramdown fight."[587]

380.     The RCAHC conflates the issue of (a) the treatment of Class 9 Indirect Abuse Claims and (b) the option that Chartered Organizations have to participate in the Plan.  For the sake of clarity, a "deathtrap" is a provision in a plan that incentivizes an impaired class to vote for the plan by providing a distribution (or a larger distribution) on account of their claims than what that class would otherwise be entitled to receive.[588]  In such a scenario, if a class votes to accept, then the class as a whole will receive a distribution or a higher distribution on the claims in that class.  But if that class rejects, then the entire class will receive no distribution (or a lower distribution).  That is a death trap.  There is **no** death trap with respect to the treatment of the claims in Class 9 in the Plan.  Whether Class 9 votes to accept the Plan does not change the fact that the Indirect Abuse Claims therein are waived or channeled to the Settlement Trust.  The Plan provides the same treatment for each Claim in Class 9, regardless of how a claimant votes on the Plan, which is consistent with section 1123(a)(4).  Therefore, there is no death trap.

381.     The RCAHC seeks the benefits that come with being a Contributing Chartered Organization or a Participating Chartered Organization without making the substantial contributions that come with receiving those benefits.  Simply put, the RCAHC wants to have its

---

[586]    RCAHC Suppl. Obj. ¶ 11.

[587]    *Id.*

[588]    *See, e.g., In re Emerge Energy Servs. LP,* No. 19-11563 (KBO), 2019 WL 7634308, at \*16 (Bankr. D. Del. Dec. 5, 2019); *In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 275-76 (Bankr. S.D.N.Y. 2007); *In re Zenith Electronics Corp.,* 241 B.R. 92, 105 (Bankr. D. Del. 1999).

cake and eat it too.  But that is not the way the Plan works.  As a baseline, the Plan treats all Chartered Organizations as Participating Chartered Organizations in the Chartered Organization settlement, other than Chartered Organizations that are in bankruptcy.[589]  If a Chartered Organization objects to the Plan or submits an opt-out request in writing, then it is opting out of being categorized as a Participating Chartered Organization and associated settlements.[590]  This objection requirement (as well as the requirement to provide written notice of opting out of the settlement) is the clearest way for parties to show that they do not consent to being included in the settlement as a Participating Chartered Organization.  This form of withdrawing consent is consistent with the way in which parties show consent to other provisions in the Plan, such as the third party releases, as discussed above.[591]  And, as demonstrated by the amended Bankruptcy Rule 2019 verified statement filed by the RCAHC on February 9, 2022,[592] in which two of its members resigned prior to the RCAHC filing the Objection, its members understand the structure of Chartered Organization participation in the Plan.

382.    All Chartered Organizations have a right to object to the Plan.[593]  If they exercise that right, that does not impact their treatment under Class 9, for the subset of Chartered Organizations that filed proofs of claim.[594]  It only affects their level of participation as a Chartered Organization under the Plan.  Moreover, Article IV.J.1. of the Plan provides an express pathway for an Opt-Out Chartered Organization to become a Protected Party after the Effective Date.  And

---

[589]    Plan Art. I.A.199.

[590]    *Id.*

[591]    *See* Plan Art. X.J.3, X.J.4

[592]    D.I. 8740.

[593]    *See* Plan Art. III.B.11.

[594]    *Id.*

if a Chartered Organization has changed its mind after more carefully considering its options, it may opt back into treatment as a Participating Chartered Organization at any time prior to the beginning of the Confirmation Hearing or thereafter with the consent of the Debtors. Accordingly, the RCAHC's argument that the Plan's "deathtrap" violates section 1123(a)(4) by coercing and penalizing Chartered Organizations that reject the Plan is simply wrong.

383. Even if the Plan included a deathtrap—which it does not—the cases cited to support the RCAHC's position are inapposite. RCAHC cites to a footnote in *Allegheny* stating that "there is no authority in the Bankruptcy Code for discriminating against classes who vote against a plan of reorganization."[595] There, while the court makes no reference to a deathtrap, the plan provision struck by the court provided that if any class of equity holders rejected the plan, then that class and any junior class would not receive any distribution.[596] Here, if a Chartered Organization rejects the Plan, it does not change the treatment of Class 9 or any other Class.

384. Citing the same disclosure statement transcript, the RCAHC highlights Judge Sontchi's rebuke of the "objection triggered deathtrap" provision in *Molycorp* as dispositive on this issue.[597] However, the RCAHC's reliance on *Molycorp* is misguided, as Judge Sontchi did not reject the deathtrap provision in that case on the basis that it was "objection triggered." Rather, the issue in *Molycorp* was that the effect of the deathtrap "squash[ed] the rights of fiduciaries" by "put[ting] the committee in an impossible situation, where . . . if they object . . . on legitimate bases [while] everybody [to whom they owe a fiduciary duty to] has voted yes, they are robbing their

---

[595] RCAHC Obj. ¶ 7 [D.I. 8686]; *In re Allegany Int'l., Inc.*, 118 B.R. 282, 304 n.15 (Bankr. W.D. Pa. 1990).

[596] *Id.*

[597] RCAHC Suppl. Obj. ¶¶ 1, 8, 22.

constituency of a recovery."[598] Judge Sontchi recognized this structure as an "unacceptable" catch-22 for the creditor committee and indenture trustee because they could potentially both breach their fiduciary duty by acting or not acting.[599] Here, there is no catch-22 under the Plan. First, all of the statutory committees in this case support the Plan. Second, objecting to the Plan has no impact on recovery under Class 9 as discussed above. Third, treating an objecting party as having opted out of being included as a "Participating Chartered Organization" is consistent with the definition of "Participating Chartered Organization" and the actions by a Chartered Organization of objecting. A Participating Chartered Organization is consenting to the settlements and insurance assignments that are fundamental to the Plan and receiving enhanced protections as compensation for such consent. If a Chartered Organization objects to this treatment they then are not consenting; no one can consent to the Plan and object to it at the same time. Moreover, if a Chartered Organization has changed its mind after more carefully considering its options, it may opt back into treatment as a Participating Chartered Organization. Even those Chartered Organizations that have objected to the Plan need only withdraw their support for such objection and thereby opt back into the consensual treatment under the Plan. Indeed, if the RCAHC would like to advise the Debtors and the Court at the outset of the Confirmation Hearing that some or all of its members would like to consent to the Plan and be treated as Participating Chartered Organizations, they may do so. What they cannot do, is oppose the Plan, attempt to block the settlements contained therein, destroy any chance most survivors have of being compensated for

---

[598]    *In re Molycorp, Inc.*, No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) Hr'g Tr. at 66:12-20; *see also id.* at 58:3-12 (MR. BUCHBINDER: "[T]he effect of the deathtrap is to put the fiduciaries, the committee and the indenture trustee, in a position where, ***if they oppose the plan, someone could accuse them of violating their duties*** because the deathtrap is quite clear that you get nothing if you oppose the plan. And on the other hand, ***if they don't oppose the plan, they could be violating their duties*** because there might be valid reasons to oppose the plan. But in any event, the effect of the provision is it muzzles them from doing their job.") (emphasis added).

[599]    *Id.* at 67:24-68:2.

their Abuse Claims, and then argue that they should be treated as having consented to the Plan after their objections are overruled. That is not how consent works.

385. *Affordable Auto Repair* does not support the RCAHC's position.[600] Contrary to the RCAHC's assertion that the court in that case "rejected a deathtrap . . . because the deathtrap rewarded individuals . . . who voted to accept the plan with a better distribution than those . . . who voted to reject the plan,"[601] the court did not rule on this issue and even approved the disclosure statement, despite recognizing that the deathtrap[602] did not "appear on its face to have a valid and legitimate business purpose."[603] Again, the "deathtrap" was tied to distribution on a claim.

386. The other cases the RCAHC cites support the Debtors' Plan. In *Washington Mutual*, the court determined that "[w]hat is important is that each claimant within a class have the same opportunity to receive equal treatment."[604] In *Washington Mutual*, the court determined that conditioning any distribution on whether the creditor grants a third-party release was not improper, since "[p]roviding different treatment to a creditor who agrees to settle instead of litigating is permitted under section 1123(a)(4)."[605] Likewise, the court in *Dana Corp*. explained that the "key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the

---

[600]    No. 19-18367 (MW), 2020 WL 6991012 (Bankr. C.D. Cal. Sept. 2, 2020).

[601]    RCAHC Suppl. Obj. ¶ 9.

[602]    *Affordable Auto*, 2020 WL 6991012, at *1 ("[T]he treatment of general unsecured claims placed in Class 4 [was] as follows: (1) Class 4 members who vote to accept the Plan are paid 8 percent of their claims over 36 months at 4 percent per annum interest; (2) Class 4 members who vote to reject the Plan are paid 4 percent of their claims with no interest, the payment to be made in one lump sum in the 48th month; and (3) Class 4 members who do not vote (and who do not otherwise oppose Plan confirmation) are treated in the same manner as Class 4 members who vote to accept the plan (*viz.,* they are paid 8 percent of their claims over 36 months with 4 percent per annum interest) provided that Class 4 as a whole accepts the Plan.")

[603]    *Affordable Auto*, 2020 WL 6991012, at *2-3.

[604]    *In re Wash. Mut., Inc.*, 442 B.R. 314, 356 (Bankr. D. Del. 2011).

[605]    *Id.* at 355 (citing *In re Dow Corning Corp.*, 244 B.R. 445, 472 (E.D. Mich. 2000)).

same thing, but whether they have the same opportunity."[606] That is exactly what happened here. As stated above, all Chartered Organization holders of a Class 9 claim will have their claims channeled to the Settlement Trust, and they each have the "same opportunity" to be a part of the Chartered Organization settlement and be treated as a Participating Chartered Organization. If they decide not to participate as a Participating Chartered Organization, their Class 9 claims are still channeled to the Settlement Trust. Therefore, the RCAHC's objection to the Plan on 1123(a)(4) grounds should be overruled.

### (e)    Section 1123(a)(5):  Adequate Means for Implementation

387.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide adequate means for the plan's implementation. Article V of the Plan and the other provisions of the Plan as well as the exhibits and schedules to the Plan, the various documents and agreements set forth in the Plan Documents, including the Plan Supplement, provide adequate and proper means for the implementation of the Plan, including, without limitation, (a) the establishment and funding of the Settlement Trust and the transfer of the Settlement Trust Assets to the Settlement Trust, (b) the channeling of Abuse Claims to the Settlement Trust in accordance with the TDP, (c) the continued legal existence of Reorganized BSA (for the avoidance of doubt, as defined in the Plan, "Reorganized BSA" shall include Reorganized BSA and Reorganized Delaware BSA), (d) all actions set forth in Article V of the Plan, (e) the establishment and funding of the Core Value Cash Pool to make Distributions to holders of Allowed General Unsecured Claims, (f) the appointment of the Creditor Representative, (g) the compromise and settlement of each of the Abuse Claims Settlement, the Insurance Settlement Agreements, the JPM / Creditors' Committee Settlement, the

---

[606]    *In re Dana Corp.*, 412 B.R. 53, 62 (Bankr. S.D.N..Y. 2008).

TCJC Settlement, the United Methodist Settlement, and the Settlement of Restricted and Core Asset Disputes, (h) entry into the Foundation Loan Agreement, (i) the creation and execution of the BSA Settlement Trust Note, (j) the establishment of the DST in accordance with the DST Agreement, and (k) the taking of all necessary or appropriate actions by the Debtors or Reorganized BSA, as applicable, to enable them to implement the provisions of the Plan. The Debtors are committed to becoming the gold standard in abuse prevention. As such, the Plan also provides for certain important youth protection and abuse prevention efforts from the Debtors.

388.    As part of the BSA Settlement Trust Contribution, the Debtors are assigning their rights in insurance to the Settlement Trust. Although these policies contain certain anti-assignment provisions, numerous courts, including courts in this Circuit, have held that the transfer of the debtor's insurance rights to a personal injury trust is valid and enforceable pursuant to section 1123(a)(5) of the Bankruptcy Code, notwithstanding any anti-assignment provisions in such insurance policies.[607]    Accordingly, the Plan, together with the Plan Documents, provides the means for implementation of the Plan as required by section 1123(a)(5).

### (f)    Section 1123(a)(6):  Amendment of the Reorganized BSA and Delaware BSA's Governance Documents

389.    Section 1123(a)(6) of the Bankruptcy Code prohibits the issuance of nonvoting equity securities and requires a debtor's corporate documents to so provide. Under the BSA

---

[607]    *See Combustion Engineering*, 391 F. 3d at 218 n.17 (providing that "even if the subject insurance policies purported to prohibit assignment of Combustion Engineering's insurance proceeds, these provisions would not prevent the assignment of proceeds to the bankruptcy trust"); *see also Fed.-Mogul*, 385 B.R. 560, 567 (2008) ("[Section] 1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies may be assigned to a trust or other entity."); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D. Del. 2006) (under *Combustion Engineering*, section 1123(a)(5) preempts anti-assignment clauses in insurance policies); *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *2 (Bankr. D.N.J. Sept. 2, 2008) ("a plan of reorganization may assign insurance policies to a personal injury trust despite the existence of anti-assignment clauses in those policies"); *In re Stone & Webster, Inc.*, 286 B.R. 532, 543 (Bankr. D. Del. 2002) (same); *In re W. Asbestos Co.*, 313 B.R. 832, 858 (Bankr. N.D. Cal. 2003) (same).

Charter, the BSA has no power to issue certificates of stock, its object and purpose being solely of a charitable character and not for pecuniary profit.[608]  Similarly, Delaware BSA shares the same object and purpose as being solely of a charitable character and not for pecuniary profit. Accordingly, the requirement of section 1123(a)(6) of the Bankruptcy Code does not apply to the Debtors.  Nonetheless and for the avoidance of doubt, as set forth in the proposed Confirmation Order, the charters, by-laws, certificates of formation, limited liability agreements, or similar governing documents, as applicable, of the Debtors or Reorganized BSA shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code.  After the Effective Date, Reorganized BSA may amend and restate its or their charters, by-laws, certificates of formation, limited liability agreements, or similar governing documents, as applicable, as permitted by applicable law.  Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

(g)  **Section 1123(a)(7):  Designation of Directors and Officers.**

1.  Section 1123(a)(7) of the Bankruptcy Code requires that a plan contain provisions consistent with the interests of creditors and with public policy with respect to the manner of selection of any officer, director, or trustee or any successor thereto.  Consistent with section 1123(a)(7), the Debtors have identified the directors and officers of Reorganized BSA in the Plan Supplement to the extent available.  Article V.C. of the Plan also provides that the Amended BSA Bylaws will govern the designation and election of directors of Reorganized BSA.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.[609]

3.  **Section 1123(b):  The Plan Complies with the Discretionary Provisions**

---

[608] Plan Art. V.C.

[609] Section 1123(a)(8) is inapplicable to these Chapter 11 Cases because neither of the Debtors is an individual.

**of Section 1123(b) of the Bankruptcy Code.**

390. Section 1123(b) of the Bankruptcy Code sets forth certain discretionary provisions that may be incorporated into a chapter 11 plan. Under this provision, a plan may, among other things, (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption, assignment, or rejection of executory contracts and unexpired leases, (c) provide for the settlement of claims and/or the retention of claims or causes of action, (d) modify or leave unaffected the rights of holders of claims, and (e) include any other appropriate provision not inconsistent with the Bankruptcy Code. As demonstrated herein, the Plan is consistent with these provisions.

### (a) Section 1123(b)(1): Impairment/Unimpairment of Class

391. Section 1123(b)(1) of the Bankruptcy Code provides that a plan may impair or leave unimpaired any class of claims or interests. Consistent with this provision, the Plan provides that (a) Classes 1, 2, and 10 are Unimpaired, and (b) Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8 and 9 are Impaired.

### (b) Section 1123(b)(2): Assumption, Assignment or Rejection of Executory Contracts and Unexpired Leases

392. Section 1123(b)(2) of the Bankruptcy Code permits a plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code. In accordance with this provision, <u>Article VI</u> of the Plan provides that each executory contract and unexpired lease shall be deemed assumed by Reorganized BSA on the Effective Date under sections 365 or 1123 of the Bankruptcy Code, except for such executory contracts and unexpired leases that (a) are identified on the Rejected Contracts and Unexpired Leases Schedule, (b) previously expired or terminated pursuant to their terms, (c) have previously been assumed or rejected pursuant to a Final Order of the Bankruptcy

Court, (d) are the subject of a motion to reject that remains pending as of the Effective Date, (e) as to which the effective date of rejection will occur (or is requested by the Debtors to occur) after the Effective Date, or (f) as to which the Debtors or Reorganized BSA, as applicable, determine, in the exercise of their reasonable business judgment, that the Cure Amount, as determined by a Final Order or as otherwise finally resolved, would render assumption of such executory contract or unexpired lease unfavorable to the Debtors or Reorganized BSA. Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

**(c)     Section 1123(b)(3): Settlement and Retention of Claims or Interests by the Debtors.**

393.    ***Settlement of Claims***.  Section 1123(b)(3)(A) states that a plan may provide for the settlement or adjustment of any claim belonging to the debtor or the estate.  Here, consistent with that provision, the Plan provides for a series of Settlements, including settlements of claims belonging to the Debtors.  The Settlements are fair and reasonable and in the best interests of the Debtors' Estate, as demonstrated in section I above.

394.    ***Retention of Causes of Action and Reservation of Rights***.  Section 1123(b)(3)(B) of the Bankruptcy Code permits a chapter 11 plan to provide for the retention and enforcement of any claim or interest by the debtor, a trustee, or a representative of the estate.  Under the Plan, and subject to the transfer of the Settlement Trust Causes of Action and the Insurance Actions to the Settlement Trust pursuant to Article IV.D. of the Plan and the Debtors' and their Estates' release of certain Estate Causes of Action under Article X.J., all Causes of Action that a Debtor may hold against any Person will vest in Reorganized BSA on the Effective Date.  Thereafter, subject to Article IV.D. and Article X.J. of the Plan, (a) Reorganized BSA shall have the exclusive right, authority, and discretion to determine and to file, enforce, settle, or litigate to judgment any such Causes of Action, and (b) the Settlement Trust shall have rights to prosecute the Settlement Trust

Causes of Action and the Insurance Actions as and to the extent set forth in the Plan, as of the Effective Date.[610]   Accordingly, the Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

### (d) Section 1123(b)(6): Settlement and Retention of Claims or Interests by the Debtors

395.   Section 1123(b)(6) permits a plan to include "any other appropriate provision not inconsistent with the applicable provisions of this title."  Here, in accordance with section 1123(b), the Plan provides for (a) a release and permanent injunction of certain Abuse Claims (the Channeling Injunction) against certain non-Debtor third parties (*see supra* ection II, (b) releases of Claims held by certain ***consenting*** creditors against certain non-Debtor third parties (*see supra* section III), (c) releases of certain Claims held by the Debtors and their Estates (the Debtor Releases) (*see supra* section V.A), (d) an exculpation of the Debtors and certain Estate fiduciaries (*see supra* section V.B), and (e) an insurance entity injunction to facilitate the insurance assignment, injunctions related to the releases and exculpation, and an injunction against the interference of the Plan (*see supra* section V.C).  The Debtors have set forth in detail in the applicable section the reasons why the release, injunction, and exculpation provisions set forth in the Plan are not inconsistent with the the Bankruptcy Code and should be approved.

### B. Section 1129(a)(2):  The Debtors' Compliance with Applicable Provisions of the Bankruptcy Code.

396.   Section 1129(a)(2) of the Bankruptcy Code requires the plan proponent comply with all applicable provisions of the Bankruptcy Code.  The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation

---

[610]    *See* Plan Art. IV.D, IV.V, X.J.

requirements under sections 1125 and 1126 of the Bankruptcy Code. [611]

**1.      Section 1125:  Postpetition Disclosure Statement and Solicitation.**

397.      Section 1125(b) of the Bankruptcy Code prohibits the Debtors from soliciting acceptances or rejections of the Plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, a written disclosure statement, approved after notice and a hearing, by the court as containing adequate information."

398.      The Debtors have satisfied section 1125.  On September 30, 2021, before votes were solicited on the Plan, the Court entered an order approving the Disclosure Statement as containing adequate information and approving the Solicitation Procedures for soliciting and tabulating the votes.  The Debtors complied with the solicitation materials requirement by mailing solicitation packages to holders of Claims in the Voting Classes.  This mailing included a cover letter, the Confirmation Hearing Notice, the Disclosure Statement with all exhibits, including the Plan, the Solicitation Procedures Order (including the Solicitation Procedures but excluding other exhibits), a form of Ballot and return envelope, as applicable, letters from the official committees and the Coalition and FCR, and a Plan summary and FAQ.[612]  In compliance with section 1125(b), the Debtors did not solicit acceptances of the Plan from any holder of a Claim prior to entry of the Disclosure Statement Order.

399.      After filing a modified version of the Plan on December 18, 2021, the Debtors

---

[611]      *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also, e.g.*, *In re Lapworth*, No. 97-34529, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 3, 1998) ("The adequacy of disclosure is an essential element for plan confirmation embodied in the § 1129(a)(2) confirmation requirement.").

[612]      *See Affidavit of Service* [D.I. 7999]; *Affidavit of Supplemental Service* [D.I. 8378].

provided an extension of the Voting Deadline to December 28, 2021.[613]  The Final Voting Report

was filed on January 17, 2022.  After filing the February 15 modifications to the Plan, the Court

approved a limited extended voting deadline of March 7, 2022, for holders of Direct and Indirect

Abuse Claims in Class 8 and Class 9 to submit and change votes, in their discretion.  This limited

extension of the voting deadline has permitted holders of Claims in Class 8 and Class 9 with an

opportunity to change their votes in light of the changes to the Plan resulting from the TCC/Abuse

Survivor Settlement.  The Debtors obtained approval of supplemental disclosures pursuant to

section 1125 that were mailed to holders of Class 8 Direct Abuse Claims or their counsel and to

approximately 69,000 Chartered Organizations, including the subset of Chartered Organizations

holding Class 9 Claims.[614]  Prior to and after filing the proposed supplemental disclosures with the

Court, the Debtors solicited feedback and comments from all parties participating in the

Confirmation proceedings and from Chartered Organization counsel.

   400. Each of the notices informed parties about potentially material and relevant changes

set forth in the modified Plan and the limited extension of the voting deadline along with an

extended date for Chartered Organizations to make an election to opt out of the Plan (or withdraw

a prior election) and thereby become an Opt-Out Chartered Organization.[615]  Accordingly, the

Debtors submit that they complied with their solicitation and disclosure obligations under section

---

[613] *See Affidavit of Service* [D.I. 8170]. The deadline to vote to accept or reject the Plan was December 28, 2021, which was an extension from the original December 14, 2021 voting deadline [D.I. 7608].

[614] *See Order Approving Form and Manner of Notice of Supplemental Disclosure Regarding Plan Modifications* [D.I. 8894].

[615] *See Supplemental Disclosure Regarding Plan Modifications and Summary of Chartered Organizations' Options Under the Debtors' Modified Chapter 11 Plan of Reorganization, Opt-Out Election Procedures for Participating Chartered Organizations, and Supplemental Voting Deadline of March 7, 2022 at 4:00 P.M. (Eastern Time) for Holders of Class 9 Indirect Abuse Claims* [D.I. 8904]; *see also Notice of Supplemental Voting Deadline of March 7, 2022 at 4:00 P.M. (Eastern Time) for Holders of Class 8 Direct Abuse Claims and Limited Disclosure Regarding Changes in Debtors' Chapter 11 Plan of Reorganization* [D.I. 8905].

1125. Objections to the Plan related to the Debtors' disclosure obligations under section 1125 of the Bankruptcy Code and with respect to the requirements of section 1127, as well as compliance with the Due Process Clause under the Fifth Amendment, are set forth below.

## 2. Section 1126: Acceptance of the Plan.

401.     Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a chapter 11 plan and determining acceptances thereof.  Under section 1126, only holders of allowed claims in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[616]  The Voting Classes included Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims).  The Debtors did not solicit votes from any holders of Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), or Class 10 (Interests in Delaware BSA), as such Classes were Unimpaired and deemed to have accepted the Plan.

402.     The requirements of section 1126 have been satisfied.  A class of claims accepts the Plan if at least two-thirds in amount or more than one-half in number of holders of allowed claims votes to accept the plan.[617]  The Final Voting Report filed on January 17, 2022 demonstrates that all Classes of Claims entitled to vote accepted the Plan, and Debtors believe that this acceptance will increase after the limited extended voting deadline has passed and an updated Final

---

[616]     *See* 11 U.S.C. § 1126(a), (f), (g).

[617]     11 U.S.C. § 1126(c).

Voting Report is filed.[618]

403.    Based on the foregoing, the Debtors submit that the requirements of section 1129(a)(2) have been satisfied.

### C.    Section 1129(a)(3):  The Plan Has Been Proposed In Good Faith and Not by Any Means Forbidden by Law

404.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."[619]  The Third Circuit has held that for a plan to be proposed in good faith it must "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[620]  Whether a plan has been proposed in good faith is a factual inquiry, assessed on a case-by-case basis in light of the totality of the circumstances surrounding the establishment of the chapter 11 plan.[621]  Courts have "considerable discretion in finding good faith."[622]  In this Circuit, to establish that a plan was proposed in good faith, a plan proponent must establish that the plan "[a] fosters a result consistent with the Bankruptcy Code's objectives; [b] has been proposed with honesty and good intentions and with a basis for expecting that

---

[618]    *See Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Final Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8345].

[619]    11 U.S.C. § 1129(a)(3).

[620]    *PWS Holding*, 228 F.3d at 242 (internal quotations, citations, and modifications omitted); *See In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999); *see also Koelbl v. Glessing* (*In re Koelbl*), 751 F.2d 137, 139 (2d Cir. 1984) (in other words, there must be "some relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11).

[621]    *W.R. Grace*, 475 B.R. at 87; *see also* Oct. 25, 2021 Hr'g Tr. 8:20-9:2 (The Court: "In making the good faith determination courts must consider the totality of the circumstances focusing more to the process of plan development th[a]n the content of the plan. Good faith is shown when the plan has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate and delivering value to creditors. Good faith has been found to be lacking if a plan is proposed with ulterior motives").

[622]    *See W.R. Grace*, 475 B.R. at 88 (citing *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)).

reorganization can be effected; and [c] exhibited a fundamental fairness in dealing with the creditors."[623] Here, the Debtors have met these factors.

405. First, the Plan fosters reorganization and value maximization, a result consistent with the Bankruptcy Code's key objectives.[624] As further discussed above, the impetus for these Chapter 11 Cases was the onslaught of Abuse-related litigation filed against the BSA, Local Councils, and/or Chartered Organizations. Due to the essential role of Local Councils and Chartered Organizations in furthering the Debtors' Scouting mission and their inclusion as covered parties under certain BSA Insurance Policies, a Scouting-related Abuse Claim against a Local Council, Chartered Organization, or other non-Debtor Protected or Limited Protected Party is in essence a Claim against the Debtors. As such, the Plan provides a way to resolve Scouting-related Abuse Claims against the Debtors as well as relevant parties inextricably intertwined with the Debtors and best positions Debtors to continue operating as a going concern. In addition, as discussed herein and as will be demonstrated at the Confirmation Hearing, the Plan maximizes the value of potential recoveries available to holders of Abuse Claims through the Settlement Trust and the TDP. The evidence at confirmation will show that the Plan is the best available option for avoiding years of uncertain, complex, and highly litigious proceedings that would result in the complete destruction of the BSA and preclude recoveries to which abuse survivors are entitled. The Plan also establishes certain agreed upon, go-forward parameters for the Debtors' operations,

---

[623] *Id.* at 87–88 (*citing In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001)); *In re Washington Mut., Inc.*, 461 B.R. 200, 239 (Bankr. D. Del. 2011); *accord In re Frascella Enters., Inc.*, 360 B.R. 435, 446 (Bankr. E.D. Pa. 2007).

[624] *W.R. Grace*, 475 B.R. at 88 (the debtor's attempt to "readjust[] its debt structure" and "operate on the market as a 'going concern'" as a result of "its involvement in multiple tracks of extensive, protracted litigation over the years" was "exactly what Chapter 11 was designed to accomplish" and the proposed plan satisfied this good faith factor).

including continued youth protection programs,[625] that would help bolster the BSA's charitable mission.

406.     Second, contrary to the inaccurate allegations of certain objecting parties, the Debtors have proposed the Plan with honesty and good intentions.[626]  From the outset of these Chapter 11 Cases, the Debtors have been forthright about the reasons they sought bankruptcy protection and have been unwavering in declaring and pursuing their objective of maximizing potential recoveries for abuse survivors.[627]  With these objectives in the forefront, the Plan is the product of two years of tireless efforts, arm's-length negotiations and mediation among the Debtors, JPM, Creditors' Committee, the TCC, the Coalition, the FCR, Insurance Companies, Chartered Organizations, and numerous other creditor constituencies.  These negotiations were challenging, oftentimes contentious, and in some cases (such as with the RCAHC), futile and did not result in fruitful settlements.  Nonetheless, the Plan contains a series of compromises that, while not perfect for every single one of the Debtors' constituents, represent a good faith effort to maximize recoveries for creditors, resolve Scouting-related Abuse Claims as a whole, and provide recoveries for abuse survivors through the Settlement Trust.  In turn, the Plan will allow the Debtors to continue their charitable mission for many more decades to come.[628]

---

[625]     *See* Plan Ex. L, Youth Protection Program.

