**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | Re: D.I. 6445, 6528, 7996, 8813, 8830 |

**REPLY OF THE ZALKIN LAW FIRM, P.C. AND PFAU COCHRAN VERTETIS AMALA PLLC IN SUPPORT OF THE DEBTORS' THIRD MODIFIED FIFTH AMENDED PLAN OF REORGANIZATION**

The Zalkin Law Firm, P.C. ("Zalkin") and Pfau Cochran Vertetis Amala PLLC ("PCVA" and together with Zalkin, the "Firms") are parties – as are the Debtors, Ad Hoc Committee of Local Councils, TCC, Coalition, and FCR – to a global plan settlement term sheet (the "Global Settlement") that resulted in the filing of the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8813] (with its related exhibits and supplements, the "Plan")[1] with the support of major survivor representatives in this case. Consistent with the terms of the Global Settlement, the Firms support the Plan and have recommended their clients vote in favor of the Plan. The Firms file this Reply to articulate the key changes incorporated into the Plan as result of the Global Settlement that resulted in the Firms' change in position from objectors to supporters and to respond to certain objections raised by non-settling insurers about the Plan's new Independent Review Option.[2]

---

[1] Unless otherwise defined, capitalized terms have the meaning ascribed to them in the Plan. Statutory references are to the Bankruptcy Code (the "Code") unless context otherwise requires.

[2] Although the Firms support of the Plan as a general matter, they reserved the right under the Global Settlement to file a limited objection to the special definition of Abuse Claim to encompass non-Scouting related Abuse for which TCJC (as opposed to any other Chartered Organization or Settling Insurer) is responsible. That limited objection and a supporting declaration from Jason Amala were filed under seal on February 9, 2022 [D.I. 8769 & 8770] and re-filed in un-redacted form on February 15, 2022 [D.I. 8832 & 8833] (the "Limited Objection").

1

## I. PRELIMINARY STATEMENT

1.      Prior to the execution of the Global Settlement, the Firms vigorously opposed the prior iteration of the Plan (the "Prior Plan").  Among other defects, the Prior Plan proposed impermissibly broad releases for non-debtor Chartered Organizations in exchange for little to no financial contribution, capped many survivor recoveries at artificially and unfairly low TDP values, and failed to provide an efficient path to recover on insurance policies issued by non-settling insurers, particularly excess insurers.  The Prior Plan thus failed to present a viable mechanism that would permit survivors like those represented by the Firms to receive payment commensurate with the harm they suffered.  The Plan as modified pursuant to the Global Settlement resolves these flaws of the Prior Plan and now holds out a promise for fair compensation for survivors.

2.      The initial voting report revealed a sharp divide in interests within the body of Abuse survivors.[3]  There is a large number of individual survivors whose Abuse Claims have relatively modest value in the tort system because of the limited nature of the abuse suffered, restrictive substantive law in the relevant jurisdiction, limited vicarious liability, financially weak institutional defendants, statute of limitations issues, and evidentiary and proof problems.  The holders of these claims, many of whom elected a $3,500 expedited payment option under the Prior Plan, generally supported the Prior Plan.  On the other hand, the Firms' clients generally hold strong claims for severe Abuse suffered in jurisdictions with favorable substantive law and permissive statutes of limitation against well-insured or financially strong Local Councils and Chartered Organization co-defendants.  The Prior Plan was highly disadvantageous to these claims and they rejected the Prior Plan in large numbers.  Part of the problem was general underfunding of

---

[3]      The *Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the Solicitation of Votes and Final Tabulation of Ballots [etc.]* [D.I. 8345] (the "First Voting Report") shows that holders of Class 8 Direct Abuse Claims who did not elect the $3,500 quick-pay option rejected the Prior Plan at a rate of 29%.  Specifically, the First Voting Report identifies 53,596 valid votes of Direct Abuse Claims on the Prior Plan, 7,287 of which made the expedited payment election and 46,309 of which did not.  The First Voting Report also identifies 14,166 valid votes of Direct Abuse Claims that rejected the Plan, 708 of which were from claims that made the expedited payment election and 13,458 of which did not, meaning that of the 46,309 valid votes cast by non-expedited payment Direct Abuse Claimants on the Prior Plan, 13,458 claims (or 29%) rejected the Prior Plan.

the Settlement Trust because of inefficient exploitation of the Debtors' valuable insurance assets. But that problem was compounded by the redistributional aspects of the Prior Plan which artificially capped the value of the strongest claims at levels well below their tort system value, failed to account for differences in rights to sources of value that only stronger claims could have reached in the tort system (including excess insurance coverage), and limited the ability of these survivors to demonstrate the gravity of the harms they had suffered to a pre-identified set of scaling factors.  The point and virtue of the Global Settlement from the Firms' perspective is that it meaningfully addresses these concerns and provides a more equitable path to compensation for those who have suffered the most severe Abuse and hold the most valuable claims.

