**Exhibit 1**



Transcript of the Testimony of

# BRUCE GRIGGS

December 01, 2021

## IN RE BOY SCOUTS AND DELAWARE BSA

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

```
 1
 2              UNITED STATES BANKRUPTCY COURT
 3                FOR THE DISTRICT OF DELAWARE
 4                        -  -  -
 5    IN RE:                    : CHAPTER 11
 6    BOY SCOUTS OF AMERICA AND  : CASE NO.
 7    DELAWARE BSA, LLC,         : 20-10343 (LSS)
 8        Debtors.               : (Jointly Administered)
 9                        -  -  -
10
11
12               Remote videotaped deposition of
13    BRUCE GRIGGS, held via videoconference on
14    Wednesday, December 1, 2021, beginning at
15    approximately 10:06 a.m., the proceedings being
16    recorded stenographically by Gail Inghram
17    Verbano, Registered Diplomate Reporter, Certified
18    Realtime Reporter, Certified Shorthand
19    Reporter-CA (No. 8635), and transcribed under her
20    direction.
21
22
23
24                                          COPY
25
```

Page 126

1  of issues.
2      Q.   Okay.  Excuse my ignorance of
3  these categories.
4           So can you put a little more meat
5  on the bone on what the mental health
6  professional expert would be doing.
7      A.   Typically, conducting some sort of
8  psychological examination of the plaintiff to
9  assess the plaintiff's mental state and any
10 damages that are attributable to the sexual abuse
11 that the victim suffered, so just kind of a
12 mental health evaluation.
13     Q.   Okay.  And on the standard of care
14 expert, same question.
15     A.   Yes, so that would be someone who
16 could speak to -- as an example, if the abuse
17 occurred in 1972, talking about the state of
18 knowledge of sexual abuse in 1972, what kind of
19 procedures were in place in 1972, what was the
20 standard of care at that time.
21     Q.   And that would go --
22     A.   And what it is today and how it's
23 changed.
24     Q.   And so that would go to the issue
25 of whether the Boy Scouts were negligent or not;

Page 127

1  correct?
2      A.   Yes.
3      Q.   And then you mentioned a third
4  category that I was trying to scribble down here
5  furiously, protect -- a protection expert, can
6  you --
7      A.   Youth protection procedures.  So
8  what procedures were in place then, how has that
9  evolved over time, what is the Boy Scouts doing
10 today to protect its youth.  You know, all of the
11 things that go into any youth serving
12 organization that has kids, how do you do the
13 best you can to ensure that they're safe and
14 protected.
15     Q.   Okay.  And does that also go to
16 the issue of whether the Boy Scouts were
17 negligent or not?
18     A.   It can go to that issue.  It could
19 also potentially go to punitive damages.
20     Q.   Okay.  So I think you testified
21 earlier there were fact depositions taken
22 generally.  So would that be of the plaintiff?
23     A.   The plaintiff; if the -- the
24 perpetrator was alive and accessible, sometimes
25 the perpetrator would be deposed.

Page 128

1           If there were other -- for
2  example, adult youth leaders of the troop who
3  would have been -- had knowledge of relevant
4  facts at the time, that person might be deposed.
5           In limited circumstances other
6  members of the troop -- so if -- you know, the
7  victim's troop, if you could locate those persons
8  and, again, had knowledge of relevant facts, they
9  could be deposed.  Those are examples.
10     Q.   Okay.  And was the general purpose
11 of the fact depositions to develop the
12 Boy Scouts' defenses?
13     A.   To develop defenses and to
14 discover facts so that you could evaluate the
15 claims.
16     Q.   To see whether it was a viable
17 claim; correct?
18     A.   See whether it was a viable claim
19 or to see if it was a claim that needed to be
20 resolved rather than continue to be litigated.
21     Q.   Okay.  I think you said earlier
22 that -- and correct me if I'm wrong -- there were
23 two cases that went to trial that you're aware
24 of.
25     A.   Yes.

Page 129

1      Q.   And what were those two cases?
2  I'm sorry.  If you answered this before, I just
3  don't have it.
4      A.   The first was the Kerry Lewis case
5  in Oregon in 2010.
6      Q.   And what was the second one?
7      A.   Second was the Gordon case in
8  Connecticut, which I believe was tried in 2015 or
9  '16 or so, but I'm not sure of the dates of that
10 one.
11     Q.   The Lewis case in 2010, what was
12 the result?
13     A.   About a $20 million injury verdict
14 against the Boy Scouts.
15     Q.   Is that -- was that the one in
16 Portland, Oregon that Paul Mones tried?
17     A.   Yes, Paul Mones and others.
18     Q.   And what ended up happening?  Did
19 the Boy Scouts pay the verdict or did that get
20 settled after the verdict?
21     A.   It was settled post-verdict.
22     Q.   Do you remember for how much?
23     A.   I don't.
24     Q.   Okay.  And then the Gordon case in
25 Connecticut in 2015 or 2016, what was the result

Page 130

1  there?
2  A.   About an $11 million jury verdict,
3  I believe.
4  Q.   Against the Boy Scouts?
5  A.   Against the Boy Scouts, yes.
6  Q.   Okay. And did that verdict amount
7  get paid or was it appealed or settled or what
8  happened?
9  A.   That was appealed. As I
10 understand it, based on an erroneous jury
11 instruction. But during the pendency of the
12 appeal, my understanding is the parties reached a
13 high-low agreement. And the Connecticut Supreme
14 Court ultimately reversed it based on the
15 erroneous jury instruction, which then means it
16 settled for the low of the high-low agreement.
17 Q.   Okay. Were there appeals taken in
18 any of the underlying sexual abuse cases?
19 A.   When we got involved, the -- what
20 has been referred to as the Hacker cases were on
21 appeal to the Illinois court of appeals. That
22 was resolved, I believe, in late 2016 in a manner
23 adverse to the Boy Scouts.
24      And then the Brookover cases that
25 I talked about where the statute of repose was

Page 131

1  involved, the plaintiffs appealed that final
2  judgment and that was also resolved on appeal.
3  Q.   Okay. And the Boy Scouts won the
4  Brookover cases; correct?
5  A.   Yes.
6  Q.   Right. And then the Hacker cases
7  in Illinois, the Boy Scouts moved for summary
8  judgment in those cases, didn't they?
9  A.   Yes. As to one of the plaintiffs.
10 Q.   Right. And then there was an
11 appeal to the Illinois appellate court; correct?
12 A.   Correct.
13 Q.   And there was actually a petition
14 for review filed with the Illinois Supreme Court
15 wasn't there?
16 A.   Yes.
17 Q.   And that was filed by the
18 Boy Scouts; correct?
19 A.   Yes.
20 Q.   And that was denied by the
21 Illinois Supreme Court; correct?
22 A.   The petition for review was
23 denied, right. They did not hear the case.
24 Q.   Right. And so the Illinois
25 appellate court opinion in the Hacker case, see

Page 132

1  if this -- well, I'll just ask you rather than me
2  trying to characterize it. What did -- what's
3  your memory of what the Illinois appellate court
4  held?
5  A.   They essentially held that the
6  statute of limitations was a factual question to
7  be decided by the jury. So they rejected the
8  Boy Scouts' argument that the claims were barred
9  by the statute of limitations.
10 Q.   And did they -- they held that the
11 fraudulent concealment that the plaintiffs were
12 alleging was a fact issue for trial?
13 A.   Yes.
14 Q.   And that case never got tried;
15 right, those cases --
16 A.   There were 16 of them, and post
17 the ruling from the Illinois court of appeals
18 they were set as 16 separate trials, month by
19 month sequentially.
20 Q.   And none of them were tried; is
21 that correct?
22 A.   That is correct.
23 Q.   They were all settled?
24 A.   They were.
25 Q.   Would you say the Hacker cases

Page 133

1  were the most significant cases that you saw on
2  your watch as national coordinating counsel for
3  the Boy Scouts?
4  A.   In my view, yes.
5  Q.   And the most extreme cases?
6  A.   They had a variety of unfavorable
7  facts that made them very difficult to defend.
8  Q.   The cases that the Boy Scouts were
9  perhaps the most vulnerable in?
10      MR. MARTIN:  Objection to form.
11 A.   As a collective group, yes, given
12 the number of them.
13 Q.   And in that respect, would you say
14 that the Hacker cases were -- you could
15 differentiate the Hacker cases from many of the
16 other cases that were filed against the
17 Boy Scouts?
18 A.   That is fair.
19 Q.   Okay. Have you followed, in your
20 role as national coordinating counsel,
21 developments in the law with respect to
22 dispositive rulings in sexual abuse cases?
23 A.   Yes.
24 Q.   Okay. Can you -- can you tell me
25 what you've done there?

Page 250

1  law firms, the Pfau and Zalkin Law Firm.
2  So he's designated for us on our Topic
3  Number 2 and our Topic Number 3.
4      MR. MARTIN: Okay. Thank you.
5  So we'll take a -- let's take -- let's
6  take a 10-minute break.
7      THE VIDEOGRAPHER: Going off
8  the record at 4:56 p.m.
9          - - -
10     (Whereupon, a short recess was taken.)
11         - - -
12     THE VIDEOGRAPHER: We are back
13 on the record at 5:06 p.m.
14     MR. RUDMAN: Mr. Griggs, I have
15 no further questions for you this
16 afternoon. Thanks for your time.
17     **THE WITNESS: Thank you.**
18         EXAMINATION
19 BY MR. PFISTER:
20     Q.   Good afternoon, Mr. Griggs. My
21 name is Rob Pfister from the law firm of KTBS
22 Law. I represent the Zalkin Law Firm PC and Pfau
23 Cochran Vertetis & Amala PLLC.
24     How are you today?
25     A.   I'm doing well. How are you?

Page 251

1   Q.   Doing great. Thank you.
2        I have a couple of topics I want
3  to ask you questions on. The first concerns some
4  of the dollar amounts that we saw in some of the
5  earlier charts regarding settlements and trials.
6        First of all, is it your
7  understanding or am I correct that the maximum
8  dollar value under the TDP is $2.7 million?
9   **A.   I believe that's correct.**
10  Q.   And is it also correct that in the
11 past 11 years there have been only two jury
12 verdicts in sex abuse cases against the Boy
13 Scouts?
14  **A.   I believe that's correct.**
15  Q.   And in one of those cases, the
16 Oregon case in 2010, there was a $20 million jury
17 verdict; correct?
18  **A.   Yes.**
19  Q.   And in the Connecticut case in
20 2015 or 2016, there was an $11 million jury
21 verdict; correct?
22  **A.   Correct.**
23  MR. PFISTER: If I could ask
24 the technician to pull up Exhibit 4, which
25 is one of the Excel spreadsheets.

Page 252

1      THE DOCUMENT TECH: One moment.
2  I'm pulling that up right now.
3      MR. PFISTER: Thank you.
4      And if we could sort by column,
5  it looks like M, which is the settlement
6  dollar figures, sort them highest to
7  lowest. Maybe sort them the other way,
8  because the highest should start at 9.6.
9      Well, if you can filter instead
10 of doing that, instead of sorting you can
11 filter it above -- anything above
12 2.5 million -- or 2.7 million. Or you can
13 just pick 2 point -- yeah, 2.75 million.
14 Perfect.
15  Q.   Okay. So looking at that filtered
16 column there, am I correct that there have been
17 six -- pardon me -- am I correct that there have
18 been four $4 million settlements?
19  **A.   Yes, that appears to be correct.**
20  Q.   Okay. Two settlements for
21 $3.5 million each?
22  **A.   I see one on line 235 -- or claim**
23 **number 235. Where is the other one?**
24     I see -- yeah, I see. Yeah, I see
25 four.

Page 253

1   Q.   Yep, yep.
2   **A.   I see them.**
3   Q.   Okay. And there has been -- there
4  have been four settlements for $6 million each;
5  is that correct?
6   **A.   I'm seeing three but I'm maybe**
7  **just not scrolling down far enough.**
8   Q.   The ones I have are Claims 158,
9  159, 123, and 482.
10     I don't know if we can sort by
11 claim number or not. That might work. Here it
12 is.
13  **A.   Okay. It was just -- it was not**
14 **appearing on my screen.**
15  Q.   It was hidden.
16  **A.   Okay. I see them, yes.**
17  Q.   Okay. And then the other
18 settlement figures we have, we have one -- and
19 see if we can sort of these by dollar figure.
20 That -- I should have asked that earlier if --
21 even -- now that we have filtered it, if it will
22 sort by dollar figure.
23     It still doesn't want to. Well, I
24 can ask regardless.
25     So we've got -- the highest one on

Page 254

1 the chart is 9.6 million; right?
2   A.   Yes.
3   Q.   We've got one for 9 million?
4   A.   Yes.
5   Q.   One for 7.5 million?
6   A.   Yes.
7   Q.   One for 7.4 million?
8   A.   Yes.
9   Q.   One for 7.25 million?
10  A.   Yes.
11  Q.   One for 5 million?
12  A.   Yes.
13  Q.   One for 4.9 million?
14  A.   Yes.
15  Q.   One for 2.95 million?
16  A.   Yes.
17  Q.   And one for 2.75 million; correct?
18  A.   Yes.
19  Q.   Okay.  And now certain of those
20 fall within what I think you previously described
21 as the Hacker case; is that right?
22  A.   Correct, 16 of them.
23  Q.   Okay.  But not all of them --
24 okay.  But not all of them; right?  We've got
25 some from other cases as well; correct?

Page 255

1   A.   Right.
2   Q.   Okay.  May I ask you a quick
3 question on the status?  Most of them say,
4 "Closed, settled."  A few of them say, "Closed,
5 acknowledged."  What does "closed, acknowledged"
6 mean?
7   A.   Can you point me to the -- where
8 it says that?
9   Q.   Number -- you might have to delete
10 the filter and they are numbers 509 and 516.
11       So if we can sort by claim number.
12       There's one, "closed,
13 acknowledged," 516.
14  A.   I believe what that means is we
15 got a claim from New York which we recorded into
16 our system, and as I recall, because I do recall
17 this one, we tried to settle it.  We were not
18 successful so we ended up closing it because it
19 was barred by the statute of limitations but it
20 remained in the system.  So it just means we got
21 the claim but we didn't pay any money to resolve
22 it.
23  Q.   Got it.  Okay.
24       MR. PFISTER:  We can take down
25    Exhibit 4, please.

Page 256

1   Q.   And I have some questions on
2 allocation.  You previously testified, I believe
3 it was in response to some of the first examining
4 counsel's questions, that proportionate fault was
5 a significant consideration in the defense of sex
6 abuse cases against Boy Scouts of America.
7       Do you recall that?
8   A.   I do recall that and I should
9 clarify that a little bit.  You know,
10 proportionate responsibility if the perpetrator
11 could be held responsible.  If that perpetrator
12 could be on the verdict form and have his
13 percentage of fault attributed to him, that would
14 reduce the overall verdict, that would be
15 significant.
16  Q.   Well, let me ask about other
17 potential defendants who aren't the perpetrator.
18       So in certain of the sex abuse
19 lawsuits that you coordinated the defense of, is
20 it correct to say that the perpetrator himself,
21 or herself, was named as a defendant?
22  A.   In a limited number, yes.
23  Q.   Were there also cases in which the
24 chartered organization was named as a defendant?
25  A.   Yes.

Page 257

1   Q.   Were there cases in which the
2 local council was named as a defendant?
3   A.   Yes.
4   Q.   Aside from BSA itself, the
5 perpetrator, the chartered organization, and the
6 local council, were there typically any other
7 defendants in these sex abuse cases?
8   A.   There were on occasion individuals
9 named so not the accused abuser but somebody who
10 was allegedly an adult volunteer within the troop
11 who, again, allegedly may have had knowledge of
12 what was going on.  So in circumstances like that
13 they might be named as defendants.
14  Q.   Okay.  Did BSA ever take the
15 position that it was not responsible for the acts
16 of the abuse perpetrator?
17  A.   In limited circumstances, yes.
18  Q.   And did BSA ever succeed in --
19 when it made that argument?
20  A.   Well, in the context of a summary
21 judgment motion that says we're not legally
22 responsible, yes, BSA succeeded on a limited
23 number of occasions.
24  Q.   Did BSA ever take the position
25 that it is or it was not responsible for the

```
                                        Page 322
 1
 2                 C E R T I F I C A T I O N
 3
 4
 5           I hereby certify that I have read
 6   the foregoing transcript of my deposition
 7   testimony, and that my answers to the questions
 8   propounded, with the attached corrections or
 9   changes, if any, are true and correct.
10
11      ----------------------------------
        BRUCE GRIGGS
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                        Page 323
 1          CERTIFICATE OF SHORTHAND REPORTER
 2
 3           I, Gail Inghram Verbano,
 4   Registered Diplomate Reporter, Certified Realtime
 5   Reporter, Certified Shorthand Reporter (CA) and
 6   Notary Public, the officer before whom the
 7   foregoing proceedings were taken, do hereby
 8   certify that the foregoing transcript is a true
 9   and correct record of the proceedings; that said
10   proceedings were taken by me stenographically and
11   thereafter reduced to typewriting under my
12   supervision; and that I am neither counsel for,
13   related to, nor employed by any of the parties to
14   this case and have no interest, financial or
15   otherwise, in its outcome.
16
17
18      *Gail L. Inghram Verbano*
        _____
19      Gail Inghram Verbano, CSR, RDR, CRR
        CA-CSR No. 8635
20
21
22
23
24
25
```