**EXHIBIT 1**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
|  | **Hearing Date: March 14, 2022 at 10:00 a.m. (ET)** |
|  | **Re: D.I. 8813** |

## STATEMENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, A UTAH CORPORATION SOLE IN SUPPORT OF CONFIRMATION OF DEBTORS' THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC AND IN REPLY TO PLAN OBJECTIONS

---

[1] The Debtors ("***Debtors***" or "***BSA***") in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

FACTS .......................................................................................................................5

    I.     Procedural History ...................................................................................5

    II.    Scouting Was TCJC's Primary Form of Youth Programming for Over 100 Years ......................................................................................................7

    III.   Claims Against the BSA and TCJC Arise from the Same Facts ...........10

    IV.   History of Claims Against TCJC in the Tort System ...........................16

    V.    The BSA Indemnifies TCJC for Abuse Claims ...................................17

    VI.   TCJC is Insured Under BSA and Local Council Policies......................19

          A.    TCJC is Insured Under the BSA's Primary and Excess General Liability Insurance Policies.....................................................19

          B.    TCJC is Also Insured Under Numerous Local Council Policies..............22

    VII.   Few Abuse Claims Related to TCJC Are Potentially Compensable Under State Law .........................................................................................25

    VIII.  TCJC Settlement Terms........................................................................27

    IX.   The TCJC Settlement Provides for Payment in Full of TCJC Abuse Claims ...................................................................................................28

ARGUMENT ..........................................................................................................32

    I.     This Court Has Authority to Grant Final Approval of the TCJC Settlement and the Release of TCJC Abuse Claims ..........................32

          A.    This Court Has Constitutional Authority to Grant Final Approval of the TCJC Settlement and Releases ........................................32

          B.    This Court Has Subject Matter Jurisdiction to Resolve the Kinds of Third-Party Claims at Issue Here...............................................33

               1.    Core Jurisdiction Exists ................................................34

               2.    In the Alternative, Related-To Jurisdiction Exists .........36

i

|  |  | i. | Related-To Jurisdiction Exists Because Prosecution of Abuse Claims Against TCJC Would Impose a Financial Impact on the Settlement Trust | 36 |

|  |  | ii. | Related-To Jurisdiction Exists Because TCJC Abuse Claims Are Inextricably Intertwined with Abuse Claims Against the Estates | 37 |

|  |  | iii. | Related-To Jurisdiction Exists Because Prosecution of TCJC Abuse Claims Would Deplete Valuable Insurance Assets Otherwise Available to the Estates | 44 |

|  |  | iv. | Jurisdiction Exists Because Prosecution of TCJC Abuse Claims Would Liquidate Indemnity Claims Against The Estates | 47 |

C.      The Bankruptcy Code Authorizes Bankruptcy Courts To Grant Nonconsensual Third-Party Releases In Appropriate Circumstances ................. 49

        1.      The Code's Text, Purpose, History, and Precedent Authorize Third-Party Releases When Fair And Necessary, In Extraordinary Cases ................................................................ 49

        2.      The SDNY Decision in *Purdue* is Inapplicable and Wrong ......... 52

II.      The Bankruptcy Court Should Grant The Third-Party Releases ........................ 53

    A.      The TCJC Settlement, Including the Third-Party Releases, is Fair ........... 55

    B.      The Third-Party Releases Are Necessary ................................................. 61

    C.      This Case is Extraordinary ....................................................................... 63

III.      The Best Interests Test is Satisfied With Respect to TCJC Abuse Claims ........... 64

    A.      Section 1129(a)(7) Does Not Apply to Third-Party Claims ..................... 64

    B.      The  TCJC Settlement Provides Abuse Claimants with Greater Value Than They Would Receive in Chapter 7 ......................................... 65

RESERVATION OF RIGHTS ............................................................................... 67

CONCLUSION ...................................................................................................... 67

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re A.H. Robins*,
   788 F.2d 994 (4th Cir. 1986) ..............................................................................44, 45

*In re A.H. Robins Co., Inc.*,
   828 F.2d 1023 (4th Cir. 1987), *cert. denied sub nom Oberg v. Aetna Cas. &*
   *Surety Co.*, 485 U.S. 569 (1988)................................................................................45

*In re A.H. Robins*,
   880 F.2d 694 (4th Cir. 1989) ....................................................................................60

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007)........................................................................64

*In re Airadigm Commc'ns, Inc.*,
   519 F.3d 640 (7th Cir. 2008) ....................................................................................51

*In re Amatex Corp.*,
   755 F.2d 1034 (3d Cir. 1985)....................................................................................39

*In re AOV Indus., Inc.*,
   792 F.2d 1140 (D.C. Cir. 1986)................................................................................34

*Bailey v. United States*,
   516 U.S. 137 (1995)..................................................................................................53

*Bayless v. Indus. Comm'n of Arizona*,
   880 P.2d 654 (Ariz. Ct. App. 1993)..........................................................................42

*In re Blitz U.S.A., Inc.*,
   No. 11-13603, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014)................................ *passim*

*In re Burns & Roe Enters.*,
   2005 Bankr. LEXIS 3173 ..........................................................................................58

*In re Catholic Diocese of Wilmington, Inc.*,
   No. 09-13560 (CSS) (Bankr. D. Del. Aug. 8, 2011)..................................................41

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995)............................................................................................36, 49

*Cervantez v. J.C. Penney Co.*,
   24 Cal. 3d 579 (1979) ..............................................................................................13

*In re Charles St. African Methodist Episcopal Church of Bos.*,
499 B.R. 66 (Bankr. D. Mass. 2013) .............................................................34, 35

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004) .............................................37, 38, 40, 48

*In re Comcoach Corp.*,
698 F.2d 571 (2d Cir. 1983) .............................................................39

*In re Continental Airlines*,
203 F.3d 203 (3d Cir. 2000) ................................................. *passim*

*Coram Healthcare*,
315 B.R. 321 (Bankr. D. Del. 2004) .............................................60

*CoreStates Bank, N.A. v. Huls Arn., Inc.*,
176 F.3d 187 (3d Cir. 1999) .............................................................48

*Doe 1 et al. v COP, et al.*,
3:07-cv-01499-PK (D. Or. 2007) .............................................16

*In re Matter of Dues*,
98 B.R. 434 (Bankr. N.D. Ind. 1989) .............................................39

*In re Dow Corning Corp.*,
280 F.3d 648 (6th Cir. 2002) .............................................51, 59

*In re Dow Corning Corp.*,
86 F.3d 482 (6th Cir. 1996) .............................................44

*In re Drexel Burnham*,
960 F.2d 285 (2d Cir. 1992) .............................................52

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) .............................................59

*In re U.S. Fidelis, Inc.*,
481 B.R. 503 (Bankr. E.D. Mo. 2012) .............................................59

*Flickinger v. Swedlow Engineering Co., Inc.*,
45 Cal. 2d 388 (Cal. 1955) .............................................14, 43

*In re Flintkote Co.*,
No. 04-11300 (JKF) (Bankr. D. Del. Nov. 26, 2007) .............................................58

*In re Forty-Eight Insulations, Inc.*,
133 B.R. 973 (Bankr. N.D. Ill. 1991) .............................................62

*In re Global Indus. Technologies, Inc.*,
  645 F.3d 201 (3d Cir. 2011)................................................................50

*In re Global Indus. Techs., Inc.*,
  No. 02-21626, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013).......................55

*Hibbs v. Winn*,
  542 U.S. 88 (2004)......................................................................52

*Hong Sang Market, Inc. v. Peng*,
  20 Cal. App. 5th 474, 229 Cal. Rptr. 3d 99 (Cal. Ct. App. 2018) ...................14, 42

*Imerys Talc Am., Inc.*,
  No. 19-mc-103 (MN) (D. Del. July 19, 2019)........................................47, 48

*In re Mallinckrodt plc*,
  No. 20-12522 (Bankr. D. Del. Feb. 3, 2022) ....................................... *passim*

*International Union of Op. Engineers Local 542 v. Mallinckrodt ARD, Inc.*,
  No. 21-114, 2021 WL 915722 (E.D. Pa. March 10, 2021)..........................37, 38, 39

*In re Johns Manville Corp.*,
  40 B.R. 219 (S.D.N.Y. 1984)..............................................................43

*In re Jordan*,
  403 B.R. 339 (Bankr. W.D. Pa. 2009) ....................................................39

*K.F. v. The Corp. of the President of the Church of Jesus Christ of Latter-day Saints*,
  No. 2:04-cv-02338, 2006 WL 3734770 (W.D. Wash. Oct. 12, 2006)...................16

*Landry v. Luscher*,
  95 Wash. App. 779, 976 P.2d 1274 (1999).........................................14, 41

*Lang v. BSA, Ventura County Council, TCJC, et al.*
  (Ca. Sup. Ct. 2012) .....................................................................11

*In re Lower Bucks Hosp.*,
  471 B.R. 419 (3d Cir. 2012) .........................................................34, 35

*In re LTL Management, LLC*,
  No. 21-30589 (MBK) (Bankr. D.N.J. Feb. 25, 2022)...................................66

*MacArthur Co. v. Johns-Manville Corp.*,
  837 F. 2d 89 (2d. Cir. 1988)............................................................52

*Malta v. Phoenix Title & Tr. Co.*,
  259 P.2d 554 (Ariz. 1953)...............................................................14

*In re Marcus Hook Dev. Park Inc.*
    943 F.2d 261 (3d Cir. 1991).....................................................................................36

*In re Martin Paint Stores,*
    199 B.R. 258 (Bankr. S.D.N.Y. 1996) .....................................................................39

*In re Master Mortg. Inv. Fund, Inc.,*
    168 B.R. 930 (Bankr. W.D. Mo. 1994).....................................................................54

*Mejia v. Merchants Building Maintenance, LLC,*
    38 Cal. App. 5th 723, 251 Cal. Rptr. 3d 61 (Cal. Ct. App. 2019) ...........................14

*In re Metromedia Fiber Network,*
    416 F.3d 136 (2d Cir. 2005)...............................................................................52, 59

*In re Millennium Lab Holdings II, LLC*
    575 B.R. 252 (Bankr. D. Del. 2017), aff'd 591 B.R. 559 (D. Del. 2018), aff'd
    945 F.3d 126 (3d Cir. 2019), cert. denied, s, —— U.S. ——, 140 S. Ct. 2805,
    207 L.Ed.2d 142 (2020) .................................................................................. *passim*

*In re Millennium Lab Holdings II, LLC*
    945 F.3d 126 (3d Cir. 2019).......................................................................32, 34, 51

*Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint
    Chapter 11 Plan, In re Purdue Pharma L.P.*, Case No. 19-23649 (Bankr.
    S.D.N.Y. Sept. 16, 2021).........................................................................................64

*Mullarkey v. Tamboer (In re Mullarkey),*
    536 F.3d 215 (3d Cir. 2008).....................................................................................34

*In re Pacor, Inc.,*
    743 F.2d 984 (3d Cir. 1984).....................................................................................36

*In re Perry,*
    394 B.R. 852 (Bankr. S.D. Tex. 2008) ....................................................................39

*In re Plant Insulation Co.,*
    469 B.R. 843 (Bankr. N.D. Cal. 2012) ....................................................................65

*In re Public Serv. Co.,*
    88 B.R. 546 (Bankr. D.N.H. 1988) ..........................................................................39

*In re Purdue Pharma, L.P.,*
    No 7:21-cv-7532-CM (S.D.N.Y. Dec. 16, 2021)........................................40, 52, 53

*In re Purdue Pharma L.P.*
    (RDD) (Bankr. S.D.N.Y. Sept. 17, 2021) ...........................................................55, 65

*In re PWS Holding Corp.*,
 228 F.3d 224 (3d Cir. 2000)............................................................51, 53

*In re Quigley Co.*,
 676 F.3d 45 (2d Cir. 2012)..............................................................40, 44

*Seale v. Gowans*,
 923 P.2d 1361 (Utah 1996)...............................................................14, 42

*In re SoyNut Butter Co.*,
 No. 17-B-14970, 2018 WL 3689549 (Bankr. N.D. Ill. Aug. 1, 2018) ...................................61

*Stern v. Marshall*,
 564 U.S. 462 (2011)..........................................................................32

*In re TK Holdings Inc.*,
 No. 17-11375, 2018 WL 1306271 (Bankr. D. Del. Mar. 13, 2018) ...............54, 63
 No. 17-11375 (BLS) (Bankr. D. Del. Feb. 16, 2018) ............................41

*Travelers Indem. Co. v. Citgo Petroleum Corp.*,
 166 F.3d 761 (5th Cir. 1999) .............................................................62

*United Artists Theatre Co. v. Walton*,
 315 F.3d 217 (3d Cir. 2003).............................................................54, 59

*United States v. Energy Resources Co., Inc.*,
 495 U.S. 545 (1990)..........................................................................50

*In re USA Gymnastics*,
 No. 18-09108 (RLM) (Bankr. S.D. In. Dec. 16, 2021) [Docket No. 1776]............................41

*Vitek Inc. v. Floyd*,
 51 F.3d 530 (5th Cir. 1995) ...............................................................62

*Wing v. Hulet*,
 684 P.2d 314 (Idaho Ct. App. 1984)....................................................14, 42

*In re W.R. Grace & Co.*,
 13 F.4th 279 (3d Cir. 2021) ...............................................................36

*In re W.R. Grace & Co.*,
 591 F.3d 164 (3d Cir. 2009)..............................................................4, 46

*In re W.R. Grace & Co.*,
 900 F.3d 126 (3d Cir. 2018)................................................... *passim*

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
 386 B.R. 17 (Bankr. D. Del. 2008) ............................................4, 38, 44, 45

*World Trade Ctr. Props. LLC v. Certain Underwriters at Lloyd's of London,*
   650 F.3d 145 (2d Cir. 2011)..................................................................................62

## STATUTES

11 U.S.C.
   § 105................................................................................................................49
   § 105(a)..................................................................................................49, 50, 51
   § 502................................................................................................................48
   § 524(e)........................................................................................................ *passim*
   § 524(g)............................................................................................................60
   § 524(g)(2)(B)(IV)(bb).....................................................................................60
   §§ 1121–1144..................................................................................................34
   § 1123................................................................................................................52
   § 1123(a)(5)..............................................................................................49, 50
   § 1123(b)..........................................................................................................49
   § 1123(b)(6).....................................................................................................49
   § 1129(a)(1)......................................................................................................51
   § 1129(a)(7)......................................................................................................64
   § 1129(a)(7)(A)................................................................................................64

28 U.S.C.
   § 157(b)(1).......................................................................................................34
   § 157(b)(2)(L)..................................................................................................34
   § 1334.........................................................................................................35, 36

Ariz. Rev. Stat. § 12-2506(A)....................................................................................31

Cal. Civ. Code § 1431.2..............................................................................................31

Idaho Code § 6-803....................................................................................................31

Utah Code Ann. § 78B-5-820................................................................................31, 56

## RULES

Fed. R. Civ. P. 19.......................................................................................................41

## TREATISES

2 Colier on Bankruptcy (16th ed. 2021)....................................................................49

6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 41.04 (7th ed.).........................15

CACI No. 406..............................................................................................................14

Judicial Council of California Civil Jury Instructions (2020 ed.).............................15

Rest. (2d) of Judgments § 24 (1982) ..........................................................................14, 42

Rest. (2d) of Agency § 213 ................................................................................................12

Rest. (2d) of Agency § 82 ..................................................................................................13

Rest. (2d) of Torts § 323 ...................................................................................................13

The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole ("*TCJC*"), files

this statement (this "*Statement*") in support of confirmation of the Debtors' *Third Modified Fifth*

*Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*

[Docket No. 8813] (the "*Plan*")[2] and in reply to certain Plan objections.   In support of its

Statement, TCJC hereby asserts the following:

## PRELIMINARY STATEMENT

1.        TCJC was the foundational Chartered Organization of the Boy Scouts of America.

TCJC supported the Debtors for over 100 years and entrusted the Scouting program with virtually

all of the millions of boys who grew up as TCJC members between 1913 and 2018.   TCJC now

respectfully requests that this Court confirm the Plan and approve the TCJC Settlement to

compensate survivors of Abuse in Scouting through payment in full of claims allocable to TCJC.

2.        These Chapter 11 Cases present an extraordinary means to deliver compensation to

tens of thousands of survivors.   Prior to these chapter 11 cases, approximately 1,700 abuse claims

are known to have been bought against the Debtors.   Approximately 82,209 Abuse Claims have

been timely filed in this case.   In the absence of the Plan and the TCJC Settlement, tens of

thousands of these claims—likely the majority of these claims—would be dismissed in the tort

system or disallowed through a claims resolution process applying state law based on applicable

statutes of limitation and insufficient proof of liability.   The ability for survivors to file a proof of

claim and obtain payment for that claim through the Plan and Trust Distribution Procedures

("*TDPs*") creates a process that provides confidentiality, efficiency, speed of resolution, certainty,

and perhaps some dignity of justice for survivors on a scale that is not possible through any other

---

[2]        Capitalized terms used but not otherwise defined in this Statement shall have the meanings ascribed to them
in the Plan.

1

legal means.  Put plainly, the TCJC Settlement and the Plan are *the only* means available to provide compensation to an unprecedented number of survivors, many of whom lack viable recourse outside of the Plan and TDPs.

3.      The TCJC Settlement delivers a substantial contribution to survivors with claims related to TCJC through, among other things, a cash contribution of $250 million, waiver of indemnity claims of over ████████ (plus unliquidated contingent claims), and contribution of valuable insurance rights arising from policies issued to the Debtors and non-debtor Local Councils.  Most importantly, this contribution enables payment in full of claims allocable to TCJC through the TDPs.  In stark comparison, if the Plan is not confirmed, compensation on any level is an uncertainty for many if not most survivors.  No objecting party has presented any evidence to the contrary.  The fairness of this settlement is evidenced by the super-majority of over 53,000 survivors who have voted in favor of the Plan.

4.      The TCJC Settlement is necessary to the Debtors' reorganization and maximization of value for survivors.  Insurance rights are the largest asset of the Debtors' estates by orders of magnitude.  These insurance rights, and the insurance rights of Local Councils, are subject to the co-equal rights of TCJC as an additional insured party.  In the absence of the TCJC Settlement that provides for TCJC to contribute its insurance rights to the Settlement Trust created under the Plan, TCJC would be entitled to assert claims against the Debtors' and Local Councils' insurance policies and reduce the value of insurance settlements for the estates.  Time-consuming and extensive litigation would be required to adjudicate the relative rights of TCJC and other parties to these policies.  Such litigation will result in substantial administrative expenses and significant delay, which would impair distributions to survivors.  For these reasons, among others, the Settling Insurers have in fact conditioned their respective agreements, which contribute an aggregate of

over $1.5 billion, on the effectiveness of the TCJC Settlement. This condition further demonstrates the necessity of the TCJC Settlement.[3]

5.      This Court is well within its authority and jurisdiction to approve the Plan and TCJC Settlement under Third Circuit law without any modifications. Third Circuit law is clear that the Court has both constitutional and statutory authority to approve nonconsensual third-party releases, including the release provided by the TCJC Settlement. Furthermore, the Court has subject matter jurisdiction to approve the TCJC Settlement and Channeling Injunction. This jurisdiction flows from the Court's core jurisdiction to confirm the Plan, including the TCJC Settlement. In the alternative, the Court has non-core related-to jurisdiction over Scouting-related claims against TCJC.

6.      Claims against TCJC would affect the Debtors' estates for multiple independent reasons, any one of which is sufficient for related-to jurisdiction. First, the post-Effective Date obligations of the Settlement Trust under the Plan and TCJC Settlement to defend the Channeling Injunction as to TCJC constitutes an effect on the estate that provides subject matter jurisdiction. *See In re W.R. Grace & Co.*, 900 F.3d 126, 139 (3d Cir. 2018). Second, TCJC has a "unity of interests" with the Debtors' estates as to claims against TCJC that are related to Scouting. Claims against the estates and related claims against TCJC are inextricably intertwined and cannot be severed under applicable state law. Indeed, this Court has previously found jurisdiction on this basis over such claims. *See* Ex. 1, Tr. of Hr'g Ruling on the BSA's Mot. for a Prelim. Inj. Pursuant to §§ 105(a), 362 of the Bankr. Code (Mar. 30, 2020), 14:9–12. Third, claims against TCJC would remove insurance assets of the estates by triggering TCJC's co-equal rights to such insurance assets, which provides a basis for jurisdiction. *See, e.g., In re Blitz U.S.A., Inc.*, No. 11-13603

---

[3]      *See infra* note 41.

(PJW), 2014 WL 2582976, at *6 (Bankr. D. Del. Jan. 30, 2014). Fourth, claims against TCJC would give rise to indemnity claims against the estates and thereby give rise to jurisdiction. *See, e.g.*, *In re W.R. Grace & Co.*, 386 B.R. 17, 28 (Bankr. D. Del. 2008).

7. Objections to the scope of the injunction embodied in the TCJC Settlement with respect to so-called "Mixed Claims" suffer from multiple fatal flaws.[4] As a threshold matter, objectors that do not assert claims against TCJC do not have standing to challenge the scope of the Channeling Injunction as to TCJC. For example, Lujan & Wolff LLP has represented that it does not represent any client that asserts claims against TCJC, and accordingly, they should not be entitled to object to the TCJC Settlement.

8. Even if a party has standing to bring an objection to the scope of the Channeling Injunction as to the TCJC, the Pfau/Zalkin Objection[5] is based on a faulty premise that tort claims of a survivor arising from a single perpetrator can be severed into independent causes of action for claims that are related to Scouting and those that allegedly are not. The objectors ask this Court to flip established bankruptcy law on its head and sever their state law claims to permit them to bring claims outside of the bankruptcy process against TCJC in a manner that cannot survive in the tort system. State law defines the nature of the Abuse Claims asserted in these cases. According to state law, plaintiffs may not bring separate lawsuits for claims that arise from a common nucleus of facts. In reality, in the event of litigation over a so-called "Mixed Claim", even if a plaintiff brings suit solely against TCJC, TCJC would be entitled to bring the Debtors

---

[4] Individual survivors who have voted to support the Plan, including those that changed their votes to support the Plan in light of recent settlements, are not capable of objecting to the Plan or the TCJC Settlement. TCJC reserves the right to contest standing to object to the Plan and TCJC Settlement based on the final results of voting. *See also infra* note **Error! Reference source not found.**.

[5] *See Limited Objection of the Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC to Treatment of TCJC in Debtors' Second Modified Fifth Amended Plan of Reorganization* [Docket No. 8770] ("***Pfau/Zalkin Objection***").

into the suit and argue that the Debtors should be allocated a share of fault. This reality evidences that claims against TCJC and the Debtors are "inextricably intertwined," even when a plaintiff argues that some portion of Abuse occurred prior to the plaintiff's involvement in Scouting, so long as a part of the claims at issue (including counter-claims by TCJC against the Debtors) are related to Scouting. Any party that has filed a proof of claim in these cases has admitted, under penalty of perjury, that its claims are related to Scouting, and they should be bound to that position.

9.    The Plan and TCJC Settlement deliver compensation in full for TCJC's allocable share of liability for Scouting-related claims. No party has shown evidence to the contrary. The terms of the Plan and TCJC Settlement are unequivocally within this Court's authority and jurisdiction. The TCJC Settlement is a fair and necessary element of the Plan, and it should be approved in accordance with Third Circuit law. The incredible complexity of this case is overshadowed only by the challenges that would be faced in the event that the Plan is not confirmed. Counsel that represents a constituency totaling 57 claims related to TCJC,[6] and who is bound to recommend to those same claimants to vote to accept the Plan, should not be permitted to derail the TCJC Settlement that is supported by over 53,000 survivors that are entitled to receive the fair and swift compensation provided by the Plan and TCJC Settlement.

**FACTS**

I.    **Procedural History**

10.    On February 18, 2020 (the "***Petition Date***"), the BSA commenced these Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"). On the same day, the BSA initiated an adversary proceeding by filing its *Verified Complaint for Injunctive Relief*, Adv. Pro. No. 20-50527 (LSS) (the "***Complaint***") (cited herein as

---

[6]    *See* Pfau/Zalkin Objection, ¶ 8.

5

"Adv. Pro."). Along with the Complaint, the BSA filed *The BSA's Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* (the "***Preliminary Injunction Motion***"). In the Preliminary Injunction Motion, the BSA sought to extend the automatic stay to enjoin the prosecution of pending claims against the BSA and other non-debtor entities (including TCJC). As a result of an agreement reached among the BSA, the official committee of unsecured creditors (the "***UCC***"), and the Tort Claimants' Committee (the "***TCC***"), the Bankruptcy Court entered the *Consent Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Granting the BSA's Motion for a Preliminary Injunction* (the "***Consent Order***") on March 30, 2020. *See* Adv. Pro. Docket No. 54. The Consent Order has been extended through the date that the Bankruptcy Court issues its decision confirming or denying confirmation of the BSA's Plan. *See* Adv. Pro. Docket No. 179.

11. TCJC initially opposed the Plan and Disclosure Statement due to the Plan's proposed treatment of TCJC's insurance rights under the BSA Insurance Policies and Local Council Insurance Policies, and because of the discriminatory treatment of Indirect Abuse Claims as originally contemplated in the Plan and TDPs relative to holders of claims of equal priority. *See* Docket Nos. 3263 & 6009. On September 14, 2021, as the result of extensive mediation among the Mediation Parties,[7] the Mediators filed the *Sixth Mediators' Report* [Docket No. 6210] describing the terms of the proposed settlement (the "***TCJC Settlement Term Sheet***") among TCJC, the Debtors, the Coalition of Abused Scouts for Justice (the "***Coalition***"), the legal representative for future claimants (the "***FCR***"), and the Ad Hoc Committee of Local Councils (the "***AHC***"). Subsequently, on February 18, 2022, the TCJC Settlement Term Sheet was

---

[7]    As defined in the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [Docket No. 812].

memorialized in the TCJC Settlement Agreement, filed at Docket No. 8908-1 (the "***TCJC***

***Settlement***"). The TCJC Settlement is described more fully in Section VIII, *infra*.

12. On September 30, 2021, the Court entered an order approving the Debtors'

Disclosure Statement. *See* Docket No. 6438. Following the solicitation period, the Debtors'

balloting agent reported 73.57% of Direct Abuse Claims accepted the Plan, while 26.43% of Direct

Abuse Claims rejected the Plan. The balloting agent further provided that of the Direct Abuse

Claims, (1) 11.41% of those voting by Master Ballot accepted the Plan, while 88.59% rejected the

Plan, and (2) 87.10% of those voting by Direct Ballot accepted the Plan, while 12.90% rejected

the Plan. *See Declaration of Catherine Nownes-Whitaker of Omni Agent Solutions Regarding the*

*Solicitation of Votes and Final Tabulation of Ballots Cast of the Second Modified Fifth Amended*

*Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket

No. 8345].

## II.    Scouting Was TCJC's Primary Form of Youth Programming for Over 100 Years

13. Historically, TCJC and the BSA shared a close and long-standing relationship in

Scouting. In 1913, TCJC became the first charter organization of the BSA. Until December 2019,

TCJC partnered with the BSA to deliver the Scouting program to boys and young men to gain

skills, values, and spiritual strength through outdoor activities and programs.[8]

14. From 1928 to 2019, the BSA's Scouting program was the official activity program

for TCJC youth. During this time, TCJC sent millions of boys and young men into the Scouting

program. No other Chartered Organization shared such a deep connection with Scouting that

virtually all boys involved in such Chartered Organization became part of Scouting.

---

[8]    In December 2019, TCJC concluded its 105-year relationship as a Chartered Organization with all BSA
scouting programs. As reported by the Debtors, the effect of this change was expected to remove nearly half a million
scouts from the BSA's Scouting programs.

15.     TCJC participated in Scouting through the chartering of troops by local TCJC congregations, which are known as wards and branches.  These wards and branches are not separate legal entities.  The leaders of these units are known as bishops and branch presidents.  These are volunteer positions that are typically held for three to five years and rotated among ordinary congregation members.

16.     Until late 2019, each year, most wards and branches in the United States would charter a scout troop.  The bishop or branch president would become the chartered organization representative.  TCJC would pay the fees to the BSA for each Scouting unit it sponsored and the registration fees for TCJC adults and youths that participated in Scouting.  TCJC also raised additional money for Scouting through Friends of Scouting fundraisers.

17.     The chartering agreement for each unit sponsored by TCJC governed the relationship between TCJC and the BSA/Local Council.  Although the charter agreements have changed over the years, under the typical charter language, TCJC would agree to run the Scouting unit according to BSA policies and guidelines.  The BSA and Local Councils would, in turn, agree, among other things, to provide training to leaders, review and approve applications for adult members, including conducting a criminal background check, and, in some cases, the Local Councils agreed to provide primary general liability insurance to cover TCJC and its volunteers.

18.     Thus, although the day-to-day operations of a Scout troop were administered by TCJC pursuant to BSA guidelines, each TCJC adult scouting leader had to be approved by the BSA.  As will be shown at the confirmation hearing, each TCJC volunteer had to complete a BSA adult application and be approved by the BSA.  In that regard, TCJC now understands that to assist with the approval process, the BSA kept ineligible volunteer files concerning adults who may pose a danger to youths that participate in Scouting.

19.    TCJC President Thomas S. Monson described the integration of the Scouting program into TCJC in 1990:

> The Church of Jesus Christ of Latter-day Saints continues to have Scouting comprise the large measure of the activity program for our young men at all levels - Cubs, Boy Scouts, Varsity and Explorers. . . . I like the way the Church has coordinated and fully correlated the activities of the young men with the instruction we provide in the Aaronic Priesthood. We don't have a Scoutmaster competing against a deacon quorum adviser, or a priest quorum adviser competing against the Explorer post leader because we have blended them so that it's one boy and one troop, one Church and one program.

*See* Ex. 2, Our Leaders Speak on Scouting and Exploring: Statement of TCJC President Thomas S. Monson, TCJC003830 (Feb. 3, 1990).  Thus, while TCJC was involved in Scouting, there was no situation where an adult male that served in Scouting would act in a Scouting capacity in some instances and then a TCJC capacity in other instances.  Instead, the adult would at all times when interacting with youth be serving in both TCJC and Scouting capacities.  For example, if someone served as a TCJC Young Men President, he was also an adult Scouting leader.

20.    TCJC's and the BSA's close historical relationship is evidenced by published and organizational documentation spanning from the early 1900s to the early 2000s.  *See, e.g.,* Ex. 3, *Vanguard-Scout Guide*, TCJC001171, TCJC001175 (1929) ("Perhaps no other institution sponsoring Scouting is so well adapted for efficient work in these fields as is the L. D. S. Church."); *see also* Ex. 4, LDS Church and Scouting 'Stronger than Ever," TCJC003796 (Sept. 21, 2003) (stating that TCJC "was the first chartered organization in the Boy Scouts of America back in 1913, and today it has more Scouting units than any other organization . . . .").  In addition, BSA

Local Council leadership recently confirmed that Scouting was, in fact, "a required part" of TCJC's youth and young men's program. *See* Ex. 5, Hunt Dep., 71:2–5 (Dec. 9, 2021).[9]

21.     Since its inception, the BSA has relied on Chartered Organizations, including TCJC, to assist the BSA in enrolling new members. *See* Ex. 5 at 201:12–15.  It is estimated that TCJC's disassociation from BSA as a Chartered Organization reduced the BSA's membership by nearly half a million youth. *Id.* at 82:5–17.  The BSA and its Local Councils have stated that the post-petition goal is to maintain its relationships with its "value[d]" chartered organizations, who have historically provided meeting places for BSA troops and approved the scout leaders in charge of the troops. *Id.* at 206:12–20, 208:4–10.  The importance of TCJC's 105-year relationship with the BSA is undeniable and cannot be divorced from the resolution of these Chapter 11 Cases.

### III.    Claims Against the BSA and TCJC Arise from the Same Facts

22.     Prior to the Petition Date, TCJC was named alongside the BSA, Local Councils, and perpetrators in lawsuits alleging Abuse in the context of the Scouting program.  A review of past complaints demonstrates that plaintiffs have historically asserted overlapping claims against the BSA and TCJC, based on an identical set of facts giving rise to such claims. *See, e.g.,* Ex. 6, Compl. in the Superior Ct. of the State of Ariz. in and for the Cnty. of Coconino, TCJC008650 (Dec. 30, 2020) (naming TCJC and several Councils and describing ███████████

████████████████████████████████████████████████████████████

████████████████████████████████ Ex. 7, Pet., 3, 5–9, *Slamin v. Heart of Am. Council, BSA, and TCJC, et al.*, (Mo. Cir. Ct. 2015) (1516-cv-07546), TCJC008320 (Apr. 14, 2015)

████████████████████████████████████████████████████████████

████████████████████ ; Ex. 8, Compl., 29, *Novak v. Boy Scout of Am., Chester Cnty. Council,*

---

[9] All depositions cited herein refer to depositions in the above-captioned matter.

*TCJC, et al.*, (Pa. Ct. Com. Pl 2012)  (1212017146), TCJC010069 (Dec. 12, 2012) ███████

████████████████████████████████████████████████████████████████████████████████

Ex. 9, Compl., 23, *Bateman v. Pacific Harbors Council and TCJC, et al.*, Wa. Sup. Ct. (21-2-05399-0) (Apr. 7, 2021) (pleading "NEGLIGENCE" against "All Defendants" based on a common set of facts); Ex. 10, Am. Compl., 9-10, *R.D. & C.D. v. BSA & TCJC*, (D. Wash. 2010) (2:10-CV-1006), TCJC009075 (Aug. 10, 2010) ████████████████████████████████████████

█████████████████████████████  Ex. 11, Third Am. Compl., 5, 21-23,  *Lang v. BSA, Ventura County Council, TCJC, et al.*, (Ca. Sup. Ct. 2012) (56-2010-00384465-CU-PO-VTA), TCJC009757 (Oct. 29, 2010) ████████████████████████████████████████████

█████████████████████████████████████████

23.    Specifically, pleadings that named both the BSA and TCJC as defendants typically involved alleged Abuse by individuals who were affiliated with both institutions. *See, e.g.,* Ex. 10

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████  Employees of both organizations have confirmed the overlapping nature of the facts arising in cases brought together against TCJC and the BSA.[10] Because Katheryn McNally, the TCC's valuation expert, did not analyze the value of the TCJC Abuse Claims in her expert report,[11] the TCC has agreed that it will offer no evidence or testimony through McNally related to the purported value of Abuse Claims relating to TCJC or the adequacy

---

[10]    *See* Ex. 12, Rytting Dep., 74:16–20 (Nov. 29, 2021) (confirming that in the course of TCJC's and the BSA's partnership, the entities were named as defendants in abuse lawsuits); *see also* Ex. 13, Allen Dep., 72:1–18 (Dec. 2, 2021) (stating that Chartered Organizations and Local Councils would be named as co-defendants in abuse cases brought against the BSA).

[11]    In her deposition, Katheryn McNally stated that she is not aware of any sexual abuse claim in the BSA bankruptcy case that is not related to the BSA, nor is she aware of sexual abuse claims related to TCJC that are not related to scouting. *See* Ex. 14, McNally Dep., 363:13–20, 366:10–14 (Feb. 3, 2022).

and/or reasonableness of the TCJC Settlement. *Stipulation Withdrawing Motion in Limine Without Prejudice* [Docket No. 9005]. Thus, no party has presented evidence that rebuts the evidence presented by BSA and TCJC that the TCJC Settlement delivers cash consideration to the Settlement Trust that exceeds TCJC's allocable share of liability for TCJC Abuse Claims in the tort system.

24.    In the tort system, claimants typically asserted several causes of action against TCJC, including negligent hiring and supervision, failure to protect, ratification, and intentional infliction of emotional distress, as more fully detailed below:[12]

　　i.   Negligent Hiring.  Plaintiffs have asserted claims for negligent hiring where "[a] person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: . . . (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others."  Restatement (Second) of Agency § 213. "Liability results under the rule stated in this Section, not because of the relation of the parties, but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment." *Id.*

　　ii.  Negligent Supervision.  Plaintiffs have asserted claims for negligent supervision on the theory that a "[t]he principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is

---

[12]    *See, e.g.*, Ex. 11 at 21-26, 39-43 ███████████████████████████████

████████████████████████████████ Ex. 7 at 3, 5-9 ████████████

██ Ex. 9 at 23 ████████████████

███████████ Ex. 10 at 3 (asserting claims of negligent failure to protect, negligent hiring, and negligent supervision based on common set of fact and damage allegations arising from abuse by scout leader).

likely to harm others in view of the work or instrumentalities entrusted to him."

Restatement (Second) of Agency § 213, cmt. d.

iii.  <u>Negligent Failure to Protect</u>.  Plaintiffs have asserted claims for negligent failure to protect, which provides that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm . . . ."  Restatement (Second) of Torts § 323.

iv.  <u>Ratification</u>.  Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.  *See* Restatement (Second) of Agency § 82.

v.  <u>Intention Infliction of Emotional Distress ("*IIED*")</u>.    IIED requires demonstrating: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."  *See, e.g.*, *Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 593 (1979).

25.    When claims such as these are asserted in the tort system, they are litigated in a single lawsuit, against all responsible parties, at the same time.  The law is clear that when a primary right is violated, such as the right to freedom from bodily harm, "[a] plaintiff is prohibited

from dividing a primary right and enforcing it in two suits." *Mejia v. Merchs. Bldg. Maint., LLC*, 38 Cal. App. 5th 723, 737, 251 Cal. Rptr. 3d 61 (Cal. Ct. App. 2019) (citation omitted).  Where a claim arises from a common nucleus of operative facts, such claim cannot be "split" or litigated in piecemeal or successive actions against co-defendants.  *See, e.g.*, *Malta v. Phoenix Title & Tr. Co.*, 259 P.2d 554, 557 (Ariz. 1953) ("A plaintiff is not permitted to split his claim and harass an adversary with more than one action for one wrong."); *Flickinger v. Swedlow Eng'g Co., Inc.*, 45 Cal. 2d 388, 393 (Cal. 1955) ("The law abhors a multiplicity of actions. . . . [A] party cannot by negligence or design withhold issues and litigate them in successive actions; he may not split his demands or defenses; he may not submit his case in piecemeal fashion."); *Hong Sang Mkt., Inc. v. Peng*, 20 Cal. App. 5th 474, 490, 229 Cal. Rptr. 3d 99 (Cal. Ct. App. 2018) ("Thus, while a primary right may support multiple theories of liability or various forms of relief, it gives rise to a single, indivisible cause of action."); *Wing v. Hulet*, 684 P.2d 314, 318 (Idaho Ct. App. 1984)  ("The rule against splitting a claim applies even though the remedies or forms of relief demanded in one suit are different from those demanded in another."); *Seale v. Gowans*, 923 P.2d 1361, 1364 (Utah 1996) ("'[O]nce injury results there is but a single tort and not a series of separate torts, one for each resultant harm. . . . [A] plaintiff may not split this cause of action by seeking damages for some of his injuries in one suit and for later-developing injuries in another.'") (internal citation omitted); *Landry v. Luscher*, 95 Wash. App. 779, 780, 976 P.2d 1274 (Wash. App. Div. 3 1999) ("Filing two separate lawsuits based on the same event—claim splitting—is precluded in Washington.").

26.     It is black letter law that if an action is brought for part of a claim, a judgment obtained in the action precludes the claimant from bringing a second action against a separate defendant based upon the same claim.  *See* Restatement (Second) of Judgments § 24 at 196 (1982)

("When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar, the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, *or series of connected transactions, out of which the action arose*") (emphasis added).

27.    Moreover, where a fact finder determines that more than one defendant was a factor in causing a plaintiff's harm, the state law that would apply to the overwhelming majority of TCJC Abuse Claims[13] would require that a fact finder *must* apportion fault by assigning percentages of responsibility among co-defendants.    *See, e.g.*, CACI No. 406 ("Apportionment of Responsibility"), Judicial Council of California Civil Jury Instructions (2020 ed.); Jury Instruction 41.04 ("Fault to Be Apportioned"), 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 41.04 (7th ed.).

28.    In cases tried to verdict, liability has historically been apportioned among co-defendants, including the BSA, TCJC, perpetrators, and/or Local Councils (as applicable).  In the majority of pre-1984 cases settled without a trial, settlement dollars were often allocated between the BSA and TCJC, consistent with the apportionment scheme utilized in the tort system, although other considerations impacted the split as well.  The fact that settlements would be apportioned is accepted by the valuation experts of both the BSA[14] and the TCC,[15] and is explicit from the BSA's

---

[13]    As defined in the TCJC Settlement Agreement, "***TCJC Abuse Claims***" refers to any Abuse Claim in connection, in whole or in part, with TCJC's involvement in, or sponsorship of, one or more Scouting units (including any Claim that has been asserted or may be amended to assert in a proof of claim alleging abuse, whether or not timely filed, in the Chapter 11 Cases.

[14]    In the deposition of Dr. Charles Bates, the BSA's valuation expert, Dr. Bates confirmed that it is appropriate to allocate only a share of financial responsibility from abuse claims to TCJC because "other BSA-related parties would share in a portion of that liability, either through shared insurance . . . or as part of the shared responsibility." Ex. 15, Bates Dep., 212:3–11 (Jan. 28, 2022).

[15]    *See* Ex. 14 at 398:18–400:22 (explaining that while she made no opinion regarding what value of the claims potentially relating to TCJC would be apportioned to TCJC specifically, the total value she attributes to TCJC-related claims represent claim values for all BSA-related entities' share).

business records.[16]

## IV.   History of Claims Against TCJC in the Tort System

29.     As a threshold matter, most Abuse Claims brought against TCJC  were settled before such cases ever went to trial.  Accordingly, there is not a significant number of verdicts reached in the tort system with respect to TCJC's liability in connection with TCJC-related Abuse Claims against BSA.

30.     For example, in one of the few TCJC-related Abuse lawsuits tried to verdict, a Washington jury attributed 75% fault to the abuser's intentional conduct and 25% to the negligent conduct of TCJC and three nonparties.  Of the four negligent parties, the jury found TCJC 25% responsible, and found other negligent nonparties 45%, 15%, and 15% at fault, respectively.  These nonparties included the survivor's parents.  Thus, TCJC was ultimately apportioned 5% of the liability.  *See K.F. v. The Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, No. 2:04-cv-02338, 2006 WL 3734770 (W.D. Wash. Oct. 12, 2006).

31.     The following verdict further illustrates the percentage of TCJC liability found in prior cases:[17]



---

[16]     *See* Ex. 16, BSA Claims and Settlement Apportionment Spreadsheet, BSA-PLAN_00122136 (May 2, 2016) (illustrating that liability and settlement amounts for sexual abuse claims were apportioned amongst TCJC, BSA, insurers, and other interested parties).

[17]     In *Doe 1 et al. v COP, et al.*, 3:07-cv-01499-PK (D. Or. 2007), TCJC is considered a "Non-Party" given it was not a party to the trial as it had settled before the trial began.  The jury was asked to apportion fault as to TCJC regardless, and apportioned TCJC 25% notwithstanding that TCJC did not appear in the trial to defend itself due to the pre-trial settlement.

32.     As evidenced by the exemplar verdicts, significant fault was rarely apportioned to TCJC, and the average settlement per case is significantly lower than what the TCJC Settlement provides to claimants holding TCJC Abuse Claims.  *See* Ex. 17, Rebuttal Report of Jessica B. Horewitz, 12 (Jan. 5, 2022).

## V.    The BSA Indemnifies TCJC for Abuse Claims

33.     For over a century, TCJC's involvement in Scouting has been premised upon the expectation and agreement that TCJC would be held harmless by the BSA for any injuries or wrongdoing connected to Scouting.   In fact, the BSA historically assumed the lead role in defending and resolving Abuse Claims on behalf of Chartered Organizations, including TCJC (upon request).   TCJC tendered, and the BSA fully defended and paid, any and all costs associated with the settlement of Abuse Claims.[18]  As TCJC will demonstrate at trial, in the event a Chartered Organization fronted the cost of litigating Abuse Claims, the BSA would provide contribution so that "everybody had paid their portion."  Ex. 13 at 54:19–55:3.  This established practice is evidence of the BSA's formal commitment through corporate resolutions to indemnify Chartered Organizations.[19,20]

---

[18]     *See* Ex. 18, Notice of Claim and Tender for Def. and Indem., TCJC008289 (Jan. 20, 2016).

[19]     *See, e.g.,* Ex. 19, Boy Scouts of Am.: Resol. Regarding Ins. & Indemnification of Chartered Orgs. & Use of Charter Agreement in Civil Litig., TCJC005979 (Sept. 23, 2021)

[20]     The circumstances may vary if a Chartered Organization had an insurance policy separate and apart from the BSA policies under which they were covered.  *See* Ex. 13 at 235:24–237:22

34.     Additionally, TCJC and the BSA had an understanding that the BSA would provide full defense and indemnification of Abuse Claims involving TCJC.  *See* Ex. 20, Letter Regarding Indem. for Or. Claims, TCJC008963, TCJC008973-TCJC008974 (Feb. 4, 2004).  It was TCJC's understanding that pursuant to these verbal agreements and course of dealing, the BSA provided full defense and indemnification for Scouting-related claims, and that TCJC's scout registration fees increased in part to defray the cost of increasing insurance premiums.  *Id.*  The parties' course of dealing established that TCJC tendered Abuse Claims to the BSA, the BSA confirmed the claims were related to Scouting, and the BSA then provided TCJC with a full defense and indemnification. *Id.*  TCJC maintained that the BSA provided such services to TCJC in appreciation of the continued and significant financial and other support that TCJC provided the BSA.  *Id.*  In fact, TCJC's financial support included approximately $65 million TCJC provided to the BSA in the form of annual registrations, charitable donations, and real estate purchases between 2006-2019 alone.

35.     TCJC's position is supported by historical documentation between TCJC and the BSA.  In correspondence regarding a claim arising out of TCJC's sponsorship of a BSA troop in the early 1990s, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

*See* Ex. 21, Letter from Debra Duhs Griffith to Dwayne L. Liddell, TCJC008164 (May 16, 1991). TCJC's understanding is further supported by additional correspondence from TCJC's counsel in that time period,[21] and consistent with practice, ███████████████████████

███████████████████     *See* Ex. 23, Letter from Mark L. Dama to Paul D. Rytting, TCJC008219 (Feb. 11, 1994).  Similar correspondence between TCJC and the BSA was prevalent

---

[21]     *See* Ex. 22, Letter from Allen M. Swan to Jack E. Greer, TCJC008147 (Apr. 19, 1990) ███████

throughout the decade, in which the BSA continued to defend and indemnify TCJC in Abuse litigation.[22,23]

## VI.    TCJC is Insured Under BSA and Local Council Policies

### A.    TCJC is Insured Under the BSA's Primary and Excess General Liability Insurance Policies

36.    Shared insurance has been a key feature of TCJC's participation in the BSA's Scouting program for over forty-five years.  Beginning in 1978, █████████████████

█████████████████████████████████████████

█████████████ BSA's Mem. of Law in Support of Mtn. for Prelim. Inj., at 11 (Adv. Case No. 20-50527, Docket No. 7); Decl. of Brian Whittman in Supp. of BSA's Mtn. for Prelim. Inj. ¶ 15 (Adv. Case No. 20-50527, Docket No. 8); *see also* Disclosure Statement at 66 [Docket No. 6445].



███    *See* Disclosure Statement at 66; Ex. 27, Hartford Ins. Pol'y 10CA43349E, BSA-

---

[22]    *See, e.g.*, Ex. 24, Letter from Mark L. Dama to Allen M. Swan, TCJC008175 (Jan. 23, 1992)█

█████████; Ex. 25, Letter from Mark L. Dama to Jack E. Greer, TCJC008176 (Feb. 3, 1992)█

[23]    In certain instances, █



*See, e.g.*, Ex. 26, TCJC-BSA Hold Harmless Agreement, BSA-RSA_00000705, BSA-RSA_00000706 (Apr. 29, 2011) (

PLAN_00251749, Add'l Insured Endt.; Ex. 28, Hartford Ins. Pol'y 10CA43359E, BSA-

PLAN_00485313, Add'l Insured Endt.[24]

37.     The insurance rights provided to organizations like TCJC were no mere

afterthought.  Rather, the BSA structured its general liability insurance program with a central

purpose of providing primary, first-dollar defense and indemnity coverage to chartering

organizations for claims arising from their sponsorship of Scouting.  ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ Ex. 29, INA Ins. Pol'y GLP 70 64 52, BSA-

PLAN_00485360, Endt.  4 ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ *See, e.g.*, Ex. 30, INA Ins Pol'y ISL 1353, BSA-

---

[24] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[25]     Generally speaking, "fronting" policies include a deductible equal to the policy limit such that the policyholder retains the risk and is essentially self-insured.  *See Fronting*, irmi.com/term/insurance-definitions/fronting (last visited Feb. 2, 2022).  Among other purposes, fronting arrangements allow entities that self-insure to comply with financial responsibility laws in states that require evidence of coverage by an admitted insurer. *Id.*  Fronting companies assume a credit risk (for which they charge a percentage of the policy premium) because they remain responsible to honor the policy's obligations in the event the Named Insured entity is unable to pay.  *Id.*

PLAN_00485508, Endt. 8 (1981-82 policy period); Ex. 31, Liberty Ins. Pol'y TB1-191-409751-121, BSA-PLAN_00489840, Endt. 2 (2001-02 policy period); Ex. 32, Old Republic Ins. Pol'y MWZY 59555, BSA-PLAN_00495190 (2012–13 policy period).

38.     As Debtors acknowledge, TCJC has rights in the BSA policies from 1976 forward based on the inclusion of "sponsor[]" and/or "Chartered Organizations" in the definition of "insured" or "additional insured."  *See* Disclosure Statement, Art. III F.3; *see also, e.g.*, Ex. 30 at § (b) ("Persons or Entities Insured").  The Debtors and their advisors have further acknowledged on multiple occasions throughout the course of the bankruptcy proceedings that TCJC and other Chartered Organizations have rights under the BSA's insurance policies.[26]

39.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████        Ex. 35, INA Ins. Pol'y ISLGO293172-2, BSA-PLAN_00485693, Endt. 9.  That endorsement states:



40.    ████████████████████████████████████████

████████████████████████████████████████

████████████        *See, e.g.*, Ex. 36, INA Insurance Policy HDO G1 07 54 09-4, BSA-

<hr />

[26]     *See* Ex. 33, Whitman Dep., 68:1–17 (July 14, 2021) (stating that "the BSA is not the only insured on many of its policies"); *see also* Dec. 7, 2021 Dep. of Brian Whittman, 94:24–95:7 (stating that  Chartered Organizations became insureds under the BSA's insurance policies covering abuse claims starting in 1976 and continuing through the petition date); Ex. 34, Whitman Dep., 198:4–199:11 (Dec. 7, 2021) (stating that in addition to the TCJC settlement being above the lowest point of reasonableness, the BSA's view is that TCJC, at the very least, had rights in the BSA's insurance from 1976 and after.).

PLAN_00486958 (1990–91 policy period); Ex. 31 at Endt. 5 (2001–02 policy period); Ex. 32 (2012–13 policy period).

41.     TCJC's rights under the BSA's general liability policies do not end at the primary level.  From at least 1978 forward, TCJC qualifies as an insured or additional insured under the BSA's umbrella and excess policies as well, many of which follow form to the primary policies. *See* Disclosure Statement at 66.  ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  Ex. 37, Expert Report of Nancy Gutzler, 17 & Table. 4 (Dec. 5, 2021).

## B.     TCJC is Also Insured Under Numerous Local Council Policies

42.     TCJC is also entitled to coverage under numerous liability insurance policies issued to the Local Councils from at least 1965 to 1978.  From 1965 to 1971, Century Indemnity Company (formerly INA) "created an insurance program for the Local Councils" called the Scout Blanket Liability Program.  Disclosure Statement at 64.  Through the Scout Blanket Liability Program, Century issued hundreds of general liability insurance policies, generally designated with policy numbers beginning with "SBL," to Local Councils in which TCJC sponsored scouting units.  *See* Plan at Schedule 3.  Although the Local Councils were not able to produce complete copies of all of the SBL policies, ████████████████████████████████████████

██████████████████████  *See, e.g.*, Ex. 38, INA Ins. Pol'y SBL 25054, BSA-PLAN_00255734. ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████  *Id.* at 1

(emphasis added); *see also* Ex. 39, Expert Report of Michael L. Averill, 11 (Dec. 5, 2021). This definition is consistent with the materials used to market the Scout Blanket Liability Program

to prospective insureds.  *See* Ex. 39 at 10–11.  Each Scout Blanket Liability policy provides per occurrence liability limits of between $250,000 and $1 million with no aggregate limit.  *See* Plan at Schedule 3.

43.    The Scout Blanket Liability policies are not the only Local Council policies that insure TCJC. 

. *See* Ex. 27 at Named Insured Endt.,

Plan at Schedule 3.

*See, e.g.,* Ex. 40, National Union Insurance Policy BE 1151554, BSA-PLAN_00252358, Endt. 5

*Id.* at Endt. 1.

*See id.* at Endt. 5

Plan at Schedule 3.

44.    A patchwork of other policies procured by the various Local Councils also provide coverage to TCJC.  Liberty Mutual (formerly General Casualty Company of America), for example, issued general liability policies to the Cascade Pacific Council (formerly the Portland Area Council, in which TCJC sponsored units and from which it has received a number of claims) for a number of years beginning as far back as 1949.  *See* Plan at Schedule 3.

██████████████████████████████████████████████

████████████   *See, e.g.*, Ex. 41, General Casualty BLP 67048, BSA-PLAN_00242627, BSA 236

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████   *See* Ex. 39 at 8; Plan at Schedule 3.  The number of policies issued to Local Councils totals nearly seven-thousand.  Plan at Schedule 3.  As shown in the preceding paragraphs, TCJC has insurance rights under a significant portion of these policies.

45.    As TCJC will demonstrate at trial, TCJC has tendered claims for defense and indemnity under all of the BSA and Local Council policies that are implicated by the claims asserted against TCJC in these proceedings.  In so doing, TCJC tendered not only those policies in place at the time of the alleged abuse for any given claim, but also those policies in place after the abuse took place in recognition of (1) the policies' coverage for "injuries" occurring during the policy period, and (2) TCJC's experience that sexual abuse claimants may be entitled to compensation for mental and physical injuries persisting long past the date of abuse, often into the present day.

46.    The BSA has entered into settlement agreements (subject to the Court's approval) with several of its major insurers: Century Indemnity/Chubb; Hartford; Zurich American Insurance Company, American Guarantee & Liability Insurance Company, and Steadfast Insurance Company (collectively, "*Zurich*"); and Clarendon National Insurance Company (formerly Clarendon America Insurance Company), River Thames Insurance Company Limited (as successor to UnionAmerica Insurance Company Limited), and Zurich American Insurance Company (as successor to Maryland Casualty Company and American General Fire & Casualty Company) (collectively, "*Clarendon*").

24

47.     In recognition of this claims history, the BSA's settlements with its insurers are conditioned upon TCJC's release of its claims for coverage.  *See infra* note 41.  Together, these insurers have agreed to contribute over $1.5 billion to the Settlement Trust in exchange for a complete release of claims against them.  Each of these settlements is conditioned upon the Chartered Organizations' assignment of their insurance rights to the settlement trust or, in the alternative, releases by the Chartered Organizations of their claims against the respective insurers' policies.  *See id.*

## VII.    Few Abuse Claims Related to TCJC Are Potentially Compensable Under State Law

48.     As described in the preceding Sections II, III, and IV, TCJC and the BSA have shared a close and long-standing relationship in Scouting.  Until December 31, 2019, TCJC had been the largest Chartered Organization and partner of the BSA.

49.     Of the more than 82,200 Direct Abuse Claims timely filed in these Chapter 11 Cases, the Debtors identified approximately 7,700 such claims that could potentially be attributable to TCJC's involvement with Scouting.  The 7,700 claims initially identified by the Debtors included (i) approximately 2,850 such claims that directly identify TCJC, (ii) approximately 650 such claims that contain information tied to other Abuse Claims attributable to TCJC, and (iii) approximately 4,200 such claims relating to Local Councils with more than fifty percent (50%) of their membership historically comprising TCJC members.[27]

50.     Upon receiving the approximately 7,700 claims and related data, TCJC performed an extensive and thorough statistical sampling analysis of thousands of claims that were potentially

---

[27]     The Debtors' process for identifying these 7,700 claims involved identifying information included on the face of the timely filed Direct Abuse Claims that could potentially relate to or implicate TCJC.

relevant to TCJC.  This analysis involved a methodical review of the claims and underlying facts instead of focusing solely on facially-present criteria or key terms.

51.    As a result of this analysis, TCJC concluded that the vast majority of the approximately 7,700 claims reviewed were invalid as to TCJC based on a variety of factors. Namely, TCJC reviewed the approximately 7,700 claims for (i) duplicates, (ii) whether any of the claims were previously settled, (iii) whether there was a legitimate connection to TCJC (including whether the alleged perpetrator was affiliated with TCJC), (iv) whether the claims were barred by statutes of limitations, and (v) whether the claims should be covered by insurance.  Out of the 7,700 claims, TCJC's analysis found that only 324 claims may potentially have value in the tort system.  Dr. Bates recognized that certain claim categories he used to identify claims potentially relating to TCJC "almost assuredly include some Abuse Claims which were not affiliated with the TCJC."  Ex. 42, Expert Report of Charles E. Bates, 53 (Dec. 5, 2021); Ex. 15 at 224:9–17.  Thus, the Debtors' estimate of claims potentially relating to TCJC proves to be over-inclusive, and Dr. Bates expressed this during his deposition, stating that he was sure that not all of the 7,700 claims would have value in the tort system.  Ex. 15 at 224:18–24.

52.    Dr. Jessica B. Horewitz's analysis supports the conclusions drawn by TCJC in its statistical sampling.  Although the TCC's expert identified an astounding 1,554 claims with potential value in the tort system,[28] Dr. Horewitz observed that the data upon which McNally relied did not support McNally's opinion that 1,554 such claims would have value in the tort system. *See* Ex. 17 at 13–14.  Dr. Horewitz further opined that McNally only had superficial knowledge regarding specific TCJC involvement at the Scout leader (or Local Council) level and was therefore unable to credibly evaluate TCJC's relationship (if any) on each of the 1,554 claims.  *Id.*

---

[28]    *See* Ex. 43, Expert Report of Katheryn R. McNally, 24 (Dec. 5, 202134).

## VIII.   TCJC Settlement Terms

53.     The TCJC Settlement, by its terms, constitutes a full and complete compromise and settlement of (i) TCJC Abuse Claims; (ii) TCJC Claims;[29] and (iii) disputes relating to the Plan, including, among other things, the TCJC Insurance Rights.[30]

54.     Pursuant to the TCJC Settlement, on the Effective Date of the Plan, TCJC will (i) deposit $250 million in cash into escrow; (ii) consent, pursuant to the Plan, to the assignment and transfer by the Debtors, the Local Councils, and any other co-insureds of any and all rights, attributable to (a) the Abuse Insurance Policies, the Abuse Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (b) the Insurance Actions; and (c) the Insurance Action Recoveries; and (iii) with respect to the Indirect Abuse Claims (Claim Nos. 1248 and 12530) filed by TCJC, consent to the subordination of such Indirect Abuse Claims to the payment of Direct Abuse Claims.

55.     On the date that the Confirmation Order and Affirmation Order become Final Orders, TCJC will (i) contribute to the Settlement Trust $250 million in cash previously held in escrow; (ii) consent to the waiver, release, and expungement of the TCJC Claims and agree not to

---

[29]     "TCJC Claims" refers to all Causes of Action and Claims relating to (1) Abuse Claims, (2) the Chapter 11 Cases, (3) the Plan, and/or (4) any Claims that were or could have been asserted by TCJC against the Debtors or the other Releasing Parties, including any Indirect Abuse Claims.

[30]     "TCJC Insurance Rights" refers to all of TCJC's rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Abuse Insurance Policies, the Abuse Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries.  Notwithstanding anything else to the contrary contained herein, to the extent a holder of an Abuse Claim is entitled to receive payment from the TCJC Settlement Contribution pursuant to the Plan and Settlement Trust Documents, as a condition precedent to receiving any proceeds from the TCJC Settlement Contribution, such holder shall be required to execute (and shall be deemed to have granted) a full and complete written release in favor of TCJC with respect to such Abuse Claim, which release shall be in form and substance acceptable to TCJC and a copy of which form shall be filed with the form of TCJC Settlement Agreement filed in the Plan Supplement.

assert any claim against, among others, the Debtors, Reorganized BSA, or the Settlement Trust; and (iii) further agree to transfer and assign the TCJC Insurance Rights to the Settlement Trust.

56.     In exchange for TCJC's contributions to the Settlement Trust described above, TCJC will become a Protected Party under the Plan, with all the benefits and protections of the Channeling Injunction.  Pursuant to the Channeling Injunction, (i) all TCJC Abuse Claims shall be permanently channeled to the Settlement Trust under the Plan; (ii) such TCJC Abuse Claims shall thereafter be asserted exclusively against the Settlement Trust and may not proceed in any manner against TCJC in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum; and (iii) shall be processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.

57.     In the event that any litigation asserting an Abuse Claim is filed in any forum naming TCJC as a defendant, in violation of the terms of the Plan or the Confirmation Order, the Settlement Trust shall, at the request of TCJC, promptly appear (1) before the Bankruptcy Court to obtain entry of an order enforcing the Channeling Injunction and (2) in such litigation seek the dismissal of the case.

## IX.     The TCJC Settlement Provides for Payment in Full of TCJC Abuse Claims

58.     The TCJC Settlement provides full and complete compromise and settlement of TCJC Abuse Claims and absolves TCJC of any further financial responsibility on any past, present, or future TCJC Abuse Claims.  The Debtors testified that TCJC's $250 million settlement payment and contribution of insurance and indemnification rights, among the TCJC Settlement's additional terms, should fully resolve the 7,700 current claims plus all future claims Debtors believe may

involve TCJC.[31]  TCJC's view comports with the Debtors', and the TCJC Settlement is further supported by the FCR as both reasonable and in the best interests of future claimants.[32]

59.     TCJC's position is supported by an in-depth analysis of historical BSA claim data. In her expert report of January 5, 2022, Dr. Horewitz stated that TCJC's potential liability with respect to certain Abuse Claims is covered in full by the TCJC Settlement.   In particular, Dr. Horewitz concluded TCJC's agreement to release claims against the BSA, as well as to contribute $250 million, seeks to "fully compensate those claimants and settle [TCJC's] potential liability arising out of such claims," in addition to contributing TCJC's indemnity and insurance rights.  *See* Ex. 17 at 2.

60.     In support of her conclusion, Dr. Horewitz found that the $250 million TCJC is contributing "is sufficient to address TCJC's responsibility in the BSA bankruptcy," even under her "high claim count" and "high claim face value," both of which she considers to be conservative and highly unlikely scenarios.  *Id.* at 17.  Dr. Horewitz's conclusion holds for future claims as well; even assuming that latent claims are brought against TCJC, Dr. Horewitz's high-end liability scenario remains sufficient to capture the impact of such future claims.  *Id.* at 14.  The Debtors' valuation expert, Dr. Charles Bates, also expressed his agreement that the TCJC Settlement serves to "fully resolve [TCJC's] share of liability for all the Abuse Claims."  *See* Ex. 42 at 54.

61.     Dr. Horewitz used BSA historical settlement data to calculate an average aggregate claim value, which yielded a range of potential values, including a low-end of $344,998 per claim and a high-end of $442,045 per claim.  *See* Ex. 17 at 10.  After accounting for certain factors, such

---

[31]     Ex. 44, Desai Dep., 316:12–317:18 (Dec. 3, 2021) (affirming that the BSA believes that TCJC's $250 million settlement payment and contribution of insurance rights resolves the 7,700 current claims plus all future claims involving TCJC).

[32]     Ex. 45, Patton Dep., 113:20–114:22 (Nov. 30, 2021).

as apportionment of fault,[33] Dr. Horewitz concluded that TCJC's $250 million cash contribution was more than sufficient to cover TCJC's apportioned liability, even in the unlikeliest scenarios she modeled.  Specifically, Dr. Horewitz determined that, assuming a 50-50 split of liability between TCJC and the BSA—which she considered "conservative" —[34] TCJC's cash consideration covered TCJC's liability "under all but the most extreme and unlikely circumstances," a scenario in which both her highest claim count and highest average claim value were assumed.  *Id.* at 12, Table 4.  Dr. Horewitz further concluded that TCJC's settlement is sufficient even under the highest ends of her claim count and value ranges—an outcome that is "highly unlikely" to occur—if TCJC were apportioned 42.2% or less of liability.  *Id.* at 17.

62.    Dr. Horewitz's conclusions did not consider the additional value of TCJC's insurance rights under the BSA and Local Council policies, or TCJC's indemnity rights.  *Id.* at 12. Dr. Horewitz did, however, separately analyze the value of TCJC's insurance rights in an appendix to her report and concluded that those rights are worth between $156 and $164 million in years with remaining coverage, a figure that would readily cover any shortfall if necessary.  *Id.* at 22, Table A2.

63.    Dr. Horewitz's report notes that the majority of TCJC Abuse Claims come from four states:  California, Utah, Arizona, and Idaho.  *Id.* at 14.  In her high-end claim count estimation, 49% of the TCJC Abuse Claims are from those four states; in her low-end claim count estimation, it is 81% of TCJC Abuse Claims.  *Id.*  These states take a modified or restrictive approach to joint and several liability.

---

[33]    *Id.* at 11.

[34]    *Id.* at 12.

64.     For example, California permits joint and several liability for economic damages, but not for non-economic damages (such as pain, suffering, or, emotional distress, among others).[35] Utah generally does not permit joint and several liability.[36] Arizona abolished joint and several liability save for limited circumstances, such as when parties act in concert to commit intentional torts or when one party is the agent of another.[37] Idaho takes the same approach as Arizona, limiting joint and several liability to circumstances where parties act in concert or one party is agent of another.[38]  In short, Dr. Horewitz found there is virtually no conceivable scenario in which the consideration conveyed in the TCJC Settlement would not meet or exceed TCJC's liability in the tort system after accounting for all applicable factors relevant to TCJC.

65.     No party has offered any basis to rebut the reasonableness of the TCJC Settlement.[39]  Because Katheryn McNally, the TCC's valuation expert, did not analyze the value of the TCJC Abuse Claims in her expert report,[40] the TCC has agreed that it will offer no evidence or testimony through McNally related to the purported value of Abuse Claims relating to TCJC or the adequacy and/or reasonableness of the TCJC Settlement.  *Stipulation Withdrawing Motion in Limine Without Prejudice* [Docket No. 9005].  Thus, no party has presented evidence that rebuts

---

[35]     Cal. Civ. Code § 1431.2 ("In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint.").

[36]     Utah Code Ann. § 78B-5-820 ("[T]he maximum amount for which a defendant may be liable to any person seeking recovery is that percentage or proportion of the damages equivalent to the percentage or proportion of fault attributed to that defendant. . . . A defendant is not entitled to contribution from any other person.").

[37]     Ariz. Rev. Stat. § 12-2506(A) ("In an action for personal injury, property damage or wrongful death, the liability of each defendant for damages is several only and is not joint, except as otherwise provided in this section. Each defendant is liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be entered against the defendant for that amount.").

[38]     Idaho Code § 6-803 ("A party shall be jointly and severally liable for the fault of another person or entity or for payment of the proportionate share of another party where they were acting in concert or when a person was acting as an agent or servant of another party.").

[39]     Ex. 14., 370:6-12 ███████████████████████████████████████████████████████████████

[40]     Ex. 43; Ex. 14, 399:15–400:22.

31

the evidence presented by BSA and TCJC that the TCJC Settlement delivers cash consideration to the Settlement Trust that exceeds TCJC's allocable share of liability for TCJC Abuse Claims in the tort system.

## ARGUMENT

### I.    This Court Has Authority to Grant Final Approval of the TCJC Settlement and the Release of TCJC Abuse Claims

#### A.    This Court Has Constitutional Authority to Grant Final Approval of the TCJC Settlement and Releases

66.    This Court has constitutional authority to confirm a plan containing nonconsensual third-party releases. *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 140 (3d Cir. 2019). As Article I courts, bankruptcy courts may enter final judgment only on claims that "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *See Stern v. Marshall*, 564 U.S. 462, 499 (2011). In *Millennium Lab*, the Third Circuit found that the bankruptcy court acted within constitutional bounds when it approved third-party releases in resolving a matter "*integral* to the restructuring of the debtor-creditor relationship." 945 F.3d at 139 (emphasis added). Similarly here, the release of TCJC Abuse Claims and approval of the TCJC Settlement are integral to the Debtors' ability to provide robust and equitable compensation to holders of Abuse Claims. First, in addition to a $250 million cash contribution, TCJC has agreed to contribute its insurance rights under the BSA and Local Council Insurance Policies, which TCJC's expert values between $156 million and $164 million in years with remaining coverage. *See* Ex. 17 at 22, Table A2. Second, and critical to the Debtors' restructuring, TCJC's release and contribution of insurance rights is a prerequisite to the settlements reached with Settling Insurance Companies, which, together with the TCJC cash contribution, provide substantial upfront value to

the Settlement Trust.[41]   Finally, TCJC's subordination and ultimate release of a significant indemnity claim, as well as waiver of future indemnity rights, removes a substantial claim that would otherwise be channeled to the Settlement Trust.  Accordingly, the releases of TCJC Abuse Claims included in the TCJC Settlement is "integral" to the Debtors' ability to provide equitable compensation to claimants and to obtain the level of protection (for Local Councils and Chartered Organizations) necessary to emerge from bankruptcy.

### B.    This Court Has Subject Matter Jurisdiction to Resolve the Kinds of Third-Party Claims at Issue Here

67.    The Court has subject matter jurisdiction to approve the TCJC Settlement and Channeling Injunction.  This is grounded in the Court's "core" jurisdiction to confirm the Plan, including the third-party releases in favor of TCJC.  In the alternative, the Court has non-core, related-to jurisdiction with respect to TCJC Abuse Claims.

---

[41]    *See* Century and Chubb Companies Insurance Settlement Agreement ("***Century Agreement***") [Docket No. 8907-1] at 9 ("Upon the Release Date, subject to the limitations below and those set forth in Section 15, the Debtors, Reorganized BSA . . . other Protected Parties (including the Contributing Chartered Organizations) . . . shall automatically, without further action on the part of any Person or Entity, release Settling Insurers and each of their respective Representatives (in their capacities as such) from all Causes of Action and Claims related to, arising from or in connection with, in whole or in part (a) Abuse Insurance Policies. . ."); Hartford Insurance Settlement Agreement ("***Hartford Agreement***") [Docket No. 8816-1] at Art. II.B.2-(f) ("Conditions Precedent to Settlement Payment" including "The Hartford Protected Parties are protected against any liability, loss, or expense with respect to any Claim by any Chartered Organization arising out of or relating to coverage for Abuse Claims under any Hartford Policy or any other insurance policy issued or allegedly issued by any Hartford Protected Party, as set forth in Section VI.D of this Agreement"); Clarendon Insurance Settlement Agreement ("***Clarendon Agreement***") [Docket No. 8907-3] at 7 ("Upon the Release Date, subject to the limitations below and those set forth in Section 14, the Debtors, Reorganized BSA . . . other Protected Parties (including the Contributing Chartered Organizations) . . . shall automatically, without further action on the part of any Person or Entity, release Clarendon and its Representatives from all Causes of Action and Claims related to, arising from, or in connection with, in whole or in part (a) Abuse Insurance Policies. . ."); Zurich Insurance Settlement Agreement ("***Zurich Agreement***" and, together with the Century Agreement, the Hartford Agreement, and Clarendon Agreement, the "***Insurance Settlement Agreements***") [Docket No. 8907-2] at 8 ("Upon the Release Date, subject to the limitations below and those set forth in Section 14, the Debtors, Reorganized BSA . . . other Protected Parties (including the Contributing Chartered Organizations) . . . shall automatically, without further action on the part of any Person or Entity, release Zurich Insurers and Zurich Affiliated Insurers and each of their Representatives from all Causes of Action and Claims related to, arising from, or in connection with, in whole or in part (a) Abuse Insurance Policies. . .").

1.      **Core Jurisdiction Exists**

68.    Bankruptcy Courts may hear and determine all "core" proceedings arising under title 11, including "confirmations of plans." *See* 28 U.S.C. §§ 157(b)(1), (b)(2)(L); *see In re Mullarkey*, 536 F.3d 215, 220 (3d Cir. 2008) ("A bankruptcy court has subject matter jurisdiction over 'all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11'") (quoting 28 U.S.C. § 157(b)(1)).

69.    As many courts have recognized, bankruptcy courts have "core" subject matter jurisdiction to consider confirmation of a plan of reorganization, including a plan that contains third-party releases. *See, e.g.*, *In re Charles St. African Methodist Episcopal Church of Bos.*, 499 B.R. 66, 99 (Bankr. D. Mass. 2013) ("The matter before the Court is a plan of reorganization, the confirmation of which arises under title 11, the Bankruptcy Code.  It is what chapter 11 is all about, *see* 11 U.S.C. §§ 1121–1144, the quintessential bankruptcy matter . . . It may or may not be appropriate for a court exercising bankruptcy jurisdiction to confirm a plan containing a third-party release—and, if it is appropriate, the manner and degree of relation of the released claim to the case are certainly factors in the analysis—*but the court undoubtedly has jurisdiction to adjudicate the plan*, even without recourse to its related-to jurisdiction.") (emphasis added); *In re Lower Bucks Hosp.*, 471 B.R. 419, 448 n.45 (3d Cir. 2012) ("There is a reasonable case to be made that [the objector] and perhaps the courts in some reported decisions, have conflated subject matter jurisdiction with the substantive merits."); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1145 (D.C. Cir. 1986) ("The approval of a disclosure statement and the confirmation of a reorganization plan are clearly proceedings at the core of bankruptcy law . . . [a]lthough the bankruptcy court's decision may have an impact on claims outside the scope of the immediate proceedings.").

70.    Where, as here, a bankruptcy court is presented with third-party releases in connection with a plan of reorganization, the bankruptcy court has "core" subject matter

34

jurisdiction to adjudicate the merits of the releases as plan confirmation is a "quintessential" bankruptcy function arising *under* title 11. *See In re Charles St. African Methodist*, 499 B.R. at 99. Whether the releases are warranted under substantive bankruptcy law is an entirely separate legal issue that, in the Third Circuit, is analyzed under the framework established in *Continental Airlines*. *See In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000). The third-party releases of TCJC are a necessary component to the settlements incorporated into the Plan and are integral to confirmation. Thus, this Court has "core" jurisdiction to consider and approve the third-party releases in connection with confirmation.

71. Although certain objectors argue that this Court lacks related-to jurisdiction to approve the Plan's third-party releases, such argument confuses jurisdiction with the merits. The related-to jurisdictional inquiry is not necessary to establish subject matter jurisdiction in the plan confirmation context, but is typically discussed in decisions addressing the court's ability to issue injunctions temporarily staying third-party litigation, divorced from the plan confirmation context. *See, e.g.*, *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 287 n.160 (Bankr. D. Del. 2017) ("I believe that to the extent a "related to" analysis is relevant to third-party releases in the confirmation context, it may act as a check on the outer boundaries of permissible releases, as a *substantive matter*.") (emphasis added); *In re Lower Bucks Hosp.*, 471 B.R. at 448 n.45 ("[I]t may be more accurate to conceptualize a ruling, in a particular case, that the bankruptcy court lacks the authority to approve a particular third-party release or impose a particular injunction because the nexus between the released or enjoined matter and the bankruptcy case is too attenuated, as a decision of substantive bankruptcy law—*i.e.*, establishing the boundary line of permissible plan provisions—rather than a decision based on subject matter jurisdiction under 28 U.S.C. §

1334(b)."). As discussed below, to the extent a related-to jurisdictional analysis is required, it confirms this Court's jurisdiction to approve the third-party releases.

### 2.    In the Alternative, Related-To Jurisdiction Exists

72.    If the Court determines that it lacks "core" jurisdiction to adjudicate the merits of the third-party releases, there are several independent grounds upon which this Court can exercise related-to jurisdiction with respect to the third-party release of TCJC Abuse Claims. *See* 28 U.S.C. § 1334 ("[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or *related to* cases under title 11.") (emphasis added). In enacting section 1334(b), "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995). In the Third Circuit, related-to jurisdiction exists with respect to third-party claims if the outcome of the third-party proceeding "could conceivably have any effect" on a debtor's bankruptcy estate. *In re Pacor, Inc.*, 743 F.2d 984, 994 (3d Cir. 1984); *see also In re W.R. Grace & Co.*, 13 F.4th 279, 285 n.13 (3d Cir. 2021). "A key word in [this] test is 'conceivable.' Certainty, or even likelihood, is not a requirement." *In re Marcus Hook Dev. Park Inc.*, 943 F.2d 261, 264 (3d Cir. 1991) (citation omitted). *Pacor* provides the controlling standard for this Court's exercise of related-to jurisdiction.

### i.    Related-To Jurisdiction Exists Because Prosecution of Abuse Claims Against TCJC Would Impose a Financial Impact on the Settlement Trust

73.    The Third Circuit recently reaffirmed its earlier holding that courts properly exercise related-to jurisdiction over third party claims where, as a result of a settlement, the assertion of third-party claims would impact the assets of the estate. *See In re W.R. Grace & Co.*, 13 F.4th at 285 n.13; *see also In re W.R. Grace & Co.*, 900 F.3d at 139 ("The Court rejected this

argument and stated correctly that the relevant jurisdictional inquiry is whether the claims affect the assets of the bankruptcy estate.  In this case the indemnification provision in Grace and CNA's Settlement Agreement does so.").  In *W.R. Grace*, the bankruptcy court found that it had related-to jurisdiction with respect to third party claims against Grace's insurer because the settlement trust was obligated to indemnify and defend the insurance company with respect to channeled claims.  900 F.3d at 139.  Similarly here, the Settlement Trust's obligation to defend and enforce the Channeling Injunction with respect to TCJC Abuse Claims will have a direct financial impact on the Debtors' estates (*i.e.* the Settlement Trust).  *See* Plan, Art. IV.N ("Trust Defense of TCJC Settlement").  Accordingly, the Settlement Trust's obligations to defend the TCJC Settlement and Channeling Injunction satisfies the requirements for the Court's related-to jurisdiction over TCJC-related Abuse Claims under Third Circuit law.

ii.    **Related-To Jurisdiction Exists Because TCJC Abuse Claims Are Inextricably Intertwined with Abuse Claims Against the Estates**

74.    Courts in the Third Circuit have recognized a "unity of interest" between debtors and non-debtors as a basis for related-to jurisdiction where there is meaningful overlap in the conduct giving rise to the claims.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 231 (3d Cir. 2004); *Int'l Union of Op. Eng'rs Loc. 542 v. Mallinckrodt ARD, Inc.*, No. 21-114, 2021 WL 915722 (E.D. Pa. Mar. 10, 2021) (finding related-to jurisdiction over third-party claims against debtor's distributor based on the "inextricably intertwined" nature of the claims against the debtor and the distributor).  In *Combustion Engineering*, the court determined that there was a lack of "unity of interest" between the debtor and the non-debtors because the asbestos-related personal injury claims asserted against the debtor and the non-debtors arose from different products, involved different asbestos-containing materials, and were sold to different markets.  *See Combustion Eng'g, Inc.*, 391 F.3d at 231.  The claims did not arise from a common nucleus of

facts, but involved entirely separate and unrelated products, without any meaningful overlap in the conduct giving rise to the injury. *Id.*

75.     This case presents a fundamentally different situation: TCJC Abuse Claims arise from a common nucleus of facts involving the BSA and TCJC's *inseparable* conduct in administering the Scouting program. The claims do not involve different harms, arising from different products, affecting different people. *Cf. Combustion Eng'g, Inc.*, 391 F.3d at 231. To the contrary, the claims against the BSA and TCJC redress the *same* injury based on the *same* facts. *See supra* ¶¶ 22–28. Indeed, this Court has previously recognized, in overruling an objection to the preliminary injunction, that claims against the BSA are "inextricably intertwined" with claims against the Greater Niagara Frontier Council, which asserted identical causes of action arising from a common set of facts. *See* Ex. 1 at 14:9–12. Under applicable state law, the liability of the BSA and TCJC is not joint and several, but instead apportioned based on relative fault, such that the claims against TCJC cannot be fixed without simultaneous adjudication of claims against BSA. *See supra* ¶¶ 22–28. As a result, adjudication of liability against TCJC would have the effect of adjudicating liability against the BSA.

76.     The district court's recent opinion in *Mallinckrodt* is instructive. In *Mallinckrodt*, the district court found related-to jurisdiction over state law claims asserted against debtor's distributor for price fixing. *See Mallinckrodt*, 2021 WL 915722, at *5. The court found that, "even if indemnification is removed from the equation," state law claims alleging that the debtor engaged in a price fixing scheme with the non-debtor distributor were "inextricably intertwined," such that plaintiffs could not pursue litigation against the distributor without impacting the "rights, liabilities, options, or freedom of action" of the debtor. *Id.* The legally and factually "intertwined" nature of claims asserted against the BSA and TCJC compel a similar conclusion, such that any

litigation against TCJC would have a direct and sufficiently immediate impact against the assets of the Debtors' estates.

77.     The contention in the Pfau/Zalkin Objection that there are "Mixed Claims" filed in these cases alleging Abuse unrelated to Scouting (and thus outside the scope of this Court's jurisdiction) is legally and factually unsubstantiated.[42]

78.     *First,* each claimant that has filed a proof of claim has submitted, by admission, to the jurisdiction of the Bankruptcy Court.  The Court-approved "Sexual Abuse Survivor Proof of Claim Form" required claimants to assert, under penalty of perjury, claims for "*Scouting*-related sexual abuse."  *See* "Sexual Abuse Survivor Proof of Claim Form" [Docket No. 695-7] (emphasis added).  It is well-recognized that factual assertions contained in a proof of claim are binding, judicial admissions made to a court.  *See, e.g.*, *In re Jordan*, 403 B.R. 339, 351 (Bankr. W.D. Pa. 2009) ("The Court concludes that the 'statement' by [creditor] in the Proofs of Claim regarding the nature of the collateral is a judicial admission."); *In re Perry*, 394 B.R. 852, 857 (Bankr. S.D. Tex. 2008) (holding that proofs of claim filed by creditors are judicial admissions).  By affirmatively filing a proof of claim, each claimant has asserted that its claim is "Scouting-related"

---

[42]     As a threshold matter, it is doubtful that the Zalkin & Pfau parties have standing to object to TCJC's proposed treatment under the Plan.  While bankruptcy standing is broad, courts have routinely observed that it is not without limitation.  *See In re Martin Paint Stores*, 199 B.R. 258, 264 (Bankr. S.D.N.Y. 1996); *In re Public Serv. Co.*, 88 B.R. 546, 554 (Bankr. D.N.H. 1988) ("[I]t is . . . important that the court take care not to be so liberal in granting such applications as to overburden the reorganization process by allowing numerous parties to interject themselves in the case on every issue, to the extent that the goal of a speedy and efficient reorganization is hampered.").  Consistent with general principals of standing, courts must "determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation."  *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985); *accord In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983).  The Zalkin & Pfau parties lack standing for two reasons.  First, it defies logic that parties who voted to accept the Plan can simultaneously object to the treatment of claims under the Plan, which reflects a global settlement with respect to the treatment of Abuse Claims (including TCJC Abuse Claims).  Second, the Zalkin/Pfau objection regarding the existence of so-called "Mixed Claims" seeks to undermine the Channeling Injunction without any factual or legal support that such claims can exist in the tort system.  Parties should not be able to object to the Plan based on hypotheticals that are unsubstantiated.  *See infra* ¶¶ 79–80; *see also In re Matter of Dues*, 98 B.R. 434, 440 (Bankr. N.D. Ind. 1989) ("At confirmation, the debtor is not expected to present 'evidence and arguments to refute . . . hypothetical objections.'") (citing *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1267 (10th Cir. 1988)).

or otherwise arose "in Scouting."[43]  As such, any claim filed in these cases relating to TCJC is, by

judicial admission, a Scouting-related claim subject to the jurisdiction of the Bankruptcy Court.

79.    *Second*, the Zalkin/Pfau Objection seeks to rewrite the legal standard for related-to

jurisdiction in seeking to support its "Mixed Claims" theory.  The Third Circuit has acknowledged

that with appropriate factual findings, a Bankruptcy Court's related-to jurisdiction can extend to

*non-derivative* claims against non-debtor third parties when the assertion of claims against a third

party has a direct effect on the bankruptcy estate.  *See Combustion Eng'g*, 391 F.3d at 227-233.

Contrary to their reliance on Second Circuit precedent, the distinction between "direct" and

"derivative" liability is not legally relevant to the Third Circuit's related-to jurisdictional inquiry

(*i.e.*, *Pacor* and *Combustion*) or the substantive merits of third-party releases (*i.e.*, *Continental*).[44]

Indeed, courts in this District have confirmed plans containing releases of third-party claims,

including so-called "direct" claims.  *See, e.g.*, *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr.

D. Del. Feb. 3, 2022) [Docket No. 6378] (overruling objection to the release of third party opioid-

related claims against a non-debtor protected party (the CEO), including claims for public

nuisance, negligence, and unjust enrichment seeking to impose liability on the CEO "personally"

---

[43]    *See also* "Bar Date Notice" [Docket No. 695-2] ("You have a Sexual Abuse Claim if you experienced sexual abuse in Scouting") (emphasis added).

[44]    The Pfau/Zalkin Objection references the recent decision in *Purdue Pharma L.P.* finding that the bankruptcy court lacked statutory authority to approve nonconsensual third-party releases of "non-derivative" claims.  As the district court explained, "derivative" claims are those that "relate to injury to the corporation itself" such that "[i]f the creditor's claim is one that a bankruptcy trustee could bring on behalf of the estate, then it is derivative."  *In re Purdue Pharma L.P.*, No. 21 CV 7532 (CM), 2021 WL 5979108, at *48 (S.D.N.Y. Dec. 16, 2021), certificate of appealability granted, No. 21 CV 7532 (CM), 2022 WL 121393 (S.D.N.Y. Jan. 7, 2022).  The district court made this distinction in relying on Second Circuit case law regarding the substantive (as opposed to jurisdictional) merits of third-party releases—a distinction that is not relevant to the Third Circuit's substantive standard for approval of third-party releases.  *See In re Continental Airlines*, 203 F.3d at 214.  Moreover, as the Second Circuit itself recognized, the direct/derivative distinction is not dispositive of the jurisdictional inquiry.  *See, e.g.*, *In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012) ("It thus appears from our case law that, while we have treated whether a suit seeks to impose derivative liability as a helpful way to assess whether it has the potential to affect the bankruptcy res, the touchstone for bankruptcy jurisdiction remains 'whether its outcome might have any 'conceivable effect' on the bankruptcy estate.'").

for his role in the deceptive marketing and oversupply of opioids); *In re Blitz U.S.A.*, 2014 WL
2582976, at *19–21 (releasing and channeling personal injury and wrongful death claims related
to explosions involving debtor-manufacturer's defective gasoline cans asserted against the
debtors' largest customer, Wal-Mart, including claims based on Wal-Mart's actual knowledge and
failure to warn of dangers associated with debtors' defective product)[45]; *In re TK Holdings Inc.*,
No. 17-11375 (BLS) (Bankr. D. Del. Feb. 16, 2018) (releasing and channeling personal injury and
wrongful death claims against non-debtor OEM related to defective airbags manufactured by the
debtors, including claims alleging liability based on OEM's independent conduct)[46]; *In re Catholic
Diocese of Wilmington, Inc.*, No. 09-13560 (CSS) (Bankr. D. Del. Aug. 8, 2011) [Docket No.
1493] (releasing and channeling personal injury claims against non-debtor Catholic entities of
claims alleging abuse "for whom the Debtor *or* any Protected Party is or was legally responsible,
or whom the Debtor or any Protected Party failed to control, direct, train, or supervise") (emphasis
added); *see also In re USA Gymnastics*, No. 18-09108 (RLM) (Bankr. S.D. Ind. Dec. 16, 2021)
[Docket No. 1776] (releasing and channeling personal injury claims against non-debtor (U.S.
Olympic and Paralympic Committee) alleging sexual abuse that relates to the debtor).

80.    *Third*, the Channeling Injunction will be illusory, and unworkable, if claimants are
able to "split" each *instance* of Abuse as a separate "claim," even though each instance of Abuse
occurred in a *connected* series.  In support of their argument, the Pfau/Zalkin Objection describes

---

[45]    *See In re Blitz U.S.A., Inc.*, No. 11-13603 (PJW) (Bankr. D. Del. Jan. 21, 2014) [Docket No. 2090] (objecting claimant describing nature of claims against Wal-Mart).

[46]    In *TK Holdings*, Judge Shannon overruled objections by plaintiffs to the bankruptcy court's exercise of related-to jurisdiction over third-party actions against various car manufacturers ("*OEMs*") in the preliminary injunction context.  Plaintiffs had argued that because they are pursuing "direct theories and claims" against the OEMs based on the OEMs' own conduct in installing the defective airbags, there is no "identity of interest" that can support jurisdiction with respect to such claims. Ex. 46, Tr. of Hr'g in the matter of In re TK Holdings, 13:16-24 (Aug. 16, 2017).  Judge Shannon overruled the plaintiffs' objections in finding that the bankruptcy court possessed related-to jurisdiction over claims asserted against OEMs (although such jurisdiction was ultimately not exercised in the preliminary injunction context). *Id.* at 19:23–20:5.

a claim where "abuse took place at [perpetrator's] home when it was used for Scout meetings and activities, and at properties and facilities owned by TCJC during and after Scout meetings, Scout camping trips, and Scout physical training." *See* Pfau/Zalkin Obj. at ¶ 10.  They contend that each instance of Abuse that occurred after a Scout meeting or Scout camping trip is unrelated to Scouting and therefore a separate, divisible claim.  *See* Pfau/Zalkin Obj. at ¶ 11.  Such a result, however, would not be possible under state law and is contrary to how claims have been asserted in the tort system.  Each and every instance of Abuse that occurred in connection with Scouting is part of a "series of connected transactions" that are legally indivisible and must be asserted in a single lawsuit.  *See, e.g.*, Restatement (Second) of Judgments § 24 at 196 (1982) ("When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar, the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, *or series of connected transactions, out of which the action arose*") (emphasis added); *see also Hong Sang Mkt., Inc. v. Peng*, 20 Cal. App. 5th at 490 ("Thus, while a primary right may support multiple theories of liability or various forms of relief, it gives rise to a single, indivisible cause of action."); *Seale v. Gowans*, 923 P.2d 1361, 1364 (Utah 1996) ("Indeed, most courts follow the general rule that once some injury becomes actionable, a plaintiff must plead all damages, both present and future, and cannot thereafter bring another action once future harm occurs."); *Wing v. Hulet*, 684 P.2d 314, 318 (Idaho Ct. App. 1984) ("As noted in § 25 of the Second Restatement, quoted above, the rule against splitting a claim applies even though the remedies or forms of relief demanded in one suit are different from those demanded in another."); *Bayless v. Indus. Comm'n of Arizona*, 880 P.2d 654, 659 (Ariz. Ct. App. 1993) ("Claim preclusion bars a claimant from 'splitting' a claim.").  This is consistent with TCJC's experience in the tort system:  In the over twenty-five year period leading

42

up to the Petition Date, TCJC is not aware of any case where claims were "split" between BSA and TCJC requiring separate lawsuits. To the contrary, Scouting-related claims—including claims with multiple instances of Abuse—were always settled with the participation and financial contribution of the BSA (except in cases where the BSA elected to take cases to trial and TCJC settled prior to trial).

81.    The Plan seeks to resolve all Scouting-related claims in accordance with the basic principle that claims arising from a common nucleus of facts must be resolved as a single injury, with an appropriate apportionment of liability based on the facts of each case. *See, e.g.*, *Flickinger*, 45 Cal.2d at 393 ("The law abhors a multiplicity of actions. . . . [A] party cannot by negligence or design withhold issues and litigate them in successive actions; he may not split his demands or defenses; he may not submit his case in piecemeal fashion."). Specifically, the TDPs provide a mechanism to redress all Abuse Claims fairly and equitably in a manner that is consistent with the tort system.[47] The cash consideration contributed by TCJC is sufficient to satisfy in full TCJC's allocable share of liability with respect to any TCJC Abuse Claim. *See* TDP, Art. IX–F.1 ("Source Affected Weighting"). Moreover, through the "Independent Review" process, claimants will have the option to have a panel of retired judges evaluate their claims and make a settlement recommendation "seeking to replicate to the extent possible the amount a reasonable jury might

---

[47]    The Pfau/Zalkin Objection also contends that channeled TCJC Abuse Claims will receive reduced or no compensation for supposedly non-Scouting harm because the TDPs apply mitigating factors where the Abuse occurred outside of Scouting, including where the perpetrator had a familial relationship with a claimant. ¶ 19. This arguments misses the mark. With respect to TCJC, the Plan explicitly provides that any so-called mixed portion of a TCJC Abuse Claim is "necessarily" Scouting-related—in other words, there is no "non-Scouting-related harm" being channeled under the Plan. See Plan §I.A.–18 ("any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, TCJC, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim") (emphasis added). Any mitigating factor applied to a claim where the perpetrator was a family member is a function of how such claims are valued by the tort system—not a "discount" applied to TCJC Abuse Claims. As discussed herein, TCJC's monetary contribution provides for payment in full of TCJC's allocable share with respect to TCJC Abuse Claims based on tort system values. *See infra* ¶¶ 58–65.

award" and "taking into account the relative shares of fault that may be attributed to any parties potentially responsible." *See* TDP, Art. XIII–A ("Direct Abuse Claimant's Independent Review Option").

> ### iii.    Related-To Jurisdiction Exists Because Prosecution of TCJC Abuse Claims Would Deplete Valuable Insurance Assets Otherwise Available to the Estates

82.    Shared insurance between the Debtors and TCJC provides an independent basis for related-to jurisdiction over TCJC Abuse Claims. Courts have recognized that where debtors and non-debtors share from the same pool of insurance coverage, a judgement against the non-debtor has a direct and immediate financial impact on the debtor's estate. *See, e.g.*, *In re Blitz U.S.A.*, 2014 WL 2582976, at \*6; *In re W.R. Grace & Co.*, 386 B.R. at 28–29 (finding jurisdiction in part because debtors agreed to provide insurance for non-debtors and did so, allowing non-debtors to demand defense by debtors' insurers); *see also In re A.H. Robins*, 788 F.2d 994, 1008 (4th Cir. 1986) (sustaining injunction and transfer of claims against non-debtors in part because such claims, if successful, would reduce insurance funds available to debtor's estate); *In re Quigley Co.*, 676 F.3d at 58 ("[W]here litigation of the [lawsuits against non-debtor] would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of [debtor], the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate."); *In re Dow Corning Corp.*, 86 F.3d 482, 485, 494-95 (6th Cir. 1996) ("[T]he possible depletion of insurance policies depends on contingencies sufficiently immediate to support a finding of 'related to' jurisdiction.").

83.    In *In re Blitz U.S.A.*, the court found related-to jurisdiction sufficient to release third party claims against Wal-Mart, a vendor of the debtors entitled to be named as a named or additional insured on the debtors' policies, based a "substantial identity of interest" with the debtors. 2014 WL 2582976, at \*6. The court held that "suits against Wal-Mart are covered by the Debtors' insurance and would deplete the assets of the Debtors' Estates." *Id.* Similarly, in the

W.R. Grace bankruptcy, the debtors proposed a plan that included nonconsensual releases of several non-debtors, one of which was BNSF. *W.R. Grace*, 386 B.R. at 28–29. BNSF argued the court had related-to jurisdiction over releases of asbestos claims against it in part because it was a named insured on the debtor's liability insurance policies. *Id.* at 28. The court agreed, holding BNSF's rights under insurance policies that were property of the estate established a direct impact on the estate. *Id.* In so holding, the *W.R. Grace* court relied in part on the Fourth Circuit's decision in *In re A.H. Robins Co., Inc.*, 828 F.2d 1023 (4th Cir. 1987), *cert. denied sub nom Oberg v. Aetna Cas. & Surety Co.*, 485 U.S. 569 (1988). *See W.R. Grace*, 386 B.R. at 28. Robins was the producer of an intrauterine contraceptive device that allegedly caused personal injuries and death, leading to thousands of lawsuits against Robins and multiple non-debtor entities. The court, in the context of reviewing the automatic stay as applied to claims against non-debtor additional insureds under the debtor's policies, described liability insurance in the mass tort context as likely "'the most important asset of [the debtor's] estate.'" *A.H. Robins*, 788 F.2d at 1001 (quoting *In re Johns Manville Corp.*, 40 B.R. 219, 229 (S.D.N.Y. 1984)). The court went on to confirm the bankruptcy court's authority to issue the stay on the grounds that "[a]ny action in which the judgment may diminish this 'important asset' is unquestionably subject to a stay." *Id.*

84.    Here, pursuit of TCJC Abuse Claims has an unquestionable potential to substantially diminish the BSA's important liability insurance assets. The Settling Insurance Companies confirmed as much by making consummation of the TCJC Settlement a condition precedent to their own settlements. *See supra* note 41. TCJC is undisputedly an insured or additional insured under the BSA's primary and excess general liability insurance policies from at least 1976 forward. TCJC is also insured under numerous Local Council policies in place from 1965 to 1978, with a handful of policies insuring TCJC as early as 1949. *See supra* ¶¶ 42–44.

45

TCJC has tendered claims for defense and indemnity under all implicated policies with respect to TCJC Abuse Claims, including previously settled claims. *See, e.g.,* Ex. 47, TCJC Tender Letter, TCJC007181 (Jan. 19, 2021) (letter dated Jan. 19, 2021 tendering and requesting reimbursement of costs incurred in the defense and settlement of certain claims and suits asserted against TCJC in its capacity as a Chartered Organization of the BSA). TCJC therefore has valid, ripe claims for coverage that compete with those of the BSA and Local Councils.

85.    To varying degrees, all of the relevant expert reports acknowledge that Chartered Organizations' rights under the BSA's and the Local Councils' policies have substantial value. The BSA's valuation expert, Nancy Gutzler, opines that between 78.3% and 86.7% of the value of the claims asserted against the BSA can be allocated to solvent, nonexhausted insurance coverage. Ex. 37 at 16. Of this coverage, Gutzler opines claims with values totaling between $825 million and $2.3 billion trigger the BSA and Local Council policies that also cover Chartered Organizations. *Id.* at 17. Moreover, McNally's analysis implies that TCJC's insurance rights under BSA policies after 1978 are worth between $23 million and $31 million. Ex. 17 at 19, Table A1. However, McNally incorrectly assumes (i) TCJC is not insured under BSA policies prior to 1978, (ii) TCJC is not insured under Local Council policies, and (iii) a "first encounter" trigger applies to determine what policies apply to which claims. Even so, McNally's analysis supports the conclusion that TCJC's insurance rights are sufficient to confer related-to jurisdiction. Even if TCJC were not an insured or additional insured under pre-1976 BSA policies, it still has rights to insurance coverage under post-1976 policies for pre-1976 conduct under a "continuous trigger" theory. Generally speaking, occurrence-based liability policies like those at issue here cover "injuries" that occur during the policy period. Abuse claimants invariably allege the Abuse caused them mental and physical injuries persisting through multiple policy years, often up to the present.

As a result, Abuse occurring prior to 1976 may trigger the coverage of insurance policies effective 1976 and later due to the injuries that persist to these later policy periods.  This "continuous trigger" means that no TCJC Abuse Claim is outside the scope of a policy providing coverage to TCJC. Applying more appropriate assumptions, including that a continuous trigger will apply to TCJC's insurance coverage claims, Dr. Horewitz opines that TCJC's coverage rights under the BSA and Local Council Insurance policies have value between $156 million and $164 million.  *See id.* at 22, Table A2.

### iv.    Jurisdiction Exists Because Prosecution of TCJC Abuse Claims Would Liquidate Indemnity Claims Against The Estates

86.    TCJC's contractual indemnification rights against BSA would result in automatic liability upon the filing of a TCJC Abuse Claim against TCJC, and thus supports a finding of related-to jurisdiction with respect to such TCJC Abuse Claims.  The Third Circuit has found related-to jurisdiction based on indemnity where the filing of a claim against the non-debtor would trigger "automatic liability" against a debtor.  *See, e.g.*, *In re W.R. Grace & Co.*, 900 F.3d. at 139. As discussed above, TCJC's involvement in Scouting has always been premised upon the expectation and agreement that TCJC would be protected by the BSA for any injuries or wrongdoing connected to Scouting.  *See supra* ¶¶ 33–34.  There is a decades-long history in which TCJC tendered, and the BSA accepted, Scouting-related claims *without* a reservation of rights or other condition.  *See supra* ¶ 34.  Once the BSA confirmed that the claim was Scouting-related, the BSA typically provided TCJC with a full defense and indemnification.  As asserted in TCJC's proofs of claim, TCJC has claims against BSA for indemnification and/or contribution of costs that may be incurred in the future to defend, resolve, and/or pay TCJC Abuse Claims.  *See* Claim Nos. 1248, 12530.   TCJC also has a significant liquidated and non-contingent claim for reimbursement and/or contribution relating to the payment of costs to defend and resolve Scouting-

related claims. *Id.* There have been no objections filed to TCJC's proofs of claim, despite ample time for parties to do so, and they are accordingly entitled to a presumption of validity. *See* 11 U.S.C. § 502 ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."). Thus, the assertion of TCJC Abuse Claims against TCJC automatically triggers the BSA's contractual indemnity obligations to TCJC, which, in the absence of the TCJC Settlement, would result in significant liability against the estates.

87.    TCJC's status as a significant creditor of the estates provides an additional ground for this Court's exercise of related-to jurisdiction. In *CoreStates*, the Third Circuit found that an inter-creditor claim based on a subordination agreement fell within the court's related-to jurisdiction. *See CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 204 (3d Cir. 1999). The Third Circuit reasoned that enforcement of the subordination agreement directly concerned assets of the debtor's estate because the aggrieved creditor "might not have consented to the Plan" and "[debtor] might have had a much more difficult time having the Plan confirmed." *Id.* Importantly, the Third Circuit's later opinion in *Combustion Engineering* declined to extend *CoreStates* to find jurisdiction over independent claims against non-debtors that did not "involve[] a dispute regarding assets of the debtor's bankruptcy estate" nor have the "ability to affect directly plan administration." *In re Combustion Eng'g*, 391 F.3d at 229. Here, like *CoreStates*, claims against TCJC directly involve a dispute regarding the assets of the Debtors' estate—insurance assets shared with TCJC—the resolution of which dispute is critical to the global settlement incorporated into the Plan and, ultimately, the Debtors' ability to emerge from bankruptcy.

C.    **The Bankruptcy Code Authorizes Bankruptcy Courts To Grant Nonconsensual Third-Party Releases In Appropriate Circumstances**

1.    **The Code's Text, Purpose, History, and Precedent Authorize Third-Party Releases When Fair And Necessary, In Extraordinary Cases**

88.    The Bankruptcy Code confirms that bankruptcy courts have statutory authority to release claims against non-debtors in certain circumstances.  The text of the Bankruptcy Code provides a broad grant of affirmative authority to modify debtor-creditor relationships within the context of a chapter 11 plan of reorganization.  *See, e.g.*, *United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990); *Celotex Corp. v. Edwards*, 514 U.S. at 308 (Congress conferred broad statutory power to "deal efficiently and expeditiously with *all matters connected with* the bankruptcy estate.") (emphasis added); *see also* 2 Collier on Bankruptcy ¶ 105.01 (16th ed. 2021) ("The equitable origins of the bankruptcy power suggest substantial leeway to tailor solutions to meet the diverse problems facing bankruptcy courts").  This includes the power to confirm plan provisions "necessary" to accomplish that end, so long as the provisions are "appropriate" and "not inconsistent" with law.  *See* 11 U.S.C. § 1123(b)(6); *id.* § 105(a).

89.    Congress recognized the futility of trying to anticipate the many complicated issues requiring specific treatment in a given chapter 11 restructuring.  To support its grant of specific bankruptcy powers, Congress enacted several provisions that provided bankruptcy courts the flexibility to accommodate case-specific circumstances that necessitated uniquely tailored plans of reorganization.  For example:

- Section 1123(a)(5) states that "a plan *shall*" provide adequate means of implementation "[n]otwithstanding any otherwise applicable nonbankruptcy law," and then provides a non-exhaustive list of possible mechanisms.  11 U.S.C. § 1123(a)(5) (emphasis added).

- Section 1123(b)(6) provides that a plan may:

  "(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests; (2) subject to section 365. . . provide for

49

the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtors not previously rejected…; (3) provide for (A) the settlement or adjustment of any claim or interest belonging to the debtor or the estate…; (4) provide for the sale of all or substantially all of the property…; (5) modify the rights of holders of secured claims. . . or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

11 U.S.C. § 1123(b).

- Section 105(a) provides that: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

90.    When viewed together, these provisions confer what the Supreme Court has described as a bankruptcy court's "residual authority" to craft plans that enable successful and value-maximizing reorganization. *United States v. Energy Res. Co., Inc.*, 495 U.S. at 549. In *Energy Resources*, the Supreme Court held that a bankruptcy court could order the IRS to apply debtor payments to guaranteed tax debts rather than non-guaranteed tax debts—an order with meaningful economic consequences for the government's ability to recover on the full value of its claims—even though no provision of the Code expressly authorized such an order. *Id.* In so holding, the Supreme Court observed that § 1123(b)(6)—together with § 105(a)—codified "the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *Id.* As applied here, §§ 1123(a)(5), (b)(6), and 105(a) require the bankruptcy court to provide adequate means for the Plan's implementation and to provide the statutory authority to issue nonconsensual third-party releases as part of the Plan.

91.    For over two decades, the Third Circuit has repeatedly recognized the statutory authority of bankruptcy courts to issue nonconsensual third-party releases under appropriate circumstances. *See, e.g.*, *Continental Airlines*, 203 F.3d at 214. The Third Circuit has explicitly recognized the appropriateness of third-party releases where there are specific findings to support

the "hallmarks" of fairness, necessity to the reorganization, and fair consideration in exchange for the releases.  *See id.*; *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) ("For the Plan to be approved as designed (*i.e.*, with the inclusion of the [channeling injunctions]), the debtors needed to show that the Plan's resolution of [third-party] claims is necessary or appropriate under 11 U.S.C. § 105(a), which, *under our precedent*, requires a showing with specificity that the Silica Injunction is both necessary to the reorganization and fair.") (emphasis added); *In re Millennium Lab Holdings II*, 945 F.3d at 139 ("*Our precedents regarding nonconsensual third-party releases* and injunctions in the bankruptcy plan context set forth exacting standards that must be satisfied if such releases and injunction are to be permitted, and suggest that courts considering such releases do so with caution.") (emphasis added).

92.     Indeed, courts in the Third Circuit often and approvingly look to section 105 when permitting releases in appropriate circumstances.  *See Continental Airlines*, 203 F.3d at 214; *In re Millennium Lab Holdings II, LLC*, 575 B.R. at 272; *In re TK Holdings Inc.*, No. 17-11375, 2018 WL 1306271 (Bankr. D. Del. Mar. 13, 2018).

93.     The Third Circuit has also correctly determined that section 524(e) does not "bar[] any provision in a reorganization plan limiting the liability of third parties."  *In re PWS Holding Corp.*, 228 F.3d 224, 247 (3d Cir. 2000).  Section 524(e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).  As this and numerous other courts have recognized, § 524(e) thus acts as a savings clause, making clear a discharge does not *automatically* affect the liability of non-debtors who may also have an obligation to pay the same debt.  *See, e.g.*, *Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640, 656 (7th Cir. 2008); *In re Dow*

*Corning Corp.*, 280 F.3d 648, 657 (6th Cir. 2002) (Section 524(e) "explains the effect of a debtor's discharge.  It does not prohibit the release of a non-debtor").

### 2.    The SDNY Decision in *Purdue* is Inapplicable and Wrong

94.    Despite various objections citing to *Purdue Pharma*, the statutory analysis of sections 105(a), 1123(b)(6), and 524(e) in *Purdue Pharma* is contrary to basic principles of statutory interpretation and reflects a minority view among Circuits that have considered the issue. As a threshold matter, the *Purdue Pharma* decision was based on the district court's misinterpretation of Second Circuit precedent, which like the Third Circuit has long permitted nonconsensual third-party releases.  *See, e.g.*, *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 92 (2d Cir. 1988); *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285 (2d Cir. 1992); *Deutsche Bank A.G. v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005).  But even if the district court's interpretation of Second Circuit precedent were correct, that precedent is not binding in this Circuit, which has explicitly recognized the bankruptcy court's statutory authority to authorize third-party releases.  *See Continental Airlines*, 203 F.3d at 214.

95.    More importantly, the district court's statutory analysis was wrong as a matter of law.  For example, the district court read section 1123(b)(6) as "substantively analogous" to section 105(a), and concluded that because section 105(a) does not confer substantive authority on the bankruptcy court, neither could section 1123(b)(6) be read to do so.  *See* Decision and Order on Appeal, *In re Purdue Pharma, L.P.*, No 7:21-cv-7532-CM (S.D.N.Y. Dec. 16, 2021) ("**Purdue Op.**"), at 121.  But such a reading would effectively render sections 105(a) and 1123(b)(6) duplicative, contrary to basic principles of statutory interpretation.  *See, e.g.*, *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so

that no part will be inoperative or superfluous, void or insignificant"); *see also Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning."). Section 1123(b)(6) is specifically and uniquely operative within the context of a plan of reorganization. In the absence of an inconsistency, section 1123(b)(6) provides an independent statutory basis for the inclusion of third-party releases in appropriate circumstances and cannot be collapsed into section 105.

96.    The district court in *Purdue Pharma* also relied heavily on section 524(g)-(h), which specifically provide that a bankruptcy court may enjoin actions against a non-debtor in the asbestos context. *See Purdue* Op. at 100, 129, 134. But the district court ignored the rule of construction that Congress enacted when it created section 524(g)-(h), which states that "[n]othing in . . . the amendments made by [§ 524(g)-(h)] shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111(b), 108 Stat. 4106, 4117. That rule of construction made "clear that the special rule being devised for the asbestos claim trust/injunction mechanism is not intended to alter any authority bankruptcy courts may already have to issue injunctions in connection with a plan [of] reorganization." 140 Cong. Rec. 27,692 (Oct. 4, 1994).

97.    Finally, the district court in *Purdue Pharma* apparently adopted a view of section 524(e) that is contrary to Third Circuit precedent. *Compare Purdue* Op. at 134-35, *with In re PWS*, 228 F.3d at 247. The clear and established law of the Third Circuit confirms that nonconsensual third-party releases are authorized under the Bankruptcy Code.

## II.    The Bankruptcy Court Should Grant The Third-Party Releases

98.    The controlling standard for approval of nonconsensual third-party releases in the Third Circuit is *Continental*, which requires specific findings to support the "hallmarks" of

fairness, necessity to the reorganization, and fair consideration in exchange for nonconsensual

third-party releases. *See In re Continental Airlines*, 203 F.3d at 214; *see also United Artists

Theatre Co.*, 315 F.3d 217, 227 (3d Cir. 2003); *In re Millennium Lab Holdings II, LLC*, 575 B.R.

at 272; Opinion Confirming Chapter 11 Plan of Reorganization at 24, *In re Mallinckrodt plc*, No.

20-12522 (JTD) (Bankr. D. Del. Feb. 3, 2022) [Docket No. 6378].  In addition, courts have read

*Continental* as requiring a finding that "extraordinary circumstances" warrant the issuance of third-

party releases.  *See In re TK Holdings Inc.*, 2018 WL 1306271, at *18 (concluding that the

existence of significant personal injury claims arising from a nationwide recall presented

extraordinary circumstances).  Courts in the Third Circuit have also applied the *Master Mortgage*

factors, which serve as a "yardstick" to determine whether the *Continental* hallmarks are satisfied.

*See, e.g.*, *In re Millennium Lab Holdings II*, 575 B.R. at 272 ("The *Master Mortgage* factors, like

the *Dow* factors (or any other standard in circuits that permit third-party releases), are a federal,

judicially-created yardstick against which a third-party release is measured").[48]

99.    As discussed above, courts in the Third Circuit have approved nonconsensual

third-party releases and channeling injunctions where the *Continental* hallmarks were present.

*See, e.g.*, Opinion Confirming Chapter 11 Plan of Reorganization at 38, *In re Mallinckrodt plc*,

---

[48]    In *In re Master Mortgage*, the court specifically outlined five factors that bankruptcy courts should take into account when evaluating the nonconsensual release of claims against a non-debtor third party:

   i.   An identity of interests between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

   ii.  Substantial contribution by the non-debtor of assets to the reorganization;

   iii. The essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

   iv.  An agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" vote to accept the plan; and

   v.   Provision in the plan for payment of all or substantially all of the claims or the class or classes affected by the injunction (*i.e.*, fair consideration in exchange for the releases).

*In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 934–935 (Bankr. W.D. Mo. 1994).

54

No. 20-12522 (JTD) (Bankr. D. Del. Feb. 3, 2022) [Docket No. 6378] (approving nonconsensual third-party releases and channeling to a trust opioid-related claims asserted against, among others, the debtors' subsidiaries and affiliates, and debtors' directors and officers); *In re Blitz U.S.A.*, 2014 WL 2582976, at *19–21 (releasing and channeling to a trust personal injury and wrongful death claims related to explosions involving debtor-manufacturer's defective gasoline cans asserted against, among others, the debtors' subsidiaries and affiliates, debtors' directors and officers, and Walmart, the debtors' largest customer); *In re Global Indus. Techs., Inc.*, No. 02-21626, 2013 WL 587366, at *40 (Bankr. W.D. Pa. Feb. 13, 2013) (releasing and channeling to a trust silica personal injury claims related to debtor manufacturer's refractory products and materials asserted against, among others, debtors' subsidiaries and affiliates, debtors' directors and officers, and transferees of debtors' assets).

### A.      The TCJC Settlement, Including the Third-Party Releases, is Fair

#### 1.      The TCJC Settlement is Fundamentally Fair

100.      The global settlements incorporated into the Plan provide over $2.69 billion dollars to compensate holders of Abuse Claims in a fair and equitable manner.  TCJC's cash contribution of $250 million provides funds to pay survivors *the full tort system value* attributable to TCJC, including on claims that may be unrecoverable in the tort system because they are time-barred or lack critical factual allegations, or claims that would be difficult to pursue on a contingency basis in the tort system.  The TCJC Settlement will compensate survivors in many cases in excess of the value available in the tort system.  For example, in response to the Supplemental Objection Deadline,[49] an individual claimant holding a TCJC Abuse Claim filed an objection to the Plan and

---

[49]      Although the claimant filed an objection by the Supplemental Objection Deadline, the contents of the objection did not relate to any new aspects of the Plan with respect to TCJC.  Accordingly, the objection should be barred because it was not filed by the original Plan objection deadline.

TCJC Settlement.  *See* Docket No. 9008.  The individual asserts a claim for Abuse by a "Scout Master" that occurred in the late-1980s in connection with a Scouting troop in Utah.  *See* Claim Nos. 86604; 86635.  Although the claimant filed a proof of claim in these Chapter 11 Cases, the underlying claim is time-barred under the Utah statute of limitations, such that the claimant would have no recourse to recover against BSA or TCJC in the tort system.  *See* Utah Code § 78B-2-308.  Nevertheless, in recognition of the reality that many claims allege Abuse going back decades, the TCJC Settlement provides all claimants, including those barred under applicable statutes of limitations, with the opportunity to recover through the Plan in a manner that would not be possible in the tort system.  As Judge Dorsey aptly put it in his opinion confirming the plan of reorganization in *Mallinckrodt*, the opioid settlement "ensur[es] that the Opioid Claimants receive recoveries *far in excess of what they could obtain through continued litigation*."  Opinion Confirming Chapter 11 Plan of Reorganization at 24, *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Feb. 3, 2022) [Docket No. 6378].

101.    The TCJC Settlement provides the most timely and efficient path to compensate survivors, without the uncertainty, cost, and delay of litigation in the tort system.  Equally important, it provides a confidential process for claimants to substantiate and recover on their claims without the attention and publicity that can accompany litigation.  For these reasons, the Plan is supported by a substantial majority of individual claimants who cast direct ballots.

### 2.  The TCJC Settlement Delivers a Substantial Contribution

102.    The TCJC Settlement provides a substantial contribution to the Settlement Trust in the form of an upfront cash contribution, insurance rights, and waiver of significant claims against the estates for the ultimate benefit of Abuse Claims.

103.    *First,* TCJC is contributing $250 million in cash to the Settlement Trust for the benefit of claimants with TCJC Abuse Claims, which cash consideration exceeds the aggregate value of TCJC Abuse Claims, including future claims, in the tort system.  Indeed, the TCJC cash contribution itself provides payment in full of TCJC's relative share of liability for TCJC Abuse Claims.  TCJC's expert opined that TCJC's contribution of $250 million is sufficient to address the valuation for claim counts of more than 534 claims even ***without*** contribution from any other party and ***without*** consideration of the value of the assigned insurance rights.[50]

| Table 3 Range of Total Claim Value Before Apportionment Offsets and Insurance | | |
|---|---|---|
| **Claim Count** | **Average Claim Value** | |
| | $345,000 | $430,000 |
| 534 | $184,230,000 | $229,620,000 |
| 1,379 | $475,755,000 | $592,970,000 |

104.    Moreover, assuming a conservative 50% apportionment to TCJC with respect to TCJC Abuse Claims, the $250 million contribution exceeds any reasonable range of value attributable to TCJC ***without*** consideration of the value of the assigned insurance rights.

| Table 4 Range of Total Claim Value 50% Apportionment | | |
|---|---|---|
| **Claim Count** | **Average Claim Value** | |
| | $345,000 | $430,000 |
| 534 | $92,115,000 | $114,810,000 |
| 1,379 | $237,877,500 | $296,485,000 |

105.    TCJC has agreed to contribute its right to proceeds in the BSA and Local Council Insurance Policies for the benefit of *all holders* of Abuse Claims.  TCJC's insurance rights in years

---

[50]    Dr. Horewitz noted that, in conducting her analysis, she selected a range of values for the number of claims (the "***Claim Count***") between 534 and 1,379, and the 1,379 figure of viable TCJC Abuse Claims is a "highly unlikely value necessitating all states (other than Utah) to repeal SOL laws completely."  *See* Ex. 17 at 12.

with remaining coverage are estimated to be worth between $156 million and $164 million, and TCJC's release of such rights is a necessary condition to the settlements with the Settling Insurance Companies, which provide value in excess of $1.5 billion for survivors. *See* Ex. 17 at 22, Table A2; supra ¶¶ 4, 49.

106.    TCJC has defended its rights in the BSA and Local Council policies throughout these cases. *See* Docket Nos. 3263, 6009. The TCJC Settlement and Insurance Settlements resolve difficult and highly-contested issues among the Debtors, Local Councils, Chartered Organizations, and Settling Insurance Companies regarding the single largest asset of the Debtors' estates, and thus provide significant value to holders of Abuse Claims without the uncertainty and delay inherent in coverage litigation. Indeed, any such litigation in the post-Effective Date period would cause significant delay as parties are forced to litigate coverage issues in state court.

107.    Nor would settling the Debtors' insurance coverage subject to TCJC's rights be preferable, even if the Settling Insurance Companies permitted such a structure. It is clear that the alternative—TCJC's and other co-insureds' rights attaching to the settled insurance proceeds—as was the case in *In re Flintkote Co.*, not only withholds significant value to holders of Abuse Claims but would cause an even greater delay as parties engaged in protracted litigation regarding coverage. *Cf.* Order Approving Settlement with English and American Insurance Company, Ltd., *In re Flintkote Co.*, No. 04-11300 (JKF) (Bankr. D. Del. Nov. 26, 2007) [Docket No. 2845] (policy buyback between insured and insurer expressly preserved right of co-insured to assert claim to the settlement proceeds); *In re Burns & Roe Enters., Inc.*, No. 00-4161ORG, 2005 Bankr. LEXIS 3173, at *8 (Bankr. D.N.J. Feb. 17, 2005) (finding that to the extent any person has an interest in the settled policies, such interest will attach to the proceeds of the sale).

108.    *Finally*, TCJC is agreeing to waive a significant liquidated claim—over ███

████—and unliquidated indemnity claims against the Debtors' estates arising from the defense

and settlement of Scouting-related claims.  *See* Claim Nos. 1248, 12530.  Taken collectively, the

substantial benefit afforded by TCJC's contribution is undeniable.

### 3.    The TCJC Settlement Provides For the Payment in Full of TCJC's Allocable Share of Liability of Claims Affected by the Third-Party Releases in Favor of TCJC

109.    The Third Circuit has instructed that fair consideration must be provided in

exchange for a nonconsensual release.  *See In re United Artists Theatre Co.*, 315 F.3d at 227 (citing

*Continental*, 203 F.3d at 214–15).   Courts have interpreted this as necessitating a substantial

satisfaction of the claims affected by such third-party releases.  *See In re U.S. Fidelis, Inc.*, 481

B.R. 503, 520 (Bankr. E.D. Mo. 2012) (nonconsensual third-party release permissible where

creditors were set to receive a meaningful distribution under the plan); *In re Exide Techs.*, 303

B.R. 48, 74 n.37 (Bankr. D. Del. 2003) (noting that this factor may be satisfied "upon presentation

of a consensual plan, in the absence of objection to the release/injunction provisions, or upon a []

meaningful distribution to unsecured creditors").   Courts have recognized that fair consideration

exists where the affected claims receive a significant distribution that otherwise would be

unavailable absent confirmation of the plan.  *See, e.g.*, *In re Metromedia Fiber Network, Inc.*, 416

F.3d at 142–3 (explaining that a finding of "good and sufficient consideration" being paid to an

enjoined creditor has weight in equity, but is not an absolute requirement to justify a third-party

release).

110.    To the extent that a plan, such as the proposed Plan, provides for payment in full of

TCJC's allocable share of liability for claims affected by the third-party releases, it undoubtedly

demonstrates "fair consideration" under *Continental*, *United Artists*, and *Millennium Lab*.  *See*

*also Dow Corning*, 280 F.3d at 658 (noting that a court may enjoin a non-consenting creditor's

claims against a non-debtor if there is a "mechanism to pay for all, or substantial all, of the class or classes affected by the injunction"); *A.H. Robins Co.*, 880 F.2d 694, 701 (4th Cir. 1989) (approving plan providing for payment in full of enjoined claims).

111.    Here, the expert testimony to be provided at the confirmation hearing will demonstrate that the proceeds available from the TCJC Settlement will provide fair consideration for the releases and the channeling injunction.  As noted above, the distributions under the Plan to holders of TCJC Abuse Claims will meet or exceed the anticipated value of such claims if they were liquidated in the tort system.  The near-certainty of this outcome stands in contrast to range of potential recoveries for survivors with claims that are unrelated to TCJC and justifies the terms of the TCJC Settlement.

112.    Because the TCJC Settlement provides for payment in full of tort system values of TCJC's allocable share of liability, and further provides holders of claims with limited or no viability in the tort system with the opportunity to recover, all claimants achieve better results through the Plan (or, at a minimum, are left no worse off than in the tort system).  Indeed, the TDPs provide a process to recover tort system values through the "Independent Review Option," which seeks to "replicate to the extent possible the amount a reasonable jury might award." *See* TDP, Art. XIII–A.  Accordingly, those holders of TCJC Abuse Claims who elect for the Independent Review Option are expected to recover in full the liquidated value of their claims.

#### 4.    The Plan Is Supported by a Substantial Majority of Affected Claimants

113.    Although the case law does not specify the percentage of claims required to constitute overwhelming acceptance of a plan, courts have found that the "overwhelming acceptance" factor was satisfied by voting results similar to those indicated in the Voting Declaration. *See, e.g.*, Ex. 48, Tr. of Hr'g in the matter of In re TK Holdings, 144:16–21, 176:3–

9 (Feb. 16, 2018) (finding acceptance of the plan by a "substantial majority of impacted classes" where between 79 and 81 percent of the tort classes accepted).  In particular, 73.57% of holders of Class 8 Direct Abuse Claims voted to accept the Plan.  The balloting agent further provided that of the Direct Abuse Claims, (1) 11.41% of those voting by Master Ballot accepted the Plan, while 88.59% rejected the Plan, and (2) 87.10% of those voting by Direct Ballot accepted the Plan, while 12.90% rejected the Plan.  *See supra* ¶ 12.  These results demonstrate that individual abuse survivors heavily support the Plan, while certain plaintiffs' firms that voted their clients' claims via Master Ballot oppose the Plan.  Moreover, the Court has approved a Limited Extended Voting Deadline for Class 8 that remains pending as of the date hereof, and TCJC expects these percentages to increase in light of settlements reached with respect to the Plan.

### B.    The Third-Party Releases Are Necessary

114.    The TCJC Settlement and nonconsensual third-party releases contained in the Plan are essential to the Debtors' ability to confirm a plan at all.  The record is clear that, without a global solution, there is no path that will allow the BSA to emerge as a viable organization and fairly and equitably compensate survivors.  The only way to achieve these dual objectives requires a comprehensive solution that unlocks the value of the estates' single most valuable asset: insurance.

115.    The record demonstrates that TCJC has vigorously defended its interests in the insurance policies throughout the Chapter 11 Cases, and has tendered claims to preserve its interest in the BSA and Local Council policies.  Without the TCJC Settlement Contribution, the Debtors could not settle TCJC's "equal and independent" rights under the BSA or Local Council insurance policies.  *See In re SoyNut Butter Co.*, No. 17-B-14970, 2018 WL 3689549, at *4 (Bankr. N.D. Ill. Aug. 1, 2018) (rejecting settlement that would have released rights of non-debtor insured downstream vendors who were "afford[ed] equal and independent rights to seek indemnification

and defense" under the policy); *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 976 (Bankr. N.D. Ill. 1991) (concluding that non-debtor insured "has a contract with the insurers that allows it to make claims directly" and rejecting settlement in asbestos bankruptcy that would "extinguish[]" those rights).

116.    TCJC's contribution of its insurance rights is a prerequisite to the Debtors' ability to monetize coverage under the BSA and Local Council policies, and formulate a plan of reorganization that would achieve the dual goals of compensating survivors and continuing the Scouting mission. *See, e.g.*, *In re Blitz U.S.A.*, 2014 WL 2582976, at *4–6 (finding that non-debtor insured's contribution of its insurance rights was necessary to effectuate the insurance settlements incorporated into the plan, which provided significant recoveries to tort claimants). Without the funds from the Settling Insurance Companies and the other contributions by TCJC and the Local Councils, the Debtors cannot confirm any chapter 11 plan and certainly not one that provides the robust distributions offered in the Plan. Indeed, TCJC's release and contribution of its insurance rights in the BSA and Local Council Policies is a condition of the settlements with the Settling Insurance Companies. *See infra* note 41. Absent these funds, the Debtors are left with significantly less cash to distribute to holders of Abuse Claims, and their remaining insurance coverage would be subject to substantial litigation and competition among co-insureds, including TCJC, on a first-come, first-served basis.[51] TCJC's contribution and the interdependent Insurance

---

[51]    The Fifth Circuit, for example, has found no "true support for a general principle of insurance law that forbids an insurer from settling with one of its coinsureds to the disadvantage of another one." *Vitek Inc. v. Floyd*, 51 F.3d 530, 537 (5th Cir. 1995). Similarly, in *Travelers Indemnity Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 764-65 (5th Cir. 1999), the Fifth Circuit held that an insurer is "free to settle suits against one of its insureds without being hindered by potential liability to co-insured parties who have not yet been sued." *Id.* ("Under Texas law, an insurer defending its insured on a covered claim owes that insured a tort law duty to accept a reasonable settlement offer within policy limits rather than unreasonably risk an adverse judgment substantially over the policy limits."). Moreover, other circuits support this principle. *See, e.g.*, *World Trade Ctr. Props. LLC v. Certain Underwriters at Lloyd's of London*, 650 F.3d 145, 151 (2d Cir. 2011) (noting that a liability insurer "has discretion to settle whenever and with whomever it chooses, provided it does not act in bad faith.").

Settlements provide substantial, guaranteed recoveries to holders of Abuse Claims in a manner that is fair and equitable to claimants.

117.    The TCJC Settlement also resolves TCJC's unliquidated indemnification claims against the BSA and the Local Councils.  In the absence of the TCJC Settlement, TCJC would hold significant "Indirect Abuse Claims" against the Settlement Trust for costs incurred in defending and resolving TCJC Abuse Claims in the tort system.  TCJC's Indirect Abuse Claims would compete for Settlement Trust funds and, ultimately, impair recoveries to holders of Abuse Claims.  Accordingly, the TCJC Settlement is an indispensable part of the global settlement before this Court.

### C.    This Case is Extraordinary

118.    Courts have routinely held that the "extraordinary circumstances" factor is typically satisfied in mass tort cases where there is a significant number of tort claims.  *See, e.g.*, Opinion Confirming Chapter 11 Plan of Reorganization at 38, *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Feb. 3, 2022) [Docket No. 6378] (noting that the "extraordinary nature" of the case, evidenced by more than 3,000 cases filed against the debtors around the country, and the confluence of other factors make the case "exactly the type of extraordinary case the Third Circuit alluded to in *Continental*."); *In re TK Holdings Inc.*, 2018 WL 1306271, at *18 (finding extraordinary circumstances supported the third-party releases where debtors filed chapter 11 cases in the face of mounting mass tort liabilities).

119.    There have been more than approximately 82,200 unique and timely Abuse Claims filed in this case.  *See* Ex. 49, Expert Report of Makeda S. Murray, 6 (Dec. 5, 2021).  In light of the significant number of Abuse Claims asserted, and given the unique shared liability of such claims among the BSA, TCJC, Local Councils, and/or other Chartered Organizations, approval of the third-party releases is warranted.  Furthermore, the existence of indemnification claims, shared

63

insurance assets, and the historical and well-documented partnership between TCJC and the BSA support a finding that extraordinary circumstances exist requiring a global resolution of Abuse Claims.

120.    The Debtors' Plan provides an opportunity to provide just compensation to survivors on account of claims that may be barred under applicable state law, and it provides compensation to survivors who might not have claims strong enough to merit litigation or who might want to avoid publicity.  Put plainly, these chapter 11 cases and this Plan are *the only* means available to provide just compensation to so many survivors.  Confirmation of the Plan provides an opportunity to deliver compensation to over 82,000 survivors.[52]

## III.    **The Best Interests Test is Satisfied With Respect to TCJC Abuse Claims**

121.    Commonly referred to as the "best interests" test, section 1129(a)(7)(A) of the Bankruptcy Code requires that each creditor has either accepted the plan or "will receive or retain under the plan on account of such claim or interest in property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7."  *See* 11 U.S.C. § 1129(a)(7)(A).  Although the best interests test does not address claims against third parties, it is undeniable that the TCJC Settlement provides holders of TCJC Abuse Claims with value not less than what such claimants would receive in a chapter 7 liquidation—and for many claims, significantly greater value than what such claimants would receive in the tort system.

### A.    **Section 1129(a)(7) Does Not Apply to Third-Party Claims**

122.    Section 1129(a)(7) sets forth what debtors must provide to rejecting impaired creditors and interest holders.  As courts have recognized, section 1129(a)(7) does not speak to

---

[52]    If confirmation of this Plan is denied, the chapter 11 cases, if they continue, may still be beneficial as a claim resolution procedure applying state law, which would likely bar recoveries to tens of thousands of survivors.

claims against non-debtor third parties, but addresses the amount a dissenting creditor would receive "on account of such claim" if the debtor were liquidated under chapter 7.  *See, e.g.*, *In re Purdue Pharma L.P.*, 633 B.R. 53, 110 (Bankr. S.D.N.Y.), vacated *sub nom*. *In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021), certificate of appealability granted, No. 21 CV 7532 (CM), 2022 WL 121393 (S.D.N.Y. Jan. 7, 2022) (distinguishing contrary precedent in the Second Circuit and finding that "[a]s a matter of grammar, therefore, the comparison required by section 1129(a)(7) apparently is between the amount that the objecting creditor would receive under the plan on account of its claim and what it would "so" receive – that is, also on account of its claims – if the debtor were liquidated under chapter 7.  It would not, therefore, require analysis of the claimant's rights against third parties."); *In re Plant Insulation Co.*, 469 B.R. 843, 887 (Bankr. N.D. Cal. 2012), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013), and *aff'd*, 544 F. App'x 669 (9th Cir. 2013) ("Thus, the most natural interpretation of section 1129(a)(7) is that it addresses only the amount the dissenting creditor would receive or retain on its claim against the debtor, because that was the only question section 1129(a)(7) logically could address at the time it was enacted.").  Accordingly, the proper inquiry is whether a claimant will receive or retain value under the Plan that is not less than what such claimant would receive in a chapter 7 liquidation with respect such claim against the Debtor.

> **B.    The  TCJC Settlement Provides Abuse Claimants with Greater Value Than They Would Receive in Chapter 7**

123.    Notwithstanding the fact that third-party claims fall outside the scope of section 1129(a)(7), the TCJC Settlement provides TCJC Abuse Claims with value that is not less than what such claimants would receive in a hypothetical chapter 7 liquidation.  In a hypothetical liquidation, TCJC Abuse Claims would be subject to litigation in the tort system, with any hypothetical recovery against TCJC subject to apportionment among co-liable parties, including

the BSA.  Under the Plan, TCJC is making a contribution sufficient to pay TCJC Abuse Claims in full based on tort system values.  As discussed herein, even assuming a conservative 50% apportionment to TCJC, the $250 million contribution exceeds any reasonable range of value attributable to TCJC *without* consideration of the value of TCJC's Insurance Rights being assigned to the Settlement Trust and waiver of TCJC's indemnification claims.  *See supra* ¶¶ 102–105.  As such, the Plan provides holders of TCJC Abuse Claims with guaranteed tort system values without the cost, uncertainty, and delay inherent in litigation.[53]  Indeed, through the Independent Review Option, claimants with the most severe claims will have the opportunity to recover an award commensurate with the amount a "reasonable jury" might award in the tort system, with the potential to recover an award in excess of the scheduled TDP values.  *See* TDP, Art. XIII–A.[54] Importantly, TCJC's cash contribution will be earmarked to satisfy TCJC Abuse Claims in full, including claims liquidated through the Independent Review Option.  *See* TDPs, Art. IX–F.

124.    Moreover, in the absence of the TCJC Settlement, TCJC would retain all rights in the BSA and Local Council Insurance Policies, such that TCJC would compete for coverage with the BSA, Local Councils, and other Chartered Organizations with respect to claims asserted against such parties.  This would result in costly and value-destructive litigation as coverage issues are litigated and TCJC obtains the proceeds of insurance to which it would be entitled.  Under the

---

[53]    As courts have recognized, bankruptcy trusts can provide comprehensive, equitable, and timely recoveries to injured parties when compared to litigation in the tort system. *See, e.g.*, *In re LTL Management, LLC*, No. 21-30589 (MBK) (Bankr. D.N.J. Feb. 25, 2022), Memorandum Opinion, p. 27 [Docket No. 1572] ("Rather, this Court regards the chapter 11 process as a meaningful opportunity for justice, which can produce comprehensive, equitable, and timely recoveries for injured parties. The bankruptcy courts offer a unique opportunity to compel the participation of all parties in interest (insurers, retailers, distributors, claimants, as well as Debtor and its affiliates) in a single forum with an aim of reaching a viable and fair settlement.")

[54]    Ex. 50, Tr. of Zoom Hr'g Before Hon. Laurie Selber Silverstein, Boy Scouts Am., No. 20-10343, 34:2–5 (February 18, 2022) (TCC: "The independent review is, in our view, the TCC's  view, who looks out for those who have – and there is no insignificant abuse claim, they're all significant, but some are, frankly, more horrific than others. The independent review was to deal with those claims and particularly, and I think this is important, to appropriately get at the excess insurance.").

Plan, the global settlement with Settling Insurance Companies and other insureds, including TCJC, preserves the value of the insurance policies—perhaps the single most valuable asset of these estates—for the benefit of all Abuse Claims.  Thus, it is undeniable that the Plan provides greater recoveries for Abuse Claims without the delay and dilutive effect that coverage litigation would have in a liquidation scenario.

## RESERVATION OF RIGHTS

125.    TCJC reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Statement, to introduce evidence prior to or at any hearing regarding confirmation of the Plan, and to seek to introduce documents or other relevant information in support of the positions set forth in this Statement.  In the event that the TCJC Settlement is not approved in its entirety or is terminated or withdrawn, TCJC reserves all right rights, claims, defenses, and remedies, including, without limitation, to object to the Plan and argue that re-solicitation of the Plan or any modified chapter 11 plan is required.

## CONCLUSION

126.    For the reasons stated herein, the Court should approve the Plan.


*[Remainder of page intentionally left blank]*

Dated: March 2, 2022
          Wilmington, Delaware          _/s/ Michael J. Merchant_

**RICHARDS, LAYTON & FINGER, P.A.**
Michael J. Merchant (No. 3854)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  merchant@rlf.com

- and -

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted _pro hac vice_)
Deniz A. Irgi (admitted _pro hac vice_)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
            deniz.irgi@lw.com

- and -

Adam J. Goldberg (admitted _pro hac vice_)
Robert J. Malionek (admitted _pro hac vice_)
Madeleine C. Parish (admitted _pro hac vice_)
Benjamin A. Dozier (admitted _pro hac vice_)
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020-1401
Telephone: (212) 906-1200
E-mail: adam.goldberg@lw.com
            robert.malionek@lw.com
            madeleine.parish@lw.com
            benjamin.butzin-dozier@lw.com

_Counsel to The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole_