## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re:  D.I. 9114** |

### DECLARATION OF BRUCE GRIGGS IN SUPPORT OF CONFIRMATION OF THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

I, Bruce Griggs, pursuant to 28 U.S.C. § 1749 and under penalty of perjury, hereby declare as follows:

1.       I am over twenty-one (21) years of age, have never been convicted of a felony, and am fully competent to make this declaration (this "Declaration") in support of confirmation of the *Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, dated February 15, 2022 [D.I. 8813] (the "Plan") and the *Debtors' (I) Memorandum of Law In Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114] (the "Memorandum").

2.       I am a shareholder partner at the law firm Ogletree Deakins Nash, Smoak & Stewart, P.C. ("Ogletree").  Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal experience and knowledge or information obtained from my review of relevant documents.

---

[1]  The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## I.      Retention of Ogletree as NCC

3.      Ogletree was retained in August 2016 by the Boy Scouts of America as its National Coordinating Counsel ("NCC") with respect to Abuse Claims[2].  I have been the lead attorney at Ogletree responsible for handling that engagement.[3]  Ogletree has served as NCC since its retention and continues to serve as NCC during the Debtors' Chapter 11 Cases.  I currently oversee a team of one lawyer and one paralegal who works exclusively and full time on this engagement.  We also have a second practice assistant/paralegal who devotes most of her time to this engagement.   Prior to the bankruptcy filing, our team had as many as six attorneys and three paralegals assigned to the engagement.

4.      In preparation for my role as NCC, I familiarized myself with the BSA's prior defense strategy.  The BSA historically handled Abuse Claims brought against Local Councils, Related Non-Debtor Entities, and Chartered Organizations in a manner that shielded Local Councils, Related Non-Debtor Entities, and Chartered Organizations from both the costs of litigation and the liability incurred in the settlement of Abuse Claims.  Specifically, the BSA would generally administer and litigate Abuse Claims brought against those entities, as well as authorize and fund the payment of any settlement amounts related to such Abuse Claims.  Abuse Claims brought against TCJC were handled differently.  TCJC generally bore its own costs of litigation and at least an equal share of the liability incurred in the settlement of Abuse Claims.

5.      Ogletree was retained as NCC, to implement a more coordinated, uniform approach for investigating, defending, and resolving Abuse Claims.  Rather than have disparate local counsel across the United States handling these matters, Ogletree would lead the overarching strategy and

---

[2]  By "Abuse Claim," I am referring, where appropriate, to the prepetition claims alleging sexual abuse that Ogletree handled on behalf of BSA.

[3]  JTX Ex. 988 is a true and correct copy of my Ogletree law firm bio.

approach to each claim.  Because attorneys representing plaintiffs in Abuse Claims were highly cohesive and would share information, the BSA wanted to ensure that its defense and claim resolution strategies were consistent across the country.

6.      Ogletree's role as NCC was comprehensive.  Working together with local defense counsel in jurisdictions where claims were filed, Ogletree handled all Abuse Claims asserted against the BSA, Local Councils, and/or any Related Non-Debtor Entities[4] that were pending or filed between Ogletree's engagement and the filing of the bankruptcy.  During this time frame, I am not aware of any Abuse Claims that were pending or made against the BSA or any Local Councils or Related Non-Debtor Entities that Ogletree was not involved with.  I am also not aware of any Abuse Claims made against any Chartered Organizations that involved allegations of sexual abuse related to Scouting, which did not include either the BSA or a Local Council as a co-defendant.  I am aware of various Abuse Claims brought against all three—the BSA, Local Councils, and Chartered Organizations.[5]

7.      In total, Ogletree handled approximately 350 Abuse Claims.  As NCC, we resolved approximately 250 of those claims.[6]  The vast majority of the Abuse Claims that we settled (approximately 85%) involved allegations of sexual abuse that occurred over 30 years ago.  The rest involved allegations of sexual abuse occurring within the last 30 years.  Between 2017 and

---

[4]  There seven Related Non-Debtor Entities (as defined in the Plan).  As of the date of the filing of this Declaration, only two of the Related Non-Debtor Entities have been named in pending lawsuits: (1) Learning for Life and (2) National Boy Scouts of America Foundation.  There are 35 lawsuits pending in which Learning for Life is named as a co-defendant and there are 20 lawsuits in which National Boy Scouts of America Foundation is named as a co-defendant.

[5]  As part of discovery in this case, Ogletree produced all the complaints it had in its file relating to Abuse Claims.  Those complaints have been collected as JTX Exs. 8-1 to 8-3.  These complaints were kept in the ordinary course of business.

[6]  JTX Ex. 1003 is a true and correct copy of a spreadsheet prepared by Ogletree summarizing the BSA's settlements between 2016 and 2020.  JTX Ex. 1002 is a true and correct copy of a spreadsheet prepared by Ogletree summarizing the BSA's settlements between 2010 and 2020.  JTX Ex. 386 is a true and correct copy of another spreadsheet prepared by Ogletree describing BSA's settlements between 2016 and 2020.

3

2019, approximately $160 million was spent by, or on behalf of, the BSA, Local Councils, and Chartered Organizations in resolving Abuse Claims.

8.      The Abuse Claims that Ogletree handled varied widely in terms of the factual circumstances of the abuse and therefore, the valuation of the Abuse Claim. Some Abuse Claims could be resolved for relatively modest sums, and other Abuse Claims involving more serious abuse and facts that established a greater responsibility for scouting would be settled for greater amounts. Notably, the BSA also faced a small set of claims that involved particularly egregious facts and circumstance (such as those presented in the claims relating to the abuse perpetrated by Thomas Hacker) that resulted in particularly high, outlier settlements. The Debtors would expend substantial resources defending against these outlier claims and viewed the claims involving Hacker as an exceptional matters in regards to their settlement values.

## II.      Pre-Petition Responsibilities and Practices

9.      Broadly speaking, Ogletree's role as NCC involved coordinating with local defense counsel across the country to investigate, defend, assess, value, negotiate, and typically settle Abuse Claims asserted against the BSA and/or a Local Council.  This would include (a) doing an initial investigation of the Abuse Claim, (b) retaining and/or recommending local defense counsel on behalf of the BSA, Local Councils, and certain Chartered Organizations, (c) leading and coordinating the defense strategy on behalf of the BSA, Local Councils, and certain Chartered Organizations, (d) communicating with BSA's insurance companies, when applicable, regarding the defense of Abuse Claims, (e) evaluating and recommending settlement amounts, and (f) negotiating settlements of Abuse Claims on behalf of the BSA, Local Councils, and Chartered Organizations.

### A.    Initial Investigation

10.    Ogletree handled the initial investigation of any Abuse Claims that were made against the BSA or a Local Council.  The initial investigations of Abuse Claims were effectively "outsourced" from the BSA to Ogletree, with BSA's legal department providing general oversight.

11.    Ogletree undertook an initial investigation whenever an Abuse Claim was made. This would include circumstances where a complaint was filed, but it could also include circumstances where a pre-litigation demand had been made.  For each asserted Abuse Claim, I would assign an Ogletree lawyer to lead the initial investigation.  That lawyer would gather whatever information he or she could from the BSA, the applicable Local Council, or the applicable Chartered Organization.

12.    As part of the investigation, Ogletree lawyers would also consider any information provided by the claimant, as it was not uncommon that a claimant would voluntarily provide (typically through a claimant's attorney) any information he or she had to corroborate a claim.  The initial investigation would typically focus on (a) the type, duration, and frequency of the abuse that allegedly occurred, (b) the identity of the alleged abuser, (c) the degree of connection between Scouting and the underlying claimant, the alleged abuse, and the alleged abuser, (d) the time frame for that the alleged abuse, and (e) where the alleged abuse occurred.  Ogletree's lawyers would also investigate whether the BSA was aware of any prior acts of abuse by the alleged abuser. Ogletree would also investigate any information regarding the alleged effects of the abuse on the underlying plaintiff.

13.    The purpose of this initial investigation by Ogletree was to find out as much information as we could about strengths and weaknesses of the claim so we could evaluate the BSA's best options for defending and resolving the Abuse Claim.  Because the vast majority of Abuse Claims asserted against the BSA and/or Local Councils would settle, this initial

investigation was an important step toward assigning an initial settlement value to the claim as early as possible.

        **B.**    **Selection and Evaluation of Defense Counsel**

14. As part of my NCC responsibilities, I was also directly involved with the selection and evaluation of the local defense counsel who would defend the Abuse Claim in court. While I was retained directly by the BSA, I was responsible for (or coordinated with insurers with respect to) the selection and evaluation of local defense counsel for the BSA, Local Councils and Chartered Organizations.[7]

15. When insurance was not available for an Abuse Claim (or the only primary layer insurance available was a matching-deductible policy), I typically was responsible for hiring local defense counsel to defend the BSA and the applicable Local Council and Chartered Organization. When no insurance was available, the BSA paid out of its own pocket for the cost of its defense counsel, and such defense counsel typically also represented the Local Council or the Chartered Organization.

16. If a non-matching deductible primary-layer insurance company, such as Century, was involved in the Abuse Claim, I frequently consulted with such insurance companies regarding the selection of defense counsel for the BSA, Local Counsel and, in certain situations, Chartered Organizations, in accordance with the respective policies and applicable law. Even in situations where insurance was available, the BSA's insurers frequently deferred to my judgment and consented to the defense counsel I recommended.

---

[7] An exception to this would be The Church of Jesus Christ of Latter-Day Saints ("TCJC"). TCJC would usually retain its own independent defense counsel. When I refer in my declaration to the work I performed relating to Chartered Organizations, I am excluding TCJC.

17.    Generally, the BSA, Local Councils, and the Chartered Organizations (with the exception of TCJC) were defended by the same defense counsel.  It was rare for separate counsel to be retained on behalf of the BSA, Local Councils, and Chartered Organizations.

### C.    Coordinating Defense Strategy

18.    The Abuse Claims asserted against the BSA and the Local Councils typically included several commonalities, which suggested that the BSA should be pursuing a uniform strategy for defending and resolving Abuse Claims across the various jurisdictions.  As NCC, my team at Ogletree worked closely with local defense counsels across the country to develop defense and litigation strategies to defend and ultimately resolve Abuse Claims asserted against the BSA, Local Councils, and Chartered Organizations.   This was particularly important because, as mentioned, the various attorneys that represent sexual abuse claimants were highly cohesive and were willing to share documents and strategies.

19.    Typically, an Abuse Claim was filed jointly against the BSA, the relevant Local Council, and the relevant Chartered Organization.

20.    Because of the nature of the BSA's insurance and the unity of interest between the BSA or the Related Non-Debtor Entity. the Local Council and the Chartered Organization in Scouting (which was reflected by the fact that the BSA would include Local Councils, Related Non-Debtor Entities and Chartered Organizations as Named Insureds and insureds, respectively, on their post-1976 insurance policies,) the BSA typically did not file any sort of comparative indemnity, equitable contribution, or other third-party claims against the applicable Local Council or the applicable Chartered Organization, unless the Abuse Claim alleged abuse outside of the Scouting context. During Ogletree's tenure as NCC, the BSA rarely filed motions to dismiss lawsuits at the pleading stage.  Based on our experience and understanding of the law, motions to dismiss rarely succeeded in resolving an Abuse Claim asserted against the BSA or a Local Council.

21.     In litigation, the BSA or a Local Council rarely prevailed on a motion for summary judgment on an Abuse Claim.  Our uniform experience in handling the Abuse Claims for the BSA was that courts were increasingly reluctant to grant dispositive motions filed by the BSA.  I believe that the BSA was successful only on six motions for summary judgment in the hundreds of Abuse Claims that we handled, and only two of those six motions for summary judgment disposed of the entire case – the remaining four motions only disposed of certain claims.

22.     States within the United States have different statutes of limitations that may apply to Abuse Claims.  Statute of limitations defenses are stronger in some states than in others.  Statute of limitations functionally create barriers to claims for plaintiffs.  When applied by the courts, such statutes bar recovery.  At minimum, the existence of such a statute introduces substantial additional costs for the plaintiff, and adds risk to prospective recovery.  That risk is increased depending on the particular statute of limitations adopted by states.  There were certain jurisdictions in which I do not recall seeing a single claim brought against the BSA.  One likely explanation for this is that plaintiffs would not bring claims in jurisdictions where a statute of limitations or repose would present a significant hurdle to recovery.   In my experience, the BSA was sued less frequently in states with strong statute of limitations.  I believe that statute of limitations had a substantial chilling effect on the filing of claims.

23.     As a result, in my experience handling claims on behalf of the BSA, the BSA typically did not have a viable statute of limitations defense to the vast majority of claims that were brought.

24.     Based on my experience, courts are reluctant to grant dispositive motions on a statute of limitations basis, particularly for something like childhood sexual abuse.  Indeed, many of the states that had potentially applicable statutes of limitations also included exceptions (such

as discovery exceptions) that would effectively negate a dispositive motion on a statute of limitations defense. Accordingly, in the few circumstances when applicable, we would use the possibility of a statute of limitation defense as an argument to reduce the value of a settlement in negotiations with counsel for underlying plaintiffs, but not as a complete bar to recovery. This is because if we presented the statute of limitations defense and lost, the underlying plaintiffs' settlement demand would likely increase to be more similar to a claim that was not subject to any such defense. For instance, BSA had a statute of limitations defense to Hacker claims, but lost the motion for summary judgment on the defense. BSA took an appeal, and lost again.[8] Consequently, we did not ultimately achieve any discount for the statute of limitations in settling with the plaintiffs.

25.    The BSA believed it had meritorious defenses with respect to certain abuse claims in Idaho based on the statute of limitations. The court, however, essentially articulated a new legal theory based on fraudulent concealment that circumvented the applicable statute of limitations in that case, which prevented the BSA from prevailing on its statute of limitations defense.[9]

26.    When the BSA prevailed on a statute of limitations defense, the BSA and its insurers may still settle the claim, if the circumstances were right. For example, in a case filed in Connecticut, the trial court granted the BSA's motion for summary judgment on the basis that the

---

[8]  JTX Ex. 146 is a true and correct copy of a September 30, 2016 Opinion from the Appellate court of Illinois, First District.

[9]  JTX Ex. 111 is a true and correct copy of a Memorandum Decision and Order in *Doe v. Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints,* Case No. 1:09-cv-00351-BLW, dated August 31, 2012 denying the BSA's motion for summary judgment. JTX Ex. 133 is a true and correct copy of an Opinion from the Idaho Supreme Court filed August 27, 2015 holding that Idaho's fraud statute of limitations under Idaho Code section 5-218(4) applies to constructive fraud claims, and the discovery rule under that statute applied in determining when a constructive fraud cause of action accrues.

claim was untimely under a statute of repose.[10]  Notwithstanding that the motion for summary judgment was granted, the BSA ultimately settled that lawsuit with the consent of its insurer rather than face the cost and risk of an appeal.  The average recovery for each plaintiff in that case was approximately $15,000.[11]

27.    In litigation, the BSA would conduct affirmative discovery.  The affirmative written discovery typically involved interrogatories, requests for production, and requests for admissions. Typically, local counsel took a deposition of the abuse survivor and, only when warranted by the value of the claims, a medical or psychological examination.  The scope of our affirmative discovery was driven, in large part, by the perceived value of the Abuse Claim.  Simply put, Ogletree recommended more extensive discovery for higher value claims, and less extensive discovery for lower value claims.

28.    As part of our efforts to coordinate a consistent, nationwide defense strategy, Ogletree prepared and provided templates to local defense counsel relating to various pleadings, discovery requests, discovery responses, protective orders, and settlement agreements.  Local counsel then modified or conformed these templates, as necessary, to be consistent with the local rules of any jurisdictions.

29.    We were also responsible for coordinating the responses on behalf of the BSA, Local Councils, Related Non-Debtor Entities, and Chartered Organizations to discovery propounded by the underlying plaintiffs.  Typically, underlying plaintiffs would seek and obtain information related to the Abuse Claim, including Troop Rosters, information relating to the

---

[10] JTX Ex. 174 is a true and correct copy of a Memorandum of Decision re Defendant's Motion for Summary Judgment in *John Doe # 1, et al. v. Boy Scouts of America Corp., et al.*, filed in the Judicial District of Stamford/Norwalk at Stamford on April 20, 2018, which granted the BSA's motion for summary judgment on a statute of repose.  Exhibit 175 is a copy of the court's order relating to that Memorandum of Decision.

[11] JTX Ex. 201 is a true and correct copy of the settlement agreement reached in *John Doe # 1, et al. v. Boy Scouts of America Corp., et al.*, filed in the Judicial District of Stamford/Norwalk at Stamford on April 20, 2018.

alleged abuser (including, but not limited to, Volunteer Screening Database ("VSD") files), and information about the BSA's youth protection efforts. Although we filed motions in limine seeking to exclude the admissibility of any VSD files, I do not recall any circumstances where we were able to completely exclude the admission of any VSD files. In several cases, the BSA was required to produce not only the VSD of the alleged perpetrator, but a more significant set of the BSA's VSD files.

30.     If an Abuse Claim could not be resolved in the early stages of litigation, Ogletree and defense counsel occasionally retained an expert to opine on the applicable standard of care and on the BSA's youth protection efforts.

31.     As with the initial investigation, the BSA's purpose in taking this discovery was to evaluate the credibility and value of a claim. Because the BSA did not have much success in having these claims dismissed at the pleading stage or at the motion for summary judgment stage, our discovery efforts were focused primarily on positioning the case towards a favorable settlement, if possible.

32.     The BSA and its Local Councils did not take any Abuse Claims to verdict during Ogletree's tenure as NCC. I am aware of only two Abuse Claims that went to trial between 2010 and 2016. Juries are unique and inconsistent. Settlement provided a more consistent way to value and settle cases. Generally, we did not consider a jury trial to be a favorable forum for claims involving allegations of childhood sexual abuse, both with respect to determinations of liability as well as for determinations of damages.

### D.     Communicating with Insurers

33.     As NCC, I would communicate with the BSA's insurers to provide status updates, settlement recommendations, and any information they requested about the sexual abuse claim. The vast majority of my communications were with Century and, to a lesser degree, AIG. I also

had communications with Hartford regarding the claims asserted in Guam, but Hartford was rarely involved with other claims. Other insurance companies were largely uninvolved with respect to the defense and settlement of Abuse Claims.

34.     For Abuse Claims that could be settled within a primary layer of coverage, the BSA's excess insurance companies rarely provided input into the defense and settlement of the Abuse Claim.

35.     For Abuse Claims that were expected to exceed the primary layer of coverage, I would provide status updates and information to the representatives of the excess insurance companies. However, those excess insurance companies were rarely involved with providing input on defense strategy, and discussions were limited typically to whether or not a proposed settlement was reasonable and whether the underlying abuse occurred during their policy period.

### E.     Valuing and Settling Claims

36.     The vast majority of Abuse Claims that Ogletree handled were resolved through settlement. I was directly involved with evaluating claims and making settlement recommendations to the BSA as well as to the BSA's insurance companies.

37.     When determining whether to settle a claim and the value the claim, I would consider (1) the cost of defending the sexual abuse claim through trial and appeal, (2) the degree of risk that the BSA, the Local Council, or a Chartered Organization could be found liable by a reasonable jury, and (3) the anticipated amount that a reasonably jury could award.

38.     The cost of defending an Abuse Claim through trial was certainly an important factor in determining whether to settle an Abuse Claim. The cost of defending an Abuse Claim through trial can be very expensive.

39.     If an Abuse claimant was willing to accept a settlement offer for an amount less than the cost of defending the case through trial, the BSA would give strong consideration to such

settlement offer, so long as the case appeared credible.  If an Abuse claimant was willing to accept a settlement offer for an amount less than the cost of pursuing a dismissal of the case, the BSA would give strong consideration to that offer irrespective of the credibility of the claim.  Ogletree typically settled cases that could be settled for less than the cost of defending it.  Both the BSA and its insurance companies were typically in agreement regarding the necessity to consider the cost of defense in determining whether to settle a claim, and to settle claims where they could be settled at or less than the cost of defending them.

40.    The cost of defending each Abuse Claim is significant.  When Ogletree was first retained by the BSA, the Firm was paid a set amount per claim for the initial review of the claim on a flat fee basis.  The BSA continued to pay our fees as NCC as none of the BSA's insurance companies agreed to cover such amounts. In addition, either the BSA or the applicable insurance company paid for the local defense counsel hired to defend the lawsuit.  Between the initial investigation of the claim, the cost of discovery, motion practice (when applicable), and the cost of local defense counsel, the cost of defending the underlying Abuse Claims was significant, and certainly much greater than the $3,500 Expedited Distribution.

41.    The risk of an adverse liability finding on the BSA was the most important factor in determining whether to settle a claim and the settlement amount.  To make that determination, I would consider whether the underlying plaintiff could identify the acts of abuse that gave rise to their claim.  I would also consider whether the underlying plaintiff (or the BSA internally) could identify the alleged abuse and abuser.  I do not believe that the BSA or its insurers paid any claims without sufficient information to identify the alleged abuser.  However, I do not recall any situations where the alleged abuser could not be identified by either the claimant or through our investigation.  Particular importance was placed on whether the alleged abuse had a connection to

Scouting.   A Notice to the BSA, Local Council, or the Chartered Organization was also important. A claim is stronger if there is evidence that the BSA had notice of the abuser.   When we believed that an underlying plaintiff could establish a claim by a preponderance of the evidence, we generally focused on settlement valuation rather than the dismissal of the claim.   One of the key issues then became the degree to which Scouting was responsible for the harm, meaning the degree of liability to an organization.

42.    When determining the value of a claim, I would also consider the type of abuse. Claims alleging more serious acts of abuse would be valued higher than claims alleging less serious acts of abuse.   The plaintiffs agreed with this consideration, as shown by their willingness to settle less severe abuse cases at lower values than more severe cases. Sometimes the case involved two forms of abuse, such as penetration and oral sex.   In those cases, the value of the case would be driven by the more severe form of abuse.

43.    We also considered if the abuse involved any extended duration or frequency, the existence of any coercion or the threat or use of violence or stalking, and whether the abuse involved multiple perpetrators, all of which could increase the value of a claim.   If an Abuse claimant was exploited for child pornography along with the acts of abuse, this too could increase the value of claims.

44.    In valuing claims, we also considered the abuser profile.   The number of victims of an abuser was important.   A case is stronger when there is more than one victim.   The more victims, the stronger the case.   The reason that we considered cases involving serial abusers as stronger is because there was more opportunity for BSA, the Local Council, or the Chartered Organization to learn of, and then prevent, the abuse.   Additionally, the victims can corroborate each other that there was abuse.   Further, a failure to uncover abuse by a serial abuser increases the risk of a

punitive damages award. We generally valued claims involving serial abusers higher than single abuser cases, though the facts of a given single victim claim could raise the same risks as a serial abuser case. For instance, a single abuser claim could be as strong or stronger if the abuse was reported and not addressed. A case against an employee would be stronger than a claim against a volunteer because the institution has more control and contract with employees.

45.     Additionally, I considered the consequences of the abuse. I considered claims with more serious long-term consequences to be more valuable. Those long-term consequences could involve adverse effects with respect to the plaintiff's physical health, mental health, employment, and/or criminal history.

46.     We also considered any facts that we believed would tend to reduce the amount a jury might award against the BSA, the Local Councils, and/or the Chartered Organizations, such as whether there was a familial relationship between the abuser and the victim or whether a non-Scouting relationship was implicated by the claim. And I also considered any statute of limitations defenses. As noted, it was very difficult to prevail on the defense, but the strength of the statute and the relevant facts impacted the claim value. The stronger the statute, the lower the value.

47.     In valuing claims and making settlement recommendations, I would often review historical settlements, including settlements to which insurers provided their consent, as a starting point for considering the value of a claim based on the type of abuse. While I did not perform an economic analysis of prior settlements and establish a "claim matrix" like the one used in the Trust Distribution Procedures ("TDP") under the Plan, I relied on the prior settlements as "comps" for settlement values.

48.     Settlements typically were funded by the BSA and, when the BSA had insurance, its insurance companies. The settlement would secure releases for the BSA, as well as the

applicable Local Councils and Chartered Organizations.  Releases for such parties were critical and a condition to settlement.  There likely would have been no settlements without releases to the BSA, the Local Councils, and the Chartered Organizations involved in the Abuse Claim.

## III.    TDP Negotiations

49.    When the Debtors were drafting the initial version of the TDP, I provided the Debtors with (a) factors that I did, and would continue to  evaluate whether an Abuse Claim was legally valid and credible, (b) factors that I did, and would continue to, consider that would inflate the value of an Abuse Claim, and (c) factors that I did and would continue to, consider that would depress the value of the sexual abuse claim.  I have reviewed the TDP, and the inputs that I provided to the Debtors regarding these factors have been incorporated into the TDP.  We had also provided the Debtors with information concerning our historical settlements with Abuse claimants.

50.    During the course of negotiations of the TDP, counsel for Debtors often would ask me if certain revisions to the TDP were consistent with the BSA's pre-petition settlement practices, so that they could accept, reject, or edit a proposed revision to the draft TDP based on whether the revisions were consistent with the BSA's pre-petition practices for resolving Abuse Claims.  I have reviewed the TDP and I did not see anything incorporated into the TDP that was inconsistent with my comments regarding the BSA's pre-petition practices for resolving Abuse Claims.

51.    We also provided the Debtors with information concerning the strength of the statute of limitations defense in each state, including the potential for the passage of a reviver statute that could restore any Abuse Claims that would otherwise be time-barred against the BSA or the Local Councils under the applicable state's law.  The TDP are consistent with the information I provided.

## IV.    TDP Are Consistent With Pre-Petition Practices

52.     I have reviewed, and I am generally familiar with, the TDP[12] and the Document Appendix[13] in the Chapter 11 Cases.  The TDP and the Document Appendix provide a framework that is generally consistent with the BSA's pre-petition practices for resolving Abuse Claims.

53.     First, the fact that the TDP essentially lead to a settlement offer that can be rejected or accepted by the sexual abuse claimant is consistent with the BSA's pre-petition practices, where the vast majority of claims were resolved through settlement, though plaintiffs could have rejected settlement.  In both cases, the claimant can exit to the tort system.

54.     Second, the Document Appendix provides the Settlement Trustee with the same documents from the BSA and Local Councils that we had, and would continue to consider, when investigating an Abuse Claim.

55.     Third, the TDP permit the Settlement Trustee to secure all of the same underlying factual information that we would obtain from an Abuse claimant.  I view the initial questionnaire as a discovery tool akin to interrogatories and requests for admissions.  I view the obligation of the claimant to provide all documents relating to the Abuse Claim in his custody and any other documents requested by the Settlement Trustee as akin to a request for production.  I view the right to take an examination under oath of the sexual abuse claimant as akin to the right to take a deposition.  And I view any testing, including medical and psychological testing, as akin to a right to an independent medical examination.

56.     The fact that the Settlement Trustee does not have subpoena power over third-party witnesses does not really impact the analysis of an Abuse Claim.  Because of the nature of Abuse

---

[12] JTX Ex. 1-353 [D.I. 8813] includes a copy of the current version of the TDP.  JTX Ex. 1-427 [D.I. 6443] includes a copy of TDP that was operative at the time of my deposition.

[13] JTX Ex. 1-354 [D.I. 8815] includes a copy of the Document Appendix.

Claims, which occur behind closed doors and without witnesses, coupled with the fact that Abuse claimants are often reluctant to disclose the abuse to third parties, third-party discovery typically yielded little or nothing to the defense or valuation of for a claim for settlement.  We generally resolved claims without conducting significant third-party discovery.

57.     Fourth, the Document Appendix appears to provide claimants with access to the same basic discovery beyond they typically received from the BSA, Local Councils, or Chartered Organizations in the ordinary course of discovery.

58.     Fifth, the TDP require an Abuse claimant to satisfy the General Criteria by a preponderance of the evidence.  This is the same legal standard that would apply in the tort system to a negligence claim asserted against the BSA, a Local Council, or a Chartered Organization, and the same standard that we used in evaluating whether an Abuse claimant had a credible claim.

59.     Sixth, the methodology for determining whether an Abuse Claim is legally valid is consistent with our pre-petition practices.  Based on my work as NCC, if an underlying plaintiff could establish, by a preponderance of evidence, each of the General Criteria, I would have considered that a claim that should be settled because the claimant likely would be able to show negligence by the BSA, Local Council and/or Chartered Organization.

60.     Seventh, the methodology for valuing an Abuse Claim is generally consistent with our prepetition practices.  We generally considered the type of abuse and the value of any prior settlements consistent with the matters accounted for in the claims matrix.  We would then perform a more individualized assessment of the case based on the specific facts and circumstances, which could result in a greater or reduced settlement valuation.  The aggravating factors in the TDP are consistent with the type of information we would consider as increasing the settlement value, and

the mitigating factors in the TDP are consistent with the type of information we would consider as decreasing the settlement value of our claim.

61.     Eighth, the treatment of a possible statute of limitation or statute of repose defense is consistent with our prepetition practices.  The availability of a potential statute of limitations defense was a significant factor that we considered in evaluating the strength of a claim in the rare circumstances that we had a viable statute of limitations defense.  The availability of a potential statute of limitations defense is appropriately considered as a mitigating factor that reduces the total value of a claim, rather than as one of the General Criteria that must be satisfied for payment. Historically, statutes of limitation or repose defenses did not prevent settling with or recovering against the BSA, although those defenses likely caused plaintiffs not to file the claims in the first place.

62.     Ninth, the Expedited Distribution is consistent with our pre-petition practices. Based on my work as NCC, if an underlying plaintiff provided all of the information included in a Proof of Claim under oath and offered to settle a claim for $3,500, I would have recommended that BSA and its insurance companies should resolve that claim for that amount.[14]  This is because it would have cost the BSA more than $3,500 in legal fees alone to defend the claim. It is more than likely that the BSA and its insurers would have heeded such advice to save time and resources in litigation. The Expedited Distribution is essentially an early out option, which is a common practice for defendants, that is more cost-effective and efficient than litigating even a clearly invalid claim.  Paying such convenience claims is consistent with historical practices, as approved by insurers.  We frequently settled cases on a convenience basis, and did so with the consent of insurers when there was coverage for the settlement amount.

---

[14] JTX Ex. 1475 is a true and correct copy of a blank Proof of Claim form used in the Chapter 11 cases.

19

63.     Tenth, the Independent Review Option is consistent with our pre-petition practices. My understanding is that the Independent Review Option is a more intricate and adversarial process for resolving higher-value claims.  The BSA did settle certain claims for more than $2.7 million (which I understand is the most a claimant can recovery without electing the Independent Review Option), so including a path to resolve claims for more than $2.7 million is consistent with my pre-petition practices.[15]  When handling claims on a prepetition basis, the scope of discovery we sought on a high-value claim was typically greater than we would experience with lower-value claims.  We would also see greater participation from the insurers when dealing with higher value claims.

64.     For higher value claims (such as the claims alleging abuse by Thomas Hacker), the BSA would seek more expansive discovery from the claimants (such as by taking multiple depositions, requiring a medical examination, and when appropriate, taking more aggressive positions in dispositive motion briefing).  Higher-value claims would generally result in BSA incurring more significant defense costs, as well.  The cost of defending high-value claims like in the Hacker litigation could exceed $1 million between the costs of NCC and local defense counsel.  Therefore, it is entirely consistent with my pre-petition practice working as the BSA's NCC that claims involving a potential recovery in excess of $2.7 million would be subject to more exacting standards – whether through heightened discovery, greater insurer participation, and the pursuit of more aggressive legal theories than a lower value claim.  Further, in such cases, plaintiffs would bear significant costs in moving forward, which would typically exceed $20,000.

---

[15] JTX Ex. 1003 is a true and correct copy of a spreadsheet prepared by Ogletree summarizing the BSA's settlements between 2016 and 2020.

65.     Lastly, the TDP are consistent with historical practices because the recovery on any claim is determined by a trier of fact.  The tort system is not a mathematical tool for determining clams and values.  In the tort system, similar claims do not always achieve similar results.  The fundamental feature of the tort system is the broad discretion and judgment of the trier-in-fact in determining what claims will receive recoveries and the amount of those recoveries.  As is the case in the tort system, the trustee has broad discretion to consider all relevant information in determining an appropriate recovery.  I believe that an experienced settlement trustee will be capable of issuing more consistent awards than the varied courts and juries across the country.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed this 10th day of March, 2022

_/s/ Bruce Griggs_
Bruce Griggs