**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re:  D.I. 9114** |

**DECLARATION OF MICHAEL BURNETT IN SUPPORT OF CONFIRMATION
OF THE THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF
REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

1.      My name is Michael Burnett.  I am over twenty-one (21) years of age, have never been convicted of a felony, and am fully competent to make this Declaration. I am able to swear, and I hereby do swear to the following under penalty of perjury.

2.      I am authorized to submit this declaration ("Declaration") in support of confirmation of the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8813].[2]  Together with the Debtors' counsel, I have reviewed and am generally familiar with the Trust Distribution Procedures proposed in the Plan.

3.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, and my relevant experience and knowledge.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] [2] All terms that are capitalized but not otherwise defined herein shall have the meaning ascribed to such terms in the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8813] (the "Plan").

## I.    BACKGROUND, EDUCATION AND EXPERIENCE

4.    I am the president of Burnett Risk Control International, LLC in Charlotte, NC, a company I founded in 2003.

5.    In this capacity, among other work that I perform, I am routinely retained as a consultant on behalf of religious entities, schools, non-profit organizations, and insurers to evaluate and value sexual abuse claims in the litigation and pre-litigation context.  I have done this work for 26 years.

6.    In the last year alone, I have evaluated and valued more than 500 abuse claims.

7.    In my capacity as a consulting expert, I primarily evaluate and value abuse claims in the context of litigation, although I have also been retained to evaluate and provide valuations in arbitrations, pre-litigation disputes, and due diligence and underwriting matters.  As explained further below, "valuing" abuse claims (*i.e.,* providing an appropriate estimation of liability or an appropriate settlement value) is part of my overall claim evaluation process.

8.    I am well-versed with the claims asserted by abuse claimants and the defenses asserted by defendants in litigating abuse claims.  I am also very familiar with the types of discovery routinely requested by defense counsel in their defense of sexual abuse claims.  When I evaluate an abuse case on behalf of an insurer or defendant, I use the information that has been developed as part of the case or pre-suit investigation in order to analyze and evaluate the claim.  As part of that process, I perform a comprehensive review and analysis of the factual record developed, including information provided by claimants (whether written or oral), evaluation reports, and defense counsel reports.  I utilize all of that information to develop a comprehensive assessment of the alleged abuse and any applicable defenses thereto, in order to advise my insurer and defendant clients on a resolution strategy.

9.      As part of that evaluation, I typically provide an opinion on the appropriate settlement value of a claim.  I have been retained as an abuse evaluation consultant by an insurer of Catholic Dioceses on hundreds of cases since 2004, where I routinely perform this type of evaluation on abuse claims in litigation and pre-litigation matters.

10.     Additionally, I regularly assess the reasonableness of settlements of underlying sexual abuse claims on behalf of insurers in insurance and reinsurance disputes.

11.     I regularly give speeches and presentations on issues related to sexual abuse claims. I am the author of a monograph on sexual abuse issues, where I provide advice about how abuse claims should be properly handled by insurers and insureds, among other topics.

12.     I am also a licensed attorney in the state of Illinois and have been licensed since 1989.

13.     Prior to founding Burnett Risk Control International, LLC, I was a litigation attorney at Lord, Bissell & Brook for nearly eight years.  I was routinely retained as coverage counsel on behalf of Lloyd's of London in connection with evaluating and assessing underlying sexual abuse claims pending against their insureds, including religious organizations, institutions, and others.

14.     In addition to my qualifications outlined here, a copy of my C.V. [JTX Ex. 1181], outlining my employment history and education, is attached hereto.

## II.      ASSIGNMENT AND OPINIONS

## A.      SCOPE OF RETENTION AND ASSIGNMENT

15.     I was retained by the Boy Scouts of America and Delaware BSA, LLC (collectively, the "BSA" or the "Debtors"), to provide my opinions related to (1) whether the TDP are consistent with how sexual abuse claims are assessed and valued in the litigation context by insurers and

defendants; and (2) whether the TDP are reasonable in evaluating the veracity of sexual abuse claims and use reasonable procedures to determine their appropriate value. I have also been asked to consider and respond to certain criticisms of the TDP. I have not been asked to value the particular proofs of claim submitted in this case or examine whether the values included in the TDP matrix are appropriate.

16.    As part of that assignment, I reviewed and relied on the Trust Distribution Procedures included in the Modified Fifth Amended Plan of Reorganization filed September 30, 2021 [Doc. 6443] [JTX Ex. 1-427] (the "Original TDP"); the updated Trust Distribution Procedures as proposed in the Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC filed February 15, 2022 [Doc. 8813] [JTX Ex. 1-353] (the "Updated TDP") (collectively, the "TDP"); the Plan Appendix Re: Document Sharing [Doc. 8815-1] [JTX. Ex. 1-354]; and the redline showing the changes between the Original and Updated TDP [Doc. No. 8814] [JTX Ex. 1-358] in forming my opinion.[3]

## B.    ANALYSIS OF TDP AS COMPARED TO TORT SYSTEM

17.    Based on my review of the TDP and my considerable experience in this area, my opinion is that the TDP set forth reasonable factors and mechanisms commonly considered by litigation defendants and their insurers to assess the credibility of sexual abuse claims and to determine liability and proper valuation of sexual abuse claims. The TDP procedures and factors are consistent with how abuse claims are evaluated by defendants and their insurers when they are brought in a litigation context. The TDP provide impressive mechanisms to mimic, to the extent

---

[3] The Original TDP, Updated TDP, Redline, and Plan Appendix Re: Document Sharing [JTX Exs. 1-427, 1-353, 1-358, 1-354] are attached hereto.

possible, what would be discovered in a litigation context in order to assist the Settlement Trustee in evaluating allowed credible claims.  The bases for my opinions are explained below.

       1.      **Initial Information Requirements As Compared To Tort System.**

      18.     Article IV, Claimant Eligibility, provides for an efficient process that requires sexual abuse claimants to attest to the truth of their allegations and to corroborate their claim with supporting documentation and evidence.  The claimant must complete a twelve-page Proof of Claim form describing their abuse and their connection to Scouting, sign under oath, and provide support documentation.  In a litigation context, defendants and their insurers rely upon informal fact-finding, independent investigation, and the discovery process to investigate the facts of the claim and the potential liability to defendants.  Article IV condenses that process.  The requirements set forth by Article IV on the claimant are, in a sense, similar to the federal rules, in which litigants are now required to "fast-track" the discovery phase of litigation by producing information and documents even without formal interrogatories and requests to produce.  Article IV requires, among other things, that a claimant sign a sworn statement about his alleged abuse and requires that it be supported by evidence and supporting documentation.  Failure to do that results in disallowance of his claim.  *See* Art. VII.C.1 ("Initial Evaluation Criteria").  This gatekeeping phase provides "clear and reliable proof requirements," as well as significant information and evidence that the Settlement Trustee can use to assess eligibility and the nature of the claim early in the process.  And, as stated in Article I Purpose and General Guidelines, this process assists in the "prevention and detection of any fraud."  The processes in the TDP are similar to those that litigants in the tort system utilize, but at greater cost and delay than are afforded under the TDP.

2.    <u>**Expedited Distribution as Compared to Tort System**</u>.

19.    Article VI Expedited Distribution establishes a reasonable mechanism for a Direct Abuse Claimant to extinguish his claim early in the process, if he has demonstrated eligibility, in lieu of pursuing the claims allowance process. For any number of reasons, a claimant may prefer to accept $3,500 as an expedited resolution of his claim rather than endure the time and effort of pursuing the potential for a larger recovery at some unspecified time in the future after a much more rigorous process. This payment is not a form of strict liability because a claimant who elects that option must first attest under penalty of perjury his involvement with Scouting, and the nature of the sexual abuse. Rather, this option mimics litigation defendants' and their insurer's common practices of effecting early and proactive measures to offer litigants an "early out;" which provides for an expedited and cost-efficient resolution to risky and emotionally-charged sexual abuse claims, even in cases where there may be viable defenses to such claims.

20.    The Expedited Distribution represents a *de minimis* nuisance value settlement that benefits the Debtors and the Non-Settling Insurance Companies by providing a quick means of resolution that saves time and resources that would be expended in litigation. Even a successful, un-appealed dismissal under the tort system would usually cost defendants and their insurers significantly more than $3,500 to achieve. Absent the Expedited Distribution, the Settlement Trust would otherwise be required to fully investigate and value "early out" claims, which would require the expenditure of Trust resources. These types of expedited distributions or payments are also employed in some class-action litigation to enable class members to achieve an expedited benefit of the action. For example, in a past breast implant class action, any woman who could demonstrate that she had her breast implants removed was afforded the option to receive a $3,000 base payment, even if she had not exhibited or suffered any adverse effects of the implants. The option provided

an opportunity for insurers and insureds to "buy their peace" against even future claims by women who opted for the de minimis payments, even if they suffered adverse impacts of their breast implants at a later date.

    **3.**     **Discovery and Evaluation under TDP as Compared to Tort System.**

    21.     The Settlement Trustee will utilize the information provided pursuant to the Document Appendix[4] to evaluate claims, as the Document Appendix requires the BSA, Local Councils, and Chartered Organizations to produce a myriad of information that allows the Settlement Trustee to evaluate claims (including but not limited to troop rosters, the Volunteer Screening Database, guidelines and handbooks on youth protection). The collection and review of salient documents mimics, to a large extent, the defendant's document collection process and subpoenas to third-parties that would occur in a litigation context, but in an expedited fashion. Insurers and their insureds rely on their own records, interviews with the witness (where possible), and additional facts gained in the discovery process to compile sufficient information to determine claim validity and viability. The Settlement Trustee likewise receives this information but, arguably, in a more efficient process.

    22.     All of these investigatory provisions, again, mimic more in-depth compilation of information and evidence through the discovery process in the litigation context. Defendants and their insurers rely on formal and informal discovery to engage in an ongoing and sometimes fluid assessment of liability, damages, and claim value. These determinations are often balanced against the ever-increasing costs of protracted litigation.

    23.     Article VII requires that a claimant who goes through the claims allowance process must submit to the Settlement Trustee: i) a sworn questionnaire (something that could be likened

---

[4] Plan Appendix Re: Document Sharing [Doc. 8815-1] [JTX. Ex. 1-354].

to requests to admit or interrogatories); ii) all relevant records and documents (like requests to produce); iii) an executed agreement to: (a) produce further documents sought by the Settlement Trustee, (b) consent to any examinations requested by the Settlement Trustee, including an examination by a healthcare professional (similar to an Independent Medical Exam or psychological evaluation), and (c) consent to a sworn written or oral examination (similar to deposition testimony or deposition upon written questions). This provision also requires the claimant to submit to the Settlement Trustee's requests for further evidence and information if the Settlement Trustee determines further information is necessary.

24.     These discovery procedures are similar to how an insurer, on behalf of a defendant, would investigate the credibility of a claim, the liability exposure of their insured, and the amount that they could expect to pay to resolve sexual abuse claims. For example, when defendants and insurers retain me to produce claim valuation analysis, they typically provide answers to interrogatories, documents produced in discovery, information acquired through investigation, deposition transcripts, medical records, and Independent Medical Exam reports, where available. These all inform not just the defense against sexual abuse claims but also the valuation of abuse claims.

25.     There is no reason to believe that the TDP provisions for examinations, production of records, and sworn written and oral statements would be insufficient to acquire the requisite information to assist the Settlement Trustee in making a determination regarding credibility and damages. These procedures provide the Settlement Trustee with the flexibility to procure the information needed to adequately assess the claim, without wasting Trust resources.

26.     Certain Insurers have complained that the TDP provide too much flexibility to the Settlement Trustee, and do not require medical exams or in-depth objective testing. In my

experience, the types of in-depth objective testing and medical exams recommended by Certain Insurers may be unnecessary in the dispute resolution process. If sufficient evidence already exists that supports the allegation of abuse or, conversely, that appear to render it not credible, it is not always necessary to go through the time and expense of such examinations. This is especially true if it will lead to more costly and time-consuming discovery and evidentiary disputes with modest measurable gain. These dynamics apply equally to the TDP process. Subjecting every one of the 82,000+ claimants to interviews by a panel of specially-trained experts and objective testing to assess the impact of sexual abuse on each claimant is likely cost-prohibitive and impractical.

27.     Moreover, even when an IME or in-depth testing is performed (at considerable expense), it may not be helpful to the resolution of the case. In some cases that I have worked on that seemed not credible, I requested an IME and more in-depth testing, especially when I was coverage counsel representing insurers of defendant institutions. In some instances, the information not only confirmed that the claim was credible, but also had armed plaintiff's counsel with compelling evidence supporting the claim. Here, the Settlement Trustee has the power to require a medical exam, where she deems it appropriate, but does not waste trust resources and further traumatize victims by requiring tests that are not necessary to evaluate the claim. This is not different than the tort system, where nothing requires defense counsel to pursue all potential avenues of discovery where such discovery is not warranted or economical.

4.     **Standards and Procedures in TPDs as Compared to Tort System.**

28.     **Article VII Claims Allowance Process** sets forth the more intensive gatekeeping provisions to ensure that a claimant who chooses to opt for the TDP allowance process and claim valuation presents an allowed and credible claim. In order for the Settlement Trustee to determine if the claim is "allowed" and value the claim, the claimant must demonstrate *by a preponderance*

*of the evidence*, that they are entitled to recovery based on five factors: (a) identified acts of alleged abuse, (b) alleged abuser identification, (c) connection to Scouting, including that a Protected Party may bear legal responsibility, (d) the dates of the alleged abuse or the age of the claimant at the time of the abuse, and (e) the location of the abuse.  These General Criteria thus require a claimant to meet a threshold evidentiary standard before the Settlement Trustee can value the claim; indeed, this parallels the tort system as a claimant first must show potential liability before proceeding to an evaluation of damages.  For this reason, I do not view the TDP framework as one of strict liability.

29.     If it is determined by the trustee that the claimant has met their burden of proof, the claim will be deemed an Allowed Abuse Claim and valued based on aggravating and mitigating factors that may increase or decrease payment.  The mitigating factors, which reduce payment amounts, reflect the availability and strength of defenses that are sometimes asserted in motions to dismiss or motions for summary judgment.

30.     While the general process under the TDP does not contemplate the use of experts or pretrial motions as you would see in a litigation context, in my experience these are not the drivers for a determination of a claim's value in any event.  The impact on a claim's value is driven primarily by the facts, and the TDP emulate to a large extent the fact discovery that would occur in a typical litigation context.

### 4.     Claim Evaluation As Compared to Tort System.

31.     By the end of the Article VII Claims Allowance Process, the Settlement Trustee will have sufficient information to determine a claim's value, similar to what would be known in a litigation context at the conclusion of fact discovery.  The Settlement Trustee will have claimants' sworn statements and submissions, supplemented with an enormous amount of information from

the Debtors, Local Councils, and Charter Organizations (including troop rosters and the files from the Volunteer Screening Database), which will allow the Settlement Trustee to evaluate and corroborate claimant allegations.  This is similar to how a defendant or an adjuster would evaluate a claim on behalf of an insurer in a litigation context, and similar to how I evaluate these claims when asked to do so by insurers and defendants.  These documents, materials, facts, and sworn statements will provide the basis for the Settlement Trustee's evaluation of an abuse claim similar to what would occur in the litigation context: the alleged acts of abuse; the identity or description of the alleged abuser; whether the alleged abuser was an employee, agent or volunteer of a Protected Party, or registered as a Scout or engaged in Scouting activity; the name and location of the claimant's troop; whether the abuse occurred during the course of Scouting activity and whether a Protected Party may bear legal responsibility;  the date(s) of abuse; the claimant's age during the time of the abuse; and the location of the abuse.

32.     **General Criteria: Identified Acts of Alleged Abuse**. These are among the most important factors considered by defendants and insurers in litigation.  Obviously, more serious acts of abuse generally carry a greater resolution value.  Violent penetrative abuse can cause severe injuries and bleeding and, at times, have led to scars that are a permanent reminder of the trauma.  There would be a greater likelihood of medical records or hospital visits that could corroborate such a claim.  Also, violent and/or penetrative abuse is often experienced as being more violative, and thus the genesis or exacerbation of more severe mental and emotional distress.  The extent of the harm caused by the abuse also factors into the aggravating factors to be considered by the Settlement Trustee, as outlined below.  The TDP processes that enable the Settlement Trustee to acquire this information mimics the investigation and discovery phases of litigation relied upon by defendants and insurers.

33.     **General Criteria: Alleged Abuser Identification**.   Notably, the Settlement Trustee may assess the credibility of a claim and the associated recovery to the claimant based on an identification of the alleged abuser either by name or by specific information about the troop and alleged abuser that is sufficient to allow the Settlement Trustee to make a reasonable determination that the alleged abuser was an employee, agent or volunteer of a Protected Party, the alleged abuser was a registered Scout or participating in Scouting activity, and the abuse was directly related to Scouting activities.   Based on my experience, this is consistent with the evaluation of an abuse claim in the litigation context.   Often a victim, due to age and the passage of time, will not have an initial recollection of their abuser's name, but are able to identify them based on their role in Scouting, or where the scout troop met, or their role in a religious organization, if any.

34.     **General Criteria: Connection to Scouting**.   The Settlement Trustee may assess the credibility of a Submitted Abuse Claim by ascertaining whether the alleged sexual abuse occurred during, or resulted from, a Scouting activity and whether the BSA or a Protected Party may bear legal responsibility for the Abuse.   Under the Updated TDP, by adding the verbiage, "and (ii) that a Protected Party may bear legal responsibility," to subsection (c), the General Criteria more expressly requires an Abuse Claimant to demonstrate the potential institutional liability before the Settlement Trustee takes the next step to value the claim.   This requirement mirrors the requirement in the tort system that a claimant establish by a preponderance of the evidence that the defendant owed a duty of care to a claimant and breached that duty.

35.     The Settlement Trustee may analyze whether the abuse occurred during a Scout-sponsored camping trip or a Scout jamboree; or whether the abuse occurred immediately prior to, during or immediately after a scout meeting.   The Settlement Trustee may inquire as to whether

the perpetrator abused the claimant when he was chaperoning a Scouting activity. Was the activity one in which the claimant and/or the perpetrator was required to wear his Scouting uniform? If the abuse occurred at the perpetrator's home during the claimant's play date with the perpetrator's child or while being paid to mow the perpetrator's lawn, those would not be Scouting activities for which the BSA or a Protected Party would be expected to owe the claimant a duty of care. These are factual determinations that defendants and their insurers regularly make in litigation and, likewise, the TDP provide procedures for the Settlement Trustee to do the same.

36.    Indeed, if the alleged perpetrator's abuse of the claimant was unrelated to any Scouting activity, the Settlement Trustee could deem the claim not allowed for valuation, on the basis that, under those circumstances, the alleged abuse did not occur "on the watch" of the Protected Party and thus there existed no *duty* on the part of the Protected Party to prevent the abuse, thus there was no *breach* of any purported duty on the part of the Protected Party and, hence, the Protected Party did not *cause* the claimant's alleged harm.

37.    Further, if the alleged abuse was very attenuated from a Scouting activity, we would expect the Settlement Trustee to apply an appropriate mitigating factor (Non-Scouting relationship, Familial Relationship, Other Responsible Non-Protected Party or Absence of a Putative Defendant, as applicable), thus reducing the value of the claim. For example, if the abuser and claimant were members of the same church and the abuse occurred during religious practices or church-related or church-sponsored activities, not during any Scouting activities, then the coincidence of the abuser's and the claimant's involvement in Scouting would be unrelated to the alleged abuse. The BSA and Protected Parties would not be expected to have a duty to protect the claimant in every aspect of his life and in every situation where he may encounter the abuser, no matter how attenuated the situation was from Scouting.

38.     Arguably, if abuse occurred during Scouting activities or resulted from involvement in Scouting, especially at a location or venue where Scouting activities occurred, and by a person involved in Scouting, the element of a duty to protect and supervise minors would be sufficiently pled.  That the abuse occurred is a consideration of, or is potentially indicative of, a breach of such duty.  If the claimant was harmed by the abuse, causing discernable injuries or harm, such as the types of harm contemplated in the TDP, then all the "considerations" of potential legal responsibility (including a potential claim for negligence) would be present or at least potentially present.  In fact, I am aware that courts across the country have universally found that an adult's sexual contact or engagement with a minor is inherently and immediately injurious and requires no causation evidence to support such a finding.

39.     **General Criteria: Date and Age**.  The TDP also include provisions for the Settlement Trustee to determine the date(s) of alleged abuse and the age of the claimant at the time of the abuse.  Defendants and their insurers in sexual abuse litigation regularly acquire this information to corroborate the claim.  As with defendants and insurers, cross-checking these data points enables the Settlement Trustee to confirm that the claimant and alleged abuser were in that area at the time of the alleged abuse, that the Scout troop existed and engaged in Scouting activities at the time of the alleged abuse, and that the claimant was at an age where he would have participated in Scouting at the time of the alleged abuse.  The Date and Age requirement in the General Criteria guides the Settlement Trustee to make similar determinations as to credibility and value that defendants and their insurers would make in litigation of sexual abuse claims.

40.     **General Criteria: Location of Abuse**. The location of the abuse is another corroborating factor available to the Settlement Trustee to discern the credibility of a claim and the valuation of the claim.  If the alleged abuse occurred on premises typically used by the Scouts

to hold meetings or engage in Scouting activities, that suggests that the claim is more credible, as it confirms – or at least suggests – corroborating details concerning the claim and a connection to Scouting activity.

41.     Location also reflects upon the potential liability of the BSA or Protected Parties. If the alleged abuse occurred while on premises used by the Scouts, it evidences the existence of a duty to protect Scouts while Scouting leaders led and supervised activities.

42.     Further, location of abuse is also something that defendants and insurers consider in claim valuation analysis. Location of abuse often impacts my valuation analysis of such claims. If abuse happened during a Scout-sponsored camping trip, especially at night while most of the participants were sleeping, the value of a claim often increases.  In such situations, the abuser has a greater degree of control, and the claimant would have little to no means to escape and could not avail himself of the protections of his parents and familial safety net.

     **5.**      **Effect of Scaling Factors on Claim Evaluation as Compared to Tort System.**

43.     **The Claims Matrix.**  The Claims Matrix includes six tiers (in descending order of severity) that reasonably and functionally delineate among various types of abuse.  Each tier provides detailed descriptions of abuse types that fall into the respective tiers, and each tier includes a base and maximum value, as set forth below:[5]

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|---|---|---|---|
| 1 | Anal or vaginal penetration by adult perpetrator – includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $600,000 | $2,700,000 |

[5] From Jtx. Ex. 1-353 at 15-16.

| 2 | Oral contact by adult perpetrator – includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | $450,000 | $2,025,000 |
| | Anal or vaginal penetration by a youth perpetrator – includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | | |
| 3 | Masturbation by adult perpetrator – includes touching of the male or female genitals that involves masturbation of the abuser or claimant. | $300,000 | $1,350,000 |
| | Oral Contact by a Youth Perpetrator – includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | | |
| 4 | Masturbation by youth perpetrator – includes touching of the male or female genitals that involves masturbation of the abuser or claimant. | $300,000 | $1,350,000 |
| | Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator. | | |
| 5 | Touching of the sexual or other intimate parts (unclothed) by a youth perpetrator. | $75,000 | $337,500 |
| | Touching of the sexual or other intimate parts (clothed), regardless of who is touching whom and not including masturbation. | | |
| | Exploitation for child pornography. | | |
| 6 | Sexual abuse – no touching. | $3,500 | $8,500 |
| | Adult abuse claims. | | |

44.    In each tier, there are gradations of severity depending on the age of the perpetrator and the nature of the abuse. Five of the six tiers include delineations between adult-perpetrated and youth-perpetrated abuses.  In general, acts committed by a youth perpetrator are valued one tier lower than those committed by an adult.

45.    **Scaling Factors.**  There are three sets of Aggravating Scaling Factors, each with three to four descriptions of criteria that fall within each set, and each with an assigned numerical

multiplier.  There are four sets of considerations that go into determining the Mitigating Scaling Factor, each with multiple descriptions of criteria that fall within.  Within the purview of the Mitigating Scaling Factor is that "The Settlement Trustee may consider any further limitations on the Abuse Claimant's recovery in the tort system."

46.    The Claims Matrix and Scaling Factors set forth in Article VIII are reasonable factors routinely relied upon by defendants and their insurers to determine claim values and how much they should expect to pay to resolve a sexual abuse claim.  They reflect common and relied upon delineations of abuse for valuation purposes when these claims are assessed in litigation. When clients, including defendants and insurers, retain me to evaluate sexual abuse claims, they seek not just a suggested settlement value, but they also seek and rely upon my evaluation analysis and the relevant indicia that support the suggested value. Similarly, the Settlement Trustee will assimilate evidence and information in the Articles IV through VII processes to inform the Article VIII claim valuation process in this matter.  In this role, the Settlement Trustee will rely on the same kinds of information, factors and valuation analysis that defendants and their insurers rely upon in the litigation context to make decisions about the value of the claim, among other things.

47.    In fact, the use of well-defined and extensive criteria and numerical multipliers lends a definable metric to the valuation calculus that is usually absent in the tort system.  Without criteria and numerical multipliers, claim valuation and settlement negotiations are endeavors often beset by the shifting sands of guesswork and unscientific and vague notions of a claimant's appetite for pursuing his claim; or attempts to determine what a trier of fact might find at trial.

48.    In my experience, the detailed, well-founded, defined and extensive criteria of the Matrix and Scaling Factors in Article VIII would be welcomed by both defendants and their

insurers.  They provide a tangible and predictable basis for claim valuation in a way that avoids a volatile and emotionally-charged jury trial in the tort system.

49.     Finally, the Matrix and Scaling Factors produce a defined and finite range of claim values from $0 to $2.7 million.  In my experience, the discretion of the Settlement Trustee, constrained by the parameters established in the Matrix and Scaling Factors, and with an obligation to fairly value not just one but an entire set of 82,000+ claims, is much more favorable than the discretion of triers of fact who may be traumatized themselves over evidence and witness testimony confronting them at trials.

50.     **Scaling Factors**: The TDP valuation procedures include Scaling Factors to adjust an initial Base Matrix Value higher or lower, depending on a variety of factors and circumstances. These Scaling Factors are also derived from evidence of the "BSA's and other putative Protected Parties' historical abuse settlements, litigation, outcomes, and other evidence supporting the Scaling Factors." *See* Article VIII.B. ("Scaling Factors").  These data-driven adjustment factors support the reasonableness of their use in the valuation assessment.  Whether an adjusted valuation is derived through filters and searches applied "on the front end" of the process (as I do when analyzing claims) or is applied on the "back end of the process" as a scaling factor (as in the TDP Claims Matrix approach), defendants and their insurers rely on these metrics to distinguish among varying claims – and sometimes seemingly similar claims – to support claims handling and settlement decisions and supportable valuations.

51.     When applied to a Base Matrix Value that represents a set of similar-tiered claims, Scaling Factors enable the Settlement Trustee to distinguish among these otherwise similar claims, for valuation purposes, similar to how defendants and insurers rely on the same metrics in evaluating similar claims in the litigation context. Reducing the Scaling Factors to numerical

multipliers derived from valuation data specific to the BSA and Protected Parties provides the Settlement Trustee an easy and effective valuation metric replicating what occurs in the litigation context.

52.    **Aggravating Scaling Factors**: The aggravating Scaling Factors which may enhance claim value include: duration and frequency of abuse; exploitation of the claimant for child pornography; coercion or threat or use of violence; multiple perpetrators; abuser profile; and impact of abuse. In my experience, each of these factors can have the effect of enhancing the resolution value of a claim.  Defendants and their insurers regularly consider these factors in the valuation of claims and the concomitant decisions regarding defensibility and costs of defense.

(a)    **Duration of abuse**: I have worked on many claims involving sometimes even comparatively less serious abuse, yet the resolution value of the claims was increased because of a lengthy period of abuse. Some victims have described that the long period of abuse transformed a series of traumatizing incidents of abuse into a traumatizing way of life.  Their life experience over sometimes many years was of a regular trauma that became a debilitating stain upon their self-esteem.  I have also heard victims describe the abuse as a defining trait of their personhood, particularly when the period of abuse transcends stages of life, such as during the time that a child transitions from prepubescence into puberty. I have learned from victims that, even when the frequency of abuse may not be extensive, the fact that the period of abuse itself goes on for a long time can be devastating to the victim.  I have successfully advised defendants and insurers to settle claims of even otherwise comparatively less severe abuse for larger sums than they were initially prepared to pay precisely because the duration of the abuse spanned several years.  I have been able to demonstrate through metrics in my database that the duration of abuse often results in higher claim values.

(b)    **Frequency of abuse:** Sometimes, there may be a relatively brief period of abuse, but the frequency and/or severity of the abuse may constitute an aggravating component of the severity of the claim and the claim value.  For example, I have advised on several claims involving a month or two of abuse, but the compulsive nature of the abuser's proclivities manifested in dozens of abusive incidents in that relatively short time.  If the abuse was something on the order of anal rape, the brief period of abuse is often devastating from the standpoint of harm and valuation.

(c)    **Exploitation and child pornography**: I have worked on several claims involving abuse accompanied by exploitation of the victim, in part, for the purpose of creating and disseminating pornographic images of the minor victim.  In one case, investigation years after the victim's abuse revealed that pornographic images of him, created by the perpetrator while he abused the victim, had been shared on the internet over many years.  The permanency of harm associated with such circumstances can greatly increase the resolution value of a claim.  Even where pornographic images have not been trafficked, some perpetrators threaten to share the images with the public or the victim's family to extort their victims into continuing in the abusive relationship and remaining silent.  Defendants and insurers that I have worked with and represented give great deference to the injurious impact such facts have on claim valuation, especially when considering the impact that such evidence likely would have on a jury or another trier of fact during the damages phase of a trial.

Defendants and insurers consider the impact of any image created during a period of abuse or leading up to abuse.  I worked on a series of claims in a case in which a religious leader took thousands of photographs of prepubescent girls.  The vast majority of photos, many of which depicted fully-clothed girls from the chest to the knees, did not meet the statutory definition of

child pornography. Nevertheless, collectively, the insurer and defense counsel and I decided to test my uncomfortably high valuations with a mock jury exercise in which only the photos of fully-clothed girls were displayed. The mock jury unanimously agreed that the photos used in the exercise were not pornographic under the statute, but they agreed that the photos were "very creepy." The mock jury also agreed that none of his superiors had reason to know that the leader engaged in this kind of misconduct. Nevertheless, despite the lack of any sexual abuse, they reached an eight-figure "verdict" because of the mere existence of the non-pornographic photos and because the religious leader who took the photos was a pedophile.

(d) **Threat of violence:** I have worked on many claims which involved weapon intimidation. Not only were minors sexually abused, but in some cases the abuse included an element of sadistic physical abuse. One claim involved an educator who meted out "corporal punishment" to a 17-year old boy. The acts included tying the boy up, blindfolding him and whipping him to "discipline" him for a minor transgression. It seemed obvious that the acts involved a sadistically sexual dimension and, ultimately, the perpetrator acknowledged that he had been acting out a sexual fantasy, not administering corporal punishment. The use of violence and a weapon increased the claim value, despite the fact that there had been no overt sexual touching, sexual talk or exposure.

Many claims involve weapon intimidation in which the perpetrator brandished a gun as part of the abuse. Sometimes, the perpetrator accompanies the abuse with a threat that he will kill the child or his family if he discloses the abuse. This has been a particularly effective method with very young prepubescent children who fear that if they report the abuse their perpetrator will kill their family. In one case, the overt threat was only made the first time, but the perpetrator left the gun in full view of the child each time he abused him, a constant reminder of the threat. The terror

and sometimes physical harm from violence or the threat of violence increases claim values in a litigation context.

(e)    **Multiple perpetrators:** The presence of multiple abusers aggravates claim valuation in myriad ways.  When multiple perpetrators abuse a child in tandem or simultaneously, the experience is more terrifying for the victim.  The opportunity to escape is reduced.  The overpowering presence of multiple men abusing them simultaneously is physically overwhelming. I worked on a claim in which a victim abused by two men – one a religious leader and one a lay person – described feeling like a "rag doll" being sexually manhandled at a time in his life when he did not understand what was happening or why.  When one abuser "passes off" a child to another abuser, the compensable tort now constitutes sexual trafficking. Many claims involve a second man in the room who does not touch the child, but who engages in voyeuristic behavior and masturbates while watching the other man abusing the child.  Other times, another person in the room does not engage in sexual abuse but does and says nothing, thereby becoming an accessory.

The presence of multiple abusers exacerbates already difficult claims of sexual abuse, from both a liability and damages standpoint.  Multiple abusers provide more ways in which the claimant can argue that an institution or employer negligently supervised or did not appreciate the "red flags" of not one, but two or more offenders.  Multiple abusers also mean multiple witnesses.  This can be especially damaging if the witnesses included a pastor, administrator, or person of responsibility over one of the other abusers. Often, when considering sexual abuse in an institutional setting or a master-servant context, questions include, "Where was the pastor," or "Where was the school principal?" or "Where was the store manager?" or "Where was the house parent?" When the answer is, "He was in the room," or "He knew what was happening but didn't

want to get involved," it is bad.  When the answer is, "He was participating in the abuse," from a liability and damages standpoint, the result is devastating.  It mitigates the defensibility aspect of the claim.  In addition, the adverse impact on the victim is more acute. Victims describe feeling like a sexual "plaything."  The impact on their sexuality, promiscuity, trust issues, relationship issues, social anxieties and the like is exacerbated. Defendants and insurers understand that they will have to pay significantly more to extricate themselves from the lawsuit.

(f)    **Abuser Profile:** The TDP include an Aggravating Scaling Factor that enables the Settlement Trustee to adjust the valuation upward in the event that an abuser has been accused multiple times: 1.25 if the abuser has been accused by at least one other victim; 1.5 if the abuser has been accused by at least 5 other victims; 2.0 if the abuser was accused by at least 10 other victims; and, 1.5 to 2.0 if there is evidence *that a Protected Party knew or should have known (i) the abuser had previously committed or may commit Abuse and failed to take reasonable steps to protect the survivor from that danger, or (ii) the prior Abuse or the foreseeability of the risk of Abuse and failed to take reasonable steps to protect the survivor from that danger* [emphasis to indicate revisions in Updated TDP].  The Updated TDP language provides a more detailed articulation of when the aggravating scaling factor may be applied.  Rather than merely reference to whether a Protected Party was "negligent," the revised version provides for application of the aggravating scaling factor based on considerations of foreseeability and whether measures were taken to protect the claimant from foreseeable harm.  This is a revision that clarifies that the conduct referred to here is more aggravated misconduct that is beyond the standard of legal responsibility that exists in the General Criteria.  The direct reference to specific considerations (foreseeability and protection measures) may provide additional guidance to the Settlement

Trustee in determining whether to apply an aggravating Scaling Factor, and in determining what multiplier along the spectrum of 1.25 to 2.0 to apply.

This is the type of factor that defendants and their insurers consider when assessing claim value. When an abuser has multiple victims, he arguably represents a more malignant cause of harm to a victim than an abuser who may have engaged in a single incident of opportunistic abuse. In addition, multiple victims could represent multiple incidents of the BSA's or Protected Party's inadequate supervision or failed opportunities to identify abusive proclivities, missed signs of a pattern and practice of abuse. If multiple victims accuse an abuser, that potentially reflects multiple negligent breaches of duties of care and failed opportunities to have prevented abuse of some victims.

(g)     **Impact of the Abuse.**  When assessing sexual abuse claim valuation in litigation, defendants and their insurers assess the damages aspect of liability exposure. Some sexual abuse victims – at least outwardly – seem to navigate life fairly well or integrate the abuse into their lives in a more manageable manner.  Most victims, however, allege multiple common adverse impacts of the childhood sexual abuse. They allege myriad forms of mental and emotional distress, including Post-Traumatic Stress Disorder (PTSD) and other sequelae of trauma-induced distress, even years after their abuse.  They often allege relationship and trust issues, sexual dysfunction, anger and behavior problems, physical manifestation of emotional distress; physical injuries (sometimes permanent) due to severe penetrative abuse, flashbacks, low self-esteem, guilt, shame, humiliation, suicidal ideation, depression, anxiety, and many other manifestations of mental and emotional distress.  They often report problems with alcoholism and substance abuse issues, promiscuity and hyper- or hypo-sexuality, insomnia, nightmares, and numerous other physical ailments that are attributed to sexual abuse.  They report relationship issues that inhibit

their ability to engage in healthy emotionally and sexually intimate relationships; or they have trust issues and problems with authority which plague their ability to find and keep employment. They often reference precipitous drops in academic grades caused by the abuse and failures to attain higher education. They often have been in trouble with the law, engaged in criminal activity, been incarcerated, or filed for bankruptcy. Many abuse victims have sought therapy and counseling, or have had medical and psychiatric care and the attendant costs of such treatments. Any one of these harms can increase the claim value. Often, abuse victims allege multiple types of such harms. Defendants and their insurers as a matter of course assess these damages to determine the value of a claim, especially when medical, psychological and educational records corroborate the damages. Generally, the more serious the harm, the higher potential claim value.

53.    **Mitigating Scaling Factor:** The presence of a mitigating scaling factor provides for a reduction of the base value matrix in the event that there are circumstances that would mitigate the claim value. Defendants and their insurers routinely adjust claim values based on liability exposure and other factors. Among potential inputs to the mitigating scaling factor included in the TDP are: absence of a Protected Party relationship; presence of a responsible non-Protected Party; prior settlements, awards, contributions, or limitations received or to be received; statutes of limitations or statutes of repose; the absence of a putative defendant which could result in an "empty chair" defense at trial; and "any further limitations on the Abuse Claimant's recovery in the tort system."

(a)    **Familial Relationship:** When a perpetrator has another connection to or relationship with a victim that was the basis for his access to and abuse of the victim (responsible non-Protected Party), that is a mitigating factor that insurers consider in the valuation and handling of sexual abuse claims in the litigation context. In the past, I have participated in claims involving

abuse against a defendant who was also a family relation to the victim.  For example, in one claim, a boy was sexually abused by his revered uncle, who was a religious leader.  The uncle abused the boy on a family vacation at an island resort, not on church premises or during religious rituals.  My insurer clients relied on my valuation analysis and $0 claim valuation to deny coverage and refuse payment for the claim.  As described in a TDP mitigating scaling factor, in this claim, the fact that the abuser was a religious leader was completely incidental to the abuse.  The leader exploited his familial relationship with the boy to gain access to him and abuse him; he was able to abuse the boy because he was a trusted uncle, not because he was a trusted religious leader.  The boy was not even a congregant of the church where the perpetrator was pastor.  The familial relationship was akin to a "mitigating scaling factor" that had the effect of eliminating any value or payment for the claim.

(b)    **Other responsible parties, settlements, awards, contributions, or limitations:**  I have been involved in many claims involving judgments and awards adjusted by courts to account for a jury's assessment of contributory negligence factors or prior settlements with other defendants.    Defendants and their insurers consider potential comparative and contributory negligence and may adjust the claim value based on estimated or informed percentages of fault of multiple parties.  Often, defendants and their insurers have adjusted claim values to reflect the prior settling out of other defendants and their insurers.  In many of the claims, a jury finds an individual perpetrator guilty of abuse but not his employer or the institution of which he is an agent.  A jury's award to the plaintiff is assessed against only the perpetrator, or against what could be called a "responsible non-Protected Party." (Unfortunately, in the case of a jury's judgment against the perpetrator alone, a victim often is unable to collect the judgment because the perpetrator is destitute and/or in prison, dead, senile or otherwise judgment-proof.)  In

some jurisdictions, the charitable immunity defense has survived the evolving erosion of this defense nationwide, or it remains in some more limited form. (In some jurisdictions, a charitable or nonprofit entity's maintenance of insurance affects whether or to what extent the charitable immunity defense applies.)  In many claims, a responsible party may be a governmental entity, and sovereign immunity laws and damages caps limit the amount that a victim may recover from the public entity.  Armed with a mitigating scaling factor that accounts for the absence of a Protected Party relationship, the presence of a responsible non-Protected Party, or the presence of other awards or limitations, the Settlement Trustee may adjust the valuation downward, much the same way that a defendant or insurer would adjust their share of a resolution value to reflect the contributions and liability exposure of co-defendants or other responsible parties in a litigation context.  However, in this context, the role of the Settlement Trustee is more like that of an arbitrator than a trier of fact in litigation, and she has an obligation to not just this claimant but to all claimants to get the value right.  It is a much more efficient and predictable approach.  Rather than "making the case" to a judge or jury, either at trial or at the dispositive motion stage, and relying upon the uncertainty of the result; the Debtors' insurers know what the base value of a claim is and know what factors may adjust a claim to the lower amount they would typically assign to the claim, based on available defenses and facts.

54.    **Statutes of limitations and statutes of repose:** Obviously, these mitigating factors can have a profound effect on liability exposure and claim valuation.  Just as with defendants and insurers in the litigation context, the Settlement Trustee can adjust a claim valuation downward by assigning a mitigating factor based on an often-conditional time-bar of a statute of limitation or the more absolute bar of a statute of repose.  The case-by-case assessment of the ultimate viability of each claim ensures that the Settlement Trustee will apply the limitations laws of each

jurisdiction to mitigate the value.  Defendants and their insurers routinely include this analysis in the handling of sexual abuse claims, and they understand that when I valuate a claim for them, limitations analysis is a major component of the valuation.  Numerous horrific claims in my database would normally have resulted in significant claim values but for the operation of a statute of limitations or statute of repose that resulted in modest settlements or complete dismissal of the claim.  Defendants and insurers regularly opt to settle sexual abuse claims for less than full value amounts, including somewhat de minimis "nuisance" or "costs of defense" amounts, because it likely represents a smaller expenditure than litigating such claims to dismissal on the statute of limitations defense.  It also constitutes a leverage against the risk of a court's potential denial of a motion to dismiss or motion for summary judgment, with the potential for the making of "bad law;" especially since abuse claims are fraught with emotion and often are personally offensive to judges. In my experience, courts may deny motions to dismiss founded on strong limitations defenses in the hope that the parties will settle. Just as insurers in the litigation context often choose to settle such claims for de minimis "nuisance" or "costs of defense" amounts, the TDP provide for a Direct Abuse Claimant to elect to receive the $3,500 Expedited Distribution.  Resolution of claims with the Expedited Distribution at the conclusion of the eligibility phase, after a sworn statement corroborated by supporting documentation, effectively puts the Debtors' insurers in a similar position as they would be in the litigation context to effectuate a nuisance value settlement.

55.    Further, to the extent that a claimant with a likely time-barred claim elects to have his claim valued by the Settlement Trustee, that claim would be significantly discounted under the Mitigating Scaling Factor as set forth in Schedule 1.  This mirrors how defendants and insurers may settle time-barred claims due to defense costs, or litigation uncertainty due to courts'

increasing reluctance to dismiss claims outright on the basis of statute of repose or limitations defenses.

56.     Certain Insurers have argued that the TDP are deficient because they do not treat a statute of limitations defense as an absolute bar to recovery but, rather, as a defined subcomponent of the Mitigating Scaling Factor that, at most, may mitigate the base value to .01, but not 0 (without some additional component of the Mitigating Scaling Factor coming into play).  My experience is that, even when a claim is dismissed in litigation (which is not common), often it is a dismissal without prejudice, providing a road map and a blueprint on how to remedy pleading errors in an amended complaint.  Moreover, even where there has been a strong statute of limitations defense in a sexual abuse claim, in my experience some courts will not apply the law to dismiss the claim. Even where the statute of limitations defense is ultimately applied, the cost to achieve that win at the trial court or appellate court level sometimes exceeds the value of the claim.

57.     Additionally, statutes of limitation and statutes of repose across the country are in a state of flux.  Some state legislatures have eliminated statutes of limitations and statutes of repose for childhood sexual abuse.  Many state legislatures have opened "reviver windows" of one, two or even three years during which claimants who allege they were abused as children may come forward and file lawsuits, regardless of how long ago their abuse occurred.  To date, at least 27 jurisdictions have opened various types of reviver windows.  With these changes to statutes of limitations, many insureds and insurers no longer enjoy the protections they once did under statutes of limitations.  With the elimination of statutes of limitation and the opening of reviver windows in childhood sexual abuse claims, insurers and their insureds increasingly contend with claims for which there is little evidence of either a damning or exculpatory nature.  The Settlement Trustee may have to navigate a sometimes-complicated interplay of limitations defenses, much as

defendants and insurers would in the litigation context, to assess the level of mitigation that may be assigned to a claim value, if any.  Accordingly, it is logical for all of the reasons above that the statute of limitation and statute of repose is presented as a scaling factor, rather than an absolute bar on a claim.

58.    **The "empty chair":** Insurers routinely consider – where it is available – the "empty chair" factor as a mitigating influence that they contemplate as their and their insured's contribution to a resolution amount.  For example, in a recent Ohio claim involving an insured owner of an orphanage, a very young prepubescent female resident was raped by an older male resident of the orphanage.  The insured's negligence was well-established due to the negligence of its employees, who did not follow supervisory policies and procedures.  However, a county social services agency clearly had liability exposure because they repeatedly placed the girl in foster homes, group homes and orphanages (including the insured) in which she was repeatedly physically and sexually abused.  In addition, after the sexual assault in the insured orphanage, the girl was placed in another orphanage where she was raped twice by older male residents.  The social services agency enjoyed sovereign immunity protections (with an exception only for undefined "egregious misconduct").  The second orphanage clearly had liability exposure. Nevertheless, the girl, through her guardian ad litem, only sued the insured orphanage.  The insurer and defense counsel contemplated whether they could bring in the social services agency and the second orphanage.  Instead, I evaluated the claim with a "best claim value" accompanied by a range of values.  The lower end of the range reflected the best settlement value in the event that the plaintiff would contend with "empty chairs" at trial.  The high end of the range reflected the acceptable value in the event that the court would dismiss the social services agency and limit the admissibility of certain evidence at the motion in limine stage.  At mediation, the insurer

successfully pushed for settlement at the low end of my range, leveraging the specter of the "empty chairs" at trial. Plaintiff's counsel did not want to expand the scope of the litigation and complicate the lawsuit by adding the other stakeholders as parties. The empty chair factor mitigated the value and drove a favorable resolution vis-à-vis the insured and insurer that retained me. The Settlement Trustee has at his disposal the expressly articulated "empty chair" mitigating factor to account for an "empty chair" defense.

59.    **Article XIII** **Independent Review Option**. In the Updated TDP filed February 15, 2022, an Independent Review Option ("IRO") was added. Under the Updated TDP, a Claimant can select whether to go through the TDP evaluation process, or select the IRO. Under the IRO, a an independent third-party Neutral (selected from a panel of retired judges with tort experience) reviews the claim and makes a Settlement Recommendation to the Settlement Trustee, for the purpose of attempting to "replicate" what a jury might award to the claimant. The Neutral would factor relative shares of potentially responsible parties' fault and would apply the same standards of proof under the applicable law of the jurisdiction from where the claim arises. The Settlement Trustee then reviews the proposal by the Neutral. If the Settlement Trustee accepts the Neutral's recommendation (Accepted Settlement Recommendation), that becomes the Allowed Amount. If the Settlement Trustee rejects the Neutral's recommendation (Recommendation Rejection), the claimant may file a lawsuit to recover the Allowed Amount. If the lawsuit is dismissed, the claimant's Allowed Claim Amount would be zero, but if it is litigated to a final judgment or settlement, that amount would be the Allowed Claim Amount.

60.    Article XIII does not include a limitation on recovery, but does provide that any amount in excess of five times the Maximum Matrix Value in the Claims Matrix would be subordinate to all Direct Abuse Claims that are Allowed Abuse Claims liquidated under the TDP.

Article XIII contemplates that the Neutral could award $0 based on the statute of limitations bar. Article XIII also provides that an Accepted Settlement Recommendation of more than zero and up to $1 million would be paid from the Settlement Trust, but that any amount of an Accepted Settlement Recommendation in excess of $1 million would be paid from an Excess Award Fund.

61.     The Independent Review Option also subjects claimants to a more rigorous process. For an Abuse Claimant to avail themselves of the Independent Review Option, the claimant must elect to participate within six months, complete a claim form, complete and submit a Sexual Abuse Survivor Proof of Claim, pay administrative fees between $10,000 and $20,000 (in two installments) (unless waived by the Trustee based on the circumstances of the claimant), provide evidence of many of the same elements found in the General Criteria of Article VII, and provide evidence that the claim is not barred by the applicable statute of limitations. The claimant has to subject himself to substantial discovery, including an up to six-hour interview, mental health examination, or supplemental interrogatory responses at the discretion of the Neutral **or** upon request of a responsible insurer.

62.     The Non-Settling Insurance Companies have lamented the lack of an adversarial process in the TDP.  Article XIII should allay their concerns.  The Independent Review Option provides a heightened process that is commensurate with the additional payment that may be received by an Abuse Claimant.  It is reserved for those claimants who seek to realize a higher award than would be available under the TDP, with a higher risk and cost. They risk receiving a $0 Settlement Recommendation. They also risk the Settlement Trustee rejecting the Neutral's Settlement Recommendation.  They will also have to incur costs.

63.     The Independent Review Option also provides for greater insurer control, an issue previously raised by the Non-Settling Insurance Companies.  If a claimant elects the Independent

Review Option, the insurers will have the opportunity to participate in an adversarial process that may influence the Neutral's recommendation under this process that could subject them to significantly higher exposure than under the TDP. The IRO thereby offers a manageable balance between the less adversarial TDP (which should elicit the same or similar information and materials as a more adversarial process) and a more adversarial process preferred by the Non-Settling Insurance Companies in claims that could result in significantly higher exposure.

64.     The Independent Review Option provides greater insurer participation by: (1) requiring the Settlement Trustee to provide "prompt notice" of any Claimant seeking the IRO option; (2) providing insurers the opportunity to participate in the Independent Review, participate in discovery and provide defenses that the Neutral "must" consider and evaluate; and (3) requiring consent from the Responsible Insurer.   Upon receipt of the Settlement Recommendation from the Neutral, the Settlement Trustee must seek consent from the insurer, allowing the insurer an opportunity to evaluate the appropriateness of the Settlement Recommendation, and either agree to pay or decline payment of the Direct Abuse Claim. If the insurer refuses to fund all of the recommended settlement, the Settlement Trustee may seek recovery from the insurer.

65.     The TDP process enables the Settlement Trustee to acquire the same information and materials as in the traditional tort litigation system, but without the cost of protracted, adversarial litigation and without the risk of multi-million dollar judgments or settlements at the conclusion of such a process. Under the standard matrix review, the Non-Settling Insurance Companies enjoy a predictable maximum exposure of a $2.7 million settlement, with a range of $0 to $2.7 million. Also, importantly, transaction costs would likely be significantly lower than the tort system. Under the TDP, insurers retain all defenses to coverage and stand on all the terms and conditions of their policies. The process is less costly and provides caps on ultimate exposure.

The transaction costs of the type of adversarial system sought by the Non-Settling Insurance Companies alone in a bankruptcy involving over 82,000 claimants could be prohibitive.

66.     Nevertheless, in claims that are submitted to the Independent Review process (which carries a greater risk to insurers), the TDP affords insurers a more adversarial process that they seek.  While this more expensive and involved process makes sense for the most serious claims (those that would warrant the significant claimant investment), it would not be practical to impose the Independent Review criteria on all 82,000+ claimants.

67.     In my experience, many defendants and their insurers would welcome the more predictable and less risky paradigm provided in the TDP, especially when the information and materials that the Settlement Trustee would acquire are the same information and materials that would be gleaned from an adversarial discovery process. In addition, my experience is that defendants and their insurers would welcome the limits on exposure available under the Claims Matrix of the TDP. For the relatively few claimants that may elect the Independent Review Option, the TDP provide for greater insurer control.

68.     This is generally consistent with my experience with insurers in advising on claims in the tort system.  When the claim is expected to be at a small value, you may not have much, if any, insurer participation in the claim.  But, for claims that are expected to be settled or litigated at a high value, insurers become much more involved in the oversight of a claim.  The Independent Review Option affords insurers that right for those high-value claims, similar to their level of involvement and oversight for those claims in the tort system.

69.     In my opinion, given that the TDP provide for mechanisms that sexual abuse defendants and their insurers would typically utilize, the added costs and risk of an adversarial process would not typically be justified when the exposure of the limited and predictable costs of

defense and values under the TDP may only implicate the excess layers of coverage by modest amounts. Nevertheless, given the Non-Settling Insurance Companies' desire for a more adversarial process, the TDP strikes a rational balance between the TDP process for the majority of the claims and a more adversarial process sought by the insurers in claims that carry greater risk of exposure where claimants elect the Independent Review Option.

70.    **Independence of Settlement Trustee and Claims Administrators, and Neutrals**. Certain Insurers and their experts have suggested that, without the Non-Settling Insurance Companies' active participation in more traditional and adversarial tort litigation, the Settlement Trustee is more likely to be unduly influenced by the STAC and FCR to inflate the allowed amounts, steer claims into the Non-Settling Insurance Companies' policy periods, and disproportionately attach the non-settling insurers' limits so as to maximize and maintain the Settlement Trust assets.  There is no factual support for this complaint.  There is no reason to assume that Judge Houser, as Settlement Trustee, would use anything other than the TDP and her professional ethics to guide her in the determination of awards.  The Settlement Trustee has fiduciary obligations to only pay to resolve legally valid Allowed Claims supported by evidence and documentation.

71.    Nor is there any reason to believe that the Claims Administrators would be unfairly influenced by the STAC and FCR.  I understand the designated Claims Administrators are Hon. Michael Reagan (Ret.) as Claims Administrator for the Independent Review Process, and Hon. Diane Welsh (Ret.) as the Claims Administrator for the claims under the TDP.  I have no reason to believe that these retired judges would use anything other than their professional ethics to administer claims.

72.     Finally, as to the selection of the Neutrals, the IRO specifies that these Neutrals must be "independent" and "retired judges."  It strains credibility to argue that an independent, former member of the judiciary would be improperly influenced by the STAC and FCR in making settlement recommendations.  I have no concern that the Neutral would perform their duties with the independence required.  Moreover, the Neutral's role is limited to providing settlement recommendations to the Settlement Trustee, which the Settlement Trustee is not required to accept. This extra layer of review provides another check and balance on the process.

## C.     PROTECTIONS FOR INSURERS UNDER THE TDP

73.     Certain Insurers have raised concerns that their interests will only be protected through the adversarial nature of the traditional tort litigation system.  These opinions are based on an unfounded and somewhat provincial belief that only the adversarial nature of the common law system ferrets out the truth and affords protections to defendants and their insurers.  These opinions ignore the insurer-friendly mechanisms in the TDP that protect defendants' and insurers' interests.  These opinions also ignore the efficacy of other forms of litigation and claim resolution.

74.     Indeed, many of these alternative forms of dispute resolution are employed throughout the United States regularly, including by insurers and reinsurers.  The TDP incorporate several forms of dispute resolution that are, arguably, superior to the tort litigation system in the context of sexual abuse claims.  And finally, these opinions ignore that the TDP are intended to have no effect on the policies, and that insurers' rights under their policies are preserved.

75.     **Preservation of Insurer Rights.**  The Plan and TDP specify that the Non-Settling Insurance Companies' rights are preserved.  Specifically, the TDP state that "[n]othing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under an Insurance

Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order." *See* TDP Art. V.C ("Assignment of Insurance Rights").  Additionally, Article X.M.1. of the Plan expressly states that except for the Insurance Assignment and the Bankruptcy Code, applicable law and the findings of the bankruptcy court in the Confirmation Order, "nothing in the Plan shall modify, amend or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights or obligations under an Insurance Policy . . . and the rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of the Plan documents . . . shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law."  To the extent the Non-Settling Insurance Companies believe the Settlement Trustee has not properly valued the claim, has violated the policy's consent or voluntary payments clause, or that some other policy basis exists to withhold payment, under the TDP the Insurers may have that dispute heard in the context of a later coverage action.  *See* TDP Art. X ("Rights of Settlement Trust Against Non-Setting Insurance Companies").

76.    Additionally, as discussed above, the insurers have heightened rights under the IRO, including (a) the right to receive prompt notice of the election, (b) the right to participate in the Independent Review discovery process, (c) the right to raise any applicable defenses, which "must" be considered, and (d) the right to withhold consent.

77.    **Lack of Prejudice.**  In my opinion, the TDP do not prejudice the Non-Settling Insurance Companies.  Even if the claims proceed through the TDP, rather than a traditional protracted, adversarial and costly litigation, Certain Insurers have not demonstrated how they are thereby prejudiced.  In fact, as noted above, the TDP protect the non-settling insurers' rights to have their interests represented in the acquisition of information and materials through an

investigatory and discovery process that informs the validity and credibility of claims and ensures a data-driven valuation of credible claims.  The Settlement Trustee will determine claim credibility and value utilizing the factors, information and materials that insurers and their insureds regularly use in the tort litigation context.  Thus, they are not prejudiced at all in the TDP claim resolution process.

78.    In fact, the TDP provide protections to the Debtors and their insurers that the adversarial tort system does not.  The TDP include procedures that mimic protections afforded public entity defendants in sexual abuse claims, "front-loading" the accumulation of information and supporting documentation rather than subjecting the parties to protracted costly discovery and motion practice to discern sufficient facts to assess credibility of the claim and claim valuation.  For example, in many jurisdictions, a child sexually abused in a public school must comply with stringent requirements just to be eligible to seek recovery.  Similar to the TDP Article IV Claimant Eligibility procedures, a public-school claimant must typically file a formal written notice of claim as an eligibility prerequisite to filing a lawsuit.  As with the TDP, the notice of claim must notify the school district of the nature of the abuse, the manner in which the district or one of its agents was wrongful, the injuries caused, and a demand for compensation.  The notice of claim must be filed in a relatively short time period, often within 60 to 90 days after the injury, to be eligible to file suit against the public entity.  Similar to the bar date burden placed on claimants under the TDP, if a public-school claimant does not file a notice of claim within the limit, he is precluded from filing a lawsuit in most states.  Similar to the TDP, if the claimant does file a timely notice of claim by the bar date, the school district will investigate.  The claimant typically cannot file suit until the district denies his claim or takes no action for a set period of time.  Then, the claimant is subject to a relatively short limitations period within which to file suit—often only one year.  In

addition, claims against public school districts often are subject to damages caps – sometimes only $250,000 – and typically there is no provision for punitive damages. The TDP similarly provide "front-loaded" burdens on claimants to sign written claims with supporting documentation and evidence by the bar date. As with a public school district investigation, the Settlement Trustee then accumulates information, documents, sworn statements, records, interviews and documents and information from third parties, including the Local Councils and Charter Organizations. Similar to the public-school paradigm, there is a "cap" on the award that the Settlement Trustee may award a claimant under the TDP Matrix Values, and a claimant could even receive no award. I do not believe that the non-settling insurers will be prejudiced by a purported deprivation of rights to defend and settle.

79.    Additionally, under the Independent Review Option, the Insurers will have the opportunity to have further guaranteed participation in the claim, including by requiring the Settlement Trustee to obtain consent from the Responsible Insurer.

80.    **Cooperation.** The TDP do not eviscerate cooperation of the insured Debtors. Instead, the TDP merely provide a different paradigm for defense and settlement. The "laboring oars" of "cooperation" are taken by the claimants and the Settlement Trustee. The TDP require claimants to produce information and materials, and the Settlement Trustee – a third party Neutral – is required to assimilate and assess the information to determine credibility and value. If anything, absent the traditional adversarial defense paradigm, the TDP are more "one-sided" in favor of the insured Debtors and their insurers. They place significant early burdens on claimants to produce evidence, documents, witnesses, records; and, if warranted, to submit to medical or psychological examinations, among many other things. And then, after all that, only if claimants provide sufficient support for their claims may they proceed to the stage where they may receive

an award. The standards are not minimal. In terms of the information, evidence and witnesses, the standards are the same or similar as those found in the tort litigation context. The difference is that the TDP provide a more streamlined and less expensive means of obtaining the evidence. The transaction costs to non-settling insurers will likely be significantly less.

81.    **Unique Advantages of the TDP.** The TDP offer a unique, mutually-advantageous system to resolve sexual abuse claims asserted against the Debtors and other Related Non-Debtor Entities – mutually advantageous to the Debtors and their insurers. The TDP will not prejudice the non-settling insurers. Instead, the TDP likely will result in the Non-Settling Insurance Companies being burdened with significantly less exposure. Essentially, the TDP are a form of alternative dispute resolution (ADR). The TDP draw from a number of claim resolution systems that are more expeditious, efficient, and cost-effective alternatives to the adversarial system. These include the continental legal system, arbitration, and public entity dispute resolution.

82.    Indeed many litigants and stakeholders (including insurers) in the adversarial tort system consistently turn to ADR to effect a more expedited and cost-effective resolution of their claims. In fact, I understand that many of the pre-bankruptcy claims against the BSA proceeded to mediation or other ADR. One form of ADR is arbitration. Because of cost-effectiveness and other efficiencies, many insurers and reinsurers utilize arbitration as a form of dispute resolution, to avoid the costs and risk of protracted litigation in the adversarial tort system. Similar to arbitration, the TDP provide for a significantly more expeditious and cost-effective means to resolve claimants' sexual abuse claims. As in arbitration, the TDP provide for sworn statements, documents, interrogations or interviews, medical examinations, production of medical and other records; and the Debtors and possibly third-party litigants submit documents to an arbitrator who then decides based on what has been provided. As with an arbitrator, under the TDP the Settlement

Trustee may question a party or witness or permit limited testimony.  The parties place much greater trust in the arbitrator.  Transaction costs are significantly lower.  Awards are limited and more predictable.

### D.    RESPONSE TO INSURER CRITICISM OF TDP ON INSURANCE RIGHTS.

83.    **The Plan Does Not Increase the Quantum of Liability for the Non-Settling Insurance Companies**.  I do not believe that the TDP would increase the Non-Settling Insurance Companies' quantum of liability.  Although the volume of claims may have increased compared to the pre-bankruptcy period, it is not necessarily true that (1) the attendant costs to non-settling insurers would necessarily increase, and (2) the claims are not meritorious.  These claims have been brought and now exist, and the TDP propose an efficient way to resolve these claims.

84.    I do not agree that the insurers will pay more than they would in the tort system.  The TDP eliminate the costly adversarial process and the specter of damages awards in the tort system that are not limited by tiers and metrics built into the TDP process.  Alternatively, as to those claims that are under the Independent Review option, the Insurers have significantly more oversight over the discovery process, the ability to directly raise any defense, and the right to withhold consent.  The investigatory and discovery phases of the TDP is more expeditious, focused, and cost-effective than the typical expansive and boundless discovery phase of the tort system.  Unlike aggressive plaintiff's attorneys who may engage in fishing expeditions in the tort system, the Settlement Trustee would not use discovery to vet other theories of recovery, or to harass the Debtors and their insurers. As written, the TDP provide the Settlement Trustee with discovery mechanisms to accumulate information and evidence to evaluate the claim. The TDP process is a streamlined, focused, cost-effective, and efficient process driven by the decisionmaker/trier of fact.  The Settlement Trustee reviews the adequacy of the initial pleading,

requests discovery of necessary records and documents, takes or facilitates the provision of sworn written and oral testimony, and may seek additional records from third parties and supplemental discovery. Then, assuming a claimant did not choose the Expedited Distribution, the Settlement Trustee evaluates the submissions under the detailed guidance of Article VII to assess whether, by a preponderance of the evidence, the claimant has demonstrated the existence of five factors that mimic the elements of negligence tort liability. Then, if the claimant's and others' submissions meet the preponderance of the evidence standard to demonstrate the five factors that indicate institutional liability, only by that process does the Settlement Trustee make the determination that the claim is eligible for recovery. As noted above, this process is much more likely to quickly, efficiently, and cost-effectively produce evidence that informs the assessment of liability against the Debtors, and only then does the trier of fact (the Settlement Trustee) use the evidence to determine the Allowed Amount.

85.    As to the merits of the claims, as noted above, sexual abuse claims are inherently difficult to assess because abuse happens behind closed doors and it often takes years before a victim discloses his abuse. Unlike mass long-tail torts like asbestos or environmental contamination, sexual abuse does not carry discernable, tangible proof of the tort. There are no asbestos fibers in the lungs, no leaching chemicals to trace from an insured's plant to an adjacent third party's property. There are no manufacturing histories and employment records to verify and place a negligent party or victim at a particular location engaged in a particular activity at a particular time. In this regard, long-tail mass sexual abuse claims are unique. Compounded by the general consensus (both founded and unfounded) that such allegations are overwhelmingly truthful, it can be exceedingly difficult to discern the difference among purportedly truthful and purportedly untruthful allegations. My experience has been that, to the extent it is possible to

accumulate definitive evidence in sexual abuse claims, such claims generally are ultimately determined to be credible.  While plaintiffs' counsel may be less willing to fund (on a contingency basis) those claims that are not foreseen as profitable to firm, that does not speak to whether the claims are meritorious.  They simply may not be the type of claims that would merit a large enough award to entice a plaintiffs' firm to fund considerable litigation costs on an independent basis. This does not mean that the claims are invalid or have no merit outside of the bankruptcy process now that they have been brought.  It can equally be said that lowering the transaction costs has made it easier to bring valid claims.

86.     **The Plan's Assignment of Insurance Policies Does Not Adversely Impact the Non-Settling Insurers.**   The Settlement Trust merely stands in the shoes of BSA in bankruptcy. Although Certain Insurers complain that there is little or no guidance about apportionment among the various policies assigned to the Settlement Trust in claims that implicate the Debtors and the Chartering Organizations or Local Councils, who may also be insureds under the assigned policies, this is a non-unique criticism.  In the tort litigation context, similar issues arise regarding which entities are liable, the percentage of their liability, policies and policy periods implicated by an insured's tort, and the number and limits of implicated policies issued by varied insurers.  These issues are resolved based on insurance coverage law regarding apportionment.  If anything, compilation of the policies of the Debtors and other associated entities likely would make it easier to effectuate an appropriate, fair, and legal way to proportionately reimburse or indemnify the Debtors for relevant claims when multiple policies are implicated by a claim.

87.     **The Plan Does Not Affect The Risk Underwritten By Insurers**. Certain Insurers complain that the TDP do not preserve insurers' rights to enjoy the "quantum of liability" that they estimated when they underwrote and sold policies of insurance to the Debtors.  They essentially

lament that there is now greater exposure than they intended to assume when they entered into risk transfer relationships with the Debtors. But ultimately, this is why people and entities purchase insurance – to leverage against unforeseen risks. At the time the policies were underwritten, perhaps the expansion of litigation and costs of litigation beyond traditional norms had not occurred. Perhaps the erosion of charitable immunity had not occurred or was not fully anticipated. Perhaps underwriters did not contemplate the emergence of long-tail mass tort risks. Perhaps aggregate limits were not yet widely used, or claims-made policies with retroactive dates had not yet been widely marketed. Perhaps the need for limitations and exceptions to coverage were not yet fully appreciated. Many policies probably did not include sexual misconduct exclusions. All of these dynamics underscore the fundamental nature of insurance as a leverage against fortuitous risk. The sexual abuse crisis that has created a demand upon insurance limits was a fortuity precisely because it was likely unexpected and thus unaccounted for in the quantum of liability analysis. The irony is that the non-settling insurers have an opportunity to submit to tangible metrics and limitations in the TDP that will mitigate their potential exposure. My experience is that insurers and their insureds regularly avail themselves of arbitration, mediation, informal settlement negotiations and other forms of alternative dispute resolution to mitigate that risk. The TDP offer that same opportunity.

## III.    CONCLUSIONS

88.    Based on my review and analysis and my expertise in analyzing sexual abuse claims on behalf of insurers, it is my opinion that the TDP reflect reasonable factors utilized to determine whether a claim is legally valid and credible as well as the assessment of liability and claim valuation, and they mimic the considerations and determinations made in a litigation context. The TDP provide an efficient and cost-effective method to resolve sexual abuse claims in a manner

that will inure to the benefit of the Debtors and their insurers. The TDP provide the protections of the tort system, but not the cost and risk associated with an adversarial system in the realm of sexual abuse claim resolution.

89.    It is also my opinion that defendants and their insurers regularly rely upon procedures and factors such as those laid out in the TDP to inform their decisions about the credibility and value of sexual abuse claims asserted against their insureds.

I declare under penalty of perjury under the laws of the United States, that the foregoing statements are true and correct.

Dated: March 10, 2022                    Respectfully submitted,

Michael Burnett

_____
        Michael Burnett

4867-2595-6113 v.6