# THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re: D.I. 9114** |

### DECLARATION OF DEVANG DESAI IN SUPPORT OF CONFIRMATION OF THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

I, Devang Desai, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1. I am authorized to submit this declaration (this "Declaration") in support of confirmation of the Debtors' *Third Modified Fifth Amended Chapter 11 Plan of Reorganization For Boy Scouts of America and Delaware BSA, LLC* [D.I. 8813] (the "Plan"), and in conjunction with the *Debtors' (I) Memorandum of Law in Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114] (the "Confirmation Memorandum").[2]

2. I am a volunteer member of the National Executive Board (the "NEB") and the National Executive Committee (the "NEC") of Boy Scouts of America (the "BSA"). I have served as a member of the NEB and the NEC since May 2018 and May 2020, respectively. I serve as

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan or the Confirmation Memorandum.

chair of the NEB's Audit and Risk Management Committee, a role that I assumed in May 2020. I currently also serve as a member of the NEC's Bankruptcy Task Force (the "BTF") and have served in such capacity since the inception of the BTF in July 2020. Each of the NEB, the NEC, and the BTF is described below.

3.      Prior to becoming a volunteer member of the NEB, I was and currently remain a shareholder of the law firm of Gaebe, Mullen, Antonelli & DiMatteo based in Miami, Florida.

4.      I have been involved with the BSA since my youth and am an Eagle Scout and recipient of the Order of the Arrow's Distinguished Service Award. From 2007 until May 2020, I served as a member of the Executive Board of the South Florida Council of the BSA. I served in various volunteer roles for the South Florida Council, including as a member of the Executive Committee of the Board (2011-20) and as the National Eagle Scout Association Chair (2011-14), Camping Committee Chairman (2007-08), Vice President of Marketing (2014-19), and Vice President of Administration (2020). I have never received monetary compensation for my service on behalf of the South Florida Council in any capacity.

5.      Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal knowledge, materials provided by, or my discussions with members of the Debtors' executive and management team or information obtained from my review of relevant documents. Additionally, the views asserted in this Declaration are based upon my experience and knowledge of the Debtors' nonprofit operations. If called upon to testify, I could and would testify to each of the facts set forth herein based on my personal knowledge, discussions and review of documents. I have never been compensated for my volunteer service as a director of the BSA or for this testimony.

## **BSA GOVERNANCE**

6.    **NEB**.  The NEB is the governing body of the BSA.  The NEB is presently comprised of 72 total members.  All members of the NEB are unpaid volunteers.  Jtx 1-192 is a true and correct list of the current members of the NEB.  It is attached to this Declaration as <u>Exhibit A</u>.  The members of the NEB are elected by the voting members of the "National Council."  All voting members are unpaid volunteers.  The voting members of the National Council, of which there are approximately 1,200 include:

- All members of the NEB;

- The volunteer president and council commissioner for each of the 251 local councils;

- One volunteer individual, elected by each Local Council, for every 5,000 youth members of such Local Council; and

- Various volunteer members at large elected by the National Council and members of the National Operations and Leadership Committee and the National Operations Council.

7.    The NEB establishes committees for various purposes; however, there are certain matters that cannot be delegated to a committee and must be decided by the NEB itself.  Of relevance to the Plan, the NEB cannot delegate increasing or materially changing the indebtedness of the BSA beyond previously authorized levels.

8.    **NEC**.  The NEC is comprised of the National Chair, National Chair-elect, National Commissioner, Immediate Past National Chair, Standing Committee Chairs, Chief Executive Officer, and two members-at-large recommended by the National Chair or National Chair-elect.  I

am a member of the NEC.  Jtx 1-193 is a true and correct list of the current members of the NEC. It is attached to this Declaration as Exhibit B.

9.      The NEC includes, among others, the National "Key 3," who are responsible for guiding the BSA organization as a whole: the National Chair (Daniel G. Ownby), National Commissioner (Scott Sorrels), and Chief Executive Officer and President (Roger Mosby).  The National Chair and National Commissioner are volunteer positions.

10.      **BTF**.  The BSA's bylaws authorize the National Chair to appoint ad hoc committees and task forces of the NEC to handle special assignments.  The BTF grew out of a predecessor task force called the General Liability Insurance Program Task Force (the "GLIP"). In the summer of 2020, through unanimous approval of the NEC, the GLIP was reconstituted and renamed the BTF, and I was appointed to the BTF.  The following members of the NEC serve as members of the BTF: Alison Schuler (Chair), Scott Sorrels, Brad Tilden, Roger Mosby, and Dan Ownby.  Mr. Mosby and Mr. Ownby are ex-officio members of the BTF, based on their positions as National Chair and CEO respectively.

11.      The BTF was created to assist the NEC in fulfilling its governance and fiduciary duties by: (i) working with the BSA's General Counsel and staff to monitor the progress of the bankruptcy case and provide guidance on behalf of the NEC as appropriate; (ii) assisting the NEC in being currently informed and executing its governance role with respect to the Chapter 11 bankruptcy proceedings and issues arising in connection with or as a result of that filing; and (iii) performing such other duties as may be requested by the National Chair or are necessary or appropriate in light of the business judgment rule as it applies to the NEC in connection with the bankruptcy.  The first meeting of the BTF was on July 6, 2020. [3]

---

[3]    My understanding is that Paragraphs 1-11 were included in my previous declaration, the Declaration of Devang Desai in Support of Debtors' Motion for Entry of an Order Pursuant to Sections 363(b) and

## LOCAL COUNCILS AND VOLUNTEERS

12.    As a former Local Council Executive Board member, and as a current National Executive Board member, I understand that Local Councils and Chartered Organizations are essential for BSA to carry out its Scouting programs.  Without them, the BSA could not fulfill its mission of Scouting.

13.    To carry out its Scouting programs, the BSA has granted charters to 261 Local councils assigned to specific geographic areas across the United States (collectively, "Local Councils").  The primary function of Local Councils is to recruit, organize, and oversee the local organizations that administer the BSA's Scouting programs and to own and operate local camp grounds that are part of delivering the BSA's outdoor programming in a manner consistent with the BSA's charter, bylaws, rules and regulations, policies, and guidelines. Although the primary function of the Local Councils is to deliver Scouting at the local level, each Local Council is its own entity.  Local Councils hold legal title to and have managerial control over their property and assets.  Local Councils generally do not receive financial support from the BSA; instead, they rely upon their own fundraising through donations, product sales, special events, and corporate gifts. The BSA does, however, use its national reach and resources to provide certain corporate and administrative support to Local Councils in collecting membership fees and delivering the Scouting mission.  This support includes, among other things, general insurance liability coverage, human resources, access to training facilities, and marketing services.

---

105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief (hereinafter "D. Desai RSA Decl."), and were admitted into evidence by the Court at the Telephonic Hearing Before the Honorable Judge Laurie Selber Silverstein United States Bankruptcy Judge, on August 16, 2021. Jtx 2938 [D.I. 6000] at 29:16 – 30:1.

14.     Pursuant to the BSA's Bylaws, the BSA may revoke or refuse to renew a Local Council charter when the BSA believes such action is in the best interest of Scouting.  In such circumstances, the articles of incorporation for the particular Local Council provide that such council will take the necessary actions to dissolve the entity.  Upon dissolution, the Local Council's property will be used to satisfy its liabilities and then all rights with respect to any remaining property that belonged to the dissolved Local Council will vest in the BSA. The BSA may use the reverted assets for the benefit of Scouting.    Jtxs. 1-325 and 291 are true and correct copies of the BSA Bylaws (as filed with the Plan Supplement) and the BSA Rules and Regulations, dated September 2020.  They are attached to this Declaration as Exhibits C, and D.  *See* Ex. C at page 13 (Art. VI § 1, cl. 2; Rules and Regulations, Art. III, Council or Unit Assets Upon Dissolution; BSA Rules and Regulations, Art. III, Restricted Funds).

15.     The volunteers at the Local Council level are the lifelines of the BSA.  They engage directly with the Scouts, exemplifying the BSA's principles, and performing the day-to-day tasks that are essential to carrying out BSA's mission of Scouting.  The national level volunteers, including the NEC, NEB, and BTF, are also critical to the BSA's success.  Without the volunteers, a restructured BSA could not effectively carry out the mission of Scouting.

## BUSINESS JUDGMENT

### A.  Background

16.     As a member of the BTF, I am involved in considering matters related to the formulation of a plan of reorganization for the Debtors' Chapter 11 Cases, including the evaluation and recommendation to the NEB and NEC of the settlement terms that were ultimately memorialized in the Plan.  In connection with my responsibilities as a member of the BTF, I, along with the other members of the BTF, carefully considered and discussed with the Debtors' legal

and financial advisors, as well as the Debtors' General Counsel and Chief Financial Officer, the various restructuring options available to the Debtors, including, among other things, terms of proposed settlements and the related benefits and risks to the Debtors and their charitable mission. In evaluating these options, the BTF was provided with documents prepared by the BSA's advisors and the advisors to other parties to the Plan, regularly received advice from counsel and financial advisors, and reviewed presentation materials prepared by the BSA's management and advisors.

17.    The BTF periodically provides updates to the NEC and the NEB regarding the restructuring and the status of settlement negotiations.  The BTF also makes recommendations to the NEC or NEB regarding proposed actions in furtherance of the Debtors' restructuring.

18.    As set forth in my previous testimony, that I understand was admitted into evidence, from November 2020 through June 2021, the NEB, NEC, and BTF met in total 57 times. From July 2021 until present, the NEB, NEC and BTF met an additional 39 times.  These meetings generally lasted at least 90 minutes and regularly exceeded two hours.  Matters pertaining to the Chapter 11 Cases, including the potential global resolution of the Chapter 11 Cases, were discussed at all 96 meetings.    Jtx 2931 is a table that lists each of the NEC, BTF, and NEB meetings held from November 2020 through February 2022.  It is attached to this Declaration as <u>Exhibit E</u>.[4]  I attended each of these meetings, or, in the case of the handful of meetings was unable to attend.  I reviewed the minutes of the meetings and discussed the meetings with certain other directors.

19.    In addition to the meetings of the BTF, NEC, and NEB, I often communicated with the BSA's executive team and my colleagues on the BTF.  I estimate that I have worked on issues related to the BSA's bankruptcy for at least 40 hours a month from November 2020 through

---

[4]    True and correct copies of the minutes and presentations of the NEC, NEB, and BTF meetings from July 2021 through February 2022 that are not specifically referenced in this Declaration are attached separately as Exs. I – XXVI.

present.  Since August 2021, due to my role as a corporate representative witness on behalf of the BSA, I have spent significantly more time as a volunteer for the BSA.  My colleagues on the BTF have also devoted hundreds of hours to BSA bankruptcy-related matters.

20.    The NEC, NEB, and BTF's consideration of the settlement terms set forth in the Plan was an iterative process that progressed during the course of the Debtors' mediation with other parties in the Chapter 11 Cases.  Over the course of the mediation, the NEC, NEB and BTF regularly discussed and considered the various components of the proposed resolutions that were ultimately embodied in the Plan and the positions of the key stakeholders in the restructuring process.  They also provided guidance or authorization to BSA's CEO and General Counsel and its legal and financial advisors on negotiating parameters during the ongoing mediation.  During meetings, the NEB, NEC and BTF reviewed presentations prepared by the Debtors' advisor team describing the various potential terms and provisions of the settlements that now constitute the terms of the Plan and highlighting the advantages and disadvantages of entering into such agreements.  The factors considered included the contributions from the BSA and Local Councils to a Settlement Trust for abuse survivors, the parties included in the Plan, the ability to make further settlements with Chartered Organizations and Insurance Companies and any related limitation, the costs required under the Plan, the conditions applicable to the Settlement Trust and the Trust Distribution Procedures, youth protection issues, trust governance, the alternatives to entering into the Plan, and the risks of achieving a successful confirmation of a plan of reorganization.  The Plan was approved only after careful deliberation of these and other considerations.

21.    The BTF's goal and focus was to achieve a plan of reorganization that is in the best interests of the BSA, its estates and creditors, and would ultimately be confirmed by the Court.

The BTF and NEC understand that the Plan is supported by all of the major claimant constituencies and, of critical importance, a vast majority of abuse survivors (including the largest representative groups: the Coalition of Abused Scouts for Justice (the "Coalition") and the Torts Claimant Committee ("TCC"). The BTF and NEC also understand that the Plan is supported by the Creditors' Committee, JPM, TCJC, United Methodist Ad Hoc Committee, Hartford, Century and Chubb Companies, Clarendon, Zurich, the Ad Hoc Committee of Local Councils ("AHCLC"), and the Future Claimants' Representative ("FCR").

22.     Between February 2021 and present, there were numerous mediation meetings and negotiations with parties, all in an effort to achieve a global resolution.

**B.  Plan Settlements**

23.     From the outset of these Chapter 11 Cases, the BSA sought a global resolution that balanced the competing interests of Chartered Organizations, Insurance Companies, and abuse survivors and provided the BSA with the opportunity to survive the Bankruptcy and fulfill its mission of Scouting.  The BSA believes the Plan achieves these goals.  The BSA has worked diligently to create a global resolution that is in the best interests of the survivors.  The core of this resolution are numerous settlements the BSA has entered into with multiple parties with the assistance of the mediators and the BSA's advisors.

24.     The governing bodies of the BSA met numerous times to discuss the terms of these settlements with their advisors prior to approving the transactions.  In each case, the BSA determined using its business judgment that an agreement was in the best interests of the BSA's estate, survivors, and the BSA's other creditors.[5]

---

[5]     The settlement agreements detailed below are all attached as exhibits to the Plan. See Exs. 1-325, I-1, I-2, I-3, I-4, J-I, J-2, F, and L.

25.     The Debtor Releases, as set forth in the Plan, were negotiated at arms' length.  The Debtors are not aware of any significant claims against any of the Released Parties, except as addressed in the settlement agreements. The Debtors determined that the Debtor Releases were necessary to reach consensus on the Plan.  They are critical to the successful reorganization.

### I.     The Insurance Settlements

26.     The Debtors settled with the BSA's two primary insurers (Century and Chubb, and Hartford), and certain excess insurers (Zurich and Clarendon).  Notably, the settlements allowed the Debtors to avoid costly and lengthy litigation with these Insurance Companies over their coverage obligations for the claims submitted via the Chapter 11 proceeding.  Absent these settlements, the Debtors would expend significant amounts in litigation, which would have the corollary effect of draining the BSA estate from critical assets that would have been available to compensate abuse survivors.

27.     In reviewing the final insurance settlements, the BSA considered the (a) defenses raised by each of the insurers to their insurance-coverage obligations, (b) the cost of litigation to pursue these insurers for Abuse Claims, (c) that the TCC, Coalition, and FCR—the parties representing the vast majority of the abuse survivors—as well as the AHCLC, all support these settlements, (d) the significant contributions each of these insurance companies was making to the Settlement Trust for the benefit of abuse survivors, (e) any solvency issues related to a specific insurer; and (f) the role of the insurer in objecting in connection with the Chapter 11 Cases.

28.     The Debtors determined in their business judgment that the following settlements are necessary for the Debtors' restructuring, are reasonable, are in the best interests of the Estates, and justify the Settling Insurance Companies' inclusion in the Scouting-Related Release and Channeling Injunctions.

### a. Hartford

29.     On September 14, 2021, the NEC approved settlement terms and authorized the

BSA to enter into a settlement agreement with Hartford (the "Hartford Agreement").  Under that

agreement, Hartford has agreed to contribute $787 million in cash to the Settlement Trust, an

increase of $137 million over what Hartford initially agreed to contribute under the RSA.[6]  The

Hartford Agreement was the result of arm's-length negotiations with the assistance of the Debtors'

Advisors and the Mediators.  Jtx 1-292 is a true and correct copy of the Hartford term sheet.  It is

attached to this Declaration as Exhibit F.

30.     BSA has been historically engaged in extensive and costly coverage litigation with

Hartford concerning recovery of unreimbursed defense and indemnity amounts, and extra-

contractual damages, statutory interest, and attorneys' fees and costs.  Resolving this litigation will

not only save the BSA crucial resources necessary to contribute to the Trust, but will eliminate

protracted litigation that individual survivors may face in trying to seek compensation outside of

the Plan.

31.     The BSA engaged in considerable deliberation and consultation with our counsel

and advisors regarding the Hartford Agreement before entering into it.  Specifically, the NEC,

NEB, and BTF met with our counsel and advisors multiple times to engage in robust discussions

regarding the Hartford Agreement, including the different options, analyses of advantages and

disadvantages of the various terms and provisions, the potential costs to the BSA and survivors of

---

[6]     Previously, the Debtors and Hartford entered into a settlement agreement on April 15, 2021 (the "April
Hartford Settlement").  The Hartford Agreement also resolves significant disputes relating to the
original April Hartford Settlement.  *See* Jtx 1-425 ("Amended Disclosure Statement for the Modified
Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA,
LLC" [D.I. 6431] at 6).

continued litigation with Hartford, and a comparison of the Hartford Agreement to the prior April Hartford Settlement.

32.     On August 31, 2021, the NEC reviewed the draft settlement term sheet received from Hartford dated August 27, 2021.  At that meeting, the NEC also reviewed a presentation from our advisors detailing the potential terms of the Hartford Agreement.  The NEC had a robust discussion with its advisors concerning the key issues remaining to be negotiated in the Hartford Agreement before it could be finalized.  After the discussion, the NEC determined it would convene further to consider new developments before considering a resolution on the Hartford Agreement.  Jtxs. 754 and 755 are true and correct copies of the minutes of that meeting and presentation presented at that meeting.  They are attached to this Declaration as Exhibits G and H.

33.     On September 2, 2021, the NEC reviewed a revised presentation from our advisors detailing the potential terms of the Hartford Agreement.  After a robust discussion, the NEC authorized a settlement within certain specific parameters, subject to the BTF being provided with final versions of the term sheet and an understanding that any material modifications would be subject to further deliberations by the NEC.  Jtxs. 756 and 757 are true and correct copies of the minutes of that meeting and presentation presented at that meeting.  They are attached to this Declaration as Exhibits I and J.

34.     On September 9, 2021, the NEC reviewed a revised presentation from our advisors detailing further modifications to the Hartford Agreement.  The NEC authorized the settlement subject to the same conditions as the September 2, 2021 authorization.  Jtxs. 760 and 759 are true and correct copies of the minutes of that meeting and presentation presented at that meeting.  They are attached to this Declaration as Exhibits K and L.

35.     On September 14, 2021, the NEC reviewed the final versions of the Hartford Agreement and asked our advisors questions relating to the multiple issues in the Chapter 11 case, including mediation, other potential agreements and settlement discussions, the impact of the foregoing on the BSA's capability to carry out the mission of Scouting, liabilities and liquidity of the BSA, and any strategic alternatives available.

36.     Based on its review of the materials provided by our advisors and deliberation among the members described above, the NEC approved the Hartford Agreement determining that in our business judgment, the transaction was in the best interest of the BSA, its creditors, and other stakeholders.  Jtx 774 is a true and correct copy of the "Boy Scouts of America Executive Committee Minutes of Action Without A Meeting" dated September 14, 2021.  It is attached to this Declaration as Exhibit M.

### b.  Century and Chubb Companies

37.     On December 12, 2022, the NEC approved settlement terms and authorized the BSA to enter into a settlement agreement with Century and Chubb Companies (the "Century and Chubb Companies Agreement").  Under the agreement, Century and Chubb Companies agreed to contribute $800 million in cash to the Settlement Trust.  The Century and Chubb Companies Agreement was the result of arm's-length negotiations with the assistance of the Debtors' Advisors and the Mediators.  Jtx 1-307 is a true and correct copy of the Century and Chubb Companies term sheet.  It is attached to this Declaration as Exhibit N.  The BSA engaged in considerable deliberation and consultation with its legal and financial advisors regarding the Century and Chubb Companies Agreement before entering into it.  Specifically, the NEC, NEB, and BTF met with our advisors multiple times to engage in robust discussions regarding the Century and Chubb

Companies Agreement, including the different options, and analyses of advantages and disadvantages of the various terms and provisions.

38.    On August 31, 2021, the NEC reviewed the draft settlement term sheet received from Century and Chubb Companies dated August 29, 2021.  At that meeting, the NEC also reviewed a presentation from our advisors detailing the potential terms of the Century and Chubb Companies Agreement.  The NEC had a robust discussion with our advisors concerning the key issues that must be negotiated in the Century and Chubb Companies Agreement before it could be finalized.  After the discussion, the NEC determined it would convene further to consider new developments before considering a resolution on the Century and Chubb Companies Agreement. *See* Exs. G and H.

39.    On September 27, 2021, the BTF discussed with our advisors the potential terms of the Century and Chubb Companies Agreement.  The BTF discussed in detail the September 27 mediation regarding a potential settlement with Century and Chubb Companies, as well as the status of the mediated settlement discussions with Century and Chubb Companies.  Jtx 809 is a true and correct copy of the minutes of that meeting.  It is attached to this Declaration as Exhibit O.

40.    On November 12, 2021, the NEC received and reviewed a draft settlement term sheet received from Century and Chubb Companies.  The NEC discussed in detail with our advisors the issues presented by the Century and Chubb Companies term sheet and the related next steps.  Jtxs 955 is a true and correct copy of the minutes of that meeting.  It is attached to this Declaration as Exhibit P.

41.    On November 21, 2021, the NEC reviewed multiple presentations from our advisors detailing the potential terms of the Century and Chubb Companies Agreement.  The

presentations outlined considerations relevant to the BSA and abuse survivors that the board should consider when making its decision.  In addition to the update from our counsel and financial advisor, the NEC was presented with a settlement analysis from the BSA's Insurance Experts, KCIC.  The presentation included an overview of the Century and Chubb Companies Insurance groups, their connectedness to BSA, and Century's financial health.  Lastly, the presentation included a comparison to the Hartford Settlement.  Jtxs. 974, 975, and 973 are true and correct copies of the minutes of that meeting and presentations presented.  They are attached to this Declaration as Exhibits Q, R, and S.

42.    On November 22, 2021, the NEC reviewed an updated presentation from our advisors detailing further modifications to the Century and Chubb Companies Agreement.  After a robust discussion, the NEC authorized a settlement within certain specific parameters, subject to the NEC's approval for the final term sheet.  Jtxs. 976 and 977 are true and correct copies of the minutes of that meeting and presentation presented at that meeting.  They are attached to this Declaration as Exhibits T and U.

43.    On December 5, 2021, the BTF reviewed the draft settlement term sheet received from Century and Chubb Companies.  The BTF discussed in detail with our advisors the issues presented by the Century and Chubb Companies term sheet and the related next steps.  Jtx. 1033 is a true and correct copy of the minutes of that meeting.  It is attached to this Declaration as Exhibit V.

44.    On December 8, 2021, the NEC and our advisors discussed in detail key issues under the Century and Chubb Companies term sheet.  The discussion included a detailed analysis of the proposed treatment of chartered organizations under the Century and Chubb Companies term sheet.  The NEC asked questions concerning the mediation with other parties and its relation

to the Century and Chubb Companies term sheet.  Jtx. 1102 is a true and correct copy of the minutes of that meeting.  It is attached to this Declaration as Exhibit W.

45.    On December 12, 2021, the NEC reviewed the final versions of the Century and Chubb Companies Agreement and an updated presentation from our counsel detailing the Century and Chubb Companies Agreement and its impact on Chartered Organization treatment under the Plan.  The NEC engaged in robust discussion and asked our counsel and advisors questions relating to the multiple issues in the Chapter 11 Cases, including mediation, other potential agreements and settlement discussions, the impact of the foregoing on the BSA's capability to carry out the mission of Scouting, the BSA's liabilities and liquidity, and any strategic alternatives available.  Jtxs. 1105 and 1104 are true and correct copies of the minutes of that meeting and presentation.  They are attached to this Declaration as Exhibits X and Y.

46.    Based on its review of the materials provided by the advisors and deliberation among the members described above, the NEC approved the Century and Chubb Companies Agreement determining that in our business judgment, the transaction is in the best interest of the Corporation, its creditors, and other stakeholders.  *See* Ex. X at BSA-PLAN_02855047 ("Boy Scouts of America National Executive Committee: Resolutions Authorizing Certain Restructuring Matters" dated December 12, 2021).

### c.  Zurich Affiliated Insurers

47.    On December 21, 2021 the NEC approved settlement terms and authorized the BSA to enter into a settlement agreement with Zurich Insurers and Zurich Affiliated Insurers (collectively, "Zurich" and the settlement agreement, "Zurich Agreement").   Under that agreement, Zurich agreed to contribute $52.5 million in cash to the Settlement Trust.  The Zurich Agreement was the result of arm's-length negotiations with the assistance of the Debtors' Advisors

and the Mediators.  Jtx. 1-312 is a true and correct copy of the Zurich term sheet.  It is attached to this Declaration as Exhibit Z.

48.    The BSA engaged in considerable deliberation and consultation with its counsel and advisors regarding the Zurich Agreement before entering into it.  Specifically, the NEC, NEB, and BTF met with its counsel and advisors multiple times to engage in robust discussions regarding the Zurich Agreement, including the different options, and analyses of advantages and disadvantages of the various terms and provisions.  Zurich asserted significant objections in the Chapter 11 Cases and this settlement resolves the objections.

49.    On December 8, 2021, the NEC discussed with our counsel the potential settlement with Zurich, as well as the status of the mediated settlement discussions with Zurich.   *See* Ex. W.

50.    On December 20, 2021, the NEC met with our advisors and reviewed a presentation detailing the potential terms of the Zurich Settlement term sheet.  The advisors indicated that the settlements had substantially the same terms as the Century and Chubb Companies Settlement, which the NEC had recently approved after substantial discussions and analysis.  Jtxs. 1112 and 1113 are true and correct copies of the minutes of that meeting and presentation.  They are attached to this Declaration as Exhibits AA and BB.

51.    On December 21, 2021, the NEC met with our advisors regarding the Zurich and Clarendon Settlements.   After discussion, multiple directors moved to approve the Zurich Settlement term sheet, and the NEC unanimously authorized a settlement within the range of $52.5 million.  Jtx. 1115 is a true and correct copy of the minutes of that meeting.  It is attached to this Declaration as Exhibit CC.

52.    Based on its review of the materials provided by our advisors and deliberation among the members described above, the NEC approved the Zurich Settlement term sheet,

determining that in our business judgment, the transaction is in the best interest of the Organization, its creditors, and other stakeholders.  *Id.*

### d. Clarendon

53.    On December 21, 2021 the NEC approved settlement terms and authorized the BSA to enter into a settlement agreement with Clarendon ("Clarendon Agreement").  Under the agreement, Clarendon has agreed to contribute $16.5 million in cash to the Settlement Trust.  The Clarendon Agreement was the result of arm's-length negotiations with the assistance of the Debtors' advisors and the Mediators.  Jtx. 1-434 is a true and correct copy of the Clarendon term sheet.  It is attached to this Declaration as Exhibit DD.

54.    The BSA engaged in considerable deliberation and consultation with its counsel and advisors regarding the Clarendon Agreement before entering into it.  Specifically, the NEC, NEB, and BTF met with their counsel and advisors multiple times to engage in robust discussions regarding the Clarendon Agreement, including the different options, analyses of advantages and disadvantages of the various terms and provisions.  Clarendon asserted significant objections in the Chapter 11 Cases, creating significant challenges to the Chapter 11 Cases.  This settlement resolves the objections.

55.    On December 8, 2021, the NEC met with its advisors to discuss an update in the current status of negotiations and mediation with Clarendon.  *See* Ex. W.

56.    On December 20, 2021, the NEC met with our advisors and reviewed a presentation detailing the potential terms of the Clarendon Settlement term sheet.  The advisors indicated that the settlements had substantially the same terms as Century Settlement, which the NEC had recently approved after substantial discussions and analysis.  *See* Exs. AA and BB.

57.     On December 21, 2021, the NEC met with legal counsel and reviewed an analysis regarding the potential terms of the Clarendon Settlement term sheet.  After discussion, multiple directors moved to approve the Clarendon Settlement term sheet, and the NEC unanimously authorized a settlement within the range of $16.5 million.  *See* Ex. CC.

58.     Based on its review of the materials provided by the advisors and deliberation among the members described above, the NEC approved the Clarendon Settlement term sheet, determining that in their business judgment, the transaction is in the best interest of the Organization, its creditors, and other stakeholders.

## II.     **Chartered Organizations**

### a.  **TCJC**

59.     On September 14, 2021, the NEC approved settlement terms and authorized the BSA to enter into a settlement agreement with The Church of Jesus Christ of Latter-Day Saints ("TCJC", and the settlement agreement, the "TCJC Agreement").  The BSA and TCJC, along with the other parties to the settlement, have engaged in extensive hours of mediation to reach the TCJC Settlement set forth in the Plan.  Under the agreement, TCJC will contribute $250 million to the Settlement Trust and transferring valuable rights under insurance policies.  The TCJC Agreement was the result of arm's-length negotiations with the assistance of the Debtors' Advisors and the Mediators.  Jtx. 1-3 is a true and correct copy of the TCJC term sheet.  It is attached to this Declaration as Exhibit EE.

60.     A settlement with TCJC is critical given TCJC's over one-hundred year partnership with BSA.  Litigation with TCJC would be costly and time-consuming for both abuse survivors and the Debtors' Estates and the Settlement Trust. TCJC will likely also assert indemnification

claims against the Debtors resulting in a potential reduction of any recoveries for the abuse survivors against TCJC.

61.     The BSA engaged in considerable deliberation and consultation with our counsel and advisors regarding the TCJC Agreement before entering into it.  Specifically, the NEC, NEB, and BTF met with our counsel and advisors multiple times to engage in robust discussions regarding the TCJC Agreement, including the different options, analyses of advantages and disadvantages of the various terms and provisions.

62.     On August 31, 2021, the NEC reviewed the draft settlement term sheet received from TCJC dated August 27, 2021.  At that meeting, the NEC also reviewed a presentation from our advisors detailing the potential terms of the TCJC Agreement.  The NEC had a robust discussion with the advisors concerning the key issues that must be negotiated in the TCJC Agreement before it could be finalized.  After the discussion, the NEC determined it would convene further to consider new developments before considering a resolution on the TCJC Agreement.  *See* Exs. G and H.

63.     On September 2, 2021, the NEC reviewed a presentation from our counsel detailing the potential terms of the TCJC Agreement.  The NEC heard objections to the TCJC settlement, and viewed a presentation by Bates White that discussed TCJC claim valuations.  After robust discussion, the NEC authorized a settlement within certain specific parameters, subject to the BTF being provided with final versions of the term sheet and that any material modifications be subject to further deliberations by the NEC.  *See* Exs. I and J.

64.     On September 14, 2021 the NEC reviewed the final versions of the TCJC Agreement and the TCJC term sheet, and asked our counsel and advisors questions relating to the

multiple issues in the Chapter 11 Cases, including mediation, other potential agreements and settlement discussions.  *See* Ex. M.

65.    Based on its review of the materials provided by the advisors and deliberation among the members described above, the NEC approved the TCJC Agreement determining that in our business judgment, the transaction is in the best interest of the Organization, its creditors, and other stakeholders.  *Id.*

### b.    United Methodists

66.    On December 20, 2021, the NEC approved settlement terms and authorized the BSA to enter into a settlement agreement (the "Methodist Agreement") with the United Methodist Entities (the "Methodists").  Under the agreement, the Methodists are contributing $30 million in cash to the Settlement Trust, transferring valuable rights under insurance policies, working to strengthen and grow the Methodist partnership with Scouting through at least 2036, and cooperating and participating in various Youth Protection and Scouting safety efforts.  The Methodist Agreement is the product of arms'-length negotiations between the interested parties with the assistance of the Debtors' Advisors and Mediators.  Jtx 1-311 is a true and correct copy of the United Methodists term sheet.  It is attached to this Declaration as Exhibit FF.

67.    The continued involvement of the Methodists and their continued support for Scouting is critical to the future of the BSA.  The Methodists are a critical source of membership for the BSA.  Rather than threatening to disaffiliate with the BSA, the Methodists have agreed to recommend that the General Commission on United Methodist continue its ongoing relationship with the BSA and to support Scouting.

68.    The BSA engaged in considerable deliberation and consultation with its counsel and advisors regarding the Methodist Agreement before entering into it.  Specifically, the NEC,

NEB, and BTF met with our counsel and advisors multiple times to engage in robust discussions regarding the Methodist Agreement, including the different options, analyses of advantages and disadvantages of the various terms and provisions.

69.     On November 21, 2021, the NEC met with its advisors and reviewed a presentation detailing the potential terms of a settlement with the Methodists.  At the meeting, the NEC asked the advisors questions regarding the settlement and the Methodists continued support for Scouting. *See* Exs. Q and S.

70.     On November 22, 2021, the NEC met again with our advisors and reviewed an updated presentation detailing the potential terms of a settlement with the Methodists.  The NEC asked a number of questions concerning the revised proposal.  After the discussion, the NEC authorized the advisors to negotiate a resolution with the Methodists, subject to NEC approval of the final term sheets.   *See* Exs. T and U.

71.     On December 5, 2021, the BTF met with our advisors to discuss the status of the settlement negotiations with the Methodists.  See Ex. V.

72.     On December 8, 2021, the NEC met with our advisors to discuss the current status of the negotiations with the Methodists.  The NEC asked questions regarding updated term settlements.  *See* Ex. W.

73.     On December 12, 2021, the NEC met with our advisors detailing a further revised term sheet between BSA and the Methodists.  *See* Exs. X and Y.

74.     On December 20, 2021, the NEC met with our advisors and reviewed the final term sheet for the Methodist Agreement.  After reviewing the presentation, followed by a robust discussion, the directors unanimously approved the Methodist Agreement.   *See* Exs. AA and BB.

75.     Based on its review of the materials provided by the advisors and deliberation among the members described above, the NEC approved the Methodist Agreement determining that in our business judgment, the transaction is in the best interest of the BSA, its creditors, and other stakeholders.  *See* Ex. AA.

### III.    The Abuse Claim Settlements

#### a.  Local Councils

76.     Under the Plan, the Local Councils have agreed to contribute: (a) $500 million in cash and property, (b) the DST Note in the principal amount of $125 million,[7] a non-recourse interest-bearing promissory note, (c) their own Local Council Insurance Policies, and (d) material insurance rights in the BSA Insurance Policies.[8]

77.     A settlement including the Local Councils is necessary to ensure that all abuse survivors have access to the valuable insurance policies that will fund the Settlement Trust. Absent the settlement, abuse survivors and the Trust will be required to undergo costly and expensive litigation to determine the amount of insurance coverage available to cover Abuse Claims, how the claims would be allocated under the Local Council Insurance Policies, and the complex intricacies caused by the BSA and Local Council's respective unallocated share/uninsured share of responsibility.  Notably, the Local Councils are named or additional insureds under a substantial portion of the BSA Insurance Policies.  There is substantial overlap between the financial and legal responsibility of the BSA and Local Councils.

---

[7]    Jtx 1353 Plan Art. I.A.114 (defining DST Note); *see* Plan, Art. V.Y; Plan Ex. F.  The DST Note is in the principal amount of $125 million but $25 million of the aggregate $125 million DST Note is being contributed by Local Councils for the benefit of Participating Chartered Organizations under the Plan.

[8]    *See* Jtx 1353 Plan Art. V.S.1.a.

78.     The Local Council Settlement Contribution offers an immediate sum certain for abuse survivors.  This settlement also provides a global resolution of Scouting-related Abuse Claims against the Debtors and Local Councils, offering a centralized, streamlined, efficient, and equitable process for compensating abuse survivors.  Without the ability to make these insurance-related contributions, the Settling Insurance Companies would not have agreed to settle, resulting in expensive and protracted litigation.

79.     The BSA engaged in considerable deliberation and consultation with our counsel and advisors regarding the Local Councils contributions.

80.     On April 13, 2021, the NEC discussed the amended Plan, under which the BSA would seek an aggregate contribution from local councils of $425 million.  The NEC unanimously approved filing of the amended Plan stating councils would be asked to contribute at least $425 million.  Jtx. 449 is a true and correct copy of the minutes of that meeting.  It is attached to this Declaration as Exhibit GG.

81.     On June 21, 2021, the BTF met with its advisors and discussed the importance of local councils obtaining releases and the benefits of a channeling injunction as part of a global resolution.   Jtxs. 556 and 557 are true and correct copies of the minutes of that presentation. They are attached to this Declaration as Exhibit HH and II.

82.     On November 21, 2021, the NEC reviewed a presentation from A&M detailing the increase of the DST Note to $125 million as part of the potential Century and Chubb Companies settlement.  The NEC members asked a number of questions and debated about this presentation.  *See* Exs. Q and S.

83.     On December 12, 2021, the NEC reviewed a presentation concerning the Century settlement confirming the key parameters of the settlement and its impact on the Local Council

settlements and analysis.  The Century and Chubb Companies Agreement included increasing

the DST Note to $125 million, which was supported by the AHCLC and modifying the $100

million contingent growth payment to be split $75 million for BSA and $25 million for local

councils.  The NEC members had a robust discussion about the presentations with our advisors,

and unanimously approved a resolution stating that it was the business judgment of the NEC that

it was in the best interests of the organization to file further amendments and modifications to the

Plan incorporating the Century term sheet.  *See* <u>Exs. X</u> and <u>Y</u>.

### IV.     TCC/Abuse Survivor Settlement

84.     From the outset, it has been critical to the BSA to negotiate a Plan that is supported

by the vast majority of abuse survivors.  Accordingly, the BSA continued to mediate with abuse

survivor representatives after settling with key insurers and chartered organizations.

85.     On February 9, 2022, the NEC approved settlement terms and authorized the BSA

to enter into a settlement agreement with the largest remaining abuse survivor representative group

("<u>The TCC/Abuse Survivor Settlement</u>").[9]  Under the settlement, the BSA agreed to add key

modifications relating to the governance of the Settlement Trust, an Independent Review Option

in which holders of Direct Abuse Claims may participate, a modification to the scope of releases

for Chartered Organizations, and clarifications to certain plan terms, such as the definition of

"Abuse Claim," and the extensive YPP.  Jtx 1-350 is a true and correct copy of the TCC/Abuse

Survivor Settlement term sheet.  It is attached to this Declaration as <u>Exhibit JJ</u>.

86.     The BSA, the TCC, and other parties negotiated the key modifications over months

of mediation.  The BTF and NEC were regularly updated by our advisors on the status of the

---

[9]     The TCC settlement also includes a *settlement* with several state court counsel and plaintiff firms.

mediation.  I personally participated in mediation sessions in Los Angeles, CA between January 11-13, 2022.

87.     The BSA engaged in considerable deliberation and consultation with its counsel and advisors regarding the TCC/Abuse Survivors Agreement before entering into it.  Specifically, the NEC, NEB, and BTF met with our advisors multiple times to engage in robust discussions regarding the TCC/Abuse Survivor Settlement Agreement, including the different options, analyses of advantages and disadvantages of the various terms and provisions.

88.     On January 7, 2022, the BTF met with our advisors and reviewed a presentation updating the BTF on the status of mediation with the TCC and potential settlement.  Jtxs. 1174 and 1173 are true and correct copies of the minutes of that meeting and presentation.  They are attached to this Declaration as Exhibit KK and LL.

89.     On January 20, 2022, the NEC met with our advisors to discuss the status of a mediation regarding potential settlements with the TCC and certain individual state court representatives.  At that meeting, the NEC also reviewed and approved a powerpoint summarizing the output from an NEC retreat at Philmont between August 26 and 29, 2021 ("Philmont Retreat"). Members of the NEC attended this retreat to discuss their thoughts regarding a post-bankruptcy strategy.  I took the lead role in drafting the finalized powerpoint, and also received input from Alison Schuler and Brad Tilden. I had previously learned that Mr. Tilden had created a separate draft document relating to the Philmont Retreat. This initial draft was not presented to the NEC, nor approved. Jtx. 1185 is a true and correct copy of the NEC approved powerpoint.  It is attached to this Declaration as Exhibit MM; Jtx. 1187 is a true and correct copy of the minutes of that meeting.  It is attached to this Declaration as Exhibit NN.

90.    On January 29, 2022, the NEC met with our advisors to review a presentation detailing the status of mediation and potential settlement terms of the TCC/Abuse Survivor Settlement Agreement.  The NEC unanimously authorized the BSA's advisors to negotiate a settlement with the TCC and certain state court representatives within the parameters articulated during the meeting, subject to approval of a final term sheet.  Jtxs. 1230 and 1229 are true and correct copies of the minutes of that meeting and presentation.  They are attached to this Declaration as Exhibits OO and PP.

91.    On January 31, 2022, the NEB met with our advisors to review a presentation detailing the status of mediation and potential settlement terms of the TCC/Abuse Survivor Settlement Agreement.  Jtxs. 1236 and 1235 are true and correct copies of the minutes of that meeting and presentation.  They are attached to this Declaration as Exhibits QQ and RR.

92.    On February 6, 2022, the BTF met with our advisors to discuss the status of mediation and the proposed TCC/Abuse Survivor Settlement.  Jtx. 1278 is a true and correct copy of the minutes of that meeting.  It is attached to this Declaration as Exhibit SS.

93.    On February 9, 2022, the NEC met with our advisors and reviewed a presentation detailing the revised terms of the TCC/Abuse Survivor Settlement.  The presentation further detailed the TCC and BSA positions on each of the key outstanding issues along with an explanation of how it is resolved in the proposed term sheet.  The NEC unanimously authorized the revised terms.  The NEC also reviewed with our advisors the previously-approved terms and conditions of each settlement.  Jtxs. 1297 and 1298 are true and correct copies of the minutes of that meeting and presentation.  They are attached to this Declaration as Exhibits TT and UU.

94.    The terms approved by the NEC on February 9 also included the settlement of a claim against Pachulski Stang Ziehl & Jones LLP ("PSZJ"), in connection with communications

from Timothy Kosnoff Esq. and related actions (the "PSZJ Settlement").  Under the settlement, PSZJ agreed to contribute $1.25 million in cash to the Reorganized BSA reserved for the BSA's Youth Protection Program and to write-off $750,000 of PSZJ's fees.  In evaluating the settlement, our advisors provided NEC with communications reflecting costs to the Estate as a result of the Kosnoff communications. Jtxs. 1137 and 1111 are true and correct copies of letters from Debtors' Counsel detailing the costs imposed.  They are attached hereto this Declaration as <u>Exhibits VV</u> and <u>WW</u>.  The Debtors considered these costs in determining that the settlement was in the best interest of the Estate.

95.    Based on its review of the materials provided by the advisors and deliberation among the members described above, the NEC approved the TCC/Abuse Survivor Settlement Agreement determining that in our business judgment, the transaction, including the PSZJ Settlement, is in the best interest of the Corporation, its creditors, and other stakeholders.

96.    On February 15, 2022, in accordance with the NEC and NEB's approval of the relevant settlements, the BSA filed the Third Modified Fifth Amended Plan, which incorporated all the Settlement Agreements reflecting the terms of the various settlements detailed above. Our advisors subsequently updated both the NEC and NEB on meetings on February 15 and 16. Jtxs. 1416, 1417, 1421, and 1422 are true and correct copies of the minutes of those meetings and presentations are attached to this Declaration as <u>Exhibits XX</u>, <u>YY</u>, <u>ZZ</u> and <u>AAA</u>.

97.    On February 23, 2022, the NEC met with our advisors to discuss issues regarding the designation of the Settlement Trustee. The NEC had previously been provided biographies of the Claims Administrators and Settlement Trustee candidates and informed that our counsel was participating in all interviews.  The NEC authorized our advisors to designate the Settlement

Trustee.  Jtx. 1425 is a true and correct copy of the minutes of that meeting.  It is attached to this Declaration as Exhibit BBB.

### C.  <u>Youth Protection</u>

98.     The BSA will not compromise the safety of our youth, volunteers, and employees, and is dedicated to becoming the Gold Standard in abuse prevention.  Because of this commitment, the BSA will always seek to bolster our abuse prevention efforts.  In connection with the development of the Plan, it was important for the BSA to work directly with the survivors to reach a consensus on enhanced youth protection and safety protocols.  In furtherance of that goal, the BSA received input on youth protection issues from abuse survivors including TCC members and the survivors associated with the Coalition.  The BSA also engaged an industry expert to assist in this process.

99.     As part of the BSA's engagement on youth protection, I volunteered to serve as one of BSA's representatives as part of the Survivor Working Group ("SWG").  The SWG was formed in November 2021, and included approximately 15 survivors, most of whom were affiliated with the Coalition, as well as representatives from the BSA's youth protection team, and executive and volunteer leadership.  The SWG also included representatives of the Local Councils, and several industry experts.

100.     I understand that the survivors on the SWG participated in numerous meetings and mediations sessions, including more than a dozen meetings with BSA and Local Council representatives.  I personally attended several SWG meetings, including a meeting between the SWG and the NEC on December 14, 2021.

101.    I am also aware that BSA representatives – including representatives of the BSA's youth protection team – engaged in numerous meetings and mediation sessions with the members of the TCC, including TCC co-chairs Doug Kennedy and John Humphrey.

102.    As a result of this extensive engagement with survivors, the parties agreed to enhanced policies, protocols and commitments that are included as part of the Plan. *See* Plan, Exhibit L (the Youth Protection Program ("YPP").  Among other things, the YPP requires that the BSA (a) hire a Youth Protection executive with extensive experience in prevention of childhood abuse, (b) form a Youth Protection Committee composed of abuse survivors, and representatives of the BSA, Local Councils, and Chartered Organizations, and (c) undertake an extensive review and update of existing policies.

103.    The YPP also expands survivor representation, by requiring an otherwise qualified survivor of abuse in Scouting to be nominated to serve and placed on the NEB, and promote survivor recognition and remembrance, through (in consultation with the YPC) designing and installing a place of remembrance for all child sexual abuse survivors at a prominent location at each of the BSA's High Adventure Bases, which will serve as a nationally recognized statement of BSA's commitment to recognize the abuses of the past and to prevent abuse in the future.

104.    The BSA understands that in order for its youth protection to be a Gold Standard, the continued involvement and input of survivors is critical.  The YPP will provide an avenue to help the BSA continue to develop new safety measures.

105.    To supplement its engagement with survivors, in early November 2021, the BSA retained Lunderberg Enterprises d/b/a Praesidium ("Praesidium") to initiate an evaluation of the BSA's current youth protection program and consult BSA in guiding the continued development of the BSA's youth protection program.

106.    BSA retained Praesidium specifically because of their expertise in the study and prevention of sexual abuse in organizational settings.  Mr. Aaron Lundberg, Praesidium's CEO, has examined over 200 organizations in the United States and analyzed their methods for preventing child abuse including screening and selection methods.  Mr. Lundberg's expertise includes schools, churches, camps, and other youth recreational organizations. Jtx. 1097 is a true and correct copy of the Expert Report of Aaron Lundberg.  It is attached to this Declaration as <u>Exhibit CCC</u>.  As mentioned above, I am aware that Mr. Lundberg and his colleagues participated in numerous meetings with the SWG and TCC.  On Wednesday, November 24, 2021, I met with Mr. Lundberg to answer his questions and provide my perspective on the BSA's youth protection.

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: March 11, 2022
        Miami, Florida                                         */s/ Devang Desai*
                                                              Devang Desai