**THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re: DI 9114** |

**DECLARATION OF ADRIAN AZER IN SUPPORT OF CONFIRMATION OF THIRD
MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR
BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

I, Adrian Azer, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1.      I am over twenty-one (21) years of age, have never been convicted of a felony, and am fully competent to make this declaration (this "Declaration") in support of confirmation of the *Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, dated February 15, 2022 [D.I. 8813] (the "Plan") and the *Debtors' (I) Memorandum of Law In Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114] (the "Memorandum").

2.      I am a partner at the law firm of Haynes and Boone, LLP ("Haynes and Boone"). Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal experience and knowledge or information obtained from my review of relevant documents.

---

[1]  The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## I.    GENERAL BACKGROUND

3.      The BSA[2] retained Haynes and Boone as insurance coverage counsel in January 2018.  As coverage counsel for the BSA, I was personally involved with representing the interests of the BSA by advising the BSA on insurance issues, and by negotiating and litigating with the BSA's insurance companies regarding insurance coverage matters.   After the Petition Date, Haynes and Boone was retained as special counsel regarding insurance matters, where we continued to represent the interests of the Debtors with respect to insurance-related matters in the bankruptcy.[3]

## II.    GOOD FAITH NEGOTIATIONS OF THE TDP

### A.    The Debtors Negotiated the TDP in Good Faith with the Aim of Proposing a Fair, Equitable, and Economical Process to Resolve Abuse Clams in a Manner Consistent with Debtors' Prepetition Practices.

4.      The Trust Distribution Procedures filed on February 15, 2022, as Exhibit A to the Plan (the "Operative TDP" and each prior iteration a "TDP")[4], are the culmination of exhaustive work by the Debtors to satisfy two principles: (a) create a fair and equitable process to compensate Direct Abuse Claimants that is consistent with the BSA's prepetition practices, and (b) preserve the rights of the Non-Settling Insurance Companies, to the extent that any such rights exist.

5.      The Operative TDP embodiy both of these principles and were the result of a hard-fought, arm's-length negotiation among the Debtors and parties in interest.  The Operative TDP were designed by the Debtors to emulate, to the greatest extent practicable, the prepetition practices of the BSA and its insurance companies for investigating, evaluating, valuing, and resolving Direct

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.

[3]  JTX-1 [D.I. 463] includes a filed copy of the Order Authorizing the Retention and Employment of Haynes and Boone, LLP as Special Insurance Counsel.

[4]  JTX-1-353 is the Third Modified Fifth Amended Chapter 11 Plan of Reorganization, which includes the Operative TDP at Exhibit 1.

Abuse Claims, while simultaneously preserving all of the rights of the Non-Settling Insurance Companies to dispute and litigate coverage issues with the Settlement Trust.

6.      Constructing the Operative TDP involved no less than one hundred hours of negotiations between various stakeholders, including (a) the Debtors, (b) the Ad Hoc Committee of Local Councils, (c) the Coalition, (d) the TCC, (e) the FCR, and (f) other Abuse Claimant constituencies.

7.      The allegations by certain Non-Settling Insurance Companies that the Debtors permitted the Direct Abuse Claimant constituencies to take over the process and write their own TDP to the detriment of the Non-Settling Insurance Companies is false.  The negotiations surrounding the TDP were arm's-length and tough.  The Debtors exercised good faith throughout the whole process, taking into consideration both the interests of the Direct Abuse Claimants and the Non-Settling Insurance Companies.  The Debtors never ceded control of the TDP (including the Operative TDP) to any other party (be it a claimant constituency or an insurance company) or colluded with any third party to prejudice the rights of another.

8.      The Non-Settling Insurance Companies have incorrectly argued that the Debtors "turned over the pen" on the TDP.  To the contrary, I was directly involved in drafting the initial TDP, along with other attorneys for the Debtors.  Throughout the negotiations, I was involved in dozens of mediation sessions and other discussions where the Debtors considered language and concepts proposed by the parties negotiating on behalf of the claimants.  If these negotiating parties proposed language or concepts consistent with the two guideposts referenced above (*i.e.*, creating a fair and equitable system for resolving Abuse Claims consistent with Debtors' prepetition practices and preserving the rights of any Non-Settling Insurance Companies), on behalf of the Debtors, I (and the other attorneys representing the Debtors) gave serious consideration to those

proposals and, where appropriate and consistent with the two guideposts, incorporated such proposed terms and provisions into the draft of the TDP.  When the proposed language or concepts were inconsistent with those guideposts, I, on behalf of the Debtors, refused to incorporate the proposed terms and revisions.

9.      We designed the TDP to replicate, to the extent practicable, the Debtors' historical claim resolutions.  The Debtors did that because the historical claims resolutions were the result of arm's-length negotiations between the interested parties and were conducted through experienced experts.  Because we sought to replicate, to the extent practicable, the BSA's prepetition practices, I, along with other attorneys for the Debtors, coordinated with and relied upon the BSA's National Coordinating Counsel, Ogletree Deakins ("Ogletree"), for guidance during the negotiations of the various iterations of the TDP.  Specifically, I spoke frequently with Bruce Griggs and Sean Manning at Ogletree – as the BSA's prepetition National Coordinating Counsel and the law firm that handled all Abuse Claims from 2016 to the Petition Date – who were intimately familiar with how the BSA evaluated the validity and value of claims prepetition. Although each Abuse Claim was individually evaluated, there were common elements that allowed Ogletree and the BSA to create general guidelines to evaluate and value Abuse Claims, and which would permit a Settlement Trustee to follow a set of general guidelines to evaluate and value Abuse Claims.

10.     With respect to the Operative TDP, Bruce Griggs and Sean Manning provided guidance with respect to:  (a) the criteria that Ogletree considered when determining whether a claim was credible and valid for settlement purposes; (b) certain aggravating factors that Ogletree considered to increase the value of a claim for settlement purposes; (c) certain mitigating factors that Ogletree considered to decrease the value of a claim for settlement purposes; and (d) the types

of documents and information that Ogletree relied on, and the Settlement Trustee would need, from the claimants to evaluate the validity of their claims and to apply the aggravating and mitigating scaling factors to value claims. Bruce Griggs and Sean Manning also provided BSA with guidance concerning the categorization of each state for the purposes of applying a Statute of Limitations mitigating factor.

11.     When deciding whether to accept or reject proposed revisions to the TDP, the Debtors typically consulted with Ogletree to determine whether the revisions were consistent with the BSA's prepetition practices, which, in most instances, were approved by certain of the Debtors' insurers. The TDPs were designed to import the BSA's prepetition practices in the tort system by giving the Settlement Trustee the same type of discretion to consider all relevant facts and make awards, albeit within more standardized parameters. By way of example, the Mitigating Factors provide for a non-exhaustive list of criteria that the Settlement Trustee may evaluate to reduce the value of an Abuse Claim based on the relative difficulties in proving institutional liability. So, the same factors that would impact the resolution of sexual abuse claims from the BSA's perspective in the tort system are designed to impact the resolutions in the TDP. If the proposed revisions were consistent with the BSA's prepetition practices, the Debtors considered accepting the revisions. When the proposed revisions were inconsistent with the Debtors' prepetition practices, the Debtors refused to do so.

12.     Likewise, the BSA relied on its retained expert, Bates White, LLC ("Bates White"), for guidance. The Debtors did not allow claimants to determine claim values, as certain Non-Settling Insurance Companies have suggested. To the contrary, Bates White was provided and relied on historical settlement data and analyzed that data to provide guidance in quantifying, to the extent practicable, the historical claim values to provide guidance to the Settlement Trustee in

determining individual claims.  Bates White provided guidance with respect to (a) the calculation

of the Base Matrix Value in the TDP, and (b) quantifying the appropriate scaling factor for any of

the aggravating or mitigating factors to be consistent with prepetition practices.  The Debtors relied

on Bates White's determination of these amounts through an economic analysis of the BSA's

historical settlements between 2016 and 2020.  The Debtors concluded that using the settlement

data between 2016 and 2020 was an appropriate sample set given that the Debtors retained

Ogletree in August 2016 to achieve a more consistent defense and settlement of abuse claims.

Ogletree performed this job for years.

13.    I was personally involved with reviewing and drafting the TDP to preserve the

rights of the Non-Settling Insurance Companies.  Those efforts culminated in the protection of the

rights, to the extent any such rights exist, of the Non-Settling Insurance Companies in Article V.C

and Article X of the Operative TDP.  As described in more detail below, the Debtors considered

myriad language and approaches aimed at protecting the rights of the Non-Settling Insurance

Companies and ultimately settled on Article V.C and Article X of the TDP.

**B.    The Debtors' Drafting of the TDP (February 2021 to May 2021)**

**1.    The April 2021 TDP**

14.    At the beginning of February 2021, the Debtors had not yet started drafting the

TDP, although the Debtors understood that the Plan needed TDP to guide the administration of the

Settlement Trust.

15.    On February 2, 2021, the Debtors received a proposed term sheet (the "February

Term Sheet") from the Coalition.  The Debtors had not yet settled with the Coalition. [5]  The

Coalition did not forward a draft TDP, but a term sheet.    The February Term Sheet required that

---

[5]  JTX-375 is a true and correct copy of an email February 2,2021 from David Molton to Michael Andolina and
others.  JTX-376 is a true and correct copy of an attachment to JTX 375.

the TDP be binding on any Non-Settling Insurance Companies.  The Debtors rejected the February

Term Sheet and instead filed multiple drafts of the TDP that were directly contrary to the terms

required in the February Term Sheet.[6]

16.    On February 6, 2021, the Debtors received a draft TDP from Hartford (the

"Hartford TDP").[7]  At the time of its receipt, the Debtors and Hartford were still adverse to each

other in the Chapter 11 Cases as no settlement had been reached.  Although the Debtors disagreed

with certain elements, the Hartford TDP served as the initial foundation for the Debtors' TDP.

Specifically, the Debtors incorporated several concepts of the Hartford TDP into their first draft

of the TDP, including (a) the use of scaling factors, many of which are generally incorporated in

the Operative TDP, to adjust the value of the claim, and (b) the incorporation of an expedited

distribution mechanism.[8]  Thus, from the outset, the Debtors included certain concepts requested

by insurers.

17.    While the Debtors continued to work on drafting the TDP, the Debtors received

additional proposed Term Sheets from the Coalition during the beginning of April 2021 (the "April

Term Sheet")[9].  Again, the Debtors had not yet reached a deal with the Coalition, which continued

to assert that the TDP should be binding on the Non-Settling Insurance Companies.  As with the

---

[6]  JTX-1-412 is the Second Amended Chapter 11 Plan of Reorganization, which includes the April 2021 TDP.  JTX-1 [D.I. 4107] is the Proposed Amendments to the Second Amended Chapter 11 Plan of Reorganization.  Exhibit A-1 describes the May 2021 TDP.

[7]  JTX-380 is a true and correct copy of an email dated February 6, 2021 from Jim Ruggeri to Jessica Lauria and others.  JTX-374 is a true and correct copy of an attachment to JTX-380.

[8]  JTX 374, Section 4.2 and 4.4.c.

[9]  JTX-423 is a true and correct copy of an email dated April 3, 2021 from Michael Andolina to Eric Goodman and others.  JTX-424 is a true and correct copy of an attachment to JTX-423.  JTX-430 is a true and correct copy of an email dated April 7, 2021 from Eric Goodman to Michael Andolina and others.  JTX-431 is a true and correct copy of an attachment to JTX-430.  JTX-439 is a true and correct copy of an email dated April 10, 2021 from Eric Goodman to Michael Andolina and others.  JTX-440 is a true and correct copy of an attachment to JTX-439.

February Term Sheet, the Debtors rejected the April Term Sheet and filed a TDP that was directly

contrary to both the Coalition's February Term Sheet and April Term Sheet.[10]

18.     On April 13, 2021, the Debtors filed their Second Amended Plan, which included

the first iteration of the TDP (the "April 2021 TDP").[11]   The April 2021 TDP were drafted

exclusively by the Debtors and no claimant constituencies provided any specific input into the

drafting of the April 2021 TDP.   On April 11, 2021, the Debtors sent a draft of the TDP to the

Coalition, however, the Debtors did not receive or incorporate any specific comments to the April

2021 TDP from the Coalition before filing.[12]

19.     I understand that certain objecting parties have asserted that claimant constituencies

"took the pen" on the TDP.   For example, I understand that during his deposition, the Future Claims

Representative ("FCR"), James Patton, indicated that the Coalition originally drafted the TDP.

However, this is not true, and the FCR acknowledges as much and has clarified its prior

statements.[13]

### 2.     The May 2021 TDP

20.     The April 2021 TDP were not intended to be a final, non-negotiable version of the

TDP.   It was always the Debtors' expectation that the Debtors would continue to work on, and

---

[10] JTX-1-412 (the April 2021 TDP).

[11] JTX-1-412 (the April 2021 TDP).

[12] JTX-444 is a true and correct copy of an email dated April 11, 2021 from Michael Andolina to David Molton and others.   JTX-445 is a true and correct copy of an attachment to JTX-445.

[13] Statement of the Coalition of Abused Scouts For Justice and Future Claimants' Representative in Support of Confirmation of Modified Fifth Amended Chapter 11 Plan or Reorganization for Boy Scouts of America and Delaware BSA, LLC. [D.I. 9115].   Specifically, in footnote 68, the FCR clarified that the "Insurers conveniently omit the additional testimony of the FCR during that same deposition when he explained that his statement was referring to the Coalition wielding the pen to revise the TDPs initially drafted by the Debtors – 'the debtors' original TDP was flawed and -- in many respects and we essentially started over -- the coalition started over and prepared a TDP that's . . . built upon successful TDPs that have been used for decades in other mass tort cases; and . . . it was that document after we finished negotiating the document that I was then able to support.'" *Id.* at 55, n. 68.

meet with various stakeholders to revise, the April 2021 TDP as appropriate. The Debtors continued to develop the TDP throughout April and early-May 2021.

21.    On May 6, 2021, the Debtors received a second proposed draft of the TDP from Hartford, which the Debtors reviewed.[14]  Again, the Debtors disagreed with certain components of Hartford's proposed TDP, but Hartford's May 2021 TDP kept several material aspects of the Debtors' April 2021 TDP.[15]

22.    Specifically, the TDP revisions provided by Hartford in May and the TDP filed by the Debtors on May 16, 2021 (the "May 2021 TDP") involved several common, core concepts. These core concepts remained in place under the subsequent versions of TDP that the Debtors would file.  Under both versions of these TDP:

- The Settlement Trustee evaluates whether a claim is legally valid or invalid based on certain criteria;[16]

- If legally valid, the Settlement Trustee assigns a value to that claim using a base claim matrix value and application of a series of aggravating and mitigating factors to determine a proposed claim amount;[17]

- The Settlement Trustee then notifies the claimant of the proposed claim amount, and the claimant can either accept the award, seek reconsideration of the award, or

---

[14] JTX-474 is a true and correct copy of an email and attachment dated May 6, 2021 from Jim Ruggeri to Jessica Lauria and others.

[15] JTX-1 [D.I. 4107] is the Proposed Amendments to the Second Amended Chapter 11 Plan of Reorganization. Exhibit A-1 describes the May 2021 TDP.

[16] JTX-474, at Article V; JTX-1 [D.I. 4107], Ex.A-1 at Article V

[17] JTX-474 at Article VI; JTX-1 [D.I. 4107], Ex.A-1 at Article VI

opt out of the TDP and pursue the claim in the tort system against the Settlement Trust[18]; and

- A claimant could opt for an Expedited Distribution to resolve the claim.[19]

23. The Debtors filed the May 2021 TDP as a standalone exhibit to the Plan on May 16, 2021.[20]

24. On May 12, 2021[21] and May 14, 2021[22], the Debtors provided the Coalition and the FCR with an updated draft of the TDP; at that time, the Debtors were in general negotiations with those stakeholders regarding a potential resolution. But the May 2021 TDP did not incorporate any specific comments from the Coalition or the FCR.

**C.      The Initial Negotiations over the TDP**

25. The Debtors provided the Coalition and FCR multiple versions of the TDP, including both the April 2021 TDP and the May 2021 TDP, and the parties began exchanging redline revisions between May 26, 2021 and July 2, 2021. The Debtors also began negotiating with the TCC in early-June 2021. As a result of the negotiations and resolution with these constituencies, the Debtors filed the third iteration of the TDP on June 18, 2021 (the "June 2021 TDP")[23] and the fourth iteration of the TDP on July 2, 2021 (the "July 2021 TDP").[24]

---

[18] JTX 474 at Article 5.6; JTX-1 [D.I. 4107], Ex.A-1 at Article 10.1

[19] JTX 474 at Article 3.2; JTX-1 [D.I. 4107], Ex. A-1 at Article 3.1.

[20] JTX-1 [D.I. 4107] (May 2021 TDP).

[21] JTX-481 is a true and correct copy of an email dated May 12, 2021 from Jessica Lauria to Eric Goodman and others. JTX-482 is a true and correct copy of an attachment to JTX-481.

[22] JTX-485 is a true and correct copy of an email dated May 14, 2021 from Matthew Linder to Robert Brady and others. JTX-486 is a true and correct copy of an attachment to JTX -485

[23] JTX-1-416 is a copy of the Third Amended Chapter 11 Plan of Reorganization, which includes the June 2021 TDP. JTX-1 [D.I. 5372] includes a redline of showing the revisions made in the June 2021 TDP.

[24] JTX-1-163 is a copy of the Fourth Amended Chapter 11 Plan of Reorganization, which includes the July 2021 TDP. JTX-1 [D.I. 5486] includes a redline of showing the revisions made in the July 2021 TDP.

### 1.    The Preservation of the Rights of the Non-Settling Insurance Companies.

26.    During the negotiations of the TDP, the Debtors sought to protect the rights and interests of the Non-Settling Insurance Companies.  This ultimately culminated in Article V.C and Article X of the Operative TDP.  The language in Article V.C of the Operative TDP and Article X of the Operative TDP (with one minor exception) was finalized with the filing of the June 2021 TDP.

### a)    Negotiation of Article V.C of the TDP.

27.    On May 26, 2021, the Coalition provided the Debtors with its redline to the TDP.[25] This redline was based on the May 12, 2021 TDP that the Debtors had provided to the Coalition.

28.    The Coalition's May 26, 2021 redline included, among other things, a provision in Article V of the TDP (then captioned the "No Modification to Insurance Policies") that stated:

> The Insurance Policies have been assumed and assigned to the Settlement Trust *cum onere*.  Nothing in these [TDP] shall be interpreted as modifying the terms of any Insurance Policies.

29.    After reviewing the Coalition's redline that was sent to the Debtors on May 26, 2021, the Debtors responded with their own redline on May 28, 2021.[26]  With respect to Article V of the TDP, the Debtors provided the following language in Article V to reinforce that the TDP would not prejudice any rights of any Non-Settling Insurance Companies, to the extent any such rights existed:

> The BSA Insurance Policies have been assumed by the Debtors and assigned to the Settlement Trust *cum onere,* and the Settlement Trust has received assignment of other rights and obligations under other Insurance Policies from certain Protected Parties *cum onere*. Nothing in these [TDP] shall modify, amend, or supplement, or be

---

[25] JTX-501 is a true and correct copy of an email dated May 26, 2021 from Eric Goodman to Jessica Lauria and others.  JTX-502 is a true and correct copy of an attachment to JTX-501.

[26] JTX-505 is a true and correct copy of an email dated May 28, 2021 to Eric Goodman and others.  JTX-507 is a true and correct copy of an attachment to JTX-505.

interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy assigned to the Settlement Trust.  Pursuant to the terms of the Plan and the Confirmation Order, the Settlement Trust shall assume all rights and obligations of the Debtors under each BSA Insurance Policy and shall abide by all contractual legal and equitable rights the Non-Settling Insurance Companies have under the applicable Insurance Policies.[27]

30.    Because of the more protective language in Article V of the TDP, the Debtors felt comfortable editing and revising other sections of the TDP relating to the rights of the Non-Settling Insurance Companies.   Nevertheless, the Debtors included "belts-and-suspenders" language throughout the TDP that stated: "any such allowance by the Settlement Trustee shall be subject to any contractual, legal, and equitable rights the Non-Settling Insurance Companies have under the applicable Insurance Policies," or language to a similar effect.[28]  I inserted this language out of an abundance of caution and in an effort to assuage any concerns of the Non-Settling Insurance Companies that the TDP were impacting their contractual rights, to the extent they existed.

31.    This "belts-and-suspenders" language was ultimately deleted in future drafts of the TDP.   The other attorneys involved in the negotiations of the TDP (including attorneys representing the Debtors) found this language to be confusing and arguably ambiguous in light of the general protection afforded to the Non-Settling Insurance Companies under Article V.C.[29] After further consideration, I agreed with the general consensus that this addition was unnecessary. Rather than try to identify any and all provisions that related to any rights purportedly held by Non-Settling Insurance Companies, I concluded that the broad general protections in Article V.C would be clearer, less ambiguous, and protected the interests of the Non-Settling Insurance Companies, and thus agreed to the removal of that language.

---

[27] JTX 507, at Article V.D.

[28] JTX-507, at Article I.A., I.B., V.D., VI.C, VI.E, VI.F, and VI.G.

[29] JTX-1-416 (June 2021 TDP).

32.     On June 1, 2021[30] and June 7, 2021[31], the Debtors received additional redline revisions to the TDP from the Coalition.  The Coalition's June 7, 2021 redline deleted some of the language that was in Article V of the Debtors' May 28, 2021 draft.  The table below shows a comparison of the Debtors' and Coalition's respective language:

| Debtors' May 28, 2021 Draft | Coalition's June 7, 2021 Draft |
| --- | --- |
| No Modifications of Insurance Policies | Assignment of Insurance Rights |
| The BSA Insurance Policies have been assumed by the Debtors and assigned to the Settlement Trust *cum onere*, and the Settlement Trust has received assignment of other rights and obligations under other Insurance Policies from certain Protected Parties *cum onere*.  Nothing in these [TDP] shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy assigned to the Settlement Trust. Pursuant to the terms of the Plan and the Confirmation Order, the Settlement Trust shall assume all rights and obligations of the Debtors under each BSA Insurance Policy and shall abide by all contractual legal and equitable rights the Non-Settling Insurance Companies have under the applicable Insurance Policies. | The BSA insurance rights have been assigned to the Settlement Trust in accordance with the bankruptcy Code and pursuant to the Confirmation Order, and the Settlement Trust has received an assignment of other rights and obligations under other Insurance Policies from certain Protected Parties. |

33.     The Debtors also received a redline from the TCC on June 8, 2021.[32]  The Debtors responded to the Coalition's June revisions on June 8, 2021 and reinserted additional protective language into Article V.C of the TDP.  This language stated:

> The BSA Insurance Policies and the rights and obligations of certain
> Protected Parties have been assigned to the Settlement Trust *cum*

---

[30] JTX-517 is a true and correct copy of an email dated May 31, 2021 from Eric Goodman to Jessica Lauria and others.  JTX-518 is a true and correct copy of an attachment to JTX-517.

[31] JTX-526 is a true and correct copy of an email dated June 7, 2021 from Eric Goodman to Michael Andolina and others. JTX-527 is a true and correct copy of an attachment to JTX-527.

[32] JTX-532 is a true and correct copy of an email dated June 8, 2021 from Rob Orgel to Jessica Lauria and others. JTX-533 is a true and correct copy of an attachment to JTX-532.

*onere* in accordance with the Bankruptcy Code and pursuant to the Confirmation Order. Nothing in these [TDP] shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing the terms of any Insurance Policy or rights and obligations under an Insurance Policy assigned to the Settlement Trust. Furthermore, to the extent that an Insurer has any contractual, legal, or equitable rights related to the performance of or the applicability of any specific provision of the [TDP], the Non-Settling Insurance Companies contractual, legal, or equitable rights are expressly preserved and in no way modified, amended, supplemented, or altered.

34.     In a June 9, 2021 redline, the Coalition once again deleted this language, which was unacceptable to the Debtors.[33]  However, the Coalition subsequently provided the Debtors with another redline on June 10, 2021.[34]  The June 10, 2021 redline included more robust language protecting insurers' rights:

> … Nothing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under any Insurance Policy assigned to the Settlement Trust to the extent that such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order.  The rights and obligations, if any, of any Non-Settling Insurance Companies relating to or arising out of the TDP, or any provisions thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

35.     The Debtors believed that this language proposed by the Coalition was sufficient to protect any rights of the Non-Settling Insurance Companies, and did so to the same extent as in the Debtors' draft TDP circulated on May 28, 2021 and June 8, 2021.  Accordingly, the proposed language was ultimately was incorporated into each subsequent iteration of the TDP filed by the Debtors.

---

[33] JTX-536 is a true and correct copy of an email dated June 9, 2021 from Eric Goodman to Michael Andolina and others.  JTX-537 is a true and correct copy of an attachment to JTX-536.

[34] JTX-538 is a true and correct copy of an email dated June 10, 2021 from Eric Goodman to Michael Andolina and others.  JTX-539 is a true and correct copy of an attachment  to JTX-538.

36.     The Debtors would subsequently add additional language to Article V, and this language provided clarity with respect to the protections of the Non-Settling Insurance Companies and the treatment of self-insured retentions and retrospective premiums under the policies and applicable law.  Specifically, on September 28, 2021, the Debtors filed the following language in Article V.C of the TDP to clarify the Settlement Trust's obligations with respect to the self-insured retentions and retrospective premiums:

> Notwithstanding the foregoing, the Settlement Trust shall satisfy, to the extent required under the relevant policies and applicable law, any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies.  In the event that a Non-Settling Insurance Company pays such self-insured retention and is entitled to reimbursement from the Settlement Trust under applicable law, such Non-Settling Insurance Company shall receive that reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim.[35]

37.     The Debtors later came to understand that certain Non-Settling Insurance Companies believed that the Debtors were attempting to force insurance companies to pay self-insured retentions.  This was never the Debtors' intention.  Therefore, to clarify the point, the Debtors also agreed to include additional protective language in Article V.C of the TDP:

> Nothing herein shall obligate any Non-Settling Insurance Company to advance any self-insured retention, unless otherwise required by law.[36]

---

[35] JTX-1-423 is a copy of the Modified Fifth Amended Chapter 11 Plan of Reorganization, which includes the September 28, 2021 TDP at Exhibit 1.

[36] JTX-1-353 (Operative TDP).  JTX-1 [D.I. 8814] includes a redline showing the revisions made in the Operative TDP.

### b)     Article X of the TDP

38.     In addition to Article V.C of the various iterations of the TDP, the Debtors also sought to protect the remedies of the Non-Settling Insurance Companies through what came to be Article X of the TDP.

39.     The predecessor to Article X of the Operative TDP (Rights of Settlement Trust Against Non-Settling Insurance Companies) was Article IX (Presentment of Insured Abuse Claims to Non-Settling Insurance Companies for Payment) in the Debtors' May 28, 2021 redline to the Coalition.[37]  Similar provisions were also included in the April 2021 TDP and the May 2021 TDP. This provision contemplated that the Settlement Trustee would follow a "presentment" process. Under this procedure, the Settlement Trust would first determine whether an Abuse Claim was an Insured Abuse Claim.[38]  Then, the Settlement Trust would present the Insured Abuse Claim to the Non-Settling Insurance Company for indemnification pursuant to the terms and conditions of the applicable insurance policy.[39]  The Non-Settling Insurance Company would then have a period of time to accept or decline the indemnification request for that Insured Abuse Claim.[40]  If accepted, the Non-Settling Insurance Company would indemnify the Settlement Trust for the claim.[41]  If rejected, the Settlement Trust was authorized to commence coverage litigation against the Non-Settling Insurance Company for the claim.[42]

---

[37] JTX-505 is a true and correct copy of an email dated May 28, 2021 to Eric Goodman and others.  JTX-506 is a true and correct copy of an attachment to JTX-505.

[38] JTX Ex-1 [D.I. 4107] (May 2021 TDP), at Article 4.1.

[39] JTX Ex-1 [D.I. 4107] (May 2021 TDP), at Article 4.1.

[40] JTX Ex-1 [D.I. 4107] (May 2021 TDP), at Article 4.2.

[41] JTX Ex-1 [D.I. 4107] (May 2021 TDP), at Article 4.3.

[42] JTX Ex-1 [D.I. 4107] (May 2021 TDP), at Article 4.3, Article VIII.

40.     In a June 1, 2021 redline, the Coalition proposed deleting this "presentment process."[43]  Rather than mandating the Settlement Trustee follow any specific procedure with respect to presenting an Abuse Claim to a Non-Settling Insurance Company, the Coalition proposed the following language to allow the Settlement Trust to pursue any assigned rights against the Non-Settling Insurance Companies pursuant to the insurance policies and applicable law:

ARTICLE IX

RIGHTS OF SETTLEMENT TRUST AGAINST
NON-SETTLING INSURANCE COMPANIES

> Pursuant to the Plan, the Settlement Trust will take assignment of BSA's rights and obligations under the Insurance Policies.  For any Abuse Claim that the Settlement Trustee determined is an Allowed Abuse Claim pursuant to Article VI above, the Settlement Trustee will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials obtained through the Cooperation of Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "Insured Abuse Claim."  The Settlement Trustee may determine that multiple Non-Settling Insurance Companies have responsibility for an Insured Abuse Claim.   The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law.  The Settlement Trustee shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of the Abuse Claims.  The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust.[44]

---

[43] JTX-517 is a true and correct copy of an email dated June 1, 2021 from Eric Goodman to Jessica Lauria and others.  JTX-518 is a true and correct copy of an attachment to JTX-517.

[44] JTX-518, at Article X.

41.    On June 8, 2021, the Debtors accepted this proposed revision to what is now Article X of the TDP, subject to some minor revisions intended to incorporate the assignment of the rights of any Protected Parties to the extent provided for in the Plan.[45]  This version of Article X confirmed that the Settlement Trustee's reimbursement would be "pursuant to the Insurance Policies and applicable law."[46]  Given that all of the rights of the Non-Settling Insurance Companies were preserved under Article V.C, and that any reimbursement action would be "pursuant to the Insurance Policies and applicable law," the Debtors believed that the remedies of the Non-Settling Insurance Companies had been protected.  It was our intention to preserve the rights of the insurers, and we believe that, taken together, Article V.C and Article X of the TDP preserved the Non-Settling Insurance Companies rights and remedies under their policies, to the extent that any exist.

### 2.    The Emulation of the BSA's Prepetition Practices

42.    Additional negotiations occurred with respect to other aspects of the TDP between May 26, 2021 (when the Coalition provided its first set of redlines) and July 2, 2021 (when the Debtors filed the July 2021 TDP).  The Debtors consulted with Ogletree to the extent that the revision addressed the General Criteria or the type of Scaling Factors that would be considered and Bates White to the extent that the revision addressed claim valuation to ensure that the TDP remained consistent with the BSA's historical settlement practices.

43.    For example, in a draft dated June 15, 2021, the Coalition proposed treating the statute of limitations as a mitigating factor, rather than as one of the Initial Evaluation Criteria.[47]

---

[45] JTX-529 is a true and correct copy of an email dated June 8, 2021 from Matthew Linder to David Molton and others.  JTX-530 is a true and correct copy of an attachment to JTX-529.

[46] JTX-530, at Article X.

[47] JTX-804 is a true and correct copy of a redline proposed by the Coalition on June 15, 2021.

The Debtors consulted with Ogletree regarding their prepetition practices involving claims that implicated potential statute of limitations defenses.  Although Ogletree indicated that few claims subject to statute of limitations defenses are actually brought, when the claims are brought the BSA typically used the defense to negotiate a reduced settlement amount, *i.e.,* as a mitigating factor.  The Debtors ultimately incorporated this change because the treatment of a potential statute of limitation defense as a mitigating factor was consistent with the BSA's prepetition practices.[48]

44.     Similarly, the Debtors originally proposed an Expedited Distribution of $1,500 in the June 2021 TDP.[49]  The Coalition subsequently suggested that the Expedited Distribution should be increased to $3,500 which the Debtors accepted after consulting with Ogletree over whether to make the revision.[50]  The Debtors concluded that agreeing to a $3,500 expedited distribution was economically rational because Ogletree indicated that the BSA would have settled any sexual abuse claim on a prepetition basis for $3,500 if the claimant provided the information required in the Proof of Claim Form.  Notably, Ogletree stated that the cost of defending against a sexual abuse claim would exceed $3,500 given the fees of Ogletree and the local defense counsel.  Therefore, the Debtors concluded that the increase in value of the Expedited Distribution to $3,500 was appropriate.

### 3.     Outreach to the Insurance Companies

45.     Prior to filing the July 2021 TDP, the Debtors notified their insurers outside of the mediation context that the Debtors had been engaged in negotiations with the Coalition and the

---

[48] JTX-1-416 (June 2021 TDP), at Article VI.

[49] JTX-1-416 (June 2021 TDP), at Article VI.A.

[50] JTX 577 is a true and correct copy of an email dated June 25, 2021 from Andrew O'Neill to Eric Goodman and others. JTX-578 is an attachment to JTX-577.

FCR regarding a potential resolution.[51]  The Debtors noted that no deal was finalized and provided the insurers with a draft Restructuring Support Agreement, a draft term sheet, and a draft of the TDP.[52]  In this letter, the Debtors informed the insurers that the terms of these documents constituted a reasonable settlement offer and, if incorporated, would provide the BSA with an avenue to achieving its restructuring objective, successfully exit the Chapter 11 Cases, and preserve the rights of the insurers.[53]  The Debtors requested any comments from the insurers by June 28, 2021.[54]

46.    The Debtors did not receive any revisions or comments to the TDP by June 28, 2021.  Instead, on June 28, 2021, the Debtors received emails from various insurance companies objecting to the TDP.[55]  Notwithstanding the negotiations that the Debtors had been engaged in, the insurers charged, without basis, that  the Debtors with improperly colluding with the Coalition and the FCR (even though the Debtors were providing the insurers with the opportunity to provide constructive comments to the TDP) and threatened the Debtors with multi-year litigation.  No constructive comments to the TDP were provided.

47.    In the Debtors' view, the insurers were not willing to engage constructively to seek a mutually agreeable resolution with any sort of creditor support.  Accordingly, the Debtors proceeded to continue their good faith negotiations with the Coalition and FCR, the parties that would constructively engage.

---

[51] JTX-572 is a true and correct copy of a letter dated June 25, 2021 from Ernest Martin to certain counsel for the BSA's insurance companies.

[52] JTX-572.

[53] JTX-572

[54] JTX-572.

[55] JTX-659 is a true and correct copy of an email string dated June 30, 2021 from Ernest Martin to Michael Rosenthal and certain counsel for the BSA's insurance companies.

**D.      The Subsequent Revisions to the TDP: July 2021 to September 2021.**

48.      After filing the July 2021 TDP, the Debtors engaged in further negotiations regarding the TDP at arm's-length and in good faith.  On September 15, 2021, the Debtors filed a new iteration of the TDP (the "September 15, 2021 TDP") that changed the treatment of Indirect Abuse Claims.[56]

49.      The Debtors filed another iteration of the TDP on September 28, 2021 (the "September 28, 2021 TDP").[57]  In this version, the Debtors expressly provided more detail regarding the treatment of self-insured retentions under the TDP in an effort to satisfy the objection from certain Non-Settling Insurance Companies, specifically stating that no Non-Settling Insurance Company would be required to advance any self-insured retention unless otherwise required by law.[58]  This iteration of the TDP also provided for less favorable treatment for the statute of limitations in Pennsylvania, downgrading it from a Gray 1 state (which involved a .50-.70 mitigating factor) to a Gray 2 state (which involved a .30-.45 mitigating factor), because such treatment was consistent with input received from Ogletree.[59]

**E.      The Final Revisions to the TDP: January 2022 to February 2022.**

**1.      Revisions to the TDP**

50.      A consistent objection by certain Non-Settling Insurance Companies to the TDP was that the TDP did not expressly require showing of negligence in the General Criteria, (*i.e.*, the initial evaluation by the Settlement Trustee regarding the validity of a claim).  The Debtors' view

---

[56] JTX 1-418 is a copy of the Fifth Amended Chapter 11 Plan of Reorganization, which includes the September 15, 2021 TDP.

[57] JTX 1-423 is a copy of the Modified Fifth Amended Chapter 11 Plan of Reorganization, which includes the September 28, 2021 TDP.

[58] JTX-1-423 (September 28, 2021 TDP), at Article V.C.

[59] JTX-1-423 (September 28, 2021 TDP), at Schedule 1 (Statute of Limitations Table).

was that the showing of negligence was subsumed by the General Criteria.  In other words, if the Settlement Trustee found each of the General Criteria was met by a preponderance of the evidence, that was sufficient to establish potential liability on the part of an organizational defendant.

51.    Nonetheless, in response to the objections filed by certain Non-Settling Insurance Companies, the Debtors resumed negotiations with the Coalition, FCR and the TCC concerning this issue.  After extensive negotiations with the Coalition, FCR, and TCC, the parties agreed to revise the General Criteria to make clear that the General Criteria required a showing of legal responsibility by either the BSA, a Local Council, or a Chartered Organization from a Scouting-related activity.[60]  Specifically, General Condition (c) of the General Criteria was revised as follows:

| **Solicitation TDP (September 30, 2021)** | **Operative TDP (February 15, 2022)** |
| --- | --- |
| Connection to Scouting.  The Abuse Claimant has provided information showing (or the Settlement Trustee otherwise determines) that the Abuse Claimant was abused during a Scouting activity or that the Abuse resulted from involvement in Scouting Activities. | Connection to Scouting.  The Abuse Claimant has provided information showing (or the Settlement Trustee otherwise determines) (i) that the Abuse Claimant was abused during a Scouting activity or that the Abuse resulted from involvement in Scouting Activities, and (ii) that a Protected Party **may bear legal responsibility**; |

52.    The Debtors also agreed to revise one of the aggravating criteria in connection with the objections raised by certain Non-Settling Insurance Companies.[61]  Under the aggravating criteria for "Abuser Profile," the Solicitation TDP provided "1.25 to 2.0 if there is evidence of negligence of a Protected Party (*e.g.*, the inclusion of the perpetrator in the IV File (Volunteer Screening Database) for abuse reasons.)"[62]

---

[60] JTX-1 (D.I. 8814) (Redline of Operative TDP) at Article VII.C.2.(c).

[61] JTX-1 (D.I. 8814) (Redline of Operative TDP) at Article VIII.C.2.

[62] JTX-1 (D.I. 8814) (Redline of Operative TDP) at Article VIII.C.2.

53.     The Debtors understood and intended that this aggravating criteria was to apply to special circumstances where the BSA had or should have had particularized notice of the abuse, such as if the alleged abuser was in the VSD files at the time the abuse occurred.  The Non-Settling Insurance Companies contended this was the only place in the TDP that required a showing of negligence.  To address the concerns stated by the Non-Settling Insurance Companies, the Debtors revised this provision as well for the Operative TDP as follows:

| Solicitation TDP (September 30, 2021) | Operative TDP (February 14, 2022) |
|---|---|
| 1.25 to 2.0 if there is evidence of negligence of a Protected Party (e.g., the inclusion of the perpetrator in the IV File (Volunteer Screening Database) for abuse reasons.) | 1.25 to 2.0 if there is evidence that the Protected Party knew or should have known (i) the abuser had previously committed or may commit Abuse and failed to take reasonable steps to protect the survivor from that damage, or (ii) of the prior Abuse of the foreseeability of the risk of Abuse and failed to take reasonable steps to protect the survivor from that danger. |

### 2.     Independent Review Option

54.     Toward the end of January 2022, the Debtors engaged in further negotiations with the Coalition, the FCR, the TCC and other attorneys representing the interests of abuse claimants. Certain parties representing claimants had objected to the application of the $2.7 million maximum value cap to the TDP when the Debtors had settled particularly egregious claims on a prepetition basis for amounts in excess of that figure.

55.     The Debtors engaged in arm's-length, mediated negotiations between January 25, 2022 and February 14, 2022, which led to the creation of the Independent Review Option.[63]  The Debtors recognized that an Independent Review Option may be an appropriate concept to include into the TDP because the Debtors did have a prepetition history of settling egregious claims for

---

[63] JTX-1-353 (Operative TDP), Article XIII.

more than $2.7 million.  The Independent Review Option contemplates recoveries above the values stated in the TDP (with any amounts above 5x subordinated to payment of all Abuse Claims).[64]

56.    The Debtors also ensured that the Independent Review Option's procedure was consistent with the BSA's prepetition practices.  First, the Independent Review Option contemplated more significant, mandatory discovery than other claims administered under the TDP.[65]  This was consistent with the BSA's prepetition practices, where higher-value claims were more aggressively litigated and where the BSA would require stronger corroborating evidence to support a higher settlement value.[66]

57.    Second, the Independent Review Option required more direct participation by the Non-Settling Insurance Companies, including with respect to the Neutral formulating the Settlement Recommendation.[67]  The Independent Review Option expressly provides for direct participation rights of an insurance company if such rights are available under the terms of their policies.

58.    Finally, the Debtors ensured that any claims resolved through the Independent Review Option would be treated as a settlement, rather than as a confirmed judgment.[68]  Earlier iterations required that the award be accompanied by stipulations for judgment.[69]  Prior to the Petition Date, the BSA did not agree to confirmed judgments as part of their settlement practices. Accordingly, the Debtors refused to accede to this proposal, and ensured that claims resolved

---

[64] JTX-1-353 (Operative TDP), Article XIII.A.

[65] JTX-1-353 (Operative TDP), Article XIII.G.(vii).

[66] JTX-1-353 (Operative TDP), Article XIII.G.(vii).

[67] JTX-1-353 (Operative TDP), Article XIII.K.

[68] JTX-1-353 (Operative TDP), Article XIII.A.

[69] JTX-1196 is a true and correct copy of an email dated January 25, 2021 from Tim Gallagher to Eric Goodman and others.  JTX-1197 is a true and correct copy of an attachment to JTX-1196.

through the Independent Review Option would not be reduced to a judgment.  Because the claim would be resolved as a settlement instead of a confirmed judgment, this meant that the Neutral's settlement recommendation would have be to be reviewed and either accepted or rejected by the Settlement Trustee, which provided an additional procedural safeguard with respect to the Independent Review Option.

### III.    Selection of the Settlement Trustee and Claim Administrators

59.    The Debtors were amenable to the appointment of any Settlement Trustee, so long as the Settlement Trustee was qualified and could faithfully exercise his or her fiduciary duties.

60.    Eventually, the Coalition and the TCC agreed to propose either former Judge Barbara Houser or former Judge David Levi as the Settlement Trustee.  The Debtors participated in interviews with both former Judge Houser and former Judge Levi to assess their qualifications as Settlement Trustee.  The Debtors found both former Judge Houser and former Judge Levi to be very well qualified for the position as Settlement Trustee.

61.    Because the Coalition and TCC could not get the supermajority vote required to choose between two acceptable options, the Debtors proposed former Judge Houser as the Settlement Trustee because she garnered the majority of the votes from the STAC.

62.    Additionally, the proposed Claims Administrators in the Plan are former Judge Michael Reagan (for the Independent Review Option) and former Judge Diane Welsh (for the claims otherwise administered under the TDP).  As with the Settlement Trustee, the Debtors were satisfied with the qualifications of the proposed Claims Administrators.

### IV.    Negotiation of the Document Appendix

63.    The Debtors also engaged in good faith, arm's-length negotiations with the Coalition, FCR, TCC, Settling Insurers, Ad Hoc Committee of Local Councils, and certain

Chartered Organizations relating to the Document Appendix, which was filed on February 15, 2022.[70]

64.    The Document Appendix was negotiated with the aims of (a) providing the Settlement Trustee with information to evaluate the validity and value of sexual abuse claims based on prepetition practices  to assist the Settlement Trustee's fiduciary duties, (b) providing a means for claimants to secure information from the BSA commensurate with the information that was available through discovery in the tort system, and (c) incorporating adequate guardrails to protect against the disclosure of privileged or otherwise protected or confidential information that was unavailable to claimants in prepetition litigation.

65.    The Debtors believe that the Document Appendix accomplishes these goals.  The Document Appendix provides the Settlement Trustee with all necessary information, including privileged information, to fulfill her duties as Settlement Trustee.  This allows the Settlement Trustee to perform an investigation similar to the investigation that the BSA and its counsel would perform prepetition by consulting the BSA's records and other available information.  The Document Appendix includes strict confidentiality requirements and prohibits the disclosure of any privileged materials to the claimants.[71]  And just as underlying claimants can access documents from the Debtors and the Local Councils in discovery in the tort system, the Document Appendix provides a reasonable avenue for underlying claimants to obtain non-privileged information relating to their Abuse Claim.[72]

---

[70] JTX-1-354, Section D-1 includes a copy of the Document Appendix.

[71] JTX-1-354 (Document Appendix), at Sections 14 and 15.

[72] JTX-1-354, at Section 13.

## V.     GSUSA Insurance Coverage

66.     I also understand that GSUSA asserts that the Plan unfairly discriminates against GSUSA's claim in Class 7 (Non-Abuse Litigation Claims) because it limits their maximum recovery and does not provide assurances that its claims are entitled to full coverage under the applicable insurance policies.  Under the Plan, each holder of a Class 7 Claim has a right to recover the full amount of its allowed claim against applicable insurance.  The Debtors believe that all Non-Abuse Litigation Claims, including the GSUSA's Class 7 Claim, may trigger coverage under one or more applicable policies. While the Debtors believe there may be insurance coverage if GSUSA were awarded damages, the Debtors also believe the underlying litigation involving GSUSA is likely to be dismissed.  Therefore, the GSUSA's Class 7 Claim will not implicate insurance coverage in any way and will not be subject to recovery under the Plan.[73]

*[Remainder of Page Intentionally Left Blank]*

---

[73] While litigation remains pending, the U.S. District Court for the Southern District of New York has suggested that it is likely to rule in favor of the BSA with respect to this matter. *Girl Scouts of the United States of America v. Boy Scouts of America*, No. 1:18-cv-10287 (S.D.N.Y. Nov 06, 2018), Sept. 15, 2021 Hr'g Tr. 25: 15-25 (District Court stated in its "temporary findings" that "that there has not been . . . created a likelihood of confusion by the Boy Scouts with respect to using Scouts BSA or Scouts . . ."); *see also Girl Scouts of the United States of America v. Boy Scouts of America*, No. 1:18-cv-10287 (S.D.N.Y. Nov 06, 2018), Sept. 15, 2021 Hr'g Tr. 15:17-19 (statement from the District Court that "[GSUSA] can't prevent the Boy Scouts from becoming co-ed and [GSUSA] can't prevent them from adopting a name that describes their new activity").  The District Court has not yet entered its written judgment.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed this 12th day of March, 2022

*/s/ Adrian Azer*
Adrian Azer