## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF WILLIAM S. SUGDEN IN SUPPORT OF CONFIRMATION OF THE THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

I, William S. Sugden, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare that the following is true and correct to the best of my knowledge and belief:

1.       I submit this declaration ("**Declaration**") in support of the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 8813] (the "**Plan**"), and in conjunction with *Debtors' (I) Memorandum of Law in Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114] and the *Statement of the Ad Hoc Committee of Local Councils in Support of Confirmation of the BSA's Plan of Reorganization* [D.I. 9098] (the "**Statement**").[2]

2.       This Declaration sets forth my testimony regarding certain topics related to the work of the Ad Hoc Committee of Local Councils (the "**Ad Hoc Committee**") in connection with

---

[1]       The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]       All terms that are capitalized but not otherwise defined herein shall have the meaning ascribed to such terms in the Statement or in the Plan.

these chapter 11 cases, including in particular:

a. The relationship between Local Councils and the Boy Scouts of America national organization (the "***National BSA***");

b. The formation and operations of the Ad Hoc Committee;

c. The objectives of the Ad Hoc Committee and its role in connection with these bankruptcy proceedings;

d. The Ad Hoc Committee's role in negotiating the Local Council Settlement Contribution, including its interactions with Local Councils and the development of the Ad Hoc Committee's "Formula," which is used to allocate the direct financial contribution component of the Local Council Settlement Contribution among Local Councils;

e. The Ad Hoc Committee's role in negotiating the interrelated settlements under the Plan with the key constituencies in the chapter 11 cases, including: (a) the Settling Insurance Companies, (b) the United Methodist Entities, (c) TCJC, and (d) the Tort Claimants' Committee, FCR, the Coalition of Abused Scouts for Justice (the "***Coalition***") and a supermajority of state court counsel representing holders of Abuse Claims;

f. The results of the Ad Hoc Committee's efforts to solicit contributions from each Local Council to fund the Local Council Settlement Contribution;

g. The Plan's proposed releases of Local Councils, Chartered Organizations, and their Representatives; and

h. The Ad Hoc Committee's role in helping National BSA to evolve its youth protection

measures, as incorporated in the Plan.

3.      Unless stated otherwise, my statements in this Declaration are based upon my

personal knowledge and my review of relevant documents.  If requested, I am able to testify

competently live to the facts set forth in this Declaration. The following exhibits, which I

reference in the paragraphs below, are made part of my Declaration:

| JTX#[3] | Description | Bates Beginning # |
|---|---|---|
| 7-3 | Atlanta Area Council 2020 Charter Renewal [6.7.6.31_092 Atlanta Area SR A9 2020 LCCR.pdf] | N.A. |
| 1799 | December 15, 2021 AHCLC Formula Summary (Insurers TX[4] # 249 – Sugden Deposition Exhibit 23) | BSA_AHCLC_00058868 |
| 1800 | February 11, 2021 AHCLC Formula Summary (Insurers TX # 249 – Sugden Deposition Exhibit 24) | BSA_AHCLC_00058923 |
| 475 | May 6, 2021 AHCLC Formula Summary | BSA_AHCLC_00058882 |
| 554 | June 18, 2021 AHCLC Formula Summary | BSA_AHCLC_00058890 |
| 1473 | June 2021 AHCLC Formula Spreadsheet | BSA_AHCLC_00058866 |
| 264 | Form of Annual Unit Charter Agreement – 2020 Printing | BSA-RSA_00001256 |
| 358 | Form of Annual Charter Agreement – January 2021 | BSA-PLAN_02887493 |
| 1442 | Form of Annual Charter Agreement – January 2021 Update | BSA-PLAN_02887493 |

**Personal Background**

4.      I am a Partner at Alston & Bird LLP in the Financial Restructuring &

Reorganization Group.  I joined Alston & Bird LLP in the Atlanta Office as an associate in 2003

---

[3]      Joint Trial Exhibit List.  I understand that the Joint Trial Exhibit List was delivered to the Court by the Debtors.

[4]      Notice of Filing of Certain Insurers' Exhibit List in Connection with Confirmation Hearing [D.I. 9199].

and have remained at the firm since.  Before joining Alston & Bird LLP, I received my J.D. and

M.B.A. degrees from Vanderbilt University, and a B.A. from Kenyon College.  I am a member

in good standing of the State Bar of Georgia.

5.      In my practice at Alston & Bird LLP, I regularly represent parties in connection

with bankruptcy proceedings.  My prior in-court bankruptcy representations include debtors,

bankruptcy trustees, creditors' committees and other fiduciaries, and creditors and indenture

trustees.  I also have substantial experience advising parties on insolvency-related issues in out-

of-court settings.  I am a member of the Bankruptcy Section of the Atlanta Bar Association, and

am a member of the Boards of Directors of the American Bankruptcy Institute and the

Association of Insolvency and Restructuring Advisors.

6.      I am the lead attorney for Alston & Bird LLP's *pro bono* representation of the

Atlanta Area Council in connection with these chapter 11 cases.  I have represented the Atlanta

Area Council since November 2019.  The Atlanta Area Council is a member of the Ad Hoc

Committee, which is a party to these chapter 11 cases, and I have represented the Atlanta Area

Council in connection with its participation on the Ad Hoc Committee since December 2019.

7.      Through my representation of the Atlanta Area Council, I have been involved in

substantially all of the business of the Ad Hoc Committee.  In that role, I have personally

attended virtually all Ad Hoc Committee meetings on behalf of the Atlanta Area Council.

Further, I have attended nearly all mediation sessions that the Ad Hoc Committee has

participated in during these cases, including numerous in-person sessions in New York, Chicago,

and Los Angeles from Spring 2021 through January 2022, as well as a virtual mediation session

that occurred in Miami in the Spring of 2021 and the dozens of virtual mediation sessions that

have occurred from Winter 2021 to March 2020.  I describe the business of the Ad Hoc Committee in more detail below.

8.       Additionally, I am the father to two children who are involved in Scouting.  My 13-year old is a Boy Scout, and my 9-year old is a Cub Scout.

9.       I was deposed in connection with these chapter 11 cases on November 30, 2021 as the designated Rule 30(b)(6) witness of the Ad Hoc Committee.

### Local Councils' Relationship to National BSA

10.       Scouting operates through a network of independent organizations that share a common charitable mission.  National BSA, following its Congressional charter, designs and maintains aspects of the Scouting program — setting the structure and content of the Scouting programs, owning and licensing BSA's intellectual property, setting merit badge requirements and membership qualifications, purchasing general liability insurance, and providing shared technical support, accounting, and other corporate services.  But many Scouts never interact with National BSA directly.  Instead, the tens of thousands of Scouting units nationwide — *e.g.*, "troops," "packs," and "dens" — are organized locally, through "Chartered Organizations" such as churches, schools, and civic associations, which are often colloquially referred to as Scouting's "partners."  Those Scouting units and their Chartered Organization partners are, in turn, supported by approximately 250 "Local Councils."  Local Councils receive charters from National BSA,[5] but are independent non-profit legal entities — incorporated under the laws of

---

[5]       A sample charter renewal from the Atlanta Area Council may be found in JTX# 7-3 [6.7.6.31_092 Atlanta Area SR A9 2020 LCCR.pdf].

their respective jurisdictions — with their own articles of incorporation, bylaws, boards, officers, and employees.

11.     Although legally separate, Local Councils and National BSA are closely interconnected.  Local Councils rely on National BSA to provide shared insurance, certain employee benefits, and other services.  National BSA relies on Local Councils for the bulk of its direct funding (via Scouts' membership fees and the sale of Scouting merchandise).  Local Councils also maintain relationships with both local Chartered Organizations and local donors. These relationships are vital to the success of Scouting, as they drive membership and provide essential funding.  Without a Local Council operating in a particular geographic region, National BSA would lose access to the resources necessary to operate Scouting units there.  Thus, if a Local Council were to dissolve or file for bankruptcy, it would be difficult for National BSA to reestablish the community ties necessary for a successful Scouting program.

### The Ad Hoc Committee's Formation and Operation

12.     The Ad Hoc Committee was formed by its Chair, Richard G. Mason, who was at the time the volunteer President of the Greater New York Councils, so that Local Councils would have a voice in connection with these bankruptcy proceedings.[6]  I understand that Mr. Mason was first approached by representatives of National BSA about the prospect of forming an ad hoc committee of Local Councils in late 2019.[7]

---

[6]     I understand that Mr. Mason's term as volunteer President of the Greater New York Councils has ended and he is now the volunteer Chair Emeritus.  I understand that Mr. Mason is an Eagle Scout, a partner in the law firm of Wachtell, Lipton, Rosen & Katz and Chair of the firm's Restructuring & Finance Department.

[7]     While representatives of National BSA initially suggested to Mr. Mason the idea of forming the Ad Hoc Committee, to the best of my knowledge, National BSA has never been involved in the affairs of the Ad Hoc Committee other than as expressly described in this Declaration.

13.      Eight Local Councils were asked to and ultimately did join the Ad Hoc Committee:  Andrew Jackson Council (Jackson, Mississippi), Atlanta Area Council (Atlanta, Georgia), Crossroads of America Council (Indianapolis, Indiana), Denver Area Council (Denver, Colorado), Grand Canyon Council (Phoenix, Arizona), Greater New York Councils (New York, New York), Mid-America Council (Omaha, Nebraska), and Minsi Trails Council (Allentown, Pennsylvania).  Those eight Local Councils form a broadly representative group of the approximately 250 Local Councils located throughout the United States in terms of geography, size, and potential exposure to Abuse Claims.  All eight of those Local Councils have remained members of the Ad Hoc Committee throughout these chapter 11 cases and through the date of this Declaration.

14.      Since its formation, the Ad Hoc Committee has conducted regular Zoom meetings (typically on a weekly basis) to discuss the status of the bankruptcy proceedings and the Ad Hoc Committee's efforts in connection with these proceedings.  I have personally attended almost all of those meetings.  The Ad Hoc Committee does not have formal bylaws, and instead generally operates through discussion and consensus.

15.      Although the Ad Hoc Committee is composed of only eight Local Councils, it aims to provide a voice for all Local Councils in connection with these proceedings.  To that end, the Ad Hoc Committee has executed joint defense agreements with all Local Councils, memorializing its common legal interests with them; maintains an email address through which Local Councils can communicate with the Ad Hoc Committee; has regularly solicited telephone calls and virtual meetings with representatives from various Local Councils; and has generally made itself available to answer questions.  In addition, the Ad Hoc Committee has, from January 2020 through February 2022, convened many virtual meetings open to all Local

Councils[8] to explain the status of these proceedings and solicit input (as I more fully describe below).

### The Ad Hoc Committee's Role in the Settlement Process and Development of the Formula

16.     The Ad Hoc Committee filed a notice of appearance in these cases on March 3, 2020.  *See Notice of Appearance* [D.I. 135].[9]  It retained Wachtell, Lipton, Rosen & Katz and DLA Piper, LLP (US), both on a *pro bono* basis, as its legal counsel in connection with these proceedings.

17.     The Ad Hoc Committee became a mediation party pursuant to this Court's Order on June 9, 2020.  *See Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 812].  It has participated in numerous mediation sessions since that date, and has sent representatives (frequently including myself) to attend substantially all mediation sessions, either in person or through Zoom.

18.     Through the mediation process, the Ad Hoc Committee has engaged extensively with the other mediation parties about a potential global settlement.  Local Councils have a vital interest in the outcome of these cases, given their shared mission with National BSA, and the Ad Hoc Committee has engaged on numerous issues related to the bankruptcy proceedings and the Plan.

---

[8]     Such meetings were only open to Local Councils that have signed the Joint Defense Agreement. However, I understand that all Local Councils had signed the Joint Defense Agreement shortly after the Petition Date; thus, all Local Councils were invited to nearly all of the meetings.

[9]     The Ad Hoc Committee has also filed a *Verified Statement* consistent with Bankruptcy Rule 2019 [D.I. 8893].

19.     A central focus for the Ad Hoc Committee has been the Local Council Settlement Contribution under the Plan.

20.     The Ad Hoc Committee played a unique role in negotiating the Local Council Settlement Contribution.  It interacted with both the individual Local Councils and the other mediation parties, enabling it to collect and consolidate input from both sources.  This included engaging with the other mediation parties to determine a form and amount of contribution that would garner support for a global settlement from key parties, in particular from abuse survivors and their representatives.  It also involved, simultaneously, engaging with all Local Councils and soliciting their input to assess the form and amount of a financial contribution that could be achieved.  Because of its dual-facing role, the Ad Hoc Committee was uniquely well-situated to negotiate a global resolution of these chapter 11 cases involving Local Councils.

A.     *Principles for Negotiation of the Local Council Settlement Contribution*

21.     Before turning to the systematic "Formula" that the Ad Hoc Committee developed in negotiating the Local Council Settlement Contribution, I will enumerate some basic principles that animated the Ad Hoc Committee's approach.  The amount of the Local Council Settlement Contribution needed to be broadly acceptable to the mediation parties, and in particular to the major claimant representatives.  By the same token, the Local Council Settlement Contribution needed to be financially achievable for the hundreds of Local Councils (numbering 253 as of the Petition Date).

22.     Each Local Council is an independent entity with its own board of directors and management.  Most are represented by their own legal counsel.  All have rights to shared insurance that must be settled as part of any global resolution.  And each Local Council is differently situated in terms of its financial position, the number and type of Abuse Claims it

may face in the tort system, and the statutes of limitation (among other things) that would apply to such Abuse Claims.

23.     As a result, the Ad Hoc Committee recognized that neither exclusively focusing on Local Councils that faced significant "in-statute" tort exposure, nor a series of one-off negotiations regarding each Local Council's potential contribution, offered any reasonable prospect of timely reaching a global settlement.  Focusing on more exposed Local Councils alone would not generate sufficient financial contributions to gain the support of the claimant representatives.  And no series of individual negotiations with some 250 Local Councils could be concluded on the timeframe within which the bankruptcy needed to proceed (if it would be achievable at all).

24.     Given these realities, limitations, and obstacles, the Ad Hoc Committee determined that the most appropriate way to approach the Local Council Settlement Contribution was through the development of a systematic formula (the "**Formula**") that would require each Local Council to contribute based on factors that, in the view of the Ad Hoc Committee, were relevant to equitably and appropriately divide the Local Council Settlement Contribution among Local Councils.  The development of the Formula involved thousands of hours of dialogue within the Ad Hoc Committee and with Local Councils to craft a mechanism that fairly allocates the Local Council Settlement Contribution and ensures the unanimous participation of Local Councils necessary to facilitate the contribution of Local Council insurance rights under the Plan.

25.     Through the development and use of the Formula, the Ad Hoc Committee sought to accomplish two goals in tandem.  *First*, the Formula was intended to allocate the total amount of the Local Council Settlement Contribution among Local Councils, rendering a contribution amount agreed upon with claimant representatives at least potentially achievable.  *Second*, the

Formula helped the Ad Hoc Committee assess the economic feasibility of different contribution levels for Local Councils, enabling it to communicate and negotiate with other mediation parties, including claimant representatives, about Local Councils' potential contributions to the Settlement Trust.

26.    The Ad Hoc Committee began development of the Formula in October 2020. From the outset, there were several key considerations that guided development of the Formula:

a.  *The Formula Needed to Garner the Maximum Possible Support for a Global Resolution among the Mediation Parties*:  At the time that the Ad Hoc Committee began developing the Formula, it was apparent that a significant direct financial contribution from Local Councils, in addition to contribution of their insurance rights, would be required to obtain the necessary voting support for a global resolution plan. The Formula needed to facilitate that support.

b.  *The Formula Needed to Generate a Substantial Contribution*:  Relatedly, in order to achieve survivor support and Court approval, the Formula needed to generate a substantial contribution from Local Councils.

c.  *The Formula Needed to Result in an Allocation that Had Unanimous (or Near-Unanimous) Support Among Local Councils*:  The Ad Hoc Committee believed that unanimous (or near-unanimous) Local Council support was needed for a global resolution because:

i.  All Local Councils are co-insureds under nearly all general commercial liability insurance policies purchased by the Debtors over the past 45 years; it was therefore essential that each Local Council agree to contribute its

insurance rights under the policies so that National BSA or the Settlement Trust could negotiate settlement agreements effectively with insurers regarding these policies.

ii.      Without a global resolution, the Ad Hoc Committee anticipated that the Pension Benefit Guaranty Corporation (the "***PBGC***") might assert that all Local Councils are jointly and severally liable for obligations under the Pension Plan sponsored by the Debtors (the "***Pension***").  Accordingly, any material non-participation by Local Councils that prevented global resolution could pose risks to all Local Councils related to potential termination of the Pension.

iii.     Much of National BSA's revenues come from Local Councils.  Non-participation by even a few Local Councils, and the associated risk that those Local Councils would later become economically unviable as a result of state tort litigation, would increase the economic pressure on the Reorganized BSA and remaining Local Councils, threatening their own financial viability.

iv.     Local Councils collectively share a common charitable mission with the Debtors: supporting the Scouting movement.  A resolution that does not preserve the national character of Scouting is likely to be viewed as a failure by both Local Councils and their donors, potentially reducing membership and donor participation in the future.

v.      Non-participation by even a few Local Councils could have a cascading effect where other Local Councils would "opt out" from a global settlement and instead elect to defend Abuse Claims in the tort system using shared

insurance. This is especially so because most Local Councils are located in

jurisdictions that have not enacted a "revival window" for lapsed statutes of

limitation (and, indeed, many Local Councils are located in jurisdictions

where the state constitution — and caselaw interpreting the state constitution

— would prevent revival of time-barred claims even if a revival window was

passed by the legislature). Additionally, those Local Councils do not have the

experience (and may never have the experience) of defending Abuse Claims

in the tort system. If Local Councils perceived that the Formula caused their

requested contribution to be substantially more than the likely costs of their

litigating in the tort system, there was a risk that a number of Local Councils

might "opt-out," preventing a feasible global settlement.

B.    _Specifics and Evolution of the Formula_

27.    In the following paragraphs, I describe the material pieces and evolution over

time of the Formula developed by the Ad Hoc Committee. As set forth in further detail below,

this was an iterative process that took place over many months, while the Ad Hoc Committee

was simultaneously negotiating with claimant representatives and soliciting feedback from Local

Councils. Although the Formula contains significant detail, in this Declaration, I aim to lay out

the key features of each iteration for the Court.[10] The Court may find it helpful to review

JTX# 554 [BSA_AHCLC_00058890], which contains the "final iteration" of the Formula.

---

[10]    I understand that the Ad Hoc Committee has produced both (1) decks describing each iteration of
the Formula discussed below in detail and (2) self-contained Excel spreadsheets showing all relevant data
and calculations underlying each iteration of the Formula discussed herein for which the Ad Hoc Committee
has such a spreadsheet.

(Otherwise, JTX# 1799 [BSA_AHCLC_00058868], JTX # 1800 [BSA_AHCLC_00058923], JTX# 475 [BSA_AHCLC_00058882], and JTX# 554 [BSA_AHCLC_00058890] — as noted in the footnotes — each contain the then-current status of the Formula at the dates outlined below.)[11]

> ### a.    First Formula Iteration — December 2020

28.    The Ad Hoc Committee presented the framework for the first iteration of the Formula to Local Councils on December 15, 2020.[12]  At the time, the Formula operated as follows:

a.    The Formula identified a target contribution level, which was to be negotiated with the claimant representatives (the "***Aggregate Target Contribution***").  The Aggregate Target Contribution represents the total contribution that would be provided by all Local Councils collectively.

b.    The Aggregate Target Contribution was then used to calculate a baseline contribution amount (the "***Average Local Council Contribution***"), which was the amount that each Local Council would pay if the Aggregate Target Contribution was allocated equally among each Local Council.

c.    The Formula then placed each Local Council into a different quintile for each of three factors, which factors the Ad Hoc Committee believed were key in assessing each Local Council's appropriate share of the Aggregate Target Contribution based both

---

[11]    I personally helped to prepare all of the documents cited in this paragraph.

[12]    I understand that the deck describing the Formula as of December 15, 2020 has been produced by the Ad Hoc Committee as BSA_AHCLC_00058868 (JTX# 1799).

on a Local Council's potential exposure to Abuse Claims and its ability to pay. Those three factors were:

    i.    *Financial Factor*: A factor that reflected each Local Council's total net assets (without regard to donor restrictions), as reported on each Local Council's books through accounting software used by National BSA.[13]

    ii.    *Claims Factor*: A factor that reflected the raw number of claims filed in the chapter 11 cases that identified a Local Council, using data provided by Bates White.

    iii.    *SoL Factor*: A factor that reflected how defendant- or plaintiff-friendly the statute of limitations was for Abuse Claims in the jurisdiction most relevant to each Local Council, based on the Ad Hoc Committee's analysis of each state's statute of limitations.

d.   The Formula then adjusted the Average Local Council Contribution for each Local Council according to the three aforementioned factors:

    i.    Each Local Council was placed into a quintile (*i.e.*, one of five groups) with respect to each of the Financial and Claims Factors. For example, a Local Council with total net assets in the top 80% (or above) of all Local Councils would be placed in the top quintile for the Financial Factor, while a Local Council with total net assets in the bottom 20% (or below) of all Local

---

[13]    All Local Council financial information used in the Formula was and is available to all parties in interest via National BSA's data room.

Councils would be placed in the bottom quintile.  Local Councils were also placed into one of five divisions with respect to their SoL Factors.

ii.    A multiplier, ranging between 0.5x and 1.5x, was ascribed to each quintile. A council's potential contribution amount (the "***Adjusted Contribution***") was determined by multiplying each of its three multipliers by the Average Local Council Contribution.  For example, a Local Council that was in the highest quintile among Local Councils for the Financial Factor would have a multiplier of 1.5x based on that factor, whereas a Local Council in the lowest quintile would have a multiplier of 0.5x.  A Local Council in the highest quintile for all three factors would have a total multiplier of 3.375x (1.5x * 1.5x * 1.5x), whereas one in the lowest quintile for all three factors would have a total multiplier of 0.125x (0.5x * 0.5x * 0.5x).

e.    The Ad Hoc Committee further determined that these three factors would typically yield a fair contribution for most Local Councils.  Sometimes, however, it was possible that the Formula might yield an Adjusted Contribution Amount that, based on the circumstances of the particular Local Council, would be inequitable or otherwise unlikely to gain acceptance from the Local Council.  As a result, the Formula contained certain "***Guardrails***," which were created with three principal goals in mind:

i.    to ensure that no Local Council was asked to pay more than nonbankruptcy law would permit (*i.e.*, that no Local Council would be asked to use restricted assets to make its contribution);

    ii.    to ensure that no Local Council was asked to pay so much as to leave it financially unviable and unable to fulfill its Scouting mission; and

    iii.    to ensure that no Local Council was asked to pay an amount disproportionate to its Abuse Claim exposure based on the number of Abuse Claims filed in the chapter 11 cases that identify that Local Council.

f.    The Guardrails used to achieve those goals in this iteration of the Formula were:

    i.    ***TUNA Guardrail***:  A Guardrail that limits a Local Council's contribution to a defined maximum percentage of its Total Unrestricted Net Assets ("***TUNA***").

        1.    Because Local Councils are non-profit organizations, a significant portion of their assets comes from donations or gifts that are donor-restricted under applicable nonbankruptcy law.  Accordingly, many assets held by Local Councils are either donor- or deed-restricted. These assets are not legally available for use in any settlement.

        2.    Recognizing that these assets are not legally available to contribute as part of a settlement (or in state tort litigation) and that no Local Council would be able to make a contribution prohibited by law, the Ad Hoc Committee limited each Local Council's contribution to no more than 100% of its TUNA.

        3.    The TUNA Guardrail remained unchanged through the "final" iteration of the Formula.

ii.   ***TNA Guardrail***:  A Guardrail that limited a Local Council's contribution to a defined maximum percentage of its Total Net Assets ("***TNA***") without regard to whether those assets were restricted or unrestricted.

iii.   ***Liquidity Guardrail***:  A Guardrail that limited a Local Council's contribution to a defined maximum percentage of its total liquidity (defined as the sum of its cash plus short-term and long-term investments) without regard to whether those assets were restricted or unrestricted.

    1.   To remain financially viable following the contribution of their assets to the Settlement Trust, Local Councils need to retain sufficient total and liquid assets (restricted or unrestricted) to continue operating.

    2.   Accordingly, the Ad Hoc Committee limited each Local Council's contribution to no more than 30% of such Local Council's total net assets and no more than 30% of its total liquidity, in both cases without regard to whether such assets were restricted or not.

    3.   The TNA Guardrail remained the same through the "final" iteration of the Formula.  As I discuss below, the Liquidity Guardrail was further adjusted in later iterations of the Formula.

iv.   ***Cost Per Claim Guardrail***:  A Guardrail that limited a Local Council's contribution so that its requested contribution amount on a per-claim basis would not be more than a defined multiple of the contribution amount per claim paid on average by all Local Councils.

1.  It would be inequitable to ask Local Councils facing very few claims to make contributions that were disproportionate to the contributions that other Local Councils were making to the Settlement Trust on a per-claim basis.

2.  If a Local Council was asked to make such a disproportionate contribution, the Ad Hoc Committee believed that there was a likelihood that such Local Council would "opt-out" of a global resolution and instead choose to litigate or settle Abuse Claims individually outside of these proceedings.

3.  Accordingly, this Guardrail established that no Local Council would be asked to contribute more than five times as much on a per-claim basis as the average per-claim amount contributed by all Local Councils.

g.  Each Local Council's contribution under the first iteration of the Formula was determined by taking either its Adjusted Contribution amount or a lower amount established by the Guardrails, if and as applicable.

b.    *Second Formula Iteration — February 2021*

29.    Following the presentation of the first iteration of the Formula, the Ad Hoc Committee received extensive feedback from Local Councils regarding their views of the strengths and weaknesses of the Formula and whether they would contribute under such a mechanism.  During this period alone, the Ad Hoc Committee spoke directly with most Local Councils about the Formula.  The Ad Hoc Committee also continued to engage with other

mediation parties regarding the amount of the Local Council Settlement Contribution that would be required for a global settlement.

30.     From these feedback sessions with both Local Councils and other mediation parties, the Ad Hoc Committee adjusted the Formula, and presented a second iteration to Local Councils on February 11, 2021.[14]  The most important of those changes were:

a.   The Formula used updated data from Bates White regarding the number of claims filed against each Local Council.  The Ad Hoc Committee continued to refresh this data in creating each subsequent iteration of the Formula.

b.   The Ad Hoc Committee adjusted the Formula's treatment of the Claims and Financial Factors in two ways:

   i.     Rather than grouping Local Councils into quintiles for each factor, it grouped them into deciles.  In other words, Local Councils were assigned one of ten multipliers for each factor, rather than one of five multipliers.

   ii.    The multiplier range was adjusted.  Instead of using multipliers ranging between 0.5x and 1.5x, the Formula used multipliers between 0.5x and 1.75x.

c.   The Ad Hoc Committee modified the SoL Factor to better reflect historical versions of statutes of limitation that would apply to historical Abuse Claims.  Application of the SoL Factor to each Local Council was also adjusted so as to be more closely tied to the jurisdictions in which particular Abuse Claims allegedly arose — Local

---

[14]     I understand that the deck describing the Formula as of February 11, 2021 has been produced by the Ad Hoc Committee as BSA_AHCLC_00058923 (JTX# 1800) and that the excel spreadsheet corresponding to this iteration of the Formula has been produced by the Ad Hoc Committee as BSA_AHCLC_00058865.

Councils received a "weighted" SoL Factor reflecting the blend of jurisdictions in

which Abuse Claims against a particular Local Council allegedly arose.

d.    The Ad Hoc Committee added a *Maximum Payment Guardrail*, limiting the highest

total amount that any Local Council could pay under the Formula.  This was intended

to avoid any Local Council being asked to contribute an amount so high that it would

be rational for that Local Council to file its own bankruptcy case rather than

contribute under the Formula.  The amount of the maximum payment guardrail was

initially set at $5,000,000.  (As I explain further below, under the "final" iteration of

the Formula, some Local Councils are asked to contribute as much as $10,000,000.)

c.    *Further Mediation and the National BSA Formula — March 2021*

31.    Over subsequent weeks, the Ad Hoc Committee communicated with all Local

Councils about the contribution they would need to make under the second iteration of the

Formula.  At this time, the Formula was targeted to achieve a Local Council Settlement

Contribution of $300 million, which was the amount identified in the *Amended Chapter 11 Plan

of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2293] (filed

March 1, 2021).  Based on these extensive interactions, the Ad Hoc Committee determined that

Local Councils would collectively be willing and able to contribute this amount as part of a

global resolution, with approximately 95% of Local Councils indicating their willingness to

make the requested contribution amount at that time in an aggregate amount slightly exceeding

$300 million.

32.    The Ad Hoc Committee continued to participate in mediation efforts, including

with the claimant representatives involved in these chapter 11 cases.  As indicated in both public

filings and open court at that time, the claimant representatives in these cases made clear that

they were unwilling to support a plan that included a $300 million Local Council Settlement Contribution and a greater amount would be required.

33.     On March 9, 2021, National BSA solicited Local Council participation under a formula designed by National BSA (the "***National BSA Formula***").  I understand that the National BSA Formula utilized concepts from the Ad Hoc Committee Formula — *e.g.*, a claims factor, a financial factor, and a SoL factor — but it applied those concepts differently and omitted several key guardrails that were present in the Ad Hoc Committee's Formula.  The National BSA Formula was set at a level intended to generate $600 million in aggregate Local Council contributions and it was expected under the National BSA Formula that all Local Council contributions would be required to be made in cash.

34.     Local Councils widely rejected the National BSA Formula.  In feedback provided to the Ad Hoc Committee, different Local Councils identified different reasons for not supporting the National BSA Formula.  For some, it yielded a required contribution that would have left them with inadequate resources to fund their Scouting program going forward.  For others, they would not be able to make their contribution all in cash as was contemplated under the National BSA Formula.  For yet others, such as the Local Council that I represent, while they would have been able to meet the contribution requested under the National BSA Formula (indeed, the current contribution request of my Local Council under the Ad Hoc Committee's Formula is slightly higher than the amount set forth in the National BSA Formula), they nonetheless did not support the National BSA Formula because they recognized that many other Local Councils would not be able to meet their requested contribution and thus anticipated that the ultimate contribution expected of them under the National BSA Formula might be significantly higher.  In other words, even for those Local Councils that might be able and

willing to meet the contributions expected of them under the National BSA Formula, they still viewed the National BSA Formula not to be viable given their perception of the likely inability of other Local Councils to meet their expected contributions.

        d.    *Third Formula Iteration — May 2021*

35.      On April 13, 2021, National BSA filed the *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2592] (the "**Second Amended Plan**"), which provided for a total Local Council Settlement Contribution of $425 million.

36.      Based on the feedback that the Ad Hoc Committee received from Local Councils (both as to the second iteration of the Formula and the National BSA Formula), as well as from continued interactions with the mediation parties, the Ad Hoc Committee continued to make adjustments to the Formula.  On May 6, 2021, the Ad Hoc Committee presented a third iteration of the Formula to Local Councils.[15]  This iteration of the Formula was intended to facilitate meeting the $425 million Local Council Settlement Contribution described in the Second Amended Plan, and involved a series of changes, including:

    a.    Increasing the top end of the multiplier range for the Claims Factor, which had previously been 1.75x, to 2.5x.  This multiplier range remained unchanged in the "final" iteration of the Formula.

    b.    Increasing the defined maximum percentage of total liquidity that certain Local Councils could be asked to contribute for Local Councils that met certain Claims,

---

[15]    I understand that the deck detailing the Formula as of May 6, 2021 has been produced by the Ad Hoc Committee as BSA_AHCLC_00058882 (JTX# 475) and that the excel spreadsheet corresponding to this iteration of the Formula has been produced by the Ad Hoc Committee as BSA_AHCLC_00058867.

Financial and SoL thresholds.  As I have described above, in prior iterations of the Formula there had been a Liquidity Guardrail that limited any Local Council's contribution to no more than 30% of its total liquidity.  In the third iteration of the Formula, this was adjusted for certain Local Councils.  Specifically, if a Local Council had more than $6,000,000 in total unrestricted net assets, its Liquidity Guardrail would be increased by 5%.  Additionally, if a Local Council was identified in more than 100 Abuse Claims, its Liquidity Guardrail would increase by 5%. Finally, if a Local Council was located in a jurisdiction that had an open statute of limitations "revival window," its Liquidity Guardrail would increase by 5%.  These increases were cumulative:  thus, a Local Council with more than $6,000,000 in total unrestricted net assets, more than 100 claims, and that was located in a "window state," under the third iteration of the Formula would have a Liquidity Guardrail of 45% (30% + 5% + 5% + 5%) — *i.e.*, for such a Local Council the Liquidity Guardrail would only apply if its Adjusted Contribution would exceed 45% of its total liquidity.

c.  Increasing the Maximum Contribution Guardrail amount from $5,000,000 to $6,000,000.  (As I describe below, the "final" iteration of the Formula requested that certain Local Councils make contributions of up to $10,000,000.)

d.  Introducing a new Guardrail, the "***National BSA Formula Guardrail***," which provided that no Local Council would be asked to contribute more than the *greater* of:  (1) its contribution amount under the National BSA Formula and (2) its contribution amount under the second iteration of the Ad Hoc Committee Formula (*i.e.*, the version that was presented to Local Councils on February 11, 2021).

-24-

i.   As I describe above, the National BSA Formula did not garner sufficient support among Local Councils for various reasons.  However, the changes to create the third iteration of the Formula might have resulted in a situation where certain Local Councils would be asked to pay more under the third iteration of the Formula (which sought to raise $425 million) than they were asked to pay under the National BSA Formula (which sought to raise $600 million).

ii.   The Ad Hoc Committee believed that if it asked any Local Council to pay more under the third iteration of the Formula than it had been asked to pay under the National BSA Formula, there was a risk that the particular Local Council would not participate, and would instead urge the Ad Hoc Committee to adopt the National BSA Formula instead.  As I have described above, the Ad Hoc Committee did not believe that the National BSA Formula presented a viable allocation of the Local Council Settlement Contribution and, if such a path was pursued, it would lead to a failure of the global settlement efforts. As such, the Ad Hoc Committee believed that the National BSA Formula Guardrail was a critical component to maintain the unanimous or near-unanimous support necessary from Local Councils.

37.    Based on its continuing interactions with Local Councils regarding the Formula, the Ad Hoc Committee gained confidence that it could garner support for contributions at this level, as it indicated to the Court at that time.[16]  Notably, its ability to garner this support was

---

[16]    May 21, 2021 Hearing Tr. [D.I. 4716].

predicated on the ability of Local Councils to make their contribution partially in the form of

cash and partially in the form of real property, as certain Local Councils would not have

sufficient liquid assets to make these contributions unless they could make their contributions

partially in the form of real property.

38.    However, as indicated in both papers filed and statements made on the record

around this time, claimant representatives continued to oppose a Local Council Settlement

Contribution of $425 million, indicating that a still-larger Local Council Settlement Contribution

was required if a global settlement was to be achieved.

e.    *Final Formula Iteration – June 2021*

39.    Because the third iteration of the Formula already pushed a substantial number of

Local Councils to the edge of economic viability, it was necessary to develop a new mechanism

to enable a settlement amount above $425 million and allocate that additional amount among

Local Councils.  The Ad Hoc Committee developed two mechanisms to "bridge the gap"

between the $425 million contemplated in the Second Amended Chapter 11 Plan and a $500

million contribution target, which was an amount the Ad Hoc Committee believed would either

be acceptable to the claimant representatives or mean that no global resolution was possible

because Local Councils would not be able to fund higher amounts.  These "***Bridge-the-Gap***

***Mechanisms***" were:[17]

a.    ***Bridge-the-Gap Mechanism #1***:  The Ad Hoc Committee sought to determine which

Local Councils had significant potential exposure to Abuse Claims and could

---

[17]    I understand that the deck describing the Formula as of June 18, 2021 has been produced by the Ad Hoc Committee as BSA_AHCLC_00058890 (JTX# 554) and that the excel spreadsheet corresponding to this iteration of the Formula has been produced by the Ad Hoc Committee as BSA_AHCLC_00058866 (JTX# 1473).

potentially make a larger contribution while remaining financially viable.  Based on its review of each Local Council's financial data and available liquid assets, its review of each Local Council's available real property that could be included as part of a contribution, the Abuse Claims potentially identifying that Local Council, and the Ad Hoc Committee's extensive interaction with all Local Councils throughout these proceedings, the Ad Hoc Committee identified approximately 40 Local Councils (generally, larger councils) from which it could solicit additional contributions of between $500,000 and $4,000,000.  In general, these Local Councils had a relatively high Financial Factor and/or a relatively high SoL Factor.

b.  ***Bridge-the-Gap Mechanism #2***:  Bridge-the-Gap Mechanism #1 was insufficient to generate a $500 million Aggregate Target Contribution.  As such, the Ad Hoc Committee determined that it was necessary to develop a second mechanism, Bridge-the-Gap Mechanism #2.  Unlike all other prior components of the Formula, Bridge-the-Gap Mechanism #2 did not look to a Local Council's potential exposure to Abuse Claims.  Instead, it looked only to those Local Councils that (a) were not included in Bridge-the-Gap Mechanism #1 and (b) had so far been asked to contribute less than 85% of their Liquidity Guardrail.  These Local Councils were asked to contribute the lesser of 85% of their Liquidity Guardrail or $500,000.[18]

---

[18]    To illustrate, consider a hypothetical Local Council with $5 million in total liquidity whose Liquidity Guardrail was 30%.  For that Local Council, the contribution amount would be no more than $1.5 million prior to application of any Bridge-the-Gap Mechanism.  However, if the Local Council's requested contribution was less than 85% of its Liquidity Guardrail (*i.e.*, if it had been asked to contribute less than $1.275 million under the third iteration of the Formula), it would be asked to contribute up to 85% of its Liquidity Guardrail, not to exceed $500,000.  Thus, for the hypothetical Local Council described in this footnote, if its requested contribution in the third iteration of the Formula was $1 million, it would be asked to contribute $275,000 more through Bridge-the-Gap Mechanism #2.  If, alternatively, it has been asked to

      i.   Given how the Formula had been constructed, Bridge-the-Gap

             Mechanism #2 disproportionately fell on mid-size Local Councils that

             (a) had a greater percentage of liquid assets than the average Local

             Council, and (b) had either a relatively lower exposure to Abuse Claims or

             had a relatively low SoL Factor.  A total of approximately 90 Local

             Councils were requested to make additional contributions under Bridge-

             the-Gap Mechanism #2.

      ii.   The Ad Hoc Committee viewed Bridge-the-Gap Mechanism #2 to be

             particularly risky.  It disproportionately impacted mid-sized Local

             Councils with greater-than-average liquidity and less exposure to Abuse

             Claims.  However, given the dynamics of the negotiations with the

             mediation parties at this time, the Ad Hoc Committee believed it was a

             risk that it had to accept if there was to be a global settlement.

40.    The Guardrails that I have described above did not apply to either of the two

Bridge-the-Gap Mechanisms.  If a Bridge-the-Gap Mechanism resulted in a Local Council being

requested to pay more than its cap under any of the Guardrails, those Guardrails did not limit the

amount of the request under the Bridge-the-Gap Mechanism, though the Guardrails still applied

to the "base" contribution requested from the Local Council under the third iteration of the

Formula. [19]

---

contribute $600,000 under the third iteration of the Formula, it would be asked to contribute $500,000 under
Bridge-the-Gap Mechanism #2.

[19]      To illustrate, consider a hypothetical Local Council that was subject to the Maximum Payment
Guardrail under the third iteration of the Formula.  Prior to the application of the Bridge-the-Gap
Mechanisms, that Local Council's contribution would have been $6 million.  If that Local Council was part

41.     By adding the contribution requests under the two Bridge-the-Gap Mechanisms to the contributions requested in the third iteration of the Formula, the Ad Hoc Committee was able to generate a total Local Council Settlement Contribution of approximately $500 million and allocate that contribution among all Local Councils.

42.     At this point, based on its review of the numbers allocated to Local Councils, the experience of its members in operating Local Councils themselves, and its interactions with Local Councils throughout these chapter 11 cases (particularly in response to contributions requested under the third iteration of the Formula plus the amounts sought under the Bridge-the-Gap Mechanisms), the Ad Hoc Committee concluded it would not be possible to solicit larger direct financial contributions from Local Councils — they simply would not agree to such contributions.  Thus, if $500 million in direct financial contributions was insufficient for the claimant representatives, the Ad Hoc Committee was not prepared to support higher amounts because it did not believe any higher amounts would be achievable.

43.     The deck, which I helped create, explaining the "final iteration" of the Formula to Local Councils is available at BSA_AHCLC_00058890 (JTX# 554).

C.     *The DST Note and the RSA*

44.     The Ad Hoc Committee still sought to reach a global resolution that included sufficient forms of other consideration to garner support from the major plaintiff constituencies in these cases.  In order to reach a Local Council Settlement Contribution amount that would be acceptable to the plaintiff constituencies and finally enable a global resolution, the Ad Hoc

---

of Bridge-the-Gap Mechanism #1, its requested contribution would increase between $500,000 and $4,000,000 without regard to the Maximum Payment Guardrail.  In other words, such a Local Council would have been requested to contribute an aggregate amount of between $6,500,000 and $10,000,000.

Committee helped develop the Delaware Statutory Trust Note (the "**DST Note**"),[20] which was expected to add an additional $100 million of value to the Settlement Trust.

45.     The DST Note was particularly difficult for the Ad Hoc Committee to support. Shortly before the Petition Date, National BSA (as the sponsor of the Pension) froze the Pension, directly diminishing the retirement benefits of key employees of the Local Councils.  Including the DST Note as part of the Local Council Settlement Contribution significantly reduced the likelihood that the Local Councils would either be able to partially restore those lost retirement benefits or provide similar benefits for future employees, which potentially threatens employee recruiting and retention efforts.

46.     However, the Ad Hoc Committee agreed to support the DST Note as part of the Local Council Settlement Contribution because the Ad Hoc Committee believed that (a) there was no path to achieving significantly greater direct financial contributions from Local Councils, (b) a greater aggregate contribution from Local Councils was essential to reaching a global resolution, and (c) the DST Note contains appropriate protections.

47.     On July 1, 2021, after over a year in mediation, the Ad Hoc Committee entered into a Restructuring Support Agreement (the "**RSA**") with the Debtors and all three plaintiff constituencies that had participated in the mediation to that point:  the TCC, the FCR, and the Coalition.  Included as part of the RSA was an agreement on the Local Council Settlement Contribution, which (at that time) would equal $500 million in direct contributions from Local Councils (which contribution would include not less than $300 million in cash and up to $200 million in real property) plus the $100 million DST Note.

---

[20]     As defined in the Plan Art I.A.114.

48.     As should be evident from the description that I have provided above, negotiating the Local Council Settlement Contribution in a way that obtained the support of the claimant representatives while also achieving the Ad Hoc Committee's objective of unanimous (or near-unanimous) support among Local Councils has presented unique challenges.  In my nearly nineteen years of legal practice, in which I have negotiated complicated settlements on behalf of hundreds of clients, I can think of no close corollary to the challenges associated with negotiating the Local Council Settlement Contribution.  As I explain further below, subsequent negotiations that have culminated in the settlements now embodied in the Plan were similarly challenging.

49.     The RSA obligated the Ad Hoc Committee to undertake reasonable efforts to persuade Local Councils to make direct contributions that, in the aggregate, amounted to $500 million.

### The Ad Hoc Committee's Efforts to Solicit Local Council Contributions

50.     Roughly contemporaneously with its entry into the RSA, the Ad Hoc Committee began soliciting letters of intent from all Local Councils for contributions in the amounts indicated by the final iteration of the Formula (including any applicable Bridge-the-Gap Mechanisms).  The Ad Hoc Committee expended tremendous effort persuading Local Councils to make the requested contribution amounts.  In the approximately three-week period during which the Ad Hoc Committee focused its campaign to solicit letters of intent, representatives of the Ad Hoc Committee held hundreds of phone calls with members and representatives of Local Councils and attended dozens of Local Council board meetings.  As a result of these efforts, by the end of July, the Ad Hoc Committee had received letters of intent from the vast majority of Local Councils for the amount of their contributions under the Formula (plus any applicable Bridge-the-Gap amounts) and determined that Local Councils would collectively be willing and

able to make the $500 million direct financial contribution contemplated under the RSA and to support the DST Note.

51.     In almost all cases, the letter of intent received from a Local Council provided for a contribution in the amount equal to that determined by the final iteration of the Formula (including any applicable Bridge-the-Gap Mechanisms).  The Ad Hoc Committee allowed for deviations from these contribution amounts in two, and only two, circumstances.  *First*, the Ad Hoc Committee allowed for deviations where an error in the Formula resulted in an inappropriate contribution amount.  This occurred where, for example, there was an error in a Local Council's monthly financial statement that resulted in an overstatement of the assets available to a particular Local Council.  *Second*, the Ad Hoc Committee allowed for deviations where a particular Local Council provided evidence that persuaded the Ad Hoc Committee that, notwithstanding the Guardrails built into the Formula, the contribution amount allocated to that Local Council would result in its imminent bankruptcy.  Combined, there were fewer than a dozen instances in which the Ad Hoc Committee approved a deviation from the Formula.

52.     On September 15, 2021, the Debtors filed the *Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6212] ("***Fifth Amended Plan***"), which was the final version of the plan (but for certain modifications) prior to solicitation.  Although this plan, which incorporated additional settlements beyond the Local Council Settlement Contribution, was not supported by the TCC, it retained the same amount and structure for the Local Council Settlement Contribution that existed in the RSA (which the TCC had supported).  The Local Council Settlement Contribution remained the same when the Fifth Amended Plan was sent out for solicitation on September 30, 2021.

53.     By the time the solicitation version of the Disclosure Statement was filed on

September 30, 2021, the Ad Hoc Committee had received letters of intent from every Local Council reflecting its intent to contribute the amount allocated to it.  I understand that the council-by-council contribution amounts reflected in those letters of intent, including the specific break-down between the cash and real property components were provided in Exhibit C to the Disclosure Statement [D.I. 6445 Ex. C].  As indicated in the Disclosure Statement, at that time, Local Councils had submitted letters of intent that collectively indicated an aggregate cash contribution of $408,391,763 and a real property contribution of $111,196,782, totaling $519,588,545, which slightly exceeded the $500 million contemplated under the RSA.[21]

## The Settlements Under the Plan

54.     Since the filing of the Disclosure Statement, the Ad Hoc Committee has continued to engage with other parties in mediation to resolve open issues that are important to Local Councils' interests.

55.     One of the key issues that the Ad Hoc Committee has focused on is the treatment of Chartered Organizations under the Plan.  Local Councils work directly with local Chartered Organizations to help deliver Scouting in their communities and support BSA's charitable mission.  In most Local Councils, many Scouts are members of troops or units that are directly sponsored by Chartered Organizations.  Chartered Organizations also provide volunteers, facilities, recruiting assistance, and other resources that are vital to National BSA and Local Council operations.  Indeed, Chartered Organizations are sufficiently important to Local

---

[21]     As I explain below, this amount over $500 million was built into the Formula.  The Ad Hoc Committee anticipated that there might be certain circumstances where a Local Council's initial commitment might not ultimately be able to be met, so the Ad Hoc Committee built in some "overage" into the Aggregate Target Contribution amount.

Councils that the letters of intent submitted by Local Councils included an express contingency requiring that the Plan provide for a satisfactory treatment of Chartered Organizations.[22]  The RSA similarly recognized the need for resolution for Chartered Organizations, obligating the parties to that agreement to work in good faith to agree on such a resolution.[23]

56.    Although certain issues related to Chartered Organizations remained unresolved at the time that the Plan was sent out for solicitation, the parties continued to engage throughout the mediation.  These mediation efforts resulted in several settlement agreements, including the Century and Chubb Settlement Agreement, the United Methodist Ad Hoc Committee Settlement Agreement (which were included in mediator's reports filed on December 14 and December 22, 2021, respectively[24]), and the TCC Settlement Agreement (which was included in a mediator's report filed on February 10, 2022[25]).  These settlement agreements provided substantial protections to all Chartered Organizations (regardless of whether they have agreed to make an independent contribution to the Settlement Trust to become a Contributing Chartered Organization).  To facilitate these settlements for Chartered Organizations, the Ad Hoc Committee agreed to support the payment of three additional forms of consideration to the Settlement Trust (the "***Supplemental LC Contribution***"), each to be funded by Local Councils:

---

[22]    Specifically, the form of letter of intent (which was attached to the Disclosure Statement [D.I. 6445, Ex. B]) was conditioned on:  "Acceptable resolution of insurance and indemnity issues with respect to our chartered partners, to be negotiated, including through the use of a channeling injunction and/or voluntary releases."

[23]    *See Boy Scouts of America Reorganization Term Sheet* [D.I. 5466-2] ("The Parties shall work in good faith to develop a protocol for addressing participation by Chartered Organizations in the benefits of the Channeling Injunction.").

[24]    *See Seventh Mediator's Report* [D.I. 7745] (Dec. 14, 2021); *Eighth Mediator's Report* [D.I. 7929] (Dec. 22, 2021).

[25]    *See Eleventh Mediator's Report* [D.I. 8772] (Feb. 10, 2022).

a.  ***LC Overage***:  In order to ensure that Local Councils collectively met the $500 million in direct cash/real property contributions under the Local Council Settlement Contribution set forth in the Fifth Amended Plan and to mitigate certain risks that could cause one or more Local Councils to fall short of its individual allocation, particularly related to the valuations of Local Council-owned properties, the Ad Hoc Committee originally designed the Formula to produce aggregate contributions exceeding $500 million (by slightly less than $20 million, leaving approximately a 4% margin).  Under the Fifth Amended Plan, Local Councils were required to contribute $500 million of cash and real property, notwithstanding that the individual allocations summed to a slightly larger number.  As part of the settlements that are now before the Court in the Plan, however, any overage above $500 million ("***LC Overage***") would be contributed to the Settlement Trust.  The Ad Hoc Committee agreed that the LC Overage must be at least $15 million.

b.  ***Increase in the Size of the DST Note***:  The increased, committed amounts to be paid from Local Councils to support the settlements that are currently before the Court as incorporated in the Plan are intended to sum to $40 million.  Up to $19 million of that amount (and not less than $15 million) is intended to be supported by the LC Overage.  Any excess will be covered by an increase in the size of the DST Note.  Thus, if the LC Overage remains $19 million, the DST Note will be increased to $121 million.  If the LC Overage falls to the floor of $515 million, the amount of the DST Note will be increased to $125 million.

c.  ***Settlement Growth Payment***:  In addition to the above, the Ad Hoc Committee also agreed to support the inclusion of the Settlement Growth Payment as part of its efforts to secure the settlement agreements contained in the Plan.  The Settlement Growth Payment is intended to align the interests of National BSA, Local Councils, Chartered Organizations, and the Settlement Trust to grow Scouting in the future.  Such growth, if achieved, will both further bolster the Scouting movement and will simultaneously augment the Settlement Trust for survivors.

The Settlement Growth Payment is a variable payment stream made to the Settlement Trust, in an amount up to $100 million, by National BSA that only commences upon (a) the repayment by National BSA of the BSA Settlement Trust Note, and (b) National BSA's total indebtedness being less than $225 million.  The Settlement Growth Payment is equal to 50% of $72 for each paid youth member above 1.5 million and 50% of $45 for each paid adult volunteer above 500,000.  Essentially, the Settlement Growth Payment will only be made if the Scouting movement increases in size by at least 50% over the coming years and the amount of the payment will be 50% of the current membership dues for any such growth over 50% of the Scouting population.  As set forth above, National BSA is the direct financial beneficiary of such growth and Local Councils are the indirect beneficiaries.  As such, Local Councils have agreed to reimburse National BSA for 25% of any of the Settlement Growth Payments that it actually makes.

d.    Local Councils believe that growth in Scouting is important for Scouting's future success.  By aligning the interests of National BSA, Local Councils, Chartered Organizations, and the Settlement Trust, the Settlement Growth Payment is a thoughtful way to set Scouting on the path for success in the future.

57.    The Supplemental LC Contribution serves as consideration to facilitate the protections under the Plan for Chartered Organizations that have not yet become Contributing Chartered Organizations, including, among other things, a twelve-month post-Effective Date interim injunction (subject to potential further extensions) that will afford Participating Chartered Organizations an opportunity to assess Abuse Claims that may be pursued against them and assess whether they want to negotiate with the Settlement Trust to become a Contributing Chartered Organization.  The Supplemental LC Contribution is being made on behalf of Chartered Organizations as part of the Chartered Organization Contribution.

58.    The Supplemental LC Contribution that I have described above was agreed by the Ad Hoc Committee prior to January 2022.  However, commencing in early January 2022, the Ad Hoc Committee agreed to participate in a series of intensive mediation sessions with the objective of obtaining support for the Plan from the TCC and other claimant representatives that had not yet agreed to support the Plan.  These additional negotiations led to the settlements embodied in the current version of the Plan.  Based on these negotiations, Participating Chartered Organizations will receive: (a) channeling of all Abuse Claims that arose on and after January 1, 1976 through the Petition Date; (b) channeling of Abuse Claims to the extent they arose before January 1, 1976 if covered by an insurance policy issued by a Settling Insurer; (c) the benefit of any applicable insurance policies to the extent such insurance was not issued by a Settling Insurer; and (d) an extension of the preliminary injunction (staying all Abuse Claims) for not less

than one year from the Effective Date, which protection was primarily paid for through the Supplemental LC Contribution.

59.     As noted above in Paragraph 55, the letters of intent that Local Councils have submitted were expressly conditioned upon the Plan incorporating an acceptable resolution of Scouting-related Abuse Claims for Chartered Organizations.  The Ad Hoc Committee has solicited feedback from Local Councils regarding the treatment of Chartered Organizations under the current Plan, including through a nationwide Zoom call open to all Local Councils.  To date, *no* Local Council has stated that it views the revised treatment of Chartered Organizations to be unacceptable such that it would not make the contribution set forth in its letter of intent. The Ad Hoc Committee believes that Local Councils will consider the Plan's proposed treatment of Chartered Organizations an "acceptable resolution of insurance and indemnity issues with respect to our chartered partners," as required in the signed letters of intent.

### Status of Local Council Commitments to Fund the
### Local Council Settlement Contribution

60.     As noted previously, the Ad Hoc Committee has secured letters of intent from every Local Council indicating their intent to contribute cash and real property in the amounts indicated on Exhibit X-1 of the Plan Supplement [D.I. 8815] filed on February 15, 2022.

61.     Accounting for the requirement to fund the LC Overage in the amount of at least $15 million, Local Councils are required to make a direct financial contribution of at least $515 million, in addition to funding obligations related to the DST Note and Settlement Growth Payment.  The Plan provides some flexibility regarding the form of the Local Council Settlement Contribution.  In particular, the Plan allows for that contribution to be partially in the form of cash and partially in the form of real property.  So long as the Local Councils have collectively

contributed sufficient cash (at least $300 million) and real property (up to $200 million) to the Settlement Trust and so long as the aggregate cash and property contribution is not less than $515 million in the aggregate on the Effective Date, the Local Councils are deemed to have made the requisite contribution.

62.     Since the Ad Hoc Committee first solicited letters of intent from Local Councils, Local Councils have been preparing to make their contributions.  In particular, some Local Councils have sought appraisals of their real property, as contemplated under the Plan.  Although the vast majority of Local Council-owned property had already been appraised by either the TCC or National BSA's appraisers as part of these chapter 11 cases, in certain situations, additional appraisals were required to facilitate a Local Council's contribution of real property to the Settlement Trust.  The Ad Hoc Committee, in conjunction with the Debtors and the Coalition, have worked collaboratively to facilitate these appraisals ("***Qualified On-Site Appraisals***") on the terms set forth in the Plan.  I understand that Local Councils currently anticipate contributing 127 properties, collectively worth an expected value of $103,025,318, to the Settlement Trust, and that approximately 5 appraisals of properties estimated to be worth less than $5 million remain outstanding as of the date hereof.  Based on this progress and its ongoing interactions with Local Councils regarding this process, the Ad Hoc Committee is confident that all necessary appraisals will be completed in advance of the Effective Date of the Plan.

63.     In certain instances, Local Councils have changed the form of their contribution (either switching a portion of their real property contribution to cash or vice-versa), whether in response to the results of the appraisal process or certain real-world events (such as the successful sale of a property that was otherwise designated to be contributed, with the proceeds being contributed instead of the real property itself).  In more limited instances still, the amount

of the contribution has changed, consuming a small portion of the approximately $19 million contingency indicated in the Disclosure Statement.[26]  I understand that the expected form and amount of contribution from each Local Council, as indicated in each Local Council's most recent letter of intent, was most recently indicated in Exhibit X-1 to the *Fourth Amended Plan Supplement* [D.I. 8815] filed on February 15, 2022.  As set forth in that filing, the aggregate value of the expected individual Local Council contributions was $519,531,478, with a cash contribution of $416,975,066 and a real property contribution of $102,556,412.

64.     For reasons I describe above (including in particular the successful solicitation of letters of intent from every Local Council and the extensive communication with all Local Councils throughout these proceedings), although the Ad Hoc Committee cannot formally bind any Local Council, if the Plan is confirmed in its current form, the Ad Hoc Committee expects that Local Councils will collectively be able to make the required contribution.

65.     In addition to at least $515 million of cash and real property contributions, Local Councils are making indirect contributions to the Settlement Trust through the DST Note.  A Local Council's contributions under the DST Note will be allocated based on the size of that Local Council's employee base, as the DST Note is funded by a percentage of payroll from each Local Council.  Although those amounts have not been individually allocated by Local Council, the amounts are necessarily part of each Local Council's contribution to the Settlement Trust.

66.     Under the Plan, Local Councils will also contribute their rights to the BSA Insurance Policies and the Local Council Insurance Policies.  I understand that, if a Local Council is unable to transfer its rights to any proceeds under the BSA Insurance Policies or the

---

[26]     *See* Disclosure Statement Ex. C at 5 [D.I. 6445].

Local Council Insurance Policies, it is required to take reasonable steps to pursue those insurance benefits for the benefit of the Settlement Trust and transfer any recoveries to the Settlement Trust. In either case, the value of a Local Council's interest in the BSA Insurance Policies and the Local Council Insurance Policies will be transferred to the Settlement Trust.

### Releases of Local Councils, Chartered Organizations, and each of their Representatives Are Essential to the Local Council Settlement Contribution

67.    The releases and channeling injunctions contained in the Plan are essential to the settlements embodied in the Plan, including the Local Council Settlement Contribution. This is true for the releases/channeling injunctions of Abuse Claims against Local Councils and their Representatives, as well as the releases of Abuse Claims against Chartered Organizations and their Representatives to the extent provided in the Plan.

68.    First, if Abuse Claims against Local Councils are not channeled to the Settlement Trust, Local Councils will not make the Local Council Settlement Contribution. This is made clear in their letters of intent, which are expressly contingent on "[e]ntry of a channeling injunction and releases covering our Local Council (including any predecessors to our Local Council, and any trusts or entities that support Local Council operations), our Local Council's board members, volunteers and employees (other than alleged perpetrators)."[27]  Indeed, it is not reasonable to expect that Local Councils will contribute hundreds of millions of dollars of direct and indirect consideration — in addition to their valuable insurance rights — to the Settlement Trust while still retaining potential liability for Abuse Claims. The same is true for Abuse Claims against any Representatives of a Local Council — without coverage for these individuals, a Local Council will likely face indemnity/contribution claims from such Representatives, rendering a

---

[27]    Disclosure Statement Ex. B [D.I. 6445].

"global resolution" illusory.  Local Councils' ability to continue their operations and to support

the Scouting mission depends on complete release of Abuse Claims against them.

69.    Local Councils will also not contribute to the Settlement Trust unless Indirect

Abuse Claims — including indemnity, contribution, and subrogation claims from insurers and

Chartered Organizations — against Local Councils are released and channeled as well.  I

understand that, since 2014, the form of charter agreement that Local Councils have executed

with Chartered Organizations each year contains the following language:  "The Local Council

agrees to: . . . [i]ndemnify the Charter Organization in accordance with the resolutions and

policies of the National Executive Board of the Boy Scouts of America."[28]  Charter

Organizations have asserted, including during these chapter 11 cases, that this provision creates a

contractual indemnity obligation of Local Councils with respect to any Abuse Claims asserted

against a Charter Organization.  Certain insurers have also asserted that they have contingent

Indirect Abuse Claims against Local Councils.  While Local Councils would likely dispute such

claims, the cost and distraction of litigating them would frustrate Local Councils' ability to

operate.  Again, it is not reasonable to expect that Local Councils will make the substantial

financial contribution (including giving up their insurance coverage) contemplated by the Plan

while still retaining potential exposure on indemnity/contribution/subrogation claims brought by

Chartered Organizations or insurers.  Indeed, under the Plan, Local Councils are funding certain

protections for Chartered Organizations — *see* Paragraphs 56 and 57 above.  The Local Council

that I represent — and all other Local Councils that I have interacted with — would not agree to

do so, nor to fund the Local Council Settlement Contribution more generally, if they could still

---

[28]      *E.g.*, JTX # 264 (Form of Annual Unit Charter Agreement – 2020 Printing) [BSA-RSA_00001256]; *JTX* # 358 (Form of Annual Charter Agreement – January 2021) [BSA-PLAN_02887493]; *JTX* # 1442 (Form of Annual Charter Agreement – January 2021 Update) [BSA-PLAN_02887493].

face such litigation from Chartered Organizations regarding Abuse Claims after the Effective Date.

70.     From my personal interactions with Local Councils, I am confident that without the releases and channeling injunctions contained in the Plan of (a) Local Councils, (b) Local Councils' Representatives, (3) Chartered Organizations, and (4) Chartered Organizations' Representatives, Local Councils will not make the Local Council Settlement Contribution or the Supplemental LC Contribution.

### The Ad Hoc Committee's Support for the Plan's Youth Protection Measures

71.     During the negotiations leading up to the settlements set forth in the most recent version of the Plan, representatives of the Ad Hoc Committee participated in numerous sessions with survivors, including with survivors associated with the Survivor Working Group ("*SWG*"), which was formed by the Coalition.  Local Council representatives, including multiple employees of the Atlanta Area Council, participated.  Those negotiations included multiple mediation sessions with the SWG, as well as numerous sessions with BSA's youth protection employees, and volunteer and executive leadership.  The Ad Hoc Committee was also involved in mediation sessions with TCC members, and reviewed and revised numerous draft proposals of enhanced youth protection measures.  Among other involvement, Local Council representatives shared their own "best practices" for youth protection and described various youth protection initiatives that have already been launched at the Local Council level.

72.     These sessions were constructive, and ultimately resulted in the enhanced youth protection measures contained in the Plan.[29]

---

[29]     *See* Plan Ex. F.

73.     The Ad Hoc Committee has reviewed these enhanced youth protection measures and the members of the Ad Hoc Committee support them unanimously.  As part of these enhanced youth protections measures, each of the Ad Hoc Committee's eight members have agreed to take steps to identify and appoint at least one otherwise qualified Local Council board member who is a survivor of sexual abuse.  The Ad Hoc Committee has also recommended to all Local Councils that they take this same step with their own Boards.

74.     In addition, under the Plan, Local Councils will continue to be active in future youth protection efforts, including by:

a)  participating on the Youth Protection Committee alongside representatives of the BSA, Chartered Organizations, and survivors nominated by the TCC and the SWG;

b)  Working with BSA's Youth Protection Executive to implement and monitor Local Council youth protection; and

c)  Cooperating with the National BSA on incident reporting and the formation of Unit Leader working groups to regularly identify, discuss, and develop additional ways to protect youth in Scouting.

[Remainder of page intentionally blank]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14, 2022

_____

William S. Sugden