IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re: D.I. 9114** |

### DECLARATION OF MAKEDA S. MURRAY IN SUPPORT OF CONFIRMATION OF THE THIRD MODIFIED FIFTH AMENDED PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

I, Makeda S. Murray, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1.      I am a Principal at Bates White, LLC ("Bates White"), which serves as the Abuse Claims consultant and advisor to Boy Scouts of America (the "BSA") and Delaware BSA, LLC ("Delaware BSA"), the non-profit corporations that are debtors and debtors in possession in the above-captioned Chapter 11 Cases (together, the "Debtors"). I am over twenty-one (21) years of age. I am authorized by the Debtors and fully competent to make this declaration (this "Declaration") in support of confirmation of the Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, dated February 15, 2022 [D.I. 8813; JTX 1-353] (as may be amended, modified, or supplemented, and together with any exhibits and schedules thereto, the "Plan"), and in conjunction with the *Debtors' (I) Memorandum of Law in Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

AMERICAS 113538893

*Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114; JTX 2909] (the "<u>Memorandum</u>").[2]

2.      Bates White is an economic consulting firm based in Washington, D.C., that specializes in providing advanced economic, financial, and econometric analysis to law firms, companies, and government agencies.  I work in the Environmental and Product Liability Practice, where I lead teams on matters involving damages estimation, asbestos liability valuation, and forecasting.  I manage the preparation and analysis of large, complex data sets used in expert testimony and by counsel in both litigation and settlement.  I specialize in data analysis and management, and have worked on matters related to the asbestos, insurance, automotive parts, and manufacturing industries.  I received my BA and BS *summa cum laude* from the College of Arts and Sciences at Howard University in 2007, where I was awarded a full academic scholarship.  In 2014, I earned an MBA in Strategic Management from The Wharton School at the University of Pennsylvania.[3]

3.      My work often involves the assessment and preparation of data for use in liability valuation and damages estimation matters.  I have developed databases of unique claims and provided explanations regarding the method used to process and standardize data.  My experience includes the standardization, processing, and analysis of claims data, as well as the preparation of indemnity and defense cost forecasts for asbestos and other liabilities.  I have worked for clients in a myriad of industries, and I use the same methods for my analyses regardless of who retains me.

4.      On February 18, 2020 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan.
[3] Makeda S. Murray Curriculum Vitae [JTX 1020] (Ex. 1).

AMERICAS 113538893

Court for the District of Delaware.  According to the Debtors, this case was filed to achieve two key objectives: equitably compensate Abuse Survivors who were harmed during their time in Scouting and continue to carry out Scouting's mission for years to come.[4]  Filing for bankruptcy had the effect of staying pending sexual abuse-related litigation against the Debtors and provided the Debtors with a forum to comprehensively resolve past sexual Abuse Claims in an organized and consistent manner.

5.      By Order of this Court dated April 7, 2020, the Debtors were authorized to retain Bates White as their Abuse Claims consultant and advisor.[5]  In that capacity, Bates White was asked by White & Case LLP, Counsel to the Debtors ("White & Case"), to provide expert testimony regarding the data processing and standardization of the Proofs of Claim ("POCs") submitted by Abuse Survivors during the Debtors' Chapter 11 Cases.

6.      In September 2019, the BSA asked Bates White, in its capacity as BSA's Abuse Claims consultant and advisor, to estimate the total value of its (sexual) Abuse Claims as of the Petition Date, as though they were tort system claims that were being resolved at values consistent with the sexual Abuse Claims the organization had resolved in the past.  The firm was also asked by counsel for the Debtors to provide analysis of data regarding the Debtors' historical resolutions of abuse claims, as well as claiming trends evidenced by the POC forms that have been submitted with respect to Abuse Claims in these Chapter 11 Cases, as will be addressed by Dr. Charles E. Bates ("Dr. Bates").  In support of that work, and to facilitate better understanding of the Abuse Claims on behalf of other parties, Bates White was asked to provide support in the processing and standardization of data contained in the POCs submitted by Abuse Survivors.

---

[4] Debtors' Informational Brief [JTX 1-1] (Ex. 2).
[5] Bates White's engagement agreement for this matter was executed with counsel to the Debtors who are presently at White & Case LLP, but at the time of the retention were at Sidley Austin LLP.

AMERICAS 113538893

7.      As part of that work, Bates White was asked to process and standardize the POCs submitted by Abuse Survivors in this matter.  To that end, Bates White performed the following work:

1.      Evaluation, processing, and provision of summary tabulations regarding the POC submissions.

    A.      Programmatic and manual review of the POC submissions and compilation of records into a single database to be used by Bates White, as the Debtors' Abuse Claims valuation expert, in disclosures and for other purposes, as well as be provided to the mediation parties for their analysis.

    B.      Analysis and provision of summary tabulations based on the POC submission data.

    C.      Deduplication of the POC records to produce a database of the unique Abuse Claims that were filed on or before the bar date of November 16, 2020 (the "Bar Date"), in this case.

2.      Identification of Abuse Claims that referenced specific Chartered Organizations and Local Councils as additional potentially responsible parties in their POC submissions; identification of records that were potentially associated with major BSA Chartered Organizations.

3.      Processing of the BSA's historical settlements data to be used as an input for setting Abuse Claim values in the BSA valuation model.

8.      In connection with my engagement, the Debtors, through White & Case, requested that I prepare expert reports in support of the confirmation of the Plan.  I submitted a total of two expert reports.[6]  I submitted my expert report dated December 5, 2021 regarding the method Bates

---

[6] Makeda S. Murray Expert Report, dated December 5, 2021 [JTX 1018] (Ex. 3); Makeda S. Murray Rebuttal Expert Report, dated January 5, 2022 [JTX 1135] (Ex. 4).

AMERICAS 113538893

White undertook to process and standardize the POCs submitted by Abuse Survivors in these Chapter 11 Cases ("Murray Affirmative Report").  In addition, I submitted a rebuttal expert report on a subset of this topic ("Murray Rebuttal Report").  Attached hereto as exhibits are all of the exhibits included in my Affirmative Report and Rebuttal Report.[7]

9.      My expert analyses, opinions, and conclusions are based solely on the work performed by me and those under my supervision and my reasonable reliance on information provided by the Debtors and other consultants or advisors to the Debtors.

10.      Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal experience and knowledge or information obtained from my review of relevant documents.  I am not being compensated specifically for this testimony other than through payments received by Bates White as a professional retained by the Debtors in these Chapter 11 Cases.

## PROOF OF CLAIM DATA SUMMARY

11.      Bates White has produced a set of data with regard to Abuse Claims known as the "Tranche VI data," which reflects 82,209 unique and timely Abuse Claims.  These data are based on the POC submissions received by Omni Agent Solutions ("Omni"), the BSA's claims noticing agent, as of July 2, 2021, and reflect a total of 117,037 records.[8]  Those 117,037 records consolidate down to 82,209 for two reasons.  First, many of the records reflect duplicate submissions.  Second, for purposes of the Bates White analysis, Abuse Claims were only considered timely if the individual had made at least one POC submission prior to or on the Bar Date.[9]  The most recent

---

[7] Exs 5-8 (Ex. 5, Affirmative Report Ex. B [JTX 1021]; Ex. 6, Affirmative Report Ex. C [JTX 1022]; Ex. 7, Affirmative Report Ex. D [JTX 1023]; Ex. 8, Rebuttal Report Ex. A [JTX 1136]).
[8] BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta [JTX 676] (Ex. 9).
[9] Omni date received report used in Tranche 6 production (7/20/2021): Date Received Report 072021 v2.xlsx [JTX 690] (Ex. 10).

AMERICAS 113538893

data that Dr. Bates relies on in forming his opinions are referred to here as "Tranche VI" because this latest data set represents the sixth iteration of data that Bates White has produced in this matter.

12.    The POC submissions that form the basis of these data were based on a specific form approved by this Court for use by Abuse Survivors.[10]  While that form was specifically designed to facilitate the gathering of information that would be useful for evaluating such Abuse Claims, that information is not necessarily immediately available in a format that lends itself to programmatic evaluation.  For example, question Part 4.K., which solicits information regarding when the abuse occurred, allows for open-ended, long-form text responses that are impossible to easily utilize in analyses.[11]  Although converting information from this format into data that can be readily analyzed is a complicated and necessarily imperfect process, the Tranche VI data provide an accurate and best available representation of those submissions.

13.    In addition to the Tranche VI data, Bates White produced four other databases of the BSA's POC information under mediation, Tranches I–III and V, as well as a fifth database, Tranche IV.  These data are referred to as Tranches because each subsequent data production represented an increasing portion of the Abuse Claim submissions to date.  Given that there was a lag in processing POC submissions to produce these data sets, the titles were intended to make clear that the data sets were not complete.  Those data were first produced to the mediation parties on the dates shown in Figure 1 (Tranche IV was produced again as part of litigation discovery on November 13, 2021).

---

[10] Sexual Abuse Proof of Claim form – "For purposes of this Sexual Abuse Survivor Proof of Claim, the term Sexual Abuse Survivor refers to a person who was sexually abused before turning eighteen (18) years of age." [JTX 1475] (Ex. 11).

[11] Sexual Abuse Proof of Claim form, Part 4.K. – "When did the first act of sexual abuse take place? If you do not remember the calendar date, what school grade were you in at the time and what season of the year was it (spring, summer, fall, winter), and what age were you when it started? If the sexual abuse took place over a period of time, please state when it started and when it stopped. If you were sexually abused by more than one sexual abuser indicate when the sexual abuse by each of the sexual abusers started and stopped." [JTX 1475] (Ex. 11).

**Figure 1: The BSA's POC Database Production Counts**[12]

| Database | Records as of date | Record count | Production date | Unique & timely Abuse Claim count |
|---|---|---|---|---|
| Tranche I | 11/12/2020 | 26,779 | 12/8/2020 | N/A |
| Tranche II | 12/17/2020 | 51,210 | 12/19/2020 | N/A |
| Tranche III | 12/31/2020 | 96,251 | 1/2/2021 | N/A |
| Tranche IV | 2/8/2021 | 100,964 | 2/19/2021 | 82,358 |
| Tranche V | 3/31/2021 | 106,117 | 4/17/2021 | 82,458 |
| Tranche VI | 7/2/2021 | 117,037 | 7/28/2021 | 82,209 |

14.     Using Tranche VI of the BSA POC data, Bates White also identified records and corresponding unique and timely Abuse Claims that were potentially associated with the Chartered Organizations.  While the recorded Chartered Organization, or Chartered Organizations in the case of Abuse Claims that listed more than one, can be identified directly in the data, additional work was performed to flag the records, and the corresponding unique and timely Abuse Claims, potentially associated with several of the largest Chartered Organizations.

**Figure 2: The BSA's POC Counts For Select Chartered Organizations**[13]

| Chartered Organization* [14] | Record count | Unique & timely Abuse Claim count |
|---|---|---|
| Church of Jesus Christ of Latter-day Saints | 9,884 | 7,716 |
| Catholic Church | 9,415 | 7,046 |
| Methodist Church | 7,256 | 5,665 |
| Episcopal Church | 1,192 | 962 |
| Knights of Columbus* | 404 | 298 |
| Kiwanis Club* | 258 | 204 |
| Faegre Diocese* | 130 | 107 |

15.     Additionally, Bates White processed the BSA's historical settlements from 2016 to 2020 for use in setting average Abuse Claim values in the BSA valuation model.

---

[12] Tranche I [JTX 321] (Ex. 12); Tranche II [JTX 344] (Ex. 13); Tranche III [JTX 357] (Ex. 14); Tranche IV [JTX 382] (Ex. 15); Tranche V [JTX 417] (Ex. 16); Tranche VI [JTX 678] (Ex. 17).

[13] POC counts for select Chartering Organizations.xlsx [JTX 1534] (Ex. 18).

[14] For the organization names in Figure 2 that are followed by an asterisk, it should be noted that those Chartered Organizations did not request unique and timely counts so only the full Tranche VI record count was provided to them.

AMERICAS 113538893

**Figure 3: Historical Resolutions Since 2016 By Size Of Payments To Claimants[15]**

| Payment size | Claims resolved | Total amount paid | Mean amount paid |
|---|---|---|---|
| Dismissed w/out payment | 11 | $0 | $0 |
| Four and five figure payments | 115 | $4,302,500 | $37,413 |
| Six figure payments | 94 | $30,007,000 | $319,223 |
| Seven figure payments | 42 | $135,865,000 | $3,234,881 |
| **Grand Total** | **262** | **$170,174,500** | **$649,521** |
| **Median** | | | **$100,000** |

## OVERVIEW OF DATA COLLECTION AND STANDARDIZATION PROCEDURE

16.    For an Abuse Claim to be considered in the BSA's bankruptcy proceeding, each claimant was required to submit a POC form[16] to Omni. This could be done by either mailing the completed POC form to Omni or electronically uploading the completed POC form to Omni's online claims portal.

17.    The POC form contained six sections, labeled Parts 1–6, that contained a combination of question formats ranging from simple "Check the box" to more open-ended "Long-form text" formats like "Please describe what happened to you...."[17]

18.    As part of Bates White role as the Debtors' Abuse Claims consultant and advisor, we were tasked with reviewing the submitted POCs (which were downloaded from Omni as a Microsoft Excel workbook) and producing extracts of standardized data that could be more readily used in analyses by all mediation parties. To that end, in November 2020, Bates White, in conjunction with the mediation parties, decided on a shortlist of standardized data fields[18] that

---

[15] Historical resolutions by payment size.xlsx [JTX 1535] (Ex. 19).

[16] Sexual Abuse Proof of Claim form – "For purposes of this Sexual Abuse Survivor Proof of Claim, the term Sexual Abuse Survivor refers to a person who was sexually abused before turning eighteen (18) years of age… This Sexual Abuse Survivor Proof of Claim is only for people who were sexually abused before turning eighteen (18) years of age and where the sexual abuse (defined below) occurred on or before February 18, 2020." [JTX 1475] (Ex. 11).

[17] The Court-approved POC form covering Abuse Claims shows all the sections and questions. [JTX 1475] (Ex. 11).

[18] *2020.11.25 DRAFT proposed data field standardization list---for mediation only.xlsx* produced to the mediation parties on November 25, 2020 [JTX 1536] (Ex. 20).

AMERICAS 113538893

Bates White would produce in Microsoft Excel format.  While all the information related to a given submission, including the actual form itself and the Omni optical character recognition transcription, is available to the relevant parties via the Omni claims portal, we used a combination of programmatic and manual review to ensure that the key data fields were available in a useful analytical format.

19.    To produce the first standardized Abuse Claims database (Tranche I) on December 8, 2020, Bates White reviewed and standardized the responses for all POC forms that were available in the Omni database as of a November 12, 2020 download.[19]  At that time, due to the large number of filings and the associated manual review process, there was up to a one-month lag between the Omni data extract download date and the Tranche production date.  In subsequent Tranche database productions, Bates White reviewed and standardized the responses for submitted POC forms that were *new* to the Omni data extract, where new in this context also includes amended Abuse Claims since the previously produced Tranche database (i.e., only records that had not yet been reviewed).[20]

20.    From a practical perspective, the manual review of the 110,000+ records was a time-intensive endeavor that required a large review team and a set of review rules to minimize subjectivity and improve the uniformity of the standardized responses.  For each wave of records to be reviewed, the team under my direction created separate Excel workbooks, each containing the information for up to 250 records.  Each workbook was assigned to a reviewer who manually standardized the responses to the agreed-upon key questions.  Manual standardization focused

---

[19] Tranche 1 (11/12/2020): SearchExport_11_12_2020_16_08_40_PM_UTC.xlsx [JTX 321] (Ex. 12).

[20] Tranche 2 (12/17/2020): SearchExport_12_17_2020_14_18_57_PM_UTC.xlsx [JTX 345] (Ex. 42); Tranche 3 (12/31/2020): SearchExport_12_31_2020_19_14_52_PM_UTC.xlsx [JTX 357] (Ex. 14); Tranche 4 (2/8/2021): SearchExport_02_08_2021_14_35_04_PM_UTC.xlsx [JTX 382] (Ex. 15); Tranche 5 (3/31/2021): SearchExport_03_31_2021_02_46_59_AM_UTC.xlsx [JTX 417] (Ex. 16); Tranche 6 (7/6/2021): SearchExport_07_06_2021_20_27_31_PM_UTC.xlsx [JTX 678] (Ex. 17).

AMERICAS 113538893

primarily on the following fields: abuse dates, abuse frequency, abuser identity, abuse location, troop information, Local Council, and Chartered Organization.

21.     Upon review completion of a given wave of records, Bates White compiled the manually reviewed Excel workbooks into a single database of POC records and performed additional, programmatic field cleaning.  During the Tranche VI iteration of this process, Bates White also removed POC records that Omni had flagged as withdrawn or voided before deduplicating the data to produce the Tranche VI unique and timely Abuse Claims database.  For valuation purposes, Bates White consolidated the information provided across duplicate submissions provided by a single Abuse Survivor based on the protocols noted below such that we always took populated values over missing values and ultimately removed Abuse Claims that were filed after the Bar Date.

22.     When consolidating fields for duplicate submissions, Bates White kept all the information provided by any version of the duplicate records for fields where the information could not easily be processed by a mathematical function.  For example, the data include:

    1.     All named Local Councils.

    2.     All troop and chartered organization information.

    3.     All abuser information.

    4.     All abuse locations.

23.     When consolidating information in fields that did lend themselves to cross-record evaluation, Bates White collapsed the duplicate records and kept information based on the following protocol:

    1.     Most severe allegation.

    2.     Earliest date of first abuse & latest date of last abuse.

AMERICAS 113538893

3.    Highest abuse frequency.

24.    Bates White also kept *either* (a) the latest valid (i.e., prior to the Bar Date) filing date associated with a given Abuse Claim or, if all records associated with the Abuse Claim were filed after the Bar Date, (b) the earliest filing date.

## MANUAL REVIEW AND STANDARDIZATION OF PROOF OF CLAIM DATA

25.    Bates White's manual review of the BSA POC data involved examining and standardizing the transcribed fields provided in the Omni data extract.  Bates White established certain standardization protocols for these fields, as detailed below, to minimize subjectivity and interpretation while maximizing ease of use.

26.    Each field in Omni's data extract contained a response to a specific question on the POC form.  For example, *AbuseLocation* in the Omni database reflects responses to question 4.E. of the POC form ("Where were you at the time you were sexually abused (city, state, territory, and/or country?)").  Bates White is aware that the information that satisfies a given question on the POC may be found in other places on the POC or inferred from information produced in response to other POC questions.  However, the goal with these data was for the standardization to reflect and provide the most accurate representations of POC responses by Abuse Survivors based on the information provided for each question.  To that end, the team reviewed each field independently and refrained from making subjective inferences or attempting to "fill in the blanks" using information found elsewhere on the POC when the response to a given question was unclear. Anecdotally, during a working session to review responses, the team came across a reference to "Greenville" that did not include state information.  Based on an internet search, we found Greenvilles in South Carolina, North Carolina, Ohio, Texas and California.  For reasons like this, if a POC submission included a response like "Greenville" and was missing state information, the

11

standardized state data entry associated with that response was coded as "Unknown." As noted above, the question on abuse location on the POC form (Part 4.E.) asks for state information in addition to city.

27.    As a result of the Bates White independent review of POC responses, there are inconsistencies in Abuse Survivor responses that are reflected in the Bates White coded fields. For example, sometimes checkbox-based responses conflict with the contextual information provided in associated long-form response fields. For example, in response to question Part 4.L.i., which invited Abuse Survivors to "provide a description in your own words and/or use the checkboxes below," an Abuse Survivor may have checked the box to indicate "I was sexually abused once," but then reported 10 occurrences of abuse in the associated text-response field ("If you were sexually abused more than once, please state how many times (if you recall)"). The Bates White coded fields would reflect this discrepancy.

28.    As a general rule, for the purposes of this standardization exercise, Bates White differentiated between responses that do not provide the requisite information ("Unknown") and no response or a blank data field ("Missing"). Consider again the example of "Greenville" above. Because there was a response in regard to location, but that response did not clearly identify a state, abuse state was treated as "Unknown" and recorded as "YY". This is distinct from an Abuse Claim that simply did not include a response to the question. An Abuse Claim with a blank response field for this question would be treated as having a "Missing" abuse state and the field would be coded as "ZZ".

12

A.    **Abuser Identification Fields**

29.    The following abuser-related fields in the Tranche data sets were coded based on the information provided in POC Parts 4.A.–4.D., which asked for details that aid in the identification of the Abuse Survivors' sexual abuse perpetrators.

1.    **"Abuser unknown?"** flag: This field is "1" for any POC where the abuser(s) were not identified *by name or partial name* in the response to Part 4.B. ("Please name each person who sexually abused you in relation to your involvement in Scouting...")

2.    **Abuser Name** fields: These fields contain abuser name(s), if provided in Part 4.B.

A.    If the response included a partial name, the missing portion of the name is coded as "UNKNOWN." For example, if an Abuse Survivor reported that their abuser's last name was Jackson but did not provide the abuser's first name, the corresponding abuser name field is coded as "UNKNOWN JACKSON."

3.    **"Is Abuser [#] an adult or minor?"** fields: These fields indicate whether the corresponding sexual abuser was identified as an adult or a youth in Part 4.B., either explicitly using those terms or implicitly based on reported age and/or physical descriptors.

A.    If this information was not provided, we populated this field based on information provided in *Abuser Position,* the Abuse Survivor's response to Part 4.D., and the raw Omni Abuser Name field:

i.    Scoutmaster—Assumed adult, with the understanding that in rare cases it is possible for someone under the age of 18 to be a Scoutmaster.

ii.    Assistant Scoutmaster—Assumed adult, with the understanding that it is possible for someone under the age of 18 to be an Assistant Scoutmaster.

iii.    Den Leader—Assumed adult.

AMERICAS 113538893

iv.    Scout—Assumed youth, with the understanding that Eagle Scouts and descriptors such as "older scout" may be someone 18 or older.

4.    **Abuser name categorization**: This field is coded based on responses to POC Part 4.B. and indicates the highest level of abuser detail provided in the response, in the following order of priority:

A.    **"Name provided"**—The response included a full abuser name.

B.    **"Partial name provided"**—The response included a partial abuser name.

C.    **"Physical Description only"**—The response did not include a (full or partial) abuser name but instead listed physical descriptors that might help identify the abuser. Physical descriptors include some combination of race, gender, age, height, weight, mannerisms, etc.  This determination is subjective and likely has minor variations across Abuse Claims and reviewers.

D.    **"Unknown"**—The response did not include a full or partial abuser name or a physical description.  An example of a response that would be coded as "Unknown" is "I do not recall."

E.    **"Missing"**—The field was blank (there was no response).

5.    **Abuser Position** field: Contains the highest Scouting position of the sexual abuser(s) based on the Abuse Survivor's response to Part 4.D.  This field was coded based on the corresponding boxes checked by the Abuse Survivor on the POC form, and contains one of the following categories (listed in order of priority):

A.    Adult Scout leader in my Scouting unit

B.    Adult Scout leader not in my Scouting unit

C.    Youth Scout in my Scouting unit

14

D.      Youth Scout not in my Scouting unit

E.      Camp personnel (e.g., camp staff) not in my Scouting unit

F.      I don't know

G.      Other

H.      Missing (Bates White classification for no response)

**B.      Abuse Location Fields**

30.     The following fields were coded based on the information provided in POC Part 4.E., which asked where the sexual abuse occurred.

1.      **"Location [#] of abuse?"** fields: These fields contain the location(s) where the sexual abuse took place.  During processing, we abbreviate location names[21] such that the fields contain:

A.      A two-letter abbreviation for a US state

B.      A two-letter abbreviation for a US territory

C.      A three-letter ISO code for non-US countries (if the abuse took place outside of the United States).[22]

D.      "YY" to indicate that the response did not contain relevant information (e.g., the field may have read "At the abuser's home" or "I don't remember")

E.      "ZZ" to indicate that the field was blank.

31.     For Abuse Claims that provided multiple locations, the location list was ordered such that the location appearing first was the location that provided the Abuse Claim with the most generous statute of limitations status (i.e., "Not barred").  As an example, for a given Abuse Claim

---

[21] Bates White state and country translation table: BW state_country translation table.xlsx (Murray Opening Materials Considered List) [JTX 1068] (Ex. 21).

[22] List of world nations and their country codes (8/25/2021): Country Codes List - ISO ALPHA-2, ISO ALPHA-3 and Numerical Country Codes - Nations Online Project.pdf [JTX 748] (Ex. 22).

15

with two abuse locations, one of which resulted in a "Barred" categorization and another that resulted in a "Not Barred" categorization, the location assigned as "*Location 1 of Abuse*" was the state that produced the "Not Barred" result.

## C.    Scouting Unit Fields

32.    The following fields were coded based on information provided in POC Part 4.G., which asked for details about the Abuse Survivors' Scouting units during the time of sexual abuse.

33.    **BW troop number**: Troop Number reflects the troop the Abuse Survivor was involved with at the time of the abuse.

a.    The word "Troop" could be affiliated with a Pack, Den, or Explorer unit number instead of Boy Scout Troop number.  If an Abuse Survivor reported multiple levels of scouting, we assumed the Abuse Survivor misinterpreted the question and provided their overall scouting involvement rather than at the time of the abuse.  We therefore coded just the Boy Scout troop number.

b.    For Abuse Claims that did not provide a troop number (regardless of whether the raw text field was blank or contained irrelevant information), troop number is coded as 9999.

34.    **BW troop state**: The location(s) in which the Abuse Survivor's troop was based at the time of the abuse.

a.    This field was standardized using the procedure detailed in paragraph [31], except that for records that provided multiple troop locations, the troop location list has not been sorted; the locations appear in the order in which they were transcribed.

16

**D.**     **Chartered Organization Fields**

35.     The following fields were coded based on the information in POC Part 4.H., which asked for details about the organizations that sponsored the Abuse Survivors' Scouting units during the time of sexual abuse.

36.     **Name of Chartering/Sponsoring Organization** fields: Contain the names of the organization(s) that sponsored the Abuse Survivor's troop(s).

37.     **Chartering/Sponsoring Organization Category** fields: Contain the general category of the corresponding Chartered Organization:

1.     **"Church – [denomination]"**—Used to classify any religious organization, identified by denomination, where possible.

   A.     If the POC response indicated that the Chartered Organization may have belonged to more than one religious denomination, this field is coded to include all denominations named.   For example, if a response indicated "A Lutheran or Mormon Church," this field is coded as "CHURCH – LUTHERAN OR TCJC."

2.     **"School – [education level]"** – Any educational facility.

   A.     If the POC provided the level of schooling ("Elementary," "Middle," "High"), said level is reflected in this field.  If no education level was provided, this field is coded as "SCHOOL – OTHER."

3.     **"Civic"**—Any nonprofit, not-for-profit or community organization such as American Legion, YMCA, Salvation Army, community/recreation centers, etc.

4.     **"Private Business"**—Any for-profit business.

5.     **"Military"**—Entities affiliated with the US military (most commonly military bases).

6.     **"Other"**—Organization type that cannot be categorized as one of the above.

AMERICAS 113538893

7.    **"Unknown"**—The POC response indicated the chartered organization was unknown.

8.    **"Missing"**—The POC response field was blank (no response was provided).

38.    **Chartering/Sponsoring Organization State** fields: Contain the location in which the corresponding chartered organization was based.

    a.    These fields are standardized according to the protocol detailed in paragraph [31]. Bates White was asked to flag records that were potentially associated with certain Chartered Organizations that had significant historical relationships with the BSA, such as the Church of Jesus Christ of Latter-day Saints, the Catholic Church, and the Methodist Church. This identification was performed using a multi-step methodology that relied, in part, on the above fields.

## E.    Local Council Fields

39.    The following fields were coded based on the information in POC Part 4.I., which asked for details about the Local Council affiliated with the Abuse Survivors' Scouting units during the time of sexual abuse. These fields were used to determine the relevant liability for the more than 250 Local Councils in the BSA organization. In cases where an Abuse Survivor listed more than one Local Council, all are listed.

40.    Given the BSA's long history, the number and names of Local Councils have changed over time: councils have been renamed, some have been disbanded, some have merged into larger councils, and other have split into multiple councils. Examples of these occurrences are:

AMERICAS 113538893

1.      Merge: The Local Council that is now known as Golden Gate Area was created by the merger of the San Francisco Bay Area, Alameda, and Mount Diablo Silverado councils in June 2020.

2.      Disbandment: In 2014, the Central New Jersey Local Council disbanded due to financial difficulties, and control over that jurisdiction was given to neighboring councils.

3.      Renaming: Birmingham Area Council was renamed to Central Alabama Council in 1996.

4.      Split: In 1968, the Staten Island Local Council split, with some of its jurisdiction being controlled by Greater New York, and the remainder being spun into a new Local Council, GNY Staten Island.[23]

41.      To accurately map historical Local Council names to current Local Council names, Bates White created a translation table documenting (a) a full list of all current Local Councils and (b) a list of each Local Council's previous name(s) and sub-councils prior to any mergers, splits, and/or renaming. This translation table was constructed using a combination of online research and instruction/documents from counsel.[24] The Local Council names were then searched for in each Abuse Survivor's response to POC Part 4.I., creating a preliminary Local Council assignment.

42.      In cases where none of the Local Council names appear in the Abuse Survivor's response, Bates White assigned a preliminary Local Council based on one of the following criteria:

1.      **Local council number**—Each Local Council, whether current or historical, is assigned a unique identifying number. Often Abuse Survivors listed the number associated with their

---

[23] Council Change History 1950-Present (FINAL).xlsx [JTX 628] (Ex. 43); Golden Gate Area Council History - https://ggacbsa.org/history/ [JTX 1537] (Ex. 23).

[24] Bates White Local Council translation table: Bates White Local Council translation table.xlsx [JTX 1067] (Ex. 24).

AMERICAS 113538893

council rather than its name.  Using the translation table, the team was able to populate Local Council name for that subset of records.

2. **Location identifiers**—Rather than naming a Local Council, many Abuse Survivors instead indicated their council's jurisdiction. Preliminary Local Councils were assigned to these Abuse Claims on the basis of a web or online search of the BSA website using a combination of city, state, and/or zip code.[25]  In cases where the Abuse Survivor mentioned a camp name, a council was assigned using this name and the Abuse Location fields.  The methodology for Local Council identification and standardization was different from our general approach of independently processing the Abuse Survivor response because of the Preliminary Injunction Stipulation that the Debtors agreed to and the plaintiff groups' interest in Local Council assignments.

3. **Unknowns**—In some cases, Abuse Survivors provided responses indicating that they did not know what Local Council they belonged to or responses that could not be interpreted. In these cases, the preliminary Local Council assignment was "Unknown."

4. **Missing**—In cases where Abuse Survivors did not respond to the question, the preliminary Local Council assignment was "Missing."

43.    Depending on the Abuse Survivor's interpretation of POC Part 4.I., the response may have listed the name of the Local Council affiliated with the Abuse Survivor's troop, the Local Council responsible for overseeing the abuse location, both, or neither. To confirm the preliminary assignments, each Abuse Claim was sent to its corresponding Local Councils; each council was tasked with verifying whether the Abuse Claim would fall under its jurisdiction, and if not, indicating which council the Abuse Claim should be assigned to, if known.  In cases where

---

[25] The BSA Local Council locator - https://www.scouting.org/about/local-council-locator/ [JTX 1539] (Ex. 25).

AMERICAS 113538893

a Local Council indicated an Abuse Claim belonged to a different council, the Abuse Claim was assigned to both the original and the newly indicated council.

44.     Lastly, Abuse Claims were, at times, manually assigned based on research done by the BSA, third parties, Local Councils, or other relevant parties.

45.     Using the aforementioned information, final Local Council assignments were created, resulting in two fields:

1.   **Historical Local Council Name:** The name of the Local Council indicated by the Abuse Survivor

2.   **Current Local Council Name:** The Local Council currently responsible for the jurisdiction previously served by the Historical Local Council.

**F.    Abuse Timing And Frequency Fields**

46.     The following fields were coded based on the information in POC Parts 4.K.–4.L., which asked for details regarding when the first act of sexual abuse took place, as well as the frequency with which the sexual abuse occurred.

47.     **Abuse Start Date** and **Abuse End Date**: These fields contain information about when the sexual abuse began and ended.  The POC question pertaining to abuse timing allowed for a long-form text response.  As a result, Abuse Survivors provided responses in many timing formats, including exact dates, years with a seasonal indicator, ambiguous decade ranges, age(s), grade(s), and/or combinations of any of these.  The Bates White manual review protocol employed the following prioritization for recording abuse start and end dates:

1.     Record exact date, if available.

2.     Record year and month, if available, and no exact date was provided.

21

3.      Record year and season, if available, and no exact date or year and month was provided.

4.      Record year, if available, and no exact date, year and month, or year and season combinations were provided.

5.      Record age, if available, and no exact date or year was provided.

6.      Record grade, if available, and no exact date, year or age was provided.

48.     To the extent that multiple of the above formats were provided, and they appeared to conflict with one another, the Bates White manual reviewers standardized the higher-priority format of the timing information, following the prioritization set forth above, and did not make any subjective attempts to reconcile the discrepancy.  For example, if a response read, "I was 17 years old and in 1st grade," manual reviewers recorded the provided age.

49.     When coding some variation of a year, the manual reviewers standardized the information in full date form according to the table provided below:

| Format | Start date | End date |
|---|---|---|
| Year only (no further detail) | 1/1/XXXX | 12/31/XXXX |
| 19XXs | 1/1/19X0 | 12/31/19X9 |
| EARLY 19XXs | 1/1/19X0 | 12/31/19X3 |
| MID 19XXs | 1/1/19X4 | 12/31/19X6 |
| LATE 19XXs | 1/1/19X7 | 12/31/19X9 |
| [Month] 19XX | [Month #]/1/19XX | [Month #]/[Final day of month]/19XX |
| Winter 19XX | 1/1/19XX | 3/31/19XX |
| Spring 19XX | 4/1/19XX | 6/30/19XX |
| Summer 19XX | 7/1/19XX | 9/30/19XX |
| Fall 19XX | 10/1/19XX | 12/31/19XX |

50.     When coding some variation of an age or grade, the manual reviewers recorded the provided number in a separate field.  The recorded age and grade fields were later used in processing to calculate a start and end year using the Abuse Survivor's birth year, if provided.  The

22

standardization/calculation protocols for responses that provided only ages or grades were defined as follows:

    a.    For responses from which the manual review extracted an age (or ages), Bates White calculated an interim abuse start year as year of birth (if provided) plus youngest age provided, and calculated an interim abuse end year as year of birth (if provided) plus oldest age provided.

    b.    For responses from which the manual review extracted a grade (or grades), Bates White calculated an interim abuse start year as year of birth (if provided) plus 5 plus lowest grade provided, and calculated an interim abuse end year as year of birth (if provided) plus 5 plus highest grade provided. (Bates White assumed that children are 6 years old in first grade.)

    c.    The resulting start and end years were then standardized in full date form according to the methodology detailed for the "Year(s) Provided" descriptor in the table above.

51.    POC responses varied in the number of data points provided.  For responses that provided a year range or a list of years, Bates White coded abuse start date as the standardized full date corresponding to the earliest date/year/age/grade provided and abuse end date as the standardized end date corresponding to the latest date/year/age/grade provided.

52.    **Abuse dates categorization**: This field contains the format of the abuse dates as they were provided in the POC response.  If an Abuse Survivor provided an abuse start date and end date in different formats, the more exact format (as defined by the priority level listed above) is recorded.  For example, if a response read "The abuse started when I was nine, and ended in Summer 1976," this field was coded as "YEAR AND SEASON PROVIDED."

AMERICAS 113538893

53. **Age at first abuse**: This field is generated based on the first numeric age of abuse recorded using the response to Part 4.K.  For records where abuse age was not recorded (either because it was not provided or because the response contained a higher-priority date format), *Age at First Abuse* was calculated as the difference between the year reflected in the *Abuse Start Date* field and the Abuse Survivor's year of birth, if both of these data points were provided.

54. **Intermittent abuse flag**: This field is coded as "1" for responses that indicated that the abuse occurred over multiple non-continuous time periods.

55. **Number of times abused**: This field contains the minimum number of times the abuse occurred, if an Abuse Survivor provided this information in response to Part 4.L. of the POC form.  During processing, the following standardization procedures were applied:

    a.    For responses that provided a range or a set of multiple values, this field contains the minimum numeric value provided (e.g., if a response read "5–10 times," this field is coded as "5").

    b.    For records that checked the box to indicate "*I was sexually abused once*" (Part 4.L.i.), did *not* check the box to indicate "*I was sexually abused more than once*" (Part 4.L.i.), and provided no additional information in the long-form text field, this field is coded as "1."

56. This "Number of times abused" field is identical to the *Min abuse count* field in the Tranche data.

**G.**    <u>**Abuse Allegation Fields**</u>

57. **BW abuse allegation**: This field contains the most severe allegation indicated by the Abuse Survivor based on their checkbox responses to POC Part 4.M.i.

AMERICAS 113538893

58.     **Provided abuse description (long-form)**: This flag indicates whether an Abuse Survivor provided a long-form text response (in addition to their checkbox responses) regarding the type(s) of abuse they experienced.  Although Bates White recognized that this field may contain helpful supplemental information, after multiple attempts at standardizing the allegations contained in this field, it became clear that there was no method of doing so that would allow Bates White to consistently pull allegation information with any degree of precision or certainty.

59.     Although the POC form provided a framework for more uniform question responses, there were numerous opportunities for long-form text expression that was difficult to consistently interpret and codify based on our pre-defined protocols.  Bates White implemented a methodology that limited the potential for error in standardization and produced six data sets that provided parties in this bankruptcy proceeding with information that was consistent and easy to use.

## STATUTE OF LIMITATIONS ANALYSIS

60.     In addition to the data standardization efforts, Bates White created a field that flags records that are presumptively barred based on the applicable Statutes of Limitations ("SOL") in the named abuse state(s).  Bates White analysis involved comparing a record's processed birth date, abuse location, and abuse date fields to a list of SOL criteria for U.S. states provided by Ogletree[26] as well as additional written instructions.[27]  This table of state-specific SOL criteria effectively provides an age to maturity before which claims can be presumptively brought in a given state or territory.  In recent years, many states have been refining their SOLs.  The SOL translation table that was used in Tranche VI to determine presumptively (not) barred status was

---

[26] SOL translation table used in Tranche VI production: Bates White BSA SOL translation table (Tranche 6) – confidential.xlsx [JTX 1075] (Ex. 26).
[27] Statute of Limitations 50 State Survey – Ogletree [JTX 360] (Ex. 27).

AMERICAS 113538893

revised by Ogletree to incorporate updates to SOL criteria that had been made by states since the Tranche IV production.[28] Some states currently have open revival windows, which in effect means that there is no time limit with regard to how long ago the abuse event occurred. Bates White's record-level presumptive SOL evaluation was conducted on the basis of all of the available recorded abuse states and territories, the Abuse Survivor's current age, and the date since last abuse.

61.    **SOL flag**: This field contains the Bates White calculated SOL status, based on the applicable SOL(s) in the provided Location(s) of abuse.

a.    The Ogletree SOL table contains information on current and prior SOLs that are applicable in U.S. states. These criteria may include, among other things, current Abuse Survivor age, years since discovery of injury, and whether the state has implemented a revival window. If a state has implemented a revival window, all records alleging abuse in that state are presumptively not barred.

b.    Bates White calculated each Abuse Survivor's age based on their date of birth to compare against each named abuse state's statutes

i.    For records that did not provide a date of birth, Bates White estimated current Abuse Survivor age by first calculating the average age at first abuse for all records that provided abuse timing and date of birth information, then subtracting that average age from the Abuse Survivor's year of first abuse.

---

[28] SOL translation table used in Tranche IV production: Bates White BSA SOL translation table (Tranche 4) – confidential.xlsx [JTX 1074] (Ex. 28).

AMERICAS 113538893

      ii.     For international locations and U.S. territories, Bates White applied the U.S. federal SOL criteria.

    c.     Bates White then applied the SOL criteria for each of the states a record provided in the Location of Abuse fields.  In instances where multiple abuse states were provided and the different state statutes resulted in different SOL statuses ("Barred" versus "Not Barred"), we kept the "Not Barred" SOL status.

    d.     For claims with multiple POC submissions, where at least one of the underlying records had a "Not Barred" status, the code was designed to keep the "Not Barred" Statute of Limitation status.[29]

### DE-DUPLICATION OF ABUSE CLAIMS DATA

62.    Throughout these Chapter 11 Cases, Abuse Survivors have been able to amend their previously filed POCs, if desired, by submitting an amendment cover page along with a revised POC form and/or other supplemental documents.  While some Abuse Claims used the amendment cover sheet, others submitted multiple POC forms.  When Omni received these amendments, it either updated the existing claim number or added a new record entry for the amendment, complete with a new claim number.

63.    Many Abuse Survivors did not submit an amendment cover page when amending previously submitted POC forms or providing supplemental documentation.  Since Omni could not distinguish these amendments from new Abuse Claims, Omni treated these submissions as

---

[29] Technically, the entirety of the SOL code is re-run on the deduplicated abuse claims data, described below, taking advantage of all the same information that is evaluated for each separate POC submission (or record).  There are two cases where the deduplicated claim status is "Barred" even though each had an underlying record that was evaluated as "Not Barred."  This occurred because the information associated with the underlying POC record that produced the "Not Barred" status was withdrawn from the process (Records that were ultimately withdrawn can be identified in the Tranche VI POC database using the "Withdrawn claim flag" field).  This is the correct treatment for these two claims given that information was withdrawn."

AMERICAS 113538893

new records and assigned them unique claim numbers.[30]  In turn, because they appeared as "new"

records in the Omni data extract, different POCs filed by the same Abuse Survivor were manually

reviewed and standardized by Bates White multiple times.  Because these submissions were not in

fact unique Abuse Claims, but instead contained additional or updated information for preexisting

POC submissions, Bates White undertook a process to merge and consolidate the information

contained across all POC records that mapped to the same Abuse Survivor—that is, consolidating

key fields for duplicative POCs—to generate a database of unique Abuse Claims that precluded

the same Abuse Survivor from appearing multiple times in the data sets being used for valuation

purposes.[31, 32]

64.    Because information entered on a POC can vary, including in terms of

completeness, spelling, nicknames, Bates White identified duplicate records by evaluating

information across the following seven personally identifying information fields:

      a.      Last name

      b.      Birth month and year

      c.      Last four digits of Social Security Number

      d.      Zip code

      e.      First name

      f.      Phone number

      g.      Email

---

[30] Note that in some cases, Abuse Survivors submitted identical forms, sometimes close in time, sometimes not.  In other cases, supplemental filings were submitted that included additional or different information.

[31] Valuation model data (Tranche 6): Bates White BSA reviewed POC deduplicated data (Tranche 6) -- confidential -- for production.xlsx (Murray Opening Materials Considered List; Murray Rebuttal Materials Considered List) [JTX 1077] (Ex. 29).

[32] Valuation model data (Tranche 4): Bates White BSA reviewed POC deduplicated data (Tranche 4) -- confidential -- for production.xlsx (Murray Opening Materials Considered List) [JTX 1076] (Ex. 30).

AMERICAS 113538893

65.     Bates White identified as duplicates any set of records that had matching information in at least four of the aforementioned seven fields.[33]  This method for identifying duplicates catches instances where, for example, an Abuse Survivor submits two different POCs with the same first name, last name, phone number, and email address, but leaves the last four digits of their Social Security Number missing on one of the POCs.  If a more restrictive method were used to identify duplicates, such as using only first name, last name, birth year and month, and last four digits of Social Security Number, the two POCs in this scenario would not be identified as duplicates.

66.     In addition to the above criteria, Bates White also identified duplicates based on fields included by Omni that track explicit amendments.  These fields identify either (a) the prior claim number the current Abuse Claim is intended to amend (*amendsclaimno*) and/or (b) the subsequent claim number that was submitted to amend the current Abuse Claim (*amendedbyclaimno*).[34]  These fields were used to further identify potential duplicates that were not identified using the above criteria.  The figure below shows an example of six Abuse Claims that were identified as duplicates using the criteria discussed above.

**Figure 4: Example Of Abuse Claims Identified As Duplicates**

| Claim number | Last name | First name | Last 4 SSN | Date of birth | Zip code | Email | Phone # | Date received | Amended by | Amends |
|---|---|---|---|---|---|---|---|---|---|---|
| 90128-A | FULL LAST | FIRST | | 1/1/1900 | 22222 | REDACTED@GMAIL.COM | 555-555-5555 | 44151 | 109624 | |
| 74896-A | LAST | FIRST | | 1/1/1900 | 22222 | REDACTED@GMAIL.COM | | 44149 | 100027 | |
| 100027-A | LAST | FIRST | | 1/1/1900 | 22222 | REDACTED@GMAIL.COM | | 44214 | 115661 | 74896 |
| 109620-A | FULL LAST | FIRST | 1234 | 1/1/1900 | 22222 | ALSO_REDACTED@GMAIL.COM | 555-555-5555 | 44298 | 109624 | 90128 |
| 109624 | FULL LAST | FIRST | 1234 | 1/1/1900 | 22222 | ALSO_REDACTED@GMAIL.COM | 555-555-5555 | 44298 | | 90128 |
| 115661 | LAST | FIRST | | 1/1/1900 | 22222 | REDACTED@GMAIL.COM | | 44342 | | 100027 |

---

[33] Our process of deduplication considered blanks/missings as a match only when they occurred for one of the first four aforementioned fields.  This rule was not applied to the remaining three fields because they were considered to be less indicative of a strong match since they are more often blank/missing in the data.

[34] Tranche 6 (7/6/2021): SearchExport_07_06_2021_20_27_31_PM_UTC.xlsx [JTX 678] (Ex. 17).

AMERICAS 113538893

67.     Following the identification of duplicate records, Bates White consolidated the information contained in key POC response fields into a single Abuse Claim that kept the following information below:

a.     All abuser identity information provided

b.     All abuse locations provided

c.     All troop numbers and troop locations provided

d.     All Chartered Organization information provided

e.     All Local Council information provided

f.     Earliest Abuse Start Date

g.     Latest Abuse End Date

h.     Highest abuse frequency

i.     Most severe abuse allegation

j.     Most inclusive SOL status[35]

k.     All affirmative responses to the following checkbox questions: *Survivor Involvement in Scouting? Other contact/relationship with abuser*, *Impact of abuse*, *Abuse involved,* and *Reported abuse*, among others.

## IDENTIFICATION OF RECORDS ASSOCIATED WITH MAJOR CHARTERED ORGANIZATIONS

68.     Bates White undertook the identification of records potentially associated with each major Chartered Organization.  To identify records that implicated a given Chartered Organization group, we took the following steps:

• **Step 1**: Performed a string search for terms related to the Chartered Organization group across a subset of potentially relevant fields, including raw text fields from the Omni data

---

[35] *See supra* n.29.

AMERICAS 113538893

extract, and the processed Chartered Organization name, category, and state fields.  The list of text fields is provided in Appendix D of my Affirmative Report.[36]

- Bates White developed a list of search terms based primarily on the organization name and words commonly used in the context of the organization.  The list would include the name of the organization, abbreviations, potential misspellings, and alternative names.  For example, to identify records affiliated with the Church of Jesus Christ of Latter-day Saints, Bates White searched for "Church of Jesus Christ of Latter-day Saints," "Later-day Saints," "LDS Ward," and "Mormon Church," among other terms.

- Any record containing a relevant term in one of the text fields we searched was flagged as identifying the given organization.

- **Step 2**: Flagged records that mapped to chapters/groups listed in supplemental entity-level files provided by the BSA or compiled using publicly available data.

- For the Church of Jesus Christ of Latter-day Saints ("TCJC"), the BSA provided a list of Local Councils with high percentage Church membership as of 2017.[37] Records belonging to Local Councils with greater than 50% TCJC membership for Boy Scout units were flagged as associated with TCJC.

- For the Catholic Church, Bates White obtained a publicly available list of large Catholic churches by state and performed a string search based on this list to flag records that (a) named a church on the list and (b) listed a state that mapped to the state of the associated church name.[38]

---

[36] Makeda S. Murray Expert Report, Exhibit D [JTX 1023] (Ex. 7).
[37] The BSA's list of high-percentage TCJC Local Councils (11/25/2020): BSA list of Local Councils with high percentage TCJC membership: Copy of LDS vs BSA Youth December 2017.xlsx [JTX 330] (Ex. 31).
[38] List of large Catholic churches & their states (4/2/2021): List of Catholic churches.xlsx [JTX 421] (Ex. 32).

AMERICAS 113538893

- In addition, the BSA provided lists of names and associated states, Local Councils, and troop numbers for entities affiliated with the Methodist Church,[39] the Episcopal Church,[40] the Catholic Church,[41] the Kiwanis Club,[42] the Faegre Diocese,[43] and the Knights of Columbus.[44]  Records that matched an entity on these lists based on any of the following field combinations were flagged as associated with the organization group:

  - Chartered organization name and troop state

  - Chartered organization name and Local Council

  - Chartered organization name, sponsor/troop state and Local Council.

Records identified in Steps 1 and 2 above were treated as "base" records.  This set of records was subsequently used to identify "secondary" records that shared common characteristics with the "base" records in Step 3.

- **Step 3**: Identified "secondary" records as ones that named either:

  - An *abuser* (full name) that appears three or more times among the "base" records.

  - A *troop number* and *troop state* combination that appears five or more times among the "base" records.

---

[39] The BSA's list of Methodist churches (12/29/2020): UNITED_METHODIST_CHURCH_026_1999-2020_BSA_12292020.xlsx [JTX 346] (Ex. 33).

[40] The BSA's list of Episcopal churches (7/20/2021): Chartered Organizaion Listing_024-214Episcopal Church-EC-Reformed_1999-2021_07202021.xlsx [JTX 691] (Ex. 34).

[41] The BSA's list of Catholic churches (4/1/2021): Catholic-Church-Roman_ALL_19992021_04012021.xlsx [JTX 418] (Ex. 35); Version 1, used for Catholic search (4/1/2021): Catholic-Knights-of-ColumbusRoman_ALL_1999-2021_04012021.xlsx [JTX 419] (Ex. 36).

[42] The BSA's list of Kiwanis Club organizations (8/2/2021): Chartered Organization Listing_083 - Kiwanis International_1999-2021_08012021.xlsx [JTX 711] (Ex. 37).

[43] List of Faegre Diocese (9/20/2021): Diocese - FDBR Clients as of 9.17.21.xlsx [JTX 785] (Ex. 38).

[44] Version 2, used (in addition to version 1) for KOC-only search (10/20/2021): Chartered Organization Listing_Code 084_Knights-of-Columbus-RomanCatholic_With_Units_10202021.xlsx [JTX 887] (Ex. 39).

AMERICAS 113538893

- A *Chartered Organization name* that appears three or more times among the "base" records.[45]

- **Step 4**: Reset flags for records that appeared to be improperly identified in Steps 2 and 3 detailed above.  The reset flag was generated using the abuse organization category fields generated during POC data processing.

  - For religious organizations, the reset flag required that a record explicitly name a religious organization of a *different* denomination and *never* names the denomination in question.  This flag was then used to reset only records that do not directly name the relevant religious organization (and thus were only flagged in Step 2 and/or 3).  For example, if an Abuse Survivor explicitly stated that their abuse took place at an LDS Church but provided only a Methodist Chartered Organization, this record would not be reset.

  - For civic organizations, the reset flag required that a record explicitly name a religious organization, an educational institution, or the military, and *never* name a civic organization.  This flag was then used to reset only records that did not directly identify the relevant civic organization (and thus were only flagged in Step 2 and/or 3).  For example, if an Abuse Survivor explicitly stated that their abuse took place at a VFW hall but indicated *only* an Episcopal Chartered Organization, this record would not be reset.

69.    During deduplication, we collapsed the major Chartered Organization identification flags associated with a given Abuse Claim, such that if any record associated with a

---

[45] Secondary identification of claims on the basis of common Chartering Organization name was done for religious Chartering Organizations only (with the exception of Faegre Diocese, for which we were provided a fulsome list of individual entity names).  In general, religious organizations were the only organization type where the name of the organization did not always include an indication of the denomination.

AMERICAS 113538893

given Abuse Claim was flagged for a certain Chartered Organization, the composite Abuse Claim was also flagged for that organization.

## THE BSA HISTORICAL SETTLEMENT CLAIMS PROCESSING

70.     Bates White requested and received data on the BSA's historical abuse settlements from Ogletree Deakins, the Debtors' national coordinating counsel for sexual abuse-related litigation since 2016.  Ogletree provided Bates White with two Excel workbooks during the course of this matter that we have relied upon and processed for valuation purposes.  The first of these was received on February 21, 2021, and included information on 262 historical abuse claims filed against the BSA from 2016 to 2020.[46]  The second file was received on November 29, 2021, and contained the previous 262 claims plus an additional to 311 historical claims from the same period, for a total of 573 historical settlements between 2011 and 2020.[47]

71.     Bates White performed basic standardization on these claims data for use in analysis. Below, I outline how we processed the following fields for each historical claim in the two files.

a.      **Claimant name**: We split claimant names into first and last name and removed special characters, nicknames, and information provided in parentheticals.

b.      **Claimant birth year**: For claims where the claimant birth date is unknown or missing, "1900" was used as the birth year.

c.      **Age at abuse**: For claims where the claimant age at abuse is unknown or missing, "99" was used as the age at abuse.

---

[46] Historical settlements spreadsheet from Ogletree (2/21/2021): 2021.02.21 BSA Historical Settlements [JTX 387] (Ex. 40).
[47] Historical settlements spreadsheet (2010-2020) (11/29/2021): 2021-11-24 BSA Historical Settlements 2020-2010 Sort (OD UNredacted Rev5 - w BW Data) [JTX 986] (Ex. 41).

AMERICAS 113538893

d.    **Abuse state**: The state field was standardized such that:

    i.    A two-letter abbreviation was used for a US state, or

    ii.    A two-letter abbreviation was used for a US territory, or

    iii.    A three-letter ISO code was used for non-US countries (if the abuse took place outside of the United States).

    iv.    "ZZ" was used to indicate that the field was blank.

e.    **Abuse years**: We extracted the first year of abuse and last year of abuse from the abuse year range provided in the files. For ambiguous date ranges, we used the earliest possible year as the abuse start year and the latest possible year as the abuse end year. For example, a claim with the years "1960s–1970s" would have a start year of "1960" and an end year of 1979.

f.    **Abuse allegation**: The abuse allegations are categorized in the same way as the POC database. For claims where allegation was missing, the field was set to "8. Missing."

g.    **Number of abuse occurrences**: Where the frequency of abuse was unknown or missing, this field was left blank.

h.    **Abuser name**: We split the abuser's name into first and last name for each distinct abuser named in the claims, while also performing basic standardization and removing special characters and aliases.

i.    **Whether the abuser was an adult or youth**: This field was already standardized in the data.

AMERICAS 113538893

j.       **Number of historical claims brought against abuser**: For claims with multiple abusers, the maximum number of historical claims brought against all the named abusers was used.

k.       **Resolution year**: For claims where the resolution year was unknown or missing, we used "9999" as the year.

l.       **Settlement amount**: This field was already standardized in the data.

m.       **Current legal status of claim**: We corrected minor typos in this field.

<u>**ADDITIONAL STANDARDIZATION OF ABUSER NAMES IN THE TRANCHE VI DATA**</u>

72.       Bates White undertook the process of reviewing the available abuser name information and standardizing it in such a way that we would be able to generate an accurate count of claims by abuser, and identify repeat abusers in and across the datasets.

A.       <u>**BSA Historical Settlements**</u>

73.       Utilizing the BSA historical settlements file, Bates White took the following steps to standardize the abuser names.  Fictional examples are provided below to illustrate the process. It should be noted that all abusers named in the historical settlement data had full names:

1.       Removed extraneous characters or information in quotes or parentheses

A.       DANIEL "DANNY" DOE, JR was updated to DANIEL DOE, JR

B.       EUGENE (GENE) DEERE; ADAM EVE was updated to EUGENE DEERE; ADAM EVE

2.       Removed suffices

A.       DANIEL DOE, JR was updated to DANIEL DOE

AMERICAS 113538893

3.      Split out the names for different abusers

      A.      EUGENE DEERE; ADAM EVE was updated to two separate names: EUGENE DEERE and ADAM EVE

4.      Isolated the first and last names to remove middle names or middle initials because they were not consistently included across claims and abuser names

      A.      JAMES HERBERT BOND and JAMES H. BOND were updated to JAMES BOND

5.      Standardized abuser names in the dataset that were similar but not exact matches based on known/established nickname conventions

      A.      EDDIE READY was updated to EDWARD READY

      B.      DICK TRACY was updated to RICHARD TRACY

      C.      FRED FLINSTONE was updated to FREDERICK FLINTSTONE

6.      Prior to abuser name standardization, there were 159 "unique" abusers with first and last names in the BSA historical settlements data; 100 of which had a pre-existing single-claim abuser indicator provided by Ogletree in the field labeled "Number of Historical Claims brought against Abuser."  The result of standardizing abuser name in the BSA historical settlements file was the identification of 157 distinct abuser names across the 573 settlements.  There was no change to the count of single claim abusers in the BSA historical settlements data as a result of name standardization.

**B.      BSA Tranche VI Dataset**

74.      Using the record-level Tranche VI dataset produced with my initial report, we took the following steps to standardize abuser names:

1.      Restricted the set of abusers for review and standardization to those with full names, i.e., abuser information where the Abuse Survivor provided at least abuser first name and last

AMERICAS 113538893

name. We did not include middle names or initials in our standardization because of how inconsistently they appeared in the data.

2.    Followed steps 1-2, and 4 as outlined in the BSA historical settlements section above (step 3 was not necessary as abuser names were already split out in the Tranche data).

3.    Generated a list of abuser names sorted by abuser last name and conducted a manual review of said list to identify and update names based on apparent miss-spellings and transcription errors.

    A.    FREDERIK FLINSTONE and FREDERICK FLINSTOON were updated to FREDERICK FLINTSTONE

4.    Conducted the same programmatic cleaning/standardization of names as outlined above in the standardization of names in historical settlements (*see supra* at ¶ 73).

75.    Prior to abuser name standardization, there were 29,964 "unique" abusers with first and last names in the full Tranche VI dataset.  The result of standardizing abuser name in the BSA Tranche VI data file was the identification of 28,530 distinct abuser names across the 117,037 records.  After consolidation and deduplication, 30,501 of the 82,209 unique and timely claims provided at least one abuser with a full name, and there were 28,486 unique abuser names in the data.  Based on the 28,486 unique abusers in the Tranche VI deduplicated data, there are 24,887 single-claim abusers, and 3,599 multi-claim abusers.

## C.    Abuse Claim Count Analysis

76.    In order to estimate the total claim count for abusers with first and last names in the BSA historical settlements and unique and timely POC data, we took the following steps:

    a.    Conducted a comparison of abuser names between the BSA historical settlements file and the BSA Tranche VI data to standardize abuser names

AMERICAS 113538893

between the two sources for purposes of merging information across the datasets.

b.  Merged the abuser claim count from the BSA Tranche VI data to the BSA historical settlements based on matching abuser first and last name.

c.  Generated a field named *"Abuser Frequency (total)"* that was the sum of the claim counts for a given named abuser across both datasets. For example, if Berry Crusoe was an abuser named in two claims in the historical settlements data, and named in eight claims in the unique and timely POC data, the total claim count associated with Berry Crusoe would be ten claims.

77.    As a result of merging the BSA historical settlements and POC data, the count of abusers that were flagged as single-claim abusers in the historical settlements data was updated from 100  abusers to 51 abusers.  This means that 49 abusers in the historical data were also named by Abuse Survivors in the POC data.

**Figure 5: Updated Abuser Frequency Category By Settlement Claim Number**

| Claim Number | Abuser(s) Full Name | Settlement | Original Abuser Frequency Category | Updated Abuser Frequency Category | Reason for Update |
|---|---|---|---|---|---|
| 8 | DK | $400,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 10 | RD | $25,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 16 | GH | $1,970,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 31 | WS | $112,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 33 | PL | $125,000 | 0-1 | 10+ | Abuser name found in POC data |
| 36 | RG | $115,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 49 | GB | $25,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 53 | MD; TC; QT | $0 | 0-1 | 2-4 | Abuser name found in POC data |

39

| Claim Number | Abuser(s) Full Name | Settlement | Original Abuser Frequency Category | Updated Abuser Frequency Category | Reason for Update |
|---|---|---|---|---|---|
| 60 | DM | $5,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 63 | RS | $300,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 64 | KB | $75,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 68 | JM | $100,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 70 | JK; RS | $475,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 71 | RS | $175,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 72 | DA | $500,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 81 | GG | $75,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 91 | JG | $20,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 94 | FS | $0 | 0-1 | 2-4 | Abuser name found in POC data |
| 95 | CH; EA; AP; MP; JB; KK | $0 | 0-1 | 2-4 | Abuser name found in POC data |
| 97 | GM | $2,150,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 106 | JH; TS | $1,000,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 111 | BD | $0 | 0-1 | 2-4 | Abuser name found in POC data |
| 128 | TE | $385,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 161 | FW | $1,200,000 | 0-1 | 5-9 | Abuser name found in POC data |
| 223 | GG | $275,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 256 | AL | $20,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 258 | LS | $22,500 | 0-1 | 5-9 | Abuser name found in POC data |
| 259 | CR | $22,500 | 0-1 | 2-4 | Abuser name found in POC data |
| 261 | TH | $22,500 | 0-1 | 2-4 | Abuser name found in POC data |
| 298 | AD & SH | $140,000 | 1 | 10+ | Abuser name found in POC data/Appears multiple times in BSA-PLAN_01635877 |
| 310 | AC | $950,000 | 1 | 10+ | Abuser name found in POC data |
| 312 | PS | $550,000 | 1 | 2-4 | Abuser name found in POC data |
| 357 | LL | $62,500 | 1 | 2-4 | Abuser name found in POC data |

AMERICAS 113538893

| Claim Number | Abuser(s) Full Name | Settlement | Original Abuser Frequency Category | Updated Abuser Frequency Category | Reason for Update |
|---|---|---|---|---|---|
| 362 | RB | $8,000 | 1 | 5-9 | Abuser name found in POC data |
| 374 | MC; JP | $175,000 | 1 | 2-4 | Abuser name found in POC data |
| 412 | GR | $500,000 | 1 | 2-4 | Abuser name found in POC data |
| 435 | DS | $50,000 | 1 | 2-4 | Abuser name found in POC data |
| 440 | JM | $275,000 | 1 | 5-9 | Abuser name found in POC data |
| 451 | DS | $25,000 | 1 | 2-4 | Abuser name found in POC data |
| 483 | AP | $750,000 | 1 | 2-4 | Abuser name found in POC data |
| 513 | CP | $375,000 | 0-1 | 2-4 | Abuser name found in POC data |
| 514 | AS | $2,300,000 | 1 | 2-4 | Abuser name found in POC data |
| 541 | FS | $300,000 | 1 | 5-9 | Abuser name found in POC data |
| 548 | ET | $60,000 | 1 | 2-4 | Abuser name found in POC data |
| 552 | DH | $95,000 | 1 | 2-4 | Abuser name found in POC data |
| 571 | GB | $350,000 | 1 | 2-4 | Abuser name found in POC data |

78.     Conversely, the merge resulted in an update of the unique and timely POC count of single-claim abusers from 24,887 to 24,857.  All told, there were 3,648 abusers that were named in more than one historical settlement or unique and timely POC claim.

**Figure 6: Abuser Counts By BSA Dataset**

| Data set | Pre-standardization "unique" abuser count | Pre-standardization single-claim abuser count | Post-standardization unique abuser count | Post-standardization single-claim abuser count | Post-HS/POC Merge single-claim abuser count |
|---|---|---|---|---|---|
| Historical settlements | 159 | 100 | 157 | 100 | 51 |
| Tranche VI (full) | 29,964 | 21,728 | 28,530 | 20,242 | N/A |
| Tranche VI (UT) | N/A | N/A | 28,486 | 24,887 | 24,857 |

41

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed this 14 day of March, 2022

_____

Makeda S. Murray

AMERICAS 113538893