1
2
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

3                                   .   Chapter 11
     IN RE:                         .
4                                   .   Case No. 20-10343 (LSS)
     BOY SCOUTS OF AMERICA AND      .
5    DELAWARE BSA, LLC,             .
                                    .   Courtroom No. 2
6                                   .   824 North Market Street
                                    .   Wilmington, Delaware 19801
7                                   .
                       Debtors.     .   Monday, March 14, 2022
8    . . . . . . . . . . . . . . .      10:00 A.M.

9              TRANSCRIPT OF CONFIRMATION HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10              UNITED STATES BANKRUPTCY JUDGE

11                        **TRIAL (DAY ONE)**

12   APPEARANCES:

13
     For the Debtor:        Derek Abbott, Esquire
14                          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                            1201 North Market Street, 16th Floor
15                          Wilmington, Delaware 19899

16                          - and -

17                          Jessica C. Lauria, Esquire
                            Glenn Kurtz, Esquire
18                          WHITE & CASE LLP
                            1221 Avenue of the Americas
19                          New York, New York 10020

20   Audio Operator:        Brandon J. McCarthy

21   Transcription Company: Reliable
                            1007 N. Orange Street
22                          Wilmington, Delaware 19801
                            (302)654-8080
23                          Email:  gmatthews@reliable-co.com

24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.

1   APPEARANCES (Cont'd):

2   For the Debtors:          Michael C. Andolina, Esquire
                              WHITE & CASE LLP
3                             111 South Wacker Drive
                              Chicago, Illinois 60606
4

5   For AIG Companies:        James Hallowell, Esquire
                              Mitchell Karlan, Esquire
6                             GIBSON DUNN & CRUTCHER LLP
                              200 Park Avenue
7                             New York, New York 10166

8   For Tort Claimants:       Richard Pachulski, Esquire
                              Alan Kornfeld, Esquire
9                             PACHULSKI STANG ZIEHL & JONES LLP
                              10100 Santa Monica Blvd., 13th Floor
10                            Los Angeles, California 90067

11  For the United            Thomas Macauley, Esquire
    Methodist Ad Hoc          MACAULEY LLC
12  Committee:                300 Delaware Avenue, Suite 750
                              Wilmington, Delaware 19801
13

14  For the Ad Hoc            Joseph Celentino, Esquire
    Committee of Local        WACHTELL LIPTON ROSEN & KATZ
15  Councils:                 51 W 52nd Street
                              New York, New York 10019
16

17  For the U.S. Trustee:     David Buchbinder, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
18                            OFFICE OF THE UNITED STATES TRUSTEE
                              844 King Street, Suite 2207
19                            Lockbox 35
                              Wilmington, Delaware 19801
20

21  For Great American:       David Christian, Esquire
                              DAVID CHRISTIAN ATTORNEYS LLC
22                            105 W. Madison Street, Suite 1400
                              Chicago, Illinois 60602

23  For the Roman Catholic    Neil Lloyd, Esquire
    Ad Hoc Committee:         ARENTFOX SCHIFF LLP
24                            233 South Wacker Drive, Suite 7100
                              Chicago, Illinois 60606
25

1 | APPEARANCES (Cont'd):

2 | For the Coalition of          Cameron Moxley, Esquire
   | Abused Scouts for             BROWN RUDNICK LLP
3 | Justice:                      7 Times Square
   |                              New York, New York 10036
4 |

5 | For Guam Abuse                Delia Lujan Wolff, Esquire
   | Survivors:                    LUJAN & WOLFF LLP
6 |                              238 Archbishop FC Flores
   |                              Suite 300
7 |                              Hagatna, Guam 96910

8 | For Sexual Abuse              Gilion Dumas, Esquire
   | Claimants:                    DUMAS & VAUGHN
9 |                              3835 NE Hancock Street, Suite GL-B
   |                              Portland, Oregon 97212
10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

INDEX

MATTER GOING FORWARD:

1.  Third Modified Fifth Amended Chapter 11 Plan of
Reorganization for Boy Scouts of America and Delaware BSA, LLC
(D.I. 8813; Filed 2/15/22)


WITNESSES

DEBTOR'S WITNESSES:                                        PAGE

     DEVANG DESAI

          Direct Examination by Mr. Andolina        15

          Cross Examination by Mr. Hallowell        76

          Cross Examination by Mr. Moxley           183

          Cross Examination by Ms. Lujan Wolff       189

          Cross Examination by Mr. Buchbinder       252

          Redirect Examination by Mr. Andolina      265

EXHIBITS:

Devang Desai Declaration

DX-1, JX-1926, JX-1185

JTX-1925

JTX-1172

JTX-3003

JTX-378

JTX-3005

JTX-442

1    EXHIBITS (Cont'd):

2    JTX-3004

3    JTX-474

4    JTX-476

5    JTX-524

6    JTX-2253

7    JTX-757

8    JTX-2263

9    JTX-1128

10    JTX-3006

11    JTX-1176

1          (Proceedings commence at 10:06 a.m.)

2              THE COURT:  Good morning.  This is Judge

3  Silverstein.  We're here in the Boy Scouts of America

4  bankruptcy, Case 20-10343.

5              Mr. Abbott.

6              MR. ABBOTT:  Good morning, Your Honor.  Derek

7  Abbott of Morris Nichols here for the debtors.

8              Your Honor, I just wanted to make sure -- I know

9  the Court got a lot of stuff from us, but I wanted to make

10  sure that among them was the amended agenda.

11              THE COURT:  I believe I have that.

12              MR. ABBOTT:  Thank you, Your Honor.

13              We are going to start today with Mr. Kurtz from

14  White & Case, so I'll cede the podium to him, if I may.

15              THE COURT:  Thank you.

16              Mr. Kurtz.

17              MR. KURTZ:  Good morning, Your Honor.  Glenn Kurtz

18  from White & Case on behalf of the debtors.  I will be brief.

19              In the first place, it's been a long haul and we're

20  very appreciative and very pleased to be starting today.  I

21  thought it made sense to maybe set the table, so Your Honor

22  would have some sense of the timing for the case.

23              You have probably noticed that we filed

24  declarations for our first four witnesses on Friday morning.

25  We have since canvassed the objectors and ascertained that

1   they expect to have four to five hours of cross-examination

2   for each of those witnesses.  Those are estimates, so nobody

3   stands and gets upset, nobody has agreed to cap themselves.

4   We've urged the objectors to coordinate, to avoid duplication,

5   and hopefully they'll do that.  We'll certainly raise that

6   issue as appropriate when it comes up.  Given those hours,

7   particularly with some redirect, that appears to be taking us

8   through the entire week, and perhaps even entering into the

9   very early parts of next week, for planning purposes.

10          We also filed a declaration for our fifth witness

11  on Sunday morning.  We filed 2 other declarations this

12  morning.  And that takes us through 11 of our first 12

13  witnesses.  There's still one declaration, James Patton, for

14  the FCR, that I suspect will be filed soon.  But we're

15  primarily through most of our case.  We have maybe 2 or 3 or 4

16  more declarations.  We'll get those filed this week, long in

17  advance of the 72 hours.

18          While I'm on that subject, I want to comment that

19  we had committed with Your Honor to try to get things in as

20  soon as possible, so that you would have an opportunity and

21  time to read.  Your Honor made a couple of remarks about the

22  general notion of streamlining.  I did want to recognize that

23  we -- the way this is streamlined because, the cameras are

24  off, Your Honor is continuing trial by reading through these

25  materials, and we greatly appreciate that and wanted to

1  acknowledge that.  We know that's not our right, that's our

2  privilege here.

3            Objections have been filed, we have filed some

4  responses to objections.  I'm going to make a recommendation

5  that we address objections at the time that the declaration is

6  offered into evidence.  I say that because, in some instances,

7  there may be a brief direct, including this morning, to try to

8  cure some of the objections, including objections as they

9  relate to foundation or the like.

10           We hope that the objections will be presented and

11 heard briefly, the way they would live, and that they're not

12 being used as a platform for making confirmation objections or

13 arguing about a cross-examination that has not yet taken

14 place.

15           I've tried not to be argumentative this morning, so

16 that we could get right to the evidence and maybe avoid sort

17 of a parade of opening remarks, and the debtors are prepared

18 to move to their first witness, Mr. Devang Desai, who will be

19 presented by Mike Andolina from White & Case.

20           THE COURT:  Mr. Hallowell.

21           MR. HALLOWELL:  Your Honor, Jim Hallowell, Gibson,

22 Dunn & Crutcher, representing AIG, on behalf of the certain

23 insurers.  We just have a brief issue of a housekeeping matter

24 before we begin this morning.

25           The certain insurers advised the parties this

1  weekend that, under Federal Rule of Evidence 615, we request

2  that all fact witnesses, unless they fall within one of the

3  enumerated exceptions under the rule, be excluded, so that

4  they cannot hear other witnesses' testimony.

5        THE COURT:  Thank you.  Was there any agreement

6  with respect to that?

7        MR. HALLOWELL:  There has not been disagreement,

8  and I believe that there's a general understanding that the

9  parties will adhere to.

10        THE COURT:  Okay.

11        MR. HALLOWELL:  But if there is disagreement, I'd

12  like to know about it.

13        THE COURT:  Okay.  Thank you.

14        And Mr. Kornfeld?

15        MR. KORNFELD:  Good morning, Your Honor.  Alan

16  Kornfeld, Pachulski, Stang, Ziehl & Jones, for the TCC.

17        Your Honor, there is no agreement, in general, with

18  the designation under Rule 615 or the sequestration under Rule

19  615.  But specifically, with respect to Douglas Kennedy, who

20  is the co-chair of the TCC, he is within, as Mr. Hallowell put

21  it, one of the exceptions to 615, which is 615(b), which

22  provides that the sequestration rule of 615, and I quote:

23        "-- does not authorize excluding (b) an officer or

24  employee of a party that is not a natural person, after being

25  designated as the party's representative by its attorney."

1    Dr. Kennedy is designated as the party

2  representative for the TCC.  So, unless Your Honor has

3  questions or feels otherwise, he will not be excluded.

4    THE COURT:  Mr. Hallowell, do you have any issue

5  with the exception that Mr. Kornfeld is pointing to?

6    MR. HALLOWELL:  We do not.  We acknowledge that a

7  party may designate a representative.  We'd ask the TCC about

8  the status of Mr. Humphrey.

9    MR. KORNFELD:  Mr. Humphrey will not be a witness,

10  so he is -- and he is not a party representative.

11    MR. HALLOWELL:  We'd ask the Boy Scouts if they

12  have a party representative to this proceeding.

13    MR. KURTZ:  Your Honor --

14    THE COURT:  Mr. Kurtz.

15    MR. KURTZ:  Can I speak?

16    THE COURT:  Yes.

17    MR. KURTZ:  In the first place, we don't have any

18  objection.  I don't know that there's any discretion involved

19  in the invocation of the rule.  They have a right to invoke

20  it, they did revoke -- invoke it and it is what it is.  It's

21  only for fact witnesses, which has been clarified.

22    Our corporate representative is Steve McGowan, he's

23  not a witness.  And obviously, that's -- everybody knows that

24  everyone is entitled to a corporate representative.  I don't

25  think there's going to be a dispute about that, as well.

1          THE COURT:  Thank you.

2          Mr. Martin.

3          MR. CELENTINO:  Good morning, Your Honor.  This I

4 Joe Celentino with Wachtell Lipton on behalf of the Ad Hoc

5 Committee of Local Councils.

6          Your Honor, I just wanted to clarify that Mr.

7 William Sugden is designated as the representative for ad hoc

8 committee, and he will be testifying, as well.

9          THE COURT:  Thank you.  Okay.  Mr. Kurtz, let's

10 begin.

11          MR. MACAULEY:  Your Honor, excuse me.

12          THE COURT:  Oh, I'm sorry.  Mr. Macauley.

13          MR. MACAULEY:  Sorry, I didn't put my hand up, Your

14 Honor.  For the record, Thomas Macauley on behalf of the

15 United Ad Hoc  -- United Methodist Ad Hoc Committee.  Our

16 representative is Bishop Schol, and he's also our fact

17 witness, so we would be -- we would be in that same boat.

18          THE COURT:  Thank you.

19          MR. MACAULEY:  Thank you, Your Honor.

20          MR. KURTZ:  Thank you, Your Honor.  I'm going to

21 move this over, the virtual podium -- which, in this case,

22 would be a virtual desk -- to Mike Andolina to call Mr. Devang

23 Desai.  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          MR. ANDOLINA:  Good morning, Your Honor.  Mike

1  Andolina, White & Case, on behalf of the Boy Scouts of

2  America.  Your Honor, I'm here with our first witness, Mr.

3  Devang Desai.  We're in a conference room here in Miami.

4          Before we begin, Your Honor -- begin, Your Honor, a

5  few housekeeping matters.

6          We wanted to let the Court know that, with respect

7  to Mr. Desai's declaration, there was a very limited objection

8  filed by certain insurers with respect to four paragraphs of

9  his declaration.  The objection was filed at Docket Number 931

10 -- I've got a hole punch, so maybe someone could help me --

11         THE COURT:  I found it.

12         MR. ANDOLINA:  -- with that.

13         THE COURT:  I've got it.

14         MR. ANDOLINA:  Okay.

15         THE COURT:  It's 9311.

16         MR. ANDOLINA:  Thank you, Your Honor.

17         There are four paragraphs that the insurers object

18 to on evidentiary grounds:  Paragraph 25, 26, 27, 28, and 77.

19         Your Honor, as Mr. Kurtz referenced, these are

20 foundational objections.  And my intent, Your Honor, is, in my

21 --

22         UNIDENTIFIED:  (Indiscernible)

23         THE COURT:  Excuse me.  Everyone needs to make

24 certain that they are muted.  Thank you.

25         Mr. Andolina.

1        MR. ANDOLINA:  Thank you, Your Honor.

2        My intent is to, in my direct of Mr. Desai -- as we

3   indicated to the Court, we do have limited direct of Mr.

4   Desai, my intent is to cover those paragraphs and then, upon

5   completion of Mr. Desai's direct testimony, to offer his

6   declaration, along with the testimony that the Court has just

7   heard.  Is that acceptable to the Court?

8        THE COURT:  It is.

9        MR. ANDOLINA:  Thank you, Your Honor.

10       And I will also note that there was only one

11  exhibit that was objected to by any of the parties to date;

12  that is JTX-1097.  The debtors are not going to seek to

13  introduce that into evidence in connection with Mr. Desai, so

14  no need for the Court to consider that issue at this time.

15       THE COURT:  Thank you.

16       MR. ANDOLINA:  Your Honor, two additional

17  housekeeping matters.  I hope that Your Honor has two binders

18  in front of Your Honor.  The first would be Exhibits A through

19  CCC, which is attached to Mr. Desai's declaration.

20       The second is supplemental exhibits that were

21  referenced in -- on Page 7, Footnote 4 of the declaration.

22  That includes Exhibits I through -- I believe that's XXVI.  I

23  don't intend to use those, Your Honor, but we did include them

24  as additional minutes and presentations that we will seek to

25  move into evidence.  I wanted to make sure Your Honor had that

1  second binder.

2          THE COURT:  I do.

3          MR. ANDOLINA:  And then, finally, Your Honor, we

4  delivered this morning, I believe, a folder of seven

5  demonstrative exhibits -- or actually, I think, it's eight.  I

6  think seven came from the debtors and one from the objecting

7  insurers.  With Your Honor's permission, we would intend to

8  project those in connection with Mr. Desai's testimony, in

9  order to assist the Court and assist Mr. Desai in providing

10  his testimony to Your Honor.

11          THE COURT:  Okay.  I have those, as well.

12          MR. ANDOLINA:  Thank you.

13          Lastly, Judge, just for the record, in the room

14  with me here are, in addition to Mr. Desai, two of my

15  colleagues at White & Case, Sam Hershey and Michael Jaoude.

16  They are behind the curtain, so to speak, but I did want to

17  let the Court know that, to the extent they're still awake

18  after the weekend, they are in the room.  And I'm also joined

19  by Mr. James Beal (phonetic), who is our video technician, who

20  will assist with projecting the various materials on the Zoom,

21  Your Honor.

22          THE COURT:  Thank you.

23          MR. ANDOLINA:  With that, Your Honor, we would like

24  to have Mr. Desai sworn.  I will tell Your Honor that I'm

25  going to do my best to not retread old ground, but I will be

1  asking some questions of Mr. Desai in order to sort of set the

2  stage for some of his testimony.

3          I believe that the timing of his presentation, we

4  expect it to be about 45 minutes.  I've been told, as Mr.

5  Kurtz referenced, that several parties intend to cross-examine

6  Mr. Desai.  The certain insurers have told us they expect an

7  hour; the Roman Catholic Ad Hoc Committee an hour to 1.5;

8  Dumas & Vaughn, one hour; Ms. Wolff has not indicated the

9  amount of time; then, finally, Mr. Buchbinder indicated 10

10 minutes to an hour.  Again, we will try to proceed efficiently

11 and hope that, on cross-examination, the objecting parties

12 will do the same.

13          THE COURT:  Thank you.

14          MR. ANDOLINA:  We're ready to proceed, Your Honor.

15          THE COURT:  Thank you.  Mr. Desai, will you please

16 raise your right hand.

17 DEVANG DESAI, WITNESS FOR THE DEBTORS, AFFIRMED

18          THE COURT:  Please state your full name and spell

19 your last name for the record.

20          THE WITNESS:  Devang Desai.  The last name is

21 spelled D, as in David, e-s-a-i.

22

23          THE COURT:  Mr. Andolina.

24          MR. ANDOLINA:  Thank you, Your Honor.

25                    DIRECT EXAMINATION

1  BY MR. ANDOLINA:

2  Q    Mr. Desai, could you describe for the Court the role you

3  currently play for the Boy Scouts of America?

4  A    Good morning.  My name is Devang Desai, and I have the

5  pleasure of serving as a voluntarily member of the National

6  Executive Board of the Boy Scouts of America.  In that

7  capacity, since 2018, I've had also the pleasure, in May of

8  2020, to serve as a member of the National Executive

9  Committee, where I chair the Boy Scouts of America's Audit

10 Enterprise Risk Management Committee; and, in July of 2020,

11 was also asked to serve as a member of the Bankruptcy Task

12 Force.

13 Q    How long have you been associated with the national

14 organization of the BSA?

15 A    I've been a Boy Scout since I've been a young kid.

16 Growing up in Miami, Florida, I started in the Cub Scout

17 Program and worked my way through to earning the rank of Eagle

18 Scout on December 12th, 1989.

19 Q    Did you previously play any role with the local council?

20 A    As a local scouter here in South Florida, following my

21 graduation from college and law school, I had an opportunity

22 to join our local council, the South Florida Council Executive

23 Board, in 2007, and have served on the council's Executive

24 Board and Executive Committee until May of 2020. I've had the

25 opportunity to hold a variety of roles, including the

1  Chairperson for the National Eagle Scout Association here,

2  locally, along with serving as Vice President of Marketing and

3  Administration for our council.

4  Q    In light of your experience in volunteer leadership on

5  both the National Executive Committee and National Executive

6  Board and service on the -- as a local council board member,

7  can you describe the relationship between the national BSA

8  organization and its local councils?

9  A    The Boy Scouts of America relies upon our 251 local

10  council partners in order to deliver scouting in the various

11  communities in which our councils are housed.  Each council is

12  an independent legal entity, separate and apart from the

13  national organization.

14      The national organization provides, on an annual basis,

15  what's called a "council charter."  And that agreement spells

16  out the relationship between the national organization and the

17  local organization, as we refer to them as "local councils."

18      Each local council is responsible for their own

19  operations, which include the raising of dollars to support

20  scouting, as well as the programs that they offer.  They are

21  responsible for recruiting membership into the program.  And

22  the national office provides, on a centralized basis, IT

23  services -- IT services, the utilization of our IP and

24  trademarks and logos and badges and supplies, along with the

25  providing of human relations for our employees, and not to

1  mention insurance for each and every one of our local councils

2  and affiliated entities.

3  Q    We've had a lot of discussion in this case, Mr. Desai,

4  about charter or sponsoring organizations.  Can you describe

5  the relationship between the BSA and its chartered

6  organizations?

7  A    The Boy Scouts of America depends heavily on our

8  partnership with various chartered organizations.  In many

9  cases, our chartered organizations are religious institutions,

10  but they can also be other entities.  And these institutions

11  serve as partners with our local scouting units and councils,

12  in order to provide facilities and -- and an infrastructure

13  where folks that are members of the scouting program have an

14  opportunity to meet, to socialize, to learn the skills that

15  scouting teaches, and also, more often than not, a place to

16  house their troop (indiscernible) or camp equipment, whether

17  it's in a shed or a meeting space that the charter

18  organization provides.

19  Q    So you just mentioned the term "troop."  What is a

20  "troop," and how does that fit into the BSA's structure?

21  A    So, locally, within our councils, we have separate

22  programs for -- depending on the age of the young person.

23  They could either be involved in a Cub Scout program, which

24  would be housed within a pack, which is just a numeric

25  designation of a -- an organization that's affiliated with a

1  particular school, church, or other chartered organization.

2       And then, as you graduate from being a Cub Scout, you

3  join the Scouts BSA program, which is an older -- older young

4  person program, if you will, generally between the ages of 10

5  to 18.  And those are referred to as "troops."  Again, they

6  are provided a numeric designation.  And each troop can have

7  roughly 40 to 60 young people, along with their volunteer

8  leadership that are usually their parents.

9           MR. ANDOLINA:  Your Honor, with your permission,

10  I'd like to show Mr. Desai Defendant -- DDX-2, which is a

11  demonstrative exhibits that we provided to Your Honor.

12           THE COURT:  Yes.

13           MR. ANDOLINA:  Could I project that, Your Honor?

14           THE COURT:  Yes.

15           MR. ANDOLINA:  Thank you.

16  BY MR. ANDOLINA:

17  Q    Mr. Desai, you mentioned in your opening testimony your

18  role on the NEB, NEC, BTF.  Can you describe for the Court the

19  governance structure of the BSA?

20  A    The Boy Scouts of America is governed by a seventy-two-

21  member volunteer board that is commonly referred to as the

22  "National Executive."  The National Executive Board is a

23  grouping of volunteer scouters, some of whom have had a

24  history of scouting; others have never been part of scouting

25  in their young life, but have an affinity for service to the

1  organization.  The National Executive Board is elected on an

2  annual basis through our general membership, at our annual

3  meeting, which is traditionally held in May.

4      The National Executive Board has within it an Executive

5  Committee, that is referred to as the "National Executive

6  Committee" or "NEC."  This body consists of 12 individuals,

7  one of whom happens to be our Chief Scout Executive or CEO

8  Roger Mosby.

9      Within that grouping of 12, the National Executive

10  Committee houses our key three volunteers, who are referred to

11  as our National Chair, Mr. Ownby; the count -- the National

12  Commissioner, who is Scott Sorrels; and our CEO and Chief

13  Scout Executive Roger Mosby.  Those three individuals make up

14  what we refer to in the scouting vernacular as the "key

15  three."

16      Along with other members of the National Executive

17  Board, we create the NEC.  Some of us are chairs of the

18  standing committees of the board.  I mentioned I chair the

19  Audit Enterprise Risk Management Committee, along with the

20  Nominations and Governance Committee.  We have an H.R.

21  Committee; a Finance Committee; a Mission, Reputation, and

22  Strategy Committee; and also a Finance Committee and Fund

23  Raising.  Then we have two at-large members of the board that

24  serve on our NEC.

25      This group is responsible for what I would call the

1  "day-to-day affairs" and managing the organization, working

2  with our senior leadership at the Boy Scouts of America, to

3  ensure that the wishes of the board are enacted and followed

4  through, strategies are being worked on and implemented and

5  operationalized [sic] in between various board meetings.

6       Following that, we have a group called the "Bankruptcy

7  Task Force."  This group originally came about because, prior

8  to July of 2020, the organization had a group known as GLIP --

9  G-L-I-P -- standing for General Liability, Insurance

10 Protection Committee.  And that committee oversaw the various

11 claims that were being made or filed against the organization

12 and our local councils, working with our general counsel's

13 office, as well as our outside counsel.

14      That group was converted to the Bankruptcy Task Force in

15 July of 2020.  And that group, the "BTF," as we commonly call

16 it, is comprised of six total people, all of whom are charged

17 with the responsibility of working with our professional

18 advisors on a fairly detailed and more regular basis than

19 certain members of our board to understand the intricacies of

20 this restructuring process; provide guidance, advice, and

21 recommendations to both the NEC and to the full board.

22 Q    So, with respect to the NEB, the NEC, and the BTF, you

23 mentioned meetings in connection with the bankruptcy.  How

24 frequently, since November 2020, did the three groups that I

25 just referenced meet?

1   A    Quote a lot.  I would -- I would tell you that I've lost

2   count, but generally around 100 times, we've -- we've met as a

3   grouping of either the BTF, the NEC, or the board to address

4   to address many of the ups and downs, if you will, of this

5   process and, in working with our advisors, have met for

6   several hours at a time for each of those weeks.

7            MR. ANDOLINA:  Your Honor, with your permission,

8   I'd like to share DDX-3, which is a demonstrative that has

9   been provided to the Court.

10           THE COURT:  Yes.

11           MR. ANDOLINA:  Thank you, Your Honor.

12  BY MR. ANDOLINA:

13  Q    Mr. Desai, could you describe this chart that we've put

14  together for the Court?

15  A    This document reflects the numbers and types of meetings

16  that the volunteer leadership of the organization has

17  participated in since November 6th, 2020, up through the

18  present date.  The meetings are all color-coded, so you'll see

19  that there have been 40 National Executive Committee meetings,

20  17 National Executive Board meetings, and 41 Bankruptcy Task

21  Force meetings, all of whom are attended by the

22  representatives that were shown on the prior slide, in order

23  to become familiar with, provide authority, and engage in

24  dialogue concerning issues throughout this restructuring

25  process.

1 Q    Mr. Desai, of these meetings that are reflected on

2 Demonstrative Exhibit 2, how many did you miss?

3 A    I missed four.

4 Q    And after you missed those meetings, did you take any

5 steps with respect to the discussions that occurred?

6 A    Yes, I did.  My normal practice for -- if I was not able

7 to make the meeting or attend in full, was generally to

8 contact our legal -- our general counsel, Steve McGowan, as

9 well as speak to the Chair of the Bankruptcy Task Force, Ms.

10 Schuler, and other members of our NEC, in order to catch up on

11 what I missed and/or provide any input.  And oftentimes, I'd

12 also speak to our advisors, as well.

13 Q    What advisors did the BSA retain in connection with this

14 restructuring?

15 A    The Boy Scouts of America has retained several advisors

16 from the inception of this restructuring process; namely, our

17 restructuring counsel at White & Case, our insurance counsel

18 Haynes and Boone, our claims administrator Omni, the estimator

19 of claims KCIC.  We've had Bates and White is involved, as

20 well, with respect to the claims.

21     We've engaged the services of various consulting

22 experts; namely, Praesidium, who's been involved in helping us

23 with our youth protection initiatives and programs.

24     And in addition, we also have financial advisor with

25 Alvarez & Marsal being led by Mr. Brian Whitman.

1 Q    And with respect to those advisors, can you talk to the

2 Court about their involvement in the meetings reflected on

3 Demonstrative Exhibit Number 3?

4 A    When the Bankruptcy Task Force or the board or NEC met,

5 we would generally have present our advisors; namely, our

6 restructuring counsel, as well as insurance counsel and our

7 financial advisors.

8      There have been times during the course of the

9 restructuring process where we needed deeper dives into

10 particular topics, whether that was an insurance archeologist,

11 whether that's a deep dive into the analysis of the claims,

12 the insurance policies, and sometimes even a discussion into

13 the pension and issues associated with the pension, we would

14 bring in those subject matter experts in order to educate the

15 Bankruptcy Task Force, the NEC, and also at times the full

16 board.

17 Q    You'll note on Demonstrative Exhibit 3 the reference to

18 the RSA hearing.  Do you recall testifying before Her Honor at

19 that hearing?

20 A    Yes, I do.

21 Q    And as indicated on the chart, did the NEB, NEC, and BTF

22 continue to meet following the RSA hearing?

23 A    Yes, we did.

24          MR. ANDOLINA:  Your Honor, if I could show you --

25 or if I could ask the Court to project Demonstrative Exhibit

1 Number 4?

2          THE COURT:  Yes.

3          MR. ANDOLINA:  Thank you, Your Honor.

4 BY MR. ANDOLINA:

5 Q   Mr. Desai, could you describe the cadence of meetings and

6 how it changed, if at all, following the RSA hearing?

7 A    Following the RSA hearing, as you'll see here, the number

8 of meetings that the National Executive Committee held, as

9 compared to the Bankruptcy Task Force, increased greatly to 22

10 versus 9.  And the rationale behind that was members of the

11 BTF area also members of the NEC, but the NEC encompassed a

12 larger body of board members.

13     And due to the ongoing nature and frequency of

14 discussions related to resolution with various parties, the

15 needing of authority, in terms of settlement parameters, it

16 was appropriate that more members of our NEC met with more

17 frequency, as opposed to having a BTF meeting, followed by an

18 NEC meeting, and then a board meeting, to help streamline some

19 of the -- the decisions that needed to be made.

20 Q   Thank you.

21          MR. ANDOLINA:  And you can take that demonstrative

22 down.  Unless the Court needs to see it?

23          THE COURT:  I don't.  Thank you.

24          MR. ANDOLINA:  Thank you, Judge.

25 BY MR. ANDOLINA:

1  Q    Did the NEB or the NEC or the BTF have any other meetings

2  outside of the meetings identified on the demonstratives that

3  we just discussed?

4  A    We have.  In addition to the restructuring process, the

5  Boy Scouts of America were still alive, well, and active.  And

6  so the board and the NEC has also had to ensure that we

7  continue to provide our young people with programs that are

8  teaching them leadership skills and values based on

9  educational opportunities, providing the resources, and making

10 sure our national camps and bases are operating to the

11 standards that we've adopted.

12     And so, along the way, in addition to dealing with the

13 restructuring process as an organization, our National Chair

14 also wanted the members of our National Executive Committee to

15 participate in a retreat.

16     And the function of the retreat -- which was held in

17 August of 2021 at Philmont Scout Ranch in Cimarron, New Mexico

18 -- was to imagine an organization post-bankruptcy, and to

19 discuss and -- and strategize over topics at a very high

20 level, relative to the delivery of the program, being made

21 innovative and utilizing technology, efforts to figure out

22 ways in which to fund-raise.  Strategies were discussed on

23 growing the organization, in terms of membership.  Discussions

24 were had about safety enhancement to youth protection members.

25     And so we had a weekend retreat as an NEC with the help

1  from a consultant to help facilitate discussions, similar to

2  what probably occurs in other nonprofit organizations or --

3  or, for that matter, boards, where you may engage in slot

4  analysis and talking about, you know, where your organization

5  is and where it could be and what the challenges are along the

6  way.

7  Q    And were you made aware of a plan to document the

8  discussions that occurred during the retreat?

9  A    Yes.  I recall, at our last session at the retreat, there

10  was a request made by the Chair to try to synthesize the

11  conversations that were held at Philmont in a format that

12  would allow for a presentation to be made to the National

13  Executive Board.

14  Q    And at some point, did you receive a draft of a

15  presentation from the Philmont retreat?

16  A    I did.  In preparation for my deposition testimony, on

17  December the 3rd of 2021, I was provided with a draft

18  presentation from our counsel, you, Mr. Andolina, that was

19  prepared by Mr. Tilden.

20  Q    And how did you know it had been prepared by Mr. Tildon?

21  A    I saw the cover email that attached the draft

22  presentation that Mr. Tilden had sent to the Boy Scouts'

23  general counsel Mr. McGowan.

24  Q    Prior to seeing that document in preparation for your

25  deposition, had you seen it before?

1  A      I had not.

2  Q      What was your reaction when you reviewed the document?

3  A      When I first saw the document, there were some things in

4  the document that I didn't agree with because it didn't

5  comport with my recollection of events that -- and

6  conversations, frankly, that took places amongst the NEC at

7  the retreat.

8  Q      What did you do in light of that?

9  A      After I received the document, I took it upon myself to

10 contact Mr. Tilden and speak to him, in terms of how he came

11 to draft the document, what his understandings and

12 recollection were from the retreat, recognizing full well that

13 Mr. Tilden is obviously the incoming of the Boy Scouts of

14 America, and he comes from a background that is within an

15 industry that's heavily regulated; namely, the aviation space,

16 and engaged in a conversation with him about some of his

17 statements that were made in the presentation.

18      And in addition to Mr. Tilden, I also spoke to Ms.

19 Schuler.  And it was determined, amongst the three of us, that

20 we would take some time to jump on a Zoom, in order to prepare

21 a document that could be sent to the National Executive

22 Committee for their review and approval, such that a final

23 presentation can be voted upon by the NEC, and then eventually

24 shared with the full board.

25 Q      And can you tell us about the process that you and Mr.

1  Tilden and Ms. Schuler went through, in terms of preparing the

2  document you just referred to?

3  A    Basically, given the pandemic world, we -- I actually set

4  up a Zoom call with the two of them, and it occurred on

5  January 19th.  And the three of us went through Mr. Tilden's

6  document and made some edits to it.  And we then sent that

7  document to our general counsel Mr. McGowan, who included it

8  as part of the meetings materials for the National Executive

9  Committee meeting, which took place on January the 20th.

10       During that NEC meeting, members of the NEC were able to

11  review that document as part of their meeting prep.  They had

12  some -- requested semantical changes, if you will, on two

13  areas.  We made those changes and the document was unanimously

14  approved.

15  Q    Has the document been shared with the NEB at this point?

16  A    Not yet, given some of the other things that have

17  occupied the board's agenda.

18            MR. ANDOLINA:  Your Honor, with your permission,

19  I'd like to show to Mr. Desai and to Your Honor a

20  demonstrative exhibit that has actually been provided by the

21  certain insurers.  My understanding -- and I believe the

22  insurers could confirm this -- is that that demonstrative is a

23  PowerPoint comparite [sic] between JTX-1926 and JTX-1185.  And

24  with Your Honor's permission, I'd like to show that document

25  to Mr. Desai and ask him a few questions about it.

1          THE COURT:  Okay.

2  BY MR. ANDOLINA:

3  Q    Mr. Desai, as I mentioned, this is a document that the

4  insurers have presented.  And we'll take them at their word

5  that this is a redline of the PowerPoint that you just talked

6  about.  I'm going to walk through and ask some questions about

7  the changes that you and Mr. Tilden and Ms. Schuler made to

8  that document.

9      Can you describe for the Court the changes on the cover

10 slide and your decision on that?

11 A    Yes.  I -- I think the first slide document that's being

12 shown basically -- and making my words -- I'd  probably say

13 semantical, semantics, in terms of how we wanted to title it.

14 But basically, it just indicates that the following

15 presentation would be a summary at a very high level of

16 initial thoughts that were held and -- by the NEC during the

17 retreat.

18          MR. ANDOLINA:  And can we go to slide --

19 Q    And you changed the dates to reflect the actual time of

20 the retreat.  Is that correct?

21 A    That's correct.

22 Q    Do you know what the October dates referred to?

23 A    Those dates referred to a meeting, a board meeting,

24 frankly, that was going to be held and was held, where this

25 presentation was optimistically going to be shown.  But

1 because of, again, other things that occupied the board's

2 agenda and the NEC, it was determined to push this to a later

3 date.

4            MR. ANDOLINA:  Go to the second slide, please.

5 Q    This says "deleted graphics."  Can you describe to the

6 Court your revisions here?

7 A    Sure.  Again, keeping in mind that the purpose of this

8 retreat was to focus on an organization post-bankruptcy and

9 one that would be emerging from bankruptcy, you -- we talked

10 about planning.  We talked about things that were needed, in

11 order to continue to build upon the successes of the

12 organization and its growth, its finances and other things.

13       And so, while the slide, in terms of the statement,

14 "Plans are Nothing, Planning is Everything" is appropriate, I

15 just didn't like, personally, the reference to generalizing

16 how, in terms of a war theme, since it just didn't sit well

17 with me from a presentation perspective.

18            MR. ANDOLINA:  Next page, please.

19 Q    Can you describe this change for the Court?

20 A    It's -- this, to me, is like the age-old example of if I

21 can be honest with you.  Well, I don't always hope you are

22 being honest with me, and that, you know, I don't need you

23 tell me you're being honest.  And so, as scouts, a scout is

24 trustworthy, and we don't need to say that this is an honest

25 assessment.  Frankly, it's just a real-time capture of where

1  we are and it's an assessment, and one that is already

2  assuming that we're going to be honest with ourselves, and so

3  we struck the word "honest."

4          MR. ANDOLINA:  And if we can go to the next page.

5  Q    You make the same change on this slide, correct?

6  A    That is correct.

7          MR. ANDOLINA:  Next page, please.

8  Q    Can you describe the revisions that were made to this

9  slide on Insurers' Exhibit 1, Demonstrative Exhibit 1?

10 A    So this is a slide I -- in which my recollection of the

11 conversation differed from that of Mr. Tilden's, in that I

12 don't believe that we, as an organization, has a safety

13 perception problem, again, recognizing that Mr. Tilden came

14 from a regulated industry, aviation.  Safety is absolutely

15 important, it should always be at the forefront and is at the

16 forefront.

17     And I am super happy to know that Mr. Tilden, as the

18 incoming chair of our organization, is making youth safety,

19 youth protection, safety in general, reporting, report

20 filling, and transparency absolute priorities for the board

21 and for the organization, as a whole.

22     But in terms of this particular slide, the organization

23 focused its conversation during the retreat, not just on youth

24 protection related matters, but on incidents outside of the

25 youth protection realm; for example, injuries that occur at a

1  camp.  You know, Johnny or Sally are out river rafting, get

2  injured while swimming or, you know, god forbid someone can't

3  swim and drowns.  The types of reporting associated with that,

4  the types of things that are in place, mechanisms that we as

5  an organization have to ensure that incidents of safety and

6  injuries don't occur, the reporting of those types of

7  incidences on a more regular basis, as opposed to a gap in

8  time, so that the organization is aware of them and can make

9  the appropriate changes and remedies that are needed if

10  something has to change, and so we talked a little bit about

11  that.

12       We also talk a lot about ensuring that, at every NEC and

13  board meeting, as well as the committee that I chair, the

14  Audit Enterprise Risk Management Committee, we had reports of

15  information related to the number of safety incidences

16  reported around the country, within our councils, and also our

17  service territories as we've been restructured.  And

18  understanding the genesis of those reports and what types of

19  injuries are occurring, whether they're trips and falls or

20  cuts and bruises or, god forbid, more tragic, injuries related

21  to transportation when folks are going to and from events

22  associated with scouting.

23       So we wanted to know all of those things on a more

24  regular basis and encourage our volunteers, as well as our

25  professional staff members to provide those types of reports

1  with more information and -- and -- and be more transparent

2  about it and not worry about, you know, dealing with it on a

3  localized level.

4          MR. ANDOLINA:  So if we can go to the next slide.

5  Q    The next page, which is the third bullet on the slide.

6  A    The third bullet, just cleaning up a sentence, basically

7  describing what the origination would look like from a

8  financial perspective, since we are going to be taking on some

9  -- some -- some significant debt, as we attempt to emerge from

10 this process.

11         MR. ANDOLINA:  Okay.  If we can go to the next

12 slide.

13 BY MR. ANDOLINA:

14 Q    Can you describe the changes here relating to local

15 councils and chartered organizations?

16 A    I don't believe this will come as a surprise to anyone,

17 including Your Honor.  As this process has continued to

18 unfold, the national organization, meaning the Boy Scouts of

19 America, has had its challenges as it relates to

20 communication, working with various constituencies within our

21 organization, our local council leadership, our chartered

22 organization partners, from sharing of information to

23 communicating.

24      And so this document or slide discusses how we, as an

25 organization and the leadership of the organization are

1  continually striving to do a better job at working with our

2  local council partners, as well as our chartered

3  organizations, to ensure that scouting continues to succeed

4  and grow and be delivered seamlessly.

5  Q    And this document was created reflecting conversations in

6  August.  Do you believe strides have been made in that respect

7  since that time?

8  A    Absolutely.  In fact, I think the group that Mr. Mason

9  chairs, the ad hoc council group, along with some of our key

10  chartered organization; for example, the Methodists, through

11  the efforts of Bishop Schol and his partnership with the Boy

12  Scouts of America, and our ability to collaborate and work

13  together through this litigation process, has demonstrated

14  that the organization is able to and can and should continue

15  to build upon the bridge of (indiscernible) and collaboration

16  in order for all of us to succeed.

17              MR. ANDOLINA:  If we could go to the next slide.

18  Q    Can you describe this slide, Mr. Desai?

19  A    So, as the leadership of the organization, the benefits

20  that would flow to the organization, to our chartered partners

21  and to the local councils, given the intricate relationship or

22  interplay between all of us, following emergence are the

23  things that we've listed here, which would be that the scouts

24  are not going to compromise on our values, which are timely

25  and timeless, I would argue, and that the scout oath and scout

1  law are not changing following us, hopefully emerging.

2       But then there are other things that we, as an

3  organization, would like to see as part of this restructuring

4  process, having availed ourselves of -- of the Bankruptcy Code

5  and the protections afforded.  One of those, namely, is the

6  illumination of liabilities on a historic basis, cleaning up

7  our balance sheet a little bit, helping (indiscernible)

8  maintain some of our core assets, which allow for the delivery

9  of scouting to take place and provide opportunities to scouts

10  from all over the country and, frankly, the world to engage

11  in, and allow for our local councils to be contributing

12  members of the settlement trust and allowing them to keep

13  their resources, such that, as I mentioned earlier this

14  morning, because they are responsible for membership,

15  recruiting, growth, sustainability, the delivery of scouting

16  and the program aspects of it, allow them to have the -- the

17  resources that are necessary to keep doing that.

18            MR. ANDOLINA:  Can we go to the next slide?

19  A    During the retreat, through the consultant Mr. Raschilla

20  from GALE Consulting, he talked about a vision statement like

21  any other organization would, akin to maybe a mission

22  statement, things like that, some language on what that would

23  look like if we had to create a new vision statement for the

24  organization.  And these are examples of some of the things

25  that we were able to spit ball during the hour or so session

1   that we had on it.

2        And following the retreat, these proposed or recommended

3   vision statements, if you will, were provided to Ms. Schuler,

4   who, as I indicated, was also present at the retreat.  She

5   happens to chair the BSA's Mission, Representation, and

6   Strategy Standing Committee of the board.  And this was an

7   exercise that would allow for her committee to maybe flush out

8   the statement and report back to the board.

9             MR. ANDOLINA:  Okay.  Can you go to the next slide.

10  Q    And I think you just (indiscernible) that slide.  Is that

11  correct?

12  A    We just -- we stated -- basically, it's a placeholder

13  that said strategy lines, and we struck that statement and

14  just said our strategy, meaning what we would do to try to

15  accomplish some of those high-level topics involving growth,

16  finances, youth protection, on a go forward basis.

17            MR. ANDOLINA:  Okay.  Next slide.

18  Q    And this is the first of those important strategy steps.

19  Is that correct?

20  A    That's right.  As our CEO and Chief Scout Executive has,

21  you know, made abundantly clear, along with our leadership,

22  not only locally, but all the way on through the organization

23  to our highest levels, the safety of our young people is

24  paramount.  We have to be the best at being and keeping our

25  young people safe.

1       And as such, we engaged in a conversation to look at

2   some of those policies that we currently have in place and

3   what we could do to make them better.  And as you'll see, as

4   part of the conversation that the NEC had in August, some of

5   these terms, topics, at a high level, are actually things that

6   we finally memorialized and agreed to, again, through

7   collaboration during this process, with representatives of the

8   Coalition of Actual Survivors, in addition to Dr. Kennedy and

9   Mr. Humphrey and other members of the TCC, in order to

10  formulate a comprehensive set of youth protection measures as

11  part of our plan, which I believe is Exhibit L of the plan.

12  Q   And additional comments on the next page?

13  A   Again, same -- same comments on Points 4 and 5, both of

14  which you will recognize as being part of our agreements as

15  part of the plan to improve upon our youth protection measures

16  and striving to be that gold standard for our young people.

17          MR. ANDOLINA:  Next slide.

18  Q   Can you talk about the changes on this slide, Mr. Desai?

19  A   Young people want to have fun, they want to be safe.  And

20  we, as the leaders of the scouting organization, need to make

21  sure that we can tap into the minds of young people in the

22  sense of what do they want, what's going to keep them around

23  and keep them engaged.  And of course, utilizing technology is

24  one of those ways in which we can do it, to make the program

25  more fun and -- and available and accessible to all.

1        We -- we, as the NEC, had talked about some high-level

2   concepts of what can we do to speak to more young people in

3   America and ensure that scouting -- and every young person has

4   an opportunity to join scouting, in order to benefit from what

5   scouting offers.

6            MR. ANDOLINA:  Okay.  And I think two slides down

7   is the next changes.  You can go to the next page.

8   BY MR. ANDOLINA:

9   Q    Can you describe this slide, Mr. Desai?

10  A    Streamline and simplify.  I think everybody in this

11  restructuring process will appreciate that comment.  But we,

12  as an organization, have learned, unfortunately, as part of

13  this process, sometimes the hard way, in terms of having to

14  look through of many, many professional members of our team.

15           But through it, you know, between dealing with laying

16  folks off and dealing with the pandemic, we've learned to

17  figure out ways in which we can streamline the way that we

18  deliver services.  And in so doing, we need to continue to

19  explore that as an organization, so that we can continue to be

20  more efficient and reach more young people and deliver

21  scouting to everyone.

22           MR. ANDOLINA:  Okay.  Next slide.

23  A    This slide references the fact that we, as an

24  organization, need to certainly improve on our financial

25  position.  As we look ahead, how do we move forward with,

1  oddly now, our obligations that we've undertaken as part of

2  this process, with respect to our creditors, both financial,

3  as well as our survivors, and how do we continue to reduce

4  debt to the organization as we continue to deliver top-notch

5  services to our young people.

6         MR. ANDOLINA:  Okay.  I think that's -- I think

7  that's it, you can take that down.

8  BY MR. ANDOLINA:

9  Q    So, Mr. Desai, at this point, when you saw this document

10 in December of last year, was the anticipation that the entire

11 NEC would be involved in a conversation about the final work

12 product?

13 A    Absolutely.  And that's exactly what occurred on the

14 twenty -- January 20th.  And as I mentioned, despite Mr.

15 Tilden, Ms. Schuler, and I making some of the changes, members

16 of the NEC had additional changes to some of the language and

17 the phraseology of it.  And we made those during our meeting,

18 real-time, and eventually, the entire presentation was

19 approved by the NEC.

20 Q    And you were questioned, Mr. Desai, by various counsel

21 from the TCC and others in December at your deposition about

22 that presentation.  Is that right?

23 A    Yes, I was.

24 Q    And at that point, the TCC had not yet resolved with the

25 BSA.

1   A     That's correct.  In fact, when my deposition was taken on

2   the 3rd of December, we had not reached a resolution with

3   Century, the Methodists, the TCC, and so those were all still

4   being worked on, including the Catholics.

5   Q    So I'd like to bring you back to that time frame of

6   December of 2021, Mr. Desai.

7           MR. ANDOLINA:  And Your Honor, with your

8   permission, I'd like to put a demonstrative up that outlines

9   the settlement timing and structure, and that would be BSA

10  DDX, I believe it's Number 5 or 6.

11          THE COURT:  You may.

12          MR. ANDOLINA:  Thank you, Your Honor.

13        (Pause in proceedings)

14  BY MR. ANDOLINA:

15  Q    So, Mr. Desai, I want to call your attention to this

16  demonstrative, DDX-5.  And if you could describe for the Court

17  what this outlines, in terms of the various blocks that are

18  under the BSA meeting dates and the various entities that are

19  described here.

20  A     This document demonstrates the efforts of many, many

21  people over the last two years, in order to attempt to

22  accomplish the two goals that the organization set out to

23  achieve; namely, the ability to equitably compensate victims

24  to historical abuse, and two, allowing for the mission of

25  scouting to continue.

1       And in so doing, this document will show how the board,

2   the NEC, and the BTF, in working with our advisors, and all of

3   the various settling parties were able to achieve settlements

4   that allowed for a settlement trust to be built over time.

5   And the key milestones included on the lefthand side show the

6   dates upon which of these agreements were entered into between

7   the national organization and the parties to those agreements.

8   Q   So let me bring you to the December time frame, Mr.

9   Desai.  At that point, the BSA had worked with the local

10  councils to establish a contribution to the settlement trust.

11          MR. ANDOLINA:  And Your Honor, I did want to

12  identify Paragraph 76 of Mr. Desai's declaration.

13  BY MR. ANDOLINA:

14  Q   Mr. Desai, can you take a look at Paragraph 76 of your

15  declaration?

16          MR. ANDOLINA:  Your Honor, is it okay if I show it

17  to him?

18          THE COURT:  Yes.

19      (Pause in proceedings)

20  BY MR. ANDOLINA:

21  Q   So, Mr. Desai, you state:

22          "Under the plan, the local councils have agreed to

23  contribute $500 million in cash from property."

24      Is that accurate?

25  A   It's not.  It's a scrivener's and my fault in not

1  catching it when I executed and worked on the affidavit.  It's

2  actually 515 million in cash and property.

3  Q    Okay.  And that's reflected on Defendants' Demonstrative

4  Exhibit Number 5?

5  A    That's correct.

6            MR. ANDOLINA:  Okay.  If we could put that back up.

7  Q    I want to talk to you about the first two settlement

8  agreements prior to -- or following the local council

9  commitment with the Hartford and TCJC.

10        Did the board consider those resolutions?

11 A    The board did consider those resolutions -- and by

12 "board," I'm referring to the NEC at this time -- did consider

13 those resolutions and allowed for our advisors to effectuate

14 the resolutions as seen.

15 Q    And with respect to the Hartford resolution, the board --

16 and I'm meaning -- by the "board," I mean the NEC -- met four

17 times in connection with that?

18 A    That's correct.

19 Q    And that agreement was approved by email on 9/14?

20 A    That is correct.  There was a resolution that was

21 circulated to which members of the NEC cast their vote on the

22 14th of September as reflected on the chart.

23 Q    What were the considerations that the board took into

24 account in terms of the resolution with Hartford?

25 A    So in terms of the Hartford this was one of the first

1  insurers which had agreed to resolve their issues with the

2  organization as well as with certain other partners of the BSA

3  in order to start building what I would call, like say, the

4  pathway to the building blocks to a global resolution.

5        Initially, with the Hartford, there were some

6  challenges, as I believe folks know, in terms of during the

7  RSA hearing.  And following the RSA hearing we were able, with

8  our advisors to achieve a resolution with Hartford that had

9  support from the coalition, the future claimant's

10 representative, the unsecured creditors committee, as well as

11 our local council partners through the ad hoc group.

12       In so achieving those party's agreements to the Hartford

13 agreements it was the first time in which the BSA, along with

14 our local councils, and now insurance company were able to

15 actually have the resources north of a billion dollars in

16 order to help achieve our two objectives, again, to equitably

17 compensate victims as well as allow for the mission to

18 continue.

19 Q    And the TCJC settlement was reached at the same time as

20 the Hartford agreement, is that right?

21 A    That's correct.  You know, these things are not

22 happening in an isolated vacuum.  So while the Hartford

23 agreement and negotiations were taking place the negotiations

24 were also taking place with the TCJC or The Church of Jesus

25 Christ of Latter Day Saints.

1      Again, trying to get additional resources put into the

2   trust was a very good thing.  On top of that the board or the

3   NEC, falling into your trap here, Mr. Andolina, considered

4   many things which included the ability to save on resources

5   for the organization to not continue to litigate with Hartford

6   and their counsel, engage in extensive discovery, along with

7   our partner the TCJC who had a very unique relationship with

8   the scouting organization as compared to some of our other

9   chartered partners.

10  Q    Can you describe the unique nature of the TCJC

11  relationship and how that impacted, if at all, the board's

12  consideration?

13  A    Yes.  The relationship that the Boy Scouts of America

14  enjoyed with the TCJC was quite different then what we have

15  with our other chartered partners, the Methodists, or the

16  Catholics, and many others.  The TCJC organization, basically,

17  provided scouting to every one of their young people.

18  Scouting was engrained in the culture of the TCJC.  Their

19  local LDS or TCJC stakes and boards required that young people

20  participate in the scouting program because it was their

21  organization's program for young people similar to what other

22  organizations may have, youth group and other things, for

23  people, but those are more voluntary as opposed to the

24  official church program.

25      So because of that relationship there were certain

1  nuances that any See had to consider in working with our

2  advisors as well as our claims estimators to be able to

3  effectuate a resolution with the TCJC that is different than

4  the resolutions achieved with our other ongoing chartered

5  partner, the Methodist Church.

6  Q    In connection with considering the TCJC resolution did

7  the NEC receive any input regarding TCJC claims?

8  A    Yes.  The NEC did receive input.  In fact, I remember we

9  had a thorough presentation that was made to the NEC from KCIC

10 -- I'm sorry, from Bates White relative to the claims.  I am

11 mixing up my acronyms.  But from Bates White about the claims

12 and the number of claims (indiscernible).

13 Q    And you recall -- let me show you what has been marked

14 as JTX-756.

15        Your Honor, this is at Tab I of the Desai declaration

16 binder.  And with your permission, Your Honor, I'd like to

17 share that on the screen.

18              THE COURT:  Okay.

19              MR. ANDOLINA:  Thank you, Your Honor.

20              If we could zoom in a little.

21 BY MR. ANDOLINA:

22 Q    So, Mr. Desai, these are minutes from the NEC meeting on

23 September 2nd, 2021.  Do you see that?

24 A    Yes.

25 Q    And is this the meeting that you were referring to where

1  information from Bates & White was shared with the NEC?

2  A    Yes.

3  Q    And if you review, and I will show you this document so

4  you can have a closer look, the minutes from September 2nd is

5  the NEC also discussing other potential resolutions at the

6  same time?

7  A    Yes, we are.  The NEC at this time, as I indicated,

8  settlements were not happening in an isolated setting.  At

9  this time we also discussed the resolutions and the term

10 sheets with the Hartford while we undertook the termsheet and

11 settlement agreement with the TCJC.

12 Q    And if I can ask you to look at presentation that

13 provided at that meeting on September 2nd which is JTX-757.

14        Your Honor, that is at Exhibit J in your binder.

15        Your Honor, do I have your permission to allow Mr. Desai

16 to look at the binder so he can have a hard copy in front of

17 him?

18              THE COURT:  Yes.

19              MR. ANDOLINA:  Thank you.

20 BY MR. ANDOLINA:

21 Q    Just generally, Mr. Desai, are these the types of

22 presentations that were provided to the NEC by the BSA's

23 advisor in the time period of November 2020 through present?

24 A    Yes, they are.

25 Q    And if we flip through your advisor is proving updates

1  on the Hartford settlement, current terms of the Hartford

2  termsheet, the TCJC settlement and then is this the Bates

3  White presentation that you referred to in your earlier

4  testimony, Mr. Desai?

5  A    Yes, it is.

6  Q    And you were in attendance for this meeting on September

7  2nd, is that correct?

8  A    I was.

9  Q    And from the minutes of the meeting it looks like the

10  meeting lasted an hour and 40 minutes.  Is that its typical

11  time for an NEC meeting?

12  A    It was on the shorter end, but, yes, those are -- that

13  is an average time.

14  Q    So if we go back to demonstrative five, following the

15  agreements with the Hartford and TCJC in early December was

16  the NEC hearing about ongoing discussions with Century and

17  Chubb?

18  A    Yes, we were.  Following the settlements that were

19  effectuated with Hartford and the TCJC around the December

20  timeframe I recall that there was a significant amount of

21  activity taking place because of several negotiations that

22  were ongoing.  Namely, those negotiations were between

23  Century, Chubb, the United Methodist Church, and the Catholic

24  organizations.  Participating in those discussions, of course,

25  were representatives from the BSA, representatives for the ad

1  hoc group, in addition to the FCR and other stakeholders.

2      So during this timeframe I recall our advisors sharing

3  with us information about ongoing settlement discussions, the

4  need for input on a variety of the terms including scopes of

5  releases, definitions, if you will, of certain phrases in the

6  agreements; namely the definition of a claim, scouting related

7  abuse claim, and exactly what types of things were being asked

8  of certain parties relative to their own insurance policies,

9  and how all of this could be memorialized, if possible, in a

10 way in which our local councils, in addition to chartered

11 partners, would be able to provide -- to get releases for

12 things that occurred thus far in this process.

13 Q    Was the issue of third-party releases for local councils

14 and chartering organizations something that was discussed

15 frequently by the board?

16 A    Absolutely.  The organization was one that is complex,

17 to say the least, and I will say that the relationship that we

18 enjoyed with local councils and our chartered partners is

19 probably akin to a tripartite relationship.  We need all of us

20 in order to make scouting work.

21     So when the organization embarked on this journey we

22 have always contemplated and always anticipated that through

23 this process we and our tripartite partners, the local

24 councils, the chartered organizations, because of the

25 interconnectedness of those two things with the national

1  organization would achieve the benefits of a release of any

2  and all historical abuse liability so that we --

3        (Audio stops)

4          MR. ANDOLINA:  My apologies, Your Honor.  My

5  computer somehow is not on mute.

6  BY MR. ANDOLINA:

7  Q    Can you continue with your response, Mr. Desai?

8  A    Sure.  Because of the interconnectedness of the three

9  entities, namely the national organization, the local

10 councils, and our chartered partners, we have always

11 envisioned, as part of a global resolution, that after those

12 entities would receive the benefit of a release of any and all

13 historical abuse liability because in order for scouting to

14 work it is critical that the local councils as well as

15 chartered organizations be allowed to move forward together

16 with the national organization.

17 Q    In the, it looks like, seven or eight meetings that the

18 NEC and BTF had to consider the Century settlement was there

19 discussion regarding Century and Chubb's need to have releases

20 from local councils and chartering organizations?

21 A    I recall that as part of the agreements with carriers,

22 whether it was a Hartford, Century, Chubb and moving on up the

23 pathway they required that local councils provide and

24 chartered organizations provide a release as it pertained to a

25 scouting related abuse claim.  So I know that there was

1  significant dialog related to the finding what scouting

2  related abuse claim (inaudible).

3       In order for a resolution to be effectuated with the

4  insurers they needed assurances that they, themselves, would

5  not find themselves back in court litigating over a claim,

6  dealing with a scouting related abuse liability at a later

7  date and expending resources especially after having

8  contributed to a settlement.

9       So the parties recognize that and there had been many

10 challenges along the way to get everybody on board, but

11 eventually the signatories to the agreement with Century came

12 to a consensus and understood what they were giving up by way

13 of a release for any scouting related abuse which encapsulated

14 chartered organizations as well as local councils that were

15 the beneficiaries of those policies.

16 Q    In connection with its consideration of the Century

17 resolution did the board receive any information regarding the

18 financial wherewithal of Century?

19 A    We did.  In fact, I recall that the board had a fairly

20 robust presentation that was provided to us relative to

21 Century, Chubb, the terms of the proposed settlement that they

22 were suggesting; how that would impact relationships with

23 other parties whether they were already assembling party or

24 another constituency group, for example, other carriers, other

25 chartered orgs, other survivor groups like the TCC and what

1  that would mean.

2       So the board also asked a lot of questions because in

3  the headlines in terms of newspapers there was a lot of dialog

4  concerning the viability and liquidity of Century as an

5  insurance company.  So we, as the NEC, and, frankly, the board

6  itself had significant concerns on whether or not this insurer

7  would be in a position to continue going forward and to

8  honoring the insuring agreements and the policies that the

9  organization had purchased.

10  Q    Let me direct your attention, Mr. Desai, to Exhibits

11  JTX-974.

12       Your Honor, this is at Tab Q of the Desai binder.

13       Mr. Desai, do you recall this meeting on November 21st,

14  2001 of the National Executive Committee?

15  A    Yes, I do.

16  Q    And was this the meeting that you referred to where

17  information was provided to the NEC regarding the financial

18  wherewithal of Century?

19  A    Yes.  This is the meeting that I recall where KCIC

20  presented on issues related to Century and its ability to

21  contribute to its settlement trust.

22  Q    And that is reflected on the second page of the meeting

23  minutes at BSA plan 0255063, is that correct?

24  A    That is correct.

25            MR. ANDOLINA:  And we won't go through the whole

1  presentation, but, Your Honor, at Exhibit R is the

2  presentation from KCIC.  That is JTX-975.

3  BY MR. ANDOLINA:

4  Q    And we can just show you the cover page and the first

5  page of the document.  Is it your recollection that the

6  presentation was led by Mr. Martin and KCIC representatives?

7  A    Yes.  We -- as I mentioned previously, the BSA had

8  engaged insurance counsel through Haynes & Boone, and Mr.

9  Varnan and his colleague Mr. Azure, along with representatives

10 of KCIC led the NEC in terms of this discussion about Century.

11 Q    You can take this down, please, James.

12      You mentioned that the discussions with Century, and

13 this is reflected in the various minutes and presentations,

14 were happening simultaneous, negotiations, with the Catholics

15 and Methodists?

16 A    That is correct.  In December we recall that in addition

17 to Century, Chubb and the settlement discussions taking place

18 there we continually, as an entity, pushed our advisors to be

19 able to effectuate more and more resolutions as possible with

20 other partners.  At this point of time it was with the

21 Methodists and the Catholics who are our chartered partners

22 because around this timeframe there has been a lot of

23 "unrest", as I will call it, between our chartering

24 organizations and some of the messaging that they were sending

25 out to our local units and councils in terms of their ongoing

1  and future commitments to scouting.

2  Q     Can you describe that specifically with respect to the

3  Methodists?

4  A     Yes.  In terms of the Methodist Church I appreciated

5  their efforts in working with the BSA, but I can assure you

6  that it was after a lot of work by both sides.  You know, in

7  working with Mr. Scholl and his team we were able to achieve

8  what is finally before the court in terms of a resolution;

9  however, prior to achieving that resolution there were

10  significant concerns from the Methodist Church relative to

11  their ongoing support of scouting, the ability to allow our

12  scout units, pack or troops, another organization affiliated

13  with the scouting, to use their facilities.  Also, the

14  organization, meaning the Methodist Church, had significant

15  concerns related to their own insurance and how that would be

16  implicated as part of any settlement or the ongoing

17  restructuring of the BSA going forward.

18  Q     Was the BSA, the coalition, and FCR eventually able to

19  reach agreement with the Methodists?

20  A     We were.

21  Q     And what were the considerations for the board in

22  approving that resolution?

23  A     Because, again, the organization, meaning the BSA, in

24  this tripartite relationship model heavily relies upon our

25  chartered partners and our local councils for the delivery and

1  success of scouting.  The fact that the Methodist

2  organization, in addition to a monetary contribution, had

3  agreed to support scouting in an active manner up through the

4  present and up to 2036, coupled with the fact that they agreed

5  to take an active role in various youth protection measures

6  that the organization wanted to enhance, and also adopt, was

7  also a very attractive feature of their willingness to resolve

8  this matter with us, as well as to members of the coalition

9  and the future claimant's representative because it signaled

10  to other chartered organizations that the relationship that

11  the Methodist Church and the Boy Scouts of America shared with

12  our local councils, in fact, is, in fact, one that is strong.

13       Despite our differences we were able to work through

14  them and the fact that the Methodist Church was willing to

15  acknowledge their public support for scouting and help us grow

16  the organization into the future was some of the terms that

17  the NEC relished in and appreciated because in addition to

18  allowing the organization to grow we all knew that with that

19  commitment from the Methodist organization  we could also

20  provide additional resources to the settlement trust for the

21  benefit of our survivors.

22  Q    Can you explain what you mean by that?

23  A    The parties to the settlements have agreed to what we

24  have internally labeled, I suppose, a "growth note" which is

25  if the organization grows we're able to provide more resources

1  by way of funding to the settlement trust based upon

2  membership.

3       It's a win/win for everyone because that means the Boy

4  Scouts of America continues to grow and succeed, and change

5  lives in a positive way around this country, but it also means

6  that with the support of the Methodist Church we are able to

7  achieve what the BSA set out to do which is to equitably

8  compensate victims of historical abuse and, of course, keep

9  the mission of scouting alive and well.

10  Q    You mentioned concerns that were expressed with respect

11  to independent insurance.  Without revealing any mediation

12  communications, Mr. Desai, did the board have an understanding

13  of whether with respect to the Methodists those issues were

14  resolved?

15  A    Yes.  The NEC spent a lot of time not only with our

16  advisors, but also representatives with the Methodist

17  organization in discussing insurance related issues.  And

18  eventually the Methodists and the BSA, and our partners,

19  realized and understood that the Methodist Church would not be

20  giving up any of their own insurance rights as part of their

21  willingness to enter into a settlement agreement with the BSA,

22  local councils, and the coalition, and FCR.

23  Q    That agreement included resolution with Century,

24  correct?

25  A    Absolutely.  One of the challenges that occurred is that

1   since resolving our differences with Century and achieving a

2   resolution with Century any future settlement that was entered

3   into by the Boy Scouts of America required that future

4   settling organization or entity to also agree with and conform

5   with the terms and conditions of insurance related issues and

6   definitions, if you will, contained within the Century

7   settlement agreement and termsheet.

8        So today, as we sit here today, we have the support of

9   all the survivors as it relates to insurance matters,

10  definitions of certain things, and a willingness to allow for

11  scouting to continue and to, again, achieve the number one

12  objective which was to help equitably compensate our victims.

13  Q    If we could go back to Defendants' Exhibit 5, DX-5, I

14  want to draw your attention to the two insurance resolutions

15  that were reached on 12/21/21, Mr. Desai.  What were the

16  board's considerations in approving those two settlements?

17  A    So the settlements that were effectuated with Clarendon,

18  Zurich, again, continued to allow the organization to build

19  upon this path to a global resolution and build the settlement

20  trust to a more significant level.  And achieving resolutions

21  with additional carriers meant that the organization would,

22  frankly, not have to litigate more and expend resources with

23  two additional carriers and eliminate a lot of the back and

24  forth in discovery that was associated with entities like

25  Hartford and Century Chubb.  Now adding Zurich and Clarendon

1  to the list would help conserve resources, resources that were

2  vitally critical to the ongoing operations of the organization

3  as well as the ability of the organization to continue to

4  support survivors.

5       Having those additional carriers off the table meant

6  that we weren't battling over coverage related issues.  We

7  were able to secure more funding for survivors and with these

8  other carriers supporting scouting our chartered partners were

9  also benefiting from the contributions that were being made by

10  these carriers if those chartered organizations and claims may

11  have fallen within those coverage years afforded by these

12  particular carriers.

13  Q     So if we go to the end of December, Mr. Desai, of last

14  year can you describe any Sees perspective on where things

15  stood in terms of our pathway to a global resolution?

16  A     Closing out 2021 the NEC was looking forward to having a

17  confirmation process and one that we could stick with in terms

18  of a deadline and a duty given the sensitivities surrounding

19  the organization and its resources.  And coming out of

20  December 2021 we also understood and were able to receive the

21  vote results, quite frankly.  And we spent a lot of time with

22  our advisors during the holiday season trying to understand

23  the voting results, trying to understand the ongoing nature of

24  trying to build a pathway to a more formalized global

25  resolution and recognizing that we needed to engage more with

1  partners like the tort claimant's committee and the Catholics

2  who had not resolved their differences with the organization

3  in December for a variety of reasons.

4      We continued to work.  Our advisors continued to work.

5  That led us to the timeframe in January and February where a

6  lot of things took place.  Frankly, I think, it was the season

7  of mediations for almost 60 days it seemed like.

8  Q    So with respect to the January mediations, Mr. Desai,

9  did you personally participate in any aspect?

10 A    I did.  I had an opportunity to participate in the

11 mediation sessions in Los Angeles on January 13th through the

12 14th in that timeframe.

13 Q    And why did you decide to participate in the in-person

14 mediations in Los Angeles?

15 A    Our board chair and members of the NEC felt that it was

16 critically important to have a representative present during

17 the mediation sessions, and a representative that wasn't one

18 of our advisors.  In an effort to be able to speak directly to

19 representatives of groups that had not necessarily engaged in

20 a resolution at that time.

21      So because of other members' scheduling issues and

22 conflicts I was able to represent the organization during the

23 mediation sessions, and had an opportunity firsthand, quite

24 frankly, to talk directly with the representatives of the tort

25 claimant's committee, their counsel, along with

1  representatives of other groups, for example, certain insurers

2  meeting with Hartford, Mr. Ruggeri, Century, Mr. Schiavoni,

3  along with speaking to Mr. Patterson, seeing Mr. Hurley on

4  zoom who attended as well, along with speaking with counsel

5  for the TCJC, as well as engaging in meaningful conversations

6  with our mediator Mr. Gallagher.

7  Q     And what did you glean in terms of the parties efforts

8  in the January time period and the NEC's goals?

9  A     During this timeframe, as I indicated, there were so

10 many mediating sessions taking place.  In addition to those

11 sessions there were a lot of discussions happening as it

12 related to the organization's efforts to enhance and build

13 upon our youth protection measures.  The NEC, in working with

14 our advisors, and was called a "survivor working group" which

15 was made up of representatives of the coalition actual

16 survivors met many times in order to formulate a plan which

17 could be implemented to build upon and be that gold standard

18 of youth protection during this timeframe.

19     Following the very active mediation sessions there was

20 also significant, significant movement and consensus building

21 with the TCC.  Frankly, things that were occurring in a

22 positive manner such that the organization was able to

23 eventually garner more support for the plan as well as provide

24 the protections that we needed for our local councils, as well

25 as our chartered partners which also yielded additional

1  support for the plan as we move forward in the timeline of

2  events.

3  Q    And during that time period as reflected on Defendant --

4  I'm sorry, DTX-5, all three of the BTF, the NEC, and the MEB

5  are being updated on the progress of the mediation, is that

6  correct?

7  A    Absolutely.  We -- there has never been a lack of

8  information or updates from our advisors, both real time

9  updates, meetings on the fly, to schedule meetings, to discuss

10  the on goings of what was taking place at the mediation

11  sessions, along with some of the other things that were

12  happening because, as I mentioned, the Boy Scouts of America

13  and our local councils and chartered organizations continued

14  to deliver scouting because it does not stop and hasn't

15  stopped.

16      So the board and the NEC are all dealing and juggling

17  with all of these things that are taking place real time, but

18  are advisors did continually provide us with updates.  We

19  received requests to engage in conversations and vote on

20  things that provided our advisors with additional authority on

21  certain terms as well as providing us with better

22  understandings on the interplay with various insurance issues

23  and prior settlements, and the progress that was being made

24  with respect to the tort claimants committee becoming a

25  partner with the other settling entities.

1  Q     So on December -- I'm sorry, on February 9th the NEC

2  provided authority to the advisors to enter into a TCC

3  termsheet.  Let me direct your attention, Mr. Desai, to JTX-

4  1297.

5       Your Honor, this is at Tab TT in Your Honor's Desai

6  binder.  Are you there, Your Honor?

7            THE COURT:  Yes. Thank you.

8            MR. ANDOLINA:  Thank you.

9  BY MR. ANDOLINA:

10 Q    Mr. Desai, do you recall this meeting?

11 A    I do.  This meeting was on the 9th of February of this

12 year where the NEC provided authority to enter into a

13 termsheet with the TCC.

14      (Audio interruption)

15            THE COURT:  Excuse me.  Please mute your phones and

16 your audio.

17            MR. ANDOLINA:  Thank you, Your Honor.

18 BY MR. ANDOLINA:

19 Q    Was there a presentation made by the BSA's advisors in

20 connection with the additional terms that were being discussed

21 and approved at the time?

22 A    Yes, there was.  As I mentioned, there were significant

23 mediation sessions taking place in January and as part of

24 those sessions our advisors would provide us with the updates

25 on the landscape as it was evolving.  On February 9th there

1  was discussion that our advisors had with the NEC relative to

2  certain things; for example, issues related to trust

3  governments, the exchanging of documents, information or

4  discovery as part of the trust administration process.  Some

5  of the youth protection related measures and enhancements that

6  were being requested by the TCC, and a host of other topics

7  involving definitions within the famous, the trust

8  distribution procedures, as I have become familiar with over

9  time.

10      So the -- our advisors brought up those concerns and

11  requests, if you will, to members of the NEC for further

12  discussion and how those terms have evolved during the course

13  of the last 30 days in January to February 9th such that we

14  were in a position finally to be able to effectuate a

15  resolution with the tort claimant's committee.  Not only just

16  the tort claimant's committee, but, frankly, a resolution with

17  the coalition and their constituency to finally have support,

18  overwhelming victim support, from all survivors of abuse that

19  are associated with this restructuring process.

20  Q    So if I could ask you to look at JTX-1298.

21      Your Honor, that is the next tab at UU.

22      Mr. Desai, let me direct you to the third page of this

23  document.  To the third and the fourth page when you were

24  referring to the issues that the advisors discussed with you

25  those had been provided in previous meetings and the NEC was

1  being updated as to the status of negotiations in real time?

2  A      That is correct.

3  Q      And was there active engagement by NEC members on those

4  terms?

5  A      There was.  There was dialog among the members of the

6  NEC with our advisors on what these things would mean, how

7  they interplayed with prior resolutions overreached, along

8  with how our local councils and are chartered organizations

9  would be treated under this termsheet and settlement agreement

10  with the TCC recognizing the inter-relationship and, frankly,

11  vital nature of how our organization is structured and meeting

12  those two partners to allow for scouting to continue into the

13  future, along with conversation on other release related

14  issues in terms of definitional things and scope.

15  Q      So following the execution of the TCC termsheet on

16  February 9th did the NEC then monitor the ongoing discussions

17  that resulted in the filing of the plan?

18  A      Yes, we did.

19  Q      And the plan was filed in the early morning of February

20  15th?

21  A      That's correct.  We knew, based upon Your Honor's

22  rulings, that there is a deadline of the 15th of February in

23  which the organization had to get on file certain documents.

24  We were, obviously, in keeping up with that instruction very

25  mindful of the fact that getting the tort claimant's committee

1  on board and, frankly, every other partner, the coalition, all

2  the other insurers that we have already discussed, coupled

3  with our chartering partners, the Methodist Church, the TCJC,

4  as well as our local councils that putting this plan together

5  and allowing for the delivery of additional resources to the

6  trust, and the settlement trust governance procedures which

7  were vitally important, by the way, to the NEC because at the

8  end of the day the survivors are scouts.

9       We wanted to ensure that when this plan hopefully will

10 get confirmed that our survivors are treated fairly, have the

11 ability to have a transparent process through the exchange of

12 materials and having their stories and experiences shared, and

13 that the trustee and other members of the settlement advisory

14 committee honorably treat our scouts.  So the NEC was very

15 concerned with that and asked that our advisors participate in

16 ensuring that any selection, a trustee or even an

17 administrator to this trust, aren't above board individuals

18 who will do just that.

19 Q    I want to come back to that, Mr. Desai, but as part of

20 the plan or reorganization and as indicated in your

21 declaration at Paragraph 25, were the debtor releases that

22 were included in the plan something that the board in its

23 business judgment considered?

24 A    Yes.  The concept of the debtor releases, as I indicated

25 in my declaration, was a concept that the board, the NEC, the

1  BTF has always considered as essential to the adoption of our

2  plan.  It is necessary to allow for those releases to happen,

3  for work that folks may have done as part of this

4  restructuring process based upon not only their contributions

5  in terms of getting us to this point, but also for the advice

6  that they may have provided coupled with the fact that they

7  are contributing members of the settlement trust and should

8  benefit from a release from the organization.

9      So that has always been a provision or a term, call it

10 what you want, that the NEC, as well as the BTF understood to

11 be part of the overall plan of reorganization as well as

12 within all of our settlement agreements.

13 Q    Mr. Desai, you referenced the governance of the trust

14 and with Your Honor's permission I'd like to publish DTX-6.

15             THE COURT:  You may.

16             MR. ANDOLINA:  Thank you, Your Honor.

17 BY MR. ANDOLINA:

18 Q    Did the NEC receive information about the candidates

19 that would be considered as trustee and claims administrators?

20 A    Yes, we did.  In fact, we received an email that

21 contained eight proposed trustees.  Each of those individuals

22 had a (inaudible) associated with their names.  That allowed

23 for members of the NEC to review each and every one of the

24 proposed trustee's vetting.

25 Q    And did you click on that link and review the bios?

1  A      I did.  I looked at all eight of these individuals, all

2  of whom are accomplished in their own right.  I did so in an

3  effort to be prepared for our NEC meeting where we were

4  discussing the trust governance issues.  As I indicated just a

5  few minutes ago, the fact that it was no paramount to us as

6  the leaders, the volunteer leaders of the Boy Scouts of

7  America that our scouts are trained fairly and have a

8  transparent process on a go forward basis with the settlement

9  trust and the experiences that they would have with that

10 process.

11 Q      And did the board -- I'm sorry, did the NEC eventually

12 consider and approve the designation of Judge Houser as the

13 settlement trustee in connection with the plan?

14 A      We did.  In fact, we had a meeting that was put together

15 fairly quickly because we understood that there was the

16 inability of members of the staff, the settlement trust

17 advisory committee to agree on a unanimous basis to a trustee

18 and, in fact, there were two qualified individuals identified

19 where members couldn't figure it out.  As I recall, we, as the

20 NEC, had to identify who we would support and based on how the

21 voting turned out.

22      We went with the person that, again, both candidates

23 were qualified, but one candidate received one more vote then

24 the other.  We ended up selecting Judge Houser and I also know

25 that that was subject of a court hearing.  Following that and

1  amazingly everybody was able to agree to Judge Houser.  We are

2  excited that Judge Houser, how brings her qualifications to

3  the trust, has been the individual that will be charged with

4  the responsibility to ensure for a fair and transparent

5  process for survivors.

6  Q     So I have a final topic that I want to cover with you,

7  Mr. Desai, and that's the BSA's youth protection program.

8         James, we can take this slide down.

9         So can you describe, and we don't need to publish the

10 slide on that, Mr. Desai, your role as it relates to the BSA's

11 youth protection program?

12 A     The Boy Scouts of America has many measures that are in

13 place to protect our young people.  We comply refer to them as

14 barriers to abuse.  Myself, as a volunteer scouter from 18

15 years of age to the present, have had to undergo the training,

16 the background screening that all of our volunteers who work

17 with our young people have to do.  I have participated in the

18 youth protection online courses.  I have had to renew my

19 understanding and commitment to those principals.  When my

20 youth protection certification expires I get a notification so

21 I have to redo it.  In fact, I just did that a little bit

22 under a year ago so that I could stay involved as a volunteer

23 in working with our young people.

24        It teaches us ways in which we communicate with our

25 young people and to ensure that we always have safeguards in

1   place in how we communicate with them.  So every one of our

2   volunteers, board members has to undergo this type of training

3   and screening process.  So with that, as the barriers, the

4   barriers through abuse, as we call them.

5        We also have to adapt.  We have had to enhance our

6   procedures.  We have had to modernize the way in which we

7   continue to ensure that our young people are safe.  Scouting

8   has evolved much like any other organization throughout the

9   years.  And with the help of the partnerships that we have

10  forged with the tort claimants committee, the coalition, our

11  chartered partners, the Methodist Church and anyone else in

12  the future that will join this pathway to a resolution we are

13  committed to building upon our youth protection measures to

14  become that gold standard as some of our survivors have

15  indicated in our calls that we should be and, frankly, we need

16  to be.  We strive every single day to ensure that our young

17  people are safe because that is our number one priority as an

18  organization.

19            MR. ANDOLINA:  So, with your permission, Your

20  Honor, I'd like to publish DEX-7, related to Enhanced BSA

21  Youth Protection Program.

22  BY MR. ANDOLINA:

23  Q    Mr. Desai, before we talk about the specifics of the

24  Enhanced Youth Protection that is embodied in the plan, could

25  you describe for the Court your role with respect to

1 involvement in this plan as part of the restructuring?

2 A      As it relates to the youth protection measures that

3 we've agreed to, I had the opportunity to serve on the

4 survivor working group, meeting many of the survivors, hearing

5 their stories, and understanding their desires as it related

6 to the forward movement of this organization.  And, in so

7 doing, working with those survivors, working with our

8 dedicated professionals and local council volunteers and local

9 council executives, we were able to formulate many

10 enhancements, not just internally, as shown here on the

11 screen, but also working with the folks that do this on a

12 daily basis -- our consultants like Presidium -- and hearing

13 what it is that they have to say based upon a review of our

14 current policies and procedures, based upon their dialogue

15 with many, many professionals and volunteers in the

16 organization.

17 Q      Did you meet directly with Presidium?

18 A      I did, I did have a one-on-one call with the

19 representative from Presidium and to share my thoughts about

20 our current state of affairs and where, aspirationally, we

21 should be going and moving towards, which, frankly, I'm very

22 excited that in working with our partners we've been able to

23 achieve just that, not only from a youth protection committee,

24 but also the hiring of a youth protection executive, who will

25 serve as an exec. within the Boy Scouts of America to ensure

1  that our young people continue to be safe.  And also falling

2  along the lines, as Mr. Tillman continues to speak about --

3  he's the incoming chair -- that safety is our number one focus

4  and that, though transparent reporting, frequency of

5  reporting, safety of all types, whether it is an unfortunate

6  youth protection violation to a scrape or a broken bone that

7  occur on our properties.

8         And so we -- you know, we've learned a lot through

9  this process and, frankly, as -- if there's ever one thing

10 that's probably the most important out of everything in this

11 restructuring process, it is that we have renewed our

12 commitments to building a more safer Scouting organization for

13 our young people.

14 Q    In connection with those discussions, Mr. Desai, that

15 you referenced, did the NEC meet with the survivors working

16 group directly?

17 A    We did.  Members of the NEC had an opportunity to meet

18 with survivors.  In fact, it was probably one of the more

19 emotionally charged meetings that we have ever had, in

20 understanding the challenges and horrible experiences that our

21 Scouts endured while in the program.

22        But one other thing that came out of those

23 conversations was the renewed hope that, together, we can make

24 things better to ensure that our young people are safe.

25 Q    And did you also or is the NEC aware and involved in

1  engagement with members of the TCC that resulted in the

2  protection plan?

3  A    Because of the timeline of events in reaching a

4  resolution with the TCC, I know that representatives from Boy

5  Scouts of America, with our advisers, participated in many

6  conversations with Dr. Kennedy and Mr. Humphrey, and

7  potentially other members of the TCC, to work out enhanced

8  youth protection measures, which have eventually culminated in

9  every survivor constituency group supporting the plan of

10 reorganization as appears before the Court today.

11 Q    Mr. Desai, from your perspective, what's the most

12 important thing about the Youth Protection Enhancement that

13 the BSA and survivors have been able to partner on?

14 A    I don't view any one as more important than the other.

15 I think the totality of all of the measures that we have been

16 able to agree upon and commit to are going to make the

17 organization that much better to become that gold standard.

18         And one of the other critical components of it is

19 the ability for the organization to know where we've been and

20 know where we're going, and as part of that is to create a

21 remembrance, slash, recognition area for all of our survivors

22 at our High Adventure bases, so that it serves as a good

23 reminder to all of us to always keep safety and youth

24 protection at the forefront of all that we do.

25 Q    As we enter what we hope is the final stage of this

1  process, Mr. Desai, that you've been extremely involved in, do

2  you have any thoughts that you'd like to share with the

3  parties and the Court?

4  A    Your Honor, I've had the benefit of being a recipient of

5  all the good things that the Boy Scouts stands for.  I came to

6  this country as a first generation American.  My parents

7  wanted to have a better life for my brother and I.  And we

8  joined Scouts and joined at a young age, from Cub Scouts all

9  the way through Boy Scouts, eventually becoming Eagle Scout.

10  And my story is not very dissimilar to the thousands of other

11  young people today who are first generation or minorities who

12  find a home in Scouting, not just for ourselves, but the

13  ability to find a voice and to learn about leadership,

14  positive mentorship, and the experiences in the outdoors and

15  lifelong lessons that I, even today as a practicing lawyer,

16  often look back upon and learn from.

17            And I recognize that not everybody has had that

18  quintessential experience that I have had the benefit of

19  having and I, as sitting here on behalf of our organization,

20  am sorry, we are sorry.  But let that not sway us from the

21  realities of all the great things that are happening in the

22  Boy Scouts of America in the past, what's happening today, and

23  what continues to happen in the future.  We have so many young

24  people who do such amazing things for this country and for the

25  communities that they live in who are the future lawyers,

1  judges, politicians and, hopefully, one day, the Presidents of

2  this country, especially now that we have an organization that

3  is ever-more inclusive than it has ever been before.  To teach

4  our young people those essential values of our Scout oath and

5  Scout law, and to just be darn-right good human beings and

6  productive citizens in society.

7          And I thank you, Your Honor, for listening to me

8  and for allowing us the opportunity to be before you today.

9          MR. ANDOLINA:  Thank you, Your Honor.  I have no

10  further questions for Mr. Desai.  I would ask that the

11  declaration and all of the exhibits, with the exception of the

12  Lumbert (ph) report that I identified earlier, be admitted

13  into evidence and that Mr. Desai be cross-examined.

14          MR. HALLOWELL:  Your Honor, the certain insurers

15  filed objections to particular paragraphs of Mr. Desai's

16  declaration.

17          THE COURT:  Yes.

18          MR. HALLOWELL:  He has testified for approximately

19  two hours.  This was not anything limited.  While we gave some

20  consideration to moving to strike the entirety of his

21  declaration, we suggest instead that we simply strike

22  paragraphs 25, 26, 27, 28, and the last two sentences of

23  paragraph 77.  We believe that the Scouts can rely on whatever

24  testimony has been adduced by Mr. Desai during this direct for

25  those paragraphs.

1            THE COURT:  Mr. Andolina?

2            MR. ANDOLINA:  (Indiscernible) rooted in

3  foundation, certainly with respect to each of those

4  paragraphs, I believe I laid the foundation, and I do not

5  believe that any of the lay opinion objections are

6  appropriate.  I believe that Mr. Desai testified as to his

7  personal experience and his personal views on behalf of the

8  NEC.

9            So I think I have laid the foundation and I think

10  the 701 objection with respect to each of the five categories

11  or paragraphs should be overruled and those paragraphs, along

12  with his direct testimony, should be admitted.

13            THE COURT:  Okay, I'm going to overrule the

14  objections.  This witness clearly has a foundation to make the

15  statements that were made in the identified paragraphs and,

16  while I agree that perhaps we've had more than limited direct,

17  some of these statements were not specifically covered on

18  direct and I believe they're not improper lay opinion.  So

19  I'll overrule the objections that remain.

20       (Desai declaration received in evidence)

21            MR. ANDOLINA:  Thank you, Your Honor.

22            THE COURT:  Okay.  Let's take ten minutes and then

23  we'll start with the cross.

24            COUNSEL:  Thank you, Your Honor.

25            THE COURT:  We're in recess.

1       (Recess taken at 12:10 p.m.)

2       (Proceedings resumed at 12:20 p.m.)

3         THE COURT:  This is Judge Silverstein, we're back

4 on the record.

5         MR. ANDOLINA:  We're here at your convenience, Your

6 Honor.

7         THE COURT:  Mr. Hallowell, cross?

8         MR. HALLOWELL:  Thank you, Your Honor.

9               CROSS-EXAMINATION

10 BY MR. HALLOWELL:

11 Q    Good morning, Mr. Desai.  My name is Jim Hallowell, I'm

12 an attorney with Gibson, Dunn & Crutcher, and I represent the

13 AIG companies in this matter.  I'm going to ask you questions

14 today on behalf of the certain insurers.  Can you hear me

15 okay, Mr. Desai?

16 A    Yes.  Good afternoon to you as well.

17 Q    Mr. Desai, who assisted you in preparing your

18 declaration?

19 A    I was assisted by our counsel, Mr. Andolina.

20 Q    Anybody else?

21 A    He had his associate Mr. Giadi (ph), who assisted with

22 the gathering of documents that were necessary as far as

23 exhibits to my deposition -- I mean to my affidavit.

24 Q    Anybody else?

25 A    Not that I know of, no.

1  Q      Did you make any changes to the draft that was shown to
2  you?

3  A      Yes, I did.

4  Q      What changes did you make?

5  A      I made some language changes in terms of how certain
6  sentences were structured.  I had obviously missed the number
7  on -- the 500 and 515 on the councils' contribution.  And, as
8  I think through it, some typographical errors here and there
9  but, aside from that, that's it.

10 Q      Okay.  So, for the most part, is it fair to say that
11 your declaration was drafted by your counsel?

12            MR. ANDOLINA:  Objection to form.

13            THE COURT:  Overruled.

14            THE WITNESS:  Yes and no -- sorry.  Yes and no,
15 because I did have significant input into the affidavit.  As
16 you may know, Mr. Hallowell, there are many parts of my
17 declaration that are similar to the RSA declaration I had, but
18 it also discussed what occurred post-RSA, of which I engaged
19 in conversations with Mr. Andolina and Mr. Giadi based upon my
20 review of my notes and ensuring that what was being described
21 in the declaration was in fact correct.

22 BY MR. HALLOWELL:

23 Q      So they prepared the declaration and you reviewed it,
24 correct?

25 A      Yes, when --

1  Q     Was that the same process for the RSA declaration?

2  A     Yes, with input and suggested changes that I described

3  that I would have made.

4  Q     Okay.  And the suggested changes and the input are what

5  you described at the beginning of our conversations, correct?

6  A     As it relates to this particular declaration for this

7  confirmation hearing, yes.

8  Q     Okay.  Well, tell me about the RSA declaration, what

9  input did you have in the RSA declaration?

10  A     Going back in time, I recall that I had several

11  conversations with Mr. Andolina as we were preparing the

12  declaration.  In fact, he and I were on a Zoom call, several

13  Zoom calls, where we would literally type the affidavit and

14  the substance of it out together, and I would offer input, I

15  would offer suggestions on typed sentences, how the sentences

16  were worded, in preparation for my RSA declaration.

17  Q     Did you also participate in Zoom calls with respect to

18  your confirmation hearing declaration?

19  A     I did.  I believe White & Case uses Webex, same thing,

20  but yes.

21  Q     Okay.  And is it fair to say that for both declarations

22  it was White & Case that did the typing and the drafting and

23  it was you that had the conversations with them?

24  A     Yes -- as you're describing it, yes.  And, again, I made

25  the necessary changes and input that was required to have a

1  declaration that I could put my name on.

2  Q    I want to talk to you a little bit about what Mr.

3  Andolina talked to you about, which is the Philmont retreat.

4  Would you turn your -- first, before I do that, both you and

5  the Court should have a binder provided by the certain

6  insurers for this cross-examination.

7  A    Allow me one moment to have Mr. Andolina grab it,

8  please.

9            THE COURT:  I do have that.

10           MR. HALLOWELL:  Thank you, Your Honor.

11           THE WITNESS:  I now have it, Mr. Hallowell.

12  BY MR. HALLOWELL:

13  Q    All right.  I'm not sure where they wound up in your

14  binder, but in my binder it's the very last entry and it's

15  Insurers' DX-1, and that's the demonstrative exhibit that Mr.

16  Andolina walked you through earlier in your testimony today.

17  Can you find that for me, please?

18       (Pause)

19  A    I have it.

20           MR. HALLOWELL:  Your Honor, the certain insurers

21  offer DX-1 into evidence.

22           THE COURT:  Objections?

23           MR. ANDOLINA:  I object on the grounds, Your Honor,

24  that this is a demonstrative.  Can I have Mr. Hallowell

25  confirm the documents that this was prepared in comparison to,

1  please?

2          MR. HALLOWELL:  Absolutely, Your Honor.  The

3  comparison is from JX-1926.  JX-1926 is the original document

4  that's in your binder as well and JX-1185 is the revised

5  document, also in the binder.  And to be clear, Your Honor, we

6  offer both 1926 and 1185 into evidence.

7          THE COURT:  Any objections, Mr. Andolina?

8          MR. ANDOLINA:  No objection.

9          THE COURT:  Then all three are admitted.

10     (Exhibits DX-1, JX-1926 and JX-1185 received in

11  evidence)

12  BY MR. HALLOWELL:

13  Q     So, Mr. Desai, there was a board retreat that took place

14  on August 27th and August 28th, 2021, correct?

15  A     Yes, sir.

16  Q     And that took place at Philmont, correct?

17  A     Yes, sir.

18  Q     Philmont is one of the Boy Scouts' National High

19  Adventure bases, right?

20  A     Yes, sir.

21  Q     And a High Adventure base is a Scout camp that offers

22  extreme adventures, correct?

23  A     Yes, sir.

24  Q     Philmont has meeting facilities too, correct?

25  A     Yes.

1  Q     The retreat was attended by the NEC members and by BSA

2  CEO Roger Mosby, correct?

3  A     Yes.

4  Q     And there weren't any lawyers present at this retreat,

5  correct?

6  A     Aside from certain members of the NEC being lawyers in

7  their day jobs, that would be correct.

8  Q     And you weren't acting as lawyers at the retreat, were

9  you?

10  A     Correct.

11  Q     Okay.  You participated in both days of the retreat,

12  right?

13  A     I did.

14  Q     And in fact you took handwritten notes at the retreat?

15  A     Yes.

16  Q     And those notes are at JTX-1925, correct?

17         MR. HALLOWELL:  And, Your Honor, I'm worried that I

18  may have slipped something.  Did I say 1926 when I was

19  referring to the earlier Philmont draft?

20         THE COURT:  Yes.

21         MR. HALLOWELL:  Okay, I'm sorry, Your Honor.

22  BY MR. HALLOWELL:

23  Q     Could you turn your attention, Mr. Desai, to JTX-1925?

24  A     Yes.

25  Q     These are your handwritten notes from the retreat,

1  correct?

2  A     Yes, sir.

3           MR. HALLOWELL:  Your Honor, the certain insurers

4  offer JTX-1925 into evidence.

5           MR. ANDOLINA:  No objection.

6           THE COURT:  Admitted.

7       (Exhibit JTX-1925 received in evidence)

8  BY MR. HALLOWELL:

9  Q     If you take a look at the page ended Bates 878, the

10  first thing you say in your notes is, "Moving BSA beyond

11  bankruptcy; bright, sustainable future," correct?

12  A     Yes.

13  Q     Okay.  And your notes were a synopsis of conversations

14  that were taking place as part of the facilitated

15  conversations at the Philmont retreat, right?

16  A     Yes, my summation of them, my characterization of them,

17  that's correct.

18  Q     Okay.  And the NEB and the NEC, they didn't prepare any

19  materials from the board to use at the retreat, right?

20  A     The NEB, the board, would not have.  And in terms of the

21  actual NEC, meaning the 12 members of the NEC, the only

22  materials that we had received in advance of the retreat were

23  based upon the calls that their consultant had with each

24  member of the NEC and the output of those calls in terms of

25  where each of us saw the organization post-emergency, what we

1   thought of in terms of the strengths of the organization, the

2   opportunities that were available to the organization on a go-

3   forward basis.

4            So we had those materials that were synthesized,

5   and of course we had received a schedule -- yeah, meaning

6   materials as far as how to sign up and register and pay for

7   your lodging, those types of things.

8   Q    Okay.  It sounds like a pretty typical retreat.

9            Would you turn to the Bates page ended 880, please?

10  Approximately two thirds of the way down the page there's a

11  circled note, do you see that?

12  A    Yes, sir.

13  Q    And that circled note reads "Preemptive consolidation,"

14  right?

15  A    Yes.

16  Q    And preemptive consolidation refers to the potential

17  consolidation of local councils going forward, correct?

18  A    Yes.

19  Q    You dated your notes, correct?

20  A    Yes, generally.

21  Q    Turn to page 882.  There's an entry there August 28th,

22  2021; do you see that?

23  A    Yes.

24  Q    And my understanding is that on August 28th the NEC

25  members participating in the retreat were split up by the

1  facilitator into various subgroups, correct?

2  A     Yes, sir.

3  Q     And you participated in the stakeholder communications

4  and program subgroups, correct?

5  A     Yes, sir.

6  Q     Okay, but your notes reflect reports back from all of

7  the subgroups, right?

8  A     Yes.

9  Q     Okay.  Turn to Bates page ended 887, please.  Do you see

10 an entry there approximately one third of the way down that

11 says, "Streamline org"?

12 A     Yes.

13 Q     And this was the report back from a subgroup that dealt

14 with streamlining the BSA organization, correct?

15 A     Yes.

16 Q     And these are your notes from the presentation that was

17 made by that subgroup, right?

18 A     Yes.

19 Q     You don't recall who among the NEC members was in that

20 subgroup, do you?

21       (Pause)

22 A     It looks like on page 882 of my notes there are four

23 individuals that I wrote down on the right-hand side, on the

24 line saying "Simplify organization," which would indicate to

25 me that those would have been the members of that subgroup.

1  Q     And who are those four individuals?

2  A     I had written down Jack, Roger, Brad, Allison.

3  Q     Who are Jack, Roger, Brad, and Allison?

4  A     Jack Furst (ph), Roger Mosby refers to our CEO, Brad

5  Tildon (ph), and then Allison Schuler.

6  Q     Okay.  And Brad Tildon is the chair elect of the BSA;

7  correct?

8  A     Yes, sir.

9  Q     And he's the person that drafted the first presentation

10 that we're going to talk about in a little bit; right?

11 A     Yes.

12 Q     And Allison Schuler is another member of the bankruptcy

13 task force; correct?

14 A     Yes.

15 Q     Brad Tildon is also on the bankruptcy task force;

16 correct?

17 A     Yes.

18 Q     And Allison Schuler helped you in redrafting the

19 presentation that Mr. Tildon drafted; right?

20 A     No, she participated along with myself and Mr. Tildon in

21 putting together the document that was provided to the NEC.

22 Q     The document that was provided to the NEC is a revised

23 version of the document that Mr. Tildon first prepared;

24 correct?

25 A     It took the draft that Mr. Tildon made and put it into a

1  form that could be shared with the board, yes.

2  Q    Okay.  Turn back to the page Bates ended 888.  This is

3  the readout, if you will, at the Philmont retreat from the

4  streamline organization subgroup.  One of the things that is

5  said is, "Too much collaboration, slow decision making."  Do

6  you see that?

7  A    I do.

8  Q    Okay.  Another thing that's said there is, "Explore

9  pension termination post-bankruptcy."  Do you see that?

10  A    I do.

11  Q    And a couple of lines down there's another thing that

12  says, "Throw what we can into bankruptcy process for judge to

13  put in order."  Do you see that?

14  A    Yes.

15  Q    That was one of the readouts from the streamline

16  organization section at the Philmont retreat; correct?

17  A    Yes.

18  Q    Mr. Desai, I direct your attention to JTX-1926.  This is

19  the debrief presentation that was prepared by Mr. Tildon;

20  correct?

21  A    It appears to be the draft he created, yes.

22  Q    Okay.  And this is a draft document that he prepared in

23  approximately October 2021; correct?

24  A    I don't know when he prepared it.

25  Q    He prepared it sometime after the retreat in August;

1  right?

2  A    Yes.

3  Q    And sometime before December 3rd, 2021; correct?

4  A    I wouldn't know since I had never seen it until my --

5  the week of my deposition.

6  Q    Your deposition was on December 3rd, 2021; correct?

7  A    Yes, sir.

8  Q    And you say now that you saw this document a week before

9  your deposition; is that right?

10  A    I saw it during the prep session with Mr. Andolina for

11  my December 3rd deposition, correct.

12  Q    And I am the lawyer that asked you questions about this

13  document during your deposition; correct?

14  A    Yes, sir.

15  Q    And it was only after that deposition that you began the

16  process of rewriting this presentation; correct?

17  A    Yes, since I had never seen it before, that's correct.

18  Q    Would you turn to page 2 of the presentation?  This is

19  the picture of General Eisenhower that you testified about

20  earlier this morning; correct?

21  A    Yes, sir.

22  Q    I asked you specifically about this picture in your

23  deposition; correct?

24  A    You did.  You asked me who we were at war with.

25  Q    That's right.  And your response to that was to remove

1  this picture from the revised presentation; correct?

2              MR. ANDOLINA:  Objection, argumentative.

3              THE COURT:  Overruled.

4              THE WITNESS:  May you ask your question again,

5  please?

6  BY MR. HALLOWELL:

7  Q     I think you know the question.

8              THE COURT:  Can you re-ask it, please?

9              MR. HALLOWELL:  Okay.

10 BY MR. HALLOWELL:

11 Q     Your reaction to my question in your deposition was to

12 remove this picture from the presentation; correct?

13 A     I wouldn't call it a reaction to your questioning me,

14 sir.  Again, because I had never seen this presentation prior

15 to my prep session for my December 3rd deposition, having had

16 an opportunity to, obviously, review it, as I indicated

17 previously, Mr. Hallowell, I did speak to Mr. Tildon and also

18 to Ms. Schuler and revised this presentation to accurately

19 reflect the conversations that took place at Philmont.  And,

20 yes, while I do recognize the importance of planning because

21 that's critical to anything, I didn't think that the imagery

22 that was depicted here was the right messaging to share with

23 the board.

24 Q     Could you turn to the Bates page ended 058, please?

25              (Pause)

1  A      Okay.

2  Q      Mr. Tildon's drafts, these are listed as "Our

3  strengths," correct?

4  A      Yes, they are.

5  Q      And one of those strengths is, number two, "Local

6  councils, as well as National, are 100 percent free of all

7  abuse claims."  Do you see that?

8  A      I do see that.

9  Q      Another one of "Our strengths," as set forth by Mr.

10 Tildon, the chair-elect of the BSA, is "We retain all four

11 High Adventure bases."  Do you see that?

12 A      I see that.

13 Q      And the next one in number 4 is, "Our local councils

14 come out of bankruptcy with some balance sheet strength."  Do

15 you see that?

16 A      Yes.

17 Q      And you have heard, haven't you, that by at least some

18 calculations the local councils, in an aggregate basis, have

19 approximately $2 billion in unrestricted assets; is that

20 correct?

21 A      I have heard that through Mr. Whitman as part of this

22 process; however, I have not examined every local council's

23 balance sheets or am not aware of their ownership interests in

24 any properties, et cetera, but I do believe that Mr. Tildon

25 was summarizing what he believed to be things that would

1  emerge from a successful confirmation process.

2  Q    I direct your attention to the Bates page ended 065.

3  Mr. --

4          MR. HALLOWELL:  -- is everyone at that page?

5          THE WITNESS:  Yes, sir.

6  BY MR. HALLOWELL:

7  Q    Mr. Tildon has set forth here, "Make the BSA debt free."

8  Do you see that?

9  A    Yes.

10 Q    Okay.  And this whole presentation is about preliminary

11 thoughts, right, that's what it says on the cover?

12 A    Yes.

13 Q    Okay.  So these are the preliminary thoughts of Mr.

14 Tildon, correct?

15 A    Based upon his recollection, I assume, from the retreat.

16 Q    Okay.  Turn to the next page, Bates ended 066.  This is

17 a continuation of Mr. Tildon's thoughts coming from the

18 Philmont retreat about making the BSA debt free.  Do you see

19 that?

20 A    Yes.

21 Q    And one of his thoughts is to raise $400 million from

22 donors by December 15th, 2023.  Do you see that?

23 A    I do.

24 Q    Another one of his thoughts is to place that money in a

25 trust pending a successful campaign, right?

1    A      I see that.

2    Q      Another one of his thoughts is to place the High

3    Adventure bases that we talked about earlier in trust as well?

4    A      I see that.

5    Q      Okay.  And the next one is to explore pension plan

6    termination?

7    A      I see that.

8    Q      And, again, to be 100 percent debt free by December

9    31st, 2023?

10   A      I see that.

11   Q      Would you turn to what has now been introduced into

12   evidence as DX-1, which is the comparison that Mr. Andolina

13   walked you through and that the certain insurers prepared.

14   Let me know when you're there.

15   A      I'm there.

16   Q      And I think we've established that this is a comparison

17   of Mr. Tildon's version to your version; correct?

18          MR. ANDOLINA:  Objection to form in describing

19   "your version" --

20          THE COURT:  Sustained.  Do you want to --

21          MR. ANDOLINA:  -- the version approved by --

22          THE COURT:  -- rephrase?

23          MR. ANDOLINA:  I'm sorry, Your Honor.

24   BY MR. HALLOWELL:

25   Q      Would you turn, Mr. Desai, to DX-1, page 18?

1        Mr. Andolina walked you through this presentation,

2   but he stopped at this page.  Do you remember that?

3   A    I recall walking through the presentation, yes.

4   Q    Okay.  Turn to page 20.  These are the changes that you

5   made to Mr. Tildon's preliminary thoughts to make the BSA debt

6   free?

7   A    Again, I know you're characterizing it as changes I

8   made, Mr. Hallowell, but it was in conjunction with Ms.

9   Schuler and Mr. Tildon himself where we revised an initial

10  draft.

11  Q    Okay.

12  A    And as it relates to this particular page and some of

13  the strikeouts, there are things on this document that were

14  not specifically discussed and may have been aspirational in

15  terms of thought processes by certain people, but it's

16  certainly a wish list of things to continue to make the

17  organization more viable into the future and allow for us to

18  honor our commitments through this process.

19  Q    Mr. Tildon prepared the first draft of the presentation,

20  we agree with that, right?

21  A    Yes, sir.

22  Q    And you took the lead in drafting the finalized

23  PowerPoint; correct?

24  A    I along with Ms. Schuler and Mr. Tildon revised the

25  document that the NEC looked at.

1  Q     Mr. Desai, I direct your attention to your confirmation
2  declaration.  Would you please turn to paragraph 89 of your
3  confirmation declaration?
4  A     Is that in your binder, Mr. Hallowell?
5  Q     No, I think you have to go back to yours.
6           MR. ANDOLINA:  I'll provide it.
7           THE WITNESS:  I can see it, it's on the screen.
8  BY MR. HALLOWELL:
9  Q     Okay.  Can you see two thirds of the way down that
10 either White & Case or you wrote, "I took the lead in drafting
11 the finalized PowerPoint and also received input from Allison
12 Schuler and Brad Tildon"?
13 A     I do see that and --
14 Q     And that's what you said in your declaration; correct?
15 A     That's what's said there and, as I indicated, I
16 organized a PowerPoint -- I mean a Zoom call with Mr. Tildon
17 and Ms. Schuler and I had on my computer the PowerPoint where
18 I was making changes as the two of them in real time were
19 providing input.
20 Q     Mr. Desai, you declared under perjury that you took the
21 lead in drafting the finalized PowerPoint, do you want to
22 retract that statement now?
23 A     No, sir.  I actually did type on my computer the changes
24 that were discussed between the three of us.
25 Q     Mr. Desai, I direct your attention back to Insurers' DX-

1    1, page 20.  And I just want to go through the changes that

2    were made.

3              So the heading was changed in the presentation;

4    right?  It now says, "Reduce debt and improve financial

5    profile."  Correct?

6    A    That's what it says, yes.

7    Q    And everything about raising $400 million from donors by

8    December 15th, 2023 has been completely stricken; right?

9    A    Yes, it has been struck.

10   Q    And that's been replaced with, "Aggressively fundraise

11   to both service debt and reduce principal"?

12   A    Yes.

13   Q    Okay.  And the line about "Place High Adventure bases in

14   trust," that's been taken out too, right?

15   A    It's been restated.

16   Q    It's been restated as, "Explore asset protection

17   measures post-emergence," right?

18   A    Yes, sir.

19   Q    Okay.  And then "Explore pension plan termination" has

20   also been taken out; correct?

21   A    Yes.

22   Q    And that's been replaced with something completely

23   different, right?  That now says, "Build continuing education

24   plan to increase business financial acumen," right?

25   A    Yes, sir.

1    Q      Has the BSA discussed with its advisers terminating its

2    pension plan?

3    A      I can tell you that early on in the restructuring

4    process there had been conversations to explore any and all

5    options related to the pension plan, and it also led to a very

6    robust meeting one time in presentations with our pension

7    counsel to provide us with a variety of scenarios under which

8    that could be done; however, in so doing, there would be

9    significant liabilities to the organization for terminating

10   the plan.

11   Q      Let me ask you a slightly different question -- it's

12   related to pension plans, but it's a little bit different.

13   Have your advisers recommended that the BSA should stop

14   funding the pension plan?

15            MR. ANDOLINA:  Objection, that calls for attorney-

16   client communications.

17   BY MR. HALLOWELL:

18   Q      Mr. Desai, I direct your attention to JTX-1172.

19          (Pause)

20   Q      This is a document that's been prepared by Alvarez &

21   Marsal.  Do you see that?

22   A      Yes, sir.

23   Q      Okay.  And it's entitled, "BSA Bankruptcy Task Force

24   delayed emergence and liquidity update."  Do you see that?

25   A      Yes, sir.

1   Q      So this is a presentation that would have been made to

2   the BTF on January 7th, 2022; correct?

3   A      Yes, sir.

4   Q      Would you turn to page 4 of the presentation?  Oh, no,

5   sorry, it's numbered page 3, but I guess it's the fourth side.

6   This refers to --

7   A      Go ahead.

8   Q      -- delayed emergence and liquidity mitigation options.

9   Do you see that?

10  A      Yes.

11  Q      At the top are actions requiring court approval and plan

12  amendment.  Do you see that?

13  A      Yes.

14  Q      This was back in January, right?

15  A      Yes, sir.

16  Q      And among the things that would require court approval

17  and plan amendment back in January was use of sale proceeds

18  from Scouting U building and National Distribution Center.  Do

19  you see that?

20  A      Yes.

21  Q      And that would bring about approximately $15.5 million

22  that the Boy Scouts could use for operations purposes;

23  correct?

24  A      That's right.

25  Q      It's noted, at least at this time, that that action

1  would require an amendment to the plan and that Coalition

2  would likely oppose the use of such funds for BSA's

3  operations, right?

4  A    That's what it says.

5  Q    Okay.  Now, in fact -- and we'll talk about this later,

6  but in fact, as part of the TCC settlement term sheet, there's

7  now an agreement that the Boy Scouts can use the Scouting U

8  proceeds and the National Distribution Center proceeds for

9  their operations purposes, right?

10  A    Yes, sir.  There was a negotiated term based upon the

11  posture of this case and the delays in starting the

12  confirmation process.  And so the organization had made the

13  ask of the various creditors to see if they would support us

14  retaining those funds.

15  Q    Okay.  Take a look at the actions that can be

16  unilaterally made by the BSA.  Do you see that?

17  A    Yes.

18  Q    And one of those actions is stop funding the pension.

19  Do you see that?

20  A    Yes.

21  Q    This is a unilateral action which is available to the

22  BSA.  Do you see that?

23  A    It is an option available, yes.

24  Q    And A&M refers to Alvarez & Marsal, right?

25  A    That's correct.

1  Q      They're your financial advisers?

2  A      Yes.

3  Q      Alvarez & Marsal recommends doing so to preserve cash as

4  the pension currently is an overfunded position and funding is

5  planned to stop at emergence.  Do you see that?

6  A      I do.

7  Q      Why is funding planned to stop at emergence?

8  A      I don't know; however, what I can tell you is that the

9  NEC did not adopt this recommendation and continues to fund

10  the pension.

11          MR. HALLOWELL:  Your Honor, the certain insurers

12  move JTX-1172 into evidence.

13          MR. ANDOLINA:  No objection.

14          THE COURT:  It's admitted.

15      (Exhibit JTX-1172 received in evidence)

16  BY MR. HALLOWELL:

17  Q      Would you turn back to DX-1, please?

18      (Pause)

19  Q      Page 5 of DX-1 talks about "The Boy Scouts' brutal

20  facts," do you see that?

21  A      Yes.

22  Q      And that was initially set forth in Mr. Tildon's

23  presentation and that title continues in the presentation that

24  has been approved by the NEC, correct?

25  A      Yes.

1  Q     And there are some things that haven't been changed at

2  all.  Forty five years of membership declines.  Do you see

3  that?

4  A     Yes.

5  Q     And then, at the bottom, "Current youth membership equal

6  to what we had in 1938."  Do you see that?

7  A     Yes.

8  Q     Mr. Tildon wrote, "Safety perception problem and, if

9  we're honest with ourselves, youth safety needs further

10  improvement.  We do not currently have an adequate safety

11  culture."  Do you see that?

12  A     I do.

13  Q     That was what was discussed at the 2021 Philmont retreat

14  and what Mr. Tildon wrote in October 2021, correct?

15            MR. ANDOLINA:  Objection.

16            THE WITNESS:  Those were the top -- those were the

17  statements that Mr. Tildon made and ones which I disagreed

18  with.

19  BY MR. HALLOWELL:

20  Q     Mr. Tildon states, "We started the bankruptcy process

21  with 1700 claims and came out of bankruptcy with 80,000

22  claims."  Correct?

23  A     Yes.

24  Q     And you took the lead in drafting the finalized

25  presentation and you struck all this; correct?

1  A      When you are referring to me taking the lead, I

2  physically typed while Mr. Tildon and Ms. Schuler provided

3  input on the Zoom call, yes.

4  Q      Who wrote the sentence, "Safety/youth protection

5  perception problem"?

6  A      That seems to be contained within Mr. Tildon's initial

7  draft.

8  Q      No, I think the way these things go, this is an addition

9  since it's underlined.

10             MR. ANDOLINA:  I'll refer you to the third

11  paragraph that's been struck, Mr. Hallowell.

12  BY MR. HALLOWELL:

13  Q      No, I'm looking at after number 2.  "Safety," slash,

14  "youth protection perception problem.  Youth safety can

15  continuously evolve/improve."  Who wrote that?

16  A      I would have written that based on the conversation with

17  the -- with Mr. Tildon and Ms. Schuler on January 19.

18  Q      Let's turn to the page DX-1, page 7.  The initial draft

19  said about local councils, "Some councils are pushing for

20  profound governance changes."  Do you see that?

21  A      Yes, sir.

22  Q      The finalized presentation says, "Some councils are

23  pushing to build better trust and transparency."  Do you see

24  that?

25  A      Yes.

1   Q      Who wrote "to build better trust and transparency"?

2   A      That came about as a result of the January 19th

3   conversation between the three of us.

4   Q      Do you remember whose suggestion it was?

5   A      I can tell you the three of us have been very actively

6   involved in working to improve our relationships, as well as

7   the governance of the organization with our local council

8   partners as part of this restructuring process and in that

9   same line, in an effort to do that, there have been some

10  councils who have been asking for more transparency into how

11  the national organization is run, the decisions that are being

12  made, how the national organization and the board members are

13  selected.  And so, there are a host of concerns that have

14  boiled up throughout this process in which we created a task

15  force through the governance group that Mr. Chorderly

16  (phonetic) chairs in order to create a local council chair

17  cabinet working with a number of local council leaders,

18  volunteer leaders to address the concerns that were being

19  raised during this restructuring process, as well as through

20  the group that Mr. Mason represents, along with the assistant

21  (indiscernible).

22  Q      Are there any local councils that are pushing for

23  profound governance changes?

24  A      There are some councils that are more vocal than others;

25  however, I think like Mr. Vine (phonetic) and his current

1  client, in this case, they're not speaking for everyone, so

2  we, likewise, have some similar issues internally as a family,

3  where not every council is seeking profound governance

4  changes, as indicated there, but there are certain councils

5  that are asking for it, yes.

6  Q    The next item refers to chartering organizations'

7  relationships are frayed.

8        Do you see that?

9  A    Yes.

10 Q    And the first draft said, current model unlikely to

11 survive, given heightened focus on abuse exposure.

12       Do you see that?

13 A    Yes.

14 Q    And that referred to the current model of the BSA,

15 correct?

16 A    That's right.  Our current relationship at the time with

17 our chartered organizations, that is, as you may recall, the

18 knowledge used in Methodist churches is a great example.  The

19 Methodists have indicated (audio interference.)

20             THE COURT:  Excuse me, Mr. Desai.

21             Please check your audio.  I'm getting cross-talk.

22 Make sure it's off.

23             I'm sorry, Mr. Desai?

24             THE WITNESS:  No problem, Your Honor.

25             Taking the Methodists as an example, the Methodist

1  Church at or around this time frame, following the August

2  retreat had started to indicate to the BSA leadership their

3  ongoingness for Scouting and issued directives and

4  communications to all of their churches to terminate

5  relationships and agreements as a chartered organization

6  sponsor with our units.  And so, as you can imagine, that

7  would have created a significant problem for the organization.

8          And through several mediation sessions, where we

9  worked out the differences under the leadership of Bishop

10 Schol to ensuring that Methodists and others are continuing

11 partners with the BSA.  But in so doing, it may require us to

12 revisit our charter partner agreements and a relationship in

13 terms of how facilities are provided to our Scouting units for

14 purposes of meeting and conducting events and what that might

15 look like as far as ensuring obligations on the part of a unit

16 council, the national organization, *vis-a-vis*, even chartered

17 organizations.  So, that's what that statement is meant to

18 address.

19 BY MR. HALLOWELL:

20 Q    Okay.  Well, there's really two statements here.  The

21 statement written by Mr. Tilden says that the BSA current

22 model, unlikely to survive, given heightened focus on abuse

23 exposure.  And the revised statement says the BSA current

24 model faces uncertainty in bankruptcy, needs to explore new

25 model options.

1        Do you see that?

2  A      Yes, sir.

3  Q      Who wrote the revised version?

4  A      Again, the revisions were made by the three of us and I

5  physically was the one typing while Brad and Alison were on my

6  Zoom screen.

7  Q      Do you remember who had the idea to change that

8  particular one?

9  A      I do believe there was not one person that was a

10  champion.  I believe it was a culmination of three heads

11  thinking, because as I just described, there has been a lot of

12  uncertainty with our chartered organizations in this process,

13  given the number of abuse claims, given the issues attendant

14  with insurance, as you're well aware, and how chartered

15  organizations are being treated.

16        And so, it has forced the organization to think

17  differently and creatively in order to continue to allow our

18  Scouts a place to meet and what that model will look like as

19  we move forward.  It may not change.  It may change.  I don't

20  know.

21  Q      Somewhere in your answer there, I thought I heard the

22  phrase "three-headed thinking"; was I right about that?

23  A      The three of us, meaning Mr. Tilden, myself, and      Ms.

24  Shore.

25  Q      Were you meaning that to be a good thing or a bad thing?

1    A      I think the three of us were collaborating and sharing

2    our viewpoints from the retreats, so I look at that as a great

3    thing.

4    Q      Mr. Desai, I want to turn to a slightly different topic.

5    You're -- you understand that the trust distribution

6    procedures, or TDPs, as I'll call them from time to time, your

7    understanding is that they serve as the bylaws for which the

8    trust is governed and how claims will be administered,

9    correct?

10   A      Yes, sir.

11   Q      And it's your understanding that the BSA's role in this

12   case in determining the TDPs was to provide drafts based on

13   historical data from prior resolutions of historical sex abuse

14   cases, correct?

15   A      Yes, sir.

16   Q      And the historical data provided the framework for which

17   the BSA and the parties to the TDPs would be able to agree on

18   an valuation of claims, right?

19   A      Subject to the Court's approval, yes, sir.

20   Q      Okay.  Now, you were not involved indirectly negotiating

21   any version of the TDPs, correct?

22   A      That would be a fair statement.

23   Q      And just to take it a bit further so we know, it wasn't

24   just you.  The National Executive Board wasn't involved

25   indirectly negotiating any version of the TDPs, correct?

1  A    The National Executive Board, NEC, BTF, we were not

2  involved in the drafting or negotiating of the TDPs.

3  Q    Right.  And the TDPs were negotiated by BSA's counsel,

4  right?

5  A    They were a product of negotiations between many

6  parties, yes, including our counsel.

7  Q    Okay.  Well, within BSA, it was the counsel that dealt

8  with it, right?

9  A    Yes.

10  Q    Okay.

11  A    In addition to relying upon the organizations' data,

12  which would have been provided to our general counsel, yes,

13  sir.

14  Q    Let's talk about the settlement trust.  You didn't have

15  a direct role in negotiating the settlement trust agreement,

16  correct?

17  A    That's correct.

18  Q    And neither did the National Executive Board, NEC, the

19  BTF or anyone else within BSA, other than its outside counsel,

20  correct?

21  A    I wouldn't know if Mr. McGowan played any role in that,

22  however, generally, as far as the volunteers in the

23  organization, you would be correct.

24  Q    And you didn't have any role in coming up with the

25  composition of the Settlement Trust Advisory Committee,

1  correct?

2  A      No, sir.

3  Q      Okay.  And to the extent that anyone at BSA was involved

4  in the Settlement Trust Advisory Committee, that would have

5  been your outside advisors, correct?

6          MR. ANDOLINA:  Objection to the characterization of

7  "involved."

8          THE WITNESS:  It's my understanding.

9          THE COURT:  Overruled.

10          THE WITNESS:  I'm sorry.

11          THE COURT:  You can answer.

12          THE WITNESS:  It's my understanding that the makeup

13  and selection of folks to the Settlement Trust Advisory

14  Committee was not something that our advisors indicated;

15  however, they would have been involved in the process of

16  drafting procedures for that settlement agreement that created

17  the various governance procedures, because as you will recall,

18  the NEC was extremely adamant in ensuring that whoever is

19  administering the Trust and whoever makes up the Settlement

20  Trust Advisory Committee are members who are of the utmost

21  integrity and will treat every survivor with the utmost

22  respect they deserve to ensure for a fair and transparent

23  process.

24  BY MR. HALLOWELL:

25  Q      But the NEC hasn't conducted any due diligence with

1  regard to the members of the Settlement Trust Advisory

2  Committee, has it?

3  A    The -- our advisors provided us with information as to

4  the members of the Settlement Trust Advisory Committee, some

5  of whom I believe are attorneys affiliated with representing

6  survivors in this restructuring process.  In addition to that,

7  there are claims administrators and then, of course, we've

8  heard (indiscernible) about the settlement trustee.

9  Q    I asked you about the Settlement Trust Advisory

10  Committee members.  The NEC hasn't done anything to vet the

11  Settlement Trust Advisory Committee members, has it?

12  A    I stand by my prior answer, Mr. Hallowell.

13  Q    Well, what is your prior answer?

14  A    I just indicated to you, sir, that our advisors had

15  provided us with the names of the members of the Settlement

16  Trust Advisory Committee, provided us with information on

17  their backgrounds, many of whom are attorneys that represents

18  survivors in this particular restructuring process and with

19  the understanding that the NEC provided to our advisors to

20  ensure that any member of the SACT, the settlement trustee, or

21  the claims administrators all have to be individuals who, for

22  lack of a better word, are Scout-like, in the sense that they

23  would be fair, honest, transparent, and treat survivors with

24  the utmost dignity and respect in order to ensure for a fair

25  resolution of their claim.

1  Q     Mr. Desai, you deferred entirely to your counsel, with

2  regard to BSA's determination that the Settlement Trust

3  Advisory Committee proposed members are accepted, didn't you?

4  A     We relied heavily on the expertise of our professionals.

5  Q     You deferred entirely to your counsel, correct?

6  A     Incorporating my prior responses to the last few

7  questions, we did defer to our advisors, yes, sir.

8           MR. HALLOWELL:  Your Honor, I want to direct

9  Mr. Desai to his deposition transcript, page 227, line 3

10  through 18.

11           THE COURT:  Do I have that?  Is that included in a

12  binder?

13           MR. HALLOWELL:  We have included it in our cross

14  binder, Your Honor.  We included all transcripts from the two

15  depositions that Mr. Desai participated in and from the RSA

16  hearing.

17           THE COURT:  Okay.

18           MR. ANDOLINA:  Mr. Hallowell, can you identify the

19  tab and the page, please.

20           MR. HALLOWELL:  It's at the front -- it should be

21  in the -- I don't know how the binder was constructed because

22  it was a cooperative effort with your office, but in my binder

23  at it's the front.

24           MR. ANDOLINA:  What page, Mr. Hallowell?

25           MR. HALLOWELL:  From the December deposition, it's

1  page 227, beginning at line 3 going through line 18.

2           THE COURT:  Excuse me, please make sure you are --

3  your audio is off.

4           Okay.  December 3rd deposition, and what page?

5           MR. HALLOWELL:  Page 227, beginning of line 3 and

6  going to line 18.

7           THE COURT:  Thank you.

8           THE WITNESS:  I have that, sir.

9           MR. HALLOWELL:  Your Honor, may I read these

10 questions and answers to Mr. Desai from his December 3rd

11 deposition?

12          MR. ANDOLINA:  Your Honor, I'm going to object on

13 two grounds.  One, I believe those are the exact same answers

14 that he just gave and, two, on the time frame ground, in light

15 of the fact that this decision was in December and we've had

16 significant additional discussions, including with respect to

17 the Trust throughout the first three months of this year, I

18 would view this as inappropriate impeachment.

19          THE COURT:  Sustained.

20 BY MR. HALLOWELL:

21 Q    Mr. Desai, regarding the TDPs, you understand that in

22 February 2021, the Coalition provided the BSA with a

23 settlement term sheet that included the initial terms

24 regarding the TDPs and the Settlement Trust, correct?

25 A    Yes, sir.

1   Q       Turning your attention to JTX-3003.

2   A       3008?

3   Q       Sorry, 3003.

4           Let me know when you're there.

5   A       I have it, sir.

6   Q       Okay.  And you have a recollection of the fact that the

7   Coalition provided a settlement term sheet and initial terms

8   regarding the TDPs, correct?

9   A       Yes, sir.

10  Q       But you did not see this document at or near the time

11  that it was provided to your legal advisors, did you?

12  A       The document that you've referenced, that Tab 3003, the

13  email and its attachments, I did not see this since I'm not a

14  recipient of it.

15  Q       Okay.  And there was no -- and take a look at the next

16  page, JTX-3003-3, and you see it says "BSA preliminary term

17  sheet"?

18  A       Yes, sir.

19  Q       Do you know whether or not this term sheet was ever

20  provided to you?

21  A       Sitting here today, I can't recall, but I do know that

22  at or near this time frame, we would have seen various term

23  sheets because of the various negotiations going on between

24  our counsel and the Coalition.

25  Q       Okay.  Turn to page JTX-3003-6.

1  A      Okay.

2  Q      And these are the initial terms for the trust

3  distribution procedures that were proposed by the Coalition.

4         Do you see that?

5  A      I see that.

6  Q      And you don't have a recollection of having reviewed

7  these at the time that they were circulated, do you?

8  A      I know I've seen the various versions of the TDPs, so

9  sitting here today, Mr. Hallowell, I'm not able to confirm or

10 deny that statement.

11              MR. HALLOWELL:  Your Honor, the Certain Insurers

12 offer JTX-3003.

13              MR. ANDOLINA:  No objection.

14              THE COURT:  It's admitted.

15          (Exhibit JTX-3003 received into evidence)

16 BY MR. HALLOWELL:

17 Q      Mr. Desai, turn to page 3003-7.

18 A      Okay.

19 Q      At the bottom, there is a section there that says

20 binding claims value determinations.

21         Do you see that?

22 A      Yes.

23 Q      This was the proposal made by the Coalition in February

24 2021, correct?

25 A      Yes.

1  Q     And it says, determinations of values of approved

2  settled claims and tort election claims shall be binding on

3  insurers.

4        Do you see that?

5  A     I do.

6  Q     Do you recall any discussion of that in February 2021?

7  A     There was discussion about that between our advisors and

8  BTF and the NEC and I know since then, there's been

9  significant conversations about that statement and whether or

10 not that would be included in the proposed TDPs that would

11 eventually have Her Honor decide.

12 Q     And those discussions among your advisors are

13 privileged, correct?

14 A     They would have been discussions that the advisors would

15 have had, obviously, sharing information with us is the NEC

16 and BTF, along with conversations the advisors would have had

17 throughout the mediation process.

18 Q     Okay.  Turn to the next page, JTX-3003-8.

19 A     Okay.

20 Q     And these are the initial terms provided by the

21 Coalition for the Settlement Trust term sheet.

22        Do you see that?

23 A     Yes, sir.

24 Q     Okay.  Do you know if the Board discussed this

25 particular term sheet in any meeting?

1        MR. ANDOLINA:  Objection.  Just for clarification,

2   Mr. Hallowell, in terms of the Board.

3        MR. HALLOWELL:  Why don't we go to JTX-378 and the

4   Board is the Bankruptcy Task Force?

5        MR. ANDOLINA:  And just for the record, we do not

6   refer to the Bankruptcy Task Force as the "Board," so that's

7   why I asked for clarification.

8   BY MR. HALLOWELL:

9   Q    Mr. Desai, do you recognize JTX-378?

10  A    Yes, it's a presentation that would have been made to

11  BTF on the 3rd of February, 2021.

12  Q    Now, on page 2, there's an agenda that lists Coalition

13  term sheet.

14        Do you see that?

15  A    Yes.

16  Q    And on page 4 and 5, there are discussions of the

17  Coalition term sheet including positives, negatives, and

18  considerations.

19        Do you see that?

20  A    Yes, sir.

21  Q    Did the Bankruptcy Task Force discuss whether it was

22  appropriate for the Coalition to be setting the terms for the

23  trust distribution procedures?

24  A    The bankruptcy --

25        MR. ANDOLINA:  Let me just object because it

1 | assumes facts not in evidence.

2 |        THE COURT:  Can you repeat the question.

3 | BY MR. HALLOWELL:

4 | Q    Did the Bankruptcy Task Force discuss whether it was

5 | appropriate for the Coalition to be setting the initial terms

6 | for the trust distribution procedures?

7 |        THE COURT:  I'm going to overrule that.

8 |        THE WITNESS:  The Bankruptcy Task Force had

9 | received information from our advisors on the viability of the

10 | proposed terms from the Coalition, hence the presentation

11 | you're showing me, which discusses the proposed times or

12 | positives/negatives, and the considerations that our advisors

13 | were asking the BTF to think about, engaged in dialogue about,

14 | and then eventually recommend to the NEC for approval.

15 |        And so whether it was appropriate or not for the

16 | Coalition to propose terms, I think throughout the course of

17 | this restructuring, everyone has proposed a lot of things.

18 | BY MR. HALLOWELL:

19 | Q    Well, but the question is, did the NEC discuss whether

20 | it was appropriate for the Coalition to be setting the initial

21 | terms for the trust distribution procedures?

22 |        MR. ANDOLINA:  Objection; asked and answered.

23 |        MR. HALLOWELL:  It was asked; it wasn't answered.

24 |        THE COURT:  Overruled.

25 |        THE WITNESS:  The BTF did consider the bid proposal

1  and understood that any party can make the proposals that they

2  wanted to make, however, the TDPs were subject to approval.

3          MR. HALLOWELL:  Your Honor, the Certain Insurers

4  move JTX-378 into evidence.

5          MR. ANDOLINA:  No objection, Your Honor.

6          THE COURT:  It's admitted.

7      (Exhibit JTX-378 received into evidence)

8  BY MR. HALLOWELL:

9  Q    Mr. Desai, after the Coalition sent its initial proposal

10 regarding the TDPs in February 2021, the BSA and the Coalition

11 exchanged drafts of the TDPs, correct?

12 A    Yes, sir.

13 Q    I'd direct your attention to JTX-3005.  Let me know when

14 you're there.

15 A    I'm here.

16 Q    JTX-3005 is an email from Mr. Goodman to Mr. Andolina?

17 A    Yes, sir.

18 Q    And that's April 10th, 2021?

19 A    Yes, sir.

20 Q    And you know that Mr. Goodman is a lawyer for the

21 Coalition, correct?

22 A    Yes, sir.

23 Q    And if you'd turn to the next page, 3005-2, do you see

24 Mr. Goodman has sent along a Boy Scouts of America

25 reorganization termsheet?

1   A      Yes.

2   Q      And if you turn to 3005-7, Mr. Goodman has set out claim

3   values and on 3005-8, he has forwarded the additional trust

4   distribution procedures.

5          Do you see that?

6   A      I do.

7   Q      Turn to JTX-3005-16, and on that page, Mr. Goodman has

8   set out the Coalition's proposals (audio interference) the

9   Settlement Trust Advisory Committee and the future claimants

10  representative.

11         Do you see that?

12  A      Yes.

13         MR. HALLOWELL:  Your Honor, the Certain Insurers

14  move JTX-3005 into evidence.

15         MR. ANDOLINA:  No objection.

16         THE COURT:  It's admitted.

17      (Exhibit JTX-3005 received into evidence)

18  BY MR. HALLOWELL:

19  Q      At the time of your deposition in December, Mr. Desai,

20  you weren't familiar with this document, were you?

21  A      I don't know if I had seen this document or not.  I

22  mean, I know it existed prior to my deposition --

23  Q      Okay.

24  A      -- but I can't seem to recall what we had talked about.

25  Q      You don't -- you didn't remember then whether you had

1  seen the document.  You just remember, right?

2  A    That's right.  There have been several versions of so

3  many documents, including the TDPs that you're showing me,

4  between February, April, and, of course, through this present

5  day that I, personally, as I sit here today, can't recall if I

6  have seen this exact document.

7  Q    Okay.  So, Mr. Desai, I direct your attention to

8  JTX-442.

9  A    Okay.

10 Q    JTX-442 are the minutes of an April 11th, 2021, NEC

11 meeting.

12       Do you see that?

13 A    Yes, sir.

14 Q    And this meeting took place right after the BSA had

15 received a revised term sheet from the Coalition on

16 April 10th, correct?

17 A    Yes.

18 Q    Okay.  And in the second paragraph, there's a notation

19 that Ms. Jessica Lauria reported on the issues with the

20 Coalition terms.

21       Do you see that?

22 A    Yes.

23 Q    Okay.  And you believe that the NEC discussed draft TDPs

24 during this April 11th meeting, right?

25 A    I do, because it also makes references to Haynes and

1  Boone who are our insurance counsel who also assisted with our

2  restructuring counsel in the negotiating and drafting of the

3  TDPs.

4  Q    But you didn't remember during your deposition, and I'll

5  ask if you remember now, which draft of the TDPs were

6  discussed at this meeting?

7  A    At the risk of guessing, since this meeting followed the

8  April 11th -- was on April 11th, I'm sorry, it would have more

9  likely than not been the more current draft, but that's just a

10  guess, sitting here today.

11  Q    Okay.  So, you don't know, and you would be guessing, as

12  to which draft of the TDPs were discussed at this meeting,

13  correct?

14  A    My common sense tells me that it would have been the

15  most current draft that was being discussed, but without

16  seeing it in front of me or the actual presentation,

17  unredacted, I couldn't tell you.

18  Q    In April and May 2021, do you recall that the BSA was

19  negotiating settlements, I guess, separately, with both,

20  Hartford on one hand and the Coalition on the other?

21  A    We were trying to negotiate with a lot of parties,

22  including (indiscernible) the Coalition, Hartford, and others,

23  because this time frame would have been right after, I think,

24  January/February, when the Court had strongly suggested to the

25  parties to get moving on trying to resolve issues and this is

1  when we started to see mediation starting to come about,

2  whether in person or via Zoom.  And so, yes, there were

3  several conversations with the Coalition, Hartford, as well

4  as, I believe, Century, that were taking place around this

5  time frame.

6  Q    Well, the minutes refer -- take a look at the second

7  line beneath the bankruptcy update -- the minutes refer to

8  three-way negotiations with the Coalition, Hartford, and the

9  BSA.

10       Do you see that?

11 A    Yes, sir.

12 Q    Does that square with your recollection?

13 A    Yes.

14 Q    Okay.  I direct your attention to JTX-300 -- oh, sorry.

15          MR. HALLOWELL:  JTX-442, we would like to move that

16 into evidence, as well.

17          MR. ANDOLINA:  No objection.

18          THE COURT:  It's admitted.

19       (Exhibit JTX-442 received into evidence)

20 BY MR. HALLOWELL:

21 Q    Let me turn your attention now to JTX-3004.  JTX-3004 is

22 an email from Mr. Andolina to David Molton and a bunch of

23 others and Mr. Andolina states that attached is a draft TDP.

24       Do you see that?

25 A    Yes, sir.

1    Q       Now, he is also states, This had not been reviewed by

2    our client and is preliminary and subject to our ongoing

3    review and revision.

4           Do you see that?

5    A       Yes, sir.

6               MR. HALLOWELL:  Your Honor, the Certain Insurers

7    move JTX-3004 into evidence.

8               MR. ANDOLINA:  No objection, Your Honor.

9               THE COURT:  It's admit.

10          (Exhibit JTX-3004 received into evidence)

11   BY MR. HALLOWELL:

12   Q       And if you turn to the second page, you'll see at the

13   very top, it says, White & Case draft, April 10th, 2021, and

14   that they are trust distribution procedures.

15          Do you see that?

16   A       Yes, sir.

17   Q       Okay.  At the time of your deposition in December, you

18   told me that you had not seen this document before, correct?

19   A       I stand by my prior testimony.

20   Q       Okay.  And you haven't gained any detailed familiarity

21   with it since then?

22   A       No, sir.

23   Q       Let me direct your attention to JTX-474.  Now, JTX-474

24   is an email from Mr. Ruggeri to Ms. Lauria and Mr. Andolina

25   and others.

1        Do you see that?

2   A    Yes, sir.

3   Q    And this is an email that also attaches trust

4   distribution procedures drafts.

5        Do you see that?

6   A    Yes.

7   Q    And you know who Mr. Ruggeri is, correct?

8   A    Yes, sir.

9   Q    He's a lawyer for Hartford, right?

10  A    Yes.

11  Q    And he used to work at a firm called Shipman & Goodwin?

12  A    Yes.

13  Q    And if you turn to the first page of the trust

14  distribution procedures, up in the top right, it says, S & G

15  revisions, 5/6/2021.

16       Do you see that?

17  A    Yes.

18  Q    So, these were revisions that were provided by the

19  Hartford, correct?

20  A    Yes.

21          MR. HALLOWELL:  And, Your Honor, the Certain

22  Insurers move JTX-474 in.

23          MR. ANDOLINA:  No objection.

24          THE COURT:  It's admitted.

25      (Exhibit JTX-474 received into evidence)

1  BY MR. HALLOWELL:

2  Q     At the time of your deposition in December, you weren't

3  familiar with whether you had reviewed this particular version

4  of the trust distribution procedures at any (indiscernible)

5  time, correct?

6  A     That's correct, sir.

7  Q     And that recollection hasn't changed since that time,

8  has it?

9  A     It has not, no.

10 Q     I want to direct your attention to JTX-476.  JTX-476 are

11 the minutes of a Bankruptcy Task Force meeting on     May

12 7th, 2021.

13        Do you see that?

14 A     Yes.

15 Q     Okay.  And you didn't attend this meeting; you had a

16 conflict, right?

17 A     Yes, sir.

18 Q     Okay.  But as you testified on direct, after the

19 meeting, you caught up with people and you found out what was

20 discussed, right?

21 A     Yes.

22 Q     Okay.  And you were told that the BSA's insurance

23 counsel and its restructuring advisors were working on

24 finalizing the back-and-forth on the TDPs, right?

25 A     That's correct.

1  Q      And you weren't told anything more that happen that,

2  correct?

3  A      That would be correct.

4  Q      And, in fact, you wouldn't know what version of the TDPs

5  were discussed at this meeting or what people were working on,

6  right?

7  A      Again, common sense would dictate that it would be the

8  latest draft, so whichever version existed on or before

9  May 7th.

10  Q      But that would be a guess, right?

11  A      A logical conclusion on my part, common sense.  I

12  wouldn't understand why folks would be working on multiple

13  drafts.

14  Q      Okay.  But you weren't there, so you don't know what

15  they were doing, do you?

16  A      Fair enough.

17  Q      I want to turn to a slightly different topic now.

18          MR. HALLOWELL:  Oh, I want to move 476 into

19  evidence, JTX-476.

20          MR. ANDOLINA:  No objection.

21          THE COURT:  It's admitted.

22      (Exhibit JTX-476 received into evidence)

23  BY MR. HALLOWELL:

24  Q      I won't hold you to the exact date, Mr. Desai, but BSA

25  filed its third amended Chapter 11 plan of reorganization on

1  approximately June 18th, 2021, correct?

2  A      Yes, sir.

3  Q      Okay.  And under the third amended plan, the debtors

4  would provide approximately $250 million to fund a settlement

5  trust for abuse survivors, correct?

6  A      Yes.

7  Q      And that was a result of mediation with the claimants

8  groups, correct?

9  A      Yes.

10  Q      Okay.  I'm going to direct your attention to JTX-524.

11  JTX-524 are the minutes from a June 5th, 2021, National

12  Executive Board meeting, correct?

13  A      Yes, sir.

14  Q      And so, that's the big board, right?

15  A      The 72-member board, yes, sir.

16  Q      Okay.  And Mr. Andolina won't get mad if I call this one

17  a board, right?

18              MR. ANDOLINA:  You can answer.

19  BY MR. HALLOWELL:

20  Q      All right.  I have a note, Mr. Desai, that the two-

21  hundred-and-fifty-million-dollar contribution at that time was

22  composed of approximately $120 million (audio interference)

23  the distribution center, Scouting University, and any cash

24  over $75 million.

25      Does that sound about right to you?

1  A      (Indiscernible) sir, yes.

2  Q      Okay.  And then there was a fifty-million-dollar piece

3  that was cash from reallocating restrictive investment, right?

4  A      Correct.

5  Q      Then there was also an eighty-million-dollar fixed note?

6  A      Yes.

7  Q      Okay.  And so, at that time, when the Board was meeting,

8  as memorialized in JTX-524, this was referred to as the two-

9  hundred-and-fifty-million-dollar settlement with an eighty-

10  million-dollar component, correct?

11  A      Yes.

12  Q      And, in fact, on page 3 of JTX-524, there's a statement

13  that says, upon motion unanimously approved without any

14  abstentions, the Board voted to approve the proposed

15  settlement package, estimated at $250 million, including the

16  additional eighty-million-dollar note to the victim's trust.

17         Do you see that?

18  A      Yes, sir.

19              MR. HALLOWELL:  Your Honor, the Certain Insurers

20  move JTX-524 into evidence.

21              MR. ANDOLINA:  No objection.

22              THE COURT:  It's admitted.

23         (Exhibit JTX-524 received into evidence)

24  BY MR. HALLOWELL:

25  Q      Mr. Desai, as a board member, when you were presented

1  and asked to vote on the two-hundred-and-fifty-million and the

2  eighty-million-dollar note on June 5th, 2021, you understood

3  that no matter what happened afterward with regard to the

4  TDPs, including how they were applied by the trust, that's all

5  the Boy Scouts would be economically on the hook for, right?

6  A    We understood that our contribution to the settlement

7  trust was at $250 million and that aside from the monetary

8  component of our contribution, the settlement and any other

9  attendant terms would certainly need Court approval.

10 Q    Yeah, but you understood that the $250 million meant

11 that no matter what happened afterward, with regard to the

12 TDPs, how they were applied by the trust, that's all the Boy

13 Scouts would be economically on the hook for, right?

14 A    That was the contribution (audio interference) with the

15 organization, yes, and as it relates to the application of the

16 TDPs and other provisions as you described, again, while it

17 wasn't as a monetary level in terms of contribution by the

18 organization, those terms were negotiated between the parties

19 and subject to Court approval.

20      And in the event the Court didn't approve them, of

21 course, the parties would have to come back to the table to

22 figure it out.

23 Q    Okay.  But I'm just asking you, that you knew, as a

24 Board, when you were presented and asked to vote on the

25 $250 million, that no matter what happened afterward with

 1  regard to the TDPs, how they were applied by the trust, that's

 2  all the Boy Scouts would be economically on the hook for if

 3  the plan were approved, correct?

 4          MR. ANDOLINA:  Objection to "as a Board."

 5          THE COURT:  Overruled.

 6          THE WITNESS:  My understanding is that would be the

 7  BSA contribution to the trust, regardless of the other

 8  documents that made up the settlement agreement, but that the

 9  BSA would still have an ongoing obligation to cover any and

10  all of the professional fees associated with the

11  restructuring.

12  BY MR. HALLOWELL:

13  Q    Okay.  So, other than the professional fees, you

14  understood that no matter what happened afterward, that the

15  two-hundred-and-fifty-million-dollar contribution to the

16  settlement trust was all that the Boy Scouts would be

17  economically on the hook for, right?

18  A    (Indiscernible) correct.

19  Q    And after that settlement, in June 2021, the BSA

20  continued to have settlement discussions with the Hartford,

21  right?

22  A    Yes.

23  Q    Okay.  Turning your attention to JTX-2253.

24  A    Okay.

25  Q    JTX-2253 are the minutes from the September 2nd, 2021,

1  meeting of the National Executive Committee.

2       Do you see that?

3  A    Yes, sir.

4         MR. HALLOWELL:  The Certain Insurers move to admit

5  JTX-2253.

6         MR. ANDOLINA:  I believe, you were, this was

7  already in evidence, pursuant to Mr. Desai's direct testimony,

8  but there's no objections.

9         THE COURT:  Okay.  To the extent it wasn't, it's

10  admitted.

11      (Exhibit JTX-2253 received into evidence)

12         MR. HALLOWELL:  Thank you, Your Honor.

13  BY MR. HALLOWELL:

14  Q    You attended this meeting, correct?

15  A    Yes, sir.

16  Q    And the second bullet says, Bankruptcy update, or the

17  second bullet under bankruptcy update says that there was a

18  discussion of the status of the draft term sheets reflecting

19  proposed settlements among the debtors, Ad Hoc Committee of

20  Local Councils, the Coalition of Abused Scouts for Justice and

21  the future claimants representative, with respect to Hartford

22  and TCJC respectively.

23       Do you see that?

24  A    Yes, sir.

25  Q    And turning to the second page of Exhibit 2253, there's

1  a discussion of settlement authority.

2        Do you see that?

3  A     Yes.

4  Q     And under that it reads, The AC authorized settlements

5  with Hartford and the TCJC within the parameters discussed

6  during the meeting.

7        Do you see that?

8  A     Yes.

9  Q     Okay.  So, the settlement authority for the Hartford

10 settlement and the TCJC settlement was established by the NEC

11 at this meeting, correct?

12 A     Yes.

13 Q     I'll turn your attention back to the first page.

14       There's a list of advisors who attended this meeting,

15 correct?

16 A     Yes.

17 Q     And it includes White & Case?

18 A     Yes.

19 Q     Haynes and Boone?

20 A     Yes.

21 Q     Alvarez & Marsal?

22 A     Yes.

23 Q     And it also includes Bates White, correct?

24 A     Yes.

25 Q     And Bates White is an advisor with regard to abuse

1  claims, right?

2  A     Yes.

3  Q     How would you describe their role?

4  A     They are -- they provide the expertise and the analysis

5  on the number of claims, the claims administrators, potential

6  valuation.  So, they know the data and the universe of claims;

7  that's their specialty.

8  Q     Okay.  And you've interacted, at least on a Zoom basis,

9  with people from Bates White, correct?

10  A     We have, yes.

11  Q     And I'd direct your attention to JTX-757?

12         MR. HALLOWELL:  And, Your Honor, I think this is

13  among the documents that were admitted as part of Mr. Desai's

14  deposition, but out of an abundance of caution, the Certain

15  Insurers move to admit it again.

16         MR. ANDOLINA:  It has been and no objection.

17         THE COURT:  Okay.  It's admitted.

18      (Exhibit JTX-757 received into evidence)

19  BY MR. HALLOWELL:

20  Q     You received this presentation in your role as a board

21  member on September 2nd, 2021, correct?

22  A     Yes, sir.

23  Q     Okay.  And Exhibit 757 contains materials from Bates

24  White, including information about claims numbers and ranges

25  and things like that, right?

1   A      Yes, sir.

2   Q      If you look at the fourth page of Exhibit 757, there's a

3   slide titled, Hartford:  April Hartford settlement.

4          Do you see that?

5   A      Yes.

6   Q      And the fifth bullet down says, Bates White has

7   estimated the value of abuse claims as 2.4 to 7.1 billion.

8          Do you see that?

9   A      I do.

10  Q      And the next bullet states that this range is based on

11  current information, proofs of claim, historical settlements

12  of abuse claims by the BSA, and the publicly available

13  information related to potentially comparable settlements.

14         Do you see that?

15  A      Yes.

16  Q      So, the BSA relied on Bates White's estimated range in

17  its April 2021 settlement with the Hartford, right?

18  A      I would say that it was one of the factors that the

19  organization considered in entering into the April 2021

20  version of the Hartford settlement.

21  Q      Okay.  Turn to the next page, please.

22  A      Okay.

23  Q      And that page is captioned, Hartford current term sheet.

24         Do you see that?

25  A      Yes, sir.

1   Q      And this was a revised settlement with Hartford that was

2   taking place in September 2021, correct?

3   A      No, sir.

4   Q      And in fact the second bullet states, a revised Hartford

5   settlement at 785 million implies a total trust value of

6   approximately 3.9 billion, which continues to be within and

7   well above the bottom of the estimated valuation of abuse

8   claims of 2.4 to 7.1 billion, correct?

9   A      Yes, sir.

10  Q      And so, the BSA continued to rely on the Bates White

11  estimate range in its assessment of the revised settlement

12  with the Hartford, correct?

13  A      In fact, sir, yes, that's correct.

14  Q      Seven hundred and eighty-five million is approximately

15  20 percent of 3.9 billion, correct?

16  A      Yes, sir.

17  Q      And the BSA, in making its determination regarding the

18  Hartford settlement, considered 20 percent or thereabouts to

19  be a reasonable estimate of Hartford's share of the total sex

20  abuse liability, correct?

21  A      At the time that we were discussing this term sheet,

22  that would have been correct.

23  Q      Mr. Desai, I want to move your forward in time to the

24  December time period.

25              MR. HALLOWELL:  And, Your Honor, I just want to

 1   flag, I think I have a fairly long series of questions here.

 2   I don't know when you're intending to break.

 3        THE COURT:  It's -- how much longer -- so, this is

 4   a long series and then you have another series?

 5        MR. HALLOWELL:  I have a long series and then I

 6   think I might just have a small series after that, but I can't

 7   really do the small series without doing the long series

 8   first.

 9        THE COURT:  Okay.  Let's take a break.

10        MR. HALLOWELL:  Thank you.

11        THE COURT:  It's 1:52 Eastern time.  We will

12   reconvene at 2:35 Eastern time.

13        And, Mr. Desai, please do not speak with anyone

14   regarding your testimony.

15        THE WITNESS:  Yes, ma'am.

16        THE COURT:  Okay.  We're in recess, again, until

17   2:35 Eastern.

18        (Recess taken at 1:52 p.m.)

19        (Proceedings resume at 2:35 p.m.)

20        THE COURT:  Good afternoon.  This is Judge

21   Silverstein.  We are back on the record now.

22        MR. ANDOLINA:  Your Honor, before Mr. Hallowell

23   resumes his questioning, I just wanted to get a sense of Your

24   Honor's schedule.  We understand that there are several other

25   parties that may need to question Mr. Desai.  He can stay as

 1  late as Your Honor wants.  Obviously, we'd love to have him

 2  done today, but wanted a sense of where Your Honor is.

 3              THE COURT:  Well, that would be my sense.  I'd love

 4  to have this witness done today, as well, but we'll see where

 5  we are.

 6              MR. ANDOLINA:  Thank you, Judge.

 7              THE COURT:  Thank you.

 8              Mr. Hallowell.

 9  DEVANG DESAI, WITNESS FOR THE DEBTORS, PREVIOUSLY AFFIRMED

10                    CONTINUED CROSS-EXAMINATION

11  BY MR. HALLOWELL:

12  Q    Mr. Desai, would you turn in your binder to JTX-1117,

13  please?

14  A    (Indiscernible)

15  Q    Okay.  JTX-1117 are the minutes from the Bankruptcy Task

16  Force meeting on December 22nd, 2021, correct?

17  A    Yes, sir.

18  Q    And my understanding is these minutes have already been

19  introduced into evidence with the packet that came in with

20  your declaration.

21  A    Yes, sir.

22  Q    Okay.  You participated in this meeting, correct?

23  A    Yes.

24  Q    These minutes note, in the second-to-last bullet point,

25  that the Bankruptcy Task Force discussed updates on the voting

1  and planning for the voting deadline.  Do you see that?

2  A    I see that -- I'm sorry.  I was on the second-to-last

3  paragraph.

4        Yes, I do see updates on the voting and planning for the

5  voting deadline.

6  Q    And at that time, the voting deadline was December 28th,

7  2021, correct?

8  A    Yes, sir.

9  Q    And the voting here refers to voting by BSA's creditors

10  on the bankruptcy plan, correct?

11  A    Yes.

12  Q    And this includes the Class 8 abuse claimants, correct?

13  A    Yes.

14  Q    There was an accompanying presentation to this meeting.

15  Please turn to JTX-1116.  Do you recognize this document?

16  A    Yes, sir.

17        (Pause in proceedings)

18

19  Q    Yeah.  So this document was presented to the Bankruptcy

20  Task Force on the same day, correct?

21  A    Yes.

22  Q    Okay.  And it's my understanding that this document has

23  also been admitted into evidence with your materials, correct?

24  A    Yes.

25  Q    On the last page of the presentation, there's a slide

1  titled "Discussion Next Steps."  Do you see that?

2  A    Yes.

3  Q    And the second bullet says, "Voting deadline and

4  results," with a redaction.  Do you see that?

5  A    Yes.

6  Q    Were there voting results that were discussed by the

7  Bankruptcy Task Force at this time?

8  A    I wouldn't call them "results."  I think there was

9  discussions had, in terms of where the thresholds needed to be

10 under the law, in order for the plan to receive con --

11 approval or be able to be confirmed by the Court, what those

12 numbers would look like, and what, based upon the

13 conversations that our advisors had with the claims folks --

14 Omni, Bates White, as well as through all of their

15 conversations with the various parties to the settlement

16 agreements -- what their thinking was in terms of where we

17 would potentially be by the deadline.

18      And -- and so the discussions with the BTF were to, one,

19 educate us again, remind us of where -- what those numbers

20 needed to be or look like, in terms of minimum requirements;

21 and, preliminarily, what their intelligence, by way of their

22 conversations with their counterparts, was telling them that

23 the vote could be at by the deadline.

24 Q    Okay.  Turn to JTX-1122, please.  JTX-1122 are the

25 minutes of the Bankruptcy Task Force meeting on December 30th,

1  2021.  Do you see that?

2  A    Yes, sir.

3  Q    All right.  And this was two days after the voting

4  deadline, correct?

5  A    Yes, sir.

6  Q    These minutes have also been introduced into evidence

7  with your materials, right?

8  A    Yes, sir.

9  Q    Okay.  And you participated in this meeting?

10  A    I did.

11  Q    If you take a look at the header, the meeting began at 7

12  p.m. central time.  Do you see that?

13  A    Yes.

14  Q    And if you go all the way to the bottom, you'll see that

15  the meeting was adjourned at 9:15 p.m. central time.  Do you

16  see that?

17  A    Yes, sir.

18  Q    So this was a two-hour-and-fifteen-minute meeting,

19  correct?

20  A    Yes.

21  Q    And take a look at the heading "Bankruptcy Discussion,"

22  the first bullet.  There was an update on the voting results,

23  including a summary of the results, for key classes of claims.

24  Do you see that?

25  A    Yes.

1  Q    And the second bullet states that you discussed:

2       " -- relevant voting thresholds under applicable

3  bankruptcy law and analysis of the voting results in light of

4  these thresholds."

5       Do you see that?

6  A    Yes.

7  Q    And that's basically what you just told me was discussed

8  at the earlier meeting, right?

9  A    That's right.  But this time, we now had the actual

10 results and we engaged in a significant conversation as to

11 what our advisors believed would occur and what we could

12 expect moving forward, in terms of how the Court may or may

13 not decide things.

14      And in particular, as the document reflects, I do recall

15 specifically making sure to request of our advisors, in

16 particular, I wanted a very thorough analysis of all the case

17 law out there pertaining to third-party releases, in light of

18 some of the other news from other courts concerning the Purdue

19 Pharma matter and how third-party releases would be handled in

20 a situation post Purdue Pharma in this current circuit that is

21 binding on this Court, relative to where the voting fell, and

22 what we needed to do as an organization to continue to improve

23 upon those results.

24 Q    And that's what the minutes show, don't they, Mr. Desai?

25 A    Yes, sir.

1  Q    The last second -- sentence of the minutes state:

2          "Mr. Desai requested that the advisors prepare a

3  summary chart outlining key case law for the BTF review."

4       Do you see that?

5  A    Yes, sir.

6  Q    Okay.  And as you just told me, you did, in fact, make

7  that request, right?

8  A    I did.

9  Q    And Mr. Desai, I don't want to waive -- or have you waive

10  any attorney/client privilege, but I'll just ask:

11       Did your advisors respond to that request?

12  A    Yes.

13  Q    I direct your attention, Mr. Desai, to JTX-2263.  JTX-

14  2263 are a set of your handwritten notes, correct?

15  A    Yes, sir.

16  Q    And you keep these notes in chronological order as you

17  attend various Boy Scouts meetings, correct?

18  A    Yes, sir.

19          MR. HALLOWELL:  Your Honor, the certain insurers

20  offer JTX-2263 into evidence.

21          MR. ANDOLINA:  No objection.

22          THE COURT:  Admitted.

23       (JTX-2263 received in evidence)

24  BY MR. HALLOWELL:

25  Q    Mr. Desai, I direct your attention to the page with the

1  Bates ending 7130.

2  A    Okay.

3  Q    And halfway down the page, there's the date December

4  30th, 2021.  Do you see that?

5  A    Yes.

6  Q    And there's the BTF box?

7  A    Yes.

8  Q    So these were your notes during the Bankruptcy Task Force

9  meeting on that date, correct?

10  A    Yes.

11  Q    And you note, "Voting update, preliminary result."  Do

12  you see that?

13  A    Yes.

14  Q    You were also concerned about class acceptance.  Do you

15  see that?

16  A    I wrote "class acceptance."

17  Q    Okay.  Below the privileged materials, you have a

18  notation about "indirect class issue."  Do you see that?

19  A    Yes.

20  Q    And there's "C-O" after that.  Do you see that?

21  A    Yes.

22  Q    "C-O" stands for "chartered organizations."  Is that

23  correct?

24  A    Yes.

25  Q    And so, at that point, am I reading your notes correctly

1  that chartered organizations had accepted the plan at only

2  55.77 percent?

3          MR. ANDOLINA:  Objection.  Do you recall.  And I'd

4  also admonish the witness.  I don't think he's gone past this,

5  but with respect to privileged discussions at the board

6  meeting, to not get into that -- those categories of

7  discussions.

8          THE WITNESS:  I was just -- I was trying to write

9  down the numbers that were being discussed during our meeting.

10 I am hopeful that I wrote them down accurately.  But that

11 figure would have represented maybe a preliminary output of

12 votes for that particular class.

13 BY MR. HALLOWELL:

14 Q    And by "that particular class," do you mean the Class 9

15 indirect abuse claimants?

16 A    Yes, sir.

17 Q    Okay.  The next line refers to "direct."  Do you see

18 that?

19 A    Yes.

20 Q    And those are the Class 8 direct claimants, correct?

21 A    Yes.

22 Q    And you have percentages there again.  Do you see that?

23 A    I do.

24 Q    And it's 72.87 percent versus 27.13 percent.  Do you see

25 that?

1  A    Yes.

2  Q    Were those the results at that time, to your knowledge,

3  of the voting for the Class 8 direct abuse claimants?

4  A    My notes indicate that these were the preliminary

5  results, yes.

6  Q    Below that, you wrote "master ballot issues."  Do you see

7  that?

8  A    Yes, sir.

9  Q    What did you mean by that?

10          MR. ANDOLINA:  Again, I would admonish the witness

11  not to describe any communications, to the extent they reflect

12  legal advice provided by counsel.

13          With that admonition, you can answer.

14          THE WITNESS:  I wrote "master ballot issues" to

15  basically summarize and capture what Mr. Andolina just

16  described as the dialogue that we had with our advisors

17  concerning master balloting and some of the challenges that

18  were potentially present with respect to master ballots and

19  what our go forward strategy would be to address some of those

20  concerns and seek, potentially, the intervention of the Court.

21  BY MR. HALLOWELL:

22  Q    Is there anything beyond that, that you can say about

23  that, without violating attorney/client privilege?

24  A    I cannot.  No, sir, I cannot.

25  Q    On the next page, ending Bates 7131, in the box midway

1  down the page, I read that to mean Master Mortgage factors.

2  Do you see that?

3  A    I do.

4  Q    What are the "Master Mortgage factors"?

5           MR. ANDOLINA:  Objection.  Calls for a legal

6  conclusion, and also to the extent it reveals attorney/client

7  communication.  I would instruct the witness not to answer.

8           THE COURT:  I'm going to overrule with respect to

9  the question of what did he mean by it.

10          THE WITNESS:  Mr. Hallowell, I -- I wrote down

11  "Master Mortgage factors" because it was a case that was

12  brought up during this discussion, and I believe there were

13  also prior discussions throughout my notes concerning the

14  Master Mortgage factors.  And I recall that Mr. Lauria

15  provided the Bankruptcy Task Force with a refresher on what

16  the case was and how those Master Mortgage factors would apply

17  to our case, given where we were in the restructuring process,

18  and that's -- that's how I would answer that question.

19  BY MR. HALLOWELL:

20  Q    So, as of December 30th, 2021, the Bankruptcy Task Force

21  was focused on the preliminary results of the vote of the

22  Class 8 claimants, correct?

23  A    It was one of the many things we were focused on at that

24  time frame, yes, sir.

25  Q    And you were focused on the Master Mortgage factors,

1  correct?

2  A    I wouldn't call it that we were focused on just that.  I

3  think my notes reflect a lot of topical areas that we were

4  focused on.  Master Mortgage was certainly one of the many

5  topics that our advisors discussed with us, in light of

6  receiving the preliminary voting results.

7  Q    Mr. Desai, I direct your attention to JTX-1123.

8  A    Okay.

9  Q    JTX-1123 is a presentation that was made to the

10  Bankruptcy Task Force by White & Case on December 30th, 2021.

11  Do you see that?

12  A    Yes, sir.

13  Q    And it's my understanding that this presentation has also

14  been entered into evidence along with the materials

15  accompanying your declaration.  Is that so?

16  A    Yes, sir.

17  Q    I direct your attention to the page ended Bates 086.  Do

18  you see that?

19  A    Yes, sir.

20  Q    And that's captioned "Voting Update Summary."  Do you see

21  that?

22  A    Yes.

23  Q    Right below:

24          "Tabulation not yet completed.  Information based

25  on preliminary results."

1  A      Yes.

2  Q      A little ways down there, there's a discussion of

3  relevant thresholds and then a privilege box.  Do you see

4  that?

5  A      Yes.

6  Q      Below the privilege box, it says "indirect abuse claims,"

7  and that those claims had accepted at 55.77 percent and

8  rejected at 23 point -- 33.34 percent.  Do you see that?

9  A      Yes.

10  Q      And then there's a discussion of direct abuse claims.  Do

11  you see that?

12  A      Yes.

13  Q      And the direct abuse claims had accepted at 72.87 percent

14  and rejected at 27.13 percent.  Do you see that?

15  A      Yes, sir.

16  Q      And this was an area of focus of the Bankruptcy Task

17  Force, correct?

18  A      Again, it was one of the many topics discussed between

19  members of the task force and our advisors.

20  Q      Turn to the next page, please.

21         White & Case prepared a voting update claim analysis for

22  you.  Do you see that?

23  A      Yes, sir.

24  Q      And the first box looks at the voting status by B-W abuse

25  allegation.  Do you see that?

1  A    Yes.

2  Q    And the second box looks at the vote status by B-W-S-O-L

3  flag.  Do you see that?

4  A    Yes.

5  Q    Do you understand "BW" to mean Bates White in those two

6  boxes?

7  A    I do.

8  Q    Okay.  So the boxes -- let's take the first box.  The

9  first box organizes the claimant vote status by Bates White's

10  analysis of the abuse allegation made by the claimant.  Is

11  that correct?

12  A    Yes, it's based upon what's indicated in the proof of

13  claim and as ascertained by Bates White.

14  Q    Okay.  And if you look at the first column, running from

15  numbers one down to number eight, there are different

16  categories of abuse, correct?

17  A    Yes, sir.

18  Q    And is it fair to say that those categories of abuse

19  generally go from more severe abuse at the top to less severe

20  or unknown abuse at the bottom?

21  A    I -- I would generally agree with you on that, yes.

22  Q    Okay.  Now take a look at the last column, "Acceptance

23  Rate Excluding Abstained."  Do you see that?

24  A    Yes.

25  Q    Is it fair to say that, generally speaking, at this time,

1  claimants with allegations of more severe abuse accepted the

2  plan at a lower rate than claimants with allegations of less

3  severe abuse?

4              MR. ANDOLINA:  Objection.  It calls for

5  speculation.

6              MR. HALLOWELL:  I'm just --

7              MR. ANDOLINA:  The data --

8              MR. HALLOWELL:  -- asking him to read the chart.

9              MR. ANDOLINA:  The data speaks for itself.

10             THE COURT:  Overruled.

11             THE WITNESS:  The preliminary results indicate that

12  the abuse allegation category marked "penetration," 69.5

13  percent of the class accepted.  Do you want me to keep reading

14  all of them?

15  BY MR. HALLOWELL:

16  Q    Mr. Desai, I want you to answer my question, so I'll

17  repeat it.

18       Is it fair to say that, generally speaking, claimants

19  with allegations of more severe abuse accepted the plan at a

20  lower rate than claimants with allegations of less severe

21  abuse?

22  A    Based on this document and the preliminary results, the

23  categories indicating more severe abuse suggest approval

24  ratings at or near 70 percent, and in one case at 69 percent -

25  - 69 and a half, I'm sorry, in two cases.

1  Q    Mr. Desai, is it fair to say that, generally speaking,

2  claimants with allegations of more severe abuse accepted the

3  plan at a lower rate than claimants with allegations of less

4  severe abuse?

5  A    The results indicate that claimants in the more severe

6  abuse category description accepted the plan at a different

7  rate that was lower than those towards the less severe abuse

8  categories, as you've indicated, who approved the plan above

9  the 75 percent threshold.

10  Q    Mr. Desai, I direct your attention to the second box.

11  This is the vote status box that relates to the Bates White

12  statute of limitations flag.  Do you see that?

13  A    Yes.

14  Q    And you understand that "SOL" there stands for statute of

15  limitations, correct?

16  A    Yes, sir.

17  Q    Okay.  And if you look at the first column, you'll that

18  there's a category of not barred claims and a category of

19  barred claims.  Do you see that?

20  A    Yes.

21  Q    And if you look at the last column, there is an

22  acceptance rate, excluding abstained.  Do you see that?

23  A    Yes.

24  Q    Mr. Desai, is it fair to say that, generally speaking,

25  claimants with not barred claims accepted the plan at a lower

1  rate than claimants with barred claims?

2  A    The data indicated that claimants with not barred claims

3  accepted at a lesser rate than those with barred.

4  Q    Mr. Desai, I direct your attention to the next page of

5  the presentation.

6        White & Case prepared for you a voting update local

7  council analysis.  Do you see that?

8  A    Yes, sir.

9  Q    And this analysis noted that 83 local councils with over

10 30 claimants voting had a less than 66.7 percent acceptance

11 rate for the plan.  Do you see that?

12 A    Yes, sir.

13 Q    And an additional 104 local councils with over 30

14 claimants voting had an acceptance rate between 66.7 and 74.9

15 percent.  Do you see that?

16 A    Yes.

17 Q    And indeed, only 42 local councils with over 30 claimants

18 voting had a 75 percent and greater acceptance right.  Do you

19 see that?

20 A    Yes.

21 Q    Is it fair to say, Mr. Desai, that B -- that the

22 Bankruptcy Task Force was focused on the breakdown of votes by

23 local council?

24 A    I -- I wouldn't necessarily agree that we were -- the

25 Bankruptcy Task Force was focused on an analysis of a

1  breakdown of votes by local council.  This is how the data was

2  presented to us.

3       And what I can also say is that it is my understanding

4  from some of the court hearings that I listened in on that

5  there were requests made by certain parties to know how the

6  voting turned out based upon councils and the amount of

7  claimants within council voting to accept or reject.

8  Q    Okay.  So this was information that your counsel provided

9  to you, correct?

10 A    Yes, sir.

11 Q    But it wasn't information that you wanted?

12 A    No, I -- I understood your question to mean did -- did

13 the Bankruptcy Task Force request this type of breakdown, and

14 the answer to that I've already addressed.  And so the

15 information is certainly helpful and important to the task

16 force, but it's not something we told our advisors provide us

17 this specific breakdown based on councils and the number of

18 claimants in each council.

19 Q    Mr. Desai, my question was:  Is it fair to say that the

20 Bankruptcy Task Force was focused on the breakdown of votes by

21 local council?

22            MR. ANDOLINA:  Objection.  Asked and answered.

23            THE COURT:  Sustained.

24            MR. HALLOWELL:  It was asked ...

25            THE COURT:  Sustained.

1  BY MR. HALLOWELL:

2  Q    Mr. Desai, is it fair to say that these were

3  disappointing preliminary results for the Bankruptcy Task

4  Force?

5  A    I would say that the preliminary voting results were just

6  that.  We certainly had more work to do, and our advisors

7  worked in an effort to continue to build a consensus to gain

8  additional support for the plan.

9  Q    Mr. Desai, I direct your attention to JTX-1127.

10 A    Okay.

11 Q    JTX-1127 are the minutes for the NEC meeting, January

12 2nd, 2022.

13 A    Yes.

14 Q    My understanding is, is that these minutes are also in

15 evidence with your materials.  Is that correct?

16 A    Yes, sir.

17 Q    You attended this meeting?

18 A    I did.

19 Q    In the second bullet, under the "bankruptcy discussion"

20 line, these minutes state that:

21          "There was an update concerning the voting results

22 with respect to key classes of claims, the relevant legal

23 thresholds for acceptance of a plan of reorganization, and

24 various interpretations of the voting results."

25       Do you see that?

1  Q    So, in addition to the Bankruptcy Task Force, the NEC was

2  also focused on the voting results, correct?

3           MR. ANDOLINA:  Objection to characterization.

4  A    The NEC, which is also comprised of certain members of

5  the Bankruptcy Task Force, was also provided with the

6  preliminary voting results and had discussions concerning

7  those results with our advisors.

8  Q    Were they focused on the voting results?

9  A    It was one of many topics the NEC was discussing on the

10 night of January 2nd, 2022.

11 Q    I direct your attention to JTX-1128.  JTX-1128 are the

12 draft minutes of the National Executive Board on January 2nd,

13 2022.  Do you see that?

14 A    Yes, sir.

15 Q    And I actually don't know if these were among the

16 materials that were included with yours.

17           MR. HALLOWELL:  And so, on behalf of the certain

18 insurers, I move JTX-1128 into evidence.

19           MR. ANDOLINA:  No objection.

20           THE COURT:  Admitted.

21           MR. ANDOLINA:  And I believe they were, Your Honor.

22      (JTX-1128 received in evidence)

23 BY MR. HALLOWELL:

24 Q    Now, five minutes after the NEC meeting ended, the

25 National Executive Board held its meeting, correct?

1  A    Yes, sir.

2  Q    And you attended both meetings, correct?

3  A    Yes, sir.

4  Q    And there was a bankruptcy updated provided to the NEB,

5  as well, right?

6  A    Correct.

7  Q    And that update bullet is the same update bullet as the

8  NEC update bullet, correct?

9  A    That's correct.

10 Q    Is it fair to say that the NEB was also focused on the

11 claimant voting results?

12 A    Again, I would answer your question by stating that the

13 NEB was provided with the preliminary voting results, just

14 like the NEC was, by our advisors.  And a discussion was had,

15 as far as what the preliminary results mean, how to interpret

16 them, and what the plan was with our advisors to finalize the

17 voting data and the next steps, along with, at the time, the

18 NEB was also advised of certain additional settlements that

19 had been secured with the Methodists during the December time

20 frame, along with Century and Chubb.

21 Q    Mr. Desai, you took notes at this National Executive

22 Board meeting, correct?

23 A    I would have, but I would have to look and see if -- my

24 notes to confirm that.

25 Q    Let's do it.

1  A     That was my normal practice, that was my normal practice.

2  Q     They're JTX 2263.  I would direct your attention to the

3  Bates ending 7132.  Midway down the page there's a reference

4  to NEC and across from that it says 1/2/21.  I'm guessing

5  that's an error and you meant 1/2/22, is that correct?

6  A     Yes, sir.

7  Q     And right below NEC is NEB, do you see that?

8  A     Yes.

9  Q     And right below NEB you list out 73.07 accept by direct

10 v. 26.93 percent reject.  Do you see that?

11 A     Yes, sir.

12 Q     And that was your note with regard to the Class 8 direct

13 abuse claimants, correct?

14 A     Correct.

15 Q     And then there's a note below that about the indirect

16 claimants, correct?

17 A     Yes, sir.

18 Q     And they had accepted at a 60.5 percent rate, correct?

19 A     Yes, sir.

20 Q     And then below a privilege box you've got a note that I

21 read as 24K didn't vote.  Do you see that?

22 A     Yes, sir.

23 Q     What do you mean by that?

24 A     That was my notation based upon what I heard from our

25 meeting that 24,000 individuals who had filed a proof of claim

1  did not cast a ballot.

2  Q    And then below that you've got a note that says

3  "subclass issues by counsel."  Do you see that?

4  A    Yes, sir.

5  Q    And then below that it says 83 local councils had less

6  then 66.7 percent approved.  Do you see that?

7  A    Yes, sir.

8  Q    Was that discussed with the national executive board?

9  A    The board was shown the same data that you had

10  previously walked me through.  So that is why I just recapture

11  that in my notes.

12  Q    Okay.  Was there any non-privileged discussion that you

13  can share with us about that issue?

14  A    No.  The only thing I can share with you would have been

15  the fact that the data was presented as we had previously

16  walked through.  I recall that there may have been some

17  questions from certain board members asking about what that

18  meant and how we move forward because it was reiterated that

19  these were also (inaudible) results which I believe had to be

20  filed by, if memory serves me correct, I think the 4th of

21  January with the court.  So this is, kind of, real time

22  information that was turned in.

23  Q    Okay.  I'd turn your attention to JTX-3006.

24  A    Okay.

25  Q    JTX-3006 is entitled the official committee of tort

1  claimant's status report regarding the second modified fifth

2  amended Chapter 11 plan.  Do you see that?

3  A    Yes, sir.

4  Q    Have you seen this document before?

5  A    As a matter of fact I have, yes.

6           MR. HALLOWELL:  Your Honor, the certain insurers

7  move JTX-3006 into evidence.

8           MR. ANDOLINA:  No objection, Your Honor; although,

9  I thought the court indicated she had a perspective with

10  respect to pleadings, but I don't have an objection.

11           THE COURT:  I will admit it.  I'm not sure what its

12  going to be used for yet.

13      (JTX-3006 received into evidence)

14  BY MR. HALLOWELL:

15  Q    I would direct your attention to Paragraph 3 of the

16  status report.  In Paragraph 3 the TCC states,

17       "Survivors have spoken.  The preliminary voting report

18  indicates that only 73.12 percent of holders of Class 8 direct

19  abuse claims voted to accept the plan and 26.88 percent of

20  such holders voted to reject the plan."

21       Do you see that?

22  A    Yes, sir.

23  Q    I'd direct your attention to Paragraph 4.  In Paragraph

24  4 the TCC states,

25       "The extent of survivor support is a litmus test for

1 confirmation of the plan.  Among other requirements the non-

2 debtor third-party releases that form the core of the plan

3 must enjoy the overwhelming support of those parties effected

4 by such releases in order to be approved."

5       Do you see that?

6 A     Yes.

7 Q     And the TCC cites to the <u>Continental Airlines</u> case which

8 cites to the <u>Master Mortgage</u> case.  Do you see that?

9 A     Yes.

10 Q     I would direct your attention to Paragraph 5.  In

11 Paragraph 5 the TCC states,

12       "In Chapter 11 cases where non-debtor third-party

13 releases have been approved courts generally appear to have

14 interpreted overwhelming creditor support to mean that, at

15 least, 90 percent of the effected voting creditors accept the

16 plan."

17       Do you see that?

18             MR. ANDOLINA:  Objection, Your Honor.  I am not

19 sure I see the purpose of Mr. Hallowell putting a pleading in

20 front of my witness, our witness, and just regurgitating the

21 language of the pleading.  Appreciating there are numerous

22 other parties that was to cross Mr. Desai, I would ask for the

23 court to consider whether we can move forward.

24             THE COURT:  Yeah.  Where are we going with this?

25             MR. HALLOWELL:  This is notice, Your Honor.  I will

1   be through this document quickly and onto another document

2   that I want to ask the witness about.

3           THE COURT:  Notice of what?

4           MR. HALLOWELL:  This is notice of the TCC's status

5   report to you which occasioned the filing of a document by the

6   Boy Scouts of America that I believe Mr. Desai is familiar

7   with.

8           THE COURT:  Okay.  Let's move through it.

9   BY MR. HALLOWELL:

10  Q    I've got one last paragraph to refer you to, Mr. Desai.

11  I'd direct your attention to Paragraph 8.  The very last line

12  of Paragraph 8,

13       "The TCC characterized the BSA's plan as dead on

14  arrival."

15       Do you see that?

16  A    I see that.

17  Q    Was this status report circulated to the bankruptcy task

18  force when it came in?

19  A    I'm pausing for a moment because I don't know if it was

20  circulated to the NEC, which includes members of the BTF, or

21  just to the BTF.  The answer is, yes, it was circulated to one

22  if not both of those bodies.

23  Q    I'd direct your attention to JTX-2264.  And these are

24  the minutes of the bankruptcy task for dated January 7th,

25  2022.  Do you see that?

1  A    Yes.

2  Q    And I believe that these are already in evidence with

3  your materials, correct?

4  A    Yes, sir.

5  Q    And you participated in this meeting?

6  A    I did.

7  Q    Turning to the middle bullet under bankruptcy update.

8  The bankruptcy task force continued to discuss the preliminary

9  voting results on the BSA's plan of reorganization.  Do you

10 see that?

11 A    Yes, sir.

12 Q    There was also mention of the fact in the first bullet

13 that an in-person mediation had occurred on January 3rd and

14 4th, with among others, the TCC.  Do you see that?

15 A    Yes, sir.

16 Q    Then down below, one bullet up from the bottom, there's

17 another indication of further mediation sessions scheduled for

18 January 12th through the 14th also with the TCC.

19 A    Yes.  Those are the ones I attended.

20 Q    Okay.  This meeting was on January 7th, correct?

21 A    Yes.

22 Q    Two days after that the bankruptcy task force held

23 another meeting, correct?  And I will direct your attention to

24 JTX-1176.

25 A    Yes, sir.

1  Q      These are the minutes of the bankruptcy task force

2  meeting January 9th, 2022.  Do you see that?

3  A      Yes.

4           MR. HALLOWELL:  I think these are in evidence, but

5  I'm going to offer them in evidence anyway, Your Honor.

6           Any objection, Mr. Andolina?

7           MR. ANDOLINA:  No objection.

8           THE COURT:  It's admitted.

9      (JTX-1176 received into evidence)

10 BY MR. HALLOWELL:

11 Q      Mr. Desai, the BSA's advisors were not present at this

12 meeting, correct?

13 A      That is correct.

14 Q      Mr. Desai, in your declaration you detailed nearly a

15 hundred meetings from November 2020 through February 2022 that

16 were conducted by the NEC, the NEB, and the bankruptcy

17 taskforce with regard to the Chapter 11 cases.  Do you recall

18 that?

19 A      Yes, sir.

20 Q      Okay.  And your counsel prepared a chart of all of the

21 meetings that were conducted by the NEC, the NEB, and the

22 bankruptcy taskforce.  Do you remember that chart?

23 A      Yes, sir.

24 Q      Now taking a look at that chart of all of these meetings

25 how many of those meetings were conducted in their entirety

1  without any of your financial restructuring advisors present?

2  A    I would have to take a look at every single set of

3  minutes to be able to answer your question, but not a

4  significant amount.

5  Q    Is it possible, Mr. Desai, that the January 9th, 2022

6  bankruptcy taskforce meeting was the only meeting that was

7  conducted by the bankruptcy taskforce, the NEC, or the NEB

8  during this time period without your attorneys and other

9  financial advisors?

10  A    I don't know if I would agree with that description.

11  Q    How many other such meetings do you think occurred?

12  A    There are times when the advisors would be there for a

13  very limited window and then either the board -- particularly

14  for the NEB meetings because at some point they would sign-off

15  and the board would move forward with conducting matters

16  related to the ongoing operations of the organization that had

17  nothing to do with the restructuring process.

18        As far as bankruptcy taskforce or NEC meetings I can

19  also recall several NEC meetings where that same scenario

20  would occur, but on BTF meetings very few were held without

21  our advisors.

22  Q    I asked you something a little bit different, Mr. Desai.

23  I asked you to think about how many other meetings were

24  conducted in their entirety without any of your outside

25  financial restructuring advisors present.  How many?

1  A       Aside from this one I don't know without looking through

2  all the minutes, sir.

3  Q       Underneath -- let's go back to the minutes.  There is a

4  -- do you have the minutes in front of you?

5  A       I do.

6  Q       Okay.  There is a description in the bankruptcy update

7  section of what was discussed at this meeting without the

8  financial advisors.  Do you see that?

9  A       Yes, sir.

10 Q       And the taskforce discussed several matters related to

11 mediation and the positions of the various parties, the

12 potential consequences of various scenarios and financial

13 issues related to the bankruptcy.  Do you see that?

14 A       Yes, sir.

15 Q       Okay.  Now you took notes of this meeting, didn't you?

16 A       Likely than not, yes.

17 Q       Let's go to JTX-2263, please.  I am going to take you to

18 Bates ending 7137.

19 A       Okay.

20 Q       These are the notes from the bankruptcy taskforce

21 executive session on January 9th, 2022.  Do you see that?

22 A       Yes, sir.

23 Q       This is an executive session that happened after the

24 preliminary voting results came in and after you received the

25 TCC status report, correct?

1  A       Yes, sir.

2  Q       And you discussed a number of things in this executive

3  session, correct?

4  A       We did.

5  Q       And if you look down to number six you discussed 266M

6  fees to date.  Do you see that?

7  A       Yes, sir.

8  Q       And that refers to $266 million in fees incurred by the

9  Boy Scouts of America to date in this bankruptcy, correct?

10 A       It does.  It's not fees that the Boy Scouts of America

11 have paid to our counsel, but a global payment of all the

12 professional fees for everybody involved in this case by the

13 non-profit debtor.

14 Q       What is the line -- I see a line right after $266

15 million fees to date.  What does that next line read?

16 A       The one in parenthesis, which I didn't close?

17 Q       Yes.

18 A       It says $150 million is us.

19 Q       What did you mean by that?

20 A       Meaning $150 would have been global fees related to just

21 the debtor's portion of this case.150 would have been global

22 fees related to just the debtor's portion of this case.

23 Q       Why were you discussing this in a bankruptcy taskforce

24 executive session on January 9th, 2022?

25 A       We were discussing this because, as you can imagine, the

1  fact that confirmation hearings continue to get pushed, the

2  discussions related to the ongoing dialog with certain parties

3  that have not settled or come to the table on an agreement.

4  The fact that we, as an organization, continue to very mindful

5  and concerned about our ability to survive this process and

6  continue to move forward with the mission of scouting, and

7  also to be able to contribute our portion of what we agreed

8  to, to the settlement trust in order to try to bring a

9  resolution to this entire process.

10      The discussion on fees is one that has always been had

11  because we have been vigilant and mindful of the professional

12  fee burn in this case to the point where we are have

13  micromanaged, examined, requested a fee examiner, and also

14  asked for significant deductions on the part of our advisors

15  and would hope that other people will follow suit because it

16  has been an expensive process and one we would like to end.

17  Q    Mr. Desai, I direct your attention to JTX-3007.

18  A    Yes, sir.

19  Q    Okay.  This document is the debtor's response to Exhibit

20  3006, correct?

21  A    Yes, sir.

22  Q    I'd direct your attention, Mr. Desai, to Paragraph 2 of

23  the response.  And in this you state,

24      "The TCC status report is not as the name suggests, an

25  attempt to update this court and parties in interest on the

 1  status of these Chapter 11 cases.  Rather, it is once again an

 2  advocacy piece by the TCC intended to further poison the well

 3  in these cases."

 4       Do you see that?

 5  A    I do.

 6            MR. ANDOLINA:  Your Honor, same objection to this

 7  line of walking through pleadings.  I don't understand why we

 8  are spending the court's time and Mr. Desai's time going

 9  through this process.

10            THE COURT:  Where are we going with this?

11            MR. HALLOWELL:  I am going to connect it for you

12  immediately, Your Honor.  I am going to take the witness to

13  Paragraph 7.  I am going to show him that this response

14  attaches the rebuttal expert report of Dr. Charles Bates.  I

15  am going to show him the paragraph of the Bates rebuttal

16  report that is specifically cited in that paragraph and I am

17  going to move the admission of the entirety of this

18  submission, which is both the status report and the Bates

19  rebuttal report, into evidence.

20            THE COURT:  For what, the fact that they were

21  submitted or filed?

22            MR. HALLOWELL:  This is an adopted admission by the

23  debtor of the Bates rebuttal report, Your Honor.

24            THE COURT:  Okay.

25            MR. HALLOWELL:  And the certain insurers move

1  Exhibit 3007 into evidence.

2          MR. ANDOLINA:  Your Honor, I'd like the opportunity

3  to confer with my team in light of the issues surrounding the

4  Bates White report.  So I would like to reserve, and to the

5  extent Mr. Hallowell has questions on this document and the

6  exhibit I would ask that he proceed and we can revisit the

7  debtor's position on whether the report goes into evidence

8  through this witness.

9          THE COURT:  Okay, let's do that.

10 BY MR. HALLOWELL:

11 Q    I'll make it quick.  Mr. Desai, in your role on the

12 bankruptcy taskforce were you aware of the filing of this

13 document?

14 A    This document, Mr. Hallowell, meaning the response to

15 the TCC status report?

16 Q    Yes.

17 A    Yes, sir, I was.

18 Q    Was that discussed with the bankruptcy taskforce?

19 A    The fact that our advisors were preparing a response was

20 indicated to the taskforce and then, of course, once the

21 response was filed, shared with the taskforce, NEC because I

22 don't know if it just went to the bankruptcy taskforce or not.

23 Q    But just to be clear, there is no way that this was an

24 unapproved filing by your lawyers, correct?

25 A    Our lawyers on behalf of the organization filed this

1  report in response to the TCC's "status report" and it's also

2  my understanding that following dialog with the TCC that

3  certain documents were withdrawn as we move forward on the

4  continuum in January.

5  Q    What documents were withdrawn to your understanding, Mr.

6  Desai?

7  A    I believe that the TCC may have received from the status

8  report or withdrawn it.

9  Q    Do you know that for a fact or are you just guessing?

10 A    I know that there were conversations that we had with

11 our advisors and if I am incorrect on the withdrawal of the

12 motion, I apologize, but I recall that there was some dialog

13 concerning that as a request.

14 Q    So you don't know if, in fact, that document was

15 withdrawn.  You just understand from your advisors that there

16 was a discussion with regard to it, correct?

17 A    Yes, sir. I would defer to the court's docket sheet to

18 verify that.

19 Q    Turning to Paragraph 7 of the BSA's response to the

20 status report.  In Paragraph 7 the BSA stated,

21     "Unfortunately, for survivors the TCC has failed to

22 inform them of the real facts underlying this plan including

23 the fact that Class 8 will likely be paid in full."

24     Do you see that?

25 A    Yes.

1  Q     The Boy Scouts of America goes onto state,

2        "In particular, in the Bates White rebuttal report

3  served last Wednesday, a copy of which is attached hereto as

4  Exhibit A (the Bates rebuttal report), the debtor's expert,

5  Dr. Charles E. Bates, states that based on my review of the 29

6  verdicts, further review of the settlement history and further

7  analysis of the economics of sexual abuse claim filings, I now

8  believe that the value of the abuse claims is most likely in

9  the lowest cortile of the range I originally estimated; that

10 is most likely between 2.4 and 3.6 billion."

11       Do you see that?

12 A     Yes, sir.

13 Q     The site for that is the Bates rebuttal report at three.

14 Do you see that?

15 A     Yes, sir.

16 Q     I'd direct your attention to Attachment A to the filing

17 made by the Boy Scouts of America.  That is JTX-3007-11.

18 A     Okay.

19 Q     Exhibit A is an attachment to the response filed by BSA,

20 correct?

21 A     Yes.

22 Q     And if you turn to the next page into the approximately

23 60 or so pages after that the BSA attaches the entirety of the

24 Dr. Charles Bates rebuttal report dated January 5th, 2021,

25 correct?

1  A      Yes.

2  Q      And you can see the docket stamp on the top of the

3  document, right?

4  A      Yes, sir.

5  Q      And that is Document 8234-1, correct?

6  A      Yes.

7           MR. HALLOWELL:  This is the time at which I would

8  move this document into evidence, but I understand we're going

9  to defer on that, Your Honor.

10          THE COURT:  Yeah, let's --

11          MR. ANDOLINA:  Your Honor, we'd object to entering

12 this document into evidence through this witness.  Our

13 understanding -- Mr. Bates is on our witness list and to the

14 extent that materials will be put in that the has prepared

15 they should be put in through him.

16          THE COURT:  I tend to agree with that.  Why

17 shouldn't it come in through Dr. Bates?

18          MR. HALLOWELL:  Our view is, Your Honor, it can

19 come in through Dr. Bates, but there is no reason why it can't

20 come in through this witness as well.  This is the witness who

21 has been speaking to you all day on behalf of the Boy Scouts

22 of America.  He is, effectively, the corporate representative

23 for the Boy Scouts of America.  There is no question that the

24 Boy Scouts of America have authorized this filing.  This was a

25 legal pleading made on their behalf.  And as I detailed in the

1  submission here in the response, in the text of the response,

2  the Boy Scouts of America have adopted, in its entirety, the

3  Bates rebuttal report.

4         On that basis, Your Honor, we move the Bates

5  rebuttal report into evidence.  I would note, Your Honor, that

6  we have case law for the fact that expert reports can be

7  adopted as admissions.  Your Honor, I would direct your

8  attention to Whole Foods v. Wical, 2019 WL 6910168 at *2.

9  That is a case from the District of Columbia October 22nd,

10  2019.  And Pfizer v. Teva, 2006 WL 3041102.

11         Expert reports are often considered hearsay, Your

12  Honor, but a statement is not hearsay if the statement is

13  offered against an opposing party and is one the party

14  manifested that it adopted or believed to be true.  The

15  response filing by the Boy Scouts on January 11th, 2022 adopts

16  the Bates Rebuttal report and that is why, Your Honor, we move

17  it now as an adoptive admission against the Boy Scouts of

18  America.

19         THE COURT:  Okay.  Thank you.

20         MR. ANDOLINA:  Your Honor?

21         THE COURT:  Yes.

22         MR. ANDOLINA:  I apologize.  I appreciate Mr.

23  Hallowell's explanation of the case law that he had cited.  We

24  would appreciate the opportunity to review that, to review his

25  argument, and to provide the court with a thorough and fulsome

1  response.  We can certainly do that in short order so the

2  court can have all full information before the court makes a

3  decision with respect to this report.

4           THE COURT:  I was going to ask you to do that.  I

5  will take it under consideration after I receive a response.

6           MR. ANDOLINA:  Thank you, Your Honor.

7           MR. HALLOWELL:  Your Honor, if their response is

8  prepared by the Boy Scouts are the certain insurers permitted

9  to reply?

10          THE COURT:  If you feel the need to.

11          MR. HALLOWELL:  Thank you, Your Honor.

12  BY MR. HALLOWELL:

13  Q    Mr. Desai, I think you mentioned this -- and we can take

14  down the report.  I think you have mentioned this, but the day

15  after the BSA filed that status report there was a mediation

16  in Los Angeles, correct?

17  A    Yes, sir.

18  Q    And you participated in that mediation, correct?

19  A    Yes, sir.

20  Q    That mediation didn't result in ending the case, did it,

21  at least not right away?

22  A    It certainly led to a lot of dialog that assisted in

23  getting us to the point where we are at today.

24  Q    Okay.  There were further mediations, January 18th

25  through the 20th, correct?

1  A      Yes, sir.

2  Q      Did you participate in those?

3  A      Not personally, no.

4  Q      I'd direct your attention to JTX-1230.

5  A      Okay.

6  Q      JTX-1230, I believe, have been admitted into evidence

7  and these are the minutes from the national executive

8  committee January 29th, 2022 meeting.  Do you see that?

9  A      Yes, sir.

10 Q      And the first two bullets in the bankruptcy update

11 section discuss recent developments from the in-person

12 mediation presentation that took place, correct?

13 A      Yes, sir.

14 Q      And the second bullet refers to plan amendments that

15 would be necessary to implement any potential settlements

16 arising from that mediation, correct?

17 A      Yes, sir.

18 Q      I'd direct your attention to JTX-1229.  This is a

19 presentation that was made to the NEC on January 29th, 2022,

20 correct?

21 A      Yes, sir.

22 Q      And this one has also been admitted into evidence

23 already, correct?

24 A      Yes.

25 Q      If you turn to the third slide, the third slide refers

1  to progress in mediation.  Do you see that?  It's just at the

2  top, its, otherwise, blank.

3  A    Yes.

4  Q    Okay.  And if you refer to the fifth slide there is a

5  discussion of negotiations with TCC and other claimants.  Do

6  you see that?

7  A    I do.

8  Q    And at the very bottom of that list do you see the

9  notation Bates White report?

10  A    Yes.

11  Q    It's your understanding, isn't it, Mr. Desai, that at

12  this time the claimants were demanding that the Bates White

13  rebuttal report be withdrawn?

14        MR. ANDOLINA:  Object to the extent that any answer

15  would reflect the party's mediation position.

16        THE WITNESS:  All I could tell you, Mr. Hallowell,

17  is that the Bates White report was the subject of discussions

18  during the mediation sessions particularly in my presence,

19  because I was there, and remained a discussion point

20  thereafter until we eventually had a resolution in place with

21  the TCC in early February.

22  BY MR. HALLOWELL:

23  Q    So you can't tell me whether or not the claimants were

24  demanding that the Bates White rebuttal report be withdrawn?

25  A    I believe that the topic of discussion on the Bates

1 White report was an additional term that the parties

2 negotiated about.

3 Q    Do you have anything else other than that?

4 A    No, sir, not that I'm at liberty to share with you.

5 Q    Then you are invoking the mediation privilege with

6 regard to the Bates White rebuttal report discussions, is that

7 true?

8         MR. ANDOLINA:  I will -- to the extent Mr. Desai

9 knows specific positions invoked by specific parties I would

10 tell him not to share those specific positions if he could --

11 he has testified and I don't believe there is a problem with

12 him testifying as to the general issue.

13         MR. HALLOWELL:  Your Honor, we would ask that -- we

14 would ask for a ruling that the negotiations with regard to

15 the Bates White rebuttal report are outside of the mediation

16 in their entirety.

17         THE COURT:  Why are they outside of it?

18         MR. HALLOWELL:  Because the parties should not be

19 mediating about what they can do with litigation pleadings,

20 Your Honor.

21         THE COURT:  That is a different question and I will

22 let you argue that, but I am not -- I am going to overrule

23 that basis as an objection here.

24 BY MR. HALLOWELL:

25 Q    So whose answer?  Is there anything more you can say,

1  Mr. Desai, about the negotiations that the parties --

2           THE COURT:  I'm sorry, I'm sorry, I'm sustaining

3  the objection.  You can make whatever argument you want.  I'm

4  sorry, I am sustained the objection.

5           MR. HALLOWELL:  Okay.

6  BY MR. HALLOWELL:

7  Q    Mr. Desai, in JTX-1229 there are other categories of

8  negotiations between the TCC and other plaintiffs.  Do you see

9  that?

10 A    Yes, sir.

11 Q    What do you understand special review process to mean?

12 A    The special review process is a category that I

13 understand to be part of the TDP's trust governance process

14 and that requests from survivors to go outside of the

15 valuations and have an independent person or persons review

16 their claim and supporting materials in order to assess

17 whether or not a particular survivor should receive more than

18 the allocated range of claim values within the TDP's based on

19 historical data from the BSA.

20 Q    Did you personally engage in any negotiations with

21 regard to the special review process?

22 A    No, sir.

23 Q    What does trust governance refer to?

24 A    Trust governance is the broad category of things that I

25 referenced earlier in our conversation and also with Mr.

1  Andolina related to the selection of the settlement trust

2  advisory committee, the administrators, the trustee, and,

3  again, just the admonition from the volunteer of the Boy

4  Scouts of America to our advisors and others to them that

5  every single survivor be treated fairly and with transparency

6  of the process and to ensure that the leadership of the trust

7  was scout like in their professional obligations to all of the

8  survivors.

9  Q    What does treatment of proceeds of NDC and Scouting U?

10 A    This refers to the proceeds, the $15.5 million that you

11 had questioned me about earlier related to the utilization by

12 the BSA currently of the proceeds from the sale of the

13 national distribution center and Scouting U given the

14 continuous delays in this journey.

15 Q    BSA seeks to use those proceeds for its operating

16 expenses, correct?

17 A    That's right.

18 Q    Mr. Desai, I direct your attention to JTX-1297.

19 A    Okay.

20 Q    And these are minutes from the National Executive

21 Committee meeting, February 9th, 2022?

22 A    Yes.

23 Q    The second bullet refers -- I'm looking at the

24 "Bankruptcy Update" section.  The second bullet refers to a

25 review of previously approved terms and conditions of a

1    settlement that's referred to in the first bullet, do you see

2    that?

3    A      Yes.

4    Q      Do you remember what the previously approved terms and

5    conditions were?

6    A      Off the top of my head, I do not, but going back to our

7    presentation that we just looked at, it would have surrounded

8    the categories that have been laid out on the document Exhibit

9    1229 and the page that you showed me entitled "Negotiations

10   with TCC and other plaintiffs."

11   Q      Okay.  So some of those categories had been previously

12   approved, is that your understanding?

13   A      Yes.  Some of these issue or topics were topics that our

14   advisers and the BTF and NEC were constantly in discussions

15   about and had certainly provided some form of a runway, if you

16   will, to our advisers to negotiate and then, based upon the

17   ongoing nature of the mediation process, the parties would

18   come back through our advisers for additional space on that

19   runway, and our advisers would then ask us for that authority.

20   Q      The next bullet refers to discussion of new terms and

21   conditions of such settlement.  Do you see that?

22   A      Yes, sir.

23   Q      And there are two new terms and conditions; correct?

24   The first is the use of proceeds from the sale of the National

25   Distribution Center and the second is plan provisions related

1  to exculpation and release of counsel to the TCC.  Do you see

2  that?

3  A     Yes, sir.

4  Q     Those were two new provisions that were entered on this

5  date; is that right?

6  A     These were two provisions that were authority levels

7  that we provided to our counsel because they had received

8  proposals or responses, if you will, namely to our request for

9  the utilization of proceeds of the 15.5 for the National

10 Distribution Center and the Scouting U building, and then the

11 second piece pertained to a request from the tort claimants

12 committee's counsel about a release and an exculpation for

13 certain matters.

14 Q     Why did the TCC counsel need release and exculpation for

15 certain matters?

16 A     As --

17           MR. ANDOLINA:  Objection to the extent it calls for

18 a legal conclusion.  I don't think that was the question you

19 were getting at, but that's our objection.

20           THE WITNESS:  This topic just basically pertains to

21 the period of time involving the relationship between the

22 TCC's counsel and Mr. Kosnoff, and the messaging that took

23 place and its impact on the bankruptcy process and the estate.

24 And, as a result of the parties' discussions to remediate any

25 potential impact that had occurred, there was a request and a

1  proposal that was made and was satisfactory to the Boy Scouts

2  of America such that we authorized our advisers to accept the

3  proposal as presented by counsel for the TCC.

4  BY MR. HALLOWELL:

5  Q    And this happened at the same time that there were

6  discussions regarding the use of proceeds from the sale of the

7  National Distribution Center?

8  A    Yes, sir.  February 9th was the date at which we had

9  received a final answer back from the other parties related to

10  our requests for utilization of those funds and at the same

11  time we had received a fairly finalized version of a proposal

12  from counsel for the TCC in order to finalize the entire term

13  sheet with the TCC, which is what ultimately occurred on the

14  9th of February when the NEC voted in favor and had our

15  advisers enter into the deal.

16          MR. HALLOWELL:  Your Honor, if you could give me

17  five minutes to check my notes, I think we could be close to

18  done.

19          THE COURT:  Okay.

20          MR. HALLOWELL:  Thank you.

21          THE COURT:  We're in recess for five minutes.

22      (Recess taken at 3:50 p.m.)

23      (Proceedings resumed at 3:57 p.m.)

24          MR. CHRISTIAN:  Your Honor, before we go on the

25  record, can I say something?

1          THE COURT:  Okay.

2          MR. CHRISTIAN:  Your Honor, I'm not saying this on

3  behalf of any client, but during the break I observed an

4  individual who seemed to be taking photographs of the

5  participants' screens using what looked like an iPhone or a

6  smartphone, and then closing off his video.

7          THE COURT:  That's prohibited and, if we catch

8  anyone taking photographs, it will be reported to the

9  appropriate people and authorities.

10          Thank you.

11          MR. CHRISTIAN:  Thank you, Your Honor.

12          THE COURT:  Mr. Hallowell?

13          MR. ANDOLINA:  Your Honor, before Mr. Hallowell

14  proceeds, Mr. Kurtz, who's handling Mr. Bates as a witness,

15  wanted to be heard briefly, because I think we can solve a

16  problem for you or take that issue off the table.  So would

17  you mind hearing briefly from Mr. Kurtz with respect to the

18  supplemental Bates report that we discussed?

19          THE COURT:  Okay.

20          MR. KURTZ:  Good afternoon, Your Honor.  I think we

21  can maybe make this go away.  I don't agree -- I should just

22  say for the record, we don't agree that this is an adopted

23  admission because it was attached to a status report.  We

24  don't think this is the right witness for it, but I'm

25  certainly not objecting to the introduction of our own

1  witness' rebuttal report.

2          It won't come as a surprise that insurers, at least

3  initially, disputed the report and said the numbers were too

4  high; certain of the claimants, including the TCC, said it was

5  too low.  I think I just feel somewhat compelled to at least

6  note to the Court that, when we reached an agreement with the

7  TCC, some of the terms addressed this rebuttal report that

8  we're not objecting to.  That was included in a mediator

9  report, which is Docket 8772, and it basically said that they

10  weren't agreeing to the rebuttal report, that the report was

11  an estimate and not a result of a contested hearing, and that

12  the conclusions wouldn't be binding on liability in the

13  future.  And so I feel that it should at least not prompt a

14  fight, note that that -- those provisions, but otherwise we

15  have no objection to the introduction of Dr. Bates' rebuttal

16  report.

17          THE COURT:  Okay.  Mr. Hallowell?

18          MR. HALLOWELL:  Your Honor, if the BSA is not

19  objecting, then I -- let me make sure I get this right -- the

20  certain insurers move JTX-3007, including the entirety of the

21  Bates rebuttal report, which is Exhibit A to that document,

22  into evidence.

23          THE COURT:  Okay, it's admitted.

24          Do you have any further questions for Mr. Desai?

25          MR. HALLOWELL:  I thank you for the opportunity to

1  check my notes, Your Honor, and I do not have any further

2  questions.

3          THE COURT:  Thank you.

4          Who is our next questioner?  Mr. Lloyd?

5          MR. LLOYD:  Thank you, Your Honor, Neil Lloyd on

6  behalf of the Roman Catholic Ad Hoc Committee.  In light of

7  the direct that we heard and the extensive cross-examination,

8  the Roman Catholic Ad Hoc Committee is going to waive cross of

9  this witness and thank him for his time.

10          THE COURT:  Thank you.

11          Mr. Moxley?

12          MR. MOXLEY:  Good afternoon, Your Honor, Cameron

13  Moxley on behalf of the Coalition of Abused Scouts for

14  Justice.  Your Honor, we have a brief cross-examination, if I

15  -- I know other parties may intend to as well, so I'm happy to

16  go next, if that pleases the Court.

17          THE COURT:  That's fine, but the Coalition is

18  supporting the plan, correct?

19          MR. MOXLEY:  We do.  We have just a handful of

20  questions, Your Honor.  I wasn't sure if there were any other

21  questioners who wished to ask Mr. Desai any questions today.

22          THE COURT:  All right, go ahead.

23          MR. MOXLEY:  Thank you, Your Honor.

24                         CROSS-EXAMINATION

25  BY MR. MOXLEY:

1  Q     If I could -- first, good afternoon, Mr. Desai.

2  A     Good afternoon.

3  Q     Mr. Desai, if I could ask you to look at JTX-3005,

4  please.

5           MR. MOXLEY:  And, Your Honor, I'm not sure if that

6  can be brought up on the screen.  I'm happy to share my

7  screen, if that's the way we should operate to bring the

8  exhibit back to the video.

9           THE COURT:  I don't know what's been arranged, but

10 I think you can share.

11          MR. MOXLEY:  Great.

12          THE WITNESS:  Mr. Moxley, is that an exhibit that's

13 within the certain insurers' notebook or in the notebook for

14 my declaration?

15          MR. MOXLEY:  It was -- I believe it was -- JTX-

16 3005-1 was in the insurers' notebook.  It was for sure, it was

17 in that.  I'll share it on the screen.

18          THE WITNESS:  All right.  You're referring to an

19 email dated April 10, 2021?

20          MR. MOXLEY:  That's correct.  And I've shared my

21 screen now, I don't know if you can see that.

22          THE WITNESS:  I can.

23 BY MR. MOXLEY:

24 Q     Okay, terrific.  Do you recall being asked some

25 questions about this document, Mr. Desai?

1    A      Yes, sir.

2    Q      Could you just identify what this is again for the

3    record, please?

4    A      This appears to be an email dated April 10, 2021 from

5    Eric Goodman to Michael Andolina, Jessica Boelter Lauria,

6    Kevin Carey, Paul Finn (ph), Tim Gallagher, and a host of

7    other people on the carbon copy line.

8    Q      Thank you, sir.  And I believe you testified earlier you

9    understand that Mr. Goodman is an attorney with Brown Rudnick,

10   representing the Coalition; correct?

11   A      Yes, sir.

12   Q      Okay.  I'd ask you to flip to page JTX-3005-7.  And I've

13   put that on the screen as well.

14   A      Okay.

15   Q      Mr. Desai, do you see where it says, "TDP claim values,"

16   on the left side?

17   A      Yes.

18   Q      And do you see the column next to that on the right?

19   A      Yes.

20   Q      Are there any claim values in that right-hand column?

21   A      No.

22   Q      Mr. Desai, are there any numbers in that box at all?

23   A      There are numbers, but it refers to a bankruptcy rule.

24   Q      Thank you, sir.  Do you know why there are no claim

25   values in that column?

1  A      No.  I believe that the document references that values

2  shall be consistent with and based on available evidence,

3  including the debtors' historical settlement data and other

4  settlements involving abuse claims.

5  Q    And, Mr. Desai, do you see the first sentence in that

6  box that reads, "Upon appropriate order of the bankruptcy

7  court, the debtors shall immediately produce to the Coalition

8  and the future claimants' representative all settlement and

9  judgment data in their possession, custody, or control

10  pertaining to abuse claims, subject to the protective order

11  and mediation privilege," do you see that?

12  A      Yes, sir.

13  Q    Mr. Desai, do you know why the Coalition and the FCR

14  wanted the debtors to produce their settlement and judgment

15  data?

16  A    So that the parties could arrive at the TDP claim values

17  for the Court to consider and eventually approve.

18  Q    And, Mr. Desai, do you know if that information was ever

19  produced to the Coalition or the FCR?

20  A    I personally do not know if it was, but I have seen

21  references to claim values in the TDPs and the plan that has

22  been presented to this Court, and so my response should be

23  yes.

24  Q    Mr. Desai, do you see the second sentence where the

25  Coalition and the FCR are asking the debtors to prepare trust

1   distribution procedures that include values based on

2   particular claim characteristics?

3   A     Yes.

4   Q     And do you know what is being referred to there with

5   respect to the phrase "particular claim characteristics"?

6   A     It -- particular claim characteristics refers to the

7   type of abuse category and a valuation, minimum/maximum, that

8   would be affiliated with that particular type of abuse.

9   Q     Mr. Desai, do you see the third sentence there in that

10  box where the Coalition and the FCR are asking that the claim

11  values from the TDP be consistent with the debtors' historical

12  settlement data and other settlements involving abuse claims?

13  A     Yes, sir.

14  Q     Do you know what the phrase "historical settlement data"

15  there is referring to?

16  A     I do.

17  Q     And what is that?

18  A     The historical settlement data refers to the prior

19  litigation and/or claims resolution history available to the

20  Boy Scouts of America for prior abuse claims that have been

21  resolved.

22  Q     Mr. Desai, do you see the fourth sentence where the

23  Coalition and the FCR are asking for TDP claim determination

24  that reflect the best available information concerning the

25  value of the direct abuse claims?

1   A       Bear with me one second.

2   Q       Of course.

3           (Pause)

4   A       I do see that, yes.

5   Q       And, Mr. Desai, do you know what is meant there by best

6   available information?

7   A       Basically, that the parties would do the due diligence

8   that would be necessary to ensure that whatever values are

9   placed within the TDPs for a particular claim category are

10  consistent with what the historical data shows, but also what

11  is available in the tort system if a claimant was to elect

12  proceeding forward with filing a lawsuit and taking it to

13  fruition before a trial by jury.

14  Q       Mr. Desai, would you agree with me that the Coalition

15  and the FCR in this document are not proposing any specific

16  claim values?

17  A       Yes.

18  Q       And, Mr. Desai, based on this term sheet, do you think

19  that the Coalition and the FCR were capable of proposing

20  specific claim values at this time?

21  A       Given the quality of lawyers that are involved and the

22  fact that primarily the Coalition had a lot of trial counsel

23  involved, I am sure that they could have come up with values,

24  but this document does not purport to indicate what those

25  values are.

1  Q      Thank you, Mr. Desai.

2            MR. MOXLEY:  Your Honor, I have no further

3  questions.

4            THE COURT:  Thank you.

5            Ms. Lujan?

6            MS. LUJAN WOLFF:  Thank you, Your Honor.  I have

7  some questions -- sorry, I just need to --

8                       CROSS-EXAMINATION

9  BY MS. LUJAN WOLFF:

10 Q      Mr. Desai, my name is Delia Lujan Wolff, I represent

11 Lujan claimants who are survivors of abuse, who were abused in

12 Guam, and I'd like to ask you if you know what the principal

13 place of business of the BSA is?

14 A      Yes, I do.

15 Q      What is that?

16 A      The Boy Scouts of America is headquartered in Dallas,

17 Texas.

18 Q      Okay.  And that's also where the BSA is domiciled?

19 A      The national organization, yes.

20 Q      And that's where the BSA resides?

21 A      Yes.

22 Q      Okay.  And, as a member of the National Executive Board

23 and the National Executive Committee, do you have personal

24 knowledge of what the BSA considered in deciding whether to

25 file for bankruptcy?

1  A      Yes.

2  Q      As the BSA was deciding whether to file for bankruptcy,

3  did BSA seek the input of the 200-plus local councils?

4  A      I recall that the BSA did conduct and have an annual

5  meeting whereby presentations and a town hall-esque process

6  was had for members of the national council, which would

7  include representatives of the local councils, to listen to

8  information and ask questions of not only BSA's counsel at the

9  time, but also to ask questions of the BSA's key three, who I

10 previously indicated would have been the national chair, along

11 with the national commissioner, and the chief Scout executive

12 or CEO.

13 Q      Okay.  So I think in your answer you've identified one

14 meeting that the BSA had with representatives of some local

15 councils, is that correct?

16 A      The BSA at its annual meeting would have had

17 representatives from every council present at that meeting.

18 Q      When was this annual meeting?

19 A      Generally, our annual meetings are conducted in May, and

20 so it would have been in the calendar year that involved the

21 pre-filing of the bankruptcy petition.

22 Q      And since the BSA filed for bankruptcy in February 2020,

23 is it your answer that the BSA had this discussion with the

24 local council representatives in May 2019?

25 A      Yes, we would have had these presentations at or near

1  that time frame because I recall that there was a presentation

2  by the BSA's counsel at that time to the national council, in

3  addition to the National Executive Board, which then

4  culminated in attempts to try to see if a resolution could be

5  had without the need for the formalized bankruptcy process in

6  the fall of that year.

7          And in response to those various attempts to try to

8  resolve this matter, the parties had been advised that we

9  would have to go through the claims process and proceed with a

10 formalized bankruptcy filing, which is what occurred in

11 February 2020 of that year and leading us to the current date.

12 Q    Okay, just so I understand.  So is it your testimony

13 that the BSA had an annual meeting and simply discussed the

14 potential filing for bankruptcy, and this was a meeting simply

15 of the BSA, which includes among its, I guess, board or

16 committee members representatives of local councils, is that

17 your testimony?

18 A    Yes, but let me just clarify for you.  The national

19 council, which is different than the National Executive Board,

20 the national council has as its members' representatives of

21 each of our councils.  Those individuals come to an annual

22 meeting that is held every May, the business meeting, whereby

23 representatives or delegates of the local councils will vote

24 on matters involving the organization as a whole; the

25 selection of the National Executive Board sleight; the sleight

1  of the National Executive Committee, which is the grouping of

2  the 11 volunteers plus the CEO.  And so those are the types of

3  things that occur at the national annual meeting.

4          During the meeting in the year prior to the

5  bankruptcy filing, there were several presentations,

6  opportunities for engagement with our local council

7  representatives at that meeting, so that they were advised on

8  the various options available to the organization at that

9  time; what plan our advisers, in consultation with the

10  National Executive Board, were planning to pursue; and what

11  the alternative options would be if an attempt at resolving

12  things was not fruitful.  All of that occurred prior to the

13  filing of the formalized bankruptcy petition in 2020.

14  Q    Okay.  And so, at the annual meeting in May 2019, the

15  BSA provided local council representatives who were part of

16  the national council opportunities for engagement on the

17  possibility -- to discuss the possibility of bankruptcy

18  filing; correct?

19  A    Yes, ma'am.

20  Q    And that was the only meeting in which the BSA sought

21  the input of local councils prior to filing for bankruptcy in

22  February 2020, correct?

23  A    I wouldn't say it was the only meeting.  I would say

24  that that was the one big, organized meeting where everybody

25  was in attendance at, recognizing that the local councils are

1  not the individuals in bankruptcy; it's actually the national

2  organization, the Boy Scouts of America, that is, the debtor.

3  And so, in an effort to keep the local councils abreast of

4  what was transpiring, what they could anticipate, questions,

5  how the bankruptcy filing, if we did engage in that filing,

6  what that would implicate for local councils, all of those

7  types of topics were presented upon.

8           Questions and answers could have happened and did

9  happen between representatives in the room, along with our

10  counsel at the time and representatives of the key three.  And

11  I recall this because I was in attendance at that national

12  meeting.

13  Q    Yes, this is the national annual meeting in May 2019.

14  So my question is, what other meetings occurred other than

15  this annual meeting in May of 2019 where the BSA sought the

16  input of the 200-plus local councils prior to filing for

17  bankruptcy?

18  A    The only other meetings that would have occurred would

19  have happened outside my presence and mainly I know that the

20  organization has the monthly calls with stat executives, who

21  are the CEOs of the localized councils, and other

22  professionals that are affiliated with the organization.  Our

23  key three would have also been in communication with the

24  volunteer leadership of the local councils by way of

25  correspondences and webinars and Zoom-related type meetings.

1          So I do know that the organization had many of

2   those types of events take place after the May meeting in an

3   effort to keep folks abreast of what was transpiring.

4   Q    Well, other than what was -- other than the engagement

5   of the local councils and the May 2019 annual meeting, what

6   other input are you aware of that the local councils gave to

7   the Boy Scouts and to assist the BSA in filing for -- in its

8   decision-making whether to file for bankruptcy?

9          MR. ANDOLINA:  Objection, asked and answered.

10          THE COURT:  Sustained.

11          MS. LUJAN WOLFF:  I don't believe that it's been

12   answered.  I think there have just been -- he hasn't clearly

13   answered the question.  I'd ask him to answer the question.

14          THE COURT:  I'm going to sustain that objection.

15   BY MS. LUJAN WOLFF:

16   Q    Sir, after the 2019 annual meeting, can you identify the

17   local councils who provided input to the BSA on whether to --

18   for the BSA to file for bankruptcy?

19   A    Ms. Wolff, I don't believe that the local councils would

20   have provided what you described as input for the national

21   organization to file for bankruptcy; that was a decision that

22   was made by the National Executive Board to allow for advisers

23   to place the organization into the Chapter 11 bankruptcy

24   process.

25   Q    Prior to the BSA filing for bankruptcy, did the BSA seek

1  the input of any of the 40,000-plus chartered organization

2  partners in helping the BSA to decide whether to file for

3  bankruptcy?

4  A    Aside from maybe communicating with our chartered

5  partners, I don't believe that the chartered partners would

6  have had a role at that time in supporting, rejecting, or

7  expressing an opinion on whether or not the BSA would file.

8  Q    Now, you testified earlier that the BSA is domiciled,

9  resides, and has a principal place of business in Dallas,

10 Texas.  And so did the BSA consider filing for bankruptcy in

11 Texas?

12         MR. ANDOLINA:  Objection to the extent that an

13 answer would require he reveal attorney-client communications.

14         THE COURT:  So you can answer it within that

15 rubric.

16         THE WITNESS:  Yes, ma'am.  Ms. Wolff, I'm not able

17 to answer that question.

18 BY MS. LUJAN WOLFF:

19 Q    Are you able to answer why the BSA did not file for

20 bankruptcy in Texas?

21         MR. ANDOLINA:  Same objection.

22         THE WITNESS:  Again, my answer would require me to

23 divulge attorney-client matters and I am not at liberty to do

24 that.

25 BY MS. LUJAN WOLFF:

1  Q      Are you able to testify about -- or do you have personal

2  knowledge of what the Delaware BSA LLC is?

3         (Pause)

4  A      I do not.

5  Q      But you know that Delaware BSA is a debtor in a

6  consolidated bankruptcy case; correct?

7  A      Yes, ma'am.

8  Q      But you just don't know what exactly it is or what it

9  does; is that correct?

10 A      Sitting here today, you're correct, I can't answer that.

11 Q      Now, earlier, Mr. Andolina presented you with a

12 demonstrative exhibit and, I'm sorry, I don't have that

13 exhibit number, but it showed the different settlements that

14 the NEC, I believe the National Executive Committee approved.

15 Do you recall what I'm talking about?

16 A      Yes.

17 Q      And did that exhibit show all of the settlements that

18 the NEC approved after the bankruptcy filing?

19 A      Yes.

20 Q      And so, if there was a contribution to be made by a non-

21 debtor in order to get a release, it would have been reflected

22 in that demonstrative exhibit; is that correct?

23         MR. ANDOLINA:  Objection, vague.

24         MS. LUJAN WOLFF:  Let me reword it.

25 BY MS. LUJAN WOLFF:

1  Q    So if a non-debtor, meaning a third party that didn't

2  file for bankruptcy in this case, if a non-debtor wanted a

3  release, then the NEC would have had to approve that release,

4  is that correct?

5            MR. ANDOLINA:  Objection, vague.

6            THE COURT:  Can you rephrase that again?

7            MS. LUJAN WOLFF:  Yes.

8  BY MS. LUJAN WOLFF:

9  Q    Was it the -- is it the responsibility of the NEC to

10 review and approve or disapprove of any settlements between

11 the BSA and a non-debtor?

12           MR. ANDOLINA:  Same objection.

13           THE COURT:  I'm going to overrule that one, if Mr.

14 Desai can answer it.

15           THE WITNESS:  I think that, to the extent any

16 settlements have been effectuated, our advisers would

17 certainly have brought that to our attention because, in order

18 for the organization to agree to it, it would have had to come

19 through the NEC or some form, the BTF, to allow for our

20 advisers through this process to enter into.

21 BY MS. LUJAN WOLFF:

22 Q    So if a non-debtor wanted a release through a BSA -- or

23 plan of reorganization, then the NEC would have to approve

24 that release; is that correct?

25           MR. ANDOLINA:  Same objection.

1        THE COURT:  Overruled

2        THE WITNESS:  I would tell you that my answer would

3   be the same, but I would also add on that any non-debtor who

4   is seeking a release, if they were not already contemplated as

5   a released party in our bankruptcy plan definitions, we

6   certainly would have had conversations about it.  But as we

7   understand or as I understand the bankruptcy plan that's

8   before the Court, the non-debtor releases all involving

9   individuals who have provided some form of contribution to

10  this reorganization process or direct financial contribution

11  to the settlement trusts.

12  BY MS. LUJAN WOLFF:

13

14  Q    Sir, do you know what a related non-debtor entity refers

15  to?

16        MR. ANDOLINA:  Objection.  I would just ask Ms.

17  Wolff, are you referring to a definition in the plan?

18        MS. LUJAN WOLFF:  Yes, I'm referring to a

19  definition of the plan.

20  BY MS. LUJAN WOLFF:

21  Q    Are you familiar with that term, sir?

22  A    I'm familiar with the term, but I would need to see the

23  plan to be able to answer any more specific questions about

24  what that all means.

25  Q    Okay.  Well, let me ask, have you ever heard of BSA

1  Asset Management LLC?

2  A     Yes.

3  Q     And did the NEC ever consider whether the BSA Asset

4  Management should receive a release as part of this bankruptcy

5  case?

6  A     I believe that BSA Asset Management LLC is a party that

7  has been contemplated to be receiving a release under the plan

8  as a non-debtor third party, based upon the contributions that

9  they would be making to the reorganization process for the

10  debtor.

11  Q     Did the NEC approve that release at a meeting?

12  A     We have approved the plan that is before the Court that

13  encompasses that released entity and release, yes.

14  Q     So there was no presentation regarding the BSA Asset

15  Management and whether or not it should receive a release?

16  Was there a specific presentation on this issue?

17  A     The BSA Asset Management LLC entity, which is affiliated

18  with the foundation, given that they are providing some

19  financial support to the debtor, so that the debtor is able to

20  provide support in the way of contributions towards a

21  settlement trust, is receiving the release -- or it has been

22  asked to receive a release through this plan and the NEC is

23  aware of that as a result of the contributions that are being

24  made by the BSA Asset Management LLC to the debtor such that

1  it could continue to either operate or provide funding towards

2  the settlement trust.

3  Q      So, I'm sorry, what is the funding that BSA Asset

4  Management is providing in order to get their release?

5  A      There's a -- I believe that there's a loan that is

6  coming from one entity to another as part of the restructuring

7  process.

8  Q      So this is a loan that the BSA has to repay?

9  A      In general terms, yes.

10  Q      Okay.  And so are you aware of the BSA endowment master

11  trust?  Do you know what that is?

12

13  A      Generally, but I don't have any other specifics of it.

14  Q      Was the NEC --

15          UNIDENTIFIED SPEAKER:  They're still going.

16  BY MS. LUJAN WOLFF:

17  Q      Was the NEC ever asked to consider whether --

18          UNIDENTIFIED:  They ought to mute that one.

19          THE COURT:  Excuse me?

20          UNIDENTIFIED:  Now, did I mute here?

21          THE COURT:  No, you're still live.  Thank you.

22          Ms. Lujan?

23  BY MS. LUJAN WOLFF:

24  Q      Thank you.

25          Was the NEC ever asked to consider whether to grant or

    to agree to the release of the BSA Endowment Master Trust as

1  part of a plan?

2  A    The NEC was asked to approve the plan that is before the

3  Court that captured that entity and any of the other entities

4  that we (indiscernible) discuss or that I believe you may ask

5  me about, as a whole.  And so, with that is the preface, our

6  understanding is that would be our request, since we have

7  voted to approve the plan, as presented before the Court.

8  Q    Are you aware of any contribution by the BSA Endowment

9  Master Trust to the BSA or its settlement trust in order for

10  it receive a release as part of the plan?

11  A    Sitting here today, I don't know the specifics behind

12  where every dollar is coming from, from the BSA side, other

13  than what I do know is that as part of the ongoing nature of

14  the BSA's operations, we had to utilize a lot of the trusts

15  that had previously been established and the principal and the

16  spin-offs of those trusts in order to allow for operations of

17  the organization to continue during this process.

18      And so, to the extent that the BSA General Trust, as you

19  described, was one of those investment vehicles or entities,

20  then that provided funding to the BSA for allowing operations

21  to continue, they would be one of those parties that received

22  a release as contemplated in the plan.

23  Q    Do you know what the National Boy Scouts of America

24  Foundation is?

25  A    Generally, yes.

1  Q      Is it receiving a release if this plan is confirmed?

2  A      I would have to look at the definition in the plan of

3  release entities and the debtor releases that we're discussing

4  to be able to answer that question, ma'am.

5  Q      Are you aware of any contributions by the National Boy

6  Scouts of America Foundation in order to receive the release?

7  A      In contribution that I think the Foundation would be

8  making has either already been made or is contemplated to be

9  made through the plan for ongoing operations of the BSA to

10  have continued or to continue future, post-emergence.

11  Q      Do you know what Learning for Life is?

12  A      Generally, I'm aware, yes.

13  Q      And is it receiving a release if this plan is confirmed?

14  A      I'd defer to my same answer as before on the other

15  entities.

16  Q      So, you're not -- you cannot, as you're sitting here,

17  recall what, if any, contribution Learning for Life is.

18        You'd have to look at the plan; is that correct?

19  A      You asked me if they received a release and so, again, I

20  would defer to the definition in the plan that would

21  articulate with specificity what all the entities are that are

22  being proposed to receive a release and as far as any specific

23  contributions, again, I would defer to the plan documents for

24  that.

25  Q      How about Arrow WV, Inc.; do you know what that is?

1  A      I believe that is a corporate entity that has to do with

2  our property in West Virginia.

3  Q      And is Arrow WV, Inc. receiving a release under the

4  plan?

5  A      Same answer as before, ma'am.

6  Q      I understand, but I just need a clear answer.

7         To your knowledge, is it receiving a release or do you

8  not recall at this time?

9  A      As I indicated before, Ms. Wolff, I would need to look

10  at the definition of released entities that are being proposed

11  for a release within the plan that's before the Court, and if

12  that entity appears in the document as a released party, the

13  NEC would have voted to approve the plan so that our advisors

14  could file it.

15  Q      Are you aware of any contributions by Arrow WV, Inc. in

16  order for -- being made by Arrow, in order to receive a

17  release?

18  A      Any specific contributions, sitting here, no, but the

19  plan documents would speak to that and on top of that, as an

20  affiliate entity of Boy Scouts of America, it would need to

21  have a release in order to allow for the organization and its

22  affiliated entities to continue to operate free of any

23  historical abuse liability.

24  Q      Are you aware of any abuse claims that were ever made

25  against Arrow WV, Inc.?

1  A      Were made or could have been made, I don't know, with

2  specificity sitting here if there were any claims asserted

3  arising out of the operations in West Virginia against that

4  entity.

5  Q      Are you aware of abuse claims made against Learning for

6  Life?

7  A      Sitting here today, I don't know, because that's a plan

8  that was administered around the country and without looking

9  at the proofs of claim or a Bates White summary of specific

10 entities that had claims made against them, I wouldn't be able

11 to answer that, Ms. Wolff.

12 Q      I understand, but you just testified earlier that these

13 releases are needed in order for them to emerge free of any

14 abuse claim liability, and so I'll ask the question again as

15 to, I believe, National Boy Scouts of America Foundation.

16        Are you aware of any abuse claims made against that

17 Foundation?

18 A      I am not sitting here today, but, again, I would defer

19 to the claims data.

20 Q      Are you aware of abuse claims made against the BSA

21 Endowment Master Trust?

22 A      Same response.

23 Q      And that response is that you don't -- you're not aware

24 of any, correct?

25 A      As I sit here today, no, without looking at a Bates

1  White report that would identify where all the claims are from

2  and who they are against.

3  Q     How about the BSA Asset Management, LLC, are you aware

4  of my abuse claims made against that BSA Asset Management?

5  A     Same response as before.

6  Q     Do you know what the -- and I hope I'm saying it right;

7  please correct me if I'm not -- do you know what the Adakoke

8  (phonetic) Youth Ventures, Inc. is?

9  A     I do not know.

10  Q     Do you know what the Adakokan (phonetic) Youth

11  Adventures, Inc. is?

12  A     No, ma'am.

13  Q     Do you know what the Delaware -- I'm sorry -- do you

14  know what the BSA Commingled Endowment Fund, LP is?

15  A     Not specifically, no.

16  Q     Now, I'd like to ask you about the Hartford settlement.

17        Was the NEC involved in approving, during this

18  bankruptcy case, the first Hartford settlement in the amount

19  of $650 million?

20  A     Yes, ma'am.

21  Q     And that first Hartford settlement, that -- isn't it

22  correct that that agreement required the BSA to propose a BSA

23  toggle alternative; in other words, a BSA-only plan?

24        MR. ANDOLINA:  Objection to characterization of the

25  settlement.

1          THE COURT:  Overruled.

2          If he can answer it?

3          THE WITNESS:  I don't believe, Ms. Wolff, that the

4  settlement required the inclusion of a BSA toggle plan.  I do

5  recall that, without looking at the document, I do recall that

6  at the time that the NEC entered into the Hartford settlement

7  agreement, there were conversations about the two different

8  options; mangily, the one that was a global option and the

9  other one which, you know, we are referring to as a "toggle,"

10  meaning BSA only.

11          And, obviously, as I sit here, I can tell you that

12  the preferred option for the BSA is a global resolution

13  because of my description of the interconnectedness of the

14  relationships between the organization, our local councils,

15  and our chartered partners, having a BSA-only option would

16  have been disastrous for the delivery of Scouting and would,

17  invariably, have yielded in almost 250-plus bankruptcies

18  around this country from our local councils.

19          And so, the best alternative and the one that's

20  before this Court today that we are proud of is a global

21  resolution, based upon the consensus and the path that has

22  been built.

23  BY MS. LUJAN WOLFF:

24  Q    I understand that it's your belief that a global

25  resolution is the best alternative, but the BSA did propose,

1  as part of a plan of reorganization, the BSA toggle, which is
2  a BSA-only plan, correct?
3  A     Yes, ma'am.  That option has always been available to
4  the BSA.
5  Q     And that continues to be available to the BSA, correct?
6  A     It does continue to be available; however, it's not an
7  option that needs to be exercised upon, given the fact that
8  the organization, through the efforts of many of the insurers
9  and chartered partners and our local council partners have
10  been able to forge a pathway that would allow for the
11  organization and our local councils and chartered partners to
12  hopefully emerge from this process while achieving the twofold
13  objectives that the Boy Scouts of America set out to do, which
14  were, one, to equitably compensate our victims and, two, to
15  allow the mission of Scouting to continue.
16  Q     Okay.  And so, just going back to that six-hundred-and-
17  fifty-million-dollar Hartford settlement agreement, isn't it
18  correct that that agreement did not include a release of abuse
19  liability to benefit chartered organizations?
20  A     (No verbal response.)
21  Q     Maybe I'm not saying it the best -- maybe I'll rephrase
22  the question.
23         Isn't it correct that that first Hartford settlement of
24  $650 million did not include chartered organizations receiving
25  a release of liability on abuse claims during which time the

1  BSA had the Hartford policies; isn't that correct?

2  A    Ms. Wolff, without looking at the documents, sitting

3  here today, I can't recall exactly that the documents said,

4  but I'm happy to take a look at it if you want to show me.

5            THE COURT:  Ms. Wolff, you're muted.

6            MS. LUJAN WOLFF:  Thank you.

7  BY MS. LUJAN WOLFF:

8  Q    Just to be clear, sir, the BSA toggle plan, that had no

9  third-party releases for local councils or chartered

10  organizations, correct?

11 A    The BSA toggle you would not have contemplated the

12 releases as you described, correct.

13 Q    Thank you.

14       And the toggle plan, also, did not include releases for

15 insurers, correct?

16 A    That is generally correct, because under the toggle

17 scenario, which was a suboptimal plan for the reasons I

18 advised earlier, it would basically have been allowing for the

19 national organization to extricate itself and potentially

20 assign all of our rights to (audio interference) to a trust.

21 Q    The BSA toggle plan also included no channeling

22 injunction, channeling claims against nondebtors to a BSA

23 Settlement Trust, correct?

24 A    If you're reading from the document, I will take your

25 representation as accurate, yes, ma'am.

1  Q    And the NEC exercised its reasonable business judgment

2  in approving this BSA toggle plan, correct?

3  A    The NEC did have robust conversations about the options

4  available to us and, obviously, a global resolution was the

5  preferred option, which is what's before the Court and the

6  parties today and that is why we never exercised the

7  (indiscernible) filing of pivoting to a BSA-only or a toggle

8  plan, given the ability of the parties to build a significant

9  pathway to achieve the two objectives that I previously

10 described.

11 Q    And what you're saying just know is that the BSA has

12 never filed only a BSA plan; in other words, it's only

13 included the -- it has a -- the BSA-only discharge as a toggle

14 plan alternative; is that correct?

15        MR. ANDOLINA:  Objection; vague.

16        THE COURT:  Can you rephrase?

17        MS. LUJAN WOLFF:  I'll strike it and I don't think

18 it -- I'll move on.  Thank you.

19 BY MS. LUJAN WOLFF:

20 Q    Sir, may I ask you about the third-modified, fifth

21 amended plan, which is the current plan.

22      Now, this plan includes a Hartford settlement agreement

23 with BSA, correct?

24 A    Yes, ma'am.

25 Q    And in your declaration, you stated that the BSA

1  exercised its business judgment in approving the final

2  versions of this Hartford agreement on September 14, 2021,

3  correct?

4  A     Yes, ma'am.

5  Q     In deciding whether to approve the Hartford agreement,

6  did the BSA consider for each BSA insurance policy year, the

7  number of survivors who were first sexually abused during that

8  year?

9  A     The Bankruptcy Task Force, MORP (phonetic), and the NEC

10  received presentations from our insurance counsel, along with

11  Bates White relative to the numbers of claims that fell within

12  certain policy years and for certain types of policies.  And

13  so, as a whole, we were able to generally ascertain where

14  claims were and the potential values associated with those

15  claims, given our historical data that was, of course,

16  available to us internally, as well as the types of abuse

17  associated with the claim.

18         And entering into each of the insurance settlements and

19  also as administered in the TCJC settlement documents and the

20  presentation that I believe Mr. Hallowell and Mr. Andolina

21  showed me earlier, the NEC and the Bankruptcy Task Force did

22  consider -- did consider the number of claims relative to the

23  availability of insurance coverage and by which carrier.

24  Q     Sir, have you ever heard of a first-encounter agreement?

25  A     I'm sorry, the what?

1  Q    Have you ever heard of the first-encounter agreement?

2  A    I don't believe so, ma'am.

3  Q    Okay.  Did the BSA consider in deciding whether to

4  approve the Hartford agreement, did the BSA consider for each

5  Hartford policy year, the number of survivors who were abused

6  during that year, but who were first abused during a prior

7  year?

8       Do you understand what I'm asking?

9  A    Not really, no.

10  Q    Let's say that there was an abuse survivor who was

11  abused in 1970.  The first abuse was in 1970 and then the same

12  survivor was abused, again, in 1971 and in 1971, we have a

13  Hartford primary policy.

14      So, my question is, in that scenario, was the BSA

15  considering that survivor's abuse, 1971, which was the second

16  year of abuse and I'm asking about that, because I mean that's

17  the Hartford year.  It's not 1970; it begins in 1971.

18      And so, in that scenario, where an abuse survivor was

19  abused earlier, was the BSA considering that person's claim of

20  abuse in 1970, even though it's a second-year abuse?

21          MR. ANDOLINA:  Objection, just to the specificity

22  of the entire line.  Mr. Desai has testified repeatedly in

23  terms of the types of information and has shared with the

24  Court the types of information that the NEC, BTF reviewed in

25  exercise its business judgment.  He's answered many of these

1  specific questions from Ms. Wolff, but I would ask, Your

2  Honor, if we can consider moving on from some of these very

3  specific questions.

4           THE COURT:  I will let you ask this one and we'll

5  see if he can answer it, but we don't need continued, the same

6  specificity.

7           THE WITNESS:  Ms. Wolff, what I will tell you is

8  that the BTF and the NEC, through the various presentations

9  made by our advisors, provided us with information relative to

10  the number of claims, types of claims, where those claims fell

11  within the policy years, whether there was any overlap of the

12  claims with either multiple carriers or repeated exposure to a

13  single perpetrator or multiple perpetrator over a course of

14  time.

15           And while we did not sit there and do an insurance

16  analysis as an NEC or Bankruptcy Task Force, I would suggest

17  that that would probably be left to folks that are far more

18  intelligent than I, in terms of the nuances of the insurance

19  policies and allow for the settlement trusts to adjudicate

20  those claims that have not only an initial starting date for

21  the initial abuse and then the repeated abuse over periods of

22  time for that particular claim to be compensated fairly within

23  the confines of the policies and the available resources in

24  the trust.

25  BY MS. LUJAN WOLFF:

1  Q     In considering whether to approve the final version of

2  the Hartford agreement, did BSA consider Hartford's liability

3  exposure in policies bought by local councils that are not BSA

4  insurance policies?

5  A     Yes.  There was significant discussion and interplay

6  between the national organization, Boy Scouts of America, the

7  debtor, along with representatives of the ad hoc council.

8  When working on entering into the second Hartford settlement,

9  which as I think everyone knows, allowed for an increase of

10 over $150 million going into the settlement trust, plus the

11 participation by the Coalition, the future claimants

12 representative, and the Ad Hoc Group of Local Councils, and

13 the BSA.  And so, there had to be consensus among the local

14 councils that had policies with the Hartford and the BSA in

15 order to structure that second and "finally entered into"

16 settlement agreement with Hartford in order for it to move

17 forward.

18 Q     Did the BSA consider Hartford's liability exposure in

19 policies bought by chartered organizations are not BSA

20 insurance policies?

21             MR. ANDOLINA:  Objection to form; vague.

22             THE COURT:  Overruled.

23             THE WITNESS:  I will tell you, generally speaking,

24 because the agreements contemplated protecting chartered

25 organizations and the commitment to get chartered

1  organizations to support the settlement agreements that have

2  eventually been entered into, there was some conversation

3  about how the Hartford deal would implicate any policies of

4  insurance that were purchased independent of the Boy Scouts of

5  America by a chartered organization.

6           And our understanding of the plan and the

7  settlement agreement is that the Hartford agreement does not

8  strip away chartered organizations of their own individually

9  purchased insurance policies, but that we are simply resolving

10 any Scouting-related abuse claims that the Hartford

11 organization would have covered under our policies and

12 potentially, through the local council, bought policies that

13 you would inure to the benefit of that particular council, for

14 Scouting-related abuse liability.

15 BY MS. LUJAN WOLFF:

16 Q     Did the NEC receive a presentation regarding the value

17 of Hartford policies bought by chartered organizations?

18 A     Don't believe that we received that specific level of

19 detail relative to non-BSA related policies through the

20 Hartford, so no.

21 Q     And the same is also true regarding local council-

22 bought Hartford policies, right?

23 A     I'd pause a little bit to answer that question, because

24 I recall that our insurance advisors had retained the services

25 of insurance archaeologists, which I didn't even know existed

1  until this process, to research all available insurance

2  coverages available not just to the BSA, but also to every

3  local council.  And so doing that exercise, I seem to recall

4  that Mr. Martin and/or Mr. Azer would have provided us with

5  some findings about the values of any non-BSA purchased

6  insurance but purchased by local councils and during what

7  policy periods they may have fallen and who provided that

8  coverage.

9  Q    When the NEC was deciding whether to approve the

10 Hartford agreement, did the NEC consider whether the local

11 council-bought Hartford policies were part of this bankruptcy

12 estate?

13         MR. ANDOLINA:  Objection -- no, you can answer if

14 you can.  Go ahead.

15         THE WITNESS:  Recognizing that the only entity that

16 is the debtor here, which is the Boy Scouts of America, any

17 policies that would have been purchased by a local council

18 would be the property of that particular council.

19      And so, in working through the Hartford settlement that

20 has the consensus of local council, ad hoc group, the future

21 claimants representative, and the Coalition, there have been

22 more discussions about how a local council- purchased policy

23 through the Hartford could be surrendered, what that would

24 mean, what kind of value that would bring to an overall

25 Hartford deal, as it related to Scouting-related abuse claims.

1              And I'm being very specific there because local

2  councils may have purchased insurance separate and apart from

3  that provided by the BSA that would cover a whole host of

4  other things, such as trip-and-fall premised liabilities, et

5  cetera, that have nothing to do with abuse liability, and so I

6  draw that distinction to say that any abuse-related liability

7  policies would, more likely than not, have been part of the

8  discussions and negotiations with the Hartford to allow for

9  the Hartford to have complete peace and resolution of the

10 historical abuse liability.

11 BY MS. LUJAN WOLFF:

12 Q     Did the NEC consider whether the chartered

13 organization-bought Hartford policies were part of this

14 bankruptcy estate?

15          MR. ANDOLINA:  Objection; asked and answered.

16          MS. LUJAN WOLFF:  I asked about the local council

17 policies, now I'm asking about the chartered organization-

18 bought policies.

19          THE COURT:  Yes, that's what I heard.

20          Overruled.

21          THE WITNESS:  Ms. Wolff, I would probably go back

22 to my other answer regarding policies, in general, about the

23 chartered orgs.  While we knew the chartered organizations had

24 policies in place, some of them did, I should say, we

25 understood that our bankruptcy process would not implicate

1  those independently purchased chartered organization policies

2  for any Scouting-related abuse claims.

3          And so, to the extent that a chartered organization

4  had been named or identified in a proof of claim with not only

5  a Scouting-related abuse matter, but also an ongoing abuse

6  matter involving, for example, an employee of that chartered

7  organization that went beyond a Scouting event.  Our

8  bankruptcy plan and the settlements we effectuated did not

9  contemplate where we'd be providing a release for a chartered

10  organization for their independent liability in those specific

11  situations, absent that chartered organization contributing

12  dollars to a settlement trust, for example, TCJC and the

13  Methodists, who have made cash contributions, to absolve

14  themselves of all historical liability and receive the benefit

15  of a full release and the channeling injunction.

16  BY MS. LUJAN WOLFF:

17  Q    Do you know what it means for property to be a part of

18  the bankruptcy estate, do you know what that means?

19          MR. ANDOLINA:  Objection; calls for a legal

20  conclusion.

21          THE COURT:  Sustained.

22  BY MS. LUJAN WOLFF:

23  Q    Sir, have you ever heard of a 2011 settlement agreement

24  between the BSA and Hartford regarding 1976 and 1977 policies?

25  A    I'm quiet, Ms. Wolff, because I'm thinking.  Sorry.

1       The only -- specifically, no, but it may have come up in

2   a conversation with the BTF over the course of the last two or

3   two and a half years, but I don't recall seeing it or the

4   specifics of it.

5   Q     Did the NEC consider --

6              UNIDENTIFIED:  (Indiscernible.)

7              MS. LUJAN WOLFF:  I'm sorry, someone's not muted.

8   Thank you.

9   BY MS. LUJAN WOLFF:

10  Q     Did the NEC consider the possibility that the BSA had no

11  rights to coverage for abuse claims for years 1976 and 1977?

12             MR. ANDOLINA:  Same objection with respect to the

13  specificity of issues now on specific years for specific

14  carriers.  I appreciate the Court's flexibility, but I feel

15  like we're treading into the same (indiscernible) around here.

16             MS. LUJAN WOLFF:  Mr. Desai testified as to what

17  NEC considered prior to approving settlements.  He testified

18  in his declaration and in person about the business judgment

19  of the NEC in approving these settlements, and so this

20  question is really going to, was this a consideration?  Was

21  this brought before the NEC when it approved the settlement?

22             THE COURT:  Overruled.

23             You can answer.

24             THE WITNESS:  Ms. Wolff, can you please re-ask the

25  question?

1  BY MS. LUJAN WOLFF:

2  Q     Did the -- I'll ask it a different way -- did the NEC

3  receive a presentation about the 1976 and 1977 Hartford

4  primary policies being released by the BSA?

5  A     Yes, I recall, again, that there was significant

6  discussion relative to Hartford for a period of time because,

7  in my mind, I kind of break it up pre-RSA and post-RSA, given

8  that there were two versions of the Hartford agreement.  So,

9  we did discuss the years in which the Hartford afforded

10 coverage.  We discussed at some level, a potential gap in

11 coverage and how that was being addressed, so yes.

12 Q     And so, the NEC discussed that the BSA had a gap in

13 coverage for 1976 and 1977 Hartford policies; is that correct?

14 A     My word "gap," but yes, we did discuss that time frame

15 relative to the Hartford.  And, Ms. Wolff, if I may beg your,

16 as well as the Judge's, indulgence on a personal break for

17 five minutes, I would really appreciate it.

18         THE COURT:  Yes.  We will be in recess for five

19 minutes.

20         THE WITNESS:  Thank you, Your Honor.

21         MS. LUJAN WOLFF:  Thank you.

22     (Recess taken at 5:08 p.m.)

23     (Proceedings commenced at 5:14 p.m.)

24         THE COURT:  This is Judge Silverstein.  We can go

25 back on the record.

1          MALE VOICE:  Thank you, Your Honor.  We're back.

2          THE COURT:  Thank you.  Ms. Wolff?

3          MS. WOLFF:  Thank you.  Thank you.

4     Q.   Sir, did the NEC consider -- in deciding whether to

5  approve the Hartford Agreement, did the NEC consider the value

6  of chartered organizations' interests in BSA insurance

7  policies bought by -- bought from Hartford?

8     A.   So to answer that question, I would say that

9  depending on the year that the organization would have

10 provided coverage to a chartered organization by way of a

11 status as an additional insured, the NEC through counsel

12 considered how chartered organizations would be treated under

13 the Hartford Settlement Agreement and how we would be able to

14 protect them for any staffing-related abuse claim.

15    Q.   Did the BSA consider that some chartered

16 organizations are Debtors in their own bankruptcy cases?

17    A.   Yes.

18    Q.   Did the BSA consider that a sale of Hartford

19 policies free and clear of Debtor chartered organizations'

20 interests might violate the automatic stay issued in

21 connection with the Debtor chartered organization's own

22 bankruptcy case?

23    A.   You're -- well, that -- that, to me, probably

24 involves subject matters and expertise in areas that I don't

25 believe the NEC is qualified to delve into.  But we would have

1  relied upon our advisors to ensure that whatever settlement

2  agreements we were entering into were not violative of any

3  laws or rules and regulations and that we would be in a

4  position to protect our Creditors, which, of course, include

5  survivors, as well as our partner organizations and -- and

6  local councils to the extent that they fall within the

7  coverages of the policies at issue

8  and -- and the period of time.

9      Q.   Now, I'd like to direct your attention to the

10 Hartford Term Sheet that was approved by BSA on September 14,

11 2021, and that is JTX1-002.  I believe that is -- that was

12 provided as -- as part of the Debtor's binder, so I believe it

13 should be in the Debtor's binder.

14     A.   Okay.  If you would give me one second.

15          MR. ANDOLINA:  Ms. -- Ms. Wolff, when you refer to

16 the Debtor's binder, is -- is this -- are you referring to the

17 trial exhibits in connection with Mr. Desai's declaration?

18 We're -- we're having to look for it.  Is that what you're

19 referring to?

20          MS. WOLFF:  It -- well, we didn't receive a hard

21 copy of the binder, so I'm assuming -- I mean, this was an --

22 this was part of the -- Desai exhibits that were circulated

23 among the participating parties.

24          MR. ANDOLINA:  Okay.  And, you know, we did -- we

25 did send that electronically.  (Inaudible) Hartford Term

 1 | Sheet?

 2 | MALE VOICE:  Are -- are you asking about the Term

 3 | Sheet, Ms. Wolff?

 4 | MALE VOICE:  (Inaudible).

 5 | THE COURT:  I think it's --

 6 | MALE VOICE:  You're on mute.

 7 | THE COURT:  Maybe (inaudible) --

 8 | MS. WOLFF:  Yes, I'll -- I'll share my screen.

 9 | MR. DESAI:  I have Exhibit F in front of me, which

10 | is the Hartford (Inaudible) Term Sheet filed with the Court on

11 | 9/14/21.

12 | MS. WOLFF:  Yes.  I'm sorry.  I'll -- I'll try to

13 | share my screen.

14 | Q.   And so you see that this is Exhibit A, Hartford

15 | Term Sheet, and this is -- it was filed with the Court

16 | September 14, 2021, Docket 6210-1, and this is marked by

17 | Debtors as JTX1-02.

18 | A.   Yes.

19 | Q.   So you're familiar with this term sheet, sir?

20 | A.   Yes, ma'am.

21 | Q.   Okay.  So I'm just going to scroll down to Page 3

22 | of the document.  And I'm looking at release of Hartford.  You

23 | see that paragraph?

24 | A.   Yes.

25 | Q.   And so it says here, upon the release date, the

1  Debtors reorganized BSA -- and I'm sorry, just before I read

2  it, this is -- this is the final version of the Hartford

3  agreement that -- that the NEC approved, correct?

4       A.   This is the final version of the term sheet that

5  the NEC approved.

6       Q.   And so the terms of -- okay.  And this is the last

7  time that the NEC approved terms of a Hartford settlement

8  agreement, correct, September 14, 2021?

9       A.   I know that on September 14, 2021, we approved the

10 term sheet.  I believe there may have been a separate

11 document, namely a resolution, that would have approved the

12 settlement agreement, which would have incorporated the terms

13 as spelled out in term sheet.

14      Q.   Okay.  Now, we looked earlier at the demonstrative

15 exhibit that was provided by Debtors, and I'm talking about

16 the list of exhibits, and it showed the dates that the NEC

17 approved the settlement, the different dates, right?  And

18 isn't it correct that the -- the most recent date -- the final

19 date that the NEC approved a Hartford settlement was September

20 14, 2021?

21      A.   Yes, ma'am.

22      Q.   Okay.  And so looking at this term sheet approved

23 on September 14, 2021, and I'm going to read this paragraph,

24 Number 7, release of Hartford.  I'm not going to read all of

25 it, just a portion, okay?  Upon the --

1      A.    Okay.

2      Q.    Thank you.  "Upon the release date, the Debtors'

3  reorganized BSA-related non-Debtor entities, local councils,

4  other protected parties, limited protected parties, settling

5  insurance companies, the FCR, the coalition and the trust, the

6  releasing parties shall release Hartford from all causes of

7  action and claims relating to, one, abuse insurance policies;

8  two, the Debtor's bankruptcy proceeding; three, the Debtor's

9  amended plan; four, the prior Hartford settlement agreement;

10 five, the 2010 BSA Hartford settlement agreement; six, the

11 2011 BSA Hartford settlement agreement; seven, A, abuse claims

12 against the protected parties, and, B, post-1975 chartered

13 organization abuse claims against the limited protected

14 parties; and/or eight, any claims asserted by Hartford against

15 the Debtors or any of the releasing parties or by the Debtors

16 or any of the releasing parties against Hartford in the

17 Debtor's Chapter 11 cases."

18          So before going on to -- I mean, just focusing on

19 this first part of the sentence: the -- the insurance policies

20 that are referenced here that are being -- that -- that

21 Hartford is being released of, isn't it correct that those

22 insurance policies are what's referred to as the abuse

23 insurance policies that I have highlighted here?

24          MR. ANDOLINA:  Objection.  Calls for legal

25 conclusion.

1          THE COURT:  I think it just calls for reading, but

2    --

3          Q.    So you see, sir -- you understand here that -- I

4    mean, this -- it says, the only reference to insurance

5    policies here one through eight is number one, abuse insurance

6    policies.  Is that your understanding?

7          A.    It -- the number in the document indicates abuse

8    insurance policies, yes.

9          Q.    Okay.  And so is it correct that -- that this is a

10   term -- this insurance policy that is defined in the plan?

11         A.    I would need to look at the plan, but I believe

12   that that may be a defined term, yes.

13         Q.    Okay.  So I'm just -- I'll show you the plan, the

14   Third Modified Fifth Amended Plan, and we'll see if it defines

15   abuse insurance policies.

16         MR. ANDOLINA:  I'm just going to object to this

17   line to the extent that Ms. Wolff is asking questions about a

18   term sheet from September and then the current version of the

19   plan, which incorporates the final Hartford settlement

20   agreement from February 14th.  So I just don't want the

21   witness to be misled.

22         MS. WOLFF:  Okay.  Well, I can pull up the plan

23   that was filed by Debtors after September 14.  I believe that

24   that would have been the Solicitation version of the plan, the

25   Modified Fifth Amended Plan.  I can pull that up, if I just

1  have a minute.

2           THE COURT:  Well, what's your question going to be?

3           MS. WOLFF:  We're -- Your Honor, we're -- I would

4  like to show the witness the definition of abuse insurance

5  policies.

6           THE COURT:  Okay.

7           MS. WOLFF:  And to be clear about what policies are

8  being -- Hartford was being released as part of this final

9  version of the Hartford agreement approved by the NEC.

10          MR. ANDOLINA:  Just to be clear, are you pulling

11 the current plan, or is that -- is that what you intend to

12 show the witness?

13          MS. WOLFF:  No, I'm going to show -- just so -- to

14 be clear so that no one is being misled, we'll take a look at

15 the Modified Fifth Amended Plan to be -- which -- which would

16 have been filed around that time.

17          MR. ANDOLINA:  Your Honor, I'm just going to object

18 to --

19          THE COURT:  Yeah.  I'm not sure, Ms. Wolff, where

20 we're going here because we're on the Third Modified Fifth

21 Amended Plan.  So if we're talking -- if you have questions

22 about a previous plan, maybe they could be relevant, but I'm

23 not sure what your -- where you're going with it to know

24 whether it could be relevant.

25          MS. WOLFF:  Yes, Your Honor.  Where I'm going, Your

1  Honor, is that Mr. Desai's testimony and the exhibits

2  introduced and, I believe, admitted by Debtors shows that they

3  -- that the NEC had a final -- had approved the final version,

4  in their own words, of a Hartford plan on September 14, 2021,

5  and JTX1-002 shows what the terms of that plan are.  And that

6  -- that is also the plan that calls for Hartford to pay $787

7  million.  And so what -- what I'm looking to, Your Honor, is

8  what was -- what did that $787 million buy at that time and

9  versus what are -- what is Hartford receiving now for that

10  same 787 million?

11            THE COURT:  Okay.

12            MR. ANDOLINA:  And, Your Honor, I appreciate the

13  pathway that's been explained.  From our perspective, this is

14  all legal argument.  Of course, Mr. Desai will be here to

15  answer any question, but this -- this seems to be something

16  that would -- would appear in a brief and would be an argument

17  in terms of confirmation.  But obviously, the Court will

18  decide the questions that Mr. Desai should answer.

19            THE COURT:  Why isn't this just legal argument,

20  based on the documents?

21            MS. WOLFF:  Your Honor, I just want to be clear

22  with Mr. Desai that these were the terms that the NEC finally

23  approved and that there -- there was no further approval of

24  these -- of any revised agreement.

25            MR. ANDOLINA:  Your Honor --

1           MS. WOLFF:  And -- and that's going --

2           MR. ANDOLINA:  -- he's testified to all the

3  approvals.  He's testified to the approvals of the December --

4  September 14th Hartford Agreement and the subsequent approval

5  of the Hartford Settlement Agreement that was incorporated

6  into the plan, those documents, and the -- the very clear

7  narrative of the governance of BSA in terms of what was

8  considered and what was approved has been, frankly, testified

9  to ad nauseum.  So I just don't understand why the record that

10  has been established isn't sufficient for Ms. Wolff at this

11  point.

12           MS. WOLFF:  Your Honor, I -- this is a short line

13  of questioning.  I'm -- I'm able to show him the document.

14  This reaches the solicitation version of the plan filed

15  September 30, just 16 days after the term -- the Hartford term

16  sheet that was finally approved by the NEC.

17           THE COURT:  Okay, if you want to show it to him,

18  you can show it to him.

19           MS. WOLFF:  Thank you.  I'm going to share my

20  screen.

21      Q.   Okay.  Now, sir, you see here, it says Document

22  6443.  It was filed September 30, 2021.  And I can scroll up

23  so that you can be sure of what you're seeing.  But it says

24  here, Modified Fifth Amended Chapter 11 Plan of

25  Reorganization.  Do you recognize this document?

1          A.    I do, not because I can see it clearly, but from

2   what you're saying.  If you -- you kind of have to enlarge it

3   so I can actually read it.  That would be great.  Thank you.

4   And, yes, ma'am, you are correct.

5          Q.    Sorry, is that better?

6          A.    Yes, ma'am, it is.  Thank you.

7          Q.    Okay.  Just let me know, please, if -- if you need

8   me to enlarge it or reduce the size.  Thank you.

9          A.    (Inaudible).

10         Q.    Okay.  So I'm just going to scroll down to Page --

11  to -- I believe it's Page 12.  Okay.  You see here, sir, where

12  it says on Paragraph 20, Abuse Insurance Policies?

13         A.    Yes, ma'am.

14         Q.    Would this -- and let's see what it says here.

15  Abuse insurance policies means collectively the BSA insurance

16  policies and the local council insurance policies.  Abuse

17  insurance policies do not include nonabuse insurance policies.

18  Do you see that?

19         A.    Yes, ma'am.

20         Q.    Okay.  And so in the Hartford Term Sheet that was

21  approved on September 14, 2021, and which referenced abuse

22  insurance policies, would this be the term that is being

23  referenced, abuse insurance policies?  Is this -- is this what

24  that refers to?

25         A.    Yes, it does.  It refers to policies that, of

1  course, are issued by the Hartford, solely limited to abuse

2  claims or claims pertaining to abuse that would be covered

3  under those policies and their applicable terms and

4  conditions.

5       Q.   Now, isn't it correct that BSA insurance policies

6  refers to insurance policies that are bought by the BSA?

7       A.   Yes, ma'am.

8       Q.   Okay, and local council insurance policies refers

9  to insurance policies bought by the local councils, correct?

10      A.   Yes, ma'am.

11      Q.   Okay.  And so the Hartford Term Sheet approved by

12 the NEC on September 14, 2021, provided for the release of

13 Hartford of the abuse insurance policies as defined in

14 Paragraph 20, correct?

15      A.   It releases abuse insurance policies as that -- as

16 that term is defined in the plan, that's correct.  But the

17 other caveat I would add to the Hartford Term Sheet is that

18 the rest of that sentence that you read to me indicates that

19 the foregoing release by the limited protected parties of

20 Hartford in Clause 1, which is the abuse insurance policies,

21 only applies to abuse insurance policies that are the subject

22 of participating chartered organization insurance assignments.

23      Q.   Okay.  So -- but isn't it correct that this -- that

24 the -- the settlement -- the Hartford Settlement Term Sheet

25 approved by the NEC did not include a release of Hartford of

1  chartered-organization-bought Hartford policies?

2       A.   Correct.   The -- the Hartford Agreement and all of

3  the agreements that the BSA has endeavored to achieve do not

4  take away rights that a chartered organization would have to

5  any independent policies that they may have purchased, unless,

6  of course -- and this is where you -- you need, I think, a

7  deeper dive in terms of the facts, but unless, of course,

8  there are scenarios where the abuse involves not only a

9  Scouting-related abuse matter, but potentially abuse that

10 continued to occur in a non-Scouting scenario that involved

11 the same actors, and thus, there is a potential that a charter

12 organization's insurance policy could be implicated.   But

13 sitting here today, I can't give you a specific answer on what

14 charter organization insurance policy is or is not implicated.

15 But what I can tell you is that the NEC and BTF did consider

16 how we can protect our chartered partners through the

17 insurance that the Boys Scouts of American and/or local

18 councils would have and how it applied to charter

19 organizations, depending on the period of time that we're

20 discussing.

21      Q.   Okay.   And so you've just confirmed that the --

22 that on September 14, 2021, the final version of the Hartford

23 Agreement did not include a release of Hartford of chartered-

24 organization-bought Hartford policies.   And so given that

25 fact, I'm -- how did the NEC or the BSA exercise reasonable

1  business judgment in approving the Third Modified Fifth

2  Amended Plan, the current plan, which includes a release of

3  Hartford of chartered-organization-bought policies as to

4  Scouting abuse?

5       A.   (Inaudible)

6            MR. ANDOLINA:  (Inaudible) Objection.  Misstates

7  the testimony.

8            THE COURT:  I think that's fair.  I think you

9  recharacterized his testimony.  Sustained.

10      Q.   Sir -- just to be clear, sir, did the -- I want to

11  make sure I'm not -- I'm not trying to trick you or mislead

12  you, and so I -- I want to characterize your testimony; I want

13  to state it in -- in the -- you know, accurately.  And so,

14  please, I need to ask again.  Did the September 14, 2021,

15  Hartford Term Sheet that was approved by the NEC include a

16  release of Hartford of chartered-organization-bought Hartford

17  policies?

18            MR. ANDOLINA:  (Inaudible).

19            MALE VOICE:  (Inaudible), I think that goes back to

20  Mr. Andolina's objection that it calls for legal conclusion.

21  I think we can fight about what's in the Term Sheet.  That's

22  seven pages, single-spaced.  It has other provisions in there,

23  even -- (inaudible) at seven, the release of Hartford rebuts

24  the question.  And I just don't think these -- think these are

25  fair questions to ask of Mr. Desai.  I guess you can ask him

1  if he knows, but ultimately we're all dependent on what the

2  term sheet and the ultimate settlement agreement say.

3         THE COURT:  I am, Ms. Wolff, going to be looking at

4  the -- at the plan and what it calls for, so I think

5  your -- your questions are sort of going beyond fact as to

6  what the NEC considered because of the way they're phrased.

7  I'm going to sustain the objection.

8         Q.   Mr. Desai, did -- can you tell me -- or can you

9  testify as to when the NEC considered whether to enter an

10  agreement that released Hartford of chartered-organization-

11  bought policies for Scouting abuse?

12        A.   Ms. Wolff, I would tell you that we need to look at

13  this in probably two different categories, one, with respect

14  to chartered organizations and -- and how they would be --

15        THE COURT:  Excuse me.  Will people please check

16  their audio?

17        A.   I'll -- I'll start again, Ms. Wolff.  We need to

18  look at this in two categories, and that's how the NEC and the

19  BTF considered this.  Number one -- number one, with respect

20  to policies purchased by the National Boy Scouts of American

21  Organization and policies purchased by the local councils,

22  depending on the timeframe involved, if they had forwarded

23  coverage to a chartered organization for any Scouting-related

24  abuse liability, the settlement with the Hartford contemplates

25  that the BSA and the local council policy that was purchased

1  through the Hartford would provide release for Scouting-
2  related abuse to that chartered organization.

3         Secondly, if there was a policy purchased by the
4  charter organization independent of the BSA or a local council
5  and that policy was implicated as a result of any Scouting-
6  related abuse, the Term Sheet a Paragraph 8 speaks to the fact
7  that the chartered organization treatment under the plan, it
8  says that the Debtors, the coalition, and the FCR and the
9  trust will utilize their best efforts to obtain an assignment
10  from that particular chartered organization to turn over that
11  Hartford policy purchased by that chartered organization as it
12  relates to abuse insurance coverage.  I hope that answers your
13  question.

14        Q.   Sir, I don't think you answered my question.  The
15  question was when did the NEC consider the release of Hartford
16  as to chartered organization-bought Hartford policies?

17        A.   I think, Ms. Wolff, that prior to the entry into
18  this term sheet and the ongoing negotiations with the Hartford
19  -- that the NEC and the bankruptcy taskforce in the meetings
20  that have been identified would have discussed how chartered
21  organizations were going to be treated, and as such, when
22  provided the approval on September 14th, 2021, it was our
23  authorization that our advisors acted under, which is what is
24  been memorialized in this document.

25        Q.   Now, let's turn to the Century term sheet.  There

1   was a Century term sheet presentation.  It's JTX-1104.

2            MR. ANDOLINA:  Would it be possible for you

3   reference the tab or maybe someone on our team can tell us the

4   tab.

5            MALE VOICE:  It's Tab Y.

6            MS. WOLFF:  It's Exhibit Y.

7            MR. ANDOLINA:  Thank you.

8            MR. DESAI:  I have it.

9   BY MS. WOLFF:

10       Q.   Okay.  And I'll try to share my screen.  Do you see

11  that, sir?

12       A.   Yes, ma'am.

13       Q.   Okay.  Thank you.  This is Century term sheet and

14  other updates.  This is a presentation to BSA National

15  Executive Committee on December 12th, 2021, correct?

16       A.   Yes, ma'am.

17       Q.   And I believe that this was already admitted as

18  part of your declaration; is that right?

19       A.   Yes, ma'am.

20       Q.   Thank you.  We could go to Page 4.

21            THE COURT:  Ms. Wolff?

22            MS. WOLFF:  I'm sorry.  Here in Guam, I have the

23  offices now being populated with people here in Guam.  It's

24  almost 8:00 a.m..  I'm sorry.  Let me (inaudible).  I'm sorry.

25            MS. WOLFF:  If I could just have a second, Your

1    Honor.

2              THE COURT:  Yes.

3              MS. WOLFF:  Thank you.  Okay.  I'm sorry.  It was

4    not Page 4, I believe it's Page 3 of the document.

5    BY MS. WOLFF:

6         Q.   If you look to sale of policies, you see in the

7    final version, the third column here, sir?

8         A.   Yes, ma'am.

9         Q.   I just want to be clear before we get to this.

10   This is -- this document, this presentation, it shows the

11   final version of the Century term sheet that was approved by

12   the NEC; is that correct?

13        A.   Yes.

14        Q.   Okay.  And so this final version provides that the

15   sale includes, one, BSA policies and, two, insurance policies

16   issued by the settling insurers to local councils for pre-

17   petition of these claims, which will be assigned to the

18   Debtor's estate to the plan effective date, okay.  And so the

19   NEC approved -- the final version that the NEC approved

20   regarding the Century and Chubb settlement agreement included

21   this sale here that I just read, this -- the BSA policies and

22   insurance policies issued by settled insurers to local

23   councils, correct?

24        A.   Yes, ma'am.

25        Q.   And so in exchange for these two kinds of policies,

1   Century is paying under the plan $800 million; is that

2   correct?

3           A.   Yes.

4           Q.   Isn't it also correct that as part of this

5   agreement -- as part of the current plan, Century is getting a

6   release not just as to basic policies and insurance policies

7   issued by -- issued to local councils, but Century's also

8   getting a release as to insurance policies bought by charted

9   organizations for Scouting abuse, correct?

10              MR. ANDOLINA:  Object to form.

11  BY MS. WOLFF:

12          Q.   Do you understand the question, sir, that you could

13  answer?

14              THE COURT:  Hold on for a minute.

15              MR. ANDOLINA:  Your Honor, I'm just confused about

16  the plan that she's referring to.

17              THE COURT:  The current plan.

18              MR. ANDOLINA:  The timing.  Is it a reference to

19  the current plan?

20              MS. WOLFF:  Let me clarify.

21  BY MS. WOLFF:

22          Q.   So sir, again, looking at the demonstrative showing

23  the NEC's approval of the various settlement agreements that

24  make up the current plan, isn't it correct that the -- that

25  that demonstrative showed that the Century agreement was

1  finally approved by the NEC on December 14, 2021?

2      A.    Yeah, I'm with you so far.

3      Q.    So that's correct, right?  The NEC approved the

4  final version of the Century term sheet on December 14, 2021?

5      A.    Yes, the NEC approved the final term sheet on that

6  date.

7      Q.    Okay.  And the NEC was not called to consider any

8  revised Century agreement agreement after December 14, 2021;

9  is that correct?

10          MR. ANDOLINA:  Objection.  Contrary to prior

11  testimony.

12          THE COURT:  Sustained.

13  BY MS. WOLFF:

14      Q.    Well, sir, without looking to the document, do you

15  recall whether or not the current plan, the Third Amended

16  Modified Fifth -- I'm sorry, the Third Modified Fifth Amended

17  Plan, do you recall if that as the Century Agreement includes

18  a sale of only these two policies, kinds of policies, that are

19  shown here in the presentation?

20          MR. ANDOLINA:  Objection.  I'm sorry, I'll withdraw

21  the objection.  You can answer if you can.

22      A.    Without looking at the plan, Ms. Wolff, you'll

23  recall, I believe, last Wednesday when we chatted that we

24  spoke about the very types of chartered organizations and

25  their treatment under the plan vis a vis the various settling

1  insurers.  And so depending on the classification of the

2  chartered organization, either as a contributing and

3  participating or opt out, there would be certain requirements

4  of that chartered organization to do certain things to obtain

5  a different classification under the plan.

6           However, for this particular term sheet that you're

7  showing me is only contemplating those policies that were

8  purchased by BSA and local councils.  However, under the plan,

9  there are additional categories that one needs to consider in

10 taking all this together as an entire -- in terms of its

11 entirety.

12      Q.    Thank you for your answer, sir.  In deciding

13 whether to approve the Century and Chubb companies' Agreement,

14 did the BSA consider for each BSA insurance policy here the

15 number of survivors who were first sexually abused during that

16 year?

17      A.    Yes, while I can't tell you that the NEC or

18 bankruptcy taskforce at every step of an insurance settlement

19 had a specific conversation about that topic, what I will

20 defer and refer you back to would be the original presentation

21 that was made by our insurance consultants as well as

22 insurance counsel on the number of claims associated with the

23 various policies that the BSA, as well as the local councils,

24 had in place and what those dollar amounts potentially in

25 terms of exposure look like vis a vis each of the varying

1  insurers that afforded coverage to the organization as well as

2  to our local councils.

3      Q.   In deciding whether to approve the Century and

4  Chubb companies' Agreement, did the NEC consider -- I'm sorry

5  -- Century's liability exposure in policies bought by local

6  councils?

7          MR. ANDOLINA:  Objection.  Are we talking about the

8  December agreement or are we talking about the settlement

9  agreement that's embodied in the plan?  Just so we can be

10  clear.

11          MS. WOLFF:  The plan, the current plan, the Third

12  Modified Fifth Amended Plan.

13      A.   I would tell you I'd respond with the same answers

14  I just gave that -- and the other thing I would add, Ms.

15  Wolff, was that the NEC and the bankruptcy taskforce also

16  considered a number of other factors associated with Century,

17  and I believe Mr. Hallowell may have spoken to me about this

18  earlier, but the solvency issues affiliated with Century, the

19  various coverage defenses, and also the ability of the Boy

20  Scouts of America to effectuate a settlement with another

21  insurer and to help minimize the ongoing expenditures to the

22  bankruptcy estate over what I would describe as an inordinate

23  amount of discovery and other issues in dealing with

24  Century/Chubb.

25      Q.   In deciding whether to approve the Century and

1 Chubb companies' Agreement that's part of the current plan,

2 did the NEC consider Century's liability exposure in Century

3 or Chubb company policies bought by chartered organizations?

4     A.   I would probably tell you the same answers I gave

5 you for that question related to the Hartford.  What we looked

6 at and the information we were presented with from our

7 advisors and the insurance professionals pertain to the

8 overall estimated liability for historical abuse that

9 Century/Chubb would have based upon all the proofs of claims

10 that were filed and given the periods of time in which

11 Century/Chubb afforded coverage for related abuse claims.

12     Q.   Now, you testified earlier about -- that the NEC

13 was aware of chartered organizations who are debtors in their

14 own bankruptcy case, correct?

15     A.   Yes, ma'am.

16     Q.   Do you recall the NEC being requested to approve a

17 change in the treatment of Debtor chartered organizations?

18     A.   I know that the plan as currently filed and before

19 the Court contemplates chartered organizations that are

20 involved in their bankruptcies.

21     Q.   Are you aware that the plan treats Debtor-chartered

22 organizations as opt-out chartered organizations?

23     A.   I would have to defer to the plan and the language

24 of that particular section, Ms. Wolff, and I'm happy to do

25 that, if you'd like.

1        Q.    And I'm sorry, I don't believe I had an answer to

2    my earlier question, but did the NEC -- was the NEC

3    specifically asked to approve a change in the treatment of

4    Debtor-chartered organizations?

5        A.    That very specific request, I don't recall that as

6    a specific request or line item on an agenda.  However, in

7    approving various versions of the plans that have been filed

8    along this journey, I do know that there has been an evolution

9    of things -- treatment of chartered organizations, whether

10   they are contributing, participating, opt-outs, or bankrupt,

11   all of those are very specific-defined terms in the plan

12   that's before the Court today.

13       Q.    Now, earlier, Mr. Andolina, and then later, Mr.

14   Hallowell, asked you about a PowerPoint that you took the lead

15   in drafting regarding the Philmont retreat.  Do you recall

16   that, sir?

17       A.    Yes.

18       Q.    The PowerPoint?

19       A.    Yes.

20       Q.    And in the PowerPoint that you took the lead in

21   drafting, it says that BSA recognized as a brutal fact that

22   local council relationships are frayed and that some councils

23   are pushing to build better (inaudible); do you remember that?

24            MR. ANDOLINA:  Your Honor, I'm just going to object

25   to this line.  One of the things we requested of the cross-

1  examining party is coordination, and I appreciate Ms. Wolff

2  spent very significant time diving into the issues regarding

3  the insurance settlements.  I don't know what hour we're on

4  for cross-examination, but these topics have been covered

5  thoroughly.  I would ask the Court's assistance in helping us

6  move forward.

7         THE COURT:  Is there something new about this?

8         MS. WOLFF:  Yes, I just have a question about the

9  transparency, Your Honor.  Just one question as to that, and

10 then, I have a couple questions or a few more questions

11 regarding that PowerPoint presentation.  But as to that, the

12 local councils and transparency, I just have one question.

13        THE COURT:  Okay.  Let's get to that question.

14 BY MS. WOLFF:

15    Q.   Sir, did BSA recognize that local councils could

16 build better trust and transparency for survivors of abuse by

17 filing for bankruptcy themselves and meeting the transparency

18 requirements of the bankruptcy code?

19        MR. ANDOLINA:  Objection, vague.

20        THE COURT:  If you can answer it, you can answer

21 it.

22    A.   Ms. Wolff, I just need a clarification from you.

23 Are you asking me if the NEC considered whether local councils

24 would file bankruptcies, and in so doing, allow information

25 about financials and other things to be shared through the

1    discovery process?  Is that what you're asking me?

2        Q.    What I'm asking, sir, is about the transparency

3    that's discussed in the PowerPoint.  It says here some

4    councils are pushing to build better trust and transparency.

5    And so what I'm asking you is did the BSA consider or did the

6    BSA recognize that that transparency could be achieved by

7    local councils filing for bankruptcy themselves and meeting

8    the transparency requirements of the bankruptcy code in order

9    to get a release of abuse claims.

10       A.    So I think you're misstating the slide deck for the

11   NEC's Philmont retreat and what that statement refers to, and

12   so I'll clarify it.  The suggestion in the draft presentation

13   pertaining to local councils requesting more transparency and

14   reforms in governance pertain to the relationship between the

15   national organization and the local council in terms of how

16   the national counsel communicates with the local council, how

17   members of the national executive board are selected, how the

18   nominations committee of the national organization works, what

19   type of application and solicitation for candidates exists

20   among the organization to identify prospective board members,

21   how local councils could have more of a say in matters related

22   to the national council expending resources or at times, the

23   national council potentially assessing an increase in,

24   hypothetically, our member fee or asking for potentially

25   reimbursement in expenditures utilized for the benefit of the

1  entire movement.

2          So those all are the types of things that the local

3  councils  -- and I use that as a very generic term because it

4  wasn't every single local council, but a handful of them.

5  We're asking for more transparency in the manner in which the

6  national organization was being governed, the business that

7  the national organization was embarking on, the decision-

8  making process of the board, as well as the NEC and the

9  management of the organization.

10          And through this process of the restructuring

11  process, I mentioned previously that the Boy Scouts of

12  America, as one of its standing committees, has a nominations

13  and governance committee, which is chaired by our past chair,

14  Jim Turley.  Mr. Turley, as part of this journey, led a

15  taskforce that included representatives of many local councils

16  who were advocating for more change and transparency in how

17  the organization is structured, how decisions are made, and

18  you may see references to that in certain board meeting

19  minutes that were part of my declaration.  And so in working

20  through those challenges, we have continued our efforts to

21  become better partners with our partners on the local level,

22  i.e., the local councils.

23          Q.   Thank you, sir, for clarifying what it meant in the

24  PowerPoint, but let me ask, did the BSA, during this

25  bankruptcy case, ever consider that local councils could build

1  better trust and transparency for survivors of abuse by filing

2  for bankruptcy themselves and meeting the transparency

3  requirements of the bankruptcy code?

4         MR. ANDOLINA:  Objection.  Asked and answered.

5         THE COURT:  Sustained.

6  BY MS. WOLFF:

7    Q.    Sir, in that same PowerPoint, BSA recognized as a

8  brutal fact that chartering organization relationships are

9  frayed and that the current model faces uncertainty and

10  bankruptcy, need to explore new models, options.  Do you

11  remember that, sir?

12   A.    Yes, ma'am.

13   Q.    The new models options includes creating a Scouting

14  experience for single Scouts not dependent on a unit or

15  chartering organization, correct?

16   A.    I would say that that is one of many options that

17  are available in the manner in which Scouting is delivered.

18  Given the last two years that our world has been rocked by the

19  pandemic, folks are generally reluctant to be around others in

20  large settings.  And so the traditional model of Scouting had

21  to be reexamined, which also required us to relook at how

22  people and facilities or chartered organizations are all

23  working together.

24         And this goes back to probably my example earlier

25  in the day about this tripartite relationship between local

1  councils, chartered orgs, and the national organization and

2  the interconnectivity between all the three.  So that example

3  of a future model is there on the table, potentially.

4          Another example, and this came about through the

5  conversation with the Methodist organization, changing our

6  chartering agreements to potentially facilities-use agreements

7  only.  That would look a little different, so there are a lot

8  of options out there, and certainly many that we haven't fully

9  vetted yet, but certainly are in the process of doing that as

10 an organization.

11     Q.   So isn't it fair to say that one of the strategies

12 of the BSA is to deliver the mission of Scouting with less

13 reliance on a chartered organization?

14     A.   I would say that we certainly value our

15 relationships with our chartered organizations.  And so our

16 preference would be to certainly have them involved as

17 supporters and partners of the mission of Scouting because

18 it's good for everyone.  But in the instances where either a

19 chartered organization is not willing to participate or

20 partner with the organization, we as an organization have to

21 be creative in looking at other alternatives so that our young

22 people have a facility or a place to meet and call home to

23 deliver Scouting.

24     Q.   Sir, at the time -- well, the NEC approved this

25 PowerPoint on January 20, 2022, correct?

1      A.    Yes, ma'am.

2      Q.    And the NEC approved the PowerPoint as a realistic

3  assessment of the present condition of Scouting and the goals

4  of the BSA; is that correct?

5      A.    I think what the NEC approved was a preliminary

6  output/summary of our retreat that Philmont Scout Ranch

7  (inaudible).  What the NEC approved was a summary of the

8  output from the NEC retreat held at Philmont Scout Ranch.

9      Q.    And in the -- and one of the brutal facts

10  recognized by the BSA was that when you view all the councils

11  and the national service center on a combined basis, we have

12  far too many camps, correct?

13          MR. ANDOLINA:  We just object to the continued line

14  of questioning on this document and its relevance to the

15  objections raised by Ms. Lujan-Wolff.  We're now going on, I

16  think, hour 3, so continuing objection to this line.

17          THE COURT:  Ms. Wolff?

18          MS. WOLFF:  And Your Honor, I have maybe two

19  questions left, and then, I think that -- I believe I'm done,

20  but it really just goes to --

21          THE COURT:  I'm going to let you ask the questions.

22  I'm going to let you ask these questions.  The Debtors

23  introduced these documents.  Go ahead.

24          MS. WOLFF:  Thank you.

25  BY MS. WOLFF:

1      Q.   And so, sir, I'm going to re-ask it because I don't

2   believe I heard an answer.  In the PowerPoint, the BSA

3   recognized as a brutal fact that when you view all councils

4   and the national service council, on a combined basis, we have

5   far too many camps; that's correct, right?

6      A.   So I would answer that by saying as part of this

7   restructuring process through the various parties, whether

8   it's TCC or other individuals, the ad hoc group of local

9   councils, assessments were done to figure out what is owned by

10  a local council, what properties exist for the benefit of

11  potential contributions to the settlement trust.  I can't sit

12  here and -- and speak to the valuations of any of those

13  properties or how they're held in terms of ownership and other

14  issues, but what I can tell you is that overall, there are

15  certainly properties and things that local councils may have

16  that may not be utilized fully because either the local

17  council is not in a position to keep up with necessary

18  maintenance obligations, the property may or may not have

19  environmentally related issues, but the organization -- but

20  the council may still rights to it for a variety of reasons.

21  So there's a lot of factors in that statement, but at -- at

22  the end of it, yes, the local councils do own camps.  The

23  national organization operates four (inaudible) bases that are

24  very different than the local Scout camps that are owned and

25  operated and managed by local councils --

1      Q.   I'm sorry, someone -- thank you.

2      A.   -- this -- this -- and -- and so through this

3  restructuring process, really we have a, you know, a good

4  handle on what the national council has vis-a-vis what local

5  councils have.  And I would certainly defer to Mr. Mason and

6  his team on ownership, liability, et cetera of any of the

7  local council properties.

8      Q.   And -- and sir, the PowerPoint identifies the

9  strategy of BSA to streamline and simplify by encouraging

10 streamlining of local councils to create a sustainable cost

11 structures and vibrant financials -- financially stable

12 councils, correct?

13         MR. ANDOLINA:  Can you just identify the page that

14 you're referring to there, Ms. --

15         MS. WOLFF:  Yes -- yes, mister -- yes, Mr.

16 Andolina.  Page 12.

17     Q.   The streamline and simplify.

18     A.   Yes, I do see that.

19     Q.   Okay.  And so this streamlining includes resolving

20 the problem of local councils having too many camps?

21     A.   That is one consideration, that would be correct,

22 in addition to the ability of both the national organization

23 and the local council to participate in figuring out what

24 services a local council requires of the national organization

25 and vice versa, such that we can eliminate excess services

1  that are not being fully utilized or a local council doesn't

2  really need.

3         One -- one good example of something that everyone

4  needs would be the sharing of IT services, HR functions, and

5  certainly insurance purchases, and so those are the types of

6  things that we're referring to here when we're discussing

7  streamlining in order to create a more sustainable cost

8  structure and financially stable councils.  Because at the end

9  of the day, a council that is healthy not only incorporates

10  financial health, but also health of the council in terms of

11  membership so that overall, the entire organization can

12  succeed and in turn allows the organization to be able to

13  fulfill its obligations to our creditors and provide

14  compensation to the settlement trust.

15      Q.   So sir, this PowerPoint is -- it memorializes what

16  was discussed at Philmont in August 2021, but it's also a

17  document for going forward, correct?  For BSA's strategy going

18  forward; is that correct?

19      A.   It -- it is not the strategy, but it certainly

20  highlights the conversation of the National Executive

21  Committee from August, 2021, on what our thoughts were for

22  what we could be doing as far as goalposts post-emergence to

23  allow for the organization to thrive.

24      Q.   Thank you so much, sir.  I have no further

25  questions

1          THE COURT:  Thank you.

2          MR. DESAI:  Thank you, ma'am.

3          THE COURT:  Thank you.  Are there going to be any

4 other questions on cross-exam?

5          MS. DUMAS:  Your Honor, I put myself down for

6 having cross-exam, but I have no questions for this witness.

7          THE COURT:  Thank you, Ms. Dumas.  Mr. Buchbinder?

8          MR. BUCHBINDER:  I have questions, and based on

9 what I've been hearing, I probably have 30 minutes of

10 questions, and that's my best estimate.

11          THE COURT:  Is there anyone else?  Well, I'm

12 breaking my first rule of going too late, but I'd like to get

13 Mr. Desai done.  I think we can.  So Mr. Buchbinder, let's go

14 ahead.

15          MR. BUCHBINDER:  I had a choice, but okay.

16                    CROSS EXAMINATION

17 BY MR. BUCHBINDER:

18      Q.    (Inaudible) column is going to need some screen

19 sharing and I'm counting on Mr. Andolina and counsel -- the

20 main exhibit I'm going to be referring to is JTX353, which is

21 the Third Modified Fifth Amended Plan.  But now, before we get

22 to the exhibits, and that's fine (Inaudible), you can keep it

23 there.  Mr. Desai, earlier today you testified about Debtor's

24 Demonstrative Number 5.  And in that demonstrative, you

25 identified eight settlements; do you recall that, sir?

1      A.   Yes, sir.

2      Q.   Do we need to review the specific settlements you

3  identified at that time again, or can I proceed without that?

4      A.   You -- your choice.

5      Q.   I'll proceed without that.  Other than the eight

6  settlements you discussed in Debtor's Demonstrative 5, has the

7  Debtor made any agreement with any other entity for

8  contributions to this plan?

9      A.   So we have made agreements with some of our secured

10  creditors, namely JP Morgan.

11     Q.   Out -- outside of JP Morgan and the official

12  creditors' committee, other than the eight settlements you

13  identified in Debtor's Demonstrative 5, have you made any

14  other abuse settlements with financial contributions?

15          MR. ANDOLINA:  Mr. Buchbinder, are you referring to

16  the Patrolsky (phonetic) settlement?

17          MR. BUCHBINDER:  I asked a question, and I asked

18  for an answer.  I said other than the eight settlements and

19  Debtor's Demonstrative 5, have you made other settlements with

20  -- for abuse claims?  It's a simple question.  It calls for a

21  yes or a no.

22          MR. ANDOLINA:  I'll -- I'll -- I'll object because

23  abuse claims is somewhat vague in terms whether their

24  settlement I just referenced would fit in that category.  I

25  don't believe it would, but that's why I asked the question.

1          MR. BUCHBINDER:  Okay.  Okay.  We're going to do

2   this the long way, Mr. Desai.  In Debtor's Demonstrative 5,

3   why don't we put that on the screen if you can put that up,

4   Mr. Andolina.

5          MR. ANDOLINA:  Sure.  Happy to.

6          MALE VOICE:  He wants Demonstrative 5.

7          MR. ANDOLINA:  Demonstrative 5.

8      Q.   All right.  You spoke at great length regarding

9   this exhibit, this morning, didn't you, sir?

10     A.   I did -- I testified about this document.  Yes,

11  sir.

12     Q.   Okay.  Can you identify any other settlements, not

13  including JP Morgan, can you identify any other settlements

14  that would involve depositing funds into the proposed

15  settlement trust?

16     A.   With your qualification of depositing funds into

17  the settlement trust, at this juncture, I cannot identify any

18  other settlements, besides the one -- aside from what is

19  identified in Demonstrative Exhibit 5.

20     Q.   That's because there aren't any at this time; is

21  that correct?

22     A.   That -- that is correct.

23     Q.   Okay.  So there's only two Debtors in this case,

24  correct?

25     A.   That's correct.

 1         Q.    There's the Boy Scouts of America and the Delaware

 2   BSA LLC, correct?

 3         A.    Yes, sir.

 4         Q.    By the way, is the Delaware BSA LLC -- is that a

 5   nonprofit?

 6         A.    I -- I would be making an assumption.

 7         Q.    What's your assumption?

 8         A.    That it is.

 9         Q.    Okay.  So now, let me direct your attention, Mr.

10   McClelland, this is where you come in.  Let me direct your

11   attention to definition 245 of Exhibit 353:  The Definition of

12   Released Parties.

13         A.    May I grab a copy of the plan that's on my chair

14   over here?

15         Q.    Certainly, sir.  And I'll be referring to this

16   exhibit through the rest of the questioning.  Let me know when

17   you're ready.

18         A.    Yes, sir.  245?

19         Q.    Yes, sir.

20         A.    Okay.

21         Q.    Now, if you'll look at definition 245, you'll see a

22   number of subdivisions from A to R, correct?

23         A.    Yes, sir.

24         Q.    And a number of these entities are capitalized,

25   correct?

1        A.    Yes, they are.

2        Q.    Like Related Non-Debtor Entities?

3        A.    Yes.

4        Q.    The Contributing Charter Organizations?

5        A.    Yes.

6        Q.    And All Of Such Kirstin's representatives; do you

7   see that?  That's number R.

8        A.    Yes.

9        Q.    Now all of these capitalized terms, they themselves

10  are definitions; isn't that correct?

11       A.    Yes.

12       Q.    So now, let's look at another definition:  The

13  definition of protected parties, which I believe is definition

14  number 236.

15       A.    Okay.

16       Q.    Let me know when you have that in front of you, Mr.

17  Desai.

18       A.    I have it in front of me.

19       Q.    Okay.  Again there's a list of subdivisions A

20  through F, and those are all capitalized terms, are they not?

21       A.    Yes, sir.

22       Q.    The Local Councils is a separate definition,

23  correct?

24       A.    Yes.

25       Q.    Contributing Chartered Organizations is a separate

1 definition, correct?

2     A.   Yes.

3     Q.   And Representatives is a separate definition; isn't

4 that correct?

5     A.   Purse's representatives, yes, sir.

6     Q.   Okay.  Well -- well -- well, we'll get there.  Now,

7 there's (inaudible) release provisions in this plan.  We're

8 not going to explore them today, but is it your general

9 understanding that plan provision 10J3 is the abuse claims

10 release by the abuse claims class, class 80?

11     A.   10J3?

12     Q.   10J3.

13        MR. ANDOLINA:  Mr. Buchbinder, would you be able to

14 refer us to a -- a page?

15        MR. BUCHBINDER:  I would have thought that he would

16 be familiar with the plan.

17        MR. DESAI:  I am, sir.  It's on Page 127, and I

18 have it.

19 BY MR. BUCHBINDER:

20     Q.   Okay.  So 10J3, isn't that the claim -- isn't that

21 the release that pertains to class 8, the abuse claims class?

22     A.   Yes, it is.

23     Q.   And the protected parties get the release from the

24 abuse claims class, don't they?

25     A.   Yes.

1    Q.   Now, would you characterize from your general

2   knowledge and your experience with this case, would you

3   classify the protected parties release in 10J -- 10J3 to be

4   the -- to be the -- the full release, the best release that

5   anyone can get in this case?

6            MR. ANDOLINA:  Objection to form:  vague.

7            THE COURT:  Sustained.

8            MR. BUCHBINDER:  That's not vague.

9            THE COURT:  Yes.

10           MR. BUCHBINDER:  I mean, he's looking --

11           THE COURT:  Yes, it is.  Sustained.

12   Q.   All right.  The protected parties get a release

13   that's more efficacious than that of released parties, don't

14   they?

15           MR. ANDOLINA:  Objection: vague; calls for a legal

16   conclusion.

17           THE COURT:  Sustained.

18           MR. BUCHBINDER:  All right.  We'll deal with that

19   later.

20   Q.   Let's look at some of these other definitions.

21   Let's go now to the definition of Representatives.  Definition

22   249:  Can you read that for us, Mr. Desai?  Can you read it

23   out loud for us?

24   A.   Sure.  Representatives means with respect to any

25   person.  Such persons a) predecessors, successors, assigns,

1  subsidiaries, and affiliates; b) current and former officers,

2  directors, principals, equity holders, trustees, members,

3  partners, managers, officials, board members, advisory board

4  members, employees, agents, volunteers, attorneys, financial

5  advisors, accountants, investment bankers, consultants,

6  representatives, and other professionals; and c) respective

7  heirs, executors, estates, and nominees in each case solely in

8  its capacity as such.

9       Q.   Thank you.  And all these representatives are

10 either protected parties or released parties, correct?

11      A.   Yes, they are.

12      Q.   Can you tell me, for example, with respect to the

13 protected parties who all the predecessors, successors,

14 assigns, subsidiaries, and affiliates are?

15           MR. ANDOLINA:  Objection; vague; call for a

16 narrative answer that would take quite a bit of time.

17           MR. BUCHBINDER:  Your Honor, the witness has

18 testified in his declaration and testimony that he

19 investigated all the releases of all the people, and decided

20 they were all making necessary and critical contributions to

21 the case.  I'm asking him to identify who these

22 representatives are and what their contribution is to the

23 case.  We can spend all night.  Or he can answer no.

24           THE COURT:  I'm going to overrule the objection.

25 But why don't you ask the question again?

1      Q.   All right.  Mr. Desai, can you identify the

2   representatives of the protected parties, and if you can, the

3   contributions they are making to this case?

4      A.   The -- as defined, protected parties at definition

5   236 are the Debtors reorganized BSA --

6           MR. BUCHBINDER:  Objection, Your Honor.  The

7   question was about the definition of Representatives 249.  It

8   wasn't about protected parties.

9           MR. ANDOLINA:  Your Honor, could -- could --

10          THE COURT:  I'm going to let Mr. --

11          MR. ANDOLINA:  -- Mr. Buchbinder let the witness --

12          THE COURT:  Yes.

13          MR. ANDOLINA:  -- finish his answer.

14          THE COURT:  I'm going to -- please, Mr. Desai,

15   complete your answer.

16          MR. DESAI:  Thank you, Your Honor.

17      A.   Mr. Buchbinder, in terms of representatives of

18   protected parties, they would include representatives of the

19   Debtor, the reorganized BSA, local councils, related non-

20   Debtor entities, contributing charter organizations, the

21   settling insurance companies, and all such person's

22   representatives.  They don't include, of course, the release

23   for any perpetrator as a protected party.  And so,

24   representatives of those protected parties would mean the

25   individuals that would make up those entities, have

1  contributed to this bankruptcy process either by way of their

2  work or by way of the financial contributions to the

3  settlement trust.

4           And so by virtue of this plan and the definitions

5  afforded to those protected parties, there is naturally a

6  legal extension, I would -- I would believe, that a corporate

7  entity is made up of people who operate on -- who operate the

8  corporate entity.  That corporate entity could have a board of

9  directors and officers and shareholders and directors who

10  would be needing a release for any historical abuse liability

11  that is attended with that particular corporate entity.

12      Q.   So for example, tell me what the representatives of

13  the representatives of the local council have done to obtain a

14  release in this case.

15      A.   Local councils, who I've described to be a very

16  integral part of the Boy Scouts of America and our delivery of

17  our mission -- local council representatives from board

18  members to employees to current former members of the board,

19  all of whom have provided capital by way of a contribution to

20  the settlement trust in either the form of cash or properties,

21  and as such they should be entitled to receive a full and

22  complete release for any and all pre-petition historical abuse

23  liability.

24      Q.   How much have the board members agreed to

25  contribute to the settlement trust fund?  I didn't see that

1  anywhere.

2        MR. ANDOLINA:  Objection; argumentative.

3        THE COURT:  Sustained.  Can you rephrase it,

4  please?

5     Q.   How much have the board members agreed to

6  contribute to the settlement trust?

7        MR. ANDOLINA:  Same objection.

8        THE COURT:  Overruled.

9     A.   The board members, Mr. Buchbinder, would be acting

10  within the scope of their fiduciary obligations to either a

11  local council or to the national organization, and as such,

12  absent any other indicators, the corporate entities are the

13  ones that are making the contributions for the organization

14  and on behalf of the people that comprise the organization, be

15  it employees or current former board members.

16     Q.   Has any actual board member agreed to contribute a

17  single penny to this plan?

18        MR. ANDOLINA:  Objection; argumentative.

19        THE COURT:  Overruled.

20     A.   I am not aware because I -- I would not know this

21  in terms of local councils and your 200-plus local boards, but

22  I am not aware of anyone on the national board who has agreed,

23  as you described, to contribute personally dollars to a

24  settlement trust, excluding, of course, all of the man-hours

25  that board members have put into this process on a voluntary

1  basis.

2      Q.    Let's now look at the definition of local councils.

3  And that is definition number 182.  Do you have that in front

4  of you, sir?

5      A.    Yes, sir.

6      Q.    I'm not going to ask you to read it, but on the

7  fifth line -- fourth line after the phrase local council,

8  there's a reference to Scouting in it, and then there's a list

9  of the number of I'll say organizations:  troops, dens, packs,

10  posts, clubs, crews, ships, tribes, et cetera.  Are any of

11  these entities Debtors in this case?

12      A.    By its very definition, local councils are not

13  Debtors in this case.

14      Q.    Thank you.  All of these Scouting units, as you

15  describe it in definition 182, they will all get a release,

16  won't they?

17      A.    Each of these Scouting units are ways in which a

18  local council organizes our various groupings of young people,

19  depending on the type of program they are involved in locally.

20  And by virtue of the local council providing a contribution to

21  the settlement trust, each of these entities, as defined,

22  would receive a release if Her Honor agrees to provide that.

23  Again, because of the interconnectedness of a local council

24  with the national organization, and our local chartering org

25  partners, we -- we can't continue to deliver the mission of

1  Scouting without them.

2      Q.   Now, to the extent that these Scouting units are

3  sponsored or organized by the chartered organizations, do they

4  also count as chartered organizations for purposes of getting

5  a protected parties or a limited protected parties release?

6      A.   Other organizations are obviously a defined

7  grouping of things within the plan.  And so a chartered

8  organization would certainly sponsor one of these units called

9  a troop or a pack, and so, depending on the classification of

10 the chartered organization, be it a contributing,

11 participating, or opt out, there are certain types of releases

12 that that chartering organization would get.  However, a local

13 unit, like the troop example or a pack example I provided as

14 part of the local council structure would be released because

15 of the contribution provided by the local council on its

16 behalf.

17     Q.   Now, you talk about the charter organizations, and

18 a contributing chartered organization.  There's only two of

19 them at the present time; isn't that correct?  The Church of

20 Jesus Christ and the United Methodists?

21     A.   Yes, sir.

22     Q.   A participating chartered organization doesn't have

23 to do anything to be a participating chartered organization;

24 is that correct?

25     A.   Generally speaking, that's correct.

1          Q.   And an opt-out -- an opt-out chartered organization

2    is a chartered organization that objected to the plan.

3          A.   Either specifically, or simply never did anything.

4    That would be correct.

5          Q.   Okay.  But you participate just by being present?

6          A.   Yes.

7          Q.   A chartered organization doesn't have to do a thing

8    to be a participating chartered organization?

9               MR. ANDOLINA:  Objection.

10         A.   I would defer to the terms of the -- of what a

11   participating chartered organization means.  I will leave it

12   at that.

13         Q.   Actually, I'm fine with that, too.  Your Honor, I

14   don't believe I have any further questions.  Thank you very

15   much.

16              THE COURT:  Thank you.  Okay.  Is the Debtor going

17   to want to do any re-direct?

18              MR. ANDOLINA:  Your Honor, I'll make it easy, I

19   have one question.  We won't have to take a break.  If -- if I

20   could ask that question of Mr. Desai?

21              THE COURT:  Yes.

22                        REDIRECT EXAMINATION

23   BY MR. ANDOLINA:

24         Q.   Mr. Desai, I'd -- I'd ask the Court to look to

25   Exhibit C of your declaration, and earlier, you testified, and

1   I'm specifically referring to Page 6 of 33, which is the

2   Congressional Charter issued to the Boy Scouts of America in

3   December of 1915.  I'm sure it seems like that's about when

4   your deposition started, or your testimony started.  Mr.

5   Desai, you previously testified that you believe that -- the

6   organization and the -- the BSA was a corporation under the

7   laws of the State of Texas.  I'd ask you to look at Section 4

8   of the Congressional Charter and see if that clarifies your

9   recollection as to where the organization is, in fact,

10  incorporated.

11        A.   Mr. Andolina, I would -- I would tell you that

12  I -- I recall Ms. Wolff was asking where the corporation had

13  its headquarter offices, and that was in Dallas, Texas.  But

14  as it relates to the law of which the Boy Scouts of America is

15  governed by, our Congressional Charter speaks to that in

16  Section 4, and indicates that we are governed under the laws

17  of the District of Columbia.

18             MR. ANDOLINA:  I -- I have no further questions,

19  Mr. Desai.

20             THE COURT:  Okay.  Thank you.  Mr. Desai, Thank you

21  for your testimony.  It's concluded, and you're excused.

22             MR. DESAI:  Thank you, ma'am.

23             THE COURT:  Okay.  We are going to adjourn for the

24  evening.  We will start again at 10 o'clock Eastern time

25  tomorrow.  Mr. Andolina, I assume we're starting with Mr.

1   Whitman, my -- that's my recollection is he's witness number

2   two?

3           MR. ANDOLINA:  Your recollection is correct, Your

4   Honor.  Mr. Whitman will be available to start the day.

5           THE COURT:  Okay.  Let me ask, how many people are

6   planning to cross-examine Mr. Whitman?  Just put up your

7   hands, maybe, on the -- or show your face.  Okay.  One,

8   two -- okay, so I have five.  I will ask that in your cross-

9   examination you try not duplicative, and I do understand

10  people have different interests, and you won't -- you may want

11  to bring out different facts, but rest assured, I'm listening,

12  and if one person has brought out those facts, you don't need

13  to bring them out again.  And you will be free to argue

14  regardless of who brings out the facts as to whatever issues

15  you have.  So thank you very much, and we'll see you in the

16  morning, or --

17          MR. ANDOLINA:  Thank you, Your Honor.  Have a nice

18  evening.

19          THE COURT:  Thank you.

20      (Proceedings concluded at 6:47 p.m.)

21

22

23

24

25

1

2                           <u>CERTIFICATION</u>

3          We certify that the foregoing is a correct

4   transcript from the electronic sound recording of the

5   proceedings in the above-entitled matter to the best of our

6   knowledge and ability.

7

8   <u>/s/ William J. Garling</u>                    <u>April 6, 2022</u>

9   William J. Garling, CET-543

10

11  <u>/s/ Tracey J. Williams</u>                    <u>April 6, 2022</u>

12  Tracey J. Williams, CET-914

13

14  <u>/s/ Mary Zajaczkowski</u>                     <u>April 6, 2022</u>

15  Mary Zajaczkowski, CET-531

16

17  <u>/s/ Coleen Rand</u>                           <u>April 6, 2022</u>

18  Coleen Rand, CET-341

19
    Certified Court Transcriptionists
20
    For Reliable
21

22

23

24

25