**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | D.I. Ref.: 9337 |

**DEBTORS' RESPONSE TO OBJECTION OF THE CERTAIN INSURERS TO THE
DECLARATION OF ADRIAN AZER**

Boy Scouts of America (the "**BSA**") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession (together, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this response (the "**Response**") to the *Objection of the Certain Insurers to the Declaration of Adrian Azer* [D.I. 9337] (the "**Objection**") filed by the Certain Insurers (the "**Certain Insurers**"), seeking to exclude certain paragraphs in the *Declaration of Adrian Azer in Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 9309] (the "**Azer Declaration**").  In support of the Response, the Debtors state as follows:

**PRELIMINARY STATEMENT**

The Certain Insurers have repeatedly argued, including during the confirmation hearing, that the initial TDPs were drafted by the Coalition.  *See* Mar. 15, 2022 H'rg Tr. at 65:10-11 (Mr. Jacobs: "We don't think the debtors drafted the initial version [of the TDPs]"); *see also* Mar. 14,

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

2022 H'rg Tr. at 149:14-19 (Mr. Hallowell: "Mr Desai, regarding the TDPs, you understand that in February 2021 the Coalition provided the BSA with the settlement term sheet that included the initial terms regarding the TDPs and the settlement trust; correct?").  The Certain Insurers now seek to exclude the testimony of Adrian Azer, the witness that disproves their position.  None of the grounds that the Certain Insurers offer for excluding Mr. Azer has merit or comes close to meeting the high standard for the extreme sanction of preclusion.  Mr. Azer has testified appropriately in response to the Certain Insurers' questions at his depositions and is prepared to testify at trial as a percipient witness with personal knowledge of the factual issues relevant to the Certain Insurers' arguments.

## RESPONSE

1.      "The exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Quinn v. Consol. Freightways Corp. of Delaware*, 283 F.3d 572, 576 (3d Cir. 2002) (reversing district court decision precluding witness testimony); *Inline Connection Corp. v. AOL Time Warner, Inc.* 470 F. Supp. 2d 435, 441-42 (D. Del. 2007) ("The court, in adherence to the standards of Third Circuit, will only exclude critical evidence as an 'extreme sanction.'  There is no evidence of willful deception or flagrant disregard of a court order.").  None of the arguments asserted by the Certain Insurers justifies the extreme sanction of precluding Mr. Azer's testimony.

### A.      Mr. Azer Has Personal Knowledge of the Issues On Which He Testifies

2.      The Certain Insurers argue that the "Debtors should be precluded from offering certain testimony contained in the Azer Declaration because it lacks foundation."  Obj. ¶ 1.  Specifically, the Certain Insurers argue that Mr. Azer lacks personal knowledge of the BSA prepetition litigation practices. That is true, but also irrelevant as Mr. Azer is not testifying to

2

such practices. To the contrary, Mr. Azer's testimony is that he solicited and received information about the prepetition practices and then crafted TDPs to emulate them. The Certain Insurers ignore that Mr. Azer repeatedly so states in the very paragraphs to which the Certain Insurers object:

> Because we sought to replicate, to the extent practicable, the BSA's prepetition practices, I, along with other attorneys for the Debtors, coordinated with and relied upon the BSA's National Coordinating Counsel, Ogletree Deakins ('Ogletree'), for guidance during the negotiations of the various iterations of the TDP. Specifically, I spoke frequently with Bruce Griggs and Sean Manning at Ogletree – as the BSA's prepetition National Coordinating Counsel and the law firm that handled all Abuse Claims from 2016 to the Petition Date – who were intimately familiar with how the BSA evaluated the validity and value of claims prepetition."

Azer Decl. ¶ 9; *see also id.* ¶ 10 (stating that Mr. Griggs "provided guidance" with respect to various prepetition practices regarding settling abuse claims); *id.* ¶ 11 ("When deciding whether to accept or reject proposed revisions to the TDP, the Debtors typically consulted with Ogletree to determine whether the revisions were consistent with the BSA's prepetition practices"); *id.* ¶ 42 ("The Debtors consulted with Ogletree to the extent that the revision addressed the General Criteria or the type of Scaling Factors that would be considered"); *id.* ¶ 43 ("The Debtors consulted with Ogletree regarding their prepetition practices involving claims that implicated potential statute of limitations defenses."); *id.* ¶ 44 ("The Debtors concluded that agreeing to a $3,500 expedited distribution was economically rational because Ogletree indicated that the BSA would have settled any sexual abuse claim on a prepetition basis for $3,500 if the claimant provided the information required in the Proof of Claim Form."). Mr. Azer has personal knowledge of what he was told and how he used such information.[2]

---

[2] The Certain Insurers argue that Mr. Azer's testimony will be "duplicative" of Mr. Griggs' testimony. Obj. at 2, n.2. Yet despite having had Mr. Griggs' declaration for four days before filing the Objection and Mr. Azer's declaration for two days before filing the Objection, the Certain Insurers fail to identify a

AMERICAS 113765584

B.    <u>**Mr. Azer Answered Questions At His Deposition Appropriately**</u>

3.    The Certain Insurers argue that, at his March 10, 2022 deposition, "Mr. Azer was repeatedly instructed not to interpret what the TDPs mean or offer any legal opinions or conclusions."  Obj. ¶ 3.  This is true, because it is not Mr. Azer's role, as a fact witness, to interpret legal documents or offer legal conclusions.  *See, e.g.*, *Shreves v. Frontier Rail Corp.*, 2021 WL 6206635, at *4 (E.D. Wash. Mar. 23, 2021) (granting protective order regarding 30(b)(6) deposition notice upon finding that "a Rule 30(b)(6) deposition [is] an improper vehicle for taking discovery into legal contentions"); *Zeleny v. Newsom*, No. 17-CV-07357-RS (TSH), 2020 WL 3057467, at *2 (N.D. Cal. June 9, 2020) (denying motion to compel 30(b)(6) deposition because "oral testimony in which the witness has to answer questions on the spot about a party's legal contentions is an improper use of a deposition"); *Cardinal Aluminum Co. v. Cont'l Cas. Co.*, 2015 U.S. Dist. LEXIS 86162, at *9 (W.D. Ky. July 1, 2015) (granting protective order upon finding that "questions as to legal conclusions exceed the scope of permissible discovery and are not appropriate for a 30(b)(6) deposition"); *see also Byrd v. Wal-Mart Transp.*, No. CV609-014, 2009 U.S. Dist. LEXIS 87356, at *5 (S.D. Ga. Sep. 23, 2009) (denying motion to compel 30(b)(6) deposition testimony because "plaintiffs' question did not seek unprotected facts.  Instead, it invited the deponent to testify as to mental impressions[.]").

4.    While it is true that Mr. Azer did not answer improper questions, he nonetheless provided over 200 pages of answers to the Certain Insurers' proper questions.  These answers were in addition to the nearly 200 pages of answers to the Certain Insurers' questions that Mr. Azer provided at his deposition in December 2021, which, as the Certain Insurers acknowledge,

---

single area of duplication between their testimonies.  That is because there is none.  Mr. Griggs testified regarding the Debtors' historical practices in connection with prepetition abuse claims, and Mr. Azer testified regarding the ways in which those historical practices were used to create the TDPs.

AMERICAS 113765584

addressed "the TDPs, the draft[s], prior versions negotiations and communications concerning the TDPs." Obj. at 3, n.3. Indeed, the examples in the Objection are selectively edited to give the misimpression that Mr. Azer refused to answer the Certain Insurers' questions. When viewed in full context, it is clear that Mr. Azer provided answers in response to each of the questions that the Certain Insurers cite.

5.      For example, the Certain Insurers cite Mr. Martin's statement that "if you're asking for what the document means, then I'm going to object on the basis that it calls for a legal conclusion. If you're going to ask him if there were discussions about it, that I'll allow." Obj. ¶ 3) (citing March Tr. at 40:11-16). Mr. Martin made this statement in response to the Certain Insurers' question whether "one of the goals of the Independent Review Option [was] to maximize the trust's ability to recover from the debtors' excess insurers." March Tr. at 40:2-5. The Certain Insurers omit that, only a few lines later, Mr. Martin clarified that the statement they quoted was not an instruction not to answer, and Mr. Azer provides a robust answer to the exact question the Certain Insurers had asked:

> Q. So is it the debtors' understanding that the purpose behind the Independent Review Option is to maximize the trust's ability to recover from the debtors' excess insurance?
>
> Mr. Martin: Same objection.
>
> Mr. Appleby: And that's an instruction not to answer?
>
> Mr. Martin: Well, no, I'm just saying it calls for a legal conclusion.
>
> The Witness: So, answer? All right. So again, Mr. Appleby, as I told you, the purpose of the independent review is consistent with what I said previously, which is we understood there was a hole that was inconsistent with our pre-petition practices related to claims that were – could be valued excess of the 2.7 million, and this was a mechanism to provide for that recovery and fill that hole. That was the purpose of the independent review.

5

March Tr. at 41:9-42:5.[3]

6.       Similarly, Certain Insurers claim that Mr. Azer "refused to answer" questions regarding "the debtors' understanding . . . of what it means for a responsible insurer to be given a reasonable opportunity to participate in the independent review." Obj. ¶ 4 (citing March Tr. at 111:25-112:11). While it is true that Mr. Azer stated that this question improperly called for "my legal opinion," Certain Insurers omit that, in the very next line, Certain Insurers reformulated their question into a proper form, and received the exact information they were seeking:

> Q.  Okay.  So, were there any conversations during the negotiations about what that means for a responsible insurer to be given a reasonable opportunity to participate in the independent review?
>
> A.  I mean, we obviously wanted it -- we had negotiations to make sure that the insurers were involved and intimately involved in all aspects of the process.  So, that broad language was meant to provide for that.  This neutral can -- obviously has some discretion, but we wanted to build in that there is an ability to -- for the responsible insurer to participate, consistent with how excess insurers would typically participate on a pre-petition basis.

March Tr. at 112:13-113:4.

7.       Certain Insurers also claim that "at deposition, Mr. Azer testified he could not say whether the General Criteria 'includes the statutes of limitations' requirement because: 'you're asking me to interpret the document. That would call for a legal opinion.'"  Obj. ¶ 5 (citing March Tr. at 95:2-10).  Again, Certain Insurers omit that, in the very next line, they reformulated their question into a proper form and received a robust answer providing the exact information they sought:

---

[3] Certain Insurers also cite the Debtors' responses and objections to the 30(b)(6) deposition notice, which include an objection "to the extent" any topic "purports to require the Debtors to provide legal conclusions or testimony regarding legal documents that speak for themselves." Obj. ¶ 3. These objections are standard and appropriate, and have nothing to do with Mr. Azer's testimony.

Q.  At the time you were negotiating that language that appears in the TDPs, was it your understanding that the 'may be liable' language included the statute of limitations issue?

MR. MARTIN: Objection to form.

THE WITNESS: Yes, when we were negotiating the language to insert this, let me give you context and then we can talk about what it means.  You know, this language was inserted because certain insureds objected in their plan objections arguing, and their experts basically said, hey, there's no what they deemed negligence requirement, negligence is too narrow because there's lots of potential causes of action.  So, when we inserted this, we wanted to make sure that there was evidence of a cognizable claim, but obviously it's higher because they have to meet a preponderance of the evidence.  You know, that includes everything.  It includes, you know, that you actually have a valid claim.  That was not -- you know, limitations were not in the forefront, but could it be read to be that way, sure."

March Tr. at 95:13-96:13.

8.      Finally, Mr. Azer properly refused to answer Certain Insurers' improper question as to whether "the Debtors would have any objection to including language in the mitigating factors that make clear that a lack of negligence is a mitigating factor," which called for Mr. Azer to testify as to the BSA's potential future position rather than any factual information.  Obj. ¶ 5 (citing March Tr. at 168:8-19).  The Certain Insurers then conceal that, following Mr. Azer's refusal to answer that improper question, they asked several proper questions regarding lack of negligence as a mitigating factor, including whether (i) the Debtors "ever communicate[d] to the claimants' representatives that Judge Houser will be able to consider a lack of negligence as a mitigating scaling factor?"; (ii) the Debtors "ever communicate[d] that the settlement trustee would be able to consider the lack of negligence as a mitigating factor?"; and (iii) "the claimants' representatives ever communicate[d] to the debtors that they did not want negligence to be a

mitigating factor?"  March Tr. at 170:22-171:22.  Mr. Azer provided answers to all of these

questions.  *Id.*[4]

C.    **Mr. Azer's Testimony Is Not Legal Argument Or Conclusion**

9.    The Certain Insurers argue that certain statements in Mr. Azer's declaration are

"legal argument and conclusions" because his testimony responds to the Certain Insurers' factual

contentions that "the Debtors 'turned over the pen' on the TDP."  Obj. ¶ 7 (citing Azer Decl.

¶ 7).  Witnesses are free to respond to and refute any relevant matter, including incorrect factual

assertions.  Indeed, witness routinely do so.  The Certain Insurers cite nothing to support their

novel argument.  Here, the examples highlighted by the Certain Insurers all relate to the factual

question of whether the Debtors ceded control over drafting the TDPs to other parties, which is a

factual matter that Mr. Azer appropriately addresses in his testimony.  *See id.* (citing Mr. Azer's

testimony in paragraph 7 of his declaration that "allegations by certain Non-Settling Insurance

Companies that the Debtors permitted the Direct Abuse Claimant constituencies to take over the

process and write their own TDP to the detriment of the Non-Settling Insurance Companies is

false"); *id.* (citing Mr. Azer's testimony in paragraph 8 of his declaration that "[t]he Non-Settling

Insurance Companies have incorrectly argued that the Debtors 'turned over the pen' on the

TDP"); *id.* (citing Mr. Azer's testimony in paragraph 12 of his declaration that "[t]he Debtors did

not allow claimants to determine claim values, as certain Non-Settling Insurance Companies

---

[4] Similarly, Mr. Azer did not offer his opinion as to whether "the Independent Review Option . . . provide[s] the Insurers with the right to a deposition." March Tr. 70:22-24.  However, the Certain Insurers reformulated this question to ask "whether the debtors push[ed] for the insurers to have the right to take a deposition as part of the Independent Review Option," which Mr. Azer answered:  "So, what we pushed for is the very broad language in the negotiation that's in sub-part K2, which is, Any responsible insurer shall be given a reasonable opportunity to participate, participate being a broad word, in the independent review."  March Tr. at 71:12-21.

AMERICAS 113765584

have suggested.").  In each of these examples, Mr. Azer properly testifies regarding facts refuting Certain Insurers' incorrect positions.

**D.      Mr. Azer's Testimony Is Not Undisclosed Expert Opinion**

10.      Certain Insurers argue that certain statements in Mr. Azer's declaration are "undisclosed expert opinion."  Obj. ¶ 7.  Certain Insurers do not identify a single such alleged statement.  To the contrary, Mr. Azer has testified to what he did and what he intended.

**E.      The Use Of The Term "Debtors" Is Appropriate**

11.      The Certain Insurers also take issue with Mr. Azer's "statements regarding the *Debtors'* actions, opinions, and positions," *id.* (emphasis in original), Mr. Azer is merely testifying regarding his actions, opinions, and positions as the Debtors' representative.  For example, the Certain Insurers challenge Mr. Azer's testimony that "[t]he Debtors never ceded control of the TDP (including the Operative TDP) to any other party (be it a claimant constituency or an insurance company) or colluded with any third party to prejudice the rights of another."  Azer Decl. ¶ 7.  But this is a factual statement regarding the process by which the TDPs were negotiated.  There is no dispute that Mr. Azer represented the Debtors in negotiating the TDPs.  He is therefore competent to testify, as a factual matter, that the Debtors took the lead on drafting the TDPs and did not cede that role to any other party.  Mr. Azer was not acting for himself, he was acting for the Debtors.  Consequently, he accurately refers to the actions of him and his team as those of the Debtors.

**F.      Mr. Azer's Testimony Is Not Hearsay**

12.      The Certain Insurers argue that certain statements in Mr. Azer's declaration are hearsay.  Obj. ¶ 8.  Again, the Certain Insurers fail to identify any specific statements they allege are hearsay, or any explanation as to why these statements are hearsay.  Instead, Certain Insurers identify 31 paragraphs that allegedly contain "uncorroborated and out-of-court statements" by

9

(i) the Certain Insurers, (ii) "other attorneys (including Mr. Griggs)," and (iii) Bates White.  *Id.* None of these examples is hearsay.

13.    ***First***, the Certain Insurers are a party opponent, and so the Debtors do not violate the rule against hearsay by relying on their out-of-court statements.  *See* Fed. R. Evid. 801(d)(2)(A); *Blackburn v. UPS, Inc.*, 179 F.3d 81, 96 (3d Cir. 1999) ("Under Rule 801(d)(2)(A), a statement offered against a party is not hearsay if it is the party's own statement.").

14.    ***Second***, as demonstrated above, Mr. Azer does not rely on any statements by Mr. Griggs to show that the TDPs comport with the Debtors' prepetition practices in handling abuse claims.  Indeed, the Debtors have separately introduced Mr. Griggs' testimony to support the truth of that argument.  Rather, Mr. Azer discusses Mr. Griggs' statements to demonstrate how he came to understand the Debtors' historical practices to fashion TDPs to emulate them.  The rule against hearsay does not prohibit the introduction of out-of-court statements to show their effect on a witness.  *See* Fed. R. Evid. 801(c)(2) (defining "hearsay" as an out-of-court statement "a party offers into evidence to prove the truth of the matter asserted in the statement"); *LaRochelle v. Wilmac Corp.*, 769 Fed. App'x 57, 65 (3d Cir. 2019) ("The District Court correctly admitted these nonhearsay statements because they were not offered to prove whether Shearer abused the resident. . . . Rather, because Defendants offered these statements 'to explain why' they terminated Shearer, that is, 'for the statements' effect on the listener—those statements [were] not offered for their truth.  Therefore, they [are] admissible for a non-hearsay purpose.'" (citation omitted) (alterations in original)).

15.    ***Third***, the same is true for Bates White, who Mr. Azer cites not for the truth of their statements, but solely to show that he relied on them.  *See, e.g.*, Azer Decl. ¶ 12 ("The

Debtors relied on Bates White's determination of these amounts through an economic analysis of the BSA's historical settlements between 2016 and 2020."); *id.* ¶ 42 ("The Debtors consulted with Ogletree to the extent that the revision addressed the General Criteria or the type of Scaling Factors that would be considered and Bates White to the extent that the revision addressed claim valuation to ensure that the TDP remained consistent with the BSA's historical settlement practices.").  As with Mr. Griggs, the Debtors will introduce Bates White to support the truth of the opinions relied on by Mr. Azer.

## **CONCLUSION**

The Debtors respectfully request that the Court overrule the Objection.

11

Dated: March 14, 2022
        Wilmington, Delaware

WHITE & CASE LLP                                    /s/ Paige N. Topper
Jessica C. Lauria (admitted *pro hac vice*)         MORRIS, NICHOLS, ARSHT & TUNNELL
Glenn M. Kurtz (admitted *pro hac vice*)            LLP
Andrew Hammond (admitted *pro hac vice*)            Derek C. Abbott (No. 3376)
Samuel P. Hershey (admitted *pro hac vice*)         Andrew R. Remming (No. 5120)
1221 Avenue of the Americas                         Paige N. Topper (No. 6470)
New York, New York 10020                            1201 North Market Street, 16th Floor
Telephone:  (212) 819-8200                          P.O. Box 1347
Email:  jessica.lauria@whitecase.com                Wilmington, Delaware 19899-1347
        gkurtz@whitecase.com                        Telephone:  (302) 351-9314
        ahammond@whitecase.com                      Email: dabbott@morrisnichols.com
        sam.hershey@whitecase.com                           aremming@morrisnichols.com
                                                            ptopper@morrisnichols.com
– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        laura.baccash@whitecase.com
        blair.warner@whitecase.com

AMERICAS 113765584