<pre>
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3                                    .    Chapter 11
   IN RE:                            .
4                                    .    Case No. 20-10343 (LSS)
   BOY SCOUTS OF AMERICA AND         .
5  DELAWARE BSA, LLC,                .
                                     .    Courtroom No. 2
6                                    .    824 North Market Street
                                     .    Wilmington, Delaware 19801
7                                    .
                   Debtors.          .    Tuesday, March 15, 2022
8  . . . . . . . . . . . . . . . . . .    10:00 A.M.

9               TRANSCRIPT OF CONFIRMATION HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                UNITED STATES BANKRUPTCY JUDGE

11                         **TRIAL (DAY TWO)**

12 APPEARANCES:

13 For the Debtor:          Derek Abbott, Esquire
14                          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                            1201 North Market Street, 16th Floor
15                          Wilmington, Delaware 19899

16                          - and -

17                          Andrew Hammond, Esquire
                            Glenn Kurtz, Esquire
18                          WHITE & CASE LLP
                            1221 Avenue of the Americas
19                          New York, New York 10020

20 Audio Operator:          Brandon J. McCarthy

21 Transcription Company:   Reliable
22                          1007 N. Orange Street
                            Wilmington, Delaware 19801
23                          (302)654-8080
                            Email:  gmatthews@reliable-co.com
24

25 Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.
</pre>

APPEARANCES (Cont'd):

For the Debtors:              Michael C. Andolina, Esquire
                             WHITE & CASE LLP
                             111 South Wacker Drive
                             Chicago, Illinois 60606

                             - and -

                             Ernest Martin, Jr., Esquire
                             HAYNES & BOONE LLP
                             2323 Victory Avenue, Suite 700
                             Dallas, Texas 75219

For AIG Companies:           James Hallowell, Esquire
                             Mitchell Karlan, Esquire
                             GIBSON DUNN & CRUTCHER LLP
                             200 Park Avenue
                             New York, New York 10166

For Tort Claimants:          Richard Pachulski, Esquire
                             Alan Kornfeld, Esquire
                             PACHULSKI STANG ZIEHL & JONES LLP
                             10100 Santa Monica Blvd., 13th Floor
                             Los Angeles, California 90067

For the United               Thomas Macauley, Esquire
Methodist Ad Hoc             MACAULEY LLC
Committee:                   300 Delaware Avenue, Suite 750
                             Wilmington, Delaware 19801

For the Ad Hoc               Joseph Celentino, Esquire
Committee of Local           WACHTELL LIPTON ROSEN & KATZ
Councils:                    51 W 52nd Street
                             New York, New York 10019

For the U.S. Trustee:        David Buchbinder, Esquire
                             UNITED STATES DEPARTMENT OF JUSTICE
                             OFFICE OF THE UNITED STATES TRUSTEE
                             844 King Street, Suite 2207
                             Lockbox 35
                             Wilmington, Delaware 19801

1   APPEARANCES (Cont'd):

2   For the Coalition of        Cameron Moxley, Esquire
    Abused Scouts for           BROWN RUDNICK LLP
3   Justice:                    7 Times Square
                                New York, New York 10036
4

5   For Guam Abuse              Delia Lujan Wolff, Esquire
    Survivors:                  LUJAN & WOLFF LLP
6                               238 Archbishop FC Flores
                                Suite 300
7                               Hagatna, Guam 96910

8   For Sexual Abuse            Gilion Dumas, Esquire
    Claimants:                  DUMAS & VAUGHN
9                               3835 NE Hancock Street, Suite GL-B
                                Portland, Oregon 97212
10

11  For Gemini Insurance        John Baay, Esquire
    Company:                    GIEGER, LABORDE & LAPEROUSE
12                              701 Poydras Street, Suite 4800
                                New Orleans, Louisiana 70139
13

14  For Century Indemnity:      Tancred Schiavoni, Esquire
                                O'MELVENY & MYERS LLP
15                              7 Times Square
                                New York, New York 10036

16  For the Roman Catholic      Neil Lloyd, Esquire
    Ad Hoc Committee:           ARENTFOX SCHIFF LLP
17                              233 South Wacker Drive, Suite 7100
                                Chicago, Illinois 60606
18

19                              - and -

20                              Jeremy Ryan, Esquire
                                POTTER ANDERSON & CORROON LLP
21                              1313 N. Market Street, 6th Floor
                                Wilmington, Delaware 19801
22

23  For Great American:         David Christian, Esquire
                                DAVID CHRISTIAN ATTORNEYS LLC
24                              105 W. Madison Street, Suite 1400
                                Chicago, Illinois 60602
25

1    APPEARANCES (Cont'd):

2    For Hartford:            James Ruggeri, Esquire
                              SHIPMAN & GOODWIN LLP
3                             1875 K Street NW, Suite 600
                              Washington, DC 20006
4

5    For Continental         Laura McNally, Esquire
     Insurance and Columbia  LOEB & LOEB LLP
6    Casualty:               321 North Clark Street, Suite 2300
                              Chicago, Illinois 60654
7

8    For National Surety,    Todd Jacobs, Esquire
     Corporation, and        BRADLEY & RICE, PC
9    Fire & Casualty:        111 S Wacker Drive, Suite 5100
                              Chicago, Illinois 60606

10   For the Church of Jesus  Robert Malionek, Esquire
     Christ of Latter-day    LATHAM & WATKINS LLP
11   Saints:                 1271 Avenue of the Americas
                              New York, New York 10020
12

13   For Zalkin, PCVA:       Robert Pfister, Esquire
                              KTBS LAW LLP
14                            1801 Century Park East, 26th Floor
                              Los Angeles, California 90067
15

16   For the Committee of    Edwin Caldie, Esquire
     Unsecured Creditors     STINSON LLP
17   For Archdiocese of      50 South Sixth Street, Suite 2600
     Agana:                  Minneapolis, Minnesota 55402

18

19

20

21

22

23

24

25

1                               INDEX

2 MATTER GOING FORWARD:

3 1.   Third Modified Fifth Amended Chapter 11 Plan of
  Reorganization for Boy Scouts of America and Delaware BSA, LLC
4 (D.I. 8813; Filed 2/15/22)

5

6                             WITNESSES

7 DEBTOR'S WITNESSES:                                        PAGE

8     BRIAN WHITTMAN

9         Cross Examination by Mr. Baay                      40

10     BRUCE GRIGGS

11         Cross Examination by Mr. Jacobs                   60

12         Cross Examination by Ms. Dumas                    166

13         Cross Examination by Mr. Pfister                  183

14         Cross Examination by Ms. Lujan Wolff              187

15         Redirect Examination by Mr. Martin                193

16         Re-Cross Examination by Mr. Moxley                217

17         Re-Cross Examination by Mr. Jacobs                220

18         Re-Cross Examination by Ms. Lujan Wolff           220

19         Re-Cross Examination by Ms. Dumas                 226

20         Re-Cross Examination by Mr. Malionek              228

21

22 EXHIBITS:

23 Brian Whittman Declaration

24 Joint Exhibit 8

25 JTX-1684, 1810, 1663, 1664, 2232, 360

1          (Proceedings commence at 10:03 a.m.)

2          THE COURT:  Good morning.  This is Judge

3  Silverstein.  We're back in the Boy Scouts of America

4  bankruptcy, Case 20-10343, for our continued confirmation

5  hearing.

6          Mr. Abbott.

7          MR. ABBOTT:  Good morning, Your Honor.  Derek

8  Abbott of Morris Nichols, here (indiscernible) Your Honor

9  (indiscernible) Mr. Whittman, and Andrew Hammond from White &

10 Case will be dealing with Mr. Whittman's testimony today,

11 which will be topics other than feasibility.

12          I know there are some objections pending that we'll

13 have to straighten out in the first instance, so we're at the

14 Court's pleasure on that.

15          THE COURT:  Okay.  Thank you.  Yes, let's deal with

16 the objections that were filed.

17          MR. RYAN:  Good morning, Your Honor.  Can you hear

18 me?

19          THE COURT:  Good morning.  Yes, Mr. Ryan.

20          MR. RYAN:  Thank you, Your Honor.  For the record,

21 Jeremy Ryan of Potter, Anderson & Corroon on behalf of the

22 Roman Catholic Ad Hoc Committee.

23          Your Honor, we did file an objection.  We did let

24 chambers know yesterday afternoon that we have limited the

25 objection to two paragraphs with respect to each of the

1  settling insurer testimony offered by Mr. Whittman, and also

2  two more additional paragraphs that are in his testimony with

3  respect to the Century settlement.

4          And Your Honor, for context on this, we noticed the

5  deposition of the debtors on at 30(b)(6) on a variety of

6  topics, all of which asked for the debtors' understanding of

7  certain terms and the exercise of their business judgment in

8  entering into settlement agreements containing those terms.

9  Mr. Desai was initially designated for all those topics, for

10 both of those sub-topics.

11         Last Wednesday, moments before his deposition, we

12 were informed by the debtors that he would not be testifying

13 as to understanding, that that would, instead, be moved to Mr.

14 Azer last Friday.

15         And Your Honor, just for a little bit more context,

16 at the same time that they're doing this, the debtors had to

17 have been preparing Mr. Whittman's declaration that's seeking

18 to enter in testimony on the same subjects we were seeking a

19 30(b)(6) designee because our topics are clearly going to

20 settlements and the Master Mortgage factors.

21         So we have the debtors designating witnesses other

22 than those they know who they're going to call to testify days

23 later, and with Mr. Whittman also being testified -- being

24 called to testify and deposed on Wednesday afternoon, as well.

25         So, Your Honor, at Mr. Desai's deposition, it was

1  very clear from the outset -- and this is consistent with his

2  testimony yesterday -- that he was only going to testify at a

3  very high level, not going to go into any detail of what the

4  board actually discussed, that they were asserting

5  attorney/client privilege and the mediation privilege.  It's

6  clear in his deposition, it's clear from yesterday's

7  testimony.

8          Your Honor, we can provide cites to Mr. Desai's

9  deposition if you'd like after this or as part of this, but

10  there are a multitude of objections where they said legal

11  conclusion, mediation privilege, or attorney/client privilege,

12  and instructed him not to answer when we tried to probe

13  further beyond the very high level that he testified to at the

14  outset of his deposition on the exercise of their business

15  judgment.

16          We asked for questions of Mr. Desai about the bid

17  and the ask during the negotiations.  He was instructed not to

18  answer on the basis of mediation privilege.  We instructed

19  [sic] on the specifics of the briefing he was receiving from

20  his advisors.  He was instructed not to answer on the basis of

21  mediation privilege and attorney/client privilege.

22          And Your Honor, Mr. Desai testified yesterday they

23  had nearly 100 meetings, every single one of which, except for

24  one, their attorneys were present.  And their position with

25  respect to his deposition then is, other than the absolute

1  highest level of we had meetings and we discussed, nothing

2  further could be probed into in discovery because it was

3  subject to mediation privilege and attorney/client privilege.

4        To expedite the deposition, rather than go through

5  this for each settlement agreement, we then asked general

6  questions that the debtor would assert these positions with

7  respect to the rest of the settlement agreements after we

8  concluded our examination on the Century settlement and

9  certain provisions of the plan.

10        Yesterday, as I said, more of that was made.  We

11  saw on the screen the KCIC presentation that's the subject of

12  Mr. Whitten's testimony on Century.  It was redacted, Your

13  Honor.  There's no substance behind we had a meeting.

14        On Friday, we then took the deposition of Mr. Azer

15  for the debtors' understanding of these terms.  Every question

16  about the debtors' understanding was met with an instruction

17  not to answer on the basis that understanding called for a

18  legal conclusion.  This included, Your Honor, the question as

19  to what policies met the criteria for the channeling

20  injunction for chartered organizations.  Every single question

21  was a legal conclusion to which no response was allowed to be

22  given.

23        So then, Your Honor, we take -- turning to Mr.

24  Whittman's declaration -- and for reference, I'll go to

25  Paragraph 106 and 107 --

1           THE COURT:  Uh-huh.

2           MR. RYAN:  -- of his declaration with respect to

3    the Hartford settlement.

4           In Paragraph 106 -- and identical language appears

5    with respect to the other four carriers' settlements -- Mr.

6    Whittman starts to testify to his belief about the willingness

7    of carriers to agree to certain terms.  As we saw yesterday

8    and as we saw at the deposition, the bid and the ask was

9    shielded.  We don't know who asked for what or why.  It's

10   fundamentally unfair for Mr. Whitman to now testify as to his

11   beliefs about necessity when we could never probe into who

12   asked for what and why.  Those are essential questions to

13   determine necessity.

14          Similarly, in Paragraph 107, the second-to-last

15   sentence, he testifies as to the essential nature of the

16   Hartford releases.  Your Honor, to us, "essential,"

17   "necessary," they're all the same words.

18          If we can't probe into who asked for what and why,

19   they shouldn't be allowed to testify as to the essential

20   nature based on that.  These paragraphs from Mr. Whittman

21   necessarily rely on mediation privilege that was shielded from

22   us and necessarily rely on the attorney/client privilege that

23   they refused to answer questions on.

24          And then, with respect to the two additional

25   Century paragraphs, Your Honor, those both specifically

1  reference the KCIC testimony -- or presentation to the board.

2  We saw yesterday how that was redacted.  So those are in

3  addition.  But again, Mr. Whittman's testimony is founded on

4  information materials to which the debtors did not allow

5  discovery.

6           Nor can the debtors offer anything with respect to

7  the mediation into evidence because our local rules prohibit

8  parties from seeking to do just that.  As the rule provides,

9  no party may seek to enter into evidence -- not just 408

10 limited materials, this is 9019-5(d)(1).  But in addition to

11 the limitation to admissibility under Rule 408:

12          "No party may rely on or introduce as evidence in

13 connection with any arbitral, judicial, or other proceeding,

14 including any hearing held by this Court in connection with a

15 referred matter, whether oral or written" --

16          And then (I):

17          "Views expressed or suggestions made by a party

18 with respect to possible settlement of a dispute."

19          So we cannot take discovery of it, nor can the

20 debtors offer that into evidence.  So, if the debtors want to

21 hide behind the sword -- the shield of all of these

22 privileges, that's their choice.  The consequences are what

23 they are.

24          And Your Honor, the Court in ResCap confronted the

25 exact same situation, 491 B.R. 63.  And what the Court is

1 ResCap said is, once you've asserted privileges like this

2 throughout discovery, you cannot now introduce the substance

3 of whatever advise or privileged material is sought and

4 received in order to demonstrate the proper exercise of

5 business judgment.

6          The debtors made conscious choices on the eve of

7 trial.  We abided those.  We did not challenge the privileges,

8 we abided them.  There's a local rule that's very clear.  They

9 have made those choices.  The consequence is they can't seek

10 to admit evidence that relies on mediation privilege or that

11 would go to advice that they shield with the attorney/client

12 privilege.

13          All the presentations of non-legal advisors were

14 done in the presence of White & Case and Hayes and Boone, and

15 then asserted attorney/client privilege with respect to all

16 those presentations.

17          Does Your Honor have any questions?

18          THE COURT:  No, although I think your presentation

19 went a little bit beyond your filing.

20          But let me hear from the debtors in response.

21     (Pause in proceedings)

22          MR. HAMMOND:  Sorry, Your Honor.  Andrew Hammond

23 from White & Case on behalf of the debtors.

24          Your Honor, I think there are -- I'll just comment

25 first on Mr. Ryan's presentation and then address the merits

1  of the brief.  But first, I think there's a fundamentally

2  erroneous foundation to his argument, which is that the

3  debtors are relying on mediation privileged materials.  You

4  will note, in his presentation, he failed to identify a single

5  quote that he's challenging that relied on any information

6  that was provided in mediation.  And there's a reason for

7  that, and that's because there is none.

8          So, going back to the brief, the Roman Catholic Ad

9  Hoc Committee had identified three grounds on which to exclude

10 certain paragraphs of Mr. Whittman's testimony:

11         The first was the interpreted legal documents.  You

12 didn't hear anything from Mr. Ryan as to the interpretation of

13 legal documents offered by Mr. Whittman.

14         Second, you heard that Mr. Whittman testified about

15 the debtors' exercise of business judgment.  But again, in the

16 paragraphs that he cited -- and we'll look at page -- can we

17 call up Paragraphs 106 and 107 to Mr. Whittman's declaration?

18         You will see there is no legal interpretation.  Mr.

19 Whittman simply states that, under the settlement, Hartford

20 will receive the benefit of the releases and injunctions

21 provided in the plan.  I would submit that is not a legal

22 interpretation.

23         THE COURT:  No, that's not what he's saying.  Where

24 is he saying that, that Hartford --

25         MR. HAMMOND:  In para --

1          THE COURT:  -- will receive them?

2          MR. HAMMOND:  In Paragraph 106, at the top.

3          THE COURT:  Ah, that's --

4          MR. HAMMOND:  "As noted" --

5          THE COURT:  -- the first sentence.  That's not what

6    -- okay.  That's the first sentence.

7          MR. HAMMOND:  Okay.  Well, the objection was he was

8    interpreting legal documents.  The only document that is being

9    interpreted in Paragraph 106, if you could argue that's

10   interpretation, is the plan.  So I don't see any other basis

11   for an objection on that ground here.

12         THE COURT:  What about the next two sentences.

13         MR. HAMMOND:  Yes, Your Honor.

14         "I don't believe that Hartford would be willing to

15   agree to the terms set forth in the Hartford insurance

16   settlement, including the monetary contribution that would be

17   provided to the settlement trust, absent these provisions."

18         Again, not a legal conclusion or interpreting legal

19   documents.

20         "And the releases and injunctions that would

21   benefit Hartford are an essential condition of the debtors

22   receiving the substantial benefits of the Hartford insurance

23   settlement."

24         Again -- once again, not interpreting legal

25   documents.

1          So the question he's raising is whether that -- and

2    I apologize, Your Honor.  Should I exclude Mr. Whittman from

3    the hearing?

4          THE COURT:  Well, yeah.  Why -- Mr. Whittman, why

5    don't you exit -- thank you -- the room, until we finish --

6          MR. WHITTMAN:  Yes --

7          THE COURT:  -- with this.

8          MR. WHITTMAN:  -- Your Honor.

9          THE COURT:  Thank you.

10          MR. HAMMOND:  I apologize for the oversight.

11          THE COURT:  Okay.  I agree this isn't interpreting

12    legal documents.  But what about the other grounds?

13          MR. HAMMOND:  Well, the other grounds are business

14    judgment.  And I don't see mister -- I think Mr. Whittman is

15    the debtors' financial advisor, and rendering advice to the

16    debtors, that his views as to the releases that would

17    provided, including the monetary contribution that's being

18    provided to the settlement trust, are independently relevant

19    here, independent of the business judgment of the debtors,

20    one.

21          And two, there are a host of grounds on which Mr.

22    Whittman's testimony would be based, including common sense.

23    In every case, Your Honor, where you're going to have a party

24    contributing hundreds of millions of dollars, they're not

25    going to contribute hundreds of millions of dollars without

1  obtaining a release.

2          THE COURT:  Well, if it's common sense --

3          MR. HAMMOND:  And so --

4          THE COURT:  If it's common sense, then why does the

5  fact finder need the benefit of an opinion?

6          MR. HAMMOND:  Well, I don't think this is an

7  opinion, Your Honor.  I think, at the end of the day, I

8  believe that this is the advisor to the debtors' view on the

9  likelihood that you would -- could negotiate a settlement

10  without a release.  And I think that's important for purposes

11  of assessing the reasonableness of the terms here.

12          THE COURT:  So that's his independent view?

13          MR. HAMMOND:  Yes, Your Honor.

14          THE COURT:  And you want it to come in for his

15  view.

16          MR. HAMMOND:  Yes, Your Honor.

17          THE COURT:  Okay.  And what's his view --

18          MR. HAMMOND:  And --

19          THE COURT:  -- informed by?

20          MR. HAMMOND:  I think his view would be informed by

21  the fact that we have a -- well, certainly, it would be

22  subject to cross-examination on this, Your Honor.  But

23  certainly, his view is going to be informed by his experience

24  here, in terms of, you know, operating as a financial advisor,

25  and also just common sense, that this is the way that

1  settlements work.

2           UNIDENTIFIED:  (Indiscernible)

3           THE COURT:  Okay.

4           MR. HAMMOND:  Sorry, Your Honor.

5           THE COURT:  Where in --

6           MR. HAMMOND:  My apologies.

7           THE COURT:  Where in Rule --

8           MR. HAMMOND:  701?

9           THE COURT:  Where in Rule 701 does it say that --

10  well, is he coming in as a percipiant witness or is he coming

11  in as an expert?

12          MR. HAMMOND:  On these topics, Your Honor, he's

13  coming in as a percipient witness.  So I don't think 701 is

14  actually applicable to these paragraphs.  I think his

15  independent mind set is applicable.  He's not offering an

16  opinion.

17          THE COURT:  Well, he's offering, I believe -- I

18  guess that's an opinion -- I believe that Hartford would be

19  unwilling to do something or willing to do something.  And on

20  what basis does that he have that view --

21          MR. HAMMOND:  I believe he --

22          THE COURT:  -- or form that view?

23          MR. HAMMOND:  I believe his view would be informed

24  by the fact that Hartford is paying $787 million to settle

25  these claims; and that, in settling those claims, they would

1  not want additional exposure.

2         THE COURT:  Okay.  So why is his view any better or

3  worse than anybody else's view on that, if that's his basis?

4  That's your common sense argument.

5         MR. HAMMOND:  That's right, Your Honor.  But I do

6  believe, as the debtors' financial advisor, and the person who

7  was advising the debtors in connection with these settlements,

8  which he's testified to multiple times, that is independently

9  relevant here.

10         THE COURT:  Okay.  What about the arguments about

11  assertions of mediation privilege, attorney/client privilege?

12         MR. HAMMOND:  Well, you can see in the Hartford

13  settlement itself, Your Honor, that the releases are in there,

14  and you can make the argument from the final document itself.

15         THE COURT:  Yeah.  So why do I need Mr. Whittman's

16  thoughts on that?

17         MR. HAMMOND:  I think you need Mr. Whittman's

18  thoughts on that for purposes of assessing any guidance he

19  provided to the board.

20         THE COURT:  Is he going to testify about what

21  guidance he provided to the board?

22         MR. HAMMOND:  In certain circumstances, I'm sure he

23  will, if asked on cross-examination.

24         THE COURT:  Okay.

25         MR. HAMMOND:  And then, Your Honor, I'd like to

1  turn to Paragraph 107 --

2           THE COURT:  Uh-huh.

3           MR. HAMMOND:  -- where it says -- you know,

4  Paragraph 7 [sic] provides that:

5           "Any claim relating to abuse occurring during

6  scouting activity that is brought against Hartford would

7  necessarily implicate the BSA."

8           And if you read through the rest of the paragraph,

9  Your Honor, that's being challenged by the Roman Catholic Ad

10 Hoc Committee, I -- we would submit that such testimony is not

11 covered on any of the grounds in which they've raised an

12 objection.  It's not mediation privilege.  It's not

13 interpreting a legal document, and it's not business judgment.

14          So, for those reasons, we would request that the

15 Roman Catholic Ad Hoc Committee's objection be overruled.

16          THE COURT:  Okay.  Let me hear -- I'm sorry.  I

17 probably -- I should have heard from the other objector first.

18 Let me hear --

19          MR. HAMMOND:  Uh --

20          THE COURT:  -- from the other objector, and then --

21          MR. HAMMOND:  Your Honor, if I may --

22          THE COURT:  -- I'll circle back.

23          MR. HAMMOND:  -- can I finish with the Roman

24 Catholic's -- because there are two paragraphs --

25          THE COURT:  Ah --

1            MR. HAMMOND:  -- that he doesn't --

2            THE COURT:  Yes.

3            MR. HAMMOND:  -- address that --

4            THE COURT:  You may.

5            MR. HAMMOND:  I apologize.

6            Your Honor, there are two additional paragraphs

7    that Mr. Ryan had referenced.  One was Paragraph 130 --

8            THE COURT:  Uh-huh.

9            MR. HAMMOND:  -- where he stated that, you know,

10   the presentation, JTX-975, was entirely redacted.

11           Can we call up JTX-975?  And can you scroll through

12   that?

13        (Pause in proceedings)

14           MR. HAMMOND:  And as you see, Your Honor, that

15   presentation wasn't entirely redacted, and there actually is a

16   sentence in there that talks about Century (indiscernible) so

17   there's no basis to exclude Paragraph 130 (indiscernible)

18   declaration.

19        (Pause in proceedings)

20           MR. HAMMOND:  And then, turning to Paragraph 132.

21           THE COURT:  Yes.

22           MR. HAMMOND:  Mr. Ryan objected.  I'm not quite

23   sure what the basis for the objection was.  Mr. Whittman

24   states that:

25           "I believe that the Century and Chubb Companies

1 insurance settlement and the amount of the Century and Chubb

2 Companies' insurance settlement contribution was reasonable

3 because it was agreed to in arm's length negotiations between

4 sophisticated parties with opposing economic interests."

5          And I'm not sure what the basis for the objection

6 was.  But none of the identified bases in his pleading would

7 be sufficient to preclude Mr. Whittman from offering the

8 opinion -- the testimony that's expressed in Paragraph 132.

9 This isn't mediation, this isn't interpreting a legal

10 document, he's not testifying about business judgment.  He's

11 testifying about his own views, which is independently

12 relevant as to the reasonableness of the settlement.

13          THE COURT:  Okay.  Thank you.

14          MR. HAMMOND:  Thank you, Your Honor.

15          THE COURT:  Okay.  Let me hear from our other

16 objector.

17          MR. CALDIE:  Good morning, Your Honor.  I think

18 you're referring to the Official Committee of Unsecured

19 Creditors for the Archdiocese of Agana.  Is that right?

20          THE COURT:  Yes.

21          MR. CALDIE:  Good morning.  Edwin Caldie, here on

22 behalf of that committee.  Thank you, Your Honor.

23          I would begin by joining in the arguments of the ad

24 hoc group.  Some of the things that were stated on the record

25 today were the first time that the Archdiocese of Agana

1  Committee had heard them; for example, no testifying as to

2  understanding at a 30(b)(6) deposition is truly concerning.

3          We're also happy to hear that -- in the response

4  that we received to our objection, you heard that the debtor

5  agreed that Mr. Whittman is not testifying as an expert.  And

6  while that provided some reassurance, it also emphasizes our

7  concerns with respect to other issues.

8          Your Honor, I'm unaware of any precedent.  You

9  know, a witness has to testify only if the evidence is

10  introduced to support a finding that the witness has personal

11  knowledge.  You have to -- you have to testify as to personal

12  knowledge.  I'm unaware of any precedent stating that a

13  witness can have personal knowledge of common sense.  I -- the

14  notion that someone is going to testify as to common sense,

15  that highlights the issue about which we're objecting

16  perfectly.

17          You -- a witness cannot take the stand and simply

18  say I was in the room, so I know it was common sense, and I

19  know it was necessary that these things occur.  But we can't

20  meaningfully get underneath those factual assertions because

21  we can't ask about things that are subject -- that -- who said

22  it, when did they say it, why did they say it, what did you

23  evaluate.

24          If we're going to talk about necessity and we're

25  going to have common sense -- which I would respectfully

1  submit sounds more like tautology to me than it does even

2  common sense -- we need to be able to meaningfully cross-

3  examine.  If we're going to have a fact witness show up and

4  testify as to the necessity of certain terms of settlement, we

5  need to be allowed to ask and to get answers about what the

6  basis for that conclusion is.  And if we can't, then that,

7  from my perspective, tautological testimony cannot be given

8  evidentiary weight.

9         Testimony has to be rationally based on a witness'

10  own perceptions.  Specifically, you can't testify as what --

11  as to what might happen in a hypothetical negotiation, and

12  that's precisely what we have here.  We have the insurance

13  companies, A, B, C, D, would not have agreed to these other

14  possible things; therefore, this is necessary.

15         So, on the one hand, we can't ask about things that

16  are subject to mediation confidentiality or attorney/client

17  privilege, which I understand, I understand the second one.

18  But also, we can't just have some -- we need to know whether

19  or not these things are necessary, Your Honor.  I'm kind of

20  repeating myself, so I'll move on.

21         With respect to necessity, we need to know that

22  these insurance companies absolutely required injunctions.  We

23  need to know that these insurance companies absolutely

24  required third-party releases.  We need to know that these

25  insurance companies absolutely required policy buy-backs.  Two

1   of these three terms, to my knowledge, are not required by the

2   policies at issue.

3        So it is incredibly important that we ask this

4   person -- really, the primary issue on the issue of necessity

5   -- how it is that he concluded it was necessary to give these

6   insurance companies things that they're not entitled to under

7   their insurance policies simply to get them to do something

8   that they're required to do under their insurance policies.

9   We -- if we can't ask those things, this witness' testimony

10  should not be afforded evidentiary weight.  It's not fair.

11       Your Honor, the debtors' response.  I'm sorry.  I'm

12  looking at my notes and I've already covered that.

13       So, to conclude, Your Honor, we continue to stand

14  on our objection.  We have laid out in our written objection

15  the specific paragraphs to which we object.  We would be fine

16  entering the rest of Mr. Whittman's declaration into evidence

17  absent the paragraphs that we've identified.  Does the Court

18  have any questions?

19       THE COURT:  No.  Thank you.

20       MR. CALDIE:  Oh, I'm sorry, Your Honor.  One

21  further point, if I may?

22       THE COURT:  Yes.

23       MR. CALDIE:  We would respectfully propose, Your

24  Honor, that we wait until after -- at the very least, that we

25  wait until after Mr. Whittman's live testimony and revisit the

1  need to get this declaration into evidence now if Your Honor

2  is inclined to deny the objections at this point.  That would

3  afford both the Ad Hoc Catholic Committee and the Archdiocese

4  Committee to probe the issues and to see what lies underneath,

5  what person perceptions lie underneath the testimony of the

6  witness, and then we can revisit whether or not the

7  declaration should come into evidence in full after that

8  further education.  Thank you, Your Honor.

9           THE COURT:  Thank you, Mr. Caldie.

10          Okay.  That's actually what I'm inclined to do --

11          MR. HAMMOND:  Your Honor --

12          THE COURT:  -- is to --

13          MR. HAMMOND:  -- may I?  I apologize.

14          THE COURT:  Yes?

15          MR. HAMMOND:  May I respond to --

16          THE COURT:  Yes.

17          MR. HAMMOND:  So I guess, with respect to the Guam

18  Committee, I would just make one point.  I wanted to make a

19  few points:

20          First, as I understand it, they now acknowledge

21  that there's no legal basis in their pleading to object to Mr.

22  Whittman's testimony.  He acknowledges that Mr. Whittman is

23  not testifying as an expert witness; and, therefore, the

24  grounds that he has identified are not sufficient to exclude

25  his testimony.

1          To the extent that they're interested in cross-

2    examining Mr. Whittman, they have not appeared and -- or

3    examined him in any of the six depositions that he's had in

4    this case.  So I would submit that their efforts to probe

5    beyond Mr. Whittman's understand -- probe Mr. Whittman's

6    understanding has not been exercised, notwithstanding the

7    multiple times that Mr. Whittman has appeared for testimony

8    here.  So I think that falls a little bit flat.

9          THE COURT:  Are you suggesting they should not be

10   permitted to cross-examine here?

11         MR. HAMMOND:  Absolutely not, Your Honor.  But I

12   don't think the argument that they're advancing, which is that

13   they need to get behind Mr. Whittman's testimony, if they

14   wanted to examine that testimony, they had multiple

15   opportunities to do so in this case, and they have not

16   exercised that right as of yet.  I believe Mr. Whittman will

17   testify to this during cross-examination, and he can certainly

18   address any questions at that point in time.

19         And the third point I'd like to raise, Your Honor,

20   is:  Just because there's an assertion of mediation privilege,

21   or just because there is an assertion of attorney/client

22   privilege, that doesn't mean that the witness cannot testify.

23   Your Honor, if you're not relying on that privilege, there is

24   no sword/shield.  So the basis for that testimony can be

25   explored, provided, however, if he's not relying on that

1  testimony, there's no basis to exclude, or not relying on

2  mediation privilege or attorney/client information, here's no

3  basis to exclude it.

4           MR. RYAN:  Your Honor, may I respond to some of

5  these points, as well?

6           THE COURT:  Yes, quickly.

7           MR. RYAN:  First, Your Honor, I apologize for not

8  being clear.  When we withdrew our objection to the other

9  paragraph, we were withdrawing our objection as to legal

10  conclusion.  As Your Honor noted yesterday in the cross of Mr.

11  Desai, some things are just simple reading, even if people say

12  it calls for a legal conclusion, which is why we allowed

13  (indiscernible) a lot of paragraphs.

14           Mr. Hammond, in his response, said that Mr.

15  Whittman is going to testify about the advice he gave to the

16  board.  That was precisely the subject into which discovery

17  was precluded.

18           THE COURT:  Is --

19           MR. RYAN:  It is fundamentally unfair -- I'm sorry,

20  Your Honor.  I interrupted you.

21           THE COURT:  Okay.  But I don't think his

22  declaration specifically talks about advice he gave to the

23  board or what advice he gave to the board.  Or did I miss

24  that?

25           MR. RYAN:  You -- Your Honor, I think it's embedded

1  within it, and Mr. Hammond said he would, and that's not fair.

2        And I hear what the committee in Agana said about

3  let us probe on cross.  There are two remedies when someone

4  asserts privileges and prohibits discovery:  One is to bar the

5  introduction of any evidence for which they seek to introduce

6  against their discovery conduct; the other is to reopen

7  discovery.  It's too late, Your Honor.  They made these

8  choices on the -- literally on the eve of trial.  We were

9  taking these depositions last week, they made these choices.

10  So those are the two remedies.

11        It is fundamentally unfair to ask us to inquire of

12  Mr. Whittman information into which we've had no discovery.

13  There has been no discovery of bid and ask of any settling

14  insurer on any of the terms to which findings need to be made

15  under Master Mortgage.  We can't do that on the cross --

16        THE COURT:  (Indiscernible)

17        MR. RYAN:  -- without having gotten documents.

18        And Your Honor, the KCIC thing, the presentation

19  that Mr. Hammond showed on the screen?  The most important

20  pages were fully redacted, analysis of KCIC settlement -- or

21  KCIC's analysis of settlement.  And when you look at Paragraph

22  132, the second sentence says:

23        "I believe the settlement is reasonable based on

24  KCIC's presentation of their analysis."

25        They've made these choices.  We are where we are

1   here today.  The consequences are what they are.

2          Now, if the debtors want to stipulate that the

3   entirety of Mr. Whittman's testimony is going to be no one

4   would settle without asking for a release, and not go any

5   farther, that's fine.  But they can't go into what Hartford,

6   Century, Zurich, or Clarendon wanted.  They can rely on the

7   common sense of people want releases in settlements, and that

8   will be the extent of their evidence on necessity.

9          THE COURT:  Can you point me, Mr. Ryan, to where in

10  the depositions the directions not to respond were given?

11         MR. RYAN:  Yes, Your Honor.

12      (Pause in proceedings)

13         MR. RYAN:  Your Honor, Mr. Azer's deposition, every

14  question as to understanding of the documents was met with a

15  direction not to answer.

16         THE COURT:  Okay.  I'm not sure --

17         MR. RYAN:  With respect to Mr. Desai --

18         THE COURT:  I'm not sure that I have Mr. Azer's

19  deposition in front of me.  Did someone give me that?

20         MR. RYAN:  We can get that provided to chambers,

21  Your Honor.  But I don't think anyone will deny that every

22  question where they were asked -- he was asked about the

23  debtors' understanding of terms was met with an objection and

24  an instruction not to answer.

25         MR. SCHIAVONI:  I would like to be heard on that

1  issue, Your Honor.

2          MR. RYAN:  Your Honor --

3          MR. SCHIAVONI:  I was at --

4          MR. RYAN:  -- if I could --

5          MR. SCHIAVONI:  -- the deposition.

6          MR. RYAN:  -- finish my presentation before --

7          THE COURT:  I'm only --

8          MR. RYAN:  -- Mr. Schiavoni --

9          THE COURT:  -- going to --

10          MR. RYAN:  -- speaks.

11          THE COURT:  I'm only going to hear from the people

12  who filed papers on this issue.

13          Continue, Mr. Ryan.

14          MR. RYAN:  Thank you, Your Honor.

15          With respect to Mr. Desai, I can give you some

16  examples, but there, the record -- his deposition record is

17  replete with instructions not to answer.

18          But his deposition at Pages 21 to 24 is where he

19  describes at a high level what the board's exercise of

20  business judgment was.  He specifically says:

21          "I'm not going to testify as to attorney/client

22  privilege."

23          I believe that's at Page 23, to start his answer on

24  page 23.

25          At Page 52, we inquired about what updates did the

1    board receive.  He was instructed not to answer.

2          Similar questions at Pages 71 to 73, he was

3    instructed not to answer.

4          Pages 63 and 64, what briefing did the board

5    receive, can't -- real specifics.  Instructions not to answer.

6          Any time we went beyond the very generality of a

7    meeting was held, what did the board consider, there were

8    instructions not to answer on the basis of mediation privilege

9    or attorney/client privilege.

10          MR. HAMMOND:  Your Honor, may I be heard?

11          THE COURT:  Mr. Hammond.

12          MR. HAMMOND:  Thank you, Your Honor.

13          I didn't -- I have a few points that I'd like to

14    clarify here.

15          First, Your Honor, this brief that was filed by the

16    Roman Catholic Ad Hoc Committee was filed on Sunday morning at

17    nine o'clock.  We had a meet-and-confer with the Roman

18    Catholic Ad Hoc Committee on Sunday.  We have asked the Roman

19    Catholic Ad Hoc Committee to identify what they are referring

20    to in connection with their objection.  We haven't received

21    any writing, other than an email from Mr. Ryan yesterday,

22    saying that he was referring to Paragraph 34 of Mr. Desai's

23    deposition.  That is the sole basis that they've identified to

24    date for this hearing.

25          And what they said was -- the question was:

1        "Why is it necessary for participating chartered

2   organizations to make the assignment of independent insurance

3   coverage?"

4        And there was an instruction not to answer offered

5   of Mr. Desai, who was testifying as to business judgment and

6   already had testified as to business judgment.

7        And the topics in question, this was the only thing

8   that they've identified to us, to date.  And none of that has

9   any bearing on Mr. Whittman's testimony here, and it's outside

10  of the 30(b)(6) witness -- the 30(b)(6) topics that they were

11  identify -- they were examining on.  So we would submit that

12  that's not a basis to preclude any testimony on this point.

13       And the second point I would make, Your Honor:

14  They keep arguing about Mr. Whittman testifying as to issues

15  that they haven't had an opportunity to examine him on.  Mr.

16  Whittman's testimony is reflected in his declaration.  As we

17  said in the pretrial order, Mr. Whittman's testimony will be

18  submitted only by declaration (indiscernible) so that is the

19  scope of his testimony.  His testimony isn't going beyond

20  that, unless they examine into it.

21       So we would submit, Your Honor, that we submit the

22  declaration, admit the declaration into evidence, and allow

23  the Roman Catholics to cross-examine on those topics.  We

24  think that's the appropriate way to proceed in this vein.

25            THE COURT:  Well, if they haven't been able to get

1 discovery on those topics, what good does it do for them to

2 answer -- to ask questions cold of Mr. Whittman?

3          MR. HAMMOND:  Well, they have Mr. Whittman's

4 testimony.  And two, I don't -- they have received discovery

5 on those topics, they have received information on business

6 judgment and what the debtor exercised their business judgment

7 on.

8          THE COURT:  Okay.

9          MR. HAMMOND:  They had six -- they've had six

10 opportunities to examine Mr. Whittman.  Mr. Whittman testified

11 extensively at the December 7th deposition regarding the

12 Hartford settlement.  And at the end of the day, Your Honor,

13 we believe that, you know, at least with respect to Mr.

14 Whittman's testimony, they've had ample opportunity to examine

15 him.

16          THE COURT:  Okay.

17          MR. RYAN:  Your Honor, we noticed these topics

18 after and took these depositions after all the insurance

19 settlements were done and on the third modified plan.  The

20 December deposition of Mr. Whittman, all that existed then was

21 a Hartford termsheet and a draft settlement agreement that

22 Hartford testified the debtors put on the docket without

23 Hartford's acknowledgment.

24          So, to point to prior things, we noticed a

25 deposition on exercise of business judgment and understanding,

1  took that deposition after all of these settlements were

2  required to be filed.  We got two witnesses.  Understand was a

3  legal conclusion across the board.  With respect to the

4  exercise of business judgment, again, going to the Master

5  Mortgage factors, we were met with instructions not to answer.

6          Page 52, at the bottom, Line 22:

7          "Question:  Please tell us everything that you

8  recall, sir, about the updates you received from counsel

9  during the negotiation of the Century termsheet?

10         "Mr. Andolina" --

11         Top of Page 53:

12         "Objection to form.  I'll allow Mr. Desai to

13  testify in terms of his recollection of the cadence, but not

14  with respect to positions -- specific positions that may have

15  been exchanged in the mediation, nor with respect to any

16  advice provided by counsel."

17         We -- as Your Honor said, it does us no good to

18  cross someone cold when the documents that have the cadences,

19  when the updates that tell about the cadences have been

20  shielded from discovery.

21         And Your Honor, we have a local rule, because they

22  shielded this and chose to conduct all of this in the scope of

23  a mediation, we have a mediation rule that says no party may

24  seek to enter into evidence that exact type of information,

25  offers to settle, whether they're willing to consider a

1  particular term.  It's barred from introduction by local rule.

2           MR. HAMMOND:  Your Honor, may I respond briefly?

3           THE COURT:  Yes.

4           MR. HAMMOND:  Your Honor, with respect to the

5  mediation, again, as we pointed -- as we went through with the

6  paragraphs and Mr. Whittman's declaration that Mr. Ryan is

7  challenging, he has failed to identify a single paragraph that

8  reveals any mediation privileged information.

9           MR. RYAN:  And Your Honor --

10          MR. HAMMOND:  It's --

11          MR. RYAN:  -- may I be -- I'm sorry, Mr. Hammond.

12  I apologize.

13          MR. HAMMOND:  It's all right, Mr. Ryan.

14          There is simply nothing there --

15          THE COURT:  Well, that's --

16          MR. HAMMOND:  -- that he --

17          THE COURT:  -- the point.

18          MR. HAMMOND:  -- that he has challenged.

19          THE COURT:  That's the point, isn't it?  That he's

20  making conclusory statements that he drew based on what he did

21  in mediation, but he -- but they're not allowed to explore

22  that.

23          MR. HAMMOND:  Your Honor, it's the same issue with

24  respect to privileged material, if you're examining a board

25  for example, right?  You can't examine the board on the

1  privileged material if there's an assertion of privilege, but

2  you can examine the board member on all other topics.  That

3  doesn't preclude the board member from testifying about how he

4  exercised his business judgment just because he's exercising

5  privilege.

6           And it's the same -- so, too, here, Your Honor.

7  It's the same point.  The invocation of mediation privilege

8  does not preclude a witness from testifying about the subject

9  matter.

10          MR. HAMMOND:  You can't --

11          THE COURT:  Okay.  But what --

12          MR. HAMMOND:  -- rely on what --

13          THE COURT:  -- about our local --

14          MR. HAMMOND:  -- happened in the mediation.

15          THE COURT:  What about our local rule?

16          MR. HAMMOND:  Again, Your Honor, I believe if you

17  read the Roman Catholic's objection, which they cite the local

18  rule as follows, right?  Local Rule 9019-5(d)(1)(i) on Docket

19  9310, at Page 2.

20          THE COURT:  Uh-huh.

21          MR. HAMMOND:  They say:

22          "No person may rely on or introduce as evidence, in

23  connection with any arbitral, judicial, or other proceeding,

24  including any hearing held by this Court in connection with a

25  referred matter, whether oral or written, views expressed or

1  suggestions made by a party with respect to a possible

2  settlement of the dispute."

3          There is none of that in this declaration, Your

4  Honor.

5          THE COURT:  Okay.  Okay.

6          MR. HAMMOND:  The local rule is inapplicable.

7          THE COURT:  Here's what we're going to do.  I'm

8  going to hear the testimony and permit cross-examination, and

9  we'll see what objections are raised.

10         And to the extent that you're putting this in for

11  common sense, I think that's inappropriate under Rule 701.

12  And to the extent otherwise, I'll give it, to the extent I

13  accept the testimony, the weight it deserves.

14         MR. HAMMOND:  Your Honor, since we're not

15  proceeding with a direct, may I suggest that we introduce the

16  declaration and you can reserve on specific paragraphs?

17         THE COURT:  Yes, I will reserve on all of the

18  paragraphs that have been identified.

19         MR. HAMMOND:  And just so we're clear, Your Honor,

20  the objection that has been lodged by the Roman Catholics has

21  been narrowed to Paragraphs 106, 107, 130, 132, 134, 135, 169,

22  170, 183, 184, and 238.

23         THE COURT:  Yes.  And then I will also reserve on

24  the paragraphs identified by the Official Committee --

25         MR. HAMMOND:  Guam --

1    THE COURT:  -- of --

2    MR. HAMMOND:  -- Committee?

3    THE COURT:  -- Unsecured Creditors for the

4  Archbishop of Agana, and which largely overlap as I outlined

5  them, but all of those paragraphs.

6    (Partial Whittman Declaration received in evidence)

7    (Pause in proceedings)

8    MR. HAMMOND:  Your Honor, should I call the

9  witness?

10    THE COURT:  Yes.

11    (Pause in proceedings)

12    MR. RYAN:  Your Honor, could we have a five-minute

13  break before we proceed with cross?

14    THE COURT:  You can.

15    MR. RYAN:  Thank you, Your Honor.

16    THE COURT:  Thank you.  Thank you.

17    Mr. Whittman, we're going to take five minutes, and

18  then we'll start with your testimony.

19    We're in recess.

20    (Recess taken at 10:49 a.m.)

21    (Proceedings resume at 10:59 a.m.)

22    THE COURT:  This is Judge Silverstein.  We're back

23  on the record.

24    (Pause in proceedings)

25    THE COURT:  Mr. Baay?

1          MR. BAAY:  Yes, Your Honor.  John Baay with Gieger,

2   Laborde & Laperouse, for Gemini Insurance Company.

3          And on behalf of the certain insurers, I just

4   wanted to make sure that you wanted to deal with objections.

5   We had objected to a couple of the exhibits that are attached

6   --

7          THE COURT:  Yes.

8          MR. BAAY:  -- to the declaration.  So I wanted to

9   make sure, if the declaration gets pushed in, that it's just

10  the declaration and not any of those exhibits.  So we can deal

11  with that now or when they are pushed in, your preference.

12         THE COURT:  Yes, fair.  Thank you for raising that.

13  I do have that note.

14         So, Mr. Hammond, what about the certain insurers'

15  objection to the exhibits?

16         MR. HAMMOND:  The only exhibits that were objected

17  to by the certain insurers were Mr. Whittman's expert reports.

18  We would not be offering those exhibits, but we would move the

19  remaining exhibits into evidence.

20         THE COURT:  Okay.  Very good.

21         MR. BAAY:  Fair enough.  Thank you, Your Honor.

22         THE COURT:  Thank you, Mr. Baay.

23         Okay.  Mr. Whittman, can you raise your right hand,

24  please?

25  BRIAN WHITTMAN, WITNESS FOR THE DEBTORS, AFFIRMED

1          THE COURT:  Please state your full name and spell

2    your last name for the record.

3          THE WITNESS:  Brian Whittman, W-h-I-t-t-m-a-n.

4          THE COURT:  Thank you.  And Mr. Whittman, do you

5    still stand by the statements made in your declaration?

6          THE WITNESS:  I do.

7          THE COURT:  Okay.  Thank you.

8          Mr. Ryan.

9          MR. RYAN:  Your Honor, if Mr. Hammond is just going

10   to offer in Mr. Whittman's declaration, with the reservations

11   we spoke of, the Roman Catholic Ad Hoc Committee does not have

12   any questions for cross.

13         THE COURT:  Okay.  Does anyone else -- did anyone

14   wish to cross?  Mr. Baay.

15         MR. BAAY:  Thank you, Your Honor.  Again, John Baay

16   with Gieger, Laborde & Laperouse, for Gemini Insurance Company

17   and on behalf of the certain insurers.

18                    CROSS-EXAMINATION

19   BY MR. BAAY:

20   Q   Mr. Whittman, I just have a few questions for you today.

21         MR. BAAY:  Matt, if you can please pull up

22   Paragraphs 210 through 214 from Mr. Whittman's declaration.

23   That is Docket 9280, regarding local council insurance.

24         MR. HAMMOND:  Your Honor, this is Andrew Hammond

25   for the debtors for the record.

1        Mr. Whittman has a copy of his declaration in front

2  of him.

3        THE COURT:  Thank you.

4  BY MR. BAAY:

5  Q    Mr. Whittman, this section of your declaration covers

6  your opinion regarding the reasonableness of the local

7  councils' contributions to the settlement trust, correct?

8  A    Correct.

9  Q    And in forming your opinion on that issue, you relied on

10  the work done by Ms. Gutzler with KCIC, correct?

11  A    That is one component of the basis for my opinion.

12  There's -- there's multiple components for the basis for my

13  opinions that the local councils' contribution is substantial,

14  but that is one component.

15  Q    Okay.  And one of the -- and the substance of that

16  component, as you described it, is her report that provided

17  you with a range of values in Chart Number 3 for the local

18  council insurance policies, correct?

19        MR. BAAY:  If you can scroll down just a little

20  bit.

21  BY MR. BAAY:

22  Q    That's Chart Number 3?

23  A    That is correct.

24  Q    Okay.  And for the values of the BSA policies where

25  local councils are additional insureds you pulled those values

1  from her report as well, correct?

2  A      That is correct.

3  Q      Okay.  And you did not independently confirm any of

4  those numbers, correct?

5  A      Other then where the value is coming from the

6  settlements that have already been entered into, no, I do not.

7  Q      Okay.  I'm just talking about the value of the policies.

8  You didn't do anything to -- and you are not offering an

9  opinion as to the accuracy of those numbers that you lifted

10  from the KCIC report, correct?

11  A      Correct.

12  Q      And, likewise, all of the abuse insurance policies you

13  referred to in those paragraphs are taken from her report,

14  correct?

15  A      That is correct.

16  Q      And you did not independently review those abuse

17  insurance policies, correct?

18  A      Correct.

19  Q      And you are not offering any opinion on the terms,

20  conditions or limits of any of the abuse insurance policies,

21  correct?

22  A      I am not offering an opinion on the limits or terms of

23  those policies, that is correct.

24          MR. BAAY:  Thank you, Mr. Whittman.  That is all

25  the questions I have for today.  We will reserve our rights

1  for further questions when you are called back later in the

2  case.  Thank you very much.

3          THE WITNESS:  Thank you.

4          THE COURT:  Thank you.

5          Ms. Dumas.

6          MS. DUMAS:  I will reserve rights if he is called

7  back and not ask questions right now.  Thank you.

8          MR. HAMMOND:  Your Honor, with respect to his

9  future testimony that is going to be addressing feasibility.

10 So to the extent that there are questions that are not going

11 to be directed to feasibility we suggest that they be

12 addressed at this point in time.

13         THE COURT:  That is my understanding that this is

14 everything but feasibility.

15         MS. DUMAS:  Yes.  Thank you.

16         THE COURT:  Thank you.

17         Is there anyone who wishes to cross-examine Mr.

18 Whittman?

19     (No verbal response)

20         THE COURT:  The official committee for the

21 Archdiocese of Agana is not going to cross-examine?

22         MR. CALDIE:  Thank you, Your Honor. Edwin Caldie

23 for the committee.

24         By the way, I would welcome Your Honor to call it

25 the Guam Committee just for ease of pronunciation for the rest

1  of the case.  I will do the same.

2            No, Your Honor, after hearing the remaining

3  argument from the Catholic Ad Hoc Group and the debtor's

4  responses, and hearing the questions asked by certain

5  insurers' attorney, we will simply reserve our right, of

6  course, to cross Mr. Whittman on issues that he testifies to

7  in the future.

8            THE COURT:  Okay.  Last call, anyone else?

9        (No verbal response)

10           THE COURT:  I hear no one.

11           Thank you, Mr. Whittman.

12           THE WITNESS:  Thank you, Your Honor.

13           THE COURT:  You're excused.

14       (Witness excused)

15           UNIDENTIFIED:  Your Honor, we were not

16  anticipating, after we saw the hands yesterday to have

17  everyone pass on cross-examining Mr. Whittman.  Could we have

18  a 15 minute recess, please?

19           THE COURT:  Yes.  Our next witness is Mr. Griggs,

20  correct?

21           UNIDENTIFIED:  That is correct, Your Honor.

22           THE COURT:  Okay.  I do see some hands now.  Mr.

23  Martin.

24           MR. MARTIN:  Yes, Your Honor.  Mr. Martin, Ernest

25  Martin here with Haynes & Boone for the debtors.

1            I will be presenting Mr. Griggs.  As Mr. Hammond

2    said, we anticipated that there were going to be many

3    questioners and lots of time going on with his examination,

4    but I have contacted Mr. Griggs, who is at his hotel, to get

5    here immediately.  So that is, kind of, the state of play

6    right now.  He is on his way.

7            THE COURT:  Okay.  Thank you.

8            Mr. Jacobs.

9            MR. JACOBS:  Yes.  Good morning, Your Honor.

10           Can you hear me okay?

11           THE COURT:  I can.

12           MR. JACOBS:  I am Todd Jacobs.  I am here on behalf

13   of National Surety Corporation and Interstate Fire & Casualty,

14   and the insurer group.  I am going to be handling Mr. Griggs's

15   cross examination today.

16           There were a few objections to the declaration and

17   the exhibits that I suggest maybe we could handle those while

18   Mr. Griggs comes over from his hotel.

19           THE COURT:  I would actually like to take the

20   break, but we will handle the objections prior to his

21   testimony.  So thank you.

22           MR. JACOBS:  Thank you.

23           THE COURT:  It is, I've got, 11:08.  We will come

24   back at 11:30.  We're in recess.

25       (Recess taken at 11:08 a.m.)

1          (Proceedings resumed at 11:30 a.m.)

2          THE COURT:  Okay.  This is Judge Silverstein.

3   We're back on the record.

4          We will deal first with the objections to certain

5   paragraphs of Mr. Griggs's declaration.

6          MR. JACOBS:  Your Honor, if I might.  Again, Todd

7   Jacobs, again, on behalf of certain insurers.  I think I will

8   just say certain insurers because it's shorter than my

9   clients' names.

10         There is basically -- we took to heart Your Honor's

11  admonition to not put additional issues on your plate.  So we

12  tried to keep this short.  There is, basically, four

13  categories of things and I particularly don't want to object

14  too much to Mr. Griggs because one of the things we found out

15  in discovery is that we're law school classmates.  So I have

16  to be somewhat kind to him.

17         The first objection, Your Honor, is to one of the

18  exhibits.  I believe it is Joint Exhibit 8-1 to 8-3 which we

19  internally have started calling them (inaudible) because it

20  consists of 465,000 plus pages of what look to be -- I guess

21  we got this over the weekend, Your Honor. I can't say I've

22  looked at every single one of the 465,000 pages, but it looks

23  like pleadings from the underlying sexual abuse cases,

24  complaints, answers, that kind of thing. I think there may be

25  redacted IV files; IV meaning the ineligible volunteer files.

1  It's a mish-mash of a lot of documents from the underlying

2  cases.

3         We just don't think a 465,000 page exhibit should

4  come into the record.  These should have been broken into

5  individual exhibits.  We might have agreed to them, but it's

6  basically just a document dump, Your Honor.  Mr. Griggs's

7  declaration isn't specifically addressing any of these

8  documents.

9         So we think it's inappropriate.  Federal rules of

10 evidence, basically all of them, Your Honor, relevance,

11 burden, hearsay.  When you're dealing with 465,000 documents I

12 think they all apply.  We just don't think it should come in.

13         MR. MARTIN:  Your Honor, may I respond?

14         THE COURT:  Yes, you may respond.

15         MR. MARTIN:  Thank you, Your Honor.  Ernest Martin

16 with Haynes & Boone for the debtors all the way from Dallas,

17 Texas.  Good to be with you, Your Honor.

18         I think Mr. Jacobs doesn't realize that in Texas

19 everything is big.  So here is the thing about this exhibit.

20 These are just the underlying complaints and these are

21 exhibits that, of course, the insurers and everyone else

22 already have.  They have had them for months, but let's talk

23 about, okay, I think the objection is they're too voluminous.

24 Well that is not a basis for rejecting exhibits.

25         Relevance, let's talk about relevance.  Why are we

1  putting these in? Simply to show who was actually sued in

2  these cases.  You are going to hear throughout this bankruptcy

3  about, sort of, the unity of interest between and amongst the

4  BSA, the local councils, the chartered organizations and you

5  are going to hear about that in the context of the insurance

6  and you're going to hear about that in context of the lawsuits

7  that were filed against the BSA, and against the local

8  councils, and against the chartered organizations.

9        So that is, if you recall from Mr. Griggs's

10 declaration, he actually made that point and then referred to

11 the complaints, then the footnote which is Footnote 5 of his

12 declaration, which is Docket 9273, referencing Exhibits 8-1 to

13 8-3 which are just the underlying complaints.  They are not IV

14 files, as Mr. Jacobs said.  These are just the underlying

15 complaints.

16       Again, there is no reason, just because they're

17 voluminous -- I will wait till you get back, Your Honor.

18     (Pause)

19       THE COURT:  Okay.  I was just looking -- excuse me,

20 I was just looking in the six parts of exhibit binders that

21 were rolled over here to find Joint Exhibit 8.  I actually

22 don't see it.

23       MR. ABBOTT:  Your Honor, Derek Abbott.  I

24 apologize.  As we alerted your staff we did send a couple of

25 those much larger exhibits over on (inaudible).  That may be

1  where you can locate them, Your Honor.

2            THE COURT:  Okay.  Thank you. I do recall that.

3            I'm sorry, please continue.

4            MR. MARTIN:  Thank you, Your Honor.

5            My point was simply just because a document is

6  voluminous does not make it inadmissible.  By the way, Your

7  Honor, I don't know if you have had an opportunity to review

8  this, but we did file, the debtor's filed a response to the

9  certain insurers' objection.

10           THE COURT:  I have that.

11           MR. MARTIN:  Yes.  That is Docket 9339.  So we have

12  in here case authority which supports the point that I just

13  made which is just because it's a voluminous document doesn't

14  make it inadmissible.  Again, the reason for putting it in, as

15  I said, to demonstrate the unity of interest between those

16  parties.

17           THE COURT:  What do you want me to do with the

18  voluminous documents; look at the captions, know they're

19  there, what?

20           MR. MARTIN:  Yes.  Look at the captions, know

21  they're there, who are the defendants that are typically named

22  in these suits.

23           THE COURT:  Doesn't Mr. Griggs tell me that in his

24  declaration?

25           MR. MARTIN:  You know, he does talk generally about

1  the various parties.  One of the things that we also want you

2  to know is that, for example, some of those parities included

3  TCJC.  They included the Methodists which are settled parties,

4  settled organization parties.

5         So, again, it is a small point, but it is an

6  important point which, again, is to demonstrate the unity of

7  interest among and between these parties; nothing more,

8  nothing less.

9         THE COURT:  Okay.  I will admit the exhibit for the

10  purposes of reviewing who the defendants are in various

11  lawsuits.  I will not purport to look at 465,000 pages of

12  documents and they're not being admitted, certainly, not for

13  the truth of any underlying litigation or for any of the

14  particular statements in there, but I will look at it for who

15  the defendants are.

16      (Joint Exhibit 8 received into evidence)

17         MR. MARTIN:  Thank you, Your Honor.

18         MR. JACOBS:  Thank you, Your Honor.

19         The second point of four.  Yesterday we received

20  from the debtors a proposed demonstrative exhibit to use with

21  Mr. Griggs which was surprising to us because under the

22  pretrial order Mr. Griggs is listed as testifying by

23  declaration only and so if we're not going to hear live

24  testimony from him on direct I don't understand how we can

25  have a demonstrative exhibit and it can't be for rebuttal

1  because they don't know what I am going to ask on cross.  So

2  it seems like this should not be used.

3          MR. MARTIN:  May I respond, Your Honor?

4          THE COURT:  Mr. Martin.

5          MR. MARTIN:  Well, he's right.  I don't know what

6  questions he's going to ask, but I always like to be prepared

7  and to the extent that he is going to cover what I think he is

8  going to cover this will be used in that regard.

9          THE COURT:  Okay.  I will rule on that when and if

10  you seek to use it.

11          MR. MARTIN:  Thank you, Your Honor.

12          MR. JACOBS:  I will just note, Your Honor, if we

13  get to that point the demonstrative looks to be mostly just a

14  slightly different words what is at the end of Mr. Griggs's

15  declaration already.  So I am not sure it's literally a

16  demonstrative, but I guess we will get there when we get

17  there.

18          Third, we objected to one paragraph of his

19  declarations where Mr. Griggs purported to say that the

20  debtors drafted the initial version of the TDP's.  So I saw

21  that the debtors had a filing today clarifying that that is

22  not what he is saying.

23          Just for context, Your Honor, you know, Mr. Griggs

24  was the debtor's national coordinating counsel for four years

25  before the bankruptcy.  So, you know, he is quite

1  knowledgeable about the defense prepetition.  I think what

2  we're going to hear on cross, and I don't really think that

3  this is disputed, is that Mr. Griggs did not participate in

4  drafting the TDP's, didn't write them, didn't approve them.

5  He did supply some information that the debtors say was

6  included in the TDP's, but he's not the TDP negotiator or

7  draft person or anyone who approved the TDP's.

8          As I understand, the debtors are going to say Mr.

9  Azer, who is Mr. Martin's partner, is going to be testifying

10  about the negotiation of the TDP's.  He is their witness and

11  Mr. Burnett is their expert witness on the reasonableness of

12  the TDP's.  So that is, sort of, how this all lines up.  And

13  Mr. Griggs was the national coordinating council, you know,

14  with what happened prepetition with very limited involvement

15  in the actual TDP's, but we will get to that on cross.

16          I just wanted to make sure that this is not in the

17  record, the debtor's draft of the initial version of the TDP.

18  And I understand from the debtors that they have clarified

19  that's not what he's saying.

20          THE COURT:  Okay.  So are you comfortable with the

21  clarification?  Is that what I am hearing, Mr. Jacobs?

22          MR. JACOBS:  Yeah.  I mean our objection was, Your

23  Honor, that it said when the debtors were drafting the initial

24  version.  We don't think the debtor's drafted the initial

25  version.  That was the objection.

1          THE COURT:  Okay.  I will not consider that intro

2     to suggest -- to be testimony that the debtors drafted the

3     TDP's, the initial version of the TDP's.

4          MR. JACOBS:  Thank you.

5          So last category of objection, four of four.  So

6     the end of Mr. Griggs's declaration, let me get it here in

7     front of me, it's the last section, Your Honor, starting on

8     page 17, Paragraph 52, to the end which I think is 65.

9     Basically, what Mr. Griggs does there is he goes through what

10    is in the TDP's and says that, you know, his prepetition

11    activities are consistent with what is in the TDP's.  He does

12    a comparison.

13          Your Honor, first off, its opinion testimony,

14    number one.  Mr. Griggs was not identified by the debtors as

15    an expert witness.  The rules require that.  The court's

16    orders require that.  We didn't -- so this is opinion

17    testimony number one.  So I think we can hear from Mr. Griggs

18    and we didn't object to, you know, the part of his declaration

19    where he talks about what he actually did, but this is him

20    reading the TDP's, which is a legal document, in the plan and

21    telling us what's in there and what is not in there.

22          I mean we can all read this, Your Honor. I mean I

23    have read it.  I'm sure you have as well.  I don't think we

24    need to have Mr. Griggs read it to us. Its opinion testimony.

25    I think it's (inaudible) and, frankly, it's a legal

1 conclusion. So we don't object to Mr. Griggs talking about

2 what he actually did, but this comparison in the TDP we think

3 is out of bounds.

4        I think this is going to be a long hearing to begin

5 with.  If we have to with all the witnesses cross-examine them

6 on what's -- their interpretation of what is in the document

7 that is everyone's reading this is really going to take a long

8 time. I will tell you that my cross is going to be

9 significantly longer if we have to compare what actually is

10 Mr. Griggs's opinion of what is in legal document as part of

11 the plan.

12        So we think those ought to be excised and stricken

13 and that we're happy to hear from Mr. Griggs's, otherwise, on

14 what he actually did.  He is a fact witness, not an expert

15 witness.

16        THE COURT:  Mr. Martin.

17        MR. MARTIN:  Your Honor, wow, what an overreach I

18 have to say about this.  I mean it is as if Mr. Jacobs didn't

19 read the first 16 pages of Mr. Griggs's declaration.  The

20 first 16 pages of his declaration painstakingly go through his

21 personal experience in handling prepetition sexual abuse

22 claims for the Boy Scouts.

23        The section that they have a problem with is when

24 Mr. Griggs's is then taking that very detailed experience set-

25 out in his declaration and saying is that consistent with what

1   is in the TDP.  You may recall, Your Honor, that back in

2   November of last year the insurers, the certain insurers came

3   to you when we wanted to depose certain insurance companies

4   about how they were handling sexual abuse claims.  They argued

5   to you, wait a minute, Your Honor, you shouldn't let anybody

6   take depositions of any carriers because what's important in

7   determining whether or not the TDP's are appropriate is what

8   did the BSA do?  How did they deal with the claims?  How did

9   they deal with those claims?

10          These carriers were telling you back then you

11  should be looking at the BSA's practices and they even

12  referred to Mr. Griggs when they did that.  That is what we

13  are doing now.  All we are doing is we're saying we have put

14  these TDP's together, we have identified certain factors that

15  are considered in the TDP's, criteria, scaling factors and all

16  of those factors were prepared after consulting with our

17  national coordinating council, Mr. Griggs, who spent time and

18  time again.

19          You will see if you look through, and if Mr. Jacobs

20  had read the first 16 pages of Mr. Griggs's declaration he

21  went through everything from when he started, what he did when

22  he started, his initial investigation, his prepetition

23  responsibilities, selection of defense counsel, coordination

24  of defense strategies, and on, and on.  Why does he do that?

25  He does that to be able to say, listen, those practices were

1   consistent with what we have in the TDP's.  Of course Mr.

2   Griggs should be talking about that.

3           This is not an expert opinion, it's an opinion

4   based on what he has actually done personally.  This is

5   personal knowledge of Mr. Griggs.  And if push comes to shove

6   and we want to call this opinion testimony then under Rule 701

7   we know that that is appropriate.  And, in fact, in our

8   response that we filed today we cite to a Third Circuit case

9   Gee v. Martin Transportation which says the following:

10          It is well settled that the modern trend favors the

11  admission of lay opinion testimony provided that it is well-

12  founded on personal knowledge and susceptible to specific

13  cross examination.  Here it is, whereas here as lay witness's

14  opinion testimony is based on sufficient experience or

15  specialized knowledge and if sufficient connection exists

16  between such knowledge and experience, and the lay opinion

17  that opinion should be admitted because it may be fairly

18  considered to be rationally based on the perception of the

19  witness and truly helpful to the jury.

20          No question this is exactly what you should hear

21  and what you should hear from Mr. Griggs about how those

22  practices comport with what we have in the TDP's.  For those

23  reasons, Your Honor, especially this particular objection

24  should be summarily rejected.

25          THE COURT:  Did Mr. Griggs not have to be

1  identified as an expert because you are saying he's a lay

2  witness, lay expert?

3           MR. MARTIN:  He's a lay witness.  He is the

4  national coordinating counsel for the Boy Scouts.

5           THE COURT:  And how is his testimony going to be --

6  am I going to have them three witnesses on the debtor's

7  position that the TDP's are consistent with the debtor's

8  prepetition practices?

9           MR. MARTIN:  You are going to hear from Bruce

10 Griggs who is the national coordinating counsel for the Boy

11 Scouts who is going to say I was hired in August of 2016 and

12 for years I actually was familiar, intimately, with the

13 prepetition practices.  So you are going to get that angle and

14 then we're going to have Mr. Burnett who is not going to be

15 focused on the BSA practices, but he is going to say I know

16 what defendants and insurance companies do in handling sexual

17 abuse cases.

18          So not only are you going to hear from the BSA, but

19 you are going to hear from our expert who says these

20 procedures, these factors that are embedded in the TDP, are

21 consistent not only with BSA's practices, but the practices

22 that you find that are handled by carriers, and by defendants,

23 and by religious organizations all over the country.  I think

24 that is important for you to hear.

25          THE COURT:  Well I am going to overrule the

1  objection.  I will hear the testimony.

2          MR. MARTIN:  Thank you, Your Honor.

3          Then, Your Honor, we do move to admit Bruce

4  Griggs's declaration along with all of the exhibits attached

5  to Mr. Griggs's declaration.

6          THE COURT:  Okay.

7          MR. JACOBS:  Same objections we already had, Your

8  Honor.

9          THE COURT:  Yes.  I will overrule those objections.

10 They are noted for the record.  It's admitted.

11     (Griggs declaration and attached exhibits received into

12 evidence)

13         MR. MARTIN:  Your Honor, we are going to call Mr.

14 Griggs in now if you would like.

15         THE COURT:  Yes.  Thank you.

16         MR. MARTIN:  Your Honor, just so that you know,

17 because our setup here in Dallas is a little bit different

18 that you have seen previously.  I am going to let you know who

19 is in the room so everyone knows that.

20         So it's kind of unnerving because the camera is on

21 me and I can see me, and I don't like that.

22         THE COURT:  I know the feeling.

23         MR. MARTIN:  We have Mr. Griggs who you can see now

24 is sitting right to my right.  We have Mr. David Brooks who is

25 our trial technician who is in the room.  He is going to help

1  with exhibits if we need to.  Then my colleague, Mike Stoner,

2  is on my left at the table.  So those are the only individuals

3  that are in the room.

4            THE COURT:  Thank you.

5            Mr. Abbott.

6            MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott,

7  again, for the debtors.

8            Your Honor, there is one other preliminary matter

9  that I think has come to folks attention that we would like to

10 point the court to (inaudible) going to go on a while.  Could

11 I ask Mr. Kurtz to address that.

12           THE COURT:  Okay.

13           MR. KURTZ:  Good morning, Your Honor.  Glenn Kurtz,

14 White & Case, for the debtors.

15           Sorry, we thought we would address this before Mr.

16 Griggs started once I saw he was actually in the room when I

17 was, sort of, walking that way.  What we really wanted to

18 report is that the debtors are working to resolve the

19 objections that were raised this morning to the introduction

20 of the declaration of Brian Whittman.  So we would ask the

21 court to maybe hold off on a ruling and maybe we can elevate

22 that work entirely; perhaps by tomorrow morning if that works

23 for Your Honor we will be able to report back on (inaudible).

24           THE COURT:  Thank you.  I will (inaudible) to that

25 opportunity.

1          MR. KURTZ:  Thank you, Your Honor.

2          The other thing is we apologize for the delay in

3   the day.  We have been doing what we can to canvass people and

4   for the court to have the timing and the canvassing was five

5   hours and it became zero hours to where we are absolutely

6   delighted by that and appreciate that it would be helpful if

7   people would update us if there are changes so that we don't

8   end up having witnesses with holes in the court's schedule or

9   witnesses that are not where they need to be.  So we do

10  appreciate that we saved a lot of time today.

11         THE COURT:  Thank you.

12         MR. KURTZ:  Thank you very much, Your Honor.

13         THE COURT:  Mr. Griggs's, we're going to swear you

14  in.  Will you raise your right hand, please.

15              BRUCE GRIGGS, DEBTOR WITNESS, SWORN

16         THE COURT:  Please state your full name and spell

17  your last name for the record.

18         THE WITNESS:  Bruce Griggs, G-R-I-G-G-S.

19         THE COURT:  Mr. Jacobs.

20                    CROSS EXAMINATION

21  BY MR. JACOBS:

22  Q    Good morning.  Todd Jacobs for the certain insurers.

23  Good morning, Mr. Griggs.  Nice to see you again.

24  A    You as well.

25  Q    We met at your deposition, correct?

1   A      We did.

2   Q      You were deposed on, I think it was, December 1st of

3   last year, is that correct?

4   A      I believe that is right.

5   Q      And in that deposition -- prior to that deposition you

6   were prepared for four to five hours, isn't that correct?

7   A      Yes.

8   Q      The preparation was conducted by Ernest Martin and

9   Adrian Azer, isn't that correct?

10  A      It is.

11  Q      Okay.  Who are Mr. Martin and Mr. Azer?

12  A      They are coverage counsel for the Boy Scouts.

13  Q      They're the special insurance counsel for the Boy

14  Scouts?

15  A      Correct.

16  Q      Okay.  Do you understand it's their job to maximize

17  insurance recovery for the Boy Scouts?

18  A      I don't understand that one way or the other.  I just

19  know they're coverage counsel for the Boy Scouts.

20  Q      Well they're not here to minimize insurance recovery,

21  are they?

22  A      I think you would have to ask them that.

23  Q      In your experience -- you have worked with them for a

24  number of years, haven't you?

25  A      I have.

1   Q      They were trying to recover insurance for the Boy

2   Scouts, right?

3   A      Yes.  Trying to find historical policies and trying to

4   make sure that those policies that were in place responded to

5   claims.

6   Q      And their goal was to maximize the amount of insurance

7   proceeds they could get for the debtors, isn't that correct?

8   A      I think their goal was to be accurate in making sure

9   that responsive insurance policies applied to claims. If that

10  maximized insurance coverage -- I'm not quibbling with you

11  over that, I'm just saying that is how I understand their goal

12  to be.

13  Q      Do you understand Mr. Azer is also going to be a fact

14  witness in this case?

15  A      I understand that anecdotally.

16  Q      Have you talked to Mr. Azer about that?

17  A      I have not.

18  Q      What did you do to prepare for today's testimony?

19  A      I read my deposition.  I read my declaration.  I

20  reviewed all of my deposition exhibits and all of the exhibits

21  to my deposition, and I met with Mr. Martin.

22  Q      Did you meet with Mr. Azer?

23  A      I did not.

24  Q      Okay.  So you met with Mr. Martin.  Anyone else?

25  A      Mr. Stoner.  There could have been some others in the

1  room, but it was principally those two.

2  Q    And Mr. Stoner, he is also with Haynes & Boone, correct?

3  A    He is.

4  Q    And Haynes & Boone, again, is the debtor's special

5  insurance counsel, correct?

6  A    Correct.

7  Q    How long did you meet with Mr. Martin and Mr. Stoner?

8  A    Probably for three hours or so on Sunday and, again,

9  yesterday about two hours.

10  Q    And you put in a written declaration for this proceeding

11  today, isn't that correct?

12  A    I did.

13  Q    Did you write that declaration?

14  A    I didn't draft it, but I reviewed it once it was

15  drafted, made changes to it, made sure that it was all correct

16  and then sent it back.

17  Q    Okay.  Who wrote the declaration?

18  A    I don't know.

19  Q    Was it someone at Haynes & Boone?

20  A    Likely.

21  Q    Okay.  And, again, Haynes & Boone is the debtor's

22  special insurance counsel, correct?

23  A    Yes.

24  Q    So they wrote your declaration?

25  A    Well as far as I know they did.

1  Q      Well who would know better than you, Mr. Griggs?

2  A      Again, I don't know who specifically wrote it.  I know

3  it was sent to me by Haynes & Boone.

4  Q      Okay.  Who sent it to you?

5  A      Probably Mr. Stoner.

6  Q      Okay.  Do you know if Mr. Azer wrote any of it?

7  A      I do not.

8  Q      Do you know if Mr. Martin wrote it?

9  A      I doubt it.

10 Q      Do you know if Mr. Stoner wrote it?

11 A      That would seem most likely.

12 Q      Okay.  So Mr. Stoner from Haynes & Boone who is the

13 debtor's special insurance counsel wrote your declaration,

14 correct?

15 A      As far as I know.

16 Q      Thank you.

17        I want to start off just generally with your role as

18 national coordinating council.  Mr. Griggs, a lot of this I

19 think is going to be familiar from your deposition.  So maybe

20 that will make you more comfortable.

21        So let me start off and violate the first rule of cross

22 examination and ask you an open ended question.  So what --

23 you got hired in August 1st of 2016 to be the debtor's

24 national coordinating council, right?

25 A      That is right.

1    Q      Okay.  Can you tell me why that happened?

2    A      I think the Boy Scouts was not satisfied with how their

3    litigation was progressing.  It was a serious threat to their

4    very existence.  The plaintiffs' counsel in sexual abuse cases

5    has been very coordinated with sharing of information, and

6    documents, and strategies.  Boy Scouts prior to August 1st of

7    2016 was not that.  There was disparate defense counsel kind

8    of all over the country.  Inconsistent approaches in cases.

9    There were issues with discovery that were going on that were

10   concerning.

11          So the Boy Scouts wanted a coordinated approach.  They

12   wanted somebody with a lot of litigation experience and

13   ability to handle large projects to come in, manage all of the

14   abuse litigation, coordinate the defense, coordinate the

15   hiring of defense counsel, try to achieve consistency in

16   results and better results.

17   Q      Thank you for that.

18          So part of the reason you got brought in as national

19   coordinating council in August of 2016 was that the

20   plaintiff's attorneys were highly coordinated in these cases,

21   isn't that correct?

22   A      They were.

23   Q      Were highly cohesive?

24   A      You know, I don't want to overstate it.  Not all of them

25   were, but certainly a subset of them were.

1  Q     Okay.  The Boy Scouts thought that they needed more

2  consistency on their end, correct?

3  A     That is my impression.  You know, I can't speak to

4  exactly what all was going on with that, but that was my

5  understanding.  More consistency, a better approach.

6  Q     Okay.  And the goal was to more effectively defend the

7  sexual abuse cases, wasn't it?

8  A     It was.

9  Q     And you (inaudible) some consistency and approach across

10  multiple jurisdictions, correct?

11  A     That is correct.

12  Q     And you wanted to make sure that the Boy Scouts were

13  asserting the correct defenses in the various jurisdictions,

14  didn't you?

15  A     Yes, but also not asserting defenses that didn't make

16  sense in a particular case.

17  Q     So there's 50 states, right, which makes this

18  examination a little harder because there's different elements

19  in 50 states, but the idea was to have a consistent approach

20  to the defense, correct?

21  A     Correct.

22  Q     And raise appropriate defenses in the various

23  jurisdictions?

24  A     That's fair.

25  Q     And you wanted -- part of the goal was to just get

1  better results in the cases, correct?

2  A    Yes.

3  Q    And to lower the amount of money that the Boy Scouts

4  were paying in those cases, correct?

5  A    Correct.

6  Q    And the goal really was to put on the very best possible

7  defense that the Boy Scouts could put on, wasn't it?

8  A    It was to represent the Boy Scouts in the best possible

9  way which would include putting on the best defense that you

10 can.

11 Q    And I think you said at your deposition you thought, you

12 know, at the end of the day the effort was a qualified

13 success.  Isn't that correct, Mr. Griggs?

14 A    Qualified because here we are in bankruptcy.  So,

15 obviously, it was not a complete success.

16 Q    Qualified success, right?

17 A    For a period of time, yes.

18 Q    You thought you got better results than the Boy Scouts

19 had gotten pre-August 1st, 2016?

20 A    For a period of time, yes.

21 Q    Right.  So in the four years you thought there was

22 really a value to have good defense counsel involved, didn't

23 you?

24 A    I did.

25 Q    Okay.  Thank you.

1        Let me just ask you a little bit about the structure of

2   the national coordinating council.  So as I understand it you

3   were the lead counsel, correct?

4   A    Yes.

5   Q    And Ogletree was your firm where your partner was the

6   national coordinating council, correct?

7   A    That is right.

8   Q    And you had six full-time Ogletree defense lawyers

9   working on the defense of the Boy Scouts, isn't that correct?

10  A    As many as six.  It wasn't always six.  And the six

11  includes me.

12  Q    Okay.

13  A    Me plus five.

14  Q    Okay.  You plus five.  So I will go with around six

15  realizing it might have changed a little bit over time.

16       And then you had a series of counsel across the country,

17  correct, regional and local counsel who also represented the

18  Boy Scouts in the underlying section of these cases, correct?

19  A    We had defense counsel in any jurisdiction in which

20  there was a case file or a claim filed, and that defense

21  counsel appeared in the cases.  Ogletree did not appear in the

22  cases.  We coordinated the defense.

23  Q    And so in this -- should I call it regional counsel or

24  local counsel, which is more appropriate?

25  A    I think local counsel would be more accurate.

1  Q    Okay.  So I will go with local counsel.  So you had

2  local counsel where the Boy Scouts had cases, correct?

3  A    Correct.

4  Q    Right, and as I understand from your deposition the Boy

5  Scouts didn't have counsel in more than half of the states in

6  the United States, isn't that correct?

7  A    I believe that is right.

8  Q    And the reason for that, Mr. Griggs, is because there

9  weren't cases in more than half of the states because of the

10  statute of limitations.  Isn't that correct?

11  A    That could be one of the reasons.  The statute of

12  limitations or other reasons, but its correct that we didn't

13  have counsel where we didn't have cases.

14  Q    Right.  So there weren't cases where there was a statute

15  of limitations defense and it was more than half of the

16  jurisdictions in the U.S., correct?

17  A    Well I wouldn't agree that it was just limited because

18  of the statute of limitations.  It could be that a particular

19  state didn't have much of a presence in scouting, could be

20  other reasons, but it also could be statute of limitations.

21  Q    Which states did the Boy Scouts not have a presence in?

22  A    You know, I think some of the far norther, say like

23  South Dakota, North Dakota, maybe some of the Western states.

24  I really don't know, but I am just hesitant to say it was just

25  because of the statute of limitations because I can't really

1  say that.

2  Q    Right.  Well in your deposition you said that that is

3  what you thought, right, Mr. Griggs, that you didn't have

4  cases in jurisdictions where there were the statute of

5  limitations that barred the claims?

6  A    I think I said what I just told you.

7  Q    Why don't we pull-up your deposition at page 103.  Matt,

8  if you could bring this up.

9        MR. MARTIN:  Excuse me.  Sorry, there's just a tech

10  issue here.  I'm being told that when Mr. Griggs is talking

11  the camera is on me. It should be on Mr. Griggs.

12        THE COURT:  I see everybody.

13        MR. MARTIN:  Okay.  All right.

14  BY MR. JACOBS:

15  Q    It's actually on page 104.  Thank you for bearing with

16  me.  Line 14.  So you were asked the following question and

17  gave the following answer:

18        Question:

19        "So if I'm understanding this correctly, the reason they

20  would have had defense counsel in less than half of the states

21  is there weren't claims because the claims would have been

22  time barred?"

23        Your answer is,

24        "Yes, that's likely true. So yes it is if a particular

25  state had a statute of limitations that barred the claim and

1  plaintiffs' lawyers weren't filing claims in those states and

2  we didn't have defense counsel there."

3       Do you see that question and answer, Mr. Griggs?

4  A    I do see it.

5  Q    That is the question I asked you and the answer you gave

6  on December 1st, correct?

7  A    Correct.

8  Q    Thank you.  You can take that down.

9       So, Mr. Griggs, your declaration points out that the Boy

10 Scouts didn't file a lot of motions to dismiss or motions for

11 summary judgment.  Do I have that correct?

12 A    Correct.

13 Q    And part of the reason for that or maybe even the

14 biggest reason for that is you didn't have to file motions

15 because there weren't cases filed in more than half of the

16 jurisdictions in the United States, were there?

17 A    Well we didn't file a lot of motions to dismiss or

18 motions for summary judgment in the cases that were filed.

19 That was my point.

20 Q    So what I am saying is I sort of strenuously agree with

21 you in the states where the statute of limitations didn't bar

22 the claim.  There wasn't a lot of motion practice.  The point

23 is you didn't have to file them in most of the states because

24 you didn't have claims, right?

25 A    Well, obviously, if we didn't have a claim, no, we

1  didn't have to file a motion.

2  Q     Right.  So the statute of limitations is really the

3  legal issue where you would have seen a motion to dismiss or a

4  motion for summary judgment, correct?

5  A     No, I don't think I would necessarily agree with that.

6  So in the cases that were filed typically statute of

7  limitations was not the principal issue.  There were --

8  Q     I'm talking -- I'm sorry, I didn't mean to --

9            MR. MARTIN:  Let him finish, please.

10            MR. JACOBS:  Yeah, I'm sorry.  I didn't mean to

11  speak over the top.  You can finish, Mr. Griggs.

12            THE WITNESS:  I'm done.

13  BY MR. JACOBS:

14  Q     My point is, Mr. Griggs, had you gotten cases filed in

15  jurisdictions where there was a statute of limitations that

16  barred the claim the Boy Scouts would have filed a motion to

17  dismiss, wouldn't they?

18  A     Boy Scouts may have or unless we could resolve the claim

19  very cheaply without going through that process we might have

20  done that as well.

21  Q     Yeah, but you didn't even have the cases to go through

22  that process.  There wasn't any reason to save defense costs

23  because the cases weren't even filed, right?

24  A     You know, that's generally true.  Did we have cases or

25  claims that were brought to our attention that we thought were

1  time barred that we tried to resolve, yes, we did.

2  Q    You had a handful.  We talked about those in your

3  deposition, right, there were a few of those.

4  A    There were.

5  Q    But by in large there weren't cases filed in

6  jurisdictions where the statute of limitations barred the

7  claims, right?

8  A    There weren't many. There were some, some of our most

9  serious cases filed in jurisdictions where we thought the

10  claims was barred by statute of limitations, but a court told

11  us otherwise.

12  Q    So you didn't have to file a motion to dismiss or motion

13  for summary judgment where there were no cases, right?

14  A    Correct.

15  Q    And there were no defense costs to be saved because

16  there were no cases to defend, right?

17  A    Right.

18  Q    And that all changed as part of the bankruptcy, didn't

19  it?

20  A    What exactly changed?

21  Q    Well now you've got 82,000 plus cases, right?

22  A    No, we don't have 82,000 plus cases.  We have -- I will

23  accept your number 82,000 claims, but those aren't all cases.

24  Q    Well I will say -- I will take your point.  I'm going to

25  use 82,000 because I think that's the number I have heard

1  after cases get duplicated.  Now you've got 82,000 cases,

2  right?

3  A    Claims.

4  Q    Claims.  And how many did you have prepetition?

5  A    About -- I think we handled about 350 cases from August

6  1st, 2016 through the petition date.

7  Q    So if you go up to 82,000 that is a several level order

8  of magnitude increase in the number of claims, isn't it?

9  A    It is.

10  Q    Many of those cases are from jurisdictions where no

11  cases were filed at all against the Boy Scouts prepetition

12  because of the statute of limitations issue, right?

13  A    I really can't speak with precision to where all of

14  those claims are. I can say that there is a whole lot of

15  claims and cases in New York, in New Jersey, and other states

16  that have revival statutes that allow the claims in cases to

17  be filed.

18  Q    So there are some states with reviver statutes,

19  California, New York, New Jersey being among them.  I grant

20  you that, but there are a lot of states that don't have

21  reviver statutes, right?

22  A    I think that's fair.

23  Q    And we went over some of these and like the ones you

24  remembered offhand in your deposition.  For example, Texas

25  doesn't have a reviver, right?

1    A      It does not.

2    Q      There's thousands of proofs of claim in the bankruptcy

3    from Texas, isn't there?

4    A      I don't know.

5    Q      You haven't looked at the proofs of claim, have you?

6    A      I have not.

7    Q      You haven't done any study of the proofs of claim?

8    A      No.  My job is to handle cases that are filed.

9    Q      Okay.  You haven't done any study of the viability of

10   any of those claims?

11   A      I have not.

12   Q      Okay.  The Boy Scouts, in general, hasn't done any

13   evaluation of the viability of any of these claims, have they?

14   A      I don't know the answer to that.  If you are saying it

15   has internally the Boy Scouts done that I would say no.  Has

16   someone on their behalf done it, I don't know.

17   Q      They might have some expert witness in this bankruptcy,

18   right?

19   A      Correct.

20   Q      But you didn't do it, right?

21   A      I did not.

22   Q      And Ogletree didn't do it, right?

23   A      No.

24   Q      And you are the Boy Scouts national coordinating

25   council, if anyone had done it for the Boy Scouts it would be

1  you, wouldn't it?

2  A    I can't say that.

3  Q    Well who would it be?

4  A    It could be somebody else handling the proofs of claim

5  because that is very different then a lawsuit that gets filed.

6  Q    Okay. I think you mentioned other states that you

7  remembered that didn't have a reviver statute including

8  Colorado, correct?

9  A    I think what I was saying is I recall that you were

10  asking me where we had cases.  Maybe I got that wrong, but

11  that is the way I think about it; where did we have cases.

12  Colorado would be one of the states where we did not.

13  Q    Right.  I think you're right on that.  So Colorado is

14  one of the states you didn't have cases.  Ohio is one of the

15  states you didn't have cases, correct?

16  A    I believe that is correct.

17  Q    Do you know there's thousands of proofs of claim from

18  Ohio in the bankruptcy?

19  A    I don't know.

20  Q    I think you mentioned Nevada is a state you didn't have

21  cases?

22  A    That's correct.

23  Q    Wisconsin, is that correct?

24  A    I believe it is.

25  Q    I think you mentioned Tennessee.

1  A      I don't recall any cases in Tennessee.

2  Q      And then I think you said there's probably a lot of

3  others, but you just didn't recall offhand which ones they

4  were, right?

5  A      Correct.

6            MR. JACOBS:   Your Honor, I am not going to go

7  through all 50 states.   I think the point has been made.

8  BY MR. JACOBS:

9  Q      Have you -- did you work at all with Bates White in this

10  case?

11  A      To some extent. I provided input to Bates White.

12  Q      What input did you provide to them?

13  A      Input regarding what kind of factors Ogletree considered

14  when evaluating abuse claims, what we did to investigate

15  claims, kind of the process oriented things.   What factors

16  increased the value of the claim, what factors decreased the

17  value of the claim; those kinds of issues.

18  Q      Did you provide them information on statute of

19  limitations in various states?

20  A      Yes.   Ogletree did, yes.

21  Q      To Bates White?

22  A      I believe so.

23  Q      Matt, could you pull-up Joint Exhibit 1684?

24          For the record this is Joint Exhibit 1684.   It's a

25  February 24th, 2021 presentation by Bates White called

1  preliminary valuation of proof of claim records.  Do you see

2  that, Mr. Griggs?

3  A    I do.

4  Q    You were showed this at your deposition, correct?

5  A    Yes, I believe I was.

6  Q    Have you seen this before, I mean other than your

7  deposition?

8  A    I have reviewed it before today.

9  Q    So, Matt, can you -- unfortunately, I don't think this

10 has internal page numbers, but I think its page 17 if my count

11 is correct.  So if you can, Matt, highlight the third column,

12 its claims not presumptively barred by statute of limitations

13 and the column above that claims barred by statute of

14 limitations.

15      Do you see that, Mr. Griggs?

16 A    I do.

17 Q    So claims barred by statute of limitations these are the

18 proofs of claim, correct?

19 A    As far as I know, yes.

20 Q    And the number there is 53,163, correct?

21 A    That is what that says, yes.

22 Q    And Ogletree would have supplied the information to

23 Bates White that resulted in this calculation, correct?

24 A    Ogletree supplied a memo to Bates White that detailed

25 the statute of limitations in each jurisdiction.  That is what

1  we provided. We did not come up with these numbers.

2  Q     Right.  But they took the information that you provided

3  and did the calculation, correct?

4  A     Presumably.

5  Q     Right.  And then this says there's 23,022 claims not

6  presumptively barred; correct?

7  A     That's what it says, yes.

8  Q     And the same drill there, they would have taken -- Bates

9  White would have taken the information Ogletree provided and

10  done its calculation?

11  A     Presumably, yes.

12  Q     So we have Bates White on record with 53,163 of the

13  claims are barred by the statute of limitations; correct?

14  A     At the time that was created, that's what it says; I

15  don't know if it would be different today.

16         MR. JACOBS:  Okay, Your Honor, oh behalf of the

17  certain insurers, I'd like to move into evidence Joint Exhibit

18  1684.

19         MR. MARTIN:  No objection, Your Honor.

20         THE COURT:  Thank you.  It's admitted.

21      (Exhibit JTX-1684 received in evidence)

22         MR. JACOBS:  Thank you.  Okay, you can take that

23  down, Matt.

24  BY MR. JACOBS:

25  Q     I think you also said in your declaration it was your

1  experience that -- I don't want to put words in your mouth,

2  I'll say it my way and then you can correct me if I'm wrong.

3  The courts were somewhat reluctant to grant -- in the

4  jurisdictions where their cases were actually filed, leaving

5  out the more than half that there weren't any, courts were,

6  you thought, somewhat reluctant to grant motions based on

7  statute of limitations issues, isn't that correct?

8  A    Correct.

9  Q    Okay.  So, Mr. Griggs, don't you think courts generally

10 follow the law?

11 A    I think courts make a good faith effort to come to the

12 right results, but sometimes that good faith effort is guided

13 by lots of different external factors that affect rulings.

14 Q    Okay.  Have you -- I know the Boy Scouts went into

15 bankruptcy, I think, in February 2020, have you followed

16 developments with respect to limitations, statute of

17 limitation issues in various jurisdictions since the

18 bankruptcy was filed?

19 A    To some extent.  My focus really is more on the stuff

20 that affects the Boy Scouts.  So I don't do it in an everyday,

21 cohesive way, if that's your question.

22 Q    Okay.  Well, I just wanted to show you because my

23 impression -- I'm involved with a lot of these cases, Mr.

24 Griggs, so I don't really comport with yours as to what courts

25 are doing with statute of limitations issues in jurisdictions

1  where cases actually get filed.

2          MR. JACOBS:  Matt, could you bring up Joint Exhibit

3  2233?

4  BY MR. JACOBS:

5  Q    Okay.  Just for the record, this is a district court

6  opinion from the Southern District of Ohio in the Garrett v.

7  Ohio State University sexual abuse cases, known colloquially

8  as the Strauss sexual abuse cases.  Have you seen this before,

9  Mr. Griggs?

10 A    I have not seen the opinion; I recall you asking me

11 about it in my deposition.

12 Q    Okay.  Well, you can take a look at it, but the federal

13 district court judge in Ohio dismissed hundreds of sexual

14 abuse cases filed against Ohio State University based on the

15 statute of limitations, isn't that correct?

16 A    I don't know.

17 Q    Okay.  This is a recent opinion.

18 A    I'll take your word for it.

19 Q    Okay.

20         MR. JACOBS:  Your Honor, I don't know what you want

21 to do.  I'm going to move this into evidence, although I'm

22 cognizant that this is a legal -- this is a legal document

23 that's an opinion that's available out there for anyone who

24 wants to do legal research, but I think I heard Your Honor say

25 you didn't really want to take judicial notice of things.  So,

1  out of an abundance of caution, I'm just going to move this

2  into evidence on behalf of the certain insurers.

3       MR. MARTIN:  And we object, Your Honor.  We haven't

4  read this, the new -- it's not even -- it's hearsay and

5  there's really no reason -- the relevance, I think, is also

6  questionable.  So, on those grounds, we object.

7       THE COURT:  I'm going to sustain the objection.  If

8  you want to argue it when we get to argument, you can do

9  whatever you want with the case.

10       MR. JACOBS:  Okay.  Thank you, Your Honor.  We'll

11  probably put it in brief.

12       Matt, could you bring up Joint Exhibit 3008?

13       (Pause)

14  BY MR. JACOBS:

15  Q    For the record, this is an appellate court opinion from

16  Illinois Appellate Court 2nd District in a sexual abuse case

17  involving a minor.  Have you seen this, Mr. Griggs?

18  A    No.

19  Q    And the court dismissed the case based on the statute of

20  limitations.  And you can read it, if you want.  That's really

21  going to be my only question about it.  Do you see that?

22  A    I see that you're showing me a copy of the case, yes.

23  Q    Right.  So do you know how many thousands of cases were

24  filed in the Boy Scouts bankruptcy from Illinois?

25  A    I don't know.

1  Q      Okay.

2            MR. JACOBS:  Your Honor, I'm not going to move it

3  in, we'll reserve this for argument as well.

4            Matt, could you bring up Joint Exhibit 3009?

5  BY MR. JACOBS:

6  Q      This is an opinion from a three-judge panel in North

7  Carolina, very recent, December of this year, invalidating on

8  constitutional grounds the North Carolina reviver statute.

9  Have you seen this before, Mr. Griggs?

10 A      I have.

11 Q      Okay.  And so you know that North Carolina now doesn't

12 have a reviver, right?

13 A      I don't know that that process is complete yet, I'm

14 aware of that decision.

15 Q      Do you know how many hundreds of cases were filed in the

16 Boy Scouts bankruptcy from North Carolina?

17 A      No, I don't.

18 Q      Okay.

19            MR. JACOBS:  You can take that down, Matt.

20            And, Your Honor, I will not offer it into evidence,

21 but we'll reserve it for argument.

22 BY MR. JACOBS:

23 Q      Let me switch gears just a little bit.  Part of your

24 declaration talks about insurance -- insurer participation in

25 the defense of the underlying sexual abuse cases.  Do you

1  recall that, Mr. Griggs?

2  A    Yes.

3  Q    Okay.  And that part of the declaration was written by

4  Haynes & Boone, wasn't it?

5  A    Whoever wrote it, yes.

6  Q    Yeah, I think you identify probably Mike Stoner.

7  A    Right.

8  Q    Right?  So, prepetition, insurers were involved in the

9  defense of the Boy Scouts sexual abuse cases, weren't they?

10 A    Well, involved to the extent they received notice, if

11 there was insurance.  There wasn't insurance in -- certainly

12 not all of the case.  But they received notice and then I

13 would or somebody on my team would communicate with them,

14 update them on status of cases and whatnot, and, if

15 appropriate, they would participate in mediation or settlement

16 discussions.

17 Q    So for -- do you know how many of the cases insurers

18 were not involved with?

19 A    I don't know for sure.  I think of it in terms of

20 decades.  So, you know, in the '60s, it was primarily what I

21 think of as Chubb was the primary insurance carrier.  In the

22 '70s, that changed.  Hartford was involved, but Hartford at

23 the time was denying coverage, so they weren't involved in the

24 cases.  And then it changed again in the '80s and '90s.  It

25 just depended on the years.

1    Q      So in years where there was potential insurance and

2    insurers were involved -- taking out Hartford, correct?

3    A      In years where there was potential insurance, yeah.

4    Q      Right.

5    A      They were involved, as I said, and they got notice, they

6    were kept up to date.  They typically were not involved in

7    strategy decisions, deciding who gets deposed or when, or any

8    of those things.

9    Q      But the insurers help select defense counsel in

10   coordination with you, didn't they?

11   A      On occasion, that's true.  And they certainly would have

12   to -- I wouldn't hire a defense counsel without their consent.

13   Q      Right.  And in cases where it was actually the insurers'

14   money involved, you would make sure to get consent from them

15   to do anything, didn't you?

16   A      To do anything might be a little broad, I wouldn't quite

17   agree with that, but certainly I would agree that we would

18   advise them of what we were doing.

19   Q      Well, before you settled any cases prepetition, if an

20   insurer was involved with insurer money, you certainly would

21   have gotten their consent to settle the cases, wouldn't you?

22   A      I would.

23   Q      Okay.  And that was primarily Sentry, right?

24   A      Chubb, yes.

25   Q      Well, I'll call them whatever you want to call them --

1   A     Well, that's just the way I think about them, that's

2   all.  So Sentry it is, Sentry, yes.

3   Q     Well, Mr. Schiavoni may jump in and yell at me, but I'll

4   go with Sentry or Chubb.  So they were the insurer in the '60s

5   and '70s and '80s, right?

6   A     You know, they were certainly in the '60s and again in

7   the '80s, they weren't always involved in the '70s, is my

8   recollection.

9   Q     Okay.  And that was Hartford for the years in the '70s

10  that --

11  A     Correct.

12  Q     Right?

13  A     Correct.

14  Q     And so would you say Sentry had the majority of the

15  coverage for these claims?

16  A     I would say that's who I dealt with most often.  Whether

17  they had the majority of the claims, I don't know.

18  Q     Okay.  Who was it at Sentry that you dealt with?

19  A     First, it was Dave Humphries who was the principal, you

20  know, adjuster assigned to the Boy Scouts.  That evolved a

21  little bit over time and it became Shelly Williams --

22  Katherine Williams.

23  Q     All right.  And then I think you said some point in '80s

24  they're basically wasn't insurance for the sexual abuse cases,

25  was there?

1  A     It seems like there were responsive policies through
2  most of the '80s.  I can't think of a year in the '80s where
3  there wasn't any.  But, again, that may not be right.  I am
4  not an insurance coverage lawyer, but I would just -- when we
5  got claims, we would investigate whether there was potential
6  insurance responsive to the claims.
7  Q     I think you called it in your declaration matching
8  deductible insurance policies, do you remember that?
9  A     Yes.
10 Q     And that's something Mike Stoner wrote, isn't it?
11 A     Whoever wrote it.
12 Q     Right.  And so would those policies have been after
13 1986, do you know?
14 A     I don't know.
15 Q     Okay, but at some point later in time it was really the
16 Boy Scouts' money involved --
17 A     Correct.
18 Q     -- with those cases, correct?  Right?  And earlier it
19 might have been Sentry or Hartford, but later on it was the
20 Boy Scouts; right?
21 A     Right.  Later on it became -- as I recall it, the first
22 layer was Boy Scouts' money before any insurance would be
23 implicated.
24 Q     Right.  And so excess insurers were rarely involved;
25 right?

1  A      That's fair.

2  Q      Because it was largely the Boy Scouts' money in those

3  later years; correct?

4  A      Unless you got what we viewed as a real, potential high-

5  exposure claim, that's when the excess carriers would get more

6  involved.

7  Q      Right.  For example, the Hacker claims?

8  A      Correct.

9  Q      Right.  We'll come back to the Hacker claims, but just

10 the excess insurers were involved in the Hacker claims,

11 weren't they?

12 A      A limited number of them, from my recollection, were

13 involved --

14 Q      Right.

15 A      -- not very many.

16 Q      Do you remember who it was?

17 A      It was Allianz.

18 Q      Yeah, it was my client, right?  It was actually National

19 -- it was actually National Surety, wasn't it?

20 A      National Surety.

21 Q      Right, it was National --

22 A      Sorry.  I've done my best to forget the Hacker claims,

23 so that --

24 Q      Well, unfortunately, I think I'm going to make you

25 remember them --

1  A      All right.

2  Q      -- for a few minutes here later, but -- so it was Sentry

3  and it was National Surety.  There were excess insurers

4  involved where the cases potentially implicated the excess,

5  correct?

6  A      Correct.

7  Q      Right?  And there weren't many of those, were there?

8  A      No, there weren't.

9  Q      I mean, other than Hacker, can you remember any?

10  A      Yes.

11  Q      Okay.  Which ones?

12  A      There was a three-plaintiff case in New Jersey -- I

13  don't know if I'm permitted to say the name, so that's why --

14  I know the name, but a three-plaintiff case in New Jersey that

15  started trial, it was settled after -- or in the middle of

16  jury selection, that implicated excess coverage.

17  Q      Okay.

18  A      There was also AIG was involved in cases; I can't

19  specifically remember which ones.  I think there was one in

20  New Hampshire that implicated AIG's excess policy, they were

21  involved.

22  Q      Okay.  In the cases where insurers were involved, the

23  Boy Scouts and the insurers were on the same side, weren't

24  they?

25  A      To some extent, I would say.

1  Q      Yeah.  Well, I mean, to the extent the plaintiffs were

2  on one side and the Boy Scouts and the insurers had a common

3  interest in either defeating or reducing the value of the

4  case; right?

5  A      Right, but there was also coverage litigation between

6  the carriers and the Boy Scouts at the same time.

7  Q      Right.  But that came out of Hacker, right --

8  A      It did.

9  Q      -- the Hacker -- and it wasn't out of the other cases;

10  right?

11  A      There was -- as I recall, there was also coverage

12  litigation with Hartford, but Hacker is the group of cases

13  that I think generated most of that dispute.

14  Q      So, exempting Hacker out and whatever the issues were

15  with Hartford, the insurers and the Boy Scouts were on the

16  same side; correct?

17  A      Well, to the extent your question is did they -- were

18  they trying to come up with a best possible way to resolve the

19  claim, correct, I would say that's a fair statement.

20  Q      Thank you.  And if insurers in those cases where

21  insurers were involved asked you information, you'd provide

22  it; correct?

23  A      Typically, yes.

24  Q      And you wouldn't -- those cases wouldn't have been

25  settled without asking the insurers for consent; correct?

1    A      Correct.

2    Q      And they weren't settled unless the insurer consented;

3    correct?

4    A      Well, again, Hacker cases were because they needed to be

5    settled, but I can't think really of any other cases where we

6    settled it without an insurer's consent except for all the

7    Hartford cases where we neither asked them for consent, nor

8    received it.

9    Q      Okay.  So, exempting out Hartford and exempting out

10   Hacker, the insurers would have been asked to consent and did

11   consent to paying these settlements if they did -- let me

12   start that again, that's too many -- you would have asked the

13   insurers to consent; correct?

14   A      Yes.  And now let me just correct one thing, just to

15   make sure I got it right.  There were -- there was at least

16   one case in California where excess -- one or more excess

17   carriers was involved.  I don't think I mentioned that before,

18   but I do recall it as I sit here, yeah.

19   Q      Okay.  So, exempting out Hartford and the Hacker cases,

20   the Boy Scouts asked for the insurers' consent to settle;

21   correct?

22   A      Yes.

23   Q      And the insurers either consented or they didn't; right?

24   A      Right.

25   Q      Okay.  Thank you.

1       Let me change gears here just slightly.  I want to

2   talk to you just a little bit about the substantive defenses

3   that the Boy Scouts raised in the prepetition sexual abuse

4   cases.  And, again, we did talk about this in your deposition,

5   so I don't think there's going to be any great surprises here.

6   But, first off, the Boy Scouts always defended the cases;

7   right?  If there was a case filed in court, you hired a

8   lawyer; right?

9   A     Yes.

10  Q     Right?

11        (Pause)

12  A     (Indiscernible) yes.

13  Q     Right.  And then you'd have a local counsel; correct?

14  A     Correct.

15  Q     And in some cases, some of the more extraordinary cases

16  -- I'm talking about Hacker specifically -- you might actually

17  have even more counsel; correct?

18  A     I'm not sure what you mean by that.

19  Q     Well, so, in Hacker -- well, I'm going to come back to

20  this in a little more detail -- Pretzel & Stouffer, which is a

21  defense firm in Chicago, was working you, a defendant in the

22  Hacker cases; correct?

23  A     Well, Pretzel & Stouffer had been hired by the Boy

24  Scouts when the Hacker cases were filed, which was, I think,

25  in 2013 maybe.  So it predated Ogletree.  When Ogletree got

1  involved, part of my job was to evaluate all defense counsel,

2  and then we made a decision at some point the transfer the

3  case from that firm to Winston & Strawn.

4  Q    Right.  And so Winston & Strawn got the case.  Winston &

5  Strawn is a large, international firm based in Chicago;

6  correct?

7  A    Correct.

8  Q    And you hired Dan Webb to defend those cases; correct?

9  A    That is correct.

10  Q    Okay.  And so Dan Webb is one of the most famous trial

11  lawyers in America, isn't he?

12  A    He is.

13  Q    And he's the chairman of Winston & Strawn?

14  A    I don't know that, but he is a famous trial lawyer.

15  Q    And he's a former U.S. Attorney in Chicago?

16  A    He is.

17  Q    And most recently seen, for those who follow the

18  headlines, as the special prosecutor in the Jussie Smollett

19  case in Chicago?

20  A    He's an accomplished guy.

21  Q    Yes.  You went, sir, with the best of the best for the

22  bigger cases, didn't you?

23  A    Well, actually, what we did in Hacker specifically was

24  we hired Winston & Strawn to file a petition with the Illinois

25  Supreme Court to hear the -- you know, the Court of Appeals

1  opinion, basically appeal the Court of Appeals' decision,

2  that's why we hired them in the first instance.  Once that was

3  unsuccessful and the cases came back -- there was at that time

4  16 cases, they had separate cause numbers, and the trial court

5  set them for trial sequentially one after another.  So, 30

6  days apart, 16 cases, and we needed a trial lawyer.

7  Q    Well, while we're talking about Hacker, why don't I just

8  do this now so we don't jump around too much?

9           So I think you said in your deposition that you

10 considered the Hacker case as an outlier; is that correct?

11 A    Correct.

12 Q    And they're probably the most extraordinary cases that

13 you had as national coordinating counsel?

14 A    They were, in my view.

15 Q    Right, the ones that were the biggest threat to the Boy

16 Scouts; correct?

17 A    Yes.

18 Q    And they were -- the cases were highly contentious,

19 weren't they?

20 A    Not highly contentious, they were -- they had a very

21 high exposure.

22 Q    High exposure -- the Boy Scouts litigated those cases,

23 didn't they?

24 A    Yes.

25 Q    Yeah, they filed a motion for summary judgment?

1  A      In one of the cases.

2  Q      Right.  They filed an appeal in the Illinois appellate

3  court?

4  A      The parties agreed to take an interlocutory appeal.  So

5  the trial court denied summary judgment on the statute of

6  limitations issue, the plaintiffs' counsel and then defense

7  counsel agreed to take an interlocutory appeal because

8  everybody agreed it was in the best interest to get the issue

9  resolved and not, you know, spend a lot of time and money only

10 to have it resolved later.  So that's how it got to the

11 Illinois Court of Appeals.

12 Q      Right.  And so -- and these are the cases you hired

13 Winston & Strawn and Dan Webb in; correct?

14 A      Yes.

15 Q      And eventually those cases all settled; correct?

16 A      They did.

17 Q      Okay.  So I took a look -- and maybe I can cut through

18 this -- I think your declaration said that Boy Scouts, during

19 the time you were national coordinating counsel, had paid $160

20 million to settle sexual abuse cases prepetition; is that

21 correct?

22 A      I believe that's what it says.

23 Q      Okay.  So I looked at -- again, to save Judge

24 Silverstein having to look at all these spread sheets -- the

25 Hacker cases were 89.1 million of that 160 million, weren't

1  they?

2  A     That sounds about right, they were --

3  Q     Right.

4  A     -- very expensive.

5  Q     Right.  So more than half of the prepetition settlement,

6  total settlement amount was from 16 Hacker cases; correct?

7  A     In the period of time that Ogletree was involved --

8  Q     Right.

9  A     -- in the engagements.

10 Q     So that leaves, some rough math, about $70 million for

11 all of the other cases that you settled?

12 A     Whatever that math is.

13 Q     Okay.  And so how many other cases were there, if you

14 subtract Hacker?

15 A     Well, Hacker had, you know, 18 plaintiffs originally.

16 So, when I say 350 cases, I'm including cases and claims.  So

17 there wouldn't have been 350 cases, but let's just say 300 or

18 so cases.

19 Q     Okay.  So 300 or so cases, if you subtract Hacker out,

20 300 cases was $70 million; is that correct?

21 A     Yes, whatever --

22 Q     So, rough --

23 A     -- that -- whatever that math is, yeah.

24 Q     Right.  So, rough math -- lawyers are bad at math, but I

25 actually did this before we got on the Zoom, so it's about

1   300,000 a case if you exclude Hacker, isn't it, on average?

2   A     Again, I'll take your word for it.

3   Q     Okay.  Well, Judge Silverstein can do the math, but if

4   it's helpful, I think it's around 300,000 for all the non-

5   Hacker cases.

6             So let's talk about the substantive defenses that

7   were raised in the underlying cases.  And so if you could --

8             MR. JACOBS:  -- Matt, if you could bring up Joint

9   Exhibit 1808?

10  BY MR. JACOBS:

11  Q     So, Mr. Griggs, this was Exhibit 9 at your deposition.

12  For the record, this is a Boy Scouts answer in a case in Ohio

13  -- or, excuse me, Idaho -- I made a big mistake for Ohioans

14  and Idahoans -- in Idaho.  This is typical of an answer that

15  the Boy Scouts would have filed in the underlying sexual abuse

16  cases, isn't it?

17  A     Again, they would vary by jurisdiction, but this was

18  certainly typical of one that would be filed in Idaho.

19  Q     And I think we agreed at the deposition that certainly

20  there's differences in different state's laws, but this was

21  fairly -- this complaint -- or this answer is fairly

22  consistent with answers in jurisdictions where Boy Scouts

23  filed answers; correct?

24  A     Well, again, I'd have to look at all what it says, but

25  if the question goes to what the affirmative defenses that

1  were raised, are those fairly typical, I think I would say

2  yes.

3  Q    Right.  So -- thank you for that.

4        So let's just go -- I want you to help educate me

5  and the Court on the defenses that the Boy Scouts raised.

6        MR. JACOBS:  So, Matt, if you could go to the

7  affirmative defenses, which start on page 11.

8  BY MR. JACOBS:

9  Q    Okay.  Mr. Griggs, if you see in the second defense

10 there, it brings up that the cases may be time barred, do you

11 see that?

12 A    Yes.

13 Q    Okay.  Now, that's a defense that the Boy Scouts

14 consistently raised in prepetition cases where it was

15 appropriate; correct?

16 A    Where it was appropriate, yes.

17 Q    Right.  In jurisdictions where you had a statute of

18 limitations defense, the Boy Scouts always raised it; right?

19 A    Yes.

20 Q    Okay.  If you go to the third defense, this says that

21 the plaintiffs were not -- not the plaintiffs, I'm sorry,

22 these are the perpetrators, correct, Mr. Griggs, the alleged

23 sexual abusers Bone, Livy (ph) and Schmidt?

24 A    I don't specifically recall Bone and Schmidt, I do

25 recall Livy.  Livy was the perpetrator.

1  Q    Right.  So what you're saying here, that the defense

2  that the Boy Scouts is that the perpetrator, the actual

3  perpetrator of the sexual abuse, was not an agent, servant, or

4  employee of the Boy Scouts; correct?

5  A    Correct.

6  Q    Okay.  And that's a defense that the Boy Scouts

7  consistently asserted in the underlying sexual abuse cases;

8  didn't they?

9  A    Yes.

10 Q    Okay.  Can you just explain to the Court what that

11 defense is?

12 A    Just exactly that, that -- you know, typically, to the

13 extent there's a typical, it would be a troop leader who's the

14 accused abuser, and those are chosen at the local troop level

15 and they are not employees of Boy Scouts national, they're not

16 -- you know, we would say the defense is that they're not an

17 agent of the Boy Scouts.  Somebody at the local level in Idaho

18 who the parents choose as a troop leader is not an agent of

19 the Boy Scouts.

20 Q    And so this was consistently asserted; correct?

21 A    Without much success, but yes; consistently asserted.

22 Q    So the perpetrator themselves of the sexual abuse, it's

23 basically strict liability for that sort of defendant, isn't

24 it, because it's intentional conduct?

25 A    Typically, they weren't named as defendants, but --

1  yeah, but if they were, they're not going to have much of a

2  defense.

3  Q    They're not going to have a defense.  And the point is

4  the Boy Scouts have a defense that the perpetrators don't

5  have; correct?

6  A    Yes.

7  Q    And that's the institutional defense that the

8  perpetrators are not agents, servants, or employees of Boy

9  Scouts?

10  A    Right.  That is a defense, whether it is a successful

11  defense is a different question.

12  Q    Right, but my question is this was consistently asserted

13  by the Boy Scouts prepetition, wasn't it?

14  A    It was.

15  Q    Okay.  And if you go back to the second defense, so this

16  complaint -- the complaint in this case alleged fraud and

17  fraudulent concealment; didn't it, Mr. Griggs?

18  A    It did.

19  Q    Okay.  And you'll see in the second sentence, that's the

20  sentence that starts, "The substance" -- "The substance of

21  these two claims is in fact negligence of defendants allegedly

22  causing bodily injury in the form of child sexual abuse."  Do

23  you see that, Mr. Griggs?

24  A    I do.

25  Q    So the Boy Scouts consistently in their pleadings cast

1  allegations that sounded in fraud as really being negligence

2  claims, didn't they?

3  A    Again, that would be very jurisdiction-specific.  The

4  reason it's in there in Idaho is because, if their personal

5  injury statute of limitations applied, the claims would be

6  barred; if a fraud statute of limitations applied, the claims

7  may not be barred.

8  Q    Right.

9  A    And so, under Idaho law, the substance of the claims

10 controls which statutes of limitations apply, so that's why

11 that's pleaded that way.

12 Q    Right.  So, but at a minimum, the Boy Scouts would say

13 there had to be some form of negligence for them to be -- for

14 the Boy Scouts to be potentially liable; isn't that correct?

15 A    Well, there may be claims that are strictly fraud based.

16 So, no, I wouldn't agree that that's correct.

17 Q    Well, so putting aside the cases that allege just fraud,

18 the Boy Scouts never took the position that they were liable

19 unless there was at least negligence; correct?

20 A    Right, there would have to be some basis to hold them

21 legally liable, I would agree with that.

22 Q    Right, right.  And some basis that the alleged

23 perpetrator would (indiscernible); correct?

24 A    I guess.  I don't quite know what you're asking me.

25 Q    Well, all I'm getting to is the Boy Scouts have defenses

1   that the perpetrator doesn't have; right?  The Boy Scouts is

2   the institution.

3   A     Correct.

4   Q     And there had to have been either some sort of

5   negligence or fraud or notice for the Boy Scouts to be held

6   liable; correct?

7   A     Well, there had to be a legal basis to hold them liable,

8   what that is --

9   Q     Right.

10  A     -- could be different things.

11  Q     Right.  So it's not strict liability for the Boy Scouts;

12  correct?

13  A     Correct.

14  Q     And I think you said at your deposition that it would

15  have been unusual for the Boy Scouts to settle a case unless

16  there was some evidence of negligence; correct?

17  A     I don't recall exactly what I said, but I don't really

18  disagree with that.  There certainly were times when we

19  thought a claim wasn't valid, but, nonetheless, it made sense

20  to settle it because the sum of money was low enough that it

21  would cost more to defend the claim than to settle the claim.

22  Q     Okay.  Exempting those few cases out, the Boy Scouts

23  didn't routinely pay cases unless there was evidence of

24  negligence, did they?

25  A     Unless there was evidence of legal responsibility.

1  Q     Right.  Okay, thank you.

2         The Boy Scouts consistently raised the defense that

3  there was no legal duty on the Boy Scouts' behalf, didn't

4  they?

5  A     They did.

6  Q     Okay.  Can you explain what that means?

7  A     It's really the same, that the local level is where the

8  troop leaders were selected and whatnot, and that Boy Scouts

9  national didn't have a legal duty to the individual Scouts in

10 the troop.

11 Q     Okay.  And the Boy Scouts' notice or knowledge of the

12 perpetrator' propensity to abuse children was also a

13 significant factor in the underlying cases, wasn't it?

14 A     Well, both ways.  So, if the Boy Scouts had knowledge of

15 somebody with a propensity to abuse, I would view that as

16 highly significant; if the Boy Scouts did not have knowledge,

17 it was a factor.  But, again, the way that the plaintiffs'

18 lawyers pleaded the cases, they did not make that the central

19 issue.

20 Q     All right, but the Boy Scouts raised it as a defense;

21 correct?

22 A     Correct.

23 Q     And it goes to the negligence inquiry whether the Boy

24 Scouts had notice or knowledge?

25 A     It can go to that, yes.

1    Q      And it goes to the legal duty analysis as well, doesn't

2    it?

3    A      I don't view those two things as really fundamentally

4    different.  So, yes, I would say it can go to that.

5    Q      Okay.  So, putting aside the more than half --

6              MR. JACOBS:  -- you could -- Matt, I think you can

7    take that down.

8    BY MR. JACOBS:

9    Q      Putting aside the more than half of the states in the

10   United States where there weren't any cases, these are the

11   kinds of defenses that were raised in cases that were actually

12   filed; correct?

13   A      Yes.

14   Q      Okay.  And I think you said in your declaration that

15   there weren't a lot of motions to dismiss or summary judgment

16   motions filed; correct?

17   A      Correct.

18   Q      And -- well, that's in part -- we've already talked

19   about this -- because you didn't have to file them in

20   jurisdictions where there were no cases to begin with; right?

21   A      Yes.

22   Q      Right.  And so the converse is true as well, the

23   plaintiffs didn't file summary judgment motions either, did

24   they?

25   A      I can't think of any specific times where a plaintiff

1  might have done that, but I can't say they never did, I just

2  don't recall any.

3  Q     Right, because once you get beyond really the statute of

4  limitations issue and maybe a few other isolated arguments,

5  these are cases that really turn on the facts, aren't they?

6  A     Yes.

7  Q     Right.  So the Boy Scouts didn't file a lot of motions

8  and neither did the plaintiffs.

9  A     Yes.

10  Q     I think you said in your declaration that there were, at

11  least as far as you could recall, maybe six summary judgment

12  motions that the Boy Scouts filed and they were at least

13  partially successful on?

14  A     Yes.

15  Q     Okay.  And do you recall -- well, why don't we bring

16  this up.

17          MR. JACOBS:  Matt, if you could bring up JTX-1811 -

18  - or, actually, 1810.  Sorry.

19      (Pause)

20  BY MR. JACOBS:

21  Q     So this is the debtors' responses and objections to the

22  propounding insurers' first set of requests for admissions to

23  the debtors.  Do you see that, Mr. Griggs?

24  A     I do.

25  Q     And this was an exhibit at your deposition; correct?

1    A    Correct.

2    Q    And Ogletree supplied some information that was included

3    in the debtors' responses, wasn't it?

4    A    I believe so.

5    Q    Okay.

6            MR. JACOBS:  So, Matt, if you'd go down to request

7    to admit number -- I believe it's on page 9.

8    BY MR. JACOBS:

9    Q    And I'm not going to go through these, I just want to

10   point out to the Court what -- you're going to find this.

11           If you look from request number 9 all the way

12   through request number 21, which is, by my count, 12 separate

13   requests to admit, the Boy Scouts admitted that they had

14   prevailed on summary judgment in underlying cases; is that

15   correct?

16   A    Well, but to be fair, your question to me was how many

17   did Ogletree file in cases --

18   Q    Right.

19   A    -- and I said --

20   Q    Yeah, I'm asking --

21   A    -- (indiscernible) and I think that's right, and this

22   goes beyond that time frame.

23   Q    Yeah, I actually wasn't trying to impeach you, Mr.

24   Griggs.  So there were six on your watch; correct?

25   A    Correct.

1  Q      And then there were some before 2016; correct?

2  A      That is correct.

3  Q      And those are spelled out in the answers to requests to

4  admit number 9 through 21; is that correct?

5  A      That is correct.

6  Q      Actually, it's 9 through 22.  Sorry.  Nine through 22,

7  Mr. Griggs?

8  A      Yes, that appears to be right.

9          MR. MARTIN:  I'm sorry, do you want him to review

10  that --

11          MR. JACOBS:  Well, he can, if he wants.  I don't

12  want to waste the Court's time reading documents.  What I want

13  to do is -- I think he answered the question -- I'd like to

14  move Joint Exhibit 1810 into evidence, Your Honor.

15          MR. MARTIN:  Well, I think Your Honor has indicated

16  an unwillingness to take judicial notice of filings.  So I'm

17  not sure that, based on that, whether this should be coming

18  in.

19          THE COURT:  I'm going to admit this.  These are

20  requests for admission.

21      (Exhibit JTX-1810 received in evidence)

22          MR. MARTIN:  Fine, Your Honor.

23          MR. JACOBS:  And the reason I'm doing that, Your

24  Honor, to cut through this, is there's 12 cases the Boy Scouts

25  won on summary judgment.  Okay?

1    You can take that down, Matt.  Thank you.

2  BY MR. JACOBS:

3  Q    The Boy Scouts also put together a damages case in the

4  underlying cases, didn't it?

5  A    A damages case?  Did we defend damages, against damages?

6  Yes.

7  Q    Correct.  And as I understood your testimony from your

8  deposition, the Boy Scouts, in cases at least that went that

9  far, would put together an alternative damages analysis to

10  what the plaintiffs proposed; isn't that correct?

11  A    We would try to come up with an alternative.  I can't

12  say that that's something we did in every case or even in many

13  cases, but try to come up with an alternative to the

14  plaintiffs' damages calculations.

15  Q    Right.  So, in cases that went far enough that folks

16  were talking about damages, the Boy Scouts put together an

17  alternative damages analysis, didn't they?

18  A    Well, again, I really can't agree with that statement.

19  We would try to come up with an alternative, we were not

20  always successful in doing so.

21  Q    Okay, but you at least tried; correct?

22  A    Correct.

23  Q    Okay.  Am I correct that the Boy Scouts evaluated

24  individual sexual abuse cases prepetition on an individual

25  basis?

1   A     Yes.

2   Q     They didn't use a matrix, did they?

3   A     No, did not use a formulized matrix like the one that's

4   -- that I have seen here.

5   Q     Right.  There's a matrix in the TDPs, right?

6   A     Yes.

7   Q     And the Boy Scouts didn't use any matrix prepetition,

8   did they?

9   A     No, not one like that.

10   Q     Okay.  So I can think of maybe one exception to that.

11   Do you recall, Mr. Griggs, we talked in your deposition, there

12   was a prepetition mediation --

13   A     Yes.

14   Q     -- in New York City, do you recall that?

15   A     I do.

16   Q     I think it was in October of 2019?

17   A     I believe that's right.

18   Q     Okay.  And I believe Ogletree provided the Boy Scouts

19   some information to use at that mediation, didn't they?

20   A     We provided it to someone.  When you say the Boy Scouts,

21   I don't know that we provided it to the Boy Scouts.  We did

22   provide information for use in the mediation.

23   Q     And you provided it to either the Boy Scouts or their

24   counsel; isn't that correct?

25   A     I believe it was provided to bankruptcy counsel.

1  Q     To White -- well, it probably would have been Sidley &

2  Austin at that time.

3  A     Yes, it would have been Sidley & Austin.

4  Q     Right.  So you provided information that was used at

5  that mediation; am I correct?

6  A     Yes.

7           MR. JACOBS:  So, Matt, could you pull up Joint

8  Exhibit 1663 and 1664?

9  BY MR. JACOBS:

10 Q     Okay.  1663, for the record, is an email from Mike

11 Andolina to Jim Stang.  Do you see that?

12 A     I do.

13 Q     And this is dated October 28, 2019?

14 A     Correct.

15 Q     Okay.  Is this in conjunction with the mediation that we

16 just discussed?

17 A     I believe so.

18 Q     Okay.

19           MR. JACOBS:  If you pull up the next exhibit, Matt,

20 which is the attachment to the email, it's a matrix protocol.

21 BY MR. JACOBS:

22 Q     Do you see that, Mr. Griggs?

23 A     Yes.

24 Q     And you say that there's a matrix there with base

25 amounts and maximum amounts?

1  A     Yes.

2  Q     Okay.  Would that information have come from Ogletree?

3  A     I can't say for sure because I really don't recall, but

4  likely the way that worked is they asked us for our thoughts

5  on abuse claims of this type and what their worth.  And, you

6  know, my best recollection is we had used something similar to

7  this for the mediation in Guam, so it was kind of Guam-

8  focused, and that's what we provided them and then I think

9  they came up with this.  That's --

10  Q     Okay.

11  A     -- my recollection of it.

12  Q     Okay.  So, thank you for that.

13         So, October 28, 2019, this would have been before

14  the bankruptcy was filed; correct?

15  A     Correct.

16  Q     And so the bankruptcy was filed, I think, in February of

17  2020; correct?

18  A     Correct.

19  Q     So this matrix would have been put together actually

20  pre-bankruptcy while the underlying cases were being defended;

21  correct?

22  A     Yes.

23  Q     So it's closer to the time of the actual defense of the

24  underlying cases than the TDPs we have in this case; correct?

25  A     Correct.

1  Q    Okay.  And have you -- you've reviewed the TDPs here,

2  right, Mr. Griggs?

3  A    I have.

4  Q    Right.  And so the amounts on this matrix from October

5  28 of 2019 are substantially less than in the TDPs, aren't

6  they?

7  A    They are less.

8  Q    So, for example -- I won't go through the whole thing,

9  but just to give Your Honor an indication -- the base amount

10 for a penetration claim here is 400,000; correct?

11 A    That's what it says, yes.

12 Q    And in the present TDPs it's 600,000; right?

13 A    Correct.

14 Q    And the maximum amount in the October 28, 2019 matrix is

15 a million dollars; right?

16 A    Right.

17 Q    And in the finalized TDPs it's $2.7 million; correct?

18 A    Correct.

19 Q    It's a pretty substantial difference, isn't it?

20 A    It's a difference.

21 Q    And this matrix was provided with information from

22 Ogletree during the actual prepetition defense of the claims

23 before the bankruptcy; correct?

24 A    Yes, but understand this wasn't a negotiated document,

25 this was just a -- to be provided to the plaintiffs' counsel

1   for use at mediation without their input.  The TDPs,

2   obviously, have their input.

3   Q     So this is the Boy Scouts' input; correct?

4   A     Yeah, this is the Boy Scouts' counsel's input.

5            MR. JACOBS:  Your Honor, I'd like to move these two

6   exhibits into evidence, and let me make sure I've got the

7   exact numbers for the record.  It's Joint Exhibit 1663 and

8   Joint Exhibit 1664.

9            MR. MARTIN:  No objection, Your Honor.

10           THE COURT:  Thank you.  They're admitted.

11        (Exhibits JTX-1663 and JTX-1664 received in evidence)

12           MR. JACOBS:  Thank you.

13  BY MR. JACOBS:

14  Q     All right, I'm going to switch gears here to -- we were

15  talking about substantive defenses that the Boy Scouts had in

16  the underlying sexual abuse cases; I'd like to talk a little

17  bit about procedure in the underlying sexual abuse cases.  So

18  I think we already went over this.

19           You had defense counsel in all the cases that were

20  filed; correct?

21  A     Correct.

22  Q     It would have been Ogletree, it would have been local

23  counsel, and then, when you get into serious cases like

24  Hacker, you could have Dan Webb; correct?

25  A     Yes.

1  Q    The Boy Scouts filed answers in all of those cases,

2  didn't they?

3  A    Yes.

4  Q    And many of the -- we looked at an example answer;

5  correct?

6  A    Yes.

7  Q    That's typical of an answer the Boy Scouts would have

8  filed; correct?

9  A    Typical of one filed in Idaho.

10 Q    Right.  And there would be differences state by state,

11 but the major defenses that we went through are the defenses

12 that the Boy Scouts raised consistently, aren't they?

13 A    I think that's fair.

14 Q    Okay.  And, where appropriate, the Boy Scouts did fact

15 discovery, didn't they?

16 A    Yes.

17 Q    If the perpetrator was still available, alleged

18 perpetrator, he might be deposed; correct?

19 A    Might be.  I would say that was rare, but yes.

20 Q    Like, for example, Hacker was deposed, wasn't he?

21 A    You know, I don't recall.  If he was deposed, it would

22 have been like in 2013 or so when I wasn't involved.  So I

23 just don't recall if he was deposed.

24 Q    He was.  I think he was in jail at the time, actually.

25      You would have taken fact discovery of the

1 plaintiff; correct?

2 A     Correct.

3 Q     In appropriate cases, you might have taken fact

4 discovery of other actors too, like other members of the

5 troop; correct?

6 A     Again, very rare, but could it have happened?  Yes.

7 Q     And there may have been discovery of other third parties

8 to determine the viability of the case; correct?

9 A     I wouldn't say to determine viability.  Third party

10 discovery, to me, would go more to damages than viability.

11 Q     Well, just, for example, to determine whether a

12 perpetrator had actually committed the sexual abuse.  For

13 example, was the person actually a Scout leader?

14 A     Yeah, I can't think of any third party discovery we did

15 that went to that issue.

16 Q     But it would have been of the parties to the case;

17 correct?

18 A     Well, the plaintiff, of course, and then if you had any

19 records establishing that the person was in Scouting, those

20 kinds of things.

21 Q     Okay.  And, when the cases got far enough along, the Boy

22 Scouts hired experts, didn't they?

23 A     Sometimes.

24 Q     Right.  And I think we identified three different

25 categories of experts that the Boy Scouts would hire in

1  appropriate cases.  Do you remember that, Mr. Griggs?

2  A    Generally, yes.

3  Q    Okay.  The first was a mental health expert.  Do you

4  recall that?

5  A    Right.  So, if we thought that would be a useful

6  examination, we would retain a mental health expert,

7  typically, in the jurisdiction where the case was filed, to

8  have them do an examination, but it did not happen in every

9  case and it typically wasn't very useful.

10  Q    In addition to a mental health expert, the Boy Scouts

11  would hire a standard-of-care expert, wouldn't they?

12  A    Yes, particularly if the plaintiffs had designated one.

13  Q    Right.  Can you explain to the Court what a standard-of-

14  care expert is?

15  A    Yes.  So because most of these cases and the facts are

16  so old, so you might have abuse that occurred in the 1960s,

17  the standard of care for youth protection and whatnot today is

18  fundamentally different than it was then, so you'd want a

19  standard-of-care expert who could speak to what was known

20  about sexual abuse in the 1960s, you know, what protective

21  measures did youth service organizations have in place at the

22  time.  The best analogy I can think of is like being sued for

23  a car wreck today that happened in 1960 and being held liable

24  because it didn't have airbags.

25  Q    So the standard-of-care expert would go to the

1  negligence inquiry, wouldn't it?

2  A    Yes.

3  Q    And --

4  A    It could also go to other issues, but negligence, yes.

5  Q    Well, the idea was to have the standard-of-care expert

6  say the Boy Scouts weren't negligent based on the standards at

7  the time; correct?

8  A    Correct.

9  Q    Okay.  And then there was a third category of experts

10 that the Boy Scouts would hire called dealing with youth

11 protection procedures, do you recall that?

12 A    I do.

13 Q    Okay.  Can you explain for the Court what that third

14 category is?

15 A    Sure.  It's exactly that, what youth protection

16 procedures were in place then, were those appropriate at the

17 time, and then what is in place now and are they appropriate

18 at the time, because, you know, even though most of the cases

19 are so old, you know, the jury is going to assess things like

20 punitive damages, they want to know about your youth

21 protection policies that are in place today.  And so we would

22 typically use -- the Boy Scouts' youth protection director

23 then, the youth protection director Michael Johnson as an

24 expert.  And, if the case warranted it, we would get outside

25 experts to speak to those issues as well.

1  Q     And I think we've already talked -- taking you through

2  procedural defenses, I think we've already talked about

3  summary judgment motions, those were filed where appropriate,

4  although rarely; correct?

5  A     Correct.

6  Q     In cases that were approaching trial, the Boy Scouts

7  would file motions in limine, wouldn't they?

8  A     Right.  We had very, very few that approached trial, but

9  certainly if one was approaching file we would file motions in

10 limine.

11 Q     Okay.  Can you tell us just generally what kinds of

12 motions in limine those would be?

13 A     You know, there is one that was predominant and that was

14 a motion in limine to exclude the introduction into evidence

15 of VSD files, Volunteer Screening Database files, because,

16 again, just as an example, if the abuse occurred in 1960, the

17 particular plaintiff's counsel in the case might want to

18 introduce what we then called IV files, VSD files from 1950 to

19 1990, you know, put thousands and thousands of files into

20 evidence, and we would seek to exclude those.

21 Q     Okay.  So there would be the motion in limine with

22 respect to the IV files.  Any others come to mind?

23 A     If you had a multi-plaintiff case -- or even if it

24 wasn't a multi-plaintiff case -- motion in limine to try to

25 prevent, you know, 14 other witnesses who haven't filed claims

1   -- or maybe they have filed claims -- from coming in and

2   testifying in this plaintiff's case.  We would try to get it

3   focused to this plaintiff's case so that you didn't have the

4   Hacker problem of, you know, you have 18 cases, they're not

5   all the same, but if all 18 plaintiffs get to testify in each

6   case, that's a problem.

7   Q    Thank you.  Any other motions in limine that might be

8   filed?

9   A    You know, those are the two case-specific ones.  There

10  would always be the standard motions in limine that you'd

11  file, but those would be more unique to the Boy Scouts.

12  Q    Okay.  By standard, do you have anything in mind?

13  A    You know, a *motion in limine* to not allow people to talk

14  about insurance coverage.  Those kinds of things.

15  Q    Standard things that would be filed in a tort case that

16  you don't want the jury to hear about?

17  A    Correct.  In any case.

18  Q    In the underlying sexual abuse cases, did the Boy Scouts

19  have a jury trial right?

20  A    Yes.

21  Q    And they had a right to appeal?

22  A    Yes.

23  Q    Post-judgment, if it was adverse, correct?

24  A    Correct.

25  Q    In some jurisdictions, they had the right to file

1  interlocutory appeals, correct?

2  A    I don't know about a right to.  If that procedural

3  mechanism was available, then yes.

4  Q    Well, for example, in the Hacker (phonetic) cases

5  Illinois, those were in Chicago, the Circuit Court of Cook

6  County, there was an interlocutory appeal filed on the statute

7  of limitations, wasn't there?

8  A    By agreement.  I don't know if that could have been done

9  without the agreement of the Plaintiffs' counsel.

10  Q    Okay.  But it did happen in some cases that there were

11  interlocutory appeals?

12  A    It happened in that one and that's the only one I know

13  that was.

14  Q    Okay.  And all of these procedural rights are designed

15  to have the Boy Scouts and the Defendant to have due process,

16  aren't they?

17  A    Yes.

18  Q    And these are all hallmarks of an adversarial system in

19  the United States, aren't they, Mr. Griggs?

20  A    They are.

21  Q    Was there -- in your experience, was the -- do you know

22  what Bankruptcy Rule 2004 is?

23  A    Not specifically.

24  Q    Have you ever heard of a 2004 exam?

25  A    I have not.

1  Q    Okay.  So, I take it from that, no one was doing a

2  Bankruptcy Rule 2004 exam in the underlying cases were they?

3  A    Well, I don't know what that is, so I can't speak to

4  that.

5  Q    Have you looked at the docket appendix in this case to

6  see that the Plaintiffs have a 2004 right to discovery in the

7  proposed plan?

8  A    I have looked at the docket appendix, but in the focused

9  on that issue.

10  Q    Okay.  But in your experience, there was no 2004 exam in

11  the underlying cases, was there?

12  A    No.

13  Q    Okay.  And the Boy Scouts, you didn't share documents

14  with the Plaintiffs to help them fill in their cases, did you?

15  A    We did share documents with the Plaintiffs, yes.

16  Q    But you didn't -- it wasn't part of national

17  coordinating counsel's goal to help the Plaintiffs establish

18  their case, was it?

19  A    No.

20  Q    Okay.

21  A    We wouldn't require a formal discovery request to get a

22  particular document.  If you know you're going to have to

23  produce it anyway, we would provide the documents.

24  Q    Right.  But you defended the Boy Scouts to the extent

25  provided by the law and not help the Plaintiffs put their case

1  together, didn't you?

2  A    Yes.

3  Q    Okay.  Let me just clean something up on -- let's talk

4  about Hacker just for another minute just because we talked

5  about it before to make sure we got the total picture here.

6        So, what were the allegations with respect to Thomas

7  Hacker?

8  A    Thomas Hacker, as I recall, started in Scouting in

9  Indianapolis.  He was a teacher.  He was convicted of sexual

10  abuse or some sort of sexual misconduct with a youth; not in

11  Scouting, but I think in the school system in Indiana in about

12  1970.  He was placed in the ID files at that time and excluded

13  from Scouting.

14        He then moved to Illinois, again, I think he worked in

15  the public school system and his son was a Scout.  So, at that

16  time, as a parent, you didn't have to register to be in

17  Scouting, so he would accompany his son to troop activities

18  and then at some point, he reregistered with the Boy Scouts

19  using an alias and it was not detected, so he was able to get

20  back into Scouting and he abused, unfortunately, many others.

21  Q    And so the allegations that the Plaintiffs made in

22  Hacker were essentially that the Boy Scouts either knew or

23  should have known about his propensity to sexually abuse kids

24  and then fraudulently concealed it; isn't that correct,

25  Mr. Griggs?

1  A    I don't know that anybody said the Boy Scouts

2  fraudulently concealed anything.  They did say the Boy Scouts

3  knew or should have known.

4  Q    Well, the appellate opinion, I think you actually -- the

5  Boy Scouts entered into evidence without objection, which is

6  Joint Exhibit 146, do you recall that Mr. Griggs?

7  A    Yes.

8  Q    So, the Appellate Court opinion was that the case could

9  go to trial because the Boy Scouts -- the statute of

10  limitations may have been tolled because of the Boy Scouts'

11  fraudulent conceal; isn't that correct?

12  A    Right.  The opinion said it was all a fact question for

13  the jury about whether the statute of limitations would bar

14  the claim.

15  Q    Right.  So the Court didn't actually rule against the

16  Boy Scouts; it just held that it was a fact issue, whether the

17  limitations period was tolled because of the alleged

18  fraudulent concealment?

19  A    Well, they absolutely ruled against the Boy Scouts.  The

20  effect of that ruling is what drove those cases to settle for

21  what they did.

22  Q    Right.  But they didn't find against you as a matter of

23  law, they just said it was a fact issue for the jury?

24  A    I considered it, in effect, a finding against you as a

25  matter of law, because it was my judgment and others'

 1 | judgments that you were not going to prevail on that issue
 2 | before a jury.
 3 | Q    Okay.  Do you recall -- and the Boy Scouts settled all
 4 | those 16 Hacker cases, correct?
 5 | A    Correct.
 6 | Q    And it was $89.1 million?
 7 | A    That's what you said previously.
 8 | Q    Now, do you recall whether the insurance companies
 9 | agreed with those valuations?
10 | A    For the most part, they did not.  They -- some companies
11 | paid a portion of them.  Others didn't pay anything.
12 | Q    Okay.
13 |          MR. JACOBS:  Matt, could you bring up Joint Exhibit
14 | 2232.
15 | BY MR. JACOBS:
16 | Q    Just take a second to read this, Mr. Griggs.  Is this
17 | the operative complaint in the Hacker cases?
18 | A    I don't know if that's the last complaint.  My
19 | recollection is, at some point, each individual Plaintiff
20 | filed their own individual complaint, but again, it may be
21 | that this is the last operative complaint where they're all
22 | named as one.
23 | Q    Okay.  I think this is the last complaint, but I'm not
24 | sure if it's important for them.
25 |          The reason I'm putting this up, so -- and I apologize

1  for the length of this and killing trees by send it over to

2  the Court -- this is a 502-page complaint, isn't it,

3  Mr. Griggs?

4  A    I'm not looking at the whole document, but I will agree

5  that it was lengthy.

6        MR. JACOBS:  And so, Matt, if you go to page 497 of

7  this 502 page complaint, you'll see I actually had to look

8  this up on Google because I didn't know that Roman numerals

9  went up this high.

10 BY MR. JACOBS:

11 Q    That's Count 99.

12      Do you see that, Mr. Griggs?

13 A    I do.

14 Q    So, this is a 99-count complaint filed against the Boy

15 Scouts?

16 A    Yes.

17 Q    Okay.

18      MR. JACOBS:  And if you go -- Matt, go to page 42.

19 Actually, go to page 12.

20 BY MR. JACOBS:

21 Q    This is the beginning of the factual allegations that

22 were common for all the Defendant against the Boy Scouts?

23 A    Yes.

24 Q    And then this goes on, I think, for some 30 pages about

25 what the allegations were, up to page 42, correct,

1  Mr. Griggs?

2  A     That's correct.

3  Q     So, this is the kind of complaint one sees in an

4  extraordinary case against the Boy Scouts that settled for the

5  amount of money it did; isn't that correct?

6  A     I don't know that I could characterize this as being

7  typical of complaints in other cases.

8  Q     Well, that's kind of my point.  It's not, right?

9        If you get into big-time litigation with an

10  extraordinary situation, this is the level of litigation

11  activity that you see, isn't it.

12  A     Yeah, and hard for me to compare it to other cases, but

13  I would agree that this case was unusual.

14           MR. JACOBS:  Your Honor, for completeness, I'd like

15  to move into evidence Joint Exhibit 2232, which is the third

16  amended complaint in the Hacker cases.

17           MR. MARTIN:  No objection, Your Honor.

18           THE COURT:  It's admitted.

19      (Exhibit JTX-2232 received into evidence)

20  BY MR. JACOBS:

21  Q     Okay.  Let's move to a different topic, Mr. Griggs.

22        The TDPs in this case, TDPs are trust distribution

23  procedures; is that correct?

24  A     Yes.

25  Q     Okay.  They're not trust and defense procedures, are

1  they?  That's not what the "D" stands for it, is it?

2  A     Not to my knowledge.

3  Q     No, it's distribution.  It's hacking up the money from

4  settlements, right?  It's to be distributed?

5  A     Right.

6  Q     Not to be defended, not like the tort system, is it?

7  A     It is, in ways, like the tort system and not like it in

8  other ways.

9  Q     Okay.  Let me, first off, you didn't negotiate the TDPs,

10  did you?

11  A     No.

12  Q     You didn't write any of the TDPs, did you?

13  A     I did not.

14  Q     You weren't asked to approve the TDPs were you?

15  A     I was asked to provide input on the TDPs to a limited

16  part of them and then once that part was drafted, I would have

17  reviewed it.

18  Q     Right.  But you weren't formally asked to review them,

19  were you?

20  A     No.

21         MR. JACOBS:  And could we pull up, Matt, Joint

22  Exhibit 1811, which is the Debtor's responses to the

23  propounding insurers' first set of interrogatories.  And if

24  you'd go to Interrogatory 12.

25  BY MR. JACOBS:

1    Q    It says, the question is:  Identify each individual who

2    participated in drafting or approving the TDPs and state in

3    detail, their role.

4         Do you see that, Mr. Griggs?

5    A    I do.

6    Q    Okay.  There's a bunch of objections but then if you go

7    down to the next paragraph, it says, Subject to, and without

8    waiting, the foregoing objections, there's a long list of

9    lawyers at then, Sidley Austin, then White & Case, and Haynes

10   and Boone, the insurance recovery lawyers, who participated in

11   the drafting of the TDPs on behalf of the Boy Scouts.

12        Do you see that?

13   A    I do.

14   Q    Okay.  And your name's not listed, is it?

15   A    No.

16   Q    And no one from Ogletree is listed, is it?

17   A    No.

18   Q    So, the Boy Scouts did not use their national

19   coordinating counsel for defense of the sexual abuse cases to

20   negotiate the TDPs, did they?

21   A    Not to negotiate them, no.

22   Q    And they didn't use them to draft the TDPs either, did

23   they?

24   A    No.

25   Q    They used their bankruptcy counsel, correct?

1  A      And others.

2  Q      And they used their insurance recovery counsel, correct?

3  A      Correct.

4  Q      The company -- their insurance recovery counsel whose

5  role is to maximize insurance recoveries from insurers, isn't

6  it?

7  A      Their insurance recovery counsel's whole role is to

8  evaluate insurance.

9  Q      Well, they're not trying to minimize recovery, are they?

10 A      No.

11         MR. JACOBS:  You can take that down, Matt.

12 BY MR. JACOBS:

13 Q      I believe you testified in your deposition, Mr. Griggs,

14 that you provided some information for the bankruptcy counsel

15 and insurance recovery counsel to use in the negotiation of

16 the TDPs, do you recall that?

17 A      I do.

18 Q      Okay.  You provided some statute of limitations

19 information, correct?

20 A      Correct.

21 Q      I think you provided some general information on how the

22 factors considered in evaluating claims?

23 A      Right.  Provided information on what Ogletree considered

24 in evaluating claims, what would make a claim more valuable or

25 less valuable, how we investigated claims, our basic claims

1  experience.

2  Q    Okay.  But you didn't provide on the claims matrix

3  that's in the TDPs, did you?

4  A    No.

5  Q    You didn't give them the values that are in the TDPs,

6  did you?

7  A    The values were derive from the information that we gave

8  them.  So, we gave them historical settlements information,

9  which, as I understand it, then a statistical analysis was

10  done of that information to come up with the ranges that you

11  see in the matrix.

12  Q    Yeah, but that was negotiated with the -- to the extent

13  it was negotiated, it was with the Plaintiffs' lawyers,

14  correct?

15          MR. MARTIN:  Objection to form.

16          THE WITNESS:  Not really what I'm speaking of.

17          So, what I'm speaking of is historical settlement

18  data given to the consultants who then did statistical

19  analysis to come up with settlement ranges.

20  BY MR. JACOBS:

21  Q    You don't know that that's how the TDP values were

22  created, do you?  As a matter of fact, if you look at a

23  document earlier that had that a much lower value that was

24  put -- the information was provided by Ogletree to the Boy

25  Scouts, now the cases were actually been defended in the tort

1  system?

2  A    I would say that I do know that's primarily how those

3  numbers were achieved.  Now, whether it also reflected input

4  from other interested parties, you know, that would be fair;

5  it likely did.

6  Q    But it wasn't done by you, correct?

7  A    No, we just provided data.

8  Q    Right.  And you didn't negotiate, you didn't draft, and

9  you didn't approve?

10  A    Correct.

11  Q    Your declaration talks about the independent review

12  process that (indiscernible) the TDPs, do you remember that?

13  A    I do.

14  Q    Okay.  That's a recent revision of the TDPs, isn't it?

15  A    It is.

16  Q    Okay.  You weren't involved in writing that independent

17  review process, were you?

18  A    I was not.

19  Q    You didn't draft it, did you?

20  A    No.

21  Q    You weren't at the mediation where this independent

22  review process came from?

23  A    No.

24  Q    So, the Boy Scouts didn't use their national

25  coordinating counsel to negotiate the independent review

1  process, did they?

2  A    They did not.

3  Q    Have you -- you've read -- you've read the independent

4  review process, right?

5  A    I have.

6  Q    Okay.  Is there -- there's no defense lawyer in the

7  independent review process, is there?

8  A    I would need to look at it to say whether there's a

9  defense lawyer or not.  I know that there's insurer

10  participation and participation of other parties.

11  Q    Yeah, I can bring it up for you if you want and we can

12  certainly review that, but I can tell you, there isn't a

13  defense lawyer.

14  A    I'll take your word for it.

15  Q    Okay.  There's no defense lawyer.  There's no Bruce

16  Griggs there, is there?

17  A    There certainly is not that.

18  Q    And there's Ogletree there, is there?

19  A    No.

20  Q    There's no Winston & Strawn there, is there?

21  A    Not that I know of.

22  Q    There's no Dan Rudd there, is there?

23  A    No.

24  Q    And these are supposedly the extraordinary claims that

25  are going to be reviewed through that process, right?

1  A    The highest exposure claims, yes.

2  Q    Right.  Like the Hacker claims, right?

3  A    I don't know that they're like the Hacker claims, but

4  they could be.

5  Q    Well, the allegation, I guess, would be no one really

6  knows.  They're high-value claims, right?

7  A    Yes.

8  Q    Like the Hacker claims, in that regard?

9  A    Yes.

10  Q    But completely unlike the Hacker claims in the defense

11  effort that's allowed, isn't it?

12  A    I don't know that I would agree with that.  It seems

13  like those procedures had a lot of process in them, so it

14  looked like a pretty exacting process to me.

15  Q    Yeah, but you didn't actually work on that, right; you

16  just read it after the fact?

17  A    Correct.

18  Q    Okay.  So, there's something called a "neutral" in the

19  independent review process.

20       Did you see that?

21  A    I did.

22  Q    Okay.  And the neutral, as I understand it, is the

23  person who's going to come up with a valuation and then

24  recommend that to the settlement trustee.

25       Did you see that?

1    A      I did.

2    Q      Do you know how to neutrals are chosen?

3    A      Not specifically.  My understanding is it's retired

4    judges that the parties have to agree on.

5    Q      Okay.  Did you -- have you reviewed the settlement trust

6    agreement in this case?

7    A      The settlement trust agreement.  You would have to show

8    me which document that is.

9    Q      Okay.  Why don't we bring that up.

10           MR. JACOBS:  Matt, I believe it's Exhibit B of the

11   plan.  Matt, I think it's Joint Exhibit 1-353 and it's

12   Exhibit B, starting on page 191 of 459.

13           MR. MARTIN:  Todd, if you don't mind, you have a

14   notebook for the witness.  I'm going to make sure that he does

15   have it in front of him if that's okay.

16   Your Honor, is that okay?

17           THE COURT:  Yes.

18           THE WITNESS:  So, what's the exhibit number, I'm

19   sorry?

20   BY MR. JACOBS:

21   Q      Yeah, it's Exhibit 1-353.

22   A      All right.  I'm looking at the first page of it.

23          You're on page 191, right?

24   Q      Yeah, I think it says Exhibit B, settlement trust

25   agreement.

1  A     Okay.  I'm there.

2  Q     And did you review this document before signing the

3  declaration that Haynes and Boone wrote?

4  A     I don't specifically recall reviewing Exhibit B, but I

5  may have at some point.

6  Q     Okay.  You don't know.

7        You don't know whether you reviewed it or not?

8  A     I don't.

9  Q     Okay.  Do you know how the neutral is selected under the

10 settlement trustee agreement?

11 A     Not specifically without looking.

12 Q     Okay.  So, if you turn to page 14 of that document,

13 Section 4.1(b), do you see there, the trustee?

14 A     Yes, I see that.

15 Q     Okay.  The trustee, with the consent of five members of

16 the STAC -- do you know what the STAC is?

17 A     I don't know what the acronym stands for.

18 Q     If I told you, settlement trustee, I think, advisory

19 committee, does that ring a bell?

20 A     It sounds like.

21 Q     The trustee, with the consent of five members of the

22 STAC and with the reasonable concept of the FCR -- do you know

23 who the FCR is?

24 A     I know what the position is.  I don't know -- I don't

25 recall the individual's name.

1  Q     It's the future claimants representative, right?

2  A     Right.

3  Q     And that's the individual who's here to look out for

4  folks who may have a future sexual abuse claim, correct?

5  A     Correct.

6  Q     It says, Shall employ individuals to serve as neutrals

7  in the independent review process under the TDP, giving due

8  weight in the selection process to prior service as a retired

9  judge with court experience.

10        Do you see that?

11 A     I do.

12 Q     Okay.  So, there's got to be five members of the STAC

13 who consent to this along with the FCR, correct?

14 A     That appears to be correct.

15 Q     Okay.  Do you know who the members of the STAC are,

16 Mr. Griggs?

17 A     I don't.

18        MR. JACOBS:  Okay.  Why don't we pull up, Matt, I

19 believe it's in the plan supplement, which is Joint

20 Exhibit 1.  It's the page that lists who the STAC members are.

21        MR. MARTIN:  I'm sorry, what exhibit?

22        MR. JACOBS:  I think it's 1, Ernest.

23        MR. MARTIN:  Okay.

24        MR. JACOBS:  It's actually -- there's a lot of

25 pages in this case.  I think it's Exhibit H-1 in the plan

1  supplement.

2           MR. MARTIN:  Do you have a page number?

3           MR. JACOBS:  Well, we can pull it up.  It is -- I

4  think the best I can tell you is it's Exhibit H-1.  There

5  are -- I don't see page numbers.  I can pull it up.

6  There it -- this is what I'm going to show him.  It's H-1,

7  exhibit in the plan supplement.

8  BY MR. JACOBS:

9  Q    So, Mr. Griggs, this is the initial members of the

10 Settlement Trust Advisory Committee.

11          Do you see that?

12 A    I do.

13 Q    That's the STAC, right?

14 A    Right.

15 Q    And it's from these seven individuals that we have to

16 have five of them consenting to the neutral, along with the

17 FCR, correct?

18 A    Yes.

19 Q    Okay.  Do you know who these seven individuals are?

20 A    I know three of them, personally --

21 Q    And the other four?

22 A    -- and the others, I think I know what they do.

23 Q    Okay.  Why don't you go first through the three that you

24 know.

25 A    I know Paul Mones.  I know Chris Hurley.  And I know

1  Jordan Merson just through telephone conversations.

2       Mr. Mones and Mr. Hurley, I've had multiple dealings

3  with.

4  Q    Okay.  Just for the Court's edification, Christopher

5  Hurley is a Plaintiffs' lawyer, correct?

6  A    He.

7  Q    Filed sexual abuse cases against the Boy Scouts?

8  A    He filed the Hacker cases.

9  Q    Right.  He was the lead counsel in the Hacker cases,

10 correct?

11 A    Yes.

12 Q    And he was -- his partner is Evan Smola, correct?

13 A    Or at least was.

14 Q    I think he still is.

15      So, Christopher Hurley is the lead Plaintiffs' lawyer

16 from Hacker.

17      Who is Paul Mones?

18 A    Paul Mones is a lawyer that's in California who

19 represented individuals in abuse cases in multiple

20 jurisdictions during all of the time that we served as

21 national coordinating counsel.

22 Q    And he's a lead Plaintiffs' lawyer in cases against the

23 Boy Scouts, isn't he?

24 A    He is.

25 Q    Okay.  And who's Jordan Merson?  I think he's the other

1 one you identified.

2 A    As I recall, he is a lawyer in New York who represents

3 individuals in sexual abuse cases.

4 Q    Okay.  And so, the other four, Adam Slater -- do you

5 know Mr. Slater?

6 A    Not that I recall.

7 Q    Okay.  Do you know if he's a Plaintiffs' lawyer who

8 filed sexual abuse cases against the Boy Scouts?

9 A    I would presume that he is, but I don't know that.

10 Q    Okay.  I can't represent to you that he is and we'll see

11 that in a minute.

12      So, Kenneth Rothweiler, do you know who he is?

13 A    I know his name.  I don't know him personally, at least,

14 not that I recall.

15 Q    Okay.  He's a Plaintiffs' lawyer who filed sexual abuse

16 cases against the Boy Scouts, isn't he?

17 A    I believe he is.

18 Q    Okay.  And then the one -- Sean Higgins.  Do you know

19 who Mr. Higgins is?

20 A    I do not.

21 Q    Okay.  Do you know if he's a Plaintiffs' lawyer who

22 filed sexual abuse cases against the Boy Scouts?

23 A    By his inclusion in this grouping, I would assume that

24 he is, but I don't know that.

25 Q    Okay.  He is; I can tell you that.

1       And then Irwin Zalkin, do you know who Irwin Zalkin is?

2  A    Again, I recognize the name.  I don't know him.

3  Q    Okay.  He's a lawyer who filed sexual abuse cases

4  against the Boy Scouts, isn't he?

5  A    He likely is.  I don't know that for sure.

6  Q    Okay.  So, all seven members of the STAC are Plaintiffs'

7  lawyers, aren't they, Mr. Griggs?

8  A    That's what it appears to be.

9  Q    Okay.  And these are the individuals who have consent

10 rights, along with the FCR, in picking the neutrals; isn't

11 that correct?

12 A    Yes.

13 Q    Okay.

14        MR. JACOBS:  Can you pull up, Matt, the eleventh

15 mediator's report and go to page, I believe it's page 46.

16 BY MR. JACOBS:

17 Q    So, this is a list -- have you seen this before,

18 Mr. Griggs?

19 A    I believe that I have.  I don't specifically recall it,

20 but I would typically review -- if a mediator's report was

21 released, I would review it.

22 Q    All right.  And so, this is the mediator's report that

23 identified the most recent settlement that brought us together

24 today, isn't it?

25 A    I don't know that, but I'll, again, take your word for

1  it.

2  Q    Okay.  This was filed February 10th.  So, there's a list

3  of State Court counsel who signed the agreement that's

4  attached to the mediator's report.

5       Do you see that?

6  A    Yes.

7  Q    Okay.  And it includes the members of the STAC.  So, if

8  you scroll down -- keep scrolling down -- I think we're going

9  to find all seven members.  So, stop at Eisenberg Rothweiler.

10      Do you see that?

11 A    Yes.

12 Q    See how many claims Eisenberg -- it's got the number of

13 claims.  Those are the proofs of claim that have been filed in

14 the bankruptcy, correct?

15 A    That's my understanding.

16 Q    So, Eisenberg Rothweiler.  This is Ken Rothweiler,

17 correct, from the STAC --

18 A    I believe so.

19 Q    -- had 16,869 proofs of claim.

20      Do you see that.

21 A    Yes.

22 Q    Okay.  Do you know how many cases Eisenberg Rothweiler

23 had pre-bankruptcy?

24 A    I don't.

25 Q    It wasn't anything like 16,869, was it?

1   A      No.

2   Q      Okay.  And then go down to Hurley McKenna & Mertz.

3          Evan Smola -- those are the Hacker Plaintiffs' lawyers,

4   correct?

5   A      Correct.

6   Q      And he -- and Christopher Hurley is a member of the

7   STAC?

8   A      Yes.

9   Q      And so, they have 3,762 claims.

10         Do you see that?

11  A      I do.

12  Q      That's proofs of claim in the bankruptcy, correct?

13  A      Yes.

14  Q      How many cases did the Hurley firm have pre-petition,

15  Mr. Griggs?  I know about the 16 Hacker cases, but did they

16  have any more?

17  A      You know, the Hacker cases, I believe, originally

18  were 18, but I don't believe they had any others.

19  Q      Okay.  So, they have 16 cases pre-petition and now they

20  have 3,762.

21         Do you see that?

22  A      Okay.  And, again, I think they had 18 originally.

23  Q      Okay.  I'll go with 18.

24         Eighteen versus 3,762, correct?

25  A      Yes.

1  Q      And Mr. Hurley is on the STAC?

2  A      Yes.

3  Q      Okay.  If you keep scrolling down, the next number --

4  keep going -- Merson Law.

5         There's a Jordan Merson and he's on the STAC, correct?

6  A      Correct.

7  Q      And he's got 314 claims in the bankruptcy, correct?

8  A      Correct.

9  Q      And then if you go down to Paul Mones, he's got 259

10  claims in the bankruptcy, correct?

11  A      Yes.

12  Q      Okay.  Keep going down.

13         MR. MARTIN:  You shall, I'm going to interpose an

14  objection, here.  Mr. Griggs already said he was not involved

15  in selecting the STAC.  I don't know why we're going through

16  this.  It almost sounds like a closing argument to me.

17         What's the purpose of this?

18         MR. JACOBS:  Oh, I'm going to tie it up real quick,

19  Your Honor.

20         THE COURT:  I'm going to give you some leeway on

21  this, given that he's talking -- his declaration talked about

22  the TDPs.

23  BY MR. JACOBS:

24  Q      So, Slater Slater & Schulman, I think they are the last

25  member of the STAC, right.

1       Do you see that at the end?

2   A    I do.

3   Q    And they've got 14,170 claims in the bankruptcy,

4   correct?

5   A    Correct.

6   Q    And so, you need five of these seven STAC members, along

7   with the FCR to select the neutral who's going to decide the

8   cases under the independent review process, correct, Mr.

9   Griggs?

10  A    That's how I understand it.

11  Q    Okay.  So, basically, the Plaintiffs' lawyers are

12  picking the neutral, correct?

13  A    The STAC is picking the neutral and the FCR.

14          MR. MARTIN:  Objection.

15  BY MR. JACOBS:

16  Q    And they're all Plaintiffs' lawyers, correct?

17          MR. MARTIN:  Hold on.  Objection.

18          I don't think you mean to mislead the witness, but

19  you read earlier it's the trustee, so I don't think you're

20  intending to mislead the witness, but as you read from the

21  document before, it's the trustee with the consent of the

22  STAC, so please be fair to the witness.

23          MR. JACOBS:  I think it's been clear, Mr. Martin,

24  but I take your point.

25  BY MR. JACOBS:

1  Q    It's got to have -- the neutral has got to have a

2  consent of five of these seven Plaintiffs' lawyers, along with

3  the FCR, correct?

4  A    Yes.

5  Q    So, it's -- with respect to the STAC's consent rights,

6  they're all Plaintiffs' lawyers, right?

7  A    That's what it appears to be, yes.

8  Q    Okay.  Is there any defense lawyers picking the

9  neutrals?

10 A    Not that I'm aware of.

11 Q    Is there any third party picking the neutrals as part of

12 the STAC consent rights?

13 A    It sounds like the U.S. Trustee has to be involved, but

14 not as part of the STAC rights.

15 Q    Right.  So, you think that's -- so, do you think that's

16 the U.S. Trustee and not the settlement trustee?

17 A    No, I think it's the settlement trustee.

18 Q    Okay.  Do you know who the settlement trustee is?

19 A    I have been told who it is.

20 Q    Okay.  You haven't done any investigation into that?

21 A    No.

22 Q    Okay.  But, there's no defense lawyer helping to pick

23 the neutral, is there?

24 A    Not that I'm aware of.

25 Q    Okay.  No one from Ogletree?

1  A      No.

2  Q      Not Bruce Griggs?

3  A      No.

4  Q      Not any of the local lawyers you have defending cases?

5  A      No.

6  Q      Not Dan Rudd?

7  A      No.

8  Q      Not Winston & Strawn?

9  A      No.

10  Q     So, there's no defense input into the neutral here, is

11  there?

12  A      Not that I know of.

13  Q      Mr. Griggs, in resolving cases in the tort system, did

14  you ever create a binding EDR process that was selected where

15  the decision-maker was decided entirely by a Plaintiffs' bar?

16  A      Not that I can think of.

17  Q      Right.  You wouldn't do that, would you?

18  A      Well, not that I can think of.

19  Q      Well --

20  A      We did sometimes use EDR processes where we agreed to

21  use whoever the Plaintiffs' counsel wanted to use.

22  Q      Right.  But that wouldn't have been a binding process,

23  would it?

24  A      Likely not.  That would have been more like a mediation.

25  Q      Right.  I mean, you would have provided something being

1  fair, right?

2  A    Yes.

3  Q    Okay.

4         MR. JACOBS:  I think you can take that down, Matt.

5  BY MR. JACOBS:

6  Q    Since your declaration does talk about comparison

7  between the tort system -- actually, I see Mr. Hallowell has

8  his hand up.  I'll stop briefly.

9         THE COURT:  Mr. Hallowell?

10        MR. HALLOWELL:  Your Honor, can you hear me?

11        THE COURT:  I can.

12        MR. HALLOWELL:  We just wanted to provide the

13 exhibit numbers for the last two documents.  And they are, for

14 the Settlement Trust Advisory Committee, it's Exhibit 1-354 at

15 page 49 and for the eleventh mediator's report, it's

16 Exhibit 1-350.

17        THE COURT:  Okay.

18        MR. JACOBS:  Thank you.  Your Honor, I don't know

19 if I need to move these into evidence since they're all part

20 of the plan and the plan supplement, but to the extent I need

21 to, I'd like to move them into evidence.

22        THE COURT:  I don't think you need to.  I think you

23 can refer to them.  They are part of the record in this case.

24        MR. JACOBS:  Okay.  Thank you.

25 BY MR. JACOBS:

1  Q      So, your declaration talks about comparison of the tort

2  system and the TDPs, correct?

3  A      Yes.

4  Q      Okay.  So, let's first talk about -- I never know what

5  to call them -- the regular TDPs; the ones that are not the

6  expedited review or the independent review process.

7         Okay.  You've read those, haven't you, Mr. Griggs?

8  A      I have.

9  Q      Okay.  There's no defense counsel in those TDPs, is

10 there?

11 A      No.

12 Q      Okay.  There's -- you're not there?

13 A      No.

14 Q      Okay.  Not a local counsel -- not local lawyers there?

15 A      No.

16 Q      Dan Rudd's not there?

17 A      No.

18 Q      Winston & Strawn's not there?

19 A      No.

20 Q      No one's there, right?  There's no defense presence.

21 A      Right.  There's no a defense lawyer there.

22 Q      That's completely unlike the tort system, isn't it,

23 Mr. Griggs?

24 A      Yes, it's not like a case in court, no.

25 Q      Is there a provision to file an answer?

1  A      No.

2  Q      No.

3        So, since there's no provision to file an answer,

4  there's no ability to raise any of the substantive defenses in

5  the pleading that we went over earlier, correct?

6  A      No, I don't agree with that.

7  Q      In an answer?

8  A      Well, you don't file an answer, but if my view, the

9  trustee can consider any defense that would apply to the

10 claim.

11 Q      Okay.  Well, we'll come back to this.  I want to go

12 through this list first.

13        There's no ability to file an answer with the

14 substantive defenses that we went over earlier, is there:

15 negligence, duty, all those things?

16 A      There's not an ability to file an answer that I know of,

17 no.

18        Could someone choose to file a responsive pleading of

19 some kind to a claim -- I don't know.

20 Q      Yeah, but there's no one there to file it.  There's no

21 defense lawyer to file it, is there?

22 A      That's true.

23 Q      Okay.  Is there any provision to file a motion to

24 dismiss?

25 A      No.

1  Q      Okay.  Is there any provision to file a motion for

2  summary judgment?

3  A      No.

4  Q      Is there any ability to file a *motion in limine*?

5  A      There wouldn't be a trial, so there wouldn't be that.

6  Q      Okay.  Is there expert discovery?

7  A      Not per se; although, I do think it contemplates, for

8  example, psychological examination, if warranted.

9  Q      Yeah, but not expert discovery like you describe in the

10  tort system in the three categories, correct?

11  A      Correct.

12  Q      Okay.  There's no jury trial right, is there?

13  A      No.

14  Q      There's no appeal right, no defense, is there?

15  A      I'm not really conversant with the appeal rights in this

16  process, but you wouldn't have an appeal to a court of

17  appeals, no.

18  Q      So, all of the procedural defenses that provide for due

19  process for Defendants in the tort system are absent from the

20  TDPs, aren't they?

21  A      Well, again, I don't agree with your characterization of

22  that.  I think all of the procedural defenses are embedded

23  into the validity criteria, the mitigating factors, all the

24  things the trustee can consider in placing a value on the

25  claim.

1  Q     Yeah, but they're not -- the list I just went through,
2  they're not there, are they?
3        I mean, I understand your opinions that these are sort
4  of in the criteria somewhere, but they're not -- I mean, I can
5  go through the list again, but none of them are actually in
6  the TDPs, are they?
7  A     Well, for example, the statute of limitations is in the
8  TDP.  There is a legal liability standard that's in the TDP.
9  There are many mechanisms that are exactly the kinds of things
10 that we would utilize in evaluating claims that are in the
11 TDP.
12 Q     So, the statute of limitations that's in the TDP, that's
13 a mitigating or an exacerbating factor, isn't it?
14 A     That's where it's specifically listed as a mitigating
15 factor.
16 Q     Right.  So, under the trust distribution procedures,
17 it's entirely possible that claims are going to get paid out
18 in more than half the states than none were even brought
19 pre-petition, isn't it?
20 A     I don't know that I could say that.
21 Q     Okay.  Because you're not the trustee, right?
22 A     I am not.
23 Q     But the statute of limitations is not listed in the
24 general criteria as a gatekeeper to pinning a claim, is it?
25 A     It's listed in the mitigating factors and then there's a

1  separate section that says that any limitation in the tort

2  system can be considered, so I would consider that a

3  limitation in the tort system.

4  Q     But that's after the claim is going to be allowed, isn't

5  it?

6  A     Correct.  And it could reduce the claim to zero, so ...

7  Q     Right.  But in the tort system, most of those cases

8  weren't even brought, were they?

9  A     Well, most of what cases?

10  Q     In jurisdictions where there was an applicable statute

11  of limitations that barred the claims, which was more than

12  half the states in the United States, right?

13  A     In order --

14  Q     Those cases are going to get paid under the TDPs, aren't

15  they, Mr. Griggs?

16  A     I don't know.  I don't know.  It could be that the

17  answer to that is no.  It may be that the trustee says this

18  claim is barred by limitations and other mitigating factors

19  and the way that math works under the system, you put it

20  together and the claim could get zero.

21  Q     Okay.  So, you think the trustee could zero out statute

22  of limitations claims?

23  A     I think the trustee could zero out claims, which -- and

24  maybe the great majority of the reason for doing so is because

25  of statute of limitations.

1   Q     Okay.  We'll take a look at that.

2         So, this isn't an adversarial system, is it, not like

3   the tort system?

4   A     Well, I don't think that the function is precisely the

5   same.  This is a trust distribution procedure trying to

6   resolve claims.

7   Q     Right.  It's a distribution procedure, not a defense

8   procedure, is it?

9   A     True.

10  Q     Okay.  So, we went through a number of the substantive

11  defenses that the Boy Scouts relays typically in the

12  underlying sexual abuse cases, like negligence, for example,

13  right?

14  A     Yes.

15  Q     So, do the trust distribution procedures say that the

16  Plaintiff has to prove that the Boy Scouts are negligent?

17  A     I think it says -- I'm not looking at the precise

18  wording -- but I think it says there has to be a basis to hold

19  them legally responsible or something to that effect.

20  Q     Okay.

21         MR. JACOBS:  Why don't we pull up the TDPs, Matt,

22  which is -- it's attached to the plan as Exhibit A.

23         THE WITNESS:  What is the exhibit number?

24  BY MR. JACOBS:

25  Q     I think it's 353, Mr. Griggs, and it's Exhibit A to

1  that.  And then take as much time as you need to look at

2  these, but I believe it's page 164 of 459 in that exhibit.

3  A    Okay.  I'm there.

4          MR. JACOBS:  Okay.  And, Matt, it's in  Subsection

5  C, connecting to Scouting, and it's Number 2, that a protected

6  party may bear legal responsibility.

7  BY MR. JACOBS:

8  Q    Is that the language you're referring to, Mr. Griggs,

9  with respect to the substantive defenses in the legal system?

10  A    Right.  That's the language that I was referring to when

11  you said, do they have to find negligence.

12  Q    Right.  So, this says that a protected party may bear

13  legal responsibility, right?

14  A    Yes.

15  Q    By my count, that's eight words, correct?

16  A    That is correct.

17  Q    And it said may, right?

18  A    It does.

19  Q    It doesn't say, Does have legal responsibility, does it?

20  A    No, it says may.

21  Q    It doesn't use the word "negligence," does it?

22  A    No.

23  Q    It doesn't use the word "duty," does it?

24  A    No.

25  Q    It doesn't say "statute of limitations," does it?

1  A      No, note right there, no.

2  Q      Okay.  It doesn't raise a damages defense, does it?

3  A      No.

4  Q      It doesn't speak to the Boy Scouts' knowledge of a

5  perpetrator's propensity to commit abuse, does it?

6  A      It does not.

7  Q      Okay.  All of the defenses that we saw in the typical --

8  spelled out in the typical answer that the Boy Scouts would

9  file in the underlying cases, which was Joint Exhibit 1808,

10  none of those are listed here, are they?

11  A      They are not listed.

12  Q      Right.  And if this was really going to duplicate the

13  tort system, don't you think those should be listed,

14  Mr. Griggs?

15  A      No, not necessarily, I don't think that.

16  Q      Okay.  But that's just your opinion, right?

17  A      Well, you asked me for my opinion.

18  Q      Well, don't you think that the document that's guiding

19  the settlement trustee, if it was really going to replicate

20  the tort system, would include the defenses that the Boy

21  Scouts raised in the tort system?

22  A      I think it does include those defenses, because all of

23  the data that was prepared to prepare these trust distribution

24  procedures was based on cases that included all of those

25  defenses.  So, that's how you came up with this.      So, it

1  is all embedded in the trust distribution procedures.

2  Q    So, that eight words, in your view, encompasses all the

3  defenses that the Boy Scouts raised in the tort system?

4  A    No, not just those eight words.  The entire claims

5  allowance procedures, that you have to fill out a proof of

6  claim, which is very detailed and provides a lot of

7  information.  That you have to consider the alleged abuse, the

8  abuser identification, connection to Scouting, the date and

9  age, the location of abuse.  That you consider mitigating

10 factors, such as the statute of limitations and other factors.

11 And that the trustee may also consider any other limitation on

12 someone's recovery in the tort some.  To me, that encompasses

13 every defense that you could raise.

14 Q    Okay.  But it doesn't list negligence, does it?

15 A    No.

16 Q    And that was the Boy Scouts' principal defense in the

17 tort system, wasn't it?

18 A    No, negligence was not the Boy Scouts' defense.

19 Q    Well, that there was no negligence, correct?

20 A    I would say the Boy Scouts' defense was that the Boy

21 Scouts was not responsible to alleged abuse that occurred at a

22 local troop level.

23 Q    Okay.  And there's nothing about duty, is there?

24 A    Not that is listed, no.

25 Q    Okay.  There's nothing about the perpetrator not being

1  an employee, agent, or servant of the Boy Scouts, is there?

2  A    Not specifically, no.

3  Q    Okay.

4  A    There is a section about connection to Scouting.

5  Q    Right.  But none of those legal concepts are written

6  here in the trust distribution procedures, are they, by name,

7  are they?

8        (Audio interference)

9            THE COURT:  Excuse me.  Someone's audio needs to be

10 muted.

11           THE WITNESS:  They are not listed by name.

12 BY MR. JACOBS:

13 Q    Okay.  And you didn't negotiate this, did you,

14 Mr. Griggs?

15 A    No.

16 Q    You didn't write this, did you?

17 A    As I've said, no.

18 Q    You weren't asked to review and approve it, were you?

19 A    I was asked to review it.  I wasn't asked to approve it.

20 Q    Right.  The national coordinating counsel wasn't asked

21 to put this in at all, were they?

22           MR. MARTIN:  Objection; form.

23           THE WITNESS:  Well, again, all I can say that it

24 is -- I provided information about all of these things.  That

25 resulted in these trust distribution procedures, which I

1  reviewed.

2  BY MR. JACOBS:

3  Q    But you didn't write this language, did you?

4  A    No.

5  Q    Do you know who did write this language?

6  A    Not specifically.

7  Q    Okay.  And when Haynes and Boone wrote your declaration

8  here, they didn't include that in what you knew about, did

9  they?

10  A    Didn't include what?

11  Q    That any knowledge on your part about where this

12  provision came from?

13  A    Not that I can recall.

14  Q    Okay.  Let's talk just briefly about the expedited

15  distribution procedures.

16      Did you review that, Mr. Griggs?

17  A    Yes.

18  Q    So, there's a procedure to pay out $3500, correct?

19  A    Correct.

20  Q    Okay.  And I think you said something in your

21  declaration about sometimes it costs more than $3500 to defend

22  a case and that is a reasonable thing to do.

23      Do you recall that?

24  A    I recall saying sometimes, I would, you know, with 99

25  percent confidence say every time.

 1 | Q     Okay.  But in more than half the states, there wouldn't

 2 | have been any sexual abuse cases, would there?

 3 |          MR. MARTIN:  Objection; form, calls for

 4 | speculation.

 5 |          THE WITNESS:  Again, I don't know if it's more than

 6 | half.  What I can tell you is in some states where we may not

 7 | have had cases, but we would get claims in those states and we

 8 | would evaluate those.

 9 | BY MR. JACOBS:

10 | Q     Right.  But I think you said you didn't have defense

11 | counsel in more than half of the cases -- in more than half of

12 | the states because you didn't have cases, right?

13 | A     I'm just not sure what the exact number is.  That sounds

14 | about right to me.

15 | Q     Okay.  So, you wouldn't have been spending $3500 a case

16 | to resolve cases that weren't filed, would you?

17 | A     Right.  We might spend $3500 or more to resolve a claim

18 | that we were aware of in one of those states.

19 | Q     If that happened, right?

20 | A     And it did.

21 | Q     Yeah, but by and large, there weren't cases in more than

22 | half of the states, right?

23 | A     True.

24 | Q     There certainly weren't 82,000 cases, were there?

25 | A     No.

1   Q     And so, if this was the insurers' money to pay these

2   cases, would you have asked the insurers to consent to this

3   sort of defense cost settlement?

4   A     Yes.

5   Q     Okay.  So --

6   A     Well, that's a qualified "yes."

7         So, you know, if there's -- if it's first-dollar

8   insurance, and let's just use as an example, it falls in a

9   (indiscernible) year, I would email or call Dave Humphreys and

10  say, hey, we've got this claim.  Someone is, you know,

11  threatening a lawsuit.  We think it's time-barred, but we

12  could probably get rid of it now for $5,000.  Is that

13  something that you want to do?

14  Q     Right.  And because it's --

15  A     That's the cadence of it.

16  Q     And because it's the insurers' money you were dealing

17  with, you would have asked for their consent, right?

18  A     Correct.

19  Q     Right.  And so, if the $3500 per claim is being paid out

20  as the expedited distribution as insurer money, that would

21  have required insurer consent, wouldn't it?

22  A     Well, so, yeah, obviously, I couldn't, at least in my

23  experience, I couldn't spend an insurer's money without their

24  consent.  There might be times where, whether Century wanted

25  to participate or not, the Boy Scouts would just pay it to not

1  have to deal with that claim.

2  Q    Right.  But if you're dealing with the insurers' money,

3  you're getting their consent, right?

4  A    Yes.

5  Q    Do you have any idea whether the insurers have consented

6  to this provision here?

7  A    I take it from the tone of your questions, probably not,

8  but I don't know for sure.

9  Q    Now -- well, no, they haven't; I'll tell you that.

10       And so, just another -- I'm bad at math -- but 82,000

11  claims, if you assumed everyone took the $3500, that's

12  $210 million, isn't it?

13  A    I don't know.

14  Q    That's not a *de minimis* amount of money, is it?

15  A    Not to me.

16  Q    Okay.  You, or the Boy Scouts, wouldn't have paid 82,000

17  time-barred claims in the tort system, would they?

18  A    I don't believe they would.

19  Q    No, I don't think so, either.

20  A    Unless -- I'd have to qualify that -- if the Boy Scouts

21  knew that it would completely resolve all claims of abuse up

22  to a certain point in time, they might well have done that and

23  they might have saved them money from this process.

24  Q    Well, let me ask you this.  So, if you start paying out

25  time-barred claims in a tort system, don't you just think

1  you're going to get more tort claims?

2  A    The reason I hesitate is this:  these claims are old,

3  right.  And so, as every year goes by, you have a decreasing

4  number of abuse claims.  So, at the recent times, you know,

5  the rate of incident of abuse in the Boy Scouts is very, very

6  small.  So, you're not going to get anywhere near the universe

7  of claims moving forward that you had in the past, in my

8  judgment.

9  Q    Well, that's not the teaching of this bankruptcy, is it,

10  Mr. Griggs?

11  A    I don't understand your question.

12  Q    Well, the bankruptcy was filed and we went from 350

13  cases to 82,000-plus, didn't we?

14  A    Yes.

15  Q    Okay.  And if you had started paying out 82,000

16  time-barred claims in the tort system, don't you think you

17  would have gotten more claims?

18      I mean, the only reason we're limited to 82,000 here is

19  because of the bar date.

20  A    I don't know.  There's just no way for me to know.

21  Q    Okay.  Are you surprised by the number of cases filed in

22  this bankruptcy case, Mr. Griggs?

23  A    By the number of claims?

24  Q    Yes.

25  A    Yeah, I wasn't expecting that many.

1   Q     Right.  And you think it's because of the Plaintiffs'
2   advertising, don't you?
3   A     I don't why it is, but I wouldn't be surprised if that
4   was a factor.
5   Q     Well, I asked you that in your deposition, and we can
6   pull it up -- why don't we pull it up.
7              MR. JACOBS:  It's page 183, Matt.
8              THE WITNESS:  I would give the same answer, but I
9   don't know for sure what drove those numbers.
10  BY MR. JACOBS:
11  Q     Yeah, just completely --
12             MR. MARTIN:  Hold on.  I objected to that question.
13  Obviously, it calls for speculation and would ask the Court
14  for a ruling on that.
15             THE COURT:  Okay.  I didn't hear the objection on
16  that and sometimes I will say Mr. Griggs is speaking very
17  quickly after your objections.
18             THE WITNESS:  I'm sorry.
19             THE COURT:  I'll sustain the objection.
20  BY MR. JACOBS:
21  Q     Okay.  Mr. Griggs, it's true you don't recall the dates
22  that you were asked to provide information in respect of the
23  TDP criteria?
24  A     Not specifically.
25  Q     Okay.  So, you can't pinpoint when that was?

1  A     I cannot.

2  Q     Okay.

3          MR. JACOBS:  Your Honor, if we could take a couple

4  minutes?  I think I'm close to done or may be done.  If I

5  could consult with my colleagues and see what I've missed.

6          THE COURT:  Let's take five minutes and see where

7  you are.

8          MR. JACOBS:  Okay.  Thank you.

9      (Recess taken at 2:10 p.m.)

10     (Proceedings resumed at 2:16 p.m.)

11         THE COURT:  Okay.  Gentlemen, we're back on the

12 record.

13         Mr. Jacobs?

14         MR. JACOBS:  Your Honor, thank you.

15         I think I'm done, subject to any questions after

16 redirect.

17         THE COURT:  Okay.  Thank you.

18         We're going to take our lunch break now.  Let me

19 find out first, is there anyone else who's going to

20 cross-examine Mr. Griggs?

21         I see a few hands.

22         MS. DUMAS:  Yes.

23         THE COURT:  I see Ms. Dumas, Ms. Wolff,

24 Mr. Pfister.

25         Okay.  We're going to take our lunch break.  We

1  will reconvene five minutes after 3:00.  Five minute after the

2  hour for further cross.

3           And let me also announce, with respect to --

4  because we're getting some inquiries -- with respect to

5  Thursday, because I had mentioned previously that that was a

6  day on which I had some other court hearings, we have been

7  able to clear the morning, so we will be going on Thursday

8  until 2:00 and then we will take a break from 2:00 to 3:30 and

9  depending on where we are and what we can get done, we'll

10 reconvene at 3:30 for another hour and a half or two.  But we

11 will be able to proceed on Thursday on those parameters.

12           Okay.  Thank you very much.  We're in recess until

13 3:05 Eastern time.

14           COUNSEL:  Thank you.

15       (Recess taken at 2:18 p.m.)

16       (Proceedings resume at 3:06 p.m.)

17           THE COURT:  This is Judge Silverstein.  We're back

18 on the record.

19           MS. DUMAS:  Thank you.

20           THE COURT:  Ms. Dumas.

21           MS. DUMAS:  Your Honor, thank you.  Gillian Dumas

22 for the Dumas & Vaughn claimants.  And those of us who are

23 going to cross-examine this afternoon have conferred on an

24 order.  So we've agreed that I will go first and hopefully

25 keep things moving along.

1                THE COURT:  Thank you.

2                MS. DUMAS:  Okay.

3                THE COURT:  You may proceed.

4                          CROSS-EXAMINATION

5   BY MS. DUMAS:

6   Q    Mr. Gibbs, you were asked some questions about those

7   lawsuits filed in Idaho earlier today.  Do you remember those

8   cases?

9   A    I do.

10  Q    Were you personally involved in any of those?

11  A    To some extent, yes.

12  Q    Okay.  And do you remember -- and specifically, Mr.

13  Jacobs asked you several questions about the affirmative

14  defenses that the Boy Scouts raised in those lawsuits.  Do you

15  remember the outcome of any of those affirmative defenses?

16  A    I don't recall that we got any of those cases dismissed,

17  either through a motion to dismiss or on summary judgment.

18  Q    Okay.  And specifically, in those cases -- and I'll

19  represent to you that I was the plaintiffs' attorney in those

20  cases -- do you recall that we filed summary judgment motions

21  against your affirmative defenses?

22  A    I don't recall that.

23                MS. DUMAS:  Okay.  And I am going to see if I can,

24  in fact, share my screen.  Let me see.  But I don't know if I

25  can.  Here we go.

1    (Pause in proceedings)

2        MS. DUMAS:  Well, that's one.  And then we've got -

3  - let me see if I can get this up to show you.  Here.

4    (Pause in proceedings)

5        MS. DUMAS:  Let's see.

6  BY MS. DUMAS:

7  Q    Does that work?

8  A    No.

9  Q    No, it did not work.  Then, see, I do not have a helper

10  to show you documents.  I was trying to show you the document.

11  A    Now that you mention it, I do -- I think I do recall that

12  happening.

13  Q    Okay.  And do you recall, in fact, that the Court

14  dismissed 12 of BSA's 18 affirmative defenses on motion by the

15  plaintiffs' attorneys?

16  A    I don't -- I don't specifically recall, but I don't have

17  any reason to dispute that.

18  Q    Okay.  And in other cases where the plaintiffs' attorneys

19  have moved for summary judgment on your affirmative defenses,

20  did courts also dismiss BSA's affirmative defenses?

21  A    I -- I really can't remember any other specific cases

22  where that happened.  That was not common.

23  Q    Okay.  Would you dispute that it has happened in several

24  -- in cases where plaintiffs did move against your affirmative

25  defenses?

1  A    I just don't know.

2  Q    Is that one of the reasons why BSA stopped raising some

3  of the affirmative defenses that it historically raised?

4  A    No, I don't think I would say that.  To the extent that,

5  once we got involved, if we stopped raising affirmative

6  defenses that had been raised before, it was because either I

7  or someone on my team determined that that wouldn't be

8  successful in that jurisdiction.

9  Q    Okay.  And is one of the reasons it wasn't affirm -- it

10 wasn't successful because plaintiffs had had those affirmative

11 defenses dismissed on summary judgment?

12 A    I don't recall that ever going into my line of thinking.

13        MR. MARTIN:  Ms. Dumas, excuse me.  I don't mean to

14 interrupt your flow.  But do you want to remove the document

15 you have from the -- on the screen?

16        MS. DUMAS:  I can't see it, so I -- that's not what

17 I'm looking at, so I'm afraid -- hang on.  Let me see if I can

18 get rid of everything.  Is it all gone?

19        THE COURT:  (Indiscernible) her ability to share?

20        MR. MARTIN:  No, it's still up there.  There -- no,

21 it's gone now.

22        MS. DUMAS:  All right.

23        MR. MARTIN:  Thank you.

24        MS. DUMAS:  I think I -- I think I did it right

25 now.  Okay.  Sorry about that.

1  BY MS. DUMAS:

2  Q    Okay.  Mr. Jacobs showed you his Exhibit 1684.  And I'm

3  not going to try to do that, since I obviously don't have the

4  ability.  But that was a breakdown of the -- it was a

5  presentation --

6  A    I recall it.

7  Q    -- okay -- that included a valuation -- a preliminary

8  valuation of the proof of claims.  Do you have that in front

9  of you?

10 A    I do.

11 Q    Okay.  And you mentioned, in reference to that exhibit,

12 that several of the claims -- it shows there two lines -- that

13 some were presumptively barred by the statute of limitations.

14 Is that an accurate representation of your prior testimony?

15 A    Well, that -- that's what the document says.

16 Q    Okay.  I believe -- does the document just say that some

17 of the claims are barred by the statute of limitations?

18 A    It says both -- both things.  It says claims barred by

19 the statute of limitations and claims not presumptively barred

20 by the statute of limitations.

21 Q    Okay.  And it's the word "presumptively" that I'm

22 thinking about.  Is that your description or does the document

23 actually say "presumptively"?

24 A    The document says "presumptively."

25 Q    Okay.  And is it presumptive because that presumption can

1  be challenged through the claims process in the bankruptcy, or

2  at least that's what the plan contemplates?

3            MR. MARTIN:  Objection.  Calls for speculation.

4  A    I -- I didn't prepare this, so I don't know.

5  Q    Okay.  Is it your understanding of the proposed TDP that

6  a claimant can somehow challenge the idea that their claim is

7  barred by a statute of limitations, present documentation that

8  would say that their claim is not barred by the statute of

9  limitations?

10 A    I -- I presume that a plaintiff could do that.

11 Q    Okay.

12 A    I don't know that for certain.

13 Q    All right.  Are you familiar, through your work as

14 National Coordinating Counsel for the Boy Scouts, with some of

15 the various statutes of limitations that apply to sex abuse

16 claims in the different states?

17 A    Yes.

18 Q    And are you aware that some statutes of limitations have

19 two components:  One that might be an age limit, and another

20 component that says a person can bring a claim within a

21 certain number of years of when they make a connection between

22 the child abuse and their injury?

23 A    I am.

24 Q    Okay.  And so, under those types of statutes of

25 limitations, there is some question, a fact question, isn't

1  there, about whether a claim may or may not be barred by the

2  statute of limitations?

3  A    There certainly could be.

4  Q    Okay.  And that is an issue that BSA has litigated in

5  many of these cases, correct?

6  A    That is correct.

7  Q    Okay.  It's not cut and dried, like you have to bring a

8  claim before your 40 or you're out, correct?

9  A    Right.  In those states that have that statutory

10  mechanism, I would agree with you.

11  Q    Okay.  And those states include states like Oregon,

12  Washington, Montana, and several others, correct?

13  A    Certainly Oregon and Montana.  Washington, just off the

14  top of my head, I -- I don't recall.

15  Q    Okay.  So, when that document, for example, talks about

16  claims that are presumptively barred, is it your understanding

17  that it is contemplating claims in states with those types of

18  statutes of limitations, where someone might be over the age

19  limit, but it's a fact question about whether or not they're

20  in the time period when they made that connection between the

21  abuse and their -- discovery of their injury?

22  A    I don't know.  I didn't prepare this document.

23  Q    Okay.  But it is your understanding that statutes of

24  limitations are one of the issues in the TDP that can increase

25  or decrease the value, correct?

1  A    It is a mitigating factor, so I'm not sure how it would

2  increase the value.  But if -- if a claim is -- is barred or

3  falls into a category where it's likely barred, it would

4  decrease the value.

5  Q    Okay.  And if, for example, in a state like Oregon or

6  Washington, you -- are you familiar with the idea, under the

7  TDP, that those states are called a "gray one" under the TDP?

8  A    I'll take your word for it.  I'm familiar that -- that

9  there's denominations of gray one, gray two, and gray three.

10 Q    Okay.  And those gray areas reflect the statute of

11 limitations in those states?

12 A    Correct.  They're the -- the -- as I recall it, gray one

13 would be the closest to an open state, so that -- that the

14 limitations analysis of a gray one would be that's closer to

15 there not being any bar at all.  Gray two would be kind of in

16 the middle.  Gray three would be very likely barred, but there

17 is some chance someone could still recover.

18 Q    Okay.  And under the TDP, a claimant can argue that their

19 claim should not be barred in one of those gray states,

20 correct?

21 A    I think that's right.  It's hard for me to be definitive

22 about that, but -- but I wouldn't be surprised to learn that

23 that's correct.

24 Q    Okay.  But unlike in litigation, where statute of

25 limitations is an affirmative defense and the burden is --

1  would be on the BSA to prove that a claim is barred by the

2  statute of limitations, under the TDP, that burden is flipped

3  and is put on the claimant to prove that their claim isn't

4  barred by the statute of limitations, correct?

5  A    Well, that's not quite the way I think about it.  The

6  burden is on the claimant to provide factual information about

7  their claim, and then it's up to the trustee to apply the

8  factors to that claim.

9  Q    Okay.  And that information would include statute of

10  limitations information, even though that is typically an

11  affirmative defense on which the burden of proof falls on the

12  defendant.

13  A    Well, the statute of limitations information being when

14  did the claim occur, how many years ago was that.

15  Q    And in states with -- when the statute of limitations

16  depends on making the connection between the abuse and the

17  injury, that information is also relevant --

18  A    True.

19  Q    -- correct?  Okay.

20      Prior to Ogletree and Deakins becoming the national

21  coordinating counsel for the Boy Scouts, Skadden Arps was the

22  national coordinating counsel, correct?

23  A    Not that I'm aware of.

24  Q    Well, from about August of 2010 until sometime when

25  Ogletree and Deakins took over, wasn't Skadden Arps the

1  national coordinating counsel?

2  A    No, I don't believe that's true.

3  Q    Do you know Mark Cheffo at Skadden Arps?

4  A    I do not.

5  Q    Okay.  Do you have any information at all about Mark

6  Cheffo and Skadden Arps acting as National Coordinating

7  Counsel for Boy Scouts of America at any period?

8  A    I do not.

9  Q    Did anyone at Boy Scouts ever talk to you about Skadden

10 Arps being their national coordinating counsel before Ogletree

11 and Deakins took over that role?

12 A    They talked to me about two lawyers in Florida who kind

13 of fulfilled a similar role, but they were not with Skadden

14 and Arps.

15 Q    Right.  Okay.  And I was going to ask you.

16      So were those the two lawyers at Lane, Reese and

17 Summers, who were the national coordinating counsel until

18 2010?

19 A    I -- I'm not sure they were designated as national

20 coordinating counsel, but they did help coordinate the defense

21 of cases, and I don't know when they stopped that role.

22 Q    Okay.  Would you agree that Skadden Arps is a well -- is

23 a law firm with a good reputation for litigation?

24 A    I would agree that they're a law firm with a good

25 reputation.  What they're known for, I couldn't speak to

1  specifically.

2  Q    Do you believe that Skadden Arps has, I believe your

3  words earlier were "a lot of litigation experience"?

4  A    My -- my words from when?

5  Q    From when you described your impression of what BSA

6  needed to handle the sex abuse claims on a national level?

7  A    Yeah, that was -- I was talking about what BSA needed.  I

8  wasn't talking about Skadden Arps.

9  Q    I --

10  A    I wasn't --

11  Q    I --

12  A    -- asked about Skadden Arps.

13  Q    I know.

14      Do you believe that Skadden Arps has a lot of litigation

15  experience?

16  A    I'm not familiar with Skadden Arps' litigation

17  experience.

18  Q    In your declaration, on Page 11, at paragraph --

19          MS. DUMAS:  And I just want to make sure I'm not

20  sharing my screen.

21  BY MS. DUMAS:

22  Q    I didn't share that screen, did I?

23  A    No.

24  Q    Thank you.

25      Okay.  In your declaration, at Page 11.

1        MR. MARTIN:  If you don't mind, I'm going to hand

2   him a copy --

3        MS. DUMAS:  Please do.

4        MR. MARTIN:  -- of his declaration.  Thank you.

5   BY MS. DUMAS:

6   Q    I want to direct you to Paragraph 32.

7   A    I see it.

8   Q    You say in that paragraph:

9        "I am aware of only two abuse claims that went to

10  trial between 2010 and 2016."

11       Is one of those trials the Kerry Lewis trial in

12  Portland?

13  A    Yes.

14  Q    Okay.  And are you aware of what the verdict was in that

15  trial?

16  A    My recollection is it was approximately $20 million.

17  Q    Okay.  And do you remember what the breakdown was between

18  compensatory and punitive damages?

19  A    Far more in punitive damages than compensatory damages.

20  Q    Okay.  Do you recall what the breakdown was?

21  A    I really don't.

22  Q    Okay.  And are you aware that, in Oregon, the -- most of

23  the punitive damages goes to the State?

24  A    Anecdotally aware.  I don't know specifically how all

25  that works.

1  Q    Okay.  In doing your work for this bankruptcy case,

2  compiling those settlement numbers that you put together on

3  your spreadsheets of historical settlements, did you review

4  the Kerry Lewis case?

5  A    I don't know that I did that specific to that project,

6  but I have reviewed the Kerry Lewis case at various times over

7  the last five years.

8  Q    Okay.  And Kerry Lewis was one plaintiff among eight

9  related plaintiffs in two filed cases, correct?

10 A    I don't know the specifics of that.

11 Q    Okay.  All eight of those claims settled after the Kerry

12 Lewis verdict, correct?

13 A    They did.

14 Q    And why did you not include those 2.2-million-dollar

15 settlements for each of those 8 claimants on your spreadsheet?

16 A    I don't know.  I was relying on data that we tracked, and

17 so one spreadsheet went from 2016 to 2020, one went from 2010

18 up to 2020.  Anything prior to 2016 would have been

19 information provided to me by the Boy Scouts.

20 Q    Okay.  But you were aware of the Kerry Lewis trial,

21 correct?

22 A    I was aware of a twenty-million-dollar verdict that

23 settled post-verdict.

24 Q    Okay.  Did you ask the Boy Scouts to provide you

25 information on the settlement of that case, so that you could

1   include it in your spreadsheet?

2   A    I -- I likely did at some point, but I don't specifically

3   recall that.

4   Q    Okay.  So you could have listed those eight settlements,

5   each for $2.2 million, on your chart that you've provided to

6   the Court in this case.

7             MR. MARTIN:  I'm sorry.  Which chart are you

8   referring to?

9             MS. DUMAS:  Which is the exhibit marked by the Boy

10  Scouts, 1002 or 1003.  I have to see which one is which.

11  1003.  I can't remember which one is which.  One -- it looks

12  like 1003 is the -- your chart with settlements from 2016 to

13  2020, and Exhibit 1002 is your chart with exhibit -- with

14  settlements going back to years unmarked, but the first -- the

15  first year on that chart is 2010.

16            MR. MARTIN:  So, Ms. Dumas, I just want to make

17  clear, I think these are exhibits that were provided to the

18  Court on a hard drive.  And I want to just make sure that the

19  witness and everyone knows which one we're on and that we have

20  it in front of us.

21            So do you want him to be looking at Exhibit 1003?

22            MS. DUMAS:  Yes.

23            MR. MARTIN:  Is that the one?

24            MS. DUMAS:  One zero zero -- I can't -- no, 1002.

25            MR. MARTIN:  Okay.  1002.  So, Your Honor, if you

1  don't mind, if we could pull it up separately.

2         THE COURT:  Ms. Dumas --

3         MR. MARTIN:  Would it be --

4         THE COURT:  -- would that be helpful for you?

5         MS. DUMAS:  If you could.

6         MR. MARTIN:  Mr. Brooks, could you pull that up,

7  please?

8         MS. DUMAS:  There you go.  Thank you.

9         THE COURT:  Thank you.

10 BY MS. DUMAS:

11 Q    You're on Exhibit 1002.  Again, my quest -- only question

12 was:  You could have included those 8 settlements for $2.2

13 million each, correct?

14 A    Well, first, I don't recall the Kerry Lewis plaintiffs

15 getting $2.2 million each.  You are saying that, but I don't

16 recall that.

17     Second, if you would scroll down.

18     (Pause in proceedings)

19     I think it was -- probably was resolved in 2011.

20     (Pause in proceedings)

21 Q    Do you want him to scroll up a little bit until you get

22 to the dates?

23 A    Yes.

24     So, looking at resolution here -- okay.  2011.

25     (Pause in proceedings)

1        Yeah, I don't have an explaination about why it's not

2  there.

3        So, again, what we did with pre 2016 was just rely on

4  data given to us by the Boy Scouts about historical

5  settlements, and that data was exported into this spreadsheet.

6  Q    If that data had been included on this chart, would you

7  agree that would have made the chart more accurate, int erms

8  of reporting historic settlements?

9  A    Well, any historic settlement in that time frame should

10  be reported on the chart.  And if something is missing, yes,

11  it would be more accurate if it was reported.

12  Q    As national coordinating counsel, did you also consider

13  the venue where the case was filed in determining the

14  settlement value?

15  A    Yes.

16            MS. DUMAS:  Okay.  And you can take that exhibit

17  down.  Thank you.

18  BY MS. DUMAS:

19  Q    So, for example, was the venue where the Hacker case was

20  filed, was that a factor in considering what the settlement

21  value of those cases was?

22  A    That was a factor.

23  Q    Okay.  And in settling one of our cases in Portland for

24  $4.9 million, was the fact that it was filed in Portland,

25  Oregon a factor in the settlement value?

1  A    To a lesser extent than cases filed in Cook County,

2  Illinois, but certainly a factor.

3  Q    Okay.  Multnomah County is also considered a plaintiff-

4  friendly jurisdiction, isn't it?

5  A    I think it is.

6  Q    Okay.  You could have included choice of venue as a

7  factor in your settlement analysis in your declaration,

8  correct?

9        MR. MARTIN:  Objection.  Vague.  "Settlement

10  analysis," I'm not sure what that means.

11        THE WITNESS:  I'm not really sure what you're

12  asking me about.

13  BY MS. DUMAS:

14  Q    Okay.  Well, you didn't mention choice of venue in your

15  declaration when you were talking about the things BSA

16  considered when considering settlement value.  You could have,

17  couldn't you?

18  A    Could have.

19  Q    Okay.  And likewise, when you explained what factors were

20  part of the TDP, the TDP does not consider venue.  It doesn't

21  mention venue, does it?

22  A    I don't think it specifically mentions venue, but it

23  certainly mentions location of the abuse, which, to me,

24  connotates kind of where the venue would be.

25  Q    Okay.  Is settlement value reflected in the TDP?  Excuse

1  me.

2       Is venue reflected in the numbers in the TDP?

3  A    I would say yes.

4       (Pause in proceedings)

5  Q    Is there anything written in the TDP -- other than that

6  the plaintiff has to explain the location, is there anything

7  in the TDP specifically talking about venue?

8  A    No.

9       (Pause in proceedings)

10 Q    Mr. Jacobs showed you a list of 12 cases that BSA won on

11 summary judgment.  Can you give me an estimate of the number

12 of cases you think that BSA lost summary judgment motions that

13 they filed?

14 A    I could only speak to the time period from August 1 of

15 2016 to the petition date.  And as I said, we -- we probably

16 only filed six or so motions for summary judgment during that

17 period.  Of the six -- and these would have either been a

18 motion for summary judgment or a motion to dismiss.

19 Q    Uh-huh.

20 A    Of the six, two were granted in full, one case in Oregon,

21 one case in Connecticut; and the other four, they were granted

22 in part, the disclosing of claims, but not the whole case.

23       There could have been others.  Those are just the ones

24 that occur to me off the top of my head.

25 Q    Okay.  In your declaration, you said that you do not

1  remember any time that BSA won a motion for summary judgment

2  on statute of limitations grounds.  Is that correct?

3  A    Well, I remember that the case in Connecticut was a

4  statute of repose, which is a little bit different than a

5  statute of limitations.  But that was the basis for that

6  motion.

7  Q    Okay.  Is it correct that you do not remember a case that

8  BSA won summary judgment on for statute of limitations.

9  A    Not -- not during my engagement with the Boy Scouts.

10         MS. DUMAS:  All right.  Those are all my questions.

11  Thank you.

12         THE COURT:  Thank you.

13         THE WITNESS:  Thank you.

14         THE COURT:  Mr. Pfister.

15                    CROSS-EXAMINATION

16  BY MR. PFISTER:

17  Q    Good afternoon, Mr. Griggs.  My name is Rob Pfister from

18  the Klee Tuchin law firm, on behalf of the PCVA and Zalkin law

19  firms, which are plan proponents, except for a very limited

20  carveout, which is the topic of my questioning for you today.

21  Can you hear me okay?

22  A    I can.

23  Q    Excellent.

24       I'd like to turn with you, please, to Paragraph 4 of

25  your trial declaration.  And I'm specifically going to ask you

1  questions about the last two sentences of that paragraph.  Are

2  you there?

3  A    Yes, I'm here.

4  Q    Okay?  So I'll read it for you, and then I'll ask you if

5  I read it correctly.  Quote:

6         "Abuse claims brought against TCJC were handled

7  differently.  TCJC generally bore its own costs of litigation

8  and at least an equal share of the liability incurred in the

9  settlement of abuse claims."

10        Did I read that correctly?

11 A    You did.

12 Q    And when you state -- or when you testify that TCJC bore

13 at least an equal share of the liability, what you're saying

14 there is that, sometimes, it was more than 50 percent of the

15 settlement payment came from TCJC.  Is that correct?

16 A    Well, kind of two comments there:

17     One, we had very few cases with TCJC during my

18 engagement, so there wasn't much of a universe to draw from.

19     But what I remember about that, it was a -- typically,

20 about a 50/50 split.  That's what I recall.  There could be a

21 case where they paid more, I just don't specifically recall

22 it.

23 Q    Okay.  And in those cases; that is, TCJC-related cases,

24 TCJC retained its own defense counsel, correct?

25 A    Yes.

1  Q    And TCJC took the lead in the defense of those cases,

2  correct?

3  A    Typically, yes.

4  Q    Okay.  And when it came time to resolve those cases by

5  way of settlement -- well, first of all, none of those cases

6  are the cases that went to trial or resulted in verdicts,

7  correct?

8  A    Correct.

9  Q    Okay.  So any resolutions were all resolutions by way of

10 settlement, correct?

11 A    Correct.

12 Q    Okay.  And when it came time to decide how to allocation

13 the settlement between TCJC and BSA, there was a negotiation.

14 Is that right?

15 A    There were discussions.

16 Q    And the point of those discussions was to assess the

17 degree to which the abuse really occurred within Scouting,

18 versus whether it was more specifically church-related; isn't

19 that right?

20 A    That would be certainly part of Ogletree's discussion

21 with the Boy Scouts and Ogletree's assessment.

22     Now, whether we specifically talk about that with

23 counsel for the TCJC, I don't specifically recall those

24 conversations.

25 Q    Okay.  But BSA's assessment as to how much BSA should

1  pay, not just in terms of an overall dollar amount, but what

2  percentage of the payment should come from BSA when you were

3  having those discussions, the point of that was to determine

4  how much of the abuse really occurred within Scouting versus

5  whether it was more broadly church-related; isn't that right?

6  A    I think that is right.

7  Q    Okay.  And the portion of the liability that was being

8  settled that was attributable to the church-related

9  activities, the idea was that that portion ought to be paid by

10 the church and not by BSA, correct?

11 A    I would kind of state it the negative way.  The idea was

12 that BSA should not have to pay for conduct that it's not

13 responsible for.

14 Q    And similarly, the portion that was conduct --

15 Scouting -- that was conduct in the context of Scouting, the

16 idea was, is that BSA should pay for that and not the Church,

17 correct?

18 A    If it was Scouting-related and was not happening -- if

19 it was happening outside of the church and out of Scouting,

20 then that's what the conduct BSA is responsible for.

21             MR. PFISTER:  I have no further questions.  Thank

22 you.

23             THE WITNESS:  Thank you.

24             THE COURT:  Thank you.

25             Ms. Wolff?

1     MS. LUJAN WOLFF:  Your Honor, I have some

2  questions.  Delia Lujan Wolff from Lujan & Wolff, LLP, out of

3  Guam.

4                        CROSS-EXAMINATION

5  BY MS. LUJAN WOLFF:

6  Q     Hi, sir.

7  A     Hello.

8  Q     Now, in pre-petition child abuse sex cases, Plaintiffs

9  often times asserted negligence claims against the BSA and

10  other Defendants, right?

11  A     Yes.

12  Q     And regarding negligence claims, you would look at

13  whether a Defendant owed a duty to protect the Plaintiff?

14  A     Correct.  Duty would be an element of a negligence

15  claim.

16  Q     And in cases where the BSA was sued, along with a local

17  council or chartered organization, you would look at whether

18  the BSA owed a duty to protect the Plaintiff when it came to

19  the BSA's liability, correct?

20  A     Yes.

21  Q     And for a local council's liability, you would look at

22  whether the local council owed a duty to protect the

23  Plaintiff?

24  A     Well, I would say whether they owed a duty of care,

25  however you phrase that, but the legal duty would be, do they

1  owe a duty of care.

2  Q      Thank you.

3         And for the chartered organization's liability, you

4  would look at whether the chartered organization owed a duty

5  of care to protect the Plaintiff, right?

6  A      Similar analysis.

7  Q      Okay.  And so, you recall, sir, that there were pre-

8  petition cases filed in Guam?

9  A      I do.

10  Q      And there were about at least 140 cases, pre-petition,

11  right --

12  A      That sounds about right.

13  Q      -- that you were involved in, as national coordinating

14  counsel?

15  A      Yes.

16  Q      And the vast majority of those Guam cases alleged abuse

17  by a Catholic priest who was also a Scout master.

18  A      He was a Catholic priest and he was, what I would

19  consider a self-appointed Scout master.

20  Q      Okay.  Now, almost all of those cases in Guam were

21  against the BSA, the Aloha Council, and the Archbishop of

22  Agana; is that correct?

23  A      Yes, there were other Defendants, as well, but I would

24  say the majority of them would capture those three.

25  Q      And the local council was the Aloha Council; is that

1  correct?

2  A     Yes.

3  Q     And where the Archbishop of Agana was sued, the

4  Archbishop of Agana was the chartered organization, correct?

5  A     Legally, I don't know the answer to that question.

6  That's how they were designated in the lawsuits.

7  Q     Okay.  But it was your understanding that the Catholic

8  Church in Guam was the chartered organization?

9  A     That's not really my understanding.

10 The honest answer so that question is, I don't know.  I know

11 that's how they were denominated in all the complaints that

12 were filed.

13 Q     Okay.  Now, in the Guam cases, the Archbishop of Agana

14 had its own lawyer, correct?

15 A     Yes.

16 Q     And that was -- I forget the full name -- but it was

17 Mike Patterson's firm out of Seattle?

18 A     That's right.

19 Q     And the BSA had separate counsel, the Civille & Tang

20 firm?

21 A     That was BSA's Guam counsel and then BSA also retained

22 the Markowitz firm from Portland to assess with those cases.

23 Q     Yes, thank you.

24       And now, of those approximately 140 cases, about 70 of

25 those cases settled pre-petition?

1  A      That sounds about right.

2  Q      And about 70 of those cases did not settle, right?

3  A      The ones that your firm handled did not settle.  The

4  ones handled by other firms did settle.

5  Q      Yes, so my firm, Lujan & Wolff, represent about 70 of

6  the pre-petition cases, correct?

7  A      Again, I don't know exactly what the numbers were, but

8  I'll take your word for it.

9  Q      And despite settlement efforts in the cases handled by

10 my office, settlement negotiations were not successful,

11 correct?

12 A      For your firm's cases, correct.

13 Q      Now, in these Guam cases, the BSA believed that the

14 Archbishop of Agana bore some responsibility for the abuse; is

15 that correct?

16 A      That is correct.

17 Q      And BSA took the position that it was not responsible

18 for the Archbishop of Agana's failure to protect the

19 Plaintiff; is that correct?

20 A      Wasn't responsible for conduct that was purely

21 church-related and not Scouting-related.

22 Q      Okay.  And so, again, well, in looking at the Archbishop

23 of Agana's liabilities for negligence, was it -- it was the

24 BSA's position that the BSA was not responsible for the -- if

25 the Archbishop of Agana breached its duty of care to protect

1  the Plaintiff, correct?

2  A     The Catholic Diocese would be responsible for its own

3  duty of care, their own conduct within the Church that wasn't

4  related to Scouting.

5  Q     Okay.  And in these pre-petition cases, the

6  approximately 350 pre-petition cases that you were involved in

7  as national coordinating counsel, were you aware of any

8  written indemnification agreements between the BSA and

9  chartered organizations?

10  A     No.

11  Q     And were you aware as national coordinating counsel of

12  BSA taking the position that a chartered organization would

13  only be responsible for a Plaintiffs' abuse if the BSA was

14  found to be responsible?

15  A     I didn't quite understand your question but let me

16  say -- let me just explain to you a little bit.  Typically,

17  the Boy Scouts only settled cases, would settle on behalf of

18  the Boy Scouts and the local council and the chartered

19  organization.  That could be a little time-specific, depending

20  on when the claim is, but that's generally how it worked.  So,

21  Guam was an exception to that and the reason it was an

22  exception is because Father Brouillard was a Catholic priest

23  and the way that he got boys involved in Scouting was through

24  the church activities.  So, he encountered them first as altar

25  boys within the church, then he would take them on Scouting

1  activities and whatnot.

2       So, there was a clear delineation between how things

3  worked there, as opposed to, let's say, a school that acts as

4  a chartered organization.  They don't have any contact with

5  the kids until there's a troop meeting at the school.

6       Does that make sense?

7            MS. LUJAN WOLFF:  Thank you, sir.

8            I don't have any further questions.  Thank you.

9            THE COURT:  Thank you.

10           Mr. Moxley?

11           MR. MOXLEY:  Good afternoon, Your Honor.

12           Can you hear me okay, Your Honor?

13           THE COURT:  Yes.

14           MR. MOXLEY:  Okay.  Great.

15           Your Honor, the Coalition -- as you know, I

16  represent the Coalition -- I'm from Brown Rudnick -- the

17  Coalition, as you know, is a plan proponent.  We have a

18  handful of questions for Mr. Griggs that may or may not be

19  addressed by Mr. Martin on his redirect.  Our questions are

20  really in the vein of a redirect in that they are clarifying

21  some questions that -- an issue that came up on cross.

22           I'm happy to wait until after Mr. Martin questions

23  Mr. Griggs.  I just wanted to make sure I cited this to the

24  Court in case Your Honor was concerned about the proper order

25  of questioners.

1           So, if you'd like me to ask my questions now, I'm

2   happy to do that or I'm happy to wait until after Mr. Martin

3   goes.

4           THE COURT:  I'll ask Mr. Martin which he would

5   prefer, since this is his witness.

6           MR. MARTIN:  I think I would prefer to do my

7   redirect and then if I don't touch on issues that Mr. Moxley

8   thinks he needs to, then, obviously, he's free to do so.

9           THE COURT:  Okay.

10          MR. MOXLEY:  Thank you.

11          MR. MARTIN:  I'm just not sure.  Are we through

12  with cross or ...

13          THE COURT:  Well, is there anyone else?

14       (No verbal response)

15          THE COURT:  Cross is over.

16          Redirect?

17          MR. MARTIN:  Thank you, Your Honor.

18                      REDIRECT EXAMINATION

19  BY MR. MARTIN:

20  Q    So, Mr. Griggs, thank you for being here.  I appreciate

21  your participation in this.

22       I want to cover, first of all, your involvement in

23  connection with the TDPs.  And in the examination by

24  Mr. Jacobs of you, you indicated that you did not draft the

25  TDPs and so I want to make sure I understand fully what your

1  involvement was.  So, could you explain to the Court exactly

2  what your involvement was in connection with the TDPs.

3  A    Yes.  So, as the Boy Scouts approached a bankruptcy

4  filing and then continuing post-petition, we had conversations

5  with bankruptcy counsel and other interested parties about the

6  role in which we had played.

7       And through the TDP process, the way that came up is, it

8  was in the sense of what kinds of things did you consider in

9  evaluating a claim; for example, the date of abuse, the

10  location of abuse, the identity of the perpetrator, identity

11  of the victim, those kinds of issues.  And then also, what

12  kinds of things made a claim more valuable than not, you know,

13  the aggravating factors.  And then, to the same degree, then,

14  the mitigating factors; what kinds of things made claims less

15  valuable than not.

16       So, we had a series of conversations along those lines

17  and then, ultimately, that resulted in the TDPs being prepared

18  and then, at that point, we reviewed them and gave any

19  additional input.

20  Q    Thank you.

21       MR. MARTIN:  At this time, Your Honor, I would like

22  to use the demonstrative aid that was referenced earlier to

23  show the Court and use in my redirect of Mr. Griggs, and it is

24  Defense Demonstrative Exhibit 9 through 22.

25       THE COURT:  Okay.

1             MR. MARTIN:  May I show that to you, Your Honor?

2             THE COURT:  Yes.

3             MR. JACOBS:  Your Honor, may I be heard?

4             THE COURT:  Yes.

5             MR. JACOBS:  And I reiterate the objection that we

6  made at the beginning.  The demonstrative is really just the

7  last few pages of Mr. Griggs' declaration with no words in it.

8  I don't think it's proper redirect.  This is basically what's

9  in his written examination and the redirect ought to be

10 limited to what was elicited in cross, and this is really

11 just -- what it really is, Your Honor, is a late-submitted

12 declaration in slightly different words from what was in the

13 written declaration that was timely filed.  So, we would

14 object to using it.

15            MR. MARTIN:  Well, Your Honor, if I may, one of the

16 things that we decided is less like to hear was what    Mr.

17 Jacobs asked to see whether or not, in my redirect, and with

18 respect to the demonstrative aid, whether those would be

19 touching those subjects.

20            Well, we have heard Mr. Jacobs talk about the

21 substantive defenses that were used in pre-petition practice,

22 talked about the procedures that were used, talked about the

23 statute of limitations, talked about the tort system, talked

24 about what kind of negligence or legal responsibility might

25 affected.  All of those are matters that are set forth in the

1  demonstrative aid and will help us kind of go through those

2  issues with Mr. Griggs during his redirect.

3            THE COURT:  You know, no, I'm looking at this and I

4  don't think we need a demonstrative on this.  I think he can

5  ask him questions that are responsive to the cross-

6  examination.

7            MR. MARTIN:  Okay.  Very well.  Thank you, Your

8  Honor.

9  BY MR. MARTIN:

10 Q    One of the exhibits that Mr. Jacobs showed you,

11 Mr. Griggs -- and if I could get that -- that is the matrix

12 that was used in a mediation in 2019.  I think it's 1664,

13 JTX-1664, which is on the screen here.

14      Do you see that, Mr. Griggs?

15 A    I do.

16 Q    And Mr. Jacobs asked you questions about the evaluation

17 that are in this document.

18      What was your understanding what the purpose of this

19 document and in what manner it was being used at that time?

20 A    It was obviously a pre-petition mediation in an effort

21 to avoid a bankruptcy filing, and so it was done just for that

22 purpose:  for purposes of mediation.

23 Q    Okay.  Was it your understanding that this was an

24 attempt to negotiate?

25 A    Yes.

1  Q     Okay.  And in your experience as a lawyer, do you always

2  give you highest number in negotiations?

3  A     No.

4  Q     Okay.  And so, and do you recall sort of what your

5  participation was in providing this document?

6  A     From what I recall is, again, that we would provide

7  settlement information and it would have been limited to the

8  time period that Ogletree was involved, provided that to

9  whoever it was provided to, who then used that to develop this

10  matrix.  That's my recollection of it.

11  Q     And compared to the TDP and the values that are in the

12  TDP, would you tell the Court, again, what was your

13  involvement in terms of providing data that would be relevant

14  to those numbers in the TDP.

15  A     Pretty much the same process.  We provided historical

16  settlement data from August 1, 2016, through the petition

17  dates and then we were tasked with collecting the same types

18  of data for the time period, 2010 to August 1, 2016, and we

19  provided that data.

20  Q     Okay.  So, to be clear, what you provided is

21  settlement -- historical settlement amounts from 2016 to 2020.

22  That's what you provided; is that correct?

23  A     In the first instance, yes.

24  Q     Okay.  So, wore you involved at all in the data

25  computation of that information?

1  A      No.

2  Q      Okay.  Do you know who was involved in that?

3  A      I believe it was Bates White.

4  Q      Okay.  So, you weren't involved in actually coming up

5  with the base amount or the maximum amount of any of these

6  types of abuse values?

7  A      Not other than providing the historical settlement data.

8  That was our involvement in that.

9  Q      Okay.  Thank you.

10        MR. MARTIN:  You can remove that document from the

11 screen.  Thank you.

12 BY MR. MARTIN:

13 Q      I want to draw your attention to the TDP.

14        MR. MARTIN:  So, if we could bring up the TDP.

15 This is Exhibit 353, Joint Exhibit 353 -- sorry, 1-353.

16 BY MR. MARTIN:

17 Q      And I want to draw your attention, sir, to page 170   of

18 459 -- actually, I'm going to start somewhere different.

19 Excuse me.

20        If we can start on page 164 of 459, and I'm looking at

21 the general criteria for evaluating submitted abuse claims.

22 A      I see it.

23 Q      Okay.  Do you see all of these Subparagraphs (a), (b),

24 (c), (d), and (e)?

25 A      Yes.

1  Q    Okay.  So, what we see here is general criteria for

2  evaluating abuse claims.

3        What was your involvement, sir, in providing the

4  information that is set forth in this section of the TDP?

5  A    Providing this information.  So, again, if the questions

6  to me were:  What did you consider in evaluating the validity

7  of an abuse claim?

8        These are the factors that we would consider.  And there

9  were others, but these are the central factors that we look

10 for in every case.

11 Q    And so, there were a number of questions that

12 Mr. Jacobs asked you about, well, why isn't negligence in

13 here?

14       And can you explain to the Court where would the notion

15 or the principle or the concept of negligence be found in the

16 general criteria?

17 A    It would be found under Section C(ii) there, that a

18 protected party may bear legal responsibility.

19       But I would also say more broadly, it's found in the

20 entirety of the TDP, because again, if you're talking about

21 the values in the matrix, those were all based on the

22 historical settlement data, which included all defenses that

23 we raised to all claims.  Those cases settled for whatever

24 they settled for, you know, even though we raised all these

25 various defenses, so that's how that came about.

1  Q      And if you look specifically at Subsection (c), do you

2  see the connection to Scouting paragraph there?

3  A      Yes.

4  Q      Do you see a little (ii) there?

5  A      Yes.

6  Q      Okay.  What did you understand that to mean?

7         And it says that a protected party may bear legal

8  responsibility.  What did you understand that to mean?

9  A      I understood that to mean that there has to be some

10 legal basis to hold a protected party, whether it's BSA or

11 local council or a chartered organization, responsible.  So,

12 that could be (indiscernible).  It could be something broader

13 than that.

14         MR. JACOBS:  Your Honor, sorry, I'm a little late

15 on the draw here, but we're just asking the witness to

16 interpret a legal document that he didn't write and I think it

17 shouldn't be permitted.  I'd move to strike the answer.

18         THE COURT:  Why not?

19         MR. MARTIN:  I'm sorry?

20         THE COURT:  Why not?

21         MR. MARTIN:  Well --

22         THE COURT:  He didn't write this.

23         MR. MARTIN:  He didn't write it, but he provided

24 input to make -- in fact, he said he actually did provide (a)

25 through (e).

1        THE COURT:  Well, no.  I'm going to sustain the

2   objection.  He said he didn't write it, so what he thinks it

3   means doesn't really matter.

4        MR. MARTIN:  Okay.  Very good.

5   BY MR. MARTIN:

6   Q    I do want to talk to you, sir, about motions to dismiss

7   and motions for summary judgment that were actually filed or

8   prepared under your watch, okay.

9        Is it your understanding or testimony, sir, that those

10  were few and far between?

11  A    Yes.

12  Q    And could you explain why that is?

13  A    Because in the various jurisdictions where the claims

14  were filed, our evaluation was, with these types of factual

15  allegations and just the law of that jurisdiction, that those

16  motions were not likely to have much success.  So we made

17  choices not to file motions unless we were confident that that

18  motion could be granted.

19  Q    Okay.  And so of the many cases that you've handled, and

20  I think you said that there were around 300, would you say

21  that in the majority of those cases you found no need to file

22  any kind of motion to dismiss or motion for summary judgment?

23  A    Right.  I would say that we made the determination that

24  the motions would not be likely to succeed in those cases and

25  that would be why we did not file them.

1  Q     And, sir, in your role as national coordinating counsel,

2  I take it that you would use various tools in -- and I'm going

3  to call it your toolbox, as a lawyer, in defending cases.  You

4  might consider interrogatories, document requests, requests

5  for admissions, examinations of the sort, would that be

6  something that would be in your toolbox?

7  A     Yes.

8  Q     Would you use all of those tools in the toolbox for

9  every claim?

10  A     No, every claim would be considered on its own and we

11  would decide what would be the appropriate discovery to do in

12  that case.

13  Q     Would you consider it necessary to always retain an

14  expert in your handling of sexual abuse claims?

15  A     Not in every case.

16  Q     Why is that?

17  A     Some cases didn't merit that, is one reason.  Also, it

18  might depend on what the other side, what the plaintiff's

19  lawyer has done.  So, if they have retained experts on

20  standard of care or a psychological expert, something like

21  that, that might necessitate the need for us to do so.  If

22  they didn't do that, that might lead us down a different path.

23        We also found sometimes that, you know,

24  particularly with respect to a mental-type exam, number one,

25  that can be traumatic to the victim, which can make them more

1  insistent on litigating their case than they otherwise would

2  be, but, number two, we sometimes found that those particular

3  exams weren't helpful to us.  So that, post that exam, our

4  case got worse rather than better.  So you wanted to carefully

5  consider whether to do that.

6  Q     So sometimes actually retaining a mental health

7  professional to provide an exam of the claimant might make

8  things worse?

9  A     Not every time by any means, but sometimes it could.

10 Q     What about would you find it necessary to request

11 documents from third parties in every case?

12 A     No.

13 Q     Why is that?

14 A     Well, many times the plaintiffs' lawyers would provide

15 what I would characterize as third party documents.  For

16 example, educational records, any treatment records.  There

17 would be no need to subpoena those records if they had been

18 provided by plaintiff's counsel, so we didn't often do that.

19          And then, with respect to other types of third

20 party discovery, there really just wasn't much that was

21 applicable to the --

22 Q     What about --

23 A     -- (indiscernible) --

24 Q     -- depositions?

25          MR. JACOBS:  Mr. Martin, I'm sorry, I don't mean to

1  interrupt your flow, could we take this document down, so we

2  can see --

3              MR. MARTIN:  Oh, I'm sorry.

4              MR. JACOBS:  -- the people?

5              MR. MARTIN:  I apologize.

6              MR. JACOBS:  Thank you.

7  BY MR. MARTIN:

8  Q      Mr. Griggs, what about depositions?  And talk to us

9  about the need for in every case to take depositions.

10  A      Again, every case was different, so we did not take

11  depositions in every case.  I think, to be fair, I would say

12  we certainly would want some sort of sworn testimony in the

13  form of an interrogatory answer or deposition testimony or

14  something if the case was going to be fully litigated.  There

15  were cases in which we were able to resolve them very quickly

16  without doing any discovery.  So there would be no

17  depositions, no written discovery, it would be a voluntary

18  exchange of information, we would get it resolved.  If we're

19  not able to get it resolved like that, that's when we would

20  consider depositions.

21  Q      Okay.  And what about requests for admissions?

22  A      Sometimes use them.  You know, requests for admissions

23  are -- can be a useful tool, for example, in trying to

24  establish dates of when abuse occurred or what troop you were

25  in or things like that, but they're not a great utility in

1  these types of cases, in my experience.

2  Q    I want to talk to you now about your experience in

3  having contact and conversations with excess insurers while

4  you were handling BSA's prepetition cases.  How often did you

5  actually have dialogue with excess carriers?

6  A    Rarely.

7  Q    And why is that?

8  A    Either the claims were not of such an exposure level

9  that it would get into the excess carrier's level or, if we

10  were keeping an excess carrier informed of a case that might

11  get to their level, they just weren't responding.  Those would

12  be the reasons.

13  Q    How often did the excess carriers indicate to you that

14  they wanted to be more involved?

15  A    I can't really recall a time when someone put it that

16  way, they want to be more involved.  I would say in the Hacker

17  cases they were more involved in terms of thinking about how

18  to resolve the cases, what they were willing to pay to resolve

19  the cases.

20  Q    So was it your experience that, the higher value the

21  claim was, the more involved the excess carrier might want to

22  be?

23  A    Yes.

24  Q    Let's very briefly talk about the statute of

25  limitations.  So is it your experience, sir, handling claims

1  for the BSA prepetition that you came across some claims that

2  might have a defense of the statute of limitations?

3  A    Some, yes.

4  Q    Okay.  And do you -- can you think of times or

5  experiences where the BSA decided to settle a case even though

6  it might think it was -- it had an appropriate defense of the

7  statute of limitations?

8  A    Well, there's kind of two categories of those cases.  So

9  one would be just a claim, not a lawsuit, filed in a state

10 where we would look at it and say, well, that's just plainly

11 barred.  But, nonetheless, we might make a decision to resolve

12 that claim on a -- at a small dollar value just to avoid the

13 cost of litigation.  So that's one category.

14        The other category is some of the high-exposure

15 cases where we thought we had a solid statute of limitations

16 defense, but the plaintiffs' lawyers did not agree with us and

17 the court may have told us otherwise, and then we made a

18 decision to settle those claims.

19 Q    And did you settle any of those claims with the consent

20 and coordination with insurers?

21 A    If insurance -- if a claim fell within an insurance

22 company's layer of coverage and we were talking about

23 insurance money, yes, we would settle those with their

24 consent.

25 Q    And can you think of either a case involving a statute

1  of limitations defense or a statute of repose defense where

2  you felt the BSA had a strong position but, nonetheless, ended

3  up paying money to the claimants with the consent of the

4  insurance company?

5  A     Yes.  So I can think of two that immediately come to

6  mind.  One, the Hacker cases, we had strong limitations

7  defenses, but the Illinois Court of Appeals ruled against the

8  Boy Scouts.  And so, after that happened, even though we

9  thought we still had very strong defenses, the Boy Scouts was

10 not in a position to take the risk of trying those cases and

11 subjecting the organization to that potential exposure.  So

12 that was one.

13        The other one was a case in Connecticut involving,

14 I think, 18 plaintiffs where we actually prevailed on a -- it

15 was either a motion to dismiss or a motion for summary

16 judgment based on the statute of repose.  And that was a

17 Century case.  The plaintiffs appealed that decision and the

18 case was settled on appeal with Century's knowledge and

19 consent.

20 Q     And in the cross-examination earlier there was a lot of

21 discussion concerning Ogletree's role in helping with the

22 analysis of the states and their statutes of limitation.  Do

23 you recall that?

24 A     Yes.

25 Q     Okay.

1    MR. MARTIN:  Your Honor, with your permission, I'd

2    like to show him JTX-360.

3    THE COURT:  Okay, you may.

4    (Pause)

5    BY MR. MARTIN:

6    Q    Mr. Griggs, do you see --

7    MR. MARTIN:  -- and, Your Honor, do you mind if I

8    hand him a copy, a hard copy as well?

9    THE COURT:  You may.

10   BY MR. MARTIN:

11   Q    Mr. Griggs, could you tell me what this document is?

12   A    It's a version of a memorandum that Sean Manning, who

13   was a lawyer on my Boy Scouts team, prepared detailing the

14   limitations period in each of the 50 states.

15   Q    Okay.  So, earlier, you had testified about Ogletree's

16   input into the statute of limitations information, is this a

17   document that was prepared by Ogletree and used for that

18   purpose?

19   A    Yes.

20   MR. MARTIN:  And, Your Honor, we admit -- we move

21   to admit JTX-360.

22   MR. JACOBS:  Your Honor, I'm going to object.  This

23   is -- it's a legal document, it's more like a brief and, just

24   like the opinions from my cross-examination that we didn't

25   admit, if people want to put this in a brief or argue it in

1  closing argument, it might be appropriate there.  It's not

2  really a factual exhibit, so we would object to its admission.

3            MR. MARTIN:  Your Honor, it's not a pleading, it's

4  the work product of Ogletree, which was the input that it

5  provided in connection with the TDPs.  So this is the work

6  that was done by the firm for that purpose.

7            THE COURT:  Overruled, I'll admit it.

8        (Exhibit JTX-360 received in evidence)

9            MR. MARTIN:  Thank you.

10 BY MR. MARTIN:

11 Q    One of the questions, Mr. Griggs, that was asked of you

12 involved the independent review process, do you remember that?

13 A    Yes.

14 Q    And there was some discussion about who the neutral was.

15 Do you remember that discussion?

16 A    I do.

17 Q    Okay.  And I think you answered that you believed that

18 the neutral would be somebody that was a retired judge, do you

19 remember that?

20 A    I do.

21 Q    Okay.  In all your experience, sir, do you recall having

22 any concerns about a jurist performing duties that require a

23 jurist to be independent?

24 A    No.

25 Q    And I take it that, of course, you're not aware of who

1  the neutral will be in connection with the independent review

2  process, is that right?

3  A    That is right.

4  Q    Okay.  I want to now turn to the scaling factors.

5          MR. MARTIN:  And, Mr. Brooks, if you could put back

6  on the screen Document 351-353.  That's it.  And if you would

7  please go to page 169.

8          THE WITNESS:  I'm there.

9  BY MR. MARTIN:

10 Q    Okay.  Do you see the section that refers to scaling

11 factors?

12 A    Yes.

13 Q    And then below that you've got paragraph C, aggravating

14 scaling factors, and then there are a number of subparagraphs

15 there.  Do you see that?

16 A    I do.

17 Q    And then going further on to the following page, page

18 171, there is paragraph E, mitigating scaling factors, do you

19 see that?

20 A    Yes.

21 Q    Could you tell -- explain to the Court what your

22 involvement was in connection with these sections of the TDP,

23 please?

24 A    Essentially the same, providing the information about

25 what issues we considered in evaluating claims and valuing

1  claims, and these are all factors that we considered.

2  Q      Considered for what purpose?

3  A      In determining whether a claim was more valuable or less

4  valuable along the spectrum of claims.

5  Q      And so could you explain to the Court, in reference to

6  your prepetition practices of handling sexual abuse claims for

7  the BSA, how some of the aggravating factors actually played

8  into how you valued claims at that time?

9  A      Sure.  So, if you think about an abuse claim, if it's

10  one act of abuse that happened one time with one perpetrator,

11  whether it's less severe abuse or the most severe abuse,

12  that's a different claim than someone who was abused multiple

13  times over a long period of time and certainly if they were

14  abused by more than one person, that would factor in as well.

15          So, you know, extended duration of abuse, frequency

16  of abuse, tends to increase the value of the claim.  If you

17  have cases where someone is exploiting kids, you know, for

18  child pornography -- again, to be fair, we didn't have many of

19  those, but we had some, but that was a factor you would

20  consider.  Any use of forces or threats or violence would be a

21  factor to consider in valuing the claim and, as I said,

22  multiple perpetrators.  So those would all be factors that

23  would increase the value of claims.

24          On the mitigating side one of those is, is there a

25  familial relationship.  What that refers to is we had cases

1   where the abuse started at home.  So it would be, let's say, a

2   stepfather or something like that, and then that same person

3   also happened to be the troop leader.  So it was really the

4   family relationship that was the causal nexus of the abuse as

5   opposed to Scouting, we would consider that in valuing the

6   claim.

7           Other non-Scouting relationship.  So, again, this

8   would be if somebody knew a certain person outside of

9   Scouting and that's how they got access to that person, that's

10  how they gain that person's trust, and then they carry that

11  over to a Scouting-related event.

12          Then other responsible non-protected parties, that

13  would just be if there is some other entity that's not

14  involved in Scouting and they're the entity that's really

15  responsible for the Scouting, we would consider that in

16  valuing the claim.

17  Q    Okay.  What about -- how would you consider the impact

18  of the abuse, how would that play into your calculation or

19  your assessment of a case prepetition?

20  A    Well, if the abuse has severely impacted the victim in

21  an objective way -- and I'm not suggesting that not every

22  victim is impacted, but you might have somebody who's been in

23  jail all of their life or they've been in an institution all

24  of their life, or they've had really specific problems that

25  could be attributed to the abuse, versus someone who, despite

1  what happened to them, has been highly successful, is highly

2  educated and you can't really objectively discern the effects

3  of the abuse.

4  Q    Let's talk about your experiences prepetition of trying

5  to resolve matters quickly without a lot of costs involved.

6  Can you explain experiences that you had in handling BSA's

7  sexual abuse docket?

8  A    Yes.  So it evolved a little bit.  So, when I first got

9  involved in August of '16, you know, our job was to evaluate

10 all the pending claims, which we did, and then try to figure

11 out how are we going to move them forward from here.  But what

12 we learned after about a year's worth of experience is these

13 claims don't tend to get better over time; just the opposite

14 happens, they get worse.

15        And so it became very important to me to try to

16 figure out is this something we can settle very early on, so

17 this doesn't result in a three-to-four-year litigation path

18 with tons of discovery where my case isn't getting any better,

19 it's just getting more expensive and it's increasing in value.

20 So we spent a lot of time and effort in trying to resolve

21 claims at the earliest stage of the process that we could.

22        MR. MARTIN:  And, by the way, if you could remove

23 the document from the screen.  Thank you.

24 BY MR. MARTIN:

25 Q    And, Mr. Griggs, were there situations where you would

1   recommend that the BSA settle a claim even though you were not

2   far advanced into the discovery of the case?

3   A    Many situations.

4   Q    Could you explain situations like that to us, please?

5   A    Just exactly that.  A claim would come in, we would get

6   whatever records we could get from the local counsel, if --

7   whatever relevant records BSA national had, if they had any,

8   and then we would get whatever documents and information the

9   plaintiffs' lawyers would give us, and we would do an

10  evaluation of the claim.  And if I determine it's something

11  that can or should be settled early on, we would engage in

12  that process, whether through direct negotiation or sometimes

13  an ADR process like mediation.

14  Q    Do you recall any situations where involved carriers

15  would have agreed with that approach?

16  A    Yes, I don't really recall carriers not agreeing to that

17  approach.

18  Q    In your experience, what is important to insurance

19  companies in actually the defense of the case?

20            MR. JACOBS:  Your Honor, I'm going to -- I let this

21  go a little bit.  I mean, this is asking for hearsay from

22  unknown insurance companies, I think it's objectionable.

23            MR. MARTIN:  It's based on his experience.

24            MR. JACOBS:  It's still hearsay, Your Honor.

25            THE COURT:  Let me hear your particular question

1  again.

2           MR. MARTIN:  Let me rephrase it.  How about that,

3  Your Honor?  I will rephrase the question.

4  BY MR. MARTIN:

5  Q     In your experience, Mr. Griggs, did you ever encounter

6  situations where an insurance company was agreeable to

7  resolving a case even though you had not yet advanced in the

8  discovery of the case?

9  A     Yes.

10  Q     Okay.  Can you explain that, please?

11          MR. JACOBS:  Same objection, Your Honor, now we're

12  to the hearsay.  And Mr. Martin is also leading the witness.

13  I mean, I know this is a bench trial, but he shouldn't be

14  leading his own witness.

15          THE COURT:  Sustained.

16  BY MR. MARTIN:

17  Q     So, Mr. Griggs, in your experience, why is it a good

18  idea to try to resolve claims early on in the life of the

19  case?

20          MR. JACOBS:  I'm just going to object again, he's

21  leading, Your Honor.

22          THE COURT:  Sustained.

23  BY MR. MARTIN:

24  Q     Can you explain some cases where you did settle cases

25  early on?

1   A     Yes.  It's hard to recall too many of the specific ones.

2   One that stands out in my mind is another Century case that

3   was filed in Louisiana against the Boy Scouts and the Diocese

4   there, and we agreed to a basically pre-suit mediation process

5   where we went down and kind of got basic information about the

6   claim.  Dave Humphries from Century traveled to Louisiana,

7   somebody from my team went, mediated the case and settled.

8   That is an example.  Guam is a really good example.

9          Those cases were filed, but everybody early on

10  agreed to stay those cases and came up with a process by which

11  people took essentially three-hour recorded statements of all

12  the individuals and they exchanged basic documents and

13  information.  We then evaluated all of those statements and

14  ultimately went through, I believe, four separate mediations,

15  one in Guam, one in Hawaii, two in San Francisco, trying to

16  resolve those claims.  And that was with full carrier

17  participation.

18  Q     Thank you.

19          MR. MARTIN:  Your Honor, I have no further

20  questions of the witness at this time.

21          THE COURT:  Thank you.

22          Mr. Moxley?

23          MR. JACOBS:  Your Honor, I think I have just one or

24  two, I don't know if others should go first.

25          THE COURT:  Well, let me let Mr. Moxley go first.

1          MR. MOXLEY:  Thank you, Your Honor.

2                    RECROSS EXAMINATION

3    BY MR. MOXLEY:

4    Q     Good afternoon, Mr. Griggs.  Cameron Moxley of Brown

5    Rudnick on behalf of the Coalition.  How are you, sir?

6    A     I am doing well.  How are you?

7    Q     Great.  Thank you.

8          Mr. Griggs, just a few clarifying questions, if I could,

9    regarding statute of limitation issues that you were asked

10   about on cross examination.

11         Has BSA been sued in states where the statute of

12   limitations, at least, facially presents a possible defense to

13   abuse claims?

14   A     Yes.

15   Q     And, Mr. Griggs, to your knowledge have there been cases

16   where plaintiffs have successfully plead around the statute of

17   limitations?

18   A     Yes.

19   Q     To your knowledge, Mr. Griggs, have there been cases

20   where courts have rejected a statute of limitations argument

21   that the BSA raised?

22   A     Yes.

23   Q     And in your experience, sir, what circumstances could an

24   abuse claim that is facially time barred survive a motion to

25   dismiss?

1  A      If it's one of the states that has a connect the dots

2  statutory scheme that is one way.  Other states have discovery

3  rules that, essentially say, you know, the time doesn't begin

4  to run until you discover the effects of the abuse or

5  something like that.  That would be a way.  The fraudulent

6  concealment cases are probably the best example.  The cases in

7  Idaho, on their face, were all time barred, but the federal

8  judge in that case adopted what was then a novel theory.

9      A fraudulent concealment that applied four year fraud

10 statute of limitations instead of a two year personal injury

11 statute of limitations to those claims and he had the clock

12 running from the time a series of VSD files were publicly

13 produced.  So that operated to revive what, otherwise, likely

14 would have been time barred claims.

15 Q      So in your experience, Mr. Griggs, the existence of a

16 statute of limitations defense is, obviously, not a 100

17 percent bar to claims, is that right?

18 A      That is right.

19 Q      Sometimes it works and sometimes it doesn't work,

20 correct?

21 A      Yes.

22 Q      And, Mr. Griggs, in your view and experience the

23 existence of a statute of limitation defense does not mean

24 that the abuse claim has no value, is that right?

25 A      That is right.

1  Q    If someone said, Mr. Griggs, that all claims that are

2  subject to a statute of limitations defense are worth nothing

3  that would be an over-simplification based on your experience,

4  is that right?

5  A    It would be to me.

6           MR. JACOBS:  Your Honor, the Coalition is one of

7  the proponents of the plan.  So, in effect, Mr. Griggs is Mr.

8  Moxley's witness as well.  He has been leading with every

9  single one of these questions and I would object to leading.

10          THE COURT:  Sustained on the last one.

11          MR. MOXLEY:  Just to clarify, Your Honor, I don't

12 think my prior questions were leading.

13          THE COURT:  They may not have been, but you just

14 got an objection on the last one.  Sustained.

15          MR. MOXLEY:  Thank you, Judge.  I just wanted to

16 confirm that.

17          Mr. Griggs, I have nothing further.  Thank you.

18          THE WITNESS:  Thank you.

19          THE COURT:  Thank you.

20          Mr. Jacobs, do you have a few by way of re-cross?

21          MR. JACOBS:  Just a couple.

22          THE COURT:  Okay.

23          MR. JACOBS:  Could we put back up Joint Exhibit 360

24 which was just admitted?

25          THE COURT:  That's the memorandum?

1          MR. JACOBS:  Yeah.

2                    RECROSS EXAMINATION

3  BY MR. JACOBS:

4  Q     Mr. Griggs, do you see Exhibit 360?

5  A     Yes.

6  Q     Do you see up in the corner it says attorney/client

7  privileged communication and attorney work product?

8  A     Yes.

9  Q     So who would this be protected from in your view?

10  A     In a non-bankruptcy world it would be protected from

11  plaintiffs' lawyers, adverse parties to the Boy Scouts.

12  Q     Right.  So we just admitted this document in open court

13  with how many plaintiffs' lawyers on the zoom, do you know?

14  A     I don't know.

15          MR. JACOBS:  Thank you.  That's all I have.

16          THE COURT:  Thank you.

17          Ms. Wolff.

18          MS. WOLFF:  Yes, Your Honor. I only have a few

19  questions.  Thank you.

20                    RECROSS EXAMINATION

21  BY MS. WOLFF:

22  Q     Sir?

23  A     Yes.

24  Q     To go back to the Guam cases, you recall that the Guam

25  cases, including the seventy or so claims that my firm

1  represents, those cases were generally alleging abuse from

2  about 1955 until approximately 1981, correct?

3  A     I think the huge majority of the abuse occurred from the

4  '55 maybe to the mid 70's, but I seem to recall one plaintiff

5  might have had abuse as late as 1981.

6  Q     Yes.  Okay.  And in those cases you recall that the

7  plaintiffs, I believe it was almost all of the probably 140

8  plaintiffs who filed lawsuits in Guam the BSA and the Guam

9  Church, the Archbishop of Agana took sworn testimony of the

10 plaintiffs, correct?

11 A     Yes, that is correct.

12 Q     They were, basically, depositions limited in time,

13 correct?

14 A     I'm not sure they were depositions.  They were kind of

15 oral statements, they were recorded.

16 Q     But the parties agreed that they had the same effect as

17 a deposition, correct?

18 A     What I recall about it is it was done for purposes of

19 the mediations and that there would be a chance to go back in

20 and take a more complete deposition if the cases returned to

21 active litigation.

22 Q     Yes.  Up to the full seven hours, correct?

23 A     Yes.

24 Q     And not only were the plaintiffs deposed, but the

25 parties also or at least the plaintiffs lawyers and BSA's

1  lawyer, the church's lawyer all flew out to, or at least many

2  of them, Minnesota for the deposition of Father Lewis which

3  took at least four days, correct?

4  A     I do recall that.

5  Q     And during this period you mentioned that there was some

6  discovery that was taken and that discovery included the

7  plaintiffs providing answers to a questionnaire.  Do you

8  remember that?

9  A     I do.

10  Q     And then also provided their employment records, their

11  education records, and their health records.  Do you remember

12  that?

13  A     I do remember that.

14  Q     And not just the plaintiffs providing information, but

15  the church and the Boy Scouts provided all the documents that

16  they had concerning the allegations, correct?

17  A     Correct.

18  Q     And so that was all exchanged among the defendants and

19  the plaintiffs, correct?

20  A     That is true.

21  Q     So there was discovery -- so although the parties went

22  into mediation by 2018 there was this discovery that was

23  happening and the mediations that you described, correct?

24  A     Yes.

25  Q     And after the BSA, I guess, failed to reach settlements

1  with the 70 clients represented by my office the mediation

2  period ended, correct?

3  A    I don't recall exactly when it ended, but, yes, it did

4  at some point.

5  Q    And so the cases were to proceed, but before the cases

6  could proceed much further the BSA filed for bankruptcy in

7  February 2020, right?

8  A    I think the diocese filed for bankruptcy first and then

9  the BSA, but I may be wrong about that.

10  Q    No, you're absolutely correct.

11      Now you mentioned earlier that rarely or it wasn't

12  often, but maybe rarely, the excess -- do you recall the

13  excess carriers being involved in handling these 350

14  prepetition claims, correct?

15  A    They weren't involved very often.  Guam would be an

16  exception to that.  There was, at least, one excess carrier

17  who attended the mediation in Guam.

18  Q    Would that have been First State?

19  A    I think it was AIG.

20  Q    Okay.  That's National Union?

21  A    I am not sure.  To me it's AIG.  That is what I

22  remember.

23  Q    Do you recall First State acknowledging that there was

24  potential coverage for claims in Guam?

25  A    I do not recall that.

1  Q    Okay.  Are you aware that for some years in which

2  Century was involved or -- you say its Chubb, but for some

3  years that Chubb was involved are you aware that for some of

4  those years Chubb wasn't just the primary insurer, but was

5  also the excess insurer for some of those years?  Are you

6  aware of that?

7  A    I would have to look at the insurance coverage chart,

8  really, to be able to respond to that.  You know, my

9  recollection is through the bulk of the 60's there was no

10 excess coverage.  Chubb was the primary carrier and that was

11 all there was.

12 Q    Around 1969 Chubb became an excess carrier.  Did you

13 know that?

14 A    I don't know it as I sit here, but I had a chart that I

15 used that would have told me that at the time if that's right.

16 Q    Okay.  And sometimes Hartford Insurance was the excess

17 carrier for some of these years, right, beginning in the

18 1970's?

19 A    Yes.

20 Q    And so if Hartford wasn't acknowledging coverage as a

21 primary insurer then did that also mean that they weren't

22 acknowledging coverage as an excess insurer?

23 A    Not necessarily.  There were a few discreet policy years

24 where Hartford would respond to claims in the excess layer as

25 I recall it.

1  Q     And when you say Hartford are you also including First

2  State?

3  A     I don't make those distinctions.  To me it was Hartford.

4  Q     Okay.  Do you remember who the lawyer for Hartford was

5  at that time?

6  A     I do not.  Maybe I do, Jim Ruggeri, I think.

7  Q     And so sometimes Jim Ruggeri on behalf of Hartford would

8  be involved on behalf of the excess carrier in these

9  prepetition cases?

10 A     No, no, I wouldn't say that.

11         MR. RUGGERI:  Your Honor, James Ruggeri speaking

12 since my name has been mentioned.  I would object.  This is

13 way outside the scope of any redirect.  I don't really know

14 what we're doing.  It's not relevant to the declaration.  I

15 think it's calling for speculation.  It's not bearing on any

16 of the testimony received or he has provided so far today.  So

17 I would object to this line of questioning about Jim Ruggeri

18 and in regard to Hartford, Your Honor.  Thank you.

19         THE COURT:  Sustained.

20         MS. LUGAN WOLFF:  Your Honor, he said Mr. Ruggeri's

21 name, not me. This is directly relevant to his testimony about

22 excess carriers not often being involved.  So --

23         THE WITNESS:  I think the court sustained it, so I

24 won't say anything further.

25         THE COURT:  Yeah. I sustained that objection.  I

1  think the beginning of it was fine, but I think you've gone

2  beyond redirect.

3           MS. LUGAN WOLFF:  I have no further questions.

4  Thank you.

5           THE COURT:  Thank you.

6           Ms. Dumas, you have redirect.

7           MS. DUMAS:  I have very short re-cross.

8           THE COURT:  I'm sorry, re-cross.  Thank you.

9           MS. DUMAS:  Yes.  Thank you.

10                    RECROSS EXAMINATION

11 BY MS. DUMAS:

12 Q    Mr. Griggs, how many of the pending cases or the cases

13 leading up to the bankruptcy filing involved any kind of

14 fraudulent concealment theories?

15 A    I couldn't give you a number, but there was a fair

16 number.  That was a common pleading.

17 Q    Okay.  Did you see an increase in that theory being

18 asserted after the success of that theory in Idaho?

19 A    Yes.

20 Q    Can you give me, off the top of your head, a list of the

21 states where that theory was asserted?

22 A    No, but I can tell you that it became a very common

23 pleading.  It looked as if someone took a pleading in one

24 case, shared it with a broad group of plaintiffs' lawyers and

25 then that pleading got adopted.

1  Q     Was the pleading that you believe was shared was that --

2  did it look it was Judge Winmill's decision or was it a copy

3  from Idaho or --

4  A     Yeah, it would have been a combination of those things.

5  So whatever complaints were filed after Judge Winmill's

6  decision asserting fraudulent concealment claims became kind

7  of the template for complaints in other jurisdictions.

8  Q     Okay.  And you say shared.  Do you know if it was shared

9  or if it was just found on the court docket?  I mean it was

10 available to anyone who had access to the federal court

11 docket, correct?

12 A     I assume so.  Anecdotally I believe it was shared.

13 Q     But you can't put a number on how many cases you saw

14 that theory asserted?

15 A     No.

16 Q     Did the rise in that theory have any bearing on BSA's

17 decision to file for bankruptcy?

18 A     No, not specifically that.  It had bearing on the number

19 of claims that were likely to avoid a limitations bar.

20 Q     And that -- and did that consideration drive some of the

21 settlements you were making prior to bankruptcy?

22 A     Yes.

23              MS. DUMAS:  Thank you.  No further questions.

24              THE COURT:  Thank you.

25              MR. MALIONEK:  Your Honor, this is Robert Malionek

1    of Latham on behalf of the Church of Jesus Christ of Latter-

2    day Saints.  Could I ask a few -- just a couple minutes of

3    clarifying questions based on some of the questions that came

4    up during cross?

5              THE COURT:  That came up during cross?

6              MR. MALIONEK: I just have been waiting patiently,

7    Your Honor, trying to find the right time to be able to step-

8    in.

9              THE COURT:  Okay.

10              MR. MALIONEK:  Thank you.

11                        RECROSS EXAMINATION

12   BY MR. MALIONEK:

13   Q    Mr. Griggs, I believe that you referred to LDS to refer

14   to my client, but we use TCJC.  If I use that term will you

15   understand what I mean?

16   A    I will.

17   Q    You were asked on cross examination some questions about

18   claims alleging abuse against both BSA and TCJC.  Do you

19   remember that?

20   A    I do.

21   Q    And at times the TCJC did contribute to a settlement of

22   that claim -- of those claims along with the BSA, correct?

23   A    Yes.

24   Q    You were asked if there were negotiations, that was the

25   terms you used, between the BSA and TCJC regarding the

1  allocation of liability between the two.  I believe that you

2  said there were "discussions" between the two.  Is that right?

3  A     Yes.

4  Q     And in those discussions which the BSA and TCJC

5  discussed various factors regarding the allocation between the

6  two?

7  A     I don't remember the specific conversations, but I can

8  tell you generally it would be a discussion of the overall

9  settlement value and how much each party should contribute to

10  it.

11  Q     Okay.  Would you agree there wasn't one single factor

12  that determined the allocation between the BSA and TCJC?

13  A     I would agree with that.

14  Q     Would you agree there was no formulaic way for

15  determining allocations that the BSA took?

16  A     Yes.

17  Q     And the BSA conducted its own investigation of the claim

18  and potential allocation between the two?

19  A     It did.

20  Q     Okay.  And you understood that TCJC did the same?

21  A     Yes.

22  Q     And then the BSA and TCJC would try to agree on what an

23  appropriate allocation should be?

24  A     That's right.

25  Q     Do you ever recall any instance in which the BSA took

1  the position that it was not responsible at all for abuse and

2  that responsibility should be fully allocated to TCJC?

3  A    Not in cases that I handled which, again, 2016 going

4  forward there weren't very many.  So I don't recall that

5  coming up, but I couldn't speak to that prior to 2016.

6  Q    Right.  I am only asking about your own personal

7  knowledge.

8       Were there ever any times, based on your personal

9  knowledge, that you can identify that both the BSA and TCJC

10 were identified as involved in which the BSA asserted claims

11 against TCJC that TCJC bore sole responsibility?

12 A    No.

13 Q    Can you identify any times in which the BSA took the

14 position that it had evidence to conclude that TCJC was solely

15 responsible for the claim?

16 A    None that I can recall.

17       MR. MALIONEK:  Thank you, Your Honor.  Thank you,

18 sir.  I don't have any further questions.

19       THE COURT:  Thank you.

20       Anyone else?

21    (No verbal response)

22       THE COURT:  Thank you, Mr. Griggs, for your

23 testimony.

24       THE WITNESS:  Thank you, Your Honor.

25       MR. MARTIN:  Your Honor, is Mr. Griggs excused?

1          THE COURT:  Yes, you're excused.

2      (Witness excused)

3          THE COURT:  Okay.

4          MR. MARTIN:  Your Honor, our next witness is Mr.

5  Burnett, but I don't know what your schedule is or how you

6  want to proceed.

7          THE COURT:  I don't have my pretrial order in front

8  of me.  How is Mr. Burnett to be offered, live or declaration?

9          MR. MARTIN:  By declaration, Your Honor.

10          THE COURT:  How many counsel are going to want to

11  cross-examine Mr. Burnett?  Just Ms. McNally?

12          Ms. McNally, how long do you think you have on

13  cross?

14          MS. MCNALLY:  I would expect just a couple hours.

15  I will be representing Continental Insurance Company and the

16  certain insurers.  It covers similar grounds as today with Mr.

17  Griggs.  I will try and shorten it for that reason, but I

18  would not expect this will be under a couple of hours.

19          THE COURT:  Okay.  Then we're going to take him in

20  the morning.

21          MS. MCNALLY:  Thank you, Your Honor.

22          THE COURT:  And who is after that?

23          MS. MCNALLY:  I believe that's Mr. Azer.

24          MR. MARTIN:  Yes, that is Mr. Azer.

25          THE COURT:  Okay.  Has -- have there been

1  objections filed to Mr. Azer's declaration? I suspect so.

2           MR. MARTIN:  I do believe so, Your Honor.

3           UNIDENTIFIED:  Yes, there have been.

4           THE COURT:  I would ask the debtors to get their

5  response into that as soon as they can --

6           MR. MARTIN:  Will do, Your Honor.  Of course.

7           THE COURT:  -- because Mr. Azer is going forward

8  tomorrow.

9           MR. MARTIN:  Of course.  We will do that.

10          THE COURT:  Then we are adjourned and we will start

11  again at 10 o'clock tomorrow morning Eastern Time.

12          MR. MARTIN:  Thank you, Your Honor.

13          THE COURT:  Thank you.

14      (Proceedings concluded at 4:46 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                           <u>CERTIFICATION</u>

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    <u>/s/ William J. Garling</u>                    <u>March 16, 2022</u>

8    William J. Garling, CET-543

9

10   <u>/s/ Tracey J. Williams</u>                    <u>March 16, 2022</u>

11   Tracey J. Williams, CET-914

12

13   <u>/s/ Mary Zajaczkowski</u>                     <u>March 16, 2022</u>

14   Mary Zajaczkowski, CET-531

15

16   <u>/s/ Coleen Rand</u>                           <u>March 16, 2022</u>

17   Coleen Rand, CET-341

18
     Certified Court Transcriptionists
19
     For Reliable
20

21

22

23

24

25