IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Re: 9114 |

**DECLARATION OF DR. CHARLES E. BATES IN SUPPORT OF CONFIRMATION OF THE THIRD MODIFIED FIFTH AMENDED PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

I, Dr. Charles E. Bates, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1. I am the Chairman of Bates White, LLC ("Bates White"), an economic consulting firm based in Washington, DC, that specializes in providing advanced economic, financial, and econometric analysis to law firms, companies, and government agencies.[2] I am over twenty-one (21) years of age. I am authorized by the Debtors and fully competent to make this declaration (this "Declaration") in support of confirmation of the Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, dated February 15, 2022 [D.I. 8813; JTX 1-353] (as may be amended, modified, or supplemented, and together with any exhibits and schedules thereto, the "Plan"), and in conjunction with the *Debtors' (I) Memorandum of Law in Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114; JTX 2909] (the "Memorandum").

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] A copy of my CV [JTX-2033] is attached hereto.

1

2.      By Order of this Court dated April 7, 2020, the Debtors were authorized to retain Bates White as their Abuse Claims consultant and advisor.  In that capacity, Bates White was asked by counsel to the Debtors to provide expert testimony regarding, as relevant here, the value of the Abuse Claims asserted against The Church of Jesus Christ of Latter-day Saints ("TCJC").[3]

3.      My expert analyses, opinions, and conclusions are based solely on the work performed by me and under my supervision and my reasonable reliance on information provided by the Debtors and other consultants or advisors to the Debtors, including data extracted from proofs of claim filed in this case,[4] and information concerning BSA's defense and settlement of abuse claims brought against the BSA prepetition, other potentially comparable settlements, and information from academic literature on the prevalence and nature of such claims.  This is the type of information experts typically rely upon in valuing claims.

4.      Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal experience and knowledge or information obtained from my review of relevant documents.  I am not being compensated specifically for this testimony other than through payments received by Bates White as a professional retained by the Debtors in these Chapter 11 Cases.

## PORTION OF VALUATION ATTRIBUTABLE TO TCJC ABUSE CLAIMS

### A. Identification of Potential TCJC Abuse Claims

5.      As described in more detail in the Murray Declaration, my team at Bates White identified a subset of the 82,209 unique and timely abuse proofs of claim asserted against the Debtors ("Abuse Claims") that was potentially associated with TCJC.

---

[3] I was also asked to provide expert opinions on other matters, which I will testify about live at the confirmation hearing.

[4] Further information regarding the nature and processing of the Proof of Claim submissions and the historical data is set forth in the Declaration of Makeda S. Murray [D.I. 9317] (the "Murray Declaration").

6. First, Abuse Claims that directly identified the Mormon church on at least one of their POC submissions were flagged. This means, for example, that an Abuse Claim that said the claimant's troop was chartered by the Mormon church (or some recognizable misspelling thereof), would be coded as associated with TCJC.[5] This first step identified the set of Abuse Claims that, based on the claimants' own sworn Proof of Claim submissions, self-identified having a claim against TCJC ("TCJC Abuse Claims"). In total, this set of claims directly identifying TCJC was 2,854 Abuse Claims.

7. Second, Abuse Claims that shared common characteristics with TCJC Abuse Claims were flagged as being potentially related to TCJC. An Abuse Claim that identified certain criteria that were common to several other Abuse Claims—and where those others had identified TCJC—was flagged as potentially related to TCJC.[6] An Abuse Claim that identified, on at least one POC submission, a Local Council which was known to have been predominately affiliated with TCJC (more than 50% of that Local Council's members), was flagged as potentially related to TCJC.[7] Counting these Abuse Claims along with the TCJC Abuse Claims identified through the process described in ¶ 6, my team identified 7,716 of the 82,209 unique timely Abuse Claims as being potentially associated with TCJC ("Potential TCJC Abuse Claims").

8. While the subset of the Abuse Claims identified as TCJC Abuse Claims are those that self-identified as having a claim against the TCJC, the full group of Potential TCJC Abuse Claims almost assuredly includes some Abuse Claims which were not affiliated with TCJC (since, for example, there were troops sponsored by other Charted Organizations present in the Local Councils where TCJC charters included the majority of members).

---

[5] *See* Murray Decl. ¶ 68, Step 1.
[6] *See* Murray Decl. ¶ 68, Step 3.
[7] *See* Murray Decl. ¶ 68, Step 2.

### B. Portion of Valuation Associated with Potential TCJC Abuse Claims

9. After identifying TCJC Abuse Claims and Potential TCJC Abuse Claims, I then calculated the value associated with these groups of claims. Specifically, I calculated the total aggregate value for such Abuse Claims that is attributable to *all* BSA-related parties, including the Debtors, the Debtors' insurers, Local Councils, as well as TCJC. The value of the Abuse Claims as to TCJC in isolation would be only some share of this total.

10. Moreover, as a general matter, my aggregate valuation is not designed to affix the value of any individual Abuse Claim. For that reason, the benchmark valuation scenario cannot just simply be divided and assigned to small subsets of specific Abuse Claims. In the case of TCJC, however, the total Potential TCJC Abuse Claims are significant in number. In addition, these Abuse Claims, while subject to some degree of regional concentration, are not confined to any one particular jurisdiction; the Potential TCJC Abuse Claims include many western states such as Idaho, which has a tighter statute of limitations window, and California, which has a much more open window. Thus, in this case, it is reasonable to look at the overall value assigned to these Abuse Claims as a point of reference for determining their relative value, in the aggregate, against all the BSA-related parties including the Debtors, Debtors' insurers, Local Councils, and Chartered Organization (in this case TCJC).

11. In order to calculate the value associated with the TCJC Abuse Claims and Potential TCJC Abuse Claims, I created a version of my aggregate valuation model which incorporates additional information relevant to the potential value of the TCJC Abuse Claims and Potential TCJC Abuse Claims.[8] In particular, the model incorporates flags which identify the claims falling within the sets of 2,854 TCJC Abuse Claims and 7,716 Potential TCJC Abuse Claims, as well as

---

[8] Bates White BSA valuation model (Tranche 6 - TCJC summary) -- confidential -- for production.xlsx [JTX-1503]

which claims relate to abuse alleged to have occurred prior to 1976. These flags allow me to isolate the value associated with these subsets of claims under the same valuation scenarios as I considered under my aggregate valuation range, including the endpoints of the valuation range ($2.4 and $7.1 billion) and the midpoint scenario ($4.75 billion). Under the midpoint of my valuation range, the total aggregate value associated with the TCJC Abuse Claims is roughly $170 million, while the total aggregate value including the Potential TCJC Abuse Claims is roughly $640 million (inclusive of the $170 million for TCJC Abuse Claims).

12.     I further calculated the portion of the midpoint value associated with the TCJC Abuse Claims and the Potential TCJC Abuse Claims, with respect to Abuse Claims that arose before and after 1976. This is because counsel for the Debtors advised me that such Abuse Claims may not have value directly as to TCJC to the degree the first abuse occurred on or after 1976. Specifically, they advise that such Abuse Claims may be covered by the BSA's insurance or the BSA through an indemnity claim. The portion of the total value attributable to the TCJC Abuse Claims with a date of first abuse in or prior to 1975 is roughly $57 million. The total value including the Potential TCJC Abuse Claims with a date of first abuse in or prior to 1975 is roughly $300 million (inclusive of the $57 million for TCJC Abuse Claims).

13.     The figure below summarizes these conclusions:

| Time Period | Total valuation (TCJC Abuse Claims) | Midpoint | Total valuation (Potential TCJC Abuse Claims) |
|---|---|---|---|
| Pre-1976 | $57,000,000 | $177,000,000 | $297,000,000 |
| 1976 and Post | $117,000,000 | $233,000,000 | $348,000,000 |

As noted above, these values are the aggregate values of these groups of Abuse Claims as against all BSA-related parties, and not exclusively TCJC's share of liability.

14.     My understanding is that TCJC has agreed to a settlement of $250 million to fully resolve its share of liability with respect to all Abuse Claims. That amount exceeds the midpoint

of both valuations, including the pool that includes claims that do not directly identify TCJC, and without any reduction for shared liability or the risk that TCJC may have limited direct financial responsibility for the Abuse Claims with abuse that first occurred after 1975.

I declare under penalty of perjury that the foregoing statements are true and correct. Executed this 17th day of March, 2022

*Charles E. Bates*

_____
Dr. Charles E. Bates



EXHIBIT

Bates-4

2001 K Street NW North Building, Suite 500
Washington, DC 20006
Main 202. 408. 6110

# CHARLES E. BATES, PHD
Chairman

**AREAS OF EXPERTISE**

- Asbestos and mass tort litigation
- Complex litigation damages
- Data decision tools and databases
- Econometrics and forecasting
- Financial and statistical analysis
- Product liability estimation



## SUMMARY OF EXPERIENCE

Charles E. Bates has extensive experience in statistics, econometric modeling, and economic analysis. He specializes in the application of statistics and computer modeling to economic and financial issues. Dr. Bates has more than 25 years of experience and provides clients with a wide range of litigation and commercial consulting services, including expert testimony and guidance on economic and statistical issues.

Dr. Bates is a prominent advisor in mass tort litigation. He provides companies' senior management with sensitivity analyses tailored to its assessment of major issues, while incorporating its overall attitudes toward risk. As part of these analyses, he has led the development of several highly sophisticated, customized analytical tools that estimate clients' future liability from personal injury and property damage lawsuits.

## EDUCATION

- Advanced Seminar in Pharmacoeconomics, Harvard School of Public Health
- PhD, Economics, University of Rochester
- MA, Economics, University of Rochester
- BA, Economics and Mathematics (high honors), University of California, San Diego

## PROFESSIONAL EXPERIENCE

Prior to founding Bates White, Dr. Bates was a Vice President at A.T. Kearney. Previously, he was the Partner in Charge of the Economic Analysis group at KPMG. Dr. Bates began his career on the faculty of Johns Hopkins University's Department of Economics, where he taught courses in advanced statistical economic analysis and trade theory.

Highly Confidential – Subject to Protective Order

JTX 2033

## SELECTED MASS TORT EXPERIENCE

- Retained as an asbestos liability valuation expert, authored declarations and report, and testified on behalf of the debtor in the matter *In re DBMP LLC* pending in the US Bankruptcy Court for the Western District of North Carolina, Charlotte Division.

- Retained as an asbestos liability valuation expert, authored declarations, and testified on behalf of the debtor in the matter *In re Bestwall LLC* pending in the US Bankruptcy Court for the Western District of North Carolina, Charlotte Division.

- Retained as an asbestos liability valuation expert, authored declarations, and testified on behalf of Truck Insurance Exchange in the matter *In re Kaiser Gypsum Company, Inc., et al.* pending in the US Bankruptcy Court for the Western District of North Carolina, Charlotte Division.

- Served as an asbestos liability valuation expert on behalf of Garlock Sealing Technologies in its bankruptcy proceedings. Testified before the US Bankruptcy Court for the Western District of North Carolina both in preliminary case hearings and at trial.

- Served as an expert in asbestos claims valuation for financial reporting purposes in *Erica P. John Fund Inc. et al. v. Halliburton Company et al.* on behalf of certain Halliburton stockholders regarding Halliburton's financial disclosures of its asbestos liabilities after its acquisition of Dresser in 1998.

- Served as the Individual Claimant Representative on behalf of potential future No Notice Individual Creditors as part of the Amending Scheme of Arrangement for OIC Run-Off Limited (formerly the Orion Insurance Company plc).

- Testified before the Senate Judiciary Committee on the economic viability of the Trust Fund proposed under S.852, the Fairness in Asbestos Injury Resolution (FAIR) Act of 2005. Testimony clarified Bates White's independent analysis on the estimate of potential entitlements created by the administrative no-fault trust fund that uses medical criteria for claims-filing eligibility.

- Authored expert reports and provided testimony in *United States Fid. & Guar. Co. v. American Re-Insurance Company* in asbestos claims valuation, estimation methodology, and asbestos reinsurance billing regarding the proper reinsurance bill associated with USF&G's reinsurance bill of its asbestos-related payments to Western MacArthur.

- Served as an asbestos liability valuation expert on behalf of Specialty Products Holding Corp./Bondex International in its bankruptcy proceedings.

- Authored expert report and provided deposition testimony regarding the value of diacetyl claims on behalf of the Official Committee of Equity Security Holders in the Chemtura Corporation bankruptcy proceedings.

- Retained as testifying expert by outside counsel of the Hartford Financial Services Group to address the asbestos liability of MacArthur Company and Western MacArthur Company. Estimated asbestos liability in the context of bankruptcy proceedings.

- Testified in the Babcock & Wilcox bankruptcy confirmation hearing on behalf of the Insurers Joint Defense Group to address asbestos liability. Developed claims criteria evaluation framework for use in assessing asbestos liability forecasts and trust distribution procedures.

- Served as testifying expert on behalf of Sealed Air in the fraudulent conveyance matter regarding the 1998 acquisition of Cryovac from W.R. Grace. Directed estimation of foreseeable asbestos liability for fraudulent conveyance matter to advise the debtor in the recent bankruptcy of a defendant with over $200 million in

Highly Confidential – Subject to Protective Order

annual asbestos payments. Developed asbestos liability forecasting model and software. Directed industry research and interviewed industry experts.

- Served as testifying expert on behalf of CSX Transportation on the suitability of asbestos claim settlements for arbitration proceedings of *CSX Transportation, Inc. v. Lloyd's, London*.
- Provided expert statistical testimony on behalf of the Center for Claims Resolution in arbitration proceedings of *GAF v. Center for Claims Resolution*.
- Developed procedures and oversaw teams to extract relevant information from paper claims files to construct electronic databases for use in mass tort liability analysis.
- Developed and applied several customized automated analytical tools for various clients in the asbestos industry. These highly sophisticated analytical tools estimate a company's future asbestos liability and provide senior management with sensitivity analyses that can be tailored to its own assessments of major pending issues and its overall attitudes towards risk.
- Developed an asbestos forecasting tool to allow a client to combine our in-depth quantitative analysis with the client's own qualitative understanding about the probabilities associated with specific major events—such as significant pending litigation, the bankruptcy of other defendants, or changes in the overall legal environment—each of which could have substantially impacted the company's liability.
- Developed a tool to assist claim analysts in determining appropriate asbestos settlement values based on a statistical analysis of claim characteristics.
- Created a proprietary impairment database based on asbestos claim files from multiple districts throughout the United States.
- For a large trust being established to settle a company's asbestos liability, conducted an analysis to determine whether the trust would have sufficient funds to pay future asbestos claimants. This case was ultimately heard by the US Supreme Court.
- For a company undergoing reorganization under Chapter 11, estimated its future financial ability to pay asbestos claimants. The analyses correctly predicted that the reorganized company would not be able to meet its future asbestos-related liability.
- For a company requiring an estimate of its asbestos liability on its public financial statements, developed detailed liability forecasts and sensitivity analysis tools used by the company's senior financial management.
- For a consortium of companies involved in asbestos liability, analyzed the expected future liability of the individual companies to determine the appropriateness of the methods used to allocate liability payments.
- For an insurance broker, conducted a risk analysis of a company's future asbestos liability in order for the company to successfully obtain insurance for that liability. This event resulted in a substantial increase in the company's stock price.
- For a company in negotiations with a major acquisition target, evaluated the target's asbestos liability. The evaluation ultimately led to the cancellation of the acquisition.
- For a major railroad company in a contract dispute with its insurance company on asbestos-related issues, developed a state-of-the-art litigation decision tree model that incorporated the client's settlement history into a quantitative evaluation of its legal strategy. This model allowed the client to determine what its settlement values would have been, if it had settled at different stages of the litigation.

Highly Confidential – Subject to Protective Order

- Developed an econometric model of property damage lawsuits for estimating the future liability of a former asbestos manufacturer arising from the presence of its asbestos products in buildings.

## SELECTED LITIGATION AND CONSULTING EXPERIENCE

- Served as senior economic advisor on issues of analytical methodology for numerous pharmacoeconometric and health outcomes research projects. Expertise in the development of decision tools and the creative use of modeling applications for pharmacoeconomics and outcomes research.
- Led a team of economists that provided litigation consulting services in the largest US price-fixing case. Case involved development of state-of-the-art economic models, damages analysis, client presentations, pretrial discovery, industry research, preparation of evidence and testimony, depositions, and critique of opposing expert analyses and reports and reports for a consortium of more than 150 companies.
- Provided expert testimony on behalf of the taxpayers on the statistical basis and accuracy of shrinkage accruals in *Kroger v. Commissioner*. Citing Dr. Bates' testimony extensively, the Court ruled in favor of Kroger.
- Served as consulting expert and performed statistical and quantitative analyses to assess the merits of a class action alleging payment of fees to mortgage brokers for referral of federally related mortgage loans.
- For a start-up global telecommunications enterprise, provided consulting services and developed comprehensive computer model to evaluate the firm's financial plan. Model incorporated marketing, pricing, and communications traffic in a single modeling framework to facilitate sensitivity analysis by creditors and to evaluate the risk associated with the strategic business plan.
- Provided expert testimony on behalf of the taxpayer analyzing the statistical prediction of bond ratings using company financial data in *Nestlé Holdings Inc. v. Commissioner*. On the basis of Dr. Bates' testimony, the Court rejected the IRS expert testimony on the subject.
- Submitted expert testimony on the statistical and financial analysis of option transactions and an analysis of alternative stock option hedges in *McMahon, Brafman, and Morgan v. Commissioner*. On the basis of Dr. Bates' testimony, the IRS settled the case at terms favorable to the taxpayer.
- Provided expert testimony in rebuttal on behalf of the taxpayers of Internal Revenue Service experts on the statistical basis and accuracy of shrinkage accruals in *Wal-Mart v. Commissioner*. The Court rejected the testimony of the IRS experts and ruled in favor of Wal-Mart.
- Served as consulting expert and analyzed the racial composition for a large manufacturing corporation using Equal Employment Opportunity data and employed sophisticated statistical analysis and modeling to determine the validity and strength of an employment discrimination claim.
- Provided expert testimony in the arbitration hearing of *VNC v. MedPartners*.
- Provided expert testimony in California Superior Court on the validity of economic comparability adjustments for pipeline easement rents in *Southern Pacific Transportation Corp. v. Santa Fe Pacific Corp*.
- Served as statistical expert and developed detailed statistical analysis of customs trade data for use in criminal transfer pricing litigation.
- Analyzed beneficial life of company credit card in a tax matter for a large retailer drawing on the company's point-of-sale data, credit card data, and customer demographic information.

Highly Confidential – Subject to Protective Order

- Developed state-of-the-art models to account for default correlation for underwriting credit insurance; models became the standard tools for the country's largest credit insurance firm.

## PUBLICATIONS

- Bates, Charles E., Charles H. Mullin, and Marc C. Scarcella. "The Claiming Game." *Mealey's Litigation Report: Asbestos* 25, no. 1 (February 3, 2010).
- Bates, Charles E., Charles H. Mullin, and A. Rachel Marquardt. "The Naming Game." *Mealey's Litigation Report: Asbestos* 24, no. 15 (September 2, 2009).
- Bates, Charles E., and Charles H. Mullin. "State of the Asbestos Litigation Environment—October 2008." *Mealey's Litigation Report: Asbestos* 23, no. 19 (November 3, 2008).
- Bates, Charles E., and Charles H. Mullin. "Show Me the Money." *Mealey's Litigation Report: Asbestos* 22, no. 21 (December 3, 2007).
- Bates, Charles E., and Charles H. Mullin. "The Bankruptcy Wave of 2000—Companies Sunk by an Ocean of Recruited Asbestos Claims." *Mealey's Litigation Report: Asbestos* 21, no. 24 (January 24, 2007).
- Bates, Charles E., and Charles H. Mullin. "Having Your Tort and Eating It Too?" *Mealey's Asbestos Bankruptcy Report* 6, no. 4 (November 2006).
- Bates, Charles E., and Halbert White. "Determination of Estimator with Minimum Asymptotic Covariance Matrices." *Econometric Theory* 9 (1993).
- Bates, Charles E., and Halbert White. "Efficient Instrumental Variables Estimation of Systems of Implicit Heterogeneous Nonlinear Dynamic Models with Nonspherical Errors." In *International Symposia in Economic Theory and Econometrics*, vol. 3, edited by W.A. Barnett, E.R. Berndt and H. White. New York: Cambridge University Press, 1988.
- Bates, Charles E. "Instrumental Variables." In *The New Palgrave: A Dictionary of Economics*, edited by John Eatwell, Murray Milgate, and Peter Newman. London: Macmillan, 1987.
- Bates, Charles E., and Halbert White. "An Asymptotic Theory of Consistent Estimation for Parametric Models." *Econometric Theory* 1 (1985).

## SELECTED SPEAKING ENGAGEMENTS

- "The Top Emerging Trends in 2015 Asbestos Litigation." Perrin Conferences Cutting-Edge Issues in Asbestos Litigation Conference, March 15–17, 2015.
- "Asbestos Bankruptcy: A Discussion of the Top Trends in Today's Chapter 11 Cases." Perrin Conferences Asbestos Litigation Conference: A National Overview & Outlook, Sept. 8–10, 2014.
- "An asbestos defendant's legal liability—the experience in Garlock's bankruptcy asbestos estimation trial." Bates White webinar, July 29, 2014.
- "Concussion Suits against the NFL, NCAA, and Uniform Equipment Manufacturers." Perrin Conferences' Legal Webinar Series, May 24, 2012.
- "An Update on US Mass Tort Claims." Perrin Conferences' Emerging Risks on Dual Frontiers: Perspectives on Potential Liabilities in the New Decade, April 12–13, 2012, London, United Kingdom.

Highly Confidential – Subject to Protective Order

- "The Next Chapter of Asbestos Bankruptcy: New Filings, Confirmations, & Estimations." Perrin Conferences' Asbestos Litigation Conference: A National Overview & Outlook, September 13–15, 2010, San Francisco, CA.

- "Trust Online: The Impact of Asbestos Bankruptcies on the Tort System." Perrin Conferences' Asbestos Bankruptcy Conference: Featuring a Judicial Roundtable on Asbestos Compensation, June 21, 2010, Chicago, IL.

- "Current Litigation Trends that are Impacting Asbestos Plaintiffs, Defendants, & Insurers." Perrin Conferences Asbestos Litigation Mega Conference, September 14–16, 2009, San Francisco, CA.

- "Verdicts, Settlements and the Future of Values: Where Are We Heading? A Roundtable Discussion." HB Litigation Conferences' Emerging Trends in Asbestos Litigation, March 9–11, 2009, Los Angeles, CA.

- "Role of Bankruptcy Trusts in Civil Asbestos." Mealey's Emerging Trends in Asbestos Litigation Conference, March 3–5, 2008, Los Angeles, CA.

- "The Intersection between Traditional Litigation & the New Bankruptcy Trusts." Mealey's Asbestos Bankruptcy Conference June, June 7–8, 2007, Chicago, IL.

- ABA's Insurance Coverage Litigation Committee conference, March 1–4, 2007, Tucson, AZ.

- Mealey's Asbestos Conference: The New Face of Asbestos Litigation, February 8–9, 2007, Washington, DC.

- Mealey's Asbestos Bankruptcy Conference, December 4–5, 2006, Philadelphia, PA.

- "Seeking Solutions to European Asbestos Claiming: Will it be FAIR?" Keynote address, Mealey's International Asbestos Conference, November 1–2, 2006, London, United Kingdom.

- Mealey's Asbestos Bankruptcy Conference, June 9, 2006, Chicago, IL.

- Harris Martin Publishing Asbestos Litigation Conference, March 2, 2006, Washington DC.

- Mealey's Wall Street Forum: Asbestos Conference, February 8, 2006, New York, NY.

- Mealey's Asbestos Legislation Teleconference, February 7, 2006.

## PROFESSIONAL ASSOCIATIONS

- American Bar Association
- American Economic Association
- Econometric Society
- International Society for Pharmacoeconomics and Outcomes Research (ISPOR)
- Medical Outcomes Trust
- National Association of Business Economists

Highly Confidential – Subject to Protective Order