```
 1                  UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3                                    .   Chapter 11
       IN RE:                         .
 4                                    .   Case No. 20-10343 (LSS)
       BOY SCOUTS OF AMERICA AND      .
 5     DELAWARE BSA, LLC,             .
                                      .   Courtroom No. 2
 6                                    .   824 North Market Street
                                      .   Wilmington, Delaware 19801
 7                                    .
                        Debtors.      .   Wednesday, March 16, 2022
 8     . . . . . . . . . . . . . . .  .   10:00 A.M.

 9              TRANSCRIPT OF CONFIRMATION HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                UNITED STATES BANKRUPTCY JUDGE

11                         TRIAL (DAY THREE)

12     APPEARANCES:

13
       For the Debtor:          Derek Abbott, Esquire
14                              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                1201 North Market Street, 16th Floor
15                              Wilmington, Delaware 19899

16                              - and -

17                              Andrew Hammond, Esquire
                                Glenn Kurtz, Esquire
18                              WHITE & CASE LLP
                                1221 Avenue of the Americas
19                              New York, New York 10020

20     Audio Operator:          Brandon J. McCarthy

21     Transcription Company:   Reliable
                                1007 N. Orange Street
22                              Wilmington, Delaware 19801
                                (302)654-8080
23                              Email:  gmatthews@reliable-co.com

24
       Proceedings recorded by electronic sound recording; transcript
25     produced by transcription service.
```

1   APPEARANCES (Cont'd):

2   For the Debtors:          Michael C. Andolina, Esquire
                              WHITE & CASE LLP
3                             111 South Wacker Drive
                              Chicago, Illinois 60606
4
                              - and -
5
6                             Ernest Martin, Jr., Esquire
                              HAYNES & BOONE LLP
7                             2323 Victory Avenue, Suite 700
                              Dallas, Texas 75219
8
    For AIG Companies:        James Hallowell, Esquire
9                             Mitchell Karlan, Esquire
                              GIBSON DUNN & CRUTCHER LLP
10                            200 Park Avenue
                              New York, New York 10166
11
12  For Tort Claimants:       Richard Pachulski, Esquire
                              Alan Kornfeld, Esquire
13                            PACHULSKI STANG ZIEHL & JONES LLP
                              10100 Santa Monica Blvd., 13th Floor
14                            Los Angeles, California 90067

15  For the United           Thomas Macauley, Esquire
    Methodist Ad Hoc         MACAULEY LLC
16  Committee:               300 Delaware Avenue, Suite 750
                              Wilmington, Delaware 19801
17
    For the Ad Hoc           Joseph Celentino, Esquire
18  Committee of Local       WACHTELL LIPTON ROSEN & KATZ
    Councils:                51 W 52nd Street
19                            New York, New York 10019
20
    For the U.S. Trustee:     David Buchbinder, Esquire
21                            UNITED STATES DEPARTMENT OF JUSTICE
                              OFFICE OF THE UNITED STATES TRUSTEE
22                            844 King Street, Suite 2207
                              Lockbox 35
23                            Wilmington, Delaware 19801

24

25

1   APPEARANCES (Cont'd):

2   For the Coalition of        Cameron Moxley, Esquire
    Abused Scouts for          BROWN RUDNICK LLP
3   Justice:                   7 Times Square
                               New York, New York 10036
4

5   For Guam Abuse             Delia Lujan Wolff, Esquire
    Survivors:                 LUJAN & WOLFF LLP
6                              238 Archbishop FC Flores
                               Suite 300
7                              Hagatna, Guam 96910

8   For Sexual Abuse           Gilion Dumas, Esquire
    Claimants:                 DUMAS & VAUGHN
9                              3835 NE Hancock Street, Suite GL-B
                               Portland, Oregon 97212
10

11  For Gemini Insurance       John Baay, Esquire
    Company:                   GIEGER, LABORDE & LAPEROUSE
12                             701 Poydras Street, Suite 4800
                               New Orleans, Louisiana 70139
13

    For Century Indemnity:     Tancred Schiavoni, Esquire
14                             O'MELVENY & MYERS LLP
                               7 Times Square
15                             New York, New York 10036

16  For the Roman Catholic     Neil Lloyd, Esquire
    Ad Hoc Committee:          ARENTFOX SCHIFF LLP
17                             233 South Wacker Drive, Suite 7100
                               Chicago, Illinois 60606
18
                               - and -
19

20                             Jeremy Ryan, Esquire
                               POTTER ANDERSON & CORROON LLP
21                             1313 N. Market Street, 6th Floor
                               Wilmington, Delaware 19801
22

    For Great American:        David Christian, Esquire
23                             DAVID CHRISTIAN ATTORNEYS LLC
                               105 W. Madison Street, Suite 1400
24                             Chicago, Illinois 60602

25

1   APPEARANCES (Cont'd):

2   For Hartford:              James Ruggeri, Esquire
                               SHIPMAN & GOODWIN LLP
3                              1875 K Street NW, Suite 600
                               Washington, DC 20006
4
5   For Continental           Laura McNally, Esquire
    Insurance and Columbia    LOEB & LOEB LLP
6   Casualty:                 321 North Clark Street, Suite 2300
                               Chicago, Illinois 60654
7
    For National Surety,      Todd Jacobs, Esquire
8   Corporation, and          BRADLEY & RICE, PC
    Fire & Casualty:          111 S Wacker Drive, Suite 5100
9                              Chicago, Illinois 60606

10  For the Church of Jesus   Robert Malionek, Esquire
    Christ of Latter-day      LATHAM & WATKINS LLP
11  Saints:                   1271 Avenue of the Americas
                               New York, New York 10020
12
13  For Zalkin, PCVA:         Robert Pfister, Esquire
                               KTBS LAW LLP
14                             1801 Century Park East, 26th Floor
                               Los Angeles, California 90067
15
    For the Committee of      Edwin Caldie, Esquire
16  Unsecured Creditors       STINSON LLP
    For Archdiocese of        50 South Sixth Street, Suite 2600
17  Agana:                    Minneapolis, Minnesota 55402

18

19

20

21

22

23

24

25

1                                INDEX

2   MATTER GOING FORWARD:

3   1.   Third Modified Fifth Amended Chapter 11 Plan of
    Reorganization for Boy Scouts of America and Delaware BSA, LLC
4   (D.I. 8813; Filed 2/15/22)

5

6                              WITNESSES

7   DEBTOR'S WITNESSES:                                      PAGE

8      MICHAEL BURNETT

9         Cross Examination by Ms. McNally             8

10        Redirect Examination by Mr. Martin          211

11        Re-Cross Examination by Ms. McNally         253

12        Redirect Examination by Mr. Martin         261

13

14  EXHIBITS:

    JTX-1182
15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commence at 10:05 a.m.)

2          THE COURT:  Good morning.  This is Judge

3 Silverstein.  We're here in the continued confirmation case.

4          Mr. Abbott.

5          MR. ABBOTT:  Good morning, Your Honor.  Derek

6 Abbott of Morris Nichols here for the debtors.

7          As discussed at the end of the day yesterday, we're

8 going to go right to Mr. Burnett, I believe.  So I'll turn it

9 over to Mr. Martin.

10         THE COURT:  Mr. Martin.

11         MR. MARTIN:  Good morning, Your Honor.  Happy hump

12 day.  I have some good news, and we have survived the Ides of

13 March, so we are good to go.  And so, Your Honor, we do want

14 to proceed with Mr. Burnett.  I just want to remind the Court

15 of two things:

16         One is that we have filed Mr. Burnett's

17 declaration, and that declaration is Docket Number 9274, along

18 with exhibits attached to that declaration.  I'm happy to

19 report there are no objections that have been filed concerning

20 Mr. Burnett's declaration.

21         The second thing, Your Honor, is to just remind the

22 Court that the Court has overruled the challenges to Mr.

23 Burnett's qualifications; and so, therefore, we do tender Mr.

24 Burnett as our expert for the opinions that are set forth in

25 his declaration.

1              And with that, Your Honor, we are ready to proceed
2  with cross-examination.
3              THE COURT:  Thank you.
4              I will accept Mr. Burnett as an expert on the
5  issues --
6              AUTOMATED VOICE:  Recording in progress.
7              THE COURT:  -- on the issues for which he opined in
8  his declaration.
9              And Mr. Burnett, would you raise your right hand,
10 please.
11 MICHAEL BURNETT, WITNESS FOR THE DEBTORS, AFFIRM
12             THE COURT:  Please state your full name and spell
13 your last name for the record.
14             THE WITNESS:  Michael Burnett, B-u-r-n-e-t-t.
15             THE COURT:  Thank you.
16             Mr. Burnett, do you currently affirm the statements
17 that were made in your declaration?
18             THE WITNESS:  Yes.
19             THE COURT:  Okay.  Time for cross, Ms. McNally.
20             MS. MCNALLY:  Good morning, Your Honor, Counsel,
21 Mr. Burnett.
22             THE WITNESS:  Good morning.
23             MS. MCNALLY:  My name is Laura McNally.  I
24 represent the Continental Insurance company, and today, I'm
25 also on behalf of the certain insurers.  I'll have some

1   questions for you about your declaration and your positions

2   that you stated in your declaration.

3           THE WITNESS:  All right.

4                   CROSS-EXAMINATION

5   BY MS. MCNALLY:

6   Q    Do you have that document in front of you?

7   A    I do not.

8   Q    It might be helpful if you get it, yeah.

9           MR. MARTIN:  While he's doing that, Your Honor, we

10  did receive some binders from opposing counsel that I believe

11  contain exhibits.  We have not looked at that.  We do have

12  that handy.

13          And Ms. McNally, at any time that you want him to

14  refer to that, I'll be happy to get that and provide that to

15  him.

16          MS. MCNALLY:  Thank you so much.  If you could get

17  that plan, the plan itself, handy, I think that will be the

18  main one that we'll be referring to.  The other ones, I'm not

19  quite as sure.

20          MR. MARTIN:  One second, please.

21          MS. MCNALLY:  That's the four-hundred-some-page --

22  the full document.

23          MR. MARTIN:  Is there a particular exhibit number

24  that you want to refer to?

25          MS. MCNALLY:  Yes, 353.

1            MR. MARTIN:  Thank you.

2        (Pause in proceedings)

3            MS. MCNALLY:  Are you ready?

4            THE WITNESS:  Yes.

5            MS. MCNALLY:  Okay.  Thank you.

6   BY MS. MCNALLY:

7   Q    Mr. Burnett, who is in the room with you?

8   A    Mr. Martin, Ms. DuBose, and Dave, the -- the tech person.

9   Q    Okay.  And Mr. Martin and Ms. DuBose are both from Haynes

10  and Boone?

11  A    That's correct.

12  Q    Okay.  I'd like to refer to your declaration, sir.  Who

13  wrote that text?

14  A    Primarily, I believe Ms. DuBose, taking all the

15  information from my other reports and then compiling it into

16  that.  And then I -- it was sent to me.  I reviewed it, made

17  edits, and added -- added some narrative.

18  Q    After you made edits, did -- were there -- did the law

19  firm of Haynes and Boone make further edits to your document,

20  your declaration?

21  A    I think -- I think maybe like -- you know, I think typos,

22  maybe things like that.

23  Q    Okay.  If you'd turn to the last page of that document,

24  there's a number below your signature.

25  A    Yes.

1  Q    And it says at the end of that number "V period 6"

2  A    That's correct.

3  Q    Does that indicate to you that that was the sixth version

4  of that document?

5  A    I'm not sure.

6  Q    Okay.  Does this -- is this number reflective of the

7  document management system of Haynes and Boone?

8  A    I would imagine so, but I don't know for sure.

9  Q    Is it -- it's not yours.

10  A    No, it's not my -- I don't have that.

11  Q    Okay.  Thank you, sir.

12       I'd like to start with your background a little bit.  Am

13  I right that you've never before been asked to opine on the

14  reasonableness of trust distribution procedures in any

15  bankruptcy at all?

16  A    That's correct.

17  Q    Okay.  And you were in private practice until 2003,

18  correct?

19  A    That's correct.

20  Q    And you left as an associate from Lord, Bissell & Brook

21  and opened up Burnett Risk International.

22  A    Risk Control International, that's correct.

23  Q    Risk Control International.  Thank you.

24       And you've been with that firm, or you've run that firm

25  since 2003, 19 years.

1    A    That's correct.  January of 2003.

2    Q    Okay.  You told me in your dep -- you say that, in your

3    deposition, that you weren't happy with the amount of time you

4    had been spending away from your children and your wife?

5    A    That's correct.

6    Q    And your wife noticed that, when you were involved with

7    sexual abuse claims and had the opportunity to interact with

8    victims and to help bring about settlements of those claims

9    and resolutions of those claims, that's when you were most

10   energized.

11   A    That's correct.  I was working on those sexual abuse

12   claims for a number of years before that.  But it's when I

13   went to mediation or informal settlement negotiations and that

14   kind of thing, and had an operation -- opportunity to be a

15   part of the resolution of those claims that I really felt

16   energized by that work.

17   Q    Okay.  And so, because of that, you decided to set up

18   Burnett Risk Control International.

19   A    That's correct.

20   Q    What's the "international" part --

21   A    I've worked on --

22   Q    -- (indiscernible)

23   A    I've worked on cases in other places, and I have -- I --

24   I worked on some cases in Canada.  I have worked with -- or

25   been, you know, involved with people in the London market,

1  that kind of thing.

2  Q    Okay.

3          MR. MARTIN:  Excuse me.  Was -- I'm sorry to

4  interrupt.  Just one thing.

5          Mr. Burnett, I think, if you look at the camera

6  that's on top there --

7          THE WITNESS:  Oh ...

8          MR. MARTIN:  -- it might be better that they're

9  looking at you --

10          THE WITNESS:  Okay.

11          MR. MARTIN:  -- (indiscernible)

12          THE WITNESS:  Yeah, I'm just --

13          MR. MARTIN:  I just wanted to -- I'm so sorry.

14          THE WITNESS:  Okay.

15          MR. MARTIN:  I just wanted to make sure that Your

16  Honor was able to see him as he's talking, so thank you.

17          THE COURT:  Thank you.

18  BY MS. MCNALLY:

19  Q    Okay.  Have you completed your answer?

20  A    Yes.

21  Q    Okay.  Now I noticed a motto on your website is "We

22  resolved sexual abuse claims."

23  A    That's correct.

24  Q    That's prominent on the first --

25          MS. MCNALLY:  If we could look at Joint Exhibit

1   1182 for identification.

2         (Pause in proceedings)

3             MS. MCNALLY:  I apologize.  I should have mentioned

4   that's also in the binder.

5             THE WITNESS:  Thank you.

6   BY MS. MCNALLY:

7   Q    Do you see that document, sir?

8   A    I do.

9   Q    And that is the website of Burnett Risk Control

10  International?

11  A    Right.  That's a copy of, I believe, the first page of my

12  website.

13            MR. MARTIN:  Sorry.

14  Q    You only have one page?

15  A    I'm sorry, no.  The other pages are there, as well.

16  Q    So those are certain pages of your website.

17  A    That's correct.

18  Q    Okay.  And you're familiar with the text there, drafted

19  it yourself --

20  A    Yes.

21  Q    -- or with help?  Okay.

22  A    Yes.

23            MS. MCNALLY:  And Your Honor, I move the admission

24  of Joint Exhibit eleven -- or -- yeah, Exhibit 1182.

25            MR. MARTIN:  No objection.

1            THE COURT:  Admitted.

2         (JTX-1182 received in evidence)

3            MS. MCNALLY:  Okay.

4  BY MS. MCNALLY:

5  Q    All right.  So right there on the front page, amongst the

6  clouds, "We resolve sexual abuse claims."

7  A    Yes.

8  Q    And if we go to the second page of the document, you

9  state up at the top there:

10            "Healing is a journey, not a destination.  We try

11  to be the light that guides survivors to healing by making the

12  journey as smooth as possible, with a firm foundation and a

13  straight and true path."

14       Did I read that correctly, sir?

15  A    Yes, you did.

16  Q    For some reason, we've lost your video feed.

17  A    Yeah, the light is -- the light is off there.  Oh, I

18  accidentally -- or I take that away -- okay.  Very good.

19  Q    Thank you.

20       So that is your -- that's your language, sir?

21  A    Yes, it is.

22  Q    But you would agree with me that it's not the goal of the

23  legal system, the tort system to be a light that guides

24  plaintiffs to healing?

25  A    Well, I -- I would not agree with that.  I think that the

1  -- the -- for me, working on sexual abuse claims, the goal is

2  to try to resolve those claims as quickly and compassionately

3  and cost-effectively as possible.  And most of the claims that

4  I work on are involved in the tort system.

5  Q   Right.  And I'd appreciate it if you'd directly answer my

6  question.

7      My question is:  In the tort system -- you're -- if you

8  could just watch your video again.

9  A   Oh, yeah, I --

10     (Participants confer)

11          THE WITNESS:  Oh, you know what?  Could we take

12  this away?

13          UNIDENTIFIED:  Sure.

14          THE WITNESS:  Okay.  Okay.  Thank you.

15          I believe I've answered your question.

16          MS. MCNALLY:  Okay.  I was speaking.  Sorry.

17  BY MS. MCNALLY:

18  Q   What I'd appreciate an answer to is this:  While that

19  might be a goal of the parties, the legal system itself does

20  not have embedded into it as elements, as particular standards

21  being a light that guides plaintiff to healing?

22  A   I would not -- that's correct, in the sense that I would

23  not find that, for example, as an element of negligence or an

24  element -- element of respondent superior or something like

25  that.

1  Q      Okay.

2  A      But my --

3  Q      Thank you.

4  A      -- experience is, both as coverage counsel and defense

5  counsel and in the work that I do now, when there are claims

6  in the tort litigation system, the goal is to try to get those

7  resolved as quickly as possible, and that occurs when people

8  feel that they have reached a point with -- whether that's --

9  you know, in my case, typically in settlement, where they've

10 reached a point where they are happy enough about where we are

11 in negotiations that they're willing to settle for a certain

12 amount.

13 Q      I appreciate your comments there, sir, and you'll have

14 plenty of time to talk about what you're thoughts are.  We're

15 going to cover that in depth today.  I'm trying to get at what

16 the process is.  And I appreciate -- I want you to not -- take

17 no criticism at all from me in these questions.  I appreciate

18 your intentions with respect being a guide -- a light that

19 guides.

20      My question is just simply that it's not officially part

21 of the process.  That's my questions.

22 A      Those words --

23 Q      All right?

24 A      Those words typically would not be found, that's correct.

25 Q      Okay.  Thank you.

1          Now you said in your declaration, at page -- Paragraph

2   5:

3              "I am routinely retained as a consult" -- "I am

4   routinely retained as a consultant on behalf of" --

5              And then some names.

6              "-- insurers to evaluate and value sex abuse claims

7   in litigation and pre-litigation contexts."

8        Do you see that?

9   A    I do.

10  Q    Now, in the 19 years that you've run Burnett Risk Control

11  International, you've actually been retained by one insurer.

12  Am I right about that, sir?

13  A    I've been retained by a number of insurers over those

14  years.

15  Q    You have been retained by more than one insurer at

16  Burnett Risk Control International?

17  A    That's correct.

18  Q    Okay.  I'd like you to turn -- we're going to have to

19  refer to your deposition.  And I'd like to turn to Page 261 of

20  your deposition, please.

21              THE COURT:  Ms. McNally, is that in your cross

22  binder?

23              MS. MCNALLY:  I believe it should be.

24              THE COURT:  Okay.

25              THE WITNESS:  What tab is that?

1          MR. MARTIN:  (Indiscernible)

2          MS. MCNALLY:  I think it might be the last one

3   because I think they were put in chron order.

4          THE COURT:  Yes.

5          MS. MCNALLY:  Am I right about that?  Okay.  Thank

6   you.

7          THE WITNESS:  Is that in -- is that in Binder 2?

8          MS. MCNALLY:  I don't know how your firm printed

9   the binders.

10          THE COURT:  1, it's in the first binder.

11       (Participants confer)

12          MS. MCNALLY:  If you'd like, you can look on the

13   screen.

14          THE WITNESS:  Oh.  Yeah, Ms. McNally, we don't have

15   it in the binder that you provided to us.

16          MS. MCNALLY:  Okay.  Thank you.  When I emailed

17   with your colleagues yesterday Mr. Martin, I mentioned the

18   need to have the deposition printed and handy, and I was told

19   that it would be, so I apologize if it didn't make it to you.

20   But we can look at the screen.

21          MR. MARTIN:  We printed everything that was

22   provided to us.

23          MS. MCNALLY:  You did?

24          MR. MARTIN:  Yes.  It's not in here.

25       (Participants confer)

 1            MR. MARTIN:  There's the deposition of Adam Slater

 2  that --

 3            MS. MCNALLY:  Yes, I understand.

 4            MR. MARTIN:  -- you asked --

 5            MS. MCNALLY:  Right.  I'm saying, in separate

 6  correspondence yesterday and -- or it might have been the

 7  night before, with (indiscernible) Green at your office.  I

 8  sent your part of the deposition, and she said those were

 9  printed.

10            But that's fine.  We can just look at the screen.

11  We're not going to spend a ton of time on these, I'm hoping.

12  BY MS. MCNALLY:

13  Q    And Page 261.  If we start with -- let's start with Line

14  15 -- 19:

15            "Which insurers have you had as clients?"

16         At Burnett Risk Control International is the context of

17  that question.

18            "Which insurers have you had as clients?"

19         And you said:

20            "Primarily, the National Catholic Risk Retention

21  Group.  And I'm trying to think if there are others.  I really

22  have to think about it.  I don't recall."

23         And then the next line says:

24            "So, other than National Catholic Risk Control

25  Retention Group, you can't recall any other insurer clients?"

1        And your -- and you responded:

2            "Not as I sit here today."

3        And then you talked about people you've worked with from

4    Lord Bissell.  And then -- and you don't identify any other

5    insurers that you were retained by at Burnett Risk Control

6    International.  That was in your deposition held this January.

7        Did I read that correctly, sir?

8    A    You read that correctly.  But I believe, elsewhere, my

9    memory is that I also testified that I was retained by an

10   insurer, a captive insurer for a different denomination, not -

11   - a non-Catholic denomination in a reinsurance arbitration.

12       I -- in addition to that, since my deposition, I recall

13   that I was also retained by a -- an insurer in -- as a non-

14   disclosed expert, I want to say 10 or 15 years ago, involving

15   hundreds of underlying sexual abuse claims, where a

16   professional had sexually abused hundreds of children in the

17   course of his professional services.

18   Q    What insurance company was that, sir?

19   A    I'm not permitted to disclose that.

20   Q    Well, sir, there are many insurers who are part of this

21   case, and it's important that we understand potential

22   conflicts at issue.  And we'd ask that you disclose that.

23   A    I understand that.  But I actually called the attorney

24   yesterday and asked her whether or not I could disclose that

25   because I had forgotten to -- I had just forgotten that

1  engagement, and she requested that I not disclose that because

2  I was only a non-disclosed expert in that case.

3  Q    You had forgotten an engagement that involved hundreds of

4  abused children, sir?

5  A    I had.  It was a number of years ago.

6  Q    How many years ago?

7  A    I want to -- I want to say it was about ten years ago.

8  Q    Okay.

9  A    And may I also say --

10 Q    Can you --

11 A    -- as I sit here --

12 Q    Can you hold it for a second?

13 A    Sure.

14           THE COURT:  Please check your audio.  Thank you.

15           Ms. McNally.

16 BY MS. MCNALLY:

17 Q    You were saying, sir?

18 A    Oh, I also want to add that I actually do not recall

19 which insurer it was that retained me.  I work primarily with

20 --

21 Q    (Indiscernible)

22 A    -- with coverage counsel.

23 Q    Okay.  You don't recall your client?

24 A    I don't recall the insurer.  And even if I did, I'm not

25 permitted to disclose the insurance carrier.

1  Q    Can you describe the type of insurer it was?  For

2  example, your prior answer said it was a cap -- you had worked

3  for a captive insurer for a different denomination.  Can you

4  describe the insurer that you're not remembering right now?

5  A    It was an insurer of a -- and it was of an institution.

6  And I believe it was casualty coverage that had been provided.

7  And there were a number of different entities involved in

8  that, it was a very large litigation.  And so that was one of

9  -- one of the insurers.

10  Q    When you say --

11  A    I believe that there were two policy years involved.

12  Q    When you say it was of an institution, is it a -- in

13  other words, it's like a captive insurer or a mutual?

14  A    It was not -- to my memory, it was not, no.

15  Q    It was a commercial insurer?

16  A    Yes.

17  Q    Okay.  And what was the case?

18  A    Well, I -- I can't disclose.  I -- I -- to do that may

19  actually indicate what the matter was, and I've been

20  specifically instructed not to do that.

21       What I can tell you, in general terms, is that it was a

22  case that involved a professional who provided services

23  involving children; and that, during the course of many

24  decades, he had sexually abused many of those children during

25  the course of his practice; and that, ultimately, it was

1  discovered after his death, actually.

2  Q    What -- when did this happen?

3  A    When did the abuse --

4  Q    This rep --

5  A    -- happen?

6  Q    This representation?

7  A    I -- I want to say it was about ten years ago.

8  Q    And I'm taking from your statement that you did not

9  provide any testimony in that action.

10 A    I did not.

11 Q    Did you disclose this to Haynes and Boone?

12 A    Not until yesterday because I had forgotten that

13 engagement.

14 Q    Okay.  Mr. Burnett, I'm going to ask you to reconsider

15 identifying the matter.  You described it as "many decades,"

16 and you only had one -- your client had one or two years.  So

17 it seems to me the likelihood that we'd be able to trace back

18 who you worked for is remote.  And so, for our ability to at

19 least check conflicts, I would ask that you disclose the

20 matter you provided consulting services on.

21 A    Well, yesterday, I was expressly instructed not to

22 disclose that, so I want to respect the request of the

23 attorney yesterday.

24        MS. MCNALLY:  Your Honor --

25 A    And -- and I -- and as I -- as I sit here, I don't recall

1   what the carrier was.

2          MS. MCNALLY:  Your Honor, there is no privilege

3   called my former client asked me not to tell the case name.

4   He's here under subpoena.  The counsel for the Boy Scouts have

5   not asserted a privilege.  This is plainly relevant to

6   questions relating to bias, potential conflict, and we'd ask

7   for an answer to this question.

8          MR. MARTIN:  Your Honor, may I suggest that we

9   table this for now and give us an opportunity to talk to Mr.

10  Burnett at a break and figure out how to handle this issue and

11  see what we can do to provide any kind of information that

12  might be useful?

13         THE COURT:  I would give you that opportunity.

14         MR. MARTIN:  Thank you, Your Honor.

15  BY MS. MCNALLY:

16  Q    All right.  Well, the one we -- so we have a denomination

17  on a reinsurance matter, correct?

18  A    That's correct.

19  Q    And that -- what denomination is that?

20  A    Well, again, that was -- that was something that is

21  privileged and confidential.  I've also been instructed not to

22  tell -- you know, to disclose that, as well.  It was a

23  reinsurance arbitration.

24  Q    When did -- did you provide testimony in that

25  arbitration?

1   A    Yes, I did.

2   Q    And when was that?

3   A    I want to say it was about 12 or 13 years ago.

4   Q    Okay.  Can we -- sir, Mr. Burnett --

5            MS. MCNALLY:  Mr. Martin, will you please add this

6   to the list of items to discuss with your witness during the

7   break?

8            MR. MARTIN:  Will do.

9   BY MS. MCNALLY:

10  Q    Have you run a conflict check, sir --

11  A    I have.

12  Q    -- on -- have you run a conflict check on the

13  denomination you're not identifying?

14  A    I have.

15  Q    And did you run in this -- how did you decide what list

16  to run it against?

17  A    There was a list that I was given early on in the

18  engagement that I -- I believe it was entitled "Potentially

19  Involved Parties" -- or "Entities," something like that.  It

20  was a long list of potentially involved parties.

21  Q    How many people were -- how many names were on that list?

22  A    Of -- of the potentially involved parties that I --

23  Q    Yes.

24  A    I don't recall.  It was fair -- fairly lengthy.

25  Q    How many pages?

1  A    I -- I don't know.  A number of pages.

2  Q    Was the number more like 5 or more like 40,000?

3  A    I would say somewhere in between 5 and 40,000.

4  Q    All right.  And the reason I came up with the name

5  40,000, sir, is that is the number of chartering organizations

6  that the Boy Scouts -- roughly, roughly the number of

7  chartering organizations in this Boy Scouts bankruptcy.

8      Do you believe that you ran your list of your former

9  clients that you aren't disclosing against the list of all the

10  chartering organizations in this bankruptcy?

11  A    I believe I did.

12  Q    Okay.  So, when you said it's somewhere below 40,000, it

13  should have been close to 40,000.  Am I right?

14  A    Well, it -- I don't remember there being 40,000 names on

15  that list.  It was a -- I believe it was an exhibit to a large

16  document in this -- in this matter.

17  Q    Do you remember what document it was attached to?

18  A    I don't.  I believe that was back in October.

19  Q    Okay.  Well, let's talk about the one insurer who

20  retained you that you're willing to tell us about.  That was

21  National Catholic Risk Retention Group?

22  A    Yes.

23  Q    Now risk retention groups differ from traditional

24  insurance companies, correct?

25  A    That's correct.

1  Q    They're under the Liability Risk Retention Act, Federal

2  Law 15 U.S.C. 3901.  They're mutual companies.  That means

3  they're owned by the members of the group, right?

4  A    That's my understanding.  This -- the risk retention

5  group refers to itself, though, as an insurer, as do I.  But

6  yes, I -- I acknowledge that it's different than a traditional

7  insurance company.

8  Q    And the statute provides that it has as its owners only

9  persons who comprise the membership of the risk retention

10  group and who are provided insurance by that group.

11  A    I -- I trust what you're saying is true, yes.

12  Q    Okay.  So the website of the National Catholic Risk

13  Control Retention Group -- and I think I have a couple of

14  printouts of the -- a couple of pages from that website in

15  your binder there.  Tell -- you can refer to them.  You don't

16  need to.  Here's the question:

17       The website describes itself, saying:

18       "We are owned by our shareholder Catholic entities and

19  employ highly experienced professionals who understand and

20  share the values of the church and who work with our

21  shareholders to develop sound solutions for optical risk" --

22  sorry -- "optimal risk management."

23       Does that sound right to you, sir?

24  A    It does.

25  Q    And that's your understanding of that client.

1  A     Yes.

2  Q     And it says, "We are governed" -- on the website it

3  provides:

4          "We are governed by an eleven-person board of

5  directors comprised exclusively by individuals employed by

6  shareholder Catholic institutions."

7  A     Yes.

8  Q     Right?

9  A     That's my understanding.

10  Q    And the members of the board of that entity are from the

11  -- include people from the Diocese of Kansas City, the Diocese

12  of Shreveport, the Diocese of Brooklyn, the Diocese of

13  Portland, and the Archdiocese of Boston.  Are you aware of

14  that, sir?

15  A    I am aware of that.

16  Q    And the chairman of the board is the Head Bishop from the

17  Diocese of Portland Maine.

18  A    That's correct.

19  Q    So you -- where do -- is it fair to say, putting aside

20  the two other insurers who hired you that you won't tell us

21  about, putting those aside, is it fair to say the National

22  Catholic Risk Retention Group is your primary insurer client

23  for the past 19 years?

24  A    Yes, that's correct.

25  Q    And when I say "primary insurer," I don't mean like first

1  layer coverage, I mean the pain, the principal.  Yes, okay.

2  A    I understand.  Thank you.  Insurer humor.

3       So would you agree with me, sir, that the way that a

4  defendant-run mutual approaches claim resolution might differ,

5  might differ from the way an independent commercial carrier

6  approaches resolution of claims?

7  A    That has not been my experience.  The claims that I have

8  worked on, which I think were in the hundreds, I have

9  approached those, and the people that I work with at National

10 Catholic approach those, their defense counsel who represent

11 shareholders of the National Catholic Risk Retention Group

12 handle those claims just as any other insurance carrier would.

13 Q    And you're comparing that to those that you worked for 19

14 years before, as well as the 2 that you aren't disclosing to

15 us, 1 of which is also a mutual?

16 A    I don't know if that's a mutual.  I -- it -- it may be.

17 But that's correct.  Every -- so far -- and when I was

18 coverage counsel at Lord, Bissell & Brook and worked on

19 thousands of claims there, the -- no, that was the London

20 market, that was not a risk retention group.  But in terms of

21 how those claims were handled, there's no difference between

22 my experience at -- at Lord Bissell, say, and what I've worked

23 on the last 19 years.

24 Q    Would you acknowledge that, when the insurance company is

25 also made up of the defendants, they might include other

1  factors in their calculus, such as, for instance, the nature

2  of their pastoral relationships?

3  A     You mean in terms of the handling of sexual abuse claims?

4  Q     Right.

5  A     That's certainly a pastoral approach.  It's one of the

6  reasons why they -- they retain me is because they know I take

7  that approach to the resolution of sexual abuse claims.  But

8  in terms of the litigation of the claims or the insurance

9  coverage issues that are attendant to those, they're the same

10  as any other insurer.

11  Q     Right.  But we're here today and part of what you want to

12  talk about is the resolution of the claims, so the -- and it's

13  not a criticism.  Please understand there's no criticism

14  intended in anyway.  I find it quite admirable.

15       The pastoral approach, for example, is one way a

16  defendant, who is a church-run insurer might be con --

17  evaluating resolution, that differs from commercial insurers

18  just out in the world.  Is that fair?

19  A     It is fair.  I -- I'm not taking it as a criticism.  I

20  just want to make sure that I'm accurate in describing the

21  fact that those claims -- irrespective of the fact that there

22  is a pastoral consideration that those claims are being

23  handled the same way as my experience is in other

24  circumstances.

25  Q     In the litigation -- in litigation?

1  A    That's correct, or pre-litigation --

2  Q    Uh-huh.

3  A    -- some --

4  Q    So they're being defended?

5  A    Yes.

6  Q    Okay.  We'll get back to that part.

7       Now, when we talked about running the conflict check,

8  did you run a conflicts check of all of the member owners of

9  your primary counsel -- client against the parties relevant to

10 this case?

11 A    What I did is I went down the list of -- of the Dioceses

12 that were on that list, some of which were in my memory, some

13 of which were shareholders of the National Catholic Risk

14 Retention Group.  And where I had worked on something, I

15 indicated that on the chart.

16 Q    And you provided that to Hayes and Boone?

17 A    Yes.

18 Q    Okay.  You've never represented the Boy Scouts in --

19 before, have you, sir?

20 A    That's correct.  I have not.

21 Q    You didn't provide any service to them whatsoever before

22 this matter.

23 A    No, I did not.

24 Q    And you're working exclusively on the bankruptcy case

25 itself.

1  A    That's correct.

2  Q    Not on any other outside matters for the Boy Scouts.

3  A    That's correct.  I am not.

4  Q    Were you told, sir, that you would be represented to this

5  Court and on the docket as an ordinary course professional?

6  A    As a what?  Excuse me?

7  Q    Ordinary course professional.

8  A    I don't recall that term being used.

9  Q    Okay.  Now you said in your dep -- in your declaration at

10  Paragraph 6:

11          "In the last year alone, I have evaluated and

12  valued more than 500 claims."

13  A    That's correct.

14  Q    I just want to establish those are -- none of those

15  claims are claims in this action.

16  A    Not that I know of.  Well, I -- I take that back.

17    I did not value claims.  But in the one matter where I

18  am a non-disclosed expert in an -- in a diocesan bankruptcy, I

19  did not value -- I believe that there may have been some.  I

20  told them that I had been retained for this -- for this

21  engagement, and so anything that might involve the Boy Scouts,

22  that I would not look at those.  I recused myself from those,

23  so I did not valuate those.  But I believe that there were

24  some in there.

25  Q    Okay.  I thought we just learned that the -- is it -- is

1  the diocesan bankruptcy for the National Catholic Organization

2  -- the National Catholic Risk Control Retention -- I'm sorry.

3  I'm getting your client name wrong.

4  A    (Indiscernible)

5  Q    Is that -- the diocesan bankruptcy for that organization?

6  A    Well, the risk retention group is not in bankruptcy.  The

7  -- the diocese that is involved is a shareholder of the

8  National Catholic Risk Retention Group.  But they have a

9  number of insurers going way back.

10  Q    Okay.  I want to understand your question -- your answer

11  to the prior question.  I thought you just said it's a

12  consulting relationship you hadn't disclosed.  Am I right?

13  That is the one where you told them I can't look at Boy

14  Scouts.

15  A    Oh, that's correct, yes.

16  Q    Okay.  And who are you consulting for in that matter?

17  A    I -- I've been instructed not to tell because I'm a non-

18  disclosed expert.  I -- I have been told that I will likely be

19  disclosed, but it's premature for that.  So they've requested

20  that I not disclose that.

21  Q    Okay.  And so, in that circumstance, it's not an

22  insurance company; it's a defendant -- it's a defendant itself

23  --

24  A    It -- right.

25  Q    -- or potentially --

1  A    They're -- they're debtors in the bankruptcy.

2  Q    All right.  You are representing --

3              UNIDENTIFIED:  (Indiscernible)

4              THE COURT:  Excuse me.

5  BY MS. MCNALLY:

6  Q    You are a --

7              THE COURT:  Excuse me.

8  A    -- consulting expert --

9              THE COURT:  Excuse me for a moment, Ms. McNally.

10             This is a reminder --

11             MS. MCNALLY:  Sure, sure.

12             THE COURT:  This is a reminder to everyone in this

13 hearing that, if your vid -- if your audio goes on, we will

14 remove you from the hearing without any warning.  So please

15 keep your audio off.

16             Ms. McNally.

17 BY MS. MCNALLY:

18 Q    All right.  You know, I appreciate what you just

19 mentioned, sir, because it's calling to mind a question I

20 should have thought to ask.

21      Do you represent any entities, whether their dioceses or

22 otherwise, that are all -- potentially also mentioned or

23 referred to in a proof of claim in this action?

24 A    Yes, and I indicated that.

25 Q    Where?

1  A    In -- when I -- at the beginning of my engagement when I

2  was provided that document and to go down -- I went down, and

3  whenever there was -- there was an entity that I had -- you

4  know, that I had represented or had -- was representing, I

5  indicated that on the chart.

6  Q    And how many were there?

7  A    I -- I don't recall.  Some of them were law firms that I

8  had worked with, some of them were dioceses, that -- that kind

9  of thing.  I don't recall how many of them there were.  There

10 weren't that many.

11 Q    What does that mean, sir, not "that many"?

12 A    I -- it's just that there were not that many potentially

13 involved parties that I had done work for or had some kind of

14 association with.

15 Q    Is not "that many" more than ten?

16 A    It -- I don't recall.

17 Q    Okay.  Is it fair to say you have not reviewed any proofs

18 of claim in this action?

19 A    I have not reviewed any proofs of claim.

20        MS. MCNALLY:  Okay.  Your Honor, at this time, I

21 would like to -- I'm prepared to proceed.  And if this all

22 goes to weight, we're -- I'm ready to do more.  But at this

23 time, Your Honor, I would like to renew our motion to exclude

24 this witness on several grounds:

25        First, he has no experience on how Boy Scouts

1 approaches the resolution of claims.  He has acknowledged that

2 he's never done any work on Boy Scouts matters before.  So his

3 view -- and his view as to how other defendants evaluate and

4 process claims is really of no relevance to your

5 interpretation to the plan itself.

6 　　　　　Second, in the past 19 years, he has disclosed to

7 us one insurer.  He has others he has represented, we are

8 hearing today for the first time.  And those are not -- he is

9 not sharing those, and there's no way for us to evaluate

10 potential bias.

11 　　　　　Third -- I should ask and confirm this.

12 BY MS. MCNALLY:

13 Q    So you have never worked for any of the certain insurers

14 in this case, correct?  Those who have filed objections to the

15 plan.

16 A    That's correct.

17 　　　　　MS. MCNALLY:  Okay.  Third, he hasn't worked for

18 any of the objecting insurers to the plan.  So, when it comes

19 to evaluating how the plan would be viewed by insurers, it's

20 irrelevant what other -- his experience has no bearing on what

21 the insurers at issue -- this is a known set -- the known set

22 of insurers here, he has no experience with.

23 　　　　　Fourth, his testimony is largely cumulative of what

24 we heard yesterday from Mr. Griggs, except as to insurance

25 coverage issues, where we have these conflicts.

1            And Your Honor, these conflicts would precluded --

2    I rep -- I'll argue would have precluded his engagement as a

3    Rule 327 professional if he had been properly brought to this

4    Court and not smuggled in as an ordinary course professional.

5            So, for these reasons, and we move on the basis of

6    Rule 702, that has specialized knowledge of what other

7    insurers working for other defendants might do will not help

8    the trier of fact understand the evidence or determine a fact

9    in issue.  If you believe this all goes to weight, I'm

10   prepared to proceed.  But I think, largely, this will not be

11   useful to the Court and is rife with conflict issues.

12           MR. MARTIN:  Your Honor, may I respond?

13           THE COURT:  Yes.

14           MR. MARTIN:  Your Honor has already painstakingly

15   reviewed the carriers' objections to this witness.  They have

16   had ample opportunity to challenge his qualifications and they

17   knew that he had not worked for BSA.  This is the first time

18   that we're hearing -- just because he hasn't worked for BSA

19   does not make him unqualified.  This Court has already

20   entertained those arguments and has rejected them.

21           I think it's totally inappropriate to do that at

22   this point in time.  He is ready here for cross-examination.

23           THE COURT:  Thank you.

24           I'm going to deny the request to revisit the motion

25   in limine.  We had extensive briefing on the motion in limine,

1  and I've ruled.  And I don't -- as I said, I don't see a need

2  to revisit it.  You can certainly continue to cross-examine.

3  And I think it does go to what weight I give his testimony.

4           MS. MCNALLY:  Thank you, Your Honor.  And of

5  course, we meant no disrespect by re-urging that.  We learned

6  some new things today.

7           THE COURT:  Yes.

8           THE WITNESS:  I understand.

9  BY MS. MCNALLY:

10 Q    Okay.  Let's start with talking about the settlement

11 trustee.  Now you're aware, sir, that the person selected to

12 be the settlement trustee is retired Judge Barbara Houser.  Is

13 that right?

14 A    Yes, I am.

15 Q    Okay.  Now the settlement trustee is -- the process for

16 selecting that person has been -- is set forth in the

17 settlement trust agreement, which is an exhibit to the plan,

18 the modified -- third amended modified (indiscernible) amended

19 plan -- I got that wrong.

20      The settlement trustee is selected pursuant to the

21 settlement trust agreement, which is a component of the plan,

22 which is Exhibit 353.  Are you aware of that, sir?

23 A    I am aware of that.

24 Q    Okay.  And do you have Exhibit 353 in front of you?  You

25 don't have to pull it up, I just want to make sure you have it

1 handy.

2      Have you read the settlement trust agreement?

3 A   I don't recall.  I've read a lot of materials.

4 Q   You know, I'm glad you mentioned that, that reminds me.

5      You know, on the first paragraph -- the second paragraph

6 of your declaration, it starts -- there's -- the second

7 sentence starts:

8           "Together with debtors' counsel, I have reviewed

9 and am generally familiar with the trust distribution

10 procedures in the plan."

11      Do you see that?

12 A   Which -- I'm sorry.  What paragraph are you on?

13 Q   2.  The second sentence of 2.

14 A   Yes.

15 Q   What does that mean, "together with debtors' counsel"?

16 A   The debtors' counsel at Hayes and Boone provided many

17 materials for me to review, and we discussed those materials

18 as I reviewed them.

19 Q   So you kind of walked through them together?

20 A   Yes.  Not -- not every single one of them, but yes.

21           THE WITNESS:  Everything went black.  Hello?  I can

22 still see --

23           MS. MCNALLY:  We can --

24           THE WITNESS:  -- (indiscernible)

25           MS. MCNALLY:  We can still see you.  Do you need a

1  break?

2           THE WITNESS:  No.  I'm sorry.  My feed went out.

3  Now it came back on.  I can see you.  Okay.

4           Sorry, Your Honor, some technical issues here.

5  Thank you.  My apologies.

6  BY MS. MCNALLY:

7  Q    All right.  So you walked through certain parts of the

8  plan with counsel for the -- from -- for the debtor?

9  A    I don't recall specifically if it was certain parts of

10  the plan.

11  Q    It might have been certain parts -- well, certain parts

12  of the trust distribution procedures?

13  A    Yes.

14  Q    Okay.  And that counsel is counsel from Haynes and Boone?

15  A    That's correct.

16  Q    And they're insurance recovery counsel, correct?  You

17  understood that?

18  A    I did.

19  Q    Okay.  If you look at, starting at Page 191 of plan

20  document -- that's Exhibit B, the settlement trust agreement.

21  A    I'm sorry.  Exhibit what?

22  Q    353, Page 191, the plan document.  That's the big --

23  A    Yes.

24  Q    -- (indiscernible)

25  A    And I'm sorry.  What page did you want me to look at?

1  Q    191.

2         (Pause in proceedings)

3  A    I'm not seeing 191.

4  Q    It would be on the top, in the top line.

5  A    Oh, oh, oh.

6         (Participants confer)

7  A    Sorry about that.

8         (Pause in proceedings)

9  A    Yes.

10  Q    All right.  So that -- the pages after that are the

11  settlement trust agreement.  Can you just look through it --

12  you can just page through it on your own.

13              MS. MCNALLY:  We don't need it on the screen, sir.

14  Q    Can you just page through it and let me know whether you

15  have looked at that document before?  Have you studied it?

16  A    I don't know if I would describe having "studied" it.

17  But I -- I don't recall, as I sit here, whether I looked at

18  this at an earlier date.  If I did, it's been quite a while.

19  Q    Okay.  Fair to say that this document wasn't -- didn't

20  feature prominently in your evaluation -- or in your opinions?

21  A    My opinions were based on a review of the TDPs, not so

22  much the plan.

23  Q    Okay.  Well -- all right.  Is it fair to say that your

24  opinion providing -- approving of the TDPs -- is it fair to

25  say that you approve of the TDPs?

1  A    I -- my opinions is that I -- that they mimic what you

2  might get in the tort litigation system and that I believe

3  that the TDPs are reasonable.

4  Q    Okay.  Is it fair to say that your opinion in that regard

5  puts heavy emphasis on the ability of the settlement trustee

6  to do her job?

7  A    I think that's fair.

8  Q    Thank you.

9       And if the TDPs didn't provide for an independent

10 trustee, your opinion might be different.

11 A    Well, I -- I suppose so.  But the -- it does provide for

12 an independent --

13 Q    Right.

14 A    -- trustee.

15 Q    Not my question.  Thank you.  Not my question.

16      My question is:  If they did not provide for an

17 independent trustee, your opinion might be different.

18 A    It might be.

19 Q    Okay.  So let's talk about whether there are any barriers

20 to hurt independence here.

21      Do you understand that the settlement trustee is

22 supervised by the settlement trust advisory committee.

23            MR. MARTIN:  Objection.  Form, vague.

24 A    I don't --

25            THE COURT:  Overruled.

1  A    -- recall the -- oh.

2          THE WITNESS:  Sorry, Judge.

3          THE COURT:  You can answer.

4          THE WITNESS:  I don't recall it being referred to a

5  "supervised."  I know that there is consent involved with some

6  of the duties of the trustee, and that there is some kind of

7  conferring.

8  BY MS. MCNALLY:

9  Q    Okay.  And those are -- then some kind of conferring is

10  done with members of the settlement trust advisory committee.

11  You're aware of that?

12  A    I am.

13  Q    Okay.  And I'm -- if I refer to that group as the "STAC,"

14  you'll understand what I'm speaking about.

15  A    Yes.

16  Q    Thank you.

17          So are you aware that the members of the -- this

18  document that we just referred to, this -- the trust

19  agreement, provides that:

20          "The members of the STAC shall serve in a fiduciary

21  capacity, representing the current holders of abuse claims.

22  The STAC shall not have any fiduciary duties or

23  responsibilities to any other party, other than the holders of

24  the abuse claims."

25          Are you familiar with that language?

 1          MR. MARTIN:  Your Honor, I'm going to object,

 2 insofar as this line of questioning does go outside the scope

 3 of direct.  Mr. Burnett did not talk about the STAC.  His

 4 focus was not on the STAC at all.  It goes way beyond the

 5 direct that's reflected in his declaration.

 6          THE COURT:  Overruled.

 7          You can answer.

 8          THE WITNESS:  I -- I'm aware of that, and I -- I

 9 saw Mr. Griggs' testimony yesterday and I saw a discussion of

10 that yesterday.

11          MS. MCNALLY:  Okay.  Thank you.

12 BY MS. MCNALLY:

13 Q    How -- did you attend yesterday?

14 A    I was not in the room, no.

15 Q    How did you see his testimony?

16 A    I saw it on -- in another -- in another room.

17 Q    How did you see it in another room?

18 A    It was on a screen.

19 Q    Okay.  And where were you?

20 A    I -- I was in another room, a conference room --

21 Q    At Haynes --

22 A    -- (indiscernible) --

23 Q    -- and Boone?

24 A    That's correct, yes.

25 Q    Who was with you?

1    A    Miss DuBose.  Ms. DuBose.

2    Q    Ms. DuBose, who's in the room with you now.

3    A    That's correct.

4    Q    Defended you at your deposition?

5    A    That's correct.

6    Q    Okay.  Did you register with the Court to watch the

7    video?

8    A    I don't believe I did.

9    Q    You watched it under the log-in of someone else.

10   A    That's correct.

11   Q    Okay.  So you saw yesterday a discussion of the STAC.

12   And it -- prior to the -- was that news to you, what Mr.

13   Griggs testified as to the makeup of the STAC?

14   A    I don't recall if I knew that before.

15   Q    Well, do you recall whether, yesterday, sitting in the

16   room with counsel, watching the video, you had the impression

17   this is news to me?

18   A    No.  I knew -- I -- I don't recall if I knew the names of

19   the individuals, but I knew that there were a STAC with

20   plaintiffs' attorneys populating it.

21   Q    Okay.  Let's talk about that.

22        So there are seven members, and they're all claimant

23   representatives.  You heard that yesterday.

24   A    I did, yes.

25   Q    Okay.  And you know that to be the fact provided in the

1  document.

2  A    Yes.

3  Q    Okay.  And you know that to be the fact provided in the

4  document.

5  A    Yes.

6  Q    When you were watching yesterday the testimony on -- in

7  another room, on a screen under someone else's log-in, were

8  you following along with documents?

9  A    No, I was not.

10  Q    Did you take notes?

11

12  A    No, I did not.

13  Q    Okay.  Now, at your deposition, you said that you hadn't

14  studied the impact of having the STAC be made up of entirely

15  of plaintiffs' lawyers; at least as of that, that was the

16  case, right?

17  A    That's correct.  As of now, as well.

18  Q    Okay.

19  A    I haven't created any opinions on that.

20  Q    All right.  Thank you.  You saved me a question.

21      So are you aware that, according to the termsheet that

22  was circulating announcing this plan, that this group of STAC

23  members collectively represent 45,000 claimants -- more than

24  45,000 claimants who filed proofs of claim?

25  A    As I sit here today, I don't -- I don't recall, one way

1  or the other, if I knew that.

2  Q    Okay.

3  A    It may -- it may have been mentioned in a document that I

4  reviewed, but I -- as I sit here today, I don't recall.

5  Q    That didn't factor into any opinion you rendered.

6  A    That's correct.

7  Q    Okay.  And are you aware that the contingency fee counsel

8  who are members of this STAC have con -- well, are contingency

9  fee counsel, first of all?  Let me say that.  Are you aware

10  that they are doing their representation on a contingency

11  basis?

12  A    I would assume that.

13  Q    And are you aware that their typical rates are 40

14  percent, up to 40 percent?

15  A    I -- I did not know that.

16  Q    All right.  So would the math of 45,000 claims at a base

17  value of 300,000 works out to more than $5 billion in fees for

18  these 7 individuals.  Are you aware of that, sir?

19            MR. MARTIN:  Objection.  Form.

20            THE COURT:  Overruled.

21            MS. MCNALLY:  Objection --

22            THE WITNESS:  I will trust that your math is

23  correct.  I -- I haven't done the math, so I'll trust that

24  your math is correct.

25  BY MS. MCNALLY:

1  Q    Okay.  So, trusting my math is correct, you have 7 people

2  supervising the trustee, who personally stand to get over $5

3  billion if their claims are only valued at 300,000.  Do you

4  understand that, sir?

5  A    I do understand that.

6  Q    Okay.  So let's talk about the powers of the STAC then.

7  And we're going to come back.  The STAC weeds through, so I'll

8  refer back to them.  But right now, I want to talk about one

9  aspect, the super-majority nature about retaining

10  professionals to assist the trustee.

11      Are you aware, sir, that for the trustee to hire any

12  professionals, she must obtain sup -- five members of those

13  seven members to agree, plus the FCR, that is to hire anyone

14  to assist the claims administrator?  Are you aware of that?

15  A    I believe I saw a reference to that yesterday.

16  Q    Okay.  And are you aware -- and it's fair to say -- I

17  should have asked this:

18      It's fair to say no one expects Judge Houser herself to

19  sit down with a stack of 89,000 proofs of claim and go through

20  them and do all of the work necessary, right?  Nobody expects

21  that.

22  A    As a single person, you mean, handling --

23  Q    Right.

24  A    -- all of them?

25  Q    Right.

1  A    I would -- I would imagine that she would have a staff of

2  people that would assist her in that work --

3  Q    Right.

4  A    -- to help --

5  Q    It's literally --

6  A    -- (indiscernible)

7  Q    It's literally impossible in one lifetime for one person

8  to do all of that work in the thorough way that your opinion

9  contemplates, obviously.

10 A    Yeah, right.  I would -- I think that's a fair statement.

11 Q    Okay.  So now we're -- let's talk about the staff who

12 will do that work.

13      And you understand that the -- on the -- for the claims

14 administrative professionals, those all need to be approved,

15 every single one, by five out of the seven claimant

16 representatives who, has a group, have billions of dollars in

17 personal money on the line.  Do you understand that?

18 A    I think I'll accept -- I'll accept what you're saying.

19      Okay.  Good.

20      And then, also, the trustee professionals -- the trust

21 agreement, you might not -- you might not recall, provides for

22 two types of professionals:  Claims administrators and

23 trustee.  Trustee professionals will, similarly, have to be

24 approved by five out of these seven individuals.  Do you

25 understand that?

1  A    I will -- I will accept your representation of that.

2  Q    Okay.  And when it came time to pick the trustee, that

3  group of seven couldn't even reach agreement about Judge

4  Houser or the alternate candidate, who was a different retired

5  judge.  Were you aware of that?

6  A    I -- I think I was aware of that.  I think I had heard

7  that there was -- that there was a vote, and that they had

8  difficulty arriving at consensus on the -- on who the trustee

9  would be.

10  Q    Right.  And they didn't have difficulty.  They were

11  unable to re -- to get to five.  Are you aware of that?

12  A    I believe so.

13  Q    And that's when you had two eminently qualified, retired,

14  neutral Federal Judges as candidates, right?

15  A    Okay.

16  Q    And is it your -- but it is your expectation that this

17  group of individuals, with a lot of money on the line, are

18  going to be able to reach consensus on all of the

19  professionals that this -- that Judge Houser wishes to retain?

20  A    That -- that they would be able to reach --

21  Q    Yeah.

22  A    -- consensus?

23  Q    It's your -- it's -- I mean, it has to be something that

24  you -- that will have to happen for this work to get done.

25  A    I would hope that they would be able to reach a consensus

1   --

2   Q    Okay.

3   A    -- especially if they had so much difficulty with Judge

4   Houser.  Then, hopefully, they've found a way to cooperate

5   with each other better.

6   Q    And one might make some assumptions about the type of

7   staff a group with such an interest would seek to hire.  Fair?

8   A    I -- I don't know, I can't speak to that.  I wouldn't

9   want to speculate about that.

10  Q    Okay.  Okay.  Is it true -- is it fair to say then that

11  your opinion is speculating that she will be able to hire the

12  types of people she would like, and not be influenced in any

13  way by the -- her -- the STAC and its goals?  Isn't that

14  speculation?

15  A    I don't agree with that.  When I rendered my opinions

16  based on the TDPs, I was not taking into account the influence

17  of the STAC and whether or not they might be able to come to

18  consensus.  I -- when I -- when I rendered my --

19  Q    Okay.

20  A    -- opinions initially, they -- I don't believe that they

21  had decided on a trustee yet, so that really wasn't something

22  that I was looking at.

23  Q    Okay.  You filed a supplemental report?

24  A    I did, yes.

25  Q    And at that time, weren't the STAC -- weren't the STAC

1  members identified?

2  A    I -- at that time, they were, I believe --

3  Q    Okay.

4  A    -- yes.

5  Q    So it's -- let's just -- can we just agree that you have

6  not considered the in -- potential influence of the STAC on

7  all of the things your opinion talks about relating to the

8  trustee's activities?

9  A    Well, I'm not sure what you're getting at.  I -- what I -

10  - I can tell you is that I rendered my opinions based on what

11  was in the TDPs, which lists the trustee as an independent.

12  And I was aware that the STAC was involved in who the trustee

13  would be.  And so I wasn't really looking at what their bias

14  might be.  What I was looking at was what the role of the

15  trustee would be, as delineated in the TDPs.

16  Q    Okay.  Thank you.

17       So let's talk about the trustee then.  Now this trustee

18  is a settlement trustee -- that's her official title,

19  settlement trustee -- and is a fiduciary to this settlement

20  trust, right?

21  A    That's correct.

22  Q    And a "fiduciary" means that she owes fiduciary duties to

23  the beneficial owners of the trust.

24  A    Well, she owes fiduciary duties to the trust.  There are

25  trust beneficiaries.  But the way I look at that is that she

1 owes -- that her first duties, her fiduciary duties, are to

2 the trust itself.

3 Q    Okay.  Do you do trust law, sir?

4 A    I do not.

5 Q    Okay.  So the beneficiaries of the trust, you -- I mean,

6 you're agreeing she owes beneficiary -- fiduciary duties to

7 the beneficiaries of the trust.  Do you agree with that?

8 A    Well, I guess it's that -- to the extent that they

9 comprise the beneficiaries of the assets of the trust, then I

10 guess you could say that.  I -- I think that -- I don't do

11 trust law, but my --

12 Q    Okay.

13 A    -- my understanding of that would be that her first duty

14 is to the maintenance of the trust.

15 Q    And the beneficiaries of the trust are the holders of

16 the abuse claims that's provided in the document, right?

17 A    Well with one caveat, I would say, and that is --

18 Q    Can we look at -- I'm sorry --

19         UNIDENTIFIED:  Let him answer, please.

20         THE COURT:  Yes.

21         MS. MCNALLY:  Yes.  I apologize.

22         THE WITNESS:  What I would say is that to the

23 extent that there will -- I would assume that there would be

24 some claim holders who would not receive any kind of an award.

25 Their claim might be disallowed or maybe through the scaling

1  factors it may be scaled to zero.  My suspicion is that they

2  would not consider themselves a beneficiary because it will

3  not have benefited from those assets.

4  BY MS. MCNALLY:

5  Q    Will you look at page 200 of Document 353?

6  A    I have it.

7  Q    Okay.  Now it says beneficiaries, the beneficial owners

8  -- Section 1.6,

9       "The beneficial owners within the meaning of Act IV of

10 the trust shall be the holders of the abuse claims."

11      Do you see that, sir?

12 A    I do.

13 Q    And it doesn't refer to what the individuals,

14 themselves, consider them to be benefiting or not.  The

15 document provides the beneficiaries are the holders of abuse

16 claims, true?

17 A    I accept that, although I'm sure that people who get

18 zero may not see it that way.

19 Q    Fair.  All right, now a principal fiduciary duty of any

20 trustee is a duty of loyalty, right?

21 A    Yes.  That's my understanding.

22 Q    And in the trust context that means -- we can take this

23 down.  In the trust context that means the duty to act solely

24 in the interest of the beneficiaries.

25 A    I will take your word for that.

1  Q      Okay.

2  A      I don't do trust law.

3  Q      All right.  And that is different from the rule of a

4  judge in the tort system?

5  A      I would say that is correct.

6  Q      Okay.  And it's also different from the role of an

7  arbitrator in a typical arbitration?

8  A      To the extent that there is no trust involved in an

9  arbitration then I would say that's true.

10 Q      I just want to clarify that to the extent part of your

11 answer.  In a typical arbitration you don't have the

12 arbitrator having fiduciary duty of loyalty to any of the

13 parties, right?

14 A      That's correct.

15 Q      And they don't have a duty to act in the best interest

16 of either party in an arbitration?

17 A      That's correct, they're supposed to be neutral.

18 Q      And you have never recommended to one of your clients

19 that they permit a fiduciary for the other side to make a

20 binding -- to be the binding arbitrator?

21 A      Well I have been involved in matters that had an

22 arbitrator where there was agreement among the parties about

23 who they might choose, but I have never advised someone to

24 accept the other side's arbitrator as someone who would have

25 loyalty only to them.

1  Q      Thank you.

2         And you have never advised your client to have the

3  fiduciary on the other side determine how much you would pay

4  like in advance whatever you say, I'm going to advise you to

5  pay whatever they want they're going to recommend, right?

6  Before you even hear the number.

7  A      Well I can tell you what my experience is and that is

8  that I was involved in an arbitration where there was

9  agreement on who the arbitrator would be and then in addition

10 to that there had been a negotiated paradigm within which the

11 arbitrator would provide certain awards so that there was a

12 cap and there was also, you know, a lowest amount.  So in that

13 circumstance it seems similar to this.

14 Q      All right.  That wasn't my question.  My question is a

15 circumstance where you say to your client the fiduciary on the

16 other side is going to come up with a number and I recommend

17 to you that we agree right now in advance that we're going to

18 accept the number given to us by the fiduciary on the other

19 side.  You have never had that experience, right?

20 A      Well I'm not sure that that is what is going on here

21 either.

22 Q      Not my question.

23 A      The non-settling insurers have the opportunity to stand

24 on their -- on the terms and conditions of their policies and

25 in the IRO part of it they could withhold consent to the

1  award.  And in addition to that, the claimant could reject --

2  after reconsideration the claimant could reject the trustees

3  award in the TDP.

4  Q    I appreciate all three of those things and believe me

5  they are on my agenda to talk to you about today.  That was

6  not my question.

7       It's a very simple question, sir.  Has there ever been a

8  time -- there has never been a time where you have advised

9  your client in advance to accept a number that the fiduciary

10  for the other side will deliver to you and be bound by that

11  number, right?

12  A    No. I have never been in that circumstance.

13  Q    Okay.  Thank you.

14       You have never been in a situation where you have

15  decided and advised your client to accept in advance the

16  defenses that the fiduciary on the other side will say you can

17  raise?

18  A    I'm sorry, could you repeat the question?

19  Q    Sure.  You have never been in a circumstance where you

20  have advised your client to let the fiduciary for the other

21  side determine what defenses might apply or not apply, right?

22  A    I have never been in that situation.

23  Q    Okay.  And you have never been in a situation where you

24  have said to your client I will let the fiduciary on the other

25  side do all of the legal research, right?

1  A      I have never been in that situation, no.

2  Q      And you have never been in a situation where you have

3  said to your client I will let -- I recommend that we let the

4  fiduciary for the other side just resolve the claim for me,

5  right?

6  A      That's correct, I have never had that situation.

7  Q      Okay.  Now you are aware from watching Mr. Griggs's

8  testimony in a different room that before bankruptcy the Boy

9  Scouts defended their cases?

10 A      Yes.  My understanding was that there was some pre-

11 litigation claims that they resolved through settlement that

12 may not have gone through litigation, typical tort litigation

13 that you would do in court.  Some were not filed, if I

14 understood his testimony correctly.

15 Q      I'm talking about cases that were filed.

16 A      Then, yes.

17 Q      And even as to the cases that weren't filed they -- the

18 Boy Scouts engaged defense counsel to work up those cases to

19 greater or lesser degrees?

20 A      I believe that is correct.

21 Q      Okay.  And those counsel were retained by the Boy Scouts

22 as formally retained attorneys?

23 A      I'm sorry, could you repeat that?

24 Q      The people who defended those cases were attorneys,

25 formal attorneys?

1  A      Yes, that is my understanding.

2  Q      They have ethical obligations under the rules of their

3  state?

4  A      That is correct.

5  Q      And those include the duty of loyalty to the Boy Scouts?

6  A      That is correct.

7  Q      And that also includes the duty to provide a zealous

8  representation as directed by the Boy Scouts?

9  A      That's correct.

10  Q      Under the TDP's there is no role for any party to serve

11  in that capacity providing zealous representation for the

12  interest of the defendant, right?

13  A      Well under the TDP's there is neither a plaintiff or a

14  defendant and there is not an advocate there in that process.

15  It's the trustee that is making decisions based on what is

16  provided to her.  So it's not a typical litigation situation

17  where you are in a court of law and there are two advocates;

18  you know, an advocate on either side.

19  Q      So you will have the claimant on one side and what I'm

20  asking you is a pretty precise question; there is no one with

21  ethical duties to the defense side of the story presenting to

22  the trustee under the TDP's?

23  A      Well I think it's fair to say that there is no one there

24  and there is no one on the other side as well.  The claimant

25  has to produce as much information as is requested by the

1  trustee to make his claim, but there isn't a plaintiff's

2  attorney, like you would have in court, who is advocating in

3  the trustee context for their client.

4  Q    Well there is the client, right?  The client gets to

5  advocate.

6  A    There is the claimant.

7  Q    Okay.  The claimant.

8       Is it your understanding then that as part of the trust

9  distribution process there is just lawyers aren't allowed?

10 A    Well the claimants are represented by counsel.

11 Q    Okay.

12 A    My understanding is that part of that process of

13 producing the proof of claim whenever there is a question and

14 the information that is going to be requested by the trustee

15 from the claimant that their attorney may be involved in that

16 process, of course.

17 Q    Of course.  And so there is no similar attorney on the

18 defense side of the story.  Is this controversial?

19 A    I'm not sure I understand the question.

20 Q    Okay.  Now when we talked at -- when Mr. Griggs talked

21 yesterday he talked about one of the things that his firm did

22 for the Boy Scouts was to work up defenses of statute of

23 limitations.  Do you recall that?

24 A    I do recall that.

25 Q    And there will be nobody other than the trustee and her

1  staff approved by the (inaudible) to do that work under the

2  TDP's?

3  A    That is correct.  That is my understanding.

4  Q    Okay.  He raised other defenses as well and worked those

5  up on behalf of the Boy Scouts, right?

6  A    You are talking about Mr. Griggs's prepetition?  Yes.

7  Q    There is no one to do that work under the structure of

8  the TDP's?

9  A    The trustee?

10  Q    Other than the trustee.

11  A    Right.  That's correct.

12  Q    Or her staff approved by the staff?

13  A    Correct.

14  Q    Okay.  Summary judgment motion in appropriate cases was

15  done by Ogletree.  You heard that?

16  A    Prepetition, yes.

17  Q    There is no summary judgment process in these TDP's?

18  A    Well I am not sure I agree with that.  In the sense that

19  there is nothing that says motion for summary judgment.  At

20  the various stages of determination by the trustee I think you

21  could liken it to a motion for summary judgment.

22  Q    Okay.

23  A    You know, at the conclusion of the general criteria if

24  the trustee did not feel that the claimant had demonstrated

25  the information that is required under the general criteria to

1  a preponderance of the evidence then she could disallow the

2  claim.

3  Q    Okay.  That would be like a sua sponte ruling in court?

4  A    That's correct.

5  Q    All right.  Well, you know, I'm so intrigued by this

6  topic, but I'm going to get to it when I get to it, but we're

7  definitely going to talk about that process.  Thank you for

8  raising it.

9       Right now I would like to talk about the expedited

10 distribution.  You, in Paragraph 20 of your declaration, refer

11 to that -- refer to the $3,500 payment, right?

12 A    Yes, I do.

13 Q    And I think you say it represents a de minimis nuisance

14 value settlement.

15 A    Yes.

16 Q    Are you aware that the voting records show that 7,381

17 people have elected the $3,500 de minimis nuisance value

18 settlement?

19 A    I was not aware of that number.

20 Q    Okay.  If you do the math on that that exceeds $25

21 million.  Are you aware of that?

22 A    I will accept your math.

23 Q    So if we go with 40 percent contingency that exceeds $10

24 million in attorney fees to counsel for clients who have

25 submitted paperwork simply raising their hand for $3,500.

1  Does that make sense?

2  A    You mean have you stated that correctly?

3  Q    No.

4  A    Does what make sense, that they would receive a

5  contingency?

6  Q    Thank you for asking that.  I didn't mean it like, what

7  a world, does that make sense.  I mean, like, do you follow my

8  math that if they have a $25 million or more pot and 40

9  percent goes to the contingency fee counsel that amount is

10  like $10 million?

11  A    I will accept your math. I am not sure why it factors

12  into the TDP's though.

13  Q    Well --

14  A    Whatever agreement is between plaintiffs' counsel and

15  their client.

16  Q    Okay. Now in the paragraph that talk about this program

17  you gave examples, but those are nuisance value settlements,

18  am I right?

19  A    Yes.

20  Q    Because there is no such thing in the U.S. law for a

21  nuisance value verdict.  That does not exist, right?

22  A    Well I guess it depends on what you mean.  I know of

23  situations where there has been something that people might

24  describe as a nuisance value because it's small enough.

25  Q    There is no -- it is not part of our legal system for a

1  judge to say what are we doing here guys, verdict for the

2  plaintiff, this is a nuisance.  That doesn't happen -- that is

3  not part of our system, right?

4  A    That is correct.

5  Q    So when nuisance value things get done it's by consent

6  as a settlement?

7  A    It is, but I see the TDP's as being a settlement

8  paradigm within a tort litigation system.

9  Q    Fair.

10 A    So in my experience over many, many years there are a

11 number of times where we have reached or I have been involved

12 in cases that arrive at what you might describe as a nuisance

13 value settlement or a cost of defense settlement where a

14 decision is made about an amount that will be paid to settle a

15 claim which represents what people anticipate will be the cost

16 of defense or less.

17 Q    Absolutely no dispute this happens that rational

18 defendants decide for their own purposes it makes sense to

19 consent to a nuisance value amount.  That absolutely happens,

20 no dispute.

21       Is it fair to say also though that there are times when

22 rational defendants decide to defend claims even knowing going

23 on that they may well have to pay more in defense costs then

24 is ever on the line.  That happens as well?

25 A    I believe that is fair.

1    Q    And there might be a variety of reasons for that.  One

2    might be they want to discourage copycat cases?

3    A    That is correct, I believe, but I wouldn't want to

4    speculate about the motives behind those kinds of decisions.

5    Q    And sometimes it's a matter of principal, we're going to

6    defend this as a matter of principal even knowing defense

7    costs will exceed?

8    A    Again, I don't want to speculate about what people's

9    motives would be in any particular matter.

10   Q    Well, sir, isn't your opinion in this case in many ways

11   speculating about what different parties motives are?

12   A    I am not sure I took that into account.

13   Q    Okay.

14   A    What I was looking at was what the responsibilities are

15   of the trustee under the TDP's.

16   Q    Now you said in your declaration that the TDP's are

17   designed to -- one of its features is to incorporate fraud

18   detection.  That is part of the trustee's job in administering

19   the TDP's?

20   A    That is correct.

21   Q    So a no questions asked payment totaling in a group of

22   $25 million that does not really advance fraud detection, does

23   it, sir?

24   A    Well I disagree with the premise that it's a no

25   questions asked. I am not sure -- what is clear is that the

1  claimant has to file a proof of claim where they present their

2  claim, they give an explanation of what happened to them, who

3  did it, and what happened.  That is in the proof of claim.  So

4  when they choose -- when they elect the expedited distribution

5  of $3,500 it's not like they are just coming forward, having

6  said nothing, and just being given $3,500.  They have that

7  obligation to present that information under the TDP's.

8  Q     Do you understand the expedited distribution component

9  to require the trustee to be vetting or evaluating the

10 statements in the proof of claim?

11 A     What I understand is for them to be at -- for the

12 claimant to be at the table they had to, under Article IV,

13 produce a certain amount of information for them to reach the

14 point where they could elect to have an expedited

15 distribution.

16 Q     My question is different.  Do you understand the trustee

17 to have any role in evaluating, vetting or corroborating in

18 any way the contents of the proofs of claim submitted in

19 expedited distribution?

20 A     What I would argue is that when the claimant has to sign

21 under penalty of perjury that that is a vetting procedure.  It

22 has not gotten to the point of Article VII where the trustee

23 would be engaged in a more rigorous process, but if they

24 haven't done that and if they haven't produced the supporting

25 documentation then they aren't even eligible to elect the

1 expedited distribution.

2      Sorry, I don't necessarily agree with the premise of

3 your question.

4 Q    Okay.  I appreciate you trying to understand to agree or

5 disagree with premise.  I am asking factual questions of you,

6 sir.

7      So is it your position that checking to see if there is

8 a signature of penalty under perjury qualifies as fraud

9 detection?

10 A    It's a gatekeeping level.  So if they get past the gate

11 so they can elect the expedited distribution then there is

12 some measure of gatekeeping there.

13 Q    Okay.

14 A    It has not risen to the level of Article VII.

15 Q    You understand those proofs of claim can be signed by

16 others on behalf of the claimant and attorney, for example, or

17 an executor?

18 A    I don't recall, but I will accept your representation of

19 that.

20 Q    Are you aware that attorneys in this case representing

21 claimants have filed proofs of claim under their signature

22 where they have not even spoken directly with the claimant?

23 A    Where they have not spoken directly with the claimant, I

24 was not aware of that.

25 Q    Let's talk about the regular claims allowance process.

1  I think we might just have to agree to disagree whether there

2  is any fraud detection on the proofs -- on the expedited

3  payment.

4       Now as I understand, the first evaluation is that there

5  has been a submission completed and signed under penalty of

6  perjury, as you said, timely submitted, yes?

7  A    Yes.

8  Q    And that there is not previously resolved by litigation

9  or settlement involving all protected parties?

10 A    Yes.

11 Q    So if that person has previously settled a claim for the

12 full amount of abuse, nevertheless it still proceeds if there

13 are other protected parties who didn't settle?

14 A    I think that's fair.

15 Q    Okay.  When you say that's fair do you mean that's

16 accurate or that is fair in a just world?

17 A    It's my -- well I don't mean in a just world.  It's my

18 memory as I sit here.

19 Q    So it's fair upon your (inaudible) not necessarily one

20 way or the other in a just world?

21 A    That is correct.

22 Q    All right.  So we might have people coming forward to

23 seek payment under the TDP even though they have been

24 compensated richly elsewhere at this first stage only?

25 A    Well I wouldn't want to speculate whether they have been

1  compensated richly and it would depend on what the findings of

2  the trustee would be.

3  Q    Okay.  So then we get to this five element test that you

4  talk about in Paragraph 28 of your declaration.

5  A    Yes.

6  Q    And those five elements, the first one is identify the

7  alleged act of abuse.

8  A    Yes.

9  Q    That is, essentially, what happened, asking like what

10 happened, right?

11 A    That is correct.

12 Q    And you say these are among the most important factors

13 considered by defendants?

14 A    Yes.

15 Q    And you say the TDP process enables the settlement

16 trustee to acquire this information and mimics the

17 investigation and discovery phases of litigation relied on by

18 defendants and insurers?

19 A    Yes.  The accumulation of documents, sworn statements,

20 any number of the different things that are mentioned in

21 Article VII.

22 Q    All right.  We are going to talk about the analogies you

23 make to the legal system, but at this point I just want to

24 confirm for you it's your belief that all of that kind of work

25 to investigation and discovery relied on typically by

1  defendants, all that work now is going to be done by staff of

2  the trustee for herself?

3  A     That is correct, yes.

4  Q     And accumulating it, evaluating it, considering other

5  potential views of that information, working it up, all done

6  by staff of the trustee?

7  A     Yes.

8  Q     Staff hired with the approval of the stack, super

9  majority?

10  A     Yes.

11  Q     Now I think you must have heard Mr. Griggs yesterday say

12  he had six people working full time during the time period on

13  and off while Ogletree was handling the defense of the claims?

14  A     I did hear that.

15  Q     And at most there were in the hundreds of claims, right?

16  A     I believe he said that, yes.

17  Q     Not in the tens of thousands?

18  A     That is correct.

19  Q     So in your mind, when you are picturing the trustee

20  doing all this work through staff, how many staff do you think

21  the trustee is going to be able to -- will need?

22  A     I don't know.  I wouldn't want to speculate about that.

23  Q     All right.  Well if you extrapolate it took six to do

24  several hundred are you thinking it will be tens, hundreds of

25  people?

1    A      I honestly don't know, but it would have to be a staff

2    that would be large enough to process the claims.

3    Q      All right.  Did that factor into your analysis, your

4    assumption that the staff will be that big?

5    A      I really wasn't focusing on how big the staff would be

6    to accomplish the task that are contemplated under the TDP's.

7    Q      Okay.  So the second factor is the alleged abuser

8    identification.

9    A      Yes.

10   Q      And that is so they can make a determination if that

11   person had a relationship to scouting?

12   A      That is correct.

13   Q      Are you aware, sir -- I'm sorry, I apologize, I don't

14   mean to speak over you. I do it all the time.  I hear it at

15   home.

16         (Laughter)

17   Q      Are you aware, sir, that there is a high number of

18   proofs of claim that don't include abuser information?

19   A      Well I didn't know what a high number is, but I do know

20   that my understanding is that there were some where people did

21   not remember who the abuser was or the name of the person,

22   that kind of thing.  I don't know what the number is though.

23   Q      Would it surprise you to learn it's in the tens of

24   thousands?

25   A      Not necessarily.  My experience is that a lot times when

1  sexual abuse victims come forward, sometimes decades later,

2  usually decades later well into their adulthood that they

3  often times don't recall the actual name of the person.  They

4  might be able to recall what the position of the person was or

5  what period of their life it was, but not necessarily the name

6  of the person.

7  Q    Okay.  And even if it's not tens of thousands, if its

8  thousands that wouldn't surprise you either, right?

9  A    That wouldn't surprise me, no.

10 Q    Okay.  And it's your expectation that the settlement

11 trustee's staff might do some investigation to evaluate

12 whether the name listed actually was a scout, was involved in

13 scouting at that time, at that location, etc., right?

14 A    That is provided for in the TDP's, yes.

15 Q    More work for that staff?

16 A    Sure.

17 Q    All right.  The next category is that the person will --

18 they may bear legal responsibility.  Is there a connection to

19 scouting including a protected party that may bear legal

20 responsibility?

21 A    Yes.

22 Q    All right.  I want to come back to that one because

23 that's a doozy, but let's talk about the next one which is

24 dates of the alleged abuse and the age of the claimant at the

25 time of abuse.  It's kind of like when did it happen, that is

1  kind of the key concept there?

2  A    That's correct.  That is corroborating information for

3  letters A through C.

4  Q    All right.  So it's also your view then that the trustee

5  is going to go out and evaluate chronology of things,

6  timelines?

7  A    I would say so, yes, to determine whether or not they

8  have provided sufficient information by preponderance of the

9  evidence that it happened at that time, that place with that

10  person.

11  Q    So the same staff is going to run that down?

12  A    Presumably, yes.

13  Q    And you are presuming that for your opinion?

14  A    Yes.

15  Q    Okay.  And then the next one is the location of the

16  abuse.  You said in Paragraph 40 that the location provides --

17  it confirms or, at least, suggests corroborating details

18  concerning the claim and a connection to scouting activity.

19  You said that?

20  A    That's correct, yes.

21  Q    And that is under the idea that if somebody lists a

22  scout place more likely it's true.  Is that (inaudible) the

23  concept?

24  A    The way I look at it is if they are able to identify the

25  location of where the abuse occurred then it's easier to

1  determine whether or not it was a place where scouting

2  activities occurred, whether or not the individual, if they

3  had been able to identify them either by name or description,

4  was a scout leader or volunteer in that location and whether

5  or not the claimant,  himself, was, you know, in a troop, I

6  guess you would call it a scouting troop, that met at that

7  location.  That scouting activities took place at that

8  location.

9  Q     You haven't looked at the proofs of claim in any

10 representative sample, right?

11 A     I have not looked at any of the proofs of claim.

12 Q     So would it be news to you that for that question many,

13 many, many say things like California, Florida and don't

14 provide, you know, an address?

15 A     That would not surprise me.  My experience a lot of

16 times the -- a victim of sexual abuse does not necessarily

17 recall the particulars of the location that they were in

18 especially if they were -- especially if the abuse happened on

19 a trip or in a place that's not where they typically live,

20 their community. I have had that experience many times where

21 victims will say something like this happened in Hawaii on a

22 trip, something like that.

23 Q     Right.  So when you say its corroborating it sounds like

24 what you're saying is if they say it happened at X, Y, Z camp

25 that can help, but they might not be able to and then the

1 trustee will have to try and push further.  Is that what you

2 would expect?

3 A    I think that is possible.  I think a piece of that is

4 that, at least in my experience, many claims that I have

5 worked on you can corroborate to some extent if, for example,

6 in my experience, if there was a priest that took an altar boy

7 on a trip, and they took a trip to a particular place at a

8 particular time, fi the person says, well, this happened in,

9 you know, Idaho or something like that then there could be

10 corroborating information because you would know, well, at

11 that particular time there was a trip to Idaho that the priest

12 took altar boys on or whatever.

13 Q    So this would be another example of work on the plate of

14 the staff of the settlement trustee, right?

15 A    That's correct.

16 Q    Do that kind of work?

17 A    Yes.

18 Q    So let's turn back to the third topic, the protected

19 party may bear legal responsibility.  So this, you say,

20 mirrors the requirement in the tort system -- I'm sorry, let

21 me start over.

22      You say this requirement mirrors the requirement in the

23 tort system that a claimant establish by a preponderance of

24 the evidence that the defendant owed a duty of care to the

25 claimant and breached that duty, right?

1  A     That's what I said, yes.  It is my experience that that

2  is the tort system.  If you look at this, say, that it's the

3  motion to dismiss stage where there may be a motion to dismiss

4  filed, and a trier of fact is determining whether or not there

5  are elements of the claim, it's not an adjudication, let's say

6  negligence, but it is to show that they have been able to name

7  the elements of the cause of action and produce some

8  information that would support that to get beyond that stage.

9  Q     All right.  So that sounds to me like what you're saying

10 is it's a prima facie case analysis, right?

11 A     I would say so.

12 Q     So you are not saying -- what you say here in Paragraph

13 34 is that the claimant establishes -- a requirement that the

14 claimant establish by a preponderance of the evidence, you're

15 saying that -- what I hear you saying now is that it's more

16 that the claimant plead and try to prove by a preponderance of

17 the evidence.

18 A     I think that the general criteria don't say -- are not

19 only pleading that they have to present a preponderance of the

20 evidence for it to be considered an allowed claim to get onto

21 the next stage.

22 Q     A preponderance of a potential, right?

23 A     Right.  Potential liability, may be liability.  It may

24 be potentially liable.

25 Q     Is that a concept in the law preponderance of a

1  potential?

2  A    Well for there to be a finding of, say, negligence a

3  trier of fact, be that a judge or a jury, is being asked

4  whether or not the claimant has or the plaintiff has produced

5  sufficient evidence to meet the standard of a preponderance of

6  the evidence.

7  Q    Right, a preponderance of the evidence; not a

8  preponderance of the potential, right?

9  A    Well the way I read that is that they have submitted

10  enough evidence to the trustee to get past that stage, enough

11  evidence that she would deem it to be a preponderance of the

12  evidence to reach the point where they could go to Article

13  VIII valuation.

14  Q    And the way you say that in Paragraph 38 is that

15  arguably -- it says,

16      "The abuse occurred is a consideration of or potentially

17  indicative of a breach of the duty if the claimant was harmed

18  by abuse causing discernible injury or harm, and such type of

19  harm contemplated in the TDP then all of the considerations of

20  potential legal responsibility including a potential claim for

21  negligence would be present or, at least, potentially

22  present."

23      Is that right?

24  A    That's correct.  That is what I wrote.

25  Q    So that is many levels of potentiality in that sentence,

1  fair?

2  A     Fair.

3  Q     So would you agree with me then these five factors get

4  to questions of who, who did it, what, what happened, when,

5  when did it occur, where, where did it occur, and how, how is

6  the connection to scouting.  That is kind of the gist of those

7  five factors?

8  A     That is correct.

9  Q     And I understand your testimony as well that all of that

10  analysis is going to be developed, and worked up, and weighed

11  with a fair eye to all parties by settlement trustee staff,

12  right?

13  A     The trustee and her staff.

14  Q     The trustee and her staff?

15  A     Yes.

16  Q     And those staff -- okay.  In a legal claim against an

17  institution in the tort system those aren't the five elements

18  -- we will talk about what they are, but would you agree with

19  me who, what, where, when, how are not the five elements of a

20  legal claim?  Like if you look in a (inaudible) or you're

21  studying for the bar the legal elements are not who, what,

22  where, when how, right?

23  A     Well if you're talking about negligence its duty, breach

24  of duty, causation and damages, but that implies what happened

25  and who did it, who had the duty.  If there was harm was it

1  caused by the breach of the duty and what are the damages?  So

2  to me those incorporate notions of who, what, when, how.

3  Q    Right.  Who, what, where, when, how are facts that get

4  plugged into those elements, but those elements are not

5  themselves who, what, where, when, how, right?

6  A    Correct.

7  Q    You have to bring them together?

8  A    That's correct.

9  Q    Okay.  So I am going to move on now to talking about

10  negligence and the elements of negligence.

11      You agreed in your declaration that in the tort system

12  an institution would need to be negligent or, worse, to be

13  held liable?

14  A    Yes.  I believe I did testify to that.

15  Q    Okay.  When you or worse we're talking about reckless or

16  intentional, right?

17  A    That is correct.

18  Q    But typically for these kinds of cases we talk about

19  negligence?

20  A    Negligence would be very rare if an institutional

21  defendant intended a child to be sexually abused.

22  Q    We should all hope.

23  A    That is correct.

24  Q    And you would agree with me that for any claim where it

25  could be established that such occurred there really wouldn't

1  even ever be any insurance anyway, right?

2  A     That is correct for intentional misconduct.

3  Q     And because of that there is never insurance in ordinary

4  policies for the abuser himself?

5  A     That is correct.

6  Q     Right.  So going forward here I'm going to be talking

7  about negligence with that understanding that that is the bulk

8  of the -- the overwhelming bulk, maybe full amount of your

9  expectation of the claims if they were brought in the tort

10  system would focus on negligence, fair?

11  A     Okay.

12  Q     Now are you aware that the bankruptcy plan states that

13  the evaluation of abuse claims under the TDP and the law

14  governing litigation shall -- sorry, let me start over.

15        Are you aware that a plan provides that the evaluation

16  of abuse claims under the TDP's and the law governing

17  litigation in the tort system shall be the jurisdiction in

18  which abuse claimants file the lawsuit, as described in

19  Article XII, or the jurisdiction where the abuse claim could

20  have been brought filed under applicable law.  Are you aware

21  of that?

22             MR. MARTIN:  Can you tell us where you're reading

23  from, Ms. McNally?

24             MS. MCNALLY:  Yeah.  Well, let me get an answer to

25  that question.

1  BY MR. MCNALLY:

2  Q    Are you aware of that, sir?

3  A    I am aware of that.

4         MS. MCNALLY:  Do you need that Ernest?  Do you need

5  that, Mr. Martin?

6         MR. MARTIN: No.  If the witness is fine that's

7  okay.  Thank you.

8  BY MS. MCNALLY:

9  Q    So a takeaway from that, wouldn't you agree, is that

10 choice of law is going to vary potentially by claimant?

11 A    That is correct, I would accept that.

12 Q    And would you agree with me, this is my personal view,

13 choice of law can be a thicket, right?

14 A    It can be.

15 Q    And it can be quite complicated on any given claim let

16 alone 82,000 claims, right?

17 A    I think that is a fair assessment.

18 Q    So is it your expectation, being aware of that

19 provision, that this settlement trustee and her staff are

20 going to be doing a choice of law analysis for 82,000 claims?

21 A    I am not sure I would call it that.  The way I read that

22 was if your abuse happened in New York and so that you have a

23 right to bring a case in New York that they would be looking

24 at New York law as the governing law of that particular claim.

25 Q    So what you did right there that was a choice of law

1 | analysis, right?

2 | A    Sure.

3 | Q    But, you know, there might be other laws just in that

4 | hypothetical you raised; for instance, if the person was

5 | abused in New York, but actually lived in New Jersey there

6 | might be a question, right?

7 | A    There could be a question.  In my experience -- and

8 | actually ironically in New York my experience is that because

9 | there is a tristate area it was not uncommon for a priest to

10 | take -- a priest in a parish in New Jersey to take altar boys

11 | on a trip into New York City, for example, where there might

12 | be abuse.  And so I guess to answer your question I guess it's

13 | possible that it could be brought in New Jersey or New York.

14 | Q    Right. I am not -- I am absolutely not asking you, sir,

15 | to do a choice of law analysis with me right now.  We all

16 | hated that part of law school.

17 |     (Laughter)

18 | Q    I am just asking if you will agree with me that those

19 | are things that a trustee or her staff will have to figure

20 | out.  It might be in that example trustee New York, might be

21 | New Jersey.  It might be, though, in that same situation with

22 | the tristate area and, what's the other state, Connecticut.

23 | Maybe if the abuser lived in Connecticut at the time maybe

24 | Connecticut, right?  Let's go with that, maybe Connecticut.

25 | A    I mean, in my experience, it would be pretty unusual,

1  but at least in the types of claims I work on, more often than

2  not, like in the Catholic context, but I suppose that's

3  possible.  The staff would have to be making that kind of

4  analysis based on what's presented in the materials.

5  Q    Okay.  And the Boy Scouts, themselves, are now based in

6  Texas, are you aware of that, I think we've heard that today?

7  A    I am aware of that.

8  Q    Okay.  So, is there -- there could be an argument that

9  maybe Texas law might apply.  Someone might assert that; is

10  that right?

11  A    They might.  I -- like you said, I don't want to do a

12  choice-of-law analysis.

13  Q    Okay.

14  A    And I agree, I hated that part of law school, too.

15  Q    All right.  Thank you.

16       So, all of that work is going to go back on the plate of

17  the trustee and her staff?

18  A    That's correct.

19  Q    Okay.  And in doing a choice-of-law analysis, as I

20  recall, part of the role is to figure out what (audio

21  interference) see how they overlap and then determine which

22  state (indiscernible), do you recall that?

23  A    I do recall that.  I guess my opinion is that it doesn't

24  seem like it would be that complicated.  To me, it's about

25  where the abuse occurred.

1  Q    Okay.  But you're not an expert on choice of law,

2  obviously, right?

3  A    No, I'm not.

4  Q    Okay.  Now, you'd agree with me, sir, I think, that the

5  general criteria that lists the five things don't expressly

6  refer to negligence?

7  A    I disagree with that.  I think --

8  Q    (Indiscernible.)

9  A    You mean, in terms of using the actual word

10  "negligence" as nomenclature, no, it does not use the word

11  negligence in the general criteria.

12  Q    Right.  And you've stated in your declaration it's your

13  view that they kind of embody, they embody the concepts that

14  underpin negligence, but my question was exactly what you

15  clarified.  It's not mentioned in that list of five, the word

16  "negligence," does not appear?

17  A    That's correct, the word "negligence," does not appear.

18  Q    And the word "negligence" might have been in an earlier

19  version, but in this version of the plan that is before the

20  Court for confirmation, negligence doesn't even appear in the

21  scaling factors by that name, right?

22  A    And when you say, "this current version," do you mean

23  the updated version that was just filed on, I believe,

24  February 15th?  That's what you're referring to?

25  Q    Yes.

1  A      That's my memory.

2  Q      Okay.  So, it is -- it now appears and it used to be

3  listed as an aggravator in a prior version of the plan, right?

4  It was an aggravating factor of negligence?

5  A      The one that I initially opined on --

6  Q      Right.

7  A      -- it did.  I do recall that it was in there.

8  Q      And that has been removed.  And in this version of the

9  plan, it states, there's now an aggravator of 1.5 to 2.0 if

10 there is evidence that a protective party knew or should have

11 known that, one, the abuser had previously committed or may

12 commit abuse and failed to take reasonable steps to protect

13 the survivor from that danger or, two, the prior abuse or the

14 foreseeability or the risk of abuse and failed to take

15 reasonable steps to protect the survivor from that danger.

16 That's now in the TDPs, instead of the word "negligence," as

17 an aggravator, right?

18 A      That's correct.

19 Q      And would you agree with me that that new language, it's

20 in Article 5(c)(2)(d) that that new language is essentially

21 still the idea of negligence?

22 A      Well, I think -- I'm not sure I would totally agree with

23 that.

24 Q      Okay.

25 A      I think, as I look at that, it seems like there's a

1  higher standard, that in order for there to be an aggravating

2  factor applied to that, that, you know, "when knew or should

3  have known" is to a point of if the person's name was listed

4  in the ID files or something of a higher order than what's in

5  the general criteria because, as I read that, it's basically

6  saying, if you're going to -- trustee, and your staff, if

7  you're going to apply an aggravating factor, there needs to be

8  more than just, was, you know, the preponderance of the

9  evidence for who did it, what happened, was there a connection

10 to Scouting.  As I read that, I think there's a higher

11 standard for there to be an aggravating factor; that was my

12 opinion.

13 Q    Okay.  Would you agree with me that what -- that this

14 goes -- that this language goes to the elements of language

15 that relates to duty and foreseeability and reasonableness.

16 That's what we're talking about when we talk about this

17 language, right?

18 A    It's true that foreseeability is a part of the

19 negligence analysis, but in this context, I read that as being

20 something more than merely providing a preponderance of the

21 evidence that there was abuse, that it was committed by

22 someone who was connected with Scouting, and that it, you

23 know, it happened connected to Scouting, and there were some

24 kind of damages.  To me, it's more than that.  It's saying, in

25 order for this to be an aggravating factor, you need to show

1  foreseeability beyond that.

2  Q    Well, it literally says, "knew or should have known of

3  the foreseeability of the risk and failed to take steps."

4  A    That's correct, but that's not required in the general

5  criteria.

6  Q    So, foreseeability -- and you agree with me that

7  "foreseeability of the risk" is a fundamental element of

8  negligence?

9  A    It is.

10  Q    And if you have that basic element of negligence, you

11  would qualify under this scaling factor, under part two --

12  A    Yes.

13  Q    -- or "foreseeability of the risk."  So, that, then, is

14  an aggravator.  This basic element of negligence is an

15  aggravator?

16  A    Yes, but it's not mentioned in the general criteria, so

17  I saw it as being something about a greater amount of

18  knowledge than, merely, that it happened and that it was --

19  and it had a connection to Scouting.

20  Q    Okay.  So, merely, that it happened and had a connection

21  to Scouting, in your view, is like, is a baseline?

22  A    Right.  That might get you past a motion to dismiss, for

23  example.

24  Q    Okay.  But it's not a mitigator.  There's nothing in the

25  base -- in this statement here that refers to mitigation, for

1  say, no evidence or poor evidence on foreseeability, right?

2  It's not in the plan.

3  A     It's listed as an aggravating factor.

4  Q     Okay.  So, when we're talking now about foreseeability,

5  that connects up with whether someone acted reasonably, right?

6  A     Yes.

7  Q     And in the tort system, to prevail -- now, I just made

8  this whole big fuss about choice of law, so when I'm talking,

9  now, about the elements of claims, I'm talking, like, the

10  general law, recognizing, as a backdrop, that it will vary

11  from place to place to place, fair?

12  A     Fair.

13  Q     Okay.  And I'm not taking what you say to be -- I'm

14  sorry, my personal view -- your statements are not intended to

15  be representing to the Court or anyone that the law is uniform

16  across the board on these topics, right?

17  A     That's correct.

18  Q     Okay.  So, we're just going to speak generally here.

19  Generally, in the tort system, on a claim of negligence, the

20  Plaintiff would have to prove on a preponderance of the

21  evidence that the Defendant acted unreasonably, right?

22  A     I think that's fair.

23  Q     And you acknowledge that there are some cases where

24  abuse occurred in the context of Scouting, but the Defendant

25  did not act unreasonably?

1  A    I'm sorry, could you repeat that.

2  Q    You acknowledge that there may be some cases where abuse

3  occurred in the context of Scouting, but the Defendant did not

4  act unreasonably?

5  A    Yes, that's correct.

6  Q    And, in fact, in the work that you do for your clients,

7  you see that on a regular basis?

8  A    I do see that on a regular basis.  We, nevertheless,

9  settle, I would say, most of those claims, even though it

10 appears as though there was no unreasonable behavior.

11 Q    Sure.  We'll talk about -- and I absolutely promise you

12 that we will get to the question of about what drives

13 settlements, what factors you consider, but right now, what

14 I'm saying -- in the role of your own consent to that process,

15 right now, I'm just saying, as a principle -- as a factual

16 matter, it happens that there are cases where there was, the

17 Defendant doesn't act unreasonably, even though the abuse

18 happened in the context of the organization?

19 A    I think that's fair.

20        MR. MARTIN:  Your Honor, if I may, at some point,

21 if we could take a final five-minute break, that would be

22 great.  Thank you.  I don't want to interrupt your line of

23 questioning, but at the appropriate time.

24        THE COURT:  Yes, I was thinking we're about there.

25        Ms. McNally, is this a good time?

1              MS. MCNALLY:  Sure.  Any time is fine.

2              THE COURT:  Okay.  Let's take 10 minutes and we'll

3    come back.  Thank you.

4              MR. MARTIN:  Thank you, Your Honor.

5              MS. MCNALLY:  Thank you.

6         (Recess taken at 11:56 a.m.)

7         (Proceedings resumed at 12:10 p.m.)

8              THE COURT:  Okay.  We're back on the record.

9              Ms. McNally?

10             MS. MCNALLY:  Your Honor, before we resume, would

11   you -- would it be possible to get an update on the conflict

12   issue?

13             MR. MARTIN:  Yes, so, I'll go ahead and report.

14             So, at the break, Mr. Burnett and I were talking

15   about what he needs to do.  So, he's going to need to make

16   some calls and given that we've only had a short period of

17   time to do it, we'll do that at the lunch break and we'll make

18   sure that we talk to the people that we need to and then

19   report back to Your Honor.

20             THE COURT:  Okay.  Thank you.

21   BY MS. MCNALLY:

22   Q    Well, if it's all right, then, Mr. Burnett, I would like

23   to proceed with our discussion.

24   A    Yes.

25   Q    Okay.  Thank you.

1       So, I think where we left things were that it -- there

2  were certainly times -- it's possible that there were

3  situations -- terrible question right off the bat.

4       It's possible there will be cases in which abuse

5  occurred on the Boy Scouts' watch in which the Boy Scouts did

6  not breach any duty?

7  A    It's possible.

8  Q    Okay.  And the question of what is reasonable relates to

9  foreseeability, right?

10  A    Yes.

11  Q    Okay.  It's possible that even if a Scout was abused by

12  someone associated with Scouting in the context of Scouting,

13  that abuse would not have been foreseeable; that's possible?

14  A    It depends on what you mean, because in my experience in

15  my work, there's often time when there was no indication that

16  the perpetrator was a bad actor and so, one could say that

17  there was no foreseeability that that individual would do it;

18  however, as a general matter, especially over time as society,

19  in general, becomes more and more aware of sexual abuse and

20  some of the red flags of abuse and that kind of things, on a

21  regular basis, I'm involved in cases where there's an

22  allegation that even if the individual who perpetrated the

23  abuse was not a known bad actor or had not tripped any of

24  those concerns, that there may have been an issue of

25  foreseeability that abuse could occur and that could speak to

1  issues about policy and procedures and that kind of thing.

2  Q    Okay.  And I think we touched on, just now, a standard

3  of care question, and we'll get to that.  But I'd like to,

4  right now, look at your deposition at page 148.

5        And on page 148 --

6  A    Excuse me, am I supposed to have it on the screen?

7  Q    It'd be nice -- if you have the deposition in front of

8  you, you can just pull it up or you can just flip to

9  page 148.  I can't get it on the screen right now.

10  A    I don't have a copy of the deposition transcript.

11  Q    Okay.  There we go.  It's on the screen.

12  A    There it is.

13  Q    All right.  And starting at line 1 on page 148:

14        "It's possible that even if a Scout was abused by

15  on employee or a volunteer associated with Scouting in the

16  context of Scouting and that the occurrence of the abuse would

17  not have been foreseeable to the Boy Scouts, right, that's

18  possible?"

19        And your answer there was simple, "I think it's

20  possible, yes."

21        Did I read that correctly?

22  A    You did.  I think I stated that a few moments ago, as

23  well.

24  Q    Okay.  Now, nothing in the TDPs expressly require the

25  settlement trustee to assess whether the Defendant acted

1  reasonably, right, expressly?

2  A    I'm so sorry.  Could you repeat that again.  I just

3  received a hard copy of that, of the deposition transcript.

4  Q    Oh, great.  That'll be helpful if we need to do that

5  again.  Maybe we won't.

6  Here's my question:  Nothing in the TDPs expressly requires

7  the settlement trustee to assess whether the Defendant acted

8  reasonably, right?

9  A    I disagree with that because when the general criteria

10  says that they may be potentially liable, it to me, that

11  incorporates, at least on some level, analysis of whether or

12  not there was a reasonable, you know, reasonable behavior on

13  the part of the Boy Scouts.

14  Q    Sir, do you understand what the word "expressly" means?

15  A    I do.

16  Q    The TDPs do not expressly require the settlement trustee

17  to assess whether the Defendant acted reasonably, correct?

18  A    You mean, in terms of using the word "reasonably."

19  Q    Right.

20  A    I take your word for it.

21  Q    Okay.  You know, you mentioned before the break,

22  something about the aggravator points and the language.  We

23  should just look back at that for a second, that the "knew or

24  should have shown, previously committed" remember that

25  language that we talked about?

1  A      Yes.

2  Q      And you said your understanding is that was written in

3  there so that if there's a reference to the abuser files,

4  known as the ID files, it's for those kinds of cases; that's

5  what it's meant to get at?

6  A      I think it could be broader than that, but, yes, that's

7  what came to mind first of all.

8  Q      It could be broader than that to include things that are

9  less obviously naming an individual, right?

10 A      I guess.  So, what I had in mind was that their name

11 might not be in the abuser files, but they could be exhibiting

12 behavior that one could argue, should have been red flags to

13 other people in the troop or the organization or the

14 volunteers, agents of the Boy Scouts.

15 Q      So, that's more just -- more what we were just talking

16 about, about being reasonable, right?

17 A      Well, in historical context, I would say that's an

18 element of it, but it could be.

19 Q      Okay.  And you're aware, aren't you, sir, that the prior

20 version of the plan, the one that you first provided an

21 opinion on, had in this section, a specific reference to the

22 ID files and that reference was deleted in this version,

23 right?

24 A      I believe that's correct.  I take your word for it.

25 Q      For example, it said in the prior version, when it

1  described evidence of negligence, a protected party, for

2  example, inclusion of the perpetrator in the ID files,

3  volunteer screening database for abuse reasons.

4       That example was deleted from this section in the

5  version of the plan that's under consideration by the Court.

6  Are you aware of that?

7  A    Yeah, I'm not sure what the import of that is, though,

8  because it's something that could still be considered by the

9  trustee.

10 Q    So, one import, would you agree with me, sir, is that

11 that deletion was an intent to signal that the scope of that

12 provision shouldn't be so limited as to claims or someone is

13 in the ID files, right?

14 A    I think that's fair.

15 Q    Okay.  Thank you.

16      And when you say that's fair, you mean what I said was

17 something you agree with?

18 A    That's correct.  Sorry.

19 Q    Okay.  So, that's fair.

20      Now, Mr. Griggs testified that the standard of care

21 varied over time, right?

22 A    Yes.

23 Q    And that is a concept you just referenced in your prior

24 answer?

25 A    That's correct.

1  Q     So, now, there's nothing in the TDP that specifically

2  allows the trustee to disallow a claim if the Boy Scouts acted

3  reasonably in the time period in question, right?

4  A     I believe that's correct.  As a practical matter, at

5  least in my world, in the many claims that I work on, that is

6  something that is a lot of people that would be in a

7  decision-making role unfortunately reflect these claims

8  through 2022 understanding vision, even though, at that time,

9  that may not have been a standard of care --

10 Q     Uh-huh.

11 A     -- for the complexities of the claims of the sexual

12 abuse arena.

13 Q     Right.  And there's also something known as a hindsight

14 bias, as well, right?

15 A     That's correct.

16 Q     And those two things are facts that Defendants actively

17 work to defeat when presenting defenses to these claims?

18 A     As a practical matter, yes, although, I will tell you in

19 many conversations with defense counsel and TPA, third-party

20 administrators and insurers, when there's discussion about

21 that on a regular basis, there's basically a consensus that

22 trying to draw those distinctions can appear to be, if

23 something were to go to trial, it can appear to be a splitting

24 of hairs and an attempt to avoid responsibility.  So, that's

25 the kind of discussion that we're having.  We're trying to

1 assess the nature of the claim, the defensibility of claims,

2 the value of claims, that kind of thing.

3 Q     You just mentioned one of the things to avoid is

4 appearing not to take responsibility; am I right about -- did

5 I hear you correctly?

6 A     Yes, you did.

7 Q     So, that factor about the importance of being seen as

8 taking responsibility is certainly something that your

9 clients, in mutual -- of pastoral organizations, would care

10 very deeply about, right?

11 A     Well, in terms of their shareholders, I think that's an

12 accurate statement; however, I think it goes beyond that.

13        It's part of the analysis of it.  You know, there's been

14 discussion about claims that might have gone to trial and part

15 of what the discussion is, is if you -- regardless of whether

16 it's a shareholder of National Catholic, that if there's an

17 attempt make it look like, well, actually, technically, at

18 this time, we couldn't have been expected to know that, at

19 least the consensus is -- is that that would not play well to

20 a jury.

21 Q     And that might not also play well to, for example,

22 parishioners and donors, right?

23 A     Yeah, it's a really interesting question because, again,

24 part of my experience is, at least in the Catholic context, it

25 is often the case that there are parishioners who are very

1  supportive of accused perpetrator priests and so they

2  actually, often times, do draw those distinctions.    They're

3  accused of making excuses for the perpetrator and I,

4  personally, don't think that's their intent, so much as it is

5  to try to support the perpetrator.

6       So, that's a topic of conversation, because when a claim

7  comes forward, often times now, bishops will say to

8  parishioners, please do not try to publicly discuss this

9  because it could cause more trauma to the person who was

10 abused or who has alleged that they were abused.

11 Q    Okay.  And I think we're getting quite far afield from

12 your views in this case, but just to close out this point, is

13 it fair to say that such questions as to what will cause

14 trauma to the -- or what will cause, say, dissension or

15 discord among parishioners and related issues are just not

16 part of the legal elements of negligence, right?

17 A    I think that's true that parishioners are probably not

18 making that kind of an analysis.

19 Q    The court system does not weigh as a factor, such

20 things, whether certain things will cause discord among the

21 parishioners, the customers, the members, right?

22 A    No, there's --

23 Q    That's a separate legal analysis?

24 A    That's correct, but there's a concern that a jury may

25 take that view, that there's an attempt to avoid

1  responsibility.

2  Q    So, another element of negligence is, or two related

3  elements, are damage and causation, right?

4  A    Yes.

5  Q    In the tort system, the Plaintiff in a negligence case

6  must prove, bears the burden, to show that the conduct

7  proximately caused the claim to damage.

8         We agree on that?

9  A    Yes.

10 Q    And if a Defendant can show that another completely

11 unrelated event in a person's life explains the damage, that

12 evidence can bear on causation and damage, right?

13 A    That's correct.

14 Q    So, the TDPs, though, do not provide for the defense

15 side of the story to work up and evaluate alternate causation

16 theories, right?

17 A    Well, as I look at the mitigating scaling factors, I

18 think that that's taken into account; for example, whether

19 other responsible, non-protected parties had some role in a

20 cause of it, whether there was a family member that may have

21 caused abuse, as well.  That kind of thing.  So, I think that

22 there's a place for that topic.

23 Q    All right.  I would put -- for my question, I'm going to

24 put those types of things in the category of, like, joint

25 cause -- like additional people involved in that circumstance.

1    What I'm talking about is something completely

2  unrelated:  a violent stranger attack that happens years

3  later, a family disaster, things of that nature, completely

4  unrelated to the abuse, there's nothing that might explain

5  some portion of the claimed damage.  There's nothing in these

6  TDPs that provide for that to be worked up, right?

7  A    Well, what I said a number of times in my reports, and I

8  believe it's in my declaration, that courts have kind of

9  universally held that when an adult has some form of sexual

10  contact with a child, that it is inherently and immediately

11  harmful to the child and so, that is a cause of damages or

12  harm.

13  Q    Certainly.  And I want you and anyone listening who

14  hears this to understand I am not saying that sexual abuse

15  does not cause harm; I'm not saying that, okay?

16  A    Yeah.

17  Q    My point is, I think you would have to agree with me

18  that even though that is true, it does not automatically

19  explain all harm that happens in the course of a person's

20  life.  It is conceivable that other things, other tragedies

21  may befall a person --

22  A    It is the --

23  Q    -- completely unrelated, right?

24  A    It is conceivable.

25      As a practical matter, the claims that I work on, on a

1  regular basis, the allegations are that all of the harm and

2  the difficulties that a victim of sexual abuse have had in

3  their life are related to the harm --

4  Q    Sure.

5  A    -- to the abuse.

6  Q    Yes, I absolutely understand those are the allegations.

7       And my question is, it is possible that even despite

8  what a person thinks, that there are, in fact, other things

9  unrelated that cause other damage.  Somebody has a terrible

10  car accident.  Someone, you know, a violent attack by a

11  stranger.  Lots of things could happen and cause harm that, in

12  a normal case, the defense might point to and say, This

13  also -- this also explains some of the damage here.

14  A    It is conceivable, as you say.  That may have been or

15  could have been caused or that some portion of the damages may

16  have been caused by other events.

17  Q    Okay.  And so, now, we agree on that.

18       What I'm saying here is that the TDPs do not provide,

19  expressly, for anyone to work that up, right?

20  A    By "work that up," you mean the kind of case that a

21  Defendant would make to demonstrate the issue of damages?

22       I think that the materials that are received by the

23  trustee -- I'm not sure that I necessarily agree with that,

24  because I believe that the materials that are received and

25  that these showings that the claimant would have to make would

1   provide that information.

2   Q    Okay.  So, let's make my hypothetical somebody has a

3   horrible car accident and loses -- had a traumatic brain

4   injury, affects their personality for the rest of their life.

5   It is your expectation that somehow that fact would be

6   reflected in the claim materials presented by the claimants or

7   are you saying that the trustee would do a separate -- a

8   trustee staff approved by the STAC would do a separate

9   investigation of that person's life, uncover the fact of the

10  brain injury, examine the impact of it, and somehow evaluate

11  it on her own?

12  A    Well, I haven't seen the proofs of claim, but I could

13  certainly imagine that that could be in there.  I don't know.

14  Q    Okay.  It's not expressly listed in the TDPs, right?

15  A    That is correct; it is not expressly listed.

16  Q    Okay.  Now, Mr. Griggs talked yesterday, and I'm sure

17  this is familiar to you as a lawyer, that there

18  are affirmative defenses that are presented by Defendants in

19  these cases?

20  A    Yes.

21  Q    One is a statute of limitations?

22  A    That is correct.

23  Q    And statute of limitations varies by state.  That's the

24  ultimate choice-of-law question in these cases, or a big one,

25  right, statute of limitations?

1   A      Yes.

2   Q      Now, would you agree with me, sir, that will statute of

3   limitations, itself, is not decided, at this, necessarily, for

4   one and for all at the state level?

5   A      (No verbal response.)

6   Q      Let me be more clear in my question.

7   A      Okay.

8   Q      Now, we'll put aside cases states where there's a

9   reviver (sic), come one, come all, anybody can file a claim,

10  right?

11  A      Yes.

12  Q      And let's put aside cases where they -- the state is

13  absolutely clear, the door is closed, no circumstance that you

14  can go through.  So, we'll put the two extremes to the side.

15  A      Uh-huh.

16  Q      For those states in the middle, you would agree with me,

17  sir, that over time, there has been changes and reforms in

18  statute of limitations for childhood sexual abuse, right?

19  A      Yes.

20  Q      And in many states, the period, the lookback period has

21  been extended over time through legislation?

22  A      That's correct.

23  Q      And the trend used to be a fairly short limitations

24  period, but then if many states, it has been extended, right?

25  A      That's correct.

1    Q    And in many state, there's no provision that that change

2    is retroactive, right?

3    A    I'm not sure I would say that definitively.  I believe

4    that that's generally correct.

5    Q    So, in evaluating a statute of limitations for any given

6    claimant, not only do you need to know what the law is in that

7    state, you actually need to know what the law was at the time

8    of the events and evaluate at that level, at that granular

9    level, agree?

10   A    Often times, that's the case, yes.

11   Q    Often times.

12        And your understanding from the TDPs, though, is that

13   the states are just flopped into different categories of

14   shades from black to white.  There's no Ohio 1960 to 1964 or

15   (indiscernible) 1968 to whatever.  It's just Ohio, right?

16   A    Yes.  I'm not sure that that would preclude the kind of

17   statute of limitations or limitations analysis that would go

18   on, that would be undertaken by the trustee and her staff.

19   Q    Okay.  Great.

20        So, this trustee, then, now has the job of figuring out

21   what state law applies for each person and then once she

22   understands the right state to apply, going back and using

23   historical legislative research of some kind to figure out

24   what the law was that would have applied at the time and

25   applying that factor; is that how you think this works?

1    A       I think it could, yes.

2    Q       Do you think that's what the provision of all these

3    colored states is doing?

4    A       Well, I think that beyond the colored states, I mean,

5    the colored states categorize, you know, gray one, gray two,

6    they categorize what the nature of the, you know, the status

7    of the statute of limitations bar would be in that particular

8    state.

9           But to your question about whether or not there would be

10   a historical analysis of what the statute of limitations may

11   have been previously, I don't see the categorizing those as

12   gray one or gray two would preclude that kind of analysis.

13   Q       Okay.  So, we could have an industrious trustee do that

14   work, as well?

15   A       We could, yes.

16   Q       Okay.  And another affirmative defense Mr. Griggs

17   mentioned was that the individual was not an agent, a servant,

18   volunteer of the Boy Scouts, right?

19   A       Yes.

20   Q       And your expectation is the trustee would work that up

21   and evaluate?

22   A       I think that, yes, that falls into the categories of the

23   general criteria of the alleged abuser and whether there was a

24   connection to Scouting.

25   Q       That was the "who" question of the five questions, okay.

1  A    That's correct.

2  Q    You're also aware that some states have charitable

3  immunity caps?

4  A    I am aware of that.

5  Q    So, the trustee would have to do some legal research --

6  once the whole choice of analysis thing is done, then it will

7  be a separate question on whether charitable immunity cap

8  would apply, if it applies?  If it applies?

9  A    Yes.

10  Q    You know, and back to choice of law, when you have

11  yours, choice of law, is -- what if more than one state's law

12  applies, how does the trustee decide which one to apply?  It

13  says, "could have been brought."

14      What happens?

15  A    Well, I think that the trustee and her staff would have

16  to do that analysis.

17  Q    Yeah, and what would she do?

18  A    Well, it would depend on the state and it would it

19  depend on the facts of each case, whether or not more than one

20  state's law applied and what the interplay of those various

21  forms of choice of law issues are.

22  Q    Right.  So, in the tort system, when there are competing

23  states, the judge has to pick one.

24      But the deal -- the provision here says the law that

25  governs is the law where it could have been brought.  And it

1  doesn't -- would you just agree with me, then, that it doesn't

2  say how the trustee breaks the tie if there are multiple

3  states that could apply under the provisions of this plan?

4  A    I don't recall seeing that.

5  Q    You don't recall seeing anything that explains what the

6  trustee should do?

7  A    That's correct.

8  Q    Okay.  So, another defense is -- relates to

9  apportionment of liability among potentially responsible

10  parties, right?

11  A    That's correct.

12  Q    And Mr. Griggs was asked about this question, I mean,

13  asked about this topic and he said -- the question was -- and

14  I'll just refresh you:

15      The portion of liability that was settled and that was

16  attributable to the church-related activities, the idea was

17  that idea -- I'm sorry -- the idea was that portion ought to

18  be paid by the Church and not BSA.

19      And Mr. Griggs changed that answer a little bit and he

20  said, I would kind of state it in the negative, the idea was

21  that BSA should not have to pay for the conduct that it's not

22  potential for.

23      Do you recall that testimony when you were watching it

24  in the other room?

25  A    I do recall that.

1  Q     So, that's the idea.

2        Now, putting aside things about protective parties and

3  channeling, et cetera, if there's a completely outside or

4  third party, additional potentially responsible party here,

5  your expectation would be that the Boy Scouts don't have to

6  pay for the portion responsible -- the portion that someone

7  else is responsible for, right?

8  A     They shouldn't have to pay for that.  That doesn't mean

9  that the way it plays out, that it's always going to result in

10 finding, you know, in that determination.  On a regular basis,

11 I work on claims that will involve both, a religious order and

12 a church, let's say --

13 Q     Okay.

14 A     -- and a diocese, and when one looks at the

15 proportionate share of liability or, at least the position

16 that I'm taking, I might say, well, this religious order

17 priest, they told the bishop that he was good to go, but they

18 knew that he wasn't, but it happened on the bishop's watch.

19       So, there's kind of an analysis being done and a

20 determination and negotiation often times about what share of

21 liability each of those entities would have in that particular

22 case.

23 Q     Uh-huh.  Uh-huh.

24 A     That doesn't mean that the bishop will be able to say, I

25 have no liability.

1  Q     Right.  And it's your experience, isn't it, that

2  whoever's the Defendant at the time is the one that the

3  Plaintiff views as the real responsible party?

4  A     I think so.  That's why they --

5  Q     (Indiscernible) often times?

6  A     That's why they name that person as a Defendant.

7  Q     And by the way, in these cases, where someone has

8  previously settled, there's nothing to -- it might have been

9  that in that prior settlement with a different protective

10 party or a different responsible party, the Plaintiff made the

11 claim in that case that that other entity was the true party

12 in responsibility, right?

13 A     You mean at trial, for example?

14 Q     Uh-huh.  Uh-huh.

15 A     I mean, it's not uncommon for there to be an empty chair

16 at trial where there was a prior settlement, that that

17 Defendant is no longer a part of the case.  But a trier of

18 fact could determine, for example, that that entity bore more

19 responsibility than the Defendant that remains in the case.

20 Q     Do you know of any mechanism in this plan at all that

21 would allow the trustee to investigate and determine whether

22 claimants here have previously filed claims in other, for

23 example, diocese in bankruptcies and obtained settlements,

24 confidentiality from those trusts?

25 A     My understanding was in the initial gatekeeping, in the

1   proof of claim, I believe it is, that there is a question

2   about whether or not there have been other settlements.

3   Q     Right.  I understand and maybe we just have a difference

4   of opinion about what counts as testing, but is there any way

5   that could be tested, other than asking the claimant, himself?

6   Is there any way that a trustee could go to the various -- the

7   other diocese bankruptcies and say, Here's my list of 88,000.

8   Can you double-check for me, is anything on that list?  Is

9   there a mechanism for that?

10  A     I think there could be as part of the investigation and

11  looking at third parties and materials that are presented.

12  And as a practical matter, if it's a Catholic entity, bishops

13  have committed themselves to no confidentiality for the last

14  20 years or so.  And so, if that claimant wanted to, they

15  could make public the settlement that they received there or

16  if it was something that was tried and there was a jury

17  verdict, for example, then that would be a matter of public

18  record.

19  Q     You know, so, certainly, the claimant could decide to

20  disclose that and certainly there could be verdicts.

21        I am asking about the confidential trust distributions

22  in other bankruptcies that don't have any kind of

23  information-sharing component.  Are you aware of any mechanism

24  that would actually permit, under her fraud- prevention hat,

25  the trustee to obtain cross-check lists without relying on the

1 claimants?

2 A    I don't know of anything that would preclude her from

3 doing that.

4 Q    Well, are you aware of the confidentiality restrictions

5 in the other bankruptcies?

6 A    Well, if there's a confidentiality restrictions, then,

7 obviously, she wouldn't have access to that information,

8 necessarily --

9 Q    Right.

10 A    -- but that doesn't preclude her from trying to obtain

11 whatever information that she can that would not be cloaked

12 with that confidentiality.

13 Q    Right.  Sure.  Sure.  The claimant could disclose.

14 Okay.

15      Let's talk about some of the -- about the analogies.

16 You make some analogies in your report or your declaration.

17      And one analogy that you make is that this is similar to

18 ADR or arbitration, right?

19 A    Yes.

20 Q    And you say this in both your declaration and your --

21 your declaration and your -- one of your reports.  It's in

22 your declaration at paragraph 73:

23      These opinions are based on an unfounded and somewhat

24 provincial belief that only the adversarial nature of the

25 common law system ferrets out the truth and protections to the

1  Defendants and their insurers.

2        Do you see that?

3  A    I do.

4  Q    Is that your language?

5  A    It is my language.

6  Q    You find the court system provincial --

7  A    I don't find the --

8  Q    Sorry.  Somewhat provincial?

9  A    I don't find the court system somewhat provincial.

10       I think what I was referring to there is, I think that

11 kind of this notion that was being advanced, that unless it

12 isn't part of an adversarial system, that there will not be

13 the accumulation of information and evidence that would be --

14 I guess, that you could trust to resolve these claims.

15       There are all kinds of other measures or means to arrive

16 at decisions, to accumulate information and evidence that are

17 not part of an adversarial system, and one of those is

18 arbitration.

19 Q    Okay.  Now, let's talk about arbitration.  Just

20 generally, ADR, I'm going to refer to like any kind of non-

21 court system, it might be arbitration, it might be mediation,

22 it might be something else like just, I don't know -- I don't

23 even know what the other categories are, so let's just say

24 those two.

25            A core premise of ADR is it's consensual in almost

1  all circumstances, right?

2  A    That's correct.

3  Q    I apologize.  My dog is barking right here.  Just one

4  second.

5        MR. MARTIN:  I think he's objecting.

6     (Laughter)

7        MS. MCNALLY:  He does not consent.

8     (Laughter)

9  BY MS. MCNALLY:

10  Q    Okay, it's a consensual process.  And, I mean, putting

11  aside, like sometimes there's mandatory mediation in small

12  claims court or something, that's not what we're talking

13  about.  Okay.

14        Now, in mediation, in mediation, one of the

15  bedrocks of mediation is that mediation requires consent of

16  the parties to reach a deal; right?

17  A    That's correct.

18  Q    And then binding mediation is an oxymoron?

19  A    That's correct.

20  Q    Okay.  And the core premise of arbitration is at least

21  that the parties consent to adjudication with limited recourse

22  rights by someone outside the judicial branch; right?

23  A    That's correct.

24  Q    And in fact this is an area of quite contested Supreme

25  Court case law on what qualifies and constitutes consent to

1 arbitration; right?

2 A     I believe that is true.

3 Q     And I would say, overall, the trend has been for courts

4 time and time and time again reinforcing the concept that

5 arbitration cannot be foisted on parties who don't consent to

6 arbitration?

7 A     Is that a question, you're asking me that?

8 Q     Yes, that's my question.

9 A     I'll take your word for it.  I'm not intimately familiar

10 with all of that case law.

11 Q     Okay.  Now, your website has some interesting language

12 about ADR that I'd like to talk about and it says, "Proponents

13 of alternate dispute resolution" -- why don't we call it up,

14 so we can just look at it.  It's nice to look at something

15 besides faces.  No comments on your face, I didn't mean to

16 suggest anything there.

17             MS. MCNALLY:  Let's see.  If you scroll down, go

18 down to the next line.  Keep going.  Go lower.

19 BY MS. MCNALLY:

20 Q     On the page, the website page, it's abuse, slash,

21 claims.  So I think --

22             MS. MCNALLY:  -- is there another page there?

23        (Pause)

24             MS. MCNALLY:  Keep going.  That's it.  There,

25 there, that's it.

1  BY MS. MCNALLY:

2  Q    RAD.  RAD, which refers to resolution to avoid dispute.

3  A    That's correct.

4  Q    "Proponents of alternative dispute resolution, ADR,

5  utilize it as a cost-effective method to resolve disputed

6  claims; however, alternative dispute resolution presumes the

7  existence of a dispute, it need not.  ADR typically is

8  premised upon the existence or expectation of discord."

9         It says that, right?  I read that correctly?

10 A    Yes, you did.

11 Q    And then you go on to say, "Burnett Risk Control

12 International seeks to engage in RAD, a resolution to avoid

13 dispute."  That's in the top of the next sentence --

14 A    That's correct.

15 Q    -- the next paragraph.  Okay.

16        So what I take from this is, in my view, at least,

17 a laudable goal of mutual -- a mutually agreeable process that

18 kind of puts to the side dispute and adversity; is that right?

19 Is that fair?

20 A    That's the aspiration.  It's difficult because people

21 who have been sexually abused oftentimes, understandably, have

22 some measure of antipathy toward the institution that their

23 perpetrator worked for or was an agent of, but that is the

24 aspiration, that there can be an engagement between the

25 institution and the individual who was abused.

1  Q     And so that's your paradigm, that's your -- your

2  laudable paradigm in the work that you do at Burnett Risk --

3  A     That's correct.

4  Q     -- Control International?  Okay.

5         And it's fair to say that that's sort of a lens

6  that you look at this work; right?

7  A     Well, in the work that I do when I'm resolving claims,

8  it is.  I try as much as possible to the stakeholders involved

9  that it doesn't have to be an adversarial dispute, that

10 there's been a terrible, tragic thing that's happened and if -

11 - especially when it's very clear that it did happen -- that

12 if the institution takes some responsibility and is apologetic

13 and attempts to atone in some way, that that will hopefully

14 lead to at least a more -- a more benevolent paradigm within

15 which to resolve the claim.

16 Q     Right, excellent.  Okay, thank you.

17        And, without sounding -- you can take that off the

18 screen -- without sounding, you know, cold-hearted, is it fair

19 to say that insurance policies, when written, don't have as

20 part of their paradigm such concepts?

21 A     That's correct.  And when I was at Ward Vessel

22 representing London on a regular basis, I had that kind of

23 conversation with insureds and their defense counsel that,

24 especially as a Catholic, I thought it was very, you know,

25 commendable that they were making an effort to do that and

1  that maybe, you know -- so, for example, they might have

2  provided counseling from the get-go when someone came forward

3  and they would seek coverage for that.  And my response to

4  that was that I believed, personally, that that's exactly what

5  you should be doing, but under the terms and conditions of the

6  contract of insurance that that's not an insurable event.

7            So I agree with you on that.

8  Q    Okay.  Thank you.

9            All right, so let's go back to the analogies.  You

10 said that proof of claim is like a complaint; am I right about

11 that --

12 A    Yes, you are.

13 Q    -- that rough analogy?

14           So in -- now, I want to think about that.  Now, a

15 complaint -- putting aside pro se claims -- in a complaint,

16 every pleading -- not just complaint, but every pleading needs

17 to be signed by represented parties, signed by counsel; right?

18 A    Yes.

19 Q    And that counsel has ethical obligations, duties of

20 candor, to the court and opposing counsel; right?

21 A    That's correct.

22 Q    And they also fall under the rules of the court, in

23 federal court, Rule 11 -- and that's a shorthand for other

24 state law as well, Rule 11; fair?

25 A    Yes.

1  Q      And Rule 11 requires that all representations are made

2  after inquiry reasonable under the circumstances; right?

3  A      That's correct.

4  Q      Not just by the party, but by the lawyer herself?

5  A      That's correct.

6  Q      And also that it's not for an improper purpose; right?

7  A      That's correct.

8  Q      And that the claims are warranted by existing law or

9  non-frivolous argument for extension of the law?

10 A      That's correct.

11 Q      And the factual contentions have evidentiary support or,

12 if specifically so identified, will have evidentiary support?

13 A      And I believe that that's included in the proof of claim

14 that has to be signed and supported by -- as it says in the

15 TDPs, supplemented by evidence and information or documents,

16 that kind of thing.

17 Q      Okay.  You agree with me those are the requirements of

18 Rule 11?

19 A      Sure.

20 Q      And those obligations run to counsel in addition to

21 parties?

22 A      Yes.

23 Q      And there is no provision in Rule 11 -- I mean -- sorry

24 -- there is no provision in the TDPs for counsel, with his or

25 her own obligations to the parties, the trustee, or anyone

1  else, to do such type of verification; right?  There's no one

2  Rule 11 certification element to the TDPs?

3  A     Well, when the claimant fills out the 12-page proof of

4  claim and signs it under penalty of perjury, and supports the

5  claim with supplemental information and materials to support

6  what they're alleging, then I think that that -- I think that

7  that contemplates similar things.  Is there something

8  mentioned about Rule 11?  No.  But do I think that it's

9  something akin to a pro se complaint?  Yes.

10  Q     Right.  Okay.  Now, you understand that there's such a

11  thing as a verified complaint in this world?

12  A     Yes.

13  Q     A verified complaint is one signed under penalty of

14  perjury?

15  A     Yes.

16  Q     And, even in those circumstances, if a party is

17  represented, that party must have counsel sign -- submit under

18  the Rule 11 certification; right?

19  A     Yes, but in this situation they're not going to have

20  counsel in the process.  The trustee will be accumulating all

21  that information, as opposed to an advocate that is making

22  those assertions.

23  Q     Sir, you -- it certainly is not news to you that, of

24  these 80-plus-thousand claimants, the overwhelming majority

25  are represented by counsel?

1  A     Yes, but they're not part of the process, the TDP

2  process.  It's not like they're going before the trustee and

3  advocating for a particular position in the TDP process.

4  Q     And those lawyers who aren't appearing, but are

5  representing a party, are going to be taking 33 to 40 percent

6  in most cases of the ultimate award, you're aware of that as

7  well, this isn't news to you?

8  A     I take your word for that.

9  Q     Okay.  And they do not have to certify with all of the

10 obligations of Rule 11, that's my simple point --

11 A     They do not.

12 Q     -- do you agree?  Okay, thank you.

13        And would you agree with me that some might find it

14 credible to say that there are many, many, many claims that

15 have been filed in the proofs of claim where there is no non-

16 frivolous argument for extending the statute of limitations?

17 A     I'm sorry, could you repeat that?  That there's no --

18 Q     In other words, would you agree -- and maybe this isn't

19 a fair question because you haven't looked at the proofs of

20 claim and I'll take that, if that's your answer, but there are

21 many, many, many claims that, if they were filed as complaints

22 in court, would subject counsel to Rule 11 sanctions because

23 of the statute of limitations issue?

24 A     I honestly don't know because I haven't looked at the

25 proofs of claim.  I wouldn't want to say something -- I just

1    don't know.

2    Q    Okay.  All right, let's talk about discovery.  Discovery

3    is such an important part of every litigation and I heard --

4    would you agree with me, every case --

5    A    Yes.

6    Q    -- that proceeds, discovery is important in the American

7    system?  Okay.

8         Now, Mr. Griggs yesterday acknowledged that the

9    facts of the cases, the facts are key; that these cases really

10   turn on the facts, factual disputes?

11   A    Yes.

12   Q    He even acknowledged that it's quite rare that summary

13   judgment is entered in favor of the plaintiff in sex abuse

14   cases?

15   A    It's rare that they're in favor of the plaintiff?

16   Q    Right.

17   A    I'm not sure, if that's his experience, and I'm trying

18   to think of my own.  I think, more often than not, there are

19   not motions for summary judgment that have been filed in the

20   cases that I work on; sometimes, but --

21   Q    That is --

22   A    -- it's usually the defendant that's filing that motion.

23   Q    Right.  And, oftentimes, you've said the defendant might

24   lose -- I'm not talking about.  I'm talking about the

25   plaintiff coming in and saying, as a matter of law, I win, you

1   just really --

2   A       Oh --

3   Q       -- like you just don't really see that; right?

4   A       That's correct, that's correct, it's very rare.

5   Q       And the reason that's very rare, one reason might be

6   that factual disputes predominant and would prevent summary

7   judgment in favor of the plaintiff on liability and damages;

8   right?

9   A       I think that's definitely true in many cases.

10  Q       And so that means facts are critical to these claims;

11  right?

12  A       That's correct.

13  Q       Okay.  Now, you said in paragraph 8 of your declaration,

14  "When I evaluate an abuse claim, I use information that has

15  been developed as part of the case or pre-suit investigation

16  in order to analyze and evaluate the claim."  Right?

17  A       That's correct.

18  Q       You said, "I perform a comprehensive review and analysis

19  of the factual record."  Right?

20  A       That's correct.

21  Q       And that includes evaluation reports and defense counsel

22  reports?

23  A       That's correct.

24  Q       Okay.  And you said, "I use all that information to

25  develop a comprehensive assessment of the alleged abuse, and

1  any applicable defenses thereto, in order to advise my insurer

2  and defendant clients on a resolution strategy."

3  A    That's --

4  Q    Right?

5  A    -- correct, yes.

6  Q    So is it right to say that what you do in these cases

7  is, as the person focusing on settlement, you really rely

8  heavily on the factual workup that has taken place by the

9  parties in the matter?

10 A    I do.  I will say that there are some other elements as

11 well and, when I'm working on cases involving the Catholic

12 Church, obviously, there are other factors that play into

13 that.  The perception among many people that the Catholic

14 Church is kind of a cesspool of abuse and that kind of thing,

15 that that is something, that's a theme that plays into the

16 assessment of the defensibility of the case and the value of

17 the case.

18 Q    Okay, that's important.  Thank you for saying that.

19          And, in addition to those sort of background

20 issues, you really dig into the facts that have been

21 developed; right?

22 A    That's correct.

23 Q    And those facts have been developed -- they've been

24 submitted by the plaintiff and they've also been developed by

25 somebody on your side, whether it's defense counsel, whether

1   it's the party, whether it's you, but somebody on your side

2   also develops facts and you look at those facts?

3   A    I do, but they -- oftentimes, they're not in litigation,

4   it's pre-litigation, so it's not like there's formal discovery

5   being done.  But, in general, you're correct that I'm

6   accumulating as much factual information from as many sources

7   as possible.

8   Q    As many as possible, right.

9        And you say in paragraph 22, "Defendants and their

10  insurers rely on formal and informal discovery to engage in an

11  ongoing and sometimes fluid assessment" --

12  A    That's correct.

13  Q    -- "of liability, damages, and claim value."

14  A    That's correct.

15  Q    And I think I heard Mr. Griggs say -- oh, you know what,

16  before we move on, paragraph 24 also talks -- says some of

17  this.  It says, "When defendants and insurers retain me to

18  produce claim value analysis, they typically provide answers

19  to interrogatories, documents produced in discovery,

20  information required through investigation, deposition

21  transcripts, medical records, and independent medical exam

22  reports, where available.  These all inform not just the

23  defense against sexual abuse claims, but also the valuation of

24  abuse claims."

25            You said that as well?

1  A     I did.  And sometimes that information isn't available

2  because it's -- you know, it's pre-suit and there's enough

3  information in the possession of the institution that it's

4  very apparent that the person making the claim is making a

5  claim that is very, very credible based on what we already

6  know.  And so there are decisions made to try to settle that

7  before there are answers to interrogatories, IMEs, and that

8  kind of thing.

9  Q     So that might be, but you also would -- what I take from

10 you here is that you will take whatever information is out

11 there -- and maybe even the more, the better -- and weave it

12 into your evaluation?

13 A     That's correct.

14 Q     Okay.  And when you listen to Mr. Griggs, he talked

15 about coordinating the defense of all the cases for the Boy

16 Scouts; right?

17 A     Yes.

18 Q     And getting better results since 2016 because of their

19 efforts?

20 A     Well, he said -- if I remember correctly, he said

21 initially they were getting better results but, maybe as time

22 went on, that their results were not as good --

23 Q     And when --

24 A     -- if I'm remembering that correctly.

25 Q     And he talked about -- when he says results, he's not

1  really talking about trials, right, because there just weren't

2  that many trials --

3  A     That's correct.

4  Q     -- right?  He's talking about settlements?

5  A     Primarily --

6           MR. MARTIN:  Well, objection, it's calling for

7  speculation about what somebody else testified to or meant.

8           THE COURT:  Overruled.  He heard the testimony.

9  BY MS. MCNALLY:

10 Q     So -- did you say you agree, sir?  I thought --

11 A     I do agree; that's what I took from what he was saying.

12 Q     So is it fair to say, between what you said and what Mr.

13 Griggs said, is that the adversarial discovery process leads -

14 - oftentimes leads to information that drives settlements?

15 A     It can, but, like I said earlier, my effort is to try to

16 keep the adversarial aspect of the process out.  And so, for

17 example, right now I'm working on a series of claims involving

18 a residential school, and those claims are not in litigation

19 and they will not go into litigation because we have criminal

20 complaints involving a claimant who -- I mean involving a

21 perpetrator who pled no contest, it's very clear that

22 everything is true.  So we requested IMEs and, in addition to

23 that, we have information, the personnel record of the

24 individual involved.  There's really nothing adversarial about

25 that process.

1           I guess, if you talk about the negotiation of a

2    settlement, you could talk about that as being some kind of an

3    adversarial process, but I know that both myself and the

4    attorney that retained me and the institution work very hard

5    to make sure that there won't be an adversarial process.  And

6    my understanding is, although I don't deal personally with

7    plaintiffs' counsel, that plaintiffs' and defense counsel,

8    although there isn't a lawsuit, that they have a good working

9    relationship and part of their interaction is just coming to

10   the right number.

11   Q    Okay.  Well, thank you for that explanation.  And I

12   don't want to be somewhat provincial, so let me say it this

13   way:  Is it fair to say that the efforts of discovery,

14   including inputs from both sides, are valuable to you in

15   representing your clients and getting the best possible

16   settlement?

17   A    Yes.

18   Q    Okay.  Thank you.

19           So when we talk about the discovery under the TDPs

20   -- and I'm using that term loosely, discovery -- you say in

21   paragraph 18 that "the requirements set forth in Article 4

22   are, in a sense, similar to the federal rules in which

23   litigants are now required to fast-track the discovery phase

24   of litigation by producing information and documents even

25   without formal interrogatories and requests to produce."

1            Do you see that?

2  A     I do.

3  Q     Which federal rules are you talking about?

4  A     I don't know the federal rules and it's been a while

5  since I've been in federal court, but the last time I was

6  involved in some manner involving -- I think that was in

7  federal court -- there was a process for an exchange of

8  materials without the whole process of, you know, propounding

9  interrogatories and that kind of thing.

10 Q     Okay.  So you're not talking about initial disclosures?

11 A     I'm talking about my experience, which is now quite a

12 while ago, that there was an obligation to exchange materials.

13 Q     All right.  Did you draft this sentence?

14 A     I did.

15 Q     Okay, which federal rules did you have in mind?

16 A     I don't know which -- what the number of the rule is or

17 anything.

18 Q     Okay.  Would it surprise you to learn there isn't a

19 federal rule that requires the parties to provide, other than

20 initial disclosures we'll talk about, "to fast-track the

21 discovery phase by producing information and documents even

22 without formal interrogatories and requests to produce"?

23 Would that surprise you?

24 A     I take your word if that's not the case.  Maybe it was

25 initial disclosures that -- you know, that I'm referring to.

1  It's been quite a while.

2  Q    Okay.  So initial disclosures, under Rule 26(a), require

3  documents and identification of witnesses at a very early

4  stage of the case, you're aware of that; right?

5  A    Yes, I think that's --

6  Q    Now --

7  A    -- what I'm referring to maybe.

8  Q    Okay.  Maybe that's what you meant?  You're not sure

9  what you meant?

10  A    Well --

11  Q    Okay.

12  A    -- I said it's been --

13  Q    Okay, okay.  So Rule 26(a) disclosures are limited,

14  though, to documents and witnesses -- and here's the language

15  -- that the disclosing party may use to support its claims or

16  defenses.  Did you know that?

17  A    That sounds right.

18  Q    So that means initial disclosures include just the good

19  stuff.  Under initial disclosures, you don't need to produce

20  the witnesses and information the other side might use, you

21  only need to produce the witnesses and information you might

22  use; right?

23  A    But that's the same situation with the proof of claim

24  where they're producing the claim that they're making and

25  supporting information --

1  Q      Well --

2  A      -- under the TDP.

3  Q      -- I think now we have found something we agree on.  The

4  TDPs themselves require only -- the claimant only to provide

5  the claimant's side of the story; right?

6  A      Right, it's essentially like a complaint.

7  Q      And I think we heard -- you weren't here that day, I'm

8  assuming -- we heard from Mr. Martin during the argument on

9  your motion in limine a reference to Paul Harvey and the rest

10 of the story.  So I would say -- I mean, I would guess you

11 would agree with me that the TDPs do not require the claimant

12 to provide the rest of the story; am I right about that?

13 A      If by the rest of the story you mean something that

14 might mitigate against his claim, I suppose he's not required

15 to provide some kind of supporting information that would

16 speak to that, it wouldn't be very supporting if he did that.

17 Q      Right.  So, if that's going to be considered, if it

18 happens at all, it's going to be up to the initiative of the

19 staff, approved by the STAC of the settlement trustee, or the

20 settlement trustee herself; am I right?

21 A      Yes.

22 Q      Okay.

23 A      I have no reason to believe that they wouldn't do a good

24 job of that or that they wouldn't be committed to that effort.

25 Q      And it might be that some of these facts, these

1  mitigating facts, are just beyond the imagining of the

2  settlement trustee and the staff appointed by the STAC; right?

3  A    I don't know if I want to admit to that or to agree to

4  that because I presume that Judge Hauser is competent and that

5  she would be surrounded by a staff of people who would also be

6  competent to determine those types of decisions and the

7  accumulation of that -- those kinds of materials and evidence

8  to inform their decisions.

9  Q    So maybe the staff might sit around and say things like

10  we should check whether this person ever had a car accident, a

11  traumatic brain injury, we should check to see whether their

12  house ever burned down, things like that?

13  A    I can't speak to something that has not happened yet.  I

14  don't know --

15  Q    Okay.

16  A    -- who those people will be.

17  Q    Okay.  In paragraph 23, you say the questionnaire is

18  like a deposition or an interrogatory?

19  A    Yes.

20  Q    And in your deposition I think you agreed that the

21  degree that that's true -- the questionnaire we're talking

22  about -- well, we'll get to it in a minute -- the degree to

23  which that is true, that the questionnaire is like a

24  deposition or interrogatory, depends really on the content of

25  the questionnaire; right?

1  A     I understand that the questionnaire has not been created

2  yet.  So I think that that's in general true that, if the

3  questionnaire asks the questions that are necessary for the

4  decision of -- for the trustee and her staff to make an

5  assessment of the claim, then the questionnaire would be like

6  interrogatories.

7  Q     Right.  And if it doesn't, if it just says what's your

8  name and what's your favorite color, if it doesn't, it

9  wouldn't; right?

10 A     Well, I think that's fair that it wouldn't --

11 Q     Fair, okay.

12 A     -- I have no reason to believe it would be like that,

13 though.

14 Q     So you don't have, though, any information on what the

15 questionnaire will say?

16 A     I think it's not created yet, so I don't think anyone

17 would.

18 Q     Okay.  Now, you said you didn't -- you hadn't read the

19 settlement trust agreement, maybe you did during the break, so

20 I'll ask.  Are you aware of the STAC's role in drafting this -

21 - in the creation of the questionnaire?

22 A     As a general matter, I believe that they're going to be

23 heavily involved in that.

24 Q     Okay.  So the settlement trust agreement, which is on

25 page 223 of that printout of Exhibit 353 --

1        (Pause)

2   A    I'm sorry, what's the page?

3   Q    3 -- sorry, 223.  And I'm going to look at subsection

4   (g) --

5             MS. MCNALLY:  -- isn't that on 223?  Yeah, up at

6   the top.

7   BY MS. MCNALLY:

8   Q    All right.  Section (g) -- part 5.14 talks about things

9   the trustee must obtain consent -- not just consult, but

10  obtain consent -- of the STAC and the FCR.  Subsection (g)

11  says, "The form and the substance of the questionnaire

12  required in connection with the trust claim submission under

13  the TDP, which is to be executed under oath by the abuse

14  claimant individually or an executor."

15            Do you see that language?

16  A    I do.

17  Q    And, by the way, where it says "or an executor," that

18  contemplates that an attorney could sign these questionnaires?

19  A    That's what I would take from it.

20  Q    Yeah.  And those attorneys could include the STAC

21  members themselves on behalf of their 45,000 claimants?

22  A    I suppose that's true.

23  Q    So, under this provision then, parties who have an

24  interest in having their claims pass through review, and get

25  their 40 percent and their billions of dollars, are

1  responsible for establishing --

2         MR. MARTIN:  Objection.

3  BY MS. MCNALLY:

4  Q    -- what that review will entail; correct?

5  A    Do you want me to answer --

6         MR. MARTIN:  (Indiscernible) --

7         THE WITNESS:  Okay.  I think -- first of all, I

8  don't know about what the contingency arrangements are with

9  their clients and that would not factor into any kind of

10  assessment that I made about the reasonableness of the TDPs.

11  That said, I think that it makes sense that the questionnaire

12  that will be produced, whoever weighs in on that, would be

13  something that would be important to provide sufficient

14  information to the trustee and her staff to be able to

15  determine whether there are sufficient indicia of facts that

16  would meet the standard of preponderance of the evidence under

17  the general criteria and then, subsequent to that, that they

18  would produce, you know, sufficient information to assess and

19  evaluate the claim, and there wouldn't -- to me, it wouldn't

20  make sense to make a questionnaire that was very tepid or

21  irrelevant or did not produce the kind of information that

22  would be attested to that would assist the trustee in her

23  task.

24  BY MS. MCNALLY:

25  Q    All right, thank you.  That's interesting; not my

1  question, though.

2        My question is, the parties who have a personal

3  interest as contingency fee counsel and having their claims

4  pass through claim review are responsible for establishing

5  what that review will be; do you agree with that?

6  A    I agree with that.

7  Q    Okay.  And the defense side of this story has no

8  opportunity to craft its own questionnaire, or even add and

9  propose questions for the questionnaire akin to an

10  interrogatory to highlight or develop any defense themes;

11  right?

12  A    Well, the defense side produces information and

13  documents that will be utilized by the trustee and her staff

14  to determine the claim.  If they have information or documents

15  that speak to those issues, then the trustee will have that in

16  front of her.

17  Q    Okay.  Again, not my question.  We'll absolutely get to

18  documents in a minute.  I'm talking about the opportunity to -

19  - I mean, in litigation, defendants send out interrogatories,

20  requests for admission, documents requests to highlight and

21  develop a defense; right?

22  A    In part, yes.

23  Q    Okay.  And there is no role in the claim questionnaire

24  development for the defense side of the story to put some of

25  those questions in --

1  A      In terms of --

2  Q      -- right?

3  A      Well, in terms of developing a defense theme, that may

4  be the case, but in terms of the -- if you look at

5  interrogatories as a means of establishing the facts in a

6  case, irrespective of the theme that's being created by

7  defense counsel, then I believe that the information and

8  materials that would be produced under the TDPs by the -- what

9  you might want to call the defense side of the table will help

10 in the development of those facts that can be utilized by the

11 trustee to assess the credibility of the claim and, you know,

12 that kind of thing -- I mean the TDPs.

13 Q      So, using the example we've been working on, if the

14 defense side of the story would have asked a question like

15 please identify any other major traumas or life events, car

16 accidents, something, some language designed to elicit that

17 information, there's no mechanism in the TDPs for anyone to

18 put that into the claim questionnaire; right?

19 A      I think it could be and I think that the trustee could

20 request whether there's any information like that.

21 Q      And if the trustee thought that was a good idea, that

22 questionnaire, with all of its implication, would have to pass

23 through the filter of the STAC members' review; right?

24 A      I think that's correct.  But, again, I'll go back to

25 what I said earlier, which is -- if the tenor of your question

1  is that there will be such a one-sided view, you know, being

2  propelled in this questionnaire, then I think that they would

3  run the risk of not providing the kinds of information that

4  they might want the trustee to have.

5  Q    Uh-huh --

6  A    Otherwise, it's like --

7  Q    -- yeah.

8  A    -- cutting off your nose to spite your face.

9  Q    All right, let's talk about -- am I right, though, when

10  you did your opinion, you did not really evaluate the

11  potential internal control issues raised by having interested

12  parties evaluate and approve the questionnaire; that just

13  wasn't something you looked at, right?

14  A    I was not paying attention to that.

15  Q    Okay.  Let's talk about requests for admission.

16          In the tort system, requests for admission is

17  something the defendants will draft and give to the plaintiff

18  in many cases?

19  A    That's correct.

20  Q    I don't know why I'm -- I apologize for my lighting

21  here.  I hope you can see me.  I look completely like a ghost

22  and --

23  A    I can see.

24  Q    Okay.  I mean, I'm pale, but I'm really not that pale.

25          (Laughter)

1  Q    Okay.  In this case, there's no opportunity for requests

2  by the defendant to draft and send requests for admission to

3  the claimant?

4  A    Not by the defendant, but the trustee has the right to

5  request a written, sworn statement.

6  Q    Right.  And that goes onto the pile of things the

7  trustee or her staff could do?

8  A    That's correct.

9  Q    And this is the staff that has to be approved by a super

10  majority of the STAC?  Okay.

11        Now, the document -- let's turn to documents, you

12  mentioned those before.  You said, "The collection and review

13  of salient documents mimics to a large extent the defendants'

14  document collection process and subpoena of the third parties

15  that would occur."

16        Am I right -- I think we can do this quickly --

17  there is no mechanism in this system for anyone other than the

18  trustee to ask for documents from the defense perspective?

19  The defense perspective -- let me get an answer to that

20  question.

21  A    That's true, but the trustee has fiduciary obligations.

22  And so, if she and her staff were to determine that that would

23  be helpful to their assessment of the claim and the valuation,

24  then I have to trust that they would do that if they felt that

25  there was a need for it.

1   Q      Okay.  And that is also assuming, isn't it, that the

2   trustee understands this particular claim well enough to even

3   realize this is something I should ask for?

4   A      Well, again, I'm going to go back to the fact that Judge

5   Hauser is a former federal court judge and that she'll be

6   supported by a staff that, presumably, are competent to the

7   task.

8   Q      Okay.  There's no requirement for live sworn testimony;

9   right?

10  A      Well, there's no necessary requirement, but --

11  Q      Thank you.

12  A      -- the trustee has the right to request a sworn oral

13  statement.

14  Q      My question was specific, there's no requirement?

15  A      There's no requirement.

16  Q      And there's not even a requirement that the trustee -- I

17  mean, sorry, there's not even a requirement that the claimant

18  submit to an informal interview; right?

19  A      I don't recall that -- I believe it's a sworn interview

20  and a requirement that -- not a requirement, that the trustee

21  can request interviews by professionals, an IME, for example.

22  Q      Right.  This will go faster if you just answer the

23  questions I ask, my question.  There is no requirement that

24  the plaintiff must have an informal interview?

25  A      I do not recall seeing the word "requirement."

1  Q      Or an examination by an independent medical

2  professional?

3  A      That is something that the trustee could request.

4  Q      Or a psychological evaluation?

5  A      The trustee could request that.

6  Q      Okay.  So, in the tort system, an IME might be required;

7  right?

8  A      That's correct.

9  Q      And in here it's really just up to the trustee's

10  discretion to require any of these things or not?

11  A      That's correct.

12  Q      And really the trustee's staff, realistically?

13  A      That's correct.

14  Q      There's no one on the defense side of this story who can

15  have input into whether the trustee should do any of those

16  things; right?

17  A      Well, there's no advocate for the defense, but the

18  trustee has fiduciary responsibilities to apply the TDP.  And

19  so, if she deems that there is not sufficient evidence or

20  information for her and her staff to make, you know, an

21  informed decision about the credibility of the claim, what's

22  been adduced through the other information, and to valuate the

23  claim, then I have to trust that Judge Hauser would do that.

24  Q      Okay.  And retention of experts, you understand that Mr.

25  Griggs would retain experts.  He said that yesterday, right?

1  A      Yes.

2  Q      For mental health issues?

3  A      Yes.

4  Q      Standard of care?

5  A      Yes.

6  Q      Which related -- like what was expected at the time;

7  right?

8  A      At the time.

9  Q      And protection procedures?

10 A      Yes.

11 Q      And there is no opportunity for anyone on the defense

12 side of this story to retain and put on expert testimony;

13 right?

14 A      Well, there is -- she does have the right to request

15 policies and procedures, handbooks, and those kinds of things

16 that would demonstrate a standard of care at a particular

17 time.

18 Q      Right.  Again, not my question.

19         I'm not asking about -- just please understand, all

20 these questions, I'm not asking about what the trustee can do.

21 I'm saying simply, there's nobody else, there's nobody else

22 who can advise on the defense side of this story to say get

23 this expert, here's an expert, here's what this expert -- like

24 there's nobody submitting that.  The trustee can do what she

25 can do, I'm not asking about that; right?

1  A     Yes, she can do what she can do.  But, in answer to that

2  question, that's correct, there's no provision for a

3  requirement to seek an expert on those issues.

4  Q    Okay.  I want to talk about independent review now.  And

5  just to get a sense, because I know this is fatiguing for

6  everyone, we're going to talk about independent review and

7  then we're going to move on to talk about some other issues

8  aside from the TDPs.  So just so you see, you know, where

9  we're going.  I know it is -- I appreciate your patience, this

10 is long.

11              Independent review.  Now --

12              MR. MARTIN:  May I -- excuse me --

13              MS. MCNALLY:  Yes.

14              MR. MARTIN:  -- Your Honor, just in terms of

15 timing, could we have just an idea of, if she has a whole

16 other section to go into -- I'm sorry, Your Honor, I can't

17 hear you.

18              THE COURT:  That's a good question.  We could take

19 a lunch break.  You're at a point --

20              MR. MARTIN:  Right.

21              THE COURT:  -- if you're going to turn to

22 independent review.  I don't want to disrupt your flow, but is

23 this a point where we could take a lunch?

24              MS. MCNALLY:  Sure, that makes sense, Your Honor.

25 I think I have more to cover with this witness than I'd want

1  anyone to do on empty stomachs before we finish, but this is

2  not going to be a whole-day thing, I just would -- now might

3  be a good time.

4            THE COURT:  Okay.

5            MR. MARTIN:  And, Your Honor, just for planning

6  purposes for our next witness, could we have a sense of like

7  who else -- or how much longer this will be, just so that we

8  can schedule accordingly?

9            THE COURT:  Well, if we take a 45-minute break for

10 lunch -- Ms. McNally, I'm assuming from what she's telling me,

11 has got at least another hour.

12           MS. MCNALLY:  I think that's right.  Some of these

13 questions have taken longer than I anticipated, frankly.  So I

14 apologize for that.  I would guess, you know, based on how

15 we're going so far, that this might be another hour-ish.

16           MR. MARTIN:  And, if I remember correctly, no other

17 opponents have questions?

18           THE COURT:  Correct, that's my memory.

19           MR. MARTIN:  Okay.  Thank you, Your Honor, I

20 appreciate it.

21           THE COURT:  Okay.  We're going to break now and

22 actually we'll come back at 2:15 Eastern.

23           COUNSEL:  Thank you, Your Honor.

24           THE COURT:  Thank you.  We're in recess.

25      (Recess taken at 1:25 p.m.)

1        (Proceedings resume at 2:15 p.m.)

2            THE COURT:  Okay.  Mr. Kurtz.

3            MR. KURTZ:  Thank you and good afternoon, Your

4   Honor.  Glenn Kurtz from White & Case on behalf of the

5   debtors.

6            I'm sorry to take up time before we continue, but I

7   did want to report something on scheduling.  This exam,

8   obviously, has taken a little longer than what was estimated.

9   And given Ms. McNally's estimate there's another hour, and I

10  believe there's redirect, as well, we're going to be getting

11  pretty close to the end of the day.

12           The next scheduled witness is Adrian Azer.  We have

13  canvassed the objectors.  They have advised us that they

14  expect approximately five and a half hours of cross-

15  examination.  We also have a motion to deal with on that, and

16  also very brief direct.

17           We have a scheduling issue with Dr. Doug Kennedy,

18  who is a survivor and the Vice Chair of the TCC.  So we are

19  intending, with the Court's permission, if we get to an

20  additional witness today -- which is not entirely clear to us

21  -- that we would put him up.  I think he's about a twenty-

22  minute direct and very little cross.

23           If we don't get to a witness today, then we will

24  put him up in the morning because he's got a scheduling

25  conflict, and it's more important that we get him through.

1  Mr. Azer won't be happy about this, but he could always be

2  available the next morning, if need be.

3           THE COURT:  Okay.  Thank you.

4           MR. KURTZ:  (Indiscernible)

5           THE COURT:  Mr. Kornfeld.

6           MR. KORNFELD:  Good afternoon, Your Honor.  For the

7  record, Alan Kornfeld for the TCC.

8           Your Honor, Dr. Kennedy is, in fact, available.

9  But I wanted to apprise the Court and Mr. Kurtz of a

10 conversation that I just had with Mr. Amos, who represents AIG

11 and the certain insurers.  And while Mr. Amos' cross-

12 examination of Dr. Kennedy and my direct of Dr. Kennedy are

13 going to be short -- I can speak to my direct, it's about a

14 half-hour, perhaps even less; Mr. Amos advises me -- and with

15 full reservation of rights -- that his cross isn't going to be

16 much longer than that.

17          The fact of the matter is Mr. Amos said that he

18 needs to get his cross-examination lined up, needs the time to

19 do that; and, therefore, cannot agree that Dr. Kennedy be

20 taken out of order today, unless we just did the direct of Dr.

21 Kennedy and waited until tomorrow to do the cross.  And for

22 various reasons, some of them tactical, I was not willing to

23 agree to that.

24          So, unfortunately -- and Mr. Kurtz, excuse us, we

25 were talking as the cameras started role here -- we are not

1 able to do that, based on the conversation we just had with

2 Mr. Amos.

3          THE COURT:  Okay.  Mr. Hallowell.

4          MR. HALLOWELL:  I'd simply confirm the statements

5 of Mr. Kornfeld.  We're prepared to cross Mr. Kennedy, we do

6 have a cross-examination of Mr. Kennedy.  This is a reordering

7 of the witnesses.  We're prepared to go forward with our cross

8 of Mr. Kennedy tomorrow.  Everyone knew that Mr. Azer was

9 before Mr. Kennedy --

10          THE COURT:  Right.

11          MR. HALLOWELL:  -- and Mr. Azer is many, many

12 hours.

13          THE COURT:  Yes.  Okay.  Well, we'll see where we

14 are, but we are where we are.  Okay.  Thank you, gentlemen.

15 MARK BURNETT, WITNESS FOR THE DEBTORS, PREVIOUSLY AFFIRMED

16          THE COURT:  Okay.  Ms. McNally.

17          MS. MCNALLY:  Thank you and good afternoon.

18                    CONTINUED CROSS-EXAMINATION

19 BY MS. MCNALLY:

20 Q   Mr. Burnett, I told you I'm going to move on to mister --

21 to independent review next.

22      I just want to confirm.  You've never personally

23 defended any sex abuse claims yourself, right?

24 A    No.

25 Q    Okay.  So let's talk about independent review.  This is a

1  new feature added to the plan in its -- in the final draft

2  that was filed in February, right?

3  A    Yes.

4  Q    And I think we agreed with -- I think we will both agree

5  that the claimant is required under this to produce some more

6  information than is explictly required under the TDP.

7  A    That's correct.

8  Q    But there is nothing that would preclude any of that

9  information from being required under the TDP, right?

10  A    As -- I -- I guess, if the claimants wanted to produce

11  that information in the TDPs, they could.

12  Q    Right.  Okay.

13        So let's talk about the T -- the independent review

14  option.  And we'll get back to why some of those things are

15  not required in the TDPs in a minute.

16        But the independent review option is -- there's a new

17  actor on the scene, and that is someone referred to in the

18  plan documents as a "neutral."  Are you familiar with that?

19  A    Yes.

20  Q    Okay.  And a "neutral" is a former judge, retired judge

21  who has experience with tort claims?

22  A    Yes.

23  Q    No other characteristics are described in here, such as

24  familiarity with sex abuse claims?

25  A    I don't recall seeing that.

1  Q    Okay.  All right.  But what -- did you see in there that

2  the selection of the neutral is done and requires a super-

3  majority consent of the STAC members?

4  A    I believe I remember seeing that.

5  Q    Yeah, so five of them have to consent to every neutral

6  who is on the -- what is described as the "panel of neutrals."

7  A    Yes.

8  Q    And even though those STAC members were not able to come

9  to consensus when the choice was just two eminent former

10 Federal Judges, they are expected to do that for purposes of

11 identifying the neutrals for the independent review.

12 A    That's what it says.

13 Q    Okay.  And in addition, the FCR must also consent to the

14 individuals who will be judging the independent review.

15 A    Yes.

16 Q    Okay.  Is it your understanding that people who go into

17 independent review also have to fill out the claim

18 questionnaire?

19 A    That's my understanding.

20 Q    All right.  So what we have now, if I want to put it all

21 together, we have the STAC members involved in writing the

22 questionnaire, supplying answers to the questionnaire, and

23 then picking the judge for independent review.  And when I say

24 selecting the answers, I mean for their own personal

25 claimants.

1  A    Yes, I believe that's a fair representation.

2  Q    Okay.  And of the -- when I say "super-majority," that

3  requires five individuals of -- right?  At least one of those

4  five, mathematically, is going to need to be one of the

5  members from the coalition contingent, right?

6  A    Okay.

7  Q    Did you know that?

8  A    I think I did know that.

9  Q    Okay.  And if you look at the number of claims held by

10 members of the coalition on the stack, the lowest number is

11 appropriate 10,000 claimants.

12 A    Okay.

13 Q    Are you aware of that?

14 A    Before today, I'm not sure I was aware of that.

15 Q    It didn't figure into your evaluation, one way or the

16 other.

17 A    No, it did not.

18 Q    Okay.  So, under independent review, if you look at page

19 -- the plan documents kind of set out the information that has

20 to be provided -- you know, wait.  I should ask one more

21 thing.

22     To get into independent review, I think you describe it,

23 and I've heard it described by others as it is reserved for

24 only the most serious of claims.

25 A    Well, I think that the more accurate description of that

1  is that it is claimants who believe that they may have a more

2  serious claim and want to avail themselves of that option.

3  Q    Uh-huh.  Uh-huh.  Right.  And to avail themselves of that

4  option, they need to pay a buy-in price of $20,000, unless

5  that fee is waived by the trustee --

6  A    That's --

7  Q    -- correct?

8  A    -- correct.

9  Q    And the trustee gets to make that decision -- the trustee

10  gets to make that decision, the trustee being supervised by

11  the STAC.

12  A    The trustee gets to make that decision.  I'm not sure I'd

13  use the term "supervised," but --

14  Q    Okay.

15  A    -- I understand.

16  Q    Okay.  So there's -- other than the buy-in price, which

17  can be waived, there's nothing that otherwise would prevent or

18  limit the number of people who want to go through this option.

19  A    Not that I know of, other than their self-selection, you

20  know.

21  Q    It's up to the claimants themselves.

22  A    That's correct.

23  Q    And the claimants might decide it's not worth it because

24  of the time or because of the risk in -- they're -- they take

25  on a greater risk.  But structurally, nothing caps the number

1  of people who enter the system.

2  A    As I understand it, that's correct.

3  Q    Okay.  So let's talk about what's involved.

4      There has to be confirmation that the claimant was in

5  scouting or attended a scouting event by either finding the

6  name on the roster; evidence that they were in a unit where

7  the event occurred, where the abuse occurred; or a sworn

8  statement by a third-party witness that the abuse claimant was

9  in a unit or attended an event where the abuse occurred.  Are

10  you familiar with that provision?

11  A    I am.

12  Q    Those three things appear to me to be fairly -- I'm

13  sorry.  I'm not going to characterize it, that's not fair.

14      There is no reason, is there, that those requirements of

15  documentary support couldn't have been included in the TDPs

16  themselves.

17  A    Well, here's how I look at it.  To me, the TDPs,

18  including both the general TDP and the IRO, are something akin

19  to a settlement paradigm in the tort litigation context.  And

20  if -- when I look at the two elements of the TDPs, to me, that

21  really mirrors a lot of the settling experience in these

22  claims, where, in the early part of a claim, that -- that's

23  more -- that looks more like the general TDP, where,

24  typically, you may not have nearly the discovery, the

25  information, that kind of thing.  And also, a lot of times,

1  you know, if it's a fairly small claim or a low-value claim,

2  you know, monetarily [sic] low-value claim, it -- it would

3  fall within that category.

4       The IRO part of it looks very much to me, in terms of

5  the greater standard or anything, of the kind of insurer

6  involvement that happens when we're talking about a larger-

7  value claim and that kind of thing.  It's my experience that,

8  a lot of times, the claims that would -- that would fall

9  within what we would call the "TDP" in this context, sometimes

10  insurers have very little, if any, involvement.

11       And depending on the policies, sometimes there is a

12  third-party administrator that may have settlement authority

13  up to a certain amount, and there's really very little, if

14  any, involvement by the insurer.

15       Once there is a claim involved, however, that is a much

16  more serious, much more involved, and potentially much more

17  valuable claims, in terms -- in terms of the settlement value,

18  that's when the insurer typically gets more involved.  There's

19  been more discovery done, oftentimes.  That might be post-

20  mediation, if there was an impasse, any number of different

21  things that could factor into that.  And that, to me, is what

22  the IRO looks more like.

23  Q    Okay.  Thank you.  Not my question.  But I want to follow

24  up on something you just said there.

25       Are you -- is it news to you that the TDPs can give

1  awards up to $2.7 million?

2  A    I do know that.

3  Q    That doesn't suggest to you that that's a significant

4  amount of money on a claim?

5  A    That is a significant amount of money.

6  Q    All right.  So what you just said about the TDPs being

7  the things that are just kind of routinely handled, you would

8  say that floor as two -- ceiling, I guess, at 2.7 is still

9  like not that significant?

10  A    Well, first of all, it is very significant.

11  Q    (Indiscernible)

12  A    And that's not what my testimony was.  What I'm saying is

13  that, in terms of -- if you bifurcate the two -- the two

14  elements of the TDPs, that the first -- I don't know what you

15  would call it -- the general TDPs, the process, follows more -

16  - and more closely tracks my experience of when a claim is a

17  smaller claim.

18       That said, the 2.7-million-dollar cap, if you will, is

19  something that is, in my experience on more serious claims, a

20  significantly lower amount than I have been a part of paying

21  in more recent years.

22  Q    Okay.

23  A    And so it could be -- it could be that a person would not

24  chose to go the IRA -- IRO -- IRO route for the reasons you

25  stated, and could still -- could still wind up with an award

1  of $2.7 million.

2  Q    So the two point -- so the -- am I -- I mean, I'm not --

3  I don't want to be unfair here.  I'm really trying to

4  understand what it is you're proposing in this.

5      Are you saying that the regular -- I don't know what

6  we'll call it, just the "regular TDP process," is more like

7  the informal, pre-suit negotiation, and that the IRO is more

8  like the once you get to court litigation process?  Is that

9  the way you're conceiving of these two things?

10  A    It's broader than that because, obviously, the -- I've

11  worked on any number of different claims that -- that are in

12  litigation and that, for any number of different reasons, wind

13  up being more settle -- settleable [sic], more -- easier to

14  resolve, even if they've been in -- in litigation.  That's,

15  oftentimes, through mediation.  And those claims sometimes

16  involve higher amounts, but there hasn't been nearly as much

17  litigation and as many defense costs incurred and that kind of

18  thing.

19  Q    Right.  Because that is a voluntary, consensual process.

20  A    Mediation, yes.

21  Q    The an -- and the analog, which you are saying is similar

22  to the TDPs, to the regular process.

23  A    The -- the regular TDP.

24  Q    Okay.

25  A    I would say so, yes.

1  Q    Okay.  Okay.  Then let's talk about -- let's get back to

2  the question I asked before we got off on this.  The question

3  I asked is:  Looking back at the confirmation under the IRO

4  requires -- I'm sorry.  The IRO requires confirmation that the

5  claimant was in a scouting unit or attended a scouting-related

6  evidence.  It needs some evidence, and that evidence can be as

7  simple as name on a roster, sworn statement of a third-party,

8  or other evidence.

9      Is there any reason that requirement could not be part

10 of the regular TDPs?

11 A    Well, I think, to a certain extent, it probably is.  If

12 they're trying -- if, in the general criteria, they're

13 required to identify an alleged abuser, then -- then one way

14 to do that would be through a roster or other -- or other

15 information or documents that indicate that that person was a

16 -- you know, part of that troop or in that location, leading

17 scouting activities.

18 Q    So it's your view that that's spelled out in the IRO, but

19 it's kind of implicit in the TDP?

20 A    I would say so.

21 Q    Do you know whether your client agrees that that

22 provision appears equally in both parts of this process?

23 A    I -- I have not discussed that particularly with them,

24 about whether it should be in both parts.  My -- my view is

25 that that's a higher standard.  In that case, it looks like

1  it's more they want to see maybe a roster; whereas, in the

2  regular TDP part, you could, as I -- as I look at it, you

3  could -- you could produce enough information or materials,

4  you know, by a preponderance of the evidence, that -- that

5  there was an alleged abuser.  You may not remember his

6  identity, you know, his name, that kind of thing.

7       But I think that, with 82,000 plus claimants, it would

8  be impractical to require the same burden on all 82,000 plus

9  claimants, as there would be required at the IRO stage.

10 Q   Now I think you just said the "abuser."  I'm -- this one

11 talks about the claimant, the claimant himself.  And Part D --

12 Part B of this section includes -- say, generally, just

13 evidence that the claimant was in a scouting unit.  Is your

14 answer still the same?

15 A   Yeah, that they -- you mean the roster to show that they

16 were in the -- in the scouting troop or whatever.

17 Q   Yeah.  Why don't we pull this up, so -- I don't want to -

18 - I don't want you to be misunderstanding what we're talking

19 about here.  This Page 183 of Exhibit 353.

20 A   I keep looking at you on the screen, but I guess you

21 prefer that I look in the camera, so I'll try to remember

22 that.

23 Q   And this Part 3.  So these three things -- and B is

24 largely is a -- kind of a catchall.  "Of other types of

25 evidence."  Is it your belief, sir, that this -- proof -- this

1  kind of confirmation is required, but not spelled out in the

2  regular TDPs?

3  A    I think this is a higher standard.  I think they're --

4  they're requiring more specific information or, you know, that

5  it be supplemented with more, I guess, tangible evidence.

6  Q    And so the regular TDPs, it's your view that payment up

7  to $2.7 million could be made under the regular TDPs without

8  even this minimum level of proof?

9  A    I think, to show a connection with scouting, you would

10  have to show -- and I don't know how you would do that, I

11  don't know what the specific requirements would be under the

12  general TDPs, under the general criteria --

13  Q    Uh-huh.

14  A    -- to show a connection with scouting.  You would have to

15  show that you were involved in scouting.

16  Q    Okay.  Well, let's just -- let's look at the next one.

17  Look at Part 4.

18      In this one, the claimant pro -- must provide evidence

19  that the perpetrator was in -- somehow involved in scouting.

20  It gives specific language there.  Do you see -- can you read

21  that?

22  A    Yes.

23  Q    Now is there a reason this could not be included

24  specifically in the TDPs?

25  A    I think that -- I mean, it's -- to say it could not be --

1  I guess, if they wanted to, they could.  But to me, the more -

2  - the bigger burden for producing more specific information

3  that's contemplated in this would be impractical for 82,000 --

4  over 82,000 claimants.

5  Q    Okay.  Well, first of all, it's not really 82,000 because

6  seventy-five-plus hundred have -- are out of this potential,

7  right?  Because of the (indiscernible) so let's say 75,000,

8  not that that changes it.

9      So, of the 75,000, like, in theory, they could all pay

10  $20,000.  I mean, there's a lot of money at stake, right?  You

11  could have 70,000 who are having to do this.  Then what

12  happens?

13  A    Well, I'm not sure what the question is.  But the twenty-

14  thousand-dollar fee, essentially, I think is commensurate with

15  the -- you know, the opportunity that they have to potentially

16  have a significantly larger award than 2.7 million.  And so I

17  would think a claimant would have to make a decision whether

18  they were willing to part with $20,000, if, for example, the

19  neutral recommended a zero value on their claim.

20  Q    Right.  That is the agency of the claimant to decide,

21  right?

22  A    Yes.

23  Q    What I'm saying here is that the structure of your deal,

24  the structure -- sorry -- the structure of this plan has an

25  option that, theoretically, 70,000 people could take advantage

1  of if they wanted to take off the top $20,000 from their

2  assets and pay that in; 70,000 could take advantage of this

3  plan.  And somehow, the debtor finds that feasible because

4  there's no other limitation on who can take advantage of that

5  plan and jump through these minimal evidentiary hurdles,

6  right?

7  A    I think it's very unlikely that you would have a hundred

8  percent of those people take advantage of the IRO.  I -- I

9  think that the risk would be too high for them.  And possibly,

10 there could be any number of different reasons why they may

11 not avail themselves of that option.

12 Q    But if they do, it seems like, under your theory, we're

13 going to be in a pickle here because it's just completely

14 impossible to be done.  Is that your view?

15 A    No, that's not my view.  It would be -- it would probably

16 be more time-consuming, but it's certainly not impossible to

17 be done.

18 Q    Okay.  So, with that in mind, why is this not required in

19 the TDPs, that it will be done?

20 A    Precisely because it would be a bigger burden on seventy-

21 some thousand people, and it would, I think, take a lot more

22 time.  And for people who don't want to have that kind of --

23 who are not willing to take those kinds of risks, it would not

24 be something that would be necessary for them.

25 Q    Okay.  So, for those people who don't want to take the

1  risk, it's better for them to ex -- to participate in a system
2  that is more likely to just require their word on things than
3  having to produce the kinds of evidence required, as described
4  in the IRO, right?
5  A    I don't agree that it's only their word.  I think that
6  they -- the trustee and her staff will have a significant
7  amount of information and documents and additional information
8  that they can request on those claims -- those claimants that
9  only participate in the general TDP process.
10 Q    Okay.  Fair amendment.  It's either their word or,
11 potentially, the risk that the staff of the trustee will think
12 to ask for more.
13 A    Well, and they -- there could be a decision, for example,
14 under that process, that someone has not met the preponderance
15 of the evidence standard and it would be disallowed.  So, if
16 that were the case, I think that that could be based on
17 information and materials that will be provided by the
18 debtors.
19 Q    And when you say "preponderance of the evidence," it's
20 preponderance of the evidence of a potential, right?  That --
21 we went over that earlier.
22 A    Yeah, under the general criteria.
23 Q    Yeah.  Okay.
24       Then the next one is, if we look at Part 5.
25             "Must establish and provide evidence that the claim

1  is timely under the applicable statute of limitations."

2       Do you see that language?

3  A    Yes, I do.

4  Q    So, again, there's nothing that would -- I think you said

5  earlier that the trustee could apply this standard under the

6  TDPs?

7  A    Well, it's -- the -- the burden is different.  They're

8  not required, in the first instance, to provide, you know, the

9  evidence that it's timely.

10  Q    Right.  And so, under the TDPs, instead of requiring the

11  plaintiff -- or the claimant to do it, the TDPs require the

12  trustee to decide she wants it; and, if so, seek it and follow

13  up with the claimant to get that information.

14  A    Well, I trust that, under the general TDPs, the regular

15  ones, that the -- that the trustee and her staff would do that

16  because that's part of what they're tasked with, is a

17  determination of whether or not the mitigating scaling factor

18  involving limitations defenses would be applicable.  And so

19  they wouldn't be able to do that part of the valuation

20  analysis unless they determined what the status of the statute

21  of limitations defense would be for those claims.

22  Q    So it's both, just kind of in a different place?  That's

23  your --

24  A    Well, I --

25  Q    -- (indiscernible)

1  A    I think it's more -- in the IRO, I think that the burden

2  is higher.  In -- in the IRO, there, in the first instance,

3  the claimant is being required to provide evidence,

4  affirmative evidence at the very beginning of the process,

5  that it's timely under the statute of limitations.

6  Q    Is the burden higher or is it just the burden of -- the -

7  - who -- the timing of the production?  I mean, if the trustee

8  requires it, it's going to be required, right?  The burden

9  would be the same.

10  A    Well, in the -- in the IRO, it is -- the requirement is

11  that it's done up front.  And the -- I would suggest that the

12  burden is somewhat higher because the neutral could determine

13  that, if it is not timely under the statute of limitations,

14  that it would be a zero claim; whereas, under the TDP, the

15  general TDPs, the statute of limitations is a scaling factor.

16  It's not required in the first instance for the -- the

17  claimant to come forward with that, satisfying that burden.

18  Q    So, under the general TDPs, if the trustee concludes that

19  a claim is fully time-barred, you -- it's your position that

20  she cannot zero out the value of that -- she cannot zero out

21  the award?

22  A    Well, the -- the trustee could assign a -- the lowest, I

23  think, is .01.  And that makes sense in the early part of the

24  claim, which that -- the general TDPs, I think, mimic.  In the

25  early part of a claim, even if -- if you feel that you --

1   which happens all the time in my -- in my work.  If you

2   believe that there's a very strong statute of limitations,

3   it's going to cost some money; assuming that you're completely

4   successful, it will cost some amount of money to put together

5   a motion to dismiss or a motion for summary judgment and to

6   argue that successfully.  And then you always taste -- take

7   the risk that it -- that it won't be successful.

8   Q    Uh-huh.

9   A    And so that .01 multiplier makes sense to me at that --

10  at that phase.

11  Q    So, in my hypo here, the trustee decided absolutely, no

12  doubt about it, a hundred percent, it is time-barred period,

13  no exception.  But if it hadn't been, this would have been a

14  2.7-million-dollar claim.  In that case, the lowest she could

15  pay and would have to pay is two point -- two -- $27,000?

16  A    I think, if -- I -- under that scenario, I think that

17  that would be the case if it were not barred -- or if it were

18  not taken down to a zero value by -- for some other reason --

19  Q    Oh, sure.  Okay.

20  A    -- under the other mitigating factors.

21  Q    Okay.  Now Number 6, let's look at Number 6.  This is:

22          "Direct evidence that BSA, a local council, or a

23  chartered organization was negligent or otherwise liable on

24  account of a direct abuse claim and evidence of damages or

25  benchmark judgments or settlements relevant to the damages

1  claim.  Damages must be supported by an expert report."

2  A     Yes.

3  Q     Do you see that?

4       Now I think we talked about this morning and into the

5  afternoon, that these are things that all -- all things that

6  the trustee herself could require, as well.

7  A     That's correct.

8  Q     So the only difference here is that, instead of leaving

9  it up to the judgment of the trustee's STAC-approved staff and

10  the trustee to request it, it's now just an obligation of the

11  independent review option, right?

12  A     It's a higher burden on the claimant at the IRO phase

13  than it is under the general TDP.  And again, that makes sense

14  to me because that -- that mimics how these handle -- how

15  these claims are handled in my work and in my world, that it

16  depends on the nature of the claim.  And if it's -- if it's a

17  relatively less valuable claim or for a number of different

18  reasons, then we would likely not ask for an IME or some kind

19  of an expert's report or things like that.  You know, under --

20  it more mimics the lower standard of the general TDP.

21  Q     Right.  And I feel like we're going around on these and

22  repeating, so I'm glad there's only one more of these to talk

23  about.

24       What my point is:  If the trustee asks for this

25  information, it's required.  Equally as if -- much as if the

1  independent review option automatically requires it, the

2  trustee herself could require these exactly same things, but

3  it's just not written down and automatic, right?

4  A    If she wanted to, she could get them.  And my -- my guess

5  is that, on many claims, she may not feel that it's necessary.

6  Q    Okay.  And the point about how this is only for the most

7  serious, again, it's really only -- it's not for the most

8  serious.  It's for the ones where the claimants have paid the

9  entry fee.  That's the only limiter, right?

10  A    Well, and presumably, there will be more -- you know, the

11  way it will pan out is it will be more serious because I think

12  that's why many claimants would be willing to pay those --

13  those fees and take on the risk of getting a zero.

14  Q    Have you spoken with claimants about this?

15  A    I have not.

16  Q    Okay.  And now the last one is that:

17        "The defendant is subject to up to a six-hour

18  interview, mental health examination, or supplemental signed

19  and dated interrogatory response at the discretion of the

20  neutral or upon the request of the responsible insurer."

21      Do you see that?

22  A    Yes, I do.

23  Q    There is no automatic -- there is no six-hour interview

24  component and mental health component automatically of the TDP

25  process, as well, right?

1  A    Not automatically, that's correct.

2  Q    You know, that comes -- springs to mind something I kind

3  of wished I had talked about, so I'll do it now.

4       We talked about earlier that local -- the applicable law

5  is the law of the particular jurisdiction of the claim, right?

6  A    Yes.

7  Q    I didn't say that very well.  I'm glad you know what I'm

8  talking about.

9       Now are you familiar with the California certificate of

10  merit process?

11  A    I'm not.

12  Q    Okay.  In California State Court, to bring a sex abuse

13  claim, the claimant must provide a certificate of merit with

14  the complaint from a mental health practitioner.  Are you

15  aware of that?

16  A    Not specifically, no.

17  Q    And so it -- you haven't considered whether that needs to

18  be a component that the trustee is responsible for collecting;

19  you haven't considered that.

20  A    That was not part of my analysis.

21  Q    Okay.  All right.  So that is -- we just walked through a

22  part of this independent review option -- opportunity --

23  independent review process, things that are required here that

24  could be required in the trust distribution procedure, in

25  theory, but are not required explicitly, right?

1  A    That's correct.  The trustee may request them.

2  Q    Okay.  Now -- but there's the insurer component.  That's

3  a little different here, too.  Now the insurer component

4  requires that the trustee provides prompt notice to any

5  potentially responsible, non-settling insurer of any claim,

6  right?

7  A    That's correct.

8  Q    Now, as someone who described himself as a coverage

9  lawyer, I'm sure you're going to agree with me that the

10 question of who is potentially responsible is oftentimes not

11 obvious, right?

12 A    Not right off the bat.

13 Q    And oftentimes --

14 A    That's true.

15 Q    -- it is quite disputed who is potentially responsible,

16 non-insurers.

17 A    Do you mean which insurer is responsible?

18 Q    Potentially responsible?

19 A    Sometimes it is, yes.

20 Q    It is -- it can be -- it can definitely be highly, hotly

21 contested.

22 A    Yes.

23 Q    Okay.  So, for the trustee to provide this prompt notice,

24 am I right now that the trustee also needs to have some

25 ability to determine just coverage issues like trigger?

1  A    I don't think necessarily.  If -- if the trustee has

2  information about what the alleged dates of abuse were, and

3  presumably the trustee could see what insurer was on risk at

4  that time and provide notice to them, or if it spanned a

5  period of time and there are more than one insurer that might

6  have been on risk, provide notice to multiple insurers.

7  Q    And is this concept known as "trigger" in insurance law?

8  A    Yes.

9  Q    Okay.  So the insurer -- someone is going to have to

10  provide the trustee with a coverage chart, right?

11  A    For that purpose, yes, to be able to provide notice to

12  the insurer.

13  Q    Uh-huh.  And someone is probably going to have to advise

14  Judge Houser on what is the rule as to trigger on these

15  claims, right?

16  A    I'm not necessarily sure about that.  But -- but to me,

17  if she has dates of abuse and she knows what the insurers on

18  risk are, then she can put those people on notice and let them

19  work out the issues of trigger between themselves.

20  Q    Well --

21  A    That's what coverage litigation is for.

22  Q    Do you trust that -- are you -- you don't believe it

23  requires any knowledge of cover law to figure out trigger on

24  the sex abuse claims of this volume?  Is that your position?

25  A    I mean, I think that that's an overstatement of my

1  position.  But regardless, my guess is that, as a former

2  Federal Court Judge, that Judge Houser likely has some of that

3  information.

4      But I don't think that someone who puts carriers on

5  notice needs to be an experienced coverage attorney.  If they

6  have allegations in front of them that give dates of abuse and

7  they're aware of what carriers were on risk at that particular

8  time, then notice can be given to one or more that -- that

9  encompass that period of abuse.  And then I would not think

10 that it's up to the trustee to get involved in those coverage

11 disputes between the carriers.

12 Q   Well, it's not necessarily between the carriers.  It

13 might be between the carriers and the trust.

14     I mean, let's go at -- let's go at it this way.  Would

15 you agree with me that it seems likely that the settlement

16 trustee is going to need to -- will consider retaining

17 coverage counsel herself?

18 A   I think so because she can -- she can take action against

19 the insurer if the insurer refuses to --

20 Q   And that's --

21 A   -- to accept the (indiscernible)

22 Q   And that's another set of professionals that will need to

23 pass muster of the STAC.

24 A   I -- I don't know about that.  I don't remember seeing

25 that, any mention of who the trustee would retain and whether

1  or not they would require approval from the STAC.

2  Q    Well, the STAC is required to approve all of the -- all

3  of the professional staff, right?  We went through that

4  earlier today.

5  A    I mean, I guess.  I don't -- my -- I do not see that as

6  talking about coverage counsel.

7  Q    Okay.  Now the insurers have a provision to -- are

8  permitted to present a defense, and I think that's what --

9  what is that --

10  A    In the IRO?

11  Q    Uh-huh, yes.

12  A    Yeah, I believe that's right,

13  Q    They are provide -- they are -- the independent review

14  option provides they can review and comment -- and to describe

15  what that means, it's they can review and comment on the

16  neutral's evaluation.

17  A    They can.  And they can withhold consent from --

18  Q    Well --

19  A    -- the --

20  Q    -- we'll get to that.  Sorry, sorry, sorry.  We'll get to

21  consent in a minute.

22       There is no provision written down in this document that

23  provides for the insurer to conduct examinations at any kind

24  of a hearing, right?

25  A    They can be present at -- I believe at the deposition.

1   And I don't recall hearings, but certainly they can be present

2   at the deposition.  And they -- and what you just put on the

3   screen a few moments ago, that they -- reasonable requests by

4   the insurer can be part of that process.

5   Q    Okay.  Actually, there's not even a description of a

6   hearing in this process --

7   A    I --

8   Q    -- is there?

9   A    I don't recall seeing that.

10  Q    Right.  Because it's not there, right?

11  A    I -- I think you're right it's not there.

12  Q    Right.

13  A    That --

14  Q    And there --

15  A    -- seems like more of an adversarial process than I would

16  -- than I would guess the TDPs were contemplated to provide.

17  Q    So -- and even the IRO then is, in your view, not a fully

18  adversarial process.

19  A    I would agree with that.

20  Q    Okay.  And there's no opportunity provided in here or

21  power given to the in -- to the insurers who elect to

22  participate to conduct third-party discovery.

23  A    I don't recall seeing that.

24  Q    Because it's not there, right?

25  A    Right.

1  Q    Okay.  So they can comment on the neutral's evaluation,

2  but there's no provision about the neutral needs to do with

3  that comment, other than be reasonably appropriate, right?

4  A    Well, the -- the neutral needs to -- it says "must," my

5  memory is that it said it "must" consider defenses asserted by

6  the insurers, and then the insurers can comment on that and

7  the insurers can -- can withhold consent --

8  Q    Right.

9  A    -- from --

10 Q    (Indiscernible)

11 A    I'm sorry.  I got -- go ahead.  I'm sorry.

12 Q    And I --

13          MR. MARTIN:  Would you like to show him the

14 document --

15          THE WITNESS:  I jumped ahead.

16          MR. MARTIN:  -- so he doesn't have to guess?

17          MS. MCNALLY:  Yeah.  No, I promise you, sir, that

18 we will talk about consent.  It's on my list, it's coming up.

19 I'm not talking yet about consent; I'm still talking about --

20 I'm still talking about the process, right?

21 BY MS. MCNALLY:

22 Q    So they can -- the Judge -- or sorry.  The former judge,

23 the neutral must consider the presentation of the insurers.

24 A    That's correct.

25 Q    Okay.  And that does differ -- and I guess you said  this

1 is not quite fully adversarial.  That does differ from the

2 legal system, where there is oftentimes more expected of a

3 court than just please consider; there's actual legal

4 standards, right?

5 A    Well, I think it says "must" consider.

6 Q    Okay.  My question remains.  The legal system doesn't

7 just say judges must consider; there's legal standards for

8 evaluating defenses presented by the defense side of a case;

9 like make findings, for example.

10 A    Well, I guess -- I guess my reading of that is that it's

11 the equivalent of like filing a motion to dismiss or a motion

12 for summary judgment, where the defendant might put arguments

13 in front of the Court and the Court would be required to

14 review the materials, perhaps hold a hearing, and then rule on

15 the motion.

16 Q    Right.  And those two specific examples have very

17 different standards.  What's a motion to dismiss standard?

18 What's a motion for summary judgment standard?  Are there

19 facts in dispute?  What must the assumptions be in one -- in

20 favor of one side of another?  There's nothing like that in

21 the independent review option?

22 A    You mean in terms of -- to back up, the word "must."

23 Q    "Must" is doing a whole lot of work in that sentence if

24 that's what you think it means.

25            MR. MARTIN:  Objection.  Argumentative.

1   A    I -- I think --

2   Q    I apologize.

3   A    No, that's all right.

4        I think that it -- the way I read it is that it -- it's

5   a higher standard and -- than what -- the general TDPs.  And

6   there, whereas the insurers have much less involvement in the

7   general TDPs than in the IRO part of the -- of the TDPs, that

8   they can present defenses that cannot be ignored, they must be

9   considered.

10       Now I guess, to your point, there's not a detailed

11  explanation of what is behind the word "must."  But the way I

12  read that is that they will be -- that a neutral, as a former

13  Federal Court Judge, would -- would be competent to the task

14  and would undertake as -- as he or she should.

15  Q    Okay.  I just want to clarify.  When you say "former

16  Federal Court Judge," it doesn't need to be a Federal Court

17  Judge, does it?

18  A    You're correct.  I -- a former -- a former judge.

19  Q    Right.  It could be a State Court Judge who was, for

20  example, elected --

21  A    That's --

22  Q    -- right?

23  A    That's correct.

24  Q    Okay.  So, after the neutral comes up with a number, the

25  trustee is first permitted to accept that recommendation or

1  not, right?

2  A    Correct.  Accept or reject it.

3  Q    Right.

4       And if the claimant is unhappy with the outcome, the

5  claimant can go to the tort system.

6  A    That's correct.

7  Q    There is no such right for the insurer who participated

8  to similarly say I want to take this underlying claim to the

9  tort system.

10  A    Well, I don't want to get ahead of myself, I know you're

11  not there yet.  But to me, that part of the IRO, where it

12  gives the insurers the option of withholding their consent and

13  also the fact that they are enabled to stand on all the terms

14  and conditions of their policies provides them the

15  opportunity, if they want to, to engage in declaratory

16  judgment litigation, for example.  And so I would say that I

17  think that that's a more accurate of reading of that, rather

18  than that they have no options at all.

19  Q    Okay.  Well, we'll talk about the consent because it's

20  just like bursting.  I'm happy to talk about consent, but

21  we're going to have to come back to where we were here.

22       The consent right is the consent to pay the bill that is

23  handed over, right?  It's to pay the tab.  You can agree to

24  pay what we're telling you to pay, right?

25  A    Correct.

1  Q    And if you don't agree to pay what we're telling you to

2  pay, you have the right to be sued.

3  A    Well, you could be sued.

4  Q    That's -- it's not really much more of a consent like, if

5  you don't consent, we start over, or if you don't consent, we

6  go back to the TDPs.  It's if you don't consent, you can be

7  sued for the amount of the tab, right?

8  A    That's correct because they have withheld consent for the

9  amount.

10 Q    So, my original question, then, is, if the claimant

11 doesn't like the outcome, the claimant can bring their case in

12 court, right?

13 A    Yes.

14 Q    If the insurer doesn't like the outcome, the insurer is

15 unable to bring the tort claim and to force the tort claim to

16 be litigated in court?

17 A    Well, if the insurer withholds consent, so that they're

18 not paying the tab, as you put it, they may be sued, but they

19 may not be, and I don't know what -- you know, you'd have to

20 ask the trustee what that -- what would go into that

21 decision-making process.  But if they denied consent for the

22 amount, I'm not sure why they would then choose to litigate it

23 on their own.  They may wind up not having to pay that.

24 Q    Okay.  I don't think you're understanding my question.

25 There's no mechanism for the -- for the refusal to consent,

1   there's no way that, as a result, it forces the Plaintiff, the

2   claimant, the individual to go bring a personal injury tort

3   claim in tort?

4   A     You mean the insurer?

5   Q     No.  The insurer -- can the insurer's refusal to consent

6   mean that the tort claimant -- that the individual claimant

7   has to go bring a tort claim or anything about -- any

8   litigation of the tort, itself?

9   A     If they chose not to, they wouldn't have to.  I think I

10  don't understand your question.

11  Q     Okay.  So, the tort -- if the claimant doesn't like the

12  outcome, the claimant, himself, can go to court, right.

13  A     Yes.

14  Q     And if he doesn't like that outcome, has a right to

15  appeal, right?

16  A     Yes.

17  Q     Okay.  And can take advantage and get judicial findings

18  and (indiscernible) all those things that come along with

19  court litigation rights?

20  A     Yes, in the tort system.

21  Q     And those rights, if the insurer can't -- doesn't have a

22  mirror, except as you say, by denying and then getting sued,

23  they don't have those rights, correct?

24  A     It's not provided for in the IRO.

25  Q     It's not provided, all right.

1        All right.  So --

2   A    I'm not sure why they would want to.  If they've not

3   given consent and no one comes after them to pay that amount

4   and say, sit on it.

5   Q    Well, let's get to that.  Let's talk about lawsuits

6   against the insurer and this is the next segment, and it's the

7   second-to-last one, I think, you'll be happy to hear, on what

8   we're going to be doing today, and this is talking about the

9   contract rights.

10  A    Yes.

11  Q    Okay.  So, you understand that insurance policies are

12  contracts; contracts that were written between parties.  One

13  party is the debtor here, but the other party, nondebtor,

14  third-party insurance companies, right?

15  A    Yes.

16  Q    Okay.  And prior to founding Burnett Risk Control

17  International you were a litigation attorney at Lord

18  Bissell & Brook for nearly eight years.

19  A    That's correct.

20  Q    And you were routinely retained as coverage counsel on

21  behalf of Lloyd's of London in connection with evaluating and

22  assessing sexual abuse claims against insureds, right?

23  A    Yes.

24  Q    So, you have familiarity with insurance coverage

25  concepts?

1   A      Yes.

2   Q      Okay.  Now, one of the duties, one of the duties in

3   liable-types of coverage such as those at issue here is a duty

4   of cooperation, right?

5   A      Yes.

6   Q      Now, in your view, paragraph 80 of your report -- of

7   your declaration, says the TDP do not -- let me just ask what

8   that means.

9          The coverage -- the duty of cooperation.  The duty of

10  cooperation means that -- well, why don't you describe it.

11  Why don't you describe the duty of cooperation.

12  A      The duty to cooperate is, at least in the policies I've

13  dealt with in my career, is a mutual obligation on both, the

14  part of the insurer and the insured.  The insurer -- the

15  insured has to cooperate with the insurer in providing

16  whatever information and cooperating in the litigation of a

17  claim if that's what's chosen and the insurer is handling it

18  when their policy is implicated, when their (indiscernible)

19  are implicated.

20         On the flipside, the insurer is obligated or has a

21  requisite duty to or reciprocal duty to make sure that they're

22  not doing anything that will prejudice their insured in the

23  handling of a claim.

24  Q      Okay.  And that second component that you just

25  mentioned, it travels alongside the duty to cooperate, but

1  it's not, itself, the duty to cooperate.

2       That duty is the duty of the policyholder, right?

3  A    You're talking about the one where they're obligated to

4  cooperate with the insurer?

5  Q    Right.

6  A    Yeah.

7  Q    Okay.  So, as part of the duty of cooperation, the

8  insurer -- the policyholder can't do things to essentially

9  just give up the case?

10  A    We lost the sound.

11          MR. MARTIN:  I can't hear you.

12          THE WITNESS:  We lost the sound.

13          MS. MCNALLY:  Apologies.  It was such an excellent

14  point I was making.

15       (Laughter)

16  BY MS. MCNALLY:

17  Q    So, essentially, what that requires is that the

18  policyholder has to participate with the insurer if the

19  insurer wants to defend the case.  The policyholder, at a

20  baseline, has to cooperate with that effort, as requested?

21  A    That's my experience, yes.

22  Q    Okay.  Thank you.

23       And in paragraph 80 of your statement there, you said

24  the TDP do not eviscerate the cooperation of the debtors;

25  instead, the TDP merely provide a different paradigm for

 1  defense and settlement.  The laboring oars of cooperation are

 2  taken by the claimants and the settlement trustee.

 3       Do you see that?

 4  A    I do.

 5  Q    So, there are two parts to that.  Let's start with the

 6  claimants.  There is no concept in insurance-coverage law

 7  whereby a policyholder can satisfy its duty to cooperate by

 8  saying, just get it from the party that's suing me, right.

 9       That obligation runs to the policyholder and cannot be

10  foisted off on the opposing side, right?

11  A    That is true.

12       But in this context, the materials that would typically

13  be produced in the information, in the litigation of a claim,

14  where the insurer is driving that, are provided by the

15  claimant and I would say, more importantly, by the trustee, in

16  acquiring that information.  So, the debtor is not involved in

17  the handling of the claim, so much as the trustee is.

18       And so, those -- it's not like the debtor is there to do

19  that.  The debtor may have produced that information,

20  materials from the files and that kind of thing, but once that

21  happens, their -- that information, those materials, that

22  evidence has now been adduced as it would be under a

23  cooperation clause if the insurer was driving litigation of a

24  claim.  That's what I meant by that.

25  Q    Yeah.  Well, surely, I agree with you that that's what's

1  happening under this agreement, but that's not what I'm asking

2  you.  I'm asking you about what is allowed under coverage law.

3       And let me just start with my understanding of the

4  evidence that you're talking about.  Is it the case that there

5  is only a single copy of all this evidence that the debtor has

6  and once they give it to the settlement trustee, it will be

7  gone forever and they won't have access to it themselves?

8  A     I would not think so.

9  Q     Right.  So, there is an obligation of the debtor.  Do

10 the policies -- do the contracts entered into by this debtor

11 provide that the debtor, at its decision, may give that

12 obligation to someone else, in particular, someone suing the

13 debtor or the debtors' estate?

14 A     Well, the trustee stands in the shoes of the debtor

15 under those circumstances.  And I don't -- I mean, just as a

16 general matter, I'm not sure why the debtors would be

17 precluded from providing information to their insurers in any

18 event.

19 Q     So, to my question --

20 A     In this process, the trustee stands in the shoes of the

21 debtors and has that information.  It just didn't come about

22 through an adversary process.

23 Q     So, again, my question, and I'm just going to try this

24 one more time and if you can't get an answer, I can't get an

25 answer, but you're saying in this statement, the laboring oars

1  of cooperation are taken by the claimants.

2  A     Yes.

3  Q     My question for you is, under the contract, is the

4  policyholder in these contracts, permitted to give his

5  cooperation obligation to the party suing the policyholder?

6  A     No.

7  Q     Okay.  Thank you.

8        Is the party -- does the contract provide that its

9  cooperation may be delegated to someone who's a fiduciary of

10 the party suing the policyholder?

11 A     No.

12 Q     Okay.  So, next is the duty to defend.  I want to talk

13 about that.

14       Now, primary liability policies typically have a right

15 and duty to defend, right?

16 A     That's correct.

17 Q     And you're aware, I'm sure, that there are, among the

18 non-settling insurers, at least one, maybe two, who have

19 primary layer of obligations.

20       Are you aware of that?

21 A     I've heard discussion of that, but I wasn't looking at

22 any policies.  I wasn't provided any policies and that was

23 beyond the scope of my engagement in this matter.

24 Q     Okay.  And you're aware, as well, that many access

25 policies have a right to participate in the defense, right?

1  A      And associate with the defense.

2  Q      Yeah.  Yes?

3  A      Yes, I'm sorry.

4  Q      Okay.  Thank you.

5         And those are provisions bargained for in the contracts?

6  A      Yes.

7  Q      Now, the cost of defense at the primary layer, almost

8  always outside of the limits, right?

9  A      That's correct.

10  Q      And by that, I mean that the cost of defense are borne

11  by the insurer, right?

12  A      That's correct.

13  Q      Okay.  They're not charged to the policyholder?

14  A      That's correct.

15  Q      And the cost of associating a defense are also typically

16  not borne by the policyholder; they're borne by the insurer?

17  A      Yes.

18  Q      Now, you're aware, I'm sure, that the cost of the

19  settlement trust shall be paid by the settlement trust assets,

20  right?

21  A      Yes.

22  Q      In fact, it says:  The settlement trust shall bear the

23  sole responsibility with respect to the settlement trust

24  expenses?

25  A      Yes.

1  Q    So, we've spent a lot of time today going through

2  instance after instance after instance of things that

3  previously would have been done by the defense side that are

4  now going to be expected of the trustee, right?

5  A    That's correct.

6  Q    And under the insurance model and the contracts, many of

7  those costs would have been borne by the insurers and not by

8  the debtor, right?

9  A    Generally, yes.

10 Q    But now, they've all been shuffled over to the

11 settlement trust and they will be used -- and settlement trust

12 assets are going to be depleted doing this work that,

13 otherwise, would have been borne by the defending -- by the

14 insurers, right?

15          MR. MARTIN:  Objection; assumes facts not in

16 evidence.

17          THE COURT:  Overruled.

18          THE WITNESS:  So, if the trustee is the one that's

19 making the determination as to the value of a claim and there

20 are expenses associated with doing that, that come out of the

21 trust assets, that's correct.

22 BY MS. MCNALLY:

23 Q    Okay.  And if some of that work had been done by

24 insurers in a different model, that would have saved some

25 money in the trust, wouldn't it?

1  A      Potentially.

2  Q      Okay.  So, then, another right is a right to consent to

3  settlement.  That's an important right in the contract, right?

4  A      That's correct.

5  Q      And in your experience dealing with insurers and

6  representing them yourself, that is a right they hold dear,

7  yes?

8  A      Yes.

9  Q      Okay.  Mr. Griggs, yesterday, talked about this a bit.

10  Do you remember, he was asked, Well, before you settled cases

11  pre-petition, if an insurer was involved with insurance money,

12  you certainly would have gotten your fair consent to settle

13  cases.

14        And he answered, immediately, I would.

15        Do you recall that?

16  A      Yes.  So, would I.

17  Q      Thank you.

18        And he said, If insurance -- if insurers in those cases

19  were involved in the ask for information, you provided him.

20        He said, Typically yes.

21        Those cases wouldn't have been settled without asking

22  the insurer for consent, correct?

23        Correct.  I couldn't -- and he offered -- I couldn't

24  spend an insurer's money without their consent, right.

25        Right.

1      Right, he said that?  Do you recall?

2   A     Yes.  Yes.

3   Q     And that is entirely consistent with your experience in

4   representing -- in being on the insurer's side as outside

5   counsel?

6   A     Yes.

7   Q     And it's also consistent with your experience now at

8   your firm?

9   A     Yes.

10  Q     Now, you are not aware, are you, of any provision in the

11  policies that would permit a party to substitute arbitration

12  without the consent of the insurer, right?

13  A     I have not looked at the policies.  They were not

14  provided to me, so I don't want to speak to something I'm

15  not -- you know, I haven't looked at.  But as a general sense,

16  that would typically be the case.

17  Q     I'm curious, did you ever ask to see the policies?

18  A     No, it wasn't part of the scope of my engagement.

19  Q     You could have asked, but you didn't?

20  A     I suppose so, but it wasn't necessary for my analysis.

21  Q     Okay.  So, sometimes it happens, though, that -- and

22  you've experienced this -- sometimes it will happen that a

23  policyholder will consent without first checking with the

24  insurer, right.  They'll just go out and settle a case.

25      That happens?

1  A      I have had matters where that happened.  It's

2  distressing.

3  Q      And when -- it's distressing; is that what you just

4  said?

5  A      Yes, it is.

6  Q      It is.

7         And it's a problem?

8  A      That's correct; if that happens.

9  Q      Yeah.  And so, in that situation, the insurer has the

10 right to say, well, that was your own money.  We're not going

11 to reimburse.

12 A      I think it depends on the policy, but generally, I think

13 that's true.

14 Q      And you have made that argument, yourself, when you were

15 representing the Lloyd -- the companies, right?

16 A      I have made that argument.  I think what, really, my

17 experience, more often than not, was a situation that resulted

18 in a negotiation.  If the -- and always, of course, you want

19 to be put on notice first.  But on those occasions -- and they

20 weren't very often -- but on those occasions where one of the

21 insureds had settled for an amount, not having put the insurer

22 on notice and sometimes there being no notice whatever on the

23 claim, then if it was a very, you know, quote, unquote,

24 favorable settlement, then there was little reason to quibble

25 with that, just because it's the kind of settlement that would

1  have been approved anyway and likely involved significantly

2  fewer transaction costs associated with the handling of the

3  claim.

4  Q    So, you, as the insurer-side counsel would evaluate and

5  reach your own decision on whether or not to accept the deal,

6  right?

7  A    Yeah.  Uh-huh.

8  Q    And if --

9  A    And negotiate something in between.

10 Q    Right.  And while that did happen, it certainly did not

11 happen 82,000 times on your watch, right?

12 A    That's correct.

13 Q    So, let's talk about the -- something you mentioned

14 earlier, which is the preservation of the insurers' coverage

15 rights.

16 A    Yes.

17 Q    And I say, "coverage rights," but I'm really talking

18 about contract rights.

19      You understand that, right?

20 A    Yes.

21 Q    Okay.  Now, it was important to your plan -- I'm

22 sorry -- it was important to your opinion in this case that

23 all of the insurers' contract rights are unaffected by the

24 plan, right?

25 A    Yes.

1  Q     And it was an important procedural protection in your

2  view that makes the TDPs, in part, reasonable.  I think you

3  said that in your deposition?

4  A     Yes.

5  Q     All right.  Well, let's talk about that.  Let's look at

6  page 140 of Exhibit 353 in Section XM.  All right.  Actually,

7  let's start on the prior page.  It kind of starts at the

8  bottom of 130.  Yeah, there we go.

9        Now, I have the language up on the screen that I'd like

10 to focus on.  Section M.

11 A     Okay.

12 Q     And you quote this in your declaration, as I recall,

13 this sentence here, Except for the insurance assignment, or as

14 otherwise provided in the Bankruptcy Code, applicable law, the

15 findings that are made by the Bankruptcy Court in the

16 confirmation order, or the findings made by the District Court

17 in the affirmation order, nothing in this plan shall modify,

18 et cetera, or be interpreted as modifying, amending, et

19 cetera, the terms of any insurance policy.

20       All right.  I can continue reading, but that's kind of

21 where I -- that's where I want to focus, right there, okay.

22 And that's kind of the key language that you're talking about

23 when you say you have the belief that the procedures are

24 protective of the insurance contract rights, yes?

25 A     Right.  And found in Articles 5 and 10 of the TDPs.

1  Q    Okay.  Now, let's look at this language.  On the second

2  line, it talks about the findings made by the Bankruptcy Court

3  in the confirmation order.

4        Do you see that language?

5  A    I do.

6            MR. MARTIN:  Your Honor, I'm going to object

7  because this goes outside the scope of his declaration.

8            THE COURT:  Ms. McNally, can you show me where his

9  declaration addresses this point.

10           MS. MCNALLY:  Well, Your Honor, he said in his

11  testimony today on the stand, he has offered more than once,

12  the importance of the insurance have the insurers having their

13  consent rights and having maintained their coverage rights.

14  And he just said it right before I got into these questions

15  and he said these are important to his opinion in this case,

16  that there is this backstop -- he didn't say "backstop";

17  that's my word -- that they are maintaining their coverage

18  rights.

19           So, I want to talk about his belief that the

20  insurers are able to maintain their contract rights.  That's

21  fairly within the scope of what he has testified to today on

22  the stand, without objection.

23           MR. MARTIN:  That's in the context of the TDPs.

24  This is, with respect to a plan, which is not part of his

25  direct examination; it's reflected in his declaration.  It

1  goes outside the scope of his declaration.

2              He had definitely spoken about the insurers' rights

3  not being affected, as set forth in the TDP and he can talk

4  about that.  That's what he has talked about.

5              MS. MCNALLY:  Your Honor, if the debtor is happy to

6  stipulate that there are findings that you are being asked to

7  make will not in any way relate to the TDPs, I am pleased to

8  drop these questions.

9              My understanding, however, is the findings are

10 absolutely connected to the TDPs and, I think, are fair game

11 for examination.

12             THE COURT:  Overruled.

13             You can cross on this.

14 BY MS. MCNALLY:

15 Q    All right.  So, you understand that the Court is being

16 asked to make some findings, Mr. Burnett?

17 A    Yes.

18 Q    Okay.  So, let's -- have you read them?

19 A    Have I read what, I'm sorry?

20 Q    Have you read the findings?

21 A    (No verbal response.)

22 Q    We'll get to -- I'll show you them, I'm just asking you,

23 generally, do you recall reviewing the findings?

24 A    I don't recall.

25 Q    Okay.  Let's go to page 118 of this document.  And some

1  of them are lengthy.  I apologize, I didn't draft them.

2          MS. MCNALLY:  Let's start with letter F.  No,

3  that's the wrong one.  Apologies.  Hold on a second.  I have

4  the wrong letter here.  Can you -- that's not -- I don't  mean

5  S.  Can you pull that back?

6          Just a second.  My apologies.

7      (Pause)

8          MS. MCNALLY:  Sorry.  With the updated version of

9  the plan, we reordered some of these, so I just want to make

10 sure I have the right one here.

11         THE COURT:  Uh-huh.

12     (Pause)

13         MS. MCNALLY:  Okay.  It's letter X, the procedures

14 and -- oh, yeah, it's right there on the screen.  Okay.

15 BY MS. MCNALLY:

16 Q    And I want to give you a second to read it and then I

17 can read it to the Court, but I'd like you to be able to read

18 it without that distraction.

19 A    Okay.

20 Q    All right.  And for the record, this section says:

21     The procedures included, it's asked for a finding of the

22 Court that the procedures included in the trust distribution

23 procedures, pertaining to the allowance of abuse claims and,

24 two, the criteria included in the trust distribution

25 procedures pertaining to the calculation of the allowed claim

1    amounts, including in the trust distribution procedures claims

2    matrix, base matrix values, maximum matrix values, and scaling

3    factors, each as defined in the trust distribution procedures

4    are appropriate and provide for a fair and equitable

5    settlement of the abuse claims, based on an evidentiary record

6    offered to the Bankruptcy Court.

7        Do you see that language?

8    A    I do.

9    Q    And with that finding, then, finding of this Federal

10   Court, the insurers will not be able to argue -- is that

11   your -- you understand there is a risk that the insurers would

12   not be allowed to argue their contract rights that this

13   procedure is anything other than as described here:

14   appropriate and fair?

15       MR. MARTIN:  Objection; calls for a legal

16   conclusion.

17       THE COURT:  I'd like his understanding.

18   BY MS. MCNALLY:

19   Q    Now, Mr. Burnett, I would just say, I'm not asking you

20   to offer a legal opinion.  I'm asking you to accept -- to

21   agree with me or not, that this language here is addressing

22   the contract rights of the insurers.

23   A    The way I read that language is it's merely saying that

24   the Court could, if the Court found this, that the TDPs, as

25   set forth are appropriate and, you know, provide a fair and

1  equitable settlement process, not that there is a finding, I

2  guess, a legal finding -- I want to be careful here -- of an

3  interpretation of policies.

4       And I'm not a bankruptcy lawyer, so I'm not quite sure

5  what the process is in the bankruptcy court, but that's how I

6  read that.

7  Q    Okay.  Is it fair this is the first time you've given

8  any direct review of this provision, sitting here right now?

9  A    I think I had it in my -- it was either in my

10  declaration or one of my reports.

11  Q    Right.

12  A    I have seen this before.

13  Q    Okay.  I'm going to ask you about this finding and some

14  others and I don't want to put you in an unfair position.

15       So, if your answer is, you really haven't considered it

16  and you don't have any view on it, that's okay, too.  I'm not

17  trying to back you into doing legal analysis on the fly, okay.

18  I really am not trying to be tricky here.  Okay.

19       So, you understand in coverage litigation, there are

20  times when insurers will make the argument that the process

21  that gave rise to a result wasn't fair and based on this

22  finding, that will have an impact on the insurers' ability to

23  make that argument with respect to the outcomes of the TDP

24  process?

25            MR. MARTIN:  Objection; calls for a legal

1  conclusion.  She just admitted he doesn't know and she's

2  acknowledged it.

3            THE COURT:  Well, I don't actually think that was

4  the case, but given the conclusion that Mister -- but given

5  the conclusion that it's important to his decision that all

6  insurance contract rights are intact, I want to know what he

7  thinks the plan does.

8            THE WITNESS:  I think that the way I read this was

9  to me, I looked at Article 5 and Article 10.  Those both say

10 that there is nothing that -- and those are the in TDPs, of

11 course -- that there's nothing in the TDPs that denies any

12 rights under the policies that the insurers hold; those rights

13 are preserved.

14            So, I hope this isn't a legal conclusion, but when

15 I look at that, to me what it says is that the process is a

16 fair process in the context of this bankruptcy action, dealing

17 with 82,000-plus claims and that that's not making a statement

18 about what the terms and conditions of the policies are or

19 whether or not they have somehow been abrogated or whether or

20 not any of the underlying amounts, allowed amounts that a

21 trustee would find are, in any way, fair.  They were not fair.

22 BY MS. MCNALLY:

23 Q    So, a statement about what the trustee finds being fair

24 is not -- you don't think that's included in this one, right?

25 A    I think that there are 82,000-plus claims, so each claim

1  is submitted to the trustee.  There'll be a determination made

2  and, ultimately, if it gets past the gatekeeping stages,

3  there'll be a valuation assigned.

4       I, based on how I read it, I don't see how this can

5  speak to something that has not happened yet.

6  Q    Right.  And so, a finding, asking about a finding --

7  making findings about things that have not happened yet and

8  using that in subsequent coverage litigation would be a

9  problem.  You'd agree with that, right?

10 A    I'm talking about individual values.

11 Q    Uh-uh.

12 A    And if I read this correctly, it's talking about the

13 construct of the TDPs.

14 Q    Okay.  Now, you just said Article 5 and 10.  You realize

15 Article 5 and 10 is all subject to the findings, so this is

16 kind of baked in as an exception to what you think 5 and 10

17 say, right?

18 A    If it's based on this, then I would say yes, but I don't

19 see why that in any way prejudices the insurers if they can

20 stand on their policies.

21 Q    Okay.  So, if the policy -- if a defense in a policy

22 contract lawsuit that the insurers would have made before,

23 that the outcome is the result of an unfair process, this

24 finding by this Court would be used to prejudice those rights.

25      Do you see that?

1  A      I understand the question and you're asking, what, like,

2  from a *res judicata* standpoint or something?

3  Q      Well, we'll get to *res judicata* in a second.

4  All right.  Maybe I'll just move on to the next one.  Let's

5  look at finding AA.

6  A      Yes.  I don't know if you're waiting for me.

7  Q      Okay.  So, AA says:

8         It is a finding of this Court, base matrix values in the

9  trust distribution procedures are based on and consistent with

10 the debtors' historical abuse settlement and litigation

11 outcomes.

12        Do you see that?

13 A      Yes.

14 Q      So, in a coverage action, if there would have been a

15 dispute under the contract rights as to the values used to

16 settle, this particular finding could theoretically be used to

17 address the insurers' assertion of their contract rights.

18        Do you understand that --

19              MR. MARTIN:  Your Honor, this is --

20 BY MS. MCNALLY:

21 Q      Do you understand that, sir?

22              MR. MARTIN:  I'm sorry, my apologies.

23              Your Honor, this -- I object.  This is way outside

24 the scope of his direct, even beyond what we were going

25 through just now.  This is getting way beyond what this

1  witness has been retained for.

2          MS. MCNALLY:  Your Honor, it's literally talking

3  about the trust distribution procedures; that is the entire

4  scope of his opinion.

5          MR. MARTIN:  No, it's talking about the base matrix

6  values, which he has -- this witness has not designated on

7  values and he's made that abundantly clear in his deposition

8  and throughout his reports.

9          MS. MCNALLY:  Right.  Let me clarify.

10          I'm not asking him to evaluate whether it's true or

11  not, that they're consistent.  I think Mr. Griggs' testimony

12  sheds light on that question.

13          I'm talking about the use of this finding and I'm

14  testing his position that nothing here that happens in the

15  settlement is impacting in any way, it's fully preserving the

16  coverage rights.

17          And my -- what I'm trying to posit is that these

18  findings, including AA, are potential limitations on the

19  ability of the insurers to vindicate their contract rights --

20      (Audio interference)

21          MS. MCNALLY:  -- after the conclusion of this case.

22          THE COURT:  Why isn't that argument?

23          MS. MCNALLY:  It's a question to -- it is argument,

24  and it also a challenge to his opinion, because he agreed a

25  foundational point of his opinion is that the insurers

1  maintain their coverage rights.  He's giving a coverage view,

2  so I'm testing that point, that opinion.

3          THE COURT:  Okay.  For that portion of it, yes,

4  I'll overrule to that extent.

5  BY MS. MCNALLY:

6  Q    So, sir, let me just narrow my focus so we don't have

7  any misunderstanding of what I'm asking you here.  I'm not

8  asking you to have a view on what those settlement values have

9  been in the past.

10      My view is, does this in any way influence your opinion

11 that the insurance coverage rights are unimpacted by the

12 settlement?

13 A    I don't think it does.

14 Q    Okay.

15 A    And perhaps I don't understand your question, but all I

16 can say is that because there's a whole process that is

17 employed by the trustee to value claims, irrespective of where

18 they came from, there was a construct put together.   And so,

19 if she uses a particular set of scaling factors and a base

20 amount which would have a cap as a maximum amount, that that

21 is fair under the TDPs, as written, and I don't know that it

22 would necessarily impact the insurers' rights under the terms

23 and conditions of their policies, if that's the methodology

24 she uses.  Presumably, you would have to look at it on a

25 case-by-case basis.

1  Q      Right.  Right.

2         Let's look at finding W.  The plan documents, including

3  the plan in the confirmation order, which will include

4  findings, shall be binding on all parties in interest,

5  consistent with applicable legal doctrines, including the

6  doctrine of *res judicata* and *collateral estoppel* and

7  Section 1141 of the Bankruptcy Code and related authority.

8         Do you see that?

9  A      Yes, I do.

10 Q      All right.  Now, do you understand that the insurers are

11 parties in interest?

12 A      Yes.

13 Q      All right.  And that the findings would be part of the

14 confirmation order, it's contemplated?

15 A      Yes.

16 Q      So, by this, the findings of this Court would have

17 preclusive effect against the insurers in later contract

18 actions?

19             MR. MARTIN:  Objection.  Sorry.

20 BY MS. MCNALLY:

21 Q      And so, my question is, do you understand that that is

22 the effect, and if you do, does that affect your opinion that

23 the insurers' contract rights are unaffected by this trust

24 distribution procedure?

25             MR. MARTIN:  Objection; calls for a legal

1  conclusion, is argumentative, is outside the scope of his

2  designation and his declaration.

3          THE COURT:  I'll sustain it, except for the last

4  part of the question, which was, "Does it affect your

5  opinion?"

6          THE WITNESS:  It does not affect my opinion.

7  BY MS. MCNALLY:

8  Q    Okay.  Let's look at number four -- I'm sorry,    letter

9  Y.

10         All right.  And I'm not going to read the whole thing

11 because it's only part of it that I want to talk about.  The

12 right to payment that the holder of an abuse claim has against

13 the debtors or another protected party or a limited, protected

14 party is the amount of such abuse claim as determined under

15 the trust procedures.

16         Do you see that language?

17 A    Yes.

18 Q    And do you understand the way -- what this is saying is

19 that when an abuse claimant against an award through the TDPs

20 or the IRO, that is the amount of -- that is the determined

21 amount of the abuse claim, right?

22 A    Yes, that's what the trustee has determined.

23 Q    Uh-huh.  So, in the TDP process, the cap would be, for

24 the most severe cases, $2.7 million, right?

25 A    Did you say for most of the cases?

1  Q      For the most severe cases?

2  A      Oh, for the most severe cases; yes, presumably.

3  Q      And under the IRO option, there is no cap?

4  A      That's correct.

5  Q      It could be hundreds of millions of dollars.  There is

6  no cap?

7  A      I would be surprised if it's hundreds of millions of

8  dollars -- that would be something new -- but my understanding

9  is that there is no cap.

10 Q      And this document, then, permits suit against the

11 insurers for the determined amount of -- that has been

12 determined through the TDP process, right?

13 A      Well, I don't know if I'm going far afield here, but to

14 me, when there is -- coverage litigation is after the

15 determination of an underlying lawsuit, let's say, and there's

16 been -- there are coverage defenses that the insurance

17 carriers believe that they can stand on.

18        What they're looking at, let's say it's a hundred-

19 thousand-dollar verdict or something and they don't believe

20 they owe coverage, they're dealing with one-hundred-thousand-

21 dollar amount that they're being asked to pay and that they're

22 disputing.  So, I'm not sure how any different this is anytime

23 that there is an adjudication and you have an award of some

24 kind, whether that's through a judge or a jury or whatever,

25 and the insurers are contesting coverage for that amount.

1  Q    Okay.  Well, since you raised it, I would like to ask

2  you some questions about what you just offered there.

3       In that circumstance, let's say it was an arbitration

4  and they have a hundred-thousand-dollar verdict, the insurers

5  could assert the right, like, a coverage right, something

6  like, I didn't issue that coverage.  I was not a risk at that

7  time.  Those kinds of things, having nothing to do with the

8  amount, hundred thousand dollars, right?

9  A    Right.

10 Q    Now, then, there are certain times where the insurers

11 are allowed to contest the hundred-thousand-dollar part and

12 say that number was not reasonable, right?

13 A    But then, aren't you going against the determination of

14 a trier of fact?

15 Q    Well, that's my point.

16 A    So, if --

17 Q    There are times --

18 A    Will you let me finish, please.

19 Q    I'm sorry.

20 A    So, if the insurer files, let's say, a declaratory

21 judgment action and asserts various coverage defenses, I don't

22 recall something that says, well, you can contest the amount.

23 So, if this is supposed to mimic that, and in my view, for the

24 most serious ones it does, the insurers could stand on the

25 terms and conditions of their policies and say, we don't owe

1  coverage for that, irrespective of what the amount is, whether

2  it's 2.7 or $3 million here or whatever.

3  Q    So, they are allowed to say there is no coverage, right?

4  A    Right.

5  Q    But there are some circumstances where they are allowed

6  to -- where they will contest the reasonableness of the award

7  in question.  Is this news to you that there are sometimes

8  where they can and sometimes where they cannot contest the

9  reasonableness of the award at issue?

10  A    I think it's very rare, at least in my experience.

11       I've been involved many matters where we contested

12  coverage --

13  Q    Uh-huh.

14  A    -- and sometimes those matters may have gone to trial

15  and resulted in a verdict.

16       But we were saying from the get-go that under our

17  policy, coverage didn't attach for that matter, irrespective

18  of what the award was.

19  Q    And one of the reasons you might say that is that the

20  award below happened in an improper way, like, without

21  consent, right?

22  A    If that were the case.

23  Q    Yeah.  And that there might be circumstances where you

24  would have raised the reasonableness -- if you would just take

25  me at this and we can have a separate argument about it when

1  we're doing legal argument about contesting the

2  reasonableness -- would you agree with me that through this

3  finding, if there is a right to contest reasonableness, Y

4  precludes it because it says the amount is the amount.  The

5  amount that was found is the amount, period.

6          Does that change your opinion, sir?

7  A    I don't think it does.

8  Q    Okay.  All right.

9          Well, you know, I'm just going go to my last section and

10 we'll be done here.  We don't need to have this up anymore.

11         I want to talk about -- I want to bring us back to Judge

12 Houser, who's the settlement trustee, if she actually wants

13 this job.  Because what I heard you say today, this is an

14 enormous undertaking; is that fair?

15 A    It's fair.  Over 82,000 claims.

16 Q    Over 82,000 claims.

17         And she has to act as the fiduciary to the trust, to the

18 direct abuse claims, right?

19 A    Yes.

20 Q    She will be working with the -- I know you challenged me

21 saying "supervision," so I don't want to say supervision --

22 she will be working with the Settlement Trust Advisory

23 Committee reviewing her work, right?

24             MR. MARTIN:  Objection; form.

25             THE WITNESS:  I'm not sure I understood it as them,

1  you know, deciding what she can and can't do or giving a

2  thumbs-up or a thumbs-down on the decision she makes.  It

3  could be that some claimants would disagree, ask for

4  reconsideration.  She could reconsider it and come to a

5  different conclusion.  If she doesn't, they then have the

6  option of going to the tort system.

7  BY MS. MCNALLY:

8  Q    I'm talking about the STAC, sir.  That the STAC has --

9  the STAC, made up of the seven personal injury claimant

10  council, they has to consult with them on some issues, many

11  issues, right?

12  A    On some issues, but I didn't see anywhere in the TDPs

13  where she's submitting her decision --

14  Q    Right.

15  A    -- for approval to the STAC.

16  Q    My point is, simply, she has to consult with these seven

17  individuals who hold tens of thousands of abuse claims as part

18  of her job?

19  A    Yes.

20  Q    And for some very significant rules or questions, she

21  has to get their approval on things, such as hiring, right?

22  A    I believe so.

23  Q    And then some issues, she actually has to get not just

24  majority, she has to get supermajority, she has to get

25  supermajority agreement, right?

1  A    Yes.

2  Q    Five out of seven, plus, in some circumstances, the

3  future claimants representative --

4  A    Yes.

5  Q    -- to do her job, right?

6  A    Yes, that's part of it.

7  Q    And part of the job is just ordinary course stuff like

8  (audio interference) --

9  A    Sorry?

10  Q    Yeah, I did that.

11        -- like hiring.  Ordinary course work, she's got to go

12  through the trouble to get this approval, right?

13  A    I believe so.

14  Q    Right.  She has to field -- and so, from now on, when

15  they say, "she," it's going to be she and her staff, approved

16  by the seven, okay.

17  A    Okay.

18  Q    So, she and her seven, approved by the seven, are going

19  to have to be investigators on 82,000 -- let's say 75,000,

20  because we're going to put to the side, the convenience class,

21  even though I think there's even some work you said that they

22  need to do for those -- 75,000.  She has to be an investigator

23  on 75,000 claims?

24        MR. MARTIN:  Your Honor, objection.  This is

25  repetitive, asked and answered.

1          THE COURT:  It is somewhat repetitive.

2          MS. MCNALLY:  I have -- it'll be under three

3  minutes.  I'm just kind of summarizing.  I'd like to get this

4  altogether, sir.

5          MR. MARTIN:  Then it's argumentative in a closing.

6          THE COURT:  Is there anything new?  Are there new

7  questions?

8          MS. MCNALLY:  Just a moment.  Just a couple

9  questions, then.

10          THE COURT:  Okay.

11  BY MS. MCNALLY:

12  Q    So, putting together, sir, she has fact development and

13  evaluation and legal research obligations to do for 75,000

14  claims, at least?

15  A    Yes.  I'm not sure that she would be replicating all of

16  that for each and every claim.  Presumably, once the work is

17  done for some claims in, I don't know, New Jersey, say, I

18  would imagine they're not going to have to redo the research

19  for that every single time and look at the law every single

20  time.

21  Q    Okay.  Some efficiencies.

22          And on top of that, she's charged with detecting fraud?

23  A    Yes, the whole process, yes.

24  Q    And this will be on a budget, taking assets from the

25  Trust?

1  A      Yes.

2  Q      Okay.  Well, that sounds like quite a challenge.

3         Would you agree with me on that?

4  A      It's a challenge, but she's a former Federal Court

5  judge, so I'm sure she's up to the task.

6  Q      Okay.

7            MS. MCNALLY:  Well, Your Honor, I'd like to, other

8  than the conflict issues that we mentioned a couple times now,

9  I don't have any further questions for Mr. Burnett.

10           THE COURT:  Thank you.

11           MR. MARTIN:  And, Your Honor, we do have something

12 to report on that.  So, we have, during the breaks, we have

13 had an opportunity, or Mr. Burnett had an opportunity to get

14 some information that I am able to share with everyone.

15           So, the first item, which was the reinsurance

16 dispute, which his last work on it was in 2009.  The -- he

17 represented Church Insurance Company -- that's the name of the

18 insurer -- Church Insurance Company, a captive for the

19 Episcopalian Church.  That case had no connection, whatsoever,

20 to Scouting and it's a closed matter.

21           The second matter was a representation of an

22 insurer in 2010.  His last work was 2011.  It involved a claim

23 involving a hospital.  He cannot recall who the carrier is,

24 however, it has absolutely nothing to do with Scouting, and as

25 I said, his last work on it was 2011.

1         THE COURT:  Okay.  Thank you.

2         MS. MCNALLY:  Okay.  Well, I might have some

3  questions on redirect, but for right now, I have no other

4  questions.

5         MR. MARTIN:  Your Honor, may we take a short break

6  before we go to redirect?

7         THE COURT:  Yes.  We'll reconvene at the top of the

8  hour.

9         MR. MARTIN:  Thank you.

10         MS. MCNALLY:  Thank you.

11     (Recess taken at 3:49 p.m.)

12     (Proceedings resumed at 4:02 p.m.)

13         THE COURT:  Mr. Martin?

14         MR. MARTIN:  Thank you, Your Honor.

15                    REDIRECT-EXAMINATION

16  BY MR. MARTIN:

17  Q    Mr. Burnett, it's been a long day.  Thank you for being

18  here.  I have several areas of questions that I'd like to go

19  over with you.

20      I want to start with your testimony concerning your work

21  with the National Catholic Risk Retention Group and what kind

22  of entity is that, again, sir?

23  A    It's a retention group.  It's something that's owned by

24  the shareholder bishops and the Christian Brothers, which is

25  the largest shareholder by the insureds of the company.

1    Q      Is it operating as an insurer?

2    A      Yes.

3    Q      And what do they do with claims?

4    A      All claims are sexual abuse claims.

5    Q      And do they deny claims from time to time?

6    A      They deny claims.  They provide defense the primary

7    (indiscernible) excess is 750, excess up to 250 SIR,

8    typically.  And so, sometimes they're not getting involved

9    until a little bit later, but they are associated with defense

10   and so they are defending claims and consulting with their

11   insureds on claims.  They bring me in on the sexual abuse

12   claims.

13   Q     And, sir, how long have you been consulting with this

14   organization?

15   A     I think for just about -- you know, I've had my own

16   business now for 19 years -- probably about 18 and a half of

17   that time.

18   Q     And what, specifically, do you consult with them about?

19   A     A number of things.  They bring me in on claims to

20   consult on the liability exposure and defensibility of claims,

21   on value of claims.  I have attended many mediations both, on

22   behalf of the director of claims or even sometimes both of us

23   are there.  Just any number of different things.

24   Q     And you mentioned claims, what kinds of claims do you

25   consult with them on?

1  A     The overwhelming majority of my work has been on sexual

2  misconduct claims.  There have been a few employment claims

3  that they brought me in on and I've also assisted on the

4  drafting of some of their forms.

5  Q     And are those claims both, in and out of litigation?

6  A     Yes.

7  Q     And what percentage of those would be involved in

8  litigation?

9  A     I would say the overwhelming majority of them are in

10  litigation.

11  Q     Okay.  Sir, I want to draw your attention to the TDPs.

12  We're going to have -- I'm going to have Mr. Brooks put the

13  TDPs up on the screen and I'd like to ask you some questions

14  about that.

15  A     Okay.

16  Q     I'd like to draw your attention to paragraph (b) on page

17  164.  Do you see, the title is "general principles"?

18  A     Yes.

19  Q     Okay.  Can you read just the first two lines of that

20  paragraph.

21  A     General principles:  To achieve maximum fairness and

22  efficiency and recoveries for holders of allowed abuse claims.

23  These TDP are founded on the following principles.

24  Q     And then there are a number of principles that are

25  listed below there.

1    Do you see that?

2  A    Yes.

3  Q    What does last one say?

4  A    Independence of the settlement trust and settlement

5  trustee.

6  Q    And earlier in your answers to Mr. McNally --

7  Ms. McNally's questions, excuse me -- you mentioned the

8  settlement trustee being independent.

9  A    Yes.

10  Q    Do you remember that?

11  A    I do.

12  Q    Okay.  What do you understand independence to mean?

13  A    I understand it to mean independent of the other

14  stakeholders involved.  That they're -- she will not be

15  aligned with either the, what you might call the Plaintiff or

16  the claimants, nor will she be aligned with the debtors or the

17  insurers.

18  Q    And there was a lot of discussion earlier this afternoon

19  by Ms. McNally about the STAC and the trustee.

20    Do you remember that?

21  A    Yes.

22  Q    Okay.  And you, of course, know that the settlement

23  trustee that has been approved is retired judge, Barbara

24  Houser; is that right?

25  A    Yes.

1  Q     Okay.  Do you have any concerns that former Judge Houser

2  will be influenced by the STAC?

3  A     I do not.  As a former Federal Court judge, I can't

4  imagine that.

5  Q     Do you have any concerns that she won't influence the

6  STAC?

7  A     That she won't influence them?

8  Q     Yeah.  Is there a possibility she could influence the

9  STAC?

10  A     I would guess that in conferring with them, that she

11  potentially could.

12  Q     And do you have any concerns that former Judge Houser

13  will be influenced by the FCR?

14  A     No.

15  Q     Why not?

16  A     Because she's a former Federal Court judge and she has a

17  reputation, I would assume, that she would want to uphold.

18  She has ethical standards that she would want to abide by.

19       There would be -- the TDPs provide a set of guidelines

20  and a process to go by and it would seem that if she started

21  to stray from that or it was apparent that she wasn't

22  following them appropriately, that that might be apparent.

23       And just in a personal way, I would think that however

24  she is compensated, that it's not on a contingency; she

25  doesn't have a stake in the matter if she, you know,

1  disproportionately favors one claimant over another.

2  Q     What do you understand the settlement trustee's

3  responsibilities are, just generally speaking?

4  A     Generally speaking, the settlement trustee's

5  responsibilities are to accumulate as much information and

6  evidence as is available that she believes is necessary to

7  evaluate the credibility of the claim and the validity of the

8  claim as one that should be subjected to the valuation process

9  and then in addition to that, to then, if it makes it to that

10 level, then to employ the valuation parameters of Article 8 of

11 the TDPs to value the claim.

12       And, of course, part of that would be to make sure that

13 there's no fraud and to make sure that the claimants have

14 survived the gatekeeping, you know, the gatekeeping steps of

15 the process.

16 Q     Given your understanding of the TDPs, Mr. Burnett, who's

17 the one that makes the decision on whether or not a claim is

18 allowed?

19 A     The trustee.

20 Q     And who makes the decision on whether or not a value is

21 assigned to an allowed amount?

22 A     The trustee.

23 Q     And given your understanding of how the TDPs work, is

24 the STAC involved in approving whether or not the claim is

25 allowed?

1  A      No.

2  Q      Is the STAC involved in approving the claim values?

3  A      No.

4  Q      Is the STAC involved in determining whether or not to

5  make a reconsideration of one of the decisions concerning

6  whether a claim is allowed?

7           MS. MCNALLY:  Your Honor, I have to object to these

8  leading questions on redirect.

9           MR. MARTIN:  Your Honor, this is an expert opinion.

10  We're trying to move things along.

11           THE COURT:  Yeah, I'll permit this, but let's get

12  into some non-leading questions.

13           MR. MARTIN:  Okay.  Thank you, Your Honor.

14  BY MR. MARTIN:

15  Q      Do you know who the claims administrators are that have

16  been approved in connection with the TDP?

17  A      I remember seeing the names.  I believe one was a Judge

18  Reagan.  I don't recall the other name.

19  Q      Does former Judge Diane Welsh ring familiar?

20  A      Yes, it does.

21  Q      And do you have any concerns about the independence of

22  either one?

23  A      I don't.  In a similar way to Judge Houser, my

24  understanding is that they're former Federal Court judges and

25  that there's no reason for me to believe that a former Federal

1  Court judge would be anything other than fair and impartial.

2  Q    Now, Certain Insurers have suggested that the governance

3  structure of the TDPs create a moral hazard.

4       What is a moral hazard in your understanding of that

5  term?

6            MS. MCNALLY:  Your Honor, I would have to object.

7  This is not within the scope of the cross.

8            THE COURT:  Where was it?  When was moral hazard

9  used?

10           MR. MARTIN:  Let me rephrase.  Thank you, Your

11  Honor.  Let me just rephrase that.

12  BY MR. MARTIN:

13  Q    Are there any checks-and-balances, to your knowledge,

14  Mr. Burnett, against the trustee maximizing the value of a

15  claim every time?

16  A    I think there are.  First of all, there are the embedded

17  checks-and-balances in the sense that there are gatekeeping

18  places in the TDPs where a claimant would not even make it to

19  a level of that claim being evaluated by Judge Houser if they

20  didn't survive that level.  So, in a sense, those could be

21  considered a check and a balance.

22       In addition to that, the trustee will have fiduciary

23  duties to the trust and that's a check and a balance; a check

24  on potential misconduct, I guess you would say.  And as part

25  of that, I think that with respect to fiduciary duties, if the

1   trustee and her staff were not to properly valuate a claim or

2   evaluate it in the first instance to let it go to the

3   valuation stage and then to evaluate the claim, so that

4   perhaps one claim were to be disproportionately valued higher

5   than it should have been, that does a disservice to other

6   claimants that may be in the system and who have passed those

7   other gate places on a threshold to have their claim evaluated

8   and valuated.

9   Q    I want to direct your attention to Article 7(a) of the

10  TDP and it's entitled "claims-allowance process."

11       Can you see that?

12  A    I do, yes.

13  Q    Just generally speaking, and then I'll ask you some more

14  specific questions, what do you understand the purpose of this

15  section of the TDP to be?

16  A    Primarily, my understanding is that it is to provide the

17  framework within which the claim will be evaluated by the

18  trustee so that it sets forth the various things that the, the

19  various submissions that have to be made by the claimant to

20  reach that point and then provides a framework within which to

21  assess the, by a preponderance of the evidence, whether or not

22  the claimant has produced that, to assess whether that claim

23  should move on to the next level.  And that is based on all of

24  the materials that would be gathered by the trustee.

25  Q    Okay.  And so, I'm going to go over this in a little bit

1  more detail with you.  If you look at the second sentence that

2  begins, "In order to properly make a trust claim

3  submission ..."

4        Do you see that?

5  A    Yes.

6  Q    And there are certain things that an abuse claimant must

7  do in order to properly make a trust claim submission.

8        What are those things?

9  A    So, as it's set forth there, they have to complete,

10  under oath and under penalty of perjury, the questionnaire,

11  which I understand has not been created yet, produce all

12  records and documents that they possess or they have some kind

13  of control over, that they can produce, pertaining to

14  settlements and awards, contributions, anything that would be

15  relevant in the valuation of the claim.

16        Execute an agreement where they are agreeing to make

17  themselves available for statements or interviews under oath

18  and to produce further records and documents.  I already said

19  to cooperate in examinations.  I think I covered most of that,

20  didn't I?

21  Q    And, sir, what happens if the abuse claimant doesn't

22  comply with each of these requirements, that is to say

23  arbitration questionnaire under oath, production of documents,

24  et cetera, what happens?

25  A    The claim would be disallowed.

1    Q     Okay.  So, when you were talking to Ms. McNally earlier

2    about the questionnaire, that was just one of the things,

3    right?

4    A     That's correct.

5            MS. MCNALLY:  Objection; leading.

6            Your Honor, I appreciate him going with efficiency

7    here, but this is direct and it's actually a new direct being

8    done in the guise of redirect.  So, I object to the leading

9    questions.

10           THE COURT:  Sustained.

11   BY MR. MARTIN:

12   Q     What role does the STAC have in whether any of the items

13   that we just looked at are completed?

14   A     They don't have any role in that.  They're not the ones

15   that are accumulating information and evaluating the

16   information.

17   Q     I want to talk to you about the expedited distribution

18   process that we -- you spoke about that earlier.  Do you

19   recall your testimony, Mr. Burnett, about the expedited

20   distribution?

21   A     I do.

22   Q     And do you remember questions about not requiring a

23   signature being signed on behalf of an attorney, do you

24   remember that line of questioning?

25   A     I do remember that.

1  Q      I'm going to show you the TDP Section VI(a).

2            MR. MARTIN:  If you could turn to that, Mr. Brooks.

3  Thank you.

4  BY MR. MARTIN:

5  Q      And you'll see paragraph (a) --

6            MS. MCNALLY:  I'm sorry, apologies.

7            What page is that of the PDF?

8            MR. MARTIN:  Yes, 61 -- 161, I'm sorry.

9            MS. MCNALLY:  Thank you.

10 BY MR. MARTIN:

11 Q      Are you familiar with this provision, sir?

12 A      I am.

13 Q      And what do you understand is the requirement for an

14 abuse claimant to be entitled to an expedited distribution

15 under the TDP?

16 A      They have to have submitted the proof of claim under

17 their signature or signed a proof of claim and with the

18 information that's required under that, you know, as indicated

19 as Article 4, I believe, that is the supplementary materials

20 and information to corroborate their claim.

21 Q      Is there anything in this provision that refers to how

22 they must sign it or attest to it?

23 A      I do not see that.

24 Q      Do you see Roman numeral -- I'm sorry -- 3?

25 A      Roman numeral 3:  The direct abuse claimant has

1  personally signed his or her proof of claim --

2         MR. MARTIN:  Could you highlight that, please.

3  Thank you.

4  BY MR. MARTIN:

5  Q    Do you see there where it says that it must be done

6  under penalty of perjury?

7  A    Yes, I do.

8  Q    Okay.  And so, I'd like to show you JTX-1475, please.

9         MR. MARTIN:  Mr. Brooks, if you could put that on

10  the screen.

11  BY MR. MARTIN:

12  Q    Okay.  This, sir, is a proof of claim form, just a blank

13  form.  I know you have not seen any of them or reviewed them,

14  but have you reviewed this blank form in connection with your

15  review of the TDPs?

16  A    I have, yes.

17  Q    Okay.  Would you please look at page 11 of 12.

18  A    Okay.

19  Q    Do you see part 6 -- if you could highlight that,

20  please -- okay.  Can you explain to the Court what kind of

21  information does this proof of claim require of an abuse

22  claimant.

23  A    It requires them to answer whether or not there was a

24  lawsuit that was regarding sexual abuse allegedly suffered by

25  the claimant and that they filed and it was filed on their

1  behalf.  And if it was, they have to attach a copy of that

2  complaint from that lawsuit and, presumably, they filed it and

3  it was filed on their behalf.

4  Q    What else?

5  A    Also, prior to bankruptcy claims, relating to, again,

6  relating to sexual abuse.  That also requires that they attach

7  a copy of the completed claim form, any payments that they may

8  have received in those actions, a lawsuit, a bankruptcy, and

9  the amount that they received.  And it asks whether or not

10 they are currently a debtor in a bankruptcy case and if the

11 answer is yes, then they have to provide the name of the case,

12 the court, the date it was filed, and the case number, and the

13 type of bankruptcy -- Chapter 7, 11, 12, or 13 -- and the name

14 of the trustee.

15 Q    And if they fail to do so, what happens?

16 A    If they fail to provide that information when it

17 happened?

18 Q    Yes.

19 A    Then they would be ineligible to receive compensation.

20      And like this says, if it's fraudulent, they could face,

21 potentially, criminal liability.

22          MR. MARTIN:  You can take that down.  Thank you.

23 BY MR. MARTIN:

24 Q    In your experience, Mr. Burnett, handles sexual abuse

25 claims, what is your experience in terms of how an insurance

1  company would react to being able to settle a claim for $3500?

2  A    My clients, both policyholders and insureds, would jump

3  at a chance to pay $3500 to resolve a claim.

4  Q    And can you explain to the Court, is that dependent on

5  anything at all in terms of what they would have to do?

6  A    Well, I think, just the opportunity to settle for that

7  amount, a sexual abuse claim -- sexual abuse claims are very

8  volatile.  They are traumatic for the people involved.  There

9  is a very difficult to defend against and, so, if for example,

10  a claim came in the door and in pretty short order, they were

11  able to determine that they could reach agreement on a $3500

12  amount, it wouldn't require much more than that if, for

13  example, there was a strong statute of limitations defense.

14  But the cost of, let's just say you had a guaranteed win, the

15  cost of achieving that and even if it were on appeal would be

16  significant -- typically be significantly more than $3500.

17  Q    If you, in handling the sexual abuse claims that you do

18  handle on behalf of an insurer, if you had the information as

19  contained in the proof of claim that we just saw, would you be

20  recommending that your clients pay that amount, the $3500?

21  A    Yes.

22  Q    And why is that?

23  A    Because the amount is to *de minimis* that it would not be

24  in their best interests to litigate the claim at a

25  significantly higher cost even if it meant that it would be

1  completely successful.  And in the case of the National

2  Catholic Risk Retention Group, where there's a large SIR, they

3  and their shareholders are generally pretty much in lockstep

4  agreement about the handling of those claims and especially

5  when I'm brought in and I can confer on those.

6  And of course that amount will be well within the self-insurer

7  retention and would not implicate National Catholic's layer,

8  which they call the buffer layer, the

9  seven-hundred-and-fifty-thousand-dollar layer.  And so that is

10  something that they would, like I said, they would jump at the

11  chance to do that.

12       And as a general matter, as well, my experience has been

13  that the overwhelming majority of sexual abuse allegations in

14  the thousands that I have handled are true or that they are

15  largely true.  And so, if you understand that from the get-go,

16  then litigating a volatile claim like that when you know you

17  could get out for $3500 -- it sounds crass to say it that

18  way -- but that you could resolve a claim for $3500 would be

19  the right thing to do.

20  Q    Sir, you said a couple of things that I want to camp on

21  for just a second.  You said that sexual abuse claims are hard

22  to defend.

23       Why is that?

24  A    Well, number one, the claims are really tragic.  They

25  involve really tragic circumstances.  They are very emotional

 1  claims.  They are very volatile claims.  People have been

 2  grievously harmed in a number of different ways when they were

 3  at a very vulnerable time in their lives; assuming we're

 4  talking about minors, when they were at a very vulnerable

 5  point in their lives.  And it generally has had profound

 6  impact on their maturation, their sexual development, their

 7  ability to be in healthy relationships and to achieve some of

 8  the things in life that they were hoping to achieve, whether

 9  that's higher-education or a career of their choice, that kind

10  of thing.  So, there's that.

11       But then, let's just say the Catholic Church context and

12  increasingly, the other denominations, as well, there's a

13  growing perception among many people in the community -- and I

14  know that anecdotally, I also know that through my work --

15  that, let's say, that the Catholic Church is a hotbed of abuse

16  and when people hear about sexual abuse allegations, that

17  they're always true, and that there was always a cover-up.

18  That bishops knew what was happening and chose to turn a blind

19  eye.  And there is enough information out there about a bygone

20  era where that was true, that it's not an unfounded

21  assumption.

22       By the same token, I have worked on many, many claims

23  where that was not true, where the abuse that happened would

24  have been completely unexpected because there was no

25  indication whatsoever that the perpetrator was, in fact, a

1  perpetrator and would do such a thing.

2  Q      Thank you.

3       I want to talk about the procedures that are set forth

4  in the TDP.  And if you look --

5              MR. MARTIN:  And, Mr. Brooks, if you'll put the TDP

6  back on the screen.  Again, this will be Exhibit 1 through 53.

7  We will be on page 163 of 459.

8  BY MR. MARTIN:

9  Q      Do you see in the middle of the page, there's a

10  reference to settlement trustee review procedures?

11  A      Yes.

12  Q      I just want to talk generally and get your understanding

13  of the overall procedures that are set forth in the TDP.

14       Can you kind of walk us through those procedures.

15  A      Yes, so, this says, for example, initial evaluation

16  criteria.  So, some of the procedures are really threshold

17  matters.  They are submitting claims, but there are certain

18  requirements being placed on the claimant that's coming

19  forward to submit a certain amount of information and

20  materials in their possession or control at that initial stage

21  to meet that standard and not be a disallowed claim, so to

22  speak, and then go on to the next level.

23       And those require certain date restrictions and, you

24  know, it says like 1(b) says a timely submitted for the claim

25  and not previously resolved and it's that the proof of claim

1  has been substantively completed under penalty of perjury.

2       And so, those -- all that information is or all those

3  procedures are procedures that allow that person to get to the

4  next level.

5  Q    Let me stop you there and ask, how would you compare

6  that or liken it to what you would find in the tort system?

7  A    I analogize it to almost like a motion to dismiss stage,

8  whether or not there's a motion to dismiss filed or there's

9  contemplation of that.  You know, my clients are often times

10 looking for whether or not something is -- whether the

11 elements have been -- the elements of something have been

12 toward have been alleged, whether there is -- it's timely

13 filed, whether it's been served, whether the allegations that

14 have been made are sufficient, that kind of thing.

15      And so that -- so, when I'm brought in on a claim, often

16 times, those decisions or that analysis has already been done.

17 Q    And at this stage, what can the trustee (audio

18 interference) -- at this stage, what can the trustee actually

19 do?

20          MS. MCNALLY:  Objection.  Your Honor, I would just

21 like to object to the cumulative and asked and answered nature

22 of every single one of these questions.  If the parties wanted

23 to do a direct, they should have done a direct.  This is

24 cumulative redirect and I would request that we move in an

25 efficient manner and not just repeat the direct that would

1 have been handled by direct if there had been one, rather than

2 the choice to do a declaration.

3          MR. MARTIN:  Your Honor, I am just trying to go

4 through, topically, some issues that were raised on cross;

5 that's all I'm doing.

6          THE COURT:  I think this is close enough to the

7 cross, but yes, let's not do a whole direct.

8          MR. MARTIN:  Yes, Your Honor, of course.

9 BY MR. MARTIN:

10 Q     Concerning this initial evaluation criteria phase or

11 procedure what can or cannot the trustee do?  What is the

12 trustee permitted to do?

13 A     Well the sentence right after Subsection (c) is very

14 explicit that if they have not met those provisions that the

15 trustee can disallow the claim.

16 Q     Okay.  Let me get quickly to the next section which is

17 the general criteria and we have heard you discuss various

18 issues concerning this, sir.  If you could go to the next

19 page, please.  I want to draw your attention to the connection

20 to scouting Subparagraph (c) and you recall there were a

21 number of questions by Ms. McNally about this particular

22 language.  I am going to draw your attention to, it says,

23          "The abuse claimant has provided information showing,

24 (II), that a protected party may bear legal responsibility."

25          Do you remember that line of questioning?

1   A      Yes.

2   Q      I think you were directed to note that the word

3   "negligence" is not there?

4   A      That is correct.

5   Q      Is that a concern for you?

6   A      Not really.  I believe that the general criteria that

7   are listed in this in many respects they mimic the elements of

8   negligence.  You know, there has to be a showing of an

9   activity, a connection to scouting activity that there was an

10  abuse that was perpetrated by someone that in some way was

11  connected with that.

12      In addition to that I think that adding this Subsection

13  (II) in the updated TDP's that they broadened it.  The example

14  I gave at my declaration was that, for example, in the state

15  of Oregon under Fearing v. Bucher that the Oregon Supreme

16  Court has held that there is responding on liability

17  available.  And so it's not just something that would be

18  limited to negligence, a negligence cause of action depending

19  on the jurisdiction.

20      I believe that given the general criteria that the

21  claimant has to show that if they show -- if they are able to

22  meet by preponderance of the evidence those various elements

23  that essentially what they are doing is that they are making a

24  claim of negligence.

25  Q      I want to ask you a question about the sexual abuse

1  matters that you have been involved in over the course of your

2  career.  Looking at that experience how many of those claims

3  actually went to trial?

4  A    Of the claims that I have worked on since I started by

5  business I don't recall any that have gone to trial.  Now when

6  I was in Lord, Bissell & Brook and we were working on

7  thousands of claims on behalf of London I don't recall.  It's

8  possible that some of those that I worked on directly or that

9  reported on may have gone to trial, I just don't recall.  If

10  so it would be a very, very negligible number of those claims.

11  Q    Do you have an opinion, sir, as to why that is the case?

12  A    Yes.  I think because of the volatility of the claims

13  it's really difficult to take the risk to go to trial and to

14  try to get a (inaudible) verdict.  So, for example, several

15  years ago in the Diocese of Rockville Center in New York there

16  was a girl and a boy, teenagers, that were sexually abused by

17  a youth director.  I guess that diocese decided to go to trial

18  on those claims.  The result was, I think, that the verdict

19  for the male was like $5.9 million, for the female it was

20  something like $5.5 million.  So combined over $11 million.

21      In addition to that, in the Diocese of Burlington,

22  Vermont a number of years ago anecdotally I know from the

23  people I know there they felt that their backs were against

24  the wall, so to speak, because plaintiff's counsel didn't come

25  off their demands.  So they took several cases to trial and

1  they lost those cases primarily for very large verdicts.

2  There was one case that the jury did find was barred by the

3  statute of limitations, but the jury still awarded $15,000

4  inexplicable to the plaintiffs.

5       So even in a case where the jury felt that it was barred

6  they were willing to award money to the plaintiff.

7  Q    Can you explain to the court your experience as to

8  whether or not religious institutions, educational

9  institutions or insurers generally advocate going to trial or

10 not?

11 A    They generally advocate not going to trial.  They

12 recognize the cost and the risk involved in taking,

13 especially, these types of claims to trial.

14 Q    So Ms. McNally mentioned in her examination of you that,

15 for example, the TDP's don't have anything about the right to

16 file a *motion in limine*.  Do you remember hearing that?

17 A    I do recall that.

18 Q    Do you know what a *motion in limine* is?

19 A    I do, yes.

20 Q    What is it?

21 A    That is where the parties go before the court before

22 trial to try to get the court to not permit certain evidence

23 to come in at trial.

24 Q    Okay.  But in your experience these cases rarely go to

25 trial, right?

1  A      That is correct.

2  Q      And she also mentioned --

3  A      May I expand on that?

4  Q      Yes, please.

5  A      When I do a comprehensive evaluation of a claim I look

6  at those types of things and I often times will do

7  comprehensive valuation reports for my clients where I discuss

8  things like that where I indicate often times the severity of

9  very bad evidence and whether I believe, based on my research

10 and based on discussions with defense counsel, a court is

11 likely to admit certain kinds of evidence that potentially

12 could be exculpatory things like that.

13 Q      I want to talk now with you, Mr. Burnett, about the

14 defenses that are raised in sexual abuse claims and how those

15 defenses might compare with what is found in the TDP's.  Do

16 you remember that line of questioning that Ms. McNally went

17 through with you?

18 A      Yes.

19 Q      Okay.  I want to start with the statute of limitations.

20 You were questioned about that.  Do you remember that?

21 A      Yes.

22 Q      Okay.  Mr. Brooks, if you could please go to Schedule 1

23 that is attached to the TDP's and it is found on page 190 of

24 459.  My apologies, it starts at 189 and goes to 190.

25        Mr. Burnett, do you recall reviewing Schedule 1 of the

1  TDP?

2  A     Yes.

3  Q     Can you explain to the us what this is?

4  A     So there are different categories, closed gray one, gray

5  two, different categories that, essentially, batch various

6  states into a category where they are -- where, you know, the

7  statute of limitations may be closed, for example. It's a very

8  clear and probably strong defense.  So there is a number that

9  is assigned to that.

10      So if you look at the legend above that is in green

11  there are those -- that first category of states that are

12  closed then the scaling factor that the trustee would apply to

13  claims in those states would be .01 to .1 depending on the

14  circumstances presumably with the facts of the particular

15  claim.  Then there are other gradations of, you know, I guess

16  you would say, the strength of the statute of limitations

17  defense in certain jurisdictions.

18  Q     Do you remember the questions that were asked of you

19  concerning at what period of time you might be considering a

20  particular statute in a particular state.  Do you remember

21  that line of questioning?

22  A     Yes.

23  Q     Now looking at the scaling factor here is it just one

24  number?

25  A     No.

1  Q     What do you see there?

2  A     There are five different categories and then there's a

3  range within each category.

4  Q     Okay.  So in each category there is a range and so how

5  does that factor into your analysis, Mr. Burnett, that the

6  trustee would be determining in applying the statute of

7  limitations issue in connection with valuing a claim?

8  A     Well, again, it depends on -- the strength of the

9  statute of limitations with a defense perspective in a

10  particular category of state and then I think that given the

11  range that the trustee could likely look at the law, her staff

12  could look at the law in a particular state (inaudible) of

13  that law, and depending on where it stands and what would be

14  applicable and maybe how courts and legislatures in that

15  jurisdiction have handled the issue of statutes of limitation

16  and the applicability of one version of the statute verses a

17  prior version.  That could affect where on that range -- just

18  say grade two, for example, the range of .3 to .45 I think

19  that the trustee could probably determine where on that range

20  a particular claim might fall when there has been an evolution

21  of the statute of limitations.

22  Q     In your experience handling sexual abuse claims, Mr.

23  Burnett, would you and your clients ever settle claims that

24  you believed you had a statute of limitations defense?

25  A     We regularly settled claims that we believe have statute

1  of limitation defenses.

2  Q    Why?

3  A    Because, number one, and, of course, it depends on the

4  jurisdiction as well, it's not always as simple as saying, oh,

5  we have a strong statute of limitations defense, this case is

6  barred, we will clearly get dismissed or granted summary

7  judgment.  My experience is that that is somewhat rare.  It's

8  increasingly rare.  It has happened.  I am aware of cases, but

9  what my experience has been is that often times there are

10 judges who will not apply the law the way you would expect

11 them to.  That has happened.

12     You know, I handled -- I ultimately worked on about 300

13 claims in the Diocese of Manchester for a number of years and

14 they had a very strong statute of limitations defense in the

15 state of New Hampshire, but when there was a case that went

16 before the local court on that issue, and there was an

17 expectation that it would be barred, the judge did not apply

18 the law.  So it appeared that he overwhelming majority of the

19 claims confronting the diocese would land in that court.  The

20 consensus with defense counsel and the risk manager was that

21 the judge was trying to get the parties to come to some kind

22 of a settlement in a really tragic claim which led to us

23 engaging in really protracted settlement negotiations with a

24 series of plaintiffs' attorneys on well over 120 claims over a

25 period of probably six months where the understanding was the

1  overwhelming majority of those claims, if the statute of

2  limitations were applied as one would expect that they would

3  be barred.

4  Q    So the fact that the statute of limitations issue is not

5  a gain issue is that a concern for you?

6            MS. MCNALLY:   Objection; leading again.

7            MR. MARTIN:   Is it a concern?

8            THE COURT:   Restate your question, please.

9  BY MR. MARTIN:

10  Q    Do you have any concerns, sir, concerning where the

11  statute of limitations is in the TDP?

12  A    I don't.  In the initial -- the general TDP I don't

13  because in terms of having a real world effect the TDP's, by

14  having a .01 to .1, let's say, in the jurisdictions with the

15  strongest statute of limitations defense that indicates a real

16  world assessment of what it might cost even when there is a

17  strong statute of limitations.

18        So if it were a gating -- if it were way up, you know,

19  at the beginning of the process as kind of a threshold that

20  would not be realistic in my experience because the many

21  claims that I work on many, many of them have statutes of

22  limitations and we understand in the very beginning,

23  especially where it seems very apparent that the claim is

24  true, that it is an enormous risk to try and stand on that

25  defense and avoid the opportunity to try to settle at a

1 reasonable number early on in the claim.

2 Q    Now Ms. McNally was quick to remind us that there are

3 many other defenses that defendants might raise in the tort

4 system in defense of a sexual abuse claim.  What other

5 defenses are you aware of that are actually captured in the

6 TDP?

7 A    Well it's interesting because one of the general

8 criteria is that they have to allege abuse.  And, for example,

9 I worked on -- one claimant comes to mind, a 17 year old boy,

10 he was in his late 40's by the time he came forward, he had

11 been part of a youth group where there was a priest that was a

12 director of the youth group, at the end of every meeting they

13 all hugged each other, all the participants and the leaders,

14 and many years later that priest was implicated in several

15 sexual misconduct claims.

16      This individual came forward and said when I was 17 I

17 was in this group and I was sexually abused by the priest.

18 And in asking questions of him and receiving materials it was

19 very obvious from the behavior that he indicated that there

20 was no sexual abuse.  He was, you know, kind of in his words

21 "creeped out" by the fact that the guy that he had admired and

22 was kind of a mentor had been involved in sexual abuse, but

23 when he described the actions it wasn't sexual abuse.

24      It could be a situation where there was no connection

25 with the insured diocese.  I worked on a claim where an uncle

1    priest sexually abused his nephew.  It was on a family trip.

2    The nephew wasn't in his congregation, he wasn't his pastor,

3    and it was very apparent that the only reason that he was able

4    to abuse his nephew was because of the familial connection,

5    not because he was a priest of the diocese.  So that claim was

6    one that I represented London on and I put a zero valuation on

7    that claim and indicated that London would not be providing

8    coverage because really there was no connection between the

9    abuse and the diocese involved.

10   Q    What are those defenses, sir, where are they found in

11   the TDP?

12   A    Well there is the obligation to file -- to allege abuse,

13   to allege that someone -- you know, who the abuser was and

14   what the connection to scouting was.  So sometimes if they

15   can't name someone, and I've had that experience too where

16   they are not -- the person who is alleging abuse is not able

17   to identify someone that even remotely resembles someone that

18   was at that location at that time.  So that is a defense

19   where, again, it doesn't appear that anyone that is from the

20   institution had anything to do with that person's abuse.

21   Q    Mr. Brooks, could you put on the screen -- again, we're

22   still looking at the TDP.  Would you please go to page 171 of

23   459, Mr. Brooks, please.  Thank you.

24        I would draw your attention, Mr. Burnett, to the

25   mitigating scaling factors.  How do those factors instruct

1  your views of what defenses might be available?

2  A    What do you mean?  As I look at the list they do -- they

3  are defenses that might be available.

4  Q    How so?

5  A    Well the one familial relationship is one that I just

6  described where the abuse was perpetrated not in any

7  connection to the institution or the activities of the

8  institution, but because of it's a family member that kind of

9  thing.

10 Q    Before you go on let me just stop and ask you what is

11 your understanding of how the mitigating factors work in the

12 TDP.

13 A    Well there is a base -- the matrix has for each tier or

14 abuse a base value.  Then the trustee assigns either or,

15 and/or an aggravating scaling factor and a mitigating scaling

16 factor to reflect certain aggravating circumstances that might

17 be attendant to the claim or mitigating factors in the form of

18 defenses that would reduce the value of the claim.

19 Q    And if you will go down to B.

20 A    Yes.

21 Q    Does this provision compare to anything you have seen in

22 the tort system?

23 A    Yes.  On a regular basis what I am looking at when I

24 evaluate a claim that is in litigation is whether or not there

25 was a connection to what the activities were or to the

1  institution.  And so, for example, right now I am working on a

2  series of claims involving a residential school where a house

3  father sexually abused some girls that were in the house that

4  he and his wife were responsible for.  That is a clear example

5  of a connection between the abuse, and the institution, and

6  the activities.

7       I have worked on claims, though, where it's really

8  difficult to find that there was any kind of connection to,

9  you know, the institution or the types of activities that are

10 being engaged in, in the institution.

11 Q    What is your understanding of what the trustee can do in

12 applying these mitigating factors?

13 A    The trustee can apply the multiplier which would be for

14 the mitigating scaling factors is something less than one.  It

15 can apply a mitigating multiplier that reflects the presence

16 of a defense that would be something that would affect the

17 size of an award or a settlement that one might expect to get.

18 Q    Mr. Brooks, would you go to the next page, 172 of 459,

19 please.  Were still in the mitigating factors, but do you see

20 little Roman numeral (ii) there on page 172.  Could you

21 highlight that?  Thank you.

22      Could you read that very quickly, Mr. Burnett, please?

23 A    Okay.

24 Q    Do you recall Ms. McNally asking you if certain words

25 were, and I think she used the words "expressly" are they

1  "expressly" in the TDP.  Do you remember that line of

2  questioning?

3  A     I do.

4  Q     Do you remember her saying whether the charitable

5  immunity defense was actually in the TDP.  Do you remember

6  that line of questioning?

7  A     Yes.

8  Q     Okay.  What is your understanding of this highlighted

9  section?  What does this mean to you?

10 A     Subsection (ii)?

11 Q     Yes.

12 A     If the claimant had received some other compensation

13 through the tort system then that would be something that she

14 might consider if she would, otherwise, value the claim at a

15 certain amount, but it's apparent from the materials and

16 information that she has been provided that the claimant

17 receive something from a non-protected party that would be

18 something that would mitigate the value that she would then

19 assign to that claim to account for that.

20 Q     Mr. Brooks, would you highlight the first sentence,

21 please?

22       What is your understanding, Mr. Burnett, based on this

23 language that is in the TDP, what the trustee can do?

24 A     Essentially, what she will be doing is accounting for an

25 offset or a setoff based on other recoveries.

1  Q    You see where it says the settlement trustee may

2  consider any further limitations on the abuse claims recovery

3  in the tort system?

4  A    Yes.

5  Q    Do you understand what that means?

6  A    I believe it means that if -- in the tort system, if the

7  claimant brought his claim in the tort system if there were

8  limitations, whatever those defenses may be, what offsets

9  there may be, any kind of thing that can effect that, that

10 that is something that she could consider as the trustee in

11 the valuation of the claim and the assignment of a mitigating

12 multiplier.

13 Q    Okay.  You can take that down.  Thank you.

14      I want to ask you about discovery that Ms. McNally

15 talked to you about in connection with the TDP as compared to

16 the tort system.

17 A    Okay.

18 Q    First of all, what kinds of discovery do you normally

19 engage in, in connection with a sexual abuse claim based on

20 your experience?

21 A    Well usually there are interrogatories, document

22 production requests, sometimes requests to admit, sometimes

23 there are affidavits involved, sometimes there's an

24 independent medical examination and receive those records, if

25 there are school records that are relevant, or counseling

1  records, medical records.

2         I worked on a claim involving a rape of a

3  cognitively impaired young woman and she had a trip to the

4  emergency room.  So we were able to get all of those records.

5  Any number of different things that you would typically get in

6  discovery.

7  Q    So I heard you say interrogatories, requests for

8  admissions, requests for production, examinations.  Did I miss

9  any?

10 A    The usual thing like depositions and things like that.

11 As a practical matter there is a lot of thought that goes into

12 whether or not -- in the claims that I work on there will be a

13 request for the deposition of the victim survivor because it

14 can be traumatizing and especially if there is enough

15 information that defense counsel and the insurer feel

16 confident they have to assess the claim and whether they want

17 to go forward then subjecting a claimant to that could be

18 traumatizing for the claimant and could sometimes make them

19 angry, embolden them beyond the desire to settle the claim.

20        My experience -- I heard Mr. Griggs say this yesterday,

21 it's exactly my experience which is these claims do not get

22 better over time and sometimes the more information you get

23 the more difficult they get.

24 Q    So of each of these, I'll call them, "discovery tools"

25 that we just talked about how often do you use every single

1  one of them in a defense of a sexual abuse claim?

2  A    Well when I am evaluating a claim whatever is made

3  available to me I review, but I think to your point there are

4  many times when decisions are made about not doing everything

5  that you could.  Like I just mentioned a moment ago not

6  subjecting a victim survivor to a deposition or perhaps

7  deciding not to request an IME, or psychological evaluation if

8  there is significant amount of information in records that

9  already reflect on that kind of information that we would be

10 searching for in discovery and we don't want to antagonize the

11 victim or their counsel in the process of doing that.  So we

12 don't always use every discovery tool and availability.

13 Q    And in your experience handling sexual abuse claims, sir

14 how often do you recommend an independent medical examination?

15 A    Well it depends.  I don't know the answer to that as a

16 percentage.  I mentioned a while ago the claims that are

17 involved with a residential school that are not in litigation.

18 It's pre-litigation.  Plaintiffs' counsel and defense counsel

19 have a very good working relationship and they make a big

20 effort to try to keep the temperate down, so to speak.

21     In those claims, because we are not anticipating going

22 into litigation where you would typically have discovery,

23 defense counsel has requested IME's in those cases.  So that

24 is something that gives me a higher comfort level that I have

25 the information that I need despite the fact that the claim is

1  not in litigation that I need to properly valuate the claim to

2  put a value on it.

3  Q    Have you had experiences where that kind of examination

4  might not be helpful at all?

5  A    Yes. I have had situations where I requested an IME or

6  psychological evaluation and then regretted it after the fact

7  because it really did have the effect of traumatizing the

8  victim/survivor and making it more difficult to even get an

9  agreement to go to mediation. And, you know, in that situation

10 there was no anger or antagonism toward the claimant, but

11 certainly we understood that she felt that way.  So that was

12 something that I regretted doing.

13       There was another time when in the Diocese of Manchester

14 we were working with hundreds of claims.  There was one that

15 came along, it didn't involve a discovery request like an IME,

16 but we did not believe the claim.  To us, to me it didn't not

17 add up.  So plaintiffs' counsel offered to have her come and

18 speak with us and it was one of those situations where within

19 minutes I knew this was a really credible claim.  It was

20 almost a sure thing that she had been abused.  So that had an

21 impact on the valuation of the claim and also the valuation

22 that ultimately I assigned to it.

23 Q    Do you recall, Mr. Burnett, instances where your

24 insurance company clients did not want you to do an

25 independent medical examination of the claimant?

1  A    That has happened. There have been times when I wanted

2  to do it and defense counsel pushes back because of some of

3  the things I just discussed where they know the case better

4  than I do.  They have dealt with the plaintiffs' counsel, the

5  client and they recognize that that would not be productive.

6  Q    And as we talked about this, sort of, full arsenal of

7  discovery tools in the toolbox, have you had experience where

8  your insurance company clients did not want you to use every

9  single "tool" in the box?

10 A    Yes, especially on -- this happens a lot with the claims

11 I work on with the National Catholic Risk Retention Group.

12 When it seems apparent, based on information that we already

13 have, for example if it's an accused priest that is on a

14 diocesan website as having been credibly accused, and the

15 person comes forward and they are giving an account of what

16 happened to them that lines up very closely with what we

17 already know about the individual, about where he was

18 assigned, about the nature of abuse he perpetrated, his *modus*

19 *operandi*, that kind of thing then at this point in time we

20 have worked together for so long that there is general

21 agreement between myself and the director of claims that this

22 is a case we probably don't need to do X, Y, Z.

23 Q    And do you always hire experts in the handling of sexual

24 abuse claims in your experience?

25 A    That has been very rare in my experience.  The claims

1  that I work on don't go to trial.  So there is -- you know,

2  with the exception of asking a psychologist, an independent

3  psychologist, to do a psychological evaluation or something

4  like that there is not an effort in the claims that I have

5  worked on in my experience to retain experts for the

6  litigation of the claim.

7  Q    Have you had experiences where you insurance company

8  clients did not want you to take the deposition of the

9  claimant?

10  A    Yes.  Typically I don't depose the claimant.  It would

11  be defense counsel.  Sometimes defense counsel, especially if

12  they're not experienced in sexual abuse claims, would approach

13  the handling of the claim just by way of any kind of

14  commercial litigation to claim or personal injury claim where

15  they want to notice up the depositions of the players involved

16  and they want to engage in the type of extensive discovery

17  that you might in a typical personal injury claim.

18      Usually in conferring with them I am able to, and a lot

19  of times this is at the direction of the insurers, impress

20  upon them that that would not be productive necessarily if we

21  have sufficient information to draw conclusions about the

22  credibility of the claim and the valuation and defense of the

23  validity of the claim.

24  Q    Now let's talk about TDP.  What "discovery tools" are

25  available to the settlement trustee under the TDP?

1  A     Well the TDP provides for the settlement trustee to

2  obtain all kinds of records, medical records, to have an

3  independent medical exam or psychological evaluation, records

4  from the debtors to subject the claimant to a sworn written or

5  oral statement, any number of different things that you would

6  typically see in the litigation context.

7  Q     I want to go back to the tort system now a little bit.

8  So in your experience handling sexual abuse claims how often

9  are you attempting to get discovery from third parties?

10 A     It depends on the severity of the claim and whether or

11 not we feel that it could be settled.  I would say that as a

12 practical matter there is not typically a lot of third-party

13 evidence.  Every now and then I will work on a claim where

14 someone will, a sister or brother of the claimant, call the

15 chancery and say, you know, my brother is a liar, don't

16 believe a word he says or something like that.  And, of

17 course, that is a situation where we would want to send an

18 investigator out and talk to that person.  And if it got that

19 far maybe subpoena his or her deposition; things like that.

20 Q     There was some discussion earlier today in the tort

21 system defendants might want to file a motion to dismiss or a

22 motion for summary judgment?  First of all, in your experience

23 handling sexual abuse claims how often were you -- did you

24 know of that defense counsel was filing motions to dismiss or

25 motions for summary judgment?

1   A     Claims that I work on its pretty rare.  Like I said,

2   I've been doing this for over 26 years.  It's not that its

3   unheard of, but even a lot of the motions to dismiss that are

4   filed are, I would say, usually denied because there is a

5   feeling that there is enough potential issue of fact to take

6   it beyond the motion for summary judgment stage.

7             MR. MARTIN:  Your Honor, if you would just give me

8   a few minutes I think I may be close to done, but I would like

9   to look at my notes.

10            THE COURT:  Certainly.  We will take a five minute

11  recess.

12            MR. MARTIN:  Thank you.

13        (Recess taken at 5:08 p.m.)

14        (Proceedings resumed at 5:14 p.m.)

15            THE COURT:  Mr. Martin.

16            MR. MARTIN:  Thank you, Your Honor.  Just a few

17  more questions.

18  BY MR. MARTIN:

19  Q     Mr. Burnett, you have had an opportunity to study the

20  TDP that we have bene talking about all day long. Question for

21  you, given your understanding of the TDP what protections are

22  afforded the insurance companies?

23  A     Under both Article 5 and Article 10, the insurance

24  companies can stand on the terms and conditions in their

25  policies and it's indicated that nothing in the TDPs in any

1  way amends or changes or adds to in any way the contracts of

2  insurance, the policies of insurance.

3  Q     Is there anything in the TDP that prevents the insurance

4  company from raising any defense under their policy, to your

5  knowledge?

6  A     Not to my knowledge.

7  Q     Is there anything in the TDP that prohibits the trustee

8  from conferring with the insurance companies?

9           MS. MCNALLY:  Objection, leading.

10          THE COURT:  Sustained.

11 BY MR. MARTIN:

12 Q     Okay.  What prohibitions, Mr. Burnett, are found in the

13 TDP affecting the insurance companies, to your knowledge?

14 A     There is nothing that I saw and I think that's a really

15 good thing because, just as a practical matter and as a matter

16 of prudence, it would make sense to me if I were the trustee

17 that I would want to be able to confer with the insurance

18 carriers, especially on a claim -- you know, if a claim looked

19 like it was going to impact the layer of the applicable

20 insurance policy or the -- you know, the insurer.  And so,

21 rather than waiting until the end and kind of dumping in the

22 lap of the insurance carrier, you know, let's say a $2.7

23 million valuation, it would make sense to me, I would want to

24 have that opportunity if I were the trustee to have a

25 relationship with the insurance carrier and to be able to

1  confer with him as I went along.

2  Q    And, again, there's nothing in the TDP that prohibits

3  that?

4         MS. MCNALLY:  Objection, leading.

5         THE COURT:  Sustained.

6  BY MR. MARTIN:

7  Q    So, in your review of the TDP, Mr. Burnett, did you find

8  anything in that document that would abridge or modify the

9  rights of the insurance companies?

10 A    No.

11        MR. MARTIN:  I have no further questions, Your

12 Honor.  Thank you.

13        THE COURT:  Thank you.

14        MS. MCNALLY:  Your Honor, I just have a few more

15 and I promise it will be under five minutes, it will be -- I'm

16 going to be as fast as I can be.

17        THE COURT:  Okay, Ms. McNally.

18        MS. MCNALLY:  Well, I guess it depends on the

19 answers I get, but I'm shooting for under five minutes.

20                      RECROSS-EXAMINATION

21 BY MS. MCNALLY:

22 Q    All right, sir, you looked at a list on the TDPs that

23 referred to item 7, it was independence of the settlement

24 trustee; you saw that?

25 A    Yes.

1    Q      Now, that is part of the trust, you're aware of, right?

2    A      The trust and the trustee, yes, it referenced both of

3    them.

4    Q      And are you aware, sir, that as a matter of trust law

5    that the trustee is incapable of disclaiming fiduciary

6    obligations to the beneficiaries of the trust; right?

7              MR. MARTIN:  Objection, it calls for a legal

8    conclusion.

9              THE COURT:  Well, he can ask, I guess, whether he -

10   - well, yes, sustained.

11   BY MS. MCNALLY:

12   Q    Do you have any understanding in evaluating and reaching

13   your opinion as to whether the trustee in her independence has

14   the ability to disclaim the fiduciary obligation to the

15   claimants?

16   A      Well, as I said earlier, I don't know trust law --

17   Q      Okay.

18   A      -- but I would think that if she -- if she has fiduciary

19   duties to the trust and there are trust beneficiaries, that if

20   she didn't -- if she didn't dispatch her fiduciary duties

21   appropriately, then it could affect adversely the

22   beneficiaries of the trust.

23   Q      All right, thank you.

24             I think when we talked about negligence earlier and

25   on redirect, we were talking about that being in or not.  In

1  your deposition, didn't you agree that it would have been a

2  helpful clarification for negligence to be listed itself in

3  the TDPs?

4  A     I think it could have been.  I'm not sure that it's

5  necessary because it seems apparent from the general criteria

6  that that's a cause of action that's contemplated under the

7  general criteria.

8  Q     Okay.  Now, you talked about checks and balances -- and

9  this was like on -- I think we were -- just now on redirect we

10 were talking about the idea essentially of overvaluing, there

11 would be a problem overvaluing, right --

12 A     Yes.

13 Q     -- that was the context?

14 A     Yes.

15 Q     And you said that a check and balance is it would be a

16 disservice to the others, do you remember using those words?

17 A     Yes.

18 Q     That's not really a check or a balance, it's just an

19 effect; right?

20              MR. MARTIN:  Objection, argumentative.

21              THE COURT:  Sustained.

22              MS. MCNALLY:  I'm not arguing, I'm testing his

23 premise that it's a check or a balance.

24              THE COURT:  I think it's argumentative.

25              MS. MCNALLY:  Okay.

1  BY MS. MCNALLY:

2  Q    And it's only a disservice if there is a fixed pot;

3  right?

4  A    Well, I don't necessarily agree with that because,

5  irrespective of how large the pot is and whether or not it can

6  be replenished, if there are 82,000-plus claimants and she

7  were to, hypothetically, inappropriately value a claim beyond

8  the value it should receive when you take the base value and

9  apply this either, or, or and aggravating and mitigating

10  scaling factors, then should we do a disservice to the other

11  claimants that may -- you know, there may be a diminishment of

12  the assets of the trust in that situation -- and it would also

13  be, obviously, not appropriate if she were not applying the

14  procedures as they've been set forth.

15  Q    Right.  And when I say fixed pot, that's what I mean,

16  diminishment.  If there is a pot that's big enough and

17  unlimited, it doesn't do a disservice to anyone except perhaps

18  the person responsible for funding the pot; right?

19          MR. MARTIN:  Objection, assumes facts not in

20  evidence, improper hypothetical --

21          THE COURT:  Sustained.

22          MS. MCNALLY:  It's a hypothetical to an expert

23  who's offering an opinion.

24          MR. MARTIN:  Improper hypothetical.

25          THE COURT:  Sustained.

1  BY MS. MCNALLY:

2  Q    Now, you said earlier it's your view that, generally,

3  these claims are true, the abuse claims are true, you reached

4  that conclusion?

5  A    The majority of the claims that I -- the overwhelming

6  majority have been true.

7  Q    Now, that is on your experience, sir?

8  A    It is my experience.

9  Q    You're not offering any opinion on these claims?

10  A    I have -- no, I have not seen the proofs of claim.

11  Q    And the claims that you work on, were there ever any

12  anywhere in the magnitude of number of claims that have been

13  brought in the course of this bankruptcy?

14  A    No.

15  Q    And have you worked on any claims that have been

16  collected following mass advertising campaigns, some of which

17  promised payment without having to show anything?

18          MR. MARTIN:  Objection, argumentative.

19          THE COURT:  I'll overrule that.  You can answer.

20          THE WITNESS:  I'm not sure if I understand the

21  question but, if I do -- if I understand your question, you're

22  saying have you worked on a collection of claims where they

23  resulted from mass advertising of, say, a plaintiff's

24  attorney; is that correct?

25          MS. MCNALLY:  That's generated the volume like we

1  have seen in this case.

2          THE WITNESS:  Certainly not this volume -- no, I

3  don't believe I have.

4  BY MS. MCNALLY:

5  Q    Now, you talked about earlier that very few cases have

6  gone to trial; right?

7  A    That's correct.

8  Q    And yet also in those cases you have used discovery,

9  taken through sometimes an adversarial process, to lead to

10 settlements; right?

11 A    Yes.

12 Q    Okay.

13 A    Sometimes.

14 Q    Including then when there was a settlement for claims

15 that are outside the statute of limitations?

16 A    Yes -- you mean they would otherwise be barred if --

17 Q    Right.

18 A    Yes.

19 Q    You talked about that.  And you talked about claims

20 where there might have been a defense available; right?

21 A    Yes.

22 Q    And you also talked about there were tools in the

23 arsenal in the toolbox, some of them used and some of them not

24 used?

25 A    Yes.

1  Q      And in every one of those instances -- and I'm not going

2  to drag us back through every one, but in every one of those

3  instances the decision to exercise that judgment was made not

4  by the other side, right?  It was made by your client or the

5  insurer, right?

6  A      That's correct.

7  Q      They didn't leave it up to the claimant to decide which

8  tools in the arsenal and the toolbox to use or which defenses

9  to assert, right?

10 A      Well, I guess to put a finer point on it, sometimes, in

11 fact oftentimes, that's part of a negotiation between

12 plaintiff's counsel and defense counsel, and it depends on the

13 claim, the circumstances, the jurisdiction, but a lot of times

14 there's a decision made after conferring with plaintiff's

15 counsel and sometimes they -- you know, defense counsel will

16 concede to that and say, you know, we don't want to traumatize

17 your client, that's not what we're here for, that kind of

18 thing.

19 Q      Right.  The defendant there is exercising its agency to

20 decide whether or not to take that deposition, for example?

21 A      That's correct, because the plaintiff's counsel could

22 ask that and they say, no, we're going to take the deposition.

23 Q      Okay.  Finally, as to the STAC, we spent a little time

24 just now talking about the STAC having less of a role,

25 perhaps, than Mr. Martin thought I suggested.

1        Here's a question.  The STAC member lawyers who

2  have claims in the bankruptcy, you would expect, wouldn't you,

3  that those lawyers in advising their clients and fulfilling

4  their obligations as their lawyers would assist in compiling

5  the records and filing out the questionnaires, right?

6  A    I would think that would probably happen a lot.

7  Q    It would be malpractice otherwise, wouldn't it?

8        MR. MARTIN:  Objection, calls for a legal

9  conclusion.

10       THE COURT:  Sustained.

11 BY MS. MCNALLY:

12 Q    And those STAC members, you will agree, also would have

13 been involved in approving the questions to be asked --

14       MR. MARTIN:  Objection, calls --

15 BY MS. MCNALLY:

16 Q    -- in the questionnaire?

17       MR. MARTIN:  -- calls for specula -- I'm sorry,

18 objection, calls for speculation.

19       THE COURT:  Overruled.

20       THE WITNESS:  So what's the question again, that

21 the STAC would be involved in putting the questionnaire

22 together?

23       MS. MCNALLY:  Right.

24       MR. MARTIN:  I believe that's what the TDP said.

25 BY MS. MCNALLY:

1  Q    That's what they require, yes.  Thank you.  I think it's

2  a settlement trust agreement, but other than that, that's my

3  last question.  Thank you, sir.

4            THE COURT:  Thank you.

5            MR. MARTIN:  Just one follow-up, Your Honor, if I

6  may?

7            THE COURT:  Okay.

8                      REDIRECT EXAMINATION

9  BY MR. MARTIN:

10 Q    Mr. Burnett, who decides to take discovery under the

11 TDP?

12 A    The trustee.

13           MR. MARTIN:  Thank you.  No other questions.

14           THE COURT:  Thank you.

15           MS. MCNALLY:  Thank you, sir.

16           THE COURT:  Thank you for your testimony  You're

17 excused.

18           THE WITNESS:  Thank you.

19      (Witness excused)

20           THE COURT:  Okay.  Mr. Martin, are you going to be

21 putting on Mr. Azer tomorrow?

22           MR. MARTIN:  I am not, Your Honor, Mr. Kurtz will

23 be handling Mr. Azer.  And I assume, Your Honor -- I'm not

24 quite sure what your schedule is going forward today or

25 tomorrow, so I will obviously defer to you.

1          THE COURT:  Well, I'm not sure there's much more we

2  can accomplish this evening, given my understanding of the

3  witnesses.

4          So, Mr. Kornfeld?

5          MR. KORNFELD:  Thank you, Your Honor.  For the

6  record, Alan Kornfeld for the TCC.  We did confer with the

7  debtors' counsel regarding the order of witnesses and, because

8  Dr. Kennedy's testimony will be very short -- not just

9  relatively short, but really short, both on the direct and the

10  cross, he will be the next witness.  He will start first thing

11  tomorrow morning.

12          THE COURT:  Okay, that's fine.  Then I will see

13  everyone in the morning at 10 o'clock.  And we will work

14  through with 15-minute or so breaks somewhere, but we'll work

15  through to 2 o'clock, and then we're taking a break at 2:00,

16  from 2:00 to 3:30, and we'll be back, I assume still on Mr.

17  Azer at that point.

18          Okay.

19          COUNSEL:  Thank you, Your Honor.

20          THE COURT:  Good evening.  We're adjourned for the

21  day.

22      (Proceedings concluded at 5:28 p.m.)

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ William J. Garling                    March 17, 2022

William J. Garling, CET-543

/s/ Tracey J. Williams                    March 17, 2022

Tracey J. Williams, CET-914

/s/ Mary Zajaczkowski                     March 17, 2022

Mary Zajaczkowski, CET-531

/s/ Coleen Rand                           March 17, 2022

Coleen Rand, CET-341

Certified Court Transcriptionists

For Reliable