**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF NANCY GUTZLER

I, Nancy Gutzler, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1.      I am over twenty-one (21) years of age, have never been convicted of a felony, and am fully competent to make this declaration (this "Declaration") in support of confirmation of the *Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, dated February 15, 2022 [D.I. 8813] (the "Plan") and the *Debtors' (I) Memorandum of Law In Support of Confirmation of Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC and (II) Omnibus Reply to Plan Confirmation Objections* [D.I. 9114] (the "Memorandum").

2.      Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal experience and knowledge or information obtained from my review of relevant documents.

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## I.    **BACKGROUND AND EXPERIENCE**

3.    I am currently a Senior Managing Director at KCIC, a nationally recognized firm that focuses on helping corporations manage their mass-tort liabilities, including through evaluating the availability of potential insurance coverage.   I have over 30 years of experience in this role and have helped numerous clients evaluate their potential insurance coverage with respect to mass-tort liabilities.  This includes analysis of claims data, sampling of claims populations, and allocation of claims costs to insurance coverage.

4.    My prior experience includes representing both insurance companies and policyholders, and this provides me with a unique perspective on the management of mass tort claims and the allocation of claims to coverage.[2]

5.    I have previously testified as an expert in multiple cases regarding the allocation of claims to insurance, proof of exhaustion of underlying coverage limits, and calculation of unpaid allocations and associated interest.[3]  I have experience with allocation for many types of mass tort claims—often including allocation of thousands of claims to thousands of insurance policies—and I do not believe the nature of the underlying tort affects my allocation analysis.

6.    I was retained by the Boy Scouts of America and Delaware BSA, LLC (collectively, the "BSA" or the "Debtors") to provide an expert report and opinions related to certain aspects of the BSA insurance coverage and allocation of liability to insurance coverage, including the following issues: (1) the overall insurance program covering the BSA and the Local Councils, including the archeology that was performed to evaluate the scope of potential historical coverage for those insureds; (2) an evaluation of the various settlements with insurers relative to the value of claims allocated to coverage provided by those settling insurers; (3) whether there is a

---

[2]   JTX 1038 [Nancy Gutzler Curriculum Vitae].
[3]   JTX 1038 [Nancy Gutzler Curriculum Vitae].

mechanism in place to pay all or substantially all claims arising out of sexual abuse ("Abuse Claims"); and (4) the impact the Article XIII Independent Review Option ("IRO") in the Trust Distribution Procedures ("TDP") has on my analysis and related opinions.[4]

## II.    INSURANCE COVERAGE FOR ABUSE CLAIMS

### A.    Overview of the BSA Insurance Program.

7.    The BSA insurance coverage program has been in existence for more than eight decades and has evolved over the years, with variations in insurance carriers, covered entities, type and amount of limits, and the use of deductibles.[5]  While the characteristics of the BSA's policies varied over time, nearly all of the years have some available coverage for Abuse Claims.[6]  These policies provided both primary and excess coverage with substantial limits in many years of coverage.[7]

8.    The BSA insurance program includes policies that either have a per-occurrence limit or an aggregate limit, or both.[8]  A per-occurrence limit represents how much an insurance policy will pay for any one occurrence (*i.e.*, if each Abuse Claim is a single occurrence and there is no applicable aggregate limit, the policy will pay up to its per-occurrence limit for each Abuse Claim occurring during the policy period).  An aggregate limit represents the overall amount a policy will pay for all occurrences that take place during the policy period; once the applicable

---

[4]    The views expressed herein, including those regarding the BSA and Local Council insurance programs, the appropriateness of any assumptions used in this report, or any other matter, are my own and do not necessarily represent the views of any other party to this case.

[5]    JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[6]    JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[7]    JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies]; JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].

[8]    Policy limits determine how much an insurance policy will pay.  The BSA insurance program includes some policies that have only per-occurrence (or per-person) limits that apply to Abuse Claims and other policies where both per-occurrence limits and aggregate limits apply. JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

payments made by these policies reach the aggregate limit, the policy will no longer respond to claims.

9.    Between at least 1935 and 1982, the BSA purchased primary insurance policies that provided coverage for Abuse Claims, with the limits of liability subject to a per-person or per-occurrence limit.[9]  While most of these policies also included an aggregate limit, the aggregate limits often were limited to specific types of liability and did not include Abuse Claims.[10]

10.    Starting in 1969 through 1982, the BSA began to procure excess insurance policies. These policies would be applicable once the primary-insurance coverage was exhausted (*i.e.*, the excess policy would "attach" if the value of a claim exceeded the limits of liability available under the primary insurance policy).  The vast majority of these excess policies provided per-occurrence coverage with no aggregate limit, meaning that once the primary policy's per-occurrence limit (generally $500,000) was exhausted by a claim, the excess policy attached to cover any remaining value of the claim.[11]  For policies lacking an aggregate limit or policies with an aggregate limit that does not apply to Abuse Claims, the policies can pay many times the per-occurrence limits without exhausting.

11.    Beginning in 1983, the BSA insurance policies generally had aggregate limits that applied to Abuse Claims (*i.e.*, the aggregate limit was no longer limited to products/completed claims).[12]  These years of coverage have significantly higher limits of coverage than in prior years as the BSA procured sufficient insurance coverage to protect against its potential liabilities and it

---

[9]    JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[10]    For example, many of these policies include aggregate limits for products/completed operations. Products/completed operations are typically applied when a policyholder manufactures a product, and the insurers capped their liability through this aggregate for bodily injury or property damage resulting from that product. Abuse Claims do not constitute a product or completed operation. JTX 10 [BSA and LC Insurance Policies].
[11]    JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies]; JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].
[12]    JTX 10 [BSA and LC Insurance Policies].

no longer had that coverage on a non-aggregated, per-occurrence basis.  Notably, just in the post-1982 period, there is approximately $3.6 billion in aggregate limits of liability available (after accounting for all settlements and prior exhaustion).[13]  This $3.6 billion does not include the pre-1983 insurance coverage because such policies generally have only per-occurrence limits (with no aggregate limits), and those limits of liability are accessed by each Abuse Claim triggering those policies in a given policy period, regardless of the number of occurrences during that period.[14]

12.    Starting in 1986 and continuing through 2018, the BSA purchased primary and first-layer excess policies that have deductibles that match the policies' limits of liability, dollar for dollar.[15]  The "matching deductible" policies required the BSA pay or reimburse the deductibles before excess coverage attached to cover the remaining value of a claim to the extent it exceeded the limits of the underlying policies.[16]  I understand the BSA's position is that the primary "matching deductible" policies did not have an aggregate limit for 1986-1987 and 2009-2018, but did include an aggregate limit for 1988-2008.[17]  I understand that certain insurers contest this position.[18]

13.    During these years, the BSA procured significant excess insurance coverage above the "matching deductible" primary and first-layer excess policies.[19]  In most years, the BSA had over $140 million in excess insurance coverage available for a single coverage year.[20]  Although certain of this insurance has been eroded, i.e., used to pay claims pre-petition, and some of this

---

[13]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[14]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[15]  JTX 10 [BSA and LC Insurance Policies].

[16]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].  The Debtors and certain insurers dispute whether insolvent insureds are required to reimburse the deductible under these policies.

[17]  See, e.g., JTX 1-425 [Amended Disclosure Statement for the Modified Fifth Amended Plan (D.I. 6431)] at 67-68.

[18]  See, e.g., JTX 1-280 [Certain Insurers' DS Objection (D.I. 6062)] at 5-8.

[19]  JTX 10 [BSA and LC Insurance Policies]; JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].

[20]  JTX 10 [BSA and LC Insurance Policies]; JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].

insurance is subject to the settlement agreements with insurers discussed below, there is still significant excess insurance coverage available.[21]

14.     Beginning in 2019 and continuing to the present, the BSA discontinued the use of policies with matching deductibles.[22]

### 1)  Coverage Under the BSA Insurance Program for Local Councils

15.     In addition to providing insurance coverage to the BSA, the BSA insurance program also provided insurance coverage to Local Councils beginning in 1971.[23]

16.     Prior to 1971, Local Councils were not insureds under the BSA insurance program; instead, Local Councils purchased independent insurance policies that provided insurance coverage for Abuse Claims, among other things.[24]

17.     Beginning in 1971, the BSA gave Local Councils the opportunity to pay a premium such that a specific Local Council would be added as an additional insured (*i.e.*, a party with rights to the insurance coverage) on the BSA's commercial general-liability insurance policies.[25]  That practice continued from 1971 to 1974, and by 1975 a substantial number of the Local Councils were additional insureds on the BSA's insurance policies.[26]  Nonetheless, certain Local Councils opted not to be included in the BSA insurance-coverage program and continued to purchase coverage independently during this period (that insurance program is discussed below).

18.     Starting in 1975, all Local Councils became insureds under the BSA's insurance program.[27]  Between 1975 and the end of 1977, the Local Councils were additional insureds under

---

[21]   JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies]; JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].
[22]   JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[23]   JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[24]   JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[25]   JTX 10 [BSA and LC Insurance Policies] at BSA-PLAN_00251525.
[26]   JTX 347 [Revised Exhibit 9 to Gutzler Report].
[27]   JTX 347 [Revised Exhibit 9 to Gutzler Report].

policies issued by Hartford to the BSA.[28]  And beginning in 1978 and continuing to the present, the BSA implemented its General Liability Insurance Program ("GLIP"), whereby all Local Councils were added as named insureds under insurance policies issued to the BSA.[29]

### 2) Coverage Under the BSA Insurance Program for Chartered Organizations

19.    Beginning in 1976, the BSA amended its insurance policies to provide insurance coverage for Chartered Organizations.  Starting in 1976, the BSA included an endorsement on its Hartford insurance policies that provided that "sponsors" (*i.e.*, Chartered Organizations) would be additional insureds.[30]  Prior to 1976, none of the BSA's insurance policies included such language and neither the named insured nor the definition of insured (or any endorsements) included any reference to "sponsors" or chartered organizations.[31]  Starting in 1978, the BSA specifically included Chartered Organizations as insureds on its insurance policies, albeit with some variation in coverage provided by primary and excess layers.[32]

### B.    Overview of the Local Council Insurance Program.

20.    As noted above, the BSA began to include Local Councils on their insurance program beginning in 1971, with all Local Councils becoming insureds under the BSA's insurance policies in 1975.[33]  KCIC was asked to organize and lead a large-scale search for missing insurance policies purchased by the Local Councils prior to the GLIP in 1978; this is typically referred to as insurance archeology ("Policy Archeology").

---

[28]  JTX 347 [Revised Exhibit 9 to Gutzler Report].
[29]  JTX 10 [BSA and LC Insurance Policies] at BSA-PLAN_00485360.
[30]  JTX 347 [Revised Exhibit 9 to Gutzler Report].
[31]  JTX 10 [BSA and LC Insurance Policies].
[32]  JTX 10 [BSA and LC Insurance Policies] at BSA-PLAN_00485360.
[33]  JTX 10 [BSA and LC Insurance Policies].

**1) KCIC's Policy Archeology Efforts to Locate Local-Council Insurance Policies.**

21.    KCIC's Policy Archeology focused on locating evidence of policies independently issued to Local Councils prior to 1978 (the "Local Council Insurance Policies").[34]   KCIC: (1) conducted extensive searches of the BSA's physical and digital records stretching back to its founding in the early 20th century, (2) coordinated with the Local Councils to search for and locate whether they had Local Council Insurance Policies or secondary evidence[35] of such policies; and (3) through counsel, sought discovery from the insurers regarding the issuance of Local Council Insurance Policies.[36]

22.    Through the Policy Archeology, KCIC located evidence that, from 1965 and ending in January 1972, Insurance Company of North America ("INA")[37] administered a Scout Blanket Liability program ("SBL") for Local Councils through the Park Servicing Organization in New Jersey.[38]   Under the SBL program, a Local Council could apply, choose the desired amount of limits (either $250,000, $500,000, or $1,000,000), and receive a liability insurance policy from INA on the SBL form.[39]   According to the BSA's records, nearly 300 Local Councils participated in this plan through the Park Servicing Organization or a local insurance broker.[40]   The INA SBL

---

[34]   JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)].

[35]   Secondary evidence of insurance policies typically refers to a document, board minutes, or other evidence that establishes that a policy was issued by an insurer, notwithstanding that the actual policy cannot be located.  Indeed, in many circumstances, KCIC was able to locate evidence that provided for the specific policy number of a Local Council Insurance Policy, notwithstanding that neither KCIC, the BSA, or Local Council could locate the policy itself. *See, e.g.,* JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 1046 [BSA Local Council Insurance Archaeology Guidance (Gutzler-Opening report-Exhibit 7.1)].

[36]   JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)].

[37]   Now known as Century Indemnity Company ("Century").

[38]   JTX 1064 [INA Scout Blanket Liability Program Brochure (Gutzler Opening Materials Considered List)]; JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 13-5 [Gutzler Opening Materials Considered List].

[39]   JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 13-5 at Bates No. BSA-PLAN_01636438 ("TAC Letters from BSA re Liability Insurance 1971.pdf"); JTX 10 [BSA and LC Insurance Policies]; JTX 1064 [INA Scout Blanket Liability Program Brochure (Gutzler Opening Materials Considered List)].

[40]   JTX 13-5 at Bates No. BSA-PLAN_01636433 ("November 1 1971 Letter to Scout Executives.pdf"); JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 13-5 [Gutzler Opening Materials Considered List].

program ended in 1972 when INA declined to continue insuring Local Councils on this basis.  INA did, however, continue to insure some Local Councils through other policies.[41]

23.     In addition to the insurance program established by INA, several other insurers provided insurance coverage to Local Councils.[42]  Specifically, the Hartford Insurance Group, through various insurance subsidiaries (collectively, "Hartford") issued policies starting in 1959 and into the late 1970s to various Local Councils.[43]  Likewise, New Hampshire Insurance Company ("New Hampshire")[44] administered its Local Council insurance program through R.F Lyons Company in Santa Ana, CA ("R.F. Lyons Program").[45]  A letter to Local Council presidents indicates that, in 1974, New Hampshire insured "...nearly 10% of the BSA councils and have had the same general program and underwriters since 1960."[46]

24.     The Policy Archeology also uncovered primary and secondary evidence that the Local Councils procured insurance policies from various other insurers.  While the number of policies issued by each insurer varied, Local Councils procured insurance coverage from, among others, Travelers Insurance Companies through certain of its insurance subsidiaries (collectively, "Travelers"), Maryland Casualty Company[47], and CNA through certain of its insurance subsidiaries such as Continental Insurance Company (collectively "CNA Insurance Companies").[48]

---

[41]  JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 347 [Revised Exhibit 9 to Gutzler Report].

[42]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[43]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[44]  A subsidiary of American International Group ("AIG").

[45]  JTX 1045 [Policy Archeology (Gutzler-Opening report-Exhibit 7)]; JTX 13-5 [Gutzler Opening Materials Considered List].

[46] JTX 13-5 at Bates No. BSA-PLAN_01636435 ("R.F Lyons Letter to Local Councils.pdf").

[47]  Clarendon National Insurance Company ("Clarendon") is the successor to certain policies issued by Maryland Casualty Company.

[48]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

### 2) Coverage of Chartered Organizations Under Local Council Policies.

25.     In the course of its insurance archeology efforts, KCIC also reviewed the Local Council policies and secondary evidence to determine whether Chartered Organizations were included as insureds.  In some instances, Chartered Organizations were included as insureds either under the "Who Is An Insured" provision of the policy or by endorsement.[49]  KCIC's extensive insurance archeology efforts indicate that coverage was available to Chartered Organizations under certain individual policy forms.

26.     For example, the INA (Century) policy form under the SBL explicitly included Chartered Organizations in the definition of insured.[50]  However, Century also issued other policies to Local Councils other than the SBL, some of which did not name Chartered Organizations as insureds or additional insureds in either the insured provision of the policy or by endorsement.[51]

27.     Similarly, the definition of "insured" in the Hartford Local Council policies generally did not reference "Volunteers," "Sponsors," or "Chartered Organizations."[52]  However, certain of the Hartford Local Council policies added sponsors, i.e., Chartered Organizations, as insureds by endorsement.[53]

28.     When possible, KCIC evaluated whether coverage was potentially available for Chartered Organizations based on the terms of policies issued to historically-affiliated Local Councils.[54]  For policies issued by insurers in which only secondary evidence was found, it is

---

[49]  *See, e.g.,* JTX 10 [BSA and LC Insurance Policies] at BSA-PLAN_00258480.

[50]  JTX 1064 [INA Scout Blanket Liability Program Brochure].

[51]  *See, e.g.,* JTX 1157 [Insurance Company of North America - Sioux Council Inc. (Gutzler Rebuttal Materials Considered List)].

[52]  *See, e.g.,* JTX 1155 [Hartford Fire Insurance Co. Policy No. 12CCP500098 (Gutzler Rebuttal Materials Considered List)].

[53]  *See, e.g.,* JTX 1154 [Hartford Pine Tree Council Casualty Insurance Policy No. 04C157992 (Gutzler Rebuttal Materials Considered List)].

[54]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

difficult to determine with certainty whether Chartered Organizations were insureds under those policies.

29.    KCIC used this information to create coverage charts showing coverage available for the BSA, as well as charts depicting the coverage under policies for insurers that the BSA has settled with, and coverage available from non-settling insurers.[55]

### III.    INSURANCE ALLOCATION

#### A.    Allocation Methodology and Purpose.

30.    Having collected extensive information regarding the scope of coverage available to the BSA, Local Councils, and Chartered Organizations under policies issued to the BSA and Local Councils since the 1930s and aggregating that information into a database, I was tasked with modeling the coverage potentially available for Abuse Claims for purposes of evaluating:  (1) the insurance settlements entered into by the various claimant constituencies and the Debtors in relation to the potential coverage available to pay Abuse Claims; and (2) whether sufficient insurance assets are potentially available for payment of all or substantially all of the Abuse Claims pursuant to the mechanism created in the Plan.  In doing so, I relied upon claim information compiled by Makeda Murray of Bates White (the "Tranche VI data") as well as a series of related claim valuation scenarios from Dr. Charles Bates, also of Bates White.[56]  This process is known

---

[55]  JTX 1-361 [Supp. Disclosure re Plan Modification and Chartered Orgs.' Options (D.I. 8904)] at 6 ("To allow Opt-Out Chartered Organizations to determine the non-settled insurance coverage available, the Debtors are providing information reflecting the post1976 settled and non-settled BSA insurance policies and Local Council insurance policies, each of which include coverage to Opt-Out Chartered Organizations for Abuse Claims, at https://omniagentsolutions.com/bsa-ballots." The link directed users to a website with two sets of policy-related information: (1) "Coverage Charts for BSA/LC Insurance Policies" and (2) "Settled/Unsettled Local Council Policy Information").

[56]  JTX 676 [BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta]; JTX 1052 [Expert Report of Charles E. Bates (Dec. 5, 2021)]; JTX 1194 [Supplemental Report of Charles E. Bates]; JTX 1431 [Charles E. Bates Second Supplemental Expert Report, dated March 2, 2022]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

as "allocation" or "allocation modeling."[57]  To be clear, this modeling was not done for the purpose of binding non-settling insurers, the TCC, the Coalition, the FCR, or any other entity, including the Settlement Trust, to specific allocation models or requiring this Court to decide coverage issues on the merits, but only to analyze what coverage may be available based upon the analysis of the potential aggregate values for Abuse Claims in this matter.

31.    Three categories of information are needed for allocation modeling: (1) policy information, such as named insureds, policy periods, coverage limits (per-occurrence and aggregate limits), attachment points for a layer, relevant exclusions, and whether defense costs are covered by the policy, and, if so, whether defense costs erode coverage limits; (2) underlying claim information, such as estimated claim values, dates of injury, and parties involved; and (3) methods of allocating, such as which policies are triggered by a particular claim and how claim values can be distributed among multiple triggered policies, with rules governing allocation varying by state or by agreement of the parties.

32.    I describe below how each of these categories of information were incorporated into KCIC's allocation modeling to determine the amount of coverage potentially available to pay Abuse Claims under various aggregate claim valuation scenarios.  This analysis in-turn allowed me to (1) evaluate the insurance settlements entered into by the various claimant constituencies and the Debtors, relative to the value of potential coverage under a given allocation model, and (2) opine as to whether sufficient additional insurance assets may be available through the mechanism created in the Plan to pay all or substantially all of the Abuse Claims.

---

[57]  Allocation modeling is used to estimate the value of an insurance program based on a set of assumptions and a certain liability amount; by apportioning the underlying liability (i.e., underlying claims data) to policies according to their terms and applicable law, it is possible to estimate the total value of available coverage based on which policies are triggered and how much coverage those policies provide to claims.  This is a routine analysis that is performed by both insurers and insureds to evaluate the potential coverage available to pay underlying claims.

1)    **Coding Policy Terms to Use for Allocation.**

33.    As noted, *supra*, KCIC collected extensive information regarding policies issued to the BSA and Local Councils since the 1930s and coded that information in a database. Specifically, KCIC added relevant evidence of policy terms to the policy database tracking all available information about the policy, including, the insurer, policy number, limits, dates, named insured, applicable exclusions (if any), Local Council insured, the current Local Council associated with the named insured, the type of coverage (CGL, umbrella, Scout Blanket Liability, automotive, worker's comp, etc.), and the quality of the evidence of the policies' terms.

34.    Where information for a specific policy's coverage period or limits was incomplete, KCIC made certain factual assumptions; these assumptions primarily impacted KCIC's analysis of independent Local Council policies, as opposed to policies issued to the BSA.[58]

35.    Applying these assumptions allowed KCIC to create a comprehensive database of thousands of policies issued to the BSA and Local Councils with data regarding the following fields: whether a specific policy was issued to the BSA or a Local Council (whether a historical predecessor or current Local Council), issuing carrier, policy number, coverage period, attachment point, per-occurrence limit, aggregate limit, whether the policy covered all Local Councils or just specific Local Councils, whether the policy covered Chartered Organizations, whether the policy contained a sexual abuse exclusion, and whether the policy was issued by an insolvent insurer.[59]

2)    **Evaluating Prior Erosion/Exhaustion.**

36.    Prior to performing an allocation, it was necessary for me to determine whether certain policies that are subject to aggregate limits (i.e., a maximum amount available to pay any number of occurrences) were either partially eroded or fully exhausted by prior payments. KCIC

---

[58] JTX 1047 [Policy Allocation Assumptions (Gutzler-Opening report-Exhibit 8)].
[59] JTX 347 [Revised Exhibit 9 to Gutzler Report].

did this by reviewing (1) the BSA's historical records and (2) in certain circumstances, the historical records of insurers identifying their payment of claims.[60]

37.    The BSA tracks historical and current claims information in an electronic risk management system called Riskonnect, which is maintained by BSA employees.  Riskonnect contains key claim-related data going back decades, including claim number, claimant name, dates of loss/dates of abuse, settlement amounts paid, defense expenses paid, claim status, and allegation (abuse vs. non-abuse).  However, Riskonnect does not consistently track which settlements and defense costs were billed to certain insurers or paid under certain policies.[61]  Thus, in order to determine whether a given policy was eroded or exhausted, it was necessary for KCIC to estimate payments using certain assumptions about which policy the payment was made under.

38.    KCIC evaluated the prior exhaustion by applying the settlement amounts and related expenses to the applicable insurance coverage, using the first date of abuse to determine which policies provided coverage for a given claim.[62]  By utilizing the date of first abuse to apply the entire value of an underlying claim and related defense costs to policies providing coverage in that year (accounting for any deductible paid by the BSA), KCIC was able to estimate how much coverage remained under a given policy's aggregate limit.  When a policy's aggregate limit was reached, any remaining value of an underlying claim was paid by the next attaching policy, with this process continuing until the claim was fully paid or no further coverage was available.

39.    By performing this exhaustion analysis for all underlying claim payments made by the BSA's insurers pre-petition and subtracting those amounts from the aggregate limits of the

---

[60]  JTX 1043 [Table of Policies with Prior Exhaustion Amounts (Gutzler-Opening report-Exhibit 5)]; JTX 1044 [Prior Exhaustion (Gutzler-Opening report-Exhibit 6)]; JTX 1063 [Exhaustion Report – All Policies (Excel) - As of 01.22.2021 - Riskonnect data from the BSA (Gutzler Opening Materials Considered List)].

[61]  JTX 1063 [Exhaustion Report – All Policies (Excel) - As of 01.22.2021 - Riskonnect data from the BSA (Gutzler Opening Materials Considered List)]; JTX 1044 [Prior Exhaustion (Gutzler-Opening report-Exhibit 6)].

[62]  JTX 1044 [Prior Exhaustion (Gutzler-Opening report-Exhibit 6)].

triggered policies, KCIC was able to estimate how much remaining coverage was available to pay Abuse Claims made through this bankruptcy.[63]   KCIC incorporated this erosion and exhaustion data into its allocation modeling for Abuse Claims by only allocating the value of Abuse Clams to policies which had not been exhausted or by pre-petition claim payments.  Where a policy was partially eroded by pre-petition payments, KCIC only allocated the value of Abuse Claims to the remaining available aggregate limit.[64]

### 3) Incorporating Tranche VI Data into Allocation Models.

40.     Once the policies had been coded and we evaluated the exhaustion/erosion of the available insurance, I then had to take the potential liability and allocate it to the insurance coverage.  In order to conduct the allocation, I relied upon claim information compiled by Makeda Murray of Bates White—the so-called "Tranche VI data"—as well as a series of related valuation scenarios from Dr. Charles Bates, also of Bates White.[65]   The data contains claim-specific details used in allocation, such as claim number, claimant date of birth, the date of first abuse (the "first encounter"), claimant age at first encounter, state where the abuse occurred, the historical name of the Local Council.[66]   The valuation scenarios, which range in aggregate value from $2.4 billion to $7.1 billion, provide different representative distributions of values across those claims which I use for my allocations.[67]

---

[63]  JTX 1043 [Table of Policies with Prior Exhaustion Amounts (Gutzler-Opening report-Exhibit 5)].
[64]  JTX 347 [Revised Exhibit 9 to Gutzler Report].
[65]  JTX 676 [BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].
[66]  JTX 676 [BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].
[67]  JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602

41.     By comparing the Tranche VI data with KCIC's above-mentioned database of policy terms relevant to coverage, it was possible for KCIC to model how much coverage was potentially available based on the details—including the estimated value—of thousands of underlying Abuse Claims.

### 4)     Legal Assumptions Necessary for Allocation.

42.     In order to allocate tens of thousands of underlying claims across thousands of liability policies, it was necessary to incorporate several legal assumptions in the allocation model, including: the trigger date, number of occurrences, the presence of aggregate limits on some policies, and joint-and-several liability for a claim among multiple insureds.   These legal assumptions were adopted on the advice of the Debtors' counsel but are reasonable given the information that I have reviewed.

*The Trigger Date Assumption.*

43.     Regarding the trigger date assumption, KCIC assumed that the date of first encounter would determine which policy year a claim would be allocated to (*e.g.*, primary and excess policies providing coverage on the date of first abuse would potentially be triggered). Where the date of first encounter was unknown (*i.e.* not provided in the proof of claim) but the claimant's date of birth was known, KCIC used the average age of first abuse (10 years old) for claims to calculate the date of first encounter.

44.     The rationale for using the trigger date assumption was based on the First Encounter Agreement (FEA).[68]   The FEA was an agreement entered into between the BSA and Century in 1996 in which it was agreed that the date of "occurrence" pertaining to Abuse Claims would be

---

[Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

[68]   JTX 7 [Data Site Documents] at BSA-PLAN_00510023.

the date of when the first act of Abuse took place—regardless of whether additional acts of Abuse occurred in later policy periods.[69]  While Century and the BSA were the only parties to the FEA, it is my understanding that several (if not most) of the BSA's other insurers ascribed to this agreement and provided coverage according to the first alleged year the Abuse occurred.[70]

45.    Moreover, some of the insurance policies in the later years include a "First Encounter Endorsement," that requires that the only triggered policy is the policy in the year where the abuse first allegedly began.[71]  Because it was custom for the Debtors and a majority of the insurers to adjust claims according to the FEA pre-petition or the policy themselves required it, I believe it was a reasonable assumption to use this as the trigger date for purposes of allocating tens-of-thousands of Abuse Claims across policies issued by dozens of insurers.

46.    By utilizing the date of first encounter as the trigger for my allocation analysis, it was not necessary for KCIC's allocation modeling to consider the end date of abuse.

*The Single Occurrence Assumption.*

47.    As a related legal assumption, KCIC treated each survivor as the occurrence for purposes of allocating Abuse Claims to coverage.  As discussed immediately below, there are various occurrence approaches, but, as noted by counsel, this approach was applied by the BSA pre-petition when seeking insurance coverage and almost all of the BSA's insurers (with the exception of Hartford) adopted this "occurrence" approach.

48.    The approach applied by the BSA and its insurers (except Hartford) pre-petition was to treat each survivor as the "occurrence" under the policy (the "Survivor Approach").[72]  This

---

[69]  JTX 7 [Data Site Documents] at BSA-PLAN_00510023.
[70]  JTX 2958 [Compilation of letters from various insurers regarding the FEA]
[71]  JTX 10 [BSA and LC Insurance Policies] at BSA-PLAN_00492916.
[72]  JTX 7 [Data Site Documents] at BSA-PLAN_00510023; JTX 2958 [Compilation of letters from various insurers regarding the FEA].

was regardless of the number of acts of abuse, perpetrators, etc.  This Survivor Approach is in contrast with a multi-occurrence approach, where each instance of abuse is considered a separate "occurrence."  A third "occurrence" approach is that all claims of abuse are considered a "single" occurrence because the occurrence is the BSA's purported negligent supervision (an occurrence approach only espoused by Hartford).[73]

49.    It is my understanding that in the 60+ years that the Debtors and its insurers (except for Hartford) have been adjusting claims, a Survivor Approach was always used to determine the available coverage.[74]

50.    Therefore, I believe it was a reasonable assumption to use the Survivor Approach based on the custom and practice of the Debtors and its insurers prior to the Petition date.

*The Aggregate Limit Assumption.*

51.    With respect to the matching-deductible policies issued to the BSA by Century and Liberty between 1988 and 2008, KCIC assumed that the primary policies included aggregate limits of liability.  In other words, KCIC assumed that these policies had aggregate limits at the primary layer.  KCIC did not assume that policies issued prior to 1988 or after 2008 had aggregate limits.

52.    KCIC recognizes that a dispute exists between the BSA, its primary insurers, and certain other insurers as to the treatment of the deductibles under these policies.[75]  The primary insurers have asserted that, if they are obligated to pay in lieu of the deductible, their obligations are subject to a $1 million aggregate limit of liability.[76]  Other insurers have argued that, if the

---

[73]  JTX 182 [Letter from James Ruggeri to Adrian Azer].
[74]  JTX 1063 [Exhaustion Report – All Policies (Excel) - As of 01.22.2021 - Riskonnect data from the BSA (Gutzler Opening Materials Considered List)]; In pre-petition litigation and in the adversary proceeding, Hartford has argued that all of the BSA's Abuse Claims—regardless of whether they involve the same perpetrator, whether they occurred at different locations, whether they occurred at different time—constitute a single occurrence.  However, Hartford is the only BSA insurer that has taken this occurrence approach. *See, e.g.,* JTX 182 [Letter from James Ruggeri to Adrian Azer].
[75]  JTX 1-425 [Amended Disclosure Statement for the Modified Fifth Amended Plan (D.I. 6431)] at 68.
[76]  JTX 1-278 [Liberty Mutual DS Objection (D.I. 6057)] at 5-7.

18

primary insurer is obligated to pay the $1 million aggregate limit of liability, then a $1 million self-insured retention ("SIR") applies in lieu of the per-occurrence deductible that must be paid by the BSA or Local Councils.[77]

53.    Although KCIC's assumption that the 1988-2008 policies included an aggregate limit was based on the advice of Debtors' counsel, the Debtors have settled with certain excess insurers in these years.[78]  These insurers would not have had the incentive to settle at the amounts that they did, but for the risk that the primary insurance policies may be subject to an aggregate limit of liability.

*The Joint-and-Several Assumption.*

54.    Where Abuse Claims implicated both the BSA and one or more Local Council insurance policies, KCIC used assumptions as to apportioning liability jointly and severally between the BSA and Local Councils insurance policies.[79]

55.    Where both Debtor and Local Council policies were triggered by a claim, KCIC apportioned the claim evenly across the number of triggered policies (*e.g.* a claim triggering two such policies would be allocated 50/50).

56.    If one such policy had a lower per-occurrence limit than other triggered policies (i.e. a policy issued to a Local Council reached its limit prior to a policy issued to the BSA, or visa-versa), the claim value would be allocated evenly by the number of policies triggered *until* the lower per-occurrence limit was reached, with the remaining claim value being allocated to policies with per-occurrence limits that had not yet been reached.

---

[77]  JTX 1-280 [Certain Insurers' DS Objection (D.I. 6062)] at 4-14.
[78]  JTX 1-432 [Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations (D.I. 7929)]; JTX 1-316 [Tenth Mediator's Report (D.I. 8102), including Clarendon Term Sheet].
[79]  JTX 1050 [Claim Allocation Examples (Gutzler-Opening report-Exhibit 11)].

57.     This assumption was based on a discussion with the BSA's National Coordinating Counsel and their understanding that a majority of states apply a joint and several liability scheme with respect to allocation of liability for Abuse Claims between co-defendants.

## IV.     EVALUATION OF SETTLEMENTS WITH VARIOUS INSURERS

58.     The KCIC allocation analysis made it possible for me to evaluate the settlements with insurers by comparing their contributions to the Settlement Trust with their potential exposure based on the allocation modeling, taking into consideration discounts, based on litigation risk and solvency risk, that could be applied to the amounts allocated to each insurer.

59.     In a mass tort, with thousands of claims and complex coverage programs (as is the case with the BSA), insurers and insureds may enter into settlement agreements to provide more certainty and to avoid litigation regarding disputes.  Rather than litigating all disagreements to conclusion, both sides reach a compromise on key issues and find a mutually acceptable value.

60.     In my experience, various factors should be considered when evaluating a settlement of insurance coverage, including: (1) litigation risks (e.g. insurance-coverage defenses, estimated value of current claims, prior exhaustion levels, prior settlements); (2) the insurer's financial position; (3) estimates of the value of current claims and evaluation of how those valuations overlap with the potentially available coverage(s); and (4) expense of coverage litigation, including both the actual litigation expense and the time value of money as it relates to delayed payment to the insured.   In my experience, both insurers and insureds take these factors into account when negotiating a settlement amount.

61.     I evaluated settlements between the Debtors and (1) Hartford, (2) Century/Chubb, (3) Zurich, and (4) Clarendon, respectively.

62.    The table below demonstrates the total potential allocation to each category of coverage, including each of the four settled insurers (with Century and Chubb combined) under multiple aggregate claim valuations provided by Dr. Bates:[80]

| Category | $2.4 Billion BW Tort Distribution | $3.0 Billion TDP Distribution | $3.3 Billion TDP Distribution | $3.6 Billion TDP Distribution | $3.6 Billion BW Tort Distribution |
|---|---|---|---|---|---|
| Century/Chubb | $1,250,666,311 | $1,434,919,710 | $1,546,479,054 | $1,884,155,500 | $1,834,263,558 |
| Hartford | $477,535,263 | $698,331,465 | $765,648,955 | $767,419,261 | $716,358,283 |
| Zurich | $73,826,900 | $61,216,969 | $66,183,646 | $74,187,281 | $83,752,366 |
| Clarendon | $3,878,517 | $6,564,759 | $7,434,084 | $9,070,978 | $7,855,750 |
| Other Non-Settled Insurers | $274,448,112 | $321,319,886 | $361,749,271 | $357,745,809 | $400,546,854 |
| Deductible Policies | $148,920,756 | $136,326,124 | $146,370,719 | $172,414,714 | $211,031,107 |
| Insolvent | $5,741,197 | $9,191,418 | $10,741,197 | $18,218,073 | $26,705,962 |
| Uninsured | $164,982,943 | $332,129,668 | $400,928,770 | $316,788,383 | $319,486,120 |
| **Total** | **$2,400,000,000** | **$3,000,000,000** | **$3,305,535,696** | **$3,600,000,000** | **$3,600,000,000** |

63.    As discussed in detail below, there are considerations beyond the total potential allocations reported above that impact the reasonableness assessment of any settlement.

## A.    The Hartford Settlement.

*Hartford's Insurance Program.*

64.    The Hartford issued primary and some umbrella policies to the BSA from September 21, 1971, to January 1, 1978, and certain additional excess policies including excess policies in 1981 and 1982.[81]  The Hartford policies had a per-person or per-occurrence limit with an aggregate that only applied to products/completed operations claims, i.e., no aggregate limit with respect to Abuse Claims.[82]

---

[80]  JTX 1186 [Policy Listing with Allocation Results].
[81]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[82]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

65.     In 2010, the BSA entered into a settlement with Hartford that resolved certain primary and excess policies that were issued in 1981 and 1982.[83] Further, in 2011, the BSA entered into a settlement agreement with Hartford that settled coverage with respect to the 1976 and 1977 Hartford primary policies.[84]  It is my understanding that, although Hartford contends that Abuse Claims were released under these policies pursuant to the 2011 settlement agreement, the Local Councils and Chartered Organizations have asserted their right to coverage under those policies were not impacted by this settlement agreement.[85]

66.     Hartford also issued similar primary and umbrella policies to Local Councils; these policies generally had a per-person or per-occurrence limit with no applicable aggregate limit.[86]

*Settlement Considerations.*

67.     The BSA, Hartford, the Ad Hoc Committee, the Future Claimants' Representative, and Coalition agreed in principle on settlement terms as memorialized in the Hartford Insurance Settlement Agreement, the approval of which is incorporated into the Plan.[87]  Pursuant to this settlement, Hartford will contribute $787 million to the Settlement Trust if the Debtors' Plan of Reorganization is confirmed.[88]  In evaluating the Hartford Settlement, I took into account several settlement considerations—including the BSA's contentious coverage disputes with the Hartford.

*Coverage Litigation with Hartford.*

68.     Prior to the Petition Date, the BSA was litigating against Hartford in several jurisdictions across the country.  In 2018, the BSA filed suit against Hartford in Texas state court

---

[83]   JTX 92 [2010 Hartford Settlement] at BSA-Plan_00332125.
[84]   JTX 1481 [2011.08.04 Initial Hartford Settlement Agreement].
[85]   JTX 1-425 [Amended Disclosure Statement for the Modified Fifth Amended Plan (D.I. 6431)] at 67, 71.
[86]   JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[87]   JTX 1-292 [Sixth Mediator's Report with Attachments (includes Hartford and TCJC Term Sheets) (D.I. 6210)].
[88]   JTX 1-292 [Sixth Mediator's Report with Attachments (includes Hartford and TCJC Term Sheets) (D.I. 6210)].

for its improper denial of coverage in connection with the Abuse Claims (the "Texas Action").[89] The BSA asserted several claims against Hartford, including (1) declaratory judgment; (2) breach of contract; and (3) bad faith claims.[90]  Hartford counterclaimed: (1) that the BSA breached its duty to cooperate with Hartford under the relevant policies; (2) that Abuse Claims, in general, arise out of a single occurrence, meaning that Hartford would only need to pay the single per-occurrence limit of each triggered policy, regardless of the number of Abuse Claims that occurred and regardless of whether an aggregate limit applied; and (3) that the BSA and Local Councils expected or intended the injuries caused by Abuse Claims.[91]  The BSA was also involved in litigation against Hartford in Illinois, which addressed several of the same coverage issues (the "Illinois Action").[92] It is my understanding that the BSA expended substantial resources fighting with Hartford in both actions.[93]

69.    Further, Hartford filed an adversary proceeding in the Bankruptcy Court, seeking to litigate the same coverage issues.[94]  Finally, I understand that Hartford was actively involved in the BSA's bankruptcy and raised objections that the BSA's proposed Plan violated Hartford's right to raise coverage defenses under its policies.[95]

70.    While the BSA disputed the coverage arguments raised by Hartford, continued litigation would be a drain on the BSA's resources.  Moreover, if Hartford were to succeed on its single occurrence theory, this would result in a ruling that would substantially limit the amount Hartford (and potentially other insurers) would ultimately pay for Abuse Claims.

---

[89]  JTX 181 [Texas Complaint against Hartford]; JTX 3-2 [BSA's Motion to Dismiss Adversary Proceeding (D.I. 22)] at 6, 12-13.
[90]  JTX 181 [Texas Complaint against Hartford] at 6-9.
[91]  JTX 3-2 [BSA's Motion to Dismiss Adversary Proceeding (D.I. 22)] at 6-7, 12-13.
[92]  JTX 162 [Illinois Complaint filed by National Surety]; JTX 3-2 [BSA's Motion to Dismiss Adversary Proceeding (D.I. 22)] at 13.
[93]  JTX 3-2 [BSA's Motion to Dismiss Adversary Proceeding (D.I. 22)] at 13.
[94]  JTX 3-2 [BSA's Motion to Dismiss Adversary Proceeding (D.I. 22)] at 15-16.
[95]  JTX 1-279 [Hartford DS Objection (D.I. 6058)] at 35-38.

*Secondary Evidence v. Primary Evidence.*

71.     I also considered that, while policy evidence for Hartford is generally complete, there are some policies substantiated by only secondary evidence (e.g. coverage evidenced indirectly by certificates of insurance, correspondence, internal BSA records, receipts/invoices for premiums, renewal documents, and schedules of underlying insurance in other policies).[96]  As such, the BSA and Local Councils faced litigation risk that a court could determine that these policies do not exist and/or the terms would limit the available coverage.

72.     Specifically, of the $140 million of per-occurrence limits potentially available to pay Abuse Claims under the Hartford Policies, roughly $26 million worth of per-occurrence limits are based on secondary evidence rather than on the terms in the policies themselves.[97]  In coverage litigation, these policies would be at risk of not providing any coverage for Abuse Claims.

*Allocation to Hartford Policies.*

73.     As indicated by the attached exhibit, KCIC's allocation modeling indicated that the total coverage available for Abuse Claims from Hartford was between $477,535,263 and $767,419,261 based on an aggregate value of Abuse Claim between $2.4 billion and $3.6 billion.[98]

74.     The primary-layer Hartford policies include coverage for defense costs the BSA incurs in defending Abuse Claims.  These defense costs would not erode the limits of those policies, and would therefore be "in addition" to any liability amounts owed by Hartford.

---

[96]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

[97]  JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies]. Although the original number listed in my report was $16.4 million out of $130 million in per-occurrence limits, that number increases to $26,015,000 and $140 million, respectively, once First State policies are also included. *See* JTX 347 [Revised Exhibit 9 to Gutzler Report].

[98]  *See supra*, ¶ 62 (Solvent Hartford Coverage under the "$2.4 Billion BW Tort Distribution" and the "$3.6 Billion TDP Distribution"); JTX 1186 [Policy Listing with Allocation Results].

*Conclusions Regarding the Hartford Settlement.*

75.     Having evaluated multiple factors potentially affecting the value of the Hartford coverage, I believe there was a reasonable basis for the BSA to agree to release its rights under the Hartford Policies in return for a $787 million contribution to the Settlement Trust.

76.     The BSA's extensive and costly prior coverage litigation with Hartford (including both the pre-petition lawsuits and in the adversary proceeding) indicated that there was a significant risk of protracted coverage litigation with Hartford if a settlement was not reached, with such future litigation expenses consuming a substantial portion of the BSA's resources that could otherwise be used to pay Abuse Claims.  Hartford's involvement as one of the most active insurers lodging objections to the Plan also indicated a risk that the BSA's costs associated with its bankruptcy would increase in the absence of a settlement with Hartford.[99]

77.     Likewise, the coverage defenses raised by Hartford posed a significant risk that coverage litigation could result in rulings that could substantially reduce the value of coverage available under Hartford's policies.  Hartford's assertion that all Abuse Claims are a single occurrence would have dramatically reduced the coverage available under its policies (and potentially other insurers' policies), as would a court ruling that the BSA's secondary evidence of coverage was insufficient to prove that $26.0 million in per-occurrence limits existed.

78.     In consideration of all these significant expenses and risks of coverage litigation, as well as the value of Abuse Claims allocated to Hartford policies in KCIC's allocation modeling, I believe there was a reasonable basis for the BSA to settle with Hartford for $787 million.

---

[99] *See, e.g.,* JTX 1-279 [Hartford DS Objection (D.I. 6058)]; JTX 1-23 [Hartford Motion for Leave to File Objection to Bar Date Motion (D.I. 651)].

**B.      The Century/Chubb Settlement.**

*Century's Insurance Program.*

79.      Century issued primary and excess policies insurance policies to the BSA beginning as early as 1935 and continuing to 1971, with additional coverage provided between 1978 and 1996.[100]  Chubb issued various excess insurance policies to the BSA between 1985 and 2020.[101]

80.      As noted *supra*, Century also issued significant coverage to the Local Councils prior to 1976 through the SBL and via other policy forms, including some non-SBL policies issued in 1976 and 1977.  Many of these policies are either incomplete or are supported by secondary evidence.

*Settlement Considerations.*

81.      On December 12, 2021, the BSA and the Century and Chubb Companies agreed in principle on settlement terms as memorialized in the Century and Chubb Settlement.  The terms of the agreement are summarized in the Term Sheet.[102]  Pursuant to this settlement, the Chubb and Century companies will pay $800 million to the Settlement Trust to pay Abuse Claims if the Debtors' Plan of Reorganization is confirmed.  In reviewing the settlement, I took into account several considerations, including, among others, pre-petition coverage litigation with Century, solvency concerns, and various coverage risks.

*Coverage Litigation Against Century.*

82.      Prior to the petition date, the BSA and Century were engaged in contentious insurance-coverage litigation in two forums.  The BSA filed an action in Texas state court against, among others, Century (the "Century Texas Action").[103]  However, Century was also litigating

---

[100] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[101] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].
[102] JTX 1-307 [Seventh Mediator's Report, Century and Chubb Companies Term Sheet (D.I. 7745)].
[103] JTX 185 [Texas Complaint against Century, National Surety and Allianz] (This Century Texas Action was separate from the Texas Action filed against Hartford).

coverage issues against the BSA in the Illinois Action referenced above.[104]  In both the Century Texas Action and Illinois Action, I understand that Century served extensive discovery and lodged a series of procedural motions.

83.    In those insurance-coverage actions, Century raised a number of coverage defenses which, if successful, could substantially reduce or even eliminate the coverage available for Abuse Claims under their policies.[105]  Some of the specific coverage defenses raised by Century and Chubb included: (1) that the BSA breached its duty to cooperate under the relevant policies;  (2) that the BSA breached the "consent to settle" and "voluntary settlement" clauses in the relevant policies; and (3) that Century/Chubb have no coverage obligations for Abuse Claims that are barred by the applicable statute of limitations.[106]

84.    While the BSA disputes these coverage defenses, continued litigation would have been a drain on the BSA's resources and could have resulted in a ruling that would limit the amount Century and/or Chubb would ultimately pay for Abuse Claims.

*Century's Participation in the Debtors' Bankruptcy.*

85.    It is my understanding that Century has been actively involved in the Debtors' bankruptcy.[107]  It is also my understanding that the Debtors expended substantial estate resources to respond to each of these objections.

---

[104] JTX 162 [Illinois Complaint filed by National Surety]; JTX 202 [Illinois Century Answer].

[105] *See generally* JTX 202 [Illinois Century Answer].

[106] JTX 1-143 [Century DS Objection (D.I. 3856)] 32-34; JTX 1-180 [Century RSA Objection (D.I. 5707)] at 8, 30 (pages 3 and 25, as numbered in the brief); JTX 1-281 [Century's DS Objection (D.I. 6065)] at 5-9 (pages 1-5, as numbered in the brief).

[107] *See, e.g.*, JTX 1-21 [Century Joinder of Hartford Bar Date Objection (D.I. 656)]; JTX 1-143 [Century DS Objection (D.I. 3856)]; JTX 1-145 [Century DS Objection (D.I. 3857)]; JTX 1-180 [Century RSA Objection (D.I. 5707)]; JTX 1-182 [Century Objection to Payment of Coalition Lawyers (D.I. 5709)]; JTX 1-281 [Century's DS Objection (D.I. 6065)].

*Concerns with Collectability Related to Century.*

86.     I also considered the solvency risks associated with Century and the impact that would have on the Debtors' ability to collect from Century.  In the KCIC allocation modeling, the vast majority of Century's exposure is due to amounts allocated to Century rather than Chubb.[108] Century is a run-off insurer paying claims under policies issued by Insurance Company of North America.[109]  This means that it is a solvent insurance company that manages and pays claims under insurance policies for which Century is responsible, but it is no longer actively underwriting new business.  Century is not an income-generating insurer through the continued receipt of premiums, and there is significant uncertainty regarding the assets available to satisfy Century Indemnity Company's obligations to the Debtors and to Century's other policyholders.

*Secondary Evidence v. Primary Evidence.*

87.     As with Hartford, a significant amount of the value of coverage allocated to Century and Chubb policies issued to the BSA and Local Councils is based on secondary evidence; depending on which aggregate valuation scenario is applied, 12-15% of the total value of coverage provided by the Century and Chubb policies is supported solely by secondary evidence—an amount of coverage worth hundreds of millions of dollars.[110]  To the extent that a court were to determine that this coverage did not exist or limited the availability of the coverage, then Century and Chubb's overall exposure would decrease significantly.

---

[108] JTX 1186 [Policy Listing with Allocation Results].

[109] JTX 356 [Century Indemnity Annual Statement] at 34-36 (explaining that the Insurance Departments of multiple states approved Century's Plan of Restructure, placing it in run-off); JTX 975 [Presentation by KCIC Re Century Settlement Analysis, dated November 21, 2021].

[110] JTX 1186 [Policy Listing with Allocation Results].

88.     Additionally, many of the Century policies consist of independent Local Council policies (rather than policies covering all Local Councils), increasing the likely cost of piecemeal coverage litigation for individual policies.[111]

*Allocation to Century/Chubb Policies.*

89.     As indicated by the attached exhibit, KCIC's allocation modeling indicated that the total coverage available for Abuse Claims under the Century and Chubb policies (combined) was between $1,250,666,311 and $1,884,155,500 based on an aggregate value of Abuse Claims between $2.4 billion and $3.6 billion.[112]

*Conclusions Regarding the Century Settlement.*

90.     Having evaluated multiple factors potentially affecting the value of the Century/Chubb coverage, I believe there was a reasonable basis for the BSA to release its rights under the Century and Chubb Policies in return for an $800 million contribution to the Settlement Trust.

91.     The BSA's extensive and costly pre-petition coverage litigation with Century, as well as Century's litany of objections in the present bankruptcy proceeding, indicate that there was a substantial risk that protracted coverage litigation with Century and Chubb in the absence of a settlement would consume a substantial portion of the BSA's resources that could otherwise be used to pay Abuse Claims.  In addition to the substantial litigation expenses posed by coverage litigation against Century and Chubb, there was also a significant risk that future rulings in favor of Century or Chubb on their coverage defenses could substantially reduce the value of coverage available to pay Abuse Claims.  Likewise, there was a significant risk that rulings against the BSA

---

[111] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 1186 [Policy Listing with Allocation Results].
[112] *See supra*, ¶ 62 (Solvent Century/Chubb Coverage under the "$2.4 Billion BW Tort Distribution" and the "$3.6 Billion TDP Distribution"); JTX 1186 [Policy Listing with Allocation Results].

on its secondary evidence of the terms of Century or Chubb could substantially reduce available coverage.  Further, as noted above, there was some risk regarding the solvency of Century, which would impact any future collectability.

92.    In consideration of all these significant expenses and risks of coverage litigation, as well as the value of Abuse Claims allocated to the Century and Chubb policies in KCIC's allocation modeling, I believe there was a reasonable basis for the BSA to settle with Century and Chubb for $800 million.

## C.    The Zurich Settlement.

### Zurich's Insurance Program.

93.    Zurich issued excess-level coverage to the BSA between 1989 and 2018, with underlying matching-deductible policies between 1989 and 2008 that were issued by Century and Liberty Mutual.[113]

### Settlement Considerations.

94.    On December 21, 2021, the BSA and the Zurich Insurers agreed in principle on settlement terms as memorialized in the Zurich Settlement Agreement.[114]  Pursuant to this settlement, Zurich will pay $52.5 million to the Settlement Trust to pay Abuse Claims if the Debtors' Plan of Reorganization is confirmed—an amount which reflects a discount on the total estimated value of coverage provided by the Zurich policies under various allocation models.[115]

---

[113] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 1186 [Policy Listing with Allocation Results].

[114] JTX 1-432 [Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations (D.I. 7929)] at 40 (page 7/28 of D.I. 7929-2).  (As defined in the Term Sheet, "Zurich Insurers" includes "…American Zurich Insurance Company, American Guarantee & Liability Insurance Company, and Steadfast Insurance Company…").

[115] JTX 1-432 [Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations (D.I. 7929)] at 36 (page 2/28 of D.I. 7929-2).

*Risks of Coverage Litigation.*

95.     Zurich raised a number of the same coverage defenses as the other insurers, which, if successful, would substantially reduce or even eliminate the coverage available for Abuse Claims under their policies.[116]  In addition to these litigation risks based on coverage defenses, a substantial amount of the Zurich coverage would be at risk if the underlying Century and Liberty Mutual matching-deductible policies are determined not to have aggregate limits.  In such a circumstance, the BSA would be required to pay virtually all claims which did not exceed the per-occurrence limit for such matching-deductible policies, regardless of the number of Abuse Claims in the relevant policy term.  If Zurich succeeded in arguing that the matching deductible policies had no aggregate limit, the majority of coverage for Abuse Claims allocated to Zurich's excess policies would be at risk.

96.     While the BSA does not concede that any of these coverage defenses are valid, they are significant risks that had to be weighed in considering the benefits of a comprehensive settlement in contrast to the alternative coverage litigation.

*Allocation to Zurich Policies.*

97.     As indicated by the attached exhibit, KCIC's allocation modeling indicated that the total coverage available for Abuse Claims from Zurich was between $73,826,900 and $74,187,281 based on an aggregate value for Abuse Claim between $2.4 billion and $3.6 billion.[117]

98.     Furthermore, any future defense costs the BSA incurs in defending Abuse Claims would erode the limits of some of the Zurich policies in an amount greater than is reflected in the current allocation modeling.[118]  This means that, in the absence of a settlement, there could

---

[116] *See, e.g.,* JTX 1-172 [Certain Insurers' Objection to Debtors' RSA Motion (D.I. 5684)] at 11-12, 42.

[117] *See supra*, ¶ 62 (Solvent Zurich Coverage under the "$2.4 Billion BW Tort Distribution" and the "$3.6 Billion TDP Distribution"); JTX 1186 [Policy Listing with Allocation Results].

[118] JTX 10 [BSA and LC Insurance Policies].

potentially be less money available to pay Abuse Claims than is reflected in the allocations to Zurich's policies.

*Conclusions Regarding the Zurich Settlement.*

99.    Having evaluated multiple factors potentially affecting the value of the Zurich coverage, I believe there was a reasonable basis for the BSA to agree to release its rights under the Zurich Policies in return for a $52.5 million contribution by Zurich to the Settlement Trust.

100.    Based upon my experience in evaluating insurance coverage settlements, the coverage defenses raised by Zurich posed a considerable risk that coverage litigation could result in rulings which substantially reduced the value of coverage for Abuse Claims available under Zurich's policies.  Furthermore, although not yet raised by Zurich as a coverage defense, the possibility of a court ruling that the matching-deductible policies issued by Zurich had no aggregate limit could risk the majority of excess coverage available to pay Abuse Claims.

101.    I believe there was a reasonable basis for the BSA to settle with Zurich for $52.5 million; any resulting discount in the value of Zurich's policies was appropriate in relation to the risks of coverage litigation based on Zurich's coverage defenses and the risk that a court could rule that the matching-deductible policies underlying Zurich's policies had no aggregate limits.

**D.    The Clarendon Settlement.**

*Clarendon's Insurance Program.*

102.    Clarendon issued primary policies to a number of independent Local Councils from 1957 to 1979, and also issued excess policies to the BSA between 2003 and 2006.[119]

---

[119] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies].

*Settlement Considerations.*

103.    On September 30, 2021, the BSA and Clarendon agreed in principle on settlement terms as memorialized in the Clarendon Settlement Agreement.  Pursuant to this settlement, Clarendon will pay $16.5 million to the Settlement Trust to pay Abuse Claims if the Debtors' Plan of Reorganization is confirmed.[120]

*Risks of Coverage Litigation.*

104.    The terms of a number of the Clarendon primary policies issued to independent Local Councils are based on secondary evidence, including certificates of insurance, policy listings, and coverage assumed based on continuity of coverage.[121]  There was a risk if the Local Councils were forced to pursue coverage litigation against Clarendon that a court would rule that this secondary evidence was insufficient to prove the existence or terms of the Clarendon policies, reducing the coverage available for Abuse Claims.  In addition, as with Zurich, the Clarendon policies issued to the BSA are excess of years with matching deductibles and, to the extent that those primary policies are not subject to an aggregate limit, then any recovery from Clarendon would be in significant jeopardy.[122]

*Allocation to Clarendon Policies.*

105.    As indicated by the attached exhibit, KCIC's allocation modeling indicated that the total coverage available for Abuse Claims from Clarendon was between $3,878,517 and $9,070,978 based on an aggregate value of Abuse Claim between $2.4 billion and $3.6 billion.[123]

---

[120] JTX 1-316 [Tenth Mediator's Report (D.I. 8102), including Clarendon Term Sheet].
[121] JTX 347 [Revised Exhibit 9 to Gutzler Report].
[122] JTX 1040 [BSA Coverage Charts (Gutzler-Opening report-Exhibit 3)].
[123] *See supra*, ¶ 62 (Solvent Clarendon Coverage under the "$2.4 Billion BW Tort Distribution" and the "$3.6 Billion TDP Distribution"); JTX 1186 [Policy Listing with Allocation Results].

*Conclusions Regarding the Clarendon Settlement.*

106.    In consideration of the amount of Abuse Claims allocated to Clarendon policies under multiple allocation models and the coverage risks noted above, I believe there was a reasonable basis for the BSA to settle with Clarendon for $16.5 million.

## V.    Mechanism to Pay All or Substantially All Abuse Claims

107.    The Debtors requested that I analyze whether the Plan provides a mechanism to pay all or substantially all of the Abuse Claims.  In connection with this analysis, I was specifically asked to calculate the "Unsettled Value," which is the difference between the estimated amount of current contributions to the Settlement Trust (the "Secured Contributions") and various amounts within Dr. Bates's estimated aggregate valuations of Abuse Claims under several of the scenarios he presented within the lower quartile of his full range (the "Estimated Aggregate Value").  I was also asked to consider whether additional sources of funding are available to pay any Unsettled Value.

## A.    Calculating Unsettled Values for Various Estimated Aggregate Values.

108.    I began my analysis by determining the value of Secured Contributions which are currently available to contribute to the Settlement Trust.

109.    My analysis was based on Brian Whittman's analysis of the BSA's assets in his Updated Expert Report, dated December 29, 2021, in which he stated that the BSA will be able to contribute $160 million to the Settlement Trust.[124]  While Mr. Whittman recently revised his estimates to incorporate financial information collected in the months since his Updated Expert

---

[124] JTX 1118 [Updated Expert Report of Brian Whittman] at 40.

Report, he maintains that "there is over $2.7 billion of cash and property that is being contributed to the Settlement Trust under the Plan[,]" including specific items of contributions by the BSA.[125]

110.    The Local Councils will be able to contribute $640 million to the Settlement Trust, including $600 million discussed in Mr. Whittman's report and an additional $40 million that the Local Councils agreed to pay.[126]

111.    In addition to direct contributions from the BSA and Local Councils, the BSA also secured $1.656 billion dollars in funding through its settlements with various insurers, including: $800 million from the Century/Chubb Settlement; $787 million from the Hartford Settlement; $52.5 million from the Zurich Settlement; and $16.5 million from the Clarendon Settlement.[127]

112.    Two groups of Chartered Organizations have also agreed to contribute to the Settlement Trust.  The Church of Jesus Christ of Latter-day Saints (the "TCJC") agreed to contribute $250 million to the Settlement Trust and the Methodist Church agreed to contribute $30 million.[128]

113.    By combining the amounts of these contributions, I determined that the combined value of Secured Contributions to the Settlement Trust is currently $2.7 billion.

114.    After determining the value of Secured Contributions, I compared that value to the total Estimated Aggregate Value based on four separate Abuse Claim valuations described in Dr.

---

[125] Declaration of Brian Whittman in Support of Confirmation of the Third Modified Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 9280) at 19-21, 23.

[126] JTX 1118 [Updated Expert Report of Brian Whittman] at 72; JTX 1-307 [Seventh Mediator's Report, Century and Chubb Companies Term Sheet (D.I. 7745)] at 2.

[127] *See, e.g.,* JTX 1-307 [Seventh Mediator's Report, Century and Chubb Companies Term Sheet (D.I. 7745)]; JTX 1-292 [Sixth Mediator's Report with Attachments (includes Hartford and TCJC Term Sheets) (D.I. 6210)]; JTX 1-316 [Tenth Mediator's Report (D.I. 8102), including Clarendon Term Sheet]; JTX 1-432 [Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations (D.I. 7929)].

[128] JTX 1-292 [Sixth Mediator's Report with Attachments (includes Hartford and TCJC Term Sheets) (D.I. 6210)]; JTX 1-432 [Notice of Eighth and Ninth Mediator's Report Regarding United Methodist Term Sheet and Zurich Term Sheet Including Treatment of Chartered Organizations (D.I. 7929)].

Bates's expert reports.  These included: (1) the $2.4 billion Estimated Aggregate Value from Dr. Bates's Expert Report under his potential tort distribution; (2) the $3.0 billion rescaled Estimated Aggregate Value from Dr. Bates's Supplemental Report under his potential TDP distribution; (3) the $3.305 billion Estimated Aggregate Value from Dr. Bates's Supplemental Report under his potential TDP distribution; (4) the $3.6 billion Estimated Aggregate Values derived from Dr. Bates's potential tort distribution (as described in his Expert Report); and (5) the $3.6 billion Estimated Aggregate Value from Dr. Bates's Supplemental Report under his potential TDP distribution.[129]

115.    By comparing each Bates White Estimated Aggregate Value scenario (which encompass a range of $2.4 billion to $3.6 billion) to the $2.7 billion in Secured Contributions that I identified, I was able to determine the resulting Unsettled Value that would need to be provided by additional sources of funding in order to pay the Estimated Aggregate Value.

**B.    Identifying Additional Sources of Funding.**

116.    Based on KCIC's allocation modeling, existing sources of Secured Contributions, and my experience with evaluating settlements of mass tort insurance coverage, I believe there is a mechanism in place for the payment of all or substantially all of the Abuse Claims, with additional funding from three sources: (1) additional settlements with insurers for policies that received allocations under KCIC's allocation modeling; (2) settlements with insurers for policies that did not receive allocations under KCIC's allocation modeling; and (3) additional contributions from Chartered Organizations.

---

[129] JTX 676 [BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta]; JTX 1052 [Expert Report of Charles E. Bates (Dec. 5, 2021)]; JTX 1194 [Supplemental Report of Charles E. Bates]; JTX 1431 [Charles E. Bates Second Supplemental Expert Report, dated March 2, 2022]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

*Funding from Non-Settled Insurers for Policies that Received Allocations.*

117.    Based on Dr. Bates's conclusion that the Estimated Aggregate Value will likely remain in the range of $2.4 to $3.6 billion (the "lower quartile" of the broader range of $2.4 billion to $7.1 billion that he considered), KCIC was able to use allocation modeling to estimate the specific amount of coverage potentially available to pay Abuse Claims under policies issued by solvent Non-Settling Insurers (the "Allocated Non-Settling Insurers").[130]    Specifically, Abuse Claims may trigger these insurers' policies based on the allocation using Dr. Bates' Estimated Aggregate Value.

118.    Depending on which Estimated Aggregate Value (between $3.0 billion and $3.6 billion) is applied, the Allocated Non-Settling Insurers would owe between $321,319,886 and $400,546,854 in estimated coverage for Abuse Claims:[131]

| Category | $2.4 Billion BW Tort Distribution | $3.0 Billion TDP Distribution | $3.3 Billion TDP Distribution | $3.6 Billion TDP Distribution | $3.6 Billion BW Tort Distribution |
|---|---|---|---|---|---|
| Solvent Coverage (Other Non-Settled Insurers) | $274,448,112 | $321,319,886 | $361,749,271 | $357,745,809 | $400,546,854 |

*Funding from Non-Settled Insurers for Policies that Did Not Receive Allocations.*

119.    In addition to the potential Secured Contributions from Allocated Non-Settling Insurers, I believe there is a reasonable possibility for Non-Settled Insurers that do not currently have any claims allocated to certain policies ("NSNA Insurers") in my current allocation to have exposure and/or contribute settlement payments as part of the Settlement Trust.

---

[130] JTX 1194 [Supplemental Report of Charles E. Bates] at 11-12.

[131] JTX 1186 [Policy Listing with Allocation Results]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

120.    The lack of allocation to NSNA Insurers' policies can occur for a variety of reasons, such as the NSNA Insurers' policies providing higher-level excess coverage in policy years where the limits of lower-level policies are not yet fully exhausted.  This lack of allocation merely indicates that NSNA Insurers are *less likely* than Allocated Non-Settling Insurers to be required to pay out on their policies based on the various representative claim value distributions presented under the Bates White aggregate Abuse Claim scenarios—it does not indicate that NSNA Insurers have no risk under their policies.  They have always had, and continue to have, exposure under their policies.

121.    The table below demonstrates the total limits of coverage potentially available under policies issued to the BSA and Local Councils *by the NSNA Insurers*:[132]

| Insured Parties | $3.0 Billion TDP Distribution | $3.3 Billion TDP Distribution | $3.6 Billion TDP Distribution | $3.6 Billion BW Tort Distribution |
|---|---|---|---|---|
| National | $3,403,171,804 | $3,385,319,620 | $3,347,465,938 | $3,300,999,443 |
| Local | $892,706,824 | $872,205,482 | $943,015,088 | $1,103,845,000 |
| Total | $4,295,878,628 | $4,257,525,102 | $4,290,481,026 | $4,404,844,443 |

122.    Although it is difficult to precisely quantify the expected value of NSNA Insurers' policies without additional information not yet available to any party, my experience from other mass tort insurance coverage settlements indicates that insurers are often willing to settle policies with no current allocation in order to mitigate the risk that their policies would attach under different circumstances and in exchange for a release of liability on those policies.

123.    The IRO described in the TDP could also result in additional allocation to the NSNA Insurers.  By allowing individual claimants to potentially recover an award larger than the

---

[132] JTX 1186 [Policy Listing with Allocation Results]; JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 10 [BSA and LC Insurance Policies]; JTX 1058 [Bates White BSA valuation model (Tranche 6) (Gutzler Opening Materials Considered List)]; JTX 1601 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1602 [Bates White BSA trust simulation model (Tranche VI) -- confidential -- for production.xlsx]; JTX 1603 Bates White BSA valuation model updated (Tranche 6) -- confidential -- for production.xlsx].

$2.7 million cap under the TDP, the IRO increases the odds that a higher-level excess policy will be triggered for Abuse Claims.[133]

124.    The additional contribution of settlements with NSNA Insurers are a valid and viable part of the mechanism in the Plan to pay all or substantially all of the Abuse Claims.

_Funding from Additional Chartered Organizations._

125.    In my opinion, it is likely for the BSA to secure additional funding from some of the thousands of Chartered Organizations that have not yet made a monetary contribution to the Settlement Trust.

126.    As noted, _supra_, both the TCJC and the Methodist Church have already contributed a combined $280 million in Secured Contributions to the Settlement Trust as consideration for their treatment as Protected Parties under the Plan's Channeling Injunction.  In other words, the TCJC and Methodist Church were willing to make substantial contributions to the Settlement Trust in return for the full benefits and protections of the Channeling Injunction, thereby shielding themselves from future liability for Abuse Claims.

127.    There are over _41,000_ Chartered Organizations in the United States, including numerous other large Chartered Organizations.[134]  Under the current plan these organizations have a temporary reprieve or stay from litigation post emergence by virtue of the Local Council contribution.  But any entity that wants a permanent injunction will need to reach a settlement with the Trust.  There is a potential for non-settling Chartered Organizations to be liable for claims in the event they elect not to become a Contributing Chartered Organization.[135]  This potential liability creates an incentive for many of these remaining Chartered Organizations to follow the lead of the

---

[133] JTX 1-350 [Eleventh Mediators Report (D.I. 8772), including TCC Term Sheet] at 23-27.
[134] JTX 1-425 [Amended Disclosure Statement for the Modified Fifth Amended Plan (D.I. 6431)] at 67-68.
[135] JTX 347 [Revised Exhibit 9 to Gutzler Report]; JTX 676 [BSA record-level Tranche VI dataset containing 117,037 records: 02 Processed POC 2021.07.06.dta].

TCJC and Methodist Church in making a substantial contribution to the Settlement Trust in order to secure additional protections under the Plan's Channeling Injunction.

128.    While it is difficult to quantify the expected value of additional contributions to the Settlement Trust from other Chartered Organizations, the substantial contributions from the TCJC and Methodist Church indicate that contributions from additional Chartered Organizations could reduce the Unsettled Value.

**C.    My Conclusion Regarding Payment of All or Substantially All of the Abuse Claims.**

129.    Although I did not attempt to quantify the expected value of potential funding from settlements with NSNA Insurers or contributions from Chartered Organizations, I believe these additional sources could provide substantial additional contributions to the Settlement Trust.  As noted in the chart in ¶121, *supra*, there are at least $4.3 billion in total limits potentially available to cover Abuse Claims which did not receive allocations under the current aggregate Abuse Claim valuation scenarios; even a small percentage of recovery of the amount of such limits from NSNA Insurers could yield significant additional funding for the Settlement Trust.

130.    Taking all of these potential sources of additional funding into account, I believe there is a mechanism in place for the Settlement Trust to pay all, or substantially all of the Abuse Claims.

## VI.    THE INDEPENDENT REVIEW OPTION

131.    The Debtors requested that I consider whether my analysis would be impacted by the IRO that was incorporated within the revised TDP filed with the Third Modified Fifth Amended Plan.  My conclusion that there is a mechanism in place to pay all or substantially all of the Abuse Claims is only improved by the IRO.

132.    The purpose of the IRO is to provide claimants that believe their Abuse Claim is worth more than the maximum value available under the TDP with the right to have their claim evaluated to potentially receive a higher award than is available through the TDP.[136]

133.    In order to exercise the IRO option, each claimant is required to pay $20,000 to cover the litigation-related expenses incurred by the Settlement Trust in administering the IRO process.[137]    The IRO process is significantly more time-consuming and expensive than the TDP process, but a claimant that prevails on an Abuse Claim through the IRO process could potentially be eligible to receive an award multiple times larger than the maximum value available under the TDP.[138]

134.    One effect of the IRO may be to create additional pressure on non-settling insurers to enter into a settlement with the Trust.  Under the TDP process, Abuse Claimants always had the ability to elect to proceed in the tort system and their recovery was not limited by the TDP values. Based on my experience, the non-settling insurers would have considered their potential liability for "high value" claims that may proceed in the tort system.  The IRO, however, creates a more direct mechanism for Abuse Claimants to recover on their "high-value" claims and, thereby, may create additional pressure for the non-settling insurers to settle.  Furthermore, as discussed above, over $4 billion of unallocated insurance coverage exists and to the extent the IRO identifies additional high value claims, those claims may be allocated to such insurance.

135.    Therefore, I maintain my opinion that there is a viable mechanism in place for the Settlement Trust to pay all or substantially all of the Abuse Claims.

---

[136] JTX 1-350 [Eleventh Mediators Report (D.I. 8772), including TCC Term Sheet] at 23.
[137] JTX 1-350 [Eleventh Mediators Report (D.I. 8772), including TCC Term Sheet] at 24-25.
[138] JTX 1-350 [Eleventh Mediators Report (D.I. 8772), including TCC Term Sheet] at 23-27.

136.    I declare under penalty of perjury under the laws of the United States, that the foregoing statements are true and correct.

Dated: March 19, 2022                    Respectfully submitted,


_/s/  Nancy Gutzler_____
Nancy Gutzler