IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**DECLARATION OF JESSICA HOREWITZ IN SUPPORT OF TCJC'S SETTLEMENT AND CONFIRMATION OF THE DEBTORS' THIRD MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

I, Jessica Horewitz, hereby declare that the following is true to the best of my knowledge, information and belief:

**A.   Background and Qualifications**

1.    I am currently a Principal at Gnarus Advisors LLC ("Gnarus") and serve as Gnarus' President. Gnarus is a consulting firm that provides analytic and expert services to clients facing complex challenges arising from uncertainty, adverse events, and disputes. Gnarus specializes in, among other things, expert consulting and testimonial support in litigation and arbitration matters through in-depth research, analysis, and quantitative modeling.

2.    I attended college at The George Washington University, where I received a Bachelor's of Arts in Economics in 1990. I then attended the University of Virginia, where I received a Master's degree and a Ph.D. in Economics in 1992 and 1997, respectively.

---

[1]    The Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

3.  I have been employed by Gnarus or Gnarus-related entities since February 2011. Prior to Gnarus, I worked at a number of other consulting firms dating back to 1995, including Navigant Consulting, Inc., LECG, LLC, and PHB Hagler Bailly. I have also held faculty appointments at the University of Virginia, Duquesne University, and The George Washington University.

4.  I have more than 25 years of experience using analytical and statistical tools in a variety of settings, including bankruptcy, complex damage calculations, economic forecasting, statistical analysis, and cash-flow analysis. I have been retained as an expert witness in dozens of matters, including damages and insurance coverage actions. Of particular relevance here, I was retained as a consulting expert by a major institution in order to evaluate liability associated with alleged sex abuse by an employee, and I was a guest speaker at a conference regarding the topic of sexual abuse litigation and coverage. I have also been involved in liability estimation in other mass tort matters relating to asbestos, pharmaceuticals, manufactured goods, and environmental toxins.

5.  A full summary of my experience and qualifications is contained in my CV, which is attached to this declaration as Exhibit 1.

**B.  Summary of Engagement and Methodology**

6.  I was retained by the Church of Jesus Christ of Latter-day Saints ("TCJC") as an expert witness to develop a claim valuation model that addresses the sufficiency of TCJC's proposed $250 million cash contribution to the BSA Settlement Trust to settle all claims for which TCJC could face liability in the tort system ("TCJC's Settlement").

7.  To determine whether TCJC's Settlement is sufficient, I performed four primary steps. **First**, I reviewed the full population of sexual abuse claims that were timely filed in these bankruptcy proceedings (the "Abuse Claims") and identified the subset of claims that both involve

TCJC and would have value in the tort system. **Second**, I determined the range of per-claim values of those claims in the tort system. **Third**, I determined the share of liability that would likely be apportioned to TCJC in the tort system. **Fourth**, I considered the additional value of the potential insurance recovery proceeds owed under BSA and Local Council insurance policies that provide coverage to TCJC.

8. I examined each element in turn and then compared my findings (using various scenarios) to the amount of TCJC's Settlement in order to determine whether the settlement amount is sufficient to compensate abuse claimants for TCJC's potential liability.

9. Through this independent analysis, I concluded that TCJC's Settlement is greater than TCJC's potential liability arising from the Abuse Claims under a broad range of expected conditions.

### C. The Number of TCJC Claims with Value in the Tort System Could be as Low as 534 and is Almost Certainly Below 1,379

10. As the first step in my analysis, I began with the full extract of 82,209 unique and timely filed Abuse Claims identified by the Boy Scouts of America's ("BSA" or the "Debtors") retained expert, Bates White.[2] I then sought to determine the number of Abuse Claims that are connected to TCJC and that could potentially have value in the tort system (the "TCJC Claims").

11. To identify the universe of TCJC Claims, I excluded any claims that, on their face, lacked allegations connecting the claim to TCJC or otherwise had a characteristic that indicated

---

[2] In conjunction with reports served by certain of its experts, Bates White provided interested parties to these bankruptcy proceedings with an Excel spreadsheet that recorded the information contained in the Proofs of Claim asserting sexual abuse claims that were timely filed in the bankruptcy (the "POC Claim Data"). The POC Claim Data reflects data from the underlying Proofs of Claim, including, for example, name of alleged abuser, date of alleged abuse, description of the alleged abuse, the name of any chartering organization or local council associated with the claimant's troop, etc. I relied on the total claim counts and underlying data reflected in the POC Claim Data and did not independently verify this finding.

3

the claim had no value in the tort system. These exclusions were based on a number of relevant data points provided in the POC Claim Data, including information regarding: (i) the claimant's birth date; (ii) the alleged abuser, including name; (iii) the underlying allegations, including type, location, and timeframe of the alleged abuse; (iv) the claimant's scouting history, including council name and council chartered organization; and (v) statute of limitations.

12. Because this process requires assumptions that could reasonably lead to variance in the final claim count, I identified both a likely "high" and "low" claim count to provide a range of options for consideration that, in conjunction with the valuation, can be compared against TCJC's Settlement.

13. The bases upon which I excluded claims are:

   a. **Abuse Allegation**: I excluded any claim for which the underlying allegation of abuse in the POC Claim Data provided to me was recorded as "Missing" or "Unknown/Unconfirmed." I understand from counsel that the amount of damages, if any, often depends on whether and how the claimant was abused. I excluded these claims based on guidance from TCJC's counsel that claims lacking allegations of abuse would likely not have value in the tort system. This resulted in 5,481 claims being excluded in both the low- and high-end scenarios.

   b. **Chartered Organization Category**: I next excluded any claim remaining in the POC Claim Data that did not mention TCJC as a chartered organization associated with the claim. Specifically, the POC Claim Data includes fields describing the chartered

4

      organization affiliated with each individual claim and, where the entry did not identify TCJC, it was excluded. This resulted in an additional 74,274 claims being excluded in both the low- and high-end scenarios.

c. **Prior TCJC Settlement**: Of the remaining claims in the POC Claim Data, I excluded any that had been previously settled by TCJC. I did so based on a list of prior settlements involving TCJC, including the Claim ID number from the underlying Proofs of Claim, that was provided to me by TCJC's counsel. This resulted in an additional 15 claims being excluded in both the low- and high-end scenarios.

d. **Statute of Limitations Application**: Of the remaining claims, I next excluded any claim that would be presumptively barred by the applicable statute of limitations ("SOL"). I was provided with rules from TCJC's counsel for applying the SOL, if any, for each state where abuse was alleged to have occurred.

      For the low-end scenario, I determined whether the claim was barred per the rules provided and the information available for each claim. If the necessary information was not available to determine the status, I treated the claim as not barred. This resulted in 1,555 claims being excluded in the low-end scenario.

      The high-end scenario assumes that SOL laws will be swept away or changed such that they are not applicable to sex abuse claims related to BSA, with an exception for claims that allege that

5

the abuse occurred in Utah. Utah was not excluded from my analysis based on instruction from counsel that it is not reasonable to assume Utah's SOL laws could be changed such that previously barred claims would no longer be barred. This resulted in 638 claims being excluded in the high-end scenario.

e. **Abuser Name**: In the high-end scenario for this category, I excluded any claim for which the abuser's name in the POC Claim Data provided to me was recorded as "Missing" or "Unknown." I excluded these claims based on guidance from TCJC's counsel that a claim must identify the alleged abuser to have value in the tort system.

For the low-end scenario, I further excluded claims in which the POC Claim Data provided to me recorded only a physical description of the abuser in the POC Claim Data, under the assumption that a physical description alone (without a name) is not sufficient to "identify" the abuser.

This resulted in 329 claims being excluded in the low-end scenario and 418 claims being excluded in the high-end scenario.[3]

f. **Age when Abuse Occurred**: In the high-end scenario for this category, I excluded any claim for which the age of the claimant

---

[3] The exclusion process is cumulative, such that the number of remaining claims in the low- and high-end scenarios may differ after any given step. As a result, after applying the exclusions relating to abuser name, fewer claims were excluded in the low-end scenario because the population of remaining claims in that set was smaller due to the cumulative effect of prior exclusions.

6

when abuse first occurred was recorded in the POC Claim Data to be 18 years old or older. I excluded these claims based on guidance from TCJC's counsel that a claimant must have been under the age of 18 on the date the abuse first occurred for it to have value in the tort system.

For the low-end scenario, I further excluded claims in which the claimant's age was not provided.

This resulted in 21 claims being excluded in the low-end scenario and 4 claims being excluded in the high-end scenario.

14. After applying these exclusions to the total set of Abuse Claims, I calculated a low-end population of 534 TCJC Claims and a high-end population of 1,379 TCJC Claims. I consider the assumptions I have used to determine the "high" count to be conservative, such that I believe it unlikely that the actual number of TCJC Claims would approach the "high" end of the range. However, I took this approach in order to demonstrate that TCJC's Settlement would be sufficient even in the face of unlikely scenarios such as those contemplated by the "high" end of the range.

**D.   The Average Value of a TCJC Claim is Likely Between $345,000 and $428,000**

15. After identifying the population of TCJC Claims, I next determined the average tort system value of those claims. To do so, I used historical settlement data for sex abuse claims involving BSA, as provided to interested parties to this bankruptcy by the Debtors' expert, Bates White.

16. Specifically, Bates White produced two datasets of historical BSA settlements alongside Dr. Bates' report. The first is comprised of 262 abuse claims involving BSA from 2016 to prior to the Petition Data, which were resolved for a combined total of $170 million (the "2016-

7

20 Dataset"). The second is comprised of 573 abuse claims involving BSA from 2010 to prior to the Petition Date, which were resolved for a combined total of $266 million (the "2010-20 Dataset").

17. While these two datasets provide sufficient data to arrive at a settlement value for the total population of claims involving BSA, that population is not necessarily representative of claims asserted against TCJC or TCJC's likely liability arising from those claims, both of which comprise a small sub-set of all Abuse Claims. As a result, I reviewed the two datasets in detail in order to further refine the data to better align with TCJC's claimant population.

18. In particular, the BSA datasets are skewed by the inclusion of a large number of claims asserted against one serial abuser, Thomas Hacker, who is not affiliated with TCJC. With respect to the 2016-20 Dataset, the Hacker claims account for over 50% of the total settlement dollars while comprising less than 7% of the total claims. With respect to the 2010-20 Dataset, the Hacker claims account for 34% of the total settlement dollars while comprising less than 4% of the total claims. Those settlements are statistical outliers that drive the per-claim average up in a way that would bias my analysis because Hacker has no affiliation whatsoever with TCJC. As a result, I excluded any settlements related to Hacker from the two BSA datasets in calculating the value of TCJC Claims.

19. Moreover, I determined that the 2010-20 Dataset was less reliable than the 2016-20 Dataset due to the former containing a large number of claims that do not specify an abuse type. Specifically, the 2010-20 Dataset contains an additional 263 non-Hacker settlements not included in the 2016-20 Dataset. Of those additional claims, 239 (over 90% of the additional claims) do not specify an abuse type yet reflect an average value of nearly $300,000 per claim. This is anomalous because, on average, those values are in line with claims reflecting the most severe

abuse types, such as claims involving allegations of penetration or oral sex, instead of the lower values typically associated with claims lacking an abuse type. By contrast, the 2016-20 Dataset contains 35 claims that do not specify an abuse type, which reflect an average value of approximately $54,000 per claim. Because the claims that are missing an abuse type in the 2010-20 Dataset do not follow this expected pattern, I concluded that the 2010-20 Dataset is less reliable, and instead used the 2016-2020 Dataset to determine the expected value of TCJC Claims.

20. After focusing on the 2016-20 Dataset and excluding the Hacker settlements, I calculated average per-claim values based on the remaining settlements in the Dataset. The average value of the 235 remaining claims in the 2016-20 Dataset is $344,998 per claim.

21. However, as described above, when I determined the number of TCJC Claims, I excluded any claim from the TCJC Claim count for which the underlying allegations of abuse in the POC Claim Data was categorized as "Missing" or "Unknown/Unconfirmed." This step implicitly assigned those claims a claim value of $0 in the tort system. Given that assumption, I also calculated the average value for only those 2016-20 claims that specified an abuse type, resulting in a value of $428,341 per claim.

22. In sum, the average per-claim value of the TCJC Claims likely ranges between $344,998 on the low end and $428,341 on the high end.

### E. TCJC Would Likely be Apportioned 50% or Less of Liability for Any Claims

23. I next considered the effect that apportionment of fault between multiple tortfeasors would have on TCJC's potential liability in the tort system.

24. With respect to the TCJC Claims, TCJC is just one of several parties that could be apportioned some share of liability. Other parties that could be held partially liable in the tort system include the alleged abuser, BSA, BSA Local Council, the claimant's parents, and others.

9

As a result, typically the full-face value of a claim settlement or verdict would be allocated among multiple defendants in the tort system.

25. I understand that the 2016-20 Dataset reflects settlements as between claimants, on the one hand, and potentially liable parties other than the abuser (such as BSA, BSA Local Councils and, when appropriate, TCJC), on the other hand. As such, the settlement values in the 2016-20 Dataset do not account for additional liability potentially attributable to an abuser. To properly evaluate the tort system value of TCJC Claims, I only considered the apportionment of the non-abuser liability between BSA and TCJC and did not consider the potential share of liability assignable to abusers.

26. Counsel provided me with a list of approximately 28 verdict summaries in sexual abuse cases and, upon review, I determined that the relationship between liable parties in two of the cases most closely mirrored the specific dynamic between TCJC, BSA, and other parties that may be assigned a share of liability arising out of claims asserted in this bankruptcy. In these two cases, the verdict apportioned liability among the abuser and multiple third-party organizations, providing me a structure to determine the appropriate range of apportionment between BSA and TCJC.

27. In *Menzies v. Los Angeles Unified Sch. District*,[4] 10% of liability was apportioned to the abuser, 45% was apportioned to a school, and 45% was apportioned to a sponsor. The non-abuser liability was evenly split between school and sponsoring organization, supporting the concept that non-abuser parties might share liability evenly, and thus supporting a 50% TCJC apportionment.

---

[4] *Menzies v. Los Angeles Unified Sch. District*, 46 Trials Digest 15th 9, 2012 WL 5942689.

28. In *Confidential v. Watchtower Bible & Tract Soc'y of New York Inc.*,[5] 60% of liability was apportioned to the abuser, 27% was apportioned to a national organization, and 13% was apportioned to a local congregation. This case supports the concept that, if non-abuser liability is not shared evenly among non-abuser parties, then a national organization such as BSA is more likely to bear the bulk of liability as compared to those who help run the local troop involved (such as a TCJC-sponsored troop or the specific BSA Local Council). In this case, the national organization was assigned two-thirds of the non-abuser liability, and the local sponsor was assigned one-third.

29. As a result, I considered a 50% apportionment of non-abuser liability to TCJC to be an upper bound across the TCJC Claims. Given BSA's role as a national organizer and the fact that some claims may include other non-abuser defendants (such as a BSA Local Council), the actual amount of liability apportioned to TCJC on average in the tort system is likely lower. In light of those facts, as well as the apportionment of fault evidenced in the verdict summaries I reviewed, I considered the range of fault likely to be apportioned to TCJC for any claim to be between 25% and 50% of non-abuser liability.

**F. TCJC's Settlement is Sufficient Under Virtually All Feasible Scenarios**

30. After determining the number of TCJC Claims, the average per-claim value of those Claims, and the proportion of liability likely to be assigned to TCJC, I next calculated TCJC's expected tort system liability based on my findings.

31. In order to calculate TCJC's potential liability, I considered both the low-end claim count (534) and high-end claim count (1,379), as well as the low-end claim value (approximately

---

[5] *Confidential v. Watchtower Bible & Tract Soc'y of New York Inc.*, 34 Trials Digest 15th 20, 2012 WL 3610733.

11

$345,000) and the high-end claim value (approximately $430,000). Under these conditions, the total value of TCJC Claims, before application of apportionment among defendants and before valuing TCJC's insurance rights, is between $184 million and $593 million, as shown below:

| Claim Count | Range of Total Claim Value Before Apportionment Offsets and Insurance | |
|---|---|---|
| | Average Claim Value | |
| | $345,000 | $430,000 |
| 534 | $184,230,000 | $229,620,000 |
| 1,379 | $475,755,000 | $592,970,000 |

32. Under this scenario, TCJC's settlement contribution of $250 million is sufficient to address the valuation for claim counts of more than 534 even without contribution from any other party and without consideration of the value of the assigned insurance rights.

33. If a conservative apportionment to TCJC of 50% of non-abuser liability is assumed, the proposed TCJC contribution is sufficient to cover the TCJC valuation under all but the most extreme and unlikely circumstances, as shown below:

| Claim Count | Range of Total Claim Value 50% Apportionment | |
|---|---|---|
| | Average Claim Value | |
| | $345,000 | $430,000 |
| 534 | $92,115,000 | $114,810,000 |
| 1,379 | $237,877,500 | $296,485,000 |

34. In this scenario, TCJC's Settlement is sufficient under all scenarios in which either my low claim count and/or low claim value is assumed. TCJC's Settlement is also sufficient even if *both* my high claim count and my high claim value are assumed, both of which I consider to be conservative and highly unlikely scenarios, so long as the apportionment of non-abuser liability to

12

TCJC is 42.2% or less. Given these results, I concluded that TCJC's Settlement is sufficient to address TCJC's projected tort system liability.

35. In order to confirm that my conclusions were accurate, I stress tested them using the most conservative claims counts and values calculated by other expert witnesses that served reports in this bankruptcy. Specifically, I considered a scenario in which TCJC faced 1,554 claims, the highest number of claims relating to TCJC as calculated by Katheryn McNally, who was retained by the Tort Claimants' Committee (the "TCC"). I also determined that, after adjusting for the Hacker claims, the average claim value as calculated by Ms. McNally would be approximately $398,000 per claim. Using these adjusted figures, I determined that the resulting liability of just over $618 million for all 1,554 claims would fall within TCJC's Settlement range if TCJC is apportioned 40% or less of liability, an amount that falls within the 25% to 50% apportionment range I considered reasonable for TCJC, without consideration of the value of TCJC's insurance rights.

### G. Future Claims Are Unlikely to Have a Significant Impact on TCJC's Potential Liability

36. Because I understand that the BSA Settlement Trust is also intended to address claims that might arise in the future for claimants with latent memories of abuse, I considered the potential impact of future claims on TCJC's potential tort system liability. However, the majority of TCJC Claims arise in states which, as I am informed by counsel, do not allow latent memory claims to be filed, including Arizona, California, Idaho, and Utah. Specifically, 81% of the TCJC Claims (431/534) in my low scenario and 49% of the TCJC Claims (675/1,379) in my high scenario arise in one of these four states. Further, TCJC Claims comprise less than 1% (534) or at most 1.7% (1,379) of the 82,209 overall BSA claims. The likelihood that a latent memory claim would both arise outside of Arizona, California, Idaho, or Utah and involve TCJC is extremely

13

small. As a result, I consider my high claim count (which is very likely over-inclusive and overstates TCJC's likely liability) sufficient to capture the impact of any latent memory claims.

### H.  The Value of TCJC's Insurance Rights Further Confirms the Sufficiency of TCJC's Settlement

37. I understand from TCJC's counsel that, in addition to TCJC's proposed cash contribution of $250 million to settle its potential liability, TCJC will contribute its rights to coverage under its own, BSA's, and BSA Local Councils' insurance policies as part of TCJC's Settlement.

38. The total value of these insurance rights were addressed by reports served in connection with the BSA bankruptcy, including Katheryn McNally and Mark Kolman on behalf of the TCC. However, none of these reports purported to calculate the value of TCJC's insurance rights specifically. In order to calculate the amount of insurance proceeds that TCJC would be entitled to under the TCC's scenario, I utilized their findings and applied them to TCJC's specific circumstances. Specifically, Ms. McNally determined that between 13.3% and 16.6% of liability attributable to chartered organizations, such as TCJC, would be allocable to solvent insurance coverage. Mr. Kolman determined that an appropriate discount against all insurance companies on the risk of potential liability under applicable policies is 25-30%.

39. Using those assumptions, I calculated the value of TCJC's share of insurance rights to be between $23 million and $31 million based on the TCC's general analysis with respect to chartered organizations, as shown below:

14

| | Insurance Allocation | |
|---|---|---|
| | **Chartered Organizations** | |
| **Category** | **Low** | **High** |
| Solvent Coverage Allocation | 13% | 17% |
| Settlement Discount (Kolman - 25%-30%) | 30% | 25% |
| **Insurance Recovery** | **9%** | **12%** |
| TCJC Cash Contribution (millions) | $250 | $250 |
| Insurance Recovery for TCJC ($ millions) | $23 | $31 |
| **Total Contribution Value ($ millions)** | **$273** | **$281** |

40. However, the actual value of any insurance recovery for TCJC will depend on a variety of allocation and settlement assumptions that could reasonably vary from those used by the TCC. I received instruction from counsel as to the likely application of coverage with respect to certain issues, including, but not limited to: (i) whether chartered organizations are covered under pre-1976 Local Council policies; (ii) whether chartered organizations must pay deductibles before accessing coverage in "fronting" policies; (iii) the appropriate trigger for insurance coverage; and (iv) the application of aggregate versus per-occurrence policy limits.

41. In particular, I analyzed the potential impact of several key assumptions:

    a. **Trigger of Coverage**: I considered the impact of the adoption of a "continuous trigger" theory of coverage, where liability for each claim is spread from date of initial abuse through end of coverage, rather than allocated entirely to a single policy period based on the date of initial abuse. I did so based on my understanding from counsel that the continuous trigger theory is likely to apply to TCJC Claims. Under the continuous trigger theory, liability is spread from the date of initial abuse through March 2020 (assuming the claimant

alleges ongoing injury from the date of initial abuse). The result (after accounting for the other changes below) is that substantially greater insurance proceeds would be available to cover claims over time than if the policy allocated liability for all claims based exclusively on the date of initial abuse.

b. **"Fronting" policies**: I considered a scenario in which TCJC would not be required to match deductibles with respect to the "fronting" policies issued by INA, Liberty Mutual, and Old Republic, and therefore, any TCJC liability allocated to those policies would be covered at dollar one based on instruction from counsel that insureds other than the Named Insured (i.e., chartered organizations) are not responsible to pay a deductible to access this coverage. The result is that TCJC would not be required to pay any amount out of pocket under those policies before coverage applied.

c. **Coverage Period**: I considered a scenario in which TCJC is covered by the BSA's insurance policies for claims arising in 1976 and onward. I did so based on my understanding from counsel that BSA's insurance policies provide coverage for "sponsors," including chartered organizations, from 1976 onward. I also understand from counsel that TCJC qualifies as an insured in at least some of the pre-1976 Local Council insurance policies as well.

42. After applying a continuous trigger theory, accounting for non-deductible "fronting" policies, and adjusting the date of coverage to begin in 1976, the pro-rata share of

TCJC's liability up to 1975 would remain categorized as uninsured, a conservative assumption given the possibility of access to Local Council policies. Conversely, the pro-rata share of the liability from 1976-2020 would be allocated to available insurance coverage.

43. To determine this pro-rata share that could potentially be allocated to post-1975 coverage, I first determined a weighted average date of first abuse based on total costs allocated to each pre-1976 policy period. I calculated this weighted average date to be 1968.

44. Next, I used this weighted average date of first abuse to calculate that a pro-rata share of approximately 15% of costs associated with those claims would fall within the 1968-1975 time period and, therefore, remain uninsured. Conversely, the remaining 85% of costs would be allocated to the 1976-2020 time period and, under a continuous trigger and not subject to the "fronting policy" deductibles, covered by applicable BSA insurance policies.

45. Finally, I applied the 85% share to the total TCJC costs that were categorized as uninsured in in the TCC's calculation of chartered organizations' share of insurance rights. This step was designed to determine the amount of costs that had been previously assumed to be uninsured that, under my revised scenario, would actually be allocated to solvent available coverage.

46. I calculated TCJC's potential insurance recovery proceeds based on my revised assumptions to be between $156 million and $164 million, as follows:

| | Low | | High | |
|---|---|---|---|---|
| **Chartered Organizations Insurance Recovery with Updated Assumptions** | | | | |
| Category | Original | Updated | Original | Updated |
| Solvent Coverage Allocation | 13% | 89% | 17% | 88% |
| Settlement Discount (Kolman - 25%-30%) | 30% | 30% | 25% | 25% |
| **Insurance Recovery** | **9%** | **63%** | **12%** | **66%** |
| TCJC Cash Contribution ($ millions) | $250 | $250 | $250 | $250 |
| Insurance Recovery for TCJC ($ millions) | $23 | $156 | $31 | $164 |
| **Total Contribution Value ($ millions)** | **$273** | **$406** | **$281** | **$414** |

47. By giving up its rights to any insurance proceeds, TCJC is freeing up those proceeds to cover the liability of other parties and to contribute additional funds to the BSA Settlement Trust that otherwise may not have been available. Although TCJC's Settlement is sufficient even without accounting for the value of the TCJC insurance rights, the value of those rights—which could be as much as $164 million—only underscores that TCJC's Settlement is fair and reasonable.

**I.    Conclusion**

48. Accordingly, I conclude that TCJC's Settlement is sufficient to cover TCJC's likely liability arising out of Abuse Claims filed in these bankruptcy proceedings.

Dated: March 19, 2022

*Jessica Horewitz*
Jessica Horewitz, Ph.D.
Principal & President
Gnarus Advisors LLC