**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**DECLARATION OF PAUL RYTTING IN SUPPORT OF**
**CONFIRMATION OF DEBTORS' THIRD MODIFIED**
**FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
**FOR  BOY  SCOUTS  OF AMERICA AND DELAWARE BSA, LLC**

I, Paul Rytting, hereby declare that the following is true to the best of my knowledge, information and belief:

**A.      Background, Education And Employment At TCJC**

1.      I have been employed by The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole ("***TCJC***") since 1991.  Since 2002, I have held the position of Director of Risk Management for TCJC.  I submit this Declaration in support of confirmation of the Debtors' *Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (the "***Plan***")[2] and in reply to certain Plan objections.

2.      As Director of Risk Management for TCJC, my responsibilities include administration of risk management functions and services, including safety, insurance, claims, litigation, and contingency planning for TCJC operations in over 160 countries.  In connection

---

[1]      The Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

with this role and these responsibilities, I am familiar with TCJC's youth program as well as the historical handling of claims, including alleged Abuse Claims, asserted against TCJC.

3.    Prior to serving as Director of Risk Management, I served as Director of Human Resources - Legal Services from 2001 to 2002 and Manager of Claims and Litigation from 1991 to 2001.  When I began working in the Risk Management Division in 1991, I spoke with my supervisors and reviewed prior records and correspondence to become familiar with TCJC's historical practice regarding litigation claims, including records and communications with the BSA regarding claims connected to Scouting, including Abuse Claims.  Through this process, I became familiar with the BSA's longstanding practice of indemnifying and assuming responsibility for TCJC's defense in Scouting related claims.  When I became Director of Risk Management, I personally oversaw TCJC's tendering of Scouting claims, including Abuse Claims, to the BSA and communicated with the BSA regarding its indemnification and defense of TCJC in Scouting related claims.

4.    I also have extensive ecclesiastical experience within TCJC, having served in various TCJC leadership positions throughout my life.  These positions were volunteer ecclesiastical positions separate from my employment with TCJC.  Since at least 1991, I have served in various Scouting positions within TCJC's youth program.  From 2006 to 2011, I served as a bishop of a TCJC ward.[3]  As bishop I served as the Chartered Organization representative for the Scouting units sponsored by the ward.  From 2011 to 2020, I served as a stake president overseeing several wards.  As a stake president, I was a Zone Commissioner in the local Scouting

---

[3]    Although TCJC is a national organization and a single legal entity, day-to-day church activities are carried out through local TCJC congregations, known as wards or branches.  The leaders of these wards or branches are known as bishops or branch presidents, who typically hold their volunteer positions for three to five years.  Usually 8 to 10 wards or branches make up a stake.  The leader of a stake is the stake president who typically holds the volunteer position for 8 to 10 years.

District connected to the Great Salt Lake Council and as such I oversaw the Scouting units within the wards and branches of the stake.

5.      I attended college at Brigham Young University, where I received a Bachelor's of Arts in Political Science in 1983.  I then attended law school at Brigham Young University, and received my J.D. in 1986.  Immediately after law school, I worked at Hanson Baker Ludlow Drumheller P.S. as a litigation attorney for nearly four years before becoming an employee of TCJC.

**B.      TCJC's Official Activity Program For Its Young Men Was Scouting**

6.      TCJC's longstanding partnership with the BSA and sponsorship of Scouting troops is well-documented, including in the publication *Century of Honor: 100 Years of Scouting in the Church of Jesus Christ of Latter-day Saints*.[4]  I am familiar with that relationship through my role as Director of Risk Management, my various TCJC ecclesiastical roles, and my time as a Boy Scout when I was a youth.  TCJC was a Chartered Organization of the BSA from 1913 until 2019.

7.      The BSA's Scouting program was first designated by TCJC as the official activity program for young men affiliated with TCJC in the 1920s, and all boys were automatically enrolled in Scouting at age eight.  Thus, virtually all boys involved in TCJC also became involved in Scouting.  TCJC participated in Scouting as a Chartered Organization through the wards and branches that ran the day-to-day Scouting program.  Until late 2019, each year, almost every ward or branch in North America would charter a Scout troop and a Cub pack.  The bishop or branch president would become the Chartered Organization representative.

---

[4]      Exhibit A is a copy of *Century of Honor: 100 Years of Scouting in the Church of Jesus Christ of Latter-day Saints*, Nettie Francis, LDS-BSA Relationship Office (2013), marked as JTX 115.

8.      TCJC relied upon and followed BSA guidelines, handbooks, and training instructions to run Scouting programs.  The BSA provided various materials, including "A Guide to Safe Scouting,"[5] to local Charter Organizations, for carrying out Scouting activities.

9.      The chartering agreement (or "charter") for each unit sponsored by TCJC governed the relationship among TCJC, the BSA, and affiliated Local Councils.  Although the charters have changed over the years, under the typical charter language, TCJC agreed to run the Scouting unit according to BSA policies and guidelines.  TCJC also made significant monetary and other valuable contributions to the BSA over the years.  In turn, the BSA and/or the Local Councils would agree, among other things, to (i) provide training to leaders; (ii) review, vet, and approve applications for adult Scouting leaders, including conducting background checks; and (iii) provide both indemnification and insurance coverage to TCJC.  Both TCJC and the BSA expected that the financial contributions TCJC provided to the BSA would help enable the BSA to provide these services and benefits to TCJC.

10.     The process for approving TCJC adult Scouting leaders was extensive, and TCJC relied upon the BSA for significant vetting, including formal background checks.  The BSA assured TCJC that its adult volunteer application process was comprehensive and some TCJC volunteers were rejected by the BSA.  TCJC did not allow rejected volunteers to participate in Scouting.

11.     TCJC also conducted its own independent internal review of the proposed adult Scouting leader.  This review consisted of (i) conducting an in-depth interview of the volunteer; (ii) the local TCJC bishop reviewing the proposed volunteer's membership record to see if there

---

[5]      Exhibit B is a copy of *A Guide to Safe Scouting*, Boy Scouts of America, marked as JTX 42.  Exhibit C is an additional example of materials provided by the BSA, marked as JTX 47.  As with *Century of Honor*, I am familiar with these materials as part of my role as Director of Risk Management, as well as through the various ecclesiastical roles in which I have served with TCJC.

is an annotation[6] to the volunteer's record that may indicate the volunteer is unfit to serve as a Scouting leader; and (iii) presenting the volunteer to the congregation for a sustaining vote, during which any member of the congregation could object if the member deemed the volunteer to be unfit.

12.     In describing the historical nature of Scouting within TCJC in a publication called *Our Leaders Speak on Scouting and Exploring*, with which I am familiar through my roles with Scouting and with TCJC, TCJC President Thomas S. Monson stated in 1990, "[w]e don't have a Scoutmaster competing against a deacons quorum adviser, or a priests quorum adviser competing against the Explorer post leader because we have blended them so that it's one boy and one troop, one Church and one program.  They serve together; they work together."[7]  This statement is consistent with my experience and accurately summarizes the integrated nature of Scouting within TCJC.

### C.     Claims Against The BSA And TCJC Often Arise From The Same Facts

13.     As standard operating procedure, when the Risk Management Division received letters and other communications relating to an allegation of Abuse, the Risk Management Division would investigate the claim.  This underlying investigation included: (i) forwarding all relevant information to legal counsel for investigation and follow-up; (ii) interviewing bishops and local TCJC leaders; (iii) obtaining statements or conducting interviews (or even pre-lawsuit depositions on the record) of the alleged victim if permitted by counsel; (iv) interviewing the alleged perpetrator and those who knew the alleged victim and/or the alleged perpetrator; and (v) analyzing the relevant complaint and any corresponding complaint by the alleged victim against a

---

[6]     If child abuse is reported against a member, the record of that member is annotated.

[7]     Exhibit D is a copy of *Our Leaders Speak on Scouting and Exploring*, The Church of Jesus Christ of Latter-day Saints, marked as JTX 33.

related party.  After conducting such an investigation, including by working with its counsel, TCJC would respond accordingly.

14.    Historically, when Abuse Claims were asserted against TCJC related to Scouting, those Claims were asserted not just against TCJC, but also against the BSA (among others).  In lawsuits alleging Abuse in the context of Scouting, where TCJC is named as a defendant, the BSA, Local Councils, and perpetrators are also often named as defendants.  Even if claimants decide only to name the BSA or TCJC in a specific complaint, when the claims arise out of Scouting, these claims generally apply to the BSA and TCJC based on an identical set of facts.  Once TCJC, with the assistance of counsel, conducted its own investigation into the allegations in these complaints (even if the complaints named only TCJC), it would often discover that the Abuse did, in fact, relate to Scouting activities.  TCJC then, as a matter of practice, notified the BSA of such Abuse Claims.

15.    For Abuse Claims in these Chapter 11 Cases involving TCJC male youth as victims, the claims cannot be severed into independent causes of action for claims that are related to Scouting and those that are not.  For example, in *Hiser v. The Church of Jesus Christ of Latter-day Saints*, an Abuse Claimant in these Chapter 11 Cases (in other words, someone alleging Abuse related to Scouting) attempted to circumvent the automatic stay by filing a complaint naming TCJC as a defendant, but not the BSA or any affiliates of the BSA.  Because *Hiser* was a "proceeding against the debtor . . . or to recover a claim against the debtor" connected to Scouting, this Court stayed the case in accordance with 11 U.S.C. §§ 105(a) and 362(a).  *See In re Boy Scouts of Am.*

*& Delaware BSA, LLC,* Chapter 11 No. 20-10343 (LSS), Adv. Pro. No. 20-50527 (LSS), Adv. Dkt No. 162 (Bankr. D. Del. Mar. 17, 2021).[8]

16.    Thus, while some Abuse Claimants have asserted claims for sexual abuse against TCJC in the tort system without naming the BSA as a defendant or otherwise joining the BSA, I am not aware of any Abuse Claims filed in these Chapter 11 Cases that involve allegations of Abuse unrelated to Scouting.

### D.    The BSA's Course Of Conduct Has Been To Indemnify Or Provide Insurance To TCJC For Historical Abuse Claims

17.    As discussed above, TCJC contributed significant financial support to the BSA over the years.  TCJC would pay to the BSA (i) fees for the Scouting unit each TCJC ward/branch sponsored, and (ii) registration fees for TCJC adults and youths that participated in Scouting.  For example, TCJC contributed approximately $65 million in the form of annual registrations and charitable donations between 2006 and 2019 alone.  TCJC wards and stakes also raised millions of additional dollars annually for Local Councils and the BSA through myriads of local Friends of Scouting fundraising drives.

18.    In return for TCJC acting as one of the BSA's primary Chartered Organizations and partners and providing such significant financial contributions, the BSA provided TCJC insurance and otherwise covered liabilities arising from Scouting-related activities run by TCJC.  TCJC's extensive involvement in and support of Scouting has been premised upon the expectation and agreement that TCJC would be held harmless by the BSA and the Local Council affiliated with a

---

[8]    Exhibit E is the decision of Judge Aiken of the District of Oregon confirming the stay in *Hiser v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints*, Case No. 6:21-cv-00280-AA, marked as JTX 1482.

specific Scouting Troop or Cub pack for any injuries or wrongdoing connected to Scouting, whether through insurance or indemnification.[9]

19.     Since at least 1991, when I began working at TCJC, the BSA promised and provided full defense and indemnification of claims for injuries related to Scouting, including TCJC Abuse Claims, as part of the regular course of conduct between the two organizations. TCJC relied upon and accepted such indemnification from the BSA, which the BSA provided in exchange for TCJC's generous financial support and partnership. For TCJC Abuse Claims, the parties' course of conduct was: TCJC tendered Abuse Claims to the BSA, the BSA confirmed the claims were related to Scouting, and the BSA then provided TCJC with a full defense and coverage and/or indemnification.[10] For example, in a February 11, 1994 letter to me, the BSA "agree[d] to defend, under reservation of rights, the LDS Church" and assigned the matter to an attorney.[11]

20.     Typically, the BSA would assume defense of the cases, and the claims would be either litigated, dismissed, or settled at the BSA's full cost and discretion. For example, a 2016 settlement agreement released any and all claims by an individual claimant against TCJC, BSA, and the relevant Local Council.[12] On other occasions, TCJC engaged its own, separate counsel to defend litigation related to TCJC Abuse Claims. When TCJC engaged defense counsel that did not also represent the BSA, the BSA would almost always pay defense costs and contribute all or

---

[9]     Exhibit F is an example of a Resolution Regarding Insurance and Indemnification of Chartered Organizations and Use of Charter Agreement in Civil Litigation, marked as JTX 797. Exhibit G is an example of an Annual Charter Agreement Form, marked as JTX 2949. Exhibit H is an example of a Hold Harmless Agreement of properties or facilities owned by TCJC between the BSA and TCJC, marked as JTX 95.

[10]    Exhibit I is an example of a letter that I received accepting TCJC's tender of defense for a sexual abuse claim on February 11, 1994 from Mark L. Dama of the BSA, marked as JTX 41. Exhibits J, K, and L are additional exemplar letters accepting TCJC's tender of defense, marked as JTX 38, JTX 39, and JTX 40, respectively.

[11]    Exhibit I at TCJC008219.

[12]    Exhibit M is an example of the settlement agreements produced in these Chapter 11 Cases, specifically, a settlement agreement involving the BSA, TCJC, and the Grand Canyon Council, Boy Scouts of America, marked as JTX 148. TCJC produced around 115 examples of settlement agreements resolving Abuse Claims, most of which were reached not just with TCJC, but also with the BSA and Local Councils.

a portion of the total settlement costs.  In a few instances, TCJC decided not to seek recovery at the time for defense and settlement costs due to the longstanding working relationship between the BSA and TCJC.    Nevertheless, TCJC has asserted these valid and valuable claims for indemnification and/or contribution in connection with these Chapter 11 Cases.

21.    In addition to understanding the historical practice of indemnification from the BSA, I have reviewed and understand that BSA and Local Council insurance policies provide coverage to TCJC for TCJC Abuse Claims, including by naming Chartered Organizations, including TCJC, as additional insureds with rights to share in the policies' proceeds.

22.    In connection with these Chapter 11 Cases, TCJC has also tendered claims for defense and indemnification directly to the BSA and Local Council insurance carriers that are implicated by the claims asserted against TCJC in connection with these Chapter 11 Cases.[13]  In so doing, TCJC tendered not only to the carriers whose policies were in place at the time of the alleged abuse for any particular asserted claim, but also to carriers whose  policies provided coverage for time periods after the abuse took place in recognition of (i) the policies' coverage for injuries that occurred during the policy period, and (ii) TCJC's experience that Abuse Claimants allege and may experience mental and physical injuries continuing long past the date of the alleged abuse, often into the present day.

E.    **TCJC's Settlement With The BSA**

23.    TCJC is determined to provide survivors of Scouting-related Abuse with a significant, final payment.  Dating back to the initial filing of these Chapter 11 Cases in February 2020, I have received regular updates regarding the progress of the bankruptcy and TCJC's

---

[13]    Exhibit N is an example of a letter from TCJC tendering claims directly to one of the BSA's insurance carriers, marked as JTX 366.

involvement.  TCJC has been involved in meaningful, good faith, arms' length negotiations, via mediation and otherwise, with the Debtors and other parties participating in mediation in these Chapter 11 Cases, particularly the Coalition of Abused Scouts for Justice and the Future Claimants' Representative, but also the Official Committee of Tort Claimants.  These negotiations were extensive and involved in-person, virtual, telephonic, formal and informal discussions among the parties.  I attended one mediation session in person, on or around October 1, 2021 at White & Case's office in New York.  During that mediation, I met (among others) Tim Gallagher and the Honorable Kevin Carey, the mediators appointed to oversee the negotiations in these Chapter 11 Cases.  These negotiations took place over the course of more than two years and TCJC has continued to participate in good faith up until this hearing.

24.    Following these extensive, arms' length negotiations with the Coalition of Abused Scouts for Justice, the Future Claimants' Representative, the Ad Hoc Committee of Local Councils, the Debtors, and other participating parties, TCJC reached agreement on the TCJC Settlement, filed with the *Sixth Mediators' Report* [Docket No. 6210] on September 14, 2021.[14] Pursuant to the TCJC Settlement, on the Effective Date of the Plan, subject to the terms and conditions more fully described in the TCJC Settlement Agreement, TCJC will (i) deposit $250 million in cash into escrow; (ii) consent, pursuant to the Plan, to the assignment and transfer by the Debtors, the Local Councils, and any other co-insureds of any and all rights, attributable to (a) the Abuse Insurance Policies, the Abuse Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (b) the Insurance Actions; and (c) the Insurance Action Recoveries; and (iii) with respect to the Indirect Abuse Claims (Claim Nos. 1248

---

[14]    Exhibit O is the TCJC Term Sheet contained in the *Sixth Mediators' Report* [Docket No. 6210], marked as JTX 1-292.

and 12530) filed by TCJC,[15] consent to the waiver of indemnity claims of over $64 million (plus unliquidated contingent claims) as well as release its claims for indemnification and/or contribution as part of the TCJC Settlement.  The TCJC Settlement constitutes generous and significant contributions to the Settlement Trust and is the largest contribution by any Chartered Organization.

25.    In exchange for TCJC's contributions to the Settlement Trust described above, TCJC will become a Protected Party under the Plan, with all the benefits and protections of the Channeling Injunction.  Absent the consideration TCJC expects to receive under the TCJC Settlement, including being a Protected Party under the terms of the current Plan, TCJC would not contribute $250 million in cash to the Settlement Trust or make these other significant contributions.

**F.    The Plan Is The Best Option To Deliver Compensation To Survivors**

26.    The near-certain recovery for TCJC Abuse Claimants from funds contributed by TCJC pursuant to the TCJC Settlement contrasts the range of potential recoveries for survivors if the TCJC Settlement is rejected.  Absent the TCJC Settlement, survivors asserting TCJC Abuse Claims could be forced to assert claims in another court, which would likely result in protracted litigation and a delayed payment, if any, to the survivors.  Many survivors, in my experience, would receive no compensation in the tort system due to statutes of limitations, and these Chapter 11 Cases allow TCJC to provide these survivors with a substantial and certain payment.  Further, any hypothetical recovery against TCJC is subject to apportionment among co-liable parties, including the BSA, Local Councils, individual perpetrators, and various others.  The TCJC

---

[15]    Exhibits P and Q are the Proofs of Claim filed by TCJC against the BSA, marked as JTX 14-14 and JTX 14-15, respectively.

Settlement provides survivors with a substantial contribution and certainty through a final payment.

27.    Pursuant to the TCJC Settlement, TCJC will contribute its insurance rights to the Settlement Trust created under the Plan.  In the absence of the TCJC Settlement, TCJC would assert claims against the Debtors' and Local Councils' insurance policies and have its claims attach to the proceeds of the insurance settlements.  TCJC is prepared to assert such claims and defend its rights to insurance proceeds, which would result in costly, protracted, and value-destructive litigation as coverage issues are litigated and TCJC obtains the proceeds of insurance to which it would be entitled.

28.    Accordingly, I believe that this Court should confirm the Debtors' Plan  and the TCJC Settlement contained therein.

Dated: March 19, 2022

Paul Rytting
Director, Risk Management Division
The Church of Jesus Christ of Latter-day Saints,
a Utah Corporation sole