[626]     *See Matter of Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985) (good faith is satisfied where the chapter 11 plan is proposed for a legitimate and honest purpose to reorganize and "has a reasonable hope of success").

[627]     *See e.g.*, *Debtors' Information Brief* at 6-7 [D.I. 4]; First Day Declaration ¶ 10 [D.I. 16]; Disclosure Statement Art. II.A. [D.I. 6445].

[628]     Although the Lujan Claimants attempt to preserve their now-moot objection regarding the continued existence of Delaware BSA under the Plan (Lujan Suppl. Obj., at 13-14), the existence or dissolution of a debtor-affiliate falls within the discretion of a debtor's business judgment and any allegations of a bad faith filing at confirmation are baseless and should be overruled.

407.     In addition, "[i]n analyzing whether a plan has been proposed for honest and good reasons, courts routinely consider whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists."[629]     As discussed herein, the Plan (including the settlements embodied therein) and Plan Documents were negotiated at arm's length among representatives of the Debtors and numerous creditor groups and their respective professionals, and there is no evidence to the contrary.

408.     Third, the majority of the core creditor constituencies in these Chapter 11 Cases support of confirmation of the Plan.  That the Plan has garnered such significant support—which was not the case several months ago—is not only a major feat, but demonstrates that the Plan is fundamentally fair to creditors.[630]     Moreover, the Plan provides significant recoveries to the Debtors' creditors.  General Unsecured Claims will receive their pro rata share of the Core Value Cash Pool, resulting in an estimated 75% to 95% recovery.[631]     Holders of General Unsecured Claims or Non-Abuse Litigation Claims that have an Allowed Claim of $50,000 or less will become Convenience Class Claims, which are paid in full.  Non-Abuse Litigation Claim holders are receiving payment based on available insurance proceeds.  Holders of General Unsecured Claims or Non-Abuse Litigation Claims that have an Allowed Claim over $50,000 can consent to reduce such Claim to $50,000 or less to become a Convenience Class claimant and have such Claim paid in full.  And as discussed above, holders of Abuse Claims are receiving payment of all

---

[629]     *W.R. Grace*, 475 B.R. at 88.

[630]     *See In re Maremont Corp.*, 601 B.R. 1, 20 (Bankr. D. Del. 2019) ("The [d]ebtors' good faith is evidence from the facts and record of the [c]hapter 11 [c]cases," which demonstrate "that the [d]ebtors engaged in extensive good-faith arm's length negotiations with [major stakeholders], which led to the [p]lan's formulation.").

[631]     *See* Disclosure Statement Art. II.H.

or substantially all of such Claims. None of this would have been achievable without the settlements embodied in the Plan.

409.    Notwithstanding the abundant showing that the Plan was proposed in good faith, certain parties, including the Certain Insurers, RCAHC, and Lujan Claimants,[632] object to the Plan for failure to satisfy section 1129(a)(3). The arguments generally stem from various allegations that misconstrue the facts, the Plan, or the section 1129(a)(3) inquiry. Even if the allegations or assumptions were true or correct, none of them negate the fact that the Debtors proposed the Plan with "honesty and good intensions" and in good faith.

### 1. The Objections Raised by the Debtors' Insurance Companies under Section 1129(a)(3) Should be Overruled.

410.    Certain Insurers (*i.e.*, Non-Settling Insurance Companies under the Plan) contend that the Plan violates Section 1129(a)(3) for various reasons. Specifically, the Certain Insurers contend that the Plan is not "insurance neutral" based on their assertions that the Plan (a) seeks to improperly bind the Non-Settling Insurance Companies to prejudicial coverage determinations through the proposed findings set forth in Article IX.A.3.(w)-(aa) (jointly, the "Proposed Findings"),[633] (b) modifies the rights of the Non-Settling Insurance Companies,[634] and (c) improperly inflates the "quantum of liability" of the Non-Settling Insurance Companies.[635] In addition to those arguments, the Certain Insurers incorrectly contend that the Debtors collusively

---

[632]    *See* Certain Insurer Obj. and Suppl. Obj. [D.I. 8695, 9033]; RCAHC Obj. and Suppl. Obj. [D.I. 8686, 9028]; Lujan Claimants Obj. and Suppl. Obj. [D.I. 8708, 9031]. *See also* Old Republic Obj. [D.I. 8699]; *Pro Se* Claimant [D.I. 8761]; *Pro Se* Claimant [D.I. 9007]; U.S. Trustee [D.I. 9015]; Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. [D.I. 9021]. To the extent any section 1129(a)(3) arguments in these Objections are not addressed in this Memorandum, they are addressed in the Objection Chart.

[633] *See* Certain Insurers Obj. ¶¶ 106-122 [D.I. 8695]; Certain Insurers Supp. Obj. ¶¶ 36-38 [D.I. 9033].

[634] *See* Certain Insurers Obj. ¶¶ 129-147 [D.I. 8695]; Certain Insurers Supp. Obj. ¶¶ 39-44 [D.I. 9033].

[635] *See* Certain Insurers Obj. ¶¶ 123-128 [D.I. 8695]; Certain Insurers Supp. Obj. ¶¶ 45-49 [D.I. 9033].

ceded control of the Plan and the TDP to the claimant constituencies.[636] Certain Insurers also object to (a) the assignment of the independent Local Council insurance policies to the Settlement Trust,[637] (b) the rights of the Settlement Trustee to consent to the settlement of Non-Abuse Litigation Claims that exceed the Specified Primary Insurance Policies,[638] and (c) the rights of the holders of Direct Abuse Claims to seek documents under the Document Appendix.[639]

411. As described in more detail below, each of the objections raised by the Certain Insurers under Section 1129(a)(3) are speculative, baseless, and without merit. The Certain Insurers' reliance on "insurance neutrality" as a basis for rejecting the Plan is without basis. "Insurance neutrality" is simply a matter of standing; it is not a requirement under the Bankruptcy Code for Plan confirmation. Even so, the objections raised by the Certain Insurers under the guise of "insurance neutrality" should be overruled. Each of the Proposed Findings are necessary for Plan confirmation, and the speculation that the Settlement Trustee will misuse the Proposed Findings in subsequent coverage litigation is without basis. Moreover, the Certain Insurers' contention that the Plan is not "insurance neutral" on the basis that it modifies contractual provisions in the applicable insurance policies is also without basis. The Plan and the TDP actually preserve all of the rights under the insurance policies, as well as the ability of the Non-Settling Insurance Companies to assess those rights in any future insurance coverage litigation. Finally, neither the Plan nor the TDP increase the "quantum of liability" of the Non-Settling Insurance Companies. Both the TDP and the Independent Review Option provide fair and equitable paths

---

[636] *See* Certain Insurers Obj. ¶¶ 179, 186-189 [D.I. 8695]; Certain Insurers Supp. Obj. 83-86 [D.I. 9033].

[637] *See* Certain Insurers Obj. ¶¶ 148-155 [D.I. 8695].

[638] *See* Old Republic Obj. ¶¶ 5, 9 [D.I. 8699]; Markel Obj. ¶ 2-11 [D.I. 8684].

[639] *See* Certain Insurers Supp. Obj. ¶¶ 55-62 [D.I. 9033].

toward resolving Direct Abuse Claims in amounts that are consistent with the BSA's prepetition practices or with the amount a jury could be reasonably expected to award in the tort system.

412. The other objections raised by the Certain Insurers should also be overruled. Indeed, the unsupported speculation that the Debtors ceded control of the Plan and the TDP to claimant constituencies is factually without basis. Additionally, the assignment of the Local Council Insurance Policies and the provisions relating to the resolution of the Non-Abuse Litigation Claims are authorized by law and are not prejudicial to the rights of any Non-Settling Insurance Companies. Finally, the Certain Insurers' objection to the scope of documents that a holder of a Direct Abuse Claim can receive under the Document Appendix is without basis, as the Certain Insurers' ignore procedural safeguards and simply provide the holders of a Direct Abuse Claims within information they would otherwise be entitled to in discovery.

<b>(a)    The Insurance Neutrality Provisions Are Consistent with the Standard Insurance Neutrality Language in the Third Circuit.</b>

413. Certain Insurers object to the Plan on the basis that it is not "insurance neutral."[640] However, nothing in the Bankruptcy Code nor applicable law requires a chapter 11 plan to be insurance neutral. [641] Rather, "insurance neutrality" is a judicially-developed standing doctrine meant to limit the ability of a debtor's insurance companies from frustrating the process of confirming a Chapter 11 plan.[642]

---

[640]     Certain Insurers Obj. ¶¶ 105-122 [D.I. 8695]; Everest Obj. ¶ 3 [D.I. 8672]; Liberty Obj. ¶¶ 15-17 [D.I. 8698].

[641]     *See In re Purdue Pharma L.P.*, 633 B.R. 53, 63 (Bankr. S.D.N.Y. 2021) ("*Purdue I*") ("[T]here is no requirement that a Chapter 11 plan be 'insurance neutral' in any respect. . . . The 'insurance-neutral' argument of the objecting insurance companies therefore is not grounded on an underlying principle of bankruptcy law but rather only on due process concern."), *vacated on other grounds*, No. 21-cv-7532 (CM), 2021 U.S. LEXIS 242236 (S.D.N.Y. Dec. 16, 2021) ("*Purdue II*"). Despite vacating the bankruptcy court's confirmation of the debtors' plan in *Purdue I*, the *Purdue II* court noted that the bankruptcy court's "comprehensive opinion" regarding insurance neutrality "[is] not implicated by any of the appeals to this [c]ourt." *Purdue II*, 2021 U.S. Dist. LEXIS 242236, at *112 n.41.

[642]     *In re Combustion Engineering*, 391 F.3d 190, 202 (3d Cir. 2004).

414.     Nevertheless, the Plan preserves all of the Non-Settling Insurance Companies'
rights and remedies, if any, available, and it does not rewrite or modify any of the applicable
insurance policies in contravention of "insurance neutrality" or any requirements in the
Bankruptcy Code.  When read as a whole and in connection with the TDP, the Plan is, in fact,
"insurance neutral" and consistent with Third Circuit law because it preserves all of the rights and
remedies of the Non-Settling Insurance Companies.

415.     Article X.M of the Plan provides:

> Except for the Insurance Assignment, or as otherwise provided in the
> Bankruptcy Code, applicable law, the findings made by the Bankruptcy
> Court in the Confirmation Order, or the findings made by the District Court
> in the Affirmation Order, nothing in the Plan shall modify, amend, or
> supplement, or be interpreted as modifying, amending, or supplementing,
> the terms of any Insurance Policy or rights or obligations under an Insurance
> Policy to the extent such rights and obligations are otherwise available
> under applicable law, and the rights and obligations, if any, of any Non-
> Settling Insurance Company relating to or arising out of the Plan
> Documents, including the Plan, the Confirmation Order, and the
> Affirmation Order, or any provision thereof, shall be determined pursuant
> to the terms and provisions of the Insurance Policies and applicable law.

416.     In and of itself, this provision is clear that all of the Certain Insurers' contractual
rights (to the extent any exist under applicable state law) are not subject to modification,
amendment, or supplementation.  Certain Insurers focus on the fact that Article X.M of the Plan
exempts "the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable
law, the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made
by the District Court in the Affirmation Order" from its ambit.[643]  However, Article X.M of the
Plan and the Protective Insurance Provisions found in the TDP (collectively, the "Insurance

---

[643]     Certain Insurers Obj. ¶ 110.

Neutrality Provisions") confirm that all of the rights and remedies of any Non-Settling Insurance Companies are preserved.

417. To the extent that a Non-Settling Insurance Company contends that a Direct Abuse Claim is not covered under the applicable policy, the Insurance Neutrality Provisions permit the Non-Settling Insurance Company to deny coverage for such claim and to have the dispute resolved in separate coverage litigation. Nothing in the Plan or the TDP specifically mandate a Non-Settling Insurance Company to pay on account of any Direct Abuse Claim.

418. Based on the above, the Plan is consistent with Third Circuit law concerning "insurance neutrality." Read together, the Insurance Neutrality Provisions mimic the "insurance neutral language" in *Combustion Engineering* in substance. In *Combustion Engineering*, the Third Circuit interpreted the following language to be "insurance neutral":

> Notwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable, or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.[644]

419. The Third Circuit has held that certain insurance companies did not have appellate standing to challenge a plan calling them to fund an asbestos trust because the plan, through the "insurance neutral" provision, did not materially alter the prepetition rights and obligations of the objecting insurance companies.[645] Similar to the provision in *Combustion Engineering*, the Insurance Neutrality Provisions operate to preserve the Non-Settling Insurance Companies'

---

[644] *Combustion Engineering*, 391 F.3d at 209.

[645] *Id.*

prepetition rights and defenses (if any such rights and defenses exist under applicable state law), as they relate to coverage obligations.

420.     Certain Insurers cite to *Blitz U.S.A., Inc.*[646] to support the proposition that "[m]ore recent cases in this Circuit have *required* even more robust protective language" is disingenuous.[647]  The mere fact that a plan *may* provide more robust language to protect an insurer does not mean that a plan *must* provide such protections in order to be confirmed.  The *Blitz* confirmation order does not bind this Court to the Certain Insurers' argument, nor mandate any changes to the language in the Plan.

421.     Likewise, the Certain Insurers' citation to the May 19, 2021 hearing transcript in these Chapter 11 Cases to support their claim that "this Court has recognized [that] a proposed plan that seeks to modify insurance contract terms is not confirmable as a matter of law"[648] is wrong.  Certain Insurers rely on the Court's statement that it "[doesn't] view an insurance contract different than any other contract" and that "the plan shouldn't do anything to it that the [B]ankruptcy [C]ode doesn't say can be done to it."[649]  These quotes are without proper context. During the same hearing, the Court made clear that it was not deciding whether a plan had to be insurance neutral to be confirmed.[650]

422.     The operative issue is the substance (not the form) of the Plan's impact on the rights (to the extent such rights exist under applicable state law) of the Non-Settling Insurance

---

[646]     *In re Blitz U.S.A., Inc.*, No. 11-13603 (PJW), 2013 WL 6825607 (Bankr. D. Del. Nov. 12, 2013).

[647]     Certain Insurers Obj. ¶ 108 (emphasis added). The *Blitz* citation is to a confirmation order and not a published decision from this Court.

[648]     Certain Insurers Obj. ¶ 105 [D.I. 8695].

[649]     May 19, 2021 Hr'g Tr. 228:8-12.

[650]     May 19, 2021 Hr'g Tr. 241:22 ("no coverage issues is going to be adjudicated"); 242:10-11 ("I can tell everyone right now that I can't imagine I would decide a coverage issue.  How is that part of the process?")  .

Companies. And here, because the Debtors have expressly preserved the rights, if any, of any Non-Settling Insurance Companies, the Plan is insurance neutral.

### (1) The TDP Do Not Seek to Determine Coverage Issues Through the Proposed Findings.

423. Notwithstanding the robust protections afforded to Non-Settling Insurance Companies through the Insurance Neutral Provisions, Certain Insurers argue that the Plan is not insurance neutral because the Plan is designed to improperly prejudice Non-Settling Insurance Companies in post-confirmation coverage litigation through a combination of Article X.M of the Plan and the Proposed Findings.[651]

424. Certain Insurers object to Article IX.A.3.x.[652,653] However, the Certain Insurers' objection to this finding is without merit. As noted above, all of the rights in the TDP are expressly preserved through the Protective Insurance Provisions and, as such, the Certain Insurers' contention that this finding alters their contractual rights is directly contradicted by Article V.C of the TDP.

425. Similarly, Article IX.A.3.w[654] and Article IX.A.3.z[655] of the Plan do not prejudice

---

[651] Certain Insurers Obj. ¶ 56, 57, 111, 117 [D.I. 8695]; Everest Supp. Obj., ¶5 [D.I. 9020].

[652] Art. IX.A.3.x of the Plan states that "(i) the procedures in the TDP pertaining to the allowance of Abuse Claims, and (ii) the criteria included in the TDP pertaininig to the calculation of the Allowed Claim Amou`nts, including the TDP's Claim Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the DP), are apprpropriate and provide for a fair and equitable settlement of Abuse Claims based on the evidenetiary record offered to the Bankrutpcy Court as required by and in compliance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, provide adequate and proper means for the implementation of the Plan as required by and in compliance with section 1123 of the Bankruptcy Code, comport with the requirements for the issuance of the Channeling Injunction under section 105(a), and otherwise comply with the Bankruptcy Code and applicable law."

[653] Certain Insurers Obj. ¶ 117-18.

[654] Art. IX.A.3.w of the Plan states that "the Plan Documents (including the Plan) and the Confirmation Order shall be binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of res judicata and collateral estoppel, and section 1141 of the Bankruptcy Code."

[655] Art. IX.A.3.z of the Plan states that "the Plan and the TDP were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code."

the rights of the Certain Insurers. Neither of these provisions should be controversial. Certain Insurers acknowledge that section 1141 itself sets forth the binding effect of the Confirmation Order. To the extent the Insurers dispute whether a particular matter was decided in the context of confirmation or is addressed by the Plan or Confirmation Order, nothing in the Plan or Confirmation Order impairs their ability to raise such disputes in post-confirmiation litigation. As to Article IX.A.3.z, Certain Insurers assert, that the "[w]hile section 1129(a)(3) requires that the Plan be proposed in good faith, there is no requirement in that section that a good faith determination be made to the TDP…"[656] This argument is simply illogical. Certain Insurers provide no authority to suggest that the good faith requirement of section 1129(a)(3) includes a Plan, but does not include provisions (like the TDP) that are expressly incorporated in to the Plan or (b) any explanation as to how a Plan can be proposed in good faith without a finding that all provisions incorporated into the Plan are also proposed in good faith. Rather, because the Plan must meet the requirements of section 1129(a)(3), the TDP, which are attached as Exhibit A to the Plan and expressly incoporated therein,[657] must meet the requirements of Section 1129(a)(3). Accordingly, this proposed finding is entirely appropriate, and the Certain Insurers' objection that this provision adversely prejudices their rights should be overruled.

426.    Likewise, Certain Insurers' argument that the combined Proposed Finding (w) and (z), which asserts that both the Plan and TDP are proposed in good faith, invites this Court to determine that the Settlement Trustee "will likely later misuse" these findings to argue that all future Abuse Claim settlements and payments will be in good faith. These arguments are entirely speculative and should be overruled. To the extent that Certain Insurers speculate that the

---

[656]    Certain Insurers Ob. ¶ 120 [D.I. 8695].

[657]    Plan, Art. VI.I.

Settlement Trustee will "misuse" these findings in an insurance coverage action, Certain Insurers have provided no evidence that the Settlement Trustee would do so, or that a court would agree with any position taken by the Settlement Trustee (or any other person or entity) concerning the theoretical "misuse" of the combined findings

427. Certain Insurers also speculate that the Settlement Trustee will seek to misuse the proposed findings to prejudice Certain Insurers in subsequent coverage litigation. For example, Certain Insurers object to Proposed Finding (w), which simply makes reference to section 1141, self-executing provision of the Bankruptcy Code.[658] Certain Insurers argue that Proposed Finding (x) combined with Proposed Finding (w) "intend for a post-confirmation coverage court to find that the entry of [Finding (s)] . . . results in an immediate and improper determination by this Court of the amount of loss, if any, that would otherwise be resolved by the coverage court."[659] However, this conclusion is also mere speculation and the Court has clearly indicated that it would not determine any coverage issues.[660]

428. Certain Insurers also object to the inclusion of Article IX.A.3.aa in the Plan,[661] asserting that Proposed Finding (aa) is not necessary for Bankruptcy Confirmation,[662] however, this Proposed Finding may be relevant in establishing that the TDP are fair and equitable and the Debtors will present evidence at the Confirmation Hearing in support of this finding. Certain Insurers further speculate that the Article IX.A.3.aa of the Plan is intended to prematurely and

---

[658] Certain Insurers Obj. ¶ 115 [D.I. 8695].

[659] Certain Insurers Obj. ¶ 111 [D.I. 8695].

[660] May 19, 2021 Hr'g Tr. 241:22 ("no coverage issues is going to be adjudicated"); 242:10-11 ("I can tell everyone right now that I can't imagine I would decide a coverage issue. How is that part of the process?").

[661] Article IX.A.3.aa of the Plan provides that "the Base Matrix Values in the Trust Distributions are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes."

[662] Certain Insurers Supp. Obj. ¶ 36 [D.I. 9033].

improperly tip the scales in coverage litigation, and will be used in connection with Article IX.A.3.w to assert that all future settlements entered into without insurer consent are binding on the insurers before a single Abuse Claim has been either allowed or valued.[663]  However, these concerns are unsubstantiated by evidence and baseless as the TDP expressly preserve their rights under the Protective Insurance Provision.

429.    In addition, the Certain Insurers argue that Article IX.A.3.y of the Plan[664] is an attempt to determine insurance coverage in a manner rejected by *Fuller Austin*.[665]  However, as this Court has previously discussed, this Court may need to make appropriate findings regarding the TDP for confirmation purposes to provide proper guidance for the Settlement Trustee to evaluate claims consistently.[666]  Article IX.A.3.y does not bind any insurance company with respect to any coverage determination.  In fact, it specifically provides that "nothing herein shall determine that any insurer is obligated to pay the Debtors' or another Protected Party's or a Limited

---

[663]  Certain Insurers Supp. Obj. ¶¶ 36, 37 [D.I. 9033].

[664]  Article IX.A.3.y of the Plan states "the rightto payment that the holder of an Abuse Claim has against the Debtors or another Protected Party or a Limited Protected Party is the amount of such Abuse Claim as determined under the Trust Distribution Procedures and is not (i) the BSA Settlement Trust Contribution, the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution, the Century and Chubb Companies Settlement Contribution, the Zurich Insurers Settlement Contribution, the Clarendon Settlement Contribution, the TCJC Settlement Contribution, the United Methodist Settlement Contribution, contributions by other Settling Insurance Companies, or any component(s) of such contributions, or (ii) theinitial or supplemental payment percentages established under the Trust Distribution Procedures to make distributions to holders of Abuse Claims, <u>provided,</u> <u>however,</u> that nothing herein shall determine that any insurer is obligated to pay the Debtors' or another Protected Party's or a Limited Protected Party's liability so determined under the Trust Distribution Procedures.

[665]  *Fuller-Austin Insul. Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958 (Cal. Ct. App. 2006).

[666]  Sept. 28, 2021 Hr'g Tr. at 42:25-44:17 ("The Court: And I can anticipate that I would need to make some findings for confirmation purposes on a record that's build at confirmation with respect to the TDPs and maybe the value in the TDPs, depending on the objections that I get. . . . [D]epending on the objections I get, that I may have . . . to determine that the TDPs set up an appropriate process for the settlement trustee to exercise his discretion within. . . . because we don't send the claims to a trust with no guidance on how to evaluate them; there has to be guidance on how to evaluate them, so that all of those claims are evaluated consistently and share appropriately from the pot.")

Protected Party's liability so determined under the Trust Distribution Procedures." Rather, Article IX.A.3.y provides the Settlement Trustee with the necessary guidance on how to value claims, seek reimbursement, and exercise his or her fiduciary duties.

### (2) The TDP Do Not Rewrite or Modify Any Insurance Policies.

430. Certain Non-Settling Insurance Companies argue that the TDP alter their contractual rights, citing to the "No Action" clause, issues related to the SIRs and deductibles, and certain arguments related to indemnification, contribution, subrogation, and reinsurance.[667] As explained below, each of these contentions is without basis. Specifically, the Certain Insurers ignore the Protective Insurance Provisions, which preserves their rights under their insurance policies and reserves to insurance coverage litigation the resolution of many of the issues identified.[668] Nothing in the Plan prevents an insurance company from denying coverage, for any reasons, on the basis that a claim for reimbursement by the Settlement Trustee is not covered under the Certain Insurers' insurance policies.

### (a) The No Action Clause

431. Certain Insurers argue that by disposing of their rights under the "no action clauses," the TDP deny the Certain Insurers' ability to challenge the reasonableness of the settlements reached by the Settlement Trust and evade the tort system procedures and safeguards that provide a mechanism for identifying claims that are fraudulent, false, or simply not legally cognizable.[669] Similarly, Markel argues that its right to defend itself in any suit against BSA under

---

[667] Certain Insurers' Obj. [D.I. 8695 ¶¶ 130, 137]; Markel Insurers' Obj. [D.I. 8684 ¶¶ 20-21]; Everest Obj. [D.I. 8672 ¶¶ 4-5]; Allianz Insurers' Obj. [D.I. 8696 ¶¶ 24, 28].

[668] The evidence presented at confirmation will demonstrate that while drafting the Plan, the Debtors intended to preserve contractual rights for the insurers and also take into consideration the interests of other parties.

[669] Certain Insurers Obj. ¶ 136-138 [D.I. 8695].

its primary insurance policies and its right to investigate and settle any claim under its excess insurance policies are affected under the Plan.[670]  Each of these concerns are without merit and should be overruled.

432.    As described in more detail above, the TDP provide for a fair and equitable process that mimics the tort system for resolving Direct Abuse Claims asserted against the Protected Parties.  To the extent the Certain Insurers contend that a claim is not covered because the processes contemplated under the TDP, or the actions taken by the Settlement Trustee, cause prejudice to any rights under their insurance policies, the Protective Insurance Provisions give the Certain Insurers the right to deny coverage or that claim, and to have the dispute subsequently resolved in coverage litigation.  However, the interplay between the TDP and the "no action" clause is not an appropriate issue to be determined at the Confirmation Hearing.  Rather, it is a coverage issue to be decided in the appropriate venue after confirmation.

433.    In addition, the Certain Insurers simply ignore the Insurance Neutral Provisions that explicitly preserve their coverage defense rights.  Not only does <u>Article V.C</u> of the TDP (Assignment of Insurance Rights) provide that nothing in the TDP modifies, supplements or amends the insurance policies, but <u>Article X</u> of the TDP (Rights of Settlement Trust Against Non-Settling Insurance Companies) further contemplates disputes with Non-Settling Insurance Companies regarding coverage, in which the Non-Settling Insurance Companies may assert those rights.

434.    The preservation of insurer defense rights under the Plan and the TDP is consistent with the Debtors' approach since the onset of these Chapter 11 Cases. As will be demonstrated at

---

[670]    Markel Obj. ¶ 4 [D.I. 8684].

the Confirmation Hearing, the TDP is modeled after a draft originally proposed by Hartford.

**(b)      Self-Insured Retentions and Deductibles**

435.      Coverage disputes exist as to whether certain primary policies contain an aggregate deductible or a non-aggregated deductible, and whether certain excess insurance policies are excess to a self-insured retention ("SIR"), an aggregate deductible, or a non-aggregated deductible.[671]  The resolution of those issues will be subject to future coverage litigation, and that dispute is not before this Court.

436.      To the extent that any policies are excess to a SIR, the Certain Insurers assert that the Plan impermissibly lacks a clear requirement in the TDP for the Settlement Trust to satisfy the SIR and impermissibly mandates the payment of retrospective premiums.[672]  However, Article V.C of the TDP explicitly rebuts that position, stating that "the Settlement Trustee shall satisfy, to the extent required under the relevant policies and applicable law, any retrospective premiums and [SIRs] arising out of any Abuse Claims under the Abuse Insurance Policies….  Nothing herein shall obligate a Non-Settling Insurance Company to advance any [SIR], unless otherwise required by applicable law."[673]  Nothing in the TDP require, either explicitly or implicitly, an insurance company "drop down" and pay any amounts within an applicable SIR, unless otherwise required under applicable state law or the terms of the policies.

437.      In the event that a Non-Settling Insurance Company *voluntarily* wants elects to pay a SIR to facilitate the resolution of a Direct Abuse Claim, the TDP provide further protection to such Non-Settling Insurance Company by providing it with an "offset" in which the Non-Settling

---

[671]      Disclosure Statement Art. III.F.

[672]      Certain Insurers Obj. ¶ 140.

[673]      Plan Ex. A, TDP Art. V.C.

Insurance Company would be "entitled to reimbursement from the Settlement Trust" and "receive that reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim."[674] Rather than being an "illusory" protection, the right to setoff provides the same exact level of protection the Certain Insurers had with regard to the SIRs prepetition.[675] Again, nothing in the Plan or the TDP require that an excess insurance company drop down and pay on account of any specific Direct Abuse Claim, unless otherwise required under state law or the terms of the policies.

438. Certain Insurers also speculate that claims related to deductibles arising from policies issued to non-debtor Local Councils and Chartered Organizations are swept into the definition of Indirect Abuse Claims and afforded Indirect Abuse Claim treatment under the Plan.[676] The Certain Insurers contend that the elimination of their purported deductible rights improperly shifts the contractual relationship to one where the insurer pays first and subsequently must seek reimbursement. Instead, they argue that the Debtors should continue to be bound by their purported obligations to satisfy deductible obligations before any liability on the part of the Non-Settling Insurance Companies should attach.[677] In a similar vein, Liberty Mutual asserts that the Plan's Insurance Assignment "purports to turn Liberty's no-risk transfer 'fronting' program on its head" by "transferring risk from the insured to the insurer."[678] According to Liberty Mutual, the

---

[674] *Id.*

[675] *Miller v. Zurich Am. Ins. Co. (In re WL Homes LLC)*, 563 B.R. 512, 516 (Bankr. D. Del. 2017) (holding that insurer may assert a right of recoupment to offset a return premium owing to the debtor against amounts that the debtor would owe under a self-insured retention because "[t]o allow the [debtor] to enjoy the benefit of the Return Premiums and relieve it of the burden of the SIR would be inequitable.").

[676] Certain Insurers Obj. ¶ 143.

[677] Certain Insurers Obj. ¶ 142.

[678] Liberty Mutual Obj. ¶¶ 2,18.

prepetition LM Contracts and Umbrella Policies did not pose any risk to Liberty Mutual. However, "the proposed Plan and TDP require that Liberty bear *all* the risk."[679]

439.     The Debtors dispute Liberty Mutual's characterization of its insurance policies as providing for a "no-risk" financial accommodation. However, the nature of the risk transfer arising under Liberty Mutual's insurance policies is a question for coverage litigation, not a confirmation hearing. Moreover, courts have rejected the argument that the channeling of non-debtor claims to a Settlement Trust unlawfully "re-writes" the insurance policy that includes a deductible.[680] Instead, when a non-debtor insured contributes significant assets to the estate in exchange for a channeling injunction, there is nothing improper about having the claim for the deductible be channeled as well.

###                    (c)     Reinsurance, Indemnification, Contribution, and Subrogation Rights.

440.     Certain Insurers assert that the Plan does not comply with the requirements of section 1129(a)(3) because it extinguishes any reinsurance rights that a Non-Settling Insurance Company may have against a Settling Insurance Company.[681] However, this argument is without basis, because the Plan expressly exempts any reinsurance or retrocessionaire claims from the Insurer Entity Inunction.[682]

---

[679]     Liberty Mutual Obj. ¶¶ 21.

[680]     *In re Babcock & Wilcox Co.*, No. 00-10992, 2004 WL 4945985, at *47 (Bankr. E.D. La. Nov. 9, 2004), vacated on other grounds, No. CIV.A. 05-232, 2005 WL 4982364 (E.D. La. Dec. 28, 2005); *In re Ames Dep't Stores, Inc.*, No. 93 CIV. 4014 (KMW), 1995 WL 311764, at *2 (S.D.N.Y. May 18, 1995) ("There is no doubt that a post-petition breach [an insolvent insured's failure to pay deductible amounts] . . . may impose a burden on the other party to the contract because the law allows for compensation only in bankruptcy dollars. However, [an insurer's] attempt to transform the unpleasant consequences it faces as a result of such a post-petition breach into a rewriting of the contract by the bankruptcy court is unavailing.")

[681]     Allianz Obj. ¶¶ 26, 34; Certain Insurers Obj. ¶¶ 144, 146-147.

[682]     Plan, Art. X.H.3.g.

441.     Allianz and Certain Insurers also argue that the Plan impairs Non-Settling Insurance Company's contractual state rights and state law rights to the extent that the Plan extinguishes any intra-insurer claims.[683]  It is not the intent of the Plan to interfere with or extinguish any intra-insurer rights that a Non-Settling Insurance Company may have.  The Debtors have reached out to Allianz to work out language for the Conformation Order to address this concern.

442.     Finally, Allianz contends that the Plan extinguishes their rights of contribution against Protected Parties.  Whether Allianz has any rights of contribution or subrogation against any Protected Parties is a coverage issue that should be determined in separate coverage litigation.  The Debtors do not seek to predetermine any disputed coverage issues in the Plan.

### (3)     The Plan Does Not Impermissibly Inflate the Contractual Liabilities of the Non-Settling Insurance Companies.

443.     Despite the Insurance Neutral Provisions which were designed specifically to preserve the rights of any Non-Settling Insurance Companies, Certain Insurers object to the TDP on the basis that the TDP inflate the number and value of Abuse Claims subject to coverage and materially increase the Non-Settling Insurance Comapanies' exposure beyond their prepetition obligations and in a manner inconsistent with the tort system.[684]  Certain Insurers argue that the Plan alters their rights by materially increasing the quantum of liability in a manner inconsistent with the tort system, suggesting an "utterly unprecedented 30,000% increase in the number of claims."[685]  In addition to the number of claims, the Certain Insurers object on the basis that the procedures in the TDP are "designed to radically inflate the value of such claims well beyond what

---

[683]     Allianz Obj. ¶ 26, 40; Certain Insurers Obj. ¶ 144.

[684]     Certain Insurers Obj. ¶¶ 123-128 [D.I. 8695]; Liberty Obj. ¶ 2 [D.I. 8698]; Allianz Obj. ¶¶ 31, 39 [D.I. 8696]; Everest Obj. ¶ 5 [D.I. 8672].

[685]     Certain Insurers Obj. ¶¶ 123-124 [D.I. 8695].

could be expected in the tort system."[686] According to Certain Insurers, the cumulative effect is a "gross[] overstate[ment]" of the Debtors' actual liability and that of the non-Debtor Protected Parties, and an arbitrary modification of the Debtors' risk profile.[687]

444. As a threshold matter, the Certain Insurers incorrectly assert that the TDP lead to an overvaluation of claims. As explained above in section I.C.1. and as will be demonstrated in the Confirmation Hearing, the procedures established in the TDP (a) are based on the Debtors' prepetition settlement practices for resolving Direct Abuse Claims and (b) incorporate appropriate and equitable Claims Matrix Values, aggravating factors, and mitigating factors. In fact, the Debtors have modified the Plan in response to certain objections raised by the Certain Insurers that more clearly articulates the requirement of liability as a General Criteria, and deletes the reference to "negligence" in the aggravating criteria.[688] And as described in section I.C.1. above, the treatment of the statute of limitations as a mitigating factor (as opposed to a condition for the establishment of a valid abuse claim) is consistent with the BSA's prepetition practices.

445. Certain Insurers cite to *Global Industrial Technologies* (*GIT*) for the proposition that a Plan that increases the "quantum of liability" of an insurer cannot be confirmed.[689] However, this position is without basis. As a threshold issue, *Global Industrial Technologies* is a case about standing, not the confirmability of a Plan.[690]

446. In *Global Industrial Technologies*, the debtors contacted asbestos claimants' attorneys representing clients with silica-related claims against other companies to obtain the 75%

---

[686]   Certain Insurers Obj. ¶ 126.

[687]   Certain Insurers Obj. ¶¶ 124, 128.

[688]   Plan Ex. A, TDP Arts. VII.C.2(c), VIII.C.2(b).

[689]   Certain Insurers Obj. ¶¶ 107, 124-125

[690]   645 F.3d 201, 209-215 (3d Cir. 2011)

approval to confirm their plan, resulting in the sharp increase of silica claims.[691]  Ultimately, 5,125 votes for the debtors' plan were cast on behalf of persons alleging that the debtors were responsible for their silica-related injuries, with five law firms accounting for 4,039 votes.[692]  Each of the law firms that submitted votes on behalf of silica claimants also submitted votes on behalf of asbestos claimants, and the requisite majority of both groups of claimants voted in favor of the plan.[693]  This reality in light of the two troubling facts that were uncovered at the confirmation hearing showed that the vote on the plan was tainted:  (a) first because certain physicians generated a 'high volume' of diagnoses that, at a high rate, proved to be inaccurate, and (b) second, a statistically unlikely number of individuals were diagnosed with both silica-related disease and asbestos-related disease.[694]  Ultimately 55.5% of the silica claims at issue involved diagnoses from physicians who were ultimately discredited.[695]

447.    The increase of claims in *GIT* is fundamentally different from these Chapter 11 Cases.  First, votes were solicited from over 82,200 individual claimants represented by various counsel across the country; in addition, 293 votes were from pro se claimants.  Second, the Debtors did not solicit claimants directly from plaintiffs' firms to increase their chances of obtaining the requisite number of votes unlike in *GIT* where that was the debtors' clear reason for increasing the claims pool.  Third, there is no reason to question the validity of material batch claims.  Although the Certain Insurers cite anomalies in the proofs of claim, they alleged no wrongdoing or

---

[691]    *Id.* at 205.

[692]    *Id.* at 206.

[693]    *Id.*

[694]    *Id.* at 207.  "[A] golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis."  *Id.*

[695]    *Id.* at 208.

coordination on the part of the Debtors. And the Certain Insurers have not identified any of them to be fraudulent.

448. In *GIT*, the high percentage of claimants diagnosed with both silicosis and asbestosis was a statistical anomaly that suggested fraudulent behavior.[696] There are no statistical irregularities here; only anecdotal statements, which the Debtors take seriously while also recognizing that the facts known to date demonstrate that they do not rise to the same misconduct that the Court faced in *GIT*. The statistical anomaly all but guaranteed that the insurers were prejudiced by the plan in that case. Indeed, the Third Circuit's holding on "insurance neutrality" was not based solely on the "explosion of new claims" but also on the "entirely new set of administrative costs, including the ***investigative burden of finding any meritorious suits in the haystack of potentially fraudulent ones***."[697] The Non-Settling Insurance Companies will not be so burdened here, as the Settlement Trustee will be tasked with evaluating the claims under the TDP.[698] Importantly, the *GIT* court did not rule that these burdens rendered the Plan unconfirmable; rather, the court only ruled that the objecting insurers had standing to raise argument.[699]

449. The Plan and the TDP simply do not "inflate" the insurers' "quantum of liability."[700] Indeed, the Certain Insurers have not identified any specific claims which they contend they would be liable for under the TDP, but not liable for in the tort system. Contrary to Certain Insurers' assertion that the TDP and Insurance Assignment would result in a catastrophic

---

[696]   *Id.* at 207.

[697]   *Global Indus. Techs.*, 645 F.3d at 214.

[698]   Plan Ex. A, TDP Art. VII.B-C.

[699]   *Global* Indus. *Techs.*, 645 F.3d at 214.

[700]   Certain Insurers Obj. ¶ 184.

and unexpected increase to the Debtors' risk profile, the Debtors will show at the Confirmation Hearing that that insurer liabilities and obligations under the TDP appropriately fall within a reasonable range of their prepetition obligations.

450.    The Certain Insurers also contend that the Independent Review Option increases the "quantum of liability" of the Non-Settling Insurance Companies.[701]  Once again, the arguments raised by the Certain Insures are nothing more than speculation.  As a threshold issue, the purpose of the Independent Review Option is "to replicate to the extent possible the amount a reasonably jury might award for the Direct Abuse Claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the Direct Abuse Claim and applying the same standard of proof that would apply applicable law."[702]  It defies logic to assert that the Independent Review Option would increase the Non-Settling Insurance Companies' "quantum of liability" when the entire purpose of the Independent Review Option is to replicate the amount a reasonable jury would award.  Indeed, the Independent Review Option does not seek to increase the Non-Settling Insurance Company's "quantum of liability," but rather it seeks to replicate the Non-Settling Insurance Company's quantum of liability.

451.    The Certain Insurers offer absurd hypotheticals to support its position that the "quantum of liability" would increase under the Plan.  The Certain Insurers assert that Dr. Bates' valuation of the aggregate liability would increase from $3.45 billion to $5.45 billion if each of the 387 Abuse Claims modeled to receive a settlement of over $1 million opts into the Independent Review Option and receives five times higher than the average recovery in Dr. Bates'

---

[701]    Certain Insures Suppl. Obj. ¶ 45; Everest. Suppl. Obj. ¶ 7.

[702]    Plan Ex. A, TDP Art. XIII.

simulation.[703]  However, there is nothing to suggest that all 387 Abuse Claims would elect the Independent Review Option, or that any of these Abuse Claims would recover in excess of what could be recovered as a Trust Claim Submission.  In fact, under the Indirect Review Option, a holder of a Direct Abuse Claim could be awarded $0.  All the Independent Review Option does is provide for a mechanism for those claimants who believe they have particularly high value claims to secure a recovery in excess of the cap on the Trust Claim Submissions, but only to the extent that their claim would be worth more in the tort system.  And it is entirely conceivable that the holder of a Direct Abuse Claim could elect the Independent Review Option and receive less than what would have been recovered as a Trust Claim Submission.

452.    Finally, the Plan and the TDP do not impact the Non-Settling Insurance Companies' coverage obligations.  All such rights have been protected though Article X.M of the Plan and Articles V and X of the TDP.  The mere volume of claims asserted against the Debtors, which the Debtors had no involvement with, do not constitute an impermissible "increase in the quantum of liability" of the prepetition insurance policies.  Accordingly, this objection should be overruled.

## 2.    The Plan and the TDP Were Negotiated in Good Faith and Through an Arm's-Length, Mediated Process.

453.    Certain Insurers contend that plaintiffs' attorneys "dominated the drafting" of the TDP, which are being used to pay claims for their own gain, and, as a result, the Plan should not be confirmed.[704]  Contrary to the characterization by the Certain Insurers and as will be shown at the Confirmation Hearing, the Debtors prepared the initial draft of the TDP.  Indeed, the Certain Insurers concede that the "Coalition denies that it was the author of the TDPs," but continue to

---

[703]  Certain Insurers Supp. Obj. ¶ 48 [D.I. 9033].

[704]  Certain Insurers' Obj. [D.I. 8695 ¶ 18]; Certain Insurers' Obj. [D.I. 8695 ¶¶ 30-31].

assert that the TDP are collusive.[705]   These conclusory assertions, however, lack merit, defy logic, are based on pure speculation, and have been proven not to be true.[706]

454.    As the Debtors will show at the Confirmation Hearing, the Debtors took the pen to the TDP and did so based on good faith, arm's-length negotiations with claimant constituencies, all with the ultimate goal of emulating the BSA's prepetition practices while preserving the Non-Settling Insurance Companies' rights.   Although Certain Insurers may not agree with the Plan, disagreement between parties in interest over specific provisions in a debtor's plan does not constitute evidence of bad faith or prejudice.[707]

455.    Contrary to the Certain Insurers' allegation that the Coalition dominated the drafting of the TDP, the Debtors' procedures are built off of an initial draft provided by Hartford, which some of the Certain Insurers asked to be adopted.[708]   For example, as will be shown at the Confirmation Hearing, an early proposal by Hartford to the Debtors to incorporate into the Debtors' initial draft of the TDP featured a nearly identical system for valuing the Direct Abuse Claims, where the Direct Abuse Claim would be assigned a base matrix value, and then be adjusted upwards or downwards by the Settlement Trustee through the consideration of various aggravating and mitigating factors, which are similar to the ones used in the Debtors' TDP.  The original TDP proposed by Hartford also included an early iteration of the Expedited Distribution.  Thus, Certain

---

[705]   Certain Insurers' Obj. [D.I. 8695 ¶¶ 29-30].

[706]   The evidence presented at confirmation will demonstrate that the Debtors drafted the TDP to be consistent with prepetition practices, which was based on the Debtors' own evaluation.

[707]   *See, e.g., In re Envirodyne Indus., Inc.,* 1993 WL 566565 (Bankr. N.D. Ill. Dec. 20, 1993) ("A plan has not necessarily been proposed in bad faith simply because a party does not like the treatment of its claims") (citing *In re Mulberry Phosphates, Inc*., 149 B.R. 702, 708 (Bankr. M.D. Fl. 1993).

[708]   Certain Insurers' Obj. ¶¶ 30-31 [D.I. 8695]. The evidence presented at confirmation will demonstrate that Hartford initially provided a draft of the TDP, which included an expedited distribution process; the Debtors conceptually incorporated that, along with several other mechanisms, into the Debtors' TDP under the Plan.

Insurers' contentions that these provisions and features are improper are misplaced and should be overruled.

456.     In formulating the TDP, the Debtors consulted with their National Coordinating Counsel to establish (a) general criteria necessary to establish the legal validity of a claim, and (b) specific aggravating and mitigating factors that would affect the valuation of a claim.  These criteria are based on the Debtors' prepetition handling of sexual-abuse claims and, in most instances, were approved by the Debtors' insurers prepetition that handled and resolves sexual abuse claims on behalf of the Debtors, Local Councils, and Chartered Organizations.

457.     Following the expertise and experience of National Coordinating Counsel and Bates White in drafting the initial TDP documents, the Debtors then considered comments and revisions by the Coalition and claimant constituencies via Plan and TDP negotiations with the ultimate aim of preparing TDP that emulated the Debtors' prepetition practices.  During these negotiations with claimant constituencies, the Debtors would consult with National Coordinating Counsel to determine whether any given proposals or revisions by the claimants were consistent with the Debtors' prepetition practices for evaluating and resolving Abuse Claims. When such comments and revisions were consistent, the Debtors would incorporate the revisions; when they were not, the Debtors would reject them.

458.     Certain Insurers also contend that the Debtors ceded control over the negotiations of the Independent Review Option and the most recent revisions to the TDP.[709]  This is simply not the case.  In the view of Certain Insurers, any sort of negotiation over the means to resolve the

---

[709]     Certain Insurers Suppl. Obj. ¶ 84-86.

Direct Abuse Claims with the Coalition or the TCC is tantamount to the Debtors ceding control.[710]

As will be established at trial, the Debtors engaged in good faith, mediated negotiations to reach a mutually amicable resolution with respect to the Independent Review Option and to address legitimate creditor objections. As explained above, the Independent Review Option provides a fair and equitable means to resolving Direct Abuse Claims while simultaneously preserving all of the rights of the Non-Settling Insurance Companies. The unsupported speculation by the Non-Settling Insurance Companies that the Debtors failed to negotiate with the Coalition and the TCC in good faith is both offensive as well as wrong.

459. The Certain Insurers have further asserted that the negotiations of the Independent Review Option and the revisions to the TDP are collusive and in bad faith due to the treatment of the Debtors' expert, Dr. Charles Bates.[711] This is contrary to the express provisions of the TCC/Abuse Survivor Settlement, which clearly provide that any opinion offered by Dr. Bates will be "truthful and consistent with his own opinions."[712] Indeed, conferring with a party that also supports the Plan is just good practice, not collusion. Moreover, although the Certain Insurers seem to be a bit confused, at times attacking Dr. Bates while simultaneously worried that Dr. Bates' opinions will not be put into evidence—they need not worry. Dr. Bates is an ethical professional,

---

[710] Certain Insurers also argue the Coalition and Pfau/Zalkin Professionals are "demanding" payment of fees which is inappropriate because the Debtors are contributing no cash to the Settlement Trust and payment of fees would dilute recoveries of all abuse survivors, including those not represented by the Coalition and Pfau/Zalkin Professionals. Certain Insurers Suppl. Obj. ¶¶ 90-92 [D.I. 9033]. The Coalition and Pfau/Zalkin Professionals are required to file a final fee application, and any payment is subject to the Court granting a motion filed pursuant to sections 363(b), 1129(a)(4), and 503(b) of the Bankruptcy Code, and subject to the Court's approval of such fees and expenses as reasonable. Plan Art. V.T. If the motion is approved by the Court, the payments will reimburse fees that have benefited and will continue to benefit the Debtors' Estates and all abuse survivors. If granted, the payment of fees will pale in comparison to the fees of pursuing a plan (i) that lacked survivor support or (ii) led to chapter 7 liquidation, which would lead to delay and ultimately, less assets available to abuse survivors.

[711] Certain Insurers Suppl. Obj. ¶¶ 87-89 [D.I. 9033] (arguing the TCC, FCR, and Coalition are dictating the scope and substance of the evidence the Debtors may submit at the Confirmation Hearing).

[712] *Eleventh Mediator's Report*, Ex. A at 10 [8772-1].

he has formed his own opinions and he will provide them to the Court at confirmation.[713] Dr. Bates will also be available for cross examination. Thus, the Court should overrule the Certain Insurers' argument that amounts to bare speculation without substance.[714]

460. Certain Insurers cite *In re American Capital* in support of their argument that the plan was not proposed in good faith.[715] Specifically, the Certain Insurers argue that the plan was not proposed in good faith but was rather the "result of a collusive bargain" wherein "the Coalition and FCR, with the Debtors' tacit support, devised a plan to inflate the Debtors' claim exposure" while making no contributions to the plan. *American Capital*, however, is inapposite and does not support the Certain Insurers' contentions, but supports that the Debtors *did* propose the plan in good faith.

461. Preliminarily, Certain Insurers attempt to misstate the Third Circuit opinion. *In American Capital*, the Third Circuit expressly held that the debtors' proposed plan in that case was *not* collusive because the insurers could not "point[] to any evidence of an agreement to defraud insurers."[716] Rather, the court there held that the plan was not proposed in good faith due to a conflict of interest created by the plan wherein the debtors would be financially incentivized to sabotage their own defense due to a kickback mechanism.[717] This was because, by the debtors own admission, a settlement with the post-confirmation trust was the only way a claimant could recover

---

[713] *See Debtors' Confirmation Hearing Witness List* [D.I. 8608].

[714] *In re Washington Mutual, Inc.*, 442 B.R. 314, 364 (Bankr. D. Del. 2011) ("More than mere innuendo and speculation is needed to establish a lack of good faith."); *In re W.R. Grace & Co.*, 475 B.R. 34, 89 (D. Del. 2012) ("There is no evidence that Grace was dishonest or had ulterior motives when it proposed the Joint Plan. Nor is there any indication that Grace intended to abuse the judicial process. Rather, the record shows that the Joint Plan was the result of years of litigation and extensive arms-length negotiations."); *In re Crowe*, No. 19-04406, 2021 WL 2212005, at *7 (Bankr. D. Ariz. June 1, 2021) ("There is nothing in the record that indicates the [debtors] did not propose their Plan in good faith or that the [debtors] proposed their Plan by a means forbidden by law. Based upon the foregoing, the Court finds that § 1129(a)(3) is satisfied.").

[715] 688 F.3d 145, 158 (3d Cir. 2012)

[716] 688 F.3d at 158.

[717] *Id.*

where the debtors made *no* contributions to the trust and where a settlement would require the debtors' involvement in defense and discovery because the question of liability was still at issue.[718] Thus, because the debtor was required to cooperate in the defense but was incentivized under the plan to do otherwise, the court held that the plan was not proposed in good faith.[719] Further, in addition to this conflict of interest, the plan eliminated insurers' ability to take discovery, submit evidence, contest causation, or appeal a decision, and was outside the section 524(g) context.[720] Lastly, in order for a claimant to pursue a claim against the trust, they had to incur a Surcharge mechanism that would go to the benefit of the debtors to pay the creditors through a payment fund.[721]

462.    Here, no such conflict or collusion exists. The Debtors have an express agreement (via the Plan and TDP) to preserve insurers' rights under their respective insurance policies, and, as in *American Capital*, certainly have no agreement to defraud the insurers, and thus, there can be no collusion. Furthermore, the Certain Insurers do not argue here nor can there be a conflict of interest because the Debtors are in no way incentivized under the Plan to sabotage their own defense post-confirmation, are meaningfully contributing to the Plan, and the Plan has no similar mechanism to the surcharge requiring claimants to incur costs to the benefit of the Debtor in order to potentially recover a settlement.  The court did consider the trust's alleged impairment of certain procedural rights of the insurers as a factor in its analysis, but only because—unlike in typical mass-tort trust scenarios— the debtor's financial interest in high claim awards created an "inherent conflict of interest."[722]

---

[718] *Id* at 159.
[719] *Id* at 158-9.
[720] *Id* at 159-60.
[721] *Id.*
[722] *Id.* at 158.

(a) **The Plan Does Not Interfere with the Rights of the Non-Settling Insurance Companies to Resolve Non-Abuse Litigation Claims.**

463.    Old Republic and Markel raise objections to the Plan on the basis that the Plan interferes with their right to settle Non-Abuse Litigation Claims.[723]   Eric Pai has also raised a similar objection with respect to consent rights of the Settlement Trustee with respect to Non-abuse Litigation Claims.[724]   The Debtors are willing to include language in the Confirmation Order that confirms that the Settlement Trustee's will not have any consent rights over any Non-Abuse Litigation Claims under any Specified Primary Insurance Policies.   The Settlement Trust shall have consent over any post-Effective Date settlement of any Non-Abuse Litigation Claim that is entitled to a recovery from the proceeds of any Specified Excess Insuarnce Policies to the extent that the Debtors had such consent rights under the policies or applicable law.   For such a settlement, the holder of the Non-Abuse Litigation Claim will serve the Settlement Trust's counsel with a copy of the proposed settlement, and the Settlement Trust shall have fourteen (14) days to object, and will be deemed to have provided consent if no objection is raised.   If the Settlement Trust does not consent to the proposed settlement, the holder of the Non-Abuse Litigation Claim may file a motion with the Bankruptcy Court seeking a determination whether the Settlement Trust unreasonably withheld its consent to the proposed settlement.

464.    Eric Pai has also asserted that there is a conflict between the Settlement Trustee's fidcuiary duties to holders of Abuse Claims and holders of Non-Abuse Claims.[725]   However, the Plan expressly imposes a duty on the Settlement Trustee to treat Direct Abuse Claims and Non-Abuse Litigation Claims that implicate the Specified Insurance Policies fairly, and that the

---

[723]   Old Republic Obj. ¶¶ 5, 9; Markel Obj. ¶ 2-11.

[724]   Pai. Obj. ¶¶ 20-21 [D.I. 8677].

[725]   Pai Obj. ¶ ¶20-21 [D.I. 8677].

Settlement Trustee must bear in mind the interest of both Direct Abuse Claims and Non-Abuse Litigation Claims in structuring any settlements involving Specified Insurance Policies.[726]  In light of this provision, the assertion that the Settlement Trustee cannot fulfill her fiduciary duties is speculative and without merit.

### a. The Assignments of the Abuse Insurance Polices Are Not Prohibited By Law.

465.    Certain Insurers raise concerns regarding the assignment of insurance policies issued to the Local Councils.  Certain Insurers also dispute the very existence of many Local Council policies and contend that "secondary evidence" as to the existence of policies is not sufficient.[727]  Despite these concerns, the language in the Plan assures that Non-Settling Insurance Companies that have issued policies only to Local Councils will not be prejudiced under the Plan.

466.    In exchange for the protections of the Channeling Injunction, Local Councils have agreed to assign certain independent insurance policies to the Settlement Trust.[728]  This assignment is part of the consideration provided by the Local Councils in exchange for the protections of the Channeling Injunction.  Just as this Court has jurisdiction to approve the financial contributions by the Local Councils and Chartered Organizations to the Settlement Trust in exchange for the protection of the Channeling Injunction, so too does the Court have jurisdiction over the assignment of the rights in the Local Council Insurance Policies.

467.    Moreover, no Non-Settling Insurance Company (or any other insurance company) will be prejudiced by the assignment.  Pursuant to Article V.C of the TDP, the assignment of the Local Council policies is subject to applicable law, and the vast majority of jurisdictions do not

---

[726]   Plan Art. IV.D.3(b).

[727]   Certain Insurers Obj. ¶¶ 154-155.

[728]   Plan Art. V.S.1.

enforce anti-assignment provisions for post-loss assignment.[729]  Accordingly, this caveat preserves the Non-Settling Insurance Companies' right to dispute their coverage obligations under certain insurance policies as well as the existence of such policies, to the extent that any anti-assignment provisions prohibit the transfer of the policies.

468.    Further, Certain Insurers argue that the "saving clause" of Article V.S.1, as applied, would essentially be an impermissible assignment of non-debtor policies, purportedly "a distinction without a difference."[730]  They also believe that the Court does not have the authority to order Local Councils and Chartered Organizations that are not debtors to pursue insurance assets and contribute them to the Settlement Trust.[731]  However, as this Court has noted previously, the workaround provided under the savings clause may permissibly allow non-debtor insureds to retain their insurance and pursue their rights on behalf of claimants, and then turn those proceeds to the Settlement Trust.[732]  Indeed, there is nothing improper about a Local Council or a Chartered Organization agreeing to provide assistance and to pay any amounts recovered under insurance

---

[729]  3 Couch on Ins. § 35:8 (2010) ("[T]he great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments of the policy, except with the consent of the insurer, apply only to assignments before loss, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising under the policy, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim. The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.)

[730]  Certain Insurers Obj. ¶ 153 [D.I. 8695].

[731]  Certain Insurers Obj. ¶ 153 [D.I. 8695].

[732]  Sept. 28, 2021 Hr'g Tr. at 21:3-23 (Mr Rosenthal: But to the extent that these work at all . . . this is merely a de facto assignment of insurance rights and an impermissible work around that contravenes the applicable Third Circuit law.  The Court: Why is that? Why would that be an impermissible workaround? Mr. Rosenthal: Because we think it accomplishes the same thing . . . . its [sic.] effectively assigning the rights to the insurance to the trust. It's just a different way to do it.  The Court: Well sometimes there are different ways to do things that make them permissible.  And if we're talking about a technical assignment versus a workaround assignment if a party decides that they are going to go and pursue the insurance and then provide the proceeds to the trust what is wrong with that workaround?  Mr. Rosenthal: I think it gets use to the same goal, but I hear Your Honor's statements and it may be that the way it ends up being structured may actually be an acceptable workaround.").

policies to the Settlement Trust  These meritless objections raised by the Certain Insurers simply demonstrate that their primary purpose is to frustrate the Debtors' Plan.

469. Munich asserts that it holds policies that cover only certain risks of the Local Councils.[733] Munich argues that since Debtors are not insured under the applicable insurance, the Debtors have no rights to assign them, as they are not property of the estate, and that any such assignment would be legally ineffective.[734] However, whether the policies issued by Munich are more appropriately categorized as a BSA Insurance Policy or a Local Council Insurance Policy under the Plan, such assignments are authorized as provided for above.

(b)     **The Plan and the TDP Do Not Implicate Any Constitutional Rights of the Non-Settling Insurance Companies.**

470. Certain Insurers allege violations of their constitutional rights under the Fifth and Seventh Amendments.[735] They acknowledge that while the Bankruptcy Code may authorize impairment of contractual obligations, it can only do so in a manner that that does not result in an unconstitutional deprivation of property without just compensation and due process of law.[736]

471. The cases cited by the Certain Insurers to support their constitutional arguments are inapposite. In *United States v. Sec. Indus. Bank*, the court held the court's pre-Bankruptcy Code authority under section 522(f)(2) is subject to the Fifth Amendment's prohibition against "taking private property without compensation" in criminal cases.[737] Likewise, *Louisville Joint Stock Land Bank v. Radford* concerned the "taking of substantive rights in specific property" in criminal

---

[733]    Munich Obj. ¶ 1.

[734]    Munich Obj. ¶ 5.

[735]    Certain Insurers Obj. ¶¶ 158-159.

[736]    Certain Insurers Obj. ¶ 156.

[737]    459 U.S. 70, 74-75 (1982).

cases.[738] Here, the Debtors' Plan does not seek to "take" anything away from the Certain Insurers. Nor do these Chapter 11 Cases concern criminal matters. The case *Granfinanciera, S.A. v. Nordberg* concerns the Seventh Amendment, which preserves the right to a jury trial only in federal courts, whereas the insurance actions contemplated by Certain Insurers are state law claims.[739] Moreover, there is nothing in the Plan that abridges the Certain Insurers' right to have coverage determinations heard by a jury in a subsequent coverage litigation. None of the cases cited by Certain Insurers concern issues pertinent to these Chapter 11 Cases. Accordingly, the Court should overrule these objections.

> **(1)** **The Document Appendix Provides Abuse Claimants and the Certain Insurers Only Documents to Which They are Entitled.**

472. Certain Insurers object to the Document Appendix on the basis that claimants are receiving information they would not otherwise be entitled to in the tort system, including documents that irrelevant, privileged or confidential. Certain Insurers contend that such production of documents streamlines the claimant's ability to maximize their recovery under either the Independent Review or the TDP process. Certain Insurers contend that this breaches the duty to defend and cooperation clauses under their respective policies, thus prejudicing the Certain Insurers. Such assertions are not supported by the provisions of the Document Appendix,[740] the record, or case law, and once again are premised on an acceptance of the Certain Insurers' coverage positions; therefore, this objection is baseless and should be overruled.

---

[738]     295 U.S. 555, 589-602 (1935).

[739]     492 U.S. 33, 51-52 (1989).

[740]    Plan Supplement Ex. D-1, Document Appendix [D.I. 8815].

473.     The Document Appendix contemplates that certain documents will be provided to the Settlement Trustee, including rosters, Volunteer Screening Database, documents in possession of Ogletree Deakins related to unresolved claims, such as complaints, depositions, and discovery responses.[741] Certain Insurers contend that producing such documents would breach the duty to defend and cooperation clauses of their respective policies because they will be prejudiced. Not so.

474.     For an insured to breach the duty to cooperate, an insured's conduct must "*materially*" prejudice the insurer's ability to defend the lawsuit on the insured's behalf.[742] Certain Insurers have failed to identify in what manner they would be prejudiced, much more "*materially*" prejudiced by the production of these documents.

475.     Indeed, many of these documents (if not all) have already been made available to the parties in interest in these Chapter 11 Cases, including the claimants and the Certain Insurers, through the bankruptcy discovery process. The Certain Insurers fail to provide any support for their assertions that the production of these documents will now somehow provide the claimants with a "roadmap" for claimants to assert claims in a way that maximizes recovery.

476.     Moreover, the Certain Insurers' contentions that the Document Appendix gives claimants access to documents that are irrelevant, privileged and confidential completely ignores the Document Appendix itself. The Document Appendix provides numerous safeguards against

---

[741]  Plan Supplement Ex. D-1, Document Appendix ¶ 1. [D.I. 8815].

[742]  *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 468 (5th Cir. 2002) (internal citations and quotations omitted) (applying Texas law); *see also Verdetto v. State Farm Fire & Cas. Co.*, 510 Fed. Appx. 209, 212 (3d Cir. 2013) (applying Pennsylvania law).  In the context of bankruptcy, Third Circuit courts have also held that an insurer's right to participate in or control the defense of a claim may be "redefined in a bankruptcy case" and that the Bankruptcy Code has "reshaped debtor and creditor rights in marked departure from state law."  *In re Congoleum Corp.*, Nos. 03-51524, 6449, 2008 Bankr. LEXIS 2375, at *24 (Bankr. D.N.J. Sep. 2, 2008).

the production of privileged or confidential information.  For example, the Document Appendix specifically notes that any privileged documents are vested ***solely*** in the Settlement Trustee and the Settlement Trustee is not permitted to share such privileged documents with the STAC or any claimant.[743]  The Settlement Trustee is, however, allowed to share such privileged information with the Insurers.  The Document Appendix provides the same safeguards with respect to confidential information.[744]

477.    The Document Appendix does not provide the claimants with any information or documents that they otherwise would not be entitled to in the tort system nor does it deny the Certain Insurers from documents to which it is entitled in order to defend the claim.  Certain Insurers' objection with respect to the Document Appendix should be overruled.

### 3.        All Other Objections under Section 1129(a)(3) Should be Overruled.

#### (a)        Lujan Claimants' Objections Should be Overruled

478.    The Lujan Claimants contend, among other things, that the Debtors did not propose the Plan with honesty and good intentions because the Plan: (a) disposed of the Archbishop of Agaña's interest in the BSA Insurance Policies where those interests were part of its bankruptcy estate;[745] (b) was modified ten days before the voting deadline and without disclosure to the Lujan Claimants that their rights would be affected;[746] and (c) is fundamentally unfair because abuse survivors are losing their direct claims against insurers along with other survivors who do not have

---

[743]    Plan Supplement Ex. D-1, Document Appendix ¶ 14. [D.I. 8815].

[744]    *Id.* at ¶ 15.

[745]    Lujan Obj. at 43.  The RCAHC raises a similar argument, asserting that the Plan ignores the automatic stay applicable to other Chartered Organizations that are themselves chapter 11 debtors.  RCAHC Obj. ¶ 206.

[746]    Lujan Obj. at 43.

that right and fails to adequately compensate or protect the Lujan Claimants' rights in the BSA Insurance Policies.[747] Each of these arguments are without merit and should be overruled.

479.    First, as clearly stated in the Plan and discussed above, any Chartered Organization that is debtor in bankruptcy as of the Confirmation Date is treated as an "Opt-Out Chartered Organization" and will only be treated as a Participating Chartered Organization if it advises Debtors' counsel in writing that it wishes to make the Chartered Organization Insurance Assignment.[748] The Plan does not relinquish the rights of any Chartered Organization debtor or override the authority of the Bankruptcy Court presiding over such debtor's case. Second, any alleged due process violation is untenable as all holders of Abuse Claims, including the Lujan Claimants, were granted additional notice of the Plan modifications[749] and time to change their votes to accept or reject the Plan.[750] Lastly, as discussed above, the channeling of all Abuse Claims to the Settlement Trust provides a process that is fair, more efficient and cost-effective for abuse survivors than the tort system.

---

[747]    Lujan Obj. at 43–44.

[748]    Plan Art. I.A.196 (defining "Opt-Out Chartered Organization"); I.A.199 (defining "Participating Chartered Organization); Art. V.S.1(e). *See also* Plan Ex. K (identifying the Archbishop of Agaña as a Chartered Organization as a debtor in bankruptcy).

[749]    *Order Approving Form and Manner of Notice of Supplemental Disclosure Regarding Plan Modifications* [D.I. 8894]; *see also Supplemental Disclosure Regarding Plan Modifications and Summary of Chartered Organizations' Options Under the Debtors' Modified Chapter 11 Plan of Reorganization, Opt-Out Election Procedures for Participating Chartered Organizations, and Supplemental Voting Deadline of March 7, 2022 at 4:00 p.m. (Eastern Time)* [D.I. 8904] and *Notice of Supplemental Voting Deadline of March 7, 2022 at 4:00 p.m. (Eastern Time) for Holders of Class 8 Direct Abuse Claims and Limited Disclosure Regarding Changes in Debtors' Chapter 11 Plan of Reorganization* [D.I. 8905].

[750]    Any arguments with respect to Plan modifications during or after solicitation is not in and of itself bad faith, and the Lujan Claimants do not cite to any case law to the contrary. In addition, the Debtors have always reserved the right "to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code. *See* Disclosure Statement, Art. VI.X.2, at 192.

**(b)** **RCAHC's Objections Should be Overruled**

480.    The RCAHC presents a litany of arguments under the guise of good faith,[751] many of which are substantively addressed in other sections of this Memorandum,[752] moot,[753] or lack merit.  Among other things, the RCAHC argues that the Plan was not proposed in good faith because the Debtors followed "the demands of certain Direct Abuse Claimants, the Settling Insurance Companies and their counsel to the detriment of Chartered Organizations," which were excluded from the negotiations.[754]  The RCAHC further asserts that the Debtors allegedly deprive or discriminate against Chartered Organizations in favor of holders of Abuse Claims or Settling Insurance Companies.[755]  All such objections are baseless and unavailing.

481.    *ACandS*[756] and *World Pasta*,[757] are inapplicable.  In *ACandS*, the court found that the plan had not been proposed in good faith where the prepetition committee that drafted the prepetition trust, chose the trustee for the trust, and crafted a security agreement would be crafted, as well as the treatment of each of the classes under the plan.  Unlike in *ACandS* where the court's

---

[751]    RCAHC Obj. ¶ 206; RCAHC Suppl. Obj. ¶¶ 12-13.

[752]    As shown in **Exhibit B**, the Objections that challenged the Plan's satisfaction of section 1129(a)(3) of the Bankruptcy Code do not come close to showing that the Debtors did not propose the Plan in good faith.

[753]    The RCAHC's assertion that "[t]he Plan discriminates against Catholic Chartered Organizations by requiring a cash contribution for essential rfeleases and protection provided for free to Other Chartered Organizations" is moot under the modified Plan.  RCAHC Obj. ¶ 206        .

[754]    RCAHC Obj. ¶ 205.  The Debtors engaged in extensive negotiations with the RCAHC while negotiating with the United Methodist Entities.  That the RCAHC were not able to reach an agreement despite good faith efforts or the RCAHC's disagreement with certain Plan provisions does not in any way diminish the fact that the Plan was proposed in good faith.

[755]    RCAHC Suppl. Obj. ¶¶ 13-14 (regarding the so-called "deathtrap").  The Debtors changed the "Participating Chartered Organization" definition to clarify that Chartered Organizations that objected to the Plan (such as the RCAHC and its eleven members with purported shared common interests [D.I. 8740]) are Opt-Out Chartered Organizations.  And as discussed above, Opt-Out Chartered Organizations are not "in the process to lose potentially valuable rights."  *Id.* ¶ 14.

[756]    *See In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004).

[757]    *Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 571 (M.D. Pa. 2005).

finding that the "unbridled dominance of the committee in the debtor's affairs and actions during the prepetition period, its continued influence flowing from its majority status on the post-petition creditors committee, and the obvious self-dealing that resulted from control of the debtor" made it "impossible" for the court to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code,[758] these Chapter 11 Cases do not suffer from such improper influence from any single creditor constituency. Here, the Debtors maintained appropriate control of the Plan and Plan Documents at all times. The Debtors also engaged in countless mediations sessions with various parties in interest that resulted in consensual, arms'-length settlement agreements, each of which contributes to the overall goal of achieving a global resolution of claims.

482. While the RCAHC cites *World Pasta Co.* for the proposition that "debtors have an obligation to their creditors to propose a plan that is fair to all creditors and not to let one creditor class dominate the formulation of a plan,"[759] this was in fact not the court's holding. The RCAHC cites the committee's argument, which the court found to be "meritless."[760] Instead, the *World Pasta* court held that the plan was the product of negotiations and consensus between the debtors and their major creditor groups and did not "cede any control over their operations, the formulation of their plan, or the general management of their chapter 11 cases."[761]

483. The RCAHC offers other arguments, all of which lack merit. For example, the RCAHC asserts that "[i]n exchange, the Plan offers a worthless Indirect Claim and requires a ransom to pay for a blanket protection of a release in Channeling Injunction against tort litigation

---

[758] *In re ACandS*, 311 B.R. at 43.

[759] RCAHC Obj. ¶ 205.

[760] *Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 571 (M.D. Pa. 2005).

[761] *Id.*

and expensive coverage litigation against the Trust and Settling Insurers."[762] But the value of a particular Chartered Organization's contribution is based on variety of considerations, including historical settlement values and potential exposure, and the subject of extensive negotiation between the relevant parties, and whether an Indirect Abuse Claim is worthless depends on the holder's rights to collect. The RCAHC also asserts that "[t]he Plan denies due process to Chartered Organizations by denying Indirect Abuse Claims that were late-filed because Chartered Organizations never received any prior notice of claims or even threatened claims against them despite the Debtors' knowledge thereof."[763] Similarly, the RCAHC argues that "Chartered Organizations have yet to receive individualized notice from the Debtors informing them of abuse claims, even though the Debtors have access to those claims and information concerning which claims are associated with particular Chartered Organizations."[764] The Debtors have met their noticing obligations, as discussed above, and have no duty to tell parties in interest what claims they may have against the Debtors.

484. The RCAHC further argues that the Plan sets up the RCAHC to be the targets of future tort litigation by abuse survivors whose lawyers are funded by their share of Abuse Claims distributions while depriving Chartered Organizations their defense and indemnification rights.[765] This argument is also inaccurate as any defense or indemnification rights are preserved under the Plan for Opt-Out Chartered Organizations.

---

[762] *Id.*

[763] *Id.*

[764] *Id.*

[765] RCAHC Obj. ¶ 207.

485. For the foregoing reasons and as will be demonstrated at the Confirmation Hearing, the Debtors have proposed the Plan in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

**D.     Section 1129(a)(4):  The Payment for Certain Services or for Certain Costs and Expenses Is Subject to Court Approval**

486.     Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, the debtor, or a person issuing securities or acquiring property under the plan, be subject to approval of the bankruptcy court as reasonable. Section 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the court.[766]

487.     All payments made or to be made by the Debtors or supporting parties to the Plan for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been authorized by, approved by, or are subject to the approval of the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.  Contrary to the U.S. Trustee Objection,[767] with respect to payment of the Coalition and Pfau/Zalkin Restructuring Expenses under Article V.T. of the Plan, Coalition professionals are required to file a final fee application, and any payment is subject to the Court granting a motion filed pursuant to sections 363(b), 1129(a)(4), and 503(b) of the Bankruptcy

---

[766] *See Lisanti v. Lubetkin* (*In re Lisanti Foods, Inc.*), 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a Plan should not be confirmed unless fees and expenses related to the Plan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd sub nom.*, 241 F. App'x 1 (3d Cir. 2007); *see also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'").

[767] The U.S. Trustee's objection was filed before the Pfau/Zalkin Restructuring Expenses were contemplated in the Plan.  The Debtors' response to the U.S. Trustee's objection also applies to the Pfau/Zalkin Restructuring Expenses.

Code, and subject to the Court's approval of such fees and expenses as reasonable. As such, the U.S. Trustee's argument that the Plan authorizes the payment of the Coalition Professionals' fees and expenses without complying with the Bankruptcy Code provisions governing the payment of administrative expenses should be overruled.[768] Article XI.C. of the Plan also expressly provides that the Court will retain jurisdiction to "hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code."

488. As provided in section 4.1 of the Settlement Trust Agreement, as modified and filed as Exhibit B to the Plan on February 15, 2022, among the Trust Assets shall be funds contributed from Pachulski Stang Ziehl & Jones LLP (the "PSZJ Contribution"). The Settlement Trustee shall have discretion to use such part of the PSZJ Contribution as the Settlement Trustee may determine to distribute to holders of Abuse Claims in recognition of their positive contributions made prior to, during or after the Chapter 11 Cases benefiting survivors of childhood sexual abuse and preventing abuse. To the extent necessary and if section 1129(a)(4) applies to these fees and costs, this provision has been sufficiently disclosed and is subject to the approval of the Court pursuant to the Confirmation Order. The Plan therefore satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

489. With respect to payments being made under the Plan and otherwise to stakeholder professionals out of distributions to creditors under the Settlement Trust, the Debtors submit that such payments are not within the scope of section 1129(a)(4). Nonetheless, in an abundance of caution and in light of the Debtors' recent designation of former Judge Barbara J. Houser as the

---

[768] U.S. Trustee Obj. ¶¶ 117–23.

initial Settlement Trustee and former Judges Michael Reagan and Diane Welsh as the Claims Administrators for purposes of confirmation of the Plan, the Debtors are disclosing Judge Houser's current hourly rate of $1,665, Judge Reagan's hourly rate of $950, and Judge Welsh's hourly rate of $975, but note that the proposed compensation structure remains under discussion at this time. In the alternative, to the extent any such payments are within the scope of section 1129(a)(4), the Debtors will establish that, based upon the record to be established at the Confirmation Hearing, such fees and costs are reasonable and should be approved.

**E.**     **Section 1129(a)(5): The Debtors Have Disclosed Information Regarding Directors, Officers, and Insiders of the Debtors**

490.     Section 1129(a)(5) of the Bankruptcy Code requires that (a) the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor, (b) the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and (c) disclosure of the identity and compensation of any insiders that the reorganized debtor intends to retain or employ.

491.     In compliance with section 1129(a)(5) of the Bankruptcy Code, the Debtors have disclosed the identities and affiliations of the directors and officers of Reorganized BSA in the Plan Supplement. Certain individuals identified on <u>Exhibit F-1</u> of the Plan Supplement, including the existing National Executive Board members that served prior to the Effective Date and the officers of BSA and Delaware BSA, will continue in office on the Effective Date. Pursuant to the Amended BSA Bylaws, following the Effective Date Reorganized BSA shall appoint a qualified survivor of abuse in Scouting to the National Executive Board, who shall be recommended for appointment by the STAC. Additionally, as of the date hereof, the Debtors are informed that the National Executive Board has voted to approve Joseph Zirkman, currently the Deputy General Counsel of the BSA, to replace Steven P. McGowan as the General Counsel and Secretary of the

Debtors, effective as of April 1, 2022.

492.   The appointment or continuance of these individuals and the process by which such individuals have been or will be identified or appointed are consistent with the interests of holders of Claims and with public policy.   Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.      Section 1129(a)(6):  Rate Changes—Inapplicable Provision.**

493.   Section 1129(a)(6) of the Bankruptcy Code provides that any applicable governmental regulatory commission with jurisdiction has approved any rate change provided for in the plan.  The Plan does not provide for any rate changes over which a governmental regulatory body has jurisdiction, and accordingly, section 1129(a)(6) does not apply to the Plan.

**G.      Section 1129(a)(7):  The Best Interest Test Does Not Apply to the Debtors.**

494.   Section 1129(a)(7) of the Bankruptcy Code sets forth the "best interest test,"  which requires that each holder of a claim or an equity interest in a particular class either (a) has accepted the plan or (b) will receive or retain under the plan . . . property of a value that, as of the plan's effective date, is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  The best interest test, however, does not apply to the Plan and the Chapter 11 Cases.  Section 1112(c) of the Bankruptcy Code provides that chapter 11 cases involving a debtor that is not "not a moneyed, business, or commercial corporations" (*i.e.*, non-profits such as the Debtors) may not be involuntarily converted to cases under chapter 7 of the Bankruptcy Code.[769]  The Debtors are non-profit entities, and their cases

---

[769] *See* 11 U.S.C. § 1112(c) ("The court may not convert a case under [chapter 11] to a case under chapter 7 of this title if the debtor is . . . not a moneyed, business, or commercial corporations, unless the debtor requests such conversion."); *In re Grace Christian Ministries, Inc.*, 287 B.R. 352, 355 (Bankr. W.D. Pa. 2002) ("A corporation . . . may not be an involuntary chapter 7 or 11 debtor if it is a not-for-profit corporation.").

cannot be converted involuntarily to chapter 7. Thus, it makes no legal or logical sense to require the non-profit Debtors to satisfy section 1129(a)(7) to demonstrate that creditors receive more in a hypothetical liquidation than they would under the Plan.[770]

495. The U.S. Trustee incorrectly argues that non-profit debtors must satisfy section 1129(a)(7),[771] failing to identify a single case holding that a non-profit entity must satisfy 1129(a)(7). Rather, the U.S. Trustee cites cases in which non-profit debtors elected to submit a liquidation analysis and did not challenge the applicability of the best interest test.[772] At bottom, section 1129(a)(7) does not apply to these Chapter 11 Cases, and all objections on these grounds should be overruled.

## 1. The Best Interest Test Does Not Apply to the Local Councils.

496. Even if the Debtors were required to meet the best interest test, the Local Councils are independently organized 503(c) non-profit corporations that are non-debtors. Notably, no party has asserted that the Local Councils must satisfy the best interest test. Given this undisputed

---

[770] Thus, for example, certain Church debtors likewise have argued that a hypothetical chapter 7 liquidation analysis is not necessary to satisfy the "best interests of creditors" test under § 1129(a)(7)(A)(ii). *See, e.g.,* Third Amended Disclosure Statement Regarding Plan of Reorganization Dated, May 25, 2005 at 85-86, In re Roman Catholic Church of the Diocese of Tucson aka the Diocese of Tucson, Case No. 4-bk-04-04721-JMM (Bankr. D. Ariz. May 25, 2005) (analogizing to chapter 9 test requiring only "a reasonable effort by the [church] debtor that is a better alternative to the creditors than dismissal of the case") (internal quotation marks, citation omitted).

[771] U.S. Trustee Obj. at ¶¶ 128-31.

[772] U.S. Trustee Obj. ¶ 130 (citing *In re Gen. Teamsters, Warehousemen & Helpers Union, Local* 890, 265 F.3d 869, 877 (9th Cir. 2001) (rejecting "best interests" challenge where the only asset at issue could not be liquidated); *In re St. Mary's Hosp., Passaic, N.J.*, No. 09-15619, 2010 WL 5126151, at *6 (Bankr. D.N.J. Feb. 2, 2010) (finding that plan complied with section 1129(a)(7) with no discussion of non-profit status); *In re Save Our Springs (S.O.S.) All., Inc.*, 388 B.R. 202, 239 (Bankr W.D. Tex. 2008), *aff'd*, 2009 WL 8637183 (W.D. Tex. 2009), *aff'd*, 632 F.3d 168 (5th Cir. 2011) (denying confirmation of Debtor's Plan on multiple grounds, but noting that section 1129(a)(7) requirement was met); *In re Wabash Valley Power Ass'n*, No. 85-2238, 1991 WL 11004220, at *53 (Bankr. S.D. Ind. Aug. 7, 1991), *aff'd*, 72 F.3d 1305 (7th Cir. 1995) (noting that debtor and creditor entered into stipulation that they would not address the liquidation value of debtor at the valuation hearing); *In re Mandalay Shores Co-op. Hous. Ass'n*, 53 B.R. 609, 614-15 (Bankr. M.D. Fla. 1985) (holding that nonprofit debtor satisfied the requirement under section 1129(a)(7)(A) when debtor sought to cramdown certain unsecured priority claims from former members because "there is serious doubt that in a voluntary chapter 7 case" the creditors would receive anything)).

record, the Court should find that the Local Council are not subject to the best interest test.

497.    Even if the Court were to find that Local Councils were required to satisfy the best interest test (and it should not), the Court should evaluate the hypothetical liquidation of the Local Councils in the aggregate against the proposed Local Council settlement contribution to the Settlement Trust pursuant to the Plan, as discussed in section II.E.1.b.  Here, the Local Council settlement contribution far exceeds what creditors would receive in a hypothetical liquidation of the Local Councils.

## 2.    The Plan Satisfies the Best Interest Test.

498.    The U.S. Trustee objects on the grounds that "the Debtors have not attempted to prove that the Plan complies with section 1129(a)(7)."[773]  To the contrary, the Debtors prepared a hypothetical liquidation analysis for the BSA, the Related Non-Debtor Entities, and the Local Councils, which is attached as Exhibit D to the Disclosure Statement (the "Liquidation Analysis"), to compare the estimated distributions a dissenting creditor would receive in a chapter 7 scenario versus the Plan.[774]  On December 29, 2021, the Debtors submitted the Updated Expert Report of Brian Whittman (the "Updated Whittman Report") to compare the recoveries under the Plan to the recoveries available in a hypothetical liquidation and to assess the impact of a hypothetical liquidation on insurance recoveries as compared to the Plan, including a modified liquidation analysis (the "Modified Liquidation Analysis").[775]

---

[773]   U.S. Trustee Obj. ¶ 131; *see also Pro se* Claimant Washburn Obj. ¶¶ 25-26 [D.I. 9007].

[774]   The U.S. Trustee objects on the grounds that "the Debtors have not attempted to prove that the Plan complies with section 1129(a)(7)," U.S. Trustee Obj. ¶ 131.  *Pro se* Claimant Washburn argues similarly.  *Pro se* Claimant Obj. [D.I. 9007] ¶¶ 25-26.  To the contrary, the Debtors and their advisors prepared a hypothetical liquidation analysis for the BSA, the Related Non-Debtor Entities, and the Local Councils, which is attached as Exhibit D to the Disclosure Statement, to compare the estimated distributions a dissenting creditor would receive in a chapter 7 scenario versus the Plan. Disclosure Statement, Ex. D

[775]   Updated Whittman Rep. at 35-77.

499. The Liquidation Analysis demonstrates that all classes of creditors are receiving equal or more under the Plan than they would in a hypothetical Chapter 7 liquidation of the Debtors and the Related Non-Debtors Entities.[776] For Class 6 General Unsecured Claims, the estimated recovery under the Plan is $25 million, resulting in an estimated low-end recovery of 75% as compared to an estimated high-end recovery in the Liquidation Analysis of 0.3% to 0.6% (at Abuse Claims of $7.1 billion and $2.4 billion, respectively). For Class 8 and Class 9 Claims, both of which are channeled to the Settlement Trust, the Plan provides for the BSA to contribute the $80 million BSA Settlement Trust Note, Artwork deemed to be worth $59 million, and Oil & Gas interests valued at $7.6 million for a total of $146.6 million[777] (prior to considering Local Council, insurance or Chartered Organizations contributions) as compared to a high end estimated recovery of $19.4 million in the liquidation of the BSA and Related Non-Debtors.

500. To the extent the Court were to conclude the Local Councils must also satisfy the best interest test, the Liquidation Analysis shows that, prior to considering the detrimental impact of a liquidation on insurance, that the Local Councils' contribution under the Plan of $600 million ($540 million net of assumed 10% cost of administering the Settlement Trust[778]) is higher than the

---

[776] Updated Whittman Rep. at 36-37.

[777] Updated Whittman Rep., Chart 21, assuming no Net Unrestricted Cash and Investments and excluding the Warehouse and Distribution Center and Scouting University

[778] The Disclosure Statement reflected Plan recovery percentages net of assumed cost to operate the Settlement Trust. Costs are estimated between 6 and 10% of total assets with costs expected to be at the high end of the range in a smaller trust and at or below the lower end of the range in a larger trust under the Plan. Since the time the Disclosure Statement was approved approximately, $900 million of incremental settlements have been added to the value of the Settlement Trust which will lower the costs as a percentage of assets. *See Seventh Mediator's Report* [D.I. 7745] (detailing Century and Chubb Companies Term Sheet, which provided for a cash contribution of $800,000); *Eighth Mediator's Report* [D.I. 7884] (detailing United Methodist Term Sheet, which provided for a cash contribution of $30 million); *Ninth Mediator's Report* [D.I. 7928] (detailing Zurich Term Sheet, which provided for a cash contribution of $52.5 million); *Tenth Mediator's Report* [D.I. detailing Clarendon Term Sheet, which provided for a cash contribution of $16.5 million). In addition, Pachulski Stang Ziehl & Jones LLP is also making a cash contribution of $1.25 million to be reserved for the Youth Protection Program. Plan Art. IV.S.7

high end estimated recovery of $389.3 million[779] in the liquidation of the Local Councils in the aggregate, a differential of over $150 million. As discussed below, this differential increases by an additional $459 million to $822 million when factoring in the impact of a liquidation on cost and time to recover against insurance.[780]

501. The Liquidation Analysis is divided into three components: (a) a liquidation of only the Debtors and Related Non-Debtor Entities, (b) a liquidation of the Debtors, Related Non-Debtor Entities, and Local Councils, and (c) a liquidation of only the Local Councils in the aggregate. Each component of the Liquidation Analysis reflects that creditors are receiving equal or better treatment under the Plan than in a hypothetical liquidation.[781] Notably, no significant creditor constituency contends that it would get more value under a liquidation scenario.

### (a) Liquidation of only the Debtors and Non-Debtor Entities

502. In the liquidation of the Debtors and Related Non-Debtor Entities, the Modified Liquidation Analysis shows that $1,093.3 million would be available for distribution to creditors under the Plan whereas $356.9 million would be available for distribution in a liquidation, and that all classes of creditors would recover more under the Plan than in a liquidation, both at the high and low end of the range of abuse claims.[782] Class 8, Direct Abuse Claims, would receive $19.4 million at the high end of the range of abuse claims in a liquidation, whereas Direct Abuse Claims

---

[779]  Updated Whittman Rep., Chart 20.

[780]  Updated Whittman Rep., Chart 22.

[781]  *Id.* at 35.

[782]  Per the Supplement Report of Brian Whittman dated March 2, 2022 liquidation recoveries of $19.4 million amount are expected to decline to zero if the Conversion Date is delayed to June 30th due to a decline in cash and increase in accrued professional fees, and the $737 million Plan contribution would decline to $672 million as a result of the removal of the Warehouse and Distribution Center and the Scouting University from the BSA Settlement Trust Contribution and from assuming a delay in emergence to June 30, 2022 and the resulting decline in cash.

would receive $737 million under the Plan in the same scenario.[783]   This means that Classes 2, 5, 6, and 8 receive less at the highest range of the Modified Liquidation Analysis as compared to their lowest recoveries under the Plan.

<blockquote>

**(b)     Liquidation of the Debtors, Related Non-Debtor Entities, and Local Councils**
</blockquote>

503.     Further, although not required to satisfy the best interest test as it relates to the non-debtor Local Councils,[784] the Consolidated Liquidation Analysis of the Debtors, Related Non-Debtor Entities and Local Councils shows that Direct Abuse Claims would receive $737 million under the Plan whereas they would receive between $384.4 and $421 million in a liquidation, in both cases excluding the value of insurance.[785]   This already large gap between the recovery under the Plan and the Liquidation Analysis does not account for the higher costs that would be incurred by the 251 Local Councils to secure contributions from insurers in the absence of a Plan, which is estimated to be between $459 million and $822 million,[786] which would further reduce the recoveries to creditors in a liquidation in comparison to the Plan if one accounted for insurance proceeds.  As such, all classes of creditors would receive more under the Plan than in a hypothetical liquidation in the Consolidated Liquidation Analysis.

---

[783]   Updated Whittman Rep. Chart 18.

[784]   The I.G. Objection states in conclusory fashion that the Debtors' Liquidation Analysis does not "proper[ly] disclose . . . the assets and liabilities of Local Councils such that direct abuse claimants can meaningfully assess whether the Plan meets the best interests of creditors test."  I.G. Obj. at 4.   The Debtors believe the conclusory I.G. Objection is meritless and does not warrant a response.   Nevertheless, the Debtors provide the following analysis of a hypothetical liquidation of the Local Councils, which further demonstrates that dissenting creditors would receive more under the Plan than under a hypothetical liquidation of the Debtors and the non-debtor Local Councils.  Further, contrary to the I.G. Objection, this Court's ruling in the Disclosure Statement Order confirms that there was adequate disclosure with respect to the Liquidation Analysis.

[785]   *See* Updated Whittman Rep., Chart 19.  This analysis assumes that the PBGC would assert a $1.1 billion claim against the BSA and Local Councils.

[786]   This analysis assumes that there would be, among other things, a 25% contingent fee for attorneys to recover insurance proceeds and a 3% fee for the Chapter 7 Trustee.  *See* Updated Whittman Rep., Chart 22.

### (c) Liquidation of only the Non-Debtor Local Councils in the Aggregate

504.     A hypothetical liquidation of the non-debtor Local Councils generates an estimated $1.6 billion of liquidation proceeds net costs.[787]  The majority of these net proceeds would be consumed by the approximately $1.1 billion joint and several secured PBGC Claim at the Local Council level, leaving only $439 million to satisfy all administrative and unsecured claims for all Local Councils combined.  Further, even though the Liquidation Analysis shows that $389 million would be left to satisfy Abuse Claims, which is over $200 million less than the consideration that the Local Councils are contributing to the Settlement Trust to satisfy Abuse Claims under the Plan.[788]  The Modified Liquidation Analysis shows that the gap between Plan recovery and liquidation recovery would grow by an additional $459 million to $822 million, as is further explained below, if one accounted for additional litigation and other costs to recover insurance proceeds absent the Plan.

### 3.     There Are Additional Costs and Expenses That Would Be Incurred in a Chapter 7 Proceeding That Would Not Otherwise Be Liabilities Under the Plan.

#### (a) The Modified Liquidation Analysis Shows the Clear Benefits of the Plan with Respect to Insurance Settlements.

505.     On December 29, 2021, the Debtors submitted the Updated Whitman Report to account for certain developments including additional facts from the Expert Report of Nancy Gutzler Dated December 5, 2021 and Supplemental Expert Report of Nancy Gutzler (the "KCIC Report").  Specifically, the Liquidation Analysis in the Disclosure Statement did not account for

---

[787]   Updated Whitman Rep. at 74.

[788]   After accounting for administrative expenses, Mr. Whittman estimates that $540 million of the $600 million contributed by Local Councils would be available for distributions to claimants of the Settlement Trust.  Updated Whittman Rep. at 40, Chart 20.

the cost of recovering insurance proceeds on the basis that recoveries from such proceeds were assumed to be the same or greater under the Plan than in a hypothetical chapter 7 liquidation due in part to the aggregation of insurance rights. As detailed in the Updated Whitman Report, there is a clear benefit to the Plan versus a liquidation as it relates to the Hartford Insurance Settlement, the Century and Chubb Companies Insurance Settlement, and the Zurich Term Sheet because the costs to obtain these settlements have already been incurred.

506.    In contrast, in a hypothetical liquidation of the 251 Local Councils, there would be no settlement and separate chapter 7 trustees would need to pursue complex and extensive litigation with Hartford, Century, and Zurich and the non-settling insurers to recover insurance proceeds in connection with the 82,000 Abuse Claims.[789] The Updated Whittman Report estimates that, even when adopting conservative estimates, which assume that the trustee would pay counsel a 25% contingency fee to pursue coverage litigation to obtain insurance proceeds and that the U.S. Trustee would recoup a 3% fee, the additional insurance litigation and other costs absent a plan would be between $459 and $569 million.[790] If one accounted for the time value of money, this figure could increase to up to $822 million at the high end.

    **(b) The PBGC Claim for Unfunded Benefit Liability Would Decrease the Available Funds in a Chapter 7 Liquidation for Holders of Abuse Claims.**

507.    A chapter 7 liquidation would impose additional costs and expenses on the Debtors

---

[789]  Such fees would also apply with respect to litigation against Clarendon, another Settling Insurance Company. At the time the Updated Whittman Report was submitted on December 29, 2021, the settlement with Clarendon was not yet finalized. The Clarendon Term Sheet was later executed on December 30, 2021. *See Tenth Mediator's Report* [D.I. 8095].

[790]  Updated Whittman Rep., Chart 22.

that they would otherwise not incur under the Plan[791]—the most substantial of which is the $1.1 billion PBGC Claim, which is contingent on the termination of the Debtors' single-employer defined benefit pension plan.[792] Under the Plan, the Debtors will assume and reinstate the defined benefit pension plan, rendering the PBGC Claim moot. But in liquidation, the pension plan would terminate and the PBGC would successfully assert a lien under section 4068(a) of ERISA, arising as of the termination date against each member of the controlled group in an amount not to exceed 30% of the "collective net worth" of all members of the controlled group combined. Even if a lien could not be asserted, each member of the controlled group (which includes all Local Councils) would be jointly liable to the PBGC for the $1.1 billion unsecured portion of the PBGC claim,[793] vastly exceeding any other unsecured claims recoveries at the Local Councils.[794]

508. One objection from a *pro se* Claimant identifies the "nature and amount of the claim of the Pension Benefit Guarantee Corporation ("PBGC"), including, without limitation, whether the Local Councils are liable on the claim" as a topic.[795] But the *Pro Se* Claimant's conclusory and meritless objection fails to articulate any purported deficiency in the Debtors' Liquidation Analysis with respect to the PBGC claim. This Objection further ignores the record. The PBGC filed a proof of claim asserting statutory liability for an "unfunded benefit liability" ("UBL") in

---

[791] *Cf. In re Adelphia Comms'ns Corp.*, 368 B.R. 140, 254 (Bankr. S.D.N.Y. 2007) ("[T]he chapter 7 trustee's advisors would be entitled to reasonable compensation for services rendered and related expenses incurred, which would be entitled to treatment as administrative expense claims. Given the amount of time such professionals would be required to devote to become familiar with the Debtors and the issues related to these cases, such fees and costs would reduce overall recoveries." (footnote omitted)).

[792] POC 1162.

[793] A sensitivity analysis of the effects of an unsecured PBGC Claim asserted jointly and severally against the Related Non-Debtor Entities and each Local Council as opposed to a secured claim is included in the Updated Whittman Report and shows that the effect of the PBGC Claim being treated as unsecured versus secured against the Related Non-Debtor Entities and Local Councils is only $3.6 million on an aggregated basis.

[794] POC 1162 ¶ 7.
[795] *Pro Se* Claimant's Obj. [D.I. 8658] ¶ (c).

the amount of $1.1 billion as of October 2020 for the Boy Scouts of America Retirement Plan for Employees Pension Plan (the "Pension Plan").[796] The PBGC further contends that upon termination of the Pension Plan, the BSA and each Local Council shall become "jointly and severally liable to PBGC for the total amount of [the $1.1 billion UBL claim],"[797] and that if any person liable fails to pay the liability after demand, "a lien arises in favor of the PBGC as of the termination of the [Pension Plan]."[798] Furthermore, the PBGC asserts that the claim is an "administrative expense entitled to priority as a tax incurred by the estate … or is entitled to tax priority under 11 US.C. 507(a)(8)."[799] To date, the PBGC has not amended its proof of claim.

509.   The PBGC's assertion of joint and several liability for the UBL claim is also consistent with the BSA's decades of financial and tax reporting that the Pension Plan is "single employer plan" for a controlled group. The BSA Pension Plan has filed tax returns for decades as a "single employer pension plan" with the BSA and all of its Local Councils defined as a single controlled group of participating employers under common control.[800] Filings of Actuarial Statements (Schedules B and SB) for Forms 5500 prepared and signed by the BSA's enrolled actuaries also reflect this tax filing status.[801] In light of the PBGC's proof of claim, and the corroborating history of the BSA's tax and financial reporting with respect to the Pension Plan, the *Pro Se* Objection should be overruled.

(c)    **Additional Fees and Expenses Associated with a Chapter 7**

---

[796]   Proof of Claim filed by the PBGC on or about October 29, 2020, at ¶¶ 6-10.  [POC # 1162].

[797]   *Id.*at ¶ 7.  As the PBGC Claim is unliquidated until the event of termination, the value of the claim is not fixed. Mr. Whittman analyzed the impact of both higher ($1.2 billion) and lower ($700 million potential claim amounts, and the recovery for Class 8 and 9 creditors remain higher under the Plan.  Updated Whitman Report at 62-64.

[798]   *Id.* at ¶ 9.

[799]   *Id*. at ¶¶ 9-11.

[800]   1999 Form 5300 Line 6 Controlled Group Attachment (BSA-PLAN_0126469).

[801]   BSA 2020 Schedule SB Package (BSA-PLAN_02625064 – BSA-PLAN_02625092).

**Liquidation.**

510.    In disposing assets, the Debtors will be required to comply with the applicable non-bankruptcy law that governing nonprofit entities, which may further materially diminish proceeds available from a chapter 7 liquidation.  These obligations vary among jurisdictions but can require, *among other things*, consent from a state's attorney general or other governmental authorities.[802] These associated costs and delays were not factored into the Liquidation Analysis—even though they are reasonably expected to reduce recoveries in a chapter 7 liquidation.[803]

511.    Additional consequences of a hypothetical liquidation further demonstrate that creditors recover more under the Plan as compared to a hypothetical liquidation.  For example (a) continued delay in the case as well as other factors have reduced the BSA's settlement contribution to approximately $146.6 million ($131.9 million if considered net of 10% illustrative trust costs); however, those same factors would reduce estimated Liquidation Analysis gross proceeds, ultimately resulting in $0 Abuse Claim recoveries for Class 8 and Class 9 for the BSA and Related Non-Debtor Entities,[804] (b) substantial litigation fees and other administrative costs would be incurred and reduce insurance proceeds received,[805] (c) a significant portion of the Debtors' assets held as collateral for JPM's financing would be liquidated to pay JPM's secured debt,[806] and (d) the increased valuation, if any, of Abuse Claims would result in, at most, a 5% increase in

---

[802]    *See In re Bishop College*, 151 B.R. 394, 397 (Bankr. N.D. Tex. 1993) (observing that the Texas attorney general intervened in the chapter 7 trustee's turnover action, which under Texas law "is required in all disputes involving charitable trusts").

[803]    Disclosure Statement, Ex. D (Liquidation Analysis) at 5.

[804]    Brian Whittman Updated Expert Rep. at 40 (Dec. 29, 2021); Brian Whittman Supplemental Expert Rep. at 5 (Mar. 2, 2022) at 5.

[805]    *Id.* at 47.

[806]    *Id.* at 54-56

recovery[807]—an immaterial incremental benefit compared to recovery under the Plan. Taken together, a hypothetical liquidation would result in the liquidation trustee incurring significant professional fees in an effort to liquidate assets of limited or depressed value, which costs would not be incurred under the Plan. Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

4.    **Objections Asserting that the Plan Does Not Satisfy the Best-Interests Test in Accordance with Section 1129(a)(7) of the Bankruptcy Code Should Be Overruled**

512.    Various parties object to the Debtors' satisfaction of the best interest test on the basis that the value they would receive or retain under the Plan on account of their claims, which they would have to release pursuant to the Scouting-Related Release to receive distributions under the Plan, is less than what they would receive in a hypothetical liquidation. Pai argues that the Plan impairs his section 524(e) rights as administrator of the estate to recover proceeds from any applicable Specified Insurance Policy, and that in a chapter 7 liquidation, he would "retain all his rights under Bankruptcy Code Section 524(e) to recover from all $211 million of proceeds available under the applicable insurance policies."[808] The Plan, he argues, prohibits the payment of his Class 7 Non-Abuse Litigation Claim unless he releases the claim against the Local Councils.[809]

513.    Pai is mistaken. First, claimants with Class 7 Non-Abuse Litigation Claims are expected to recover up to 100% of their claims.[810] Under the Plan, Pai, as a holder of a Class 7 claim, retains his rights to recover up to the amount of his Allowed Non-Abuse Litigation Claim

---

[807]    *Id.* at 61.

[808]    Pai Obj. ¶ 23.

[809]    Pai Obj. ¶ 13.

[810]    Disclosure Statement Art. II.H.

from (x) available insurance coverage or the proceeds of any Insurance Policy, including any Abuse Insurance Policy or Non-Abuse Insurance Policy, (y) applicable proceeds of any Insurance Settlement Agreements, and (z) co-liable non-debtors (if any) or their insurance coverage.[811] To the extent Pai fails to recover the full amount from the foregoing, he may elect to have the unsatisfied portion of his claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000.[812]

514.   Second, Article IV.D.3 states that "the holder of a Non-Abuse Litigation Claim may recover up to the full amount of such Claim in the first instance from any such available unsettled Specified Primary Insurance Policy(ies) or unsettled Specified Excess Insurance Policy(ies)."[813] Before the Settlement Trust settles one or more Specified Insurance Policies under which Pai seeks recovery, Pai will be able to recover up to $1,000,000 of his claim under any such Specified Primary Insurance Policy(ies).[814] Any amounts exceeding $1,000,000 will be recoverable in the first instance from any such available unsettled Specified Excess Insurance Policies.[815] To the extent that Pai cannot, as a result of the Settlement Trust's release of such Specified Insurance Policy(ies), recover the full amount of any judgment or settlement of Pai's claim from any Specified Insurance Policy(ies) under which Pai seeks recovery, then any unpaid amounts (up to applicable policy limits) will be submitted to the Settlement Trust, which will pay such amounts

---

[811]   Plan Art. III.B.9.

[812]   *Id.*

[813]   Plan Art. IV.D.3

[814]   *Id.*

[815]   *Id.*

out of the proceeds of the Specified Insurance Policies.[816]

515. The source of Pai's recovery is not relevant for purposes of the best interest test. Accordingly, his objection that the Plan "restrain[s]" him from seeking recovery through the tort system or that he is "require[d]" to receive proceeds from the Specified Insurance Policies is a red herring.[817]  Based on the plain language of the Plan, Pai clearly recovers more under the Plan than he would in a hypothetical liquidation, and the fact that he is the only claimant in Class 7 objecting on the basis of the best interest test is telling.

516. The following four objections are related to the release of direct claims that would be retained in a hypothetical liquidation and will be addressed collectively.  D&V Claimants argue that because they can only receive payment under the Plan if they release their claims against local councils, chartered organizations, and settling insurers, the Plan deprives them of their claims against these non-debtors, which they would have in a chapter 7 liquidation.[818]

517. Jane Doe argues that (a) her state court claims against the non-debtor defendants (released under the Plan) must be considered as part of the Liquidation Analysis[819] and (b) the Liquidation Analysis improperly excludes insurance recoveries and does not account for recoveries against Limited Protected Parties.[820]

518. The Lujan Claimants argue that (a) the Plan fails to satisfy the best interest test because it enjoins them from suing non-debtors and requires them to release Protected Parties to

---

[816]  *Id.*

[817]  Pai Obj. ¶ 23.

[818]  D&V Claimants Obj. at 12.

[819]  Jane Doe Obj. ¶ 42.

[820]  Jane Doe Obj. ¶ 44.

receive distributions under the Plan,[821] (b) the Insurance Entity Injunction prohibits them from recovering payments under insurance policies issued by Non-Settling Insurance Companies, which they would be able to pursue in a chapter 7 liquidation,[822] (c) the Plan precludes them from recovering compensation through the Archbishop of Agana bankruptcy case.[823] while such amounts would be available in a chapter 7 liquidation.[824]

519. The RCAHC argues that (a) the Roman Catholic Chartered Organizations are not receiving or retaining what they would receive in a chapter 7 liquidation, including their rights as additional insureds under the Local Council Policies and as insured under their own policies,[825] (b) in exchange for forfeiting their rights, the Chartered Organizations will likely receive nothing and will lose their policies' defense coverage,[826] and (c) Class 9 Indirect Abuse Claimants allegedly will receive no recovery under the Plan but would retain their existing insurance policies in a chapter 7 liquidation.[827]

520. Each of these objections asserts that the Liquidation Analysis fails to show that the value received pursuant to the Plan by releasing their claims would be greater than if they preserved their claims in a hypothetical liquidation. But the plain meaning of section 1129(a)(7)(A) of the Bankruptcy Code does not support the assertion that the Debtors must include the value of the Claims that third parties are releasing against the non-debtor Chartered Organizations, Settling Insurance Companies, and Non-Debtor Entities in the Liquidation Analysis. Section 1129(a)(7)

---

[821]   Lujan Claimants Obj. at 21.

[822]   Lujan Claimants Obj. at 21.

[823]   Lujan Claimants Obj. at 21-22.

[824]   Lujan Claimants Obj. at 23.

[825]   RCAHC Obj. ¶ 182.

[826]   *Id.*

[827]   *Id.* ¶ 189.

provides that an impaired creditor "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7."[828]  The use of the word "so" in section 1129(a)(7) refers to the "on account of such claim" that appears earlier in the sentence, such that an impaired creditor must "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would . . . receive or retain [on account of such claim or interest] if the debtor were liquidated under chapter 7."[829]  As Judge Drain explained, this requires a comparison "between the amount that the objecting creditor would receive under the plan on account of its claim and what it would 'so' receive—that is, also on account of its claim—if the debtor were liquidated under chapter 7.  It would not, therefore, require analysis of the claimant's rights against third parties."[830]  What a creditor may "receive or retain" on account of claims against third parties in a liquidation is therefore irrelevant.

521.     The cases cited in these objections miss this significant distinction and are not

---

[828]  11 U.S.C. § 1129(a)(7) (emphasis added).

[829]  *Id.; see also In re Purdue Pharma L.P.*, No. 19-23649, 2021 WL 4240974, at * 8 (Bankr. S.D.N.Y Sept. 17, 2021) ("*Purdue II*") (holding that the plain language of section 1129(a)(7) does not require a liquidation analysis to include an analysis of a claimants' rights against third parties).

[830]  *See id.* (emphasis added) (internal citations omitted).  On appeal, the district court did not challenge the bankruptcy court's reasoning or ruling.  *Purdue II*, 2021 U.S. Dist. LEXIS 252236, at * 130 n.46.

binding.[831]  Indeed, Judge Drain specifically rejected the rationales in *Ditech*[832] and *Quigley*[833] on

this point because "neither of those decisions addresses the plain meaning argument" inherent to

the language of section 1129(a)(7)(A) of the Bankruptcy Code.

522.     Further, the *Ditech* and *Quigley* courts did not hold, as the objecting parties suggest,

that any and all claims that would be retained in a hypothetical liquidation must be included in a

best interest analysis.  Rather, the value of claims retained outside of a bankruptcy should only be

included in a best interest analysis, if at all, when the value of those claims is both not speculative

and is capable of estimation.[834]  In *Ditech*, the court determined that the values of certain litigation

claims that consumers could assert against a buyer of the debtors' assets in a chapter 7 scenario

should have been included in the debtors' liquidation analysis in large part because the debtors'

own liquidation analysis assumed a sale of those assets under section 363, thereby making them

capable of estimation.[835]  Thus, the consumer claims were neither speculative nor incapable of

estimation.[836]

523.     In *Quigley*, the court considered the value of derivative, third-party creditor

asbestos claims against the debtors' shareholder, Pfizer, in the best interests analysis because,

---

[831]   The Lujan Claimants and D&V Claimants cite *In re Conseco, Inc.*, 301 B.R. 525 (Bankr. N.D. Ill. 2003) for the proposition that a plan violates the best interest test where the plan requires that creditors must release nondebtors in order to receive any payment under the Chapter 11 plan.  Lujan Claimants Obj. at 21; D&V Claimants Obj. at 12.  This is not the holding of *Conseco*.  In fact, satisfaction of the best interest test was not at issue before the *Conseco* court.  Rather, the court found that, based on the agreed-upon valuation of the debtor, the creditor in that case was not entitled to any distribution under section 1129(a)(7)(A)(ii).  *Conseco*, 301 B.R. at 528.  The court then held that the voluntary release of non-debtors did not conflict with the Bankruptcy Code.  *Id.*  The relevance of this case with respect to the best interest test is unclear.

[832]   606 B.R. 544, 610-14 (Bankr. S.D.N.Y. 2019).

[833]   437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010).

[834]   *Ditech*, 606 B.R. at 615 ("[W]hen weighing [third-party] claims in a liquidation analysis, the claims cannot be speculative or incapable of estimation . . . ."); *Quigley*, 437 B.R. at 145 (same).

[835]   606 B.R. at 616-17.

[836]   *Ditech*, 606 B.R. at 614-15.

unlike here, such claims were "neither speculative nor incapable of estimation."[837] The court was only able to estimate that the asbestos claims against Pfizer would be worth 23% of their face value based on extensive testimony and expert analysis of Pfizer's likely liability outside of bankruptcy and an extensive record of approximately sixty-six settlement agreements previously entered into by Pfizer and Quigely under a joint defense agreement.[838]

524.     Here, the D&V Claimants, Lujan Claimants, RCAHC, and Jane Doe—all alleged holders of various types of claims against a variety of Related Non-Debtor Entities and Settling Insurance Companies—assert in conclusory fashion that their claims would retain more value in a hypothetical liquidation, when in fact their claims are both speculative and incapable of estimation. It is not appropriate to include speculative values in a liquidation analysis, and neither the Bankruptcy Code nor applicable law assign to Debtors the impossible task of valuing unripe and speculative claims in the liquidation analysis.[839] Notably, not a single one of the parties challenging the Debtors' satisfaction of the best interest test has sought to offer expert testimony or other credible evidence on the value of their claims, supporting the conclusion that these speculative claims are incapable of reliable estimation. And unlike *Quigley* where the sixty-six separate settlement agreements established a reliable track record of Pfizer's likely liability going forward, there is no such track record upon which to estimate the value of such claims in the Liquidation Analysis.

525.     *Hercules Offshore*,[840] a case cited by the RCAHC, is on point. As is the case with

---

[837]     *Id.* at 145.

[838]     *Quigley*, 437 B.R. at 115, 134, 146.

[839]     *See, e.g.*, *Adelphia*, 368 B.R. at 253 (rejecting creditors' unsubstantiated assertion that IPO costs would be lower in a hypothetical liquidation as "only speculation").

[840]     565 B.R. 732 (Bankr. D. Del. 2016).

each objecting party here, the equity committee in *Hercules* stated in conclusory fashion that the Plan fails the best interest test because it released claims held by the equity security holders that would be available to them in a hypothetical liquidation.[841]  The court did not entertain such conclusory statements: "even assuming that the claims have merit, the Equity Committee has offered no credible evidence that holders of HERO Common Stock would recover greater value in a chapter 7 case than they are to receive under the Plan."[842]  Similarly, none of the objecting parties here has offered any evidence or an estimate of their own that would suggest that their claims are not merely speculative.  Given the absence of any evidence to value these claims, the Debtors are not required to include those claims in their Liquidation Analysis, and the objections should be overruled.

526.    Further, the objectors' reliance on *Washington Mutual* is misplaced.[843]  There, the court did not consider the value of the released third-party claims in the liquidation analysis and held that, because other parties agreed to release $54 billion in claims they held against the debtors, the plan objectors (including equity holders likely to receive no recovery under the plan) would receive less in a chapter 7 liquidation than under the plan.[844]

527.    The final two cases that RCAHC cites are irrelevant, misleading, and not binding. The RCAHC cites a footnote of *SunEdison, Inc.*[845] for the proposition that "a chapter 11 plan that releases third-party claims of an impaired creditor who is not receiving any recovery does not

---

[841]    *Id.* at 765.

[842]    *Id.*

[843]    442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation.").

[844]    *Id.* at 360.

[845]    576 B.R. 453, 457 n.4 (Bankr. S.D.N.Y. 2017).

comply with Section 1129(a)(7) and cannot be confirmed."[846]  This is a misleading characterization for several reasons.  First, the footnote is *dicta*, not a holding.  The case does not mention the best interest test or section 1129 outside this footnote, and the best interest test was not at issue before the court.  Second, the footnote specifically refers to "[n]on-voting classes deemed to reject the Plan under 11 U.S.C. § 1126(g)," not all impaired creditors generally, as the RCAHC objection suggests.[847]  Therefore, even if the cited footnote was treated as persuasive authority, it is inapplicable because the RCAHC is composed of (at most) Class 9 claimants that are all members of a voting class (to the extent they have a claim at all).

528.  The RCAHC cites inapposite *Mcorp* for the proposition that a plan of reorganization "may not be confirmed where the evidence is not sufficient on which to base an independent factual determination that the proposed plan is in the best interest of the creditors pursuant to § 1129(a)(7)."[848]  In *Mcorp*, there was "no admissible evidence of the value of most of the real estate in which the [d]ebtors have an interest," the expert testimony left "serious unanswered questions as to the accuracy of the Ernst & Young estimates and the methodology utilized in arriving at the estimates of present value," the expert "acknowledged having little experience in valuation of banks and having failed to review important agreements," and the debtors' liquidation analysis "did not include a significant MCorp Financial asset" that the debtor identified in the disclosure statement as having "a substantial estimated recovery value."[849]  In contrast, the Updated Whittman Report and the Liquidation Analysis provide a robust analysis of

---

[846]  RCAHC Obj. ¶ 181.

[847]  *SunEdison*, 576 B.R. at 457 n.4.

[848]  137 B.R. 219 (Bankr. S.D. Tex. 1992).

[849]  *In re Mcorp Fin., Inc.*, 137 B.R. at 229-31.

the assets and liabilities of the Debtors and even the Local Councils should the Court find that the best interest test applies to the Local Councils as well. Accordingly, as demonstrated through the Updated Whittman Report, Liquidation Analysis, and as will be shown at the Confirmation Hearing, the Debtors have satisfied section 1129(a)(7).

529. In addition, the RCAHC argues that Class 9 Indirect Abuse Claimants "currently stand to recover nothing under the Plan," while a liquidation scenario "would provide [them] an opportunity for full recovery."[850] The RCAHC is incorrect. First, under the Plan, Indirect Abuse Claims are channeled to the Settlement Trust.[851] The Settlement Trust provides a mechanism for payment of any viable Indirect Abuse Claim so these claimants are receiving a recovery.[852] Second, as discussed above, there would be more funds available under the Settlement Trust than in a liquidation to satisfy Indirect Abuse Claims. Third, there would be fewer Indirect Abuse Claims under the Plan than in a liquidation because under the Plan the Local Councils, Participating Chartered Organizations and Contributing Chartered Organizations are all releasing Indirect Abuse Claims,[853] leaving more funds available to satisfy any remaining Indirect Abuse Claims held by the 343 Opt Out Chartered Organizations. Fourth, the RCAHC has failed to identify a single holder of an Indirect Abuse Claim that would recover more in a liquidation than under the Plan. Accordingly, as demonstrated through the Updated Whittman Report, and as will be shown at the Confirmation Hearing, the Debtors have satisfied section 1129(a)(7).

---

[850] RCAHC Obj. ¶ 189.

[851] Plan Art. III.B.11.

[852] *See* Plan Ex. A, TDP Article IV B.

[853] The Local Councils' Indirect Abuse Claims will be released as part of the Local Councils' Settlement Contributions. (Plan ¶181(d)). The Contributing Chartered Organizations' Indirect Abuse Claims would be waived, released and expunged as part of the Contributing Chartered Organization Settlement Contribution. (Plan, ¶185(c)). And the Participating Chartered Organizations' Settlement Contribution waive and release any Indirect Abuse Claims (Plan ¶ 203(b)).

530.     Even if it were appropriate to consider the value of released third-party claims in the best interest analysis here, the outcome of the analysis would not change.  As described above, under the Plan, an estimated $672 million will be distributed on account of Class 8 claims channeled to the Settlement Trust from the BSA Settlement Contribution and the Local Council Settlement Trust Contribution, whereas the value remaining for distribution to those claims in a hypothetical chapter 7 liquidation of the Debtors, Related Non-Debtor Entities, and the Local Councils is only $402.5 million[854], in each case prior to considering insurance.  This differential of $269.5 million further increases by $459 to $822 million of additional litigation and other costs that would be incurred to recover insurance proceeds absent the Plan. Thus, in order for holders of all third-party claims to be better off in a hypothetical liquidation scenario, the aggregate recoveries on claims released under the Plan would need to exceed $728.5 million ($269.5 million plus $459 million). This gap is far too wide to close.  Similarly, with respect to the Local Councils only, under the Plan an estimated $540 to $600 million will be distributed on account of Class 8 and Class 9 claims channeled to the Settlement Trust.  The value remaining for distribution to those claims in a hypothetical chapter 7 liquidation of the Local Councils is, in the best case scenario, $389 million.  Thus, in order for holders of all third-party claims to be better off in a hypothetical liquidation scenario, the aggregate recoveries on claims released against the Local Councils under the Plan would need to exceed recoveries under the Plan by $150 to $210 million.  The gap widens even further if one accounts for the $459 to $822 million additional litigation and other costs that would be incurred to recover insurance proceeds absent the Plan.

531.     Recoveries by creditors on account of any direct claims would likely be further

---

[854]  Updated Whittman Rep. at Chart 19 ($421.9 million), as adjusted for Supplemental Report of Brian Whittman dated March 2, 2022 (reduction of $19.4 million)

eroded or eliminated by the cost, delay, and uncertainty of direct litigation. Contrary to the simplified analysis above that considered all creditor claims in the aggregate, no one creditor holds all of the direct claims. In reality, there would be tens of thousands of creditors asserting claims against the non-debtor entities, and each creditor's hypothetical recovery would reduce the funds available to others, leading to complex, time-consuming and expensive litigation and massive delays in the courts. It would likely be many years before a single creditor recovers on any judgment.

532. Accordingly, even if the objectors' speculative claims could be accounted for in the best interests analysis, the Plan still complies with section 1129(a)(7) of the Bankruptcy Code. Notably, all Voting Classes voted to accept the Plan, suggesting that economically rational individuals with a stake in the matter understand that the creditors fare far better under the Plan than any liquidation scenario in which direct claims against the Related Non-Debtor Entities, Local Councils, and Settling Insurance Companies are individually pursued by tens of thousands of plaintiffs.

**H.      Section 1129(a)(8):  Acceptance by Impaired Classes.**

533. Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept a plan or not be impaired under the plan. As set forth above, the holders of Claims in Classes 1, 2, and 10 are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan.

534. Section 1126 of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-third in amount and more than one-half in number of the claims in their respective class that voted on the Plan. As reflected in the Final Voting Report, Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims),

Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims) with respect to Debtor BSA, Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims) have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.

535.    With respect to Class 5, Class 6, Class 7, Class 8, and Class 9 for Debtor Delaware BSA, such classes are vacant or have no votes submitted in such class and, accordingly, pursuant to Article III.C. of the Plan and Section V.D.16 of the Solicitation Procedures (Exhibit 1 to the Solicitation Procedures Order), are deemed eliminated from the Plan for purposes of voting to accept or reject the Plan or are deemed to have voted to accept the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) with respect to that Class.[855] Based on the preliminary extended voting results with respect to Class 8 and Class 9 at the timing of filing, the Debtors expect such classes to continue to be in acceptance of the Plan. As such, the Plan satisfies the requirements of section 1129(a)(8) of the Bankruptcy Code.

**I.      Section 1129(a)(9):   The Plan Provides for Payment in Full of Allowed Administrative and Priority Claims**

536.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments, unless the holder of a particular claim agrees to different treatment with respect to such claim. The treatment of Administrative Expense Claims under Article II.A. of the Plan, Priority Tax Claims under Article II.B. of the Plan, and Other Priority Claims and Other Secured Claims under Article III.B. of the Plan is consistent with the requirements of section

---

[855] *See Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Final Tabulation of Ballots Cast on the Second Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8345].

1129(a)(9), as these Claims will either be paid in full in cash on the Effective Date or will receive other treatment consistent with the provisions of section 1129(a)(9). Accordingly, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.     Section 1129(a)(10): Acceptance of the Plan by at Least One Impaired Class of Claims Have Accepted the Plan.**

537.     Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of a plan by at least one impaired class of claims, excluding acceptance by any insider. The Debtors have satisfied this requirement because at least one Impaired Class of Claims voted to accept the Plan at each Debtor entity.[856]

**K.     Section 1129(a)(11): The Plan Is Feasible.**

538.     Section 1129(a)(11) of the Bankruptcy Code requires the bankruptcy court to determine that a plan is feasible. This means that neither "liquidation" nor "the need for further financial reorganization" will occur after the plan is confirmed "unless such liquidation or reorganization is proposed in the plan."[857]     In determining whether a plan is feasible, Bankruptcy courts consider whether a plan is workable and has a reasonable likelihood of success.[858]     The Debtors must show that the plan is "more likely than not" feasible.[859]     This does not require a showing that the plan is guaranteed to succeed.[860]     Rather, the Debtors need only demonstrate a

---

[856]     *See* Final Voting Report.

[857]     11 U.S.C. § 1129(a)(11).

[858]     *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 167 (Bankr. D. Del. 2006); *In re NII Holdings*, 288 B.R. 356, 364 (Bankr. D. Del. 2002).

[859]     *See Briscoe Enters.*, 994 F.2d at 1164; *CoreStates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997);.

[860]     *See Internal Revenue Serv. v. Kaplan* (*In re Kaplan*), 104 F.3d 589, 597 (3d Cir. 1997); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *see also In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

reasonable assurance of success to meet this burden, which is a relatively low standard of proof.[861]

539.     Although the purpose of the feasibility test is to "protect against far-fetched visionary or speculative plans,"[862] courts have made clear that "[t]he mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds."[863]    Courts have identified the following nonexclusive factors as probative with respect to the feasibility of a plan:[864]

>    (a)  the adequacy of the capital structure;
>
>    (b)  the earning power of the business;
>
>    (c)  economic conditions;
>
>    (d)  the ability of management;
>
>    (e)  the probability of the continuation of the same management;
>
>    (f)  the provisions for adequate working capital; and
>
>    (g)  any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

540.     The Debtors more than satisfy their burden under section 1129(a)(11) of the Bankruptcy Code.  Contrary to the assertions of the RCAHC, the feasibility of the Plan is grounded

---

[861]  *See e.g., In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) ("The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility.") (internal quotation marks omitted); *In re Texaco, Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be a reasonable assurance of commercial viability.").

[862]  *In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013)

[863]  *Adelphia*, 341 B.R. at 421; *see WorldCom*, 2003 Bankr. LEXIS 1401, at *170 (making clear that "speculative prospects of failure cannot defeat feasibility").

[864]  Not all factors are necessarily applicable to non-profit entities such as the Debtors.  As one court noted, "many of these elements are applicable only to business corporations rather than non-profit religious corporations, such as the instant Debtor.  However, they all are illustrative of the type of considerations which a court must make in weighing the feasibility of any Plan." *In re Temple Zion*, 125 B.R. 910, 915 (Bankr. E.D. Pa. 1991) (finding plan feasible over numerous objections given that non-profit debtor's plan was reasonable); *see also, In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 173 (5th Cir 2011) (finding "[t]here is no requirement, however, that the court consider all six factors" in considering feasibility of nonprofit debtor's plan where "feasibility depends almost exclusively on the willingness of [the debtor's] donors to give.").

in a detailed, bottoms-up business plan, developed by management and thoroughly vetted and risk adjusted by the Debtor's expert Mr. Whittman.[865]   The Debtors, with the assistance of their advisors, prepared projections (the "Financial Projections") for 2021 through 2025 included as Exhibit E to the Disclosure Statement.[866]  The financial projections were updated in late 2021 (the "Updated Financial Projections") to account for (a) the Debtors' actual performance through the first 9 months of 2021, (b) expectations for the last quarter of 2021, (c) a review of the 2022 preliminary "bottoms-up" budget, and (c) the extrapolation of such projections through 2025.[867] Bankruptcy courts in the Third Circuit have consistently recognized that financial projections of four years (or less) are sufficient in determining whether a plan is feasible.[868]

541.   Both the Financial Projections and Updated Financial Projections show that the Reorganized Debtors will have sufficient liquidity to operate their non-profit operations and support their capital structure.  Like any business plan, the Updated Financial Projections are not without risk; however, they represent reasonable projections based on historical performance as adjusted for one-time events.  Following confirmation of the Plan, the Reorganized BSA will be able to meet its financial obligations under the Plan and retain sufficient liquidity and capital resources to continue its charitable mission without the need for further reorganization or liquidation anticipated in the future.

542.   The RCAHC objects to the Plan's feasibility under section 1129(a)(11) of the Bankruptcy Code on the grounds that the Debtors' projections are allegedly inconsistent with

---

[865]   Whittman Updated Expert Report, Ex. C.

[866]   *See* Disclosure Statement, Ex. E.

[867]   Whittman Ex. Report., 9.

[868]   *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 151 (Bankr. D.N.J. 2010) (finding plan feasible based on three year projections).

historical trends. First, the RCAHC asserts that the membership growth in the projections are asymmetric to historical trends, citing Cub Scouts' membership growth as an example.[869] The RCAHC is simply wrong. The RCAHC ignores that the BSA's membership was severely impacted by COVID-19 in 2020 and to a lesser degree in 2021 and is now starting to recover, with new member additions in the fall of 2021 up over 150% from 2020. Second, the RCACH argues incorrectly that the forecast that "Cub Scouts' membership . . . will grow between 2% and 4% from 2020 to 2025" is inconsistent with recent historical trends for Cub Scouts.[870] This argument ignores that overall youth membership is forecast to *decline*, not grow, over the course of the Updated Financial Projections. As Mr. Whittman explains, far from projecting substantial growth, the Debtors' membership projections assume a negative 3.5% Cumulative Annual Growth Rate ("CAGR") that continues unabated from 2020 through 2025.[871] The negative 3.5% CAGR is even greater than the historical negative 3.3% CAGR in BSA membership levels from 2010 to 2019.[872] These trends are reflected in Chart 11 of Mr. Whittman's Updated Expert Report, which appears below.

---

[869]  RCAHC Obj. ¶143.

[870]  RCAHC Obj. ¶143.

[871]  Updated Whittman Report, at 3, Chart 11 at 23.

[872]  *Id*. at 3.



(membership in thousands)

■ Youth  ■ Adult

Forecast Period

543. Further, the Updated Financial Projections are conservative in that they do not assume that the sharp loss of BSA membership attributable to the COVID-19 pandemic in 2020 will be recovered. Instead, the negative 3.5% CAGR is applied from end of year 2020 (the year most impacted by the COVID-19 pandemic) forward. The Updated Financial Projections project a loss in members even though the Debtors added 210,000 new members in the fall of 2021, a 150% increase over the 82,000 new members recruited for the same period in 2020.[873] The 210,000 new members recruited in 2021 number approximately half of the 405,000 new members recruited in 2019, demonstrating that there is room to improve on recruiting once the headwinds from COVID restrictions abate.[874]

544. The Updated Financial Projections project that BSA membership (adult and youth

---

[873] *Id.*, Chart 12 at 24.

[874] *Id.*

combined) is projected to decrease from 1,692,000 at year-end 2020 to 1,415,000 in 2025 over the length of the forecast period.[875] While the RCAHC relies on Ms. Kibler's contention that the negative CAGR should be applied to 2021 membership levels throughout the forecast period,[876] such an approach would artificially decrease projected membership levels. As explained in Mr. Whittman's report, youth membership in 2021 is artificially depressed due to, among other things, continued COVID-19-related restrictions on the BSA's ability to recruit and the corresponding impact of such restrictions on the Scouting experience.[877] Accordingly, it is inappropriate to use 2021 as the foundation for the future membership forecast.

545.    The RCAHC further questions the Debtors' optimism that COVID-19 will become manageable as lacking "objective support" and, thus, argues that the Debtors' forecasted membership levels are unreasonable.[878] Again, the RCAHC is wrong. As noted above, the projections assume a continued decline in membership, rather than growth, from the end of 2020 to the end of 2025 at a negative 3.5% CAGR. The RCAHC is also wrong to assume that COVID-19 will represent a permanent barrier to membership growth and the overall success of the BSA – from air travel and restaurants to in-person schooling to demand for labor, the United States is clearly adjusting to living with COVID-19 and will the Boy Scouts.[879] Indeed, given the number of states and communities that have recently relaxed COVID-19-related restrictions, the RCAHC's unfounded claim that "it is reasonable to assume that 2021 represented a new normalized

---

[875]  Updated Whittman Report, Chart 11 at 23.

[876]  RCAHC Obj. ¶¶ 143-44 (citing Kibler Expert Report at 13).

[877]  Whittman Report at 3.

[878]  RCAHC Obj. ¶144.

[879]  Whittman Feasibility Rebuttal at 11.

environment" is baseless.[880]  Rather, given recent developments, it is reasonable to expect that the BSA will return to historical programming and recruiting patterns during the forecast period.[881]

546.    While the Debtors did experience a 17% decline in Cub Scouts membership in 2021 (as opposed to their projected 6% decrease), this was largely due to the lingering effects of the COVID-19 pandemic which prevented the BSA from engaging in traditional recruiting efforts, such as recruiting in schools as well as the fact that a significant number of Cubs Scouts aged-up and converted to Scouts BSA.[882]  Given the sharp rebound in recruiting in 2021, notwithstanding the strong headwinds of COVID-19, there is every reason to believe that the BSA's membership will begin to track more historical trend lines as COVID-19 subsides, youth become vaccinated,[883] COVID-19-related restrictions are relaxed, and the country continues to adapt to COVID-19. Moreover, as Mr. Whittman explains, there is even more reason to be optimistic with respect to the Debtors' membership forecasts.  In the coming years, following emergence from bankruptcy, the headwinds faced by Debtors due to the unresolved issues of historical abuse will be resolved, the membership standards issues which dominated much of the 2010s will be behind the BSA, and the BSA expects to target and grow its female membership.[884]

---

[880]  RCAHC Obj. ¶143.

[881]  Dena Bunis and Jenny Rough, *List of Coronavirus-Related Restrictions in Every State: Most states have dropped COVID-related restrictions*, Feb. 23, 2022, AARP, available at https://aarp.org/politics-society/government-elections/info-2020/coronavirus-state-restrictions.html (accessed Mar. 2, 2022) (discussing state-by-state COVID-19-related restrictions, and reflecting that 40 out of the 50 states are now fully reopened in that they do not have to follow capacity limits or curfews).

[882]  Whittman Feasability Expert Report at 10.

[883]  COVID-16 vaccines were not available to children age 5 to 11, including the prime Cub Scout recruiting demographic, until October 29, 2021, well after the pinnacle of the recruiting season. *FDA Authorizes Pfizer-BioNTech COVID-19 Vaccine for Emergency Use in Children 5 through 11 Years of Age*, Oct. 29, 2021, FDA, available at https://www.fda.gov/news-events/press-announcements/fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use-children-5-through-11-years-age (accessed Mar. 2, 2022).

[884]  Updated Whittman Report at 22.

547. The RCAHC next complains that the Debtors' projections do not contemplate any significant Chartered Organization disaffiliation with Scouting and argue that it is "unreasonable to assume that the Roman Catholic Entities will continue to support Scouting programs and more likely that they will cease serving as Chartered Organizations, resulting in the potential loss of many of the approximately 111,000 members in Catholic-chartered units, almost 12% of Scouting."[885] First, to date, approximately 320 Chartered Organizations out of the more than 100,000 current and former Chartered Organizations (*i.e*, less than 1% of Chartered Organizations) have elected to become an Opt-Out Chartered Organization under the Plan. This means that the remaining Chartered Organizations are Participating or Contributing Chartered Organizations under the Plan who will receive a release. Second, the RCAHC does not represent all Catholic Chartered Organizations. Rather, the Catholic Mutual Relief Society of America, an insurance company, leads the RCAHC. Only the following dioceses and archdioceses are part of the RCAHC: Roman Catholic Diocese of Souix City, Roman Catholic Diocese of Joliet, Roman Catholic Diocese of Omaha, Roman Catholic Diocese of Winona-Rochester, Roman Catholic Archdiocese of Washington, D.C., Roman Catholic Archdiocese of New York, Roman Catholic Archdiocese of Chicago, Roman Catholic Diocese of Syracuse, Roman Catholic Diocese of Rochester, New York, and Roman Catholic Diocese of Buffalo.[886] Indeed, the RCAHC's expert, Ms. Kibler, had no idea how many scouts were affiliated with the members of the RCAHC.[887]

548. Further, there is no indication that a Catholic diocese or other juridical body would cease sponsoring a Scouting unit based on the treatment a diocese will receive under the Plan.

---

[885] RCAHC Obj. at ¶¶148-149.

[886] *See* Third Amended Verified Statement of the Roman Catholic Ad Hoc Committee, D.I. 8740, Exhibit A.

[887] Kibler Dep. Tr. 106:11-23.

Indeed, such action would likely upset parishioners and disrupt the Catholic Church's own efforts to retain members who enjoy participating in scouting. Although the RCAHC opines that there will be a mass disaffiliation of RCAHC Chartered Organizations that has not transpired.

549.     Regardless, the BSA Plan is feasible even absent the continued support of the Roman Catholic Entities.  First, Mr. Whittman prepared sensitivities in which total membership (youth and adults) falls 174,000 below the projected levels.[888]   This sensitivity analysis demonstrates that the Debtors would still be able to meet their financial obligations through 2025 even in the event of such a dramatic departure.  Second, the UMAHC entered into a settlement agreement with the Debtors whereby they agreed to recommend to the United Methodist Entities, which are affiliated with approximately 19% of the BSA's members, to continue their scouting relationship and chartering agreements with the BSA and to work to grow Scouting through 2036.[889]  This agreement with the UMAHC substantially reduces the risk that there will be a significant loss of membership due to the disaffiliation of Chartered Organizations.

550.     Even if certain Chartered Organizations were to disaffiliate from scouting, that is unlikely to have a significant impact on membership, and such downside scenario is accounted for in Mr. Whittman's sensitivity analysis.  In this respect, the remaining religious Chartered Organizations do not require their youth parishioners to participate in Scouting, which is unlike the unique relationship that TCJC had with Scouting.[890]  As such, the disaffiliation of a Chartered Organization may not necessarily impact the decision of a particular scout to remain involved with Scouting.  Further, the BSA is prepared for the possibility that certain Chartered Organizations

---

[888]   Updated Whittman Report, Chart 13 at 25.

[889]   United Methodist Settlement Agreement, Plan Ex. J-2.

[890]   Updated Whittman Report at 30.

disaffiliate from Scouting. For example, the BSA could seek to enter into a facilities use agreement with a Chartered Organization to obtain space to conduct meetings, which is one of the primary functions served by a Chartered Organization.[891] The BSA and Local Councils could also seek to find alternative sponsors or a group of parents or Local Council could sponsor the unit.[892] As such, it is reasonable to believe that Mr. Whittman's sensitivity analysis captures any likely downside scenario with membership.

551. The RCAHC complains that the Debtors' projections with respect to supply revenue, High Adventure Base ("HAB") revenue, unit charter fee revenue, contributions and bequests, other revenues and capital expenditures are "unrealistic under the circumstances" is baseless.[893]

552. The RCAHC claims that the Debtors "do not substantiate" approximately 20% increases from current levels in supply revenue per member is ironic given that they have no basis to dispute this projected increase.[894] They simply ignore the fact that even though revenue was depressed in the first quarter of 2021 due to the impact of COVID-19 and reduced foot traffic in scout shops, supply revenue increased from $46 per member in 2020 to $77 per member in 2021, even though the BSA had lower than expected new member recruitment as will be demonstrated at the confirmation hearing. As the Updated Financial Projections assume higher levels of new members, it is reasonable to expect the revenue per member to increase given that new members typically buy more supplies.[895]

---

[891] Updated Whittman Report at 31.

[892] Whittman Feasibility Rebuttal at 8.

[893] RCAHC Obj. ¶ 145.

[894] RCAHC Obj. ¶145.

[895] Whittman Feasibility Rebuttal, p. 15.

553.     Further, the RCAHC wrongly contends that the Debtors "provided no support" for the estimated HAB revenue.[896]   First, the Updated Financial Projections show a very modest increase in HAB attendance from 2022 through 2025, with each year forecast to have lower attendance than achieved in 2021.  Accordingly, the Updated Financial Projections show that 2022 and 2023 HAB attendance figures as a percentage of Scouts BSA are in line with 2021 actual results of 13%.[897]   Attendance percentages increase only slightly in 2024 and 2025 to 15%. Second, with respect to the Summit, the RCAHC ignores that the Summit is focused on growing revenue from non-scouting activities and that the BSA is in discussion with multiple parties, including schools, religious organizations, sports-related establishments, and individuals to increase revenue from such activities.  Lastly, the Updated Financial Projections reflect that HABs have successfully implemented price increases each year at Philmont.[898]   As prices are set approximately 20 months in advance of the camping season for Philmont and Northern Tier, registration for 2022 is largely complete and 2023 registration is largely complete for Philmont and those price increases have been accepted by the BSA's membership.[899]   Accordingly, the RCAHC's complaints regarding the Debtors' estimated HAB revenue are unfounded.

554.     The RCAHC's claim that the Debtors' anticipated increase in Unit Charter Fees is "significantly more aggressive[] than historical and even recent increases" is baseless.[900]   This $75 fee increase is "per unit," and when divided amongst the members of each unit, averaging

---

[896]   RCAHC Obj. ¶145.

[897]   Updated Financial Projections, High Adventure Bases 2021-2025, BSA-PLAN_01642920.

[898]   Updated Financial Projections, Philmont 2021-2025, BSA-PLAN_01642920.

[899]   Whittman Feasibility Rebuttal at 16.

[900]   RCAHC Obj. ¶145.

approximately 22 members per unit, equates to a *de minimis* increase of $3 per member.[901]  The

RCAHC provides no basis to believe that the BSA will not be able to implement such a *de minimis*

price increase.

555.    The RCAHC's claim that the Debtors' projected contributions and bequests of $12

million per annum in 2025 is unreasonable because "contributions and bequests dropped to $7

million and $5 million" in 2020 and 2021, respectively, ignores the BSA's historical track record

of fund raising.[902]  First, as Mr. Whittman explained, it is reasonable and expected that donors will

contribute less during bankruptcy given the uncertainty of where and how contributions will be

utilized.[903]  Second, the BSA's average historical annual contributions of $8 million from 2015-

2019 excludes a substantial, non-recurring bequest.[904]  Such large, one-time contributions are not

uncommon.  Further, the BSA has a proven track record of raising substantial donations.  The BSA

received cash donations of over $200 million from 2010 to 2019 associated with the development

of the Summit Bechtel Reserve.[905]  Additionally, as the Updated Financial Projections show, the

BSA is projecting an increase of $4 million more in annual expenses to implement fundraising

programs to target new and existing donors.[906]  Accordingly, the BSA is positioned to achieve

increased donations upon emergence from bankruptcy in line with the Updated Financial

Projections.

556.    The RCAHC contests the Debtors' projected increases in "other revenues" for

---

[901]   Whittman Feasibility Rebuttal, at 17.

[902]   RCAHC Obj. ¶ 150 (emphasis omitted).

[903]   January 20, 2022 Whittman Deposition Tr., at 88:14-89:11.

[904]   December 13, 2021 Whittman Deposition Tr., at 209:23-211:10.

[905]   Whittman Feasibility Rebuttal, at 18.

[906]   *Id.*

2022, their ability to achieve $2.5 million per year in "unspecified" cost savings, and the reduction of capital expenditures to $4.5 million "when their historical average is $13.3 million."[907] As shown below, these complaints are unfounded.

    (a) The projections for increased "other revenues" in 2022 are primarily due to two components. First, the BSA has recently implemented increases to Local Council billings in 2022 with a mix of IT and national service fees that are estimated to generate $2 million in additional revenues annually. Second, magazine operations, shown as net of expenses, are anticipated to increase in 2022 due to, among other things, a $3 price increase.[908] The BSA's projections for "other revenues" are thus reasonable.

    (b) The RCAHC ignores the fact that the BSA has a proven track record of achieving cost reductions, as the BSA has cut over $47 million in corporate and general and administrative costs since 2019. The BSA is presently expending significant resources to support the bankruptcy process, and these expenses can be eliminated post emergence. Further, the actual expenses in 2021 were $9 million favorable to the Updated Financial Projections and lower than forecast for 2022 through 2025, driven by continued focus on cost reductions in the fourth quarter. Accordingly, the BSA's forecast that it can achieve $2.5 million in cost savings by 2023 is reasonable and should be credited.[909]

    (c) The RCAHC fails to recognize that from 2013 to 2019, the BSA's capital expenditures were artificially inflated with extraordinary capital expenses relating to large construction projects. These large projects have since been completed, and the BSA's projected capital expenditures are in line with 2020 and 2021 actual spending.[910] Additionally, the BSA has a much smaller footprint now than it had from 2013 to 2019 as the Scouting U building has already been sold, there are fewer scout shops in operation, and the BSA plans to sell its national headquarters.[911] Accordingly, the BSA's projected capital expenditures appropriately reflect its current, smaller footprint and are reasonable.

    557. Additionally, the RCAHC asserts that "as demonstrated in the Kibler Report . . .

---

[907] RCAHC Obj. ¶150 (emphases omitted).

[908] Updated Financial Projections, Other Assumptions, BSA-PLAN_01642920; Whittman Feasibility Rebuttal, at 18.

[909] *See* Updated Whittman Expert Report, Section IV.II.B Key Assumptions and Drivers, Chart 5 Reconciliation from the BSA's 2022 Budget to Updated Financial Projections

[910] Whittman Feasibility Rebuttal, at 20.

[911] Whittman Feasibility Rebuttal, at 20.

and under the various membership and assumption scenarios discussed therein, the Debtors likely may violate the liquidity covenant incorporated in their loan agreements as early as 2022, violate their debt service coverage covenant as early as 2023, and have no liquidity as early as 2024."[912] These assumptions are based on unrealistic scenarios posited by their expert, Ms. Kibler. In her report, Ms. Kibler focused on the possibility that the United Methodist Entities — the largest group of Chartered Organizations — would withdraw from scouting, and that this would result in a significant decrease in the BSA's membership. After her report was issued, however, the UMAHC entered into a settlement with the Debtors pursuant to which the United Methodist Entities agreed to support the BSA through at least 2036. Remarkably, Ms. Kibler testified that even though the Methodists have now agreed to support scouting through 2036, this settlement had "no" impact on the reasonableness of her assumptions that the BSA would suffer dramatic losses of membership due to the disaffilation of Chartered Organizations.[913] As the decision of the largest and most critical group of Chartered Organizations to support rather than disaffiliate from Scouting had "no" impact on Ms. Kibler's analysis, it is clear that her opinion is not grounded in reason. Mr. Whittman's downside sensitivities are more realistic and appropriate under the circumstances, and they indicate that the BSA has an ample covenant cushion and time to course correct if membership falls below projected levels. Accordingly, the RCAHC's feasibility arguments are without merit.

### L. Section 1129(a)(12): The Plan Provides for Payment of Statutory Fees

558. Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees to the U.S. Trustee be paid as of the effective date. Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [28 U.S.C. § 1930]" are afforded priority

---

[912] RCAHC Obj. ¶ 150 (emphases omitted).

[913] Kibler Dep. at 200: 6-12.

as administrative expenses.[914]   In accordance with these sections, Article XII.O. of the Plan provides that all fees payable under section 1930 of title 28 of the United States Code and statutory interest thereon shall be paid.

**M.      Section 1129(a)(13):  Continuation of Retiree Benefits.**

559.     Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree benefits, as such term is defined in section 1114(a) of the Bankruptcy Code, at levels established under section 1114 of the Bankruptcy Code.  The Plan acknowledges the Debtors' compliance with section 1129(a)(13) for any retiree benefits, providing for Reorganized BSA's continued performance of obligations under all Compensation and Benefits Programs entered into before the Petition Date.[915]  For the avoidance of doubt, the Pension Plan shall be treated as set forth in Article V.Z. of the Plan, and shall be assumed and continued by Reorganized BSA on the Effective Date. Accordingly, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**N.      Sections 1129(a)(14) and 1129(a)(15) Do Not Apply to Corporate Debtors.**

560.     Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation and, accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable.

561.     Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).  The Debtors are not individuals and, accordingly, section 1129(a)(15) is inapplicable.

**O.      Section 1129(a)(16):  Transfers to the Settlement Trust Have Been Made in**

---

[914]   11 U.S.C. § 507(a)(1).

[915]  *See* Plan Art. VI.G.

**Accordance with Non-Bankruptcy Law.**

562.    Section 1129(a)(16) of the Bankruptcy Code provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with applicable provisions of non-bankruptcy law.[916] Section 1129(a)(16) "keeps in place the state law restrictions on nonprofit entities, and buttresses this rule by giving standing to state attorneys general to raise this issue."[917]  A plan complies with section 1129(a)(16) if there are no "applicable provisions of nonbankruptcy law" specifically governing the transfer of property by a nonprofit.[918]

563.    As explained above, the BSA intends to sell its insurance rights under certain Insurance Policies to the Settling Insurance Companies and transfer its cash and certain other unrestricted assets to the Settlement Trust.[919]  No provision of state law in Texas (where the Debtors are headquartered), or the District of Columbia, where the BSA is incorporated, applies

---

[916]   *See In re Claar Cellars LLC*, 623 B.R. 578, 598 (Bankr. E.D. Wash. 2021) ("Bankruptcy Code section 1129(a)(16) requires that any transfer of property under a plan must be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.").

[917]   7 COLLIER ON BANKRUPTCY ¶ 1129.02 (16th 2021); *see also In re Claar Cellars LLC*, 623 B.R. at 598 n.39 (explaining the legislative history associated with section 1129(a)(16)'s addition to the Bankruptcy Code and despite the apparent focus to regulate transfers of property by nonprofit entities, "Congress declined to limit the provision in such a way" given that "[s]ection 1129(a)(16) contains no language that could be read to impose a nonprofit limitation").

[918]   *In re Roman Catholic Bishop of Stockton*, No. 14-20371, 2017 WL 118013, *7 (Bankr. E.D. Cal. Jan. 10, 2017) (confirming plan of nonprofit debtor where there was no showing that any transfer of property under the plan violated state law applicable to transfers of property by nonprofit organizations); *see also In re Roman Catholic Archbishop of Portland in Or.*, No. 04-37154, 2007 Bankr. LEXIS 1180, at *26 (Bankr. D. Or. Apr. 13, 2007) (same).

[919]   *See* Plan Arts. I.A.44 (defining BSA Settlement Trust Contribution); *see also* Plan Art. IX.A.3.d (providing that as a condition precedent to Confirmation of the Plan, the Bankruptcy Court shall make certain findings and determinations, such as "the Settlement Trust will be funded with the Settlement Trust Assets").

to restrict the Debtors' ability to transfer these assets as proposed under the Plan.[920]  No attorney general has objected to the Plan, and no objector has identified or cited any provision of state law governing the transfer of property by a nonprofit that the Plan could violate.  All transfers under the Plan comply with any applicable provisions of non-bankruptcy law that govern the transfer of property by a nonprofit entity, thereby satisfying section 1129(a)(16) of the Bankruptcy Code.

### P.    Section 1129(b): The "Cramdown" Requirements Are Inapplicable.

564.    As set forth above, each Voting Class has voted to or is deemed to have accepted the Plan, and there are no Impaired Classes that are deemed to reject the Plan.  Therefore, section 1129(b) of the Bankruptcy Code is inapplicable to the Voting Classes in the Chapter 11 Cases and the Plan.

### Q.    Section 1129(c): The Plan Is the Only Plan.

565.    The Plan is the only plan that has been filed in the Chapter 11 Cases and meets the requirements of sections 1129(a) and (b) of the Bankruptcy Code, thereby satisfying the requirements of section 1129(c).

### R.    Section 1129(d): Principal Purpose of the Plan.

566.    The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act, and no governmental unit has objected to confirmation of the Plan on any such grounds.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### S.    Section 1129(e): Small Business Case Plans—Inapplicable Provision.

---

[920] *See generally* TEX. BUS. ORGS. CODE ANN. §§ 22.001–22.516; D.C. CODE ANN. §§ 29-401.01–29-414.04; *see also In re Roman Catholic Archbishop of Portland*, 2007 Bankr. LEXIS 1180, at *26 ("There are no provisions in ORS chapter 65, which governs non-profit corporations, that would prevent the transfers of property that are included in this plan. Therefore, the plan complies with this requirement.").

567. The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases

## VII. The Modifications to the Plan Do Not Require Resolicitation.

568. The RCAHC and the Guam Committee objected to the December 18 plan claiming that resolicitation or supplemental disclosure of the December 18 plan is warranted under the Bankruptcy Code.[921] The RCAHC and Guam Committee's objections should be overruled for four reasons: (1) they lack standing to raise a re-solicitation objection; (2) their objections became moot upon the filing of the Plan and approval of the Plan Modification Motion; (3) the plan modifications are immaterial and do not warrant re-solicitation; and (4) the Debtors nonetheless provided sufficient notice of all plan modifications throughout these Chapter 11 Cases.

### A. The RCAHC and Guam Committee Lack Standing to Object to the Plan Modifications.

569. The RCAHC and Guam Committee lack standing to object to the plan modifications. Because plan modifications are immaterial unless they materially "affect a creditor or interest holder *who accepted the plan*,"[922] a creditor that rejects a plan "lacks standing to object to the plan's modification."[923] The members of RCAHC are among the most active participants

---

[921] *See* RCAHC Obj. ¶ 110-113; Guam Committee Obj., at 23-25. Aside from the RCAHC and Guam Committee objections discussed above, no party has argued that the Plan requires resolicitation. That said, the Plan modifications do not have a material or adverse economic impact on stakeholder recoveries. Indeed, Holders of Abuse Claims have seen an appreciable increase in their potential recoveries from the Settlement Trust. The Debtors also provided comprehensive supplemental disclosures to Holders of Abuse Claims as detailed in the Plan Modification Motion. Therefore, the modifications to the Plan, including those incorporating the post-solicitation Settlements, comply with section 1127 of the Bankruptcy Code and all other requirements of the Bankruptcy Code and Bankruptcy Rules and, accordingly, do not require resolicitation of the Plan.

[922] *American Solar*, 90 B.R. at 824 (emphasis added).

[923] *In re Nat'l Truck Funding LLC*, 588 B.R. 175, 179 (Bankr. S.D. Miss. 2018).

in these Chapter 11 Cases and they have not accepted the Plan.[924]  Indeed, the RCAHC filed two objections to confirmation of the Plan totaling over 100 pages, noticed 15 depositions and requested and received countless pages of discovery.  As such, it strains credulity for the RCAHC to assert that any further disclosure would have affected its members' vote.  Although the Guam Committee does not vote on the Plan, the Guam Committee represents the interests of Guam survivors, most of whom are represented by counsel in these Chapter 11 Cases and voted to reject the Plan.[925]  Therefore, neither party has standing to raise this objection.  This fact, standing alone, requires the Court to overrule the objections.[926]

### B. The RCAHC and Guam Committee's Objections Are Moot.

570.    Were the Court to find that the RCAHC and Guam Committee have standing to object (which they do not), their objections are now moot because the Debtors' provided the RCAHC, the Guam Committee and thousands of Chartered Organizations with extensive supplemental disclosures regarding the Plan, a supplemental objection deadline and an extended voting deadline.  On February 15, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order Approving Supplemental Notices Regarding Plan Modifications*[927] (the "Plan Modification

---

[924]    The RCAHC has disclosed that its members are the Catholic Mutual Relief Society of America and twelve, independent, regional Roman Catholic Archdiocese.  See Second Amended Verified Statement of the Roman Catholic Ad Hoc Committee Pursuant to Bankruptcy Rule 2019 [D.I. 7805].  Given the RCAHC's objection to the Plan, the Debtors presume that its members have not accepted the Plan, but votes are still being tabulated because the Revised Final Voting Report is due March 10, 2022.  However, if any member of the RCAHC has accepted the Plan, that would be a significant fact for the Court to consider in evaluating the positions taken by the RCAHC and, accordingly, counsel to the RCAHC has an obligation to disclose any acceptance promptly.

[925]    Guam Committee Obj. at 1 [D.I. 9023].  Lujan & Wolff LLP is a "Participating Party" in these confirmation proceedings, received countless pages of discovery, and filed a 43-page objection and 14-page supplemental objection to the Plan. As with the RCAHC, there is simply no level of additional disclosure that could have been provided to an active, well-informed and sophisticated participant in these Chapter 11 Cases like Lujan & Wolff LLP.  *See* Lujan Claimants Obj. and Suppl. Obj. [D.I. 8708, 9031].

[926]    *See In re Sweetwater*, 57 B.R. 354, 358 (D. Utah 1985) (quoting *Fondiller v. Robertson* (*In re Fondiller*), 707 F.2d 441, 442–43 (9th Cir.1983).

[927]    D.I. 8823.

Motion"). Through the Plan Modification Motion, the Debtors requested approval of a notice to Chartered Organizations and holders of Class 8 Direct Abuse Claims that disclosed the plan modifications in the Plan pursuant to section 1125. Critically, the Debtors developed the Chartered Organization and Class 8 supplemental disclosures with the input of numerous parties in interest, including the RCAHC. The end result was a comprehensive disclosure tailored to Chartered Organizations and to holders of Class 8 Direct Abuse Claims detailing the Plan.

571. In particular, the Chartered Orgnaization notice (a) described the requirement for Participating Chartered Organizations to receive broader protection under the Channeling Injunction; (b) confirmed that the Channeling Injunction for Opt-Out Chartered Organizations applies to Abuse Claims covered by Settling Insurance Companies under insurance policies issued to Chartered Organizations; (c) noted that Chartered Organizations will now be required to make a separate monetary contribution in order to become a Contributing Chartered Organization; and (d) reiterated that the Plan still provides a framework to resolve certain historical Scouting-related Abuse Claims against Chartered Organizations.[928]    Moreover, the notice outlined in detail the three options for Chartered Organizations under the Plan, including the revised opt-out provisions in which Chartered Organizations can opt-out and forfeit protections, including certain releases and injunctions. With respect to holders of Class 8 Direct Abuse Claims, the supplemental disclosure detailed various improvements and clarifications to the Plan resulting from the modifications to the Plan as a result of the TCC/Abuse Survivor Settlement. Among other things, the Debtors provided disclosure regarding (a) clarifications to the definition of "Abuse Claim" and the addition of "Mixed Claim" under the Plan, (b) the strengthening and improvements to BSA's

---

[928]  *See* Chartered Organization Notice [D.I. 8904].

Youth Protection procedures, (c) an overview of the terms of the PSZJ Settlement, (d) detail regarding the modification to Class 10 under the Plan (which the Debtors view as immaterial), (e) the revision to the TDP to provide holders of Direct Abuse Claims with the option to participate in an independent review procedure, and (f) the modification to the scope of the releases for certain Chartered Organizations.[929]

572.    In addition, the notices served on all holders of Class 8 Direct Abuse Claims and Chartered Organizations identified the supplemental objection deadline in connection with the Plan. Finally, the Debtors provided a Court-approved extended voting deadline for Chartered Organizations holding Class 9 Indirect Abuse Claims and holders of Class 8 Direct Abuse Claims to submit Ballots modifying their votes on the Plan, and disclosed procedures for submitting revised votes with respect to the Plan.[930] Despite the Debtors' belief that supplemental disclosure to Chartered Organizations and holders of Class 8 Direct Abuse Claims was *not* required, the Debtors developed a comprehensive disclosure regarding the Plan that allowed these parties to (a) understand the Plan modifications, (b) choose their options or opt out (with respect to Chartered Organizations), (c) submit a Ballot and change their vote on the Plan, and (d) assert any objections to those Plan modifications.[931]

573.    After the hearing on the Plan Modification Motion—and over the objection of the RCAHC—the Court entered the order approving the notice to Chartered Organizations[932] (the

---

[929] D.I. 8905.
[930]    Initially, the Debtors proposed a supplemental voting deadline of March 4, 2022. At the February 18 hearing, the Court further extended the limited extend voting deadline to March 7, 2022, giving Chartered Organizations even more time to review the plan modifications and change their vote.
[931]    *See* id.
[932]    *Id.*; D.I. 8894.

"Plan Modification Order").[933] Through the Plan Modification Order the Court found that the notice for Chartered Organizations was "approved as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code with respect to the modified plan terms incorporated into the Modified Plan."[934] The notice was served on all Chartered Organizations on February 18, 2022, giving Chartered Organizations approximately two weeks to review the Plan modifications and change their vote if necessary.

574.    Not only did the Plan Modification Motion and Plan Modification Order render the RCAHC's and Guam Committee's objections moot, it provided sufficient information for the RCAHC, the Guam Committee, Chartered Organizations to understand the plan modifications, object to the Plan, and change their votes, as applicable.  Accordingly, the Debtors submit that the objections of the RCAHC and Guam Committee are moot and should be overruled.

C.    **The Plan Modifications are Neither Material nor Adverse and, Therefore, Do Not Require Resolicitation.**

575.    The Bankruptcy Code permits modifications of a plan "at any time" before confirmation.[935]  It further provides that all stakeholders who previously accepted a plan will be deemed to have accepted the modified plan.[936]  Bankruptcy Rule 3019 states that post-solicitation plan modifications do not require resolicitation if the proposed modifications do not adversely

---

[933]    Notably, the Debtors submitted a proposed form of order in connection with the Plan Modification Motion that incorporated comments and suggestions from the RCAHC.

[934]    *See* Plan Modification Order, ¶ 3.

[935]    11 U.S.C. § 1127.

[936]    11 U.S.C. § 1127(a); *In re Camp Arrowhead, Ltd.,* 451 B.R. 678, 701–2 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent* . . . [w]ithout an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing.") (citing *Pac. Lumber,* 584 F.3d at 253; *In re Pilgrim's Pride Corp.,* No. 08-45664-DML-11, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010)).

change the treatment of parties who have previously voted for the plan."[937]    In interpreting

Bankruptcy Rule 3019, courts have held that only "material" or "adverse" modifications require

resolicitation.[938]    Plan modifications are immaterial unless they "so affect a creditor or interest

holder who accepted the plan that such entity, if it knew of the modification, would be likely to

reconsider its acceptance."[939]    Plan modifications that maintain or improve the recovery for

affected creditors are not adverse or material and do not require resolicitation.[940]    Furthermore,

mere minimal reductions in recovery for affected creditors do not warrant resolicitation.[941] Despite

the RCAHC and Guam Committee's objections claiming otherwise, the Debtors' Plan

---

[937] Fed. R. Bankr. P. 3019.  As stated above, neither the RCACH nor the Guam Committee have standing to raise this objection given their opposition to the Plan.

[938] *See In re Aleris International, Inc.*, No. 09-10478, 2010 WL 3492664, at *32 (Bankr. D. Del. 2010) (explaining that "[f]urther disclosure and resolicitation of votes on a modified plan is only required, however, when the modification materially and adversely affects parties who previously voted for the plan."); *In re Federal–Mogul Global Inc.*, No. 01-10578, 2007 WL 4180545, *39 (Bankr. D. Del. 2007) (additional disclosure under section 1125 is not required where plan "[m]odifications do not materially and adversely affect or change the treatment of any [c]laim against or [e]quity [i]nterest in any Debtor"); *In re USN Commc'ns, Inc.*, 280 B.R 573, 596 (Bankr. D. Del. 2002) (approving post-acceptance, pre-confirmation modification without further disclosure where the modification "did not 'materially or adversely affect or change'" treatment under the plan); *Beal Bank, S.S.B. v. Jack's Marine, Inc., (In re Beal Bank, S.S.B.)*, 201 B.R. 376, 380 n. 4 (E.D. Pa. 1996) (further disclosure and solicitation not required under section 1127(b) and (c) where modifications to the plan were immaterial); *In re Century Glove, Inc.*, No. 90-400, 1993 WL 239489, at *12 (D. Del. Feb. 10, 1993) (upholding bankruptcy court's finding that section 1127 did not require further disclosure and resolicitation of votes on plan modification that altered the treatment to only one creditor when "the modification at issue did not materially and adversely impact any creditors who previously voted for the Plan"); *American Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988).

[939] *American Solar*, 90 B.R. at 824.

[940] *See In re New Power Co.*, 438 F.3d 1113, 1117–18 (11th Cir. 2006) (explaining that a party's "vote for or against a plan" may be applied "to a modified Plan unless the modification materially and adversely changes" the party's treatment); *In re Mangia Pizza Inv., LP*, 480 B.R. 669, 689 (Bankr. W.D. Tex. 2012) ("[A]nyone who voted to accept the previous plan will be deemed to have accepted the modified plan if the modified plan 'does not adversely change the treatment of [that creditor's] claim.'" (citing *In re Dow Corning Corp.*, 237 B.R. 374, 378 (E.D. Mich. 1999)); *Am. Solar King*, 90 B.R. at 826 ("If a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.").

[941] *In re Sentinel Mgmt. Grp.*, 398 B.R. 281, 302-03 (Bankr. N.D. Ill. 2008) (determining resolicitation was not required where the modification resulted in "a minuscule dilution of the amount" that, "while adverse, [was] not material, but [was] de minimus [sic]").  The Debtors also note that several courts applying this test have also specifically held that a party objecting to a plan's modification must be "aggrieved" under the aggrieved person test, which requires that "an appellant must be 'directly and adversely affected pecuniarily by an order of the bankruptcy court.'"

modifications do not adversely affect the treatment of Chartered Organizations or holders of Direct Abuse Claims, are not material, and do not require resolicitation under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

576.     Chartered Organizations do not receive adverse treatment under the Plan with respect to their claims. Class 9 treatmetn remains unchanged. Moreover, the RCAHC and Guam Committee fail to recognize that the plan modifications that had to do with releases afforded Chartered Organizations under the Plan were necessary to implement the terms of several settlements that either maintain or improve the treatment of Chartered Organizations' claims. In fact, Chartered Organizations receive similar treatment under the Plan as they did under the September 30 Plan. Under the Plan, Chartered Organizations (except for TCJC and the United Methodist Entities, which are Contributing Chartered Organizations) will be treated as either Opt-Out Chartered Organizations or Participating Chartered Organizations (unless they opt out of such treatment and become an Opt-Out Chartered Organization). To become a Contributing Chartered Organization and receive broader protection under the Channeling Injunction, they are required to make a separate monetary contribution, among other things. The Plan provides protections for Chartered Organizations as Limited Protected Parties, similar to the treatment under the September 30 Plan, but also provides the added benefit of an injunction following the Effective Date that provides time for Chartered Organizations to become Contributing Chartered Organizations if they wish. In short, the plan modifications changed *the process* for Chartered Organizations to benefit from certain injunctions and releases under the Plan. However, the plan modifications did not change the *treatment* of Chartered Organizations' claims.[942] Because the *treatment* of those claims

---

[942] *In re Mesa Air Group, Inc.*, 2011 WL 320466, 2011 Bankr. LEXIS 3855 (Bankr. S.D.N.Y. Jan. 20, 2011) (finding that a plan modification that diluted a shareholder's voting power under a shareholder agreement did not warrant re-solicitation because, in part, it "did not amount to an adverse change in *treatment*") (emphasis added).

were not affected, the plan modifications cannot be considered material or adverse. Accordingly, resolicitation is not required and the objections should be overruled.

577. With respect to Direct Abuse Claims, the plan modifications pertaining to holders of Class 8 Direct Abuse Claims are favorable to such claimants—i.e., they are not materially adverse to the treatment of these Claims. Instead, the revised TDP structure, which now permits high-value claims to be liquidated through an independent review process, will likely benefit holders of Direct Abuse Claims by increasing the Settlement Trust's ability to settle excess insurance policies at higher percentages, leading to larger contributions to the Settlement Trust for all claimants recovering therefrom. Specifically, holders of Direct Abuse Claims will now have the chance to receive greater recoveries should they pursue the independent review process under the TDP. The other changes to the Plan improve or leave unchanged the rights of holders of Direct Abuse Claims under the Plan. Accordingly, resolicitation is not required.

**D.     The Debtors Have Complied With all Applicable Requirements Under Sections 1125 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.**

578. Based on the foregoing, the Debtors submit that RCAHC and the Guam Committee are wrong and no resolicitation is required. Nontheless, the Debtors submit they have satisfied all applicable requirements under sections 1125 and 1127 of the Bankruptcy Code by consistently providing extensive disclosure of all plan modifications applicable to Chartered Organizations throughout these Chapter 11 Cases. A summary of these extensive disclosures follows.

579. The voting Chartered Organizations received the Debtors' *Notice of Filing of Plan Supplement to Modified Fifth Amended Chapter 11 Plan of Reorganization*, which included details pertaining to the TCJC and Hartford Settlements.[943] Chartered Organizations received details from

---

[943]   *See* Affidavit/Declaration of Service, D.I. 7673.

the Century settlement term sheet when it was published as part of the *Seventh Mediator's Report*.[944]  Upon filing the *Notice of Filing of Debtors' Second Modified Fifth Amended Chapter 11 Plan of Reorganization and Blackline Thereof*,[945] voting Chartered Organizations who had submitted their ballot or opt-out form prior to the settlement were notified of their option to change their vote or opt-out election prior to the Voting Deadline.[946]  All Chartered Organizations became aware of the United Methodist and Zurich settlement terms sheets shortly after the Debtors executed those settlements.[947]  Similarly, they received notice of both the Clarendon settlement term sheet and the TCC/Abuse Survivor Settlement.[948]  After executing and disclosing the TCC/Abuse Survivor Settlement, the Debtors filed and served on Chartered Organizations the *Notice of Filing of Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization and Blackline Thereof*.[949]  And to ensure Chartered Organizations received adequate disclosure of the plan modifications under the Plan, the Debtors filed the Plan Modification Motion and served the notice in connection therewith.  Moreover, since the outset of these cases, the Debtors sought to achieve consensus over division and were steadfastly optimistic that further settlements would be achieved.  To provide notice of these future settlements and their attendant plan modifications, the Debtors included the following in their Disclosure Statement:

> Mediation and settlement negotiations with various parties are on-going and will continue after the date of this Disclosure Statement. Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions

---

[944]  *See* Affidavit/Declaration of Service, D.I. 8169.
[945]  [D.I. 7834].
[946]  *See* Affidavit of Service, D.I. 7826.
[947]  *See Notice of Eighth and Ninth Mediators' Report*, D.I. 7929; Affidavit of Service, D.I. 8171.
[948]  *See* Affidavit of Service, D.I. 8224 (Clarendon Term Sheet); Affidavit of Service (TCC/Abuse Survivor Settlement).
[949]  [D.I. 8814]; *See* Affidavit of Service, D.I. XX.  In addition, throughout these Chapter 11 cases, the Debtors have directed the Solicitation Agent to include each plan and subsequent modifications on the Claims Agent Website.

and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors one or more times including after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.[950]

This provision was included in the Disclosure Statement for the very purpose of providing notice—notice the Debtors continuously provide to Chartered Organizations in these Chapter 11 Cases.

580. Finally, disclosure should be unnecessary when (i) Debtors have already reached agreement with the representatives to whom such disclosure would be directed and (ii) there has been no change to treatment of claims from those parties entitled to vote on the Plan. The Plan incorporates numerous settlements, including the Century and Chubb Companies Settlement Agreement and the TCC/Abuse Survivor Settlement. The parties to these settlements would be who the Debtors would direct supplemental disclosures, but they have already agreed to support the Plan. In addition, and as mentioned above, the RCAHC rejected the December 18 plan and the Guam Committee is not entitled to vote on the Plan. The Debtors' latest plan modifications would not change their position or lack of support for the plan. Accordingly, supplemental disclosure beyond what the Debtors had already initiated and completed is unnecessary. The very structure of the Debtors' Disclosure Statement, each version of the Plan, and the Plan Modification Motion and related Order placed Chartered Organizations on notice and created mechanism for Chartered Organizations to review the modifications, object to the Plan, and change their votes. No further resolicitation should be required

## VIII.   The Plan Does Not Violate the Fifth Amendment's Due Process Clause Because It

---

[950] *Amended Disclosure Statement*, D.E. 6445 at 41 (Sept. 30, 2021).

**Does Not Permit Bankrupt Chartered Organizations to Transfer Their Interests in BSA Insurance Polices Absent Bankruptcy Court Approval.**

581.    With little authority supporting its objections to the Plan, the Guam Committee concocts a novel reading of the Fifth Amendment's Due Process Clause to argue that the Plan runs afoul of the United States Constitution.[951]  Specifically, the Guam Committee argues that Plan cannot be confirmed because it permits the Archdiocese of Agaña, a bankrupt Chartered Organization, to "dispos[e] of its rights in the BSA Insurance Policies" by opting-in to the Plan without first requiring the Archdiocese to (a) obtain court-approval of a section 363 or Bankruptcy Rule 9019 motion in the Guam Bankruptcy Court and (b) provide notice and opportunity to be heard to the Guam Survivors.[952]  Not so.  The Plan does not run afoul of the Fifth Amendment's Due Process Clause because it does not absolve bankrupt Chartered Organizations of their obligations under the Bankruptcy Code.

582.    The Guam Committee's objection is premised on the false notion that a bankrupt Chartered Organization's notice of an *intent* to make the Participating Chartered Organization Insurance Assignment is functionally equivalent to alienating those assets to the Debtors' estate or the Settlement Trust.  Under the terms of the Plan, bankrupt Chartered Organizations are, by default, treated as Opt-Out Chartered Organizations.[953]  However, unlike most other Chartered Organizations, bankrupt Chartered Organizations do not have a deadline to opt-in—they can do so at any time.[954]  To opt-in as a Limited Protected Party, a bankrupt Chartered Organization must "advise[] Debtors' counsel in writing that *it wishes* to make the Participating Chartered

---

[951]    Guam Committee Obj., at 25-28 [D.I. 8683].

[952]    *Id.* at 26-27 (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

[953]    Plan Art. I(A)(196).

[954]    *Id.*

Organization Insurance Assignment."[955]  This written notice *does not* automatically transfer any property rights into the Debtors' estate or the Settlement Trust.  To effectuate the Participating Chartered Organization Insurance Assignment, bankrupt Chartered Organizations still need approval from the appropriate Bankruptcy Court.  Nothing in the Plan purports to supersede a bankrupt chartered organization's obligations to conform with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

583.    Thus, the Guam Committee's objection is meritless.  The objection is based on the implausible assumption that the Archdiocese will intentionally violate the Bankruptcy Code, Bankruptcy Rules and black letter case law and not seek approval from the Guam Bankruptcy Court to transfer its assets and interests under the BSA Insurance Policies.  While the Guam Committee's argument rests on pure speculation, the Debtors' response is based in fact.  Indeed, another bankrupt Chartered Organization has provided written notice of an intent to opt-in and has notified the Debtors that the Participating Chartered Organization Insurance Assignment is subject to approval from the district court.[956]  Like other parties in interest in these Chapter 11 Cases, the Guam Survivors will have all the notice and opportunity to object that they are entitled to under the Federal Rules of Bankruptcy Procedure if and when the Archdiocese engages in appropriate motion practice before the Guam Bankruptcy Court.  Accordingly, the Guam Survivors are not deprived of any due process under the Plan, and the Plan should be confirmed because it otherwise

---

[955]    *Id.* at Art. I(A)(199) (emphasis added).

[956]    The Debtors also note that paragraph 6 of the Century and Chubb Companies Insurance Settlement Agreement provides: "Although the Parties do not believe that the Sale would constitute a violation of the automatic stay applicable to any Chartered Organization that is a debtor in bankruptcy and that asserts an interest in one or more BSA Settling Insurers' Policies, to the extent the Bankruptcy Court (or any other court with jurisdiction) determines that the Sale would constitute such a violation, then the Parties shall seek a determination from the Bankruptcy Court that they may proceed with the Sale or relief from such stay to effectuate the Sale."  Century and Chubb Companies Insurance Settlement Agreement Plan § 6, Ex. I-2. *See* Plan Exh. K (Chartered Organizations That Are Debtors in Bankruptcy).

satisfies the requirements of section 1129 of the Bankruptcy Code.

## IX. Responses to Other Objections to the Plan.

### A. Objections Related to the Settlement Trust Governance Should be Overruled.

#### 1. Objections to the Settlement Trustee.

584.     Certain parties object to Mr. Eric D. Green as Settlement Trustee.[957]   Any objections to Mr. Eric D. Green as the Settlement Trustee are moot.   The proposed Settlement Trustee is now former Judge Barbara Houser.   The two proposed Claims Administrators are (i) former Judge Michael Reagan for the Independent Review Process and (ii) former Judge Diane Welsh for the claims otherwise administered under the TDP.[958]   No parties filed objections to former Judges Barbara Houser, Michael Reagan, and Diane Welsh.

585.     Certain objecting Non-Settling Insurance Companies contend that the Settlement Trustee will be unduly influenced by the STAC and inflate values of Abuse Claims relative to the tort system.[959]   These objections are not only baseless speculation but based upon a completely unsupported and unsupportable premise that former Judge Houser is susceptible of undue influence and cannot perform her duties with impartiality and fairness.   There is no basis for such contention and the objections should be overruled.   Former Judge Houser has served the judiciary in a number of capacities during her twenty-one years on the bench; Judge Houser's wide array of experiences as an advocate, judge, and mediator in complex chapter 11 matters are invaluable to

---

[957]   Certain Insurers' Obj. ¶¶ 7, 17, 49 [D.I. 8695]; Allianz Insurers Obj. ¶ 39 [D.I. 8696]; Markel Insurers Obj. ¶ 11 [D.I. 8684].

[958]   *Notice of Identities of the Claims Administrators and Status Update Regarding the Settlement Trustee in Connection with the Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization* [D.I. 8912]. "The Claims Administrators shall assist the Settlement Trustee in the resolution of Abuse Claims in accordance with these TDP and provide information necessary for the Settlement Trustee to implement these TDP." Plan Ex. A, TDP Art. III.

[959]   Certain Insurers' ¶¶ 7, 168 [D.I. 8695]; Allianz Insurers' Obj. ¶ 39 [D.I. 8696]; Markel Insurers' ¶ 10 [D.I. 8684].

the administration of the Settlement Trust.[960]  There has never been any question about her abilities, impartiality, or fairness.

586.    As Mr. Burnett explained in his expert report, any objections that the Settlement Trustee will be unduly influenced "preemptively question both the character and competency of the Settlement Trustee, assigning myriad improper impulses and attitudes that, even if they were accurate, are equally present among decision makers in the tort system."[961]  There is no factual support or any reason to assume that the Settlement Trustee would use anything other than the TDP and her professional ethics to guide her in the determination of awards for holders of Abuse Claims.[962]

587.    The Settlement Trustee also has no incentive to overvalue Abuse Claims, which would result in a redistribution of Settlement Trust assets, preferring certain claimants to the detriment of others.  The Settlement Trustee is the fiduciary to the Settlement Trust and will act in accordance with the TDP and Settlement Trust Agreement.[963]  Any suspected attempt by the Settlement Trustee to misuse their discretion to inflate values in applying the Scaling Factors would result in a reallocation of value among the abuse survivors inconsistent with the Settlement Trustee's fiduciary obligations.  Further, for Abuse Claims that are covered by Settling Insurers, any overvaluation by the Settlement Trustee will not increase the pot of the assets available to pay such Abuse Claims.  As a result, if the Settlement Trustee were to merely inflate the value of all

---

[960]  *Notice of Supplement to Disclosures Regarding Settlement Trustee in Connection with the Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization* [D.I. 8981].

[961]  Michael Burnett Rebuttal Expert Report ¶ 5 (Jan. 5, 2022).

[962]  Michael Burnett Rebuttal Expert Report ¶ 15 (Jan. 5, 2022).

[963]  "The Trustee is and shall act as the fiduciary to the Trust in accordance with the provisions of this Trust Agreement. . . Nothing in the Trust Documents or any related document shall require the Trustee to take any action if the Trustee reasonably believes that such action is contrary to law." Plan Ex. B, Settlement Trust Agreement § 2.1(b).

Abuse Claims, the Settlement Trustee would be disadvantaging other meritorious Abuse Claims. Accordingly, the speculative argument that the Settlement Trustee has an incentive, economic or otherwise, to overvalue Abuse Claims is without merit.

## 2. Objections to the STAC.

588. Certain Non-Settling Insurance Companies object to the composition of the STAC[964] on the basis that the STAC consists solely of plaintiffs' attorneys who were selected without any input from the insurers.[965] The Certain Insurers specifically argue the STAC's authority and governance of the Settlement Trust is contrary to "public policy"[966] under sections 1129(a)(5)(A)(ii) and 1123(a)(7) because the STAC owes duties to the beneficiaries of the Settlement Trust and their individual clients.[967] Based on the plain language of the Code and case law, sections 1129(a)(5)(A)(ii) and 1123(a)(7) of the Code may not even apply to the composition

---

[964] The initial STAC members shall consist of the following (a) Coalition Appointees: (1) Adam Slater; (2) Sean Higgins; (3) Kenneth M. Rothweiler; (b) TCC Appointees: (1) Jordan Merson; (2) Paul Mones; (3) Christopher Hurley; and (c) the Pfau/Zalkin Appointee: (1) Irwin Zalkin. The alternate STAC members are: (1) Deborah Levy (Coalition); (2) Peter Janci (TCC); and (3) Michael Pfau (Pfau/Zalkin). Plan Ex. B, Settlement Trust Agreement § 6.1.

[965] Markel Insurers' Obj. ¶ 10 [D.I. 8684]; Certain Insurers' Obj. ¶ 7 [D.I. 8695]; Certain Insurers' Suppl. Obj. ¶¶ 63-72 [D.I. 9033].

[966] *In re Digerati Techs., Inc.*, No. 13-33264, 2014 WL 2203895, at *2 (Bankr. S.D. Tex. May 27, 2014) ("While the Code defines many words and phrases, the phrase, "consistent with ... public policy," is not one of them. The absence of a definition necessarily means that bankruptcy courts are left to exercise their sound discretion on the issue.") (citing *In the Matter of: Mirant Corp.*, 440 F.3d 238, 253 (5th Cir. 2006)); *see In re SM 104 Ltd.*, 160 B.R. 202 (Bankr.S.D.Fla.1993) (manager who diverted rents, made misrepresentations to secured creditors, commingled funds and maintained a grossly inadequate accounting system, was prohibited by § 1129(a)(5) from continuing in that capacity).

[967] Section 1123(a)(7) allows a plan to contain only "provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). This section is augmented by section 1129(a)(5), which requires, as a condition of confirmation, that the plan disclose the identity and affiliation of any individuals proposed to serve, after confirmation of the plan, as directors, officers or voting trustees of the debtor, of an affiliate of the debtor participating in a joint plan with the debtor or of a successor to the debtor under the plan. 11 U.S.C. § 1129(a)(5). In addition, section 1129(a)(5)(A)(ii) requires that the appointment or continuance of any director, officer or voting trustee be consistent with "the interests of creditors and equity security holders and with public policy." 7 Collier on Bankruptcy ¶ 1123.01 (16th 2021).

of the STAC under the Plan.[968]  The bankruptcy court in *Eagle-Picher* overruled a similar objection that argued the trustee's advisory committee is comprised of personal injury lawyers with obligations to their clients and a conflict of interest exists.[969] There, the court held the trust advisory committee members "are not subject to the provisions of § 1129(a)(5)(A)(1) and even if they were, the Plan provisions are consistent with the requirements of that section."[970]

589.    Assuming sections 1129(a)(5)(A)(ii) and 1123(a)(7) of the Code apply, the Certain Insurers do not cite a single case where a STAC proposed under a plan was not approved or where the composition of a STAC violated public policy.[971] The Certain Insurers cite *Beyond.com Corp.*, which is inapposite and involved adequate disclosure of a liquidation manager's agreement rather than appointment of a STAC.[972] Here, the Debtors have adequately disclosed the STAC and the terms of the Settlement Trust Agreement.[973] The objections are based on pure speculation as to

---

[968]  *In re Eagle-Picher Indus., Inc.*, 1996 U.S. Dist. LEXIS 17160, at *29-30 (S.D. Ohio 1996); *see also In re Sentinel Mgmt. Grp.*, 398 B.R. 281, 308 (Bankr. N.D. Ill. 2008) ("The Court notes that in the over five pages that the Plan Objectors devote to this particular argument, they do not cite a single case in support of their position that the exclusion of [creditor] from the Liquidation Trust Committee violates § 1129(a)(5). Neither the Liquidation Trustee nor the Liquidation Trust Committee constitutes an individual who would serve as a director, officer, or voting trustee of [the debtor].") (citing *In re American Solar King*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988)).

[969]  *In re Eagle-Picher Indus., Inc.*, 1996 U.S. Dist. LEXIS 17160, at *29-30.

[970]  *In re Eagle-Picher Indus., Inc.*, 1996 U.S. Dist. LEXIS 17160, at *30.

[971]  *See* Certain Insurers Obj. ¶¶ 161-63 [D.I. 8695]; Certain Insurers Suppl. Obj. ¶¶ 66, 67 [D.I. 9033].

[972]  Certain Insurers Suppl. Obj. ¶¶ 66 [D.I. 9033] (citing *In re Beyond.com Corp.*, 289 B.R. 138, 144-45 (N.D. Cal. 2003)).

[973]  *Beyond.com Corp* did not involve a settlement trust advisory committee or mass-tort debtor, and the court did not make any finding on public policy. In *Beyond.com Corp*, the court found the liquidation plan was patently unconfirmable for several reasons, including the plan's violation of section 1129(a)(5)(A)(i) where the plan contemplated the debtor's former chief operating officer would serve as a liquidation manager supervised by the unsecured creditor's committee but the debtor did not disclose the terms of the agreement that would govern the liquidation manager's post-effective date duties and the unsecured creditor's committee bylaws. *See In re Beyond.com Corp.*, 289 B.R. at 140-141, 144-45 ("While the court is not prepared to find that the service of [debtor's former chief operating officer] as Liquidation Manager is unfit, or that management by [debtor's former chief operating officer] or the [unsecured creditor's] committee is contrary to the interests of parties in this case or against public policy, the disclosures to date are insufficient to enable the court to conclude that the converse is true. Without adequate disclosures, the court cannot conduct an intelligent analysis of whether the continuance of those parties in their roles is consistent with the interests of creditors and equity security holders and with public policy.").

how the STAC will function and simply assumes the STAC will act against the interests of the survivors as a whole in violation of their fiduciary duties.[974] The selection of the STAC members is consistent with public policy because they do "not hold or represent an interest adverse to the [Settlement] Trust" and the appointment of the STAC "is consistent with the interests of [c]reditors."[975] Indeed, the STAC members have a fiduciary duty to act in the best interests of creditors (*i.e.*, current holders of Abuse Claims).[976] Further, the Settlement Trust Agreement provides limitations on the STAC's authority[977] and the TDP specifically provide that the STAC and the FCR "shall have no authority or ability to modify, reject, or influence any claim allowance or Allowed Claim Amount determination."[978] The Settlement Trustee is not permitted to make any distribution of assets other than those authorized by the Settlement Trust Documents regardless of what the STAC recommends.[979]

590. Allowing the Debtors to propose a Settlement Trustee and the STAC is in line with

---

[974] *In re Sentinel Mgmt. Grp.*, 398 B.R. 281, 309 (Bankr. N.D. Ill. 2008) ("The Plan Objectors failed to show that the Liquidation Trustee and the Liquidation Trust Committee are not consistent with the interests of creditors and public policy.").

[975] *In re Roman Catholic Bishop of Stockton*, No. 14-20371, 2017 Bankr. LEXIS 102, *13 (Bankr. E.D. Cal. Jan. 10, 2017) (holding the plan satisfies section 1129(a)(5) of the Code and appointing trustee proposed under the plan as it was consistent with the interests of creditors and with public policy); *see also In re Bashas' Inc.*, 437 B.R. 874, 912 (Bankr. D. Ariz. 2010) ("Indeed, continued service by prior management may be inconsistent with the interests of creditors and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor.").

[976] Plan Ex. B, Settlement Trust Agreement § 6.2. The STAC "represents the interests of holders of present Abuse Claims in the administration of the Settlement Trust." Plan Ex. A, TDP Art. III.A.

[977] *See* Plan Ex. B, Settlement Trust Agreement § 2.2.

[978] Plan Ex. A, TDP Art. III.B.

[979] Plan Ex. B, Settlement Trust Agreement § 2.2(a)(iii).

precedent mass-tort cases.[980] Under the Plan, the STAC members must be reasonably acceptable to the Debtors, which they are.[981] These objecting Non-Settling Insurance Companies do not cite any cases, applicable law, or provision of the Bankruptcy Code that would require the Debtors to receive input from the insurers while selecting the composition of the STAC.[982] In the event a STAC member breaches his or her fiduciary duties, the STAC member is taking a risk that a beneficiary of the Settlement Trust (*i.e.*, holder of an Abuse Claim) may pursue legal action against them for violating their fiduciary duties. Even if the parade of horribles occurs as the Non-Settling Insurance Companies predict, a member of the STAC may be removed for good cause (e.g., fraud, self-dealing, intentional misrepresentation, willful misconduct) upon a majority vote of the other members of the STAC and upon approval of the Bankruptcy Court.[983]

591. Proposing the Settlement Trustee and the composition of the STAC is also in compliance with Delaware Trust Law.[984] The Settlement Trust, established under <u>Article IV</u> of

---

[980] *See In re Insys Therapeutics, Inc.*, No. 19-11292 (Bankr. D. Del. Jan. 16, 2020) [D.I. 1115 at 11] (confirming plan where the plan documents provide adequate and proper means for the implementation of the plan including the appointment of the trustee, claims administrator, and members of the trust board pursuant to the lists filed with the plan supplement); *see also In re Maremont Corp.*, No. 19-10118 (Bankr. D. Del. May 17, 2019) [D.I. 241 ¶¶ 32, 35] (confirming plan that appointed the members of the personal injury trust advisory committee and appointed the personal injury trustee); *In re Sepco Corp.*, No. 16-50058 (Bankr. N.D. Oh. Mar. 24, 2020) [D.I. 733 ¶ 46] (same); *In re Yarway Corp.*, No. 13-11025 (Bankr. D. Del. Apr. 8, 2015) [D.I. 860 ¶ 43] (same); *In re Kaiser Gypsum Co., Inc.*, No 16-31602 (W.D.N.C. July 28, 2021) [D.I. 2745 at 39] (same).

[981] Plan Ex. B, Settlement Trust Agreement §§ 5.13, 5.14; Plan Art. IV.F.1 ("The STAC members shall be reasonably acceptable to the Debtors and shall have the functions, duties, and rights provided in the Settlement Trust Agreement.").

[982] *See* Markel Insurers' Obj. [D.I. 8684]; Certain Insurers' Obj. [D.I. 8695]; Certain Insurers' Suppl. Obj. [D.I. 9033].

[983] Plan Ex. B, Settlement Trust Agreement § 6.5(c).

[984] The Settlement Trust is a Delaware Statutory Trust, which is a trust entity formed pursuant to Chapter 38 of Title 12 of the Delaware Code and governed by the applicable trust governing documents. *See* 12 Del. C. § 3801(i). In addition to Chapter 38 of the Delaware Code and except to the extent set forth in the relevant trust governing documents, the other provisions of Delaware statutory law applicable to common law trusts, including Chapters 33 and 35 of Title 12 of the Delaware Code (collectively, with Chapter 38 and Delaware common law regarding trusts, "<u>Delaware Trust Law</u>"), are applicable to a Delaware Statutory Trust. 12 Del. C. §3809 ("Except to the extent otherwise provided in the governing instrument of a statutory trust or in this subchapter, the laws of this State pertaining to trusts are hereby made applicable to statutory trusts".).

the Plan and the Settlement Trust Agreement, is organized under the laws of the state of Delaware.[985]  With regard to Delaware Statutory Trusts, Chapter 38 of Title 12 of the Delaware Code specifically provides that "[i]t is the policy of this subchapter to give maximum effect to the principle of freedom of contract and to the enforceability of governing instruments."[986]  Under Delaware Trust Law, two fundamental concepts are (a) the primacy of the settlor's intent when creating a trust and (b) the settlor's contractual freedom to reflect this intent in the trust's governing documents.[987]  Delaware Trust Law provides a broad ability to define and limit the scope of the duties of each of the persons engaged in the administration or monitoring of a Delaware Statutory Trust.[988]  Under the Settlement Trust Agreement, the BSA is the settlor of the Settlement Trust.[989]  Therefore, under Delaware Trust Law, BSA's contractual freedom to propose the Settlement Trustee and the STAC is proper and appropriate.

592.    Lastly, if the Non-Settling Insurance Companies believe the STAC ever does improperly influence the Settlement Trustee and this thereby renders a claim not covered by the policy or subject to denial of coverage, the Non-Settling Insurance Companies can deny coverage

---

[985]  Plan Art. IV; Plan Ex. B, Settlement Trust Agreement § 1.1.

[986]  12 Del. C. § 3828(b).

[987]  12 Del. C. §§ 3303(a) ("Notwithstanding any other provision of this Code or other law, the terms of a governing instrument may expand, restrict, eliminate, or otherwise vary any laws of general application to fiduciaries, trusts, and trust administration . . ."), 3801(e) ("A governing instrument . . . may contain any provision that is not inconsistent with law or with the information contained in the certificate of trust."); *see Honeywell Int'l, Inc. v. N. Am. Refractories Asbestos Personal Injury Settlement Trust (In re N. Am. Refractories Co.)*, 542 B.R. 350, 364 (Bankr. W.D. Pa. 2015) ("The 'seminal rule' of construction in trust cases under Delaware law is that the settlor's intention controls the interpretation of the instrument.") (citing *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1292 (Del. 1989)).

[988]  12 Del. C. § 3806(c) ("To the extent that, at law or in equity, a trustee . . . or other person has duties (including fiduciary duties) to a statutory trust or to another trustee or beneficial owner or to another person that is a party to or is otherwise bound by a governing instrument, the trustee's . . . or other person's duties may be expanded or restricted or eliminated by provisions in the governing instrument; provided, that the governing instrument may not eliminate the implied contractual covenant of good faith and fair dealing . . . .").

[989]  Plan Ex. B, Settlement Trust Agreement § 1.1.

and have that fight at that time—when the facts of the situation are actually known rather than speculative. This Court is not making any coverage decisions; those issues will ultimately be decided by a coverage court. Thus, the objections to the STAC lack merit, are grounded in pure speculation, and should be overruled.

## B. The Objection to the Insurance Entity Injunction Should be Overruled.

593.    The RCAHC asserts that Article X.F.3. of the Plan is impermissibly vague and cannot be approved.[990] It argues that Rule 65(d) of the Federal Rules of Civil Procedures requires "[e]very order granting an injunction to describe in reasonable detail what is enjoined and must not refer to other documents to do so."[991] According to the RCAHC, the channeling injunction provision under Article X.F.3. of the Plan is inadequate because for parties to determine its effect on a specific insurance policy, they must read Article X.F.3. and apply it to specific insurance policies "rendering parties completely unable to interpret the injunction from the four corners of the order."[992]

594.    The standard, however, does not require the injunction to answer coverage questions or describe with specificity every possible variable the RCAHC can invent. The Third Circuit has consistently recognized that injunctions designed to bar future violations, including channeling injunctions, should "be as specific as possible under the totality of the circumstances, such that a reasonable person could understand what conduct is proscribed."[993] "Broad, non-

---

[990]    RCAHC Supp. Obj. ¶¶ 16, 20.

[991]    RCAHC Supp. Obj. ¶ 20.

[992]    RCAHC Obj. ¶ 160.

[993]    *In re W.R. Grace & Co.*, 475 B.R. 34, 96 (Bankr. D. Del. 2012) *citing Louis W. Epstein Family P'Ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994) (*quoting Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1022 (9th Cir. 1985)); *Prosser v. Springel*, Nos. Civ. A. 2008–16, 2008–18, 2008 WL 2368898, at *7 (D. Vi. June 6, 2008) (*quoting Medtronic, Inc. v. Benda*, 689 F.2d 645, 649 (7th Cir.1982)).

specific language that merely enjoins a party to obey the law or comply with an agreement" will not suffice, however; broad language drafted to encompass an unknown number of parties is permissible "if it is clearly necessary to protect the assets of the bankrupt's estate."[994] The Court should consider whether, "[g]iven the complexity of the [plan], the various provisions of the several settlements at play, the massive number of parties involved, and the still unknown number of potential future claimants, the Bankruptcy Court could not have realistically framed a more specific order."[995]

595.    The Delaware District Court has overruled objections to injunctions demanding that they provide explicit descriptions of every permutation of activity enjoined. "To be effective an injunction does not have to list every possible action that a party can take that would violate the injunction. . . . Moreover, injunctive language should not be read in a vacuum, divorced from the context and understandings of the parties."[996] "[M]ore specific language is itself problematic because if narrow literalism is the rule of interpretation, injunctions will spring loopholes."[997]

596.    In *W.R. Grace*, certain claimants objected to a channeling injunction designed to preclude the assertion of third party asbestos claims against the debtor or insurers with whom the debtor previously reached settlements in exchange for contributed funds to the asbestos trust.[998] The channeling injunction in the plan provided a definition of an "Asbestos PI Claim" and court found that those "parties covered by the injunction—"Asbestos Protected Parties"—are likewise clearly listed in [a specified section of the] Joint Plan. [This section] directly states that insurers

---

[994]    *Id*. (internal citations omitted).

[995]    *Id*. (internal citations omitted).

[996]    *In re Triad Guaranty Inc.*, No. 14-1464, 2016 WL 3523834, at *11 (D. Del. June 27, 2016).

[997]    *Id*. (internal citations omitted).

[998]    *In re W.R. Grace & Co.*, 475 B.R. at 96.

with whom Grace has reached settlements and who have agreed to contribute funds to the asbestos trust—referred to as 'Settled Asbestos Insurance Companies'—are encompassed within the Asbestos Protected Party definition."[999] The court concluded that the channeling injunction was not ambiguous because it provided enough specificity and reasonable detail "sufficient to put all involved parties on notice of what is prohibited—the pursuit of an Asbestos PI Claim against Grace or any Asbestos Protected Party for its derivative liability, including those insurers with whom Grace previously settled."[1000]

597.     The channeling injunction in *W.R. Grace & Co* did not list every insurer covered by the injunction, rather, it provided sufficient information to allow parties to determine whether a given insurer was covered. The court explained that "[b]y necessity, the injunction uses sufficiently broad language because it was crafted to encompass the hundreds of potential asbestos claims that may be filed in the future."[1001] The court pointed out that the objecting claimants had "not provided, nor has the Court independently found, any provision of the Bankruptcy Code or federal case law indicating that a bankruptcy court judge must explicitly address all possible future legal issues and rule on whether or not they would be covered by the channeling injunction. Such a requirement would be unreasonable, impractical, and, for all intents and purposes, impossible given the massive scale of this case and the still unknown number of future claims."[1002] Further, the court noted that if it had addressed these claims at the outset "it may have unintentionally crossed into the unconstitutional territory of advisory opinions."[1003]

---

[999] *Id*.

[1000] *Id*.

[1001] *Id*.

[1002] *Id*. at 97.

[1003] *Id*.

598.    The RCAHC demands that the channeling injunction in <u>Article X.F.3.</u> must literally state whether each of the "thousands and thousands" of insurance policies at issue covers any given Abuse Claim.[1004] This is not the Debtors' responsibility. Indeed, the insurance policies issued to individual chartered organizations are not in the possession or control of the Debtors.  More importantly, the determination of whether any Abuse Claim is covered by one of the Chartered Organizations' own policies will be highly factually specific and is not properly (nor will it ever properly be) before this Court. While it is necessary for the injunction to provide sufficient information to allow parties to determine whether Abuse Claims covered by a given insurer may be channeled, it does not require that the injunction "be read in a vacuum, divorced from the context and understandings of the parties" and applied without other documents providing that context and those understandings.[1005] The channeling injunction provision under <u>Article X.F.3.</u> of the Plan does not require parties to "locate and review potentially applicable insurance policies issued by the Settling [Insurance Companies]" to BSA or Local Councils to determine whether the policies cover the channeled Abuse Claim.[1006] The BSA and Local Council polices have been identified.[1007]  Moreover, <u>Article X.F.3.</u> of the Plan provides that

> any liability insurance policy (other than an automobile policy or director's and officer's policy) that was issued by the Settling Insurance Companies shall be automatically deemed to "cover" or provide "coverage" for an Abuse Claim against a Chartered Organization if (i) such policy includes the Chartered Organization, by name or by referring to Chartered Organizations categorically as chartered organizations, charters, sponsoring organizations, or sponsors, as insureds or additional insureds, (ii) such policy was in effect when the alleged Abuse underlying such Abuse Claim allegedly took place; and (iii) such policy does not

---

[1004] RCAHC Obj. ¶¶ 160-61; RCAHC Supp. Obj. ¶ 19.

[1005] *In re Triad*, No. 2016 WL 3523834, at *11.

[1006]  RCAHC Obj. ¶¶ 160-61; RCAHC Supp. Obj. ¶ 19.

[1007]  Plan, at Schedule 1 and 2/

specifically exclude all abuse or molestation, regardless of state of mind. . . .[1008]

599.    Article X.F.3. is sufficient because, when applied in the context of a specific insurance policy, a party can determine whether the channeling injunction applies to that specific insurance policy.  The channeling injunction applies to Abuse Claims.  Nothing else is required..  Thus, the Plan describes the nature of the injunction, what has been enjoined, and what insurance companies are Settling Insurance Companies.

600.    The Debtors have gone above and beyond what is required to help the parties make these determinations. The Debtors provided insurance coverage charts listing insurers and policies of the Debtors and Local Councils and settled and available coverage to help the parties determine the non-settled insurance coverage available.[1009] On February 24, 2022, the Debtors also held an informational session via video conference with the Debtors' insurance expert for the Chartered Organizations to answer questions and discuss BSA and Local Councils insurance.  Beyond this, a Chartered Organization need not do anything more than it would have done outside of the channeling injunction context to determine if the injunction applies. First, if the Chartered Organization is a Participating Chartered Organization it has consented and thereby has no objection.  Second if the Chartered Organization has decided to opt-out, then to the extent an Abuse Claim is filed against such Opt-Out Chartered Organization and it believes the claim is covered by its own insurance, the Opt-Out Chartered Organization continues to have such coverage and should proceed accordingly.   If the Opt-Out Chartered Organization's own insurance is issued by a Settling Insurance Company, the Settling Insurance Company will assert that the claim has been

---

[1008] *See* Plan, Art. X.F.3.

[1009] *Boy Scouts of America Coverage Charts:1976-2020*, Coverage Charts for BSA/LC Insurance Policies, Omni Agent Solutions (2022), https://casedocs.omniagentsolutions.com/cmsvol2/pub_47373/17379ed6-8eb0-454b-bf0a-ed5187df49c1_BSA_Coverage_Charts_consolidated.pdf.

channeled on their behalf.

### C. Objections to the Discharge Injunction and the Retention of Jurisdiction Provision.

601.     If the Court confirms the Plan, Allianz and Travelers request relief from the discharge and injunctive provisions so that they may continue to pursue prepetition lawsuits against the Debtors. [1010]  Debtors do not necessarily ultimately oppose the Court providing relief from the discharge and injunctive provisions in the Plan, however for the reasons articulated in the *Debtors' Objection to the Allianz Insurers' Motion for Relief from the Automatic Stay* [D.I. 6825][1011] and *Objection of the Future Claimants' Representative and the Coalition of Abused Scouts for Justice to the Allianz Insurers' Motion for Relief from the Automatic Stay and Joinder in the Debtors' Opposition Thereto* [D.I. 6827], this request is premature, and ultimately, if the Plan is confirmed and goes effective, the Debtors are not the right party in interest to litigate these actions.  The Settlement Trustee, the beneficiary of the insurance in question, will be responsible for defending against such litigation, and should be given a fair opportunity to get up to speed and retain counsel to address this motion.

602.     Certain Insurers also object to the Retention of Jurisdiction provision under Article IX of the Plan to provide this Court with subject matter jurisdiction over any coverage litigation.[1012] Consistent with the Court's guidance, the Debtors do not intend or expect for any coverage litigation to be heard in this Court.

### RESERVATION OF RIGHTS

---

[1010] Allianz Obj. ¶ 49 [D.I. 8696]; Travelers Obj. [D.I. 8700].

[1011] *See also Objection of the Future Claimants' Representative and the Coalition of Abused Scouts for Justice to the Allianz Insurers' Motion for Relief from the Automatic Stay and Joinder in the Debtors' Opposition Thereto* [D.I. 6827].

[1012] Certain Insurers Supp. Obj. ¶ 93 [D.I. 9033].

603.     The Debtors reserve all rights to supplement, amend, or modify this Memorandum (and the exhibits attached hereto), and any other documents filed by the Debtors in connection with confirmation of the Plan.  The Debtors further reserve all rights and defenses to respond to, at the Confirmation Hearing, any and all objections or supplemental objections, whether or not argued in this Memorandum, listed in the Response Chart, or otherwise submitted to the Court and the record of these Chapter 11 Cases.

## **CONCLUSION**

For all of the reasons set forth herein, the Debtors respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling any objections, and granting such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: March 2, 2022

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Derek C. Abbott*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email:      dabbott@morrisnichols.com
              aremming@morrisnichols.com
              ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**

Jessica C. Lauria (admitted *pro hac vice*)
Glenn Kurtz (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:      jessica.lauria@whitecase.com
              gkurtz@whitecase.com

– and –

Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email:      mandolina@whitecase.com
              mlinder@whitecase.com
              laura.baccash@whitecase.com
              blair.warner@whitecase.com

*Attorneys for the Debtors and Debtors In Possession*