3.    Viewed in this context the Certain Insurers' objection, *see, e.g.*, Supp. Obj. at ¶ 1-2 & 19-20, suggesting the existence of a corrupt bargain among claimants and other Plan supporters to simply inflate claims to the detriment of the insurers is non-substantive table-pounding rhetoric. There is no corrupt bargain.  Diverse segments of the claimant body have come together in a compromise to craft a Plan that is fair to both.  The Plan as modified contemplates improved Settlement Trust funding by structuring an efficient process that will avoid needless creation of new coverage defenses for non-settling insurers.  Stronger claims will now have an administrative mechanism that is properly geared to evaluating large claims at a fair level that mimics tort system values and will have access to the proceeds of excess insurance that only strong claims can credibly lay claim to.  Rights against Chartered Organizations that are otherwise viable in the tort system are better preserved through limitations on the definition of Abuse Claim and the scope of the proposed Channeling Injunction.  The Plan's modifications are intended to optimize the value of the Settlement Trust and redesign its distributional provisions to better reflect the strength of some survivors' more valuable state law rights.  The Trust's governance is modified to ensure that a fully independent trustee is appropriately informed by an advisory committee structured to reflect an appropriate balance between these various claimant groups.  The Global Settlement is fully

disclosed and the improvements it incorporates increase not only the confirmability and feasibility of the Plan but also its fairness.  There is nothing in the least corrupt about the hard-fought compromise among diverse survivor interests that the revised Plan reflects.

4.      The centerpiece of the Plan modifications is the Independent Review Option for the holders of high-value Abuse Claims that will enable liquidate their claims (through a Settlement Recommendation) based on an accurate assessment of the tort system value of their claims without artificially capping the individual's Abuse Claim on the basis of categorical matrix values and pre-established aggravating and mitigating scaling factors.  Independent Review is specifically designed for holders of Abuse Claims whose claims are supported by, and collectible from, excess layers of non-settled insurance.  Non-settling insurers are invited, but not required, to participate in Independent Review.  The Settlement Trust is then empowered to make demand upon and collect accepted Settlement Recommendations from responsible Non-Settling Insurers in accordance with otherwise applicable law.  Survivors who elect Independent Review will have distribution rights for amounts of their claim awards in excess of $1 million to be paid from an Excess Award Fund comprised of the proceeds from excess insurer settlements.

5.      The Independent Review Option thus solves two problems with the Prior Plan in a single stroke.  It provides a fair and efficient administrative process for liquidating and distributing recoveries to the highest value Abuse Claims in a manner that is commensurate with the tort system value of those claims, and it provides an efficient mechanism for the Settlement Trust, on behalf of survivors more broadly, to thereafter liquidate rights against Non-Settling Insurers, consistent with otherwise applicable law.  By capping the vast majority of Abuse Claims at dollar amounts well below the threshold for triggering excess coverage, the Prior Plan effectively insulated the excess insurers, making settlement less likely.  Under the current Plan, Independent Review provides a mechanism for establishing the high-value claims that would otherwise have been established in the tort system and that will reach into the excess insurance coverage layer.

6.       Certain non-settling insurers (the "Certain Insurers") complain that the Independent Review Option denies them due process of law by substituting an administrative process for adversary litigation with the right to a jury trial.[4]  But due process is a flexible concept.  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).  In the context of mass-tort chapter 11 cases involving tens of thousands of individual claims due process always entails as an initial matter the substitution of an administrative process for adversary litigation.  *In re Dow Corning Corp.*, 211 B.R. 545, 577-79 (Bankr. E.D. Mich. 1997) & 11 U.S.C. § 524(g)(2)(B)(ii)(V).   Efficient administrative resolution of the vast majority of the debtor's personal injury liabilities is an essential feature of any feasible mass-tort chapter 11 plan.  Seen in this light, the Certain Insurers' due process objections fall away. Of course the Direct Abuse Claims will be primarily liquidated through a TDP and administrative processing of claims and not through adversarial litigation determined by a jury.  The Certain Insurers are entitled to due process but they have no vested right in law or under their policies to any particular form of due process.  The process that is afforded to Certain Insurers under Independent Review mimics but does not slavishly follow the tort system.  It is a process designed to be administered efficiently though the Settlement Trust, calculated to result in the prompt and fair liquidation of a significant number of $1 million-plus claims.  All parties, including the Certain Insurers, may avail themselves of and participate in the Independent Review process, which will be presided over by an independent Neutral who is charged with applying the relevant state law.  Or Certain Insurers, after receiving notice and an opportunity to participate may stand aside, and litigate their coverage defenses and issues in subsequent proceedings in nonbankruptcy fora.  *See* TDP, Art. XIII § K(iv) & (v).  Due process does not demand more than this.

---

[4]    *See Certain Insurers' Supplemental Objection to Confirmation of Debtors' Chapter 11 Plan* [D.I. 9033] (the "Supplemental Objection"), at ¶ 2 & 14.  The Certain Insurers also raise other issues with the Plan, including the alternative treatment of Abuse Claims under the general TDPs and Independent Review, however the Certain Insurers lack standing to attack those aspects of the Plan that affect only the interests of creditors, and not the contractual interests of insurers.  *See, e.g.*, *In re A.P.I. Inc.*, 331 B.R. 828, 854 & 863 (Bankr. D. Minn. 2005).

7.      Indeed, it is worth remembering that these bankruptcy cases were precipitated in the first instance by the refusal of certain of the Debtors' insurers to accept coverage for sexual Abuse Claims.  Disc. Stmt., at p. 67-68.  Instead of protecting their insureds in accordance with their contractual obligations, these insurers declined to accept coverage, reserved rights, and raised coverage obstacles, resulting in coverage litigation in multiple forums.  *Id.*  Many additional insurers were joined into those coverage actions and likewise disputed coverage.  On a postpetition basis, the non-settling insurers in this bankruptcy case appear to have generally taken the same position.

8.      Having left the Debtors to deal with catastrophic sex abuse liabilities on their own, these same non-settling insurers now seek to attack and impede a plan of reorganization that prudently balances the rights and interests of all parties, including the coverage-denying insurers, by (1) establishing procedures designed to afford survivors with fair compensation determined through a transparent evidentiary process implemented by retired judges with relevant experience, (2) adopting both general TDP and Independent Review procedures that account for the disparities in claim values, (3) allowing early and consistent participation by potentially responsive insurers (despite their coverage positions), and (4) ultimately leaving retained insurer coverage defenses intact for adjudication in state court litigation should the insurers refuse to participate in or disagree with the Settlement Recommendations.

9.      In addition to Independent Review, other key modifications to the Plan resolve other issues the Firms had with the Prior Plan and make the Plan better for all survivors.  The scope of the proposed channeling injunction in the Plan is now narrower than what was proposed in the Prior Plan in terms of the extent of abuse that is captured by the definition of Abuse Claims.  Under the Prior Plan, an Abuse Claim would have been channeled to the Settlement Trust if the claim arose "in whole or in part" in connection with Scouting.  Other than with respect to claims

implicating TCJC,[5] the definition of Abuse Claims under the current Plan has now been revised to acknowledge "Mixed Claims," which are claims against Chartered Organizations that have both Scouting-related and non-Scouting-related sexual Abuse components.  The non-Scouting-related component of Mixed Claims are no longer channeled under the Plan.

10.    The scope of the proposed channeling injunction in the Plan is also narrower than what was proposed in the Prior Plan (as it had been modified) in terms of the temporal scope of the protection afforded to Chartered Organizations.  Under the Prior Plan, as modified by settlements reached with Century and the Local Councils, pre-1976 Abuse Claims against all Chartered Organizations, other than those associated with the Roman Catholic Church, would have been channeled to the Settlement Trust in exchange for an increase in the Local Council settlement contribution purportedly made *on behalf of* those Chartered Organizations.  Under the current Plan, Chartered Organizations must make *their own* monetary contributions to purchase such a release, and pre-1976 Abuse Claims against non-contributing Chartered Organizations are not channeled to the Settlement Trust unless those claims are covered under a Settling Insurers' policy.

11.    Finally, the Plan provides a balanced governance structure that is more broadly representative of the survivor body.  The proposed STAC is balanced between the representatives of those holding smaller claims who will primarily be compensated through the general provisions of the TDP and those holding larger claims who will disproportionately look towards Independent Review.  These representatives of the beneficiaries of the Trust, along with the FCR, will have key input into the fixing of payment percentages, future settlements, and other key decisions of the Settlement Trust.  In other respects a fully independent Trustee of unquestioned integrity will be responsible for Trust administration.  The Plan also now provides for a robust, comprehensive

---

[5]    As set forth in the Limited Objection, the Firms oppose the TCJC-specific definition of Abuse Claims that seeks to channel the non-Scouting-related portion of Mixed Claims asserted against TCJC to the Settlement Trust.

youth protection program for Boy Scouts moving forward.  Survivors will have a critical role in shaping the youth protection program and monitoring its implementation and evolution.

12.     As a result of these changes, the current Plan is not only confirmable under applicable law, but also represents the best attainable outcome of these bankruptcy cases.  The Certain Insurers take the position that the Plan as revised is not confirmable, and they identify the Independent Review Option as a primary defect standing in the way of confirmation.  Supp. Obj., at ¶ 2.  As noted above and discussed further below, the critiques levied by the Certain Insurers are not well founded.  That the Certain Insurers feel targeted by this feature of the Plan, Supp. Obj., at ¶ 41, is not a flaw in the Plan—the Certain Insurers provided coverage for Scouting-related Abuse Claims and, absent these bankruptcy cases, they would be exposed to survivors' claims in the tort system.  Independent Review provides a mechanism for payment substantially in full of survivors' claims in a manner that respects the due process rights of the Certain Insurers and is calculated to optimize the Settlement Trust's ability to recover on its insurance assets.  The Plan thus provides a viable path forward for all parties within the confines of applicable law.

13.     Accordingly, and for the reasons set forth herein, the Firms respectfully submit that the Plan should be confirmed (except to the extent set forth in the Firms' Limited Objection).

## II.  ARGUMENT

14.     To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *In re Armstrong World Indus.*, *Inc.*, 348 B.R. 111, 120, n.15 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).  The Debtors have set forth how the Plan satisfies the confirmation standards generally, and the Firms will not repeat those arguments here. The Firms believe these standards are fully satisfied (other than as noted in the Firms' Limited Objection with respect to TCJC).  Instead, the Firms focus on responding to the Certain Insurers' Supplemental Objection and their critiques of the Independent Review Option.

A.    **The Independent Review Option Accords with Due Process and Appropriately Accounts for the Rights of Non-Settled Insurers Under Contract and Applicable Law**

15.    The main thrust of the Certain Insurers' critique of Independent Review is that the process does not exactly replicate all of the various "safeguards of the tort system" and as such, the process violates the Certain Insurers' contractual rights and due process rights.  Supp. Obj., at ¶ 43. The Supreme Court has made clear, however, that "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.  Due process is flexible and calls for such procedural protections as the particular situation demands."  *Mathews*, 424 U.S. at 334 (internal alterations, quotation marks, and citations omitted); *see also In re Energy Future Holdings Corp.*, 949 F.3d 806, 822 (3d Cir. 2020) ("the appropriate safeguards are dictated by the particular circumstances" (internal quotation marks and citations omitted)).

16.    The Certain Insurers do not have the right, in this bankruptcy case, to have claims determined exactly in accordance with the procedures that would have been applicable had the claims been litigated in the tort system.  Rather, administrative procedures for resolving claims are necessary and appropriate.[6]  *See, e.g.*, *In re Dow Corning Corp.*, 211 B.R. 545, 577-79 (Bankr. E.D. Mich. 1997) ("The inescapable conclusion is that the traditional tort system simply does not work in mass tort situations like the one facing the Debtor. … [T]here is the concern that both plaintiffs and defendants may be denied the constitutional guarantees of due process and the right to a jury trial.  Nonetheless, … through [] careful and prudent design and implementation[,] the legitimate rights of all parties can be safeguarded."); *cf. also* § 524(g)(2)(B)(ii)(V).

---

[6]    *See also* Memorandum Opinion, *In re LTL Management, LLC*, Case No. 21-30589 (Bankr. D.N.J. Feb. 25, 2022) (D.I. 1572), at pp. 20-21, 27 & 29-30 ("[N]o mechanism for handling the thorny challenges of mass torts is perfect, including bankruptcy.  Indeed it is the nature of mass torts to present different combinations of challenges, and those challenges follow mass torts wherever they go. … There is nothing to fear in the migration of tort litigation out of the tort system and into the bankruptcy system.  Rather, this Court regards the chapter 11 process as a meaningful opportunity for justice, which can produce comprehensive, equitable, and timely recoveries for injured parties. … A trust would establish a far simpler and streamlined process … than currently available in the tort system." (internal quotation marks and citations omitted)).

17.     All that is required is that the particular administrative procedure sought to be employed accord with constitutional due process.  The Supreme Court has stated that whether an administrative procedure is "constitutionally sufficient requires analysis of the governmental and private interests that are affected." *Mathews*, 424 U.S. at 334.  The inquiry "generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 334-35.

18.     In their Supplemental Objection, the Certain Insurers claim that Independent Review Option is "a one-sided process" in which the Certain Insurers are denied the right to participate, in violation of their due process rights and their contractual rights to control the defense of claims and consent to settlement.  *See, e.g.*, Supp. Obj., at ¶ 2, ¶ 12 & ¶ 35.  These arguments have been considered and rejected by other courts, where, as here, the Plan preserves the non-settling insurers' rights to litigate coverage in subsequent proceedings in nonbankruptcy fora.  *See, e.g.*, *In re A.P.I. Inc.*, 331 B.R. 828, 845-52 (Bankr. D. Minn. 2005) (overruling objections of non-settling insurers who opposed administrative process for liquidating and paying mass tort claims and rejecting arguments that such a process impaired insurers' due process and contractual rights).

19.     Moreover, the Independent Review Option *does* provide for insurer participation, including notice to any potentially responsible non-settling insurer of any claim that has elected the Independent Review Option, "a reasonable opportunity to participate in the Independent Review," and the ability to "raise and present any potentially applicable defense."  TDP, Art. XIII § K. The Neutral must "consider and apply any defense that would otherwise be available in the tort system," including any defenses raised and presented by a potentially responsible insurer who elects to participate in the process.  *Id.* at § J & § K.  As for the legal standard the Neutral will

10

apply, it is not "some level of negligence and damages" as the Certain Insurers suggest, Supp. Obj. at ¶ 16, nor is the Plan "silent" as to what the Neutral is to do with the issues and defenses raised by participating insurers, Supp. Obj., at ¶ 14; rather, the Neutral must evaluate claims "applying the same standard of proof that would apply under applicable law."[7] TDP, Art. XIII § A.

20.    Indeed, in Independent Review, the survivor must provide evidence that "the claim is timely under the applicable statute of limitations," that "one or more of the BSA, Local Council or Chartered Organization was negligent or is otherwise liable" on account of the survivor's claim, and regarding the extent of damages, all of which must be measured under the "same standard of proof" that would govern under applicable law if the claim were litigated in the tort system. *Id.* § A & G.  All documents produced in the discovery process authorized by the TDPs shall be authenticated by the producing party, thereby establishing the reliability of the factual record.  Plan Supp., Ex. D-1 (Plan Appendix Re: Document Sharing), at § 6 & § 7.  The Settlement Trustee is also empowered to pursue depositions, to ensure that a balanced factual record is developed. *Id.* at § 11.  The survivor's damages must likewise be proven with evidence that would be sufficient under applicable state law, such as medical and counseling records, sworn witness statements (who may be subject to deposition), comparable judgments, and expert reports.  TDP, Art. XIII § G(vi).

21.    Indeed, contrary to the non-settling insurers' protestations, the Plan in many instances may afford them greater rights than they would hold pursuant to state law.  It is axiomatic and universally accepted that when an insurer fails to acknowledge its contractual obligations its insured is allowed to address and resolve the disputed claim on its own.[8]  That doctrine, deeply

---

[7]    The Certain Insurers also take aim at the neutral decision-makers designated to adjudicate the Independent Review Process.  Supp. Obj., at ¶ 2 & ¶ 12.  The TDPs provide that in Independent Review the "Neutral" will be "an independent third party []selected from a panel of retired judges with tort experience maintained by the Settlement Trust." TDP, Art. XIII § A.  There is no reason to believe the panel of retired judges maintained by the Settlement Trust will be anything other than independent, qualified, neutral decision makers.

[8]    *See, e.g.*, *Se. Wis. Prof'l Baseball Park Dist. v. Mitsubishi Heavy Indus. Am., Inc.*, 738 N.W.2d 87, 111 (Wis. Ct. App. 2007) (liability insurer that breached duty to defend forfeited the right to control the defense); *Safeco Ins. Co. v. Superior Court*, 84 Cal.Rptr.2d 43, 45 (Cal. Ct. App. 1999) ("[I]f the insurer wrongfully refuses to defend, leaving the insured to his own resources to provide a defense, then the insurer forfeits the right to control

embedded in contract law, recognizes that an insurer cannot decline to honor its contractual

obligations while concurrently holding the insured  hostage to the disputed contract.  An insurer's

coverage denial not only permits the insured to negotiate a settlement on its own, it also waives

policy provisions that may also run in favor of the insurer, including provisions that would

otherwise require the insured to cooperate, to provide notice, or to seek insurer consent to settle.[9]

Accordingly, outside the strictures of bankruptcy and by state law principles, once the insurers

failed to accept coverage, the Debtors had every right to negotiate and enter a good faith settlement

without the involvement of those insurers.[10]

22.    Here, the Plan gives certain of the non-settling insurers significant participatory

rights notwithstanding their disputed coverage positions.  The Independent Review procedures

provide the insurers with early notice of claims under review, the opportunity to participate in the

evaluation process and settlement, and ultimately the right to contest the settlement and adjudicate

their retained coverage defenses in state or federal courts.  The rigors of Independent Review

certainly require more exacting proof and permit greater insurer participation rights than most trust

administrative procedures, and are sufficient to satisfy due process.  These specific protections,

together with the general mandate that the Neutral "seek[] to replicate to the extent possible the

amount a reasonable jury might award for the Direct Abuse Claim" ensure the fairness of the

---

settlement and defense.  In that event, the insured is free to settle the lawsuit on his own.").

[9]    *E.g.*, *Dunn v. Columbia Nat. Ins. Co.*, Case No. 2:17-cv-0246 (N.D. Ga. Sept. 30, 2019) (D.I. 103).  A right to jury trial may be waived by denial of coverage as well.  *Butler Bros. v. Am. Fidelity Co.*, 139 N.W. 355, 358 (1913) ("Undoubtedly the insured may waive the condition requiring a trial of the issue, and the authorities are practically unanimous in holding that a denial of liability and refusal to take the defense is a waiver of this condition.").

[10]    It is not only the Debtors and the insurers who have rights under the policies; under statutory and case law in many states, survivors in many instances have vested rights in insurance policies following the occurrence of injury. *See, e.g.*, *Maryland Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273-74 (1941) (a tort victim has a potential financial interest in the insurer's insurance policy, and the impairment of this interest is an injury that will support standing under Article III); *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 682 (7th Cir.1992) ("the victim of an insured's tort, even though he is not a third-party beneficiary of his insurer's insurance policy, has a legally protected interest in that policy before he has reduced his tort claim to judgment").  Some states even require the injured party to be included in any negotiations of policy changes that will affect their rights. *See e.g.*, *Smith & Wesson v. Birmingham Fire Ins. Co.,* 510 N.Y.S.2d 606, 608 (1987); *Maryland Cas. Co. v. Wilson*, 433 P.2d 650, 652 (1967); *Shapiro v. Republic Indem. Co*., 341 P.2d 289, 290 (1959); *Womack v. Allstate Ins. Co.*, 296 S.W.2d 233, 236 (1956).

results of the Independent Review Option.  *Id.*  There has been no effort whatsoever to inflate survivor recoveries.  The ability of survivors to recover in excess of the artificially depressed categorical TDP claim value limits (which imposed a maximum claim value of $2.7 million) is consistent with the Debtors' prepetition litigation experience.[11]

23.     The Certain Insurers' repeated claim that the Plan seeks "to bind Certain Insurers to the results of the 'Independent Review'" without "even basic due process" is thus without merit. Supp. Obj., at ¶ 19.  No party is requesting that this Court determine that Independent Review results in a binding coverage determination.  If the Settlement Trustee determines that a Settlement Recommendation is reasonable and the Responsible Insurer refuses to pay all or portion of the Accepted Settlement Recommendation, then "the Settlement Trustee may exercise any and all rights available to it under applicable law" and "shall have the right to pursue the Accepted Settlement Recommendation through any appropriate legal mechanisms"  TDP, Art. XIII § K(iv) & (v).  The non-settling Responsible Insurer retains all rights available under applicable law to appear and contest collection of the award as part of those non-bankruptcy legal proceedings.  Substituting the Settlement Trust for the Debtors is not objectionable and does not deprive the non-settling insurers of any due process or contractual rights.  *See, e.g. In re A.P.I. Inc.*, 331 B.R. at 852-53. Non-settled insurers retain their rights and are free to respond to and contest the Settlement Trustee's efforts to collect awards on individual claims in the courts or they can negotiate a global resolution of their liability.  That is the essence of due process.

---

[11]   For the period 2010-2020, the Debtors reached at least twenty-one settlements in excess of $2.7 million.  *See* Exhibit 1, Griggs Dep. Tr. (Dec. 1, 2021), at 251:23-254:18 (identifying one $9.6 million settlement, one $9 million settlement, one $7.5 million settlement, one $7.4 million settlement, one $7.25 million settlement, four $6 million settlements, one $5 million settlement, one $4.9 million settlement, two $4.8 million settlements, four $4 million settlements, two $3.5 million settlements, one $2.95 million settlement, and one $2.75 million settlement). Two of the three jury verdicts entered against the Debtors on account of Scouting-related sexual abuse claims in the last ten years were also well in excess of $2.7 million.  *Id.* at 128:21-130:5 ($20 million & $11 million).

13

B.      **Independent Review Provides a Mechanism for Payment of Substantially All Abuse Claims, as Necessary to Support the Plan's Non-Debtor Releases**

24.      Nonconsensual nondebtor releases of related parties' liability have been approved in some cases in the Third Circuit, after a proper showing under what have been termed the *Master Mortgage* factors.  *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017) (citing *In re Master Mortgage Investment Fund*, 168 B.R 930 (W.D. Mo. 1994)), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd*, 945 F.3d 126 (3d Cir. 2019).[12]  As to the last *Master Mortgage* factor—payment of all or substantially all of the claims of the affected creditors—it is sufficient that the "plan provides a *mechanism* for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction."  *In re Master Mortg.*, 168 B.R at 935 (emphasis added).

25.      Independent Review provides such a mechanism for more substantial payment of Direct Abuse Claims, a mechanism lacking in the Prior Plan.  By eliminating the artificial limits on claim values, the Independent Review Option permits survivors to establish the full value of their claims, which is the amount a reasonable jury would be likely to award under applicable state law. Without this mechanism, the Prior Plan could never have paid survivors substantially in full, because even if survivors had received substantially full payment on TDP claim values, those claim values would not have been representative of some survivors' true entitlements.  Moreover, payment substantially in full depends not only on claim values, but also on the Settlement Trust's ability to pay out on those claim values.  By limiting the vast majority of Abuse Claims at dollar amounts below the threshold for triggering excess coverage, the Prior Plan effectively insulated the excess insurers, potentially impairing the Trust's insurance assets.  The Independent Review

---

[12]    The *Master Mortgage* factors are: (i) an identity of interest between the debtor and the third party, such that a suit against the nondebtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) substantial contribution by the nondebtor of assets to the reorganization; (iii) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (iv) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" vote to accept the plan; and (v) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction. *In re Master Mortg.*, 168 B.R at 937-38.

Option now provides a vehicle for establishing the high-value claims that would otherwise have been established in the tort system and that will reach into the excess coverage layer. This will result in increasing recoveries for survivors who elect Independent Review and for those who do not (by virtue of the 20% spillover to the general fund).[13]  In addition, by allocating payment of the portion of high-value claims in excess of $1 million to the Excess Award Fund, rather than the general Settlement Trust funds, Independent Review reduces the dilutive effect of high-value claims on the assets available to fund other Abuse Claims from the Settlement Trust.

26.     In short, Independent Review is an essential element of the Plan, both in terms of the Plan's ability to meet the confirmation standards and comply with applicable law regarding non-debtor releases and in terms of the Plan's ability to deliver fair compensation to all survivors.

**C.     The Findings in Connection with Plan Confirmation Can and Should Preserve the Rights of Both Non-Settling Insurers and Survivors with Respect to Coverage Issues**

27.     One of the most challenging aspects of mass-tort chapter 11 cases is to square the imperatives of (i) distributing settlement proceeds among the tort victims in an efficient and equitable way and (ii) preserving for survivors' benefit the value of outstanding non-settled insurance proceeds that may cover the liabilities being resolved and channeled under the plan. The Firms' consent to the Plan here is conditioned on findings that preserve the rights of both the tort victims and the non-settling insurers with respect to policies that are not being compromised under the plan. In resolving the tension in a way that allows for efficient and fair administrative resolution of settled claims and preserves rights as to non-settled insurance, the Firms are not asking the Court to determine that the TDP or the Independent Review Option bind any particular non-settling insurer with respect to any particular claim, or to determine the coverage obligations of

---

[13]   It is true that under the Prior Plan, all survivors would have theoretically shared in the proceeds of settlements with excess carriers, whereas under the current Plan, survivors who do not elect Independent Review share in only 20% of such proceeds. The reality, however, is that due to the low TDP claim values under the Prior Plan, favorable settlements with excess carriers were less likely. All survivors therefore do better with a structure that results in claim values that more accurately reflect the outcomes that would be obtained in the tort system. Moreover, survivors who hold higher value claims are fairly entitled to capture more of the value of excess insurance.

any non-settling insurer.  The proposed findings with which the Certain Insurers take issue do not do either; the proposed findings only specify the rights and obligations of the survivors under the Plan to avoid the risk that a subsequent coverage court charged with determining the liability of a non-settling insurer might misinterpret the Plan to find that some aspect of the treatment vitiated coverage that was otherwise present.  Non-settling insurers retain the coverage the defenses that they had pre-bankruptcy, but the requested findings assure the survivors that the Plan itself through the administrative resolution of settled liabilities does not inadvertently create new coverage defenses that did not previously exist.  As argued above, the use of trust distribution procedures is fully authorized by the Code, and even mandated in circumstances where it is impractical to determine the validity of each claim under the tort system.  Survivors should not be forced to choose between foregoing insurance recoveries for which carriers may be liable and the impractical alternative of having thousands of jury trials.  These mechanisms and the desire to preserve what non-settled insurance exists is consistent with and implement the dictates of section 524(e), which provides that the discharge of the debtor under the plan "does not affect the liability of any other entity on, or the property of any other entity, such debt."  11 U.S.C. §524(e); *cf, In re Edgeworth,* 933 F.2d 195, 197 ([t]he "fresh start policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured.") .

28.    An example of potential misinterpretation is provided by *Fuller Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958 (2006).  There, the California Court of Appeal held, in coverage litigation following confirmation of a 524(g) plan, that the liability of a 524(g) settlement trust for asbestos claims was not equal to the value of those claims as resolved under the procedures in that case, but only for the payment percentage of those values that the trust was able to pay the claimants based on the assets available to the trust obtained from settling parties.  *Id.,* at 996-97.  This had the effect of limiting non-settling insurers' coverage obligation to the amount that the trust was able to pay each claimant, not the amount of the claims for which the trust was

actually liable to the claimants.  This counterintuitive result—to deprive the trust of the insurance proceeds needed to pay the covered liabilities on the basis that the Trust lacked the funds to pay those liabilities without the insurance—is the kind of mischief that can result when complex bankruptcy plans end up in the hands of generalist courts.[14]  In the case of survivors electing the Independent Review Option, the initial payment percentage for the Excess Award Fund could be zero, reflecting that fact that the Excess Award Fund may not be funded until settlements are reached with presently non-settling excess insurers.  For that reason, the Firms have conditioned their consent to the Plan on the proposed finding, now found at Article IX.A.3.y., to make it clear that the Trust's liability to any survivor is for the amount of the survivor's claim as reflected in an Accepted Settlement Recommendation, not merely the amount that the Trust is able to pay from time to time.  Such a finding is not a determination that any non-settling insurer is liable for any particular claim or even at all but simply defines the relative rights of the Trust and the survivors.

29.    Similarly, the other challenged Plan findings upon which the Firms' consent to the Plan is conditioned specify that the Plan as confirmed complies with the appropriate legal standards for confirmation—that the assignments of existing non-settled insurance assets to the Settlement Trust are permissible, that the Plan is proposed in good faith, and that the base matrix values that the Settlement Trustee will use as the starting point under the TDP (subject to upward and downward adjustment based on the various scaling factors) are not arbitrary, but are consistent with the Debtors' historical litigation and settlement experience.  The Firms believe that these findings will be amply supported by the evidentiary record in this case and that, if so supported, they are appropriate findings for this Court to make in confirming the Plan.

---

[14] Certain Insurers rely on *Fuller Austin* in their *Objection to Confirmation of Debtors' Chapter 11 Plan*  [Dkt. No. 8695] at 52.  It is also notable that, unlike in this case, the debtors in *Fuller Austin* resisted the involvement of the non-settling insurers in the bankruptcy case.

## III.  CONCLUSION

For all the foregoing reasons, the Firms respectfully request that the Court confirm the Plan,

except to the extent set forth in the Limited Objection with respect to the TCJC Settlement.


DATED:  March 2, 2022                    By:  */s/ David M. Klauder*

KTBS LAW LLP                              BIELLI & KLAUDER, LLC
Thomas E. Patterson (*pro hac vice*)      David M. Klauder, Esquire (No. 5769)
Daniel J. Bussel (*pro hac vice*)         1204 N. King Street
Robert J. Pfister (*pro hac vice*)        Wilmington, DE 19801
Sasha M. Gurvitz (*pro hac vice*)         Phone: (302) 803-4600
1801 Century Park East, Twenty-Sixth Floor Fax: (302) 397-2557
Los Angeles, California 90067             Email: dklauder@bk-legal.com
Telephone     310-407-4000


*Counsel to each of The Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC*